Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

**DEFENDANT-APPELLANT'S MOTION TO STAY
PRELIMINARY INJUNCTION PENDING APPEAL AND
REQUEST FOR EXPEDITED RELIEF**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant-Appellant National Board of Medical Examiners states that it has no parent corporation, and that no publicly traded corporation owns 10 percent or more of its stock.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ...........................i

TABLE OF CONTENTS ......................................................... ii

TABLE OF AUTHORITIES.................................................. iii

INTRODUCTION...................................................................1

STATEMENT OF FACTS.......................................................3

    A.   NBME and the USMLE.......................................3

    B.   Jessica Ramsay ..................................................4

    C.   Procedural History............................................15

ARGUMENT.........................................................................16

    I.    This Court is likely to reverse the mandatory preliminary injunction on the merits. ....................17

    II.   NBME will be irreparably harmed. ........................24

    III.  A stay will not substantially harm Plaintiff. .........25

    IV.  The public interest favors a stay. ...........................26

CONCLUSION .....................................................................27

CERTIFICATE OF COMPLIANCE ......................................29

CERTIFICATE OF SERVICE ..............................................30

ELECTRONIC DOCUMENT CERTIFICATE.....................31

CERTIFICATE OF BAR ADMISSION ................................32

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*B.C. v. Mt. Vernon Sch. Dist.*,
    837 F.3d 152 (2d Cir. 2016) ............................................... 23

*Bach v. Law Sch. Adm. Council*,
    2014 U.S. Dist. LEXIS 124632
    (M.D.N.C. Feb. 4, 2014) ............................................. 21, 26

*Baer v. NBME*,
    392 F. Supp. 2d 42 (D. Mass. 2005) ................................. 26

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
    2016 WL 1404157 (E.D. Pa. Apr. 11, 2016) .......... 19, 21, 23

*Black v. NBME*,
    281 F. Supp. 3d 1247 (M.D. Fla. 2017) ............................ 21

*Collins v. Prudential Inv. & Ret. Servs.*,
    119 F. App'x 371 (3d Cir. 2005) ....................................... 22

*Cunningham v. Nordisk*,
    615 F. App'x 97 (3d Cir. 2015) ......................................... 21

*Doe v. N.Y. Univ.*,
    666 F.2d 761 (2d Cir. 1981) ............................................. 25

*Doe v. NBME*,
    199 F.3d 146 (3rd Cir. 1999) ............................................ 17

*Doherty v. NBME*,
    No. 19-30661 (5th Cir. Sept. 3, 2019), 2019 WL
    5855779 (Nov. 7, 2019) ................................................ 2, 24

**PAGE(S)**

*EEOC v. Chevron Phillips Chem. Co., LP,*
  570 F.3d 606 (5th Cir. 2009)..............................................19

*Glueck v. Nat'l Conf. of Bar Exam'rs,*
  2018 WL 3977891 (W.D. Tex. Aug. 20, 2018)..................21

*Gonzales v. NBME,*
  225 F.3d 620 (6th Cir. 2000)......................................17, 21

*Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs,*
  870 F. Supp. 2d 607 (S.D. Ind. 2012) ..........................22, 23

*In re Revel AC, Inc.,*
  802 F.3d 558 (3d Cir. 2015) ..............................................17

*Kelly v. W. Va. Bd. of Law Exam'rs,*
  2008 WL 2891036 (S.D.W. Va. July 24, 2008)..................26

*Love v. Law Sch. Admission Council,*
  513 F. Supp. 2d 206 (E.D. Pa. 2007) ..................4, 7, 22, 23

*Marshall v. Sisters of Holy Family of Nazareth,*
  399 F. Supp. 2d 597 (E.D. Pa. 2005) ................................22

*Martin v. Helstad,*
  699 F.2d 387 (7th Cir. 1983)..............................................25

*Matthews v. Penn. Dep't of Corrections,*
  613 F. App'x 163 (3rd Cir. 2015) ......................................19

*Morriss v. BNSF Ry. Co.,*
  817 F.3d 1104 (8th Cir. 2016)............................................21

*P.C. Yonkers, Inc. v. Celebrations the Party &
  Seasonal Superstore, LLC,*
  428 F.3d 504 (3d Cir. 2005) ..............................................24

**PAGE(S)**

*Powell v. NBME,*
    364 F.3d 79 (2d Cir. 2004) .................................. 3, 4, 24, 26

*Rawdin v. Am. Bd. of Pediatrics,*
    985 F. Supp. 2d 636 (E.D. Pa. 2013) ................................ 21

*Rothberg v. Law Sch. Admission Council,*
    102 F. App'x 122 (10th Cir. 2004) .............................. 24, 25

*Rumbin v. Ass'n of Am. Med. Colleges,*
    803 F. Supp. 2d 83 (D. Conn. 2011) .................................. 22

*Trinity Indus., Inc. v. Chicago Bridge & Iron Co.,*
    735 F.3d 131 (3d Cir. 2013) ................................................ 27

*Winter v. NRDC,*
    555 U.S. 7 (2008) ........................................................ 24, 25

**STATUTES**

42 U.S.C. § 12102 ................................................................ 18

42 U.S.C. § 12182 ................................................................ 17

42 U.S.C. § 12189 ................................................................ 17

**REGULATIONS**

28 C.F.R. § 36.101 .............................................................. 20

28 C.F.R. § 36.105 ..................................................... 1, 18, 19

29 C.F.R. § 1630.2 .............................................................. 20

**OTHER AUTHORITIES**

Settlement Agreement (Feb. 23, 2011),
    https://www.ada.gov/nbme.htm ........................................ 22

**PAGE(S)**

USMLE, *Scoring & Score Reporting,*
https://www.usmle.org/bulletin/scores/#reporting ........... 16

## INTRODUCTION

Among many other accomplishments, Jessica Ramsay earned mostly A's before graduating near the top of her high school class, scored in the top three percent on the ACT college admissions test, and did extremely well on the Medical College Admission Test, all without accommodations. Nevertheless, she seeks double testing time on the United States Medical Licensing Exam ("USMLE") for alleged lifelong reading impairments she says qualify her as disabled under the Americans with Disabilities Act ("ADA").

A person is "disabled" if substantially limited *"compared to most people in the general population."* 28 C.F.R. § 36.105 (d)(1)(v). Recognizing two decades of above-average academic performance, the court correctly found that Plaintiff *outperforms* most people—yet granted a mandatory preliminary injunction giving her twice the time afforded other examinees.

The National Board of Medical Examiners ("NBME") requests a stay of the preliminary injunction.

NBME is likely to succeed on the merits. The court's conclusion that Plaintiff is disabled—despite *never* finding she is substantially limited compared to most people—is erroneous. The court ignored its finding of above-average

-1-

performance and effectively concluded that the ADA requires deference to Plaintiff's (latest) expert—who has a "reputation" for helping secure testing accommodations and never claimed Plaintiff is substantially limited compared to most people. The district court's reasoning conflicts with a body of case law crediting "real-world" evidence of functional abilities (including from this circuit), negates a plaintiff's burden of proving a disability, and virtually guarantees accommodations to anyone who can obtain a diagnosis and litigate.

The injunction unfairly advantages Plaintiff while harming NBME, other test-takers, and the public. Factoring in Plaintiff's alleged harm, which is neither likely nor irreparable, the balance of harm tips sharply in NBME's favor.

A stay is warranted to maintain the status quo pending appeal. *See Doherty v. NBME*, No. 19-30661 (5th Cir. Sept. 3, 2019) (granting stay in directly analogous case), 2019 WL 5855779 (Nov. 7, 2019) (vacating preliminary injunction).

Given the February 20 test date, NBME requests a ruling by February 19 if possible (to avoid Plaintiff taking a test that might be set aside), but in all events before March 11, 2020—the earliest date her score would be reported.

## STATEMENT OF FACTS

### A.   NBME and the USMLE

NBME is a nonprofit organization located in Philadelphia. Ex.4 at 1. With the Federation of State Medical Boards, NBME sponsors the USMLE—a standardized test designed to assess the minimum competencies needed to provide safe and effective patient care. *Id.* The USMLE is comprised of three "Steps" consisting primarily of multiple-choice questions answered on a computer over a full day. *Id.* at 2. Licensing authorities rely on USMLE scores, *id.*, as do residency programs in evaluating applicants, Ex.3 at 43.

NBME provides accommodations to disabled examinees and conscientiously evaluates each request, often (as here) with the assistance of external experts. Ex.4 at 3-4. NBME's "procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." *Powell v. NBME*, 364 F.3d 79, 88 (2d Cir. 2004).

Following the recent college admissions scandal—which illustrates the ease with which students can obtain

diagnoses to support accommodations on high-stakes tests—
NBME's "duty to ensure that its examination is fairly ad-
ministered to all" has never been clearer. *Id.* at 89.

### B.    Jessica Ramsay

Plaintiff is a student at Western Michigan University
School of Medicine. Ex.10 at 1. She claims to be disabled
based on diagnoses of a learning disability and Attention
Deficit Hyperactivity Disorder ("ADHD") and entitled to dou-
ble time on all three Steps of the USMLE. *See id.* at 3.

**Elementary School.** Plaintiff's early school years are rele-
vant because learning disorders and ADHD are "life-long"
impairments that do not suddenly "manifest themselves"
during adulthood. *Love v. Law Sch. Admission Council*, 513
F. Supp. 2d 206, 219 (E.D. Pa. 2007); *see* Ex.6 at 2-5; Ex.19
(Plaintiff's academic and testing history summaries).

Plaintiff excelled academically in elementary school, par-
ticipating in a gifted program and earning mostly A's. Ex.3
at 356; Ex.12. Although Plaintiff testified that she consist-
ently struggled and "receiv[ed] special assistance from [her]
teachers on virtually a daily basis" (Ex.3 at 98, 102), she rep-
resented to NBME in her request form that the only

accommodations she received in her K-12 years were informal accommodations from her first grade teacher. Ex.9 at 6.

Plaintiff's report cards also contradict her testimony. In kindergarten and first grade, she received top marks in reading and on measures of attention. Ex.12 at 1-4. In second grade she earned an above-average grade and standardized test score in reading; her ability to "listen[] carefully, follow[] directions and stay[] on task" was "excellent." *Id.* at 5-7, 18.

In third and fourth grades, Plaintiff received A's in reading and a notation of "mastery" in the subject. *Id.* at 8-11. Her teachers never indicated that she received any extra assistance—even in the "Additional Programs/Support" section of her report cards addressing that specific issue. *Id.* at 9, 11, 13. In fifth grade, Plaintiff earned all A's. *Id.* at 14.

Plaintiff's parents "never considered the possibility that [she] might have a learning disability," Ex.9 at 7, even though her mother purportedly has a history of both dyslexia and ADHD, Ex.26 at 2.

In elementary school, Plaintiff was evaluated by Dr. Tanguay, an optometrist, because of letter reversals. Ex.5 at 4; Ex.13. Dr. Tanguay did not diagnose a learning disorder. *Id.*

After participating in skills training, Plaintiff "scored above age level in all categories," and her comprehension and perceptual skills were "excellent." Ex.13 at 2. Plaintiff's preliminary injunction motion did not rely on the optometrist's testing. *See* Dist. Ct. Dkt. No. ("ECF") 7-2.

**Middle & High School.** Plaintiff excelled in middle school without accommodations. Ex.3 at 106. She tested into an accelerated program, earned all A's, and received all average or above-average scores—including in reading—on a statewide standardized test. *Id.* at 33-34; Ex.14.

Plaintiff also surpassed the vast majority of her high school classmates academically, without accommodations. Ex.10 at 4; Ex.15 at 1. Despite claiming that "[t]imed tests" were her "downfall in all of [her] classes," Ex.10 at 13, and that she "rarely got an exam grade that accurately reflected how much [she] knew," Ex.9 at 8, Plaintiff earned mostly A's while taking numerous honors and AP classes, juggling a host of extra-curricular activities, and working. Ex.3 at 106-14; Ex.15. She was in the National Honor Society and graduated with a 3.75 GPA. Ex.3 at 110; Ex.7 at 16. Out of 225 students in her class, Plaintiff ranked 28th. Ex.15 at 1.

Plaintiff's college application essay walked through a day in her life: 6 a.m. swim practice; AP and honors classes; back-to-back after-school swim and soccer practices; and then homework ("a research paper, Spanish translations and exercises, a pre-lab and chemistry problems[,] … a 35-page history chapter and 15 extremely hard calculus problems"). Ex.17 at 10. She wrote: "EXHAUSTION. REPEAT. College? Hit me with everything you've got." *Id.* Unsurprisingly, Plaintiff reports working hard during this period. Ex.9 at 8.

**ACT College Admission Test.** Consistent with her top grades, Plaintiff received a stellar score without accommodations on the ACT, a "strictly timed" standardized test "involv[ing] reading and processing information." *Love*, 513 F. Supp. 2d at 227; Ex.10 at 3; Ex.16.

Although Plaintiff claimed she "was not able to read all the questions and could not accurately demonstrate [her] knowledge [on the ACT]," Ex.10 at 9, she scored in the 97th percentile—***the top three percent***—of all examinees who took the ACT in 2007. Ex.16. Her overall reading score was in the 91st percentile (*top 9%*), and her reading subscore in

"Arts/Literature" was in the 99th percentile (*top 1%*). *Id.* Plaintiff characterized her score as "acceptable." Ex.10 at 9.

**Ohio State.** Plaintiff also did very well at Ohio State University, where she graduated *cum laude* in genetics with minors in business and dance. Ex.18. For the first five terms—during which she received no accommodations—she earned A's and B's and made the Dean's List four times. *Id.*

Plaintiff wrote that, while in college, she was "tipped off" she might "have a problem" when she "could not get above an A- on [her] written [Spanish] tests, even though all [her] answers were 'technically correct.'" Ex.9 at 11-12.

In March 2009, Plaintiff visited Dr. Alan Smiy, her primary care physician. *See* Ex.20. Dr. Smiy met with Plaintiff for half hour, did not administer any tests, and made no formal diagnosis. *Id.*; Ex.3 at 116-17. He noted that Plaintiff had "no problems" in high school, and while "college stress" was causing her to "switch letters around a bit," she had "more focus issues than dyslexic tendencies." Ex.20 at 2-4. He gave her a prescription for Ritalin. *Id.* at 5.

Although Dr. Smiy did not indicate any diagnosis in his office visit summary, Ex.20, he wrote more than a year later

on an Ohio State accommodation request form that he diagnosed Plaintiff with "moderate" ADHD in March 2009. Ex.21 at 2-3. He noted that Plaintiff had no known history of accommodations. *Id.* at 4.

**Medical College Admission Test.** Without accommodations, Plaintiff scored very well on the MCAT, a challenging multiple-choice exam that requires significant reading and concentration. Ex.6 at 4; Ex.10 at 3; Ex.22. Plaintiff scored in the top 21 percent of all test-takers—a high-performing sample of over 70,000 college-educated individuals. Ex.22. On the most reading-intensive section (Verbal Reasoning), she scored in the top 33 percent. *Id.*

**Western Michigan School of Medicine.** Plaintiff began medical school in 2014. Ex.9 at 5. That same year, she visited Charles Livingston, a social worker and limited-license psychologist, to help her secure accommodations in medical school and "meet the increased curricular demands." Ex.8 at 7; *see* Ex.23. Mr. Livingston's report incorrectly noted that Plaintiff had been "diagnosed with … Dyslexia" and received "various testing in elementary and middle school"—presumably because Plaintiff told him that. Ex.23 at 1.

According to Mr. Livingston, Plaintiff was "tired," "stressed," and worried her grades did not reflect her knowledge. *Id.* Even though her "reading comprehension was above average" and she received an average score on a test reflecting attentional functioning, Mr. Livingston diagnosed her with ADHD. *Id.* at 1-2; Ex.5 at 5-6. After receiving that evaluation, Plaintiff's medical school granted her twice the time given to her classmates. Ex.8 at 7.

During medical school, Plaintiff took standardized subject-matter exams. She received many below-average scores, despite receiving double testing time. Ex.3 at 236-46; Ex.24. Plaintiff testified that her poor performance had nothing to do with how much testing time she received. Ex.3 at 240-44.

**Seeking USMLE Accommodations.** In December 2016, Plaintiff sought accommodations on USMLE Step 1 and Step 2 Clinical Knowledge ("Step 2 CK")—including 100 percent additional time—based on diagnoses of dyslexia and ADHD. Ex.9. Her application inaccurately represented she had received double testing time during college. *Id.* at 5.

After consulting an outside expert, NBME determined that Plaintiff had not shown a substantial limitation and denied her request for extra testing time. Ex.4 at 5-6.

Plaintiff took Step 1 in July 2017 without accommodations and missed passing by a single point. Ex.27. Although she asserted in her briefing and testified that she could only read 60 to 70 percent of the exam (Ex.8 at 10; Ex.3 at 160), Plaintiff's test records show that she spent time on *every* question. Ex.3 at 580-87. Examinees have, under standard conditions, about 90 seconds to answer each question. *Id.* at 580. Plaintiff averaged 76 seconds on questions she answered correctly and 107 seconds on those she missed. *Id.* at 580, 582. She spent less than 20 seconds on only four questions and answered them all correctly. *Id.* at 584.

Plaintiff took a leave of absence from medical school. Instead of retaking Step 1, she found "an evaluator who could do the testing" she "thought was needed to show that [she] did have these disabilities," *id.* at 53-54, and submitted a new request to NBME in June 2018, Ex.10. In addition to learning disabilities and ADHD, Plaintiff relied on migraines and a clotting disorder with deep vein thrombosis ("DVT").

*Id.* at 3. She sought double testing time, a private room, and additional break time. *Id.* at 2. She also submitted a new evaluation, from Alan Lewandowski, Ph.D. *Id.* at 6; Ex.26.

That evaluation indicated depression, inefficient thinking, and health concerns. Ex.26 at 8. "Academic" testing resulted in a "high average" reading score and a finding that "[r]eading … [was] normal to above normal and consistent with past education." *Id.* at 7-8. "Attention" testing resulted in largely normal scores. *Id.* at 7. Dr. Lewandowski nevertheless diagnosed Plaintiff with ADHD and a learning disability and recommended 50 percent extra testing time. *Id.* at 9-10. Six months later, after Plaintiff contacted him, he recommended 100 percent extra time. *Id.* at 12.

Plaintiff also submitted letters of support to NBME from Dr. Reukberg, Dean Overton, and Dr. Houtman. Each was substantively revised by Plaintiff and reviewed by her lawyer before submission. Ex.3 at 164-72, 202-17, 222-25.

Although NBME concluded—after again consulting an external expert—that Ms. Ramsay was not entitled to extra testing time, it approved additional break time, two-day

testing, and a separate room to address her stated needs associated with migraines and DVT. Ex.4 at 7-8.

Plaintiff chose not to retake Step 1 with these accommodations. Instead, she obtained yet another evaluation, from Robert Smith, Ph.D., who has "a reputation" among students and specializes in "**EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED TESTS**." Ex.3 at 220, 441-42; Ex.7 at 42.

Despite access to substantial contrary evidence, Dr. Smith's report incorrectly stated that Plaintiff "has a history of academic struggles that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments[.]" Ex.7 at 11-14. He acknowledged at the hearing, however, that nothing in her K-12 academic records or history of standardized testing reflected any learning or attention issues. Ex.3 at 468-71. Dr. Smith nevertheless diagnosed Plaintiff with a learning disorder based on 1st or 2nd percentile scores on certain manipulable reading tests—which, if accurate, would be expected from a child in elementary or middle school. Ex.3 at 451-53; Ex.6 at 14; Ex.7 at 28-39; Ex. 19; Ex.28.

Dr. Smith also diagnosed her with ADHD, based primarily on self-reports by Plaintiff and her mother, Ex.3 at 450, and Plaintiff's poor performance on a computerized test. Ex.7 at 37-39; Ex.6 at 9-11. He did so despite no documented early onset or attentional issues in other settings (as required for a proper diagnosis, Ex.3 at 450) and her non-impaired performance on a similar test administered by Dr. Lewandowski one year earlier. Ex.6 at 10-11.

In December 2018, Plaintiff submitted the Smith evaluation—which she and her lawyer helped draft, Ex.3 at 473—and requested that NBME reconsider its denial of extra time. Ex.4 at 8. NBME concluded, after considering a second external expert's recommendation, that the aberrationally low scores from the Smith evaluation were not credible and Plaintiff had not shown a substantial limitation compared to most people.[1] Ex.4 at 8-9; Ex. 6; Ex.11.

---

[1] The court stated that NBME's evaluator "accepted that Plaintiff's 'exceptionally low scores'" were "valid and credible." Ex.1 at 10. That finding was clearly erroneous. NBME's letter (partially-quoted by the court) unambiguously stated that Plaintiff's reading scores in the bottom five percent, on tests she took to secure extra testing time, were **not credible** given two decades of above-average scores. Ex.11 at 2; *see also* Ex.6 at 7.

Plaintiff remained on leave from medical school. Ex.3 at 14. After she requested "an indefinite leave of absence," her school indicated she could extend her leave until March 2, 2020 if she takes Step 1 by that date, or voluntarily withdraw and reapply when "prepared to take USMLE Step 1," (with no deadline for reapplying). Ex.25.

## C.   Procedural History

Plaintiff sued NBME under the ADA and Rehabilitation Act.[2] ECF 1, at 1 (May 8, 2019). The complaint alleges she is entitled to double testing time on all USMLE exams because of her diagnosed impairments and "history of significant reading difficulties and distractibility throughout her educational career." *Id.* at 2.

Plaintiff sought a mandatory preliminary injunction. ECF 7. After a hearing in early December, ECF 25-27, the district court granted Plaintiff's motion, Ex.1 (Dec. 31, 2019). NBME was ordered to provide double testing time—the very relief that would otherwise be warranted only if she prevailed on the merits. *Id.*

---

[2] Plaintiff did not rely upon her Rehabilitation Act claim in seeking a preliminary injunction. Although discussed in the court's decision, Ex.1 at 19, that claim was not relevant below and is not relevant on appeal.

NBME appealed, ECF 30 (Jan. 7, 2019), and sought a stay from the district court on January 23, 2019, ECF 32. The court denied NBME's motion on February 4. Ex.2.

Plaintiff is scheduled to take Step 1 with double testing time on February 20 and 21, 2020. ECF 32-2, at 13. If she tests on those dates, her scores could be reported as early as March 11, 2020. *See* USMLE, *Scoring & Score Reporting*, https://www.usmle.org/bulletin/scores/#reporting.

## ARGUMENT

Plaintiff is not "disabled" and should not receive extra time on the USMLE. The district court's decision conflicts with the ADA and extensive case law interpreting it in the testing context. Granting her extra time is unfair to other test-takers and the entities that rely on USMLE scores. NBME thus seeks a stay pending a ruling by this Court on the merits of the mandatory preliminary injunction.

This Court considers four factors in deciding a motion to stay pending appeal: (1) whether the applicant has made a strong showing it is likely to succeed on the merits; (2) whether the applicant will be irreparably harmed absent a stay; (3) whether a stay will substantially harm the other

party; and (4) where the public interest lies. *In re Revel AC, Inc.*, 802 F.3d 558, 565 (3d Cir. 2015).

The first two factors are "most critical," the first being "arguably the more important piece of the stay analysis." *Id.* at 568. This Court applies a "sliding-scale" approach, under which "the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor[.]" *Id.* at 570.

All four factors favor granting a stay.

## I.    This Court is likely to reverse the mandatory preliminary injunction on the merits.

Under Title III of the ADA, NBME must offer the US-MLE "in a place and manner accessible to persons with disabilities." 42 U.S.C. § 12189.[3] To prove a violation, a plaintiff must first demonstrate she is disabled. *See Gonzales v. NBME*, 225 F.3d 620, 626 (6th Cir. 2000). The key question on appeal is whether Plaintiff is disabled within the meaning of the ADA.

---

[3] The court mistakenly indicated that Plaintiff's claim arises under 42 U.S.C. § 12182, which covers "public accommodations." Ex.1 at 19-20. Because NBME is a "private entity" covered by Section 12189, Section 12182 does not apply. *Doe v. NBME*, 199 F.3d 146, 154-55 (3rd Cir. 1999).

"Disability" is a legal term of art, tied to substantial impairment relative to most people. It requires "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Critically, an impairment must "substantially limit[] the ability of an individual to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v).

The district court never determined that Plaintiff is substantially impaired compared to most people. Instead of applying the correct standard, the court (1) erroneously conflated a diagnosis with a disability, and (2) misinterpreted the 2008 amendments to the ADA as effectively mandating deference to a plaintiff's supporting professional.

*First*, the district court improperly determined that Plaintiff is disabled because she has diagnosed impairments, rather than a substantial limitation. The court's ***single*** statement considering the general population found that Plaintiff ***outperforms*** most people:

> Certainly, in comparison to the average individual in the general population, Plaintiff appears to have been and continues to be quite successful in her endeavors.

Ex.1 at 32. The court at no point—in its order or at the hearing—found that Plaintiff is substantially limited compared to most people (nor did Plaintiff's expert argue she is). *See* Ex.1; Ex.3 at 616. In nevertheless concluding that Plaintiff is disabled, the court improperly conflated a diagnosis with a disability: "Plaintiff is disabled within the meaning of the [ADA] *by virtue of* her diagnoses of [ADHD and] Specific Learning Disorder[.]" Ex.1 at 50 (emphasis added).

A diagnosed impairment does not establish a disability. 28 C.F.R. § 36.105(d)(1)(v); *Matthews v. Penn. Dep't of Corrections*, 613 F. App'x 163, 167 (3rd Cir. 2015). Rather, an impairment "does not make one disabled for purposes of the ADA" *unless* it substantially limits the individual compared to most people.[4] *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009).

Here, Plaintiff's diagnosed impairments cannot support a disability finding—even as alleged—unless she is substantially limited compared to most people. She is not, and the

---

[4] For example, a court in this circuit correctly held that a test-taker was not disabled—even though she was indisputably dyslexic and born deaf—because her impairment did not substantially limit her reading when compared to most people. *Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, 2016 WL 1404157, *1-5, 8-11 (E.D. Pa. Apr. 11, 2016).

court never found that she is. By conflating a mere diagnosed impairment with a "disability" and ignoring its own finding of consistent above-average performance, the court did not apply the correct legal standard. Its disability finding based on that analysis is erroneous.

*Second*, the court misinterpreted the Americans with Disabilities Act Amendments Act ("ADAAA") as essentially eliminating an ADA plaintiff's burden of proving a disability.

Noting that the term "disability" should "be construed broadly," the court reasoned that NBME's failure to rely on the Smith report—and instead "analyze the results of the various tests [itself]" and focus on Plaintiff's grades and test scores—was a "blatant error," as "neither [of NBME's external experts] … met with Plaintiff[.]" Ex.1 at 44-47. That interpretation of the ADA has no basis in the statute, its implementing regulations,[5] or relevant case law.

The ADA's "expansive" coverage extends only as far as its concrete legal standards. *See* 28 C.F.R. § 36.101(b) ("[T]his

---

[5] The court devoted four pages to quoting 29 C.F.R. § 1630.2(j), a "Department of Justice" regulation it found "particularly instructive." Ex.1 at 24-28. But that regulation was promulgated by the EEOC, not DOJ, and addresses the ADA's Title I, not Title III. Regardless, the regulation does not support the district court's analysis.

part shall be construed broadly in favor of expansive coverage to the maximum extent *permitted by the terms of the ADA*" (emphasis added)). The ADAAA's "general policy statement" regarding "broad coverage" "cannot trump [its] plain language" establishing who qualifies as disabled. *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1110-12 (8th Cir. 2016).

"Although ... the ADAAA made it easier to prove a disability, [a plaintiff] must still show a substantial limitation." *Cunningham v. Nordisk*, 615 F. App'x 97, 100 (3d Cir. 2015). That is, plaintiffs must still prove an "impairment 'substantially limits [their] ability … to perform a major life activity as compared to most people.'" *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013), *aff'd*, 582 F. App'x 114 (3d Cir. 2014).

Applying that framework, numerous courts (pre- and post-ADAAA) have rejected the conclusions of an examinee's supporting professional in analogous cases, oftentimes because—as here—they did not align with "real-world" grades and scores on standardized tests.[6]

---

[6] *See, e.g., Gonzales*, 225 F.3d at 629-30; *Glueck v. Nat'l Conf. of Bar Exam'rs*, 2018 WL 3977891, at *6 (W.D. Tex. Aug. 20, 2018); *Black v. NBME*, 281 F. Supp. 3d 1247, 1252-53 (M.D. Fla. 2017); *Bibber*, 2016 WL 1404157, at *5; *Bach v. Law*

No court has ruled that a testing agency must disregard the findings of its expert simply because that person never met with the plaintiff. Not only is there no authority for that unreasonable and impractical position, but DOJ has said, post-ADAAA, that NBME "is *not required* to defer to the conclusions or recommendations of an applicant's supporting professional[.]" Settlement Agreement ¶ 17 (Feb. 23, 2011), https://www.ada.gov/nbme.htm (emphasis added).

In short, there is no support for concluding that NBME must defer to Plaintiff's professional, that grades or standardized test scores cannot be relied upon or determinative, or that the ADAAA somehow eliminated Ms. Ramsay's—or any ADA plaintiff's—burden of establishing a disability. To the contrary, the court's reading of the ADA conflicts with the statute, as amended, which retains the substantial

---

*Sch. Adm. Council*, 2014 U.S. Dist. LEXIS 124632, at *5 (M.D.N.C. Feb. 4, 2014); *Healy v. Nat'l Bd. of Osteopathic Med. Exam'rs,* 870 F. Supp. 2d 607, 619-21 (S.D. Ind. 2012); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011); *Love*, 513 F. Supp. 2d at 214; *cf. Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] work, academic [background], and community involvement contradict[] her claim that [ADHD] substantially limits her abilities to think, learn, remember and concentrate."); *Marshall v. Sisters of Holy Family of Nazareth*, 399 F. Supp. 2d 597, 603-04 (E.D. Pa. 2005).

limitation requirement. *Cf. B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 159-60 (2d Cir. 2016) (rejecting interpretation of the ADA that reads out the "substantial limitation requirement"). The court's disability determination based on that error is both unsupported and unsupportable.

Moreover, the court's ruling has implications beyond this case. In stark contrast to the holdings and analysis in other decisions from this circuit (*e.g., Bibber* (E.D. Pa.) and *Love* (E.D. Pa.)), the court allowed Plaintiff's performance on a handful of manipulable diagnostic assessments (Ex.3 at 451-53; Ex.28)—administered to obtain extra time on a licensing exam by a professional consulted specifically to help secure accommodations—to trump two decades of "real world" evidence showing she is not substantially limited compared to most people. The court's decision creates a roadmap to receiving accommodations for anyone who can secure a diagnosis and litigate. *See Healy*, 870 F. Supp. 2d at 616 (the ADA is not meant to "allow individuals to advance to professional positions through a back door").

A stay is warranted while the Court reviews this important and timely question regarding the proper application

of the ADA in this context. *See* Order Granting Stay, *Doherty*, No. 19-30661 (5th Cir. Sept. 3, 2019); *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 123 (10th Cir. 2004) (same).

## II.    NBME will be irreparably harmed.

The court did not address the effect on NBME of denying the injunction nor balance the relevant interests. *See* Ex.1 at 18, 48-51. That alone was legal error. *Winter v. NRDC*, 555 U.S. 7, 24 (2008) ("[C]ourts *must* balance the competing claims of injury and *must* consider the effect on each party of granting or withholding the requested relief." (emphasis added)); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("[P]laintiff [must] establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

NBME will be irreparably harmed if a stay is not issued. Providing Plaintiff with unwarranted accommodations on Step 1 and releasing that score will undermine NBME's "duty to ensure that its examination is fairly administered to all those taking it." *Powell*, 364 F.3d at 89; *see Rothberg*, 102

F. App'x at 125-26 (finding irreparable harm to LSAC if accommodated LSAT score were released).

## III.    A stay will not substantially harm Plaintiff.

By contrast, Plaintiff will not be irreparably harmed if she cannot take Step 1 later this month with double time. Any claimed injury is neither irreparable nor likely to occur. *See Winter*, 555 U.S. at 20. First, a mere delay in testing or education is not irreparable harm. *Rothberg*, 102 F. App'x at 126.[7] Plaintiff's school will let her withdraw and then reapply at the conclusion of this case, when she is prepared to take Step 1 (with or without accommodations). Ex.25.

Second, Plaintiff's alleged harm is purely speculative. *Winter*, 555 U.S. at 22 (irreparable harm must be "*likely*"). Plaintiff has said she "*may* never be able to receive the academic degree of Doctor of Medicine," and "[f]urther delay *could* jeopardize even this very delayed schedule." ECF 7, at 2; ECF 7-3, at 12 (emphasis added).

The court made no finding that Plaintiff will likely fail without extra time, *see* Ex.1, and there is no evidence she would. She missed passing by one point, and her ability to

---

[7] *See also Martin v. Helstad*, 699 F.2d 387, 391-92 (7th Cir. 1983); *Doe v. N.Y. Univ.*, 666 F.2d 761, 773 (2d Cir. 1981).

review every question—despite the district court's clearly erroneous contrary finding, *id.* at 6—suggests she could pass if adequately prepared.[8] Ex.3 at 580-84; Ex. 24; Ex. 27.

The *possibility* of injury cannot establish irreparable harm or outweigh the harm to NBME and other test-takers if Plaintiff receives an unwarranted accommodation.

## IV.    The public interest favors a stay.

The public interest also favors a stay. Like NBME, the public "has an interest in the fair administration of standardized tests." *Bach*, 2014 U.S. Dist. LEXIS 124632, at *8. That interest is particularly strong where, as here, the test assesses the competency of potential doctors and is critical to licensing decisions. Ex.4 at 1-2.

And if residency programs or other third parties rely on USMLE scores earned with unwarranted accommodations, it will "alter[] the substance of the product because [the scores will] not be guaranteed to reflect each examinee's abilities accurately." *Powell*, 364 F.3d at 89. That would unfairly

---

[8] Courts have held that alleged harm is speculative where it is unclear a plaintiff would fail, given prior success on tests without accommodations. *See e.g.*, *Baer v. NBME*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005); *Bach,* 2014 U.S. Dist. LEXIS 124632, at *5-6; *Kelly v. W. Va. Bd. of Law Exam'rs* 2008 WL 2891036, at *2 (S.D.W. Va. July 24, 2008).

advantage Plaintiff to the detriment of other examinees, residency applicants, and residency programs. Because that includes applicants with disabilities, the injunction could harm the very population the ADA is meant to protect.[9]

## CONCLUSION

A "mandatory [preliminary] injunction is an extraordinary remedy to be employed only in the most unusual case." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013). This is not such a case.

NBME respectfully requests that the Court stay the preliminary injunction pending appeal and issue a ruling no later than March 11, 2020.

---

[9] Although the court referenced a need for physicians in "rural, economically-depressed areas," it never found that Plaintiff intends to practice in such an area, nor is there any indication she does. Ex.1 at 49. Regardless, it would be inappropriate to alter ADA standards because a plaintiff might decide to practice in a rural area.

Respectfully submitted,

Alison R. Caditz, #51530
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

/s/ Robert A. Burgoyne
Robert A. Burgoyne, #366757
Caroline Mew, #467354
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

*Counsel of Record for Defendant-
Appellant*

February 7, 2020

## CERTIFICATE OF COMPLIANCE

I certify that this motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,200 words, excluding the parts exempted by Rule 27(a)(2)(B). I further certify that the motion complies with the typeface and type-style requirements of Rule 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

*Counsel of Record for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I certify that on February 7, 2020, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

**ELECTRONIC DOCUMENT CERTIFICATE**

I certify that: (1) the electronic submission is an exact copy of the paper document in compliance; and (2) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

<u>/s/ Robert A. Burgoyne</u>
Robert A. Burgoyne

## CERTIFICATE OF BAR ADMISSION

Pursuant to Local Appellate Rule 46.1(e), I certify that I am counsel of record and a member of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Robert A. Burgoyne
Robert A. Burgoyne