## EXHIBITS

Exhibit 1: District Court's Order Granting Preliminary Injunction (Dec. 31, 2019)

Exhibit 2: District Court's Order Denying Motion to Stay Pending Appeal (Feb. 4, 2020)

Exhibit 3: Preliminary Injunction Hearing Transcript (Dec. 3-5, 2019)

Exhibit 4: Declaration of Catherine Farmer, Psy.D.

Exhibit 5: Declaration of Steven G. Zecker, Ph.D.

Exhibit 6: Declaration of Benjamin J. Lovett, Ph.D., and Lovett Internal Review

Exhibit 7: Declaration of Robert D. Smith, Ph.D., Smith Evaluation, and Smith Website Homepage

Exhibit 8: Declaration of Jessica Ramsay

Exhibit 9: 2016 NBME Accommodations Request Form and Personal Statement

Exhibit 10: 2018 NBME Accommodations Request Form and Personal Statement

Exhibit 11: NBME Decision Letter (Feb. 14, 2019)

Exhibit 12: K-5 Report Cards and Score Reports

Exhibit 13: Tanguay Letters

Exhibit 14: Middle School Transcript and Score Report

Exhibit 15: High School Transcript and Alumni History

Exhibit 16: ACT Score Report

Exhibit 17: University of Wisconsin College Application

Exhibit 18: Ohio State University Transcript

Exhibit 19: Academic and Testing History Summaries

Exhibit 20: Dr. Smiy Office Visit Notes

Exhibit 21: Ohio State ADD/ADHD Verification Form

Exhibit 22: MCAT Score Report

Exhibit 23: Livingston Evaluation

Exhibit 24: Score Reports for Subject-Matter Examinations

Exhibit 25: Letter from Western Michigan School of Medicine re: leave of absence

Exhibit 26: Lewandowski Evaluation and Correspondence

Exhibit 27: USMLE Step 1 Score Report

Exhibit 28: Article: *An Investigation of Methods to Detect Feigned Reading Disabilities* (2010)

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
JESSICA RAMSAY,                    :
                                   :   CIVIL ACTION
          Plaintiff               :
                                   :
     vs.                           :   NO. 19-CV-2002
                                   :
NATIONAL BOARD OF MEDICAL          :
EXAMINERS                          :
                                   :
          Defendant               :
```

## MEMORANDUM AND ORDER

**JOYNER, J.**                                    **December  30, 2019**

     This case has been brought before this Court on Motion of
the Plaintiff, Jessica Ramsay, for Preliminary Injunction (Doc.
No. 7).  Following three full-day evidentiary hearings on
December 3, 4, and 5, 2019, the matter is now ripe for
disposition and we therefore hereby make the following:

### FINDINGS OF FACT

     1.  Plaintiff Jessica Ramsay is a citizen of the State of
Michigan residing at 6862 Tall Oaks Drive, Apt. 3B, Kalamazoo,
Michigan.

     2.  Defendant National Board of Medical Examiners ("NBME")
is a non-profit corporation organized and existing under the

laws of the District of Columbia, with its principal place of business at 3750 Market Street, Philadelphia, Pennsylvania.

3.   Plaintiff is a medical student in the M.D. program at the Homer Stryker M.D. School of Medicine of Western Michigan University ("WMed").

4.   NBME develops a series of standardized timed examinations that are known collectively as the United States Medical Licensing Examination ("USMLE") and which are largely in written format.  NBME administers these examinations through a third-party-vendor throughout the United States and these examinations are relied upon by states throughout the country in making decisions regarding medical licensure.  In order to receive the degree of Doctor of Medicine (*i.e.* M.D.), to apply and/or be considered for medical residency training programs, and to become licensed as a physician, medical students must first take and pass all of the USMLE "Step" examinations.

5.   Plaintiff was required by Western Michigan Medical School to take and pass the USMLE Step 1 examination at or near the end of her third year of medical school.  In addition to being pre-requisite to continuation of their medical school educations, scores on the Step 1 examination are also significant in that they are used by medical residency training programs throughout the United States to rank student candidates in the very-competitive residency match process.  Consequently,

even if a student passes the Step 1 examination but with a low score, they may be unable to compete or may be significantly hindered in competing for a residency match with the possible result that they are not selected at all for admission to any residency program upon graduation from medical school.

6.   Step 2 of the USMLE consists of two parts:  Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills).  These examinations must also be taken and passed by M.D. medical students prior to graduation from medical school.

7.   Step 3 of the USMLE must generally be taken and passed by graduates of M.D. degree programs, prior to licensing as physicians.[1]

8.   Only students of accredited medical schools are eligible to take the USMLE Step examinations.

9.   Plaintiff entered Western Michigan University Medical School in 2014 and had a projected graduation date of May, 2018.

10.   In March 2009, during her sophomore year at Ohio State University, Plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder, Migraine Headaches and probable dyslexia by her family physician, Dr. Alan Smiy. She was prescribed Ritalin to treat the ADHD and granted educational/testing

---

[1]  As noted by NBME in its Answer to paragraph 18 of Plaintiff's Complaint, this process generally applies to medical students seeking to be licensed as allopathic (M.D.) physicians.  Although similar, the process for testing and/or the examinations necessary for licensure as osteopathic (D.O.) physicians may be somewhat different.

accommodations by and through the University's Office of Disability Services ("ODS"), including additional time to complete examinations (1 1/2 time), taking examinations in a distraction-reduced space (typically a separate room), use of visual aids such as colored pencils and markers and access to scrap paper, along with access to an ODS counselor throughout the balance of her college career. These and additional accommodations were also granted to Plaintiff by her medical school such that she had up to twice (2X) the time to complete examinations, access to text-to-speech software and calculator during exams, was permitted to have a granola bar or other snack and water with her during testing in her separate exam room, an additional free print allowance, and written examinations on paper (so she could mark them up). Among the examinations for which Plaintiff has received these accommodations during her medical school career are a number of subject matter examinations developed by NBME.

11. In or around late November/early December, 2016 while a third-year medical student and in anticipation of having to sit for the Step 1 USMLE, Plaintiff applied to NBME for test accommodations, seeking many of the same accommodations that she had been receiving from Western Michigan University Medical School and Ohio State University. Earlier that year, Plaintiff had also suffered a deep vein thrombosis in her leg causing her

to miss some three weeks from classes.  Plaintiff was
subsequently diagnosed with a clotting disorder and prescribed
Xarelto.  In support of her application for accommodations,
Plaintiff provided the supporting documents sought by NBME,
including medical and psychological evaluation reports and
records, school reports and a Personal Statement describing her
impairments and how they affect her current, everyday
functioning.  Specifically, in addition to her Personal
Statement, Plaintiff had provided copies of her school records
from St. Joseph's High School, Ohio State University and Western
Michigan University Medical School, and records/reports from the
following medical/psychological providers and/or evaluators: Dr.
Mary Alice Tanguay, Therapeutic Optometrist, Katherine Turner,
M.D., Alan N. Smiy, M.D., and Charles A. Livingston, M.A., a
Licensed Masters Social Worker and Limited Licensed
Psychologist.

12.  NBME did not provide a decision on Plaintiff's request
until more than three months later - on or about March 10, 2017.
At the time it denied Plaintiff's request for accommodations,
NBME stated: "Overall, the documents you provided do not
demonstrate a record of chronic and pervasive problems with
inattention, impulsivity, behavioral regulation, or
distractibility that has substantially impaired your functioning
during your development or currently." In reaching this

conclusion, NBME noted that "[d]espite your reported history of difficulties, your documentation shows that you progressed through primary and secondary school without grade retention, evaluation, or services and with an academic record and scores on timed standardized tests sufficient to gain admission to college, all without accommodations."

13.   Faced with an NBME requirement that she submit new information as a pre-requisite for reconsideration or an appeal of its denial, Plaintiff took the Step 1 examination in July 2017 without accommodations with the hope that she could pass and enter into her fourth year of medical school.  In so doing, Plaintiff was unable to read all of the questions in each testing "block" which required her to guess at the answers to those remaining questions that she did not have time to read. Plaintiff failed the examination by one point.

14.   As a consequence of her failure of the USMLE Step 1 exam and in order to afford Plaintiff the opportunity to take the exam with accommodations, Western Michigan Medical School permitted Plaintiff to take a leave of absence which effectively commenced in August 2017.  That leave of absence has been extended several times such that it continues to the present. However, Plaintiff has been advised by the school that no further extensions will be granted and she will be required to

withdraw from the medical school if she does not take and pass
the Step 1 examination by March 2, 2020.

15.  On June 6, 2018, Plaintiff re-applied to NBME for
accommodations on her re-take of the Step 1 USMLE, after having
submitted to additional evaluations by Alan Lewandowski, Ph.D.,
a Neurologist/Clinical Psychologist and Bruce Reukberg, M.D. a
psychiatrist, both of whom found that Plaintiff met the DSM-5
and the ICD-10[2] criteria for Attention Deficit and Hyperactivity
Disorder - Combined Type, and the Specific Learning Disorders of
Abnormal Scanning and Processing Speed with Impairments in
Reading and Written Expression.  In addition to providing these
records/reports and all of the other materials that she had
previously submitted as well as an updated Personal Statement,
Plaintiff also provided letters of support from Jennifer N.
Houtman, M.D., her then-primary care physician and her medical
school mentor and Clinical Skills course instructor, and David
Overton, M.D., the Associate Dean and Chair of the Essential
Abilities Committee at Western Michigan University Medical
School attesting to Plaintiff's diagnoses of ADHD, Learning
Disorders, Migraine Headaches and Clotting Disorder with recent

[2] The DSM-5 is the Diagnostic and Statistical Manual of Mental Disorders,
Fifth Edition of the American Psychiatric Association and the ICD-10 is the
10th revision of the International Statistical Classification of Diseases and
Related Health Problems from the World Health Organization.

Deep Vein Thrombosis and Post-Thrombotic Syndrome and to her need for accommodations on the Step 1 USMLE.

16.  On September 11, 2018, NBME again found that Plaintiff's "documentation does not demonstrate that 100% additional testing time is an appropriate modification of your USMLE Step 1 administration," reasoning that since Ms. Ramsay's performance on the Conners Continuous Performance Test was normal, she had attained a 3.8 Grade Point Average in high school, an ACT score between 27 and 30 and a 30 M on the MCAT all under standard conditions, the data did not "demonstrate a developmental history of impaired cognitive or academic functioning or that standard testing time is a barrier to your access to the USMLE."  Nevertheless, recognizing that Plaintiff's clotting disorder required some accommodation, NBME granted Plaintiff additional break time and testing over two days, a separate testing room to permit her to stand, walk or stretch during the exam and permission to read aloud in that room.

17.  On or about September 25, 2018, Plaintiff consulted Robert D. Smith, Ph.D., another Psychologist/Neuropsychologist and the Michigan Dyslexia Institute for yet another evaluation, this time targeted at her dyslexia in anticipation of an appeal of the NBME's September 11, 2018 denial.  Dr. Smith administered a battery of tests, some of which were the same as those which

had been previously administered by Dr. Lewandowski and Charles

Livingston.  At the conclusion of testing, Dr. Smith determined

that Plaintiff did indeed have the specific learning disorder of

developmental dyslexia which impaired her reading, reading

comprehension and severely impaired her reading rate and fluent

word recognition.  Dr. Smith concluded that "Jessica's pattern

of reading and writing scores is typical of the intelligent

dyslexic reader who struggles with efficient decoding and

processing of the printed words, but can use her intelligence to

substantially compensate and extract seemingly adequate

comprehension from passages."  In also diagnosing Plaintiff with

Attention Deficit Hyperactivity Disorder - Combined Presentation

and finding her level of reading impairment to be severe such

that it could be "expected to significantly and substantially

interfere with education efforts without accommodations such as

extended time," Dr. Smith also recommended a series of testing

accommodations including 100% additional time.

    18.  Plaintiff thereafter sought reconsideration of the

NBME's September 11, 2018 decision by way of an appeal letter

sent on her behalf by her attorney, Lawrence Berger, on December

12, 2018.  Once again, in reliance on Plaintiff's overall strong

academic performance throughout her educational career and on

the earlier standardized ACT and MCAT test scores, NBME denied

Plaintiff's appeal and her renewed request for the extended
testing time accommodation on February 14, 2019.

19.  On March 19, 2019, Plaintiff's counsel sent another
letter to the NBME requesting reconsideration of its September
11, 2018 and February 14, 2019 denials.  In an email addressed
to Plaintiff by NBME's Director of Disability Services and ADA
Compliance Officer for Testing Programs, Catherine Farmer,
dated March 27, 2019, NBME denied the request for further
reconsideration.  In the email, Dr. Farmer reiterated that, in
view of Plaintiff's "average and above average performances on
timed standardized tests taken for the purpose of gaining
admission to college and medical school," NBME had concluded
that Plaintiff's "skills are better than most people in the
general population."  NBME made this determination
notwithstanding that its evaluator had accepted that Plaintiff's
"exceptionally low scores on timed reading tests administered
for the purpose requesting test accommodations [was] valid and
credible."

20.  In making its decision to deny Plaintiff's requests
for accommodations, NBME referred Ms. Ramsay's applications and
supporting documentation to two of its outside, independent
contractor-evaluators, Steven G. Zecker, Ph.D. and Benjamin J.
Lovett, Ph.D. for their opinions.  Dr. Zecker is presently an
Associate Professor in the Department of Communication Sciences

and Disorders at Northwestern University and has been employed
by NBME as an outside consultant/evaluator for the past 16
years. Dr. Lovett is now currently an Associate Professor of
Psychology and Education at Teachers College, Columbia
University[3] and has been employed as an outside
consultant/evaluator since 2010.  Both Drs. Zecker and Lovett
are paid at the rate of $200 per hour for their reviewing
services.  Drs. Zecker and Lovett reviewed only the written
materials submitted by Plaintiff; neither ever interviewed or
met her prior to giving their opinions to NBME and to testifying
as expert witnesses before this Court.

    21.  Prior to the enactment of the ADA Amendments Act of
2008, NBME, along with seven other standardized testing
organizations[4], sent a letter dated July 14, 2008 to various U.S.
Senators opposing the passage of the Act as it was written.
Among the "significant concerns" expressed by these
organizations were the "significant costs in complying with the
ADA," and "the important implications beyond just the
substantial costs incurred by testing organizations to provide

---

[3] At the time of his review of Plaintiff's accommodations request, Dr. Lovett
was an Associate Professor of Psychology at the State University of New York
(SUNY) Cortland and an Adjunct Professor of Psychology at Syracuse
University.  Dr. Zecker has held his position at Northwestern University
since 1991.
[4]  These organizations were ACT, Inc., the Association of American Medical
Colleges, the Federation of State Medical Boards of the United States, Inc.,
the Graduate Management Admission Council, the Law School Admission Council,
the National Conference of Bar Examiners and the National Council of
Examiners for Engineering and Surveying.

such accommodations."  It was the expressed opinion of the
testing organizations that "[t]hese requests [for
accommodations] involve, in some way, the very cognitive skills
(such as thinking and concentrating) that a standardized exam is
attempting to measure," and that "[t]he provision of such
accommodations - especially extra testing time - can affect the
comparability of the resulting scores and scores achieved under
standard testing conditions…. Accommodations can thus undermine
the very purpose of a 'standardized' examination" such that they
could "also affect the interests of the general public if the
exams in question are licensing exams or exams that are taken to
gain access to professional schools such as medical school or
law school."

22.  Some six years later, in response to the ADA Notice of
Proposed Rulemaking concerning the drafting of the implementing
Regulations by DOJ for the ADA Amendments Act, Defense counsel
Robert Burgoyne wrote a lengthy letter on behalf of four
standardized testing organizations which he represented,
including NBME.[5] In that letter, the four organizations took
exception to and opposed, *inter alia*: (1) the inclusion of the
directive that "the primary object of attention in cases brought

---

[5] Mr. Burgoyne represents NBME in this case and the organizations which he
represented in the drafting of this letter, in addition to NBME were the
Association of American Medical Colleges ("AAMC"), the Graduate Management
Admission Council ("GMAC") and the National Conference of Bar Examiners
("NCBE").

under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability" in 28 C.F.R. §36.101(b); (2) the notation that "[t]he question of whether an individual meets the definition of disability under this part should not demand extensive analysis" in 28 C.F.R. §36.101(b) and 28 C.F.R. §36.105(d)(1)(iii); (3) the language that "[s]ubstantially limits is not meant to be a demanding standard" proposed for inclusion in 28 C.F.R. §105(d)(1)(i); (4) the inclusion in the discussion of the proposed rules of examples of "self-mitigating measures or undocumented modifications or accommodations for students with impairments that affect learning, reading, or concentrating" as possibly including "measures such as devoting a far larger portion of the day, weekends and holidays to study than students without disabilities; teaching oneself strategies to facilitate reading connected text or mnemonics to remember facts, receiving extra time to complete tests, receiving modified homework assignments, or being permitted to take exams in a different format or in a less stressful or anxiety-provoking setting. Each of these mitigating measures, whether formal or informal, documented or undocumented, can lessen the impact of, and improve the academic function of a student having to deal with a substantial limitation in a major life activity such as

concentrating, reading, speaking, learning, or writing.
Nevertheless, these are only temporary supports; the individual
still has a substantial limitation in a major life activity and
would be a person with a disability under the ADA."  In that
same letter Mr. Burgoyne, on behalf of the testing organizations
asked that DOJ "add a regulation which notes that, although
mitigating measures are not to be considered in assessing
whether a person has a disability, it is appropriate to consider
such measures in determining whether accommodations are needed."
He suggested: "The purpose of accommodations is to address an
individual's functional limitations.  If mitigating measures
already address an individual's functional limitations, there is
no need for accommodations."

    23.    On or about December 5, 2016, Defense counsel
Burgoyne gave a power point presentation in the course of a
training seminar to NBME's outside consulting reviewers such as
Drs. Zecker and Lovett, among others, which was entitled *ADA
Legal Update for NBME and its Outside Consultants.*"  In addition
to reviewing the relevant provisions of the ADA applicable to
entities offering examinations related to licensing and
credentialing for secondary or post-secondary education,
professional or trade purposes, the presentation included a
discussion of the process underlying the Department of Justice's
("DOJ") Title II and Title III Rulemaking.  In the course of

that discussion, the power point presentation included the
following observations on the DOJ's Notice of Proposed
Rulemaking (dated 1/30/14 and found at 79 Fed. Reg. 483):

- … **many ADHD diagnoses may not "meet the clinical
  definition** … and thus **would not qualify for an
  accommodation** under the revised definition of
  disability" (prompting DOJ to reduce its estimate of
  the # of individuals with ADHD by 30%)

- In response to comments on the proposed rule, DOJ
  added ADHD as an example of a physical or mental
  impairment that can constitute a covered disability

- … that, in estimating the cost impact of the new
  regulations on testing entities and colleges when it
  published its Notice of Proposed Rulemaking, DOJ "had
  assumed based on some available research that 30
  percent of those who self-identify as having ADHD as
  their primary disability would not need additional
  testing time because they would not meet the clinical
  definition of the disability."

- DOJ retreated from that approach in the final rule,
  because of concerns raised by some commenters

- "One commenter raised concern about presenting a
  specific percentage of students with ADHD who would
  not meet that clinical definition, because that number
  might inadvertently become a benchmark for
  postsecondary institutions and national testing
  entities to deny accommodations to a similar
  percentage of applicants requesting additional exam
  time because of their ADHD."

- "The Department did not intend for this percentage to
  establish a benchmark. Covered entities should
  continue to evaluate requests for additional exam time
  by all individuals with disabilities on an
  individualized basis. In direct response to these
  concerns, the Department has decided not to reduce the
  number of individuals with ADHD who could now receive
  testing accommodations as a direct result of the ADA

Amendments Act in estimating the financial impact of the new regulations." (emphasis in original)

## DISCUSSION

On May 8, 2019, Plaintiff filed her Complaint commencing this action alleging violations and seeking relief under the Americans with Disabilities Act, 42 U.S.C. §12101, *et. seq.* ("ADA") and Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Section 504").  Following the filing of Defendant's Answer to the Complaint, Plaintiff filed the Motion for Preliminary Injunction which is now before us. By this motion, Plaintiff asks this Court to enter an injunction in her favor preliminarily enjoining and restraining NBME and all others acting in concert with it from refusing to grant her the accommodation of 100% extended testing (double) time for the USMLE Step 1 and all subsequent Step USMLE examinations.

A.  *Standards for Ruling on Preliminary Injunction Motions*

Fed. R. Civ. P. 65(d) outlines the "Contents and Scope of Every Injunction and Restraining Order" by way of the following language:

(1) *Contents.*

Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its terms specifically; and

(C) describe in reasonable detail - and not by referring to the complaint or other document - the act or acts restrained or required.

(2) *Persons Bound.* The order binds only the following who receive actual notice of it by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) other persons who are in active concert or participation with anyone described in Rule 65(d)(2)(A) or (B).

Of course, under Rule 65(a)(1), a preliminary injunction may only issue on notice to the adverse party. "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867, 138 L. Ed.2d 162 (1997)(emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed.2d 249 (2008). "The grant or denial of a preliminary injunction is almost always based on an

abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequence of immediate irreparable injury." GlaxoSmithKline Consumer Healthcare, L.P. v. Merix Pharmaceutical Corp., No. 05-4566, 2006 U.S. App. LEXIS 16377, 197 Fed. Appx. 120, 123 (3d Cir. 2006)(quoting U.S. Steel Corp. v. Fraternal Ass'n of Steelhaulers, 431 F.2d 1046, 1048 (3d Cir. 1970)).  Indeed, "[i]n each case courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Winter, 555 U.S. at 24, 129 S. Ct. at 377 (quoting Amoco Production Co. v. Gambell, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed.2d 542 (1987)).

It should also be noted that in order to make the required showing of irreparable harm, it is incumbent upon the plaintiff to demonstrate that he is threatened by a harm "which cannot be redressed by a legal or equitable remedy..." "The preliminary injunction must be the *only* way of protecting the plaintiff from [the] harm." Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992)(quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).  Moreover, "a party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." Ferring Pharmaceuticals, Inc. v. Watson

Pharmaceuticals, Inc., 765 F.3d 205, 219, n. 13 (3d Cir.

2014)((quoting Acierno v. New Castle County, 40 F.3d 645, 653

(3d Cir. 1994); See also, Doe v. Law School Admission

Council, Inc., Nos. 17-3230, 17-3357, 2019 U.S. App. LEXIS 32784

at * 10 (3d Cir. Nov. 1, 2019)(same).

> B.  *Plaintiff's Entitlement to Accommodations under the
> Americans with Disabilities Act and/or the Rehabilitation
> Act*

As stated, Plaintiff here is alleging that NBME violated

Title III of the Americans with Disabilities Act ("ADA"), 42

U.S.C. §12182 and Section 504 of the Rehabilitation Act ("§504"

and/or "RHA"), 29 U.S.C. §794 by failing to grant her repeated

requests for accommodations in the taking of Step 1 of the

USMLE.[6]   In general, these Acts provide the following in

pertinent part:

---

[6] It should be noted that Defendant long ago conceded that its services
constitute a public accommodation covered by title III of the ADA.  See,
e.g., Powell v. National Board of Medical Examiners, 364 F.3d 79, 85 (2d Cir.
2004).  Defendant also does not dispute that it is subject to this portion of
the ADA here, though it denies that it is the recipient of Federal financial
assistance such as is required to be subject to §504 of the RHA.  (Def's Ans.
to Pl's Compl., Doc. No. 3, ¶s 3-4).  Insofar as it appears that no discovery
has been taken and no record evidence on the matter of NBME's receipt of
federal funds has been presented, however, we cannot and do not address that
issue at this time.  Indeed, it is not necessary that we do so now given that
the standards adopted by titles II and III of the ADA are generally the same
as those required under the RHA and that for this reason, Courts typically
consider the merits of claims under both statutes together. Powell, supra,
(citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)); K.N. v.
Gloucester City Board of Education, 379 F. Supp. 3d 334, 354-355 (D.N.J.
2019).  See also, Bragdon v. Abbott, 524 U.S. 624, 631-632, 118 S. Ct. 2196,
2202, 141 L. Ed.2d 540, 553 (1998)("The ADA's definition of disability is
drawn almost verbatim from the definition of "handicapped individual"
included in the Rehabilitation Act of 1973, … and the definition of
"handicap" contained in the Fair Housing Amendments Act of 1988." (internal
citations omitted).

## §12182.  Prohibition of discrimination by public accommodations.

**(a)  General rule.**  No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

…..

## §794.  Nondiscrimination under Federal grants and programs

**(a) Promulgation of rules and regulations.**  No otherwise qualified individual with a disability in the United States, as defined in section 7(20) [29 U.S.C. §725(20)], shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. …

Under the ADA, "[t]he term 'disability means, with respect

to an individual -

(A)  a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)  a record of such an impairment; or

(C)  being regarded as having such an impairment…

42 U.S.C. §12102(1).  "Major life activities," in turn, "include

but are not limited to, caring for oneself, performing manual

tasks, seeing, hearing, eating, sleeping, walking, standing,

lifting, bending, speaking, breathing, learning, reading,

concentrating, thinking, communicating, and working."  42 U.S.C.

§12102(2).  Under Section 504 of the RHA, an "[i]ndividual with

a disability" is defined to mean in general "any individual who-

> (i) has a physical or mental impairment which for such
> individual constitutes or results in a substantial
> impediment to employment; and

> (ii) can benefit in terms of an employment outcome from
> vocational rehabilitation services provided pursuant to
> title I, III, or VI [29 U.S.C. §§720, *et. seq.* 771, *et.
> seq.* or 795 *et. seq.*]

29 U.S.C. §705(20)(A).

Title III of the ADA renders testing entities such as

Defendant here subject to its anti-discrimination mandates.  In

this regard, 42 U.S.C. §12189 provides:

**§12189.  Examinations and courses**

> Any person that offers examinations or courses related to
> applications, licensing, certification or credentialing for
> secondary or post-secondary education, professional, or
> trade purposes shall offer such examinations or courses in
> a place and manner accessible to persons with disabilities
> or offer alternative accessible arrangements for such
> individuals.

To show a violation of the ADA based on a failure to

accommodate, a Plaintiff must prove: (1) that she is disabled;

(2) that her requests for accommodation are reasonable; and (3)

that those requests have been denied.  Rawdin v. American Board

of Pediatrics, 985 F. Supp. 2d 636, 647 (E.D. Pa. 2013); Mahmood

v. National Board of Medical Examiners, No. 12-1544, 2012 U.S.

Dist. LEXIS 86837, 2012 WL 2368462 at * 4 (E.D. Pa. June 21,

2012)).  In this case, there is no dispute as to the

reasonableness of Plaintiff's requested accommodations nor is there any question but that her request has been denied.[7] Consequently, the threshold issues before us for adjudication are whether or not the Plaintiff truly is disabled and, of course, whether the pre-requisites for issuance of a preliminary injunction have been satisfied.

In determining the question of Plaintiff's disability, we must examine the evidence presented at the hearing under the lens of the ADA Amendments Act of 2008 which took effect on January 1, 2009.  As clearly reflected in Section 2, the Findings and Purpose Notes to the text of the Amendments Act, the Statute was a direct response to what Congress believed was the improper narrowing of the "broad scope of protection intended to be afforded by the ADA" by the Supreme Court decisions in <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471 (1999) and <u>Toyota Motor Manufacturing, Kentucky, Inc. v. Williams</u>, 534 U.S. 184 (2002) which had the effect of "eliminating protection for many individuals whom Congress intended to protect."  <u>See</u>, <u>e.g.</u>, 122 Stat. 3553; 110 P.L. 325;

---

[7] As set forth above in our factual findings, Plaintiff initially sought 100% additional exam time (double time), a separate, distraction-reduced room for testing, colored dry-erase markers to use on the laminated paper, an alarm or timer (either in the room, visible on the computer screen or a visual signal or reminder from a proctor), water and a snack in the room to facilitate taking needed medications at the appropriate times.  Following Plaintiff's second application, NMBE granted Plaintiff all of her requested modifications with the exception of additional time, although they did permit added break time and testing over 2 days.  Accordingly, the only accommodation still being sought is that of additional (double) testing time.

Enacted S. 3406; 110 Enacted S. 3406 (Sept. 25, 2008).

Specifically, Congress took exception with what it characterized

as lower courts' incorrect findings "in individual cases that

people with a range of substantially limiting impairments are

not people with disabilities," and with the then-current EEOC

ADA regulations defining the term "'substantially limits' as

'significantly restricted'" for the reason that that definition

was "inconsistent with congressional intent, by expressing too

high a standard."  Id.  In so doing, Congress meant to convey

that its intent was "that the primary object of attention in

cases brought under the ADA should be whether entities covered

under the ADA have complied with their obligations," … and "that

the question of whether an individual's impairment is a

disability under the ADA should not demand extensive analysis."

Id.  The Amendments Act further clarified that:

> "[t]he determination of whether an impairment substantially
> limits a major life activity shall be made without regard
> to the ameliorative effects of mitigating measures such as
> (I) medication, medical supplies, equipment, or appliances,
> low-vision devices (which do not include ordinary
> eyeglasses or contact lenses), prosthetics including limbs
> and devices, hearing aids and cochlear implants or other
> implantable hearing devices, mobility devices, or oxygen
> therapy equipment and supplies; (II) use of assistive
> technology; (III) reasonable accommodations or auxiliary
> aids or services; or (IV) learned behavioral or adaptive
> neurological modifications."

42 U.S.C. §12102(4)(E)(1).

The implementing regulations promulgated by the Department of Justice[8] are similar[9].  Indeed, 29 C.F.R. §1630.1(c)(4) and 28 C.F.R. §36.101(b) both provide:

> Broad coverage.  The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA.  Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability.  The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 C.F.R. §1630.2(j) is particularly instructive with regard to the meaning to be ascribed to the term "substantially limits" and provides as follows in relevant part:

> **(1)**  Rules of construction.  The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity:
>
>> **(i)**  The term "substantially limits" shall be construed broadly in favor of expansive coverage, to

---

[8] "Congress directed the DOJ to promulgate regulations implementing Title III, 42 U.S.C. §12186(b), and, as a result, such regulations are 'entitled to substantial deference,' and 'given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Rawdin v. American Board of Pediatrics, No. 13-4544, 582 Fed. Appx. 114, 118, n.9, 2014 U.S. App. LEXIS 17002, 2014 WL 4345834 (3d Cir. Sept. 3, 2014)(quoting Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) and Helen L. v. DiDario, 46 F.3d 325, 331-32 (3d Cir. 1995)).

[9] In fact, the language of 29 C.F.R. §1630.2 and 28 C.F.R. §§ 36.105 and 36.301 outlining the purpose and broad coverage goal and setting forth key definitions nearly mirrors that contained in the statute itself at §§12101, 12102, 12103 and 12111.

the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii)  An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(iii)  The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity.  Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

(iv)  The determination of whether an impairment substantially limits a major life activity requires an individualized assessment.  However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.

(v)  The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis.  Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.

(vi)  The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures.  However, the ameliorative effects of ordinary eyeglasses or contact lenses shall

be considered in determining whether an impairment substantially limits a major life activity.

**(vii)**  An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

**(viii)**  An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment.

**(ix)**  The six month "transitory" part of the "transitory and minor" exception to "regarded as" coverage in §1630.15(f) does not apply to the definition of "disability" under paragraphs (g)(1)(i) (the "actual disability" prong) or (g)(1)(ii) (the "record of" prong) of this section.  The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.

…

**(4)**  Condition, manner, or duration --

**(i)** At all times taking into account the principles in paragraphs (j)(1)(i) through (ix) of this section, in determining whether an individual is substantially limited in a major life activity, it may useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

**(ii)** Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of

a major bodily function.  In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

**(iii)**  In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve.  For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read,  write, or learn compared to most people in the general population.

**(iv)**  Given the rules of construction set forth in paragraphs (j)(1)(i) through (ix) of this section, it may often be unnecessary to conduct an analysis involving most or all of these types of facts.  This is particularly true with respect to impairments such as those described in paragraph (j)(3)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

**(5)**  Examples of mitigating measures -- Mitigating measures include, but are not limited to:

**(i)**  Medication, medical supplies, equipment, or appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

**(ii)**  Use of assistive technology;

**(iii)** Reasonable accommodations or "auxiliary aids or services" (as defined by 42 U.S.C. §12103(1);

**(iv)** Learned behavioral or adaptive neurological modifications; or

**(v)** Psychotherapy, behavioral therapy, or physical therapy.

**(6)** Ordinary eyeglasses or contact lenses -- defined. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

It is particularly noteworthy for purposes of this case that specific learning disabilities such as dyslexia and Attention Deficit Hyperactivity Disorder are included within the definition of "physical or mental impairment" for purposes of the Act(s). 28 C.F.R. §36.105(b)(1)(ii); (b)(2). Furthermore, 28 C.F.R. §36.309, the regulation which specifically governs the giving of "Examinations and Courses" states the following in relevant part:

**(a)** General. Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

**(b)** Examinations. (1) Any private entity offering an examination covered by this section must assure that --

**(i)** The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual or speaking skills, the

examination accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual or speaking skills (except where those skills are the factors that the examination purports to measure);

**(ii)**  An examination that is designed for individuals with impaired sensory, manual, or speaking skills is offered at equally locations, as often, and in as timely a manner as are other examinations; and

**(iii)** The examination is administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements are made.

**(iv)**  Any request for documentation, if such documentation is required, is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested.

**(v)**  When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, or related aids and services provided in response to an Individualized Education Program (IEP) provided under the Individuals with Disabilities Education Act or a plan describing services provided pursuant to section 504 of the Rehabilitation Act of 1973, as amended (often referred to as a Section 504 Plan).

**(vi)**  The entity responds in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

**(2)**  Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given.

**(3)**  A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the

measurement of the skills or knowledge the examination is
intended to test or would result in an undue burden.
Auxiliary aids and services required by this section may
include taped examinations, interpreters or other effective
methods of making orally delivered materials available to
individuals with hearing impairments, Brailled or large
print examinations and answer sheets or qualified readers
for individuals with visual impairments or learning
disabilities, transcribers for individuals with manual
impairments, and other similar services and actions.

**(4)**  Alternative accessible arrangements may include, for
example, provision of an examination at an individual's
home with a proctor if accessible facilities or equipment
are unavailable.  Alternative arrangements must provide
comparable conditions to those provided for nondisabled
individuals.

        ….

In applying the foregoing to the case at hand, we note that

insofar as the above-quoted regulations are "the equivalent[s]

of a 'legislative rule' … issued by an agency pursuant to

statutory authority," they thus have the 'force and effect' of

law."  PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.,

139 S. Ct. 2051, 2055, 204 L. Ed.2d 433 (2019)(quoting Chrysler

Corp. v. Brown, 441 U.S. 281, 302-303, 99 S. Ct. 1705, 60 L.

Ed.2d 208 (1979) and Batterton v. Francis, 432 U.S. 416, 425,

n.9, 97 S. Ct. 2399, 53 L. Ed.2d 448 (1977)).  At the very

minimum, the regulations are "entitled to substantial deference"

and "given controlling weight" unless "it can be shown that they

are arbitrary, capricious, or manifestly contrary to the

statute."  See, n. 8, supra. See also, Olmstead v. L.C. ex rel.

Zimring, 527 U.S. 581, 597-598, 119 S. Ct. 2176, 2185-2186, 144

L. Ed.2d 540 (1999)("Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, … its views warrant respect") and Bragdon v. Abbott, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L. Ed.2d 540 (1998)("It is enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance'"(quoting Skidmore v. Swift & Co., 323 U.S. 134, 139-140, 65 S. Ct. 161, 89 L. Ed.2d 124 (1944)).

Defendant NBME does not disagree that the regulatory language addressing the type of accommodations sought by Plaintiff is appropriately applied here *if* Plaintiff is found to be disabled within the meaning of the statutes.  See e.g., *Defendant NBME's Opposition to Plaintiff's Motion for Preliminary Injunction*  at p. 22.  Thus, the threshold question in this matter for purposes of assessing the correctness of NBME's decisions to deny accommodations to Plaintiff and determining Plaintiff's likelihood of success on the merits, is whether or not Ms. Ramsay truly is disabled within the meaning of the ADA and/or the RHA.

In resolving this question, we note at the outset that Defendant is right that the documentary evidence of Plaintiff's ADHD and dyslexia in her early years is indeed sparse and that for the most part, Plaintiff performed exceedingly well overall

academically during this time with little help.  Likewise, Ms.
Ramsay scored quite well on several standardized tests without
accommodations, including the ACT and the MCAT examinations.
Certainly, in comparison to the average individual in the
general population, Plaintiff appears to have been and continues
to be quite successful in her endeavors.

Nevertheless, while performance is unquestionably an
important factor to consider, the Regulations make clear that it
is not the *only* consideration.  And, the record here does
reflect that Plaintiff has a history of having struggled with
reading, visual perception, focus and attention beginning at
least in the first or second grade[10].  While there is no evidence
that her elementary school itself ever formally provided
accommodations, Plaintiff's classroom teachers did.  These
informal accommodations/interventions included providing an
alphabet board to assist in reading and writing letters, a
distraction-reduced space (*i.e.* plaintiff was often seated at

---

[10]  Some examples of the evidence of such struggles from the record include
Plaintiff's second and third grade school reports from Sunset Oaks Academy
wherein her teachers noted "I will help her with the switching of letters"
and "Jessica needs to focus on getting her work done on time;" her Stanford
Achievement Test Record from first grade reflecting that Plaintiff scored in
the 13th percentile in Word Reading, a score that was in stark contrast to her
next lowest score in the 69th percentile for mathematics computation; and the
notation on the report of Plaintiff's scores on the Iowa Tests of Basic
Skills and Cognitive Abilities Test from the sixth grade that despite
"seem[ing] to be high in overall cognitive ability" "Jessica's actual
achievement is lower than expected in seven test areas. These are Vocabulary,
Reading Comprehension, Spelling, Capitalization, punctuation, Social Studies
and Math Computation.  These represent areas in which Jessica is not doing as
well as she might be expected.  Jessica might do better in these areas with
additional effort and with continued encouragement."

the "time-out" desk), being kept in the classroom during recess so she could finish the classwork that she couldn't finish during regular class time, being given extra time to complete assignments and tests and spending extra time with her teachers, provided a quiet environment, and altered grading such that many of her elementary, middle and high school teachers agreed to grade her on the portions of examinations completed in lieu of the tests in their entirety and affording her opportunities to re-do work that were not afforded to all other students.  In addition, at or about age 7 and at the recommendation of her classroom teacher because of "reversals in her school work," Plaintiff was evaluated by a therapeutic optometrist, Dr. Mary Alice Tanguay, who performed testing of Plaintiff's visual perceptual and spatial skills.  Dr. Tanguay found "substantial deficits in the areas of visual-spatial relationships, visual discrimination and was also lacking in visual memory."  Dr. Tanguay prescribed eyeglasses and perceptual skills training which took place over a three-month period from February - May, 1998.  When Dr. Tanguay saw Plaintiff again in January 2000, she found her comprehension and perceptual skills to be excellent but that "[s]he still has the original vision problem, which may slightly reduce her reading speed."

Plaintiff testified that fourth and fifth grades became far more difficult for her because she had to do a lot more writing.

Her homeroom teacher was also her language arts teacher, was very strict and became angry with her because she would often forget things, had trouble handing in her homework and had a lot of difficulty with writing and spelling.  Only after her mother went to see her teacher did Plaintiff's teacher begin spending more time with her to help her get her work done.  Throughout Plaintiff's middle and high school years, she spent far more time completing her homework assignments and studying for tests than her peers, usually receiving late-night help from her mother to finish her work and proof-read her papers. Her friends thought she was exaggerating because she was always working on her homework and could only hang out with them in the summer and occasionally on the weekends. Plaintiff's hard work evidently paid off as she graduated from high school with a 3.747 grade point average, a class ranking of 28 out of a class of 225 and an acceptance to Ohio State University.  Throughout her high school years, Plaintiff was also a multi-sport athlete in swimming and soccer, and played junior varsity volleyball her freshman and sophomore years.  She took the ACT in her sophomore and junior years in high school without accommodations and scored well (27 and 30) overall.

    In college, Plaintiff testified that she had a very hard time keeping up with the workload because of all of the required reading.  Since she had lived in Texas when she was young where

Spanish is a much-spoken language, Plaintiff had always done well in Spanish class in high school.  In her college Spanish class oral examinations, she always had high scores.  However, her overall grades would suffer because she had difficulty on the written portions of the tests.  She asked her instructor if it was possible to disregard the written parts of the exams and consider only the oral portions, but her instructor told her that she could not do that unless plaintiff had a diagnosed disability.  Plaintiff had a similar experience in organic chemistry and her professor in that class suggested that she go to the University's Office of Disability Services ("ODS").  ODS referred her to an advisor who in turn recommended that she be formally evaluated.

Plaintiff then went to see her primary care doctor, Dr. Alan Smiy who, after listening to her describe her life-long struggles, evaluated and subsequently diagnosed her with ADHD and told her that she probably also had dyslexia.  The record does not evince what tests, if any, Dr. Smiy administered to Plaintiff in making his ADHD diagnosis, though Plaintiff testified that he told her that the testing for dyslexia was long and costly and he wasn't qualified to administer those tests or diagnose that.  In any event, Dr. Smiy said that the accommodations for dyslexia were probably the same as for ADHD. He prescribed and Plaintiff then began a trial course of Ritalin

for ADHD and the record demonstrates that she has taken medication for ADHD since that time, although the actual medications have varied over the years and have included Adderall and Vyvanse. She did not pursue testing for dyslexia at that time.

Subsequent to her formal diagnosis of ADHD from Dr. Smiy and his completion of the necessary forms, Plaintiff received testing accommodations from Ohio State midway through her sophomore year. Those accommodations included receiving additional time (1 1/2 time) on tests, being able to take exams on paper instead of on the computer, being permitted to use colored pens, markers or pencils, having access to scrap paper, taking examinations in a distraction-reduced space (typically a separate room), and having access to an ODS counselor throughout the balance of her college career. Plaintiff took the MCAT examination while still in college but, as she did not know that she could receive accommodations for the test, she did not ask for them and thus took the exam without any. Plaintiff scored reasonably well nonetheless, receiving a score of 30M.

At the end of her senior year in college, Plaintiff applied to medical schools, but did not get in. After graduating in June 2012 *cum laude* with a 3.562 grade point average with a degree in Molecular Genetics from Ohio State, Plaintiff took some time off, worked doing autism research, bartending and

dancing with a modern dance company and re-applied to medical
schools for admission in 2014.  She was accepted to Western
Michigan University Medical School and matriculated in the Fall
of 2014.

Upon entry to medical school, Plaintiff sought to continue
receiving the accommodations that she had received in college.
In support of the Request for Reasonable Accommodation that
Plaintiff made to Western Michigan in 2014, Plaintiff was
evaluated by Charles Livingston, M.A., a licensed social worker
and psychologist in the fall of that year.  Mr. Livingston
administered several assessment batteries, notably the Wechsler
Adult Intelligence Scale (WAIS-IV) and the Wechsler Individual
Achievement Test (WIAT) which resulted in a "broad range in the
results, compared to other people of a similar age. Composite
scores for verbal comprehension and perceptual (non-verbal)
reasoning were both at the 96th percentile.  Strengths included
abstract verbal reasoning, practical comprehension, visual
spatial reasoning, and long-term memory.  The composite score
for working memory attention, and concentration was at the 63rd
percentile.  The composite score for processing speed was at the
10th percentile."  Mr. Livingston went on to observe:

> Individuals with similar scores spend so much time and
> energy in basic data entry tasks, so to speak, so that there
> is little left for higher order fluid reasoning and
> synthesizing.  Jessie's exceptionally bright reasoning
> abilities and long-term memory stand in contrast to

relatively low attention and concentration and very low processing speed.  Her native intelligence has been some compensation for low abilities in the identified areas.

And he further concluded:

The diagnosis of ADHD, predominantly inattentive, severe, 314.00 is supported by the written records, self-report, [11] and objective test results.  There has been a persistent pattern of careless mistakes in daily activities and schoolwork, difficulty sustaining attention in tasks and academics, lapses in focus when spoken to directly, incomplete follow-through on instructions and tasks of daily living, being easily sidetracked, struggling to meet deadlines, trouble keeping materials and belongings in order, avoiding reading and writing tasks requiring sustained mental effort, losing things, and being easily distracted by extraneous stimuli.  The symptoms are not better described or indicated by a neurotic or psychotic disorder or substance abuse.  There is historical information that suggests a likelihood of dyslexia.

Plaintiff was subsequently granted accommodations by her medical school which included having up to twice the time to take examinations, taking examinations in a distraction-reduced space (typically a separate room), use of visual aids such as colored pencils and markers and access to scrap paper[12], access to text-to-speech software and calculator during exams, having a

---

12   At the hearing before the undersigned, Plaintiff testified  that she uses different colored pencils in her notetaking, among other endeavors, giving different types of diseases, conditions, etc. different colors so that they stand out in her notes and make them easier to locate while studying. She prefers to use pencils because she often makes mistakes.  She explained that it is difficult and time-consuming for her to decode each word separately and read through text so she uses her finger or another object to keep her place as she goes through the decoding/reading process.  Plaintiff also testified that she usually needs to read through sentences and paragraphs several times usually aloud, in order to comprehend the meaning of the text.

granola bar or other snack and water with her during testing, an additional free print allowance, and written examinations on paper (so she could mark them up).  Again, included among the examinations for which Plaintiff has received these accommodations during her medical school career are a number of the subject matter examinations developed by NBME.

In addition to providing reports and records from Dr. Tanguay, Dr. Smiy and Mr. Livingston, following NBME's initial denial of her accommodations request, Plaintiff also underwent evaluations and/or produced the results of her examinations by several other providers, all of whom agreed with the diagnoses that she had been previously given of, *inter alia*, Attention Deficit Hyperactivity Disorder and Dyslexia.  Specifically, Plaintiff produced a report of her neurocognitive examination by Alan Lewandowski, Ph.D, a board certified neuropsychologist, who administered a broad series of assessments to Plaintiff including the WAIS-IV, the Wide Range Achievement Test (4th ed.), Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number Writing Test, Tactile Form Recognition Test, the California Verbal Learning Test (2d ed.), the Rey Osterrieth Complex Figure Test, a Grip Strength Test, Finger Oscillation Tactile Performance Test, Trail Making Tests A and B, Category Test, the Seashore Rhythm Test, the Speech Sounds Perception Test, a Personality Assessment Inventory and an Aphasia

Screening Test.  In reviewing the results of the tests administered, Dr. Lewandowski found that while Plaintiff's achievement studies were normal, her intellectual, neurocognitive and psychological studies were abnormal/ borderline abnormal and it was his clinical impression that Plaintiff indeed had attention deficit hyperactivity disorder and a nonverbal learning disability characterized by abnormal scanning and processing speed.

Additionally, Plaintiff also produced an 8-page report from her treating psychiatrist, Dr. Bruce Ruekberg, M.D., a 5-page report from Jennifer N. Houtman, M.D., Plaintiff's then-primary care physician and medical school mentor, a letter of support from David Overton, M.D., the Associate Dean of WMed, and a 30-page report from Robert D. Smith, Ph.D. a licensed psychologist and neuropsychologist with the Michigan Dyslexia Institute.  For his part, Dr. Ruekberg  gave his professional opinion that Plaintiff had functional limitations due to ADHD, Combined type and the Specific Learning Disorder of abnormal scanning and processing speed with impairments in reading and written expression and that she thus was "without question, … a qualified person with disabilities under the ADA…"

Dr. Houtman confirmed "from … personal observation of [plaintiff] as a patient, and as a student, that she has the following diagnoses that require accommodations:  attention

deficit/hyperactivity disorder, Combined presentation…, Learning

disability, nonverbal (abnormal scanning and processing speed…

[w]ith impairment in reading…, [w]ith impairment in written

expression…, Migraines with aura, without status migranosis…,

[c]lotting disorder with recent Deep Venous Thrombosis…/Post-

thrombotic syndrome." (diagnostic codes from DSM-5 and ICD-10

omitted).

Dr. Smith, who also testified at the hearing in this

matter, reported that he diagnosed Ms. Ramsay with Specific

Learning Disorder with impairment in reading (developmental

dyslexia), reading comprehension, severely impaired reading rate

and fluent word recognition and with ADHD Combined after

interviewing her and her mother and administering the following

battery of tests: the Test of Memory Malingering (TOMM), Adult

ADHD Rating Scale-IV with Adult Prompts, Nelson-Denny Reading

Test, Wechsler Individual Achievement Test (3d ed.) (WIAT-III),

Woodcock-Johnson IV Test of Achievement, Gray Oral Reading Tests

(5th ed.)(GORT), the Integrated Visual & Auditory Continuous

Performance Test (IVA + Plus) and reviewing the Symptom

Checklist-90 Revised (SCL-90-R).

Despite this evidence and primarily in reliance on the

opinions of its two outside-contracted reviewing experts, NBME

concluded that Plaintiff is *not* disabled and it has therefore

denied her requests for accommodations.  NBME's first outside

reviewing expert, Steven G. Zecker, Ph.D. is an Associate
Professor of Communication Sciences and Disorders at
Northwestern University and is licensed in Illinois as a
Registered Clinical Psychologist.  He testified that he
specializes in Learning Disorders and ADHD and that he
supervises the clinic run by Northwestern University graduate
students.  As a clinician, Dr. Zecker primarily sees young,
school-age children aged around 6-7 years of age through young
adults.  He rarely sees adults.  Dr. Zecker has been employed as
an external consultant for NBME and other testing providers for
the past 16 years and he reviewed both Plaintiff's first and
second requests for accommodations on the Step 1 USMLE.
Although he did not doubt that the tests administered by her
providers had been appropriately given or that the scores were
as reported, in reviewing the documentation submitted by
Plaintiff including her personal statement, and the reports and
records outlined above, Dr. Zecker took exception with the
conclusions reached in that he did not believe that the tests
results supported the other providers' findings of ADHD and LD.
In any event, Dr. Zecker stated:

> Ms. Ramsay's academic history prior to medical school and
> her exceptional unaccommodated standardized test
> performance, in my professional opinion, provide strong
> evidence that Ms. Ramsay is not substantially impaired in a
> major life function in a manner that warrants
> accommodations on the USMLE under the ADA.

In addition to Dr. Zecker, NBME also referred Plaintiff's file to Benjamin Lovett, Ph.D, who is an Associate Professor at Teacher's College of Columbia University and who has also been employed as an external consultant/reviewer by NBME and other testing providers since 2010.  Dr. Lovett attested that his professional expertise is in the diagnosis and management of neurodevelopmental disorders, including Learning Disabilities and ADHD and he has published numerous articles and book chapters on these subjects.  As part of his work, he often meets with young adults who have learning and attention problems and assesses their self-reported symptoms and their objective performances on various tests of cognitive, academic and behavioral functioning.  Dr. Lovett testified that ADHD and Learning Disorders are considered under the DSM-V to be neurodevelopmental disorders because they begin early in childhood and thus, in the absence of symptoms during childhood, the criteria for diagnosing those conditions is not satisfied. Since he did not see any evidence that Ms. Ramsay's symptoms had presented during childhood, he did not believe that she had a disorder.

In reviewing the documentation submitted by Plaintiff, Dr. Lovett also did not find the scores or the conclusions of those providers who had evaluated and diagnosed Plaintiff to be

credible.  Rather, he testified that he looks primarily at what

he characterized as "real-world" test scores, *i.e.* those

standardized tests actually taken and under what conditions, in

assessing the strength of a diagnosis.  According to Dr. Lovett,

> Here, there is insufficient evidence that Ms. Ramsay is
> substantially limited in her ability to read or engage in
> any other activity that is relevant to taking the USMLE,
> when she is compared to most people in the general
> population, at least with regard to LD/ADHD issues.  There
> are no historical school or work records reflecting such
> limitations.  Although at times Ms. Ramsay has obtained
> scores during diagnostic evaluations that would
> superficially suggest possible substantial limitations,
> those scores (and other evidence from the diagnostic
> evaluations) are not supported by – and are often
> inconsistent with – other important evidence, including her
> performance on real-world timed tests that required
> significant amounts of reading.

In many ways, the outcome of this case is best achieved by

resolving a "battle of experts" and we note our finding that all

of the experts who examined Plaintiff and/or reviewed the

documents on behalf of the Defendant and who testified at the

preliminary injunction hearing appear eminently qualified.  In

undertaking this resolution, however, we are constrained to

follow the provisions of the ADA and the guidance and directives

set forth in the implementing regulations.  In conjunction with

those directives, we first note that unlike Mr. Livingston and

Drs. Tanguay, Smiy, Ruekberg, Lewandowski, Houtman, and Smith,

neither Dr. Lovett nor Dr. Zecker evaluated or even met

Plaintiff before testifying before this Court at the hearing.

In rejecting the findings of all of the aforesaid doctors and psychologists who interviewed and administered educational and neuropsychological testing to Plaintiff in the process of diagnosing her, Drs. Lovett and Zecker focused primarily on Plaintiff's record of academic performance throughout her school years and her performance on standardized tests and on the paucity of documentation of disability in her primary and secondary school years.  To be sure, it is certainly possible that they did not have the benefit of seeing all of the early school records which were produced to this Court.  However, in their rejection of the conclusions of those providers who actually *did* evaluate Plaintiff, Drs. Lovett and Zecker instead undertook to analyze the results of the various tests themselves, substituting their own opinions regarding how those test results should be interpreted.  In thus adopting the findings of Drs. Zecker and Lovett, NBME did likewise.

This was a blatant error in light of the language of both the statute and the relevant provisions of the Code of Federal Regulations.  Indeed, it was the stated goal of Congress in enacting the ADA Amendments Act to make it easier for individuals with disabilities to obtain protection under the Act and to mandate that the definition of "disability" "be construed broadly in favor of expansive coverage."  See, 29 C.F.R. §1630.1(c)(4), 1630.2(j), and 28 C.F.R. §36.101(b).  The

Regulations clearly state that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, **not** whether the individual meets the definition of disability."  And, "[t]he question of whether an individual meets the definition of disability under this part should **not** demand **extensive analysis.**" Id.(emphasis added).  In re-analyzing the results of the numerous diagnostic tests that were administered, Drs. Zecker and Lovett did just that.  They thus focused on whether Plaintiff met the definition of disability, rather than whether the covered entity had complied with their obligations under the Act(s).  Indeed, although NBME may not have liked the terminology used in the implementing regulations, despite its registered objections, the foregoing language is what was enacted and it is this language which must be followed in assessing accommodations requests under the ADA.  It decidedly did not do so in this case.

It further appears that NBME either discounted or disregarded entirely the admonition to focus on "how a major life activity is substantially limited, and not on what outcomes an individual can achieve" and apparently ignored the example that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the

additional time or effort he or she must spend to read, write,
or learn compared to most people in the general population."  29
C.F.R. §1630.2(j)(4)(iii).  NBME's exclusive focus on
Plaintiff's prior academic successes and her performance on the
ACT and MCAT standardized examinations without accommodations
was therefore improper, particularly given that we can discern
that no consideration was given to the other evidence produced
by Plaintiff, including her lengthy personal statement[13].

Finally, we also find that Defendant ran afoul of 28 C.F.R.
§36.309(b)(v) which requires that "[w]hen considering requests
for … accommodations …  the [testing]entity give[]considerable
weight to documentation of past modifications, accommodations,
or auxiliary aids or services received in similar testing
situations…"  Again, it does not appear from the record that
NBME gave any consideration, much less the "considerable weight"
required to Ms. Ramsay's past record of having received
accommodations.

In view of all of the evidence provided by Plaintiff both
in the form of the materials and supporting documentation
submitted to NBME pursuant to her numerous requests for
accommodations and requests for reconsideration of the denials
thereof and at the three-day hearing before the undersigned, we

---

[13] It should be noted that the Personal Statement was required by NBME to be
submitted along with all of the other required documentation in order for the
request for accommodations to be considered.

find that Plaintiff has sufficiently established that she is indeed a qualified individual with a disability within the meaning of the ADA despite her prior academic successes and her performances on standardized tests.  Indeed, we find that the evidence as outlined above supports the conclusion that, despite having Attention Deficit/Hyperactivity Disorder and Dyslexia/Learning Disorder of reading/scanning/processing speeds, Ms. Ramsay has been able through her high intelligence and remarkably hard work habits to achieve great academic success.  Thus, Plaintiff has shown the requisite likelihood of success on the merits of her Complaint in this matter.

We also find that the evidence supports the finding that Plaintiff will suffer irreparable harm unless granted preliminary relief.  Again, the record evidence reflects that unless Plaintiff takes and passes her Step 1 USMLE by March 2, 2020, she will be forced to withdraw from medical school and that it is highly unlikely that she would be able to transfer to another school, given what has transpired.  That enrollment in a medical school is a pre-requisite to being allowed to sit for the Step 1 exam is further evidence of the "Catch 22" in which Plaintiff finds herself and further supports the conclusion that her medical career will effectively end if she cannot satisfy WMed's mandate by March 2, 2020.  The element of irreparable harm is thus satisfied.

Finally, we also find the record evidence supportive of a finding that the balance of equities and the public interest both militate in favor of granting injunctive relief here.  It is obviously in the public interest that the dictates of the ADA and the RHA be followed - Congress so decreed by passing both statutes.  Further, one need only to read the myriad newspaper and magazine articles or watch television documentaries, among other news sources, to learn that there remains a great need for qualified and capable physicians throughout the United States, particularly in rural, economically-depressed areas of the Country.  While we share NBME's concern for the fulfillment of its mission to provide such physicians, we feel certain that granting this plaintiff the relief which she seeks here does not run afoul of this goal.  In granting preliminary relief, we are granting Plaintiff only the *opportunity* to move forward should she succeed in passing her examinations with appropriate accommodations. This Court is not a licensing or credentialing body and by this decision we do not assume that mantle.

In furtherance of all of the preceding findings, we now enter the following:

## CONCLUSIONS OF LAW

1.  This Court has jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1343.

2.    Plaintiff is disabled within the meaning of the
Americans with Disabilities and the Rehabilitation Acts by
virtue of her diagnoses of Attention Deficit Hyperactivity
Disorder, Specific Learning Disorder with impairments in reading
(developmental dyslexia), and reading comprehension, Migraine
Headaches and Deep Vein Thrombosis/Post-Thrombotic Syndrome.

3.    As a disabled individual under the foregoing federal
statutes, Plaintiff is entitled to reasonable accommodations in
sitting for examinations given by any person or entity relating
to applications, licensing, credentialing, or certification for
secondary or post-secondary education, professional or trade
purposes.

4.    Defendant NBME, by virtue of its status as the testing
organization responsible, along with the Federation of State
Medical Boards, for the administration of, *inter alia*, the
United States Medical Licensing Examination ("USMLE"), is
obligated to offer its exams in such place and manner as would
make those exams accessible to persons with disabilities or to
offer alternative accessible arrangements for such individuals,
*i.e.* to provide reasonable accommodations where necessary.

5.    Plaintiff's request for additional (2X or double) time
to complete the USMLE was reasonable, as were her requests for a
separate, distraction-reduced room for testing, colored dry-
erase markers to use on the laminated paper, an alarm or timer

(either in the room, visible on the computer screen or a visual signal or reminder from a proctor), water and a snack in the room to facilitate taking needed medications at the appropriate times, given the nature of her disabilities.

6.   Defendant's continued denial/refusal to grant Plaintiff's request for double time to take the USMLE was unreasonable and constitutes a violation of her rights under the ADA.

7.   Plaintiff has demonstrated a strong likelihood that she will succeed on the merits of the claims raised in her Complaint were this case to proceed to trial.

8.   Plaintiff has demonstrated that, in the absence of the issuance of a preliminary injunction directing Defendant to refrain from refusing to provide her with the reasonable accommodation of 100% extended testing time on the USMLE Step 1 examination, she will suffer and will continue to suffer immediate irreparable harm for which there is no adequate remedy at law.

An Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JESSICA RAMSAY,                    :
                                   :   CIVIL ACTION
        Plaintiff                  :
                                   :
    vs.                            :   NO. 19-CV-2002
                                   :
NATIONAL BOARD OF MEDICAL          :
EXAMINERS                          :
                                   :
        Defendant                  :


**ORDER**


AND NOW, this    30TH    day of December, 2019, upon
consideration of Plaintiff's Motion for Preliminary Injunction
(Doc. No. 7) and Defendant's Response in Opposition thereto, and
following Hearings in this matter and for the reasons set forth
in the preceding Memorandum, it is hereby ORDERED that the
Motion is GRANTED and Defendant National Board of Medical
Examiners is ENJOINED from failing and/or refusing to provide
Plaintiff Jessica Ramsay with 100 percent extended (2X or double
time) testing time for the United States Medical Licensing
Examinations (USMLE) Step 1, Step 2 CK and Step 3 and for the

reading and written segments of the Step 2 CS examination.

                              BY THE COURT:


                               S/J. CURTIS JOYNER
                              _____
                              J. CURTIS JOYNER,      J.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
JESSICA RAMSAY              :
                           :  CIVIL ACTION
           Plaintiff        :
     vs.                    :
                           :  NO. 19-CV-2002
NATIONAL BOARD OF MEDICAL   :
EXAMINERS                   :
                           :
           Defendant        :
```

## ORDER

AND NOW, this    3rd    day of February, 2020, upon

consideration of Defendant's Motion to Stay Pending Appeal and

Request for Expedited Ruling (Doc. No. 32), it is hereby ORDERED

that the Motion is DENIED.[1]

BY THE COURT:

s/ J. Curtis Joyner

_____

J. CURTIS JOYNER,        J.

---

[1]   There are four factors which are properly considered in determining whether or not to grant a stay pending appeal: (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) whether the appellant will suffer irreparable injury absent a stay; (3) whether a stay would substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest.  Revel AC, Inc. v. IDEA Boardwalk LLC, 802 F.3d 558, 565 (3d Cir. 2015); Republic of Philippines v. Westinghouse Electric Corp., 949 F.2d 653, 658 (3d Cir. 1991).

In applying these factors to the case at hand, we find that Defendant has not made the requisite strong showing that it is likely to succeed on the merits nor has it shown that it will suffer irreparable injury in the absence of a stay or that a stay is in the interest of the public.  Moreover, we believe that the record in this action, as discussed in the Memorandum Decision which is now on appeal, amply supports the finding that the Plaintiff would suffer substantial harm should a stay be granted.  Indeed, it may even be argued that by now requesting such a stay on appeal of this Court's order entering a preliminary injunction, Defendant is endeavoring to, de facto, effectively overturn the injunction and moot the Court's decision. For these reasons, the Motion to Stay Pending Appeal is denied.

# EXHIBIT 3

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                         -  -  -

 3    JESSICA RAMSAY,           :  CIVIL ACTION NO.
              Plaintiff,        :  2:19-cv-02002
 4                             :
       v.                      :
 5                             :
      NATIONAL BOARD OF MEDICAL :  PRELIMINARY
 6    EXAMINERS,                :  INJUNCTION HEARING
              Defendant.        :  DAY 1
 7    _____

 8
                             James A. Byrne U.S. Courthouse
 9                           601 Market Street
                             Philadelphia, PA 19106
10                           December 3, 2019
                             Commencing at 10:44 a.m.
11    _____

12           BEFORE THE HONORABLE J. CURTIS JOYNER

13    _____

14
      APPEARANCES:
15
              REISMAN CAROLLA GRAN & ZUBA, LLP
16            BY:  LAWRENCE D. BERGER, ESQUIRE
              19 Chestnut Street
17            Haddonfield, New Jersey 08033
              (856) 354-5640
18            larry@rcglawoffices.com
              Representing the Plaintiff
19

20

21                         -  -  -

22           Ann Marie Mitchell, CRR, RDR, RMR
                   Official Court Reporter
23                   (267) 299-7250

24
      Proceedings taken stenographically and prepared utilizing
25    computer-aided transcription
```

```
 1  APPEARANCES CONTINUED:

 2
        STEIN & VARGAS LLP
 3      BY:  MICHAEL STEVEN STEIN, ESQUIRE
        BY:  MARY C. VARGAS, ESQUIRE
 4      10 G Street NE
        Suite 600
 5      Washington, DC 20002
        (202) 248-5092
 6      michael.stein@steinvargas.com
        mary.vargas@steinvargas.com
 7      Representing the Plaintiff

 8

 9
        PERKINS COIE LLP
10      BY:  ROBERT A. BURGOYNE, ESQUIRE
        BY:  CAROLINE M. MEW, ESQUIRE
11      700 - 13th Street, NW
        Suite 600
12      Washington, DC 20005
        (202) 654-6200
13      rburgoyne@perkinscoie.com
        cmew@perkinscoie.com
14      Representing the Defendant

15

16                          -   -   -

17

18

19

20

21

22

23

24

25
```

1              (Court called to order at 10:44 a.m.)

2              THE COURT:  You may be seated.  Good morning.

3              RESPONSE:  Good morning, Your Honor.

4              THE COURT:  All right, Counsel.  Are we ready to

5    proceed in Ramsay v. National Board of Medical Examiners?

6              MR. BURGOYNE:  Yes, Your Honor.

7              MR. BERGER:  Yes, Your Honor.

8              THE COURT:  Very good.

9              Let me hear from you.

10             Obviously I'm familiar with the reasons why we're

11   here, in reference to the injunction hearing today.  And I saw

12   your pleadings, memorandums.

13             So if you want to make a brief opening statement, you

14   can.  If you don't, that's fine.  We can move on.  Your choice.

15             MS. VARGAS:  Just briefly, Your Honor.  My name is

16   Mary Vargas, and this is Larry Berger, and together we

17   represent the plaintiff, Jessica Ramsay, who is with us at

18   counsel table.

19             Jessica Ramsay is an extraordinary young woman.  She's

20   completed three years of medical school successfully.  She's

21   been nominated by her peers for an honors award, an honor

22   society, because of her excellence in care of patients.  And

23   part of what makes Ms. Ramsay so extraordinary is what she's

24   achieved despite a lifetime of struggling with reading and

25   focus.

1          Since Ms. Ramsay was a small child, she's required

2    extra time.  She's received accommodations either formally or

3    informally throughout her life.  But we're here because the

4    National Board of Medical Examiners, which administers the

5    United States Medical Licensing Examination, the USMLE, has

6    refused repeated requests and a wealth of documentation to

7    provide her here the accommodation that is very basic, that is

8    nothing unusual in the world of test administration, and it

9    costs them nothing to provide her at this point.

10          So despite all of her hard work, despite all of the

11    evidence that she's provided, she's now very literally on the

12    precipice of losing her future.  Her ability to be a doctor, to

13    practice medicine, rests on what this Court does.  She must

14    take the USMLE Step 1 by March 2, 2020, or she will be

15    dismissed from medical school and that will be the end of her

16    career.  This isn't like law school where you can transfer.  In

17    medical school it is almost unheard of for a student to go to

18    another medical school.  And it is entirely impossible once

19    you've been dismissed.  You have to be a student in good

20    standing to even begin the process of trying to transfer to

21    another medical school.

22          Every expert that has examined Ms. Ramsay, all of her

23    treating sources, her medical school, their faculty, her

24    college, her teachers when she was younger, everyone has

25    recognized the same thing, that she has difficulty reading,

1  that reading is slow and laborious for her.  She is a brilliant

2  young woman, but she has dyslexia and she has ADHD.

3        So in order for her to read, as you'll hear in her

4  testimony, it's an entirely different process from what you and

5  I might do, and it takes significantly more time.  The question

6  that is before the Court, as I understood from Mr. Burgoyne

7  when we met in August or September in chambers, is a very

8  limited one.  It's a question of whether or not Ms. Ramsay has

9  a disability.  This isn't a question where we look to the DSM.

10  This isn't really even a question where experts ought to be

11  competing with each other.  This is a question of whether she

12  has a substantial impairment that limits a major life activity

13  such as reading.  And the evidence will show that she does.

14        In the face of an extraordinary amount of evidence

15  from multiple sources showing that she needs extra time, the

16  NBME is offering only one thing -- well, really two things.

17  They're offering the testimony of two hired NBME consultants

18  who reviewed papers that Ms. Ramsay submitted.  They did not

19  evaluate Ms. Ramsay.  They haven't even met her before today.

20  And in the context of learning disabilities, the United States

21  Department of Justice has recognized that it is critically

22  important, specifically for learning disabilities, that an

23  individual be examined in person.

24        When the ADA Amendments Act was passed in 2008, the

25  entire purpose of that change in the law was to make it less of

1   a focus on determining narrowly whether somebody has a

2   disability.  There were Supreme Court decisions that very

3   narrowly interpreted that analysis.  The change in the law was

4   intended to avoid the very reason that we're here.  And the

5   NBME participated in that process, objected to the changes in

6   the law, sought to have the regulations not say what they

7   actually say.  And having failed to do that before in the

8   legislative process, they are now trying to do that on Ms.

9   Ramsay's back in this courtroom.

10          We ask the Court to apply the law as it's written, the

11  regulations as they were promulgated.  The United States

12  Department of Justice testing accommodations guidelines and

13  technical assistance as it was drafted, not what the NBME

14  wishes it was and not what they're trying to change it to be in

15  this courtroom.

16          And just to go very quickly through the key points of

17  that law.  First of all, Congress has said that the

18  determination of disability should not require extensive

19  analysis, that the definition of disability is meant to be

20  broadly defined, that whether a person is disabled is

21  determined without regard for any kind of self-mitigation or

22  ameliorative effects of mitigating measures.

23          The Department of Justice has specifically said with

24  respect to testing entities that they should defer to the

25  opinion of qualified professionals who have actually examined

1  the candidate in question.

2          And most notably -- and I'm going to read this part so

3  I don't get it wrong -- a person with a history of academic

4  success may still be a person with a disability who is entitled

5  to testing accommodations under the ADA.  A history of academic

6  success does not mean that a person does not have a disability

7  that requires testing accommodations.  For example, someone

8  with a learning disability may achieve a high level of academic

9  success but may nevertheless be substantially limited in one or

10  more of the major life activities of reading, writing, speaking

11  or learning because of the additional time or effort he or she

12  must spend to read, write, speak or learn.

13          That is Ms. Ramsay.

14          And finally -- well, two things.

15          The Department of Justice has said that reliance on a

16  student's grades, for example, what they got in history in 3rd

17  grade or what they got on a standardized test, reliance on that

18  in determining disability is inconsistent with the

19  Congressional intent in enacting the ADA Amendments Act.  And

20  that's what the NBME is asking this Court to do.

21          Finally, the regulations provide that testing entities

22  have to make accommodations, not to just let the person in the

23  door, but to make sure that the testing is administered in a

24  way so that it best ensures that the candidate or the student

25  is showing what they know and is not showing their disability.

1    And that is critical for Ms. Ramsay.  Having the extended time

2    in a separate room, that with extended break time, that is how

3    she can best show what she knows because of a lifetime of

4    reading disabilities.

5           So in the real world, with the law and the

6    regulations, all of the documentary evidence, all of her

7    history of accommodations, she has demonstrated that she needs

8    the accommodations that she's requested.  And applying the law

9    as it actually is mandates a conclusion that she needs those

10   accommodations.  There is an extraordinary likelihood of

11   success on the merits in this case.

12          The public interest must support an accomplished young

13   woman who has fought tooth and nail to achieve despite

14   disabilities.  They must support her.  And in this case there

15   is no cost to the NBME because they've already agreed that she

16   can have the test over two days.  So doing the test with

17   extended time, it's still a two-day test.  It doesn't require

18   any additional testing beyond that.  There is no cost.

19          And most importantly, it allows us to have a young

20   woman who has worked incredibly hard for what she's

21   accomplished to become a doctor.  And that's the kind of doctor

22   that I want, and that's certainly the kind of doctor that the

23   public interest wants to be supporting.

24          Thank you.

25          THE COURT:  Very well.  Yes, Counsel.

1          MR. BURGOYNE:  Thank you, Your Honor.  Robert Burgoyne

2     for the National Board of Medical Examiners.  And with me today

3     is my colleague, Caroline Mew.

4          We're here today, Your Honor, as you know, on a motion

5     for a preliminary injunction which the Supreme Court has

6     described as a drastic and extreme remedy.

7          The burden on Ms. Ramsay in this case is to establish

8     that all four preliminary injunction factors support her

9     request for relief, and it's a burden that's even higher

10    because she's seeking a mandatory preliminary injunction.

11    She's asking the Court to give her the relief that she's

12    otherwise entitled to only if she prevails on the merits at the

13    end of the case.

14         It's a burden she can't meet on this case.  The first

15    factor, likelihood of success on the merits.  We don't disagree

16    that Ms. Ramsay is an extraordinary young woman from everything

17    we've seen.  We don't disagree that she's worked hard in

18    medical school.  Most students do.  Where we do disagree is

19    whether she meets the ADA standard for being disabled, because

20    she's only entitled to accommodations on the NBME licensing

21    exams if she's substantially limited in a major life activity

22    relevant to taking the exam as compared to most people in the

23    general population, not compared to her medical school peers,

24    not compared to other individuals with high school or college

25    educations, compared to the general population.

1          That's a burden she can't meet in light of the real

2    world evidence that is in the record and the Court will hear

3    today.

4          Ms. Vargas referred to the real world.  What the real

5    world objective evidence has shown is that Ms. Ramsay was not

6    diagnosed with dyslexia until 2018.  We'll hear from the expert

7    who was the first expert to identify her as having dyslexia.

8          She was first identified with having ADHD in 2009 when

9    she went in to see her primary care physician, met with him for

10   half an hour, was diagnosed with ADHD and put on Ritalin and

11   then obtained accommodations starting at the end of her

12   sophomore year in college.  Prior to that point, no one had

13   ever diagnosed her formally with ADHD or dyslexia.  She had

14   never received accommodations in her high school years or

15   college years up until the end of her sophomore year in

16   college.

17         And notwithstanding that fact, she was an excellent

18   student, receiving mostly As, occasionally Bs, National Honor

19   Society, participated in varsity sports, took many standardized

20   tests that regrettably we will painfully walk through in which

21   she performed not just average but at the upper echelon.  She

22   did extremely well on other standardized tests, including the

23   ACT College Admission Test, which she took twice and on the

24   second time scored in the 95th percentile, and then also on the

25   Medical College Admission Test in which her overall score was

1  in the 79th percentile, an exam taken by a very accomplished

2  population and an exam as to which one has to have strong

3  reading and comprehension.

4       We also believe that Ms. Ramsay won't be able to

5  established irreparable harm, the other key factor for a

6  preliminary injunction.  In order to be irreparably harmed, she

7  has to show that she will suffer immediate and certain

8  irreparable harm.  The harm at issue here is a delay in her

9  medical education, the core irreparable harm.  Her medical

10 school has said she has the option.  If she doesn't, she has to

11 take the Step 1 exam prior to March 2, 2020.  Or she could

12 withdraw and then reapply to the school.  Or she could simply

13 test in the meantime with the accommodations that NBME has

14 approved for her.  So she's not going to be able to establish a

15 clear and certain likelihood of immediate irreparable harm.

16       There was a fair amount of reference to the Department

17 of Justice's guidance.  The Department of Justice itself has

18 said that any guidance we issue has no legal impact beyond the

19 statute or the regulations, which is to say that if there are

20 obligations found in technical guidance documents, the DOJ

21 won't enforce those obligations if they don't trace back to the

22 actual statutory language or the regulatory language.  There's

23 nothing in the ADA that requires the National Board of Medical

24 Examiners to defer to an examinee's treating professional.

25 There's nothing in the DOJ guidance that prohibits the NBME

1  from getting input from external experts.  In fact, that's a
2  good thing.  NBME doesn't make these decisions on their own.
3  They go to external professionals with expertise in the area of
4  the impairment and get input before they make their decisions,
5  and they did that in this case.
6       There's nothing in the ADA Amendments Act that changed
7  the ultimate legal standard, which is to say is someone
8  substantially limited as compared to most people in the general
9  population.  There's no question it made the enforcement of the
10  statute broader and that that's what Congress anticipated, but
11  it didn't alter the standard in a way that impacts the outcome
12  of this case.
13       In many respects, this case is very much like a 2016
14  case decided by Judge Dalzell by the name of Bibber v. National
15  Board of Osteopathic Medical Examiners.  A similar case,
16  plaintiff diagnosed with dyslexia, a longer history of
17  diagnosis, ultimately came time to take her licensing exam,
18  similar to the NBME licensing exam, and the Court ultimately
19  held that as compared to most people in the general population,
20  she wasn't disabled and therefore wasn't entitled to
21  accommodations, which again consisted primarily of extended
22  testing time.  That was a case decided after the ADA Amendments
23  Act.  And in deciding the case, Judge Dalzell looked to the
24  plaintiff's history of academic performance on real world
25  objective measures.

1          So for all these reasons, Your Honor, we encourage you

2     and ask the Court to deny the request for a preliminary

3     injunction.

4          THE COURT:  Very good.

5          Let us proceed.  Call your first witness.

6          MS. VARGAS:  Your Honor, if I may ask, does the Court

7     have a preference where counsel stands or sits.

8          THE COURT:  I don't just as long as the court reporter

9     is able to hear you clearly and loudly and take down any

10    testimony.

11         MS. VARGAS:  Thank you.

12         THE COURT:  So you can stay there.  It doesn't matter.

13         MS. VARGAS:  Thank you, Your Honor.

14         Then plaintiff calls Jessica Ramsay.

15         THE COURT:  Ms. Ramsay, please come up here and watch

16    your step coming around the witness box.  It has a slight

17    incline.

18         THE WITNESS:  Can I bring the water?

19         THE COURT:  Sure.

20         JESSICA RAMSAY, after having been duly sworn, was

21    examined and testified as follows:

22         COURT REPORTER:  Please state your name for the

23    record.

24         THE WITNESS:  Jessica Ramsay.

25         THE COURT:  You may proceed, Counsel.

1                    DIRECT EXAMINATION

2  BY MS. VARGAS:

3  Q.   Good morning, Ms. Ramsay.  What is your current

4  occupation?

5  A.   I am a medical student currently on leave of absence.

6            THE COURT:  Ma'am, you can bend that mic right

7  straight to you and speak directly into it.  All right?

8            THE WITNESS:  Is this good?

9            THE COURT:  Keep your voice up loud and clear so if

10  you have to, you can shout.

11            THE WITNESS:  Okay.

12            THE COURT:  All right?

13            THE WITNESS:  Yes.

14  BY MS. VARGAS:

15  Q.   Ms. Ramsay, why did you want to go to medical school?

16  A.   I think that the desire has evolved over time.  I think --

17  I've always really enjoyed learning about the body and how it

18  works and what happens when it doesn't work and how to fix

19  that.  And then growing up with my brothers who are autistic

20  and have a lot of other special needs, and having other

21  siblings that are foster siblings in my life, the desire to

22  learn more about that kind of built over time.  And

23  particularly, I became interested in the genetics of it and how

24  that worked.  And so I decided I wanted to study genetics in

25  college and picked schools that had a genetics program for

1    undergrad.

2         And then while I was there, I really kind of --

3         THE COURT:  Go ahead.  I don't want to stop you, but

4    it's still kind of very light.

5         THE WITNESS:  I'm sorry.

6         THE COURT:  It's okay.

7         COURT REPORTER:  The microphone doesn't seem to be on.

8         THE COURT:  You'll have to excuse me today.  My clerk

9    is out.

10        And they were in here fixing or adjusting things

11   earlier.  Let's see.

12        THE COURT:  Tap that mic, would you, please.  It's not

13   on.

14   BY MS. VARGAS:

15   Q.   We'll continue.  And if you can just speak as loud as you

16   can, we'll try to make this work.

17   A.   Okay.

18   Q.   So you were testifying about why you decided to go to

19   medical school.

20   A.   Yeah.

21   Q.   Had you finished answering that question or was there

22   more?

23   A.   I think I was still talking.

24        Do you know what the last thing I said was?

25        I think I was still talking.  Do you know what the last

1  thing I said was?

2  Q.   Well, let me ask you this:  Is there a certain area of

3  medicine that interests you?

4  A.   I really want to go into pediatrics.  It's something I'm

5  really passionate about.

6  Q.   Why pediatrics?

7  A.   Because I've always loved working with kids, so I was

8  drawn to that.  And in my clinical rotations in my third year,

9  I liked learning everything.

10       But the difference was -- what sort of solidified this for

11  me was when I was on my pediatrics rotation, I -- no matter

12  what kind of day I was having in the morning, when I would go

13  in, and whether I was in the hospital or in the clinic, and

14  then come home, I was always having, like, a better day.  I was

15  always happier coming home than when I went in.  And that to me

16  just like screamed that that's what I was supposed to be doing.

17  And that's what I wanted to do with my life, and that's what

18  I'm going to do with my life, so...

19  Q.   So you testified a few minutes ago that you're on leave

20  from medical school.

21       What happened?

22  A.   Yeah.  Well, first, I applied for accommodations for the

23  Step 1 exam, and I didn't receive them.  And I discussed with

24  my school what my best option would be and was advised to go

25  ahead and try to take Step 1 without the accommodations to see

1  if I could stay on track with my class and graduate on time.

2  And I -- so I attempted it without the accommodations that I

3  needed, and I failed.

4      And then I was currently in a fourth year rotation when I

5  found out that I failed, and so I was allowed to finish that

6  rotation, but then the school had me drop everything after that

7  until I was able to receive accommodations and take the Step

8  again.  And in the process, I was -- the school had me go on

9  leave of absence.  And I've had to extend the leave of absence

10 and this process.  And I'm still on leave.

11 Q.   So did you receive accommodations in medical school?

12 A.   Yes.

13 Q.   What accommodations did you receive?

14 A.   Mostly double time on tests and a separate room to take

15 them in.  And for the tests that were written by my school, as

16 opposed to like the NBME, I had those tests on paper instead of

17 on the computer so that I could use like my markers and

18 highlighters and stuff to like help me read and annotate as I

19 go.

20          THE COURT:  Excuse us for a moment.

21          (A discussion off the record occurred.)

22          THE WITNESS:  And I also had a water bottle and my

23 meds and like a granola bar in the room, but out of sight, so

24 that if the test were -- when I needed to take a medication,

25 then I was able to do that quickly and not distract for too

1   long from the test.

2          And I also had -- for the clinical exams that we had

3   with standardized patients, which are called OSCEs, which is

4   O-S-C-E, I think.  And for that I had -- initially I started

5   with time-and-a-half for the note writing portion, but I wasn't

6   able to write all that I had done in the encounter in the note

7   in that time.  And I was still struggling to read the prompt

8   for the encounter going in.  So my school -- I had requested

9   from my school the double time like I had been receiving on my

10  other exams and for the note writing portion.  And a few extra

11  minutes at the beginning to make sure I was able to read the

12  prompt and the instructions before going into the room.  And

13  they granted that.  So I had that for the -- all of -- I

14  believe all of the third-year OSCEs.

15  BY MS. VARGAS:

16  Q.   Did you have any other accommodations in medical school?

17  A.   Yeah.  When -- at the beginning of the year, I was really

18  struggling -- beginning of the first year, sorry, I was really

19  struggling to like keep up with reading and really get to most

20  of the reading.  And my school ended up providing the Kurzweil

21  software, which is it reads like PDFs and stuff to me.  And it

22  highlights the words as it reads them so I can follow along.

23  So they provided that software, which I use for most reading

24  that's longer than like a line.

25  Q.   So what kind of reading did you use the Kurzweil speech

1   reading software for?

2   A.   Pretty much anything that I had to read, whether it was

3   like assigned reading from textbooks or maybe research articles

4   or even if I had to look something up online and it was like a

5   couple paragraphs, sometimes emails, if they're long.  Pretty

6   much everything.

7   Q.   You mentioned that you take medication.

8        What kind of medication do you take?

9   A.   I take a few.  I have Vyvanse, which is like Adderall but

10  it's longer acting.

11  Q.   So what is the Adderall for?

12  A.   My ADHD.

13  Q.   Okay.

14  A.   And it helps me like focus throughout the day.  And if I

15  do get distracted, it helps me kind of realize that and bring

16  myself back to what I was supposed to be focusing on.  And like

17  if I need to read, which takes a lot of mental effort, it helps

18  me to focus on what I need to do to read.  And then it helps me

19  to sit still and not be too fidgety throughout the day.

20  Q.   What other medications do you take?

21  A.   I take Buspar, which is in the morning and in the evening.

22  And that's for anxiety that started like after I was denied

23  accommodations the first time.  And then metoprolol, which I

24  take in the evening, which is for migraine prevention, like

25  prophylaxis.  And then I take an aspirin every other day for a

1  blood thinner.

2  Q.    Why do you take aspirin, blood thinners?

3  A.    Because I had a DVT when I was in my -- the end of my

4  second year of med school and later found out I had a clotting

5  disorder.  And I was on Xarelto, which was another blood

6  thinner, for two years.  And when I was taken off of that, I

7  was advised to take aspirin to kind of maintain a blood

8  thinner.

9  Q.    You testified a moment ago that you used the Kurzweil to

10  read to you your medical school work.

11      Was there reading that you did yourself?

12  A.    Can you clarify what you mean by that?

13  Q.    Where you weren't able to use the speech reading

14  software --

15  A.    Uh-huh.

16  Q.    -- how do you read?

17  A.    You mean like if it's in a book?

18  Q.    Yeah.

19  A.    I -- it's like a long process.  I have to decode

20  everything and take each word one at a time and figure out what

21  the word is and what it means and then build that up into like

22  the sentence and try to figure out what the sentence means, and

23  then build that up with like each sentence and figure out what

24  the paragraph means.  And hopefully by that time I still

25  remember what it all meant.  And then I can put it together and

1    process it.  And generally when I do that, I need to like write

2    on the text itself.  And I use a lot of colors, which have

3    specific meanings to me, and I draw pictures and I -- like

4    pretty much it looks like a mess to other people, but it all

5    has meaning to me.  But that's how I decipher what's on the

6    page and make it -- translate it into something that I can

7    understand.

8    Q.  Can you explain what you mean by using colors?

9    A.  Yeah.  I have a lot of like markers and highlighters and

10   stuff that I use, and I have them, but they -- I don't know.

11   It's a system, and I have different colors for different

12   meanings.  And as I read, I -- it would be hard to describe

13   without showing, but...

14   Q.  You have your markers with you?

15   A.  Yeah.

16        MS. VARGAS:  Your Honor, would it be okay to let the

17   witness explain using her markers?

18        THE COURT:  Sure.  We'll allow it.

19        Just out of some curiosity, were you precluded from

20   using these markers in that earlier test that you say you

21   failed?

22        THE WITNESS:  What is precluded?

23        THE COURT:  Pardon?

24        THE WITNESS:  What does precluded mean?

25        THE COURT:  Not allowed.

1          THE WITNESS:  No, I was not allowed to.

2          THE COURT:  You were not allowed to do that?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  Very well.

5          THE WITNESS:  Do you want me to get them?

6          MS. VARGAS:  Yes, please, if that's all right?

7          THE COURT:  Sure.

8          THE WITNESS:  Thank you.

9          I'll try to hold them up so you can see.

10   BY MS. VARGAS:

11   Q.   What are these?

12   A.   These are my markers and pens and pencils and -- sorry.

13   And I pretty much always have them with me because if I have to

14   read, it helps.

15   Q.   How do you use them?

16   A.   Let me get them out.

17        Okay.  I'll hold them up so you can see.

18        So I have colored pencils, because I hate writing with pen

19   because it's permanent and I make a ton of mistakes, so I also

20   always have erasers.  But I have a color system.  And each

21   color means something.

22        So red is like diseases or disorders or typically down

23   arrows, because I can't distinguish arrows just looking at

24   them, or like distinguish the direction.  And so making it a

25   color when I'm looking at it once I've figured out what it is

1  helps me to see it when I'm looking at it with the rest of the

2  text.

3       So the opposite then is green, which is up arrows and

4  pretty much any like treatment or management of a disease, so

5  like drug names or if a specific therapy is recommended, like

6  physical therapy.

7       And then blue -- sorry, that's not blue but this is blue.

8       Okay.  So blue is like diagnostic tests like labs or chest

9  x-rays or biopsies and the findings that you would find on

10 those.

11      And light blue is like physical findings like on a

12 physical exam or symptoms like shortness of breath or like if

13 you have a rash and what the rash looks like.

14      And then orange is like chemicals or like mechanisms of

15 actions, mechanism of actions for drugs or like how they work

16 or like a disease process, like if there's a specific enzyme

17 that's not functioning or something, that's orange.

18      And then purple is -- oh, sorry.  Purple is like

19 histology, which is like what cells look like under a

20 microscope.  And then it's like if there's a specific cell line

21 that's they're talking about, like skin cells or something,

22 then that's histology, and so that's purple.

23      And then, sorry, this teal color is genetics.  And so

24 anything that has to do with genes, so like a gene that's

25 mutated or like mode of inheritance or like just -- I guess a

 1  gene that's not functioning or the gene that's mutated that --

 2  I will use that color.

 3      And then yellow is for like risk factors or like if a

 4  disease is particular to like women over men or in children

 5  versus adults or smokers versus nonsmokers, things that really

 6  stick out or is like a key finding or things that are like

 7  super important or like specific to that disease, then that's

 8  yellow because that stands out.

 9      Gray is protozoa.

10      This yellow is also -- specifically this one, not any

11  other yellow, is fungi or yeast.

12      Brown is bacteria.  And again, specifically this brown.

13      And this one is like a tan -- orangish-tan.  And that one

14  is viruses.

15      And I think pink is negative symptoms, so like things that

16  are like an infection or like if you have hemorrhaging or

17  something that is a side effect of something else but it has a

18  negative effect on the person and that's not just something

19  benign like headache or swelling or something, then that would

20  be pink.

21      And then I always carry Wite-Out because I -- when I write

22  in pen or in marker and make the mistakes that I do, I need to

23  fix them a lot, and so I have Wite-Out.

24      And I always -- or pretty much always have these with me

25  to read.

1  Q.   Is this something -- have you seen other medical students

2  do this?

3  A.   No.

4  Q.   Why do you do this?

5  A.   Because I need to.  Otherwise, the -- it doesn't -- the

6  reading that I have to do doesn't really make sense to me

7  without being able to use a system to give it meaning.

8  Q.   So after you put these colors on it, how does that help

9  you?

10 A.   So it's kind of like when you're learning another language

11 and you have to translate what the words mean and you probably

12 write it out or do whatever notes you would do to remember what

13 you're learning, I have to do that with pictures and colors.

14 And I have to translate whatever the chunk of text is on the

15 page to something that I can see and recognize and know what it

16 means.

17      And so if you ask me, you know, what is the name of this

18 enzyme and you just hand me a page and I don't -- I can't -- I

19 couldn't find it if I tried, if my life depended on it.  But if

20 it -- unless it was already like visually standing out, and

21 then I might see it.

22      And for me, if you just hand me a chunk of text, nothing

23 stands out.  So I have to go through piece by piece and give

24 each word or each important word, so something like not "the,"

25 give it meaning.  And then I can look at it and know where that

1  thing is and what it means, so if someone is like what is this

2  enzyme and I see the orange on the page, there's the enzyme and

3  I can tell you what that is.  Or if they say what diagnostic

4  test was used, then I can see where it's blue.  And I can say

5  they used a chest x-ray and these were the findings.

6  Q.  When did you first start using this system?

7  A.  This one specifically, med school.  But I developed using

8  colors over time.  And I think I've pretty much almost always,

9  from what I can remember, in school used colors to mean -- to

10 mean something for whatever I was studying.

11 Q.  So talking about school, what was elementary school like

12 for you?

13 A.  Well, I've always really liked learning.  I like to learn

14 things and to problem solve.  But the -- reading in

15 particularly has always been hard.  Spelling has been very much

16 not my best subject.  And writing has been extremely difficult

17 for me, because in order to write, you also have to read and

18 spell what you're writing.  And I've always struggled with

19 that.

20      And so, you know, as you're learning that when you grow

21 up, it's like you want to do well, because I liked learning, I

22 wanted to impress my teachers, do well in school, impress my

23 parents, and also just for my own knowledge, but it was really

24 difficult.  And I struggled.  And so it was embarrassing.

25 Q.  Did anyone else know that you struggled in school?

 1   A.   Sorry.  Can I get some Kleenex?

 2        THE COURT:  There's some tissues right behind you.

 3        THE WITNESS:  Can you repeat the question, please?

 4   BY MS. VARGAS:

 5   Q.   Did anyone else know that you struggled in school?

 6   A.   Yeah.  My teachers helped me a lot, and I think they did

 7   that because they recognized that I was having a lot of

 8   difficulty with like learning to read and with switching my

 9   letters around.  And so they tried to help me because they knew

10   that I wanted to do it right and I wanted to learn.  And so

11   they took the time to make sure that I could, like, do the best

12   I can to learn it.

13   Q.   What kind of things did your teachers do to help you?

14   A.   First, they spent a lot of extra time with me, but they

15   would -- specifically like I remember my first grade teacher

16   would put me like at the time-out desk, which was also really

17   embarrassing, because no one wants to be at the time-out desk.

18   But it would separate me from my class.  And she would do that

19   for like assignments or tests or quizzes, especially like

20   reading or -- like reading, class reading or like writing

21   assignments or spelling tests.  And she would do that so I

22   wasn't distracted by everyone else and so that I would try to

23   focus on my work.

24        And then because I really struggled with like the

25   reversals, switching my letters around and like writing the

1    wrong letter because it looked like another letter or writing

2    it backwards, they gave me an alphabet chart so that I could

3    make sure that the letter I was writing was the same as the

4    letter that I wanted to be writing.

5         So I would have to like -- say if I was trying to spell

6    boat, I would know that, okay, the sound is B, so I would have

7    to go AB and then figure out, okay, that's a B.  I need to

8    write that one.

9         It would like -- if I had a spelling test, they would

10   reread -- after they read the words for everybody, they would

11   come over to just my desk and read them for me and give me the

12   time between each one to figure out what I wanted to put down.

13   And then reread the word and read it slowly and spend that

14   extra time doing that for me.

15        And like a lot of times if I wasn't getting something,

16   they would keep me in at recess and work with me over recess.

17        And -- or if I couldn't finish an assignment, they would

18   have me finish it over recess because I didn't have enough time

19   during class.

20   Q.   Did anyone ever raise concern in elementary school about

21   your reading?

22   A.   Yeah.  I mean, I don't know exactly how many, but I know

23   my first grade teacher, the one who started giving me the

24   alphabet chart and putting me at the time-out desk, I know that

25   she told my mom that I was having trouble with reversing

1  letters and I was a slow reader and recommended that I get that

2  checked out.  And so I was referred to Dr. Tanguay, who was the

3  optometrist or ophthalmologist.  I'm not sure what her title

4  is.

5  Q.   What did you do with Dr. Tanguay?

6  A.   She gave me some tests, like I think it's called visual

7  perception testing.  And it had like these pictures, like where

8  one -- the column on the left was like a reference.  And then I

9  would have to find which one looked -- which one was the same.

10 And I had to do that over and over for all these different

11 pictures.

12      And then she said something, I did have a problem with

13 something.  And -- with like discriminating between shapes, I

14 think.  And then she recommended that I have like more therapy

15 with her for that.  And so we did that for a while.  Like a

16 couple years, I think.

17 Q.   Did she recommend any other treatment?

18 A.   She gave glasses, but they didn't help, so I didn't really

19 wear them like after I realized they didn't really help.

20      And then like since then, I've gotten my vision testing.

21 And I have like 20/13 vision, so it's fine.

22 Q.   Did you receive extra time on tests in elementary school?

23 A.   Yeah.  I definitely pretty much was always given the time

24 I needed to complete tests or assignments.

25      I think, again, especially because my teachers knew that I

1  wanted to do it and I was working really hard to do it, I

2  wasn't just slacking off or goofing off or, you know, causing

3  trouble, that they saw that I wanted to do it and I wanted to

4  do it right, and so they gave me the time that I needed to work

5  through it and do it.  And so, I mean, as early as we started

6  having assignments is when I started being given like extra

7  time to do those things.

8  Q.   How were your grades in elementary school?

9  A.   I mean, I don't remember specifically, but I know that

10 they were As and Bs.

11 Q.   And did you have any kind of formal IEP or 504 plan?

12 A.   No, not that I'm aware of.

13 Q.   And how did you do -- as elementary school went on, how

14 did you do in fourth, fifth grade?

15 A.   Well, fourth grade specifically was like a really hard

16 year for me because we had to do a lot more writing.  Instead

17 of just writing maybe like a paragraph on a page, we were

18 supposed to write papers with like the intro and the body

19 paragraphs and the conclusion.  And we had to write a lot of

20 them.  And we were supposed to like proofread our own stuff and

21 have multiple drafts.

22      And this was all new, and it was a lot.  And I was still

23 struggling just to write and read in general, and so that added

24 a lot of -- added like stress and hard work for me.  And I --

25 my teacher was also really strict.  And she was the language

1  arts teacher in that grade.  And we had multiple teachers, like

2  for each class.

3      And so my I guess homeroom teacher was the language arts

4  teacher, and she was really strict and expected a lot from us.

5      And I would always be turning stuff in late or forgetting

6  assignments or forgetting to bring it home, even if I

7  remembered that I had the assignment, like when I got home.

8  And so she would get mad at me in class.  Or if I was talking

9  and not paying attention, she would kind of be like Jessie, get

10  back to work.  And it would stress me out because I didn't want

11  to be disrespectful and I didn't want to be getting in trouble.

12  So I would frequently come home in tears, upset and telling my

13  mom like, this is so hard, like I need help.

14      And I know my mom went in and talked to her a lot.  And

15  she ended up working with me a lot to get better and tried to

16  help me set up ways to remind myself to do things.  Or she

17  would remind me or have my mom remind me.  Or she would help me

18  to make it so that I could be successful, even though I was

19  still struggling with all of these things.

20  Q.   What kind of things did your mother do to help you?

21  A.   Everything.  My mom, like, spent hours working with me on

22  everything, from which direction letters are supposed to face

23  to spelling to writing.  She would edit everything that I

24  wrote, spellcheck it, proofread it, make sure punctuation was

25  where it was supposed to be.  If I needed help with math,

1  because they assigned like story problems which were hard for

2  me because I couldn't figure out what the question was asking,

3  but I could do the math, she would read the question to me and

4  help me figure out what it was asking so that I could actually

5  do my homework.

6       And my dad would do that too.  And they would make me

7  write my spelling words over and over, like ten times every

8  night.  Like if they were assigned at the beginning of the week

9  and my test was Friday, every night they would sit there and

10  just have me do it again.  And they would do like mock spelling

11  tests.  And then if I got something wrong, they would do it

12  again.

13       Yeah.  And like a lot of times, I guess it's probably

14  started either late elementary or early middle school.  But I

15  would end up having to pull like all-nighters or be up late

16  working on papers or reading because I couldn't finish it in

17  like a reasonable amount of time.

18       And so my mom would -- like if it was reading, she would

19  let me do as much as I could, and then she would read the rest

20  to me out loud or like talk me through it and help me process

21  what I was reading.

22       When I was struggling with writing papers, she would help

23  me like organize my thoughts and put my thoughts in words so

24  that it made sense on paper.

25       Yeah.  She did like a lot for me.

RAMSAY - DIRECT                                              33

1  Q.   When you were in fifth grade, did you have any kind of

2  special testing?

3  A.   Are you referring to the ACE program?

4  Q.   What is the ACE program?

5  A.   I forget what it stands for, and I think in the deposition

6  Mr. Burgoyne said it was something creative.  I don't remember

7  what the A and E stood for.

8  Q.   What was the test for?

9  A.   For math.  I had to -- when I was in Texas, I was in the

10  ACE program for math, which was -- I thought was an accelerated

11  math, but I wouldn't be able to tell.  I don't know the

12  curriculum from regular math.

13      So when we moved to Michigan in the middle of fifth grade,

14  they didn't accept that to start their accelerated math

15  program, and so they had me take a test with anybody else who

16  wanted to start that in sixth grade.

17      And was your question, what was the test?

18  Q.   Yeah.  So how did you do on that test?

19  A.   Well, it was a test -- I think it was 60 questions, and I

20  don't know how long they gave us, but --

21  Q.   Did they give you extra time on that test?

22  A.   No.

23  Q.   So what happened?

24  A.   So we were supposed to complete 30 -- or get 30 right in

25  order to be able to go into their math program in sixth grade.

1  And I ran out of time on the test, but I got through 29 of the

2  questions.  And I was really confident that I knew what I was

3  doing and I knew the answers.  And I had started the 30th one

4  when the time ran out, so I was really upset because I knew

5  that was what was needed to be able to go forward.  And so when

6  I got home that day, I was upset and I told my mom.  And she

7  went in and met with the principal to see if I could, like,

8  finish that question or if they could give partial credit and

9  see if the work for that one was right, like if they graded the

10  first 29 and I got those right, if they could grade the work

11  for the 30th.  And it turned out that I did get the 29 right,

12  so they did grade the work that I had and said that it was on

13  the right track to get the right answer, and so they let me

14  into the program.

15  Q.  How did your workload -- say, when you got into high

16  school, how did your workload compare to your peers, your

17  friends?

18  A.  I don't know specifically, because we never really talked

19  about like how long we were spending each night, but I know

20  that my friends were like hanging out and doing other things,

21  and I really didn't get the chance to during the school year.

22  I was pretty much only able to hang out with people during the

23  summer and maybe once or twice on weekends.  But they were all

24  hanging out, and they were frustrated with me because I was

25  never able to hang out.  Ad I was always doing homework.  I did

 1  play sports, but I wasn't like -- you know, once I got home

 2  from the sport I was always doing homework.  And I was up until

 3  like 3:00 in the morning usually with my mom sitting there at

 4  the kitchen table, like helping me or making me focus.  And

 5  then I would get up and do it again.

 6      And so I didn't have the time that they did.  And I know

 7  they were always frustrated with me for that.  And I just

 8  didn't understand how they had so much time when I, like, was

 9  always doing homework.

10  Q.  And then you went to college.

11      What happened when you went to college?

12  A.  There was a lot more reading.  And couldn't really, like,

13  manage it.  I didn't have enough time in the day to keep up

14  with the reading and, like, organizing everything and keeping

15  track of everything.  And I was making a lot of mistakes.  And

16  so I pretty much felt like I was drowning, like I was trying so

17  hard to swim but I like couldn't keep up with everything.

18      And then I was -- I don't know.  I was really frustrated.

19  So I was talking to my teachers about like what could I do to

20  be better, did they have any suggestions.

21      And I remember like my Spanish teacher was the first one

22  who said something, but -- and I had been really good at

23  Spanish in high school because I had pretty much been taking

24  Spanish lessons since I was little, like 3.  And I lived in

25  Texas and it's spoken there a lot.  And so I was around it a

1  lot.  And I had gotten really good at it through high school.

2  And college, the Spanish class, there was like an oral

3  component.  So we had to like take an oral test where we would

4  speak conversationally with the professor and then there was

5  the written part.  And I would do really great on the oral part

6  and she knew I knew my stuff, but then I would always get

7  marked off for like stupid things like writing the letters in

8  the wrong order or spelling it wrong or, like, not putting the

9  words in the right order and -- on the written test.

10       And I was so frustrated because I knew the stuff.  And so

11  I asked her, like, what else can I do, do you recommend

12  anything?  And she was like, no, I can't -- I can't do anything

13  for you.  And I was like, can you -- I mean, you know that I

14  know this, can you not grade the spelling if I'm close.  And

15  she said, I can't do that unless you have like a diagnosis or

16  something.  And you would have to go to ODS to do that.

17  Q.   What is ODS?

18  A.   Office of Disability Services.

19       And I kind of thought of that, but I didn't necessarily do

20  anything about it.  I was still just frustrated, but it made me

21  not enjoy Spanish anymore, which is sad.

22       So then the second teacher that kind of, like, said

23  something was my organic chemistry professor.  And he knew me

24  really well.  And this was in I think -- maybe later, the last

25  chemistry.

1      And I was working really hard.  And I liked organic
2  chemistry because it was visual and it wasn't like a lot of
3  like reading and writing, it was like putting things together
4  like molecules together and figuring out like how they would
5  fit together, which was easy for me.  But the tests were really
6  long, and I wouldn't -- I would get like halfway through the
7  tests or partway through the tests and I wouldn't even get to
8  the other questions.  And I thought I was maybe just struggling
9  to understand the material or process it or something.  And so
10  I asked my teacher, like, what -- do I need a tutor or
11  something, like what can I do to be better and do this better.
12      And he looked at my test, and he flipped through it and
13  said, well, a tutor is not going to help you because you know
14  all of this.  Everything in here is right, but the second half
15  of this is blank, like you didn't even get there, so I think
16  you just need more time.  And I think you should go and talk to
17  ODS.
18      And I really liked this teacher and I trusted him.  And so
19  when he said that, I -- since it was the second time I had been
20  told this, I thought maybe I need to.  And so I went into set
21  up an appointment with ODS.  And they assigned me an advisor.
22  And she talked to me about like what my struggles were.  And
23  she said she thought I needed to be evaluated and that they
24  would give me temporary accommodations while that was
25  happening.

1  Q.   So did you have that evaluation?

2  A.   I went in to see my primary care provider, who at the time

3  was Dr. Smiy.

4       And I told him about like my struggles and that I was

5  concerned with actually dyslexia, because I was switching my

6  letters around still and I was having such a hard time with

7  like reading and pretty much all the struggles I've had this

8  whole time.  But that for some reason now it was so much harder

9  to, like, fix it before it was noticed by someone else.  And I

10 saw I was missing a lot of points on tests and stuff.

11      And he started asking me other questions and ended up

12 diagnosing me with ADD at the time, which is ADHD now.  And he

13 said, you probably are dyslexic, but I can't diagnose that

14 myself.  You would need testing.  I can't do the testing

15 because that's really expensive and it takes a long time, and I

16 know that you need to like -- we need to do something about

17 this now.  And what I can do is try to treat the ADHD

18 medically.  And having the improved focus may help you a little

19 bit with the reading and improve your focus and -- on what you

20 need to do to read.

21      And so he trialed me on Ritalin.  And then over time we

22 switched that to Adderall, but we like adjusted the dose to

23 maximize the -- how much it helped.

24      And he said that, you know, the accommodations that would

25 be needed for dyslexia are probably the same accommodations

1  that you'll get for ADHD or ADD.  And so, you know, I don't

2  think that you need the testing because that should be adequate

3  for what you need.  And if it's not, just come back to me and

4  I'll refer you for testing.

5  Q.  So what did you do next?

6  A.  Well, the ODS had him fill out a form, and then they

7  evaluated the form.  And also when they met with me and they --

8  and looked at some of the tests, I think that I maybe brought

9  in to show them what mistakes I was making.  And then they gave

10  me the additional time and tests in a separate room, and they

11  let me have tests on paper instead of on the computer.  And

12  they let me use like markers and stuff.  I think I got priority

13  scheduling.  And I had access to the ODS counselor.

14  Q.  How much extra time did they give you?

15  A.  Time-and-a-half.

16  Q.  And then what did you do after college?

17  A.  I applied for medical school and didn't get in the first

18  time.  So then I tried to do some things to like build up my

19  resume, my application.  And I was still interested in autism,

20  so I did some research, genetic research in autism.  First I

21  was a volunteer, but then I ended up getting paid for it later

22  on, towards the end.  And then I always worked at a bar in town

23  because I wasn't getting paid for most of the time.  And then I

24  danced with a local modern dance company.  And then I reapplied

25  for med school.

1  Q.    Did you take the MCAT?

2  A.    Yes.

3  Q.    Did you have accommodations for the MCAT?

4  A.    No.

5  Q.    Why not?

6  A.    By the time that I was diagnosed, it was right before my

7  test was scheduled, my MCAT was scheduled.  And I didn't know

8  that they even offered accommodations until someone said

9  something to me about it.  And I sent an email to -- I looked

10  it up once I heard that it was a thing.  And I -- it said that

11  there were these requirements for documentation that you had to

12  submit in order to request accommodation.  And one of them was

13  an evaluation by a -- like a licensed evaluator or something.

14  And I wasn't sure if Dr. Smiy's evaluation counted, so I

15  emailed them to ask.  And they responded kind of generically,

16  like please see our guidelines, and they didn't really offer

17  any advice as to whether or not his evaluation would be

18  adequate.

19      And so then I met with my ODS advisor to see if she

20  thought that it was adequate.  And she said, in our experience,

21  no, that's not going to be adequate.  They want to see like a

22  neuropsych evaluation, which your primary care doctor didn't

23  refer you to do.

24      And she also recommended that I not apply for

25  accommodations, because at that time they were flagged.  So

1  like if I -- when I got my score report or when the schools

2  that I applied to received my score report, it would say that I

3  received accommodations and that it would probably, like,

4  negatively impact my application regardless of how I did on the

5  test.

6  Q.   How did you do on the test, on the MCAT?

7  A.   I got a 30M.

8  Q.   On which section did you get a 30M?

9  A.   That's all of them.  That's the score.  30 is the

10  cumulative score and the M is the writing score.

11  Q.   Okay.  So did you get scores for different parts of the

12  test or was there only one score?

13  A.   There were subscores for each section.  And like there's

14  physical sciences and then verbal reasoning and biological

15  sciences.  And then a writing section, which was like two

16  passages -- two prompts, and you write two essays.

17  Q.   After you took the MCAT, you testified that you did not

18  get into medical school initially?

19  A.   No.

20  Q.   And then did you reapply?

21  A.   Yes.

22  Q.   And what happened the second time?

23  A.   I initially was waitlisted for a couple places.  First

24  waitlisted for interviews.  And then I got an interview at my

25  school, like Ohio State.  And then later got an interview at

1  Western Michigan University, their school.  And then I was

2  waitlisted for both after my interview.

3      And in I think May, I got accepted to Western Michigan

4  University and then much later in the summer I got rejected

5  from OSU.  And I guess my only option -- I could go to Western

6  Michigan, which I did, or not go.  And obviously, I went.

7  Q.   So what is the USMLE?

8  A.   It's a testing agency for med schools.  I think the MD

9  degree, not the DO degree.  And they write the Step exams.

10  Q.   How many parts of this exam are there?

11  A.   There's Step 1, Step 2 clinical knowledge, Step 2 clinical

12  skills and Step 3.  But Step 3 is taken during residency.

13  Q.   So when do you have to take -- when in your medical school

14  education do you take Step 1?

15  A.   I think it varies by school, and it also varied in my

16  school, because my school was new, like brand new.  And so our

17  class had to take it after third year, but the class after us

18  took it sometime in the middle of third year.  And the class

19  after them took it at a different time.  So it changes.  But I

20  think right now their policy -- my school's policy is that you

21  are supposed to take it before you start -- you're supposed to

22  pass it before you start fourth year.

23  Q.   What happens if you don't pass it before you start fourth

24  year?

25  A.   You either have to go on leave or you don't start fourth

1   year until you do pass it.

2   Q.   Are you allowed to take the test as many times as you

3   want?

4   A.   No.

5   Q.   What are the limits on taking the test?

6   A.   Our school only allows a student to take it three times

7   before they're dismissed from the school if they don't pass it.

8   But I think that the NBME or the USMLE only allows six.

9   Q.   How are the scores used in terms of getting residency?

10  A.   So the Step 1 score is usually the most heavily weighted

11  or the most commonly used factor to evaluate, at least

12  initially.  So when you submit your application for residency,

13  a lot of times the first thing they look at is your Step

14  1 score, and whether or not you passed it but also was your

15  score competitive.  And by competitive it needs to be like

16  higher, in the higher range for whatever field you're applying

17  for.  And if you have a failed attempt, then that is a big red

18  flag usually for most programs.  And so if they have a -- if

19  you have a failed attempt, you know, they may give you a chance

20  and ask you what happened, or they just may not look at the

21  rest of your application.

22  Q.   So when did you -- when were you supposed to take the Step

23  1 of the USMLE?

24  A.   I was supposed to take it after my -- completing my third

25  year.  And we were allowed to take it after starting fourth

1  year, as long as like we passed it before I think they gave us

2  like September 9th is when our school wanted us to pass it by.

3  Q.   Is there any preparation that you do as part of your

4  medical school education to be prepared to take the Step 1?

5  A.   Pretty much all of med school, like the first two years in

6  particular are the basic sciences.  And then the third year is

7  like the clinical sciences so you take clinical rotations but

8  we're also still learning the basic sciences to -- like

9  integrated and medicine.  And --

10      What was the question?  I'm sorry.

11 Q.   Let me ask you this:  What is the shelf exam?

12 A.   A shelf exam is an exam that's specific for the

13 rotation -- the clinical rotation you're on.  So like there's

14 an internal medicine exam and there's like a family medicine.

15 That would be pediatrics, psych and surgery.  And they're

16 written by the NBME to test that.  So they're standardized

17 across all medical schools.

18 Q.   Did you have accommodations on those shelf exams?

19 A.   Yes.

20 Q.   What accommodations did you have?

21 A.   I had double testing time, a separate room and I think --

22 oh, and they let me use colored dry erase markers on a

23 laminated -- not on a laminated -- on a laminated sheet they

24 give to everybody but usually everybody just has a black

25 marker.

1    Q.    How did you do on those shelf exams?

2    A.    It varied by the content, like the type of course.  The

3    first one that I had was internal medicine, which is known to

4    be a pretty hard exam.  It covers a lot of material, and it's

5    pretty intricate, like, medicine-wise.

6          And because it was my first clinical rotation and we

7    didn't have a class ahead of us to like give us pointers or

8    anything, I was kind of just thrown into a new context I had

9    never really been in before.  And so I wasn't able to get to a

10   lot of material during the course, like the reading that was

11   assigned, but I learned a lot in clinic.  And so I didn't score

12   as well as probably other ones, but I passed.  And like I think

13   my OB and my peds I did -- and psych I did really well on

14   because I was able to get to the material during the course and

15   I was able to show that I knew that.

16         But on the OB one, I -- we also have OSCEs that go with

17   the shelf exams in order to pass the course.  And that's a

18   clinical test.  So we have a standardized patient, and we go in

19   and see this patient.  And then we have to write a note that --

20   it's like the history is a paragraph and the physical findings

21   are a paragraph.  And then you list your differential

22   diagnosis, so what you think it could be.  And then you also

23   have to list the support for each diagnosis, and you're

24   supposed to list -- so there's three -- like you can put three

25   differential diagnoses.  You can put more but I never got that

1  far.  And then you are supposed to put at least three support,

2  whether it's historical findings or physical findings, for each

3  diagnosis that you put.  And then there's a line for any

4  diagnostic tests that you want to order.

5      And -- so it's a lot of writing.  And so even if I got all

6  the information in the clinical encounter, I usually didn't

7  have enough time on the OSCE to like get my thoughts out and

8  organize it and put it in the framework.  And when I type, I

9  still mess things up.  So I spent a lot of time trying to make

10  sure I had the right words, like it said what I was trying to

11  say.

12      And so usually I would run out of time.  And on that one,

13  the OB one, I learned that if you put diagnoses in the

14  diagnostic part -- the diagnosis part but you don't put the

15  support that you have in that support part also in the

16  paragraphs, it doesn't count.  And so I failed that OSCE.

17      And then I also failed a neuro OSCE twice because I hadn't

18  gotten to the reading that the OSCE was based off of.

19      And so my clerkship director after I failed the first one

20  met with me and said you did a phenomenal job on the patient

21  encounter, you asked all the right questions.  I think you're a

22  like little too specific in your -- what you think it might be

23  and maybe like make it broader, but I can't give you much more

24  because it would give it away.

25      And so I tried again.  The same thing happened.  And she

1  was like, I'm sorry, you failed this again.  Why don't you take

2  a look at this reading specifically and then, you know, come

3  back in a week and we'll try again.

4      And so after I had been pointed to a specific reading and

5  I had the time to like have it read to me with my computer,

6  then I passed.

7  Q.  You said that you didn't get to the reading initially.

8      Why was that?

9  A.  There's just too much reading and we were in clinic a lot

10 or like our clinical hours were -- like we had long days.  And

11 so at the end I would do as much reading or studying as I could

12 get to without compromising like my health, because I needed to

13 sleep in order to take care of patients.  I didn't want to

14 compromise my decision-making ability, like when I'm taking

15 care of other patients.  So I would do as much reading as I

16 could each night, and if I had like a lunch break during the

17 day, but I just didn't get to all of the reading.

18     And like in the clinic, if I don't have my computer, I

19 don't have access to the software that I use to read to me, so

20 it's like I am stuck trying to use this method, which, you

21 know, doesn't really work if you only have like ten minutes to

22 read in between cases or something.  So I didn't get to a lot

23 of the reading assignments.  And that was one that I didn't get

24 to.

25 Q.  So you testified earlier that you applied for

1  accommodations for Step 1 of the USMLE.

2      Can you tell me how you did that?

3  A.   Sorry, can you repeat that?

4  Q.   You testified that you applied for accommodations to take

5  Step 1.

6      What did you do to apply for accommodations?

7  A.   So I -- there's like an application that they -- form that

8  they have online.  And I printed that out, and I had the

9  guidelines that they publish.  And I filled that out, and

10 there's also a form that the school has to fill out that

11 certifies that I received accommodations there.  And --

12 Q.   We can actually take a moment, Your Honor.  We have

13 binders, and I don't think that we've given them yet, with the

14 exhibits prepared.

15          THE COURT:  Sure.

16          MS. VARGAS:  Shall we provide that to you?

17          THE COURT:  Yeah.  You can leave a copy here and make

18 sure your witness has a copy so that she can identify the

19 exhibits.  Let's move along.

20          MS. VARGAS:  May I approach?

21          THE COURT:  Give it to your witness first.  I can get

22 it later.  Watch yourself.  Don't hurt yourself.

23          MS. VARGAS:  On the clerk's bench?

24          THE COURT:  That would be fine.  Thank you.

25          Are we going to need our markers or pencils

1  or anything like that?

2          MS. VARGAS:  No.  We can put those away.

3          THE COURT:  Very good.

4          THE WITNESS:  Sorry.

5  BY MS. VARGAS:

6  Q.  So the book of documents in front of you is open to the

7  document that I'd like you to look at.

8      Do you know what that document is?

9  A.  I think that was an email I sent to the USMLE or NBME

10  disability services asking about like what I would need to do

11  to apply for accommodations.

12          THE COURT:  What exhibit number is that?

13          THE WITNESS:  1?

14          THE COURT:  Very good.  Continue, Counsel.

15  BY MS. VARGAS:

16  Q.  So this is Exhibit 1 in the binder.

17      If you could look through that first exhibit and let us

18  know if you know what the entirety of the first exhibit is.

19  A.  You want me to say what things are as I get to them?

20  Q.  Right.

21  A.  So after the email is the form that I filled out to submit

22  my request, which is the NBME's form.  Sorry, at the top it

23  says USMLE form, but that I submitted for my request.

24      And then the next one is the one my school sent that said

25  what I received at school in terms of accommodations.  And

1   there are five, that I received them.

2   Q.   So, okay.  On page 8 of 83, the numbers are at the very

3   bottom right, what is that document?

4   A.   It says it's the USMLE's certification of prior test

5   accommodation.

6   Q.   Okay.  And then what's the next page?

7   A.   That is my personal statement that I submitted with it.

8   Q.   Did you write your personal statement?

9   A.   Yes, with help.

10  Q.   How did you write your personal statement?

11  A.   A lot of -- like I would try to write my ideas out,

12  usually like either in a table or a bulleted list.  And then my

13  mom would help me expand that and put it in words.  And then I

14  would go back through and try to add more to it and make it

15  meet the guidelines that they published.  And then my mom would

16  go back and edit it.  And we would just go back and forth until

17  it was like cohesive and made sense.

18  Q.   How much time did you spend writing this personal

19  statement approximately?

20  A.   Probably more than a month, maybe months.

21  Q.   Turning to the next document in this exhibit, on page 18

22  of 83.

23  A.   Do you want me to identify it?

24  Q.   What is that?

25  A.   That is the -- my medical school's request for

 1   accommodation that I filled out.  And then I think the

 2   following pages are the supplemental writing -- things that I

 3   submitted.

 4   Q.   Turning to page 32 of 83, you do you recognize that

 5   document?

 6   A.   Yeah.

 7   Q.   What is that?

 8   A.   That is Dr. Tanguay's letter from when I was in like first

 9   or second grade.

10   Q.   What comes after that in this document?  What else did you

11   submit?

12   A.   There's another letter from her, from like three years

13   later.  Page 34 is a physical exam that my primary care

14   provider at the time filled out and -- as part of my med school

15   like entry requirements.  Then the following page is Dr. Smiy's

16   notes, records that I had from when I requested accommodations

17   at OSU.  And so they -- I sent those because they talked about

18   the ADHD.

19        And then -- do you want me to keep going?

20   Q.   If you could just flip through this and let me know if

21   this is all of the information that you provided to the NBME

22   when you first requested accommodations.

23        MS. VARGAS:  Your Honor, do we need to have these

24   admitted into evidence?

25        THE COURT:  You can move them in at the conclusion of

1   the hearing.

2          MS. VARGAS:  Okay.

3          THE COURT:  That's if you want them to be considered.

4   That's your call.

5          THE WITNESS:  There seems to be mostly everything.

6   And then there's also the email of receipt from the NBME.  And

7   they asked for my MCATs score report.

8   BY MS. VARGAS:

9   Q.  And did you provide that?

10  A.  Yes.

11         MS. VARGAS:  I'd like to move to have this admitted

12  into evidence as Exhibit 1.

13         MR. BURGOYNE:  We don't have any objection.  In the

14  interest of sort of moving more quickly through this two-day

15  hearing, my assumption was we weren't going to go through every

16  document and try to prove it up and get it into evidence, but

17  we haven't had a chance to discuss that with counsel.

18         I don't know if Your Honor has a preference.

19         THE COURT:  Very well.  I'll grant the admission of

20  this document and you can talk about it during our break and

21  reduce the time process that we're here.

22         MR. BURGOYNE:  Thank you, Your Honor.

23         THE COURT:  Sure.

24         (Exhibit P-1 admitted.)

25  BY MS. VARGAS:

1  Q.   What happened after you submitted this application for

2  accommodations the first time?

3  A.   I waited more than the 60 days that they recommend.  And

4  then I got denied the accommodations.

5  Q.   Did the NBME give you any accommodations at all?

6  A.   No.

7  Q.   And what did you do?

8  A.   Then I talked to my school and asked them what I should

9  do, whether I should try to appeal or reapply or like if they

10 thought I should just take the exam.  And everybody that I

11 talked to in the like student affairs or the testing people

12 said that I should take the exam to try to stay on track with

13 my expected graduation.

14 Q.   Did you do that?

15 A.   I did.

16 Q.   And what happened?

17 A.   I failed.

18 Q.   When did you find out that you failed?

19 A.   A month after I took it.  And I believe I took it in July

20 of 2017 and found out in August.

21 Q.   So then what did you do?

22 A.   So then I tried to figure out what my best option to move

23 forward was.  And I knew that I needed the accommodations that

24 I had requested to be able to show my knowledge on the exam.

25 And so I tried to find an evaluator who could do the testing

1   like that I thought was needed to show that I did have these

2   disabilities and the need for the accommodations I had

3   requested since the NBME had said that I didn't have the

4   documentation showing this.

5        And I scheduled an appointment with the first available

6   person who had an availability who was willing to do the

7   testing.  And that was several months out, I believe in like

8   the fall.  And then I had to wait for the actual testing after

9   meeting with them.  And then had to wait several months just to

10  get the report from -- it's Dr. Lewandowski who did the

11  evaluation.

12       And then I was also waiting for letters of support from

13  the school, because they had found a document about applying

14  for accommodations and provided that to me.  And in there was a

15  description of schools providing a letter of support, so I

16  asked the school to do that.  And they did.  And so I was

17  waiting for that.  And I was waiting for the letter from Dr.

18  Ruekberg and Dr. Houtman to describe why I needed

19  accommodations and what they -- and how they helped.

20       And so once I got all of those pieces in like June, I

21  submitted my second application.

22  Q.   Okay.  And what did your school do when they found out

23  that you failed Step 1?

24  A.   Well, first they made me drop all of the courses I was in.

25  And then because I was the first person to fail Step 1, I was

1  in the first class of -- I was the first.  And they didn't

2  really know what to do.  And in their policy manual -- well,

3  now it's called the policy manual, but their handbook at the

4  time said that the test should be retaken in three months

5  unless there were extenuating circumstances.  And they thought

6  that mine was an extenuating circumstance.  And they wanted me

7  to be able to get the accommodations that I need.  And so they

8  had me go on a leave of absence, which by the time they figured

9  this out was in March.  And so they backdated the leave of

10 absence to August when I found out I failed.  And so that they

11 would pause the timeline that requires me to take it in the

12 three months but also the timeline for how long we have to

13 complete our school -- our education.

14 Q.   So then when did you submit your second application for

15 accommodations?

16 A.   I believe that was June of 2018.

17 Q.   And what did you ask the NBME to provide?

18 A.   Double testing time and a separate room and extra break

19 time at that time.

20 Q.   And what was the purpose of the double time?

21 A.   To give me the time that I need to work through and read

22 each question and the answer choices, since I can't read all of

23 the questions in that -- the given time.  And also to, like,

24 have time to read aloud and use the compensatory mechanisms

25 that I do use and to move around when I need to and especially

1  like because I have the clotting disorder, to walk when I need

2  to so that I don't increase my risk of having another clot.

3  And to be able to like fidget and read aloud and do the things

4  that may be distracting but also things that I need and not

5  take away time from the exam.

6       And then -- did you only ask about the time?

7  Q.   And then what happened with your second request for

8  accommodation to the NBME?

9  A.   They approved the room and the -- the separate room and

10  the break time, but they denied the additional testing time.

11  Q.   And what were the disabilities that you had listed as

12  needing accommodation when you applied for accommodation to the

13  NBME?

14  A.   The first time or the second time?

15  Q.   Second time.

16  A.   ADHD, dyslexia, migraines with aura, and DVT with

17  postthrombotic syndrome and my clotting disorder.

18       THE COURT:  And the first time was it ADHD and

19  dyslexia?

20       THE WITNESS:  Yeah, dyslexia and ADHD because I didn't

21  know at that time that I could request accommodations for

22  clotting disorder, DVT and the migraines.

23  BY MS. VARGAS:

24  Q.   When do you get migraines?

25       THE COURT:  Go ahead.  I was going to ask one further

1  question.

2          MS. VARGAS:  I'm sorry.

3          THE COURT:  In reference to your failing the first

4  test, you failed the first test by 1; is that correct?

5          THE WITNESS:  That is correct.

6          THE COURT:  You had a what, 160 or 159?

7          THE WITNESS:  I had 191, and it needed 192 to pass.

8          THE COURT:  And that's without any accommodations at

9  all?

10         THE WITNESS:  Yes.

11         THE COURT:  Very well.  You can continue, Counsel.

12 BY MS. VARGAS:

13 Q.  So what happened with your second request for

14 accommodations?

15 A.  They approved the room and the break time but not the

16 additional testing time.

17 Q.  So what did you do?

18 A.  So I -- in their denial letter, they had said that I

19 didn't have sufficient documentation of my -- or objective data

20 of my slow reading, which I figured was something I could

21 provide, so I got additional testing to address that.  And so I

22 did that, and I -- I don't remember if I wrote another personal

23 statement or not, but I submitted that.  And they denied --

24 they still denied my request.

25 Q.  Who provided this new testing?

1   A.    Dr. Smith.

2   Q.    Where is he employed?

3   A.    Michigan Dyslexia Institute.

4   Q.    How did the testing that he provided compare to other

5   testing that you received from -- over the years?

6   A.    It was different.  It actually tested like -- it was

7   reading specific versus testing my head before.  It was more

8   like just cognitive ability in general.  And so he had me read

9   a lot of -- a lot of just like paragraphs or questions

10  sometimes versus like before the tests were like one word, like

11  can you read this one word, which if it's one word, I can

12  generally like sound it out or if I -- it's something I

13  recognize, I might know it.  But it's also not crowded by like

14  being in the middle of a block of text.  And usually the prior

15  ones weren't timed, and some of Dr. Smith's were timed.  And

16  then he had like different computer based tests for, like --

17  before I had one where you click on the letter X and then it

18  shows you some other stuff in between.  And then Dr. Smith's

19  was both like visual and audio, so I had headphones.  And they

20  said or showed the number 1 or the number 2, and then I had to

21  click I think for number 1 whether it was said or showed.

22  Q.    And what happened after you submitted Dr. Smith's

23  documentation and your -- to the NBME?

24  A.    They denied it.

25  Q.    And then what did you do?

1  A.   And then I filed the complaint.  Well, actually, we

2  submitted a letter for reconsideration, and they denied it

3  again.  And then we filed a complaint.

4        MS. VARGAS:  Your Honor, I have -- all of her

5  applications for accommodations are in this binder.  I'd like

6  them to be in evidence, but rather than taking all the time to

7  go through all of them, if counsel doesn't object and Your

8  Honor is amenable, I propose that we just admit to evidence all

9  of the applications for accommodation, which are Exhibit 1, 2,

10  3 and 4.

11        MR. BURGOYNE:  I don't have any objection to that,

12  Your Honor.

13        THE COURT:  Very well.  They're admitted.

14        (Exhibits P-2, P-3 and P-4 admitted.)

15        MS. VARGAS:  Thank you, Your Honor.

16        Your Honor, might we take a break?

17        THE COURT:  I wanted to go 15 more minutes before we

18  break for lunch.  I have a conference call in another case that

19  I have to take at 1:00, and so I'm trying to have a lunch and

20  do business also.  Okay?

21        MS. VARGAS:  Are you okay for another 15 minutes?

22        THE WITNESS:  Yeah.

23  BY MS. VARGAS:

24  Q.   If you could turn to Exhibit 19.

25  A.   Okay.

1  Q.  And then do you recognize what this is?

2  A.  I believe it is the MCAT or a version.

3  Q.  If you could turn to page 7 of that exhibit.  The numbers

4  are on the very bottom right corner of the page.

5  A.  Okay.

6  Q.  Could you explain how you took the MCAT without

7  accommodations?

8  A.  Sure.  Do you want me to like walk you through overall, or

9  do you want me to go through a question?

10  Q.  Well, look at a question.

11     Why don't you start with the first question.

12  A.  Okay.

13  Q.  How would you go about answering the first question?

14  A.  Is this the same exhibit that the NBME had in their

15  deposition with me?

16  Q.  Yes.

17  A.  I have notes on that.  Can I use those to help me describe

18  it?

19  Q.  Would that help you remember how to -- how you answered

20  these questions?

21  A.  Yeah.

22     MS. VARGAS:  Your Honor, may I show her?  And I have a

23  copy for everyone.

24     THE COURT:  Yes.

25     MR. BURGOYNE:  I've never seen the notes before, Your

1  Honor, so that would be great.

2          MR. BERGER:  It's just an annotation.

3          MS. VARGAS:  May I approach, Your Honor.

4          THE COURT:  Sure.  And counsel need not ask permission

5  to approach your witness to give her an exhibit to assist in

6  this testimony.

7          THE WITNESS:  Okay.  So generally when I go through --

8  BY MS. VARGAS:

9  Q.   Can you explain -- go ahead.

10 A.   Like if I were going to do the first passage, I would skip

11 ahead to the question, and I would -- there's like a number of

12 questions.  And then I would read the last line, but in this

13 case this only has one line, so I would read the line.  And I

14 would do it -- if it was something I could answer without

15 reading the passage, I would.  If it was something like that I

16 needed maybe numbers to do, so like it's math, which like here

17 I talk about -- and I highlighted it in blue, which means it's

18 a formula, like a math formula.  And so I knew that there would

19 be numbers in the passage that I would have to use to solve it.

20 And I don't think my comments that were on here show up, but I

21 had written where on the page went with each number.

22      But I would pretty much look.  And it says in the

23 question, based on the passage, the volume of the collected $CO_2$

24 gas at the -- and then I can't see what's there -- was closest

25 to which of the following.  And then it gives like one of the

1   variables.  And so I would basically look for where it's CO2

2   gas, and then it says -- I basically would find the numbers

3   there.  And then because numbers stand out as opposed to a

4   chunk of words, I would highlight those.  And then I would plug

5   them into a formula.  And I pretty much didn't read any of the

6   passage.

7          And then I would move on to the next question, and I would

8   read that.  And if I knew that without having to read anything,

9   I would answer that.

10         And then in the third question, where there is like a

11  couple lines, I would still start with the last line.  And it

12  says, like, compared to the volume and reaction and to the

13  volume in reaction 1 and the volume in reaction 3 would -- and

14  then so I saw where there was three reactions.  And so based on

15  that, I would see if I could answer it, which I couldn't.  So

16  then I would look to see if I could see where it said something

17  about reaction 2, because that's what it's referencing, like

18  the reference point.  And at the bottom of the page, there's

19  like a number 2.

20         So I saw that it was reaction 2, and then I read that

21  reaction 2 was best.  And so if it was best, then I would

22  probably guess that the other two were lower U.  So --

23  Q.  So when you took the MCAT, did you have time to read the

24  entire test?

25  A.  No.

1  Q.   Do you know if other students had time to read the entire

2  test?

3  A.   Yes.

4       MR. BURGOYNE:  Objection, Your Honor.  I don't think

5  there's any foundation for that testimony.

6       THE COURT:  I'm going to sustain the objection.

7  BY MS. VARGAS:

8  Q.   Did you take any test prep courses --

9  A.   Yes.

10  Q.   -- before taking the MCAT?

11       And what test-taking strategies did you use, did you learn

12  in that class?

13  A.   I didn't necessarily learn any new ones, but I -- the ones

14  that I pretty much used my whole life to kind of do the minimum

15  reading possible, which was read the question line and then the

16  answer choices and then if needed go back and read something

17  from a passage.  That's how they recommended reading it in

18  order to be able to answer the questions that didn't require a

19  lot of reading first and get through as many of those as

20  possible.  And then if you have time, go back and do the other

21  ones that required more reading.

22  Q.   How many multiple choice options for answers are there on

23  the MCAT, the questions?

24  A.   Four.

25  Q.   Is that different from Step 1?

1  A.    Yeah.

2  Q.    How many multiple choice answers are there on Step 1

3  questions?

4  A.    It varies.  There can be anywhere from four to like

5  whatever J or K is, so like ten or more.

6  Q.    Ten or more options to answer?

7  A.    On some, yeah.

8  Q.    And so did you use other self-mitigation strategies to

9  take the MCAT beyond what you learned in your test-taking prep

10 course?

11 A.    I mostly used that -- like the how to answer, not read.

12 So I read the question without reading a lot of the passages.

13 And then because there wasn't like a guessing penalty like

14 there was on the ACT, you know, when it would get to like the

15 five-minute warning at the end, I would just go back and select

16 answers to make sure that all of them were filled so at least I

17 would have a chance of getting credit for some of the ones I

18 couldn't get to.  And then with like the remaining five

19 minutes, try to go back and read if I could to maybe get one or

20 two of the answers more.

21      I wasn't allowed to like read aloud or anything.  I

22 would -- like on the scrap paper, I think there was a paper for

23 the MCAT, I would like draw things to help me like understand

24 or work through math or anything like that.

25 Q.    And those mitigation techniques that you used on the MCAT,

1   were you able to use those on Step 1?

2   A.   No, not really.

3   Q.   Why not?

4   A.   Well, I can't skip reading on Step 1 all of like -- it's

5   set up differently, so it's not just like one long passage and

6   then like six or seven questions.  It's like a passage as a

7   question and then the answers.  And it's like that for each

8   question, but some questions have videos or pictures or you

9   have to listen to a heart murmur in addition to like a

10  paragraph that you have to analyze.  And everything in that

11  paragraph is important.  And you have to take that information

12  and like consider all of it in order to be able to answer the

13  question.  And so I can't just skip reading on the MCAT -- I'm

14  sorry, the USMLE Step 1.

15  Q.   When you took Step 1, what was your strategy?  How did you

16  go about taking that test?

17  A.   So I mean, I can walk you through it again, but it's kind

18  of the same, like.  I would start at the beginning, so we only

19  had like an hour per block.  And if I could understand, I would

20  read the last line of the question prompt or whatever, which

21  was the question line generally.  And if I understood what it

22  was asking and I could answer it, I would -- like if it was

23  something I knew what it was asking, I would read the answer

24  choices so I knew what to look for in the body of the question,

25  and then I would read the body of the question and highlight

1  the key things related to the answer choices that would help me

2  decide between them.  And then I would answer.  And because I

3  didn't have a lot of time, I didn't take a lot of time to like,

4  you know, second guess myself and would move on to the next

5  question.  And I would do as much as I could.  And then if I

6  got to a question that was -- like I couldn't understand or I

7  was confused by the question line, I knew not to spend a lot of

8  time trying to figure that out and I would move on to the next

9  one.

10      If the question body was particularly long, then I would,

11  you know, move on to the next one.  And then generally I

12  would -- that would be a first pass of the questions.  And that

13  would maybe take like -- I'm not sure.  I have notes on that

14  too, of how I went through the test.

15      But I would go back, and I would have like half, around

16  half of the time left and a lot of the questions left.  And

17  then I would go back to the ones I hadn't got to, and then they

18  would probably be the longer ones.  And I would try to read

19  the -- I would go through it the same way and read the question

20  line.  If I understood it, I would read the answers and then

21  try to look for the information in the body paragraph that

22  would help me distinguish between them as I read the body and

23  then answer the question.

24      And because I knew I didn't have a lot of time, I wouldn't

25  spend a lot of time second guessing or anything like that.  I

RAMSAY - DIRECT

1  would move on to the next one.

2      And then I would get through the second pass.  And then if

3  I would maybe have, I don't know, 10, 12 minutes left and have

4  probably 20-some questions left.  And -- or like around 20

5  questions left.  And then I would take the last 10, 12 minutes

6  to go through the ones that were confusing to me at the

7  beginning and see if this time when I read the question line I

8  understood it.  And if so, I would do the same thing and go

9  through and pick an answer.  And then when the timer gets to

10  five minutes, it flashes on your screen and it makes you select

11  to -- like it pops up in the middle, and you have to ignore it.

12      And then -- so at five minutes, I knew there were five

13  minutes left.  And I would go and put an answer for any that I

14  haven't gotten an answer for or hadn't had the chance to read

15  the whole question.  And then I would -- after doing that,

16  would try to go back through to the ones that I hadn't gotten

17  to and still try to read as much as I could and maybe answer

18  one or two.

19  Q.  Did you have the time that you needed to show what you

20  knew on Step 1?

21  A.  No.

22  Q.  If you could turn to Exhibit 20 --

23      THE COURT:  We'll take our break now.  We'll be in

24  recess until 1:30.  All right?  And enjoy your lunch today.

25      (Luncheon recess at 12:45 p.m. **until 1:30 p.m.)**

1          THE COURT:  You may be seated.

2          Are we ready to proceed?

3          MS. VARGAS:  Yes, Your Honor.

4          THE COURT:  Ma'am, would you resume the witness stand,

5     please.

6          And I'll remind you, you are still under oath from

7     previously being sworn in.  Do you understand that?

8          THE WITNESS:  Yes.

9          THE COURT:  And this pitcher here is for you along

10    with the water.  If you want it down there, that's fine.  If

11    not, I'll move it so I can watch you.

12          THE WITNESS:  Perfect.  Sorry.

13          MS. VARGAS:  Your Honor, we had been discussing

14    Exhibit 19 and 20, and I would like to move to have Exhibits 19

15    and 20 moved into evidence?

16          THE COURT:  I take it there's no objection thereto?

17          MR. BURGOYNE:  Certainly not to 19, Your Honor.

18          THE COURT:  What is 20?

19          MS. VARGAS:  It's the Step 1.

20          THE COURT:  Sample test questions?

21          MR. BURGOYNE:  That's fine.  I didn't realize we had

22    gotten to those.  Thank you.

23          THE COURT:  Very well.  They're both admitted.

24          (Exhibits P-19 and P-20 admitted.)

25          THE WITNESS:  Are we looking at one of them?

1  BY MS. VARGAS:

2  Q.   Jessie, if you could look at Exhibit 19, about halfway

3  through that exhibit, it says Verbal Reasoning Section.  And

4  it's page 29 of 74.

5  A.   Okay.

6  Q.   And if you could turn to page 31 of 74.

7       What is this?

8  A.   This is a passage, the first passage.

9  Q.   How would you go about answering this passage?

10 A.   Well, I would --

11 Q.   Answering the questions about this passage, I should say.

12 A.   I would go to the questions.  And similarly, I had like a

13 marked-up, annotated version from before.  But I would do the

14 same thing.  I would read the last line, the question line.

15 And if there was something that was like -- said like referred

16 to, paragraph whatever or line whatever, and what does this

17 word within that mean, or something like that, then I would do

18 those first, because it told me where to go.  So I wouldn't

19 have to read all of the passage.  And then if there were other

20 questions that I could answer or reason through without

21 reading, I would answer those.

22      And then if there were things that were like italicized

23 words or something that would be a little easier for me to

24 visually find in a passage that were talked about in the

25 question, then I would try to find those and just read around

1  those in the passage.  And I think in my notes, I highlighted

2  to show where I would read and where I wouldn't.

3  Q.   Would it help you remember how you answered these

4  questions if I showed you your annotated notes?

5  A.   Yes.

6       MS. VARGAS:  May I do that, Your Honor?  I'm happy to

7  provide copies.

8       MR. BURGOYNE:  I don't have any objection, Your Honor.

9  I don't know that this is an annotation of how she actually

10  answered her questions on the MCAT.  It's something they

11  created for the purposes of today.

12      THE COURT:  Very well.  You'll have an opportunity to

13  cross-examine the witness on it.

14      MR. BURGOYNE:  That's fine.

15      THE WITNESS:  Thank you.

16  BY MS. VARGAS:

17  Q.   So Jessie, can you explain what you did with this

18  document?

19  A.   Yes.  So after it was provided in the deposition, I tried

20  to explain how I would go through, but it didn't seem to be

21  very clear.  So I annotated the document, and I went through --

22  like for the physical sciences, I went through and kind of

23  showed like the order I would go through and how I would do

24  that.

25      But for the verbal reasoning, where it was pretty much all

1    reading, it was harder for me to just -- there was no formulas

2    really for me to show like what formula I would use.  So I went

3    through, and I basically had to take this in order to annotate

4    it.

5         And so I went through like I would go through it if I were

6    taking it, and then tried to annotate what I was doing as I did

7    it.

8         And so for like 43, I would read it, which says:  Which of

9    the following developments would be least likely to be useful

10   to photo trappers?  And then I would read the answer choices

11   and see if there were anything that I could rule out.

12        But since I don't really know what photo trappers are, I

13   would probably look back at this document and see if I could

14   find where it was in there.

15        And just kind of glancing, I saw where there were like

16   two dashes in the fourth paragraph, which kind of caught my

17   attention.  And then I saw next to it was photo trapper.  And

18   so then I recognized that and said so.  And then would have

19   read a little bit around there.

20        But -- and then I went through and did kind of the same

21   thing for each question.  But apparently when I did this for

22   real, I probably, because I didn't know what photo trappers

23   were, I went to 44 and then started with that one.  And it

24   said:  What was the main purpose of the fourth paragraph of --

25   I'm sorry, the main purpose of the fourth paragraph of the

1    passages to.  And then -- so because it pointed to the fourth

2    paragraph, I would go through and read the fourth paragraph and

3    then recognize the photo trapper from the first question.  And

4    then reading that paragraph, I think I would have guessed on

5    the main purpose.  And I ruled out A and B, and then I would

6    have guessed on D.

7         Do you want me to reason through that or --

8    Q.   No.  So looking at the passage, how much of that passage

9    would you have read in order to answer the questions?

10   A.   Well, I tried to show where I would read by like

11   underlining or describing where I would start reading or -- and

12   reading.  And so I calculated -- sorry.

13        I calculated like how many words versus how many words

14   were in the whole passage.  And I did that by copying the

15   passage and putting it in Word and using word count.  And then

16   where I would start reading and end reading on here, I would

17   highlight that in the Word document and have it do the word

18   count for me.  So I would figure out how many words I actually

19   read of the actual passage, which is at the top of the page.

20   And I did that for each passage.

21   Q.   So all of the cross-throughs and the highlights and the

22   red words that are on this document, who wrote those?

23   A.   I did.

24   Q.   Did anybody help you with that?

25   A.   No.

1          MS. VARGAS:  Your Honor, I would like to move to admit

2    her annotated verbal reasoning section into evidence.

3          THE COURT:  Okay.  No objections, it will be admitted

4    into evidence.

5          MR. BURGOYNE:  You're correct, Your Honor.  No

6    objection.

7          THE COURT:  Very good.

8          (Exhibit P-19A admitted.)

9          MS. VARGAS:  Is that 19A?

10          THE COURT:  Is this an additional number that you're

11    submitting?  What was the last number?

12          MS. VARGAS:  This was an annotation of Exhibit 19.

13          THE COURT:  Right.  So you want to have it marked as

14    19A?

15          MS. VARGAS:  Yes, please.  Thank you.

16          THE COURT:  Very well.  We'll mark it as 19A.

17          MS. VARGAS:  Thank you.

18          Should I give a copy to the Court?

19          THE COURT:  Sure.  Put it right down there.  And we'll

20    include it in our -- that's fine.

21    BY MS. VARGAS:

22    Q.  If you could turn to Exhibit 13.

23    A.  Okay.

24    Q.  Do you recognize that document?

25    A.  Yes.  That's our medical student policy manual or our

1   handbook.

2   Q.   And is this the handbook that's in effect currently at

3   your medical school?

4   A.   I believe so.

5        MS. VARGAS:   I would like to move to have Exhibit 13

6   admitted into evidence.

7        MR. BURGOYNE:   No objection, Your Honor.

8        THE COURT:   It's admitted.

9        (Exhibit P-13 admitted.)

10  BY MS. VARGAS:

11  Q.   And then turning to Exhibit 14.

12  A.   Okay.

13  Q.   If you could turn to page 8 of 13.

14  A.   Okay.

15  Q.   Do you recognize this document?

16  A.   Yes.

17  Q.   What is this?

18  A.   This is a letter from my school, specifically from Dr. Z

19  or Ziemkowski in response to my request for an extension to my

20  leave of absence.

21  Q.   And what was the school's response to your last request

22  for a leave of absence?

23  A.   That they would only extend it until March 2nd.

24  Q.   And after March 2nd what happens?

25  A.   If I can't get accommodations and take the test by then, I

1  will be forced to withdraw or I will be dismissed from the

2  program and I will be done.

3  Q.   What happens if you withdraw from the program?

4  A.   Technically, I can reapply, although I was told very --

5  they made a point of telling me that doesn't mean that they

6  will re -- like re-accept me to the school, just that I have

7  the opportunity to reapply, versus if I was dismissed from the

8  school, then I would not be allowed to reapply.

9  Q.   Would you be able to apply to other schools if you were

10  dismissed from Western Michigan?

11  A.   I could apply, but the chances of me being accepted

12  because I had already been enrolled in another school and been

13  forced to withdraw or withdrawn and I had not already passed

14  Step 1, then I would have a very -- it would be very unlikely

15  for me to be accepted anywhere.

16        MS. VARGAS:  I would like to move to have Exhibit 14

17  admitted into evidence.  This is the packet of leave of absence

18  documents.

19        MR. BURGOYNE:  No objection, Your Honor.

20        THE COURT:  Very well.  It's admitted.

21        (Exhibit P-14 admitted.)

22  BY MS. VARGAS:

23  Q.   Jessie, why is it important to you to have accommodations

24  on Step 1?

25  A.   Because the accommodations I requested are the

1   accommodations I need in order to be able to read all of the

2   questions and therefore have the opportunity to answer the

3   questions based on my knowledge.  And if I don't have the

4   opportunity to read all of the questions, then the score that I

5   get isn't an accurate representation of what I actually know

6   and my competency of the material.  And if I don't have the

7   opportunity to show that, then my score doesn't accurately

8   reflect -- like if I pass, I should be able to know that I

9   passed because I knew the material.  And if I fail, I should be

10  able to know that I failed because I didn't know the material,

11  not because I wasn't able to read the questions and have an

12  opportunity to answer them, like other students get to.

13  Q.   And what importance, if any, does your score have on

14  residency match?

15  A.   It's huge.  That's the first thing that programs look at.

16  And if you failed, they may not even look at the rest of your

17  application.  It may get filtered out before they even see your

18  name.  And if you have -- if you have a low score even, like if

19  you pass and have a low score, they still may filter you out.

20  So it's huge.

21  Q.   If you had received a 192 on Step 1 without accommodation,

22  do you believe that would have been representative of your

23  ability?

24  A.   No.

25  Q.   Why not?

1  A.    Because it would have been a score based on me only

2  getting to read part of -- like some of the questions and not

3  all of them.  So they don't know whether I don't know that

4  material or I never got to see the questions and didn't answer

5  the questions based on my knowledge, so they were just random

6  guesses.

7       So when my score is compared to everyone else, my score

8  looks like -- they take it at face value, like that was my

9  ability.  And they don't know that I didn't get to answer or

10 see -- read the questions for a large portion of the test, and

11 they don't know that I actually do know the material and I can

12 do this.  And they think that I am not as competent as other

13 students, and so they don't give me the opportunity to show

14 that.

15 Q.    What will you do if you can't take Step 1 by March 2nd?

16 A.    I don't know.  I haven't gotten that far.

17 Q.    How many of the questions on your Step 1 attempt do you

18 estimate that you could read completely?

19 A.    On Step 1?

20 Q.    Uh-huh.

21 A.    I believe it was 65, about 65 percent, to 70.

22 Q.    How do you make that estimate?

23 A.    When I was going through the test, based on how I had gone

24 through, you have an option to like mark the question.  So by

25 the time I hit that five-minute warning and I had to fill in

1    guesses, the ones that I had guessed on, I marked.  And I like

2    kept track of about how many I had marked or had -- that were

3    left when I guessed on them for each section.  And it was

4    roughly overall about 65 percent of the ones -- sorry, like

5    35 percent I had guessed on.  And I had only gotten to about

6    65 percent, an average over all of the sections.

7    Q.   How did you prepare, study for Step 1?

8    A.   I did a lot of things.  I listened to Pathoma lectures and

9    watched them.  And they show you pictures and they talk about

10   it and they relate everything to not only a clinical context

11   but the test and how it -- like how it's important to the test.

12   And I used First Aid, which is a book -- a review book that's

13   well known.  All of these sources are well known for medical

14   students.  But it's like the bible of studying for Step 1.  And

15   it is a review source.

16       And then I also used the UWorld question bank and Kaplan

17   question bank.  And I would go through those questions and then

18   answer them.  And if I got them wrong, or even if I got them

19   right but maybe didn't know exactly why it was right or I

20   wasn't confident on the material, it would give an explanation.

21   And I would read and process that explanation.  And then I

22   would write it into my First Aid book and draw pictures like in

23   the relevant section.  And then if there wasn't enough room to

24   fit it there, I would do it on notebook paper and shove that in

25   my book in there, so it would be in there.

1      And then I would watch a lot of online videos, like

2   OnlineMedEd or the Pathoma, which breaks things down but it

3   walks you through.  And it's visual, and somebody is talking to

4   me so I don't have to read it, so it helps me process and

5   review a lot faster than if I were to have to read it.  And

6   then I compile all of this, and I write it down and I keep

7   doing questions and I repeat.

8      We would do practice questions with like friends who were

9   also studying -- or sorry, practice tests.  And they would read

10  the question and then we would both like separately select our

11  answer and then go through the explanation.

12  Q.   What do you mean, they would read the question?

13  A.   My friends who are supportive of me and study with me,

14  they read the questions out loud so that I don't have to read

15  them.  And also it doesn't slow them down waiting for me to

16  read the question and get to my answer while they've already

17  read it and got their answer.  And since it's like a -- it's a

18  really fast-paced time.  Everybody is trying to cram as much

19  knowledge into their brains as possible before they take Step 1

20  over like the course of a couple months.

21      And so if I'm there slowing them down, like that's not

22  okay.  And so they would read it so that I could get the

23  material and answer the question.  And they could do it, so...

24  Q.   Have you done any preparation for Step 2?

25  A.   Yes.

1    Q.    What is Step 2, Step 2CK?

2    A.    CK is clinical knowledge, which is a similar test to Step

3    1 in that it's computerized, like written test, like multiple

4    choice questions.  But it is more clinically focused, but

5    because of that, the questions are longer and have more

6    information in them that you have to like analyze in order to

7    answer the question.

8    Q.    Can you explain what you mean by the questions are longer?

9    As compared to Step 1, how much longer are they?

10   A.    I'm not sure exactly, but I just know that looking at the

11   screen, like if a Step 1 question is like this, the Step 2 can

12   be anywhere from like a paragraph to like sometimes they're

13   like a page.  And they have more information, like labs and

14   stuff, whereas the Step 1 does have labs and stuff that you

15   have to coordinate or consider in coordination with the other

16   information sometimes, but Step 2 has a lot of more of that,

17   because it's more clinical.  So there's a lot -- there's more

18   information you have to integrate to answer the question.

19   Q.    Will you need accommodations for Step 2?

20   A.    Yes.

21   Q.    What accommodations will you need for Step 2?

22   A.    Specifically CK?

23   Q.    Yes, I'm sorry, for CK.

24   A.    I will need double time and I will need a separate room

25   and break time, just like I do for Step 1.

1   Q.   At any point did you request that the NBME provide speech

2   reading for your test?

3   A.   No.

4   Q.   Why not?

5   A.   I didn't know that it was allowed.  I didn't know it was

6   something they offered.  It was a fairly new thing.  I didn't

7   know it was available for a long time as an accommodation in

8   general.  And so by the time I found out, it was pretty -- I

9   think I was in my -- as a test accommodation, let's see -- I

10  think it was in med school when I realized it was a thing.  So

11  I didn't know I was allowed to ask for it.

12  Q.   Would that help you?

13  A.   I believe -- I believe it would, but I would have to know

14  the system that was used.  Like I wouldn't -- I wouldn't -- it

15  would help me to have something read to me as opposed to me

16  struggling to read through it, but if I didn't know how to use

17  the system that they use on the test before going into the

18  test, then I wouldn't want to like waste time trying to figure

19  that out on the test, if that makes sense.

20  Q.   Did you ever request that the NBME provide you with paper

21  tests rather than a computerized version?

22  A.   Not -- I don't think for Step 1, but for the other NBME

23  exams that our school receives or gives, like the shelf exams

24  or the -- they're called like CBSE exams, the comprehensive

25  basic science exams that our school gave, they had requested

1  from the NBME that the test be given on paper because that's

2  how they provided their exams to me.  And the NBME responded to

3  them that that wasn't allowed, they don't give anyone tests on

4  paper, because it's a computerized exam.  And so I assumed that

5  that was not allowed at all, so I didn't request that for my

6  Step 1 exam.

7  Q.   What accommodations -- did you have accommodations for the

8  other NBME exams you took that you just mentioned?

9  A.   The CBSE ones?

10 Q.   Yes.

11 A.   For the ones that counted for our -- either like moving on

12 into third year, the clinical year, or the ones that were like

13 shelf exams, I did have accommodations.

14 Q.   What did you have?

15 A.   I had the double time, the separate room and the colored

16 dry erase markers.  And then my meds and the water bottle and

17 the granola bar in the room.  But I didn't use -- there was a

18 couple exams at the end after my third year -- after I had

19 found out that I was not receiving accommodations because the

20 NBME had denied them but before I took Step 1 -- that our

21 school had us take the CBSE again as a formative exam, which is

22 their term for it doesn't count as a grade, it's only for like

23 informing us -- seeing how we would do on Step 1.  It was sort

24 of a benchmark.

25      And then I had been approved for the same accommodations

 1   that I received on all the other NBME exams, but because I knew

 2   I wasn't receiving accommodations for the Step 1 exam, I

 3   decided to try to simulate a timed -- a standard timed exam.

 4   So I had the proctor tell me when it was five minutes to the

 5   end of a normal block, which I believe is an hour, and then I

 6   would do the same thing as I would and mark whatever I hadn't

 7   and pick an answer, whatever I hadn't gotten to.  And when it

 8   was 60 minutes, the proctor would tell me, and I would submit

 9   that section and move on.  So I tried to simulate what my Step

10   1 would be like.

11   Q.   Did you have enough time?

12   A.   No.

13   Q.   Did you say that you -- did you testify that you took

14   practice exams for Step 2?

15   A.   Yes.

16   Q.   And how much -- did you have a sense of how much you were

17   able to read of the questions on the sample Step 2 exam?

18   A.   Yeah.  It was like 50 at most.  The questions are a lot

19   longer, so I couldn't read as many of them.

20            MS. VARGAS:  I have no further questions.

21            THE COURT:  Very well.

22            Cross-examination.

23            MR. BURGOYNE:  Thank you, Your Honor.

24            Good morning, Jessica.

25            THE COURT:  Afternoon.

1          THE WITNESS:  Good morning.  Afternoon.

2          MR. BURGOYNE:  Afternoon, yes.  Where has the day

3    gone?

4                    CROSS-EXAMINATION

5    BY MR. BURGOYNE:

6    Q.   Let me ask you a few questions for follow-up before we get

7    into another line of inquiry.

8          Specifically relating to your status in medical school, as

9    I understand it, you've been told by your medical school that

10   you are required to take the Step 1 exam prior to March 2,

11   2020; is that correct?

12   A.   I am required to -- in order to return to the curriculum,

13   I have to take Step 1, but in order to stay in the curriculum,

14   I have to pass Step 1.

15   Q.   But by the date March 2, that's when you have to take the

16   exam?

17   A.   Yeah.

18   Q.   And the medical school has told you that you have the

19   option of voluntarily withdrawing?

20   A.   Yes.

21   Q.   And you can apply for readmission if you were to do that?

22   A.   Yes.  They have said that.

23   Q.   There was a little bit of testimony there at the end about

24   the Step 2 CK exam.

25        Are you registered to take the Step 2 CK exam?

1   A.   Not anymore.

2   Q.   Were you ever registered to take the Step 2 CK?

3   A.   Yes.

4   Q.   When were you registered?

5   A.   I'm not exactly sure, but it was shortly after -- the

6   first time was shortly after I was registered for the Step 1

7   exam the first time, so it would have been I think in the fall

8   of 2017.  But I didn't get to take it because I failed Step 1.

9   And then I may have registered another time, but I don't know.

10  I don't remember.

11  Q.   And there's nothing in the letter that you received from

12  your school regarding your leave of absence that relates to the

13  Step 2 CK exam.  Is that --

14  A.   Not that I recall, there isn't anything.

15  Q.   Let me make sure I understand your allegations regarding

16  the impairments that you've experienced and the impact they've

17  had on you.

18       I'll bring you a different set of exhibits, because

19  they're -- and I'll try to work out of these so you don't have

20  to go back and forth.

21       Let me get that out of your way.

22            MS. MEW:  Your Honor, would you like these?

23            THE COURT:  Yes.  Just put them down there.

24  BY MR. BURGOYNE:

25  Q.   Here is the RDX number.  This will be Exhibit 1.  And then

```
 1  I'll be asking you sometimes about tabs that are within an

 2  exhibit, to help orient you.

 3       Let's look at one of the personal statements that you

 4  provided in support of your accommodation requests.  If you

 5  look at the first exhibit, and then go to Tab A.

 6  A.   Okay.

 7  Q.   And then will you go to page 9 of that document.  This is

 8  your June 6, 2018 personal statement.

 9  A.   Page 9?

10  Q.   Page 9, yes.

11  A.   Okay.

12  Q.   At the bottom.

13  A.   What about it?

14  Q.   Okay.  You found that page?

15  A.   Yeah.

16  Q.   Okay.  And this is the personal statement you described

17  earlier as something you had worked on for a month or longer?

18  A.   Is this the first one or second one I filed?

19  Q.   This is your second one.

20  A.   I believe I spent about a month on it, if not more.

21  Q.   And if you look at the second paragraph here, there's a

22  statement that reads:  The effects that ADHD and learning

23  disabilities have on my life are most quantifiable when

24  assessing my academic performance, but they do not just affect

25  school.  For me they are a 24 /7 thing.
```

1       Are those accurate statements?

2   A.   Yes.

3   Q.   Look at Exhibit 1, Tab C, if you would, please.

4   A.   Okay.

5   Q.   And do you recognize this document?

6   A.   I believe this is Dr. Smith's report.

7   Q.   Right.  And he's the doctor you went to see in support of

8   your request for reconsideration when you were denied

9   accommodations?

10  A.   The -- yes.  The third time.  Yeah.

11  Q.   And look, if you would, please, at page 4 of his report.

12  And you'll have to look at the top of the document for the page

13  numbers.

14  A.   Okay.

15  Q.   And there's a statement that says that Ms. Ramsay,

16  Jessica, had a history of academic struggle that began from

17  hers first days in school --

18  A.   I'm sorry, where are you?

19  Q.   Right under School History.

20  A.   Okay.

21  Q.   Do you see that language?

22  A.   Yes.

23  Q.   So it reads:  Ms. Ramsay, Jessica, has a history of

24  academic struggles that began from her first day in school and

25  has consistently required accommodation such as extended time

1   on tests and assignments, altered grading schemes, frequent

2   breaks and a private space for testing and completing class

3   work in order to compensate for distractibility, impaired

4   attention and concentration, impaired reading comprehension,

5   impaired reading speed and hyperactivity.

6        Is that information you provided to Dr. Smith?

7   A.   I provided my history and current symptoms at the time

8   that he evaluated me, and he put the information he thought was

9   relevant or important into the report.

10  Q.   A slightly different question, but are those statements

11  accurate?

12  A.   Yes.

13  Q.   So you've had a history of academic struggle that began

14  from your first day in school?

15  A.   From what I remember, yeah, from the beginning of school.

16  Q.   And then look, if you would, please, at page 5, the next

17  page here.

18  A.   Okay.

19  Q.   And there's an additional discussion of your symptoms and

20  impairment.

21       And beginning in the first paragraph, there's a statement

22  discussing your experience in third grade at Carrollton-Farmers

23  Branch Public School System.  That was in Texas.  Correct?

24  A.   Yeah.

25  Q.   And you attended Carrollton-Farmers public schools through

1   the fifth grade?

2   A.   Through part of fifth grade, yeah.

3   Q.   And then you moved to Michigan?

4   A.   Yes.

5   Q.   And then there's a statement there that you were still

6   struggling with reading, writing and spelling when compared to

7   your peers, and your mother informed your teachers about your

8   history and what prior teachers had done to help Jessica.

9        Are those accurate statements?

10  A.   Yes.

11  Q.   And then the next paragraph states that Jessica and her

12  mother, Jerri Shold also reported that beginning in her

13  earliest school years and continuing through elementary school

14  and beyond, Jessica had severe problems in the following areas.

15  And then they walk through the various areas where you had been

16  experiencing severe problems?

17  A.   Okay.

18  Q.   Are those statements accurate?

19  A.   Where are they on the page?

20  Q.   Second full paragraph.

21  A.   Which ones are you asking about?

22  Q.   Well, we'll look at all of them.

23       Were you having severe problems with making mistakes in

24  your school work?

25  A.   Yes.

1  Q.   Were you having severe problems sustaining attention when

2  you were doing tasks or activities at school?

3  A.   Yeah.

4  Q.   Did you have severe problems finishing your school work

5  both at home and at school?

6  A.   Yeah.

7  Q.   Were you having severe problems procrastinating and losing

8  attention and being distractible?

9  A.   Yes.

10 Q.   If you go to the next paragraph, the last sentence,

11 there's a statement that your first, second, third and fourth

12 grade teachers noticed that Jessica had difficulty with

13 reading, spelling and writing, and each teacher provided extra

14 individual but informal remedial spelling and writing

15 instruction during those grades.

16      Are those accurate statements?

17 A.   Yes.  And with reading.

18 Q.   So they were also providing assistance with reading that

19 was referenced here?

20 A.   Yeah.

21 Q.   And are you aware of any written evidence to support those

22 statements, or is that based on information you provided to Dr.

23 Smith?

24 A.   I believe it was both some comments on either report cards

25 or progress reports or something that we had at the time, and

1    as well as the history provided by myself and my mom who had

2    better memory of what happened when -- at least with the

3    teachers, or discussion with the teachers when I was younger.

4    Q.    So the struggles began in elementary school.  They

5    involved reading, writing and spelling.  Your teachers were

6    aware of those struggles?

7    A.    I believe so, which would be why they would work with me.

8    Q.    And your parents were aware of those struggles?

9    A.    I think in some ways.  I don't know if they knew the

10   extent.

11   Q.    And so I take it you were not able to mask the problems

12   you were having by virtue of your intelligence or your

13   knowledge of a given subject, they were still aware of the

14   issues you were having?

15   A.    Again, I don't think they knew the extent.  I think they

16   were aware that I was struggling to read because I was an

17   extremely slow reader or would struggle to read like story

18   problems for math, so they would read it to me.  But I think

19   because I was working hard and trying to do the things, they

20   helped me to do them.  And so they were aware that I needed

21   extra help to do these things.

22   Q.    Look, if you would, at your personal statement that you

23   provided in support of your initial request for accommodations

24   on the Step 1 exam, which is Defendant's Exhibit 4, Tab B.

25   A.    You said B?  You said Tab B?

 1  Q.   Tab B as in boy, yes.

 2  A.   Okay.

 3  Q.   In that document, you'll look at page 2, first full

 4  paragraph.   There's a discussion of a teacher in the second

 5  grade who had noticed trouble that you were experiencing with

 6  letter reversals.

 7  A.   Uh-huh.

 8  Q.   And then it goes on to say that she provided you with an

 9  alphabet chart?

10  A.   Uh-huh.

11          THE COURT:   That's a yes?

12          THE WITNESS:   Yes, sorry.

13  BY MR. BURGOYNE:

14  Q.   And then put you in what's referred to here as a time-out

15  desk?

16  A.   Yes.

17  Q.   I believe in your testimony earlier, you said that was

18  your first grade teacher.   Is it in fact your second grade

19  teacher?

20  A.   No.   I believe it was actually my first grade.   My memory

21  at the time that I wrote this, I wasn't sure.   But then when he

22  looked back at the timeline of everything, figured out that it

23  was my first grade teacher.   But I also had these things -- the

24  alphabet chart and the separate desk in second grade, so I

25  remembered having it in second grade too.

1  Q.   Look at the last two, three sentences of this paragraph,

2  if you would, please.

3       After discussing those accommodations that you received

4  from the teacher -- and you're saying that was in both the

5  first grade and the second grade?

6  A.   And later too, but...

7  Q.   And these were informal accommodations.  Right?

8  A.   Correct.

9  Q.   They weren't anything that the school had officially

10 approved for you?

11 A.   I wouldn't know.  I just know that the teacher provided

12 them.

13 Q.   Okay.  Well, in fact you say in your next sentence here,

14 you address that issue.  You say:  Unfortunately, these

15 accommodations were unofficial, enacted by my teacher rather

16 than the school, so I do not have any record that they were

17 provided.  Other than this visual testing --

18      And you're referring there to the evaluation you had by

19 Dr. Tanguay; is that correct?

20 A.   Yes.

21 Q.   And you say:  Other than this visual testing, I was not

22 evaluated for learning disabilities until 2009 and so did not

23 receive any other aid or accommodation.  Consequently, I have

24 little supporting documentation from my childhood.

25      Was it accurate, as you said in this report, that you did

1  not receive any other aid or accommodation, informal or formal,

2  during your educational years?

3  A.    I believe in my mind when I wrote this, I was referring to

4  formal accommodations, because I didn't receive other formal

5  accommodations.  I did receive informal accommodations

6  throughout my education.

7  Q.    But this paragraph, you agree, is dealing with informal

8  accommodations that you received?

9  A.    Are you asking if it's talking about I did not receive any

10 other informal accommodations?

11 Q.    No.  When you were discussing the alphabet charts and the

12 time-out chair, that was an informal accommodation?

13 A.    Yeah.  That's what I remember.  We don't have

14 documentation of them.

15 Q.    Look at the bottom of this paragraph.  And there's some

16 discussion that overlaps with some testimony you gave this

17 morning.

18       First of all, at the end of that paragraph that begins

19 "growing up," there's a statement:  I rarely got an exam grade

20 that accurately reflected how much I knew.

21       Was that an accurate statement?

22 A.    Yes.

23 Q.    You then go on to discuss your -- then you had tested into

24 the ACE, Academic Creative Education program in elementary

25 school when you lived in Texas.

1    And that was an accelerated program, I think you said, for

2  math?

3  A.   I believe it was accelerated and it was math.

4  Q.   Then you go on to say that when you moved to Michigan, you

5  had to wait until the end of the year to test into an

6  accelerated program that started in the sixth grade in Michigan

7  and continued through high school.

8    So were you in an accelerated educational program from

9  sixth grade through high school while you were in Michigan?

10 A.   Just in math.

11 Q.   Just in math.  You were first diagnosed with dyslexia in

12 2018 by Dr. Smith.  Correct?

13 A.   Yes.

14 Q.   And how old were you at that time?

15 A.   I would have been 28 probably, depending on the month.  I

16 think that was in the fall, so yeah, 28.

17 Q.   And you were first diagnosed with ADHD in 2009 by Dr.

18 Smiy?

19 A.   Yes.

20 Q.   And at that point you were a sophomore in college?

21 A.   I believe so.

22 Q.   Look again, if you would, please, at your personal

23 statement, which was Defendant's Exhibit 1, Tab A.  And this is

24 again a personal statement that you sent to NBME in support of

25 your second request for accommodations?

1   A.   Okay.

2   Q.   Look at page 8, if you would, and the second full

3   paragraph that begins "in 2009."

4   A.   Under the asterisks?

5   Q.   Yes.

6   A.   Okay.

7   Q.   Do you see that paragraph?

8   A.   Yes.

9   Q.   Did you see the statement:  Dr. Smiy also clinically

10  diagnosed me with dyslexia but did not recommend further

11  workup.

12        Did accurate that Dr. Smiy clinically diagnosed you with

13  dyslexia in 2009?

14  A.   I'm sorry, where is it, the sentence you're talking about?

15  Q.   The last sentence in that paragraph.

16  A.   Okay.  And then what was your question again?

17  Q.   Whether Dr. Smiy clinically diagnosed you with dyslexia,

18  as you informed the NBME in 2008?

19  A.   Yes.

20  Q.   Okay.  So which is it?  I thought you were first diagnosed

21  with dyslexia by Dr. Smith or -- Dr. Smith in 2018, and here

22  you're referring to having been diagnosed by Dr. Smiy in 2009?

23  A.   My understanding at that time was that it could be

24  clinically diagnosed not just with neuropsychological testing.

25  And so I -- from my understanding, he had clinically diagnosed

1    me with dyslexia.  He just hadn't referred me for the

2    neuropsychological evaluation which later was provided by Dr.

3    Smith in...

4    Q.    And what's the documentation that you can point us to that

5    reflects his clinical diagnosis?

6    A.    When he filled out the form for OSU and wrote on there.

7    Q.    And that's a form that was verifying the fact that you had

8    ADHD?

9    A.    Yes.

10   Q.    Look if you would, please, at Defendant's Exhibit 8 and

11   let's go through some of your educational records.

12   A.    You said 8?

13   Q.    Defendant's Exhibit 8.  This colorful page with stickers.

14         Do you recognize Exhibit 8 as records that you obtained

15   from your kindergarten years?

16   A.    Yes.

17   Q.    And you don't have to spend much time on these, but was it

18   the general practice that if you were doing everything you were

19   supposed to do and exhibiting proper behavior, you would get a

20   sticker for that week?

21   A.    I don't know about everything, but generally if you

22   weren't misbehaving or causing too many problems, you would get

23   a sticker.  I mean, it's kindergarten, so...

24   Q.    There are various comments provided in the kindergarten

25   report by your teachers?

1  A.   I'm sorry, what was the question?

2  Q.   Yeah.  Your teachers in kindergarten provided comments,

3  didn't they?

4  A.   Sometimes.

5  Q.   Look, if you would, at Defendant's Exhibit 9.

6       And I believe you testified earlier that some of your

7  particular struggles were occurring in grades 1 through 4; is

8  that correct?

9  A.   They were always occurring.

10 Q.   Okay.

11 A.   But they were probably -- I received the most help in

12 grades 1 through 4.

13 Q.   Let's look at Exhibit 9, which is in fact your report card

14 from kindergarten.

15 A.   Okay.

16 Q.   Do you see there's comments on the left side?

17 A.   Yes.

18 Q.   Jessica is a wonderful student, works hard in class,

19 always does her best.  Making good progress in all areas.

20 Becoming more assertive and independent, doing well in class,

21 very nice girl.

22      And is that your mother's signature there?

23 A.   Yes.

24 Q.   And then the next page is your grades for that year?

25 A.   Okay.

1  Q.   And then it has your general work habits over there and

2  your social development.

3       And were there any work habits such as adequately paying

4  attention, your adequate attention span, or showing personal

5  organization in which you were given anything other than

6  excellent progress?

7  A.   Just under the social development and conduct one,

8  there's --

9  Q.   That has to do with self-confidence.  Right?

10 A.   Yeah.

11 Q.   Look if you would, please, at Defendant's Exhibit 10.

12      Is this a first grade report that you provided?

13 A.   Yes.

14 Q.   And look at the second page of this document for me.

15 A.   Okay.

16 Q.   And again, are these the grades that you received in first

17 grade?

18 A.   Yes.

19 Q.   And you got a grade for phonics, which was a 94.  And your

20 reading grade was E at that time, and that reflected excellent

21 progress?

22 A.   Yeah, excellent progress.

23 Q.   Defendant's Exhibit 11 is your second grade report card

24 from kindergarten or from Sunset Oaks Academy; is that correct?

25 A.   Yes.

1  Q.   And then on page 2, are those your grades from the -- from
2  that grade?
3  A.   Yes.
4  Q.   And you had a 94 in phonics, S plus in reading and then 97
5  in spelling; is that correct?
6  A.   Yes.
7  Q.   Exhibit 12 is the report card you produced.  And this is
8  your physical education report card which just addresses your
9  conduct in physical education; is that right?
10 A.   Yes.
11 Q.   Exhibit 13.  Now we're at Carrollton-Farmers Branch School
12 District, which was the school we discussed a few minutes ago
13 in Texas where you indicated that I believe you had time --
14 were struggling there as well?
15 A.   Yes.
16 Q.   And the first one is your grade 3 report card; is that
17 correct?
18 A.   Yes.
19 Q.   And on the bottom left of the first page, does that
20 indicate that you had achieved mastery in reading?
21 A.   I'm sorry, yes.
22 Q.   And then there's a place where it looks like where your
23 mother could indicate whether you needed any tutorials.
24      And did she indicate at that time that you needed any
25 tutorials?

1  A.   I'm not sure if it was my mom who circled or the teacher

2  who circled, but there were no tutorials that were indicated.

3  Q.   Fair enough.  So whether it was your mom or your teachers,

4  nobody apparently believed you needed tutorials at that point

5  in your education?

6  A.   Apparently not.

7  Q.   Then we get to your grades on the next page.

8       Would you agree with me in grade 3, you had all A's?

9  A.   Where?

10 Q.   On the left side for your academic areas.  For your final

11 grades?

12 A.   Yes.

13 Q.   And then one of your academic areas was reading, where you

14 achieved grades of 86, 91, 93, 92, 96 and 96.

15      And those were all grades that you received certainly

16 without any formal accommodations?

17 A.   Yeah, without formal accommodations.

18 Q.   Now, this is an interesting report card, because it

19 indicates whether you're receiving additional classroom

20 supports.

21      So look at the right, if you would, where's there's a

22 reference to additional programs and support.

23 A.   Okay.

24 Q.   And was there any indication at this time that you were

25 taking any classes in the learning center?

1   A.   No.

2   Q.   Was there any indication that you were getting specialized

3   reading support from anyone?

4   A.   There are no check marks in that area, so no.

5   Q.   And was there any indication that your grades were based

6   on intensive teacher assistance?

7   A.   Again, there's no check marks in any of those, so no.

8   Q.   And this is one of the grades where you testified you were

9   receiving special assistance from your teachers on virtually a

10  daily basis?

11  A.   Yes.  I was still receiving help then.

12  Q.   Is there any indication at this time that you were getting

13  special tutoring?

14  A.   No.

15  Q.   Look at DX-14, which is your fourth grade report card

16  while you were at Carrollton?

17  A.   Okay.

18  Q.   Did anyone indicate, either your mother or your teachers,

19  that tutorials were needed when you were in the fourth grade?

20  A.   The only one that's circled is for the number 2, which is

21  no.  For the rest, I can't say.

22  Q.   There are no yeses circled, are there?

23  A.   No.

24  Q.   Then on the second page are your grades from grade 4.

25  A.   Okay.

1 Q.   And you had straight A's as your final grades for this

2 academic year as well?

3 A.   Yes.

4 Q.   Again, your reading level was shown to be on level for all

5 semesters, for all parts of the calendar year; is that correct?

6 A.   Yes.

7 Q.   And your reading grades were -- the last two were 94 and

8 94?

9 A.   Yes.

10 Q.   And again, if we can go to the additional program support,

11 there's nothing here indicating that you were getting

12 specialized reading support; is that correct?

13 A.   That's correct.

14 Q.   And nothing indicating that your grades were based on any

15 sort of intensive teacher assistance.  Correct?

16 A.   That's correct.

17 Q.   And the one thing that is indicated here is the ACE is

18 circled, and that's a reference to I believe the accelerated

19 program in math that you testified to earlier?

20 A.   Yes.

21 Q.   DX-15.  I believe this is the year that you testified that

22 you moved -- fifth grade you moved from Texas to Michigan.

23       Is this the report card from the first half of your school

24 year when you were still in Texas?

25 A.   Yes.

1  Q.   And are those your grades on the second page there for the

2  first two -- I don't know, what do they call them, semesters,

3  but the first two parts of the academic year when you were

4  still at Carrollton?

5  A.   Yes.

6  Q.   At that time your reading grades it looked like were 97

7  and 94?

8  A.   Yes.

9  Q.   And on the right side, was there any indication that in

10  the fifth grade you were receiving specialized reading support?

11  A.   No.

12  Q.   And again, no indication you were getting intensive

13  teacher assistance?

14  A.   No.

15  Q.   Defendant's Exhibit 16.  This is your report card from St.

16  Joseph's Public School at Brown Elementary School for the

17  second half of grade 5; is that correct?

18  A.   Yes, I believe so.

19  Q.   Is it correct, you have straight A's on the right side?

20  A.   A's and A minuses and O.

21  Q.   And O stands for outstanding; is that correct?  The key to

22  the grades, middle of the page, bottom.

23  A.   Yes.

24  Q.   Do you see there's some comments provided on the second

25  semester next to your language course, there's a comment, and

1  just there's a little code, it says O under COM?  And you see

2  the comments are at the bottom?

3  A.   Okay.

4  Q.   And O stands for excellent study skills?

5  A.   Okay.

6  Q.   What class was that?

7  A.   I would assume language arts.

8  Q.   And then your reading grade was an A?

9  A.   Yes.

10 Q.   And you were not receiving any type of formal

11 accommodations from the school at that time?

12 A.   No formal accommodations, no.

13 Q.   And this was a public school?

14 A.   Yes.

15 Q.   So to your knowledge, did they have individual education

16 programs available for students?

17 A.   I would assume so.

18 Q.   Look at the last page on this document, which are comments

19 from your teachers.

20 A.   Okay.

21 Q.   Second marking period:  Jessica is doing beautiful work in

22 all subject areas!

23      Then the fourth period:  You're doing fine work in all

24 subject areas all semester.  Jessica, congratulations for

25 winning second place in the original book category and expo.

1   Keep on writing creatively and consider working on the school

2   paper.

3        And is it your testimony that this was a time when you

4   were struggling with reading and writing at school?

5   A.   Yes.

6   Q.   Exhibit 17 is your report card from grade 6.  Looks like

7   you're now at Upton Middle School?

8   A.   Yes.

9   Q.   And did you have straight A's both semesters in the sixth

10  grade?

11  A.   A's and A minuses, yeah.

12  Q.   And again, this was at a time when you were not receiving

13  any formal accommodations from the school?

14  A.   Correct.

15  Q.   Exhibit 18, is this a report card reflecting your grades

16  from grades 9, 10, 11 and 12, so basically your high school

17  grades from St. Joseph's High School?

18  A.   Yes.

19  Q.   And it shows that -- it looks basically like you have all

20  A's and an occasional B plus; is that correct?

21  A.   I see several B's and B pluses and B minuses.

22  Q.   I see one B minus.

23       In any event, all A's and B's?

24  A.   Yes.

25  Q.   And your final grade point average was a 3.747 on the

 1  right side?

 2  A.   Yes.

 3  Q.   And your class rank was 28 out of 225 students?

 4  A.   That's what it says.

 5  Q.   Look at some of these courses you were taking in high

 6  school.

 7       It looks like you were taking an Honors English class in

 8  the ninth grade?

 9  A.   Yes.

10  Q.   And you were taking Honors Algebra?

11  A.   Yes.

12  Q.   And again, in 10th grade and 11th grade you also took

13  Honors English classes?

14  A.   Yes.

15  Q.   And you received A's in both semesters for those two

16  courses?

17  A.   For 10th and 11th you're talking?

18  Q.   Yes.

19  A.   Yeah.  For 10th was A's and 11th was A minuses.

20  Q.   And then you also took Advanced Placement US History?

21  A.   Yes.

22  Q.   In the 11th grade?

23  A.   Yes.

24  Q.   And then it looks like you were taking Honors Chemistry

25  and Honors Physics as well; is that correct?

1   A.   Yes.

2   Q.   And then it looks like in 10th grade you were taking

3   Honors Trigonometry and Honors Biology?

4   A.   Yes.

5   Q.   And while you were getting all of these good grades, you

6   were also participating in extracurricular activities?

7   A.   Sometimes.  It depends on like the season.

8   Q.   Look at Defendant's Exhibit 19 for me.

9   A.   Okay.

10  Q.   And you'll see these, this is a document captioned Alumni

11  History from St. Joseph's High School.  And it's got your name

12  there, and 2008.

13       2008 was the year you graduated?

14  A.   Yes.

15  Q.   And then it looks like for your years -- why don't you

16  just tell us, what years were you a varsity swimmer at St.

17  Joseph's High School?

18  A.   All four years.

19  Q.   And what years did you play on the soccer team at high

20  school?

21  A.   On -- does it matter which one?

22  Q.   Doesn't matter.

23  A.   All four.

24  Q.   And were you a captain of swim team your senior year?

25  A.   Yes.

1   Q.   And it also looks like you played volleyball?

2   A.   Freshman -- sorry, freshman and JV, so for two years.

3   Q.   And then look if you would at Defendant's Exhibit 20,

4   which is a senior athletic awards --

5   A.   Yes.

6   Q.   -- document.  And if you look at the page that says at the

7   bottom right-hand corner NBME 1033.  It's a little harder to

8   read.  I apologize.

9   A.   Okay.

10   Q.   Do you recall that you were -- you see your name under the

11   last award section for the Southwestern Michigan Athletic

12   Conference Academic Conference Members with a GPA of 3.5 or

13   better?

14   A.   Yes.

15   Q.   And then it looks like right above that, you also got a

16   senior athletic plaque award.

17        What did the plaque award symbolize or represent?

18   A.   I'm not sure, to be honest.

19   Q.   Look at DX-56 -- a little trickier -- which is your other

20   notebook.

21   A.   Okay.

22   Q.   While you're looking at that, DX-56 is an electronic

23   admission application that you submitted to the University of

24   Wisconsin in Madison, Wisconsin in 2008; is that correct?

25   A.   This may have been a draft.  I don't know if it's what was

1  actually submitted.

2  Q.   Go, if you would, to the page which, if you're looking at

3  the top, is page 7.

4       And here's an additional listing of activities that you

5  participated in in high school.  Do you see that?  Section 8,

6  Activities?

7  A.   Yeah.  Yes.

8  Q.   And so again, it's got soccer, swimming, captain, Coach's

9  Award, varsity four years.  You were also a member of the

10 National Honor Society?

11 A.   Yes.

12 Q.   It looks like you were a volunteer at a Miracle Baseball

13 League?

14 A.   Yes.

15 Q.   You were in the Key Club.

16      What's the Key Club?

17 A.   I don't really remember.  I think it -- I didn't really go

18 to the meetings.  So I think I went to a couple of them.  And

19 then we volunteered I think a couple times as a group.

20 Q.   And then you were in the Spanish Club, and you were also

21 the men's swim team manager.  And it looks like you devoted

22 approximately 15 hours a week when you were doing that?

23 A.   Yeah.

24 Q.   And it looks like when you were playing soccer, that was

25 taking you 12 hours a week, and swimming was taking you about

1    20 hours per week?

2    A.    Yeah.    These were averages, but yeah.

3    Q.    Okay.    And then you also tutored at some point.    It looks

4    like you spent two hours a week tutoring somebody, for two

5    years.

6          What were you tutoring, what subject?

7    A.    I don't remember.    But I know it was somebody else

8    younger, like in maybe fourth grade.    It was probably math or

9    science.

10    Q.    And then babysitting, you spent five hours a week

11    babysitting?

12    A.    Approximately.    But again, it's an average.

13    Q.    If you go to the page that says page 10 at the top.    It

14    was an essay you wrote where the school was trying to get a

15    better sense of you?

16    A.    Yes.

17    Q.    And is this an essay you sent to or prepared for the

18    University of Wisconsin?

19    A.    Again, I don't know if it was the final, but yes.

20    Q.    And in this essay, were you walking through a typical day

21    in your life?

22    A.    Not a typical day, but it was a day that I thought showed

23    some of my skills.

24    Q.    And then in this discussion, it has you getting up at 5:45

25    a.m., getting to morning swim practice at 6:00 a.m.    7:00 a.m.

1  into the showers.  8:00 a.m. school starts.  Then you go to

2  Honors English, Honors Chemistry, eat lunch, on to AP History,

3  AP Calculus.  End of the school day, school is over.  Pack, get

4  ready, back into the pool.  Another two-hour practice.  Drive,

5  determination, get a ride, practice is over.  Change.  Change

6  into shin guards and socks, cleats, 20 minutes to soccer

7  practice.  Soccer practice till 8:00 p.m.  Drive 20 minutes

8  home.  Then begin to work on your homework, research paper,

9  Spanish translation and exercises, pre-lab chemistry problems,

10  chapter review questions.  Take a break for food, back to

11  homework.  Continue with a 35-page history chapter and 15

12  extremely hard calculus problems.  2:00 a.m., done for the day.

13  Not quite done with homework.

14      Did you have days like that in high school?

15  A.   Some, yes.

16  Q.   And then in fact, on the next page, there's a

17  certification of accuracy saying the information that you had

18  provided in your application was accurate?

19  A.   Okay.

20  Q.   Correct?

21  A.   Yes.

22  Q.   Look, if you would, at DX-7.

23  A.   7?

24  Q.   7.  These are I believe some interrogatory responses you

25  provided to us in discovery.

1  A.   Okay.

2  Q.   And we'll go through them all again, but does this also

3  include a discussion of your extracurricular activities?

4  A.   What page?

5  Q.   Page 14.  And these look like extracurricular activities

6  after you graduated from high school.  Do you see that?

7        MR. BERGER:   I'm sorry, where are we in this document?

8        MR. BURGOYNE:   The first one -- there's two spots.

9  The first one is on page 14, discussion of jobs and activities

10 that she performed after high school.

11       THE WITNESS:   The one on 14, the date ranges are from

12 like present, so while I've been on leave.  And I think it goes

13 backwards.

14 BY MR. BURGOYNE:

15 Q.   Actually, the ones I really want to ask you about are

16 the -- turn to page 22, if you would.

17 A.   Okay.

18 Q.   And again these are just additional activities that you

19 participated in while you were in high school; is that correct?

20 A.   Mostly in high school.  Some of them were outside of high

21 school.

22 Q.   One of the things that it looks like you did is you

23 participated in acting, paid and unpaid?

24 A.   Yes.

25 Q.   And it looks like you said about two to three hours per

1  week for a couple of weeks.

2      It also says you were a lifeguard for several years?

3  A.   Yes.

4  Q.   And did you do that both in the school year but mostly in

5  the summers?

6  A.   A lot of these were mostly in the summers.  And then if I

7  had time like over a winter break or something, would pick up a

8  shift.

9  Q.   And you both -- you were responsible for the safety of the

10  people in the pool when you were the lifeguard?

11  A.   Yes.

12  Q.   And then you also taught lessons?

13  A.   Yes.  But not while I was lifeguarding.

14  Q.   That was separate from --

15  A.   Yeah.  It might be there were two guards on duty if I had

16  lessons or maybe my shift that day was only lessons.

17  Q.   And then it looks like you were also in an indie film at

18  some point in 11th grade?

19  A.   As part of the acting.  That was over the summer.

20  Q.   You did some modeling and then also participated in dance

21  as a high school elective?

22  A.   Yes.

23  Q.   Then at this point on the strength of your grades and your

24  ACT score, which we'll discuss in a minute, you were admitted

25  to Ohio State University?

1  A.   I'm sure they weighed a lot of parts of my application.

2  They didn't tell me what it was based off of, but I would

3  assume grades and extracurricular activities and essays and

4  letters of recommendation.

5  Q.   And then you began attending Ohio State in the fall of

6  2008.   Correct?

7  A.   Yes.

8  Q.   Let's look at Dr. Smiy's evaluation.   He's the one who

9  diagnosed you with ADHD.   Correct?

10  A.   Yes.

11  Q.   Let's look at -- it's DX-41 in the notebooks you have.

12      And this is the first time you've been diagnosed with a

13  disability that led to accommodations; is that correct?

14  A.   Formal accommodations, yeah.

15  Q.   And Exhibit 41, this is the record of your visit to Dr.

16  Smiy; is that correct?

17  A.   I believe so.

18  Q.   And you testified, I believe, that you went to see him

19  because you wanted to get documentation to support

20  accommodations at Ohio State University?

21  A.   I believe.   I believe so.

22  Q.   And you also testified that you were having problems, as I

23  recall, that were identified by maybe an organic chemistry

24  teacher and a Spanish teacher?

25  A.   Uh-huh.

1    Q.   Why didn't they give you informal accommodations?  Why did

2    you feel the need to get formal accommodations?  Why didn't

3    they just give you extra time?

4    A.   Because apparently they weren't allowed to because they

5    told me such, that they wish they could but they can't just do

6    that and it has to go through the university, so they

7    recommended going through the appropriate channels.

8    Q.   And then you went to see Dr. Smiy, and he had -- he was

9    your primary care physician at this point and had been for

10   several years?

11   A.   Yes.

12   Q.   And if you look -- well, let's get the date on here for

13   our bearings.

14        This is March 24, 2009, and it reflects an office visit.

15   And next to it he has -- someone has typed in ADD/ADHD?

16           MR. BERGER:  What page are you on?

17           MR. BURGOYNE:  The first page.

18           THE WITNESS:  Yes.

19   BY MR. BURGOYNE:

20   Q.   Do you see that?

21   A.   Yes.

22   Q.   And then on page 2, there's a history of the present

23   illness.

24        At this time you spent -- all the time that you spent with

25   him was just spent talking with him; is that correct?

1  A.   I'm sure he did a physical exam, but otherwise, yes.

2  Q.   Okay.  He didn't administer any diagnostic assessments?

3  A.   He asked me questions, but I -- he didn't do testing like

4  Dr. Smith did.

5  Q.   And he didn't have you fill out any symptom checklists or

6  anything like that?

7  A.   Not that I remember.  I just remember him asking

8  questions, which may have been part of a checklist.

9  Q.   Then if you see under the history of present illness, and

10  it says, reasons for visit, see chief complaint.  Chief

11  complaint, ADD/ADHD?

12  A.   Are we on the same page?

13  Q.   Page 2 at the bottom.

14       Do you see that?

15  A.   Yes.

16  Q.   There's a discussion right below that, high school, no

17  problems?

18  A.   Yes.

19  Q.   Do you see that?  Is that information you provided to him

20  during your discussion?

21  A.   Not that I remember.

22  Q.   And then the next page, there's the statement:  College

23  stress is making her switch letters around a bit, always a slow

24  reader, takes a lot of concentration for her to read, has to

25  reread a lot to get to the point.  Not as good of a test taker,

1  better orally, names are a problem for her, procrastinates,

2  reading especially, multitasking okay.

3      Is that information you provided to him during your

4  evaluation?

5  A.   I think that it is some of the information I provided and

6  that he interpreted and made notes of in his notes.

7  Q.   Turn to the next page, if you would, please.

8      And at the bottom there's an assessment that he makes?

9  A.   Okay.

10  Q.   Do you see that he has comments, and it says:  ADD versus

11  possible dyslexia.  Patient has more focus issues than dyslexic

12  tendencies.  Recommend a trial of Ritalin as prescribed.

13      At this point did he place you on Ritalin?

14  A.   Yes.

15  Q.   Was that the first time in your life you had been taking

16  Ritalin or any other type of medication to address any

17  attention-related issues?

18  A.   Yes.

19  Q.   You were never on Ritalin when you were in high school,

20  elementary school, any of those places?

21  A.   No.

22  Q.   And it looks like he gave you an ADD survey and

23  literature.

24      Do you recall him doing that?

25  A.   I don't.  I don't recall.  I think he gave a pamphlet.

1   Q.   And then it says:   Face to face time with the patient, 30

2   minutes.

3        Is that consistent with your recollection of how long you

4   spent with Dr. Smiy?

5   A.   Yeah, I think that's probably about what it was.

6   Q.   Look to Exhibit 42 for me, if you would.

7        Is this a form that you had to get Dr. Smiy to complete in

8   support of your request for accommodations at Ohio State?

9   A.   Yes.

10  Q.   Did you complete the first part -- is that your

11  handwriting on the first part of page 2, the student

12  information?

13  A.   Yeah.  Yes.

14  Q.   And then did you provide this form to Dr. Smiy's office to

15  complete the diagnostic information?

16  A.   I believe that it was faxed to him from the office of

17  disability services.

18  Q.   Here he does assign a formal diagnosis to you.  He

19  diagnoses you with -- he says 314, predominantly inattentive.

20       Did you understand that to be predominantly inattentive

21  type of ADHD?

22  A.   At this time I believe that's what he thought.

23  Q.   And he didn't indicate there was an issue with

24  hyperactivity or impulsivity?

25  A.   He didn't check those.

1   Q.   Okay.   And then in the next box he tells us how he arrived

2   at his diagnosis; is that correct?

3   A.   That's what that category is, and then he checked.

4   Q.   And what did he check under there?

5   A.   Developmental history, medical history, structured or

6   unstructured, clinical interview with the student.

7   Q.   Then on the next page, there is a statement, what is the

8   severity of the condition, and he checked moderate; is that

9   correct?

10  A.   I'm sorry, you said the next page?

11  Q.   Yes.   It's page 3 at the bottom.

12  A.   At the bottom?

13  Q.   Yes.   It says page 3 on the bottom of the page, and the

14  reference to the severity is at the top.

15       Do you see that?

16  A.   Sorry.   Yes.

17  Q.   And he identified the severity of your condition as

18  moderate?

19  A.   Yes.

20  Q.   Then the next one in terms of your ADHD history, he states

21  no hyperactivity component known.

22       And then above that he states that his first contact with

23  you was in February of 2003 and his last contact with you was

24  July 2010.

25       So he had been your primary care physician at least as of

1   that point for about seven years?

2   A.   At that point, yes, but I can't really read his

3   handwriting very well, so --

4        THE COURT:  Counsel, before you go to another exhibit

5   or another page, we're going to take a brief break now.  We'll

6   be in recess for 15 minutes.  I have a conference call.

7        MR. BURGOYNE:  Thank you, Your Honor.

8        (Recess at 3:00 p.m. until 3:16 p.m.)

9        THE COURT:  All right.  Let us proceed.

10       And again, I'll remind you you're still under oath

11   from previously being sworn earlier.

12       THE WITNESS:  Yes, Your Honor.

13       THE COURT:  Counsel, you may proceed.

14   BY MR. BURGOYNE:

15   Q.   Jessica, we are still looking at your ADHD verification

16   form.  And if you could look at page 4 of that document for me.

17   A.   Okay.

18   Q.   And do you see in the middle of the page, there's a

19   heading called educational history?

20   A.   Yes.

21   Q.   And it says:  Provide a history of the use of any

22   educational accommodations and services related to this

23   disability?

24   A.   Okay.

25   Q.   And what did Dr. Smiy provide in response to that

1    question?

2    A.    The first word is "none."  And I don't know what --

3    something date, to date.

4    Q.    It might say none known to date?

5    A.    Yeah, none known to date.

6    Q.    And then the bottom of the page, he identifies some ADHD

7    symptoms that in his view you were currently exhibiting.

8         And do you see he's marked some but not all of the

9    symptoms for inattention on the bottom of page 4?

10   A.    Yes.

11   Q.    And then on the bottom -- the top of page 5, for your

12   hyperactivity symptoms, he appears to have indicated NA, not

13   applicable, and the same for impulsivity; is that correct?

14   A.    Yes.

15   Q.    I believe you indicated, actually, they started approving

16   accommodations for you at Ohio State before you submitted the

17   verification form?

18   A.    Yes.  They had temporary accommodations.

19   Q.    Those temporary accommodations were provided in the May

20   time period of your sophomore year?

21   A.    I'm not sure exactly when those started.

22   Q.    In any event, at some point during your sophomore year?

23   A.    Yes.

24   Q.    Look at DX-22, if you would, for me.

25         Is this your transcript from Ohio State University?

1   A.   Yes.

2   Q.   I think you testified that when you got to college, you

3   encountered a lot more reading?

4   A.   Yes.

5   Q.   So college was harder than high school was?

6   A.   I think it depends on the class, because if it was like

7   dance, it wasn't really reading.  But in general, the content

8   was harder, and the reading, there was more reading, but I

9   didn't necessarily get to the reading.

10  Q.   And you indicated -- I think you testified you couldn't

11  handle it, you were drowning, you couldn't keep up once you got

12  to college.

13       Is that your testimony earlier?

14  A.   Yes.

15  Q.   Look at your transcript for the first quarter.

16       So Ohio State was on the quarter system?

17  A.   Yes.

18  Q.   So in the autumn 2008 quarter, it looks like you made

19  Dean's List?

20  A.   Where does it say?

21  Q.   Right above winter 2009 quarter to the left.

22  A.   Yes.

23  Q.   And it shows your cumulative GPA after your first quarter

24  was -- it looks like a 3.566?

25  A.   Yes.

1  Q.    Correct?

2  A.    Yes.

3  Q.    And you were not receiving any accommodations at that

4  time?

5  A.    No.

6  Q.    Likewise --

7  A.    Not formal accommodations.

8  Q.    I thought we established earlier you weren't getting

9  informal accommodations at Ohio State because they couldn't

10  just give them to you?

11  A.    Again, it would depend on what it was, like whether they

12  were helping me explain something versus on testing, something

13  on grades or not.

14  Q.    So they weren't giving you extra testing time in all

15  events, were they?

16  A.    No.

17  Q.    Then likewise for the winter quarter, you again made

18  Dean's List.  And at that time you were not receiving any

19  extended testing time or any other accommodation along those

20  lines?

21  A.    I did receive -- or I was on the Dean's List.  That was

22  your first question.  Right?

23  Q.    Right.

24  A.    And then I had, again, like I said, informal

25  accommodations but no extended time on testing, like formal

1    accommodations.

2    Q.    And it looks like you've got all A's and B's up to through

3    the winter 2010 quarter.  And your cumulative GPA at that point

4    was a 3.635; is that correct?

5    A.    After the winter quarter?

6    Q.    After your winter 2010 quarter.

7    A.    Yes.

8    Q.    And then it was -- it looks like in the spring quarter,

9    perhaps you got accommodations on your year-end exams.  Is this

10   when you would have started getting accommodations, in the

11   spring?

12   A.    I definitely had them by the spring.  I don't know, like I

13   said, when the temporary kicked in.

14   Q.    Then if you look at your grades afterwards, it looks like

15   they stayed A's and B's after you started receiving

16   accommodations with the exception of one C; is that correct?

17   A.    Are we on the other page?

18   Q.    Yes.  Two pages over, I'm sorry.

19   A.    Yes.

20   Q.    Let's look a little bit at your standardized testing

21   history.

22         You've taken several standardized tests over the course of

23   your lifetime; is that correct?

24   A.    Yes.

25   Q.    And they began in kindergarten?

1  A.   I think so.

2  Q.   Look at Defendant's Exhibit 24.

3  A.   Okay.

4  Q.   And you see this is a Stanford Early School Achievement

5  test?

6  A.   Yes.

7  Q.   And it has your name on the right side?

8  A.   Yes.

9  Q.   And kindergarten, it appears the date of testing was April

10  1996 and you were at Sunset Oaks Academy at that time?

11  A.   Yes.

12  Q.   And what was your percentile rank for your total reading

13  score on that exam?

14  A.   96.

15  Q.   And then word reading, you were in the 86th percentile?

16  A.   Yes.

17  Q.   And by 96th percentile, that means you were in the top

18  4 percent of the individuals who were taking that test for some

19  period of time?

20  A.   I believe so.

21  Q.   And you didn't receive any accommodations on this

22  standardized test, did you?

23  A.   I don't remember taking this test, so...

24  Q.   Fair enough.  Exhibit 25, another standardized test.  You

25  took this one in the first grade.  And your total reading score

1    was what percentile?

2    A.    70.

3    Q.    70th percentile.  And then Exhibit 26, another Stanford

4    Achievement Test.  You're in the second grade.  I believe you

5    indicated this was one of the grades when you were getting

6    informal accommodations?

7    A.    Yes.

8    Q.    And your total reading, you were in the 88th percentile in

9    the second grade?

10   A.    Yes, yes.

11   Q.    And your reading comprehension was at the 76th percentile?

12   A.    Yes.

13   Q.    Correct?

14        And again, at this point you were not receiving any formal

15   accommodations?

16   A.    Correct.

17   Q.    Let's look at Defendant's Exhibit 27, which is the Iowa

18   Test of Basic Skills and Cognitive Abilities Test.

19   A.    Okay.

20   Q.    Do you recall reviewing this document when you were

21   preparing your materials to submit to the NBME?

22   A.    Not the first time, but I think it would have been after

23   the second.

24   Q.    Perhaps in connection with one of the reconsideration

25   requests?

1  A.   Are you talking about like before the third one?

2  Q.   Yeah.  At any point did you consider whether you should

3  submit this document to the NBME?

4  A.   I think I asked if this was relevant but also I probably

5  did ask if it was something that I should submit.

6  Q.   Who did you ask?

7  A.   I don't recall specifically, but if it was something I

8  found before seeing Dr. Smith or in the time that I knew Dr.

9  Smith, then I probably sent it to him and asked if it was

10  relevant to documenting -- the documentation that should be

11  submitted.

12  Q.   And eventually, this document was never provided to NBME,

13  was it?

14  A.   It was provided during the discovery.

15  Q.   Discovery, but not in support of any of your accommodation

16  requests?

17  A.   No.

18  Q.   Okay.  And this is from -- what grade were you in here?

19  This is the sixth grade, it looks like.  The sixth grade.

20       Do you see that in the upper right-hand corner?

21  A.   I believe so, yeah.

22  Q.   And do you see that the basic skills that you were

23  evaluated for at that time included vocabulary, reading

24  comprehension and then a reading total?  Do you see that on the

25  left side?

1  A.   Yes.

2  Q.   And do you see on the top of obtained scores there's a

3  heading that says NPR, national percentile rank?  Do you see

4  that?

5  A.   Yeah, yes.

6  Q.   And what was your national percentile rank for your

7  vocabulary?

8  A.   83.

9  Q.   All right.  And how about your reading comprehension?

10  A.   66.

11  Q.   And then your reading total was what?

12  A.   74.

13  Q.   And then if you go down, there's a composite score

14  reflecting your performance on all of the subtests and

15  components of this exam.

16      What was your composite national percentile score?

17  A.   In the same table?

18  Q.   Yes.  It's right above math computation.

19  A.   86.

20  Q.   And you did not receive any formal accommodations on this

21  test?

22  A.   Not that I remember.

23  Q.   Look at Exhibit 28, which is a document provided by St.

24  Joseph's High School reflecting your test results while you

25  were in high school?

1  A.  Okay.

2  Q.  You see there's a reference on the left side to the PLAN

3  test.

4  A.  Yes.

5  Q.  Is that a standardized ACT exam?

6  A.  I think it's a practice ACT exam that's probably

7  standardized.

8  Q.  And then we'll look at these in a minute but right below

9  that are your ACT scores.

10      You took the ACT exam twice?

11  A.  Yes.

12  Q.  And then there's also a reference here to the PSAT/NMSQT.

13      What is the PSAT exam?

14  A.  I'm not sure.  I don't remember taking it.

15  Q.  And the PSAT exam, also a standardized test, reflects

16  critical reading as one of its evaluated components.  And I

17  know it's a little small, but what was your percentile

18  performance in critical reading on the PSAT exam in the 10th

19  grade?

20  A.  Is that the first or second?  You said 10th grade?

21  Q.  10th grade, yes.

22  A.  For critical reading?  71.

23  Q.  And then for critical reading in the 11th grade, what was

24  your percentile rank?

25  A.  70.

1  Q.  And you were in the 95th percentile in your math

2  performance in that one?

3  A.  In the second one?

4  Q.  Yes.

5  A.  Yes.

6  Q.  Is that correct?

7  A.  Yes.

8  Q.  Look at DX-29.

9      And this is your actual PLAN score report from ACT --

10  A.  Yes.

11  Q.  -- reflecting a test date of November 2, 2005?

12  A.  Yes.

13  Q.  Do you see that?

14  A.  Yes.

15  Q.  Then what was your composite score on the ACT PLAN test

16  percentile?

17  A.  20 -- oh, percentile.  97.  No, wait.  Is it on the left

18  column?

19  Q.  Yes.

20  A.  Yeah, 97.

21  Q.  So for this PLAN, you were in the top 3 percentile of

22  everybody who took the PLAN in the United States?

23  A.  I believe so.

24  Q.  Okay.  English, you were in the 98th percentile, so the

25  top 2 percent?

1  A.   I believe so.

2  Q.   Reading, you were in the top 73 percent?  I'm sorry, you

3  were in the 73rd percentile, the top 27 percent of all

4  examinees?

5  A.   Yes.

6  Q.   And then there's -- there's a column that indicates your

7  college readiness in the middle of the page.

8       What does it indicate your college readiness was for

9  English and reading?

10  A.   15 and 19 -- or, sorry, 15 and 17.

11  Q.   So you were above in both categories?

12  A.   Yes.

13  Q.   Of where you would be in college, individuals going to

14  college?

15  A.   Yes, it says above.

16  Q.   Please look at Exhibit 30.

17       You did not get extended testing time on the ACT PLAN

18  test?

19  A.   I'm sorry, on the PLAN?

20  Q.   Yes.

21  A.   I don't believe so.

22  Q.   And you didn't take that on a computer with Kurzweil

23  software or anything like that?

24  A.   I don't know if it was taken on a computer.  I think it

25  was a test booklet.

1  Q.  And on Exhibit 30 is your ACT test?

2  A.  Yes.

3  Q.  And this is the first time you took the test, which -- I

4  think you took it when you were a junior in high school, March

5  2007.

6      And what percentile were you in for your composite score

7  when you took the ACT exam?

8  A.  You said percentile?

9  Q.  Yes.

10 A.  89th.

11 Q.  Well, 89 in your state.

12     What about in the United States?

13 A.  Oh, sorry.  90.

14 Q.  So you're in the top 10th percentile in the United States.

15     Do you know how many students take the ACT exam each year?

16 A.  No.

17 Q.  Would it surprise you if it was over a million?

18 A.  Probably not.

19 Q.  And then there's also a reading score.

20     And what was your percentile rank in reading?

21 A.  87.

22 Q.  And you took the ACT test without extended time, without a

23 private room and without any other accommodations?

24 A.  Yes.

25 Q.  And you took that in a test room with other students?

 1  A.   Yes.

 2  Q.   Exhibit 31.  Is this your ACT score report for when you

 3  took the ACT exam in October 2007?

 4  A.   Yes.

 5  Q.   And it looks like you'd improved your score here.

 6       What was your percentile performance for examinees in the

 7  United States on this exam?

 8  A.   97th.

 9  Q.   And what percentile were you in nationally for reading?

10  A.   91st.

11  Q.   So you were in the top 9 percent of all individuals on the

12  ACT exam that year across the country?

13  A.   It would appear so.

14  Q.   Look at the next page.  It's Defendant's Exhibit 32.

15       When you were asked about the MCAT earlier today?

16  A.   Yes.

17  Q.   And so this is your actual score report from the MCAT?

18  A.   Yes.

19  Q.   And it shows you took this exam in April 2011.  And for

20  your composite score, what percentile were you on this exam?

21  A.   79th.

22  Q.   And do you see that at the bottom there's a footnote that

23  discusses what that percentile rank is reflecting?  And do you

24  see the last sentence, it says:  The percentile ranks are based

25  on tests administered from January 2012 through September 2014.

1       Do you know how many individuals take the MCAT each year?

2  A.   No.  But I took it in 2011.  Right?  Or MCAT?  Okay, no.

3  I'm sorry.  That was the ACT.

4  Q.   So it also breaks down your individual test scores,

5  physical sciences, you were in the 79th percentile, and that

6  was one of the parts of the test that you annotated; is that

7  correct?

8  A.   Sorry, can we back up?  I think I just said that it was

9  for the ACT.

10      2011 is when I took the MCAT.

11 Q.   Correct.

12 A.   Yes.  And this said -- these percentile ranks are for 2012

13 through 2014.

14 Q.   That's what it says, yes.

15 A.   Okay.  And then what was your next question, I'm sorry?

16 Q.   So physical sciences, you were in the 79th percentile?

17 A.   Yes.

18 Q.   Verbal reasoning, you were in the 67th percentile.  And

19 then biological sciences, you were in the 88th percentile?

20 A.   Yes.

21 Q.   And the MCAT was a computer-based examination when you

22 took it?

23 A.   It was when I took it.

24 Q.   And it's all multiple choice.  There's also a writing

25 component?

 1   A.   Correct.

 2   Q.   But the three sections we just looked at, physical

 3   sciences, verbal reasoning and biological sciences, those are

 4   all multiple choice questions?

 5   A.   Along with passages, yes.

 6   Q.   And it's an exam that lasts, total time, somewhere around

 7   four to five hours total exam time?

 8   A.   I don't remember exactly, but that sounds about right.

 9   Q.   And you didn't receive extended testing time on the MCAT?

10   A.   No.

11   Q.   You didn't use any screen reading software?

12   A.   I didn't know it was available at that time.

13   Q.   You didn't read aloud when you took the exam?

14   A.   I wasn't allowed to, but I mouthed it or read with my

15   mouth without making any noise.

16   Q.   And you didn't test in a separate testing room?

17   A.   No.

18   Q.   Exhibit 33, just to round out your standardized testing,

19   this is your Step 1 score report?

20   A.   Yes.

21   Q.   And you failed the exam by 1 point?

22   A.   Yes.

23   Q.   And then on the second page, there's a performance

24   profile.

25        Do you see that?

1  A.   Yes.

2  Q.   And the middle of the exam is sort of borderline

3  performance?

4  A.   Yes.

5  Q.   And then the stars on the right side indicate you

6  performed higher in those subjects?

7  A.   Yes.

8  Q.   And on the left it looks like it indicates you had lower

9  performance on those subjects?

10  A.   Yes.

11  Q.   And you had performance, depending on the subject, that

12  was on both sides of borderline performance, some lower and

13  some higher?

14  A.   Yes.  Mostly lower.

15  Q.   Look, if you would, please, at -- look at DX-2, paragraphs

16  20 and 21.

17       And this is the declaration that you submitted in support

18  of your preliminary injunction.

19  A.   Sorry, what page?

20  Q.   Go to DX-2.

21  A.   Yes.

22  Q.   And then go to -- it's page 6.

23       Do you see in paragraph 20 you describe the ACT exam?

24  A.   Yes.

25  Q.   And you state:  For the ACT, the intrinsic nature of the

1  test made it possible to answer many of the questions without

2  reading the question prompt, which allowed me to get through

3  enough of the questions to score well enough to get into

4  college, though my score did not adequately reflect my

5  knowledge or reasoning ability.

6       On the last ACT you took, you were in the 97th percentile.

7       So is it your testimony you should have been in a higher

8  percentile than that?

9  A.   It's my testimony that I didn't get to read all of the

10  questions, so I didn't get to show all of my knowledge on all

11  of the questions.

12  Q.   Okay.  You go on to state:  Most of the questions required

13  little reading in order to find the answers, and therefore, I

14  was able to answer enough questions to achieve an acceptable

15  score -- top 3 percent -- even though I was not able to read

16  all of the questions.  And due to the guessing penalty that is

17  applied in scoring the ACT, I had to leave some questions

18  unanswered.

19       What do you mean there by the guessing penalty?

20  A.   On the ACT, if you are wrong, like if you fill in an

21  answer and you are wrong, you have -- there's a negative point

22  value that's associated with that, so it actually takes away

23  points from your score.

24  Q.   Then in paragraph 22, you state:  For the MCAT, as for the

25  ACT, many of the questions could be answered without reading

1    and gathering information from the passages.

2        Is that an accurate statement?

3    A.    Yes.

4    Q.    Look at DX-1, Tab A, which is your personal statement.

5        And again, you're discussing the ACT and the MCAT here, do

6    you see that, in the second full paragraph, page 3?

7    A.    I see where I write ACT and MCAT a bunch.

8    Q.    And in that first sentence, it says:  I was able to avoid

9    reading strategically for some prior standardized tests like

10   the MCAT and the -- the ACT and MCAT because the tests were

11   designed so that many of the questions could be answered

12   without reading the whole question.

13       What was the basis for your statement that the ACT and

14   MCAT were designed so that people could answer the questions

15   without reading the whole passage?

16   A.    A couple things.  When I had taken the prep courses or --

17   like for the ACT, the school provided a prep course.  They let

18   us know that a lot of the questions could be answered without

19   reading the passages that were associated.  And so they advised

20   doing that.  And since that's how I normally take tests anyway,

21   that seemed to fit.

22       And when we took the practice exams that they gave us, it

23   seemed to be like they were right.

24       And so when I took it, it was the same thing.

25   Q.    But does that go to how the questions were designed?

1  A.   I'm sorry, what?

2  Q.   I'm wondering where you got the basis for your statement

3  that the questions were designed so they could be answered that

4  way?

5  A.   That's what the -- they had told us, and that's what the

6  booklet said.

7  Q.   The test booklet?

8  A.   Yeah.

9  Q.   Then you go on to say:  Additionally, due to the guessing

10  penalty, I had to leave the questions I was not able to read

11  unanswered.

12       And that's referring to the ACT exam?

13  A.   Yes.

14  Q.   Look at DX-60 for me, please.

15  A.   Okay.

16  Q.   DX-60 is a document captioned -- titled the ACT, preparing

17  for the ACT 2007-2008.

18       And do you recall seeing this document or a document like

19  this when you were preparing for taking the ACT exam?

20  A.   Yeah.  They probably gave this in their prep course.

21  Q.   Okay.  And what year did you take the ACT exam?

22  A.   2007.

23  Q.   And then this book includes complete practice tests.  But

24  turn to page 3, if you would, for me where there's a discussion

25  of general test-taking strategies for the ACT.

1  A.   Okay.

2  Q.   And do you see on the top right-hand side, where the

3  advice given is to read each question carefully?

4  A.   Okay.

5  Q.   And then there's the next statement, answer the easy

6  questions first.

7       Is that similar to what you testified you did when -- as a

8  test-taking strategy?

9  A.   I don't know if I would say easy, but answerable, but...

10  Q.   It goes on to say:  Answer every question.  There is no

11  penalty for guessing.

12       So when you said in your various papers that you left

13  answers unanswered on the ACT test because there was a guessing

14  penalty, that was simply -- that was just a mistake?

15  A.   As far as I remember, to my best recollection, there was a

16  guess penalty and we were told not to guess.

17  Q.   Go to page 8, if you would, please.  And there's a

18  description of the reading test, which is one of the components

19  of the ACT exam.

20  A.   You said 8?

21  Q.   Page 8, yes.

22  A.   Okay.

23  Q.   There's a statement:  The ACT reading test is a

24  40-question, 35-minute test that measures your reading

25  comprehension.

1   A.   Okay.

2   Q.   So you've got less than a minute to answer each of the

3   questions?

4   A.   Okay.

5   Q.   And then over on the right, it states, first full

6   sentence:  The test compromises four prose passages that are

7   representative of the level and kinds of texts commonly

8   encountered in first year college curricula?

9   A.   Okay.

10   Q.   And then you go on down, and there are tips for taking the

11   ACT reading test.

12       And read the second heading for me, please?

13   A.   The second one underneath?

14   Q.   Yes.

15   A.   Read the passage carefully.

16   Q.   Correct.  And right below that it says:  Before you begin

17   answering a question, read the entire passage thoroughly.  It

18   is important that you read every sentence rather than skim the

19   text.

20   A.   Okay.

21   Q.   Do you recall receiving that advice before you took the

22   ACT exam?

23   A.   Not receiving that advice.

24   Q.   And then under the ACT science test, under the next page,

25   9, do you see again the advice provided is to read the passage

1   carefully and that it is important to read the entire text and

2   examine any graphs, tables or figures?  Do you see that on the

3   bottom left-hand side?

4   A.   Not specifically.

5   Q.   It's the first two sentences under the heading read the

6   passage carefully.

7   A.   Okay.

8   Q.   So now let's actually look at what the reading test was.

9        And again, this is a test where you scored in the

10  90-something percentile?

11  A.   Okay.

12  Q.   First passage:  This is an exam which has passages

13  followed by several questions.

14  A.   What page are you on?

15  Q.   Page 34.  And this first one is -- involves prose fiction,

16  the first passage.

17  A.   Okay.

18  Q.   Now, I understood you to say the first thing you would do

19  is read the last sentence in the passage?

20  A.   Not the passage, the question.  So like if --

21  Q.   Let's go to the next page then.

22       So we've got ten questions tied to that passage.

23  A.   All right.

24  Q.   Tell me what you would do here.  What's the first thing

25  you would read on this page?

1  A.   Well, I would start with the first question and read the

2  last line of that question, which in this case there's only

3  one.  And then -- you want me to keep going?

4  Q.   So the first question, the main theme of this passage

5  concerns the -- right?

6  A.   Okay.

7  Q.   So you'd read that.

8       And is that a question you could answer without reading

9  the passage?

10  A.   Not that one, so I would move on to the next one.

11  Q.   All right.  Which of the following questions is not

12  answered by information in the passage.

13      Is that a question you could answer without reading the

14  passage?

15  A.   Nope.  So I would move on to the next question.

16  Q.   The narrator draws which of the following comparisons

17  between the old couple and Eugene's parents.

18      Is that one you could answer without going through the

19  passage?

20  A.   Probably not, but I probably wouldn't have to read the

21  whole passage.

22  Q.   The next one, in terms of developing the narrative, the

23  last two paragraphs, line 67 and 87, primarily serve to -- so

24  that's one you could go to and just read that amount of text?

25  A.   That's what I would do, yes.

1    Q.   Question 5, it can most reasonably be inferred from the

2    passage that when the narrative says X, she is most nearly

3    indicating that, and then it goes on.

4         Is that one you could read or answer without reading the

5    passage?

6    A.   Number 5?

7    Q.   Yes.

8    A.   That has lines that it shows -- lines 30 and 31, so I

9    would read those.

10   Q.   If you go on -- let me ask you something.  The length of

11   the passage here in the reading test, is this longer than the

12   questions you encountered on Step 1?

13        MS. VARGAS:  I'm going to object.  I'm not sure what

14   the relevance of this is, because this isn't a test she ever

15   took.  This is a sample question you've selected, so --

16        MR. BURGOYNE:  Well, yeah.  But we went through the

17   same exercise with the MCAT.

18        MS. VARGAS:  She actually took the MCAT.

19        MR. BURGOYNE:  She didn't take that MCAT.  That was a

20   publicly disclosed MCAT exam from 2010.

21        MS. VARGAS:  That took some of the same questions that

22   were on her exam.  This is a practice book that you've selected

23   out of --

24        MR. BURGOYNE:  I've selected it, Judge, just because

25   it was the practice book for her year and it has the practice

1    ACT test on it and it illustrates the type of questions she

2    encountered.

3            THE COURT:  If you want me to rule on it or if you

4    want to continue your discussion without me, I'll allow you to

5    continue the discussion.  But if there's an objection before

6    the Court, I'll rule on it.

7            Overruled.

8            All right.  Let's move on.

9            MR. BURGOYNE:  Thank you, Your Honor.

10   BY MR. BURGOYNE:

11   Q.   So my question to you, Ms. Ramsay, was, is the passage

12   that's reflected here on page 34, one-page passage, is this

13   content longer than the content that you encountered in a

14   typical Step 1 question?

15   A.   Since this is associated with ten questions, I'm not sure

16   how much of the reading is for which question, but the passage

17   itself is probably longer than the typical Step 1 question.

18   Q.   And there are passages throughout the reading section of

19   the test, is that correct, on the ACT exam?

20   A.   Yes.

21   Q.   In fact, if you go to the English test that is on page 14,

22   it also includes passages; is that correct?

23   A.   That looks like it does.

24   Q.   And that looks like the math test was a 60-minute test

25   with 60 questions, some of which are problems and others of

1    which contained text.

2        If you look at page 26 of the exam, do you recall having

3    to read text when answering some of the math questions on the

4    ACT exam?

5    A.   I don't recall specifically.  I am sure there were some

6    where I had to read some text, but most of them were like

7    solving the math problems.

8    Q.   And then the science part of this test, page 42, that also

9    included passages that you had to read and then answer a series

10   of questions; is that correct?

11   A.   Yes, yes.  Sorry.

12   Q.   Let's look -- while we're here, let's look at the Step 1

13   sample questions, which is DX-61.  You looked at a version of

14   the same document when Ms. Vargas was asking you some

15   questions.

16   A.   Okay.

17   Q.   Did you practice with these sample test questions?

18   A.   These specific ones?

19   Q.   Or something like this from the NBME website?

20   A.   I did a lot of practice.  I'm sure I did a similar -- the

21   sample questions that were out at the time that I did them, and

22   I'm sure I did a lot of other question banks.

23        MR. BERGER:  I just want to note for the record, this

24   is not exactly the same.  I certainly haven't compared it

25   question by question.  But this one appears to say that it was

1  updated in February 2017, and I believe that the one that we

2  marked and was referred to earlier was updated in February

3  2019.

4  BY MR. BURGOYNE:

5  Q.   In all events, you've seen a version of these practice

6  questions?

7  A.   Yes.

8  Q.   And you practiced with a version of these practice

9  questions?

10  A.   I did some of them as part of my practice, yes.

11  Q.   And when you take the Step 1 exam, each question is a

12  distinct question, in other words, there's not a passage

13  followed by a series of questions?

14  A.   Generally that is the case.  There are paired questions

15  sometimes, which isn't like a passage and then multiple

16  questions.  It's like a question like I described earlier for

17  Step 1 where you have to read all of it and figure out the

18  answer and you can't see the second question until you answer

19  the first.  And so it's like a gatekeeper, because if you see

20  the second question, that gives away something to help you

21  answer the first, so like that's why they don't let you see it.

22  Q.   Let's just look at a sample questionnaire.  Just to turn

23  to page 8.  And you see question 3?

24  A.   Yes.

25  Q.   It's a three-sentence question with a photograph?

1   A.   Yes.

2   Q.   Is that a common type of question that you encounter on

3   the Step 1 exam, a photograph, then a description, and then a

4   series of questions or a question tied to that photograph?

5   A.   It is one of the types.

6   Q.   And are these questions generally representative of the

7   questions you saw on the Step 1 exam?

8   A.   I can't really say without looking at all of them, but I

9   know that they can't be completely representative because the

10  Step 1 questions sometimes have videos or sound clips

11  associated with them along with the question.  And it's not

12  just like identify this murmur.  It's a clinical question

13  similar to, you know, like one of these on the page probably,

14  along with the clip.  And you have to spend the time listening

15  to or watching the clip and then reading the question and

16  answering the question.

17  Q.   And in fact, to page 3, it points out that those

18  audio-type questions are not represented here?

19  A.   Page 3.  Okay.

20  Q.   See the note at page 3.

21       Let's look at some of the MCAT questions that you

22  discussed earlier.  And we can work right off the ones that you

23  indicated.

24  A.   Okay.

25  Q.   First of all, when did you do these annotations?

1  A.   Within the last couple days.

2  Q.   And make sure I understand exactly what you did here.

3       It looks like the physical sciences section.

4       Is this the entire section for physical sciences that

5  you've annotated?

6  A.   I believe so.

7  Q.   And then you've got highlighting here.

8       What is this highlighting supposed to indicate?  For

9  example, the blue highlighting on page 5.

10  A.   That's where I would have looked at, read.

11  Q.   And when you took the actual MCAT, were you able to

12  highlight on the screen?

13  A.   I don't remember, but possibly.

14  Q.   And then when you do a different color highlighting here,

15  the green, what is that supposed to tell us?

16  A.   That's probably showing for your benefit like the color

17  that associates with the question to show you where I read for

18  that question.

19  Q.   Again, that's not anything you were actually doing when

20  you took the MCAT?

21  A.   No.  I was demonstrating to show you where I was reading.

22  Q.   And then all these comments here, these comments,

23  completely passage independent, can answer based on prior

24  knowledge, essentially passage independent, could/would answer

25  solely based on the tiny bit I would have read to answer number

1  1.

2      Those are just comments you provided throughout this

3  document?

4  A.   Yes, so you could see how I would go through that document

5  and take it.

6  Q.   Then where there's information crossed out, what does that

7  indicate when you've crossed out an answer?

8  A.   As an interruption, that's my thought process of ruling

9  out an answer.

10  Q.   So in all these questions, I take it you would have read

11  at least the answer choices?

12  A.   Yes.  If I got that far.  I did it as if I would have

13  gotten that far.  And I think I commented about that in there.

14  Q.   Some of these are kind of -- let's look at the verbal

15  reasoning next, Exhibit 19A.

16      And again, you went through the same exercise here.  I'm

17  looking at page 34.  And there's ten sets of comments sort of

18  explaining to me or the Court how you would have gone about

19  answering this question?

20  A.   Yeah.  So for the verbal section, I did it slightly

21  different than the physical sciences because I couldn't just

22  say here's a formula and that's the formula I used.  So I had

23  to pretty much take it like I would take it, except for that I

24  didn't limit the time because then I wouldn't be able to

25  annotate.  And then because of that, I went through the tests

1  as if I had gotten to all of that.  But I just showed you what

2  I would have done had I been in that testing scenario.

3  Q.   You even got to the point where you would go through and

4  count the total number of words in the passage and then

5  estimate how many passages you actually would have read when

6  you were taking the exam?

7  A.   That's incorrect.  I copy-and-pasted the passage into a

8  Word document and used word count to find the number of words.

9       And then if I read a part of it or a couple words or

10  whatever, I would highlight that and get the word count of

11  that.  But that was after I had already gone through.  I did

12  that after I had gone through the document.

13  Q.   And this work was all your independent work, nobody helped

14  you?

15  A.   Correct.

16  Q.   And how long did it take you to do that?

17  A.   Days.  And I didn't finish.  I haven't gotten to the

18  biological sciences.  And I didn't do the writing sample.

19  Q.   Let's look at Exhibit 58, please.  And it's still relating

20  to the MCAT exam.

21       And this says Second Edition, The Official Guide to the

22  MCAT Exam?

23  A.   Okay.

24  Q.   And have you seen this document before?

25  A.   I'm not sure.

1  Q.   Or a version of the official guide for the MCAT?

2  A.   I'm sure I've seen a version.

3  Q.   I thought you had told me that you owned a copy of this or

4  a similar version at one point?

5  A.   Yes.  I think -- if this is the one that I thought had the

6  practice questions in it, that's what I thought it was, when we

7  were in deposition.

8  Q.   And I'll tell you, it does include -- this is not -- this

9  is excerpts from the book.

10  A.   Okay.

11  Q.   And the book does include practice questions.

12  A.   Then yeah, then I probably own...

13  Q.   And you'll see on page 2, it has got a 2011 copyright, and

14  that was the year that you took the MCAT?

15  A.   Okay.  Yes.

16  Q.   Look at page 13.  And there's a discussion of the role of

17  the exam, and it indicates the MCAT exam is taken by more than

18  70,000 students each year.

19  A.   Okay.

20  Q.   Do you recall I had asked you the number, and you weren't

21  sure about that?

22  A.   Yes.

23  Q.   And then there's a breakdown.  If you look at page 15,

24  there's a little summary of the exam.

25  A.   Okay.

1  Q.   Do you see that?

2        And it's just a good shorthand here?

3        So in the physical science areas, there's seven passages

4  and 52 questions.

5  A.   Okay.

6  Q.   And then verbal reasoning, again, seven passages, 40

7  questions.  Biological science, 70 -- or seven passages and 52

8  questions.

9        So in all three of the multiple choice sections, there are

10  passage-based questions; is that correct?

11  A.   Yes.  Except for the writing sample.

12  Q.   I think you indicated that at least one of the reasons you

13  didn't request accommodations on the MCAT was because you

14  didn't know they were available?

15  A.   Yeah.  I didn't find out they were available or even that

16  they existed until shortly before I took the MCAT.

17  Q.   And I assume at some point when you were registering for

18  the MCAT, you went to their website?

19  A.   Probably, yeah.

20  Q.   You didn't see the references there for taking

21  accommodated tests?

22  A.   No.  I don't remember seeing them.

23  Q.   Look at page 24, which is headed What is Accommodated

24  Testing and Who Needs to Apply.

25        Do you recall reading this section in which AAMC discusses

1    the availability of accommodations on the exam?

2    A.    I don't recall specifically reading it.  I probably -- I

3    may have seen it.  I probably paged through the beginning of

4    this book, but I don't know if I saw this specifically.

5    Q.    Let's look at your request for accommodations on Step 1.

6          Turn to DX-4, Tab A.

7    A.    Okay.

8    Q.    And this should be your first request for accommodations,

9    which I think you testified to or about this morning.

10   A.    Okay.

11   Q.    Turn to page 4, if you would, please.

12         And you see there's a section here that asks for

13   information about your impairment?

14   A.    Yes.

15   Q.    And section D1X asks you to check the box that best

16   describes the nature of your impairment and list the year it

17   was first diagnosed by a qualified professional.

18         All right?  And what's the first box you checked?

19   A.    Reading.

20   Q.    Is that under the learning impairment category?

21   A.    Yes.

22   Q.    And did Dr. Tanguay, the optometrist, diagnose you with a

23   learning disability?

24   A.    Not a learning disability, but at the time that I filled

25   this out and submitted it, I didn't know that she was not able

1  to diagnose a learning disability with the DSM criteria, but

2  she did diagnose that I had problems with reading.

3  Q.   Were the problems she diagnosed you with, were they vision

4  related as opposed to a cognitive issue?  I mean, she's an

5  optometrist?

6  A.   She's an optometrist, so I don't know if she could say.

7  She said to the best of her ability that I had issues with the

8  flipping and I think she said like visual perception, which

9  perception implies how you perceive that information.

10  Q.   Then the next thing, you also reference dyslexia here.

11  And you refer to a provisional diagnosis by Dr. Smiy?

12  A.   Yes.

13  Q.   And we already looked at his documentation.

14       You also reference here as another impairment migraines.

15  Right?  Here at the bottom?

16  A.   Yes.

17  Q.   And you said you were diagnosed with those in 1997.  And

18  the next one asks you to list the current diagnoses for which

19  you're requesting accommodations.  And here you listed only

20  ADHD and dyslexia and did not include the migraines you

21  referenced above?

22  A.   Yes.  And as I said before, I didn't know that I could

23  request accommodations for migraines or at that time DVT

24  either.

25  Q.   Look at the next page for me.

1  A.   Okay.

2  Q.   And do you see there's a reference to the accommodations

3  that you have received previously in post-secondary education.

4  And you state, you identified for NBME the accommodations you

5  received at Ohio State University.

6       Do you see that?

7  A.   Yes.

8  Q.   And one of the things you indicate is that you received

9  double testing time from Ohio State.

10      That isn't accurate, is it?

11 A.   That is inaccurate, like not accurate.  That was probably

12 a mistake on my part.

13 Q.   You were getting time-and-a-half at Ohio State?

14 A.   Yeah.

15 Q.   Over on the right you said you were receiving

16 accommodations from Ohio State from 2009 to 2013.  That was

17 also inaccurate, wasn't it?

18 A.   I'm not sure, because I don't know when the temporary

19 kicked in.

20 Q.   I think --

21 A.   That probably was more 2010, but I don't know.  It could

22 have been the end of 2009.

23 Q.   Turn to the next page for me.  There is a discussion of

24 accommodations you received in primary and secondary school.

25 Do you see that?

1    A.    Okay.

2    Q.    It asks you to provide each school and all formal

3    accommodations that you received and when you received them.

4          Do you see that heading?

5    A.    Yes.

6    Q.    You indicate in high school, none.  Middle school, none.

7    And then in elementary school, you referred to the alphabet

8    chart again that we discussed earlier, and the distraction

9    reduced space, which we discussed earlier, extra time for

10   writing and reading.  These were provided by the teacher, not

11   the school, so I do not have records confirming them.  And you

12   refer to a single year in which you receive those

13   accommodations; is that right?

14   A.    I think I was trying to provide the dates that I remember

15   it starting, but --

16   Q.    It states dates provided?

17   A.    Yeah.  I probably misread it or wasn't paying attention.

18   Q.    And although they asked for formal accommodations, you

19   chose to provide informal accommodations as part of your

20   answer?

21   A.    Yeah, probably for the same reasons.

22   Q.    And those were the accommodations that you received in

23   Sunset Oaks Academy, second or first grade?

24   A.    Yeah.  And carried on through some of them.

25   Q.    And no reference to similar informal accommodations in

1  high school or middle school that you reported to NBME on your

2  first application?

3  A.   On this form, but I did discuss some of them in my

4  personal statement.  But I also didn't know that I needed to

5  list, like, every type of thing that my teachers would do to

6  help me.  I thought that was kind of overkill and unnecessary,

7  so I left a lot of that stuff out on this form at the time that

8  I first applied.

9  Q.   Okay.  I think you already testified to your test-taking

10  strategies, the Step 1 exam?

11  A.   Okay, yes.

12  Q.   Do you recall that?

13       At some point did you -- let me make sure I understand

14  this.

15       The test-taking strategies that you report that you used

16  on the MCAT or the Step 1 exam, did you say those were

17  strategies that were also recommended by a test prep program

18  that you took?

19  A.   So I use -- I can't use the exact same testing strategy

20  that I used for the MCAT on Step 1 because I have to -- we have

21  to read the entire question for Step 1 questions to get the

22  information needed to answer the question, whereas that wasn't

23  true for most of the questions for the MCAT.

24       And I have developed that strategy of reading as little as

25  possible because I couldn't read everything on most tests, like

1   early on.  I don't even know if I could say when I first

2   started doing that.  But that's typically something that test

3   prep people recommend.  And so it was -- it confirmed what I

4   did, or validated it.

5   Q.   Okay.  Let's shift gears now to your testing experience

6   when you took the Step 1 exam in July of 2017.

7        Look at DX-1, which is the Complaint, and page 9.

8        And do you see paragraph 40 there?  I'm sorry.

9   A.   Yes.

10  Q.   In paragraph 40, the middle sentence begins with "because

11  of her dyslexia."

12       Do you see that?

13  A.   Okay.

14  Q.   Because of her dyslexia and ADHD, Ramsay was only able to

15  read about 60 to 70 percent of the questions in each block and

16  had to enter guesses for the remaining questions without

17  reading them.

18       Is that an accurate statement?

19  A.   Yes.

20  Q.   And for every question on Step 1, did you spend at least

21  some time reading the question, including the passage?

22  A.   I -- can you clarify passage?

23  Q.   Well, the vignette, the lead-in, the stem to the question?

24  A.   I think I -- I don't know if I can say every question, but

25  I know that I tried to read the last line of the vignette and

1  possibly the answer choices for the questions if I could get

2  there.  But I don't know if I could say I did -- was able to

3  successfully do that for all of the questions for all of the

4  sections.

5  Q.  Let me make sure I understand.  For the 30 to 40 percent

6  of the questions that you say you didn't have time to read, is

7  it your testimony that you didn't read any of the question for

8  30 to 40 percent of the exam?

9  A.  I probably was able to look at and at least start the last

10 line.  I may not have read the whole last line or I may not

11 have read anything else.

12 Q.  In your Complaint you said without reading them?

13 A.  Without fully reading them, reading the whole question.

14 Q.  Look at DX-2, paragraph 28.

15 A.  Okay.

16 Q.  And this is your declaration in this case?

17 A.  Is it?  I think so.

18 Q.  And have you located paragraph 28?

19 A.  Yes.

20 Q.  And in this paragraph, you state in the middle of the

21 paragraph:  I did not have time to read all of the questions

22 and in the last minute of each block was forced to blindly

23 select answer choices for about 30 to 35 percent of the

24 questions.

25      So is it your testimony that for 30 to 35 percent of the

1  questions, you simply chose an answer without reading any of

2  the passage?

3  A.   Like I said before, I may have started or possibly read

4  the last line of the passage if I got to it, but I may not have

5  read -- been able to read the question, the whole question to

6  answer the question, the whole vignette to answer the question.

7  Q.   Let me ask you to look on -- just to make sure we're

8  understanding each other here, is it now your testimony that

9  you might have read some of the content and all of the

10  questions, some of the questions?

11  A.   So I -- okay.   I read the last line or started reading the

12  last line if I could, if I got to that many.   I may not have

13  read it for all -- I may not have read the whole line or any of

14  it for all of the questions.   I don't know if I could

15  specifically say or definitively say for all of them.   But I

16  tried for most of them to at least see if it was something I

17  understood the question line of.

18  Q.   Let me hand you your deposition transcript.

19       The reason I'm asking this is because throughout your

20  court papers, there is the suggestion that you weren't able to

21  read 35 to 40 percent of the test questions.

22  A.   Correct.

23       THE COURT:   Counsel, would you direct your opposing

24  counsel to what page and line.

25       MR. BURGOYNE:   Yes.   I'm sorry, Your Honor.

1          THE COURT:  Sure.

2          MR. BURGOYNE:  Page 136 of the transcript, lines 1

3   through 5.

4          MR. BERGER:  Page 136?

5          MR. BURGOYNE:  Page 136, yes.

6   BY MR. BURGOYNE:

7   Q.   One more notebook.  Right here.

8        And do you recall me asking you in the deposition:  Does

9   that mean for 30 to 35 percent the questions, you just chose an

10  answer without reading any of the passage?

11       And what was your answer?

12  A.   My answer was yes.

13  Q.   And is that different than your answer today?

14  A.   Yes, I -- in the instance that we're talking about fully

15  reading the passage or any of the passage, yes.  Or reading

16  part of the passage, the question line.  And also because we're

17  referring to a vignette and using the word "passage."

18  Q.   I don't think I'll need to give this to you again.  If I

19  do, I'll bring it back.

20  A.   Okay.

21  Q.   Let's transition to your second request for

22  accommodations.

23       And in support -- this is DX-4, Tab J.

24  A.   Okay.

25  Q.   And on this accommodation request, you relied upon your

1    migraines and your clotting disorder as additional disabilities

2    in support of your request for accommodations; is that correct?

3    A.   This is the second one?

4    Q.   Yeah.   Your second request for accommodations.

5    A.   Those were additional diagnoses that I included, yes.

6    Q.   And that was June 2018?

7    A.   Yes.

8    Q.   And you submitted a fair amount of paper to NBME in

9    support of that accommodation request; is that correct?   I

10   think you referenced, for example --

11   A.   Yes.

12   Q.   -- you got a letter from your school?

13   A.   A letter of support, yes.

14   Q.   And that was Dean Overton or Associate Dean Overton?

15   A.   Again, I'm not sure what his title is for sure, but it's

16   Dr. Overton.

17   Q.   You also submitted a document from a Dr. Ruekberg?

18   A.   Yes.

19   Q.   And then you also submitted a letter of support from a Dr.

20   Houtman?

21   A.   Yes.

22   Q.   And before we get into those documents, NBME granted some

23   accommodations for that request; is that correct?

24   A.   They granted the separate room and the -- and extra break

25   time based on my migraines and DVT with post-thrombotic

1  syndrome and clotting disorder.

2  Q.   And you were going to be allowed to test over two days?

3  A.   Yes.

4  Q.   And as a result of testing over two days, each testing

5  block was going to last how long?

6  A.   I'm not sure.  I don't know.  I think -- I don't know if I

7  was ever told this, but I think maybe 30 minutes.

8  Q.   And how long is the standard test block?

9  A.   60 minutes.

10  Q.   So you would now be allowed to test over two days, but

11  only you would have to sit or stand for half an hour for each

12  test block?

13  A.   Correct.

14  Q.   And you were in a private room, and if you wanted to talk

15  aloud, you could talk aloud?

16  A.   Yes.

17  Q.   Look, if you would, please -- first of all, who is Dr.

18  Ruekberg?

19  A.   My treating psychiatrist.

20  Q.   And he's never conducted a diagnostic evaluation of you,

21  has he, similar to what you went through with Dr. Smith?

22  A.   No.

23  Q.   Look at Exhibit 64.

24       And I'm assuming Dr. Ruekberg's letter is in one of the

25  documents that were admitted this morning because you submitted

1  that letter to NBME in support of your second request for

2  accommodations?

3  A.   I believe so.

4  Q.   Exhibit 64 is a series of email messages that extends from

5  Ramsay -- the Bates number on the right -- 26 through 102.

6       Do you recall having extensive communications back and

7  forth with Dr. Ruekberg after you asked him to submit a letter

8  supporting your request for accommodations?

9  A.   I'm sorry, you said through 102?

10  Q.   Yes.  Basically the entire exhibit consists of a series of

11  emails with attachments.

12  A.   A lot of those are -- like I just flip to a page, like

13  page 73, and that's from my school.  Maybe not.  I'm sorry.

14  That's the heading.  I'm sorry.

15       Okay.  And what was your question?  Sorry.

16  Q.   My question was whether or not you and your lawyer worked

17  with Dr. Ruekberg over the course of several months to prepare

18  a letter that you then -- to prepare the letter that you then

19  sent to NBME?

20       MS. VARGAS:  Objection, attorney-client privilege and

21  work product.

22       THE COURT:  I'm going to sustain the question as it's

23  raised at this point in time.  You can try to rephrase it.

24       MR. BURGOYNE:  Sure.

25  BY MR. BURGOYNE:

1   Q.   Look at the first two pages, actually, it's the first

2   three pages, Defendant's Exhibit 64.

3   A.   Okay.

4   Q.   And the first -- bottom there, is that an email from you

5   to Dr. Ruekberg in December 2017 thanking him for his help on

6   your request for accommodations?

7   A.   Yes.

8   Q.   And then the next three pages are sort of a three-page

9   document.

10       Is that an initial draft that Dr. Ruekberg prepared of his

11  letter?

12  A.   Yes.  It was a very early draft of like some of what his

13  thoughts were for including into his letter.

14  Q.   At the bottom of this document, he says that in his

15  opinion, you should be given 50 percent additional testing time

16  over two days?

17  A.   What page?

18  Q.   That's 27.

19  A.   Where?

20  Q.   The very bottom.  "In my professional opinion, therefore."

21  A.   Okay.

22  Q.   And he recommended 50 percent extra time?

23  A.   Okay.

24  Q.   In his draft; is that correct?

25  A.   It looks like that.

1  Q.   Then on the top of the next page, there's a paragraph that

2  reads:   Even if the board does not find Jessica meets criteria

3  for accommodations for ADHD, in my professional opinion, the

4  board should approve Jessica for accommodation for reading and

5  writing learning disabilities.

6  A.   Okay.

7  Q.   Do you recall seeing that paragraph in one of his early

8  drafts?

9  A.   Not specifically, but I remember talking about it, about

10 how he -- that even if you didn't want to provide

11 accommodations for ADHD, that I should definitely get them for

12 dyslexia.

13 Q.   And when he submitted his final letter, he recommended

14 100 percent extra time; is that correct?

15 A.   Yes.

16 Q.   And when he submitted his final letter, this paragraph

17 wasn't in the final letter discussing the difference between

18 your ADHD and your LD?

19 A.   Which paragraph?

20 Q.   The paragraph that just read about even if the board does

21 not find Jessica meets criteria for accommodations for ADHD?

22 A.   I don't know for sure if it is, but I would assume that

23 you're asking because it wasn't.

24 Q.   All right.   Then we go two more pages, and let's start

25 with page 32.

1          THE COURT:  Counsel, we'll be adjourning the day at a

2  quarter of 5:00, so everyone knows.

3          MR. BURGOYNE:  Okay.

4  BY MR. BURGOYNE:

5  Q.  The document that says 32.  And then you'll see there's a

6  series of highlighted text, some blue, some yellow, and the

7  three-page letter is now a five-page letter.

8          Is this a revised draft or comments that you sent to him?

9  A.  I know it's a second draft or another draft.  I don't know

10  if I sent it to him or if he sent it to me.

11  Q.  Look at page 52.  And do you see it says final draft at

12  the top.  And it looks to be draft version number 4 under the

13  attachments.  And you state here:  Dear Dr. Ruekberg, sorry it

14  is so long.  I had to add a lot of support to each of the

15  points in the NBME guidelines.

16          Do you recall providing substantive content to Dr.

17  Ruekberg for his letter?

18  A.  I recall adding a lot of the details because he hadn't

19  included them, but it wasn't anything that he didn't already

20  know.  And I wanted to make sure that the facts that he had in

21  there were correct and that they met the guidelines that are

22  published by the NBME, because after going through, I realized

23  that was important to meet those guidelines.  So I wanted to

24  make sure that his letter met the guidelines, but also at any

25  point if he didn't agree with any of it, he wouldn't have

 1  signed it or he would have taken it out.

 2  Q.   Look at page 71 for me.  Do you see this is a document --

 3  this document and the next page, 71 and 72, do you see a lot of

 4  text has been redacted here?

 5         MS. VARGAS:  Objection, attorney-client privilege and

 6  work product.

 7         THE COURT:  Not to this question.  Your objection is

 8  noted as overruled.

 9         Do you notice that?

10         THE WITNESS:  I do notice that.

11         THE COURT:  Next question.

12  BY MR. BURGOYNE:

13  Q.   Is this an email from your attorney to Dr. Ruekberg?

14         MS. VARGAS:  Objection, attorney-client privilege and

15  work product.

16         THE COURT:  I'll sustain the objection.

17         MR. BURGOYNE:  Your Honor, I'm not asking about the

18  content, I'm just asking about --

19  BY MR. BURGOYNE:

20  Q.   I'll ask this, who is Lawrence Berger?

21  A.   He's one of my lawyers.

22  Q.   Is this email from him?

23         THE COURT:  If you know.

24         THE WITNESS:  Yeah.  It looks like that.

25  BY MR. BURGOYNE:

1  Q.  Who is the email sent to?

2  A.  Dr. Ruekberg.

3  Q.  The next page, the entire page is redacted.

4      Who is this email from?

5  A.  It looks like it's from Mr. Berger.

6  Q.  And Mr. Berger is your lawyer.

7      And who was this email sent to?

8  A.  It looks like Dr. Ruekberg.

9  Q.  And you are a correct on the letter?  You were copied on

10 the letter?

11 A.  Yes.

12 Q.  Then look at page 93 for me.

13     And this is content that's also been redacted.  And it's

14 on the actual school letterhead.

15     Do you know why these redactions were made?

16 A.  I do not.

17 Q.  And then finally, on page 102, there's an additional email

18 with the entire text of the email redacted.

19     Is this an email from Lawrence Berger to Bruce Ruekberg?

20         MS. VARGAS:  Objection, Your Honor.  We continue to

21 object on attorney-client privilege and work product.

22         THE COURT:  So noted.

23         These sections of the communications that have been

24 deleted, so to speak, are not in evidence.  The communications

25 as to who they are will be allowed.  All right?

1          Anything else?

2          MR. BURGOYNE:  Final question for the day, Your Honor.

3   BY MR. BURGOYNE:

4   Q.   Ms. Ramsay, are you able to tell us which parts of Dr.

5   Ruekberg's letter reflect your input versus your lawyer's input

6   versus Dr. Ruekberg's input?

7          MS. VARGAS:  Objection, attorney-client privilege and

8   work product, to the extent it asks for input by attorneys.

9          THE COURT:  Yes, but I don't think the question asked

10  that.  It asked as to which part she had input in.

11         Can you answer that question yes or no, ma'am?

12         THE WITNESS:  I can answer it.

13         THE COURT:  You can answer it?

14         THE WITNESS:  I can answer with I don't know.  I

15  couldn't tell you which parts were, like, things I edited and

16  which parts Dr. Ruekberg wrote at this time.

17         MR. BURGOYNE:  Okay.  I have no further questions for

18  today, Your Honor.

19         THE COURT:  Very well.

20         Counsel, just before we adjourn, how long do you

21  anticipate this to go?  I only had tomorrow blocked off for

22  further testimony, and at this pace that we're going at today,

23  I don't know how much further you have.

24         Don't everybody speak at once.

25         MR. BURGOYNE:  I suppose I ought to speak first, Your

1   Honor, since I've got to wrap up Ms. Ramsay and then they've

2   got rebuttal.

3            So I would guess I probably have another half hour to

4   45 minutes with Ms. Ramsay.

5            THE COURT:  And you'll have redirect to rehabilitate

6   your witness and potentially there's some recross.

7            How many other witnesses do you propose calling?

8            MS. VARGAS:  We only intend to call one other witness,

9   Your Honor.

10           THE COURT:  And that witness will be approximately how

11  long?

12           MS. VARGAS:  That's Dr. Smith, so I would imagine it

13  would be fairly lengthy.

14           THE COURT:  And then after Dr. Smith testifies, how

15  long is, if any, defense?  We're not even getting into cross

16  examination at this juncture.

17           MR. BURGOYNE:  For us, Your Honor, one witness.  Ms.

18  Farmer has already submitted a declaration.  If we let that be

19  her testimony, I could strike her.  And then we've got the two

20  external reviewers who reviewed the documentation, so...

21           MS. VARGAS:  Your Honor, in that case --

22           MR. BURGOYNE:  And one other witness, I'm sorry, Your

23  Honor, one other witness.

24           THE COURT:  Very well.  Yes, ma'am?

25           MS. VARGAS:  We had understood in communication

1    between counsel in advance that defense would be calling Dr.

2    Farmer.  If defense is not calling Dr. Farmer, we would.

3              THE COURT:  You will be.

4              MR. BURGOYNE:  I'm happy to call her, Your Honor.  I

5    don't have a problem with that.

6              THE COURT:  You try your own cases in front of me,

7    Counsel.

8              All right.  We'll reconvene tomorrow at 9:30, and I'll

9    let you know as to the remainder of this week if at all.  All

10   right?

11             MR. BURGOYNE:  Your Honor, one point of clarification.

12   One of our experts needs to -- he understood originally it was

13   going to be a one-day hearing.  He's got to get back to New

14   York.

15             THE COURT:  How did he understand it was going to be a

16   one-day hearing?

17             MR. BURGOYNE:  That's what the order said.  And then

18   we called up and learned after the fact that it in fact was on

19   the docket for two.  So he's got to be back in New York.  He's

20   on a 12:00 train.

21             Are you okay if plaintiffs are okay with us taking a

22   witness out of order?

23             THE COURT:  I don't have any problems with it at all.

24             How long do you anticipate it?

25             MR. BURGOYNE:  Hour.  We'll try to tighten it up.

1          THE COURT:  All right.  We'll see.  9:30 tomorrow

2    morning.  And we're adjourned.

3          (Proceedings concluded at 4:47 p.m.)

4

5

6

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10    _____

11    Ann Marie Mitchell, CRR, RDR, RMR
      Official Court Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          -   -   -

2                    I N D E X

3                          -   -   -

4

   Witness              Direct        Cross        Redirect        Recross

5    JESSICA RAMSAY    14            84

6

7

8                          -   -   -

9                    E X H I B I T S

10                         -   -   -

11

   NO.                                    ADMITTED PAGE

12

   P-1                                    52

13

   P-2                                    59

14

   P-3                                    59

15

   P-4                                    59

16

   P-13                                   74

17

   P-14                                   75

18

   P-19                                   68

19

   P-19A                                  73

20

   P-20                                   68

21

22

23

24

25

**/7** [1] - 86:25
**08033** [1] - 1:17
**1** [84] - 1:6, 4:14, 11:11,
16:23, 16:25, 42:11, 42:14,
43:10, 43:14, 43:23, 44:4,
48:1, 48:5, 49:13, 49:16,
52:12, 52:24, 54:23, 54:25,
57:4, 58:20, 58:21, 59:9,
62:13, 63:25, 64:2, 65:1,
65:4, 65:14, 65:15, 67:20,
68:19, 75:14, 75:24, 76:21,
77:15, 77:17, 77:19, 78:7,
78:14, 79:19, 80:3, 80:9,
80:11, 80:14, 80:25, 81:22,
82:6, 82:20, 82:23, 83:2,
83:10, 84:10, 84:13, 84:14,
85:6, 85:8, 85:25, 87:3,
91:24, 95:23, 98:7, 98:12,
136:19, 136:21, 145:12,
146:14, 146:17, 147:12,
148:11, 148:17, 149:3,
149:7, 149:10, 151:1, 155:5,
159:10, 159:16, 159:20,
159:21, 160:6, 160:20,
163:2, 176:12
**10** [6] - 2:4, 67:3, 67:5, 99:11,
106:16, 111:13
**100** [1] - 168:14
**102** [3] - 166:5, 166:9, 171:17
**1033** [1] - 109:7
**10:44** [2] - 1:10, 3:1
**10th** [8] - 107:12, 107:17,
107:19, 108:2, 130:18,
130:20, 130:21, 133:14
**11** [2] - 99:23, 106:16
**11th** [6] - 107:12, 107:17,
107:19, 107:22, 114:18,
130:23
**12** [5] - 67:3, 67:5, 100:7,
106:16, 110:25
**12:00** [1] - 174:20
**12:45** [1] - 67:25
**13** [7] - 73:22, 74:5, 74:9,
74:13, 100:11, 153:16,
176:19
**136** [3] - 163:2, 163:4, 163:5
**13th** [1] - 2:11
**14** [9] - 74:11, 75:16, 75:21,
113:5, 113:9, 113:11,
146:21, 176:5, 176:20
**15** [8] - 59:17, 59:21, 110:22,
112:11, 121:6, 132:10,
153:23
**159** [1] - 57:6
**16** [1] - 104:15
**160** [1] - 57:6
**17** [2] - 106:6, 132:10
**18** [2] - 50:21, 106:15
**19** [11] - 1:16, 59:24, 68:14,
68:17, 68:24, 69:2, 73:12,

108:8, 132:10, 176:16
**191** [1] - 57:7
**19106** [1] - 1:9
**192** [2] - 57:7, 76:21
**1996** [1] - 126:10
**1997** [1] - 156:17
**19A** [6] - 73:8, 73:9, 73:14,
73:16, 151:15, 176:18
**1:00** [1] - 59:19
**1:30** [2] - 67:24, 67:25
**2** [35] - 4:14, 11:11, 42:11,
58:20, 59:9, 59:14, 62:17,
62:19, 62:20, 62:21, 79:24,
80:1, 80:11, 80:16, 80:19,
80:21, 83:14, 83:17, 84:10,
84:15, 84:24, 84:25, 85:2,
85:13, 92:3, 100:1, 102:20,
116:22, 117:13, 119:11,
131:11, 131:25, 153:13,
176:13
**20** [14] - 67:4, 67:22, 68:14,
68:15, 68:18, 68:24, 109:3,
111:1, 112:6, 112:7, 131:17,
137:16, 137:23, 176:17
**20-some** [1] - 67:4
**20/13** [1] - 29:21
**20002** [1] - 2:5
**20005** [1] - 2:12
**2003** [1] - 120:23
**2005** [1] - 131:11
**2007** [3] - 133:5, 134:3,
140:22
**2007-2008** [1] - 140:17
**2008** [7] - 5:24, 96:18,
108:12, 108:13, 109:24,
115:6, 123:18
**2009** [10] - 10:8, 93:22,
95:17, 96:3, 96:13, 96:22,
116:14, 123:21, 157:16,
157:22
**2010** [5] - 120:24, 125:3,
125:6, 145:20, 157:21
**2011** [4] - 134:19, 135:2,
135:10, 153:13
**2012** [2] - 134:25, 135:12
**2013** [1] - 157:16
**2014** [2] - 134:25, 135:13
**2016** [1] - 12:13
**2017** [5] - 53:20, 85:8, 148:1,
160:6, 167:5
**2018** [6] - 10:6, 55:16, 86:8,
95:12, 96:21, 164:6
**2019** [2] - 1:10, 148:3
**202** [2] - 2:5, 2:12
**2020** [3] - 4:14, 11:11, 84:11
**21** [1] - 137:16
**22** [2] - 113:16, 138:24
**225** [1] - 107:3
**24** [4] - 86:25, 116:14, 126:2,
154:23

**248-5092** [1] - 2:5
**25** [1] - 126:24
**26** [3] - 127:3, 147:2, 166:5
**267** [1] - 1:23
**27** [3] - 127:17, 132:3, 167:18
**28** [6] - 95:15, 95:16, 107:3,
129:23, 161:14, 161:18
**29** [4] - 34:1, 34:10, 34:11,
69:4
**299-7250** [1] - 1:23
**2:00** [1] - 109:12
**2:19-cv-02002** [1] - 1:3
**2CK** [1] - 80:1
**2nd** [3] - 74:23, 74:24, 77:15
**3** [20] - 1:10, 35:24, 42:12,
59:10, 59:14, 62:13, 100:16,
101:8, 120:11, 120:13,
131:21, 138:15, 139:6,
140:24, 148:23, 149:17,
149:19, 149:20, 176:14
**3.5** [1] - 109:12
**3.566** [1] - 123:24
**3.635** [1] - 125:4
**3.747** [1] - 106:25
**30** [13] - 33:24, 41:9, 119:1,
132:16, 133:1, 145:8, 161:5,
161:8, 161:23, 161:25,
163:9, 165:7
**30M** [2] - 41:7, 41:8
**30th** [2] - 34:3, 34:11
**31** [3] - 69:6, 134:2, 145:8
**314** [1] - 119:19
**32** [4] - 51:4, 134:14, 168:25,
169:5
**33** [1] - 136:18
**34** [4] - 51:13, 143:15,
146:12, 151:17
**35** [5] - 78:5, 161:23, 161:25,
162:21, 163:9
**35-minute** [1] - 141:24
**35-page** [1] - 112:11
**354-5640** [1] - 1:17
**3:00** [2] - 35:3, 121:8
**3:16** [1] - 121:8
**3rd** [1] - 7:16
**4** [13] - 59:10, 59:14, 87:11,
91:24, 98:7, 98:12, 102:24,
121:16, 122:9, 126:18,
155:11, 169:12, 176:15
**40** [6] - 154:6, 160:8, 160:10,
161:5, 161:8, 162:11
**40-question** [1] - 141:24
**41** [1] - 115:15
**42** [2] - 119:6, 147:8
**43** [1] - 71:8
**44** [1] - 71:23
**45** [1] - 173:4
**4:47** [1] - 175:3
**5** [7] - 88:16, 104:17, 122:11,

145:1, 145:6, 150:9, 163:3
**50** [3] - 83:18, 167:15, 167:22
**504** [1] - 30:11
**52** [4] - 154:4, 154:7, 169:11,
176:12
**58** [1] - 152:19
**59** [3] - 176:13, 176:14,
176:15
**5:00** [1] - 169:2
**5:45** [1] - 111:24
**6** [3] - 86:8, 106:6, 137:22
**60** [6] - 33:19, 53:3, 83:8,
146:25, 160:15, 165:9
**60-minute** [1] - 146:24
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**64** [3] - 165:23, 166:4, 167:2
**65** [4] - 77:21, 78:4, 78:6
**654-6200** [1] - 2:12
**66** [1] - 129:10
**67** [1] - 144:23
**67th** [1] - 135:18
**68** [2] - 176:16, 176:17
**6:00** [1] - 111:25
**7** [4] - 60:3, 110:3, 112:23,
112:24
**70** [5] - 77:21, 127:2, 130:25,
154:7, 160:15
**70,000** [1] - 153:18
**700** [1] - 2:11
**70th** [1] - 127:3
**71** [3] - 130:22, 170:2, 170:3
**72** [1] - 170:3
**73** [3] - 132:2, 166:13, 176:18
**73rd** [1] - 132:3
**74** [4] - 69:4, 69:6, 129:12,
176:19
**75** [1] - 176:20
**76th** [1] - 127:11
**79th** [4] - 11:1, 134:21,
135:5, 135:16
**7:00** [1] - 111:25
**8** [12] - 50:2, 74:13, 96:2,
97:10, 97:12, 97:13, 97:14,
110:5, 141:17, 141:20,
141:21, 148:23
**83** [4] - 50:2, 50:22, 51:4,
129:8
**84** [1] - 176:5
**856** [1] - 1:17
**86** [2] - 101:14, 129:19
**86th** [1] - 126:15
**87** [2] - 133:21, 144:23
**88th** [2] - 127:8, 135:19
**89** [1] - 133:11
**89th** [1] - 133:10
**8:00** [2] - 112:1, 112:7
**9** [9] - 86:7, 86:9, 86:10, 98:5,
98:13, 106:16, 134:11,

142:25, 160:7
**90** [1] - 133:13
**90-something** [1] - 143:10
**91** [1] - 101:14
**91st** [1] - 134:10
**92** [1] - 101:14
**93** [2] - 101:14, 171:12
**94** [5] - 99:19, 100:4, 103:7, 103:8, 104:7
**95th** [2] - 10:24, 131:1
**96** [3] - 101:14, 126:14
**96th** [1] - 126:17
**97** [4] - 100:4, 104:6, 131:17, 131:20
**97th** [2] - 134:8, 138:6
**98th** [1] - 131:24
**9:30** [2] - 174:8, 175:1
**9th** [1] - 44:2
**A's** [12] - 101:8, 103:1, 104:19, 104:20, 106:9, 106:11, 106:20, 106:23, 107:15, 107:19, 125:2, 125:15
**a.m** [7] - 1:10, 3:1, 111:25, 112:1, 112:12
**AAMC** [1] - 154:25
**AB** [1] - 28:7
**Abilities** [1] - 127:18
**ability** [7] - 4:12, 47:14, 58:8, 76:23, 77:9, 138:5, 156:7
**able** [43] - 11:4, 11:14, 13:9, 17:7, 17:25, 18:6, 18:11, 20:13, 25:7, 33:11, 33:25, 34:5, 34:22, 34:25, 45:9, 45:14, 45:15, 53:24, 55:7, 56:3, 63:18, 65:1, 65:12, 75:9, 76:1, 76:8, 76:10, 76:11, 83:17, 91:11, 138:14, 138:15, 139:8, 140:10, 150:11, 151:24, 155:25, 160:14, 161:2, 161:9, 162:5, 162:20, 172:4
**above-entitled** [1] - 175:8
**absence** [9] - 14:5, 17:9, 55:8, 55:10, 74:20, 74:22, 75:17, 85:12
**Academic** [2] - 94:24, 109:12
**academic** [12] - 7:3, 7:5, 7:8, 12:24, 86:24, 87:16, 87:24, 88:13, 101:10, 101:13, 103:2, 104:3
**Academy** [3] - 99:24, 126:10, 158:23
**accelerated** [7] - 33:10, 33:14, 95:1, 95:3, 95:6, 95:8, 103:18
**accept** [2] - 33:14, 75:6
**acceptable** [1] - 138:14
**accepted** [3] - 42:3, 75:11, 75:15

**access** [2] - 39:13, 47:19
**accommodated** [1] - 154:21
**Accommodated** [1] - 154:23
**accommodation** [21] - 4:7, 40:12, 50:5, 51:1, 56:8, 56:12, 59:9, 76:21, 81:7, 81:9, 86:4, 87:25, 93:23, 94:1, 94:12, 124:19, 128:15, 163:25, 164:9, 168:4
**accommodations** [129] - 4:2, 6:12, 7:5, 7:7, 7:22, 8:7, 8:8, 8:10, 9:20, 10:11, 10:14, 11:13, 12:21, 16:22, 16:25, 17:2, 17:7, 17:11, 17:13, 18:16, 19:23, 37:24, 38:24, 38:25, 40:3, 40:8, 40:25, 41:3, 44:18, 44:20, 48:1, 48:4, 48:6, 48:11, 49:11, 49:25, 51:16, 51:22, 53:2, 53:4, 53:5, 53:23, 54:2, 54:14, 54:19, 55:7, 55:15, 56:21, 57:8, 57:14, 59:5, 60:7, 74:25, 75:23, 75:25, 76:1, 80:19, 80:21, 82:7, 82:13, 82:19, 82:25, 83:2, 87:9, 91:23, 93:3, 93:7, 93:15, 94:4, 94:5, 94:8, 94:10, 95:25, 101:16, 101:17, 105:11, 105:12, 106:13, 115:13, 115:14, 115:20, 116:1, 116:2, 119:8, 121:22, 122:16, 122:18, 122:19, 124:3, 124:7, 124:9, 124:25, 125:1, 125:9, 125:10, 125:16, 126:21, 127:6, 127:15, 129:20, 133:23, 154:13, 155:1, 155:5, 155:8, 156:19, 156:23, 157:2, 157:4, 157:16, 157:24, 158:3, 158:13, 158:18, 158:19, 158:22, 158:25, 163:22, 164:2, 164:4, 164:23, 166:2, 166:8, 167:6, 168:3, 168:11, 168:21
**accomplished** [3] - 8:12, 8:21, 11:1
**accuracy** [1] - 112:17
**accurate** [14] - 76:5, 87:1, 88:11, 89:9, 89:18, 90:16, 93:25, 94:21, 96:12, 112:18, 139:2, 157:10, 157:11, 160:18
**accurately** [2] - 76:7, 94:20
**ACE** [5] - 33:3, 33:4, 33:10, 94:24, 103:17
**achieve** [7] - 7:8, 8:13, 138:14
**achieved** [3] - 3:24, 100:20, 101:14

**Achievement** [2] - 126:4, 127:4
**Act** [4] - 5:24, 7:19, 12:6, 12:23
**ACT** [45] - 10:23, 64:14, 114:24, 130:5, 130:6, 130:9, 130:10, 131:9, 131:15, 132:17, 133:1, 133:7, 133:15, 133:22, 134:2, 134:3, 134:12, 135:3, 135:9, 137:23, 137:25, 138:6, 138:17, 138:20, 138:25, 139:5, 139:7, 139:10, 139:13, 139:17, 140:12, 140:16, 140:17, 140:19, 140:21, 140:25, 141:13, 141:19, 141:23, 142:11, 142:22, 142:24, 146:1, 146:19, 147:4
**acting** [3] - 19:10, 113:23, 114:19
**ACTION** [1] - 1:3
**actions** [2] - 23:15
**Activities** [1] - 110:6
**activities** [9] - 7:10, 90:2, 108:6, 110:4, 113:3, 113:5, 113:9, 113:18, 115:3
**activity** [2] - 5:12, 9:21
**actual** [7] - 11:22, 54:8, 72:19, 131:9, 134:17, 150:11, 171:14
**ad** [1] - 34:25
**ADA** [7] - 5:24, 7:5, 7:19, 9:19, 11:23, 12:6, 12:22
**add** [2] - 50:14, 169:14
**ADD** [4] - 38:12, 39:1, 118:10, 118:22
**ADD/ADHD** [2] - 116:15, 117:11
**added** [2] - 30:23, 30:24
**Adderall** [3] - 19:9, 19:11, 38:22
**adding** [1] - 169:18
**addition** [1] - 65:9
**additional** [17] - 7:11, 8:18, 39:10, 56:10, 57:16, 57:21, 73:10, 88:19, 101:19, 101:22, 103:10, 110:4, 113:18, 164:1, 164:5, 167:15, 171:17
**additionally** [1] - 140:9
**address** [3] - 57:21, 93:14, 118:16
**addresses** [1] - 100:8
**adequate** [5] - 39:2, 40:18, 40:20, 40:21, 99:4
**adequately** [2] - 99:3, 138:4
**ADHD** [26] - 5:2, 10:8, 10:10, 10:13, 19:12, 38:12, 38:17, 39:1, 51:18, 56:16, 56:18,

56:20, 86:22, 95:17, 97:8, 115:9, 119:21, 120:20, 121:15, 122:6, 156:20, 160:14, 168:3, 168:11, 168:18, 168:21
**adjourn** [1] - 172:20
**adjourned** [1] - 175:2
**adjourning** [1] - 169:1
**adjusted** [1] - 38:22
**adjusting** [1] - 15:10
**administer** [1] - 117:2
**administered** [2] - 7:23, 134:25
**administers** [1] - 4:4
**administration** [1] - 4:8
**admission** [2] - 52:19, 109:23
**Admission** [2] - 10:23, 10:25
**admit** [2] - 59:8, 73:1
**ADMITTED** [1] - 176:11
**admitted** [17] - 51:24, 52:11, 52:24, 59:13, 59:14, 68:23, 68:24, 73:3, 73:8, 74:6, 74:8, 74:9, 75:17, 75:20, 75:21, 114:24, 165:25
**adults** [1] - 24:5
**advance** [1] - 174:1
**Advanced** [1] - 107:20
**advice** [5] - 40:17, 141:3, 142:21, 142:23, 142:25
**advised** [3] - 16:24, 20:7, 139:19
**advisor** [2] - 37:21, 40:19
**affairs** [1] - 53:11
**affect** [1] - 86:24
**afternoon** [3] - 83:25, 84:1, 84:2
**afterwards** [1] - 125:14
**agency** [1] - 42:8
**ago** [3] - 16:19, 20:9, 100:12
**agree** [3] - 94:7, 101:8, 169:25
**agreed** [6] - 8:15
**ahead** [6] - 15:3, 16:25, 45:7, 56:25, 61:9, 61:11
**Aid** [2] - 78:12, 78:22
**aid** [2] - 93:23, 94:1
**aided** [1] - 1:25
**Algebra** [1] - 107:10
**all-nighters** [1] - 32:15
**allegations** [1] - 85:15
**allow** [2] - 21:18, 146:4
**allowed** [18] - 17:5, 21:25, 22:1, 22:2, 43:2, 43:25, 64:21, 75:8, 81:5, 81:11, 82:3, 82:5, 116:4, 136:14, 138:2, 165:2, 165:10, 171:25
**allows** [3] - 8:19, 43:6, 43:8
**almost** [2] - 4:17, 26:8
**aloud** [6] - 55:24, 56:3,

64:21, 136:13, 165:15
**alphabet** [6] - 28:2, 28:24, 92:9, 92:24, 94:11, 158:7
**alter** [1] - 12:11
**altered** - 88:1
**Alumni** [1] - 108:10
**ameliorative** [1] - 6:22
**amenable** [1] - 59:8
**Amendments** [4] - 5:24, 7:19, 12:6, 12:22
**amount** [5] - 5:14, 11:16, 32:17, 144:24, 164:8
**analysis** [2] - 6:3, 6:19
**analyze** [2] - 65:10, 80:6
**Ann** [2] - 1:22, 175:11
**annotate** [4] - 17:18, 71:3, 71:6, 151:25
**annotated** [6] - 69:13, 70:4, 70:21, 73:2, 135:6, 150:5
**annotation** [3] - 61:2, 70:9, 73:12
**annotations** [1] - 149:25
**answer** [71] - 34:13, 55:22, 61:14, 62:9, 62:15, 63:16, 63:18, 64:6, 64:11, 65:12, 65:22, 65:23, 66:1, 66:2, 66:23, 67:9, 67:13, 67:14, 67:17, 69:20, 69:21, 71:10, 72:9, 76:2, 76:12, 77:4, 77:9, 78:18, 79:11, 79:16, 79:17, 79:23, 80:7, 80:18, 83:7, 138:1, 138:14, 138:21, 139:14, 141:5, 141:10, 142:2, 144:8, 144:13, 144:18, 145:4, 147:9, 148:18, 148:21, 150:23, 150:24, 150:25, 151:7, 151:9, 151:11, 158:20, 159:22, 161:1, 161:23, 162:1, 162:6, 163:10, 163:11, 163:12, 163:13, 172:11, 172:12, 172:13, 172:14
**answerable** [1] - 141:9
**answered** [8] - 60:19, 70:3, 70:10, 138:25, 139:11, 139:18, 140:3, 144:12
**answering** [8] - 15:21, 60:13, 69:9, 69:11, 142:17, 147:3, 149:16, 151:19
**answers** [9] - 34:3, 63:22, 64:2, 64:16, 64:20, 65:7, 66:20, 138:13, 141:13
**anticipate** [2] - 172:21, 174:24
**anticipated** [1] - 12:10
**anxiety** [1] - 19:22
**anyway** [1] - 139:20
**AP** [2] - 112:2, 112:3
**apologize** [1] - 109:8

**appeal** [1] - 53:9
**appear** [1] - 134:13
**APPEARANCES** [2] - 1:14, 2:1
**applicable** [1] - 122:13
**application** [13] - 39:19, 41:4, 43:12, 43:21, 48:7, 53:1, 54:21, 55:14, 76:17, 109:23, 112:18, 115:1, 159:2
**applications** [2] - 59:5, 59:9
**applied** [8] - 16:22, 39:17, 41:2, 47:25, 48:4, 56:12, 138:17, 159:8
**apply** [7] - 6:10, 40:24, 48:6, 49:11, 75:9, 75:11, 84:21
**Apply** [1] - 154:24
**applying** [3] - 8:8, 43:16, 54:13
**appointment** [2] - 37:21, 54:5
**approach** [3] - 48:20, 61:3, 61:5
**appropriate** [1] - 116:7
**approve** [1] - 168:4
**approved** [5] - 11:14, 56:9, 57:15, 82:25, 93:10
**approving** [1] - 122:15
**April** [2] - 126:9, 134:19
**area** [3] - 12:3, 16:2, 102:4
**areas** [8] - 89:14, 89:15, 98:19, 101:10, 101:13, 105:22, 105:24, 154:3
**arrived** [1] - 120:1
**arrows** [3] - 22:23, 23:3
**articles** [1] - 19:3
**arts** [3] - 31:1, 31:3, 105:7
**aspirin** [3] - 19:25, 20:2, 20:7
**assertive** [1] - 98:20
**assessing** [1] - 86:24
**assessment** [1] - 118:8
**assessments** [1] - 117:2
**assign** [1] - 119:18
**assigned** [5] - 19:3, 32:1, 32:8, 37:21, 45:11
**assignment** [2] - 28:17, 31:7
**assignments** [7] - 27:19, 27:21, 29:24, 30:6, 31:6, 47:23, 88:1
**assist** [1] - 61:5
**assistance** [6] - 6:13, 90:18, 102:6, 102:9, 103:15, 104:13
**Associate** [1] - 164:14
**associated** [4] - 138:22, 139:19, 146:15, 149:11
**associates** [1] - 150:17
**assume** [5] - 105:7, 105:17, 115:3, 154:17, 168:22
**assumed** [1] - 82:4
**assuming** [1] - 165:24

**assumption** [1] - 52:15
**asterisks** [1] - 96:4
**athletic** [2] - 109:4, 109:16
**Athletic** [1] - 109:11
**attachments** [2] - 166:11, 169:13
**attempt** [3] - 43:17, 43:19, 77:17
**attempted** - 17:2
**attended** [1] - 88:25
**attending** [1] - 115:5
**attention** [9] - 31:9, 71:17, 88:4, 90:1, 90:8, 99:4, 118:17, 158:17
**attention-related** [1] - 118:17
**attorney** [6] - 166:20, 170:5, 170:13, 170:14, 171:21, 172:7
**attorney-client** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**attorneys** [1] - 172:8
**audio** [2] - 58:19, 149:18
**audio-type** [1] - 149:18
**August** [3] - 5:7, 53:20, 55:10
**aura** [1] - 56:16
**autism** [2] - 39:19, 39:20
**autistic** [1] - 14:19
**autumn** [1] - 123:18
**availability** [2] - 54:6, 155:1
**available** [6] - 54:5, 81:7, 105:16, 136:12, 154:14, 154:15
**average** [4] - 10:21, 78:6, 106:25, 111:12
**averages** [1] - 111:2
**avoid** [2] - 6:4, 139:8
**award** [4] - 3:21, 109:11, 109:16, 109:17
**Award** [1] - 110:9
**awards** [1] - 109:4
**aware** [7] - 30:12, 90:21, 91:6, 91:8, 91:13, 91:16, 91:20
**B's** [4] - 106:21, 106:23, 125:2, 125:15
**babysitting** [2] - 111:10, 111:11
**backdated** [1] - 55:9
**backwards** [2] - 28:2, 113:13
**bacteria** [1] - 24:12
**bank** [2] - 78:16, 78:17
**banks** [1] - 147:22
**bar** [3] - 17:23, 39:22, 82:17
**Baseball** [1] - 110:12
**based** [18] - 46:18, 58:16, 61:23, 62:14, 76:3, 77:1, 77:5, 77:23, 90:22, 102:5, 103:14, 115:2, 134:24,

135:21, 150:23, 150:25, 154:10, 164:25
**basic** [5] - 4:7, 44:6, 44:8, 81:25, 128:22
**Basic** [1] - 127:18
**basis** [3] - 102:10, 139:13, 140:2
**Bates** [1] - 166:5
**bearings** [1] - 116:13
**beautiful** [1] - 105:21
**became** [1] - 14:23
**become** [1] - 8:21
**becoming** [1] - 98:20
**BEFORE** [1] - 1:12
**began** [6] - 87:16, 87:24, 88:13, 91:4, 115:5, 125:25
**begin** [3] - 4:20, 112:8, 142:16
**beginning** [10] - 18:11, 18:17, 18:18, 32:8, 65:18, 67:7, 88:15, 88:21, 89:12, 155:3
**begins** [3] - 94:18, 96:3, 160:10
**behavior** [1] - 97:19
**behind** [1] - 27:2
**below** [3] - 117:16, 130:8, 142:16
**bench** [1] - 48:23
**benchmark** [1] - 82:24
**bend** [1] - 14:6
**benefit** [1] - 150:16
**benign** [1] - 24:19
**BERGER** [7] - 1:16, 3:7, 61:2, 113:7, 116:16, 147:23, 163:4
**Berger** [5] - 3:16, 170:20, 171:5, 171:6, 171:19
**best** [12] - 7:24, 8:3, 16:24, 26:16, 27:11, 53:22, 62:21, 98:19, 141:15, 155:15, 156:7
**better** [9] - 16:14, 31:15, 35:20, 37:11, 91:2, 109:13, 111:15, 118:1
**between** [9] - 28:12, 29:13, 47:22, 58:18, 66:2, 66:22, 144:17, 168:17, 174:1
**beyond** [4] - 8:18, 11:18, 64:9, 89:14
**Bibber** [1] - 12:14
**bible** [1] - 78:14
**big** [1] - 43:17
**binder** [2] - 49:16, 59:5
**binders** [1] - 48:13
**biological** [5] - 41:14, 135:19, 136:3, 152:18, 154:7
**Biology** [1] - 108:3
**biopsies** [1] - 23:9
**bit** [6] - 38:19, 71:19, 84:23, 117:23, 125:20, 150:25

**black** [1] - 44:24
**blank** [1] - 37:15
**blindly** [1] - 161:22
**block** [8] - 58:14, 65:19, 83:5, 160:15, 161:22, 165:5, 165:8, 165:12
**blocked** [1] - 172:21
**blood** [4] - 20:1, 20:2, 20:5, 20:7
**blue** [9] - 23:7, 23:8, 23:11, 26:4, 61:17, 150:9, 169:6
**BOARD** [1] - 1:5
**Board** [5] - 3:5, 4:4, 9:2, 11:23, 12:15
**board** [3] - 168:2, 168:4, 168:20
**boat** [1] - 28:6
**body** [7] - 14:17, 30:18, 65:24, 65:25, 66:10, 66:21, 66:22
**book** [13] - 20:17, 49:6, 78:12, 78:22, 78:25, 105:25, 140:23, 145:22, 145:25, 153:9, 153:11, 155:4
**booklet** [3] - 132:25, 140:6, 140:7
**borderline** [2] - 137:2, 137:12
**bottle** [2] - 17:22, 82:16
**bottom** [23] - 50:3, 60:4, 62:18, 86:12, 94:15, 100:19, 104:22, 105:2, 109:7, 117:13, 118:8, 120:11, 120:12, 120:13, 122:6, 122:9, 122:11, 134:22, 143:3, 156:15, 167:4, 167:14, 167:20
**box** [4] - 13:16, 120:1, 155:15, 155:18
**boy** [1] - 92:1
**brains** [1] - 79:19
**Branch** [2] - 88:23, 100:11
**brand** [1] - 42:16
**break** [14] - 8:2, 47:16, 52:20, 55:18, 56:10, 57:15, 59:16, 59:18, 67:23, 80:25, 112:10, 114:7, 121:5, 164:24
**breakdown** [1] - 153:23
**breaks** [3] - 79:2, 88:2, 135:4
**breath** [1] - 23:12
**brief** [2] - 3:13, 121:5
**briefly** [1] - 3:15
**brilliant** [1] - 5:1
**bring** [5] - 13:18, 19:15, 31:6, 85:18, 163:19
**broader** [2] - 12:10, 46:23
**broadly** [1] - 6:20
**brothers** [1] - 14:19
**brought** [1] - 39:8
**brown** [2] - 24:12

**Brown** [1] - 104:16
**Bruce** [1] - 171:19
**Bs** [2] - 10:18, 30:10
**build** [3] - 20:21, 20:23, 39:18
**built** [1] - 14:22
**bulleted** [1] - 50:12
**bunch** [1] - 139:7
**burden** [4] - 9:7, 9:9, 9:14, 10:1
**Burgoyne** [3] - 5:6, 9:1, 33:6
**BURGOYNE** [54] - 2:10, 3:6, 9:1, 52:13, 52:22, 59:11, 60:25, 63:4, 68:17, 68:21, 70:8, 70:14, 73:5, 74:7, 75:19, 83:23, 84:2, 84:5, 85:24, 92:13, 113:8, 113:14, 116:17, 116:19, 121:7, 121:14, 145:16, 145:19, 145:24, 146:9, 146:10, 148:4, 162:25, 163:2, 163:5, 163:6, 166:24, 166:25, 169:3, 169:4, 170:12, 170:17, 170:19, 170:25, 172:2, 172:3, 172:17, 172:25, 173:17, 173:22, 174:4, 174:11, 174:17, 174:25
**business** [1] - 59:20
**Buspar** [1] - 19:21
**but..** [3] - 21:13, 93:6, 141:9
**Byrne** [1] - 1:8
**calculated** [2] - 72:12, 72:13
**Calculus** [1] - 112:3
**calculus** [1] - 112:12
**calendar** [1] - 103:5
**candidate** [2] - 7:1, 7:24
**captain** [2] - 108:24, 110:8
**captioned** [2] - 108:10, 140:16
**card** [11] - 98:13, 99:23, 100:7, 100:8, 100:16, 101:18, 102:15, 103:23, 104:15, 106:6, 106:15
**cards** [1] - 90:24
**care** [9] - 3:22, 10:9, 38:2, 40:22, 47:13, 47:15, 51:13, 116:9, 120:25
**career** [1] - 4:16
**carefully** [4] - 141:3, 142:15, 143:1, 143:6
**Caroline** [1] - 9:3
**CAROLINE** [1] - 2:10
**CAROLLA** [1] - 1:15
**carried** [1] - 158:24
**Carrollton** [5] - 88:22, 88:25, 100:11, 102:16, 104:4
**Carrollton-Farmers** [3] - 88:22, 88:25, 100:11
**carry** [1] - 24:21

**case** [18] - 8:11, 8:14, 9:7, 9:13, 9:14, 12:5, 12:12, 12:13, 12:14, 12:15, 12:22, 12:23, 59:18, 61:13, 144:2, 148:14, 161:16, 173:21
**cases** [2] - 47:22, 174:6
**categories** [1] - 132:11
**category** [3] - 105:25, 120:3, 155:20
**caught** [1] - 71:16
**causing** [2] - 30:2, 97:22
**CBSE** [3] - 81:24, 82:9, 82:21
**cell** [1] - 23:20
**cells** [2] - 23:19, 23:21
**center** [1] - 101:25
**certain** [3] - 11:7, 11:15, 16:2
**certainly** [4] - 8:22, 68:17, 101:15, 147:24
**certification** [2] - 50:4, 112:17
**certifies** [1] - 48:11
**certify** [1] - 175:7
**chair** [1] - 94:12
**chambers** [1] - 5:7
**chance** [5] - 34:21, 43:19, 52:17, 64:17, 67:14
**chances** [1] - 75:11
**change** [5] - 5:25, 6:3, 6:14, 112:5
**changed** [1] - 12:6
**changes** [2] - 6:5, 42:19
**channels** [1] - 116:7
**chapter** [2] - 112:10, 112:11
**chart** [5] - 28:2, 28:24, 92:9, 92:24, 158:8
**charts** [1] - 94:11
**check** [5] - 102:4, 102:7, 119:25, 120:4, 155:15
**checked** [4] - 29:2, 120:3, 120:8, 155:18
**checklist** [1] - 117:8
**checklists** [1] - 117:5
**chemicals** [1] - 23:14
**chemistry** [5] - 36:23, 36:25, 37:2, 112:9, 115:23
**Chemistry** [2] - 107:24, 112:2
**chest** [2] - 23:8, 26:5
**Chestnut** [1] - 1:16
**chief** [2] - 117:10
**child** [1] - 4:1
**childhood** [1] - 93:24
**children** [1] - 24:4
**choice** [7] - 3:14, 63:22, 64:2, 80:4, 135:24, 136:4, 154:9
**choices** [8] - 55:22, 63:16, 65:24, 66:1, 71:10, 151:11, 161:1, 161:23

**chose** [3] - 158:19, 162:1, 163:9
**chunk** [3] - 25:14, 25:22, 62:4
**circled** [5] - 101:1, 101:2, 102:20, 102:22, 103:18
**circumstance** [1] - 55:6
**circumstances** [1] - 55:5
**CIVIL** [1] - 1:3
**CK** [7] - 80:2, 80:22, 80:23, 84:24, 84:25, 85:2, 85:13
**clarification** [1] - 174:11
**clarify** [2] - 20:12, 160:22
**class** [20] - 17:1, 27:18, 27:20, 28:19, 31:2, 31:8, 36:2, 42:17, 42:18, 45:7, 55:1, 63:12, 88:2, 98:18, 98:20, 105:6, 107:3, 107:7, 123:6
**classes** [2] - 101:25, 107:13
**classroom** [1] - 101:19
**clear** [3] - 11:15, 14:9, 70:21
**clearly** [1] - 13:9
**cleats** [1] - 112:6
**clerk** [1] - 15:8
**clerk's** [1] - 48:23
**clerkship** [1] - 46:19
**click** [2] - 58:17, 58:21
**client** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**clinic** [4] - 16:13, 45:11, 47:9, 47:18
**clinical** [18] - 16:8, 18:2, 42:11, 44:7, 44:13, 45:6, 45:18, 46:6, 47:10, 78:10, 80:2, 80:17, 82:12, 97:5, 120:6, 149:12
**clinically** [6] - 80:4, 96:9, 96:12, 96:17, 96:24, 96:25
**clip** [2] - 149:14, 149:15
**clips** [1] - 149:10
**close** [1] - 36:14
**closest** [1] - 61:24
**clot** [1] - 56:2
**clotting** [6] - 20:4, 56:1, 56:17, 56:22, 164:1, 165:1
**Club** [3] - 110:15, 110:16, 110:20
**cmew@perkinscoie.com** [1] - 2:13
**CO2** [2] - 61:23, 62:1
**Coach's** [1] - 110:8
**code** [1] - 105:1
**cognitive** [2] - 58:8, 156:4
**Cognitive** [1] - 127:18
**cohesive** [1] - 50:17
**COIE** [1] - 2:9
**colleague** [1] - 9:3
**collected** [1] - 61:23

**College** [2] - 10:23, 10:25
**college** [21] - 4:24, 9:24, 10:12, 10:15, 10:16, 14:25, 35:10, 35:11, 36:2, 39:16, 95:20, 117:22, 123:2, 123:5, 123:12, 132:7, 132:8, 132:13, 132:14, 138:4, 142:8
**color** [7] - 22:20, 22:21, 22:25, 23:23, 24:2, 150:14, 150:16
**colored** [3] - 22:18, 44:22, 82:15
**colorful** [1] - 97:13
**colors** [7] - 21:2, 21:8, 21:11, 25:8, 25:13, 26:8, 26:9
**column** [3] - 29:8, 131:18, 132:6
**COM** [1] - 105:1
**coming** [2] - 13:16, 16:15
**Commencing** [1] - 1:10
**comment** [1] - 104:25
**commented** [1] - 151:13
**comments** [14] - 61:20, 90:24, 97:24, 98:2, 98:16, 104:24, 105:2, 105:18, 118:10, 150:22, 151:2, 151:17, 169:8
**common** [1] - 149:2
**commonly** [2] - 43:11, 142:7
**communication** [1] - 173:25
**communications** [3] - 166:6, 171:23, 171:24
**company** [1] - 39:24
**compare** [2] - 34:16, 58:4
**compared** [11] - 9:22, 9:23, 9:24, 9:25, 12:8, 12:19, 62:12, 77:7, 80:9, 89:6, 147:24
**comparisons** [1] - 144:16
**compensate** [1] - 88:3
**compensatory** [1] - 55:24
**competency** [1] - 76:6
**competent** [1] - 77:12
**competing** [1] - 5:11
**competitive** [2] - 43:15
**compile** [1] - 79:6
**Complaint** [2] - 160:7, 161:12
**complaint** [4] - 59:1, 59:3, 117:10, 117:11
**complete** [7] - 29:24, 33:24, 55:13, 119:7, 119:10, 119:15, 140:23
**completed** [1] - 3:20
**completely** [3] - 77:18, 149:9, 150:23
**completing** [2] - 43:24, 88:2
**component** [1] - 36:3, 120:21, 135:25
**components** [3] - 129:15,

130:16, 141:18
**composite** [5] - 129:13, 129:16, 131:15, 133:6, 134:20
**comprehension** [6] - 11:3, 88:4, 127:11, 128:24, 129:9, 141:25
**comprehensive** [1] - 81:24
**compromise** [1] - 47:14
**compromises** [1] - 142:6
**compromising** [1] - 47:12
**computation** [1] - 129:18
**computer** [9] - 1:25, 17:17, 39:11, 47:5, 47:18, 58:16, 132:22, 132:24, 135:21
**computer-aided** [1] - 1:25
**computer-based** [1] - 135:21
**computerized** [2] - 80:3, 81:21, 82:4
**concentration** [2] - 88:4, 117:24
**concern** [1] - 28:20
**concerned** [1] - 38:5
**concerns** [1] - 144:5
**concluded** [1] - 175:3
**conclusion** [3] - 8:9, 30:19, 51:25
**condition** [2] - 120:8, 120:17
**conduct** [2] - 99:7, 100:9
**conducted** [1] - 165:20
**Conference** [2] - 109:12
**conference** [2] - 59:18, 121:6
**confidence** [1] - 99:9
**confident** [2] - 34:2, 78:20
**confirmed** [1] - 160:3
**confirming** [1] - 158:11
**confused** [1] - 66:7
**confusing** [1] - 67:6
**congratulations** [1] - 105:24
**Congress** [2] - 6:17, 12:10
**Congressional** [1] - 7:19
**connection** [1] - 127:24
**consequently** [1] - 93:23
**consider** [4] - 65:12, 80:15, 106:1, 128:2
**considered** [1] - 52:3
**consisted** [1] - 12:21
**consistent** [1] - 119:3
**consistently** [1] - 87:25
**consists** [1] - 166:10
**consultants** [1] - 5:17
**contact** [2] - 120:22, 120:23
**contained** [1] - 147:1
**content** [8] - 45:2, 123:7, 146:13, 162:9, 169:16, 170:18, 171:13
**context** [3] - 5:20, 45:8, 78:10

**continue** [7] - 15:15, 49:14, 57:11, 112:11, 146:4, 146:5, 171:20
**continued** [1] - 95:7
**CONTINUED** [1] - 2:1
**continuing** [1] - 89:13
**conversationally** [1] - 36:4
**coordinate** [1] - 80:15
**coordination** [1] - 80:15
**copied** [1] - 171:9
**copies** [1] - 70:7
**copy** [6] - 48:17, 48:18, 60:23, 73:18, 152:7, 153:3
**copy-and-pasted** [1] - 152:7
**copying** [1] - 72:14
**copyright** [1] - 153:13
**core** [1] - 11:9
**corner** [3] - 60:4, 109:7, 128:20
**correct** [60] - 57:4, 57:5, 73:5, 84:11, 88:23, 93:8, 93:19, 95:12, 98:8, 99:24, 100:5, 100:17, 103:5, 103:12, 103:13, 103:15, 103:16, 104:17, 104:19, 104:21, 106:14, 106:20, 107:25, 109:24, 112:20, 113:19, 115:6, 115:9, 115:13, 115:16, 116:25, 120:2, 120:9, 122:13, 124:1, 125:4, 125:16, 125:23, 127:13, 127:16, 131:6, 135:7, 135:11, 136:1, 142:16, 146:19, 146:22, 147:10, 152:15, 154:10, 162:22, 164:2, 164:9, 164:23, 165:13, 167:24, 168:14, 169:21, 171:9, 175:7
**cost** [2] - 8:15, 8:18
**costs** [1] - 4:9
**could/would** [1] - 150:24
**counsel** [7] - 3:18, 13:7, 52:17, 59:7, 61:4, 121:4, 121:13, 162:23, 162:24, 169:1, 174:1
**Counsel** [7] - 3:4, 8:25, 13:25, 49:14, 57:11, 172:20, 174:7
**counselor** [1] - 39:13
**count** [7] - 46:16, 72:15, 72:18, 82:22, 152:4, 152:8, 152:10
**counted** [2] - 40:14, 82:11
**country** [1] - 134:12
**couple** [13] - 19:5, 29:16, 41:23, 62:11, 79:20, 82:18, 110:18, 110:19, 114:1, 139:16, 144:17, 150:1, 152:9
**course** [11] - 45:2, 45:10, 45:14, 45:17, 64:10, 79:20,

104:25, 125:22, 139:17, 140:20, 166:17
**courses** [5] - 54:24, 63:8, 107:5, 107:16, 139:16
**COURT** [3] - 1:1, 13:22, 15:7
**court** [1] - 162:20
**Court** [7] - 1:22, 3:1, 4:13, 6:2, 7:20, 9:5, 175:11
**Courthouse** [1] - 1:8
**courtroom** [2] - 6:9, 6:15
**covers** [1] - 45:4
**cram** [1] - 79:18
**created** [1] - 70:11
**creative** [1] - 33:6
**Creative** [1] - 94:24
**creatively** [1] - 106:1
**credit** [2] - 34:8, 64:17
**criteria** [3] - 156:1, 168:2, 168:21
**critical** [5] - 8:1, 130:16, 130:18, 130:22, 130:23
**critically** [1] - 5:21
**Cross** [1] - 176:4
**CROSS** [1] - 84:4
**cross** [4] - 70:13, 72:21, 83:22, 173:15
**cross-examination** [1] - 83:22
**CROSS-EXAMINATION** [1] - 84:4
**cross-examine** [1] - 70:13
**cross-throughs** [1] - 72:21
**crossed** [2] - 151:6, 151:7
**crowded** [1] - 58:13
**CRR** [2] - 1:22, 175:11
**cumulative** [3] - 41:10, 123:23, 125:3
**curiosity** [1] - 21:19
**current** [3] - 14:3, 88:7, 156:18
**curricula** [1] - 142:8
**curriculum** [3] - 33:12, 84:12, 84:13
**CURTIS** [1] - 1:12
**D1X** [1] - 155:15
**dad** [1] - 32:6
**daily** [1] - 102:10
**Dalzell** [2] - 12:14, 12:23
**dance** [3] - 39:24, 114:20, 123:7
**danced** [1] - 39:24
**dashes** [1] - 71:16
**data** [1] - 57:19
**date** [9] - 84:15, 113:11, 116:12, 122:3, 122:4, 122:5, 126:9, 131:11
**dates** [2] - 158:14, 158:16
**DAY** [1] - 1:6
**days** [11] - 8:16, 47:10, 53:3,

87:17, 112:14, 150:1, 152:17, 165:2, 165:4, 165:10, 167:16
**DC** [2] - 2:5, 2:12
**dealing** [1] - 94:7
**Dean** [2] - 164:14
**Dean's** [3] - 123:19, 124:18, 124:21
**dear** [1] - 169:13
**December** [2] - 1:10, 167:5
**decide** [1] - 66:2
**decided** [5] - 12:14, 12:22, 14:24, 15:18, 83:3
**deciding** [1] - 12:23
**decipher** [1] - 21:5
**decision** [1] - 47:14
**decision-making** [1] - 47:14
**decisions** [3] - 6:2, 12:2, 12:4
**declaration** [3] - 137:17, 161:16, 173:18
**decode** [1] - 20:19
**Defendant** [2] - 1:6, 2:14
**Defendant's** [14] - 91:24, 95:23, 97:10, 97:13, 98:5, 99:11, 99:23, 104:15, 108:8, 109:3, 126:2, 127:17, 134:14, 167:2
**defense** [3] - 173:15, 174:1, 174:2
**defer** [2] - 6:24, 11:24
**defined** [1] - 6:20
**definitely** [3] - 29:23, 125:12, 168:11
**definition** [1] - 6:19
**definitively** [1] - 162:15
**degree** [2] - 42:9
**delay** [1] - 11:8
**deleted** [1] - 171:24
**demonstrated** [1] - 8:7
**demonstrating** [1] - 150:21
**denial** [1] - 57:18
**denied** [9] - 19:22, 53:4, 56:10, 57:23, 57:24, 58:24, 59:2, 82:20, 87:8
**deny** [1] - 13:2
**Department** [6] - 5:21, 6:12, 6:23, 7:15, 11:16, 11:17
**depended** [1] - 25:19
**deposition** [6] - 33:5, 60:15, 70:19, 153:7, 162:18, 163:8
**describe** [4] - 21:12, 54:18, 60:17, 137:23
**described** [3] - 9:6, 86:16, 148:16
**describes** [1] - 155:16
**describing** [1] - 72:11
**description** [3] - 54:15, 141:18, 149:3
**designed** [4] - 139:11,

139:14, 139:25, 140:3
**desire** [2] - 14:16, 14:21
**desk** [6] - 27:16, 27:17, 28:11, 28:24, 92:15, 92:24
**despite** [4] - 3:24, 4:10, 8:13
**details** [1] - 169:18
**determination** [2] - 6:18, 112:5
**determined** [1] - 6:21
**determining** [2] - 6:1, 7:18
**developed** [2] - 26:7, 159:24
**developing** [1] - 144:22
**development** [2] - 99:2, 99:7
**developmental** [1] - 120:5
**developments** [1] - 71:9
**devoted** [1] - 110:21
**diagnose** [4] - 38:13, 155:22, 156:1, 156:2
**diagnosed** [19] - 10:6, 10:10, 10:13, 12:16, 40:6, 95:11, 95:17, 96:10, 96:12, 96:17, 96:20, 96:22, 96:24, 96:25, 115:9, 115:12, 155:17, 156:3, 156:17
**diagnoses** [5] - 45:25, 46:13, 119:19, 156:18, 164:5
**diagnosing** [1] - 38:12
**diagnosis** [10] - 12:17, 36:15, 45:22, 45:23, 46:3, 46:14, 97:5, 119:18, 120:2, 156:11
**diagnostic** [7] - 23:8, 26:3, 46:4, 46:14, 117:2, 119:15, 165:20
**difference** [2] - 16:10, 168:17
**different** [14] - 5:4, 21:11, 29:10, 41:11, 42:19, 58:6, 58:16, 63:25, 85:18, 88:10, 150:14, 151:21, 163:13
**differential** [2] - 45:21, 45:25
**differently** [1] - 65:5
**difficult** [2] - 26:16, 26:24
**difficulty** [3] - 4:25, 27:8, 90:12
**direct** [1] - 162:23
**Direct** [1] - 176:4
**DIRECT** [1] - 14:1
**direction** [2] - 22:24, 31:22
**directly** [1] - 14:7
**director** [1] - 46:19
**disabilities** [10] - 5:20, 5:22, 8:4, 8:14, 54:2, 56:11, 86:23, 93:22, 164:1, 168:5
**Disability** [1] - 36:18
**disability** [16] - 5:9, 6:2, 6:18, 6:19, 7:4, 7:6, 7:8, 7:18, 7:25, 49:10, 115:13, 119:17, 121:23, 155:23, 155:24, 156:1

**disabled** [3] - 6:20, 9:19, 12:20
**disagree** [3] - 9:15, 9:17, 9:18
**disclosed** [1] - 145:20
**discovery** [3] - 112:25, 128:14, 128:15
**discriminating** [1] - 29:13
**discuss** [4] - 52:17, 94:23, 114:24, 159:3
**discussed** [5] - 16:23, 100:12, 149:22, 158:8, 158:9
**discusses** [2] - 134:23, 154:25
**discussing** [6] - 68:13, 88:22, 93:3, 94:11, 139:5, 168:17
**discussion** [15] - 17:21, 88:19, 91:3, 92:4, 94:16, 111:24, 113:3, 113:9, 117:16, 117:20, 140:24, 146:4, 146:5, 153:16, 157:23
**disease** [4] - 23:4, 23:16, 24:4, 24:7
**diseases** [1] - 22:22
**dismissed** [6] - 4:15, 4:19, 43:7, 75:1, 75:7, 75:10
**disorder** [6] - 20:5, 56:1, 56:17, 56:22, 164:1, 165:1
**disorders** [1] - 22:22
**disrespectful** [1] - 31:11
**distinct** [1] - 148:12
**distinguish** [3] - 22:23, 22:24, 66:22
**distract** [1] - 17:25
**distracted** [2] - 19:15, 27:22
**distractibility** [1] - 88:3
**distractible** [1] - 90:8
**distracting** [1] - 56:4
**distraction** [1] - 158:8
**District** [1] - 100:12
**DISTRICT** [2] - 1:1, 1:1
**DO** [1] - 42:9
**docket** [1] - 174:19
**doctor** [6] - 4:12, 8:21, 8:22, 40:22, 87:7
**document** [45] - 49:7, 49:8, 50:3, 50:21, 51:5, 51:10, 52:16, 52:20, 54:13, 70:18, 70:21, 71:13, 72:17, 72:22, 73:24, 74:15, 86:7, 87:5, 87:12, 92:3, 99:14, 105:18, 108:10, 109:6, 113:7, 121:16, 127:20, 128:3, 128:12, 129:23, 140:16, 140:18, 147:14, 151:3, 151:4, 152:8, 152:12, 152:24, 164:17, 167:9, 167:14, 169:5, 170:2, 170:3
**documentary** [1] - 8:6

**documentation** [12] - 4:6, 40:11, 54:4, 57:19, 58:23, 93:24, 94:14, 97:4, 115:19, 128:10, 156:13, 173:20
**documenting** [1] - 128:10
**documents** [5] - 11:20, 49:6, 75:18, 164:22, 165:25
**DOJ** [2] - 11:20, 11:25
**done** [7] - 18:6, 75:2, 79:24, 89:8, 112:12, 112:13, 152:2
**door** [1] - 7:23
**dose** [1] - 38:22
**double** [8] - 17:14, 18:9, 44:21, 55:18, 55:20, 80:24, 82:15, 157:9
**down** [13] - 13:9, 22:22, 28:12, 68:10, 73:19, 79:2, 79:6, 79:15, 79:21, 85:23, 129:13, 135:4, 142:10
**Dr** [61] - 29:2, 29:5, 38:3, 40:14, 51:8, 51:15, 54:10, 54:17, 54:18, 58:1, 58:15, 58:18, 58:22, 74:18, 87:6, 88:6, 90:22, 93:19, 95:12, 95:17, 96:9, 96:12, 96:17, 96:21, 96:22, 97:2, 115:8, 115:15, 116:8, 117:4, 119:4, 119:7, 119:14, 121:25, 128:8, 155:22, 156:11, 164:16, 164:17, 164:19, 165:17, 165:21, 165:24, 166:7, 166:17, 167:5, 167:10, 169:13, 169:16, 170:13, 171:2, 171:8, 172:4, 172:6, 172:16, 173:12, 173:14, 174:1, 174:2
**draft** [9] - 109:25, 167:10, 167:12, 167:24, 169:8, 169:9, 169:11, 169:12
**drafted** [1] - 6:13
**drafts** [2] - 30:21, 168:8
**drastic** [1] - 9:6
**draw** [3] - 21:3, 64:23, 78:22
**drawn** [1] - 16:8
**draws** [1] - 144:16
**drive** [2] - 112:4, 112:7
**drop** [2] - 17:6, 54:24
**drowning** [2] - 35:16, 123:11
**drug** [1] - 23:5
**drugs** [1] - 23:15
**dry** [2] - 44:22, 82:16
**DSM** [2] - 5:9, 156:1
**due** [2] - 138:16, 140:9
**duly** [1] - 13:20
**during** [14] - 28:19, 34:21, 34:22, 42:12, 45:10, 45:14, 47:16, 52:20, 90:15, 94:2, 117:20, 118:3, 122:22, 128:14
**duty** [1] - 114:15

**DVT** [5] - 20:3, 56:16, 56:22, 156:23, 164:25
**DX-1** [2] - 139:4, 160:7
**DX-14** [1] - 102:15
**DX-15** [1] - 103:21
**DX-2** [3] - 137:15, 137:20, 161:14
**DX-22** [1] - 122:24
**DX-29** [1] - 131:8
**DX-4** [2] - 155:6, 163:23
**DX-41** [1] - 115:11
**DX-56** [2] - 109:19, 109:22
**DX-60** [2] - 140:14, 140:16
**DX-61** [1] - 147:13
**DX-7** [1] - 112:22
**Dyslexia** [1] - 58:3
**dyslexia** [22] - 5:2, 10:6, 10:7, 10:13, 12:16, 38:5, 38:25, 56:16, 56:19, 56:20, 95:11, 96:10, 96:13, 96:17, 96:21, 97:1, 118:11, 156:10, 156:20, 160:11, 160:14, 168:12
**dyslexic** [2] - 38:13, 118:11
**earliest** [1] - 89:13
**Early** [1] - 126:4
**early** [5] - 30:5, 32:14, 160:1, 167:12, 168:7
**easier** [1] - 69:23
**EASTERN** [1] - 1:1
**easy** [3] - 37:5, 141:5, 141:9
**eat** [1] - 112:2
**echelon** [1] - 10:21
**edit** [2] - 31:23, 50:16
**edited** [1] - 172:15
**Edition** [1] - 152:21
**Education** [1] - 94:24
**education** [10] - 11:9, 42:14, 44:4, 55:13, 94:6, 100:8, 100:9, 101:5, 105:15, 157:3
**educational** [5] - 94:2, 95:8, 97:11, 121:19, 121:22
**educations** [1] - 9:25
**effect** [3] - 24:17, 24:18, 74:2
**effects** [2] - 6:22, 86:22
**effort** [2] - 7:11, 19:17
**either** [8] - 4:2, 32:14, 42:25, 50:12, 82:11, 90:24, 102:18, 156:24
**elective** [1] - 114:21
**electronic** [1] - 109:22
**Elementary** [1] - 104:16
**elementary** [11] - 26:11, 28:20, 29:22, 30:8, 30:13, 32:14, 89:13, 91:4, 94:24, 118:20, 158:7
**email** [14] - 40:9, 49:9, 49:21, 52:6, 166:4, 167:4, 170:13, 170:22, 171:1, 171:4, 171:7, 171:17, 171:18, 171:19

**emailed** [1] - 40:15
**emails** [2] - 19:5, 166:11
**embarrassing** [2] - 26:24, 27:17
**employed** [1] - 58:2
**enacted** [1] - 93:15
**enacting** [1] - 7:19
**encounter** [5] - 18:6, 18:8, 46:6, 46:21, 149:2
**encountered** [5] - 123:3, 142:8, 145:12, 146:2, 146:13
**encourage** [1] - 13:1
**end** [18] - 4:15, 9:13, 10:11, 10:15, 20:3, 32:15, 39:22, 47:11, 64:15, 72:16, 82:18, 83:5, 84:23, 94:18, 95:5, 112:3, 125:9, 157:22
**ended** [4] - 18:20, 31:15, 38:11, 39:21
**enforce** [1] - 11:21
**enforcement** [1] - 12:9
**English** [6] - 107:7, 107:13, 112:2, 131:24, 132:9, 146:21
**enjoy** [2] - 36:21, 67:24
**enjoyed** [1] - 14:17
**enrolled** [1] - 75:12
**ensures** [1] - 7:24
**enter** [1] - 160:16
**entire** [5] - 5:25, 62:24, 63:1, 142:17, 143:1, 150:4, 159:21, 166:10, 171:3, 171:18
**entirely** [2] - 4:18, 5:4
**entirety** [1] - 49:18
**entities** [2] - 6:24, 7:21
**entitled** [5] - 7:4, 9:12, 9:20, 12:20, 175:8
**entry** [1] - 51:15
**enzyme** [4] - 23:16, 25:18, 26:2
**erase** [2] - 44:22, 82:16
**erasers** [1] - 22:20
**especially** [4] - 27:19, 29:25, 55:25, 118:2
**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10
**essay** [3] - 111:14, 111:17, 111:20
**essays** [2] - 41:16, 115:3
**essentially** [1] - 150:24
**establish** [2] - 9:7, 11:14
**established** [2] - 11:5, 124:8
**estimate** [3] - 77:18, 77:22, 152:5
**Eugene's** [1] - 144:17
**evaluate** [2] - 5:19, 43:11
**evaluated** [6] - 37:23, 39:7, 88:8, 93:22, 128:23, 130:16
**evaluation** [11] - 38:1, 40:13, 40:14, 40:17, 40:22, 54:11,

93:18, 97:2, 115:8, 118:4, 165:20
**evaluator** [2] - 40:13, 53:25
**evening** [2] - 19:21, 19:24
**event** [2] - 106:23, 122:22
**events** [2] - 124:15, 148:5
**eventually** [1] - 128:12
**evidence** [18] - 4:11, 5:13, 5:14, 8:6, 10:2, 10:5, 51:24, 52:12, 52:16, 59:6, 59:8, 68:15, 73:2, 73:4, 74:6, 75:17, 90:21, 171:24
**evolved** [1] - 14:16
**exact** [1] - 159:19
**exactly** [8] - 28:22, 78:19, 80:10, 85:5, 122:21, 136:8, 147:24, 150:2
**exam** [79] - 9:22, 11:1, 11:2, 11:11, 12:17, 12:18, 16:23, 23:12, 42:10, 44:11, 44:12, 44:14, 45:4, 51:13, 53:10, 53:12, 53:24, 56:5, 82:4, 82:6, 82:21, 83:2, 83:3, 83:17, 84:10, 84:16, 84:24, 84:25, 85:7, 85:13, 91:24, 94:19, 117:1, 126:13, 129:15, 130:5, 130:6, 130:10, 130:13, 130:15, 130:18, 133:7, 133:15, 134:3, 134:7, 134:12, 134:19, 134:20, 136:6, 136:7, 136:13, 136:21, 137:2, 137:23, 140:12, 140:19, 140:21, 141:19, 142:22, 143:12, 145:20, 145:22, 146:19, 147:2, 147:4, 148:11, 149:3, 149:7, 152:6, 152:20, 153:17, 153:24, 155:1, 159:10, 159:16, 160:6, 161:8
**Exam** [1] - 152:22
**Examination** [1] - 4:5
**EXAMINATION** [2] - 14:1, 84:4
**examination** [2] - 83:22, 135:21, 173:16
**examine** [2] - 70:13, 143:2
**examined** [4] - 4:22, 5:23, 6:25, 13:21
**examinee's** [1] - 11:24
**examinees** [2] - 132:4, 134:6
**EXAMINERS** [1] - 1:6
**Examiners** [5] - 3:5, 4:4, 9:2, 11:24, 12:15
**example** [4] - 7:7, 7:16, 150:9, 164:10
**exams** [19] - 9:21, 18:2, 18:10, 42:9, 44:18, 45:1, 45:17, 81:23, 81:24, 81:25, 82:2, 82:8, 82:13, 82:18,

83:1, 83:14, 125:9, 139:22
**excellence** [1] - 3:22
**excellent** [5] - 10:17, 99:6, 99:20, 99:22, 105:4
**except** [2] - 151:23, 154:11
**exception** [1] - 125:16
**excerpts** [1] - 153:9
**excuse** [2] - 15:8, 17:20
**exercise** [2] - 145:17, 151:16
**exercises** [1] - 112:9
**exhibit** [13] - 49:12, 49:17, 49:18, 50:21, 52:24, 60:3, 60:14, 61:5, 69:3, 86:2, 86:5, 121:4, 166:10
**Exhibit** [50] - 49:16, 52:12, 59:9, 59:24, 67:22, 68:14, 69:2, 73:8, 73:12, 73:22, 74:5, 74:9, 74:11, 75:16, 75:21, 85:25, 87:3, 91:24, 95:23, 97:10, 97:13, 97:14, 98:5, 98:13, 99:11, 99:23, 100:7, 100:11, 104:15, 106:6, 106:15, 108:8, 109:3, 115:15, 119:6, 126:2, 126:24, 127:3, 127:17, 129:23, 132:16, 133:1, 134:2, 134:14, 136:18, 151:15, 152:19, 165:23, 166:4, 167:2
**exhibiting** [2] - 97:19, 122:7
**Exhibits** [3] - 59:14, 68:14, 68:24
**exhibits** [3] - 48:14, 48:19, 85:18
**existed** [1] - 154:16
**expand** [1] - 50:13
**expected** [2] - 31:4, 53:13
**expensive** [1] - 38:15
**experience** [3] - 40:20, 88:22, 160:5
**experienced** [1] - 85:16
**experiencing** [2] - 89:16, 92:5
**expert** [3] - 4:22, 10:6, 10:7
**expertise** [1] - 12:3
**experts** [3] - 5:10, 12:1, 174:12
**explain** [8] - 21:8, 21:17, 60:6, 61:9, 70:17, 70:20, 80:8, 124:12
**explaining** [1] - 151:18
**explanation** [3] - 78:20, 78:21, 79:11
**expo** [1] - 105:25
**extend** [2] - 17:9, 74:23
**extended** [10] - 8:1, 8:2, 8:17, 12:21, 87:25, 124:19, 124:25, 132:17, 133:22, 136:9
**extends** [1] - 166:4

**extension** [1] - 74:19
**extensive** [2] - 6:18, 166:6
**extent** [3] - 91:10, 91:15, 172:8
**extenuating** [2] - 55:5, 55:6
**external** [3] - 12:1, 12:3, 173:20
**extra** [18] - 4:2, 5:15, 18:10, 27:14, 28:14, 29:22, 30:6, 33:21, 39:14, 55:18, 90:13, 91:21, 116:3, 124:14, 158:9, 164:24, 167:22, 168:14
**extracurricular** [4] - 108:6, 113:3, 113:5, 115:3
**extraordinary** [5] - 3:19, 3:23, 5:14, 8:10, 9:16
**extreme** [1] - 9:6
**extremely** [4] - 10:22, 26:16, 91:17, 112:12
**face** [5] - 5:14, 31:22, 77:8, 119:1
**fact** [11] - 10:17, 12:1, 92:18, 93:13, 97:7, 98:13, 112:16, 146:21, 149:17, 174:18
**factor** [3] - 9:15, 11:5, 43:11
**factors** [2] - 9:8, 24:3
**facts** [1] - 169:20
**faculty** [1] - 4:23
**fail** [2] - 54:25, 76:9
**failed** [19] - 6:7, 17:3, 17:5, 21:21, 43:17, 43:19, 46:16, 46:17, 46:19, 47:1, 53:17, 53:18, 54:23, 55:10, 57:4, 76:10, 76:16, 85:8, 136:21
**failing** [1] - 57:3
**fair** [4] - 11:16, 101:3, 126:24, 164:8
**fairly** [2] - 81:6, 173:13
**fall** [4] - 54:8, 85:7, 95:16, 115:5
**familiar** [1] - 3:10
**family** [1] - 44:14
**far** [5] - 46:1, 77:16, 141:15, 151:12, 151:13
**Farmer** [1] - 173:18, 174:2
**Farmers** [3] - 88:22, 88:25, 100:11
**fast** [1] - 79:18
**fast-paced** [1] - 79:18
**faster** [1] - 79:5
**faxed** [1] - 119:16
**February** [3] - 120:23, 148:1, 148:2
**felt** [1] - 35:16
**few** [5] - 16:19, 18:10, 19:9, 84:6, 100:12
**fiction** [1] - 143:15
**fidget** [1] - 56:3
**fidgety** [1] - 19:19
**field** [1] - 43:16

**fifth** [7] - 30:14, 33:1, 33:13, 89:1, 89:2, 103:22, 104:10
**figure** [12] - 20:20, 20:22, 20:23, 28:7, 28:12, 32:2, 32:4, 53:22, 66:8, 72:18, 81:18, 148:17
**figured** [4] - 22:25, 55:8, 57:20, 92:22
**figures** [1] - 143:2
**figuring** [1] - 37:4
**filed** [3] - 59:1, 59:3, 86:18
**fill** [5] - 39:6, 48:10, 77:25, 117:5, 138:20
**filled** [7] - 48:9, 49:21, 51:1, 51:14, 64:16, 97:6, 155:24
**film** [1] - 114:17
**filter** [1] - 76:19
**filtered** [1] - 76:17
**final** [9] - 101:10, 103:1, 106:25, 111:19, 168:13, 168:16, 168:17, 169:11, 172:2
**finally** [2] - 7:14, 7:21, 171:17
**findings** [6] - 23:9, 23:11, 26:5, 45:20, 46:2
**fine** [8] - 3:14, 29:21, 48:24, 68:10, 68:21, 70:14, 73:20, 105:23
**finish** [6] - 17:5, 28:17, 28:18, 32:16, 34:8, 152:17
**finished** [1] - 15:21
**finishing** [1] - 90:4
**first** [114] - 6:17, 9:14, 10:7, 10:8, 13:5, 16:22, 18:18, 19:23, 26:6, 27:14, 27:15, 28:23, 34:10, 35:21, 39:17, 39:20, 41:23, 43:13, 44:5, 45:3, 45:6, 46:19, 48:21, 49:17, 49:18, 51:8, 51:22, 53:2, 54:5, 54:24, 54:25, 55:1, 56:14, 56:18, 57:3, 57:4, 60:11, 60:13, 61:10, 63:19, 66:12, 69:8, 69:18, 72:3, 76:15, 85:6, 85:7, 86:5, 86:18, 87:17, 87:24, 88:14, 88:21, 90:11, 92:3, 92:18, 92:20, 92:23, 93:5, 94:18, 95:11, 95:17, 96:20, 99:12, 99:16, 100:16, 100:19, 103:23, 104:2, 104:3, 113:8, 113:9, 115:12, 116:17, 118:15, 119:10, 119:11, 120:22, 122:2, 123:15, 123:23, 124:22, 126:25, 127:22, 130:20, 133:3, 139:8, 141:6, 142:5, 142:8, 143:5, 143:12, 143:15, 143:16, 143:18, 143:24, 144:1, 144:4, 148:19,

148:21, 149:25, 155:8, 155:17, 155:18, 158:23, 159:2, 159:8, 160:1, 165:17, 167:1, 167:4, 172:25
**First** [2] - 78:12, 78:22
**fit** [3] - 37:5, 78:24, 139:21
**five** [11] - 50:1, 64:15, 64:18, 67:10, 67:12, 77:25, 83:4, 111:10, 136:7, 169:7
**five-minute** [2] - 64:15, 77:25
**five-page** [1] - 169:7
**fix** [3] - 14:18, 24:23, 38:9
**fixing** [1] - 15:10
**flag** [1] - 43:18
**flagged** [1] - 40:25
**flashes** [1] - 67:10
**flip** [2] - 51:20, 166:12
**flipped** [1] - 37:12
**flipping** [1] - 156:8
**focus** [9] - 3:25, 6:1, 19:14, 19:18, 27:23, 35:4, 38:18, 38:19, 118:11
**focused** [1] - 80:4
**focusing** [1] - 19:16
**follow** [2] - 18:22, 84:6
**follow-up** [1] - 84:6
**followed** [2] - 143:13, 148:13
**following** [7] - 51:2, 51:15, 61:25, 71:9, 89:14, 144:11, 144:16
**follows** [1] - 13:21
**food** [1] - 112:10
**footnote** [1] - 134:22
**forced** [2] - 75:1, 75:13, 161:22
**foregoing** [1] - 175:7
**forget** [1] - 33:5
**forgetting** [2] - 31:5, 31:6
**form** [15] - 39:6, 39:7, 48:7, 48:10, 49:21, 49:22, 49:23, 97:6, 97:7, 119:7, 119:14, 121:16, 122:17, 159:3, 159:7
**formal** [18] - 30:11, 94:1, 94:4, 101:16, 101:17, 105:10, 105:12, 106:13, 115:14, 116:2, 119:18, 124:7, 124:25, 127:14, 129:20, 158:2, 158:18
**formally** [2] - 4:2, 10:13
**formative** [1] - 82:21
**formula** [6] - 61:18, 62:5, 71:2, 151:22
**formulas** [1] - 71:1
**forth** [3] - 50:16, 85:20, 166:7
**forward** [2] - 34:5, 53:23
**foster** [1] - 14:21
**fought** [1] - 8:13
**foundation** [1] - 63:5

**four** [8] - 9:8, 63:24, 64:4, 108:18, 108:23, 110:9, 136:7, 142:6
**fourth** [17] - 17:4, 30:14, 30:15, 42:22, 42:23, 42:25, 43:25, 71:16, 71:24, 71:25, 72:1, 72:2, 90:11, 102:15, 102:19, 105:23, 111:8
**framework** [1] - 46:8
**frequent** [1] - 88:1
**frequently** [1] - 31:12
**freshman** [2] - 109:2
**Friday** [1] - 32:9
**friends** [4] - 34:17, 34:20, 79:8, 79:13
**front** [2] - 49:6, 174:6
**frustrated** [4] - 34:24, 35:7, 35:18, 36:10, 36:20
**full** [5] - 89:20, 92:3, 96:2, 139:6, 142:5
**fully** [2] - 161:13, 163:14
**functioning** [2] - 23:17, 24:1
**fungi** [1] - 24:11
**future** [1] - 4:12
**gas** [2] - 61:24, 62:2
**gatekeeper** [1] - 148:19
**gathering** [1] - 139:1
**gears** [1] - 160:5
**gene** [3] - 23:24, 24:1
**general** [11] - 9:23, 9:25, 12:8, 12:19, 30:23, 58:8, 81:8, 97:18, 99:1, 123:7, 140:25
**generally** [8] - 21:1, 58:12, 61:7, 65:21, 66:11, 97:21, 148:14, 149:6
**generically** [1] - 40:15
**genes** [1] - 23:24
**genetic** [1] - 39:20
**genetics** [4] - 14:23, 14:24, 14:25, 23:23
**girl** [1] - 98:21
**given** [9] - 29:23, 30:6, 48:13, 55:23, 82:1, 91:13, 99:5, 141:3, 167:15
**glancing** [1] - 71:15
**glasses** [1] - 29:18
**goofing** [1] - 30:2
**GPA** [3] - 109:12, 123:23, 125:3
**grade** [67] - 7:17, 27:15, 28:23, 30:14, 30:15, 31:1, 33:1, 33:13, 33:16, 33:25, 34:10, 34:12, 36:14, 51:9, 82:22, 88:22, 89:1, 89:2, 90:12, 92:5, 92:18, 92:20, 92:23, 92:24, 92:25, 93:5, 94:19, 95:6, 95:9, 99:12, 99:17, 99:19, 99:20, 99:23, 100:2, 100:16, 101:8,

**halfway** - 37:6, 69:2
**hand** [7] - 25:18, 25:22, 109:7, 128:20, 141:2, 143:3, 162:18
**handbook** [3] - 55:3, 74:1, 74:2
**handle** [1] - 123:11
**handwriting** [2] - 119:11, 121:3
**hang** - 34:22, 34:25
**hanging** [2] - 34:20, 34:24
**happier** - 16:15
**happy** [2] - 70:6, 174:4
**hard** [17] - 4:10, 8:20, 9:17, 21:12, 26:15, 30:1, 30:15, 30:24, 31:13, 32:1, 35:17, 37:1, 38:6, 45:4, 91:19, 98:18, 112:12
**harder** - 38:8, 71:1, 109:7, 123:5, 123:8
**harm** [5] - 11:5, 11:8, 11:9, 11:15
**harmed** [1] - 11:6
**hate** - 22:18
**head** [1] - 58:7
**headache** [1] - 24:19
**headed** [1] - 154:23
**heading** [6] - 121:19, 129:3, 142:12, 143:5, 158:4, 166:14
**headphones** [1] - 58:19
**health** [1] - 47:12
**hear** [5] - 3:9, 5:3, 10:2, 10:6, 13:9
**heard** [1] - 40:10
**HEARING** [1] - 1:6
**hearing** [5] - 3:11, 52:1, 52:15, 174:13, 174:16
**heart** [1] - 65:9
**heavily** - 43:10
**held** - 12:19
**help** [35] - 17:18, 25:8, 27:9, 27:13, 29:18, 29:19, 31:13, 31:16, 31:17, 31:20, 31:25, 32:4, 32:20, 32:22, 37:13, 38:18, 50:9, 50:13, 60:17, 60:19, 64:23, 66:1, 66:22, 70:3, 72:24, 81:12, 81:15, 86:2, 89:8, 91:21, 98:11, 102:11, 148:20, 159:6, 167:5
**helped** [5] - 27:6, 38:23, 54:19, 91:20, 152:13
**helping** [2] - 35:4, 124:12
**helps** [7] - 19:14, 19:15, 19:17, 19:18, 22:14, 23:1, 79:4
**hemorrhaging** [1] - 24:16
**high** [26] - 7:8, 9:24, 10:14, 34:15, 35:23, 36:1, 95:7, 95:9, 106:16, 107:5, 108:19, 110:5, 112:14, 113:6,

113:10, 113:19, 113:20, 114:21, 117:16, 118:19, 123:5, 129:25, 133:4, 158:6, 159:1
**High** [4] - 106:17, 108:11, 108:17, 129:24
**higher** [6] - 9:9, 43:16, 137:6, 137:13, 138:7
**highlight** [5] - 62:4, 65:25, 72:17, 150:12, 152:10
**highlighted** [3] - 61:17, 70:1, 169:6
**highlighters** [2] - 17:18, 21:9
**highlighting** [4] - 150:7, 150:8, 150:9, 150:14
**highlights** [2] - 18:22, 72:21
**hired** [1] - 5:17
**histology** [2] - 23:19, 23:22
**historical** [1] - 46:2
**history** [22] - 7:3, 7:5, 7:16, 8:7, 12:16, 12:24, 45:20, 87:16, 87:23, 88:7, 88:13, 89:8, 91:1, 112:11, 116:22, 117:9, 120:5, 120:20, 121:19, 121:21, 125:21
**History** [4] - 87:19, 107:20, 108:11, 112:2
**hit** [1] - 77:25
**hold** [2] - 22:9, 22:17
**home** [9] - 16:14, 16:15, 31:6, 31:7, 31:12, 34:6, 35:1, 90:5, 112:8
**homeroom** [1] - 31:3
**homework** [7] - 32:5, 34:25, 35:2, 35:9, 112:8, 112:11, 112:13
**honest** [1] - 109:18
**honor** [1] - 3:21
**Honor** [52] - 3:3, 3:6, 3:7, 3:15, 9:1, 9:4, 10:18, 13:1, 13:6, 13:13, 21:16, 22:3, 48:12, 51:23, 52:18, 52:22, 59:4, 59:8, 59:12, 59:15, 59:16, 60:22, 61:1, 61:3, 63:4, 68:3, 68:13, 68:17, 70:6, 70:8, 73:1, 73:5, 74:7, 75:19, 83:23, 85:22, 110:10, 121:7, 121:12, 146:9, 162:25, 170:17, 171:20, 172:2, 172:18, 173:1, 173:9, 173:17, 173:21, 173:23, 174:4, 174:11
**HONORABLE** [1] - 1:12
**Honors** [9] - 107:7, 107:10, 107:13, 107:24, 107:25, 108:3, 112:2
**honors** [1] - 3:21
**hopefully** [1] - 20:24
**hospital** [1] - 16:13
**hour** [7] - 10:10, 65:19, 83:5,

112:4, 165:11, 173:3, 174:25
**hours** [9] - 31:21, 47:10, 110:22, 110:25, 111:1, 111:4, 111:10, 113:25, 136:7
**Houtman** [2] - 54:18, 164:20
**huge** [2] - 76:15, 76:20
**hurt** [1] - 48:22
**hyperactivity** [4] - 88:5, 119:24, 120:21, 122:12
**ideas** [1] - 50:11
**identified** [4] - 10:8, 115:23, 120:17, 157:4
**identifies** [1] - 122:6
**identify** [4] - 10:7, 48:18, 50:23, 149:12
**IEP** [1] - 30:11
**ignore** [1] - 67:11
**illness** [2] - 116:23, 117:9
**illustrates** [1] - 146:1
**imagine** [1] - 173:12
**immediate** [2] - 11:7, 11:15
**impact** [3] - 11:18, 41:4, 85:16
**impacts** [1] - 12:11
**impaired** [3] - 88:3, 88:4, 88:5
**impairment** [7] - 5:12, 12:4, 88:20, 155:13, 155:16, 155:20, 156:14
**impairments** [1] - 85:16
**implies** [1] - 156:9
**importance** [1] - 76:13
**important** [10] - 5:22, 24:7, 25:24, 65:11, 75:23, 78:11, 88:9, 142:18, 143:1, 169:23
**importantly** [1] - 8:19
**impossible** [1] - 4:18
**impress** [2] - 26:22
**improve** [1] - 38:19
**improved** [2] - 38:18, 134:5
**impulsivity** [2] - 119:24, 122:13
**in..** [1] - 97:3
**inaccurate** [2] - 157:11, 157:17
**inattention** [1] - 122:9
**inattentive** [2] - 119:19, 119:20
**incline** [1] - 13:17
**include** [5] - 73:20, 113:3, 153:8, 153:11, 156:20
**included** [4] - 128:23, 147:9, 164:5, 169:19
**includes** [2] - 140:23, 146:22
**including** [3] - 10:22, 160:21, 167:13
**inconsistent** [1] - 7:18
**incorrect** [1] - 152:7
**increase** [1] - 56:2

102:15, 102:19, 102:24, 103:22, 104:10, 104:17, 105:8, 106:6, 106:10, 106:25, 107:8, 107:12, 107:22, 108:2, 111:8, 114:18, 126:25, 127:4, 127:9, 128:18, 128:19, 130:19, 130:20, 130:21, 130:23, 158:23
**graded** [1] - 34:9
**grades** [30] - 7:16, 30:8, 90:15, 98:7, 98:12, 98:24, 99:16, 100:1, 101:7, 101:11, 101:14, 101:15, 102:5, 102:8, 102:24, 103:1, 103:7, 103:14, 104:1, 104:6, 104:22, 106:15, 106:16, 106:17, 108:5, 114:23, 115:3, 124:13, 125:14, 127:5
**grading** [1] - 88:1
**graduate** [1] - 17:1
**graduated** [2] - 108:13, 113:6
**graduation** [1] - 53:13
**GRAN** [1] - 1:15
**granola** [2] - 17:23, 82:17
**grant** [1] - 52:19
**granted** [3] - 18:13, 164:22, 164:24
**graphs** [1] - 143:2
**gray** [1] - 24:9
**great** [2] - 36:5, 61:1
**green** [2] - 23:3, 150:15
**group** [1] - 110:19
**grow** [1] - 26:20
**growing** [2] - 14:19, 94:19
**guards** [2] - 112:6, 114:15
**guess** [9] - 23:25, 31:3, 32:13, 42:5, 62:22, 66:4, 141:16, 173:3
**guessed** [5] - 72:4, 72:6, 78:1, 78:3, 78:5
**guesses** [3] - 77:6, 78:1, 160:16
**guessing** [7] - 64:13, 66:25, 138:16, 138:19, 140:9, 141:11, 141:13
**guidance** [4] - 11:17, 11:18, 11:20, 11:25
**Guide** [1] - 152:21
**guide** [1] - 153:1
**guidelines** [8] - 6:12, 40:16, 48:9, 50:15, 169:15, 169:21, 169:23, 169:24
**habits** [2] - 99:1, 99:3
**Haddonfield** [1] - 1:17
**half** [11] - 10:10, 18:5, 37:14, 39:15, 66:15, 66:16, 103:23, 104:17, 157:13, 165:11, 173:3

**incredibly** [1] - 8:20
**independent** [4] - 98:20, 150:23, 150:24, 152:13
**indicate** [11] - 100:20, 100:23, 100:24, 102:18, 119:23, 132:8, 137:5, 150:8, 151:7, 157:8, 158:6
**indicated** [9] - 100:13, 101:2, 103:17, 122:12, 122:15, 123:10, 127:5, 149:23, 154:12
**indicates** [4] - 101:19, 132:6, 137:8, 153:17
**indicating** [3] - 103:11, 103:14, 145:3
**indication** [6] - 101:24, 102:2, 102:5, 102:12, 104:9, 104:12
**indie** [1] - 114:17
**individual** [4] - 5:23, 90:14, 105:15, 135:4
**individuals** [5] - 9:24, 126:18, 132:13, 134:11, 135:1
**infection** [1] - 24:16
**inferred** [1] - 145:1
**informal** [13] - 90:14, 93:7, 94:1, 94:5, 94:7, 94:10, 94:12, 116:1, 124:9, 124:24, 127:6, 158:19, 158:25
**informally** [1] - 4:3
**information** [23] - 46:6, 51:21, 65:11, 66:21, 80:6, 80:13, 80:16, 80:18, 88:6, 88:8, 90:22, 112:17, 117:19, 118:3, 118:5, 119:12, 119:15, 139:1, 144:12, 151:6, 155:13, 156:9, 159:22
**informed** [2] - 89:7, 96:18
**informing** [1] - 82:23
**inheritance** [1] - 23:25
**initial** [2] - 91:23, 167:10
**INJUNCTION** [1] - 1:6
**injunction** [7] - 3:11, 9:5, 9:8, 9:10, 11:6, 13:3, 137:18
**input** [7] - 12:1, 12:4, 172:5, 172:6, 172:8, 172:10
**inquiry** [1] - 84:7
**instance** [1] - 163:14
**instead** [3] - 17:16, 30:16, 39:11
**Institute** [1] - 58:3
**instruction** [1] - 90:15
**instructions** [1] - 18:12
**integrate** [1] - 80:18
**integrated** [1] - 44:9
**intelligence** [1] - 91:12
**intend** [1] - 173:8
**intended** [1] - 6:4
**intensive** [3] - 102:6, 103:15,

104:12
**intent** [1] - 7:19
**interest** [3] - 8:12, 8:23, 52:14
**interested** [2] - 14:23, 39:19
**interesting** [1] - 101:18
**interests** [1] - 16:3
**internal** [2] - 44:14, 45:3
**interpreted** [2] - 6:3, 118:6
**interrogatory** [1] - 112:24
**interruption** [1] - 151:8
**interview** [4] - 41:24, 41:25, 42:2, 120:6
**interviews** [1] - 41:24
**intricate** [1] - 45:5
**intrinsic** [1] - 137:25
**intro** [1] - 30:18
**involved** [1] - 91:5
**involves** [1] - 143:15
**Iowa** [1] - 127:17
**irreparable** [4] - 11:5, 11:8, 11:9, 11:15
**irreparably** [1] - 11:6
**issue** [5] - 11:8, 11:18, 93:14, 119:23, 156:4
**issues** [4] - 91:14, 118:11, 118:17, 156:7
**italicized** [1] - 69:22
**itself** [3] - 11:17, 21:2, 146:17
**James** [1] - 1:8
**January** [1] - 134:25
**Jerry** [1] - 89:12
**Jersey** [1] - 1:17
**Jessica** [18] - 3:17, 3:19, 13:14, 13:24, 83:24, 87:16, 87:23, 89:8, 89:11, 89:14, 90:12, 98:18, 105:21, 105:24, 121:15, 168:2, 168:4, 168:21
**JESSICA** [3] - 1:3, 13:20, 176:5
**Jessie** [4] - 31:9, 69:2, 70:17, 75:23
**job** [1] - 46:20
**jobs** [1] - 113:9
**Joseph's** [5] - 104:16, 106:17, 108:11, 108:17, 129:24
**JOYNER** [1] - 1:12
**Judge** [3] - 12:14, 12:23, 145:24
**July** [3] - 53:19, 120:24, 160:6
**juncture** [1] - 173:16
**June** [4] - 54:20, 55:16, 86:8, 164:6
**junior** [1] - 133:4
**Justice** [5] - 5:21, 6:12, 6:23, 7:15, 11:17

**Justice's** [1] - 11:17
**JV** [1] - 109:2
**Kaplan** [1] - 78:16
**keep** [10] - 14:9, 18:19, 28:16, 35:13, 35:17, 51:19, 79:6, 106:1, 123:11, 144:3
**keeping** [1] - 35:14
**kept** [1] - 78:2
**key** [5] - 6:16, 11:5, 24:6, 66:1, 104:21
**Key** [2] - 110:15, 110:16
**kicked** [2] - 125:13, 157:19
**kids** [1] - 16:7
**kind** [29] - 6:21, 8:21, 8:22, 14:22, 15:2, 15:4, 16:12, 18:25, 19:8, 19:15, 20:7, 25:10, 27:13, 30:11, 31:9, 31:20, 33:1, 36:19, 36:22, 40:15, 45:8, 63:14, 65:17, 70:22, 71:15, 71:16, 71:20, 151:14, 159:6
**kindergarten** [8] - 97:15, 97:23, 97:24, 98:2, 98:14, 99:24, 125:25, 126:9
**kinds** [1] - 142:7
**kitchen** [1] - 35:4
**Kleenex** [1] - 27:1
**knowledge** [12] - 26:23, 42:11, 53:24, 76:3, 77:5, 79:19, 80:2, 91:13, 105:15, 138:5, 138:10, 150:24
**known** [6] - 45:3, 78:13, 120:21, 122:4, 122:5
**knows** [2] - 8:3, 169:2
**Kurzweil** [4] - 18:20, 18:25, 20:9, 132:22
**lab** [1] - 112:9
**laborious** [1] - 5:1
**labs** [3] - 23:8, 80:13, 80:14
**laminated** [3] - 44:23
**language** [8] - 11:22, 25:10, 30:25, 31:3, 87:21, 104:25, 105:7
**large** [1] - 77:10
**Larry** [1] - 3:16
**larry@rcglawoffices.com** [1] - 1:18
**last** [31] - 15:24, 15:25, 36:24, 61:12, 62:11, 65:20, 67:5, 69:14, 73:11, 74:21, 90:10, 93:1, 96:15, 103:7, 105:18, 109:11, 120:23, 134:24, 138:6, 143:19, 144:2, 144:23, 150:1, 160:25, 161:9, 161:10, 161:22, 162:4, 162:11, 162:12, 165:5
**lasts** [1] - 136:6
**late** [3] - 31:5, 32:14, 32:15
**law** [8] - 4:16, 5:25, 6:3, 6:6,

6:10, 6:17, 8:5, 8:8
**Lawrence** [2] - 170:20, 171:19
**LAWRENCE** [1] - 1:16
**lawyer** [2] - 166:16, 171:6
**lawyer's** [1] - 172:5
**lawyers** [1] - 170:21
**LD** [1] - 168:18
**lead** [1] - 160:23
**lead-in** [1] - 160:23
**League** [1] - 110:13
**learn** [7] - 7:12, 14:22, 26:13, 27:10, 27:12, 63:11, 63:13
**learned** [4] - 45:11, 46:13, 64:9, 174:18
**learning** [21] - 5:20, 5:22, 7:8, 7:11, 14:17, 16:9, 25:10, 25:13, 26:13, 26:20, 26:21, 27:8, 44:8, 86:22, 93:22, 101:25, 155:20, 155:23, 155:24, 156:1, 168:5
**least** [11] - 43:11, 46:1, 64:16, 71:9, 91:2, 120:25, 151:11, 154:12, 160:20, 161:9, 162:16
**leave** [16] - 14:5, 16:19, 17:9, 17:10, 42:25, 48:17, 55:8, 55:9, 74:20, 74:22, 75:17, 85:12, 113:12, 138:17, 140:10
**lectures** [1] - 78:8
**led** [1] - 115:13
**left** [19] - 29:8, 66:16, 67:3, 67:4, 67:5, 67:13, 78:3, 98:16, 100:19, 101:10, 123:21, 128:25, 130:2, 131:17, 137:8, 141:12, 143:3, 159:7
**left-hand** [1] - 143:3
**legal** [2] - 11:18, 12:7
**legislative** [1] - 6:8
**length** [1] - 145:10
**lengthy** [1] - 173:13
**less** [2] - 5:25, 142:2
**lessons** [4] - 35:24, 114:12, 114:16
**letter** [34] - 28:1, 28:3, 28:4, 51:8, 51:12, 54:15, 54:17, 57:18, 58:17, 59:2, 74:18, 85:11, 92:6, 164:12, 164:13, 164:19, 165:24, 166:1, 166:7, 166:18, 167:11, 167:13, 168:13, 168:16, 168:17, 169:7, 169:17, 169:24, 171:9, 171:10, 172:5
**letterhead** [1] - 171:14
**letters** [9] - 27:9, 27:25, 29:1, 31:22, 36:7, 38:6, 54:12, 115:4, 117:23
**level** [4] - 7:8, 103:4, 142:7

**Lewandowski** [1] - 54:10
**licensed** [1] - 40:13
**Licensing** [1] - 4:5
**licensing** [3] - 9:20, 12:17, 12:18
**life** [12] - 4:3, 5:12, 7:10, 9:21, 14:21, 16:17, 16:18, 25:19, 63:14, 86:23, 111:21, 118:15
**lifeguard** [2] - 114:2, 114:10
**lifeguarding** [1] - 114:13
**lifetime** [3] - 3:24, 8:3, 125:23
**light** [3] - 10:1, 15:4, 23:11
**likelihood** [3] - 8:10, 9:15, 11:15
**likely** [1] - 71:9
**likewise** [2] - 124:6, 124:17
**limit** [1] - 151:24
**limited** [4] - 5:8, 7:9, 9:21, 12:8
**limits** [2] - 5:12, 43:5
**line** [29] - 18:24, 23:20, 46:3, 61:12, 61:13, 62:11, 63:15, 65:20, 65:21, 66:7, 66:20, 67:7, 69:14, 69:16, 84:7, 144:2, 144:23, 160:25, 161:10, 162:4, 162:11, 162:12, 162:13, 162:17, 162:24, 163:16
**lines** [5] - 62:11, 124:20, 145:8, 163:2
**list** [7] - 45:21, 45:23, 45:24, 50:12, 155:16, 156:18, 159:5
**List** [3] - 123:19, 124:18, 124:21
**listed** [2] - 56:11, 156:19
**listen** [1] - 65:9
**listened** [1] - 78:8
**listening** [1] - 149:14
**listing** [1] - 110:4
**literally** [1] - 4:11
**literature** [1] - 118:23
**lived** [2] - 35:24, 94:25
**LLP** [3] - 1:15, 2:2, 2:9
**local** [1] - 39:24
**located** [1] - 161:18
**look** [91] - 5:9, 19:4, 23:19, 25:25, 43:13, 43:20, 47:2, 49:7, 49:17, 60:10, 61:22, 62:1, 62:16, 65:24, 66:21, 69:2, 71:13, 76:15, 76:16, 86:3, 86:5, 86:21, 87:3, 87:11, 87:12, 88:16, 89:22, 91:22, 92:3, 93:1, 94:15, 95:22, 96:2, 97:10, 98:5, 98:13, 99:11, 99:14, 101:21, 102:15, 105:18, 107:5, 108:8, 109:3, 109:6, 109:19, 112:22, 113:5, 115:8,

115:11, 116:12, 119:6, 121:16, 122:24, 123:15, 125:14, 125:20, 126:2, 127:17, 129:23, 130:8, 131:8, 132:16, 134:14, 137:15, 139:4, 140:14, 143:8, 147:2, 147:12, 148:22, 149:21, 151:14, 152:19, 153:16, 153:23, 154:23, 155:5, 156:25, 160:7, 161:9, 161:14, 162:7, 165:17, 165:23, 167:1, 169:11, 170:2, 171:12
**looked** [12] - 12:23, 28:1, 29:9, 37:12, 39:8, 40:9, 92:22, 104:6, 136:2, 147:13, 150:10, 156:13
**looking** [11] - 22:23, 22:25, 23:1, 68:25, 72:8, 80:10, 109:22, 110:2, 121:15, 149:8, 151:17
**looks** [36] - 21:4, 23:13, 77:8, 100:22, 106:6, 106:19, 107:7, 107:24, 108:2, 108:15, 109:1, 109:15, 110:12, 110:21, 110:24, 111:3, 113:22, 113:25, 114:17, 118:22, 123:18, 123:24, 125:2, 125:8, 125:14, 128:19, 134:5, 137:8, 146:23, 146:24, 150:3, 167:25, 169:12, 170:24, 171:5, 171:8
**losing** [2] - 4:12, 90:7
**loud** [4] - 14:9, 15:15, 32:20, 79:14
**loudly** [1] - 13:9
**loved** [1] - 16:7
**low** [2] - 76:18, 76:19
**lower** [4] - 62:22, 137:8, 137:12, 137:14
**lunch** [5] - 47:16, 59:18, 59:19, 67:24, 112:2
**Luncheon** [1] - 67:25
**ma'am** [4] - 14:6, 68:4, 172:11, 173:24
**mad** [1] - 31:8
**Madison** [1] - 109:24
**main** [4] - 71:24, 71:25, 72:5, 144:4
**maintain** [1] - 20:7
**major** [3] - 5:12, 7:10, 9:21
**manage** [1] - 35:13
**management** [1] - 23:4
**manager** [1] - 110:21
**mandates** [1] - 8:9
**mandatory** [1] - 9:10
**manual** [3] - 55:2, 55:3, 73:25
**March** [10] - 4:14, 11:11,

55:9, 74:23, 74:24, 77:15, 84:10, 84:15, 116:14, 133:4
**Marie** [2] - 1:22, 175:11
**mark** [3] - 73:16, 77:24, 83:6
**marked** [7] - 36:7, 69:13, 73:13, 78:1, 78:2, 122:8, 148:2
**marked-up** [1] - 69:13
**marker** [2] - 24:22, 44:25
**markers** [10] - 17:17, 21:9, 21:14, 21:17, 21:20, 22:12, 39:12, 44:22, 48:25, 82:16
**Market** [1] - 1:9
**marking** [1] - 105:21
**marks** [2] - 102:4, 102:7
**MARY** [1] - 2:3
**Mary** [1] - 3:16
**mary.vargas@steinvargas. com** [1] - 2:6
**mask** [1] - 91:11
**mastery** [1] - 100:20
**match** [1] - 76:14
**material** [11] - 37:9, 45:4, 45:10, 45:14, 76:6, 76:9, 76:10, 77:4, 77:11, 78:20, 79:23
**materials** [1] - 127:21
**math** [23] - 31:25, 32:3, 33:9, 33:10, 33:11, 33:12, 33:14, 33:25, 61:16, 61:18, 64:24, 91:18, 95:2, 95:3, 95:10, 95:11, 103:19, 111:8, 129:18, 131:1, 146:24, 147:3, 147:7
**matter** [5] - 13:12, 16:11, 108:21, 108:22, 175:8
**maximize** [1] - 38:23
**MCAT** [46] - 40:1, 40:3, 40:7, 41:6, 41:17, 60:2, 60:6, 62:23, 63:10, 63:23, 64:9, 64:23, 64:25, 65:13, 70:10, 134:15, 134:17, 135:1, 135:2, 135:10, 135:21, 136:9, 138:24, 139:5, 139:7, 139:10, 139:14, 145:17, 145:18, 145:19, 145:20, 149:21, 150:11, 150:20, 152:20, 152:22, 153:1, 153:14, 153:17, 154:13, 154:16, 154:18, 159:16, 159:20, 159:23
**MCATs** [1] - 52:7
**MD** [1] - 42:8
**mean** [21] - 7:6, 20:12, 20:17, 21:8, 21:24, 25:11, 26:9, 26:10, 28:22, 30:5, 30:9, 36:13, 65:17, 69:17, 75:5, 79:12, 80:8, 97:23, 138:19, 156:4, 163:9
**meaning** [3] - 21:5, 25:7,

25:25
**meanings** [2] - 21:3, 21:12
**means** [8] - 20:21, 20:22, 20:24, 22:21, 25:16, 26:1, 61:17, 126:17
**meant** [2] - 6:19, 20:25
**meantime** [1] - 11:13
**measures** [3] - 6:22, 12:25, 141:24
**mechanism** [1] - 23:15
**mechanisms** [2] - 23:14, 55:24
**med** [7] - 20:4, 26:7, 39:25, 42:8, 44:5, 51:14, 81:10
**MEDICAL** [1] - 1:5
**Medical** [7] - 3:5, 4:4, 4:5, 9:2, 10:25, 11:23, 12:15
**medical** [31] - 3:20, 4:15, 4:17, 4:18, 4:21, 4:23, 9:18, 9:23, 11:9, 14:5, 14:15, 15:19, 16:20, 17:11, 18:16, 20:10, 25:1, 39:17, 41:18, 42:13, 44:4, 44:17, 50:25, 73:25, 74:3, 78:13, 84:8, 84:9, 84:18, 120:5
**medically** [1] - 38:18
**medication** [4] - 17:24, 19:7, 19:8, 118:16
**medications** [1] - 19:20
**medicine** [7] - 4:13, 16:3, 44:9, 44:14, 45:3, 45:5
**medicine-wise** [1] - 45:5
**meds** [2] - 17:23, 82:16
**meet** [4] - 9:14, 10:1, 50:15, 169:23
**meeting** [1] - 54:9
**meetings** [1] - 110:18
**meets** [3] - 9:19, 168:2, 168:21
**member** [1] - 110:9
**Members** [1] - 109:12
**memorandums** [1] - 3:12
**memory** [2] - 91:2, 92:20
**men** [1] - 24:4
**men's** [1] - 110:21
**mental** [1] - 19:17
**mentioned** [2] - 19:7, 82:8
**merits** [3] - 8:11, 9:12, 9:15
**mess** [2] - 21:4, 46:9
**messages** [1] - 166:4
**met** [9] - 5:7, 5:19, 10:9, 34:7, 39:7, 40:19, 46:20, 169:21, 169:24
**method** [1] - 47:20
**metoprolol** [1] - 19:23
**Mew** [1] - 9:3
**MEW** [2] - 2:10, 85:22
**mic** [2] - 14:6, 15:12
**MICHAEL** [1] - 2:3
**michael.stein@**

**steinvargas.com** [1] - 2:6
**Michigan** [12] - 33:13, 42:1, 42:3, 42:6, 58:3, 75:10, 89:3, 95:4, 95:6, 95:9, 103:22, 109:11
**microphone** [1] - 15:7
**microscope** [1] - 23:20
**middle** [13] - 32:14, 33:13, 42:18, 58:14, 67:11, 104:22, 121:18, 132:7, 137:2, 158:6, 159:1, 160:10, 161:20
**Middle** [1] - 106:7
**might** [8] - 5:5, 25:21, 46:22, 58:13, 59:16, 114:15, 122:4, 162:9
**migraine** [1] - 19:24
**migraines** [8] - 56:16, 56:22, 56:24, 156:14, 156:20, 156:23, 164:1, 164:25
**million** [1] - 133:17
**mind** [1] - 94:3
**mine** [1] - 55:6
**minimum** [1] - 63:14
**minus** [1] - 106:22
**minuses** [4] - 104:20, 106:11, 106:21, 107:19
**minute** [6] - 64:15, 77:25, 114:24, 130:8, 142:2, 161:22
**minutes** [21] - 16:19, 18:11, 47:21, 59:17, 59:21, 64:19, 67:3, 67:5, 67:10, 67:12, 67:13, 83:4, 83:8, 100:12, 112:6, 112:7, 119:2, 121:6, 165:7, 165:9, 173:4
**Miracle** [1] - 110:12
**misbehaving** [1] - 97:22
**misread** [1] - 158:17
**missing** [1] - 38:10
**mistake** [2] - 141:14, 157:12
**mistakes** [5] - 22:19, 24:22, 35:15, 39:9, 89:23
**Mitchell** [2] - 1:22, 175:11
**mitigating** [1] - 6:22
**mitigation** [3] - 6:21, 64:8, 64:25
**mock** [1] - 32:10
**mode** [1] - 23:25
**modeling** [1] - 114:20
**moderate** [2] - 120:8, 120:18
**modern** [1] - 39:24
**molecules** [1] - 37:4
**mom** [13] - 28:25, 31:13, 31:14, 31:17, 31:21, 32:18, 34:6, 35:3, 50:13, 50:15, 91:1, 101:1, 101:3
**moment** [3] - 17:20, 20:9, 48:12
**month** [5] - 50:20, 53:19, 86:17, 86:20, 95:15
**months** [7] - 50:20, 54:7,

54:9, 55:4, 55:12, 79:20, 166:17
**morning** [13] - 3:2, 3:3, 14:3, 16:12, 19:21, 35:3, 83:24, 84:1, 94:17, 111:25, 155:9, 165:25, 175:2
**most** [22] - 7:2, 8:19, 9:18, 9:22, 12:8, 12:19, 18:19, 18:23, 39:23, 43:10, 43:11, 43:18, 83:18, 86:23, 98:11, 138:12, 145:11, 145:2, 147:6, 159:23, 159:25, 162:16
**mostly** [6] - 10:18, 17:14, 52:5, 64:11, 113:20, 114:4, 114:6, 137:14
**mother** [5] - 31:20, 89:7, 89:12, 100:23, 102:18
**mother's** [1] - 98:22
**motion** [1] - 9:4
**mouth** [1] - 136:15
**mouthed** [1] - 136:14
**move** [20] - 3:14, 48:19, 51:25, 52:11, 53:22, 55:25, 62:7, 66:4, 66:8, 66:11, 67:1, 68:11, 68:14, 73:1, 74:5, 75:16, 83:9, 144:10, 144:15, 146:8
**moved** [6] - 33:13, 68:15, 89:3, 95:4, 103:22
**moving** [2] - 52:14, 82:11
**MR** [59] - 3:6, 3:7, 9:1, 52:13, 52:22, 59:11, 60:25, 61:2, 63:4, 68:17, 68:21, 70:8, 70:14, 73:5, 74:7, 75:19, 83:23, 84:2, 84:5, 85:24, 92:13, 113:7, 113:8, 113:14, 116:16, 116:17, 116:19, 121:7, 121:14, 145:16, 145:19, 145:24, 146:9, 146:10, 147:23, 148:4, 162:25, 163:2, 163:4, 163:5, 163:6, 166:24, 166:25, 169:3, 169:4, 170:12, 170:17, 170:19, 170:25, 172:2, 172:3, 172:17, 172:25, 173:17, 173:22, 174:4, 174:11, 174:17, 174:25
**MS** [64] - 3:15, 13:6, 13:11, 13:13, 14:2, 14:14, 15:14, 18:15, 21:16, 22:6, 22:10, 27:4, 48:16, 48:20, 48:23, 49:2, 49:5, 49:15, 51:23, 52:2, 52:8, 52:11, 52:25, 56:23, 57:2, 57:12, 59:4, 59:15, 59:21, 59:23, 60:22, 61:3, 61:8, 63:7, 68:3, 68:13, 68:19, 69:1, 70:6, 70:16, 73:1, 73:9, 73:12, 73:15, 73:17, 73:21, 74:5, 74:10,

75:16, 75:22, 83:20, 85:22, 145:13, 145:18, 145:21, 166:20, 170:5, 170:14, 171:20, 172:7, 173:8, 173:12, 173:21, 173:25
**multiple** [10] - 5:15, 30:21, 31:1, 63:22, 64:2, 80:3, 135:24, 136:4, 148:15, 154:9
**multitasking** [1] - 118:2
**murmur** [2] - 65:9, 149:12
**must** [4] - 4:13, 7:12, 8:12, 8:14
**mutated** [2] - 23:25, 24:1
**NA** [1] - 122:12
**nail** [1] - 8:13
**name** [8] - 3:15, 12:14, 13:22, 25:17, 76:18, 108:11, 109:10, 126:7
**names** [2] - 23:5, 118:1
**narrative** [2] - 144:22, 145:2
**narrator** [1] - 144:16
**narrowly** [2] - 6:1, 6:3
**national** [3] - 129:3, 129:6, 129:16
**NATIONAL** [1] - 1:5
**National** [7] - 3:5, 4:4, 9:2, 10:18, 11:23, 12:14, 110:10
**nationally** [1] - 134:9
**nature** [2] - 137:25, 155:16
**NBME** [47] - 5:16, 5:17, 6:5, 6:13, 7:20, 8:15, 9:20, 11:13, 11:25, 12:2, 12:18, 17:16, 43:8, 44:16, 49:9, 51:21, 52:6, 53:5, 54:3, 55:17, 56:8, 56:13, 58:23, 60:14, 81:1, 81:20, 81:22, 82:1, 82:2, 82:8, 82:20, 83:1, 95:24, 96:18, 109:7, 127:21, 128:3, 128:12, 147:19, 157:4, 159:1, 164:8, 164:22, 166:1, 166:19, 169:15, 169:22
**NBME's** [1] - 49:22
**NE** [1] - 2:4
**nearly** [1] - 145:2
**necessarily** [3] - 36:19, 63:13, 123:9
**need** [33] - 19:17, 19:18, 21:1, 24:22, 25:5, 28:7, 31:13, 37:10, 37:16, 37:20, 38:14, 38:16, 38:20, 39:2, 39:3, 48:25, 49:10, 51:23, 54:2, 55:7, 55:21, 55:25, 56:1, 56:4, 61:4, 76:1, 80:19, 80:21, 80:24, 116:2, 163:18
**needed** [23] - 17:3, 17:24, 29:24, 30:4, 31:25, 34:5, 37:23, 38:25, 47:12, 53:23, 54:1, 54:18, 57:7, 61:16, 63:16, 67:19, 91:20, 100:23, 100:24, 101:4, 102:19,

159:4, 159:22
**needing** [1] - 56:12
**Needs** [1] - 154:24
**needs** [6] - 5:15, 8:7, 8:9, 14:20, 43:15, 174:12
**negative** [3] - 24:15, 24:18, 138:21
**negatively** [1] - 41:4
**neuro** [1] - 46:17
**neuropsych** [1] - 40:22
**neuropsychological** [2] - 96:24, 97:2
**never** [10] - 10:14, 34:18, 34:25, 45:9, 45:25, 60:25, 77:4, 118:19, 128:12, 165:20
**nevertheless** [1] - 7:9
**new** [7] - 30:22, 42:16, 45:8, 57:25, 63:13, 81:6
**New** [3] - 1:17, 174:13, 174:19
**next** [43] - 39:5, 49:24, 50:6, 50:21, 62:7, 66:4, 66:8, 66:11, 67:1, 71:17, 88:16, 89:11, 90:10, 93:13, 98:24, 101:7, 104:25, 112:16, 116:15, 117:22, 118:7, 120:1, 120:7, 120:10, 120:20, 134:14, 135:15, 141:5, 142:24, 143:21, 144:10, 144:15, 144:22, 151:15, 156:10, 156:18, 156:25, 157:23, 167:8, 168:1, 170:3, 170:11, 171:3
**nice** [1] - 98:21
**night** [4] - 32:8, 32:9, 34:19, 47:16
**nighters** [1] - 32:15
**ninth** [1] - 107:8
**NO** [2] - 1:3, 176:11
**nobody** [2] - 101:4, 152:13
**noise** [1] - 136:15
**nominated** [1] - 3:21
**none** [5] - 122:2, 122:4, 122:5, 158:6
**nonsmokers** [1] - 24:5
**normal** [1] - 83:5
**normally** [1] - 139:20
**notably** [1] - 7:2
**note** [6] - 18:5, 18:6, 18:10, 45:19, 147:23, 149:20
**notebook** [3] - 78:24, 109:20, 163:7
**notebooks** [1] - 115:11
**noted** [2] - 170:8, 171:22
**notes** [9] - 25:12, 51:16, 60:17, 60:25, 66:13, 70:1, 70:4, 118:6
**nothing** [9] - 4:8, 4:9, 11:23, 11:25, 12:6, 25:22, 85:11, 103:11, 103:14

**notice** [2] - 170:9, 170:10
**noticed** [3] - 38:9, 90:12, 92:5
**notwithstanding** [1] - 10:17
**November** [1] - 131:11
**NPR** [1] - 129:3
**number** [18] - 49:12, 58:20, 58:21, 61:11, 61:21, 62:19, 73:10, 73:11, 85:25, 102:20, 145:6, 150:25, 152:4, 152:8, 153:20, 166:5, 169:12
**numbers** [7] - 50:2, 60:3, 61:16, 61:19, 62:2, 62:3, 87:13
**NW** [1] - 2:11
**Oaks** [3] - 99:24, 126:10, 158:23
**oath** [2] - 68:6, 121:10
**OB** [3] - 45:13, 45:16, 46:13
**object** [3] - 59:7, 145:13, 171:21
**objected** [1] - 6:5
**objection** [17] - 52:13, 59:11, 63:4, 63:6, 68:16, 70:8, 73:6, 74:7, 75:19, 146:5, 166:20, 170:5, 170:7, 170:14, 170:16, 171:20, 172:7
**objections** [1] - 73:3
**objective** [3] - 10:5, 12:25, 57:19
**obligations** [2] - 11:20, 11:21
**obtained** [3] - 10:11, 97:14, 129:2
**obviously** [2] - 3:10, 42:6
**occasional** [1] - 106:20
**occasionally** [1] - 10:18
**occupation** [1] - 14:4
**occurred** [1] - 17:21
**occurring** [2] - 98:7, 98:9
**October** [1] - 134:3
**ODS** [7] - 36:16, 36:17, 37:17, 37:21, 39:6, 39:13, 40:19
**offer** [1] - 40:16
**offered** [2] - 40:8, 81:6
**offering** [2] - 5:16, 5:17
**office** [3] - 116:14, 119:14, 119:16
**Office** [1] - 36:18
**Official** [3] - 1:22, 152:21, 175:11
**official** [1] - 153:1
**officially** [1] - 93:9
**Ohio** [13] - 41:25, 114:25, 115:5, 115:20, 119:8, 122:16, 122:25, 123:16, 124:9, 157:5, 157:9, 157:13, 157:16
**old** [2] - 95:14, 144:17

**once** [8] - 4:18, 22:25, 34:23, 35:1, 40:10, 54:20, 123:11, 172:24
**one** [105] - 5:8, 5:16, 7:9, 10:12, 11:2, 20:20, 24:10, 24:13, 26:7, 27:17, 28:8, 28:12, 28:23, 29:8, 29:9, 34:3, 34:9, 35:21, 40:12, 41:12, 45:3, 45:16, 46:12, 46:13, 46:19, 47:23, 49:24, 56:25, 58:10, 58:11, 58:17, 61:13, 61:25, 64:19, 65:5, 66:9, 66:11, 67:1, 67:18, 68:25, 71:23, 86:3, 86:18, 86:19, 99:7, 100:16, 101:13, 102:8, 102:20, 103:17, 106:22, 108:21, 113:8, 113:9, 113:11, 113:22, 115:8, 120:20, 125:16, 126:25, 127:5, 127:24, 128:1, 130:16, 131:2, 131:3, 135:6, 141:18, 142:13, 143:15, 144:3, 144:10, 144:18, 144:22, 144:24, 145:4, 146:12, 147:25, 148:1, 149:5, 149:13, 153:4, 153:5, 154:12, 156:18, 157:8, 163:7, 164:3, 165:24, 168:7, 170:21, 173:8, 173:17, 173:22, 173:23, 174:11, 174:12, 174:13, 174:16
**one-day** [2] - 174:13, 174:16
**one-page** [1] - 146:12
**ones** [19] - 45:12, 58:15, 63:13, 63:21, 64:17, 66:17, 66:18, 67:6, 67:16, 78:1, 78:4, 82:9, 82:11, 82:12, 89:21, 113:15, 147:18, 149:22
**online** [3] - 19:4, 48:8, 79:1
**OnlineMedEd** [1] - 79:2
**open** [1] - 49:6
**opening** [1] - 3:13
**ophthalmologist** [1] - 29:3
**opinion** [4] - 6:25, 167:15, 167:20, 168:3
**opportunity** [7] - 70:12, 75:7, 76:2, 76:4, 76:7, 76:12, 77:13
**opposed** [4] - 17:16, 62:3, 81:15, 156:4
**opposing** [1] - 162:23
**opposite** [1] - 23:3
**option** [6] - 11:10, 16:24, 42:5, 53:22, 77:24, 84:19
**options** [2] - 63:22, 64:6
**optometrist** [4] - 29:3, 155:22, 156:5, 156:6
**oral** [3] - 36:2, 36:3, 36:5

**orally** [1] - 118:1
**orange** [3] - 23:14, 23:17, 26:2
**orangish** [1] - 24:13
**orangish-tan** [1] - 24:13
**order** [24] - 3:1, 5:3, 11:6, 26:17, 33:25, 36:8, 36:9, 40:12, 45:17, 46:4, 47:13, 63:18, 65:12, 70:23, 71:3, 72:9, 76:1, 80:6, 84:12, 84:13, 88:3, 138:13, 174:17, 174:22
**organic** [2] - 36:23, 37:1, 115:23
**organization** [1] - 99:5
**organize** [2] - 32:23, 46:8
**organizing** [1] - 35:14
**orient** [1] - 86:2
**original** [1] - 105:25
**originally** [1] - 174:12
**OSCE** [5] - 18:4, 46:7, 46:16, 46:17, 46:18
**OSCEs** [3] - 18:3, 18:14, 45:16
**Osteopathic** [1] - 12:15
**OSU** [3] - 42:5, 51:17, 97:6
**otherwise** [3] - 9:12, 25:5, 117:1
**ought** [2] - 5:10, 172:25
**outcome** [1] - 12:11
**outside** [1] - 113:20
**outstanding** [1] - 104:21
**overall** [3] - 10:25, 60:8, 78:4
**overkill** [1] - 159:6
**overlaps** [1] - 94:16
**overruled** [2] - 146:7, 170:8
**Overton** [3] - 164:14, 164:16
**own** [4] - 12:2, 26:23, 30:20, 174:6
**own..** [1] - 153:12
**owned** [1] - 153:3
**p.m** [6] - 67:25, 112:7, 121:8, 175:3
**PA** [1] - 1:9
**pace** [1] - 172:22
**paced** [1] - 79:18
**pack** [1] - 112:3
**packet** [1] - 75:17
**PAGE** [1] - 176:11
**page** [124] - 21:6, 25:15, 25:18, 26:2, 30:17, 50:2, 50:6, 50:21, 51:4, 51:13, 51:15, 60:3, 60:4, 61:21, 62:18, 69:4, 69:6, 72:19, 74:13, 80:13, 86:7, 86:9, 86:10, 86:14, 87:11, 87:12, 88:16, 88:17, 89:19, 92:3, 96:2, 97:13, 98:24, 99:14, 100:1, 100:19, 101:7, 102:24, 104:1, 104:22,

105:18, 109:6, 110:2, 110:3, 111:13, 112:16, 113:4, 113:5, 113:9, 113:16, 116:16, 116:17, 116:22, 117:12, 117:13, 117:22, 118:7, 119:11, 120:7, 120:10, 120:11, 120:13, 121:5, 121:16, 121:18, 122:6, 122:9, 122:11, 125:17, 132:7, 134:14, 136:23, 137:19, 137:22, 139:6, 140:24, 141:17, 141:21, 142:24, 143:14, 143:15, 143:21, 143:25, 146:12, 146:21, 147:2, 147:8, 148:23, 149:13, 149:17, 149:19, 149:20, 150:9, 151:17, 153:13, 153:16, 153:23, 154:23, 155:11, 156:25, 157:23, 160:7, 162:24, 163:2, 163:4, 163:5, 166:12, 166:13, 167:8, 167:17, 168:1, 168:25, 169:7, 169:11, 170:2, 170:3, 171:3, 171:12, 171:17
**paged** [1] - 155:3
**pages** [6] - 51:2, 125:18, 167:1, 167:2, 167:8, 168:24
**paid** [3] - 39:21, 39:23, 113:23
**painfully** [1] - 10:20
**paired** [1] - 148:14
**pamphlet** [1] - 118:25
**paper** [12] - 17:16, 32:24, 39:11, 64:22, 78:24, 81:20, 82:1, 82:4, 106:2, 112:8, 164:8
**papers** [6] - 5:18, 30:18, 32:16, 32:22, 141:12, 162:20
**paragraph** [42] - 20:24, 30:17, 45:20, 45:21, 65:10, 65:11, 66:21, 69:16, 71:16, 71:24, 71:25, 72:2, 72:4, 80:12, 86:21, 88:21, 89:11, 89:20, 90:10, 92:4, 93:1, 94:7, 94:15, 94:18, 96:3, 96:7, 96:15, 137:23, 138:24, 139:6, 160:8, 160:10, 161:14, 161:18, 161:20, 161:21, 168:1, 168:7, 168:16, 168:19, 168:20
**paragraphs** [6] - 19:5, 30:19, 46:16, 58:9, 137:15, 144:23
**pardon** [1] - 21:23
**parents** [3] - 26:23, 91:8, 144:17
**part** [22] - 3:23, 7:2, 36:5, 44:3, 46:14, 46:15, 51:14, 77:2, 89:2, 114:19, 117:8,

119:10, 119:11, 147:8,
148:10, 152:9, 157:12,
158:19, 163:16, 172:10
**partial** [1] - 34:8
**participated** [6] - 6:5, 10:19,
110:5, 113:19, 113:23,
114:20
**participating** [1] - 108:6
**particular** [3] - 24:4, 44:6,
98:7
**particularly** [3] - 14:23,
26:15, 66:10
**parts** [9] - 41:11, 42:10,
103:5, 104:3, 115:1, 135:6,
172:4, 172:15, 172:16
**partway** [1] - 37:7
**pass** [12] - 42:22, 42:23,
43:1, 43:7, 44:2, 45:17, 57:7,
66:12, 67:2, 76:8, 76:19,
84:14
**passage** [59] - 61:10, 61:15,
61:19, 61:23, 62:6, 63:17,
65:5, 65:6, 69:8, 69:9, 69:11,
69:19, 69:24, 70:1, 72:8,
72:14, 72:15, 72:19, 72:20,
139:15, 142:15, 142:17,
142:25, 143:6, 143:12,
143:16, 143:19, 143:20,
143:22, 144:4, 144:9,
144:12, 144:14, 144:19,
144:21, 145:2, 145:5,
145:11, 146:11, 146:12,
146:16, 148:12, 148:15,
150:23, 150:24, 152:4,
152:7, 154:10, 160:21,
160:22, 162:2, 162:4,
163:10, 163:15, 163:16,
163:17
**passage-based** [1] - 154:10
**passages** [15] - 41:16, 64:12,
72:1, 136:5, 139:1, 139:19,
142:6, 143:12, 146:18,
146:22, 147:9, 152:5, 154:3,
154:6, 154:7
**passed** [7] - 5:24, 43:14,
44:1, 45:12, 47:6, 75:13,
76:9
**passionate** [1] - 16:5
**pasted** [1] - 152:7
**Pathoma** [2] - 78:8, 79:2
**patient** [5] - 45:18, 45:19,
46:20, 118:11, 119:1
**patients** [4] - 3:22, 18:3,
47:13, 47:15
**pause** [1] - 55:11
**paying** [3] - 31:9, 99:3,
158:17
**PDFs** [1] - 18:21
**pediatrics** [4] - 16:4, 16:6,
16:11, 44:15

**peds** [1] - 45:13
**peers** [4] - 3:21, 9:23, 34:16,
89:7
**pen** [2] - 22:18, 24:22
**penalty** [7] - 64:13, 138:16,
138:19, 140:10, 141:11,
141:14, 141:16
**pencils** [3] - 22:12, 22:18,
48:25
**PENNSYLVANIA** [1] - 1:1
**pens** [1] - 22:12
**people** [9] - 9:22, 12:8,
12:19, 21:4, 34:22, 53:11,
114:10, 139:14, 160:3
**per** [3] - 65:19, 111:1, 113:25
**perceive** [1] - 156:9
**percent** [20] - 77:21, 78:4,
78:5, 78:6, 126:18, 131:25,
132:2, 132:3, 134:11,
138:15, 160:15, 161:5,
161:8, 161:23, 161:25,
162:21, 163:9, 167:15,
167:22, 168:14
**percentile** [37] - 10:24, 11:1,
126:12, 126:15, 126:17,
127:1, 127:3, 127:8, 127:11,
129:3, 129:6, 129:16,
130:17, 130:24, 131:1,
131:16, 131:17, 131:21,
131:24, 132:3, 133:6, 133:8,
133:14, 133:20, 134:6,
134:9, 134:20, 134:23,
134:24, 135:5, 135:12,
135:16, 135:18, 135:19,
138:6, 138:8, 143:10
**perception** [2] - 29:7, 156:8,
156:9
**perfect** [1] - 68:12
**performance** [11] - 12:24,
86:24, 129:14, 130:18,
131:2, 134:6, 136:23, 137:3,
137:9, 137:11, 137:12
**performed** [3] - 10:21,
113:10, 137:6
**perhaps** [2] - 125:9, 127:24
**period** [4] - 105:21, 105:23,
122:20, 126:19
**PERKINS** [1] - 2:9
**permanent** [1] - 22:19
**permission** [1] - 61:4
**person** [9] - 5:23, 6:20, 7:3,
7:4, 7:6, 7:22, 24:18, 54:6,
54:25
**personal** [14] - 50:7, 50:8,
50:10, 50:18, 57:22, 86:3,
86:8, 86:16, 91:22, 95:22,
95:24, 99:4, 139:4, 159:4
**phenomenal** [1] - 46:20
**Philadelphia** [1] - 1:9
**phonics** [2] - 99:19, 100:4

**photo** [5] - 71:10, 71:12,
71:17, 71:22, 72:3
**photograph** [3] - 148:25,
149:3, 149:4
**physical** [18] - 23:6, 23:11,
23:12, 41:14, 45:20, 46:2,
51:13, 70:22, 100:8, 100:9,
117:1, 135:5, 135:16, 136:2,
150:3, 150:4, 151:21, 154:3
**physician** [3] - 10:9, 116:9,
120:25
**Physics** [1] - 107:25
**pick** [3] - 67:9, 83:7, 114:7
**picked** [1] - 14:25
**pictures** [7] - 21:3, 25:13,
29:7, 29:11, 65:8, 78:9,
78:22
**piece** [2] - 25:23
**pieces** [1] - 54:20
**pink** [2] - 24:15, 24:20
**pitcher** [1] - 68:9
**place** [3] - 100:22, 105:25,
118:13
**Placement** [1] - 107:20
**places** [2] - 41:23, 118:20
**Plaintiff** [3] - 1:3, 1:18, 2:7
**plaintiff** [3] - 3:17, 12:16,
13:14
**plaintiff's** [1] - 12:24
**plaintiffs** [1] - 174:21
**plan** [1] - 30:11
**PLAN** [7] - 130:2, 131:9,
131:15, 131:21, 131:22,
132:17, 132:19
**plaque** [2] - 109:16, 109:17
**play** [2] - 35:1, 108:19
**played** [1] - 109:1
**playing** [1] - 110:24
**pleadings** [1] - 3:12
**plug** [1] - 62:4
**plus** [2] - 100:4, 106:20
**pluses** [1] - 106:21
**point** [30] - 4:9, 10:12, 62:18,
75:5, 81:1, 95:20, 97:4,
101:4, 106:25, 111:3,
114:18, 114:23, 116:9,
117:25, 118:13, 121:1,
121:2, 122:22, 125:3,
127:14, 128:2, 136:21,
138:21, 152:3, 153:4,
154:17, 159:13, 166:23,
169:25, 174:11
**pointed** [2] - 47:4, 72:1
**pointers** [1] - 45:7
**points** [5] - 6:16, 38:10,
138:23, 149:17, 169:15
**policy** [5] - 42:20, 55:2, 55:3,
73:25
**pool** [2] - 112:4, 114:10
**pops** [1] - 67:11

**population** [5] - 9:23, 9:25,
11:2, 12:9, 12:19
**portion** [3] - 18:5, 18:10,
77:10
**possible** [6] - 63:15, 63:20,
79:19, 118:11, 138:1, 159:25
**possibly** [3] - 150:13, 161:1,
162:3
**post** [2] - 157:3, 164:25
**post-secondary** [1] - 157:3
**post-thrombotic** [1] - 164:25
**postthrombotic** [1] - 56:17
**potentially** [1] - 173:6
**practice** [23] - 4:13, 79:8,
79:9, 83:14, 97:18, 111:25,
112:4, 112:5, 112:7, 130:6,
139:22, 140:23, 145:22,
145:25, 147:17, 147:20,
148:5, 148:8, 148:10, 153:6,
153:11
**practiced** [1] - 148:8
**pre** [1] - 112:9
**pre-lab** [1] - 112:9
**precipice** [1] - 4:12
**precluded** [3] - 21:19, 21:22,
21:24
**predominantly** [2] - 119:19,
119:20
**preference** [2] - 13:7, 52:18
**PRELIMINARY** [1] - 1:5
**preliminary** [6] - 9:5, 9:8,
9:10, 11:6, 13:2, 137:18
**prep** [7] - 63:8, 64:9, 139:16,
139:17, 140:20, 159:17,
160:3
**preparation** [2] - 44:3, 79:24
**prepare** [3] - 78:7, 166:17,
166:18
**prepared** [5] - 1:24, 44:4,
48:14, 111:17, 167:10
**preparing** [3] - 127:21,
140:16, 140:19
**prescribed** [1] - 118:12
**present** [3] - 113:12, 116:22,
117:9
**pretty** [21] - 19:2, 19:5, 21:4,
22:13, 23:4, 24:24, 26:8,
29:23, 34:22, 35:16, 35:23,
38:7, 44:5, 45:4, 45:5, 61:22,
62:5, 63:14, 70:25, 81:8,
151:23
**prevails** [1] - 9:12
**prevention** [1] - 19:24
**previously** [3] - 68:7, 121:11,
157:3
**primarily** [2] - 12:21, 144:23
**primary** [7] - 10:9, 38:2,
40:22, 51:13, 116:9, 120:25,
157:24
**principal** [1] - 34:7

**printed** [1] - 48:8
**priority** [1] - 39:12
**private** [3] - 88:2, 133:23, 165:14
**privilege** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**problem** [4] - 26:14, 29:12, 118:1, 174:5
**problems** [19] - 32:1, 89:14, 89:16, 89:23, 90:1, 90:4, 90:7, 91:11, 91:18, 97:22, 112:9, 112:12, 115:22, 117:17, 146:25, 147:7, 156:2, 156:3, 174:23
**proceed** [6] - 3:5, 13:5, 13:25, 68:2, 121:9, 121:13
**proceedings** [1] - 175:8
**Proceedings** [2] - 1:24, 175:3
**process** [15] - 4:20, 5:4, 6:5, 6:8, 17:8, 17:10, 20:19, 21:1, 23:16, 32:20, 37:9, 52:21, 78:21, 79:4, 151:8
**procrastinates** [1] - 118:1
**procrastinating** [1] - 90:7
**proctor** [2] - 83:4, 83:8
**produced** [1] - 100:7
**product** [5] - 166:21, 170:6, 170:15, 171:21, 172:8
**professional** [4] - 11:24, 155:17, 167:20, 168:3
**professionals** [2] - 6:25, 12:3
**professor** [2] - 36:4, 36:23
**profile** [1] - 136:24
**program** [16] - 14:25, 33:3, 33:4, 33:10, 33:15, 33:25, 34:14, 75:2, 75:3, 94:24, 95:1, 95:6, 95:8, 103:10, 103:19, 159:17
**programs** [4] - 43:18, 76:15, 101:22, 105:16
**progress** [5] - 90:25, 98:19, 99:6, 99:21, 99:22
**prohibits** [1] - 11:25
**prompt** [4] - 18:7, 18:12, 65:20, 138:2
**prompts** [1] - 41:16
**promulgated** [1] - 6:11
**proofread** [2] - 30:20, 31:24
**proper** [1] - 97:19
**prophylaxis** [1] - 19:25
**propose** [2] - 59:8, 173:7
**prose** [2] - 142:6, 143:15
**protozoa** [1] - 24:9
**prove** [1] - 52:16
**provide** [17] - 4:7, 4:9, 7:21, 48:16, 52:9, 55:17, 57:21, 70:7, 81:1, 81:20, 119:14, 121:21, 121:25, 158:2,

158:14, 158:19, 168:10
**provided** [37] - 4:11, 18:23, 51:21, 54:14, 57:25, 58:4, 70:19, 82:2, 86:4, 88:6, 88:7, 90:13, 90:22, 91:1, 91:23, 92:8, 93:11, 93:17, 97:2, 97:24, 98:2, 99:12, 104:24, 112:18, 112:25, 117:19, 118:3, 118:5, 122:19, 128:12, 128:14, 129:23, 139:17, 142:25, 151:2, 158:10, 158:16
**provider** [2] - 38:2, 51:14
**providing** [4] - 18:20, 54:15, 90:18, 169:16
**provisional** [1] - 156:11
**PSAT** [3] - 130:13, 130:15, 130:18
**PSAT/NMSQT** [1] - 130:12
**psych** [2] - 44:15, 45:13
**psychiatrist** [1] - 165:19
**public** [4] - 8:12, 8:23, 88:25, 105:13
**Public** [2] - 88:23, 104:16
**publicly** [1] - 145:20
**publish** [1] - 48:9
**published** [2] - 50:15, 169:22
**pull** [1] - 32:15
**punctuation** [1] - 31:24
**purple** [3] - 23:18, 23:22
**purpose** [5] - 5:25, 55:20, 71:24, 71:25, 72:5
**purposes** [1] - 70:11
**put** [20] - 10:10, 20:25, 25:8, 27:16, 28:12, 32:23, 45:24, 45:25, 46:1, 46:3, 46:8, 46:13, 46:14, 49:2, 50:13, 67:13, 73:19, 85:23, 88:8, 92:14
**putting** [4] - 28:24, 36:8, 37:3, 72:15
**qualified** [2] - 6:25, 155:17
**quantifiable** [1] - 86:23
**quarter** [11] - 123:15, 123:16, 123:18, 123:21, 123:23, 124:17, 125:3, 125:5, 125:6, 125:8, 169:2
**questionnaire** [1] - 148:22
**questions** [114] - 33:19, 34:2, 37:8, 38:11, 46:21, 55:23, 58:9, 60:20, 61:12, 63:18, 63:23, 64:3, 65:6, 65:8, 66:12, 66:16, 67:4, 67:5, 68:20, 69:11, 69:12, 69:20, 70:4, 70:10, 72:9, 76:2, 76:3, 76:4, 76:11, 77:2, 77:4, 77:5, 77:10, 77:17, 78:17, 79:7, 79:8, 79:14, 80:4, 80:5, 80:8, 83:17, 83:18, 83:20, 84:6, 112:10, 117:3, 117:8, 136:4,

138:1, 138:3, 138:10, 138:11, 138:12, 138:14, 138:16, 138:17, 138:25, 139:11, 139:14, 139:18, 139:25, 140:3, 140:10, 141:6, 142:3, 143:13, 143:22, 144:11, 145:12, 145:21, 146:1, 146:15, 146:25, 147:3, 147:10, 147:13, 147:15, 147:17, 147:21, 148:6, 148:9, 148:13, 148:14, 148:16, 149:4, 149:6, 149:7, 149:10, 149:18, 149:21, 151:10, 153:6, 153:11, 154:4, 154:7, 154:8, 154:10, 159:21, 159:23, 160:15, 160:16, 161:1, 161:3, 161:6, 161:21, 161:24, 162:1, 162:10, 162:14, 162:21, 163:9, 172:17
**quickly** [3] - 6:16, 17:25, 52:14
**quite** [1] - 112:13
**quizzes** [1] - 27:19
**raise** [1] - 28:20
**raised** [1] - 166:23
**RAMSAY** [3] - 1:3, 13:20, 176:5
**Ramsay** [28] - 3:5, 3:17, 3:19, 3:23, 4:1, 4:22, 5:8, 5:18, 5:19, 7:13, 8:1, 9:7, 9:16, 10:5, 11:4, 13:14, 13:15, 13:24, 14:3, 14:15, 87:15, 87:23, 146:11, 160:14, 166:5, 172:4, 173:1, 173:4
**Ramsay's** [1] - 6:9
**ran** [2] - 34:1, 34:4
**random** [1] - 77:5
**range** [1] - 43:16
**ranges** [1] - 113:11
**rank** [7] - 107:3, 126:12, 129:3, 129:6, 130:24, 133:20, 134:23
**ranks** [2] - 134:24, 135:12
**rarely** [1] - 94:19
**rash** [2] - 23:13
**rather** [4] - 59:6, 81:21, 93:15, 142:18
**ray** [1] - 26:5
**rays** [1] - 23:9
**rburgoyne@perkinscoie. com** [1] - 2:13
**RDR** [2] - 1:22, 175:11
**RDX** [1] - 85:25
**re** [2] - 75:6
**re-accept** [1] - 75:6
**reaction** [6] - 62:12, 62:13, 62:17, 62:20, 62:21

**reactions** [1] - 62:14
**read** [142] - 5:3, 7:2, 7:12, 17:18, 18:7, 18:11, 19:2, 19:17, 19:18, 20:10, 20:16, 21:12, 22:14, 24:25, 26:17, 27:8, 28:10, 28:11, 28:13, 30:23, 32:3, 32:19, 38:20, 47:5, 47:19, 47:22, 55:21, 55:22, 55:24, 56:3, 58:8, 58:11, 61:12, 61:13, 62:5, 62:8, 62:20, 62:23, 63:1, 63:15, 63:16, 64:11, 64:12, 64:19, 64:21, 65:20, 65:23, 65:25, 66:18, 66:19, 66:20, 66:22, 67:7, 67:14, 67:17, 69:14, 69:19, 69:25, 70:2, 71:8, 71:10, 71:19, 72:2, 72:9, 72:10, 72:19, 76:1, 76:4, 76:11, 77:2, 77:10, 77:18, 78:21, 79:4, 79:5, 79:9, 79:12, 79:14, 79:16, 79:17, 79:22, 81:15, 81:16, 83:17, 83:19, 91:16, 91:17, 91:18, 109:8, 117:24, 121:2, 136:13, 136:14, 138:9, 138:15, 140:10, 141:3, 142:12, 142:15, 142:17, 142:18, 142:25, 143:1, 143:5, 143:19, 143:25, 144:1, 144:7, 144:20, 144:24, 145:4, 145:9, 147:3, 147:6, 147:9, 148:17, 150:10, 150:17, 150:25, 151:10, 152:5, 152:9, 159:21, 159:25, 160:15, 160:25, 161:6, 161:7, 161:10, 161:11, 161:21, 162:3, 162:5, 162:9, 162:11, 162:13, 162:21, 168:20
**reader** [3] - 29:1, 91:17, 117:24
**readiness** [2] - 132:7, 132:8
**reading** [138] - 3:24, 4:25, 5:1, 5:13, 7:10, 8:4, 11:3, 18:19, 18:20, 18:23, 18:25, 19:1, 19:3, 20:11, 20:13, 25:6, 26:14, 27:20, 28:21, 32:16, 32:18, 32:21, 35:12, 35:14, 37:3, 38:7, 38:19, 45:10, 46:18, 47:2, 47:4, 47:7, 47:9, 47:11, 47:15, 47:17, 47:23, 57:20, 58:7, 61:15, 63:15, 63:17, 63:19, 63:21, 64:12, 65:4, 65:13, 69:21, 71:1, 72:4, 72:11, 72:12, 72:16, 81:2, 88:4, 88:5, 89:6, 90:13, 90:17, 90:18, 91:5, 99:20, 100:4, 100:20, 101:13, 102:3, 103:4, 103:7, 103:12, 104:6,

104:10, 105:8, 106:4, 118:2, 123:3, 123:7, 123:8, 123:9, 126:12, 126:15, 126:25, 127:8, 127:11, 128:23, 128:24, 129:9, 129:11, 130:16, 130:18, 130:22, 130:23, 132:2, 132:9, 133:19, 133:20, 134:9, 136:11, 138:2, 138:13, 138:25, 139:9, 139:12, 139:15, 139:19, 141:18, 141:23, 141:24, 142:11, 143:8, 144:8, 144:13, 145:4, 145:11, 146:16, 146:18, 149:15, 150:21, 154:25, 155:2, 155:19, 156:2, 158:10, 159:24, 160:17, 160:21, 161:12, 161:13, 162:1, 162:11, 163:10, 163:15, 168:4

**readmission** [1] - 84:21
**reads** [5] - 18:21, 18:22, 86:22, 87:23, 168:2
**ready** [3] - 3:4, 68:2, 112:4
**real** [6] - 8:5, 10:1, 10:4, 12:24, 71:22
**realize** [2] - 19:15, 68:21
**realized** [3] - 29:19, 81:10, 169:22
**really** [50] - 5:10, 5:16, 14:17, 15:2, 16:4, 16:5, 18:17, 18:18, 18:19, 24:5, 25:6, 26:13, 26:23, 27:16, 27:24, 29:18, 29:19, 30:1, 30:15, 30:25, 31:4, 34:2, 34:4, 34:18, 34:21, 35:12, 35:18, 35:22, 36:1, 36:5, 36:24, 37:1, 37:5, 37:18, 38:15, 40:16, 45:9, 45:13, 47:21, 55:2, 65:2, 71:2, 71:12, 79:18, 110:17, 113:15, 121:2, 123:7, 149:8
**reapplied** [1] - 39:24
**reapply** [6] - 11:12, 41:20, 53:9, 75:4, 75:7, 75:8
**reason** [5] - 6:4, 38:8, 69:20, 72:7, 162:19
**reasonable** [1] - 32:17
**reasonably** [1] - 145:1
**Reasoning** [1] - 69:3
**reasoning** [8] - 41:14, 70:25, 73:2, 135:18, 136:3, 138:5, 151:15, 154:6
**reasons** [5] - 3:10, 13:1, 117:10, 154:12, 158:21
**rebuttal** [1] - 173:2
**receipt** [1] - 52:6
**receive** [15] - 16:23, 17:7, 17:11, 17:13, 29:22, 93:23, 94:1, 94:4, 94:5, 94:9,

124:21, 126:21, 129:20, 136:9, 158:12
**received** [24] - 4:2, 10:14, 41:2, 41:3, 48:11, 49:25, 50:1, 58:5, 76:21, 83:1, 85:11, 93:3, 94:8, 98:11, 99:16, 101:15, 107:15, 157:3, 157:5, 157:8, 157:24, 158:3, 158:22
**receives** [1] - 81:23
**receiving** [17] - 10:18, 18:9, 82:19, 83:2, 101:19, 102:9, 102:11, 104:10, 105:10, 106:12, 124:3, 124:18, 125:15, 127:14, 142:21, 142:23, 157:15
**Recess** [1] - 121:8
**recess** [6] - 28:16, 28:18, 67:24, 67:25, 121:6
**recognize** [9] - 25:15, 51:4, 58:13, 60:1, 72:3, 73:24, 74:15, 87:5, 97:14
**recognized** [4] - 4:25, 5:21, 27:7, 71:18
**recollection** [2] - 119:3, 141:15
**recommend** [6] - 29:17, 36:11, 53:3, 96:10, 118:12, 160:3
**recommendation** [1] - 115:4
**recommended** [9] - 23:5, 29:1, 29:14, 40:24, 63:17, 116:7, 159:17, 167:22, 168:13
**reconsideration** [3] - 59:2, 87:8, 127:24
**reconvene** [1] - 174:8
**record** [7] - 10:2, 13:23, 17:21, 93:16, 115:15, 147:23, 175:8
**records** [4] - 51:16, 97:11, 97:14, 158:11
**recross** [1] - 173:6
**Recross** [1] - 176:4
**red** [3] - 22:22, 43:17, 72:22
**redacted** [4] - 170:4, 171:3, 171:13, 171:18
**redactions** [1] - 171:15
**redirect** [1] - 173:5
**Redirect** [1] - 176:4
**reduce** [1] - 52:21
**reduced** [1] - 158:9
**refer** [4] - 39:4, 40:23, 156:11, 158:12
**reference** [14] - 3:11, 11:16, 29:8, 57:3, 62:18, 101:22, 103:18, 120:14, 130:2, 130:12, 156:10, 156:14, 157:2, 158:25
**referenced** [3] - 90:19,

156:21, 164:10
**references** [1] - 154:20
**referencing** [1] - 62:17
**referred** [7] - 10:4, 29:2, 69:15, 92:14, 97:1, 148:2, 158:7
**referring** [6] - 33:3, 93:18, 94:3, 96:22, 140:12, 163:17
**reflect** [3] - 76:8, 138:4, 172:5
**reflected** [3] - 94:20, 99:20, 146:12
**reflecting** [5] - 106:15, 129:14, 129:24, 131:11, 134:23
**reflects** [3] - 97:5, 116:14, 130:15
**refused** [1] - 4:6
**regard** [1] - 6:21
**regarding** [2] - 85:12, 85:15
**regardless** [1] - 41:4
**registered** [5] - 84:25, 85:2, 85:4, 85:6, 85:9
**registering** [1] - 154:17
**regrettably** [1] - 10:20
**regular** [1] - 33:12
**regulations** [5] - 6:6, 6:11, 7:21, 8:6, 11:19
**regulatory** [1] - 11:22
**rehabilitate** [1] - 173:5
**REISMAN** [1] - 1:15
**rejected** [1] - 42:4
**relate** [1] - 78:10
**related** [4] - 66:1, 118:17, 121:22, 156:4
**relates** [1] - 85:12
**relating** [2] - 84:8, 152:19
**relevance** [1] - 145:14
**relevant** [5] - 9:22, 78:23, 88:9, 128:4, 128:10
**reliance** [2] - 7:15, 7:17
**relied** [1] - 163:25
**relief** [2] - 9:9, 9:11
**remainder** [1] - 174:9
**remaining** [2] - 64:18, 160:16
**remedial** [1] - 90:14
**remedy** [1] - 9:6
**remember** [27] - 20:25, 25:12, 26:9, 27:15, 30:9, 33:6, 35:21, 57:22, 60:19, 70:3, 85:10, 88:15, 94:13, 110:17, 111:7, 117:7, 117:21, 126:23, 129:22, 130:14, 136:8, 141:15, 150:13, 154:22, 158:14, 168:9
**remembered** [2] - 31:7, 92:25
**remind** [5] - 31:16, 31:17,

68:6, 121:10
**repeat** [3] - 27:3, 48:3, 79:7
**repeated** [1] - 4:6
**rephrase** [1] - 166:23
**report** [27] - 41:1, 41:2, 52:7, 54:10, 87:6, 87:11, 88:9, 90:24, 93:25, 97:25, 98:13, 99:12, 99:23, 100:7, 100:8, 100:16, 101:18, 102:15, 103:23, 104:15, 106:6, 106:15, 131:9, 134:2, 134:17, 136:19, 159:15
**reported** [2] - 89:12, 159:1
**REPORTER** [2] - 13:22, 15:7
**reporter** [1] - 13:8
**Reporter** [2] - 1:22, 175:11
**reports** [1] - 90:25
**represent** [2] - 3:17, 109:17
**representation** [1] - 76:5
**representative** [4] - 76:22, 142:7, 149:6, 149:9
**represented** [1] - 149:18
**Representing** [3] - 1:18, 2:7, 2:14
**request** [32] - 9:9, 13:2, 40:12, 49:22, 49:23, 50:25, 56:7, 56:21, 57:13, 57:24, 74:19, 74:21, 81:1, 81:20, 82:5, 87:8, 91:23, 95:25, 119:8, 154:13, 155:5, 155:8, 156:23, 163:21, 163:25, 164:2, 164:4, 164:9, 164:23, 166:1, 166:8, 167:6
**requested** [8] - 8:8, 18:8, 51:16, 51:22, 53:24, 54:3, 75:25, 81:25
**requesting** [1] - 156:19
**requests** [4] - 4:6, 86:4, 127:25, 128:16
**require** [3] - 6:18, 8:17, 63:18
**required** [6] - 4:1, 63:21, 84:10, 84:12, 87:25, 138:12
**requirements** [2] - 40:11, 51:15
**requires** [3] - 7:7, 11:23, 55:11
**reread** [3] - 28:10, 28:13, 117:25
**research** [4] - 19:3, 39:20, 112:8
**residency** [4] - 42:12, 43:9, 43:12, 76:14
**respect** [1] - 6:24
**respects** [1] - 12:13
**responded** [2] - 40:15, 82:2
**RESPONSE** [1] - 3:3
**response** [3] - 74:19, 74:21, 121:25
**responses** [1] - 112:24

**responsible** [1] - 114:9
**rest** [5] - 23:1, 32:19, 43:21, 76:16, 102:21
**rests** [1] - 4:13
**result** [1] - 165:4
**results** [1] - 129:24
**resume** [2] - 39:19, 68:4
**retaken** [1] - 55:4
**return** [1] - 84:12
**reversals** [2] - 27:25, 92:6
**reversing** [1] - 28:25
**review** [4] - 78:12, 78:15, 79:5, 112:10
**reviewed** [2] - 5:18, 173:20
**reviewers** [1] - 173:20
**reviewing** [1] - 127:20
**revised** [1] - 169:8
**ride** [1] - 112:5
**right-hand** [3] - 109:7, 128:20, 141:2
**risk** [2] - 24:3, 56:2
**Ritalin** [6] - 10:10, 38:21, 118:12, 118:13, 118:16, 118:19
**RMR** [2] - 1:22, 175:11
**Robert** [1] - 9:1
**ROBERT** [1] - 2:10
**role** [1] - 153:16
**room** [19] - 8:2, 17:14, 17:23, 18:12, 39:10, 44:21, 55:18, 56:9, 57:15, 78:23, 80:24, 82:15, 82:17, 133:23, 133:25, 136:16, 164:24, 165:14
**rotation** [6] - 16:11, 17:4, 17:6, 44:13, 45:6
**rotations** [2] - 16:8, 44:7
**roughly** [1] - 78:4
**round** [1] - 136:18
**Ruekberg** [14] - 54:18, 164:17, 165:18, 166:7, 166:17, 167:5, 167:10, 169:13, 169:17, 170:13, 171:2, 171:8, 171:19, 172:16
**Ruekberg's** [3] - 165:24, 172:5, 172:6
**rule** [3] - 71:11, 146:3, 146:6
**ruled** [1] - 72:5
**ruling** [1] - 151:8
**run** [1] - 46:12
**sad** [1] - 36:21
**safety** [1] - 114:9
**sample** [9] - 68:20, 83:17, 145:15, 147:13, 147:17, 147:21, 148:22, 152:18, 154:11
**saw** [9] - 3:11, 30:3, 38:10, 62:14, 62:20, 71:15, 71:17, 149:7, 155:4
**scenario** [1] - 152:2

**scheduled** [3] - 40:7, 54:5
**scheduling** [1] - 39:13
**schemes** [1] - 88:1
**Schoal** [1] - 89:12
**school** [137] - 3:20, 4:15, 4:16, 4:17, 4:18, 4:21, 4:23, 9:18, 9:23, 9:24, 10:14, 11:10, 11:12, 14:15, 15:19, 16:20, 16:24, 17:6, 17:8, 17:11, 17:15, 18:8, 18:9, 18:16, 18:20, 20:4, 20:10, 26:7, 26:9, 26:11, 26:22, 26:25, 27:5, 28:20, 29:22, 30:8, 30:13, 32:14, 34:16, 34:21, 35:23, 36:1, 39:17, 39:25, 41:18, 41:25, 42:1, 42:13, 42:15, 42:16, 43:6, 43:7, 44:2, 44:4, 44:5, 48:10, 49:24, 49:25, 51:14, 53:8, 54:13, 54:16, 54:22, 55:13, 74:3, 74:18, 75:6, 75:8, 75:12, 81:10, 81:23, 81:25, 82:21, 84:8, 84:9, 84:18, 85:12, 86:25, 87:17, 87:24, 88:14, 88:15, 89:13, 89:24, 90:2, 90:4, 90:5, 91:4, 93:9, 93:16, 94:25, 95:7, 95:9, 100:12, 103:23, 105:11, 105:13, 106:1, 106:4, 106:13, 106:16, 107:6, 108:20, 110:5, 111:14, 112:1, 112:3, 112:14, 113:6, 113:10, 113:19, 113:20, 113:21, 114:4, 114:21, 117:16, 118:19, 118:20, 123:5, 129:25, 133:4, 139:17, 157:24, 158:2, 158:6, 158:7, 158:11, 159:1, 164:12, 166:13, 171:14
**School** [11] - 87:19, 88:23, 100:11, 104:16, 106:7, 106:17, 108:11, 108:17, 126:4, 129:24
**school's** [3] - 42:20, 50:25, 74:21
**schools** [7] - 14:25, 41:1, 42:8, 44:17, 54:15, 75:9, 88:25
**science** [6] - 81:25, 111:9, 142:24, 147:8, 154:3, 154:7
**sciences** [15] - 41:14, 41:15, 44:6, 44:7, 44:8, 70:22, 135:5, 135:16, 135:19, 136:3, 150:3, 150:4, 151:21, 152:18
**score** [38] - 10:25, 41:1, 41:2, 41:9, 41:10, 41:12, 43:10, 43:14, 43:15, 45:11, 52:7, 76:4, 76:7, 76:13, 76:18, 76:19, 77:1, 77:7, 114:24,

126:13, 126:25, 129:13, 129:16, 131:9, 131:15, 133:6, 133:19, 134:2, 134:5, 134:17, 134:20, 136:19, 138:3, 138:4, 138:15, 138:23
**scored** [2] - 10:24, 143:9
**scores** [6] - 41:11, 43:9, 129:2, 130:9, 135:4
**scoring** [1] - 138:17
**scrap** [1] - 64:22
**screamed** [1] - 16:16
**screen** [4] - 67:10, 80:11, 136:11, 150:12
**season** [1] - 108:7
**seated** [2] - 3:2, 68:1
**Second** [1] - 152:21
**second** [53] - 10:24, 20:4, 36:22, 37:14, 37:19, 41:22, 51:9, 54:21, 55:14, 56:7, 56:14, 56:15, 57:13, 66:4, 66:25, 67:2, 86:18, 86:19, 86:21, 89:20, 90:11, 92:4, 92:18, 92:24, 92:25, 93:5, 95:25, 96:2, 99:14, 99:23, 102:24, 104:1, 104:17, 104:24, 105:21, 105:25, 127:4, 127:9, 127:23, 130:20, 131:3, 136:23, 139:6, 142:12, 142:13, 148:18, 148:20, 158:23, 163:21, 164:3, 164:4, 166:1, 169:9
**secondary** [2] - 157:3, 157:24
**section** [16] - 41:8, 41:13, 41:15, 73:2, 78:3, 78:23, 83:9, 109:11, 110:5, 146:18, 150:3, 150:4, 151:20, 154:25, 155:12, 155:15
**Section** [1] - 69:3
**sections** [5] - 78:6, 136:2, 154:9, 161:4, 171:23
**see** [91] - 10:9, 15:11, 16:25, 22:9, 22:17, 23:1, 25:15, 25:21, 26:2, 26:4, 34:7, 34:9, 38:2, 40:16, 40:19, 40:21, 45:19, 61:24, 62:15, 62:16, 67:7, 71:11, 71:13, 76:17, 77:4, 77:10, 81:9, 87:7, 87:21, 96:7, 96:9, 98:16, 104:24, 105:1, 106:21, 106:22, 108:10, 109:10, 110:5, 113:6, 115:18, 116:8, 116:20, 117:9, 117:10, 117:14, 117:19, 118:10, 120:15, 121:18, 122:8, 126:4, 128:20, 128:22, 128:24, 129:2, 129:3, 130:2, 131:13, 134:22, 134:24, 136:25, 137:23, 139:6,

139:7, 141:2, 142:25, 143:2, 148:18, 148:19, 148:21, 148:23, 149:20, 151:4, 153:13, 154:1, 154:20, 155:12, 157:2, 157:6, 157:25, 158:4, 160:8, 160:12, 162:16, 169:5, 169:11, 170:2, 170:3, 175:1
**seeing** [5] - 82:23, 128:8, 140:18, 154:22, 168:7
**seeking** [1] - 9:10
**seem** [2] - 15:7, 70:20
**select** [4] - 64:15, 67:10, 79:10, 161:23
**selected** [3] - 145:15, 145:22, 145:24
**self** [3] - 6:21, 64:8, 99:9
**self-confidence** [1] - 99:9
**self-mitigation** [2] - 6:21, 64:8
**semester** [2] - 104:25, 105:24
**semesters** [4] - 103:5, 104:2, 106:9, 107:15
**senior** [3] - 108:24, 109:4, 109:16
**sense** [6] - 25:6, 32:24, 50:17, 81:19, 83:16, 111:15
**sent** [13] - 40:9, 49:9, 49:24, 51:17, 95:24, 111:17, 128:9, 166:19, 169:8, 169:10, 171:1, 171:7
**sentence** [14] - 20:22, 20:23, 90:10, 93:13, 96:14, 96:15, 134:24, 139:8, 142:6, 142:18, 143:19, 148:25, 160:10
**sentences** [2] - 93:1, 143:5
**separate** [13] - 8:2, 17:14, 27:18, 39:10, 44:21, 55:18, 56:9, 80:24, 82:15, 92:24, 114:14, 136:16, 164:24
**separately** [1] - 79:10
**September** [3] - 5:7, 44:2, 134:25
**series** [6] - 147:9, 148:13, 149:4, 164:4, 166:10, 169:6
**serve** [1] - 144:23
**services** [3] - 49:10, 119:17, 121:22
**Services** [1] - 36:18
**set** [4] - 31:16, 37:20, 65:5, 85:18
**sets** [1] - 151:17
**seven** [5] - 65:6, 121:1, 154:3, 154:6, 154:7
**several** [8] - 54:7, 54:9, 106:21, 114:2, 116:10, 125:22, 143:13, 166:17
**severe** [6] - 89:14, 89:16,

89:23, 90:1, 90:4, 90:7
**severity** [3] - 120:8, 120:14, 120:17
**shall** [1] - 48:16
**shapes** [1] - 29:13
**sheet** [1] - 44:23
**shelf** [7] - 44:11, 44:12, 44:18, 45:1, 45:17, 81:23, 82:13
**shift** [3] - 114:8, 114:16, 160:5
**shin** [1] - 112:6
**shorthand** [1] - 154:2
**shortly** [3] - 85:5, 85:6, 154:16
**shortness** [1] - 23:12
**shout** [1] - 14:10
**shove** [1] - 78:24
**show** [19] - 5:13, 8:3, 11:7, 39:9, 45:15, 53:24, 54:1, 60:22, 61:20, 67:19, 70:2, 71:2, 72:10, 76:7, 77:13, 78:9, 138:10, 150:17, 150:21
**showed** [6] - 58:20, 58:21, 70:4, 70:23, 111:22, 152:1
**showers** [1] - 112:1
**showing** [7] - 5:15, 7:25, 21:13, 54:4, 99:4, 150:16
**shown** [2] - 10:5, 103:4
**shows** [5] - 58:18, 106:19, 123:23, 134:19, 145:8
**siblings** [2] - 14:21
**side** [12] - 24:17, 98:16, 101:10, 104:9, 104:19, 107:1, 126:7, 128:25, 130:2, 137:5, 141:2, 143:3
**sides** [1] - 137:12
**sight** [1] - 17:23
**signature** [1] - 98:22
**signed** [1] - 170:1
**significantly** [1] - 5:5
**similar** [9] - 12:15, 12:18, 80:2, 141:7, 147:20, 149:13, 153:4, 158:25, 165:21
**similarly** [1] - 69:12
**simply** [3] - 11:12, 141:14, 162:1
**simulate** [2] - 83:3, 83:9
**single** [1] - 158:12
**sit** [3] - 19:19, 32:9, 165:11
**sits** [1] - 13:7
**sitting** [1] - 35:3
**six** [2] - 43:8, 65:6
**sixth** [7] - 33:16, 33:25, 95:6, 95:9, 106:9, 128:19
**Skills** [1] - 127:18
**skills** [4] - 42:12, 105:4, 111:23, 128:22
**skim** [1] - 142:18
**skin** [1] - 23:21

**skip** [3] - 61:10, 65:4, 65:13
**slacking** [1] - 30:2
**sleep** [1] - 47:13
**slight** [1] - 13:16
**slightly** [2] - 88:10, 151:20
**slow** [6] - 5:1, 29:1, 57:20, 79:15, 91:17, 117:23
**slowing** [1] - 79:21
**slowly** [1] - 28:13
**small** [2] - 4:1, 130:17
**Smith** [13] - 58:1, 88:6, 90:23, 95:12, 96:21, 97:3, 117:4, 128:8, 128:9, 165:21, 173:12, 173:14
**Smith's** [4] - 58:15, 58:18, 58:22, 87:6
**Smiy** [12] - 38:3, 95:18, 96:9, 96:12, 96:17, 96:22, 115:16, 116:8, 119:4, 119:7, 121:25, 156:11
**Smiy's** [4] - 40:14, 51:15, 115:8, 119:14
**smokers** [1] - 24:5
**so..** [5] - 16:18, 79:23, 97:23, 126:23, 173:20
**soccer** [5] - 108:19, 110:8, 110:24, 112:6, 112:7
**social** [2] - 99:2, 99:7
**society** [1] - 3:22
**Society** [2] - 10:19, 110:10
**socks** [1] - 112:6
**software** [7] - 18:21, 18:23, 19:1, 20:14, 47:19, 132:23, 136:11
**solely** [1] - 150:25
**solidified** [1] - 16:10
**solve** [2] - 26:14, 61:19
**solving** [1] - 147:7
**someone** [6] - 7:7, 12:7, 26:1, 38:9, 40:8, 116:15
**sometime** [1] - 42:18
**sometimes** [9] - 19:5, 58:10, 80:12, 80:16, 86:1, 98:4, 108:7, 148:15, 149:10
**somewhere** [1] - 136:6
**sophomore** [5] - 10:12, 10:15, 95:20, 122:20, 122:22
**sorry** [48] - 15:5, 18:18, 22:12, 23:7, 23:18, 23:23, 27:1, 44:10, 47:1, 48:3, 49:4, 49:22, 57:2, 65:14, 68:12, 71:25, 72:12, 78:4, 79:9, 80:23, 87:18, 92:12, 96:14, 98:1, 100:21, 109:2, 113:7, 120:10, 120:16, 125:18, 132:2, 132:10, 132:19, 133:13, 135:3, 135:8, 135:15, 137:19, 140:1, 147:11, 160:8, 162:25, 166:9, 166:13, 166:14,

166:15, 169:13, 173:22
**sort** [7] - 16:10, 52:14, 82:23, 103:15, 137:2, 151:17, 167:8
**sought** [1] - 6:6
**sound** [3] - 28:6, 58:12, 149:10
**sounds** [1] - 136:8
**source** [1] - 78:15
**sources** [3] - 4:23, 5:15, 78:13
**Southwestern** [1] - 109:11
**space** [2] - 88:2, 158:9
**span** [1] - 99:4
**Spanish** [8] - 35:21, 35:23, 35:24, 36:2, 36:21, 110:20, 112:9, 115:24
**speaking** [1] - 7:10
**special** [4] - 14:20, 33:2, 102:9, 102:13
**specialized** [3] - 102:2, 103:12, 104:10
**specific** [10] - 21:3, 23:5, 23:16, 23:20, 24:7, 44:12, 46:22, 47:4, 58:7, 147:18
**specifically** [20] - 5:22, 6:23, 24:10, 24:12, 26:7, 27:15, 30:9, 30:15, 34:18, 47:2, 74:18, 80:22, 84:8, 128:7, 143:4, 147:5, 155:2, 155:4, 162:15, 168:9
**speech** [3] - 18:25, 20:13, 81:1
**speed** [1] - 88:5
**spell** [2] - 26:18, 28:5
**spellcheck** [1] - 31:24
**spelling** [13] - 26:15, 27:21, 28:9, 31:23, 32:7, 32:10, 36:8, 36:14, 89:6, 90:13, 90:14, 91:5, 100:5
**spend** [8] - 7:12, 28:13, 50:18, 66:7, 66:25, 97:17, 149:14, 160:20
**spending** [1] - 34:19
**spent** [10] - 27:14, 31:21, 46:9, 86:20, 111:4, 111:10, 116:24, 116:25, 119:4
**spoken** [1] - 35:25
**sport** [1] - 35:2
**sports** [2] - 10:19, 35:1
**spots** [1] - 113:8
**spring** [2] - 125:8, 125:11, 125:12
**St** [5] - 104:15, 106:17, 108:11, 108:16, 129:23
**stand** [3] - 62:3, 68:4, 165:11
**standard** [5] - 9:19, 12:7, 12:11, 83:3, 165:8
**standardized** [15] - 7:17, 10:19, 10:22, 18:3, 44:16, 45:18, 125:20, 125:22,

126:22, 126:24, 130:5, 130:7, 130:15, 136:18, 139:9
**standing** [2] - 4:20, 25:20
**stands** [6] - 13:7, 24:8, 25:23, 33:5, 104:21, 105:4
**Stanford** [2] - 126:4, 127:3
**stars** [1] - 137:5
**start** [15] - 26:6, 33:14, 33:16, 42:21, 42:22, 42:23, 42:25, 60:11, 62:11, 65:18, 72:11, 72:16, 144:1, 161:9, 168:24
**started** [17] - 18:4, 19:22, 28:23, 30:5, 30:6, 32:14, 34:3, 38:11, 71:23, 95:6, 122:15, 122:21, 125:10, 125:15, 160:2, 162:3, 162:11
**starting** [3] - 10:11, 43:25, 158:15
**starts** [1] - 112:1
**state** [8] - 13:22, 133:11, 137:25, 138:12, 138:24, 157:4, 161:20, 169:13
**State** [13] - 41:25, 114:25, 115:5, 115:20, 119:8, 122:16, 122:25, 123:16, 124:9, 157:5, 157:9, 157:13, 157:16
**statement** [29] - 3:13, 50:7, 50:8, 50:10, 50:19, 57:23, 86:8, 86:16, 86:22, 87:15, 88:21, 89:5, 90:11, 91:22, 94:19, 94:21, 95:23, 95:24, 96:9, 117:22, 120:7, 139:2, 139:4, 139:13, 140:2, 141:5, 141:23, 159:4, 160:18
**statements** [7] - 86:3, 87:1, 88:10, 89:9, 89:18, 90:16, 90:22
**States** [7] - 4:5, 5:20, 6:11, 131:22, 133:12, 133:14, 134:7
**STATES** [1] - 1:1
**states** [5] - 89:11, 120:20, 120:22, 142:5, 158:16
**status** [1] - 84:8
**statute** [2] - 11:19, 12:10
**statutory** [1] - 11:22
**stay** [4] - 13:12, 17:1, 53:12, 84:13
**stayed** [1] - 125:15
**STEIN** [2] - 2:2, 2:3
**stem** [1] - 160:23
**stenographically** [1] - 1:24
**Step** [84] - 4:14, 11:11, 16:23, 16:25, 17:7, 42:9, 42:11, 42:12, 42:14, 43:10, 43:13, 43:22, 44:4, 48:1, 48:5, 54:23, 54:25, 63:25, 64:2, 65:1, 65:4, 65:14,

65:15, 67:20, 68:19, 75:14, 75:24, 76:21, 77:15, 77:17, 77:19, 78:7, 78:14, 79:19, 79:24, 80:1, 80:2, 80:9, 80:11, 80:14, 80:16, 80:19, 80:21, 80:25, 81:22, 82:6, 82:20, 82:23, 83:2, 83:9, 83:14, 83:17, 84:10, 84:13, 84:14, 84:24, 84:25, 85:2, 85:6, 85:8, 85:13, 91:24, 136:19, 145:12, 146:14, 146:17, 147:12, 148:11, 148:17, 149:3, 149:7, 149:10, 155:5, 159:10, 159:16, 159:20, 159:21, 160:6, 160:20

**step** [1] - 13:16

**STEVEN** [1] - 2:3

**stick** [1] - 24:6

**sticker** [2] - 97:20, 97:23

**stickers** [1] - 97:13

**still** [29] - 7:4, 8:17, 15:4, 15:23, 15:25, 17:10, 18:7, 19:19, 20:24, 30:22, 31:19, 36:20, 38:6, 39:19, 44:8, 46:9, 57:24, 62:11, 67:17, 68:6, 76:19, 89:5, 91:13, 102:11, 103:24, 104:4, 121:10, 121:15, 152:19

**stood** [1] - 33:7

**stop** [1] - 15:3

**story** [2] - 32:1, 91:17

**straight** [4] - 14:7, 103:1, 104:19, 106:9

**strategically** [1] - 139:9

**strategies** [6] - 63:11, 64:8, 140:25, 159:10, 159:15, 159:17

**strategy** [4] - 65:15, 141:8, 159:19, 159:24

**Street** [4] - 1:9, 1:16, 2:4, 2:11

**strength** [1] - 114:23

**stress** [3] - 30:24, 31:10, 117:23

**strict** [2] - 30:25, 31:4

**strike** [1] - 173:19

**strong** [1] - 11:2

**structured** [1] - 120:5

**struggle** [3] - 87:16, 88:13, 91:17

**struggled** [5] - 26:18, 26:24, 26:25, 27:5, 27:24

**struggles** [8] - 37:22, 38:4, 38:7, 87:24, 91:4, 91:6, 91:8, 98:7

**struggling** [13] - 3:24, 18:7, 18:18, 18:19, 30:23, 31:19, 32:22, 37:8, 81:16, 89:6, 91:16, 100:14, 106:4

**stuck** [1] - 47:20

**student** [11] - 4:17, 4:19, 7:24, 10:18, 14:5, 43:6, 53:11, 73:25, 98:18, 119:11, 120:6

**student's** [1] - 7:16

**students** [11] - 9:18, 25:1, 63:1, 76:12, 77:13, 78:14, 105:16, 107:3, 133:15, 133:25, 153:18

**study** [4] - 14:24, 78:7, 79:13, 105:4

**studying** [4] - 26:10, 47:11, 78:14, 79:9

**stuff** [13] - 17:18, 18:21, 21:10, 30:20, 31:5, 36:6, 36:10, 38:10, 39:12, 58:18, 80:14, 159:7

**stupid** [1] - 36:7

**subject** [6] - 26:16, 91:13, 105:22, 105:24, 111:6, 137:11

**subjects** [2] - 137:6, 137:9

**submit** [10] - 40:12, 43:12, 49:21, 51:11, 55:14, 83:8, 127:21, 128:3, 128:5, 166:7

**submitted** [22] - 5:18, 49:23, 50:7, 51:3, 53:1, 54:21, 57:23, 58:22, 59:2, 109:23, 110:1, 122:16, 128:11, 137:17, 155:25, 164:8, 164:17, 164:19, 165:25, 168:13, 168:16, 173:18

**submitting** [1] - 73:11

**subscores** [1] - 41:13

**substantial** [1] - 5:12

**substantially** [3] - 7:9, 9:21, 12:8

**substantive** [1] - 169:16

**subtests** [1] - 129:14

**success** [5] - 7:4, 7:6, 7:9, 8:11, 9:15

**successful** [1] - 31:18

**successfully** [2] - 3:20, 161:3

**suffer** [1] - 11:7

**sufficient** [1] - 57:19

**suggestion** [1] - 162:20

**suggestions** [1] - 35:20

**Suite** [2] - 2:4, 2:11

**summary** [1] - 153:24

**summer** [3] - 34:23, 42:4, 114:19

**summers** [2] - 114:5, 114:6

**Sunset** [3] - 99:24, 126:10, 158:23

**super** [1] - 24:7

**supplemental** [1] - 51:2

**support** [30] - 8:12, 8:14, 9:8, 45:23, 46:1, 46:15, 54:12,

54:15, 86:4, 87:7, 90:21, 91:23, 95:24, 101:22, 102:3, 103:10, 103:12, 104:10, 115:19, 119:8, 128:15, 137:17, 163:23, 164:2, 164:9, 164:13, 164:19, 166:1, 169:14

**supporting** [3] - 8:23, 93:24, 166:8

**supportive** [1] - 79:13

**supports** [1] - 101:20

**suppose** [1] - 172:25

**supposed** [16] - 16:16, 19:16, 30:18, 30:20, 31:22, 31:25, 33:24, 42:21, 43:22, 43:24, 45:24, 46:1, 97:19, 150:8, 150:15

**Supreme** [2] - 6:2, 9:5

**surgery** [1] - 44:15

**surprise** [1] - 133:17

**survey** [1] - 118:22

**sustain** [3] - 63:6, 166:22, 170:16

**sustaining** [1] - 90:1

**swelling** [1] - 24:19

**swim** [4] - 35:17, 108:24, 110:21, 111:25

**swimmer** [1] - 110:8

**swimming** [2] - 110:8, 110:25

**switch** [1] - 117:23

**switched** [1] - 38:22

**switching** [3] - 27:8, 27:25, 38:5

**sworn** [3] - 13:20, 68:7, 121:11

**symbolize** [1] - 109:17

**symptom** [1] - 117:5

**symptoms** [7] - 23:12, 24:15, 88:7, 88:19, 122:7, 122:9, 122:12

**syndrome** [2] - 56:17, 165:1

**System** [1] - 88:23

**system** [7] - 21:11, 22:20, 25:7, 26:6, 81:14, 81:17, 123:16

**Tab** [9] - 86:5, 87:3, 91:24, 91:25, 92:1, 95:23, 139:4, 155:6, 163:23

**table** [4] - 3:18, 35:4, 50:12, 129:17

**tables** [1] - 143:2

**tabs** [1] - 86:1

**taker** [1] - 117:25

**tan** [1] - 24:13

**Tanguay** [4] - 29:2, 29:5, 93:19, 155:22

**Tanguay's** [1] - 51:8

**tap** [1] - 15:12

**tasks** [1] - 90:2

**taught** [1] - 114:12

**teacher** [25] - 27:15, 28:23, 30:25, 31:1, 31:3, 31:4, 35:21, 36:22, 37:10, 37:18, 90:13, 92:4, 92:18, 92:19, 92:23, 93:4, 93:11, 93:15, 101:1, 102:6, 103:15, 104:13, 115:24, 158:10

**teachers** [20] - 4:24, 26:22, 27:6, 27:13, 29:25, 31:1, 35:19, 89:7, 89:8, 90:12, 91:3, 91:5, 97:25, 98:2, 101:3, 102:9, 102:18, 105:19, 159:5

**teal** [1] - 23:23

**team** [3] - 108:19, 108:24, 110:21

**tears** [1] - 31:12

**technical** [2] - 6:13, 11:20

**technically** [1] - 75:4

**techniques** [1] - 64:25

**temporary** [5] - 37:24, 122:18, 122:19, 125:13, 157:18

**ten** [7] - 32:7, 47:21, 64:5, 64:6, 143:22, 146:15, 151:17

**tendencies** [1] - 118:12

**term** [1] - 82:22

**terms** [4] - 43:9, 49:25, 120:20, 144:22

**test** [108] - 4:8, 7:17, 8:16, 8:17, 11:13, 17:24, 18:1, 21:20, 26:4, 28:9, 32:9, 33:8, 33:15, 33:17, 33:18, 33:19, 33:21, 34:1, 36:3, 36:9, 37:12, 40:7, 41:5, 41:6, 41:12, 43:2, 43:5, 44:16, 45:18, 50:4, 55:4, 57:4, 62:24, 63:2, 63:8, 63:11, 64:9, 65:16, 66:14, 68:20, 74:25, 77:10, 77:23, 78:11, 80:2, 80:3, 81:2, 81:9, 81:17, 81:18, 81:19, 82:1, 95:5, 117:25, 126:5, 126:18, 126:22, 126:23, 126:24, 129:21, 129:24, 130:3, 130:15, 131:11, 131:15, 132:18, 132:25, 133:1, 133:3, 133:22, 133:25, 135:4, 135:6, 136:16, 138:1, 140:7, 140:25, 141:8, 141:13, 141:18, 141:23, 141:24, 142:6, 142:11, 142:24, 143:8, 143:9, 145:11, 145:14, 146:1, 146:19, 146:21, 146:24, 147:8, 147:17, 159:9, 159:15, 159:17, 160:2, 162:21, 165:2, 165:8, 165:10, 165:12

**Test** [5] - 10:23, 10:25, 127:4, 127:18

**test-taking** [6] - 63:11, 64:9, 140:25, 141:8, 159:9, 159:15

**tested** [2] - 58:6, 94:23

**testified** [17] - 13:21, 16:19, 20:9, 41:17, 47:25, 48:4, 98:6, 102:8, 103:19, 103:21, 115:18, 115:22, 123:2, 123:10, 141:7, 155:9, 159:9

**testifies** [1] - 173:14

**testify** [1] - 83:13

**testifying** [1] - 15:18

**testimony** [17] - 5:4, 5:17, 13:10, 61:6, 63:5, 84:23, 92:17, 94:16, 106:3, 123:13, 138:7, 138:9, 161:7, 161:25, 162:8, 172:22, 173:19

**Testing** [1] - 154:24

**testing** [51] - 6:12, 6:24, 7:5, 7:7, 7:21, 7:23, 8:18, 12:22, 29:7, 29:20, 33:2, 38:14, 39:2, 39:4, 42:8, 44:21, 53:11, 53:25, 54:7, 54:8, 55:18, 56:10, 57:16, 57:21, 57:25, 58:4, 58:5, 58:7, 88:2, 93:17, 93:21, 96:24, 117:3, 124:12, 124:14, 124:19, 124:25, 125:20, 126:9, 132:17, 136:9, 136:16, 136:18, 152:2, 157:9, 159:19, 160:5, 165:4, 167:15

**tests** [35] - 10:20, 10:22, 17:14, 17:15, 17:16, 23:8, 27:19, 27:21, 29:6, 29:22, 29:24, 32:11, 37:5, 37:7, 38:10, 39:8, 39:10, 39:11, 46:4, 58:10, 58:16, 79:9, 81:21, 82:3, 88:1, 125:22, 134:25, 139:9, 139:10, 139:20, 140:23, 151:25, 154:21, 159:25

**Texas** [7] - 33:9, 35:25, 88:23, 94:25, 100:13, 103:22, 103:24

**text** [14] - 21:2, 23:2, 25:14, 25:22, 58:14, 142:19, 143:1, 144:24, 147:1, 147:3, 147:6, 169:6, 170:4, 171:18

**textbooks** [1] - 19:3

**texts** [1] - 142:7

**thanking** [1] - 167:5

**The court** [104] - 3:2, 3:4, 3:8, 5:6, 6:10, 8:25, 9:11, 10:2, 12:18, 13:2, 13:4, 13:6, 13:8, 13:12, 13:15, 13:19, 13:25, 14:6, 14:9, 14:12, 15:3, 15:6, 15:8, 15:12, 17:20, 21:18, 21:23, 21:25, 22:2, 22:4, 22:7, 27:2, 48:15,

48:17, 48:21, 48:24, 49:3, 49:12, 49:14, 51:25, 52:3, 52:19, 52:23, 56:18, 56:25, 57:3, 57:6, 57:8, 57:11, 59:13, 59:17, 60:24, 61:4, 63:6, 67:23, 68:1, 68:4, 68:9, 68:16, 68:18, 68:20, 68:23, 70:12, 73:3, 73:7, 73:10, 73:13, 73:16, 73:18, 73:19, 74:8, 75:20, 83:21, 83:25, 85:23, 92:11, 121:4, 121:9, 121:13, 146:3, 146:6, 151:18, 162:23, 163:1, 166:22, 169:1, 170:7, 170:11, 170:16, 170:23, 171:22, 172:9, 172:13, 172:19, 173:5, 173:10, 173:14, 173:24, 174:3, 174:6, 174:15, 174:23, 175:1

**the witness** [40] - 13:16, 13:18, 13:24, 14:8, 14:11, 14:13, 15:5, 17:22, 21:16, 21:22, 21:24, 22:1, 22:3, 22:5, 22:8, 27:3, 49:4, 49:13, 52:5, 56:20, 57:5, 57:7, 57:10, 59:22, 61:7, 68:4, 68:8, 68:12, 68:25, 70:13, 70:15, 84:1, 92:12, 113:11, 116:18, 121:12, 170:10, 170:24, 172:12, 172:14

**theme** [1] - 144:4

**therapy** [3] - 23:5, 23:6, 29:14

**therefore** [4] - 12:20, 76:2, 138:13, 167:20

**thereto** [1] - 68:16

**they've** [4] - 8:15, 79:16, 85:16, 173:1

**thinner** [3] - 20:1, 20:6, 20:8

**thinners** [1] - 20:2

**third** [13] - 16:8, 18:14, 42:17, 42:18, 43:24, 44:6, 62:10, 82:12, 82:18, 87:10, 88:22, 90:11, 128:1

**third-year** [1] - 18:14

**thoroughly** [1] - 142:17

**thoughts** [4] - 32:23, 46:7, 167:13

**three** [18] - 3:20, 43:6, 45:24, 46:1, 51:12, 55:4, 55:12, 62:14, 93:1, 113:25, 136:2, 148:25, 154:9, 167:2, 167:8, 169:7

**three-page** [2] - 167:8, 169:7

**three-sentence** [1] - 148:25

**thrombotic** [1] - 164:25

**throughout** [7] - 4:3, 19:14, 19:19, 94:6, 146:18, 151:2, 162:19

**throughs** [1] - 72:21

**thrown** [1] - 45:8

**tied** [2] - 143:22, 149:4

**tighten** [1] - 174:25

**time-and-a-half** [3] - 18:5, 39:15, 157:13

**time-out** [5] - 27:16, 27:17, 28:24, 92:14, 94:12

**timed** [4] - 58:15, 83:3

**timeline** [3] - 55:11, 55:12, 92:22

**timer** [1] - 67:9

**tiny** [1] - 150:25

**tips** [1] - 142:10

**tissues** [1] - 27:2

**title** [2] - 29:3, 164:15

**titled** [1] - 140:16

**today** [12] - 3:11, 5:19, 9:2, 9:4, 10:3, 15:8, 67:24, 70:11, 134:15, 163:13, 172:18, 172:22

**together** [5] - 3:16, 20:25, 37:3, 37:4, 37:5

**tomorrow** [3] - 172:21, 174:8, 175:1

**ton** [1] - 22:19

**took** [44] - 10:19, 10:23, 27:11, 41:17, 42:18, 42:19, 53:19, 60:6, 62:23, 65:15, 82:8, 82:20, 83:13, 107:12, 107:20, 126:25, 130:10, 131:22, 133:3, 133:4, 133:7, 133:22, 133:25, 134:3, 134:19, 135:2, 135:10, 135:22, 135:23, 136:13, 138:6, 139:22, 139:24, 142:21, 145:15, 145:18, 145:21, 150:11, 150:20, 153:14, 154:16, 159:18, 160:6

**tooth** [1] - 8:13

**top** [19] - 49:22, 72:19, 87:12, 110:3, 111:13, 120:14, 122:11, 126:17, 129:2, 131:21, 131:25, 132:2, 132:3, 133:14, 134:11, 138:15, 141:2, 168:1, 169:12

**total** [8] - 126:12, 126:25, 127:8, 128:24, 129:11, 136:6, 136:7, 152:4

**towards** [1] - 39:22

**town** [1] - 39:22

**trace** [1] - 11:21

**track** [5] - 17:1, 34:13, 35:15, 53:12, 78:2

**train** [1] - 174:20

**transcript** [5] - 122:25, 123:15, 162:18, 163:2, 175:7

**transcription** [1] - 1:25

**transfer** [2] - 4:16, 4:20

**transition** [1] - 163:21

**translate** [3] - 21:6, 25:11, 25:14

**translation** [1] - 112:9

**trapper** [2] - 71:17, 72:3

**trappers** [3] - 71:10, 71:12, 71:22

**treat** [1] - 38:17

**treating** [3] - 4:23, 11:24, 165:19

**treatment** [2] - 23:4, 29:17

**trial** [1] - 118:12

**trialed** [1] - 38:21

**trickier** [1] - 109:19

**tried** [13] - 25:19, 27:9, 31:15, 39:18, 46:25, 53:22, 53:25, 70:19, 71:6, 72:10, 83:9, 160:25, 162:16

**Trigonometry** [1] - 108:3

**trouble** [4] - 28:25, 30:3, 31:11, 92:5

**true** [1] - 159:23

**trusted** [1] - 37:18

**try** [23] - 15:16, 16:25, 20:22, 22:9, 27:22, 38:17, 47:3, 50:11, 50:14, 52:16, 53:9, 53:12, 64:19, 66:18, 66:21, 67:16, 67:17, 69:25, 83:3, 85:19, 166:23, 174:6, 174:25

**trying** [15] - 4:20, 6:8, 6:14, 28:5, 35:16, 46:9, 46:10, 47:20, 59:19, 66:8, 79:18, 81:18, 91:19, 111:14, 158:14

**turn** [13] - 59:24, 60:3, 67:22, 69:6, 73:22, 74:13, 113:16, 118:7, 140:24, 148:22, 155:6, 155:11, 157:23

**turned** [1] - 34:11

**turning** [4] - 31:5, 50:21, 51:4, 74:11

**tutor** [2] - 37:10, 37:13

**tutored** [1] - 111:3

**tutorials** [5] - 100:23, 100:25, 101:2, 101:4, 102:19

**tutoring** [3] - 102:13, 111:4, 111:6

**twice** [4] - 10:23, 34:23, 46:17, 130:10

**two** [38] - 5:16, 5:17, 7:14, 8:16, 8:17, 20:6, 41:15, 41:16, 44:5, 52:14, 62:22, 64:20, 67:18, 71:16, 93:1, 103:7, 104:2, 104:3, 107:15, 109:2, 111:4, 112:4, 113:8, 113:25, 114:15, 125:18, 143:5, 144:23, 165:2, 165:4, 165:10, 167:1, 167:16, 168:24, 173:19, 174:19

**two-day** [2] - 8:17, 52:14

**two-hour** [1] - 112:4

**type** [9] - 45:2, 46:8, 105:10,

118:16, 119:21, 146:1, 149:2, 149:18, 159:5
typed [1] - 116:15
types [1] - 149:5
typical [4] - 111:20, 111:22, 146:14, 146:17
typically [2] - 22:22, 160:2
U.S [1] - 1:8
ultimate [1] - 12:7
ultimately [2] - 12:17, 12:18
unanswered [3] - 138:18, 140:11, 141:13
under [16] - 7:5, 23:19, 68:6, 87:19, 96:4, 99:7, 105:1, 109:10, 117:9, 120:4, 121:10, 142:24, 143:5, 155:20, 169:12
undergrad [1] - 15:1
underlining [1] - 72:11
underneath [1] - 142:13
understood [8] - 5:6, 65:21, 66:20, 67:8, 143:18, 162:17, 173:25, 174:12
unfortunately [1] - 93:14
unheard [1] - 4:17
UNITED [1] - 1:1
United [7] - 4:5, 5:20, 6:11, 131:22, 133:12, 133:14, 134:7
University [8] - 42:1, 42:4, 109:23, 111:18, 114:25, 115:20, 122:25, 157:5
university [1] - 116:6
unless [3] - 25:20, 36:15, 55:5
unlikely [1] - 75:14
unnecessary [1] - 159:6
unofficial [1] - 93:15
unpaid [1] - 113:23
unstructured [1] - 120:6
unusual [1] - 4:8
up [42] - 10:15, 13:15, 14:9, 14:19, 18:19, 18:20, 19:4, 20:21, 20:23, 22:9, 22:17, 23:3, 26:21, 31:15, 31:16, 32:15, 35:2, 35:5, 35:13, 35:17, 37:21, 38:11, 39:18, 39:21, 40:10, 46:9, 52:16, 61:20, 65:5, 67:11, 69:13, 84:6, 94:19, 111:24, 114:7, 123:11, 125:2, 135:8, 173:1, 174:18, 174:25
updated [2] - 148:1, 148:2
upper [2] - 10:21, 128:20
upset [3] - 31:12, 34:4, 34:6
Upton [1] - 106:7
US [1] - 107:20
useful [1] - 71:9
USMLE [9] - 4:5, 4:14, 42:7, 43:8, 43:23, 48:1, 49:9,

49:23, 65:14
USMLE's [1] - 50:4
utilizing [1] - 1:24
UWorld [1] - 78:16
validated [1] - 160:4
value [2] - 77:8, 138:22
Vargas [3] - 3:16, 10:4, 147:14
VARGAS [65] - 2:2, 2:3, 3:15, 13:6, 13:11, 13:13, 14:2, 14:14, 15:14, 18:15, 21:16, 22:6, 22:10, 27:4, 48:16, 48:20, 48:23, 49:2, 49:5, 49:15, 51:23, 52:2, 52:8, 52:11, 52:25, 56:23, 57:2, 57:12, 59:4, 59:15, 59:21, 59:23, 60:22, 61:3, 61:8, 63:7, 68:3, 68:13, 68:19, 69:1, 70:6, 70:16, 73:1, 73:9, 73:12, 73:15, 73:17, 73:21, 74:5, 74:10, 75:16, 75:22, 83:20, 145:13, 145:18, 145:21, 166:20, 170:5, 170:14, 171:20, 172:7, 173:8, 173:12, 173:21, 173:25
variables [1] - 62:1
varied [2] - 42:15, 45:2
varies [2] - 42:15, 64:4
various [3] - 89:15, 97:24, 141:12
varsity [3] - 10:19, 108:16, 110:9
Verbal [1] - 69:3
verbal [8] - 41:14, 70:25, 73:2, 135:18, 136:3, 151:14, 151:20, 154:6
verification [1] - 121:15, 122:17
verifying [1] - 97:7
version [10] - 60:2, 69:13, 81:21, 147:13, 148:5, 148:8, 153:1, 153:2, 153:4, 169:12
versus [1] - 24:5, 58:7, 58:10, 72:13, 75:7, 118:10, 124:12, 172:5, 172:6
videos [3] - 65:8, 79:1, 149:10
view [1] - 122:7
vignette [4] - 160:23, 160:25, 162:6, 163:17
virtually [1] - 102:9
virtue [1] - 91:12
viruses [1] - 24:14
vision [3] - 29:20, 29:21, 156:3
visit [3] - 115:15, 116:14, 117:10
visual [7] - 29:6, 37:2, 58:19, 79:3, 93:17, 93:21, 156:8

visually [2] - 25:20, 69:24
vocabulary [2] - 128:23, 129:7
voice [1] - 14:9
volleyball [1] - 109:1
volume [4] - 61:23, 62:12, 62:13
voluntarily [1] - 84:19
volunteer [2] - 39:21, 110:12
volunteered [1] - 110:19
Vyvanse [1] - 19:9
wait [4] - 54:8, 54:9, 95:5, 131:17
waited [1] - 53:3
waiting [4] - 54:12, 54:17, 79:15
waitlisted [3] - 41:23, 41:24, 42:2
walk [5] - 10:20, 56:1, 60:8, 65:17, 89:15
walking [1] - 111:20
walks [1] - 79:3
wants [2] - 8:23, 27:17
warning [2] - 64:15, 77:25
Washington [2] - 2:5, 2:12
waste [1] - 81:18
watch [4] - 13:15, 48:22, 68:11, 79:1
watched [1] - 78:9
watching [1] - 149:15
water [4] - 13:18, 17:22, 68:10, 82:16
ways [2] - 31:16, 91:9
wealth [1] - 4:6
wear [1] - 29:19
website [2] - 147:19, 154:18
week [10] - 32:8, 47:3, 97:20, 110:22, 110:25, 111:1, 111:4, 111:10, 114:1, 174:9
weekends [1] - 34:23
weeks [1] - 114:1
weighed [1] - 115:1
weighted [1] - 43:10
Western [4] - 42:1, 42:3, 42:5, 75:10
whereas [2] - 80:14, 159:22
whole [12] - 38:8, 63:14, 67:15, 72:14, 139:12, 139:15, 144:21, 161:10, 161:13, 162:5, 162:6, 162:13
willing [1] - 54:6
winning [1] - 105:25
winter [6] - 114:7, 123:21, 124:17, 125:3, 125:5, 125:6
Wisconsin [3] - 109:24, 111:18
wise [1] - 45:5
wish [1] - 116:5
wishes [1] - 6:14

Wite [2] - 24:21, 24:23
Wite-Out [2] - 24:21, 24:23
withdraw [4] - 11:12, 75:1, 75:3, 75:13
withdrawing [1] - 84:19
withdrawn [1] - 75:13
witness [11] - 13:5, 48:18, 48:21, 61:5, 173:6, 173:8, 173:10, 173:17, 173:22, 173:23, 174:22
Witness [1] - 176:4
witnesses [1] - 173:7
woman [5] - 3:19, 5:2, 8:13, 8:20, 9:16
women [1] - 24:4
wonderful [1] - 98:18
wondering [1] - 140:2
word [16] - 20:20, 20:21, 25:24, 28:13, 58:10, 58:11, 69:17, 72:15, 72:17, 122:2, 126:15, 152:8, 152:10, 163:17
Word [3] - 72:15, 72:17, 152:8
words [18] - 18:22, 25:11, 28:10, 32:7, 32:23, 36:9, 46:10, 50:13, 62:4, 69:23, 72:13, 72:18, 72:22, 148:12, 152:4, 152:8, 152:9
workload [2] - 34:15, 34:16
works [2] - 14:18, 98:18
workup [1] - 96:11
world [6] - 4:8, 8:5, 10:2, 10:4, 10:5, 12:24
wrap [1] - 173:1
write [20] - 7:12, 18:6, 21:1, 24:21, 25:12, 26:17, 28:8, 30:18, 30:19, 30:23, 32:7, 41:16, 42:9, 45:19, 50:8, 50:10, 50:11, 78:22, 79:6, 139:7
writing [33] - 7:10, 18:5, 18:10, 22:18, 26:16, 26:18, 27:20, 27:25, 28:1, 28:3, 28:4, 30:16, 30:17, 31:23, 32:22, 36:7, 37:3, 41:10, 41:15, 46:5, 50:18, 51:2, 89:6, 90:13, 90:14, 91:5, 106:1, 106:4, 135:24, 152:18, 154:11, 158:10, 168:5
written [8] - 6:10, 17:15, 36:5, 36:9, 44:16, 61:21, 80:3, 90:21
wrote [8] - 31:24, 57:22, 72:22, 92:21, 94:3, 97:6, 111:14, 172:16
x-ray [1] - 26:5
x-rays [1] - 23:9
Xarelto [1] - 20:5

**year** [44] - 10:12, 10:15, 16:8, 17:4, 18:14, 18:17, 18:18, 20:4, 30:16, 34:21, 42:17, 42:18, 42:22, 42:24, 43:1, 43:25, 44:1, 44:6, 82:12, 82:18, 95:5, 98:24, 103:2, 103:5, 103:21, 103:24, 104:3, 108:13, 108:24, 114:4, 122:20, 122:22, 125:9, 133:15, 134:12, 135:1, 140:21, 142:8, 145:25, 153:14, 153:18, 155:16, 158:12

**year-end** [1] - 125:9

**years** [21] - 3:20, 10:14, 10:15, 20:6, 29:16, 44:5, 51:12, 58:5, 89:13, 94:2, 97:15, 108:15, 108:16, 108:18, 108:19, 109:2, 110:9, 111:5, 114:2, 116:10, 121:1

**yeast** [1] - 24:11

**yellow** [5] - 24:3, 24:8, 24:10, 24:11, 169:6

**yeses** [1] - 102:22

**York** [2] - 174:14, 174:19

**young** [5] - 3:19, 5:2, 8:12, 8:19, 9:16

**younger** [3] - 4:24, 91:3, 111:8

**yourself** [3] - 20:11, 48:22

**Ziemkowski** [1] - 74:19

**ZUBA** [1] - 1:15

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                        -  -  -

 3   JESSICA RAMSAY,            :  CIVIL ACTION NO.
            Plaintiff,          :  2:19-cv-02002
 4                             :
      v.                        :
 5                             :
     NATIONAL BOARD OF MEDICAL  :  PRELIMINARY
 6   EXAMINERS,                 :  INJUNCTION HEARING
            Defendant.          :  DAY 2
 7   _____

 8
                               James A. Byrne U.S. Courthouse
 9                             601 Market Street
                               Philadelphia, PA 19106
10                             December 4, 2019
                               Commencing at 9:29 a.m.
11   _____

12          BEFORE THE HONORABLE J. CURTIS JOYNER

13   _____

14
     APPEARANCES:
15
            REISMAN CAROLLA GRAN & ZUBA, LLP
16          BY:  LAWRENCE D. BERGER, ESQUIRE
            19 Chestnut Street
17          Haddonfield, New Jersey 08033
            (856) 354-5640
18          larry@rcglawoffices.com
            Representing the Plaintiff
19

20

21                        -  -  -

22          Ann Marie Mitchell, CRR, RDR, RMR
                 Official Court Reporter
23                   (267) 299-7250

24
     Proceedings taken stenographically and prepared utilizing
25   computer-aided transcription
```

```
 1   APPEARANCES CONTINUED:

 2
          STEIN & VARGAS LLP
 3        BY:  MICHAEL STEVEN STEIN, ESQUIRE
          BY:  MARY C. VARGAS, ESQUIRE
 4        10 G Street NE
          Suite 600
 5        Washington, DC 20002
          (202) 248-5092
 6        michael.stein@steinvargas.com
          mary.vargas@steinvargas.com
 7        Representing the Plaintiff

 8

 9
          PERKINS COIE LLP
10        BY:  ROBERT A. BURGOYNE, ESQUIRE
          BY:  CAROLINE M. MEW, ESQUIRE
11        700 - 13th Street, NW
          Suite 600
12        Washington, DC 20005
          (202) 654-6200
13        rburgoyne@perkinscoie.com
          cmew@perkinscoie.com
14        Representing the Defendant

15

16                              -  -  -

17

18

19

20

21

22

23

24

25
```

```
 1                 (Court called to order at 9:29 a.m.)

 2           THE COURT:  Good morning.

 3           Are we ready to proceed?

 4           MS. VARGAS:  Yes, Your Honor.

 5           THE COURT:  Very well.  You may resume the stand, Ms.

 6   Ramsay.

 7           Oh, you're calling somebody out of order?

 8           MR. BURGOYNE:  Your Honor, he was going to defend a

 9   thesis today and his student notified him last night that she

10   is not coming, so we don't have to go out of order.

11           THE COURT:  I'm sorry to hear that from the student.

12           MR. BURGOYNE:  Yeah, it was a little -- not a good way

13   to start on your getting your thesis reviewed.

14           THE COURT:  No.  All right, Ms. Ramsay, then we can

15   proceed with the continuation of your testimony.

16           MS. VARGAS:  Your Honor, if I could just ask briefly

17   about scheduling.

18           There was some discussion at the end of the day

19   yesterday that we might not finish today and what that --

20           THE COURT:  If you don't finish today, then we'll

21   finish tomorrow.

22           MS. VARGAS:  Okay.  Thank you, Your Honor.

23           THE COURT:  I hope.

24           And, Ms. Ramsay, I'll remind you you're still under

25   oath from previously being sworn in yesterday.
```

1          Do you understand that, ma'am?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Very well.  We have the same situation

4    with the mics today.  I'm working without my clerk.  She has a

5    family matter this week, so I'm lonely.

6          MR. BURGOYNE:  Jessica, I'm going to start with

7    Exhibit 73, if you want to turn to that.

8          THE WITNESS:  Thank you.  I think it's on.

9          THE COURT:  Great.  There it is.  All right.  Let's

10   proceed.

11                        CROSS-EXAMINATION

12   BY MR. BURGOYNE:

13   Q.   All right.  Good morning, Jessica.  I just mentioned,

14   let's start with Exhibit 73, please.

15   A.   Okay.

16   Q.   And as you can see, this is an email from you to Dr.

17   Ruekberg, who we were -- an individual we were discussing

18   yesterday.  And he is your psychologist?

19   A.   Psychiatrist.

20   Q.   Treating psychiatrist?

21   A.   Yes.

22   Q.   Okay.  And he provided a letter in support of your second

23   request for accommodations on Step 1.  Correct?

24   A.   Yes.

25   Q.   Okay.  In this letter dated January 26, 2018, you tell

1   him:  Sorry for not getting this to you sooner, I was trying to

2   get at least a little bit in each section and get rid of a lot

3   of extra details to make the information clearer.

4       And then you attach a table --

5   A.   Yes.

6   Q.   -- to this document.  And we're going to look at several

7   exhibits today in which you have such tables.  And I'll note to

8   you these weren't produced to us by you in discovery, these

9   were produced to us by Dr. Ruekberg.

10  A.   Okay.

11  Q.   Okay?

12      What is the table that you were preparing and working on

13  in these various communications to Dr. Ruekberg, starting on

14  the second page?

15  A.   This table was something I used to help me write my

16  personal statement.  And he asked to see it, because I had a

17  hard time communicating everything he was asking about or

18  everything that the guidelines asked about.  And so he asked me

19  to put it -- or to send him the table that I had used.  But I

20  wasn't quite done with it, so it took me longer than expected

21  to get it to him.

22  Q.   Okay.  And this is seven or eight pages, but there's sort

23  of pictures included in the table?

24  A.   Yeah.

25  Q.   Where did you get this document that you were working

1  from?  I assume you didn't go in and paste these pictures of

2  clocks and things like that in here.

3  A.   Yeah, I did.

4  Q.   Okay.  So this is a document you created entirely?

5  A.   Yes.

6  Q.   And on the last page -- I'm sorry, these pages aren't

7  numbered, but it's the next to the last page in this document.

8  A.   Okay.

9  Q.   And you see on the first column, it just has, how will

10  each accommodation alleviate functional limitations.  And then

11  on the right, you've provided a statement regarding how much

12  extra time you thought you needed.

13      And what amount of extra time did you include in the chart

14  at that time?

15  A.   50 percent.

16          MR. BURGOYNE:  And the Bates number, Your Honor, for

17  that page is 2248.

18  BY MR. BURGOYNE:

19  Q.   And if you turn, Jessica, if you would, please, to

20  Exhibit 74, is this an email message that you sent Dr. Ruekberg

21  in February of 2018?

22  A.   Yes.

23  Q.   And you're forwarding another copy of the table that you

24  had prepared?

25  A.   It appears so.

1    Q.   And then in addition to the table, it looks like you've

2    gone in and now prepared comments in the right-hand margins for

3    him to review?

4    A.   Yes.

5    Q.   And then on the page that's the second page of this

6    document, I'm sorry, it's the page that says 231 at the bottom.

7    A.   Okay.

8    Q.   Your first comment, the last comment in that block, you

9    state:  To help with Step 2 CS requests later, it may also be

10   beneficial to mention at least how -- and I can't read it

11   because it's blue -- is even more of a struggle because I not

12   only have to translate my thoughts into words but I have to

13   read and reread what I've written using the process I've

14   described.

15   A.   Okay.

16   Q.   And that's -- were you attempting at this point to have

17   him include language that might help you get accommodations on

18   Step 2 CS?

19   A.   I don't think language was the issue, it was whether or

20   not to include the writing as part of the explanation with --

21   for what I struggle with, because I didn't know if reapplying

22   for Step 2 CS, if I would have the opportunity to include that

23   then, because I haven't been through this process that far

24   before.

25   Q.   And then if you look at the page that says 239 at the

1  bottom, Bates number.

2  A.   Okay.

3  Q.   All right.  And the last sentence in this page states:  I

4  think a separate testing room, 50 percent additional testing

5  time with additional break time over two days would best

6  equalize my access to the exam.

7  A.   Okay.

8  Q.   All right.  And those were words you wrote?

9  A.   At the time, yes.

10 Q.   And those were words you wrote in, what, 2018, February

11 2018?

12 A.   Yes.

13 Q.   And that was after you'd taken Step 1 the first time?

14 A.   Yes.

15 Q.   And out of those, at this point, you have a separate

16 testing room?

17 A.   Yes.

18 Q.   You have additional break time?

19 A.   Yes.

20 Q.   And you have testing over two days?

21 A.   Yes.

22 Q.   So the one thing you don't have is any additional time,

23 50 percent?

24 A.   Correct.

25 Q.   Look at the next page.  It's Exhibit 75, rather.

1  A.   Okay.

2  Q.   And do you recall that in connection with working with

3  Dr. Ruekberg in his preparation of a supporting letter, you and

4  your mother and your fiancé completed ADHD symptom checklists?

5  A.   Yes.

6  Q.   And would you confirm for me that Exhibit 75 contains the

7  symptom checklist that you provided and your mother provided

8  and your fiancé provided to Dr. Ruekberg?

9  A.   Yes.

10 Q.   And the first one, page -- Bates page 223, it says at the

11 top, Jerri mom.

12      Is that your handwriting?

13 A.   I can't really tell, but I think so.

14 Q.   Okay.  And it reappears on the next page.  I don't know if

15 that makes it easier to confirm that's your handwriting?

16 A.   I believe so.

17 Q.   Okay.  And so the first two pages reflect what your mom

18 was reporting regarding your ADHD symptoms?

19 A.   Yes.  I had to do this over the phone with her, so I had

20 to ask her -- I sent her the list.

21 Q.   Okay.  And it looks like there's a total of 18 symptoms

22 described in this chart?

23 A.   Yes.

24 Q.   And it looks like she indicated on here that you had all

25 18 symptoms and that the degree of severity for all of them was

1   severe; is that correct?

2   A.   It appears so, yes.

3   Q.   And then you also filled out a prompt or a symptom report

4   for Dr. Ruekberg.  Is that on the third page at 225?

5   A.   Yes.

6   Q.   And it looks like you likewise indicated that you have all

7   18 symptoms, and again indicated that they were -- assigned to

8   each of them the most severe rating possible?

9   A.   In the major categories, yes, but I also ranked each

10  individual prompt separately.

11  Q.   But relative to the 18 categories, you assigned maximum

12  severity to each one?

13  A.   Yes.

14  Q.   The last two pages starting on 227, are these the ratings

15  provided by your fiancé?

16  A.   Yes.

17  Q.   And his name is Neil?

18  A.   Correct.

19  Q.   And it looks like he's assigned sort of varying degrees of

20  symptoms.  Some he indicates, for example, can't organize, he

21  indicates you have no symptoms in that regard.  Others he

22  indicates you have moderate symptoms.  And then some he

23  indicates you have severe symptoms; is that correct?

24  A.   Yes.

25  Q.   Look at Exhibit 76 for me.

1  A.   Okay.

2  Q.   And would you just confirm this is another chart that you

3  prepared, an updated chart that you sent Dr. Ruekberg in March

4  2018?

5  A.   It appears so.

6  Q.   And it looks like on the page 219, as of March 2018,

7  you're still indicating that you need 50 percent additional

8  time?

9  A.   Where is that?

10 Q.   Requested accommodations on page 219.

11 A.   Can you point or tell me where again, please?

12 Q.   Sure.

13 A.   On the table that you're referring to?

14 Q.   Do you see on the left-hand side, the first column, it

15 says requested accommodations, middle of the page?

16 A.   Okay.  Yeah.  It says 50 percent.

17 Q.   Okay.  So at that time, as of March, you still thought

18 50 percent --

19 A.   I don't know if I thought that.  I think I was asking for

20 advice on whether -- if I decreased the amount of time I was

21 requesting, if it would be more likely to be approved.  And so

22 I had been talking to people to see if they had any experience

23 with that.  So at that time, I was considering it.

24 Q.   The last page of this document, you say the same thing:  I

25 think the separate testing room, 50 percent additional testing

1  time, additional break time over two days would equalize my

2  access to the exam.

3  A.   It appears unchanged from the one in February, so yes.

4  Q.   Exhibit 77.  Is this an email from you to Dr. Ruekberg in

5  March of 2018?

6  A.   Yes.

7  Q.   In the second line you say:  To make it easier for you and

8  the school to support my request for accommodations, I worked

9  really hard to condense my reasoning down to the bare minimum.

10  I've attached the document to this email and also sent one to

11  the school so they would be working from the same information.

12       And then is the document that follows that, you've now got

13  a two-page document.  Is that a document you prepared and sent

14  to Dr. Ruekberg?

15  A.   I believe so.

16  Q.   And again, you've indicated 50 percent additional testing

17  time over two days.  Page 207.

18  A.   Where in the...

19  Q.   The paragraph begins, "Simplified versions of the main

20  things I want to say to support each accommodation I am

21  requesting."

22  A.   Oh, okay.  Yes.

23  Q.   And the working diagnoses you identified to him at this

24  time in support of the accommodations you wanted were ADHD,

25  combined presentation, and then learning disability nonverbal

1  with impairment in reading with impairment in written

2  expression.  And you say over on the right:  I'm still not sure

3  which to use for now.  I've included the one Dr. Lewandowski

4  gave as well as the ones we've talked about.

5  A.   Where was that?

6  Q.   Your comment on the right.

7  A.   On the same page?

8  Q.   Same page.  You didn't mention migraines at this time?

9  A.   Not apparently in this document, but I haven't read the

10  whole thing.

11      What was your first question about that, about the

12  comment?

13  Q.   Yeah.  That's a comment you wrote in there saying you were

14  still not sure which learning disability to identify in support

15  of your accommodation?

16  A.   Yes.  I wasn't sure if the learning disability that Dr.

17  Lewandowski had diagnosed was encompassed by the one that -- or

18  the couple that Dr. Ruekberg had diagnosed clinically.

19  Q.   And again, we established yesterday, Dr. Ruekberg didn't

20  perform any diagnostic evaluation of you, he didn't administer

21  the type of assessments Dr. Smith did?

22  A.   No.  But I didn't know that that made a difference at that

23  point.

24  Q.   The next exhibit is Exhibit 78.  We're now into April

25  2018.

1      Is this another email from you to Dr. Ruekberg?

2   A.   Yes.

3   Q.   All right.  And you say in this email:  Sending the

4   document to you so you have it to make changes if needed during

5   the appointment.  Sorry I'm not completely done with it.  I

6   tried.

7   A.   Okay.

8   Q.   All right.  And then the document that follows goes from

9   page 194 to 202 -- or 1, basically.

10      And is this your revised version of Dr. Ruekberg's initial

11   letter?

12   A.   I don't know if it's technically my revised version.  I

13   think I had help with that from other people.

14   Q.   Which other people did you have help with on that?

15          MS. VARGAS:  Objection, attorney-client privilege and

16   work product.

17   BY MR. BURGOYNE:

18   Q.   Putting aside your lawyers, who else helped you?

19          THE COURT:  He's withdrawn the question.

20   BY MR. BURGOYNE:

21   Q.   Putting aside your lawyers --

22          THE COURT:  He's rephrased question.  All right?

23          MS. VARGAS:  Thank you.

24          THE COURT:  All right.

25          THE WITNESS:  Maybe my mom helped me with editing and

1   stuff.

2   BY MR. BURGOYNE:

3   Q.   And then the document that follows, there's comments over

4   in the right and highlighting.

5        Are those comments and highlighting that you provided?

6   A.   I don't know if all of them are all from me.

7   Q.   Well, they said Comment JR.

8   A.   I may have been communicating some.

9   Q.   You typed them in, in all events; is that correct?  Is

10  this a document you prepared and then sent to Dr. Ruekberg,

11  since it has your initials in the comments?

12  A.   He wrote the letter.  I had typed the comments.

13  Q.   Okay.  And the comments go -- like you have 38 comment

14  boxes that you provided to him.  I take it, in order to provide

15  those comments, you were closely reading this letter?

16  A.   I had the Kurzweil to help with that.

17  Q.   And it looks like some of your comments on page 198?

18  A.   Okay.

19  Q.   You'll recall at the top there was a paragraph I asked you

20  about yesterday that was in his initial draft, stating:  Even

21  if the board does not find Jessica meets criteria for

22  accommodations for ADHD, in my professional opinion, the board

23  should approve Jessica for accommodations for reading and

24  writing learning disabilities.

25  A.   Okay.

1  Q.   Do you remember our discussion in that paragraph

2  yesterday?

3  A.   Yes.

4  Q.   And then I asked whether you had suggested that that be

5  deleted or changed.

6  A.   Okay.

7  Q.   Okay.  And you see on one of your comments here you tell

8  him that you would rephrase that paragraph; is that correct?

9  A.   Yes.

10  Q.   And then your next comment is:  May be smart to say

11  something along the lines of, quote, In all future exams of a

12  similar nature to help the process moving forward.

13  A.   Yes.

14  Q.   And then there's -- a sentence has been inserted

15  addressing informal accommodations, stating:  She has

16  received -- she received informal accommodations starting in

17  the second grade, including a secluded testing area and extra

18  time to work on assignments.  Throughout elementary, middle and

19  high school, there were multiple instances where working with

20  her teachers and sometimes needing to involve her mother,

21  Jessica received informal accommodations.

22       And do you see over on the right you say:  I added this

23  sentence, but you can change it?

24  A.   Which comment?

25  Q.   21.

1  A.    Okay.

2  Q.    And do you recall making that suggestion to Dr. Ruekberg

3  for an addition?

4  A.    I don't recall doing it specifically, but it says here.

5  Q.    Then on page 2200 at the top, it looks like you were

6  correcting spelling and grammar errors, one of your comments?

7  A.    Again, my mom helped me with editing.

8  Q.    Exhibit 79.

9  A.    Okay.

10 Q.    And you said, this is April 20:  Dear Dr. Ruekberg, Here

11 is the final draft of the letter.  Sorry it is so long.  I had

12 to add a lot to support each of the points in the NBME

13 guidelines.

14       And then what follows is a nine-page, small-font document.

15       Is that the document you sent him in April 2018?

16 A.    I'm sorry, because it's not dated, but I would assume so

17 if it was attached.

18 Q.    And if we go to Exhibit 64, page 42 -- I'm sorry, page 27,

19 Jessica.

20       THE COURT:  Three strikes, you're out, Counsel.

21       MR. BURGOYNE:  Pardon me?

22       THE COURT:  Is that your phone ringing?

23       MR. BURGOYNE:  Well, I actually was wondering that,

24 Your Honor.

25       I apologize, Your Honor.

 1  BY MR. BURGOYNE:

 2  Q.   Page 27.

 3  A.   Okay.

 4  Q.   Okay.  And I think we established yesterday, this was an

 5  early draft from Dr. Ruekberg of his letter; is that correct?

 6  A.   Yes.  I believe this is the one that I said was his early

 7  thoughts in the draft, yeah.

 8  Q.   And now if we go to 79, that two-and-a-half page letter

 9  has become the nine-page letter that was eventually sent to

10  NBME?

11  A.   I'm sorry, Exhibit 79?

12  Q.   Yes.

13  A.   Okay.

14  Q.   Is that correct?

15  A.   Your question was, the attachment is nine pages?

16  Q.   Yeah.  That's what, at least at that time, was the final

17  version of the letter?

18  A.   At that time, yes.

19  Q.   Okay.  Then if you go to Exhibit 80, we're now into May

20  2018.  And you're forwarding suggestions for Dr. Ruekberg's

21  letter?

22         MS. VARGAS:  Your Honor, this exhibit includes

23  attorney-client privilege and attorney work product.  It's

24  actually documented that way on the exhibit and was disclosed

25  inappropriately.  And so to the extent you would be seeking to

1  put before the Court privileged material, we would object.

2       MR. BURGOYNE:  Your Honor, this is the letter that was

3  produced to us in discovery by Dr. Ruekberg.  They were aware

4  of it.  It's been in our exhibit book.

5       THE COURT:  Your objection at this time is overruled.

6       I'm going to allow questions on it.  This is not a

7  proceeding where a jury is sitting.  I can remove the

8  considerations that are attorney-client from any considerations

9  that I may have in reference to the preliminary injunction or

10 the permanent injunction.

11      MS. VARGAS:  Thank you, Your Honor.

12      THE COURT:  So it's overruled at this time.  All

13 right?

14      MR. BURGOYNE:  Thank you.

15      THE WITNESS:  What was your question again?

16 BY MR. BURGOYNE:

17 Q.   The question was, at this point in this email from May

18 2018, are you forwarding suggested changes to Dr. Ruekberg's

19 letter from your attorney?

20 A.   I think so.

21 Q.   It looks like at the bottom there were also comments

22 provided on your draft letter from a Dr. Sorrentino.

23      Who is Dr. Sorrentino?

24      MS. VARGAS:  Your Honor, he's asking work product and

25 attorney-client privilege.  I recognize what you've said, but

1  he's now asking directly about communication from the attorney

2  in the court record.

3        THE COURT:  I'm going to sustain the objection to this

4  question.

5        MR. BURGOYNE:  And I'll just note, Your Honor, this

6  isn't -- presumably it's not attorney-client privilege because

7  it was sent to Dr. Ruekberg and any privilege would have been

8  waived.  It might be work product, but it was prepared in

9  connection with a request for reconsideration, not in

10 connection with this lawsuit, so I'm not sure there's a valid

11 work product.  Notwithstanding that, I'll accept your ruling

12 and move on.

13       THE COURT:  I find it to be a work product.  And I

14 sustain the objection, so move on.

15 BY MR. BURGOYNE:

16 Q.  Exhibit 81.  Actually, you don't even have to worry about

17 Exhibit 81.

18       MR. BURGOYNE:  I apologize, Judge.

19       THE WITNESS:  Okay.

20 BY MR. BURGOYNE:

21 Q.  We're now up to Exhibit 82.  And this looks like what is

22 in fact the final draft of the letter.

23       THE COURT:  And again, this is work product?

24       MS. VARGAS:  Yes, it is, Your Honor.  It's directly

25 discussing communication with the attorney.

1        THE COURT:  Very well.  It's sustained.

2        Next.

3   BY MR. BURGOYNE:

4   Q.   Exhibit 85.  We've now gotten to the point, it's September

5   22, 2018.  You submitted your second request for accommodations

6   in June, and that request was denied.  And you're now working

7   with your attorney on a request for reconsideration at this

8   time.  Is that accurate?

9   A.   Okay.

10  Q.   Is that timing accurate?

11  A.   In June we're working on it, is that what you said?

12  Q.   No.  In June you had submitted your second request.

13  A.   Yes.

14  Q.   It was subsequently granted in part and denied in part.

15       And at this point, September, you're working with your

16  attorney on a request for reconsideration; is that correct?

17  A.   Yes.

18  Q.   Okay.  And is this a letter -- an email from you to

19  Dr. Ruekberg?

20  A.   Yes.

21  Q.   And it looks like in the third bullet point you're

22  reporting that you had had a preliminary telephone conversation

23  with Dr. Smith and that he is someone you identified --

24  A.   For the third -- like left side bullet?

25  Q.   They're dark bullet points, yes.

1   A.   Sorry, what was your question again?

2   Q.   First of all, did you identify Dr. Smith by doing an

3   internet search?

4   A.   I did originally, yes.

5   Q.   Okay.  And then the bottom of this, you say:  Separately,

6   my lawyer also received a recommendation for Dr. Smith for a

7   colleague who has worked with medical students applying for

8   accommodations from the NBME.

9        MS. VARGAS:  Your Honor, work product.

10       THE COURT:  Overruled.

11  BY MR. BURGOYNE:

12  Q.   And then first indented bullet point, it looks like you're

13  saying:  Here are some highlights from our conversation that

14  might interest you.

15       And that's referring to your telephone -- was that a

16  telephone conversation you had with Dr. Smith initially?

17  A.   I believe it was.

18  Q.   And then that first bullet point, you say:  He stated that

19  the testing Dr. Lewandowski performed is used to show deficits

20  incurred from trauma, CVA or brain tumors and is generally not

21  helpful in showing ADHD and not at all appropriate for

22  evaluating possible learning disorders and that he should have

23  done appropriate testing.

24       Is that information that you received from Dr. Smith?

25  A.   It may not be a direct quote, but it's the impression that

1    I received.

2    Q.    And you met in person with Dr. Lewandowski on two

3    occasions?

4    A.    I believe so, yes.

5    Q.    All right.  And the first time was I think maybe a one- to

6    two-hour evaluation, just discussion and interview?

7    A.    I don't know if it was two hours, but I know that it was

8    longer than like -- I know it was longer than half an hour.  I

9    don't know exactly how long it was.

10   Q.    Longer than you spent with Dr. Smiy?

11   A.    Yes.

12   Q.    And then you came back a second time to see him, and he

13   performed a series of assessments?

14   A.    His technician did.

15   Q.    Okay.  And he's a licensed neuropsychologist?

16   A.    I believe so.

17   Q.    And at this point you had already sent -- Dr. Ruekberg's

18   letter had already been sent to the NBME.  For the record, the

19   final version of that letter was included in PX-2 at page 37.

20   But you attached to this document another edited document with

21   redlines and comments.

22         What were you contemplating that Dr. Ruekberg was going to

23   do in September 2018?  Why did you send him this information?

24   A.    To the best of my recollection, I think this was when we

25   were considering having him write a follow-up letter to address

1  the points that the denial letter had said -- had said, but

2  since they didn't really acknowledge anything from

3  Dr. Ruekberg, we decided against it.

4  Q.   On page 152, comment 9, looks like you're discussing the

5  severity of certain symptoms you experienced there on the

6  bottom where the draft letter was?

7  A.   Okay.

8  Q.   And you state:  We can support moderate with the fact that

9  I have to have Neil, other people, read for me at home, outside

10  of school, and I require accommodations for reading and writing

11  at school.  We could even support severe because I can neither

12  read nor write efficiently at home, school or work.

13  A.   Okay.

14  Q.   What were you communicating -- why were you making those

15  comments to Dr. Ruekberg at that time?

16  A.   I don't remember at this time.  I'm assuming it had to do

17  with whatever conversations we were having at the time.

18  Q.   You also submitted a letter from a Dr. Houtman?

19  A.   Yes.

20  Q.   And that letter is included in the record at PX-2, page

21  45.

22       Did you and your lawyer also work with Dr. Houtman in

23  crafting her letter?

24  A.   Not crafting it, no.

25  Q.   Preparing it, drafting it?

1  A.   She sent us the letter almost written, and we asked her

2  to -- or, well, actually, she had forgotten a section, and we

3  asked her to put that back in.  And she had already, like, said

4  she had forgotten, so she added that section too.  And then I

5  think we may have helped with editing at the end.

6  Q.   Okay.  Look at Exhibit 65, please.  And confirm for me, if

7  you will, that these are a series of emails and attachments

8  that were on your computer and you forwarded to or you provided

9  to us in discovery?

10 A.   You said 65?

11 Q.   65, yeah.  Starting with Ramsay 0003.

12 A.   Okay.

13      Okay.

14 Q.   And is this a document you sent to Dr. Houtman in May 2018

15 with a description of the symptoms that you -- and impairments

16 that you thought supported accommodation?

17 A.   I believe it was the same list we looked at earlier.

18 Q.   Reminds me, you said a moment -- in one of your emails,

19 you said, I have simplified everything that I've put together,

20 Dr. Ruekberg, and I'm getting this to you and to the school so

21 that everybody has the same information, words to that effect.

22      Who was it you were sending that simplified version of

23 your background to when you referred to the school?

24 A.   My best guess would have been that it was to Erin Dafoe.

25 Q.   Erin Dafoe is the individual who drafted the letter that

 1  eventually went out over Mr. Overton's or Dean Overton's

 2  signature?

 3  A.   I believe so.

 4  Q.   Look at page -- the page that says 8 at the bottom.

 5  A.   Okay.

 6  Q.   All right.  And I'll explain to you that, as I understand

 7  the manner in which these documents were produced to us, the

 8  attachments came first and then the email that was forwarding

 9  the attachments.

10       So if you look at page 8, this is an email from Dr.

11  Houtman to you saying:  Here is my first attempt.  Let me know

12  what needs changing and I'll get it on letterhead.

13       Is that an email you received from Dr. Houtman?

14  A.   It appears so.

15  Q.   And then if you go back to pages 6 and 7, is this her

16  initial draft that you referenced a minute ago?

17  A.   If that was the one attached to the email, then yes.

18  Q.   It looks like she sent this to you on June 3, 2018 at

19  almost 6:00; is that right?

20  A.   It looks like it.

21  Q.   If you then go to page 17, which is the same date, her

22  letter came to you about 6:00, and it looks at 9:17 p.m. you've

23  sent back the redlined document that is found at pages 14

24  through 16.

25  A.   I'm sorry, can you say that again?

1  Q.   Sure.  On page 17, is this an email, in the middle of the

2  page, that you sent to Dr. Houtman?

3  A.   Yes.

4  Q.   All right.  It's dated June 3rd, 9:17 p.m.?

5  A.   Okay.

6  Q.   And it's got a paragraph here where you say:  Thanks so

7  much for writing the letter!  There's then a redacted sentence,

8  presumably on work product grounds.  And then you explain to

9  her the changes you've made to the letter.

10     And then if you look at the three pages preceding that

11  email, are those changes that you forwarded to her on that

12  date?

13  A.   I don't know if they're all changes or just areas that I

14  highlighted with changes, but...

15  Q.   In all events, they're comments you made after reviewing

16  her letter and reading that letter?

17  A.   I don't know if they were my comments.  I typed them, like

18  you stated before.

19  Q.   Okay.  And if they weren't your comments, whose comments

20  would they be?

21  A.   My lawyer's.

22  Q.   And the final letter we mentioned was the letter from Dean

23  Overton.

24          MR. BURGOYNE:  Which is PX-2, Your Honor, at page 50.

25  BY MR. BURGOYNE:

1  Q.   And if you look at Exhibit 63.

2  A.   Okay.

3  Q.   And at the bottom of the page, is this an email from you

4  to Erin Dafoe on April 11, 2018?

5  A.   Yes.

6  Q.   And you say:  I lied.  I read it and I am so impressed you

7  were able to organize the mess of thoughts and words I gave you

8  into something so well put together.  I only have a few

9  corrections/editing requests.

10 A.   Okay.

11 Q.   So did you prepare the initial draft of the letter for Ms.

12 Dafoe, or did she prepare an initial draft using information

13 you gave her?

14 A.   She prepared the letter, the initial draft.

15 Q.   When that request was denied in June, as you said, you

16 went to see Dr. Smith.  Correct?

17 A.   Denied in June?

18 Q.   You submitted it in June, and it was subsequently denied.

19 A.   In September, I think, yes.

20 Q.   To make sure we have that in the record, would you look at

21 DX-4, Tab M, and just confirm that this is the letter you

22 received from NBME granting certain accommodations but denying

23 extended time.  And specifically the accommodations you were

24 approved for are on page 3 of the letter.

25 A.   This is the letter, yeah.

1  Q.   So just in terms of time, it's September 11, 2018 was when

2  you learned the decision from NBME?

3  A.   That one, yes.

4  Q.   And then very soon thereafter, you went to see Dr. Smith.

5  Correct?  I believe you saw him on September 25th for an

6  evaluation?

7  A.   That sounds right.

8  Q.   And you went to see him specifically to get an evaluation

9  report that would support your request for extended testing

10  time?

11  A.   No.  I went there specifically for testing that measured

12  reading speed, because the letter had said something about not

13  having objective measurements of my reading speed.  And since I

14  went to Lewandowski for the same thing but he didn't do those

15  tests, I looked for someone who could do those tests.

16  Q.   Okay.  But you wanted that testing in order to support

17  your request for extended testing time on Step 1?

18  A.   Since I hadn't -- since I was told basically I didn't have

19  enough documentation to support it, yes.

20  Q.   And then you and your attorney worked with Dr. Smith on

21  his letter; is that correct?

22  A.   I don't know necessarily if I did, but I know that we

23  communicated about making sure all the facts were correct.

24  Q.   And Dr. Smith in fact sent drafts of his report to both

25  you and your counsel for review?

1      MS. VARGAS:  Objection, Your Honor, work product.

2      THE COURT:  Yes.

3      MS. VARGAS:  Dr. Smith is an expert witness we'll be

4  calling to the stand next.

5      THE COURT:  And you'll be able to cross-examine.  Very

6  well.

7  BY MR. BURGOYNE:

8  Q.  Exhibit 48, 49 and 50, would you just confirm for us that

9  these are all emails either to or from you and Dr. Smith?

10  A.  I'm sorry, was that -- what numbers?

11  Q.  I'm sorry, Jessica.  48, 49 and 50.

12  A.  Thank you.

13  Q.  So we can start with 48.

14      And then pages 40 -- the first two pages, it says 45 and

15  46 in the Bates numbers.

16  A.  Okay.

17  Q.  Is that information you sent to Dr. Smith for his

18  consideration to be included in his report?

19  A.  I believe so.

20  Q.  And then 49, Exhibit 49, is this an email from Dr. Smith

21  to you and Lawrence Berger forwarding a draft of the report?

22  A.  Yes.

23      MS. VARGAS:  Objection, work product.

24      THE COURT:  Again, it's work product, Counsel.

25  BY MR. BURGOYNE:

1  Q.   Exhibit 50.  Can you just confirm these are email

2  exchanges between you and Dr. Smith?

3  A.   Yes.

4  Q.   Turn to Exhibit 57, if you would.

5       Would you confirm that this is a secondary application

6  that you prepared for the University of Wisconsin's medical

7  school?

8  A.   I don't know if it was the final one, but possibly.  But

9  it was for the University of Wisconsin.

10 Q.   And did you end up applying to medical school in

11 Wisconsin?

12 A.   Which year?

13 Q.   Any year.

14 A.   I think so.

15 Q.   And then if you look at page -- the page it says at the

16 bottom, Ramsay 47.

17      And is this a discussion of your employers and activities?

18 A.   That's the title of the table, yes.

19 Q.   It looks like you have a description of your lifeguarding

20 job.  As a guard, I have to react quickly and intelligently in

21 emergency situations, provide necessary care.  And you were

22 also providing swim instructions over a four-year period, it

23 looks like.

24      And this is after high school, 2008 to 2012?

25 A.   Yes, yes.

1  Q.   And then it looks -- if you turn the page, it looks like

2  when you were at Ohio State, for the first description here,

3  you were teaching a chemistry lab at school?

4  A.   Yes.

5  Q.   And you were tutoring students in both general and organic

6  chemistry?

7  A.   Yes.

8  Q.   And you were guiding students in proper lab procedures?

9  A.   Yes.

10 Q.   And grading lab reports, assignments and quizzes and

11 exams?

12 A.   Yes.

13 Q.   And the next one, it looks like you have a different

14 title, you're now an instructor's assistant and head teaching

15 assistant?

16 A.   It was the same job, it just had different names.

17 Q.   Okay.  And this is post-graduation, it looks like?

18 A.   Yes.

19 Q.   And you were working full time in this position?

20 A.   They included the grading hours I believe in that, so yes.

21 Q.   On the left side you indicate 40 hours per week?

22 A.   Yeah.  That was within the job description.

23 Q.   Okay.  And it looks like you had this job not quite a

24 year?

25 A.   Yeah, yes.

1  Q.   And you were, in this position, it says you were teaching

2  three lab sections.

3       How many students were in each lab section?

4  A.   No more than 20.

5  Q.   So you were teaching three sections.  You were also head

6  TA for one section each week and that you managed six sections.

7       Did that mean you supervised sections that were under the

8  responsibility of other teaching assistants?

9  A.   Yes.  But mostly I was supposed to be in the chemistry

10 supply window so that if anything went wrong for those labs,

11 then I could be there to help out or answer questions for

12 students who came by.

13 Q.   Look at DX-4, Tab L.  We discussed a little bit your time

14 with Dr. Lewandowski.

15 A.   Okay.

16 Q.   And in this document, it's probably easiest to look at --

17 there's no page in numbers or Bates numbers.  So look at the

18 top of the page and go to the page that says page 79 of 106.

19 A.   Okay.

20 Q.   And this is page 5 of the document.

21      And this is a letter from Dr. Lewandowski on a

22 consultation dated October 25, 2017.

23 A.   Okay.

24 Q.   And you see in the last paragraph there, he says:  I spent

25 approximately 120 minutes with a patient today in individual

1  examination consulting with her mother, providing a detailed

2  neurobehavioral cognitive status examination and preparing this

3  consultation.

4  A.  Okay.

5  Q.  Does that refresh your recollection regarding the amount

6  of time you spent with him?  Easier way to say it, you don't

7  have any reason to disagree with his summary of how long he

8  spent with you?

9  A.  I don't know if that's the time he spent with me, but it

10  could have been between me and his note.

11  Q.  Okay.  On page 2 of this document, there is a discussion

12  of some of the background information he obtained from you at

13  the time.

14  A.  Okay.

15  Q.  Do you see that, social history?

16  A.  Sorry.

17  Q.  And in your social history, there's a section called

18  avocational.  And this is on page 76 of 106.

19       Do you see that?

20  A.  Can you say where on the page?

21  Q.  It's right above medical.

22  A.  Okay.

23  Q.  All right.  And do you recall discussing with Dr.

24  Lewandowski your interests?

25  A.  Somewhat.  He kind of didn't really let me talk a lot, but

1  he would say, do you like this, do you like this.  And then if

2  he hit something that I said yes to, then he would ask more

3  details about that, but quickly.  So I do remember somewhat

4  those things.

5  Q.  And he lists -- you reported to him that your interests

6  include sports, art, painting acrylics, drawing, ceramics,

7  camping, reading, paper making.

8      Are those all interests that you communicated to him

9  during your evaluation?

10  A.  No.  I would have never said reading.  I think in fact I

11  said that I hated reading.  But I like being read to is

12  probably something I would have said.

13  Q.  Let me ask you to flip to your deposition.

14          THE COURT:  Page and line?

15          MR. BURGOYNE:  Page 232.

16          MR. BERGER:  Give us a moment, please.

17          THE COURT:  One moment.  Let him get to that before

18  you ask your question.  That's the proper procedure before you

19  ask the question, Counsel.

20          MR. BURGOYNE:  Okay.  And, Larry, it's line 2, page

21  232.

22          THE WITNESS:  Okay.

23  BY MR. BURGOYNE:

24  Q.  In looking at line 2 from your deposition, my question

25  was:  On page 2, there's a list of your avocational interests.

1     You said:  Where you highlighted.  Okay.

2     And I go on and say:  And then avocational.  Sports, art,

3  painting, acrylics, drawing, ceramics, camping, reading, paper

4  making.

5     And I then asked you:  Is that all information you

6  provided to him?

7     And what was your answer at that point?

8  A.   Can you tell me what line the --

9  Q.   Line 12.  It's the answer immediately after the question I

10  put to you.

11  A.   Okay.  It says:  He asked me what my interests were, so I

12  would assume so because that's all stuff I like to do.

13  Q.   I'll take that back from you.

14     Exhibit 52.  This is a copy of your CV; is that correct?

15  A.   It's a working copy.

16  Q.   And then on page 2, there's a list of publications and

17  presentations.  Correct?

18  A.   Okay.  Yes.

19  Q.   And it looks like you've been a co-author on four

20  publications?

21  A.   That's correct.

22  Q.   And are those all peer-reviewed, do you know?

23  A.   I'm not sure.

24  Q.   And then let's just look at a couple of them.

25     Exhibit 53.

1  A.   Okay.

2  Q.   And it's a research article from 2015 entitled "Genetic

3  Influences on Nicotinic A5 Receptor," and the title continues

4  on.

5       And on this particular article, you are the lead author in

6  terms of which author is listed first.

7       What is the significance of being the lead author on a

8  publication?

9  A.   Generally -- it can vary, but generally it's the person

10 who put in the most work or had the idea for the research,

11 whether the most work was the paper itself or the research,

12 like the experiments that went into it.

13 Q.   And then Exhibit 54, is this a second article that you

14 were the lead author on, it's titled "Organic Acid Disorders"?

15 A.   Yes.

16 Q.   And it looks like this was from 2018?

17 A.   Yes.

18 Q.   You scored on the Step 1 exam a 191.  Correct?

19 A.   Yes.

20 Q.   And then your attorney asked you, if you had gotten a

21 passing score of 192, would that have been representative of

22 your knowledge and abilities.  And I believe you answered no?

23 A.   When was this?

24 Q.   Yesterday.

25 A.   I believe that's correct.

1  Q.   Okay.  Would a 195 have been representative of your

2  knowledge and abilities?

3  A.   It's impossible to tell, because I wasn't able to read all

4  of the -- each question.

5  Q.   Well, if you received a 195, would you think that was a

6  reasonable representation of your abilities?

7  A.   It's impossible to know.  I would have to read all of the

8  questions and answer them to know what my score would be.  That

9  would be representative.

10  Q.   Okay.  Because you were able to answer at 192, because you

11  can't answer at 195?

12  A.   The score isn't -- my ability to read isn't based on the

13  score.  The score is based on my ability to read.

14  Q.   Look at Exhibit 66 for me.

15       Yesterday you testified a few times during your direct

16  about exams that you took in medical school and you referred to

17  them as NBME exams.

18  A.   Okay.

19  Q.   Those are subject matter exams or shelf exams that NBME

20  prepares but that schools can use; is that correct?

21  A.   Some of them are.

22  Q.   And any decision regarding accommodations on those exams,

23  those are made by your school, not NBME.  Correct?

24  A.   I'm not sure about that.

25  Q.   Do you have any reason to think that NBME was involved in

1  deciding whether you got accommodations on your subject matter

2  exams?

3  A.   Yes.

4  Q.   What's your basis for that?

5  A.   Because my school told me that when they contacted NBME

6  to like request and provide the accommodations, that when I

7  initially requested that they be on paper, the test be provided

8  on paper like I was receiving at school, the NBME had told my

9  school that they can't do that and -- because they only provide

10  the test on the computer.  And so that is what happened.  I

11  still had to take the test on a computer.

12  Q.   Okay.  So other than whether or not there was a paper

13  version of these tests, was NBME involved at all in deciding

14  whether or not you could get accommodations when you took those

15  exams at your medical school?

16  A.   I don't know.  That's just what my school told me.  So as

17  far as I knew, they had been asking NBME.

18  Q.   Okay.  And you weren't involved in any of those

19  discussions?  Those were discussions that your school said they

20  had with NBME?

21  A.   I believe so, yes.

22  Q.   Okay.  Let's look at Exhibit 66.

23  A.   Okay.

24  Q.   And this is a document captioned Customized Examination

25  Performance Profile.  Examination name:  NBME CAS 1.

 1  A.   Okay.

 2  Q.   What is this document?  What subjects were you being

 3  evaluated for under this exam, do you recall?

 4  A.   I know this was one of the first exams that we had in -- I

 5  believe it was after our first term in our first year.  And we

 6  would have only had our first few classes, so I believe that

 7  the topics selected were to be representative -- or not

 8  representative, to be only from those subjects that we had --

 9  courses we had taken.

10  Q.   Okay.  Let's look at the next page then, which is 27,

11  Ramsay 27.

12  A.   Okay.

13  Q.   And this is a customized examination performance profile

14  for an exam that you took, it looks like it says organic,

15  maybe, I'm not sure, but you took this exam in 2015, June.

16  That was your second year of medical school?

17  A.   Nope.

18  Q.   When was that?

19  A.   That would have been the end of my first year.

20  Q.   End of your first year.  And did you take this examination

21  with accommodations?

22  A.   I believe so.

23  Q.   And that would have included double testing time?

24  A.   I believe so, yeah.

25  Q.   The second page, does this reflect your performance on the

1    exam?

2    A.    At that time, I believe it would.

3    Q.    Okay.  And so with accommodations, you got 66 percent of

4    the questions correct it looks like.

5          And does this indicate that you were below average

6    performance in several areas, for example, cardiovascular?

7    A.    In a couple of them, yes.

8    Q.    Physiology, yes, it looks like you didn't do as well?

9    A.    Yes.

10   Q.    Look, please, at NBME -- or Defendant's Exhibit 67, which

11   is a document captioned NBME Comprehensive Basic Science

12   Self-Assessment.

13   A.    Okay.

14   Q.    And it looks like this was a test you took in 2016.

15         This was also your first year?

16   A.    2016 would have been my second year.

17   Q.    Your second year.  Okay.

18         All right.  And is this an assessment you took with

19   extended testing time?

20   A.    I believe so.

21   Q.    Okay.  And likewise, with whatever other accommodations

22   your school provided, including a private testing room?

23   A.    Yes.

24   Q.    And this was an exam you took on computer?

25   A.    Yes.

1  Q.   And do you see it's broken down, performance profile,

2  lower performance, borderline performance and then higher

3  performance?

4  A.   Yes.

5  Q.   And would you agree that in several areas your performance

6  was below borderline?

7  A.   Yes.

8  Q.   And whatever reason that was, it didn't have to do with

9  how much testing time you were provided on that testing?

10  A.   No.  At that time, I don't believe so.  That was right

11  after I had my DVT and had to make up my neuro course.

12  Q.   If you look over on the page that says Ramsay 33 --

13  A.   I'm sorry, you said Ramsay 33?

14  Q.   Yeah.

15  A.   Okay.

16  Q.   And on this particular test, you achieved a score of 310

17  with accommodations.

18       And do you see on this page there's a sort of rough

19  forecasting of, if you achieve a particular score on this exam,

20  here's the approximate Step 1 exam?

21  A.   Okay.

22  Q.   And what was the approximate Step 1 exam you would have

23  achieved with a 310 on this?

24  A.   It says 188 as approximate.

25  Q.   That's slightly below what you actually achieved with no

1  accommodations when you took Step 1?

2  A.   At this time, yes.

3  Q.   How many times did you take that test?  Once or more than

4  once?

5  A.   Which test?

6  Q.   The one we just looked at, the comprehensive.

7  A.   I don't know because I don't know what version that was.

8  And the one we just looked at was a self-assessment.

9  Q.   Okay.  In this same assessment, it looks like you took it

10 again, if you look at page 57.  And it looks like the test date

11 of this document is captioned NBME Comprehensive Basic Science

12 Self-Assessment Performance Profile.  And the test date is June

13 2017.

14 A.   Okay.

15 Q.   And you took it a second time and you got the identical

16 score, it looks like, 310?

17 A.   It looks like it.  And this is a CB -- okay.  Okay.  Yes.

18 Q.   And again, an exam you took with all the accommodations

19 that the school provided?

20 A.   No.

21 Q.   This one you did not have accommodations on?

22 A.   I didn't -- not use the time because I had already been

23 denied accommodations, and so I was trying to simulate what

24 would happen if I had standard time, but I still used the room

25 and -- I think just the room.

1  Q.  So you had a private testing room with no extended time?

2  A.  Yes.

3  Q.  Did the test with no extended time?

4  A.  I didn't test with extended time.

5  Q.  And your score at this point was the same, but you had

6  slightly different testing in that situation?

7  A.  Right.  And it was also after third year and it was the

8  day after my surgery rotation ended, so didn't have time to

9  study for it.

10 Q.  Look at Exhibit 68.  Is this a subject matter exam that

11 you took as part of your surgery course at school or rotation?

12 A.  Yes.

13 Q.  And this is dated April of 2017 on the second page where

14 it says 174?

15 A.  Okay.

16 Q.  It looks like you got a 67 percent score.

17     And again, would you agree with me that most of your

18 performance was below average on the score report?

19 A.  For surgery, yes, which is Step 2 content.

20 Q.  And then did I understand you to say that you thought you

21 did better in psychiatry than you did in surgery?

22 A.  I believe so, at least in the overall grade.

23 Q.  Turn to the next page, if you would, 175.

24 A.  Okay.

25 Q.  And is this the results of your psychiatry examination

1  that you took after your subject matter or for your course?

2  A.   Yes.

3  Q.   And if you look at page 2, is this your score report for

4  how you did on that exam?

5  A.   Yes.

6  Q.   Are subject matter exams taken on a computer?

7  A.   Yes.

8  Q.   And this is an exam you took with double testing time?

9  A.   Yes.

10  Q.   And whatever other accommodations the school provided?

11  A.   Yes.

12  Q.   And would you look at your performance there.  Would you

13  agree that in many, if not most, of the categories here, mental

14  disorders, mechanisms of disease, management, emergency

15  department, patient groups for females, your performance was

16  below average?

17  A.   Some of those you listed were on the average performance,

18  but yes, some of those were below.

19  Q.   Look if you would, please, at the page that says 262.

20       And now it looks like a subject matter exam from August

21  2016 for family medicine?

22  A.   Yes.

23  Q.   Again, this is a standardized exam you took with extended

24  testing time?

25  A.   Yes.

1  Q.   And other accommodations.  And it looks like your score

2  was a 60.

3       And would you agree that most of your performance

4  categories on this exam, you performed below average?

5  A.   Yes.

6  Q.   So whatever the reason for that performance was, it didn't

7  have anything to do with how much testing time you were allowed

8  on that day to take the exam?

9  A.   No.  It had to do with the difficulty of the questions,

10  because they were pretty ambiguous.

11  Q.   And then finally, looking at your medicine exam on page

12  264.

13  A.   Okay.

14  Q.   Is this an exam you took to evaluate your knowledge and

15  abilities after taking your medicine course at school?

16  A.   Sorry, it was -- you were asking about the medicine

17  course, yes.

18  Q.   Yeah.  What is this exam evaluating?  What had you just

19  completed before taking this exam?

20  A.   The internal medicine rotation, which was my first

21  clinical.

22  Q.   And again, would you agree that your performance was below

23  average on most of the subject areas?

24  A.   It's below on five of them.  The rest are below average or

25  average.

1  Q.   And that was an exam you took with the school's

2  accommodations?

3  A.   Yes.

4  Q.   Look at Exhibit 70 for me.

5  A.   Exhibit or page?

6  Q.   I'm sorry.  It's Exhibit 70.

7  A.   Okay.  Thank you.

8       Okay.

9  Q.   All right.  And what is this document?

10  A.   This is what is called a student dashboard at my school.

11  Q.   And tell the Court what a student dashboard is.

12  A.   It shows a box and whisker, I think it's called, graph of

13  performance on exams relative to other students.

14  Q.   Is that other students at your medical school?

15  A.   Within my class.

16  Q.   Within your class.

17       What did you have, approximately 50 students in your

18  class?

19  A.   It varied at the time of year, but approximately.

20  Q.   Okay.  All right.  And what does the red dot signify on

21  the first page, page 87?

22  A.   The red dot is my score.

23  Q.   And what does the sort of dark shaded gray area indicate

24  on each?

25  A.   Those would be the middle quartiles.

1  Q.   So on many of these, it looks like two of them you're in

2  the bottom, but in more of those you were below the bottom

3  quartile in each of these subject areas as of this date?

4  A.   Yes.

5          MR. BURGOYNE:  Your Honor, I have no other questions.

6          THE COURT:  Very well.  Why don't we take --

7          MR. BURGOYNE:  Oh, I'm sorry, we have just mechanics

8  of getting our exhibits in.

9          THE COURT:  Okay.  I'll give you a chance to do that

10 in your case.

11         MR. BURGOYNE:  Okay.

12         THE COURT:  All right.  Why don't we take our morning

13 break now.  We'll be in recess till 11:00.

14         (Recess at 10:47 a.m. until 11:01 a.m.)

15         THE COURT:  Let's proceed.

16         Ms. Ramsay, please resume the witness stand.

17                      REDIRECT EXAMINATION

18 BY MS. VARGAS:

19 Q.   Good morning, Ms. Ramsay.

20      You had testified a few moments ago before our break about

21 your performance on the shelf exams.

22      Can you tell us a little bit about your experience in the

23 rotations that ended with those shelf exams?

24 A.   Sure.  So first of all, our school is a new medical

25 school, and I was in the first class originally.  And so this

 1   was kind of a test run for everybody.  And because of that, we

 2   didn't have a class ahead of us to kind of show us the ropes or

 3   give us pointers on how to manage everything.  So we were kind

 4   of on our own.  And so like I said, my first couple rotations,

 5   clinical rotations, were quite a new experience for me, and

 6   there was a huge learning curve with that.  And because of

 7   that, not only because of that, but also just the sheer amount

 8   of time we were expected to be in either the clinic or the

 9   hospital, didn't leave a lot of time for reading or studying.

10         And because I am a slow reader and not everything was

11   available in a format that could be -- the Kurzweil could be

12   used on.  Or if I was at the hospital, some of their computers

13   didn't have software to read to me.  And that's the only place

14   I would get -- be able to have access to whatever that

15   information was, I didn't necessarily get to see all of the

16   information that was being tested on.

17         In some of the lighter rotations where there was either

18   less reading or there was more time to read for me, I got to

19   more of the material and did -- was able to show that I had

20   gotten to that material because I knew it.

21         And there -- so it varied based on the rotation.

22         There was also a rotation at the end which was the

23   psychiatry one, which they didn't tell us that neurology would

24   be included on that and we had our neurology as part of our

25   internal medicine rotation.  At least our clinical part was

1   during our internal medicine, and so I didn't study that part

2   of it before taking that exam.

3       It's just stuff like that.  Because it's their first year,

4   it's our first year, and so there was a lot of like

5   miscommunication.  But in general, if I had access to the

6   material and had time to access the material, I would do what I

7   could to learn it.  And I generally did a decent job.

8       But on the -- the testing week, the final week of our

9   block, we had not only the shelf exams, which are the written

10  exams on the computer, we also had OSCEs.  And those are

11  clinical tests for like -- with standardized patients where I

12  talked about yesterday, the setup of the note that we had to

13  write.  And a lot of times those were based off of reading too.

14  And if I hadn't gotten to the reading for those, then it made

15  it harder for me to state the diagnosis or support that they

16  were looking for in the words that they were looking for.  Even

17  if I was close or had the right reasoning or the right

18  question -- I had asked the right questions and done the right

19  exam in the encounter, and that was some of the feedback that I

20  got from my clerkship directors, when I hadn't passed either in

21  the writing portion or the -- coming up with the right

22  diagnosis or the expected diagnosis for that encounter.

23      And then so that particularly was the neuro OSCE.  And I

24  failed it twice.  And then the clerkship director pointed me to

25  the reading that the case was from, and I passed it.

 1        In my OB rotation, I also failed that note because I
 2   didn't have time to write everything.  And so I made sure -- I
 3   had the diagnosis and support, but I didn't put that support
 4   also in the other paragraphs because I didn't have time.  And
 5   so I didn't even get credit for that.  And she told me that I
 6   had a great exam, physical exam, and great questioning of the
 7   patient and she could follow my logic there, but -- and those
 8   are videotaped for them to view, to grade us.  She said I did
 9   really well through that, but it just wasn't in my note
10   because -- and she could only grade the note.  She couldn't
11   grade what I had asked for the note writing portion.
12        So I had to redo that one, but...
13   Q.   So you also testified that you had a DVT?
14   A.   I did.
15   Q.   Can you explain what happened?
16   A.   I was at the beginning of my neurology rotation in my --
17   at the end of my second year, and I -- and during the -- one of
18   the lectures, my leg was bothering me or had been bothering me.
19   And I sort of had this feeling that like, watch, this is
20   probably a DVT.  And it was like a kind of a joke in the back
21   of my head.  But then it still kept bothering me.  So I told
22   Neil about it.  And then after -- that was like a Tuesday.  And
23   by Friday, my leg -- it had changed.  My leg had hurt a lot
24   more and had traveled up my leg.
25        And then so by Friday evening, my leg was extremely

1   swollen and very visibly swollen compared to my other leg.  And

2   so we went to the emergency department Saturday.  And they did

3   an ultrasound and said that I had a clot from my foot up to my

4   hip, basically, all the way up.  And they didn't even check the

5   other leg.  And they didn't check my IVC, which is the vein

6   that goes back to your heart.  And so it could have gone all

7   the way up.  And if it had gone all the way up to my heart, I

8   would have died.

9        So we caught it before that, but they had to put me on

10  blood thinners, Xarelto, which I was on for two years after

11  that.  But I was in a lot of pain from that for quite a while,

12  and I missed school for like three weeks.

13       And in this process, I was trying -- I had to go to a

14  bunch of doctor appointments to try to figure out what was

15  going on, why the clot happened, and dealing with the pain.

16  And I had initially tried to study while I was off to try to

17  keep up with the course, but I realized that with the pain and

18  the meds that I was on, I couldn't do that.

19       So then I worked it out with my school that during the

20  summer break, which is more intended -- it's a study break that

21  the students -- the rest of my class had before they took

22  the -- that exam, I don't know if it was a CBSSA or the CBSE,

23  but the one that we took in the following June, I believe --

24  Q.   I'm sorry to interrupt.

25       What is the purpose of that test?

1  A.   That was to see whether -- if we pass that, we could start

2  our clinical exams -- or, sorry, clinical rotations for third

3  year.  And if we didn't, then we had to spend one rotation of

4  that doing independent study to study for it and pass it before

5  beginning our clinical rotations.  And it would have been a

6  study program with the school.

7       And so I -- instead of getting that time to study for that

8  exam, that month, which my -- the rest of my class got, I spent

9  that time having to make up my neurology rotation, both the

10 class work and the anatomy part.

11      And so I -- and then in the very last week of that, I

12 was -- like right before we started school, was the exam.

13 Q.   So yesterday defense counsel reviewed your report cards

14 all the way back to kindergarten.

15      Did you obtain those grades with or without accommodation?

16 A.   I have -- I attained those with the informal

17 accommodations and all of the help and support I was getting

18 from friends and family and my teachers.

19 Q.   And whose idea was it to provide you with those informal

20 accommodations?

21 A.   My teachers.

22 Q.   Do you know why the teachers decided to provide you those

23 informal accommodations?

24 A.   I don't know for a fact, but I assume it's because they

25 realized I was struggling or needed some extra help,

1  specifically that help that they could provide to allow me to

2  do the best work that I could.

3  Q.   Defense counsel also asked you about receiving

4  accommodations at OSU in college.

5       Whose idea was it for you to get those accommodations?

6  A.   Initially it was recommended by my Spanish professor and

7  then again by my organic chemistry professor.

8  Q.   Do you know why they made those recommendations?

9  A.   Both had said that when I had asked them about what I

10 could do to do better in the class or achieve, like just show

11 better what I knew or even learn more to do better, they looked

12 at my coursework and my -- and in the case of my Spanish

13 teacher, my oral tests with her.  And both said in a way that,

14 you know, there wasn't much else I could do because I knew the

15 material and it was clear that I knew it by the other things

16 that I had shown, which weren't necessarily timed, and that

17 they thought that just having the extra time would give me the

18 opportunity I needed to show what I knew.

19 Q.   Turning for a moment to the ACT.

20      On the ACT, did you read everything that was on the test?

21 A.   No.

22 Q.   What did you do when you encountered questions that

23 required you to read the entire question or passage?

24 A.   Moved on to the next question that maybe didn't require

25 that.

1  Q.   And what types of questions based on the reading were you

2  able to answer without reading the passage?

3  A.   A lot of the ones that had formulas or math that I could

4  do, or if it was just factual knowledge, so if I knew the

5  answer based on something I had learned without having to read

6  the passage, which maybe the passage restated what I already

7  knew, but I didn't read it if I didn't have to, so I wouldn't

8  be able to say specifically.

9       But then for like the verbal or -- I don't know what the

10 section titles are for the ACT.  But for the ones that were

11 reading based, a lot of the times it would say a line or a

12 paragraph to go to or a specific word even to think about, so I

13 would focus on those and just read those.

14 Q.   How would you compare your experience taking the ACT with

15 your experience taking the MCAT?

16 A.   Well, for one, the MCAT was like a lot longer time wise.

17 There were more sections with more questions that I remember.

18 And the content was more difficult because it was something for

19 college students.  And it included more like sciences, like

20 biology and physics and chemistry, but it also had a writing

21 section and a verbal section.

22      And from my recollection, the ACT had a guess penalty,

23 guessing penalty.  And I'm pretty sure both of them had

24 passages with multiple questions associated with them, and that

25 both of them had multiple questions within the passage, related

1  questions, not just the ones labeled as passage independent,

2  that you could answer without any or very little reading of the

3  passages.

4  Q.   Do you recall how you scored on the writing sample on the

5  MCAT?

6  A.   I got a score of M, which is kind of a weird scoring

7  system.

8  Q.   Do you remember your percentile rank?

9  A.   I believe it was 31 -- 31st percentile.

10  Q.   Defense counsel asked you yesterday about Step 1.

11  A.   Yes.

12  Q.   How would you compare Step 1 with the MCAT?

13  A.   Well, even though the MCAT had like some topics of science

14  and health, the Step 1 is mostly like health-related.  And

15  sometimes there's statistics or social -- social health

16  questions, but that's a very small portion of the questions.

17  It's mostly all health related.  And it's -- the questions

18  themselves are not related to a passage.  They are the

19  question.  And in order to evaluate the information in the

20  passage -- or sorry, evaluate the information in the question

21  for Step 1, in order to answer the question, you have to read

22  the whole question for each question.  And you can't skip

23  information.  There's no like line it directs you to.  It's all

24  information related to that patient or that disease or whatever

25  it's trying to have you analyze in order to answer the

 1  question.  And so you can't skip reading like you could with

 2  the MCAT or the ACT that had a long passage and then several

 3  questions associated with it.

 4  Q.   You testified earlier this morning that you enjoy being

 5  read to?

 6  A.   Yes.

 7  Q.   Who reads to you?

 8  A.   Neil, sometimes my parents, my friends will.  I had a

 9  friend in -- when I was between undergrad and middle --

10  undergrad and medical school who was reading the Game of

11  Thrones book series, and so every now and then she would invite

12  me over and she would read the Game of Thrones series to me.

13  And she would do like the little voices for each character,

14  which was cool.  And a lot of my friends read -- like if I'm

15  watching a movie, they know that if there's captions at the

16  bottom, that I can't read fast enough.  My parents do this too.

17  But they'll read it for me.  That's less enjoyable and more

18  necessity, but it's a lot more enjoyable to watch the movie if

19  they're doing it and I don't have to pause it to do it.

20       Yeah.  I've pretty much always enjoyed -- like I enjoy the

21  story, pretty much like I feel anybody would, except for that.

22  It's -- I don't know.  There's that personal connection, too,

23  with somebody reading to you.

24  Q.   Do you ever read for pleasure on your own?

25  A.   No.

1  Q.   Why is that?

2  A.   It's work for me.  It's hard work.  And even if I want the

3  story, that act of reading it is not enjoyable and it takes

4  forever.  And so it's not -- it's not an activity that I would

5  choose to do for fun or leisure or however people describe it.

6  It's work for me.

7  Q.   If you withdraw from medical school, can you be readmitted

8  if you have not passed Step 1?

9  A.   No.

10  Q.   And can you take Step 1 if you're not enrolled in medical

11  school?

12  A.   No.

13         MS. VARGAS:  No further questions.

14         THE COURT:  Any recross?

15         MR. BURGOYNE:  Just a couple of quick questions, Your

16  Honor.

17                    RECROSS-EXAMINATION

18  BY MR. BURGOYNE:

19  Q.   Ms. Ramsay, you testified about your performance on the

20  writing section of the MCAT exam?

21  A.   Yes.

22  Q.   And you performed I think at the 31st percentile.

23       There's no writing component to the Step 1 exam, is there?

24  A.   Not Step 1.

25  Q.   And then I think you indicated on the ACT exam, if you got

1  to a question that you couldn't answer, you just moved on to

2  the next question if it required reading?

3  A.   Yes.

4  Q.   And do you recall you scored in the 97th percentile on the

5  ACT exam?

6  A.   Yes.

7  Q.   And your reading scores in arts and literature were in the

8  99th percentile?

9  A.   Yes.

10 Q.   You said the MCAT is a longer exam than the ACT, and it

11 also includes some science and biology?

12 A.   With longer, I think I was referring to the time that it

13 was scheduled.

14 Q.   Okay.  The amount of time the test takes?

15 A.   Yeah.  I don't know about word count because I don't have

16 access to those exams.

17 Q.   And again, you refer to a guessing penalty, but do you

18 recall yesterday we saw in the ACT booklet that ACT says there

19 is no guessing penalty on the exam?

20 A.   That's what it says, but, again, my recollection is that

21 there was.

22         MR. BURGOYNE:  Okay.  No further questions.

23         THE COURT:  Very well.  You may step down now, ma'am.

24 Watch your step.

25         Next witness.

1          MR. BURGOYNE:  Your Honor, we have I guess a

2     scheduling question.

3          Our preference is to sort of continue on with

4     plaintiffs putting on their case and us putting ours on.  Our

5     experts aren't available tomorrow but are available a week from

6     Friday, or Friday.  We can have at least one of them available

7     Friday, I think.

8          THE COURT:  Surely you jest.

9          Why wouldn't they be available pursuant to us

10    scheduling this hearing for this week?

11         MR. BURGOYNE:  Well, again, Your Honor, it was our

12    understanding initially it was a one-day and then it was a

13    two-day hearing, so it wasn't our understanding it could

14    continue for a third, so I apologize.

15         THE COURT:  Well, this is a second day, and so where

16    are they?

17         MR. BURGOYNE:  They're here, Your Honor.

18         THE COURT:  All right.  We can get to them.

19         MR. BURGOYNE:  All right.  We'll take them out of

20    order and we'll put ours on next?

21         THE COURT:  If necessary, but you can't --

22         MR. BURGOYNE:  Okay.

23         THE COURT:  You're looking at my scheduling and you're

24    attempting on a Friday and that's not conceivable.

25         MR. BURGOYNE:  Okay.  That's fine, Your Honor.  We

1  thought we would check with you and see if that was a

2  possibility.

3         THE COURT:  Very well.  Yes.

4         MR. BERGER:  Yes.  And we will accommodate that.  But

5  I then need a moment to consult with Dr. Smith, who would

6  otherwise be the next expert, because he has to rearrange his

7  schedule.

8         THE COURT:  Fine.

9         MR. BERGER:  So if I could just have two minutes --

10        THE COURT:  You've got two minutes right now.

11        MR. BERGER:  Thank you very much.

12        MR. BURGOYNE:  And we'll get our witness.

13        THE COURT:  You said they're not going to be long in

14  any case?

15        MR. BURGOYNE:  One is very short.  The other one is a

16  little longer.

17        (A discussion off the record occurred.)

18        THE COURT:  Let's proceed.  We'll have you call your

19  witness out of order.

20        How long is your expert witness, just out of

21  curiosity?

22        MR. BERGER:  I estimate that his direct will be

23  between an hour and an hour-and-a-half, but I think closer to

24  an hour.  And I don't know about their cross, obviously.

25        THE COURT:  Cross-examination.

 1          Very well.  Why don't you call your witness.

 2          MS. MEW:  Thank you, Your Honor.  The defense calls

 3  Dr. Benjamin Lovett.

 4          THE COURT:  All right.  Watch your step coming around

 5  there and around this.

 6          THE WITNESS:  Thank you.

 7          DR. BENJAMIN LOVETT, after having been duly sworn, was

 8  examined and testified as follows:

 9          COURT REPORTER:  State your name for the record.

10          THE WITNESS:  Benjamin Lovett.

11                      DIRECT EXAMINATION

12  BY MS. MEW:

13  Q.   Good morning, Dr. Lovett.

14  A.   Good morning.

15  Q.   Are you an external consultant for NBME?

16  A.   Yes.

17  Q.   And how long have you been serving in that role?

18  A.   I believe it's been nine years.  I think I started in

19  2010.

20  Q.   And briefly, what do you do in that role?

21  A.   For NBME, I review cases that are sent to them,

22  applications for accommodations.  So typically I'll get an

23  email that asks me to go to a secure website.  I download a

24  file that has the documents that the applicant has submitted,

25  review those and write a review with some sort of

1  recommendation.  Or if I can't provide one, I give it still a

2  summary of the documents.

3  Q.   And what questions does NBME ask you to answer as you're

4  reviewing accommodation requests on the USMLE?

5  A.   One thing I consider is whether or not the applicant meets

6  criteria for the diagnoses that they have requested

7  accommodations under.  If they have, then I also ask a question

8  of whether or not they're substantially limited in any major

9  life activities that are relevant to taking whatever tests

10  they've asked for accommodations on.  And then, if appropriate,

11  I recommend or summarize evidence with regard to what

12  accommodations, if any, are indicated based on the evidence

13  that's been submitted.

14  Q.   And did you review Jessica Ramsay's request for

15  accommodations in the US MLE?

16  A.   I did.  I wasn't an initial reviewer, so I saw I believe

17  it was her request for reconsideration.

18  Q.   And is it your understanding in reviewing that request for

19  reconsideration that you saw her entire file, all of the

20  documentation she had submitted to the NBME up to that point in

21  support of her requests?

22  A.   It is, yes, that I saw all the evidence that she had

23  submitted up to that point.

24  Q.   And did you provide a written analysis and recommendation

25  to NBME with respect to her request?

 1  A.   I did.

 2  Q.   And then did you also provide a declaration in this

 3  litigation relating to Ms. Ramsay's testing accommodation

 4  request?

 5  A.   Yes.

 6  Q.   Dr. Lovett, I'm going to ask you to turn to Exhibit 6 in

 7  the defense exhibit book, which should be a black binder, the

 8  first volume.

 9  A.   Okay.  Let's see.  Okay.

10       Okay.  I'm there.

11  Q.   You're going to be quicker than I am.

12  A.   That's okay.

13  Q.   Do you recognize this exhibit with the beginning document,

14  the declaration that you submitted in this litigation?

15  A.   Yes.

16  Q.   And then Tab A to Exhibit 6, do you recognize this as your

17  CV?

18  A.   Yes.  As of the time the declaration was submitted.

19  Q.   Understood.  And then Exhibit B, is this the letter that

20  you submitted to NBME containing your analysis and

21  recommendation on initially reviewing Ms. Ramsay's request for

22  reconsideration?

23  A.   Yes.  That's my review of the documentation.

24       MS. MEW:  Your Honor, this is in the record in terms

25  of being filed in support of our preliminary injunction

1  opposition, but we'd also ask to admit Exhibit 6 to the record

2  today.

3          THE COURT:  Very well.  Hearing no objection.

4          MR. BURGOYNE:  No objection.

5          THE COURT:  It's admitted.

6          (DX-6 admitted.)

7  BY MS. MEW:

8  Q.   Dr. Lovett, we are going to get into more details very

9  shortly, but could you briefly state the opinion that you

10 reached regarding Ms. Ramsay's request for testing

11 accommodations based on the materials that she submitted to

12 NBME in support of her request?

13 A.   Sure.  Ms. Ramsay had requested accommodations under

14 several different conditions or diagnoses.  And my expertise is

15 in learning disabilities and ADHD, so I reviewed with regard to

16 those.  And that really applies to pretty much all of the

17 testimony that I'm giving.

18      And my conclusion is that there was insufficient evidence

19 supporting learning disabilities or ADHD.  And there was

20 actually some pretty significant evidence undermining those

21 diagnoses, arguing against the learning disabilities in

22 particular.

23 Q.   And then since the time that you even prepared your

24 declaration in this case, have you reviewed additional material

25 that's been produced during the discovery?  And I'm speaking

1  specifically with regard to Ms. Ramsay's school records, the

2  report cards and additional standardized test scores that we've

3  been discussing in the hearing.

4  A.  Yes.  Those have been provided to me, and I have reviewed

5  them.

6  Q.  Have the opinions that you expressed in your declaration

7  and in your written report for NBME changed in any respect with

8  regard to this additional information?

9  A.  No.  The school records and especially the standardized

10  test scores actually really strengthen the argument against the

11  learning disabilities.  And things like the excellent scores

12  for attention or excellent ratings by teachers for attention in

13  the report cards further weaken the argument for ADHD and more

14  undermine that diagnosis as well.

15  Q.  And we're going to get again into a little more detail of

16  that, but before we do so, I'd like to talk just a bit about

17  your background and credentials.

18      We can reference your CV, which is Exhibit 6A, Defense

19  Exhibit 6A.

20      If you'll just briefly state your educational background.

21  A.  I have a bachelor's degree in psychology from Penn State

22  University, a master's degree in psychology from Syracuse and a

23  doctoral degree, a PhD in school psychology, from Syracuse as

24  well.

25  Q.  And where do you currently work?

1  A.   Teachers College, Columbia University in New York City.

2  Q.   And how long have you been in that position?

3  A.   Just for a few months.  I've -- since September 1, 2019

4  officially, as it says on the CV.

5  Q.   Okay.  And where were you before then?

6  A.   Before then, for five years, I was a professor achieving

7  tenure at the State University of New York at Cortland.  Before

8  that, I taught for seven years at a small liberal arts college,

9  Elmira College.

10  Q.   Do you have any particular specialties in your work?

11  A.   Learning disabilities and ADHD, specifically their

12  diagnostic assessment.  And also the provision of testing

13  accommodations to students with disabilities.  Most of my work,

14  pretty much all of my current work, is on one of those two

15  things or both.

16  Q.   And what are your primary job responsibilities as a

17  professor?

18  A.   As a professor, teaching, research and service.  They're

19  sort of the three things professors do.  So I teach classes at

20  Teachers College, I train graduate students who are becoming

21  certified school psychologists, and some of them will become

22  researchers as well.  So I teach courses on law and ethics for

23  school psychologists, for instance.

24      I was brought there, really, to take over the assessment

25  courses, and so I'll start those in the spring semester.  So

1  that's teaching.

2        In terms of research, I present at conferences, giving --

3  I do talks.  I publish in peer-reviewed journals.  I published

4  a book on testing accommodations.

5        And then with regard to service, that involves things like

6  sitting on committees, advising students, other sorts of

7  informal mentoring and that sort of thing.

8  Q.   Focusing particularly on your research work, if we could

9  look at Exhibit 6A, which is your CV, pages 2 through 9.

10       Is this a listing of your publications and works in

11  progress, including publications in peer-reviewed journals?

12  A.   Yes.

13  Q.   And focusing specifically on your peer-reviewed journal

14  articles, does any of this research pertain to learning

15  disabilities or ADHD?

16  A.   Yes.  Many of the articles are about learning disabilities

17  and/or ADHD.

18  Q.   And what types of journals are you publishing in?

19  A.   Journals in the fields of psychology and education,

20  specifically journals on assessment issues, journal on school

21  psychology, things like that.

22  Q.   And you mentioned that you have been invited to give -- to

23  speak to different groups.

24       Now, can you give examples of some of the groups that

25  you've been invited to present to?

1  A.    Sure.  Currently a lot of the talks that I give are

2  actually to schools.  So I speak to teachers.  I speak to

3  school administrators, groups of school psychologists.  In

4  addition, I've done continuing education workshops for

5  psychologists, those who do evaluations, things like that.

6  I've also given invited talks beyond that to reviewers, for

7  instance, of documentation.  I've given invited talks at

8  conferences, things like that.

9  Q.    And just briefly, focusing on your teaching, if we look at

10  page 16 of your CV, is this an accurate listing of the courses

11  you have taught?

12  A.    As of that date, yes.

13  Q.    So you might have some additional courses you're now

14  teaching at Columbia?

15  A.    Right.  There's one this semester.

16  Q.    And do you teach classes that address learning

17  disabilities and ADHD?

18  A.    Yes.  And I have for many years now.

19  Q.    Dr. Lovett, are you a licensed psychologist?

20  A.    I am.

21  Q.    What does it mean to be a licensed psychologist?

22  A.    In New York state, at least, the requirements for

23  licensure are education, experience and examination passing.

24        So you have to have a doctoral degree from an appropriate

25  institution.  You have to have thousands of hours of experience

 1  supervised doing various sorts of psychological practice,

 2  assessment consultation and intervention.  And then you also

 3  have to pass a licensure exam.

 4  Q.  Do you see patients or clients as part of your work?

 5  A.  I don't.  I don't have a clinical practice.  I

 6  occasionally do clinical consultation, but I don't have a

 7  clinical practice.

 8  Q.  And do you currently perform diagnostic evaluations as

 9  part of your work?

10  A.  No.

11  Q.  Have you ever performed diagnostic evaluations?

12  A.  I've been part of teams certainly in school and clinical

13  settings doing them, but not presently.  And that was during my

14  training as part of that supervised experience.

15  Q.  Are you familiar, nevertheless, with the diagnostic tests

16  that were administered to Ms. Ramsay by Dr. Smith and her other

17  evaluators?

18  A.  Yes.  I've given many of them myself for research

19  purposes, for training purposes.  And even those that I haven't

20  given myself, I'm familiar with their content and format in

21  general.

22        MS. MEW:  Your Honor, the defense offers Dr. Lovett as

23  an expert witness in the evaluation and diagnosis of

24  individuals with learning disabilities, ADHD, as well as the

25  provision of accommodations and testing and academic

1  environments and research related to this.

2       THE COURT:  Very well.

3       MR. BERGER:  Your Honor, I think my comments have more

4  to do with weight than overall expertise.  So certainly we

5  acknowledge that by education and training, Dr. Lovett has

6  expertise in these areas Counsel has brought out.  And he does

7  acknowledge that he does not have a clinical practice.  And

8  that will, of course, be something that I will examine about

9  and will give -- there will be some arguments, therefore, about

10  the weight.

11       So with all that, we don't object to allowing this to

12  proceed, but I may have particular points to make later on

13  about his expertise in particular areas.

14       THE COURT:  Very well.  We find the witness to be an

15  expert in the area that has been stated by counsel.

16       You may proceed.

17       MS. MEW:  Thank you, Your Honor.

18                    DIRECT EXAMINATION

19  BY MS. MEW:

20  Q.  Dr. Lovett, when you are reviewing a request for

21  accommodations on the USMLE like Ms. Ramsay's, do you meet with

22  that individual in person as part of your review?

23  A.  No.

24  Q.  So how are you able to assess whether that individual has

25  an impairment or should be receiving testing accommodations on

1  the test?

2  A.   Based on the documentation that they've provided.  And

3  that documentation virtually always involves records and

4  reports from individuals who have met with them personally.

5       So I can't think of a case of a diagnosis of learning

6  disabilities or ADHD where an applicant has not submitted

7  letters or reports, records, from someone who performed an

8  evaluation personally.

9  Q.   And so you are looking to the information that they

10  themselves have put forth in support of their request?

11  A.   Exactly.  For NBME in particular, I believe that I see all

12  of the documents that are submitted even if there's email

13  correspondence between the applicant and NBME.

14  Q.   And are you familiar with other -- in other contexts where

15  there are other reviews of individuals' impairments or levels

16  of disability for purposes of receiving services in other

17  contexts where the review might be solely based on paper, as

18  opposed to an in-person meeting?

19  A.   Generally, yes.  I have colleagues who review for

20  disability, not so much under ADA but workmen's compensation

21  and other sorts of things.  And my understanding is that at

22  times there's no personal evaluation.

23  Q.   And let's focus now on your review of Ms. Ramsay's file.

24       And just starting first with logistics, how did NBME reach

25  out to you to review her file?

1  A.   In her case, I believe, just like in virtually all cases

2  with NBME, I got an email one day asking me to log in to a

3  secure website because there was a review that had been

4  deposited for me to look at.  And so I went to that website,

5  logged in and downloaded a file of documentation, a PDF file of

6  all the papers that had been submitted.

7  Q.   And did you have any communication with NBME about the

8  substance of this file before you began your review?

9  A.   I don't believe so.  I don't recall any communication in

10 this case.  And the years that I've been working with NBME, I

11 can only remember a handful of times when I've communicated

12 with them about a file before writing a report.  In those

13 cases, it's because there's a piece of paper that's illegible

14 or there's a piece a paper that seems to be like missing a page

15 or something like that, maybe when it was photocopied.  And in

16 this case, I certainly don't recall anything like that.

17 Q.   And then between the time you reviewed the file and you

18 wrote the report that was attached as Exhibit B to your

19 declaration, did you have any communications with NBME?

20 A.   Again, I don't recall any, and it would have been

21 extremely unusual.

22 Q.   And then after you submitted your report to NBME, did they

23 suggest any revisions or changes to the report that you wrote?

24 A.   Just the same thing, I don't recall any.  I don't believe

25 there were any communications at that point.  And it would be

1  extremely unusual to hear anything.  In the vast, vast majority

2  of cases after I turn in a review, I don't hear anything at

3  all.

4  Q.   When Ms. Ramsay requested accommodations on the USMLE,

5  which diagnoses or impairments were the basis for her request?

6  A.   She requested accommodations under learning disabilities

7  and reading and writing, ADHD, headaches and a clotting

8  disorder.

9  Q.   And as you previously stated, your testimony today is

10 focusing on the learning disabilities and ADHD.  Correct?

11 A.   Exactly.

12 Q.   Okay.  Can you very briefly explain the diagnostic

13 features of ADHD?

14 A.   Sure.  To have ADHD, someone not only needs to have

15 episodes or instances where they have trouble paying attention

16 or impulsive or overactive/hyperactive, but they have to be

17 often and they have to be frequent.  They have to be to a level

18 that's atypical and very unusual for their age.  And so that's

19 just one of the criteria.  You have to have very high levels of

20 symptoms.

21      The second criterion is that they have to start early in

22 life.  So they have to be present -- you have to have some

23 symptoms by age 12.

24      The third criterion is that they have to be present in

25 multiple settings.  If someone is only showing symptoms at

1  school, for instance, that's not ADHD.

2      A fourth criterion is that they have to interfere with

3  someone's performance.  If someone has those symptoms but

4  they're doing fine, that's not ADHD.  It may be a personality

5  profile or a personality trait or set of traits, but it's not a

6  disorder.  Disorders involve impairment.

7      And then finally, it can't be due to something else.  So

8  if someone is having high levels of those symptoms because

9  of -- just because of drug use or something like that, we

10  wouldn't call that ADHD.  So those are the five criterion for

11  ADHD.

12      For learning disabilities, the core sort of --

13  Q.  Let me stop you.  Let's stay on ADHD for just a minute.

14  A.  Okay.

15  Q.  What are some of the traits or characteristics that are

16  represented in the sort of symptom criteria for ADHD?

17  A.  Sure, yeah.  So there are 18 symptoms that are listed in

18  the DSM for ADHD.  Nine of them have to do with inattention.

19  Those are things like making careless mistakes, being easily

20  distracted.  The other nine have to do with hyperactivity and

21  impulsiveness.  Those are things like talking excessively, you

22  know, being impulsive, reacting before you should, things like

23  that.

24  Q.  How do you differentiate individuals who have these types

25  of traits, maybe not to a clinical level, in individuals who

1  experience these traits to something that would constitute

2  ADHD?

3  A.   Yeah, these are things that I had sort of mentioned

4  earlier.  So one is certainly the frequency.  Again, everyone

5  has experiences where they have trouble paying attention in

6  certain settings, where they have to work harder than others to

7  pay attention or focus.  We all have experiences where we feel

8  jittery.  We all have experiences where we act impulsively and

9  then regret it later and things like that.  But the frequency

10  is one thing.  So frequency and severity, we can sort of put

11  those together.

12       And then another feature would be the impairment, the fact

13  that it's actually causing problems for someone, if they are

14  experiencing significant negative consequences and then the

15  symptoms continue.

16       So for most of us, when we experience significant enough

17  negative consequences, we learn, we adapt, we change sort of

18  the way that we're behaving.  For individuals with ADHD, those

19  negative consequences bother them.  They really cause them some

20  distress, but they continue to engage in those behaviors.  And

21  so it's something that really causes a substantial level of

22  impairment typically.

23  Q.   And what would be an example of a substantial level of

24  impairment?

25  A.   So depending on the symptoms, it would differ, but for

1  someone who, for instance, a schoolchild with ADHD, we would

2  expect them to be doing poorly in school.  So if someone has

3  ADHD to a significant degree such that they meet the criteria

4  for clinical diagnosis, we would expect that they have trouble

5  remembering to turn in work, to the point where their grades

6  are affected, but they continue to not turn in work despite

7  those negative consequence.  We would expect that they're not

8  paying attention to the teacher and so they're actually not

9  getting instruction in the sense.  So we would expect that to

10  be reflected in terms of their school performance as well.

11  Those are the sorts of things for a schoolchild, for instance,

12  with inattention.

13  Q.  And we were speaking about school, but is ADHD a learning

14  disability?

15  A.  No, no.  Technically ADHD would not be considered a

16  learning disability.  Those are separate categories in the

17  classification system.

18  Q.  So could someone have ADHD and have no functional

19  impairment, say, in reading or writing?

20  A.  Yes.  I certainly have seen cases where folks who I think

21  have a valid diagnosis of ADHD nonetheless do well in reading

22  and writing for various reasons.

23  Q.  And then you were starting on this and I stopped you.  But

24  now if you could just briefly discuss the diagnostic criteria

25  for specific learning disorders?

1   A.   Yeah, absolutely.  So learning disabilities involve

2   trouble acquiring academic skills initially, reading, math or

3   writing skills or some grouping of those.  And in addition,

4   that's reflected in terms of poor performance on standardized

5   tests.  That's actually something that's in the diagnostic

6   criteria as well as poor performance in real world settings,

7   educational or occupational performance.  Those things are

8   noted in the criteria.

9        And then also those deficits can't be due to another

10  disorder or another problem.  Like, for instance, if someone

11  has a general low ability, then that could explain academic

12  problems, but we wouldn't call that a learning disability.

13  Q.   And so what kind of objective evidence are you looking for

14  in determining whether someone meets a diagnostic criteria for

15  a learning disability?

16  A.   There are really two types of evidence that I look for as

17  a reviewer.  One is evidence from diagnostic tests that are

18  administered by, you know, an evaluator, and then the second

19  sort of evidence is from real world settings, because we really

20  need both.  So the real world evidence would include things

21  like grades on real world standardized tests that are taken for

22  admission purposes or for, you know, group tests that are given

23  in schools but under a standardized set of conditions, as well

24  as grades and other records of school performance.  Those are

25  in that second grouping of real world evidence.

1  Q.   If an individual has sort of uneven strengths and

2  weaknesses, let's say, really superior math skills or above

3  average math skills but perhaps just average reading skills, is

4  that sufficient to show a learning disability?

5  A.   No, absolutely not.  It is typical to have a profile of

6  strengths and weaknesses in the sense of having some things

7  that you're better at than other things.  We all have some

8  personal strengths, we all have some personal weaknesses in

9  that sense of the term.  And so if your math skills are better

10  that your reading skills, that by itself doesn't mean anything.

11      I should also mention individuals with higher levels of

12  ability tend to have more variability across areas.

13  Q.   Are you familiar with the concept of individuals who are

14  both gifted and learning disabled?

15  A.   Absolutely.

16  Q.   What does it mean to be gifted?

17  A.   Traditionally giftedness was defined rather narrowly based

18  on a high IQ score, an IQ score above 120 or 130 in some cases.

19  There's no official definition of giftedness in a diagnostic

20  manual.  And these days, different school districts have

21  different criteria for entry into giftedness programs.  Many

22  still use IQ tests, but they also may use tests of academic

23  skills, creativity tests as well, parent and teacher ratings,

24  things like that.

25  Q.   Is it possible to be both gifted and learning disabled?

1  A.   Absolutely.  There's no reason why someone, you know,

2  cannot have significant deficits in academic skills even if

3  they meet those various criteria to be called gifted.

4  Q.   And how would you expect that to present itself?

5  A.   We would see evidence of both meeting the gifted criteria

6  and also separately distinctly meeting the criteria for a

7  learning disability.

8       So whatever your preferred definition or whatever a school

9  district is using as a gifted criteria set, they would be

10  meeting those, and in addition, they would meet the

11  requirements for a learning disability separately.

12  Q.   And does a learning disability require some level of

13  impaired performance?

14  A.   It's the core definition of it.  Academic skills are

15  substantially and quantifiably impaired.  Substantially and

16  quantifiably is the term in the diagnostic criteria.

17  Q.   What is the discrepancy theory?

18  A.   For a long time, starting back when the concept of

19  learning disabilities was first developed, it was thought

20  initially that learning disabilities should be diagnosed by

21  looking at a discrepancy between someone's IQ and someone's

22  level of achievement.

23       And so for a long period of time, the diagnostic criteria,

24  the clinical diagnostic criteria for learning disabilities

25  involved some sort of calculation of that discrepancy.  So you

1   would administer an IQ test, you would administer a test of

2   academic skills.  And if there was an area where there was a

3   significant gap between IQ and achievement, then that was part

4   of the criteria for a learning disability.

5       Research accumulated over the course of a decade showing

6   that those discrepancies are not reliable and also that they're

7   not a valid indicator for many reasons.  And so when the

8   diagnostic manual that's most commonly used, the DSM, was

9   revised, it was actually revised specifically to address that

10  problem.  And so the discrepancy criteria are gone.  And that's

11  been since 2013 at the latest, at least.  But the discrepancy

12  approach has been under attack by researchers whose data

13  continue not to support it for decades.

14  Q.  And just for the record, when you're referring to the DSM,

15  what are you referring to?

16  A.  That's the Diagnostic and Statistical Manual of Mental

17  Disorders, currently in its fifth edition, so that would be the

18  DSM-5.

19  Q.  And so if I understand it correctly, under the discrepancy

20  theory, someone could potentially be diagnosed with a learning

21  disability if they had an IQ in the 95th percentile but

22  academic scores in the average range?

23  A.  In theory, yes.  When the discrepancy formulas and the

24  discrepancy criteria were originally developed, it was never

25  anticipated, I think, but it would be applied to folks like

1   that.  The thought was that to be referred for an evaluation to

2   see if someone has a learning disability in the first place,

3   they would actually be doing poorly academically, they would

4   actually have low academic skills.  And I think it was a later

5   application or misapplication to individuals who were not

6   impaired academically.

7       But it is true that under the discrepancy approach to

8   diagnosis, in theory, someone certainly could have average

9   range achievement and still qualify as having a learning

10  disability because they were not performing up to their

11  ability.  The idea was that IQ was the sort of measure of your

12  potential and you were entitled to perform in every area up to

13  your IQ.  We know for a lot of reasons that's wrong.

14  Q.  So within your profession, that is no longer an accepted

15  method for diagnosis?

16      MR. BERGER:  Objection.  I think at this point, on a

17  question like that, that counsel is leading her own witness

18  more than is appropriate.

19      THE COURT:  You can rephrase your question.

20  BY MS. MEW:

21  Q.  Is the discrepancy model currently accepted in your

22  profession?

23  A.  I don't know any researchers who would endorse it, folks

24  who specialize in looking at evidence and conducting scientific

25  studies of learning disabilities.  Are there practitioners, are

1    there evaluators who use it, at times, yes.

2    Q.    Are ADHD and specific learning disabilities

3    neurodevelopmental disorders?

4    A.    Yes.  That's the category in the DSM that they're called,

5    neurodevelopmental disorders, because they are understood to be

6    brain based and to start early in childhood.

7    Q.    Okay.  You anticipated my second question.  Thanks.

8        So now focusing back on your review of accommodation

9    requests, what type of information are you looking for when you

10    review a file for a candidate who requests accommodations on

11    the USMLE?

12    A.    Well, it depends on the disorder.  So, again, for learning

13    disabilities, it's the two types of evidence that I just -- I

14    discussed earlier.  So one thing that I look for is evidence

15    from standardized diagnostic tests that are given by an

16    evaluator showing scores that are below the average range in

17    terms of academic skills, and then the second type of evidence

18    that I look for is real world evidence.  So evidence of poor

19    grades, evidence of poor performance on real world tests that

20    are taken without accommodations.

21    Q.    Ms. Ramsay submitted a report from Dr. Robert Smith in

22    support of her request for reconsideration.

23        Are you familiar with that report?

24    A.    Yes.

25    Q.    If you'll turn to Defendant's Exhibit 3 and Tab B behind

1   that.

2   A.   Okay.  I'm there.

3   Q.   Is this the report from Dr. Smith that you reviewed as

4   part of your review of her file?

5   A.   Yes.

6   Q.   Looking at the first page of this report, Dr. Smith lists

7   a number of sources of information.  And focusing here on the

8   items in caps, I'm going to take them a bit out of order.  I'm

9   just going to ask you to just very briefly explain what some of

10  these tests are.

11       One of them is the Nelson-Denny Reading Test.

12  A.   Uh-huh.

13  Q.   Is this a diagnostic test?

14  A.   The Nelson-Denny, that one is a little bit complicated

15  because it was -- it's generally interpreted to be a screening

16  test, but it can provide useful evidence relating to a

17  diagnosis of reading problems.

18  Q.   And what does it measure?

19  A.   It measures reading skills.  It has a component that looks

20  at someone's ability to take a vocabulary test through reading.

21  It has another component that looks at reading comprehension,

22  where someone reads passages and then answers multiple choice

23  questions about the passages.  And it generates sort of a

24  supplemental score, called reading rate, that is really not

25  reliable even according to the Nelson-Denny manual, but that's

1   part of the comprehension portion.

2   Q.   Did Ms. Ramsay obtain any below average scores on this

3   test?

4   A.   Yes.

5   Q.   And if it helps, you can refer to pages 22 to 23.  And

6   it's of the report, not -- the page in the actual report, not

7   the page numbers on the top that show the court filing.

8   A.   Okay.  Yes, I'm there.

9   Q.   What were Ms. Ramsay's below average scores on this test?

10  A.   So according to this report, her vocabulary score was

11  below average at the 11th percentile.  The 11th percentile

12  would generally be considered, in many tests, the low average

13  range, I should say.  And that 11th percentile score did

14  compare her to graduating college seniors.  But compared to

15  that group, her scores were below average.

16       I should mention, in the DSM -- the performance doesn't

17  just have to be below average, it has to be below average

18  compared to age expectations.

19       And so the Nelson-Denny doesn't directly show any sort of

20  age comparison.  Dr. Smith also compared Ms. Ramsay's

21  performance to those of graduating high school seniors.  And

22  that's often done for the purposes of getting something that

23  roughly approximates a general population sort of comparison.

24       That showed that her comprehension score was low average

25  at the 18th percentile.  And her reading rate score, the

1  unreliable score, as I mentioned, even the manual shows to be

2  so, was at the 1st percentile, at the very bottom.

3  Q.    Why does the manual state that that reading rate score is

4  unreliable?

5  A.    Well, there are ways of calculating a test's reliability.

6  And here it was done, I believe, by correlating the two forms

7  of the Nelson-Denny test.  And the correlation between those

8  two forms was below what's generally considered to be a

9  minimally accepted level of reliability.

10      So .7 is often described as minimally acceptable.  And if

11  I recall correctly from the manual, I think the reliability of

12  the reading rate score is .68.

13  Q.    And how is the reading rate score measured?

14  A.    So during the comprehension portion of the Nelson-Denny,

15  someone starts reading the first passage on the test.  And one

16  minute in, you stop them and ask them basically to indicate

17  where they are.

18      So it's a -- it's -- you're essentially asking someone how

19  far they've gotten, but there's no check on their comprehension

20  for that reading rate score.  And it's just based on one minute

21  of their silent reading with no comprehension check.

22  Q.    And so if these scores, the ones that you mentioned, the

23  reading rate score in particular, if the 1 percent score is

24  accepted at face value, what would it reflect?

25  A.    If we put aside the issues with reliability, it would

1  suggest that her reading speed is in the bottom 1 percent, even

2  compared to high school students, high school seniors in this

3  case.

4  Q.   And did Dr. Smith also administer the Wechsler Individual

5  Achievement Test, Third Edition?

6  A.   Yes.

7  Q.   And is that commonly referred to by acronyms, like WIAT,

8  WIAT?

9  A.   Yes, I've always heard the WIAT, or that's how I was

10  trained, but WIAT is another pronunciation.

11  Q.   W-I-A-T.  What does this test measure?

12  A.   The WIAT is a general achievement battery, so it measures

13  academic skills in a bunch of areas, reading, math, writing, as

14  well as oral language.

15  Q.   Did Ms. Ramsay obtain any below average scores on this

16  test?  And if it helps, I think this is page 18.

17  A.   Okay.  Yes, she did.  On the WIAT, the main score that I

18  would say was below average, in this case described as far

19  below average, was her oral reading fluency score.

20  Q.   And what was that score?

21  A.   That was based on her reading passages aloud and looking

22  at the speed that she took to read those passages.

23  Q.   And then what actual score did she receive?

24  A.   She received a 67, where 100 is average.  And so that was

25  at the 1st percentile.

1          MR. BERGER:  Can I just ask for a page reference?

2          MS. MEW:  Oh, I'm sorry, yes.  Page 18 of 31.  I'm

3    using the report page numbers, not the court filing numbers.

4          THE WITNESS:  There's a table of scores there.

5    BY MS. MEW:

6    Q.   And so if we took that score at face value, what would it

7    indicate?

8    A.   That would, again, suggest that her reading speed or

9    fluency, which includes, actually, a bit of comprehension, was

10   in the bottom 1 percent.  And the WIAT compared her to age

11   peers.  So that would have been compared to other folks her age

12   at the time, her reading fluency was in the bottom 1 percent of

13   the population approximately.

14   Q.   Did Ms. Ramsay also take the Woodcock-Johnson IV Tests of

15   Achievement?

16   A.   Portions of those tests, yes.

17   Q.   Which portions did she take?  Which portions did Dr. Smith

18   administer?

19   A.   Let me look for them.

20   Q.   And this is page 21.

21   A.   Okay.  So she took, at the very least, the

22   sentence reading fluency test and -- the sentence reading

23   fluency test and the word fluency reading test.  And together

24   the scores on those two tests are used to make an overall

25   composite score called reading rate.

1  Q.   And did Ms. Ramsay obtain any below average scores on

2  these tests?

3  A.   All of her scores, the overall reading rate and the two

4  subscores that it's made of, are below the average range

5  certainly, even below the low average range.

6       Her overall score for reading rate is at the 1st

7  percentile.  So again, that would be the -- approximately the

8  bottom 1 percent of the population.

9  Q.   And when you say the population, is that age based or --

10  A.   In this case she was, again, compared to age peers.

11  Q.   So this is saying that she's performing at the 1 percent

12  level, 99 percent of her same age peers perform better?

13  A.   Taken at value, that's approximately -- taken at face

14  value, that's approximately the interpretation here.

15  Q.   That's what it would be.

16       And then did Dr. Smith also administer the Gray Oral

17  Reading Test, or the GORT?

18  A.   Yes.

19  Q.   Okay.  This is pages 21 and 22.

20       And what does this test measure?

21  A.   This test measures oral reading skills, both with regard

22  to accuracy and fluency, as well as comprehension.

23  Q.   And how does it measure that?

24  A.   So the individual reads a series of passages that get

25  progressively longer and more difficult.  And after each

1  passage, after reading it aloud, the passage is removed and the

2  individual answers comprehension questions about it.  While the

3  client is reading the passages, the examiner notes whether or

4  not errors are made, as well as the time that's taken, things

5  like that.

6  Q.  And did Ms. Ramsay obtain any below average scores on

7  these GORT tests?

8  A.  Yes.  So her rate score was 3, which is at the first

9  percentile.  Her accuracy score, in terms of errors being made,

10 was also below average.  Her fluency score is made up of the

11 rate and accuracy scores, so it, too, unsurprisingly then is

12 below average.  And her comprehension score was also very low,

13 a 3, where 10 is average in this case.  And her score was 3

14 and, that was at the 1st percentile as well.

15 Q.  And so again, taken at face value, what would these scores

16 reflect?

17 A.  Extremely poor reading skills with regard to a variety of

18 different areas of reading.  Not just the speed, but also

19 things like accuracy and comprehension.

20 Q.  And falling at the 1 percentile, who is that compared to?

21 A.  That was compared, not exactly to age peers, because the

22 GORT doesn't quite go up to Ms. Ramsay's age range, but to a

23 sample of the general population, I believe, of 19 to 23 year

24 olds.

25 Q.  So with respect to the below average scores on these

1 various tests we just discussed, in your opinion, are those

2 scores credible?

3 A.   No.

4 Q.   And what do you mean first when we're talking about --

5 credible, what do you mean when you're discussing a credible

6 score?

7 A.   Yeah.  Non-credible is a term that's used in the

8 scientific research literature with regard to assessment.  So

9 when someone takes diagnostic tests and they get scores that,

10 for whatever reason, are not accurate representations of their

11 true skill levels, that could be called a set of non-credible

12 scores.

13 Q.   And so why is it your opinion that these scores are not

14 credible?

15 A.   Because of the overwhelming real world evidence to the

16 contrary.

17 Q.   And what real world evidence are you speaking of?

18 A.   Things like performance on admissions tests, like the ACT

19 and MCAT that were taken without accommodations.  Performance

20 on group administered standardized achievement tests in school,

21 in Ms. Ramsay's K to 12 education, grades, things like that.

22 Q.   So what should an evaluator do when faced with

23 inconsistencies between real world performance and results of

24 diagnostic testing?

25 A.   Well, there are a number of reasons that can cause

1  non-credible data, and so you want to think about what

2  mechanism might explain them in a particular case.

3      So, for instance, if you're evaluating someone who is just

4  recovering from the flu, then you're probably not getting an

5  accurate representation of their skills, if you see that they

6  perform much worse on a diagnostic test that day than they do

7  in the real world during most of their life.  And so that would

8  be one thing to consider.  It doesn't seem to be operating in

9  this case.

10     Another mechanism that would have to be considered is

11 motivation.  So in real world contexts, especially in

12 admissions tests, the individual is motivated usually to

13 perform as well as they possibly can.  The goal is to do

14 something like get into college, get into a good medical

15 school, things like that.

16     In contrast, that motivation, that incentive, is not there

17 in diagnostic testing.  And sometimes in diagnostic testing

18 it's the opposite.  So if someone is already contemplating

19 getting accommodations, if someone already believes that they

20 need accommodations, then if they perform well during the

21 diagnostic testing, then they're not going to get a

22 recommendation for accommodations.

23 Q.  Are there ways that the clinician can test for this

24 motivation?

25 A.  There are specialized assessment measures that have been

1  developed to try to look at someone's motivation or effort

2  level during an assessment, but the discrepancy between the

3  real world evidence and the diagnostic testing would actually

4  be to me the most clear evidence that there's something wrong

5  with the diagnostic test scores.  But there are specialized

6  assessment measures that have been developed.

7  Q.   What are performance validity tests?

8  A.   Performance validity tests are a type of those measures

9  that look at someone's motivation or effort during diagnostic

10 testing.  And they were generally developed to look at feigned

11 memory problems or exaggerated memory problems or otherwise

12 non-credible memory problems.  A lot of them were developed for

13 use or have been used in civil litigation where someone is

14 alleging an injury that may have occurred, say, during a car

15 accident, someone says that they have memory problems

16 afterwards.  And that test is given to detect if their memory

17 problems are genuine or exaggerated or feigned.

18 Q.   And so did Dr. Smith administer one of these types of

19 tests?

20 A.   He did.  He gave the Test of Memory Malingering, which, as

21 its title suggests, was developed to look at feigned memory

22 problems or exaggerated or non-credible memory problems.

23 Q.   And how -- very briefly, how does this -- what does this

24 test measure?  How are you --

25 A.   In the Test of Memory Malingering, you show someone -- to

1   make it very simple line -- drawings of different common

2   objects, like a door or a saw or something like that.  And you

3   show them sets of these and then ask which they've seen before

4   and which they haven't, things like that.

5   Q.   Is there any reading involved on this test?

6   A.   No.

7   Q.   How did Ms. Ramsay perform on this test of memory

8   malingering?

9   A.   In Dr. Smith's report, he describes the two parts of the

10  Test of Memory Malingering that are typically used to score at,

11  Trial 2 and the Retention trial.  And I believe she got perfect

12  scores on both of those, suggesting that she -- if those are

13  taken to mean what the Test of Memory Malingering normally

14  means, it suggests that she was not exaggerating or feigning

15  any memory problems.

16  Q.   So in this case, does that explain away the discrepancy

17  between the diagnostic tests and the real world performance

18  that you referred to?

19  A.   No, it would have nothing to do with that.  In this case,

20  especially by the time that Ms. Ramsay saw Dr. Smith, as she

21  testified to earlier today, she needed evidence of slow

22  reading.  She obtained evidence of slow reading.  The Test of

23  Memory Malingering never would have picked up on slow reading,

24  whether it was genuine, exaggerated, feigned, credible,

25  non-credible.

 1  Q.   Focusing now, or switching to ADHD, Dr. Smith administered

 2  or utilized assessments relating to attention; is that correct?

 3  A.   Yes.

 4  Q.   What are the adult ADHD rating scales?  And you know what?

 5  Let's look at Defendant's Exhibit -- let's look at Defendant's

 6  Exhibit 76.

 7  A.   Okay.  76.  I'm there.

 8  Q.   Oh, 46, 46.  My apologies, all.

 9  A.   Okay.  I'm at 46.

10  Q.   You still beat me there.

11       So are these the adult ADHD rating scales with adult

12  prompts?

13  A.   Yes.

14  Q.   And so just briefly explain, what are these rating scales

15  used for?

16  A.   So these are used as part of a diagnostic assessment for

17  ADHD.  So I had mentioned earlier that there are 18 official

18  symptoms of ADHD in the DSM.  And you see those listed here.

19       And in addition, you see more specific prompts, questions

20  that can be asked that are more adult specific.  So the ADHD

21  criteria were originally developed long ago for children.  It

22  was thought of as a childhood disorder.  We know that certainly

23  there are cases where it continues to adulthood.  It still has

24  to have childhood onset, but it has to -- but it can continue

25  to adulthood.  And so there have been criteria for -- or I

1  should say there have been assessment measures developed that

2  have more adult-specific examples of DSM symptoms.

3  Q.   If you look at pages 60 and 61 of Exhibit 46, it looks

4  like these are Ms. Ramsay's scores that she applied on this

5  rating scale.

6       What do these ratings convey in terms of her symptoms and

7  the level of severity?

8  A.   It appears that when Ms. Ramsay rated each of her 18

9  symptoms in a sort of overall way, she reported that 17 of them

10 were experienced to a severe degree and one of them was

11 reported as being present to a mild degree.

12 Q.   What type of day-to-day behavior would you expect to see

13 from someone who is endorsing this number and level of severity

14 of symptoms of ADHD?

15 A.   Well, some of that is contained in the individual prompt,

16 so there are times when Ms. Ramsay reports having severe

17 problems with, for instance, forgetting things.  There are

18 other times when we would just expect to see general pretty

19 significant life impairment.  To have a diagnosis of ADHD, you

20 only actually have to have five symptoms under the current

21 criteria if you're 17 or older.  And so reporting 17 out of the

22 18 symptoms as being present to a severe degree, we would

23 expect someone to be grossly impaired.  We would expect someone

24 to not be able to function in school or work settings.  We

25 would expect someone to have deficits that I would expect to be

1  visible in terms of everyday behavior in life, to have that

2  many more symptoms than are needed for a diagnosis.

3  Q.   In your opinion, are Ms. Ramsay's reports as to the level

4  and degree of her symptoms credible based on the other records

5  that you see?

6  A.   At the very least, I would say they're not adequately

7  supported by objective evidence.

8  Q.   What is the Integrated Visual and Auditory Continuous

9  Performance Test?

10  A.   That's a computerized test that's often given as part of

11  ADHD evaluations, where someone has to press keys at certain

12  times during the task and then withhold pressing during other

13  times.  So it's supposed to look at both attention as well as

14  self-control.

15  Q.   And is this another test that Dr. Smith administered?

16  A.   He did.

17  Q.   How did Ms. Ramsay perform on this test?

18  A.   Just to be precise, I'd have to go back to --

19  Q.   Please do.  I'm sorry.

20  A.   Let's see.  So I'm back in Dr. Smith's report.

21        Okay.  Dr. Smith actually administered the test that you

22  mentioned twice, it's listed.  And there were a number of very

23  low scores both times.

24  Q.   And if you wait just a minute, Dr. Lovett.

25        THE COURT:  What page?

 1          MS. MEW:  Page 12, page 11, beginning on page 11.

 2          THE WITNESS:  This is page 11 to 14 of the report

 3     where it says page X of 31.

 4          MS. MEW:  Just hold on for one minute.

 5          THE WITNESS:  Sure.

 6          MS. MEW:  So this is Exhibit 3B.

 7          MR. BERGER:  Okay.  Thank you.

 8     BY MS. MEW:

 9     Q.  So if you could continue.

10          How did Ms. Ramsay perform on this?

11     A.  Well, the tests that we're describing, it's known as the

12     IVA, or I-V-A, for short.  It generates many scores.  Dozens of

13     scores, actually.  But the overall scores are the ones that I

14     think -- total scores or composites are the ones that are, in

15     some sense, most important, or easily interpretable.  Ms.

16     Ramsay's performance was far below the average range at the 1st

17     percentile.  It appears that, again, if these scores were taken

18     at face value, her attention skills and her self-control skills

19     would be very, very poor, in the bottom 1 percent of the

20     population.

21     Q.  Do you consider these scores to be credible?

22     A.  I don't consider them to be adequately supported.

23     Q.  Dr. Lovett, is it appropriate to diagnose a learning

24     disability or ADHD based solely on scores of diagnostic,

25     in-office assessments, diagnostic assessments?

1  A.   No.  It's in the criteria for both types of disorders.  If

2  you look at the DSM criteria for both learning disabilities and

3  ADHD, you see reference to things in real world settings,

4  educational and occupational functioning, in the case of

5  learning disabilities, academic, social and occupational

6  situations for ADHD.  So you see reference to things outside of

7  the diagnostic context.

8  Q.   Do you remember, from your review of Dr. Smith's report,

9  whether he had any, what you've discussed as real world

10  evidence that he considered as part of his report?

11  A.   Yes.  I remember at the very least there were report

12  cards, selected report cards that at least he had listed as

13  reviewing.  And there may be more.  I can go to the listing of

14  things.

15  Q.   Okay.  So we're back to Exhibit 3B on the first page,

16  first and second page.

17  A.   So the records that he describes as having reviewed

18  include an MCAT score report, the ACT score report.  So those

19  two, obviously, very important, real world standardized tests,

20  taken without accommodations.  He reports the report cards that

21  I had mentioned earlier, a high school transcript, an

22  undergraduate college transcript, as well as the Step 1 score

23  report.

24  Q.   And how did Dr. Smith treat this real world evidence in

25  his analysis?

1  A.   At one point in the report, I believe he described the

2  report cards and the real world records, something like that,

3  as not clearly showing impairment or not clearly showing

4  problems academically.  Let me see.  It may have been in the

5  summary.

6       Perhaps it's in the background history.

7  Q.   And that's fine.  I don't think you need to look for a

8  direct quote if that's your...

9  A.   Yeah.  I remember at one point there was an admission that

10  there wasn't clear evidence from the report cards of problems.

11  And with regard to some of the other evidence that I mentioned,

12  the MCAT as well as -- well, for the MCAT at the very least,

13  there's a description on page 7 of the report about reading

14  strategy involving not reading any of the passages until you

15  first answer the questions that you could without reading the

16  passage, something we've heard about a number of times already.

17       So the evidence from the real world was discussed.  I

18  don't believe it was interpreted correctly, but it was

19  reviewed.

20  Q.   If you look on page 29 of the report, the first full

21  paragraph, is that what you were looking for?

22  A.   Yes, that's actually the exact passage I was thinking of.

23  In the first full paragraph, the only full paragraph on that

24  page, the available school records do not clearly reflect

25  academic struggles in elementary, middle or high school.  And

1   then Dr. Smith provides what he feels is a sort of explaining

2   away of that.  This is the result of the family obtaining help,

3   et cetera, which we've heard already in the hearing.

4   Q.   In the records that you reviewed relating for Ms. Ramsay's

5   school records that we've discussed in this hearing, did you

6   see any indication in those records that she had received

7   informal accommodations?

8   A.   I did not.  Even when there were places on the report

9   cards where there were spots for the teacher to indicate that

10  specifically, any sort of unusual or additional or atypical

11  support or help.  So no, absolutely not.

12  Q.   Dr. Lovett, are you familiar with the ACT exam?

13  A.   Generally, yes.

14  Q.   Can you generally describe its content?

15  A.   It's a test that's used for college admission.  It has

16  different sections that yield scores in a variety of areas.

17  And the overall scores include English, math, science and

18  reading.

19  Q.   Is the ACT a test used for diagnosing learning

20  disabilities?

21  A.   It's not a test that was designed to diagnose learning

22  disabilities through a clinical evaluation, but it can provide

23  very helpful evidence, because, remember, the learning

24  disability criteria involve real world functioning.  So it can

25  provide evidence that's certainly relevant to making a

1  diagnosis.  And if someone has a learning disability, we would

2  expect it to be reflected on that test, so long as it's taken

3  without accommodations.

4      I should also mention the ACT has a writing portion, I

5  don't think I mentioned that earlier, as part of the scores.

6  Q.   Well, we can turn to -- why don't you turn to Defendant's

7  Exhibits 30 and 31, so you have the scores.

8  A.   Okay.  I'm there.

9  Q.   Do you know how many individuals take the ACT exam each

10 year?

11 A.   I understand that it's been somewhere between a million

12 and 2 million and may have surpassed 2 million recently.

13 Q.   And how does the cohort of individuals who take the ACT

14 compare to the general population?

15 A.   In a rough way, I would describe it as reflecting the

16 general population at that age and grade level.

17 Q.   How did Ms. Ramsay perform on the ACT?

18 A.   So the -- when she took it in March of 2007, her overall

19 score was at the 90th percentile, so in the top 10 percent of

20 that cohort that we described.  And her reading score, in

21 particular, the overall reading score was at the 87th

22 percentile, so in the top 13 percent of that --

23 Q.   And you're looking at Exhibit 30?

24 A.   I am.  So that was the March 2007 administration of the

25 ACT.

1    And then she took it again in October of 2007.  Her

2    overall score was at the 97th percentile, so in the top

3    3 percent of individuals in that cohort.  And then the reading

4    score in particular was at the 91st percentile, so in the top

5    9 percent of the individuals in the population there.

6    Q.    And you're looking now at Defendant's Exhibit 31?

7    A.    Yes.

8    Q.    Would Ms. Ramsay's performance to perform at this level on

9    the ACT exam, would Ms. Ramsay need to read with fluency?

10   A.    I believe so, yes.

11   Q.    Would she need to read with automaticity?

12   A.    Some degree of it, yes, absolutely.

13   Q.    What does Ms. Ramsay's performance on the ACT tell us with

14   respect to her alleged learning disabilities, ADHD?

15   A.    It's among many pieces of evidence that really undermine

16   those diagnoses.  To have a learning disability and to be

17   performing in the top 3 percent on a college admissions test

18   that is a reading-based test, with some writing, to --

19          MR. BERGER:  Your Honor, I'm going to object at this

20   point because of lack of foundation, because all that Dr.

21   Lovett has said is that he's generally familiar with the ACT.

22   We don't know if he's familiar with the ACT as it was

23   administered when Ms. Ramsay was taking it.  We don't know the

24   extent of his familiarity.  We don't know --

25          THE COURT:  If that's a form of an objection,

LOVETT - DIRECT

1  overruled.

2          MR. BERGER:  Yes, sir.

3          THE COURT:  You'll have an opportunity to

4  cross-examine the witness.

5          You may continue, sir.

6  BY MS. MEW:

7  Q.  What does Ms. Ramsay's performance on the ACT tell us with

8  respect to whether she's substantially limited in any major

9  life activity relevant to taking standardized tests?

10  A.  Well, with regard to the tests that she -- it suggests

11  that she is generally not substantially limited in that regard.

12          Considering the Step 1 exam, which she's applied for

13  accommodations on, one skill that's needed when you're taking

14  that test is reading comprehension skills under timed

15  conditions.  And those were measured in the ACT and found to be

16  not only adequate but well above average.

17  Q.  Let's turn now to Defendant's Exhibit 32, which is Ms.

18  Ramsay's MCAT score report.

19          Are you familiar with the Medical College Admission Test?

20  A.  Again, generally.  I have seen sample items that have been

21  disclosed by the Association for American Medical Colleges, the

22  group that administers the test.  I'm familiar with the

23  different sections and what the formats of the items are like.

24  Q.  Can you very briefly describe its consent?

25  A.  Yeah.  So the MCAT has changed over time.  The version

1 that Ms. Ramsay took yielded scores in four areas, physical

2 sciences, verbal reasoning, biological sciences and then a

3 writing sample.  So the physical sciences, verbal reasoning and

4 biological sciences involve multiple choice questions.  And of

5 those three sections that are multiple choice based, the

6 physical sciences and biological sciences are what I would call

7 content intensive, content heavy, in the sense that they are

8 relying on specific premedical knowledge that you're supposed

9 to have.  You're applying to get into medical school.

10     The verbal reasoning portion I would not describe as

11 content heavy in that sense.  You're not expected to be

12 familiar with a lot of specific background content for the

13 different passages.  Instead, you're supposed to be able to

14 read, comprehend and analyze them under the timed conditions

15 under the standard administration conditions of the test.

16 Q.   Is the MCAT a test that can be used to -- as a diagnostic

17 test for learning disabilities?

18 A.   Again, I wouldn't call it a diagnostic test.  It wasn't

19 designed for the purpose of diagnosis of learning disabilities,

20 but it's absolutely a test where we would expect learning

21 disabilities to be reflected.  It certainly is a part of the

22 information that should be considered during a diagnostic

23 assessment of learning disabilities.

24 Q.   How does the cohort who takes the MCAT compare to the

25 general population?

1 A.   Well, if you're taking the MCAT, you're typically applying

2 to medical school.  And so if you're a medical school

3 applicant, you may be a junior or senior in college.  You may

4 have graduated from college.  We would expect individuals who

5 are taking the MCAT to be above average compared to the general

6 population in terms of their academic skills.

7 Q.   And how did Ms. Ramsay's performance compare to this above

8 average cohort?

9 A.   Her overall score on the MCAT was at the 79th percentile.

10 So better than 79 percent of that select group to begin with.

11     Her verbal reasoning score, which, again, is the one that

12 really represents that timed reading comprehension, that was at

13 the 67th percentile.  So her performance was better than

14 two-thirds of that select group when it comes to timed reading

15 comprehension.

16 Q.   Does performance at this level on the MCAT require reading

17 with fluency?

18 A.   I believe it does.

19 Q.   And does performance at this level of the MCAT require

20 reading with automaticity?

21 A.   I do believe so, some degree of automaticity.

22 Q.   What does Ms. Ramsay's performance on the MCAT tell us

23 with respect to her diagnosis of learning disabilities and

24 ADHD?

25 A.   Certainly with regard to the learning disability diagnoses

1  that she's applied for accommodations under reading and

2  writing, it severely undermines those diagnoses.  She performed

3  in the average range on the writing sample and she performed

4  above -- well, she performed in the average range again on

5  verbal reasoning, compared to that highly select group.

6  Q.  What does Ms. Ramsay's performance on the MCAT tell us

7  with respect to whether she is substantially limited in any

8  major life activity relevant to taking a standardized test?

9        MR. BERGER:  Objection to legal conclusion.

10       THE COURT:  Overruled.

11       THE WITNESS:  It suggests that she does not have those

12 limitations with regard to tests that are similar in format in

13 terms of what you have to do on the MCAT, at least.  You know,

14 a reading-based test where you're responding to multiple choice

15 questions.

16 BY MS. MEW:

17 Q.  Just shifting gears a bit.

18     We've alluded to this before, but in the course of this

19 litigation, have you reviewed additional school and

20 standardized test records for Ms. Ramsay?

21 A.  Again, yes.

22 Q.  And you were here for the testimony yesterday, so you were

23 following along and I don't need to go through --

24 A.  I was.  Some of those I had seen and others I had not.

25 Q.  In Ms. Ramsay's case, did the results of the diagnostic

LOVETT - DIRECT

1  testing conducted by Dr. Smith, with respect to where the

2  scores were exceptionally low, match with what you've seen and

3  heard about in her school and other standardized test history?

4  A.   They directly and thoroughly contradict each other.

5  Q.   In your opinion, does Ms. Ramsay meet the diagnostic

6  criteria for any specific learning disability?

7  A.   No, I don't believe so.

8  Q.   In your opinion, does Ms. Ramsay meet the diagnostic

9  criteria for ADHD?

10  A.   I don't believe there is sufficient evidence to conclude

11  that ADHD is present.  And there also is some evidence that

12  suggests the opposite, that it is not.

13  Q.   In your opinion, again based on the materials you've

14  reviewed, is Ms. Ramsay substantially limited in any major life

15  activity relevant to taking the USMLE?

16  A.   At least with regard to the learning disabilities and

17  ADHD, again, I could not find sufficient evidence that she is.

18  Q.   Or that she requires extra time on the USMLE?

19  A.   Exactly, yes.  That I cannot find -- that I wasn't able to

20  find sufficient evidence, certainly, of a need for additional

21  time.

22  Q.   Dr. Lovett, I think you testified at the start of your

23  testimony that when you make recommendations to NBME, sometimes

24  you recommend denying, sometimes you recommend granting,

25  sometimes you make no recommendation at all.  Is this a close

1  case, is this a borderline case between yes or no?

2  A.   Even based on the initial documentation, I would say no,

3  it's not a close case.  So given that even when I first

4  reviewed the case, there were multiple pieces of clear real

5  world evidence of adequate or above average performance on

6  timed measures of reading comprehension, from the real world, I

7  would say no.  And since I have seen some additional documents

8  and even, honestly, having sat here for this hearing, I've

9  heard even more that really undermines both the diagnoses, as

10  well as the accommodation needs, relative to the standard that

11  we use.

12          MS. MEW:  Thank you, Dr. Lovett.

13          THE COURT:  Very well.  Cross-examination.

14          MR. BERGER:  Your Honor, it's 12:30 --

15          THE COURT:  I'm aware of the time.

16          Are you ready to proceed, Counsel?

17          MR. BERGER:  Do you want me to --

18          THE COURT:  Yes.  I said before we resumed that we

19  would be taking lunch at a quarter of 1:00.

20          MR. BERGER:  Okay.

21          THE COURT:  And we'll be in lunch until 1:30.

22          MR. BERGER:  Right.

23          THE COURT:  I want to use this time as much as I can.

24          MR. BERGER:  Yes.

25          THE COURT:  So I don't have to spend your time and my

1  time any longer than necessary.

2        MR. BERGER:  Absolutely.

3        THE COURT:  All right?

4        MR. BERGER:  I apologize, I missed that.

5        THE COURT:  No problem.  I'm just trying to make sure

6  it's clear.

7                    CROSS-EXAMINATION

8  BY MR. BERGER:

9  Q.   Dr. Lovett, good afternoon.

10 A.   Good afternoon.

11 Q.   You recall that several weeks ago I took your deposition.

12 Correct?

13 A.   Yes.

14 Q.   And I asked you at that time several questions about the

15 tests that Dr. Smith administered to Ms. Ramsay and the results

16 that he got.

17      And I may want to refer to some of those, again,

18 specifically, but generally, I asked you, for example, with

19 respect to the WIAT-III, which you discussed in your testimony,

20 whether you had any doubt that Dr. Smith had actually

21 administered that test.  And let me ask you that question now.

22      Do you have any doubt that he administered the portions of

23 the WIAT-III that he described in his report?

24 A.   I have no reason to doubt that, no.

25 Q.   And do you have any doubt that he -- that the results of

1  his administration of that test were as he reported?

2  A.   No.  I haven't rescored them, but I have no reason to

3  doubt that the scores, you know, were calculated correctly in

4  the sense that Ms. Ramsay obtained those scores on those tests.

5  Q.   And I asked you also I believe with respect to the

6  WIAT-III whether you would agree that that was an appropriate

7  test to administer in a case where there was consideration of a

8  dyslexia diagnosis.

9  A.   Yeah.

10  Q.   And what's your answer to that?

11  A.   I believe it was what I'm going to say it is now as well,

12  which is that it can certainly contribute useful information

13  towards that diagnosis.  Like any piece of evidence, it has to

14  be interpreted correctly, but to give that during a diagnostic

15  battery would not be inappropriate.

16  Q.   And that's generally consistent with your testimony so far

17  today.  Correct?

18  A.   I hope so.

19  Q.   And the same -- let me just quickly review the same set of

20  questions with respect to the Woodcock-Johnson IV.

21     Do you have any doubt that Dr. Smith administered those

22  portions of the Woodcock-Johnson IV that he described?

23  A.   No.

24  Q.   And do you have any doubt that the results from his

25  administration were what he reported?

1   A.   I have no reason to doubt that the scores were

2   miscalculated.

3   Q.   And again, is that a test that is appropriate for a

4   situation where a diagnosis of dyslexia is being considered?

5   A.   As I had said in the deposition and as I had said with

6   regard to other tests that were described, it can certainly

7   contribute useful evidence when one is assessing the presence

8   of learning disabilities if it's properly interpreted.

9   Q.   All right.  And the same question then with respect -- or

10  series of questions with respect to the Gray Oral Reading Test,

11  or GORT.

12       Do you have any doubt that he administered the GORT as he

13  described?

14  A.   No.

15  Q.   And do you have any doubt that he -- that the results were

16  what he reported?

17  A.   Again, I have no reason to doubt it.  I haven't rescored

18  it, but I have no reason to doubt that those scores were

19  correctly calculated.

20  Q.   And is the GORT an appropriate test to administer in a

21  case where a diagnosis of dyslexia is being considered?

22  A.   As with the others, it can contribute useful information

23  if it's interpreted properly.

24  Q.   Now, I don't believe that in the deposition I asked the

25  same question with respect to the IVA or IVA+Plus.  That test,

1  as I understand it, is one that relates to the diagnosis of

2  ADHD; is that correct?

3  A.   Yes.

4  Q.   And do you have any reason to doubt that Dr. Smith

5  administered that test as he described in the report?

6  A.   No.

7  Q.   And do you have any reason to doubt that he achieved the

8  results that he reported?

9  A.   No.

10  Q.   And is that an appropriate test to consider when

11  considering a diagnosis in an adult like Ms. Ramsay of ADHD?

12  A.   Although it's not a primary source of evidence, I don't

13  think it's inappropriate to include that in a battery for ADHD.

14  Q.   Do you recall from Dr. Smith's report whether Ms. Ramsay

15  took her ADHD medication on the day that he tested her, that

16  Dr. Smith tested her?

17  A.   If I recall correctly, she did not take her ADHD

18  medication on that day.  I would have to check the report, but

19  I recall that --

20  Q.   Yes, I think you're recalling correctly.  I think that's

21  what the test said -- what the report says.

22      Is that an appropriate procedure when you are testing

23  someone for ADHD?

24  A.   There are debates about that.  There's no consensus among

25  clinicians in my experience, so there are reasons why you might

1  want to have someone on medication, there are reasons why you

2  might want to have them off medication.  I don't think it was

3  inappropriate to ask Ms. Ramsay not to take medication or to

4  test her off medication.

5  Q.  Do you know, and this is kind of a legal question, so I

6  will apologize in advance, but I think certainly you have some

7  familiarity with the ADA.

8      Do you know what the ADA provides as to whether mitigating

9  measures like medication should be considered in determining

10 whether somebody has a disability?

11 A.  My understanding is that it differs with regard to the

12 issue of disability versus accommodation needs.  And for the

13 purposes of disability, I understand the current version of the

14 ADA as amended to indicate that determination of disability, as

15 opposed to accommodation needs, should be made without

16 reference to mitigating factors, with the exception of

17 eyeglasses, I believe.  Accommodation needs being another

18 matter.

19 Q.  So when Dr. Smith tested Ms. Ramsay based on what he has

20 reported, she was not, on that day, getting whatever benefit

21 she gets from the ADHD medication that's been prescribed for

22 her; is that correct?

23 A.  I'm sorry, could you repeat that question?

24 Q.  Let me try and restate it.

25     On the day when Dr. Smith tested her and based on what he

1  said in his report, on that day she did not have the ADHD

2  medication, so that mitigating measure was not in play when he

3  tested her?

4  A.  Correct.

5  Q.  All right.  You mentioned with respect to ADHD that one of

6  the criteria is the presence of symptoms prior to the age of

7  12.

8      Is that generally correct?

9  A.  Yes.

10 Q.  Is it also true that ADHD can be diagnosed for the first

11 time when somebody is an adult?

12 A.  It can certainly be diagnosed for the first time when

13 there's evidence of the symptom prior to age 12.

14 Q.  And the DSM-5 specifically says that it can be diagnosed

15 in an adult?

16 A.  I know that there are -- I mean, I would have to check the

17 DSM, but I certainly, you know, know that the DSM-5

18 acknowledges adult ADHD-related issues.  I don't think there's

19 any problem diagnosing it in an adult.  It can even be

20 diagnosed, as I say, for the first time in an adult, but,

21 again, it has to show symptoms much earlier on.

22 Q.  The group of people who apply for accommodations for USMLE

23 Step 1 are not a group of people that is the same as the

24 general population, would you agree with me?

25 A.  I would certainly -- I would not expect them to be.

1   Q.   They are all people who have been accepted to a medical

2   school.  Correct?

3   A.   I believe so.

4   Q.   And they're all people -- and it varies from one school to

5   another, but they are all people who have completed either

6   generally two years or three years of medical school.  Correct?

7   A.   I would have to check the exact requirements for taking

8   the Step 1 exam, but as a general rule, they are, at the very

9   least I believe enrolled in medical school.  As you say, it

10  would vary from school to school, but as a whole, yes.

11  Q.   Okay.  And my -- last question before we break.

12       On your direct testimony, you discussed the fact that in

13  cases that NBME sends you for review, that in some cases you do

14  recommend that an accommodation be granted, and in some cases

15  you recommend against that.

16       What would you estimate is the percentage of cases in

17  which you recommend that an accommodation be granted?

18  A.   I don't keep track of that.  I couldn't estimate that.

19  And as I say, in some cases I don't even make a recommendation,

20  I might just summarize things.  I also review for other testing

21  agencies and so it's hard to think about what was NBME versus

22  other things.

23  Q.   Okay.  One other -- one other question.

24       What other testing agencies do you currently review for?

25  A.   I review regularly for the National Board of Osteopathic

1  Medical Examiners, the New York State Board of Law Examiners,

2  for the New York Bar Exam and the Law School Admissions

3  Council, for the LSAT.  Those I would say are the regular

4  agencies.  Occasionally I also will review by special request

5  for an agency that has a particular issue and have reviewed for

6  others in the past.

7          MR. BERGER:  Your Honor, I think this is a good time.

8          THE COURT:  Very good.  We shall be in recess till

9  1:30.  And enjoy your lunch today.

10         And sir, I will advise you you're under

11 cross-examination now and you cannot consult with counsel in

12 reference to your testimony.  You can talk to them about

13 anything, lunch or the game last night or whatever or this

14 weekend, but not about your testimony because you're under

15 cross-examination.

16         THE WITNESS:  Thank you.

17         THE COURT:  We'll be in recess.

18         (Luncheon recess at 12:46 p.m. until 1:31 p.m.)

19         THE COURT:  You may be seated.

20         You can resume the witness stand, sir.

21         THE WITNESS:  Thank you.

22         THE COURT:  And I'll remind you, you are still under

23 oath from previously being sworn in this afternoon.

24         THE WITNESS:  I understand.

25         THE COURT:  You may proceed, Counsel.

1  BY MR. BERGER:

2  Q.   In teaching students who are training to become

3  psychologists, who are studying to become psychologists, do you

4  teach courses about assessment or have you taught courses about

5  assessment?

6  A.   I will be starting the graduate courses for school

7  psychologists in the spring.  I've certainly taught courses for

8  undergraduates on assessment, and some of them are in education

9  or other fields where they are administering achievement

10  measures, things like that.

11  Q.   Would you teach your students that they should administer

12  a test like the ACT in order to help them in reaching a

13  diagnosis?

14  A.   I would definitely tell them they need to review someone's

15  ACT scores when making a diagnosis.  The ACT is not a test

16  that's given in a one-to-one format from a clinical evaluator,

17  so it's information that would need to be reviewed on making a

18  diagnosis, and I certainly have taught that.

19  Q.   And I assume that the same would be true for the MCAT?

20  A.   Exactly.

21  Q.   Do you believe based on your knowledge of ADHD that

22  someone with ADHD can be successful in school?

23  A.   With intervention and accommodation, I certainly think

24  that's possible, and I've seen it happen.

25  Q.   And do you believe, again, based on your knowledge and

LOVETT - CROSS

1  experience, that someone with dyslexia can be successful in

2  school?

3  A.   Dyslexia is a little tougher, because if the intervention

4  is effective, there's a question of whether or not the person

5  really still has dyslexia or a learning disability in reading

6  or anything like that.  But I would say that with

7  accommodations and interventions, I've seen students who at

8  least at some point have had a diagnosis of dyslexia, or a

9  profile of scores that may indicate a learning disability in

10 reading, be successful in school with appropriate measures.

11 That really depends on the exact data for that individual.

12 Q.   Well, in the case of a person with dyslexia, would a

13 possible accommodation be to allow that person additional time

14 to read whatever had to be read?

15 A.   It really would depend on the person's profile.  I can see

16 that being one of the things, but for a child who has dyslexia,

17 at least as it's generally understood as a learning disability

18 in reading, the term "dyslexia" is used somewhat more flexibly,

19 so it's a little harder to speak about dyslexia.  But if we're

20 talking about what qualifies as a learning disability in

21 reading, at least under the DSM, extended time would not be the

22 first thing that would come to mind.  If someone has trouble,

23 especially as a child with a learning disability in reading,

24 then I would expect that they would actually need a more

25 intensive accommodation, like a reader or something like that,

LOVETT - CROSS

1   on tests.  But extended time could be part of a package of

2   accommodations that are given to a student with dyslexia.

3   Q.   All right.  So Ms. Ramsay -- and you were present during

4   Ms. Ramsay's testimony.  Correct?  And she testified that she

5   has, in some situations, been able to use the Kurzweil program.

6        Are you familiar with that?

7   A.   Generally, yes, uh-huh.

8   Q.   All right.  So if someone who had dyslexia was permitted

9   to use a Kurzweil -- the Kurzweil program, would that person

10  still be a person with dyslexia?

11  A.   Well, first of all, since you're referring to Ms. Ramsay's

12  testimony, I don't recall a period of time during which she

13  reported having had access to Kurzweil or having used it.

14       Putting that aside, an individual who has a learning

15  disability in reading or some sort of reading problems, could

16  certainly be assisted by the Kurzweil technology.

17  Q.   Do you believe that people with ADHD can be successful in

18  work or in their careers?

19  A.   Again, if someone has appropriate intervention, then they

20  certainly may be able to.

21  Q.   And do you believe that somebody with dyslexia can be

22  successful in work or in a career?

23  A.   Well, again, there, if the intervention is successful, I

24  don't know if I would use the term "dyslexia" or a learning

25  disability in reading to describe them anymore.  Those sorts of

1   problems can sometimes be treated very effectively.  But can

2   someone who has one point has a diagnosis or some sort of

3   reading problems later become successful through appropriate

4   intervention?  Absolutely.

5   Q.   Aren't there in fact very well known business and

6   political leaders who have been widely reported as having

7   either ADHD or dyslexia?

8   A.   I don't think that relates to your prior question, because

9   I would just say in those cases, we rarely have the sort of

10  evidence to review to know whether or not that's the case.

11  Historical figures are often said to have had dyslexia or ADHD.

12  We never know that to be the case.

13  Q.   Okay.  Well, whether -- forget about my previous question.

14  Answer this question.

15       Isn't it true that there are well known political and

16  business figures who have been widely reported as having either

17  ADHD or dyslexia?

18  A.   I certainly have heard of famous people who it is claimed

19  have ADHD or dyslexia.

20  Q.   I believe that there have been such reports about Charles

21  Schwab, for example?

22  A.   I have heard of that.

23  Q.   And about Sir Richard Branson?

24  A.   I heard of that as well.

25  Q.   And about David Boies, the attorney?

1  A.   Yes.

2  Q.   Leading attorney.

3  A.   I have heard that claim.

4  Q.   And one that I remember from long ago in my life, former

5  vice president and former governor Rockefeller.  Correct?

6  A.   I don't know that I've heard of that particular case of

7  purported disability or dyslexia or ADHD.  I don't know the

8  details of what you're referring to there.

9  Q.   Do you believe that somebody who has ADHD can successfully

10 become a physician?

11 A.   I don't think there's anything about having ADHD per se

12 that would prevent someone from becoming a physician.  ADHD is

13 heterogenous in terms of its level of severity.  And again,

14 with appropriate intervention, and at times accommodations, I

15 don't think that it would be impossible for someone to both

16 meet the criteria at some point, perhaps, prior to

17 intervention, and then be able to be a physician.

18 Q.   Do you believe that -- same question for dyslexia.  Do you

19 believe that somebody with dyslexia could successfully complete

20 training and practice as a physician?

21 A.   Again, with dyslexia, I'm hesitant to say much about that

22 term, but for a learning disability in reading with appropriate

23 intervention, someone who at one point -- or accommodations,

24 someone who at one point met criteria for a learning disability

25 in reading may well be able to be a successful physician.

1 Q.  Have you in your work as a reviewer for NBME ever made a

2 recommendation for an extended testing time accommodation --

3 A.  I'm sure --

4 Q.  -- for a student on any of the step exams?

5 A.  I'm sure I have.

6 Q.  And do you remember what -- what the diagnosis was that

7 the request was based on in that case or in those cases?

8 A.  I am sure there have been multiple times when I've

9 recommended it.  The diagnoses would vary, but, I mean, I don't

10 remember -- we're not talking about a particular instance, so I

11 typically review cases where learning disabilities and ADHD are

12 at least part of the list of diagnoses that someone is

13 requesting accommodations under, but I can't --

14 Q.  So again, just in general, not right now specifically

15 referring to Ms. Ramsay, can extended testing time be an

16 appropriate accommodation for someone who has ADHD?

17 A.  There are times when that would be an appropriate

18 accommodation.

19 Q.  And can extended testing time be an appropriate

20 accommodation for somebody with dyslexia?

21 A.  Yes, there are times when that would be an appropriate

22 accommodation.

23 Q.  We discussed earlier some of the tests that Dr. Smith did.

24 I think we talked about the WIAT-information and the

25 Nelson-Denny and the GORT and also I think the Woodcock-Johnson

1   IV.

2        Are any of those tests tests for which somebody can study,

3   that is, the person who is taking the tests, who is being

4   evaluated, can you study for that test?

5   A.   I mean, if by study you mean prepare, I'm trying to think

6   about how one would study for those sorts of tests.

7        Unless you found -- I suppose you could find out

8   information by looking them up, but I don't think of those as

9   tests that people typically study for.

10  Q.   And actually, isn't it true that the publishers of those

11  tests go to great lengths to make sure that the tests are not

12  publicly disclosed?

13  A.   It's true.  I mean, some tests there are available things

14  online about them, the Nelson-Denny in particular.  But it's

15  true that some of those tests would not generally be studied

16  for.  I wouldn't expect that to be typical.

17  Q.   By contrast to those tests, the MCAT is a test for which

18  you could study.  Correct?

19  A.   Yes.

20  Q.   And the ACT is a test for which you could study?

21  A.   Yes.

22  Q.   Were you present yesterday when Ms. Ramsay testified about

23  the way in which she took the MCAT?

24  A.   I believe so.

25  Q.   And particularly, you might recall -- and I don't know

1  whether you've had an opportunity to see this, but there was an

2  exhibit that was marked in which she had marked up a form of

3  the verbal reasoning section of the MCAT.

4      Have you see that exhibit?

5  A.  I have not.  I remember being present when it was

6  discussed, but I haven't seen it.

7      MR. BERGER:  Your Honor, the exhibit to which I'm

8  referring -- and, Professor Lovett -- Professor Lovett, the

9  exhibit to which I'm referring was marked as P-19A yesterday.

10 It's not in the binders, so I don't know whether a copy is

11 readily available.  I have one copy that I can show the

12 witness, and I can --

13     THE COURT:  Did you give it to the Court?

14     MR. BERGER:  Yes, yes, we did.  We did give a copy to

15 the reporter.

16     This is it.

17     THE COURT:  All right.  Take it up to him.

18 BY MR. BERGER:

19 Q.  Have you reviewed this exhibit before?

20 A.  No.

21 Q.  All right.  Let me direct your attention to the pages that

22 have the numbers 29 and 30.

23 A.  Okay.

24 Q.  And you'll see that on page 29 is a copy of a -- is a

25 reading passage.  And then on page 30, there are several

1 questions that are based on the reading passage.

2 A.   I see.

3 Q.   In each of these, Ms. Ramsay had marked up the document.

4 This was, by the way, a document that was marked during her

5 deposition.  And so she took that and marked up a copy of it as

6 she explained yesterday to indicate how she would have

7 approached these questions.

8     Look at page 30 and question number 44.

9 A.   Okay.

10 Q.   And Ms. Ramsay in her comments said she would have tried

11 to answer this one first.  And that you see the question itself

12 refers to the fourth paragraph, so the question gives you a

13 specific reference, and she would have read the fourth

14 paragraph and answered based on that.

15     Is that approach to a question like this that would reduce

16 the amount of reading that she would have had to do?

17 A.   Well, with regard to the question -- with regard to

18 question 44, reading the fourth paragraph to answer that as

19 opposed to reading the whole paragraph -- or rather the whole

20 passage would be less reading, so...

21 Q.   All right.  And then she indicates that she would then

22 have tried question 43 based on having read paragraph 4 and so

23 forth.

24     I mean, my general -- what I'm trying to get at here, and

25 I think now let's refer back to your report, the report that

1  you submitted.  It will just take me a little bit, because I

2  have to find it in the defendant's binder.  And I think it's

3  Exhibit 6 and Tab B.

4      You knew from --

5  A.   I'm at Defendant's 6, B now.

6  Q.   All right.  Now, the exhibit we were looking at a moment

7  ago was part of the verbal reasoning test, the MCAT verbal

8  reasoning test.

9          THE COURT:  Is that a question or a statement?

10         MR. BERGER:  I'm just reminding the witness of what we

11  were talking about.

12  BY MR. BERGER:

13  Q.   We were looking at Exhibit P-19A.  That is Ms. Ramsay's

14  notes about the verbal reasoning test, about an MCAT verbal

15  reasoning test.

16  A.   I can't speak to what it is.  I don't know that you

17  described, and I don't recall from yesterday whether this is a

18  release test or a practice test, so I can't comment on that,

19  but...

20  Q.   All right.  In Ms. Ramsay's request for accommodations,

21  she commented about the MCAT.

22      Do you remember what generally she said about her

23  performance on the MCAT?

24  A.   I remember more I think from the testimony that I've

25  heard -- and it's hard to distinguish whether there was a

1  difference between those two things, but I remember her

2  describing strategies that she used to try to avoid significant

3  reading --

4  Q.   All right.

5  A.   -- on the MCAT, which she reports having used.

6  Q.   All right.  Now, you, in your report -- and now I am

7  referring to DX-5, Tab B, which is your report.

8  A.   I think it's DX-6.

9  Q.   I'm sorry, DX6.  Which is your report at -- it's page 2 of

10  your report, page 35 of the overall, but page 2 of your report.

11      In the carryover paragraph at the top of page 2, you say

12  that you were extremely skeptical that Ms. Ramsay possesses a

13  special way of answering ACT and MCAT items without actually

14  reading relevant text.  And you go on to say, still quoting,

15  and it is disappointing that her credulous advocates have

16  accepted her explanation, unquote.

17      But we just reviewed something that shows that you could

18  answer at least one question on the MCAT without reading the

19  entire reading test.

20      Do you agree?

21  A.   I agree that for item I believe 44 it was that -- I don't

22  believe that I said that in my testimony.  I think I agreed

23  that it would be less reading to read the fourth paragraph than

24  to read the entire passage, which is I believe what you had

25  asked.

1  Q.   No, that is what you said.  And --

2  A.   And so I don't believe that I made any comment about

3  whether or not any of these strategies were used and whether or

4  not they could be used to take the MCAT in its entirety.

5  Q.   Well, you don't know, do you?  You've never taken the

6  MCAT.  Correct?

7  A.   I haven't taken the MCAT.

8  Q.   And you've never been a reviewer for the MCAT, have you?

9  A.   I've never reviewed accommodation requests for the MCAT.

10 Q.   But one of the things that you emphasized in your report

11 as what you called a real world example that showed that -- or

12 that caused you to question whether Ms. Ramsay had dyslexia,

13 one of the things that you cited in your report was her score

14 on the MCAT.  Correct?

15 A.   Yes.

16 Q.   And yet you're telling me that you haven't taken the MCAT

17 yourself?

18 A.   I've never applied to medical school.

19 Q.   Okay.  And you don't know -- is this -- let me approach

20 this a different way.

21      I think you have said or someone from NBME has said that,

22 oh, yes, everybody uses that strategy, something like that, the

23 strategy of not reading as much.  I don't know whether that's

24 in your report.  I can look for it.

25      But is that, to your knowledge, a widely used strategy for

1  people taking a test like the MCAT?

2  A.   I'm familiar with different strategies of taking tests,

3  and I've even done some research on it.  I know that it's

4  common, as I say in my report, for people to read questions

5  first and then go to the passage afterwards, and as I say, to

6  search for relevant information in the passage.  So I believe

7  that is common.  And I've done some research consistent with

8  that, that has demonstrated that.  But as I say in my report,

9  that still involves reading a substantial amount of text.

10  Q.   Can that strategy be used in the USMLE Step 1?

11  A.   I don't know that there's a difference between those.  I

12  can't really speak to the differences with regard to what

13  strategies would and would not work in that regard.  As was

14  discussed so far, the questions have a somewhat different

15  format, but -- in that they tend to be a single vignette about

16  a patient followed by a question about the scenario.  But

17  beyond that, I've never actually considered whether or not

18  different strategies would be appropriate.

19  Q.   All right.  Do you recall that Dr. Smith in his report

20  referred to several different measures of reading fluency?

21  A.   Yes.

22  Q.   And I think that we reviewed some of these or NBME's

23  counsel reviewed some of these with you before today.  But do

24  you recall, for example, that he found that -- and I can refer

25  you to pages, if that would be helpful.  But he found reading

1  comprehension and fluency according to the WIAT-information, he

2  found at the 4th percentile.  Correct?

3  A.    I would have to check the specifics about the 4th

4  percentile, but I remember that there were low scores on --

5  Q.    Okay.  It's DX-3 and Tab B, which is his report, Dr.

6  Smith's report.  Tell me when you're there.

7  A.    I think it's Tab B?

8  Q.    Yeah, I'm sorry.

9  A.    Okay.

10  Q.    I think that's what I said, Tab B.

11  A.    Okay.  I'm at the WIAT-information table of scores on page

12  18 of 31 of the report.

13  Q.    Well, yes.  Actually, there are references both -- I was

14  looking at page 16, but, yes, there are references on page 18.

15  And that's fine.

16      So reading comprehension and fluency, 4th percentile?

17  A.    Yes.  I don't know that we discussed that particular score

18  earlier, but I'm just reading fluency, that's reading

19  comprehension and fluency, that was at the 4th percentile.

20  Q.    Yeah.  And he also refers to the GORT-5 and to -- and I

21  think we did discuss these before.  I think you referred in

22  your testimony before to the little table that's in the middle.

23  Oh, that -- I'm sorry, that's Woodcock-Johnson still.  So let's

24  look at that too.

25      In the middle of page 21 of the report, there is a table

1  of scores from the Woodcock-Johnson.  And that shows a reading

2  rate score at the 1st percentile.  Correct?

3  A.   Yes.

4  Q.   And a sentence reading fluency at the 7th percentile and

5  word reading fluency at the 0.2 percentile?

6  A.   Yes.

7  Q.   And then on the same page below that, there is a

8  discussion of the rate score from the GORT on the last

9  paragraph on the page, rate score of 3, which is at the 1st

10  percentile and an accuracy score of 5, which is at the 5th

11  percentile.  And then over on to the next page, on to page 22,

12  fluency measure, which is from combining the rate and accuracy

13  scores.  And that's at the 2nd percentile.

14      So we have three different assessments that Dr. Smith

15  administered.  And you accept that he administered them, you

16  accept -- haven't personally confirmed, but you accept that

17  he's reporting accurately how Ms. Ramsay performed.  And I

18  think you also testified before the break that these were all

19  appropriate things to consider in considering a diagnosis of

20  dyslexia.

21      Does the fact that there are three different instruments

22  that he administered would show a consistent pattern of

23  results, is that something that should be considered in making

24  this decision?

25  A.   Should it be considered, absolutely.  In this particular

1  case, this does not suggest that there is a learning disability

2  in reading.  Should all of the scores be considered, certainly.

3  Q.    In looking at a result like the MCAT result in Ms.

4  Ramsay's case, or the ACT result in Ms. Ramsay's case, is it

5  important to know how she got whatever score she got?

6  A.    It's important to consider -- I believe it's important to

7  consider all of the information that an applicant provides when

8  they submit a request for an accommodation.  And so if someone

9  describes a strategy which they report having used when they

10  took a test, it certainly is something that should be

11  considered and that I do consider.  Like any information, it

12  has to be weighted with regard to its credibility, its

13  accuracy, its consistency with other information.

14  Q.    All right.  You spoke this morning about her report cards

15  from elementary school.  And I think you must have heard her

16  testify yesterday and today about the informal help, not

17  documented, but the informal help that her teachers provided

18  for her.

19       And in this proceeding, it's not for you or me to decide

20  who is telling the truth and who is not telling the truth.

21  That's the judge's job.

22       But if what Ms. Ramsay testified is true about the way in

23  which her teachers helped her, is that something that should be

24  considered in looking at those report cards?

25  A.    When I review the request, I certainly consider all

1  information -- I guess I should say when I reviewed the

2  request, I don't believe I had access to the report cards.  So

3  I apologize, could you ask your question again?

4  Q.   Well, but you did refer to the report cards in your

5  testimony this morning.

6  A.   Yes, uh-huh.

7  Q.   And you heard Ms. Ramsay's testimony about how her

8  teachers assisted her during those grades.  So is that

9  something that should be considered in evaluating those report

10  cards?

11  A.   Descriptions of people's experiences, what their teachers

12  in the school, should certainly be considered when making any

13  sort of decision about diagnosis or accommodation needs.  And

14  as with other information, like test scores, it has to be

15  weighted with regard to its credibility, accuracy and

16  consistency.

17  Q.   And you did have information about Ms. Ramsay's

18  experiences in primary school in her personal statement.

19  Correct?

20  A.   I believe so.  I'd have to check, but I believe that there

21  were reports relating to her childhood.  I would have to check

22  again my report or her submission.

23  Q.   I believe that you said that you have been working as a

24  reviewer for NBME for nine or ten years?

25  A.   Yeah, I believe it's been about nine maybe.

1  Q.  And how are you paid for your services to NBME?

2  A.  For reviewing requests, I'm paid by the hour.  Currently I

3  received $200 an hour for reviewing requests.

4  Q.  And for testifying?

5  A.  For testifying, instead it's based on days and half --

6  it's a day rate, so it's $2,000 for a full day, $1,000 for a

7  half day, I believe.

8  Q.  Does NBME have an annual conference for its reviewer

9  consultants?

10  A.  It has a meeting, yes.

11  Q.  And have you attended those conferences?

12  A.  Most years for the past nine, I believe so.

13  Q.  Okay.  Let me just ask you to look very briefly

14  at exhibit -- and this is in the plaintiff's binder, so I may

15  need to help find that for you, but it's P-34 that I want you

16  to look at very briefly.

17  A.  I think I just have the defendant's exhibits.

18  Q.  Not in -- and 34, P-34.

19  A.  Okay.  I'm there.

20  Q.  All right.  Can you identify for the record what P-34 is?

21  A.  This appears to be slides from a presentation for NBME and

22  its outside consultants about ADA.

23  Q.  And what was the date?

24  A.  December 5, 2016.

25  Q.  Who was the presenter?

1  A.   Robert Burgoyne.

2  Q.   And do you recall attending the conference that year?

3  A.   Not specifically, but I was likely there.  As I said, I've

4  attended the vast majority of the meetings since I've been

5  working with them.

6  Q.   Do you know if Professor Zecker also attends those

7  conferences?

8  A.   Yes.

9  Q.   And Mr. Burgoyne is NBME's counsel.  Correct?

10  A.   I know that he represents NBME in some cases.  I don't

11  know the exact title or relationship.

12       THE COURT:  We can take notice of that, Counsel.

13  Moving along.

14  BY MR. BERGER:

15  Q.   Am I right that prior to yesterday when Ms. Ramsay

16  testified and you were in court, you had never met Ms. Ramsay

17  before?

18  A.   Yes.

19  Q.   And you've never done yourself any evaluation of Ms.

20  Ramsay by administering testing instruments to her or

21  interviewing her, anything of that kind.  Correct?

22  A.   No.  That is correct.

23  Q.   In your review of her application, what consideration did

24  you give to the fact that her medical school had provided her

25  with various testing accommodations?

1    A.   I certainly gave that, you know, some weight in terms of

2    considering someone's history of accommodations.  I always

3    consider that.  It's really impossible to interpret the data in

4    someone's file without knowing their history of accommodations.

5    When you're looking at someone's history of performance, you

6    have to know when did they receive them, when did they not

7    receive them.  So to me that's very important information.

8    Q.   And would you say the same thing with respect to the

9    accommodations she received from Ohio State University?

10   A.   Yes.  Again, it doesn't mean the likely -- the information

11   about the medical school, it doesn't mean that someone needed

12   them then or needs them now, but it certainly is very important

13   information to know when you're interpreting everything in the

14   file.

15   Q.   Do you know whether Ms. Ramsay was taking ADHD medication

16   at the time that she took the MCAT?

17   A.   I don't recall whether that information was in the

18   documentation.

19           MR. BERGER:  Your Honor, can I just have one minute to

20   consult with my colleagues?

21           THE COURT:  Sure.

22           MR. BERGER:  Your Honor, I would like to offer in

23   evidence P-34, which is the presentation from the 2016 NBME

24   consultants meeting that Professor Lovett testified about.

25           THE COURT:  Any objections?

1           MS. MEW:  No objection, Your Honor.

2           THE COURT:  It's admitted.

3           (Exhibit P-34 admitted into evidence.)

4           MR. BERGER:  I have no further questions.

5           THE COURT:  Very well.  Any redirect?

6           MS. MEW:  No redirect, Your Honor.

7           THE COURT:  Very well.  So you may step down.

8           And Counsel, this witness can be excused?

9           MS. MEW:  Thank you, Your Honor.

10          Is that all right with plaintiffs?

11          THE COURT:  Yes.  I'm asking counsel, is there any

12   reason to keep this witness around?

13          MR. BERGER:  No.

14          THE COURT:  You can be excused, sir.

15          THE WITNESS:  Thank you, Your Honor.

16          THE COURT:  Next.

17          MS. MEW:  Your Honor, the defense would like to call

18   Dr. Steven Zecker.

19          THE COURT:  Very well.

20          Watch your step coming around there, sir, and also

21   around here.

22          DR. STEVEN ZECKER, after having been duly sworn, was

23   examined and testified as follows:

24          COURT REPORTER:  Please state your name.

25          THE WITNESS:  Steven Zecker.

1                        DIRECT EXAMINATION

2  BY MS. MEW:

3  Q.   Good afternoon, Dr. Zecker.

4  A.   Good afternoon.

5  Q.   Are you an external consultant for NBME?

6  A.   Yes, I am.

7  Q.   And how long have you served in that capacity?

8  A.   16 years, I believe.

9  Q.   And can you briefly explain what you do in that role?

10  A.   As Professor Lovett described, I receive documentation

11  submitted by applicants for accommodations and review it and

12  provide my professional opinion about that.

13  Q.   Did you review Jessica Ramsay's request for testing

14  accommodations on the USMLE?

15  A.   Yes, I did.

16  Q.   And just to get the timeline in your role, I understand

17  that you reviewed her first request in December 2016.

18  A.   Yes.

19  Q.   Correct?

20       And then she submitted another request in June of 2018.

21       Did you review that request?

22  A.   Yes.

23  Q.   And then when she sought reconsideration, that's the

24  request that Dr. Lovett reviewed; is that correct?

25  A.   Yes.

1   Q.   For your reviews, did you provide a written analysis and

2   recommendation for NBME following review?

3   A.   I did.

4   Q.   If you will please look at volume 1 of the defendant's

5   exhibits, we're going back to the black binders.

6       Dr. Zecker, if you would please turn to Exhibit 5.  That's

7   Exhibit 5.

8   A.   Okay.

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   And is this a declaration that you prepared in connection

12  with this litigation?

13  A.   Correct.

14  Q.   And then Tab A to Exhibit 5, is this a copy of your CV at

15  the time you submitted this declaration in August of 2019?

16  A.   Yes, it is.

17  Q.   Then Exhibit B, is this your January 13, 2017

18  recommendation letter to NBME for Ms. Ramsay's first question

19  for testing accommodations?

20  A.   Yes, it is.

21  Q.   And finally, turning to Exhibit C, is this your July 19,

22  2018 recommendation letter to NBME with respect to Ms. Ramsay's

23  second request for testing accommodations?

24  A.   Yes, it is.

25  Q.   Dr. Ramsay (sic), are the opinions expressed in these

1  documents, do they remain your opinions today?

2  A.  Yes.

3       MS. MEW:  Your Honor, the defendants would like to

4  offer Exhibit 5 to the record.

5       THE COURT:  Hearing no objections, they're admitted.

6       (Exhibit DX-5 admitted.)

7  BY MS. MEW:

8  Q.  Dr. Zecker, we did just discuss that Ms. Ramsay

9  subsequently sought reconsideration and she submitted an

10  additional report from Dr. Robert Smith in support of that

11  request.

12       Since the time you prepared your reports, have you

13  subsequently reviewed Dr. Smith's report?

14  A.  I have subsequently, yes.

15  Q.  Has anything in that report changed your opinions with

16  respect to Ms. Ramsay's request for testing accommodations?

17  A.  No.

18  Q.  And have you also reviewed the school -- the additional

19  report cards and standardized test scores that have been

20  discussed in the hearing the last two days and were produced in

21  discovery in this litigation?

22  A.  Yes, I have.

23  Q.  And have your opinions expressed in your prior reports

24  changed in any way in light of this new information?

25  A.  No.

1  Q.  Dr. Zecker, we're just going to briefly discuss your

2  credentials.  And if you'd like, you may turn back to

3  Exhibit 5A, which is your CV.

4  A.  Uh-huh.

5  Q.  Could you just briefly explain your educational

6  background?

7  A.  Yes.  I have a bachelor's degree in psychology and

8  sociology from the University of Michigan and a master's and

9  PhD in psychology from Wayne State University.

10  Q.  And where do you currently work?

11  A.  At Northwestern University.

12  Q.  And what is your position there?

13  A.  I am professor in communication sciences and disorders.

14  Q.  And how long have you held this position?

15  A.  35 years.

16  Q.  Do you have any particular specialties?

17  A.  My specialties are learning disabilities and ADHD.

18  Q.  And in your role at Northwestern, do you teach classes?

19  A.  I do teach multiple classes, yes.

20  Q.  If we can turn to page 12 of Exhibit 5A.  And that's 12 in

21  the lower right-hand corner.

22  A.  Yes.

23  Q.  Is this a listing here on page 12 of courses that you have

24  taught?

25  A.  Yes.

1   Q.   Have you taught courses specifically relating to learning

2   disabilities?

3   A.   I have.

4   Q.   So I'm looking down here.

5   A.   I am currently, in fact.

6   Q.   So it looks like you've been teaching a learning

7   disabilities class for the past ten years?

8   A.   Correct.

9   Q.   And another one, it looks like attention deficit disorder

10  and related behavior disorders.

11       How long have you been teaching this class?  It might

12  require --

13  A.   20 -- 25-plus years.

14  Q.   And do you perform any research in the area of learning

15  disabilities or ADHD?

16  A.   In both areas I do, yes, uh-huh.

17  Q.   If we could also turn to page 7 in your CV.

18  A.   Uh-huh.

19  Q.   It looks like this list, invited presentations, can you

20  just very briefly describe the types of groups that you give

21  presentations to and on what topics?

22  A.   I give presentations to a variety of groups, to parent

23  groups, to school districts, to -- at professional conferences,

24  primarily those.

25  Q.   And do you also have a clinical practice, Dr. Zecker?

1  A.   Correct.

2  Q.   Are you a licensed psychologist?

3  A.   Yes, I am.

4  Q.   How long have you been seeing patients or clients -- do

5  you use patients or clients?

6  A.   Oh, since the -- since around 1990.

7  Q.   Do you perform diagnostic evaluations of individuals for

8  learning disabilities and ADHD as part of this practice?

9  A.   I do.  That's my primary focus, yes.

10 Q.   And then do I understand that you also supervise the

11 clinic at Northwestern?

12 A.   Correct.

13 Q.   And what clinic is that?

14 A.   It's currently called the speech language and learning

15 clinic.  For many years it was called the learning disabilities

16 clinic.

17 Q.   And are you supervising diagnostic evaluations at this

18 clinic?

19 A.   I am a consultant at this point with that.  I supervised

20 the clinic for about 20 years or so.

21 Q.   And so who are you supervising?

22 A.   Primarily graduate students who are working on their

23 masters degrees and who plan to work in the field of learning

24 disabilities.

25 Q.   And what are you supervising them on?

1  A.   We would have a weekly diagnostic evaluation that would

2  cover two days.  And they would learn the various techniques

3  involved in proper evaluation and diagnosis of learning

4  disabilities.

5  Q.   And if we could also turn to page 11 in your CV.  We're

6  still in Exhibit 5A.

7  A.   Uh-huh.

8  Q.   Down at the bottom you list some professional memberships.

9  And it carries over to page 12.  But I wanted to ask about just

10  a couple of these -- a few of these organizations.

11      What is the Learning Disabilities Association of America?

12  A.   That is a group of professionals, largely professionals,

13  who have a shared interest in the field of learning

14  disabilities and meet for an annual meeting to discuss current

15  topics in the field.

16  Q.   And are you a member of this group?

17  A.   Yes.

18  Q.   And you're also a member of the International Dyslexia

19  Association?

20  A.   I am.

21  Q.   And what is this group?

22  A.   That is a worldwide group that does essentially the same

23  thing, gets together on an annual basis and presents results of

24  research and talks about current trends in the field.

25  Q.   And then Children and Adults With Attention Deficit

1  Disorder.

2      What is this group?

3  A.   That is a group that was initially started by parents and

4  is both a parent and professional organization that provides

5  parents with opportunities to learn about ADHD and allows

6  professionals in the field to interact with each other and

7  discuss contemporary issues.

8          MS. MEW:  Your Honor, the defendants offer Dr. Zecker

9  as an expert witness in the evaluation and diagnosis of

10 individuals with learning disabilities and ADHD, as well as the

11 review of accommodation requests on standardized tests.

12         THE COURT:  Very well.

13         Counsel, any questions as to qualifications?

14         MR. BERGER:  No.  I think that there are particular

15 areas that we may question, but -- as we said with Professor

16 Lovett.

17         THE COURT:  Very well.  It goes to the weight of the

18 consideration of the expertise.

19         We find this witness to be an expert in those fields.

20         MS. MEW:  Thank you, Your Honor.

21                      DIRECT EXAMINATION

22 BY MS. MEW:

23 Q.   With my apologies for switching notebooks, if you could

24 get the plaintiff's white notebook exhibits back, please.

25         MR. BURGOYNE:  Can I do this, Your Honor?

ZECKER – DIRECT

1          THE COURT:  Yes, Counsel.

2          MR. BURGOYNE:  Which one do you want?

3          MS. MEW:  33, please.

4    BY MS. MEW:

5    Q.   Dr. Zecker, are you now looking at Plaintiff's Exhibit 33?

6    A.   Yes.

7    Q.   Do you recognize this document?

8    A.   Yes.  This is an article that I wrote for a journal in I

9    believe 1999 or 2000.

10   Q.   And what is the title of this article?

11   A.   "Underachievement and Learning Disabilities in Children

12   who are Gifted."

13   Q.   If you turn to page 2 of this article, sort of midway

14   through this page, you give an example of a boy who you named

15   Lucas with an IQ at the 99th percentile and then reading

16   decoding skills at an average range in the 50th percentile.

17        Do you see where I am?

18   A.   Yes.

19   Q.   Here you state that:  Despite the fact that Lucas is

20   decoding at a grade appropriate level, by virtually any

21   definition of a learning disability, he's underachieving and he

22   would be considered learning disabled.

23        What theory are you applying there in this conclusion?

24   A.   Yes.  That was based on the discrepancy model, which was

25   discussed earlier today, which, at the time that this was

1  written, was still the prevailing model being used in Illinois,

2  where most of the consumers of this information would have

3  been.

4  Q.   And do you go on to state that:  Even if Lucas was

5  performing, if his decoding score was in the 75th percentile,

6  he would still qualify for -- as being learning disabled.

7       And that, again, is that also under the discrepancy

8  analysis?

9  A.   Correct.  And was applicable to school-aged children.

10  Q.   And I know that Dr. Lovett covered this, we don't need to

11  go through it again, but in your professional opinion, is the

12  discrepancy theory now applicable in diagnosing learning

13  disabilities?

14  A.   Correct.

15  Q.   I'm sorry, is it still applicable or not applicable?

16  A.   Oh, no, I'm sorry.  It's not applicable anymore, yes.

17  Q.   And even if you were to accept this example that someone

18  had the discrepancy between IQ and achievement, where the IQ is

19  at the 99th percentile and achievement is at the 50th

20  percentile, would this individual be substantially limited in

21  the major life activity of reading?

22  A.   No.

23  Q.   How did NBME reach out to you to review Ms. Ramsay's first

24  request for testing accommodations?

25  A.   In the same manner that Professor Lovett described

ZECKER - DIRECT

1  earlier.  I received an email and accessed the secure website

2  where the documentation that Ms. Ramsay had submitted was

3  contained.

4  Q.   Did you have any communication with NBME between the time

5  you received this file and the time that you submitted your

6  letter report?

7  A.   No.

8  Q.   And then how did -- after you submitted that letter

9  report, did NBME contact you in any way and ask you to make any

10  changes or revisions to your report?

11  A.   No.

12  Q.   And then how did NBME reach out to you to ask you to

13  review Ms. Ramsay's June 2018 request for accommodations?

14  A.   In an identical manner.

15  Q.   Did you have any communications with NBME between the time

16  that they reached out to you and the time you submitted your

17  second letter report?

18  A.   No.

19  Q.   And did NBME reach out to you after receiving that second

20  report and ask you to make any changes or revisions to your

21  recommendations?

22  A.   No.

23  Q.   We're going to primarily stand on the written reports in

24  the interest of time.

25       So can you just very briefly state what conclusions you

1  reached regarding Ms. Ramsay's request for testing

2  accommodations on the USMLE?

3  A.    I -- in both instances or --

4  Q.    Yes.

5  A.    Okay, yeah.  It's essentially the same in both.  I had

6  reviewed all of the materials and did not believe that they

7  demonstrated that she had a substantial limitation in either

8  attention or reading and did not believe that accommodations --

9  an extended time accommodation was warranted.

10  Q.    And again, we mentioned or you mentioned that you've since

11  reviewed Dr. Smith's report, you've reviewed the additional

12  school records and standardized testing scores that have been

13  discussed in this hearing.

14       Does that remain your opinion today?

15  A.    I have reviewed those, yes.

16  Q.    And does it remain your opinion that Ms. Ramsay is not

17  substantially limited in a major life activity relative to --

18  A.    My opinion has not changed from that, no.

19            MS. MEW:  I don't have any further questions.

20            THE COURT:  Cross-examination.

21                      CROSS-EXAMINATION

22  BY MR. BERGER:

23  Q.    Professor Zecker, in your clinical practice, do you see

24  primarily children or primarily adults or both?

25  A.    Primarily school-aged kids, starting at around age 7 up

1   through young adults.  An occasional older adult, but it's

2   unusual.

3   Q.   Would you look at Exhibit 5 again.  That is your

4   declaration.  And I'm referring to the declaration itself now,

5   so not one of the tabs.

6       Do you have that volume there, or do I need to help you?

7   A.   I don't think I do.

8           MR. BURGOYNE:  Which one are you asking about?

9           MR. BERGER:  Exhibit 5, D-5.

10          THE WITNESS:  I am there.

11   BY MR. BERGER:

12   Q.   Okay.  Just one more question before we get to that.

13       I think you said in your answer just now that you

14   generally saw children starting with age 7?

15   A.   6 or 7, yeah.

16   Q.   6 or 7.

17       Why don't you see children younger than that?

18   A.   The diagnosis of learning disabilities and ADHD is

19   notoriously unreliable at those ages.  Good instruments to

20   assess and diagnose are not prevalent.

21   Q.   In your declaration, I want to refer you to paragraph 3.

22   And you can read the whole paragraph to yourself if you want,

23   but the part that I want to read is actually just the last

24   sentence of paragraph 3, which begins on page 2.  And let me

25   just read that into the record.

1       As part of my work I frequently meet with young adults who

2   have diagnoses of learning and attention problems to assess

3   both their self-reported symptoms and their objective

4   performance on various tests of cognitive, academic and

5   behavioral functioning.

6       Do you see that sentence?

7   A.   Yes.

8   Q.   Who wrote that sentence?

9   A.   As I recall, I did.  Well, it was edited to some degree,

10  but I provided most of this.

11  Q.   All right.  Would you now look at Exhibit 6, which is

12  Professor Lovett's declaration.

13  A.   Yes.

14  Q.   And also paragraph 3.  And the last sentence of Professor

15  Lovett's paragraph 3 reads:  As part of my work, I frequently

16  meet with young adults who have diagnoses of learning and

17  attention problems, and I assess both their self-reported

18  symptoms and their objective performance on various tests of

19  cognitive, academic and behavioral functioning.

20  A.   Yes, I see that.

21  Q.   Okay.  I think the two sentences that I just read to you

22  are word for word the same.

23  A.   They appear to be.

24  Q.   So I'll ask again, who wrote the sentence as it appears in

25  your declaration?

1  A.   I wrote parts of it.  I don't recall exactly that

2  sentence, but I certainly reviewed it all and agreed with it

3  all.

4  Q.   You have testified that you have been a reviewer for NBME

5  for some time.  I don't remember exactly how many years you

6  said.

7  A.   16 or so.

8  Q.   16 years.  And I guess you heard Professor Lovett testify

9  about the annual meetings that he attends?

10 A.   Yes.

11 Q.   And do you also attend those meetings?

12 A.   Most of them, yeah.  I have missed several, but most of

13 them.

14 Q.   All right.  You said that you had reviewed Dr. Smith's --

15 let me start the question again.

16      As I understand it, you were not asked by NBME to do a

17 written review of Dr. Smith's report but that you had read it

18 at some point?

19 A.   Yes.  I saw it fairly recently, yes.

20 Q.   Okay.  And do you understand Dr. Smith to be a clinical

21 psychologist engaged in private practice?

22 A.   Yes.

23 Q.   Do you think that people like Dr. Smith who are -- whose

24 main activity is clinical practice are inherently biased in

25 favor of the people that they evaluate?

1  A.   I can't speak for Dr. Smith in that regard.

2  Q.   In general.

3  A.   There has been some research to show that practitioners

4  are biased in some regards, yes.

5  Q.   So when you're doing your work as a reviewer for NBME, if

6  you receive a report from a private practitioner evaluating the

7  student, you assume that the practitioner is biased in favor of

8  the student.  Right?

9  A.   No.

10  Q.   Okay.  What do you assume?

11  A.   I assume that the person who was conducting the evaluation

12  was doing so in a straightforward and unbiased manner.

13  Q.   From your review of Dr. Smith's report, is there any

14  reason why you question that in this case?

15  A.   Question bias?

16  Q.   Question in this case whether he was performing his work

17  in an unbiased and professional manner.

18  A.   I don't have any question about that, no.

19  Q.   Is there a consensus about the discrepancy model

20  currently, or is it still a matter of discussion?

21  A.   It has largely fallen into disfavor.  It varies from state

22  to state, and even from school district to school district, but

23  it is not commonly used anymore.

24  Q.   What about -- I'm sorry.

25  A.   There's been a substantial amount of research that has

1   discredited the validity of it.

2   Q.   Just for the record, because I'm not trying to be cute or

3   tricky about this, is Illinois the only state in which you are

4   licensed as a psychologist?

5   A.   Yes.

6   Q.   Have you ever been licensed in another state?

7   A.   No.

8   Q.   So you're not licensed in Texas?

9   A.   I am not.

10  Q.   Or in Michigan?

11  A.   Correct.

12  Q.   All right.  Do you know whether the discrepancy model

13  is -- well, I'm sorry.  Strike that.

14       Are you familiar with a manual that is known as the ICD or

15  International Classification of Diseases?

16  A.   I am.

17  Q.   And do you know what the current edition of ICD is?

18  A.   10.

19  Q.   And is ICD-10 also a widely used manual for diagnosing,

20  among other things, not just this, but among other things,

21  learning disorders and conditions like ADHD?

22  A.   Yes.  It is -- as the name says, it's the international

23  classification.  And as a result, it is more commonly used in

24  other countries than in the United States, but, yes, it is

25  used.

1  Q.   Are you a reviewer for the MCAT?

2  A.   Yes.

3  Q.   And how long have you been a reviewer for the MCAT?

4  A.   About ten years.  I'm not sure exactly, I'd have to look

5  it up.

6  Q.   Let me ask you to look at -- we're going back now to

7  Exhibit 5, which is your declaration, and Tab B, which I think

8  you have identified as the report.

9  A.   Is that this one?

10 Q.   Exhibit DX-5 and Tab B, which is the report that you did

11 for NBME in January of 2017.

12 A.   Oh, DX-5.  Correct.  Yes, I have it.

13 Q.   And on the second page of Tab B, the paragraph that starts

14 about in the middle of the page, you comment twice about --

15 well, you're generally commenting about Ms. Ramsay's personal

16 statement here.

17      What's the personal statement in the USMLE accommodations

18 application?  What role does that play?

19 A.   It is weighed along with everything else as a factor in

20 the decision.

21 Q.   That's something that NBME asks students to provide.

22 Correct?

23 A.   Yes.  All students provide one.

24 Q.   And you comment in the paragraph to which I just referred

25 in the first line that Ms. Ramsay's personal statement was

1  lengthy?

2  A.   Yes.

3  Q.   And then about in the middle of the paragraph, you

4  describe it as her well-written, nine page long personal

5  statement?

6  A.   Yes.

7  Q.   Can a student with ADHD write something that is lengthy?

8  A.   Sure.

9  Q.   Can a student with ADHD write something which is well

10  written?

11  A.   Yes.

12  Q.   Do you know how long it took Ms. Ramsay to write her

13  personal statement?

14  A.   I have heard that discussed over the last two days.  I did

15  not know that at this time.

16  Q.   I don't recall the exact amount, but it was an extended

17  effort?

18  A.   Yes.  I think she said a month or so, yes.

19  Q.   Is that different from or the same as taking a test like

20  the USMLE?

21  A.   I'm sorry, is writing a personal statement --

22  Q.   Yes.

23  A.   -- the same as taking a test?  No.

24  Q.   And how is it different?

25  A.   Well, one has as much time as they need to do it, can go

1 back and edit, revise, rewrite, ask for assistance from other

2 individuals on it, all things that are not possible on a

3 standardized test.

4 Q.   In the same paragraph, you refer to the fact that Ms.

5 Ramsay was in a gifted program through fifth grade?

6 A.   Uh-huh, yes.

7 Q.   Do you recall or do you know what subject the gifted

8 program was in?

9 A.   In math.

10 Q.   Okay.  Could somebody with dyslexia succeed in a gifted

11 program in math?

12 A.   Yes.  As Dr. Lovett was referring to earlier, that most

13 people have patterns of strengths and weaknesses, and one can

14 be very strong in one area and weaker in another, yes.

15 Q.   So the fact that Ms. Ramsay is gifted in math doesn't

16 indicate that she doesn't have dyslexia?

17 A.   It in and of itself doesn't preclude that, no.

18 Q.   All right.  You wrote in the same paragraph -- well, let

19 me just read a couple of sentences and ask you about them.

20     You wrote, and this is about in the middle of the

21 paragraph:  Ms. Ramsay indicates that writing is "pure agony"

22 for her and she experiences "panic and despair" and "awareness

23 of the impending doom" while working on tests.  Such

24 descriptions, in my professional opinion, are highly suggestive

25 of a significant effective component to her described

1  struggles, although as I will indicate, this has never been

2  explored in any evaluation.

3       All right.  Did you ever evaluate Ms. Ramsay personally?

4  A.  No.

5  Q.  And are you aware that Dr. Smith did evaluate her in

6  person?

7  A.  Yes.

8  Q.  Let's go to Tab C now, which is the second review that you

9  did.

10 A.  Yes.

11 Q.  If you look at the second page -- actually, it starts on

12 the first page and continues over, but you're listing a number

13 of things that were submitted as part of Ms. Ramsay's

14 application.  Correct?

15 A.  Yes.

16 Q.  And am I right in understanding this was a whole new

17 application that she submitted?

18 A.  Yes.  That also contained some of -- the documentation

19 that was submitted earlier, yes.

20 Q.  So she submitted the first application and that was turned

21 down.  Right?

22 A.  Yes.

23 Q.  And now she in -- at this time has submitted a brand new

24 application.

25      And one of the things you list around the middle of the

1  carryover paragraph on page 2 is a letter from Dr. Ruekberg?

2  A.   Which point number is that?

3  Q.   It is page -- 2nd of Tab C.

4  A.   No, no, no, I'm looking at that, but each of these

5  documents is numbered here.

6  Q.   Yeah.

7  A.   I was just asking you which number it was.

8  Q.   Yeah.  The page numbers at the top are a different thing.

9       So about in the middle.

10  A.   Oh, yes.  Okay.

11  Q.   Okay.  Do you remember reviewing Dr. Ruekberg's letter?

12  A.   I'm sure I did.  I don't specifically remember it.

13  Q.   Okay.  Do you remember if Dr. Ruekberg said anything about

14  whether Ms. Ramsay's difficulties were the result of, as you

15  called it, an effective disorder as opposed to dyslexia and

16  ADHD?

17  A.   I do not recall.

18  Q.   Okay.  Do you know whether Dr. Ruekberg had met with Ms.

19  Ramsay in person?

20  A.   I would assume he did.  And I have heard today that he

21  did.

22  Q.   Still on Tab C, your second review report, you comment

23  near the bottom of the page about Ms. Ramsay's MCAT score

24  report.

25  A.   Yes.

1  Q.   Is the MCAT an appropriate diagnostic instrument for

2  dyslexia?

3  A.   No.

4  Q.   Have you ever administered the MCAT to somebody who you

5  were evaluating?

6  A.   No.

7  Q.   If I asked you the same questions about the ACT exam,

8  would you give the same answers?

9  A.   Yes.

10  Q.   All right.  You said that you had reviewed Dr. Smith's

11  report.  And since I think you were in the courtroom when

12  Professor Lovett testified, you might recall that I reviewed

13  with Professor Lovett several of the tests that Dr. Smith

14  performed.

15  A.   Correct.

16  Q.   And in general, from your review of Dr. Smith's report, do

17  you have any reason to question that he actually administered

18  the tests that he said that he administered?

19  A.   No.

20  Q.   Or got the results that he reported?

21  A.   I'm sorry?

22  Q.   Or got the results that he reported in his report?

23  A.   Oh, no.  No, I do not.

24  Q.   Okay.  Would you agree with Professor Lovett that one of

25  those tests, the WIAT-information, is an appropriate test to

1  administer when a diagnosis of dyslexia is being considered?

2  A.   Sure.  It is among the measures that are appropriate, yes.

3  Q.   And also that the GORT-5 is an appropriate test to

4  administer in such a case?

5  A.   Yes.  With the caveat there that the norms were not

6  completely appropriate given the age, but yes.

7  Q.   And the Woodcock-Johnson IV reading rate cluster, is that

8  an appropriate test to administer?

9  A.   Yes.

10  Q.   And the Nelson-Denny reading test, is that an appropriate

11  test to administer?

12  A.   Well, as Dr. Lovett pointed out, it is not -- the

13  Nelson-Denny is not considered a good diagnostic measure due to

14  its technical weaknesses, but as a screening measure, yes.

15  Q.   I also asked Professor Lovett about a test called the

16  IVA+Plus.

17        Are you familiar with that test?

18  A.   I am.

19  Q.   And you know from your review of Dr. Smith's report that

20  he administered that test.  Correct?

21  A.   Twice as I recall, yes.

22  Q.   Why did he administer it twice?

23  A.   He indicated he was looking for consistency of results.

24  Q.   And do you agree that that's an appropriate test to

25  administer in a case where an ADHD diagnosis is being

1  considered?

2  A.   Yes.  It can supplement the other information obtained,

3  yes.

4  Q.   And you don't have any reason to doubt that he actually

5  did administer that test or that he got the results that he

6  described?

7  A.   Correct.

8  Q.   I also asked Professor Lovett about whether these are

9  tests, the WIAT and the Woodcock-Johnson and the GORT, that

10 somebody can study for before they're administered.

11 A.   No, I do not believe it is.  Those are measures of

12 acquired knowledge, acquired skills, and as such really can't

13 be studied for.

14 Q.   And they're different in that way from the MCAT.  Correct?

15 A.   Yes.

16 Q.   When NBME sends you a case to review, do they set any kind

17 of time limit on the review?

18 A.   Yes.

19 Q.   Do you recall what that was in the case of your first

20 review of Ms. Ramsay?

21 A.   I believe ten days.

22 Q.   Is that typical in your experience?

23 A.   Yes.

24 Q.   And was it similar for the second review?

25 A.   Yes.

1  Q.  Your first review, which is Tab B, I think, in Exhibit 5,

2  is dated January 13, 2017.

3  A.  Yes, it is.

4  Q.  All right.  Am I right that you did not -- at least not at

5  that time, see whatever letter NBME sent to Ms. Ramsay?

6  A.  Correct, I did not.

7  Q.  If I refer to that as a decision letter, do you --

8  A.  Yes.

9  Q.  Do you know when the decision letter was sent?

10  A.  Offhand, no, I do not.

11  Q.  Okay.  And looking at Tab C, your review letter is dated

12  July the 19th, 2018; is that correct?

13  A.  Correct.

14  Q.  And do you know when in that case NBME sent the decision

15  letter to Ms. Ramsay?

16  A.  I do not.

17  Q.  If a young child is thought to be underachieving for

18  whatever reason, would you still say that parents of such a

19  child should consider looking for help for that child even if

20  some people think the discrepancy model is no longer any good?

21  A.  Certainly individuals who have a discrepancy as we were

22  discussing earlier can be assisted by appropriate interventions

23  and so on, sure.

24  Q.  So if there is a discrepancy, that could be an indication

25  that the person has a learning disability?

1  A.   Not under -- well, it would depend on the level at which

2  they were functioning, but it could be the case.

3  Q.   I'm not asking at this point whether that's a diagnostic

4  standard.  I'm just saying is that something that would lead

5  you to -- if you were speaking to a parent and the parent told

6  you my son is really, really smart but he can't read very

7  quickly, a very, very slow reader, would that be a reason that

8  you would suggest the parent get the child evaluated?

9  A.   Yes.

10 Q.   All right.  If that same child got informal help that

11 allowed him to function in school without an evaluation, would

12 you say that means he doesn't have a disability?

13 A.   It depends on what you mean by informal help, I think.

14      If a child is able to function at an appropriate level,

15 then I would say they're not disabled, yes.

16 Q.   Well, some of the help that was described by Ms. Ramsay in

17 her testimony was the teacher giving her an alphabet chart, the

18 teacher reading things to her, other people reading things to

19 her.  If Ms. Ramsay had dyslexia and if Ms. Ramsay nevertheless

20 had a high level of intelligence, is that kind of help

21 something that would help her to do well in school?

22 A.   In some aspects.  In the area -- for example, she received

23 very good grades in reading.  And having someone read to her

24 would not lead to a grade of A in reading, I would presume.

25 That it's based on her own reading that would lead to that

1  grade.

2  Q.   Do you know whether any of the grades for reading at that

3  level were for timed reading tests?

4  A.   I do not know.

5          MR. BERGER:  Your Honor, may I have a moment to

6  consult?

7          THE COURT:  Yes, Counsel.  As a matter of fact, you

8  can have a break.  We'll be in recess for 15 minutes.

9          (Recess at 3:04 p.m. until 3:18 p.m.)

10         THE COURT:  Are we ready to proceed?

11         MR. BERGER:  Yes, Your Honor.

12         THE COURT:  Very well.

13         MR. BERGER:  We have no further questions for

14  Professor Zecker.

15         THE COURT:  Excellent.  Any redirect?

16         MS. MEW:  No, Your Honor.

17         THE COURT:  And is there any reason why this witness

18  can't be excused?

19         MR. BERGER:  No, Your Honor.

20         MS. MEW:  No.

21         THE COURT:  Very well.  This witness is done.  And,

22  sir, you can be excused.

23         THE WITNESS:  Thank you.

24         THE COURT:  And that completes your expert witnesses

25  that you needed to call out of order?

1          MS. MEW:  Yes, that is correct.  Thank you, Your

2  Honor.

3          THE COURT:  Very well.  And now back to the

4  plaintiff's case in chief.

5          MS. VARGAS:  Your Honor, we already consulted with

6  defense, and they have no objection.  Would it be all right

7  with the Court if Ms. Ramsay stood in the back?  She has been

8  sitting for a long time and is having leg issues.

9          THE COURT:  Sure.  There's no requirement that she

10  even be here, you know.

11          MS. VARGAS:  Okay.

12          THE COURT:  This is not a criminal case or anything.

13  She's a plaintiff.  I've had cases where the plaintiff missed a

14  day or two, so it's not necessary.

15          Whatever makes you feel comfortable, ma'am.

16          MS. RAMSAY:  Thank you.

17          MR. BERGER:  Your Honor, plaintiff calls Dr. Robert

18  Smith as our next witness.

19          THE COURT:  Very well.  Come forward, sir, watch your

20  step coming around the corner there and also around the corner

21  by the witness box.  There's an incline and a decline.

22          DR. ROBERT SMITH, after having been duly sworn, was

23  examined and testified as follows:

24          THE COURT REPORTER:  Please state your name for the

25  record.

SMITH - VOIR DIRE - DIRECT

1    THE WITNESS:  Robert Dean Smith.

2              DIRECT EXAMINATION

3  BY MR. BERGER:

4  Q.   Dr. Smith, I am going to begin by asking you some

5  questions about the declaration that you submitted in this case

6  and the various exhibits to that.  So let me make sure that you

7  have the right document in front of you.

8              MR. BERGER:  May I approach, Your Honor?

9              THE COURT:  Yes.

10  BY MR. BERGER:

11  Q.   Dr. Smith, do you have plaintiff's exhibit binder in front

12  of you?  And I have turned to Tab 21.

13      Would you look at Exhibit P-21 and tell me if you

14  recognize that as being the declaration that you submitted in

15  this case?

16  A.   Yes, it is.

17  Q.   And that is your signature on page 10.  Correct?

18  A.   Yes.

19  Q.   And if you turn past that, you come to Exhibit A, which is

20  your curriculum vitae; is that correct?

21  A.   Yes.

22  Q.   Can you briefly describe for the court your educational

23  history.

24  A.   I have a bachelor's degree in psychology from Central

25  Michigan University, a master of arts in clinical psychology

1   from Central Michigan University and a PhD in counseling

2   psychology from Michigan State University.

3   Q.   Did you also complete a post-doctoral program at Fielding

4   University?

5   A.   Yes.  At the time was called Fielding Institute.  It's now

6   called Fielding University.  It's a two-year post-doc in

7   neuropsychology.

8   Q.   And can you briefly describe your work history after you

9   completed the post doctoral program in 1999?

10  A.   At that time I was in private practice and a part of the

11  time at that time, about a third of the time as a consultant

12  for the Michigan Dyslexia Institute.

13  Q.   Are you licensed as a psychologist?

14  A.   Yes.

15  Q.   In what state are you licensed in?

16  A.   Michigan.

17  Q.   And how long have you been licensed?

18  A.   Since 1986.

19  Q.   Are you a member of any professional associations that

20  relate to your work as a psychologist?

21  A.   The American Psychological Association and the National

22  Academy of Neuropsychology.

23  Q.   What are the membership requirements for the National

24  Academy of Neuropsychology?

25  A.   To be a full member, you have to complete what's a

1  recognized -- a program that follows policies that they have in

2  terms of what they recognize as the appropriate training

3  regimen.  Then you have to be recommended by somebody who is a

4  member, who knows your work.

5  Q.  You have already heard testimony since you've been in the

6  courtroom about something called the Diagnostic and Statistical

7  Manual of Mental Disorders?

8  A.  Yes.

9  Q.  Are you familiar with that?

10  A.  Yes.

11  Q.  And are you familiar with the current edition of DSM?

12  A.  5.

13  Q.  DSM-5?

14  A.  Yes.

15  Q.  Are you also familiar with something called the

16  International Classification of Diseases?

17  A.  Yes.

18  Q.  And what is the current edition of the ICD?

19  A.  That's 10, Clinical Modification.

20  Q.  And am I right that the ICD-10 Clinical Modification is a

21  version that is specifically designed for use in the United

22  States?

23  A.  Yes.

24  Q.  Are you familiar with a condition that is known as

25  dyslexia?

1  A.   Yes.

2  Q.   What is dyslexia?

3  A.   Dyslexia is a physiological and neurological disorder that

4  interferes with acquiring and applying basic reading skills.

5  Q.   What is it like for a dyslexic person to try to read or

6  understand a written text?

7  A.   They have difficulty recognizing the words, regardless of

8  what the meaning of the word is, just identify correctly what

9  the word is.  And it takes a lot of mental energy, even after

10  remediation, to correctly identify those words.  A lot of their

11  mental effort has to go into that.  And that, of course, does

12  interfere with reading comprehension, although reading

13  comprehension may frequently function in the average range.

14  Q.   How do you go about assessing a person for dyslexia?

15  A.   Well, primarily it's through -- dyslexia is primarily

16  defined as an impairment of acquiring basic reading skills,

17  which is -- and developing what's called automaticity or oral

18  fluency.  And you administer tests that primarily measure those

19  skills.  You also administer reading comprehension, but the

20  disorder is defined by the difficulty of acquiring the basic

21  reading skills.

22  Q.   Are you familiar also with a condition that is known as

23  attention-deficit/hyperactivity disorder or ADHD?

24  A.   Yes.

25  Q.   And what is ADHD?

1   A.   Well, ADHD, there are several presentations.  But ADHD is

2   difficulty focusing attention, being excessively distracted,

3   disorganized, misunderstanding directions.  There are some

4   other criteria which I don't recall off the top of my head.

5        Then the other category, which are hyperactivity,

6   impulsivity symptoms.  Primarily hyperactivity symptoms.  There

7   are three impulsive symptoms.  Basically difficulty, for an

8   adult, sitting still or feeling restless even when they do sit

9   still; talking too much, interrupting other people, difficulty

10  waiting in line, abnormal impatience, that kind of thing.

11  Q.   And how do you assess a person for ADHD?

12  A.   You acquire through interview, questionnaires, rating

13  scales, a description of their current functioning.  And in

14  particular, you're looking for signs of theses symptoms and how

15  frequent they are and whether those symptoms also appeared when

16  they were before the age of 12.  It doesn't require the -- that

17  for them to -- it's difficult to establish the range of

18  symptoms that occurred before the age of 12, because recall is

19  often not entirely accurate.  So it only requires that some of

20  the symptoms were present then.  And it causes significant

21  interference in functioning.

22  Q.   Is it common or uncommon for somebody with dyslexia to

23  also have ADHD?

24  A.   It's very common.

25  Q.   And by the way, can you -- over the course of your career,

1  can you estimate how many assessments you've done in which

2  you've evaluated a person for dyslexia or for ADHD or both?

3  A.   Together, about 1,300, since around 1995.

4  Q.   Based on your experience with doing that, with evaluating

5  people with both or one or the other, how is somebody affected

6  if he has or she has both of these conditions?

7  A.   Well, they feed on each other.  They make each one worse.

8  Can't distinguish -- reliably it's a matter of opinion about

9  how much of the problem is due to the attention deficit and how

10  much is due to the dyslexia, because they overlap a lot and

11  they just make each other worse, exacerbate the problems in

12  each condition.

13  Q.   As you know, the case that brings us to court today is a

14  case about testing accommodations for a test, for the USMLE.

15       In any of the assessments that you've done, have you ever

16  made a recommendation about whether an individual had a

17  disability that affected her ability to take a timed test like

18  the USMLE?

19  A.   Yes.  That's the most common problem for somebody who has

20  either dyslexia or attention deficit disorder.  That's the most

21  standard, common accommodation.

22       Some people with dyslexia read so poorly that they also

23  have to have things read to them.  Particularly the extended

24  time is primarily applying to people who have developed

25  compensatory strategies, either on their own or through formal

SMITH - DIRECT

1  kinds of instruction, to strength their reading skills.

2          MR. BERGER:  Your Honor, we would like to offer Dr.

3  Smith as an expert witness on the assessment of individuals

4  with ADHD and dyslexia and how those conditions affect their

5  ability to take timed tests.

6          THE COURT:  Very well.  Any questions as to

7  qualifications?

8          MR. BURGOYNE:  No objection, Your Honor.

9          THE COURT:  Very well.  We so find.

10                  DIRECT EXAMINATION

11  BY MR. BERGER:

12  Q.   When someone comes to you for an assessment, what do you

13  do?

14  A.   I do the interview.  Well, we have some questionnaires

15  that we send out to them and ask for them to fill them in

16  before they come in.  And that helps guide me in the interview

17  to ask additional information from what they respond there.

18          They try to, first of all, size up how likely is it that

19  they have that condition and should we go forward and do

20  testing.  It's not uncommon where I've -- basically, we've

21  stopped at the end of the interview because I've concluded or

22  recommended to them -- I'm generally willing to consider doing

23  the evaluation, but I usually make a recommendation whether

24  testing is really going to be beneficial to them or clarify

25  things based on what I learn from the interview.

1    And whatever records they may have, I ask them to bring

2    those in, because that helps make -- any past testing that's

3    been done provides information about -- even more information

4    about how likely they are to have the condition, either ADHD or

5    dyslexia.

6    Q.   So does it ever occur after this initial interview that

7    you don't go forward or the individual doesn't go forward with

8    getting the full assessment?

9    A.   Yes.

10   Q.   You, I know, are acquainted with Ms. Ramsay, the plaintiff

11   in this case.

12        When did you first meet her?

13   A.   Face to face, that would have been on September 25, 2018.

14   I spoke with her on the phone somewhat prior to that.

15   Q.   And what did she tell you about what she was coming to

16   speak to you about?

17   A.   Well, she described to me that she was a medical student

18   and had been denied accommodations.  And she'd had other

19   evaluations done.  And that she was doing an appeal and that

20   she was looking for somebody who was capable of doing that kind

21   of an evaluation, who was experienced or familiar with it.  And

22   I asked her to send me whatever data she had so I could look it

23   over to see what's been done in the past and whether or not

24   there was things that were done in the past that would

25   basically tell me whether or not right off the bat whether she

1  was likely to have it or not have it.

2      It's not uncommon for me, when I get a phone call like

3  that -- if I get enough information that tells me that, you

4  know, I don't think this is really going to do for you what you

5  want it to do and it's -- you know, because there's evidence

6  here that shows otherwise, I usually discourage people from

7  going forward with the evaluation.

8  Q.   So in the case -- in Ms. Ramsay's case, what did you tell

9  her at this stage?

10 A.   Well, when I looked it over, nobody had done the kind of

11 testing that you need to do to even check into dyslexia.  The

12 only thing that they had done was a couple of brief things and

13 then a couple of reading comprehension tests, which don't

14 really tell you whether somebody has dyslexia or not.

15      In regards to the attention deficit, I thought some of the

16 work that was done, particularly by Dr. Ruekberg, seemed pretty

17 okay.  But the reports, from my experience, didn't try to

18 address more specifically what the DSM-5 requires and what

19 people generally expect to see in one of these reports if

20 you're making that kind of an application.

21 Q.   Okay.  When you refer to the report in that last answer,

22 were you referring to Dr. Lewandowski's report?

23 A.   In -- well, yes.  That was the one that -- he didn't --

24 there wasn't much of a write-up.  And he didn't -- as far as --

25 he didn't address specifically the DSM-5 criteria and how she

1  met it.  And in regards to dyslexia or reading, the tests that

2  he administered was inadequate for evaluating that.  It was a

3  reading -- no, I'm sorry, it wasn't a reading comprehension.

4  It was a screening test, the WRAT5, I think, which is just a

5  screening.  That's not considered an adequate battery for

6  evaluating a learning disability.

7       Let me add, dyslexia is the most common learning

8  disability, although that is not the title -- the terminology

9  that is typically used.  It's mentioned in the DSM-5.  But the

10  labeling in the DSM-5 refers to specific learning disorders in

11  either reading, writing or math.  And you could have basic

12  reading or a disorder in reading comprehension.  They are kind

13  of mutually exclusive -- not mutually exclusive.  You can have

14  one or the other.  You can have both.  You can have both, but

15  you can have one or the other.

16  Q.  And what's the terminology in ICD-10 for dyslexia?

17  A.  I don't recall the specific -- I don't recall the specific

18  language, something along the lines of a -- I don't remember,

19  scholastic learning disorder, something like that.

20  Q.  So --

21  A.  Or academic learning disorder.

22  Q.  -- after having this conversation with Ms. Ramsay, you

23  told her, as I understand it, that you thought there were some

24  additional tests that you could do that hadn't been done

25  before.  Right?

SMITH - DIRECT

1  A.   Yes.  That are a part of actually a standard battery that

2  if you're going to do dyslexia, these are the tests that are

3  agreed upon by dyslexia experts you should do.  And none of

4  those were done.

5  Q.   When you spoke to her, you didn't know what the results of

6  those tests would be; is that --

7  A.   Oh, no, not at all.

8  Q.   And did you tell her that?

9  A.   Yes.

10 Q.   And what did she decide about whether she wanted to go

11 ahead?

12 A.   Well, she decided to go forward.  Now, I did emphasize to

13 her that I didn't know and it might not turn out -- you know,

14 it might not really show that she has dyslexia.

15 Q.   All right.  You still should have Exhibit P21 in front of

16 you.  And turn, please, to page 15 of the overall document.

17      And tell me what appears at page 15?

18 A.   Well, her name, date, when the test was done and when the

19 report was completed; a list of the -- what I referred to are

20 sources of information, but that includes --

21 Q.   Okay.  Well, I'm ahead of myself.  You're ahead of me.

22 A.   Okay.

23 Q.   Just what I just wanted to actually identify -- and I

24 didn't ask it the right way -- pages 15 through 45 of P-21 are

25 your report, are they not?

 1  A.   Yes.

 2  Q.   And that's your signature on page 45?

 3  A.   Yes.

 4  Q.   So this is the report that you created after you had met

 5  with Ms. Ramsay and done the tests.  Right?

 6  A.   Yes.

 7  Q.   All right.  I'm going to ask now just briefly about some

 8  of the sections.  And the first section, which I think you

 9  started to talk about, is sources of information.

10       So what is that section about?

11  A.   Well, it's just listing that I did an interview with her

12  and her mother and then the tests that I administered.

13  Q.   All right.  And then the next section -- oh, by the way,

14  those tests that you describe under sources of information, are

15  those all tests that you administered yourself?

16  A.   Yes, I administered all the tests.  I don't have a

17  technician.

18  Q.   All right.  The next section which starts on page 15 and

19  continues over is called records reviewed?

20  A.   Yes.

21  Q.   And what's that section about generally?

22  A.   Well, that's about all the documents I asked her to bring

23  in for me, as much as I can get, to look over both -- primarily

24  before the interview and during the interview.  The ones that

25  she sent to me, plus anything extra she brought to the

1  interview that I would then interview as part of the −− I would

2  review as part of the interview.

3  Q.   And there's a section then −− I'm going to skip over the

4  reason for referral, because I think we've already covered

5  that, that Ms. Ramsay came to see you because of her problems

6  with the USMLE.

7       But the next section, which starts history and interview

8  information.  And this is a long section, so I'm not asking you

9  to describe it in detail, but what generally is the purpose of

10 the section and of the interview?

11 A.   To summarize the information that I gathered from her

12 through the questionnaires and interview and even reviewing

13 some of the records about her history of her problems and

14 describe the problems that she's had leading up to the present

15 time.

16 Q.   And this was an in-person interview.  Correct?

17 A.   Yes.

18 Q.   Do you remember approximately how long the interview

19 lasted?

20 A.   Yes.  Well, these interviews −− I schedule out an hour,

21 and they usually take two before we even consider doing −−

22 that's a lot of stuff to go through.  And before we even start

23 doing the testing.

24 Q.   All right.  As part of the history and interview

25 information, if you turn to page 18 of Exhibit P-21.  And it's

1   page 4 of your report.

2        There's a section that starts on that page called school

3   history?

4   A.   Yeah.

5   Q.   And what generally is the purpose of that section?

6   A.   Well, similar to what I just described, except related to

7   her experiences in school, difficulty she's had in school, what

8   she's done to try to address it up to the present time.

9   Q.   What did you find out about whether Ms. Ramsay had formal

10  accommodations while she was in elementary school?

11  A.   I found out that she hadn't had any formal -- she hadn't

12  had any really evaluation and had not had any formal

13  accommodations.

14  Q.   And what did you -- and if I ask the same question about

15  middle school and high school, would it be the same answer?

16  A.   Yes.

17  Q.   Is that unusual for people, adults with dyslexia that

18  hasn't previously been diagnosed?

19  A.   No.  I might qualify that.  That happens -- in my

20  experience, that happens fairly frequently.  I mean, it's not

21  like half the time.  If I put a figure -- make up a figure,

22  maybe 10 or 15 percent of the time that people come in with

23  that kind of a history.

24  Q.   On page 8 of the report --

25  A.   Page 8?

1  Q.  Yes.  It's page 22 of the total document, but it's page 8

2  of the report, the section at the top of the page, mental

3  status and observations.

4  A.  Okay, yeah.

5  Q.  What generally is the purpose of that section?

6  A.  You know, I'm still looking for that section, I'm sorry.

7     What page are you talking about?

8  Q.  It should -- well, it should say -- at the top, it should

9  say page 22 of 60.  And at the bottom --

10 A.  Oh, never mind.  I got it.

11 Q.  Well, and then there's the actual -- so it's page 8 of the

12 report?

13 A.  Sure.  I'm there now.

14 Q.  We have too many page numbers in this case.

15    All right.  So you've got the page that has mental status

16 and observations at the top?

17 A.  Right.

18 Q.  And what generally is the purpose of that section?

19 A.  It's to describe her general functioning, to review some

20 questions that I would ask her about her sleep and just my

21 observations about how she handled herself.  These are

22 screening things that -- these kind of observations are used to

23 screen -- initial screening for whether you have a severe kind

24 of behavioral disorder or something that stands out, a

25 psychological disorder that we might need to look into further.

1  It's not the end of it, but it's the beginning part of checking

2  into that.

3  Q.   During your interview or all of your testing of Ms.

4  Ramsay, did you observe anything that would affect her ability

5  to respond to your questions or respond to the instruments that

6  you were giving her?

7  A.   No.  And I left -- it's not just a description of her

8  psychological functioning.  I'm also including in there general

9  statements about what she was like during the interview and how

10 she interacted with me so that I could make some kind of an

11 assessment or comment about how she responded to the tasks I

12 asked her to do.

13 Q.   Okay.  Toward the bottom of the same page, there is a

14 section entitled intellectual functioning.  And that continues

15 over to page 11 of your report, which is page 25 of the overall

16 document.

17      What generally was the purpose of that section?

18 A.   Well, number one is to make sure she doesn't have low

19 ability, which her history says that's probably not the case.

20 She's in medical school, so I didn't think she got -- but it's

21 to double check that.

22      But also, since I'm evaluating for attention deficit

23 disorder and cognitive functioning in general, it's to get a

24 general sense of what is her cognitive functioning like to

25 begin with.  And this reflects functioning in four basic

1  domains that are generally associated with the IQ score,

2  although not necessarily intelligence.

3  Q.   So you're referring, I think, to -- or let me see if I've

4  got this right.  You're referring to verbal comprehension?  You

5  said for --

6  A.   Yes, I'm referring to verbal comprehension.  It's called

7  perceptual reasoning, but most people would think of it as and

8  it used to be called nonverbal reasoning.  Working memory,

9  which is actively processing information in your head.  And

10 processing speed, which is really an attention-related

11 condition.  It's kind of a -- the terminology, it's evolved --

12 historically that's the terminology that they've used.  But the

13 nature of the subtests that are done really tap into

14 difficulties with attention.

15 Q.   Now I'd like to ask you about some of the specific

16 findings that are contained in your report.

17       And look first, if you would, at page 16 through page 18.

18 A.   Which page --

19 Q.   So it's page 30 of the document, starting with page 30 of

20 the document, 30 through 32.

21 A.   All right.

22 Q.   Now, you refer in these pages and some other places to

23 fluency.

24       And can you tell me how you're using the word "fluency" in

25 your report?

1  A.   Fluency -- oral reading fluency, which is what we're

2  referring to there, is the speed and accuracy with which a

3  person can read words and oftentimes referred to as

4  automaticity, which is a reflection of how -- the non-dyslexic

5  reader reads effortlessly in doing this.  The dyslexic reader,

6  even when they had remediation, substantial remediation, still

7  stumbles and is slow and often makes a lot of mistakes in doing

8  this, as opposed to the non-dyslexic or non-impaired reader who

9  does it without thinking, or not thinking very much.

10 Q.   So as part of the testing you did, were there some

11 measurements of fluency?

12 A.   Several.  Both silent and oral.

13 Q.   So on page 18 of the report, there is a summary of scores

14 from the WIAT-information?

15 A.   Yes.

16 Q.   I think it's been referred to before in the hearing, but

17 just for the record, what is WIAT-information an abbreviation

18 for?

19 A.   The Wechsler Individual Achievement Test, Third Edition,

20 most recent edition.  Although they're coming out with a new

21 one next year.

22 Q.   All right.  And is there information on page 18 of the

23 report, page 32 of the document, about fluency?

24 A.   Yes.

25 Q.   Describe that.

1 A.   Oral reading fluency.  She had to read -- she ended up

2 reading three passages.  You only use -- the reason for that

3 was the way that the WIAT sets things up is that you start off

4 at a level of difficulty that is expected that a person of her

5 age would be able to read fairly efficiently within a certain

6 time limit.

7      If they go over that time limit, regardless of the

8 mistakes, you don't score that.  You stop that testing,

9 although you're allowed to continue, because I've found it

10 awkward to stop somebody.  It's embarrassing for them to be

11 stopped.  But you don't score that.

12      You then revert to -- somewhat easier, the next two easier

13 passages and do that.  And the first one that she does, she has

14 to do that within a certain maximum time limit.  And if she

15 does that, then you administer the next one in the order.  And

16 those are the two that are used for scoring.  And you're --

17 there are two scores, both the speed with which she does it and

18 then the number of errors, although the oral -- this score, the

19 oral reading fluency, is a combination of the speed with which

20 she does it and some of the errors but not all of the errors.

21      There's another -- am I getting ahead of myself?

22 Q.   No.  That's -- I think it's a good thing to explain at

23 this point.

24 A.   I should stop?

25 Q.   No, no, no.  Go ahead and explain how the errors are

1  treated.

2  A.    The nature of the scoring for the WIAT, in terms of

3  scoring errors, you do have another -- there's a subscore.  You

4  have a speed score, which is how fast did she do it, and then

5  you have another score considering accuracy.  The accuracy

6  score, which is a component score, you count the times that she

7  omitted a word, misread a word and didn't correct it, added a

8  word.  Is there another one in there?  No, that's it.  And that

9  ends up with that score.  However, in terms of the errors that

10  are counted to come up with the primary oral reading, the only

11  errors that factor in there are the times that she added a word

12  or misread a word and didn't correct it.  If you turn around

13  and correct it, it doesn't count as an error.

14  Q.    So -- and I think that if I have this right, that we're on

15  page 18 of the report.  But on page 16, you talk about the oral

16  reading accuracy score being average and at the 55th

17  percentile.  Correct?

18  A.    Let me find it again.

19      Yes, 55th percentile.

20  Q.    Okay.  So generally speaking, on this test, subject to the

21  explanation you gave of how this test treats accuracy,

22  generally speaking, she read accurately but slowly?

23  A.    On this test.  The Gray Oral is scored differently, so it

24  produces a different score with a different meaning.

25  Q.    Okay.  So we'll talk about that too.

1      But -- and I think you explained generally how this is

2  scored, but on page 18 for oral reading fluency, it says that

3  the standard score was 67?

4  A.   Yes.

5  Q.   And that the percentile rank was 1?

6  A.   1.

7  Q.   Okay.  And I think we all have been talking about

8  percentile for two days, but just to put it in the record here,

9  when you say that a score is in the 1st percentile, what does

10 that mean?

11 A.   That means her performances was only as good or high as

12 1 percent of other people her age.  Now, conversely that means

13 that 99 percent of people her age were better at her than that.

14 Q.   And for the WIAT-information, this is an age-based

15 comparison?

16 A.   Yes.

17 Q.   You're comparing her with other like-aged people?

18 A.   That's correct.  This goes up to age 50.

19      MR. BERGER:  Your Honor, at this point I had planned

20 to try to play some of the recordings that Dr. Smith made of

21 Ms. Ramsay's actual performance.  And we have yet to master the

22 technical difficulties of playing them, so I'm going to pass

23 over that for now.

24      THE COURT:  That's a good idea.

25 BY MR. BERGER:

1  Q.  So on this fluency score that we've just been talking

2  about, the oral reading fluency score on the WIAT-information,

3  is that -- is it fair to say that is determined mainly by

4  reading speed?

5  A.  On this test it is.  It is much more influenced by speed

6  than the errors that are made, unless you make a whole bunch of

7  errors.  She didn't make enough of those -- primarily speed is

8  influenced on that particular score.

9  Q.  And I think one of the things you said is if you make an

10  error and then correct it, then it isn't counted as an error.

11  Right?

12  A.  That's correct.

13  Q.  Okay.  All right.  Well, then let's talk about the GORT,

14  because you've mentioned that.  And the GORT is discussed in

15  your report, I believe starting at page 21 of the report, but

16  page 35 of the document.

17  A.  Yup.  Okay.

18  Q.  And that discussion continues on over to the next page

19  too.  So on the GORT, according to your report, Ms. Ramsay had

20  an accuracy score that was at the 5th percentile.

21  A.  Right.

22  Q.  And a rate score that was at -- well, and then it goes on

23  to say the fluency score.  The fluency score, that was at the

24  2nd percentile.  That's over on the next page.

25  A.  Uh-huh.

1  Q.  And you say in your report, she was able to correctly read

2  most of the words but her reading was slow.

3  A.  Where is that at here?

4  Q.  That's on page 22 of the report, third line.

5  A.  All right.  Let me look at that.

6      22, the third line?

7      Read most of the words but her reading was slow.

8      Yes.  That's reflecting -- the way that the Gray Oral was

9  scored, she made a lot of corrections.  She would read a word

10 wrong and then would correct it.  Unlike the WIAT, those are

11 not counted as errors on the WIAT.  Those are counted as errors

12 on the GORT, because it reflects stumbling and awkwardness and

13 misreading something at first and then having to go back and

14 correct it.

15 Q.  And in fact, you went on in this same page to give a

16 description in your report of the manner in which she read?

17 A.  Correct.

18 Q.  Can you just summarize that very briefly?

19 A.  Well, she read in short phrases, two- and four-word

20 phrases, halting, a lot of hesitations, a lot of

21 self-corrections, a lot of rereading of a phrase or a

22 four-word -- a four-word phrase throughout the passages that

23 she was reading.  So it reflects a lot of hesitation and

24 uncertainty about what's the correct word.

25 Q.  Okay.  Let's just turn back one page to page 21 of the

1  report.  And there's a discussion there at the top of the page

2  and then a table in the middle of the page of results from the

3  Woodcock-Johnson IV?

4  A.   Yes.

5  Q.   And first can you just summarize what you found about

6  reading rate and sentence reading fluency and word reading

7  fluency?

8  A.   Those are -- well, sentence reading fluency is a silent

9  reading task.  And what you do is basically you're reading

10  simple sentences, they're not really difficult words to read,

11  and you're marking whether they're true or false, yes or no.

12  Like, for instance, a bird writes books, is that false or true.

13  Well, you know, that's pretty simple.  And so -- and then you

14  get three minutes to do as many of those as you can.

15      Every error you make gets counted against you.  It

16  detracts from your score.

17      The word reading fluency is you have a -- rows of four

18  words.  Two of the words are related, like shoe, stone, sock

19  and pencil.  Well, shoe and sock would be the ones that are

20  related.  And she has to mark those.  And then she's allowed to

21  skip -- like in the silent reading, the instructions are skip

22  anything you're not sure about.  You can go back for it later

23  if you have time.  Most people don't finish the whole task in

24  the three minutes.  And the same is the true for the word

25  reading.  You can skip anything you're not sure about.  Get as

1  many done as you can as fast as you can.

2  Q.   So we've reviewed so far three different tests that you

3  did, the WIAT-information --

4  A.   Let me also add that those -- you're reading those

5  silently.  Unlike the WIAT and the GORT-5 where you're reading

6  out loud, those you're reading silently.

7  Q.   Okay.  So anyhow, three different tests, the WIAT and the

8  Woodcock-Johnson and the GORT-5.

9       And your results for all three of those, for three

10 different tests, and you've described the tests, showed low

11 scores for fluency?

12 A.   Very low scores.

13 Q.   And then there also is a test that you did called the

14 Nelson-Denny?

15 A.   Yes.

16 Q.   And you can see a reference to that on page 30 of the

17 report, which is page 44 of the document.

18      And what generally did the Nelson-Denny testing tell you

19 about Jessica's performance?

20 A.   Well, let me look at this -- I'm at the wrong -- you said

21 44 of the doc?

22 Q.   Yes.  It's the page with the title recommendations at the

23 top.

24 A.   I'm confused.  You're referring to the Nelson-Denny.  I'm

25 not -- and that's not in this part, I don't think, is it?

1   Q.   Well, it's discussed as part --

2   A.   Oh, yeah.  I see that I referred to the Nelson-Denny.

3   Q.   Correct.  There may -- I mean, if you want to look for a

4   different reference to the Nelson-Denny, that's fine, but --

5   A.   I'll do that, because it's -- I go into a little more

6   detail earlier than that.

7        So what's your question again, please?

8   Q.   Just what -- whether the Nelson-Denny was another piece of

9   evidence about Ms. Ramsay's reading ability.

10  A.   Yes.  Mostly I'm focusing on the reading comprehension

11  test, which you get 20 minutes for.  Like Dr. Lovett said

12  earlier, I take -- the rate score, I take with a grain of salt.

13  It's not terribly -- it's not terribly reliable the way it's

14  conducted.  It's only one minute reading and silently.

15       But what she did was she answered 95 percent of the

16  questions that she attempted correctly.  But I think it was

17  only 40 -- she only attempted 42 percent of the questions that

18  were there before the time ran out.

19  Q.   And that's because she ran out of time?

20  A.   Yes.  Most adult -- most -- there was some research done

21  on this that most high school seniors can finish the whole 38

22  questions in the 20-minute time limit.  But that's not part of

23  the scoring.  That's just some supplemental testing that was

24  done on high school seniors.

25  Q.   Now, there's evidence in the case about various

1  standardized tests that Ms. Ramsay took over time, especially

2  the ACT, which is a college admissions test, and the MCAT.

3  A.    Uh-huh.

4  Q.    How would you compare the kinds of tests that we've just

5  been discussing, the WIAT-information, the GORT-5, the

6  Woodcock-Johnson IV and the Nelson-Denny, with a test like the

7  ACT or the MCAT?

8  A.    Those are not diagnostic reading tests.  They primarily

9  rely on reading comprehension.  And they don't give us any

10  information about what was going on for the person in order to

11  accomplish what they accomplished on it.

12  Q.    You have testified generally and your report refers to the

13  fact that you reviewed early school records --

14  A.    Yes.

15  Q.    -- for Jessica.  I think report cards?

16  A.    Yes.

17  Q.    And would you say that there is any indication in those

18  records of a reading problem?

19  A.    No, not much.  Actually, none.

20  Q.    Is it common or uncommon for dyslexia to be unrecognized

21  in early school records?

22  A.    Yes.  I mean, it's common in my experience.  I don't find

23  those kind of school records to be all that accurate of a

24  reflection of what was going on.  They typically don't say

25  much.  I mean, they give the grades and they make a few

1  comments, but my impression about most -- over these years

2  about most teachers is that they're -- if the student is

3  managing to accomplish the tasks and get a good grade, no

4  matter how they do it, the teacher wants to be encouraging and

5  positive and they don't want to focus on anything that's

6  negative.

7         MR. BURGOYNE:  Lack of foundation, Your Honor,

8  objection.

9         THE COURT:  Overruled.  We'll grant him some expert

10  license.

11        THE WITNESS:  If I could say one more thing about

12  that?

13  BY MR. BERGER:

14  Q.  Yes.

15  A.  My experience, again, is that I look for those things,

16  because sometimes there's something there that says something.

17  But the absence of something there doesn't -- doesn't tell me

18  that something wasn't going on.  That's the basic -- what I'm

19  trying to say.

20  Q.  I want to show you now an exhibit from defendant's exhibit

21  book.  So let me help find that for you, but I'm going to be

22  referring to D-27.

23      Dr. Smith, D27 appears to be a report on a test called the

24  Iowa Test of Basic Skills that Ms. Ramsay took when she was 11

25  years old.

1  A.   Yes.

2  Q.   Do you see that?

3       And have you reviewed this before?

4  A.   I don't think that was available to me when I did my

5  evaluation, but I have looked at it subsequently.

6  Q.   And is there any information on this report that relates

7  to the difference between Jessica's performance and her

8  cognitive ability?

9  A.   Yes.

10  Q.   Could you describe that?

11  A.   The Iowa Test is frequently done in combination with a

12  test called the Cognitive Abilities Test, which is a

13  group-administered test trying to measure IQ or intelligence.

14  And it's not as -- considered as precise as the individually

15  administered tests like the Wechsler, but it's commonly done.

16  I remember when I was this age doing it.  Or remember looking

17  at these things at that.

18       And what this does, though, is that for the cog, it gives

19  a -- for the cog ability test, it provides a combination -- I

20  mean, percentile ranks, scores in relation to other children

21  her age, as well as other children in the same grade.  And

22  those are mentioned here.  They're both far above average.

23       And what it says, though, is that her -- the measurements

24  of her -- this is a standardized group administered test.  What

25  this says is that like her -- a number -- well, I'll just read

1  what it says here.

2      That a number of her academic skills are significantly

3  below what they would have expected given her cognitive

4  abilities test.  The vocabulary reading comprehension,

5  spelling, capitalization, punctuation, social studies and math

6  computation, they represent areas in which Jessica is not doing

7  as well as she might be expected.

8      The measures of her intelligence are -- the overall

9  measure for the grade -- they're using the grade -- well,

10  they're both -- they're using the grade score here.  That's at

11  the 98th percentile.  And her reading score is at the 74th

12  percentile.  And although that's a good score compared to other

13  kids, that's far below what you would expect for somebody with

14  that of a cognitive ability.

15  Q.  When Professor Lovett and Professor Zecker testified,

16  there was some discussion about what they called the

17  discrepancy model.

18      Do you recall that?

19  A.  Yes, yes.

20  Q.  Is the discrepancy model still recognized either in DSM-5

21  or ICD-10?

22  A.  It's recognized in ICD-10.

23  Q.  And are there also scholars in the field that have

24  advocated for the discrepancy model?

25  A.  Yes.  The problem with the discrepancy model is that there

1   is a lot of controversy about that, a lot of debate among

2   expert researchers about this thing, some for it, some against

3   it.  And leading to a lot of criticism about the DSM-5

4   eliminating it.  The problem with the discrepancy model is that

5   with children with learning disabilities frequently didn't

6   exhibit a significant discrepancy.  And then they were ruled

7   out from having a learning disability when in fact they were

8   struggling.

9        But the presence of a discrepancy is a meaningful thing.

10  And that's what these other experts are saying, is that the

11  absence of it, we should eliminate it for that reason and not

12  disqualify somebody if they don't have that discrepancy,

13  because there's an interactive effect that can happen where

14  your learning disability can actually depress the development

15  of your intellectual abilities.  But if you happen to have one,

16  that's still meaningful.  That's what the criticism is, that

17  that shouldn't have been thrown out for that reason in order to

18  solve the other problem.

19       That's particularly promoted by Drs. Bennett and Sally

20  Shaywitz at the Yale University Dyslexia Center in their

21  research on the connections and the importance of the IQ and

22  discrepancy.

23  Q.  And in your report, did you consider whether there were

24  discrepancies between Jessica's performance and her cognitive

25  ability?

1  A.   Yes.  And let me add to that.  It's not enough to have a

2  discrepancy.  That can happen just by the nature of the test.

3  The issue then is if you have a discrepancy, it means that,

4  well, it didn't happen just because of the sloppiness of the

5  test, but you also have to look how frequently does that occur

6  in the general population for it to be clinically meaningful.

7  It needs to be unusual.  And generally the cut for that is

8  generally anything 15 percent or less is considered unusual,

9  therefore, abnormal.

10 Q.   And did you consider that in your report?

11 A.   Yes, absolutely.

12 Q.   Is page 11 the right reference in your report?  That's

13 page 25 of the overall document, page 11 of your report.

14      And I can help you find it if that --

15 A.   As long as I don't knock things over here.

16      What page?

17 Q.   It's page 11 of the report.

18 A.   That should be at the end of the academic discussion.

19 Q.   Yep.

20 A.   That's usually where I -- no.  That would be at the end of

21 the WIAT, because that's really the only one I use for that.

22 That's the only one -- they did studies on -- they did

23 develop -- I call it the WIAT.  The WIAT, the WIAT.

24      Where they -- in the standardization sample, they do like

25 5,000 kids and adults to measure how frequently these kind of

1  discrepancies occur in the population sample.  And that's where

2  those figures come from.  And it's a big enough sample that we

3  can make a generalization that that probably reflects what

4  occurs out there with the whole population in general.

5  Q.   Okay.

6  A.   You want me to find that?  Is that what you're looking for

7  here?

8  Q.   I don't think we need --

9  A.   I'm there now, so if you want me to refer to it.

10  Q.   No.

11  A.   I did it in two ways.  Because there's a -- I used the IQ,

12  even though I don't think that's a valid measure of her

13  intelligence.  And I use it with the General Ability Index,

14  which is a preferred measure among the -- many of the

15  organizations that deal with gifted, because -- especially the

16  gifted learning disabled, because they often do have these

17  discrepancies in some of these other domains, like processing

18  speed and working memory index.

19       And those are also -- these discrepancies, that's also

20  important, because base rate, how frequently does that occur

21  with people at that level?  So, again, it has to be unusual,

22  lower than 15 percent.  So it's not like it just occurs all the

23  time for people.  It's not occurring very often, therefore,

24  it's unusual and, therefore, abnormal.

25       And so that's where the General Ability Index doesn't use

1  those.  The working memory index and the processing speed index

2  are actually attention-related components.  And so when you

3  factor those out, the verbal comprehension and the perceptual

4  reasoning are solving problems, both verbally and nonverbally,

5  which is what most people would think of as intelligence to

6  begin with.  And it would represent your optimal -- well, a

7  better estimate of your intelligence when you're able to use

8  all of your compensatory strategies that you may have.

9  Q.   And what's the reason why, in Ms. Ramsay's case, the

10 General Ability Index is a better measure than IQ?

11 A.   Well, because her -- the unusual discrepancies between her

12 verbal comprehension index and her performance reasoning index

13 and her -- in particular, the processing speed index.  That --

14 I could -- I need to go back to the IQ or the Wechsler

15 intelligence scale to comment on it.

16     Do you want me to do that?

17 Q.   Yes.

18 A.   How frequently that was?  I mean, that's important.  It's

19 not enough to have a discrepancy.  I said that.

20 Q.   I think page 9 of your report, if I'm looking at the right

21 thing.

22 A.   Thank you.  Page 9.

23     The -- and we're comparing her against other -- in this

24 instance, against other people who have an IQ of 117.

25     And I did some comparisons.  I'm -- I didn't include it in

1 the report.  We're making kind of an arbitrary decision about

2 which group are we going to calculate these things.

3      If I calculated it based on how frequently do these kind

4 of discrepancies occur with people with an even higher IQ,

5 which would be where people typically think of gifted, with an

6 IQ score, they occur even less frequently.  But it's pretty

7 infrequently here.

8      This is -- the difference between her performance

9 reasoning index and processing speed occurred in only

10 1.3 percent of the population of people at that level.  That's

11 pretty uncommon.

12 Q.   What page are you?

13 A.   I'm on page 24 of 60 of the exhibit.

14 Q.   Okay.

15 A.   Or 10 of 31 of my report.

16 Q.   Okay.  I want to change the subject now and talk about the

17 diagnosis of ADHD --

18 A.   Okay.

19 Q.   -- in Jessica's case, in Ms. Ramsay's case.

20      What generally did you base the diagnosis on in her case?

21 A.   The descriptions that she and her mother and her fiancé

22 Neil gave and their responses to the rating scales that I asked

23 them to fill out, which I asked him -- her mother -- pretty

24 sure -- yes, I did.  I asked her mother to fill out that rating

25 scale, about how Jessica was when she was under the age of 12,

1  during her elementary school years.  And that's primarily how

2  you conclude about an attention deficit.

3      There are no -- you want me to get into this?

4  Q.  Well, let me just ask this:  Was there a specific test

5  that you did with respect to ADHD?

6  A.  Yes.

7  Q.  And what test was that?

8  A.  That was the IVA, the Integrated Visual and Auditory

9  Attention -- Continuous Performance Test.

10  Q.  And what were the findings from it?

11  A.  She was extremely low, both administrations.

12  Q.  Well, for example, in your report on -- in your report,

13  you begin the discussion of the -- let's just have it in the

14  record at this point, what you're referring to.  The full name

15  is the Integrated Visual and Auditory Continuous Performance

16  Test.  Correct?

17  A.  Yes.

18  Q.  Sometimes called the IVA or the IVA+Plus?

19  A.  The IVA+Plus is the term.

20  Q.  And that begins at page 11 of the report.  And then at

21  page 12 you begin to explain the findings.  And you said that

22  you administered it twice?

23  A.  Yes.

24  Q.  And why did you administer it twice?

25  A.  Because the scores were so low, I wanted to see if I would

1  get a similar result to see how reliable that was.

2      Trying to factor in some of the test error that are built

3  into some of these kind of tests.  So offset it to see if I get

4  it, a similar kind of result or something drastically

5  different.

6  Q.  All right.  So on page 13 of the report, around the middle

7  of the page, where you're just describing the first time you

8  administered it -- and actually, there are a number -- let me

9  just review them quickly.

10     On page 12, you talk about the Full Scale Response Control

11 Quotient?

12 A.  Yeah.

13 Q.  And you say that that was -- got you a score of 44, which

14 was in the extremely impaired range.  Correct?

15 A.  Let me just move this before I knock it over.

16     What page?

17 Q.  Page 12 of the report, and near the bottom.

18 A.  Okay.  All right.

19 Q.  There's a global quotient scale score you report on the

20 first time you administered the test of 44?

21 A.  Yes.

22 Q.  And you say that fell in the extremely impaired range?

23 A.  Yes.

24 Q.  And then you also describe her auditory response control

25 quotient scale was 38?

1  A.   Oh, wait a minute.  Auditory response.

2  Q.   And the visual response control quotient scale on the next

3  page.

4  A.   That's 38 for the auditory and 65 for the visual.

5  Q.   Okay.  And you say they both fell into the -- or all three

6  of those fell into the extremely impaired range?

7  A.   Yes.  Well, one is extremely and one is severely.  I don't

8  know if they're different.  They're both bad.

9  Q.   All right.  And on the next page you described something

10  called the Full Scale Attention Quotient?

11  A.   Uh-huh.

12  Q.   Also in the extremely impaired range?

13  A.   Uh-huh.  Oh, you're asking the question?

14  Q.   Yeah, yeah.

15  A.   What's the question again?

16  Q.   Just to confirm that you described the Full Scale

17  Attention Quotient as falling in the severely impaired range?

18  A.   Yes.

19  Q.   And the visual attention quotient also in the extremely

20  impaired range?

21  A.   Yes.

22  Q.   And the next paragraph down, you refer to the combined

23  sustained attention scale also in the extremely impaired range

24  and the visual sustained attention quotient scale also in the

25  extremely impaired range?

1  A.   Could I -- well --

2  Q.   And without going through the second administration in as

3  much detail, did those findings generally confirm the findings

4  from the first administration?

5  A.   Yes.

6  Q.   So was this additional evidence that you considered as

7  part of your ADHD diagnosis?

8  A.   Yes.  Just as a note, these kind of tests, there are

9  several on the market, they're all patterned after air traffic

10  controllers sitting in front of a screen watching something

11  that's extremely boring and having to keep their attention on

12  it because these are very boring.  Most people with attention

13  deficit hate doing this test.  It's miserable for them to sit

14  through 15 minutes of this.

15  Q.   Let's look at page 8 of your report.  It's page 22 of the

16  big document but page 8 of the report, page 8 of 31.

17       And I'm going to be discussing this section called --

18  under the heading symptom validity.

19  A.   Yes.

20  Q.   You describe that you administered a test called a Test of

21  Memory Malingering, or TOMM?

22  A.   Yes.

23  Q.   Why did you administer the TOMM in this case?

24  A.   It's one of the most commonly used tests, it has a lot of

25  research behind it, beyond being experimental.

1    And I'm assessing for both attention deficit and dyslexia.

2    And it's one of the most frequently used tests that's used.

3    Q.   Besides the TOMM, is there anything else that you relied

4    on in considering whether Ms. Ramsay was making genuine effort

5    during all this testing?

6    A.   Yes.  Well, her general demeanor -- well, primarily her

7    general demeanor.  And she came across to me as a very sincere

8    person who was trying her best.  And the symptom validity

9    test -- actually, they used to be called symptom validity

10   tests, but they're actually referred to as performance validity

11   tests now.  It's a supplement to try to see if there's any --

12   to supplement what my own judgment was about her, her efforts.

13   Q.   But you did also choose to do the TOMM, the Test of Memory

14   Malingering in this case.  You didn't rely just on your

15   clinical --

16   A.   No, no.  I choose to do this.  And this has been -- it's

17   been used in studies with -- to examine people who have reading

18   disabilities in addition to memory or attention deficit.  It's

19   been used in a broad range of neuropsychological dysfunction,

20   brain dysfunction, attention deficit, learning disabilities,

21   dyslexia.  And so it's been researched in those areas as being

22   effective.

23   Q.   Taking account of everything that we've reviewed this

24   afternoon and everything that you've described in your report,

25   what conclusion did you reach about whether Jessica Ramsay has

1  dyslexia?

2  A.   I had no question about it.

3  Q.   And would you -- could you briefly summarize your reasons

4  for that conclusion?

5  A.   Well, her performance on the test that actually measured

6  dyslexia, the measures of basic reading, oral reading fluency,

7  silent reading speed, those are the primary tests that reflect

8  whether or not you have dyslexia.

9  Q.   And based on everything that you've described and in your

10  report, what conclusion did you reach about whether she had

11  ADHD?

12  A.   I concluded that she did have ADHD.  By the description

13  from her mother and her, it seemed credible to me.  The

14  explanation for why it doesn't -- what they did for her when

15  she was a youngster in elementary school seemed credible to me

16  and was -- supported that those symptoms were there.

17  Q.   You're aware and you describe in your report about prior

18  professional evaluations of whether she had ADHD or not.

19  A.   Uh-huh.

20  Q.   By Dr. Smiy?

21  A.   Yes.

22  Q.   And also by Dr. Ruekberg?

23  A.   Yes.

24  Q.   And did you consider their findings in reaching your

25  conclusion about ADHD?

1    A.    Not so much Dr. Smiy.  And I don't mean that in a negative

2    way toward him, but a general office practice doesn't go into a

3    lot of detail.  They're making the best guess they can with the

4    limited time they have.  They're going to treat them.  They get

5    to make that decision.  And then they're going to see how well

6    they respond.  That's typically what happens in a doctor's

7    office.

8        Dr. Ruekberg, from what I read, did more of what a typical

9    evaluation for attention deficit is, which is the collection of

10   interviews, information and the filling out of rating scales

11   that pertain to the symptoms of attention deficit.

12       Actually, that is what is primarily -- I mean, you collect

13   as much history as you can.  I use these -- like the IVA tests,

14   I use that.  And I look at patterns of the Wechsler to see if

15   that's consistent.  There are other conditions that can produce

16   that pattern, so that's not a -- they're not specific to that.

17       But no professional organizations have approved any

18   neuropsychological tests as a primary determinant of attention

19   deficit, either for or against having it.  And they have to

20   basically collect what information you can about their history,

21   the frequency of their symptoms that you gather from them and

22   other people who know them, and you make your best professional

23   judgment.  It's a lot less -- it's primarily not test driven.

24       So for instance, if she had scored well on the IVA, that

25   wouldn't matter, because those kind of tests in general have

1  been found to have a very high false negative rate.  I mean,

2  they've failed to detect it, roughly speaking, about 50 percent

3  of the time when in fact it's there.  If they happen to find

4  something, they're right about 90 percent of the time.  That

5  doesn't mean that they have attention deficit.  It means they

6  have impaired attention, which could be from psychosis,

7  depression, brain damage, a whole host of many things, having

8  the flu, taking medicine.  But then based on the history, you

9  could make an inference about, well, what could that be about,

10  why did they perform in the impaired range.

11  Q.   And Ms. Ramsay didn't have any of those --

12  A.   No, she did not have anything going on.  And she didn't

13  take any medication because what good would it do to do a test

14  of attention if she's getting the treatment for it?

15  Q.   Based on your testing, everything in your report,

16  everything you've described this afternoon, is it your opinion

17  that Ms. Ramsay needs testing accommodations for timed written

18  tests like the USMLE?

19  A.   Yes.

20  Q.   And what accommodations do you believe that she needs?

21  A.   I think she needs to have double the usual time because of

22  those measures of reading speed and oral reading fluency and

23  other tests like the Nelson-Denny that reflected very slow

24  reading on a reading comprehension test.  I don't mean the

25  rate.  I mean the number of questions she was able to attempt

1   in the 20-minute time limit.

2          MR. BERGER:  Thank you.  That concludes our direct

3   examination, Your Honor.

4          THE COURT:  All right, Counsel.  Rather than get

5   started with cross-examination this afternoon, let's start

6   tomorrow morning at 9:30.  All right?

7          MR. BURGOYNE:  Thank you, Your Honor.

8          THE COURT:  We're adjourned.

9          (Proceedings concluded at 4:38 p.m.)

10

11

12

13          I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16   _____

17   Ann Marie Mitchell, CRR, RDR, RMR
     Official Court Reporter
18

19

20

21

22

23

24

25

```
 1                          -   -   -

 2                      I N D E X

 3                          -   -   -

 4
        Witness              Direct      Cross       Redirect      Recross
 5
        JESSICA RAMSAY                    4           48            58
 6
        DR. BENJAMIN     62
 7      LOVETT - VOIR
        DIRE
 8
        DR. BENJAMIN     71          110
 9      LOVETT

10      DR. STEVEN       139
        ZECKER - VOIR
11      DIRE

12      DR. STEVEN       146         150
        ZECKER
13
        DR. ROBERT       168
14      SMITH - VOIR
        DIRE
15
        DR. ROBERT       174
16      SMITH

17

18                          -   -   -

19                    E X H I B I T S

20                          -   -   -

21
        NO.                                ADMITTED PAGE
22
        DX-5                               141
23
        DX-6                               65
24
        P-34                               138
25
```

**$1,000** [1] - 135:6
**$2,000** [1] - 135:6
**$200** [1] - 135:3
**0.2** [1] - 132:5
**0003** [1] - 25:11
**08033** [1] - 1:17
**1** [35] - 4:23, 8:13, 14:9, 29:17, 37:18, 39:25, 42:20, 42:22, 43:1, 56:10, 56:12, 56:14, 56:21, 58:8, 58:10, 58:23, 58:24, 67:3, 86:23, 87:1, 88:10, 88:12, 89:8, 89:11, 90:20, 98:19, 99:22, 104:12, 115:23, 116:8, 130:10, 140:4, 188:5, 188:6, 188:12
**1,300** [1] - 173:3
**1.3** [1] - 202:10
**10** [8] - 2:4, 90:13, 102:19, 155:18, 168:17, 170:19, 181:22, 202:15
**100** [1] - 87:24
**106** [2] - 33:18, 34:18
**10:47** [1] - 48:14
**11** [12] - 28:4, 29:1, 98:1, 98:2, 145:5, 183:15, 195:24, 199:12, 199:13, 199:17, 203:20
**110** [1] - 212:8
**117** [1] - 201:24
**11:00** [1] - 48:13
**11:01** [1] - 48:14
**11th** [3] - 85:11, 85:13
**12** [16] - 36:9, 74:23, 91:21, 98:1, 115:7, 115:13, 142:20, 142:23, 145:9, 172:16, 172:18, 202:25, 203:21, 204:10, 204:17
**120** [2] - 33:25, 79:18
**12:30** [1] - 109:14
**12:46** [1] - 117:18
**13** [4] - 102:22, 140:17, 164:2, 204:6
**130** [1] - 79:18
**138** [1] - 212:24
**139** [1] - 212:10
**13th** [1] - 2:11
**14** [2] - 26:23, 98:2
**141** [1] - 212:22
**146** [1] - 212:12
**15** [9] - 166:8, 178:16, 178:17, 178:24, 179:18, 181:22, 199:8, 200:22, 206:14
**150** [1] - 212:12
**152** [1] - 24:4
**16** [8] - 26:24, 69:10, 131:14, 139:8, 153:7, 153:8, 184:17, 187:15
**168** [1] - 212:13

**17** [5] - 26:21, 27:1, 96:9, 96:21
**174** [2] - 44:14, 212:15
**175** [1] - 44:23
**18** [18] - 9:21, 9:25, 10:7, 10:11, 75:17, 87:16, 88:2, 95:17, 96:8, 96:22, 131:12, 131:14, 180:25, 184:17, 185:13, 185:22, 187:15, 188:2
**188** [1] - 42:24
**18th** [1] - 85:25
**19** [3] - 1:16, 90:23, 140:21
**191** [1] - 37:18
**19106** [1] - 1:9
**192** [2] - 37:21, 38:10
**194** [1] - 14:9
**195** [3] - 38:1, 38:5, 38:11
**198** [1] - 15:17
**1986** [1] - 169:18
**1990** [1] - 144:6
**1995** [1] - 173:3
**1999** [2] - 147:9, 169:9
**19th** [1] - 164:12
**1:00** [1] - 109:19
**1:30** [2] - 109:21, 117:9
**1:31** [1] - 117:18
**1st** [8] - 86:2, 87:25, 89:6, 90:14, 98:16, 132:2, 132:9, 188:9
**2** [21] - 1:6, 7:9, 7:18, 7:22, 34:11, 35:20, 35:24, 35:25, 36:16, 44:19, 45:3, 68:9, 94:11, 102:12, 128:9, 128:10, 128:11, 147:13, 151:24, 160:1
**20** [5] - 17:10, 33:4, 143:13, 144:20, 193:11
**20-minute** [2] - 193:22, 211:1
**2000** [1] - 147:9
**20002** [1] - 2:5
**20005** [1] - 2:12
**2007** [3] - 102:18, 102:24, 103:1
**2008** [1] - 31:24
**2010** [1] - 62:19
**2012** [1] - 31:24
**2013** [1] - 81:11
**2015** [2] - 37:2, 40:15
**2016** [6] - 41:14, 41:16, 45:21, 135:24, 137:23, 139:17
**2017** [6] - 33:22, 43:13, 44:13, 140:17, 156:11, 164:2
**2018** [23] - 4:25, 6:21, 8:10, 8:11, 11:4, 11:6, 12:5, 13:25, 17:15, 18:20, 19:18, 21:5, 23:23, 25:14, 26:18, 28:4, 29:1, 37:16, 139:20, 140:22, 149:13, 164:12, 175:13

**2019** [3] - 1:10, 67:3, 140:15
**202** [3] - 2:5, 2:12, 14:9
**207** [1] - 12:17
**21** [7] - 16:25, 88:20, 89:19, 131:25, 168:12, 189:15, 190:25
**219** [2] - 11:6, 11:10
**22** [9] - 21:5, 85:5, 89:19, 132:11, 182:1, 182:9, 190:4, 190:6, 206:15
**2200** [1] - 17:5
**223** [1] - 9:10
**2248** [1] - 6:17
**225** [1] - 10:4
**227** [1] - 10:14
**23** [2] - 85:5, 90:23
**231** [1] - 7:6
**232** [2] - 35:15, 35:21
**239** [1] - 7:25
**24** [1] - 202:13
**248-5092** [1] - 2:5
**25** [4] - 33:22, 175:13, 183:15, 199:13
**25-plus** [1] - 143:13
**25th** [1] - 29:5
**26** [1] - 4:25
**262** [1] - 45:19
**264** [1] - 46:12
**267** [1] - 1:23
**27** [4] - 17:18, 18:2, 40:10, 40:11
**29** [3] - 100:20, 125:22, 125:24
**299-7250** [1] - 1:23
**2:19-cv-02002** [1] - 1:3
**2nd** [3] - 132:13, 160:3, 189:24
**3** [13] - 26:18, 28:24, 83:25, 90:8, 90:13, 103:3, 103:17, 132:9, 151:21, 151:24, 152:14, 152:15
**30** [9] - 102:7, 102:23, 125:22, 125:25, 126:8, 184:19, 184:20, 192:16
**31** [8] - 56:9, 88:2, 98:3, 102:7, 103:6, 131:12, 202:15, 206:16
**310** [3] - 42:16, 42:23, 43:16
**31st** [2] - 56:9, 58:22
**32** [3] - 104:17, 184:20, 185:23
**33** [4] - 42:12, 42:13, 147:3, 147:5
**34** [1] - 135:18
**35** [3] - 128:10, 142:15, 189:16
**354-5640** [1] - 1:17
**37** [1] - 23:19
**38** [4] - 15:13, 193:21,

204:25, 205:4
**3:04** [1] - 166:9
**3:18** [1] - 166:9
**3B** [2] - 98:6, 99:15
**3rd** [1] - 27:4
**4** [4] - 1:10, 126:22, 181:1, 212:5
**40** [3] - 30:14, 32:21, 193:17
**42** [2] - 17:18, 193:17
**43** [1] - 126:22
**44** [7] - 126:8, 126:18, 128:21, 192:17, 192:21, 204:13, 204:20
**45** [4] - 24:21, 30:14, 178:24, 179:2
**46** [5] - 30:15, 95:8, 95:9, 96:3
**47** [1] - 31:16
**48** [4] - 30:8, 30:11, 30:13, 212:5
**49** [4] - 30:8, 30:11, 30:20
**4:38** [1] - 211:9
**4th** [4] - 131:2, 131:3, 131:16, 131:19
**5** [12] - 33:20, 132:10, 135:24, 140:6, 140:7, 140:14, 141:4, 151:3, 151:9, 156:7, 164:1, 170:12
**5,000** [1] - 199:25
**50** [15] - 6:15, 8:4, 8:23, 11:7, 11:16, 11:18, 11:25, 12:16, 27:24, 30:8, 30:11, 31:1, 47:17, 188:18, 210:2
**50th** [2] - 147:16, 148:19
**52** [1] - 36:14
**53** [1] - 36:25
**54** [1] - 37:13
**55th** [2] - 187:16, 187:19
**57** [2] - 31:4, 43:10
**58** [1] - 212:5
**5A** [3] - 142:3, 142:20, 145:6
**5th** [2] - 132:10, 189:20
**6** [9] - 26:15, 64:6, 64:16, 65:1, 127:3, 127:5, 151:15, 151:16, 152:11
**60** [4] - 46:2, 96:3, 182:9, 202:13
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**61** [1] - 96:3
**62** [1] - 212:6
**63** [1] - 28:1
**64** [1] - 17:18
**65** [5] - 25:6, 25:10, 25:11, 205:4, 212:23
**654-6200** [1] - 2:12
**66** [3] - 38:14, 39:22, 41:3
**67** [4] - 41:10, 44:16, 87:24, 188:3

**67th** [1] - 106:13
**68** [2] - 44:10, 86:12
**6:00** [2] - 26:19, 26:22
**6A** [3] - 66:18, 66:19, 68:9
**7** [8] - 26:15, 86:10, 100:13, 143:17, 150:25, 151:14, 151:15, 151:16
**70** [2] - 47:4, 47:6
**700** [1] - 2:11
**71** [1] - 212:8
**73** [2] - 4:7, 4:14
**74** [1] - 6:20
**74th** [1] - 197:11
**75** [2] - 8:25, 9:6
**75th** [1] - 148:5
**76** [4] - 10:25, 34:18, 95:6, 95:7
**77** [1] - 12:4
**78** [1] - 13:24
**79** [5] - 17:8, 18:8, 18:11, 33:18, 106:10
**79th** [1] - 106:9
**7th** [1] - 132:4
**8** [9] - 26:4, 26:10, 181:24, 181:25, 182:1, 182:11, 206:15, 206:16
**80** [1] - 18:19
**81** [2] - 20:16, 20:17
**82** [1] - 20:21
**85** [1] - 21:4
**856** [1] - 1:17
**87** [1] - 47:21
**87th** [1] - 102:21
**9** [5] - 24:4, 68:9, 103:5, 201:20, 201:22
**90** [1] - 210:4
**90th** [1] - 102:19
**91st** [1] - 103:4
**95** [1] - 193:15
**95th** [1] - 81:21
**97th** [2] - 59:4, 103:2
**98th** [1] - 197:11
**99** [2] - 89:12, 188:13
**99th** [3] - 59:8, 147:15, 148:19
**9:17** [2] - 26:22, 27:4
**9:29** [2] - 1:10, 3:1
**9:30** [1] - 211:6
**a.m** [4] - 1:10, 3:1, 48:14
**A5** [1] - 37:3
**abbreviation** [1] - 185:17
**abilities** [6] - 37:22, 38:2, 38:6, 46:15, 197:4, 198:15
**Abilities** [1] - 196:12
**ability** [15] - 38:12, 38:13, 78:11, 79:12, 82:11, 84:20, 173:17, 174:5, 183:4, 183:19, 193:9, 196:8, 196:19, 197:14, 198:25

**Ability** [3] - 200:13, 200:25, 201:10
**able** [21] - 28:7, 30:5, 38:3, 38:10, 49:14, 49:19, 55:2, 55:8, 71:24, 96:24, 105:13, 108:19, 120:5, 120:20, 122:17, 122:25, 165:14, 186:5, 190:1, 201:7, 210:25
**abnormal** [3] - 172:10, 199:9, 200:24
**above-entitled** [1] - 211:14
**absence** [2] - 195:17, 198:11
**absolutely** [11] - 78:1, 79:5, 79:15, 80:1, 101:11, 103:12, 105:20, 110:2, 121:4, 132:25, 199:11
**academic** [19] - 70:25, 78:2, 78:11, 79:22, 80:2, 80:14, 81:2, 81:22, 82:4, 83:17, 87:13, 99:5, 100:25, 106:6, 152:4, 152:19, 177:21, 197:2, 199:18
**academically** [3] - 82:3, 82:6, 100:4
**Academy** [2] - 169:22, 169:24
**accept** [5] - 20:11, 132:15, 132:16, 148:17
**acceptable** [1] - 86:10
**accepted** [6] - 82:14, 82:21, 86:9, 86:24, 116:1, 128:16
**access** [8] - 8:6, 12:2, 49:14, 50:5, 50:6, 59:16, 120:13, 134:2
**accessed** [1] - 149:1
**accident** [1] - 93:15
**accommodate** [1] - 61:4
**accommodation** [28] - 6:10, 12:20, 13:15, 25:16, 53:15, 63:4, 64:3, 83:8, 109:10, 114:12, 114:15, 114:17, 116:14, 116:17, 118:23, 119:13, 119:25, 123:2, 123:16, 123:18, 123:20, 123:22, 129:9, 133:8, 134:13, 146:11, 150:9, 173:21
**accommodations** [88] - 4:23, 7:17, 11:10, 11:15, 12:8, 12:24, 15:22, 15:23, 16:15, 16:16, 16:21, 21:5, 22:8, 24:10, 28:22, 28:23, 38:22, 39:1, 39:6, 39:14, 40:21, 41:3, 41:21, 42:17, 43:1, 43:18, 43:21, 43:23, 45:10, 46:1, 47:2, 53:17, 53:20, 53:23, 54:4, 54:5, 62:22, 63:7, 63:10, 63:12, 63:15, 65:11, 65:13, 67:13, 68:4, 70:25, 71:21, 71:25, 74:4,

74:6, 83:10, 83:20, 91:19, 92:19, 92:20, 92:22, 99:20, 101:7, 102:3, 104:13, 107:1, 115:22, 119:7, 120:2, 122:14, 122:23, 123:13, 127:20, 136:25, 137:2, 137:4, 137:9, 139:11, 139:14, 140:19, 140:23, 141:16, 148:24, 149:13, 150:2, 150:8, 156:17, 173:14, 175:18, 181:10, 181:13, 210:17, 210:20
**accomplish** [2] - 194:11, 195:3
**accomplished** [1] - 194:11
**according** [4] - 84:25, 85:10, 131:1, 189:19
**account** [1] - 207:23
**accumulated** [1] - 81:5
**accuracy** [14] - 89:22, 90:9, 90:11, 90:19, 132:10, 132:12, 133:13, 134:15, 185:2, 187:5, 187:16, 187:21, 189:20
**accurate** [7] - 21:8, 21:10, 69:10, 91:10, 92:5, 172:19, 194:23
**accurately** [2] - 132:17, 187:22
**achieve** [2] - 42:19, 54:10
**achieved** [4] - 42:16, 42:23, 42:25, 113:7
**achievement** [8] - 80:22, 81:3, 82:9, 87:12, 91:20, 118:9, 148:18, 148:19
**Achievement** [3] - 87:5, 88:15, 185:19
**achieving** [1] - 67:6
**Acid** [1] - 37:14
**acknowledge** [3] - 24:2, 71:5, 71:7
**acknowledges** [1] - 115:18
**acquainted** [1] - 175:10
**acquire** [1] - 172:12
**acquired** [2] - 163:12
**acquiring** [4] - 78:2, 171:4, 171:16, 171:20
**acronyms** [1] - 87:7
**acrylics** [2] - 35:6, 36:3
**act** [2] - 58:3, 76:8
**ACT** [35] - 54:19, 54:20, 55:10, 55:14, 55:22, 57:2, 58:25, 59:5, 59:10, 59:18, 91:18, 99:18, 101:12, 101:19, 102:4, 102:9, 102:13, 102:17, 102:25, 103:9, 103:13, 103:21, 103:22, 104:7, 104:15, 118:12, 118:15, 124:20, 128:13, 133:4, 161:7, 194:2,

194:7
**ACTION** [1] - 1:3
**actively** [1] - 184:9
**activities** [2] - 31:17, 63:9
**activity** [7] - 58:4, 104:9, 107:8, 108:15, 148:21, 150:17, 153:24
**actual** [4] - 85:6, 87:23, 182:11, 188:21
**ADA** [5] - 72:20, 114:7, 114:8, 114:14, 135:22
**adapt** [1] - 76:17
**add** [4] - 17:12, 177:7, 192:4, 199:1
**added** [4] - 16:22, 25:4, 187:7, 187:11
**addition** [7] - 7:1, 17:3, 69:4, 78:3, 80:10, 95:19, 207:18
**additional** [23] - 8:4, 8:5, 8:18, 8:22, 11:7, 11:25, 12:1, 12:16, 65:24, 66:2, 66:8, 69:13, 101:10, 107:19, 108:20, 109:7, 119:13, 141:10, 141:18, 150:11, 174:17, 177:24, 206:6
**address** [6] - 23:25, 69:16, 81:9, 176:18, 176:25, 181:8
**addressing** [1] - 16:15
**adequate** [3] - 104:16, 109:5, 177:5
**adequately** [2] - 97:6, 98:22
**ADHD** [103] - 9:4, 9:18, 12:24, 15:22, 22:21, 65:15, 65:19, 66:13, 67:11, 68:15, 68:17, 69:17, 70:24, 72:6, 74:7, 74:10, 74:13, 74:14, 75:1, 75:4, 75:10, 75:11, 75:13, 75:16, 75:18, 76:2, 76:18, 77:1, 77:3, 77:13, 77:15, 77:18, 77:21, 83:2, 95:1, 95:4, 95:11, 95:17, 95:18, 95:20, 96:14, 96:19, 97:11, 98:24, 99:3, 99:6, 103:14, 106:24, 108:9, 108:11, 108:17, 113:2, 113:11, 113:13, 113:15, 113:17, 113:23, 114:21, 115:1, 115:5, 115:10, 115:18, 118:21, 118:22, 120:17, 121:7, 121:11, 121:17, 121:19, 122:7, 122:9, 122:11, 122:12, 123:11, 123:16, 137:15, 142:17, 143:15, 144:8, 146:5, 146:10, 151:18, 155:21, 157:7, 157:9, 160:16, 162:25, 171:23, 171:25, 172:1, 172:11, 172:23, 173:2, 174:4, 175:4, 202:17, 203:5, 206:7,

208:11, 208:12, 208:18, 208:25

**ADHD-related** [1] - 115:18

**adjourned** [1] - 211:8

**administer** [22] - 13:20, 81:1, 87:4, 88:18, 89:16, 93:18, 111:7, 112:20, 118:11, 162:1, 162:4, 162:8, 162:11, 162:22, 162:25, 163:5, 171:18, 171:19, 186:15, 203:24, 206:23

**administered** [32] - 70:16, 78:18, 91:20, 95:1, 97:15, 97:21, 103:23, 110:15, 110:21, 110:22, 111:21, 112:12, 113:5, 132:15, 132:22, 161:4, 161:17, 161:18, 162:20, 163:10, 177:2, 179:12, 179:15, 179:16, 196:13, 196:15, 196:24, 203:22, 204:8, 204:20, 206:20

**administering** [2] - 118:9, 136:20

**administers** [1] - 104:22

**administration** [6] - 102:24, 105:15, 111:1, 111:25, 206:2, 206:4

**administrations** [1] - 203:11

**administrators** [1] - 69:3

**Admission** [1] - 104:19

**admission** [3] - 78:22, 100:9, 101:15

**Admissions** [1] - 117:2

**admissions** [4] - 91:18, 92:12, 103:17, 194:2

**admit** [1] - 65:1

**ADMITTED** [1] - 212:21

**admitted** [6] - 65:5, 65:6, 138:2, 138:3, 141:5, 141:6

**adult** [14] - 95:4, 95:11, 95:20, 96:2, 113:11, 115:11, 115:15, 115:18, 115:19, 115:20, 151:1, 172:8, 193:20

**adult-specific** [1] - 96:2

**adulthood** [2] - 95:23, 95:25

**adults** [6] - 150:24, 151:1, 152:1, 152:16, 181:17, 199:25

**Adults** [1] - 145:25

**advance** [1] - 114:6

**advice** [1] - 11:20

**advise** [1] - 117:10

**advising** [1] - 68:6

**advocated** [1] - 197:24

**advocates** [1] - 128:15

**affect** [2] - 174:4, 183:4

**affected** [3] - 77:6, 173:5, 173:17

**afternoon** [8] - 110:9,

110:10, 117:23, 139:3, 139:4, 207:24, 210:16, 211:5

**afterwards** [2] - 93:16, 130:5

**age** [27] - 74:18, 74:23, 85:18, 85:20, 88:10, 88:11, 89:9, 89:10, 89:12, 90:21, 90:22, 102:16, 115:6, 115:13, 150:25, 151:14, 162:6, 172:16, 172:18, 186:5, 188:12, 188:13, 188:14, 188:18, 196:16, 196:21, 202:25

**age-based** [1] - 188:14

**aged** [3] - 148:9, 150:25, 188:17

**agencies** [3] - 116:21, 116:24, 117:4

**agency** [1] - 117:5

**ages** [1] - 151:19

**ago** [6] - 26:16, 48:20, 95:21, 110:11, 122:4, 127:7

**agony** [1] - 158:21

**agree** [11] - 42:5, 44:17, 45:13, 46:3, 46:22, 111:6, 115:24, 128:20, 128:21, 161:24, 162:24

**agreed** [3] - 128:22, 153:2, 178:3

**ahead** [6] - 49:2, 178:11, 178:21, 186:21, 186:25

**aided** [1] - 1:25

**air** [1] - 206:9

**alleged** [1] - 103:14

**alleging** [1] - 93:14

**alleviate** [1] - 6:10

**allow** [3] - 19:6, 54:1, 119:13

**allowed** [4] - 46:7, 165:11, 186:9, 191:20

**allowing** [1] - 71:11

**allows** [1] - 146:5

**alluded** [1] - 107:18

**almost** [2] - 25:1, 26:19

**aloud** [2] - 87:21, 90:1

**alphabet** [1] - 165:17

**ambiguous** [1] - 46:10

**amended** [1] - 114:14

**America** [1] - 145:11

**American** [2] - 104:21, 169:21

**amount** [9] - 6:13, 11:20, 34:5, 49:7, 59:14, 126:16, 130:9, 154:25, 157:16

**analysis** [5] - 63:24, 64:20, 99:25, 140:1, 148:8

**analyze** [2] - 56:25, 105:14

**anatomy** [1] - 53:10

**Ann** [2] - 1:22, 211:17

**annual** [4] - 135:8, 145:14, 145:23, 153:9

**answer** [22] - 33:11, 36:7,

36:9, 38:8, 38:10, 38:11, 55:2, 55:5, 56:2, 56:21, 56:25, 59:1, 63:3, 100:15, 111:10, 121:14, 126:11, 126:18, 128:18, 151:13, 176:21, 181:15

**answered** [3] - 37:22, 126:14, 193:15

**answering** [1] - 128:13

**answers** [3] - 84:22, 90:2, 161:8

**anticipated** [2] - 81:25, 83:7

**anyhow** [1] - 192:7

**apologies** [2] - 95:8, 146:23

**apologize** [6] - 17:25, 20:18, 60:14, 110:4, 114:6, 134:3

**appeal** [1] - 175:19

**appear** [1] - 152:23

**APPEARANCES** [2] - 1:14, 2:1

**appeared** [1] - 172:15

**applicable** [5] - 148:9, 148:12, 148:15, 148:16

**applicant** [6] - 62:24, 63:5, 72:6, 72:13, 106:3, 133:7

**applicants** [1] - 139:11

**application** [9] - 31:5, 82:5, 136:23, 156:18, 159:14, 159:17, 159:20, 159:24, 176:20

**applications** [1] - 62:22

**applied** [5] - 81:25, 96:4, 104:12, 107:1, 129:18

**applies** [1] - 65:16

**apply** [1] - 115:22

**applying** [7] - 22:7, 31:10, 105:9, 106:1, 147:23, 171:4, 173:24

**appointment** [1] - 14:5

**appointments** [1] - 52:14

**approach** [5] - 81:12, 82:7, 126:15, 129:19, 168:8

**approached** [1] - 126:7

**appropriate** [34] - 22:21, 22:23, 63:10, 69:24, 82:18, 98:23, 111:6, 112:3, 112:20, 113:10, 113:22, 119:10, 120:19, 121:3, 122:14, 122:22, 123:16, 123:17, 123:19, 123:21, 130:18, 132:19, 147:20, 161:1, 161:25, 162:2, 162:3, 162:6, 162:8, 162:10, 162:24, 164:22, 165:14, 170:2

**approve** [1] - 15:23

**approved** [3] - 11:21, 28:24, 209:17

**approximate** [3] - 42:20, 42:22, 42:24

**approximates** [1] - 85:23

**April** [5] - 13:24, 17:10, 17:15, 28:4, 44:13

**arbitrary** [1] - 202:1

**area** [8] - 16:17, 47:23, 71:15, 81:2, 82:12, 143:14, 158:14, 165:22

**areas** [16] - 27:13, 41:6, 42:5, 46:23, 48:3, 71:6, 71:13, 79:12, 87:13, 90:18, 101:16, 105:1, 143:16, 146:15, 197:6, 207:21

**arguing** [1] - 65:21

**argument** [2] - 66:10, 66:13

**arguments** [1] - 71:9

**art** [2] - 35:6, 36:2

**article** [6] - 37:2, 37:5, 37:13, 147:8, 147:10, 147:13

**articles** [2] - 68:14, 68:16

**arts** [3] - 59:7, 67:8, 168:25

**aside** [4] - 14:18, 14:21, 86:25, 120:14

**aspects** [1] - 165:22

**assess** [5] - 71:24, 150:20, 152:2, 152:17, 172:11

**assessing** [3] - 112:7, 171:14, 207:1

**Assessment** [2] - 41:12, 43:12

**assessment** [21] - 41:18, 43:8, 43:9, 67:12, 67:24, 68:20, 70:2, 91:8, 92:25, 93:2, 93:6, 95:16, 96:1, 105:23, 118:4, 118:5, 118:8, 174:3, 174:12, 175:8, 183:11

**assessments** [8] - 13:21, 23:13, 95:2, 98:25, 132:14, 173:1, 173:15

**assigned** [3] - 10:7, 10:11, 10:19

**assignments** [2] - 16:18, 32:10

**assistance** [1] - 158:1

**assistant** [2] - 32:14, 32:15

**assistants** [1] - 33:8

**assisted** [3] - 120:16, 134:8, 164:22

**associated** [3] - 55:24, 57:3, 184:1

**Association** [4] - 104:21, 145:11, 145:19, 169:21

**associations** [1] - 169:19

**assume** [9] - 6:1, 17:16, 36:12, 53:24, 118:19, 154:7, 154:10, 154:11, 160:20

**assuming** [1] - 24:16

**attach** [1] - 5:4

**attached** [5] - 12:10, 17:17, 23:20, 26:17, 73:18

**attachment** [1] - 18:15

**attachments** [3] - 25:7, 26:8,

26:9

**attack** [1] - 81:12

**attained** [1] - 53:16

**attempt** [2] - 26:11, 210:25

**attempted** [2] - 193:16, 193:17

**attempting** [2] - 7:16, 60:24

**attend** [1] - 153:11

**attended** [2] - 135:11, 136:4

**attending** [1] - 136:2

**attends** [2] - 136:6, 153:9

**Attention** [4] - 145:25, 203:9, 205:10, 205:17

**attention** [38] - 66:12, 74:15, 76:5, 76:7, 77:8, 95:2, 97:13, 98:18, 125:21, 143:9, 150:8, 152:2, 152:17, 171:23, 172:2, 173:9, 173:20, 176:15, 183:22, 184:10, 184:14, 201:2, 203:2, 205:19, 205:23, 205:24, 206:11, 206:12, 207:1, 207:18, 207:20, 209:9, 209:11, 209:18, 210:5, 210:6, 210:14

**attention-deficit/ hyperactivity** [1] - 171:23

**attention-related** [2] - 184:10, 201:2

**attorney** [15] - 14:15, 18:23, 19:8, 19:19, 19:25, 20:1, 20:6, 20:25, 21:7, 21:16, 29:20, 37:20, 121:25, 122:2

**attorney-client** [5] - 14:15, 18:23, 19:8, 19:25, 20:6

**atypical** [2] - 74:18, 101:10

**Auditory** [3] - 97:8, 203:8, 203:15

**auditory** [3] - 204:24, 205:1, 205:4

**August** [2] - 45:20, 140:15

**author** [5] - 36:19, 37:5, 37:6, 37:7, 37:14

**automaticity** [5] - 103:11, 106:20, 106:21, 171:17, 185:4

**available** [9] - 49:11, 60:5, 60:6, 60:9, 100:24, 124:13, 125:11, 196:4

**average** [44] - 41:5, 44:18, 45:16, 45:17, 46:4, 46:23, 46:24, 46:25, 79:3, 81:22, 82:8, 83:16, 85:2, 85:9, 85:11, 85:12, 85:15, 85:17, 85:24, 87:15, 87:18, 87:19, 87:24, 89:1, 89:4, 89:5, 90:6, 90:10, 90:12, 90:13, 90:25, 98:16, 104:16, 106:5, 106:8, 107:3, 107:4, 109:5, 147:16, 171:13, 187:16, 196:22

**avocational** [3] - 34:18, 35:25, 36:2

**avoid** [1] - 128:2

**aware** [4] - 19:3, 109:15, 159:5, 208:17

**awareness** [1] - 158:22

**awkward** [1] - 186:10

**awkwardness** [1] - 190:12

**bachelor's** [3] - 66:21, 142:7, 168:24

**background** [7] - 25:23, 34:12, 66:17, 66:20, 100:6, 105:12, 142:6

**bad** [1] - 205:8

**Bar** [1] - 117:2

**bare** [1] - 12:9

**base** [2] - 200:20, 202:20

**based** [41] - 38:12, 38:13, 49:21, 50:13, 55:1, 55:5, 55:11, 63:12, 65:11, 72:2, 72:17, 79:17, 83:6, 86:20, 87:21, 89:9, 97:4, 98:24, 103:18, 105:5, 107:14, 108:13, 109:2, 114:19, 114:25, 118:21, 118:25, 123:7, 126:1, 126:14, 126:22, 135:5, 147:24, 165:25, 173:4, 174:25, 188:14, 202:3, 208:9, 210:8, 210:15

**basic** [7] - 171:4, 171:16, 171:20, 177:11, 183:25, 195:18, 208:6

**Basic** [3] - 41:11, 43:11, 195:24

**basis** [3] - 39:4, 74:5, 145:23

**bat** [1] - 175:25

**Bates** [5] - 6:16, 8:1, 9:10, 30:15, 33:17

**battery** [5] - 87:12, 111:15, 113:13, 177:5, 178:1

**beat** [1] - 95:10

**become** [6] - 18:9, 67:21, 118:2, 118:3, 121:3, 122:10

**becoming** [2] - 67:20, 122:12

**BEFORE** [1] - 1:12

**began** [1] - 73:8

**begin** [6] - 106:10, 168:4, 183:25, 201:6, 203:13, 203:21

**beginning** [5] - 51:16, 53:5, 64:13, 98:1, 183:1

**begins** [2] - 12:19, 151:24, 203:20

**behaving** [1] - 76:18

**behavior** [3] - 96:12, 97:1, 143:10

**behavioral** [3] - 152:5, 152:19, 182:24

**behaviors** [1] - 76:20

**behind** [2] - 83:25, 206:25

**believes** [1] - 92:19

**below** [33] - 41:5, 42:6, 42:25, 44:18, 45:16, 45:18, 46:4, 46:22, 46:24, 48:2, 83:16, 85:2, 85:9, 85:11, 85:15, 85:17, 86:8, 87:15, 87:18, 87:19, 89:1, 89:4, 89:5, 90:6, 90:10, 90:12, 90:25, 98:16, 132:7, 197:3, 197:13

**beneficial** [2] - 7:10, 174:24

**benefit** [1] - 114:20

**Benjamin** [2] - 62:3, 62:10

**BENJAMIN** [3] - 62:7, 212:6, 212:8

**Bennett** [1] - 198:19

**BERGER** [51] - 1:16, 35:16, 61:4, 61:9, 61:11, 61:22, 71:3, 82:16, 88:1, 98:7, 103:19, 104:2, 107:9, 109:14, 109:17, 109:20, 109:22, 109:24, 110:2, 110:4, 110:8, 117:7, 118:1, 125:7, 125:14, 125:18, 127:10, 127:12, 136:14, 137:19, 137:22, 138:4, 138:13, 146:14, 150:22, 151:9, 151:11, 166:5, 166:11, 166:13, 166:19, 167:17, 168:3, 168:8, 168:10, 174:2, 174:11, 188:19, 188:25, 195:13, 211:2

**Berger** [2] - 30:21

**best** [7] - 8:5, 23:24, 25:24, 54:2, 207:8, 209:3, 209:22

**better** [12] - 44:21, 54:10, 54:11, 79:7, 79:9, 89:12, 106:10, 106:13, 188:13, 201:7, 201:10

**between** [23] - 31:2, 34:10, 57:9, 61:23, 72:13, 73:17, 80:21, 81:3, 86:7, 91:23, 93:2, 94:17, 102:11, 109:1, 128:1, 130:11, 148:18, 149:4, 149:15, 196:7, 198:24, 201:11, 202:8

**beyond** [2] - 69:6, 130:17, 206:25

**bias** [1] - 154:15

**biased** [3] - 153:24, 154:4, 154:7

**big** [2] - 200:2, 206:16

**binder** [4] - 64:7, 127:2, 135:14, 168:11

**binders** [2] - 125:10, 140:5

**biological** [3] - 105:2, 105:4, 105:6

**biology** [2] - 55:20, 59:11

**bird** [1] - 191:12

**bit** [9] - 5:2, 33:13, 48:22, 66:16, 84:8, 84:14, 88:9, 107:17, 127:1

**black** [2] - 64:7, 140:5

**block** [2] - 7:8, 50:9

**blood** [1] - 52:10

**blue** [1] - 7:11

**BOARD** [1] - 1:5

**board** [2] - 15:21, 15:22

**Board** [2] - 116:25, 117:1

**Boies** [1] - 121:25

**book** [5] - 19:4, 57:11, 64:7, 68:4, 195:21

**booklet** [1] - 59:18

**books** [1] - 191:12

**borderline** [3] - 42:2, 42:6, 109:1

**boring** [2] - 206:11, 206:12

**bother** [1] - 76:19

**bothering** [3] - 51:18, 51:21

**bottom** [22] - 7:6, 8:1, 19:21, 22:5, 24:6, 26:4, 28:3, 31:16, 42:8, 57:16, 86:2, 87:1, 88:10, 88:12, 89:8, 98:19, 145:8, 160:23, 182:9, 183:13, 204:17

**box** [2] - 47:12, 167:21

**boxes** [1] - 15:14

**boy** [1] - 147:14

**brain** [4] - 22:20, 83:6, 207:20, 210:7

**brand** [1] - 159:23

**Branson** [1] - 121:23

**break** [10] - 8:5, 8:18, 12:1, 48:13, 48:20, 52:20, 116:11, 132:18, 166:8

**brief** [1] - 176:12

**briefly** [23] - 3:16, 62:20, 65:9, 66:20, 69:9, 74:12, 77:24, 84:9, 93:23, 95:14, 104:24, 135:13, 135:16, 139:9, 142:1, 142:5, 143:20, 149:25, 168:22, 169:8, 179:7, 190:18, 208:3

**bring** [2] - 175:1, 179:22

**brings** [1] - 173:13

**broad** [1] - 207:19

**broken** [1] - 42:1

**brought** [3] - 67:24, 71:6, 179:25

**built** [1] - 204:2

**bullet** [5] - 21:21, 21:24, 21:25, 22:12, 22:18

**bunch** [3] - 52:14, 87:13, 189:6

**Burgoyne** [2] - 136:1, 136:9

**BURGOYNE** [50] - 2:10, 3:8, 3:12, 4:6, 4:12, 6:16, 6:18, 14:17, 14:20, 15:2, 17:21,

17:23, 18:1, 19:2, 19:14, 19:16, 20:5, 20:15, 20:18, 20:20, 21:3, 22:11, 27:24, 27:25, 30:7, 30:25, 35:15, 35:20, 35:23, 48:5, 48:7, 48:11, 58:15, 58:18, 59:22, 60:1, 60:11, 60:17, 60:19, 60:22, 60:25, 61:12, 61:15, 65:4, 146:25, 147:2, 151:8, 174:8, 195:7, 211:7

**business** [2] - 121:5, 121:16

**but..** [3] - 27:14, 51:12, 127:19

**Byrne** [1] - 1:8

**calculate** [1] - 202:2

**calculated** [3] - 111:3, 112:19, 202:3

**calculating** [1] - 86:5

**calculation** [1] - 80:25

**camping** [2] - 35:7, 36:3

**candidate** [1] - 83:10

**cannot** [2] - 80:2, 108:19, 117:11

**capable** [1] - 175:20

**capacity** [1] - 139:7

**capitalization** [1] - 197:5

**caps** [1] - 84:8

**captioned** [3] - 39:24, 41:11, 43:11

**captions** [1] - 57:15

**car** [1] - 93:14

**cardiovascular** [1] - 41:6

**cards** [16] - 53:13, 66:2, 66:13, 99:12, 99:20, 100:2, 100:10, 101:9, 133:14, 133:24, 134:2, 134:4, 134:10, 141:19, 194:15

**care** [1] - 31:21

**career** [2] - 120:22, 172:25

**careers** [1] - 120:18

**careless** [1] - 75:19

**CAROLINE** [1] - 2:10

**CAROLLA** [1] - 1:15

**carries** [1] - 145:9

**carryover** [2] - 128:11, 160:1

**CAS** [1] - 39:25

**case** [60] - 48:10, 50:25, 54:12, 60:4, 61:14, 65:24, 72:5, 73:1, 73:10, 73:16, 87:3, 87:18, 89:10, 90:13, 92:2, 92:9, 94:16, 94:19, 99:4, 107:25, 109:1, 109:3, 109:4, 111:7, 112:21, 119:12, 121:10, 121:12, 122:6, 123:7, 133:1, 133:4, 154:14, 154:16, 162:4, 162:25, 163:16, 163:19, 164:14, 165:2, 167:4, 167:12, 168:5, 168:15, 173:13, 173:14, 175:11,

176:8, 182:14, 183:19, 193:25, 201:9, 202:19, 202:20, 206:23, 207:14

**cases** [17] - 62:21, 73:1, 73:13, 74:2, 77:20, 79:18, 95:23, 116:13, 116:14, 116:16, 116:19, 121:9, 123:7, 123:11, 136:10, 167:13

**categories** [5] - 10:9, 10:11, 45:13, 46:4, 77:16

**category** [2] - 83:4, 172:5

**caught** [1] - 52:9

**caused** [1] - 129:12

**causes** [2] - 76:21, 172:20

**causing** [1] - 76:13

**caveat** [1] - 162:5

**CB** [1] - 43:17

**CBSE** [1] - 52:22

**CBSSA** [1] - 52:22

**Center** [1] - 198:20

**Central** [2] - 168:24, 169:1

**ceramics** [2] - 35:6, 36:3

**certain** [6] - 24:5, 28:22, 76:6, 97:11, 186:5, 186:14

**certainly** [32] - 70:12, 71:4, 73:16, 76:4, 77:20, 82:8, 89:5, 95:22, 101:25, 105:21, 106:25, 108:20, 111:12, 112:6, 114:6, 115:12, 115:17, 115:25, 118:7, 118:18, 118:23, 120:16, 120:20, 121:18, 133:2, 133:10, 133:25, 134:12, 137:1, 137:12, 153:2, 164:21

**certified** [1] - 67:21

**certify** [1] - 211:13

**cetera** [1] - 101:3

**chance** [1] - 48:9

**change** [3] - 16:23, 76:17, 202:16

**changed** [7] - 16:5, 51:23, 66:7, 104:25, 141:15, 141:24, 150:18

**changes** [9] - 14:4, 19:18, 27:9, 27:11, 27:13, 27:14, 73:23, 149:10, 149:20

**changing** [1] - 26:12

**character** [1] - 57:13

**characteristics** [1] - 75:15

**Charles** [1] - 121:20

**chart** [5] - 6:13, 9:22, 11:2, 11:3, 165:17

**check** [13] - 52:4, 52:5, 61:1, 86:19, 86:21, 113:18, 115:16, 116:7, 131:3, 134:20, 134:21, 176:11, 183:21

**checking** [1] - 183:1

**checklist** [1] - 9:7

**checklists** [1] - 9:4

**chemistry** [5] - 32:3, 32:6, 33:9, 54:7, 55:20

**Chestnut** [1] - 1:16

**chief** [1] - 167:4

**child** [8] - 119:16, 119:23, 164:17, 164:19, 165:8, 165:10, 165:14

**childhood** [4] - 83:6, 95:22, 95:24, 134:21

**children** [8] - 95:21, 148:9, 150:24, 151:14, 151:17, 196:20, 196:21, 198:5

**Children** [2] - 145:25, 147:11

**choice** [4] - 84:22, 105:4, 105:5, 107:14

**choose** [3] - 58:5, 207:13, 207:16

**cited** [1] - 129:13

**City** [1] - 67:1

**civil** [1] - 93:13

**CIVIL** [1] - 1:3

**claim** [1] - 122:3

**claimed** [1] - 121:18

**clarify** [1] - 174:24

**class** [11] - 47:15, 47:16, 47:18, 48:25, 49:2, 52:21, 53:8, 53:10, 54:10, 143:7, 143:11

**classes** [5] - 40:6, 67:19, 69:16, 142:18, 142:19

**Classification** [2] - 155:15, 170:16

**classification** [2] - 77:17, 155:23

**clear** [5] - 54:15, 93:4, 100:10, 109:4, 110:6

**clearer** [1] - 5:3

**clearly** [3] - 100:3, 100:24

**clerk** [1] - 4:4

**clerkship** [2] - 50:20, 50:24

**client** [6] - 14:15, 18:23, 19:8, 19:25, 20:6, 90:3

**clients** [3] - 70:4, 144:4, 144:5

**clinic** [7] - 49:8, 144:11, 144:13, 144:15, 144:16, 144:18, 144:20

**Clinical** [2] - 170:19, 170:20

**clinical** [23] - 46:21, 49:5, 49:25, 50:11, 53:2, 53:5, 70:5, 70:6, 70:7, 70:12, 71:7, 75:25, 77:4, 80:24, 101:22, 118:16, 143:25, 150:23, 153:20, 153:24, 168:25, 207:15

**clinically** [2] - 13:18, 199:6

**clinician** [1] - 92:23

**clinicians** [1] - 113:25

**clocks** [1] - 6:2

**close** [3] - 50:17, 108:25, 109:3

**closely** [1] - 15:15

**closer** [1] - 61:23

**clot** [2] - 52:3, 52:15

**clotting** [1] - 74:7

**cluster** [1] - 162:7

**cmew@perkinscoie.com** [1] - 2:13

**co** [1] - 36:19

**co-author** [1] - 36:19

**cog** [2] - 196:18, 196:19

**cognitive** [9] - 34:2, 152:4, 152:19, 183:23, 183:24, 196:8, 197:3, 197:14, 198:24

**Cognitive** [1] - 196:12

**cohort** [5] - 102:13, 102:20, 103:3, 105:24, 106:8

**COIE** [1] - 2:9

**colleague** [1] - 22:7

**colleagues** [2] - 72:19, 137:20

**collect** [2] - 209:12, 209:20

**collection** [1] - 209:9

**College** [4] - 67:1, 67:9, 67:20, 104:19

**college** [11] - 54:4, 55:19, 67:8, 85:14, 92:14, 99:22, 101:15, 103:17, 106:3, 106:4, 194:2

**Colleges** [1] - 104:21

**Columbia** [2] - 67:1, 69:14

**column** [2] - 6:9, 11:14

**combination** [3] - 186:19, 196:11, 196:19

**combined** [2] - 12:25, 205:22

**combining** [1] - 132:12

**comfortable** [1] - 167:15

**coming** [7] - 3:10, 50:21, 62:4, 138:20, 167:20, 175:15, 185:20

**Commencing** [1] - 1:10

**Comment** [1] - 15:7

**comment** [16] - 7:8, 13:6, 13:12, 13:13, 15:13, 16:10, 16:24, 24:4, 127:18, 129:2, 156:14, 156:24, 160:22, 183:11, 201:15

**commented** [1] - 127:21

**commenting** [1] - 156:15

**comments** [20] - 7:2, 15:3, 15:5, 15:11, 15:12, 15:13, 15:15, 15:17, 16:7, 17:6, 19:21, 23:21, 24:15, 27:15, 27:17, 27:19, 71:3, 126:10, 195:1

**committees** [1] - 68:6

**common** [10] - 94:1, 130:4, 130:7, 172:22, 172:24, 173:19, 173:21, 177:7,

194:20, 194:22
**commonly** [6] - 81:8, 87:7, 154:23, 155:23, 196:15, 206:24
**communicated** [3] - 29:23, 35:8, 73:11
**communicating** [3] - 5:17, 15:8, 24:14
**communication** [6] - 20:1, 20:25, 73:7, 73:9, 142:13, 149:4
**communications** [4] - 5:13, 73:19, 73:25, 149:15
**compare** [7] - 55:14, 56:12, 85:14, 102:14, 105:24, 106:7, 194:4
**compared** [13] - 52:1, 85:14, 85:18, 85:20, 87:2, 88:10, 88:11, 89:10, 90:20, 90:21, 106:5, 107:5, 197:12
**comparing** [2] - 188:17, 201:23
**comparison** [3] - 85:20, 85:23, 188:15
**comparisons** [1] - 201:25
**compensation** [1] - 72:20
**compensatory** [2] - 173:25, 201:8
**complete** [3] - 122:19, 169:3, 169:25
**completed** [5] - 9:4, 46:19, 116:5, 169:9, 178:19
**completely** [2] - 14:5, 162:6
**completes** [1] - 166:24
**complicated** [1] - 84:14
**component** [5] - 58:23, 84:19, 84:21, 158:25, 187:6
**components** [1] - 201:2
**composite** [1] - 88:25
**composites** [1] - 98:14
**comprehend** [1] - 105:14
**comprehension** [32] - 84:21, 85:1, 85:24, 86:14, 86:19, 86:21, 88:9, 89:22, 90:2, 90:12, 90:19, 104:14, 106:12, 106:15, 109:6, 131:1, 131:16, 131:19, 171:12, 171:13, 171:19, 176:13, 177:3, 177:12, 184:4, 184:6, 193:10, 194:9, 197:4, 201:3, 201:12, 210:24
**comprehensive** [1] - 43:6
**Comprehensive** [2] - 41:11, 43:11
**computation** [1] - 197:6
**computer** [7] - 1:25, 25:8, 39:10, 39:11, 41:24, 45:6, 50:10
**computer-aided** [1] - 1:25
**computerized** [1] - 97:10

**computers** [1] - 49:12
**conceivable** [1] - 60:24
**concept** [2] - 79:13, 80:18
**conclude** [2] - 108:10, 203:2
**concluded** [3] - 174:21, 208:12, 211:9
**concludes** [1] - 211:2
**conclusion** [7] - 65:18, 107:9, 147:23, 207:25, 208:4, 208:10, 208:25
**conclusions** [1] - 149:25
**condense** [1] - 12:9
**condition** [6] - 170:24, 171:22, 173:12, 174:19, 175:4, 184:11
**conditions** [5] - 65:14, 78:23, 104:15, 105:14, 105:15, 155:21, 173:6, 174:4, 209:15
**conducted** [2] - 108:1, 193:14
**conducting** [2] - 82:24, 154:11
**conference** [2] - 135:8, 136:2
**conferences** [5] - 68:2, 69:8, 135:11, 136:7, 143:23
**confirm** [10] - 9:6, 9:15, 11:2, 25:6, 28:21, 30:8, 31:1, 31:5, 205:16, 206:3
**confirmed** [1] - 132:16
**confused** [1] - 192:24
**connection** [5] - 9:2, 20:9, 20:10, 57:22, 140:11
**connections** [1] - 198:21
**consensus** [2] - 113:24, 154:19
**consent** [1] - 104:24
**consequence** [1] - 77:7
**consequences** [3] - 76:14, 76:17, 76:19
**consider** [17] - 63:5, 92:8, 98:21, 98:22, 113:10, 132:19, 133:6, 133:7, 133:11, 133:25, 137:3, 164:19, 174:22, 180:21, 198:23, 199:10, 208:24
**consideration** [4] - 30:18, 111:7, 136:23, 146:18
**considerations** [2] - 19:8
**considered** [25] - 77:15, 85:12, 86:8, 92:10, 99:10, 105:22, 112:4, 112:21, 114:9, 130:17, 132:23, 132:25, 133:2, 133:11, 133:24, 134:9, 134:12, 147:22, 162:1, 162:13, 163:1, 177:5, 196:14, 199:8, 206:6
**considering** [8] - 11:23,

23:25, 104:12, 113:11, 132:19, 137:2, 187:5, 207:4
**consistency** [3] - 133:13, 134:16, 162:23
**consistent** [4] - 111:16, 130:7, 132:22, 209:15
**constitute** [1] - 76:1
**consult** [4] - 61:5, 117:11, 137:20, 166:6
**consultant** [4] - 62:15, 139:5, 144:19, 169:11
**consultants** [3] - 135:9, 135:22, 137:24
**consultation** [4] - 33:22, 34:3, 70:2, 70:6
**consulted** [1] - 167:5
**consulting** [1] - 34:1
**consumers** [1] - 148:2
**contact** [1] - 149:9
**contacted** [1] - 39:5
**contained** [4] - 96:15, 149:3, 159:18, 184:16
**containing** [1] - 64:20
**contains** [1] - 9:6
**contemplating** [2] - 23:22, 92:18
**contemporary** [1] - 146:7
**content** [8] - 44:19, 55:18, 70:20, 101:14, 105:7, 105:11, 105:12
**context** [1] - 99:7
**contexts** [3] - 72:14, 72:17, 92:11
**continuation** [1] - 3:15
**continue** [10] - 60:3, 60:14, 76:15, 76:20, 77:6, 81:13, 95:24, 98:9, 104:5, 186:9
**CONTINUED** [1] - 2:1
**continues** [6] - 37:3, 95:23, 159:12, 179:19, 183:14, 189:18
**continuing** [1] - 69:4
**Continuous** [3] - 97:8, 203:9, 203:15
**contradict** [1] - 108:4
**contrary** [1] - 91:16
**contrast** [2] - 92:16, 124:17
**contribute** [3] - 111:12, 112:7, 112:22
**Control** [1] - 204:10
**control** [4] - 97:14, 98:18, 204:24, 205:2
**controllers** [1] - 206:10
**controversy** [1] - 198:1
**conversation** [4] - 21:22, 22:13, 22:16, 177:22
**conversations** [1] - 24:17
**conversely** [1] - 188:12
**convey** [1] - 96:6
**cool** [1] - 57:14

**copy** [9] - 6:23, 36:14, 36:15, 125:10, 125:11, 125:14, 125:24, 126:5, 140:14
**core** [2] - 75:12, 80:14
**corner** [3] - 142:21, 167:20
**correct** [81] - 4:23, 8:24, 10:1, 10:18, 10:23, 15:9, 16:8, 18:5, 18:14, 21:16, 28:16, 29:5, 29:21, 29:23, 36:14, 36:17, 36:21, 37:18, 37:25, 38:20, 38:23, 41:4, 74:10, 95:2, 110:12, 111:17, 113:2, 114:22, 115:4, 115:8, 116:2, 116:6, 120:4, 122:5, 124:18, 129:6, 129:14, 131:2, 132:2, 134:19, 136:9, 136:21, 136:22, 139:19, 139:24, 140:13, 143:8, 144:1, 144:12, 148:9, 148:14, 155:11, 156:12, 156:22, 159:14, 161:15, 162:20, 163:7, 163:14, 164:6, 164:12, 164:13, 167:1, 168:17, 168:20, 180:16, 187:7, 187:12, 187:13, 187:17, 188:18, 189:10, 189:12, 190:10, 190:14, 190:17, 190:24, 193:3, 203:16, 204:14, 211:13
**correcting** [1] - 17:6
**corrections** [2] - 190:9, 190:21
**corrections/editing** [1] - 28:9
**correctly** [12] - 81:19, 86:11, 100:18, 111:3, 111:14, 112:19, 113:17, 133:20, 171:8, 171:10, 190:1, 193:16
**correlating** [1] - 86:6
**correlation** [1] - 86:7
**correspondence** [1] - 72:13
**Cortland** [1] - 67:7
**Council** [1] - 117:3
**counsel** [10] - 29:25, 53:13, 54:3, 56:10, 71:15, 82:17, 117:11, 130:23, 136:9, 138:11
**Counsel** [17] - 17:20, 30:24, 35:19, 71:6, 109:16, 117:25, 136:12, 138:8, 146:13, 147:1, 166:7, 211:4
**counseling** [1] - 169:1
**count** [3] - 59:15, 187:6, 187:13
**counted** [5] - 187:10, 189:10, 190:11, 191:15
**countries** [1] - 155:24
**couple** [9] - 13:18, 36:24, 41:7, 49:4, 49:4, 58:15, 145:10,

158:19, 176:12, 176:13
**course** [11] - 42:11, 44:11,
45:1, 46:15, 46:17, 52:17,
71:8, 81:5, 107:18, 171:11,
172:25
**courses** [11] - 40:9, 67:22,
67:25, 69:10, 69:13, 118:4,
118:6, 118:7, 142:23, 143:1
**coursework** [1] - 54:12
**Court** [3] - 1:22, 3:1, 211:17
**court** [2] - 136:16, 173:13
**COURT** [3] - 1:1, 62:9,
138:24
**Courthouse** [1] - 1:8
**courtroom** [2] - 161:11,
170:6
**cover** [1] - 145:2
**covered** [2] - 148:10, 180:4
**crafting** [2] - 24:23, 24:24
**created** [2] - 6:4, 179:4
**creativity** [1] - 79:23
**credentials** [2] - 66:17, 142:2
**credibility** [2] - 133:12,
134:15
**credible** [15] - 91:2, 91:5,
91:7, 91:11, 91:14, 92:1,
93:12, 93:22, 94:24, 94:25,
97:4, 98:21, 208:13, 208:15
**credit** [1] - 51:5
**credulous** [1] - 128:15
**criminal** [1] - 167:12
**criteria** [33] - 15:21, 63:6,
74:19, 75:16, 77:3, 77:24,
78:6, 78:8, 78:14, 79:21,
80:3, 80:5, 80:6, 80:9, 80:16,
80:23, 80:24, 81:4, 81:10,
81:24, 95:21, 95:25, 96:21,
99:1, 99:2, 101:24, 108:6,
108:9, 115:6, 122:16,
122:24, 172:4, 176:25
**criterion** [4] - 74:21, 74:24,
75:2, 75:10
**criticism** [2] - 198:3, 198:16
**Cross** [1] - 212:4
**cross** [9] - 30:5, 61:24,
61:25, 104:4, 109:13,
117:11, 117:15, 150:20,
211:5
**CROSS** [3] - 4:11, 110:7,
150:21
**cross-examination** [6] -
61:25, 109:13, 117:11,
117:15, 150:20, 211:5
**CROSS-EXAMINATION** [3] -
4:11, 110:7, 150:21
**cross-examine** [2] - 30:5,
104:4
**CRR** [2] - 1:22, 211:17
**CS** [3] - 7:9, 7:18, 7:22
**curiosity** [1] - 61:21

**current** [9] - 67:14, 96:20,
114:13, 145:14, 145:24,
155:17, 170:11, 170:18,
172:13
**curriculum** [1] - 168:20
**CURTIS** [1] - 1:12
**curve** [1] - 49:6
**Customized** [1] - 39:24
**customized** [1] - 40:13
**cut** [1] - 199:7
**cute** [1] - 155:2
**CV** [10] - 36:14, 64:17, 66:18,
67:4, 68:9, 69:10, 140:14,
142:3, 143:17, 145:5
**CVA** [1] - 22:20
**D-27** [1] - 195:22
**D-5** [1] - 151:9
**D27** [1] - 195:23
**Dafoe** [4] - 25:24, 25:25,
28:4, 28:12
**damage** [1] - 210:7
**dark** [2] - 21:25, 47:23
**dashboard** [2] - 47:10, 47:11
**data** [5] - 81:12, 92:1,
119:11, 137:3, 175:22
**date** [8] - 26:21, 27:12,
43:10, 43:12, 48:3, 69:12,
135:23, 178:18
**dated** [7] - 4:25, 17:16, 27:4,
33:22, 44:13, 164:2, 164:11
**David** [1] - 121:25
**DAY** [1] - 1:6
**day-to-day** [1] - 96:12
**days** [11] - 8:5, 8:20, 12:1,
12:17, 79:20, 135:5, 141:20,
145:2, 157:14, 163:21, 188:8
**DC** [2] - 2:5, 2:12
**deal** [1] - 200:15
**dealing** [1] - 52:15
**Dean** [3] - 26:1, 27:22, 168:1
**Dear** [1] - 17:10
**debate** [1] - 198:1
**debates** [1] - 113:24
**decade** [1] - 81:5
**decades** [1] - 81:13
**December** [3] - 1:10, 135:24,
139:17
**decent** [1] - 50:7
**decide** [2] - 133:19, 178:10
**decided** [3] - 24:3, 53:22,
178:12
**deciding** [2] - 39:1, 39:13
**decision** [10] - 29:2, 38:22,
132:24, 134:13, 156:20,
164:7, 164:9, 164:14, 202:1,
209:5
**declaration** [16] - 64:2,
64:14, 64:18, 65:24, 66:6,
73:19, 140:11, 140:15,
151:4, 151:21, 152:12,

152:25, 156:7, 168:5, 168:14
**decline** [1] - 167:21
**decoding** [3] - 147:16,
147:20, 148:5
**decreased** [1] - 11:20
**defend** [1] - 3:8
**Defendant** [2] - 1:6, 2:14
**defendant's** [4] - 127:2,
135:17, 140:4, 195:20
**Defendant's** [8] - 41:10,
83:25, 95:5, 102:6, 103:6,
104:17, 127:5
**defendants** [2] - 141:3,
146:8
**Defense** [1] - 66:18
**defense** [8] - 53:13, 54:3,
56:10, 62:2, 64:7, 70:22,
138:17, 167:6
**deficit** [14] - 143:9, 173:9,
173:20, 176:15, 183:22,
203:2, 206:13, 207:1,
207:18, 207:20, 209:9,
209:11, 209:19, 210:5
**Deficit** [1] - 145:25
**deficit/hyperactivity** [1] -
171:23
**deficits** [4] - 22:19, 78:9,
80:2, 96:25
**defined** [3] - 79:17, 171:16,
171:20
**definitely** [1] - 118:14
**definition** [4] - 79:19, 80:8,
80:14, 147:21
**degree** [15] - 9:25, 66:21,
66:22, 66:23, 69:24, 77:3,
96:10, 96:11, 96:22, 97:4,
103:12, 106:21, 142:7,
152:9, 168:24
**degrees** [2] - 10:19, 144:23
**deleted** [1] - 16:5
**demeanor** [2] - 207:6, 207:7
**demonstrated** [2] - 130:8,
150:7
**denial** [1] - 24:1
**denied** [7] - 21:6, 21:14,
28:15, 28:17, 28:18, 43:23,
175:18
**Denny** [18] - 84:11, 84:14,
84:25, 85:19, 86:7, 86:14,
123:25, 124:14, 162:10,
162:13, 192:14, 192:18,
192:24, 193:2, 193:4, 193:8,
194:6, 210:23
**denying** [2] - 28:22, 108:24
**department** [2] - 45:15, 52:2
**deposited** [1] - 73:4
**deposition** [6] - 35:13,
35:24, 110:11, 112:5,
112:24, 126:5
**depress** [1] - 198:14

**depression** [1] - 210:7
**describe** [19] - 58:5, 101:14,
102:15, 104:24, 105:10,
120:25, 143:20, 157:4,
168:22, 169:8, 179:14,
180:9, 180:14, 182:19,
185:25, 196:10, 204:24,
206:20, 208:17
**described** [25] - 7:14, 9:22,
86:10, 87:18, 100:1, 102:20,
110:23, 111:22, 112:6,
112:13, 113:5, 127:17,
139:10, 148:25, 158:25,
163:6, 165:16, 175:17,
181:6, 192:10, 205:9,
205:16, 207:24, 208:9,
210:16
**describes** [3] - 94:9, 99:17,
133:9
**describing** [3] - 98:11,
128:2, 204:7
**description** [9] - 25:15,
31:19, 32:2, 32:22, 100:13,
172:13, 183:7, 190:16,
208:12
**descriptions** [3] - 134:11,
158:24, 202:21
**designed** [3] - 101:21,
105:19, 170:21
**despair** [1] - 158:22
**despite** [2] - 77:6, 147:19
**detail** [5] - 66:15, 180:9,
193:6, 206:3, 209:3
**detailed** [1] - 34:1
**details** [4] - 5:3, 35:3, 65:8,
122:8
**detect** [2] - 93:16, 210:2
**determinant** [1] - 209:18
**determination** [1] - 114:14
**determined** [1] - 189:3
**determining** [2] - 78:14,
114:9
**detracts** [1] - 191:16
**develop** [1] - 199:23
**developed** [10] - 80:19,
81:24, 93:1, 93:6, 93:10,
93:12, 93:21, 95:21, 96:1,
173:24
**developing** [1] - 171:17
**development** [1] - 198:14
**diagnose** [3] - 98:23, 101:21,
151:20
**diagnosed** [9] - 13:17, 13:18,
80:20, 81:20, 115:10,
115:12, 115:14, 115:20,
181:18
**diagnoses** [13] - 12:23, 63:6,
65:14, 65:21, 74:5, 103:16,
106:25, 107:2, 109:9, 123:9,
123:12, 152:2, 152:16

**diagnosing** [4] - 101:19, 115:19, 148:12, 155:19
**diagnosis** [39] - 50:15, 50:22, 51:3, 66:14, 70:23, 72:5, 77:4, 77:21, 82:8, 82:15, 84:17, 96:19, 97:2, 102:1, 105:19, 106:23, 111:8, 111:13, 112:4, 112:21, 113:1, 113:11, 118:13, 118:15, 118:18, 119:8, 121:2, 123:6, 132:19, 134:13, 145:3, 146:9, 151:18, 162:1, 162:25, 202:17, 202:20, 206:7
**Diagnostic** [2] - 81:16, 170:6
**diagnostic** [45] - 13:20, 67:12, 70:8, 70:11, 70:15, 74:12, 77:24, 78:5, 78:14, 78:17, 79:19, 80:16, 80:23, 80:24, 81:8, 83:15, 84:13, 91:9, 91:24, 92:6, 92:17, 92:21, 93:3, 93:5, 93:9, 94:17, 95:16, 98:24, 98:25, 99:7, 105:16, 105:18, 105:22, 107:25, 108:5, 108:8, 111:14, 144:7, 144:17, 145:1, 161:1, 162:13, 165:3, 194:8
**died** [1] - 52:8
**differ** [1] - 76:25
**difference** [5] - 13:22, 128:1, 130:11, 196:7, 202:8
**differences** [1] - 130:12
**different** [31] - 32:13, 32:16, 44:6, 65:14, 68:23, 79:20, 79:21, 90:18, 94:1, 101:16, 104:23, 105:13, 129:20, 130:2, 130:14, 130:18, 130:20, 132:14, 132:21, 157:19, 157:24, 160:8, 163:14, 187:24, 192:2, 192:7, 192:10, 193:4, 204:5, 205:8
**differentiate** [1] - 75:24
**differently** [1] - 187:23
**differs** [1] - 114:11
**difficult** [4] - 55:18, 89:25, 172:17, 191:10
**difficulties** [3] - 160:14, 184:14, 188:22
**difficulty** [8] - 46:9, 171:7, 171:20, 172:2, 172:7, 172:9, 181:7, 186:4
**DIRE** [3] - 212:7, 212:11, 212:14
**direct** [7] - 22:25, 38:15, 61:22, 100:8, 116:12, 125:21, 211:2
**DIRECT** [6] - 62:11, 71:18, 139:1, 146:21, 168:2, 174:10

**Direct** [1] - 212:4
**directions** [1] - 172:3
**directly** [4] - 20:1, 20:24, 85:19, 108:4
**director** [1] - 50:24
**directors** [1] - 50:20
**directs** [1] - 56:23
**disabilities** [50] - 15:24, 65:15, 65:19, 65:21, 66:11, 67:11, 67:13, 68:15, 68:16, 69:17, 70:24, 72:6, 74:6, 74:10, 75:12, 78:1, 80:19, 80:20, 80:24, 82:25, 83:2, 83:13, 99:2, 99:5, 101:20, 101:22, 103:14, 105:17, 105:19, 105:21, 105:23, 106:23, 108:16, 112:8, 123:11, 142:17, 143:2, 143:7, 143:15, 144:8, 144:15, 144:24, 145:4, 145:14, 146:10, 148:13, 151:18, 198:5, 207:18, 207:20
**Disabilities** [2] - 145:11, 147:11
**disability** [46] - 12:25, 13:14, 13:16, 72:16, 72:20, 77:14, 77:16, 78:12, 78:15, 79:4, 80:7, 80:11, 80:12, 81:4, 81:21, 82:2, 82:10, 98:24, 101:24, 102:1, 103:16, 106:25, 108:6, 114:10, 114:12, 114:13, 114:14, 119:5, 119:9, 119:17, 119:20, 119:23, 120:15, 120:25, 122:7, 122:22, 122:24, 133:1, 147:21, 164:25, 165:12, 173:17, 177:6, 177:8, 198:7, 198:14
**disabled** [6] - 79:14, 79:25, 147:22, 148:6, 165:15, 200:16
**disagree** [1] - 34:7
**disappointing** [1] - 128:15
**disclosed** [3] - 18:24, 104:21, 124:12
**discourage** [1] - 176:6
**discovery** [5] - 5:8, 19:3, 25:9, 65:25, 141:21
**discredited** [1] - 155:1
**discrepancies** [7] - 81:6, 198:24, 200:1, 200:17, 200:19, 201:11, 202:4
**discrepancy** [33] - 80:17, 80:21, 80:25, 81:10, 81:11, 81:19, 81:23, 81:24, 82:7, 82:21, 93:2, 94:16, 147:24, 148:7, 148:12, 148:18, 154:19, 155:12, 164:20, 164:21, 164:24, 197:17,

197:20, 197:24, 197:25, 198:4, 198:6, 198:9, 198:12, 198:22, 199:2, 199:3, 201:19
**discuss** [6] - 77:24, 131:21, 141:8, 142:1, 145:14, 146:7
**discussed** [18] - 33:13, 83:14, 91:1, 99:9, 100:17, 101:5, 110:19, 116:12, 123:23, 125:6, 130:14, 131:17, 141:20, 147:25, 150:13, 157:14, 189:14, 193:1
**discussing** [9] - 4:17, 20:25, 24:4, 34:23, 66:3, 91:5, 164:22, 194:5, 206:17
**discussion** [13] - 3:18, 16:1, 23:6, 31:17, 34:11, 61:17, 132:8, 154:20, 189:18, 191:1, 197:16, 199:18, 203:13
**discussions** [2] - 39:19
**disease** [2] - 45:14, 56:24
**Diseases** [2] - 155:15, 170:16
**disfavor** [1] - 154:21
**Disorder** [1] - 146:1
**disorder** [17] - 74:8, 75:6, 78:10, 83:12, 95:22, 143:9, 160:15, 171:3, 171:20, 171:23, 173:20, 177:12, 177:19, 177:21, 182:24, 182:25, 183:23
**disorders** [11] - 22:22, 45:14, 75:6, 77:25, 83:3, 83:5, 99:1, 142:13, 143:10, 155:21, 177:10
**Disorders** [3] - 37:14, 81:17, 170:7
**disorganized** [1] - 172:3
**disqualify** [1] - 198:12
**distinctly** [1] - 80:6
**distinguish** [2] - 127:25, 173:8
**distracted** [2] - 75:20, 172:2
**distress** [1] - 76:20
**DISTRICT** [2] - 1:1, 1:1
**district** [3] - 80:9, 154:22
**districts** [2] - 79:20, 143:23
**doc** [2] - 169:6, 192:21
**doctor** [1] - 52:14
**doctor's** [1] - 209:6
**doctoral** [4] - 66:23, 69:24, 169:3, 169:9
**document** [45] - 5:6, 5:25, 6:4, 6:7, 7:6, 11:24, 12:10, 12:12, 12:13, 13:9, 14:4, 14:8, 15:3, 15:10, 17:14, 17:15, 23:20, 25:14, 26:23, 33:16, 33:20, 34:11, 39:24, 40:2, 41:11, 43:11, 47:9,

64:13, 126:3, 126:4, 140:9, 147:7, 168:7, 178:16, 182:1, 183:16, 184:19, 184:20, 185:23, 189:16, 192:17, 199:13, 206:16
**documentation** [12] - 29:19, 63:20, 64:23, 69:7, 72:2, 72:3, 73:5, 109:2, 137:18, 139:10, 149:2, 159:18
**documented** [2] - 18:24, 133:17
**documents** [8] - 26:7, 62:24, 63:2, 72:12, 109:7, 141:1, 160:5, 179:22
**domains** [2] - 184:1, 200:17
**done** [31] - 5:20, 14:5, 22:23, 50:18, 69:4, 85:22, 86:6, 130:3, 130:7, 136:19, 166:21, 173:1, 173:15, 175:3, 175:19, 175:23, 175:24, 176:10, 176:12, 176:16, 177:24, 178:4, 178:18, 179:5, 181:8, 184:13, 192:1, 193:20, 193:24, 196:11, 196:15
**doom** [1] - 158:23
**door** [1] - 94:2
**dot** [2] - 47:20, 47:22
**double** [4] - 40:23, 45:8, 183:21, 210:21
**doubt** [15] - 110:20, 110:22, 110:24, 110:25, 111:3, 111:21, 111:24, 112:1, 112:12, 112:15, 112:17, 112:18, 113:4, 113:7, 163:4
**down** [8] - 12:9, 42:1, 59:23, 138:7, 143:4, 145:8, 159:21, 205:22
**download** [1] - 62:23
**downloaded** [1] - 73:5
**dozens** [1] - 98:12
**Dr** [150] - 4:16, 5:9, 5:13, 6:20, 9:3, 9:8, 10:4, 11:3, 12:4, 12:14, 13:3, 13:16, 13:18, 13:19, 13:21, 14:1, 14:10, 15:10, 17:2, 17:10, 18:5, 18:20, 19:3, 19:18, 19:22, 19:23, 20:7, 21:19, 21:23, 22:2, 22:6, 22:16, 22:19, 22:24, 23:2, 23:10, 23:17, 23:22, 24:3, 24:15, 24:18, 24:22, 25:14, 25:20, 26:10, 26:13, 27:2, 28:16, 29:4, 29:20, 29:24, 30:3, 30:9, 30:17, 30:20, 31:2, 33:14, 33:21, 34:23, 61:5, 62:3, 62:13, 64:6, 65:8, 69:19, 70:16, 70:22, 71:5, 71:20, 83:21, 84:3, 84:6, 85:20, 87:4, 88:17, 89:16,

93:18, 94:9, 94:20, 95:1,
97:15, 97:20, 97:21, 97:24,
98:23, 99:8, 99:24, 101:1,
101:12, 103:20, 108:1,
108:22, 109:12, 110:9,
110:15, 110:20, 111:21,
113:4, 113:14, 113:16,
114:19, 114:25, 123:23,
130:19, 131:5, 132:14,
138:18, 139:3, 139:24,
140:6, 140:25, 141:8,
141:10, 141:13, 142:1,
143:25, 146:8, 147:5,
148:10, 150:11, 153:14,
153:17, 153:20, 153:23,
154:1, 154:13, 158:12,
159:5, 160:1, 160:11,
160:13, 160:18, 161:10,
161:13, 161:16, 162:12,
162:19, 167:17, 168:4,
168:11, 174:2, 176:16,
176:22, 188:20, 193:11,
195:23, 208:20, 208:22,
209:1, 209:8
**DR** [9] - 62:7, 138:22,
167:22, 212:6, 212:8,
212:10, 212:12, 212:13,
212:15
**draft** [12] - 15:20, 17:11,
18:5, 18:7, 19:22, 20:22,
24:6, 26:16, 28:11, 28:12,
28:14, 30:21
**drafted** [1] - 25:25
**drafting** [1] - 24:25
**drafts** [1] - 29:24
**drastically** [1] - 204:4
**drawing** [2] - 35:6, 36:3
**drawings** [1] - 94:1
**driven** [1] - 209:23
**Drs** [1] - 198:19
**drug** [1] - 75:9
**DSM** [11] - 75:18, 81:8,
81:14, 83:4, 85:16, 95:18,
96:2, 99:2, 115:17, 119:21,
170:11
**DSM-5** [10] - 81:18, 115:14,
115:17, 170:13, 176:18,
176:25, 177:9, 177:10,
197:20, 198:3
**due** [5] - 75:7, 78:9, 162:13,
173:9, 173:10
**duly** [3] - 62:7, 138:22,
167:22
**during** [27] - 14:4, 35:9,
38:15, 50:1, 51:17, 52:19,
65:25, 70:13, 86:14, 92:7,
92:20, 93:2, 93:9, 93:14,
97:12, 105:22, 111:14,
120:3, 120:12, 126:4, 134:8,
179:24, 183:3, 183:9, 203:1,
207:5
**DVT** [3] - 42:11, 51:13, 51:20
**DX-3** [1] - 131:5
**DX-4** [2] - 28:21, 33:13
**DX-5** [5] - 128:7, 141:6,
156:10, 156:12, 212:22
**DX-6** [3] - 65:6, 128:8,
212:23
**DX6** [1] - 128:9
**dysfunction** [2] - 207:19,
207:20
**dyslexia** [60] - 111:8, 112:4,
112:21, 119:1, 119:3, 119:5,
119:8, 119:12, 119:16,
119:18, 119:19, 120:2,
120:8, 120:10, 120:21,
120:24, 121:7, 121:11,
121:17, 121:19, 122:7,
122:18, 122:19, 122:21,
123:20, 129:12, 132:20,
158:10, 158:16, 160:15,
161:2, 162:1, 165:19,
170:25, 171:2, 171:3,
171:14, 171:15, 172:22,
173:2, 173:10, 173:20,
173:22, 174:4, 175:5,
176:11, 176:14, 177:1,
177:7, 177:16, 178:2, 178:3,
178:14, 181:17, 194:20,
207:1, 207:21, 208:1, 208:6,
208:8
**Dyslexia** [3] - 145:18,
169:12, 198:20
**dyslexic** [4] - 171:5, 185:4,
185:5, 185:8
**early** [4] - 18:5, 18:6, 74:21,
83:6, 194:13, 194:21
**easier** [5] - 9:15, 12:7, 34:6,
186:12
**easiest** [1] - 33:16
**easily** [2] - 75:19, 98:15
**EASTERN** [1] - 1:1
**edit** [1] - 158:1
**edited** [2] - 23:20, 152:9
**editing** [3] - 14:25, 17:7, 25:5
**edition** [5] - 81:17, 155:17,
170:11, 170:18, 185:20
**Edition** [2] - 87:5, 185:19
**education** [6] - 68:19, 69:4,
69:23, 71:5, 91:21, 118:8
**educational** [5] - 66:20, 78:7,
99:4, 142:5, 168:22
**effect** [2] - 25:21, 198:13
**effective** [4] - 119:4, 158:25,
160:15, 207:22
**effectively** [1] - 121:1
**efficiently** [2] - 24:12, 186:5
**effort** [5] - 93:1, 93:9,
157:17, 177:11, 207:4
**effortlessly** [1] - 185:5
**efforts** [1] - 207:12
**eight** [1] - 5:22
**either** [14] - 30:9, 49:8,
49:17, 50:20, 116:5, 121:7,
121:16, 150:7, 173:20,
173:25, 175:4, 177:11,
197:20, 209:19
**elementary** [6] - 16:18,
100:25, 133:15, 181:10,
203:1, 208:15
**eliminate** [1] - 198:11
**eliminating** [1] - 198:4
**Elmira** [1] - 67:9
**email** [21] - 4:16, 6:20, 12:4,
12:10, 14:1, 14:3, 19:17,
21:18, 26:8, 26:10, 26:13,
26:17, 27:1, 27:11, 28:3,
30:20, 31:1, 62:23, 72:12,
73:2, 149:1
**emails** [3] - 25:7, 25:18, 30:9
**embarrassing** [1] - 186:10
**emergency** [3] - 31:21,
45:14, 52:2
**emphasize** [1] - 178:12
**emphasized** [1] - 129:10
**employers** [1] - 31:17
**encompassed** [1] - 13:17
**encounter** [2] - 50:19, 50:22
**encountered** [1] - 54:22
**encouraging** [1] - 195:4
**end** [11] - 3:18, 25:5, 31:10,
40:19, 40:20, 49:22, 51:17,
174:21, 183:1, 199:18,
199:20
**ended** [3] - 44:8, 48:23,
186:1
**endorse** [1] - 82:23
**endorsing** [1] - 96:13
**ends** [1] - 187:9
**energy** [1] - 171:9
**engage** [1] - 76:20
**engaged** [1] - 153:21
**English** [1] - 101:17
**enjoy** [3] - 57:4, 57:20, 117:9
**enjoyable** [3] - 57:17, 57:18,
58:3
**enjoyed** [1] - 57:20
**enrolled** [2] - 58:10, 116:9
**entire** [4] - 54:23, 63:19,
128:19, 128:24
**entirely** [2] - 6:4, 172:19
**entirety** [1] - 129:4
**entitled** [4] - 37:2, 82:12,
183:14, 211:14
**entry** [1] - 79:21
**environments** [1] - 71:1
**episodes** [1] - 74:15
**equalize** [2] - 8:6, 12:1
**Erin** [3] - 25:24, 25:25, 28:4
**error** [5] - 187:13, 189:10,
191:15, 204:2
**errors** [14] - 17:6, 90:4, 90:9,
186:18, 186:20, 186:25,
187:3, 187:9, 187:11, 189:6,
189:7, 190:11
**especially** [6] - 66:9, 92:11,
94:20, 119:23, 194:1, 200:15
**ESQUIRE** [5] - 1:16, 2:3, 2:3,
2:10, 2:10
**essentially** [3] - 86:18,
145:22, 150:5
**establish** [1] - 172:17
**established** [2] - 13:19, 18:4
**estimate** [5] - 61:22, 116:16,
116:18, 173:1, 201:7
**et** [1] - 101:3
**ethics** [1] - 67:22
**evaluate** [4] - 46:14, 56:19,
56:20, 153:25, 159:3, 159:5
**evaluated** [4] - 40:3, 124:4,
165:8, 173:2
**evaluating** [10] - 22:22,
46:18, 92:3, 134:9, 154:6,
161:5, 173:4, 177:2, 177:6,
183:22
**evaluation** [23] - 13:20, 23:6,
29:6, 29:8, 35:9, 70:23, 72:8,
72:22, 82:1, 101:22, 136:19,
145:1, 145:3, 146:9, 154:11,
159:2, 165:11, 174:23,
175:21, 176:7, 181:12,
196:5, 209:9
**evaluations** [8] - 69:5, 70:8,
70:11, 97:11, 144:7, 144:17,
175:19, 208:18
**evaluator** [4] - 78:18, 83:16,
91:22, 118:16
**evaluators** [2] - 70:17, 83:1
**evening** [1] - 51:25
**events** [2] - 15:9, 27:15
**eventually** [2] - 18:9, 26:1
**everyday** [1] - 97:1
**evidence** [51] - 63:11, 63:12,
63:22, 65:18, 65:20, 78:13,
78:16, 78:17, 78:19, 78:20,
78:25, 80:5, 82:24, 83:13,
83:14, 83:17, 83:18, 83:19,
84:16, 91:15, 91:17, 93:3,
93:4, 94:21, 94:22, 97:7,
99:10, 99:24, 100:10,
100:11, 100:17, 101:23,
101:25, 103:15, 108:10,
108:11, 108:17, 108:20,
109:5, 111:13, 112:7,
113:12, 115:13, 121:10,
137:23, 138:3, 176:5, 193:9,
193:25, 206:6
**evolved** [1] - 184:11
**exacerbate** [1] - 173:11

**exact** [5] - 100:22, 116:7, 119:11, 136:11, 157:16
**exactly** [9] - 23:9, 72:11, 74:11, 90:21, 108:19, 118:20, 153:1, 153:5, 156:4
**exaggerated** [4] - 93:11, 93:17, 93:22, 94:24
**exaggerating** [1] - 94:14
**exam** [44] - 8:6, 12:2, 37:18, 40:3, 40:14, 40:15, 41:1, 41:24, 42:19, 42:20, 42:22, 43:18, 44:10, 45:4, 45:8, 45:20, 45:23, 46:4, 46:8, 46:11, 46:14, 46:18, 46:19, 47:1, 50:2, 50:19, 51:6, 52:22, 53:8, 53:12, 58:20, 58:23, 58:25, 59:5, 59:10, 59:19, 70:3, 101:12, 102:9, 103:9, 104:12, 116:8, 161:7
**Exam** [1] - 117:2
**examination** [14] - 34:1, 34:2, 39:25, 40:13, 40:20, 44:25, 61:25, 69:23, 109:13, 117:11, 117:15, 150:20, 211:3, 211:5
**Examination** [1] - 39:24
**EXAMINATION** [11] - 4:11, 48:17, 58:17, 62:11, 71:18, 110:7, 139:1, 146:21, 150:21, 168:2, 174:10
**examine** [4] - 30:5, 71:8, 104:4, 207:17
**examined** [3] - 62:8, 138:23, 167:23
**examiner** [1] - 90:3
**Examiners** [2] - 117:1
**EXAMINERS** [1] - 1:6
**example** [11] - 10:20, 41:6, 76:23, 110:18, 121:21, 129:11, 130:24, 147:14, 148:17, 165:22, 203:12
**examples** [2] - 68:24, 96:2
**exams** [19] - 16:11, 32:11, 38:16, 38:17, 38:19, 38:22, 39:2, 39:15, 40:4, 45:6, 47:13, 48:21, 48:23, 50:9, 50:10, 53:2, 59:16, 123:4
**excellent** [3] - 66:11, 66:12, 166:15
**except** [2] - 57:21, 181:6
**exception** [1] - 114:16
**exceptionally** [1] - 108:2
**excessively** [2] - 75:21, 172:2
**exchanges** [1] - 31:2
**exclusive** [2] - 177:13
**excused** [4] - 138:8, 138:14, 166:18, 166:22
**Exhibit** [73] - 4:7, 4:14, 6:20, 8:25, 9:6, 10:25, 12:4, 13:24,

17:8, 17:18, 18:11, 18:19, 20:16, 20:17, 20:21, 21:4, 25:6, 28:1, 30:8, 30:20, 31:1, 31:4, 36:14, 36:25, 37:13, 38:14, 39:22, 41:10, 44:10, 47:4, 47:5, 47:6, 64:6, 64:16, 64:19, 65:1, 66:18, 66:19, 68:9, 73:18, 83:25, 95:5, 95:6, 96:3, 98:6, 99:15, 102:23, 103:6, 104:17, 127:3, 127:13, 138:3, 140:6, 140:7, 140:14, 140:17, 140:21, 141:4, 141:6, 142:3, 142:20, 145:6, 147:5, 151:3, 151:9, 152:11, 156:7, 156:10, 164:1, 168:13, 168:19, 178:15, 180:25
**exhibit** [18] - 13:24, 18:22, 18:24, 19:4, 64:7, 64:13, 125:2, 125:4, 125:7, 125:9, 125:19, 127:6, 135:14, 168:11, 195:20, 198:6, 202:13
**exhibits** [6] - 5:7, 48:8, 135:17, 140:5, 146:24, 168:6
**Exhibits** [1] - 102:7
**expect** [19] - 77:2, 77:4, 77:7, 77:9, 80:4, 96:12, 96:18, 96:23, 96:25, 102:2, 105:20, 106:4, 115:25, 119:24, 124:16, 176:19, 197:13
**expectations** [1] - 85:18
**expected** [7] - 5:20, 49:8, 50:22, 105:11, 186:4, 197:3, 197:7
**experience** [18] - 11:22, 48:22, 49:5, 55:14, 55:15, 69:23, 69:25, 70:14, 76:1, 76:16, 113:25, 119:1, 163:22, 173:4, 176:17, 181:20, 194:22, 195:15
**experienced** [3] - 24:5, 96:10, 175:21
**experiences** [7] - 76:5, 76:7, 76:8, 134:11, 134:18, 158:22, 181:7
**experiencing** [1] - 76:14
**experimental** [1] - 206:25
**experiments** [1] - 37:12
**expert** [11] - 30:3, 61:6, 61:20, 70:23, 71:15, 146:9, 146:19, 166:24, 174:3, 195:9, 198:2
**expertise** [5] - 65:14, 71:4, 71:6, 71:13, 146:18
**experts** [3] - 60:5, 178:3, 198:10
**explain** [14] - 26:6, 27:8, 51:15, 74:12, 78:11, 84:9, 92:2, 94:16, 95:14, 139:9,

142:5, 186:22, 186:25, 203:21
**explained** [2] - 126:6, 188:1
**explaining** [1] - 101:1
**explanation** [4] - 7:20, 128:16, 187:21, 208:14
**explored** [1] - 159:2
**expressed** [3] - 66:6, 140:25, 141:23
**expression** [1] - 13:2
**extended** [16] - 28:23, 29:9, 29:17, 41:19, 44:1, 44:3, 44:4, 45:23, 119:21, 120:1, 123:2, 123:15, 123:19, 150:9, 157:16, 173:23
**extent** [2] - 18:25, 103:24
**external** [2] - 62:15, 139:5
**extra** [8] - 5:3, 6:12, 6:13, 16:17, 53:25, 54:17, 108:18, 179:25
**extremely** [15] - 51:25, 73:21, 74:1, 90:17, 128:12, 203:11, 204:14, 204:22, 205:6, 205:7, 205:12, 205:19, 205:23, 205:25, 206:11
**eyeglasses** [1] - 114:17

**face** [7] - 86:24, 88:6, 89:13, 90:15, 98:18, 175:13
**faced** [1] - 91:22
**fact** [19] - 20:22, 24:8, 29:24, 35:10, 53:24, 76:12, 116:12, 121:5, 132:21, 136:24, 143:5, 147:19, 158:4, 158:15, 166:7, 190:15, 194:13, 198:7, 210:3
**factor** [4] - 156:19, 187:11, 201:3, 204:2
**factors** [1] - 114:16
**facts** [1] - 29:23
**factual** [1] - 55:4
**failed** [3] - 50:24, 51:1, 210:2
**fair** [1] - 189:3
**fairly** [3] - 153:19, 181:20, 186:5
**fallen** [1] - 154:21
**falling** [2] - 90:20, 205:11
**false** [3] - 191:11, 191:12, 210:1
**familiar** [21] - 70:15, 70:20, 72:14, 79:13, 83:23, 101:12, 103:21, 103:22, 104:19, 104:22, 105:12, 120:6, 130:2, 155:14, 162:17, 170:9, 170:11, 170:15, 170:24, 171:22, 175:21
**familiarity** [2] - 103:24, 114:7
**family** [4] - 4:5, 45:21, 53:18, 101:2
**famous** [1] - 121:18

**far** [11] - 7:23, 39:17, 86:19, 87:18, 98:16, 111:16, 130:14, 176:24, 192:2, 196:22, 197:13
**fast** [3] - 57:16, 187:4, 192:1
**favor** [2] - 153:25, 154:7
**feature** [1] - 76:12
**features** [1] - 74:13
**February** [3] - 6:21, 8:10, 12:3
**feed** [1] - 173:7
**feedback** [1] - 50:19
**feigned** [4] - 93:10, 93:17, 93:21, 94:24
**feigning** [1] - 94:14
**fell** [3] - 204:22, 205:5, 205:6
**females** [1] - 45:15
**few** [7] - 28:8, 38:15, 40:6, 48:20, 67:3, 145:10, 194:25
**fiancé** [4] - 9:4, 9:8, 10:15, 202:21
**field** [6] - 144:23, 145:13, 145:15, 145:24, 146:6, 197:23
**Fielding** [3] - 169:3, 169:5, 169:6
**fields** [3] - 68:19, 118:9, 146:19
**fifth** [2] - 81:17, 158:5
**figure** [3] - 52:14, 181:21
**figures** [3] - 121:11, 121:16, 200:2
**file** [14] - 62:24, 63:19, 72:23, 72:25, 73:5, 73:8, 73:12, 73:17, 83:10, 84:4, 137:4, 137:14, 149:5
**filed** [1] - 64:25
**filing** [2] - 85:7, 88:3
**fill** [3] - 174:15, 202:23, 202:24
**filled** [1] - 10:3
**filling** [1] - 209:10
**final** [7] - 17:11, 18:16, 20:22, 23:19, 27:22, 31:8, 50:8
**finally** [3] - 46:11, 75:7, 140:21
**findings** [6] - 184:16, 203:10, 203:21, 206:3, 208:24
**fine** [6] - 60:25, 61:8, 75:4, 100:7, 131:15, 193:4
**finish** [5] - 3:19, 3:20, 3:21, 191:23, 193:21
**first** [69] - 6:9, 7:8, 8:13, 9:10, 9:17, 11:14, 13:11, 22:2, 22:12, 22:18, 23:5, 26:8, 26:11, 30:14, 32:2, 37:6, 40:4, 40:5, 40:6, 40:19, 40:20, 41:15, 46:20, 47:21, 48:24, 48:25, 49:4, 50:3,

50:4, 64:8, 72:24, 80:19, 82:2, 84:6, 86:15, 90:8, 91:4, 99:15, 99:16, 100:15, 100:20, 100:23, 109:3, 115:10, 115:12, 115:20, 119:22, 120:11, 126:11, 130:5, 139:17, 140:18, 148:23, 156:25, 159:12, 159:20, 163:19, 164:1, 174:18, 175:12, 179:8, 184:17, 186:13, 190:13, 191:5, 204:7, 204:20, 206:4

**five** [4] - 46:24, 67:6, 75:10, 96:20

**flexibly** [1] - 119:18

**flip** [1] - 35:13

**flu** [2] - 92:4, 210:8

**fluency** [39] - 87:19, 88:9, 88:12, 88:22, 88:23, 89:22, 90:10, 103:9, 106:17, 130:20, 131:1, 131:16, 131:18, 131:19, 132:4, 132:5, 132:12, 171:18, 184:23, 184:24, 185:1, 185:11, 185:23, 186:1, 186:19, 188:2, 189:1, 189:2, 189:23, 191:6, 191:7, 191:8, 191:17, 192:11, 208:6, 210:22

**focus** [5] - 55:13, 72:23, 76:7, 144:9, 195:5

**focusing** [9] - 68:8, 68:13, 69:9, 74:10, 83:8, 84:7, 95:1, 172:2, 193:10

**folks** [4] - 77:20, 81:25, 82:23, 88:11

**follow** [2] - 23:25, 51:7

**follow-up** [1] - 23:25

**followed** [1] - 130:16

**following** [3] - 52:23, 107:23, 140:2

**follows** [8] - 12:12, 14:8, 15:3, 17:14, 62:8, 138:23, 167:23, 170:1

**font** [1] - 17:14

**foot** [1] - 52:3

**forecasting** [1] - 42:19

**foregoing** [1] - 211:13

**forever** [1] - 58:4

**forget** [1] - 121:13

**forgetting** [1] - 96:17

**forgotten** [2] - 25:2, 25:4

**form** [4] - 103:25, 125:2

**formal** [4] - 173:25, 181:9, 181:11, 181:12

**format** [5] - 49:11, 70:20, 107:12, 118:16, 130:15

**formats** [1] - 104:23

**former** [2] - 122:4, 122:5

**forms** [2] - 86:6, 86:8

**formulas** [2] - 55:3, 81:23

**forth** [2] - 72:10, 126:23

**forward** [7] - 16:12, 167:19, 174:19, 175:7, 176:7, 178:12

**forwarded** [2] - 25:8, 27:11

**forwarding** [5] - 6:23, 18:20, 19:18, 26:8, 30:21

**foundation** [1] - 103:20, 195:7

**four** [8] - 31:22, 36:19, 105:1, 183:25, 190:19, 190:22, 191:17

**four-word** [3] - 190:19, 190:22

**four-year** [1] - 31:22

**fourth** [5] - 75:2, 126:12, 126:13, 126:18, 128:23

**frequency** [4] - 76:4, 76:9, 76:10, 209:21

**frequent** [2] - 74:17, 172:15

**frequently** [13] - 152:1, 152:15, 171:13, 181:20, 196:11, 198:5, 199:5, 199:25, 200:20, 201:18, 202:3, 202:6, 207:2

**Friday** [6] - 51:23, 51:25, 60:6, 60:7, 60:24

**friend** [1] - 57:9

**friends** [3] - 53:18, 57:8, 57:14

**front** [4] - 168:7, 168:11, 178:15, 206:10

**full** [8] - 32:19, 100:20, 100:23, 135:6, 169:25, 175:8, 203:14

**Full** [2] - 204:10, 205:10, 205:16

**fun** [1] - 58:5

**function** [4] - 96:24, 165:11, 165:14, 171:13

**functional** [2] - 6:10, 77:18

**functioning** [13] - 99:4, 101:24, 152:5, 152:19, 165:2, 172:13, 172:21, 182:19, 183:8, 183:14, 183:23, 183:24, 183:25

**future** [1] - 16:11

**game** [1] - 117:13

**Game** [2] - 57:10, 57:12

**gap** [1] - 81:3

**gather** [1] - 209:21

**gathered** [1] - 180:11

**gears** [1] - 107:17

**General** [3] - 200:13, 200:25, 201:10

**general** [28] - 32:5, 50:5, 70:21, 78:11, 85:23, 87:12, 90:23, 96:18, 102:14, 102:16, 105:25, 106:5, 115:24, 116:8, 123:14,

126:24, 154:2, 161:16, 182:19, 183:8, 183:23, 183:24, 199:6, 200:4, 207:6, 207:7, 209:2, 209:25

**generalization** [1] - 200:3

**generally** [42] - 22:20, 37:9, 50:7, 72:19, 84:15, 85:12, 86:8, 93:10, 101:13, 101:14, 103:21, 104:11, 104:20, 110:18, 111:16, 115:8, 116:6, 119:17, 120:7, 124:15, 127:22, 151:14, 156:15, 174:22, 176:19, 179:21, 180:9, 181:5, 182:5, 182:18, 183:17, 184:1, 187:20, 187:22, 188:1, 192:18, 194:12, 199:7, 199:8, 202:20, 206:3

**generates** [2] - 84:23, 98:12

**Genetic** [1] - 37:2

**genuine** [3] - 93:17, 94:24, 207:4

**gifted** [13] - 79:14, 79:16, 79:25, 80:3, 80:5, 80:9, 158:5, 158:7, 158:10, 158:15, 200:15, 200:16, 202:5

**Gifted** [1] - 147:12

**giftedness** [3] - 79:17, 79:19, 79:21

**given** [13] - 69:6, 69:7, 70:18, 70:20, 78:22, 83:15, 93:16, 97:10, 109:3, 118:16, 120:2, 162:6, 197:3

**global** [1] - 204:19

**goal** [1] - 92:13

**GORT** [13] - 89:17, 90:7, 90:22, 112:11, 112:12, 112:20, 123:25, 132:8, 163:9, 189:13, 189:14, 189:19, 190:12

**GORT-5** [5] - 131:20, 162:3, 192:5, 192:8, 194:5

**governor** [1] - 122:5

**grade** [15] - 16:17, 44:22, 51:8, 51:10, 51:11, 102:16, 147:20, 158:5, 165:24, 166:1, 195:3, 196:21, 197:9, 197:10

**grades** [10] - 53:15, 77:5, 78:21, 78:24, 83:19, 91:21, 134:8, 165:23, 166:2, 194:25

**grading** [2] - 32:10, 32:20

**graduate** [3] - 67:20, 118:6, 144:22

**graduated** [1] - 106:4

**graduating** [2] - 85:14, 85:21

**graduation** [1] - 32:17

**grain** [1] - 193:12

**grammar** [1] - 17:6

**GRAN** [1] - 1:15

**grant** [1] - 195:9

**granted** [3] - 21:14, 116:14, 116:17

**granting** [2] - 28:22, 108:24

**graph** [1] - 47:12

**gray** [1] - 47:23

**Gray** [4] - 89:16, 112:10, 187:23, 190:8

**great** [4] - 4:9, 51:6, 124:11

**grossly** [1] - 96:23

**grounds** [1] - 27:8

**group** [18] - 78:22, 85:15, 91:20, 104:22, 106:10, 106:14, 107:5, 115:22, 115:23, 145:12, 145:16, 145:21, 145:22, 146:2, 146:3, 196:13, 196:24, 202:2

**group-administered** [1] - 196:13

**grouping** [2] - 78:3, 78:25

**groups** [7] - 45:15, 68:23, 68:24, 69:3, 143:20, 143:22, 143:23

**guard** [1] - 31:20

**guess** [6] - 25:24, 55:22, 60:1, 134:1, 153:8, 209:3

**guessing** [2] - 55:23, 59:17, 59:19

**guide** [1] - 174:16

**guidelines** [2] - 5:18, 17:13

**guiding** [1] - 32:8

**Haddonfield** [1] - 1:17

**half** [6] - 18:8, 23:8, 61:23, 135:5, 135:7, 181:21

**halting** [1] - 190:20

**hand** [3] - 7:2, 11:14, 142:21

**handful** [1] - 73:11

**handled** [1] - 182:21

**handwriting** [2] - 9:12, 9:15

**hard** [5] - 5:17, 12:9, 58:2, 116:21, 127:25

**harder** [3] - 50:15, 76:6, 119:19

**hate** [1] - 206:13

**hated** [1] - 35:11

**head** [5] - 32:14, 33:5, 51:21, 172:4, 184:9

**headaches** [1] - 74:7

**heading** [1] - 206:18

**health** [4] - 56:14, 56:15, 56:17

**health-related** [1] - 56:14

**hear** [3] - 3:11, 74:1, 74:2

**heard** [17] - 87:9, 100:16, 101:3, 108:3, 109:9, 121:18, 121:22, 121:24, 122:3, 122:6, 127:25, 133:15, 134:7, 153:8, 157:14, 160:20, 170:5

**hearing** [1] - 60:10, 60:13, 65:3, 66:3, 101:3, 101:5, 109:8, 141:5, 141:20, 150:13, 185:16
**HEARING** [1] - 1:6
**heart** [2] - 52:6, 52:7
**heavy** [2] - 105:7, 105:11
**held** [1] - 142:14
**help** [26] - 5:15, 7:9, 7:17, 14:13, 14:14, 15:16, 16:12, 33:11, 53:17, 53:25, 54:1, 101:2, 101:11, 118:12, 133:16, 133:17, 135:15, 151:6, 164:19, 165:10, 165:13, 165:16, 165:20, 165:21, 195:21, 199:14
**helped** [5] - 14:18, 14:25, 17:7, 25:5, 133:23
**helpful** [3] - 22:21, 101:23, 130:25
**helps** [4] - 85:5, 87:16, 174:16, 175:2
**herself** [1] - 182:21
**hesitant** [1] - 122:21
**hesitation** [1] - 190:23
**hesitations** [1] - 190:20
**heterogenous** [1] - 122:13
**high** [16] - 16:19, 31:24, 74:19, 75:8, 79:18, 85:21, 87:2, 99:21, 100:25, 165:20, 181:15, 188:11, 193:21, 193:24, 210:1
**higher** [3] - 42:2, 79:11, 202:4
**highlighted** [2] - 27:14, 36:1
**highlighting** [2] - 15:4, 15:5
**highlights** [1] - 22:13
**highly** [2] - 107:5, 158:24
**hip** [1] - 52:4
**historical** [1] - 121:11
**historically** [1] - 184:12
**history** [18] - 34:15, 34:17, 100:6, 108:3, 137:2, 137:4, 137:5, 168:23, 169:8, 180:7, 180:13, 180:24, 181:3, 181:23, 183:19, 209:13, 209:20, 210:8
**hit** [1] - 35:2
**hold** [1] - 98:4
**home** [2] - 24:9, 24:12
**honestly** [1] - 109:8
**Honor** [57] - 3:4, 3:8, 3:16, 3:22, 4:2, 6:16, 17:24, 17:25, 18:22, 19:2, 19:11, 19:24, 20:5, 20:24, 22:9, 27:24, 30:1, 48:5, 58:16, 60:1, 60:11, 60:17, 60:25, 62:2, 64:24, 70:22, 71:3, 71:17, 103:19, 109:14, 117:7, 125:7, 137:19, 137:22,

138:1, 138:6, 138:9, 138:15, 138:17, 141:3, 146:8, 146:20, 146:25, 166:5, 166:11, 166:16, 166:19, 167:2, 167:5, 167:17, 168:8, 174:2, 174:8, 188:19, 195:7, 211:3, 211:7
**HONORABLE** [1] - 1:12
**hope** [2] - 3:23, 111:18
**hospital** [2] - 49:9, 49:12
**host** [1] - 210:7
**hour** [2] - 23:6, 23:8, 61:23, 61:24, 135:2, 135:3, 180:20
**hour-and-a-half** [1] - 61:23
**hours** [4] - 23:7, 32:20, 32:21, 69:25
**Houtman** [6] - 24:18, 24:22, 25:14, 26:11, 26:13, 27:2
**huge** [1] - 49:6
**hurt** [1] - 51:23
**hyperactivity** [3] - 75:20, 172:5, 172:6
**ICD** [3] - 155:14, 155:17, 170:18
**ICD-10** [5] - 155:19, 170:20, 177:16, 197:21, 197:22
**idea** [3] - 37:10, 53:19, 54:5, 82:11, 188:24
**identical** [2] - 43:15, 149:14
**identified** [3] - 12:23, 21:23, 156:8
**identify** [6] - 13:14, 22:2, 135:20, 171:8, 171:10, 178:23
**III** [3] - 110:19, 110:23, 111:6
**illegible** [1] - 73:13
**Illinois** [2] - 148:1, 155:3
**immediately** [1] - 36:9
**impaired** [15] - 80:13, 80:15, 82:6, 96:23, 185:8, 204:14, 204:22, 205:6, 205:12, 205:17, 205:20, 205:23, 205:25, 210:6, 210:10
**impairment** [11] - 13:1, 71:25, 75:6, 76:12, 76:22, 76:24, 77:19, 96:19, 100:3, 171:16
**impairments** [3] - 25:15, 72:15, 74:5
**impatience** [1] - 172:10
**impending** [1] - 158:23
**importance** [1] - 198:21
**important** [9] - 98:15, 99:19, 133:5, 133:6, 137:7, 137:12, 200:20, 201:18
**impossible** [4] - 38:3, 38:7, 122:15, 137:3
**impressed** [1] - 28:6
**impression** [2] - 22:25, 195:1

**impulsive** [3] - 74:16, 75:22, 172:7
**impulsively** [1] - 76:8
**impulsiveness** [1] - 75:21
**impulsivity** [1] - 172:6
**in-office** [1] - 98:25
**in-person** [2] - 72:18, 180:16
**inadequate** [1] - 177:2
**inappropriate** [3] - 111:15, 113:13, 114:3
**inappropriately** [1] - 18:25
**inattention** [2] - 75:18, 77:12
**incentive** [1] - 92:16
**incline** [1] - 167:21
**include** [10] - 6:13, 7:17, 7:20, 7:22, 35:6, 78:20, 99:18, 101:17, 113:13, 201:25
**included** [9] - 5:23, 13:3, 23:19, 24:20, 30:18, 32:20, 40:23, 49:24, 55:19
**includes** [4] - 18:22, 59:11, 88:9, 178:20
**including** [4] - 16:17, 41:22, 68:11, 183:8
**inconsistencies** [1] - 91:23
**incurred** [1] - 22:20
**indented** [1] - 22:12
**independent** [2] - 53:4, 56:1
**Index** [3] - 200:13, 200:25, 201:10
**index** [7] - 200:18, 201:1, 201:12, 201:13, 201:13, 202:9
**indicate** [12] - 32:21, 41:5, 47:23, 86:16, 88:7, 101:9, 114:14, 119:9, 126:6, 158:16, 159:1
**indicated** [7] - 9:24, 10:6, 10:7, 12:16, 58:25, 63:12, 162:23
**indicates** [6] - 10:20, 10:21, 10:22, 10:23, 126:21, 158:21
**indicating** [1] - 11:7
**indication** [3] - 101:6, 164:24, 194:17
**indicator** [1] - 81:7
**individual** [16] - 4:17, 10:10, 25:25, 33:25, 71:22, 71:24, 79:1, 89:24, 90:2, 92:12, 96:15, 119:11, 120:14, 148:20, 173:16, 175:7
**Individual** [2] - 87:4, 185:19
**individually** [1] - 196:14
**individuals** [18] - 70:24, 72:4, 75:24, 75:25, 76:18, 79:11, 79:13, 82:5, 102:9, 102:13, 103:3, 103:5, 106:4, 144:7, 146:10, 158:2, 164:21, 174:3
**individuals'** [1] - 72:15

**inference** [1] - 210:9
**influenced** [2] - 189:5, 189:8
**Influences** [1] - 37:3
**informal** [12] - 16:15, 16:16, 16:21, 53:16, 53:19, 53:23, 68:7, 101:7, 133:16, 133:17, 165:10, 165:13
**information** [64] - 5:3, 12:11, 22:24, 23:23, 25:21, 28:12, 30:17, 34:12, 36:5, 49:15, 49:16, 56:19, 56:20, 56:23, 56:24, 66:8, 72:9, 83:9, 84:7, 105:22, 111:12, 112:22, 118:17, 123:24, 124:8, 130:6, 131:1, 131:11, 133:7, 133:11, 133:13, 134:1, 134:14, 134:17, 137:7, 137:10, 137:13, 137:17, 141:24, 148:2, 161:25, 163:2, 174:17, 175:3, 176:3, 178:20, 179:9, 179:14, 180:8, 180:11, 180:25, 184:9, 185:14, 185:17, 185:22, 188:14, 189:2, 192:3, 194:5, 194:10, 196:6, 209:10, 209:20
**infrequently** [1] - 202:7
**inherently** [1] - 153:24
**initial** [10] - 14:10, 15:20, 26:16, 28:11, 28:12, 28:14, 63:16, 109:2, 175:6, 182:23
**initials** [1] - 15:11
**INJUNCTION** [1] - 1:6
**injunction** [3] - 19:9, 19:10, 64:25
**injury** [1] - 93:14
**inserted** [1] - 16:14
**instance** [12] - 67:23, 69:7, 75:1, 77:1, 77:11, 78:10, 92:3, 96:17, 123:10, 191:12, 201:24, 209:24
**instances** [3] - 16:19, 74:15, 150:3
**instead** [3] - 53:7, 105:13, 135:5
**Institute** [2] - 169:5, 169:12
**institution** [1] - 69:25
**instruction** [2] - 77:9, 174:1
**instructions** [2] - 31:22, 191:21
**instructor's** [1] - 32:14
**instrument** [1] - 161:1
**instruments** [4] - 132:21, 136:20, 151:19, 183:5
**insufficient** [1] - 65:18
**Integrated** [3] - 97:8, 203:8, 203:15
**intellectual** [2] - 183:14, 198:15
**intelligence** [8] - 165:20,

184:2, 196:13, 197:8, 200:13, 201:5, 201:7, 201:15
**intelligently** [1] - 31:20
**intended** [1] - 52:20
**intensive** [2] - 105:7, 119:25
**interact** [1] - 146:6
**interacted** [1] - 183:10
**interactive** [1] - 198:13
**interest** [3] - 22:14, 145:13, 149:24
**interests** [5] - 34:24, 35:5, 35:8, 35:25, 36:11
**interfere** [2] - 75:2, 171:12
**interference** [1] - 172:21
**interferes** [1] - 171:4
**internal** [3] - 46:20, 49:25, 50:1
**international** [1] - 155:22
**International** [3] - 145:18, 155:15, 170:16
**internet** [1] - 22:3
**interpret** [1] - 137:3
**interpretable** [1] - 98:15
**interpretation** [1] - 89:14
**interpreted** [5] - 84:15, 100:18, 111:14, 112:8, 112:23
**interpreting** [1] - 137:13
**interrupt** [1] - 52:24
**interrupting** [1] - 172:9
**intervention** [9] - 70:2, 118:23, 119:3, 120:19, 120:23, 121:4, 122:14, 122:17, 122:23
**interventions** [2] - 119:7, 164:22
**interview** [21] - 23:6, 172:12, 174:14, 174:16, 174:21, 174:25, 175:6, 179:11, 179:24, 180:1, 180:2, 180:7, 180:10, 180:12, 180:16, 180:18, 180:24, 183:3, 183:9
**interviewing** [1] - 136:21
**interviews** [2] - 180:20, 209:10
**invite** [1] - 57:11
**invited** [5] - 68:22, 68:25, 69:6, 69:7, 143:19
**involve** [5] - 16:20, 75:6, 78:1, 101:24, 105:4
**involved** [6] - 38:25, 39:13, 39:18, 80:25, 94:5, 145:3
**involves** [3] - 68:5, 72:3, 130:9
**involving** [1] - 100:14
**Iowa** [2] - 195:24, 196:11
**IQ** [21] - 79:18, 79:22, 80:21, 81:1, 81:3, 81:21, 82:11, 82:13, 147:15, 148:18, 184:1, 196:13, 198:21,

200:11, 201:10, 201:14, 201:24, 202:4, 202:6
**issue** [4] - 7:19, 114:12, 117:5, 199:3
**issues** [5] - 68:20, 86:25, 115:18, 146:7, 167:8
**item** [1] - 128:21
**items** [4] - 84:8, 104:20, 104:23, 128:13
**itself** [6] - 37:11, 79:10, 80:4, 126:11, 151:4, 158:17
**IV** [7] - 88:14, 111:20, 111:22, 124:1, 162:7, 191:3, 194:6
**IVA** [7] - 98:12, 112:25, 203:8, 203:18, 209:13, 209:24
**IVA+Plus** [4] - 112:25, 162:16, 203:18, 203:19
**IVC** [1] - 52:5
**James** [1] - 1:8
**January** [4] - 4:25, 140:17, 156:11, 164:2
**Jerri** [1] - 9:11
**Jersey** [1] - 1:17
**Jessica** [14] - 4:6, 4:13, 6:19, 15:21, 15:23, 16:21, 17:19, 30:11, 63:14, 139:13, 194:15, 197:6, 202:25, 207:25
**JESSICA** [2] - 1:3, 212:5
**Jessica's** [4] - 192:19, 196:7, 198:24, 202:19
**jest** [1] - 60:8
**jittery** [1] - 76:8
**job** [7] - 31:20, 32:16, 32:22, 32:23, 50:7, 67:16, 133:21
**Johnson** [11] - 88:14, 111:20, 111:22, 123:25, 131:23, 132:1, 162:7, 163:9, 191:3, 192:8, 194:6
**joke** [1] - 51:20
**journal** [3] - 68:13, 68:20, 147:8
**journals** [5] - 68:3, 68:11, 68:18, 68:19, 68:20
**JOYNER** [1] - 1:12
**JR** [1] - 15:7
**Judge** [1] - 20:18
**judge's** [1] - 133:21
**judgment** [2] - 207:12, 209:23
**July** [2] - 140:21, 164:12
**June** [13] - 21:6, 21:11, 21:12, 26:18, 27:4, 28:15, 28:17, 28:18, 40:15, 43:12, 52:23, 139:20, 149:13
**junior** [1] - 106:3
**jury** [1] - 19:7
**keep** [4] - 52:17, 116:18,

138:12, 206:11
**kept** [1] - 51:21
**keys** [1] - 97:11
**kids** [3] - 150:25, 197:13, 199:25
**kind** [29] - 34:25, 49:1, 49:2, 49:3, 51:20, 56:6, 78:13, 114:5, 136:21, 163:16, 165:20, 172:10, 175:20, 176:10, 176:20, 177:12, 181:23, 182:22, 182:23, 183:10, 184:11, 194:23, 199:25, 202:1, 202:3, 204:3, 204:4, 206:8, 209:25
**kindergarten** [1] - 53:14
**kinds** [2] - 174:1, 194:4
**knock** [2] - 199:15, 204:15
**knowing** [1] - 137:4
**knowledge** [9] - 37:22, 38:2, 46:14, 55:4, 105:8, 118:21, 118:25, 129:25, 163:12
**known** [6] - 98:11, 121:5, 121:15, 155:14, 170:24, 171:22
**knows** [1] - 170:4
**Kurzweil** [7] - 15:16, 49:11, 120:5, 120:9, 120:13, 120:16
**lab** [5] - 32:3, 32:8, 32:10, 33:2, 33:3
**labeled** [1] - 56:1
**labeling** [1] - 177:10
**labs** [1] - 33:10
**lack** [2] - 103:20, 195:7
**language** [5] - 7:17, 7:19, 87:14, 144:14, 177:18
**largely** [2] - 145:12, 154:21
**Larry** [1] - 35:20
**larry@rcglawoffices.com** [1] - 1:18
**last** [17] - 3:9, 6:6, 6:7, 7:8, 8:3, 10:14, 11:24, 33:24, 53:11, 116:11, 117:13, 132:8, 141:20, 151:23, 152:14, 157:14, 176:21
**lasted** [1] - 180:19
**latest** [1] - 81:11
**Law** [2] - 117:1, 117:2
**law** [1] - 67:22
**LAWRENCE** [1] - 1:16
**Lawrence** [1] - 30:21
**lawsuit** [1] - 20:10
**lawyer** [2] - 22:6, 24:22
**lawyer's** [1] - 27:21
**lawyers** [2] - 14:18, 14:21
**lead** [6] - 37:5, 37:7, 37:14, 165:4, 165:24, 165:25
**leaders** [1] - 121:6
**leading** [4] - 82:17, 122:2, 180:14, 198:3
**learn** [6] - 50:7, 54:11, 76:17,

145:2, 146:5, 174:25
**learned** [2] - 29:2, 55:5
**Learning** [2] - 145:11, 147:11
**learning** [100] - 12:25, 13:14, 13:16, 15:24, 22:22, 49:6, 65:15, 65:19, 65:21, 66:11, 67:11, 68:14, 68:16, 69:16, 70:24, 72:5, 74:6, 74:10, 75:12, 77:13, 77:16, 77:25, 78:1, 78:12, 78:15, 79:4, 79:14, 79:25, 80:7, 80:11, 80:12, 80:19, 80:20, 80:24, 81:4, 81:20, 82:2, 82:9, 82:25, 83:2, 83:12, 98:23, 99:2, 99:5, 101:19, 101:21, 101:23, 102:1, 103:14, 103:16, 105:17, 105:19, 105:20, 105:23, 106:23, 106:25, 108:6, 108:16, 112:8, 119:5, 119:9, 119:17, 119:20, 119:23, 120:14, 120:24, 122:22, 122:24, 123:11, 133:1, 142:17, 143:1, 143:6, 143:14, 144:8, 144:14, 144:15, 144:23, 145:3, 145:13, 146:10, 147:21, 147:22, 148:6, 148:12, 151:18, 152:2, 152:16, 155:21, 164:25, 177:6, 177:7, 177:10, 177:19, 177:21, 198:5, 198:7, 198:14, 200:16, 207:20
**least** [22] - 5:2, 7:10, 18:16, 44:22, 49:25, 60:6, 69:22, 81:11, 88:21, 97:6, 99:11, 99:12, 100:12, 107:13, 108:16, 116:9, 119:8, 119:17, 119:21, 123:12, 128:18, 164:4
**leave** [1] - 49:9
**lectures** [1] - 51:18
**left** [4] - 11:14, 21:24, 32:21, 183:7
**left-hand** [1] - 11:14
**leg** [8] - 51:18, 51:23, 51:24, 51:25, 52:1, 52:5, 167:8
**legal** [2] - 107:9, 114:5
**leisure** [1] - 58:5
**lengths** [1] - 124:11
**lengthy** [2] - 157:1, 157:7
**less** [7] - 49:18, 57:17, 126:20, 128:23, 199:8, 202:6, 209:23
**letter** [55] - 4:22, 4:25, 9:3, 14:11, 15:12, 15:15, 17:11, 18:5, 18:8, 18:9, 18:17, 18:21, 19:2, 19:19, 19:22, 20:22, 21:18, 23:18, 23:19,

23:25, 24:1, 24:6, 24:18,
24:20, 24:23, 25:1, 25:25,
26:22, 27:7, 27:9, 27:16,
27:22, 28:11, 28:14, 28:21,
28:24, 28:25, 29:12, 29:21,
33:21, 64:19, 140:18,
140:22, 149:6, 149:8,
149:17, 160:1, 160:11,
164:5, 164:7, 164:9, 164:11,
164:15
**letterhead** [1] - 26:12
**letters** [1] - 72:7
**level** [25] - 74:17, 75:25,
76:21, 76:23, 80:12, 80:22,
86:9, 89:12, 93:2, 96:7,
96:13, 97:3, 102:16, 103:8,
106:16, 106:19, 122:13,
147:20, 165:1, 165:14,
165:20, 166:3, 186:4,
200:21, 202:10
**levels** [5] - 72:15, 74:19,
75:8, 79:11, 91:11
**Lewandowski** [8] - 13:3,
13:17, 22:19, 23:2, 29:14,
33:14, 33:21, 34:24
**Lewandowski's** [1] - 176:22
**liberal** [1] - 67:8
**license** [1] - 195:10
**licensed** [10] - 23:15, 69:19,
69:21, 144:2, 155:4, 155:6,
155:8, 169:13, 169:15,
169:17
**licensure** [2] - 69:23, 70:3
**lied** [1] - 28:6
**life** [11] - 63:9, 74:22, 92:7,
96:19, 97:1, 104:9, 107:8,
108:14, 122:4, 148:21,
150:17
**lifeguarding** [1] - 31:19
**light** [1] - 141:24
**lighter** [1] - 49:17
**like-aged** [1] - 188:17
**likely** [6] - 11:21, 136:3,
137:10, 174:18, 175:4, 176:1
**likewise** [2] - 10:6, 41:21
**limit** [6] - 163:17, 186:6,
186:7, 186:14, 193:22, 211:1
**limitation** [1] - 150:7
**limitations** [2] - 6:10, 107:12
**limited** [8] - 63:8, 104:8,
104:11, 107:7, 108:14,
148:20, 150:17, 209:4
**line** [13] - 12:7, 35:14, 35:20,
35:24, 36:8, 36:9, 55:11,
56:23, 94:1, 156:25, 172:10,
190:4, 190:6
**lines** [2] - 16:11, 177:18
**list** [9] - 9:20, 25:17, 35:25,
36:16, 123:12, 143:19,
145:8, 159:25, 178:19

**listed** [6] - 37:6, 45:17,
75:17, 95:18, 97:22, 99:12
**listing** [6] - 68:10, 69:10,
99:13, 142:23, 159:12,
179:11
**lists** [2] - 35:5, 84:6
**literature** [2] - 59:7, 91:8
**litigation** [6] - 64:3, 64:14,
93:13, 107:19, 140:12,
141:21
**LLP** [3] - 1:15, 2:2, 2:9
**log** [1] - 73:2
**logged** [1] - 73:5
**logic** [1] - 51:7
**logistics** [1] - 72:24
**lonely** [1] - 4:5
**look** [67] - 5:6, 7:25, 8:25,
10:25, 25:6, 26:4, 26:10,
27:10, 28:1, 28:20, 31:15,
33:13, 33:16, 33:17, 36:24,
38:14, 39:22, 40:10, 41:10,
42:12, 43:10, 44:10, 45:3,
45:12, 45:19, 47:4, 68:9,
69:9, 73:4, 78:16, 83:14,
83:18, 88:19, 93:1, 93:9,
93:10, 93:21, 95:5, 96:3,
97:13, 99:2, 100:7, 100:20,
126:8, 129:24, 131:24,
135:13, 135:16, 140:4,
151:3, 152:11, 156:4, 156:6,
159:11, 168:13, 175:22,
179:23, 182:25, 184:17,
190:5, 192:20, 193:3,
195:15, 199:5, 206:15,
209:14
**looked** [7] - 25:17, 29:15,
43:6, 43:8, 54:11, 176:10,
196:5
**looking** [34] - 35:24, 46:11,
50:16, 60:23, 72:9, 78:13,
80:21, 82:24, 83:9, 84:6,
87:21, 100:21, 102:23,
103:6, 124:8, 127:6, 127:13,
131:14, 133:3, 133:24,
137:5, 143:4, 147:5, 160:4,
162:23, 164:11, 164:19,
172:14, 175:20, 182:6,
196:16, 200:6, 201:20
**looks** [43] - 7:1, 9:21, 9:24,
10:6, 10:19, 11:6, 15:17,
17:5, 19:21, 20:21, 21:21,
22:12, 24:4, 26:18, 26:20,
26:22, 31:19, 31:23, 32:1,
32:13, 32:17, 32:23, 36:19,
37:16, 40:14, 41:4, 41:8,
41:14, 43:9, 43:10, 43:16,
43:17, 44:16, 45:20, 46:1,
48:1, 84:19, 84:21, 96:3,
143:6, 143:9, 143:19
**loud** [1] - 192:6

**Lovett** [34] - 62:3, 62:10,
62:13, 64:6, 65:8, 69:19,
70:22, 71:5, 71:20, 97:24,
98:23, 101:12, 103:21,
108:22, 109:12, 110:9,
125:8, 137:24, 139:10,
139:24, 146:16, 148:10,
148:25, 153:8, 158:12,
161:12, 161:13, 161:24,
162:12, 162:15, 163:8,
193:11, 197:15
**LOVETT** [3] - 62:7, 212:7,
212:9
**Lovett's** [2] - 152:12, 152:15
**low** [14] - 78:11, 82:4, 85:12,
85:24, 89:5, 90:12, 97:23,
108:2, 131:4, 183:18,
192:10, 192:12, 203:11,
203:25
**lower** [3] - 42:2, 142:21,
200:22
**LSAT** [1] - 117:3
**Lucas** [3] - 147:15, 147:19,
148:4
**lunch** [4] - 109:19, 109:21,
117:9, 117:13
**Luncheon** [1] - 117:18
**ma'am** [3] - 4:1, 59:23,
167:15
**main** [3] - 12:19, 87:17,
153:24
**major** [7] - 10:9, 63:8, 104:8,
107:8, 108:14, 148:21,
150:17
**majority** [2] - 74:1, 136:4
**Malingering** [7] - 93:20,
93:25, 94:10, 94:13, 94:23,
206:21, 207:14
**malingering** [1] - 94:8
**manage** [1] - 49:3
**managed** [1] - 33:6
**management** [1] - 45:14
**managing** [1] - 195:3
**manner** [6] - 26:7, 148:25,
149:14, 154:12, 154:17,
190:16
**manual** [8] - 79:20, 81:8,
84:25, 86:1, 86:3, 86:11,
155:14, 155:19
**Manual** [2] - 81:16, 170:7
**March** [6] - 11:3, 11:6, 11:17,
12:5, 102:18, 102:24
**margins** [1] - 7:2
**Marie** [2] - 1:22, 211:17
**mark** [1] - 191:20
**marked** [6] - 125:2, 125:9,
126:3, 126:4, 126:5
**Market** [1] - 1:9
**market** [1] - 206:9
**marking** [1] - 191:11

**MARY** [1] - 2:3
**mary.vargas@steinvargas.
com** [1] - 2:6
**master** [2] - 168:25, 188:21
**master's** [2] - 66:22, 142:8
**masters** [1] - 144:23
**match** [1] - 108:2
**material** [7] - 19:1, 49:19,
49:20, 50:6, 54:15, 65:24
**materials** [3] - 65:11, 108:13,
150:6
**math** [12] - 55:3, 78:2, 79:2,
79:3, 79:9, 87:13, 101:17,
158:9, 158:11, 158:15,
177:11, 197:5
**matter** [14] - 4:5, 38:19, 39:1,
44:10, 45:1, 45:6, 45:20,
114:18, 154:20, 166:7,
173:8, 195:4, 209:25, 211:14
**maximum** [2] - 10:11, 186:14
**MCAT** [53] - 55:15, 55:16,
56:5, 56:12, 56:13, 57:2,
58:20, 59:10, 91:19, 99:18,
100:12, 104:18, 104:25,
105:16, 105:24, 106:1,
106:5, 106:9, 106:16,
106:19, 106:22, 107:6,
107:13, 118:19, 124:17,
124:23, 125:3, 127:7,
127:14, 127:21, 127:23,
128:5, 128:13, 128:18,
129:4, 129:6, 129:7, 129:8,
129:9, 129:14, 129:16,
130:1, 133:3, 137:16, 156:1,
156:3, 160:23, 161:1, 161:4,
163:14, 194:2, 194:7
**mean** [29] - 33:7, 69:21,
79:10, 79:16, 91:4, 91:5,
94:13, 115:16, 123:9, 124:5,
124:13, 126:24, 137:10,
137:11, 165:13, 181:20,
188:10, 193:3, 194:22,
194:25, 196:20, 201:18,
209:1, 209:12, 210:1, 210:5,
210:24, 210:25
**meaning** [2] - 171:8, 187:24
**meaningful** [3] - 198:9,
198:16, 199:6
**means** [6] - 94:14, 165:12,
188:11, 188:12, 199:3, 210:5
**measure** [17] - 82:11, 84:18,
87:11, 89:20, 89:23, 93:24,
115:2, 132:12, 162:13,
162:14, 171:18, 196:13,
197:9, 199:25, 200:12,
200:14, 201:10
**measured** [4] - 29:11, 86:13,
104:15, 208:5
**measurements** [3] - 29:13,
185:11, 196:23

**measures** [17] - 84:19, 87:12, 89:21, 92:25, 93:6, 93:8, 96:1, 109:6, 114:9, 118:10, 119:10, 130:20, 162:2, 163:11, 197:8, 208:6, 210:22

**mechanics** [1] - 48:7

**mechanism** [2] - 92:2, 92:10

**mechanisms** [1] - 45:14

**MEDICAL** [1] - 1:5

**medical** [24] - 22:7, 31:6, 31:10, 34:21, 38:16, 39:15, 40:16, 47:14, 48:24, 57:10, 58:7, 58:10, 92:14, 105:9, 106:2, 116:1, 116:6, 116:9, 129:18, 136:24, 137:11, 175:17, 183:20

**Medical** [3] - 104:19, 104:21, 117:1

**medication** [11] - 113:15, 113:18, 114:1, 114:2, 114:3, 114:4, 114:9, 114:21, 115:2, 137:15, 210:13

**medicine** [8] - 45:21, 46:11, 46:15, 46:16, 46:20, 49:25, 50:1, 210:8

**meds** [1] - 52:18

**meet** [11] - 71:21, 77:3, 80:3, 80:10, 108:5, 108:8, 122:16, 145:14, 152:1, 152:16, 175:12

**meeting** [7] - 72:18, 80:5, 80:6, 80:10, 135:10, 137:24, 145:14

**meetings** [3] - 136:4, 153:9, 153:11

**meets** [3] - 15:21, 63:5, 78:14

**member** [5] - 145:16, 145:18, 169:19, 169:25, 170:4

**membership** [1] - 169:23

**memberships** [1] - 145:8

**memory** [13] - 93:11, 93:12, 93:15, 93:16, 93:21, 93:22, 94:7, 94:15, 184:8, 200:18, 201:1, 207:18

**Memory** [7] - 93:20, 93:25, 94:10, 94:13, 94:23, 206:21, 207:13

**mental** [5] - 45:13, 171:9, 171:11, 182:2, 182:15

**Mental** [2] - 81:16, 170:7

**mention** [5] - 7:10, 13:8, 79:11, 85:16, 102:4

**mentioned** [17] - 4:13, 27:22, 68:22, 76:3, 86:1, 86:22, 95:17, 97:22, 99:21, 100:11, 102:5, 115:5, 150:10, 177:9, 189:14, 196:22

**mentoring** [1] - 68:7

**mess** [1] - 28:7

**message** [1] - 6:20

**met** [7] - 23:2, 72:4, 122:24, 136:16, 160:18, 177:1, 179:4

**method** [1] - 82:15

**MEW** [34] - 2:10, 62:2, 62:12, 64:24, 65:7, 70:22, 71:17, 71:19, 82:20, 88:2, 88:5, 98:1, 98:4, 98:6, 98:8, 104:6, 107:16, 109:12, 138:1, 138:6, 138:9, 139:17, 141:3, 141:7, 146:8, 146:20, 146:22, 147:3, 147:4, 150:19, 166:16, 166:20, 167:1

**MICHAEL** [1] - 2:3

michael.stein@ steinvargas.com [1] - 2:6

**Michigan** [7] - 142:8, 155:10, 168:25, 169:1, 169:2, 169:12, 169:16

**mics** [1] - 4:4

**middle** [16] - 11:15, 16:18, 27:1, 47:25, 57:9, 100:25, 131:22, 131:25, 156:14, 157:3, 158:20, 159:25, 160:9, 181:15, 191:2, 204:6

**midway** [1] - 147:13

**might** [18] - 3:19, 7:17, 20:8, 22:14, 69:13, 72:17, 92:2, 113:25, 114:2, 116:20, 124:25, 143:11, 161:12, 178:13, 178:14, 181:19, 182:25, 197:7

**migraines** [1] - 13:8

**mild** [1] - 96:11

**million** [3] - 102:11, 102:12

**mind** [2] - 119:22, 182:10

**minimally** [2] - 86:9, 86:10

**minimum** [1] - 12:9

**minute** [9] - 26:16, 75:13, 86:16, 86:20, 97:24, 98:4, 137:19, 193:14, 205:1

**minutes** [8] - 33:25, 61:9, 61:10, 166:8, 191:14, 191:24, 193:11, 206:14

**misapplication** [1] - 82:5

**miscalculated** [1] - 112:2

**miscommunication** [1] - 50:5

**miserable** [1] - 206:13

**misread** [2] - 187:7, 187:12

**misreading** [1] - 190:13

**missed** [4] - 52:12, 110:4, 153:12, 167:13

**missing** [1] - 73:14

**mistakes** [3] - 75:19, 185:7, 186:8

**misunderstanding** [1] - 172:3

**Mitchell** [2] - 1:22, 211:17

**mitigating** [3] - 114:8, 114:16, 115:2

**MLE** [1] - 63:15

**model** [11] - 82:21, 147:24, 148:1, 154:19, 155:12, 164:20, 197:17, 197:20, 197:24, 197:25, 198:4

**moderate** [2] - 10:22, 24:8

**Modification** [2] - 170:19, 170:20

**mom** [4] - 9:11, 9:17, 14:25, 17:7

**moment** [7] - 25:18, 35:16, 35:17, 54:19, 61:5, 127:6, 166:5

**moments** [1] - 48:20

**month** [2] - 53:8, 157:18

**months** [1] - 67:3

**morning** [10] - 3:2, 4:13, 48:12, 48:19, 57:4, 62:13, 62:14, 133:14, 134:5, 211:6

**most** [36] - 10:8, 37:10, 37:11, 44:17, 45:13, 46:3, 46:23, 67:13, 76:16, 81:8, 92:7, 93:4, 98:15, 135:12, 148:2, 152:10, 153:12, 158:12, 173:19, 173:20, 177:7, 184:7, 185:20, 190:2, 190:7, 191:23, 193:20, 193:21, 195:1, 195:2, 201:5, 206:12, 206:24, 207:2

**mostly** [4] - 33:9, 56:14, 56:17, 193:10

**mother** [9] - 9:4, 9:7, 16:20, 34:1, 179:12, 202:21, 202:23, 202:24, 208:13

**motivated** [1] - 92:16

**motivation** [5] - 92:11, 92:16, 92:24, 93:1, 93:9

**move** [3] - 20:12, 20:14, 204:15

**moved** [2] - 54:24, 59:1

**movie** [2] - 57:15, 57:18

**moving** [2] - 16:12, 136:13

**MR** [99] - 3:8, 3:12, 4:6, 4:12, 6:16, 6:18, 14:17, 14:20, 15:2, 17:21, 17:23, 18:1, 19:2, 19:14, 19:16, 20:5, 20:15, 20:18, 20:20, 21:3, 22:11, 27:24, 27:25, 30:7, 30:25, 35:15, 35:16, 35:20, 35:23, 48:5, 48:7, 48:11, 58:15, 58:18, 59:22, 60:1, 60:11, 60:17, 60:19, 60:22, 60:25, 61:4, 61:9, 61:11, 61:12, 61:15, 61:22, 65:4, 71:3, 82:16, 88:1, 98:7, 103:19, 104:2, 107:9, 109:14, 109:17, 109:20,

109:22, 109:24, 110:2, 110:4, 110:8, 117:7, 118:1, 125:7, 125:14, 125:18, 127:10, 127:12, 136:14, 137:19, 137:22, 138:4, 138:13, 146:14, 146:25, 147:2, 150:22, 151:8, 151:9, 151:11, 166:5, 166:11, 166:13, 166:19, 167:17, 168:3, 168:8, 168:10, 174:2, 174:8, 174:11, 188:19, 188:25, 195:7, 195:13, 211:2, 211:7

**MS** [51] - 3:4, 3:16, 3:22, 14:15, 14:23, 18:22, 19:11, 19:24, 20:24, 22:9, 30:1, 30:3, 30:23, 48:18, 58:13, 62:2, 62:12, 64:24, 65:7, 70:22, 71:17, 71:19, 82:20, 88:2, 88:5, 98:1, 98:4, 98:6, 98:8, 104:6, 107:16, 109:12, 138:1, 138:6, 138:9, 138:17, 139:2, 141:3, 141:7, 146:8, 146:20, 146:22, 147:3, 147:4, 150:19, 166:16, 166:20, 167:1, 167:5, 167:11, 167:16

**multiple** [11] - 16:19, 55:24, 55:25, 74:25, 84:22, 105:4, 105:5, 107:14, 109:4, 123:8, 142:19

**must** [1] - 133:15

**mutually** [2] - 177:13

**name** [8] - 10:17, 39:25, 62:9, 138:24, 155:22, 167:24, 178:18, 203:14

**named** [1] - 147:14

**names** [1] - 32:16

**narrowly** [1] - 79:17

**National** [3] - 116:25, 169:21, 169:23

**NATIONAL** [1] - 1:5

**nature** [4] - 16:12, 184:13, 187:2, 199:2

**NBME** [64] - 17:12, 18:10, 22:8, 23:18, 28:22, 29:2, 38:17, 38:19, 38:23, 38:25, 39:5, 39:8, 39:13, 39:17, 39:20, 39:25, 41:10, 41:11, 43:11, 62:15, 62:21, 63:3, 63:20, 63:25, 64:20, 65:12, 66:7, 72:11, 72:13, 72:24, 73:2, 73:7, 73:10, 73:19, 73:22, 108:23, 116:13, 116:21, 123:1, 129:21, 134:24, 135:1, 135:8, 135:21, 136:10, 137:23, 139:5, 140:2, 140:18, 140:22, 148:23, 149:4, 149:9, 149:12, 149:15,

149:19, 153:4, 153:16, 154:5, 156:11, 156:21, 163:16, 164:5, 164:14
**NBME's** [2] - 130:22, 136:9
**NE** [1] - 2:4
**near** [2] - 160:23, 204:17
**necessarily** [4] - 29:22, 49:15, 54:16, 184:2
**necessary** [4] - 31:21, 60:21, 110:1, 167:14
**necessity** [1] - 57:18
**need** [20] - 11:7, 61:5, 78:20, 92:20, 100:7, 103:9, 103:11, 107:23, 108:20, 118:14, 118:17, 119:24, 135:15, 148:10, 151:6, 157:25, 176:11, 182:25, 200:8, 201:14
**needed** [9] - 6:12, 14:4, 53:25, 54:18, 94:21, 97:2, 104:13, 137:11, 166:25
**needing** [1] - 16:20
**needs** [12] - 26:12, 74:14, 109:10, 114:12, 114:15, 114:17, 134:13, 137:12, 199:7, 210:17, 210:20, 210:21
**negative** [7] - 76:14, 76:17, 76:19, 77:7, 195:6, 209:1, 210:1
**Neil** [5] - 10:17, 24:9, 51:22, 57:8, 202:22
**Nelson** [18] - 84:11, 84:14, 84:25, 85:19, 86:7, 86:14, 123:25, 124:14, 162:10, 162:13, 192:14, 192:18, 192:24, 193:2, 193:4, 193:8, 194:6, 210:23
**Nelson-Denny** [18] - 84:11, 84:14, 84:25, 85:19, 86:7, 86:14, 123:25, 124:14, 162:10, 162:13, 192:14, 192:18, 192:24, 193:2, 193:4, 193:8, 194:6, 210:23
**neuro** [2] - 42:11, 50:23
**neurobehavioral** [1] - 34:2
**neurodevelopmental** [2] - 83:3, 83:5
**neurological** [1] - 171:3
**neurology** [4] - 49:23, 49:24, 51:16, 53:9
**neuropsychological** [2] - 207:19, 209:18
**neuropsychologist** [1] - 23:15
**neuropsychology** [1] - 169:7
**Neuropsychology** [2] - 169:22, 169:24
**never** [13] - 35:10, 81:24, 94:23, 121:12, 129:5, 129:8,

129:9, 129:18, 130:17, 136:16, 136:19, 159:1, 182:10
**nevertheless** [2] - 70:15, 165:19
**New** [6] - 1:17, 67:1, 67:7, 69:22, 117:1, 117:2
**new** [6] - 48:24, 49:5, 141:24, 159:16, 159:23, 185:20
**next** [29] - 6:7, 8:25, 9:14, 13:24, 16:10, 21:2, 30:4, 32:13, 40:10, 44:23, 54:24, 59:2, 59:25, 60:20, 61:6, 132:11, 138:16, 167:18, 179:13, 179:18, 180:7, 185:21, 186:12, 186:15, 189:18, 189:24, 205:2, 205:9, 205:22
**Nicotinic** [1] - 37:3
**night** [2] - 3:9, 117:13
**nine** [10] - 17:14, 18:9, 18:15, 62:18, 75:18, 75:20, 134:24, 134:25, 135:12, 157:4
**nine-page** [2] - 17:14, 18:9
**NO** [2] - 1:3, 212:21
**nobody** [1] - 176:10
**non** [9] - 91:7, 91:11, 92:1, 93:12, 93:22, 94:25, 185:4, 185:8
**non-credible** [6] - 91:7, 91:11, 92:1, 93:12, 93:22, 94:25
**non-dyslexic** [2] - 185:4, 185:8
**non-impaired** [1] - 185:8
**none** [2] - 178:3, 194:19
**nonetheless** [1] - 77:21
**nonverbal** [2] - 12:25, 184:8
**nonverbally** [1] - 201:4
**normally** [1] - 94:13
**norms** [1] - 162:5
**Northwestern** [3] - 142:11, 142:18, 144:11
**note** [9] - 5:7, 20:5, 34:10, 50:12, 51:1, 51:9, 51:10, 51:11, 206:8
**notebook** [1] - 146:24
**notebooks** [1] - 146:23
**noted** [1] - 78:8
**notes** [2] - 90:3, 127:14
**nothing** [1] - 94:19
**notice** [1] - 136:12
**notified** [1] - 3:9
**notoriously** [1] - 151:19
**notwithstanding** [1] - 20:11
**number** [17] - 6:16, 8:1, 84:7, 91:25, 96:13, 97:22, 100:16, 126:8, 159:12, 160:2, 160:7, 183:18, 186:18, 196:25, 197:2, 204:8, 210:25

**numbered** [2] - 6:7, 160:5
**numbers** [10] - 30:10, 30:15, 33:17, 85:7, 88:3, 125:22, 160:8, 182:14
**NW** [1] - 2:11
**oath** [2] - 3:25, 117:23
**OB** [1] - 51:1
**object** [3] - 19:1, 71:11, 103:19
**objection** [15] - 14:15, 19:5, 20:3, 20:14, 30:1, 30:23, 65:3, 65:4, 82:16, 103:25, 107:9, 138:1, 167:6, 174:8, 195:8
**objections** [2] - 137:25, 141:5
**objective** [5] - 29:13, 78:13, 97:7, 152:3, 152:18
**objects** [1] - 94:2
**observations** [4] - 182:3, 182:16, 182:21, 182:22
**observe** [1] - 183:4
**obtain** [5] - 53:15, 85:2, 87:15, 89:1, 90:6
**obtained** [4] - 34:12, 94:22, 111:4, 163:2
**obtaining** [1] - 101:2
**obviously** [2] - 61:24, 99:19
**occasional** [1] - 151:1
**occasionally** [2] - 70:6, 117:4
**occasions** [1] - 23:3
**occupational** [3] - 78:7, 99:4, 99:5
**occur** [6] - 175:6, 199:5, 200:1, 200:20, 202:4, 202:6
**occurred** [4] - 61:17, 93:14, 172:18, 202:9
**occurring** [1] - 200:23
**occurs** [2] - 200:4, 200:22
**October** [2] - 33:22, 103:1
**offer** [4] - 137:22, 141:4, 146:8, 174:2
**offers** [1] - 70:22
**offhand** [1] - 164:10
**office** [3] - 98:25, 209:2, 209:7
**Official** [2] - 1:22, 211:17
**official** [2] - 79:19, 95:17
**officially** [1] - 67:4
**offset** [1] - 204:3
**often** [9] - 74:17, 85:22, 86:10, 97:10, 121:11, 172:19, 185:7, 200:16, 200:23
**oftentimes** [1] - 185:3
**Ohio** [2] - 32:2, 137:9
**old** [1] - 195:25
**older** [2] - 96:21, 151:1
**olds** [1] - 90:24

**omitted** [1] - 187:7
**once** [2] - 43:3, 43:4
**one** [108] - 8:22, 9:10, 10:12, 12:3, 12:10, 13:3, 13:17, 16:7, 17:6, 18:6, 23:5, 25:18, 26:17, 29:3, 31:8, 32:13, 33:6, 35:17, 40:4, 43:6, 43:8, 43:21, 49:23, 51:12, 51:17, 52:23, 53:3, 55:16, 60:6, 60:12, 61:15, 63:1, 63:5, 67:14, 69:15, 73:2, 74:19, 76:4, 76:10, 78:17, 83:14, 84:11, 84:14, 86:15, 86:20, 92:8, 93:18, 96:10, 98:4, 100:1, 100:9, 104:13, 106:11, 112:7, 113:1, 115:5, 116:4, 116:23, 118:16, 119:16, 121:2, 122:4, 122:23, 122:24, 124:6, 125:11, 126:11, 128:18, 129:10, 129:13, 137:19, 143:9, 147:2, 151:5, 151:8, 151:12, 156:9, 156:23, 157:25, 158:13, 158:14, 159:25, 161:24, 173:5, 173:7, 176:19, 176:23, 177:14, 177:15, 183:18, 185:21, 186:13, 186:15, 187:8, 189:9, 190:25, 193:14, 195:11, 198:15, 199:21, 199:22, 205:7, 206:24, 207:2
**one-day** [1] - 60:12
**one-to-one** [1] - 118:16
**ones** [9] - 13:4, 55:3, 55:10, 56:1, 86:22, 98:13, 98:14, 179:24, 191:19
**online** [1] - 124:14
**onset** [1] - 95:24
**operating** [1] - 92:8
**opinion** [16] - 15:22, 65:9, 91:1, 91:13, 97:3, 108:5, 108:8, 108:13, 139:12, 148:11, 150:14, 150:16, 150:18, 158:24, 173:8, 210:16
**opinions** [5] - 66:6, 140:25, 141:1, 141:15, 141:23
**opportunities** [1] - 146:5
**opportunity** [4] - 7:22, 54:18, 104:3, 125:1
**opposed** [5] - 72:18, 114:15, 126:19, 160:15, 185:8
**opposite** [2] - 92:18, 108:12
**opposition** [1] - 65:1
**optimal** [1] - 201:6
**oral** [16] - 54:13, 87:14, 87:19, 89:21, 171:17, 185:1, 185:12, 186:1, 186:18, 186:19, 187:10, 187:15,

188:2, 189:2, 208:6, 210:22

**Oral** [4] - 89:16, 112:10, 187:23, 190:8

**order** [16] - 3:1, 3:7, 3:10, 15:14, 29:16, 56:19, 56:21, 56:25, 60:20, 61:19, 84:8, 118:12, 166:25, 186:15, 194:10, 198:17

**organic** [3] - 32:5, 40:14, 54:7

**Organic** [1] - 37:14

**organization** [1] - 146:4

**organizations** [2] - 145:10, 200:15, 209:17

**organize** [2] - 10:20, 28:7

**originally** [4] - 22:4, 48:25, 81:24, 95:21

**OSCE** [1] - 50:23

**OSCEs** [1] - 50:10

**Osteopathic** [1] - 116:25

**OSU** [1] - 54:4

**otherwise** [3] - 61:6, 93:11, 176:6

**outside** [3] - 24:9, 99:6, 135:22

**overactive/hyperactive** [1] - 74:16

**overall** [17] - 44:22, 71:4, 88:24, 89:3, 89:6, 96:9, 98:13, 101:17, 102:18, 102:21, 103:2, 106:9, 128:10, 178:16, 183:15, 197:8, 199:13

**overlap** [1] - 173:10

**overruled** [6] - 19:5, 19:12, 22:10, 104:1, 107:10, 195:9

**Overton** [1] - 27:23

**Overton's** [2] - 26:1

**overwhelming** [1] - 91:15

**own** [6] - 49:4, 57:24, 82:17, 165:25, 173:25, 207:12

**P-19A** [2] - 125:9, 127:13

**P-21** [3] - 168:13, 178:24, 180:25

**P-34** [6] - 135:15, 135:18, 135:20, 137:23, 138:3, 212:24

**p.m** [7] - 26:22, 27:4, 117:18, 166:9, 211:9

**P21** [1] - 178:15

**PA** [1] - 1:9

**package** [1] - 120:1

**page** [192] - 5:14, 6:6, 6:7, 6:17, 7:5, 7:6, 7:25, 8:3, 8:25, 9:10, 9:14, 10:4, 11:6, 11:10, 11:15, 11:24, 12:13, 12:17, 13:7, 13:8, 14:9, 15:17, 17:5, 17:14, 17:18, 18:2, 18:8, 18:9, 23:19, 24:4, 24:20, 26:4, 26:10, 26:21,

27:1, 27:2, 27:24, 28:3, 28:24, 31:15, 32:1, 33:17, 33:18, 33:20, 34:11, 34:18, 34:20, 35:14, 35:15, 35:20, 35:25, 36:16, 40:10, 40:25, 42:12, 42:18, 43:10, 44:13, 44:23, 45:3, 45:19, 46:11, 47:5, 47:21, 69:10, 73:14, 84:6, 85:6, 85:7, 87:16, 88:1, 88:2, 88:3, 88:20, 97:25, 98:1, 98:2, 98:3, 99:15, 99:16, 100:13, 100:20, 100:24, 125:24, 125:25, 126:8, 128:9, 128:10, 128:11, 131:11, 131:14, 131:25, 132:7, 132:9, 132:11, 142:20, 142:23, 143:17, 145:5, 145:9, 147:13, 147:14, 151:24, 156:13, 156:14, 157:4, 159:11, 159:12, 160:1, 160:3, 160:8, 160:23, 168:17, 178:16, 178:17, 179:2, 179:18, 180:25, 181:1, 181:2, 181:24, 181:25, 182:1, 182:2, 182:7, 182:9, 182:11, 182:14, 182:15, 183:13, 183:15, 184:17, 184:18, 184:19, 185:13, 185:22, 185:23, 187:15, 188:2, 189:15, 189:16, 189:18, 189:24, 190:4, 190:15, 190:25, 191:1, 191:2, 192:16, 192:17, 192:22, 199:12, 199:13, 199:16, 199:17, 201:20, 201:22, 202:12, 202:13, 203:20, 203:21, 204:6, 204:7, 204:10, 204:16, 204:17, 205:3, 205:9, 206:15, 206:16

**PAGE** [1] - 212:21

**pages** [18] - 5:22, 6:6, 9:17, 10:14, 18:15, 26:15, 26:23, 27:10, 30:14, 68:9, 85:5, 89:19, 96:3, 125:21, 130:25, 178:24, 184:22

**paid** [2] - 135:1, 135:2

**pain** [3] - 52:11, 52:15, 52:17

**painting** [2] - 35:6, 36:3

**panic** [1] - 158:22

**paper** [9] - 35:7, 36:3, 37:11, 39:7, 39:8, 39:12, 72:17, 73:13, 73:14

**papers** [1] - 73:6

**paragraph** [31] - 12:19, 15:19, 16:1, 16:8, 27:6, 33:24, 55:12, 100:21, 100:23, 126:12, 126:14, 126:18, 126:19, 126:22,

128:11, 128:23, 132:9, 151:21, 151:22, 151:24, 152:14, 152:15, 156:13, 156:24, 157:3, 158:4, 158:18, 158:21, 160:1, 205:22

**paragraphs** [1] - 51:4

**pardon** [1] - 17:21

**parent** [3] - 79:23, 143:22, 146:4, 165:5, 165:8

**parents** [5] - 57:8, 57:16, 146:3, 146:5, 164:18

**part** [40] - 7:20, 21:14, 44:11, 49:24, 49:25, 50:1, 53:10, 70:4, 70:9, 70:12, 70:14, 71:22, 81:3, 84:4, 85:1, 95:16, 97:10, 99:10, 102:5, 105:21, 120:1, 123:12, 127:7, 144:8, 151:23, 152:1, 152:15, 159:13, 169:10, 178:1, 180:1, 180:2, 180:24, 183:1, 185:10, 192:25, 193:1, 193:22, 206:7

**particular** [23] - 37:5, 42:16, 42:19, 65:22, 67:10, 71:12, 71:13, 72:11, 86:23, 92:2, 102:21, 103:4, 117:5, 122:6, 123:10, 124:14, 131:17, 132:25, 142:16, 146:14, 172:14, 189:8, 201:13

**particularly** [6] - 50:23, 68:8, 124:25, 173:23, 176:16, 198:19

**parts** [2] - 94:9, 153:1

**pass** [4] - 53:1, 53:4, 70:3, 188:22

**passage** [20] - 54:23, 55:2, 55:6, 55:25, 56:1, 56:18, 56:20, 57:2, 86:15, 90:1, 100:16, 100:22, 125:25, 126:1, 126:20, 128:24, 130:5, 130:6

**passages** [13] - 55:24, 56:3, 84:22, 84:23, 87:21, 87:22, 89:24, 90:3, 100:14, 105:13, 186:2, 186:13, 190:22

**passed** [3] - 50:20, 50:25, 58:8

**passing** [2] - 37:21, 69:23

**past** [7] - 117:6, 135:12, 143:7, 168:19, 175:2, 175:23, 175:24

**paste** [1] - 6:1

**patient** [5] - 33:25, 45:15, 51:7, 56:24, 130:16

**patients** [4] - 50:11, 70:4, 144:4, 144:5

**pattern** [2] - 132:22, 209:16

**patterned** [1] - 206:9

**patterns** [2] - 158:13, 209:14

**pause** [1] - 57:19

**pay** [1] - 76:7

**paying** [3] - 74:15, 76:5, 77:8

**PDF** [1] - 73:5

**peer** [4] - 36:22, 68:3, 68:11, 68:13

**peer-reviewed** [4] - 36:22, 68:3, 68:11, 68:13

**peers** [4] - 88:11, 89:10, 89:12, 90:21

**penalty** [4] - 55:22, 55:23, 59:17, 59:19

**pencil** [1] - 191:19

**Penn** [1] - 66:21

**PENNSYLVANIA** [1] - 1:1

**people** [43] - 11:22, 14:13, 14:14, 24:9, 58:5, 115:22, 115:23, 116:1, 116:4, 116:5, 120:17, 121:18, 124:9, 130:1, 130:4, 153:23, 153:25, 158:13, 164:20, 165:18, 172:9, 173:5, 173:22, 173:24, 176:6, 176:19, 181:17, 181:22, 184:7, 188:12, 188:13, 188:17, 191:23, 200:21, 200:23, 201:5, 201:24, 202:4, 202:5, 202:10, 206:12, 207:17, 209:22

**people's** [1] - 134:11

**per** [2] - 32:21, 122:11

**percent** [34] - 6:15, 8:4, 8:23, 11:7, 11:16, 11:18, 11:25, 12:16, 41:3, 44:16, 86:23, 87:1, 88:10, 88:12, 89:8, 89:11, 89:12, 98:19, 102:19, 102:22, 103:3, 103:5, 103:17, 106:10, 181:22, 188:12, 188:13, 193:15, 193:17, 199:8, 200:22, 202:10, 210:2, 210:4

**percentage** [1] - 116:16

**percentile** [48] - 56:8, 56:9, 58:22, 59:4, 59:8, 81:21, 85:11, 85:13, 85:25, 86:2, 87:25, 89:7, 90:9, 90:14, 90:20, 98:17, 102:19, 102:22, 103:2, 103:4, 106:9, 106:13, 131:2, 131:4, 131:16, 131:19, 132:2, 132:4, 132:5, 132:10, 132:11, 132:13, 147:15, 147:16, 148:5, 148:19, 148:20, 187:17, 187:19, 188:5, 188:8, 188:9, 189:20, 189:24, 196:20, 197:11, 197:12

**perceptual** [2] - 184:7, 201:3

**perfect** [1] - 94:11

**perform** [15] - 13:20, 70:8,

82:12, 89:12, 92:6, 92:13, 92:20, 94:7, 97:17, 98:10, 102:17, 103:8, 143:14, 144:7, 210:10

**Performance** [5] - 39:25, 43:12, 97:9, 203:9, 203:15

**performance** [57] - 40:13, 40:25, 41:6, 42:1, 42:2, 42:3, 42:5, 44:18, 45:12, 45:15, 45:17, 46:3, 46:6, 46:22, 47:13, 48:21, 58:19, 75:3, 77:10, 78:4, 78:6, 78:7, 78:24, 80:13, 83:19, 85:16, 85:21, 91:18, 91:19, 91:23, 93:7, 93:8, 94:17, 98:16, 103:8, 103:13, 104:7, 106:7, 106:13, 106:16, 106:19, 106:22, 107:6, 109:5, 127:23, 137:5, 152:4, 152:18, 188:21, 192:19, 196:7, 198:24, 201:12, 202:8, 207:10, 208:5

**performances** [1] - 188:11

**performed** [11] - 22:19, 23:13, 46:4, 58:22, 70:11, 72:7, 107:2, 107:3, 107:4, 132:17, 161:14

**performing** [5] - 82:10, 89:11, 103:17, 148:5, 154:16

**perhaps** [3] - 79:3, 100:6, 122:16

**period** [3] - 31:22, 80:23, 120:12

**PERKINS** [1] - 2:9

**permanent** [1] - 19:10

**permitted** [1] - 120:8

**person** [23] - 23:2, 37:9, 71:22, 72:18, 119:4, 119:12, 119:13, 120:9, 120:10, 124:3, 154:11, 159:6, 160:19, 164:25, 171:5, 171:14, 172:11, 173:2, 180:16, 185:3, 186:4, 194:10, 207:8

**person's** [1] - 119:15

**personal** [12] - 5:16, 57:22, 72:22, 79:8, 134:18, 156:15, 156:17, 156:25, 157:4, 157:13, 157:21

**personality** [2] - 75:4, 75:5

**personally** [4] - 72:4, 72:8, 132:16, 159:3

**pertain** [2] - 68:14, 209:11

**PhD** [3] - 66:23, 142:9, 169:1

**Philadelphia** [1] - 1:9

**phone** [4] - 9:19, 17:22, 175:14, 176:2

**photocopied** [1] - 73:15

**phrase** [2] - 190:21, 190:22

**phrases** [2] - 190:19, 190:20

**physical** [4] - 51:6, 105:1, 105:3, 105:6

**physician** [5] - 122:10, 122:12, 122:17, 122:20, 122:25

**physics** [1] - 55:20

**physiological** [1] - 171:3

**physiology** [1] - 41:8

**picked** [1] - 94:23

**pictures** [2] - 5:23, 6:1

**piece** [4] - 73:13, 73:14, 111:13, 193:8

**pieces** [2] - 103:15, 109:4

**place** [2] - 49:13, 82:2

**places** [2] - 101:8, 184:22

**plaintiff** [4] - 167:13, 167:17, 175:10

**Plaintiff** [1] - 1:3, 1:18, 2:7

**Plaintiff's** [1] - 147:5

**plaintiff's** [4] - 135:14, 146:24, 167:4, 168:11

**plaintiffs** [2] - 60:4, 138:10

**plan** [1] - 144:23

**planned** [1] - 188:19

**play** [3] - 115:2, 156:18, 188:20

**playing** [1] - 188:22

**pleasure** [1] - 57:24

**plus** [1] - 179:25

**point** [33] - 7:16, 8:15, 11:11, 13:23, 19:17, 21:4, 21:15, 21:21, 22:12, 22:18, 23:17, 36:7, 44:5, 63:20, 63:23, 73:25, 77:5, 82:16, 100:1, 100:9, 103:20, 119:8, 121:2, 122:16, 122:23, 122:24, 144:19, 153:18, 160:2, 165:3, 186:23, 188:19, 203:14

**pointed** [2] - 50:24, 162:12

**pointers** [1] - 49:3

**points** [4] - 17:12, 21:25, 24:1, 71:12

**policies** [1] - 170:1

**political** [2] - 121:6, 121:15

**poor** [6] - 78:4, 78:6, 83:18, 83:19, 90:17, 98:19

**poorly** [3] - 77:2, 82:3, 173:22

**population** [16] - 85:23, 88:13, 89:8, 89:9, 90:23, 98:20, 102:14, 102:16, 103:5, 105:25, 106:6, 115:24, 199:6, 200:1, 200:4, 202:10

**portion** [7] - 50:21, 51:11, 56:16, 85:1, 86:14, 102:4, 105:10

**portions** [5] - 88:16, 88:17, 110:22, 111:22

**position** [5] - 32:19, 33:1, 67:2, 142:12, 142:14

**positive** [1] - 195:5

**possesses** [1] - 128:12

**possibility** [1] - 61:2

**possible** [6] - 10:8, 22:22, 79:25, 118:24, 119:13, 158:2

**possibly** [2] - 31:8, 92:13

**post** [4] - 32:17, 169:3, 169:6, 169:9

**post-doc** [1] - 169:6

**post-doctoral** [1] - 169:3

**post-graduation** [1] - 32:17

**potential** [1] - 82:12

**potentially** [1] - 81:20

**practice** [13] - 70:1, 70:5, 70:7, 71:7, 122:20, 127:18, 143:25, 144:8, 150:23, 153:21, 153:24, 169:10, 209:2

**practitioner** [2] - 154:6, 154:7

**practitioners** [2] - 82:25, 154:3

**preceding** [1] - 27:10

**precise** [2] - 97:18, 196:14

**preclude** [1] - 158:17

**preference** [1] - 60:3

**preferred** [2] - 80:8, 200:14

**preliminary** [2] - 19:9, 21:22, 64:25

**PRELIMINARY** [1] - 1:5

**premedical** [1] - 105:8

**preparation** [1] - 9:3

**prepare** [3] - 28:11, 28:12, 124:5

**prepared** [12] - 1:24, 6:24, 7:2, 11:3, 12:13, 15:10, 20:8, 28:14, 31:6, 65:23, 140:11, 141:12

**prepares** [1] - 38:20

**preparing** [3] - 5:12, 24:25, 34:2

**prescribed** [1] - 114:21

**presence** [3] - 112:7, 115:6, 198:9

**present** [14] - 68:2, 68:25, 74:22, 74:24, 80:4, 96:11, 96:22, 108:11, 120:3, 124:22, 125:5, 172:20, 180:14, 181:8

**presentation** [3] - 12:25, 135:21, 137:23

**presentations** [5] - 36:17, 143:19, 143:21, 143:22, 172:1

**presenter** [1] - 135:25

**presently** [1] - 70:13

**presents** [1] - 145:23

**president** [1] - 122:5

**press** [1] - 97:11

**pressing** [1] - 97:12

**presumably** [2] - 20:6, 27:8

**presume** [1] - 165:24

**pretty** [13] - 46:10, 55:23, 57:20, 57:21, 65:16, 65:20, 67:14, 96:18, 176:16, 191:13, 202:6, 202:11, 202:23

**prevailing** [1] - 148:1

**prevalent** [1] - 151:20

**prevent** [1] - 122:12

**previous** [1] - 121:13

**previously** [4] - 3:25, 74:9, 117:23, 181:18

**primarily** [18] - 143:24, 144:22, 149:23, 150:24, 150:25, 171:15, 171:18, 172:6, 173:24, 179:23, 189:7, 194:8, 203:1, 207:6, 209:12, 209:23

**primary** [7] - 67:16, 113:12, 134:18, 144:9, 187:10, 208:7, 209:18

**private** [5] - 41:22, 44:1, 153:21, 154:6, 169:10

**privilege** [5] - 14:15, 18:23, 19:25, 20:6, 20:7

**privileged** [1] - 19:1

**problem** [10] - 78:10, 81:10, 110:5, 115:19, 173:9, 173:19, 194:18, 197:25, 198:4, 198:18

**problems** [24] - 76:13, 78:12, 84:17, 93:11, 93:12, 93:15, 93:17, 93:22, 94:15, 96:17, 100:4, 100:10, 120:15, 121:1, 121:3, 152:2, 152:17, 173:11, 180:5, 180:13, 180:14, 201:4

**procedure** [2] - 35:18, 113:22

**procedures** [1] - 32:8

**proceed** [10] - 3:3, 3:15, 4:10, 48:15, 61:18, 71:12, 71:16, 109:16, 117:25, 166:10

**proceeding** [2] - 19:7, 133:19

**proceedings** [1] - 211:14

**Proceedings** [2] - 1:24, 211:9

**process** [4] - 7:13, 7:23, 16:12, 52:13

**processing** [6] - 184:9, 184:10, 200:17, 201:1, 201:13, 202:9

**produce** [1] - 209:15

**produced** [6] - 5:8, 5:9, 19:3, 26:7, 65:25, 141:20

produces [1] - 187:24
product [12] - 14:16, 18:23,
19:24, 20:8, 20:11, 20:13,
20:23, 22:9, 27:8, 30:1,
30:23, 30:24
profession [2] - 82:14, 82:22
professional [12] - 15:22,
139:12, 143:23, 145:8,
146:4, 148:11, 154:17,
158:24, 169:19, 208:18,
209:17, 209:22
professionals [3] - 145:12,
146:6
professor [7] - 54:6, 54:7,
67:6, 67:17, 67:18, 142:13,
150:23
Professor [18] - 125:8,
136:6, 137:24, 139:10,
146:15, 148:25, 152:12,
152:14, 153:8, 161:12,
161:13, 161:24, 162:15,
163:8, 166:14, 197:15
professors [1] - 67:19
Profile [2] - 39:25, 43:12
profile [6] - 40:13, 42:1, 75:5,
79:5, 119:9, 119:15
program [9] - 53:6, 120:5,
120:9, 158:5, 158:8, 158:11,
169:3, 169:9, 170:1
programs [1] - 79:21
progress [1] - 68:11
progressively [1] - 89:25
promoted [1] - 198:19
prompt [3] - 10:3, 10:10,
96:15
prompts [2] - 95:12, 95:19
pronunciation [1] - 87:10
proper [3] - 32:8, 35:18,
145:3
properly [2] - 112:8, 112:23
provide [17] - 15:14, 31:21,
39:6, 39:9, 53:19, 53:22,
54:1, 63:1, 63:24, 64:2,
84:16, 101:22, 101:25,
139:12, 140:1, 156:21,
156:23
provided [21] - 4:22, 6:11,
9:7, 9:8, 10:15, 15:5, 15:14,
19:22, 25:8, 36:6, 39:7,
41:22, 42:9, 43:19, 45:10,
66:4, 72:2, 133:17, 136:24,
152:10
provides [6] - 101:1, 114:8,
133:7, 146:4, 175:3, 196:19
providing [2] - 31:22, 34:1
provision [2] - 67:12, 70:25
psychiatrist [2] - 4:19, 4:20
psychiatry [3] - 44:21, 44:25,
49:23
Psychological [1] - 169:21

psychological [3] - 70:1,
182:25, 183:8
psychologist [8] - 4:18,
69:19, 69:21, 144:2, 153:21,
155:4, 169:13, 169:20
psychologists [7] - 67:21,
67:23, 69:3, 69:5, 118:3,
118:7
psychology [10] - 66:21,
66:22, 66:23, 68:19, 68:21,
142:7, 142:9, 168:24,
168:25, 169:2
psychosis [1] - 210:6
publication [1] - 37:8
publications [4] - 36:16,
36:20, 68:10, 68:11
publicly [1] - 124:12
publish [1] - 68:3
published [1] - 68:3
publishers [1] - 124:10
publishing [1] - 68:18
punctuation [1] - 197:5
pure [1] - 158:21
purported [1] - 122:7
purpose [7] - 52:25, 105:19,
180:9, 181:5, 182:5, 182:18,
183:17
purposes [6] - 70:19, 72:16,
78:22, 85:22, 114:13
pursuant [1] - 60:9
put [15] - 5:19, 19:1, 25:3,
25:19, 28:8, 36:10, 37:10,
51:3, 52:9, 60:20, 72:10,
76:10, 86:25, 181:21, 188:8
putting [5] - 14:18, 14:21,
60:4, 120:14
PX-2 [3] - 23:19, 24:20, 27:24
qualifications [2] - 146:13,
174:7
qualifies [1] - 119:20
qualify [3] - 82:9, 148:6,
181:19
quantifiably [2] - 80:15,
80:16
quarter [1] - 109:19
quartile [1] - 48:3
quartiles [1] - 47:25
questioning [1] - 51:6
questionnaires [3] - 172:12,
174:14, 180:12
questions [47] - 19:6, 33:11,
38:8, 41:4, 46:9, 48:5, 50:18,
54:22, 55:1, 55:17, 55:24,
55:25, 56:1, 56:16, 56:17,
57:3, 58:13, 58:15, 59:22,
63:3, 84:23, 90:2, 95:19,
100:15, 105:4, 107:15,
110:14, 111:20, 112:10,
126:1, 126:7, 130:4, 130:14,
138:4, 146:13, 150:19,

161:7, 166:13, 168:5, 174:6,
182:20, 183:5, 193:16,
193:17, 193:22, 210:25
quick [1] - 58:15
quicker [1] - 64:11
quickly [5] - 31:20, 35:3,
111:19, 165:7, 204:9
quite [5] - 5:20, 32:23, 49:5,
52:11, 90:22
quizzes [1] - 32:10
quote [3] - 16:11, 22:25,
100:8
Quotient [3] - 204:11,
205:10, 205:17
quotient [5] - 204:19,
204:25, 205:2, 205:19,
205:24
quoting [1] - 128:14
RAMSAY [3] - 1:3, 167:16,
212:5
Ramsay [83] - 3:6, 3:14,
3:24, 25:11, 31:16, 40:11,
42:12, 42:13, 48:16, 48:19,
58:19, 65:13, 70:16, 74:4,
83:21, 85:2, 87:15, 88:14,
89:1, 90:6, 94:7, 94:20, 96:8,
96:16, 97:17, 98:10, 102:17,
103:9, 103:23, 105:1,
107:20, 108:5, 108:8,
108:14, 110:15, 111:4,
113:11, 113:14, 114:3,
114:19, 120:3, 123:15,
124:22, 126:3, 126:10,
128:12, 129:12, 132:17,
133:22, 136:15, 136:16,
136:20, 137:15, 140:25,
141:8, 149:2, 150:16,
157:12, 158:5, 158:15,
158:21, 159:3, 160:19,
163:20, 164:5, 164:15,
165:16, 165:19, 167:7,
175:10, 177:22, 179:5,
180:5, 181:9, 183:4, 189:19,
194:1, 195:24, 207:4,
207:25, 210:11, 210:17
Ramsay's [48] - 63:14, 64:3,
64:21, 65:10, 66:1, 71:21,
72:23, 85:9, 85:20, 90:22,
91:21, 96:4, 97:3, 98:16,
101:4, 103:8, 103:13, 104:7,
104:18, 106:7, 106:22,
107:6, 107:25, 120:4,
120:11, 127:13, 127:20,
133:4, 134:7, 134:17,
139:13, 140:18, 140:22,
141:16, 148:23, 149:13,
150:1, 156:15, 156:25,
159:13, 160:14, 160:23,
176:8, 188:21, 193:9, 201:9,
202:19

ran [2] - 193:18, 193:19
range [23] - 81:22, 82:9,
83:16, 85:13, 89:4, 89:5,
90:22, 98:16, 107:3, 107:4,
147:16, 171:13, 172:17,
204:14, 204:22, 205:6,
205:12, 205:17, 205:20,
205:23, 205:25, 207:19,
210:10
rank [2] - 56:8, 188:5
ranked [1] - 10:9
ranks [1] - 196:20
rarely [1] - 121:9
rate [24] - 84:24, 85:25, 86:3,
86:12, 86:13, 86:20, 86:23,
88:25, 89:3, 89:6, 90:8,
90:11, 132:2, 132:8, 132:9,
132:12, 135:6, 162:7,
189:22, 191:6, 193:12,
200:20, 210:1, 210:25
rated [1] - 96:8
rather [4] - 8:25, 79:17,
126:19, 211:4
rating [9] - 10:8, 95:4, 95:11,
95:14, 96:5, 172:12, 202:22,
202:24, 209:10
ratings [4] - 10:14, 66:12,
79:23, 96:6
rburgoyne@perkinscoie.
com [1] - 2:13
RDR [2] - 1:22, 211:17
reach [6] - 72:24, 148:23,
149:12, 149:19, 207:25,
208:10
reached [3] - 65:10, 149:16,
150:1
reaching [1] - 118:12, 208:24
react [1] - 31:20
reacting [1] - 75:22
read [59] - 7:10, 7:13, 13:9,
24:9, 24:12, 28:6, 35:11,
38:3, 38:7, 38:12, 38:13,
49:13, 49:18, 54:20, 54:23,
55:5, 55:7, 55:13, 56:21,
57:5, 57:12, 57:14, 57:16,
57:17, 57:24, 87:22, 103:9,
103:11, 105:14, 119:14,
126:13, 126:22, 128:23,
128:24, 130:4, 151:22,
151:23, 151:25, 152:21,
153:17, 158:19, 165:6,
165:23, 171:5, 173:22,
173:23, 185:3, 186:1, 186:5,
187:22, 190:1, 190:7, 190:9,
190:16, 190:19, 191:10,
196:25, 209:8
reader [6] - 49:10, 119:25,
165:7, 185:5, 185:8
readily [1] - 125:11
reading [181] - 13:1, 15:15,

15:23, 24:10, 27:16, 29:12, 29:13, 35:7, 35:10, 35:11, 36:3, 49:9, 49:18, 50:13, 50:14, 50:25, 55:1, 55:2, 55:11, 56:2, 57:1, 57:10, 57:23, 58:3, 59:2, 59:7, 74:7, 77:19, 77:21, 78:2, 79:3, 79:10, 84:17, 84:19, 84:20, 84:21, 84:24, 85:25, 86:3, 86:12, 86:13, 86:15, 86:20, 86:21, 86:23, 87:1, 87:13, 87:19, 87:21, 88:8, 88:12, 88:22, 88:23, 88:25, 89:3, 89:6, 89:21, 90:1, 90:3, 90:17, 90:18, 94:5, 94:22, 94:23, 100:13, 100:14, 100:15, 101:18, 102:20, 102:21, 103:3, 103:18, 104:14, 106:12, 106:14, 106:16, 106:20, 107:1, 107:14, 109:6, 119:5, 119:10, 119:18, 119:21, 119:23, 120:15, 120:25, 121:3, 122:22, 122:25, 125:25, 126:1, 126:16, 126:18, 126:19, 126:20, 128:3, 128:14, 128:18, 128:19, 128:23, 129:23, 130:9, 130:20, 130:25, 131:16, 131:18, 132:1, 132:4, 132:5, 133:2, 147:15, 148:21, 150:8, 162:7, 162:10, 165:18, 165:23, 165:24, 165:25, 166:2, 166:3, 171:4, 171:12, 171:16, 171:19, 171:21, 174:1, 176:13, 177:1, 177:3, 177:11, 177:12, 185:1, 186:1, 186:2, 186:19, 187:10, 187:16, 188:2, 189:2, 189:4, 190:2, 190:7, 190:23, 191:6, 191:8, 191:9, 191:17, 191:21, 191:25, 192:4, 192:5, 192:6, 193:9, 193:10, 193:14, 194:8, 194:9, 194:18, 197:4, 197:11, 207:17, 208:6, 208:7, 210:22, 210:24
**Reading** [3] - 84:11, 89:17, 112:10
**reading-based** [2] - 103:18, 107:14
**readmitted** [1] - 58:7
**reads** [5] - 57:7, 84:22, 89:24, 152:15, 185:5
**ready** [3] - 3:3, 109:16, 166:10
**real** [24] - 78:6, 78:19, 78:20, 78:21, 78:25, 83:18, 83:19, 91:15, 91:17, 91:23, 92:7,

92:11, 93:3, 94:17, 99:3, 99:9, 99:19, 99:24, 100:2, 100:17, 101:24, 109:4, 109:6, 129:11
**realized** [2] - 52:17, 53:25
**really** [34] - 9:13, 12:9, 24:2, 34:25, 51:9, 65:16, 66:10, 67:24, 76:19, 76:21, 78:16, 78:19, 79:2, 84:24, 103:15, 106:12, 109:9, 119:5, 119:11, 119:15, 130:12, 137:3, 163:12, 165:6, 174:24, 176:4, 176:14, 178:14, 181:12, 184:10, 184:13, 191:10, 199:21
**reappears** [1] - 9:14
**reapplying** [1] - 7:21
**rearrange** [1] - 61:6
**reason** [25] - 34:7, 38:25, 42:8, 46:6, 80:1, 91:10, 110:24, 111:2, 112:1, 112:17, 112:18, 113:4, 113:7, 138:12, 154:14, 161:17, 163:4, 164:18, 165:7, 166:17, 180:4, 186:2, 198:11, 198:17, 201:9
**reasonable** [1] - 38:6
**reasoning** [17] - 12:9, 50:17, 105:2, 105:3, 105:10, 106:11, 107:5, 125:3, 127:7, 127:8, 127:14, 127:15, 184:7, 184:8, 201:4, 201:12, 202:9
**reasons** [7] - 77:22, 81:7, 82:13, 91:25, 113:25, 114:1, 208:3
**recalling** [1] - 113:20
**receive** [5] - 87:23, 137:6, 137:7, 139:10, 154:6
**received** [6] - 16:16, 16:21, 22:6, 22:24, 23:1, 26:13, 28:22, 38:5, 87:24, 101:6, 135:3, 137:9, 149:1, 149:5, 165:22
**receiving** [5] - 39:8, 54:3, 71:25, 72:16, 149:19
**recent** [1] - 185:20
**recently** [2] - 102:12, 153:19
**Receptor** [1] - 37:3
**recess** [5] - 48:13, 117:8, 117:17, 117:18, 166:8
**Recess** [2] - 48:14, 166:9
**recognize** [7] - 19:25, 64:13, 64:16, 140:9, 147:7, 168:14, 170:2
**recognized** [3] - 170:1, 197:20, 197:22
**recognizing** [1] - 171:7
**recollection** [4] - 23:24, 34:5, 55:22, 59:20

**recommend** [6] - 63:11, 108:24, 116:14, 116:15, 116:17
**recommendation** [13] - 22:6, 63:1, 63:24, 64:21, 92:22, 108:25, 116:19, 123:2, 140:2, 140:18, 140:22, 173:16, 174:23
**recommendations** [4] - 54:8, 108:23, 149:21, 192:22
**recommended** [4] - 54:6, 123:9, 170:3, 174:22
**reconsideration** [9] - 20:9, 21:7, 21:16, 63:17, 63:19, 64:22, 83:22, 139:23, 141:9
**record** [18] - 20:2, 23:18, 24:20, 28:20, 61:17, 62:9, 64:24, 65:1, 81:14, 135:20, 141:4, 151:25, 155:2, 167:25, 185:17, 188:8, 203:14, 211:14
**recordings** [1] - 188:20
**records** [21] - 66:1, 66:9, 72:3, 72:7, 78:24, 97:4, 99:17, 100:2, 100:24, 101:4, 101:5, 101:6, 107:20, 150:12, 175:1, 179:19, 180:13, 194:13, 194:18, 194:21, 194:23
**recovering** [1] - 92:4
**Recross** [1] - 212:4
**recross** [1] - 58:14
**RECROSS** [1] - 58:17
**RECROSS-EXAMINATION** [1] - 58:17
**red** [2] - 47:20, 47:22
**redacted** [1] - 27:7
**REDIRECT** [1] - 48:17
**redirect** [3] - 138:5, 138:6, 166:15
**Redirect** [1] - 212:4
**redlined** [1] - 26:23
**redlines** [1] - 23:21
**redo** [1] - 51:12
**reduce** [1] - 126:15
**refer** [13] - 59:17, 85:5, 110:17, 126:25, 130:24, 134:4, 151:21, 158:4, 164:7, 176:21, 184:22, 200:9, 205:22
**reference** [11] - 19:9, 66:18, 88:1, 99:3, 99:6, 114:16, 117:12, 126:13, 192:16, 193:4, 199:12
**referenced** [1] - 26:16
**references** [2] - 131:13, 131:14
**referral** [1] - 180:4
**referred** [13] - 25:23, 38:16, 82:1, 87:7, 94:18, 130:20,

131:21, 156:24, 178:19, 185:3, 185:16, 193:2, 207:10
**referring** [21] - 11:13, 22:15, 59:12, 81:14, 81:15, 120:11, 122:8, 123:15, 125:8, 125:9, 128:7, 151:4, 158:12, 176:22, 184:3, 184:4, 184:6, 185:2, 192:24, 195:22, 203:14
**refers** [4] - 126:12, 131:20, 177:10, 194:12
**reflect** [6] - 9:17, 40:25, 86:24, 90:16, 100:24, 208:7
**reflected** [5] - 77:10, 78:4, 102:2, 105:21, 210:23
**reflecting** [2] - 102:15, 190:8
**reflection** [2] - 185:4, 194:24
**reflects** [4] - 183:25, 190:12, 190:23, 200:3
**refresh** [1] - 34:5
**regard** [24] - 10:21, 63:11, 65:15, 66:1, 66:8, 68:5, 89:21, 90:17, 91:8, 100:11, 104:10, 104:11, 106:25, 107:12, 108:16, 112:6, 114:11, 126:17, 130:12, 130:13, 133:12, 134:15, 154:1
**regarding** [6] - 6:11, 9:18, 34:5, 38:22, 65:10, 150:1
**regardless** [2] - 171:7, 186:7
**regards** [3] - 154:4, 176:15, 177:1
**regimen** [1] - 170:3
**regret** [1] - 76:9
**regular** [1] - 117:3
**regularly** [1] - 116:25
**REISMAN** [1] - 1:15
**relate** [1] - 169:20
**related** [13] - 55:25, 56:14, 56:17, 56:18, 56:24, 71:1, 115:18, 143:10, 181:6, 184:10, 191:18, 191:20, 201:2
**relates** [3] - 113:1, 121:8, 196:6
**relating** [6] - 64:3, 84:16, 95:2, 101:4, 134:21, 143:1
**relation** [1] - 196:20
**relationship** [1] - 136:11
**relative** [4] - 10:11, 47:13, 109:10, 150:17
**release** [1] - 127:18
**relevant** [7] - 63:9, 101:25, 104:9, 107:8, 108:15, 128:14, 130:6
**reliability** [4] - 86:5, 86:9, 86:11, 86:25
**reliable** [4] - 81:6, 84:25, 193:13, 204:1

**reliably** [1] - 173:8
**relied** [1] - 207:3
**rely** [2] - 194:9, 207:14
**relying** [1] - 105:8
**remain** [3] - 141:1, 150:14, 150:16
**remediation** [3] - 171:10, 185:6
**remember** [26] - 16:1, 24:16, 35:3, 55:17, 56:8, 73:11, 99:8, 99:11, 100:9, 101:23, 122:4, 123:6, 123:10, 125:5, 127:22, 127:24, 128:1, 131:4, 153:5, 160:11, 160:12, 160:13, 177:18, 180:18, 196:16
**remembering** [1] - 77:5
**remind** [2] - 3:24, 117:22
**reminding** [1] - 127:10
**reminds** [1] - 25:18
**remove** [1] - 19:7
**removed** [1] - 90:1
**repeat** [1] - 114:23
**rephrase** [2] - 16:8, 82:19
**rephrased** [1] - 14:22
**report** [139] - 10:3, 29:9, 29:24, 30:18, 30:21, 44:18, 45:3, 53:13, 66:2, 66:7, 66:13, 73:12, 73:18, 73:22, 73:23, 83:21, 83:23, 84:3, 84:6, 85:6, 85:10, 88:3, 94:9, 97:20, 98:2, 99:8, 99:10, 99:11, 99:12, 99:18, 99:20, 99:23, 100:1, 100:2, 100:10, 100:13, 100:20, 101:8, 104:18, 110:23, 113:5, 113:14, 113:18, 113:21, 115:1, 126:25, 128:6, 128:7, 128:9, 128:10, 129:10, 129:13, 129:24, 130:4, 130:8, 130:19, 131:5, 131:6, 131:12, 131:25, 133:9, 133:14, 133:24, 134:2, 134:4, 134:9, 134:22, 141:10, 141:13, 141:15, 141:19, 149:6, 149:9, 149:10, 149:17, 149:20, 150:11, 153:17, 154:6, 154:13, 156:8, 156:10, 160:22, 160:24, 161:11, 161:16, 161:22, 162:19, 176:21, 176:22, 178:19, 178:25, 179:4, 181:1, 181:24, 182:2, 182:12, 183:15, 184:16, 184:25, 185:13, 185:23, 187:15, 189:15, 189:19, 190:1, 190:4, 190:16, 191:1, 192:17, 194:12, 194:15, 195:23, 196:6, 198:23,

199:10, 199:12, 199:13, 199:17, 201:20, 202:1, 202:15, 203:12, 203:20, 204:6, 204:17, 204:19, 206:15, 206:16, 207:24, 208:10, 208:17, 210:15
**reported** [15] - 35:5, 96:9, 96:11, 111:1, 111:25, 112:16, 113:8, 114:20, 120:13, 121:6, 121:16, 152:3, 152:17, 161:20, 161:22
**Reporter** [2] - 1:22, 211:17
**reporter** [1] - 125:15
**REPORTER** [3] - 62:9, 138:24, 167:24
**reporting** [4] - 9:18, 21:22, 96:21, 132:17
**reports** [14] - 32:10, 72:4, 72:7, 96:16, 97:3, 99:20, 121:20, 128:5, 134:21, 141:12, 141:23, 149:23, 176:17, 176:19
**represent** [2] - 197:6, 201:6
**representation** [2] - 38:6, 92:5
**representations** [1] - 91:10
**representative** [5] - 37:21, 38:1, 38:9, 40:7, 40:8
**represented** [1] - 75:16
**Representing** [3] - 1:18, 2:7, 2:14
**represents** [2] - 106:12, 136:10
**request** [41] - 4:23, 12:8, 20:9, 21:5, 21:6, 21:7, 21:12, 21:16, 28:15, 29:9, 29:17, 39:6, 63:14, 63:17, 63:18, 63:25, 64:4, 64:21, 65:10, 65:12, 71:20, 72:10, 74:5, 83:22, 117:4, 123:7, 127:20, 133:8, 133:25, 134:2, 139:13, 139:17, 139:20, 139:21, 139:24, 140:23, 141:11, 141:16, 148:24, 149:13, 150:1
**requested** [7] - 11:10, 11:15, 39:7, 63:6, 65:13, 74:4, 74:6
**requesting** [3] - 11:21, 12:21, 123:13
**requests** [10] - 7:9, 28:9, 63:4, 63:21, 83:9, 83:10, 129:9, 135:2, 135:3, 146:11
**require** [7] - 24:10, 54:24, 80:12, 106:16, 106:19, 143:12, 172:16
**required** [2] - 54:23, 59:2
**requirement** [1] - 167:9
**requirements** [4] - 69:22, 80:11, 116:7, 169:23

**requires** [3] - 108:18, 172:19, 176:18
**reread** [1] - 7:13
**rereading** [1] - 190:21
**rescored** [2] - 111:2, 112:17
**research** [20] - 37:2, 37:10, 37:11, 67:18, 68:2, 68:8, 68:14, 70:18, 71:1, 81:5, 91:8, 130:3, 130:7, 143:14, 145:24, 154:3, 154:25, 193:20, 198:21, 206:25
**researched** [1] - 207:21
**researchers** [4] - 67:22, 81:12, 82:23, 198:2
**respect** [19] - 63:25, 66:7, 90:25, 103:14, 104:8, 106:23, 107:7, 108:1, 110:19, 111:5, 111:20, 112:9, 112:10, 112:25, 115:5, 137:8, 140:22, 141:16, 203:5
**respond** [4] - 174:17, 183:5, 209:6
**responded** [1] - 183:11
**responding** [1] - 107:14
**Response** [1] - 204:10
**response** [3] - 204:24, 205:1, 205:2
**responses** [1] - 202:22
**responsibilities** [1] - 67:16
**responsibility** [1] - 33:8
**rest** [3] - 46:24, 52:21, 53:8
**restate** [1] - 114:24
**restated** [1] - 55:6
**restless** [1] - 172:8
**result** [8] - 101:2, 133:3, 133:4, 155:23, 160:14, 204:1, 204:4
**results** [17] - 44:25, 91:23, 107:25, 110:15, 110:25, 111:24, 112:15, 113:8, 132:23, 145:23, 161:20, 161:22, 162:23, 163:5, 178:5, 191:2, 192:9
**resume** [3] - 3:5, 48:16, 117:20
**resumed** [1] - 109:18
**Retention** [1] - 94:11
**revert** [1] - 186:12
**review** [52] - 7:3, 29:25, 62:21, 62:25, 63:14, 64:23, 71:22, 72:17, 72:19, 72:23, 72:25, 73:3, 73:8, 74:2, 83:8, 83:10, 84:4, 99:8, 111:19, 116:13, 116:20, 116:24, 116:25, 117:4, 118:14, 121:10, 123:11, 133:25, 136:23, 139:11, 139:13, 139:21, 140:2, 146:11, 148:23, 149:13, 153:17,

154:13, 159:8, 160:22, 161:16, 162:19, 163:16, 163:17, 163:20, 163:24, 164:1, 164:11, 180:2, 182:19, 204:9
**reviewed** [42] - 3:13, 36:22, 53:13, 65:15, 65:24, 66:4, 68:3, 68:11, 68:13, 73:17, 84:3, 99:17, 100:19, 101:4, 107:19, 108:14, 109:4, 117:5, 118:17, 125:19, 128:17, 129:9, 130:22, 130:23, 134:1, 139:17, 139:24, 141:13, 141:18, 150:6, 150:11, 150:15, 153:2, 153:14, 161:10, 161:12, 179:19, 192:2, 194:13, 196:3, 207:23
**reviewer** [10] - 63:16, 78:17, 123:1, 129:8, 134:24, 135:8, 153:4, 154:5, 156:1, 156:3
**reviewers** [1] - 69:6
**reviewing** [10] - 27:15, 63:4, 63:18, 64:21, 71:20, 99:13, 135:2, 135:3, 160:11, 180:12
**reviews** [2] - 72:15, 140:1
**revise** [1] - 158:1
**revised** [4] - 14:10, 14:12, 81:9
**revisions** [3] - 73:23, 149:10, 149:20
**rewrite** [1] - 158:1
**Richard** [1] - 121:23
**rid** [1] - 5:2
**right-hand** [2] - 7:2, 142:21
**ringing** [1] - 17:22
**RMR** [2] - 1:22, 211:17
**Robert** [5] - 83:21, 136:1, 141:10, 167:17, 168:1
**ROBERT** [4] - 2:10, 167:22, 212:13, 212:15
**Rockefeller** [1] - 122:5
**role** [6] - 62:17, 62:20, 139:9, 139:16, 142:18, 156:18
**room** [7] - 8:4, 8:16, 11:25, 41:22, 43:24, 43:25, 44:1
**ropes** [1] - 49:2
**rotation** [10] - 44:8, 44:11, 46:20, 49:21, 49:22, 49:25, 51:1, 51:16, 53:3, 53:9
**rotations** [6] - 48:23, 49:4, 49:5, 49:17, 53:2, 53:5
**rough** [2] - 42:18, 102:15
**roughly** [2] - 85:23, 210:2
**rows** [1] - 191:17
**Ruekberg** [30] - 4:17, 5:9, 5:13, 6:20, 9:3, 9:8, 10:4, 11:3, 12:4, 12:14, 13:18, 13:19, 14:1, 15:10, 17:2, 17:10, 18:5, 19:3, 20:7,

21:19, 23:22, 24:3, 24:15, 25:20, 160:1, 160:13, 160:18, 176:16, 208:22, 209:8
**Ruekberg's** [5] - 14:10, 18:20, 19:18, 23:17, 160:11
**rule** [1] - 116:8
**ruled** [1] - 198:6
**ruling** [1] - 20:11
**run** [1] - 49:1
**Sally** [1] - 198:19
**salt** [1] - 193:12
**sample** [8] - 56:4, 90:23, 104:20, 105:3, 107:3, 199:24, 200:1, 200:2
**sat** [1] - 109:8
**Saturday** [1] - 52:2
**saw** [9] - 29:5, 59:18, 63:16, 63:19, 63:22, 94:2, 94:20, 151:14, 153:19
**scale** [6] - 96:5, 201:15, 202:25, 204:19, 204:25, 205:2, 205:23, 205:24
**Scale** [2] - 204:10, 205:10, 205:16
**scales** [6] - 95:4, 95:11, 95:14, 172:13, 202:22, 209:10
**scenario** [1] - 130:16
**schedule** [2] - 61:7, 180:20
**scheduled** [1] - 59:13
**scheduling** [4] - 3:17, 60:2, 60:10, 60:23
**scholars** [1] - 197:23
**scholastic** [1] - 177:19
**school** [107] - 12:8, 12:11, 16:19, 24:10, 24:11, 24:12, 25:20, 25:23, 31:7, 31:10, 31:24, 32:3, 38:16, 38:23, 39:5, 39:8, 39:9, 39:15, 39:16, 39:19, 40:16, 41:22, 43:19, 44:11, 45:10, 46:15, 47:10, 47:14, 48:24, 48:25, 52:12, 52:19, 53:6, 53:12, 57:10, 58:7, 58:11, 66:1, 66:9, 66:23, 67:21, 67:23, 68:20, 69:3, 70:12, 75:1, 77:2, 77:10, 77:13, 78:24, 79:20, 80:8, 85:21, 87:2, 91:20, 92:15, 96:24, 99:21, 100:24, 100:25, 101:5, 105:9, 106:2, 107:19, 108:3, 116:2, 116:4, 116:6, 116:9, 116:10, 118:6, 118:22, 119:2, 119:10, 129:18, 133:15, 134:12, 134:18, 136:24, 137:11, 141:18, 143:23, 148:9, 150:12, 150:25, 154:22, 165:11, 165:21, 181:2, 181:7,

181:10, 181:15, 183:20, 193:21, 193:24, 194:13, 194:21, 194:23, 203:1, 208:15
**School** [1] - 117:2
**school's** [1] - 47:1
**school-aged** [2] - 148:9, 150:25
**schoolchild** [2] - 77:1, 77:11
**schools** [3] - 38:20, 69:2, 78:23
**Schwab** [1] - 121:21
**science** [3] - 56:13, 59:11, 101:17
**Science** [2] - 41:11, 43:11
**sciences** [8] - 55:19, 105:2, 105:3, 105:4, 105:6, 142:13
**scientific** [2] - 82:24, 91:8
**score** [91] - 37:21, 38:8, 38:12, 38:13, 42:16, 42:19, 43:16, 44:5, 44:16, 44:18, 45:3, 46:1, 47:22, 56:6, 79:18, 84:24, 85:10, 85:13, 85:24, 85:25, 86:1, 86:3, 86:12, 86:13, 86:20, 86:23, 87:17, 87:19, 87:20, 87:23, 88:6, 88:25, 89:6, 90:8, 90:9, 90:10, 90:12, 90:13, 91:6, 94:10, 99:18, 99:22, 102:19, 102:20, 102:21, 103:2, 103:4, 104:18, 106:9, 106:11, 129:13, 131:17, 132:2, 132:8, 132:9, 132:10, 133:5, 148:5, 160:23, 184:1, 186:8, 186:11, 186:18, 187:4, 187:5, 187:6, 187:9, 187:16, 187:24, 188:3, 188:9, 189:1, 189:2, 189:8, 189:20, 189:22, 189:23, 191:16, 193:12, 197:10, 197:11, 197:12, 202:6, 204:13, 204:19
**scored** [7] - 37:18, 56:4, 59:4, 187:23, 188:2, 190:9, 209:24
**scores** [60] - 59:7, 66:2, 66:10, 66:11, 81:22, 83:16, 85:2, 85:9, 85:15, 86:22, 87:15, 88:4, 88:24, 89:1, 89:3, 90:6, 90:11, 90:15, 90:25, 91:2, 91:9, 91:12, 91:13, 93:5, 94:12, 96:4, 97:23, 98:12, 98:13, 98:14, 98:17, 98:21, 98:24, 101:16, 101:17, 102:5, 102:7, 105:1, 108:2, 111:3, 111:4, 112:1, 112:18, 118:15, 119:9, 131:4, 131:11, 132:1, 132:13, 133:2, 134:14, 141:19, 150:12, 185:13,

186:17, 192:11, 192:12, 196:20, 203:25
**scoring** [5] - 56:6, 186:16, 187:2, 187:3, 193:23
**screen** [2] - 182:23, 206:10
**screening** [6] - 84:15, 162:14, 177:4, 177:5, 182:22, 182:23
**se** [1] - 122:11
**search** [2] - 22:3, 130:6
**seated** [1] - 117:19
**secluded** [1] - 16:17
**second** [32] - 4:22, 5:14, 7:5, 12:7, 16:17, 21:5, 21:12, 23:12, 37:13, 40:16, 40:25, 41:16, 41:17, 43:15, 44:13, 51:17, 60:15, 74:21, 78:18, 78:25, 83:7, 83:17, 99:16, 140:23, 149:17, 149:19, 156:13, 159:8, 159:11, 160:22, 163:24, 206:2
**secondary** [1] - 31:5
**section** [29] - 5:2, 25:2, 25:4, 33:3, 33:6, 34:17, 55:10, 55:21, 58:20, 125:3, 179:8, 179:10, 179:13, 179:18, 179:21, 180:3, 180:7, 180:8, 180:10, 181:2, 181:5, 182:2, 182:5, 182:6, 182:18, 183:14, 183:17, 206:17
**sections** [7] - 33:2, 33:5, 33:6, 33:7, 55:17, 101:16, 104:23, 105:5, 179:8
**secure** [3] - 62:23, 73:3, 149:1
**see** [60] - 4:16, 5:16, 6:9, 11:14, 11:22, 16:7, 16:22, 23:12, 28:16, 29:4, 29:8, 33:24, 34:15, 34:19, 42:1, 42:18, 49:15, 53:1, 61:1, 64:9, 70:4, 72:11, 80:5, 82:2, 92:5, 95:18, 95:19, 96:12, 96:18, 97:5, 97:20, 99:3, 99:6, 100:4, 101:6, 119:15, 125:1, 125:4, 125:24, 126:2, 126:11, 147:17, 150:23, 151:17, 152:6, 152:20, 164:5, 175:23, 176:19, 180:5, 184:3, 192:16, 193:2, 196:2, 203:25, 204:1, 204:3, 207:11, 209:5, 209:14
**seeing** [1] - 144:4
**seeking** [1] - 18:25
**seem** [1] - 92:8
**select** [3] - 106:10, 106:14, 107:5
**selected** [2] - 40:7, 99:12
**self** [6] - 43:8, 97:14, 98:18, 152:3, 152:17, 190:21
**Self** [2] - 41:12, 43:12

**self-assessment** [1] - 43:8
**Self-Assessment** [2] - 41:12, 43:12
**self-control** [2] - 97:14, 98:18
**self-corrections** [1] - 190:21
**self-reported** [2] - 152:3, 152:17
**semester** [2] - 67:25, 69:15
**send** [4] - 5:19, 23:23, 174:15, 175:22
**Sending** [1] - 14:3
**sending** [1] - 25:22
**sends** [2] - 116:13, 163:16
**senior** [1] - 106:3
**seniors** [5] - 85:14, 85:21, 87:2, 193:21, 193:24
**sense** [8] - 77:9, 79:6, 79:9, 98:15, 105:7, 105:11, 111:4, 183:24
**sent** [23] - 6:20, 9:20, 11:3, 12:10, 12:13, 15:10, 17:15, 18:9, 20:7, 23:17, 23:18, 25:1, 25:14, 26:18, 26:23, 27:2, 29:24, 30:17, 62:21, 164:5, 164:9, 164:14, 179:25
**sentence** [15] - 8:3, 16:14, 16:23, 27:7, 88:22, 132:4, 151:24, 152:6, 152:8, 152:14, 152:24, 153:2, 191:6, 191:8
**sentences** [3] - 152:21, 158:19, 191:10
**separate** [4] - 8:4, 8:15, 11:25, 77:16
**separately** [3] - 10:10, 80:6, 80:11
**Separately** [1] - 22:5
**September** [8] - 21:4, 21:15, 23:23, 28:19, 29:1, 29:5, 67:3, 175:13
**series** [6] - 23:13, 25:7, 57:11, 57:12, 89:24, 112:10
**served** [1] - 139:7
**service** [2] - 67:18, 68:5
**services** [2] - 72:16, 135:1
**serving** [1] - 62:17
**set** [6] - 75:5, 78:23, 80:9, 91:11, 111:19, 163:16
**sets** [2] - 94:3, 186:3
**settings** [7] - 70:13, 74:25, 76:6, 78:6, 78:19, 96:24, 99:3
**setup** [1] - 50:12
**seven** [2] - 5:22, 67:8
**several** [14] - 5:6, 41:6, 42:5, 57:2, 65:14, 110:11, 110:14, 125:25, 130:20, 153:12, 161:13, 172:1, 185:12, 206:9
**severe** [8] - 10:1, 10:8,

10:23, 24:11, 96:10, 96:16, 96:22, 182:23
**severely** [3] - 107:2, 205:7, 205:17
**severity** [7] - 9:25, 10:12, 24:5, 76:10, 96:7, 96:13, 122:13
**shaded** [1] - 47:23
**shall** [1] - 117:8
**shared** [1] - 145:13
**Shaywitz** [1] - 198:20
**sheer** [1] - 49:7
**shelf** [4] - 38:19, 48:21, 48:23, 50:9
**shifting** [1] - 107:17
**shoe** [2] - 191:18, 191:19
**short** [3] - 61:15, 98:12, 190:19
**shortly** [1] - 65:9
**show** [16] - 22:19, 49:2, 49:19, 54:10, 54:18, 79:4, 85:7, 85:19, 93:25, 94:3, 115:21, 125:11, 132:22, 154:3, 178:14, 195:20
**showed** [3] - 85:24, 129:11, 192:10
**showing** [6] - 22:21, 74:25, 81:5, 83:16, 100:3
**shown** [1] - 54:16
**shows** [5] - 47:12, 86:1, 128:17, 132:1, 176:6
**sic** [1] - 140:25
**side** [3] - 11:14, 21:24, 32:21
**signature** [3] - 26:2, 168:17, 179:2
**significance** [1] - 37:7
**significant** [11] - 65:20, 76:14, 76:16, 77:3, 80:2, 81:3, 96:19, 128:2, 158:25, 172:20, 198:6
**significantly** [1] - 197:2
**signify** [1] - 47:20
**signs** [1] - 172:14
**silent** [5] - 86:21, 185:12, 191:8, 191:21, 208:7
**silently** [3] - 192:5, 192:6, 193:14
**similar** [6] - 16:12, 107:12, 163:24, 181:6, 204:1, 204:4
**simple** [3] - 94:1, 191:10, 191:13
**Simplified** [1] - 12:19
**simplified** [2] - 25:19, 25:22
**simulate** [1] - 43:23
**sincere** [1] - 207:7
**single** [1] - 130:15
**sit** [2] - 172:8, 206:13
**sitting** [5] - 19:7, 68:6, 167:8, 172:8, 206:10
**situation** [3] - 4:3, 44:6,

112:4
**situations** [3] - 31:21, 99:6, 120:5
**six** [1] - 33:6
**size** [1] - 174:18
**skeptical** [1] - 128:12
**skill** [2] - 91:11, 104:13
**skills** [30] - 78:2, 78:3, 79:2, 79:3, 79:9, 79:10, 79:23, 80:2, 80:14, 81:2, 82:4, 83:17, 84:19, 87:13, 89:21, 90:17, 92:5, 98:18, 104:14, 106:6, 147:16, 163:12, 171:4, 171:16, 171:19, 171:21, 174:1, 197:2
**Skills** [1] - 195:24
**skip** [6] - 56:22, 57:1, 180:3, 191:21, 191:25
**sleep** [1] - 182:20
**slides** [1] - 135:21
**slightly** [2] - 42:25, 44:6
**sloppiness** [1] - 199:4
**slow** [9] - 49:10, 94:21, 94:22, 94:23, 165:7, 185:7, 190:2, 190:7, 210:23
**slowly** [1] - 187:22
**small** [3] - 17:14, 56:16, 67:8
**small-font** [1] - 17:14
**smart** [2] - 16:10, 165:6
**SMITH** [3] - 167:22, 212:14, 212:16
**Smith** [55] - 13:21, 21:23, 22:2, 22:6, 22:16, 22:24, 28:16, 29:4, 29:20, 29:24, 30:3, 30:9, 30:17, 30:20, 31:2, 61:5, 70:16, 83:21, 84:3, 84:6, 85:20, 87:4, 88:17, 89:16, 93:18, 94:20, 95:1, 97:15, 97:21, 99:24, 101:1, 108:1, 110:15, 110:20, 111:21, 113:4, 113:16, 114:19, 114:25, 123:23, 130:19, 132:14, 141:10, 153:20, 153:23, 154:1, 159:5, 161:13, 167:18, 168:1, 168:4, 168:11, 174:3, 188:20, 195:23
**Smith's** [13] - 94:9, 97:20, 99:8, 113:14, 131:6, 141:13, 150:11, 153:14, 153:17, 154:13, 161:10, 161:16, 162:19
**Smiy** [3] - 23:10, 208:20, 209:1
**so..** [1] - 126:20
**social** [6] - 34:15, 34:17, 56:15, 99:5, 99:5, 197:5
**sociology** [1] - 142:8
**sock** [2] - 191:18, 191:19

**software** [1] - 49:13
**solely** [2] - 72:17, 98:24
**solve** [1] - 198:18
**solving** [1] - 201:4
**someone** [53] - 21:23, 29:15, 72:7, 74:14, 74:25, 75:3, 75:8, 76:13, 77:1, 77:2, 77:18, 78:10, 78:14, 80:1, 81:20, 82:2, 82:8, 84:22, 86:15, 86:18, 91:9, 92:3, 92:18, 92:19, 93:13, 93:15, 93:25, 96:13, 96:23, 96:25, 97:11, 102:1, 113:23, 114:1, 118:22, 119:1, 119:22, 120:8, 120:19, 121:2, 122:12, 122:15, 122:23, 122:24, 123:12, 123:16, 129:21, 133:8, 137:11, 148:17, 165:23, 174:12
**sometimes** [10] - 16:20, 56:15, 57:8, 92:17, 108:23, 108:24, 108:25, 121:1, 195:16, 203:18
**somewhat** [6] - 34:25, 35:3, 119:18, 130:14, 175:14, 186:12
**somewhere** [1] - 102:11
**son** [1] - 165:6
**soon** [1] - 29:4
**sooner** [1] - 5:1
**Sorrentino** [2] - 19:22, 19:23
**sorry** [35] - 3:11, 5:1, 6:6, 7:6, 14:5, 17:11, 17:16, 17:18, 18:11, 22:1, 26:25, 30:10, 30:11, 34:16, 42:13, 46:16, 47:6, 48:7, 52:24, 53:2, 56:20, 88:2, 97:19, 114:23, 128:9, 131:8, 131:23, 148:15, 148:16, 154:24, 155:13, 157:21, 161:21, 177:3, 182:6
**sort** [29] - 5:22, 10:19, 42:18, 47:23, 51:19, 60:3, 62:25, 67:19, 68:7, 75:12, 75:16, 76:3, 76:10, 76:17, 78:19, 79:1, 80:25, 82:11, 84:23, 85:19, 85:23, 96:9, 101:1, 101:10, 120:15, 121:2, 121:9, 134:13, 147:13
**sorts** [6] - 68:6, 70:1, 72:21, 77:11, 120:25, 124:6
**sought** [2] - 139:23, 141:9
**sounds** [1] - 29:7
**source** [1] - 113:12
**sources** [4] - 84:7, 178:20, 179:9, 179:14
**Spanish** [2] - 54:6, 54:12
**speaking** [7] - 65:25, 77:13, 91:17, 165:5, 187:20, 187:22, 210:2

**special** [2] - 117:4, 128:13
**specialize** [1] - 82:24
**specialized** [2] - 92:25, 93:5
**specialties** [3] - 67:10, 142:16, 142:17
**specific** [16] - 55:12, 77:25, 83:2, 95:19, 95:20, 96:2, 105:8, 105:12, 108:6, 126:13, 177:10, 177:17, 184:15, 203:4, 209:16
**specifically** [21] - 17:4, 28:23, 29:8, 29:11, 54:1, 55:8, 66:1, 67:11, 68:13, 68:20, 81:9, 101:10, 110:18, 115:14, 123:14, 136:3, 143:1, 160:12, 170:21, 176:18, 176:25
**specifics** [1] - 131:3
**speech** [1] - 144:14
**speed** [20] - 29:12, 29:13, 87:1, 87:22, 88:8, 90:18, 184:10, 185:2, 186:17, 186:19, 187:4, 189:4, 189:5, 189:7, 200:18, 201:1, 201:13, 202:9, 208:7, 210:22
**spelling** [2] - 17:6, 197:5
**spend** [2] - 53:3, 109:25
**spent** [6] - 23:10, 33:24, 34:6, 34:8, 34:9, 53:8
**sports** [2] - 35:6, 36:2
**spots** [1] - 101:9
**spring** [2] - 67:25, 118:7
**stage** [1] - 176:9
**stand** [5] - 3:5, 30:4, 48:16, 117:20, 149:23
**standard** [7] - 43:24, 105:15, 109:10, 165:4, 173:21, 178:1, 188:3
**standardization** [1] - 199:24
**standardized** [20] - 45:23, 50:11, 66:2, 66:9, 78:4, 78:21, 78:23, 83:15, 91:20, 99:19, 104:9, 107:8, 107:20, 108:3, 141:19, 146:11, 150:12, 158:3, 194:1, 196:24
**stands** [1] - 182:24
**start** [13] - 3:13, 4:6, 4:14, 30:13, 53:1, 67:25, 74:21, 83:6, 108:22, 153:15, 180:22, 186:3, 211:5
**started** [5] - 53:12, 62:18, 146:3, 179:9, 211:5
**starting** [12] - 5:13, 10:14, 16:16, 25:11, 72:24, 77:23, 80:18, 118:6, 150:25, 151:14, 184:19, 189:15
**starts** [6] - 86:15, 156:13, 159:11, 179:18, 180:7, 181:2
**state** [18] - 7:9, 24:8, 50:15, 62:9, 65:9, 66:20, 69:22,

86:3, 138:24, 147:19, 148:4, 149:25, 154:21, 154:22, 155:3, 155:6, 167:24, 169:15

**State** [7] - 32:2, 66:21, 67:7, 117:1, 137:9, 142:9, 169:2

**statement** [10] - 5:16, 6:11, 127:9, 134:18, 156:16, 156:17, 156:25, 157:5, 157:13, 157:21

**statements** [1] - 183:9

**States** [2] - 155:24, 170:22

**STATES** [1] - 1:1

**states** [1] - 8:3

**stating** [2] - 15:20, 16:15

**Statistical** [2] - 81:16, 170:6

**statistics** [1] - 56:15

**status** [3] - 34:2, 182:3, 182:15

**stay** [1] - 75:13

**STEIN** [2] - 2:2, 2:3

**stenographically** [1] - 1:24

**Step** [24] - 4:23, 7:9, 7:18, 7:22, 8:13, 29:17, 37:18, 42:20, 42:22, 43:1, 44:19, 56:10, 56:12, 56:14, 56:21, 58:8, 58:10, 58:23, 58:24, 99:22, 104:12, 115:23, 116:8, 130:10

**step** [7] - 59:23, 59:24, 62:4, 123:4, 138:7, 138:20, 167:20

**Steven** [2] - 138:18, 138:25

**STEVEN** [4] - 2:3, 138:22, 212:10, 212:12

**still** [33] - 3:24, 11:7, 11:17, 13:2, 13:14, 39:11, 43:24, 51:21, 63:1, 79:22, 82:9, 95:10, 95:23, 117:22, 119:5, 120:10, 128:14, 130:9, 131:23, 145:6, 148:1, 148:6, 148:15, 154:20, 160:22, 164:18, 172:8, 172:9, 178:15, 182:6, 185:6, 197:20, 198:16

**stone** [1] - 191:18

**stood** [1] - 167:7

**stop** [5] - 75:13, 86:16, 186:8, 186:10, 186:24

**stopped** [3] - 77:23, 174:21, 186:11

**story** [2] - 57:21, 58:3

**straightforward** [1] - 154:12

**strategies** [7] - 128:2, 129:3, 130:2, 130:13, 130:18, 173:25, 201:8

**strategy** [6] - 100:14, 129:22, 129:23, 129:25, 130:10, 133:9

**Street** [4] - 1:9, 1:16, 2:4, 2:11

**strength** [1] - 174:1

**strengthen** [1] - 66:10

**strengths** [4] - 79:1, 79:6, 79:8, 158:13

**strike** [1] - 155:13

**strikes** [1] - 17:20

**strong** [1] - 158:14

**struggle** [2] - 7:11, 7:21

**struggles** [2] - 100:25, 159:1

**struggling** [2] - 53:25, 198:8

**student** [12] - 3:9, 3:11, 47:10, 47:11, 120:2, 123:4, 154:7, 154:8, 157:7, 157:9, 175:17, 195:2

**students** [20] - 22:7, 32:5, 32:8, 33:3, 33:12, 47:13, 47:14, 47:17, 52:21, 55:19, 67:13, 67:20, 68:6, 87:2, 118:2, 118:11, 119:7, 144:22, 156:21, 156:23

**studied** [2] - 124:15, 163:13

**studies** [4] - 82:25, 197:5, 199:22, 207:17

**study** [16] - 44:9, 50:1, 52:16, 52:20, 53:4, 53:6, 53:7, 124:2, 124:4, 124:5, 124:6, 124:9, 124:18, 124:20, 163:10

**studying** [2] - 49:9, 118:3

**stuff** [4] - 15:1, 36:12, 50:3, 180:22

**stumbles** [1] - 185:7

**stumbling** [1] - 190:12

**subject** [11] - 38:19, 39:11, 44:10, 45:1, 45:6, 45:20, 46:23, 48:3, 158:7, 187:20, 202:16

**subjects** [2] - 40:2, 40:8

**submission** [1] - 134:22

**submit** [1] - 133:8

**submitted** [33] - 21:5, 21:12, 24:18, 28:18, 62:24, 63:13, 63:20, 63:23, 64:14, 64:18, 64:20, 65:11, 72:6, 72:12, 73:6, 73:22, 83:21, 127:1, 139:11, 139:20, 140:15, 141:9, 149:2, 149:5, 149:8, 149:16, 159:13, 159:17, 159:19, 159:20, 159:23, 168:5, 168:14

**subscore** [1] - 187:3

**subscores** [1] - 89:4

**subsequently** [6] - 21:14, 28:18, 141:9, 141:13, 141:14, 196:5

**substance** [1] - 73:8

**substantial** [6] - 76:21, 76:23, 130:9, 150:7, 154:25, 185:6

**substantially** [9] - 63:8, 80:15, 104:8, 104:11, 107:7,

108:14, 148:20, 150:17

**subtests** [1] - 184:13

**succeed** [1] - 158:10

**successful** [2] - 118:22, 119:1, 119:10, 120:17, 120:22, 120:23, 121:3, 122:25

**successfully** [2] - 122:9, 122:19

**sufficient** [4] - 79:4, 108:10, 108:17, 108:20

**suggest** [5] - 73:23, 87:1, 88:8, 133:1, 165:8

**suggested** [2] - 16:4, 19:18

**suggesting** [1] - 94:12

**suggestion** [1] - 17:2

**suggestions** [1] - 18:20

**suggestive** [1] - 158:24

**suggests** [5] - 93:21, 94:14, 104:10, 107:11, 108:12

**Suite** [2] - 2:4, 2:11

**summarize** [6] - 63:11, 116:20, 180:11, 190:18, 191:5, 208:3

**summary** [4] - 34:7, 63:2, 100:5, 185:13

**summer** [1] - 52:20

**superior** [1] - 79:2

**supervise** [1] - 144:10

**supervised** [4] - 33:7, 70:1, 70:14, 144:19

**supervising** [3] - 144:17, 144:21, 144:25

**supplement** [2] - 163:2, 207:11, 207:12

**supplemental** [2] - 84:24, 193:23

**supply** [1] - 33:10

**support** [23] - 4:22, 12:8, 12:20, 12:24, 13:14, 17:12, 24:8, 24:11, 29:9, 29:16, 29:19, 50:15, 51:3, 53:17, 63:21, 64:25, 65:12, 72:10, 81:13, 83:22, 101:11, 141:10

**supported** [4] - 25:16, 97:7, 98:22, 208:16

**supporting** [2] - 9:3, 65:19

**suppose** [1] - 124:7

**supposed** [4] - 33:9, 97:13, 105:8, 105:13

**surely** [1] - 60:8

**surgery** [4] - 44:8, 44:11, 44:19, 44:21

**surpassed** [1] - 102:12

**sustain** [2] - 20:3, 20:14

**sustained** [3] - 21:1, 205:23, 205:24

**swim** [1] - 31:22

**switching** [2] - 95:1, 146:23

**swollen** [2] - 52:1

**sworn** [5] - 3:25, 62:7, 117:23, 138:22, 167:22

**symptom** [8] - 9:4, 9:7, 10:3, 75:16, 115:13, 206:18, 207:8, 207:9

**symptoms** [41] - 9:18, 9:21, 9:25, 10:7, 10:20, 10:21, 10:22, 10:23, 24:5, 25:15, 74:20, 74:23, 74:25, 75:3, 75:8, 75:17, 76:15, 76:25, 95:18, 96:2, 96:6, 96:9, 96:14, 96:20, 96:22, 97:2, 97:4, 115:6, 115:21, 152:3, 152:18, 172:6, 172:7, 172:14, 172:15, 172:18, 172:20, 208:16, 209:11, 209:21

**Syracuse** [2] - 66:22, 66:23

**system** [2] - 56:7, 77:17

**TA** [1] - 33:6

**Tab** [19] - 28:21, 33:13, 64:16, 83:25, 127:3, 128:7, 131:5, 131:7, 131:10, 140:14, 156:7, 156:10, 156:13, 159:8, 160:3, 160:22, 164:1, 164:11, 168:12

**table** [14] - 5:4, 5:12, 5:15, 5:19, 5:23, 6:23, 7:1, 11:13, 31:18, 88:4, 131:11, 131:22, 131:25, 191:2

**tables** [1] - 5:7

**tabs** [1] - 151:5

**talks** [5] - 68:3, 69:1, 69:6, 69:7, 145:24

**tap** [1] - 184:13

**task** [3] - 97:12, 191:9, 191:23

**tasks** [2] - 183:11, 195:3

**taught** [7] - 67:8, 69:11, 118:4, 118:7, 118:18, 142:24, 143:1

**teach** [7] - 67:19, 67:22, 69:16, 118:4, 118:11, 142:18, 142:19

**teacher** [6] - 54:13, 77:8, 79:23, 101:9, 165:17, 165:18, 195:4

**teachers** [11] - 16:20, 53:18, 53:21, 53:22, 66:12, 69:2, 133:17, 133:23, 134:8, 134:11, 195:2

**Teachers** [2] - 67:1, 67:20

**teaching** [12] - 32:3, 32:14, 33:1, 33:5, 33:8, 67:18, 68:1, 69:9, 69:14, 118:2, 143:6, 143:11

**teams** [1] - 70:12

**technical** [2] - 162:14, 188:22

**technically** [2] - 14:12, 77:15
**technician** [2] - 23:14, 179:17
**techniques** [1] - 145:2
**technology** [1] - 120:16
**telephone** [3] - 21:22, 22:15, 22:16
**ten** [4] - 134:24, 143:7, 156:4, 163:21
**tend** [2] - 79:12, 130:15
**tenure** [1] - 67:7
**term** [8] - 40:5, 79:9, 80:16, 91:7, 119:18, 120:24, 122:22, 203:19
**terminology** [4] - 177:8, 177:16, 184:11, 184:12
**terms** [17] - 29:1, 37:6, 64:24, 68:2, 77:10, 78:4, 83:17, 90:9, 96:6, 97:1, 106:6, 107:13, 122:13, 137:1, 170:2, 187:2, 187:9
**terribly** [2] - 193:13
**test** [132] - 39:7, 39:10, 39:11, 41:14, 42:16, 43:3, 43:5, 43:10, 43:12, 44:3, 44:4, 49:1, 52:25, 54:20, 59:14, 66:2, 66:10, 72:1, 81:1, 84:13, 84:16, 84:20, 85:3, 85:9, 86:7, 86:15, 87:11, 87:16, 88:22, 88:23, 89:20, 89:21, 92:6, 92:23, 93:5, 93:16, 93:24, 94:5, 94:7, 97:10, 97:15, 97:17, 97:21, 101:15, 101:19, 101:21, 102:2, 103:17, 103:18, 104:14, 104:22, 105:15, 105:16, 105:17, 105:18, 105:20, 107:8, 107:14, 107:20, 108:3, 110:21, 111:1, 111:7, 112:3, 112:20, 112:25, 113:5, 113:10, 113:21, 114:4, 118:12, 118:15, 124:4, 124:17, 124:20, 127:7, 127:8, 127:14, 127:15, 127:18, 128:19, 130:1, 133:10, 134:14, 141:19, 157:19, 157:23, 158:3, 161:25, 162:3, 162:8, 162:10, 162:11, 162:15, 162:17, 162:20, 162:24, 163:5, 173:14, 173:17, 177:4, 178:18, 187:20, 187:21, 187:23, 189:5, 192:13, 193:11, 194:2, 194:6, 195:23, 196:12, 196:13, 196:19, 196:24, 197:4, 199:2, 199:5, 203:4, 203:7, 204:2, 204:20, 206:13, 206:20, 207:9,

208:5, 209:23, 210:13, 210:24
**Test** [19] - 84:11, 87:5, 89:17, 93:20, 93:25, 94:10, 94:13, 94:22, 97:9, 104:19, 112:10, 185:19, 195:24, 196:11, 196:12, 203:9, 203:16, 206:20, 207:13
**test's** [1] - 86:5
**tested** [6] - 49:16, 113:15, 113:16, 114:19, 114:25, 115:3
**testified** [20] - 38:15, 48:20, 51:13, 57:4, 58:19, 62:8, 94:21, 108:22, 120:4, 124:22, 132:18, 133:22, 136:16, 137:24, 138:23, 153:4, 161:12, 167:23, 194:12, 197:15
**testify** [2] - 133:16, 153:8
**testifying** [2] - 135:4, 135:5
**testimony** [19] - 3:15, 65:17, 74:9, 107:22, 108:23, 110:19, 111:16, 116:12, 117:12, 117:14, 120:4, 120:12, 127:24, 128:22, 131:22, 134:5, 134:7, 165:17, 170:5
**testing** [67] - 8:4, 8:16, 8:20, 11:25, 12:16, 16:17, 22:19, 22:23, 29:9, 29:11, 29:16, 29:17, 40:23, 41:19, 41:22, 42:9, 44:1, 44:6, 45:8, 45:24, 46:7, 50:8, 64:3, 65:10, 67:12, 68:4, 70:25, 71:25, 91:24, 92:17, 92:21, 93:3, 93:10, 108:1, 113:22, 116:20, 116:24, 123:2, 123:15, 123:19, 136:20, 136:25, 139:13, 140:19, 140:23, 141:16, 148:24, 150:1, 150:12, 173:14, 174:20, 174:24, 175:2, 176:11, 180:23, 183:3, 185:10, 186:8, 192:18, 193:23, 207:5, 210:15, 210:17
**Tests** [1] - 88:14
**tests** [93] - 29:15, 39:13, 50:11, 54:13, 63:9, 70:15, 78:5, 78:17, 78:21, 78:22, 79:22, 79:23, 83:15, 83:19, 84:10, 85:12, 88:16, 88:24, 89:2, 90:7, 91:1, 91:9, 91:18, 91:20, 92:12, 93:7, 93:8, 93:19, 94:17, 98:11, 99:19, 104:9, 104:10, 107:12, 110:15, 111:4, 112:6, 120:1, 123:23, 124:2, 124:3, 124:6, 124:9, 124:11, 124:13,

124:15, 124:17, 130:2, 146:11, 152:4, 152:18, 158:23, 161:13, 161:18, 161:25, 163:9, 166:3, 171:18, 174:5, 176:13, 177:1, 177:24, 178:2, 178:6, 179:5, 179:12, 179:14, 179:15, 179:16, 192:2, 192:7, 192:10, 194:1, 194:4, 194:8, 196:15, 204:3, 206:8, 206:24, 207:2, 207:10, 207:11, 208:7, 209:13, 209:18, 209:25, 210:18, 210:23
**Texas** [1] - 155:8
**text** [3] - 128:14, 130:9, 171:6
**The court** [110] - 3:2, 3:5, 3:11, 3:14, 3:20, 3:23, 4:3, 4:9, 14:19, 14:22, 14:24, 17:20, 17:22, 19:1, 19:5, 19:12, 20:2, 20:3, 20:13, 20:23, 21:1, 22:10, 30:2, 30:5, 30:24, 35:14, 35:17, 47:11, 48:6, 48:9, 48:12, 48:15, 58:14, 59:23, 60:8, 60:15, 60:18, 60:21, 60:23, 61:3, 61:8, 61:10, 61:13, 61:18, 61:25, 62:4, 65:3, 65:5, 71:2, 71:14, 82:19, 85:7, 88:3, 97:25, 103:25, 104:3, 107:10, 109:13, 109:15, 109:18, 109:21, 109:23, 109:25, 110:3, 110:5, 117:8, 117:17, 117:19, 117:22, 117:25, 125:13, 125:17, 127:9, 136:12, 137:21, 137:25, 138:2, 138:5, 138:7, 138:11, 138:14, 138:16, 138:19, 141:5, 146:12, 146:17, 147:1, 150:20, 166:7, 166:10, 166:12, 166:15, 166:17, 166:21, 166:24, 167:3, 167:7, 167:9, 167:12, 167:19, 167:24, 168:9, 168:22, 174:6, 174:9, 188:24, 195:9, 211:4, 211:8
**The witness** [28] - 4:2, 4:8, 14:25, 19:15, 20:19, 35:22, 48:16, 62:6, 62:10, 71:14, 88:4, 98:2, 98:5, 104:4, 107:11, 117:16, 117:20, 117:21, 117:24, 125:11, 127:10, 138:15, 138:25, 151:10, 166:23, 167:21, 168:1, 195:11
**the.** [1] - 12:18
**themselves** [2] - 56:18, 72:10

**theory** [6] - 80:17, 81:20, 81:23, 82:8, 147:23, 148:12
**thereafter** [1] - 29:4
**therefore** [4] - 71:9, 199:9, 200:23, 200:24
**theses** [1] - 172:14
**thesis** [2] - 3:9, 3:13
**they've** [6] - 63:10, 72:2, 86:19, 94:3, 184:12, 210:2
**thinking** [3] - 100:22, 185:9
**thinners** [1] - 52:10
**third** [10] - 10:4, 21:21, 21:24, 44:7, 53:2, 60:14, 74:24, 169:11, 190:4, 190:6
**Third** [2] - 87:5, 185:19
**thirds** [1] - 106:14
**thoroughly** [1] - 108:4
**thoughts** [3] - 7:12, 18:7, 28:7
**thousands** [1] - 69:25
**three** [19] - 17:20, 27:10, 33:2, 33:5, 52:12, 67:19, 105:5, 116:6, 132:14, 132:21, 172:7, 186:2, 191:14, 191:24, 192:2, 192:7, 192:9, 205:5
**Thrones** [2] - 57:11, 57:12
**throughout** [2] - 16:18, 190:22
**thrown** [1] - 198:17
**timed** [10] - 54:16, 104:14, 105:14, 106:12, 106:14, 109:6, 166:3, 173:17, 174:5, 210:17
**timeline** [1] - 139:16
**timing** [1] - 21:10
**title** [8] - 31:18, 32:14, 37:3, 93:21, 136:11, 147:10, 177:8, 192:22
**titled** [1] - 37:14
**titles** [1] - 55:10
**today** [18] - 3:9, 3:19, 3:20, 4:4, 5:7, 33:25, 65:2, 74:9, 94:21, 111:17, 117:9, 130:23, 133:16, 141:1, 147:25, 150:14, 160:20, 173:13
**together** [6] - 25:19, 28:8, 76:11, 88:23, 145:23, 173:3
**TOMM** [4] - 206:21, 206:23, 207:3, 207:13
**tomorrow** [3] - 3:21, 60:5, 211:6
**took** [35] - 5:20, 38:16, 39:14, 40:14, 40:15, 41:14, 41:18, 41:24, 43:1, 43:9, 43:15, 43:18, 44:11, 45:1, 45:8, 45:23, 46:14, 47:1, 52:21, 52:23, 87:22, 88:6, 88:21, 102:18, 103:1, 105:1,

110:11, 113:15, 124:23, 126:5, 133:10, 137:16, 157:12, 194:1, 195:24
**top** [18] - 9:11, 15:19, 17:5, 33:18, 85:7, 102:19, 102:22, 103:2, 103:4, 103:17, 128:11, 160:8, 172:4, 182:2, 182:8, 182:16, 191:1, 192:23
**topics** [4] - 40:7, 56:13, 143:21, 145:15
**total** [3] - 9:21, 98:14, 182:1
**tougher** [1] - 119:3
**toward** [2] - 183:13, 209:2
**towards** [1] - 111:13
**track** [1] - 116:18
**traditionally** [1] - 79:17
**traffic** [1] - 206:9
**train** [1] - 67:20
**trained** [1] - 87:10
**training** [6] - 70:14, 70:19, 71:5, 118:2, 122:20, 170:2
**trait** [1] - 75:5
**traits** [4] - 75:5, 75:15, 75:25, 76:1
**transcript** [3] - 99:21, 99:22, 211:13
**transcription** [1] - 1:25
**translate** [1] - 7:12
**trauma** [1] - 22:20
**traveled** [1] - 51:24
**treat** [2] - 99:24, 209:4
**treated** [2] - 121:1, 187:1
**treating** [1] - 4:20
**treatment** [1] - 210:14
**treats** [1] - 187:21
**trends** [1] - 145:24
**Trial** [1] - 94:11
**trial** [1] - 94:11
**tricky** [1] - 155:3
**tried** [4] - 14:6, 52:16, 126:10, 126:22
**trouble** [5] - 74:15, 76:5, 77:4, 78:2, 119:22
**true** [12] - 82:7, 91:11, 115:10, 118:19, 121:15, 124:10, 124:13, 124:15, 133:22, 191:11, 191:12, 191:24
**truth** [2] - 133:20
**try** [11] - 52:14, 52:16, 93:1, 114:24, 128:2, 171:5, 174:18, 176:17, 181:8, 188:20, 207:11
**trying** [12] - 5:1, 43:23, 52:13, 56:25, 110:5, 124:5, 126:24, 155:2, 195:19, 196:13, 204:2, 207:8
**Tuesday** [1] - 51:22
**tumors** [1] - 22:20
**turn** [25] - 4:7, 6:19, 31:4,

32:1, 44:23, 64:6, 74:2, 77:5, 77:6, 83:25, 102:6, 104:17, 140:6, 142:2, 142:20, 143:17, 145:5, 147:13, 168:19, 178:13, 178:16, 180:25, 187:12, 190:25
**turned** [2] - 159:20, 168:12
**turning** [2] - 54:19, 140:21
**tutoring** [1] - 32:5
**twice** [7] - 50:24, 97:22, 156:14, 162:21, 162:22, 203:22, 203:24
**two** [43] - 8:5, 8:20, 9:17, 10:14, 12:1, 12:13, 12:17, 18:8, 23:2, 23:6, 23:7, 30:14, 48:1, 52:10, 60:13, 61:9, 61:10, 67:14, 78:16, 83:13, 86:6, 86:8, 88:24, 89:3, 94:9, 99:19, 106:14, 116:6, 128:1, 141:20, 145:2, 152:21, 157:14, 167:14, 169:6, 180:21, 186:12, 186:16, 186:17, 188:8, 190:19, 191:18, 200:11
**two-and-a-half** [1] - 18:8
**two-day** [1] - 60:13
**two-hour** [1] - 23:6
**two-page** [1] - 12:13
**two-thirds** [1] - 106:14
**two-year** [1] - 169:6
**type** [5] - 13:21, 83:9, 83:17, 93:8, 96:12
**typed** [3] - 15:9, 15:12, 27:17
**types** [8] - 55:1, 68:18, 75:24, 78:16, 83:13, 93:18, 99:1, 143:20
**typical** [4] - 79:5, 124:16, 163:22, 209:8
**typically** [10] - 62:22, 76:22, 94:10, 106:1, 123:11, 124:9, 177:9, 194:24, 202:5, 209:6
**U.S** [1] - 1:8
**ultrasound** [1] - 52:3
**unbiased** [2] - 154:12, 154:17
**uncertainty** [1] - 190:24
**unchanged** [1] - 12:3
**uncommon** [5] - 172:22, 174:20, 176:2, 194:20, 202:11
**under** [26] - 3:24, 33:7, 40:3, 63:7, 65:13, 72:20, 74:6, 78:23, 81:12, 81:19, 82:7, 96:20, 104:14, 105:14, 105:15, 107:1, 117:10, 117:14, 117:22, 119:21, 123:13, 148:7, 165:1, 179:14, 202:25, 206:18
**underachievement** [1] - 147:11

**underachieving** [2] - 147:21, 164:17
**undergrad** [2] - 57:9, 57:10
**undergraduate** [1] - 99:22
**undergraduates** [1] - 118:8
**undermine** [2] - 66:14, 103:15
**undermines** [2] - 107:2, 109:9
**undermining** [1] - 65:20
**understood** [3] - 64:19, 83:5, 119:17
**uneven** [1] - 79:1
**United** [2] - 155:24, 170:21
**UNITED** [1] - 1:1
**University** [15] - 31:6, 31:9, 66:22, 67:1, 67:7, 137:9, 142:8, 142:9, 142:11, 168:25, 169:1, 169:2, 169:4, 169:6, 198:20
**unless** [2] - 124:7, 189:6
**unlike** [2] - 190:10, 192:5
**unquote** [1] - 128:16
**unrecognized** [1] - 194:20
**unreliable** [3] - 86:1, 86:4, 151:19
**unsurprisingly** [1] - 90:11
**unusual** [12] - 73:21, 74:1, 74:18, 101:10, 151:2, 181:17, 199:7, 199:8, 200:21, 200:24, 201:11
**up** [36] - 20:21, 23:25, 31:10, 42:11, 50:21, 51:24, 52:3, 52:4, 52:7, 52:17, 53:9, 63:20, 63:23, 82:10, 82:12, 90:10, 90:22, 94:23, 124:8, 125:2, 125:17, 126:3, 126:5, 150:25, 156:5, 174:18, 176:24, 180:14, 181:8, 181:21, 186:1, 186:3, 187:9, 187:10, 188:18
**updated** [1] - 11:3
**US** [1] - 63:15
**useful** [4] - 84:16, 111:12, 112:7, 112:22
**uses** [1] - 129:22
**USMLE** [16] - 63:4, 71:21, 74:4, 83:11, 108:15, 108:18, 115:22, 130:10, 139:14, 150:2, 156:17, 157:20, 173:14, 173:18, 180:6, 210:18
**usual** [1] - 210:21
**utilized** [1] - 95:2
**utilizing** [1] - 1:24
**valid** [4] - 20:10, 77:21, 81:7, 200:12
**validity** [7] - 93:7, 93:8, 155:1, 206:18, 207:8, 207:9, 207:10

**value** [6] - 86:24, 88:6, 89:13, 89:14, 90:15, 98:18
**VARGAS** [19] - 2:2, 2:3, 3:4, 3:16, 3:22, 14:15, 14:23, 18:22, 19:11, 19:24, 20:24, 22:9, 30:1, 30:3, 30:23, 48:18, 58:13, 167:5, 167:11
**variability** [1] - 79:12
**varied** [2] - 47:19, 49:21
**varies** [2] - 116:4, 154:21
**variety** [3] - 90:17, 101:16, 143:22
**various** [11] - 5:13, 70:1, 77:22, 80:3, 91:1, 136:25, 145:2, 152:4, 152:18, 168:6, 193:25
**vary** [3] - 37:9, 116:10, 123:9
**varying** [1] - 10:19
**vast** [3] - 74:1, 136:4
**vein** [1] - 52:5
**verbal** [16] - 55:9, 55:21, 105:2, 105:3, 105:10, 106:11, 107:5, 125:3, 127:7, 127:14, 184:4, 184:6, 201:3, 201:12
**verbally** [1] - 201:4
**version** [10] - 14:10, 14:12, 18:17, 23:19, 25:22, 39:13, 43:7, 104:25, 114:13, 170:21
**versions** [1] - 12:19
**versus** [2] - 114:12, 116:21
**vice** [1] - 122:5
**videotaped** [1] - 51:8
**view** [1] - 51:8
**vignette** [1] - 130:15
**virtually** [3] - 72:3, 73:1, 147:20
**visible** [1] - 97:1
**visibly** [1] - 52:1
**visual** [4] - 205:2, 205:4, 205:19, 205:24
**Visual** [3] - 97:8, 203:8, 203:15
**vitae** [1] - 168:20
**vocabulary** [3] - 84:20, 85:10, 197:4
**voices** [1] - 57:13
**VOIR** [3] - 212:7, 212:10, 212:14
**volume** [3] - 64:8, 140:4, 151:6
**W-I-A-T** [1] - 87:11
**wait** [2] - 97:24, 205:1
**waiting** [1] - 172:10
**waived** [1] - 20:8
**wants** [1] - 195:4
**warranted** [1] - 150:9
**Washington** [2] - 2:5, 2:12
**watch** [6] - 51:19, 57:18, 59:24, 62:4, 138:20, 167:19

watching [2] - 57:15, 206:10
Wayne [1] - 142:9
ways [3] - 86:5, 92:23,
200:11
weaken [1] - 66:13
weaker [1] - 158:14
weaknesses [5] - 79:2, 79:6,
79:8, 158:13, 162:14
website [4] - 62:23, 73:3,
73:4, 149:1
Wechsler [5] - 87:4, 185:19,
196:15, 201:14, 209:14
week [8] - 4:5, 32:21, 33:6,
50:8, 53:11, 60:5, 60:10
weekend [1] - 117:14
weekly [1] - 145:1
weeks [2] - 52:12, 110:11
weighed [1] - 156:19
weight [4] - 71:4, 71:10,
137:1, 146:17
weighted [2] - 133:12,
134:15
weird [1] - 56:6
well-written [1] - 157:4
whisker [1] - 47:12
white [1] - 146:24
whole [12] - 13:10, 56:22,
116:10, 126:19, 151:22,
159:16, 189:6, 191:23,
193:21, 200:4, 210:7
WIAT [31] - 87:7, 87:8, 87:9,
87:10, 87:12, 87:17, 88:10,
110:19, 110:23, 111:6,
123:24, 131:1, 131:11,
161:25, 163:9, 185:14,
185:17, 186:3, 187:2,
188:14, 189:2, 190:10,
190:11, 192:3, 192:5, 192:7,
194:5, 199:21, 199:23
WIAT-III [3] - 110:19, 110:23,
111:6
WIAT-information [10] -
123:24, 131:1, 131:11,
161:25, 185:14, 185:17,
188:14, 189:2, 192:3, 194:5
widely [4] - 121:6, 121:16,
129:25, 155:19
willing [1] - 174:22
window [1] - 33:10
Wisconsin [2] - 31:9, 31:11
Wisconsin's [1] - 31:6
wise [1] - 55:16
withdraw [1] - 58:7
withdrawn [1] - 14:19
withhold [1] - 97:12
Witness [1] - 212:4
witness [16] - 30:3, 59:25,
61:12, 61:19, 61:20, 62:1,
70:23, 82:17, 138:8, 138:12,
146:9, 146:19, 166:17,

166:21, 167:18, 174:3
witnesses [1] - 166:24
wondering [1] - 17:23
Woodcock [11] - 88:14,
111:20, 111:22, 123:25,
131:23, 132:1, 162:7, 163:9,
191:3, 192:8, 194:6
Woodcock-Johnson [11] -
88:14, 111:20, 111:22,
123:25, 131:23, 132:1,
162:7, 163:9, 191:3, 192:8,
194:6
word [22] - 55:12, 59:15,
88:23, 132:5, 152:22, 171:8,
171:9, 184:24, 187:7, 187:8,
187:11, 187:12, 190:9,
190:19, 190:22, 190:24,
191:6, 191:17, 191:24
words [14] - 7:12, 8:8, 8:10,
25:21, 28:7, 50:16, 171:7,
171:10, 185:3, 190:2, 190:7,
191:10, 191:18
workmen's [1] - 72:20
works [1] - 68:10
workshops [1] - 69:4
world [24] - 78:6, 78:19,
78:20, 78:21, 78:25, 83:18,
83:19, 91:15, 91:17, 91:23,
92:7, 92:11, 93:3, 94:17,
99:3, 99:9, 99:19, 99:24,
100:2, 100:17, 101:24,
109:5, 109:6, 129:11
worldwide [1] - 145:22
worry [1] - 20:16
worse [3] - 92:6, 173:7,
173:11
WRAT5 [1] - 177:4
write [10] - 5:15, 23:25,
24:12, 50:13, 51:2, 62:25,
157:7, 157:9, 157:12, 176:24
write-up [1] - 176:24
writes [1] - 191:12
writing [24] - 7:20, 15:24,
24:10, 27:7, 50:21, 51:11,
55:20, 56:4, 58:20, 58:23,
73:12, 74:7, 77:19, 77:22,
78:3, 87:13, 102:4, 103:18,
105:3, 107:2, 107:3, 157:21,
158:21, 177:11
written [14] - 7:13, 13:1,
25:1, 50:9, 63:24, 66:7,
140:1, 148:1, 149:23,
153:17, 157:4, 157:10,
171:6, 210:17
wrote [12] - 8:8, 8:10, 13:13,
15:12, 73:18, 73:23, 147:8,
152:8, 152:24, 153:1,
158:18, 158:20
Xarelto [1] - 52:10
Yale [1] - 198:20

year [22] - 31:12, 31:13,
31:22, 32:24, 40:5, 40:16,
40:19, 40:20, 41:15, 41:16,
41:17, 44:7, 47:19, 50:3,
50:4, 51:17, 53:3, 90:23,
102:10, 136:2, 169:6, 185:21
years [22] - 52:10, 62:18,
67:6, 67:8, 69:18, 73:10,
116:6, 134:24, 135:12,
139:8, 142:15, 143:7,
143:13, 144:15, 144:20,
153:5, 153:8, 156:4, 195:1,
195:25, 203:1
yesterday [20] - 3:19, 3:25,
4:18, 13:19, 15:20, 16:2,
18:4, 37:24, 38:15, 50:12,
53:13, 56:10, 59:18, 107:22,
124:22, 125:9, 126:6,
127:17, 133:16, 136:15
yield [1] - 101:16
yielded [1] - 105:1
York [5] - 67:1, 67:7, 69:22,
117:1, 117:2
young [4] - 151:1, 152:1,
152:16, 164:17
younger [1] - 151:17
youngster [1] - 208:15
your.. [1] - 100:8
yourself [4] - 129:17, 136:19,
151:22, 179:15
yup [1] - 189:17
Zecker [13] - 136:6, 138:18,
138:25, 139:3, 140:6, 141:8,
142:1, 143:25, 146:8, 147:5,
150:23, 166:14, 197:15
ZECKER [3] - 138:22,
212:10, 212:12
ZUBA [1] - 1:15

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2                         -  -  -

3    JESSICA RAMSAY,              :  CIVIL ACTION NO.
            Plaintiff,            :  2:19-cv-02002
4                                 :
       v.                         :
5                                 :
     NATIONAL BOARD OF MEDICAL    :  PRELIMINARY
6    EXAMINERS,                   :  INJUNCTION HEARING
            Defendant.            :  DAY 3
7    _____

8
                              James A. Byrne U.S. Courthouse
9                              601 Market Street
                              Philadelphia, PA 19106
10                             December 5, 2019
                              Commencing at 9:30 a.m.
11   _____

12         BEFORE THE HONORABLE J. CURTIS JOYNER

13   _____

14

     APPEARANCES:
15
         REISMAN CAROLLA GRAN & ZUBA, LLP
16       BY:  LAWRENCE D. BERGER, ESQUIRE
         19 Chestnut Street
17       Haddonfield, New Jersey 08033
         (856) 354-5640
18       larry@rcglawoffices.com
         Representing the Plaintiff
19

20

21                         -  -  -

22         Ann Marie Mitchell, CRR, RDR, RMR
              Official Court Reporter
23                 (267) 299-7250

24

     Proceedings taken stenographically and prepared utilizing
25   computer-aided transcription

```
 1   APPEARANCES CONTINUED:

 2
         STEIN & VARGAS LLP
 3       BY:  MICHAEL STEVEN STEIN, ESQUIRE
         BY:  MARY C. VARGAS, ESQUIRE
 4       10 G Street NE
         Suite 600
 5       Washington, DC 20002
         (202) 248-5092
 6       michael.stein@steinvargas.com
         mary.vargas@steinvargas.com
 7       Representing the Plaintiff

 8

 9
         PERKINS COIE LLP
10       BY:  ROBERT A. BURGOYNE, ESQUIRE
         BY:  CAROLINE M. MEW, ESQUIRE
11       700 - 13th Street, NW
         Suite 600
12       Washington, DC 20005
         (202) 654-6200
13       rburgoyne@perkinscoie.com
         cmew@perkinscoie.com
14       Representing the Defendant

15

16                            -   -   -

17

18

19

20

21

22

23

24

25
```

1              (Court called to order at 9:30 a.m.)

2              THE COURT:  Good morning.  You may be seated.

3              MR. BERGER:  Your Honor, just one brief thing before

4    Mr. Burgoyne proceeds.  And that is that when Dr. Smith

5    testified on direct yesterday, I don't believe that I formally

6    moved exhibit P-21, which is his declaration and which was

7    covered in the testimony, into evidence, so I would like to

8    offer it into evidence now.

9              THE COURT:  Very well.  Any objection?

10             MR. BURGOYNE:  No objection, Your Honor.

11             THE COURT:  It's admitted.

12             (Exhibit P-21 admitted.)

13             THE COURT:  Sir, will you come and take the stand.

14   Sir, I'll remind you you're still under oath from previously

15   being sworn in yesterday.

16             Do you understand that?

17             THE WITNESS:  Yes.

18             THE COURT:  Very well.  Let's proceed.

19             (A discussion off the record occurred.)

20             THE COURT:  Now, check your mic and make sure it's

21   operating.

22             THE WITNESS:  No.

23             THE COURT:  This is what happens when your staff is

24   not here to do all these things before you come out, talking

25   about my deputy clerk, who is out this week.

1          Let's proceed.

2          MR. BURGOYNE:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. BURGOYNE:

5    Q.   Again, good morning, Dr. Smith.

6    A.   Good morning.

7    Q.   Jessica Ramsey came to see you in the fall of 2008 because

8    she wanted to obtain an evaluation to support her request for

9    accommodations on the Step 1 exam.  Correct?

10   A.   Yes.

11   Q.   And you'd never seen or treated her prior to that time?

12   A.   No.

13   Q.   And you have a reputation in this area of providing

14   evaluation reports for students seeking accommodations on

15   standardized tests?

16   A.   Yes.

17   Q.   And I think Ms. Ramsay testified she came across your name

18   on the internet.

19        Would you look at Defense Exhibit 34, which should be the

20   page that is up.

21   A.   It is.

22   Q.   Is this the home page for your website?

23   A.   Yes.

24   Q.   So this is the first page someone will see when they go to

25   your website?

1  A.   Yes.

2  Q.   And on the top it says you specialize in the assessment

3  and treatment options for dyslexia, ADD, ADHD, learning

4  disorders.

5       And then what's the fourth area in which you specialize?

6  A.   Extended time and accommodations for standardized tests.

7  Q.   And then in the first bullet point it states that adults

8  and teens with learning disabilities may be able to get

9  additional time and other accommodations in high-stakes testing

10 situations, and you refer to the SAT, the ACT, the MCAT, the

11 LSAT, the GRE, the GMAT, et cetera.  And you state you offer

12 neuropsychological evaluations to individuals who are seeking

13 documentation as part of their application to request more time

14 and/or other accommodations.

15      Prior to Ms. Ramsay, had you evaluated anyone for

16 accommodations on the Step 1 exam?

17 A.   I'm not sure.  I think so.  I'm not sure.  I evaluated a

18 previous medical student.

19 Q.   Then would you read the last bullet point or the last

20 sentence in the second bullet point for us.

21 A.   An official DSM-5 Diagnostic and Statistical Manual of

22 Mental Disorders diagnosis is necessary when you are trying to

23 qualify for services at school or work.

24 Q.   I believe you testified about the DSM-5 yesterday?

25 A.   Yes.

1    Q.    Did you evaluate Ms. Ramsay in accordance with the

2    criteria in the DSM-5 manual?

3    A.    Yes.

4    Q.    Turn to -- actually, I'm sorry, stay on Exhibit 34.  And

5    confirm for me that the second page here is a page from your

6    website that discusses evaluation for developmental dyslexia

7    and ADHD?

8    A.    Yes, that's my website.

9    Q.    You see there's a discussion about problems with IQ

10   testing?

11   A.    Yes.

12   Q.    And it states:  Principally, the principal method of

13   diagnosing learning disabilities such as dyslexia has been to

14   compare measured intelligence and achievement levels such as

15   reading?

16   A.    Yes.

17   Q.    Is that a reference to the so-called discrepancy model

18   that we were discussing yesterday?

19   A.    It is.

20   Q.    And then you go on to say:  However, there are serious

21   problems with this approach that are frequently not considered

22   in a diagnostic evaluation?

23   A.    Yes.

24   Q.    And at the bottom you identify some problems with ADHD or

25   ADD testing?

1  A.   Yes.

2  Q.   And the first sentence says:  There's considerable

3  controversy at the present time over what are the core symptoms

4  of ADHD or ADD.

5       Is that an accurate statement?

6  A.   Yes.

7  Q.   And then the last sentence in that paragraph says:

8  Evaluations require -- and it says a care review, but that

9  means a careful review?

10  A.   Yep.

11  Q.   A careful review of all tests, histories, grade reports,

12  teacher reports and parent reports?

13  A.   Yes.

14  Q.   Is that a statement you concur in until today?

15  A.   Yes.

16  Q.   Exhibit 35, please.  I think you mentioned this document

17  yesterday but I don't think we looked at it.

18       Is this the intake interview form that you have clients

19  fill out before they come to see you?

20  A.   Yes.

21  Q.   And was this the form that Ms. Ramsay completed?

22  A.   Yes.

23  Q.   And on the front page it says she's coming to see you to

24  get appropriate diagnosis and testing accommodations?

25  A.   Yes.

1  Q.   On page 2 of this document, which is Smith-33, there's a

2  section that says at the top, thinking back to growing up to

3  your school days, do you remember having trouble, and then

4  there's several activities that you describe here?

5  A.   Yes.

6  Q.   Is this relating to possible ADHD or LD or both?

7  A.   Both.

8  Q.   And Ms. Ramsay indicated that she remembered having

9  problems in all of these areas?

10 A.   Yes.

11 Q.   You're being compensated for your work in this case.

12 Correct?

13 A.   Yes.

14 Q.   And I believe you told me your rate is $125 per hour for

15 travel and waiting time?

16 A.   Yes.

17 Q.   From the time you leave home till the time you get home?

18 A.   Well, not quite.  That's not quite how I interpret it.

19      When I get to a hotel room where I would normally be at

20 home, I'm not going to count that, that kind of thing.

21 Q.   And then you're receiving I believe either 350 or $375 per

22 hour for --

23 A.   It's 350.

24 Q.   350.

25 A.   I looked back at the document.

```
 1   Q.   Okay.  And that's for your deposition time and your time

 2   in court?

 3   A.   Just the deposition time.

 4        I'm sorry, I misunderstood.  My deposition time and the

 5   time testifying here.

 6   Q.   We looked briefly at your resume yesterday.

 7        Have you done any research relating to requests for

 8   accommodations on high-stakes standardized tests?

 9   A.   When you say research you mean studies?

10   Q.   Yes.

11   A.   No.

12   Q.   And have you written any articles or other publications on

13   that subject?

14   A.   No.

15   Q.   You were the first professional to diagnose Ms. Ramsay

16   with dyslexia.  Correct?

17   A.   Yes.

18   Q.   You also diagnosed her with ADHD?

19   A.   Yes.

20   Q.   Both of those impairments are neurodevelopmental diseases.

21   Right?

22   A.   Yes.

23   Q.   And that means they're lifelong impairments?

24   A.   Yes.

25   Q.   When you evaluate someone for a possible learning
```

 1  disorder, what do you rely upon in making your diagnosis?

 2  A.   Any documents I can get from any previous evaluations,

 3  any -- the history that I can get from the client and anybody

 4  else, and then of course my test results.

 5  Q.   Do you also want to see report cards and grades and

 6  teacher comments if they're available?

 7  A.   Yes.

 8  Q.   And do you also want to see performance on standardized

 9  tests that were taken in elementary school?

10  A.   Yes.

11  Q.   And that would include tests such as the Iowa Tests of

12  Basic Skills?

13  A.   Yes.

14  Q.   And do you also want to see results from performance on

15  standardized tests such as the ACT, the SAT and the MCAT?

16  A.   Yes.

17  Q.   Why do you want to see report cards if they're available?

18  A.   In case there's something there that's informative about

19  what was going on for them at that time.

20  Q.   I think you told me in your deposition, you want to see if

21  there's anything that would indicate the presence or absence of

22  unusual struggle.  Is that an accurate statement of reasons you

23  want to see --

24  A.   I don't remember what I said then, but from my experience,

25  as I said yesterday, it's more about is there something that

1  indicates the presence.

2  Q.   And why do you want to see teacher comments?

3  A.   For the same purpose, in case they mention something.

4  Q.   Why do you want to know about someone's standardized

5  testing history?

6  A.   To get some kind of idea how they perform in such a

7  situation.

8  Q.   In your deposition in response to that question you

9  indicated that you want to see how they performed on other

10 kinds of tasks that are related to what you're evaluating.

11      Do you think performance on standardized tests like the

12 ACT and the MCAT are related to what you're evaluating when

13 you're doing an ADHD or LD evaluation?

14 A.   Yes, but not closely related.

15 Q.   And you also indicated that you like to see something

16 objective when you're doing an evaluation; is that correct?

17 A.   Yes.

18 Q.   And would teacher reports and teacher comments and grades

19 and performance on standardized tests be the type of objective

20 information you're looking for?

21 A.   The performance on standardized tests is more objective.

22 I don't really regard some of the information on the report

23 cards as necessarily truly objective.

24 Q.   What is the biggest risk in relying upon a patient's

25 self-report with information that's provided to you during an

1  interview?

2  A.   The biggest risk is that they're not presenting it

3  accurately, either deliberately or they're just a poor

4  reporter.

5  Q.   What do you rely upon when evaluating whether someone

6  meets the diagnostic criteria for ADHD?

7  A.   Primarily -- well, if there is something in the history

8  and records that would indicate that kind of dysfunction, but

9  primarily with the client and anybody else that they know --

10 any questionnaires or reading skills have filled out, that

11 information primarily.

12 Q.   I believe you testified in both your deposition and

13 yesterday that the assessments that are sometimes used in

14 evaluating ADHD are not very reliable?

15 A.   No.

16      I'm sorry, yes.  They're not -- I don't consider them very

17 precise instruments.

18 Q.   Okay.  When Ms. Ramsay came to you, she knew she was

19 undergoing diagnostic testing, the results of which would

20 affect whether or not she got accommodations on the Step 1

21 exam?

22 A.   Yes.

23 Q.   Likewise, when she filled out ratings scales, she knew

24 that that information would influence whether she got

25 accommodations on the Step 1 exam?

1  A.   Yes.

2  Q.   You testified yesterday I think that the DSM-5 requires

3  that an individual diagnosed with ADHD has experienced multiple

4  symptoms in multiple settings and with early onset.  Is that --

5  A.   Yes.

6  Q.   All of those are part of the diagnostic criteria?

7  A.   Yes.

8  Q.   Other than the self-report by Ms. Ramsay and her mother,

9  what evidence did you see of early onset of ADH symptoms with

10 Ms. Ramsay?

11 A.   Primarily it was the report from Ms. Ramsay and her

12 mother.

13 Q.   And what evidence did you see other than self-report of

14 impairment in multiple settings?

15 A.   Primarily it was the report from Ms. Ramsay and her

16 mother.

17 Q.   And likewise regarding the presence of multiple ADH

18 symptoms, was that primarily the report of Ms. Ramsay and her

19 mother and her fiancé?

20 A.   Yes.

21 Q.   Before your deposition in this case, you reviewed some

22 articles relating to detecting performance validity problems.

23 Correct?

24 A.   Yes.

25 Q.   Why did you review those articles?

1  A.   I'm sorry, could you repeat your question for me?

2  Q.   Sure.  You testified in your deposition that before your

3  deposition, you reviewed some articles dealing with detecting

4  performance validity issues.

5       So my question is why you had done that?

6  A.   To see if I overlooked something.

7  Q.   What are performance validity problems?

8  A.   Problems?

9  Q.   Yeah.  Why does one perform a performance validity test?

10 What are you trying to evaluate?

11 A.   Well, we're trying to evaluate whether they make a good

12 effort or whether they're deliberately trying to exaggerate

13 their problems and their symptoms.

14 Q.   What does the term "malingering" mean in the diagnostic

15 context?

16 A.   Typically it means deliberately exaggerating your

17 symptoms.

18 Q.   Do individuals sometimes exaggerate or not perform to

19 their maximum in order to obtain certain external incentives?

20 A.   Yes.

21 Q.   An example might be, for example, getting Ritalin or other

22 medications which students often believe will help them?

23 A.   Yes.

24 Q.   And would another incentive be the opportunity to obtain

25 accommodations in school or on a standardized test?

1  A.   Yes.

2  Q.   How would a person malinger in order to be diagnosed with

3  a specific learning disorder?

4  A.   They use whatever knowledge they have about what the

5  condition is and try to mimic what the symptoms or performance

6  that would be expected based on what they know.

7  Q.   Is one possibility to try to do poorly on tests of

8  phonological processing?

9  A.   Yes.

10  Q.   And what are examples of tests that evaluate phonological

11  processing?

12  A.   The -- in the WIAT, the -- I get the names confused

13  sometimes between the two tests.  Pseudo word decoding I think

14  is how they title it there.

15  Q.   What other tests might you administer to try to evaluate

16  phonological process?

17  A.   If I -- well, I could use the Woodcock Johnson, the

18  Kaufman test -- test of educational achievement.  I didn't use

19  those particular tests in this instance.

20  Q.   Could a person also read very slowly when taking a

21  diagnostic assessment in order to produce a result that might

22  not reflect full effort?

23  A.   Yes.

24  Q.   And what are examples of diagnostic tests on which slow

25  reading would influence the outcome?

1  A.   Well, let me think of which ones.  On the WIAT, the oral

2  reading fluency subtest, the word reading subtest, there's a

3  supplemental measure of how fast you read those words.  Again,

4  it relates to how fast you read the words.  The Gray Oral.  The

5  Nelson-Denny, anything that has any kind of timed fact around

6  it.

7  Q.   You mentioned the Gray Oral.  That's the GORT that we were

8  referring to yesterday?

9  A.   The GORT-5, yes.

10  Q.   Nelson-Denny.  So the WIAT, the GORT and the Nelson-Denny,

11  those are all assessments that you administered to Ms. Ramsay?

12  A.   Yes.

13  Q.   How would one go about malingering in the context of an

14  ADHD diagnosis?

15  A.   I guess they would report -- based on what they know, they

16  would report the symptoms being frequently experienced.

17  Q.   What about in terms of reports that you obtained from

18  other individuals, would those individuals likewise need to

19  report significant symptoms?

20  A.   Yes.

21  Q.   Look at Exhibit 51, please.  And that's in the other

22  notebook, I apologize.  DX-51.

23  A.   Okay.

24  Q.   And this is an article entitled "An Investigation of

25  Methods to Detect Feigned Reading Disabilities."

 1  A.   Yes.

 2  Q.   Is this one of the articles you reviewed in advance of

 3  your deposition?

 4  A.   Yes.

 5  Q.   Let's look at your evaluation report for Ms. Ramsay.  And

 6  if you'll look at DX-3, it's attached to your declaration.  It

 7  is Tab B.

 8  A.   DX what.

 9  Q.   3?

10  A.   It's back in the other notebook?

11  Q.   Yes.  I apologize.

12  A.   It's okay.

13  Q.   I'll try to avoid that.

14  A.   You said DX-3.  Correct?

15  Q.   It's DX-3, Tab B.

16  A.   I'm sorry, DX-3, what?

17  Q.   Tab B as in boy.

18  A.   Got it.  All right.

19  Q.   We covered some of this yesterday with Mr. Berger in terms

20  of the types of information that you considered.

21       In your listing of records reviewed, is this a complete

22  list of the records you reviewed as part of your evaluation?

23  A.   Yes.

24  Q.   On page 2 of this, this exhibit, there's a reference to

25  the personal statement regarding Ms. Ramsay's need for

1  accommodations?  It's the second item listed.

2  A.  Yes, I see it.

3  Q.  It's dated June 6, 2018.

4  A.  Yes.

5  Q.  And did she give you her personal statement from 2016?

6  A.  I don't recall.  It's not here.  I don't recall getting

7  it.

8  Q.  And did she give you a copy of her request for

9  accommodations that she submitted to the NBME in 2016?

10  A.  I don't recall doing it, if it's not here.  I either

11  overlooked it or...

12  Q.  On the next page, page 4, you discussed this a little bit

13  yesterday, but Ms. Ramsay's school history?

14  A.  Yes.

15  Q.  And there's a statement that said she had academic

16  struggles that began from the first days in school and

17  consistently required accommodations, such as extended time on

18  tests and assignments, altered grading schemes, frequent

19  breaks, private space for testing and completing class work in

20  order to compensate for distractibility, impaired attention and

21  concentration, impaired reading comprehension, impaired reading

22  speed and hyperactivity.

23      Is that information that you relied upon in making your

24  evaluation?

25  A.  Yes.

1  Q.   Look at DX-4, Tab A for me.

2  A.   Okay.

3  Q.   And if you would go, please, to page 6 of this document.

4  A.   All right.

5  Q.   And this is Ms. Ramsay's initial request for

6  accommodations.  And you see on the top there, there's a

7  section where she discusses her accommodations in primary and

8  secondary school?

9  A.   Yes.

10  Q.   And then if you look at elementary school, there's a

11  reference to accommodations she received in one school year,

12  1996-1997?

13  A.   Yes.

14  Q.   And there's a reference to her getting an alphabet chart,

15  distraction reduced space, extra time for writing and reading.

16  And then she says:  These were provided by the teacher, not the

17  school, so I do not have records confirming them.

18      Had you ever seen this document as part of your

19  evaluation?

20  A.   I don't recall it, no.

21  Q.   And you see she doesn't list any other informal or formal

22  accommodations here?

23  A.   Yes.

24  Q.   Look at Exhibit -- back to Exhibit 3.

25      Actually, keep that one open.  I apologize.  Let me get to

1  your report here.  And take a look at DX-4, Tab B, the same

2  document you were just in.

3  A.   Just a minute.  DX-4, Tab B.  Right?

4       All right.

5  Q.   And this is Ms. Ramsay's personal statement from 2016.

6  And it's not listed in your documents you reviewed, so I take

7  it that means you had not seen this document previously?

8  A.   I don't -- well, I'm not sure.  There were so many, it's

9  possible that I have it and didn't realize there were two

10 different versions.

11 Q.   Okay.  And then on page 2 of this document in the first

12 full paragraph, there's a discussion of Ms. Ramsay experiencing

13 reversals and distinguishing between similar-appearing

14 characters when reading and writing?

15 A.   Yes.

16 Q.   First of all, are reversals something you commonly see

17 with dyslexia, or is that something people just assume happens?

18 Is that a common trait with dyslexia?

19 A.   It's common to dyslexia but not exclusive to dyslexia.

20 Q.   And then she goes on to discuss that she had been placed

21 in a time-out desk to avoid distractions and also received an

22 alphabet chart.  And then at the very last sentence, she says:

23 Unfortunately, these accommodations were unofficial, enacted by

24 my teacher rather than the school, so I do not have any record

25 that they were provided.

1       Sorry, that was the third from the last sentence?

2       Other than this visual testing, I was not evaluated for

3   learning disabilities until 2009 and so did not receive any

4   other aid or accommodation.

5       Is that language you had seen before today?

6   A.   Not that I recall.

7   Q.   In your report you also reference some prior evaluation

8   reports that you looked at, including reports from a Dr.

9   Lewandowski?

10  A.   Yes.

11  Q.   And Dr. Lewandowski is a board certified

12  neuropsychologist.  Correct?

13  A.   Yes.

14  Q.   And he personally evaluated Ms. Ramsay?

15  A.   Yes.

16  Q.   He didn't just do a paper review, in other words?

17  A.   No.

18  Q.   And I believe you concluded that the assessments he

19  administered were inappropriate?

20  A.   I wouldn't use the word "inappropriate."  If I did, I

21  shouldn't have used the word "inappropriate."

22  Q.   I will show you, you did, but --

23  A.   No, I imagine I did.  But that was a poor choice of words.

24  Not applicable, insufficient for the kind of thing he was

25  trying to evaluate.

1  Q.   I think yesterday you put it as inadequate testing?

2  A.   I wouldn't use that word again, because of the pejorative

3  nature of it.  But insufficient.

4  Q.   Okay.  I think you testified in your deposition that based

5  on the evaluation he did of Ms. Ramsay, you don't believe he

6  could have arrived at a proper diagnosis regarding a learning

7  disability?

8  A.   No.

9  Q.   No meaning you don't think he could have?

10 A.   That's correct.  Yes.

11 Q.   That was despite the fact that he met with her in person

12 and was a licensed neuropsychologist?

13 A.   Yes.

14 Q.   Look at DX-3, your same document, and Tab D, which I

15 believe is Dr. Lewandowski's evaluation --

16 A.   Yes.

17 Q.   -- report.

18      And on -- at the page -- it's page 3 of his report.

19 A.   Yes.

20 Q.   He indicates normal achievement study, reading, spelling

21 and arithmetic are normal to above normal and consistent with

22 past education.

23      What assessment did he administer to arrive at that

24 conclusion?

25 A.   The -- I believe he administered only the WRAT5, the Wide

1   Range Achievement Test, Fifth Edition.

2   Q.   Regarding the diagnosis of -- actually, let me back up and

3   ask you first about there's a reference here to Dr. Livingston

4   in your report.

5   A.   What page are you on?

6   Q.   In fact, not Dr. Livingston, just Charles Livingston, MA.

7   A.   Where page are we on?

8   Q.   That's page 2 of your report.

9   A.   Of my report.  Where is that?

10  Q.   Page 2 at the top where you've listed the records.

11          THE COURT:  What's the exhibit number?

12          THE WITNESS:  Exhibit number.

13          MR. BURGOYNE:  It's Tab B, I'm sorry, Your Honor.

14          THE COURT:  He's asking.

15          MR. BURGOYNE:  No, I apologize.

16          THE WITNESS:  I'm sorry, what's the Exhibit and what's

17  the Tab?

18  BY MR. BURGOYNE:

19  Q.   It's Exhibit 3 and Tab B.  So it's your report.

20  A.   So D?

21  Q.   B as in boy.

22  A.   D-2, Tab B?

23  Q.   D-3.

24  A.   D-3 and Tab B, thank you.

25          All right.  I'm there.

1  Q.   Okay.  And again, you're listing documents you reviewed.

2  And one of the documents you reviewed was some series of

3  reports from a Charles Livingston.

4       Do you see that reference?

5  A.   Yes.

6  Q.   And I think your opinion regarding his evaluation is that

7  it was incomplete and concluded -- and included the

8  administration of the out-of-date assessment version of the

9  WIAT?

10  A.   Yes.

11  Q.   And that based on that, you overall discounted his

12  evaluation?

13  A.   I discounted that -- those results of the WIAT that he --

14  the subtest that he administered.

15  Q.   And those results reflected what level of reading

16  comprehension, do you recall?

17  A.   You want me to look at the -- I recall in general, but --

18  Q.   Give us your general recollection of what he found.

19  A.   Well above average for a reading comprehension -- the

20  reading comprehension subtest of the old WIAT.

21  Q.   I believe you also mentioned briefly yesterday

22  Dr. Ruekberg in connection with ADHD?

23  A.   Yes.

24  Q.   And I think you said you thought his report seemed okay?

25  A.   Yes.

1   Q.   Let's streamline this a little for you.

2        I'm going to hand you two sets of documents.  I tried to

3   streamline things regarding her academic history and

4   standardized tests.

5        MR. BURGOYNE:  Your Honor.

6        THE COURT:  Thank you.

7   BY MR. BURGOYNE:

8   Q.   And so the first one is a listing of her standardized

9   testing history.  The second one is a listing of some of the

10  results you found.

11  A.   Yes.

12  Q.   And the third one is just a listing of her academic

13  history.  Let me ask you a few questions about these.

14  Hopefully this will avoid the need for you to go back and forth

15  through documents.

16       You referenced in your report Ms. Ramsay's performance on

17  the MCAT, and then also you indicated you reviewed her ACT

18  score reports and her high school transcript and her college

19  transcript and her report cards from elementary school, or at

20  least some of them?

21  A.   Yes.

22  Q.   And did her ACT and MCAT scores raise any questions in

23  your mind relative to her performance on the diagnostic

24  assessments you administered?

25  A.   How do you mean?

1  Q.  Well, did they cause you to say, there's something not

2  matching up here in terms of what I'm seeing on her MCAT scores

3  and ACT scores and what I'm seeing in her diagnostic results?

4  A.  Yes, it caused me to take a deeper look at that.

5          MR. BERGER:  Your Honor, as to this document that Mr.

6  Burgoyne is using, I have every reason to believe that he's

7  copied all the numbers accurately, and I am fine with trying to

8  expedite in this way.  I'm just going to say this has got to be

9  subject to our eventually having the opportunity -- and we can

10 do it when we break -- to check against the actual numbers.

11         THE COURT:  Sure.  If he's moving this as an exhibit,

12 before it's admitted I'll give you an opportunity to place any

13 objection you may have.

14         It appears to be a summary of the information as

15 contained in the record.  This is a common exhibit that's shown

16 to witnesses in criminal and civil cases.  So we'll proceed,

17 and we'll allow you to entertain an objection at a later point.

18 All right?

19         You may proceed.

20         MR. BURGOYNE:  Thank you, Your Honor.  And I certainly

21 attempted to capture everything accurately and happy to be

22 corrected if not.

23         THE COURT:  We shall see.

24 BY MR. BURGOYNE:

25 Q.  How did you go about addressing the questions that arose

1  in your mind regarding the MCAT and the ACT scores relative to

2  what you were seeing on your diagnostic assessments?

3  A.   Well, there are two steps.  One is when I first saw them,

4  it raised a question in my mind.  But there was enough from the

5  other -- the other evaluations that really didn't address

6  things adequately as I thought.  So I thought, okay, let's do

7  the evaluation and see what I get.  And then afterwards, trying

8  to think through, well, what's going on here, how would this

9  be, that these scores could be true and that these scores could

10 be true.

11 Q.   Okay.  And what did you do to answer that question in your

12 mind?

13 A.   Well, the first one was I was confident about the scores

14 that I got were accurate, an accurate representation of her

15 true functioning.  And in looking at the overall pattern of

16 scores in her history, the combination of her intelligence,

17 what I know about partially remediated dyslexic readers and how

18 they can perform on these kinds of standardized tests, the --

19 my conclusion was that -- and my judgment of her and her

20 effort, that my judgment was that this would be not unexpected

21 for that person of that intelligence and effort to be able to

22 perform usually compensatory strategies, to perform well on

23 these kinds of tests.

24 Q.   And by compensatory strategies, are those the test-taking

25 strategies that Ms. Ramsay testified to yesterday?

1   A.   All of the things she's described in terms of strategies

2   that she learned and that she's described.

3   Q.   Did you make any effort to go and retrieve either ACT

4   questions or Step 1 questions or MCAT questions before you

5   prepared your report?

6   A.   I did not.

7   Q.   And do you know whether the MCAT is a computer-based test

8   or a paper-based test?

9   A.   I think it's a computer-based test.

10  Q.   Do you know how long it lasts?

11  A.   That version?

12  Q.   Yes.  The version she took.

13  A.   I think it lasts about 200 minutes total, not including

14  the writing section.

15  Q.   I believe when I deposed you, you said you weren't very

16  familiar about the MCAT or the Step 1 but you were familiar

17  with the ACT test?

18  A.   Well, yes, I said that, but I'm not that familiar with it.

19  They are standard -- ACT in particular is a standardized test.

20  The formats are very common.

21  Q.   You would agree that there's a substantial amount of

22  reading involved on that exam?

23  A.   Yes.

24  Q.   And you didn't discuss with Ms. Ramsay her test-taking

25  strategy on the ACT exam, did you?

1  A.   Yeah, I did, but only in a cursory way to get some idea

2  that she'd applied the strategies that she had generally talked

3  about.

4  Q.   Look again, if you would, please, or look for the first

5  time at the list of standardized tests that I've given you.

6  A.   Yes.

7  Q.   All of which she took without accommodations?

8  A.   Yes.

9  Q.   Do you recall reviewing these score reports during your

10 deposition?

11 A.   I don't recall having these.

12      Oh, I'm sorry, deposition.  I was thinking report.

13 Q.   Let's back up.

14 A.   Yes, deposition.

15 Q.   You don't recall having all of these as part of your

16 evaluation?

17 A.   No.

18 Q.   Okay.  But you did review these during your deposition?

19 A.   Yes.

20 Q.   And for example, one of the exams that you had not seen as

21 part of your evaluation was the Iowa Tests?

22 A.   Yes.  I had not seen them.

23 Q.   And you were asked questions about that test yesterday.

24 Correct?

25 A.   Yes.

1   Q.   And I think you testified that there were instances in

2   which her -- certain of her scores, she did not perform at the

3   level that one would have anticipated?

4   A.   Yes.

5   Q.   Even as to those scores, however, were the scores that she

6   obtained average or above average on the Iowa Tests?

7   A.   Yes.

8   Q.   And her composite score in fact was at the 86th

9   percentile?

10  A.   Yes.

11  Q.   And that's an above average score?

12  A.   That one is, yes.

13  Q.   And then her reading score was at the 74th percentile?

14  A.   Yes.

15  Q.   Meaning she was in the top 26 percent.  That's an average

16  score?

17  A.   That -- the way you're wording it doesn't sound right.

18       When you say top 26, her score was higher than 74 percent,

19  which would mean lower than 26 percent.  It means she's not in

20  the top 26, she's just below the top 26.

21  Q.   If she's in the 74th percentile, she did better than

22  76 percent of the people --

23  A.   74.

24  Q.   74.

25  A.   Yeah.  She did better than 74 percent of the people that

 1   took the test.

 2   Q.   If I was misphrasing that, I apologize.

 3   A.   That's okay.

 4   Q.   In any event, she achieved an average score?

 5   A.   Yes.

 6   Q.   And you'd agree that on all of these assessments from

 7   kindergarten through the MCAT exam, she performed in the

 8   average or above average range?

 9   A.   Yes.

10         MR. BERGER:  I'm going to object here because the

11   document does omit one part of the MCAT exam, the writing

12   sample.  And if I remember --

13         THE COURT:  You'll have an opportunity to

14   cross-examine on that point -- redirect on that point, Counsel.

15         You may proceed, Counsel.

16   BY MR. BURGOYNE:

17   Q.   You were asked if the MCAT and the ACT test were

18   diagnostic tests for dyslexia, and I think you said no?

19   A.   Correct.

20   Q.   Would you agree they nevertheless provide relevant

21   information regarding someone's ability to think, read and

22   concentrate when taking a standardized test?

23   A.   Yes.

24   Q.   Putting aside the diagnostic assessments that she took in

25   your office in order to get a report for testing accommodations

1  that included extra time, are you aware of any testing results

2  from Ms. Ramsay that reflect the reading deficits that you

3  identified in your report?

4  A.   Could you restate that for me, please.

5  Q.   Sure.  Putting aside the diagnostic assessment results

6  that you obtained, are you aware of any documents reflecting

7  Ms. Ramsay's performance on standardized assessments that

8  reflect that -- reading deficits that you found in your

9  evaluation?

10 A.   Yes.

11 Q.   And what are those?

12 A.   Any of the standardized tests where she was in the average

13 range or the -- because that's substantially below where I

14 would have expected a person who is at the 98th percentile

15 intellectually.

16 Q.   So your testimony is she was average everywhere but that

17 was still below what you would have expected her to achieve?

18 A.   Yes.  And it seems to be below areas that are not reading

19 related.

20 Q.   Let me ask you to look at your deposition when I asked you

21 a similar question.

22 A.   Okay.

23 Q.   It's page 92 of your deposition, Dr. Smith.

24 A.   Is that coming up here?

25      MS. MEW:  It's coming up.

1          THE WITNESS:  Page what?

2    BY MR. BURGOYNE:

3    Q.   It's page 92, line 7.

4    A.   Okay.

5          MR. BERGER:  Okay.

6    BY MR. BURGOYNE:

7    Q.   And in line 7, my question to you was:  Putting aside the

8    diagnostic assessments that she's taken in order to get

9    accommodations, are you aware of any testing that reflects

10   reading deficits comparable to what you identified in your

11   diagnostic assessments?

12        Do you see that question?

13   A.   Yes.

14   Q.   Do you see there's a series of objections by Mr. Berger?

15   A.   Yes.

16   Q.   And then what was your answer in line 16?

17   A.   No.

18   Q.   You define dyslexia, I believe, as a neurological disorder

19   that interferes with acquiring basic reading skills?

20   A.   Yes.

21   Q.   Do you need basic reading skills to take the ACT exams?

22   A.   To take it or to --

23   Q.   To perform well.

24   A.   Yes.

25   Q.   And do you need basic reading skills to perform well on

 1  the MCAT?

 2  A.   Yes.  Let me revise that, the term "performing well."

 3  Clearly you can have impaired basic reading skills and perform

 4  well.  The question is, what does it mean.

 5  Q.   What does what mean?

 6  A.   What does the score mean, you know, is it an accurate

 7  representation of what they were trying to measure.

 8  Q.   And the other document I gave you includes a summary of

 9  her report cards and teacher comments from kindergarten up

10  through I think Ohio State before she start --

11  A.   Yes.

12  Q.   This is in the handout I gave you, the little document

13  there.

14  A.   Yes.

15  Q.   And I think you testified both yesterday and in your

16  deposition that you didn't see anything in those documents that

17  reflected an impairment in learning or an impairment in

18  attention?

19  A.   Correct.

20  Q.   You indicated that in your experience it's not uncommon

21  for teachers not to make a notation about someone who is

22  struggling if their grades are good?

23  A.   Yes.

24  Q.   And did you have any factual basis for whether that

25  happened in this case regarding Ms. Ramsay's teachers?  Do you

1   have any knowledge one way or the other regarding why they did

2   or didn't put anything on these reports?

3   A.   No.

4   Q.   And one of the -- do you recall that Ms. Ramsay reported

5   struggling when she was in the third, fourth and fifth grades?

6   A.   Yes.

7   Q.   And do you recall her saying she required almost daily

8   attention from her teachers?

9   A.   Yes.

10  Q.   Look at DX-13, 14 and 15 for me.

11  A.   Again, which ones, DX what?

12  Q.   13, 14 and 15.  These are her report cards from the third,

13  fourth and fifth grades.

14  A.   Okay.

15  Q.   And I believe these were among the records that you had

16  when you prepared your report?

17  A.   Yes.

18  Q.   So you are familiar with these report cards?

19  A.   Yes.

20  Q.   And then on page 2 of each of these report cards, let's

21  start with 13.

22       And these are a little unusual relative to the other

23  report cards because they have a specific category that asks

24  for information regarding any additional support the student

25  was receiving.

1        Do you see that on the right side?

2   A.   Yes.

3   Q.   And you would agree, I take it, that there's no indication

4   on any of these forms in this category that Ms. Ramsay was

5   receiving specialized reading support or that her grades were

6   based on intensive teacher assistance?

7   A.   Yes.

8   Q.   Did you discuss that with Ms. Ramsay?

9   A.   Not that particular -- only the general absence of things

10  showing up in there, I asked her about that.

11  Q.   You circulated drafts of your evaluation report to Ms.

12  Ramsay and her attorney.  Correct?

13  A.   Yes.

14  Q.   And you set up a system they could use to provide comments

15  and feedback on that report?

16  A.   Yes.

17  Q.   And Ms. Ramsay and her attorney did in fact provide input

18  on the report?

19        MR. BERGER:  Objection to the extent that this is

20  calling for work product.

21  BY MR. BURGOYNE:

22  Q.   I don't want to know what the input was, just yes or no

23  questions.

24  A.   Yes.

25        THE COURT:  Overruled.

1  BY MR. BURGOYNE:

2  Q.   Let's look at the handout I gave you.

3       On page 2 of the stapled document, these are some of the

4  results that you obtained and which you testified to yesterday.

5  A.   Yes.

6  Q.   And what I want to do is try to make sure we and the Court

7  have an understanding what assessments produced those results.

8  Okay?

9       It starts with the Nelson-Denny.  We can start with that

10 one.

11 A.   This right here?

12 Q.   Yes.

13          THE COURT:  You didn't just put that on my --

14          MR. BURGOYNE:  I'm sorry, Your Honor.  I was trying to

15 make sure I didn't put it somewhere it wasn't going to fall.

16          THE COURT:  Here.  We'll put it here.

17          MR. BURGOYNE:  That's fine.  That's good.

18          THE COURT:  You'll be moving me out of here in a

19 moment, won't you?

20          MR. BURGOYNE:  Your Honor, I have to get rid of some

21 of these notebooks.

22 BY MR. BURGOYNE:

23 Q.   Looking at this document, please.

24          MR. BERGER:  Before we look at this document, this

25 document is a compilation of things which we have not seen

1  before.  I think some of them do correspond with exhibits that

2  counsel identified.

3          THE COURT:  Do you need a moment to review this

4  counsel?

5          MR. BERGER:  Yes, yes.  Thank you.

6          THE COURT:  Sure.

7          MR. BURGOYNE:  While he's doing that, Your Honor, I'll

8  just help speed things along a little -- the only document in

9  here --

10          THE COURT:  Hold on.  He has to listen to the

11  questions that you're posing to the witness.

12          MR. BURGOYNE:  No, no.  I was telling him what was in

13  here so he could know exactly what he wasn't seen before.

14          THE COURT:  Okay.  Go ahead.

15          MR. BURGOYNE:  The only one in here that wasn't an

16  exhibit, Larry, is the Nelson-Denny sample questions.

17          MR. BERGER:  Okay.  Just give me an minute.

18          THE WITNESS:  Is this an exact copy of the test?

19          MR. BERGER:  No, no.  This is one that someone uses to

20  help people prepare for an employment context.

21          MR. BURGOYNE:  All set?

22          MR. BERGER:  I think we may need to check some of this

23  at another time, but I'm okay with letting Mr. Burgoyne go

24  ahead.

25          THE COURT:  Proceed with his questions.  Very well.

1        MR. BERGER:  Thank you, Your Honor.

2   BY MR. BURGOYNE:

3   Q.   Let's look first at the summary of some of your diagnostic

4   assessments that we prepared.

5        And you see one of the things you have on here is the

6   Nelson-Denny reading rate, page --

7   A.   Yes.

8   Q.   Last one?

9   A.   Yeah.

10  Q.   And that was 1 percent.  I think you testified yesterday

11  that you agreed with Dr. Lovett that that reading rate test

12  isn't a very reliable instrument?

13  A.   Correct.

14  Q.   I think you also said you place greater reliance on the

15  Nelson-Denny comprehension test?

16  A.   Yes.

17  Q.   Reading comprehension.

18       And that's a test that consists of 38 multiple choice

19  questions?

20  A.   Yes.

21  Q.   And if you just look at the tab that's Nelson-Denny sample

22  questions.

23       And as it's indicated at the top, these are not actual

24  Nelson-Denny questions.  These were questions that the Texas

25  government provided to prospective police officers who were

1  going to take the Nelson-Denny.

2      And all I want you to do is just confirm for me whether

3  these two questions are roughly representative of the type of

4  questions that appear on the Nelson-Denny in terms of length

5  and format?

6  A.  Very roughly.  They don't look quite right.  They don't

7  look quite long enough.

8  Q.  Okay.

9  A.  And I certainly don't know about the content.

10 Q.  I think you testified yesterday regarding the Nelson-Denny

11 that you had seen research showing that -- I think it was most

12 high school graduates --

13 A.  Yes.

14 Q.  -- were able to answer all 38 questions.

15 A.  Yes.  I said most.  More like 75 percent of high school

16 graduates.  That was an imprecision on -- can complete most of

17 the questions.

18 Q.  If I told you the technical manual for the Nelson-Denny

19 reflected that 62 percent of grade 16 level students were able

20 to complete all 38 questions, would that be consistent with

21 your --

22 A.  Yeah.

23 Q.  So some number, not quite 40 percent, do not answer all

24 the questions?

25 A.  Yeah.

1  Q.   The next document in here is the TOMM score sheet.

2       And is this Ms. Ramsay's score sheet?

3  A.   Yes.

4  Q.   And this is the test you administered to evaluate whether

5  or not she was providing maximum effort?

6  A.   Yes.

7  Q.   And as the TOMM score sheet reflects, there is a column A

8  and a column B and then a check mark, and there's the word

9  "spinning wheel" and then "cookie"?

10 A.   Yes.

11 Q.   Just going down, "pennant," "boat."

12      Does this exam consist just of a series of pictures that

13 you show to the --

14 A.   Yes.

15 Q.   -- patient?

16      So there's no words on the TOMM exam?

17 A.   Correct.

18 Q.   And then the individual just has to remember which picture

19 they've seen previously?

20 A.   Yes.

21 Q.   And does the speed with which someone takes the TOMM have

22 any impact on the result?

23 A.   No.

24 Q.   And I apologize, Your Honor, Defendant's Exhibit 36 is

25 what we're looking at here.

1      And you in fact administered the TOMM to Ms. Ramsay three

2   times.  Correct?

3   A.   There are three subtests for it, yes.

4   Q.   So it was one administration, but you administered it

5   three times on that occasion?

6   A.   Well, the test is structured with three different

7   administrations that you can administer.

8   Q.   And you discussed yesterday the latter two scores on which

9   she achieved perfect scores, 50?

10  A.   Yes.

11  Q.   And then on the initial test, she achieved a 42?

12  A.   Yes.

13  Q.   Would that be an unusually low score for someone?

14  A.   No.

15  Q.   If you got that score on the latter two performances,

16  would that raise any concerns in your mind regarding whether or

17  not someone might not be exercising maximum effort?

18  A.   Yes.

19  Q.   And the Test of Memory Malingering, that was developed to

20  indicate malingering in the memory area?

21  A.   Yes.

22  Q.   Let's look at the next one.  Let's look at the GORT

23  results.  This is DX-40.

24      And this doesn't have Ms. Ramsay's name on it, but would

25  you confirm that this is her GORT-5 booklet?

1  A.   Yes.

2  Q.   And at the bottom here, there's a reference to oral

3  reading percentile rank?

4  A.   Yes.

5  Q.   1 percent?

6       And is that the result that you testified to yesterday?

7  A.   Yes.

8  Q.   And that's reflected in this chart that I've handed you --

9  actually, let me ask you.  There's two results that you had at

10 1 percent, the GORT-5 reading rate and the GORT-5

11 comprehension, and then GORT-5 fluency you had at the second

12 percentile?

13 A.   The GORT -- okay.  Let me compare this.

14      The reading rate, that's at the first percentile.

15 Comprehension is at the first percentile.  Fluency is at the

16 second.  Yes.

17 Q.   And what are the assessments that she answered in order to

18 produce the reading rate score?

19 A.   I'm confused.  Could you --

20 Q.   Actually, let me just ask you this:  It looks like there

21 are 11 stories in this assessment, so-called stories at the

22 top, which consist of text?

23 A.   There are 16 stories.  And when a person gets a certain

24 score that's below on two of the passages, it's assumed they've

25 signed out that they won't be able to complete the others

1   adequately.

2   Q.   So the fact that this document ends at 11 means that Ms.

3   Ramsay maxed out at story 11?

4   A.   That's right.

5   Q.   And when you administer this test, do you read the

6   questions to her or does she read the questions out loud?

7   A.   I read them to her.

8   Q.   And then what happens after you read the questions to her?

9   A.   Then she gives me an answer, and I mark whether it's

10  correct.  I try to -- in particularly, if they give me an

11  incorrect answer, I try to make a quick note on what it was.

12  Sometimes I don't get them all down, but I try to make a note

13  on what the incorrect answers were.

14  Q.   Let's look at story 2 to we make sure we understand how

15  this works.

16       Then the first line says:  Our cat Mimi likes to sit on

17  the roof.

18  A.   Yes.

19  Q.   And then Mimi goes up the tall tree by the house.

20  A.   Yep.

21  Q.   Then she jumps on the roof.  She sits and looks at birds,

22  but she always comes down when it is time to eat.

23       So those sentences you read to Ms. Ramsay?

24  A.   No.  She reads those out loud.

25  Q.   She reads those out loud.  And then what happens?

1  A.   Then I take the book away from her.  The instructions are

2  for her to read as quickly as she can but as accurately as she

3  can.

4       Then I time the time it takes her to finish that, to get

5  to the end, take the book away from her and then I ask her the

6  questions and she orally responds.

7  Q.   And then the time below there, it looks like it's 23

8  seconds?

9  A.   Yes.

10 Q.   And that reflects how long it took her to --

11 A.   To complete that.

12 Q.   Let's look at the sample WIAT-III questions.  I apologize,

13 these are tough to read.

14      But would you confirm that the document, which is

15 Defendant's Exhibit 38?

16 A.   Yes.

17 Q.   And then starting at the second page, the third page, and

18 then the fourth page, are these the three reading passages

19 which made up the WIAT-III?

20 A.   Yes.

21 Q.   And are these the passages that resulted in the oral

22 reading fluency score that's reflected in your sheet?

23 A.   Yes.

24 Q.   Would she read these questions out loud?

25 A.   Yes.

1  Q.  The next one is the Woodcock-Johnson IV.  And although

2  there is no name on this booklet, is this Ms. Ramsay's response

3  booklet?

4  A.  Yes.

5  Q.  And the handwriting on this document, I take it, is yours?

6  A.  Yes.

7  Q.  And then it looks like there are two sections here.  One

8  is sentence reading fluency and one is word reading fluency?

9  A.  Correct.

10  Q.  Do those two assessments in combination produce the

11  reading rate cluster?

12  A.  Yes.

13  Q.  And that's one of the clusters you report in your document

14  as her performing at the first percentile?

15  A.  Yes.

16  Q.  And if we look at sentence reading fluency, let's look at

17  the second page, it looks like first there's a page where there

18  are some samples provided to the individual?

19  A.  Correct.  They have to do it so I can make sure they

20  understand the directions.

21  Q.  The next page is her actual performance on this test?

22  A.  Yes.

23  Q.  And the sentences she's reading are:  Ants are small?

24  A.  Yes.

25  Q.  Children are all different ages?

1  A.  Yes.

2  Q.  And what is -- and it says, yes or no?

3  A.  Yes.

4  Q.  Is that just basically true or false?

5  A.  Correct.

6  Q.  It looks like there are 88 of those questions?

7  A.  Yes.  Oh, wait a minute.  Yes.

8  Q.  And then for word reading fluency, again there's a page

9  with sample items?

10  A.  Yes.

11  Q.  And I think you testified about this one yesterday.  It

12  looks like there are four words in each line.  If we look at

13  the first one on the actual assessment page, which is page 25,

14  the first line is cat, read, dog, boy?

15  A.  Yes.

16  Q.  And the individual is told to mark the two that are

17  similar?

18  A.  Yes.

19          MR. BERGER:  I apologize.  Which --

20          MR. BURGOYNE:  It's Smith 107.

21          MR. BERGER:  Okay.  Thank you.

22  BY MR. BURGOYNE:

23  Q.  And again, that's your handwriting at the top, it looks

24  like?

25  A.  Yes.

```
 1  Q.   What does that say there?

 2  A.   31 correct, zero wrong.

 3  Q.   And is --

 4  A.   If you get any wrong, you get deducted.  That lowers the

 5  score.

 6  Q.   This was Defendant's Exhibit 39.

 7       It looks like there were 64 questions of which she

 8  answered -- got through 31?

 9  A.   Correct.

10  Q.   And this is a timed assessment?  She was told to stop at

11  some point?

12  A.   3 minutes.

13  Q.   You also testified regarding the IVA+Plus Continuous

14  Performance Report?

15  A.   Yes.

16  Q.   And I think you testified you administered it twice

17  because her scores were so low?

18  A.   Yes.

19  Q.   What did you mean by that?  Were you concerned about the

20  score being so low for some reason on the first administration?

21  A.   They were unusually low.

22  Q.   If the scores were low because of lack of effort, would

23  you anticipate any different result the second time it's

24  administered?

25  A.   It might not be different if somebody -- due to lack of
```

1  effort or they had a profound disorder.

2  Q.   Had Ms. Ramsay taken a similar continuous performance test

3  before for Dr. Lewandowski?

4  A.   Yes.

5  Q.   And how did she perform on that assessment?

6  A.   She performed in the average range in all but one score.

7  Q.   And again, in all events, these are the type of

8  assessments that you don't believe are very reliable?

9  A.   Yes, in general.  Let me qualify that if I could.

10 Q.   Sure.

11 A.   Their reliability is -- what wording do I want?  They're

12 not awful, but they're not as great as like the WIAT, which is

13 a more rigorous -- not rigorous.  Rigorous isn't the right

14 word.

15      Those -- the statistics for those have a much higher

16 reliability rating, where almost certainly when you -- if you

17 could repeat them again, you'd get almost the same score.

18      With scores like -- in neuropsych testing, in general

19 neuropsych testing, the scores are less reliable, so it tends

20 to be more of difference if you could repeat them again.

21 Q.   Okay.  I think you also testified that in general, you

22 place greater reliance on symptom checklists and your

23 interview?

24 A.   That's what the research says is the most applicable.

25 Q.   And so when you do that, do you get information from the

1  patient?

2  A.   Yes.

3  Q.   And then you also try to obtain information from

4  individuals who know the patient well?

5  A.   Yes.

6  Q.   That could be a family member?

7  A.   It almost always has to be a family member to know them

8  well enough to make a comment.

9  Q.   Is it sometimes a teacher?

10 A.   Sometimes.  Not generally for adults, because they just

11 don't seem to have the familiarity -- they don't know the adult

12 well enough.

13 Q.   Do you ever get information from primary care physicians?

14 A.   Generally not.

15 Q.   When you were looking at the symptom checklist that you

16 received from Ms. Ramsay, I think we saw yesterday she

17 identified 17 of 18 symptoms with maximum severity?

18 A.   Yes.

19 Q.   And did you compare that information with the information

20 that Dr. Smiy had provided when he evaluated her in 2009?

21 A.   Not closely, no.

22 Q.   Let's look at DX-42 if you would, please.

23 A.   DX-42.  I guess I'm in the wrong book.

24 Q.   It's in the other book.  I should have told you that, I'm

25 sorry.

1   A.   42.  Right?

2   Q.   Yes.  Thank you.

3   A.   Okay.

4   Q.   And this Exhibit 42 is the ADD/ADHD verification form that

5   Dr. Smiy submitted to Ohio State on behalf of Ms. Ramsay?

6   A.   Yes.

7   Q.   And just to help you a little bit, this is included as one

8   of the documents that you identified in your report as

9   something you reviewed?

10  A.   Yes.

11  Q.   If you look at page 2 of this document, that's where he

12  provides his DSM diagnosis?

13  A.   Yes.

14  Q.   And he diagnosed her as having ADHD, predominantly

15  inattentive.

16       Is that different from what you diagnosed her with?

17  A.   Yes.

18  Q.   I think you diagnosed her as having the combined type?

19  A.   Yes.

20  Q.   And that means she had both inattentive and hyperactive

21  impairment?

22  A.   Yes.

23  Q.   He indicates below that he arrived at his diagnosis

24  through developmental history.

25       What does that mean?

1  A.   I'm sorry, he arrived at his diagnosis?

2  Q.   Yes.  He says he arrived at it, on this document, through

3  first developmental history?

4  A.   I presume he asked her the same types of questions I was

5  asking her about developmental history.

6  Q.   And then what's the difference between that and medical

7  history, which he also indicated he had relied upon?

8  A.   I think medical history would be more related to a

9  diagnosis that she previously had and physical complaints, that

10 kind of thing.

11 Q.   And then he said, structured or unstructured clinical

12 interview with the student?

13 A.   Yes.

14 Q.   Is that similar to what you would have done as well?

15 A.   Yes.

16 Q.   The next page, he indicates how long he has had contact

17 with the student, and it looks like he began treating Ms.

18 Ramsay in 2003, and his last contact was 2010.

19      Did you understand that he was her primary care physician?

20 A.   Yes.

21 Q.   And then if you go to page 4, he walks through all of the

22 symptoms that were part of the ADHD diagnostic criteria under

23 the DSM-IV?

24 A.   Yes.

25 Q.   And so we're clear here, the DSM-IV is the version of the

1   Diagnostic and Statistical Manual that preceded the current

2   manual?

3   A.   Correct.

4   Q.   And how many symptoms did you need to have under that

5   version of the DSM in order to meet the diagnostic criteria for

6   ADHD?

7   A.   The criteria, there is not a strict number that you have

8   to have.  The recommended is 6.  You're allowed to deviate, but

9   then you're deviating.

10  Q.   And he identified five symptoms in this report?

11  A.   Yes.

12  Q.   And then he identified no issues with hyperactivity or

13  impulsivity?

14  A.   Yes.

15  Q.   And again, did you consider this information or discuss

16  this information with Ms. Ramsay to the extent that it was

17  inconsistent with what you were seeing on her --

18  A.   I did not discuss it with her.  I did consider it.

19        MR. BURGOYNE:  Your Honor, we have no further

20  questions.

21        THE COURT:  Very well.

22        Do you want to start with redirect now, or do you want

23  to take a break now?  Mr. Berger, it's your call.

24        MR. BERGER:  I think it would be a good time to take a

25  break.

1        THE COURT:  Very well.  We'll be in recess for 15

2   minutes then.

3        (Recess at 10:47 a.m. until 11:03 a.m.)

4        THE COURT:  You may be seated.

5        And you may proceed.

6                   REDIRECT EXAMINATION

7   BY MR. BERGER:

8   Q.   Dr. Smith, in Mr. Burgoyne's questioning, he referred you

9   to something on your web page about problems with the

10  discrepancy model?

11  A.   Yes.

12  Q.   What as you see it are the problems with the discrepancy

13  model?

14  A.   Well, actually, I don't think that page was saying there

15  was a problem with the discrepancy model.  I was referring to

16  the issues -- there's a long history of issues about IQ testing

17  and the accuracy of it and what scores should be used and that

18  kind of thing.

19       Oftentimes people get a score that doesn't really truly

20  reflect their abilities and then that is reported as if it's

21  accurate.  And then a person makes future decisions based on

22  that.

23  Q.   So if I understand correctly, there could be a case in

24  which someone had a relatively low intelligence score and there

25  would not be a discrepancy between that score and --

1  A.   That's correct.  That page, unfortunately, I have not

2  updated my website in quite a while.  That's referring to

3  DSM-IV issues and the importance of having -- the DSM-IV

4  required that you have a discrepancy and you be below average.

5  And if you don't have a discrepancy, you're out of luck.  And

6  the lack of a discrepancy is frequently because the IQ score is

7  depressed for these other reasons because it's not a really

8  true measure of your intelligence.

9  Q.   As applied to this case, however, there was in fact some

10  discrepancy in Ms. Ramsay's case.  Correct?

11  A.   Yes.

12  Q.   There is also a discussion about the fact in -- both in

13  your report and in your web page at the fact that you look for

14  early -- information about childhood problems?

15  A.   Please repeat that for me.

16  Q.   Just generally, you indicated in your report that you

17  consult records from Ms. Ramsay's childhood --

18  A.   Yes.

19  Q.   -- to look for information there?

20       And is one of the pieces of information that you looked at

21  the information from Dr. Tanguay, the optometrist who --

22  A.   Oh, yes.

23  Q.   Did that information from Dr. Tanguay, was that

24  information that you considered in evaluating and arriving at

25  your diagnoses?

1  A.   Yes.

2  Q.   And we know of course that Dr. Tanguay was an optometrist

3  and not a psychologist, but -- and so she couldn't evaluate a

4  reading -- a learning disorder, but is the fact that there was

5  something someone thought was a vision problem early on, is

6  that something that could be considered as part of your review

7  of the early records?

8  A.   Yes.

9  Q.   Is it easy to fake dyslexia?

10  A.   No.

11  Q.   You performed and there is some discussion about the TOMM,

12  the Test of Memory Malingering?

13  A.   Yes.

14  Q.   When you administered the TOMM to Ms. Ramsay, what did you

15  tell her that the purpose of that test was?

16  A.   That it was to measure a component of cognitive

17  functioning that was important for reading.  Just a general

18  statement to try to link the two together.

19  Q.   Just one moment.  Let me -- just so we also have the

20  reference to your report, if you would look at Exhibit DX-3.  I

21  can help you find it if --

22  A.   I'm sure I can find it.

23  Q.   And it's Tab B, which is your report.

24  A.   Hold on.  DX-3.  Tab B you said?

25  Q.   Tab B, which is your report.

1  A.   All right.

2  Q.   And it's page 23 of the report, although the page number

3  at the top will be different.  But it's under the discussion

4  and summary section, page 23 of 31.

5  A.   I am there.

6  Q.   All right.  So am I -- you've explained the purpose of

7  doing the TOMM, which is to check to see if Ms. Ramsay was

8  making genuine effort?

9  A.   Yes.

10  Q.   Did you tell her that?

11  A.   No.  In terms of administering the TOMM?  No.

12  Q.   Yeah.  And what did you tell her?

13  A.   About what?

14  Q.   About what the purpose was for that test.

15  A.   That it was going -- measuring a component of cognitive

16  memory function, I think I put memory in there, that's

17  important for adequate reading, something like that.

18  Q.   So if she was trying to fake a reading problem, would that

19  have affected her performance on the TOMM?

20  A.   I would have expected it to, yes.

21  Q.   Okay.  But you found that in fact that she was making

22  genuine effort?

23  A.   Yes.

24  Q.   I asked you a moment ago whether it was hard to fake

25  dyslexia or easy to fake dyslexia, something like that, and you

1  said no, that it was difficult, but would you explain that a

2  little further.  Why is it difficult?

3  A.   Well, people have misconceptions about what dyslexia is.

4  The most common misconception that persists with most people

5  is, number one, it's a visual disorder when it's not and it's

6  about flipping of letters.  And it's -- like I said earlier in

7  previous testimony that that's not exclusive to dyslexia.  So

8  they make those kinds -- so basically if people try to fake --

9  they're going to make those kind of errors and misread things

10 that are easy, because it's expected.

11 Q.   Mr. Burgoyne showed you a list of standardized exams that

12 Ms. Ramsay had taken.  One of them was the MCAT.  And I just

13 want to make part of the record at this point the other part of

14 the MCAT, the part that wasn't discussed, and that is the

15 writing sample.

16      Do you remember looking at the score for the writing

17 sample?

18 A.   Do I remember the score?

19 Q.   Yeah.

20 A.   Not for sure.  I think it was around the 31st percentile.

21 Q.   I believe that's correct.  There was also some discussion

22 this morning about DX-27.  And I think that's in the same

23 binder.  And that is a report of a test that was administered

24 to Ms. Ramsay in the sixth grade.  And we discussed it a little

25 bit yesterday.  Tell me when you've found it.

1  A.   All right.  I do.

2  Q.   We discussed it a little bit yesterday, and this morning

3  Mr. Burgoyne pointed out that the overall scores were above

4  average.  And that's correct.

5       And this isn't -- I think I'm right that you may not have

6  seen this test when you were doing your report; is that

7  correct?

8  A.   That is correct.

9  Q.   Okay.  But what is the thing that was of interest to you

10 when you did review this?

11 A.   Well, that a number of her scores, most of them related to

12 reading, were significantly below expectation or -- based on

13 the intelligence measure that they also administered, which

14 they point out in the score report here.

15 Q.   When Ms. Ramsay originally came to you and you discussed

16 the testing that Dr. Lewandowski had done, what did you say

17 about the testing that he had done and the question of dyslexia

18 which Ms. Ramsay was asking you about?

19 A.   I would have said something in general about the kind of

20 tests that needed to be done to examine that weren't done.

21 Q.   And when you gave Ms. Ramsay those tests -- and I think

22 they're generally the ones we discussed this morning, like the

23 WIAT and the Woodcock-Johnson and the GORT.  And when you

24 administered those tests to Ms. Ramsay, as far as you know, was

25 that the first time that anyone had ever administered those

1  tests to Ms. Ramsay?

2  A.   Yes.

3  Q.   And Dr. Smiy didn't do any of those tests either, did he?

4  A.   No.

5  Q.   And Dr. Smiy was a general physician, so those aren't

6  tests that he could have done.  Am I right?

7  A.   No.  Yes, you're correct.

8  Q.   Mr. Burgoyne discussed a little with you the Conners'

9  Continuous Performance Test --

10  A.   Yes.

11  Q.   -- that Dr. Lewandowski had done?

12  A.   Yes.

13  Q.   And is a test like the Conners' or a test like the

14  IVA+Plus that you did, are those tests that can provide helpful

15  information on a diagnosis of ADHD?

16  A.   Yes.

17  Q.   And what is the right way to use those tests, and what is

18  the problem with using those tests?

19  A.   Well, they are -- they supplement what you gather from

20  history and symptom counts from questionnaires and what the

21  people report.  They provide some -- sometimes provide some

22  kind of an objective support for whether there's a problem

23  related -- an attention problem.

24      The drawback from my reading of the literature is that

25  they -- of these types of tests in general is that they too

1   often fail to detect a problem when it's actually there.  And

2   that when they indicate that there's an impaired problem, that

3   doesn't automatically means it's attention deficit.  It means

4   there's an impaired problem with attention.

5       But the most problem is they're not sensitive enough to

6   pick up a problem frequently when in fact it's there.  That's

7   one of the reasons why they haven't been accepted as a core

8   diagnostic evaluation procedure.

9   Q.   Is there some literature that suggests that those tests

10  can lead to false negatives?

11  A.   Yes.

12  Q.   But that is not what happened in Ms. Ramsay's case.

13  Correct?

14  A.   Correct.

15  Q.   When you tested Ms. Ramsay, we covered this yesterday, but

16  just again to put this morning's testimony in context, was she

17  on her ADHD medication that day?

18  A.   No, she was not.

19           MR. BERGER:  I have no further questions.

20           THE COURT:  Any recross?

21           MR. BURGOYNE:  Just two, three, Your Honor.  Real

22  quick.

23                    RECROSS-EXAMINATION

24  BY MR. BURGOYNE:

25  Q.   Dr. Smith, would you look real quick at Defendant's

1   Exhibit 51.  It's in the second notebook of the two notebooks.

2   A.   Yes.

3   Q.   And you'll recall this is the article regarding detecting

4   feigned reading disabilities?

5   A.   Yes.

6   Q.   Would you read for us -- you were asked during your

7   questioning by Mr. Berger whether or not, you put it, it's

8   difficult to fake or feign dyslexia?

9   A.   Yes.

10  Q.   And you answered no, it was not, in your opinion?

11  A.   No.  I asked yes, that it was difficult.

12  Q.   It was difficult.  Right.  Sorry.  Double negative.

13       In your opinion it is difficult to feign dyslexia?

14  A.   Yes.

15  Q.   Would you read to us the last sentence in this research

16  article on page 1.

17  A.   On page 1?

18       Until recently, most clinicians assumed that students

19  could not feign a specific LD such as a reading disability.

20  And they quote an article.  And that the base rate for such

21  malingering in psychoeducational assessments was very low.

22       Do you want me to continue on to the next page?

23  Q.   Yes.

24  A.   However, this has proven not to be the case.

25       Continue?

1  Q.  No, that's good.

2      Again, have you done any research in this area?

3  A.  No.  I've not studied -- well, I mean, I've not done any

4  research articles or anything like that.

5  Q.  Quickly on the TOMM, just to confirm, there's no reading

6  on that assessment?

7  A.  Correct.

8  Q.  And it doesn't matter how long she takes to answer those

9  questions regarding the pictures she sees?

10 A.  Correct.

11 Q.  Then finally you were asked about her performance on the

12 MCAT, and I think -- on the writing sample.  And you said

13 performed at the 31st percentile?

14 A.  That's what I said, yes.

15 Q.  Is that an average score?

16 A.  It's in a lower part of the average range.

17         MR. BURGOYNE:  No further questions, Your Honor.

18         THE COURT:  Very well.  You may step down, sir, and

19 watch your step.

20         MR. BERGER:  And I promised Dr. Smith that I would ask

21 Your Honor whether he is also excused.

22         THE COURT:  Sure.  I see no reason why you can't be

23 excused.  You're excused, sir.

24         THE WITNESS:  Thank you.

25         THE COURT:  Thank you.  Have a good day.

1          Any witnesses on behalf of plaintiff?

2          MR. BERGER:  Your Honor, plaintiff rests.

3          THE COURT:  Very well.  I'll give you leave to admit

4   whatever exhibits have not been entered in at the conclusion of

5   the testimony.  All right?

6          So saying, defense.

7          MR. BURGOYNE:  We call Dr. Cathy Farmer.

8          THE COURT:  Very well.

9          And watch your step coming around, ma'am, and also

10  around the witness box.

11         DR. CATHERINE FARMER, after having been duly sworn,

12  was examined and testified as follows:

13         COURT REPORTER:  State your name for the record.

14         THE WITNESS:  Catherine Farmer, F-A-R-M-E-R.

15                        DIRECT EXAMINATION

16  BY MR. BURGOYNE:

17  Q.  Good morning, Ms. Farmer.

18  A.  Good morning.

19  Q.  Could you state your job title, please.

20  A.  I'm the director of disability services and the ADA

21  compliance services at the National Board.

22  Q.  And the National Board, that's the National Board of

23  Medical Examiners?

24  A.  It is.

25  Q.  And are your offices located here in Philadelphia?

1  A.   Yes.

2  Q.   How long have you had that job position?

3  A.   Since 2006.

4  Q.   Would you give us a brief summary of your educational

5  background.

6  A.   Originally I was a licensed practical nurse.  I earned a

7  bachelor's degree in biology, a master's in health education

8  and a doctorate in clinical psychology.

9  Q.   Are you a licensed psychologist?

10  A.   No.

11  Q.   And you're not -- you don't have a practice where you see

12  patients?

13  A.   I don't.

14  Q.   Do your responsibilities include reviewing requests for

15  accommodations on the Step 1 examination?

16  A.   Yes.

17  Q.   Did you receive a request from Jessica Ramsay?

18  A.   Yes.

19  Q.   How many requests for disability-related accommodations

20  does NBME receive in a given year, just order of magnitude?

21  A.   Last year 1,700 requests.

22  Q.   And are some of those duplicate requests from the same

23  individual?

24  A.   They could be, yes.

25  Q.   And do you have any rough approximation of how many

1  individuals receive at least one of the accommodations they

2  request?

3  A.   In a given year, roughly 60, 65 percent.

4  Q.   Briefly describe the process by which someone requests

5  accommodations and then you go about evaluating that request in

6  making your decision.

7  A.   The process actually begins with our website where we post

8  information for students and applicants on how to make a

9  request, guidelines for documentation that would be helpful to

10  support their requests, forms for them to fill out or have

11  their school fill out.

12      When they send those documents to us, we ask that they be

13  registered for the examination at that time.

14      In-house, we have staff that go over the submission just

15  to make sure all the forms are there, signed, legible.

16      Then I have a group of professional staff who are

17  psychologists, and we do an audit.  They'll do an audit of the

18  file to make sure that the information that's provided that's

19  clinically based has enough information for us to make an

20  informed decision about the request.

21      We may or may not send it out to external consultants,

22  subject matter experts, to review.  If we're able to, based on

23  the submission, grant the request, we'll do so without sending

24  it out for review.  If we're not clear that we see a

25  substantial limitation in a major life activity, we'll send the

1  submission out for consultant review.

2  Q.   Let me ask you there, do you ever deny a request without

3  sending it out to an external expert?

4  A.   Not typically, no.

5  Q.   And examinees request accommodations based on both

6  physical and mental impairments?

7  A.   Yes.

8  Q.   Do the mental impairments include impairments such as

9  learning disabilities and attention deficit disorder?

10  A.   They do.

11  Q.   Do those type of requests tend to take longer to review

12  than a request for accommodations based on a physical

13  impairment?

14  A.   They typically include a lot more documentation for us to

15  look through, yes.

16  Q.   What is the impairment that constitutes the largest

17  percentage of requests that you get?

18  A.   Probably attention-deficit/hyperactivity disorder and/or a

19  learning disability in reading or dyslexia.

20  Q.   Is it fairly common to see both of those diagnoses in a

21  request?

22  A.   It is.

23  Q.   How long do you tell examinees that it will take you to

24  process their accommodation request?

25  A.   On the request form we ask them to allow at least 60 days

 1  for us to review.  And that's from the point where we've

 2  received complete information from them.

 3  Q.  And are you able in some instances to do it more quickly

 4  than 60 days?

 5  A.  Yes.

 6  Q.  And likewise, are there instances in which you don't meet

 7  your 60-day target?

 8  A.  Yes.

 9  Q.  Look at Exhibit DX-4, which is your declaration.

10  A.  I have it.

11  Q.  And would you confirm for us that's your signature on the

12  last page of this document.

13  A.  Yes.

14  Q.  And this is a declaration you submitted in connection with

15  this case?

16  A.  It is.

17  Q.  Let's walk through your attachments here and make sure we

18  understand what these are.

19       Attachment A, Tab A?

20  A.  Have it.

21  Q.  This is Ms. Ramsay's initial request for accommodations?

22  A.  Yes.

23  Q.  And it looks like she signed this November 28, 2016.

24       Is that when you received this?

25  A.  No.  I believe this was received in January, around

1  January 6th.

2  Q.   Look at Tab B for me.  It will suggests to me maybe you

3  received it a little earlier.

4       Is that stamp on Tab B, is this Ms. Ramsay's personal

5  statement, is that an NBME stamp that says received there?

6  A.   Yes.

7  Q.   And that indicates that that document at least was

8  received December 12th?

9  A.   Yes.

10  Q.   Does that refresh your recollection that perhaps you

11  received this request sooner than January?

12  A.   I apologize, you're right.  There is a stamp on the

13  request form I see.

14  Q.   The one on the request form was hard to read.

15  A.   Yes.

16  Q.   You received this it looks like December 12th?

17  A.   Yes.

18  Q.   And then Tab B, as indicated, that's a personal statement

19  that Ms. Ramsay submitted?

20  A.   It is.

21  Q.   You routinely ask candidates to submit a personal

22  statement?

23  A.   Yes.

24  Q.   And then Tab C, this is some high school grades that Ms.

25  Ramsay submitted to you?

1  A.   Yes.

2  Q.   Tab D is at least a partial transcript from Ohio State

3  University that she submitted to you?

4  A.   I see that, yes.

5  Q.   Tab E is her MCAT score report?

6  A.   Yes.

7  Q.   Do you recall whether you received that later than her

8  initial submission?

9  A.   I don't recall.  There is a date stamped here, but I'm not

10  sure I can read.

11  Q.   And then Exhibit F, this is the report that Dr. Smiy -- or

12  at least a record of Dr. Smiy's visit in which he diagnosed Ms.

13  Ramsay with ADHD?

14  A.   Yes.

15  Q.   And then Exhibit G is the Ohio State verification form of

16  ADHD?

17  A.   That's correct.

18  Q.   And then H is a document from Mr. Livingston?

19  A.   Yes.

20  Q.   And then finally we get to your decision letter, which is

21  March 2017.

22  A.   I see it.

23  Q.   And I'll represent to you that the Livingston documents

24  included a supplement indicating that he provided documents to

25  you on January 5, 2017.

1     Do you recall asking for supplemental documents from Mr.

2  Livingston?

3  A.  Dr. Goldberg did, yes.

4  Q.  Dr. Goldberg was someone on your stuff?

5  A.  Who did the initial audit, requested the supplemental

6  information to clarify Mr. Livingston's initial report.

7  Q.  So that documentation, it looks like, came to you January

8  5, 2017.

9     Would that be when the 60 days would ordinarily begin to

10  run?

11  A.  Yes, if that was the final document that she submitted and

12  we determined or she determined that that submission was now

13  complete.

14  Q.  And then I'll represent to you that Dr. Zecker submitted a

15  report to you that was dated January 13th.

16     He's one of your external reviewers?

17  A.  Correct.

18  Q.  And you asked him to perform the initial review of Ms.

19  Ramsay's request?

20  A.  Yes.

21  Q.  Then we just looked at your decision letter March 10th.

22     So it looks like in this instance it took you just over 60

23  days to respond to her first request?

24  A.  That's correct.  60 calendar days, yes.

25  Q.  Is that what you do, 60 calendar days?  Is that what you

1  tell people?  Or is it 60 --

2  A.   Actually, at this point in time we didn't -- we didn't say

3  either or.  So we tried to make that a little bit more clear

4  now.

5  Q.   Exhibit J, is this Ms. Ramsay's second request for

6  accommodations?

7  A.   It is.

8  Q.   And this is dated above her signature it looks like June

9  6, 2018?

10  A.   It is.

11  Q.   And K is the personal statement she submitted, also dated

12  June 6, 2018, in support of this request?

13  A.   That's correct.

14  Q.   And then Exhibit L reflects some documentation provided by

15  Dr. Lewandowski?

16  A.   That's correct.

17  Q.   And if you look in that tab at the page number at the top

18  it says page 89 of 106.

19  A.   Yes.

20  Q.   And you see there's a document in here from Dr.

21  Lewandowski that's dated June 20, 2018, which was subsequent to

22  Ms. Ramsay's initial submission?

23  A.   That's correct.

24  Q.   Do you recall receiving supplemental documentation from

25  Dr. Lewandowski?

1    A.    I do.   After my initial audit of the documentation,

2    including Dr. Lewandowski's evaluation, I asked for

3    clarification of his score sheet and this is -- this submission

4    that he made to supplement.

5    Q.    And you referenced Dr. Goldberg a minute ago.

6          She performed the review and sent the decision letter out

7    on the initial request?

8    A.    That's correct.

9    Q.    And you did so on the second request?

10   A.    Yes.

11   Q.    Again, you sent this request out to Dr. Zecker; is that

12   correct?

13   A.    Yes.

14   Q.    And I'll represent to you that you got a letter from Dr.

15   Zecker that was dated July 19, 2018.

16   A.    That sounds about right.

17   Q.    And then if you'll look at Exhibit M, please.

18   A.    Yes.

19   Q.    Is this the decision letter that you prepared?

20   A.    Yes, it is.

21   Q.    Okay.   At this time it looks like something just over 80

22   days have gone by since you received the last piece of

23   supporting documentation and almost two months after you

24   received Dr. Zecker's letter recommending that extended testing

25   time be denied?

1 A.   I believe we received Dr. Lewandowski's -- notwithstanding

2 his date on the document, I think we received it around the

3 27th of the month.  So I believe it was around 77, a little

4 less than 80 days, for us to get a decision letter.  Yes.

5 Q.   So 77 or 80 days after you got the last piece of

6 documentation but almost two months after Dr. Zecker said he

7 recommended denying extra testing time?

8 A.   Yes.

9 Q.   Why did it take you so long to tell Ms. Ramsay what your

10 decision was?

11 A.   The way that requests are coming in, it's in a rolling

12 schedule.  So individuals are submitting requests every day.

13 They are in various stages of the process.  They all go through

14 the same process but at their own pace.  So we're reviewing

15 initial submissions for clarity and completeness.  Then we're

16 doing an audit.  We may ask for more information.  So there's

17 fits and stops in the process.  But this is going on

18 concurrently for dozens if not hundreds of requests for

19 information.

20      We have made a promise to students that we'll take them in

21 the order which they are received.  And so we are attempting to

22 respond to folks as quickly as possible but not have people

23 sort of jumping the queue.  And in this case we had -- my best

24 recollection is a number of requests that had come in before

25 Ms. Ramsay's.

1  Q.   And when you tell students your decision, do you simply

2  tell them yes or no, or do you attempt to provide an

3  explanation?

4  A.   If we're not granting everything that they've requested,

5  we make an effort to provide very specific detailed information

6  about why we can't grant what they requested.

7  Q.   Does that sometimes require you to pick up a file you

8  haven't looked at in a while in order to refresh your

9  recollection on the facts of that case?

10 A.   Almost always requires that, yes.

11 Q.   In this particular instance, you granted some

12 accommodations the second time but again denied extra testing

13 time?

14 A.   That's correct.

15 Q.   Let's look exactly at what you did grant.  And that's on

16 the third page of your letter.

17 A.   I see it.

18 Q.   Do you see that?

19      And it looks like you granted additional break time and

20 testing over two days.

21      Explain for the Court, if you would, exactly how that

22 would work compared to standard administration.

23 A.   So the standard Step 1 examination is an eight-hour day,

24 seven one-hour test blocks.  It's about 40 questions per hour.

25 For additional break time, we actually break the exam into two

1  days, break the exam blocks into two.  So it's shorter blocks.

2  It's just 30 minutes, half the number of items, 20 items per

3  half hour, and again, spread out over two days.  And then in

4  addition to the standard 45 minutes of break time, we give

5  additional break time.  So you have more opportunities for

6  breaks, additional break time in between -- in between test

7  blocks.

8  Q.  And how long is each test day when it's broken out over

9  two days?

10  A.  In this case, for the Step 1 exam, the first day would

11  be -- would have been five hours and 15 -- five hours in

12  length.  And the second day would have been four hours and 45

13  minutes, a little less than five.

14  Q.  And with 20 questions per block, at that point once Ms.

15  Ramsay completed that block, she had the opportunity to take a

16  break?

17  A.  Correct.

18  Q.  And there's also a reference here to separate testing

19  room.

20      Does that mean she would be testing by herself?

21  A.  Yes.

22  Q.  And would she be able to stand, walk around?

23  A.  It's a fairly small room, but yes, she could get up,

24  stand, stretch, change her position.

25  Q.  Do those testing rooms ordinarily have standing desks or

1  are they seated?

2  A.   Only the separate testing room has a desk that is usually

3  adjustable, so one can stand and take the test or sit and take

4  the test.

5  Q.   And then the final accommodation you granted was

6  permission to read aloud.

7       Back up a little.  Extra time or extra breaks and separate

8  room, were those based on her physical impairments that she had

9  relied upon in seeking accommodations the second time?

10 A.   Yes.

11 Q.   And those were I think deep vein thrombosis and then she

12 had also referenced migraines?

13 A.   That's correct.

14 Q.   And then your last accommodation you approved was

15 permission to read aloud.

16      Did that have anything to do with the physical

17 impairments?

18 A.   No, it didn't.  She had I think written in her personal

19 statements that reading aloud helps her, that she likes to do

20 that.

21      In the standard testing room, it's a room with 10 or 12

22 testing carrels, people sitting on either side and behind you.

23 One would not be able to read out loud or even subvocalize

24 without interfering with other examinees.  In a separate room

25 there is nobody to interrupt, and so she could potentially read

1  aloud if she wanted to.  However, the test proctors are alert

2  to any activities.  And we wouldn't -- I would not want them to

3  think that was suspicious behavior, so this provides an

4  official accommodation that she has our permission to do that

5  so that the proctors would be informed.

6  Q.   Okay.  Now you're referencing proctors.

7       Individuals take your exams in testing centers that are

8  operated by another company?

9  A.   Correct.  The Prometric Test Centers.

10 Q.   So when you're referencing proctors, those are the

11 Prometric employees?

12 A.   That's correct.

13 Q.   And you say for security, you wouldn't want the Prometric

14 employees to think Ms. Ramsay was doing something inappropriate

15 if she was reading out loud?

16 A.   Correct.  Or interrupt her to tell her to stop doing that.

17 Q.   Is it fair to say that NBME devotes significant resources

18 to evaluating accommodation requests?

19 A.   I think so, yes.

20 Q.   Why don't you simply approve whatever accommodations that

21 an examinee requests if it's supported by documentation from a

22 professional who seems to be qualified?

23 A.   Well, it's a -- the USMLE is a national standardized

24 licensure exam for medical licensure in this country.  And so

25 we're -- we have folks tell us what accommodations they need

1  and then provide supporting documentation.  So we're going to

2  look through every piece of information that they provide,

3  whether they had accommodations previously.  And so just one

4  evaluation or more evaluations that recommend accommodations

5  wouldn't be sufficient for us to grant.

6  Q.   Do you believe most examinees might like extended testing

7  time on an exam like this?

8  A.   I believe so, yes.

9  Q.   And do you attempt to administer your program in a

10  rigorous but fair manner for all examinees?

11  A.   Absolutely, yes.

12       MR. BURGOYNE:  No further questions.

13       THE COURT:  Cross-examination.

14                     CROSS-EXAMINATION

15  BY MS. VARGAS:

16  Q.   Good morning, Dr. Farmer.

17  A.   Good morning.

18  Q.   Did I hear you correctly that you testified you are the

19  ADA compliance officer?

20  A.   For test requirement, yes.

21  Q.   Who is Brendan Berger?

22  A.   He is a USMLE candidate.

23  Q.   And did you testify against him receiving extended time

24  during 2019?

25  A.   Did I testify against him?  In a hearing, yes.

1  Q.   What disabilities was he alleging he had?

2  A.   I believe ADHD and reading disorder.

3  Q.   What was the reason the NBME denied him the accommodations

4  that he requested?

5  A.   Because his documentation did not demonstrate a

6  substantial limitation in a major life activity.

7  Q.   Specifically what documentation from Brendan Berger did

8  the NBME rely on to make that conclusion?

9  A.   I believe we reviewed all of the documentation he provided

10  over the course of his applications, looked at every piece of

11  data that he supplied and made the conclusion based on that.

12  Q.   I guess I'm asking something different.

13       Of all the data that he provided, what data did you agree

14  with?  What data did you credit?

15       MR. BURGOYNE:  I'm going to object to this.

16       That was a different case with a different candidate

17  with different documentation.  I don't see its relevance to the

18  manner in which --

19       THE COURT:  Yeah.  Where are we going with this,

20  Counsel?

21       MS. VARGAS:  Dr. Farmer is the person who is -- I

22  believe she will testify, and she did in deposition, that she

23  was responsible for making the determination to deny

24  accommodations to Ms. Ramsay.  And we were going to get to the

25  point that she testified against Mr. Berger, and the Court

1   ordered a preliminary injunction in that case against the NBME

2   for the very same reasons that it's now trying to put forward

3   in this Court.

4           MR. BURGOYNE:  Your Honor, they've cited that in their

5   briefs.  You can read it.

6           THE COURT:  Yes.  We can take judicial notice of that.

7           MS. VARGAS:  Thank you.  Will you take judicial notice

8   of that?

9           THE COURT:  Any objection?

10          MR. BURGOYNE:  Your Honor, it's a published decision.

11          THE COURT:  It's a published decision by a court.

12          MS. VARGAS:  Thank you, Your Honor.

13          THE COURT:  Very well.

14  BY MS. VARGAS:

15  Q.   You testified a moment ago that in granting Ms. Ramsay

16  permission to read aloud that you were doing that because you

17  were concerned the proctors might think it was suspicious

18  behavior if she read aloud or mouthed as she read.

19       Why would that be suspicious?

20  A.   Well, during the examination the proctors are observing

21  all of the examinees to make sure that they are not

22  surreptitiously either taking information out or bringing

23  information in to the exam.

24  Q.   That's not something that medical students ordinarily do

25  when they're taking the USMLE; is that correct?

1  A.    Take information out or bring information in?  We

2  certainly hope not.

3  Q.    Is it typical for medical students when they take the

4  USMLE to read out loud the questions?

5  A.    They're not able to, no.

6  Q.    So it would be unusual behavior for a medical student to

7  be reading the questions on the USMLE out loud during the test

8  administration?

9  A.    It would be, yes.

10  Q.    The NBME grants more than double time.  Correct?

11  A.    Occasionally, yes.

12  Q.    For example, students have requested and the NBME has

13  granted triple time.  Right?

14  A.    Yes.

15  Q.    Jessie Ramsay didn't ask for that triple time, did she?

16  A.    No.

17  Q.    She only requested the time that she received in medical

18  school.  Right?

19  A.    She requested double time.

20  Q.    Was that the time that she received in medical school?

21  A.    I believe she does receive double time, yes.

22  Q.    You're not licensed to perform psychoeducational

23  evaluations in Michigan.  Correct?

24  A.    In Michigan, no.

25  Q.    In fact, you're not licensed to perform psychoeducational

1  evaluations anywhere, are you?

2  A.   No.

3  Q.   You've admitted in deposition that you're not an expert in

4  dyslexia.  Correct?

5  A.   Correct.

6  Q.   And you also admitted in deposition that you're not an

7  expert in ADHD.  Correct?

8  A.   That's correct.

9  Q.   You were the one who made the decision to deny Ms. Ramsay

10  the accommodations she's received?

11  A.   Yes.

12  Q.   At what point was her file transferred to you?

13  A.   I'm not sure.  Which file, which time?

14  Q.   You testified that Dr. Goldberg initially had her file,

15  and at some point you took charge of it.

16       Why did you take charge of it?

17  A.   So Dr. Goldberg was the one who made the audit and the

18  review of her first request in 2016, I believe.  When the next

19  one came in, it was assigned to me.

20  Q.   Why was that?

21  A.   They're really just assigned based on the volume.

22  Q.   Do you recall testifying in deposition that whenever a

23  candidate is represented by a lawyer, that that file is

24  automatically transferred to you?

25  A.   Oh, I don't recall that that was -- that she was

1  represented by an attorney at that time.

2  Q.   You don't recall if she was represented by an attorney in

3  June of 2018?

4  A.   Yes.  Forgive me, I didn't recall that she had been.  Yes.

5  Q.   So is that why the file was transferred to you, because

6  she was now represented by an attorney?

7  A.   I would normally respond to folks represented by

8  attorneys, yes.

9  Q.   Even though you have no expertise in ADHD or dyslexia?

10 A.   That's correct.

11 Q.   So your decision to rely on Ms. Ramsay's MCAT scores as a

12 basis for denying her request for extended time, that wasn't

13 based on any research, was it?

14 A.   The decision was to deny her request based on all of the

15 documentation that she provided and our consultant, expert

16 consultant reviews.

17 Q.   I'm asking a little bit of a different question.  I'm

18 asking about your mental process in making the decision to deny

19 her extended time.

20      Your decision to deny her extended time, it wasn't based

21 on any research, was it?

22 A.   No.

23 Q.   And in your deposition in fact you testified it was based

24 on common sense.  Correct?

25 A.   I don't recall stating that, no.

 1          MS. VARGAS:  I'm sorry, Your Honor.  One moment.

 2          THE COURT:  That's all right.

 3          MS. VARGAS:  We'll come back to that in the interest

 4  of time.

 5  BY MS. VARGAS:

 6  Q.   So in addition not having a license to conduct

 7  comprehensive psychoeducational evaluation, you testified -- I

 8  asked you some questions at deposition about your knowledge of

 9  the MCAT.  Correct?

10  A.   I believe so, yes.

11  Q.   And your knowledge of the MCAT was, is it fair to say,

12  fairly limited?

13  A.   Yes.

14  Q.   And in deposition -- would it be fair to say that based on

15  the testimony you gave in deposition that your knowledge of

16  Step 1 and Step 2 are also fairly limited?

17  A.   I wouldn't say that it's limited.  I work for the National

18  Board.  I don't work for the AAMC who publishes the MCAT.

19  Q.   Now I'm talking about Step 1 and Step 2 of the USMLE.

20          Is that administered by the NBME?

21  A.   Yes.

22  Q.   And do you work for them?

23  A.   I do.

24  Q.   Your knowledge of Step 1 and Step 2 is actually fairly

25  limited, isn't it?

1  A.   I don't believe it's limited.

2  Q.   So in your deposition do you recall how you testified when

3  I asked you about the number of multiple choice options, for

4  example, that there were on Step 1, that's a fairly basic

5  question about an exam.  Correct?

6  A.   Sure, uh-huh.  It's basic.

7  Q.   And do you recall what you answered?

8  A.   No.

9  Q.   Well, I believe you testified -- would it surprise you if

10  you testified that you thought there were maybe four multiple

11  choice answers or five multiple choice answers?

12  A.   No, it doesn't surprise me.

13  Q.   Is that correct?

14  A.   I don't know.

15  Q.   Is it possible that there are as many as, say, 10 or 12

16  multiple choice answers?

17  A.   On some items, sure.

18          THE COURT:  Now you may ask your next question.

19  BY MS. VARGAS:

20  Q.   So if there were 10 or 12 answers on a multiple choice

21  question, how would that compare, if you know, to an MCAT with

22  only four multiple choice answers in difficulty for somebody

23  with reading challenges?

24  A.   Well, I'm not sure the number of answer options has any

25  bearing on that, the difficulty of the item, the difficulty of

1  the reading.

2  Q.   Would you have to read all of the answers to answer a

3  question on an exam?

4  A.   Yes.

5  Q.   And so if there were four multiple choice options on the

6  MCAT versus as many as 10 or 12 on a Step 1 or Step 2 question

7  on the USMLE, that would be a big difference between the two

8  tests, wouldn't it?

9  A.   It would.

10 Q.   Do you agree that the MCAT is not designed for diagnosing

11 dyslexia?

12 A.   Yes.

13 Q.   Do you agree it's inappropriate to diagnose an individual

14 with dyslexia solely on the basis of diagnostic tests?

15 A.   Yes.

16 Q.   The NBME doesn't have any direct knowledge of Ms. Ramsay's

17 diagnosis, does it?

18 A.   We have only knowledge of the documentation that she

19 provided, yeah.

20 Q.   Is Dr. Zecker licensed to perform comprehensive

21 psychoeducational evaluations in Michigan?

22 A.   Not in Michigan, no.

23 Q.   Is Dr. Lovett licensed to perform psychoeducational

24 evaluations in Michigan?

25 A.   No.

1  Q.   Has Dr. Lovett testified for the NBME before in cases

2  involving denial of extended time?

3  A.   Yes.

4  Q.   In response to Ms. Ramsay's second request for

5  accommodation, you granted her permission to read the question

6  aloud.  We were discussing this a moment ago.

7       And that isn't an accommodation that's granted for DVT, is

8  it?

9  A.   No.

10  Q.   And that's not an accommodation that's granted for

11  migraines, is it?

12  A.   No.

13  Q.   In your experience, does it take longer to read something

14  out loud than it does to read it silently?

15  A.   I don't have experience, no.

16  Q.   How quickly after registering for Step 1 can nondisabled

17  students take Step 1?

18  A.   It depends on the eligibility period that they chose.

19  Q.   Well, let's say that a medical student registered for the

20  USMLE and chose the first available exam period.

21       What's the longest they would have to wait to take the

22  exam if they chose the first available?

23  A.   As soon as their eligibility -- their -- they get a

24  scheduling permit.  As long as that is within six months of the

25  test date, their permit is released and they can call Prometric

1   to schedule an exam at their discretion.

2   Q.   So how many days after submitting their registration for

3   Step 1 of the USMLE can a nondisabled student schedule that

4   test?

5   A.   I don't know.  It could be a matter of days or weeks.

6   Q.   So could it be a day or two?

7   A.   I don't know if it would be a day or two, but it could

8   probably be a few days.

9   Q.   Could it be under a week?

10  A.   Potentially.

11  Q.   How long does it take the USMLE, if you know, to provide

12  test results to medical students without disabilities who

13  take -- or any student who takes the USMLE?

14  A.   I believe it's somewhere around six weeks after their

15  exam.

16  Q.   Would it surprise you if your website says it was three to

17  four weeks?

18  A.   No.

19  Q.   Would you have any reason to think that your website was

20  incorrect?

21  A.   No.

22  Q.   Do you know how many students take the USMLE in the United

23  States in a year?

24  A.   No, not offhand.

25  Q.   Would it surprise you, taking just one year, say 2017,

1  would it surprise you to learn that there were 145,003 students

2  that took some part of the USMLE in 2017?

3  A.  No.

4  Q.  And the NBME is able to turn around all of those scores in

5  three to four weeks?

6  A.  I don't know that it's all of the scores, no.

7  Q.  With respect to Ms. Ramsay's first request for

8  accommodation, how long did it take you to decide her first

9  request?

10 A.  Again, I believe we had the decision letter sent to her in

11 about 65, 64 days.

12 Q.  I guess it depends on what you count as the first date.

13     How many days from the time she submitted her application

14 did it take for the NBME to make a final decision in her case?

15 A.  I don't recall.  I think it was more than the 65 days.

16 Q.  It was a couple months?

17 A.  Possibly, yes.

18 Q.  And with respect to her second request for accommodations,

19 do you recall how long it took from the time she submitted her

20 paperwork to the time that you wrote her a letter denying

21 testing accommodations?

22 A.  It was over 77 days.

23 Q.  A lot over 70 days?

24 A.  I don't recall.

25 Q.  Is it correct that you issued your decision letter

1  September 11, 2018?

2  A.   Yes.

3  Q.   And she submitted her documentation the beginning of June

4  2018?

5  A.   That's correct.

6  Q.   And you submitted her information to one of your paid

7  outside consultants in July of 2018.  Correct?

8  A.   Correct.

9  Q.   And did that consultant have a time limit for how long

10  they had to review her file?

11  A.   Yes.

12  Q.   Approximately what is that time limit?

13  A.   It's generally a week or two.

14  Q.   Did that consultant turn around that documentation in

15  time?

16  A.   As best as I recall, yes.

17  Q.   So then in July 2018, you had already decided to deny Ms.

18  Ramsay the testing accommodations that she had requested.

19  Correct?

20  A.   Possibly, yes.  Uh-huh.

21  Q.   I believe you testified in deposition that you typically

22  decide within two to three days of receiving an outside

23  consultant's report whether you're going to accept or deny --

24  whether you're going to provide the accommodations or not; is

25  that right?

1  A.   Yes.

2  Q.   And so in July 2018 you had already made a decision to

3  deny Ms. Ramsay testing accommodations.  Correct?

4  A.   Correct.

5  Q.   And the clock was running on her ability to be a doctor.

6  Correct?

7  A.   Correct.

8  Q.   And so what happened between July of 2018 and September of

9  2018?

10  A.   So because we are processing requests from hundreds of

11  examinees, we are taking those requests in the order in which

12  they are received.  And so what happened was, we were

13  processing and making decisions and writing letters to respond

14  to all the examinees who made the request prior to Ms. Ramsay's

15  request.

16  Q.   I believe you testified a few minutes ago that any request

17  where a candidate is represented by counsel goes to you.

18  Correct?

19  A.   It does.

20  Q.   It goes to you only?

21  A.   That's correct.

22  Q.   Is it possible if there were more individuals who could

23  review the requests for accommodation, that the requests for

24  accommodation could be turned around more quickly?

25  A.   Well, I guess I could qualify that, requests that are from

1  individuals represented are not the only requests that I get.

2  So the requests are distributed across all of the available

3  staff as equally as possible.

4  Q.   So you have responsibility for your share of all of the

5  requests for accommodation that come into the NBME.  Those are

6  divided among the staff that works on this issue.  Right?

7  A.   Correct.

8  Q.   And in addition to that, you also handle all of the

9  requests where the person is represented by counsel.  Correct?

10 A.   That is correct.

11 Q.   So if there were more than one of you, is it possible that

12 the students might get an answer more quickly about whether

13 they can take the test with the accommodations that they need?

14 A.   That's true, yes.

15 Q.   Do you have a sense of why the NBME hasn't dedicated more

16 resources in order to allow students with disabilities to have

17 an equitable opportunity to take the test as quickly as

18 students without disabilities receive?

19 A.   We actually have hired additional staff and are currently

20 recruiting for additional staff to do just that.

21 Q.   Do you do hiring?

22 A.   I'm sorry?

23 Q.   Do you do hiring for that position?

24 A.   I would be, yes.

25 Q.   And how many people are you looking to hire?

 1  A.   Currently we have one position open.

 2  Q.   Just one?

 3  A.   Yes.

 4  Q.   Are you familiar with the NBME's revenue for -- let's pick

 5  a year, 2017?

 6  A.   Not generally, no.

 7  Q.   Would it surprise you to learn that their revenue was just

 8  shy of $143 million in 2017?

 9  A.   Again, I have no frame of reference for that, so --

10  Q.   If I provide you a copy of the 990, would that --

11  A.   I don't doubt your representation.

12  Q.   So the NBME has more resources.  It could hire more than

13  just you to handle the requests from attorneys and more than

14  one more person to process these requests that are taking, in

15  Ms. Ramsay's case, many months to process, to her detriment.

16  Correct?

17  A.   Yes.

18  Q.   How would you compare the resources of the NBME that I've

19  just described to the resources of somebody who is working as a

20  babysitter?

21  A.   I'm not sure I understand the question.

22  Q.   Would you think that $143 million --

23  A.   Oh.

24  Q.   -- resources was more than somebody who is working as a

25  babysitter?

1  A.   Of course, yes.

2  Q.   You agreed in your deposition that Dr. Smith was qualified

3  to perform a comprehensive psychoeducational evaluation.

4  Correct?

5  A.   Yes.

6  Q.   And you don't disagree with the battery of tests that he

7  administered?

8  A.   No.

9  Q.   And I believe you testified at deposition that there was

10  no test that he should have done that he didn't do.  Right?

11  A.   No.

12  Q.   You agree with what I said?

13  A.   We don't actually prescribe a battery of tests.

14  Q.   Right, but in your deposition do you recall testifying

15  that there was no test that Dr. Smith should have given that he

16  didn't give?

17  A.   Correct.

18  Q.   So your decision, which you testified in deposition -- and

19  I can show you the page if it's helpful -- was based on common

20  sense, your interpretation that her performance on the MCAT

21  common sense meant she didn't have dyslexia.  That wasn't

22  consistent with the decision that was made by Ms. Ramsay's

23  medical school about accommodations, was it?

24        MR. BURGOYNE:  Your Honor, I don't think there was

25  foundation for that characterization of her testimony either or

1  in deposition.  I'm happy to have her show the deposition,

2  but --

3          THE COURT:  Very well.

4          MS. VARGAS:  I'm happy to do that.

5  BY MS. VARGAS:

6  Q.  If you could turn, please, to page 139 of your deposition.

7      And once you're on page 139...

8  A.  I'm there.

9  Q.  If you could begin reading at line 1, just so we have the

10  full context of what you testified.

11  A.  Question:  Is it your testimony that the MCAT scores are a

12  more reliable indicator than the comprehensive educational

13  evaluation in determining whether Ms. Ramsay has a disability?

14      Answer:  They're a good indicator of her ability to read

15  under time constraints content that most people -- or I'm

16  sorry, that the reference group, whether it's high school

17  students or medical applicants, have to read.

18      Question:  How do you know that?

19      Answer:  By the scores that they -- by the scores that

20  they obtain.

21      Question:  How do you know that the MCAT is testing

22  reading?

23      Answer:  They had to read it.  They had to read the exam

24  to answer that question.

25      Question:  Is there any research to support what you're

1  saying?

2      Answer:  It's common sense.

3  Q.   Thank you.  So your decision to deny Ms. Ramsay extended

4  time, that decision was not consistent with the decision made

5  by her medical school about the need for extended time, was it?

6  A.   Correct.

7  Q.   Your decision was also not consistent with the decision

8  that was made by Ohio State University about her need for

9  extended testing time.  Correct?

10  A.   Correct.

11  Q.   And your decision was also not consistent with any of the

12  doctors or specialists who actually examined Ms. Ramsay, was

13  it?

14  A.   If they recommended accommodations, no, it was not.

15  Q.   Did they recommend accommodations?

16  A.   I believe all of them -- I'm not sure if all of them did.

17  Q.   Let's talk about how you weighted the documentation that

18  Ms. Ramsay submitted in support of her request for

19  accommodations.

20      Did you defer to the comprehensive in-person evaluation by

21  Dr. Smith in reaching your decision?

22  A.   No.  We carefully considered it, but we don't

23  automatically defer to it, no.

24  Q.   I'm not asking if you do it automatically.  I'm talking

25  about your end result.

 1  A.   No.

 2  Q.   Did you defer to his, Dr. Smith's, conclusions?

 3  A.   No.

 4  Q.   Did you defer to the conclusions of any of the other

 5  individuals who provided -- who tested Ms. Ramsay?

 6  A.   No.

 7  Q.   Did you refer to the report of Dr. Lewandowski?

 8  A.   I'm sorry?

 9  Q.   Did you defer to the report of Dr. Lewandowski?

10  A.   No.

11  Q.   And he had examined Ms. Ramsay.  Correct?

12  A.   Correct.

13  Q.   Did you defer to the documentation provided by Mr.

14  Livingston?

15  A.   No.

16  Q.   Did you defer to the documentation provided by Dr. Smiy?

17  A.   No.

18  Q.   Did you defer to the documentation provided by

19  Dr. Ruekberg?

20  A.   No.

21  Q.   Did you defer to the documentation provided by Dr. Tanguay

22  referencing evaluations that were done of Ms. Ramsay when she

23  was in early elementary school?

24  A.   I believe that was the optometrist who diagnosed vision

25  impairments?  I don't recall that she made any --

 1  Q.   Do you recall that Dr. Tanguay, when she was a child in

 2  early elementary school, did testing as an optometrist and

 3  concluded that her reading time was slow?  Do you recall that?

 4  A.   Initially, yes.

 5  Q.   Did you defer to that?

 6  A.   No.

 7  Q.   If you could turn, please, to plaintiff's exhibit binder.

 8  And I'm going to be asking you about Exhibit 34.

 9          THE COURT:  It's all right.

10          THE WITNESS:  I'm sorry, Your Honor.

11          THE COURT:  You're looking for plaintiff's exhibit --

12          THE WITNESS:  I am, Your Honor.

13          THE COURT:  Here.

14          THE WITNESS:  Thank you.

15          THE COURT:  Sure.  There's one down there.

16  BY MS. VARGAS:

17  Q.   Let me know when you're ready.  It's Exhibit 34, please.

18  A.   34.  I have it.

19  Q.   Have you seen this before?

20  A.   This is the PowerPoint presentation, is that what you're

21  referring to?

22  Q.   Yes.

23  A.   I have.

24  Q.   And what was the title of this PowerPoint?

25  A.   ADA Legal Update for NBME and Its Outside Consultants by

1  Robert Burgoyne.

2  Q.   And do you see at the top right of the first PowerPoint

3  slide Norton Rose Fulbright.

4       Is that who prepared this PowerPoint presentation?

5  A.   That is the law firm that Mr. Burgoyne worked --

6  Q.   That Mr. Burgoyne works for?

7  A.   At the time, yes.

8  Q.   And how is this PowerPoint used?

9  A.   This was a presentation to a meeting of our consultants,

10 our disability consultants, in December 2016.

11 Q.   And why was this PowerPoint presentation shown to your

12 outside consultants?

13 A.   This is information that we asked Mr. Burgoyne to present

14 on the ADA for their information.

15 Q.   Why was it important for the outside consultants to have

16 information about the ADA?

17 A.   They're making reviews of requests for accommodations

18 on -- for the USMLE examination.  This is information they are

19 very interested in.

20 Q.   If you can turn, please, in that same exhibit to page 4.

21 And if you could read that page for me, please.

22 A.   "DOJ's implementing regulations," that one?

23 Q.   Yes.

24 A.   Any private entity offering an examination covered by this

25 section must assure that the examination is selected and

1   administered so as to best ensure that when the examination is

2   administered to an individual with a disability that impairs

3   sensory, manual or speaking skills, the examination results

4   accurately reflect the individual's aptitude or achievement

5   level or whatever other factor the examination purports to

6   measure, rather than reflecting the individual's impaired

7   sensory, manual or speaking skills, except where those skills

8   are the factors that the examination purports to measure.

9   Q.   Do you believe that's an accurate statement of the

10  regulations as the NBME applies it to its review of requests

11  for accommodations?

12  A.   Yes.

13  Q.   What did the NBME do to best ensure that Ms. Ramsay's test

14  results showed her ability rather than her disability?

15        MR. BURGOYNE:  Your Honor, I'm going to object.  She's

16  skipping a step in the process here.  This regulation

17  applies -- of course she's asking her about a regulation.  This

18  regulation applies only if you first determined that the

19  individual has a disability.  And it's at that point that

20  you're obligated to best ensure that the exam measures what

21  you're attempting to measure and not the disability.

22        So until NBME decides --

23        THE COURT:  Can this witness answer that?

24        MR. BURGOYNE:  Pardon me?

25        THE COURT:  Can't the witness testify?

1          MR. BURGOYNE:  She's not an attorney, Your Honor.  I

2    just don't want there to be this line of questions regarding

3    what the ADA requires.  And I don't believe that's within her

4    central purview.

5          THE COURT:  Then she can tell us that.  She's a

6    professional.

7          MR. BURGOYNE:  Thank you, Your Honor.

8          THE COURT:  Your objection is noted as overruled.

9          THE WITNESS:  I'm sorry, would you restate the

10   question?

11         MS. VARGAS:  Could we read the question back, please.

12         (The court reporter read the requested portion of the

13   record.)

14         THE WITNESS:  We did not make a finding that Ms.

15   Ramsay had a disability within the meaning of the ADA.

16   BY MS. VARGAS:

17   Q.  So do I understand your answer to mean that you never

18   applied the regulation that would require you to best ensure

19   that her test results reflected ability rather than disability?

20   A.  Not any more or less than we expect the exam for all

21   examinees will reflect their ability.  In other words, she had

22   a standard examination.

23   Q.  Turning to page 7 of that document, 7 of 35.

24         Could you read me, starting at section 1 of the DOJ

25   implementing regulation.

1    A.   Any private entity offering an examination covered by this

2    section must assure that when considering requests for

3    accommodations, the entity gives considerable weight to

4    documentation of past modifications, accommodations or

5    auxiliary aids or services received in similar testing

6    situations, as well as such modifications, accommodations or

7    related aids and services provided in response to an

8    individualized education program or IEP or a plan describing

9    the services provided pursuant to a Section 504 plan.

10   Q.   So do you see where in the middle of what you just read

11   the words "similar testing situations" is bold?

12   A.   Yes.

13   Q.   Why was that put into bold, do you know?

14   A.   I did not prepare these slides, no.

15   Q.   So would the fact that Ms. Ramsay had extended time on

16   NBME shelf exams, would that be a similar testing situation?

17   A.   Perhaps, yes.

18   Q.   Did you give considerable weight to that?

19   A.   Yes.

20   Q.   How did you give considerable weight to that?

21   A.   We noted it.  That was documentation she provided.

22   Q.   Beyond noting that she provided that documentation, how

23   did you give considerable weight to the fact that she had

24   received double time on the NBME shelf exams?

25   A.   We gave considerable weight to all of the documentation

1   that she provided, including the scores on measures that she

2   did not receive accommodations, such as the MCAT and the ACT.

3   Q.    Turning to the next page, page 8 of 35.

4         It says that the entity responds -- any private entity

5   offering an examination covered by this section must assure

6   that the entity responds in a timely manner to requests for

7   modifications, accommodations, et cetera.

8         Did you respond in a timely manner to Ms. Ramsay's request

9   for accommodation?

10  A.    I believe so, yes.

11  Q.    Turning to page 10 and 11 of this exhibit, what's the

12  import of these pages in the presentation for the consultants?

13  A.    Again, I did not prepare these slides, so I don't know why

14  they were included other than for our information and

15  discussion.

16  Q.    Are you responsible for the consultants at the NBME

17  dealing with requests for accommodation?

18  A.    Yes.

19  Q.    Do you think it was important for them to know about the

20  US Department of Justice's ADA rulemaking?

21  A.    Again, we asked Mr. Burgoyne to make a presentation on

22  what was happening in the legal environment at the time.

23  Q.    And I believe page 11 is talking about what was happening

24  in the legal environment at the time.

25        What was that?  What was happening that you're

1  referencing?

2  A.   I'm sorry, I'm missing your question, what was happening

3  at the time.

4  Q.   I can ask it differently.

5       What was the import of the ADA Amendments Acts on the

6  definition of disability in your role, if you can answer as the

7  ADA compliance officer for the defendant?

8  A.   I'm sorry, I'm still not understanding the question that

9  you're asking.  What was the import of it?

10 Q.   Right.  What changed in terms of the definition of

11 disability with the passage of the ADA Amendments Act?

12 A.   So the definition didn't change much.  It was still a

13 substantial limitation in a major life activity compared to

14 most people in the general population.  The amendments added

15 things like enumerating major life activities that weren't in

16 the previous versions, talked about mitigating measures.  So

17 there were a number of things that were updated in the

18 regulations to comport with the Amendments Act.

19 Q.   What was the purpose, the Congressional purpose, behind

20 passage of the ADA Amendments Act?

21      What was the Congressional purpose?

22 A.   I'm going to fix this first.

23      The Congressional purpose of the Amendments Act?

24 Q.   Yes.

25 A.   It was to ensure that there was broad coverage of the ADA,

1   the Americans with Disabilities Act.

2   Q.   I believe you testified in deposition that the purpose of

3   the ADA Amendments Act was to -- in response to Supreme Court

4   decisions.  Correct?

5   A.   That was true as well, yes.

6   Q.   And that the Congressional intent in amending the ADA was

7   so that the determination of whether somebody has or doesn't

8   have a disability should not be demanding extensive analysis;

9   is that correct?

10  A.   That's true.  Right.  It did not require a demanding

11  standard.  Yes.

12  Q.   And did the NBME oppose that change to the law?

13  A.   Not that I'm aware of.

14  Q.   Looking at the very top of this document that I've showed

15  you, do you see where it says the National Board of Medical

16  Examiners?

17  A.   I do.

18  Q.   And what is the date on this document?

19  A.   July 14, 2008.

20  Q.   And who is this letter addressed to?

21  A.   This is to Senators Kennedy, Harkins, Specter, Stevens and

22  Enzi.

23  Q.   And what was the subject line?  It says regarding.  What

24  was that?  What was it regarding?

25  A.   The ADA Restoration Act of 2007.

1  Q.   Have you seen this document before?

2  A.   It looks familiar.

3  Q.   So you wouldn't be surprised to learn that prior to

4  passage of the ADA Amendments Act, the NBME objected to exactly

5  the definition of disability that is being used against Ms.

6  Ramsay.  Correct?

7          MR. BURGOYNE:  I'm not sure that's an accurate

8  characterization, Your Honor, but obviously the letter says

9  whatever it says.

10          THE COURT:  Very well.  And I'll interpret it pursuant

11  to what it says.  All right.

12          And this letter has not -- this exhibit has not been

13  marked as an exhibit.  You've just shown her a document.

14          MS. VARGAS:  Thank you, Your Honor.  I would like to

15  mark it as an exhibit.

16          THE COURT:  Would you like to give it a number or a

17  letter.

18          MS. VARGAS:  Number 40.

19          THE COURT:  What is it?

20          MS. VARGAS:  Number 40.

21          THE COURT:  And write it on there or put a sticker on

22  it.

23          MS. VARGAS:  May I just write it on hers?

24          THE COURT:  Sure.

25  BY MS. VARGAS:

1  Q.  So after the NBME submitted this letter, the ADA Amendment
2  Act were passed, correct, and broadened the definition of
3  disability?
4  A.  Again, I'm not sure that it broadened the definition of a
5  disability.  Many things were included or changed, but the
6  definition remained a physical or mental impairment that
7  substantially limits a major life activity.
8  Q.  But you agree that the Congressional purpose in amending
9  the ADA was so that the determination of whether an individual
10  had a disability would not, quote, demand extensive analysis?
11  A.  So that it did not include a demanding standard, that's
12  correct.
13  Q.  So Congress rejected the NBME's position in passing the
14  ADA Amendments Act.  Correct?
15          THE COURT:  If you know.
16          THE WITNESS:  I don't know.  I could not answer that
17  question.
18  BY MS. VARGAS:
19  Q.  So then after passage of the ADA Amendments Act, are you
20  aware that the Department of Justice held notice and comment,
21  rulemaking?
22  A.  Yes.
23  Q.  And did the NBME submit comments to the notice and
24  comment, rulemaking on the ADA Amendments Act?
25  A.  I don't know.  Not that I'm aware.

1          THE COURT:  Why don't we put an exhibit number on it

2    prior to showing it to the witness.

3          MS. VARGAS:  41?

4          MR. BERGER:  Yes.

5          THE COURT:  This is normally done before court.

6          MS. VARGAS:  Apologies.

7          THE COURT:  That's all right.

8    BY MS. VARGAS:

9    Q.   Have you seen this letter before?

10   A.   One moment.  I just need to make space.

11        May I take a moment?

12   Q.   Absolutely.

13   A.   I can't say for sure whether I've seen it before.  It's

14   dated 2014.

15   Q.   And what letterhead is this letter on?

16   A.   Norton Rose Fulbright.

17   Q.   And is that Mr. Burgoyne's letterhead?

18   A.   It is the former law firm, yes.

19   Q.   And turning to the last page of this document, can you

20   tell me who signed it as having written it?

21   A.   Robert A. Burgoyne.

22   Q.   If you could please turn -- you agree that the subject of

23   the letter dated March 31, 2014 says:  ADA notice of proposed

24   rulemaking.  Correct?

25   A.   It does.

1  Q.   So would you agree that this is the NBME's comments as

2  part of the notice of proposed rulemaking for the ADA

3  Amendments Act?

4  A.   It looks like it lists a number of testing organizations,

5  yes.

6  Q.   But the NBME was one of them?

7  A.   It is.

8  Q.   And it was written by your lawyer.  Correct?

9  A.   That's correct.

10  Q.   And you see on the second page, the National Board of

11  Medical Examiners is described and listed as a signatory to the

12  letter.  Correct?

13  A.   I see that, yes.

14  Q.   Turning to page 5 of this document, could you read the

15  last paragraph, please.

16  A.   DOJ's first rule of construction states that substantially

17  limits is not meant to be a demanding standard.  This language

18  goes too far in implementing Congress's intent to broaden

19  coverage under the ADA.  It suggests incorrectly that

20  substantially limits is a negligible requirement and conflicts

21  with the more common sense, ordinary meaning of substantial.

22  Q.   Thank you.  And if you could please turn to page 7.

23       About in the middle of the page do you see the paragraph

24  that begins "the testing entities"?

25  A.   Yes.

1   Q.   Could you read that, please.

2   A.   The testing entities.  The testing entities have no

3   suggested changes to either of these proposed rules.  They are

4   concerned, however, about the following statements made by DOJ

5   in discussing the proposed rules.

6        Learned behavioral or adaptive neurological modifications

7   include those strategies developed by an individual to lessen

8   the impact of an impairment.  Reasonable modifications include

9   informal or undocumented accommodations and modifications as

10  well as those provided through a formal process.

11  Self-mitigating measures or undocumented modifications or

12  accommodations or students with impairments that affect

13  learning, reading or concentrating may include measures such as

14  devoting a far larger portion of the day, weekends and/or

15  holidays to study than students without disabilities.  Teaching

16  one's self strategies to facilitate reading connected texts or

17  mnemonics to remember facts, receiving extra time to complete

18  tests, receiving modified homework assignments or being

19  permitted to take exams in a different format or in a less

20  stressful or anxiety-provoking setting, each of these

21  mitigating measures, whether formal or informal, documented or

22  undocumented, can lessen the impact of or improve the academic

23  function of a student having to deal with a substantial

24  limitation in a major life activity such as concentrating,

25  reading, speaking, learning or writing.  Nevertheless, these

1    are only temporary supports.  The individual still has a

2    substantial limitation in a major life activity and would be a

3    person with a disability under the ADA.

4    Q.    Okay.  I'll just stop you there.

5    A.    Thank you.

6    Q.    Is it fair to say that the NBME's comment, which begins

7    right after that extensive quote, is that these comments are

8    problematic?  That was the NBME's position, the consideration

9    of self-mitigation?

10             MR. BURGOYNE:  Your Honor, again, she's already said

11   she doesn't know -- she doesn't have familiarity with this

12   letter.  The letter again says whatever it says.

13             THE COURT:  And the document will speak for itself as

14   best evidence.

15             THE WITNESS:  Excuse me.  I'm parched now, Your Honor.

16             THE COURT:  That's all right.

17             MR. BURGOYNE:  Again, I guess our objection is to

18   having her walk through a letter that she has not testified

19   she's seen previously and asking her to read text that Your

20   Honor is going to have the time and opportunity to read.

21             THE COURT:  Fine.  But there's another aspect of that,

22   Counsel, also.  It's the defendant's stated position in that

23   letter that counsel is bringing out.

24             MR. BURGOYNE:  No objection to that, Your Honor.  If

25   she wants to ask a question about it, that's fine, just to the

1    extent she has knowledge of it.

2         THE COURT:  Very well.  Moving on.

3    BY MS. VARGAS:

4    Q.  Turning to page 8, do you see the fifth paragraph down

5    that begins with "DOJ should"?

6    A.  Yes.

7    Q.  Do you agree that in this paragraph, the NBME was asking

8    the DOJ to consider disability with the mitigating measures

9    rather than whether somebody had a substantial limitation

10   without mitigating measures?

11   A.  I'm going to read it real quick first before I answer.

12        So I believe this is saying, if I'm reading this

13   correctly, DOJ should also add a regulation that notes that --

14   is that the sentence you're talking about?

15   Q.  Yes.

16   A.  Although mitigating measures are not to be considered in

17   assessing whether a person has a disability, it is appropriate

18   to consider such measures in determining whether accommodations

19   are needed.  The purpose of accommodation --

20   Q.  If I could just interrupt you, you're reading the NBME's

21   position, not the DOJ's position.  Correct?

22   A.  Again, I haven't read the entire document, so I'm kind of

23   out of context here.

24   Q.  Fair enough.

25   A.  I'm guessing it was all of the organizations represented

1   in this letter.

2   Q.   Turning to page 10, do you see where it says Section 5?

3   A.   So I know, page 10, Section --

4   Q.   It's about halfway down the page, it says Section 5 and

5   then it has the regulation cite on page 10?

6   A.   I'm sorry, you may have to indulge me here where that is.

7   Section 5?

8   Q.   The paragraph starts with "DOJ's discussion."

9   A.   I see that.

10  Q.   If you could please read that section out loud.

11  A.   -- DOJ's discussion --

12  Q.   Yes.

13  A.   -- of the condition, manner and duration, in quotes,

14  concept of Section 36.105D3, Subsection 3, includes the

15  following language:  In determining whether an individual has a

16  disability under the, quote, actual disability or, quote,

17  record of prongs of the definition of disability, the focus is

18  on how a major life activity is substantially limited and not

19  on what outcomes an individual can achieve.  For example,

20  someone with a learning disability may achieve a high level of

21  academic success but may nevertheless be substantially limited

22  in one or more major life activities, including, but not

23  limited to, reading, writing, speaking or learning because of

24  the additional time or effort he or she must spend to read,

25  write, speak or learn compared to most people in the general

1  population.

2  Q.   And if you could just read the first sentence, what the

3  NBME had to say about that regulation.

4  A.   This language discounts the relevance of an individual's,

5  quote, high level of academic success.

6  Q.   So would you agree that the NBME is asking DOJ to make a

7  student's high level of academic success a consideration in

8  determining whether they have a disability?

9  A.   Again, this letter speaks for itself.  I can't comment one

10 way or the other on it.

11 Q.   Turning to page 11, if you could read that to yourself.

12 You don't need to read it out loud.

13 A.   Read what?

14 Q.   Page 11, Section D.

15 A.   Okay.  It's about DOJ providing technical assistance, that

16 paragraph?

17 Q.   Would you agree that in this section, Mr. Burgoyne on

18 behalf of the NBME and other testing entities is asking the DOJ

19 to issue technical assistance on testing accommodations?

20 A.   Again, I wouldn't interpret this to mean anything other

21 than what it says.

22 Q.   Just using common sense, if you look at the first sentence

23 of the last paragraph, the testing entities believe that DOJ

24 should issue a supplemental NPRM that proposes clear and

25 balanced regulations on referenced topics.

1        First paragraph, faults DOJ for not issuing new technical

2   assistance on testing accommodations.  And the paragraph below

3   that, to the best of our knowledge, no additional technical

4   assistance on any of the reference subjects has been posted by

5   DOJ.  The testing entities had hoped that DOJ would address at

6   least some of these subjects.

7        THE COURT:  Is that what it states?

8        THE WITNESS:  That is what it says.

9        THE COURT:  Okay.  Moving on.

10        MR. BURGOYNE:  Just to point out, Your Honor, it was

11   the Government Ability Office that criticized DOJ for not

12   issuing technical guidance.  It wasn't the testing agency.  And

13   that's what I was following up on.

14        THE COURT:  You'll have the opportunity to put that on

15   the record.

16        Anything else?

17        MS. VARGAS:  Yes.

18   BY MS. VARGAS:

19   Q.   Turning back to Exhibit 34, page 11.

20        MR. BURGOYNE:  Your Honor, I'll just note that we're

21   getting a series of exhibits that weren't designated in advance

22   of this hearing and which are not in fact impeachment exhibits.

23        THE COURT:  Is that an objection?

24        MR. BURGOYNE:  That is the objection, Your Honor.  We

25   went through the exercise of exchanging exhibits in advance of

1  this hearing, and obviously it would have been appreciated to

2  get some of these.

3          THE COURT:  Most definitely.

4          MR. BURGOYNE:  They say whatever they say.

5          MS. VARGAS:  Can I respond?

6          THE COURT:  Yes.  For sure.  I will give you an

7  opportunity.

8          MS. VARGAS:  This is the Federal Register, and I'm

9  asking about it because it goes directly to the information

10  that is provided in Exhibit 34 to train the consultants who

11  evaluated Ms. Ramsay.

12          THE COURT:  But it's still considered an exhibit.

13  Isn't that correct, Counsel?

14          MS. VARGAS:  Yes.

15          THE COURT:  That you want to show this witness.

16  Right?

17          MS. VARGAS:  Yes, please.

18          THE COURT:  Shouldn't they have had an opportunity to

19  be given that exhibit before this hearing?

20          MS. VARGAS:  This is impeachment material, so I'm not

21  sure that we needed to provide this in advance in the same way

22  they didn't need to provide the summaries they created.

23          THE COURT:  This is impeachment material?

24          MS. VARGAS:  Yes, it is.

25          THE COURT:  Or is it defining what is already in

 1  another document?

 2          MS. VARGAS:  I believe that it's impeachment.

 3          THE COURT:  We'll see.

 4          THE WITNESS:  I'm sorry, which exhibit are we?

 5          MS. VARGAS:  I'll bring it to you.

 6          THE COURT:  As a matter of fact, why don't we take our

 7  break now before we get started.  It's lunchtime.  We'll be in

 8  recess until 1:30.

 9          And ma'am, I'll remind you, Ms. Farmer, that you're

10  under cross-examination and as such you cannot discuss your

11  testimony with counsel for defendant.  You can talk about

12  anything else, but not your testimony and your responses

13  thereto.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  We're in recess.

16          (Luncheon recess at 12:43 p.m. until 1:32 p.m.)

17          THE COURT:  Good afternoon.

18          RESPONSE:  Good afternoon, Your Honor.

19          THE COURT:  Let's proceed.

20          And I'll remind you you're still under oath after

21  previously being sworn in.  Let us proceed.

22          THE WITNESS:  Yes, Your Honor.

23  BY MS. VARGAS:

24  Q.  Good afternoon, Dr. Farmer.

25  A.  Good afternoon.

1  Q.  Did you communicate with counsel during lunch break?

2  A.  No.

3  Q.  Not at all?

4  A.  We had some words, yes.

5  Q.  So you did communicate with counsel during lunch break?

6  A.  Yes.

7  Q.  Exhibit 34, in plaintiff's exhibit binder, could you

8  please turn to the first page of that exhibit.

9  A.  The first page?

10 Q.  The first page.  If you could, what is the date on --

11 we're looking at the PowerPoint that was used, you testified,

12 to train outside consultants.  What's the date on this

13 PowerPoint?

14 A.  December 5, 2016.

15 Q.  So this PowerPoint was training consultants after passage

16 after the ADA Amendments Act.  Correct?

17 A.  It was presented at a meeting after that, yes.

18 Q.  And it was also after the Department of Justice issued its

19 final regulations for the ADA Amendments Act, wasn't it?

20 A.  Yes.

21 Q.  So turning to page 11, my understanding is that page 11,

22 page 12, a few pages after that, beginning on page 11, this is

23 training the consultants about the results of the new

24 regulations that had just come out.  Correct?

25 A.  It's informing them about that, yes.

1  Q.   And again, you testified earlier that the Congressional

2  intent behind passage of the ADA Amendments Act was so that

3  determination of disability wouldn't take substantial analysis.

4  Correct?

5  A.   Right.  That it didn't require a demanding standard.

6  Q.   So looking at the fifth bullet down, could you read that

7  to me, please?

8  A.   On which page?

9  Q.   I'm sorry, on page 11.

10 A.   Notice stated that many ADHD diagnoses may not meet the

11 clinical definition and thus would not qualify for an

12 accommodation under the revised definition of disability

13 (prompting DOJ to reduce its estimate of the number of

14 individuals with ADHD by 30 percent.)

15 Q.   So I understand the part in parentheses there at the end

16 to be -- correct me if I'm wrong -- that DOJ in its final rule

17 corrected some calculations on what they anticipated the number

18 of individuals with ADHD to be.  Correct?

19 A.   Perhaps.  I'm not exactly sure what this refers to.

20 Q.   But in terms of training your consultants about what the

21 import was of the new law and the new regulations that had just

22 gone into effect, do you think the most important thing to

23 teach them was that many ADHD diagnoses may not meet the

24 clinical definition and thus would not qualify for an

25 accommodation?

1  A.    No, it's not the most important thing.

2  Q.    In fact, that's really directly contrary to the entire

3  point of the law and regulations, wasn't it?

4  A.    Again, I didn't prepare these, so I didn't put any import

5  on one bullet or another.   This was a presentation.

6  Q.    So this was prepared by Mr. Burgoyne, your counsel?

7  A.    Uh-huh.

8  Q.    Or NBME's counsel?

9  A.    Correct.

10  Q.    Correct?

11  A.    (Witness nods head.)

12  Q.    Do you train consultants not to send emails to the NBME?

13  A.    No, not necessarily.

14  Q.    Could you turn to page 33 of this exhibit and read me the

15  last two lines.

16  A.    I'm sorry?

17  Q.    Page 33.   The heading is Usual Advice, Usual Advice for

18  External Reviewers.

19        And the fourth bullet, what was your usual advice for your

20  consultants?

21  A.    It reads:   Emails are particularly challenging because of

22  their informality.

23  Q.    What did you mean by that?

24  A.    I did not author this, so I don't know.

25  Q.    What did it mean to you?

1  A.   We ask for -- at least for the National Board our

2  reviewers submit something through their full review with all

3  of the information in it.

4       For me this means don't send it as an email, send it

5  through our official system that's a secure portal, it's not

6  informal.  Secure.

7  Q.   So I believe you've testified that the NBME has a system

8  of any time a person is represented by counsel, their file is

9  transferred to you.  Correct?

10  A.   Correct.

11  Q.   And the NBME has a system of saying, emails are

12  particularly challenging because of informality.  So you have

13  reviewers --

14       MR. BURGOYNE:  Your Honor, we've established multiple

15  times, I wrote this document.  NBME didn't write this document.

16       THE COURT:  She's asking a general question now.

17       MR. BURGOYNE:  Okay.

18       THE COURT:  Your objection is overruled.

19       You can complete your question, if there was a

20  question.

21  BY MS. VARGAS:

22  Q.   So instead of having your consultants email to communicate

23  with you, you testified in deposition that you have them call

24  you or you call them; is that correct?

25  A.   No.  They submit their review, their written review --

1   they upload it to a secure portal so we get the written review.

2   Q.   Do you recall testifying in deposition that you

3   communicate with your consultants sometimes by telephone?

4   A.   Oh, yes, uh-huh.

5   Q.   Turning back to page 11 of the PowerPoint, and it goes

6   through a few pages after that, up to page -- up to and

7   including page 15 where this PowerPoint is training consultants

8   on the DOJ's new rulemaking, do you see anywhere in that

9   training about the ADA rulemaking, do you see anywhere where it

10  says anything about disability not demanding extensive

11  analysis?

12  A.   Again, Ms. Vargas, it says what it says, so I -- if it's

13  not --

14  Q.   It's not there.   Correct?

15  A.   If it's not on the page, it's not on the page.

16  Q.   So the new regulations to the ADA Amendments Act, they

17  didn't go into effect until October of 2016.   Correct?

18  A.   I believe so.   I don't recall exactly.

19  Q.   So is it possible that students who were taking

20  standardized tests prior to the new law and then the new

21  regulations going into effect might have had a different result

22  had they requested accommodation than students submitting after

23  the change in the law and regulations?

24  A.   Because of what?   Because of --

25  Q.   Because the law changed?

1  A.   I don't know if it's possible -- you're asking would they

2  have had a different outcome if it was in a different -- you

3  know, the old or the new regulations?  Is that what you're

4  asking?

5  Q.   Yes.

6  A.   I don't know.

7  Q.   Would disability have been determined for a student

8  requesting testing accommodations differently prior to the new

9  regulations going into effect on the ADA Amendments Act?

10  A.   It would have in terms of, again, what the changes were in

11  the revisions to the regulations and the ADA amendments had to

12  do with delineating additional information about what major

13  life activities were, what mitigating measures were, when they

14  could be used.  So yes, things could have been different before

15  than after.

16  Q.   In this section on the ADA rulemaking, does it anywhere

17  say that the DOJ rejected the NBME's request to focus on or add

18  language about the importance of outcomes, tests and

19  standardized tests and grades and that kind of thing?  Do you

20  tell the consultants any of that here?

21  A.   I don't know.  I'm not familiar with all of the

22  information that's in the pages.

23       If you'd like me to review it or --

24  Q.   Sure.  It would be I believe pages 11 through 15.

25  A.   And again your question was, does it say what?

1  Q.   Does it inform the consultants, does it train the

2  consultants that the NBME's request to focus on grades and

3  performance on standardized tests, on outcomes, was explicitly

4  rejected by the Department of Justice in adopting the

5  regulations?

6  A.   I don't see anything to that effect.

7  Q.   Is it true that the Department of Justice explicitly

8  rejected Mr. Burgoyne's and the NBME's request to focus on and

9  add language about outcomes and grades and standardized test

10 performance in assessing a student's request for

11 accommodations?

12 A.   Again, I'm not sure if that's what the National Board

13 requested and I'm not sure what the Department of Justice

14 rejected or accepted.

15      MS. VARGAS:  Your Honor, I only have one question

16 about this document that we were just discussing prior to

17 lunch.

18      THE COURT:  What document is that?

19      MS. VARGAS:  It was the Federal Register cite that

20 goes directly to what this witness is testifying about right

21 now.

22      THE COURT:  And you said that goes to -- what's the

23 purpose of it?

24      MS. VARGAS:  May I read it?

25      THE COURT:  This is a document that you failed to give

1  opposing counsel because you say it's impeachment evidence?

2       MS. VARGAS:  This Federal Register cite is.  However,

3  the other documents that were part of this we did not receive

4  in discovery from defendants, and we literally found them at

5  1:00 in the morning last night, so that's why they weren't

6  disclosed earlier.  And we would have been happy to disclose

7  and we certainly would have had they produced them, but they

8  didn't.

9       MR. BURGOYNE:  They were never the subject of a

10 request that we did not respond to either by saying here's what

11 we're going to produce or these are relevant.  They don't have

12 anything to do with Jessica Ramsay's accommodation process.

13 And those were the documents we produced on an expedited basis

14 in connection with this hearing.

15      THE COURT:  Well, I'm going to overrule your objection

16 at this time.  I'll allow you to ask the question.  I'll

17 determine during the course of my deliberations and

18 determination in this case whether to accept or reject it in

19 whole or in part.

20      MS. VARGAS:  Thank you.

21 BY MS. VARGAS:

22 Q.  I'm showing you what's been marked as Exhibit 42, Dr.

23 Farmer.

24      Have you seen this document before?

25 A.  Yes.

1  Q.   What is it?

2  A.   It is the Federal Register Volume 81, Number 155,

3  Thursday, August 11, 2016, Rules and Regulations.

4  Q.   Is this the final rule adopting the regulations

5  implementing the ADA Amendments Act?

6  A.   Final as of August 11, 2016, yes.

7  Q.   If you could please turn to page 53237.

8  A.   53237?

9  Q.   Correct.

10  A.   I have it.

11  Q.   And if you look at the second paragraph beginning with

12  "organizations," could you read that, please, the first few

13  sentences?

14  A.   Organizations representing testing and educational

15  entities asked the department to add regulatory language

16  including that tested related --

17  Q.   I'm sorry, I think that was misread.

18       Would you mind taking a look at that again?

19  A.   I'm sorry, it's a little -- small print.

20       Organizations representing testing and educational

21  entities asked the department to add regulatory language

22  indicating that testing-related outcomes such as grades and

23  test scores are relevant to disability determination under the

24  ADA.  The department has considered this proposal and declines

25  to adopt it because it is inconsistent with Congressional

1  intent.

2  Q.   Okay.   Thank you.   You don't need to read any more.

3       So my question is, did you train your consultants, the

4  ones who evaluated Ms. Ramsay's request for accommodation, that

5  the Department of Justice had specifically rejected a reliance

6  on standardized test scores and grades in determining

7  disability?

8  A.   No.

9  Q.   Why not?

10 A.   You know, again, what we're training them to do, we're

11 asking the consultants to do as professionals in medicine,

12 psychology, is to review the documentation and to make a

13 determination of whether the individual has a substantial

14 limitation in a major life activity.

15      So their area of expertise is -- we're asking for their

16 clinical expertise, not to make a legal decision or even a

17 decision about accommodations, just to answer the questions

18 about whether the documentation supported the diagnoses that

19 were assigned, demonstrated impairment that substantially

20 limited a person in a major life activity compared to most

21 people, and if the accommodations that were requested seemed to

22 be supported.

23 Q.   And turning to page 21 of this document --

24 A.   I'm sorry, 21 of which document now?

25 Q.   Exhibit 34, I'm sorry.

1   A.   I have it.

2   Q.   Does the NBME comply with the DOJ's technical assistance

3   on testing accommodations?

4   A.   My understanding is that the technical assistance does not

5   supersede the ADA Amendments Act itself or the regulations.

6   It's technical assistance.  It's not law or regulation.

7   Q.   But that's not what I asked.  What I asked was:  Does the

8   NBME comply with the Department of Justice's technical

9   assistance on testing accommodations when it evaluates requests

10  like Ms. Ramsay's?

11  A.   So again, we review it, we understand that it is to

12  make -- to have assistance, but we comply with the law and the

13  regulations.

14  Q.   Let me ask you a yes or no question.

15  A.   Uh-huh.

16  Q.   Does the NBME follow the DOJ technical assistance on

17  testing accommodations when it evaluates student requests for

18  accommodations?

19  A.   In what regard?  Because nothing everything in there --

20  I'm sorry.  No.  Not everything in there is something that we

21  can do.

22  Q.   So I believe you testified earlier that you were familiar

23  with Mr. Burgoyne's letter of March 2014 as part of the

24  rulemaking on behalf of the NBME?

25  A.   The 2008 letter?

1  Q.   No.  The 2014 letter by Mr. Burgoyne on behalf of the NBME

2  about disability and testing accommodations.  And you are the

3  ADA compliance officer and in charge of disability

4  accommodation requests at the NBME.  Correct?

5  A.   I am.

6  Q.   And you're familiar with the 2014 letter from Mr. Burgoyne

7  on behalf of the NBME that we discussed earlier.  Correct?

8  A.   Again, I believe I may have seen it at the time.  I don't

9  recall.

10 Q.   And we talked earlier about the fact that on behalf of the

11 NBME, Mr. Burgoyne -- and he noted the GAO had talked about

12 need for technical assistance on testing accommodations.  But

13 then he went a step further and said that it was needed, that

14 the NBME wanted technical assistance on testing accommodations.

15 Correct?

16 A.   I don't recall what he said, I'm sorry.

17 Q.   It says:  The testing entities believe the DOJ should

18 issue supplemental NPRM.  Prior to that, to the best of our

19 knowledge, no additional technical assistance on any of the

20 reference subjects has been posted by DOJ on its website and

21 otherwise released, even though two-and-a-half years have

22 passed.  Since the letter was sent, the testing entities had

23 hoped that DOJ would address at least some of these subjects,

24 but it hasn't done so.

25      So you understood that Mr. Burgoyne was asking the

1  Department of Justice to issue technical assistance on testing

2  accommodations?

3  A.   Again, I'm not sure what he was asking for, whether -- I

4  haven't read the letter in detail.  It's out of context.  I'm

5  not sure I can answer your question.

6  Q.   Are you aware that at some time after March 31, 2014, the

7  Department of Justice issued technical assistance on testing

8  accommodations?

9  A.   Yes.

10  Q.   And what is your view on whether that technical assistance

11  matters?

12  A.   Well, again, it's not that it doesn't -- on whether it

13  matters.  The technical assistance I believe is addressed to

14  individuals making requests for accommodations.  So it's

15  actually addressed to the individual who is making the request.

16  Q.   So it was something that the NBME wanted until it came

17  out, and then the NBME all of a sudden didn't have to follow it

18  anymore?

19  A.   Again, I'm not sure that the NBME wanted it or asked for

20  it.  I don't...

21  Q.   Turning to page 21 of Exhibit 34 that we're on.

22  A.   21?

23  Q.   21.

24  A.   Uh-huh.

25  Q.   Could you read the heading and first bullet, please.

1  A.   DOJ's, quote, technical assistance regarding testing

2  accommodations.  First bullet, what is the legal significance

3  of such, quote, technical assistance.

4  Q.   Could you continue reading the rest of the first bullet,

5  please.

6  A.   Sure.  It's not the law in the sense a statute or

7  regulation is law.  It is not entitled to the type of deference

8  that courts generally give to agency interpretations of a

9  statute of their own regulations.  Courts might afford a degree

10 of deference to the agency guidance, or they might disregard

11 the guidance altogether.

12 Q.   And so when I asked you a moment ago about whether the

13 NBME follows that technical assistance on testing

14 accommodations in evaluating, let's say, as Ms. Ramsay's

15 request, you testified no.  And here you're training your

16 examiners that it's not a law in the sense a statute or

17 regulation is.  It's not entitled to deference.  This seems

18 inconsistent, doesn't it, with it Mr. Burgoyne's letter asking

19 the Department of Justice to issue that exact document?

20 A.   I'm not sure if that's what his letter was asking.

21 Q.   Turning to page 22, is there some part of that page that's

22 bolded?

23 A.   Yes.

24 Q.   Do you know if that was something that -- this is not a

25 quotation.  Correct?

1  A.   I don't know.  I didn't -- I did not prepare this slide.

2  It's not in quotes.

3  Q.   So would you agree that the parts of a presentation that

4  are bolded are the parts that are supposed to be emphasized to

5  the people who are being trained?

6  A.   I imagine some would interpret it that way, sure.

7  Q.   So there's only one thing bolded on this page that's

8  headed DOJ's Technical Assistance.

9       And what part's bolded?

10 A.   In determining whether --

11 Q.   No, that's not bolded.  What part is bolded?

12 A.   I'm getting there.  In determining whether an individual

13 is substantially limited in a major life activity, it may be

14 useful to consider, and then in bold, when compared to most

15 people in the general population the conditions under which the

16 individual performs the activity or the manner in which the

17 activity is performed.

18 Q.   So you're familiar with the DOJ technical assistance on

19 testing accommodations?

20 A.   I am.

21 Q.   Is it your sense that the most important thing in that

22 document that needed to be bolded for your trainers is when

23 compared to most people in the general population?  There

24 wasn't anything else that was more important to tell your

25 trainers?

1  A.  Again, I didn't prepare this.  I don't know what the

2  intent was of bolding that.

3  Q.  Turning to page 24.

4       MS. VARGAS:  And I'm almost done, Your Honor.

5       THE WITNESS:  24?

6  BY MS. VARGAS:

7  Q.  Page 24, yes.  Do you agree that this is about the

8  examples of types of documentation that a person could submit?

9  A.  That's what it says, yes.

10  Q.  So let's go through each of them.  It says:

11  Recommendations of qualified professionals.

12       Did Ms. Ramsay submit that?

13  A.  Yes.

14  Q.  It says:  Proof of past testing accommodations.

15       Did Ms. Ramsay submit proof of past testing accommodations

16  on the NBME shelf exams?

17  A.  She did.

18  Q.  And on her medical school exams?

19  A.  Yes.

20  Q.  And in her college training?

21  A.  That's correct.

22  Q.  Then it says:  Observations by educators.

23       Did she submit that?

24  A.  That I don't recall.

25  Q.  You don't recall if she submitted her report cards?

1   A.   Well, that's not an observation, but she did submit her

2   college transcript and her high school report card, yes.

3   Q.   What about the letter of support from Dr. Houtman, wasn't

4   that an observation by an educator?

5   A.   I believe she was also reporting her -- that she was her

6   physician.

7   Q.   So Dr. Houtman was both a treating source and on the

8   faculty teaching her as a medical student as well.  She had

9   both of those roles?

10  A.   I believe she did.

11  Q.   So they saw this young woman in multiple settings when she

12  was motivated to do her best.  Correct?

13  A.   I would assume so.

14  Q.   And what did Dr. Houtman tell the NBME about her need for

15  accommodations?

16  A.   That she did recommend extra time and breaks.

17  Q.   Did she say that she saw her struggling and she needed the

18  accommodations?

19  A.   I believe so.

20  Q.   What about the letter from Dr. Overton, one of the deans

21  at Western Michigan at the medical school, did Ms. Ramsay

22  submit that to the NBME?

23  A.   I don't recall whether that was submitted or not.

24  Q.   Would it surprise you that a dean at her medical school

25  reported to the NBME that they strongly supported that she

1  receive the accommodations she needed, including extended time,

2  double time?

3  A.  That wouldn't surprise me, no.

4  Q.  Did Ms. Ramsay submit results of psychoeducational or

5  other professional evaluations?

6  A.  Yes.

7  Q.  Did she submit an applicant's history of diagnosis?

8  A.  Yes.

9  Q.  Did she submit a statement about her history regarding

10  testing accommodations?

11  A.  She did.

12  Q.  So she submitted not one or two but every single bullet of

13  the type of accommodations that the NBME should have

14  considered.  Correct?

15  A.  She did submit documentation that we considered.  That's

16  correct.

17  Q.  And in your deposition you actually admitted that there

18  was nothing Jessie could provide the NBME to prove to you that

19  she needed the accommodations she requested.  Isn't that true?

20  A.  I believe the question was what else could she have

21  provided, and I said I don't know what else that she had that

22  she didn't provide for us that would have demonstrated that she

23  was substantially limited.

24  Q.  I believe I asked you a follow-up question after that.

25      Do you remember that?

1  A.   Not offhand, no.

2  Q.   Do you remember saying that there was nothing?

3  A.   Again, in the context of my original answer, sure, yes.

4         MS. VARGAS:  No further questions.

5         THE COURT:  Any redirect?

6                     REDIRECT EXAMINATION

7  BY MR. BURGOYNE:

8  Q.   Just one very short question.

9         You were asked about the accommodation that you approved

10 for reading out loud.

11        Is that an accommodation that had anything to do with the

12 learning disability diagnosis or the attention deficit

13 diagnosis?

14 A.   No.  It was really just to give official permission so we

15 could tell Prometric that she was allowed to do it.

16        MR. BURGOYNE:  Nothing else, Your Honor.

17        THE COURT:  Very well.  Any redirect -- I mean, any

18 recross in reference to that limited area?

19        MS. VARGAS:  No, Your Honor.

20        THE COURT:  Very good.

21        You may step down now, ma'am, and watch your step.

22        Next witness.

23        MR. BURGOYNE:  I would call, Your Honor, Mike Jodoin

24 to the stand.

25        MICHAEL GLENN JODOIN, after having been duly sworn,

1   was examined and testified as follows:

2           THE COURT:  You may be seated.

3           COURT REPORTER:  For the record, would you state your

4   name.

5           THE WITNESS:  Sure.  Michael Glenn Jodoin.

6           THE COURT:  Will you bring that microphone --

7           THE WITNESS:  Sure.

8           THE COURT:  Perfect.  You may proceed.

9                   DIRECT EXAMINATION

10  BY MR. BURGOYNE:

11  Q.   Mr. Jodoin, would you state your job title, please.

12  A.   I'm vice president for psychometrics and data analysis.

13  Q.   Would you give us a brief summary of your educational

14  background.

15  A.   Sure.  I have bachelor's degrees in mathematics and

16  mathematics education from the University of Alberta; a

17  master's degree in psychometrics and measurement, also from the

18  University of Alberta; a PhD from the University of

19  Massachusetts in psychology but it again focuses on

20  psychometrics.

21  Q.   And what is a short summary of your job responsibilities

22  at the National Board of Medical Examiners?

23  A.   My primary responsibilities are to oversee the processes

24  leading to scoring and score reporting at the NBME.

25  Q.   And does that include scoring and score reporting for the

1  USMLE exams?

2  A.   USMLE and all other exams that the NBME administers.

3  Q.   How many questions are on the Step 1 exam?

4  A.   280.

5  Q.   And are those questions broken into blocks?

6  A.   They are.  Seven blocks.

7  Q.   And how many questions in each block?

8  A.   40.

9  Q.   And how long do examinees have to answer each question?

10  A.   On average 90 seconds.

11  Q.   And are you aware that Jessica Ramsay, the plaintiff in

12  this case, took the Step 1 exam in 2017?

13  A.   I am.

14  Q.   You have two notebooks up there.  Would you find the one

15  that is volume 2 for me?

16        THE COURT:  There's a folder up here.  I don't know if

17  that's it.

18        MR. BURGOYNE:  It's one of the big ones.

19        THE WITNESS:  I've got it.

20  BY MR. BURGOYNE:

21  Q.   You've got it.

22        Have you found Exhibit 71?

23  A.   I have.

24  Q.   What is this document?

25  A.   Pardon me?

JODOIN - DIRECT

1  Q.    What is this document?

2  A.    This is a printout of an Excel document that contains data

3  captured during Jessica's administration.

4  Q.    And that's Jessica's name on the left column?

5  A.    Yep.

6  Q.    And starting -- and then the third column, it says Step 1.

7        So this is outcome data from when she took the Step 1 exam

8  in 2017?

9  A.    Correct.

10 Q.    And then what are the next two columns?

11 A.    The column labeled Examinee Response is the answer that

12 Ms. Ramsay selected during the administration.  The correct

13 answer is the response that's keyed for that item.

14 Q.    And then explain the next column.

15 A.    The item duration column is a record of the number of

16 seconds that that item was up on Ms. Ramsay's computer screen

17 during the administration.

18 Q.    And explain so we have a careful understanding.  If an

19 examinee gets to a question, looks at it on their screen, do

20 they have the ability to mark it and then come back to it

21 afterwards?

22 A.    So the interface --

23        MR. BERGER:  Objection, lack of foundation.

24        THE COURT:  Do you want to establish some foundation

25 as to how he knows that?

1        MR. BURGOYNE:  Sure.  I'd be happy to, Your Honor.

2        THE COURT:  Sure.

3   BY MR. BURGOYNE:

4   Q.   Mr. Jodoin, you're familiar with the NBME's relationship

5   with Prometric?

6   A.   I am.

7   Q.   And is Prometric your test vendor?

8   A.   They are.

9   Q.   As your test vendor, does Prometric, as part of the

10  computer-based test administration, capture electronic data

11  relating to the examinee's performance?

12  A.   The software that delivers the -- the software that

13  delivers the test is actually NBME software that is operated

14  within the Prometric Test Center.

15  Q.   So it's your software that captures that data?

16  A.   It is.

17  Q.   And then does Prometric send that data to you for every

18  examinee after an exam is administered?

19  A.   They do.

20  Q.   And does that information include the answers that the

21  candidate provided?

22  A.   It does.

23  Q.   And does it also include information regarding how long a

24  given question was on a candidate's screen?

25  A.   It does.

1  Q.   And are you familiar with the manner in which candidates

2  take the examination at a Prometric Test Center?

3  A.   I am.

4  Q.   And are you familiar with whether or not candidates have

5  the ability to mark a question and come back to it

6  subsequently?

7  A.   I am.

8        MR. BURGOYNE:  Your Honor, may I proceed?

9        THE COURT:  I think there's a sufficient foundation to

10  ask the next question.

11        MR. BURGOYNE:  Thank you, Your Honor.

12        THE COURT:  Sure.

13  BY MR. BURGOYNE:

14  Q.   Okay.  So again, when a question is on the screen when a

15  candidate is testing and they mark that question, they can come

16  back to it later?

17  A.   Uh-huh.

18        THE COURT:  That's a yes?

19        THE WITNESS:  Yes, sorry.

20        THE COURT:  That's all right.

21  BY MR. BURGOYNE:

22  Q.   And if the candidate does come back to it later during

23  that period when it hasn't been on the screen, is that time

24  included in the Item Duration time here?

25  A.   It's not.

1  Q.   So the Item Duration column strictly reflects time when

2  the information is on the screen?

3  A.   Uh-huh.

4  Q.   And you don't know -- NBME doesn't know what the candidate

5  is doing during that time, you just know that question is on

6  the screen?

7  A.   We do.

8  Q.   And then what's the next column tell us?

9  A.   Block.  So that represents the block -- the block in which

10 this item was administered to Ms. Ramsay.

11 Q.   And then Item Duration, that's stated in seconds?

12 A.   It is.

13 Q.   And what was the amount of time you said that was the

14 average amount of time for a question?

15 A.   The allotted time is 90 seconds.

16 Q.   90 seconds.  Did Ms. Ramsay answer all of the questions on

17 her exam?

18 A.   She did.

19 Q.   And do you know how many questions she answered correctly?

20 A.   169.

21 Q.   And how many did she answer incorrectly?

22 A.   111 I think that leaves.

23 Q.   For the questions she answered correctly, do you know how

24 much time she spent on each question?

25 A.   Just over 76 seconds.

1  Q.  And how much time --

2        MR. BERGER:  Your Honor, he's testifying to

3  information that I don't believe is in this document, and he

4  hasn't -- I guess this is a foundation objection again, but I

5  haven't heard how he knows that information.

6  BY MR. BURGOYNE:

7  Q.  Are those calculations that either you performed --

8        THE COURT:  You're withdrawing the previous question?

9        MR. BURGOYNE:  Yes, Your Honor.

10        THE COURT:  Very well.

11        MR. BURGOYNE:  I'll lay a foundation, I apologize.

12  BY MR. BURGOYNE:

13  Q.  Did you prepare this document?

14  A.  I did not.

15  Q.  Was it prepared by someone that you supervise?

16  A.  It was.

17  Q.  And have you subsequently independently reviewed the data

18  in this table?

19  A.  I have.

20  Q.  And have you subsequently performed calculations or

21  performed evaluations to determine either how many questions

22  were answered correctly or incorrectly or the amount of time

23  that was spent on the questions?

24  A.  I have.

25  Q.  And going back to my last question, for the questions she

1  answered incorrectly, do you know how much time she spent on

2  each question on average?

3  A.  For the incorrect questions, just over 107 seconds per

4  question.

5        MR. BERGER:  I'm sorry, could I hear that again?

6        THE WITNESS:  For the incorrect questions, the average

7  time was just over 107 seconds.

8  BY MR. BURGOYNE:

9  Q.  If someone is randomly answering a large number of

10  questions on Step 1, what would you expect to see in their

11  outcome data?

12        MR. BERGER:  Objection, speculative, lack of

13  foundation.

14        THE COURT:  I'm going to sustain the objection.  You

15  have to put a little bit more out there for me.

16  BY MR. BURGOYNE:

17  Q.  Are you familiar with the concept of examinees randomly

18  answering questions?

19  A.  I am.

20  Q.  And does that reflect the fact that for whatever reason,

21  they're answering a question without reading the entire

22  question?

23  A.  There are a number of reasons why candidates might answer

24  a question randomly.

25  Q.  What are those reasons?

1  A.   So --

2       MR. BERGER:  Objection, lack of foundation.

3       THE COURT:  And he's trying to establish a foundation.

4  Overruled.  And you'll have an opportunity to cross, and you'll

5  have a continuing objection in that regard.  Let's move on,

6  Counsel.

7       MR. BERGER:  Thank you.

8  BY MR. BURGOYNE:

9  Q.   So again, if someone -- what are the reasons why someone

10  might randomly guess at a question?

11  A.   At least a couple.  One is that people are running out of

12  time and want to randomly select answers relatively quickly in

13  the hopes of getting correct responses.  Another option is

14  people want to complete the exam at the end, sometimes without

15  demonstrating their best behavior or their true performance.

16  Q.   Is there a guessing penalty on the Step 1 exam?

17  A.   There is no guessing penalty.

18  Q.   And if someone randomly answers questions because they're

19  running out of time, is there a certain amount of time that you

20  would anticipate seeing in their outcome data?

21       MR. BERGER:  Objection, lack of foundation.

22       THE COURT:  Overruled.

23       THE WITNESS:  That means I can answer?

24       THE COURT:  Yes, you can answer that.

25       THE WITNESS:  Thank you.

 1          So traditionally people will look at rapid responses

 2   looking at something less than 10 seconds or more recently some

 3   work has looked at less than 20 seconds.

 4   BY MR. BURGOYNE:

 5   Q.   And how many questions from Ms. Ramsay's 2017 Step 1 exam

 6   reflect that she spent less than 20 seconds with the item on

 7   her screen?

 8   A.   Four.

 9   Q.   And did she get those answers right or wrong?

10   A.   All four were correct.

11   Q.   And how many questions from her exam reflected that a

12   question was open less than 40 seconds?

13   A.   25.

14   Q.   And how did she perform on those 25?

15   A.   20 of those 25 questions were correct.

16   Q.   Occasionally when you see possible indications of random

17   guessing because someone runs out of time, does that

18   necessarily occur at the end of an item block?

19   A.   That's the most frequent way it is represented.  People

20   will work through the first part of the exam, run out of time,

21   and towards the end will rapidly guess on the questions towards

22   the end of a block.  That's the most common manifestation.

23   Q.   Okay.  It doesn't happen all the time?

24   A.   It doesn't happen all the time.

25   Q.   And on Ms. Ramsay's seven blocks, if you look at the last

1    five questions on each of those blocks, how many of the

2    questions did she spend less than 40 seconds on in the last

3    four questions -- five questions in each of the blocks?

4    A.    So across those 35 questions there was one that had a

5    duration of less than 40 seconds.

6    Q.    And did she get that question right or wrong?

7    A.    She did, got it correct.

8    Q.    She got it correct.

9          Look at Defendant's Exhibit 1, please.  It's going to be

10   in the other notebook.

11   A.    I got it.

12   Q.    Defendant's Exhibit 1 is the Complaint that Ms. Ramsay

13   filed in this case.

14         And if you look at paragraph 40 for me.

15   A.    On page 9 or further back?

16   Q.    It's numbered paragraph 40.  I'll have to check the page.

17         It is page 9, yes.

18   A.    Okay.

19   Q.    Do you see the third sentence in this paragraph, it reads:

20   Because of her dyslexia and ADHD, Ramsey was only able to read

21   about 60 to 70 percent of the questions in each block and had

22   to enter guesses for the remaining questions without reading

23   them.

24         Is the outcome data that you've reviewed consistent with

25   that statement?

1  A.   It is not.

2  Q.   Why is that?

3  A.   As I testified earlier about the amount of time that the

4  screen was up, it seems likely that the candidate was able to

5  look at, presumably read and consider all of the questions, the

6  vast majority of them for more than 40 seconds.

7  Q.   Did you see any indication that 30 to 40 percent of the

8  questions had not been read by Ms. Ramsay?

9  A.   No.

10 Q.   Look at Exhibit 2, please.

11       And this is going to be paragraph 28.

12 A.   Found it.

13 Q.   And this is a declaration Ms. Ramsay provided in this

14 case.  And in paragraph 28, she makes the following statement.

15 It's towards the end of the second line.  I did not have enough

16 time to read all of the questions and in the last minute of

17 each block was forced to blindly select answer choices for

18 about 30 to 35 percent of the questions.

19       Was Ms. Ramsay's outcome data consistent with that

20 statement?

21 A.   It was not.

22       MR. BERGER:  Objection, lack of foundation.  I'll

23 cover this in cross, but --

24       THE COURT:  Your objection is noted.  It's overruled.

25 BY MR. BURGOYNE:

1  Q.   So again, was the outcome data that you reviewed

2  consistent with the assertion in Ms. Ramsay's declaration that

3  in the last minute of each block she blindly selected answer

4  choices for about 30 to 35 percent of the questions?

5  A.   No, it was not.

6  Q.   And why is that?

7  A.   As we talked about before, the questions at the end of the

8  block, but overall across all the questions, there was a

9  reasonable amount of time where that item was open and

10  available for consideration, presumably for reading by the --

11  by Ms. Ramsay.

12        MR. BURGOYNE:  No further questions, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. BERGER:

15  Q.   Would you turn back to Exhibit 71, the outcome data.

16  A.   I have it right here.

17  Q.   You testified that this was a spreadsheet --

18  A.   Uh-huh.

19  Q.   -- of data relating to Ms. Ramsay's performance?

20  A.   I believe I said this was a printout of a spreadsheet.

21  Q.   Does this present all of the data that NBME has in its

22  possession concerning Ms. Ramsay's performance on the Step 1

23  examination?

24  A.   It does not.  It does not.

25  Q.   It does not.  Does NBME have data about the order in which

 1  Ms. Ramsay accessed the questions on the examination?

 2  A.   It does.

 3  Q.   It does?

 4  A.   Uh-huh.

 5  Q.   And that is not presented in this exhibit.  Correct?

 6  A.   It is not.

 7  Q.   You said that you have some familiarity with the Step 1

 8  examination.

 9       Are there questions on the Step 1 examination which are

10  paired in the sense that you cannot look at the second question

11  in the pair until you have answered the first question?

12  A.   I don't believe there are any of those questions on Step 1

13  currently.

14  Q.   I'm sorry?

15  A.   I don't believe there are any of those questions on the

16  Step 1 exam currently.

17  Q.   Were you present when Ms. Ramsay testified about her

18  experience in taking the Step 1 examination?

19  A.   I was not.

20  Q.   And has anyone related to you what she testified about the

21  way in which she attempted to answer the questions of the Step

22  1 examination?

23  A.   No.  The limited information I had heard about was a few

24  of the paragraphs that have already been referenced.

25  Q.   In addition -- I'm sorry, did I ask whether NBME has -- I

1  think I did ask and you said that NBME does have data about the

2  order in which she accessed the questions?

3  A.   Uh-huh.

4  Q.   So Mr. Burgoyne asked you, for example, about questions at

5  the end of the block, and you gave an answer indicating that

6  she had answered those accurately?

7  A.   I believe what I said was that in the last 35 questions,

8  there was only one which she didn't have 40 seconds in total to

9  consider, and that that question was answered correctly.

10  Q.   Do you know --

11        THE COURT:  You have to allow the witness to complete

12  his answer before you cut him off, Counsel.

13        Were you finished with your response?

14        THE WITNESS:  I was.

15        THE COURT:  Let's proceed.

16  BY MR. BERGER:

17  Q.   Do you know in which order Ms. Ramsay read the questions

18  that were at the end of the block?

19  A.   When you say at the end of the block, which questions

20  she -- are you referring to the questions she navigated to last

21  in the time limit allowed for each block?

22  Q.   I thought you testified that she had been -- that she

23  had -- let's look in the exhibit at page 2 of the exhibit.

24  A.   Okay.

25  Q.   And by the way, there is a column on this exhibit, Item

1  Presentation Sequence.  What does that represent?

2  A.   That represents the order in which the items were

3  presented to Ms. Ramsay.

4  Q.   It doesn't represent the order in which Ms. Ramsay or any

5  other student for that matter actually read the questions?

6  A.   It does not necessarily.

7  Q.   You could read question 1 and then skip to question 30.

8  There's nothing to stop you from doing that?

9  A.   You can start at question 40 and work backwards if you

10  wanted to.

11  Q.   And perhaps I didn't hear your testimony correctly.

12     I thought you were making some statement about the

13  questions at the end of each block?

14  A.   I was -- I believe I was asked whether people who run out

15  of time, the most traditional way run out of time towards the

16  questions at the end of the exam, and I said that that was

17  true.

18  Q.   But you don't know whether that happened in Ms. Ramsay's

19  case?  At least you don't know it from this exhibit?

20  A.   Correct.

21  Q.   But you do have data -- NBME does have data that would

22  shows which were the questions she answered last.

23  A.   We do.

24  Q.   But that data is not presented in this exhibit?

25  A.   It's not.

1  Q.   Is the data relating to Ms. Ramsay's performance, both

2  what is presented in this exhibit and what is not presented in

3  this exhibit, is that maintained in a database of some kind?

4  A.   Repeat the question?  Are you saying whether this data and

5  other data about her?

6  Q.   About her individual performance.

7  A.   It is stored in a database.

8  Q.   It is in a database.  And so what we have here is selected

9  data from that database?

10 A.   Yes.

11 Q.   Ms. Ramsay took the examination in July 2017.  Correct?

12 A.   I assume that that's true.  I don't have the date on this

13 data.  I didn't -- I didn't look at that data.

14 Q.   I think we'll all agree that that is correct.

15     Given that she took the examination in July '17, 2017, I

16 can look up the exact date, but that doesn't really matter for

17 this question.  Let's say July 15th.

18     How soon after that would NBME have had access to the

19 database that contains this data and the other data that you

20 have not presented?

21 A.   It probably would be loaded to that database within a week

22 or less.  It depends a little bit on transmission time.

23     MR. BERGER:  Your Honor, I am going to object to this

24 exhibit on a number of grounds.  First of all, I believe that

25 this could best be described as being a summary of voluminous

1  data, an extract of a summary of voluminous data.  And as Your

2  Honor knows, the rules allow for such a summary to be

3  presented, but only when the proponent makes the originals or

4  duplicates available for examination or copying or both by

5  other parties at a reasonable time and place.  An that's

6  Rule 1006.

7        THE COURT:  And did you request that before you came

8  into this courtroom with this matter?

9        MR. BERGER:  Your Honor, this exhibit was provided to

10  us by defendants last Tuesday, and that was the first time it

11  was ever provided.  We had made a discovery request for

12  information about Ms. Ramsay's examination.  It wasn't

13  specifically for data like this, but we had made a general

14  request for information about her taking of the examination.

15  That was objected to as irrelevant and it was objected to also

16  because we were asking for the text of the questions, and that

17  was said to be confidential and proprietary.

18        THE COURT:  Let's get back to this issue, though.  All

19  right?

20        MR. BERGER:  All right.

21        THE COURT:  You're going to skew it.

22        MR. BERGER:  But we only got this exhibit last

23  Tuesday, and we immediately objected to it.

24        THE COURT:  So you've had it at least a week?

25        MR. BERGER:  We've had it for a week.

1        THE COURT:  And you made no indication to the Court

2   that there was this issue out there and that I could at least

3   order you -- order that disclosure before this witness took the

4   witness stand?  Potentially.  Right?

5        MR. BERGER:  Well, not to the Court.  That's correct.

6        THE COURT:  So --

7        MR. BERGER:  We did notify counsel of our objection.

8        THE COURT:  Okay.  So I've been sitting here, and you

9   haven't said at any point in this proceeding that you feel

10  prejudiced by not having this.

11       So you have an option.  All right?  You can get this

12  order produced.

13       How long will it take approximately?

14       THE WITNESS:  A few days.

15       THE COURT:  A few days.  And then you can also present

16  that -- after you get it and receive it, then you can put on

17  any additional testimony or evidence on the record relating

18  thereto.

19       And if need be -- you're local.  Right?

20       THE WITNESS:  Sure.

21       THE COURT:  When I say you're local, I mean you're in

22  the Continental United States?

23       THE WITNESS:  I am.

24       THE COURT:  All right.  You can have a video

25  deposition of him to further supplement the record or you can

1  bring him back here whenever we have time for the rest of this

2  hearing and put that testimony on.

3      MR. BERGER:  Your Honor, as you know, this is a

4  preliminary injunction proceeding.  And for Ms. Ramsay, it's a

5  very urgent one.  We received this exhibit on -- was it the

6  Tuesday evening before Thanksgiving.  We did notify counsel of

7  our objection.  I don't want to delay proceeding in any way.  I

8  think I've adequately stated our objection.  And if Your Honor

9  is allowing the exhibit, then I accept that.

10      I note my exception, but I accept your ruling.

11      THE COURT:  I will note your exceptions, and we will

12  continue on.

13      Just out of some sense of curiosity, have you had an

14  opportunity to examine the results that counsel has asked you

15  about that was not produced?

16      THE WITNESS:  No, I have not.

17      THE COURT:  So you don't know whether or not they

18  support the testimony that you just gave in reference to the

19  other aspect of the test?

20      THE WITNESS:  I don't know that conclusively.  I'm not

21  sure -- given the amount of time that each item was presented

22  to the candidate, it is not consistent with rapid guessing

23  behavior, regardless of the order in which they were actually

24  answered by the candidate.

25      THE COURT:  Viewed?  Okay.  Very well.

1   BY MR. BERGER:

2   Q.   Okay.  I think we've covered the fact that although you

3   have data about the order in which Ms. Ramsay accessed the

4   questions, that data is not included in this exhibit.  Correct?

5   A.   Correct.

6   Q.   How was the exhibit prepared?  Who gave the direction as

7   to what should be included?

8   A.   One of my staff asked one -- one of the psychometricians

9   in my group asked the data analyst whose primary responsibility

10  is Step 1 to pull this data from the database and to format it

11  in a way that was readily accessible to people outside of our

12  proprietary systems.

13  Q.   Looking at this document and looking at what Ms. Ramsay

14  said in this declaration that Mr. Burgoyne asked you about, can

15  you determine whether in the last minute of each block -- this

16  is what she says in paragraph 28 of her declaration, that she

17  blindly selected answer choices?  Can you determine that?

18  A.   It seems unlikely that someone could navigate to

19  30 percent of the questions and select a response in a minute.

20  Q.   All right.  Well, suppose that she -- suppose it was --

21  suppose it was two minutes, suppose it was three minutes.

22       I mean, my point is, can you determine from the data that

23  you've looked at, which may be more than the data that I have,

24  can you determine from the data that you looked at whether she

25  spent the last minute -- or whether it was a minute or two

1  minutes or three minutes making random guesses, blindly

2  choosing answers?

3  A.   So just to be clear, I have not looked at other data

4  outside of what you have here with you.  I think I stated -- I

5  testified to that before.  I want to be clear, I've only looked

6  at the data in this Excel spreadsheet.

7       Was there a follow-on question?

8  Q.   No, no.  That's fine.  That's fine.

9       Do you have any training and experience in the area of

10  learning disabilities?

11  A.   That's not an area of expertise, no.

12  Q.   Do you have any training or experience in the area of

13  attention-deficit/hyperactivity disorder?

14  A.   No.

15  Q.   Do you have any training or experience as to how people

16  with those conditions would answer questions on an examination

17  like Step 1?

18  A.   No.

19           MR. BERGER:  No further questions.

20           THE COURT:  Any redirect?

21           MR. BURGOYNE:  No, Your Honor.

22           THE COURT:  Then you may step down now, sir.

23           Any reason why this witness can't be excused?

24           MR. BERGER:  No.

25           THE COURT:  Very well.

 1          Next.

 2          MR. BURGOYNE:  Your Honor, that's the conclusion of

 3   our case.  We just need to offer into evidence our exhibits --

 4          THE COURT:  Very well.

 5          MR. BURGOYNE:  -- and we're done with our case.

 6          THE COURT:  Okay.  I'll entertain your admissions,

 7   starting out -- plaintiff wants to go first or...

 8          MR. BURGOYNE:  Do you have any others?

 9          THE COURT:  Do you want me to give you some time so

10   that you can use it wisely instead of me sitting here and

11   watching you?

12          MR. BERGER:  Ten minutes, Your Honor.

13          MR. BURGOYNE:  Ten minutes.

14          THE COURT:  Sure.  We'll reconvene at a quarter of

15   3:00.

16          And then tell me, Counsel, what is your pleasure after

17   you've moved these exhibits in?

18          Do you want to argue before the Court, or do you want

19   to submit a memorandum supporting your respective positions?

20   You tell me.

21          MS. VARGAS:  We've already submitted briefing, Your

22   Honor.  And this is obviously from our perspective time

23   sensitive, so our preference would be argument rather than

24   briefing.

25          THE COURT:  Okay.  And I take it --

1          MR. BURGOYNE:  Your Honor, I actually thought it would

2    be helpful to get the record and have briefing.  The other

3    briefing was done some time ago.  I thought it would be helpful

4    if we relatively promptly got you briefs that brought the

5    evidence that came in at this hearing into the briefing.

6          THE COURT:  I'll hear arguments.  I think that's

7    probably a quicker process, because this has taken a little

8    while to get to this point.

9          And I'll hear arguments after we move the admissions.

10   All right?  Of the evidence.

11         We'll be in recess for at least ten minutes.

12         And you can get all of these exhibits and everything

13   in order around here.

14         (Recess at 2:36 p.m. until 2:49 p.m.)

15         THE COURT:  Now, Counsel, are we ready for the

16   exhibits to be moved that have not been moved?

17         MR. BERGER:  Yes, Your Honor.

18         I would like just to -- most of what we want to offer,

19   I believe, has been offered and admitted, and I am just going

20   to note what those are in case there's any difference.  But I

21   don't think there will be.

22         We believe that P-1 through P-4 have been admitted.

23         I'm not sure about the next ones, so we would like to

24   offer P-5, which is the NBME decision letter from March 2017.

25         P-6 --

1          THE COURT:  And hearing no objection -- unless I hear

2    an objection to an exhibit that you're moving at this point in

3    time --

4          MR. BERGER:  All right.

5          THE COURT:  -- it's admitted.  All right?

6          If he has an objection --

7          MR. BERGER:  P-5, the decision letter.  P-6, the

8    decision letter.  P-7, also a decision letter, February 2019.

9    And P-8, a decision on the second appeal.  So we want to offer

10   those.

11         (Exhibits P-5, P-6, P-7 and P-8 admitted into

12   evidence.)

13         MR. BERGER:  I believe the next two exhibits I'm going

14   to mention have been admitted.  They are P-13, which are

15   excerpts from the medical school student policy manual, and

16   P-14, which are documents relating to Ms. Ramsay's leave of

17   absence.

18         I believe that P-19, the MCAT form, has been admitted,

19   and also P-19A, which are the verbal reasoning section

20   questions that Ms. Ramsay annotated and testified about.

21         I also believe that P-20, the sample one -- Step 1

22   sample questions has been admitted.  And P-21, which is Dr.

23   Smith's declaration, has been admitted.

24         (Exhibit P-20 admitted into evidence.)

25         I would like to offer P-22, which is the decision

1  letter on the February 2019 -- that may be a duplicate, but

2  just to be sure.

3          (Exhibit P-22 admitted into evidence.)

4          MR. BERGER:  I would like to offer -- there was

5  testimony about it, but I don't think it was offered, P-33,

6  which is Professor Zecker's article.

7          (Exhibit P-33 admitted into evidence.)

8          MR. BERGER:  I believe that P-34, which is the

9  PowerPoint from the NBME consultants meeting, has been

10 admitted.

11          And finally, I would like to offer P-40, P-41 and

12 P-42, which are the documents that Ms. Vargas examined Dr.

13 Farmer about, the letter from the examination organizations,

14 the letter from Mr. Burgoyne to the Department of Justice and

15 the excerpt from the Federal Register.

16          (Exhibits P-40, P-41 and P-42 admitted into evidence.)

17          THE COURT:  Very well.

18          MR. BURGOYNE:  No objection.

19          THE COURT:  And they're all admitted.

20          Moving to defense.

21          MS. MEW:  Thank you, Your Honor.  We had quite a few

22 that were discussed but not admitted, so please bear with me.

23          We would like to admit Defendant's Exhibit 1, which

24 was the Complaint with exhibits.

25          (Exhibit DX-1 admitted into evidence.)

 1          MS. MEW:  Defendant's Exhibit 2, which is the

 2    declaration of Jessica Ramsay and exhibits.

 3          (Exhibit DX-2 admitted into evidence.)

 4          MS. MEW:  Defendant's Exhibit 3, which is the

 5    declaration of Robert Smith and exhibits.

 6          (Exhibit DX-3 admitted into evidence.)

 7          MS. MEW:  Defendant's Exhibit 4, which is the

 8    declaration of Catherine Farmer and exhibits.

 9          (Exhibit DX-4 admitted into evidence.)

10          MS. MEW:  I believe 5 and 6 have already been

11    admitted.

12          Defendant's Exhibit 7, plaintiff's answers and

13    objections to defendant's first set of interrogatories.

14          (Exhibit DX-7 admitted into evidence.)

15          MS. MEW:  And to make this go faster, can I just go by

16    number or would you like to --

17          MR. BERGER:  I prefer -- I prefer to have a brief

18    description.

19          MS. MEW:  That's fine.  We'll keep going.

20          Defendant's Exhibit 8, kindergarten behavior report.

21          Defendant's Exhibit 9, kindergarten progress report.

22          Defendant's Exhibit 10, first grade progress report.

23          Defendant's Exhibit 11, second grade progress report.

24          Defendant's Exhibit 12, the physical education report

25    card.

1          Defendant's Exhibit 13, report card for third grade.

2          Defendant's Exhibit 14, report card for fourth grade.

3          Defendant Exhibit's 15, report card for Texas.

4          (Exhibits DX-8, DX-9, DX-10, DX-11, DX-12, DX-13,

5    DX-14 and DX-15 admitted into evidence.)

6          THE COURT:  Are you going through each one of the

7    numbered ones there?  Have you taken any out so far?

8          MS. MEW:  Eventually.  It's going to be most of them.

9    That's why I was wondering if I could go through large chunks.

10          THE COURT:  That would be faster.

11          MR. BERGER:  Sure, sure.

12          MS. MEW:  You know what, if you want to come look over

13   my shoulder, if it makes it easier for you.

14          MR. BERGER:  No.  If you just tell --

15          THE COURT:  The numbers.  Indicate the exhibits that

16   you're moving in a block.

17          MS. MEW:  Yes.

18          THE COURT:  From exhibit number what?

19          MS. MEW:  So now we're on to 16 through 20.

20          THE COURT:  Give him an opportunity to review those.

21          Hearing no objections.

22          (Exhibits DX-16, DX-17, DX-18, DX-19 and DX-20

23   admitted into evidence.)

24          MS. MEW:  Then 22, and then 24 through 36.

25          THE COURT:  Give him an opportunity.

 1          MR. BERGER:  Your Honor, if -- so you're offering 24

 2   through 26 but not 27?

 3          MS. MEW:  24 through 36.  We didn't discuss 37.  I

 4   don't know if we feel strongly --

 5          MR. BERGER:  I'm sorry, you're offering 24 through --

 6          MS. MEW:  36.

 7          MR. BERGER:  Through 36, okay.

 8          No objection.

 9          (Exhibits DX-22, DX-24, DX-25, DX-26, DX-27, DX-28,

10   DX-29, DX-30, DX-31, DX-32, DX-33, DX-34, DX-35 and DX-36

11   admitted into evidence.)

12          MS. MEW:  38 through 42.

13          MR. BERGER:  Okay.

14          (Exhibits DX-38, DX-39, DX-40, DX-41 and DX-42

15   admitted into evidence.)

16          MS. MEW:  46.

17          MR. BERGER:  All right.

18          (Exhibit DX-46 admitted into evidence.)

19          MS. MEW:  48 through 54.

20          MR. BERGER:  Some of these, without reviewing them

21   individually, it's possible that some of these -- obviously

22   they contain references to Ms. Ramsay's attorney, and Your

23   Honor did generally sustain our objections as to work product.

24   I think that generally those exhibits are redacted, but if

25   there are any which are not redacted, then we would object to

1   that extent.

2         THE COURT:  Very well.

3         MS. MEW:  And just to clarify, I do think, Mr. Berger,

4   that you had objected to 49 on work product grounds, but it was

5   a document that you had produced, I believe.

6         THE COURT:  And I think they indicated it was by

7   accident or something?

8         MR. BERGER:  That's okay.

9         THE COURT:  No objections?  Okay.  Very well.

10        (Exhibits DX-48, DX-49, DX-50, DX-51, DX-52, DX-53 and

11   DX-54 admitted into evidence.)

12        MR. BERGER:  So we're up to --

13        MS. MEW:  So that took us from 48 to 54.

14        Now 56 through 61.

15        MR. BERGER:  All right.

16        (Exhibits DX-56, DX-57, DX-58, DX-59, DX-60 and DX-61

17   admitted into evidence.)

18        MS. MEW:  And then 63 through 68.

19        MR. BERGER:  I'm sorry, 6 --

20        MS. MEW:  63 through 68.

21        MR. BERGER:  Okay.  Again, there is potentially some

22   work product matter in there that was not -- I think without

23   reviewing individually, I can't say, but I think those are

24   things that were produced by Dr. Ruekberg or whoever produced

25   on behalf of Dr. Ruekberg.

1           MS. MEW:  If you'll look at this, Mr. Berger, for 63

2    through 67.  I guess 63, 64, 65, those all have Bates numbers

3    showing plaintiffs produced those documents.

4           MR. BERGER:  But -- okay.  Yes.  All right.  But these

5    are all --

6           Subject to the specific objections we made during the

7    hearing which Your Honor ruled upon, we have no other

8    objections.

9           THE COURT:  Very well.  They're admitted.

10          (Exhibits DX-63, DX-64, DX-65, DX-66, DX-67 and DX-68

11   admitted into evidence.)

12          MS. MEW:  Then Exhibits 70 and 71.

13          MR. BERGER:  We object to Exhibit 71.

14          THE COURT:  What's 71?

15          MR. BERGER:  That's the outcome data exhibit we were

16   just reviewing with the witness.

17          THE COURT:  And your objection is noted.  It's

18   overruled.

19          (Exhibits DX-70 and DX-71 admitted into evidence.)

20          MS. MEW:  Then Exhibit 73 through 80.

21          MR. BERGER:  Your Honor, I think that this material

22   generally speaking is things that were produced by Dr. Ruekberg

23   of communications between him and Ms. Ramsay.  And to that

24   extent, we would not object to its admission.

25          I don't think in here that there are any work product

 1  areas, but I can't be sure without reviewing every page.  And

 2  to the extent there are, Your Honor has ruled already.

 3          THE COURT:  Very well.

 4          MR. BERGER:  So subject to that, we have no objection.

 5          THE COURT:  With that notation, the exhibits are

 6  admitted.

 7          (Exhibits DX-73, DX-74, DX-75, DX-76, DX-77, DX-78,

 8  DX-79 and DX-80 admitted into evidence.)

 9          THE COURT:  Next?

10          MS. MEW:  85.

11          MR. BERGER:  Same as for the prior emails with

12  Dr. Ruekberg.

13          THE COURT:  Very well.

14          (Exhibit DX-85 admitted into evidence.)

15          MS. MEW:  And then, Your Honor, we would like to go

16  ahead and introduce -- they're in my hands -- as Defendant's

17  Exhibits 86 and 87 the charts that Mr. Burgoyne was using in I

18  believe in his questioning of Dr. Smith this morning, the --

19          THE COURT:  Summaries?

20          MS. MEW:  The summaries.

21          MR. BERGER:  Your Honor, I don't see why that is

22  evidence.  It's just a chart of evidence.

23          THE COURT:  Yeah.  It helps or aids the viewer, the

24  finder of fact, to look at this rather than the totality of all

25  the documents to sort through and get to the final issue.

1          Is there something in the charts or summaries that you

2   disagreed with in total or in part, Counsel?

3          MR. BERGER:  Well, if I have to review it right now,

4   if I have to review it right now.  If I can have -- you know, I

5   will.

6          Which one specifically are you --

7          MS. MEW:  This one.

8          MR. BERGER:  Your Honor, I think for the record I have

9   to object because we haven't had a chance to review them.

10          THE COURT:  You can object.  Your objection is

11   overruled.  If there is something in these summaries that you

12   find are incorrect, you can contact counsel, make them aware,

13   send me a notification and I'll consider it.  All right?

14          MR. BERGER:  Thank you.

15          (Exhibits DX-86 and DX-87 admitted into evidence.)

16          THE COURT:  Let's move on.

17          Anything else from the defense?

18          MS. MEW:  No, Your Honor.

19          THE COURT:  All right.  I'll hear the plaintiff.

20          MS. VARGAS:  Thank you, Your Honor.

21          So what happened to Jessie Ramsay over the last three

22   years and what played out in this courtroom this week was

23   exactly what the ADA was amended to prevent, passed to prevent,

24   the ADA Amendments Act.

25          And in passing that law, as we heard testimony,

1  Congress specifically instructed that the question of

2  whether -- and I'm quoting, the question of whether an

3  individual's impairment is a disability under the ADA should

4  not demand extensive analysis.  Instead, the ADA, and in turn

5  its regulations, directed that the definition of disability --

6  and again quoting -- shall be construed in favor of broad

7  coverage and also to the maximum extent permitted.

8       Here defense argues that it need not defer to the

9  report of a qualified professional who actually examined Ms.

10  Ramsay, that it must only provide access to a test rather than

11  best ensuring that the test shows the student's ability and

12  potential and not their disability.  And that it should be able

13  to look at Ms. Ramsay's test scores on certain standardized

14  tests and grades while not looking at the accommodations that

15  Ms. Ramsay actually had on the NBME's own shelf exams at

16  medical school.  That it wants to disregard.

17       And as we made clear in the deposition I hope of Dr.

18  Farmer, this is not the first time that the NBME has made these

19  arguments.  These arguments were made prior to the passage of

20  the ADA Amendments Act, and they were rejected with the passage

21  of the law.  They were made prior to the adoption of

22  regulations by the Department of Justice, by Mr. Burgoyne on

23  the behalf of the NBME, and they were explicitly rejected in

24  the executive summary of the final rule as being inconsistent

25  with the Congressional history of the ADAA.

1    And then of course they requested and the NBME

2    requested that the DOJ should go ahead and issue technical

3    assistance on testing accommodations in order to provide

4    guidance to everybody on how these accommodations requests

5    would be -- should be processed and evaluated.

6    And that entire document is fully supportive of Ms.

7    Ramsay.  And it is only after that document was issued and did

8    not adopt the arguments that the NBME has continually tried to

9    push forward before Congress and before the agency, only then

10   was it something that they weren't interested in actually

11   applying.  And I do have copies of the technical assistance if

12   the Court would like me to provide those.

13   So the Department has considered -- the Department of

14   Justice has considered the arguments that were made here and

15   rejected them, and here we are.

16   Jessie Ramsay has to take and pass Step 1 of the USMLE

17   by March 2, 2020.  She can't simply withdraw from medical

18   school, because once she withdraws from medical school, she is

19   no longer eligible to take the USMLE.  And she has no guarantee

20   that if she applies to medical school again, especially after

21   what's transpired in the last three years, that she'll be

22   admitted.  So she asks only for the accommodations that she's

23   needed and has been granted in the past in medical school,

24   accommodations that she received at OSU.

25   THE COURT:  What other accommodations has -- the only

1  one is the time, as I understand it now, because the other

2  accommodations have been granted by defendants?

3          MS. VARGAS:  Yes, yes.  It's only the issue --

4          THE COURT:  So we're talking about now additional time

5  to complete the reading process?

6          MS. VARGAS:  Right.  Your Honor, it's only the issue

7  of double time, the extended time that she needs.

8          THE COURT:  Right.

9          MS. VARGAS:  And she didn't ask for the maximum amount

10 of extended time that NBME offers.  They offer triple time.

11 She didn't ask for that.  She asked for double time.  And the

12 reason is because -- and I hope you saw that when she

13 testified -- is that she wants to pass or fail on her own

14 merit, not because of her disability but because she knows the

15 material or because she doesn't.

16          So the law is clear.  It says that licensing

17 examinations -- and I'm going to quote the regulations -- must

18 be administered so as to best ensure that when the examination

19 is administered to an individual with a disability, the

20 examination results accurately reflect the individual's

21 aptitude or achievement level or whatever other factor the

22 examination purports to measure rather than reflecting the

23 individual's impaired sensory, manual or speaking skills.

24          THE COURT:  And her disability is her reading?

25          MS. VARGAS:  Yes.

 1            THE COURT:  As you relate to it.

 2            MS. VARGAS:  Reading and attention as well.

 3            And as we heard from Dr. Smith, those disabilities

 4    interact.  It takes her much more concentration than it would

 5    your average person to read and focus.  At the same time she

 6    has ADHD, so she lacks the ability to read and focus that she

 7    requires.

 8            THE COURT:  And as I recall the testimony, he was the

 9    first and only one that diagnosed her with the -- with that

10    condition?

11            MS. VARGAS:  Well, there were diagnoses before, a

12    prior diagnosis of learning disability.

13            THE COURT:  Learning disability.

14            MS. VARGAS:  But as Dr. Smith said -- and we

15    acknowledge that that examination, they didn't do the tests

16    that were needed to show learning disability, so it was Dr.

17    Smith who did the comprehensive battery and got those results.

18            THE COURT:  And those tests that were taken of your

19    client, they were more -- I guess they were her actual conduct

20    of the reading and understanding?  There was no test that she

21    performed in a -- by any type of machine or any type of test,

22    written test, that demonstrated these conditions other than his

23    observing her and the conduct that she exhibited in reading and

24    understanding and responding?

25            MS. VARGAS:  There had been documentation all the way

1   back into early or mid elementary school that her reading was

2   slow and that there was an issue for her, both from

3   Dr. Tanguay, which is in I believe Plaintiff's Exhibit 1, which

4   is the first application for --

5          THE COURT:  And that's the optometrist?

6          MS. VARGAS:  She was an optometrist, but she

7   recognized that there was something wrong with the way Jessie

8   was reading.

9          And then obviously there's Ms. Ramsay's own testimony

10   and Dr. Smith's interview of her and the input that he got from

11   her mother historically about how she was as a child and also

12   from her fiancé.  But it was Dr. Smith who was the first one to

13   do the testing that was necessary to show dyslexia.

14          What's really important about that is that the law

15   requires that disability be determined without mitigation.  So

16   when somebody is using learned behavioral conduct, when

17   somebody is taking medication for ADHD, that's mitigation.

18   You're supposed to take that out of the equation and consider

19   sort of -- I don't know if naked is the right word, but the

20   person without any of that, do they have a disability without

21   any of that.

22          None of the tests that had been done up until Dr.

23   Smith did that.  That's the import of all of this battery of

24   comprehensive psychological testing.

25          Two things:  One, that it took out the mitigation and

1   it looked at what she's actually able to do without regard for

2   what kind of tricks she's doing in order to skip the reading on

3   tests or how she had informal accommodations so she was at a

4   table alone or only parts of her test were graded in elementary

5   school.  It screens all of that out, so it's important for that

6   reason.

7        It's also important because she was administered a

8   number of different tests by Dr. Smith.  And across those

9   tests, not just within those tests, they were remarkably

10  consistent.  She was tested without her ADHD medication.  She

11  was tested actually on what would show up for dyslexia.  And it

12  wasn't that she had one test that showed something and one test

13  that didn't, consistently across the board in each test, there

14  were very strikingly similar results where she had to rely on

15  reading, particularly in a timed setting, where that showed her

16  weakness.  And that weakness unmitigated isn't going to show up

17  on other kinds of tests that either aren't timed or where she's

18  allowed to use those, you know, medications and self-mitigation

19  that we aren't supposed to consider, according to the

20  regulations and according to the technical assistance from the

21  Department of Justice.

22       So I keep referencing the technical assistance.  There

23  are just a few parts of it I'd like to highlight.

24       THE COURT:  Sure.

25       MS. VARGAS:  But I think they're all critically

1  important because they're the rules we're all supposed to play

2  by.

3        So one of the things that the technical assistance on

4  testing accommodations says is a person with a history of

5  academic success may still be a person with a disability who is

6  entitled to testing accommodations under the ADA.

7        A history of academic success does not mean that a

8  person does not have a disability that requires testing

9  accommodations.  For example, someone with a learning

10  disability may achieve a high level of academic success but may

11  nevertheless be substantially limited in one or more of the

12  major life activities of reading, writing, speaking or learning

13  because of the additional time or effort he or she must spend

14  to read, write, speak or learn compared to most people in the

15  general population.

16        Second, the testing -- I mentioned this before.

17  Testing entity, and this is a quote, must administer its exams

18  so it accurately reflects an individual's aptitude, achievement

19  level or the skill that the exam purports to measure rather

20  than the individual's impairment.

21        Three, again a quote.  Proof of past testing

22  accommodations in similar test settings is generally sufficient

23  to support a request for the same testing accommodation for

24  current standardized exams or other high-stakes tests.

25        We heard a lot from the defendants about the ACT and

1  the MCAT.  And Your Honor heard from Ms. Ramsay, her

2  explanation of how it was that she was able to circumvent some

3  of the reading on those tests and self-mitigate.

4       What we don't hear from the defendants is any talk

5  about the fact that Ms. Ramsay --

6       THE COURT:  Ohio State and the medical school gave her

7  accommodations in reference to her testing.  Yes.

8       MS. VARGAS:  Right.  Yes, sir.  Including on their

9  tests.

10       THE COURT:  On their tests.

11       MS. VARGAS:  And then furthermore that -- again a

12  quote, an absence of previous formal testing accommodations

13  does not preclude a candidate from receiving testing

14  accommodations.  In the absence of documentation of prior

15  testing accommodations, testing entities should consider the

16  entirety of a candidate's history, including informal testing

17  accommodations, to determine whether that history indicates a

18  current need.

19       And lastly -- and this is really critically

20  important -- is that -- and this is a quote, testing entities

21  should defer to the documentation from a qualified professional

22  who has made an individualized assessment of the candidate that

23  supports the need for the requested testing accommodation.

24  Candidates who submit documentation such as reports,

25  evaluations or letters that is based on careful consideration

1  of the candidate by a qualified professional should not be

2  required by testing entities to submit additional

3  documentation.  A testing entity should generally accept such

4  documentation and provide the recommended testing

5  accommodation.

6          THE COURT:  And who would that qualified expert be?

7          MS. VARGAS:  Dr. Smith.

8          THE COURT:  So you would say Dr. Smith?

9          MS. VARGAS:  Dr. Smith.

10          THE COURT:  Even though those tests might be based on

11  conduct that is manipulated, let's say?

12          I'm looking at the position that the defense is

13  clearly considering by the questions that they proposed to the

14  expert testifying.  Clearly we have an individual that's highly

15  intelligent, without any question or exceptions about that.  I

16  observed her testify for almost -- a whole day almost.  And I

17  saw how she was directed to go to different pages, to look at

18  the questions that were being posed to her.  She was able to

19  read them and respond to the questions.

20          This is a person, plaintiff, who is studying medicine,

21  who has the wherewithal to understand the test that she was

22  going to be taking and perform on those tests that she was

23  going to be requested to take.

24          So there is the possibility that those tests could be

25  manipulated, but I'm not saying she did.  I'm not saying she

1  did.  But I have to rely on the expert's representation that

2  was given to support her position.

3          MS. VARGAS:  Yes, Your Honor.  And that is exactly why

4  the technical assistance directs -- it is particularly

5  important in the context of learning disabilities, which are

6  difficult to diagnose, particularly in gifted students where

7  they can be masked through early education.  That's why the

8  Department of Justice says that it's really important to

9  actually put eyes on the person and talk to them and understand

10 how they approach the test and how that they did it, because

11 from a distance where all you have is paperwork, those kind of

12 scores by definition in a bright person with learning

13 disability, they're going to look just like Ms. Ramsay's.  You

14 have to have somebody who is trained, who is actually

15 communicating with her, who is actually looking at the validity

16 of what she's saying and the sincerity of her effort in drawing

17 a conclusion.  And that's not something that can be done in

18 learning disabilities on paper.  And that's certainly what the

19 technical assistance says.

20          THE COURT:  Very well.

21          MS. VARGAS:  So defendant has I think admitted pretty

22 clearly that it did none of the things in the technical

23 assistance despite the fact that that technical assistance is

24 entitled to deference.  The US Supreme Court in Bragdon v.

25 Abbott said that there should be deference given.  And courts

1   of appeals have held that unless the technical assistance is

2   directly contrary to the regulation itself, which they aren't

3   in this case, that they should be afforded deference.

4        And certainly it was something that Mr. Burgoyne

5   thought was worth asking for, because he did ask for it on

6   behalf of his client until he didn't like the result, and then

7   he trained the consultants, the ones who evaluated Ms. Ramsay,

8   in a version of the law that they would have preferred to have.

9        So we talked briefly about the fact that the NBME has

10  extraordinary resources.  And after Your Honor rules, whenever

11  that is, they will go about their business.  Their business

12  will go on.

13       It is a very different story for Ms. Ramsay.  If Ms.

14  Ramsay doesn't get the double time, her future as a doctor is

15  quite literally over.  It doesn't matter how much determination

16  she put in to succeed in medical school.  It doesn't matter how

17  smart she is.  It doesn't matter how hard she worked if she

18  doesn't have a fair opportunity to show what she knows.  And

19  the only way she can do that is if she has the extended time

20  that somebody with extraordinary respected credentials who

21  defendant's own people have acknowledged did everything he was

22  supposed to do, and they have no question with how he did it

23  and what he tested, unless his report is given more

24  credibility, than how this young woman did.  Did she get a

25  sticker on her kindergarten report card for good behavior?  We

 1  don't have the benefit of bringing in her kindergarten teacher.

 2  So certainly the few words they might have chosen to put in

 3  kindergarten on her report card, certainly those words can't

 4  damn her future as a doctor.

 5      And so we've already briefed the standards for what's

 6  required for a preliminary injunction.  I don't think we need

 7  to belabor that.  But I would just submit to the Court that we

 8  leave it to you to determine what's in the public interest

 9  here.

10      THE COURT:  Thank you, Counsel.

11      Defense?

12      MR. BURGOYNE:  Yes, Your Honor.  And with apologies, I

13  don't have a copy of the technical assistance guidance with me,

14  so with your indulgence, I hate to use a cell phone, but I have

15  the guidance pulled up.

16      THE COURT:  That's fine.

17      MR. BURGOYNE:  One of the things that wasn't read to

18  you with all the reading on technical assistance was the last

19  page of that document.

20      And the last page of that document states as follows:

21  This guidance document is not intended to be a final agency

22  action, has no legally binding effect and may be rescinded or

23  modified in the department's complete discretion in accordance

24  with applicable laws.  The department's guidance documents,

25  including this document, do not establish legally enforceable

1    responsibilities beyond what is required by the terms of the

2    applicable statutes, the regulations or judicial precedent.

3          And as a consequence, it is not surprising that much

4    of what you're hearing is based on the technical guidance.  In

5    fact, what the ADA requires that the testing entities like the

6    National Board of Medical Examiners administer their exams in a

7    place and manner that is accessible to individuals with

8    disabilities.  In order to be entitled to those accommodations,

9    an individual has to be disabled within the meaning of the ADA.

10   And to be disabled within the meaning of the ADA, you have to

11   be substantially limited in one or more major life activities

12   as compared to most people in the general population.

13         And the evidence in this case did not show that Ms.

14   Ramsay is in fact substantially limited in any major life

15   activities that are relevant to taking the test like the Step 1

16   exam as compared to most people in the general population.

17         The evidence that Ms. Ramsay offered was primarily Dr.

18   Smith's testimony.  And Dr. Smith in turn had reviewed

19   information from other professionals, but as you pointed out,

20   acknowledged he that was the first one to diagnose her with

21   dyslexia, a lifelong impairment, and that he had done that in

22   2018 in connection with her desire to get accommodations on the

23   Step 1 exam.

24         The first diagnosis of ADHD was in 2009.  ADHD, also a

25   lifelong impairment, but she was diagnosed with that in her

1  second year at Ohio State after she had already achieved a

2  3.56 grade point average with no accommodations.

3       Dr. Smith's testimony was that in his opinion, Dr.

4  Smiy's ADHD diagnosis was not thorough enough to have resulted

5  in an ADHD diagnosis in accordance with the DSM criteria.

6       Dr. Smith also addressed the documentation from Dr.

7  Lewandowski, which, as was acknowledged here, was not

8  sufficient to produce a reliable diagnosis regarding a learning

9  disability.

10      And then finally he said he discounted Mr.

11  Livingston's documentation because he had administered an

12  outdated test and had otherwise performed insufficient

13  evaluation of Ms. Ramsay.

14      Dr. Smith acknowledged that he saw nothing in the

15  educational records or the standardized testing history that

16  indicated that Ms. Ramsay experienced any issues in learning or

17  attention kindergarten to high school.  He acknowledged that

18  all of Ms. Ramsay's standardized test results reflected average

19  or above average results in reading.  He acknowledged that to

20  do well on the ACT and the MCAT one would have to have basic

21  reading skills.  And he defined dyslexia as the absence of

22  basic reading skills.

23      Regarding ADHD, he acknowledged that the evidence of

24  Ms. Ramsay experiencing multiple symptoms in multiple settings

25  and -- beginning in childhood, as would be required to make a

1  diagnosis under the DSM, came from Ms. Ramsay, her mother and

2  her fiancé.

3         The severe symptoms that Ms. Ramsay reported to Dr.

4  Smith were inconsistent with the symptoms that had been

5  referenced in the documentation from Dr. Smiy in 2009.

6         On the other side of the ledger, as I said, is the

7  history and -- on both standardized testing and academic

8  performance, real world objective evidence that NBME and the

9  external experts that it relied upon reviewed in making a

10 determination regarding her entitlement to accommodations.

11        At some point along the way, reading deficiencies and

12 attention deficiencies at the level Ms. Ramsay described would

13 have shown up in some form or fashion in records from

14 kindergarten to the 12th grade.  It isn't just a question of

15 stickers on her kindergarten report.  It's a question of

16 whether or not if someone is receiving daily attention from

17 teachers and a parent because of severe problems, whether one

18 would logically and reasonably anticipate that would show up

19 somewhere, either in someone's academic performance, someone's

20 performance on standardized tests, some of which include

21 lengthier content than the Step exam, and in the comments the

22 teachers provide.

23        Dr. Smith said in his experience you'll often see

24 teachers simply not make a comment there because so long as the

25 student is getting by, they don't want to communicate negative

1  information.  On the other hand, we know that at least three

2  years she had report cards that specifically captured

3  information and asked teachers to provide information on

4  whether or not the grades the student was receiving reflected

5  any intensive instruction from a teacher, any extra

6  instruction, any special guidance, and none of that showed up

7  in those records.  It is not unreasonable to rely on real world

8  evidence, nor is it unlawful to do so.

9       Ms. Vargas referenced the "best ensured" language and

10 said testing entities like NBME are required to administer

11 their exams to best ensure they're evaluating knowledge and

12 skills, not the disability.  That is certainly what the

13 regulation says, but that regulation kicks in after you've made

14 a determination whether someone is disabled within the meaning

15 of the ADA.  If someone is disabled within the meaning of the

16 ADA, it's at that point you have to identify appropriate

17 accommodations in order to best ensure that you measure their

18 abilities and knowledge and not the disability.

19      THE COURT:  Counsel, what do you say in reference

20 to -- here we have at least two higher institutions of learning

21 that when confronted with the plaintiff, they acknowledge,

22 without reservation or hesitation or pause, that she in fact

23 needs accommodations to matriculate in these environments.  And

24 that's the educational foundation that she proceeds with to

25 take the ultimate exam that you present to her.  And I think

1  she has accommodations in medical school in reference to a part

2  of the exam that she took.

3        What do you say in reference to why they meet -- why

4  she meets these criteria in these levels and fails to meet it

5  in your client's?

6        MR. BURGOYNE:  Well, two periods that you're referring

7  to, Your Honor.

8        The first instance was the Ohio State University

9  context where as a sophomore in college, she got accommodations

10 from the university.  As you heard, she got those

11 accommodations on the strength of an ADHD diagnosis that was a

12 made in a half an hour evaluation in which Dr. Smith said was

13 not sufficient to support a diagnosis.

14       Colleges vary in their liberalness with which they

15 will provide accommodations in an academic context.  In this

16 particular instance, Ohio State was willing to accept an ADHD

17 diagnosis, which we have now heard in this Court would not

18 support a diagnosis under the DSM-5 criteria.  And that's fine.

19 That's their prerogative.

20       When she gets into medical school, at that point of

21 course she's relying in part on the fact that she got

22 accommodations from Ohio State.  So there's a history of

23 accommodations, so the medical school says we know you've got

24 that.

25       She also says, well, I've got this additional

1  documentation here from Mr. Livingston, and this supports my

2  need for accommodations.

3       Well, then we have this trial and we hear, well, Mr.

4  Livingston's documentation is insufficient as well.  And again,

5  that's the medical school's prerogative.  They've admitted Ms.

6  Ramsay to medical school, and they have every reason to want to

7  see her succeed.  And that's great.  But that's very different

8  from a standardized testing context where exams are

9  purposefully standardized and where NBME, as the Second Circuit

10  has said, is obligated on the one hand to administer

11  accommodations when people show they're entitled to them.  At

12  the same time, it also has an obligation to ensure that it does

13  not provide accommodations if an individual has not

14  demonstrated a need for accommodations, and more importantly,

15  entitlement to accommodations under the ADA, because that's not

16  fair to other examinees.  Every examinee who takes this

17  challenging exam under time constraints would love to have the

18  exam taken over two days with half hour blocks instead of an

19  hour block and with the benefit of a less stressful testing

20  environment.

21       Your Honor, there was a question about the ADA

22  Amendments Act.  We don't dispute for a minute that that

23  statute broadened the coverage provided by the ADA.  On the

24  other hand, it didn't get rid of the requirement that someone

25  still has to establish substantial limitation in a major life

1  activity as compared to a person in the general population.

2          You never heard Dr. Smith once testify that she is

3  substantially limited in a major life activity as compared to

4  most people in the general population.  He testified that based

5  on her dyslexia, he believes she needs extended testing time.

6  That's a different issue than meeting the standard under the

7  ADA for disability.

8          Multiple courts subsequent to the ADA Amendments Act

9  have held that it is reasonable and appropriate in a case

10  directly like this for you to consider performance on

11  standardized tests like the MCAT, the GRE, the ACT, precisely

12  because they do tell you something.

13          The Bibber case I referenced earlier by Judge Dalzell

14  where again, a very similar case, I think the plaintiff was

15  deaf, had been diagnosed early with dyslexia, came to court

16  with two qualified professionals who testified on her behalf.

17  The testing organization had experts.  And at the end of the

18  day, Judge Dalzell said, you know, there is much that is very

19  compelling in this case and difficult, but at the end of the

20  day, I have to provide and apply the law as it is stated, which

21  is there has to be substantial limitation compared to most

22  people, and he didn't find it in that case, again, looking in

23  large part at performance on external measures of real life

24  examinations.

25          There is the Black v. The National Board of Medical

1  Examiners case out of Florida, which again where the court

2  looked to performance on real life measures, performance in

3  college, performance in high school, in middle school and

4  performance on other standardized tests.

5       And then there's the Healy case we cited in our briefs

6  out of -- I believe it's Indiana, where again the court looked

7  at those externals.

8       There's also an earlier case, Love v. Law School

9  Admission Council, decided by the Eastern District of

10 Pennsylvania, where again the court looked to performance on

11 other standardized tests in evaluating whether or not there was

12 substantial limitation.

13      There was the suggestion that because Dr. Smith

14 personally evaluated her, more weight should be given to that.

15 There was also testimony that Dr. Lewandowski personally

16 evaluated her, yet there was an acknowledgment that the fact

17 that you personally evaluate somebody doesn't necessarily mean

18 that your opinion is correct or sound or at the end of the day

19 should carry controlling weight.

20      Briefly, Your Honor, on the question of irreparable

21 harm, in order to meet that requirement of the preliminary

22 injunction standard, it has to be immediate and certain.

23 Certainly at this point it has not been shown that she is

24 certain to fail the exam if she tests next week with testing

25 over two days and the other accommodations that were provided.

1   Likewise, the harm, which I don't mean to minimize, but the

2   harm is a delay in her graduate education.  And this court and

3   other courts have held that's not sufficient for irreparable

4   harm.

5        We think the case ultimately, Your Honor, should be

6   decided on the basis that Ms. Ramsay has not shown a clear

7   likelihood of succeeding on the merits under a burden where

8   she's seeking a mandatory preliminary injunction which is

9   perhaps the highest requirement in terms of the evidentiary

10  burden when someone is seeking that type of relief.

11       Thank you, Your Honor.

12       THE COURT:  Very well.  Yes, counsel.  I know you're

13  jumping up.  Rebuttal argument.

14       MS. VARGAS:  I'll keep it brief.  I promise.

15       THE COURT:  Sure.

16       MS. VARGAS:  I would draw the Court's attention

17  obviously to the court cases cited in our brief, in particular

18  Featherstone v. Pacific Northwest University of Health

19  Sciences.  That was a case in which a deaf student was admitted

20  to medical school and then requested interpreters and

21  captioning in order to understand the content.  After that

22  request was made, the medical school withdrew his admission and

23  considered -- well, first it considered for a year whether it

24  should do that, and then it ultimately withdrew his admission.

25       We represented Mr. Featherstone, and Mr. Featherstone

1 filed for a preliminary injunction.  And that injunction was

2 granted on the day of hearing.  And in the decision, the judge

3 referenced that the delay in being able to practice to one's

4 chosen profession was in and of itself discrimination, that it

5 was irreparable harm.

6         We have more than that here.  March 2nd is not

7 distant.  It is not uncertain.  It is an absolute deadline by

8 which she has to take this test.  And the ADA does not require

9 that you take it and fail it and you take it and you fail it

10 again and you try this and you fail it again.  The ADA requires

11 that having provided documentation from a qualified

12 professional, as well as a wealth of other documentation that

13 we haven't spoken about in the last few minutes but there was

14 testimony provided about it at length over the past few days,

15 that the accommodations should be provided so that you can show

16 what you know, not whether you're limited by disability.

17         And I would cite specifically to Dr. Farmer's

18 testimony that was at deposition that she -- we discussed when

19 she was in cross-examination that there was no documentation

20 that Ms. Ramsay could provide that would change their minds.

21 There was nothing she could do.

22         And it's not just about passing.  It's about the

23 ability to even get a residency.  If you pass by a point or

24 two, your ability to get a residency is irrevocably harmed.

25 You can't claw that back.  You can't somehow get a different

1   score later and substitute that.  That doesn't happen with

2   medical school residency programs and the match.  She only has

3   one chance.  And that chance is over in this courtroom with the

4   relief that the Court either grants or doesn't grant.

5        I would also say that yes, we did talk about the

6   technical assistance and manual a lot.  That's because they

7   testified that they didn't apply it and we think it's so

8   clearly applicable.  But the law and the regulations, they also

9   support what we testified and what's in the technical

10  assistance manual.

11       Finally we heard a lot about their theme of the real

12  world, the real world being MCAT and the ACT.  And it's

13  tempting for us as well to look at Ms. Ramsay and make our own

14  determinations about was she able to read that, was she not

15  able to read that.

16       Dyslexia is not that simple.  If it were, it would be

17  diagnosed every time somebody had it when they were in second

18  grade.  And the research shows that it actually is very

19  frequently, particularly in gifted students, diagnosed very

20  late when there is this sort of perfect collision between the

21  inability of their mitigation to overcome the complexity of the

22  reading and the time requirements that are necessary to read

23  that kind of complex meaning and process it and actually show

24  what you know.

25       So whether Ms. Ramsay can understand an exhibit that

1    she wrote herself and has seen before in the courtroom, I would

2    ask the Court -- I would submit that that's not the appropriate

3    determination.  We are not neuropsychologists.  Dr. Smith is.

4    And I think he was credible in acknowledging -- you know, I

5    often see experts who say all of her testing is good, all of

6    the prior diagnosis is good.  I've rarely seen an expert in the

7    courtroom say very even-handedly, this testing, I don't think

8    this was the right test.  Or this testing, I don't think it was

9    enough.  And he did that.  And then he explained why his

10   testing was valid and what he did to ensure it was valid and

11   what he did to ensure that there wasn't some kind of

12   malingering going on.  And he concluded that there wasn't.

13          And we weren't in a position any more than the

14   external evaluators who are only looking at the documentation

15   based on Mr. Burgoyne's training of what the law requires

16   making a determination.  What matters is somebody who has the

17   expertise, what that person has concluded based on a very

18   comprehensive, extensive evaluation, using multiple testing

19   modalities that all consistently, without mitigation,

20   considered support what Ms. Ramsay at great length testified.

21          And let me say that it is incredibly difficult to

22   testify about your weaknesses.  And what we often see is that

23   very often students with disabilities, they hide them.  They

24   don't ask for what they need for a long time until they have no

25   other choice.

1        And in this case it wasn't until her professors told
2   her there is something wrong, you need to go see disability
3   services, you need testing, contrary to Mr. Burgoyne's
4   representation of colleges and medical schools passing out
5   accommodations like candy.  I assure you that is not how that
6   works.  I would be out of a job.  That's not what medical
7   schools do.  Medical schools are putting forward a student at
8   the end of four years that they believe can safely practice
9   medicine.  And they would not put forward and provide
10  accommodations if they believed that the person was not doing
11  the work and showing what they know.  They would not put a
12  finger on the scale unless it was necessary.
13       And so I would urge you to find that Ms. Ramsay has
14  shown that she is an individual with a disability, which is the
15  only question that Mr. Burgoyne when we met back in your
16  chambers two months ago, three months ago, to schedule this
17  hearing, that was the only issue he raised was whether she was
18  an individual with a disability.  I would ask you to find that
19  she is and to allow her to take the accommodations so that her
20  career doesn't end today.
21       THE COURT:  Very good.  Thank you.
22       MR. BURGOYNE:  Nothing further, Your Honor.
23       THE COURT:  I'll tell you, I'll take it under
24  advisement.  And I hope to have something for you shortly.
25       In any case, thank you for your presentation of the

1  evidence in this case.

2       And good luck to you.

3       MS. RAMSAY:  Thank you.

4       MR. BURGOYNE:  Thank you, Your Honor.

5       THE COURT:  We are adjourned.

6       Oh, make sure we have -- okay.  I have the plaintiff's

7  exhibits, the defense exhibits.  And additional exhibits that

8  you included from the witnesses today.

9       MR. BURGOYNE:  I think that's right, Your Honor.

10  We'll double check.

11      THE COURT:  And I have the summaries here from the

12  defense.

13      MS. MEW:  Do we leave in everything or should we take

14  out the ones --

15      THE COURT:  Just leave it right there.

16      Leave just the documents that are admitted into

17  evidence.

18      MS. MEW:  Okay.  All right.

19      THE COURT:  So go through your exhibit book and reduce

20  them.  And don't forget to take everything else out of the

21  courtroom.  All right.

22      MS. VARGAS:  Your Honor.

23      THE COURT:  Yes, ma'am.

24      MS. VARGAS:  Would you like me to provide a copy of

25  the technical assistance manual?

1          THE COURT:  Sure.  You can leave that here.

2          MR. BURGOYNE:  I don't mind a copy if it has the last

3  page.

4          MS. VARGAS:  It's a complete copy.

5          THE COURT:  As long as counsel has seen it and has the

6  totality of it, that's fine.

7          (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13          I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  _____

17  Ann Marie Mitchell, CRR, RDR, RMR
    Official Court Reporter
18

19

20

21

22

23

24

25

1                              -   -   -

2                         I N D E X

3                              -   -   -

4
     <u>Witness</u>          <u>Direct</u>      <u>Cross</u>      <u>Redirect</u>      <u>Recross</u>
5
     DR. ROBERT                        4         54              61
6    SMITH

7    DR. CATHERINE      64          79          137
     FARMER
8
     MICHAEL GLENN      138         150
9    JODOIN

10

11
                              -   -   -
12
                         E X H I B I T S
13
                              -   -   -
14

15       NO.                                ADMITTED PAGE

16       P-21                              3

17       P-5                               162

18       P-6                               162

19       P-7                               162

20       P-8                               162

21       P-20                              162

22       P-22                              163

23       P-33                              163

24       P-40                              163

25       P-41                              163

| | | |
|---|---|---|
| 1 | P-42 | 163 |
| 2 | DX-1 | 163 |
| 3 | DX-2 | 164 |
| 4 | DX-3 | 164 |
| 5 | DX-4 | 164 |
| 6 | DX-7 | 164 |
| 7 | DX-8 | 165 |
| 8 | DX-9 | 165 |
| 9 | DX-10 | 165 |
| 10 | DX-11 | 165 |
| 11 | DX-12 | 165 |
| 12 | DX-13 | 165 |
| 13 | DX-14 | 165 |
| 14 | DX-15 | 165 |
| 15 | DX-16 | 165 |
| 16 | DX-17 | 165 |
| 17 | DX-18 | 165 |
| 18 | DX-19 | 165 |
| 19 | DX-20 | 165 |
| 20 | DX-22 | 166 |
| 21 | DX-24 | 166 |
| 22 | DX-25 | 166 |
| 23 | DX-26 | 166 |
| 24 | DX-27 | 166 |
| 25 | DX-28 | 166 |

| 1 | DX-29 | 166 |
| 2 | DX-30 | 166 |
| 3 | DX-31 | 166 |
| 4 | DX-32 | 166 |
| 5 | DX-33 | 166 |
| 6 | DX-34 | 166 |
| 7 | DX-35 | 166 |
| 8 | DX-36 | 166 |
| 9 | DX-38 | 166 |
| 10 | DX-39 | 166 |
| 11 | DX-40 | 166 |
| 12 | DX-41 | 166 |
| 13 | DX-42 | 166 |
| 14 | DX-46 | 166 |
| 15 | DX-48 | 167 |
| 16 | DX-49 | 167 |
| 17 | DX-50 | 167 |
| 18 | DX-51 | 167 |
| 19 | DX-52 | 167 |
| 20 | DX-53 | 167 |
| 21 | DX-54 | 167 |
| 22 | DX-56 | 167 |
| 23 | DX-57 | 167 |
| 24 | DX-58 | 167 |
| 25 | DX-59 | 167 |

| 1 | DX-60 | 167 |
| 2 | DX-61 | 167 |
| 3 | DX-63 | 168 |
| 4 | DX-64 | 168 |
| 5 | DX-65 | 168 |
| 6 | DX-66 | 168 |
| 7 | DX-67 | 168 |
| 8 | DX-68 | 168 |
| 9 | DX-70 | 168 |
| 10 | DX-71 | 168 |
| 11 | DX-73 | 169 |
| 12 | DX-74 | 169 |
| 13 | DX-75 | 169 |
| 14 | DX-76 | 169 |
| 15 | DX-77 | 169 |
| 16 | DX-78 | 169 |
| 17 | DX-79 | 169 |
| 18 | DX-80 | 169 |
| 19 | DX-85 | 169 |
| 20 | DX-86 | 170 |
| 21 | DX-87 | 170 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**$125** [1] - 8:14

**$143** [2] - 94:8, 94:22

**$375** [1] - 8:21

**'17** [1] - 154:16

**08033** [1] - 1:17

**1** [49] - 4:9, 5:16, 12:20, 12:25, 28:4, 28:16, 39:10, 43:5, 43:10, 62:16, 62:17, 65:15, 75:23, 76:10, 85:16, 85:19, 85:24, 86:4, 87:6, 88:16, 88:17, 89:3, 96:9, 102:24, 139:3, 139:12, 140:6, 140:7, 145:10, 146:16, 147:5, 148:9, 148:12, 150:23, 151:8, 151:10, 151:13, 151:17, 151:19, 151:23, 153:8, 158:11, 159:18, 162:22, 163:24, 172:17, 175:4, 183:16, 183:24

**1,700** [1] - 65:21

**10** [11] - 2:4, 77:21, 86:15, 86:20, 87:6, 104:11, 114:2, 114:3, 114:5, 147:2, 164:23

**1006** [1] - 155:7

**106** [1] - 72:18

**107** [3] - 47:20, 145:3, 145:7

**10:47** [1] - 54:3

**10th** [1] - 71:21

**11** [18] - 43:21, 44:2, 44:3, 91:1, 104:11, 104:23, 115:11, 115:14, 116:19, 119:21, 119:22, 120:9, 123:5, 124:24, 127:3, 127:6, 164:24

**111** [1] - 143:22

**11:03** [1] - 54:3

**12** [6] - 77:21, 86:15, 86:20, 87:6, 119:22, 164:25

**12:43** [1] - 118:16

**12th** [3] - 69:8, 69:16, 185:15

**13** [3] - 35:12, 35:21, 165:2

**137** [1] - 198:7

**138** [1] - 198:8

**139** [1] - 96:6

**139..** [1] - 96:7

**13th** [2] - 2:11, 71:15

**14** [4] - 35:10, 35:12, 106:19, 165:3

**145,003** [1] - 90:1

**15** [7] - 35:10, 35:12, 54:1, 76:11, 123:7, 124:24, 165:4

**150** [1] - 198:8

**155** [1] - 127:2

**15th** [1] - 154:18

**16** [4] - 33:16, 40:19, 43:23, 165:20

**162** [5] - 198:17, 198:18, 198:19, 198:20, 198:21

**163** [5] - 198:22, 198:23,

---

198:24, 198:25, 199:1

**164** [5] - 199:2, 199:3, 199:4, 199:5, 199:6

**165** [13] - 199:7, 199:8, 199:9, 199:10, 199:11, 199:12, 199:13, 199:14, 199:15, 199:16, 199:17, 199:18, 199:19

**166** [20] - 199:20, 199:21, 199:22, 199:23, 199:24, 199:25, 200:1, 200:2, 200:3, 200:4, 200:5, 200:6, 200:7, 200:8, 200:9, 200:10, 200:11, 200:12, 200:13, 200:14

**167** [13] - 200:15, 200:16, 200:17, 200:18, 200:19, 200:20, 200:21, 200:22, 200:23, 200:24, 200:25, 201:1, 201:2

**168** [8] - 201:3, 201:4, 201:5, 201:6, 201:7, 201:8, 201:9, 201:10

**169** [10] - 143:20, 201:11, 201:12, 201:13, 201:14, 201:15, 201:16, 201:17, 201:18, 201:19

**17** [1] - 50:17

**170** [2] - 201:20, 201:21

**18** [1] - 50:17

**19** [2] - 1:16, 73:15

**19106** [1] - 1:9

**1996-1997** [1] - 19:12

**1:00** [1] - 126:5

**1:30** [1] - 118:8

**1:32** [1] - 118:16

**2** [18] - 8:1, 17:24, 20:11, 23:8, 23:10, 35:20, 37:3, 44:14, 51:11, 85:16, 85:19, 85:24, 87:6, 139:15, 149:10, 152:24, 164:2, 172:18

**20** [7] - 72:21, 76:2, 76:14, 147:3, 147:6, 147:15, 165:20

**200** [1] - 28:13

**20002** [1] - 2:5

**20005** [1] - 2:12

**2003** [1] - 52:18

**2006** [1] - 65:3

**2007** [1] - 106:25

**2008** [3] - 4:7, 106:19, 129:25

**2009** [4] - 21:3, 50:20, 183:25, 185:6

**2010** [1] - 52:18

**2014** [6] - 109:14, 109:23, 129:23, 130:1, 130:6, 131:6

**2016** [10] - 18:5, 18:9, 20:5, 68:23, 83:18, 100:10, 119:14, 123:17, 127:3, 127:6

**2017** [13] - 70:21, 70:25, 71:8, 89:25, 90:2, 94:5, 94:8,

---

139:12, 140:8, 147:5, 154:12, 154:16, 161:25

**2018** [14] - 18:3, 72:9, 72:12, 72:21, 73:15, 84:3, 91:1, 91:4, 91:7, 91:17, 92:2, 92:8, 92:9, 183:23

**2019** [4] - 1:10, 79:24, 162:9, 163:2

**202** [2] - 2:5, 2:12

**2020** [1] - 172:18

**21** [5] - 128:23, 128:24, 131:21, 131:22, 131:23

**22** [2] - 132:21, 165:25

**23** [3] - 45:7, 57:2, 57:4

**24** [7] - 134:3, 134:5, 134:7, 165:25, 166:2, 166:4, 166:6

**248-5092** [1] - 2:5

**25** [4] - 47:13, 147:13, 147:14, 147:15

**26** [6] - 30:15, 30:18, 30:19, 30:20, 166:3

**267** [1] - 1:23

**27** [1] - 166:3

**27th** [1] - 74:3

**28** [4] - 68:23, 149:11, 149:14, 158:17

**280** [1] - 139:4

**299-7250** [1] - 1:23

**2:19-cv-02002** [1] - 1:3

**2:36** [1] - 161:15

**2:49** [1] - 161:15

**2nd** [1] - 192:7

**3** [9] - 1:6, 17:9, 19:24, 22:18, 23:19, 48:12, 114:14, 164:5, 198:16

**3.56** [1] - 184:3

**30** [7] - 76:2, 120:14, 149:7, 149:18, 150:4, 153:8, 158:20

**31** [5] - 48:2, 48:8, 57:4, 109:23, 131:6

**31st** [2] - 58:20, 63:13

**33** [2] - 121:14, 121:17

**34** [10] - 4:19, 6:4, 99:8, 99:17, 99:18, 116:19, 117:10, 119:7, 128:25, 131:21

**35** [7] - 7:16, 102:23, 104:3, 148:4, 149:18, 150:4, 152:8

**350** [3] - 8:21, 8:23, 8:24

**354-5640** [1] - 1:17

**36** [5] - 41:24, 165:25, 166:4, 166:7, 166:8

**36.105D3** [1] - 114:14

**37** [1] - 166:4

**38** [5] - 39:18, 40:14, 40:20, 45:15, 166:13

**39** [1] - 48:6

**3:00** [1] - 160:16

**3:47** [1] - 197:8

**4** [5] - 18:12, 52:21, 100:20,

---

164:8, 198:5

**40** [14] - 40:23, 75:24, 107:18, 107:20, 139:8, 147:12, 148:2, 148:5, 148:14, 148:16, 149:6, 149:7, 152:9, 153:10

**41** [1] - 109:3

**42** [5] - 42:11, 51:1, 51:4, 126:22, 166:13

**45** [2] - 76:4, 76:12

**46** [1] - 166:17

**48** [2] - 166:20, 167:14

**49** [1] - 167:5

**5** [9] - 1:10, 70:25, 71:8, 110:14, 114:2, 114:4, 114:7, 119:14, 164:11

**50** [1] - 42:9

**504** [1] - 103:9

**51** [2] - 16:21, 62:1

**53237** [2] - 127:7, 127:8

**54** [3] - 166:20, 167:14, 198:5

**56** [1] - 167:15

**6** [7] - 18:3, 19:3, 53:8, 72:9, 72:12, 164:11, 167:20

**60** [9] - 66:3, 67:25, 68:4, 71:9, 71:22, 71:24, 71:25, 72:1, 148:21

**60-day** [1] - 68:7

**600** [2] - 2:4, 2:11

**601** [1] - 1:9

**61** [2] - 167:15, 198:5

**62** [1] - 40:19

**63** [4] - 167:19, 167:21, 168:2, 168:3

**64** [4] - 48:7, 90:11, 168:3, 198:7

**65** [4] - 66:3, 90:11, 90:15, 168:3

**654-6200** [1] - 2:12

**67** [1] - 168:3

**68** [2] - 167:19, 167:21

**6th** [1] - 69:1

**7** [6] - 33:3, 33:7, 102:23, 110:22, 164:13

**70** [3] - 90:23, 148:21, 168:13

**700** [1] - 2:11

**71** [5] - 139:22, 150:16, 168:13, 168:14, 168:15

**73** [1] - 168:21

**74** [4] - 30:18, 30:23, 30:24, 30:25

**74th** [2] - 30:13, 30:21

**75** [1] - 40:15

**76** [2] - 30:22, 143:25

**77** [3] - 74:3, 74:5, 90:22

**79** [1] - 198:7

**8** [3] - 104:3, 113:4, 164:21

**80** [4] - 73:21, 74:4, 74:5, 168:21

**81** [1] - 127:2
**85** [1] - 169:11
**856** [1] - 1:17
**86** [1] - 169:18
**86th** [1] - 30:8
**87** [1] - 169:18
**88** [1] - 47:6
**89** [1] - 72:18
**9** [3] - 148:15, 148:17, 164:22
**90** [3] - 139:10, 143:15, 143:16
**92** [2] - 32:23, 33:3
**98th** [1] - 32:14
**990** [1] - 94:10
**9:30** [2] - 1:10, 3:1
**a.m** [4] - 1:10, 3:1, 54:3
**AAMC** [1] - 85:18
**Abbott** [1] - 181:1
**abilities** [2] - 54:20, 186:19
**ability** [12] - 31:21, 92:5, 96:14, 101:14, 102:19, 102:21, 140:20, 142:5, 171:12, 174:7, 192:24, 192:25
**Ability** [1] - 116:11
**able** [20] - 5:8, 27:21, 40:14, 40:19, 43:25, 66:22, 68:3, 76:22, 77:23, 82:5, 90:4, 148:20, 149:4, 171:13, 176:2, 178:3, 179:19, 192:4, 193:15, 193:16
**above-entitled** [1] - 197:15
**absence** [6] - 10:21, 36:9, 162:18, 178:13, 178:15, 184:22
**absolute** [1] - 192:8
**absolutely** [2] - 79:11, 109:12
**academic** [13] - 18:15, 25:3, 25:12, 111:22, 114:21, 115:5, 115:7, 177:6, 177:8, 177:11, 185:8, 185:20, 187:16
**accept** [6] - 91:23, 126:18, 157:10, 157:11, 179:4, 187:17
**accepted** [2] - 61:7, 125:14
**access** [2] - 154:19, 171:11
**accessed** [3] - 151:2, 152:3, 158:4
**accessible** [2] - 158:12, 183:8
**accident** [1] - 167:8
**accommodation** [27] - 21:4, 67:24, 77:5, 77:14, 78:4, 78:18, 88:5, 88:7, 88:10, 90:8, 92:23, 92:24, 93:5, 104:9, 104:17, 113:19, 120:12, 120:25, 123:22, 126:12, 128:4, 130:4, 137:9,

137:11, 177:24, 178:24, 179:6
**accommodations** [125] - 4:9, 4:14, 5:6, 5:9, 5:14, 5:16, 7:24, 9:8, 12:20, 12:25, 14:25, 18:1, 18:9, 18:17, 19:6, 19:7, 19:11, 19:22, 20:23, 29:7, 31:25, 33:9, 65:15, 65:19, 66:1, 66:5, 67:5, 67:12, 68:21, 72:6, 75:12, 77:9, 78:20, 78:25, 79:3, 79:4, 80:3, 80:24, 83:10, 90:18, 90:21, 91:18, 91:24, 92:3, 93:13, 95:23, 97:14, 97:15, 97:19, 100:17, 101:11, 103:3, 103:4, 103:6, 104:2, 104:7, 111:9, 111:12, 113:18, 115:19, 116:2, 124:8, 125:11, 128:17, 128:21, 129:3, 129:9, 129:17, 129:18, 130:2, 130:12, 130:14, 131:2, 131:8, 131:14, 132:2, 132:14, 133:19, 134:14, 134:15, 135:15, 135:18, 136:1, 136:10, 136:13, 136:19, 171:15, 172:4, 172:5, 172:23, 172:25, 173:1, 173:3, 176:4, 177:5, 177:7, 177:10, 177:23, 178:8, 178:13, 178:15, 178:16, 178:18, 183:9, 183:23, 184:3, 185:11, 186:18, 186:24, 187:2, 187:10, 187:12, 187:16, 187:23, 187:24, 188:3, 188:12, 188:14, 188:15, 188:16, 191:1, 192:16, 195:6, 195:11, 195:20
**accordance** [3] - 6:1, 182:24, 184:6
**according** [2] - 176:20, 176:21
**accuracy** [1] - 54:17
**accurate** [8] - 7:5, 10:22, 27:14, 34:6, 54:21, 101:9, 107:7
**accurately** [8] - 12:3, 26:7, 26:21, 45:2, 101:4, 152:7, 173:21, 177:19
**achieve** [4] - 32:17, 114:19, 114:20, 177:11
**achieved** [4] - 31:4, 42:9, 42:11, 184:2
**achievement** [6] - 6:14, 15:18, 22:20, 101:4, 173:22, 177:19
**Achievement** [1] - 23:1
**acknowledge** [2] - 174:16, 186:22

**acknowledged** [7] - 181:22, 183:21, 184:8, 184:15, 184:18, 184:20, 184:24
**acknowledging** [1] - 194:5
**acknowledgment** [1] - 190:17
**acquiring** [1] - 33:19
**Act** [24] - 105:11, 105:18, 105:20, 105:23, 106:1, 106:3, 106:25, 107:4, 108:2, 108:14, 108:19, 108:24, 110:3, 119:16, 119:19, 120:2, 123:16, 124:9, 127:5, 129:5, 170:25, 171:21, 188:23, 189:9
**ACT** [18] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:3, 27:1, 28:3, 28:17, 28:19, 28:25, 31:17, 33:21, 104:2, 178:1, 184:21, 189:12, 193:13
**action** [1] - 182:23
**ACTION** [1] - 1:3
**activities** [8] - 8:4, 78:2, 105:15, 114:22, 124:13, 177:13, 183:12, 183:16
**activity** [14] - 66:25, 80:6, 105:13, 108:7, 111:24, 112:2, 114:18, 128:14, 128:20, 133:13, 133:16, 133:17, 189:2, 189:4
**Acts** [1] - 105:5
**actual** [6] - 26:10, 39:23, 46:21, 47:13, 114:16, 174:20
**ADA** [56] - 64:20, 79:19, 99:25, 100:14, 100:16, 102:3, 102:15, 104:20, 105:5, 105:7, 105:11, 105:20, 105:25, 106:3, 106:6, 106:25, 107:4, 108:1, 108:9, 108:14, 108:19, 108:24, 109:23, 110:2, 110:19, 112:3, 119:16, 119:19, 120:2, 123:9, 123:16, 124:9, 124:11, 124:16, 127:5, 127:24, 129:5, 130:3, 170:24, 170:25, 171:4, 171:5, 171:21, 177:7, 183:6, 183:10, 183:11, 186:16, 186:17, 188:18, 188:22, 188:24, 189:8, 189:9, 192:9, 192:11
**ADAA** [1] - 172:1
**adaptive** [1] - 111:6
**add** [5] - 113:13, 124:17, 125:9, 127:15, 127:21
**ADD** [3] - 5:3, 6:25, 7:4
**ADD/ADHD** [1] - 51:4
**added** [1] - 105:14
**addition** [4] - 76:4, 85:6,

93:8, 152:1
**additional** [18] - 5:9, 35:24, 75:19, 75:25, 76:5, 76:6, 93:19, 93:20, 114:24, 116:3, 124:12, 130:19, 156:18, 173:5, 177:14, 179:3, 188:1, 196:8
**address** [3] - 27:5, 116:5, 130:23
**addressed** [4] - 106:20, 131:13, 131:15, 184:7
**addressing** [1] - 26:25
**adequate** [1] - 57:17
**adequately** [3] - 27:6, 44:1, 157:9
**ADH** [2] - 13:9, 13:17
**ADHD** [37] - 5:3, 6:7, 6:24, 7:4, 8:6, 9:18, 11:13, 12:6, 12:14, 13:3, 16:14, 24:22, 51:14, 52:22, 53:6, 60:15, 61:17, 70:13, 70:16, 80:2, 83:7, 84:9, 120:10, 120:14, 120:18, 120:23, 148:20, 174:7, 175:18, 176:11, 183:25, 184:5, 184:6, 184:24, 187:12, 187:17
**adjourned** [1] - 196:6
**adjustable** [1] - 77:3
**administer** [9] - 15:15, 22:23, 42:7, 44:5, 79:9, 177:18, 183:7, 186:11, 188:11
**administered** [25] - 16:11, 21:19, 22:25, 24:14, 25:24, 41:4, 42:1, 42:4, 48:16, 48:24, 56:14, 58:23, 59:13, 59:24, 59:25, 85:20, 95:7, 101:1, 101:2, 141:18, 143:10, 173:19, 173:20, 176:8, 184:12
**administering** [1] - 57:11
**administers** [1] - 139:2
**administration** [9] - 24:8, 42:4, 48:20, 75:22, 82:8, 140:3, 140:12, 140:17, 141:10
**administrations** [1] - 42:7
**admission** [3] - 168:25, 191:23, 191:25
**Admission** [1] - 190:10
**admissions** [2] - 160:7, 161:10
**admit** [2] - 64:3, 163:24
**ADMITTED** [1] - 198:15
**admitted** [46] - 3:11, 3:12, 26:12, 83:3, 83:6, 136:17, 161:20, 161:23, 162:6, 162:12, 162:15, 162:19, 162:23, 162:24, 162:25, 163:4, 163:8, 163:11,

163:17, 163:20, 163:23,
164:1, 164:4, 164:7, 164:10,
164:12, 164:15, 165:6,
165:24, 166:12, 166:16,
166:19, 167:12, 167:18,
168:10, 168:12, 168:20,
169:7, 169:9, 169:15,
170:16, 172:23, 180:22,
188:6, 191:20, 196:17
**adopt** [2] - 127:25, 172:9
**adopting** [2] - 125:4, 127:4
**adoption** [1] - 171:22
**adult** [1] - 50:11
**adults** [2] - 5:7, 50:10
**advance** [4] - 17:2, 116:21,
116:25, 117:21
**Advice** [2] - 121:17
**advice** [1] - 121:19
**advisement** [1] - 195:25
**affect** [2] - 12:20, 111:12
**affected** [1] - 57:19
**afford** [1] - 132:9
**afforded** [1] - 181:4
**afternoon** [4] - 118:17,
118:18, 118:24, 118:25
**afterwards** [2] - 27:7, 140:21
**agency** [5] - 116:12, 132:8,
132:10, 172:10, 182:22
**ages** [1] - 46:25
**ago** [9] - 57:24, 73:5, 81:15,
88:6, 92:16, 132:12, 161:4,
195:17
**agree** [17] - 28:21, 31:6,
31:20, 36:3, 80:13, 87:10,
87:13, 95:12, 108:8, 109:22,
110:1, 113:7, 115:6, 115:17,
133:3, 134:7, 154:15
**agreed** [2] - 39:11, 95:2
**ahead** [4] - 38:14, 38:24,
169:17, 172:3
**aid** [1] - 21:4
**aided** [1] - 1:25
**aids** [3] - 103:5, 103:7,
169:24
**Alberta** [2] - 138:16, 138:18
**alert** [1] - 78:1
**alleging** [1] - 80:1
**allotted** [1] - 143:15
**allow** [7] - 26:17, 67:25,
93:16, 126:16, 152:12,
155:3, 195:20
**allowed** [4] - 53:8, 137:15,
152:22, 176:19
**allowing** [1] - 157:10
**almost** [10] - 35:7, 49:16,
49:17, 50:7, 73:23, 74:6,
75:10, 134:4, 179:17
**alone** [1] - 176:5
**aloud** [7] - 77:6, 77:15,
77:19, 78:1, 81:16, 81:18,

88:6
**alphabet** [2] - 19:14, 20:22
**altered** [1] - 18:18
**altogether** [1] - 132:11
**amended** [1] - 170:24
**amending** [2] - 106:6, 108:8
**Amendment** [1] - 108:1
**Amendments** [22] - 105:5,
105:11, 105:18, 105:20,
105:23, 106:3, 107:4,
108:14, 108:19, 108:24,
110:3, 119:16, 119:19,
120:2, 123:16, 124:9, 127:5,
129:5, 170:25, 171:21,
188:23, 189:9
**amendments** [2] - 105:14,
124:11
**Americans** [1] - 106:1
**amount** [9] - 28:21, 143:13,
143:14, 144:22, 146:19,
149:3, 150:9, 157:22, 173:10
**analysis** [6] - 106:8, 108:10,
120:3, 123:11, 138:12, 171:5
**analyst** [1] - 158:10
**Ann** [2] - 1:22, 197:18
**annotated** [1] - 162:21
**answer** [38] - 27:11, 33:16,
40:14, 40:23, 44:9, 44:11,
63:8, 86:24, 87:2, 93:12,
96:14, 96:19, 96:23, 96:24,
97:2, 101:23, 102:17, 105:6,
108:16, 113:11, 128:17,
131:5, 137:3, 139:9, 140:11,
140:13, 143:16, 143:21,
145:23, 146:23, 146:24,
149:17, 150:3, 151:22,
152:6, 152:13, 158:18,
159:17
**answered** [13] - 43:17, 48:8,
62:10, 86:7, 143:19, 143:23,
144:22, 145:1, 151:12,
152:7, 152:10, 153:23,
157:25
**answering** [3] - 145:9,
145:18, 145:21
**answers** [13] - 44:13, 86:11,
86:16, 86:20, 86:22, 87:2,
141:20, 146:12, 146:18,
147:9, 159:3, 164:13
**anticipate** [3] - 48:23,
146:20, 185:19
**anticipated** [2] - 30:3, 120:17
**ants** [1] - 46:23
**anxiety** [1] - 111:20
**anxiety-provoking** [1] -
111:20
**apologies** [2] - 109:6, 182:13
**apologize** [10] - 16:22,
17:11, 19:25, 23:15, 31:2,
41:24, 45:12, 47:19, 69:12,

144:11
**appeal** [1] - 162:10
**appeals** [1] - 181:2
**appear** [1] - 40:4
**APPEARANCES** [2] - 1:14,
2:1
**appearing** [1] - 20:13
**applicable** [5] - 21:24, 49:24,
182:25, 183:3, 193:9
**applicant's** [1] - 136:7
**applicants** [2] - 66:8, 96:17
**application** [5] - 5:13, 90:13,
175:5
**applications** [1] - 80:10
**applied** [3] - 29:2, 55:9,
102:18
**applies** [4] - 101:10, 101:17,
101:18, 172:21
**apply** [2] - 189:21, 193:8
**applying** [1] - 172:12
**appreciated** [1] - 117:1
**approach** [2] - 6:21, 180:11
**appropriate** [5] - 7:24,
113:17, 186:17, 189:10,
194:3
**approve** [1] - 78:20
**approved** [2] - 77:14, 137:9
**approximation** [1] - 65:25
**aptitude** [3] - 101:4, 173:22,
177:19
**area** [9] - 4:13, 5:5, 42:20,
63:2, 128:15, 137:18,
159:10, 159:12, 159:13
**areas** [3] - 8:9, 32:18, 169:2
**argue** [1] - 160:19
**argues** [1] - 171:9
**argument** [2] - 160:24,
191:14
**arguments** [6] - 161:7,
161:10, 171:20, 172:9,
172:15
**arithmetic** [1] - 22:21
**arose** [1] - 26:25
**arrive** [1] - 22:23
**arrived** [4] - 22:6, 51:23,
52:1, 52:2
**arriving** [1] - 55:24
**article** [5] - 16:24, 62:3,
62:16, 62:20, 163:7
**articles** [6] - 9:12, 13:22,
13:25, 14:3, 17:2, 63:4
**aside** [3] - 31:24, 32:5, 33:7
**aspect** [2] - 112:21, 157:20
**assertion** [1] - 150:2
**assessing** [2] - 113:17,
125:10
**assessment** [11] - 5:2, 15:21,
22:23, 24:8, 32:5, 43:21,
47:13, 48:10, 49:5, 63:6,
178:23

**assessments** [16] - 12:13,
16:11, 21:18, 25:24, 27:2,
31:6, 31:24, 32:7, 33:8,
33:11, 37:7, 39:4, 43:17,
46:10, 49:8, 62:21
**assigned** [3] - 83:19, 83:21,
128:19
**assignments** [2] - 18:18,
111:18
**assistance** [37] - 36:6,
115:15, 115:19, 116:2,
116:4, 129:2, 129:4, 129:6,
129:9, 129:12, 129:16,
130:12, 130:14, 130:19,
131:1, 131:7, 131:10,
131:13, 132:1, 132:3,
132:13, 133:18, 172:4,
172:12, 176:21, 176:23,
177:4, 180:5, 180:20,
180:24, 181:2, 182:14,
182:19, 193:7, 193:11, 197:1
**Assistance** [1] - 133:8
**assume** [3] - 20:17, 135:13,
154:13
**assumed** [2] - 43:24, 62:18
**assure** [4] - 100:25, 103:2,
104:5, 195:6
**attached** [1] - 17:6
**attachment** [1] - 68:19
**attachments** [1] - 68:17
**attempt** [2] - 75:2, 79:9
**attempted** [2] - 26:21,
151:22
**attempting** [2] - 74:21,
101:21
**attention** [15] - 18:20, 34:18,
35:8, 60:23, 61:3, 61:4, 67:9,
67:18, 137:12, 159:14,
174:3, 184:18, 185:13,
185:17, 191:17
**attention-deficit/**
**hyperactivity** [2] - 67:18,
159:14
**attorney** [7] - 36:12, 36:17,
84:1, 84:2, 84:6, 102:1,
166:23
**attorneys** [2] - 84:8, 94:13
**audit** [6] - 66:17, 71:5, 73:1,
74:16, 83:17
**August** [2] - 127:3, 127:6
**author** [1] - 121:24
**automatically** [4] - 61:3,
83:24, 97:23, 97:24
**auxiliary** [1] - 103:5
**available** [7] - 10:6, 10:17,
88:20, 88:22, 93:2, 150:10,
155:5
**average** [23] - 24:19, 30:6,
30:11, 30:15, 31:4, 31:8,
32:12, 32:16, 49:6, 55:4,

59:4, 63:15, 63:16, 139:10, 143:14, 145:2, 145:6, 174:6, 184:3, 184:19, 184:20
**avoid** [3] - 17:13, 20:21, 25:14
**aware** [9] - 32:1, 32:6, 33:9, 106:13, 108:20, 108:25, 131:6, 139:11, 170:13
**awful** [1] - 49:12
**babysitter** [2] - 94:20, 94:25
**bachelor's** [2] - 65:7, 138:15
**background** [2] - 65:5, 138:14
**backwards** [1] - 153:10
**balanced** [1] - 115:25
**base** [1] - 62:20
**based** [30] - 15:6, 16:15, 22:4, 24:11, 28:7, 28:8, 28:9, 36:6, 54:21, 59:12, 66:19, 66:22, 67:5, 67:12, 77:8, 80:11, 83:21, 84:13, 84:14, 84:20, 84:23, 85:14, 95:19, 141:10, 179:1, 179:11, 183:5, 189:5, 194:16, 194:18
**basic** [8] - 33:19, 33:21, 33:25, 34:3, 86:4, 86:6, 184:21, 184:23
**Basic** [1] - 10:12
**basis** [5] - 34:24, 84:12, 87:14, 126:13, 191:7
**Bates** [1] - 168:3
**battery** [4] - 95:6, 95:13, 174:18, 175:24
**bear** [1] - 163:23
**bearing** [1] - 86:25
**BEFORE** [1] - 1:12
**began** [2] - 18:16, 52:17
**begin** [2] - 71:9, 96:9
**beginning** [4] - 91:3, 119:22, 127:11, 185:1
**begins** [4] - 66:7, 110:24, 112:6, 113:5
**behalf** [11] - 51:5, 64:1, 115:18, 129:24, 130:1, 130:7, 130:10, 168:1, 171:24, 181:7, 189:17
**behavior** [7] - 78:3, 81:18, 82:6, 146:15, 157:24, 164:21, 182:1
**behavioral** [2] - 111:6, 175:17
**behind** [3] - 77:22, 105:19, 120:2
**belabor** [1] - 182:8
**believes** [1] - 189:6
**below** [10] - 30:20, 32:13, 32:17, 32:18, 43:24, 45:7, 51:23, 55:4, 59:12, 116:2
**benefit** [2] - 182:2, 188:20
**Berger** [9] - 17:19, 33:14,

53:23, 62:7, 79:21, 80:7, 80:25, 167:4, 168:2
**BERGER** [72] - 1:16, 3:3, 26:5, 31:10, 33:5, 36:19, 37:24, 38:5, 38:17, 38:19, 38:22, 39:1, 47:19, 47:21, 53:24, 54:7, 61:19, 63:20, 64:2, 109:4, 140:23, 144:2, 145:5, 145:12, 146:2, 146:7, 146:21, 149:22, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:25, 160:13, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15
**best** [17] - 74:23, 91:16, 101:1, 101:13, 101:20, 102:18, 112:14, 116:3, 130:18, 135:12, 146:15, 155:1, 171:12, 173:19, 186:10, 186:12, 186:18
**better** [2] - 30:21, 30:25
**between** [10] - 15:13, 20:13, 52:6, 54:25, 76:6, 87:7, 92:8, 168:24, 193:21
**beyond** [2] - 103:22, 183:2
**Bibber** [1] - 189:14
**big** [2] - 87:7, 139:18
**biggest** [2] - 11:24, 12:2
**binder** [3] - 58:23, 99:7, 119:7
**binding** [1] - 182:23
**biology** [1] - 65:7
**birds** [1] - 44:21
**bit** [8] - 18:12, 51:7, 58:25, 59:2, 72:3, 84:17, 145:15, 154:23
**Black** [1] - 190:1
**blindly** [4] - 149:17, 150:3, 158:18, 159:2
**block** [20] - 76:14, 76:15, 139:7, 143:9, 147:18, 147:22, 148:21, 149:17, 150:3, 150:8, 152:6, 152:19, 152:20, 152:22, 153:14, 158:16, 165:17, 188:20
**blocks** [10] - 75:24, 76:1, 76:7, 139:5, 139:6, 147:25, 148:1, 148:3, 188:19
**BOARD** [1] - 1:5
**board** [2] - 21:11, 176:14

**Board** [11] - 64:21, 64:22, 85:18, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1
**boat** [1] - 41:11
**bold** [3] - 103:11, 103:13, 133:14
**bolded** [7] - 132:22, 133:4, 133:7, 133:9, 133:11, 133:22
**bolding** [1] - 134:2
**book** [5] - 45:1, 45:5, 50:23, 50:24, 196:20
**booklet** [3] - 42:25, 46:2, 46:3
**bottom** [2] - 6:24, 43:2
**box** [1] - 64:10
**boy** [3] - 17:17, 23:21, 47:14
**Bragdon** [1] - 180:25
**break** [14] - 26:10, 53:23, 53:25, 75:19, 75:25, 76:1, 76:4, 76:5, 76:6, 76:16, 118:7, 119:1, 119:5
**breaks** [4] - 18:19, 76:6, 77:7, 135:16
**Brendan** [2] - 79:21, 80:7
**brief** [6] - 3:3, 65:4, 138:13, 164:18, 191:15, 191:18
**briefed** [1] - 182:6
**briefing** [5] - 160:22, 160:25, 161:3, 161:4, 161:6
**briefly** [5] - 9:6, 24:21, 66:4, 181:10, 190:21
**briefs** [3] - 81:5, 161:5, 190:6
**bright** [1] - 180:13
**bring** [4] - 82:1, 118:5, 138:6, 157:2
**bringing** [3] - 81:22, 112:23, 182:2
**broad** [2] - 105:25, 171:7
**broaden** [1] - 110:18
**broadened** [3] - 108:2, 108:4, 188:24
**broken** [2] - 76:8, 139:5
**brought** [1] - 161:5
**bullet** [10] - 5:7, 5:19, 5:20, 120:6, 121:5, 121:19, 131:25, 132:2, 132:4, 136:12
**burden** [2] - 191:8, 191:11
**BURGOYNE** [89] - 2:10, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:20, 26:24, 31:16, 33:2, 33:6, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 38:7, 38:12, 38:15, 38:21, 39:2, 47:20, 47:22, 53:19, 61:21, 61:24, 63:17, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 112:10,

112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14, 122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:6, 144:9, 144:11, 144:12, 145:8, 145:16, 146:8, 147:4, 149:25, 150:12, 159:22, 160:3, 160:6, 160:9, 160:14, 161:2, 163:19, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3
**Burgoyne** [25] - 3:4, 26:6, 38:23, 58:11, 59:3, 60:8, 100:1, 100:5, 100:6, 100:13, 104:21, 109:21, 115:17, 121:6, 130:1, 130:6, 130:11, 130:25, 152:5, 158:15, 163:15, 169:18, 171:23, 181:5, 195:16
**Burgoyne's** [7] - 54:8, 109:17, 125:8, 129:23, 132:18, 194:16, 195:4
**business** [1] - 181:12
**Byrne** [1] - 1:8
**calculations** [3] - 120:17, 144:7, 144:20
**calendar** [2] - 71:24, 71:25
**candidate** [14] - 79:22, 80:16, 83:23, 92:17, 141:21, 142:15, 142:22, 143:4, 149:4, 157:23, 157:25, 178:14, 178:23, 179:2
**candidate's** [2] - 141:24, 178:17
**Candidates** [1] - 178:25
**candidates** [4] - 69:21, 142:1, 142:4, 145:23
**candy** [1] - 195:6
**cannot** [2] - 118:10, 151:11
**captioning** [1] - 191:22
**capture** [2] - 26:21, 141:10
**captured** [2] - 140:3, 186:3
**captures** [1] - 141:15
**card** [7] - 135:2, 165:1, 165:2, 165:3, 165:4, 182:1, 182:4
**cards** [11] - 10:5, 10:17, 11:23, 25:19, 34:9, 35:12, 35:18, 35:20, 35:23, 134:25, 186:3
**care** [3] - 7:8, 50:13, 52:19
**career** [1] - 195:21
**careful** [4] - 7:9, 7:11, 140:18, 179:1
**carefully** [1] - 97:22
**CAROLINE** [1] - 2:10
**CAROLLA** [1] - 1:15

carrels [1] - 77:22
carry [1] - 190:20
case [41] - 8:11, 10:18, 11:3, 13:21, 34:25, 54:23, 55:9, 55:10, 61:12, 62:24, 68:15, 74:23, 75:9, 76:10, 80:16, 81:1, 90:14, 94:15, 126:18, 139:12, 148:13, 149:14, 153:20, 160:4, 160:6, 161:21, 181:4, 183:14, 189:10, 189:14, 189:15, 189:20, 189:23, 190:2, 190:6, 190:9, 191:6, 191:20, 195:2, 196:1, 196:2
cases [3] - 26:16, 88:1, 191:18
cat [2] - 44:16, 47:14
category [2] - 35:23, 36:4
CATHERINE [2] - 64:11, 198:7
Catherine [2] - 64:14, 164:9
Cathy [1] - 64:7
caused [1] - 26:4
cell [1] - 182:15
Center [2] - 141:14, 142:2
centers [1] - 78:7
Centers [1] - 78:9
central [1] - 102:4
certain [7] - 14:19, 30:2, 43:23, 146:19, 171:14, 190:23, 190:25
certainly [11] - 26:20, 40:9, 49:16, 82:2, 126:7, 180:19, 181:5, 182:3, 182:4, 186:13, 190:24
certified [1] - 21:11
certify [1] - 197:14
cetera [2] - 5:11, 104:7
challenges [1] - 86:23
challenging [3] - 121:21, 122:12, 188:18
chambers [1] - 195:17
chance [3] - 170:10, 193:4
change [5] - 76:24, 105:12, 106:12, 123:23, 192:21
changed [1] - 105:10, 108:5, 123:25
changes [2] - 111:3, 124:10
characterization [2] - 95:25, 107:8
characters [1] - 20:14
charge [3] - 83:15, 83:16, 130:3
Charles [2] - 23:6, 24:3
chart [4] - 19:14, 20:22, 43:8, 169:23
charts [2] - 169:18, 170:2
check [7] - 3:20, 26:10, 38:22, 41:8, 57:7, 148:16, 196:11

checklist [1] - 50:15
checklists [1] - 49:22
Chestnut [1] - 1:16
child [2] - 99:1, 175:12
childhood [3] - 55:14, 55:17, 185:1
children [1] - 46:25
choice [10] - 21:23, 39:18, 86:3, 86:11, 86:16, 86:20, 86:22, 87:5, 195:1
choices [3] - 149:17, 150:4, 158:18
choosing [1] - 159:3
chose [3] - 88:18, 88:20, 88:22
chosen [2] - 182:3, 192:5
chunks [1] - 165:10
Circuit [1] - 188:10
circulated [1] - 36:11
circumvent [1] - 178:3
cite [4] - 114:5, 125:19, 126:2, 192:18
cited [3] - 81:4, 190:6, 191:18
CIVIL [1] - 1:3
civil [1] - 26:16
clarification [1] - 73:3
clarify [2] - 71:6, 167:4
clarity [1] - 74:15
class [1] - 18:19
claw [1] - 193:1
clear [9] - 52:25, 66:24, 72:3, 115:24, 159:4, 159:6, 171:18, 173:17, 191:7
clearly [5] - 34:3, 179:14, 179:15, 180:23, 193:9
client [4] - 10:3, 12:9, 174:20, 181:7
client's [1] - 187:6
clients [1] - 7:18
clinical [5] - 52:11, 65:8, 120:11, 120:24, 128:16
clinically [1] - 66:19
clinicians [1] - 62:18
clock [1] - 92:5
closely [2] - 11:14, 50:21
cluster [1] - 46:11
clusters [1] - 46:13
cmew@perkinscoie.com [1] - 2:13
cognitive [2] - 56:16, 57:15
COIE [1] - 2:9
college [5] - 25:18, 134:20, 135:2, 187:10, 190:4
colleges [1] - 187:15, 195:5
collision [1] - 193:21
column [10] - 41:7, 41:8, 140:4, 140:6, 140:11, 140:14, 140:15, 143:1,

143:8, 153:1
columns [1] - 140:10
combination [2] - 27:16, 46:10
combined [1] - 51:18
coming [5] - 7:23, 32:24, 32:25, 64:9, 74:11
Commencing [1] - 1:10
comment [6] - 50:8, 108:20, 108:24, 112:6, 115:9, 185:25
comments [9] - 10:6, 11:2, 11:18, 34:9, 36:14, 108:23, 110:1, 112:7, 185:22
common [13] - 20:18, 20:19, 26:15, 28:20, 58:4, 67:20, 84:24, 95:19, 95:21, 97:2, 110:21, 115:22, 147:22
commonly [1] - 20:16
communicate [5] - 119:1, 119:5, 122:22, 123:3, 186:1
communicating [1] - 180:16
communications [1] - 168:24
company [1] - 78:8
comparable [1] - 33:10
compare [5] - 6:14, 43:13, 50:19, 86:21, 94:18
compared [12] - 75:22, 105:13, 114:25, 128:20, 133:14, 133:23, 177:15, 183:13, 183:17, 189:2, 189:4, 189:22
compelling [1] - 189:20
compensate [1] - 18:20
compensated [1] - 8:11
compensatory [2] - 27:22, 27:24
compilation [1] - 37:25
Complaint [2] - 148:12, 163:25
complaints [1] - 52:9
complete [14] - 17:21, 40:16, 40:20, 43:25, 45:11, 68:2, 71:13, 111:17, 122:19, 146:14, 152:12, 173:6, 182:24, 197:5
completed [2] - 7:21, 76:15
completeness [1] - 74:15
completing [1] - 18:19
complex [1] - 193:24
complexity [1] - 193:22
compliance [4] - 64:21, 79:19, 105:7, 130:3
comply [3] - 129:2, 129:8, 129:12
component [2] - 56:16, 57:15
comport [1] - 105:18
composite [1] - 30:8
comprehension [8] - 18:21,

24:16, 24:19, 24:20, 39:15, 39:17, 43:11, 43:15
comprehensive [8] - 85:7, 87:20, 95:3, 96:12, 97:20, 174:18, 175:25, 194:19
computer [5] - 1:25, 28:7, 28:9, 140:16, 141:10
computer-aided [1] - 1:25
computer-based [3] - 28:7, 28:9, 141:10
concentrate [1] - 31:22
concentrating [2] - 111:13, 111:24
concentration [2] - 18:21, 174:5
concept [2] - 114:14, 145:17
concerned [3] - 48:19, 81:17, 111:4
concerning [1] - 150:23
concerns [1] - 42:16
concluded [6] - 21:18, 24:7, 99:3, 194:13, 194:18, 197:8
conclusion [7] - 22:24, 27:19, 64:4, 80:8, 80:11, 160:3, 180:18
conclusions [2] - 98:2, 98:4
conclusively [1] - 157:21
concur [1] - 7:14
concurrently [1] - 74:18
condition [3] - 15:5, 114:13, 174:11
conditions [3] - 133:15, 159:17, 174:23
conduct [5] - 85:6, 174:20, 174:24, 175:17, 179:12
confident [1] - 27:13
confidential [1] - 155:18
confirm [6] - 6:5, 40:2, 42:25, 45:14, 63:5, 68:11
confirming [1] - 19:17
conflicts [1] - 110:20
confronted [1] - 186:22
confused [2] - 15:12, 43:19
Congress [3] - 108:13, 171:2, 172:10
Congress's [1] - 110:18
Congressional [8] - 105:19, 105:21, 105:23, 106:6, 108:8, 120:1, 127:25, 172:1
connected [1] - 111:16
connection [4] - 24:22, 68:14, 126:14, 183:23
Conners' [2] - 60:8, 60:13
consequence [1] - 183:4
consider [3] - 12:16, 53:15, 53:18, 113:8, 113:18, 133:14, 149:5, 152:10, 170:14, 175:19, 176:20, 178:16, 189:11
considerable [6] - 7:2,

103:3, 103:18, 103:20, 103:23, 103:25
**consideration** [4] - 112:8, 115:7, 150:10, 179:1
**considered** [15] - 6:21, 17:20, 55:24, 56:6, 97:22, 113:16, 117:12, 127:24, 136:14, 136:15, 172:14, 172:15, 191:24, 194:21
**considering** [2] - 103:2, 179:14
**consist** [2] - 41:12, 43:22
**consistent** [11] - 22:21, 40:20, 95:22, 97:4, 97:7, 97:11, 148:24, 149:19, 150:2, 157:23, 176:11
**consistently** [3] - 18:17, 176:14, 194:20
**consists** [1] - 39:18
**constitutes** [1] - 67:16
**constraints** [2] - 96:15, 188:18
**construction** [1] - 110:16
**construed** [1] - 171:7
**consult** [1] - 55:17
**consultant** [5] - 67:1, 84:15, 84:16, 91:9, 91:14
**consultant's** [1] - 91:23
**consultants** [25] - 66:21, 91:7, 100:9, 100:10, 100:12, 100:15, 104:12, 104:16, 117:10, 119:12, 119:15, 119:23, 120:20, 121:12, 121:20, 122:22, 123:3, 123:7, 124:20, 125:1, 125:2, 128:3, 128:11, 163:10, 181:8
**Consultants** [1] - 99:25
**contact** [3] - 52:16, 52:18, 170:13
**contain** [1] - 166:23
**contained** [1] - 26:15
**contains** [2] - 140:2, 154:20
**content** [4] - 40:9, 96:15, 185:22, 191:22
**context** [12] - 14:15, 16:13, 38:20, 61:16, 96:10, 113:23, 131:4, 137:3, 180:6, 187:10, 187:16, 188:9
**Continental** [1] - 156:23
**continually** [1] - 172:9
**continue** [4] - 62:22, 62:25, 132:4, 157:13
**CONTINUED** [1] - 2:1
**continuing** [1] - 146:5
**Continuous** [2] - 48:13, 60:9
**continuous** [1] - 49:2
**contrary** [3] - 121:2, 181:3, 195:4
**controlling** [1] - 190:20
**controversy** [1] - 7:3

**cookie** [1] - 41:9
**copied** [1] - 26:7
**copies** [1] - 172:12
**copy** [7] - 18:8, 38:18, 94:10, 182:14, 196:25, 197:3, 197:5
**copying** [1] - 155:5
**core** [2] - 7:3, 61:7
**correct** [130] - 4:9, 8:12, 9:16, 11:16, 13:23, 17:14, 21:12, 22:10, 29:24, 31:19, 34:19, 36:12, 39:13, 41:17, 42:2, 44:10, 46:9, 46:19, 47:5, 48:2, 48:9, 53:3, 55:1, 55:10, 58:21, 59:4, 59:7, 59:8, 60:7, 61:13, 61:14, 63:7, 63:10, 70:17, 71:17, 71:24, 72:13, 72:16, 72:23, 73:8, 73:12, 75:14, 76:17, 77:13, 78:9, 78:12, 78:16, 81:25, 82:10, 82:23, 83:4, 83:5, 83:7, 83:8, 84:10, 84:24, 85:9, 86:5, 86:13, 90:25, 91:5, 91:7, 91:8, 91:19, 92:3, 92:4, 92:6, 92:7, 92:18, 92:21, 93:7, 93:9, 93:10, 94:16, 95:4, 95:17, 97:6, 97:9, 97:10, 98:11, 98:12, 106:4, 106:9, 107:6, 108:2, 108:12, 108:14, 109:24, 110:8, 110:9, 110:12, 113:21, 117:13, 119:16, 119:24, 120:4, 120:16, 120:18, 121:9, 121:10, 122:9, 122:10, 122:24, 123:14, 123:17, 127:9, 130:4, 130:7, 130:15, 132:25, 134:21, 135:12, 136:14, 136:16, 140:9, 140:12, 146:13, 147:10, 147:15, 148:7, 148:8, 151:6, 153:21, 154:12, 154:15, 156:6, 158:5, 158:6, 190:19, 197:14
**corrected** [2] - 26:22, 120:17
**correctly** [8] - 54:23, 79:18, 113:13, 143:19, 143:23, 144:22, 152:10, 153:12
**correspond** [1] - 38:1
**Council** [1] - 190:10
**Counsel** [11] - 31:14, 31:15, 80:20, 112:22, 117:13, 146:6, 152:13, 160:17, 161:16, 170:3, 182:11
**counsel** [10] - 38:2, 38:4, 92:17, 93:9, 112:23, 118:11, 119:1, 119:5, 121:6, 121:8, 122:8, 126:1, 156:8, 157:7, 157:15, 170:13, 186:20, 191:13, 197:6
**count** [2] - 8:20, 90:12

**country** [1] - 78:24
**counts** [1] - 60:20
**couple** [2] - 90:16, 146:11
**course** [8] - 10:4, 56:2, 80:10, 95:1, 101:17, 126:17, 172:2, 187:22
**COURT** [3] - 1:1, 64:13, 138:3
**Court** [7] - 1:22, 3:1, 81:3, 106:3, 180:25, 187:18, 197:18
**court** [5] - 9:2, 81:11, 109:5, 189:16, 191:3
**Court's** [1] - 191:17
**Courthouse** [1] - 1:8
**courtroom** [6] - 155:9, 170:23, 193:4, 194:2, 194:8, 196:22
**courts** [5] - 132:8, 132:9, 181:1, 189:9, 191:4
**cover** [1] - 149:23
**coverage** [1] - 105:25, 110:19, 171:8, 188:24
**covered** [3] - 3:7, 17:19, 61:15, 100:24, 103:1, 104:5, 158:3
**created** [1] - 117:22
**credentials** [1] - 181:21
**credibility** [1] - 181:25
**credible** [1] - 194:5
**credit** [1] - 80:14
**criminal** [1] - 26:16
**criteria** [9] - 6:2, 12:6, 13:6, 52:22, 53:5, 53:7, 184:6, 187:5, 187:19
**critically** [2] - 177:1, 178:20
**criticized** [1] - 116:11
**Cross** [1] - 198:4
**cross** [6] - 31:14, 79:13, 118:10, 146:4, 149:23, 192:20
**CROSS** [3] - 4:3, 79:14, 150:13
**cross-examination** [3] - 79:13, 118:10, 192:20
**CROSS-EXAMINATION** [3] - 4:3, 79:14, 150:13
**cross-examine** [1] - 31:14
**CRR** [2] - 1:22, 197:18
**curiosity** [1] - 157:14
**current** [1] - 53:1, 177:25, 178:19
**cursory** [1] - 29:1
**CURTIS** [1] - 1:12
**cut** [1] - 152:13
**D-2** [1] - 23:22
**D-3** [2] - 23:23, 23:24
**daily** [2] - 35:7, 185:17
**Dalzell** [2] - 189:14, 189:19
**damn** [1] - 182:5

**data** [45] - 80:11, 80:13, 80:14, 138:12, 140:2, 140:7, 141:10, 141:15, 141:17, 144:17, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 150:20, 150:22, 151:1, 152:2, 153:22, 153:25, 154:2, 154:5, 154:6, 154:10, 154:14, 154:20, 155:2, 155:14, 158:4, 158:5, 158:10, 158:11, 158:23, 158:24, 158:25, 159:4, 159:7, 168:16
**database** [7] - 154:4, 154:8, 154:9, 154:10, 154:20, 154:22, 158:11
**date** [10] - 24:8, 70:9, 74:2, 88:25, 90:12, 106:18, 119:10, 119:12, 154:13, 154:17
**dated** [8] - 18:3, 71:15, 72:8, 72:11, 72:21, 73:15, 109:14, 109:23
**DAY** [1] - 1:6
**days** [29] - 8:3, 18:16, 67:25, 68:4, 71:9, 71:23, 71:24, 71:25, 73:22, 74:4, 74:5, 75:20, 76:1, 76:3, 76:9, 89:2, 89:5, 89:8, 90:11, 90:13, 90:15, 90:22, 90:23, 91:22, 156:15, 156:16, 188:19, 191:1, 192:15
**DC** [2] - 2:5, 2:12
**deadline** [1] - 192:8
**deaf** [2] - 189:16, 191:20
**deal** [1] - 111:23
**dealing** [2] - 14:3, 104:17
**dean** [1] - 135:24
**deans** [1] - 135:20
**December** [5] - 1:10, 69:8, 69:16, 100:10, 119:14
**decide** [2] - 90:8, 91:22
**decided** [3] - 91:17, 190:10, 191:7
**decides** [1] - 101:22
**decision** [38] - 66:6, 66:20, 70:20, 71:21, 73:6, 73:19, 74:4, 74:10, 75:1, 81:10, 81:11, 83:9, 84:11, 84:14, 84:18, 84:20, 90:10, 90:14, 90:25, 92:2, 95:18, 95:22, 97:3, 97:4, 97:7, 97:11, 97:21, 128:16, 128:17, 161:25, 162:8, 162:9, 162:10, 163:1, 192:3
**decisions** [3] - 54:21, 92:13, 106:4
**declaration** [12] - 3:6, 17:6, 68:9, 68:14, 149:13, 150:2, 158:15, 158:17, 162:24,

164:3, 164:6, 164:9
**declines** [1] - 127:24
**decoding** [1] - 15:13
**dedicated** [1] - 93:15
**deducted** [1] - 48:4
**deep** [1] - 77:11
**deeper** [1] - 26:4
**Defendant** [2] - 1:6, 2:14
**defendant** [4] - 105:7, 118:11, 165:4, 180:22
**Defendant's** [19] - 41:24, 45:15, 48:6, 61:25, 148:9, 148:12, 163:24, 164:2, 164:5, 164:8, 164:13, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 169:17
**defendant's** [3] - 112:22, 164:14, 181:22
**defendants** [5] - 126:4, 155:11, 173:3, 178:1, 178:5
**Defense** [1] - 4:19
**defense** [8] - 64:6, 163:21, 170:18, 171:9, 179:13, 182:12, 196:8, 196:13
**defer** [12] - 97:20, 97:23, 98:2, 98:4, 98:9, 98:13, 98:16, 98:18, 98:21, 99:5, 171:9, 178:22
**deference** [6] - 132:7, 132:10, 132:17, 180:25, 181:1, 181:4
**deficiencies** [2] - 185:12, 185:13
**deficit** [3] - 61:3, 67:9, 137:12
**deficit/hyperactivity** [2] - 67:18, 159:14
**deficits** [3] - 32:2, 32:8, 33:10
**define** [1] - 33:18
**defined** [1] - 184:22
**defining** [1] - 117:25
**definitely** [1] - 117:3
**definition** [13] - 105:6, 105:10, 105:12, 107:5, 108:2, 108:4, 108:6, 114:17, 120:11, 120:12, 120:24, 171:6, 180:13
**degree** [3] - 65:7, 132:9, 138:17
**degrees** [1] - 138:15
**delay** [3] - 157:8, 191:3, 192:4
**deliberately** [3] - 12:3, 14:12, 14:16
**deliberations** [1] - 126:17
**delineating** [1] - 124:12
**delivers** [2] - 141:12, 141:13
**demand** [2] - 108:10, 171:5

**demanding** [6] - 106:8, 106:10, 108:11, 110:17, 120:5, 123:10
**demonstrate** [1] - 80:5
**demonstrated** [4] - 128:19, 136:22, 174:23, 188:15
**demonstrating** [1] - 146:15
**denial** [1] - 88:2
**denied** [3] - 73:25, 75:12, 80:3
**Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18
**deny** [10] - 67:2, 80:23, 83:9, 84:14, 84:18, 84:20, 91:17, 91:23, 92:3, 97:3
**denying** [3] - 74:7, 84:12, 90:20
**Department** [17] - 104:20, 108:20, 119:18, 125:4, 125:7, 125:13, 128:5, 129:8, 131:1, 131:7, 132:19, 163:15, 171:23, 172:14, 176:22, 180:9
**department** [3] - 127:15, 127:21, 127:24
**department's** [2] - 182:24, 182:25
**deposed** [1] - 28:15
**deposition** [42] - 9:1, 9:3, 9:4, 10:20, 11:8, 12:12, 13:21, 14:2, 14:3, 17:3, 22:4, 29:10, 29:12, 29:14, 29:18, 32:20, 32:23, 34:16, 80:22, 83:3, 83:6, 83:22, 84:23, 85:8, 85:14, 85:15, 86:2, 91:21, 95:2, 95:9, 95:14, 95:18, 96:1, 96:6, 106:2, 122:23, 123:2, 136:17, 157:1, 171:18, 192:19
**depressed** [1] - 55:7
**deputy clerk** [1] - 3:25
**describe** [2] - 8:4, 66:4
**described** [6] - 28:1, 28:2, 94:19, 110:11, 155:1, 185:13
**describing** [1] - 103:8
**description** [1] - 164:19
**designated** [1] - 116:21
**designed** [1] - 87:10
**desire** [1] - 183:23
**desk** [2] - 20:21, 77:2
**desks** [1] - 76:25
**despite** [2] - 22:11, 180:24
**detail** [1] - 131:4
**detailed** [1] - 75:5
**detect** [1] - 61:1
**Detect** [1] - 16:25
**detecting** [3] - 13:22, 14:3, 62:3

**determination** [12] - 80:23, 106:7, 108:9, 120:3, 126:18, 127:23, 128:13, 181:16, 185:11, 186:15, 194:4, 194:17
**determinations** [1] - 193:15
**determine** [8] - 126:17, 144:21, 158:16, 158:18, 158:23, 158:25, 178:18, 182:9
**determined** [5] - 71:12, 101:18, 124:7, 175:16
**determining** [7] - 96:13, 113:18, 114:15, 115:8, 128:6, 133:10, 133:12
**detriment** [1] - 94:15
**developed** [2] - 42:19, 111:7
**developmental** [4] - 6:6, 51:24, 52:3, 52:5
**deviate** [1] - 53:8
**deviating** [1] - 53:9
**devotes** [1] - 78:17
**devoting** [1] - 111:14
**diagnose** [4] - 9:15, 87:13, 180:7, 183:21
**diagnosed** [13] - 9:18, 13:3, 15:2, 51:14, 51:16, 51:18, 70:12, 98:24, 174:10, 184:1, 189:16, 193:18, 193:20
**diagnoses** [6] - 55:25, 67:20, 120:10, 120:23, 128:18, 174:12
**diagnosing** [2] - 6:13, 87:10
**diagnosis** [26] - 5:22, 7:24, 10:1, 16:14, 22:6, 23:2, 51:12, 51:23, 52:1, 52:9, 60:15, 87:17, 136:7, 137:12, 137:13, 174:13, 183:25, 184:5, 184:6, 184:9, 185:2, 187:12, 187:14, 187:18, 187:19, 194:7
**diagnostic** [20] - 6:22, 12:6, 12:19, 13:6, 14:14, 15:21, 15:24, 25:23, 26:3, 27:2, 31:18, 31:24, 32:5, 33:8, 33:11, 39:3, 52:22, 53:5, 61:8, 87:14
**Diagnostic** [2] - 5:21, 53:1
**difference** [4] - 49:20, 52:6, 87:7, 161:21
**different** [23] - 20:10, 42:6, 46:25, 48:23, 48:25, 51:16, 57:3, 80:12, 80:16, 80:17, 84:17, 111:19, 123:21, 124:2, 124:14, 176:9, 179:18, 181:14, 188:8, 189:7, 193:1
**differently** [2] - 105:4, 124:8
**difficult** [9] - 58:1, 58:2, 62:8, 62:11, 62:12, 62:13, 180:7,

189:20, 194:22
**difficulty** [3] - 86:22, 86:25
**DIRECT** [2] - 64:15, 138:9
**direct** [2] - 3:5, 87:16
**Direct** [1] - 198:4
**directed** [2] - 171:6, 179:18
**direction** [1] - 158:7
**directions** [1] - 46:20
**directly** [5] - 117:9, 121:2, 125:20, 181:3, 189:11
**director** [1] - 64:20
**directs** [1] - 180:5
**disabilities** [16] - 5:8, 6:13, 21:3, 62:4, 67:9, 80:1, 89:12, 93:16, 93:18, 111:15, 159:11, 174:4, 180:6, 180:19, 183:9, 194:24
**Disabilities** [2] - 16:25, 106:1
**disability** [60] - 22:7, 62:19, 64:20, 65:19, 67:19, 96:13, 100:10, 101:2, 101:14, 101:19, 101:21, 102:15, 102:19, 105:6, 105:11, 106:8, 107:5, 108:3, 108:5, 108:10, 112:3, 113:8, 113:17, 114:16, 114:17, 114:20, 115:8, 120:3, 120:12, 123:10, 124:7, 127:23, 128:7, 130:2, 130:3, 137:12, 171:4, 171:6, 171:13, 173:15, 173:20, 173:25, 174:13, 174:14, 174:17, 175:16, 175:21, 177:6, 177:9, 177:11, 180:14, 184:10, 186:13, 186:19, 189:8, 192:17, 195:3, 195:15, 195:19
**disability-related** [1] - 65:19
**disabled** [4] - 183:10, 183:11, 186:15, 186:16
**disagree** [1] - 95:6
**disagreed** [1] - 170:3
**disclose** [1] - 126:6
**disclosed** [1] - 126:6
**disclosure** [1] - 156:4
**discounted** [3] - 24:11, 24:13, 184:11
**discounts** [1] - 115:4
**discovery** [2] - 126:4, 155:12
**discrepancy** [9] - 6:17, 54:10, 54:12, 54:15, 54:25, 55:4, 55:5, 55:6, 55:10
**discretion** [2] - 89:1, 182:24
**discrimination** [1] - 192:5
**discuss** [7] - 20:20, 28:24, 36:8, 53:15, 53:18, 118:10, 166:4
**discussed** [11] - 18:12, 42:8, 58:14, 58:24, 59:2, 59:15, 59:22, 60:8, 130:7, 163:23,

192:19

**discusses** [2] - 6:6, 19:7
**discussing** [4] - 6:18, 88:6, 111:5, 125:16
**discussion** [10] - 3:19, 6:9, 20:12, 55:12, 56:11, 57:3, 58:21, 104:15, 114:8, 114:11
**diseases** [1] - 9:20
**disorder** [10] - 10:1, 15:3, 33:18, 49:1, 56:4, 58:5, 67:9, 67:18, 80:2, 159:14
**disorders** [1] - 5:4
**Disorders** [1] - 5:22
**dispute** [1] - 188:23
**disregard** [2] - 132:10, 171:17
**distance** [1] - 180:12
**distant** [1] - 192:8
**distinguishing** [1] - 20:13
**distractibility** [1] - 18:20
**distraction** [1] - 19:15
**distractions** [1] - 20:21
**distributed** [1] - 93:2
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 190:10
**divided** [1] - 93:6
**doctor** [3] - 92:5, 181:15, 182:5
**doctorate** [1] - 65:8
**doctors** [1] - 97:12
**document** [64] - 7:16, 8:1, 8:25, 19:3, 19:18, 20:2, 20:7, 20:11, 22:14, 26:5, 31:11, 34:8, 34:12, 37:3, 37:23, 37:24, 37:25, 38:8, 41:1, 44:2, 45:14, 46:5, 46:13, 51:11, 52:2, 68:12, 69:7, 70:18, 71:11, 72:20, 74:2, 102:23, 106:14, 106:18, 107:1, 107:13, 109:19, 110:14, 112:13, 113:22, 118:1, 122:15, 125:16, 125:18, 125:25, 126:24, 128:23, 128:24, 132:19, 133:22, 139:24, 140:1, 140:2, 144:3, 144:13, 158:14, 167:6, 172:7, 172:8, 182:20, 182:21, 182:22, 183:1
**documentation** [47] - 5:13, 66:9, 67:14, 71:7, 72:14, 72:24, 73:1, 73:23, 74:6, 78:21, 79:1, 80:5, 80:7, 80:9, 80:17, 84:15, 87:18, 91:3, 91:14, 97:17, 98:13, 98:16, 98:18, 98:21, 103:4, 103:21, 103:22, 103:25, 128:12, 128:18, 134:8, 136:15, 175:1, 178:15, 178:22, 178:25, 179:4, 179:5, 184:7,

184:12, 185:6, 188:2, 188:5, 192:12, 192:13, 192:20, 194:15
**documented** [1] - 111:21
**documents** [21] - 10:2, 20:6, 24:1, 24:2, 25:2, 25:15, 32:6, 34:16, 51:8, 66:12, 70:23, 70:24, 71:1, 126:3, 126:13, 162:17, 163:13, 168:4, 170:1, 182:25, 196:17
**dog** [1] - 47:14
**DOJ** [22] - 102:24, 111:4, 113:5, 113:8, 113:13, 115:6, 115:15, 115:18, 115:23, 116:1, 116:5, 116:11, 120:13, 120:16, 124:17, 129:16, 130:17, 130:20, 130:23, 133:18, 172:3
**DOJ's** [9] - 100:22, 110:16, 113:21, 114:8, 114:11, 123:8, 129:2, 132:1, 133:8
**don't..** [1] - 131:20
**done** [21] - 9:7, 14:5, 52:14, 59:16, 59:17, 59:20, 60:6, 60:11, 63:2, 63:3, 95:10, 98:22, 109:5, 130:24, 134:4, 160:6, 161:4, 175:23, 180:18, 183:22
**double** [10] - 62:12, 82:10, 82:19, 82:21, 103:24, 136:2, 173:8, 173:12, 181:15, 196:11
**doubt** [1] - 94:11
**down** [10] - 41:11, 44:12, 44:22, 63:18, 99:15, 113:4, 114:4, 120:6, 137:21, 159:23
**dozens** [1] - 74:18
**DR** [3] - 64:11, 198:5, 198:7
**Dr** [97] - 3:4, 4:5, 21:8, 21:11, 22:15, 23:3, 23:6, 24:22, 32:23, 39:11, 49:3, 50:20, 51:5, 54:8, 55:21, 55:23, 56:2, 59:16, 60:3, 60:5, 60:11, 61:25, 63:20, 64:7, 70:11, 70:12, 71:3, 71:4, 71:14, 72:15, 72:20, 72:25, 73:2, 73:5, 73:11, 73:14, 73:24, 74:1, 74:6, 79:16, 80:21, 83:14, 83:17, 87:20, 87:23, 88:1, 95:2, 95:15, 97:21, 98:2, 98:7, 98:9, 98:16, 98:19, 98:21, 99:1, 118:24, 126:22, 135:3, 135:7, 135:14, 135:20, 162:23, 163:13, 167:25, 168:1, 168:23, 169:13, 169:19, 171:18, 174:4, 174:15, 174:17, 175:4, 175:11, 175:13, 175:23, 176:9, 179:8, 179:9, 179:10,

183:18, 183:19, 184:4, 184:7, 184:15, 185:4, 185:6, 185:24, 187:13, 189:3, 190:14, 190:16, 192:18, 194:4
**drafts** [1] - 36:11
**draw** [1] - 191:17
**drawback** [1] - 60:24
**drawing** [1] - 180:17
**DSM** [8] - 51:12, 52:23, 52:25, 53:5, 55:3, 184:6, 185:2
**DSM-5** [5] - 5:21, 5:24, 6:2, 13:2, 187:19
**DSM-IV** [4] - 52:23, 52:25, 55:3
**due** [1] - 48:25
**duly** [2] - 64:11, 137:25
**duplicate** [2] - 65:22, 163:2
**duplicates** [1] - 155:5
**Duration** [3] - 142:24, 143:1, 143:11
**duration** [3] - 114:13, 140:15, 148:5
**during** [16] - 11:25, 29:9, 29:18, 62:6, 79:24, 81:20, 82:7, 119:1, 119:5, 126:17, 140:3, 140:12, 140:17, 142:22, 143:5, 168:7
**DVT** [1] - 88:7
**DX** [2] - 17:8, 35:11
**DX-1** [2] - 164:1, 199:2
**DX-10** [2] - 165:5, 199:9
**DX-11** [2] - 165:5, 199:10
**DX-12** [2] - 165:5, 199:11
**DX-13** [3] - 35:10, 165:5, 199:12
**DX-14** [2] - 165:6, 199:13
**DX-15** [2] - 165:6, 199:14
**DX-16** [2] - 165:23, 199:15
**DX-17** [2] - 165:23, 199:16
**DX-18** [2] - 165:23, 199:17
**DX-19** [2] - 165:23, 199:18
**DX-2** [2] - 164:4, 199:3
**DX-20** [2] - 165:23, 199:19
**DX-22** [2] - 166:10, 199:20
**DX-24** [2] - 166:10, 199:21
**DX-25** [2] - 166:10, 199:22
**DX-26** [2] - 166:10, 199:23
**DX-27** [3] - 58:22, 166:10, 199:24
**DX-28** [2] - 166:10, 199:25
**DX-29** [2] - 166:11, 200:1
**DX-3** [9] - 17:6, 17:14, 17:15, 17:16, 22:14, 56:20, 56:24, 164:7, 199:4
**DX-30** [2] - 166:11, 200:2
**DX-31** [2] - 166:11, 200:3
**DX-32** [2] - 166:11, 200:4

**DX-33** [2] - 166:11, 200:5
**DX-34** [2] - 166:11, 200:6
**DX-35** [2] - 166:11, 200:7
**DX-36** [2] - 166:11, 200:8
**DX-38** [2] - 166:15, 200:9
**DX-39** [2] - 166:15, 200:10
**DX-4** [6] - 19:1, 20:1, 20:3, 68:9, 164:10, 199:5
**DX-40** [3] - 42:23, 166:15, 200:11
**DX-41** [2] - 166:15, 200:12
**DX-42** [4] - 50:22, 50:23, 166:15, 200:13
**DX-46** [2] - 166:19, 200:14
**DX-48** [2] - 167:11, 200:15
**DX-49** [2] - 167:11, 200:16
**DX-50** [2] - 167:11, 200:17
**DX-51** [3] - 16:22, 167:11, 200:18
**DX-52** [2] - 167:11, 200:19
**DX-53** [2] - 167:11, 200:20
**DX-54** [2] - 167:12, 200:21
**DX-56** [2] - 167:17, 200:22
**DX-57** [2] - 167:17, 200:23
**DX-58** [2] - 167:17, 200:24
**DX-59** [2] - 167:17, 200:25
**DX-60** [2] - 167:17, 201:1
**DX-61** [2] - 167:17, 201:2
**DX-63** [2] - 168:11, 201:3
**DX-64** [2] - 168:11, 201:4
**DX-65** [2] - 168:11, 201:5
**DX-66** [2] - 168:11, 201:6
**DX-67** [2] - 168:11, 201:7
**DX-68** [2] - 168:11, 201:8
**DX-7** [2] - 164:15, 199:6
**DX-70** [2] - 168:20, 201:9
**DX-71** [2] - 168:20, 201:10
**DX-73** [2] - 169:8, 201:11
**DX-74** [2] - 169:8, 201:12
**DX-75** [2] - 169:8, 201:13
**DX-76** [2] - 169:8, 201:14
**DX-77** [2] - 169:8, 201:15
**DX-78** [2] - 169:8, 201:16
**DX-79** [2] - 169:9, 201:17
**DX-8** [2] - 165:5, 199:7
**DX-80** [2] - 169:9, 201:18
**DX-85** [2] - 169:15, 201:19
**DX-86** [2] - 170:16, 201:20
**DX-87** [2] - 170:16, 201:21
**DX-9** [2] - 165:5, 199:8
**dysfunction** [1] - 12:8
**dyslexia** [32] - 5:3, 6:6, 6:13, 9:16, 20:17, 20:18, 20:19, 31:18, 33:18, 56:9, 57:25, 58:3, 58:7, 59:17, 62:8, 62:13, 67:19, 83:4, 84:9, 87:11, 87:14, 95:21, 148:20, 175:14, 176:12, 183:22, 184:22, 189:6, 189:16,

193:17
**dyslexic** [1] - 27:17
**early** [10] - 13:4, 13:9, 55:14, 56:5, 56:7, 98:23, 99:2, 175:2, 180:8, 189:16
**earned** [1] - 65:6
**easier** [1] - 165:14
**Eastern** [1] - 190:10
**EASTERN** [1] - 1:1
**easy** [3] - 56:9, 57:25, 58:10
**eat** [1] - 44:22
**Edition** [1] - 23:1
**education** [7] - 22:22, 65:7, 103:8, 138:16, 164:25, 180:8, 191:3
**educational** [8] - 15:18, 65:4, 96:12, 127:14, 127:20, 138:13, 184:16, 186:25
**educator** [1] - 135:4
**educators** [1] - 134:22
**effect** [6] - 120:22, 123:17, 123:21, 124:9, 125:6, 182:23
**effort** [15] - 14:12, 15:22, 27:20, 27:21, 28:3, 41:5, 42:17, 48:22, 49:1, 57:8, 57:22, 75:5, 114:24, 177:14, 180:17
**eight** [1] - 75:23
**eight-hour** [1] - 75:23
**either** [16] - 8:21, 12:3, 18:10, 28:3, 60:3, 72:3, 77:22, 81:22, 95:25, 111:3, 126:10, 144:7, 144:21, 176:18, 185:20, 193:5
**electronic** [1] - 141:10
**elementary** [7] - 10:9, 19:10, 25:19, 98:23, 99:2, 175:2, 176:5
**eligibility** [2] - 88:18, 88:23
**eligible** [1] - 172:20
**email** [2] - 122:4, 122:22
**emails** [4] - 121:12, 121:21, 122:11, 169:12
**emphasized** [1] - 133:4
**employees** [2] - 78:11, 78:14
**employment** [1] - 38:20
**enacted** [1] - 20:23
**end** [19] - 45:5, 97:25, 120:15, 146:14, 147:18, 147:21, 147:22, 149:15, 150:7, 152:6, 152:19, 152:20, 153:14, 153:17, 189:18, 189:20, 190:19, 195:9, 195:21
**ends** [1] - 44:2
**enforceable** [1] - 183:1
**ensure** [11] - 101:1, 101:13, 101:20, 102:18, 105:25, 173:19, 186:12, 186:18, 188:13, 194:11, 194:12

**ensured** [1] - 186:10
**ensuring** [1] - 171:12
**enter** [1] - 148:22
**entered** [1] - 64:4
**entertain** [2] - 26:17, 160:7
**entire** [4] - 113:22, 121:2, 145:21, 172:7
**entirety** [1] - 178:17
**entities** [15] - 110:24, 111:2, 115:18, 115:23, 116:5, 127:15, 127:21, 130:17, 130:22, 178:16, 178:21, 179:3, 183:6, 186:11
**entitled** [8] - 16:24, 132:7, 132:17, 177:7, 180:25, 183:9, 188:12, 197:15
**entitlement** [2] - 185:11, 188:16
**entity** [8] - 100:24, 103:1, 103:3, 104:4, 104:6, 177:18, 179:4
**enumerating** [1] - 105:15
**environment** [3] - 104:22, 104:24, 188:21
**environments** [1] - 186:24
**Enzi** [1] - 106:22
**equally** [1] - 93:3
**equation** [1] - 175:19
**equitable** [1] - 93:17
**errors** [1] - 58:9
**especially** [1] - 172:21
**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10
**establish** [4] - 140:24, 146:3, 183:1, 189:1
**established** [1] - 122:14
**estimate** [1] - 120:13
**et** [2] - 5:11, 104:7
**evaluate** [10] - 6:1, 9:25, 14:10, 14:11, 15:10, 15:15, 21:25, 41:4, 56:3, 190:18
**evaluated** [11] - 5:15, 5:17, 21:2, 21:14, 50:20, 117:11, 128:4, 172:6, 181:8, 190:15, 190:17
**evaluates** [2] - 129:9, 129:17
**evaluating** [10] - 11:10, 11:12, 12:5, 12:14, 55:24, 66:5, 78:18, 132:14, 186:12, 190:12
**evaluation** [30] - 4:8, 4:14, 6:6, 6:22, 11:13, 11:16, 17:5, 17:22, 18:24, 19:19, 21:7, 22:5, 22:15, 24:6, 24:12, 27:7, 29:16, 29:21, 32:9, 36:11, 61:8, 73:2, 79:4, 85:7, 95:3, 96:13, 97:20, 184:14, 187:13, 194:19
**evaluations** [13] - 5:12, 7:8, 10:2, 27:5, 79:4, 82:23, 83:1,

87:21, 87:24, 98:22, 136:5, 144:21, 179:1
**evaluators** [1] - 194:15
**even-handedly** [1] - 194:8
**evening** [1] - 157:7
**event** [1] - 31:4
**events** [1] - 49:7
**eventually** [2] - 26:9, 165:9
**everywhere** [1] - 32:16
**evidence** [41] - 3:7, 3:8, 13:9, 13:13, 112:14, 126:1, 156:18, 160:4, 161:6, 161:11, 162:13, 162:25, 163:4, 163:8, 163:17, 164:1, 164:4, 164:7, 164:10, 164:15, 165:6, 165:24, 166:12, 166:16, 166:19, 167:12, 167:18, 168:12, 168:20, 169:9, 169:15, 169:23, 170:16, 183:14, 183:18, 184:24, 185:9, 186:9, 196:2, 196:18
**evidentiary** [1] - 191:10
**exact** [3] - 38:18, 132:19, 154:17
**exactly** [8] - 38:13, 75:15, 75:21, 107:4, 120:19, 123:18, 170:24, 180:4
**exaggerate** [2] - 14:12, 14:18
**exaggerating** [1] - 14:16
**exam** [46] - 4:9, 5:16, 12:21, 12:25, 28:22, 28:25, 31:7, 31:11, 41:12, 41:16, 75:25, 76:1, 76:10, 78:24, 79:7, 81:23, 86:5, 87:3, 88:20, 88:22, 89:1, 89:15, 96:23, 101:20, 102:20, 139:3, 139:12, 140:7, 141:18, 143:17, 146:14, 146:16, 147:5, 147:11, 147:20, 151:17, 153:17, 177:20, 183:17, 183:24, 185:22, 187:1, 187:3, 188:18, 188:19, 190:25
**examination** [35] - 65:15, 66:13, 75:23, 79:13, 81:20, 100:18, 100:24, 100:25, 101:1, 101:3, 101:5, 101:8, 102:22, 103:1, 104:5, 118:10, 142:2, 150:24, 151:2, 151:9, 151:10, 151:19, 151:23, 154:12, 154:16, 155:5, 155:13, 155:15, 159:17, 163:14, 173:19, 173:21, 173:23, 174:16, 192:20
**EXAMINATION** [8] - 4:3, 54:6, 61:23, 64:15, 79:14, 137:6, 138:9, 150:13
**examinations** [2] - 173:18,

189:25
**examine** [3] - 31:14, 59:20, 157:15
**examined** [6] - 64:12, 97:12, 98:11, 138:1, 163:13, 171:10
**Examinee** [1] - 140:11
**examinee** [4] - 78:21, 140:19, 141:18, 188:17
**examinee's** [1] - 141:11
**examinees** [12] - 67:5, 67:23, 77:24, 79:6, 79:10, 81:21, 92:11, 92:14, 102:21, 139:9, 145:17, 188:17
**EXAMINERS** [1] - 1:6
**examiners** [1] - 132:16
**Examiners** [6] - 64:23, 106:16, 110:11, 138:22, 183:7, 190:2
**example** [8] - 14:21, 29:20, 82:12, 86:4, 114:19, 152:5, 177:10
**examples** [3] - 15:10, 15:24, 134:8
**exams** [17] - 29:20, 33:21, 58:11, 78:7, 103:16, 103:24, 111:19, 134:16, 134:18, 139:1, 139:2, 171:16, 177:18, 177:25, 183:7, 186:12, 188:9
**Excel** [2] - 140:2, 159:7
**except** [1] - 101:7
**exception** [1] - 157:11
**exceptions** [2] - 157:12, 179:16
**excerpt** [1] - 163:16
**excerpts** [1] - 162:16
**exchanging** [1] - 116:25
**exclusive** [2] - 20:19, 58:7
**excuse** [1] - 112:15
**excused** [4] - 63:21, 63:23, 159:24
**executive** [1] - 171:25
**exercise** [1] - 116:25
**exercising** [1] - 42:17
**exhibit** [41] - 3:6, 17:24, 23:11, 23:12, 26:11, 26:15, 38:16, 99:7, 99:11, 100:20, 104:11, 107:12, 107:13, 107:15, 109:1, 117:12, 117:19, 118:4, 119:7, 119:8, 121:14, 151:6, 152:24, 153:1, 153:20, 153:25, 154:3, 154:4, 154:25, 155:10, 155:23, 157:6, 157:10, 158:5, 158:7, 162:3, 165:19, 168:16, 194:1, 196:20
**Exhibit** [59] - 3:12, 4:19, 6:4, 7:16, 16:21, 19:24, 23:16, 23:19, 41:24, 45:15, 48:6,

51:4, 56:20, 62:1, 68:9, 70:11, 70:15, 72:5, 72:14, 73:17, 99:8, 99:17, 116:19, 117:10, 119:7, 126:22, 128:25, 131:21, 139:22, 148:9, 148:12, 149:10, 150:16, 162:25, 163:4, 163:8, 163:24, 164:1, 164:2, 164:4, 164:5, 164:7, 164:8, 164:10, 164:13, 164:15, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 166:19, 168:14, 168:21, 169:15, 175:4
**Exhibit's** [1] - 165:4
**exhibited** [1] - 174:24
**exhibits** [20] - 38:1, 64:4, 116:21, 116:22, 116:25, 160:4, 160:18, 161:13, 161:17, 162:14, 163:25, 164:3, 164:6, 164:9, 165:16, 166:25, 169:6, 196:8
**Exhibits** [14] - 162:12, 163:17, 165:5, 165:23, 166:10, 166:15, 167:11, 167:17, 168:11, 168:13, 168:20, 169:8, 169:18, 170:16
**expect** [2] - 102:20, 145:10
**expectation** [1] - 59:12
**expected** [5] - 15:6, 32:14, 32:17, 57:20, 58:10
**expedite** [1] - 26:8
**expedited** [1] - 126:13
**experience** [9] - 10:24, 34:20, 88:13, 88:15, 151:19, 159:10, 159:13, 159:16, 185:24
**experienced** [3] - 13:3, 16:16, 184:17
**experiencing** [2] - 20:12, 184:25
**expert** [7] - 67:3, 83:3, 83:7, 84:15, 179:7, 179:15, 194:7
**expert's** [1] - 180:2
**expertise** [5] - 84:9, 128:15, 128:16, 159:12, 194:18
**experts** [4] - 66:22, 185:10, 189:18, 194:6
**explain** [4] - 58:1, 75:21, 140:14, 140:18
**explained** [2] - 57:6, 194:10
**explanation** [2] - 75:3, 178:3
**explicitly** [3] - 125:3, 125:7, 171:24
**extended** [18] - 5:6, 18:17, 73:24, 79:6, 79:23, 84:12, 84:19, 84:20, 88:2, 97:3, 97:5, 97:9, 103:15, 136:1, 173:8, 173:11, 181:20, 189:6

**extensive** [6] - 106:8, 108:10, 112:7, 123:10, 171:5, 194:19
**extent** [7] - 36:19, 53:16, 113:1, 167:2, 168:25, 169:3, 171:8
**external** [7] - 14:19, 66:21, 67:3, 71:16, 185:10, 189:24, 194:15
**External** [1] - 121:18
**externals** [1] - 190:8
**extra** [9] - 19:15, 32:1, 74:7, 75:12, 77:7, 111:17, 135:16, 186:6
**extract** [1] - 155:2
**extraordinary** [2] - 181:11, 181:21
**eyes** [1] - 180:10
**F-A-R-M-E-R** [1] - 64:14
**facilitate** [1] - 111:16
**fact** [32] - 16:5, 22:11, 23:6, 30:8, 36:17, 42:1, 44:2, 55:9, 55:12, 55:13, 56:4, 57:21, 61:6, 82:25, 84:23, 103:15, 103:23, 116:22, 118:6, 121:2, 130:10, 145:20, 158:3, 169:25, 178:6, 180:24, 181:10, 183:6, 183:15, 186:23, 187:22, 190:17
**factor** [2] - 101:5, 173:22
**factors** [1] - 101:8
**facts** [2] - 75:9, 111:17
**factual** [1] - 34:24
**faculty** [1] - 135:8
**fail** [6] - 61:1, 173:14, 190:25, 192:10, 192:11
**failed** [1] - 125:25
**fails** [1] - 187:5
**fair** [8] - 78:17, 79:10, 85:11, 85:14, 112:6, 113:24, 181:19, 188:17
**fairly** [6] - 67:20, 76:23, 85:12, 85:16, 85:24, 86:4
**fake** [6] - 56:9, 57:18, 57:24, 57:25, 58:8, 62:8
**fall** [2] - 4:7, 37:15
**false** [2] - 47:4, 61:10
**familiar** [14] - 28:16, 28:18, 35:18, 94:4, 107:2, 124:21, 129:22, 130:6, 133:18, 141:4, 142:1, 142:4, 145:17
**familiarity** [3] - 50:11, 112:11, 151:8
**family** [2] - 50:6, 50:7
**far** [4] - 59:24, 110:18, 111:14, 165:8
**Farmer** [14] - 64:7, 64:14, 64:17, 79:16, 80:21, 118:9, 118:24, 126:23, 163:14,

164:9, 171:19
**FARMER** [2] - 64:11, 198:7
**Farmer's** [1] - 192:18
**fashion** [1] - 185:14
**fast** [2] - 16:3, 16:4
**faster** [2] - 164:16, 165:11
**faults** [1] - 116:1
**favor** [1] - 171:7
**Featherstone** [3] - 191:19, 192:1
**February** [2] - 162:9, 163:2
**Federal** [5] - 117:8, 125:19, 126:2, 127:2, 163:16
**feedback** [1] - 36:15
**feign** [3] - 62:8, 62:13, 62:19
**Feigned** [1] - 16:25
**feigned** [1] - 62:4
**few** [14] - 25:13, 89:8, 92:16, 119:22, 123:6, 127:12, 151:24, 156:15, 156:16, 163:23, 176:24, 182:3, 192:14, 192:15
**fiancé** [2] - 13:19, 175:13, 185:3
**fifth** [4] - 35:5, 35:13, 113:4, 120:6
**Fifth** [1] - 23:1
**file** [9] - 66:18, 75:7, 83:12, 83:13, 83:14, 83:23, 84:5, 91:10, 122:8
**filed** [2] - 148:13, 192:2
**fill** [3] - 7:19, 66:10, 66:11
**filled** [2] - 12:10, 12:23
**final** [10] - 71:11, 77:5, 90:14, 119:19, 120:16, 127:4, 127:6, 170:1, 171:25, 182:22
**finally** [5] - 63:11, 70:20, 163:12, 184:11, 193:12
**finder** [1] - 169:25
**fine** [10] - 26:7, 37:17, 112:21, 112:25, 159:9, 164:20, 182:17, 187:19, 197:7
**finger** [1] - 195:13
**finish** [1] - 45:4
**finished** [1] - 152:14
**firm** [2] - 100:5, 109:18
**first** [61] - 4:24, 5:7, 7:2, 9:15, 18:16, 20:11, 20:16, 23:3, 25:8, 27:3, 27:13, 29:4, 39:3, 43:14, 43:15, 44:16, 46:14, 46:17, 47:13, 47:14, 48:20, 52:3, 59:25, 71:23, 76:10, 83:18, 88:20, 88:22, 90:7, 90:8, 90:12, 100:2, 101:18, 105:22, 110:16, 113:11, 119:8, 119:9, 119:10, 127:12, 131:25, 132:2, 132:4, 147:20, 151:12,

154:25, 155:11, 160:8, 164:14, 164:23, 171:19, 174:10, 175:5, 175:13, 183:21, 183:25, 187:9, 191:24
**fits** [1] - 74:17
**five** [7] - 53:10, 76:11, 76:13, 86:11, 148:1, 148:3
**fix** [1] - 105:22
**flipping** [1] - 58:6
**Florida** [1] - 190:2
**fluency** [8] - 16:2, 43:11, 43:15, 45:22, 46:8, 46:16, 47:8
**focus** [6] - 114:17, 124:17, 125:2, 125:8, 174:6, 174:7
**focuses** [1] - 138:19
**folder** [1] - 139:16
**folks** [3] - 74:22, 78:25, 84:7
**follow** [4] - 129:16, 131:17, 136:24, 159:8
**follow-on** [1] - 159:8
**follow-up** [1] - 136:24
**following** [4] - 111:4, 114:15, 116:13, 149:14
**follows** [4] - 64:12, 132:13, 138:1, 182:21
**forced** [1] - 149:17
**foregoing** [1] - 197:14
**forget** [1] - 196:21
**forgive** [1] - 84:4
**form** [9] - 7:18, 7:21, 51:4, 67:25, 69:13, 69:14, 70:15, 162:19, 185:14
**formal** [4] - 19:21, 111:10, 111:21, 178:13
**formally** [1] - 3:5
**format** [3] - 40:5, 111:19, 158:11
**formats** [1] - 28:20
**former** [1] - 109:18
**forms** [3] - 36:4, 66:10, 66:15
**forth** [1] - 25:14
**forward** [4] - 81:2, 172:10, 195:8, 195:10
**foundation** [12] - 95:25, 140:23, 140:24, 142:9, 144:4, 144:11, 145:13, 146:2, 146:3, 146:21, 149:22, 186:25
**four** [11] - 47:12, 76:12, 86:10, 86:22, 87:5, 89:17, 90:5, 147:8, 147:10, 148:3, 195:9
**fourth** [6] - 5:5, 35:5, 35:13, 45:18, 121:19, 165:3
**frame** [1] - 94:9
**frequent** [2] - 18:18, 147:19
**frequently** [5] - 6:21, 16:16, 55:6, 61:6, 193:20

**front** [1] - 7:23
**Fulbright** [2] - 100:3, 109:16
**full** [4] - 15:22, 20:12, 96:10, 122:2
**fully** [1] - 172:7
**function** [2] - 57:16, 111:23
**functioning** [2] - 27:15, 56:17
**furthermore** [1] - 178:12
**future** [3] - 54:21, 181:15, 182:5
**GAO** [1] - 130:11
**gather** [1] - 60:19
**general** [21] - 24:17, 24:18, 36:9, 49:9, 49:18, 49:21, 56:17, 59:19, 60:5, 60:25, 105:14, 114:25, 122:16, 133:15, 133:23, 155:14, 177:16, 183:13, 183:17, 189:2, 189:5
**generally** [13] - 29:2, 50:10, 50:14, 55:16, 59:22, 91:13, 94:6, 132:8, 166:24, 166:25, 168:23, 177:23, 179:4
**genuine** [2] - 57:8, 57:22
**gifted** [2] - 180:7, 193:20
**given** [12] - 29:5, 65:20, 66:3, 95:15, 117:19, 141:24, 154:16, 157:22, 180:3, 181:1, 181:24, 190:15
**GLENN** [2] - 137:25, 198:8
**Glenn** [1] - 138:5
**GMAT** [1] - 5:11
**Goldberg** [5] - 71:3, 71:4, 73:5, 83:14, 83:17
**GORT** [5] - 16:7, 16:10, 42:22, 43:13, 59:23
**GORT-5** [5] - 16:9, 42:25, 43:10, 43:11
**Government** [1] - 116:11
**government** [1] - 39:25
**grade** [10] - 7:11, 40:19, 58:24, 164:23, 164:24, 165:2, 165:3, 184:3, 185:15, 193:19
**graded** [1] - 176:5
**grades** [14] - 10:5, 11:18, 34:22, 35:5, 35:13, 36:5, 69:24, 124:19, 125:2, 125:9, 127:22, 128:6, 171:15, 186:5
**grading** [1] - 18:18
**graduate** [1] - 191:3
**graduates** [2] - 40:12, 40:16
**GRAN** [1] - 1:15
**grant** [5] - 66:23, 75:6, 75:15, 79:5, 193:5
**granted** [10] - 75:11, 75:19, 77:5, 82:13, 88:5, 88:7, 88:10, 172:24, 173:3, 192:3
**granting** [2] - 75:4, 81:15

**grants** [2] - 82:10, 193:5
**Gray** [2] - 16:4, 16:7
**GRE** [2] - 5:11, 189:12
**great** [3] - 49:12, 188:8, 194:21
**greater** [2] - 39:14, 49:22
**grounds** [2] - 154:25, 167:5
**group** [3] - 66:16, 96:16, 158:10
**growing** [1] - 8:2
**guarantee** [1] - 172:20
**guess** [11] - 16:15, 50:23, 80:12, 90:12, 92:25, 112:17, 144:4, 146:10, 147:21, 168:3, 174:20
**guesses** [2] - 148:22, 159:2
**guessing** [5] - 113:25, 146:16, 146:17, 147:17, 157:23
**guidance** [10] - 116:12, 132:10, 132:11, 172:5, 182:14, 182:16, 182:22, 182:25, 183:5, 186:7
**guidelines** [1] - 66:9
**Haddonfield** [1] - 1:17
**half** [5] - 76:2, 76:3, 130:21, 187:13, 188:19
**halfway** [1] - 114:4
**hand** [4] - 25:2, 186:2, 188:11, 188:25
**handed** [1] - 43:8
**handedly** [1] - 194:8
**handle** [2] - 93:8, 94:13
**handout** [2] - 34:12, 37:2
**hands** [1] - 169:17
**handwriting** [2] - 46:5, 47:23
**happy** [5] - 26:21, 96:1, 96:4, 126:6, 141:1
**hard** [3] - 57:24, 69:14, 181:18
**Harkins** [1] - 106:21
**harm** [5] - 190:22, 191:2, 191:3, 191:5, 192:6
**harmed** [1] - 192:25
**hate** [1] - 182:15
**head** [1] - 121:11
**headed** [1] - 133:8
**heading** [2] - 121:17, 131:25
**health** [1] - 65:7
**Health** [1] - 191:19
**Healy** [1] - 190:6
**hear** [9] - 79:18, 145:5, 153:12, 161:7, 161:10, 162:2, 170:20, 178:5, 188:4
**heard** [10] - 144:5, 151:24, 171:1, 174:4, 178:1, 178:2, 187:11, 187:18, 189:3, 193:12
**HEARING** [1] - 1:6
**hearing** [13] - 79:25, 116:22,

117:1, 117:19, 126:14, 157:3, 161:6, 162:2, 165:22, 168:8, 183:5, 192:3, 195:18
**held** [4] - 108:20, 181:2, 189:10, 191:4
**help** [5] - 14:22, 38:8, 38:20, 51:7, 56:21
**helpful** [5] - 60:14, 66:9, 95:19, 161:3, 161:4
**helps** [2] - 77:19, 169:24
**herself** [2] - 76:20, 194:2
**hesitation** [1] - 186:23
**hide** [1] - 194:24
**high** [15] - 5:9, 9:8, 25:18, 40:12, 40:15, 69:24, 96:16, 114:20, 115:5, 115:7, 135:2, 177:11, 177:25, 184:18, 190:4
**high-stakes** [3] - 5:9, 9:8, 177:25
**higher** [3] - 30:18, 49:15, 186:21
**highest** [1] - 191:10
**highlight** [1] - 176:24
**highly** [1] - 179:15
**hire** [2] - 93:25, 94:12
**hired** [1] - 93:19
**hiring** [2] - 93:21, 93:23
**historically** [1] - 175:12
**histories** [1] - 7:11
**history** [25] - 10:3, 11:5, 12:7, 18:13, 25:3, 25:9, 25:13, 27:16, 51:24, 52:3, 52:5, 52:7, 52:8, 54:16, 60:20, 136:7, 136:9, 172:1, 177:5, 177:8, 178:17, 178:18, 184:16, 185:8, 187:23
**hold** [2] - 38:10, 56:24
**holidays** [1] - 111:15
**home** [4] - 4:22, 8:17, 8:20
**homework** [1] - 111:18
**Honor** [87] - 3:3, 3:10, 4:2, 23:13, 25:5, 26:5, 26:20, 37:14, 37:20, 38:7, 39:1, 41:24, 53:19, 61:21, 63:17, 63:21, 64:2, 81:4, 81:10, 81:12, 85:1, 95:24, 99:10, 99:12, 101:15, 102:1, 102:7, 107:8, 107:14, 112:10, 112:15, 112:20, 112:24, 116:10, 116:20, 116:24, 118:14, 118:18, 118:22, 122:14, 125:15, 134:4, 137:16, 137:19, 137:23, 141:1, 142:8, 142:11, 144:2, 144:9, 150:12, 154:24, 155:3, 155:10, 157:4, 157:9, 159:22, 160:3, 160:13, 160:23, 161:2, 161:18,

163:22, 166:2, 166:24, 168:8, 168:22, 169:3, 169:16, 169:22, 170:9, 170:19, 170:21, 173:7, 178:2, 180:4, 181:11, 182:13, 187:8, 188:22, 190:21, 191:6, 191:12, 195:23, 196:5, 196:10, 196:23
**HONORABLE** [1] - 1:12
**hope** [4] - 82:2, 171:18, 173:13, 195:25
**hoped** [2] - 116:5, 130:23
**hopefully** [1] - 25:14
**hopes** [1] - 146:13
**hotel** [1] - 8:19
**hour** [9] - 8:14, 8:22, 75:23, 75:24, 76:3, 187:13, 188:19, 188:20
**hours** [3] - 76:11, 76:12
**house** [2] - 44:19, 66:14
**Houtman** [3] - 135:3, 135:7, 135:14
**hundreds** [2] - 74:18, 92:10
**hyperactive** [1] - 51:20
**hyperactivity** [2] - 18:22, 53:12
**idea** [2] - 11:6, 29:1
**identified** [7] - 32:3, 33:10, 38:2, 50:17, 51:8, 53:10, 53:12
**identify** [2] - 6:24, 186:17
**IEP** [1] - 103:8
**III** [2] - 45:12, 45:19
**imagine** [2] - 21:23, 133:6
**immediate** [1] - 190:23
**immediately** [1] - 155:24
**impact** [3] - 41:22, 111:8, 111:22
**impaired** [8] - 18:20, 18:21, 34:3, 61:2, 61:4, 101:6, 173:24
**impairment** [13] - 13:14, 34:17, 51:21, 67:13, 67:16, 108:6, 111:8, 128:19, 171:4, 177:21, 183:22, 184:1
**impairments** [9] - 9:20, 9:23, 67:6, 67:8, 77:8, 77:17, 98:25, 111:12
**impairs** [1] - 101:2
**impeachment** [5] - 116:22, 117:20, 117:23, 118:2, 126:1
**implementing** [4] - 100:22, 102:25, 110:18, 127:5
**import** [6] - 104:12, 105:5, 105:9, 120:21, 121:4, 175:24
**importance** [2] - 55:3, 124:18
**important** [15] - 56:17, 57:17, 100:15, 104:19, 120:22,

121:1, 133:21, 133:24,
175:15, 176:6, 176:8, 177:2,
178:21, 180:6, 180:9
**importantly** [1] - 188:15
**imprecision** [1] - 40:16
**improve** [1] - 111:22
**impulsivity** [1] - 53:13
**in-house** [1] - 66:14
**in-person** [1] - 97:20
**inability** [1] - 193:22
**inadequate** [1] - 22:1
**inappropriate** [5] - 21:19,
21:20, 21:21, 78:14, 87:13
**inattentive** [2] - 51:15, 51:20
**incentive** [1] - 14:24
**incentives** [1] - 14:19
**include** [12] - 10:11, 65:14,
67:8, 67:14, 108:11, 111:7,
111:8, 111:13, 138:25,
141:20, 141:23, 185:21
**included** [10] - 24:7, 32:1,
51:7, 70:24, 104:14, 108:5,
142:24, 158:5, 158:8, 196:9
**includes** [2] - 34:8, 114:14
**including** [11] - 21:8, 28:13,
73:2, 104:1, 114:22, 123:7,
127:16, 136:1, 178:9,
178:17, 183:1
**incomplete** [1] - 24:7
**inconsistent** [5] - 53:17,
127:25, 132:18, 171:25,
185:5
**incorrect** [6] - 44:11, 44:13,
89:20, 145:3, 145:6, 170:13
**incorrectly** [4] - 110:19,
143:21, 144:22, 145:1
**incredibly** [1] - 194:22
**independently** [1] - 144:17
**Indiana** [1] - 190:7
**indicate** [5] - 10:21, 12:8,
42:20, 61:2, 165:16
**indicated** [11] - 8:8, 11:9,
11:15, 25:17, 34:20, 39:23,
52:7, 55:16, 69:18, 167:7,
184:17
**indicates** [6] - 11:1, 22:20,
51:23, 52:16, 69:7, 178:18
**indicating** [3] - 70:24,
127:22, 152:6
**indication** [3] - 36:3, 149:7,
156:2
**indications** [1] - 147:16
**indicator** [2] - 96:12, 96:14
**individual** [24] - 13:3, 41:18,
46:18, 47:16, 65:23, 87:13,
101:2, 101:19, 108:9, 111:7,
112:1, 114:15, 114:19,
128:13, 131:15, 133:12,
133:16, 154:7, 173:20,
179:15, 183:10, 188:14,

195:15, 195:19
**individual's** [8] - 101:4,
101:6, 115:4, 171:4, 173:21,
173:24, 177:19, 177:21
**individualized** [2] - 103:8,
178:23
**individually** [2] - 166:22,
167:24
**individuals** [15] - 5:12,
14:18, 16:18, 50:4, 66:1,
74:12, 78:7, 92:22, 93:1,
98:5, 120:14, 120:18,
131:14, 183:8
**indulge** [1] - 114:6
**indulgence** [1] - 182:15
**influence** [2] - 12:24, 15:25
**inform** [1] - 125:1
**informal** [6] - 19:21, 111:9,
111:21, 122:6, 176:4, 178:17
**informality** [1] - 121:22,
122:12
**information** [59] - 11:20,
11:22, 11:25, 12:11, 12:24,
17:20, 18:23, 26:14, 31:21,
35:24, 49:25, 50:3, 50:13,
50:19, 53:15, 53:16, 55:14,
55:19, 55:20, 55:21, 55:23,
55:24, 60:15, 66:8, 66:18,
66:19, 68:2, 71:6, 74:16,
74:19, 75:5, 79:2, 81:22,
81:23, 82:1, 91:6, 100:13,
100:14, 100:16, 100:18,
104:14, 117:9, 122:3,
124:12, 124:22, 141:20,
141:23, 143:2, 144:3, 144:5,
151:24, 155:13, 155:15,
183:20, 186:2, 186:4
**informative** [1] - 10:18
**informed** [2] - 66:20, 78:5
**informing** [1] - 119:25
**initial** [11] - 19:5, 42:11,
68:21, 70:8, 71:5, 71:6,
71:18, 72:22, 73:1, 73:7,
74:15
**INJUNCTION** [1] - 1:6
**injunction** [7] - 81:1, 157:5,
182:7, 190:23, 191:9, 192:2
**input** [3] - 36:17, 36:22,
175:11
**instance** [5] - 15:19, 71:22,
75:11, 187:9, 187:17
**instances** [3] - 30:1, 68:3,
68:6
**instead** [4] - 122:22, 160:11,
171:5, 188:19
**institutions** [1] - 186:21
**instructed** [1] - 171:2
**instruction** [2] - 186:6, 186:7
**instructions** [1] - 45:1
**instrument** [1] - 39:12

**instruments** [1] - 12:17
**insufficient** [4] - 21:24, 22:3,
184:13, 188:5
**intake** [1] - 7:18
**intellectually** [1] - 32:15
**intelligence** [6] - 6:14, 27:16,
27:21, 54:24, 55:8, 59:13
**intelligent** [1] - 179:16
**intended** [1] - 182:22
**intensive** [2] - 36:6, 186:6
**intent** [5] - 106:6, 110:18,
120:2, 128:1, 134:2
**interact** [1] - 174:5
**interest** [3] - 59:9, 85:3,
182:9
**interested** [2] - 100:19,
172:11
**interface** [1] - 140:22
**interferes** [1] - 33:19
**interfering** [1] - 77:24
**internet** [1] - 4:18
**interpret** [4] - 8:18, 107:10,
115:20, 133:6
**interpretation** [1] - 95:20
**interpretations** [1] - 132:8
**interpreters** [1] - 191:21
**interrogatories** [1] - 164:14
**interrupt** [3] - 77:25, 78:16,
113:20
**interview** [5] - 7:18, 12:1,
49:23, 52:12, 175:11
**introduce** [1] - 169:17
**Investigation** [1] - 16:24
**involved** [1] - 28:22
**involving** [1] - 88:2
**Iowa** [3] - 10:11, 29:21, 30:6
**IQ** [3] - 6:9, 54:16, 55:6
**irrelevant** [1] - 155:16
**irreparable** [3] - 190:21,
191:4, 192:6
**irrevocably** [1] - 192:25
**issue** [15] - 93:6, 115:19,
115:24, 130:18, 131:1,
132:19, 155:19, 156:3,
170:1, 172:3, 173:4, 173:7,
175:3, 189:7, 195:18
**issued** [4] - 90:25, 119:18,
131:7, 172:8
**issues** [6] - 14:4, 53:12,
54:16, 55:3, 184:17
**issuing** [2] - 116:1, 116:12
**item** [10] - 18:1, 86:25,
140:13, 140:15, 140:16,
143:10, 147:6, 147:18,
150:9, 157:22
**Item** [4] - 142:24, 143:1,
143:11, 153:1
**items** [5] - 47:9, 76:2, 86:17,
153:3
**itself** [5] - 112:13, 115:9,

129:5, 181:3, 192:5
**IV** [5] - 46:1, 52:23, 52:25,
55:3
**IVA+Plus** [2] - 48:13, 60:14
**James** [1] - 1:8
**January** [6] - 68:25, 69:1,
69:11, 70:25, 71:7, 71:15
**Jersey** [1] - 1:17
**Jessica** [5] - 4:7, 65:17,
126:12, 139:11, 164:3
**JESSICA** [1] - 1:3
**Jessica's** [2] - 140:3, 140:4
**Jessie** [5] - 82:15, 136:18,
170:22, 172:17, 175:8
**job** [5] - 64:19, 65:2, 138:11,
138:21, 195:7
**Jodoin** [4] - 137:23, 138:5,
138:11, 141:4
**JODOIN** [2] - 137:25, 198:9
**Johnson** [3] - 15:17, 46:1,
59:23
**JOYNER** [1] - 1:12
**judge** [1] - 192:3
**Judge** [2] - 189:14, 189:19
**judgment** [2] - 27:19, 27:20
**judicial** [2] - 81:6, 81:7,
183:3
**July** [6] - 73:15, 91:7, 91:17,
92:2, 92:8, 106:19, 154:12,
154:16, 154:18
**jumping** [2] - 74:23, 191:14
**jumps** [1] - 44:21
**June** [6] - 18:3, 72:8, 72:12,
72:21, 84:3, 91:3
**Justice** [14] - 108:20, 119:18,
125:4, 125:7, 125:13, 128:5,
131:1, 131:7, 132:19,
163:15, 171:23, 172:15,
176:22, 180:9
**Justice's** [2] - 104:20, 129:8
**Kaufman** [1] - 15:18
**keep** [4] - 19:25, 164:20,
176:23, 191:15
**Kennedy** [1] - 106:21
**keyed** [1] - 140:13
**kicks** [1] - 186:14
**kind** [17] - 8:20, 11:6, 12:8,
16:5, 21:24, 52:10, 54:18,
58:9, 59:19, 60:22, 113:22,
124:19, 154:4, 176:3,
180:12, 193:24, 194:12
**kindergarten** [10] - 31:7,
34:9, 164:21, 164:22, 182:1,
182:2, 182:4, 184:18,
185:15, 185:16
**kinds** [5] - 11:10, 27:18,
27:23, 58:8, 176:18
**knowledge** [13] - 15:4, 35:1,
85:8, 85:11, 85:15, 85:24,
87:16, 87:18, 113:1, 116:3,

130:19, 186:12, 186:19
**knows** [5] - 140:25, 144:5, 155:3, 173:15, 181:19
**labeled** [1] - 140:11
**lack** [8] - 48:22, 48:25, 55:6, 140:23, 145:12, 146:2, 146:21, 149:22
**lacks** [1] - 174:7
**language** [9] - 21:5, 110:17, 114:15, 115:4, 124:18, 125:9, 127:15, 127:21, 186:10
**large** [2] - 145:9, 165:10, 189:24
**larger** [1] - 111:14
**largest** [1] - 67:16
**Larry** [1] - 38:16
**larry@rcglawoffices.com** [1] - 1:18
**last** [36] - 5:19, 7:7, 20:22, 21:1, 39:8, 52:18, 62:15, 65:21, 68:12, 73:22, 74:5, 77:14, 109:19, 110:15, 115:23, 121:15, 126:5, 144:25, 147:25, 148:2, 149:16, 150:3, 152:8, 152:21, 153:23, 155:11, 155:23, 158:16, 159:1, 170:22, 172:22, 182:19, 182:21, 192:14, 197:3
**lastly** [1] - 178:20
**lasts** [2] - 28:10, 28:13
**late** [1] - 193:21
**latter** [2] - 42:8, 42:15
**law** [21] - 100:5, 106:12, 109:18, 120:21, 121:3, 123:20, 123:23, 123:25, 129:6, 129:12, 132:6, 132:7, 132:16, 171:1, 171:22, 173:17, 175:15, 181:9, 189:21, 193:9, 194:16
**Law** [1] - 190:9
**LAWRENCE** [1] - 1:16
**laws** [1] - 182:25
**lawyer** [2] - 83:23, 110:8
**lay** [1] - 144:11
**LD** [3] - 8:6, 11:13, 62:19
**lead** [1] - 61:10
**leading** [1] - 138:24
**learn** [5] - 90:1, 94:7, 107:3, 114:25, 177:15
**learned** [3] - 28:2, 111:6, 175:17
**learning** [28] - 5:3, 5:8, 6:13, 9:25, 15:3, 21:3, 22:6, 34:17, 56:4, 67:9, 67:19, 111:13, 111:25, 114:20, 114:23, 137:12, 159:11, 174:13, 174:14, 174:17, 177:10, 177:13, 180:6, 180:13,

**least** [16] - 25:20, 66:1, 67:25, 69:7, 70:2, 70:12, 116:6, 122:1, 130:23, 146:11, 153:20, 155:25, 156:3, 161:12, 186:2, 186:21
**leave** [8] - 8:17, 64:3, 162:17, 182:9, 196:14, 196:16, 196:17, 197:2
**leaves** [1] - 143:22
**ledger** [1] - 185:7
**left** [1] - 140:4
**legal** [4] - 104:22, 104:24, 128:16, 132:2
**Legal** [1] - 99:25
**legally** [2] - 182:23, 183:1
**legible** [1] - 66:15
**length** [4] - 40:4, 76:12, 192:15, 194:21
**lengthier** [1] - 185:22
**less** [13] - 49:19, 74:4, 76:13, 102:20, 111:19, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 154:23, 188:20
**lessen** [2] - 111:7, 111:22
**letter** [43] - 70:20, 71:21, 73:6, 73:14, 73:19, 73:24, 74:4, 75:16, 90:10, 90:20, 90:25, 106:20, 107:8, 107:12, 107:17, 108:1, 109:9, 109:15, 109:23, 110:12, 112:12, 112:18, 112:23, 114:1, 115:9, 129:23, 129:25, 130:1, 130:6, 130:22, 131:4, 132:18, 132:20, 135:3, 135:20, 161:25, 162:8, 162:9, 163:2, 163:14, 163:15
**letterhead** [2] - 109:15, 109:17
**letters** [3] - 58:6, 92:13, 179:1
**letting** [1] - 38:23
**level** [11] - 24:15, 30:3, 40:19, 101:5, 114:20, 115:5, 115:7, 173:22, 177:11, 177:20, 185:13
**levels** [2] - 6:14, 187:5
**Lewandowski** [12] - 21:9, 21:11, 49:3, 59:16, 60:11, 72:15, 72:21, 72:25, 98:7, 98:9, 184:8, 190:16
**Lewandowski's** [3] - 22:15, 73:2, 74:1
**liberalness** [1] - 187:15
**license** [1] - 85:6
**licensed** [7] - 22:12, 65:6, 65:9, 82:22, 82:25, 87:20, 87:23

**licensing** [1] - 173:17
**licensure** [2] - 78:24
**life** [20] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:13, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4, 189:24, 190:3
**lifelong** [3] - 9:23, 183:22, 184:1
**likelihood** [1] - 191:8
**likely** [1] - 149:4
**likewise** [5] - 12:23, 13:17, 16:18, 68:6, 191:2
**limit** [3] - 91:9, 91:12, 152:22
**limitation** [10] - 66:25, 80:6, 105:13, 111:24, 112:2, 113:9, 128:14, 189:1, 189:22, 190:13
**limited** [18] - 85:12, 85:16, 85:17, 85:25, 86:1, 114:18, 114:21, 114:23, 128:20, 133:13, 136:23, 137:18, 151:24, 177:12, 183:12, 183:15, 189:4, 192:17
**limits** [3] - 108:7, 110:17, 110:20
**line** [10] - 33:3, 33:7, 33:16, 44:16, 47:12, 47:14, 96:9, 102:2, 106:23, 149:15
**lines** [1] - 121:15
**link** [1] - 56:18
**list** [4] - 17:22, 19:21, 29:5, 58:11
**listed** [4] - 18:1, 20:6, 23:10, 110:11
**listen** [1] - 38:10
**listing** [5] - 17:21, 24:1, 25:8, 25:9, 25:12
**lists** [1] - 110:4
**literally** [2] - 126:4, 181:16
**literature** [2] - 60:24, 61:9
**Livingston** [9] - 23:3, 23:6, 24:3, 70:18, 70:23, 71:2, 98:14, 188:2
**Livingston's** [3] - 71:6, 184:12, 188:5
**LLP** [3] - 1:15, 2:2, 2:9
**loaded** [1] - 154:22
**local** [2] - 156:20, 156:22
**located** [1] - 64:25
**logically** [1] - 185:19
**longest** [1] - 88:21
**look** [61] - 4:19, 16:21, 17:5, 17:6, 19:1, 19:10, 19:24, 20:1, 22:14, 24:17, 26:4, 29:4, 32:20, 35:10, 37:2, 37:24, 39:3, 39:21, 40:6, 40:7, 42:22, 44:14, 45:12,

46:16, 47:12, 50:22, 51:11, 55:13, 55:19, 56:20, 61:25, 67:15, 68:9, 69:2, 72:17, 73:17, 75:15, 79:2, 115:22, 127:11, 127:18, 147:1, 147:25, 148:9, 148:14, 149:5, 149:10, 151:11, 152:24, 154:14, 154:17, 165:13, 168:2, 169:25, 171:14, 179:18, 180:14, 193:14
**looked** [17] - 7:17, 8:25, 9:6, 21:8, 55:20, 71:21, 75:8, 80:10, 147:3, 158:24, 158:25, 159:4, 159:6, 176:2, 190:3, 190:7, 190:11
**looking** [19] - 11:20, 27:15, 37:23, 41:25, 50:15, 58:16, 93:25, 99:11, 106:14, 119:11, 120:6, 147:2, 158:14, 171:15, 179:13, 180:16, 189:23, 194:15
**looks** [20] - 43:20, 44:21, 45:7, 46:7, 46:17, 47:6, 47:12, 47:23, 48:7, 52:17, 68:23, 69:16, 71:7, 71:22, 72:8, 73:21, 75:19, 107:2, 110:4, 140:19
**loud** [12] - 44:6, 44:24, 44:25, 45:24, 77:23, 78:15, 82:4, 82:7, 88:14, 114:10, 115:12, 137:10
**love** [1] - 188:18
**Love** [1] - 190:9
**Lovett** [3] - 39:11, 87:23, 88:1
**low** [7] - 42:13, 48:17, 48:20, 48:21, 48:22, 54:24, 62:21
**lower** [2] - 30:19, 63:16
**lowers** [1] - 48:4
**LSAT** [1] - 5:11
**luck** [2] - 55:5, 196:3
**lunch** [3] - 119:1, 119:5, 125:17
**Luncheon** [1] - 118:16
**lunchtime** [1] - 118:7
**MA** [1] - 23:6
**ma'am** [4] - 64:9, 118:9, 137:21, 196:24
**machine** [1] - 174:22
**magnitude** [1] - 65:20
**maintained** [1] - 154:4
**major** [18] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:12, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4
**majority** [1] - 149:6
**malinger** [1] - 15:2

**Malingering** [2] - 42:19, 56:12

**malingering** [5] - 14:14, 16:13, 42:20, 62:21, 194:13

**mandatory** [1] - 191:9

**manifestation** [1] - 147:22

**manipulated** [2] - 179:12, 180:1

**manner** [8] - 79:10, 80:18, 104:6, 104:8, 114:13, 133:16, 142:1, 183:8

**Manual** [2] - 5:21, 53:1

**manual** [10] - 6:2, 40:18, 53:2, 101:3, 101:7, 162:16, 173:24, 193:7, 193:11, 197:1

**March** [8] - 70:21, 71:21, 109:23, 129:23, 131:6, 161:25, 172:18, 192:7

**Marie** [2] - 1:22, 197:18

**mark** [7] - 41:8, 44:9, 47:16, 107:15, 140:20, 142:5, 142:15

**marked** [2] - 107:13, 126:22

**Market** [1] - 1:9

**MARY** [1] - 2:3

**mary.vargas@steinvargas. com** [1] - 2:6

**masked** [1] - 180:8

**Massachusetts** [1] - 138:19

**master's** [2] - 65:7, 138:17

**match** [1] - 193:3

**matching** [1] - 26:2

**material** [4] - 117:20, 117:23, 168:22, 173:16

**mathematics** [2] - 138:15, 138:16

**matriculate** [1] - 186:24

**matter** [12] - 63:8, 66:22, 89:5, 118:6, 153:6, 154:17, 155:9, 167:23, 181:16, 181:17, 181:18, 197:15

**matters** [3] - 131:11, 131:13, 194:17

**maxed** [1] - 44:3

**maximum** [6] - 14:19, 41:5, 42:17, 50:17, 171:8, 173:10

**MCAT** [34] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:2, 27:1, 28:4, 28:7, 28:16, 31:7, 31:11, 31:17, 34:1, 58:12, 58:14, 63:12, 70:5, 84:11, 85:9, 85:11, 85:18, 86:21, 87:6, 87:10, 95:20, 96:11, 96:21, 104:2, 162:19, 178:2, 184:21, 189:12, 193:13

**mean** [21] - 9:9, 14:14, 25:25, 30:19, 34:4, 34:5, 34:6, 48:19, 51:25, 63:3, 76:20, 102:17, 115:20, 121:23, 121:25, 137:17, 156:22,

158:23, 177:8, 190:18, 191:2

**meaning** [9] - 22:9, 30:15, 102:15, 110:21, 183:10, 183:11, 186:15, 186:16, 193:24

**means** [17] - 7:9, 9:23, 14:16, 20:7, 30:19, 44:2, 51:20, 61:3, 122:4, 146:23

**meant** [2] - 95:21, 110:17

**measure** [11] - 16:3, 34:7, 55:8, 56:16, 59:13, 101:6, 101:8, 101:21, 173:23, 177:20, 186:18

**measured** [1] - 6:14

**measurement** [1] - 138:17

**measures** [13] - 101:20, 104:1, 105:16, 111:11, 111:13, 111:21, 113:8, 113:10, 113:16, 113:18, 124:13, 189:24, 190:3

**measuring** [1] - 57:15

**MEDICAL** [1] - 1:5

**Medical** [6] - 64:23, 106:15, 110:11, 138:22, 183:7, 190:1

**medical** [37] - 5:18, 52:6, 52:8, 78:24, 81:24, 82:3, 82:6, 82:17, 82:20, 88:19, 89:12, 95:23, 96:17, 97:5, 134:18, 135:8, 135:21, 135:24, 162:16, 171:17, 172:18, 172:19, 172:21, 172:24, 178:7, 181:17, 187:2, 187:21, 187:24, 188:6, 188:7, 191:21, 191:23, 193:3, 195:5, 195:7, 195:8

**medication** [3] - 61:17, 175:18, 176:11

**medications** [2] - 14:22, 176:19

**medicine** [3] - 128:11, 179:21, 195:10

**meet** [7] - 53:5, 68:6, 120:10, 120:23, 187:4, 187:5, 190:22

**meeting** [4] - 100:9, 119:17, 163:10, 189:7

**meets** [2] - 12:6, 187:5

**member** [2] - 50:6, 50:7

**memorandum** [1] - 160:20

**Memory** [2] - 42:19, 56:12

**memory** [2] - 42:20, 57:16

**mental** [4] - 67:6, 67:8, 84:18, 108:6

**Mental** [1] - 5:22

**mention** [2] - 11:3, 162:15

**mentioned** [4] - 7:16, 16:7, 24:21, 177:17

**merit** [1] - 173:15

**merits** [1] - 191:8

**met** [2] - 22:11, 195:16

**method** [1] - 6:12

**Methods** [1] - 16:25

**MEW** [33] - 2:10, 32:25, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 196:14, 196:19

**mic** [1] - 3:20

**Michael** [1] - 138:5

**MICHAEL** [3] - 2:3, 137:25, 198:8

**michael.stein@ steinvargas.com** [1] - 2:6

**Michigan** [6] - 82:23, 82:24, 87:21, 87:22, 87:24, 135:21

**microphone** [1] - 138:6

**mid** [1] - 175:2

**middle** [3] - 103:10, 110:23, 190:4

**might** [15] - 14:21, 15:15, 15:21, 42:17, 48:25, 79:6, 81:17, 93:12, 123:21, 132:9, 132:10, 145:23, 146:10, 179:11, 182:3

**migraines** [2] - 77:12, 88:11

**Mike** [1] - 137:23

**million** [2] - 94:8, 94:22

**Mimi** [2] - 44:16, 44:19

**mimic** [1] - 15:5

**mind** [7] - 25:23, 27:1, 27:4, 27:12, 42:16, 127:18, 197:3

**minds** [1] - 192:21

**minimize** [1] - 191:2

**minute** [11] - 20:3, 38:17, 47:7, 73:5, 149:16, 150:3, 158:16, 158:20, 159:1, 188:23

**minutes** [15] - 28:13, 48:12, 54:2, 76:2, 76:4, 76:13, 92:16, 158:22, 159:2, 160:13, 160:14, 161:12, 192:14

**misconception** [1] - 58:4

**misconceptions** [1] - 58:3

**misphrasing** [1] - 31:2

**misread** [2] - 58:9, 127:17

**missing** [1] - 105:2

**misunderstood** [1] - 9:4

**Mitchell** [2] - 1:22, 197:18

**mitigate** [1] - 178:4

**mitigating** [7] - 105:16, 111:11, 111:21, 113:8, 113:10, 113:16, 124:13

**mitigation** [7] - 112:9,

175:16, 175:18, 176:1, 176:19, 193:22, 194:20

**mnemonics** [1] - 111:17

**modalities** [1] - 194:20

**model** [4] - 6:17, 54:10, 54:13, 54:15

**modifications** [7] - 103:4, 103:6, 104:7, 111:6, 111:8, 111:9, 111:11

**modified** [2] - 111:18, 182:24

**moment** [10] - 37:19, 38:3, 56:19, 57:24, 81:15, 85:1, 88:6, 109:10, 109:11, 132:12

**month** [1] - 74:3

**months** [7] - 73:23, 74:6, 88:24, 90:16, 94:15, 195:17

**morning** [12] - 3:2, 4:5, 4:6, 58:22, 59:2, 59:22, 64:17, 64:18, 79:16, 79:17, 126:5, 169:19

**morning's** [1] - 61:16

**most** [30] - 40:11, 40:15, 40:16, 49:24, 58:4, 59:11, 61:5, 62:18, 79:6, 96:15, 105:14, 114:25, 117:3, 120:22, 121:1, 128:20, 133:14, 133:21, 133:23, 147:19, 147:22, 153:16, 161:19, 165:9, 177:15, 183:13, 183:17, 189:5, 189:22

**mother** [6] - 13:8, 13:12, 13:16, 13:19, 175:12, 185:2

**motivated** [1] - 135:12

**mouthed** [1] - 81:18

**move** [3] - 146:5, 161:10, 170:17

**moved** [4] - 3:6, 160:18, 161:17

**moving** [7] - 26:11, 37:18, 113:2, 116:9, 162:3, 163:21, 165:17

**MR** [159] - 3:3, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:5, 26:20, 26:24, 31:10, 31:16, 33:2, 33:5, 33:6, 36:19, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 37:24, 38:5, 38:7, 38:12, 38:15, 38:17, 38:19, 38:21, 38:22, 39:1, 39:2, 47:19, 47:20, 47:21, 47:22, 53:19, 53:24, 54:7, 61:19, 61:21, 61:24, 63:17, 63:20, 64:2, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 109:4, 112:10, 112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14,

122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 140:23, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:2, 144:6, 144:9, 144:11, 144:12, 145:5, 145:8, 145:12, 145:16, 146:2, 146:7, 146:8, 146:21, 147:4, 149:22, 149:25, 150:12, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:22, 159:25, 160:3, 160:6, 160:9, 160:13, 160:14, 161:2, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 163:19, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3

**MS** [102] - 32:25, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:4, 196:14, 196:19, 196:23, 196:25, 197:5

**multiple** [18] - 13:3, 13:4,

13:14, 13:17, 39:18, 86:3, 86:10, 86:11, 86:16, 86:20, 86:22, 87:5, 122:14, 135:11, 184:25, 189:9, 194:19

**must** [8] - 100:25, 103:2, 104:5, 114:24, 171:11, 173:18, 177:14, 177:18

**naked** [1] - 175:20

**name** [6] - 4:17, 42:24, 46:2, 64:13, 138:4, 140:4

**names** [1] - 15:12

**national** [1] - 78:23

**NATIONAL** [1] - 1:5

**National** [11] - 64:21, 64:22, 85:17, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1

**nature** [1] - 22:3

**navigate** [1] - 158:19

**navigated** [1] - 152:21

**NBME** [78] - 18:9, 65:20, 69:5, 78:17, 80:3, 80:8, 81:1, 82:10, 82:12, 85:20, 87:16, 88:1, 90:4, 90:14, 93:5, 93:15, 94:12, 94:18, 99:25, 101:10, 101:13, 101:22, 103:16, 103:24, 104:16, 106:12, 107:4, 108:1, 108:23, 110:6, 113:7, 115:3, 115:6, 115:18, 121:12, 122:7, 122:11, 122:15, 129:2, 129:8, 129:16, 129:24, 130:1, 130:4, 130:7, 130:11, 130:14, 131:16, 131:17, 131:19, 132:13, 134:16, 135:14, 135:22, 135:25, 136:13, 136:18, 138:24, 139:2, 141:13, 143:4, 150:22, 151:1, 152:1, 152:2, 153:22, 154:19, 161:25, 163:10, 171:19, 171:24, 172:2, 172:9, 173:11, 181:10, 185:9, 186:11, 188:10

**NBME's** [12] - 94:4, 108:13, 110:1, 112:6, 112:8, 113:20, 121:8, 124:17, 125:2, 125:8, 141:4, 171:16

**NE** [1] - 2:4

**necessarily** [5] - 11:23, 121:13, 147:18, 153:7, 190:18

**necessary** [4] - 5:22, 175:14, 193:23, 195:13

**need** [29] - 16:18, 17:25, 25:14, 33:21, 33:25, 38:3, 38:22, 53:4, 78:25, 93:13, 97:5, 97:8, 109:10, 115:12, 117:22, 128:2, 130:12, 135:14, 156:20, 160:4,

171:9, 178:19, 178:24, 182:7, 188:3, 188:15, 194:25, 195:3, 195:4

**needed** [10] - 59:20, 113:19, 117:21, 130:13, 133:22, 135:17, 136:1, 136:19, 172:24, 174:17

**needs** [3] - 173:8, 186:24, 189:6

**negative** [2] - 62:12, 186:1

**negatives** [1] - 61:10

**negligible** [1] - 110:20

**Nelson** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18

**Nelson-Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18

**neurodevelopmental** [1] - 9:20

**neurological** [2] - 33:18, 111:6

**neuropsych** [2] - 49:18, 49:19

**neuropsychological** [1] - 5:12

**neuropsychologist** [2] - 21:12, 22:12

**neuropsychologists** [1] - 194:4

**never** [4] - 4:11, 102:17, 126:9, 189:3

**nevertheless** [4] - 31:20, 111:25, 114:21, 177:12

**new** [10] - 116:1, 119:23, 120:21, 123:8, 123:16, 123:20, 124:3, 124:8

**New** [1] - 1:17

**next** [20] - 18:12, 41:1, 42:22, 46:1, 46:21, 52:16, 62:22, 83:18, 86:18, 104:3, 137:22, 140:10, 140:14, 142:10, 143:8, 160:2, 161:24, 162:14, 169:10, 190:25

**night** [1] - 126:5

**NO** [2] - 1:3, 198:15

**nobody** [1] - 77:25

**nondisabled** [2] - 88:16, 89:3

**none** [3] - 175:23, 180:23, 186:7

**normal** [3] - 22:20, 22:21

**normally** [3] - 8:19, 84:7, 109:5

**Northwest** [1] - 191:19

**Norton** [2] - 100:3, 109:16

**notation** [2] - 34:21, 169:6

**note** [6] - 44:11, 44:12,

116:20, 157:11, 157:12, 161:21

**notebook** [4] - 16:22, 17:10, 62:1, 148:10

**notebooks** [3] - 37:21, 62:1, 139:14

**noted** [5] - 102:8, 103:21, 130:11, 149:24, 168:18

**notes** [1] - 113:13

**nothing** [8] - 129:19, 136:18, 137:2, 137:16, 153:9, 184:15, 192:22, 195:23

**notice** [7] - 81:6, 81:7, 108:20, 108:23, 109:23, 110:2, 120:10

**notification** [1] - 170:14

**notify** [2] - 156:8, 157:7

**noting** [1] - 103:22

**notwithstanding** [1] - 74:1

**November** [1] - 68:23

**NPRM** [2] - 115:24, 130:18

**number** [27] - 23:11, 23:12, 40:23, 53:7, 57:2, 58:5, 59:11, 72:17, 74:24, 76:2, 86:3, 86:24, 105:17, 107:16, 107:18, 107:20, 109:1, 110:4, 120:13, 120:17, 140:15, 145:9, 145:23, 154:25, 164:17, 165:19, 176:9

**Number** [1] - 127:2

**numbered** [2] - 148:16, 165:8

**numbers** [4] - 26:7, 26:10, 165:16, 168:3

**nurse** [1] - 65:6

**NW** [1] - 2:11

**oath** [2] - 3:14, 118:20

**object** [9] - 31:10, 80:15, 101:15, 154:24, 167:1, 168:14, 168:25, 170:10, 170:11

**objected** [5] - 107:4, 155:16, 155:24, 167:5

**objection** [33] - 3:9, 3:10, 26:13, 26:17, 36:19, 81:9, 102:8, 112:17, 112:24, 116:23, 116:24, 122:18, 126:15, 140:23, 144:4, 145:12, 145:14, 146:2, 145:6, 146:21, 149:22, 149:24, 156:8, 157:8, 157:9, 162:2, 162:3, 162:7, 163:19, 166:9, 168:18, 169:5, 170:11

**objections** [7] - 33:14, 164:14, 165:22, 166:24, 167:10, 168:7, 168:9

**objective** [6] - 11:16, 11:19, 11:21, 11:23, 60:22, 185:9

**obligated** [2] - 101:20,

188:11

**obligation** [1] - 188:13

**observation** [2] - 135:1, 135:4

**observations** [1] - 134:22

**observed** [1] - 179:17

**observing** [2] - 81:20, 174:24

**obtain** [5] - 4:8, 14:19, 14:24, 50:3, 96:20

**obtained** [4] - 16:17, 30:6, 32:6, 37:4

**obviously** [6] - 107:8, 117:1, 160:23, 166:22, 175:10, 191:18

**occasion** [1] - 42:5

**occasionally** [2] - 82:11, 147:16

**occur** [1] - 147:18

**occurred** [1] - 3:19

**October** [1] - 123:17

**offer** [10] - 3:8, 5:11, 160:4, 161:19, 161:25, 162:10, 163:1, 163:5, 163:12, 173:11

**offered** [3] - 161:20, 163:6, 183:18

**offering** [5] - 100:24, 103:1, 104:5, 166:2, 166:6

**offers** [1] - 173:11

**offhand** [2] - 89:24, 137:1

**Office** [1] - 116:11

**office** [1] - 31:25

**officer** [3] - 79:19, 105:7, 130:3

**officers** [1] - 39:25

**offices** [1] - 64:25

**official** [4] - 5:21, 78:4, 122:5, 137:14

**Official** [2] - 1:22, 197:18

**often** [6] - 14:22, 61:1, 185:24, 194:6, 194:23, 194:24

**oftentimes** [1] - 54:19

**Ohio** [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23

**old** [2] - 24:20, 124:3

**omit** [1] - 31:11

**once** [4] - 76:14, 96:7, 172:19, 189:3

**one** [96] - 3:3, 14:9, 15:7, 16:13, 17:2, 19:11, 19:25, 24:2, 25:8, 25:9, 25:12, 27:3, 27:13, 29:20, 30:3, 30:12, 31:11, 35:1, 35:4, 37:10, 38:15, 38:19, 39:5, 39:8, 42:4, 42:22, 46:1, 46:7, 46:8, 46:13, 47:11, 47:13, 49:6, 51:7, 55:20, 56:19, 58:5, 58:12, 61:7, 66:1, 69:14,

71:16, 75:24, 77:3, 77:23, 79:3, 83:9, 83:17, 83:19, 85:1, 89:25, 91:6, 93:11, 94:1, 94:2, 94:14, 99:15, 100:22, 109:10, 110:6, 114:22, 115:9, 121:5, 125:15, 133:7, 135:20, 136:12, 137:8, 139:14, 139:18, 146:11, 148:4, 152:9, 157:6, 158:9, 162:22, 165:7, 170:7, 170:8, 173:2, 174:10, 175:13, 176:1, 176:13, 177:4, 177:12, 182:18, 183:12, 183:21, 184:21, 185:18, 188:11, 193:4

**one's** [2] - 111:16, 192:4

**one-hour** [1] - 75:24

**ones** [9] - 16:1, 35:11, 59:22, 128:4, 139:18, 161:24, 165:8, 181:8, 196:15

**onset** [2] - 13:4, 13:9

**open** [4] - 19:25, 94:1, 147:12, 150:9

**operated** [2] - 78:8, 141:13

**operating** [1] - 3:21

**opinion** [5] - 24:6, 62:10, 62:13, 184:4, 190:19

**opportunities** [1] - 76:5

**opportunity** [15] - 14:24, 26:9, 26:12, 31:13, 76:15, 93:17, 112:20, 116:14, 117:7, 117:18, 146:4, 157:15, 165:21, 166:1, 181:19

**oppose** [1] - 106:12

**opposing** [1] - 126:1

**option** [2] - 146:13, 156:12

**options** [4] - 5:3, 86:3, 86:24, 87:5

**optometrist** [6] - 55:21, 56:2, 98:24, 99:2, 175:6, 175:7

**or..** [2] - 18:11, 160:8

**oral** [3] - 16:1, 43:2, 45:21

**Oral** [2] - 16:4, 16:7

**orally** [1] - 45:6

**order** [31] - 3:1, 14:19, 15:2, 15:21, 18:20, 31:25, 33:8, 43:17, 53:5, 65:20, 74:21, 75:8, 92:11, 93:16, 151:1, 152:3, 152:18, 153:3, 153:5, 156:4, 156:13, 157:24, 158:4, 161:14, 172:4, 176:3, 183:9, 186:18, 190:22, 191:22

**ordered** [1] - 81:1

**ordinarily** [3] - 71:9, 76:25, 81:24

**ordinary** [1] - 110:21

**organization** [1] - 189:18

**organizations** [6] - 110:4, 113:25, 127:12, 127:14, 127:20, 163:14

**original** [1] - 137:3

**originally** [2] - 59:15, 65:6

**originals** [1] - 155:4

**OSU** [1] - 172:25

**otherwise** [2] - 130:21, 184:13

**out-of-date** [1] - 24:8

**outcome** [10] - 15:25, 124:2, 140:7, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 168:16

**outcomes** [5] - 114:19, 124:18, 125:3, 125:9, 127:22

**outdated** [1] - 184:13

**Outside** [1] - 99:25

**outside** [7] - 91:7, 91:22, 100:12, 100:15, 119:12, 158:12, 159:5

**overall** [4] - 24:11, 27:15, 59:3, 150:8

**overcome** [1] - 193:22

**overlooked** [2] - 14:6, 18:11

**overrule** [1] - 126:15

**overruled** [8] - 36:25, 102:8, 122:18, 146:4, 146:22, 149:24, 168:19, 170:12

**oversee** [1] - 138:23

**overton** [1] - 135:20

**own** [7] - 74:14, 132:9, 171:16, 173:14, 175:10, 181:22, 193:14

**P-1** [1] - 161:23

**P-13** [1] - 162:15

**P-14** [1] - 162:17

**P-19** [1] - 162:19

**P-19A** [1] - 162:20

**P-20** [3] - 162:22, 162:25, 198:21

**P-21** [4] - 3:6, 3:12, 162:23, 198:16

**P-22** [3] - 163:1, 163:4, 198:22

**P-33** [3] - 163:6, 163:8, 198:23

**P-34** [1] - 163:9

**P-4** [1] - 161:23

**P-40** [3] - 163:12, 163:17, 198:24

**P-41** [3] - 163:12, 163:17, 198:25

**P-42** [3] - 163:13, 163:17, 199:1

**P-5** [4] - 161:25, 162:8, 162:12, 198:17

**P-6** [4] - 162:1, 162:8, 162:12, 198:18

**P-7** [3] - 162:9, 162:12,

198:19

**P-8** [3] - 162:10, 162:12, 198:20

**p.m** [5] - 118:16, 161:15, 197:8

**PA** [1] - 1:9

**pace** [1] - 74:14

**Pacific** [1] - 191:19

**PAGE** [1] - 198:15

**page** [105] - 4:20, 4:22, 4:24, 6:5, 7:23, 8:1, 17:24, 18:12, 19:3, 20:11, 22:18, 23:5, 23:7, 23:8, 23:10, 32:23, 33:1, 33:3, 35:20, 37:3, 39:6, 45:17, 45:18, 46:17, 46:21, 47:8, 47:13, 51:11, 52:16, 52:21, 54:9, 54:14, 55:1, 55:13, 57:2, 57:4, 62:16, 62:17, 62:22, 68:12, 72:17, 72:18, 75:16, 95:19, 96:6, 96:7, 100:20, 100:21, 102:23, 104:3, 104:11, 104:23, 109:19, 110:10, 110:14, 110:22, 110:23, 113:4, 114:2, 114:3, 114:4, 114:5, 115:11, 115:14, 116:19, 119:8, 119:9, 119:10, 119:21, 119:22, 120:8, 120:9, 121:14, 121:17, 123:5, 123:6, 123:7, 123:15, 127:7, 128:23, 131:21, 132:21, 133:7, 134:3, 134:7, 148:15, 148:16, 148:17, 152:24, 169:2, 182:20, 182:21, 197:4

**pages** [6] - 104:12, 119:22, 123:6, 124:22, 124:24, 179:18

**paid** [1] - 91:6

**pair** [1] - 151:12

**paired** [1] - 151:11

**paper** [3] - 21:16, 28:8, 180:19

**paper-based** [1] - 28:8

**paperwork** [2] - 90:20, 180:12

**paragraph** [18] - 7:7, 20:12, 110:15, 110:23, 113:4, 113:7, 114:8, 115:16, 115:23, 116:1, 116:2, 127:11, 148:14, 148:16, 148:19, 149:11, 149:14, 158:17

**paragraphs** [1] - 151:25

**parched** [1] - 112:15

**pardon** [2] - 101:24, 139:25

**parent** [2] - 7:12, 185:18

**parentheses** [1] - 120:15

**part** [27] - 5:13, 13:6, 17:22, 19:18, 29:15, 29:21, 31:11,

52:22, 56:6, 58:13, 58:14, 63:16, 90:2, 110:2, 120:15, 126:3, 126:19, 129:23, 132:21, 133:11, 141:9, 147:20, 170:3, 187:2, 187:22, 189:24
**part's** [1] - 133:9
**partial** [1] - 70:2
**partially** [1] - 27:17
**particular** [6] - 15:19, 28:19, 36:9, 75:11, 187:17, 191:18
**particularly** [7] - 44:10, 121:21, 122:12, 176:16, 180:5, 180:7, 193:20
**parties** [1] - 155:6
**parts** [4] - 133:3, 133:4, 176:5, 176:24
**pass** [3] - 172:17, 173:14, 192:24
**passage** [8] - 105:11, 105:20, 107:4, 108:19, 119:15, 120:2, 171:20, 171:21
**passages** [3] - 43:24, 45:18, 45:21
**passed** [3] - 108:2, 130:22, 170:24
**passing** [4] - 108:13, 171:1, 192:23, 195:5
**past** [7] - 22:22, 103:4, 134:14, 134:15, 172:24, 177:22, 192:15
**patient** [3] - 41:15, 50:1, 50:4
**patient's** [1] - 11:24
**patients** [1] - 65:12
**pattern** [1] - 27:15
**pause** [1] - 186:23
**pejorative** [1] - 22:2
**penalty** [2] - 146:16, 146:17
**pennant** [1] - 41:11
**Pennsylvania** [1] - 190:11
**PENNSYLVANIA** [1] - 1:1
**people** [34] - 20:17, 30:22, 30:25, 38:20, 54:19, 58:3, 58:4, 58:8, 60:21, 72:1, 74:22, 77:22, 93:25, 96:15, 105:14, 114:25, 128:21, 133:5, 133:15, 133:23, 146:11, 146:14, 147:1, 147:19, 153:15, 158:12, 159:16, 177:15, 181:22, 183:13, 183:17, 188:12, 189:5, 189:23
**per** [6] - 8:14, 8:21, 75:24, 76:2, 76:14, 145:3
**percent** [18] - 30:15, 30:18, 30:19, 30:22, 30:25, 39:10, 40:15, 40:19, 40:23, 43:5, 43:10, 66:3, 120:14, 148:21, 149:7, 149:18, 150:4, 158:20

**percentage** [1] - 67:17
**percentile** [11] - 30:9, 30:13, 30:21, 32:14, 43:3, 43:12, 43:14, 43:15, 46:14, 58:20, 63:13
**perfect** [2] - 42:9, 138:8, 193:21
**perform** [19] - 11:6, 14:9, 14:18, 27:18, 27:22, 30:2, 33:23, 33:25, 34:3, 49:5, 71:18, 82:22, 82:25, 87:20, 87:23, 95:3, 147:14, 179:23
**Performance** [2] - 48:14, 60:9
**performance** [36] - 10:8, 10:14, 11:11, 11:19, 11:21, 13:22, 14:4, 14:7, 14:9, 15:5, 25:16, 25:23, 32:7, 46:21, 49:2, 57:19, 63:11, 95:20, 125:3, 125:10, 141:11, 146:15, 150:20, 150:23, 154:2, 154:7, 185:9, 185:20, 185:21, 189:11, 189:24, 190:3, 190:4, 190:5, 190:11
**performances** [1] - 42:15
**performed** [12] - 11:9, 31:7, 49:6, 56:11, 63:13, 73:6, 133:17, 144:7, 144:20, 144:21, 174:22, 184:13
**performing** [2] - 34:2, 46:14
**performs** [1] - 133:16
**perhaps** [5] - 69:10, 103:17, 120:19, 153:12, 191:10
**period** [3] - 88:18, 88:20, 142:23
**periods** [1] - 187:7
**PERKINS** [1] - 2:9
**permission** [6] - 77:6, 77:15, 78:4, 81:16, 88:5, 137:14
**permit** [2] - 88:24, 88:25
**permitted** [2] - 111:19, 171:8
**persists** [1] - 58:4
**person** [27] - 15:2, 15:20, 22:11, 27:21, 32:14, 43:23, 54:21, 80:21, 93:9, 94:14, 97:20, 112:3, 113:17, 122:8, 128:20, 134:8, 174:6, 175:21, 177:5, 177:6, 177:9, 179:21, 180:10, 180:13, 189:2, 194:18, 195:11
**personal** [8] - 17:25, 18:5, 20:5, 69:4, 69:18, 69:21, 72:11, 77:18
**personally** [4] - 21:14, 190:15, 190:16, 190:18
**perspective** [1] - 160:23
**PhD** [1] - 138:18
**Philadelphia** [2] - 1:9, 64:25
**phone** [1] - 182:15
**phonological** [3] - 15:8,

15:10, 15:16
**physical** [7] - 52:9, 67:6, 67:12, 77:8, 77:16, 108:6, 164:25
**physician** [3] - 52:19, 60:5, 135:6
**physicians** [1] - 50:13
**pick** [3] - 61:6, 75:7, 94:4
**picture** [1] - 41:18
**pictures** [2] - 41:12, 63:9
**piece** [4] - 73:22, 74:5, 79:2, 80:10
**pieces** [1] - 55:20
**place** [5] - 26:12, 39:14, 49:22, 155:6, 183:8
**placed** [1] - 20:20
**Plaintiff** [3] - 1:3, 1:18, 2:7
**plaintiff** [8] - 64:1, 64:2, 139:11, 160:8, 170:20, 179:21, 186:22, 189:15
**plaintiff's** [5] - 99:7, 99:11, 119:7, 164:13, 196:7
**Plaintiff's** [1] - 175:4
**plaintiffs** [1] - 168:4
**plan** [2] - 103:8, 103:9
**play** [1] - 177:2
**played** [1] - 170:23
**pleasure** [1] - 160:17
**point** [28] - 5:7, 5:19, 5:20, 26:17, 31:14, 48:11, 58:13, 59:14, 68:1, 72:2, 76:14, 80:25, 83:12, 83:15, 101:19, 116:10, 121:3, 156:10, 158:23, 161:9, 162:3, 184:3, 185:12, 186:17, 187:21, 190:24, 192:24
**pointed** [2] - 59:3, 183:20
**police** [1] - 39:25
**policy** [1] - 162:16
**poor** [2] - 12:3, 21:23
**poorly** [1] - 15:7
**population** [9] - 105:14, 115:1, 133:15, 133:23, 177:16, 183:13, 183:17, 189:2, 189:5
**portal** [2] - 122:5, 123:1
**portion** [2] - 102:12, 111:14
**posed** [1] - 179:19
**posing** [1] - 38:11
**position** [12] - 65:2, 76:24, 93:23, 94:1, 108:13, 112:8, 112:22, 113:21, 179:13, 180:3, 194:14
**positions** [1] - 160:20
**possession** [1] - 150:23
**possibility** [2] - 15:7, 179:25
**possible** [12] - 8:6, 9:25, 20:9, 74:22, 86:15, 92:22, 93:3, 93:11, 123:19, 124:1, 147:16, 166:22

**possibly** [2] - 90:17, 91:20
**post** [1] - 66:7
**posted** [2] - 116:4, 130:20
**potential** [1] - 171:13
**potentially** [4] - 77:25, 89:10, 156:5, 167:22
**PowerPoint** [12] - 99:20, 99:24, 100:2, 100:4, 100:8, 100:11, 119:11, 119:13, 119:15, 123:5, 123:7, 163:10
**practical** [1] - 65:6
**practice** [3] - 65:11, 192:4, 195:9
**preceded** [1] - 53:1
**precedent** [1] - 183:3
**precise** [1] - 12:17
**precisely** [1] - 189:12
**preclude** [1] - 178:14
**predominantly** [1] - 51:14
**prefer** [2] - 164:18
**preference** [1] - 160:24
**preferred** [1] - 181:9
**prejudiced** [1] - 156:11
**preliminary** [6] - 81:1, 157:5, 182:7, 190:22, 191:9, 192:2
**PRELIMINARY** [1] - 1:5
**prepare** [7] - 38:20, 103:14, 104:13, 121:4, 133:1, 134:1, 144:13
**prepared** [9] - 1:24, 28:5, 35:16, 39:4, 73:19, 100:4, 121:6, 144:15, 158:7
**prerogative** [2] - 187:20, 188:6
**prescribe** [1] - 95:13
**presence** [3] - 10:21, 11:1, 13:17
**present** [6] - 7:3, 100:13, 150:22, 151:18, 156:16, 187:1
**Presentation** [1] - 153:2
**presentation** [9] - 99:20, 100:4, 100:9, 100:11, 104:12, 104:21, 121:5, 133:3, 196:1
**presented** [9] - 119:17, 151:6, 153:4, 153:25, 154:3, 154:21, 155:4, 157:22
**presenting** [1] - 12:2
**president** [1] - 138:12
**presumably** [2] - 149:5, 150:10
**presume** [1] - 52:4
**pretty** [1] - 180:22
**prevent** [2] - 170:24
**previous** [6] - 5:18, 10:2, 58:7, 105:16, 144:8, 178:13
**previously** [7] - 3:14, 20:7, 41:19, 52:9, 79:3, 112:19, 118:21

**primarily** [7] - 12:7, 12:9, 12:11, 13:11, 13:15, 13:18, 183:18
**primary** [5] - 19:7, 50:13, 52:19, 138:23, 158:10
**principal** [1] - 6:12
**principally** [1] - 6:12
**print** [1] - 127:19
**printout** [2] - 140:2, 150:21
**private** [4] - 18:19, 100:24, 103:1, 104:4
**problem** [11] - 54:15, 56:5, 57:18, 60:18, 60:22, 60:23, 61:1, 61:2, 61:4, 61:5, 61:6
**problematic** [1] - 112:8
**problems** [12] - 6:9, 6:21, 6:24, 8:9, 13:22, 14:7, 14:8, 14:13, 54:9, 54:12, 55:14, 185:18
**procedure** [1] - 61:8
**proceed** [12] - 3:18, 4:1, 26:16, 26:19, 31:15, 38:25, 54:5, 118:19, 118:21, 138:8, 142:8, 152:16
**proceeding** [3] - 156:10, 157:5, 157:8
**proceedings** [1] - 197:15
**Proceedings** [2] - 1:24, 197:8
**proceeds** [2] - 3:4, 186:25
**process** [16] - 15:16, 66:4, 66:7, 67:24, 74:13, 74:14, 74:17, 84:18, 94:14, 94:15, 101:16, 111:10, 126:12, 161:8, 173:6, 193:24
**processed** [1] - 172:6
**processes** [1] - 138:23
**processing** [4] - 15:8, 15:11, 92:10, 92:13
**proctors** [6] - 78:1, 78:5, 78:6, 78:10, 81:17, 81:20
**produce** [5] - 15:21, 43:18, 46:10, 126:11, 184:9
**produced** [10] - 37:7, 126:7, 126:13, 156:13, 157:16, 167:6, 167:25, 168:4, 168:23
**product** [5] - 36:20, 166:24, 167:5, 167:23, 169:1
**profession** [1] - 192:5
**professional** [9] - 9:15, 66:16, 78:22, 102:6, 136:5, 171:10, 178:22, 179:2, 192:13
**professionals** [4] - 128:11, 134:11, 183:20, 189:17
**Professor** [1] - 163:7
**professors** [1] - 195:2
**profound** [1] - 49:1
**program** [2] - 79:9, 103:8
**programs** [1] - 193:3

**progress** [3] - 164:22, 164:23, 164:24
**Prometric** [11] - 78:9, 78:11, 78:13, 88:25, 137:15, 141:5, 141:7, 141:9, 141:14, 141:17, 142:2
**promise** [2] - 74:20, 191:15
**promised** [1] - 63:20
**prompting** [1] - 120:13
**promptly** [1] - 161:5
**prongs** [1] - 114:17
**proof** [3] - 134:14, 134:15, 177:22
**proper** [1] - 22:6
**proponent** [1] - 155:4
**proposal** [1] - 127:24
**proposed** [5] - 109:23, 110:2, 111:3, 111:5, 179:14
**proposes** [1] - 115:24
**proprietary** [2] - 155:18, 158:13
**prospective** [1] - 39:25
**prove** [1] - 136:18
**proven** [1] - 62:24
**provide** [29] - 31:20, 36:14, 36:17, 60:14, 60:21, 75:2, 75:5, 79:1, 79:2, 89:11, 91:24, 94:10, 117:21, 117:22, 136:18, 136:22, 171:11, 172:4, 172:13, 179:5, 185:23, 186:4, 187:16, 188:14, 189:21, 192:21, 195:10, 196:25
**provided** [35] - 11:25, 19:16, 20:25, 39:25, 46:18, 50:20, 66:18, 70:24, 72:14, 80:9, 80:13, 84:15, 87:19, 98:5, 98:13, 98:16, 98:18, 98:21, 103:7, 103:9, 103:21, 103:22, 104:1, 111:10, 117:10, 136:21, 141:21, 149:13, 155:10, 155:12, 188:24, 191:1, 192:12, 192:15, 192:16
**provides** [2] - 51:12, 78:3
**providing** [3] - 4:13, 41:5, 115:15
**provoking** [1] - 111:20
**pseudo** [1] - 15:13
**psychoeducational** [8] - 62:21, 82:22, 82:25, 85:7, 87:21, 87:23, 95:3, 136:4
**psychological** [1] - 175:25
**psychologist** [2] - 56:3, 65:9
**psychologists** [1] - 66:17
**psychology** [3] - 65:8, 128:12, 138:19
**psychometricians** [1] - 158:9
**psychometrics** [3] - 138:12,

138:17, 138:20
**public** [1] - 182:9
**publications** [1] - 9:12
**published** [2] - 81:10, 81:11
**publishes** [1] - 85:18
**pull** [1] - 158:11
**pulled** [1] - 182:16
**purports** [4] - 101:5, 101:8, 173:23, 177:20
**purpose** [12] - 11:3, 56:15, 57:6, 57:14, 105:19, 105:21, 105:23, 106:2, 108:8, 113:19, 125:23
**purposefully** [1] - 188:10
**pursuant** [2] - 103:9, 107:10
**purview** [1] - 102:4
**push** [1] - 172:10
**put** [22] - 22:1, 35:2, 37:13, 37:15, 37:16, 57:16, 61:16, 62:7, 81:2, 103:13, 107:21, 109:1, 116:14, 121:4, 145:15, 156:17, 157:3, 180:10, 181:17, 182:3, 195:10, 195:12
**putting** [4] - 31:24, 32:5, 33:7, 195:8
**qualified** [9] - 78:22, 95:2, 134:11, 171:10, 178:22, 179:2, 179:7, 189:17, 192:12
**qualify** [5] - 5:23, 49:9, 92:25, 120:11, 120:24
**quarter** [1] - 160:15
**questioning** [3] - 54:8, 62:7, 169:19
**questionnaires** [2] - 12:10, 60:20
**questions** [101] - 25:13, 25:22, 26:25, 28:4, 29:23, 36:23, 38:11, 38:16, 38:25, 39:19, 39:22, 39:24, 40:3, 40:4, 40:14, 40:17, 40:20, 40:24, 44:6, 44:8, 45:6, 45:12, 45:24, 47:6, 48:7, 52:4, 53:20, 61:19, 63:9, 63:17, 75:24, 76:14, 79:12, 82:4, 82:7, 85:8, 102:2, 128:17, 137:4, 139:3, 139:5, 139:7, 143:16, 143:19, 143:23, 144:21, 144:23, 144:25, 145:3, 145:6, 145:10, 145:18, 146:18, 147:5, 147:11, 147:15, 147:21, 148:1, 148:2, 148:3, 148:4, 148:21, 148:22, 149:5, 149:8, 149:16, 149:18, 150:4, 150:7, 150:8, 150:12, 151:2, 151:10, 151:13, 151:16, 151:22, 152:3, 152:5, 152:8, 152:18, 152:20, 152:21, 153:6,

153:14, 153:17, 153:23, 155:17, 158:5, 158:20, 159:17, 159:20, 162:21, 162:23, 179:14, 179:19, 179:20
**queue** [1] - 74:23
**quick** [4] - 44:11, 61:22, 61:25, 113:11
**quicker** [1] - 161:8
**quickly** [9] - 45:2, 63:5, 68:3, 74:22, 88:16, 92:24, 93:12, 93:17, 146:12
**quite** [8] - 8:18, 40:6, 40:7, 40:23, 55:2, 163:22, 181:16
**quotation** [1] - 132:25
**quote** [13] - 62:20, 108:10, 112:7, 114:16, 115:5, 132:1, 132:3, 173:18, 177:18, 177:22, 178:13, 178:21
**quotes** [2] - 114:13, 133:2
**quoting** [2] - 171:3, 171:7
**raise** [2] - 25:22, 42:16
**raised** [2] - 27:4, 195:18
**RAMSAY** [2] - 1:3, 196:4
**Ramsay** [116] - 4:17, 5:15, 6:1, 7:21, 8:8, 9:15, 12:18, 13:8, 13:10, 13:11, 13:15, 13:18, 16:11, 17:5, 20:12, 21:14, 22:5, 27:25, 28:24, 32:2, 35:4, 36:4, 36:8, 36:12, 36:17, 42:1, 44:3, 44:23, 49:2, 50:16, 51:5, 52:18, 53:16, 56:14, 57:7, 58:12, 58:24, 59:15, 59:18, 59:21, 59:24, 60:1, 61:15, 65:17, 69:19, 69:25, 70:13, 74:9, 76:15, 78:14, 80:24, 81:15, 82:15, 83:9, 91:18, 92:3, 96:13, 97:3, 97:12, 97:18, 98:5, 98:11, 98:22, 102:15, 103:15, 107:6, 117:11, 134:12, 134:15, 135:21, 136:4, 139:11, 140:12, 143:10, 143:16, 148:12, 149:8, 149:13, 150:11, 151:2, 151:18, 152:18, 153:4, 153:5, 154:12, 157:5, 158:4, 158:14, 162:21, 164:3, 168:24, 170:22, 171:11, 171:16, 172:8, 172:17, 178:2, 178:6, 181:8, 181:14, 181:15, 183:15, 183:18, 184:14, 184:17, 184:25, 185:2, 185:4, 185:13, 188:7, 191:7, 192:21, 193:14, 194:1, 194:21, 195:14
**Ramsay's** [48] - 17:25, 18:13, 19:5, 20:5, 25:16, 32:7, 34:25, 41:2, 42:24, 46:2,

55:10, 55:17, 61:12, 68:21, 69:4, 71:19, 72:5, 72:22, 74:25, 84:11, 87:16, 88:4, 90:7, 92:14, 94:15, 95:22, 101:13, 104:8, 126:12, 128:4, 129:10, 132:14, 140:16, 147:5, 147:25, 149:19, 150:2, 150:20, 150:23, 153:19, 154:2, 155:13, 162:17, 166:23, 171:14, 175:10, 180:14, 184:19

**Ramsey** [2] - 4:7, 148:20

**random** [2] - 147:16, 159:2

**randomly** [6] - 145:9, 145:17, 145:24, 146:10, 146:12, 146:18

**range** [4] - 31:8, 32:13, 49:6, 63:16

**Range** [1] - 23:1

**rank** [1] - 43:3

**rapid** [2] - 147:1, 157:23

**rapidly** [1] - 147:21

**rarely** [1] - 194:7

**rate** [8] - 8:14, 39:6, 39:11, 43:10, 43:14, 43:18, 46:11, 62:20

**rather** [10] - 20:24, 101:6, 101:14, 102:19, 113:9, 160:24, 169:25, 171:11, 173:23, 177:20

**rating** [1] - 49:16

**ratings** [1] - 12:23

**rburgoyne@perkinscoie. com** [1] - 2:13

**RDR** [2] - 1:22, 197:18

**reaching** [1] - 97:21

**read** [74] - 5:19, 15:20, 16:3, 16:4, 31:21, 44:5, 44:6, 44:7, 44:8, 44:23, 45:2, 45:13, 45:24, 47:14, 62:6, 62:15, 69:14, 70:10, 77:6, 77:15, 77:23, 77:25, 81:5, 81:16, 81:18, 82:4, 87:2, 88:5, 88:13, 88:14, 96:14, 96:17, 96:23, 100:21, 102:11, 102:12, 102:24, 103:10, 110:14, 111:1, 112:19, 112:20, 113:11, 113:22, 114:10, 114:24, 115:2, 115:11, 115:12, 115:13, 120:6, 121:14, 125:24, 127:12, 128:2, 131:4, 131:25, 148:20, 149:5, 149:8, 149:16, 152:18, 153:6, 153:8, 174:6, 174:7, 177:15, 179:20, 182:18, 193:15, 193:16, 193:23

**readers** [1] - 27:17

**readily** [1] - 158:12

**reading** [86] - 6:15, 12:10, 15:25, 16:2, 18:21, 19:15, 20:14, 22:20, 24:15, 24:19, 24:20, 28:22, 30:13, 32:2, 32:8, 32:18, 33:10, 33:19, 33:21, 33:25, 34:3, 36:5, 39:6, 39:11, 39:17, 43:3, 43:10, 43:14, 43:18, 45:18, 45:22, 46:8, 46:11, 46:16, 46:23, 47:8, 56:4, 56:17, 57:17, 57:18, 59:12, 60:24, 62:4, 62:19, 63:5, 67:19, 77:19, 78:15, 80:2, 82:7, 86:23, 87:1, 96:9, 96:22, 99:3, 111:13, 111:16, 111:25, 113:12, 113:20, 114:23, 132:4, 137:10, 145:21, 148:22, 150:10, 173:6, 173:25, 174:3, 174:21, 174:24, 175:2, 175:9, 176:3, 176:16, 177:13, 178:4, 182:19, 184:20, 184:22, 184:23, 185:12, 193:23

**Reading** [1] - 16:25

**reads** [4] - 44:24, 44:25, 121:21, 148:19

**ready** [2] - 99:17, 161:16

**real** [9] - 61:21, 61:25, 113:11, 185:9, 186:8, 189:24, 190:3, 193:12, 193:13

**realize** [1] - 20:9

**really** [11] - 11:22, 27:5, 54:19, 55:7, 83:21, 121:2, 137:14, 154:17, 175:15, 178:20, 180:9

**reason** [10] - 26:6, 48:20, 63:22, 80:3, 89:19, 145:20, 159:24, 173:13, 176:7, 188:7

**reasonable** [4] - 111:8, 150:9, 155:6, 189:10

**reasonably** [1] - 185:19

**reasoning** [1] - 162:20

**reasons** [7] - 10:22, 55:7, 61:7, 81:2, 145:23, 145:25, 146:9

**rebuttal** [1] - 191:14

**receive** [10] - 21:3, 65:17, 65:20, 66:1, 82:21, 93:18, 104:2, 126:3, 136:1, 156:17

**received** [25] - 19:11, 20:21, 50:16, 68:2, 68:24, 68:25, 69:3, 69:5, 69:8, 69:11, 69:16, 70:7, 73:22, 73:24, 74:1, 74:2, 74:21, 82:17, 82:20, 83:10, 92:12, 103:5, 103:24, 157:6, 172:25

**receiving** [11] - 8:21, 35:25, 36:5, 72:24, 79:23, 91:22,

111:17, 111:18, 178:14, 185:17, 186:5

**recently** [2] - 62:18, 147:2

**recess** [5] - 54:1, 118:8, 118:15, 118:16, 161:12

**Recess** [2] - 54:3, 161:15

**recognized** [1] - 175:8

**recollection** [4] - 24:18, 69:10, 74:24, 75:9

**recommend** [3] - 79:4, 97:15, 135:16

**recommendations** [1] - 134:11

**recommended** [4] - 53:8, 74:7, 97:14, 179:5

**recommending** [1] - 73:24

**reconvene** [1] - 160:15

**record** [26] - 3:19, 20:24, 26:15, 58:13, 64:13, 70:12, 102:13, 114:17, 116:15, 138:3, 140:15, 156:18, 157:1, 161:3, 170:9, 197:15

**records** [11] - 12:8, 17:21, 17:22, 19:17, 23:10, 35:15, 55:17, 56:7, 184:16, 185:14, 186:8

**recross** [2] - 61:20, 137:18

**Recross** [1] - 198:4

**RECROSS** [1] - 61:23

**RECROSS-EXAMINATION** [1] - 61:23

**recruiting** [1] - 93:20

**redacted** [2] - 166:25, 167:1

**REDIRECT** [2] - 54:6, 137:6

**redirect** [5] - 31:14, 53:22, 137:5, 137:17, 159:21

**Redirect** [1] - 198:4

**reduce** [2] - 120:13, 196:20

**reduced** [1] - 19:15

**refer** [2] - 5:10, 98:7

**reference** [20] - 6:17, 17:24, 19:11, 19:14, 21:7, 23:3, 24:4, 43:2, 56:20, 76:18, 94:9, 96:16, 116:4, 130:20, 137:18, 157:19, 178:8, 186:20, 187:2, 187:4

**referenced** [9] - 25:16, 73:5, 77:12, 115:25, 151:25, 185:6, 186:10, 189:14, 192:4

**references** [1] - 166:23

**referencing** [5] - 78:6, 78:10, 98:22, 105:1, 176:23

**referred** [1] - 54:8

**referring** [6] - 16:8, 54:15, 55:2, 99:21, 152:21, 187:7

**refers** [1] - 120:19

**reflect** [9] - 15:22, 32:2, 32:8, 54:20, 101:4, 102:21, 145:20, 147:6, 173:21

**reflected** [9] - 24:15, 34:17,

40:19, 43:8, 45:22, 102:19, 147:11, 184:19, 186:5

**reflecting** [3] - 32:6, 101:6, 173:23

**reflects** [6] - 33:9, 41:7, 45:10, 72:14, 143:1, 177:19

**refresh** [2] - 69:10, 75:8

**regard** [4] - 11:22, 129:19, 146:5, 176:2

**regarding** [25] - 13:17, 17:25, 22:6, 23:2, 24:6, 25:3, 27:1, 31:21, 34:25, 35:1, 35:24, 40:10, 42:16, 48:13, 62:3, 63:9, 102:2, 106:23, 106:24, 132:1, 136:9, 141:23, 184:9, 184:24, 185:11

**regardless** [1] - 157:24

**Register** [5] - 117:8, 125:19, 126:2, 127:2, 163:16

**registered** [2] - 66:13, 88:19

**registering** [1] - 88:16

**registration** [1] - 89:2

**regulation** [14] - 101:16, 101:17, 101:18, 102:18, 102:25, 113:13, 114:5, 115:3, 129:6, 132:7, 132:17, 181:3, 186:14

**Regulations** [1] - 127:3

**regulations** [25] - 100:22, 101:10, 105:18, 115:25, 119:19, 119:24, 120:21, 121:3, 123:16, 123:21, 123:23, 124:3, 124:9, 124:11, 125:5, 127:4, 129:5, 129:13, 132:9, 171:6, 171:23, 173:18, 176:21, 183:3, 193:9

**regulatory** [2] - 127:15, 127:21

**REISMAN** [1] - 1:15

**reject** [1] - 126:18

**rejected** [9] - 108:13, 124:17, 125:4, 125:8, 125:14, 128:5, 171:21, 171:24, 172:16

**relate** [1] - 174:2

**related** [12] - 11:10, 11:12, 11:14, 32:19, 52:8, 59:11, 60:23, 65:19, 103:7, 127:16, 127:22, 151:21

**relates** [1] - 16:4

**relating** [8] - 8:6, 9:7, 13:22, 141:11, 150:20, 154:2, 156:18, 162:17

**relationship** [1] - 141:4

**relative** [3] - 25:23, 27:1, 35:22

**relatively** [3] - 54:24, 146:12, 161:5

**released** [2] - 88:25, 130:21

**relevance** [2] - 80:17, 115:4

**relevant** [4] - 31:20, 126:11, 127:23, 183:16
**reliability** [2] - 49:11, 49:16
**reliable** [6] - 12:14, 39:12, 49:8, 49:19, 96:12, 184:9
**reliance** [3] - 39:14, 49:22, 128:5
**relied** [4] - 18:23, 52:7, 77:9, 185:10
**relief** [2] - 191:11, 193:5
**rely** [7] - 10:1, 12:5, 80:8, 84:11, 176:15, 180:2, 186:8
**relying** [2] - 11:24, 187:22
**remained** [1] - 108:6
**remaining** [1] - 148:22
**remarkably** [1] - 176:10
**remediated** [1] - 27:17
**remember** [9] - 8:3, 10:24, 31:12, 41:18, 58:16, 58:18, 111:17, 136:25, 137:2
**remembered** [1] - 8:8
**remind** [3] - 3:14, 118:9, 118:20
**repeat** [5] - 14:1, 49:17, 49:20, 55:15, 154:5
**report** [73] - 10:5, 10:17, 11:22, 11:25, 13:8, 13:11, 13:13, 13:15, 13:18, 16:15, 16:16, 16:19, 17:5, 20:1, 21:7, 22:17, 22:18, 23:4, 23:8, 23:9, 23:19, 24:24, 25:16, 25:19, 28:5, 29:12, 31:25, 32:3, 34:9, 35:12, 35:16, 35:18, 35:20, 35:23, 36:11, 36:15, 36:18, 46:13, 51:8, 53:10, 55:13, 55:16, 56:20, 56:23, 56:25, 57:2, 58:23, 59:6, 59:14, 60:21, 70:5, 70:11, 71:6, 71:15, 91:23, 98:7, 98:9, 134:25, 135:2, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 165:4, 171:10, 181:24, 182:1, 182:4, 185:16, 186:3
**Report** [1] - 48:14
**reported** [4] - 35:4, 54:20, 135:25, 185:4
**REPORTER** [2] - 64:13, 138:3
**Reporter** [2] - 1:22, 197:18
**reporter** [2] - 12:4, 102:12
**reporting** [3] - 135:5, 138:24, 138:25
**reports** [13] - 4:14, 7:11, 7:12, 11:18, 16:17, 21:8, 24:3, 25:18, 29:9, 35:2, 178:25
**represent** [5] - 70:23, 71:14, 73:14, 153:2, 153:5

**representation** [5] - 27:14, 34:7, 94:11, 180:2, 195:5
**representative** [1] - 40:3
**represented** [12] - 83:23, 84:1, 84:2, 84:6, 84:7, 92:17, 93:1, 93:9, 113:25, 122:8, 147:19, 192:1
**representing** [2] - 127:14, 127:20
**Representing** [3] - 1:18, 2:7, 2:14
**represents** [2] - 143:9, 153:3
**reputation** [1] - 4:13
**request** [52] - 4:8, 5:13, 18:8, 19:5, 65:17, 66:2, 66:5, 66:9, 66:20, 66:23, 67:2, 67:5, 67:12, 67:21, 67:24, 67:25, 68:21, 69:11, 69:13, 69:14, 71:19, 71:23, 72:5, 72:12, 73:7, 73:9, 73:11, 83:18, 84:12, 84:14, 88:4, 90:7, 90:9, 90:18, 92:14, 92:15, 92:16, 97:18, 104:8, 124:17, 125:2, 125:8, 125:10, 126:10, 128:4, 131:15, 132:15, 155:8, 155:12, 155:15, 177:24, 191:23
**requested** [18] - 71:5, 75:4, 75:6, 80:4, 82:12, 82:17, 82:19, 91:18, 102:12, 123:22, 125:13, 128:21, 136:19, 172:2, 172:3, 178:24, 179:24, 191:21
**requesting** [1] - 124:8
**requests** [36] - 9:7, 65:14, 65:19, 65:21, 65:22, 66:4, 66:10, 67:11, 67:17, 74:11, 74:12, 74:18, 74:24, 78:18, 78:21, 92:10, 92:11, 92:23, 92:25, 93:1, 93:2, 93:5, 93:9, 94:13, 94:14, 100:17, 101:10, 103:2, 104:6, 104:17, 129:9, 129:17, 130:4, 131:14, 172:5
**require** [6] - 7:8, 75:7, 102:18, 106:10, 120:5, 192:9
**required** [8] - 18:17, 35:7, 55:4, 179:3, 182:7, 183:2, 185:1, 186:11
**requirement** [5] - 79:20, 110:20, 188:25, 190:22, 191:10
**requirements** [1] - 193:23
**requires** [9] - 13:2, 75:10, 102:3, 174:8, 175:16, 177:9, 183:6, 192:11, 194:16
**rescinded** [1] - 182:23
**research** [11] - 9:7, 9:9, 40:11, 49:24, 62:15, 63:2, 63:4, 84:13, 84:21, 96:25,

193:19
**reservation** [1] - 186:23
**residency** [3] - 192:24, 192:25, 193:3
**resources** [7] - 78:17, 93:16, 94:12, 94:18, 94:19, 94:24, 181:11
**respect** [2] - 90:7, 90:18
**respected** [1] - 181:21
**respective** [1] - 160:20
**respond** [8] - 71:23, 74:22, 84:7, 92:13, 104:8, 117:5, 126:10, 179:20
**responding** [1] - 174:25
**responds** [3] - 45:6, 104:4, 104:6
**response** [8] - 11:8, 46:2, 88:4, 103:7, 106:3, 140:13, 152:14, 158:20
**RESPONSE** [1] - 118:18
**Response** [1] - 140:11
**responses** [3] - 118:12, 146:13, 147:1
**responsibilities** [4] - 65:14, 138:21, 138:23, 183:2
**responsibility** [2] - 93:4, 158:10
**responsible** [2] - 80:23, 104:16
**rest** [2] - 132:4, 157:2
**restate** [2] - 32:4, 102:9
**Restoration** [1] - 106:25
**rests** [1] - 64:2
**result** [7] - 15:21, 41:22, 43:6, 48:23, 97:25, 123:21, 181:7
**resulted** [2] - 45:21, 184:5
**results** [25] - 10:4, 10:14, 12:19, 24:13, 24:15, 25:10, 26:3, 32:1, 32:5, 37:4, 37:7, 42:23, 43:9, 89:12, 101:3, 101:14, 102:19, 119:23, 136:4, 157:15, 173:21, 174:18, 176:15, 184:19, 184:20
**resume** [1] - 9:6
**retrieve** [1] - 28:3
**revenue** [2] - 94:4, 94:7
**reversals** [2] - 20:13, 20:16
**review** [31] - 7:8, 7:9, 7:11, 13:25, 21:16, 29:18, 38:3, 56:6, 59:10, 66:22, 66:24, 67:1, 67:11, 68:1, 71:18, 73:6, 83:18, 91:10, 92:23, 101:10, 122:2, 122:25, 123:1, 124:23, 128:12, 129:11, 165:21, 170:4, 170:5, 170:10
**reviewed** [16] - 13:21, 14:3, 17:2, 17:21, 17:22, 20:6,

24:1, 24:2, 25:17, 51:9, 80:9, 144:17, 148:24, 150:1, 183:19, 185:10
**Reviewers** [1] - 121:18
**reviewers** [3] - 71:16, 122:2, 122:13
**reviewing** [7] - 29:9, 65:14, 74:14, 166:21, 167:24, 168:17, 169:2
**reviews** [2] - 84:16, 100:17
**revise** [1] - 34:2
**revised** [1] - 120:12
**revisions** [1] - 124:11
**rid** [2] - 37:20, 188:25
**rigorous** [4] - 49:13, 79:10
**risk** [2] - 11:24, 12:2
**Ritalin** [1] - 14:21
**RMR** [2] - 1:22, 197:18
**Robert** [3] - 100:1, 109:21, 164:6
**ROBERT** [2] - 2:10, 198:5
**role** [1] - 105:6
**roles** [1] - 135:9
**rolling** [1] - 74:11
**roof** [2] - 44:17, 44:21
**room** [8] - 8:19, 76:19, 76:23, 77:2, 77:8, 77:21, 77:24
**rooms** [1] - 76:25
**Rose** [2] - 100:3, 109:16
**rough** [1] - 65:25
**roughly** [3] - 40:3, 40:6, 66:3
**routinely** [1] - 69:21
**Ruekberg** [6] - 24:22, 98:19, 167:25, 168:1, 168:23, 169:13
**Rule** [1] - 155:7
**rule** [4] - 110:16, 120:16, 127:4, 171:25
**ruled** [2] - 168:8, 169:3
**rulemaking** [9] - 104:20, 108:21, 108:24, 109:24, 110:2, 123:8, 123:9, 124:16, 129:24
**rules** [5] - 111:3, 111:5, 155:3, 177:2, 181:11
**Rules** [1] - 127:3
**ruling** [1] - 157:11
**run** [4] - 71:10, 147:20, 153:15, 153:16
**running** [3] - 92:5, 146:11, 146:19
**runs** [1] - 147:17
**safely** [1] - 195:9
**sample** [10] - 31:12, 38:16, 39:21, 45:12, 47:9, 58:15, 58:17, 63:12, 162:22, 162:23
**samples** [1] - 46:18
**SAT** [2] - 5:10, 10:15
**saw** [7] - 27:3, 50:16, 135:11, 135:17, 173:13, 179:18,

184:15
**scale** [1] - 195:13
**scales** [1] - 12:23
**schedule** [4] - 74:12, 89:1, 89:3, 195:17
**scheduling** [1] - 88:24
**schemes** [1] - 18:18
**School** [1] - 190:9
**school** [48] - 5:23, 8:3, 10:9, 14:25, 18:13, 18:16, 19:8, 19:10, 19:11, 19:17, 20:24, 25:18, 25:19, 40:12, 40:15, 66:11, 69:24, 82:18, 82:20, 95:23, 96:16, 97:5, 98:23, 99:2, 134:18, 135:2, 135:21, 135:24, 162:16, 171:17, 172:19, 172:21, 172:24, 175:2, 176:6, 178:7, 181:17, 184:18, 187:2, 187:21, 187:24, 188:7, 190:4, 191:21, 191:23, 193:3
**school's** [1] - 188:6
**schools** [3] - 195:5, 195:8
**Sciences** [1] - 191:20
**score** [34] - 25:18, 29:9, 30:8, 30:11, 30:13, 30:16, 30:18, 31:4, 34:6, 41:1, 41:2, 41:7, 42:13, 42:15, 43:18, 43:24, 45:22, 48:5, 48:20, 49:6, 49:17, 54:19, 54:24, 54:25, 55:6, 58:16, 58:18, 59:14, 63:15, 70:5, 73:3, 138:24, 138:25, 193:2
**scores** [31] - 25:22, 26:2, 26:3, 27:1, 27:9, 27:13, 27:16, 30:2, 30:5, 42:8, 42:9, 48:17, 48:22, 49:18, 49:19, 54:17, 59:3, 59:11, 84:11, 90:4, 90:6, 96:11, 96:19, 104:1, 127:23, 128:6, 171:14, 180:13
**scoring** [2] - 138:24, 138:25
**screen** [9] - 140:16, 140:19, 141:24, 142:14, 142:23, 143:2, 143:6, 147:7, 149:4
**screens** [1] - 176:6
**seated** [4] - 3:2, 54:4, 77:1, 138:2
**second** [26] - 5:20, 6:5, 18:1, 25:9, 43:11, 43:16, 45:17, 46:17, 48:23, 62:1, 72:5, 73:9, 75:12, 76:12, 77:9, 88:4, 90:18, 110:10, 127:11, 149:15, 151:11, 162:10, 164:24, 177:17, 184:2, 193:18
**Second** [1] - 188:10
**secondary** [1] - 19:8
**seconds** [17] - 45:8, 139:10, 140:16, 143:11, 143:15,

143:16, 143:25, 145:3, 145:7, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 149:6, 152:9
**Section** [6] - 103:9, 114:2, 114:3, 114:4, 114:14, 115:14
**section** [13] - 8:2, 19:7, 28:14, 57:4, 100:25, 102:24, 103:2, 104:5, 114:7, 114:10, 115:17, 124:16, 162:20
**sections** [1] - 46:7
**secure** [3] - 122:5, 122:6, 123:1
**security** [1] - 78:13
**see** [65] - 4:7, 4:24, 6:9, 7:19, 7:23, 10:5, 10:8, 10:14, 10:17, 10:20, 10:23, 11:2, 11:9, 11:15, 13:9, 13:13, 14:6, 18:2, 19:6, 19:21, 20:16, 24:4, 26:23, 27:7, 33:12, 33:14, 34:16, 36:1, 39:5, 54:12, 57:7, 63:22, 65:11, 66:24, 67:20, 69:13, 70:4, 70:22, 72:20, 75:17, 75:18, 80:17, 100:2, 103:10, 106:15, 110:10, 110:13, 110:23, 113:4, 114:2, 114:9, 118:3, 123:8, 123:9, 125:6, 145:10, 147:16, 148:19, 149:7, 169:22, 185:24, 188:8, 194:6, 194:23, 195:3
**seeing** [5] - 26:2, 26:3, 27:2, 53:17, 146:20
**seeking** [5] - 4:14, 5:12, 77:9, 191:9, 191:11
**seem** [1] - 50:11
**sees** [1] - 63:9
**select** [3] - 146:12, 149:17, 158:20
**selected** [5] - 100:25, 140:12, 150:3, 154:9, 158:18
**self** [8] - 11:25, 13:8, 13:13, 111:11, 111:16, 112:9, 176:19, 178:4
**self-mitigate** [1] - 178:4
**self-mitigating** [1] - 111:11
**self-mitigation** [2] - 112:9, 176:19
**self-report** [3] - 11:25, 13:8, 13:13
**Senators** [1] - 106:21
**send** [8] - 66:12, 66:21, 66:25, 121:12, 122:4, 141:17, 170:14
**sending** [2] - 66:23, 67:3
**sense** [12] - 84:24, 93:15, 95:20, 95:21, 97:2, 110:21, 115:22, 132:6, 132:16, 133:21, 151:11, 157:14
**sensitive** [2] - 61:5, 160:24

**sensory** [3] - 101:3, 101:7, 173:24
**sent** [4] - 73:6, 73:11, 90:10, 130:22
**sentence** [12] - 5:20, 7:2, 7:7, 20:22, 21:1, 46:8, 46:16, 62:15, 113:14, 115:2, 115:22, 148:19
**sentences** [3] - 44:23, 46:23, 127:13
**separate** [4] - 76:18, 77:2, 77:7, 77:24
**September** [2] - 91:1, 92:8
**Sequence** [1] - 153:2
**series** [4] - 24:2, 33:14, 41:12, 116:21
**serious** [1] - 6:20
**services** [7] - 5:23, 64:20, 64:21, 103:5, 103:7, 103:9, 195:4
**set** [3] - 36:14, 38:21, 164:14
**sets** [1] - 25:2
**setting** [2] - 111:20, 176:16
**settings** [5] - 13:4, 13:14, 135:11, 177:23, 184:25
**seven** [2] - 75:24, 139:6, 147:25
**several** [1] - 8:4
**severe** [2] - 185:4, 185:18
**severity** [1] - 50:17
**shall** [2] - 26:23, 171:7
**share** [1] - 93:4
**sheet** [5] - 41:1, 41:2, 41:7, 45:22, 73:3
**shelf** [4] - 103:16, 103:24, 134:16, 171:16
**short** [2] - 137:8, 138:21
**shorter** [1] - 76:1
**shortly** [1] - 195:25
**shoulder** [1] - 165:14
**show** [15] - 21:22, 41:13, 95:19, 96:1, 117:15, 174:17, 175:14, 176:12, 176:17, 181:19, 183:14, 185:19, 188:12, 192:16, 193:24
**showed** [6] - 58:11, 101:14, 106:14, 176:13, 176:16, 186:7
**showing** [6] - 36:10, 40:11, 109:2, 126:22, 168:4, 195:12
**shown** [7] - 26:15, 100:11, 107:13, 185:14, 190:24, 191:7, 195:15
**shows** [3] - 153:23, 171:12, 193:19
**shy** [1] - 94:8
**side** [3] - 36:1, 77:22, 185:7
**signatory** [1] - 110:11
**signature** [2] - 68:11, 72:8
**signed** [4] - 43:25, 66:15,

68:23, 109:20
**significance** [1] - 132:2
**significant** [2] - 16:19, 78:17
**significantly** [1] - 59:12
**silently** [1] - 88:14
**similar** [11] - 20:13, 32:21, 47:17, 49:2, 52:14, 103:5, 103:11, 103:16, 176:15, 177:23, 189:15
**similar-appearing** [1] - 20:13
**simple** [1] - 193:17
**simply** [4] - 75:1, 78:20, 172:18, 185:25
**sincerity** [1] - 180:17
**single** [1] - 136:12
**sit** [2] - 44:16, 77:3
**sits** [1] - 44:21
**sitting** [3] - 77:22, 156:9, 160:11
**situation** [2] - 11:7, 103:16
**situations** [3] - 5:10, 103:6, 103:11
**six** [2] - 88:24, 89:14
**sixth** [1] - 58:24
**skew** [1] - 155:22
**skill** [1] - 177:20
**Skills** [1] - 10:12
**skills** [12] - 12:10, 33:19, 33:21, 33:25, 34:3, 101:3, 101:7, 173:24, 184:22, 184:23, 186:13
**skip** [2] - 153:8, 176:3
**skipping** [1] - 101:16
**slide** [2] - 100:3, 133:1
**slides** [2] - 103:14, 104:13
**slow** [3] - 15:24, 99:3, 175:3
**slowly** [1] - 15:20
**small** [3] - 46:23, 76:23, 127:19
**smart** [1] - 181:18
**Smith** [30] - 3:4, 4:5, 32:23, 47:20, 54:8, 61:25, 63:20, 95:2, 95:15, 97:21, 164:6, 169:19, 174:4, 174:15, 174:18, 175:13, 175:24, 176:9, 179:8, 179:9, 179:10, 183:19, 184:7, 184:15, 185:5, 185:24, 187:13, 189:3, 190:14, 194:4
**SMITH** [1] - 198:6
**Smith's** [5] - 98:2, 162:24, 175:11, 183:19, 184:4
**Smith-33** [1] - 8:1
**Smiy** [7] - 50:20, 51:5, 60:3, 60:5, 70:11, 98:16, 185:6
**Smiy's** [2] - 70:12, 184:5
**so-called** [2] - 6:17, 43:21
**software** [4] - 141:12, 141:13, 141:15
**solely** [1] - 87:14

someone [26] - 4:24, 9:25, 12:5, 34:21, 38:19, 41:21, 42:13, 42:17, 54:24, 56:5, 66:4, 71:4, 114:20, 144:15, 145:9, 146:9, 146:18, 147:17, 158:19, 177:10, 185:17, 186:15, 186:16, 188:25, 191:11

sometimes [10] - 12:13, 14:18, 15:13, 44:12, 50:9, 50:10, 60:21, 75:7, 123:3, 146:14

somewhere [3] - 37:15, 89:14, 185:20

soon [2] - 88:23, 154:19

sooner [1] - 69:11

sophomore [1] - 187:10

sorry [37] - 6:4, 9:4, 12:16, 14:1, 17:16, 21:1, 23:13, 23:16, 29:12, 37:14, 50:25, 52:1, 62:12, 85:1, 93:22, 96:16, 98:8, 99:10, 102:9, 105:2, 105:8, 114:6, 118:4, 120:9, 121:16, 127:17, 127:19, 128:24, 128:25, 129:20, 130:16, 142:19, 145:5, 151:15, 152:1, 166:6, 167:20

sort [4] - 74:23, 170:1, 175:20, 193:21

sound [2] - 30:17, 190:19

sounds [1] - 73:16

source [1] - 135:7

space [3] - 18:19, 19:15, 109:10

speaking [7] - 101:3, 101:7, 111:25, 114:23, 168:23, 173:24, 177:13

speaks [1] - 115:9

special [1] - 186:7

specialists [1] - 97:12

specialize [2] - 5:2, 5:5

specialized [1] - 36:5

specific [5] - 15:3, 35:23, 62:19, 75:5, 168:7

specifically [7] - 80:7, 128:5, 155:14, 170:7, 171:2, 186:3, 192:18

Specter [1] - 106:21

speculative [1] - 145:12

speed [3] - 18:22, 38:8, 41:21

spelling [1] - 22:20

spend [3] - 114:24, 148:2, 177:14

spent [5] - 143:24, 144:23, 145:1, 147:6, 159:1

spinning [1] - 41:9

spoken [1] - 192:14

spread [1] - 76:3

spreadsheet [3] - 150:18, 150:21, 159:7

staff [8] - 3:23, 66:14, 66:16, 93:3, 93:6, 93:19, 93:20, 158:9

stages [1] - 74:13

stakes [3] - 5:9, 9:8, 177:25

stamp [3] - 69:4, 69:5, 69:12

stamped [1] - 70:9

stand [6] - 3:13, 76:22, 76:24, 77:3, 137:24, 156:5

standard [12] - 28:19, 75:22, 75:23, 76:4, 77:21, 102:22, 106:11, 108:11, 110:17, 120:5, 189:7, 190:23

standardized [36] - 4:15, 5:6, 9:8, 10:8, 10:15, 11:4, 11:11, 11:19, 11:21, 14:25, 25:4, 25:8, 27:18, 28:19, 29:5, 31:22, 32:7, 32:12, 58:11, 78:23, 123:20, 124:19, 125:3, 125:9, 128:6, 171:14, 177:25, 184:16, 184:19, 185:8, 185:21, 188:9, 188:10, 189:12, 190:5, 190:12

standards [1] - 182:6

standing [1] - 76:25

stapled [1] - 37:3

start [5] - 34:10, 35:21, 37:9, 53:22, 153:10

started [1] - 118:7

starting [4] - 45:17, 102:24, 140:6, 160:8

starts [2] - 37:9, 114:8

state [5] - 5:11, 64:13, 64:19, 138:3, 138:11

State [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23

statement [18] - 7:5, 7:14, 10:22, 17:25, 18:5, 18:15, 20:5, 56:18, 69:5, 69:18, 69:22, 72:11, 101:9, 136:9, 148:25, 149:14, 149:20, 153:13

statements [2] - 77:19, 111:4

States [2] - 89:23, 156:23

states [5] - 5:7, 6:12, 110:16, 116:7, 182:21

STATES [1] - 1:1

stating [1] - 84:25

Statistical [2] - 5:21, 53:1

statistics [1] - 49:15

statute [4] - 132:6, 132:9, 132:16, 188:24

statutes [1] - 183:3

stay [1] - 6:4

STEIN [2] - 2:2, 2:3

stenographically [1] - 1:24

step [8] - 63:18, 63:19, 64:9, 101:16, 130:13, 137:21, 159:23

Step [42] - 4:9, 5:16, 12:20, 12:25, 28:4, 28:16, 65:15, 75:23, 76:10, 85:16, 85:19, 85:24, 86:4, 87:6, 88:16, 88:17, 89:3, 139:3, 139:12, 140:6, 140:7, 145:10, 146:16, 147:5, 150:23, 151:8, 151:10, 151:13, 151:17, 151:19, 151:22, 158:11, 159:18, 162:22, 172:17, 183:16, 183:24, 185:22

steps [1] - 27:3

STEVEN [1] - 2:3

Stevens [1] - 106:21

sticker [2] - 107:21, 182:1

stickers [1] - 185:16

still [9] - 3:14, 32:17, 105:8, 105:12, 112:1, 117:12, 118:20, 177:6, 189:1

stop [4] - 48:10, 78:16, 112:4, 153:9

stops [1] - 74:17

stored [1] - 154:8

stories [3] - 43:21, 43:23

story [3] - 44:3, 44:14, 181:14

strategies [7] - 27:22, 27:24, 27:25, 28:1, 29:2, 111:7, 111:16

strategy [1] - 28:25

streamline [2] - 25:1, 25:3

Street [4] - 1:9, 1:16, 2:4, 2:11

strength [1] - 187:12

stressful [2] - 111:20, 188:20

stretch [1] - 76:24

strict [1] - 53:7

strictly [1] - 143:1

strikingly [1] - 176:15

strongly [2] - 135:25, 166:5

structured [2] - 42:6, 52:11

struggle [1] - 10:22

struggles [1] - 18:16

struggling [3] - 34:22, 35:5, 135:17

student [18] - 5:18, 35:24, 52:12, 52:17, 82:6, 88:19, 89:3, 89:13, 111:23, 124:7, 129:17, 135:8, 153:6, 162:16, 186:1, 186:5, 191:20, 195:8

student's [3] - 115:7, 125:10, 171:12

students [25] - 4:14, 14:22, 40:19, 62:18, 66:8, 74:20, 75:1, 81:24, 82:3, 82:12,

88:17, 89:12, 89:22, 90:1, 93:12, 93:16, 93:18, 96:17, 111:12, 111:15, 123:19, 123:22, 180:7, 193:20, 194:24

studied [1] - 63:3

studies [1] - 9:9

study [2] - 22:20, 111:15

studying [1] - 179:21

stuff [1] - 71:4

subject [8] - 9:13, 26:9, 66:22, 106:23, 109:22, 126:9, 168:7, 169:5

subjects [4] - 116:4, 116:6, 130:20, 130:23

submission [7] - 66:14, 66:23, 67:1, 70:8, 71:12, 72:22, 73:3

submissions [1] - 74:15

submit [19] - 69:21, 108:23, 122:2, 122:25, 134:8, 134:12, 134:15, 134:23, 135:1, 135:22, 136:4, 136:7, 136:9, 136:15, 160:20, 178:25, 179:3, 182:8, 194:3

submitted [19] - 18:9, 51:5, 68:14, 69:19, 69:25, 70:3, 71:11, 71:14, 72:11, 90:13, 90:19, 91:3, 91:6, 97:18, 108:1, 134:25, 135:23, 136:12, 160:22

submitting [3] - 74:12, 89:2, 123:22

Subsection [1] - 114:14

subsequent [2] - 72:21, 189:9

subsequently [3] - 142:6, 144:17, 144:20

substantial [13] - 28:21, 66:25, 80:6, 105:13, 110:21, 111:23, 112:2, 113:9, 120:3, 128:13, 189:1, 189:22, 190:13

substantially [13] - 32:13, 108:7, 110:16, 110:20, 114:18, 114:21, 128:19, 133:13, 136:23, 177:12, 183:12, 183:15, 189:4

substitute [1] - 193:2

subtest [4] - 16:2, 24:14, 24:20

subtests [1] - 42:3

subvocalize [1] - 77:23

succeed [2] - 181:17, 188:8

succeeding [1] - 191:8

success [6] - 114:21, 115:5, 115:7, 177:6, 177:8, 177:11

sudden [1] - 131:17

sufficient [6] - 79:5, 142:9, 177:23, 184:9, 187:14, 191:4

**suggested** [1] - 111:3
**suggestion** [1] - 190:14
**suggests** [3] - 61:9, 69:2, 110:19
**Suite** [2] - 2:4, 2:11
**summaries** [6] - 117:22, 169:20, 169:21, 170:2, 170:12, 196:12
**summary** [11] - 26:14, 34:8, 39:3, 57:4, 65:4, 138:13, 138:21, 155:1, 155:2, 155:3, 171:25
**supersede** [1] - 129:5
**supervise** [1] - 144:15
**supplement** [4] - 60:19, 70:24, 73:4, 157:1
**supplemental** [6] - 16:3, 71:1, 71:5, 72:24, 115:24, 130:18
**supplied** [1] - 80:11
**support** [16] - 4:8, 35:24, 36:5, 60:22, 66:10, 72:12, 96:25, 97:18, 135:3, 157:19, 177:24, 180:3, 187:14, 187:19, 193:10, 194:21
**supported** [4] - 78:21, 128:18, 128:22, 135:25
**supporting** [3] - 73:23, 79:1, 160:20
**supportive** [1] - 172:7
**supports** [3] - 112:1, 178:24, 188:2
**suppose** [4] - 158:21, 158:22
**supposed** [5] - 133:4, 175:19, 176:20, 177:2, 181:23
**Supreme** [2] - 106:3, 180:25
**surprise** [8] - 86:9, 86:12, 89:16, 89:25, 90:1, 94:7, 135:24, 136:3
**surprised** [1] - 107:3
**surprising** [1] - 183:4
**surreptitiously** [1] - 81:22
**suspicious** [3] - 78:3, 81:17, 81:19
**sustain** [2] - 145:14, 166:24
**sworn** [4] - 3:15, 64:11, 118:21, 137:25
**symptom** [3] - 49:22, 50:15, 60:20
**symptoms** [16] - 7:3, 13:4, 13:9, 13:18, 14:13, 14:17, 15:5, 16:16, 16:19, 50:17, 52:22, 53:4, 53:10, 184:25, 185:4, 185:5
**system** [4] - 36:14, 122:5, 122:7, 122:11
**systems** [1] - 158:13
**Tab** [21] - 17:7, 17:15, 17:17, 19:1, 20:1, 20:3, 22:14,

23:13, 23:17, 23:19, 23:22, 23:24, 56:23, 56:24, 56:25, 68:19, 69:2, 69:4, 69:18, 69:24, 70:2
**tab** [3] - 39:21, 70:5, 72:17
**table** [2] - 144:18, 176:5
**tall** [1] - 44:19
**Tanguay** [6] - 55:21, 55:23, 56:2, 98:21, 99:1, 175:4
**target** [1] - 68:7
**tasks** [1] - 11:10
**teach** [1] - 120:23
**teacher** [2] - 7:12, 10:6, 11:2, 11:18, 19:16, 20:24, 34:9, 36:6, 50:9, 182:2, 186:6
**teachers** [7] - 34:21, 34:25, 35:8, 185:18, 185:23, 185:25, 186:4
**teaching** [2] - 111:15, 135:8
**technical** [38] - 40:18, 115:15, 115:19, 116:1, 116:3, 116:12, 129:2, 129:4, 129:6, 129:8, 129:16, 130:12, 130:14, 130:19, 131:1, 131:7, 131:10, 131:13, 132:1, 132:3, 132:13, 133:18, 172:3, 172:12, 176:21, 176:23, 177:4, 180:5, 180:20, 180:23, 180:24, 181:2, 182:14, 182:19, 183:5, 193:7, 193:10, 197:1
**Technical** [1] - 133:8
**teens** [1] - 5:8
**telephone** [1] - 123:3
**temporary** [1] - 112:1
**tempting** [1] - 193:14
**ten** [3] - 160:13, 160:14, 161:12
**tend** [1] - 67:11
**tends** [1] - 49:19
**term** [2] - 14:14, 34:2
**terms** [16] - 16:17, 17:19, 26:2, 28:1, 40:4, 57:11, 105:10, 120:20, 124:10, 183:2, 191:10
**test** [75] - 10:4, 14:9, 14:25, 15:18, 27:24, 28:7, 28:8, 28:9, 28:17, 28:19, 28:24, 29:23, 31:1, 31:17, 31:22, 38:18, 39:11, 39:15, 39:18, 41:4, 42:6, 42:11, 44:5, 46:21, 49:2, 56:15, 57:14, 58:23, 59:6, 60:13, 75:24, 76:6, 76:8, 77:3, 77:4, 78:1, 79:20, 82:7, 88:25, 89:4, 89:12, 93:13, 93:17, 95:10, 95:15, 101:13, 102:19, 125:9, 127:23, 128:6, 141:7,

141:9, 141:10, 141:13, 157:20, 171:11, 171:12, 171:14, 174:21, 174:22, 174:23, 176:5, 176:13, 176:14, 177:23, 179:22, 180:11, 183:16, 184:13, 184:19, 192:9, 194:9
**Test** [7] - 23:1, 42:19, 56:12, 60:9, 78:9, 141:14, 142:2
**test-taking** [2] - 27:24, 28:24
**tested** [6] - 61:15, 98:5, 127:16, 176:11, 176:12, 181:24
**testified** [56] - 3:5, 4:17, 5:24, 12:12, 13:2, 14:2, 22:4, 27:25, 30:1, 34:15, 37:4, 39:10, 40:10, 43:6, 47:11, 48:13, 48:16, 49:21, 64:12, 79:18, 80:25, 81:15, 83:14, 84:23, 85:7, 86:2, 86:9, 86:10, 88:1, 91:21, 92:16, 95:9, 95:18, 96:10, 106:2, 112:18, 119:11, 120:1, 122:7, 122:23, 129:22, 132:15, 138:1, 149:3, 150:18, 151:18, 151:21, 152:23, 159:6, 162:21, 173:14, 189:5, 189:17, 193:8, 193:10, 194:21
**testify** [7] - 79:23, 79:25, 80:22, 101:25, 179:17, 189:3, 194:23
**testifying** [7] - 9:5, 83:22, 95:14, 123:2, 125:20, 144:2, 179:15
**testimony** [23] - 3:7, 32:16, 58:7, 61:16, 64:5, 85:15, 95:25, 96:11, 118:11, 118:12, 153:12, 156:18, 157:3, 157:19, 163:6, 171:1, 174:9, 175:10, 183:19, 184:4, 190:16, 192:15, 192:19
**testing** [106] - 5:9, 6:10, 6:25, 7:24, 11:5, 12:19, 18:19, 21:2, 22:1, 25:9, 31:25, 32:1, 33:9, 49:18, 49:19, 54:16, 59:16, 59:17, 73:24, 74:7, 75:12, 75:20, 76:18, 76:20, 76:25, 77:2, 77:21, 77:22, 78:7, 79:6, 90:21, 91:18, 92:3, 96:21, 97:9, 99:2, 103:5, 103:11, 103:16, 110:4, 110:24, 111:2, 115:18, 115:19, 115:23, 116:2, 116:5, 116:12, 124:8, 127:14, 127:20, 127:22, 129:3, 129:9, 129:17, 130:2, 130:12, 130:14, 130:17, 130:22, 131:1, 131:7, 132:1,

132:13, 133:19, 134:14, 134:15, 136:10, 142:15, 172:4, 175:14, 175:25, 177:5, 177:7, 177:9, 177:17, 177:18, 177:22, 177:24, 178:8, 178:13, 178:14, 178:16, 178:17, 178:21, 178:24, 179:3, 179:4, 179:5, 183:6, 184:16, 185:8, 186:11, 188:9, 188:20, 189:6, 189:18, 190:25, 194:6, 194:8, 194:9, 194:11, 194:19, 195:4
**testing-related** [1] - 127:22
**tests** [64] - 4:15, 5:6, 7:11, 9:8, 10:9, 10:11, 10:15, 11:11, 11:19, 11:21, 15:7, 15:10, 15:13, 15:15, 15:19, 15:24, 18:18, 25:4, 27:18, 27:23, 29:5, 31:18, 32:12, 59:20, 59:21, 59:24, 60:1, 60:3, 60:6, 60:14, 60:17, 60:18, 60:25, 61:9, 87:8, 87:14, 95:6, 95:13, 111:18, 123:20, 124:18, 124:19, 125:3, 171:15, 174:16, 174:19, 175:23, 176:4, 176:9, 176:10, 176:18, 177:25, 178:4, 178:10, 178:11, 179:11, 179:23, 179:25, 185:21, 189:12, 190:5, 190:12, 190:25
**Tests** [3] - 10:11, 29:21, 30:6
**Texas** [2] - 39:24, 165:4
**text** [3] - 43:22, 112:19, 155:17
**texts** [1] - 111:16
**Thanksgiving** [1] - 157:7
**The court** [198] - 3:2, 3:9, 3:11, 3:13, 3:18, 3:20, 3:23, 23:11, 23:14, 25:6, 26:11, 26:23, 31:13, 36:25, 37:6, 37:13, 37:16, 37:18, 38:3, 38:6, 38:10, 38:14, 38:25, 53:21, 54:1, 54:4, 61:20, 63:18, 63:22, 63:25, 64:3, 64:8, 75:21, 79:13, 80:19, 80:25, 81:6, 81:9, 81:11, 81:13, 85:2, 86:18, 96:3, 99:9, 99:11, 99:13, 99:15, 101:23, 101:25, 102:5, 102:8, 102:12, 107:10, 107:16, 107:19, 107:21, 107:24, 108:15, 109:1, 109:5, 109:7, 112:13, 112:16, 112:21, 113:2, 116:7, 116:9, 116:14, 116:23, 117:3, 117:6, 117:12, 117:15, 117:18, 117:23, 117:25, 118:3,

118:6, 118:15, 118:17, 118:19, 122:16, 122:18, 125:18, 125:22, 125:25, 126:15, 137:5, 137:17, 137:20, 138:2, 138:6, 138:8, 139:16, 140:24, 141:2, 142:9, 142:12, 142:18, 142:20, 144:8, 144:10, 145:14, 146:3, 146:22, 146:24, 149:24, 152:12, 152:16, 155:8, 155:19, 155:22, 155:25, 156:2, 156:6, 156:7, 156:9, 156:16, 156:22, 156:25, 157:12, 157:18, 158:1, 159:21, 159:23, 160:1, 160:5, 160:7, 160:10, 160:15, 160:19, 161:1, 161:7, 161:16, 162:2, 162:6, 163:18, 163:20, 165:7, 165:11, 165:16, 165:19, 165:21, 166:1, 167:3, 167:7, 167:10, 168:10, 168:15, 168:18, 169:4, 169:6, 169:10, 169:14, 169:20, 169:24, 170:11, 170:17, 170:20, 172:13, 173:1, 173:5, 173:9, 173:25, 174:2, 174:9, 174:14, 174:19, 175:6, 176:25, 178:7, 178:11, 179:7, 179:9, 179:11, 180:21, 182:8, 182:11, 182:17, 186:20, 190:2, 190:7, 190:11, 191:13, 191:16, 191:18, 193:5, 194:3, 195:22, 195:24, 196:6, 196:12, 196:16, 196:20, 196:24, 197:2, 197:6
**The witness** [40] - 3:17, 3:22, 23:12, 23:16, 33:1, 38:11, 38:18, 63:24, 64:10, 64:14, 99:10, 99:12, 99:14, 101:25, 102:9, 102:14, 108:16, 109:2, 112:15, 116:8, 118:4, 118:14, 118:22, 134:5, 138:5, 138:7, 139:19, 142:19, 145:6, 146:23, 146:25, 152:12, 152:15, 156:4, 156:15, 156:21, 156:24, 157:17, 157:21, 168:17
**theme** [1] - 193:12
**thereto** [2] - 118:13, 156:19
**they've** [5] - 41:19, 43:24, 75:4, 81:4, 188:6
**thinking** [2] - 8:2, 29:12
**third** [9] - 21:1, 25:12, 35:5, 35:12, 45:17, 75:16, 140:6, 148:19, 165:2
**thorough** [1] - 184:5

**three** [16] - 42:1, 42:3, 42:5, 42:6, 45:18, 61:21, 89:16, 90:5, 91:22, 158:22, 159:2, 170:22, 172:22, 177:22, 186:2, 195:17
**thrombosis** [1] - 77:11
**Thursday** [1] - 127:3
**time-out** [1] - 20:21
**timed** [4] - 16:5, 48:10, 176:16, 176:18
**timely** [2] - 104:6, 104:8
**title** [4] - 15:14, 64:19, 99:24, 138:11
**today** [4] - 7:14, 21:5, 195:21, 196:9
**together** [1] - 56:18
**TOMM** [11] - 41:1, 41:7, 41:16, 41:21, 42:1, 56:11, 56:14, 57:7, 57:11, 57:19, 63:5
**took** [17] - 28:12, 29:7, 31:1, 31:24, 45:10, 71:22, 83:15, 90:2, 90:19, 139:12, 140:7, 154:12, 154:16, 156:4, 167:14, 176:1, 187:3
**top** [15] - 5:2, 8:2, 19:6, 23:10, 30:15, 30:18, 30:20, 39:23, 43:22, 47:23, 57:3, 72:17, 100:2, 106:14
**topics** [1] - 115:25
**total** [3] - 28:13, 152:9, 170:3
**totality** [2] - 169:25, 197:7
**tough** [1] - 45:13
**towards** [4] - 147:21, 149:15, 153:16
**traditional** [1] - 153:16
**traditionally** [1] - 147:1
**train** [5] - 117:10, 119:12, 121:12, 125:1, 128:3
**trained** [3] - 133:5, 180:15, 181:8
**trainers** [2] - 133:22, 133:25
**training** [12] - 119:15, 119:23, 120:20, 123:7, 123:9, 128:10, 132:15, 134:20, 159:10, 159:13, 159:16, 194:16
**trait** [1] - 20:18
**transcript** [5] - 25:18, 25:19, 70:2, 135:2, 197:14
**transcription** [1] - 1:25
**transferred** [4] - 83:12, 83:24, 84:5, 122:9
**transmission** [1] - 154:23
**transpired** [1] - 172:22
**travel** [1] - 8:15
**treated** [1] - 4:11
**treating** [2] - 52:17, 135:7
**treatment** [1] - 5:3
**tree** [1] - 44:19

**trial** [1] - 188:4
**tricks** [1] - 176:3
**tried** [3] - 25:2, 72:3, 172:9
**triple** [3] - 82:13, 82:15, 173:11
**trouble** [1] - 8:3
**true** [13] - 27:9, 27:10, 27:15, 47:4, 55:8, 93:14, 106:5, 106:10, 125:7, 136:19, 146:15, 153:18, 154:13
**truly** [2] - 11:23, 54:19
**try** [12] - 15:5, 15:7, 15:15, 17:13, 37:6, 44:10, 44:11, 44:12, 50:3, 56:18, 58:8, 192:11
**trying** [12] - 5:22, 14:10, 14:11, 14:12, 21:25, 26:7, 27:7, 34:7, 37:14, 57:18, 81:2, 146:3
**Tuesday** [3] - 155:11, 155:24, 157:7
**turn** [14] - 6:4, 90:4, 91:14, 96:6, 99:7, 100:20, 109:22, 110:22, 119:8, 121:14, 127:7, 150:16, 171:5, 183:19
**turned** [1] - 92:24
**turning** [15] - 102:23, 104:3, 104:11, 109:19, 110:14, 113:4, 114:2, 115:11, 116:19, 119:21, 123:5, 128:23, 131:21, 132:21, 134:3
**twice** [1] - 48:16
**two** [43] - 15:13, 20:9, 25:2, 27:3, 40:3, 42:8, 42:15, 43:9, 43:24, 46:7, 46:10, 47:16, 56:18, 61:21, 62:1, 73:23, 74:6, 75:20, 75:25, 76:1, 76:3, 76:9, 87:7, 89:6, 89:7, 91:13, 91:22, 121:15, 130:21, 136:12, 139:14, 140:10, 158:22, 159:1, 162:14, 176:1, 186:21, 187:7, 188:19, 189:17, 191:1, 192:25, 195:17
**two-and-a-half** [1] - 130:21
**type** [10] - 11:19, 40:3, 49:7, 51:18, 67:11, 132:7, 136:13, 174:22, 191:11
**types** [4] - 17:20, 52:4, 60:25, 134:8
**typical** [1] - 82:3
**typically** [4] - 14:16, 67:4, 67:14, 91:21
**U.S** [1] - 1:8
**ultimate** [1] - 187:1
**ultimately** [2] - 191:6, 191:25
**uncertain** [1] - 192:8
**uncommon** [1] - 34:20
**under** [23] - 3:14, 52:22,

53:4, 57:3, 89:9, 96:15, 110:19, 112:3, 114:16, 118:10, 118:20, 120:12, 127:23, 133:15, 171:4, 177:7, 185:2, 187:19, 188:16, 188:18, 189:7, 191:8, 195:24
**undergoing** [1] - 12:19
**understood** [1] - 130:25
**undocumented** [3] - 111:9, 111:11, 111:22
**unexpected** [1] - 27:20
**unfortunately** [2] - 20:23, 55:1
**United** [2] - 89:22, 156:23
**UNITED** [1] - 1:1
**university** [1] - 187:11
**University** [7] - 70:3, 97:8, 138:16, 138:18, 187:9, 191:19
**unlawful** [1] - 186:9
**unless** [4] - 162:2, 181:2, 181:24, 195:13
**unlikely** [1] - 158:19
**unmitigated** [1] - 176:17
**unofficial** [1] - 20:23
**unreasonable** [1] - 186:8
**unstructured** [1] - 52:11
**unusual** [3] - 10:22, 35:22, 82:6
**unusually** [2] - 42:13, 48:21
**up** [34] - 4:20, 8:2, 23:2, 26:2, 29:13, 32:24, 32:25, 34:9, 36:10, 36:14, 44:19, 45:19, 61:6, 75:7, 76:23, 77:7, 116:13, 123:6, 136:24, 139:14, 139:16, 140:16, 149:4, 154:17, 167:13, 175:23, 176:12, 176:17, 182:16, 185:14, 185:19, 186:7, 191:14
**Update** [1] - 99:25
**updated** [2] - 55:2, 105:17
**upload** [1] - 123:1
**urge** [1] - 195:14
**urgent** [1] - 157:6
**US** [2] - 104:20, 180:25
**useful** [1] - 133:14
**uses** [1] - 38:19
**USMLE** [18] - 78:23, 79:22, 81:25, 82:4, 82:7, 85:19, 87:7, 88:20, 89:3, 89:11, 89:13, 89:22, 90:2, 100:18, 139:1, 139:2, 172:17, 172:20
**Usual** [2] - 121:17
**usual** [1] - 121:19
**utilizing** [1] - 1:24
**valid** [1] - 194:11
**validity** [5] - 13:22, 14:4, 14:7, 14:9, 180:16

**Vargas** [3] - 123:12, 163:13, 186:10
**VARGAS** [71] - 2:2, 2:3, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:23, 196:25, 197:5
**various** [1] - 74:13
**vary** [1] - 187:15
**vast** [1] - 149:6
**vein** [1] - 77:11
**vendor** [2] - 141:7, 141:9
**verbal** [1] - 162:20
**verification** [2] - 51:4, 70:15
**version** [6] - 24:8, 28:11, 28:12, 52:25, 53:5, 181:9
**versions** [2] - 20:10, 105:16
**versus** [1] - 87:6
**vice** [1] - 138:12
**video** [1] - 156:25
**view** [1] - 131:10
**viewed** [1] - 158:1
**viewer** [1] - 169:24
**vision** [2] - 56:5, 98:24
**visit** [1] - 70:12
**visual** [2] - 21:2, 58:5
**volume** [2] - 83:21, 139:15
**Volume** [1] - 127:2
**voluminous** [2] - 155:1, 155:2
**wait** [2] - 47:7, 88:21
**waiting** [1] - 8:15
**walk** [3] - 68:17, 76:22, 112:18
**walks** [1] - 52:21
**wants** [4] - 112:25, 160:8, 171:17, 173:14
**Washington** [2] - 2:5, 2:12
**watch** [3] - 63:19, 64:9, 137:21
**watching** [1] - 160:12
**weakness** [2] - 176:17
**weaknesses** [1] - 194:23

**wealth** [1] - 192:13
**web** [2] - 54:9, 55:13
**website** [9] - 4:22, 4:25, 6:6, 6:8, 55:2, 66:7, 89:16, 89:19, 130:20
**week** [8] - 3:25, 89:9, 91:13, 154:22, 155:25, 156:1, 170:23, 190:25
**weekends** [1] - 111:14
**weeks** [4] - 89:5, 89:14, 89:17, 90:5
**weight** [7] - 103:3, 103:18, 103:20, 103:23, 103:25, 190:15, 190:20
**weighted** [1] - 97:17
**Western** [1] - 135:21
**wheel** [1] - 41:9
**wherewithal** [1] - 179:22
**whole** [2] - 126:19, 179:17
**WIAT** [10] - 15:12, 16:1, 16:10, 24:9, 24:13, 24:20, 45:12, 45:19, 49:12, 59:23
**WIAT-III** [2] - 45:12, 45:19
**Wide** [1] - 22:25
**willing** [1] - 187:17
**wisely** [1] - 160:11
**withdraw** [1] - 172:18
**withdrawing** [1] - 144:8
**withdraws** [1] - 172:19
**withdrew** [2] - 191:23, 191:25
**Witness** [2] - 121:11, 198:4
**witness** [6] - 101:23, 117:15, 125:20, 137:22, 156:4, 159:24
**witnesses** [3] - 26:16, 64:1, 196:9
**woman** [2] - 135:11, 181:25
**wondering** [1] - 165:10
**Woodcock** [3] - 15:17, 46:1, 59:23
**Woodcock-Johnson** [2] - 46:1, 59:23
**word** [10] - 15:13, 16:2, 21:20, 21:21, 22:2, 41:8, 46:8, 47:8, 49:14, 175:20
**wording** [2] - 30:17, 49:11
**words** [11] - 16:3, 16:4, 21:16, 21:23, 41:16, 47:12, 102:21, 103:11, 119:4, 182:3, 182:4
**works** [4] - 44:15, 93:6, 100:6, 195:7
**world** [4] - 185:9, 186:8, 193:13
**worth** [1] - 181:6
**WRAT5** [1] - 22:25
**write** [5] - 107:21, 107:23, 114:25, 122:15, 177:15
**writing** [11] - 19:15, 20:14,

28:14, 31:11, 58:15, 58:16, 63:12, 92:13, 111:25, 114:23, 177:13
**written** [7] - 9:12, 77:18, 109:20, 110:8, 122:25, 123:1, 174:23
**wrote** [3] - 90:20, 122:15, 194:2
**year** [9] - 19:11, 65:20, 65:21, 66:3, 89:23, 89:25, 94:5, 184:2, 191:24
**years** [5] - 130:21, 170:23, 172:22, 186:3, 195:9
**yesterday** [27] - 3:5, 3:15, 5:24, 6:18, 7:17, 9:6, 10:25, 12:13, 13:2, 16:8, 17:19, 18:13, 22:1, 24:21, 27:25, 29:23, 34:15, 37:4, 39:10, 40:10, 42:8, 43:6, 47:11, 50:16, 58:25, 59:2, 61:15
**young** [2] - 135:11, 181:25
**yourself** [1] - 115:11
**Zecker** [5] - 71:14, 73:11, 73:15, 74:6, 87:20
**Zecker's** [2] - 73:24, 163:7
**zero** [1] - 48:2
**ZUBA** [1] - 1:15

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JESSICA RAMSAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:19-cv-02002-JCJ** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF CATHERINE FARMER, PSY.D.

1.     My name is Catherine Farmer.  I am over eighteen (18) years of age and, unless indicated otherwise, I have personal knowledge of the facts stated below.

2.     I am employed by the National Board of Medical Examiners ("NBME") as Director of Disability Services.  I hold a Doctor of Psychology degree.

3.     The NBME is a not-for-profit organization located in Philadelphia, Pennsylvania that provides assessment services for physicians and other the health professions.  Its mission is to help protect the public through state-of-the-art assessment of the knowledge and skills of health professionals.

4.     Together with the Federation of State Medical Boards, the NBME sponsors the United States Medical Licensing Examination ("USMLE"), which is a standardized examination used to evaluate applicants' competence for medical licensure in the United States and its territories.  The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.

5.      Medical licensing authorities across the country rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine.

6.      There are three "Steps" to the USMLE, all of which must be passed before an individual with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States. Step 1 is a one-day, computer-based multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine. Step 2 has two components: Step 2 CK (Clinical Knowledge), and Step 2 CS (Clinical Skills). Step 2 CK is a one-day, computer-based multiple-choice examination that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. Step 2 CS uses standardized patients to assess an examinee's ability to gather information from patients, perform physical examinations, and communicate his or her findings. Step 3 is a two-day, computer-based examination that assesses whether examinees can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.

7.      The USMLE is administered under standard conditions, and NBME has policies and procedures in place that are intended to ensure that no examinee or group of examinees receives an unfair advantage on the examination.

8.      Examinees take the USMLE Step examinations under the same testing conditions, including standard testing time. There is an exception to this policy, however, for individuals who have documented disabilities within the meaning of the Americans with Disabilities Act ("ADA"), who demonstrate that they need reasonable accommodations to access the examination(s).

9.     Testing accommodations are available on the USMLE for examinees with a disability, as defined under the ADA.   All requests for accommodations are individually reviewed and, when warranted (*i.e.*, when the examinee demonstrates that he or she is disabled within the meaning of the ADA and needs reasonable accommodations to access the examination), reasonable and appropriate accommodations are provided.

10.     Accommodations are denied when the submitted documentation fails to demonstrate that the examinee has a disability within the meaning of the ADA or that the requested accommodations are needed for access to the examination.  NBME denies requests for extra testing time or other accommodations that have not been shown to be warranted, to help ensure that its testing program is fair for all examinees and to protect the reliability of USMLE scores.

11.     NBME often seeks input from independent professionals with expertise in the relevant disability when evaluating an accommodation request.  When it does so, NBME asks the external professional to review all the supporting documentation submitted by the examinee and provide a written report on whether the documentation demonstrates the presence of a physical or mental impairment (as identified by the examinee); if so, whether the impairment substantially limits the examinee's ability to perform one or more major life activities that are relevant to taking the USMLE; and, if so, to make a recommendation on whether the requested accommodations are appropriate.

12.     On December 12, 2016, NBME received a request from Jessica Ramsay for testing accommodations on Step 1 and Step CK of the USMLE.  She requested accommodations based on diagnoses of Attention-Deficit/Hyperactivity Disorder (ADHD) and dyslexia and sought 100% additional test time (double time) over two days on both tests; a separate,

distraction-free exam space; [extra] laminated paper; colored, dry-erase markers in addition to black; and the ability to drink water and eat a snack with medications during the test. Her application informed NBME that she took the ACT and/or SAT and the Medical College Admission Test (MCAT) without accommodations. She also informed NBME that her medical school -- Western Michigan University Homer Stryker M.D. School of Medicine -- allowed her to take medical school exams with accommodations, including exams that NBME prepared for use by medical schools. Ms. Ramsay's medical school, not NBME, determined whether Ms. Ramsay would be allowed to test with accommodations on these examinations. Ms. Ramsay also reported receiving accommodations in college at The Ohio State University (between 2009 and 2013). She reported that she did not receive any accommodations in high school or middle school and received accommodations in elementary school only during the 1996-1997 school year. A true and correct copy of Ms. Ramsay's 2016 request form for Step 1 and Step 2 CK is attached at **Exhibit A**.

13.    Ms. Ramsay provided a personal statement in support of her 2016 accommodation request. A true and correct copy of this personal statement is attached at **Exhibit B**.

14.    Ms. Ramsay provided a copy of a Scholastic Record from St. Joseph High School with her 2016 accommodation request. A true and correct copy of this transcript is attached at **Exhibit C**.

15.    Ms. Ramsay provided a copy of what appears to be an unofficial transcript from The Ohio State University with her 2016 accommodation request. A true and correct copy of this transcript is attached at **Exhibit D**.

16.    In response to a request from NBME, Ms. Ramsay provided a copy of an MCAT Score Report for the MCAT examination she took on April 9, 2011 without accommodations,

which NBME reviewed as part of her 2016 accommodation request. A true and correct copy of this MCAT Score Report is attached at **Exhibit E**.

17.     Ms. Ramsay provided a March 24, 2009 "Office Visit" medical record from Alan Smiy, M.D., in support of her 2016 accommodation request. A true and correct copy of this document is attached at **Exhibit F**.

18.     Ms. Ramsay provided an ADD/ADHD Verification Form for The Ohio State University apparently filled out by Dr. Smiy in support of her 2016 accommodation request. A true and correct copy of this document is attached at **Exhibit G**.

19.     Ms. Ramsay provided a September 22, 2014 evaluation report and September 2, 2016 Addendum to this report from Charles Livingston, M.A., in support of her 2016 accommodation request. She also provided, at NBME's request, a two-page score summary from Mr. Livingston. True and correct copies of these documents are attached at **Exhibit H**.

20.     Ms. Ramsay included other materials in support of her 2016 accommodation request.

21.     NBME thoroughly reviewed all documents submitted by Ms. Ramsay in support of her request for test accommodations. It also provided Ms. Ramsay's file to an external expert reviewer, Steven G. Zecker, Ph.D., for review and recommendation. After discussing the documentation in the file, Dr. Zecker wrote in his report, "Given my conclusions, which in my professional opinion do not indicate that Ms. Ramsay is substantially limited in functioning in a manner that warrants accommodations, I recommend that you deny her request for USMLE Step 1 and Step 2-CK accommodations."

22.     Following its review of Ms. Ramsay's request, and based on Dr. Zecker's recommendations and an independent review of the file by Michelle Goldberg, Ph.D., the

Manager of Disability Services at that time, NBME concluded that Ms. Ramsay's documentation did not demonstrate a substantial limitation in her ability to perform any major life activity as compared to most people in the general population, or that her requested accommodations were needed to take Step 1 and Step 2 CK in an accessible manner. NBME therefore denied Ms. Ramsay's request for accommodations. A true and correct copy of the March 10, 2017 letter from Michelle Goldberg, Ph.D., Manager, Disability Services, to Ms. Ramsay in response to her December 12, 2016 accommodation request is attached at **Exhibit I**.

23.    On July 20, 2017, Ms. Ramsay took Step 1 without accommodations, and did not pass. With a score of 191, Ms. Ramsay was 1 point below the minimum passing score of 192. Her score was reported on August 9, 2017.

24.    On June 7, 2018, NBME received a new request from Ms. Ramsay for testing accommodations on USMLE Step 1. Ms. Ramsay sought 100% additional testing time (double time) over two days, a private testing room, and additional break time. Her request was based on a 2017 diagnosis of learning disabilities of reading and writing (with abnormal scanning and processing speed); a 2009 diagnosis of ADHD, combined type; a 1997 diagnosis of migraines with aura; and a 2016 diagnosis of a clotting disorder with deep-vein thrombosis and post-thrombotic syndrome. A true and correct copy of Ms. Ramsay's June 2018 accommodation request form for Step 1 is attached at **Exhibit J**.

25.    Ms. Ramsay submitted a new personal statement in support of this request. A true and correct copy of her 2018 personal statement is attached at **Exhibit K**.

26.    Ms. Ramsay submitted an October 25, 2017 neurocognitive consultation report and a December 7, 2017 neurocognitive examination report from Alan Lewandowski, Ph.D., in support of her June 2018 accommodation request. In response to a request from NBME, Ms.

Ramsay also provided a June 20, 2018 raw data addendum from Dr. Lewandowski. True and correct copies of these documents are attached at **Exhibit L.**

27.    Ms. Ramsay submitted other documents in support of her June 2018 request, including a letter from her lawyer, Mr. Berger. She did not include all the documents that she submitted in support of her 2016 accommodation request, but it is NBME's practice to consider a candidate's entire file, including any documents submitted in support of an earlier testing accommodation request, in reviewing any request for testing accommodations.

28.    NBME thoroughly reviewed all documents submitted in support of Ms. Ramsay's 2018 request for test accommodations. It also provided Ms. Ramsay's entire file, included the new documents, to Dr. Zecker for review and recommendation. Dr. Zecker's review was limited to Ms. Ramsay's diagnoses of ADHD and specific learning disabilities. After discussing the documentation in the file, Dr. Zecker wrote in his report, "To summarize, my review of the documentation [Ms. Ramsay] has submitted indicates that in my professional opinion she does not have a disability that according to the ADA qualifies her for the accommodations she has requested on the Step 1 examination."

29.    Following its review of Ms. Ramsay's request, and based on Dr. Zecker's recommendations and my independent review of the file, NBME concluded that Ms. Ramsay's documentation did not demonstrate that she is substantially limited in her ability to perform any major life activity as compared to most people or that 100% additional testing time was an appropriate modification of her USMLE Step 1 test administration. NBME therefore denied Ms. Ramsay's request for extra testing time. NBME did, however, approve Ms. Ramsay's requests for additional break time, testing over two days, and a separate testing room in which she may stand, walk or stretch during the exam in order to address the issues related to migraine headache

and DVT described in a May 29, 2018 letter from Jennifer N. Houtman, M.D. Because Ms. Ramsey would be testing in a separate testing room and she reported that she usually reads text aloud, she was granted permission to read aloud as a courtesy. A true and correct copy of my September 11, 2018 letter to Ms. Ramsay in response to her June 2018 accommodation request is attached at **Exhibit M**.

30.     Ms. Ramsay submitted a request for reconsideration of the denial of her request for 100% additional time on the Step 1 exam through a letter from her lawyer, Lawrence Berger, on December 12, 2018. Ms. Ramsay again provided additional documents, including a new diagnostic evaluation from Dr. Robert Smith. It is my understanding that a copy of the report from Dr. Smith has been provided as an exhibit to Ms. Ramsay's court papers, so a copy is not attached here.

31.     NBME again carefully reviewed Ms. Ramsay's request and all documents submitted in support of her request for reconsideration. It also provided Ms. Ramsay's file to an additional external expert, Benjamin Lovett, Ph.D., for review and recommendation. Dr. Lovett's review was limited to Ms. Ramsay's diagnoses of ADHD and specific learning disabilities. After discussing the documentation in the file, Dr. Lovett's report summarized Ms. Ramsay's documentation regarding learning disabilities and ADHD as follows: "(a) there is no objective evidence of poor academic skills or significant ADHD symptoms and impairment in real-world settings where most people in the general population are expected to do well, (b) Ms. Ramsay and her advocates attempt to explain away her good real-world performance using unpersuasive arguments, (c) the data from her 2018 diagnostic evaluation are not credible, (d) her 2017 and 2014 diagnostic evaluations did not involve the collection of sufficient data to justify any diagnoses, and (e) her ACT and MCAT performance suggests an ability to access

tests without accommodations, at least based on neurodevelopmental disorders such as ADHD and learning disabilities which would have been present by the time that those tests were taken."

32.    Following its review of Ms. Ramsay's request, and based on Dr. Lovett's recommendations and my independent review of the file, NBME concluded that there was no new substantive information or evidence that warranted a different decision than the decision applicable to Step 1 as communicated in my September 11, 2018 letter to Ms. Ramsay.  NBME therefore informed Ms. Ramsay by letter dated February 14, 2019 that she was not approved for extra time accommodations.  A true and correct copy of my February 14, 2019 letter to Ms. Ramsay is attached at **Exhibit N**.

33.    By letter dated March 19, 2019, Ms. Ramsay, through her attorney, requested further reconsideration of our decision regarding her request for extra time accommodations.  No new substantive information or evidence was provided by Ms. Ramsay or her lawyer for NBME's consideration, and NBME's decision did not change.  A true and correct copy of NBME's March 27, 2019 email response is attached at **Exhibit O**.

34.    Birth dates and social security numbers have been redacted from the attached documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2019

_____
Catherine Farmer

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JESSICA RAMSAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:19-cv-02002-JCJ** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF STEVEN G. ZECKER, PH.D.

I, Steven G. Zecker, declare as follows:

1.      My name is Steven G. Zecker. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2.      I am a licensed clinical psychologist.  I am also an Associate Professor in the Department of Communication Sciences and Disorders at Northwestern University.  Courses that I have taught or am teaching include "Psychoeducational Assessment and Testing Principles" and "Attention Deficit Disorder and Related Behavior Disorders."  A true and correct copy of my curriculum vitae is attached at **Exhibit A**.

3.      My professional expertise relates to the diagnosis and performance of individuals with disordered learning conditions and research into those conditions, particularly learning disabilities (LD) and Attention Deficit-Hyperactivity Disorder (ADHD). I have published articles and delivered many paper presentations on these topics. Much of my research involves ADHD, auditory processing in children with reading disabilities, giftedness and LD, and the development of spelling. I oversee the clinical practice at Northwestern's Speech, Language and Learning

diagnostic clinic. As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems to assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

4.    I have served for more than ten years as an independent professional reviewer for organizations that administer or rely upon standardized tests, in connection with requests for testing accommodations by prospective examinees that are based, at least in part, on an ADHD or LD diagnosis. For each of these organizations, my objective is to provide a neutral, professionally sound evaluation of whether the documentation submitted by the prospective examinee in support of the accommodations request demonstrates the existence of one or more impairments, diagnosed in accordance with applicable professional standards, that result in substantial functional limitations in the candidate's ability to read, learn, or perform other major life activities, as compared to most people in the general population.

5.    I was asked by NBME to perform an independent review of two requests for testing accommodations that NBME received from Jessica E. Ramsay for the United States Medical Licensing Examination. I prepared two reports for NBME based on my reviews. A true and correct copy of my January 13, 2017 letter report is attached at **Exhibit B**. A true and correct copy of my July 19, 2018 letter report is attached at **Exhibit C**. The documents that I reviewed are set out in those letter reports, and my discussion below is based on my conclusions from reviewing those documents. My review and the opinions addressed in my reports and below are restricted to Ms. Ramsay's ADHD and LD diagnoses, not her reports of migraines with aura and CDPTS diagnoses.

6.     I have reviewed these reports and reaffirm my belief in the opinions expressed therein. The discussion that follows addresses some of the points set out in my letter reports to NBME.

*Ms. Ramsay's Early Development and Acquisition of Basic Academic Skills*

7.     When arriving at a diagnosis of a specific learning disability, it is crucial to establish early difficulties in the development and acquisition of basic academic skills. According to the documents I reviewed, however, Ms. Ramsay did not submit report cards or school records from any part of her kindergarten through eighth grade education to NBME to review. Such documentation could have provided evidence of an early impairment in functioning, essential to the diagnosis of ADHD and LD, neurodevelopmental disorders with an onset of symptoms in childhood.

8.     Although Ms. Ramsay's personal statement identifies difficulties that she says have existed "since [she] was little," Ms. Ramsay also reported that she was in a gifted program through fifth grade and in an accelerated academic program from sixth grade through high school. In high school, Ms. Ramsay obtained mostly "A" grades, with no grade below "B+" in the transcript that she provided, and had earned a 3.75 GPA throughout her first three years. According to documents I reviewed, this high level of academic success was achieved in the absence of any formal accommodations.

9.     According to the college transcript that she submitted, Ms. Ramsay graduated from Ohio State with a 3.58 GPA, with grades in the "A/B" range in all but one course. Based on the documents I reviewed, it does not appear that Ms. Ramsay began receiving accommodations at Ohio State until May 2010.

10.     According to the documents I reviewed, Ms. Ramsay took the MCAT in 2011 without any accommodations. Her score (30M) placed her at the 79th percentile, an above-average score in comparison with other medical school aspirants.

11.     According to the documents I reviewed, Ms. Ramsay took the Step 1 exam in July 2017 under standard administration conditions and obtained a score (191) that was one point below the passing criterion.

*Evaluation History*

12.     According to the documents I reviewed, Ms. Ramsay was evaluated in 1997, when she was seven years old and in second grade, by an optometrist, Dr. Tanguay, because of concerns about letter reversals. Dr. Tanguay did not issue a report but wrote a half-page letter in which she summarized her findings. Dr. Tanguay apparently administered a single test, the Test of Visual-Perceptual Skills, which was incorrectly administered and incompletely scored. Ms. Ramsay reportedly underwent perceptual skills training with Dr. Tanguay for four months in 1998, after which Dr. Tanguay reported that Ms. Ramsay "scored above age level in all categories when retested" and that her comprehension and perceptual skills were "excellent." Dr. Tanguay apparently never administered any reading tests for Ms. Ramsay and did not diagnose Ms. Ramsay with a reading disorder (nor would such a diagnosis have been appropriate).

13.     According to May 2010 notes of a March 2009 office visit that I reviewed, Ms. Ramsay visited Dr. Alan Smiy for a 30-minute appointment because of a complaint of "ADD/ADHD." In his brief history, Dr. Smiy writes that Ms. Ramsay reported "no problems" in high school (contrary to Ms. Ramsay's personal statements submitted to NBME) and that "college stress" is causing her to "switch letters around a bit." Dr. Smiy apparently did not

administer any tests and summarized his assessment by writing "add vs. possible dyslexia—pt has more focus issues than dyslexic tendencies." He recommended a trial of Ritalin. However, given the absence of any formal testing during this brief appointment, no formal diagnosis was provided, and none was appropriate in my professional opinion.

14.     According to the documents I reviewed, Dr. Smiy completed an "ADD/ADHD Verification Form" from Ohio State University for Ms. Ramsay on August 13, 2010. He indicated that Ms. Ramsay qualified for the diagnosis of ADHD-Inattentive Type and was currently taking Adderall because methylphenidate had "failed" to treat her difficulties. Dr. Smiy indicated that Ms. Ramsay was exhibiting five of the nine DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th Edition) symptoms of inattention, and none of the nine DSM-IV Hyperactivity/Impulsivity symptoms. I note that DSM-IV required at least six symptoms in either category for a valid ADHD diagnosis to be provided, and thus, based on these results, Ms. Ramsay failed to qualify for an ADHD-Inattentive diagnosis. Dr. Smiy did not provide a specific recommendation for an extended time accommodation, writing only that she "may need additional time."

15.     According to the documents I reviewed, Mr. Charles Livingston, a licensed social worker and limited licensed psychologist in Michigan, evaluated Ms. Ramsay in September 2014, by which time she was in medical school. Mr. Livingston did not generate a complete report of his testing; instead he provided a one-page summary of results and conclusions to Dr. Ziemkowski at Ms. Ramsay's medical school. He indicated that Ms. Ramsay reported that she was tired and stressed and concerned that her school grades did not show her knowledge. In an "Addendum" to his initial summary (provided in 2016), Mr. Livingston indicates that he administered a mental ability test, the Wechsler Adult Intelligence Scale-IV (WAIS-IV) and an

achievement test, the Weschler Individual Achievement Test (WIAT). These tests did not directly assess attentional functioning, although Mr. Livingston indicates that Ms. Ramsay scored at the 63rd percentile on the WAIS-IV Working Memory Index, a composite score based on the results of two subtests most dependent on intact attention. In the "Addendum" to his report, Mr. Livingston discussed other documentation that he said supported an ADHD diagnosis, but in my opinion, none of this provided strong support for a formal diagnosis of ADHD. I also note that, although Mr. Livingston indicated "there is historical information that suggests a likelihood of dyslexia," the only documentation of reading achievement (the WIAT Reading Comprehension test that Mr. Livingston administered) yielded an above average (99th percentile) score.

16.     In the report, Mr. Livingston concluded that the results of his evaluation supported the diagnosis of ADHD-I (Inattentive type), severe; however, the WAIS-IV measures most dependent on attentional functioning that he reported placed her above the mean and he never demonstrated that Ms. Ramsay met the complete set of diagnostic criteria for a diagnosis of ADHD, including an onset of symptoms in childhood and impairment in multiple domains of daily living. He wrote that an extended time accommodation on tests "should be considered," despite apparently having not identified a deficit in academic fluency. Further, despite Ms. Ramsay's comments to Mr. Livingston that she was stressed, he conducted no testing of her psychological functioning. In my professional opinion, this testing was not adequate for establishing a diagnosis of ADHD-I or for supporting the provision of accommodations, including extended time.

17.     According to the documentation I reviewed, Dr. Alan Lewandowski evaluated Ms. Ramsay in October 2017, also while she was in medical school. Because she had not been

approved for Step 1 accommodations, Ms. Ramsay was seeking a more comprehensive assessment. Despite having described herself as experiencing "chronic academic disability" to Dr. Lewandowski, Ms. Ramsay also reported to Dr. Lewandowski that she graduated from high school with a 3.8 GPA and scored "between 27 and 30" on the ACT under standard administration conditions. She also indicated that she had seen a counseling psychologist for unexplained reasons (although she acknowledged some situational dysphoria) and that the counseling resulted in a "very positive outcome." Dr. Lewandowski reported that Ms. Ramsay presented "in mild distress" but did not elaborate other than to write that her mood was anxious and she was frustrated. She reported that she had been taking an antidepressant (fluoxetine) but it had been discontinued. She reported taking seven other medications, including Adderall (for ADHD), Buspar and Xanax (anti-anxiety medications), and Ambien (apparently to aid sleep). Despite Ms. Ramsay's description of herself in her personal statement to NBME as always moving, Dr. Lewandowski described her motor movements as "normal for age", and he makes no mention of any hyperactive behaviors during the course of the evaluation.

18.    According to the documents I reviewed, based on this brief two-hour consultation, Dr. Lewandowski did not provide any diagnosis but indicated he would be conducting comprehensive testing in the future to "better clarify" Ms. Ramsay's status.

19.    According to the documents I reviewed, Dr. Lewandowski subsequently saw Ms. Ramsay in December 2017 and generated a report of the "Neurocognitive Examination" that he conducted. The report consists mainly of a table of test scores, with minimal discussion. Dr. Lewandowski did not provide the names of any of the tests he administered in this report, which is highly unusual. He indicated that Ms. Ramsay's overall mental ability was high average, with the various domains of cognitive functioning ranging from below average to above average. All

measures of academic functioning resulted in scores at or above the 73rd percentile. Nine unspecified neuropsychological test results were presented; seven placed Ms. Ramsay in the normal range and two were "abnormal." Among six measures of attentional functioning, four resulted in normal scores and two were below average. Psychological testing indicated moderate depression, inefficient thinking, and health concerns. Based on these results, Dr. Lewandowski diagnosed Ms. Ramsay with Attention Deficit Disorder, Hyperactive, moderate (ADHD-H/I) and Learning Disability (LD), nonverbal (abnormal scanning and processing speed). Notably, he did not diagnose her with any affective disorder, although a substantial part of his recommendations refer to Ms. Ramsay's "mood disturbance" and ongoing affective struggles. Further, Dr. Lewandowski failed to indicate on what basis the diagnosis of an attention deficit was made, given that Ms. Ramsay performed largely within the normal range on the test assessing attention that he administered to her. He also provided no indication that Ms. Ramsay met the complete set of criteria for an ADHD diagnosis. Similarly, Dr. Lewandowski did not provide a rationale for his LD diagnosis, and in the absence of specific tests that were administered and a discussion of the findings, there was no basis for such a diagnosis in my professional opinion.

20.    According to the documents I reviewed, in a February 2018 "Addendum," Dr. Lewandowski provided the names of the tests he had administered during the December testing, and in a June 2018 letter to Ms. Ramsey, Dr. Lewandowski again provided the names of the tests as well as tables and plots of results from his earlier testing, but no additional discussion of his findings. In my professional opinion, the information presented in this additional documentation supports the conclusion that the results of Dr. Lewandowski's testing did not support the diagnosis of a disabling condition that warranted accommodations under the ADA.

*Conclusion*

21.     The documentation discussed above and in my two letter reports does not, in my professional opinion, indicate that Ms. Ramsay has a disability within the meaning of the ADA.

22.     Ms. Ramsay's academic history prior to medical school and her exceptional unaccommodated standardized test performance, in my professional opinion, provide strong evidence that Ms. Ramsay is not substantially impaired in a major life function in a manner that warrants accommodations on the USMLE under the ADA.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 30, 2019.

Steven G. Zecker, Ph.D.

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JESSICA RAMSAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:19-cv-02002-JCJ** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DECLARATION OF BENJAMIN J. LOVETT, PH.D.

I, Benjamin J. Lovett, declare as follows:

1. My name is Benjamin J. Lovett. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2. Through August 31, 2019, I am an Associate Professor of Psychology at the State University of New York (SUNY) at Cortland and an Adjunct Professor of Psychology at Syracuse University. As of September 1, 2019, I will be Associate Professor of Psychology and Education at Teachers College, Columbia University. I am a licensed psychologist. A true and correct copy of my curriculum vitae is attached at Tab A.

3. My professional expertise is in the diagnosis and management of neurodevelopmental conditions, particularly learning disabilities (LD) and Attention Deficit/ Hyperactivity Disorder (ADHD). I have published numerous articles and book chapters on these topics. As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems, and I assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

4.      Much of my research involves testing accommodations for students with disabilities, and the American Psychological Association has published a book that I co-authored on that topic, <u>Testing Accommodations for Students with Disabilities: Research-Based Practice</u>.

5.      In addition to my faculty and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the National Board of Medical Examiners (NBME), the National Board of Osteopathic Medical Examiners (NBOME), and the New York State Board of Law Examiners. For each of these organizations, among others, I have reviewed documentation submitted by examinees seeking testing accommodations based, at least in part, on ADHD and/or LD diagnoses.

6.      It is a common practice for testing entities to seek input from external experts regarding disability-based requests for testing accommodations. The external professionals have expertise in the areas of impairment that provide the basis for an accommodation request. The external professionals are asked to review documentation submitted in support of an accommodation request and to advise on matters of disability assessment and diagnosis, the level of functional impairment experienced by an applicant, and the appropriateness of specific test accommodations in a given case. The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well established and, in my opinion, professionally sound.

7.      For cognitive impairments, certain documentation is routinely anticipated (e.g., school records reflecting a learning disability or ADHD, or medical records on a brain injury), and reviewers will generally ask to have such materials submitted. By reviewing a complete historical record, an evaluator can determine the extent to which objective evidence supports the

disability diagnosis and demonstrates that the individual is substantially limited in one or more major life activities.

8.     I was asked by NBME to review Jessica Ramsay's request for 100% extra time (i.e., double the amount of standard testing time) accommodations on Step 1 of the USMLE in December 2018. At that time, I concluded that there was insufficient evidence to support Ms. Ramsay's diagnoses of learning disabilities or ADHD or to support any accommodations based on those disorders, and I prepared a report for NBME based on my review of this information. A true and correct copy of my report is attached at Tab B. The documents that I reviewed are listed on page one of the report. I have reviewed this report and reaffirm my belief in the conclusions expressed in the report.

**Ms. Ramsay's Learning Disability Diagnosis**

9.     The current official diagnostic criteria for LD require that someone have academic skills that are below the average range for age expectation and that cause problems performing in real-world settings. These academic skill weaknesses would have been present in the person's childhood and would not be better accounted for by other factors (e.g., general low intelligence). Typically, young adults with valid LD diagnoses can point to evidence of their disorder that includes report cards from their K-12 schooling showing low grades or other indicia of poor performance in the area of their LD (e.g., reading), special education records showing the specialized instruction and related services they were provided, and reports from professional evaluations showing below-average scores on diagnostic achievement tests in the area of their LD.

10.     When applicants request testing accommodations, it is also helpful to review their history of taking other timed standardized tests, and whether they tested with or without

accommodations. A consistent history of receiving accommodations throughout one's educational history is evidence that generally supports the need for such accommodations. Conversely, past performance on such tests where the applicant did *not* receive accommodations provides evidence regarding the individual's ability to read, concentrate and think in the specific context of taking a standardized test and may support the conclusion that accommodations are not needed.

11.     In Ms. Ramsay's case, two important pieces of information in her record are her score reports from the Medical College Admission Test (MCAT) and the ACT.

12.     The MCAT is a rigorous admission test taken by those applying for entry into medical school. The test has a strict time limit, and Ms. Ramsay took the test without any accommodations. One of the MCAT sections, "Verbal Reasoning," involves reading passages and answering questions about the passages under the applicable strict time limit. According to the documents that I reviewed, Ms. Ramsay's Verbal Reasoning score on the MCAT fell in the 67th percentile — better than most medical school applicants taking that test (a group that is well above-average to begin with, compared to the general population).

13.     Similarly, according to the documents that I reviewed, Ms. Ramsay reportedly performed well above the average range (between 27 and 30) on the ACT without accommodations.

14.     Ms. Ramsay offered the following explanation for her performance on the MCAT and ACT without accommodations in her Personal Statement to NBME:

> Because reading and writing are such tedious and draining processes for me, I avoid both as much as possible. I was able to do this strategically for some prior standardized tests like the ACT and MCAT because the tests were designed so that many of the questions could be answered without reading the whole question. For the ACT, I was not able to read all of the questions and could not accurately demonstrate my knowledge.

Additionally, due to the guessing penalty, I had to leave the questions I was not able to read unanswered. However, because most of the questions required little reading to find the answers, I was able to answer enough questions to achieve an acceptable score. Likewise, for the MCAT, many of the questions could be answered without reading and gathering information from the passages, so I knew to answer passage-independent questions first, and then used any time left to try to read the passages with the most unanswered questions remaining. Being able to skip much of the reading made [it] possible for me to correctly answer enough questions to achieve an acceptable score.

15.    Respectfully, based on my clinical and research experience and general awareness of the content of the MCAT and ACT examinations, this explanation is not credible. Although it is common for students to read test questions and answer options first and then search for relevant information in the corresponding passage, this still requires a significant amount of reading under time-pressured conditions. Without reading at least a substantial portion of the passages, it is highly unlikely that an examinee could answer many questions correctly. It is also my understanding that the test items in the MCAT Verbal Reasoning section generally ask for students to identify or interpret themes, perspectives, and arguments from a passage. In my opinion, an examinee could not consistently find the correct answers to questions in this section of the test without referencing the passage. Finally, although Ms. Ramsay refers to her ACT and MCAT scores as "acceptable," her performance on the ACT was in fact better than the vast majority of her peers, and her MCAT performance was better than that of most medical school applicants—a high-achieving group to begin with. These test scores, obtained without accommodations, are not consistent with someone who is unable to read and comprehend text under time pressure.

16.    Because learning disabilities are neurologically based, lifelong impairments, they would be expected to cause significant problems in school during childhood. No records were submitted to NBME showing that Ms. Ramsay experienced difficulties in school. Her evaluator,

Dr. Robert Smith, reported reviewing Ms. Ramsay's report cards for grades K, 2, 3, 4, 5, and 6 as well as her high school and college transcripts, and concluded that "the available school records do not clearly reflect academic struggles in elementary, middle, or high school." (Evaluation at 2, 29). Ms. Ramsay and her mother apparently reported that Ms. Ramsay received informal accommodations some of the time in school and specialized help from the family at home, but there are no records of this, and it is not clear why or how often informal accommodations were provided (if they were in fact provided).

17.    According to the records submitted to NBME, Ms. Ramsay also completed diagnostic evaluations in 2014, 2017, and 2018.

18.    A key indicator of learning disabilities is academic skills that are significantly below average. According to the documents that I reviewed, in the 2014 and 2017 evaluations, Ms. Ramsay's evaluators did not perform comprehensive assessments of her academic skills and did not adequately evaluate her academic skills under time-pressured conditions. Nevertheless, all of her academic skills scores as measured in those evaluations were in the average range or above.

19.    According to the documents that I reviewed, after Ms. Ramsay's request for extended time accommodations was twice denied by NBME, she underwent another diagnostic evaluation in 2018 with Dr. Robert Smith. During that evaluation, she was given several measures of academic skills that were time-pressured, and her scores reflected low performance in several areas. I understand that Dr. Smith is emphasizing in this litigation specific results including the following:

a. An Oral Reading Fluency score in the 1st percentile on the Wechsler Individual Achievement Test-3rd Edition (WIAT-III).

     b.  A Reading Rate Cluster score of 66 at the 1st percentile on the Woodcock Johnson IV

         Tests of Achievement (WJ4).

     c.  A Gray Oral Reading Test-5th Edition (GORT-5) Fluency score at the 2nd percentile.

    20.     Respectfully, these scores are not credible.  These extremely low scores would superficially suggest that Ms. Ramsay's reading skills are worse than those of almost anyone else (except for 1 or 2% of the population).  Reading skills at that level are fundamentally contradicted by Ms. Ramsay's academic history and her performance on standardized tests such as the ACT and MCAT.

    21.     On the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT), Ms. Ramsay's score was at the 2nd percentile, at the estimated level of a child in eighth grade.  Respectfully, Dr. Smith appears to have been inappropriately credulous by accepting Ms. Ramsay's NDRT score as valid and by his claim that Ms. Ramsay can employ special strategies to perform well on the extremely challenging MCAT but not on the NDRT, a test developed to be accessible even to high school students.

    22.     In my opinion, the 2018 testing data reported by Dr. Smith regarding Ms. Ramsay's academic skills under timed conditions are not credible.  They are squarely contradicted by Ms. Ramsay's average and above average scores on the ACT and MCAT, with no accommodations, and by her apparent excellent grades in high school and in college (even before documented accommodations were provided in the latter).  Ms. Ramsay's performance on the ACT and MCAT reflects her ability to access timed, unaccommodated, high-stakes examinations that require reading abilities under real-world conditions.  The scores that Ms. Ramsay obtained on the ACT and MCAT would not be obtained by someone with timed reading comprehension skills typical of a student in elementary or middle school.

23.     According to the documents that I reviewed, Dr. Smith argues that the diagnostic test scores that Ms. Ramsay obtained during his evaluation can be trusted because she performed well on the Test of Memory Malingering (TOMM). The TOMM, however, was developed to identify people feigning or exaggerating *memory* problems, not to identify people working slowly on academic tests or reporting more ADHD symptoms than they actually experience. The TOMM is not designed to measure speed, so a client may do very well on the TOMM while still obtaining scores on timed diagnostic tests that are not reflective of full effort and motivation. Respectfully, Dr. Smith's reliance on the TOMM performance apparently led him to be far too credulous of Ms. Ramsay's evaluation data, especially given the stark contrasts between her real-world performance in school and on the ACT and MCAT compared to her performance during his evaluation.

24.     Performance Validity Tests (PVTs) are assessment tools that are designed to ensure that a client (here, Ms. Ramsay) is putting forth sufficient effort and appropriate motivation during an evaluation. There are PVTs other than the TOMM that Dr. Smith could have administered to provide a more relevant measure of Ms. Ramsay's motivation in taking her 2018 diagnostic tests. Some PVTs are designed to measure speed, which would specifically address the situation in which the individual is being evaluated because he or she is seeking extended time accommodations. Dr. Smith did not administer any of these types of PVTs.

**Ms. Ramsay's ADHD Diagnosis**

25.     The current official diagnostic criteria for ADHD require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with real-world functioning. In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety

disorder). Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with current everyday life responsibilities that most people in the general population can successfully perform.

26.    According to the documents that I reviewed, there is not clear, consistent evidence of ADHD from Ms. Ramsay's clinical evaluations. Ms. Ramsay also has not provided real-world records (e.g., school records, teacher comments, work evaluations) showing significant ADHD symptoms or related functional impairment in school or work settings.

27.    Dr. Smith diagnosed Ms. Ramsay with ADHD in his 2018 evaluation. There is, however, no objective evidence that Ms. Ramsay "has a long history of inattention, distractibility and hyperactivity that have significantly interfered with academic functioning since early childhood," as Dr. Smith states in his report. (Report at 28). As discussed above, there is no objective evidence in the record that Ms. Ramsay experienced any interference in any of her academic functioning. The limited records that were provided instead reflect consistent and strong academic functioning.

28.    Beyond academic problems, I would expect someone with untreated ADHD (Ms. Ramsay was not diagnosed with ADHD as a child) to exhibit significant impairment in social and everyday life settings as a child. Ms. Ramsay has claimed such impairments and her mother also made such claims, but there is no objective record of such impairment. When Ms. Ramsay was a child in the 1990s, ADHD was a well-known condition. I would expect there to be a record of consultations with a physician or mental health practitioner during childhood given the

level of impairment during this time now reported by Ms. Ramsay and her mother. But there is no such record here.

29.    In her 2018 evaluation, after having been denied accommodations by NBME, Ms. Ramsay claimed to have almost every possible symptom of ADHD, and her mother and fiancé also described her as having many symptoms of ADHD, well above the clinical thresholds for the disorder. I do not find these reports to be credible, given the lack of objective evidence of any issues of inattention or distractibility in school or other settings during Ms. Ramsay's primary and secondary school years (remembering that ADHD is a neurodevelopmental disorder with childhood onset), and the discrepancy between these reported symptoms and the lack of objective records showing poor performance as an adult in real-world settings where most people in the general population can perform well.

30.    According to the documents that I reviewed, on a computerized test of ADHD symptoms that Dr. Smith administered to Ms. Ramsay (the IVA+Plus Continuous Performance Test),[1] her performance was extremely poor. The test generates many scores, and for each score, average performance is 100, and the vast majority of people (about 98%) obtain scores of 70 or above. All of Ms. Ramsay's scores from this test mentioned in Dr. Smith's report are below 70. (Report at 12-14). This is a highly unusual result, suggesting much worse performance than I would expect even if someone had verified ADHD. When Ms. Ramsay took a similar continuous performance test in 2017 as part of her evaluation with Dr. Lewandowski (the Conners

---

[1] Continuous performance tests (CPTs) administer a series of game-like tasks that are designed to measure an individual's ability to maintain attention over time and carefully choose when to respond and when not to respond to visual or auditory stimuli. For example, one CPT task flashes a series of digits, one at a time, on an electronic display, and the examinee is instructed to press a button every time a "1" is followed by a "9." The test machine records the number of correct responses, incorrect responses, and failures to respond.

Continuous Performance Test, Third Edition), her scores were all in the normal range, with the exception of one mildly abnormal score. Dr. Smith did not address this performance discrepancy in his report.

**Disability Status and Testing Accommodation Needs**

31.    As discussed above, there is insufficient credible evidence that Ms. Ramsay has a learning disability or ADHD. For similar reasons, there is insufficient evidence that Ms. Ramsay is disabled within the meaning of the Americans with Disabilities Act.

32.    Individuals who are substantially limited in a major life activity due to an LD or ADHD generally have extensive documentation in their academic and/or employment histories, and in their medical records, reflecting such substantial limitations, because both categories of impairment have childhood onsets. There are many such students in our schools today with learning disabilities and/or ADHD, and they commonly have school records from early grades forward that show the extent of their skill deficits (in reading, writing, or math) and/or behavior problems. It is typical for students with a reading disorder or other LD and students with ADHD to have an historical record of their disability and resulting impairment.

33.    Here, there is insufficient evidence that Ms. Ramsay is substantially limited in her ability to read or engage in any other activity that is relevant to taking the USMLE, when she is compared to most people in the general population, at least with regard to LD/ADHD issues. There are no historical school or work records reflecting such limitations. Although at times Ms. Ramsay has obtained scores during diagnostic evaluations that would superficially suggest possible substantial limitations, those scores (and other evidence from the diagnostic evaluations) are not supported by—and are often inconsistent with—other important evidence, including her performance on real-world timed tests that required significant amounts of reading.

34.     There is also insufficient evidence that Ms. Ramsay requires any accommodations to access the USMLE, at least due to LD/ADHD issues (as opposed to the physical conditions that she mentions in her documentation).  Given her performance on other, similar high-stakes standardized tests, including the ACT and the MCAT, there is insufficient credible evidence of deficits in Ms. Ramsay's access skills (e.g., timed reading comprehension and concentration) relative to most people in the general population, that would make accommodations appropriate.

35.     Although it may seem puzzling for evaluators to ignore real-world evidence that suggests diagnostic test scores to be untrustworthy, research has shown that many evaluators view their role as helping a client to secure accommodations.[2]  This sometimes results in evaluators focusing on specific diagnostic results in their reports while de-emphasizing or ignoring other results, dismissing real-world academic and standardized testing performance for reasons that are not credible, or failing to evaluate whether a client is attempting to maximize his or her performance when being evaluated.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 30, 2019.

Benjamin J. Lovett, Ph.D.

---

[2] See Gordon, M., Lewandowski, L., Murphy, K., & Dempsey, K., "ADA-based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards," *Journal of Learning Disabilities, 35*(4), 357-363 (2002).  For a more recent study with similar findings, see Harrison, A.G., Lovett, B.J. & Gordon, M., "Documenting disabilities in postsecondary settings:  Diagnosticians' understanding of legal regulations and diagnostic standards," *Canadian Journal of School Psychology, 28*(4), 303-322 (2013).

## Review of Accommodation Request

**Applicant Name:** Jessica Ramsay
**Date of Birth:** _
**Date of Review:** December 25, 2018
**Reviewer:** Benjamin J. Lovett, Ph.D.

This review concerns Jessica Ramsay, who has requested accommodations on Step 1 of the USMLE, on the basis of ADHD, learning disabilities in reading and writing, migraine headaches, and a clotting disorder. Based on prior requests, the NBME has already granted her additional break time over a two-day test administration, a private room, and permission to read aloud to herself. However, she is continuing to also request 100% extended time. She has a history of formal accommodations in medical school and part of college, but not on admissions tests such as the ACT and MCAT. She claims to have received informal accommodations in her K-12 schooling.

I have now reviewed the following documents in Ms. Ramsay's file:
- Completed application forms and personal statements
- Records showing eligibility for accommodations in medical school and in part of college
- A completed verification form for ADHD, used by her college disability services office
- Other documents from applications for accommodations in medical school and college
- Transcripts from high school and college, and a record of performance in medical school
- A signed affirmation of qualifications for the medical school program
- Score reports from NBME exams taken during medical school, including the Step 1 exam
- A score report from the MCAT
- Materials from a 1997 perceptual skills evaluation, including follow-up notes
- Correspondence (letters and e-mails) between Ms. Ramsay and NBME
- Reports from diagnostic evaluations conducted in 2014, 2017, and 2018, along with addenda and information about evaluator credentials
- Letters from an attorney representing Ms. Ramsay
- Letters from a medical school administrator, a primary care provider who also served as a medical school instructor/mentor, and a psychiatry department faculty member at her medical school

Briefly, I believe that there is insufficient evidence to support the diagnoses of learning disabilities or ADHD, or to support any accommodations based on these disorders. I will not comment on Ms. Ramsay's reported diagnoses of headaches and a clotting disorder, due to inadequate specific expertise on these points.

1. Without any accommodations, Ms. Ramsay obtained MCAT scores that were in the average range or above, relative to a group (i.e., medical school applicants) that is already well above average in academic skills, compared to the general population. Similarly, Ms. Ramsay reportedly obtained ACT scores well above the average range (between 27 and 30) without accommodations. She reports an unusual explanation for these scores: that she didn't read a significant amount of the text on these tests, answering the questions without reading the information that the questions were based on. But this does

not make sense. It is common (typical, even) for students to read test questions and answer options first and then search for relevant information in a passage. But this still involves a significant amount of reading under time-pressured conditions. And without such reading, it is often impossible to answer questions. For instance, Ms. Ramsay performed better than most medical school applicants on the MCAT Verbal Reasoning section, a test of timed reading comprehension. It is my understanding that the test items on this section generally asked for students to identify themes, perspectives, and arguments from a passage, meaning that there is no way to find the correct answer without referencing the passage. I am extremely skeptical that Ms. Ramsay possesses a special way of answering ACT and MCAT items without actually reading relevant text, and it is disappointing that her credulous advocates have accepted her explanation.

2.  Learning disabilities and ADHD would be expected to cause very significant problems in childhood. No records have been submitted to NBME showing difficulties at school, and even one of Ms. Ramsay's firmest advocates, her recent evaluator Dr. Robert Smith, has had to admit that "the available school records do not clearly reflect academic struggles in elementary, middle, or high school." Ms. Ramsay and her advocates attempt to explain this away by claiming that she received informal accommodations some of the time at school and a great deal of specialized help provided via the family. Of course, there are no records of any of this, and it is not clear how often informal accommodations were provided. Interestingly, I note that before receiving accommodations in college, Ms. Ramsay's letter grades were entirely in the A and B ranges, and she does not appear to be claiming to have received informal accommodations at her large public university. Beyond academic problems, I would expect someone with untreated ADHD to exhibit quite significant impairment in social and everyday life settings as a child. Ms. Ramsay claims such impairment, and during evaluations completed to secure accommodations, her mother has now recalled such impairment, but I am skeptical. If the impairment were half as significant as is now being claimed, why is there no record of such impairment being discussed with a physician or a mental health practitioner during childhood? When Ms. Ramsay was a child in the 1990s, ADHD was a well-known condition; it seems more than a bit odd that her mother (who reportedly has a graduate degree in education) did not consult professionals (at least as documented). In short, there is no evidence of real-world below-average functioning prior to accommodations being provided, and the explanations provided by Ms. Ramsay and her advocates are evasive and unpersuasive.

3.  Ms. Ramsay had gone to diagnostic evaluations in 2014 and 2017, and all of her academic skills scores during these evaluations were in the average range or above. However, the evaluators conducting these evaluations did not perform a comprehensive assessment of her academic skills, and specifically they did not really evaluate her academic skills under time-pressured conditions. After her request for extended time accommodations was twice denied by NBME, and she was likely under a great deal of pressure to pass Step 1 to move ahead in medical school (she was represented by an attorney by this point as well), she completed a final diagnostic evaluation with Dr. Robert Smith. During this evaluation, she was given several measures of academic skills that were time-pressured, and her performance was uniformly poor. Many of her scores suggested skills at the level of children in elementary and middle school, placing her

skills in the bottom 5% of the population. These scores are simply not credible, especially considering her average and above average scores on tests like the ACT and MCAT and her good grades in college before accommodations were provided. For instance, on the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT), her score was at the 2nd percentile, at the estimated level of a child in eighth grade. But on the MCAT verbal reasoning section, which has an almost identical format, her performance was at the 67th percentile *compared to other medical school applicants*. That Dr. Smith took the NDRT score as valid suggests that he is inappropriately credulous. It is remarkable that he would claim that on the MCAT, Ms. Ramsay can employ special strategies to do well, but on a diagnostic test developed to be accessible to ninth grade students, she apparently cannot.[1] The 2018 diagnostic testing data regarding Ms. Ramsay's academic skills under timed conditions simply cannot be trusted; they are severely undermined by her real-world performance.

4.  Another discrepancy between real-world performance (at least as shown by objective records) and diagnostic testing is present with regard to ADHD symptoms. During the 2018 diagnostic evaluation, conducted to help secure extended time accommodations after two denials and likely a great deal of pressure, Ms. Ramsay endorsed having almost every symptom of ADHD (far more than most adults with ADHD would endorse!), and her mother and fiancé also described her as having many, many symptoms, well above the clinical thresholds for the disorder. In addition, on a computerized test of ADHD symptoms, her performance in Dr. Smith's evaluation was extremely poor, again much worse than would be expected even for most individuals with ADHD. Interestingly, on a very similar test the previous year, when she was not under as much pressure to secure accommodations, she did well; Dr. Smith never addresses this discrepancy, which would further undermine the results of his evaluation. And again, there are no objective records attesting to significant ADHD symptoms or impairment in real-world settings at any point in Ms. Ramsay's life.

5.  Dr. Smith argues that the data that Ms. Ramsay provided during his evaluation of her can be trusted because she performed well on the Test of Memory Malingering (TOMM). The TOMM was developed to identify people feigning *memory* problems, not to identify people working slowly on academic tests or reporting more ADHD symptoms than they actually have. Dr. Smith's apparent misunderstanding of the TOMM has led him to be far too credulous of Ms. Ramsay's evaluation data, especially given the stark contrasts between her real-world performance and her performance during the evaluation.

To summarize Ms. Ramsay's documentation with regard to learning disabilities and ADHD, (a) there is no objective evidence of poor academic skills or significant ADHD symptoms and impairment in real-world settings where most people in the general population are expected to do

---

[1] The contrast between the NDRT comprehension task and the MCAT verbal reasoning section is especially interesting because the *former* has been criticized for containing items that are easy to answer without reading the passages. In an experimental study, college students were able to often answer many items correctly when they were not even given the passages to read! See Coleman, C., Lindstrom, J., Nelson, J., Lindstrom, W., & Gregg, K. N. (2010). Passageless comprehension on the Nelson-Denny Reading Test: Well above chance for university students. *Journal of Learning Disabilities, 43*(3), 244-249. If there is any test where Ms. Ramsay should have been able to do very well, *at least when she is trying to do well,* it is the Nelson-Denny comprehension task.

well, (b) Ms. Ramsay and her advocates attempt to explain away her good real-world performance using unpersuasive arguments, (c) the data from her 2018 diagnostic evaluation are not credible, (d) her 2017 and 2014 diagnostic evaluations did not involve the collection of sufficient data to justify any diagnoses, and (e) her ACT and MCAT performance suggests an ability to access tests without accommodations, at least based on neurodevelopmental disorders such as ADHD and learning disabilities which would have been present by the time that those tests were taken. Again, let me note that my analysis does not consider the reported problems with headaches and a clotting disorder.


Benjamin J. Lovett, Ph.D.

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA RAMSAY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-2002 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| Defendant | : | |

**DECLARATION OF ROBERT D. SMITH, Ph.D.,**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Robert D. Smith, declare as follows:

1.     The facts in this Declaration are based on my personal knowledge, including my evaluation of the plaintiff, Jessica Ramsay described below, as well as my training and experience as a psychologist.  A copy of my professional *curriculum vitae* is attached hereto as Exhibit A.

2.     As set forth in my *curriculum vitae,* I have earned the degrees of Bachelor of Science in Psychology from Central Michigan University (1972), Master of Arts in Psychology also from Central Michigan University (1974), and Doctor of Philosophy in Counseling Psychology from Michigan State University (1984).  I completed a two year post-doctoral training program in neuropsychology through the Fielding Institute (now Fielding Graduate University, Santa Barbara CA) in 1999.  I am licensed as a Psychologist by the Michigan Board of Psychology, License #6301003249.  I have more than 25 years experience in conducting neuropsychological assessments of people with learning disorders and Attention-Deficit / Hyperactivity Disorder ("ADHD").

3.      Since 1994, I have worked as a Consultant at the Michigan Dyslexia Institute.  In this position, I regularly conduct assessments of both children and adults with learning disorders including dyslexia, and ADHD.

4.      On September 25, 2018, I conducted a Neuropsychological Evaluation of Jessica Ramsay at the Michigan Dyslexia Institute in Lansing, Michigan.

5.      I subsequently prepared a written report of the Ramsay evaluation, which is attached hereto as Exhibit B.

6.      My evaluation and my report applied generally accepted standards for evaluation of mental disorders, as set forth in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), published by the American Psychiatric Association, and the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10-CM"), which is the clinical modification by the National Center for Health Statistics (NCHS) for use in the United States of the International Classification of Diseases, published by the World Health Organization.

7.      As part of the Ramsay evaluation, I interviewed Ms. Ramsay and her mother Jerri Shold.

8.      As part of the Ramsay evaluation, I administered a number of standard assessment instruments including:  the Adult ADHD-Rating Scale-IV With Adult Prompts; the Nelson-Denny Reading Test; the Wechsler Individual Achievement Test-Third Edition (WIAT-III); the Woodcock-Johnson IV Tests Of Achievement (WJ-4) (Selected Subtests); the Gray Oral Reading Tests-Fifth Edition (GORT-5); and the Integrated Visual & Auditory Continuous Performance Test (IVA+Plus).

9.      As part of the Ramsay evaluation, I also reviewed school records, and records of prior evaluations by Drs. Lewandowski and Mr. Livingston, Ms. Ramsay's Personal Statement in support of her request to the National Board of Medical Examiners ("NBME") for testing accommodations on the United States Medical Licensing Examination ("USMLE"), and other correspondence relating to the request for accommodations.  These are listed at pages 1-2 of my Report.

10.     When I met with Ms. Ramsay on September 25, 2018, I was aware that she previously made requests to NBME for extended testing time as an accommodation for the "Step 1" examination which is part of the USMLE, and that NBME had denied her request. Ms. Ramsay informed me that it was her belief that she needed extended testing time for this examination because of extremely slow reading speed.

11.     I also was aware that Ms. Ramsay had submitted evaluations by Dr. Lewandowski and Mr. Livingston in support of her prior requests to NBME.

12.     Before conducting the evaluation, I informed Ms. Ramsay that I did not know, until I carried out the assessment procedures, whether she actually had a learning disorder such as developmental dyslexia and/ or ADHD or that I would find additional evidence of dyslexia and ADHD beyond what Dr. Lewandowski and Mr. Livingston had found.

### Dyslexia

13.     The efficient reading skills of the non-impaired (non-dyslexic) adult reader reflect the acquisition and integration of multiple components and subskills.  No single reading test measures these component reading skills.  Leading researchers and specialists in the field of dyslexia, such as Sally Shaywitz, M.D., Bruce Pennington, Ph.D., and Robin Peterson, Ph.D., recommend that a comprehensive evaluation of a reading disorder such as dyslexia include tests

that are designed to measure these component skills needed for efficient, practical reading. The battery of reading tests I utilized to evaluate Ms. Ramsay reflect such a battery of tests.

14.     After I conducted the evaluation, I concluded, and stated in my report, that "Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment." Report at 26. Further, "She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits persistently impaired reading rate and reading fluency compared to other adults her age, as reflected in WJ-4 Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension scores." *Id.* at 26-27.

15.     I also considered the September 11, 2018 letter from Catherine Farmer, Psy.D., Director of Disability Services of NBME, which denied Ms. Ramsay's requests for extended test time. A copy of Dr. Farmer's September 11, 2018 letter is attached hereto as Exhibit C.

16.     Dr. Farmer stated that the 2017 evaluation by Dr. Lewandowski reported that Ms. Ramsay's "reading, spelling and arithmetic are normal to above normal,." Farmer letter, Exhibit C, at 2. A copy of Dr. Lewandowski's report is attached hereto as Exhibit D. Although Dr. Farmer did not comment about any of Dr. Lewandowski's specific results, the only measure of reading skills used by Dr. Lewandowski was the Wide Range Achievement Test-4th Edition (WRAT-4), which does not measure reading speed, reading fluency or the impact of these on comprehension. The USMLE Guidelines for Testing Accommodations specifically state that the Wide Range Achievement Test is not "considered acceptable if used as the sole measure of

reading ability or academic skills."[1]  Consequently, the WRAT-4 is also insufficient to indicate

the absence of a reading disorder.  Since Dr. Farmer is employed by the NBME to review

accommodation requests, I had assumed that Dr. Farmer would be aware that any WRAT-4

scores would be an insufficient measure of the presence or absence of adequate reading skills.

The WRAT-4 measure of "Reading" is an untimed simple test, which only measures one of the

component subskills of reading and simply requires the examinee to read from a list of words,

which allows for optimum use of compensatory strategies under untimed conditions.  The

WRAT-4 is therefore  not a measure of speed, efficiency of word recognition or comprehension.

The WRAT-4 Reading Test is simply a subtest that measures accuracy of single word

identification under untimed conditions, which therefore allows for dyslexic reader to make

optimum use of compensatory strategies.

     17.     When I reviewed Dr. Lewandowski's report, I found that he had administered the

Wechsler Adult Intelligence Scale – 4th Edition ("WAIS-IV") which showed that Ms. Ramsay's

WAIS-IV Processing Speed Index was at the 8th percentile, *i.e.,* was greater than only 8 percent

of same-aged individuals.  *See* my Report at 29.  In other words, this result indicates that only 8

percent of same-aged individuals have a processing speed that is as low or lower than

Ms. Ramsay.  As discussed in my Report at pages 23-24, the designation of "average" and

"below average" is arbitrary, and fails to recognize that clinical judgment is allowed, and should

be used.  The same is true with respect to general designations such as "normal" and "below

normal."

---

[1] Found on the Internet (7/18/2019) at https://www.usmle.org/test-accommodations/guidelines.html#guidelines-learning-disorders.  A prior online version of USMLE guidelines, quoted at page 27 of my Report, stated that "WRAT-4 is considered to be an insufficient instrument as the primary assessment of reading, writing, or math skills."

18.    Therefore, and to further address Dr. Farmer's comments, I administered additional tests to Ms. Ramsay, in order to obtain additional information concerning her reading speed, reading fluency and comprehension.  The results are described in detail in my report, and include the following:

    a.    Ms. Ramsay's WIAT-III[2] Oral Reading Fluency was at the 1st percentile, *i.e.* greater than only 1 percent of same-aged individuals and far below average.  Report at 16 and 18.

    b.    Ms. Ramsay's WJ4[3] Reading Rate Cluster score of 66 was at the 1st percentile, and far below average.  Report at 21.

    c.    Ms. Ramsay's GORT-5[4] Fluency was at the 2nd percentile, and well below average.  Report at 22.

    d.    Ms. Ramsay "was only able to attempt 47% of the Nelson-Denny[5] Comprehension items during the standard time limit."  Report at 30.

19.    In her February 14, 2019 letter denying Ms. Ramsay's request for reconsideration, Dr. Farmer implied that these results, which she characterized as "exceptionally low scores," were not "valid" or "credible" because Ms. Ramsay took other standardized tests without accommodations, namely the American College Test or "ACT," a test which is used in the college admissions process, and the Medical College Admissions Test or "MCAT," a test which is used in the medical school admissions process.  February 14, 2019 letter (attached hereto as Exhibit E) at 2.  As I stated in my report, the ACT and MCAT are not a scientifically validated

---

[2] Wechsler Individual Achievement Test – 3d Edition.

[3] Woodcock Johnson IV Tests of Achievement.

[4] Gray Oral Reading Tests – 5th Edition.

[5] Nelson Denny Reading Test.

diagnostic measure of reading skills.  Report at 27.  By contrast, the Wechsler Individual

Achievement Test-Third Edition, Woodcock-Johnson IV Tests of Achievement, and Gray Oral

Reading Tests-Fifth Edition are scientifically validated measures of overall reading and measures

of component subskills designed by reading experts and the Nelson Denny Reading Test is a

supplementary test specifically designed to measure component reading skills.

20.     I also stated in my report that the ACT and MCAT "scores [Ms. Ramsay]

managed to attain are as much a reflection of the compensatory effects of her superior intellect

rather than an absence of reading impairment."  Report at 27-28.  However, her MCAT score

was depressed by her reading disability and did not accurately reflect her true knowledge and

ability, and thus limited her choice of schools and excluded her from consideration for

admittance to a wider range of educational and career options.

21.     Dr. Farmer stated that "your evaluator appears to accept your exceptionally low

scores on timed reading tests administered for the purpose of requesting test accommodations as

valid and credible."  Farmer letter, Exhibit E, at 2.  However, Dr. Farmer did not offer an opinion

about why those scores were not valid and credible, but simply dismissed them as not being

credible.  Questions about the validity or credibility of scores are commonly attributed to less

than optimum effort on the examinee's part.  To address such questions, evaluations typically

include administration of a so-called validity test as part of the battery of tests, which I did as

discussed in the next paragraph, and which Dr. Farmer failed to consider.

22.     Thus, Dr. Farmer failed to consider that, as part of my evaluation, I administered a

test called the "Test of Memory Malingering" or TOMM, which is a measurement of symptom

validity.  As stated in my report:

> The examinee is not informed as to the purpose of this measure and in fact
> was told that it measured an important memory component underlying

> reading skill. The absence of indication of suboptimal effort on the TOMM is an indication that Jessica's effort was not suboptimal. . . . Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning.

Report at 23.  Dr. Farmer's letter does not mention or discuss the results of the TOMM.  The results of the TOMM administered to Ms. Ramsay showed that Ms. Ramsay was making strong effort on not only the TOMM but also the other tests that I administered.  In this regard, I also stated in my report that, "In the context of her request for accommodations due to a reading impairment, the reading and writing scores that are within the average range are inconsistent with poor effort from either conscious or unconscious intent.  Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning."  Report at 23.

23.     In summary, and as stated in my report, my evaluation of Ms. Ramsay supports a diagnosis of Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition, 315.00 in DSM-5 and F81.0 in ICD-10-CM.

### Attention-Deficit/ Hyperactivity Disorder

24.     Part of the process for diagnosing ADHD in an adult is an interview with the person being evaluated, when possible in the presence of a partner and/or family member.  As stated above, I interviewed Ms. Ramsay together with her mother.

25.     As stated in my Report, Ms. Ramsay stated during the diagnostic interview that she has exhibited 9 of 9 criteria associated with the "predominantly inattentive" presentation of ADHD, and 8 of 9 criteria associated with the "predominantly hyperactive-impulsive presentation of ADHD.  Ms. Ramsay's mother endorsed 8 of the 9 inattentive symptoms, and 6 of the 9 hyperactive/ impulsive symptoms.  Ms. Ramsay's fiancé (who was not interviewed, but

did complete a checklist) endorsed 7 of the inattentive symptoms and 5 of the hyperactive/

impulsive symptoms.  Report at 14-15.  The DSM-5 requires only 5 inattention or 5 hyperactive-

impulsive symptoms to be frequently and persistently present over the previous six months, in

order to receive a diagnosis of ADHD.

26.     My interview with Ms. Ramsay and her mother, Ms. Shold, also confirmed that

these symptoms of inattention, distractibility and hyperactivity were present since Ms. Ramsay's

earliest school years, which is also a DSM-5 criteria for ADHD.  My interview with Ms. Ramsay

and Ms. Shold, also confirmed that these symptoms were present in several different settings

including home, school, and interpersonal relationships.  *See, e.g,* Report at 28-29.  Prior

evaluations by Mr. Livingstone and Dr. Lewandowski also confirmed these symptoms.

27.     I also administered the Integrated Visual & Auditory Continuous Performance

Test (IVA+Plus), a computerized test of sustained attention and distractibility.  As described in

detail at pages 13-14 of my report, many of Ms. Ramsay's IVA+Plus scores fell at the 1st

percentile, which is far below average, and supports a diagnosis of Attention-

Deficit/Hyperactivity Disorder Combined Presentation, 314.01 in DSM-5 and F90.2 in

ICD-10-CM.

28.     Dr. Farmer's letter does not mention or discuss the diagnosis of ADHD, except

for the unexplained conclusion that Ms. Ramsay does not have "pervasive ADHD symptoms that

limited any major life activity compared to most people in the general population."  Farmer letter

at 2.  I disagree.  If Dr. Farmer's conclusion is based on her comments about ACT and MCAT

scores, then these tests also are not diagnostic measures of ADHD.

29.     Dr. Farmer's letter stated, "[Ms. Ramsay's] documentation with regard to learning

disabilities and ADHD offers no objective evidence of impaired reading or pervasive ADHD

symptoms that limited any major life activity compared to most people in the general population." Farmer letter, Exhibit E, at 2. Ample evidence was presented that Jessica exhibits most of the ADHD criteria and has done so for most of her life. The DSM-5 states that symptoms ". . . interfere with, or reduce the quality of, social, academic, or occupational functioning. . . ." Dr, Farmer's statement also ignores the recognition by Ohio State University, the Western Michigan University Medical School and multiple professional opinions that her symptoms significantly interfere with her functioning and that she required many accommodations, including extended time for tests.

30.    In addition, Ms. Ramsay's accomplishments and scores on selective tests to which Dr. Farmer refers have been achieved through the mitigating effects of the compensatory test taking strategies she learned through test preparation courses and the mitigating effects of the ADHD medication she began in 2009. Substantial multiple and substantive objective evidence was offered, including my own report, that appears to have been rejected without credible explanation by Dr. Farmer. In my professional opinion, the information presented in my report and the clarifications presented in this Declaration present more than ample evidence for reasonable people to conclude that the accommodations Ms. Ramsay has requested are more than justified.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

_Robert D. Smith_ 7-18-19

Robert D. Smith, Ph.D.

Dated: 7-18-19





A nonprofit organization serving children and adults with dyslexia

## NEUROPSYCHOLOGICAL EVALUATION
For Learning Problems

| | |
|---|---|
| NAME: | Jessica E. Ramsay |
| AGE: | 28 years, 0 months |
| SEX: | Female |
| DATE OF BIRTH: | 8/29/1990 |
| EXAMINATION DATE: | 9/25/2018 |
| REPORT DATE: | 11/6/2018 |
| EXAMINER: | Robert D. Smith, PhD |
| LICENSE: | 6301003249 |

**Sources of Information:**
Interview with Ms. Ramsay and her mother, Jerri Shold
TEST OF MEMORY MALINGERING (TOMM)
ADULT ADHD-Rating Scale-IV with Adult Prompts
NELSON-DENNY READING TEST
WECHSLER INDIVIDUAL ACHIEVEMENT TEST-THIRD EDITION (WIAT-III)
WOODCOCK-JOHNSON IV TESTS OF ACHIEVEMENT (WJ-4) (Selected subtests)
GRAY ORAL READING TESTS-FIFTH EDITION (GORT-5)
SYMPTOM CHECKLIST-90-REVISED (SCL-90-R)
INTEGRATED VISUAL & AUDITORY CONTINUOUS PERFORMANCE TEST (IVA+PLUS)

**Records Reviewed**
The following records were made available at the time of this examination:
Alan Lewandowski, PhD, FACPN Neurocognitive Consultation (10/25/2017)
Alan Lewandowski, PhD, FACPN Neurocognitive Examination (12/7/2017)
Alan Lewandowski, PhD, FACPN Graphs and Raw Data for Neurocognitive Examination (12/7/2017)
Bruce Ruekberg, MD, letter supporting accommodations application (6/4/2018)
Genesis Family Health Center summary of medical history and status (5/17/2010)
The Ohio State University ADD/ADHD Verification Form (8/13/2010)
Decision letters of Essential Abilities Committee Request for Reasonable Accommodations (2014-2017)
USMLE Certification of Prior Test Accommodations (6/1/2018)
Alan Lewandowski, PhD, FACPN ADDENDUM response for additional information requested by USMLE and NBME (9/2/2016)

*Visit us at www.dyslexia.net*

| Flint Rotary Center | Detroit Metro Center | State Headquarters & Abrams Teaching Laboratory | Northern Michigan Center | St. Clair Center |
|---|---|---|---|---|
| G4225 Miller Road, B-10 | 3384 W. 12 Mile Road | 532 E. Shiawassee Street | 681 E. Lake Street | 1013 S. Seventh Street |
| Flint, MI 48507-1257 | Berkley, MI 48072-1344 | Lansing, MI 48912-1214 | Harbor Springs, MI 49740-1219 | St. Clair, MI 48079-5043 |
| (810) 732-5850 | (248) 658-0777 | (517) 485-4000 | (231) 526-9282 | (810) 329-7800 |
| Fax (810) 732-1180 | Fax (248) 658-0779 | Fax (517) 485-4076 | Fax (231) 526-8677 | Fax (810) 329-2927 |

David Overton, MD, letter supporting request for accommodations (4/12/2018)
Personal Statement regarding need for accommodations (6/6/2018)
NBME letter from Catherine Farmer, PsyD, regarding offered accommodations (9/11/2018)
MCAT Score Report for exams taken (11/4/2011)
Charles Livingston, MA, WAIS-IV score report (9/12/2014), report (9/22/2014), Addendum (9/12/2014)
ACT Score Report (3/2007 & 10/2007)
USMLE Step 1 Score Report (7/017)
Review of report cards for grades K, 2, 3, 4, 5, 6
Review of high school transcript
Review of undergraduate college transcript
Review of letters from Dr. Mary Alice Tanguay, Therapeutic Optometrist (1/27/2000 & 12/1997)

**Reason for Referral**

Ms. Ramsay is currently on academic leave from her fourth year of medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1, which is a requirement for continuing and completing her medical degree. She has formally been granted accommodations, such as extended time for tests and testing in a private room, during her undergraduate years at Ohio State University and at the Western Michigan University Homer Stryker, MD School of Medicine. Ms. Ramsay applied for the same accommodations from the National Board of Medical Examiners (NBME), which administers the USMLE, but was denied accommodations. She attempted the USMLE Step 1 without accommodations, but failed. She is appealing the NBME denial and sought this evaluation as part of her appeal.

**History and Interview Information**

Ms. Ramsay is currently living with her fiancé with whom she has lived for the past two years. She described her health as fair. She has several health conditions which are being appropriately medically managed. She had a deep vein thrombosis (DVT) the full length of her leg in 2016 and was later diagnosed with a clotting disorder. The DVT damaged the circulation in her legs, and sitting or standing for long periods causes painful swelling in her legs. Her vision is normal and was screened in August 2014. No hearing problems were reported and her hearing was evaluated in 2015. Ms. Ramsay was born in Texas. Her family moved to Michigan when she was 10 years of age. Her father is 57 years old, employed in sales, with a bachelor's degree. Her mother is 68 years old and is a retired art educator with a bachelor's degree in art education and a master's degree in education. She has two adopted brothers, ages 24 and 20. There is no history of substance abuse or severe psychological problems. Ms. Ramsay has had frequent headaches since she was very young, which her mother described as occurring during and after school as early as kindergarten. Beginning in third grade, she started having daily migraine headaches with blind spots, nausea, and hypersensitivity to light, sound and temperature, which was attributable to the mental strain from reading and writing for extended periods of time. Subsequent treatment over that next year reduced the frequency of migraines, but she has continued to experience migraine symptoms throughout her academic career.

Ms. Ramsay's mother had no problems or complications during pregnancy and Ms. Ramsay had no birth complications when born. There were no problems during her infancy/toddler period. Ms. Ramsay is ambidextrous, but was originally left handed.  Her kindergarten teacher made her use her right hand, which was common practice at that time.  When home she would use her left hand, but gradually switched to primarily using her right hand for writing tasks.  She does many activities with her left hand and frequently switches back and forth.

For leisure activities Ms. Ramsay socializes with friends and family, plays sports and works out.  She enjoys camping, hiking, art, hunting, archery, soccer, running, volleyball, watching football, dance, yoga, and weight training.

Ms. Ramsay reported that she tries very hard to succeed at schoolwork. She generally likes herself, though she indicated she is anxious and worried about her future because of having to suspend medical school.  She has difficulty falling asleep, but sleeps six to eight hours a night.  Her appetite is normal.  She has several close friends she can confide in.  She is often restless or fidgety and restless. She typically avoids anything that involves waiting.  She often makes careless mistakes.  Ms. Ramsay often has difficulty getting organized and finishing what she starts.  She often has difficulty concentrating on one thing for very long.  She is often easily distracted; she tends to forget what she is supposed to do and often loses her personal belongings.

Ms. Ramsay stated that she has marked difficulty sustaining attention, especially for extended periods, is very easily distracted by sounds, movement, and flashes of light, as well as her own thoughts and sensations. These distractions make it difficult to complete tasks that require sustained mental effort, such as thinking, maintaining conversation, remembering obligations and assignments, getting organized, staying on track, and completing tasks and projects.  For example, she reported that when voting in an election she has difficulty reading and comprehending proposals she is trying to vote on.  She often forgets where she put things such as her wallet, keys, assignments, phone, and legal documents. She also indicated that she is impulsive, has difficulty waiting, including for her turn in conversations. She unintentionally interrupts others, or blurts out her thoughts before fully thinking them through or appropriately filtering them for the situation.  It is very difficult for her to focus on one idea at a time and she jumps quickly from one thought to another. She frequently forgets things she needs to do, forgets instruction, forgets what someone just said to her, and loses her train of thought when talking.

During exams and when reading, she will get lost in unrelated thoughts and loses track of what the questions are asking.  She often unintentionally completes only part of the question in an exam. Consequently, she tries to compensate by reading and rereading the question aloud and double checking her answer selections.  She also is very restless when sitting is required and constantly needs to be moving around or doing something. When expected or required to sit for prolonged periods, she becomes very restless and fidgety, doodles on papers, picks at her hair or clothes, and messes with objects within reach, which can be disruptive to others around her and has caused others at school to complain. Not being able to sit still for extended periods interferes with her ability to study, work on assignments, maintain professional behavior at work, and watch television to relax at home.  Consequently, she typically needs to take frequent breaks from these activities to walk around and do something else to help manage her restlessness. Having to perform tasks that require

sustained mental effort often results in migraine headaches and associated blind spots, which affect her ability to see and read. The headache itself, along with the associated nausea and hypersensitivity to light, sound, and temperature, exacerbates her difficulty sustaining attention and ability to read, think, process, and answer questions.

*School History*

Ms. Ramsay (Jessica) has a history of academic struggle that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments, altered grading schemes, frequent breaks, and a private space for testing and completing classwork in order to compensate for distractibility, impaired attention and concentration, impaired reading comprehension, impaired reading speed, and hyperactivity.

Jessica's mother, Jerri Shold, recalled having difficulty learning to read when she was in kindergarten (in 1955) and early elementary school and was concerned that Jessica may have similar difficulties. The parenting books Ms. Shold read all recommended beginning sight words early, so Ms. Shold started working with Jessica during her preschool years up until it was time to start kindergarten. When Ms. Shold applied the sight word programs at home, Jessica could correctly identify letters if her mother pointed at specific letters within a sight word. She could repeat the word correctly when first read aloud by her mother, and could use the word correctly in a sentence. However, when later presented with the same sight words, Jessica could not recognize the sight words she had been previously exposed to no matter how many times her mother went through the words with her. Ms. Shold tried all the different methods suggested by these sight word programs, but the words didn't mean anything to Jessica. When Jessica was about four years old, the pre-school she was enrolled in (Prince of Peace) did some developmental and IQ testing to assess whether she was ready to start kindergarten. The evaluation showed that she was intelligent and was mentally ready to start kindergarten, but noted that when shown simple images she had trouble copying them correctly. It was concluded that Jessica's fine motor skills were not at the level of a five year old. Ms. Shold and her preschool teachers thought her fine motor skills were advanced for her age. Based on the testing, Jessica was put into kindergarten for half the day, and then went back to preschool for the remainder of the day, five days a week. Her teachers reported that Jessica still was not really grasping the sight words at that point, though she was doing fine in everything else.

Ms. Shold recalled that when she had her own difficulty learning to read she was sent home with packets to help her work on phonics and reading. Ms. Shold believed that this extra help with phonics made a big difference for her, so she wanted Jessica to have the foundation of phonics so that she would be able to break words down and sound them out if she didn't recognize them. None of the public schools in her area used a phonetic reading program to teach reading. Consequently, Jessica's mother identified a private school that used a phonics-based reading program (Sunset Oaks Academy) and transferred Jessica there, where she was enrolled in fulltime Kindergarten. Ms. Shold believed the phonetic reading program was important for Jessica to progress and also thought the smaller class sizes would allow Jessica to receive more one-on-one reading, spelling and writing instruction than Jessica would receive in the public school system.

Jessica attended the Sunset Oaks Academy and received extensive individual instruction in reading, spelling and writing through the phonics-based program from Kindergarten through the second grade.  Jessica received informal accommodations of a separate quiet space and extra time to complete tests and assignments.  In third grade she transferred to the Carrollton-Farmers Branch Public School System when the family moved.  Jessica attended the Carrollton-Farmers Branch Public Schools through the fifth grade. Jessica still struggled with reading, writing, and spelling when compared to her peers and her mother informed her teachers about her history and what prior teachers had done to help Jessica.

Jessica and her mother, Jerri Shold, also reported that beginning in her earliest school years and continuing through elementary school and beyond, Jessica had severe problems in the following areas: making many mistakes in her schoolwork, sustaining attention during tasks or activities, finishing schoolwork and tasks at home, organizing tasks, disliking or procrastinating on tasks that required sustained mental effort, losing things needed for task completion, being easily distractible, being forgetful in daily activities, fidgeting, not staying seated when expected, and not waiting or taking turns. Throughout elementary school, Jessica's teachers verbally commented to Ms. Should that Jessica was very bright, but a slow reader who often forgot to turn in completed assignments.

It has always taken Jessica significantly more time and effort to study and complete assignments than other students. For example, she recalled that friends would become frustrated with her when she would not join them for recreational activities because she would typically be working on homework until bedtime (often past midnight), while her friends completed their homework in the early evening and were free for leisure activities. Ms. Shold confirmed that this was typical of Jessica's evenings from early elementary school through graduation from high school.  Her first, second, third and fourth grade teachers noticed that Jessica had difficulty with reading, spelling and writing, and each teacher provided extra individual but informal remedial reading, spelling, and writing instruction during those grades.

Jessica's second grade teacher was concerned enough to recommend that her vision be tested. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. Jessica subsequently received visual perceptual skills training from Dr. Tanguay, though Jessica's school functioning did not improve.  Ms. Should, who has a master's degree in education, also worked nightly to remediate Jessica's reading, writing and spelling problems throughout elementary school. She regularly reviewed Jessica's work in middle and high school, as well as her essays throughout college and for medical school applications.  Jessica's parents did not pursue an evaluation for her learning problems because her hard work in the evenings and the informal accommodations she received masked the degree of academic struggle she experienced.

Jessica managed to get good grades during her elementary, middle and high school years with the aid of these accommodations, which were provided on an informal basis.  While Jessica's elementary, middle school and high school records do not reflect the struggle she reported, the early onset and chronic struggle that necessitated the accommodations, her teachers' verbal descriptions of Jessica's difficulty, and her mother's remedial efforts were corroborated by her mother.

Jessica graduated from high school in 2008 with a 3.75 grade point average. Because she did not have any type of formal diagnosis or accommodations, she did not know about the possibility of accommodations such as extended time and did not apply for or receive any type of accommodations when she took the ACT entrance exam for college.

During her freshman undergraduate year at Ohio State University, her compensatory strategies were overwhelmed by academic demands and her personal life. She experienced pronounced difficulty maintaining attention during tasks and activities, repeatedly misplaced things, lost track of completed assignments, made seemingly careless mistakes in her work, often misunderstood test questions and assignment directions and could not organize her tasks and activities. She spent increasingly more time on her schoolwork trying to compensate for these difficulties and neglected other important tasks, such as paying bills, cooking, cleaning, or engaging in leisure, recreational, social activities and sleep.

Jessica subsequently consulted her primary care physician, Dr. Allen Smiy, who diagnosed her with ADHD on March 24, 2009, and began pharmacological treatment. Jessica applied to the college's Office of Disability Services (ODS) and Dr. Smiy completed the Ohio State University ADD/ADHD Verification Form on August 13, 2010, which identified a DSM-IV diagnosis of ADHD, Inattentive Type and stated that Jessica often exhibited the DSM-IV inattention symptoms of having difficulty sustaining attention in tasks or other activities, having difficulty organizing tasks and activities, avoiding or disliking tasks that required sustained mental effort, being easily distracted by extraneous stimuli and being forgetful in daily activities. Jessica was approved by Ohio State University (OSU) to formally receive the accommodations of priority class scheduling, access to an assigned Office of Disabilities Services advisor, 50% additional testing time, a distraction reduced testing space, ear plugs for all quizzes or tests, supportive materials such as scrap paper for notetaking, colored pencils and highlighters to reword and draw diagrams on test questions for better understanding.

Jessica graduated from Ohio State University in 2012 with a 3.56 grade point average. With these formal accommodations, Jessica was better able to compensate for her inattention, distractibility, hyperactivity, and difficulties in reading and writing. However, there were still many tests that required a large amount of reading and/or writing that Jessica was unable to complete because there was still not adequate time for her to read all of the questions and/or write sufficient responses, though she understood the material being tested. In these instances, Jessica reached out to her professors about this continued struggle, and often her professors provided additional informal accommodations such as altered grading schemes or more time to complete unattempt portions, to allow Jessica to achieve a grade that better represented her competency.

Jessica did not find out that applying for accommodations for the MCAT was even a possibility until, near the end of her MCAT prep course through Princeton Review, one of the course instructors mentioned it while discussing Jessica's difficulty with reading. Jessica was advised not to apply or take the MCAT with accommodations unless she was unable to achieve an acceptable score after multiple attempts because her score report would show that she had received accommodations and that would hurt her chances of getting offered interviews. Jessica then made an appointment with her advisor at the OSU Office of Disability Services (ODS) to verify the possibility of receiving accommodations and the affect it would have on her application. Jessica's ODS advisor cautioned against taking the MCAT with accommodations for the same reason and also

explained that, while Jessica had adequate documentation from her initial diagnosis by Dr. Smiy to qualify for accommodations through OSU, the AAMC would likely require a full neuropsychology evaluation which would be expensive and was unlikely to be completed in time to apply for accommodations before her scheduled MCAT exam.

Because Jessica receive advice against receiving appropriate accommodation from multiple informed sources, she decided to try the MCAT without accommodations. When she took the exam, she relied on strategies suggested by her Princeton Review instructors in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested that Jessica not read the passages until she had first answered all the questions she could without reading the passage.  Only then with any remaining time, she could go back and try to answer the passage-dependent questions starting with the shortest passages. Finally, with the last minute, it was recommended that she randomly fill in answers to any questions she wasn't able to get to. Using this strategy, Jessica was able to obtain a good score in the 79th percentile (30M) of students who take the exam.  This, however, was not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. Jessica's performance on the MCAT component sections reflected her relative weakness specific to reading tasks with a Verbal Reasoning score at the 67th percentile, a Physical Sciences score at the 79th percentile and a Biological Sciences score at the 88th percentile.

Jessica applied to fourteen medical schools the first year after taking the MCAT and was only offered one interview, but was not accepted.  The next year she again applied to twenty-five schools and received only two interviews.  She was placed on a wait list for two schools, one of which, Western Michigan University, ultimately accepted her.  Jessica believes that because she took the MCAT under standard time and with no accommodations for her ADHD, her modest MCAT score did not reflect how much she knew in the three component areas of Physical Sciences, Biological Sciences and Verbal Reasoning. If Jessica had been able to take the MCAT with appropriate accommodations, she likely would have achieved a much higher score that more accurately represented her intelligence, understanding of the material, and ability to apply the information.

Once accepted, Jessica requested accommodations from Western Michigan University Homer Stryker MD School of Medicine because of her ADHD and symptoms of dyslexia when she first began taking classes.  She was referred to Charles Livingston, MA, for an evaluation to support her application for accommodations. Western Michigan University Homer Stryker MD School of Medicine approved her application and she was formally granted the accommodations of double exam time and a separate room to minimize distractions for all standardized NBME CBSE, Shelf exams and other exams written and administered by the school.  Jessica applied for the same accommodations for the USMLE Step 1 exam, administered by the National Board of Medical Examiners (NBME) in 2016, but was denied accommodations. She attempted the USMLE without any accommodations and failed.  Jessica is currently on academic leave from medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1 exam, which is required to continue her fourth year rotations and complete her medical degree.

MENTAL STATUS & OBSERVATIONS:   Jessica was neat in appearance and her demeanor was friendly and cooperative throughout the evaluation.  She made good eye contact and her speech was at a normal rate, expressed in a normal manner and readily understood.  Jessica did not have difficulty understanding directions and in the infrequent instances in which she appeared uncertain, she requested directions to be repeated or clarified.  She persisted answering questions and completing tasks for an appropriate amount of time. Her answers to this examiner's questions were clear with appropriate, unguarded elaboration.  Her mood and attitude were normal and her affect was appropriate.  Her thought process and content were normal.  Jessica was oriented to person, place, time and date.  Jessica made a consistently high level of exertion on all tasks and the test results and self-report are an accurate measure of her functioning.  Jessica did not take any of her ADHD medication on the day of the testing so that the results would more accurately reflect her functioning without the mitigating effects of the medications.

## ASSESSMENT RESULTS

**Symptom Validity**

*Test of Memory Malingering (TOMM)*

The TOMM was administered midway through the exam.   Jessica was told that the TOMM measured important memory skills needed for efficient reading.  Jessica's performance on the TOMM resulted in 50 of 50 items correct on Trial 2 and after a delay of 15 minutes she correctly answered 50 of the 50 items on the Retention Trial.  This pattern of TOMM scores does not reflect suboptimal effort.  Her overall pattern of test scores and behavioral performance reflected strong effort on all tests administered to her.

**Intellectual Functioning**

The following interpretation is based on the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) scores obtained by Alan Lewandowski, PhD, as part of a neuropsychological evaluation conducted on November 9, 2017.  The Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) provides a general overview of Jessica's overall thinking and reasoning skills, encompassing four broad domains:   Verbal, Perceptual, Working Memory, and Processing Speed.  The Verbal Comprehension Index (VCI) provides a measure of how well she did on tasks that required her to listen to questions and give oral responses to them.   The Perceptual Reasoning Index (PRI) indicates how well she did on tasks that required her to examine and think about designs, pictures, and puzzles, and to solve problems without using words.   Her ability to attend to information, to hold and process it in memory, and to give a response is measured by the Working Memory Index (WMI).   The last index, Processing Speed Index (PSI), provides information regarding her ability to process simple visual information quickly and efficiently.  When the Index scores are markedly different from each other, the Full-Scale IQ score is not the best summary of an individual's performance.  Alternate scores or the separate index scores should be used.

The scores show how well Jessica performed compared to a group of individuals of the same age from across the United States.  An individual may have WAIS-IV scores that fall within a wide range from Extremely Low to

Very Superior.  Most individuals, however, perform within the Average range.  A percentile rank is also reported.  This shows where the individual's scores rank relative to the national comparison group.  For example, if Jessica's percentile rank (PR) was 45, it would mean that she scored higher than approximately 45 out of 100 individuals her age.

*General Intellectual Ability*
The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range and exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words.  However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores.  Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability.  Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention-related Working Memory Index and Processing Speed Index subtest scores.   Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Her GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

*Verbal Comprehension*
Jessica's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the superior range and above those of approximately 95% of her peers (VCI=125; 95% confidence interval=118-130). The VCI is designed to measure verbal reasoning and concept formation. Jessica's performance on the verbal subtests contributing to the VCI presents a diverse set of verbal abilities; she performed much better on some verbal tasks than others. The degree of variability is unusual and may be noticeable to those who know her well. Examination of Jessica's performance on individual subtests provides additional information regarding her specific verbal abilities.

Jessica achieved her best performance among the verbal reasoning tasks on the Information subtest. Her strong performance on the Information subtest was much better than that of most of her peers. The Information subtest required Jessica to respond orally to questions about common events, objects, places, and people. The subtest is primarily a measure of her fund of general knowledge. Performance on this subtest also may be influenced by cultural experience and quality of education as well as her ability to retrieve information from long-term memory (Information scaled score=16).

*Perceptual Reasoning*
Jessica's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index (PRI) are in the very superior range and above those of approximately 98% of her peers (PRI=131; 95% confidence interval=123-136). The PRI is designed to measure fluid reasoning in the perceptual domain with tasks that assess nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli. Jessica performed comparably on the perceptual reasoning

subtests contributing to the PRI, suggesting that her visual-spatial reasoning and perceptual-organizational skills are similarly developed.

*Working Memory*
Jessica's ability to sustain attention, concentrate, and exert mental control is in the high average range. She performed better than approximately 77% of her peers in this area (Working Memory Index [WMI]=111; 95% confidence interval=104-117). Jessica's abilities to sustain attention, concentrate, and exert mental control are a weakness relative to her nonverbal reasoning abilities. At her level of ability, a relative weakness in mental control likely makes the processing of complex information more time consuming for Jessica, draining her mental energies more quickly as compared to others.

*Processing Speed*
Processing speed is an indication of the rapidity with which Jessica can mentally process simple or routine information without making errors. Jessica's ability in processing simple or routine visual material without making errors is in the borderline range when compared to her peers. She performed better than approximately 8% of her peers on the processing speed tasks (Processing Speed Index [PSI]=79; 95% confidence interval=73-89). Processing visual material quickly is an ability that Jessica performs poorly when compared to her verbal and nonverbal reasoning ability.

Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 43 | VCI | 125 | 95 | 118-130 | Superior |
| Perceptual Reasoning | 46 | PRI | 131 | 98 | 123-136 | Very Superior |
| Working Memory | 24 | WMI | 111 | 77 | 104-117 | High Average |
| Processing Speed | 12 | PSI | 79 | 8 | 73-89 | Borderline |
| Full Scale | 125 | FSIQ | 117 | 87 | 113-121 | High Average |
| General Ability | 89 | GAI | 132 | 98 | 126-136 | Very Superior |

Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Ability Level |
|---|---|---|---|---|---|---|
| VCI - PRI | 125 | 131 | -6 | 8.32 | N | 34.3 |
| VCI - WMI | 125 | 111 | 14 | 8.81 | Y | 18.4 |
| VCI - PSI | 125 | 79 | 46 | 10.99 | Y | 2.7 |
| PRI - WMI | 131 | 111 | 20 | 8.81 | Y | 9 |
| PRI - PSI | 131 | 79 | 52 | 10.99 | Y | 1.3 |
| WMI - PSI | 111 | 79 | 32 | 11.38 | Y | 3.7 |
| FSIQ - GAI | 117 | 132 | -15 | 3.51 | Y | 0.4 |

Base rate by ability level.

Statistical significance (critical value) at the .05 level.

Verbal Comprehension Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Similarities | 13 | 84 |
| Vocabulary | 14 | 91 |
| Information | 16 | 98 |
| (Comprehension) | 15 | 95 |

Perceptual Reasoning Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Block Design | 15 | 95 |
| Matrix Reasoning | 16 | 98 |
| Visual Puzzles | 15 | 95 |
| (Figure Weights) | 15 | 95 |
| (Picture Completion) | 14 | 91 |

Working Memory Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Digit Span | 12 | 75 |
| Arithmetic | 12 | 75 |

Processing Speed Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Symbol Search | 7 | 16 |
| Coding | 5 | 5 |
| (Cancellation) | 9 | 37 |

**Sustained Attention**

The IVA+Plus CPT (Integrated Visual & Auditory Continuous Performance Test) is a test of attention that measures responses to 500 intermixed auditory and visual stimuli spaced 1.5 seconds apart. The task is to click the mouse when the stimulus is an auditory or visual "1" and to refrain from clicking when the stimulus is an auditory or visual "2." A correct response is defined as exactly one click to a target stimulus. The individual taking the test must be able to discriminate between 1s and 2s, switch between sensory modalities, and maintain attention for about thirteen minutes. The targets ("1") occur frequently during some sections of the test and rarely during other sections, thus testing attention under both high and low demand conditions. The high demand condition is defined as a "block" of 50 trials when the 1s are frequent. The first two target presentations are excluded from the measurement of performance under high demand conditions and are categorized as being part of the previous low demand conditions block. The reason that these first two

targets are categorized in this way is that they are still pulling for errors of inattention as the test-taker has not yet made the transition to the mode of rapid clicking that is characteristic of the high demand block.

The quotient scores for all of the IVA+Plus scales are reported as standard scores. Standard scores have a mean of 100 and a standard deviation of 15. The Wechsler Intelligence tests, which are commonly used in schools to assess Full Scale, Verbal and Performance IQ, also use standard scores (i.e., Mean=100, SD=15).

In addition to reporting standard scores for the IVA+Plus scales, the narrative report below also provides percentile rank. A person with a standard score of 100 has a percentile rank of 50, meaning that about half the people taking the test scored higher on that scale, and about half scored lower. In this narrative report, percentile rank is given in the format "(PR=50)" immediately following each standard score that is reported. For example, "John's Auditory Vigilance Score of 80 (PR=9) fell in the mildly impaired range."

Jessica was administered the IVA+Plus twice, approximately one hour apart, as a check on the consistency of her responses.

### 1st Administration

*1st Administration*

#### VALIDITY OF TEST RESULTS

Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales. The validity of the IVA+Plus CPT is assessed by determining whether an individual's responses are characteristic of random responding. The test is considered valid only when the individual's decision to click to targets and inhibit clicking to non-targets is based on self-directed responses in accordance with the test rules. Statistically, the test results for a specific sensory modality are considered invalid when the probability of the individual's response pattern being self-directed in accordance with the test rules is less than 1 in 1000.

#### IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES

A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data. Jessica's global Response Control quotient scale score indicated an extreme impairment. In addition, her global Attention quotient scale score fell in the extremely impaired range. These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

#### SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES

The Full-Scale Response Control Quotient is a global measure of the overall ability for Jessica to regulate her responses and respond appropriately. Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 44 (PR=1). This score fell in the extremely impaired range. Her Auditory Response Control quotient scale score was 38 (PR=1). This global scale score fell in the extremely impaired range.

Jessica's Visual Response Control quotient scale score was 65 (PR=1). This global scale score fell in the severely impaired range.

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain her attention. This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 50 (PR=1). This global scale score fell in the extremely impaired range. Her Auditory Attention quotient scale score was 65 (PR=1) and this global scale score fell in the severely impaired range. Jessica's Visual Attention quotient scale score was 44 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions. In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions. Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1). This score fell in the extremely impaired range. Her global Auditory Sustained Attention quotient scale score was 65 (PR=1) and it fell in the severely impaired range. Jessica's global Visual Sustained Attention quotient scale score was 59 (PR=1). This score was found to fall in the extremely impaired range.

### 2nd *Administration*

#### *VALIDITY OF TEST RESULTS*
Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales.

#### *IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES*
A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data. Jessica's global Response Control quotient scale score indicated an extreme impairment. In addition, her global Attention quotient scale score fell in the extremely impaired range. These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

#### *SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES*
The Full-Scale Response Control Quotient is a global measure of the overall ability for this individual to regulate her responses and respond appropriately. Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 37 (PR=1). This score fell in the extremely impaired range. Her Auditory Response Control quotient scale score was 48 (PR=1). This global scale score fell in the extremely impaired range. Jessica's Visual Response Control quotient scale score was 44 (PR=1). This global scale score fell in the severely impaired range.

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain attention.  This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 58 (PR=1).  This global scale score fell in the extremely impaired range.  Her Auditory Attention quotient scale score was 72 (PR=3) and this global scale score fell in the severely impaired range.   Jessica's Visual Attention quotient scale score was 50 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions.  In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions. Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1).  This score fell in the extremely impaired range.  Her global Auditory Sustained Attention quotient scale score was 73 (PR=4) and it fell in the severely impaired range.   Jessica's global Visual Sustained Attention quotient scale score was 51 (PR=1). This score was found to fall in the extremely impaired range.

**Behavioral-Psychological Functioning**

During the diagnostic interview, Jessica indicated that she has exhibited nine of the nine criteria associated with attention-deficit hyperactivity disorder, predominantly inattentive presentation, and eight of the nine criteria of ADHD, predominantly hyperactive-impulsive presentation. Jessica endorsed the following symptoms:
- Fails to pay close attention to details or makes careless mistakes
- Has difficulty sustaining attention
- Often does not listen when spoken to directly
- Has trouble following through on instructions and often fails to finish school work, chores or work duties
- Has difficulty organizing tasks and activities
- Avoids tasks that require sustained mental effort
- Loses things needed to finish tasks
- Is easily distracted
- Is forgetful in daily activities
- Often fidgets or squirms in seat
- Has difficulty remaining seated when expected
- Feels very restless most of the time
- Talks excessively
- Has difficulty waiting for her turn
- Interrupts and intrudes on others

Jessica's mother endorsed eight of the inattentive symptoms and six of the hyperactive/impulsive symptoms, which corroborated many of the difficulties Jessica described.  The ratings provided by Jessica's fiancé also

confirms that these symptoms are frequently in evidence.  Her fiancé endorsed seven of the inattentive symptoms and five of the hyperactive-impulsive symptoms.

## Symptom Checklist-90-Revised (SCL-90-R)

Overall, Jessica's SCL-90-R symptom profile is not of a nature or magnitude to be considered in the clinical range. General symptomatic distress levels are average to low-average for her, suggesting good psychological integration, and little global psychological distress. Jessica's report reflects little evidence of psychological distress associated with somatic symptoms, or psychosomatic problems. Levels of obsessive-compulsive symptoms are clearly in the clinical range. However, the symptoms she rated as involving significant distress are all behaviors she described as either difficulty concentrating or behaviors used to compensate for her ADHD symptoms.  The other behaviors from this scale that directly related to obsessive-compulsive symptoms were rated as involving no distress. Depressive symptoms are somewhat above average in this individual's record, but do not appear clinically noteworthy. There are several isolated signs or symptoms of anxiety in the respondent's test protocol. However, they do not appear to represent clinically significant experiences. There is little or no evidence of paranoid thinking in this respondent's record.

|  | SOM | O-C | I-S | DEP | ANX | HOS | PHOB | PAR | PSY | GSI | PSDI | PST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nonpatient T Score: | 41 | 66 | 50 | 56 | 52 | 40 | 44 | 41 | 44 | 55 | 66 | 49 |
| Raw Score: | 0.08 | 1.50 | 0.22 | 0.54 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.38 | 2.13 | 16 |
| Outpatient T Score: | 34 | 51 | 35 | 36 | 36 | 32 | 38 | 33 | 30 | 35 | 48 | 32 |
| Inpatient T Score: | 35 | 51 | 37 | 37 | 38 | 36 | 37 | 33 | 31 | 37 | 48 | 34 |

*Primary Symptom Dimensions*
*SOM Somatization*
*O-C Obsessive-Compulsive*
*I-S Interpersonal Sensitivity*
*DEP Depression*
*ANX Anxiety*
*HOS Hostility*
*PHOB Phobic Anxiety*
*PAR Paranoid Ideation*
*PSY Psychoticism*
*General Indices*
*GSI Global Severity Index*
*PSDI Positive Symptom Distress Index*
*PST Positive Symptom Total*

**Academic Skills**

The Wechsler Individual Achievement Test--Third Edition (WIAT-III) is an individually administered instrument designed to measure academic achievement skills in individuals from age 4 through 50.   Descriptive statements are provided, ranging from Far Below Average to Far Above Average, based on the standard score. The scores and statements below are primarily based on age-based norms.  A percentile rank is also reported in the table of scores, which shows where the clients score rank compared to a group of clients of the same age from across the United States.   For example, if the percentile rank was 45, it would mean that the individual scored higher than approximately 45% of individuals her age.

The Total Reading Composite (TRC) is an overall measure of basic reading, fluency and reading comprehension.  It is derived from the Word Reading, Pseudoword Decoding, Reading Comprehension and Oral Reading Fluency subtests.  Jessica's Total Reading Composite score of 85 is at the bottom of the low average range and is higher than 16% of individuals her age.

The Basic Reading Composite (BRC) is a measure of applying phonemic knowledge and single word decoding. It is derived from the Word Reading and Pseudoword Decoding subtests.  Jessica's Basic Reading Composite score of 96 is average and is higher than 39% of other individuals her age. The *Word Reading* subtest measures speed and accuracy of single word reading. The individual is asked to read aloud from a list of words which yields a score for accuracy and a score for speed.  Jessica's Word Reading score of 100 is average and is higher than 50% of other individuals her age.   The *Pseudoword Decoding* subtest measures speed and accuracy in applying phonemic knowledge to decode pseudowords.  Jessica's Pseudoword Decoding score of 95 is average, which is the percentile rank of 37.   The supplemental scores for speed of performing subtests were also calculated.  The Word Reading Speed score is the same as or higher than the scores obtained by only 2% of individuals in the normative sample.  Ninety-eight percent of students in the normative sample scored higher than Jessica in the Word Reading Speed score.  The Pseudoword Decoding Speed score is the same as or higher than the scores obtained by only 5% of students in the normative sample; 95% of individuals in the normative sample scored higher than her Pseudoword Decoding Speed score.

 Jessica's Reading Comprehension and Fluency Composite score of 74 is in the well below average range and is higher than only 4% of other individuals her age.   The *Reading Comprehension* subtest is untimed and measures literal and influential reading comprehension skills using paragraph passages in which she was verbally asked open-ended questions by the examiner and was allowed to verbally give her answers.  The examiner was allowed and asked for elaboration or clarification of her answers as needed. Jessica's Reading Comprehension score of 94 is in the average and is higher than 34% of other individuals her age. The *Oral Reading Fluency* subtest measures oral reading fluency of narrative passages and yields separate scores for overall oral reading accuracy and component scores for oral reading rate and oral reading fluency.  Her overall Oral Reading Fluency score of 67 is far below average and is higher than 1% of other individuals her age.  Her Oral Reading Rate score of 65 is far below average and is higher than 1% of other individuals her age.  Her Oral Reading Accuracy score of 102 is average and is higher than 55% of other individuals her age.

The Written Expression Composite (WEC) is a measure of overall writing skills.  It is derived from the Spelling, Sentence Composition, and Essay Composition subtests.   The Spelling subtest measures written spelling of single words from dictation.  The Sentence Composition subtest includes sentence combining and sentence building components, which measure sentence formulation skills including grammar, syntax, semantics and mechanics.  Jessica's Written Expression Composite score of 100 is average and is higher than 50% of other individuals her age. Her Spelling score of 108 is average and is higher than 70% of other individuals her age. Jessica's Sentence Composition score of 104 is average and is higher than 61% of other individuals her age.

The Essay Composition subtest measures spontaneous written expression, which involves productivity, theme development, text organization, grammar and mechanics.  The individual listens to instructions about general content the essay is to contain and then must plan, write and finalize an essay within a ten-minute time limit. The Essay Composition required Jessica to write an essay about her favorite game and include at least three reasons for liking it.  The Essay Composition score is significantly influenced by the number of words produced, regardless of spelling, though theme development and organization contribute to the score.   A separate supplemental component, Theme Development and Text Organization, reflects theme development and organization.   Another supplemental subtest, Grammar and Mechanics, reflects grammar, punctuation, spelling and capitalization.  Jessica's Essay Composition score of 91 is average and is higher than 27% of other individuals her age.  Her Word Count score of 92 is average and higher than 30% of other individuals her age. Jessica's Theme & Text Organization score of 94 is average and is higher than 34% of other individuals her age.  Her Grammar & Mechanics score of 91 is average and higher than 27% of other individuals her age.

The Mathematics Composite (MC) is an overall measure of ability to calculate a variety of different math procedures and apply math procedures in tasks that require math reasoning.   It is derived from the Numerical Operations and the Math Problem Solving subtests.  The Numerical Operations subtest measures math skills under untimed conditions.  The Math Problem Solving subtest measures mathematics reasoning in solving math problems that are read to the individual. Jessica's Mathematics Composite score of 133 is far above average and higher than 99% of other individuals her age.  Jessica's Numerical Operations score of 125 is well above average and is higher than 95% of other individuals her age.  Her Math Problem Solving score of 136 is far above average and is higher than 99% of other individuals her age.

**WIAT-III**                                             **Age Based Scores: age at testing 28 years, 0 months**

**Composite Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Total Reading | 85 | 81-89 | 16 | Low Average |
| Basic Reading | 96 | 92-100 | 39 | Average |
| Reading Comprehension and Fluency | 74 | 67-81 | 4 | Well Below Average |
| Written Expression | 100 | 94-106 | 50 | Average |
| Mathematics | 133 | 129-137 | 99 | Far Above Average |

**Subtest Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Reading Comprehension | 94 | 84-104 | 34 | Average |
| Math Problem Solving | 136 | 130-142 | 99 | Far Above Average |
| Sentence Composition | 104 | 96-112 | 61 | Average |
| Word Reading | 100 | 94-106 | 50 | Average |
| Essay Composition | 91 | 82-100 | 27 | Average |
| Pseudoword Decoding | 95 | 89-101 | 37 | Average |
| Numerical Operations | 125 | 120-130 | 95 | Well Above Average |
| Oral Reading Fluency | 67 | 61-73 | 1 | Far Below Average |
| Spelling | 108 | 103-113 | 70 | Average |

**Cumulative Percentages**

| | |
|---|---|
| **Word Reading Speed** | The score is the same as or higher than the scores obtained by 2% of students in the normative sample; 98% of students in the normative sample scored higher than this score. |
| **Pseudoword Decoding Speed** | The score is the same as or higher than the scores obtained by 5% of students in the normative sample; 95% of students in the normative sample scored higher than this score. |

**Subtest Component Score Summary**

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Oral Reading Fluency** | | | |
| Oral Reading Accuracy | 102 | 55 | Average |
| Oral Reading Rate | 65 | 1 | Far Below Average |
| **Essay Composition** | | | |
| Grammar and Mechanics | 91 | 27 | Average |

**Subtest Component Score Summary**

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Sentence Composition** | | | |
| Sentence Combining | 105 | 63 | Average |
| Sentence Building | 104 | 61 | Average |
| **Essay Composition** | | | |
| Word Count | 92 | 30 | Average |
| Theme Development and Text Organization | 94 | 34 | Average |

**Differences Between Composite Standard Scores**

| Comparison | Difference | Critical Value (Significance Level .05) | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|
| Total Reading vs. Basic Reading | -11 | 5.88 | Y | <=5% |
| Total Reading vs. Reading Comprehension and Fluency | 11 | 7.93 | Y | <=10% |
| Total Reading vs. Written Expression | -15 | 6.83 | Y | >15% |
| Total Reading vs. Mathematics | -48 | 5.70 | Y | <=1% |
| Basic Reading vs. Reading Comprehension and Fluency | 22 | 8.06 | Y | <=10% |
| Basic Reading vs. Written Expression | -4 | 6.98 | N | >15% |
| Basic Reading vs. Mathematics | -37 | 5.88 | Y | <=1% |
| Reading Comprehension and Fluency vs. Written Expression | -26 | 8.77 | Y | <=5% |
| Reading Comprehension and Fluency vs. Mathematics | -59 | 7.93 | Y | <=1% |
| Written Expression vs. Mathematics | -33 | 6.83 | Y | <=1% |

***Note.*** A negative difference indicates that the second composite has a higher score than the first composite listed in the comparison.

**ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS**

Ability Score:      WAIS-IV FSIQ: 117

**Predicted Difference Method**

| | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 112 | 85 | 27 | 5.89 | Y | <=1% |
| Basic Reading | 110 | 96 | 14 | 4.83 | Y | <=15% |
| Reading Comprehension and Fluency | 112 | 74 | 38 | 9.26 | Y | <=1% |
| Written Expression | 111 | 100 | 11 | 7.12 | Y | >15% |
| Mathematics | 112 | 133 | -21 | 5.87 | Y* | N/A |

**Note.** Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.
*Indicates that the actual achievement score exceeds the predicted achievement score.

**ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS**

Ability Score:      WAIS-IV GAI: 132

**Predicted Difference Method**

| | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 121 | 85 | 36 | 6.10 | Y | <=1% |
| Basic Reading | 118 | 96 | 22 | 5.01 | Y | <=5% |
| Reading Comprehension and Fluency | 120 | 74 | 46 | 9.40 | Y | <=1% |
| Written Expression | 119 | 100 | 19 | 7.25 | Y | <=10% |
| Mathematics | 120 | 133 | -13 | 6.05 | Y* | N/A |

**Note.** Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.
*Indicates that the actual achievement score exceeds the predicted achievement score.

*Woodcock/Johnson IV (WJ-4) Tests of Achievement*

The Woodcock/Johnson IV (WJ-4) Tests of Achievement are untimed, with the exception of the fluency tests, and reflect a person's ability to perform tasks when they are able to use any strategies they have developed to compensate for any weaknesses they may have in information processing. Descriptive statements are provided, ranging from far below average to very superior, based on the standard score. Jessica was compared to other adults her age in the general population.

The Reading Rate Cluster provides a measure of automaticity when reading single words and single sentences. It is derived from the Sentence Reading Fluency and Word Reading Fluency subtests. The Word Reading Fluency subtest allows three minutes for the examinee to read rows of four words and mark two words in each row that are either synonyms, antonyms or members of the same category. The Sentence Reading Fluency subtest allows three minutes for the examinee to read sentences and mark them as true or false. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range, which is higher than 1% of other individuals her age. Her Word Reading Fluency score of 58 is in the Far Below Average range, which is higher than 0.2% of other individuals her age. Her Sentence Reading Fluency score of 78 is in the Well Below Average range, which is higher than 7% of other individuals her age.

**TABLE OF SCORES**
*Woodcock-Johnson IV Tests of Achievement Form B and Extended* (Norms based on age 28-1)

| CLUSTER/Test | GE | RPI | Proficiency | SS (95% Band) | SS Classification | PR |
|---|---|---|---|---|---|---|
| READING RATE | 3.9 | 1/90 | Extremely Limited | 66 (57-75) | Far Below Average | 1 |
| Sentence Reading Fluency | 5.2 | 5/90 | Very Limited | 78 (67-88) | Well Below Average | 7 |
| Word Reading Fluency | 3.0 | 0/90 | Extremely Limited | 58 (45-71) | Far Below Average | 0.2 |

## GRAY-ORAL READING TESTS-FIFTH EDITION

The Gray-Oral Reading Tests-Fifth Edition (GORT-5) is a comprehensive measure of reading fluency with separate measures for speed, accuracy, overall fluency of combined speed and accuracy, and comprehension. Jessica's performance was compared to a group of individuals aged 19 through 23 years, which is the oldest group available for comparison. The GORT-5 was administered because it is the most comprehensive and robust measure available that reflects functioning when oral reading fluency and reading comprehension are simultaneously required. The GORT-5 passages reflect a broader range of complex reading than other measures of oral reading fluency such as the WIAT-III Oral Reading Fluency subtest.

The GORT-5 provides separate measurements of speed, accuracy, comprehension, and an overall measure reflecting the three components combined. The oldest normative age group available for comparison is a group of 19-year-old to 23 year-11-month-old adults. The GORT-5 scores of Rate, Accuracy, Fluency and Comprehension were demonstrated to have a strong correlation with age in the normative sample until age 13, with the progression of raw score gains getting smaller with each year of age until plateauing in the ages of the oldest normative age group.

Jessica's Rate score of 3 is far below average and is higher than 1% of other individuals in the comparison group. The Accuracy score reflects the number of decoding errors, omitted words, inserted words and repetitions. Her Accuracy score of 5 is well below average and is higher than 5% of other individuals in the

comparison group.  The Fluency measure is derived from combining the Rate and Accuracy scores and is a measure of overall oral reading fluency.  Jessica's Fluency score of 4 is well below average and is higher than 2% of other individuals in the comparison group.  She was able to correctly read most of the words, but her reading was slow.  Jessica read in short two-to-four words phrases and her oral reading was very halting with many repetition of words and self-corrections.  The Comprehension measure is derived from open-ended questions about the content of each passage.  Jessica's Comprehension score of 3 is extremely below average and is higher than 1% of other individuals in the comparison group. The Oral Reading Index (ORI) is derived from the Fluency and Comprehension subtests.  The ORI is an overall measure of oral automaticity and reading comprehension.  Jessica's Oral Reading Index score of 65 is extremely below average and is higher than 1% of other individuals in the comparison group.

*Nelson-Denny Reading Test*

The Nelson-Denny Form H was administered with the standard time administration to Jessica and includes three subtests (Vocabulary, Comprehension and Rate).  The questions are presented in multiple-choice answer options.  Four scores are calculated: Rate, Vocabulary, Comprehension and Total Reading.  The first subtest, Rate, is calculated from the number of words read silently during the first sixty seconds of the Comprehension subtest.   The Vocabulary subtest has a standard time limit of fifteen minutes and consists of 80 multiple-choice items, each with five response options. The words were drawn from high school and college textbooks and vary in difficulty.  The second subtest, Comprehension, has a standard time limit of twenty minutes and requires examinees to read as many of the seven passages as they can (also drawn from high school and college textbooks) and to respond to as many of the total of 38 multiple-choice questions about the contents of these passages. The Total Reading score is derived by summing the Vocabulary raw score with the Comprehension raw score.

Jessica completed Form H and her performance was compared to second semester grade-16 university students.  Jessica's Rate score is far below average, at the 1st percentile rank.  She correctly answered 49 of the 52 Vocabulary items (94%) she was able to attempt during the standard time limit.  Her Vocabulary score is below average, at the 11th percentile rank and is a 13.1 grade-equivalent score.  She correctly answered 17 of the 18 Comprehension items (94%) she was able to attempt during the standard time limit.  Jessica's Comprehension score is far below average, at the 2nd percentile rank and is an 8.7 grade-equivalent score.  Her Total Reading score is well below average, at the 4th percentile rank and is a 10.6 grade-equivalent score.

Jessica's performance was also compared with second semester grade-12 high school students. This comparison resulted in a Rate score that is far below average, at the 1st percentile rank.  Her Vocabulary score is average, at the 54th percentile rank compared to high school seniors.  Jessica's Comprehension score is low average, at the 18th percentile rank compared to high school seniors. Her Total Reading score is average, at the 33rd percentile rank compared to high school seniors.

The Nelson-Denny was originally normed to allow for the individual's performance to be compared to other individuals in grades 9 through 16.  Additional norms for healthcare professionals were developed in 2001. These norms were developed from a group of 635 medical students, 269 dental students, 176 physical therapy students and 42 interns (Haught, P.A., & Walls, R.T. Adult Learners: New Norms on the Nelson-Denny Reading

Test For Healthcare Professionals. Reading Psychology 2002, 23, 217-238). Jessica's performance was compared to this group. Her Rate score is in the Far Below Average range, at the 1st percentile rank. Her Vocabulary score is in the Far Below Average range, at the 1st percentile rank. Jessica's Comprehension score is also in the Far Below Average range, at the 1st percentile rank. Her Total Reading score is in the Far Below Average range, at the 1st percentile rank.

**Discussion and Summary**

The Test of Memory Malingering (TOMM) measure is a symptom validity measure and was administered to detect whether Jessica was making suboptimal effort, either consciously or unconsciously. The examinee is not informed as to the purpose of this measure and in fact was told that it measured an important memory component underlying reading skill. The absence of indication of suboptimal effort on the TOMM is an indication that Jessica's effort was not suboptimal. Her performances on reading and writing tests was also highly variable, ranging from average to below average. In the context of her request for accommodations due to a reading impairment, the reading and writing scores that are within the average range are inconsistent with poor effort from either conscious or unconscious intent. Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning.

The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range and exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words. However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores. Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability. Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention related Working Memory Index and Processing Speed Index subtest score. Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Jessica's GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

Current diagnostic criteria for a diagnosis of a specific learning disorder in the DSM-5 requires that reading, writing or math scores be substantially below average compared to other individuals Jessica's age and cause a significant interference with academic performance. However, the designation of "average" and "below average" is acknowledged to be arbitrary with no clear cut-off score to indicate what is below average and causes significant interference with academic performance. A standard score of 78 or less, which is below the 7th percentile, offers the greatest diagnostic certainty. However, scores vary because of test imprecision, and clinical judgment is allowed. A more lenient threshold of scores of below one standard deviation (standard score 84 or lower) is applicable when learning difficulties are supported by converging evidence from assessment, academic history and school reports. While learning difficulties are generally exhibited during the early school years, they may not become evident until later school years when demands on academic skills

exceed the individual's restricted capacities. Some individuals with impaired functioning may obtain average or better grades that are achieved through extraordinarily high levels of effort and support until the pace of completing tasks and assessment mechanisms that rely on the impaired skill exceeds the individual's compensatory strategies. Consequently, the individual with specific impairments is unable to complete tasks that rely on the impaired skills or demonstrate what she has actually learned through assessment mechanisms that rely on these specific skills. A discrepancy between aptitude and academic achievement scores is no longer a DSM-5 diagnostic criteria indicating a specific learning disorder; however, the presence of substantial discrepancies between aptitude and achievement skill provide important information reflecting an abnormal degree of struggle that persists despite compensatory efforts.

Jessica's Mathematics Composite (MC) score of 133 is in the far above average range and above those of 99% of other adults her age. Consequently, a specific learning disorder with impairment in mathematics is not indicated.

The specific learning disorder of developmental dyslexia is a neurologically-based condition that results in an unexpected difficulty acquiring an understanding of letter-phoneme relationships, acquiring a capacity for efficiently processing phonological information, or developing rapid, automatic reading fluency (either oral or silent). A persistent weakness in phonological processing significantly impedes developing accurate word recognition, automatic, effortless word recognition-fluency and reading comprehension. Reading fluency is considered to be a complex capacity to read passages rapidly, smoothly, and automatically, with little effort or conscious attention to the mechanics of reading, which then allows the majority of mental capacity to be directed to reading comprehension. Dyslexic readers may be able to acquire the capacity to accurately identify or decode words through remedial efforts, but typically have difficult acquiring automatic oral reading fluency or rapid silent reading rate. Some dyslexic readers may develop the capacity for rapid oral reading fluency or rapid silent reading, but typically at the expense of reading comprehension. The dyslexic reader lags behind the non-dyslexic reader in developing automatic word recognition capacity and must use more of his or her attention and working memory capacity to the task of identifying words than the non-dyslexic reader, which interferes with comprehension.

Many dyslexic readers compensate for the limitations in automatic word recognition through over-relying on the use of the context. The reliance on context results in the reader being hesitant and pausing in order to infer the identity of words from the surrounding words they can identify. They may make an "educated guess" when they reach an unknown word or correct a word they realize they have misread because of their restricted automaticity. They may also misread a word only to read on and realize their mistake from the context and then reread the phrase or sentence with the correct word (although sometimes a still incorrect word) inserted. The result of such an overreliance on context is a monotone prosody that is characterized by short, choppy word groupings, some word-by-word reading, pauses, omissions, added words, rereading or self-corrections. By contrast, non-dyslexic readers' phonological skills increase with practice and they become automatic in their word recognition with little need to rely on the context of the words previously identified. Automaticity occurs without conscious thought or effort and leaves more cognitive resources available for attention, comprehension and retention.

Dyslexic readers may score well on a test of reading comprehension by using context, but they are spending more of their mental energy to do so than the non-dyslexic reader.  The dyslexic reader's comprehension capacity is therefore fragile and prone to errors.  They may manage to function at seemingly adequate levels during a relatively brief test of reading, but still have difficulty sustaining such comprehension levels because of mental fatigue.  Therefore, reading performance can be erratic.

Impaired dyslexic readers frequently encounters words in print that are within their vocabulary and that they have seen before, but remain unfamiliar when presented in print. In place of oral reading fluency that results from effortless automatic word recognition, the impaired dyslexic reader has to rely on compensatory strategies such as overreliance on the context of the passage and/or repeatedly reading the same passage to identify unrecognized words through inference from surrounding words. As a result, the dyslexic reader may achieve accurate word reading through very slow, careful reading and rereading of passages.  Alternatively, when reading rapidly, uncertainty and impaired oral reading fluency will be revealed through limited voice inflection (prosody), halting two-to-four word phrases, repetitions, omitted words, added words and mispronounced words, which often results in inconsistent reading comprehension.

Jessica exhibited a pattern of reading scores typical of the dyslexic reader described above.  The previous evaluation utilized an instrument that did not provide a comprehensive assessment of the component skills involved in efficient practical reading exhibited by the non-impaired reader, which encompasses most people in the general population. Jessica's basic reading skills are within the average range when not limited by time restrictions as measured by the WIAT-III Basic Reading Composite score of 96, which is higher than 39% of other adults her age.   Jessica's grasp of basic phonics is in the average range as measured by the WIAT-III Pseudoword Decoding score of 95 that is higher than 37% of other adults her age.  Jessica's WIAT-III Word Reading score of 100 is in the average range and she was able to read single words fairly accurately.

The WIAT-III Word Reading and Pseudoword Decoding subtests also have an additional separate component measure of the speed at which she read the list of words.  The examinee is covertly timed on the WIAT-III Basic Reading subtests. The examinee is instructed to read the lists as well as they can, but the instructions specifically avoid any mention of speed, or that they are being timed, and no timing device was visible to Jessica.  The efficiency and speed at which she read these pseudowords was slower than 95% of other adults her age and the efficiency at which she read these real words was slower than 98% of other adults her age.

Jessica's reading rate and level of oral reading fluency was further assessed through four different measures. The WIAT-III Oral Reading Fluency subtest and the Gray-Oral Reading Tests-Fifth Edition measure speed and accuracy of word decoding in passages with conceptually connected content, which allow for observations of her degree of automatic oral word recognition and decoding. The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency, which rely on how many reading comprehension tasks are correctly completed within a set time limit.  Overall, measures of her reading fluency encompassing reading speed resulted in performances that were well below average and far below average compared to other individuals her age and grade level.  Jessica obtained a WIAT-III Oral Reading Fluency score of 67, which is in the far below average range and reflects a relative weakness with oral reading fluency.  Her GORT-5 oral reading was very slow and replete with many accuracy errors. Her GORT-5 Rate scaled score of 3 is higher than

1% of other individuals from a group of individuals age 19 years through 23 years, and her Accuracy scaled score of 5 is higher than 5% of other individuals from that group.  Her Fluency scaled score of 4, which is a combination of the Rate and Accuracy performance, is in the well below average range and is higher than only 2% of the comparison group.

The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency that rely on the number of correct responses to reading comprehension items completed within a time limit.  The WJ-4 Reading Rate Cluster measures reading speed by way of the number of correct responses completed and is derived from the time-limited Sentence Reading Fluency and time-limited Word Reading Fluency subtests. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range and is higher than 1% of other adults her age.  Jessica was only able to read three of the seven NDRT passages and attempted only 47% of the 38 Comprehension items on the standard-time Comprehension administration.  She correctly answered 94% of the Comprehension items she attempted.  A majority of high school seniors were found to be able to read all seven passages and attempt all 38 Comprehension items. In addition, Jessica's Nelson-Denny Rate score was lower than 99% of high school seniors.

Jessica's reading comprehension was measured both by means that were not influenced by being required to read quickly or restricted by time limits and by measures that required her to read quickly or were restricted by time limits. Her reading comprehension performance was in the average range when not impacted by speed or time limits. Her reading comprehension performance was in the below average range when impacted by speed or time limits.  The WIAT-III Reading Comprehension subtest reflects reading comprehension under conditions when reading is untimed.  She obtained a WIAT-III Reading Comprehension subtest score of 94 that is in the Average range and is higher than 34% of other individuals her age.

The GORT-5 Comprehension subtest and the Nelson-Denny Reading Test reflects reading comprehension under conditions when speed is emphasized or time is restricted.  On the GORT-5, Jessica was specifically instructed to read passages out loud "as carefully and as quickly as you can."  The GORT-5 passage was then removed from sight after she completed the passage and she was asked five open-ended questions about the content of the passage.  Her GORT-5 Comprehension scaled score of 3 is in the far below average range and is higher than only 1% of the comparison group. The Nelson-Denny Reading Test (NDRT) measured her performance on a timed test.  She correctly answered 94% of the Comprehension items she was able to attempt during the standard twenty-minute time limit.  Jessica's NDRT Comprehension score is near the bottom of the low average range at the 18th percentile compared to grade-12 students, in the Far Below range at the 2nd percentile compared to grade-16 university students, and in the Far Below Average range at the 1st percentile compared to medical and healthcare students.

Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment.  Jessica's overall basic reading skills are in the average range as measured by the WIAT-III Basic Reading Composite score of 96, which reflects word decoding skills under untimed conditions.  She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits

persistently impaired reading rate and reading fluency compared to other adults her age, as reflected in WJ-4 Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension scores.

Although discrepancies between reading scores and aptitude scores are no longer one of the diagnostic criteria, such discrepancies reflect the frequency of the degree of unexpected struggle that occurs in the general population. Jessica's WIAT-III Total Reading Composite score of 85 is significantly below her Mathematics Composite score of 133 by a very uncommon margin estimated to occur in less than 1% of other individuals in the general population, which is a reflection of the difficulty she has experienced specific to acquiring reading skills. Her WIAT-III Mathematics Composite score of 133 is commensurate with an expected score of 120 predicted by her GAI score.  However, all of her WIAT-III reading composite scores are significantly below expectation whether the expectation is measured with the FSIQ or the GAI score.  Jessica is expected to have a WIAT-III Reading Comprehension and Fluency Composite score of 112 predicted from her FSIQ score but her actual Reading Comprehension and Fluency Composite score is 74.  This is a very uncommon discrepancy of 38 points estimated to occur in 1% or less of other adults.  Similar very uncommon discrepancy margins can be seen between her predicted scores and her actual WIAT-III Basic Reading Composite and Reading Comprehension-Fluency Composites with even larger discrepancies based on her GAI score.   Jessica's history and pattern of reading scores indicate and warrant a diagnosis of Specific Learning Disorder with impairment in reading that involves reading rate, reading fluency and reading comprehension. Her impairment in reading is exacerbated by the effects of ADHD.  The severity of her impairment in reading is severe.

Double the usual time for any timed test is recommended because of Jessica's very slow reading speed and difficulty comprehending the content of passages.  The letter of September 11, 2018, from Dr. Farmer denying extended time stated that the 2017 evaluation by Dr. Lewandowski reported that "your reading, spelling and arithmetic are normal to above normal."    However, the only test of her reading skills used by Dr. Lewandowski was the Wide Range Achievement Test-4th Edition (WRAT-4), which does not measure reading speed, reading fluency or the impact of these on comprehension.  The WRAT-4 is considered to be an insufficient instrument as the primary assessment of reading, writing, or math skills.  The USMLE Guidelines for Testing Accommodations specifically states, "The Nelson-Denny Reading Test (NDRT) and Wide Range Achievement Test (WRAT) are not comprehensive diagnostic measures of achievement and therefore neither is considered acceptable if used as the sole measure of reading ability or academic skills."

Dr. Farmer also stated that "documentation does not demonstrate a developmental history of impaired scholastic skills."  Although not formally identified in her academic records, the records she provided this examiner reflect specific statements by her (and referred to in Dr. Lewandowski's report) about the difficulty she experienced from her earliest elementary years in acquiring reading and writing skills.  Dr. Farmer cited her high school grade point average as proof that she did not reflect developmental history of impaired academic functioning when in fact she stated that she achieved her  high grades because of the inordinate amount of time she had to devote to school work when compared to other students, as well as the informal accommodations she received.  Dr. Farmer further cited her scores on the ACT and MCAT as proof that her academic functioning was not impaired.  The ACT and MCAT are not comprehensive diagnostic measures of reading or other academic skills any more than the WRAT is, and the scores she managed to attain are as

much a reflection of the compensatory effects of her superior intellect rather than an absence of reading impairment.  While her scores on the ACT and the MCAT were good, she may have scored significantly higher if she had taken these tests with accommodations of a separate room and extended time.  Consequently, the ACT and MCAT scores do not provide an indication of the negative impact of her reading disability.

It is noteworthy that recent students with her MCAT score, while good at the 79th percentile combined with her college GPA, only had an acceptance rate of 38% according to the Association of American Medical Colleges.   Dr. Farmer also stated in reference to Dr. Lewandowski's evaluation that "Your evaluator's conclusions not withstanding, he reports that her performances on a computerized measure of attention-related problems, the Conners Continuous Performance Test Third Edition (CPT-3) are normal." However, according to a leading ADHD researcher and specialist, "… a sizable minority of adults with ADHD can perform these tests sufficiently well to make for an unacceptable level of false negatives for these tests."[1] The DSM-5 specifically states that, "Inattentive behavior is associated with various underlying cognitive problems on tests of attention, executive function, or memory, although these tests are not sufficiently sensitive or specific to serve as diagnostic indices." Consequently, neuropsychological tests including continuous performance tests, can provide supplementary evidence for ADHD, but seemingly normal performance cannot be used to rule out the condition.

Jessica's writing skills are in the middle of the average range compared to other adults her age as measured by the WIAT-III Written Expression Composite score of 100, which is as high or higher than 50% of other adults her age.  The subtests and component scores are also within the average range for her age.  Consequently, a specific learning disorder with impairment in written expression is not indicated.  However, Jessica's WIAT-III Written Expression Composite score of 100 is significantly below an expected score of 119 predicted by her GAI score of 132 and by an uncommon margin estimated to occur in 10% or less of the general population. This pattern represents a significant relative weakness performing writing tasks, which is presumed to be a consequence of her reading disorder and the ADHD. Jessica can be expected to be relatively slow at organizing and expressing her thoughts in writing at a level commensurate with her intelligence, which is reflected in the distinct weakness she exhibited with general processing speed as measured by the WAIS-IV.    Consequently, additional time is needed on writing tasks in order to perform at a level commensurate with her intelligence.

Jessica Ramsay is a 28-year-old, single female medical student with superior intelligence who has a long history of inattention, distractibility and hyperactivity that have significantly interfered with academic functioning since early childhood.  Jessica has been able to perform well academically, but has had to rely on extraordinary compensatory strategies in order to do so. Jessica's academic and behavioral history reflect DSM-5 diagnostic criteria indicating ADHD, Combined Presentation.

Jessica reported often experiencing 17 of the 18 DSM-5 criteria symptoms associated with ADHD that have persisted for at least the past six months with most having been present since her earliest years in school.  The persistently frequent manifestation of these symptoms was corroborated by her mother and her fiancé.  On a

---

[1] Barkley, R., Murphy, K., Fischer, M. (2008). ADHD IN ADULTS: What The Science Says (p. 433). New York, NY: The Guilford Press.

systematic rating score of the frequency of occurrence of the DSM-5 ADHD symptoms, Jessica endorsed 17 (her mother, 14 and fiancé, 11) of the 18 criteria that are associated with a diagnosis of ADHD. Only 5 inattention or 5 hyperactive-impulsive symptoms are required to be frequently and persistently present over the previous six months. The ADHD symptoms described or endorsed by Jessica, her mother and fiancé are prominently exhibited at school, at her home and with her interpersonal relationships. These symptoms were reported by Jessica and corroborated by her mother to have interfered with and reduced the quality of her academic functioning and her daily adaptive functioning since her earliest school years.

The available school records do not clearly reflect academic struggles in elementary, middle or high school, but this is a result of the family obtaining help on an informal basis, which was very successful in preventing poor academic grades, and therefore masked the degree of struggle Jessica experienced during these years. In addition, the specificity of Jessica's descriptions, which are corroborated by her mother, attest to the presence of such struggle. Although Jessica has worked hard at compensating for her deficits, her symptoms have continued to significantly interfere with her life. Results of the IVA+Plus, a computerized test of sustained attention and distractibility, reflect a severe impairment compared to other adults her age. In addition, her WAIS-IV Processing Speed Index score at only the 8th percentile for her age reflects a weak cognitive efficiency highly associated with ADHD. Jessica's symptoms are not better explained by any other psychiatric or medical condition. Her medical exams with her physician do not indicate a physical disorder or disease other than ADHD and a Specific Learning Disorder with impaired reading that would account for her ADHD symptoms or academic difficulties. Jessica's mental status and the magnitude of her psychological symptoms do not indicate a psychological condition severe enough to account for her ADHD symptoms or her academic difficulty. Jessica has also experienced longstanding feelings of discouragement, frustration, and anxiety which are best understood to be a direct secondary consequence of her underlying ADHD symptoms. Consequently, a diagnosis of ADHD, Combined Presentation is warranted in addition to a Specific Learning Disorder with impairment in reading.

**Diagnosis:   DSM-5 criteria synchronized with ICD-10-CM numerical coding**

1. Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition, 315.00 (F81.0)

2. Attention-Deficit/Hyperactivity Disorder Combined Presentation 314.01 (F90.2)

**Recommendations:**

1. Jessica's pattern of reading and writing scores is typical of the intelligent dyslexic reader who struggles with efficient decoding and processing of the printed words, but can use her intelligence to substantially compensate and extract seemingly adequate comprehension from passages.  However, the intelligent dyslexic reader's reading comprehension is fragile and susceptible to abrupt lapses and failure that interferes with academic achievement commensurate with her intelligence. Jessica's level of reading impairment is severe and can be expected to significantly and substantially interfere with educational efforts without accommodations such as extended time.  Her impaired reading skills significantly interfered with her performance on the Nelson-Denny Reading Test because of the standard time limit. Jessica correctly answered most of the items she attempted on Nelson-Denny Reading Test, but she indicated this required her to reread passages multiple times in order to gain adequate comprehension.  Consequently, her percentile rank scores were severely limited because of the time constraints.  Jessica correctly completed 94% of the Comprehension items she attempted, but was only able to attempt 47% of the Nelson-Denny Comprehension items during the standard time limit.

   Consequently, it is recommended that Jessica receive at least double the standard time allowed for tests and exams.  Any classroom test or standardized test administered without the accommodation of extended time (double) will not be an accurate and valid measure of Jessica's knowledge in a given area.  Likewise, Jessica's weakness in writing can be expected to significantly and substantially interfere with educational and assessment efforts without accommodations such as extended time. Any tests administered without extended time (at least double) should be regarded a significant and substantial under-representation of Jessica's actual abilities and knowledge, which impairs her access to the exam. Therefore, it is also recommended that at a minimum she be allowed extended time (double the standard time) for any classroom tests, standardized tests and classroom assignments.

2. At least 100% additional test time (double time) is also recommended because of her inattention, distractibility, and slow information processing. This should be used in conjunction with a private, quiet room and additional break time to address basic needs and to adequately manage ADHD symptoms and her medical disorders. Any test administered without these accommodations will not be an accurate measure of what she knows about the subject being assessed.

3. The use of a computer, computer word-processing software with spell-check, and extended time is recommended for any classroom tests or standardized tests that involves writing.   The extended time is also necessary to adequately utilize any assistive technology for reading and writing.

4. Reading material should also be provided to Jessica in audio recorded format.  An online certification has been completed to allow her to apply for a Learning Ally (learningally.org) membership.

5.  Tutorial support and assistance from the college academic support services for her reading and writing problems is recommended as needed to help Jessica function at a level commensurate with her intellectual abilities.

6.  Remedial reading instruction following the Orton-Gillingham approach may be beneficial for her dyslexia and is recommended for consideration. This is available through MDI.  However, this is a slow process and unlikely to benefit her while she is in medical school.  Also, improvement of reading fluency is uncertain and it is unknown what benefit, if any, she may obtain from such instruction.

7.  Continue treatment through her physician for ADHD with medications such as Concerta, Adderall, Intuniv, Strattera, Vyvanse, Wellbutrin or Provigil.


Robert D. Smith, PhD
Licensed Psychologist
Neuropsychologist



| Welcome | Services | DYSLEXIA Info | ADHD/ADD Info | Credentials | Cost | Contact | Resources |

## <u>Welcome</u>

Specializing in the assessment and treatment options for:

- *DYSLEXIA*
- *ADD/ADHD*
- *LEARNING DISORDERS*
- *EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED EXAMS*
- *IQ OPTIMIZATION*
- *PSYCHOTHERAPY*

## <u>Services Can Be Tax Deductible–<span style="color:red">Click Here</span></u>

- Adults and teens with learning disabilities may be able to get additional time and other accommodations in high-stakes testing situations (SAT, ACT, MCAT, LSAT, GRE, GMAT, etc). Dr. Smith offers neuropsychological evaluations to individuals who are seeking documentation as part of their application to request more time and/or other accommdations.

- BEWARE! Some websites offer so-called evaluations at a much lower cost.  However, many of these so-called "diagnoses" are not real because the practicioners are not licensed to provide a real diagnosis and use definitions that are not officially recognized and are therefore not real.  An official DSM-5 (Diagnostic and Statistical Manual of Mental Disorders) diagnosis is necessary when you are trying to qualify for services at school or work.

- Dr. Smith is a licensed psychologist and neuropsychologist and is a consultant for the Michigan Dyslexia Institute and provides comprehensive neuropsychological evaluations for Dyslexia, ADHD and other Learning Disorders at the Michigan Dyselxia Institute Abrams Teaching Laboratory in Lansing and at the Michigan Dyselxia Institute Detroit Metro Center in Berkley Michigan.

- Not sure if an evaluation is right place you or your child? All evaluations by Dr. Smith consider a braod range of causes for reading and other learning idsorders, not just Dyslexia. During the Intake Interview your history and previous evaluations, if you have them, are reviewed to determine what tests need to be administered to address your concerns and Dr. Smith will evaluate for other types of conditions that are indicated. All of this will be discussed thoroughly with you after the Intake Interview and before any testing so you can make an informed decision about what's best for you.

- Please feel free to call Dr. Smith's office if you are interested in an evaluation or services and have any questions. There are many possible considerations depending on your situation.  Dr. Smith has tried to anticipate as many questions as possible throughout this website, but if you can't find what you need, please call Dr. Smith's office at 517-349-5987.

- The Michigan Dyslexia Institute, Inc. (MDI) is a nonprofit organization, funded by a combination of grants, donations and fee for service programs serving children and adults through five regional centers throughout Michigan. MDI provides teacher training, cooperative programs with school districts and state agencies, public information about dyslexia, diagnostic evaluation and remedial reading instruction.

<span style="color:red">Michigan Dyslexia Institute</span>

DEFENDANT'S
EXHIBIT
**34**

---------------------------------------------------------

Various forms of payment are accepted, including check, Visa, Mastercard, American Express.

## Robert D. Smith, PhD

*Diagnosis & Treatment for Dyslexia, ADD & Learning Disorders*
*IQ Optimization*
*Children & Adults*

### NEUROPSYCHOLOGICAL EVALUATION FOR DEVELOPMENTAL DYSLEXIA AND ADHD (ADD)
(cost $2030) (procedure codes 96132, 96133, 96136, 96137)

This is for the purpose of determining whether a child or adult has the reading problem that meets the criteria to receive a formal diagnosis of a Reading Disorder (developmental dyslexia ) and attention deficit disorder ( ADD or ADHD ). It involves an assessment of overall cognitive functioning, tests of attention, questionnaires, rating scales and reading tests. A formal diagnosis is necessary if you are seeking insurance reimbursement or are trying to obtain special accommodations under the American with Disabilities Act in school, for standardized testing or for employment purposes. This evaluation results in an integrated written report.

Problems with IQ Testing:

Traditionally, the principal method of diagnosing learning disabilities, such as dyslexia, has been to compare measured intelligence and achievement level such as reading. It is expected that the reading score for instance, will be significantly below the IQ score if dyslexia is present. Other factors are also considered, but he center piece to diagnosis is this discrepancy in scores. However, there are serious problems with this approach that are frequently not considered in a diagnostic evaluation.

First, the concept of intelligence being a single ability accurately represented by a single score such as IQ has been seriously challenged by research. The overall functioning that is represented by IQ is actually the result of at least four, (and possibly more) separate cognitive abilities. The are most commonly identified as verbal reasoning, nonverbal reasoning, working memory and processing speed. When these are all functioning at the same level, then a single score such as the IQ can be regarded as validly representing a person's intelligence. However, It is not uncommon for people with learning disabilities to have very uneven functioning in these four areas, perhaps ranging from very low to very high. Consequently, a child or adult's reasoning and learning abilities may be much higher than what is reflected in the IQ score. Unfortunately, it is the lower IQ score that is often used in calculating the discrepancy between ability and achievement such as reading resulting in a discrepancy that is deemed within normal limits. Consequently, the learning disability that is actually present is not detected. Failing to detect a problem that actually present is called a false negative.

There are additional consequences in not properly interpreting intelligence tests. Working memory and processing speed are considered aspects of attention and are closely associated with some type of attention deficit disorder. Impairments in these areas strongly suggests that an evaluation for ADHD or ADD is in order. Relying on the traditional IQ score may mask actual impairments and result in failure to detect a problem, when in fact a problem is present. Again a false negative. This can also result in serious under measurement of actual ability or potential. Unfortunately many psychologists are only trained to use the traditional IQ score and ignore indications that a traditional IQ score is invalid.

Problems with Testing Reading:

Automaticity is acquired in the latter stage of reading acquisition when decoding of words is automatic and therefore rapid, which allows more mental resources to be directed to the task of reading comprehension. Automaticity is necessary for practical reading typical non–dyslexic readers. However, the extra steps and mental effort the dyslexic reader must use to perform basic decoding continues to reflect the ongoing interference that their dyslexia has with practical reading. Most reading tests that are used to evaluate for dyslexia are untimed and do not require Automaticity of decoding and will often fail to detect the presence of dyslexia in a person who has had substantial remediation. People with dyslexia who have had substantial amount of remedial reading instruction can often perform well on these untimed tests. Consequently, it is important to administer reading tests that require Automaticity of decoding for the evaluation to have a reasonable chance of detecting dyslexia. Unfortunately, such tests are often not included in an evaluation, which may result in a false negative diagnostic conclusion.

Problems with ADHD or ADD testing:

There is considerable controversy at the present time over what are the core symptoms of ADHD or ADD. ADD, which is ADHD, Predominantly Inattentive Type, is particularly difficult to diagnose because hyperactivity or impulsiveness are not the primary symptoms. People with ADD are not disruptive and are often well behaved in classrooms. Their symptoms involve internal, silent problems of mental processing of information that results in poor academic performance. Because their symptoms are not readily noticed by observers, their condition often goes undetected despite the suspicion that something is just not right. Because of the controversy regarding the core symptoms and the difficulty detecting symptoms evaluations often result in false negatives when in fact there is a problem. Evaluations require a care review of all tests, history, grade reports, teacher reports and parent reports.

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA RAMSAY, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-2002 |
| | : | |
| NATIONAL BOARD OF MEDICAL | : | |
| EXAMINERS, | : | |
| Defendant | : | |

**DECLARATION OF JESSICA RAMSAY IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

I, Jessica Ramsay, declare as follows:

1.      The facts in this Declaration are based on my personal knowledge.

2.      I am 28 years old and reside in Kalamazoo, Michigan.

3.      For more than 10 years, I have dreamed of and worked very hard toward

attending medical school and becoming a physician.  I am now a student at the Homer Stryker

M.D. School of Medicine which is part of Western Michigan University in Kalamazoo,

Michigan ("WMed").  I entered WMed with the first entering class in 2014, with an expected

graduation date of 2018, and I have completed the first three years of the four year M.D.

program.  I was chosen by the members of my entering class for membership in the Upjohn

Humanism Honor Society, an honor society made up of medical students who have been

identified as possessing outstanding clinical and interpersonal skills. *See* www.gold-

foundation.org/programs/ghhs/.[1]

---

[1] The members of my class were not eligible for the Gold Humanism Honor Society ("GHHS"), which is a national organization, because we were the first WMed class.  The GHHS suggested that WMed could create its own society for our class, using the same criteria, and this became the Upjohn Humanism Honor Society.

DEFENDANT'S
EXHIBIT

2

4.    However, because of the problems with the examinations that are administered by defendant, the National Board of Medical Examiners ("NBME"), that are the subject of this litigation, I did not graduate with my class in 2018.  The other members of my class have not only graduated, but have gone on to medical residency programs, which are the next stage of physician training.  By contrast, I have been compelled to take a leave of absence.  My potential graduation date has been delayed for 3 years.  If I can eventually overcome the problems with NBME, and resume my studies at WMed, I still will have lost the opportunity to graduate with my fellow students from the class of 2018.

5.    For my entire life, including primary and secondary school, college and medical school, I have had to struggle with the obstacle of very slow reading speed and problems with attention and distractibility.

6.    These disabilities are a problem for me not only in taking timed and standardized written tests, like the tests involved in this proceeding, but also in everyday life.

7.    The average person is able to scan documents, read and write, and process, recall and organize information efficiently, but I cannot.  In order to do any of these things, I must spend much more time and energy every day than most people need to.  Furthermore, the additional time and energy spent on these tasks takes away from the time, energy, and focus needed to manage other important life responsibilities like cooking, eating, cleaning, paying bills, running errands, doing laundry, sleeping, and self-care.

8.    I have always struggled with flipping, merging, and tangling letters, characters, and words both when reading and writing. I also have trouble distinguishing between words and characters that have similar shapes – characters such as **qbdp, 96, wunm, JL, 3E, 9y, 5sae, 4A,** and words like united/untied, serves/verses/reverse/server/severe/reserve, quite/quiet, from/form,

reared/reread, and though/thought/through/trough/tough – so it takes me a long time to isolate and correctly identify them. Sometimes I am unable to tell them apart without help from others or use of supportive tools.

9.      In order to read anything, especially technical material like the material on the USMLE Step 1 test, I must spend a lot of time and effort to untangle the words and decode each one, identifying their individual meanings. Then I must piece them together in the correct sequence, building them up to get the meaning of the text as a whole. This is completely different from the way that most people read. Most people read with "automaticity," *i.e.,* with fast accurate word recognition. I cannot read in the way that most people read. Instead, I need to reread text multiple times before I can fully comprehend what I am reading. Usually, I also need to read the text aloud, or have it read to me by a person or computer program, to help me interpret the words within the context of the sentence, and then within the paragraph.

10.      In addition to the problems with reading described above, I also have long suffered with distractibility, which reduces my ability to focus or maintain attention, especially for extended periods, and causes me to be very easily distracted by sounds, movement, and flashes of light, as well as my own thoughts and sensations, like hunger, restlessness, pain, and temperature. These distractions pull my focus away from my current thought or task.

11.      In my early school years, my parents and teachers worked with me on a daily basis to help me with reading, spelling and writing. They did not pursue formal evaluation or accommodations for learning disabilities, attention problems or distractibility because I worked very hard every day to mask my mistakes, both at school and elsewhere. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day. The reality

was that I was spending a very abnormal and excessive amount of time and effort to perform or work around these functions every day.

12.      In the Personal Statement that I submitted to NBME with my second application for testing accommodations, I described these problems with reading speed and distractibility in more detail, and a copy of the Personal Statement is attached hereto as Exhibit A and incorporated by reference.

13.      Although I did not have formal accommodations for my problems with reading speed, attention and distractibility before college, I needed, and sometimes received, informal accommodations in order to be successful and pass my classes.  For example, I remember a timed, multiple-choice test in 5th grade, on which we had to get at least 30 out of 60 questions right to pass.  All but one other person finished early.  I used all of the allotted time, and I was still the only person to answer less than 30 questions.  I had only been able to get through 29 of them and was working on the 30th when time ran out.  I went home crying because I felt stupid and slow.  I told my mom that I knew how to do all the questions, but I just did not have enough time.  Eventually, they made informal accommodations for me by grading the work I had shown for the 30th question, which was correct and allowed me to achieve the minimum passing score.  Similar situations have occurred all throughout my schooling, even several times since I began receiving formal accommodations in college.

14.      During my undergraduate studies at Ohio State University, the demands of school, work and life finally began outweighing my ability to self-accommodate, requiring more time and energy than I had.  In addition, as the academics became more challenging, longer hours of studying and other self-accommodations were no longer enough to compensate for my slow reading speed and distractibility.  I was having much more trouble focusing throughout the

day, and was losing track of things more frequently. I was even having trouble speaking –

mixing the beginnings or ends of neighboring words, or just not being able to find the right

words at all – which happens much more often when I am fatigued. For many of the tasks that I

needed to do on a daily basis, I knew the steps needed to accomplish each task and that I was

capable of doing each step, but I never had enough time to do all of them, even if I planned

ahead.

15.    In 2009, at the suggestion of a professor, I sought help from my primary care

physician, Dr. Allen Smiy, who diagnosed me with Attention Deficit Disorder, inattentive type,

for which he began medical management. At that time, I did not associate my restlessness and

constant need to be moving with being hyperactive – I just thought I was active.

16.    Dr. Smiy also commented about "possible dyslexia" but did not recommend

further work-up because it would have been time-consuming and expensive, and would not have

changed the treatment and accommodations that he recommended on the basis of his diagnosis of

Attention Deficit Disorder. Dr. Smiy also said that, if I was not granted the accommodations I

needed based on the diagnosis of ADD alone, he could refer me for further evaluation of

dyslexia. As explained in the next paragraph, I did receive accommodations from Ohio State on

the basis of Dr. Smiy's report, and therefore did not pursue further evaluation at that time.

17.    After I received Dr. Smiy's diagnosis, I registered with Ohio State's Office of

Disability Services (ODS) and began receiving formal accommodations in 2010, which included

50% additional testing time and a distraction-reduced testing space. (I also received other

accommodations such as the use of colored pencils, pens and highlighters, which are not

available for computer-based tests like the USMLE Step examinations.)

18.    Once I started receiving accommodations, I was able to perform better on my exams because I had more time to read, write, and work through questions.  However, even with the extra time and reduced distractions, I still had to rush to try to finish the tests.  On exams with essays or questions with lengthy prompts, which require a lot of writing or reading, I still ran out of time before I could finish.  My grades for timed examinations still did not fully reflect my level of knowledge, even with 50% extended time (time-and-a-half).

19.    For standardized exams that I took before medical school like the ACT for college admission, and the MCAT for medical school admission, I was able to answer many of the questions without reading the entire question.

20.    For the ACT, the intrinsic nature of the test made it possible to answer many of the questions without reading the question prompt, which allowed me to get through enough of the questions to score well enough to get into college, though my score did not adequately reflect my knowledge or reasoning ability.  Most of the questions required little reading in order to find the answers, and therefore, I was able to answer enough questions to achieve an acceptable score, even though I was not able to read all of the questions, and (due to the guessing penalty that is applied in scoring the ACT), I had to leave some questions unanswered.

21.    I did not request accommodations for the MCAT because, at the time that I took the MCAT, scores were "flagged" if the student received disability accommodations, and many advisors, mentors and test prep instructors told me that identification as a person with disabilities would hurt my chances for admission.  Subsequently, the practice of flagging MCAT scores was discontinued, but this was after I had already taken the exam.

22.    For the MCAT, as for the ACT, many of the questions could be answered without reading and gathering information from the passages, so I knew that I should answer these

passage independent questions first, and then use any remaining time to try to read and answer as many as I could of the remaining questions that required more reading. Then, in the last minute of each section, I blindly selected answers for the questions I was not able to get to because, unlike the ACT, there was no guessing penalty, so I did not have to leave them blank. Again, being able to skip much of the reading made it possible for me to correctly answer enough questions to achieve an acceptable score, but not a score that adequately reflected my knowledge and reasoning skills.

23.     When I began medical school in 2014, and requested accommodations, I was required by my school (WMed) to undergo a neuropsychology evaluation, for which the school recommended Charles Livingston, an M.A. psychologist working in the Kalamazoo, Michigan area where WMed is located. I submitted Mr. Livingston's report with my request for accommodations. Based on the results of Mr. Livingston's evaluation and his recommended accommodations, WMed approved accommodations including 100% extended testing time (double time) and testing in a private room as well as additional accommodations for paper-based tests.

24.     Though these initial accommodations helped greatly on tests, I needed more accommodations to meet the increased curricular demands. I was unable to keep up with the required reading assignments. I was still taking the weekly computerized quizzes (called "individual Readiness Assurance Tests" or "iRATs") under standard conditions with the rest of my class; I was unable to read all 10 questions in the 15 minutes provided and had to select random answers for the remaining questions when the time was up. Due to these continued challenges caused by my slow reading speed, and problems with attention and distractibility, I requested that the existing accommodations including 100% additional testing time and a private

testing room also be extended to weekly quizzes (iRATs).  (I also requested additional accommodations for reading assignments and general studying.)  WMed approved these additional accommodations.

25.    Throughout my time in medical school, I also had to adjust my requests, or make new ones, as I encountered new situations in the classroom and the clinic.  For example, medical students are required to take "objective structured clinical examinations" ("OSCEs") which are simulated clinical encounters in which a student interviews and assesses a standardized "patient" who is following a set script.  The student then prepares a patient note, based on the simulated encounter.  These OSCE's are modeled after, and used as preparation for, the USMLE Step 2 CS ("Clinical Skills") Exam, which I am required to pass in order to graduate.

26.    During my 2nd year of medical school, I struggled to complete simple subjective/objective encounter notes for our OSCE assessments within the 10-minute limit, and so I was granted 50% additional time for the notewriting.  As the year progressed and I and the other students gained more clinical knowledge, the prompts (patient scenarios and instructions for that encounter) that we had to read before entering the patient room became longer, and we were required to include more in our encounter notes as well.  At this point, I was no longer able to type enough within the 15 minutes (1.5 times standard OSCE note-writing time) to pass my OSCE's, and depending on the length of the prompt, sometimes I did not have enough encounter time left after reading the prompt to complete what the instructions asked for.  For these reasons, I had to request that my note-writing time be increased from 15 to 20 minutes (1.5 time to double time), as well as 2 additional minutes at the beginning of the encounter to read the prompt before entering the patient room.

27.     The USMLE exams are different from the standardized exams I took before medical school. For these exams, I must read the entire prompt for each of the questions in order to gather and analyze all of the information necessary to correctly decide on an answer. This requires far more reading than either the ACT or the MCAT did. I cannot use the methods that I used for the ACT or MCAT and avoid or minimize reading in order to get through enough questions to obtain an acceptable score. To have the same opportunity as the other students taking this exam to read and gather the necessary information from each prompt, and to be able to demonstrate my knowledge and reasoning ability, I need to read the complete prompt for each of the questions. To read and analyze the complete prompt for each question, I need the extended testing time accommodation that I am requesting.

28.     When NBME rejected my request for accommodations in 2017, and I did attempt to take the Step 1 examination under standard conditions, I did not have enough time to read all of the questions and, in the last minute of each block, was forced to blindly select answer choices for about 30 to 35 percent of the questions. (Unlike the ACT, as referenced above in paragraph 20, the scoring of the USMLE examinations does not apply a penalty for wrong answers, and so I did not have to leave unread questions blank. However, random guessing is not the same as answering a question that I have time to read ) Additionally, because I was rushed to get through as many questions as possible during the allowed time for each block, I did not have enough time to thoroughly decode, analyze and process many of the questions, or to organize my thoughts before having to select an answer.

29.     The Step 2 CK examination includes prompts which are much longer and denser than the Step 1 examination. While I was able to read 65 to 70 percent of the questions on the

Step 1 examination, I can only read about 45 percent of the questions on timed practice tests for the Step 2 CK examination.

30.    Double exam time – which I have received from my school, but not from NBME – gives me the opportunity to use the methods and supports that I need to effectively read through each question while compensating for effects of my learning disabilities.  I need this time to ensure I have the opportunity to read, understand, and gather information from each question; to apply my knowledge and preparation to process the information and decide on an answer choice; and to correctly distinguish between answer choices so I can select the appropriate answer choice for my intended answer.

31.    I have been hurt, and continue to be hurt, by the delay that I am experiencing because of NBME's refusal to allow me to have the extended testing time that I need.  NBME's refusal is delaying my education, and jeopardizing my ability to begin my professional career as a physician.  I have already spent nearly three years trying to obtain testing accommodations, and specifically extended testing time, from NBME.

32.    My school requires that I take the Step 1 examination before beginning my final year of medical school.  I began medical school in 2014, and therefore was scheduled to begin my fourth and final year in July 2017.  To allow adequate time for NBME to consider my application, I first applied for accommodations in December 2016.  NBME turned my application down in March 2017.  My school advised me to attempt to take the examination without accommodations in order to try to stay on track for graduation with my class, and I did so in July 2017 but because of my slow reading speed, I was only able to read about 65 to 70 percent of the questions in each block.  Although I felt comfortable with my ability to answer the

questions that I had time to read, I had to fill in random guesses for 30 to 35 percent of the questions, and I missed the passing score cutoff of 192.

33.    After I failed to pass Step 1 without accommodations in July 2017, I consulted a neuropsychologist, Dr. Lewandowski, in order to obtain an additional evaluation of my need for accommodations for the USMLE Step examinations. I submitted a new application, including Dr. Lewandowski's report, in June 2018. NBME again denied my request for extended testing time in September 2018. I pursued the NBME "appeal" process, in which NBME itself reviews its own decision. In order to satisfy NBME guidelines, which require that a student seeking to "appeal" (or "request reconsideration") must submit "new substantive supporting documentation,"[2] I obtained an additional neuropsychological evaluation to address and respond to NBME's stated reasons for refusing to grant extended testing time. The new evaluation, by Dr. Robert Smith, was submitted with my NBME "appeal" on December 12, 2018. NBME rejected my appeal on February 14, 2019, and rejected my request for further reconsideration on March 27, 2019. With no other choice, I filed this action against NBME on May 8, 2019.

34.    If NBME had granted my original request for accommodations, I believe that I could have passed the Step 1 examination, and also the additional step examinations – Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills)[3] that are required for graduation by WMed and other allopathic[4] medical schools. Successful completion of Step 1, Step 2 CK and Step 2 CS is also required for participation in the National Residency Match Program

---

[2] Found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html, "Reconsideration."

[3] I may request additional accommodations for the Step 2 CS examination, similar to the accommodations that WMed has granted for OSCE examinations. *See* above, paragraphs 25-26.

[4] Allopathic is the term for schools like WMed that grant the M.D. degree, as distinguished from osteopathic schools which grant the D.O. degree.

("NRMP"). If I had received the accommodations that I need, and had passed the Step examinations on schedule, I could have graduated from WMed and matched into a residency program more than a year ago. Because of NBME's continuing refusals to grant extended testing time, I had to file this lawsuit, and to request from WMed an extension of my leave of absence. A copy of WMed's letter granting an additional leave of absence to March 2, 2002 is attached hereto as Exhibit B.

35.    Because of this delay, I will probably not be able to graduate until, at the earliest, May 2021 which is three years later than my original graduation date. Further delay could jeopardize even this already very delayed schedule.

36.    Preparation for and scheduling of USMLE Step examinations requires substantial lead time. The normal scheduling window is three months. Therefore, I need to have a decision about accommodations for the Step 1 examination at least three months prior to March 2. 2020.

37.    I am also now in jeopardy of losing my future entirely. I had to take an extended leave of absence because of NBME's withholding of necessary accommodations. That leave of absence has been extended several times, and now runs out in March 2020. If I am unable to take the step exam with the necessary accommodations before March 2, 2020, I will be dismissed from medical school. If I am dismissed from medical school because of the facts and circumstances alleged, despite being well-regarded by the faculty and chosen by my peers for the Upjohn Humanism Honor Society, the medical career, to which I have aspired for more than 10 years, would be over before it began. Moreover, even if I am able to take and pass Step 1 prior to the exhaustion of my leave of absence, my ability to get a residency position is now compromised and I will be forced to disclose my disability to explain why I had to take such an

extended leave of absence.  Every day of additional delay by NBME results in further delay

before I can achieve my goal of becoming a physician.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

Jessica Ramsay

Dated: 7/22/19

# EXHIBIT 9



1105800    5-366-431-4
**Step 1 and Step 2 CK-Mult**

United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS

*Use this form if you are requesting accommodations on USMLE for the first time. Disability Services*

---

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodation.

- Complete all sections of this request form and submit it together with all required documentation at the same time you submit your Step exam application.

- Incomplete, illegible, or unsigned request forms and/or insufficient supporting documentation will delay processing of your request.

- Do not send originals. Please retain the originals of all documentation that you submit as we are unable to return submissions or provide duplicate copies to third parties.

- Submitting duplicate and/or bound documentation may delay processing of your request.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within a few days of submitting your request, please contact Disability Services at 215-590-9700. You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Allow at least 60 days for processing of your request. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete.

- The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

**You MUST provide supporting documentation verifying your current functional impairment.**

☝ In order to document your need for accommodation, <u>**submit**</u> the following with this form:

✓ A **personal statement** describing your disability and its impact on your daily life and educational functioning.

✓ **Supporting documentation** such as psychoeducational evaluations; medical records; copies of report cards, academic and score transcripts; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; verification of prior academic/test accommodations; etc.

✓ A **complete and comprehensive evaluation**. Reports from qualified professionals must be typewritten on letterhead, signed and include the professional's qualifications.

Accom Request Form (2014)

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are currently registered and requesting test accommodations: (Check all that apply)

☑  Step 1

☑  Step 2 CK (Clinical Knowledge)

☐  Step 2 CS (Clinical Skills)

☐  Step 3

## Section B: Biographical Information
**Please type or print.**

B1. Name: **Ramsay**        **Jessica**        **E**
         Last                      First                Middle Initial

B2. Gender:   ☐ Male   ☑ Female

B3. Date of Birth: ▮▮▮▮▮▮▮▮

B4. USMLE # **5** - **3** **6** **6** - **4** **3** **1** - **4** (required)

B5. Address:
**6862 Tall Oaks Dr., Apt. 3B**
Street

**Kalamazoo**            **MI**            **49009**
City                      State/Province        Zip/Postal Code

**United States**
Country

**(269) 932-8214**
Daytime Telephone Number

Alternate Telephone Number

**jessica.ramsay@med.wmich.edu**
E-mail address

B6. Medical School Name: **Western Michigan University Homer Stryker M.D. School of Medicine**

Country of Medical School: **United States**        Date of Medical School Graduation: **05/13/18**

USMLE® Request for Test Accommodations

## Section C: Accommodations Information

**C1.** Do you require wheelchair access at the examination facility? ☐ Yes ☒ No
If yes, and you require an adjustable height computer table, indicate the number of inches required from the bottom of the table to the floor: _____

**C2.** Describe the accommodation(s) you are requesting. Accommodations must be appropriate to the impairment within the context of the examination task and setting:
100% additional test time (Double time) over 2 days, separate, distraction-free exam space, extra laminated paper,

colored dry-erase markers in addition to black, water and snack to be taken with medications during the test.

**C3.** Check **ONLY ONE** box for the exam(s) for which you are registered.

### STEP 1:

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 1 day | ☐ 25% Additional test time (Time and 1/4) over 2 days |
| ☐ Additional break time over 2 days | ☐ 50% Additional test time (Time and 1/2) over 2 days |
| | ☒ 100% Additional test time (Double time) over 2 days |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

### STEP 2 CK:

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 2 days | ☐ 25% Additional test time (Time and 1/4) over 2 days |
| | ☐ 50% Additional test time (Time and 1/2) over 2 days |
| | ☒ 100% Additional test time (Double time) over 2 days |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

### STEP 3:

| **Additional Break Time** | **Additional Testing Time** |
|---|---|
| ☐ Additional break time over 4 days | ☐ 25% Additional test time (Time and 1/4) over 3 days |
| | ☐ 50% Additional test time (Time and 1/2) over 4 days |
| | ☐ 100% Additional test time (Double time) over 5 days |

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 4 days

### STEP 2 CS:

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter/note**.

☐ Patient Encounter:_____

☐ Patient Note:_____

EX 9-3

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** Check the box that best describes the **nature of your impairment** and list the **year** it was first diagnosed by a qualified professional. Check only those for which you are requesting accommodations.

| | Year first diagnosed |
|---|---|
| **Sensory** | |
| ☐ Hearing | |
| ☐ Vision | |
| ☐ Other (specify): | |
| | |
| **Learning** | |
| ☑ Reading | 1997 Dr. Mary Alice A. Tanguay, Therapeutic Optometrist |
| ☐ Writing | |
| ☐ Mathematics | |
| ☑ Other (specify): Dyslexia | 2009 Provisional Dr. Alan Smiy, M.D. |
| | |
| **Language** | |
| ☐ Expressive | |
| ☐ Receptive | |
| ☐ Other (specify): | |
| | |
| **Physical** | |
| ☐ Mobility/motor | |
| ☐ Endocrine | |
| ☐ Neurological | |
| ☐ Other (specify): | |
| | |
| **Psychiatric** | |
| ☐ Anxiety Disorder | |
| ☐ Depression/Mood Disorder | |
| ☑ Attention Deficit/Hyperactivity Disorder | 2009 |
| ☐ Other (specify): | |
| | |
| **Other Impairment** (specify) Migraines | 1997 |

**D2.** List your **current** DSM/ICD diagnosis/diagnoses for which you are requesting accommodations:

ADHD, Dyslexia

## D3. Personal Statement

⟳ **Attach a signed and dated personal statement describing your impairments(s) and their impact on daily life.** Narratives should **not** be confined to standardized test performance. The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limit your current functioning in a major life activity. In your own words, discuss how your impairment(s) would interfere with your access to the relevant USMLE Step and how the specific accommodation(s) you are requesting will alleviate this impact.

USMLE® Request for Test Accommodations

## Section E: Accommodation History

### STANDARDIZED EXAMINATIONS

**E1.** List accommodations you received for all standardized examinations such as college, graduate and professional school admissions tests and professional licensure and certification examinations. If no accommodations were provided, write NONE.

⋄ **Attach copies of official documentation from each testing agency confirming the test accommodations they provided.**

⋄ **Attached a copy of your official examination score report(s).**

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® | | None |
| ☐ MCAT® | | None |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Bar Examination(s) | | |
| ☐ Other(s) NBME | 12/19/14, 6/22/15, 1/4/16, 4/11/16, 6/24/16, 8/26/16, 10/21/16 | 2x testing time, separate distraction-free testing room, extra laminated paper & colored dry-erase markers, water & snack with medications. |

### POSTSECONDARY EDUCATION

**E2.** List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

⋄ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | Western Michigan University Homer Stryker M.D. School of Medicine | 2x testing time, separate distraction-free exam room, hard (paper) copy of tests if possible, extra scrap paper/laminated sheets, colored pencils & highlighters/dry-erase markers; water, snack & meds in room with me. | 2014-Current |
| Undergraduate School | The Ohio State University | 2x testing time, separate room or distraction-free testing area, hard (paper) copy of tests if possible, extra scrap paper, colored pencils & highlighters, water & snack in room with meds. | 2009-2013 |

### E3. Certification of Prior Test Accommodations

⋄ If you receive/received accommodations in medical school and/or residency, the appropriate official at your medical school/residency must complete and submit the **Certification of Prior Test Accommodations** form available at www.usmle.org.

USMLE® Request for Test Accommodations

## PRIMARY AND SECONDARY SCHOOL

E4. List each school and all formal accommodations you received, and the dates accommodations were provided:

☼ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | St. Joseph High School | None | |
| **Middle School** | Upton Middle School | None | |
| **Elementary School** | Sunset Oaks Academy | Alphabet chart, distraction-reduced space, extra time for writing and reading. These were provided by the teacher, not the school, so I do not have records confirming them. | 1996-1997 school year |

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information (see "Indeterminate Scores and Irregular Behavior"), if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): ___Jessica Ramsay___

Signature: _Jessie Ramsay_                    Date: _11/28/2016_

EX 9-6

||| ||| || ||| || ||| ||| || |||
1106799     5-366-431-4
Personal Statement

**Jessica Ramsay**
Dec 11, 2016

<u>Personal Statement</u>

To adjust for my learning disabilities, ADHD and Dyslexia, I am requesting accommodations for the USMLE Step exams, specifically:

- 100% additional exam time (double time) over 2 days
- a separate (secluded), distraction-reduced testing room
- various colored dry-erase markers to use on the laminated paper
- alarm or timer (in the room, visible on the computer screen, or a visual signal or verbal reminder from a proctor), water and a snack in the room with me for taking my necessary medications at the correct times

In addition to these requests for the Step 1 and Step 2 CK exams, I will also apply for accommodations for the written portion of Step 2 CS at the time of registration.

RECEIVED

DEC 1 2 2016

*  *  *

Disability Services

Being ADHD, I have a difficult time sitting still and am easily distracted by the simplest external stimuli in addition to my own thoughts. A separate testing space helps me to stay focused on the exam and what the questions are asking without the distraction of other test-takers. It also allows me to briefly stand up and stretch without distracting others, which keeps my thoughts from constantly being pulled away from the exam to suppress the urge to move. Colored dry erase markers help me to correct for my dyslexic errors and avoid misreading questions as well as to differentiate between answer choices, especially when they are similarly worded. Double exam time gives me the opportunity to read through each question while compensating for the effects of my learning disabilities so that I am able to answer the questions based on the same information as my peers and make sure that I am selecting the appropriate answer choice for my intended answer, instead of mixing them up or missing a key *"not"* that makes the answer choice the opposite of what I want. Having an alarm or timer in the room to remind me to take my prescriptions, along with water and a small snack to take with the meds are reasonable requests – especially if the snacks are unwrapped and in a clear plastic bag, and the water in a label-less clear plastic bottle, all of which can be checked by a proctor before entering the exam room. If my dosing times do not happen to line up with the exam section breaks, trying to remember and keep track of when to take my meds, having to take an unscheduled break, followed by the whole process of scanning in and out of the room to do so, takes up a large chunk of my exam time while adding another whole layer of unnecessary distraction during the exam. Instead, being able to just reach over, take the meds with a few sips and a couple bites and then get right back to the exam with minimal interruption allows me to devote more of my time and focus to the test itself.

Prior to college, I was generally able to force myself to sit still, pay attention, and recognize and correct my dyslexic errors throughout the school day because the work load was easier and there was much less of it. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day but found relief in sports and extracurricular activities, where my weaknesses in the classroom now played to my advantage. My parents and teachers never considered the possibility that I might have a learning disability

because I worked hard and was able to mask my mistakes at school, and at home, I appeared to be extraordinarily normal next to my two brothers who have autism and multiple other special needs.

I did have one teacher in 2nd grade who noticed I had trouble with "reversals" and distinguishing between similar-appearing characters when reading and writing – such as qbdp, 96, wunm, JL, 3E, ou, sae and 4A, which were even worse with cursive: *wwwndlollhd* or *gqqy*. I was then referred to a therapeutic optometrist, Dr. Mary Alice Tanguay, to be evaluated for my "reversals," but she identified my difficulties as "substantial deficits in the areas of visual-spatial relationships and visual discrimination" rather than as "dyslexia." At school, for writing assignments and spelling tests, my teacher began putting me at the "time-out desk" in a cubicle in the corner of the room and gave me an alphabet chart to help me keep my letters straight, which was all extremely embarrassing for me. Because I did not fully understand what was going on, it felt as if I were being punished for being slower and having more difficulties than my classmates because everyone else only sat at that desk if they were in trouble. However, I did recognize that this early form of "accommodations" did help and ultimately reduced distractions and gave me enough time to learn how to catch and correct my own mistakes, developing more efficient compensatory skills. The summary letters from Dr. Tanguay's evaluations before and after my teacher provided her accommodations demonstrate the progress I made as I learned to more quickly self-correct, but also noted that I would likely always be a slow reader. Unfortunately, these "accommodations" were unofficial, enacted by my teacher rather than the school, so I do not have any record that they were provided. Other than this visual testing, I was not evaluated for learning disabilities until 2009, and so did not receive any other aid or accommodation. Consequently, I have little supporting documentation from my childhood.

Growing up, my friends would always get mad at me for not being able to hang out in the evenings because they did not believe that I was still doing homework. I always wondered how everyone finished their homework, especially essays and research papers, so much faster than I did. They always seemed to have so much free time when I was constantly up past midnight trying to finish my homework. My mom would get frustrated when I was trying to write a paper because it would take me FOREVER and we only had one computer in the house. And if I had to read something online, I would get yelled at for tying up the phone line (we had dial-up service at that time). No one ever believed me when I said I was actually trying to work the whole time. They assumed I was wasting time on social media or messaging on AIM, but I rarely ever was. The worst part for me was test-taking. No matter how much I studied or how hard I worked, I rarely got an exam grade that accurately reflected how much I knew.

I had tested into the ACE (Academic Creative Education) program in elementary school when I lived in Texas, but when we moved to Michigan in the middle of 5th grade, my new school did not recognize the ACE program, so I was not allowed to participate in the Stanford EPGY (Education Program for Gifted Youth), the accelerated track used at my elementary school at the time. Instead, I had to wait until the end of the year to test into the accelerated program that started in 6th grade and continued through high school. I distinctly remember that it was a timed, multiple-choice test and we had to get at least 30 out of about 60 questions right to be accepted into the program. All but one other person finished early, but I was the only person to answer less than 30 questions. I had finished 29 and was working on the 30th when time ran out. I went home crying because I felt stupid and slow – everyone was going to know I wasn't smart enough to make it into the

program. I told my mom that I *knew* how to do all the questions, but I just did not have enough *time*. I was positive that I had gotten the 29 correct that I had finished and was almost certain that if they just graded the work I had done in the test booklet, they would see that I was going to get the right answer on the 30th. My mom called the school and asked if they could grade the work for the last question and count it in my score. They agreed and, if I got all of them correct, would give me a trial period in the program to see if I could keep up. My answers were all correct, so I was able to participate in the accelerated track "trial period" when it began in 6th grade. I did very well, understood everything and was able to do the homework, so I was allowed to stay in the program. Fortunately, there were not any timed tests to reveal my weakness until later in the program.

In 7th grade Algebra, which was part of the accelerated track, I had maintained an A- in the class from all of my homework assignments but ended up getting a C- on the exam – I forgot my calculator at home, even though I had set it out the night before, and ended up running out of time. I knew how to do all the problems, but just did not have enough time to work through them, especially without a calculator. My mom and I met with the teacher who allowed me to retake it with a calculator. I still ran out of time and ended up getting a B+ on the retake as well as for the final class grade. The same thing happened in Pre-Calculus in 10th grade, but this time I had not forgotten my calculator; I just ran out of time. I had an A- going into the final but got a D on the final exam. Devastatingly, my teacher did not allow me to retake that exam, so I ended up with a significantly lower grade in the class than I was originally on track for.

These disheartening experiences were not limited to math class; those were just more upsetting since I liked and was good at math. But timed tests have been my downfall in all of my classes, making me look unprepared and feel incredibly stupid. Being dyslexic and ADHD has caused me to struggle with words, making me a slow reader and writer both in and outside of testing. Since the beginning of my academic career, I have rarely been able to finish assigned readings for any class by the time they were due. I have always loathed reading; it is an agonizing battle of deciphering words on a page. Like most students, I would procrastinate when it came to doing homework, though in my case, it was usually only to avoid any reading or writing. Instead of watching TV or getting lost in social media, I would work on homework in other subjects or try to cross something off my running to-do list. Even with procrastinating, I actually spent a good chunk of the time between getting home and going to bed, attempting to get through the readings. Many times I was up until 3 or 4 AM just trying to finish.

In English and Literature classes, we usually had a paper due in place of exams. However, the few times we there was an exam, I would never have enough time to finish, but would usually get through enough to pass, just not enough to demonstrate what I actually knew. One monumental exception is the final exam I took for my History of Early Christianity course in undergrad. Just prior to the exam, the professor gave us the exam format (15 multiple-choice, 10 short essay and two long essay questions) as well as the two prompts for the long essays, and the option to bring a 3x5 index card into the exam containing any information we thought would be helpful. For each of the long essays, we were expected to have an introduction paragraph; three body paragraphs, each containing their own argument and supporting evidence; and a conclusion. Panicking, knowing my weakness, I went home and wrote both essays completely, then condensed them to "outlines" containing only the necessary information, and then hand wrote them on the index card... I must have written

in 6-point font. By doing all of this, I had thoroughly prepared not only for the essay prompts, but for the entire exam. I knew the content forwards and backwards, and could have *verbally* answered any question that could have been asked. But somehow, despite pushing myself to move as fast as possible and spending every second answering questions and consciously trying to redirect any distracting thoughts back to the exam, I had already used up half my time when I had completed only eight of the 10 short essay questions. At this point I chose to sacrifice the last two short essays to get started on the long essays. In the remaining time, even with the use of my prepared index card, I only managed to finish half of the first long essay. I will never forget the feeling that hit when time was up. I have never felt more stupid or inadequate. It was physically painful. I hated myself for being so inept. *Why wasn't anyone else having this problem?* I ended up emailing my professor the second I got home to let her know what happened, not to ask her to be lenient, but because I did not want her to think I had been lazy and come so unprepared. Fortunately, she was understanding enough to grade my exam only out of the sections I had started. Again, I had a solid A going into the final and came out with a B-. This episode actually happened after I had already been approved for accommodations, so I ran out of time even with 1.5x testing time and a distraction-reduced space.

For *anything* written, not just exams or papers, the process of writing is pure agony for me. Even though I know I can turn out a decent final product, the struggle to get there – keeping track of and organizing my thoughts, translating them into words, finding the *right* words to convey the intended meaning, trying to get it all typed out before I forget how I worded it, and then working to get the jumbled mess of words on the paper into a logical, cohesive order, all while on constant lookout for dyslexic errors unnoticed by spell-check – is extremely frustrating and draining. With every writing assignment, whether one paragraph or many pages, I get hit by an immediate tidal wave of dread towards doing the assignment and involuntary dislike of the person assigning this "cruel punishment." If the content can be factual and straightforward, such as for patient encounter notes where I only have to describe what I heard and observed, I can shake off the panic and despair enough to get the writing done. But when the assignment requires synthesis of words from my own thoughts, feelings and experiences, my subconscious mind just says, "Nope. **REJECTED!**" Then it flips a switch that shuts down any part of my brain it feels could be subjected to the torment of writing.

The disconnect between my awareness of the impending doom, my desire to get the assignment done and over with, and my brain's self-protection lockdown causes enough depression and anxiety to destroy any further chance of productivity no matter how focused and productive I was before. I am unable to move forward with anything that requires mental effort, much less anything to do with words. I know everything that needs to be done, I want to do it, but I can no longer generate a thought process to get me from A to B. It feels like, all at once, I am trying to ride a bike uphill, peddling like crazy, without realizing the bike has no chain; "grasping at straws" through a sheet of Plexiglas; and trying to run a marathon when I am stuck in quicksand at the starting line. Everything becomes impossible. No matter what I try to do or how hard I work at it, I get absolutely nothing useful done. The smallest tasks are now beyond overwhelming, and all the while, I am very aware that I am just wasting precious time and I can't do anything about it, which only adds to my overall stress.

While struggling to make any bit of progress, I inevitably reach a tipping point a few days, sometimes only hours, before the due date, when the stress of the situation causes my cortisol level to shoot through the roof,

overriding my brain-induced lockdown. At this point I can manage to get something done, still much slower than the average person, and will usually have to pull a few all-nighters in the process. The more important an assignment is to my grade, my applications, or my future, the more likely this last-minute crunch time will happen.

My mind is still scarred by the torture I have endured with every assignment, so that now, whenever I sit down to write, I *literally* cannot think of words. *Any* words. It is not writer's block or procrastination. Rather, the dread and mental paralysis that occur just from *knowing* I have to write more than a sentence, especially about myself, is essentially a form of PTSD. I once tried to explain how this feels to my friend, who brilliantly concluded, "Oh, like the dementors in *Harry Potter* – or when he has to wear the horcrux – they sort of suck the happiness out of him? ... So, writing is *your* horcrux." In combination with various school assignments, clerkship hours, studying for the Shelf and Step 1 exams, and managing my own medical problems and family demands, this "horcruxing" as my friend calls it, is a large part of why it has taken me so long to complete this personal statement.

* * *

During undergrad, the demands of school, work and life finally broke past my threshold, requiring more time and energy than I could muster. I had been stretched beyond my limit and was left feeling like a tornado had torn through my brain, leaving behind random, broken fragments of all the things that had so far allowed me to keep up with my peers. More than ever, I was repeatedly misplacing things and losing track of homework, and sometimes completely forgetting to bring in the assignments I had shockingly remembered to do. I was no longer able to force myself to focus or to catch and correct my dyslexic errors, and was even having trouble speaking – mixing the beginnings or ends of neighboring words or just not being able to find the right words at all. The worst part was knowing what needed to be accomplished to move forward, that I was capable of doing all of it, but was somehow never able to get it all done fast enough, even if I planned ahead. Despite making a valiant effort to stay organized and get everything done on time, I would always find a way to miss a crucial step, knocking myself back to square one.

I was spending all my waking hours just trying to get through the bare necessities for school, so that the slightest addition to my to-do list was enough weight to drag me far below the surface. If I tried to get through enough material to at least pass my classes, I had no time left to spend on myself to maintain my physical, emotional and social well-being. So, choosing to take a little time for myself, even to get some much-needed sleep, was choosing to sacrifice other important aspects of my life. It was so frustrating to not be able to just finish everything I needed to get done. Even worse, I was making exponentially more "dumb" mistakes than usual – like circling "b" instead of "d"; missing the crucial "*not*" or "*least* likely" and ending up with the exact opposite answer; or altogether misunderstanding a question because I mixed up some of the words – so that my grades were becoming an even poorer representation of my knowledge and hard work than I was already used to.

A few key things tipped me off that I might have a problem and that a common underlying cause might be to blame for all my current struggles. One was in my Spanish course, when I could not get above an A- on my

written tests, even though all my answers were "technically correct." It was clear I knew the answers because I would get an A on every oral test, but couldn't seem to transfer it to paper. I was getting so many marks off for "spelling" because I was still switching letters or words around, but was no longer able to catch it like I had before. I was so frustrated with constant mistakes, so I talked to my professor about it, explaining that I had always had this problem, but I didn't know why it was affecting me more now. Unfortunately, she was not able to do anything to help me unless I had an official diagnosis and was registered with the Office of Disability Services (ODS).

The second tip-off was around the same time. I had actually managed to get into the Honors section in the last Organic Chemistry class of the series. Although I was still pressed for time on these exams, I enjoyed and did well in this series because it was more visual and image-based than many of my other basic science courses, which better fit my learning style. Because of this, I was particularly alarmed and embarrassed when I had to turn in the first midterm exam for this course with four pages of unanswered questions at the end, simply because I ran out of time. After working so hard to get where I was and then watching as grades started slipping, I decided to get help. I asked my organic chemistry professor if he thought getting a tutor would help, but he surprised me by saying no. Again, I had gotten almost everything correct that I had answered, so he suspected lack of understanding was not the issue. He recommended talking to ODS to get more time on my exams. I did. ODS provided me with temporary accommodations while I sought evaluation and treatment from my doctor.

* * *

At my appointment, I answered questions from my primary care provider, Dr. Allen Smiy, about my current and past experiences with school, home life, sleep and possible feelings of anxiety and depression. This made me think about how much more time I was *actually* spending on a daily basis than my friends and classmates to cover the same material and do the same assignments and *how much harder* I had to work during that time to "keep up" and pay attention. Looking back now, the disparity is painfully obvious, but it was not so back then. With only vague complaints from classmates about how long they spent doing homework, and without having "normally functioning" siblings at home to compare myself to, I had no way to develop a meaningful awareness of how disproportionate my sacrifices were.

When Dr. Smiy asked if I had trouble sitting through class or if I tended to be hyperactive, I answered "probably no more than the rest of the class," because it had not occurred to me that most people did *not* struggle to sit still through class or an entire movie without fidgeting or getting up to do something else. At the time, my understanding of "hyperactivity" was running in circles around the room, climbing onto and jumping off of furniture, and more inappropriate and childish behaviors – which I did not do, so I did not associate my restlessness and the fact that I am always moving with being *hyper*active – I just thought I was *active*. I did not recognize my constant need to be up and about or doing something as out of the ordinary, nor associate these symptoms with signs of hyperactivity, until a few years ago, when I began studying and living with other med students who would get annoyed because I "just never stop moving" and "can't sit still."

At the end of the visit, Dr. Smiy diagnosed me with ADHD inattentive type (now established as combined type) and provisionally with dyslexia, discussed some accommodations and coping strategies that might help, and started treatment. Prior to this visit, I was unaware that most of my symptoms and daily struggles could all be related and were likely caused by the learning disabilities as opposed to the assumed intrinsic laziness, forgetfulness, disinterest or selective hearing. I asked why no one had suspected I might have a learning disability before now and if it was commonly missed in others, to which he responded that being diagnosed later in life was common in intelligent individuals because, like me, they are able to mask or make up for their deficits. He further explained that these individuals generally have to work much harder than their peers to function at the same level and usually reach a "breaking point" when the challenges presented by school and life finally outweigh their ability to keep up. Dr. Smiy also pointed out that it is common to get headaches while at school or doing homework from forcing themselves to focus for long periods of time without proper support, and that this may be contributing to my frequent headaches.

\* \* \*

When I originally applied for testing accommodations from ODS, I only requested extra time on tests because I had no idea there was anything more I could ask for. I had never received accommodations nor been educated on the wide range of possible support services for both school and non-academic needs. After we discussed my difficulties and concerns, my newly assigned ODS advisor suggested some additional accommodations she thought would be beneficial. Once we agreed upon a combination of services, I was approved for accommodations which included the option to take all quizzes, tests and exams in a distraction-reduced space (usually a separate room) with 1.5x testing time; use of visual aids (scrap paper, colored pencils, highlighters, etc.); and continued access to my ODS counselor, who served as an advocate while providing academic and emotional support.

I was astonished by how much my exam scores improved and stress levels decreased with the accommodations, which finally gave me the opportunity to prove I actually *was* prepared; I *had* worked incredibly hard and I *did* know the material. After getting only a C- and B without accommodations on the preceding Honors Organic Chemistry midterms, I scored a solid A on the comprehensive final exam, earning an A in the course overall. From there, my grades continued to improve, most notably on exams with multiple-choice and/or short-answer formats, especially when I was permitted to draw pictures in place of writing long explanations.

Even with the extra time and focus aids, I still had to rush to finish most exams, yet would still run out of time before I was able to complete exams with lengthy question prompts, long essays, or multiple shorter ones – the most notable example being my History of Early Christianity final. Devastating blows to my confidence, such as that one, have pushed me to firmly evaluate my weaknesses and develop a better awareness of my learning "disabilities" and the help I need to overcome them. To me, learning "disability" is a misnomer because the fact that I *can* overcome them means that I am a "differently abled" learner, not "disabled."

Now, in medical school, having accommodations has made it possible for me to keep up with my peers. As I encounter new situations in the classroom and the clinic, I am constantly reflecting on my performance and

reassessing my strengths, weaknesses and needs, sometimes requiring alterations to my current accommodations. Although I am part of the inaugural class, my school has appropriately adjusted their provisions to meet my evolving needs. For example, during 2nd year, in the strictly timed environment of our OSCE clinical skills assessments, I struggled to complete simple subjective/objective encounter notes within the 10-minute limit. After discussing my needs with the accommodations committee, my request for 1.5x time was approved. However, since beginning 3rd-year clerkships, we have moved to using the Step 2 CS-style SOAP notes for our clerkship OSCE assessments. Even though I have been thriving in the clinical environment, successfully completing full patient encounter notes in a reasonable time, I am now struggling to complete this more advanced OSCE note within the 15 minutes I am currently provided and will be requesting double time.

The effects that learning disabilities have on my life are most quantifiable when assessing my academic performance, but they do not just affect school; for me, they are a 24/7 thing. Growing up, I constantly got in trouble for "being lazy" or "ignoring" directions – failing to do simple things like hanging my jacket in the closet rather than on the back of a kitchen chair, pushing my chair in when I got up from the table, making my bed, or putting things completely away – because no matter how many times my mom asked or what I tried to make myself remember, I always got distracted halfway through, forgot what I was doing and moved on to something else.

Since being diagnosed in 2009, I have gotten better at recognizing my hyperactive and inattentive trend, which has expanded and become more apparent as I have taken on more responsibility as an adult and medical student. I have learned the hard way that it is necessary for me to spend a bit more effort to create reminders, backup reminders, and backup-backup reminders to avoid the negative domino-effects from making repetitive and perpetual "careless" mistakes, such as:

> completely forgetting I was supposed to meet my friend for lunch 3 hours ago because I was trying to study – OR – wanting to let my friend know I am running late, but too bad, I left my phone who-knows-where... *again* – OR –actually remembering I am supposed to meet a friend and even getting up early to give myself extra time to preemptively correct for the inevitable "dumb" mistakes... but *of course*, losing track of time and just happening to look at a clock only *three* minutes before I have to be at the restaurant, grabbing my phone and keys, throwing on my shoes, running out the door and shutting it behind me, only to discover I have no way of locking it because my keys found a way to magically disappear in the 15 seconds it took me to don my shoes and cross the threshold.

Knowing what to watch out for, I generally make a conscious effort to keep track of due dates and important things – usually by setting a copious number of alarms on my phone and computer and placing Post-Its all around my apartment reminding me of bill or assignment due dates, upcoming appointments, or social commitments. If something is really important for me to remember, I will even ask several other people to remind me.

But with normal daily activities, there are no motherly reminders to keep me on track. One minute I can be hurriedly throwing some leftovers in the microwave because I just realized I am starving and on the verge of

passing out, and the next minute I am looking up from a random project wondering why the microwave is beeping at me.

Already struggling to manage my life and having to surrender *much* more time and effort to studying and completing assignments, the learning disabilities intrinsically add a disproportionate amount of hoops for me to jump through than most individuals ever have to deal with, such as:

- Every time I move or my physician retires, I must immediately find a new physician and research who accepts my insurance, is actually taking new patients, and is willing to prescribe my medications.
- To get my medications, I have to call my doctor for refills EVERY 30 days, drive to their office to personally pick up the script, drive to the pharmacy, either wait for the script to be filled or drive back later just to pick it up... because a 90-day supply is not allowed in my state.
- To even be eligible to continue receiving my prescriptions, I must have a doctor visit every three to six months, depending on provider policy, which means I also have to *schedule* these appointments and actually remember to do so.
- When requesting services, because of the way our society is structured, my claim of having learning disabilities is never just taken at face value – I repeatedly have to call doctors' offices and ask that official records be sent as proof of my disabilities, then apply for accommodations and torture myself with writing support for each request.
- When current records are not enough, I have to locate a qualified psychologist, schedule an appointment, and spend several hours in a behavioral psychology evaluation.
- And, of course, I have to keep track of and pay the bills for each of these costs.

Keep in mind, the pure nature of these disabilities makes managing just ONE of these tasks, not to mention ALL of them, more difficult and time-consuming than for the average person. Every minute I spend keeping my disability affairs in order is time taken away from family, friends, recreational activities, self-maintenance, sleep and studying.

For me, managing my life is like having the contents of a ball pit dropped from the ceiling, all at once, and being expected to not let a single one hit the ground. It is impossible without help. Finally being diagnosed and receiving treatment was like being given a shopping cart to catch more balls in, and receiving academic accommodations, a second shopping cart. Sometimes my friends and family help out – each catching a few more – by reminding me about upcoming deadlines, or being patient and understanding when I jump from one thought to the next without finishing the previous one or I have to ask what we were just talking about after losing track mid-sentence.

I wish I did not need more time or accommodations, just like I wish I did not have to sacrifice the things I enjoy to make time for things I dread, but I do. Without them, in the context of the USMLE Step exams, I would not have the opportunity to get through as much content or as many questions as everyone else taking the tests, and would not be able to demonstrate all that I have learned and accomplished thus far. If given the extra time, a quiet room and colored dry-erase markers, I will invest the additional energy, and I will succeed.

Jessica Ramsay, Dec 11, 2016

*Jessie Ramsay*  12/11/2016

# EXHIBIT 10

**USMLE® Request for Test Accommodations**

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☑ Step 1

☐ Step 2 CK (Clinical Knowledge)

☐ Step 2 CS (Clinical Skills)

☐ Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C1).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: <u>Ramsay</u>      <u>Jessica</u>      <u>E</u>

         Last                 First             Middle Initial

**B2.** Gender: ☐ Male    ☑ Female

**B3.** Date of Birth: ███████

**B4.** USMLE # <u>5</u> - <u>3</u> <u>6</u> <u>6</u> - <u>4</u> <u>3</u> <u>1</u> - <u>4</u> (required)

**B5.** Address:
6862 Tall Oaks Dr, Apt 3B

Street

Kalamazoo            MI             49009

City                   State/Province        Zip/Postal Code

USA

Country

(269) 932-8214

Preferred Telephone Number

Jessica.Ramsay@med.wmich.edu

E-mail address

**B6.** Medical School Name: <u>Western Michigan University Homer Stryker M.D. School of Medicine</u>

Country of Medical School: <u>USA</u>         Date of Medical School Graduation: <u>5/12/19</u>

USMLE® Request for Test Accommodations

## Section C: Accommodations Information

### C1.   Step 1, Step 2 CK, or Step 3 (computer-based examinations)

Check the appropriate box to indicate the accommodations you are requesting. Check **ONLY ONE** box for the exam(s) for which you are currently registered:

STEP 1:

**Additional Break Time**
❑ Additional break time over 1 day

❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days

❑ 50% Additional test time (Time and 1/2) over 2 days

☑ 100% Additional test time (Double time) over 2 days

❑ Additional break time **and** 50% Additional test time (Time and 1/2) over 2 days

STEP 2 CK:

**Additional Break Time**
❑ Additional break time over 2 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 2 days

❑ 50% Additional test time (Time and 1/2) over 2 days

❑ 100% Additional test time (Double time) over 2 days

❑ Additional break time **and** 50% Additional test time (Time and 1/2) over 2 days

STEP 3:

**Additional Break Time**
❑ Additional break time over 4 days

**Additional Testing Time**
❑ 25% Additional test time (Time and 1/4) over 3 days

❑ 50% Additional test time (Time and 1/2) over 4 days

❑ 100% Additional test time (Double time) over 5 days

❑ Additional break time **and** 50% Additional test time (Time and 1/2) over 4 days

**Describe** any other accommodation(s) you are requesting for **Step 1, Step 2 CK,** or **Step 3**.

Private testing room and additional break time.

### C2.   STEP 2 CS (Clinical Skills)

Review the Step 2 CS Onsite Orientation video and Step 2 CS Content Description and General Information Booklet at www.usmle.org for detailed information about the format and delivery of the Step 2 CS examination.

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter or note**.

❑ Patient Encounter: _____

❑ Patient Note: _____

USMLE® Request for Test Accommodations

**C3.**  Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| ICD-10/DSM-5: F81.0/315.00, F81.81/315.2, F81.9/- | Learning Disabilities of Reading and Writing (with abnormal Scanning and Processing Speed) | 2017 |
| ICD-10 F90.2/DSM-5 314.01 | ADHD, Combined Type | 2009 |
| ICD-10 G43.09 | Migraines with aura, without status migranosus | 1997 |
| ICD-10 I87.009, D69.8 | Clotting disorder with recent deep vein thrombosis and Post-thrombotic syndrome | 2016 |

**D2. Personal Statement**

☞ **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E: Accommodation History

**E1. Standardized Examinations**

☞ **Attach copies of your score report(s) for any previous standardized examination taken.**

☞ **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☑ SAT®, ACT® | March 2007, October 2007 | None, None |
| ☑ MCAT® | 4/11/11 | None |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | USMLE Step 1 exam 7/20/17 | None |
| ☐ DAT® | NBME exams: CAS1 12/14/14; CAS2 6/24/15; | Double testing and break time; private testing room; extra |
| ☐ COMLEX® | CAS3 1/4/16; CBSE 4/11/16; IM Shelf 6/24/16; FM Shelf 8/26/16; OB-Gyn Shelf 10/21/16; | laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room (*except for 4/28/17 NBME CBSE, |
| ☑ Other (specify) | Peds Shelf 12/22/16; Psych Shelf 3/3/17; formative CBSE* 4/28/17 | which taken under simulated standard testing time for formative purposes) |

EX 10-3

USMLE® Request for Test Accommodations

### E2. Postsecondary Education

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

✒ **Attach copies of official records from each school(s) confirming the accommodations they provided.**

**If you receive/received accommodations in <u>medical school and/or residency</u>, have the appropriate official at your medical school/residency complete and submit the <u>USMLE Certification of Prior Test Accommodations</u> form available at <u>www.usmle.org</u>.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | WMU Homer Stryker M.D SOM | 2x testing time, private testing room, exams on paper when possible, extra scrap paper/laminated sheets, colored pencils & highlighters/dry-erase markers; water, snack & meds in room (See attached documentation for specifics) | 2014 - Present |
| Undergraduate School | Ohio State University | 2x testing time; separate, distraction-reduced testing room; exams on paper when possible; extra scrap paper; colored pencils & highlighters; additional accommodations approved by course instructor (See attached documentation for specifics) | 2010 - 2013 |

### E3. Primary and Secondary School

List each school and all formal accommodations you received, and the dates accommodations were provided:

✒ **Attach copies of official records from each school listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| High School | | | |
| Middle School | | | |
| Elementary School | | | |

**USMLE® Request for Test Accommodations**

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print):  Jessica Ramsay

Signature:  _Jessica Ramsay_                          Date:  06/06/2018

**E-mail (as a pdf), fax or mail your completed request form and supporting documents to the address below at the same time you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

Included Supportive Documentation for Accommodations Request for USMLE Step 1

| Document |
|---|
| USMLE Request for Test Accommodations form |
| Personal Statement |
| Letter of Support from Larry Berger |
| Consult Report and Neurocognitive Evaluation Results & Summary from Dr. Lewandowski |
| Clinical Summary from Dr. Ruekberg |
| Clinical Summary from Dr. Houtman |
|  |
| WMed USMLE Certification of Prior Test Accommodation Form |
| WMed Essential Abilities Committee – Approvals for Reasonable Accommodations 2014-2017 |
| WMed Letter of Support for NBME Accommodations |
| USMLE Step 1 Score Report |
| NBME Score reports for CBSE and Shelf Exams administered at WMed |
| Accommodations provided: double testing and break time; private testing room; extra laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room |
| 12/14/2014 NBME CAS1 |
| 06/24/2015 NBME CAS2 |
| 01/04/2016 NBME CAS3 |
| 04/11/2016 NBME CBSE |
| 06/24/2016 NBME Medicine Shelf |
| 08/26/2016 NBME Modular Family Medicine Core Shelf |
| 10/21/2016 NBME Obstetrics and Gynecology Shelf |
| 12/22/2016 NBME Pediatrics Shelf |
| 03/03/2017 NBME Psychiatry Shelf |
| 04/27/2017 NBME Surgery Shelf |
| Accommodations provided: private testing room; extra laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room |
| 04/28/2017 NBME CBSE (Formative) |
| MCAT Score Report (30M) |
| OSU ODS ADHD Verification Form (completed by Dr. Smiy in 2010) |
| OSU ODS Access Plan |

June 6, 2018                             USMLE# 5-366-431-4                          Jessica Ramsay

**Personal Statement**

I am submitting this Personal Statement to describe the functional impairments and symptoms I experience as a result of my learning disabilities, Attention Deficit/Hyperactivity Disorder, migraines, and residual symptoms from my deep vein thrombosis. These symptoms make it impossible for me to fully read and answer all of the questions on an equal basis with non-disabled students under the standard testing conditions. The accommodations that I am requesting are:

- 100% additional exam time (double time)

- Extra break time

- a private, distraction-reduced testing room

\* \* \*

There are many tasks in everyday life that require scanning, reading, writing, information processing, recall, and organization, which the average person does effectively and efficiently. Because of my disabilities, I am unable to do these important tasks with normal effectivity or efficiency, or sometimes even at all. These disabilities also interfere with my ability to learn, remember, recall, and express information efficiently and effectively. In order to perform any of these functions, I must spend much more time and energy every day than most people need to. Furthermore, the additional time and energy spent on these tasks takes away from the time, energy, and focus needed to manage other important life responsibilities like cooking, eating, cleaning, paying bills, running errands, doing laundry, sleeping, and self-care.

In addition, the methods I have developed over time in order to be able to read, study and manage my disabilities are only effective if I have an appropriate space and the necessary time. Let me explain.

- I have always struggled with flipping, merging, and tangling letters, characters, and words both when reading and writing. I also have trouble distinguishing between words and characters that have similar shapes – characters such as qbdp, 96, *wunm, JL, 3E, gy, ssae,* 4A, and words like united/untied, serves/verses/reverse/server/severe/reserve, quite/quiet, from/form, reared/reread, and though/thought/through/trough/tough – so it takes me a long time to isolate and correctly identify them. Sometimes I am unable to tell them apart without help from others or use of supportive tools. These tasks are progressively more difficult with stylized fonts, handwriting, and cursive – *nmwwnw, gggy, delbhh* – which I usually need someone else to read to me because I cannot read it on my own. This interferes with my ability to do many common, everyday tasks like reading handwritten instructions, phone numbers, reminders, or feedback on an assignment, and sometimes cannot even read something I wrote myself, like reminders or class notes.

- In order to read anything, especially technical material like the material on the USMLE Step 1 test, I must spend a lot of time and effort to untangle the words and decode each one, identifying their individual meanings. Then I must piece them together in the correct sequence, building them up to get the meaning of the text as a whole. This process requires me to reread text multiple times before I can fully comprehend what I am reading. Usually, I also need to read the text aloud, or have it read to me by a person or computer program, to help me

interpret the words within the context of the sentence, and then within the paragraph. Hearing the words aloud also helps me to avoid making as many mistakes overall because, when I hear something that sounds out of place, I can backtrack and try again. Though this process is very slow and tedious, it makes it possible for me to read with adequate comprehension. Additionally, there are times when I also need to physically act out or demonstrate what I am reading so that I can make sense of the information. This technique is helpful for working through information but requires adequate time and an appropriate space for me to be able to physically move around in a way that is not possible in a shared testing room without disturbing other examinees.

- When I need to read but do not have adequate time or support to properly untangle and work through the words or process the information, I miss important details, or even large chunks of information, and misinterpret the message. This leads to many, and often crucial, misunderstandings and communication errors that can have negative impacts on the personal, social, academic and professional aspects of my life, the severity of each varying depending on the situation. For example, calling someone Ashley when their name tag says Ainsley can appear careless, or even rude, leading to a bad first impression, or even loss of a potential job offer. Misreading instructions and messages, subsequently causing me to pass along an incorrect message or to unintentionally fail to follow directions, has gotten me in trouble at home, with friends, and sometimes even at work. In restaurants, it takes me a long time to read the menu, so I hold everyone up when they are ready to order. When movies and shows have subtitles, they are not on the screen long enough for me to able to read them, so I either need someone to read the captions to me or I have to pause the movie with every line so that I can give myself adequate time to read each line, which really annoys other viewers. When I do not have someone to read the captions to me, or the option to pause so I can read, I completely miss what is going on.

- When I need to read for complete understanding and learning, I mark up the text by drawing and writing directly on the page with colored pens, pencils, and highlighters. When I am not able to use colors to draw and write directly on the exam, such as for computerized exams including USMLE Step 1, I must rely on a combination of other methods, though this is generally less effective. The following are some examples of these methods:

  o Drawing and writing on scrap paper, which is less effective because I have to go back and forth between the text and scrap paper, causing me to more frequently lose my place and make mistakes. It is also much less efficient because it takes much more time to go back and forth between text and scrap paper than it does to mark directly on the text, and I require more time to check for and correct my mistakes;

  o Reading and thinking aloud which allows me to hear the words as I read to better comprehend and process the information and, importantly, to better recognize when I have made sequencing errors. This method requires a private environment so as not to interrupt other test-takers when I am talking;

  o Physically acting out or demonstrating what I am reading. This helps me to make sense of the information I am reading but requires adequate time to work through the information. Without a private room in which I can read aloud and move about the room, I will be a hindrance and distraction to other test takers.

My learning disabilities also impair my ability to effectively and efficiently express information through writing due to the switching, merging, and tangling of letters, characters, and words, similar to that which I experience while reading. Because this is a request for accommodations for Step 1, I will not describe my difficulty with writing in as much detail, but it will be relevant when I apply for accommodations for Step 2 CS.

Because reading and writing are such tedious and draining processes for me, I avoid both as much as possible. I was able to do this strategically for some prior standardized tests like the ACT and MCAT because the tests were designed so that many of the questions could be answered without reading the whole question. For the ACT, I was not able to read all of the questions and could not accurately demonstrate my knowledge. Additionally, due to the guessing penalty, I had to leave the questions I was not able to read unanswered. However, because most of the questions required little reading to find the answers, I was able to answer enough questions to achieve an acceptable score. Likewise, for the MCAT, many of the questions could be answered without reading and gathering information from the passages, so I knew to answer passage-independent questions first, and then used any time left to try to read the passages with the most unanswered questions remaining. Being able to skip much of the reading made in possible for me to correctly answer enough questions to achieve an acceptable score.

The NBME and USMLE exams are different from the standardized exams I took before medical school. For these exams, I must read the entire prompt for each of the questions in order to gather all of the information necessary to correctly decide on an answer. This requires far more reading than either the ACT or the MCAT did. To have the same opportunity as the other students taking this exam to read and gather the necessary information from each prompt, I need the accommodations that I am requesting.

In other non-testing situations, I can use videos, pictures, diagrams, interactive models, physical demonstrations, dictation, audio books, conversations, context clues, lectures, and many other sources in addition to, or even in place of, reading and writing. These sources format information in a way that I can understand, process, remember, and use more effectively and efficiently, making it easier for me to process, learn, study, communicate, and demonstrate information. When I am required to read or write without the option or opportunity to use these other formats, I require much more time and support than most people, and I am not able to understand, learn, study, memorize, or communicate information, nor demonstrate my knowledge and competency as effectively.

\* \* \*

In addition to ADHD, learning disabilities, and migraines, I also had a deep vein thrombosis (DVT) the full length of my leg in 2016 and was later diagnosed with a clotting disorder (*See* letter from Jennifer Houtman, M.D.). The DVT damaged the circulation in my legs, causing post-thrombotic syndrome, meaning that sitting or standing still for long periods causes my legs to swell and become painful, which adds to my inability to focus. During my Step 1 attempt, having to sit still for long periods without a private environment to briefly move or walk around as necessary to maintain circulation during the exam blocks caused my leg to swell and become painful, further distracting me from the exam. During the breaks, I did not have enough time to sufficiently walk around to reduce the swelling and pain that had built up during the exam. Because of my clotting disorder and DVT, I must take frequent breaks throughout the day, and briefly during the exam blocks, to move and walk around in order to maintain adequate circulation in my legs, reduce swelling and pain, and decrease the risk of forming another DVT as a result of my clotting disorder.

ADHD inhibits my ability to focus or maintain attention, especially for extended periods, and causes me to be very easily distracted by sounds, movement, and flashes of light, as well as my own thoughts and sensations, like hunger, restlessness, pain, and temperature. These distractions pull my focus away from my current

thought or task. As a result, ADHD impairs my ability to do anything that requires sustained mental effort, such as thinking, maintaining conversation, remembering obligations and assignments, getting organized, staying on track, and completing tasks and projects.

I am unable to keep track of things because I set them down and forget where I put them, which is especially problematic when I am outside my home, and with important things like my, wallet, keys, assignments, phone, and legal documents. In addition to distractibility and inattention, ADHD also causes me to be impulsive, which makes it difficult to wait my turn, especially in conversations. As a result, I unintentionally interrupt others, or blurt out my thoughts before fully thinking them through or appropriately filtering them for the situation.

The restlessness, distractibility, and inability to focus caused by my ADHD exacerbate the effects of my learning disabilities, further impairing my ability to scan, read, write, learn and process information.

My inattention, distractibility, and impulsivity make it very difficult to focus on just one idea at a time, causing me to jump quickly from one thought to another, which makes it difficult to maintain my train of thought. This frequently causes me to forget things I need to do, forget steps in a process, forget what someone just told me, and forget what I am saying when I am talking. My inattention, distractibility, and impulsivity also cause me to be unable to organize my thoughts without the adequate time or the tools I need. This is especially true for things like telling stories or writing essays and clinical notes, which must be logically presented to others.

For exams, getting lost in my thought process causes me to lose track of what the question is really asking so that I end up working only part way to or even past the answer the question was actually asking for. Many times, on multiple choice exams, the answer that I come up with is often one of the incorrect options. Without adequate time to reread the question and double check that the answer I select fits what the question is really asking, I am unable to effectively answer questions even when I correctly understand the material.

Also due to my ADHD, I constantly need to be moving around or doing something. I have always had an extremely difficult time sitting still, especially for extended periods. When I am expected or required to sit for prolonged periods, I become very restless and start shifting around in my seat, fidgeting, and doodling on my papers, which can be disruptive to others around me and has gotten me in trouble in school. Not being able to sit still for extended periods interferes with my ability to study and work on assignments, maintain professional behavior at work, and complete tasks or even watch shows to relax at home. Being able to take frequent breaks with adequate time to rest my mind while stretching and walking around helps me manage my restlessness and recharge so I have the energy focus and try to sit still when I get back to the task at hand.

I also need frequent breaks with adequate time to give my mind a rest from straining to focus and read. If I do not have adequate opportunities or time to do this, I become overly fatigued, which exacerbates the symptoms I experience related to my learning disorders and ADHD. Taking frequent breaks to give my mind a chance to rest allows me to recover before the next block so that I have the energy I need to be able to focus, read, process and remember information, and demonstrate my knowledge.

Additional break time will also help me with avoiding migraine symptoms. When I get migraines, the associated blind spots affect my ability to see and therefore to read. The headache itself, along with the associated nausea and hypersensitivity to light, sound, and temperature make it impossible for me to focus, which interferes with my ability to read, think, process, and answer questions. Because my migraines are triggered by excessive fatigue from trying to focus, read, and process the questions, having frequent breaks with adequate time to recuperate between blocks reduces the likelihood that I will get a migraine during the exam.

During my first Step 1 attempt, the standard break time allowed did not provide enough time after basic needs had been addressed for my mind to adequately recover between blocks. As a result, the effort needed to focus on the exam and suppress urges to move over the course of the exam cause me to become fatigued, triggering a migraine. I began experiencing aura symptoms during the 6th block, disrupting my focus and interfering with my ability see, read, and think, and had to wait until the block was over to use the remaining break time to retrieve and take my medications. Having to wait almost a full hour after experiencing aura symptoms before I could take the abortive medications, the aura developed into a full migraine during the 7th block, which further impaired my ability to concentrate, see, read, and think.

If I start experiencing migraine aura symptoms, I need to take medications right away to avoid getting a full migraine. The process of retrieving and taking medications during my breaks takes away from the time I need to manage my restlessness and get re-energized and refocused before the next block (*See* letter from Jennifer Houtman, M.D.).

Additionally, during breaks, I also need adequate time to stretch, move, and walk around to reduce the restlessness and leg swelling and pain I experience during the exam. Having adequate time to address these symptoms helps me get refocused before starting next block.

The standard exam space is a problem in many ways. When in the room, examinees are required to remain seated and to refrain from activities that might distract other test-takers, such as moving, tapping, or talking. In order to abide by these rules and respect the other examinees in the shared testing space, I cannot use the supportive tools and methods I require to effectively read or interpret the questions because I am not allowed to read or think aloud or briefly step away from my computer in order to make sense of question.

Sharing the space with other test-takers also significantly increases the distractions I experience during my exam, further impairing my ability to focus. If I cannot focus, I cannot read, process or recall information, nor organize my thoughts effectively. As expected, this is what I experienced during my first Step 1 attempt. Additionally, throughout several blocks, many people in the room were required to type for their exam and were typing so furiously that my desk was shaking, which completely inhibited me from being able to focus on my exam or read the questions. I could not understand the words on the screen and I could not think through anything. The effort I spent trying to focus and read during this time caused me to fatigue even more, contributing to the migraine I developed in the last two blocks.

Also, to avoid disrupting other test-takers in the standard shared testing space, I must continuously suppress the urges to get up, move around, and fidget, which greatly increases the restlessness, stress, and fatigue I experience during the exam. Additionally, while sharing a testing space, I cannot adequately manage the restlessness, swelling or pain caused by sitting for long periods because I am not allowed to briefly stand up to move, stretch, or walk around.

Additional break time, and a private room, will be helpful, but not enough, unless I also have extended testing time. As I have explained, I am easily distractible and have learning difficulties that cause me to be a very slow reader, with slow processing speed and inefficient thinking, compared to the average person. I require additional time and tools to be able to untangle and process words, effectively interpret and understand what I am reading, to organize my thoughts and information, and get back on track after distractions.

During my first Step 1 attempt, like my previous unaccommodated testing experiences, I did not have enough time to read all of the questions and, in the last minute of each block, was forced to blindly select answer choices for a significant number of un-read questions. Additionally, because I was rushed to get through as many questions as possible during the allowed time for each block, I did not have enough time to thoroughly

analyze and process many of the questions, or to organize my thoughts before having to select an answer. Since I cannot mark directly on the exam, I more frequently lose my place, misinterpret the question, and forget or misunderstand what the question is really asking. For example, if I misread a question as 'which thing is expected to **DE**crease due to a disease process,' when the question is actually asking 'which thing is expected to **IN**crease,' I will get the question wrong even though I understand how the disease process works. To be able to effectively read and understand the questions, I need to have sufficient time to untangle and process the words, to use supportive methods, and to re-read questions. When I am reading and thinking aloud, I need to have sufficient time and a private environment so that I am not a disruption and hindrance to other test-takers.

Double exam time gives me the opportunity to use the methods and supports I require to effectively read through each question while compensating for effects of my learning disabilities. I need this time to ensure I have the opportunity to read, understand, and gather information from each question; to apply my knowledge and preparation to process the information and decide on an answer choice; and to distinguish between answer choices so I can select the appropriate answer choice for my intended answer.

Double exam time also gives me adequate time to get refocused after getting distracted and to manage the additional symptoms caused by ADHD and post-thrombotic syndrome. Without this time, these symptoms interfere with my ability to focus, and taking time to appropriately address them takes time away from the time I need to read and process the questions.

* * *

My learning disabilities, ADHD and migraines affect all aspects of my life, and I have been struggling with them since I was little. Since beginning school, I have always had a lot of trouble sitting still and focusing, which interferes with my ability to pay attention in class, study, and complete homework, class assignments, papers, and exams, especially under timed conditions. My distractibility, lack of focus, and difficulty with letter reversals and tangled words causes me to make a lot of mistakes that would have been avoidable for most people. This has always been extremely frustrating because I would understand the material and would put a lot of effort into my work but would still miss tons of points for "careless" mistakes. Additionally, it has always taken me significantly more time and effort than everyone else to read, write, and process the information, so that I rarely have time or energy for anything else. In time-limited situations, like exams, I almost never have the opportunity to completely and accurately demonstrate my knowledge or hard work because I do not have enough time or access to the supports I need to adequately read, process, and answer each of the questions.

Growing up, my friends would always get mad at me for not being able to hang out in the evenings because they did not believe that I was still doing homework when they had already been done for hours. They always seemed to have so much free time when I was constantly up past midnight trying to finish my homework. In middle and high school, my mom would get frustrated when I was trying to write a paper because it would take me FOREVER and we only had one computer in the house, and she would always have to help me proof-read my work, many times at three or four in the morning. Because I am such a slow reader, whenever I had to read something online, it would take me so long that I would get yelled at for tying up the phone line (we had dial-up service at that time).

Prior to college, my parents and teachers never pursued evaluation for learning disabilities or ADHD because I worked hard and was able to mask my mistakes at school. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day. At home, having two brothers who have autism and multiple other special needs created an inaccurate comparative illusion that I could pay attention, sit still,

read, process, study, organize, and write normally. But the reality was that I was spending a very abnormal and excessive amount of time and effort to perform or work around these functions every day.

In 2nd grade, my teacher did notice that I still had trouble with letter and number "reversals" and distinguishing between similar-appearing characters and words when reading and writing. She began providing informal accommodations which included putting me at an isolated desk in a cubicle in the corner of the room to help reduce distractions, gave me extra time to complete classwork, and provided an alphabet chart to help me keep my letters straight for reading, writing, and spelling assignments.

After I was trialed on glasses, which did not help, I was referred to a therapeutic optometrist, Dr. Mary Alice Tanguay, to be evaluated for my "reversals." She identified my "substantial deficits in the areas of visual-spatial relationships and visual discrimination." In 1998, Dr. Tanguay provided visual perceptual skills training. This training did not eliminate my difficulty with character reversals, tangling, identification or discrimination, nor with spelling or reading speed. The training only helped me to develop some skills that I still use to work around the effects caused by my now formally diagnosed learning disabilities, which accounts for the improvements in the measured visual perceptual skills Dr. Tanguay mentions in her 2000 summary letter. Importantly, Dr. Tanguay also noted that even with these improved skills, I would likely always be a slow reader. Other than this visual testing, I was not evaluated for learning disabilities until 2009, and so did not receive any other formal aid or accommodation.

The effort required for me to focus and to suppress impulses so that I could sit still, pay attention in class, and avoid interrupting people has caused me to get frequent headaches since I started going to school. In third grade, when reading and writing became more prevalent, the added effort from trying to read and write for prolonged periods in addition to concentrating and sitting still started causing me to have daily migraines. Because the associated blind spots, nausea, and hypersensitivity to light, sound and temperature inhibited my ability to participate in school, I was given prophylactic treatment for about a year until the frequency of migraines decreased. When I started medical school, the increased time and effort required for me to meet expectations and complete requirements caused me to again have daily migraines requiring prophylactic treatment.

Throughout my academic career, I have required informal accommodations in order to complete and pass assignments and exams so that I could advance through school. Timed tests have been my downfall in all of my classes, because I do not have time to read and process the questions, or accurately demonstrate my knowledge and preparation, which makes me look unprepared and feel incredibly stupid. I distinctly remember a timed, multiple-choice test in 5th grade, on which we had to get at least 30 out of 60 questions right. All but one other person finished early. I was the only person to answer less than 30 questions. I had only been able to get through 29 of them and was working on the 30th when time ran out. I went home crying because I felt stupid and slow. I told my mom that I *knew* how to do all the questions, but I just did not have enough *time*. Eventually, they made informal accommodations for me by grading the work I had shown for the 30th question, which was correct and allowed me to achieve the minimum passing score. Similar situations have occurred all throughout my schooling, even several times since I began receiving formal accommodations in college.

My learning disabilities have caused me to struggle with words, making me a slow reader and writer. This is especially problematic in time-limited situations. Since the beginning of my academic career, I have almost never been able to finish assigned readings for any class by the time they were due, even when I would stay up til 3 or 4 in the morning trying to finish. If I wasn't up late trying to read, I was up late trying to write an essay. Many times, I had to pull several all-nighters in a row to get a paper done in time. For *anything* written, not just exams or papers, the process of writing is pure agony for me. Even though I know I can turn out a

decent final product, the struggle to get there – keeping track of and organizing my thoughts, translating them into words, finding the *right* words to convey the intended meaning, trying to get it all typed out before I forget how I worded it, and then working to get the jumbled mess of words on the paper into a logical, cohesive order, all while on constant lookout for dyslexic errors unnoticed by spell-check – is extremely frustrating and draining, and many times triggers migraines. For these reasons, I have always loathed reading and writing; they are agonizing battles of trying to decipher words and express and organize thoughts on a page, so I avoid doing either when possible.

\* \* \*

During my undergraduate studies at Ohio State University, the demands of school, work and life finally began outweighing my ability to self-accommodate, requiring more time and energy than I had. I was having even more trouble focusing throughout the day. I would repeatedly misplace things and lose track of assignments. I was no longer able to catch and correct the numerous errors I made – like circling "b" instead of "d"; missing the crucial "*not*" or "*least*" likely" and ending up with the exact opposite answer; or altogether misunderstanding a question because I mixed up some of the words. I was even having trouble speaking, mixing the beginnings or ends of neighboring words, or just not being able to find the right words at all, which happens much more often when I am fatigued. For many of the tasks, I knew the steps needed to accomplish each task and that I was capable of doing each step, but never had enough time to do them, even if I planned ahead. Despite making a valiant effort, I could not organize everything going on and would often miss a crucial step. It took so much time to do these things that I didn't have any time left to spend on other important tasks, like paying bills, cooking, cleaning, or activities to maintain my physical, emotional and social well-being.

In 2009, at the suggestion of a professor, I sought help from my primary care physician, Dr. Allen Smiy, who diagnosed me with ADD, inattentive type, for which he began medical management. Before this, I did not associate my restlessness and constant need to be moving with being *hyper*active – I just thought I was *active.* Dr. Smiy also clinically diagnosed me with dyslexia but did not recommend further work-up because it would not have changed the treatment.

A few months later, I registered with OSU's Office of Disability Services (ODS) and began receiving formal accommodations in 2010, which included the following:

- Priority class scheduling

- Access to an assigned ODS advisor

- 50% additional testing time, a distraction-reduced testing space, and ear plugs for all quizzes and tests

- Any supportive materials that were recommended or approved by my professors, such as extra scrap paper, colored pencils, highlighters, chemistry model kit, or a note sheet.

Once I started receiving accommodations, I was able to perform better on my exams because I had more time to read, write, and work through questions. Though, even with the extra time and reduced distractions, I still had to rush to try to finish the tests. On exams with essays or questions with lengthy prompts, which require a lot of writing and reading, I still ran out of time before I could finish.

In medical school, I received more accommodations to meet the increased curricular demands. Most notably, I was granted 100% additional testing time, unlimited free printing, and Kurzweil 3000 text-to-speech software.

I have had to adjust my requests, or make new ones, as I've encountered new situations in the classroom and the clinic. For example, during my 2nd year, I struggled to complete simple subjective/objective encounter notes for our OSCE assessments within the 10-minute limit, so was granted 50% additional time for the note-writing. When we started doing Step 2 CS-style encounters and notes for our clerkship OSCEs, I struggled to complete the added writing requirements in 15 minutes, so was granted 20 minutes, with an additional 2 minutes at the beginning of the encounter so that I had enough time to read the encounter prompt and instructions.

The effects that ADHD and learning disabilities have on my life are most quantifiable when assessing my academic performance, but they do not just affect school; for me, they are a 24/7 thing. Growing up, I constantly got in trouble for "being lazy" or "ignoring" directions – failing to do simple things like hanging my jacket in the closet rather than on the back of a kitchen chair, pushing my chair in when I got up from the table, making my bed, or putting things completely away – because no matter how many times my mom asked or what I tried to make myself remember, I always got distracted halfway through, forgot what I was doing and moved on to something else.

Since being diagnosed in 2009, I have gotten better at recognizing my hyperactive and inattentive trend, which has expanded and become more apparent as I have taken on more responsibility as an adult and medical student. I have learned the hard way that it is necessary for me to spend more effort to create reminders, backup reminders, and backup-backup reminders to avoid the negative domino-effects from making repetitive and perpetual "careless" mistakes, such as: forgetting appointments, forgetting to bring things that I need (like my wallet, phone, or paperwork), and losing track of time. However, even with the extra efforts to manage these effects, they are still apparent. For example, I still struggle with impulsively blurting things out without thinking, sometimes interrupting or offending others, and must actively try not to. I still have difficulty getting and staying organized, which is obvious with my cluttered apartment. I still mis-schedule and forget social, work, and academic obligations. I start tasks and projects, get distracted, and leave them unfinished. For example, I frequently forget that I started laundry and will then leave wet clothes in the washer for days before realizing it.

Already struggling to manage my life and having to surrender *much* more time and effort to studying and completing assignments, the learning disabilities intrinsically add a disproportionate number of hoops for me to jump through, such as:

- Remembering to request a new prescription every 30 days so that I can fill it before I run out.

- Taking off from school so that I can have medication checks every three to six months.

- Requesting academic accommodations, which is never a simple process – I have to track down old documentation and get new evaluations, and torture myself with writing support for each request.

- Keeping track of documentation and paying bills for each of these extra things.

These things may seem simple, but the pure nature of the disabilities I struggle with makes managing just one of these tasks, not to mention ALL of them, more difficult and time-consuming than for the average person. Every minute I spend keeping my disability affairs in order is time taken away from family, friends, recreational activities, self-maintenance, sleep and studying.

June 6, 2018                   USMLE# 5-366-431-4                        Jessica Ramsay

For me, managing my life is like having a large bag of balls dropped from the ceiling, all at once, and being expected to not let a single one hit the ground. It is impossible without help. Finally being diagnosed and receiving treatment was like being given a shopping cart to catch more balls in, and receiving academic accommodations, a second shopping cart. Sometimes my friends and family help out – each catching a few more – by reminding me about upcoming deadlines and being patient and understanding when I jump from one thought to the next without finishing the previous one, or when I have to ask what we were just talking about after losing track mid-sentence.

I wish I did not need more time or accommodations, just like I wish I did not have to sacrifice the things I enjoy to make time for things I dread, but I do. In the context of the USMLE Step exams, without appropriate accommodations, I will not have the opportunity to get through as many questions or as much content as everyone else taking the tests, and I will not be able to accurately demonstrate all that I have learned thus far.


Sincerely,

*Jessie Ramsay*

Jessica Ramsay, 06/06/18

# EXHIBIT 11



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

February 14, 2019

**Via E-mail to jessica.ramsay@med.wmich.edu**
Jessica E. Ramsay
6862 Tall Oaks Dr
Apt 3B
Kalamazoo, MI 49009

RE: USMLE Step 1                                   USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from providers and advocates; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

In a November 6, 2018 report of Neuropsychological Evaluation for Learning Problems, Robert D. Smith, Ph.D. writes that you sought evaluation as part of your appeal for testing accommodations for the USMLE.  Dr. Smith writes, *"Jessica's basic reading skills are within the average range when not limited by time restriction as measured by the WIAT-III Basic Reading Composite score of 96, which is higher than 39% of other adults her age…The WJ-4 [sic] Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency that rely on the number of correct responses to reading comprehension items competed within a time limit…Jessica was only able to read three of the seven NDRT passages and attempted only 47% of the 38 Comprehension items on the standard-time Comprehension administration. She correctly answered 94% of the Comprehension items she attempted…In addition, Jessica's Nelson-Denny Rate score was lower than 99% of high school seniors…Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment…She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits persistently impaired reading rate and reading fluency compared to other adults her age, as reflected on WJ-4 [sic] Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension…Jessica has been able to perform well academically, but has had to rely on extraordinary compensatory strategies in order to do so."*

Although your evaluator appears to accept your exceptionally low scores on timed reading tests administered for the purpose of requesting test accommodations as valid and credible, your average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college and medical school demonstrate that your skills are better than most people in the general population.  Regarding your performance on the MCAT taken under standard time conditions, Dr. Smith reports that you relied on strategies such as answering questions before reading the passages, a common strategy recommended by prep courses and utilized by savvy students. He writes, *"...Jessica was able to obtain a good score in the 79th percentile (30M) of students who take the exam. This, however, was not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. Jessica's performance on the MCAT component sections reflected her relative weakness specific to reading tasks with a Verbal Reasoning score at the 67th percentile, a Physical Sciences score at the 79th percentile and a Biological Sciences score at the 88th percentile...While her scores on the ACT and the MCAT were good, she may have scored significantly higher if she had taken these tests with accommodations of a separate room and extended time."*

It's not uncommon for students to feel disappointed when they do not achieve the score they expected and believe that they could or would have obtained an exceptional score with additional testing time. Benefiting from additional time is not evidence of need for accommodations or evidence of a disability. Research shows that extended time accommodations benefit students without[1] disabilities, and are viewed as beneficial by most nondisabled postsecondary students[2] contemplating taking high-stakes standardized tests.

Accommodations are provided when there is clear and credible documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance.  Your documentation with regard to learning disabilities and ADHD offers no objective evidence of impaired reading or pervasive ADHD symptoms that limited any major life activity compared to most people in the general population. Your request for reconsideration provided no new substantive information or evidence that alters our decision communicated in my September 11, 2018 letter notifying you that you that we will provide the following accommodation(s) for the USMLE Step 1 for which you are currently registered:

- **Additional break time - testing over two days:**  The exam will be administered over two days.  Day one will be 5 hours in length and will include a 15 minute tutorial and 7 blocks with approximately 20 questions per block.  Day two will be 4 hours 45 minutes in length and will include 7 blocks with approximately 20 questions per block.  You will have up to 30 minutes to complete each block.  You will receive 75 minutes of break time each day, including lunch.  You may use break time as needed between blocks.  If you complete the tutorial or an examination block in less time than allotted, the unused time will be added to your available break time.

- **Separate testing room in which you may stand, walk or stretch during exam**

- **Permission to read aloud**

Sincerely,

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Lawrence D. Berger, Esq. via e-mail to larry@rcglawoffices.com

---

[1] See, for instance, Cahan, S., Nirel, R., & Alkoby, M. (2016). The Extra-Examination Time Granting Policy: A Reconceptualization. *Journal of Psychoeducational Assessment*, *34*(5), 461-472.

[2] See Lewandowski, L., Lambert, T. L., Lovett, B. J., Panahon, C. J., & Sytsma, M. R. (2014). College students' preferences for test accommodations. *Canadian Journal of School Psychology*, *29*(2), 116-126.

# EXHIBIT 12

**Comments:**

First six weeks: Jessica is a wonderful student. She works hard in class and always does her best.

Second six weeks: Jessica is making good progress in all areas. She is beginning to "open up" in class

Third six weeks: Jessica is continuing to make good progress. She is becoming more assertive and independent.

Fourth six weeks: Jessica is making good progress in Reading. She is "opening up" more in class.

Fifth six weeks: Jessica is doing well in class. She is a very nice girl.

Sixth six weeks: Have a wonderful summer!

**PARENT'S SIGNATURE**

1. _Gerri Shot_ 10/1/95
2. _Gerri Shot_ 11/15/95
3. _Gerri Shot_ 1/14/96
4. _Gerri Shot_ 9/21/96
5. _____
6. _____

Retain in grade _____    Promoted to _1st grade_

_Judy Price_          5-23-96
Director                    Date



## SUNSET OAKS ACADEMY

**Kindergarten Progress Report**

_Jessica Ramsay_

Teacher _Mrs. Steele_

Director _Mrs Price_



**DEFENDANT'S EXHIBIT**

**9**

RAMSAY4-0015

Jessica Ramsay

| | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E- | E | E |
| Phonics | E | E | E | E | E | E | E |
| Writing | E | E | E | E | E | E | E |
| Math | E | E | E | E- | E | E | E |
| Art | E | E | E | E | E | E | E |
| Music | / | / | E | E | E | E | E |
| Physical Education | E | E | E | E | S+ | E | E |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | / | / | / | S+ | S+ | E | S+ |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | E | E | E | E | E | E |
| Used time wisely | E | E | E | E | E | E |
| Follows directions | E | E | E | E | E | E |
| Completes work | E | E | E | E | E | E |
| Works independently | E | E | E | E | E | E |
| Shows personal organization | E | E | E | E | E | E |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | E | E | E | E | E | E |
| Displays self-confidence | S+ | E | E | E | E | E |
| Is dependable | E | E | E | E | E | E |
| Has self discipline | E | E | E | E | E | E |
| Contributes to the group | E | E | E | E | E | E |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 0 | 2 | 2 | 0 | 1 | 1 |
| Times tardy | 0 | 3 | 1 | 0 | 1 | 0 |

**EXPLANATION OF MARKS**

E  = Excellent progress
S+ = Satisfactory plus progress
S  = Satisfactory progress
I  = Needs improvement
U  = Unsatisfactory progress

RAMSAY4-0016

Case: 20-1058    Document: 14-2    Page: 857    Date Filed: 02/07/2020

**Comments:**

First six weeks: Jessica is a pleasure
to have in my classroom.

Second six weeks:
I will help her with the
switching of letters.

Third six weeks:
Jessica is working hard
in class.

Fourth six weeks:
Jessica is doing a super job!

Fifth six weeks:
Jessica is progressing nicely
in her academic subjects.

Sixth six weeks:

Have a great summer!

**PARENT'S SIGNATURE**

1. _Jerri Shol_
2. _Jerri Shol_
3. _Jerri Shol_
4. _Jerri Shol_
5. _Jerri Shol_
6. _____

Retain in grade _____   Promoted to _2nd grade_

_Judy Price_          _5-22-97_
Director                 Date

EX 12-3

## SUNSET OAKS ACADEMY



**First Grade Progress Report**

_Jessica Ramsay_

Teacher _Mrs Sullins_

Director _Mrs Price_

DEFENDANT'S
EXHIBIT
**10**

RAMSAY4-0018

Case: 20-1058    Document: 14-2    Page: 858    Date Filed: 02/07/2020

|  | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E | E | E |
| Phonics | 95 | 94 | 93 | 96 | 95 | 93 | 94 |
| Writing | E | E | E | E | E | E | E |
| Math | 100 | 95 | 99 | 96 | 98 | 97 | 98 |
| Art | E | S+ | S+ | E | E | E | E |
| Music | E | S+ | S+ | E | E | E | E |
| Physical Education | S+ | | | | | | |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | E | E | E | E | E | E | E |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | S+ | E | E | E | E | E |
| Used time wisely | S+ | E | E | E | E | E |
| Follows directions | S+ | E | E | E | E | E |
| Completes work | S+ | E | E | E | E | E |
| Works independently | S+ | E | E | E | E | E |
| Shows personal organization | S+ | E | E | E | E | E |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | S+ | E | E | E | E | E |
| Displays self-confidence | S+ | E | E | E | E | E |
| Is dependable | S+ | E | E | E | E | E |
| Has self discipline | S+ | E | E | E | E | E |
| Contributes to the group | S+ | S+ | E | E | E | E |

|  | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 1 | 1 | 1 | 0 | 2 | 2 |
| Times tardy | 0 | 1 | 0 | 0 | 1 | 2 |

### EXPLANATION OF MARKS

E  = Excellent progress
S+ = Satisfactory plus progress
S  = Satisfactory progress
I  = Needs improvement
U  = Unsatisfactory progress

RAMSAY4-0019

| Spanish | S+ | E | E | E | E | E | E |
| Spelling | 80 | 90 | 97 | 92 | 98 | 98 | 93 |

EX 12-4

Case: 20-1058    Document: 14-2    Page: 859    Date Filed: 02/07/2020

**Comments:**

First six weeks:
Jessica has gotten off to an excellent start!

Second six weeks: Jessica has made great improvements in getting her work done on time!!

Third six weeks: Jessica continues to do well with completing her work on time & her confidence continues to grow.

Fourth six weeks: Jessica needs to focus on getting her work done on time.

Fifth six weeks: I am very proud of Jessica's efforts to improve her work habits!

Sixth six weeks: Have a great summer!

**PARENT'S SIGNATURE**

1. _Chris Spell_
2. _Chris Spell_
3. _Chris Spell_
4. _Chris Spell_
5. _Chris Spell_
6. _____

Retain in grade _____   Promoted to _3rd_

_Judy Price_ _____   _5-21-98_
Director                        Date

EX 12-5

## SUNSET OAKS ACADEMY



**Second Grade Progress Report**

_Jessica Ramsay_

Teacher _Mrs. Hare_

Director _Mrs. Price_

**DEFENDANT'S EXHIBIT**

**11**

RAMSAY4-0021

| | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E | E | E |
| Phonics | 93 | 92 | 95 | 93 | 92 | 96 | 94 |
| Writing | S+ | S | S+ | S | S+ | S+ | S+ |
| Math | 99 | 98 | 95 | 97 | 97 | 97 | 97 |
| Art | E | E | E | E | E | E | E |
| Music | | | | | | | |
| Physical Education | | | | | | | |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | S+ | S+ | S+ | S+ | S+ | S+ | S+ |
| Spelling | 100 | 100 | 98 | 96 | 96 | 97 | 97 |
| Spanish | | E | E | | E | | E |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | S | S+ | S+ | S+ | S+ | S |
| Used time wisely | I | S | S+ | S | S+ | S |
| Follows directions | E | E | E | E | E | E |
| Completes work | I | S | S+ | S | S+ | S |
| Works independently | S+ | S+ | S+ | S+ | E | E |
| Shows personal organization | S+ | S+ | S+ | S+ | S+ | S+ |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | E | E | E | E | E | E |
| Displays self-confidence | S | S+ | S+ | S+ | E | E |
| Is dependable | E | E | E | E | E | E |
| Has self discipline | S | S+ | S+ | S | S+ | S+ |
| Contributes to the group | S+ | S+ | S+ | S+ | S+ | S+ |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 5 | 0 | 1 | 3 | 0 | 1 |
| Times tardy | 0 | 0 | 0 | 0 | 0 | 0 |

**EXPLANATION OF MARKS**

E = Excellent progress
S+ = Satisfactory plus progress
S = Satisfactory progress
I = Needs improvement
U = Unsatisfactory progress

EX 12-6

RAMSAY4-0022

Case: 20-1058    Document: 14-2    Page: 860    Date Filed: 02/07/2020

# Sunset Oaks Academy
## Physical Education
## Report Card

Name: Jessica Ramsay

Grade: 2nd

Classroom Teacher: Mrs. Hare

E = Excellent
S = Satisfactory
N = Needs Improvement
U = Unsatisfactory

| | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Listens carefully, follows directions and stays on task | E | E | E | E | E | E |
| Participation and performance of skills are age appropriate | E | E | E | E | E | E |
| Models respect and courtesy for the teacher | E | E | E | E | E | E |
| Demonstrates good sportsmanship and gets along with classmates | E | E | E | E | E | E |

DEFENDANT'S EXHIBIT 12

EX 12-7

RAMSAY4-0020

Case: 20-1058    Document: 14-2    Page: 862    Date Filed: 02/07/2020

**Promotion Requirements**:

To be promoted to the next grade level, a student must meet **all** of the following criteria:

- Mastery of Texas Essential Knowledge and Skills (TEKS)
- Final grade average of 70 or above in Mathematics
- Final grade average of 70 or above in Language Arts (average of reading and composition grades)
- Final grade average of 70 or above in Mathematics, Language Arts, Science and Social Studies
- **Master Texas Assessment of Academic Skills (TAAS)**
  *Policy EIED (Local) and EKB (Local)*
- 90% or above attendance

On-level performance indicates a student is performing at the state and local expectations for the assigned grade level. Students may receive differentiation in their program in order to attain mastery of objectives in accordance with their academic needs. Only students functioning on grade level or above may be considered for promotion. Special education students will be promoted according to the achievement of their Individual Education Plan (IEP) goals.

|   | Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|---|
|   |   | yes | no | yes | no |
| 1. | *Carri Shold* | yes | (no) | yes | no |
| 2. | *Carri Shold* | yes | (no) | yes | no |
| 3. | *Carri Shold* | yes | (no) | yes | no |
| 4. | *Carri Shold* | yes | (no) | yes | no |
| 5. | *Carri Shold* | yes | (no) | yes | no |

(Promoted to)/Placed in grade _____ 4 _____

Summer School needed:        Yes/(No)
Summer School required:       Yes/(No)
TAAS mastery: Reading    Writing    Mathematics
(if applicable)  (Yes)/No    (Yes)/No    (Yes)/No

Form No. 113360  Rev. 7/98

EX 12-8

# CARROLLTON-FARMERS BRANCH
# INDEPENDENT SCHOOL DISTRICT

### Report Card
### for
### Grades 1 through 5

19 _98_ to _99_

Student's Name  RAMSAY          JESSICA    E
                E. L. KENT ELEMENTARY
Student I.D. Num  262344
                JOHNSON       A    (301)
                LINDA HAWKINS

Grade Level _____

Teacher _____

Elementary School _____

Principal _____



Carrollton · Farmers Branch
Independent School District

DEFENDANT'S EXHIBIT
13

RAMSAY4-0023

Case: 20-1058    Document: 14-2    Page: 863    Date Filed: 02/07/2020

Name: *Jessica*    Grade: *3*    School Year: *98-99*

| Evaluation Scales (recorded numerically only) | |
|---|---|
| Grades 1-2 Academic Areas and Character Education, Grades 3-5 Character Education only, Grades 1-5 PE, Music, and Art will be graded as: | Grades 3-5 Academic Areas will be graded as: |
| 4 = Performs at excellent level consistently | 90-100 = A |
| 3 = Performs at standard expectations consistently | 80-89 = B |
| 2 = Performs slightly below standard expectations, but makes continuous progress | 75-79 = C<br>70-74 = D |
| 1 = Performs at beginning level or below | 69-below = F |
| Grades will not be assigned in shaded areas | |

| ACADEMIC AREAS | | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | | 92 |
| Reading | | 86 | 91 | 93 | 92 | 96 | 96 | |
| Reading Level: | Above | | | | | | | |
| (check one) | On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓+ | |
| | Below | | | | | | | |
| Composition | | 87 | 92 | 88 | 92 | 86 | 95 | |
| Spelling | | 95 | 97 | 94 | 94 | 90 | 98 | |
| Math | | 88 | 89 | 88 | 91 | 90 | 95 | 90 |
| Math Level: | Above | | | | | | | |
| (check one) | On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓+ | |
| | Below | | | | | | | |
| Science/Health | | 89 | 91 | 94 | 89 | 89 | 93 | 91 |
| Social Studies | | 97 | 86 | 94 | 86 | 90 | 95 | 91 |
| Music | | 4 | 4 | 4 | 4 | 4 | 4 | |
| Art | | 4 | 4 | 4 | 4 | 4 | 4 | |
| Physical Education | | 4 | 4 | 4 | 4 | 4 | 4 | |

Applicable for students learning English:

| ESL (English as a Second Language) | | | | | | |
|---|---|---|---|---|---|---|

| CHARACTER EDUCATION | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| PRIDE - produces quality work; completes assigned tasks | 3 | 4 | 4 | 4 | 4 | 4 |
| CITIZENSHIP/SERVICE- follows school and class rules | 4 | 4 | 3 | 4 | 4 | 4 |
| RESPONSIBILITY - makes appropriate choices; accepts responsibility for choices | 4 | 4 | 4 | 3 | 3 | 3 |
| INTEGRITY -demonstrates honesty and fairness to others | 4 | 4 | 4 | 4 | 4 | 4 |
| COOPERATION - works well with others | 4 | 4 | 4 | 4 | 4 | 4 |
| RESPECT - appreciates others' diversity, demonstrates consideration for self, peers, and authority | 4 | 4 | 4 | 4 | 4 | 4 |

## ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the time service began.

| | | | |
|---|---|---|---|
| _____ Special Education | | _____ ACE/LEAP |
| _____ English as a Second Language | | _____ Bilingual |
| _____ Learning Center | | _____ 504 |
| _____ Speech | | _____ Tutoring |
| _____ Specialized Reading Support:_____ | | |
| _____ Grades based on intensive teacher assistance | | |

| NUMBER OF DAYS | 1 | 2 | 3 | 4 | 5 | 6 | Total |
|---|---|---|---|---|---|---|---|
| Absences | — | 1 | 2 | 3 | 1 | — | 7 |
| Tardies | — | — | 1 | — | 1 | — | 2 |

RAMSAY4-0024

In accordance with state law, students must be in attendance for at least 90% of the days of the school year to be promoted to the next grade level.

EX 12-9

Case: 20-1058    Document: 14-2    Page: 864    Date Filed: 02/07/2020

**Promotion Requirements**:

To be promoted to the next grade level, a student must meet **all** of the following criteria:

- Mastery of Texas Essential Knowledge and Skills (TEKS)
- Final grade average of 70 or above in Mathematics
- Final grade average of 70 or above in Language Arts (average of reading and composition grades)
- Final grade average of 70 or above in Mathematics, Language Arts, Science and Social Studies
- **Master Texas Assessment of Academic Skills (TAAS)**
  *Policy EIED (Local) and EKB (Local)*
- 90% or above attendance

On-level performance indicates a student is performing at the state and local expectations for the assigned grade level. Students may receive differentiation in their program in order to attain mastery of objectives in accordance with their academic needs. Only students functioning on grade level or above may be considered for promotion. Special education students will be promoted according to the achievement of their Individual Education Plan (IEP) goals.

| | Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|---|
| 1. | | yes | no | yes | no |
| 2. | | yes | (no) | yes | no |
| 3. | | yes | no | yes | no |
| 4. | | yes | no | yes | no |
| 5. | | yes | no | yes | no |

**Promoted to/Placed in grade** _____5_____

| | | | |
|---|---|---|---|
| Summer School needed: | Yes/No | | |
| Summer School required: | Yes/No | | |
| TAAS mastery: Reading | Writing | Mathematics | |
| (if applicable) Yes/No | Yes/No | Yes/No | |

Form No. 113360   Rev. 7/98

# CARROLLTON-FARMERS BRANCH INDEPENDENT SCHOOL DISTRICT

### Report Card
### for
### Grades 1 through 5

### 19____ to _____

Student's Name __ RAMSAY        JESSICA    E
                 E. L. KENT ELEMENTARY
Student I.D. Numt  262544
                 DEWITT       K   (400)
Grade Level_____LINDA HAWKINS_____

Teacher_____

Elementary School_____

Principal_____



Carrollton · Farmers Branch
Independent School District

RAMSAY4-0025

EX 12-10

Name: Jessica    Grade: 4    School Year: 99-00

Date Filed: 02/07/2020    Page: 865    Document: 14-2    Case: 20-1058

| Evaluation Scales (recorded numerically only) | |
|---|---|
| **Grades 1-2 Academic Areas and Character Education,** **Grades 3-5 Character Education only,** **Grades 1-5 PE, Music, and Art will be graded as:** | **Grades 3-5** **Academic Areas** **will be graded as:** |
| 4 = Performs at excellent level consistently | 90-100  = A |
| 3 = Performs at standard expectations consistently | 80-89  = B |
| 2 = Performs slightly below standard expectations, but makes continuous progress | 75-79  = C 70-74  = D |
| 1 = Performs at beginning level or below | 69-below = F |
| Grades will not be assigned in shaded areas | |

| ACADEMIC AREAS | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | 92 |
| Reading | 91 | 91 | 87 | 94 | 94 | 94 | |
| Reading Level:   Above | | | | | | | |
| (check one)   On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Below | | | | | | | |
| Composition | 90 | 92 | 91 | 90 | 94 | 90 | |
| Spelling | 91 | 97 | 94 | 93 | 94 | 94 | |
| Math | 93 | 93 | 91 | 90 | 91 | 97 | 93 |
| Math Level:   Above | | | | | | | |
| (check one)   On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Below | | | | | | | |
| Science/Health | 93 | 96 | 93 | 90 | 90 | 100 | 94 |
| Social Studies | 97 | 92 | 94 | 91 | 98 | 96 | 95 |
| Music | 4 | 4 | 4 | 4 | 4 | 4 | |
| Art | 4 | 4 | 4 | 4 | 4 | 4 | |
| Physical Education | 4 | 4 | 4 | 4 | 4 | 4 | |

Applicable for students learning English:

| ESL (English as a Second Language) | | | | | | | |
|---|---|---|---|---|---|---|---|

| CHARACTER EDUCATION | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| *PRIDE* - produces quality work; completes assigned tasks | 4 | 3 | 4 | 4 | 4 | 4 |
| *CITIZENSHIP/SERVICE*- follows school and class rules | 4 | 4 | 4 | 4 | 4 | 4 |
| *RESPONSIBILITY* - makes appropriate choices; accepts responsibility for choices | 3 | 3 | 3 | 3 | 4 | 4 |
| *INTEGRITY* -demonstrates honesty and fairness to others | 4 | 4 | 4 | 4 | 4 | 4 |
| *COOPERATION* - works well with others | 4 | 4 | 4 | 4 | 4 | 4 |
| *RESPECT* - appreciates others' diversity, demonstrates consideration for self, peers, and authority | 4 | 4 | 4 | 4 | 4 | 4 |

## ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the time service began.

| _____ Special Education | ✓ 12-00  ACE/LEAP |
|---|---|
| _____ English as a Second Language | _____ Bilingual |
| _____ Learning Center | _____ 504 |
| _____ Speech | _____ Tutoring |
| _____ Specialized Reading Support: _____ | |
| _____ Grades based on intensive teacher assistance | |

| NUMBER OF DAYS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
| Absences | 1 | 0 | 1 | 4 | 0 | 0 | 6 |
| Tardies | 0 | 0 | 0 | 0 | 0 | 0 | |

In accordance with state law, students must be in attendance for at least 90% of the days of the school year to be promoted to the next grade level.

RAMSAY4-0026

Case: 20-1058    Document: 14-2    Page: 866    Date Filed: 02/07/2020

**romotion Requirements:**

o be promoted to the next grade level, a student must meet all of the
allowing criteria:

Mastery of the Texas Essential Knowledge and Skills (TEKS)
Mathematics final grade average of 70 or above in grades 3-5; or 2 or
above in grades 1-2
Language Arts final grade average of 70 or above in grades 3-5; or 2 or
above in grade 1-2 (average of reading [60%], composition [30%], and
spelling [10%] grades)
Mathematics, Language Arts, Science and Social Studies final composite
grade average of 70 or above in grades 3-5; or 2 or above in grade 1-2
Pass the Texas Assessment of Academic Skills (TAAS) *Policy EIED
(Local) and EKB (Local)* in grades 3-5
90% or above attendance

| Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|
| | yes | no | yes | no |
| | yes | no | yes | no |
| | yes | no | yes | no |
| | yes | no | yes | no |
| | yes | no | yes | no |

**Promoted to/Placed in grade** _____

| | | | |
|---|---|---|---|
| nmer School recommended: | Yes | | No |
| nmer School required: | Yes | | No |
| AS mastery: | Reading | Writing | Mathematics |
| pplicable) | Yes / No | Yes / No | Yes / No |

m No. 113360  Rev. 8/99



# Carrollton · Farmers Branch
## Independent School District

**Report Card
for
Grades 1 through 5**

_2000_ to _2001_

Student's Name _____

     Ramsay, Jessica   262544
     Delsignore

Student I.D. Number _____

Grade Level _____

Teacher _____

Elementary School _____ Kent

Principal _____ Linda Hawkins

Case: 20-1058   Document: 14-2   Page: 867   Date Filed: 02/07/2020

me: *Jessica*    Grade: 5    School Year *2000-01*

| Evaluation Scales (recorded numerically only) | |
|---|---|
| rades 1-2 Academic Areas and Character Education,<br>rades 3-5 Character Education only,<br>rades 1-5 PE, Music, and Art will be graded as: | Grades 3-5<br>Academic Areas<br>will be graded<br>as: |

4 = Performs at excellent level consistently
3 = Performs at standard expectations consistently
2 = Performs slightly below standard expectations,
    but makes continuous progress
1 = Performs at beginning level or below

| | |
|---|---|
| 90-100 | = A |
| 80-89 | = B |
| 75-79 | = C |
| 70-74 | = D |
| 69-below | = F |

A child who receives a grade of 1 in an academic area is
required to attend tutorials. If a 2 is received in an
academic area, tutorials are strongly recommended.

Grades will not be assigned in the shaded areas below.

| ACADEMIC AREAS | | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | | |
| Reading | | | | | | | | |
| Reading Level: | Above | | | | | | | |
| (check one) | On | / | 97 | 94 | | | | |
| | Below | | | | | | | |
| Composition | | | 88 | 92 | | | | |
| Spelling | | | 97 | 96 | | | | |
| Math | | | | | | | | |
| Math Level: | Above | / | 100 | 91 | | | | |
| (check one) | On | | | | | | | |
| | Below | | | | | | | |
| Science/Health | | | 98 | 89 | | | | |
| Social Studies | | | 87 | 93 | | | | |
| Music | | | 4 | 4 | | | | |
| Art | | | 4 | 4 | | | | |
| Physical Education | | | 4 | 4 | | | | |

On-level performance indicates a student is performing at the state and local expectations for
the assigned grade level. Students may receive differentiation in their instructional program in
order to attain mastery of objectives in accordance with their academic needs. Only students
functioning on grade level or above should be considered for promotion. Special education
students will be promoted according to the achievement of their Individual Education Plan
(IEP) goals.

Applicable for students learning English only:

| ESL (English as a Second Language) | | | | | | |
|---|---|---|---|---|---|---|

| CHARACTER EDUCATION<br>(Applicable for all students) | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| PRIDE - produces quality work; completes assigned tasks | 4 | 4 | | | | |
| CITIZENSHIP/SERVICE - follows school and class rules | 4 | 4 | | | | |
| RESPONSIBILITY - makes appropriate choices; accepts responsibility for choices | 4 | 4 | | | | |
| INTEGRITY - demonstrates honesty and fairness to others | 4 | 4 | | | | |
| COOPERATION - works well with others | 4 | 4 | | | | |
| RESPECT - appreciates others' diversity; demonstrates consideration for self, peers, and authority | 4 | 4 | | | | |

## ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the
time service began.

| | |
|---|---|
| _____ Special Education | ✓ ACE/LEAP |
| _____ English as a Second Language | _____ Bilingual |
| _____ Learning Center | _____ 504 |
| _____ Speech | _____ Tutoring |
| _____ Specialized Reading Support: _____ | |
| _____ Grades based on intensive teacher assistance | |

| NUMBER OF DAYS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
| Absences | 1 | 0 | | | | | |
| Tardies | 0 | 0 | | | | | |

In accordance with state law, students must be in attendance for at least 90%
of the days of the school year to be considered for promotion to the next grade
level.

RAMSAY 4-0028

Date Filed: 02/07/2020    Page: 868    Document: 14-2    Case: 20-1058

| SCHOOL NAME | ST. JOSEPH PUBLIC SCHOOLS REPORT CARD | STUDENT NAME | STUDENT CODE |
|---|---|---|---|
| Brown Elementary | | RAMSAY JESSICA E | 487963 |

**SCHOOL MISSION STATEMENT:** We will prepare today's child to meet tomorrow's challenges.

YEAR: **2000-01**

CURRENT GRADE: **05**

HOMEROOM TEACHER: **S STOBBELAAR**

### ATTENDANCE RECORD

| MARKING PERIOD | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| PRESENT | 43.0 | 48.0 | | | 91.0 |
| ABSENT | .5 | | | | .5 |
| TARDY | | | | | |

PROMOTE TO: **06**
RETAINED IN:

| COURSE NUMBER | SUBJECT | TEACHER NAME | FIRST SEMESTER 1 GR | COM | FIRST SEMESTER 2 GR | COM | SECOND SEMESTER 1 GR | COM | SECOND SEMESTER 2 GR | COM | FINAL GRADE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10115 | LANGUAGE | STOBBELAAR | | | | | A | | A | 0 | A |
| 10215 | READING | STOBBELAAR | | | | | A | | A | | A |
| 10315 | SPELLING | STOBBELAAR | | | | | A | | A | | A |
| 10415 | HANDWRITING | STOBBELAAR | | | | | O | | O | | O |
| 10561 | MATHEMATICS | ROMMEL | | | | | A- | | A | | A |
| 10622 | SOCIAL STUDIES | LINGL | | | | | A- | 0 2 | A- | | A- |
| 10715 | SCIENCE/HEALTH | STOBBELAAR | | | | | A- | | A- | 1 | A- |
| 10864 | ART 5TH | DUNCAN | | | A- | | A | | A | | A |
| 10930 | VOCAL MUSIC 5 | SCHNEBLY | | | B+ | 2 | A- | 2 3 | A | | A- |
| 11004 | INSTRUM MUSIC | ENGLEMAN | | | | | A | | A | | A |
| 11158 | PHYS EDUC | SAYLOR | | | | | A | | A | 2 | A |
| | CITIZENSHIP ------> | | | | | O | O | | O | | |

### ADDRESS

RAMSAY        JESSICA      E
1438   OLD FARM LANE
ST. JOSEPH       MI 49085

"Citizenship" refers to the extent to which an individual displays positive attitudes, responsible behaviors, and respect for self and others.

### KEY TO GRADES(GR)

| | |
|---|---|
| A | Excellent |
| B | Above Average |
| C | Average |
| D | Below Average |
| E | Failing |
| N | Needs Improvement |
| O | Outstanding |
| S | Satisfactory |
| U | Unsatisfactory |

### COMMENTS(COM)

| | |
|---|---|
| 0 | Excellent study skills |
| 1 | Positive class involvement |
| 2 | Is making a good effort |
| 3 | Shows Improvement |
| 4 | Performs poorly on tests |
| 5 | Does not follow directions |
| 6 | Incomplete work/Poor preparation |
| 7 | Inattentive/Poor use of time |
| 8 | Not working to ability |
| 9 | Does not know basic facts/skills |

* MODIFIED PROGRAM    S. E. DESIGNATES SPECIAL EDUCATION

RAMSAY-0036

DEFENDANT'S EXHIBIT **16**

BCISD FORM DP-SG-101

# ST. JOSEPH PUBLIC SCHOOLS

STUDENT _Jessica Ramsay_    SCHOOL _Brown_

GRADE _5_    SCHOOL YEAR _2000-01_    TEACHER _Stothkhar_

COMMENTS:

**1st Marking Period**

**2nd Marking Period** Jessica is doing beautiful work in all subject areas! It is a pleasure to work with her and I anticipate an excellent semester. If I were to grade her for this short period (2 weeks & ½), she'd have A in Reading,

**3rd Marking Period** Language, Spelling and Science ( Handwriting = O) ☺ (23 of 30 Challenge spelling words correct)

(16 of 25 Challenge words correct)

**4th Marking Period** You've done fine work in all subject areas all semester, Jessica. Congratulations on winning second place in the original Story category at our Science Expo! Keep on writing creatively and consider working on the school paper at Upton.

RAMSAY4-0037

# STANFORD
## Early School Achievement Test
### Third Edition

SESAT 2
Form J

## Test Record

| Name | Jessica Ramsay |
| Teacher | Mrs. Steele |
| School | Sunset Oaks Academy |
| Grade | K |
| Date of Testing | 4-96 |
| Norms | ☐ Fall   ☐ Midyear   ☑ Spring |

| | Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
|---|---|---|---|---|---|---|
| 1 | TOTAL READING /110   (2 + 3 + 4) | 94 | 491 | 1.6 | 96 | 9 |
| 2 | Sounds and Letters /40 | 38 | 520 | 1.7 | 95 | 8 |
| 3 | Word Reading /40 | 33 | 475 | 1.4 | 86 | 7 |
| 4 | Sentence Reading /30 | 23 | 491 | 1.6 | 97 | 9 |
| 5 | Mathematics /44 | 26 | 505 | 1.6 | 91 | 8 |
| 6 | Environment /40 | 33 | 514 | 2.1 | 80 | 7 |
| 7 | Listening to Words and Stories /45 | 40 | 586 | 2.6 | 90 | 8 |
| 8 | Basic Battery /199   (1 + 5 + 7) | 170 | 510 | 1.6 | 96 | 9 |
| 9 | Complete Battery /239   (6 + 8) | 203 | 511 | 1.7 | 96 | 9 |

DEFENDANT'S
EXHIBIT
**24**

8 9 10 11 12   B C D E

Copyright © 1989 by Harcourt Brace Jovanovich, Inc. Standardization edition copyright © 1988 by Harcourt Brace Jovanovich, Inc. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. "The Psychological Corporation" and the "PSI" logo are registered trademarks of The Psychological Corporation. Printed in the United States of America.

EX 12-16

RAMSAY1-0001

# STANFORD
## Achievement Test
Eighth Edition

Primary 1　Form J
**Complete Battery**

## Test Record

Name _Jessica Ramsay_

Teacher _Mrs Sullins_

School _Sunset Oaks Academy_

Grade _1st_　　Date of Testing _4-7/ 4-11-97_

Norms　☐ Fall　☐ Midyear　☒ Spring

| Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
|---|---|---|---|---|---|
| 1　TOTAL READING /106　(2 + 3 + 4) | 87 | 545 | 2.2 | 70 | 6 |
| 2　　Word Study Skills /36 | 36 | 658 | 6.9 | 98 | 9 |
| 3　　Word Reading /30 | 13 | 463 | 1.3 | 13 | 3 |
| 4　　Reading Comprehension /40 | 38 | 605 | 3.5 | 92 | 8 |
| 5　TOTAL MATHEMATICS /90　(6 + 7 + 8) | 79 | 566 | 3.0 | 90 | 8 |
| 6　　Concepts of Number /34 | 33 | 629 | 5.2 | 99 | 9 |
| 7　　Mathematics Computation /26 | 20 | 533 | 2.3 | 69 | 6 |
| 8　　Mathematics Applications /30 | 26 | 560 | 2.7 | 83 | 7 |
| 9　Language /44 | 37 | 574 | 2.6 | 78 | 7 |
| 10　Spelling /30 | 29 | 616 | 4.3 | 95 | 8 |
| 11　Environment /40 | 33 | 592 | 3.6 | 88 | 7 |
| 12　Listening /45 | 35 | 589 | 2.7 | 78 | 7 |
| 13　Basic Battery /315　(1 + 5 + 9 + 10 + 12) | 267 | 563 | 2.5 | 86 | 7 |
| 14　Complete Battery /355　(11 + 13) | 300 | 566 | 2.7 | 87 | 7 |

89 10 11 12 A B C D E

DEFENDANT'S EXHIBIT
**25**

# STANFORD
## Achievement Test
### Eighth Edition

Primary 2    Form J
Complete Battery

# Test Record

| Name | Jessica Ramsay |
| --- | --- |
| Teacher | Michele Hare |
| School | Sunset Oaks Academy |
| Grade | 2 | Date of Testing | 4/98 |
| Norms | ☐ Fall | ☐ Midyear | ☑ Spring |

| Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
| --- | --- | --- | --- | --- | --- |
| 1  TOTAL READING /128  (2 + 3 + 4) | 113 | 633 | 5.4 | 88 | 7 |
| 2  Word Study Skills /48 | 45 | 649 | 5.8 | 88 | 7 |
| 3  Reading Vocabulary /40 | 36 | 638 | 5.5 | 88 | 7 |
| 4  Reading Comprehension /40 | 32 | 621 | 4.8 | 76 | 6 |
| 5  TOTAL MATHEMATICS /105  (6 + 7 + 8) | 95 | 626 | 5.3 | 96 | 9 |
| 6  Concepts of Number /34 | 32 | 638 | 5.5 | 95 | 8 |
| 7  Mathematics Computation /36 | 32 | 622 | 4.9 | 91 | 8 |
| 8  Mathematics Applications /35 | 31 | 621 | 4.9 | 92 | 8 |
| 9  Language /44 | 38 | 611 | 3.6 | 70 | 6 |
| 10  Spelling /30 | 24 | 603 | 3.6 | 71 | 6 |
| 11  Environment /40 | 33 | 607 | 4.4 | 87 | 7 |
| 12  Listening /45 | 33 | 597 | 3.2 | 59 | 5 |
| 13  Basic Battery /352  (1 + 5 + 9 + 10 + 12) | 303 | 615 | 4.4 | 89 | 8 |
| 14  Complete Battery /392  (11 + 13) | 336 | 614 | 4.4 | 92 | 8 |

DEFENDANT'S EXHIBIT
**26**

5 6 7 8 9 10 11 12  A B C D E

Copyright © 1989 by The Psychological Corporation. Standardization edition copyright © 1988 by The Psychological Corporation. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. "The Psychological Corporation" and "PSI" logo are registered trademarks of The Psychological Corporation. Printed in the United States of America.

RAMSAY1-0007

EX 12-18

# EXHIBIT 13

*Dr. Mary Alice A. Tanguay*
OPTOMETRIST

1850 Rosemeade
P.O. Box 116239
Carrollton, Texas 75011-6239
(214) 492-6588

December 11, 1997

TO WHOM IT MAY CONCERN

REF: JESSICA RAMSEY

Jessica Ramsey was seen in our office for a full eye examination on
October 23, 1997.  At that time it was noted that she had problems
with reversals in her school work.  Jessica has been wearing glasses
for accommodative inflexibility and hyperopea.

On December 11, 1997 we did a perceptual skills evaluation and we
enclose the results of this evaluation.

Jessica scored above her age level in visual sequential memory and
visual closure.  She was just below her age level for visual form
constancy and visual figure-ground.  She showed substantial deficits
in the areas of visual-spatial relationships and visual discrimination.
She was also lacking in visual memory.

If you have any programs that can work on these areas, I think they
would be to Jessica's advantage.  If I can provide any further information
to help with her work, please feel free to contact me.

Yours sincerely,

Dr. Mary Alice A. Tanguay
Therapeutic Optometrist

enc

MAT/mws

NBME00293

EX 13-1

# Dr. Mary Alice A. Tanguay
OPTOMETRIST

1850 Rosemeade
P.O. Box 116239
Carrollton, Texas 75011-6239
(214) 492-6588

1106782   5-366-431-4
Tanguary, M. 1/27/00-Lett

January 27, 2000

To Whom It May Concern:
Re: Jessica Ramsay

Jessica Ramsay was seen in our office for a full eye examination on October 23, 1997. At that time it was noted that she had problems with reversals in her schoolwork. Jessica had been wearing glasses for accommodative inflexibility and hyperopia.

On December 11, 1997, we did a perceptual skills evaluation. Enclosed are the results of this evaluation.

Jessica scored above her age level in visual sequential memory and visual closure. She was just below her age level for visual form constancy and visual figure-ground. She showed substantial deficits in the areas of visual-spatial relationships and visual discrimination. She was also lacking in visual memory.

Jessica returned to our office for perceptual skills training from February 1998 through May 1998. She scored above age level in all categories when retested.

At this time, her comprehension and perceptual skills are excellent. She still has the original vision problem, which may slightly reduce her reading speed.

If any further information is needed, please feel free to give us a call.

Yours sincerely,

Mary Alice A Tanguay

Dr. Mary Alice A. Tanguay
Therapeutic Optometrist

RECEIVED

DEC 12 2016

Disability Services

NBME00281

EX 13-2

# EXHIBIT 14

Case: 20-1058    Document: 14-2    Page: 877    Date Filed: 02/07/2020

# REPORT CARD

| SCHOOL NAME | STUDENT NAME | STUDENT CODE |
|---|---|---|
| St. Joseph Public Schools | RAMSAY JESSICA E | 000487963 |

| | School | School Year | Home Room | Grade |
|---|---|---|---|---|
| | Upton Middle | 2001–02 | 0207 | 06 |

| COURSE NUMBER | COURSE DESCRIPTION | TEACHER NAME | CIT | GR | COM | CIT | GR | COM | Exam | Final | CIT | GR | COM | CIT | GR | COM | Exam | Final |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | **FIRST SEMESTER** | | | | | | **SEMESTER** | | **SECOND SEMESTER** | | | | | | **SEMESTER** | |
| | | | **1** | | | **2** | | | Exam | Final | **1** | | | **2** | | | Exam | Final |
| 60302 | READING | STRAUB | 5 | A- | 9 9 | 5 | A | 6 9 | | A | 5 | A- | 9 6 | 5 | A- | 9 7 | | A- |
| 63102 | BAND BRASS/P | ENGLEMAN | 5 | A | 9 | 5 | A | | | A | 5 | A- | 9 7 6 | 5 | A | 9 | | A |
| 69103 | PHYS ED | VANDERMEULEN | 5 | A | 9 | 5 | A | 6 | | A | 5 | A- | 9 | 5 | A | 6 | | A |
| 64006 | ART | WILSCHKE | 5 | A | 9 | | | | | A | | | | | | | | |
| 60707 | SOC STUD | MATZKE | 5 | A- | 9 6 | 5 | A | 7 9 | | A | 5 | A- | 9 6 | 5 | A | 6 9 | | A |
| 60207 | LANG ARTS | STRAUB | 5 | A- | 9 7 6 | 5 | A | 9 7 | | A | 5 | A- | 9 7 | 5 | A | 9 6 | | A |
| 62907 | COMPUTERS | WINTER | | | | 5 | A | 7 | | A | | | | | | | | |
| 61707 | SCIENCE | MATZKE | 5 | A | 9 6 | 5 | A | 7 9 | | A | 5 | A | 9 6 | 5 | A | 7 9 | | A |
| 65008 | MUSIC | WRIGHT | | | | | | | | | 5 | A | 9 | | | | | |
| 62509 | HOME EC | MANN | | | | | | | | | | | | 5 | A- | 9 | | A- |
| 71210 | TRANS MATH | MILLER | 5 | A- | 9 | 5 | A | 9 | | A | 5 | A- | 9 | 5 | A | 9 | | A |
| 62010 | IND ED | SONNEVIL | | | | | | | | | | | | 5 | A | 9 | | A |
| 10014 | HOMEROOM - 6 | MATZKE | | | | | | | | | 5 | | | | | | | |

| KEY TO GRADES(GR) | KEY TO CITIZENSHIP | ADDITIONAL TEACHER COMMENTS | KEY TO COMMENTS(COM) |
|---|---|---|---|
| A Excellent | Student demonstrates self control, respect for adults, peers, and property, and observes classroom rules. | | 9 Good Effort |
| B Above Average | | | 8 Showing Improvement |
| C Average | | | 7 Positive Attitude |
| CR Credit | | | 6 Positive Class Participation |
| D Below Average | 5 Always | | 5 Needs to Improve Class Behavior |
| F Failing | 4 Usually | | 4 Not Prepared for Class/Missing Assignments |
| I Incomplete | 3 Sometimes | | 3 Not Working Up to Ability |
| N No Mark | 2 Seldom | | 2 Low Test Scores |
| | 1 Never | | 1 Absences Affect Work |
| | | | 0 Modified Expectations |

### Attendance information

| | 1 | 2 | TOTAL | 1 | 2 | TOTAL |
|---|---|---|---|---|---|---|
| Days Absent | 4.5 | 4.0 | 8.5 | 9.5 | 2.5 | 12.0 |

PROMOTED: 07
RETAINED:
PLACED IN:

PARENT'S SIGNATURE

DEFENDANT'S EXHIBIT 17

BCISD FORM

Date Filed: 02/07/2020    Page: 878    Document: 14-2    Case: 20-1058

# Iowa Tests of Basic Skills and Cognitive Abilities Test

**Service 2a:**
**Profile Narrative Report**
**Parent Copy**

Student: RAMSAY, JESSICA          Sex: F    Grade: 6 REDACTED
I.D. No.:                          Birth Date:
Class/Group: MATZKE               Age: 11 Yrs 1 Mos
Building: UPTON MIDDLE SCHOOL      Lvl/Form: 12/K    D/5
Bldg. Code: 5793                  Test Date: 9/01
System: ST JOSEPH PUBLIC SCH      Norms: FALL 1992
Order No.: 000-A1011171-00-001    Page: 119

| Iowa Tests of Basic Skills | Predicted Scores | | Obtained Scores | | | National Percentile Rank |
|---|---|---|---|---|---|---|
| | PGE | PNPR | NS | NCE | NPR | Low / Average / High |
| Vocabulary | 10.2 | 95 | 7 | 70 | 83 | |
| Rdg. Comprehension | 12.1 | 95 | 6 | 59 | 66 | |
| Reading Total | 11.1 | 96 | 6 | 64 | 74 | |
| Spelling | 10.3 | 90 | 5 | 48 | 46 | |
| Capitalization | 13.0 | 92 | 5 | 55 | 59 | |
| Punctuation | 13.5 | 95 | 6 | 61 | 69 | |
| Usage & Expression | 13.4 | 95 | 9 | 88 | 97 | |
| Language Total | 12.9 | 97 | 6 | 63 | 74 | |
| Concepts/Estimate | 11.0 | 96 | 9 | 86 | 96 | |
| Probs/Data Interp. | 12.8 | 97 | 9 | 94 | 98 | |
| Math Total | 12.1 | 98 | 9 | 93 | 98 | |
| Core Total | 12.2 | 97 | 7 | 73 | 87 | |
| Social Studies | 12.5 | 95 | 5 | 49 | 48 | |
| Science | 12.6 | 94 | 8 | 82 | 94 | |
| Maps & Diagrams | 13.3 | 96 | 8 | 78 | 91 | |
| Reference Mat'ls | 12.5 | 96 | 8 | 76 | 89 | |
| Sources of Info Total | 12.9 | 97 | 8 | 79 | 92 | |
| Composite | 12.5 | 99 | 7 | 73 | 86 | |
| Math Computation | 9.8 | 94 | 6 | 61 | 70 | |

PGE=Pred Grade Equivalent, PNPR=Pred Nat'l %ile Rank, NS=Nat'l Sta9, NCE=Normal Curve Equivalent, NPR=Nat'l %ile Rank

■ = NPR    ▨ = PNPR

| Cognitive Abilities Tests | N Items | N Att | Raw Score | Age Scores | | | Grade Scores | National Grade Percentile Rank |
|---|---|---|---|---|---|---|---|---|
| | | | | SAS | AS | APR | NPR | Low / Average / High |
| Verbal | 65 | 65 | 61 | 134 | 9 | 98 | 98 | |
| Quantitative | 60 | 57 | 53 | 130 | 9 | 97 | 97 | |
| Nonverbal | 65 | 62 | 61 | 133 | 9 | 98 | 98 | |
| Composite | | | | 136 | 9 | 99 | 98 | |

SAS=Standard Age Score, AS=Nat'l Age Sta9, APR=Nat'l Age %ile Rank

Jessica was given the Iowa Tests of Basic Skills in September, 2001. She is in sixth grade at Upton Middle School in St Joseph Public Sch.

Jessica's Composite score is the score that best describes her overall achievement on the tests. Jessica's Composite national percentile rank of 86 means that she scored higher than 86 percent of sixth grade students nationally. Her overall achievement appears to be above average for sixth grade.

A student's scores can be compared with each other to determine relative strengths and weaknesses. The following are areas of relative strength for Jessica: Usage & Expression, Math Concepts & Estimation, and Math Problems & Data Interpretation. Some of these strengths might be used to help improve other areas. The following areas are relative weaknesses which may need the most work: Reading Comprehension, Spelling, Capitalization, Punctuation, Social Studies, and Math Computation.

Different students bring different patterns and levels of abilities to learning tasks. She was given the Cognitive Abilities Test to help find out about her abilities. Jessica's national percentile rank of 98 on verbal ability means that, compared with other sixth grade students nationally, Jessica scored higher than 98 percent. Jessica appears to be high in verbal ability. Jessica's national percentile rank is 97 in quantitative ability and 98 in nonverbal ability. Jessica seems to be high in quantitative ability and high in nonverbal ability. Jessica's composite national percentile rank of 98 is a general statement of her ability. She seems to be high in overall cognitive ability.

How are Jessica's achievement scores compared to her cognitive abilities scores? Jessica's actual achievement is lower than expected in seven test areas. These are Vocabulary, Reading Comprehension, Spelling, Capitalization, Punctuation, Social Studies, and Math Computation. These represent areas in which Jessica is not doing as well as she might be expected. Jessica might do better in these areas with additional effort and with continued encouragement.

DEFENDANT'S EXHIBIT 27

RAMSAY1-0013

Riverside Publishing          EX 14-2          © 1996, 1993 The Riverside Publishing Company. All rights reserved.

# EXHIBIT 15

Case: 20-1058    Document: 14-2    Page: 880    Date Filed: 02/07/2020

RAMSAY JESSICA E
N: 1438 OLD FARM LANE
ST JOSEPH     MI 49085
BIRTH DATE:                    REDACTED

| first | middle | | birth date |
|---|---|---|---|

## GRADE 9

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 9 | SCHOOL YEAR 04-05 |
|---|---|---|---|---|

| 487963 ST JOSEPH SR | GRADES 1ST SEM | 2ND SEM | UNIT OF CREDIT | TEACHER NAME |
|---|---|---|---|---|
| AMER GOVT | A- | A- | 1.00 | ETTER |
| H ENGLISH 9 | A- | A- | 1.00 | RADENBAUG |
| SPANISH 1-2 | A | A | 1.00 | MCCOMBER |
| H ALGEBRA 3- | A- | B+ | 1.00 | FOSTER |
| ART 3 | A- | | .50 | CLARK |
| ART 4 | | A | .50 | CLARK |
| TECH DRAWING | A | A | 1.00 | BERRY, J |
| PE/HEALTH (G | A | A | 1.00 | ZUHL |

| SCHOOL 11020010 | DAYS ABSENT 7.0 | TARDY | POINT AVERAGE 3.81 | TOTAL CREDIT 7.00 |
|---|---|---|---|---|

## GRADE 10

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 10 | SCHOOL YEAR 05-06 |
|---|---|---|---|---|

| 487963 ST JOSEPH SR | GRADES 1ST SEM | 2ND SEM | UNIT OF CREDIT | TEACHER NAME |
|---|---|---|---|---|
| H ENGLISH 10 | A | A | 1.00 | DURKE |
| SPANISH 3-4 | A- | A | 1.00 | MCCOMBER |
| WORLD HIST 1 | A | A | 1.00 | CHURCH |
| WORLD HIST 2 | A | A | 1.50 | CHURCH |
| H TRIG/PRECA | A | B+ | 1.00 | MOORE |
| ARCH DRAW 1H | A | A | 1.00 | BERRY, J |
| H BIOLOGY 1- | A- | A- | 1.00 | SCHILLID |

| SCHOOL 11020010 | DAYS ABSENT 7.0 | TARDY | POINT AVERAGE 3.86 | TOTAL CREDIT 6.00 |
|---|---|---|---|---|

## GRADE 11

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 11 | SCHOOL YEAR 06-07 |
|---|---|---|---|---|

| 487963 ST JOSEPH SR | GRADES 1ST SEM | 2ND SEM | UNIT OF CREDIT | TEACHER NAME |
|---|---|---|---|---|
| H ENGLISH 11 | A- | A- | 1.00 | HUNTER |
| SPANISH 5-6 | A- | A- | 1.00 | SHEPPARD |
| AM CRIM JUST | A | | .50 | STINE |
| ECONOMICS | A | A | .50 | CHURCH |
| AP US HISTOR | A- | A- | 1.00 | COLE |
| AP CALC AB | B+ | B+ | 1.00 | FOSTER |
| H CHEMISTRY | B+ | B- | 1.00 | LUCKRITZ |

| SCHOOL 11020010 | DAYS ABSENT 4.5 | TARDY | POINT AVERAGE 3.56 | TOTAL CREDIT 6.00 |
|---|---|---|---|---|

## GRADE 12

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 12 | SCHOOL YEAR 07-08 |
|---|---|---|---|---|

| 487963 ST JOSEPH SR | GRADES 1ST SEM | 2ND SEM | UNIT OF CREDIT | TEACHER NAME |
|---|---|---|---|---|
| IS SPANISH 7 | A- | A | 1.00 | SHEPPARD |
| COLLEGE WRIT | A- | | .50 | NEALER |
| COLLEGE WRIT | | A- | .50 | NEALER |
| AP CALC BC | B | B+ | 1.00 | NIESSE |
| DANCE | A | | .50 | GRAZIANO |
| DANCE | | A | .50 | GRAZIANO |
| DANCE-INTERM | A | | .50 | GRAZIANO |
| DANCE-INTERM | | A | .50 | GRAZIANO |
| H PHYSICS 1- | A- | A- | 1.00 | NICHOLIE |

| SCHOOL 11020010 | DAYS ABSENT 8.0 | TARDY | POINT AVERAGE 3.73 | TOTAL CREDIT 6.00 |
|---|---|---|---|---|

## ST. JOSEPH HIGH SCHOOL
### 2521 Stadium Drive
### St. Joseph, Michigan 49085

Accredited-North Central Association
University of Michigan since 1892
Michigan Secondary School
since 1947
Dept. Public Instruction -
State of Michigan

G.P.A.  3.747

CLASS RANK  28  OUT OF 225

DATE ENTERED: _____

DATE OF LEAVING: _____

DATE OF GRADUATION: 6/1/08

**Grading Scale:**

| A | Superior | = | 4.000 |
|---|---|---|---|
| A- | | = | 3.667 |
| B+ | | = | 3.333 |
| B | Good | = | 3.000 |
| B- | | = | 2.667 |
| C+ | | = | 2.333 |
| C | Average | = | 2.000 |
| C- | | = | 1.667 |
| D+ | | = | 1.333 |
| D | Poor | = | 1.000 |
| D- | | = | .667 |
| F | Failure | = | 0 |
| Cr | "Credit" | = | 0 |
| N | "No Mark" | = | 0 |

Signature of High School Principal

See reverse side for possible additional documentation

DEFENDANT'S EXHIBIT
18

Alumni History

St. Joseph H.S.
2521 Stadium Drive
Saint Joseph, MI 49085

Kevin J. Guzzo
School Phone: 269-926-3220
Fax: 269-983-1470
kguzzo@sjschools.org

## RAMSAY, JESSICA                                     2008

| | | | |
|---|---|---|---|
| **Fall**<br>Girls Varsity JV Swim | School Year: 04-05 | | Lttr, Chev 1, #'s, bear |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 04-05 | 17 | Cert |
| **Winter**<br>Girls Freshman Volleyball | School Year: 04-05 | 4 | Cert |
| **Fall**<br>Girls Varsity JV Swim | School Year: 05-06 | | Chev 2 |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 05-06 | 14 | Cert |
| **Winter**<br>Girls Junior Varsity Volleyball | School Year: 05-06 | 24 | Cert    MH |
| **Fall**<br>Girls Varsity JV Swim | School Year: 06-07 | | Chev 3 |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 06-07 | 14 | cert |
| **Fall**<br>Girls Varsity JV Swim | School Year: 07-08 | | Chev 4, captain Star |
| **Spring**<br>Girls Varsity Soccer | School Year: 07-08 | 14 | Chev 1 |

Schedule Star

DEFENDANT'S
EXHIBIT
**19**

1

St. Joseph 015

NBME01028

# EXHIBIT 16

# The ACT® Plus Writing
## Student Report

DEFENDANT'S EXHIBIT 31



| | |
|---|---|
| **STUDENT'S NAME:** JESSICA E RAMSAY | **ACT ID:** -62079560 |
| **SCHOOL NAME:** SAINT JOSEPH HIGH SCHOOL | **SSN:** NOT PROVIDED |
| **SCHOOL CODE:** 233-385 | **TEST DATE & TYPE:** OCT 2007 NATIONAL |

## Your ACT Scores



Rank: Approximate percent of ACT-tested students at or below your score



| | In Your State | In the U.S. |
|---|---|---|
| **Composite Score 30** | 96% | 97% |
| **ENGLISH** 30 | | 94% |
| Usage/Mechanics 17 | | 98% |
| Rhetorical Skills 15 | | 94% |
| **MATHEMATICS** 30 | | 96% |
| Pre-Algebra/Elem. Algebra 15 | | 88% |
| Algebra/Coord. Geometry 15 | | 96% |
| Plane Geometry/Trig. 16 | | 98% |
| **READING** 30 | | 91% |
| Social Studies/Sciences 13 | | 76% |
| Arts/Literature 18 | | 99% |
| **SCIENCE** 31 | | 98% |
| **COMBINED ENGLISH/WRITING** 28 | | 90% |
| Writing (score range 2 to 12) 08 | | 77% |

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

COMMENTS ON YOUR ESSAY: YOUR ESSAY MAINTAINED FOCUS ON THE SPECIFIC ISSUE IN THE PROMPT.

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.
- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.
- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.
- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.



**Looking for more information about your individual strengths and test preparation?** Go to www.actstudent.org.

**Your College Readiness:** If your scores are at or above the following ACT benchmark scores, you will likely be ready for first-year college courses—English 18, Mathematics 22, Reading 21, Science 24.

## Your College Reports

At your direction, your scores from this test date are being reported to the colleges shown below. College planning information is provided for the first four choices you listed when you registered or tested. (Fifth and sixth choices, if any, appear just above your first choice.) Your GPA was calculated from the grades you reported. To view additional college planning information or to send additional reports, visit www.actstudent.org.

| College Name and Code | What is the profile of enrolled 1st-year students at this college? | | | Is the program of study you prefer offered? | What are the approximate annual tuition and fees? | | What percent of 1st-year students receive financial aid based on: | |
|---|---|---|---|---|---|---|---|---|
| | High School Class Rank | ACT Composite Score | High School Grade Point Average | | In-state | Out-of-state | Need? | Merit? |
| YOU DID NOT PROVIDE CODES FOR ANY COLLEGES TO WHICH TO REPORT SCORES. | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| **Your Information** | Your Class Rank | Your Composite Score | Your Calculated GPA | Your Selected Major | **RAMSAY1-0022** |
|---|---|---|---|---|---|
| | TOP 25% | 30 | 3.83 | MICROBIOLOGY | |

Check with colleges for recent changes in information.    A dash (—) indicates information was not provided or could not be calculated.    *Comprehensive fee including room and board.    © 2007 by ACT, Inc. All rights reserved.

# EXHIBIT 17

**UW System Electronic Application for Undergraduate Admission
for U.S. Citizens/Permanent Residents**

## Submitted to UW-Madison for Fall 2008

To print this page, click your browser Print button or select Print from the browser menu.   Print

## SECTION 1: PERSONAL INFORMATION

1. Legal Name (First, Middle, Last/Family):  **Jessica Erin Ramsay**
   [ ]I hereby declare that my name has changed as shown above and authorize

   the University to change my records (if applicable)
2. Previous Name(s) (First, Middle, Last/Family):
3. Social Security Number: REDACTED
4. Date of Birth (month/day/year):  REDACTED
5. Birth Place (City, State/Country):  REDACTED **TX United States**
6. Gender: (**X**)Female   ( )Male
7. Racial / Ethnic Heritage:
   [ ]African American or Black
   [ ]American Indian or Alaska Native. Tribal Affiliation: _____
   [ ]Hawaiian or Pacific Islander
   [ ]Cambodian
   [ ]Hmong
   [ ]Laotian
   [ ]Vietnamese
   [ ]Other Asian
   [ ]Mexican, Mexican American, or Chicano/a
   [ ]Puerto Rican
   [ ]Cuban
   [ ]Other Hispanic or Latino/a
   [**X**]White or Caucasian
   [ ]Other, specify:
   [ ]I choose not to respond
8. Are you a U.S. Citizen? (**X**)Yes ( )No
   If no, Country of Citizenship:
   If no, Alien Status:
   [ ]Refugee / Granted Political Asylum
   [ ]Resident Alien: (permanent resident)
      Application for Alien Registration No. (month/day/year): ___/__/___
      or Alien Registration No.:  **A**
                              [ ]Pending   [ ]Unknown
   [ ]Non-immigrant Alien, Visa Type:
   [ ]Requesting Student Visa: [ ]F1 [ ]J1 [ ]Unknown
9. Have you served on active duty in the U.S. Armed Forces? ( )Yes (**X**)No
10. Have either of your parents earned a four-year college/university degree? (**X**)Yes ( )No

DEFENDANT'S
EXHIBIT
**56**

## SECTION 2: ADDRESS

RAMSAY25-0009
10/21/2007

1. E-Mail Address:
   Preferred: **5ramsays@sbcglobal.net**
2. Permanent Home Address:
   Since: (month/year) **Dec 1999**
   Address:            **1438 Old Farm Lane**
   City:               **St. Joseph**
   County:             (for Wisconsin addresses only)
   State/Province:     **MI**
   Zip/Postal Code:    **49085**
   Country:            **United States**
   Phone Number:       **1-269-556-2277**
3. Mailing Address (if different):
   [X] Same as permanent home address
   Effective From:                 (month/day/year):
   Effective To:                   (month/day/year):
           or        [ ] Indefinite
   Address:
   City:
   State/Province:
   Zip/Postal Code:
   Country:
   Phone Number:

## SECTION 3: EDUCATION PART 1: HIGH SCHOOL, EXAMS

1. Were you home schooled at any point in grades 9-12?
   ( )Yes  (X)No
2. High School of Graduation or Its Equivalent: (select one)
   ( ) Wisconsin High School:
       Name: _____  ACT/ETS Code: _____
       City: _____
   (X)Out-of-State High School:
       Name: **St. Joseph High School**    ACT/ETS Code: **233-385**
       Location: **St. Joseph, MI**
   ( ) Academic program taught in a home setting (home schooled)
       State in Which You Were Home Schooled: (if U.S.) **MI**
   ( ) GED/HS Equivalency Diploma (HSED)
       ( )GED   ( )HSED
       Issued by State of: ____
       Test date (month/year): ____ ____
   ( ) None of the above
3. Are you currently enrolled in high school?  (X)Yes ( )No
4. Date of High School or Home School Graduation: **May/2008** (month/year)
5. ACT/SAT Date taken or scheduled: (month/year)
   ACT: **3/2007, 10/2007**      SAT:  / 
6. If you have attended any high school(s) other than the school you will graduate or have
   graduated from (in question 2), please provide the following:

**RAMSAY25-0010**

Name of School: _____
City/State/Country: _____, _____
Years Attended:    From: ___    To: ___

Name of School: _____
City/State/Country: _____, _____
Years Attended:    From: ___    To: ___

## SECTION 4: EDUCATION PART 2: HIGHER EDUCATION

List all institutions, both U.S. and foreign, of higher education attended (even if you withdrew) including name of college for courses taken in high school, colleges, universities, vocational-technical schools, the institution you are currently attending, extension programs, etc., and any degree(s) earned.

*Failure to list all institutions may result in disciplinary action, recision of admission, and/or invalidation of credits or degrees earned.*

Name of School: _____
City/State/Country: _____, _____
Dates:    From: ___ / ____ (month/year)    To: ___ / ____
Degree Earned: _____    Year: ____

## SECTION 5A: RESIDENCY FOR TUITION DETERMINATION

**Residency Declaration for Fee and Tuition Assessment**

1. Are you a legal Wisconsin resident and/or do you claim legal Wisconsin residence for tuition purposes?
   ( )Yes  **(X)**No

2. Have you, your spouse or parents recently moved to Wisconsin to begin full-time employment, or do you expect to do so before the beginning of the term for which you are applying?
   ( )Yes  **(X)**No

If Yes to either (1) OR (2) above, proceed to the following questions. You may be asked to provide further information.

If No to both (1) AND (2) above, you may skip to the next section .

3. I have lived continuously and only in Wisconsin since:
   Month/Year: ____

4. During the past TWO YEARS, have you lived at a different address than the one you listed in Section 2?
   ( )Yes  ( )No
   If Yes, list former addresses during the last two years.
   Former address #1

   _____
   _____, _____
   From: /____    To: /____

5. Do you hold a valid Wisconsin driver's license?
   ( )Yes  ( )No
   **If yes,** since (month/year): ____

RAMSAY25-0011
10/21/2007

6. Have you registered a motor vehicle(s) only in Wisconsin?
   ( )Yes  ( )No
   **If yes,** since (month/year):
7. Have you last voted or registered to vote in Wisconsin?
   ( )Yes  ( )No
   **If yes,** since (month/year):
8. Have you filed a Wisconsin state income (not property) tax return as a resident for the
   past two years?
   ( )Yes  ( )No
   **If yes,** what years?
9. I am listed as a dependent on income tax forms of:
   ( )Claim my own exemption since:  (year)
   ( )Father
   ( )Mother
   ( )Father and Mother
   ( )Spouse
   ( )Other, specify:

## SECTION 5B: RESIDENCY (CONT.): EMPLOYMENT
**List your employment history and/or activities (other than school) for the last two years.**
   [ ] I have no employment history to report

| 1. Employer: | **Southshore Health and Raquet Club** |
|---|---|
| Occupation/Activity: | **Lifeguard** |
| City: | **St. Joseph** |
| State/Country: | **MI** |
| From (month/year): | **Jun/2007** |
| To (month/year): | or [**X**]Still employed here |

| 2. Employer: | **YMCA** |
|---|---|
| Occupation/Activity: | **Lifeguard** |
| City: | **St. Joseph** |
| State/Country: | **MI** |
| From (month/year): | **May/2007** |
| To (month/year): | or [**X**]Still employed here |

## SECTION 5C: RESIDENCY (CONT.): PARENT/GUARDIAN
**Please Note:** Parent/Guardian information is essential if you are still a dependent of the
parent/guardian; it can be also a determinant of WI residency status (for tuition purposes) for
all students regardless of dependent status or applicant age.

Check the appropriate box to indicate the relationship of the individuals described below and
provide the required information:

(**X**)Father    ( )Stepfather    ( )Legal Guardian

Is he living? (**X**)Yes  ( )No

RAMSAY25-0012

https://apps22.uwex.edu/pls/ea/ea.App_Submit_Completion                    10/21/2007

EX 17-4

Name (First, Middle Init, Last/Family):

**Scott A Ramsay**

Present Home Address:

[ ] Same as applicant

Address: **1438 Old Farm Lane**

City: **St. Joseph**

State/Province: **MI**

Zip/Postal Code: **49085**

Country: **United States**

Since: **Dec/1999** (month/year)

Previous Home Address:

Address:

City:

State/Province:

Country:

Since:          (month/year)

Has he filed a Wisconsin state income (not property) tax return as a resident within the past TWO years?

( )Yes (X)No     If yes, what years:

Occupation: **Whirlpool Corperation, Sales**

U.S. Citizen? (X)Yes ( )No

If a Resident Alien, send a copy of Resident Alien Card (both sides) with your application payment.

Where and when did he last vote or register to vote?

State: **Michigan** (if U.S.)

Date: **Mar/2007** (month/year)

---

(X)Mother     ( )Stepmother     ( )Legal Guardian

---

Is she living? (X)Yes ( )No

Name (First, Middle Init, Last/Family):

**Jerri L Shold**

Present Home Address:

[ ] Same as applicant

Address: **1438 Old Farm Lane**

City: **St. Joseph**

State/Province: **MI**

Zip/Postal Code: **49085**

Country: **United States**

Since: **Dec/1999** (month/year)

Previous Home Address:

Address:

City:

State/Province:

RAMSAY25-0013
10/21/2007

EX 17-5

Country:

    Since:          (month/year)

Has she filed a Wisconsin state income (not property) tax return as a resident within the past TWO years?

    ( )Yes **(X)**No     If yes, what years:

Occupation: **Radix Communication, Documentation**

U.S. Citizen? **(X)**Yes ( )No

    If a Resident Alien, send a copy of Resident Alien Card (both sides) with your application payment.

Where and when did she last vote or register to vote?

    State: **Michigan**  (if U.S.)

    Date: **Mar/2007**  (month/year)

## SECTION 6: HIGH SCHOOL COURSES IN PROGRESS

Are you enrolled in the Wisconsin Youth Apprenticeship Program?

    ( )Yes **(X)**No

If yes, please identify program name:

If you plan to attend summer session, indicate name of school:

[ ]I am not enrolled in high school **or** I will not complete any additional high school courses prior to my enrollment in college

| Semester/Term | Year | Department Name, Course Title | # of Credits |
|---|---|---|---|
| **Acad Year** | **2007-08** | Dept: **Physical Education/Fine Arts** <br> Title: **Dance** | **2** |
| **Acad Year** | **2007-08** | Dept: **Foreign Language** <br> Title: **Spanish 7-8** | **1** |
| **Acad Year** | **2007-08** | Dept: **Math** <br> Title: **AP Calculus BC** | **1** |
| **Acad Year** | **2007-08** | Dept: **English** <br> Title: **College Writing** | **1** |
| **Acad Year** | **2007-08** | Dept: **Science** <br> Title: **Honors Physics** | **1** |

## SECTION 7: COLLEGE COURSES IN PROGRESS

If you are attending a UW Colleges campus, Wisconsin Technical College or other two-year/community college, will you have earned an associate degree prior to enrolling at the campus for which you are completing this application?

    ( )Yes ( )No

    If yes, date expected: (mo/year)   \_\_\_\_ / \_\_\_\_

**RAMSAY25-0014**
10/21/2007

If you plan to attend summer session, indicate name of school:

[ ]    I am not currently enrolled in college courses

Name of first college or university (enter courses for another college/university in the next set):
List courses in which you are currently enrolled or officially registered for at this institution:

| Semester/Term | Year | Department Name, Course Number, Course Title | # of Credits |
|---|---|---|---|
| | | Dept:          Course#: Title: | |

Name of additional college or university you are currently attending or plan to attend prior to the term for which you are applying (if applicable):
List courses in which you are currently enrolled or officially registered for at this institution:

| Semester/Term | Year | Department Name, Course Number, Course Title | # of Credits |
|---|---|---|---|
| | | Dept:          Course#: Title: | |

## SECTION 8: ACTIVITIES

Please list below, **in order of importance to you**, your principal extracurricular, community and/or volunteer activities, as well as honors/awards earned. You may include involvement with school organizations, religious and service organizations, family obligations, employment, and/or participation in the arts, athletics, publications, etc.

Activity #1:                **Soccer**
Leadership Position,        **JV Captain for 2 years, Intensity Award**
  Honors and/or Awards:
Approx. Hours per Week: **12**        Number of Years: **10**

Activity #2:                **Swimming**
Leadership Position,        **Captain, Coach's Award, Varsity for 4 years**
  Honors and/or Awards:
Approx. Hours per Week: **20**        Number of Years: **10**

Activity #3:                **National Honor Society**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week: **1.5**        Number of Years: **2**

Activity #4:                **Miracle League Baseball Volunteer**
Leadership Position,        **buddy to a child with special needs**
  Honors and/or Awards:
Approx. Hours per Week: **2**        Number of Years: **4**

Activity #5:

RAMSAY25-0015

https://apps22.uwex.edu/pls/ea/ea.App_Submit.Completion                                    10/21/2007

Leadership Position,        **Academic Award**
  Honors and/or Awards:
Approx. Hours per Week:                    Number of Years:  4

Activity #6:                **Key Club**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week:  1                 Number of Years:  2

Activity #7:                **Spanish club**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week:                    Number of Years:  2

Activity #8:                **Men's Swim Team Manager**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week:  15                Number of Years:  2

Activity #9:                **Tutoring**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week:  2                 Number of Years:  2

Activity #10:               **Babysitting**
Leadership Position,
  Honors and/or Awards:
Approx. Hours per Week:  5                 Number of Years:  7

Briefly explain (in 50-100 words) how you decided which activity above was the most
important to you.

> **Soccer is my passion. I love the intensity and pressure of being the goalie - the last defense
> between the ball and the back of the net. The adrenaline from stopping each shot pulses
> through
> me, knowing a shot could be taken at any second - making or breaking the game.**

## CAMPUS-SPECIFIC SECTION: UW-Madison Information

1. Name of institution you wish to enter:  UW-Madison

2. Are you currently enrolled at or have you previously attended UW-Madison?
   ( )Yes  (X)No
   If yes, as:
        [ ]Undergraduate
        [ ]Graduate
        [ ]Nondegree/Special Student

If yes, attendance dates: (mo/year)
     From: ___/___    To: ___/___
     [ ] Check here if dates are unknown

3. Applying as:
     (X) New Freshman
     ( ) Transfer
     ( ) Reentry
     ( ) Nondegree/Special Student
     ( ) Summer Only
     ( ) 2nd Undergraduate Degree
     ( ) Additional Major/Minor/Certification

4. Semester you plan to enter:  **Fall 2008**

5. Intended Major or Field of Study:
     Genetics

6. School or College you wish to enter at the university:
     Agricultural and Life Sciences (College of)

7. Undergrad Degree Sought:
     (X)Bachelor of Science (B.S.)
     ( )None
     ( )Unknown

8. Do you plan to teach?
     ( )Yes  (X)No
     If yes, check one:
          ( )Elementary (specify grade(s)):
          ( )Secondary
          ( )Vocational / Technical
          ( )Other
          ( )Clear above selection

9. Campus from which you expect to graduate:  **UW-Madison**

10. Enrollment:
     (X)Full-time (Planning to enroll for 12 or more credits per semester)
     ( ) Part-time (Planning to enroll for fewer than 12 credits per semester)

11. Do you plan to apply for financial aid (loans, grants, work study)?
     (X)Yes  ( )No

12. Do you plan to live on campus?
     (X)Yes  ( )No

13. Did any of the following members of your family graduate from UW-Madison?
     [ ] Father
     [ ] Mother

RAMSAY25-0017

[ ] Grandparent
[ ] Sibling
[ ] Spouse

STATEMENTS

14. The University values an educational environment that provides all members of the campus community with opportunities to grow and develop intellectually, personally, culturally and socially. In order to give us a more complete picture of you as an individual, please tell us about the particular life experiences, perspectives, talents, commitments and/or interests you will bring to our campus. In other words, how will your presence enrich our community?

**BEEP! BEEP! BEEP! My alarm goes off. Why? Confused anger is running through my head. 5:45 A.M.**
**I have 15 minutes to get to morning practice. DEDICATION. 6:00 A.M. I hit the icy water that makes me forget everything as my body works to regain the heat it lost. I swim, repeating the motions I've done so many times. INSANITY. 7:00 A.M. 30 girls fight for six barely warm showers,**
**four mirrors, three sinks, and two outlets. 8:00 A.M. School starts. I sit through six long hours of academic subjects, fighting the weight of my eyelids made heavier with every practice and**
**late night. Honors English, third year Spanish, Honors Chemistry, and finally 25 minutes for lunch. It isn't the best food, but I scarf it down anyway. HUNGER. AP US History and AP Calculus**
**end my school day, forcing more knowledge into my head. 3:05 P.M. School is over, and I have 25 minutes to shove 45 pounds of books into my back pack, get help from teachers, meet with friends, change, and get into the pool by 3:30. SPEED. Another two-hour practice in the same icy water; this time, I am awake, pushing harder, racing the clock and the girl next to me, trying to catch the one in front of me. DRIVE. LOVE. DETERMINATION. 5:30 P.M. Practice is over, my muscles**
**burn, they are on fire. I don't feel like I have the energy to get out of the pool, but I drag myself out. SATISFACTION. I change quickly, pull on my shin guards, socks, and cleats, say 'bye to my team, and drive 20 minutes to Bridgman for soccer practice. I cram any food I have into my mouth. I spend two hours diving for balls that seem impossible to catch, only to feel the thrill pulse through my body when I catch them. PAIN. ADRENALINE. PASSION. 8:00 P.M. Practice is**
**over, and I drive another 20 minutes home. I grab whatever food I can as I crawl through the door and start my homework – a research paper, Spanish translations and excercises, a pre-lab and chemistry problems, and chapter review questions. Starving, I take a break for more food. Back to homework, I continue with a 35-page history chapter and 15 extremely hard calculus problems. 2:00**
**A.M. Not quite done with homework, but I can't keep my eyes open. I use what's left of my energy to fall into bed. EXHAUSTION. REPEAT. College? Hit me with everything you've got.**

15. If there is additional information you would like us to consider in reviewing your application, please share this with us as well. This is your opportunity to tell us things about yourself that have not been asked elsewhere, if you believe they will help us become acquainted with you in ways different from courses, grades, and test scores.

RAMSAY25-0018

I have led a life far from the normal lives of other teens. I have two adopted brothers, Shaun (13 years) and Joey (9 years). Shaun and Joey have been diagnosed with ADHD, Obsessive Compulsive

Disorder, Oppositional Defiance Disorder, Sensory Integration Disorder, and Autism. Joey also has

Epilepsy and is still not potty trained.

Because a lot of people don't know how to handle people that are "different", we don't have family friends, we don't take family vacations, we can't find a babysitter, my friends don't like to come over, and a lot more.

This might not seem like a big deal, but think of all the times you have family friends over to your house and how many times you have gone to theirs. Think of relaxing vacations that take you away from school and stress. Think of all the bonfires, sleepovers, and pick-up football games you've had with your friends. Now think of how your life would change if none of that existed - not that it didn't exist at all - it just didn't exist for you. Picture hearing your friends talking about these things while you wish you had them. If the feeling hasn't hit you by now, it's the feeling of standing outside in cold rain, looking through a window, while your friends are having a party inside. I have grown up with this feeling.

Because I've grown up surrounded by stress, I work very well in high pressure situations. I don't get upset over small things. I'm very down-to-earth, and I look at the whole picture. I'm determined, hard working, and passionate about everything I do. I have good time management skills

and extreme personal drive to acheive everything I can; I don't give up. I'm always positive and make sure I enjoy life. When I'm handed an opportunity to better myself, like college, I take it and run.

## CERTIFICATION OF ACCURACY OF INFORMATION

By completing the following, I certify that the information I have provided is true and complete to the best of my knowledge and I understand that inaccurate information may affect my enrollment, tuition or financial aid status. I agree to notify the admissions office, in writing, if there is a change to any of the information, including my permanent home address. I also understand that if I have applied for financial assistance, information concerning the amount of financial aid I may be offered may be released to other agencies that may also be considering me for assistance. Further, I authorize my secondary school to release a transcript of my secondary school record and any other pertinent information to the University of Wisconsin System. If I enroll at this university, I will abide by its rules and regulations. This application and supporting documents become the property of the University of Wisconsin System.

Applicant Last Name:  **Ramsay**
First Name:           **Jessica**
Middle Name:          **Erin**
Date (month/day/year): **10/21/2007**



RAMSAY25-0019
10/21/2007

EX 17-11

If you have questions or problems, you may contact us by phone
(Monday - Thursday 8am - 6pm, Friday 8am - 4:30pm CST) or e-mail.

**Voice:** 1-800-442-6459 or 1-608-263-4567
**Deaf/HoH:** via 711 Relay
**E-Mail:** eapp@learn.uwsa.edu

When you finish using this application, please click the **Quit** button.

*Copyright © 1997 University of Wisconsin*
*Production 5.50, 1-Sep-2004*

# EXHIBIT 18



**Name:** Jessica Ramsay
**Student:** 100234048
**DOB:** ████-███***
**Print Date:** 10/29/2019
Page 1 of 2
**OSUOF**

OSU 001

*Jack Miner*
Jack Miner
University Registrar

CREDENTIALS SECURITY SEAL (∅) IN THE CORNER SHOULD TEMPORARILY DISAPPEAR WHEN RUBBED OR BREATHED ON

CONFIDENTIAL RECORD ISSUED IN ACCORDANCE WITH THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974

A BLACK AND WHITE DOCUMENT IS NOT OFFICIAL

A SECURITY STATEMENT APPEARS WHEN PHOTOCOPIED

Perkins Coie LLP
Robert A. Burgoyne
Suite 600
700 13th St., NW
Washington DC 20005

**Institutions Attended**
Lake Michigan College
The Ohio State University
Saint Joseph High School

**External Degrees**
Saint Joseph High School
High School Diploma     May 1, 2008

**OSU Degrees Awarded**

| | |
|---|---|
| Degree: | Bachelor of Science |
| Confer Date: | Jun 10, 2012 |
| Degree Honors: | Cum Laude |
| Plan: | Molecular Genetics Major |
| Plan: | General Business Minor |
| Plan: | Dance Minor |

**Beginning of Undergraduate Record**

**Autumn 2008 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOSCI | 100 | Bio Sci Survey | 1.00 | 1.00 | S | 0.000 |
| CHEM | 121 | General Chemistry | 5.00 | 5.00 | B+ | 16.500 |
| MATH | 152 | Calc&Analyt Geom 2 | 5.00 | 5.00 | A- | 18.500 |
| SPANISH | 103.66 | Intensive Review 2 | 5.00 | 5.00 | A- | 18.500 |

**Test Credits Applied Toward Biological Sciences**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| MATH | 150 | Elementry Functns | 0.00 | 5.00 | EM | 0.000 |
| MATH | 151 | Calc&Analyt Geom 1 | 0.00 | 5.00 | EM | 0.000 |
| SPANISH | 101.01 | Elemntry 1 Classrm | 0.00 | 5.00 | EM | 0.000 |
| Test Trans GPA: | | 0.000     Transfer Totals: | 0.00 | 15.00 | | 0.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.566 Term Totals | 15.00 | 31.00 | 53.500 |
| Cum GPA | 3.566 Cum Totals | 15.00 | 31.00 | 53.500 |

Dean's List

**Winter 2009 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOLOGY | 113 | Energy Transfr&Dvl | 5.00 | 5.00 | B+ | 16.500 |
| CHEM | 122 | General Chemistry | 5.00 | 5.00 | B+ | 16.500 |
| DANCE | 201.01 | Modern Technique | 2.00 | 2.00 | A | 8.000 |
| SPANISH | 104 | Intermed Span 2 | 5.00 | 5.00 | A | 20.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.588 Term Totals | 17.00 | 17.00 | 61.000 |
| Cum GPA | 3.578 Cum Totals | 32.00 | 48.00 | 114.500 |

Dean's List

**Spring 2009 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOLOGY | 114 | Form.Functn&Ecolgy | 5.00 | 5.00 | A- | 18.500 |
| CHEM | 123 | General Chemistry | 5.00 | 5.00 | B- | 13.500 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| DANCE | 202.01 | Modern Technique | 2.00 | 2.00 | A | 8.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.428 Term Totals | 14.00 | 14.00 | 48.000 |
| Cum GPA | 3.532 Cum Totals | 46.00 | 62.00 | 162.500 |

**Summer 2009 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

**Transfer Credit from Lake Michigan College**
**Applied Toward Biological Sciences**

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ECON | 200 | Prin Microeconomic | 0.00 | 4.00 | K | 0.000 |
| ENGLISH | 110.01 | First-Yr Engl Comp | 0.00 | 5.00 | K | 0.000 |
| Course Trans GPA: | | 0.000     Transfer Totals: | 0.00 | 9.00 | | 0.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 0.000 Term Totals | 0.00 | 9.00 | 0.000 |
| Cum GPA | 3.532 Cum Totals | 46.00 | 71.00 | 162.500 |

**Autumn 2009 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 251 | Organic Chemistry | 4.00 | 4.00 | A- | 14.800 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |
| PHYSICS | 111 | Mechanics & Heat | 5.00 | 5.00 | A | 20.000 |
| SOCIOL | 370 | Soc Fact Persnalty | 5.00 | 5.00 | A | 20.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.925 Term Totals | 16.00 | 16.00 | 62.800 |
| Cum GPA | 3.633 Cum Totals | 62.00 | 87.00 | 225.300 |

Dean's List

**Winter 2010 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 252 | Organic Chemistry | 4.00 | 4.00 | B+ | 13.200 |
| CHEM | 254 | Organic Chem Lab | 3.00 | 3.00 | A | 12.000 |
| PHYSICS | 112 | Elec Magnetsm & Lt | 5.00 | 5.00 | A- | 18.500 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.641 Term Totals | 12.00 | 12.00 | 43.700 |
| Cum GPA | 3.635 Cum Totals | 74.00 | 99.00 | 269.000 |

Dean's List

**Spring 2010 Quarter**
Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 253H | Organic Chemistry | 4.00 | 4.00 | A | 16.000 |
| CHEM | 255 | Organic Chem Lab | 3.00 | 3.00 | A- | 11.100 |
| CSE | 100 | Intro Computing Tch | 3.00 | 3.00 | A- | 11.100 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |

| | | GPA Hours | Earned | Points |
|---|---|---|---|---|
| Term GPA | 3.850 Term Totals | 12.00 | 12.00 | 46.200 |
| Cum GPA | 3.665 Cum Totals | 86.00 | 111.00 | 315.200 |

**DEFENDANT'S EXHIBIT 22**

NBME01035



# THE OHIO STATE UNIVERSITY

OFFICE OF THE UNIVERSITY REGISTRAR
STUDENT ACADEMIC SERVICE BUILDING, 5TH FLOOR   OSU 002
281 WEST LANE AVENUE
COLUMBUS, OH 43210-1132
TELEPHONE: 614-292-9330
EMAIL: REGISTRAR@OSU.EDU

## TRANSCRIPT KEY

### RELEASE OF INFORMATION

This transcript cannot be released to another person, agency or organization except to officials internal to your own organization or agency who have a reasonable business use for the information. Release to other parties requires written consent of the student.

### ACCREDITATION

The Ohio State University (Columbus, Lima, Mansfield, Marion, Newark and the Agricultural Technical Institute, Wooster, Ohio) is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools as a degree-granting institution at the associate, baccalaureate, masters, professional and doctoral levels.

### DETAILED TRANSCRIPT KEY

For a more detailed version of this transcript key including information on good standing, probation, dismissal and the definition of enrollment status, please visit www.registrar.osu.edu/alumni/transcriptkey.asp.

### GRADING SYSTEM

| | | | | |
|---|---|---|---|---|
| A | Excellent.....................4.0 Pts | K | Transferred Credit....................0 Pts |
| A- | Excellent.....................3.7 Pts | I | Incomplete.............................0 Pts |
| B+ | Above Average..............3.3 Pts | IP | In Progress...........................0 Pts |
| B | Above Average..............3.0 Pts | IX | Extension of Incomplete...........0 Pts |
| B- | Above Average..............2.7 Pts | P | Progress..............................0 Pts |
| C+ | Average......................2.3 Pts | PA | Pass....................................0 Pts |
| C | Average......................2.0 Pts | NP | Non-pass..............................0 Pts |
| C- | Average......................1.7 Pts | R | Registered to Audit..................0 Pts |
| D+ | Poor...........................1.3 Pts | S | Satisfactory..........................0 Pts |
| D | Poor...........................1.0 Pts | U | Unsatisfactory........................0 Pts |
| E | Failure........................0 Pts | W | Withdrew...............................0 Pts |
| EM | Examination Credit..........0 Pts | NG | Grade unreported by instructor....0 Pts |
| EN | Failure-Non Attendance....0 Pts | NEN | EN grade for PA/NP course..........0 Pts |
| | | UEN | EN grade for S/U course.............0 Pts |

# notation denotes a course involved in the forgiveness or substitution of grades - see Recalculation of Grades

### SPECIAL COURSE NUMBER NOTATIONS

| | |
|---|---|
| E suffix | Honors embedded course |
| H suffix | Honors course or honors version of a course |
| S suffix | Service Learning course |
| T suffix | Technical course (part of a two year technical program) |

### RECALCULATION OF GRADES

**FORGIVENESS OR SUBSTITUTION OF GRADES:** Students may petition their enrollment unit to repeat a course, and after completing the course the second time, have the original course credit and grade excluded from the calculation of the student's cumulative point-hour ratio, but remain on the student's official permanent record. The course or courses being substituted or repeated will bear the symbol "#" to the left of the grade.

**PERMITTED TO RESTART GPA or FRESH START:** An undergraduate student who enrolls in the university after an absence of five or more years may petition to have his/her GPA recalculated. If the petition is approved, the student resumes his/her academic program with no cumulative GPA. All courses taken will remain on the permanent record.

### CALENDAR

- The semester system replaced the quarter system for the university in summer 2012
- The semester system replaced the quarter system for the College of Law in autumn 1984.

### UNIVERSITY CLASS RANKING SYSTEM

Student rank in all undergraduate colleges is based on total credit hours completed and recorded. Graduate students are not ranked. Professional students are ranked according to progress within their curriculum.

| Semester Calendar | | | Quarter Calendar | | |
|---|---|---|---|---|---|
| Rank | Earned Hours | | Rank | Earned Hours | |
| Freshman | 0 | through 29 | Freshman | 0 | through 44 |
| Sophomore | 30 | through 59 | Sophomore | 45 | through 89 |
| Junior | 60 | through 89 | Junior | 90 | through 134 |
| Senior | 90 | and up | Senior | 135 | and up |

### COURSE NUMBERING SYSTEM

#### SEMESTER CALENDAR

**1000-1099**  UG (Undergraduate) - Non Credit Courses
Non-credit courses for orientation, remedial, or other non-college-level experiences. These are courses in addition to a program's graduation requirements.

**1100-1999**  UG - Introductory Level Undergraduate Courses
Basic courses providing undergraduate credit, but not to be counted toward major or field of specialization in any department. Courses at this level are beginning courses, required or elective courses that may be a prerequisite to other courses.

**2000-2999**  UG - Intermediate Level Undergraduate Courses
Intermediate courses providing undergraduate credit and may be counted toward a major or field of specialization.

**3000-3999**  UG - Upper Level Undergraduate Courses
Upper level courses providing undergraduate credit that may be counted toward a major or field of specialization.

**4000-4999**  UG - Advanced Level Undergraduate Courses
Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Graduate students may enroll in and receive graduate credit for 4000-level courses outside their own graduate program.

**5000-5999**  UG and G (Graduate) - Dual Career Level Courses
Courses that are regularly offered for both graduate credit and undergraduate credit. Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Foundational coursework and research providing graduate or professional credit.

**6000-6999**  G - Foundational Level Graduate and Professional Courses
Foundational courses and research providing graduate or professional credit.

**7000-7999**  G - Intermediate Level Graduate and Professional Courses
Intermediate courses and research providing graduate or professional credit.

**8000-8999**  G - Advanced Level Graduate and Professional Courses
Advanced courses and research providing graduate or professional credit.

#### Quarter Calendar

**000-099**  Non-Credit Courses (except certain seminars and colloquia) for orientation, remedial, or other non-college-level experiences. Credit is not applicable to Graduation Requirements.

**100-199**  Basic Courses providing undergraduate Credit but not to be counted on a major or field of specialization in any department. Beginning Courses, Required, or Elective Courses that may be prerequisite to other courses.

**200-299**  Basic Courses providing Undergraduate Credit and may be counted on a major or field of specialization.

**300-499**  Intermediate Courses providing Undergraduate Credit or Basic Professional Credit that may be counted on a major or field of specialization.

**500-599**  Intermediate Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization and may provide Graduate Credit only in other departments.

**600-699**  Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization, and may provide Graduate Credit (in all departments).

**700-799**  Advanced Courses providing Undergraduate, Graduate, or Professional Credit.

**800-999**  Courses providing Graduate Credit and are open to undergraduates only with the approval of the Vice Provost for Research and Dean of the Graduate School.

**TO TEST FOR AUTHENTICITY** - If you vigorously rub or breathe on the Credentials security seal located in the corner of the page adjacent to the barcode, the image will fade. This document is printed on DocuCheck WATERMARK® security paper and contains multiple overt and covert security features. Hold the page to the light to see the translucent DocuCheck WATERMARK® image. When photocopied, a security statement may appear with the word VOID throughout the face of the document. If solvents & certain other chemicals are applied to this document, the paper will stain.

In accordance with USC 438 (6) (4) (8), The Family Educational Rights and Privacy Act of 1974 (FERPA), you are hereby notified that this Official Transcript is provided upon the condition that you, your agent or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

EX 18-2

NBME01036



Jack Miner
University Registrar

Name: Jessica Ramsay     OSU 003
Student: 100234048
DOB: REDACTED ***
Print Date: 10/29/2019
Page 2 of 2
OSUOF

CREDENTIALS SECURITY SEAL ( ) IN THE CORNER SHOULD TEMPORARILY DISAPPEAR WHEN RUBBED OR BREATHED ON

CONFIDENTIAL RECORD ISSUED IN ACCORDANCE WITH THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974

### Autumn 2010 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ACCTMIS | 310 | Foundatns Of Acct | 5.00 | 5.00 | B | 15.000 |
| BIOCHEM | 511 | Intro To Biol Chem | 5.00 | 5.00 | C+ | 11.500 |
| HISTORY | 506 | His Erly Christnty | 5.00 | 5.00 | B- | 13.500 |
| PHYSICS | 113 | Modern Physics | 5.00 | 5.00 | A- | 18.500 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 2.925 | Term Totals | 20.00 | 20.00 | | 58.500 |
| Cum GPA | 3.525 | Cum Totals | 106.00 | 131.00 | | 373.700 |

### Winter 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BUSMHR | 400 | Foundations Of Mhr | 4.00 | 4.00 | A | 16.000 |
| DANCE | 200 | Concert Dnce Hstry | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 605 | Molec Genetics 1 | 4.00 | 4.00 | B | 12.000 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.692 | Term Totals | 13.00 | 13.00 | | 48.000 |
| Cum GPA | 3.543 | Cum Totals | 119.00 | 144.00 | | 421.700 |

Dean's List

### Spring 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BUSMGT | 430 | Fndtn Operatns Mgt | 4.00 | 4.00 | A | 16.000 |
| DANCE | 367.01 | Writng About Dance | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 606 | Molec Genetics 2 | 4.00 | 4.00 | B+ | 13.200 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.784 | Term Totals | 13.00 | 13.00 | | 49.200 |
| Cum GPA | 3.567 | Cum Totals | 132.00 | 157.00 | | 470.900 |

Dean's List

### Autumn 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |
| DANCE | 671.31 | Somatic Prct: Yoga | 2.00 | 2.00 | A | 8.000 |
| MICRBIOL | 520 | Gen Microbiology 1 | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 607 | Cell Biology | 3.00 | 3.00 | B+ | 9.900 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.825 | Term Totals | 12.00 | 12.00 | | 45.900 |
| Cum GPA | 3.588 | Cum Totals | 144.00 | 169.00 | | 516.800 |

Dean's List

### Winter 2012 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| AFAMAST | 121 | Afr Civilzatn 1870 | 5.00 | 5.00 | A | 20.000 |
| BUSFIN | 420 | Fndtns Of Finance | 4.00 | 4.00 | B | 12.000 |
| DANCE | 211.04 | Improvisation | 2.00 | 2.00 | A | 8.000 |
| ENGLISH | 367.02 | US Exper: Lit | 5.00 | 5.00 | A | 20.000 |

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| MICRBIOL | 649 | Introdctn Virology | 5.00 | 5.00 | B | 15.000 |
| MOLGEN | 608 | Genes/Development | 3.00 | 3.00 | B | 9.000 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.500 | Term Totals | 24.00 | 24.00 | | 84.000 |
| Cum GPA | 3.576 | Cum Totals | 168.00 | 193.00 | | 600.800 |

Dean's List

### Spring 2012 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor
Plan: Dance Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BUSML | 450 | Fndtns Of Mktg Mgt | 4.00 | 4.00 | B | 12.000 |
| DANCE | 211.03 | Mats Intro Compstn | 2.00 | 2.00 | A- | 7.400 |
| DANCE | 671.10 | Kinesiology Dance | 3.00 | 3.00 | A | 12.000 |
| EEOB | 632 | Neurobiology | 3.00 | 3.00 | A- | 11.100 |
| MOLGEN | 602 | Euk Cel & Dev B Lb | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 733 | Human Genetics | 3.00 | 3.00 | B+ | 9.900 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.620 | Term Totals | 20.00 | 20.00 | | 72.400 |
| Cum GPA | 3.580 | Cum Totals | 188.00 | 213.00 | | 673.200 |

Dean's List

Semester Transition
The comparison below shows the conversion of your academic record.

| Cumulative GPA Totals | | | GPA Hours | Earned | Points |
|---|---|---|---|---|---|
| QTR GPA: | 3.580 | QTR Totals : | 188.00 | 213.00 | 673.200 |
| SEM GPA: | 3.580 | SEM Totals : | 125.96 | 142.71 | 451.044 |

### Spring 2013 Semester

Program: Undergraduate Non-Degree
Plan: Undergraduate Non Degree Major

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ANATOMY | 2300.01 | Human Anatomy | 4.00 | 4.00 | B | 12.000 |

| | | | GPA Hours | Earned | | Points |
|---|---|---|---|---|---|---|
| Term GPA | 3.000 | Term Totals | 4.00 | 4.00 | | 12.000 |
| Cum GPA | 3.562 | Cum Totals | 129.96 | 146.71 | | 463.044 |

| Undergraduate Career Totals | | | | | | |
|---|---|---|---|---|---|---|
| Cum GPA: | 3.562 | Cum Totals | 129.96 | 146.71 | | 463.044 |

***End of UndergraduateTranscript***

CREDENTIALS SECURITY SEAL ( ) IN THE CORNER SHOULD TEMPORARILY DISAPPEAR WHEN RUBBED OR BREATHED ON

A SECURITY STATEMENT APPEARS WHEN PHOTOCOPIED     A BLACK AND WHITE DOCUMENT IS NOT OFFICIAL



# THE OHIO STATE UNIVERSITY

OFFICE OF THE UNIVERSITY REGISTRAR
STUDENT ACADEMIC SERVICE BUILDING, 5TH FLOOR    OSU 004
281 WEST LANE AVENUE
COLUMBUS, OH 43210-1132
TELEPHONE: 614-292-9330
EMAIL: REGISTRAR@OSU.EDU

## TRANSCRIPT KEY

### RELEASE OF INFORMATION

This transcript cannot be released to another person, agency or organization except to officials internal to your own organization or agency who have a reasonable business use for the information. Release to other parties requires written consent of the student.

### ACCREDITATION

The Ohio State University (Columbus, Lima, Mansfield, Marion, Newark and the Agricultural Technical Institute, Wooster, Ohio) is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools as a degree-granting institution at the associate, baccalaureate, masters, professional and doctoral levels.

### DETAILED TRANSCRIPT KEY

For a more detailed version of this transcript key including information on good standing, probation, dismissal and the definition of enrollment status, please visit www.registrar.osu.edu/alumni/transcriptkey.asp.

### GRADING SYSTEM

| | | | |
|---|---|---|---|
| A | • Excellent...................4.0 Pts | K | • Transferred Credit............0 Pts |
| A- | • Excellent...................3.7 Pts | I | • Incomplete......................0 Pts |
| B+ | • Above Average...........3.3 Pts | IP | • In Progress.....................0 Pts |
| B | • Above Average...........3.0 Pts | IX | • Extension of Incomplete.........0 Pts |
| B- | • Above Average...........2.7 Pts | P | • Progress........................0 Pts |
| C+ | • Average....................2.3 Pts | PA | • Pass.............................0 Pts |
| C | • Average....................2.0 Pts | NP | • Non-pass.......................0 Pts |
| C- | • Average....................1.7 Pts | R | • Registered to Audit............0 Pts |
| D+ | • Poor.......................1.3 Pts | S | • Satisfactory...................0 Pts |
| D | • Poor.......................1.0 Pts | U | • Unsatisfactory.................0 Pts |
| E | • Failure.....................0 Pts | W | • Withdrew......................0 Pts |
| EM | • Examination Credit..........0 Pts | NG | • Grade unreported by instructor....0 Pts |
| EN | • Failure-Non Attendance....0 Pts | NEN | • EN grade for PA/NP course.........0 Pts |
| | | UEN | • EN grade for S/U course...........0 Pts |

# notation denotes a course involved in the forgiveness or substitution of grades - see Recalculation of Grades

### SPECIAL COURSE NUMBER NOTATIONS

| | |
|---|---|
| E suffix | Honors embedded course |
| H suffix | Honors course or honors version of a course |
| S suffix | Service Learning course |
| T suffix | Technical course (part of a two year technical program) |

### RECALCULATION OF GRADES

FORGIVENESS OR SUBSTITUTION OF GRADES: Students may petition their enrollment unit to repeat a course, and after completing the course the second time, have the original course credit and grade excluded from the calculation of the student's cumulative point-hour ratio, but remain on the student's official permanent record. The course or courses being substituted or repeated will bear the symbol "#" to the left of the grade.

PERMITTED TO RESTART GPA or FRESH START: An undergraduate student who enrolls in the university after an absence of five or more years may petition to have his/her GPA recalculated. If the petition is approved, the student resumes his/her academic program with no cumulative GPA. All courses taken will remain on the permanent record.

### CALENDAR

• The semester system replaced the quarter system for the university in summer 2012
• The semester system replaced the quarter system for the College of Law in autumn 1984.

### UNIVERSITY CLASS RANKING SYSTEM

Student rank in all undergraduate colleges is based on total credit hours completed and recorded. Graduate students are not ranked. Professional students are ranked according to progress within their curriculum.

| Semester Calendar | | | Quarter Calendar | | |
|---|---|---|---|---|---|
| Rank | Earned Hours | | Rank | Earned Hours | |
| Freshman | 0 | through | 29 | Freshman | 0 | through | 44 |
| Sophomore | 30 | through | 59 | Sophomore | 45 | through | 89 |
| Junior | 60 | through | 89 | Junior | 90 | through | 134 |
| Senior | 90 | and up | | Senior | 135 | and up | |

### COURSE NUMBERING SYSTEM

#### SEMESTER CALENDAR

| | |
|---|---|
| 1000-1099 | **UG (Undergraduate) - Non Credit Courses** Non-credit courses for orientation, remedial, or other non-college-level experiences. These are courses in addition to a program's graduation requirements. |
| 1100-1999 | **UG - Introductory Level Undergraduate Courses** Basic courses providing undergraduate credit, but not to be counted toward major or field of specialization in any department. Courses at this level are beginning courses, required or elective courses that may be a prerequisite to other courses. |
| 2000-2999 | **UG - Intermediate Level Undergraduate Courses** Intermediate courses providing undergraduate credit and may be counted toward a major or field of specialization. |
| 3000-3999 | **UG - Upper Level Undergraduate Courses** Upper Level courses providing undergraduate credit that may be counted toward a major or field of specialization. |
| 4000-4999 | **UG - Advanced Level Undergraduate Courses** Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Graduate students may enroll in and receive graduate credit for 4000-level courses outside their own graduate program. |
| 5000-5999 | **UG and G (Graduate) - Dual Career Level Courses** Courses that are regularly offered for both graduate credit and undergraduate credit. Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Foundational coursework and research providing graduate or professional credit. |
| 6000-6999 | **G - Foundational Level Graduate and Professional Courses** Foundational courses and research providing graduate or professional credit. |
| 7000-7999 | **G - Intermediate Level Graduate and Professional Courses** Intermediate courses and research providing graduate or professional credit. |
| 8000-8999 | **G - Advanced Level Graduate and Professional Courses** Advanced courses and research providing graduate or professional credit. |

#### Quarter Calendar

| | |
|---|---|
| 000-099 | Non-Credit Courses (except certain seminars and colloquia) for orientation, remedial, or other non-college-level experiences. Credit is not applicable to Graduation Requirements. |
| 100-199 | Basic courses providing undergraduate credit but not to be counted on a major or field of specialization in any department. Beginning Courses, Required, or Elective Courses that may be prerequisite to other courses. |
| 200-299 | Basic Courses providing Undergraduate Credit and may be counted on a major or field of specialization. |
| 300-499 | Intermediate Courses providing Undergraduate Credit or Basic Professional Credit that may be counted on a major or field of specialization. |
| 500-599 | Intermediate Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization and may provide Graduate Credit only in other departments. |
| 600-699 | Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization, and may provide Graduate Credit (in all departments). |
| 700-799 | Advanced Courses providing Undergraduate, Graduate, or Professional Credit. |
| 800-999 | Courses providing Graduate Credit and are open to undergraduates only with the approval of the Vice Provost for Research and Dean of the Graduate School. |

TO TEST FOR AUTHENTICITY - If you vigorously rub or breathe on the Credentials security seal located in the corner of the page adjacent to the barcode, the image will fade. This document is printed on DocuCheck WATERMARK® security paper and contains multiple overt and covert security features. Hold the page to the light to see the translucent DocuCheck WATERMARK® image. When photocopied, a security statement may appear with the word VOID throughout the face of the document. If solvents & certain other chemicals are applied to this document, the paper will stain.

In accordance with USC 438 (6) (4) (8), The Family Educational Rights and Privacy Act of 1974 (FERPA), you are hereby notified that this Official Transcript is provided upon the condition that you, your agent or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

# EXHIBIT 19

## JESSICA RAMSAY PRE-MEDICAL SCHOOL STANDARDIZED TESTS
## <u>TAKEN WITHOUT ANY ACCOMMODATIONS</u>

| | | |
|---|---|---|
| Kindergarten (DX 24) | Stanford Early School Achievement Test | **Complete Battery: 96th %** <br> **Total Reading:    96th %** |
| First Grade (DX 25) | Stanford Achievement Test | **Complete Battery: 87th %** <br> **Total Reading:    70th %** |
| Second Grade (DX 27) | Stanford Achievement Test | **Complete Battery: 92nd %** <br> **Total Reading:    88th %** |
| Sixth Grade (DX 27) | Iowa Tests of Basic Skills and Cognitive Abilities Test | **Composite:    86th %** <br> **Reading Total:  74th %** |
| Tenth Grade (DX 29) | ACT Plan exam | **Composite:    97th %** <br> **English:    98th %** <br> **Reading:    73rd %** |
| Tenth Grade (DX 28) | PSAT/NMSQT | **Composite:    71st %** <br> **Critical Reading:  71st %** |
| Eleventh Grade (DX 28) | PSAT/NMSQT | **Composite:    82nd %** <br> **Critical Reading:  70th %** |
| Eleventh Grade (DX 30) | ACT Exam | **Composite:    90th %** <br> **English:    96th %** <br> **Reading:    87th %** |
| Twelfth Grade (DX 31) | ACT Exam | **Composite:    97th %** <br> **English:    94th %** <br> **Reading:    91st %** |
| College (DX 32) | MCAT Exam | **Composite:    79th %** <br> **Verbal Reasoning:    67th %** <br> **Physical Sciences:    79th %** <br> **Biological Sciences:  88th %** |

## JESSICA RAMSAY PERFORMANCE
## ON DIAGNOSTIC ASSESSMENTS

| | | |
|---|---|---|
| Dr. Smith Evaluation Report (11/6/2018) (DX 3, Ex. B) | WIAT-III Oral Reading Fluency<br>WJ-4 Reading Rate Cluster<br>GORT-5 Reading Rate<br>GORT-5 Comprehension<br>GORT-5 Fluency<br>Nelson-Denny Reading Rate | **1st %**<br>**1st %**<br>**1st %**<br>**1st %**<br>**2nd %**<br>**1st %** |

## JESSICA RAMSAY ACADEMIC HISTORY

| | | |
|---|---|---|
| Kindergarten (DX 9) | Sunset Oaks Academy | **Grades:  All E's and S+'s** |
| First grade (DX 10) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94 in phonics, 93/spelling and 98/math)** |
| Second grade (DX 11) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94/phonics, 97/spelling, 97/math)** |
| Third grade (DX 13) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"** |
| Fourth grade (DX 14) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
| Fifth grade (DX 15, DX 16) | Carrolton-Farmers Branch | **Grades:  Mostly A's, two B's**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
| | Brown Elementary School | **Grades:   All A's (final grades)** |
| Sixth Grade (DX 17) | Upton Middle School | **Grades:  All A's** |
| High School (9th - 12 grades) (DX 18) | Saint Joseph's High School | **Cumulative GPA:  3.747**<br><br>**Class rank:  28 out of 225 (top 12%)** |
| College (DX 22) | Ohio State University (No accommodations approved until May of second year) | **Cumulative GPA:        3.57**<br><br>**First Year GPA:         3.53**<br><br>**Second Year GPAs, Autumn & Winter:        3.925 & 3.641** |

# EXHIBIT 20

MAY 17 2010  14:11        GENESIS HEALTH                    269 428 2700    P.030

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
Page 1
Chart Document

1106784    5-366-431-4
Gensis Family Health Cent

**Jessica E. Ramsay**                                    : 558-2277
Female  DOB:
WH.BH.29

1697-0470001    Ins: Whirlpoo (Whirlpool Corp) Grp:

**03/24/2009 - Office Visit: ADD/ADHD**
**Provider: Alan N. Smly, MD**
**Location of Care: Genesis Family Health Center**

**Office Visit**

**Vital Signs**
**Height:** 66.50 inches
**Weight:** 132 pounds
**Temperature:** 98.4 degrees  F (tympanic)
**Pulse rate:** 70
**Pulse rhythm:** regular
**Respirations:** 16

**Blood Pressure:** 112/74 mm Hg

Select the immunization & enter the necessary information to document the immunization.

Immunization Record
Nursing Comments
Immunizations Due

Immunization Record

**Reason for visit:** ADD/ADHD

**Laceration/Wound**

**Objective**

cm

**Assessment:**

**Plan:**
Rx:
METHYLPHENIDATE HCL 10 MG TABS 1 po q am x 4 days, then 1 po bid prn.

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
*Page 2*
*Chart Document*

**Jessica E. Ramsay**                                              : 556-2277
Female  DOB:                   1697-0470001    Ins: Whirlpoo (Whirlpool Corp) Grp:
WH.BH.29

**Workability/Return to Work Report**
Employee: Jessica  Ramsay    DOB:

- 
- 
- 

**Headache History**

**Physical Exam**
**General**
General appearance: well nourished, well hydrated, no acute distress

**Ears, Nose and Throat**
External ear: normal, no lesions or deformities
Hearing: grossly intact
External nose: normal, no lesions or deformities

**Neck**
Neck: supple, no masses, trachea midline

**Chest**
Auscultation: no rales, rhonchi, or wheezes

**Cardiovascular**
Auscultation: S1, S2, no murmur, rub, or gallop
Peripheral vascular: no cyanosis, clubbing, edema, or varicosities

**Neurologic**
Cranial nerves: II - XII grossly intact

**Mental Status Exam**
Mood and affect: no depression, anxiety, or agitation

**History of Present Illness**
Reason for visit: see chief complaint
Chief Complaint: ADD/ADHD
History of Present Illness: needs help with yaz for mail in.

·high school no problems

MAY-17-2010  14:11          GENESIS HEALTH                    269 428 2700    P.032

**Genesis Family Health Center**                    *May 17, 2010*
3916 Stonegate Park  St. Joseph, MI 49085                    *Page 3*
269-428-8000  Fax: 269-428-2700                    *Chart Document*

**Jessica E. Ramsay**                                    : 558-2277
Female  DOB                    1897-0470001    Ins: Whirlpoo (Whirlpool Corp) Grp:
WH.BH.29

college stress is making her switch letters around a bit.
always a slow reader
takes alot of concentration for her to read.
has to re-read alot to get the point
not as good of a test taker, better orally.
names are a problem for her
procrastinates - reading especially
multi tasking is 'ok'

**Risk Factors**
**Seatbelt use:** 100 %

**Health Status** reviewed - no changes required

**Past, Family, and Social History**
**Past History (reviewed - no changes required):** Sinus infections
No surgeries indicated
hx of mono x 2
secondary amenorrhea
plantar wart
acne
**Social History (reviewed - no changes required):** To be in eighth grade fall of 2003.
Active in school sports - swimmer, volleyball, soccer

**Review of Systems**
**General:** denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss
**Eyes:** denies blurring, diplopia, irritation, discharge, vision loss, eye pain, photophobia
**Ears/Nose/Throat:** denies ear pain or discharge, tinnitus, decreased hearing, nasal obstruction or
discharge, nosebleeds, sore throat, hoarseness, dysphagia
**Cardiovascular:** denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND,
peripheral edema
**Respiratory:** denies cough, dyspnea, excessive sputum, hemoptysis, wheezing
**Gastrointestinal:** denies nausea, vomiting, diarrhea, constipation, change in bowel habits, abdominal
pain, melena, hematochezia, jaundice
**Genitourinary:** denies vaginal discharge, incontinence, dysuria, hematuria, urinary frequency,
amenorrhea, menorrhagia, abnormal vaginal bleeding, pelvic pain
**Musculoskeletal:** denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness,
stiffness, arthritis
**Skin:** denies rash, itching, dryness, suspicious lesions
**Neurologic:** denies transient paralysis, weakness, paresthesias, seizures, syncope, tremors, vertigo
**Psychiatric:** focus issues at school and outside of same.
**Endocrine:** denies cold intolerance, heat intolerance, polydipsia, polyphagia, polyuria, weight change
**Heme/lymphatic:** denies abnormal bruising, bleeding, enlarged lymph nodes
**Allergic/Immunologic:** denies urticaria, hay fever, persistent infections, HIV exposure

**Physical Exam**
**General appearance:** well nourished, well hydrated, no acute distress

269 428 2700   P.033

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
**Page 4**
Chart Document

**Jessica E. Ramsay**                                     : 558-2277
Female  DOB:███████       1897-0470001    Ins: Whirlpoo (Whirlpool Corp) Grp:
WH.BH.29

**Eyes**
External: conjunctivae and lids normal
Pupils: equal, round, reactive to light and accommodation

**Ears, Nose and Throat**
External ears: normal, no lesions or deformities
External nose: normal, no lesions or deformities
Hearing: grossly intact

**Neck**
Neck: supple, no masses, trachea midline

**Respiratory**
Respiratory effort: no intercostal retractions or use of accessory muscles
Auscultation: no rales, rhonchi, or wheezes

**Cardiovascular**
Auscultation: S1, S2, no murmur, rub, or gallop
Periph. circulation: no cyanosis, clubbing, edema, or varicosities

**Lymphatic**
Neck: no cervical adenopathy

**Musculoskeletal**
Gait and station: normal, can undergo exercise testing and/or participate in exercise program
Digits and nails: no clubbing, cyanosis, petechiae, or nodes
RUE: normal ROM and strength, no joint enlargement or tenderness
LUE: normal ROM and strength, no joint enlargement or tenderness

**Skin**
Inspection: no rashes, lesions, or ulcerations

**Neurologic**
Cranial nerves: II - XII grossly intact

**Mental Status Exam**
Mood and affect: no depression, anxiety, or agitation

**Assessment**
Comments: add vs possible dyslexia - pt has more focus issues than dyslexic tendencies.  recommend
trial of ritalin as precsribed.  risks/benefits, side effects outlined with pt who verbalizes understanding.  f/u
when she returns from school in may.  pt will advise how she is doing in a few weeks.  add survery and
literature provided.
face to face time with patient = 30 minutes

ᴢᴏ⁹ ⁴²⁵ ²¹ᵁᵁ    ꜰ.ᴜ³⁴

**Genesis Family Health Center**
3916 Stonegate Park St. Joseph, MI 49085
269-428-8000 Fax: 269-428-2700

*May 17, 2010*
*Page 5*
*Chart Document*

**Jessica E. Ramsay**
Female DOB
WH.BH.29

1897-0470001

: 556-2277
Ins: Whirlpoo (Whirlpool Corp) Grp:

## Plan
**New Prescriptions/Refills:**
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid
prn  #60 x 0 : Alan N. Smly, MD (03/24/2009)
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily #90 x 3 : Alan N. Smly,
MD (03/24/2009)

**Updated Medication List:**
ALLEGRA-D 12 HOUR 60-120 MG TB12 (FEXOFENADINE-PSEUDOEPHEDRINE) 1 PO QAM
ALBUTEROL SULFATE HFA 108 MCG/ACT AERS (ALBUTEROL SULFATE) 2 puffs q 6 hrs prn
* GUARDASIL IMMUNIZATION X 3 This rx is for three guardasil immunizations at the scheduled times.
MINOCYCLINE HCL 100 MG CAPS (MINOCYCLINE HCL) 1 po qd for acne
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily
RHINOCORT AQUA 32 MCG/ACT SUSP (BUDESONIDE (NASAL)) 2 sprays each nostril bid
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid
prn

**Prescriptions:**
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid
prn #60 x 0
    Entered and Authorized by:    Alan N. Smly, MD
    Signed by:    Alan N. Smly, MD on 03/24/2009
    Method used:   Print then Give to Patient
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily  #90 x 3
    Entered and Authorized by:    Alan N. Smly, MD
    Signed by:    Alan N. Smly, MD on 03/24/2009
    Method used:   Print then Give to Patient

**Motor Vehicle Accident**
**Subjective**

**Immediately:**

**Signed by Alan N. Smly, MD on 03/24/2009 at 2:19 PM**

# EXHIBIT 21



1126191  5-368-431-4
ADD/ADHD Verification For



Office for Disability Services

Office of Student Life
150 Pomerene Hall
1760 Neil Avenue
Columbus, OH 43210-1297

Phone (614) 292-3307
Fax (614) 292-4190
TDD (614) 292-0901
www.ods.osu.edu

# ADD / ADHD Verification Form

The Office for Disability Services (ODS) provides academic services and accommodations for students with diagnosed disabilities. The documentation provided regarding the disability diagnosis must demonstrate a disability covered under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act (ADA) of 1990. The ADA defines a disability as a physical or mental impairment that substantially limits one or more major life activities. In addition, in order for a student to be considered eligible to receive academic accommodations, the documentation must show functional limitations that impact the individual in the academic setting.

ODS requires current and comprehensive documentation in order to determine appropriate services and accommodations. The outline below has been developed to assist the student in working with the treating or diagnosing healthcare professional(s) in obtaining the specific information necessary to evaluate eligibility for academic accommodations.

**A. The healthcare professional(s) conducting the assessment and/or making the diagnosis must be qualified to do so.** These persons are generally trained, certified or licensed psychologists or members of a medical specialty.

**B. All parts of the form must be completed as thoroughly as possible.** Inadequate information, incomplete answers and/or illegible handwriting will delay the eligibility review process by necessitating follow up contact for clarification. *It is recommended that this form be completed by typing the information into the editable PDF version of the form available on our website at http://ods.osu.edu/posts/documents/ADHD.pdf .*

**C. The healthcare provider should attach any reports which provide additional related information** (e.g. psycho-educational testing, neuropsychological test results, etc.). If a comprehensive diagnostic report is available that provides the requested information, copies of that report can be submitted for documentation instead of this form. *Please do not provide case notes or rating scales without a narrative that explains the results.*

**D. After completing this form, sign it, complete the Healthcare Provider Information section on the last page and mail or fax it to us at the address provided in our letterhead.** The information you provide will *not* become part of the student's educational records, but it will be kept in the student's file at ODS, where it will be held strictly confidential. This form may be released to the student at his/her request. In addition to the requested information, please attach any other information you think would be relevant to the student's academic adjustment.

If you have questions regarding this form, please call the ODS office at 614-292-3307. Thank you for your assistance.

## STUDENT INFORMATION
### (Please Print Legibly or Type)

Name (Last, First, Middle): _Ramsay, Jessica, Erin_

Date of Birth: [REDACTED]    Last 4 Digits of SSN: [REDACTED]

Status (check one): ☒current student    ☐transfer student    ☐prospective student

Local phone: (_____)-_____-_____    Cell phone: (_269_)-_930_-_3001_

Address (street, city, state and zip code): _1438 Old Farm Lane_

_St. Joseph, MI 49085_

If OSU Student, OSU E-Mail address: _ramsay.32_ @OSU.EDU

E-mail address: _____

## DIAGNOSTIC INFORMATION
### (Please Print Legibly or Type)

*Please provide responses to the following items by typing or writing in a legible fashion.
Illegible forms will delay the documentation review process for the student.*

1. DSM-IV diagnosis:

   ☒ 314.00
   ☒ Predominantly Inattentive
   ☐ Predominantly Hyperactive-Impulsive
   ☐ 314.01 Combined type
   ☐ 314.9 Not otherwise specified

2. In addition to DSM-IV criteria, how did you arrive at your diagnosis?

   ☐ Behavioral observations
   ☒ Developmental history
   ☐ Rating scales
   ☒ Medical history
   ☒ Structured or unstructured clinical interview with the student
   ☐ Interviews with other persons
   ☐ Neuropsychological testing (dates of testing) _____
       (Please attach diagnostic report of testing)
   ☐ Other (Please specify) _____

3. Please state date of diagnosis: _3-24-09_

4.  What is the severity of the condition?  Please check one:

☐ mild       ☒ moderate       ☐ severe

Explain severity:

comprehension difficulty, mod dyslexic
tendencies, chronic procrastination

State the following:

a.  date of first contact with student:    2-27-03

b.  date of last contact with student:    7-13-10

5.  Student's History:

a.  **ADHD History**: Evidence of inattention and/or hyperactivity during childhood and presence of symptoms prior to age seven.  Provide information supporting the diagnosis obtained from the student/parents/and teachers.  Indicate the ADHD symptoms that were present during early school years (e.g. daydreamer, spoke out of turn, unable to sit still, difficulty following directions, etc.)

- NO Hyperactivity Component known
- SLOW READING, SOME DYSLEXIC TENDENCIES,
  DECREASED Comprehension SPEED

b.  **Psychosocial History**: Provide relevant information obtained from the student/parent(s)/guardian(s) regarding the student's psychosocial history (e.g. often engaged in verbal or physical confrontation, history of not sustaining relationships, history of employment difficulties, history of educational difficulties, history of risk-taking or dangerous activities, history of impulsive behaviors, social inappropriateness, history of psychological treatment, etc.).

SUPPORTIVE FAMILY
GOOD SOCIAL DEVELOPMENT
GOOD EFFORT IN ALL TASKS

EX 21-3

c) **Pharmacological History:** Provide relevant pharmacological history including an explanation of the extent to which the medication has mitigated the symptoms of the disorder in the past. Also include any *current medication(s)* that the student's currently prescribed including dosage, frequency of use, the adverse side effects, and the effectiveness of the medication.

CURRENT MEDS: ADDERALL 20mg bid

FAILED MEDS: METHPHONDATE 10mg bid

d) **Educational History:** Provide a history of the use of any educational accommodations and services related to this disability.

NONE KNOWN TO DATE

6. Student's Current Specific Symptoms

Please check all ADHD symptoms listed in the DSM-IV that the student *currently* exhibits:

**Inattention:**
- [ ] often fails to give close attention to details or makes careless mistakes in schoolwork, work or other activities.
- [x] often has difficulty sustaining attention in tasks or play activities.
- [ ] often does not seem to listen when spoken to directly.
- [ ] often does not follow through on instructions and details to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions).
- [x] often has difficulty organizing tasks and activities.
- [x] often avoids, dislikes, or is reluctant to engage in tasks (such as schoolwork or homework) that require sustained mental effort.
- [ ] often loses things necessary for tasks or activities (e.g. school assignments, pencils, books, tools, etc.)
- [x] is often easily distracted by extraneous stimuli.
- [x] often forgetful in daily activities.

**Hyperactivity:** MA

- [ ] often fidgets with hands or feet or squirms in seat
- [ ] often leaves (or greatly feels the need to leave) seat in classroom or in other situations in which remaining seated is expected.
- [ ] often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness).
- [ ] often has difficulty playing or engaging in leisure activities that are more sedate.
- [ ] is often "on the go" or often acts as if "driven by a motor".
- [ ] often talks excessively.

**Impulsivity** N/A

- [ ] often blurts out answers before questions have been completed
- [ ] often has difficulty awaiting turn
- [ ] often interrupts or intrudes on others (e.g. butts into conversations or games).

7. State the student's *functional limitations* based on the ADHD diagnosis, specifically in a classroom or educational setting.

   May need additional time allotted to provide for comprehension.

8. State specific recommendations regarding academic accommodations for this student, and a rationale as to why these accommodations/services are warranted based upon the student's functional limitations. Indicate why the accommodations are necessary (e.g. if a note taker is suggested, state the reasons for this request related to the student's diagnosis).

   May need additional time allotted for written tests.

9.  If current treatments (e.g. medications, counseling, etc.) are successful, state the reasons why the above academic adjustments/accommodations/services are necessary.  Please be specific.

N/A

---

## HEALTHCARE PROVIDER INFORMATION

**(Please sign & date below and fill in all other fields completely using PRINT or TYPE)**

Provider Signature: _____    Date: 8/13/10

Provider Name (Print): _____

Title: _____

License or Certification #: 4301073629 MICHIGAN

Address: _____

Phone Number: (_____)-_____-_____

FAX Number: (_____)-_____-_____

GENESIS FAMILY HEALTH CENTER, PLC
ALAN N. SMIY, MD
3916 STONEGATE PARK
ST. JOSEPH, MICHIGAN 49085
PH: 269-428-8000 / FX: 269-428-2700

**Important: After documentation is reviewed, ODS will send an email notification to the students OSU email account, (e.g. miller.6789@osu.edu), acknowledging receipt of documentation and the eligibility status.  Prospective students that do not yet have an OSU email account will be notified via paper letter sent to their home address.**

# EXHIBIT 22

# MCAT Score Report

**Name** JESSICA ERIN RAMSAY

**Verification Code** CYE7-PLI7-VHW4-DX8H

**AAMC ID** 13215693

**Date of Birth** REDACTED

**URL \*** https://apps.aamc.org/score-reporting-web/#/report/verify

*\* This report will no longer be able to be verified after 03/13/2017*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

### For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

### For exams taken before January 31, 2015

| | | MCAT Total | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
| 04/09/2011 | 30M | 28 to 32 | 79% | 10 | 79% | 09 | 67% | M | 31% | 11 | 88% |

### Notes

[1] Test scores, like other measurements, are not perfectly precise. The confidence bands that are shown for the Total Scores above mark the ranges in which the test taker's true scores probably lie. To obtain the confidence band for each section score, subtract one point from and add one point to the score (or, in the case of the Writing Sample, subtract and add one letter).

[2] The percentile ranks of scores are the percentages of test takers who received the same scores or lower scores. The percentile ranks are based on tests administered from January 2012 through September 2014.

Copyright ©1995-2015 | Association of American Medical Colleges

DEFENDANT'S EXHIBIT
**32**

RAMSAY1-0024

# EXHIBIT 23



1107651        5-366-431-4
Livingston, C. 9/22/14-Ev

**Charles Livingston, M.A.**

Licensed Masters Social Worker
Limited Licensed Psychologist

| | |
|---|---|
| **TO:** | Dr. Ziemkowski, M.D. @ WMED |
| **RE:** | Jessica Ramsay, DOB ____ age 24 |
| **DATE:** | September 22, 2014 |

An evaluation was requested due to "tired...stressed...always more to do...I don't think in words...self-corrected a lot...slow reader...comprehension okay...lowered grades do not show my knowledge...." For the purpose of this evaluation, there was a diagnostic interview, psychological testing of intellectual ability plus academic achievement in reading, and a follow-up consultation with Jessie. Based on the results, the conclusions and recommendations are as follows:

DIAGNOSTIC IMPRESSION: ADHD, inattentive type, severe, 314.00, see #4 below

1. At the time of the interview, Jessie recalled good grades until 4th grade when difficulty with reading and writing plus headaches and eye fatigue led to various testing in elementary and middle school. She indicated that an ophthalmological exam identified poor focus. She stated that untimed tests in the classroom resulted in better achievement. As an undergraduate, she was diagnosed with ADHD and Dyslexia by her primary care physician. She has used various accommodations and adaptations including distraction-reduced testing milieus, extra time for tests, an e-reader, highlighters, colored pencils, and ear plugs. She has used prescribed medication, currently Adderall 40 mg. TR in the AM plus 20 mg. in the PM. Finally, she indicated that she has always loved learning and has developed strong motivation and self-discipline.

2. On measures of intellectual ability, there was a broad range in the results, compared to other people of a similar age. Composite scores for verbal comprehension and perceptual (non-verbal) reasoning were both at the 96th percentile. Strengths included abstract verbal reasoning, practical comprehension, visuospatial reasoning, and long-term memory. The composite score for working memory, attention, and concentration was at the 63rd percentile. The composite score for processing speed was at the 10th percentile. Individuals with similar scores spend so much time and energy in basic data entry tasks, so to speak, that there is little left for higher order fluid reasoning and synthesizing. Jessie's exceptionally bright reasoning abilities and long-term memory stand in contrast to relatively low attention and concentration and very low processing speed. Her native intelligence has been some compensation for low abilities in the identified areas.

3. On measures of academic achievement, Jessie's reading comprehension was above average. (In the case of this subtest, the norms currently available extend to age 20.)

4. The biographical information and objective test results support the diagnosis. At the follow-up consultation, Jessie demonstrated her awareness of adaptive software and technological tools, such as Kurzweil 3000 software, smart pens, and Livescribe pens. Active use of all three modalities (visual, audio, manipulative) in studying could be emphasized. She was also encouraged to consider using many short study periods that respect her particular profile of abilities. At the discretion of WMED, the familiar accommodations of distraction-free testing milieus, paper testing materials, extended time, and audio recordings could be considered. Finally, it can be noted that throughout the evaluation Jessie showed a good tolerance for frustration, good motivation, and the effective use of humor for stress.

Cc: Jessica Ramsay

**Charles Livingston, M.A.**
Licensed Masters Social Worker
Limited Licensed Psychologist

9-23-14

Telephone: 269.226.2623
The Marlborough, Suite 41C
471 W. South Street
Kalamazoo, MI 49007



1107650     5-366-431-4
Qddendum or Report of 9/2

**Charles Livingston, M.A.**

Licensed Masters Social Worker
Limited Licensed Psychologist

### ADDENDUM OR REPORT OF SEPTEMBER 22, 2014

### REGARDING JESSICA RAMSAY

#### SEPTEMBER 02,2016

This addendum addresses a request for more information for the purpose of testing accommodations as requested by USMLE and NBME.

1. In response to Item 3, i.e. "Documentation necessary to substantiate ADHD....", a review of written medical records indicates difficulties with focus and headaches as early as age five. In second grade, accommodations included a secluded testing area and the use of an alphabet board to enhance letter identification. Migraines were diagnosed in third grade and led to daily prophylactic medication and adaptive eyewear. At age seven, notes from optometrist Dr. Tanquay, indicate "she showed substantial deficits in the areas of visual-spatial relationships and visual discrimination...was also lacking in verbal memory." Notes from the chart of Dr. Allan Smiy, MD, from 03-24-09 state "focus issues at school and outside of same...takes a lot of concentration to read...always a slow reader...college stress is making her switch letters around a bit...ADHD with possible Dyslexia." A review of written records from the Ohio State University Office of Disability Services dated 08-16-10 endorses a diagnosis of ADHD, inattentive type, 314.00 and recommends additional time for all exams and a distraction-reduced space. A review of written records dated 08-29-90 from the Western Michigan University Homer Stryker MD School of Medicine indicates "you will be allowed up to 1.5X time for completing your write-ups after clinical OSCE's." In addition, written records from the medical school approve the following accommodations for written exams: Kurtzwell 3000, 2X test time, separate room for tests and studying, use of extra scrap paper, plus colored pencils/highlighters, and paper tests when available.

2. In response to Item 4, i.e. "Relevant Assessment Batteries," the results on measures of intellectual ability cited in Item 2 on the report of September 22, 2014 were taken from the WAIS-IV, both standard and supplemental subtests. The results on measures of academic achievement cited in Item 3 on the report of September 22, 2014 were taken from the WIAT.

3. The diagnosis of ADHD, predominantly inattentive, severe, 314.00 is supported by the written records, self-report, and objective test results. There has been a persistent pattern of careless mistakes in daily activities and schoolwork, difficulty sustaining attention in tasks and academics, lapses in focus when spoken to directly, incomplete follow-through on instructions and tasks of daily living, being easily sidetracked, struggling to meet deadlines, trouble keeping materials and belongings in order, avoiding reading and writing tasks requiring sustained mental effort, losing things, and being easily distracted by extraneous stimuli. The symptoms are not better described or indicated by a neurotic or psychotic disorder or substance abuse. There is historical information that suggests a likelihood of dyslexia.

**Charles Livingston, M.A.**
Licensed Masters Social Worker
Limited Licensed Psychologist

**Telephone: 269.226.2623**
The Marlborough, Suite 41C
471 W. South Street
Kalamazoo, MI 49007

Page 2—Addendum—J. Ramsay

4. The recommendations of 09-22-14 plus the additional record review clearly show distractibility, difficulties in sequencing, and significantly lowered processing speed (10th percentile rank). Therefore, accommodations that address these features should include but are not limited to 2X testing time in a distraction-free space, extra scrap paper, colored markers, and food to take with prescribed medications during testing. Extra testing time follows from the lowered processing speed. A distraction-free space addresses the marked tendency to be easily sidetracked. Extra scrap paper and colored markers are visual and motor modalities that allow for the full expression of excellent perceptual reasoning (96th percentile). Finally, food with the prescribed medications is simply following the Dr.'s treatment recommendations.

Respectfully,

⊂ MA 9-2-16

Charles Livingston, M.A.

Charles Livingston, M.A.                                    Licensed Masters Social Worker
                                                           Limited Licensed Psychologist

Disability Services

## RESUME

CREDENTIALS      LICENSED MASTERS SOCIAL WORKER #6801065088
                 LIMITED LICENSED PSYCHOLOGIST #6301005851

EDUCATION        M.A. WESTERN MICHIGAN UNIVERSITY, 1983
                 B.A. KALAMAZOO COLLEGE/WESTERN MICHIGAN UNIVERSITY, 1972

EXPERIENCE       CLINICAL SOCIAL WORKER/PSYCHOLOGIST
                 • Provide psychological evaluations pertaining to attention/learning
                   problems, disability, developmental delays, substance abuse,
                   social maturity, child custody, pre-sentencing, parenting,
                   psychosis, and psychopathology
                 • Provide counseling for children, adolescents, adults, families, and
                   couples
                 • Conduct group therapy, consultations, public presentations,
                   training, and education
                 • Private practitioner 1986-present, public clinic 1983-1986,
                   internship 1982-1983, residential treatment 1972-1973, inpatient
                   psychiatric hospital 1970 and 1983

                 COLLEGE TEACHING
                 • Kalamazoo College: General Psychology, Adolescent
                   Development, Personality Theory; 2006-2010
                 • Kalamazoo Valley Community College: Introduction to
                   Psychology, Developmental Psychology, Abnormal Psychology,
                   Families in Transition Seminars; 1999-present

MEMBERSHIPS      American Psychological Association, 1987-1998
                 Western Michigan Psychological Association, 1981-1996
                      Ethics Chairperson, 1990-1996
                 Michigan Association of Professional Psychologists, 1998-2000
                 Omicron Delta Kappa—honorary fraternity for academic excellence
                 Phi Lambda—Kalamazoo College social/service society
                 Michigan Dynamometer Association, 1990-present

VOLUNTEER        Girl Scouts, AYSO Soccer, Chamber of Commerce, Public and Private
                 Schools, Girls on the Run

**Charles Livingston, M.A.**                          **Telephone: 269.226.2623**
Licensed Masters Social Worker                         The Marlborough, Suite 41C
Limited Licensed Psychologist                          471 W. South Street
                                                       Kalamazoo, MI 49007

1107984    5-366-431-4
WAIS-IV Score Report-Eval

# WAIS-IV Record Form

WECHSLER ADULT INTELLIGENCE SCALE®—FOURTH EDITION

| | Test Date | Year | Month | Day |
|---|---|---|---|---|
| | | 14 | 9 | 12 |

Examinee Name: Jessica Ramsay

Examiner Name: Charles Livingston, MA, LLP, LMSW
471 W. South St., 41-C
Kalamazoo, MI 49007
(269) 226-2623
*Under the Supervision of*
*Dr. Wassink, Ed.D.*
*Licensed Psychologist*

Birth Date

Test Age

## Total Raw Score to Scaled Score Conversion

| | Raw Score | Scaled Score | | Alt. Scaled Score |
|---|---|---|---|---|
| Block Design Tot | 63 | 16 | | |
| Similarities | 31 | 14 | | |
| Digit Span 5,4 | 25 | | 8 | |
| Matrix Reasoning | 23 | 13 | | |
| Vocabulary | 48 | 15 | | |
| Arithmetic | 20 | | 15 | |
| Symbol Search | 25 | | 7 | |
| Visual Puzzles | | | | |
| Information | 21 | 15 | | |
| Coding | 48 | | 6 | |
| Letter–Number Seq.* | 21 | | (10) | ( ) |
| Figure Weights* | | ( ) | | ( ) |
| Comprehension | 29 | (13) | | ( ) |
| Cancellation* | | | ( ) | ( ) |
| Picture Completion | 20 | (15) | | ( ) |

Sum of Scaled Scores  44  44  22  13

*16–69 only

| Verbal Comp. | Perc. Reasng. | Work. Mem. | Proc. Speed | Full Scale |
|---|---|---|---|---|

## Sum of Scaled Scores to Composite Score Conversion

| Scale | Sum of Scaled Scores | | Composite Score | Percentile Rank | Confidence Interval* 90% or 95% |
|---|---|---|---|---|---|
| Verbal Comprehension | 44 | VCI | 127 | 96 | |
| Perceptual Reasoning | 44 | PRI | 127 | 96 | |
| Working Memory | 22 | WMI | 105 | 63 | |
| Processing Speed | 13 | PSI | 81 | 10 | |
| Full Scale | | FSIQ | | | |

*SEMs used to calculate confidence intervals, refer to Table 4.3 of the Technical and Interpretive Manual.

## Subtest Scaled Score Profile



## Composite Score Profile



RECEIVED
JAN 05 2017
Disability Sol...

**PEARSON**

Copyright © 2008 NCS Pearson, Inc.
All rights reserved.
Product Number 015498O900



## Record Form

### Summary

WECHSLER
INDIVIDUAL
ACHIEVEMENT
TEST

Child's Name: Jessika Ramsay    Sex: F

School: n/a    Grade: n/a

Teacher: n/a    Examiner: Livingston M

Referral Source: Dr. Ziemkowski MD    Wossich EdD

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 14 | 09 | 12 |
| Date of Birth | | | |
| Age | 24 | | |

Reason for Referral: Academic stresses

Behavioral Observations: Oriented x4, Logical, Coherent, Memory Intact

## WIAT Subtests

☒Age  ☐Grade

| | Raw Scores | Standard Score | Confidence Interval % | Percentile | Other ☒Equivalent ☐NCE |
|---|---|---|---|---|---|
| Basic Reading | | | — | | |
| Mathematics Reasoning | | | — | | |
| Spelling | | | — | | |
| Reading Comprehension | | 134 | — | 98% | 717 ≤30 |
| Numerical Operations | | | — | | |
| Listening Comprehension | | | — | | |
| Oral Expression | | | — | | |
| Written Expression | | | — | | |

## Composites

☐Age  ☐Grade

| | Reading | Mathematics | Language | Writing | Total Composite |
|---|---|---|---|---|---|
| Sum of Raw Scores | + | + | + | = | |
| Standard Score | | | | | |
| Confidence Interval % | — | — | — | — | |
| Percentile | | | | | |
| Other ☐Equivalent ☐NCE | | | | | |

THE PSYCHOLOGICAL CORPORATION®
Harcourt Brace & Company
SAN ANTONIO
• Boston • New York • Chicago • San Francisco • Atlanta • Dallas
• Diego • Philadelphia • Austin • Fort Worth • Toronto • London

Copyright © 1992 by The Psychological Corporation
Standardization edition copyright © 1990 by The Psychological Corporation
All rights reserved. Printed in the United States of America.

09-972076

# EXHIBIT 24



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM

**Examination Name:** NBME CAS 1 M114

**Test Date: 12/19/2014**

**ID:** **1164440**

**Name:** **RAMSAY, JESSICA ERIN**

**Scaling Group: 12/18/2014**

**Total Test Scaled Score:** **70**

**Total Test Percent Correct Score:** **74**

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area; narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

DEFENDANT'S
EXHIBIT
**66**

RAMSAY1-0025



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS 1 M114

**Test Date: 12/19/2014**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 12/18/2014

**Total Test Scaled Score:** 70
**Total Test Percent Correct Score:** 74



RAMSAY1-0026

 **NBME**®

# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group: 06/22/2015**

**Total Test Scaled Score:** 67
**Total Test Percent Correct Score:** 66

---

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

**RAMSAY1-0027**



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

**ID:** **1164440**
**Name:** **RAMSAY, JESSICA ERIN**
**Scaling Group:** 06/22/2015

**Total Test Scaled Score:** 67
**Total Test Percent Correct Score:** 66



RAMSAY1-0028



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** 201516 M2 CAS3

**Test Date: 01/04/2016**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN          **Total Test Scaled Score:** 69
**Scaling Group:** 01/04/2016          **Total Test Percent Correct Score:** 70

---

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

RAMSAY1-0029



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** 201516  M2  CAS3

**Test Date: 01/04/2016**

**ID:** **1164440**
**Name:** **RAMSAY, JESSICA ERIN**
**Scaling Group:** 01/04/2016

**Total Test Scaled Score:** 69
**Total Test Percent Correct Score:** 70



RAMSAY1-0030

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)
## Performance Profile

**Name: Jessica Ramsay**

**Test Date: 4/5/2016**
**Assessment Score: 310**



The material presented in this self-assessment is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE®. Rather, the CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences.

The score you received, indicated above in the top right hand corner, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools.

The Performance Profile is provided to aid in self-assessment. The shaded region defines a borderline level of performance for each content area. Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* (www.usmle.org).



DEFENDANT'S
EXHIBIT
**67**

RAMSAY1-0031

Case: 20-1058    Page: 936    Document: 14-2    Date Filed: 02/07/2020

# National Board of Medical Examiners®
## Self-Assessment Services

## Score Interpretation Guide
## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 220 to 230 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at www.usmle.org for the most current information about the level of proficiency required to pass Step 1.

RAMSAY1-0032

Case: 20-1058    Document: 14-2    Page: 937    Date Filed: 02/07/2020

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 292 | 400 | 207 |
| 790 | 290 | 390 | 205 |
| 780 | 288 | 380 | 202 |
| 770 | 286 | 370 | 200 |
| 760 | 283 | 360 | 198 |
| 750 | 281 | 350 | 196 |
| 740 | 279 | 340 | 194 |
| 730 | 277 | 330 | 192 |
| 720 | 275 | 320 | 190 |
| 710 | 273 | 310 | 188 |
| 700 | 271 | 300 | 185 |
| 690 | 269 | 290 | 183 |
| 680 | 266 | 280 | 181 |
| 670 | 264 | 270 | 179 |
| 660 | 262 | 260 | 177 |
| 650 | 260 | 250 | 175 |
| 640 | 258 | 240 | 173 |
| 630 | 256 | 230 | 170 |
| 620 | 254 | 220 | 168 |
| 610 | 251 | 210 | 166 |
| 600 | 249 | 200 | 164 |
| 590 | 247 | 190 | 162 |
| 580 | 245 | 180 | 160 |
| 570 | 243 | 170 | 158 |
| 560 | 241 | 160 | 156 |
| 550 | 239 | 150 | 153 |
| 540 | 237 | 140 | 151 |
| 530 | 234 | 130 | 149 |
| 520 | 232 | 120 | 147 |
| 510 | 230 | 110 | 145 |
| 500 | 228 | 100 | 143 |
| 490 | 226 | 90 | 141 |
| 480 | 224 | 80 | 139 |
| 470 | 222 | 70 | 136 |
| 460 | 220 | 60 | 134 |
| 450 | 217 | 50 | 132 |
| 440 | 215 | 40 | 130 |
| 430 | 213 | 30 | 128 |
| 420 | 211 | 20 | 126 |
| 410 | 209 | 10 | < 126 |

January 2014

RAMSAY1-0033

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions. *Academic Medicine*, Vol. 79, No. 10/ October Supplement 2004

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine*, 85(10):S98-S101, October 2010.

RAMSAY1-0034

Date Filed: 02/07/2020     Page: 939     Document: 14-2     Case: 20-1058

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

### Longitudinal Performance Profile
### History of Performance Across Multiple Completed Tests

**Name:  Jessica Ramsay**                                                    **Report Date:  4/6/2016**

| Take | Test Date | Timing | Assessment Score |
|------|-----------|--------|------------------|
| 1 | 4/5/2016 | Non-Standard | 310 |

The material presented in this report is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE. The CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences. This report provides a history of your performance on the last six assessments you have completed, along with test date and timing information. The test date corresponds to the date you completed each assessment. The Assessment Score that you received on each completed test as indicated in the table above, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools. A score interpretation guide has been included at the end of this report to help you interpret your Assessment Scores.

The graphical performance profiles are provided to aid in self-assessment and are a compilation of profiles for up to the six most recently completed assessments started on or after March 2, 2016*. The performance profile graphs provide an indicator of your performance across multiple completed assessments for each content area. The shaded region defines a borderline level of performance for each content area. Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A row of asterisks indicate that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance should be interpreted as similar. Because the CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *Step 1 Content Description and Sample Test Materials* (www.usmle.org).

*BSCSA exams started on or after March 2, 2016 cannot be longitudinally compared against those started before March 2, 2016.

RAMSAY1-0035

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

### Longitudinal Performance Profile
### History of Performance Profiles Across Multiple Completed Tests

**Name:** Jessica Ramsay

**Report Date:** 4/6/2016

Date Filed: 02/07/2020    Page: 940    Document: 14-2    Case: 20-1058

| Performance Profile Bands | |
|---|---|
| L | Lower Performance |
| B (shaded area) | Borderline Performance |
| H | Higher Performance |



RAMSAY1-0036

Case: 20-1058     Document: 14-2     Page: 941     Date Filed: 02/07/2020



RAMSAY1-0037

Case: 20-1058    Document: 14-2    Page: 942    Date Filed: 02/07/2020

# National Board of Medical Examiners®
## Self-Assessment Services

## Score Interpretation Guide
## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 220 to 230 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at *www.usmle.org* for the most current information about the level of proficiency required to pass Step 1.

RAMSAY1-0038

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 292 | 400 | 207 |
| 790 | 290 | 390 | 205 |
| 780 | 288 | 380 | 202 |
| 770 | 286 | 370 | 200 |
| 760 | 283 | 360 | 198 |
| 750 | 281 | 350 | 196 |
| 740 | 279 | 340 | 194 |
| 730 | 277 | 330 | 192 |
| 720 | 275 | 320 | 190 |
| 710 | 273 | 310 | 188 |
| 700 | 271 | 300 | 185 |
| 690 | 269 | 290 | 183 |
| 680 | 266 | 280 | 181 |
| 670 | 264 | 270 | 179 |
| 660 | 262 | 260 | 177 |
| 650 | 260 | 250 | 175 |
| 640 | 258 | 240 | 173 |
| 630 | 256 | 230 | 170 |
| 620 | 254 | 220 | 168 |
| 610 | 251 | 210 | 166 |
| 600 | 249 | 200 | 164 |
| 590 | 247 | 190 | 162 |
| 580 | 245 | 180 | 160 |
| 570 | 243 | 170 | 158 |
| 560 | 241 | 160 | 156 |
| 550 | 239 | 150 | 153 |
| 540 | 237 | 140 | 151 |
| 530 | 234 | 130 | 149 |
| 520 | 232 | 120 | 147 |
| 510 | 230 | 110 | 145 |
| 500 | 228 | 100 | 143 |
| 490 | 226 | 90 | 141 |
| 480 | 224 | 80 | 139 |
| 470 | 222 | 70 | 136 |
| 460 | 220 | 60 | 134 |
| 450 | 217 | 50 | 132 |
| 440 | 215 | 40 | 130 |
| 430 | 213 | 30 | 128 |
| 420 | 211 | 20 | 126 |
| 410 | 209 | 10 | < 126 |

January 2014

RAMSAY1-0039

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions, *Academic Medicine*, Vol. 79, No. 10/ October Supplement 2004

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine*. 85(10):S98-S101, October 2010.

RAMSAY1-0040

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)
### Performance Profile

Name: **Jessica Ramsay**

Test Date: **6/6/2017**

Assessment Score: **310**



PERFORMANCE PROFILE

Lower Performance — Borderline Performance — Higher Performance

Physician Task (MK): Foundational Sci
Physician Task (PC): Diagnosis
Physician Task (PC): Principles/Mngmt
Physician Task (PBL): Evi-Based Med
Discipline: Behavioral Sciences
Discipline: Biochemistry & Nutrition
Discipline: Genetics
Discipline: Gross Anatomy & Embryology
Discipline: Histology & Cell Biology
Discipline: Microbiology & Immunology
Discipline: Pathology
Discipline: Pharmacology
Discipline: Physiology
System: General Principles
System: Blood & Lymph. Immune Systems
System: Beh Hlth, Nerv Sys/Spec Senses
System: Mus/Skin/Subcutaneous
System: Cardiovascular System
System: Respiratory/Renal/Urinary Sys
System: Gastrointestinal System
System: Repro and Endo Systems
System: Multisys Processes & Disorders
System: Biostat/Epidemiology/Pop Hlth

If you would like to view a report that will provide a longitudinal performance profile that displays a tabular history of your performance and graphical profiles for each content area for the last six self-assessments you have taken, please click here.

The material presented in this self-assessment is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE®. Rather, the CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences.

The score you received, indicated above in the top right hand corner, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools.

The Performance Profile is provided to aid in self-assessment. The shaded region defines a borderline level of performance for each content area. Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* (www.usmle.org).

RAMSAY1-0057

RAMS:AY1-0058

**National Board of Medical Examiners®**
**Self-Assessment Services**

**Score Interpretation Guide**

**NBME® Comprehensive Basic Science Self-Assessment (CBSSA)**

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 228 to 229 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at www.usmle.org for the most current information about the level of proficiency required to pass Step 1.

On the Performance Profile: MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement.

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 290 | 400 | 207 |
| 790 | 288 | 390 | 205 |
| 780 | 286 | 380 | 203 |
| 770 | 284 | 370 | 200 |
| 760 | 282 | 360 | 198 |
| 750 | 280 | 350 | 196 |
| 740 | 277 | 340 | 194 |
| 730 | 275 | 330 | 192 |
| 720 | 273 | 320 | 190 |
| 710 | 271 | 310 | 188 |
| 700 | 269 | 300 | 186 |
| 690 | 267 | 290 | 184 |
| 680 | 265 | 280 | 182 |
| 670 | 263 | 270 | 180 |
| 660 | 261 | 260 | 178 |
| 650 | 259 | 250 | 175 |
| 640 | 257 | 240 | 173 |
| 630 | 255 | 230 | 171 |
| 620 | 252 | 220 | 169 |
| 610 | 250 | 210 | 167 |
| 600 | 248 | 200 | 165 |
| 590 | 246 | 190 | 163 |
| 580 | 244 | 180 | 161 |
| 570 | 242 | 170 | 159 |
| 560 | 240 | 160 | 157 |
| 550 | 238 | 150 | 155 |
| 540 | 236 | 140 | 153 |
| 530 | 234 | 130 | 150 |
| 520 | 232 | 120 | 148 |
| 510 | 230 | 110 | 146 |
| 500 | 228 | 100 | 144 |
| 490 | 225 | 90 | 142 |
| 480 | 223 | 80 | 140 |
| 470 | 221 | 70 | 138 |
| 460 | 219 | 60 | 136 |
| 450 | 217 | 50 | 134 |
| 440 | 215 | 40 | 132 |
| 430 | 213 | 30 | 130 |
| 420 | 211 | 20 | 128 |
| 410 | 209 | 10 | < 128 |

November 2016

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions. *Academic Medicine. Vol. 79, No. 10/ October Supplement 2004*

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine. 85(10):S98-S101, October 2010.*

RAMEY1-0059



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Surgery Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 8, respectively**.

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

DEFENDANT'S
EXHIBIT
**68**

NBME00173

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

#### Surgery

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 04/27/2017

Total Equated Percent Correct Score*: 67

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀‖ or ‖▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Cardiovascular Disorders | | | |
| Diseases of the Respiratory System | | | |
| Nutritional & Digestive Disorders | | | |
| Renal, Urinary & Male Reproductive Systems | | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| In-Patient | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Geriatric | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Psychiatry Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

#### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 80 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

#### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

 **NBME** National Board of Medical Examiners
**Subject Examination Program**

Examinee Performance Profile

Psychiatry

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 03/03/2017
Total Equated Percent Correct Score*: 72

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▐ or ▐▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Mental Disorders | | | |
| Diseases of the Nervous System & Special Senses | | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Child | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.



# NBME® National Board of Medical Examiners
## Subject Examination Program

## Score Interpretation Guide for Examinees

### Pediatrics Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 77 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

#### Pediatrics

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 12/22/2016

Total Equated Percent Correct Score*: 79

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▮ or ▮▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | ◀▮▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | | |
| Nutritional & Digestive Disorders | | ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | |
| Renal, Urinary & Male Reproductive Systems | ▬▬▬▬▬▬▬▬▬▬▬▬ | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | ▬▬▬▬▬▬▬▬▬▬ | |
| Cardiovascular Disorders and Diseases of the Respiratory System | | ▬▬▬▬▬▬▬▬▬▬▬▬ | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | | | ▬▬▬▬▬▬▬▮▶ |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | ▬▬▬▬▬▬▬▬▬▬ | |
| Diagnosis | | ▬▬▬▬▬▬▬▬ | |
| Health Maintenance and Management | | ▬▬▬▬▬▬▬▬▬▬▬▬▬ | |
| **Site of Care** | | | |
| Ambulatory | | ▬▬▬▬▬▬▬▬ | |
| Emergency Department | | ▬▬▬▬▬▬▬▬▬▬▬ | |
| In-Patient | | ▬▬▬▬▬▬▬▬▬▬▬ | |
| **Patient Group** | | | |
| Male | | ▬▬▬▬▬▬▬▬▬ | |
| Female | | ▬▬▬▬▬▬▬▬ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00178

 **NBME**® **National Board of Medical Examiners**
## Subject Examination Program

### Examinee Performance Profile

**Obstetrics and Gynecology**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 10/21/2016

Total Equated Percent Correct Score*: 81

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀‖ or ‖▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Gynecologic Disorders | | ▨▨▨▨ | |
| Disorders of Pregnancy and Childbirth | | ▨▨▨▨ | |
| Gynecologic Disorders: Mechanisms of Disease | | ▨▨▨▨▨ | |
| Disorders of Pregnancy: Mechanisms of Disease | | ▨▨▨▨▨▨ | |
| Gynecologic Disorders: Diagnosis | | ▨▨▨▨▨▨ ‖▶ | |
| Disorders of Pregnancy: Diagnosis | | ▨▨▨▨▨ | |
| Gynecologic Disorders: Health Maintenance and Management | | ▨▨▨▨▨ | |
| Disorders of Pregnancy: Health Maintenance and Management | | ▨▨▨▨▨ | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | | ▨▨▨▨▨ | |
| Mechanisms of Disease | | ▨▨▨▨ | |
| Diagnosis | | ▨▨▨▨▨▨ ‖▶ | |
| Management | | ▨▨▨▨ | |
| **Site of Care** | | | |
| Ambulatory | | ▨▨▨ | |
| In-Patient | | ▨▨▨▨▨ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

# NBME® National Board of Medical Exam
## Subject Examination Program

1106774            5-366-431-4
NBME Modular Family Med.

## Score Interpretation Guide for Examinees

### Modular Family Medicine Core Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on this examination were written and reviewed by national test committees. Prior to publication, test forms are reviewed by a panel of course directors from this discipline. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 5 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 70 and 80 (75 - 5 and 75 + 5).

RECEIVED

DEC 1 2 2016

Disability Services

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

#### Modular Family Medicine Core

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440     Test Date(s): 08/26/2016
Name: RAMSAY JESSICA ERIN     FamC Equated Percent Correct Score*: 60

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀‖ or ‖▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Diseases of Skin and Musculoskeletal Systems | | | |
| Cardiovascular Disorders & Diseases of the Respiratory System | ◀‖ | | |
| Mental Disorders and Diseases of the Nervous System | ◀‖ | | |
| Gynecologic Disorders & Renal, Urinary, Male Reproductive Systems | | | |
| **Physician Tasks** | | | |
| Chronic Care | ◀‖ | | |
| Health and Health Maintenance | ◀‖ | | |
| Management | | | |
| Diagnosis including Mechanisms of Disease | ◀‖ | | |
| **Patient Group** | | | |
| Pediatric (0 - 17) | ◀‖ | | |
| Adult (18 - 65) | ◀‖ | | |
| Geriatric (66 and older) | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00262



# NBME® National Board of Medical Examiners
## Subject Examination Progra

Score Interpretation Guide for Exam 106775    5-366-431-4
NBME Medicine Exam—Test S

## Medicine Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

RECEIVED

DEC 1 2 2016

Disability Services

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

**Examinee Performance Profile**

**Medicine**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 06/24/2016
Total Equated Percent Correct Score*: 65

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◁▯ or ▯▷ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | | ▬▬▬▬▬▬▬▬ | |
| Cardiovascular Disorders | ◁▯▬▬▬▬▬▬▬ | | |
| Diseases of the Respiratory System | ▬▬▬▬▬▬▬▬▬ | | |
| Nutritional & Digestive Disorders | ▬▬▬▬▬▬▬▬ | | |
| Renal, Urinary & Male Reproductive Systems | ▬▬▬▬▬▬ | | |
| Endocrine & Metabolic Disorders | ◁▯▬▬▬▬▬▬▬▬ | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | ▬▬▬▬▬▬▬▬▬▬ | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | ◁▯▬▬▬▬▬▬ | | |
| Mechanisms of Disease | | ▬▬▬▬▬▬▬▬▬ | |
| Diagnosis | ▬▬▬▬▬▬▬▬ | | |
| Management | | ▬▬▬▬▬▬▬▬▬ | |
| **Site of Care** | | | |
| Ambulatory | | ▬▬▬▬▬▬▬ | |
| Emergency Department | | ▬▬▬▬▬▬▬▬ | |
| In-Patient | ◁▯▬▬▬▬▬▬▬ | | |
| **Patient Group** | | | |
| Male | | ▬▬▬▬▬▬▬ | |
| Female | ▬▬▬▬▬▬▬▬▬ | | |
| Geriatric | | ▬▬▬▬▬▬ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00264

# NBME® National Board of Medical Ex
## Subject Examination Prog

1126187    5-366-431-4
NBME Subject Exams (some

### Score Interpretation Guide for Students

## NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 - 3 and 60 + 3).

### Approximate USMLE Performance Equivalents

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

### Approximate Step 1 Equivalents

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|-------|-------------------|-------|-------------------|
| ≥ 94  | ≥ 260             | 68    | 195               |
| 94    | 260               | 66    | 190               |
| 92    | 255               | 64    | 185               |
| 90    | 250               | 62    | 180               |
| 88    | 245               | 60    | 175               |
| 86    | 240               | 58    | 170               |
| 84    | 235               | 56    | 165               |
| 82    | 230               | 54    | 160               |
| 80    | 225               | 52    | 155               |
| 78    | 220               | 50    | 150               |
| 76    | 215               | 48    | 145               |
| 74    | 210               | 46    | 140               |
| 72    | 205               | ≤ 46  | ≤ 140             |
| 70    | 200               |       |                   |

DEFENDANT'S EXHIBIT 69

 **NBME**® **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

**Comprehensive Basic Science**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440                                    Test Date(s): 04/28/2017
Name: RAMSAY JESSICA ERIN                      Total Scaled Score: 66

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▐▐ or ▐▐▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | |
| Biochemistry | | | |
| Gross Anatomy & Embryology | | | |
| Histology & Cell Biology | | | |
| Microbiology & Immunology | | | |
| Pathology | | | |
| Pharmacology | | | |
| Physiology | | | |
| **System** | | | |
| General Principles of Foundational Science | | | |
| Behavioral Health and Nervous Systems/Special Senses | | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | |
| Cardiovascular System | | | |
| Respiratory System | | | |
| Gastrointestinal System | | | |
| Renal/Urinary System | | | |
| Multisystem Processes & Disorders | | | |

NBME00172



# NBME® National Board of Medical Exar Subject Examination Program

1108776          5-368-431-4
NBME Compreh. Basic Scien

## Score Interpretation Guide for Students

## NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 - 3 and 60 + 3).

### Approximate USMLE Performance Equivalents

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

### Approximate Step 1 Equivalents

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|---|---|---|---|
| ≥ 94 | ≥ 260 | 68 | 195 |
| 94 | 260 | 66 | 190 |
| 92 | 255 | 64 | 185 |
| 90 | 250 | 62 | 180 |
| 88 | 245 | 60 | 175 |
| 86 | 240 | 58 | 170 |
| 84 | 235 | 56 | 165 |
| 82 | 230 | 54 | 160 |
| 80 | 225 | 52 | 155 |
| 78 | 220 | 50 | 150 |
| 76 | 215 | 48 | 145 |
| 74 | 210 | 46 | 140 |
| 72 | 205 | ≤ 46 | ≤ 140 |
| 70 | 200 | | |

RECEIVED

OCT 1 2 2016

Disability Services

 **NBME® National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

**Comprehensive Basic Science**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 04/11/2016

Total Scaled Score: 68

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀┃ or ┃▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students.*

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | ▨ |
| Biochemistry | | ▨ | |
| Gross Anatomy & Embryology | | ▨ | |
| Histology & Cell Biology | ▨ | | |
| Microbiology & Immunology | | ▨ | |
| Pathology | | ▨ | |
| Pharmacology | ◀┃▨ | | |
| Physiology | | ▨ | |
| **System** | | | |
| General Principles of Foundational Science | | ▨ | |
| Behavioral Health and Nervous Systems/Special Senses | | ▨ | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | ▨ | |
| Cardiovascular System | ◀┃▨ | | |
| Respiratory System | | | ▨┃▶ |
| Gastrointestinal System | ◀┃▨ | | |
| Renal/Urinary System | | ▨ | |
| Multisystem Processes & Disorders | | | ▨ |

# EXHIBIT 25



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

June 24, 2019

By email to Jessica.ramsay@med.wmich.edu and by USPS first class mail

Jessica Ramsay
jessica.ramsay@med.wmich.edu
6862 Tall Oaks Dr, Apt 3B
Kalamazoo, MI 49009

Lawrence D. Berger
19 Chestnut St
Haddonfield, NJ 08033

Dear Jessie,

I am in receipt of your request to again extend your leave of absence in order to pursue further
accommodations from the NBME. Your original leave of one year duration, August 28, 2017 to
August 29, 2018, was offered to allow you to retake USMLE Step 1. It was subsequently
extended for up to a year, ending August 29, 2019, with the expectation that you would resolve
your issues with the NBME and retake Step 1. Without an end date stated your current request
represents an indefinite leave of absence, which is neither allowable under WMed policies, nor
reasonable. I cannot extend your leave of absence indefinitely.

I am not able to further extend your Leave of Absence under the current expectations beyond
August 29, 2019. As an alternative and in order to support your preparation, I can offer to
extend your leave for six months, until March 2, 2020, with the expectation that you will sit for
the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by that
date.

If you are unable to return to the WMed curriculum by March 2, 2020, under the policies you
would be dismissed from medical school. Up until that date, you may voluntarily withdraw
from WMed. In either case you would be eligible to apply for readmission at the time you are
prepared to take USMLE Step 1. (You must be admitted to medical school to be eligible to
schedule and sit for USMLE Step 1.)

As I have stated before, I recognize your hard work through all parts of the WMed curriculum. I
especially recognize the clinical excellence leading to your peers identifying you as a member of

the WMed chapter of our Humanism Honor Society.  I anticipate that upon achieving a passing score on USMLE Step 1, you will demonstrate the same clinical work ethic to complete your education.  I appreciate your willingness to work with WMed faculty and staff through this process, and I look forward to supporting your career goals upon your return as a WMed student.

If you have further questions or concerns, please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file

# EXHIBIT 26

Neuropsychology Associates

1126193          5-366-431-4
**Neurocognitive Consultati**

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE CONSULTATION

**PATIENT NAME:** Jessica Ramsay          **REFERRING:** Self
**DOB:** ▮▮▮▮▮▮          **CONSULTING:** A. Lewandowski, PHD, FACPN
**DATE:** 10/25/17

### REASON FOR STUDY

Jessica Ramsay is a 27-year-old right-handed female with mixed dominance who presents for neurocognitive diagnostic study pursuant to academic difficulties of undetermined etiology and uncertain severity. She is accompanied today by her mother, Jerri Shold, who assists with her history. The patient's primary care up to age 19 has been Dr. Alan Smiy in St. Joe, Michigan. More recently, the patient's primary care has been provided by Dr. Jennifer Houtman. She reports, "I've had accommodations since I was an undergrad. I hate reading. I haven't bought a textbook since undergrad."

### HISTORY OF PRESENT ILLNESS

The patient describes a chronic academic disability without progressive pattern for a number of years that has compromised her ability for educational success. She describes a history of ADD for which she was able to self-accommodate for many years, and reports being evaluated for ADD and dyslexia in 2014 by a therapist (credentials unknown). Given the patient's description of the evaluation, this counselor administered an intellectual and achievement assessment, but is uncertain whether a complete examination was conducted or if an abbreviated and prorated approach was taken. As a result, she reports she was provided accommodations throughout medical school but was denied accommodations for the United States Medical License Examination (USMLE), Step 1. The patient presents today requesting a more comprehensive assessment in order to obtain accommodations similar to that which she was allowed throughout medical school. "I want accommodations so I can keep going. I figure the best way is to get the paperwork done properly." The patient describes herself as having a "unique learning style." She describes that throughout medical school she watched videos and attended lectures and when taking notes uses multiple colored pencils to code information in order to enhance her learning and recall. She provides an example of some notebooks this afternoon. The patient reports she has a history of "reversing my numbers," and her mother describes that as a child she had difficulty differentiating between (lowercase) b, d, p, and q. "I can't remember the name of an enzyme, but I can remember the concepts and what to do with it." In addition, the patient describes word-finding problems that exacerbate her inefficient learning and recall. With regard to the patient's attention and overactivity, she reports, "I can't stop moving. I always have to be doing something." In the past, she was prescribed Adderall and notes, "It works when I remember to take it. I can tell when the first dose is wearing off."

EX 26-1

RE: Jessica Ramsay
Page 2

## SOCIAL HISTORY

<u>General.</u> Born and reared in Texas by both parents and moved to Michigan as a 10-year-old. Her father is as 56-year-old in sales who has a BA degree and no reported history of ADD or LD. Her mother is a 67-year-old who is a retired art educator with an MA in art education and a history of dyslexia and ADHD. The patient has two adopted brothers, one who is 22 years old and is diagnosed with Asperger's that works at an Applebee's and a 19-year-old who lives at home and suffers from Prader-Willi syndrome and ASD.

<u>Family and Marital.</u> The patient is single, has never been married, and lives with her fiancé for the past two years in an apartment in Kalamazoo.

<u>Education.</u> The patient completed public high school in St. Joe, Michigan with a 3.8 GPA and an ACT score between 27 and 30 (unable to recall). She reports that she was never diagnosed with ADD in high school, but her mother reports her inattention symptoms were observed as early as a second grader. She describes that her daughter's intellectual abilities allowed her to self-accommodate and thus additional services/specialized services were not necessarily required. The patient completed a BS from Ohio State University with a 3.65 GPA majoring in genetics with minors in business and dance.

<u>Employment.</u> The patient is currently a her third year half-time student at WMU Homer Stryker School of Medicine.

<u>Military.</u> None.

<u>Legal.</u> None.

<u>Avocational.</u> Sports, art, painting (acrylics), drawing, ceramics, camping, reading, papermaking.

## MEDICAL

<u>Records.</u> No medical records were available to review at the time of this consultation.

<u>Psychologic.</u> The patient's mother reports that as a three- or four-year-old, she had some type of academic or behavioral testing. Her mother doesn't recall the credentials of the individual who administered the tests, what was administered, or for what reason the tests were administered. The patient reports consultation with a counselor 3+ years ago who provided an abbreviated intellectual and achievement examination approximately. In addition, the patient has seen a counseling psychologist, Dr. Mary Wassink with a very positive outcome.

<u>Developmental.</u> The patient's mother reports a normal pregnancy and delivery with no complications or fetal distress. She reports that her daughter achieved all neurodevelopmental milestones at age-appropriate intervals. She had no past SLP, OT, PT or audiologic assistance. She played soccer as a child and adolescent and estimates she may have had two past possible concussions complicated by very brief PTA, but she does not recall any type hospitalization.

RE: Jessica Ramsay
Page 3

<u>General Review of Systems.</u> The patient's general medical history is best known to her and her mother, and her primary care who is Dr. Jennifer Houtman. For the completeness of this report, the patient describes a history of sinusitis, frequent stress-associated hives, occasional palpitations induced by stress, exercise-induced asthma, lactose intolerance, past fracture of her ankle, anemia, Factor V Leiden. She had a past DVT diagnosed in the ED and was prescribed rivaroxaban. She reports no history of CNS disease, insult or injury as a young adult. She reports a history of migraine headache for the past 20+ years, occurring as often as a weekly or daily basis, complicated by photosensitivity, hyperacusis, nausea but not necessarily emesis. The patient reports an aura by way of visual blind spots. In addition to the above minor and insignificant concussions, the patient reports she had viral meningitis diagnosed as 20-year-old student at OSU and was hospitalized for one day.

<u>Neurodiagnostics.</u> The patient has had MR as a study volunteer, and she reports findings were normal.

<u>Surgeries.</u> T&A, wisdom teeth, root canal.

<u>Allergies.</u> NKDA. The patient reports some difficulties with the use of loratadine by way of decreased hearing acuity.

<u>Medications.</u> Adderall, BuSpar, Xarelto, metoprolol, Ambien p.r.n., Xanax p.r.n., tramadol.

<u>Risk Factors.</u> Occasional and social use of alcohol with no history of overuse.

**CLINICAL EXAMINATION**

<u>Appearance.</u> Upon examination this afternoon, the patient presents as a normally developed young adult female who presents in mild distress. Head is normocephalic and atraumatic. Eyes are symmetrical and EOMs are intact. She is well groomed and casually dressed and appears her stated age with long dark blond/brown hair and brown/hazel eyes. She is approximately 5'8" and weighs 115 lbs., has relaxed posture throughout the examination, and her facial expression is responsive with normal variability.

<u>Behavior.</u> Eye contact is normal and maintained throughout the examination. The patient's station is steady and her gait is normal for tandem heel-to-toe walk. Upper extremity general motor movements for fine and gross actions are normal for age and bilaterally coordinated as evidenced by tapping and alternating finger-to-thumb touch. Speech is normal. The patient's tone is feminine. Amplitude is soft and normal. Pitch is normal, as is rate. There is no evidence of rapid or pressured speech. Quality reflects good articulation and there is no evidence of difficulty with pronunciation. Patterns are normal and there is no evidence of phonologic or paraphasic errors. Interpersonal skills are well developed, and the patient is compliant and appropriate throughout the examination. Her attitude is cooperative and motivation is good. Sleeping patterns are described to reflect early and middle insomnia. The patient occasionally uses zolpidem to assist with sleep. Appetite is described as variable, but there is no significant change in weight. There is no history of pathognomonic eating problems such as purging or binging. Energy is described as poor and fatigued. The patient notes, "I'm restless, and I'm usually very fatigued." ADLs are not affected.

**EX 26-3**

RE: Jessica Ramsay
Page 4

<u>Emotional Regulation.</u> The patient's emotions are appropriate to thought content. Mood is anxious, and this seems to be situational and associated with school performance. Mood and affect are congruent. She is very pleasant in the examination but occasionally frustrated and worried about her school and health status. There is no evidence of acute stress or past traumatic stress. She is certainly frustrated, but she does not endorse neurovegetative symptoms or diurnal variation. The duration of her situational symptoms has been for the past number of months, suggesting a short-term concern. In the past, she notes she had some situational dysphoria "on and off" since completing high school. In the past, she has used an SSRI (fluoxetine), but this was discontinued after two months as the patient reports it was not fully effective and not particularly necessary. Rather, she coped by additional study, sports and socialization. In this manner, she describes the employment of adaptive behaviors.

<u>Sensorium.</u> A cursory review of cognitive functioning today reflects the patient is fully alert and oriented to person, place, time and purpose. There is no present evidence of history of unusual perceptual distortions. Her immediate recall is only four of five words with one trial. Her visual recall is four of four objects. The patient's delayed verbal recall is four of five words with one additional word recalled with cuing. Delayed visual recall is four of four. Simple attention and concentration are normal by way of digit sequencing and letter identification. She was able to produce six digits forward, and this is adequate. She is able to produce five digits backwards, and this is borderline given her age and educational level. She has minor difficulties with serial 7s and makes errors that she self-corrects. There are no problems with simple reversals. Calculations are above average, and her answers are both quick and accurate. There are no difficulties with long-term recall of overlearned information or personal history. Abstract reasoning is normal by way of verbal proverbs and verbal and visual similarities. Fund of knowledge is above average for both verbally and visually mediated tasks. Comprehension is also intact for both single and multiple tasks. Visual reasoning is normal for cursory tasks associated with problem solving, synthesis and attention to detail. Executive reasoning is intact for critical judgment and general decision making. Insight is good and age appropriate.

<u>Thought Processes.</u> The patient's stream of thought reveals no acute confusion or any significant psychiatric disorganization. There is no evidence of any type of slowing or acceleration of thought flow. She reports no history of suicidal ideation, and there are no risk factors observed. There is no evidence of any type of other-directed harm, unusual ideation, or unusual thought content.

**CLINICAL IMPRESSION (ICD-10)**

1. By history:
    a. Attention deficit disorder.
    b. Learning difficulties/questionable dyslexia.
    c. Situational distress also affected by both transitional anxiety and depression.
2. Difficulties with mental status, etiology and severity uncertain.
3. Rule out ADD vs. ADHD vs. dyslexia vs. dyscalculia vs. spelling dyspraxia vs. mood disorder vs. anxiety condition/GAD vs. adjustment disorder vs. normal examination.

RE: Jessica Ramsay
Page 5

## SUMMARY AND PLAN

Jessica Ramsay is a 27-year-old right-handed female with some mixed dominance in her third year of medical school who presents for neurocognitive diagnostic study pursuant to a request for accommodations for standardized testing with the USMLE Step 1. The patient's neurological history is noted for two minor and insignificant concussions associated with brief PTA but with no long-term residual consequences. Neuroimaging of the brain has not been medically necessary but was completed as a part of the patient being a test volunteer; findings are reported by the patient to be normal. The patient's general medical history with *possible* implications for cognitive dysfunction is unremarkable. The patient's preexisting psychological history is noted for worry, apprehension and anxiety associated with concern about her educational progress as a third-year medical student. Current medications include Adderall, BuSpar, metoprolol, Xarelto, Ambien, Xanax (p.r.n.), and tramadol.

I will proceed with a standardized and more comprehensive neurocognitive diagnostic study to better clarify the patient's mental status and the severity of symptoms to assist with medical decision making, care coordination, and support accommodations as appropriate. I will schedule the patient for two half sessions depending on her availability and academic demands, and provide the patient with a copy of findings as well as a copy to her primary care provider who is Dr. Jennifer Houtman. I will review findings with the patient.

I spent approximately 120 minutes with the patient today in individual examination, consulting with her mother, providing a detailed neurobehavioral cognitive status examination, and preparing this consultation. I remain available to Dr. Houtman at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified Neuropsychologist
Clinical Assistant Professor
Western Michigan University School of Medicine

AGL:tlw



1126192       5-366-431-4
Neurocognitive exam 2017-

**Neuropsychology Associates**

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Helene Pilnick, PHD
*Pediatric Neuropsychology*
JoLynn Cole, MA
*Psychotherapist*

Morris Edwards, PHD
*Certified in Biofeedback*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE EXAMINATION

| | |
|---|---|
| **Name:** | Jessica Ramsay |
| **DOB:** | |
| **Procedure:** | Neurocognitive Study |
| **Review date:** | December 7, 2017 |
| **Referred by:** | Self |
| **Performed by:** | A. Lewandowski, Ph. D., FACPN |

**Reason for Exam**    Twenty-seven-year-old right-handed female with 19 years education (3 years medical school) presents for comprehensive neurocognitive diagnostic recheck pursuant to attention and learning difficulties with undetermined etiology and uncertain severity. The primary care physician is Dr. Jennifer Houtman. The preexisting neurological history is unremarkable for CNS disease, insult or injury as a child, adolescent or young adult. Neuroimaging has been completed with MRI and findings are reported to be WNL. The general medical history with *possible* implications for cognitive dysfunction is remarkable for anemia and daily migraines. The psychological history is noted for some type of cognitive testing as a 3 or 4-year-old child and more recently, a consultation three years previously with a counselor who supervised the administration of an abbreviated IQ-achievement test (records not available for review). Current medications include Adderall, Ambien, Tramadol, Xanax and Buspar.

**Technique**    Comprehensive neurocognitive examination with HRNB and allied procedures with study date on November 9, 2017. Findings and report are based on test results integrated with additional data including records, behavioral observations of the patient and all other available relevant clinical data. Additional time spent with report analysis, interpretation and integration of test data and results completed on November 16, 2017.

**Findings**    See attached graphs and summary table below for raw data.

Jessica Ramsay
Page 2

**Report**

*Bold indicates low normal/abnormal findings*

| | Functional Area | Range | Findings | Guideline |
|---|---|---|---|---|
| **Intellectual Functioning** | Verbal Comprehension | 100 +/- 15 | 125 | Superior |
| | Perceptual Reasoning | 100 +/- 15 | 131 | Very superior |
| | Working Memory | 100 +/- 15 | 111 | High average |
| | **Processing Speed** | 100 +/- 15 | 79 | **Borderline impaired** |
| | General abilities (GAI) | 100 +/- 15 | 132 | Very superior |
| | Cognitive efficiency (CPI) | 100 +/- 15 | 94 | Average |
| | Overall Intellect (FSIQ) | 100 +/- 15 | 117 | High average |
| **Academic** | Reading | 100 +/- 15 | 114 | High average |
| | Spelling | 100 +/-15 | 109 | Average |
| | Written arithmetic | 100 +/- 15 | 110 | High average |
| **Neuropsychological** | Sensory speed: dominant | 50T +/- 10 | 50 | Normal |
| | Sensory speed: non-dominant | 50T +/- 10 | 47 | Normal |
| | Motor speed: dominant | 50T +/- 10 | 50 | Normal |
| | Motor speed: non-dominant | 50T +/- 10 | 48 | Normal |
| | Psychomotor: bilateral abilities | 50T +/- 10 | 47 | Normal |
| | Psychomotor: response speed | 50T +/- 10 | 55 | Normal |
| | **Sequencing: simple** | 50T +/- 10 | 35 | **Abnormal** |
| | **Sequencing: complex** | 50T +/- 10 | 27 | **Abnormal** |
| | Executive reasoning | 50T +/- 10 | 60 | Normal |
| **Attention** | Attention: complex (language) | 50T +/- 10 | 60 | Normal |
| | **Attention: complex (non-language)** | 50T +/- 10 | 35 | **Abnormal** |
| | Inattentiveness | 50T +/- 10 | 50/46/51/49/52/49 | Normal |
| | Impulsivity | 50T +/- 10 | 49/51/48 | Normal |
| | Sustained difficulties | 50T +/- 10 | 47 | Normal |
| | **Vigilance difficulties** | 50T +/- 10 | 69 | **Abnormal** (mild) |
| **Memory** | Verbal recall: immediate | 50T +/- 10 | 66 | Normal |
| | Verbal recall: short and long delay | 50T +/- 10 | 65/65 | Normal |
| | Visual recall: immediate | 50T +/- 10 | 61 | Normal |
| | **Visual recall: short and long delay** | 50T +/- 10 | 58/38 | **Normal/Abnormal** |

Jessica Ramsay
Page 3

|  | | | | |
|---|---|---|---|---|
| **Psychological** | Health concerns | 50T +/- 10 | 64 | **Abnormal: mild** |
| | Anxiety: generalized | 50T +/- 10 | 47 | Normal |
| | Anxiety: focused | 50T +/- 10 | 51 | Normal |
| | Depression | 50T +/- 10 | 67 | **Abnormal: moderate** |
| | Acute stress | 50T +/- 10 | 41 | Normal |
| | Inefficient thinking | 50T +/- 10 | 73 | **Abnormal: significant** |

**Summary**

1. Abnormal intellectual study
   a. Intellectual *ability* is in the *Very Superior* range (98th percentile) compared to same-aged peers.
   b. Intellectual *efficiency* is only *Average* (34th percentile) compared to same-aged peers, hence reflects a statistically significant weakness in the intellectual study.
   c. The profile suggests equal bilateral aptitude on tasks known to be sensitive to both the left and right cerebral hemispheres.
   d. The pattern reflects a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions.
   e. The IQ pattern is consistent with the patient's/parent's report of premorbid functioning, suggesting a preexisting developmental delay.

2. Normal achievement study. Reading, spelling and arithmetic are normal to above normal and consistent with past education.

3. Borderline abnormal neurocognitive study.
   a. Abnormal performance is observed on measures of sequencing/cognitive shifting, sustained complex attention, and quickness of thinking (as noted above) affecting mental flexibility, cognitive efficiency and inattention with subsequent implications for learning new information and responding to assessments under timed conditions.
   b. Performance is otherwise consistent with or supersedes age-, gender-, and education-weighed norms.

Jessica Ramsay
Page 4

4. Abnormal psychological study
   a. Elevations are observed on clinical scales associated with ill health and depression.
   b. Subscale analysis reflects significant focus and worry about personal health, feelings of failure, indecisiveness and difficulties with concentration (cognitive inefficiency), physiological symptoms associated with depression (low energy, sleep/appetite disturbance, and difficulties with concentration, decision-making, memory/learning).
   c. Emotional difficulties exacerbate the above-noted existing limitations (thought processes), and have subsequent implications for learning new information and responding to assessments under timed conditions.

**Clinical Impression**

1. By history:

   a. Attention deficit disorder
   b. Learning difficulties affecting ability to pass standardized testing

2. By diagnostic testing:

   a. Attention deficit disorder, hyperactive, moderate (F90.1)
   b. Learning disability, nonverbal (abnormal scanning and processing speed) (F81.9)

**Plan**

1. Graphic findings and report to patient.
2. Copy of findings to patient.
3. Continue with specialized cognitive medication (dextroamphetamine) to assist with inattention, if not medically contraindicated. I defer to the patient's primary care provider who is Dr. Houtman for consideration of this recommendation. Alternatively, I can provide psychiatric consultation through my clinic as part of a conjoint psychotherapy-psychiatric treatment for the patient.
4. Continue with medication to address emotional difficulties (zolpidem, alprazolam, and buspirone).
   a. The present study indicates that the patient's current psychological medication regimen is adequately effective, as elevations on clinical scales of depression are only approximately one and a half standard deviations greater than the average range.
   b. At present, these medications are provided by Dr. Houtman.
   c. If needed, I am happy to provide psychiatric assistance though my clinic as part of conjoint psychotherapy-psychiatric medication treatment for the patient.

Jessica Ramsay
Page 5

5. Consider psychotherapy to address mood disturbance and modulate affect.
6. Patient requests accommodations and written responses to a series of guidelines toward test accommodations for the United States Medical Licensing Examination (USMLE), Step 1. Guidelines provided by the patient were reviewed and the following accommodations are recommended:
    a. Fifty percent additional time to complete the examination or 100 percent additional time (double time) for an exam given over two days to compensate for slowed thought processing
    b. Two additional breaks during the examination to compensate for difficulties managing mood/stress.
    c. A separate and/or quiet area to complete the examination to compensate for inattention and distractibility.
7. The patient did not have accommodations for the MCAT and as a result scores reflect her inefficiency and slowed reading.
8. The patient is not at risk for operating a motor vehicle.
9. Consider a memory notebook to assist with organization and improve attention.
10. Recheck in 12 months to assist primary care in monitoring mental status.
11. Consider re-examination in 24 months for comparative analysis to baseline.
12. Discussed issues of safety and surrogate decision making, provided education regarding the diagnosis and management of health behavior changes, and directed to additional resources for support.
13. I remain available to patient regarding assessment and treatment needs.
14. I remain available to Dr. Houtman as the patient's primary care physician at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified in Neuropsychology
Clinical Assistant Professor, Western Michigan University
    Department of Psychiatry, Western Michigan University School of Medicine
    Psychology Department
    Department of Counseling Psychology and Counselor Education
    College of Health and Human Services (SPADA)
    Department of Military Science and Leadership

AGl: la

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Plinick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

**Addendum**

Name: Jessica Ramsay (DOB: ▮▮▮▮▮▮▮ )
Date: February 7, 2018

Re: Names of specific measures used in the neuropsychological examination of Jessica Ramsay on December 7, 2017

Weschler Adult Intellectual Scale, 4th edition, Wide Range Achievement Test 4th edition, Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number Writing Test, Tactile Form Recognition Test, California Verbal Learning Test, 2nd edition, Rey Osterrieth Complex Figure Test, Tactile Form Recognition Test, Grip Strength Test, Finger Oscillation, Tactual Performance Test, Trail Making Test A, Trail Making Test B, Category Test, Seashore Rhythm Test, Speech Sounds Perception Test, Personality Assessment Inventory, Aphasia Screening Test.

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pitnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

May 23, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Dear Jessica,

I am responding to your request for further clarification on the neuropsychological examination completed December 7, 2017. Regarding accommodations for the USMLE Step 1, and given your additional description of the requirements of the examination, my recommendations should have read, 100% additional testing time (double time), plus additional break time.

Alan Lewandowski, PhD, FACPN
Board Certified Neuropsychologist

1126531        5-3B6-431-4
Raw data table 11.9.17 Ne

Neuropsychology Associates

*Neuropsychology · Psychiatry · Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pitnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

June 20, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Re: Additional raw data tables for November 9, 2017 Neuropsychological Examination

Dear Ms. Ramsay:

Attached to this letter is an additional compilation of the findings from your recent neuropsychological assessment formatted as a table. The Raw Data Addendum constitutes a complete picture of the _entire_ data set from your assessment. As such, it is a comprehensive representation of your evaluation that includes tests administered, the normative sample group, mean scores, your individual (patient) scores, and a guideline to assist with interpretation.

Previously, you were provided with a set of graphs. These graphs that were attached to the initial report were provided to you *only* as a general and cursory guide, to be used during our review in order to assist you in understanding the findings. They were never/are not intended to be a comprehensive representation of all of the measures employed, functional areas assessed, and the general corresponding scores. They were never/are not intended for broader distribution or to be used in your request for accommodations.

Alan G. Lewandowski, Ph. D., FACPN
Clinical Psychologist
Board Certified Neuropsychologist

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 1

## Raw Data Addendum

| | Tests Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| **Wechsler Adult Intellectual Scale, 4th Edition (Standard Scores)** | Similarities | 1 | 10 | 13 | High average |
| | Vocabulary | 1 | 10 | 14 | Superior |
| | Information | 1 | 10 | 16 | Very superior |
| | Comprehension | 1 | 10 | 15 | Superior |
| | Digit span | 1 | 10 | 12 | High average |
| | Arithmetic | 1 | 10 | 12 | High average |
| | Block design | 1 | 10 | 15 | Superior |
| | Matrix reasoning | 1 | 10 | 16 | Very superior |
| | Visual puzzles | 1 | 10 | 15 | Superior |
| | Figure weights | 1 | 10 | 15 | Superior |
| | Picture completion | 1 | 10 | 14 | Superior |
| | Symbol search | 1 | 10 | 7 | Low average |
| | Coding | 1 | 10 | 5 | Borderline Impaired |
| | Cancellation | 1 | 10 | 9 | Average |
| | Verbal Comprehension Index | 1 | 100 | 125 | Superior |
| | Perceptual Reasoning Index | 1 | 100 | 131 | Very superior |
| | Working Memory Index | 1 | 100 | 111 | High average |
| | Processing Speed Index | 1 | 100 | 79 | Borderline impaired |
| | General Abilities Index | 1 | 100 | 132 | Very superior |
| | Cognitive Efficiency Index | 1 | 100 | 94 | Average |
| | Overall Intellect Index | 1 | 100 | 117 | High average |
| **Wide Range Achievement Test, 4th Edition (Standard Scores)** | Reading | 1 | 100 | 114 | High average |
| | Spelling | 1 | 100 | 109 | Average |
| | Written arithmetic | 1 | 100 | 110 | High average |
| **California Verbal Learning Test, 2nd edition (T-Scores)** | Memory: immediate recall | 4 | 50 | 66 | Normal |
| | Memory: short delay free recall | 4 | 50 | 65 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 60 | Normal |
| | Memory: long delay free recall | 4 | 50 | 65 | Normal |
| | Memory: long delay cued recall | 4 | 50 | 60 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 2

| | Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Halstead Reitan Neuropsychological Battery (T-Scores) | Tactile form recognition: dominant | 3 | 50 | 50 | Normal |
| | Tactile form recognition: non-dominant | 3 | 50 | 47 | Normal |
| | Finger oscillation: dominant | 3 | 50 | 50 | Normal |
| | Finger oscillation: non-dominant | 3 | 50 | 48 | Normal |
| | Tactile Performance: dominant | 3 | 50 | 64 | Normal |
| | Tactile Performance: non-dominant | 3 | 50 | 50 | Normal |
| | Tactile Performance: bilateral abilities | 3 | 50 | 47 | Normal |
| | Tactile Performance: response speed | 3 | 50 | 55 | Normal |
| | Tactile Performance: memory | 3 | 50 | 54 | Normal |
| | Tactile Performance: localization | 3 | 50 | 72 | Normal |
| | Trail A: simple sequencing | 3 | 50 | 35 | Abnormal |
| | Trail B: complex sequencing | 3 | 50 | 27 | Abnormal |
| | Executive reasoning | 3 | 50 | 60 | Normal |
| | Seashore rhythm | 3 | 50 | 35 | Abnormal |
| | Speech sounds perception | 3 | 50 | 60 | Normal |
| Conner's Continuous Performance Test, 3rd Edition (T-Scores) | Attention: detectability | 1 | 50 | 50 | Normal |
| | Attention: omissions | 1 | 50 | 46 | Normal |
| | Attention: commissions | 1 | 50 | 51 | Normal |
| | Attention: perseverations | 1 | 50 | 48 | Normal |
| | Attention: hit reaction time | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time SD | 1 | 50 | 52 | Normal |
| | Attention: hit reaction variability | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time block change | 1 | 50 | 47 | Normal |
| | Attention: hit reaction time ISI change | 1 | 50 | 69 | Abnormal (mild) |
| Rey Osterrieth Complex Figure (T-Scores) | Memory: immediate recall | 4 | 50 | 61 | Normal |
| | Memory: short delay free recall | 4 | 50 | 58 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 38 | Abnormal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 3

| | Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Personality Assessment Inventory (T-Scores) | Health concerns | 2 | 50 | 64 | Abnormal |
| | Anxiety: generalized/focused | 2 | 50 | 47/51 | Normal |
| | Depression | 2 | 50 | 67 | Abnormal |
| | Acute stress | 2 | 50 | 41 | Normal |
| | Cognitive inefficiency | 2 | 50 | 53 | Normal |
| | Conversion | 2 | 50 | 51 | Normal |
| | Somatization | 2 | 50 | 57 | Normal |
| | Obsessive-compulsive | 2 | 50 | 54 | Normal |
| | Phobias | 2 | 50 | 54 | Normal |
| | Traumatic stress | 2 | 50 | 45 | Normal |
| | Depression: cognitive | 2 | 50 | 67 | Abnormal |
| | Depression: affective | 2 | 50 | 50 | Normal |
| | Depression: physiological | 2 | 50 | 74 | Abnormal |
| | Activity level | 2 | 50 | 51 | Normal |
| | Grandiosity | 2 | 50 | 49 | Normal |
| | Irritability | 2 | 50 | 43 | Normal |
| | Hypervigilance | 2 | 50 | 48 | Normal |
| | Persecution | 2 | 50 | 48 | Normal |
| | Resentment | 2 | 50 | 44 | Normal |
| | Psychotic experiences | 2 | 50 | 36 | Normal |
| | Social detachment | 2 | 50 | 46 | Normal |
| | Thinking disorder/difficulty | 2 | 50 | 73 | Abnormal |
| | Affective instability | 2 | 50 | 39 | Normal |
| | Identity problems | 2 | 50 | 44 | Normal |
| | Negative relationships | 2 | 50 | 40 | Normal |
| | Self-harm | 2 | 50 | 45 | Normal |
| | Antisocial behaviors | 2 | 50 | 43 | Normal |
| | Egocentricity | 2 | 50 | 42 | Normal |
| | Stimulus-seeking | 2 | 50 | 53 | Normal |
| | Aggressive attitude | 2 | 50 | 34 | Normal |
| | Aggression: verbal and physical | 2 | 50 | 37/42 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski



1126565    5-366-431-4
Colored Image 1-Evaluatio

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski



1126566    5-366-431-4
Colored Image 2-Evaluatio

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Helene Pilnick, PHD
*Pediatric Neuropsychology*
JoLynn Cole, MA
*Psychotherapist*

Morris Edwards, PHD
*Certified in Biofeedback*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE EXAMINATION

**Name:**            Jessica Ramsay
**DOB:**             August 29, 1990
**Procedure:**       Neurocognitive Study
**Review date:**     December 7, 2017
**Referred by:**     Self
**Performed by:**    A. Lewandowski, Ph. D., FACPN

**Reason for Exam**  Twenty-seven-year-old right-handed female with 19 years education (3 years medical school) presents for comprehensive neurocognitive diagnostic recheck pursuant to attention and learning difficulties with undetermined etiology and uncertain severity. The primary care physician is Dr. Jennifer Houtman. The preexisting neurological history is unremarkable for CNS disease, insult or injury as a child, adolescent or young adult. Neuroimaging has been completed with MRI and findings are reported to be WNL. The general medical history with *possible* implications for cognitive dysfunction is remarkable for anemia and daily migraines. The psychological history is noted for some type of cognitive testing as a 3 or 4-year-old child and more recently, a consultation three years previously with a counselor who supervised the administration of an abbreviated IQ-achievement test (records not available for review). Current medications include Adderall, Ambien, Tramadol, Xanax and Buspar.

**Technique**        Comprehensive neurocognitive examination with HRNB and allied procedures with study date on November 9, 2017. Findings and report are based on test results integrated with additional data including records, behavioral observations of the patient and all other available relevant clinical data. Additional time spent with report analysis, interpretation and integration of test data and results completed on November 16, 2017.

**Findings**         See attached graphs and summary table below for raw data.

Jessica Ramsay
Page 2

## Report

*Bold indicates low normal/abnormal findings*

| | Functional Area | Range | Findings | Guideline |
|---|---|---|---|---|
| **Intellectual Functioning** | Verbal Comprehension | 100 +/- 15 | 125 | Superior |
| | Perceptual Reasoning | 100 +/- 15 | 131 | Very superior |
| | Working Memory | 100 +/- 15 | 111 | High average |
| | **Processing Speed** | 100 +/- 15 | 79 | **Borderline impaired** |
| | General abilities (GAI) | 100 +/- 15 | 132 | Very superior |
| | Cognitive efficiency (CPI) | 100 +/- 15 | 94 | Average |
| | Overall Intellect (FSIQ) | 100 +/- 15 | 117 | High average |
| **Academic** | Reading | 100 +/- 15 | 114 | High average |
| | Spelling | 100 +/-15 | 109 | Average |
| | Written arithmetic | 100 +/- 15 | 110 | High average |
| **Neuropsychological** | Sensory speed: dominant | 50T +/- 10 | 50 | Normal |
| | Sensory speed: non-dominant | 50T +/- 10 | 47 | Normal |
| | Motor speed: dominant | 50T +/- 10 | 50 | Normal |
| | Motor speed: non-dominant | 50T +/- 10 | 48 | Normal |
| | Psychomotor: bilateral abilities | 50T +/- 10 | 47 | Normal |
| | Psychomotor: response speed | 50T +/- 10 | 55 | Normal |
| | **Sequencing: simple** | 50T +/- 10 | 35 | **Abnormal** |
| | **Sequencing: complex** | 50T +/- 10 | 27 | **Abnormal** |
| | Executive reasoning | 50T +/- 10 | 60 | Normal |
| **Attention** | Attention: complex (language) | 50T +/- 10 | 60 | Normal |
| | **Attention: complex (non-language)** | 50T +/- 10 | 35 | **Abnormal** |
| | Inattentiveness | 50T +/- 10 | 50/46/51/49/52/49 | Normal |
| | Impulsivity | 50T +/- 10 | 49/51/48 | Normal |
| | Sustained difficulties | 50T +/- 10 | 47 | Normal |
| | **Vigilance difficulties** | 50T +/- 10 | 69 | **Abnormal** (mild) |
| **Memory** | Verbal recall: immediate | 50T +/- 10 | 66 | Normal |
| | Verbal recall: short and long delay | 50T +/- 10 | 65/65 | Normal |
| | Visual recall: immediate | 50T +/- 10 | 61 | Normal |
| | **Visual recall:** short and **long delay** | 50T +/- 10 | 58/38 | Normal/**Abnormal** |

Jessica Ramsay
Page 3

| | | | | |
|---|---|---|---|---|
| **Psychological** | Health concerns | 50T +/- 10 | 64 | **Abnormal: mild** |
| | Anxiety: generalized | 50T +/- 10 | 47 | Normal |
| | Anxiety: focused | 50T +/- 10 | 51 | Normal |
| | Depression | 50T +/- 10 | 67 | **Abnormal: moderate** |
| | Acute stress | 50T +/- 10 | 41 | Normal |
| | Inefficient thinking | 50T +/- 10 | 73 | **Abnormal: significant** |

**Summary**

1. Abnormal intellectual study
   a. Intellectual *ability* is in the *Very Superior* range (98th percentile) compared to same-aged peers.
   b. Intellectual *efficiency* is only *Average* (34th percentile) compared to same-aged peers, hence reflects a statistically significant weakness in the intellectual study.
   c. The profile suggests equal bilateral aptitude on tasks known to be sensitive to both the left and right cerebral hemispheres.
   d. The pattern reflects a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions.
   e. The IQ pattern is consistent with the patient's/parent's report of premorbid functioning, suggesting a preexisting developmental delay.

2. Normal achievement study. Reading, spelling and arithmetic are normal to above normal and consistent with past education.

3. Borderline abnormal neurocognitive study.
   a. Abnormal performance is observed on measures of sequencing/cognitive shifting, sustained complex attention, and quickness of thinking (as noted above) affecting mental flexibility, cognitive efficiency and inattention with subsequent implications for learning new information and responding to assessments under timed conditions.
   b. Performance is otherwise consistent with or supersedes age-, gender-, and education-weighed norms.

Jessica Ramsay
Page 4

    4. Abnormal psychological study
        a. Elevations are observed on clinical scales associated with ill health and depression.
        b. Subscale analysis reflects significant focus and worry about personal health, feelings of failure, indecisiveness and difficulties with concentration (cognitive inefficiency), physiological symptoms associated with depression (low energy, sleep/appetite disturbance, and difficulties with concentration, decision-making, memory/learning).
        c. Emotional difficulties exacerbate the above-noted existing limitations (thought processes), and have subsequent implications for learning new information and responding to assessments under timed conditions.

**Clinical Impression**

    1. By history:

        a. Attention deficit disorder
        b. Learning difficulties affecting ability to pass standardized testing

    2. By diagnostic testing:

        a. Attention deficit disorder, hyperactive, moderate (F90.1)
        b. Learning disability, nonverbal (abnormal scanning and processing speed) (F81.9)

**Plan**

    1. Graphic findings and report to patient.
    2. Copy of findings to patient.
    3. Continue with specialized cognitive medication (dextroamphetamine) to assist with inattention, if not medically contraindicated. I defer to the patient's primary care provider who is Dr. Houtman for consideration of this recommendation. Alternatively, I can provide psychiatric consultation through my clinic as part of a conjoint psychotherapy-psychiatric treatment for the patient.
    4. Continue with medication to address emotional difficulties (zolpidem, alprazolam, and buspirone).
        a. The present study indicates that the patient's current psychological medication regimen is adequately effective, as elevations on clinical scales of depression are only approximately one and a half standard deviations greater than the average range.
        b. At present, these medications are provided by Dr. Houtman.
        c. If needed, I am happy to provide psychiatric assistance though my clinic as part of conjoint psychotherapy-psychiatric medication treatment for the patient.

Jessica Ramsay
Page 5

5. Consider psychotherapy to address mood disturbance and modulate affect.
6. Patient requests accommodations and written responses to a series of guidelines toward test accommodations for the United States Medical Licensing Examination (USMLE), Step 1. Guidelines provided by the patient were reviewed and the following accommodations are recommended:
    a. Fifty percent additional time to complete the examination or 100 percent additional time (double time) for an exam given over two days to compensate for slowed thought processing
    b. Two additional breaks during the examination to compensate for difficulties managing mood/stress.
    c. A separate and/or quiet area to complete the examination to compensate for inattention and distractibility.
7. The patient did not have accommodations for the MCAT and as a result scores reflect her inefficiency and slowed reading.
8. The patient is not at risk for operating a motor vehicle.
9. Consider a memory notebook to assist with organization and improve attention.
10. Recheck in 12 months to assist primary care in monitoring mental status.
11. Consider re-examination in 24 months for comparative analysis to baseline.
12. Discussed issues of safety and surrogate decision making, provided education regarding the diagnosis and management of health behavior changes, and directed to additional resources for support.
13. I remain available to patient regarding assessment and treatment needs.
14. I remain available to Dr. Houtman as the patient's primary care physician at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified in Neuropsychology
Clinical Assistant Professor, Western Michigan University
    Department of Psychiatry, Western Michigan University School of Medicine
    Psychology Department
    Department of Counseling Psychology and Counselor Education
    College of Health and Human Services (SPADA)
    Department of Military Science and Leadership

AGl: la

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

| | | |
|---|---|---|
| Alan Lewandowski, PHD, FACPN | Helene Pilnick, PHD | Kevin Kunzer, MD |
| *Board Certified in Neuropsychology* | *Pediatric Neuropsychology* | *Psychiatry* |
| Morris Edwards, PHD | Michael Lyons, PHD | Bangalore Ramesh, MD |
| *Certified in Biofeedback* | *Clinical Psychology* | *Psychiatry* |
| JoLynn Cole, MA | Fenimore Johnson, PHD | Katelyn Briggs, MA |
| *Psychotherapist* | *Applied Behavior Analysis* | *Psychotherapist* |

**Addendum**

Name: Jessica Ramsay (DOB: 08/29/1990)
Date: February 7, 2018

Re: Names of specific measures used in the neuropsychological examination of Jessica Ramsay on December 7, 2017

Weschler Adult Intellectual Scale, 4th edition, Wide Range Achievement Test 4th edition, Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number Writing Test, Tactile Form Recognition Test, California Verbal Learning Test, 2nd edition, Rey Osterrieth Complex Figure Test, Tactile Form Recognition Test, Grip Strength Test, Finger Oscillation, Tactual Performance Test, Trail Making Test A, Trail Making Test B, Category Test, Seashore Rhythm Test, Speech Sounds Perception Test, Personality Assessment Inventory, Aphasia Screening Test.

Neuropsychology Associates

Neuropsychology - Psychiatry - Clinical Psychology
4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292

| | | |
|---|---|---|
| Alan Lewandowski, PHD, FACPN | Helene Pilnick, PHD | Kevin Kunzer, MD |
| *Board Certified in Neuropsychology* | *Pediatric Neuropsychology* | *Psychiatry* |
| Morris Edwards, PHD | Michael Lyons, PHD | Bangalore Ramesh, MD |
| *Certified in Biofeedback* | *Clinical Psychology* | *Psychiatry* |
| JoLynn Cole, MA | Fenimore Johnson, PHD | Katelyn Briggs, MA |
| *Psychotherapist* | *Applied Behavior Analysis* | *Psychotherapist* |

May 23, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Dear Jessica,

I am responding to your request for further clarification on the neuropsychological examination completed December 7, 2017. Regarding accommodations for the USMLE Step 1, and given your additional description of the requirements of the examination, my recommendations should have read, 100% additional testing time (double time), plus additional break time.

Alan Lewandowski, PhD, FACPN
Board Certified Neuropsychologist

# EXHIBIT 27



# UNITED STATES MEDICAL LICENSING EXAMINATION ®

## STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Ramsay, Jessica Erin**

**USMLE ID:  5-366-431-4**                                  **Test Date:  July 20, 2017**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying  health, disease, and modes of  therapy.  The inclusion of  Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score§ represents your result for the administration of Step 1 on the test date shown above.

| FAIL | This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions. |
|---|---|

| 191 | This score is determined by your overall performance on Step 1. For  administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 192 is set  by  USMLE to pass  Step 1. The standard error of measurement (SEM)‡ for this scale is six points. |
|---|---|

§Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

‡Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.



DEFENDANT'S
EXHIBIT
**33**

## INFORMATION PROVIDED FOR EXAMINEE USE ONLY

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

## USMLE STEP 1 PERFORMANCE PROFILE

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **PHYSICIAN TASK** | | | |
| MK: Applying Foundational Science Concepts | xxxxxxxxx | | |
| PC: Diagnosis | | xxxxxxxxxxxxx | |
| PC: Management | | xxxxxxxxxxxxxxxx | |
| PBLI: Evidence-Based Medicine | xxxxxxxxxxxxxxxxx | | |
| **DISCIPLINE** | | | |
| Behavioral Sciences | | xxxxxxxxxxxxxxxxxx | |
| Biochemistry & Nutrition | *xxxxxxx | | |
| Genetics | xxxxxxxxxxxxxxxxx | | |
| Gross Anatomy & Embryology | xxxxxxxxxxxxxxxx | | |
| Histology & Cell Biology | *xxxxxxxxxxxxxxx | | |
| Microbiology & Immunology | *xxxxxxxxxx | | |
| Pathology | xxxxxxxxx | | |
| Pharmacology | xxxxxxxxxxxx | | |
| Physiology | xxxxxxxxxxx | | |
| **SYSTEM** | | | |
| General Principles | *xxxxxxxxxxx | | |
| Blood & Lymphoreticular and Immune Systems | xxxxxxxxxxxxxxxx | | |
| Behavioral Health & Nervous Systems/Special Senses | xxxxxxxxxxxxxxxx | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | xxxxxxxxxxxxxxxxxx |
| Cardiovascular System | xxxxxxxxxxxxxxx | | |
| Respiratory and Renal/Urinary Systems | xxxxxxxxxxxxxxx | | |
| Gastrointestinal System | xxxxxxxxxxxxxxxx | | |
| Reproductive & Endocrine Systems | xxxxxxxxxxxxxx | | |
| Multisystem Processes & Disorders | xxxxxxxxxxxxxxxxx | | |
| Biostatistics & Epidemiology/Population Health | xxxxxxxxxxxxxxxxxx | | |

The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

**This profile should not be compared to those from other Step 1 administrations.**

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials*.

MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement

NBME00195

# EXHIBIT 28



OXFORD JOURNALS
OXFORD UNIVERSITY PRESS

Archives of Clinical Neuropsychology 25 (2010) 89–98

Archives
of
CLINICAL
NEUROPSYCHOLOGY

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

# An Investigation of Methods to Detect Feigned Reading Disabilities

Allyson G. Harrison*, Melanie J. Edwards, Irene Armstrong, Kevin C.H. Parker

*Department of Psychology, Queen's University, Kingston, Ontario, Canada*

*Corresponding author at: Department of Psychology, Queen's University, Kingston, Ontario, Canada K7L 3N6. Tel.: +1-613-533-6311;
fax: +1-613-533-6564. *E-mail address:* harrisna@queensu.ca (A.G. Harrison).

Accepted 8 December 2009

**Abstract**

No clinically proven method currently exists to determine if a test taker is feigning or exaggerating symptoms of a specific reading disability (RD) for potential secondary gain (i.e., extra time on examinations, access to bursary funds, or tax benefits). Our objective was to examine the utility of previously proposed symptom validity measures (i.e., the Dyslexia Assessment of Simulation or Honesty [DASH] and the resulting Feigning Index [FI]) in discriminating students with genuine RDs from sophisticated simulators given ample time to prepare, who were warned that noncredible performance could be detected. The DASH correctly classified almost 83% of coached simulators with no false positives. The FI accurately classified 86% of post-secondary students feigning RD without misidentifying any students with a genuine RD, resulting in 91.8% overall classification accuracy. These two methods show promise as a means of detecting noncredible performance in the assessment of RD.

*Keywords:* Developmental and learning disabilities; Malingering/symptom validity testing; Assessment

## Introduction

Students with disabilities are entering the post-secondary educational sector in increasing numbers (Blackorby & Wagner, 1996; Canadian Association of Disability Service Providers in Postsecondary Education, 1999; Harrison & Wolforth, 2006; McGuire, 1998). Within this population, learning disorders (LDs) are the most frequently accommodated disabilities, affecting almost half of all students receiving services (Harrison & Wolforth, 2006; Ministry of Training, Colleges and Universities, 2008). Normal learning is affected in these individuals due to impairments of neuropsychological processes (Ghelani, Sidhu, Jain, & Tannock, 2004; Kibby, Marks, Morgan, & Long, 2004; Learning Disabilities Association of Ontario, 2003). When those impairments are well accommodated, learning improves substantially. Because of the potential economic and academic benefits of obtaining an LD diagnosis, concerns have been raised regarding the possibility that unimpaired students might feign LDs in order to gain access to these accommodations and supports (Harrison, Edwards, & Parker, 2007; Mullis, 2003; Sullivan, May, & Galbally, 2007).

Students may exaggerate symptoms for a number of reasons and may not always qualify for the label of "malingering" (Kane, 2008). For instance, students seeking updated psychoeducational assessments may be motivated to exaggerate or magnify actual symptoms in order to ensure retention of accommodations provided to them throughout their high-school career (Harrison, Larochette, & Nichols, 2007). These students often come to rely on accommodations such as extra time and a computer and may fear losing them if they now perform adequately on tests of reading speed or decoding. This is of considerable concern because low motivation to perform optimally may invalidate test results and reduce the diagnostic accuracy. Another factor that may interfere with accurate interpretation of test scores and, consequently, incorrect diagnosis is unwillingness to put forth good effort on activities that are frustrating or unappealing (Adelman, Lauber, Nelson, & Smith, 1989).

Until recently, most clinicians assumed that students could not feign a specific LD, such as a reading disability (RD; Alfano & Boone, 2007), and that the base rate for such malingering in psychoeducational assessments was very low; however, this has

© The Author 2010. Published by Oxford University Press. All rights reserved. For permissions, please e-mail: journals.permissions@oxfordjournals.org.
doi:10.1093/arclin/acp104    Advance Access publication on 10 January 2010

EXHIBIT
75

proven not to be the case. Indeed, Sullivan and colleagues (2007) demonstrated that approximately 16% of post-secondary students undergoing evaluations for LD at their clinic failed a relatively easy symptom validity test (SVT), calling the reliability of their remaining scores into question. Similarly, Harrison, Edwards, and Parker (2008) demonstrated that psychological tests commonly employed in the assessment of RD can be easily manipulated by those instructed to feign a disability. For example, on tests of reading speed, phonological decoding, and visual processing, such students returned scores that were equally or more impaired than those produced by students with genuine RD. This clearly demonstrates the need for an SVT specific to those feigning or exaggerating symptoms of an RD and supports the position taken by Alfano and Boone (2007, p. 373) that "Effort in specific populations is best detected by tests designed to address layperson notions of the deficits associated with that population's disorder'. Not only will development of such an RD-specific SVT improve diagnostic accuracy, but it will also ensure that those who are not truly disabled cannot easily obtain the academic accommodations, financial supports, and other secondary gains derived from being given this diagnosis. A meta-analysis conducted by Alfano and Boone (2007) found that base rates of malingered LD and/or ADHD in post-secondary settings may equal those found in the medical-legal arena, indicating that the incidence of feigned RD is much greater than initially suspected.

In the field of neuropsychology, it is now generally accepted that SVTs must be included in any assessment occurring in a medico-legal or disability-application context (Bush et al., 2005; Green, 2007; Green et al., 2001; Iverson, 2007; Larrabee, 2003). Unfortunately, most of the currently published tests of effort or symptom validity were developed in the context of evaluating individuals feigning memory impairments and may therefore not be sensitive to individuals feigning a specific RD (Alfano & Boone, 2007). Given that students are successfully able to feign many symptoms of RD (Harrison et al., 2008), the question that remains is how best to identify such behavior when it occurs, so as to accurately interpret test scores.

Osmon, Plambeck, Klein, and Mano (2006) were the first to investigate ways to identify those feigning a reading disorder. In their study, two simulation groups were instructed to feign either reading speed or word decoding impairments. When compared with students told to exert good effort, students simulating an RD showed poor performance on a widely used neuropsychological SVT (Green's Word Memory Test [WMT; Green, 2003]). However, although scores on the WMT were highly specific (96%), they were relatively less sensitive to malingering of RD (65%). In contrast, Osmon and colleagues demonstrated that an experimental SVT, the Word Reading Test, was 90% sensitive in identifying reading simulators and 74% sensitive to speed simulators as well, both with 100% specificity. These researchers concluded that the Word Reading Test was more effective than the WMT in detecting feigned RD and advised that any SVT developed to identify individuals feigning RD must address the layperson's notion of how this disorder presents itself.

A similar study was conducted by Frazier and colleagues (2008), in which they demonstrated that two commonly used SVTs (the Victoria SVT [Slick, Hopp, Strauss, & Thompson, 1997] and the Validity Indicator Profile [Frederick, 2003]) could both differentiate simulated RD students from honest respondents at fairly high rates of specificity and sensitivity. The difficulty with both of these studies, however, is that neither included individuals with RD to ensure that these SVTs are insensitive to the actual cognitive impairments demonstrated by those with this condition. In other words, any SVT to be employed in identification of those feigning or exaggerating symptoms of RD must also ensure a low or nonexistent false-positive rate.

The Dyslexia Assessment of Simulation or Honesty (DASH) and the Feigning Index (FI) derived from it have already shown promise as measures of malingered dyslexia, at least in a preliminary investigation (Harrison et al., 2008). The premise of the DASH is based on the work of Rawlinson (1976), who found that scrambling letters in the middle of words (leaving the first and last letters in place) had little or no effect on the ability of skilled readers to understand the text. Davis (2003) expanded on this early research and noted that adults can read mixed-up words if they are small, if key letters are kept together (like "sh" or "th"), or if the word cannot be confused with many other words. The DASH presents Grade 3 reading level passages adapted from the Gray Oral Reading Test (Wiederholt & Bryant, 2001) that have been randomized in either an easy (letters scrambled according to the principles identified by Davis) or difficult (letters within words scrambled randomly) manner, and also includes two timed practice trials (one with nonscrambled words and one with scrambled words). These passages are presented on paper to subjects, who are instructed to unscramble the words and read the passages out loud as quickly as possible. Although this task appears difficult, preliminary investigations showed that post-secondary level students with RD did not find the practice and easy passages challenging to read and that their rate and accuracy were not substantially different from that of their nondisabled peers (Harrison et al., 2008). In contrast, students feigning RD read these passages more slowly and made significantly more errors on other commonly used achievement tests than did either controls or true RD students.

Harrison and colleagues (2008) developed an FI derived from the DASH and other achievement test scores to compare the performance of both honest responders and students diagnosed with RD to those obtained from analog malingerers asked to feign symptoms of RD. Initial piloting of the DASH showed that although it was not able to accurately identify all naïve simulators feigning RD, the FI demonstrated a 75% hit rate and a 0% false-positive rate. Although a strength

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

in the design of this initial study was the inclusion of actual students diagnosed with RD, it remains unclear whether the FI is able to identify the efforts of more sophisticated malingerers who have researched ways of successfully feigning symptoms. Moreover, recent research suggests that coached simulators in other contexts may be better able to feign a disability and avoid detection (e.g., Frederick, Sarfaty, Johnston, & Powel, 1994; Inman & Berry, 2002; Martin, Bolter, Todd, Gouvier, & Niccolls, 1993; Orey, Cragar, & Berry, 2000; Shum, Gorman, & Alpar, 2004). Further replication of these findings using a different sample of students with RD, as well as a more sophisticated group of malingerers, was therefore necessary.

The present study sought to validate the DASH and the FI to determine how well they could identify individuals who had taken time to research ways to feign RD. We expected that students who invested more time and effort exploring means of feigning RD would be able to avoid detection, especially if they were informed ahead of time that noncredible performance could be detected. It was thought that the DASH and the FI would be less sensitive to these sophisticated simulators compared with the scores returned by naïve simulators as reported by Harrison and colleagues (2008) and that the scores obtained by the sophisticated malingerers on achievement and processing tests would more closely mirror those returned by students with true RD.

## Materials and Methods

### Participants

We recruited two groups of students for the present study, none of whom had been included in the earlier study investigating the DASH. Students in both groups consented to participate in the present ethics-approved study: Group 1 were reading disabled students ($n = 20$) diagnosed at a university-based regional assessment center between 2008 and 2009; Group 2 were sophisticated malingerers ($n = 29$), comprised of upper year education or psychology students who had received a 1-hr guest lecture on learning disabilities and then were invited to take part in a study evaluating their ability to successfully feign an RD. Although each subject in the sophisticated malingering group was informed they would be paid $10 for their participation, they were additionally motivated to perform well by hearing that they could double this amount if they performed in a manner that was credible and avoided detection of malingering (c.f. Frederick et al., 1994; Inman & Berry, 2002; Martin et al., 1993; Orey et al., 2000; Shum et al., 2004). However, all participants received $20 after they completed the task regardless of performance.

None of the sophisticated malingerer group had a current diagnosis of a learning disability nor was any receiving scholastic accommodation, but one participant had been diagnosed with a learning disability at an earlier time. (This participant self-described as a good reader, spoke English as a first language and did not have family members with a learning disability.) All of these students enjoyed reading and only one participant self-described as a poor reader. Two participants' first language was not English and one of these participants also read first in a language other than English. Three participants had family members with a learning disability. These participants were not excluded from the analyses because persons who already have some understanding of reading problems might in fact be better able to dissimulate.

Twenty students were diagnosed with a reading disorder at our clinic during the span of the study, and all agreed to participate. RD students in Group 1 had met the DSM-IV diagnostic criteria for a reading disorder, demonstrating a significant discrepancy between measured intellectual functioning and actual academic achievement. In addition, they also met the more stringent Learning Disabilities Association of Ontario (2003) definition of a specific RD, which requires there also be evidence that the academic discrepancy is logically related to measurable deficits in the processes underlying reading (e.g., phonological awareness, naming, or processing speed [PS]). All tests except the DASH had been administered prior to diagnosis. In an effort to ensure that the pattern of test scores obtained from those with RD was an accurate reflection of actual ability, the validity of the obtained test scores for this group was initially evaluated using the Slick, Sherman, and Iverson (1999) criteria. A diagnosis of RD was rendered only if the subject failed to show evidence of malingered neurocognitive dysfunction, assessed in part by the Green WMT (Green, 2003), an instrument that has been used in many other studies as a proxy measure of test taking effort (e.g., Bauer, O'Bryant, Lynch, McCaffrey, & Fisher, 2007; Flaro, Green, & Robertson, 2007; Iverson, Green, & Gervais, 1999; Suhr et al., 2008; Sullivan et al., 2007). In other words, failure on this or any other of the criteria outlined by Slick and colleagues meant that a diagnosis was not provided as their was reasons to suspect that low effort or motivation may have negatively influenced test performance (c.f. Green, Rohling, Lees-Haley, & Allen, 2001). Furthermore, as an additional safeguard to ensure honest responding, the DASH was administered to RD students only after they had received a diagnosis and had been given their assessment report.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*A.G. Harrison et al. / Archives of Clinical Neuropsychology 25 (2010) 89–98*

*Materials*

In order to estimate overall intelligence, the sophisticated malingering group completed the North American Adult Reading Test (NAART; Uttl, 2002) before receiving specific study instructions. Research has generally reported moderately high correlations between the NAART and the measures of general intellectual ability (Crawford, Stewart, Cochrane, Parker, & Besson, 1989; Strauss, Sherman, & Spreen, 2006; Wiens, Bryan, & Crossen, 1993). RD subjects had already been assessed with the Wechsler Adult Intelligence Scale-III (Wechsler, 1997) as part of their evaluation, and so did not complete the NAART.

Subjects in both groups (RD and sophisticated) completed the newly developed DASH (Harrison et al., 2008), which involves subjects being asked to read a series of Grade 3 reading level passages aloud as quickly and accurately as possible. First, participants read a very short (40 words) nonscrambled practice passage (DASH A), followed by a short (52 words) practice passage (DASH B), where the letters in larger words are scrambled in an easy manner (e.g., baking spelled "bkaing"), but with two- and three-letter words remaining unchanged, allowing for contextual clues to assist in reading the scrambled words (e.g., "The boy was bkaing a cake for moethr"). Next, participants read a set of two scrambled reading passages. Passage 1 was comprised of 104 words, and Passage 2 had 106 words. (To protect the integrity of the DASH, more detail about the content of the passages has not been included in this paper. Interested readers may contact the corresponding author to obtain a copy of the DASH.) Completion times for all of the DASH passages were recorded, as were the number of errors made, number of extra attempts taken, and number of words skipped or passed. (Errors = words pronounced incorrectly; extra attempts = the extra times words were read or partly read either correctly or incorrectly; skips = words inadvertently missed; passes = words the subject openly said would be passed.)

All participants also completed five subtests from the Woodcock Johnson Psychoeducational Battery-III (WJPB-III; Woodcock, McGrew, & Mather, 2001). The reading fluency (RF) test is a time-limited, norm-based measure of reading speed and accuracy. Letter–word identification and word attack measure phonological processing and decoding skills when reading regular and nonsense words, respectively. Weak ability in these areas is often used as evidence of RD. The PS index is comprised of two timed measures, visual matching (VM), and decision speed (DS). The WJPB-III tests were chosen because academic accommodations such as extra time are frequently recommended for students with RD on the basis of poor performance on timed tests or reading and/or PS. It is also true that speed of information processing deficits have been implicated in LD (Weiler et al., 2000), and it would be important to know how vulnerable such tests are to deliberate manipulation.

*Procedure*

Students comprising the sophisticated malingering group initially met with a research assistant who first administered the NAART and then provided them with test instructions. These included information regarding the secondary gains that may be available to students who feign in a believable manner and instructions to use all resources available to them in an effort to research how best to feign an RD in a nondetectable manner (i.e., without being caught; copies of the specific instructions given to these participants may be requested from the corresponding author). We asked that they keep track of the websites from which they derived their information. Similar to the Harrison and colleagues (2008) study, these students were also provided with the DSM-IV criteria for diagnosis of a reading disorder, and a list of common symptoms found in those with RD. All other experimental tasks were administered to the sophisticated malingerers seven days later, after they had had time to research reading disorders.

Malingering participants completed the remaining tasks in the following order: The DASH, letter–word identification, word attack, RF, VM, and DS. Participants were debriefed following completion of these measures. During the debriefing, participants were asked what strategies they used to fake RD, and these responses were recorded. They also answered four post-test questions pertaining to strategies employed when feigning, perceived motivation associated with cash prize, perceived success in feigning, and overall effort invested in the task.

As noted above, all RD subjects had completed these same tests as part of their assessment and were given the DASH only after being provided with a diagnosis of RD.

**Results**

Table 1 shows the demographic information regarding these subjects. The mean level of intelligence in the two groups was not significantly different, $t_{25} = 1.58$, $p > .05$. When scores were collapsed across all scales, the sophisticated malingerers scored lower than the RD group on all WJPB-III scales, $F(1, 45) = 63.6$, $p < .001$, $r = .77$, Cohen's $d = 2.4$. Pairwise comparisons by subtest confirmed the difference (all $ps \le .001$, *see* Table 2). Using the WJPB-III subtests, we found that the sophisticated malingerers were very good at appearing to have a reading impairment. Given, however, that there was almost no

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*A.G. Harrison et al. / Archives of Clinical Neuropsychology 25 (2010) 89–98*     93

**Table 1.** Demographic details by instructional group

| | Group | |
| --- | --- | --- |
| | Reading disabled | Sophisticated malingerers |
| *n* | 20 | 29 |
| Age | | |
|   *M* | 20.8 | 20.7 |
|   *SD* | 3.7 | 1.9 |
|   Min | 17 | 19 |
|   Max | 32 | 28 |
| Sex | | |
|   Percent men | 50 | 34.5 |
|   Percent women | 50 | 65.6 |
| FSIQ/NAART | | |
|   *M* | 104 | 108.5 |
|   *SD* | 12.0 | 5.5 |

**Table 2.** Woodcock Johnson Test Battery Mean Scaled Scores and percentage of participants with scores less than 80 and 85, by group

| Group | Letter–word identification | Word attack | Reading fluency | Processing speed[a] |
| --- | --- | --- | --- | --- |
| WJPB-III subtest | | | | |
|   Reading disabled | 85.1 (11.2) | 80.9 (11.8) | 82.9 (8.5) | 93.3 (8.5) |
|   Sophisticated malingerers | 65.6 (18.6)* | 64.7 (19.5)* | 64.4 (8.6)* | 51.8 (21.1)* |
| Scaled scores cut at 80 | | | | |
|   Reading disabled | 5 (25%) | 9 (45%) | 9 (45%) | 0 |
|   Sophisticated malingerers | 19 (66%)* | 23 (79%)* | 25 (86%)* | 26 (90%)* |
| Scaled scores cut at 85 | | | | |
|   Reading disabled | 9 (45%) | 12 (60%) | 13 (65%) | 2 (10%) |
|   Sophisticated malingerers | 26 (90%)* | 25 (86%)* | 25 (86%)* | 28 (97%)* |

*Note:* WJPB-III = Woodcock Johnson Psychoeducational Battery-III. $n = 20$ for reading disabled and $n = 29$ for sophisticated malingerers. Values are given in Mean scores (*SD*s).

[a]Combined score based on performance of WJPB-III visual matching and decision speed.

*RD − malingering difference significant at $p \leq .01$.

overlap in test scores between groups, they also appeared to overdo the degree of impairment demonstrated. Cut-off values employed by Harrison and colleagues (2008) for the WJPB-III scaled scores (80 and 85) were again used as proxy measures of impaired reading or processing, corresponding to scores below the 10th percentile and scores greater than 1 *SD* below the mean, respectively. Table 2 provides the percentage of each group flagged as having impaired functioning using both cut-off scores. Of note, the sophisticated malingerers were successful at achieving low scaled scores on each of the four measures using either cut point criterion. Indeed, 66% of the feigners scored below threshold on all four of the WJPB-III scales, whereas only 65% of the RD group scored below threshold on even one of the WJPB-III scales.

Performance on the DASH items varied by group. As seen in Fig. 1, the sophisticated malingering group took more time than the RD group to read both the practice and test passages. As shown in Fig. 2, the sophisticated malingerers made more errors ($p < .001$), skips ($p < .05$), and extra attempts ($p < .01$) than did the RD group. In contrast, malingerers did not make more passes than the RD group ($p > .75$).

We used the raw DASH scores (i.e., time taken for each passage in seconds, number of errors, skips, extra attempts, and passes made) in a discriminant function analysis to investigate classification accuracy of participants. Table 3 shows the result of the "leave out one" classification. No RD participant was incorrectly defined as malingering, and a total of five malingerers were incorrectly defined as Honest, resulting in a total classification accuracy of 89.8%. Variables that contributed most strongly to the discrimination included all of the variables that contribute to the FI were weighted highly in the DFA, as was time to complete the difficult DASH passage. Variables related to the number of passes contributed minimally to the final discrimination.

### Feigning Index

On the basis of a set of variables that best discriminated between the various groups, Harrison and colleagues (2008) derived an FI from certain DASH variables as well number of errors and abnormally low scores from the WJPB. This index allowed for

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019



**Fig. 1.** Reading time on the DASH items as a function of passage difficulty and group membership.



**Fig. 2.** Error measures on the DASH items as a function of passage difficulty and group membership.

classification of an individual test taker as belonging to either the feigning or the honestly performing (including RD students) group. The positive predictive value for this FI was 100%, with a negative predictive value of 65%.

In the present study, the FI correctly classified 91.8% of the total sample with a positive predictive value of 100% and a negative predictive value of 90% (Table 4). These figures were consistent with those reported by Harrison and colleagues. Only four malingerers were incorrectly classified; of these, all but one produced a scaled score below 80 on WJPB subtests for PS and RF, and only one had a score below 80 on WJPB subtests for letter–word recognition and word attack skills; this increased to two participants when the cut score was set at 85. A chi-squared analysis ($\chi^2 = 35.2$ $p < 0.001$, Fishers exact test $p < 0.001$) suggests that the rate of identification of feigners by the FI is better than one would expect by chance alone even in the current sample where feigners outnumbered those with RD.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

**Table 3.** Discriminant function analysis using raw DASH values

| Actual group | Predicted group membership | |
|---|---|---|
| | Reading disabled ($n = 20$) | Sophisticated malingerers ($n = 29$) |
| Reading disabled | 20 (100%) | 0 |
| Sophisticated malingerers | 5 (17.2%) | 24 (82.8%) |
| Sensitivity .828 | PPV 1.00 | Canonical correlation .806 |
| Specificity 1.00 | NPV .8 | Wilk's Lambda .351 |
| $df = 12$ | $p < .001$ | |
| 89.8% correctly classified | 77.6% cross-validated | |

*Notes:* DASH = Dyslexia Assessment of Simulation or Honesty; PPV = the probability that an individual who receives a low score is actually malingering; NPV = the probability that an individual with a normal score is responding honestly.

**Table 4.** Discriminant function analysis using the Feigning Index

| Actual group | Predicted group membership | | |
|---|---|---|---|
| | Reading disorder ($n = 20$) | Sophisticated malingerers ($n = 29$) | |
| Reading disorder | 20 | 0 | |
| Sophisticated malingerers | 4 (13.8%) | 25 (86.2%) | |
| Sensitivity = .862 | PPV = 1.00 | Canonical Correlation = .889 | $df = 1$ |
| Specificity = 1.00 | NPV = .901 | Wilk's lambda = .210 | $p < .001$ |

*Notes:* PPV = the probability that an individual who receives a low score is actually malingering; NPV = the probability that an individual with a normal score is responding honestly. Overall cases correctly classified: 91.8%.

**Table 5.** Listing of the strategies (>10%) used by malingering participants to appear dyslexic

| Strategy | Percentage of reporting |
|---|---|
| Reversed, mixed letters, and numbers | 64.3 |
| Use synonyms or made up words | 57.1 |
| Read slowly | 53.6 |
| Read phonetically | 42.9 |
| Skip words, letters, lines | 39.3 |
| Look/act stressed/distracted | 25 |
| Read haltingly, monotone | 17.9 |
| Be accurate with simple words | 17.9 |
| Perform better on nonword tests | 10.7 |

*Strategies Used by the Sophisticated Malingerers*

Participants in the malingering group were asked to describe the amount of time spent learning about RD, the amount of effort they put forth, estimate their success at faking an RD, and whether or not the cash incentive motivated their efforts. Table 5 lists the strategies that were used by at least 10% of the group.

Scores on the FI were not associated with any of the following measures: Participants' estimate of their success at faking dyslexia, the amount of time participants spent researching dyslexia, nor the motivational factor attached to the cash incentive. However, the FI was associated with participants' perception of their effort. Those who perceived their effort to be highest also scored higher on the FI ($r = .39$, $p < .05$). In other words, the harder participants felt they had tried to fake bad, the more easily they were detected.

**Discussion**

We sought to validate the DASH and the FI to determine how well these measures could identify individuals who had taken time to research ways to feign RD in a credible manner in comparison with students with carefully diagnosed reading disabilities.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

In contrast to expectations, sophisticated malingerers were not good at avoiding detection, either by the DASH alone or by using the FI. This was despite the fact that the sophisticated feigning group were better able to produce achievement scores lower than those returned by students with true RD, meaning that on the basis of test scores alone these subjects would have succeeded in feigning RD in almost all cases. The results of the present study therefore provide strong support for the inclusion of an SVT when evaluating post-secondary students for the presence a reading disorder, and point to the vulnerability of such tests to manipulation without the addition of valid measures of effort and motivation.

The DASH appears to work well in large part because those feigning RD tend to overdo the symptoms they are producing, and this tendency has been documented in feigning of other disorders (c.f. Liljequist, Kinder, & Schinka, 1998; Wiggins & Brandt, 1988). In general, those feigning RD read even the easy, nonscrambled practice passages more slowly than did almost all of the true RD subjects, and exaggerated their deficits in an even less credible fashion when asked to decode the scrambled text. Hence, as is true of other popular SVTs, having normative data regarding the performance of those with a true disability allows for even greater classification accuracy when identifying those who are feigning or exaggerating symptoms.

Although the DASH alone achieved an acceptable rate of classifying participants, the present study confirmed that the FI derived from DASH scores plus scores from commonly used WJPB-III subtests produced an even more accurate method of identifying students motivated to feign RD. Although the FI achieved a zero percent false-positive rate, it was also able to accurately classify over 86% of the feigning subjects, a hit rate that is unusual for most SVTs. Further, the 100% positive predictive value coupled with a high negative predictive value is consistent with the previous findings of Harrison and colleagues (2008), indicating the excellent ability of the FI to provide an accurate means of identifying those feigning RD for some reason. Although Osmon and colleagues (2006) were able to correctly classify between 74% and 90% of simulators in comparison with honest students, their experimental Word Reading Test has not yet demonstrated good specificity and sensitivity when discriminating malingerers from genuinely disabled students.

Of those students who successfully avoided detection, one might suppose that they were not very motivated to feign in general, and perhaps simply failed to follow the instructions and just answered all items honestly. This did not prove to be the case, as almost all of those who avoided detection by the FI produced scores on the WJPB subtests that fell within the impaired range as defined in this study. Clearly, there are some students who are able to produce scores that would be interpreted as indicative of an RD and who would also evade detection using the FI. No observable pattern was found in the present study to better identify these individuals; more research is therefore needed to help determine how best to detect such students.

Clinicians may worry that the use of SVTs in psychoeducational assessments could wrongly accuse students of "faking;" however, the results of this investigation show that while simply using achievement scores can indeed result in misclassification of true RD, inclusion of scores from an SVT such as the FI were extremely specific, correctly classifying 86% of the feigning group and 100% of the RD subjects. In this sample, no one would have been falsely accused.

The strategies employed by sophisticated malingerers in an effort to convincingly feign RD differed in interesting ways from those used by the naïve feigners in the Harrison and colleagues (2008) study. Indeed, sophisticated feigners reported that their main strategy was to either reverse or mix up letters or numbers, followed by using synonyms or made up words when reading. Reading slowly was a strategy employed by just over half of the subjects. In contrast, the main feigning strategy reported in the original study (employed by 68% of the students) was to just read more slowly, followed by completing timed tasks more slowly, mispronouncing words, or skipping words, sentences, or lines. This finding echoes that reported by Osmon and colleagues (2006) suggesting that there is no consistency with respect to strategies chosen by those attempting to feign RD, although all strategies employed seem to mirror the lay person's notions of RD. Given that not all who feign RD use the same strategy, it was encouraging to find such a high rate of identification when using the DASH and the FI and suggests that these may be a useful adjunct to any assessment of such disorders.

Unlike studies of sophisticated malingering in the area of brain injury research (e.g., Inman & Berry, 2002; Martin et al., 1993; Orey et al., 2000; Shum et al., 2004), the present study found that none of the information readily accessed by motivated students helped them avoid detection of their deceit. The reason for this may be that although information exists to assist students in producing credible symptom profiles on standard achievement tests, no information is easily available regarding the use of SVTs in psychoeducational assessments. Thus, it is possible that even sophisticated malingerers are currently unaware of the methods used to identify noncredible performance in assessment of RD. Given the research by Ruiz, Drake, Glass, Marcotte, and Van Gorp (2002) showing how easily students could independently discover information on the internet to allow them to escape detection when feigning psychiatric symptoms, it was heartening to discover that similar information about symptom validity testing is not yet widely available in the context of RD assessment. It will therefore be important to protect the integrity of any SVTs developed in this context to minimize the risk that their use becomes widely known and publicized.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*Limitations*

Although we tried to ensure that all those diagnosed with RD were performing honestly, it is possible that some may not have performed in a credible manner on some aspects of the tests administered. Future studies should therefore administer all WJPB subtests after the diagnosis is rendered to avoid any possible effects of secondary gain on test performance.

It is also possible that the malingering group did not have the same motivation or access to information as would students undergoing a re-assessment to determine whether accommodations will be provided at the post-secondary level. Given that students at the secondary-school level are currently provided with academic accommodations and supports without requiring a formal diagnosis of a disability (Harrison, Larochette, et al., 2007), it is possible that such students fear the academic consequences of losing their long-standing accommodations and may be more savvy regarding the types of deficits expected from persons with RD, especially if they have been working around and writing tests with those who really do have disabilities. Future studies should therefore attempt to include a group of students who have specific knowledge of RD based on first-hand experience. Future studies should also include groups of poor readers to investigate the specificity of the DASH and the FI in such populations.

Given the relatively small sample size and the overrepresentation of those feigning RD, the classification rates may not be stable. Replication with a larger sample is therefore warranted.

In conclusion, our results provide a strong support for the use of the DASH and the FI in the detection of students presenting with noncredible symptoms of a reading disorder. With perfect specificity and a high level of sensitivity, both measures promise to aid clinicians in more accurately diagnosing specific reading disorders when they are present. The utility of the DASH and FI should now be investigated more broadly in a variety of settings with different clinical groups.

**Funding**

Partial funding for this research was generously provided by the National Academy of Neuropsychology Clinical Research Grant. The publication's contents are solely the responsibility of the authors and do not necessarily represent the views of the funding agency.

**Conflict of Interest**

None declared.

**References**

Adelman, H. S., Lauber, B., Nelson, P., & Smith, D. (1989). Minimizing and detecting false positive diagnoses of learning disabilities. *Journal of Learning Disabilities*, *22*, 234–244.

Alfano, K., & Boone, K. B. (2007). The use of effort tests in the context of actual versus feigned attention-deficit/hyperactivity disorder and learning disability. In K. B. Boone (Ed.), *Assessment of feigned cognitive impairment: A neuropsychological perspective*. (pp. 366–383). New York: Guilford Press.

Bauer, L., O'Bryant, S. E., Lynch, J. K., McCaffrey, R. J., & Fisher, J. M. (2007). Examining the Test of Memory Malingering Trial 1 and Word Memory Test Immediate Recognition as screening tools for insufficient effort. *Assessment*, *14*, 215–222.

Blackorby, J., & Wagner, M. (1996). Longitudinal postschool outcomes of youth with disabilities: Findings from the National Longitudinal Transition Study. *Exceptional Children*, *62*, 399–413.

Bush, S., Ruff, R., Troster, A., Barth, J., Koffler, S., Pliskin, N., et al. (2005). Symptom validity assessment: Practice issues and medical necessity. Official position of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology*, *20*, 419–426.

Canadian Association of Disability Service Providers in Postsecondary Education. (1999). *Towards developing professional standards for students with disabilities in postsecondary education in Canada*. Ottawa, ON: Author.

Crawford, J. R., Stewart, L. E., Cochrane, R. H., Parker, D. M., & Besson, J. A. (1989). Construct validity of the National Adult Reading Test: A factor analytic study. *Personality and Individual Differences*, *10*, 585–587.

Davis, M. (2003). Aoccdrnig to a rscheearch at Cmabrigde Uinervtisy. Retrieved July 25, 2005, from http://www.mrc-cbu.cam.ac.uk/_mattd/Cmabrigde/.

Flaro, L., Green, P., & Robertson, E. (2007). Word Memory Test failure 23 times higher in mild brain injury than in parents seeking custody: The power of external incentives. *Brain Injury*, *21*, 373–383.

Frazier, T. W., Frazier, A. R., Busch, R. M., Kerwood, M. A., & Demaree, H. A. (2008). Detection of simulated ADHD and reading disorder using symptom validity measures. *Archives of Clinical Neuropsychology*, *23*, 501–509.

Frederick, R. I. (2003). *VIP (Validity Indictor Profile) manual*. Minneapolis, MN: NCS Pearson.

Frederick, R. I., Sarfaty, S. D., Johnston, D. J., & Powel, J. (1994). Validation of a detector of response bias on a forced-choice test of nonverbal ability. *Neuropsychology*, *8*, 118–125.

Ghelani, K., Sidhu, R., Jain, U., & Tannock, R. (2004). Reading comprehension and reading related abilities in adolescents with reading disabilities and attention-deficit/hyperactivity disorder. *Dyslexia*, *10*, 364–384.

Green, P. (2003). *Word Memory Test for Windows: User's manual and program*. Edmonton, AB: Green's Publishing.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

98                              *A.G. Harrison et al. / Archives of Clinical Neuropsychology 25 (2010) 89–98*

Green, P. (2007). Spoiled for choice: Making comparisons between forced-choice effort tests. In K. Boone (Ed.), *Malingering of neurocognitive disorders* (pp. 50–77). New York: Guilford Press.

Green, P., Rohling, M. L., Lees-Haley, P. R., & Allen, L. M. (2001). Effort has a greater effect on test scores than severe brain injury in compensation claimants. *Brain Injury, 15,* 1045–1060.

Harrison, A. G., Edwards, M. J., & Parker, K. C. H. (2007). Identifying students faking ADHD: Preliminary findings and strategies for detection. *Archives of Clinical Neuropsychology, 22,* 577–588.

Harrison, A. G., Edwards, M. J., & Parker, K. C. H. (2008). Identifying students feigning dyslexia: Preliminary findings and strategies for detection. *Dyslexia, 14,* 228–246.

Harrison, A. G., Larochette, A., & Nichols, E. (2007). Students with learning disabilities in postsecondary education: Selected initial characteristics. *Exceptionality Education Canada, 17,* 135–154.

Harrison, A. G., & Wolforth, J. (2006). *Results from a national survey of disability service providers in the Canadian post-secondary system.* Unpublished manuscript.

Inman, T. H., & Berry, D. T. R. (2002). Cross-validation of indicators of malingering: A comparison of nine neuropsychological tests, four tests of malingering and behavioral observations. *Archives of Neuropsychology, 17,* 1–23.

Iverson, G. (2007). Identifying exaggeration and malingering. *Pain Practice, 7,* 94–102.

Iverson, G., Green, P., & Gervais, R. (1999). Using the Word Memory Test to detect biased responding in head injury litigation. *Journal of Cognitive Rehabilitation, 17 (2),* 4–8.

Kane, S. (2008). Minimizing malingering and poor effort in the LD/ADHD evaluation process. *ADHD Report, 16 (5),* 5–9.

Kibby, M. Y., Marks, W., Morgan, S., & Long, C. J. (2004). Specific impairment in developmental reading disabilities: A working memory approach. *Journal of Learning Disabilities, 37,* 349–363.

Larrabee, G. J. (2003). Detection of malingering using atypical performance patterns on standard neuropsychological tests. *Clinical Neuropsychologist, 17,* 410–425.

Learning Disabilities Association of Ontario. (2003). *Recommended best practices for assessment, diagnosis and documentation of learning disabilities.* Retrieved August 4, 2005, from http://www.ldao/resources/education/pei/assessment/Diagnostic%20Criteria_-Sept%2003.pdf.

Liljequist, L., Kinder, B. K., & Schinka, J. (1998). An investigation of malingering post-traumatic stress disorder on the Personality Assessment Inventory. *Journal of Personality Assessment, 71,* 322–336.

Martin, R. C., Bolter, J. F., Todd, M. E., Gouvier, W. D., & Niccolls, R. (1993). Effects of sophistication and motivation on the detection of malingered memory performance using a computerized forced-choice task. *Journal of Clinical and Experimental Neuropsychology, 15,* 867–880.

McGuire, J. M. (1998). Educational accommodations: A university administrator's view. In M. Gordon, & S. Keiser (Eds.), *Accommodations in higher education under the Americans with Disabilities Act (ADA): A no-nonsense guide for clinicians, educators, lawyers and administrators* (pp. 20–45). New York: Guilford.

Ministry of Training, Colleges and Universities: Postsecondary Education Division. (2008). *Disabilities statistics at Ontario universities for discussion at IDIA* (PowerPoint slides).

Mullis, C. (2003). Trouble on the SAT. *PsychologyToday.* Retrieved September 16, 2009, from https://www.psychologytoday.com/articles/200303/trouble-the-sat.

Orey, S. A., Cragar, D. E., & Berry, D. T. R. (2000). The effects of two motivational manipulations on the neuropsychological performance of mildly head injured college students. *Archives of Clinical Neuropsychology, 15,* 335–348.

Osmon, D. C., Plambeck, E. A., Klein, L., & Mano, Q. (2006). The Word Reading Test of effort in adult learning disability: A simulation study. *Clinical Neuropsychologist, 20,* 315–324.

Rawlinson, G. E. (1976). *The significance of letter position in word recognition.* Unpublished doctoral dissertation, University of Nottingham, Nottingham, UK.

Ruiz, M., Drake, E., Glass, A., Marcotte, D., & Van Gorp, W. (2002). Trying to beat the system: Misuse of the internet to assist in avoiding the detection of psychological symptom dissimulation. *Professional Psychology: Research & Practice, 33,* 294–299.

Shum, D. H. K., Gorman, J. G. O., & Alpar, A. (2004). Effects of incentive and preparation time on performance and classification accuracy of standard and malingering-specific memory tests. *Archives of Clinical Neuropsychology, 19,* 817–823.

Slick, D., Hopp, G., Strauss, E., & Thompson, G. B. (1997). *VSVT: Victoria Symptom Validity Test, version 1.0, professional manual.* Odessa, FL: Psychological Assessment Resources.

Slick, D., Sherman, E., & Iverson, G. (1999). Diagnostic criteria for malingered neurocognitive dysfunction: Proposed standards for clinical practice and research. *Clinical Neuropsychologist, 13,* 545–561.

Strauss, E., Sherman, E. M., & Spreen, O. (2006). *A compendium of neuropsychological tests: Administration, norms and commentary* (3rd ed.). New York: Oxford University Press.

Suhr, J., Hammers, D., Dobbins-Buckland, K., Zimak, E., & Hughes, C. (2008). The relationship of malingering test failure to self-reported symptoms and neuropsychological findings in adults referred for ADHD evaluation. *Archives of Clinical Neuropsychology, 23,* 521–530.

Sullivan, B., May, K., & Galbally, L. (2007). Symptom exaggeration by college adults in attention-deficit hyperactivity disorder and learning disorder assessments. *Applied Neuropsychology, 14,* 189–207.

Uttl, B. (2002). North American adult reading test: Age norms, reliability, and validity. *Journal of Clinical and Experimental Neuropsychology, 24,* 1123–1137.

Wechsler, D. (1997). *WAIS-III administration and scoring manual.* San Antonio, TX: Psychological Corporation.

Weiler, M., Harris, N., Marcus, D., Bellinger, D., Kosslyn, S., & Waber, D. (2000). Speed of Information Processing in Children Referred for Learning Problems. *Journal of Learning Disabilities, 33 (6),* 538.

Wiederholt, J. L., & Bryant, B. R. (2001). *GORT 4: Gray Oral Reading Tests Examiner's manual.* Austin, TX: Pro-Ed.

Wiens, A. N., Bryan, J. E., & Crossen, J. R. (1993). Estimating WAIS-R FSIQ from the National Adult Reading Test-Revised in normal subjects. *Clinical Neuropsychologist, 7,* 70–84.

Wiggins, E. C., & Brandt, J. (1988). The detection of simulated amnesias. *Law and Human Behavior, 12,* 57–77.

Woodcock, R. W., McGrew, K. S., & Mather, N. (2001). *The Woodcock-Johnson III.* Itasca, IL: Riverside.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019