Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant National Board of Medical Examiners states that it is a nonprofit corporation. It has no parent corporation, and no publicly traded corporation owns ten percent or more of its stock. There is no publicly owned corporation with a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ..........................i

TABLE OF CONTENTS ......................................... ii

TABLE OF AUTHORITIES.....................................iv

STATEMENT OF JURISDICTION ........................................1

INTRODUCTION.....................................................2

STATEMENT OF ISSUE PRESENTED FOR REVIEW .......5

STATEMENT OF RELATED CASES...................................5

STATEMENT OF THE CASE ...............................................5

    A.    NBME and the USMLE .....................................5

    B.    Jessica Ramsay......................................8

    C.    Procedural History ...........................31

SUMMARY OF ARGUMENT................................................33

STANDARD OF REVIEW ...................................................35

ARGUMENT.........................................................................36

I.    The district court erred in concluding on the merits that Plaintiff is "disabled."............................37

    A.    The ADA.............................................................37

    B.    The district court did not apply the correct legal standard for a "disability."......................39

# TABLE OF CONTENTS
## (Continued)

PAGE

        1.    The evidence relied on was insufficient to demonstrate a disability ...................... 40

        2.    The district court misinterpreted the ADAAA ...................................................... 48

   C.    The district court's factual findings were clearly erroneous ............................... 60

II.    Plaintiff failed to show that she is likely to suffer irreparable harm ............................ 63

III.    NBME and other test-takers will be harmed by the preliminary injunction ....................... 66

IV.    Injunctive relief would disserve the public ............. 69

CONCLUSION ....................................................... 71

CERTIFICATE OF COMPLIANCE ...................................... 72

CERTIFICATE OF SERVICE ................................................ 73

ELECTRONIC DOCUMENT CERTIFICATE ...................... 74

CERTIFICATE OF BAR ADMISSION ................................. 75

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Acierno v. New Castle Cty.*,
40 F.3d 645 (3d Cir. 1994) .................................................. 37

*B.C. v. Mt. Vernon Sch. Dist.*,
837 F.3d 152 (2d Cir. 2016) ............................................... 58

*Bach v. Law Sch. Admission Council*,
No. 1:13-CV-888, 2014 U.S. Dist. LEXIS
124632 (M.D.N.C. Feb. 4, 2014) ........................... 55, 65, 69

*Baer v. Nat'l Bd. of Med. Exam'rs*,
392 F. Supp. 2d 42 (D. Mass. 2005) ................................. 65

*Bercovitch v. Baldwin Sch. Inc.*,
133 F.3d 141 (1st Cir. 1998) ............................................. 42

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
No. 15-4987, 2016 WL 1404157
(E.D. Pa. Apr. 11, 2016) ........................................... passim

*Black & Decker Disability Plan v. Nord*,
538 U.S. 822 (2003) ........................................................... 57

*Black v. Nat'l Bd. of Med. Exam'rs*,
281 F. Supp. 3d 1247 (M.D. Fla. 2017) ....................... 42, 55

*Campbell v. Lamar Inst. of Tech.*,
842 F.3d 375 (5th Cir. 2016) ............................................. 69

*Collins v. Prudential Inv. & Ret. Servs.*,
119 F. App'x 371 (3d Cir. 2005) ........................................ 55

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Cunningham v. Nordisk*,
   615 F. App'x 97 (3d Cir. 2015)...........................................51

*Doe v. Nat'l Bd. of Med. Exam'rs*,
   199 F.3d 146 (3rd Cir. 1999) ...........................................38

*Doherty v. Nat'l Bd. of Med. Exam'rs*,
   791 F. App'x 462 (5th Cir. 2019) .................................45, 51

*EEOC v. Chevron Phillips Chem. Co., LP*,
   570 F.3d 606 (5th Cir. 2009)...............................................43

*Emory v. AstraZeneca Pharms. LP*,
   401 F.3d 174 (3d Cir. 2005) ................................................35

*Glueck v. Nat'l Conf. of Bar Exam'rs*,
   No. SA-17-CV-451-XR, 2018 WL 3977891
   (W.D. Tex. Aug. 20, 2018)....................................................55

*Gonzales v. Nat'l Bd. of Med. Exam'rs*,
   225 F.3d 620 (6th Cir. 2000).......................................38, 55

*Healy v. Nat'l Bd. of Osteopathic Exam'rs*,
   870 F. Supp. 2d 607 (S.D. Ind. 2012) .......................passim

*Hofslien v. Barnhart*,
   439 F.3d 375 (7th Cir. 2006)................................................57

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ................................................36

*Kelly v. W. Va. Bd. of Law Exam'rs*,
   No. 2:08-00933, 2008 WL 2891036
   (S.D.W. Va. July 24, 2008) .................................................65

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Koller v. Riley Riper Hollin & Colagreco*,
  850 F. Supp. 2d 502 (E.D. Pa. 2012) ................................. 50

*Kos Pharms., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ............................................... 35

*Love v. Law Sch. Admission Council*,
  513 F. Supp. 2d 206 (E.D. Pa. 2007) ................. 9, 15, 54, 59

*Mancini v. City of Providence ex rel. Lombardi*,
  909 F.3d 32 (1st Cir. 2018) ................................................ 39

*Mann v. La. High Sch. Athletic Assoc.*,
  535 F. App'x. 405 (5th Cir. 2013) ................................ 35, 52

*Marshall v. Sisters of Holy Family of Nazareth*,
  399 F. Supp. 2d 597 (E.D. Pa. 2005) ........................... 42, 55

*Martin v. Helstad*,
  699 F.2d 387 (7th Cir. 1983)............................................. 63

*Matthews v. Penn. Dep't of Corr.*,
  613 F. App'x 163 (3rd Cir. 2015) ................................. 43, 50

*Morriss v. BNSF Ry. Co.*,
  817 F.3d 1104 (8th Cir. 2016)........................................... 51

*Neely v. Benchmark Family Servs.*,
  640 F. App'x 429 (6th Cir. 2016) ...................................... 52

*Neely v. PSEG Tex., Ltd. P'ship*,
  735 F.3d 242 (5th Cir. 2013)............................................. 51

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*P.C. Yonkers, Inc. v. Celebrations the Party &*
   *Seasonal Superstore, LLC,*
   428 F.3d 504 (3d Cir. 2005) ...............................................67

*Powell v. Nat'l Bd. of Med. Exam'rs,*
   364 F.3d 79 (2d Cir. 2004) .........................................passim

*Price v. Nat'l Bd. of Med. Exam'rs,*
   966 F. Supp. 419 (S.D.W. Va. 1997)...................................69

*Rawdin v. Am. Bd. of Pediatrics,*
   985 F. Supp. 2d 636 (E.D. Pa. 2013) ....................53, 54, 59

*Reilly v. City of Harrisburg,*
   858 F.3d 173 (3d Cir. 2017) ...................................36, 63, 66

*Rothberg v. Law Sch. Admission Council,*
   102 F. App'x 122 (10th Cir. 2004) ...............................63, 69

*Rumbin v. Ass'n of Am. Med. Colleges,*
   803 F. Supp. 2d 83 (D. Conn. 2011) ..................................55

*Singh v. George Wash. Univ. Sch. of Med. &*
   *Health Scis.,*
   508 F.3d 1097 (D.C. Cir. 2007).........................................39

*Singh v. George Wash. Univ. Sch. of Med. &*
   *Health Scis.,*
   667 F.3d 1 (D.C. Cir. 2011)...............................................65

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Steere v. George Wash. Univ. Sch. of Med. &
    Health Scis.,*
    439 F. Supp. 2d 17 (D.D.C. 2006) ..................................... 66

*Trinity Indus., Inc. v. Chi. Bridge & Iron Co.,*
    735 F.3d 131 (3d Cir. 2013) ........................................ 37, 71

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................... 63, 64, 66

**STATUTES**

28 U.S.C. § 1292 ....................................................................... 1

28 U.S.C. § 1331 ....................................................................... 1

42 U.S.C. § 12102 ................................................................... 38

42 U.S.C. § 12182 ................................................................... 37

42 U.S.C. § 12189 ................................................................... 37

Americans with Disabilities Act,
    42 U.S.C. § 12101, *et seq.* .......................................... passim

**REGULATIONS**

28 C.F.R. § 36.101 .............................................................. 51, 59

28 C.F.R. § 36.105 ............................................................. passim

28 C.F.R. § 36.309 ................................................................ 45

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

29 C.F.R. § 1630.2 .................................................................50

**LEGISLATIVE HISTORY**

Statement of the Managers to Accompany S.
    3406, The Americans with Disabilities Act
    Amendments Act of 2008, 154 Cong. Rec.
    S8840 (Sept. 16, 2008) ......................................................52

**OTHER AUTHORITIES**

Jennifer Medina et al., *Actresses, Business
    Leaders & Other Wealthy Parents Charged in
    U.S. College Entry Fraud*, N.Y. Times
    (March 12, 2019) ................................................................8

Joy et al., *Assessment of ADHD Documentation
    from Candidates Requesting (ADA)
    Accommodations for the Nat'l Bd. of
    Osteopathic Med. Exam'rs COMLEX Exam*,
    12(2) J. of Attention Deficit Disorders 104
    (2010)................................................................................29

Nat'l Ctr. for Educ. Statistics, *Fast Facts: ACT
    Scores*,
    https://nces.ed.gov/fastfacts/display.asp?id=897 ..............16

Robert Weiss et al., *When Average Is Not Good
    Enough: Students With Learning Disabilities
    at Selective, Private Colleges*, J. of Learning
    Disabilities (2016)............................................................46

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*Settlement Agreement Between United States of
Am. & Nat'l Bd. of Med. Exam'rs*, DJ # 202-16-
181 (Feb. 23, 2011),
https://www.ada.gov/nbme.htm .......................................56

W. Lindstrom, et al., *Postsecondary ADHD
Documentation Requirements: Common
Practices in the Context of Clinical Issues,
Legal Standards & Empirical Findings*, 19(8)
J. of Attention Disorders 655 (2013).................................46

W. Mehrens et al., *Accommodations for
Candidates with Disabilities* 63 The Bar
Exam'r, No. 4 (1994) ..........................................................56

# STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the grant of a preliminary injunction. Appx5, 60-61 (Dec. 31, 2019). The National Board of Medical Examiners ("NBME") timely filed its notice of appeal on January 7, 2020, seven days after the district court entered its preliminary injunction order. Appx7.

## INTRODUCTION

Jessica Ramsay insists she is entitled to twice as much testing time on medical licensing exams as other examinees based on diagnoses of a learning disability and attention disorder. Despite a lifetime, objective record of academic accomplishment that cannot possibly meet the legal standard for a "disability," the district court granted her a mandatory preliminary injunction that gave her the injunctive relief she would otherwise be entitled to only if she prevailed on the merits. Because the court's legal analysis was flawed and its fact-finding riddled with errors, reversal is warranted.

Without accommodations, Ms. Ramsay graduated near the top of her high school class, scored in the top three percent on the ACT college admissions test, and did extremely well on the Medical College Admission Test. Notwithstanding that record, she sought double testing time on the United States Medical Licensing Exam ("USMLE") for alleged reading impairments she says qualify her as legally disabled under the Americans with Disabilities Act ("ADA"). A person is "disabled" if substantially limited *compared to most people in the general population.* 28 C.F.R. § 36.105(d)(1)(v) (emphasis added). Recognizing two decades of above-average

-2-

academic performance, the district court correctly found that Plaintiff *outperforms* most people. Yet the court granted a mandatory preliminary injunction giving her twice the testing time as other examinees.

To reach that result, the court made numerous errors. ***First***, the court balked at simply applying the threshold legal standard—substantial limitation compared to "most people in the general population"—which should have been the end of the matter. ***Second***, the court misread the statute and the regulations and granted far too much deference to Plaintiff's expert, who she consulted solely to get accommodations on the USMLE, has a "reputation" for helping secure exam accommodations, and acknowledged that the diagnostic tests he relied on are manipulable. ***Third***, the court never accounted for the chasm between how Plaintiff depicted herself and the objective record of her performance, which she often mischaracterized or neglected to mention to the many professionals she consulted (for the specific purpose of seeking academic and testing accommodations). ***Fourth***, the court allowed a potential delay in her medical education to qualify as a risk of harm that was "likely" and "irreparable."

On the merits, the court's reasoning conflicts with a body of case law crediting "real-world" evidence of functional abilities (including from this Circuit), negates a plaintiff's burden of proving a legal disability, and virtually guarantees extra time to anyone who can obtain a diagnosis and litigate. That matters enormously. Tens of thousands of individuals seek accommodations every year on licensing and other high-stakes exams—most often extra testing time, and most often based on a diagnosis of a learning disorder or ADHD.

Receiving unwarranted extra time is unfair to other test-takers—including those who meet the ADA's definition of disability—and compromises the public's interest in reliable medical licensing exams. The district court examined neither of those interests before granting a mandatory injunction. If the injunction is not reversed, Plaintiff will submit her un-fairly obtained score when she applies to medical residency programs, which will in turn rely on her score to the potential detriment of the programs and other candidates competing for positions. She will also attempt to take one or more of her subsequent USMLE exams with the accommodations awarded by the lower court's "preliminary" injunction.

NBME respectfully requests a reversal. Plaintiff did not show a likelihood of success or likely irreparable harm. It is other students and the fairness and integrity of the exam that will be injured if the current injunction stands.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the district court abused its discretion by granting a mandatory preliminary injunction based on the erroneous conclusions (1) that Plaintiff has a strong likelihood of showing she is substantially impaired in reading and attention compared to most people, and thus "disabled" under the ADA, Appx56; (2) that Plaintiff showed she will likely be irreparably harmed absent injunctive relief, Appx56; (3) that the balance of harms weighed in her favor, Appx57; and (4) that the public interest favored injunctive relief, Appx57.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. NBME is unaware of any related cases or proceedings.

## STATEMENT OF THE CASE

### A.   NBME and the USMLE

NBME is a nonprofit organization located in Philadelphia. Appx762. It strives to protect the public health by

providing assessment services for physicians and other health professionals. Appx762. With the Federation of State Medical Boards, NBME sponsors the USMLE—a standardized test designed to assess an examinee's ability to apply the knowledge, concepts, and principles needed to provide safe and effective patient care. Appx762.

Medical licensing authorities across the country rely on USMLE scores as part of their professional licensure process. Appx763. Medical residency programs also rely on US-MLE scores in evaluating residency applications as part of the yearly "Match" cycle that places medical school graduates with residency programs. Appx105.

The USMLE is comprised of three "Steps," one of which has two components—Step 1, Step 2 (including Step 2 Clinical Knowledge ("CK") and Step 2 Clinical Skills ("CS")), and Step 3. *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 82 (2d Cir. 2004); Appx763. With the exception of Step 2 CS, which evaluates examinees in a clinical setting, the exams consist of multiple-choice questions answered on a computer in a testing center over one to two days. Appx763. This case concerns all three Steps of the USMLE.

All examinees take the USMLE under the same conditions except individuals who are disabled within the meaning of the ADA. Appx763. NBME conscientiously evaluates each request for accommodations, often (as here) with the assistance of external experts, and provides accommodations to disabled examinees. Appx763-764, 796. In a given year, NBME provides one or more accommodations to 60 to 65 percent of the examinees who request them. Appx564-565.

NBME's "procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination." *Powell v. NBME*, 364 F.3d at 88; *see also* Appx763.

In the wake of the recent college admissions scandal—which illustrates the ease with which students can obtain diagnoses to support extra testing time on high-stakes tests—NBME's "duty to ensure that its examination is fairly

administered to all those taking it" has never been clearer.[1]
*Powell v. NBME*, 364 F.3d at 89.

## B.  Jessica Ramsay

Plaintiff is a student at Western Michigan University Homer Stryker School of Medicine. Appx854. She claims to be disabled based on diagnoses of a learning disability and Attention Deficit Hyperactivity Disorder ("ADHD") and entitled to double (100 percent extra) testing time on all three Steps of the USMLE. Appx743, 1133.

The factual background that follows goes through Plaintiff's academic record starting in elementary school and is somewhat lengthy. But of particular note is the following reality: the record shows repeatedly that Plaintiff's view of her own academic performance—which may be sincere, Defendant takes no position on that—is completely at odds with how she is actually performing.

**Elementary School.** Plaintiff's early school years are relevant because learning disorders and ADHD are "life-long"

---

[1] *See, e.g.*, Jennifer Medina et al., *Actresses, Business Leaders & Other Wealthy Parents Charged in U.S. College Entry Fraud*, N.Y. Times (March 12, 2019), https://www.ny-times.com/2019/03/12/us/college-admissions-cheating-scan-dal.html.

neurodevelopmental impairments that do not suddenly "manifest themselves" during adulthood. *Love v. Law Sch. Admission Council*, 513 F. Supp. 2d 206, 219 (E.D. Pa. 2007); *see* Appx343, 805. Plaintiff testified that the "effects that ADHD and learning disabilities have on [her] life are most quantifiable when assessing [her] academic performance," Appx148-149, and that her "severe problems" and receipt of accommodations began "in her earliest school years" and in virtually every class she took. Appx150-152, 160, 164.

But Plaintiff's testimony was flatly contradicted by her academic performance and related school records, which reveal mostly As, above-average standardized test scores (with no accommodations), participation in a gifted program, and not a trace of the intensive and near-constant support she claims to have received.

As far back as kindergarten, Plaintiff's teacher wrote that "Jessica is doing well in all areas," Appx867, and "has excellent work habits," Appx863. On a standardized test she took that year, Plaintiff's overall reading score was in the 96th percentile (top four percent). Appx870. In first grade, she earned top marks in reading and on measures of

attention, Appx872, and received an average reading score on standardized testing. Appx873.

In second grade, Plaintiff scored above average in reading, both in class and on standardized testing. Appx 876, 878 (top 12 percent in reading on Stanford Achievement Test). Although Plaintiff has said that she "constantly got in trouble for 'being lazy' or 'ignoring' directions" and "always had a lot of trouble sitting still and focusing" (Appx1081, 1138), her teacher said that her ability to "listen[] carefully, follow[] directions and stay[] on task" was "excellent," Appx877.

In third grade, Plaintiff received an A in reading and a notation of "mastery" in the subject. Appx879-880. And while Plaintiff testified that the following year, fourth grade, was "a really hard year," and that she was "struggling" and "always . . . turning stuff in late," Appx92-93, her report card shows she "perform[ed] at [an] excellent level consistently" in "produc[ing] quality work" and "complet[ing] assigned tasks," Appx887. Plaintiff again earned an A and achieved "mastery" in reading. Appx886-887.

In fifth grade, Plaintiff earned all As, including in reading. Appx889-890. Her teacher noted that "Jessica is doing

beautiful work in all subject areas" and should "consider working on the school paper." Appx891; *see* Appx167-168.

Other than noting that Plaintiff had participated in a gifted program, her third, fourth, and fifth grade teachers never indicated that she received any extra assistance—even though her report cards specifically called upon her teachers to identify any "Specialized Reading Support" or "Grades based on intensive teacher assistance." Appx880, 887, 889. Consistent with her school records, Plaintiff's initial request for accommodations from NBME stated that the only accommodations she received in her K-12 years were "unofficial" and limited accommodations provided by a single teacher—"not the school"—during the "1996-1997 school year." Appx1073, 1075.

And even though her mother purportedly has a history of dyslexia and ADHD, Appx1007, Plaintiff's parents "never considered the possibility that [she] might have a learning disability," Appx1074. Nor did her mother indicate in her report cards—which she signed year-after-year—that any tutorials were needed. Appx879, 886, 888; *compare* Appx1458 (note in Plaintiff's expert report that "school records do not

clearly reflect academic struggles in elementary, middle or high school" because "the family obtain[ed] help").

In elementary school, Plaintiff received visual testing by Dr. Mary Tanguay, an optometrist, because of letter reversals. Appx881. Dr. Tanguay administered a single test, which was done incorrectly and incompletely scored; she did not diagnose a learning disorder and gave Plaintiff glasses. Appx91, 774, 883-885. After participating in skills training, Plaintiff "scored above age level in all categories," and her comprehension and perceptual skills were "excellent." Appx882. No evidence was presented at the hearing that Plaintiff received any accommodations in elementary school based on Dr. Tanguay's evaluations, and Plaintiff's preliminary injunction motion did not rely on the optometrist's testing. *See* Dist. Ct. Dkt. Nos. 7 & 7-2.

**Middle School.** Plaintiff continued to excel in middle school without accommodations. She tested into an accelerated program, earned straight As, and reported that she "did very well, understood everything and was able to do the homework[.]" Appx95-96, 168, 892, 1076. Plaintiff received all average or above-average scores—including in reading—

on a state-wide standardized test with no accommodations. Appx893 ("Her overall achievement appears to be above average for sixth grade.")

**High School.** Plaintiff also surpassed the vast majority of her high school classmates academically, without any accommodations. Appx895, 1130. Despite claiming that "[t]imed tests" were her "downfall in all of [her] classes," Appx1139, and that she "rarely got an exam grade that accurately reflected how much [she] knew," Appx1075, Plaintiff earned mostly As while taking numerous honors and AP classes: Honors English (three years, all As), AP U.S. History, Honors Biology, Honors Chemistry, Honors Physics, Honors Algebra, Honors Trigonometry/Pre-Calculus, and AP Calculus. Appx168-170, 895. And while she has represented that "the process of writing is pure agony for me," Appx1077—and just "*knowing* I have to write more than a sentence . . . is essentially a form of PTSD," Appx1078—Plaintiff took College Writing and earned an A, Appx895.

She was in the National Honor Society and graduated with a 3.75 GPA. Appx168-169, 172. Out of 225 students in her class, Plaintiff ranked 28th (top 12 percent). Appx895.

On top of her demanding course load, Plaintiff found time for a host of time-consuming extracurricular activities. She participated in three sports (swimming and soccer all four years, and volleyball for two), and was a swim team captain her senior year. Appx170-171, 896. She was a Southwestern Michigan Athletic Conference Academic All-Conference Member and received a senior athletic award. Appx171, 903. Plaintiff also juggled various other commitments (Miracle Baseball League volunteer, Key Club member, Spanish Club member, Men's Swim Team manager), and worked (babysitting and tutoring). Appx172-174, 916-917.

Plaintiff's college application essay walked through a day in her life: 6 a.m. swim practice; AP and honors classes; back-to-back after-school swim and soccer practices; and then homework ("a research paper, Spanish translations and exercises, a pre-lab and chemistry problems[,] . . . a 35-page history chapter and 15 extremely hard calculus problems"). Appx919. She wrote: "EXHAUSTION. REPEAT. College? Hit me with everything you've got." Appx919.

Unsurprisingly, Plaintiff reports working very hard during this period. Appx1075; *see* Appx96-97 (testimony by

-14-

Plaintiff that "I was always doing homework," did not "understand how [my friends] had so much time").

Plaintiff took no ADHD-related medications during this time, Appx180, despite later reporting on a checklist she completed when seeking a diagnosis to support accommodations on the USMLE that she suffered from 17 of 18 ADHD symptoms, to the maximum severity. Appx1411-1412. Someone with the symptoms Plaintiff reported would be "grossly impaired," unable "to function in school or work settings," and would manifest "visible [deficits] in terms of everyday behavior in life." Appx356-357. Plaintiff, however, excelled in all settings.

**ACT College Admission Test.** Consistent with her top grades, Plaintiff received a stellar score without accommodations on the ACT (Appx909, 1129), a "strictly timed" standardized test "involv[ing] reading and processing information" under time pressure. *Love v. LSAC*, 513 F. Supp. 2d at 227. Most of the reading passages on the ACT are longer (in many cases significantly longer) than those on the USMLE Step 1 exam. *See* Appx208 (testimony by Plaintiff that "the [ACT] passage itself is probably longer than the typical Step

1 question."); *compare* Appx1638-1645 (sample ACT Reading section), *with* Appx1559-1602 (sample Step 1 questions); *see also* Appx1612 (guidance in ACT student manual to "read the entire passage thoroughly" and "read every sentence rather than skim the text").

Although Plaintiff claimed she "was not able to read all the questions and could not accurately demonstrate [her] knowledge [on the ACT]," Appx1135, she scored in the 97th percentile—**the top three percent**—of all examinees nationwide who took the ACT in 2007, Appx909, a pool of **over one million test-takers**.[2] Plaintiff's overall reading score was in the 91st percentile (*top nine percent*), and her reading sub-score in "Arts/Literature" was in the 99th percentile (*top one percent*). Appx909. Plaintiff characterized her score on this exam as "acceptable."[3] Appx1135.

---

[2] Nat'l Ctr. for Educ. Statistics, *Fast Facts: ACT Scores*, https://nces.ed.gov/fastfacts/display.asp?id=897.

[3] The upper-echelon ACT score Plaintiff earned her senior year was not an anomaly. She scored in the top three percent overall when she took the ACT "Plan" exam her sophomore year and was identified as being "above" the college readiness level in reading. Appx904. She also scored in the top ten percent overall when she took the ACT her junior year (top 13 percent in reading). Appx908.

**Ohio State.** Plaintiff also did very well at Ohio State University, where she graduated *cum laude* in molecular genetics with minors in business and dance. Appx854, 922. For the first five terms of college—during which she received no accommodations—Plaintiff earned all As and Bs and made the Dean's List four times. Appx922; *compare* Appx97 (testimony that she "couldn't keep up" in college). On top of her coursework, Plaintiff taught a chemistry lab and tutored students in general and organic chemistry. Appx292, 1043.

Plaintiff wrote that, while in college, she was "tipped . . . off" she might "have a problem" when she "could not get above an A- on [her] written [Spanish] tests, even though all [her] answers were 'technically correct.'" Appx1078-1079.

That experience apparently prompted Plaintiff to visit Dr. Alan Smiy, her primary care physician, in March 2009. Appx934. Dr. Smiy met with Plaintiff for half an hour and made no formal diagnosis. Appx937-938. Although the district court observed that the "record does not evince what tests, if any, Dr. Smiy administered," Appx43, Plaintiff testified that Dr. Smiy did not administer any tests during her visit, Appx179.

Dr. Smiy wrote that Plaintiff had "no problems" in high school. Appx935. And while "college stress" was causing her to "switch letters around a bit," Plaintiff had "more focus issues than dyslexic tendencies." Appx936-937. Dr. Smiy prescribed her Ritalin. Appx180, 938.[4]

Although Dr. Smiy did not indicate any diagnosis in his office visit summary, he wrote over a year later, on Plaintiff's request to Ohio State for accommodations, that he had diagnosed [her] with "moderate" ADHD in March 2009. Appx940-941. Dr. Smiy indicated on the request form that Plaintiff had no known history of accommodations. Appx941-942. Ohio State apparently began providing her with accommodations in the late spring of her sophomore year on a provisional basis, including 50 percent extra testing time, even before receiving the form submitted by Dr. Smiy. Appx184.

**Medical College Admission Test ("MCAT").** Without accommodations, Plaintiff did very well on the MCAT. Appx962, 1129. Like the USMLE exams, the MCAT is a challenging multiple-choice exam taken over several hours

---

[4] The district court also erroneously noted that Dr. Smiy diagnosed Plaintiff with "probable dyslexia." Appx11.

on a computer, with questions that require significant reading and concentration under fixed time limits. Appx798; *see* Appx1763-1764 (explaining that the Verbal Reasoning section includes seven passages, about 600 words each, and 40 questions that key off the passages); Appx365 (expert testimony that the MCAT is designed to test one's ability to "read, comprehend and analyze [passages] under . . . time conditions" and is a test where "we would expect learning disabilities to be reflected"). Most MCAT Verbal Reasoning questions are longer than those found on the USMLE. *Compare* Appx1559-1602 (sample Step 1 questions), *with* Appx1713-1727 (sample MCAT Verbal Reasoning questions).

On her first try, Plaintiff scored in the top 21 percent of all MCAT test-takers—a select, high-performing sample of over 70,000 college-educated individuals. Appx962,1761. On the MCAT's most reading-intensive section (Verbal Reasoning), Plaintiff outperformed 67 percent of other medical school aspirants (top 33 percent). Appx962.

Plaintiff testified that she was able to earn this MCAT score without accommodations by employing strategies she learned in a test-prep class. Appx125; *see* Appx390

(testimony by NBME's expert that "it's common" to employ strategies such as "read[ing] questions first and then go[ing] to the passage afterwards"). When asked whether she used other "strategies to take the MCAT beyond what [she] learned in [her] test-taking prep course," Plaintiff replied, "I mostly used that[.]" Appx126.

**Western Michigan University School of Medicine.** Plaintiff began medical school in 2014. Appx854. Since then, she has co-authored four research publications, and was the lead author on two. Appx296-297, 855, 1047-1067.

During her first year of medical school, Plaintiff visited Charles Livingston, a social worker and limited-license psychologist, to help her secure accommodations and "meet the increased curricular demands" of medical school. Appx846, 966; *see* Appx968 (referral for "academic stresses"). In his one-page report, Mr. Livingston incorrectly noted that Plaintiff had been "diagnosed with . . . Dyslexia," earned good grades only until fourth grade, and received "various testing in elementary and middle school." Appx963. Those errors regarding material background facts presumably reflect that Plaintiff provided inaccurate information.

According to Mr. Livingston, Plaintiff reported being "tired," "stressed," and worried her grades did not reflect her knowledge. Appx963. Although omitted from the district court's opinion, Mr. Livingston found that her "reading comprehension was above average." Appx963; *see* Appx776 (99th percentile score/***top one percent***). And even though Plaintiff received an average score on a test reflecting attentional functioning, Mr. Livingston diagnosed her with ADHD, grounded largely on unspecified "biographical information" (*i.e.*, Plaintiff's self-reported severe symptoms). Appx775-776, 963. After receiving Mr. Livingston's evaluation, Plaintiff's medical school granted her twice the testing time given to her classmates. Appx846.

During medical school, Plaintiff took standardized subject-matter exams (*i.e.*, "shelf" exams). She received many below-average scores, despite receiving double testing time on nearly all of them. Appx298-307; *see, e.g.*, Appx970, 972, 974, 975, 991, 996, 998, 1000, 1002; *see also* Appx307-308, 1003-1005 (medical student dashboard reflecting bottom-quartile performance on exams relative to classmates). Plaintiff testified that her poor performance had nothing to

do with how much testing time she received. Appx302, 306. Rather, she said "[i]t had to do with the difficulty of the questions." Appx306.

**Seeking USMLE Accommodations.** In December 2016, Plaintiff sought accommodations on Step 1 and Step 2 CK—including 100 percent additional time—based on diagnoses of dyslexia and ADHD. Appx1070-1071. She inaccurately represented in her application to NBME that she (1) had received double testing time during college, (2) had received accommodations all four years of college, and (3) had been diagnosed with dyslexia. Appx217-219, 1071-1072.

Despite her contrary testimony at the preliminary injunction hearing, the *only* accommodations that Plaintiff referenced as having received before college—formal or informal—were "unofficial" accommodations from one teacher during a single year in elementary school. Appx220, 1073, 1075. As to her personal statement, which she prepared with her mother, Plaintiff testified that she "tr[ied] to add more to it and make it meet the guidelines that [NBME] published," and that her "mom would go back and edit it." Appx112.

After seeking comprehensive review of her documentation by Dr. Steven Zecker, an outside expert (*see* Appx402-406, 781-794), NBME determined that Plaintiff had not shown a substantial limitation as compared to most people in the general population and denied her request for extra testing time. Appx766-767, 1125-1126.

Plaintiff took Step 1 in July 2017 without accommodations and missed passing by one point. Appx1028. She asserted repeatedly—in her complaint, briefing, and testimony—that she was only able to read 60 to 70 percent of the exam, and that her score did not reflect her knowledge because she "never got to see the questions." *See, e.g.*, Appx139, 222, 734, 849; *see also* Appx848 (claiming, in her sworn declaration, that she "was forced to blindly select answer choices for about 30 to 35 percent of the questions").

But Plaintiff's computer-based test records show that she spent time on *every* question. Appx642-649; *see* Appx1030-1038. Examinees have, under standard conditions, about 90 seconds to answer each question. Appx642. Plaintiff averaged 76 seconds on questions she answered correctly and 107 seconds on those she missed. Appx642, 644. She spent less

than 20 seconds on only four questions, and she got them all right. Appx646.

Plaintiff's Step 1 score report also shows that her near-passing score reflected her relatively poor performance on certain subjects, not a shortage of time. Appx1029.

Plaintiff took a leave of absence from medical school. Appx76. Instead of retaking Step 1, she found "an evaluator who could do the testing" she "thought was needed to show that [she] did have these disabilities," Appx115-116, and submitted a new request to NBME in June 2018, Appx1127. In addition to learning disabilities and ADHD, Plaintiff relied on migraines and a clotting disorder with deep vein thrombosis ("DVT") to support her request. Appx1129. She sought double testing time over two days, a private room, and extra break time. Appx1128. Plaintiff submitted the documentation from Dr. Smiy and Mr. Livingston, as well as a new evaluation, from Alan Lewandowski, Ph.D. Appx1132.

The Lewandowki evaluation indicated depression, inefficient thinking, and health concerns. Appx1014. "Academic" testing resulted in a "high average" reading score and a finding that "[r]eading . . . [was] normal to above normal and

consistent with past education." Appx1013-1014. "Attention" testing yielded largely normal scores. Appx1013; *see* Appx1022 (eight of nine scores were "normal"). Dr. Lewandowski nevertheless diagnosed Plaintiff with ADHD and a learning disability other than dyslexia and recommended 50 percent extra testing time. Appx1015-1016. Six months later, after Plaintiff contacted him again, Dr. Lewandowski recommended double testing time. Appx1018.

Plaintiff also submitted letters of support to NBME from Dean Overton, Dr. Houtman, and Dr. Reukberg, none of which were independently prepared by the signatories. Each letter was substantively revised and supplemented by Plaintiff, and reviewed by her lawyer, before submission to NBME. Appx227-234, 264-279, 284-287; *see, e.g.*, Appx1280, 1302, 1349, 1376 (correspondence with signatories and Plaintiff's lawyer).

When asked about the Reukberg letter—which grew from 2.5 to eight pages—Plaintiff testified, "I had to add a lot of support [to] each of the points in the NBME guidelines," and "wanted to make sure that his letter met the guidelines." Appx231, 278. She noted, "I couldn't tell you which parts

were, like, things I edited and which parts Dr. Reukberg wrote." Appx234; *see* Appx1329-1336 (heavy edits to Dr. Reukberg's draft, including some "spelling and grammar errors that [Plaintiff] corrected"); Appx1313 ("chart" prepared by Plaintiff and sent to Dr. Reukberg).

Although NBME concluded, after again consulting Dr. Zecker, that Plaintiff was not entitled to extra testing time, it approved additional break time, testing over two days, and a separate room to address her stated needs associated with migraines and DVT. Appx768-769, 1401-1403.

But Plaintiff chose not to retake Step 1 with these accommodations. Instead, she "got additional testing," this time from Robert Smith, Ph.D., who was recommended to her lawyer as having helped other students obtain accommodations on the USMLE. Appx119, 282, 1353, 1404. Dr. Smith testified that he has "a reputation" among students, Appx503, and advertises himself as specializing in "**EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED EXAMS**," Appx503-504, 1462 (offering "evaluations to individuals who are seeking documentation as part of their application to request more time" on "high-stakes" tests).

In his report, Dr. Smith stated incorrectly—and despite access to substantial contrary evidence in Plaintiff's prior evaluations, standardized testing score reports, and grades (*see* Appx1431-1432)—that Plaintiff "has a history of academic struggles that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments[.]" Appx1434. That assertion was apparently based on oral reports by Plaintiff and her mother. Dr. Smith acknowledged at the hearing, however, when asked if "there is any indication in [her academic records] of a reading problem," that there was "none." Appx454; *see* Appx530 (testimony by Dr. Smith that all standardized assessments from kindergarten through the MCAT were "in the average or above average range"). He also acknowledged that Plaintiff had neglected to provide him with the results from various standardized tests she had taken over the course of her life. Appx509.

Nevertheless, Dr. Smith diagnosed Plaintiff with a learning disorder based on 1st or 2nd percentile scores on certain reading tests that he administered (Appx832, 1459)—results which, if accurate, would be expected from a child in

elementary or middle school, Appx1508. *See* Appx801
("These extremely low scores would superficially suggest
that Ms. Ramsay's reading skills are worse than those of al-
most anyone else[.]"). Dr. Smith gave that diagnosis despite
Mr. Livingston's conclusion that Plaintiff's reading compre-
hension was above average, Appx963, and Dr. Lewandowki's
finding of "high average" reading, Appx1013.

Dr. Smith also diagnosed her with ADHD, based on self-
reports by Plaintiff and her mother, Appx512, and Plaintiff's
poor performance on a computerized test, which he said was
not of much use as a diagnostic tool. Appx548, 803-805,
1459. He did so despite (1) no documented early onset or at-
tentional issues in any setting (much less in multiple set-
tings, as required for a proper ADHD diagnosis, Appx512);
(2) Plaintiff's strong academic record (Appx926, 928); (3) her
non-impaired performance on a similar diagnostic test ad-
ministered by Dr. Lewandowski just one year earlier; and
(4) his recognition of the risk that the person is "not present-
ing [their symptoms] accurately, either deliberately or
they're just a poor reporter," Appx511. S*ee* Appx358 ("[I]f
[Plaintiff's] scores were taken at face value, her attention

skills and her self-control skills would be very, very poor, in the bottom 1 percent of the population").[5]

Notably, Dr. Smith acknowledged that the tests on which he relied are manipulable. He testified that "individuals sometimes exaggerate or [do] not perform to their maximum" in order "to obtain accommodations in school or on a standardized test." Appx513. To do so, he explained, "[t]hey use whatever knowledge they have about what the condition is and try to mimic what the symptoms or performance that would be expected[.]" Appx514. For a learning disorder, one would simply read very slowly, and for ADHD, "they would report the symptoms [as] being frequently experienced." Appx514-515; *see also* Appx352 (testimony by NBME's expert that the incentive to do well "is not there in diagnostic testing" because "if they perform well during the diagnostic

---

[5] It is not unusual for professionals to provide an ADHD diagnosis in support of accommodations on a high-stakes exam that is not supported by applicable diagnostic criteria. *See, e.g.*, J. Joy et al., *Assessment of ADHD Documentation from Candidates Requesting (ADA) Accommodations for the Nat'l Bd. of Osteopathic Med. Exam'rs COMLEX Exam*, 12(2) J. of Attention Deficit Disorders 104, 106 (2010) (finding, in a review of 50 of individuals who claimed to have ADHD, that "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD").

testing, then they're not going to get a recommendation for accommodations"); Appx1410 (note by Plaintiff that her knowledge about dyslexia comes, in part, from "med school").[6] Plaintiff "needed evidence of slow reading" and "[s]he obtained evidence of slow reading." Appx354.

In December 2018, Plaintiff submitted the Smith evaluation—which she and her lawyer helped draft (Appx289, 535)—and requested that NBME reconsider its denial of 100 percent extra testing time. Appx769, 1464.

NBME concluded, after considering an external recommendation from a second expert, Dr. Benjamin Lovett (*see* Appx326-330, 808-826), that the aberrationally low scores from the Smith evaluation were not credible and that Plaintiff had not shown a substantial limitation compared to most people. Appx769-770, 797-806, 1511-1512.

Plaintiff again sought reconsideration. Appx1526. NBME reiterated its conclusion that the "exceptionally low scores" from the Smith evaluation were not credible and that the

---

[6] As one study has explained, "[u]ntil recently, most clinicians assumed that students could not feign . . . a reading disability," but "this has proven not to be the case." Appx1535-1536; *see also* Appx561.

objective standardized testing evidence reflects that her "skills are better than most people." Appx1533.

Plaintiff remained on leave from medical school. Appx76. After requesting "an indefinite leave of absence," her school indicated she could extend her leave until March 2, 2020 if she took Step 1 by that date, or she could voluntarily withdraw and reapply when "prepared to take USMLE Step 1," with no deadline for reapplying. Appx1520, 1522.

## C. Procedural History

Plaintiff sued NBME under the ADA and Rehabilitation Act.[7] Appx726. The complaint alleges she is entitled to double testing time on all USMLE exams—Step 1, Step 2 (CK and CS), and Step 3—because of diagnosed impairments and "a history of significant reading difficulties and distractibility throughout her educational career." Appx727, 731.

Nearly three months later, Plaintiff sought a mandatory preliminary injunction. After a hearing, the district court declined briefing and later granted Plaintiff's motion. Appx60

---

[7] Plaintiff did not rely upon her Rehabilitation Act claim in seeking a preliminary injunction. Although inexplicably discussed in the lower court's decision, Appx27, that claim was not relevant below and is not relevant on appeal.

(Dec. 31, 2019); Appx660. NBME was ordered to provide double testing time—the very relief that would otherwise be warranted only if she were to prevail on the merits. Appx60. The injunction applies not only to Step 1 (the exam she needed to take to continue medical school), but also to both Step 2 exams and even to Step 3, a test she will likely not take for at least two years. Appx60.

NBME appealed, Appx7, and sought a stay from the lower court on January 23, 2020. The district court denied the stay. Appx 62. NBME then sought a stay from this Court. Plaintiff urged a stay was unnecessary because she would not submit her Step 1 score to residency programs until 2021. ECF 17, at 2-3, 8. She argued that denying the stay would enable her to resume her school work, and this Court could address the validity of her scores when deciding the merits of the appeal. *Id.*

The Court denied the motion to stay, and Plaintiff took Step 1 with double testing time on February 20 and 21, 2020. Although Plaintiff has since received a passing Step 1 score, she has not provided it to residency programs nor has she taken Step 2 CK, Step 2 CS, or Step 3.

## SUMMARY OF ARGUMENT

Plaintiff is not "disabled" within the meaning of the ADA and "it's not a close case." Appx369. She should not have received extra time on Step 1 and should not receive extra time on the three remaining USMLE exams. Her receiving extra time was unfair to other test-takers (including those actually entitled to ADA accommodations) and also harms the medical licensing authorities and residency programs that rely on USMLE scores. NBME seeks reversal of the district court's mandatory preliminary injunction, which gave Plaintiff all the relief she seeks—without having to undergo the normal litigation process and without meeting her heavy burden on any of the four preliminary injunction factors.

On the likelihood of success factor, the district court failed to apply the correct legal standard. The district court never found that Plaintiff was substantially limited compared to most people in the general population (nor could it on this record), and in fact found that Plaintiff outperforms the average person. Instead of finding a substantial limitation, as required under the ADA, the court relied on evidence that was legally insufficient to establish a disability. The lower court's misinterpretation of the ADA effectively

negates an ADA plaintiff's burden of proving a disability. It cannot be squared with the statute and regulations, or with ADA testing cases from this Circuit and others.

The district court also failed to adequately scrutinize Plaintiff's claims of irreparable harm. It abused its discretion in finding that the alleged harm, involving a possible delay in her education, is irreparable. It also erred in finding that any claimed injury was likely. The court never found that Plaintiff would fail any USMLE exam without extra time, and the record evidence shows she will almost certainly pass if adequately prepared.

Although the Plaintiff's preliminary injunction fails at factors one and two, the other two considerations also weigh in NBME's favor. Plaintiff's USMLE scores earned with unwarranted extra time will undermine the fairness and integrity of the USMLE and the residency selection process. Any alleged harm to Plaintiff from a delay in her education is outweighed by the significant injury to NBME, other test-takers, and the public. All four factors support reversing the preliminary injunction.

## STANDARD OF REVIEW

The grant of a preliminary injunction is reviewed for "an abuse of discretion, an error of law, or a clear mistake in the consideration of proof." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Although this Court reviews "findings of fact for clear error," it "exercise[s] plenary review over the district court's conclusions of law and its *application of law to the facts*[.]" *Id.* (emphasis added). Thus, "[d]espite oft repeated statements that the issuance of a preliminary injunction rests in the discretion of the trial judge, whose decisions will be reversed only for 'abuse,' a court of appeals *must reverse* if the district court has proceeded on the basis of an erroneous view of the applicable law." *Id.* (emphasis added) (citation omitted).

Determining whether an individual is disabled under the ADA requires "application of law to the facts," *see id.*, and is therefore reviewed *de novo. See Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 183 n.6 (3d Cir. 2005); *see also Mann v. La. High Sch. Athletic Assoc.*, 535 F. App'x. 405, 406, 409-10 (5th Cir. 2013) (reviewing disability determination *de novo* and reversing preliminary injunction).

# ARGUMENT

To obtain a preliminary injunction, the plaintiff "must show as a prerequisite (1) a reasonable probability of eventual success in the ligation, and (2) that [she] will be irreparably injured . . . if relief is not granted[.]" *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017). The court should also consider, when relevant, "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.*

The first two factors—likelihood of success and irreparable harm to the plaintiff absent an injunction—are "most critical." *Id.* at 179. Unless these two "gateway factors" are met, the motion must be denied. *Id.* Only if the first two factors are satisfied does the court determine whether, on balance, all four factors weigh in favor or against a preliminary injunction. *Id.*

This Court has "often recognized that the grant of injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances.'" *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) (citation omitted). That burden is "particularly heavy" for a

mandatory preliminary injunction. *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). Because it "alter[s] the status quo," *id.*, a mandatory preliminary injunction is "employed only in the most unusual case," *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

Plaintiff has not met either of the two "gateway" factors. The harm to NBME, other test-takers, and the public also supports denying the motion. The district court's mandatory preliminary injunction should be reversed.

## I.    The district court erred in concluding on the merits that Plaintiff is "disabled."

Plaintiff is not significantly impaired in reading or attention compared to most people in the general population. She is therefore not "disabled" within the meaning of the ADA.

### A.    The ADA

Under Title III of the ADA, NBME must offer the US-MLE "in a place and manner accessible to persons with disabilities." 42 U.S.C. § 12189.[8] To prove a violation, a plaintiff

---

[8] The district court mistakenly indicated that Plaintiff's claim arises under 42 U.S.C. § 12182, which covers "public accommodations." Appx27-28. Because NBME is a "private entity" covered by Section 12189, Section 12182 does not

must first show she is disabled. *See Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 626 (6th Cir. 2000). Thus, the key question on appeal is whether, as a threshold matter, Plaintiff is "disabled" within the meaning of the ADA.

"Disability" is a legal term of art, tied to substantial impairment relative to most people. As relevant here, it requires "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102 (1)(A). Under implementing Department of Justice ("DOJ") regulations, a "major life activity" includes "learning, reading, concentrating, [and] thinking," and a "physical or mental impairment" includes specific learning disorders and ADHD. 28 C.F.R. § 36.105(b)(2), (c)(1).

It is important to understand the difference between a diagnosis, an impairment, and a legal disability. Plaintiff presented diagnoses of various "impairments." Although NBME disputes that Plaintiff suffers from any "mental impairment," this Court need not decide that question. Critically, an "impairment" is not a legal *disability* unless it

---

apply. *Doe v. Nat'l Bd. of Med. Exam'rs*, 199 F.3d 146, 154-55 (3rd Cir. 1999).

"substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population.*" 28 C.F.R. § 36.105(d)(1)(v) (emphasis added).

Relative to "most people" means to a greater degree than the majority of people. *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 42 (1st Cir. 2018). Thus, in assessing substantial limitation, courts have emphasized that the point of comparison is not high-performing groups—future doctors or college graduates—but rather most members of the general population. *See, e.g.*, *Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 508 F.3d 1097, 1103 (D.C. Cir. 2007).

Here, even assuming that Plaintiff has an impairment, she was required to prove she is substantially limited compared to most people. As set forth below, she did not, and cannot, do so.

## B.   The district court did not apply the correct legal standard for a "disability."

The central legal issue on appeal is whether the district court erred in ruling that Plaintiff is "disabled"—that is, substantially limited in a major life activity (reading, thinking,

or concentrating) as compared to most people in the general population. *See* 28 C.F.R. § 36.105(d)(1)(v).

The district court correctly found—based on significant and largely uncontradicted evidence—that Plaintiff performs at a level *above* that of the average person. Appx39-40. In nonetheless concluding that Plaintiff is disabled under the ADA, the court never determined that she is substantially impaired compared to most people. That was legal error.

Rather, its disability determination (1) relied on facts legally insufficient to establish a disability, and (2) misinterpreted the 2008 amendments to the ADA as effectively mandating deference to a plaintiff's supporting professional. Separate and apart from its legal errors, the district court also relied on clearly erroneous factual findings.

### 1. The evidence relied on was insufficient to demonstrate a disability.

The district court never found that Plaintiff is disabled based on a substantial limitation. Instead, it improperly determined that she is disabled because of (1) diagnosed impairments, (2) receipt of past accommodations for part of her time at Ohio State and in medical school, and (3) her strong work ethic. But none of that evidence—even accepted as

true—can establish a disability under the ADA absent a finding of substantial limitation compared to most people in the general population. As noted above, the district court made no such finding.

In fact, the district court's *single* statement comparing Plaintiff to the general population found that she *outperforms* most people:

> [W]e note at the outset that Defendant is right that the documentary evidence of Plaintiff's ADHD and dyslexia in her early years is indeed sparse and that for the most part, Plaintiff performed exceedingly well overall academically during this time with little help. Likewise, Ms. Ramsay scored quite well on several standardized tests without accommodations, including the ACT and the MCAT[.]
>
> **Certainly, in comparison to the average individual in the general population, Plaintiff appears to have been and continues to be quite successful in her endeavors**.

Appx39-40 (emphasis added).

The court's finding that Plaintiff outperforms the average person is consistent with, and compelled by, the overwhelming evidence of largely above-average grades and standardized test scores, earned without accommodations, since she was in kindergarten (including her top three percent ACT score and top 21 percent MCAT score); *see* Appx926-928

(summaries of Plaintiff's academic and testing histories). "[T]he record shows that [Plaintiff] never experienced significant academic difficulties, and in fact has excelled academically for most of [her] years [in school.]" *Bercovitch v. Baldwin Sch. Inc.*, 133 F.3d 141, 155 (1st Cir. 1998).

"Of course, average (or above-average) performance presumptively establishes the absence of a substantial limitation." *Black v. Nat'l Bd. of Med. Exam'rs*, 281 F. Supp. 3d 1247, 1249 (M.D. Fla. 2017); *see Marshall v. Sisters of Holy Family of Nazareth*, 399 F. Supp. 2d 597, 603 (E.D. Pa. 2005) ("[A] student who learns as well as the average student does not have an impairment that substantially affects the major life activity of learning."); *Healy v. Nat'l Bd. of Osteopathic Exam'rs*, 870 F. Supp. 2d 607, 620 (S.D. Ind. 2012) ("By definition, 'average' is not 'substantially limited.'"). The court at no point—in its order or at the hearing—found that Plaintiff is substantially limited compared to most people (nor did Plaintiff's own expert even testify she is).

In nevertheless concluding that Plaintiff is disabled under the ADA, the court made various errors. *First*, it improperly conflated a disability under the ADA with a mere

diagnosis or impairment. The district court reasoned: "Plaintiff is disabled within the meaning of the [ADA] *by virtue of* her diagnoses of [ADHD and] Specific Learning Disorder[.]" Appx58 (emphasis added); *see also* Appx40 (disregarding Plaintiff's above-average performance because she "has a history of having struggled").

But *even accepting* Plaintiff's diagnosed impairments as valid (and NBME disputes they are), they do not establish a legal disability. 28 C.F.R. § 36.105(d)(1)(v); *Matthews v. Penn. Dep't of Corr.*, 613 F. App'x 163, 167 (3rd Cir. 2015) ("[N]ot every impairment will constitute a disability[.]"). Rather, an impairment "does not make one disabled for purposes of the ADA" *unless* it substantially limits the individual relative to most people. *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009); *see Healy*, 870 F. Supp. 2d at 620 (distinguishing between a clinical diagnosis "based on an internal referent"—*i.e.*, the plaintiff's intellectual ability or IQ versus her achievement, as reflected on diagnostic tests—and the ADA's definition of disability, which requires a comparison to most people).

District courts, including ones in this Circuit, have cor-
rectly recognized the critical distinction between a diagnosed
impairment and a legal disability under the ADA. *See e.g.*,
*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*, No. 15-
4987, 2016 WL 1404157, *2, 5, 11 (E.D. Pa. Apr. 11, 2016)
(holding that the plaintiff, who was indisputably dyslexic
and born deaf, was not legally disabled because her impair-
ments did not substantially limit her compared to most peo-
ple); *Healy*, 870 F. Supp. 2d at 617, 620 (holding that the
plaintiff suffered from a reading disorder but was not sub-
stantially limited relative to the average person).

Here, Plaintiff's diagnosed impairments likewise cannot
support a disability determination unless she is substan-
tially limited compared to most people in the general popula-
tion. She is not, and the district court never found that she
is. In fact, the court reached the opposite conclusion. By con-
flating a mere diagnosed impairment with a "disability" and
ignoring its own finding of consistent above-average perfor-
mance, the court misapplied the correct legal standard. 28
C.F.R. § 36.105(d)(1)(v). The court's disability determination
based on that analysis is erroneous.

*Second*, the court erred by embracing Plaintiff's legal argument that her "past record of having received accommodations" effectively precluded NBME from denying accommodations because of the regulatory requirement that "considerable weight" be given to a person's prior receipt of accommodations. Appx55 (citing 28 C.F.R. § 36.309(b)(1)(v)).

The Fifth Circuit recently rejected that exact argument in a decision vacating a preliminary injunction awarded to a prospective USMLE examinee. *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 466 (5th Cir. 2019) (concluding the plaintiff had not shown she was disabled, despite having learning disorder and ADHD diagnoses and receiving accommodations in medical school). Section 36.309(b)(1)(v), the Fifth Circuit explained, "applies only *after* a person establishes that they are disabled under the ADA." *Id.* (citing § 36.309(a)) (emphasis added). Because the plaintiff had not established a disability within the meaning of the ADA, the regulation did not apply to her.

The Fifth Circuit also reasoned that the plaintiff's medical school might have provided accommodations even if they were not warranted under the ADA, and that its decision in

that regard did not bind other entities from which accommodations were later sought. *Id.* ("Tulane may grant accommodations to individuals who do not meet the ADA's definition of disability."). Indeed, researchers have found that many students receiving accommodations in colleges are not disabled under the ADA:

> Although these students may believe their academic abilities and test-taking skills are impaired compared to their intellectually talented and high-achieving classmates, there is often little evidence that they experience substantial limitations in academic skills compared to most people in the general population, as characteristic of a disability.

Robert Weiss et al., *When Average Is Not Good Enough: Students With Learning Disabilities at Selective, Private Colleges*, J. of Learning Disabilities 1-17 (2016).[9]

Here, Plaintiff's receipt of extra time for part of college and in medical school—while relevant—was not entitled to

---

[9] *See also, e.g.*, W. Lindstrom, et al., *Postsecondary ADHD Documentation Requirements: Common Practices in the Context of Clinical Issues, Legal Standards & Empirical Findings*, 19(8) J. of Attention Disorders 655, 655 (2015) (finding that the "majority of institutions required little to verify ADHD as a disability," and that the documentation requirements for most schools "failed to address identified weaknesses in ADHD diagnosis and disability determination").

controlling weight in determining whether she is disabled. Not only was there no evidence that Plaintiff's college and medical school applied the ADA's definition of a disability, but Plaintiff's own expert testified that her college and medical school relied on faulty diagnoses in granting her accommodation. Appx282, 436-438, 520-523, 550-552.

*Third*, the district court appears to have concluded that Plaintiff is disabled because her academic success reflected "remarkably hard work habits," Appx56, which, according to Plaintiff, enabled her to overcome her alleged disabilities, *see, e.g.*, Appx66 (stressing "all of her hard work"); *see also* Appx42 (emphasis by the district court that Plaintiff "spent far more time completing her homework assignments and tests than her peers").

But working hard does not show that Plaintiff is substantially impaired. *See Healy*, 870 F. Supp. 2d at 618, 620-22 (acknowledging that the plaintiff was a driven, hard-working individual with a reading impairment, but concluding that he was not disabled under the ADA). That Plaintiff spent more time studying "simply describes good study habits." *Id.* at 621. It is also unsurprising given her ability to excel in

high school despite a remarkably demanding schedule of Honors and AP classes and many extracurricular activities. Plaintiff's work ethic does not evidence a substantial limitation in reading or any other major life activity.

* * *

Plaintiff is not substantially limited compared to most people, as confirmed by two decades of objective evidence in the form of educational and standardized testing records from situations where Plaintiff was motivated to put forth her best effort. The district court did not find otherwise, and her expert, Dr. Smith, did not testify otherwise. In nevertheless concluding that Plaintiff is disabled, the district court failed to apply the correct legal standard.

## 2.    The district court misinterpreted the ADAAA.

The district court also misinterpreted the Americans with Disabilities Act Amendments Act ("ADAAA") as essentially eliminating a plaintiff's burden of proving a disability.

Noting that the term "disability" should "be construed broadly," the court reasoned:

> In many ways, the outcome of this case is best achieved by resolving a "battle of experts[.]" . . . In undertaking this resolution, however, we are constrained to follow the

provisions of the ADA and the guidance and directives set forth in the implementing regulations[.]

[N]either Dr. Lovett nor Dr. Zecker evaluated or even met with Plaintiff before testifying before this Court at the hearing. . . . [They] focused primarily on Plaintiff's record of academic performance throughout her school years and her performance on standardized tests and on the paucity of documentation of disability in her primary and secondary school years.

[I]n their rejection of the conclusions of those providers who actually *did* evaluate Plaintiff, **Drs. Lovett and Zecker instead undertook to analyze the results of the various tests themselves**, substituting their own opinions regarding how those test results should be interpreted. . . . **This was a blatant error** in light of the language of both the statute and relevant provisions of the Code of Federal Regulations.

Appx52-53 (bold emphasis added). Despite its reference to a "battle of experts," the court made no credibility determination—noting only that both side's experts "appear eminently qualified." Appx52.

Instead, the district court deferred to Plaintiff's expert because it interpreted the ADAAA to effectively eliminate a plaintiff's burden of proving a disability and to compel deference to professionals who met personally with the plaintiff (even if the professionals ignored relevant evidence, such as grades and standardized test scores, or failed to apply

applicable diagnostic criteria). But nothing in the relevant statute, implementing regulations, or case law supports that interpretation.[10]

As an initial matter, the ADAAA was enacted "to specifically address certain impairments that were not receiving the protection that Congress intended," such as "cancer, HIV–AIDS, epilepsy, [and] diabetes[.]" *Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 513 (E.D. Pa. 2012). Such physical impairments, unlike a learning disability or ADHD, tend to be relatively straightforward, both in terms of their existence and any resulting functional limitations. *See, e.g.*, *Matthews*, 613 F. App'x at 167 (reasoning that a person who cannot lift more than 20 pounds for several months is substantially limited). The ADAAA's broad introductory language, on which the Court's preliminary

---

[10] The court devoted four pages to quoting as "particularly instructive" an inapt regulation at 29 C.F.R. § 1630.2(j), which the court mistakenly referred to as a "Department of Justice" regulation. Appx32-36. The regulation was promulgated by the EEOC, not DOJ, and addresses the ADA's Title I (dealing with employment), not Title III. Regardless, the regulation does not support the district court's analysis.

injunction order so heavily relied, Appx53-54, should be understood in that context.

More importantly, the ADA's "expansive" coverage extends only as far as its concrete legal standards. *See* 28 C.F.R. § 36.101(b) ("[T]his part shall be construed broadly in favor of expansive coverage to the maximum extent *permitted by the terms of the ADA*" (emphasis added)). The ADAAA's "general policy statement" regarding broad coverage "cannot trump [its] plain language" establishing who qualifies as disabled. *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1110-12 (8th Cir. 2016); *see also Doherty v. NBME*, 791 F. App'x at 464 (although the ADA "provide[s] for expansive construction," courts "must still analyze [the ADA's definition of disability] logically" and with due regard for the statute's express requirements).

Thus, although "the ADAAA made it easier to prove a disability, [a plaintiff] must still show a substantial limitation." *Cunningham v. Nordisk*, 615 F. App'x 97, 100 (3d Cir. 2015). Congress "in no way eliminated the term ['disability'] from the ADA or the need to prove a disability," *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 & n.4 (5th Cir.

2013), and in fact "expressly chose to retain the 'substantially limits' modifier for 'one or more major life activities,'" *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 434-35 (6th Cir. 2016). *See also Mann*, 535 F. App'x. at 410 ("Although the [ADAAA] lowered the standard that plaintiffs must meet to show that they are disabled," they "must still show substantial limitation.").

It also remains insufficient, post-ADAAA, to simply establish a diagnosed impairment. "[T]he amendments themselves made clear that 'not every impairment will constitute a disability within the meaning of [the ADA].'" *Bibber*, 2016 WL 1404157, at *6 (citations omitted); *see* Statement of the Managers to Accompany S. 3406, The Americans with Disabilities Act Amendments Act of 2008, 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) ("By retaining the essential elements of the definition of disability including the key term 'substantially limits' we reaffirm that not every individual with a physical or mental impairment is covered by the . . . definition of disability in the ADA.").

Rather, "[t]he relevant inquiry remains whether the impairment 'substantially limits [their] ability . . . to perform a

major life activity as compared to most people.'" *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013), *aff'd*, 582 F. App'x 114 (3d Cir. 2014). In short, the ADAAA did not eliminate a plaintiff's burden of proving a disability or the need to show a substantial limitation compared to most people.

Applying that framework, numerous courts (pre- and post-ADAAA) have rejected the conclusions of an examinee's supporting professional in analogous cases, oftentimes because—as here—they did not align with "real-world" evidence, *e.g.*, grades and standardized test scores.

In *Bibber*, for example, Judge Dalzell relied upon the expert opinion of the defendant testing agency's outside consultant, even though that individual had never met with the plaintiff. 2016 WL 1404157, at *4-5, 11. In holding that the plaintiff was not disabled, despite a diagnosis and diagnostic test scores in the bottom first and sixth percentile, Judge Dalzell reasoned that the plaintiff's academic and testing success without accommodations was "inconsistent with the notion that her dyslexia *substantially limits* her ability to read and process information compared to the general

population." *Id.* at *3, 10-11. Rather, her successes "evidence[d] someone who is a slow reader [but] able to read effectively in both academic situations and daily activities." *Id.* at *9.

Other courts in this Circuit have likewise declined to allow diagnostic tests to trump real-world academic testing results. *See, e.g.*, *Love v. LSAC*, 513 F. Supp. 2d at 208, 226 n.21, 227, 229 (holding that plaintiff diagnosed with a learning disability and ADHD was not disabled under the ADA, emphasizing his average ACT and SAT earned without accommodations and "giv[ing] little credence to" diagnostic test scores that were "so low that they must be treated as outliers or worse"); *Rawdin*, 985 F. Supp. 2d at 651-52.

Similarly, outside this Circuit, the *Healy* court scrutinized the expert opinions from both sides and ultimately agreed with the defendant testing agency's expert, who had relied heavily on the plaintiff's academic success without accommodations. 870 F. Supp. 2d at 620-21. The court discredited the plaintiff's experts' diagnosis of ADHD and—while it did agree the plaintiff had a reading disorder—concluded that he was not disabled given his "stellar academic record,

the majority of it achieved in the absence of accommodations." *Id.* at 617-19, 620-21 ("Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, still stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population."); *see also Black v. NBME*, 281 F. Supp. 3d at 1252-53 ("[C]onsidered in contrast to more than two decades of above-average performance, the superficial, equivocal, or unqualified opinions [of the plaintiff's psychologists] create no genuine dispute of material fact.").[11]

Moreover, no court has ruled that a testing agency must disregard the findings of its external expert simply because

---

[11] *See also Gonzales*, 225 F.3d at 629-30; *Glueck v. Nat'l Conf. of Bar Exam'rs*, No. SA-17-CV-451-XR, 2018 WL 3977891, at *6 (W.D. Tex. Aug. 20, 2018); *Bach v. Law Sch. Admission Council*, No. 1:13-CV-888, 2014 U.S. Dist. LEXIS 124632, at *5 (M.D.N.C. Feb. 4, 2014); *Rumbin v. Ass'n of Am. Med. Colleges*, 803 F. Supp. 2d 83, 95 (D. Conn. 2011); *cf. Collins v. Prudential Inv. & Ret. Servs.*, 119 F. App'x 371, 378 (3d Cir. 2005) ("[Plaintiff's] work, academic [background], and community involvement contradict[] her claim that [ADHD] substantially limits her abilities to think, learn, remember and concentrate."); *Marshall*, 399 F. Supp. 2d at 603-04.

that person never met with the plaintiff. Not only is there no authority for that unreasonable and impractical position, but DOJ has said, post-ADAAA, that NBME "is *not required* to defer to the conclusions or recommendations of an applicant's supporting professional[.]"[12]

And the facts of this case show why requiring deference to an applicant's supporting professional, simply because he or she personally evaluated an applicant, would also be illogical: the district court suggested that NBME was required to defer to the findings and recommendations of professionals who personally evaluated Plaintiff, Appx52-53, but—according to her own testifying expert—earlier professionals whom she consulted failed to perform proper diagnoses (Appx282, 436-438, 520-523, 550-552); *see also* W. Mehrens et al., *Accommodations for Candidates with Disabilities*, 63 The Bar Exam'r, No. 4, at 33, 36 (1994) ("There is great difficulty in accurately diagnosing a learning disability, and it is well known that many [such diagnoses] are done . . . in error.").

---

[12] *Settlement Agreement Between United States of Am. & Nat'l Bd. of Med. Exam'rs*, DJ # 202-16-181 ¶ 17 (Feb. 23, 2011), https://www.ada.gov/nbme.htm (emphasis added).

Allowing for different opinions is a good thing, particularly as it relates to diagnostic evidence offered to obtain extra time on exams used for medical licensure. Even in the Social Security context, where, unlike here, there *is* a regulation calling for extra weight to be given to a treating physician's views, courts have recognized that those views do not carry talismanic weight. The Seventh Circuit held in one case, for example, that an administrative law judge "was justified in giving greater weight to the medical evidence that contradicted the treating physician's evidence," noting that "many" treating physicians "will often bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *cf. Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (holding that ERISA plan administrators need not defer to a claimant's treating physician in determining whether the claimant has a qualifying disability, and explaining that the treating physician may have only known the claimant briefly and have an "incentive" to find the claimant disabled).

Here, of course, Dr. Smith was not Plaintiff's treating physician in all events; he was someone Plaintiff consulted

to get a diagnosis and a report to demonstrate her need for accommodations on the USMLE.

In short, there is no support for the lower court's conclusion that NBME must defer to an examinee's professional, that grades or standardized test scores cannot be relied on or determinative, or that the ADAAA somehow eliminated Plaintiff's—or any ADA plaintiff's—burden of establishing a disability. *See, e.g.*, Appx54 (reasoning that NBME failed to comply with "the implementing regulations" by "re-analyzing the results of the . . diagnostic tests" and "focus[ing] on whether Plaintiff met the definition of disability").

To the contrary, the court's misreading of the ADA conflicts with the statute, as amended, which retains the substantial limitation requirement. *Cf. B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 159-60 (2d Cir. 2016) (rejecting interpretation of the ADA that read out the "substantial limitation requirement"). It also conflicts with the regulations, which state that not every diagnosed impairment will qualify as a disability, and that whether a disability exists in a given case requires "individualized assessment." 28 C.F.R.

§ 36.105(d)(v), (vi). The court's disability determination based on that error is both unsupported and unsupportable.

To the extent the inquiry at hand should "not demand extensive analysis," *see* Appx54, the largely uncontradicted evidence of Plaintiff's lifetime of stellar academic and standardized testing performance supports only one conclusion—Plaintiff is not substantially limited in any major activity compared to the average person. *See* 28 C.F.R. § 36.101(b); § 36.105(d)(1)(v).

But the importance of this case goes well beyond the single plaintiff now before the Court. In stark contrast to the holdings and analysis in other decisions from this Circuit (*e.g., Bibber* (E.D. Pa.), *Love* (E.D. Pa.), *Rawdin* (E.D. Pa.)), the court below allowed Plaintiff's performance on a handful of diagnostic assessments—administered to support extra time on a licensing exam by a professional consulted specifically to help secure accommodations—to trump two decades of "real world" evidence showing she is not substantially limited compared to most people.

The lower court's decision is a roadmap to receiving accommodations for anyone who can secure a diagnosis and

litigate, to the detriment of other examinees and the public, and creates a strong disincentive for testing agencies to ever deny accommodations, even when unwarranted. *See Powell v. NBME*, 364 F.3d at 88-89; *Healy*, 870 F. Supp. 2d at 616 (the ADA is not meant "to allow individuals to advance to professional positions through a back door"); *supra*, note 1.

### C.   The district court's factual findings were clearly erroneous.

For the reasons stated above, Plaintiff cannot satisfy the standard for a disability under the ADA even if one accepts all the district court's factual findings. But the district court also clearly erred in making three factual findings that appeared to anchor its analysis: (1) that NBME denied her accommodations request "notwithstanding that its evaluator accepted that Plaintiff's 'exceptionally low scores'" were "valid and credible," Appx18; (2) that "Plaintiff was unable to read all the questions" when she took Step 1, Appx14; and (3) "that many of [Plaintiff's] elementary, middle and high school teachers" provided informal accommodations, including extra testing time, Appx41.

*First*, neither NBME nor its external expert accepted Plaintiff's aberrationally low scores on the Smith evaluation

as credible. NBME's letter (partially quoted by the district court, Appx18) unambiguously stated that Plaintiff's reading scores in the bottom five percent, on tests she took to secure extra time, were *not credible* given two decades of above-average scores. Appx1512. NBME's two independent experts reached the same conclusion. Appx410, 801.

**Second**, the district court clearly erred in finding that Plaintiff was required "to guess at the answers to . . . questions that she did not have time to read." Appx14. NBME established, and Plaintiff did not rebut, that she had time to read *every* question on Step 1. Appx642-649. As described previously, Plaintiff averaged 76 seconds on questions she got right, and 107 seconds on those she missed (17 seconds longer than the average time allotted per question). Appx642, 644. She spent less than 20 seconds on four questions and answered them all correctly. Appx646.

The district court ignored that uncontradicted evidence (and accepted Plaintiff's repeated and unsubstantiated assertions otherwise). Its finding was clearly erroneous—particularly so against a background of numerous other

instances of extensive, objective evidence flatly contradicting Plaintiff's self-reported history.

And *third*, the court clearly erred in accepting Plaintiff's testimony at the hearing that she had received "informal" academic accommodations all her life, including extra testing time. Appx40-41; *see, e.g.*, Appx164 (testifying that she received special assistance from teachers during those years "on virtually a daily basis"). On her initial accommodation request form to NBME, Plaintiff identified a single instance of accommodations prior to college (formal or informal), from an elementary school teacher, and the accommodations did not include extra testing time. Appx1072. None of her K-12 report cards reflect any accommodations, even though some included questions to teachers on that specific topic. *See, e.g.*, Appx880, 887, 889. Her long-time physician noted that she had no known history of accommodations prior to college, when he submitted a form supporting accommodations for her at Ohio State. Appx942. And Plaintiff noted in her personal statement to NBME that she was first "tipped off" that she might have a "problem" that required accommodations when she got an A- in a college course. Appx1078-1079.

## II.    Plaintiff failed to show that she is likely to suffer irreparable harm.

Plaintiff will not be irreparably harmed if she must take Step 1 without twice the testing time afforded to other examinees. Any claimed injury is neither (1) "irreparable," nor (2) "likely." *See Reilly*, 858 F.3d at 177 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**Is the harm "irreparable"?** Mere delay in testing or education is not irreparable harm. *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126 (10th Cir. 2004); *see Martin v. Helstad*, 699 F.2d 387, 391-92 (7th Cir. 1983).

Here, the district court abused its discretion in finding irreparable harm where Plaintiff did not establish any alleged injury beyond a potential delay in her medical school education. Plaintiff's school clarified the "expectation that [Plaintiff] would take the USMLE Step 1 and return to the WMed curriculum by March 2, 2020." Appx1522. It stressed that she could "return to the curriculum upon *taking* Step 1." Appx1522 (emphasis added). Alternatively, she could withdraw and reapply once ready to take Step 1 (with or without accommodations). Appx1520. Because Plaintiff could have returned to school regardless of whether she passed, the

district court's finding that she "will be required to withdraw . . if she does not take and pass [Step 1] by March 2, 2020" was clearly erroneous. Appx14-15; *see also* Appx56.[13]

The harm was not irreparable if she could not take Step 1 with extra time before March 2 (as she alleged), and it is not irreparable now. Plaintiff articulated no alleged harm beyond the possibility that she might have to take time off from, and later reapply to, medical school. That alone is insufficient to justify the extraordinary relief granted.

**Is the harm "likely"?** Perhaps even more fatal to Plaintiff's claim of irreparable harm is that her alleged injury was purely speculative. *Winter*, 555 U.S. at 22 (irreparable harm must be "*likely*"). Plaintiff said only that she "*may* never be able to receive the academic degree of Doctor of Medicine," and "[f]urther delay *could* jeopardize even this very delayed schedule." Dist. Ct. Dkt. 7 at 4; Appx851(emphases added).

The district court—despite ordering a change in the status quo and allowing Plaintiff to bypass the normal litigation

---

[13] Plaintiff's medical school did not mention the other USMLE exams (Step 2 CK, Step 2 CS, and Step 3), *see* Appx1513-1525, and the district court never explained why she would be irreparably harmed if she could not immediately obtain an order granting extra time on those exams (one of which she will likely not take for at least two years).

process—made no finding that Plaintiff will likely fail Step 1 without extra time. Nor is there evidence she would. To the contrary, the mountain of evidence in this case compels the opposite conclusion. Plaintiff admitted that the low scores she received on medical school subject-matter exams, which she took with double testing time, had *nothing to do with* how much time she received. Appx302, 306. She did poorly because she did not know the material. Appx306.

Moreover, Plaintiff missed passing Step 1 by a single point. Appx1028. Although she says this was because she was forced to "blindly select" answers for 35 to 40 percent of the questions, the evidence, as noted above, shows that insufficient time was not the issue. If anything is "likely," it is that Plaintiff will pass under standard conditions if adequately prepared.[14] *Cf. Singh v. George Wash. Univ. Sch. of Med. & Health Scis.*, 667 F.3d 1, 6 (D.C. Cir. 2011) (medical

---

[14] Courts have held that alleged harm is speculative where it is unclear a plaintiff would fail, given prior success on tests without accommodations. *See e.g.*, *Bach,* 2014 U.S. Dist. LEXIS 124632, at *5-6; *Kelly v. W. Va. Bd. of Law Exam'rs*, No. 2:08-00933, 2008 WL 2891036, at *2 (S.D.W. Va. July 24, 2008); *Baer v. Nat'l Bd. of Med. Exam'rs*, 392 F. Supp. 2d 42, 49 (D. Mass. 2005).

student failed to establish ADA claim where there were "many reasons . . . that might explain why [she] has done relatively poorly on [certain] time-limited tests"); *Steere v. George Wash. Univ. Sch. of Med. & Health Scis.*, 439 F. Supp. 2d 17, 23 (D.D.C. 2006) ("[P]laintiff's recent struggles are uncharacteristic in light of his academic record, and may simply reflect his inability to successfully adjust to new, more competitive tests.").

Because the mere *possibility* of injury is insufficient, Plaintiff did not meet her heavy burden of establishing likely irreparable harm.

*   *   *

As Plaintiff has demonstrated neither the first factor nor the second, the Court should reverse the preliminary injunction. *Reilly*, 858 F.3d at 179. The third and fourth factors also weigh in NBME's favor.

## III.    NBME and other test-takers will be harmed by the preliminary injunction.

The district court never addressed the effect on NBME of denying the preliminary injunction. *See* Appx57. That alone was legal error. *Winter*, 555 U.S. at 24 ("[Courts] *must* consider the effect on each party of granting or withholding the

requested relief." (emphasis added)); *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("[P]laintiff [must] establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

Setting that error aside, NBME and other test-takers will be irreparably harmed if the preliminary injunction is not vacated. Once Plaintiff submits her USMLE scores in applying for a residency position, it will impact the relative ranking of other USMLE examinees in the highly competitive residency application process.

Indeed, Plaintiff testified that the importance of a competitive Step 1 score in the residency match is "huge" and "the first thing that programs look at." Appx138. "[I]f you have a low score," Plaintiff testified, "[the residency program] may filter you out." Appx138; *see* Appx139 (expressing concern about her unaccommodated Step 1 score as "compared to everyone else"); Appx691 ("If you pass by a point or two, your ability to get a residency is irrevocably harmed.").

The district court, moreover, found that the scores "are used by medical residency training programs throughout the

United States to rank student candidates in the very-competitive residency match process." Appx10. The relative impact of scores applies to both Step 1 and Step 2 CK, which Plaintiff may also take with double testing time under the lower court's mandatory preliminary injunction.

Plaintiff has acknowledged that other USMLE examinees will be impacted if her Step 1 score stands. She represented to this Court in opposing a stay that, because she "will not be able to participate in the National Resident Matching Program until **2021,**" there was "no emergency requiring this Court to act precipitously on a procedural motion[.]" ECF 17, at 2-3. "No one will be harmed" absent a stay, she argued, "because she cannot even enter the Match until 2021, by which time this Court will have had the benefit of full briefing[.]" *Id.* at 8.

Lastly, Plaintiff argued below that NBME suffers no harm because giving her extra time "cost[] them nothing to provide[.]" Appx66. But that reasoning misses the mark. The harm here has nothing to do with logistics or cost, and everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the

public welfare. *Those* are the interests NBME seeks to protect, and they are important. *See Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419, 422 (S.D.W. Va. 1997) ("If a court were to grant testing accommodations to persons that do not have disabilities within the meaning of the ADA, it would allow persons to advance to professional positions through the proverbial back door," thereby "undermining the integrity of the USMLE."); *Rothberg*, 102 F. App'x at 126-27 (overturning preliminary injunction that allowed plaintiff to take the LSAT with extra time and noting LSAC would be irreparably harmed if the accommodated score were released).

## IV.  Injunctive relief would disserve the public.

The public interest also weighs strongly in favor of reversing the mandatory preliminary injunction. Like NBME, "the public also has an interest in the fair administration of standardized tests." *Bach v. Law Sch. Admission Council*, 2014 U.S. Dist. LEXIS 124632, at *8 (M.D.N.C. Feb. 4, 2014); *see Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 381 (5th Cir. 2016) (concern that the plaintiff "might obtain an unfair advantage over other students by having an extra two weeks to study" was a legitimate and "serious" reason

for denying accommodations). That interest is particularly strong where, as here, medical licensing authorities rely on the test to assess the competency of potential doctors in making licensing decisions. Appx763.

And if residency programs or other third parties rely on USMLE scores earned with unwarranted accommodations, it will "alter[] the substance of the product because the resulting scores [will] not be guaranteed to reflect each examinee's abilities accurately." *Powell v. NBME*, 364 F.3d at 89. That would unfairly advantage Plaintiff to the detriment of both residency programs and other residency applicants. Because that includes applicants with disabilities under the ADA, the injunction could harm the very population the ADA is meant to protect.[15]

---

[15] Although the court referenced a need for physicians in "rural, economically-depressed areas of the Country," it never found that Plaintiff intends to practice in such an area, nor is there any indication she does. Appx57. Regardless, it would be inappropriate to alter ADA standards because a plaintiff might decide to practice in a rural area.

## CONCLUSION

A "mandatory [preliminary] injunction is an extraordinary remedy to be employed only in the most unusual case." *Trinity*, 735 F.3d at 139. This is not that case.

The district court erred in concluding that Plaintiff is disabled within the meaning of the ADA and that Plaintiff carried her burden of demonstrating likelihood of success and likely irreparable harm absent an injunction. The mandatory preliminary injunction granting Plaintiff double testing time should be reversed.

Respectfully submitted,

Alison R. Caditz, #51530
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

/s/ Robert A. Burgoyne
Robert A. Burgoyne, #366757
Caroline Mew, #467354
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

*Counsel of Record for Defendant-Appellant*

March 23, 2020

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,930 words, excluding the parts exempted by Rule 32(f). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

**ELECTRONIC DOCUMENT CERTIFICATE**

I certify that: (1) the electronic submission is an exact copy of the paper document; and (2) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF BAR ADMISSION

Pursuant to Local Appellate Rule 46.1(e), I certify that I am counsel of record and a member of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Robert A. Burgoyne
Robert A. Burgoyne