Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**JOINT APPENDIX
VOLUME II: APPX63-725**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# **TABLE OF CONTENTS**

## **Volume I: Appx1-62**

                                                              **Page**

District Court Docket.....................................................Appx1

Notice of Appeal (Jan. 7, 2020)....................................Appx7

District Court Order Granting Preliminary
Injunction (Dec. 31, 2019)............................................Appx9

District Court Order Denying Motion to Stay
(Feb. 4, 2020) ..............................................................Appx62

## **Volume II: Appx63-725**

Preliminary Injunction Hearing Transcript
(Dec. 3-5, 2019) ........................................................ Appx63

## **Volume III: Appx726-1027**

Complaint (May 8, 2019) ...........................................Appx726

Answer to Complaint (July 8, 2019).........................Appx747

Declaration of Catherine Farmer, Psy.D. ................Appx762

Declaration & Resume of Steven G. Zecker,
Ph.D. .........................................................................Appx771

Declaration & Resume of Benjamin J. Lovett,
Ph.D. .........................................................................Appx795

Declaration & Resume of Robert D. Smith,
Ph.D. .........................................................................Appx827

Declaration of Jessica Ramsay ................................Appx840

Resume of Jessica Ramsay .....................................Appx854

Kindergarten Progress Reports & Test Record
(1995-96) ................................................................Appx857

First Grade Progress Report & Test Record
(1996-97) ................................................................Appx871

Second Grade Progress Reports & Test Record
(1997-98) ................................................................Appx875

Third Grade Report Card (1998-99) .........................Appx879

Tanguay Letters & Notes (1997, 2000) ....................Appx881

Fourth Grade Report Card (1990-2000)....................Appx886

Fifth Grade Report Cards (2000-01) ........................Appx888

Sixth Grade Report Card & Test Report
(2001-02) ................................................................Appx892

High School Transcript & Alumni History
(2004-08) ................................................................Appx895

Standardized Test Results (2007) ............................Appx897

High School Athletic Awards (2008) ........................Appx899

Plan ACT Score Report (2005).................................Appx904

ACT Score Report (March 2007)...............................Appx908

ACT Score Report (Oct. 2007)..................................Appx909

College Application to UW-Madison (2007).............Appx910

Ohio State University Transcript (2008-12)............Appx922

Academic & Standardized Testing History
Summaries..............................................................Appx926

Letter from Testing Organizations to Senator
Kennedy & Others (2008) .........................................Appx929

Smiy Office Visit Report (2009)...............................Appx934

Ohio State ADD/ADHD Verification Form
(2010) .....................................................................Appx939

Letter from R. Burgoyne to Disability Rights
Section (2014) .........................................................Appx945

MCAT Score Report (2011) ......................................Appx962

Livingston Evaluation & Addendum
(2014, 2016) ............................................................Appx963

Score Reports for Subject-Matter Examinations
(2014-17)..................................................................Appx969

Medical School Student Dashboard (2016)............Appx1003

Lewandowski Evaluations & Correspondence
(2017-18)................................................................Appx1006

## Volume IV: Appx1028-1366

USMLE Step 1 Score Report (2017).......................Appx1028

Ramsay Step 1 Outcome Data (2017) ....................Appx1030

Secondary Application to University of
Wisconsin ..............................................................Appx1039

Articles: *Genetic Influences on Nicotine α5
Receptor* (2015), *Organic Acid Disorders* (2018)....Appx1047

NBME Accommodations Request Form &
Personal Statement (2016) .....................................Appx1068

PowerPoint from NBME Consultants Meeting
(2016) ......................................................................Appx1083

Zecker Review of Ramsay Request (Jan. 2017) .....Appx1118

Letter from NBME to Ramsay (March 2017) ........Appx1125

NBME Accommodations Request Form &
Personal Statement (2018) .....................................Appx1127

Correspondence between Dafoe & Ramsay
(2018) ......................................................................Appx1231

Correspondence between Ramsay, Reukberg,
and/or Berger (2017-18) .........................................Appx1235

## Volume V: Appx1367-1683

Correspondence between Ramsay & Houtman
(2018) ......................................................................Appx1367

Zecker Review of Ramsay Request (July 2018) .....Appx1392

Letter from NBME to Ramsay (Sept. 2018)...........Appx1401

Michigan Dyslexia Institute Intake Interview
(2018) ......................................................................Appx1404

ADHD Symptoms Checklist (prepared by Ramsay
& Hughes)...............................................................Appx1411

Correspondence between Ramsay, Smith,
and/or Berger (2018) ..............................................Appx1415

Smith Evaluation (2018)........................................Appx1431

Smith Website Homepage.......................................Appx1462

Reconsideration Request from Berger to NBME
(Dec. 2018) ..............................................Appx1464

Lovett Review of Ramsay Request
(Dec. 2018) ..............................................Appx1507

Letter from NBME to Ramsay (Feb. 2019)............Appx1511

Leave of Absence Paperwork (2018-19) .................Appx1513

Reconsideration Request from Berger to NBME
(March 2019) ...........................................Appx1526

Correspondence from NBME to Ramsay
(March 2019) ...........................................Appx1533

Article: *An Investigation of Methods to Detect
Feigned Reading Disabilities* (2010) ......................Appx1535

Western Michigan University Medical Student
Policy Manual.........................................Appx1545

USMLE Website (2017): *Step 1* ..............................Appx1558

Sample Step 1 Test Questions (2017) ....................Appx1559

ACT: Preparing for the Exam & Sample Test
Questions (2007-08) .................................Appx1605

### Volume VI: Appx1684-1883

Sample MCAT Exam (2010) ...................................Appx1684

MCAT: *The Official Guide to the MCAT Exam*
(excerpts) (2011) .......................................Appx1758

MCAT Verbal Reasoning Questions with
Ramsay's Annotations ...........................................Appx1780

WIAT-III Item Data ...............................................Appx1798

Woodcock Johnson IV Diagnostic Test Records ....Appx1817

Gray Oral Reading Test Records ("GORT-V") .......Appx1824

TOMM Score Sheet ...............................................Appx1836

Article: *Underachievement & Learning
Disabilities in Children Who Are Gifted*
(1999-2000) ..........................................................Appx1839

Federal Register (excerpts)....................................Appx1844

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed this Appendix with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                      -  -  -

 3   JESSICA RAMSAY,              :  CIVIL ACTION NO.
           Plaintiff,            :  2:19-cv-02002
 4                               :
     v.                          :
 5                               :
     NATIONAL BOARD OF MEDICAL    :  PRELIMINARY
 6   EXAMINERS,                  :  INJUNCTION HEARING
           Defendant.           :  DAY 1
 7   _____

 8
                                James A. Byrne U.S. Courthouse
 9                              601 Market Street
                                Philadelphia, PA 19106
10                              December 3, 2019
                                Commencing at 10:44 a.m.
11   _____

12          BEFORE THE HONORABLE J. CURTIS JOYNER

13   _____

14
     APPEARANCES:
15
          REISMAN CAROLLA GRAN & ZUBA, LLP
16        BY:  LAWRENCE D. BERGER, ESQUIRE
          19 Chestnut Street
17        Haddonfield, New Jersey 08033
          (856) 354-5640
18        larry@rcglawoffices.com
          Representing the Plaintiff
19

20

21                      -  -  -

22          Ann Marie Mitchell, CRR, RDR, RMR
                Official Court Reporter
23                  (267) 299-7250

24
     Proceedings taken stenographically and prepared utilizing
25   computer-aided transcription
```

```
 1   APPEARANCES CONTINUED:

 2
            STEIN & VARGAS LLP
 3          BY:  MICHAEL STEVEN STEIN, ESQUIRE
            BY:  MARY C. VARGAS, ESQUIRE
 4          10 G Street NE
            Suite 600
 5          Washington, DC 20002
            (202) 248-5092
 6          michael.stein@steinvargas.com
            mary.vargas@steinvargas.com
 7          Representing the Plaintiff

 8

 9
            PERKINS COIE LLP
10          BY:  ROBERT A. BURGOYNE, ESQUIRE
            BY:  CAROLINE M. MEW, ESQUIRE
11          700 - 13th Street, NW
            Suite 600
12          Washington, DC 20005
            (202) 654-6200
13          rburgoyne@perkinscoie.com
            cmew@perkinscoie.com
14          Representing the Defendant

15

16                              -  -  -

17

18

19

20

21

22

23

24

25
```

1          (Court called to order at 10:44 a.m.)

2          THE COURT:  You may be seated.  Good morning.

3          RESPONSE:  Good morning, Your Honor.

4          THE COURT:  All right, Counsel.  Are we ready to

5     proceed in Ramsay v. National Board of Medical Examiners?

6          MR. BURGOYNE:  Yes, Your Honor.

7          MR. BERGER:  Yes, Your Honor.

8          THE COURT:  Very good.

9          Let me hear from you.

10          Obviously I'm familiar with the reasons why we're

11     here, in reference to the injunction hearing today.  And I saw

12     your pleadings, memorandums.

13          So if you want to make a brief opening statement, you

14     can.  If you don't, that's fine.  We can move on.  Your choice.

15          MS. VARGAS:  Just briefly, Your Honor.  My name is

16     Mary Vargas, and this is Larry Berger, and together we

17     represent the plaintiff, Jessica Ramsay, who is with us at

18     counsel table.

19          Jessica Ramsay is an extraordinary young woman.  She's

20     completed three years of medical school successfully.  She's

21     been nominated by her peers for an honors award, an honor

22     society, because of her excellence in care of patients.  And

23     part of what makes Ms. Ramsay so extraordinary is what she's

24     achieved despite a lifetime of struggling with reading and

25     focus.

1      Since Ms. Ramsay was a small child, she's required

2  extra time.  She's received accommodations either formally or

3  informally throughout her life.  But we're here because the

4  National Board of Medical Examiners, which administers the

5  United States Medical Licensing Examination, the USMLE, has

6  refused repeated requests and a wealth of documentation to

7  provide her here the accommodation that is very basic, that is

8  nothing unusual in the world of test administration, and it

9  costs them nothing to provide her at this point.

10     So despite all of her hard work, despite all of the

11  evidence that she's provided, she's now very literally on the

12  precipice of losing her future.  Her ability to be a doctor, to

13  practice medicine, rests on what this Court does.  She must

14  take the USMLE Step 1 by March 2, 2020, or she will be

15  dismissed from medical school and that will be the end of her

16  career.  This isn't like law school where you can transfer.  In

17  medical school it is almost unheard of for a student to go to

18  another medical school.  And it is entirely impossible once

19  you've been dismissed.  You have to be a student in good

20  standing to even begin the process of trying to transfer to

21  another medical school.

22     Every expert that has examined Ms. Ramsay, all of her

23  treating sources, her medical school, their faculty, her

24  college, her teachers when she was younger, everyone has

25  recognized the same thing, that she has difficulty reading,

1   that reading is slow and laborious for her.  She is a brilliant

2   young woman, but she has dyslexia and she has ADHD.

3         So in order for her to read, as you'll hear in her

4   testimony, it's an entirely different process from what you and

5   I might do, and it takes significantly more time.  The question

6   that is before the Court, as I understood from Mr. Burgoyne

7   when we met in August or September in chambers, is a very

8   limited one.  It's a question of whether or not Ms. Ramsay has

9   a disability.  This isn't a question where we look to the DSM.

10  This isn't really even a question where experts ought to be

11  competing with each other.  This is a question of whether she

12  has a substantial impairment that limits a major life activity

13  such as reading.  And the evidence will show that she does.

14        In the face of an extraordinary amount of evidence

15  from multiple sources showing that she needs extra time, the

16  NBME is offering only one thing -- well, really two things.

17  They're offering the testimony of two hired NBME consultants

18  who reviewed papers that Ms. Ramsay submitted.  They did not

19  evaluate Ms. Ramsay.  They haven't even met her before today.

20  And in the context of learning disabilities, the United States

21  Department of Justice has recognized that it is critically

22  important, specifically for learning disabilities, that an

23  individual be examined in person.

24        When the ADA Amendments Act was passed in 2008, the

25  entire purpose of that change in the law was to make it less of

1   a focus on determining narrowly whether somebody has a

2   disability.  There were Supreme Court decisions that very

3   narrowly interpreted that analysis.  The change in the law was

4   intended to avoid the very reason that we're here.  And the

5   NBME participated in that process, objected to the changes in

6   the law, sought to have the regulations not say what they

7   actually say.  And having failed to do that before in the

8   legislative process, they are now trying to do that on Ms.

9   Ramsay's back in this courtroom.

10      We ask the Court to apply the law as it's written, the

11   regulations as they were promulgated.  The United States

12   Department of Justice testing accommodations guidelines and

13   technical assistance as it was drafted, not what the NBME

14   wishes it was and not what they're trying to change it to be in

15   this courtroom.

16      And just to go very quickly through the key points of

17   that law.  First of all, Congress has said that the

18   determination of disability should not require extensive

19   analysis, that the definition of disability is meant to be

20   broadly defined, that whether a person is disabled is

21   determined without regard for any kind of self-mitigation or

22   ameliorative effects of mitigating measures.

23      The Department of Justice has specifically said with

24   respect to testing entities that they should defer to the

25   opinion of qualified professionals who have actually examined

1    the candidate in question.

2          And most notably -- and I'm going to read this part so
3    I don't get it wrong -- a person with a history of academic
4    success may still be a person with a disability who is entitled
5    to testing accommodations under the ADA.  A history of academic
6    success does not mean that a person does not have a disability
7    that requires testing accommodations.  For example, someone
8    with a learning disability may achieve a high level of academic
9    success but may nevertheless be substantially limited in one or
10   more of the major life activities of reading, writing, speaking
11   or learning because of the additional time or effort he or she
12   must spend to read, write, speak or learn.

13         That is Ms. Ramsay.

14         And finally -- well, two things.

15         The Department of Justice has said that reliance on a
16   student's grades, for example, what they got in history in 3rd
17   grade or what they got on a standardized test, reliance on that
18   in determining disability is inconsistent with the
19   Congressional intent in enacting the ADA Amendments Act.  And
20   that's what the NBME is asking this Court to do.

21         Finally, the regulations provide that testing entities
22   have to make accommodations, not to just let the person in the
23   door, but to make sure that the testing is administered in a
24   way so that it best ensures that the candidate or the student
25   is showing what they know and is not showing their disability.

1    And that is critical for Ms. Ramsay.  Having the extended time

2    in a separate room, that with extended break time, that is how

3    she can best show what she knows because of a lifetime of

4    reading disabilities.

5         So in the real world, with the law and the

6    regulations, all of the documentary evidence, all of her

7    history of accommodations, she has demonstrated that she needs

8    the accommodations that she's requested.  And applying the law

9    as it actually is mandates a conclusion that she needs those

10   accommodations.  There is an extraordinary likelihood of

11   success on the merits in this case.

12        The public interest must support an accomplished young

13   woman who has fought tooth and nail to achieve despite

14   disabilities.  They must support her.  And in this case there

15   is no cost to the NBME because they've already agreed that she

16   can have the test over two days.  So doing the test with

17   extended time, it's still a two-day test.  It doesn't require

18   any additional testing beyond that.  There is no cost.

19        And most importantly, it allows us to have a young

20   woman who has worked incredibly hard for what she's

21   accomplished to become a doctor.  And that's the kind of doctor

22   that I want, and that's certainly the kind of doctor that the

23   public interest wants to be supporting.

24        Thank you.

25        THE COURT:  Very well.  Yes, Counsel.

1        MR. BURGOYNE:  Thank you, Your Honor.  Robert Burgoyne

2   for the National Board of Medical Examiners.  And with me today

3   is my colleague, Caroline Mew.

4        We're here today, Your Honor, as you know, on a motion

5   for a preliminary injunction which the Supreme Court has

6   described as a drastic and extreme remedy.

7        The burden on Ms. Ramsay in this case is to establish

8   that all four preliminary injunction factors support her

9   request for relief, and it's a burden that's even higher

10  because she's seeking a mandatory preliminary injunction.

11  She's asking the Court to give her the relief that she's

12  otherwise entitled to only if she prevails on the merits at the

13  end of the case.

14        It's a burden she can't meet on this case.  The first

15  factor, likelihood of success on the merits.  We don't disagree

16  that Ms. Ramsay is an extraordinary young woman from everything

17  we've seen.  We don't disagree that she's worked hard in

18  medical school.  Most students do.  Where we do disagree is

19  whether she meets the ADA standard for being disabled, because

20  she's only entitled to accommodations on the NBME licensing

21  exams if she's substantially limited in a major life activity

22  relevant to taking the exam as compared to most people in the

23  general population, not compared to her medical school peers,

24  not compared to other individuals with high school or college

25  educations, compared to the general population.

 1          That's a burden she can't meet in light of the real

 2   world evidence that is in the record and the Court will hear

 3   today.

 4          Ms. Vargas referred to the real world.  What the real

 5   world objective evidence has shown is that Ms. Ramsay was not

 6   diagnosed with dyslexia until 2018.  We'll hear from the expert

 7   who was the first expert to identify her as having dyslexia.

 8          She was first identified with having ADHD in 2009 when

 9   she went in to see her primary care physician, met with him for

10   half an hour, was diagnosed with ADHD and put on Ritalin and

11   then obtained accommodations starting at the end of her

12   sophomore year in college.  Prior to that point, no one had

13   ever diagnosed her formally with ADHD or dyslexia.  She had

14   never received accommodations in her high school years or

15   college years up until the end of her sophomore year in

16   college.

17          And notwithstanding that fact, she was an excellent

18   student, receiving mostly As, occasionally Bs, National Honor

19   Society, participated in varsity sports, took many standardized

20   tests that regrettably we will painfully walk through in which

21   she performed not just average but at the upper echelon.  She

22   did extremely well on other standardized tests, including the

23   ACT College Admission Test, which she took twice and on the

24   second time scored in the 95th percentile, and then also on the

25   Medical College Admission Test in which her overall score was

1  in the 79th percentile, an exam taken by a very accomplished

2  population and an exam as to which one has to have strong

3  reading and comprehension.

4         We also believe that Ms. Ramsay won't be able to

5  established irreparable harm, the other key factor for a

6  preliminary injunction.  In order to be irreparably harmed, she

7  has to show that she will suffer immediate and certain

8  irreparable harm.  The harm at issue here is a delay in her

9  medical education, the core irreparable harm.  Her medical

10 school has said she has the option.  If she doesn't, she has to

11 take the Step 1 exam prior to March 2, 2020.  Or she could

12 withdraw and then reapply to the school.  Or she could simply

13 test in the meantime with the accommodations that NBME has

14 approved for her.  So she's not going to be able to establish a

15 clear and certain likelihood of immediate irreparable harm.

16        There was a fair amount of reference to the Department

17 of Justice's guidance.  The Department of Justice itself has

18 said that any guidance we issue has no legal impact beyond the

19 statute or the regulations, which is to say that if there are

20 obligations found in technical guidance documents, the DOJ

21 won't enforce those obligations if they don't trace back to the

22 actual statutory language or the regulatory language.  There's

23 nothing in the ADA that requires the National Board of Medical

24 Examiners to defer to an examinee's treating professional.

25 There's nothing in the DOJ guidance that prohibits the NBME

1   from getting input from external experts.  In fact, that's a
2   good thing.  NBME doesn't make these decisions on their own.
3   They go to external professionals with expertise in the area of
4   the impairment and get input before they make their decisions,
5   and they did that in this case.
6           There's nothing in the ADA Amendments Act that changed
7   the ultimate legal standard, which is to say is someone
8   substantially limited as compared to most people in the general
9   population.  There's no question it made the enforcement of the
10  statute broader and that that's what Congress anticipated, but
11  it didn't alter the standard in a way that impacts the outcome
12  of this case.
13          In many respects, this case is very much like a 2016
14  case decided by Judge Dalzell by the name of Bibber v. National
15  Board of Osteopathic Medical Examiners.  A similar case,
16  plaintiff diagnosed with dyslexia, a longer history of
17  diagnosis, ultimately came time to take her licensing exam,
18  similar to the NBME licensing exam, and the Court ultimately
19  held that as compared to most people in the general population,
20  she wasn't disabled and therefore wasn't entitled to
21  accommodations, which again consisted primarily of extended
22  testing time.  That was a case decided after the ADA Amendments
23  Act.  And in deciding the case, Judge Dalzell looked to the
24  plaintiff's history of academic performance on real world
25  objective measures.

1           So for all these reasons, Your Honor, we encourage you

2   and ask the Court to deny the request for a preliminary

3   injunction.

4           THE COURT:  Very good.

5           Let us proceed.  Call your first witness.

6           MS. VARGAS:  Your Honor, if I may ask, does the Court

7   have a preference where counsel stands or sits.

8           THE COURT:  I don't just as long as the court reporter

9   is able to hear you clearly and loudly and take down any

10  testimony.

11          MS. VARGAS:  Thank you.

12          THE COURT:  So you can stay there.  It doesn't matter.

13          MS. VARGAS:  Thank you, Your Honor.

14          Then plaintiff calls Jessica Ramsay.

15          THE COURT:  Ms. Ramsay, please come up here and watch

16  your step coming around the witness box.  It has a slight

17  incline.

18          THE WITNESS:  Can I bring the water?

19          THE COURT:  Sure.

20          JESSICA RAMSAY, after having been duly sworn, was

21  examined and testified as follows:

22          COURT REPORTER:  Please state your name for the

23  record.

24          THE WITNESS:  Jessica Ramsay.

25          THE COURT:  You may proceed, Counsel.

```
 1                    DIRECT EXAMINATION
 2   BY MS. VARGAS:
 3   Q.   Good morning, Ms. Ramsay.  What is your current
 4   occupation?
 5   A.   I am a medical student currently on leave of absence.
 6            THE COURT:  Ma'am, you can bend that mic right
 7   straight to you and speak directly into it.  All right?
 8            THE WITNESS:  Is this good?
 9            THE COURT:  Keep your voice up loud and clear so if
10   you have to, you can shout.
11            THE WITNESS:  Okay.
12            THE COURT:  All right?
13            THE WITNESS:  Yes.
14   BY MS. VARGAS:
15   Q.   Ms. Ramsay, why did you want to go to medical school?
16   A.   I think that the desire has evolved over time.  I think --
17   I've always really enjoyed learning about the body and how it
18   works and what happens when it doesn't work and how to fix
19   that.  And then growing up with my brothers who are autistic
20   and have a lot of other special needs, and having other
21   siblings that are foster siblings in my life, the desire to
22   learn more about that kind of built over time.  And
23   particularly, I became interested in the genetics of it and how
24   that worked.  And so I decided I wanted to study genetics in
25   college and picked schools that had a genetics program for
```

1   undergrad.

2       And then while I was there, I really kind of --

3           THE COURT:  Go ahead.  I don't want to stop you, but

4   it's still kind of very light.

5           THE WITNESS:  I'm sorry.

6           THE COURT:  It's okay.

7           COURT REPORTER:  The microphone doesn't seem to be on.

8           THE COURT:  You'll have to excuse me today.  My clerk

9   is out.

10          And they were in here fixing or adjusting things

11  earlier.  Let's see.

12          THE COURT:  Tap that mic, would you, please.  It's not

13  on.

14  BY MS. VARGAS:

15  Q.  We'll continue.  And if you can just speak as loud as you

16  can, we'll try to make this work.

17  A.  Okay.

18  Q.  So you were testifying about why you decided to go to

19  medical school.

20  A.  Yeah.

21  Q.  Had you finished answering that question or was there

22  more?

23  A.  I think I was still talking.

24      Do you know what the last thing I said was?

25      I think I was still talking.  Do you know what the last

1  thing I said was?

2  Q.   Well, let me ask you this:  Is there a certain area of

3  medicine that interests you?

4  A.   I really want to go into pediatrics.  It's something I'm

5  really passionate about.

6  Q.   Why pediatrics?

7  A.   Because I've always loved working with kids, so I was

8  drawn to that.  And in my clinical rotations in my third year,

9  I liked learning everything.

10      But the difference was -- what sort of solidified this for

11  me was when I was on my pediatrics rotation, I -- no matter

12  what kind of day I was having in the morning, when I would go

13  in, and whether I was in the hospital or in the clinic, and

14  then come home, I was always having, like, a better day.  I was

15  always happier coming home than when I went in.  And that to me

16  just like screamed that that's what I was supposed to be doing.

17  And that's what I wanted to do with my life, and that's what

18  I'm going to do with my life, so...

19  Q.   So you testified a few minutes ago that you're on leave

20  from medical school.

21      What happened?

22  A.   Yeah.  Well, first, I applied for accommodations for the

23  Step 1 exam, and I didn't receive them.  And I discussed with

24  my school what my best option would be and was advised to go

25  ahead and try to take Step 1 without the accommodations to see

1  if I could stay on track with my class and graduate on time.

2  And I -- so I attempted it without the accommodations that I

3  needed, and I failed.

4      And then I was currently in a fourth year rotation when I

5  found out that I failed, and so I was allowed to finish that

6  rotation, but then the school had me drop everything after that

7  until I was able to receive accommodations and take the Step

8  again.  And in the process, I was -- the school had me go on

9  leave of absence.  And I've had to extend the leave of absence

10 and this process.  And I'm still on leave.

11 Q.  So did you receive accommodations in medical school?

12 A.  Yes.

13 Q.  What accommodations did you receive?

14 A.  Mostly double time on tests and a separate room to take

15 them in.  And for the tests that were written by my school, as

16 opposed to like the NBME, I had those tests on paper instead of

17 on the computer so that I could use like my markers and

18 highlighters and stuff to like help me read and annotate as I

19 go.

20      THE COURT:  Excuse us for a moment.

21      (A discussion off the record occurred.)

22      THE WITNESS:  And I also had a water bottle and my

23 meds and like a granola bar in the room, but out of sight, so

24 that if the test were -- when I needed to take a medication,

25 then I was able to do that quickly and not distract for too

1  long from the test.

2          And I also had -- for the clinical exams that we had

3  with standardized patients, which are called OSCEs, which is

4  O-S-C-E, I think.  And for that I had -- initially I started

5  with time-and-a-half for the note writing portion, but I wasn't

6  able to write all that I had done in the encounter in the note

7  in that time.  And I was still struggling to read the prompt

8  for the encounter going in.  So my school -- I had requested

9  from my school the double time like I had been receiving on my

10  other exams and for the note writing portion.  And a few extra

11  minutes at the beginning to make sure I was able to read the

12  prompt and the instructions before going into the room.  And

13  they granted that.  So I had that for the -- all of -- I

14  believe all of the third-year OSCEs.

15  BY MS. VARGAS:

16  Q.   Did you have any other accommodations in medical school?

17  A.   Yeah.  When -- at the beginning of the year, I was really

18  struggling -- beginning of the first year, sorry, I was really

19  struggling to like keep up with reading and really get to most

20  of the reading.  And my school ended up providing the Kurzweil

21  software, which is it reads like PDFs and stuff to me.  And it

22  highlights the words as it reads them so I can follow along.

23  So they provided that software, which I use for most reading

24  that's longer than like a line.

25  Q.   So what kind of reading did you use the Kurzweil speech

1  reading software for?

2  A.   Pretty much anything that I had to read, whether it was

3  like assigned reading from textbooks or maybe research articles

4  or even if I had to look something up online and it was like a

5  couple paragraphs, sometimes emails, if they're long.  Pretty

6  much everything.

7  Q.   You mentioned that you take medication.

8       What kind of medication do you take?

9  A.   I take a few.  I have Vyvanse, which is like Adderall but

10 it's longer acting.

11 Q.   So what is the Adderall for?

12 A.   My ADHD.

13 Q.   Okay.

14 A.   And it helps me like focus throughout the day.  And if I

15 do get distracted, it helps me kind of realize that and bring

16 myself back to what I was supposed to be focusing on.  And like

17 if I need to read, which takes a lot of mental effort, it helps

18 me to focus on what I need to do to read.  And then it helps me

19 to sit still and not be too fidgety throughout the day.

20 Q.   What other medications do you take?

21 A.   I take Buspar, which is in the morning and in the evening.

22 And that's for anxiety that started like after I was denied

23 accommodations the first time.  And then metoprolol, which I

24 take in the evening, which is for migraine prevention, like

25 prophylaxis.  And then I take an aspirin every other day for a

1   blood thinner.

2   Q.   Why do you take aspirin, blood thinners?

3   A.   Because I had a DVT when I was in my -- the end of my

4   second year of med school and later found out I had a clotting

5   disorder.  And I was on Xarelto, which was another blood

6   thinner, for two years.  And when I was taken off of that, I

7   was advised to take aspirin to kind of maintain a blood

8   thinner.

9   Q.   You testified a moment ago that you used the Kurzweil to

10  read to you your medical school work.

11       Was there reading that you did yourself?

12  A.   Can you clarify what you mean by that?

13  Q.   Where you weren't able to use the speech reading

14  software --

15  A.   Uh-huh.

16  Q.   -- how do you read?

17  A.   You mean like if it's in a book?

18  Q.   Yeah.

19  A.   I -- it's like a long process.  I have to decode

20  everything and take each word one at a time and figure out what

21  the word is and what it means and then build that up into like

22  the sentence and try to figure out what the sentence means, and

23  then build that up with like each sentence and figure out what

24  the paragraph means.  And hopefully by that time I still

25  remember what it all meant.  And then I can put it together and

1  process it.  And generally when I do that, I need to like write

2  on the text itself.  And I use a lot of colors, which have

3  specific meanings to me, and I draw pictures and I -- like

4  pretty much it looks like a mess to other people, but it all

5  has meaning to me.  But that's how I decipher what's on the

6  page and make it -- translate it into something that I can

7  understand.

8  Q.  Can you explain what you mean by using colors?

9  A.  Yeah.  I have a lot of like markers and highlighters and

10 stuff that I use, and I have them, but they -- I don't know.

11 It's a system, and I have different colors for different

12 meanings.  And as I read, I -- it would be hard to describe

13 without showing, but...

14 Q.  You have your markers with you?

15 A.  Yeah.

16        MS. VARGAS:  Your Honor, would it be okay to let the

17 witness explain using her markers?

18        THE COURT:  Sure.  We'll allow it.

19        Just out of some curiosity, were you precluded from

20 using these markers in that earlier test that you say you

21 failed?

22        THE WITNESS:  What is precluded?

23        THE COURT:  Pardon?

24        THE WITNESS:  What does precluded mean?

25        THE COURT:  Not allowed.

1          THE WITNESS:  No, I was not allowed to.

2          THE COURT:  You were not allowed to do that?

3          THE WITNESS:  No, Your Honor.

4          THE COURT:  Very well.

5          THE WITNESS:  Do you want me to get them?

6          MS. VARGAS:  Yes, please, if that's all right?

7          THE COURT:  Sure.

8          THE WITNESS:  Thank you.

9          I'll try to hold them up so you can see.

10   BY MS. VARGAS:

11   Q.   What are these?

12   A.   These are my markers and pens and pencils and -- sorry.

13   And I pretty much always have them with me because if I have to

14   read, it helps.

15   Q.   How do you use them?

16   A.   Let me get them out.

17        Okay.  I'll hold them up so you can see.

18        So I have colored pencils, because I hate writing with pen

19   because it's permanent and I make a ton of mistakes, so I also

20   always have erasers.  But I have a color system.  And each

21   color means something.

22        So red is like diseases or disorders or typically down

23   arrows, because I can't distinguish arrows just looking at

24   them, or like distinguish the direction.  And so making it a

25   color when I'm looking at it once I've figured out what it is

1  helps me to see it when I'm looking at it with the rest of the

2  text.

3      So the opposite then is green, which is up arrows and

4  pretty much any like treatment or management of a disease, so

5  like drug names or if a specific therapy is recommended, like

6  physical therapy.

7      And then blue -- sorry, that's not blue but this is blue.

8      Okay.  So blue is like diagnostic tests like labs or chest

9  x-rays or biopsies and the findings that you would find on

10  those.

11      And light blue is like physical findings like on a

12  physical exam or symptoms like shortness of breath or like if

13  you have a rash and what the rash looks like.

14      And then orange is like chemicals or like mechanisms of

15  actions, mechanism of actions for drugs or like how they work

16  or like a disease process, like if there's a specific enzyme

17  that's not functioning or something, that's orange.

18      And then purple is -- oh, sorry.  Purple is like

19  histology, which is like what cells look like under a

20  microscope.  And then it's like if there's a specific cell line

21  that's they're talking about, like skin cells or something,

22  then that's histology, and so that's purple.

23      And then, sorry, this teal color is genetics.  And so

24  anything that has to do with genes, so like a gene that's

25  mutated or like mode of inheritance or like just -- I guess a

1  gene that's not functioning or the gene that's mutated that --

2  I will use that color.

3       And then yellow is for like risk factors or like if a

4  disease is particular to like women over men or in children

5  versus adults or smokers versus nonsmokers, things that really

6  stick out or is like a key finding or things that are like

7  super important or like specific to that disease, then that's

8  yellow because that stands out.

9       Gray is protozoa.

10      This yellow is also -- specifically this one, not any

11  other yellow, is fungi or yeast.

12      Brown is bacteria.  And again, specifically this brown.

13      And this one is like a tan -- orangish-tan.  And that one

14  is viruses.

15      And I think pink is negative symptoms, so like things that

16  are like an infection or like if you have hemorrhaging or

17  something that is a side effect of something else but it has a

18  negative effect on the person and that's not just something

19  benign like headache or swelling or something, then that would

20  be pink.

21      And then I always carry Wite-Out because I -- when I write

22  in pen or in marker and make the mistakes that I do, I need to

23  fix them a lot, and so I have Wite-Out.

24      And I always -- or pretty much always have these with me

25  to read.

1  Q.   Is this something -- have you seen other medical students

2  do this?

3  A.   No.

4  Q.   Why do you do this?

5  A.   Because I need to.  Otherwise, the -- it doesn't -- the

6  reading that I have to do doesn't really make sense to me

7  without being able to use a system to give it meaning.

8  Q.   So after you put these colors on it, how does that help

9  you?

10 A.   So it's kind of like when you're learning another language

11 and you have to translate what the words mean and you probably

12 write it out or do whatever notes you would do to remember what

13 you're learning, I have to do that with pictures and colors.

14 And I have to translate whatever the chunk of text is on the

15 page to something that I can see and recognize and know what it

16 means.

17      And so if you ask me, you know, what is the name of this

18 enzyme and you just hand me a page and I don't -- I can't -- I

19 couldn't find it if I tried, if my life depended on it.  But if

20 it -- unless it was already like visually standing out, and

21 then I might see it.

22      And for me, if you just hand me a chunk of text, nothing

23 stands out.  So I have to go through piece by piece and give

24 each word or each important word, so something like not "the,"

25 give it meaning.  And then I can look at it and know where that

1  thing is and what it means, so if someone is like what is this

2  enzyme and I see the orange on the page, there's the enzyme and

3  I can tell you what that is.  Or if they say what diagnostic

4  test was used, then I can see where it's blue.  And I can say

5  they used a chest x-ray and these were the findings.

6  Q.   When did you first start using this system?

7  A.   This one specifically, med school.  But I developed using

8  colors over time.  And I think I've pretty much almost always,

9  from what I can remember, in school used colors to mean -- to

10  mean something for whatever I was studying.

11  Q.   So talking about school, what was elementary school like

12  for you?

13  A.   Well, I've always really liked learning.  I like to learn

14  things and to problem solve.  But the -- reading in

15  particularly has always been hard.  Spelling has been very much

16  not my best subject.  And writing has been extremely difficult

17  for me, because in order to write, you also have to read and

18  spell what you're writing.  And I've always struggled with

19  that.

20       And so, you know, as you're learning that when you grow

21  up, it's like you want to do well, because I liked learning, I

22  wanted to impress my teachers, do well in school, impress my

23  parents, and also just for my own knowledge, but it was really

24  difficult.  And I struggled.  And so it was embarrassing.

25  Q.   Did anyone else know that you struggled in school?

1  A.    Sorry.  Can I get some Kleenex?

2           THE COURT:  There's some tissues right behind you.

3           THE WITNESS:  Can you repeat the question, please?

4  BY MS. VARGAS:

5  Q.   Did anyone else know that you struggled in school?

6  A.   Yeah.  My teachers helped me a lot, and I think they did

7  that because they recognized that I was having a lot of

8  difficulty with like learning to read and with switching my

9  letters around.  And so they tried to help me because they knew

10 that I wanted to do it right and I wanted to learn.  And so

11 they took the time to make sure that I could, like, do the best

12 I can to learn it.

13 Q.   What kind of things did your teachers do to help you?

14 A.    First, they spent a lot of extra time with me, but they

15 would -- specifically like I remember my first grade teacher

16 would put me like at the time-out desk, which was also really

17 embarrassing, because no one wants to be at the time-out desk.

18 But it would separate me from my class.  And she would do that

19 for like assignments or tests or quizzes, especially like

20 reading or -- like reading, class reading or like writing

21 assignments or spelling tests.  And she would do that so I

22 wasn't distracted by everyone else and so that I would try to

23 focus on my work.

24       And then because I really struggled with like the

25 reversals, switching my letters around and like writing the

1   wrong letter because it looked like another letter or writing

2   it backwards, they gave me an alphabet chart so that I could

3   make sure that the letter I was writing was the same as the

4   letter that I wanted to be writing.

5       So I would have to like -- say if I was trying to spell

6   boat, I would know that, okay, the sound is B, so I would have

7   to go AB and then figure out, okay, that's a B.  I need to

8   write that one.

9       It would like -- if I had a spelling test, they would

10  reread -- after they read the words for everybody, they would

11  come over to just my desk and read them for me and give me the

12  time between each one to figure out what I wanted to put down.

13  And then reread the word and read it slowly and spend that

14  extra time doing that for me.

15      And like a lot of times if I wasn't getting something,

16  they would keep me in at recess and work with me over recess.

17      And -- or if I couldn't finish an assignment, they would

18  have me finish it over recess because I didn't have enough time

19  during class.

20  Q.  Did anyone ever raise concern in elementary school about

21  your reading?

22  A.  Yeah.  I mean, I don't know exactly how many, but I know

23  my first grade teacher, the one who started giving me the

24  alphabet chart and putting me at the time-out desk, I know that

25  she told my mom that I was having trouble with reversing

1    letters and I was a slow reader and recommended that I get that

2    checked out.  And so I was referred to Dr. Tanguay, who was the

3    optometrist or ophthalmologist.  I'm not sure what her title

4    is.

5    Q.    What did you do with Dr. Tanguay?

6    A.    She gave me some tests, like I think it's called visual

7    perception testing.  And it had like these pictures, like where

8    one -- the column on the left was like a reference.  And then I

9    would have to find which one looked -- which one was the same.

10   And I had to do that over and over for all these different

11   pictures.

12         And then she said something, I did have a problem with

13   something.  And -- with like discriminating between shapes, I

14   think.  And then she recommended that I have like more therapy

15   with her for that.  And so we did that for a while.  Like a

16   couple years, I think.

17   Q.    Did she recommend any other treatment?

18   A.    She gave glasses, but they didn't help, so I didn't really

19   wear them like after I realized they didn't really help.

20         And then like since then, I've gotten my vision testing.

21   And I have like 20/13 vision, so it's fine.

22   Q.    Did you receive extra time on tests in elementary school?

23   A.    Yeah.  I definitely pretty much was always given the time

24   I needed to complete tests or assignments.

25         I think, again, especially because my teachers knew that I

1  wanted to do it and I was working really hard to do it, I

2  wasn't just slacking off or goofing off or, you know, causing

3  trouble, that they saw that I wanted to do it and I wanted to

4  do it right, and so they gave me the time that I needed to work

5  through it and do it.  And so, I mean, as early as we started

6  having assignments is when I started being given like extra

7  time to do those things.

8  Q.   How were your grades in elementary school?

9  A.   I mean, I don't remember specifically, but I know that

10 they were As and Bs.

11 Q.   And did you have any kind of formal IEP or 504 plan?

12 A.   No, not that I'm aware of.

13 Q.   And how did you do -- as elementary school went on, how

14 did you do in fourth, fifth grade?

15 A.   Well, fourth grade specifically was like a really hard

16 year for me because we had to do a lot more writing.  Instead

17 of just writing maybe like a paragraph on a page, we were

18 supposed to write papers with like the intro and the body

19 paragraphs and the conclusion.  And we had to write a lot of

20 them.  And we were supposed to like proofread our own stuff and

21 have multiple drafts.

22      And this was all new, and it was a lot.  And I was still

23 struggling just to write and read in general, and so that added

24 a lot of -- added like stress and hard work for me.  And I --

25 my teacher was also really strict.  And she was the language

1  arts teacher in that grade.  And we had multiple teachers, like

2  for each class.

3      And so my I guess homeroom teacher was the language arts

4  teacher, and she was really strict and expected a lot from us.

5      And I would always be turning stuff in late or forgetting

6  assignments or forgetting to bring it home, even if I

7  remembered that I had the assignment, like when I got home.

8  And so she would get mad at me in class.  Or if I was talking

9  and not paying attention, she would kind of be like Jessie, get

10  back to work.  And it would stress me out because I didn't want

11  to be disrespectful and I didn't want to be getting in trouble.

12  So I would frequently come home in tears, upset and telling my

13  mom like, this is so hard, like I need help.

14      And I know my mom went in and talked to her a lot.  And

15  she ended up working with me a lot to get better and tried to

16  help me set up ways to remind myself to do things.  Or she

17  would remind me or have my mom remind me.  Or she would help me

18  to make it so that I could be successful, even though I was

19  still struggling with all of these things.

20  Q.  What kind of things did your mother do to help you?

21  A.  Everything.  My mom, like, spent hours working with me on

22  everything, from which direction letters are supposed to face

23  to spelling to writing.  She would edit everything that I

24  wrote, spellcheck it, proofread it, make sure punctuation was

25  where it was supposed to be.  If I needed help with math,

1  because they assigned like story problems which were hard for

2  me because I couldn't figure out what the question was asking,

3  but I could do the math, she would read the question to me and

4  help me figure out what it was asking so that I could actually

5  do my homework.

6      And my dad would do that too.  And they would make me

7  write my spelling words over and over, like ten times every

8  night.  Like if they were assigned at the beginning of the week

9  and my test was Friday, every night they would sit there and

10 just have me do it again.  And they would do like mock spelling

11 tests.  And then if I got something wrong, they would do it

12 again.

13     Yeah.  And like a lot of times, I guess it's probably

14 started either late elementary or early middle school.  But I

15 would end up having to pull like all-nighters or be up late

16 working on papers or reading because I couldn't finish it in

17 like a reasonable amount of time.

18     And so my mom would -- like if it was reading, she would

19 let me do as much as I could, and then she would read the rest

20 to me out loud or like talk me through it and help me process

21 what I was reading.

22     When I was struggling with writing papers, she would help

23 me like organize my thoughts and put my thoughts in words so

24 that it made sense on paper.

25     Yeah.  She did like a lot for me.

1   Q.   When you were in fifth grade, did you have any kind of

2   special testing?

3   A.   Are you referring to the ACE program?

4   Q.   What is the ACE program?

5   A.   I forget what it stands for, and I think in the deposition

6   Mr. Burgoyne said it was something creative.  I don't remember

7   what the A and E stood for.

8   Q.   What was the test for?

9   A.   For math.  I had to -- when I was in Texas, I was in the

10  ACE program for math, which was -- I thought was an accelerated

11  math, but I wouldn't be able to tell.  I don't know the

12  curriculum from regular math.

13       So when we moved to Michigan in the middle of fifth grade,

14  they didn't accept that to start their accelerated math

15  program, and so they had me take a test with anybody else who

16  wanted to start that in sixth grade.

17       And was your question, what was the test?

18  Q.   Yeah.  So how did you do on that test?

19  A.   Well, it was a test -- I think it was 60 questions, and I

20  don't know how long they gave us, but --

21  Q.   Did they give you extra time on that test?

22  A.   No.

23  Q.   So what happened?

24  A.   So we were supposed to complete 30 -- or get 30 right in

25  order to be able to go into their math program in sixth grade.

1   And I ran out of time on the test, but I got through 29 of the

2   questions.  And I was really confident that I knew what I was

3   doing and I knew the answers.  And I had started the 30th one

4   when the time ran out, so I was really upset because I knew

5   that was what was needed to be able to go forward.  And so when

6   I got home that day, I was upset and I told my mom.  And she

7   went in and met with the principal to see if I could, like,

8   finish that question or if they could give partial credit and

9   see if the work for that one was right, like if they graded the

10  first 29 and I got those right, if they could grade the work

11  for the 30th.  And it turned out that I did get the 29 right,

12  so they did grade the work that I had and said that it was on

13  the right track to get the right answer, and so they let me

14  into the program.

15  Q.   How did your workload -- say, when you got into high

16  school, how did your workload compare to your peers, your

17  friends?

18  A.   I don't know specifically, because we never really talked

19  about like how long we were spending each night, but I know

20  that my friends were like hanging out and doing other things,

21  and I really didn't get the chance to during the school year.

22  I was pretty much only able to hang out with people during the

23  summer and maybe once or twice on weekends.  But they were all

24  hanging out, and they were frustrated with me because I was

25  never able to hang out.  Ad I was always doing homework.  I did

RAMSAY - DIRECT                                    35

1    play sports, but I wasn't like -- you know, once I got home

2    from the sport I was always doing homework.  And I was up until

3    like 3:00 in the morning usually with my mom sitting there at

4    the kitchen table, like helping me or making me focus.  And

5    then I would get up and do it again.

6         And so I didn't have the time that they did.  And I know

7    they were always frustrated with me for that.  And I just

8    didn't understand how they had so much time when I, like, was

9    always doing homework.

10   Q.  And then you went to college.

11        What happened when you went to college?

12   A.  There was a lot more reading.  And couldn't really, like,

13   manage it.  I didn't have enough time in the day to keep up

14   with the reading and, like, organizing everything and keeping

15   track of everything.  And I was making a lot of mistakes.  And

16   so I pretty much felt like I was drowning, like I was trying so

17   hard to swim but I like couldn't keep up with everything.

18        And then I was -- I don't know.  I was really frustrated.

19   So I was talking to my teachers about like what could I do to

20   be better, did they have any suggestions.

21        And I remember like my Spanish teacher was the first one

22   who said something, but -- and I had been really good at

23   Spanish in high school because I had pretty much been taking

24   Spanish lessons since I was little, like 3.  And I lived in

25   Texas and it's spoken there a lot.  And so I was around it a

1  lot.  And I had gotten really good at it through high school.

2  And college, the Spanish class, there was like an oral

3  component.  So we had to like take an oral test where we would

4  speak conversationally with the professor and then there was

5  the written part.  And I would do really great on the oral part

6  and she knew I knew my stuff, but then I would always get

7  marked off for like stupid things like writing the letters in

8  the wrong order or spelling it wrong or, like, not putting the

9  words in the right order and -- on the written test.

10      And I was so frustrated because I knew the stuff.  And so

11  I asked her, like, what else can I do, do you recommend

12  anything?  And she was like, no, I can't -- I can't do anything

13  for you.  And I was like, can you -- I mean, you know that I

14  know this, can you not grade the spelling if I'm close.  And

15  she said, I can't do that unless you have like a diagnosis or

16  something.  And you would have to go to ODS to do that.

17  Q.  What is ODS?

18  A.  Office of Disability Services.

19      And I kind of thought of that, but I didn't necessarily do

20  anything about it.  I was still just frustrated, but it made me

21  not enjoy Spanish anymore, which is sad.

22      So then the second teacher that kind of, like, said

23  something was my organic chemistry professor.  And he knew me

24  really well.  And this was in I think -- maybe later, the last

25  chemistry.

1        And I was working really hard.  And I liked organic

2   chemistry because it was visual and it wasn't like a lot of

3   like reading and writing, it was like putting things together

4   like molecules together and figuring out like how they would

5   fit together, which was easy for me.  But the tests were really

6   long, and I wouldn't -- I would get like halfway through the

7   tests or partway through the tests and I wouldn't even get to

8   the other questions.  And I thought I was maybe just struggling

9   to understand the material or process it or something.  And so

10  I asked my teacher, like, what -- do I need a tutor or

11  something, like what can I do to be better and do this better.

12       And he looked at my test, and he flipped through it and

13  said, well, a tutor is not going to help you because you know

14  all of this.  Everything in here is right, but the second half

15  of this is blank, like you didn't even get there, so I think

16  you just need more time.  And I think you should go and talk to

17  ODS.

18       And I really liked this teacher and I trusted him.  And so

19  when he said that, I -- since it was the second time I had been

20  told this, I thought maybe I need to.  And so I went into set

21  up an appointment with ODS.  And they assigned me an advisor.

22  And she talked to me about like what my struggles were.  And

23  she said she thought I needed to be evaluated and that they

24  would give me temporary accommodations while that was

25  happening.

1  Q.   So did you have that evaluation?

2  A.   I went in to see my primary care provider, who at the time

3  was Dr. Smiy.

4       And I told him about like my struggles and that I was

5  concerned with actually dyslexia, because I was switching my

6  letters around still and I was having such a hard time with

7  like reading and pretty much all the struggles I've had this

8  whole time.  But that for some reason now it was so much harder

9  to, like, fix it before it was noticed by someone else.  And I

10 saw I was missing a lot of points on tests and stuff.

11      And he started asking me other questions and ended up

12 diagnosing me with ADD at the time, which is ADHD now.  And he

13 said, you probably are dyslexic, but I can't diagnose that

14 myself.  You would need testing.  I can't do the testing

15 because that's really expensive and it takes a long time, and I

16 know that you need to like -- we need to do something about

17 this now.  And what I can do is try to treat the ADHD

18 medically.  And having the improved focus may help you a little

19 bit with the reading and improve your focus and -- on what you

20 need to do to read.

21      And so he trialed me on Ritalin.  And then over time we

22 switched that to Adderall, but we like adjusted the dose to

23 maximize the -- how much it helped.

24      And he said that, you know, the accommodations that would

25 be needed for dyslexia are probably the same accommodations

1  that you'll get for ADHD or ADD.  And so, you know, I don't

2  think that you need the testing because that should be adequate

3  for what you need.  And if it's not, just come back to me and

4  I'll refer you for testing.

5  Q.   So what did you do next?

6  A.   Well, the ODS had him fill out a form, and then they

7  evaluated the form.  And also when they met with me and they --

8  and looked at some of the tests, I think that I maybe brought

9  in to show them what mistakes I was making.  And then they gave

10  me the additional time and tests in a separate room, and they

11  let me have tests on paper instead of on the computer.  And

12  they let me use like markers and stuff.  I think I got priority

13  scheduling.  And I had access to the ODS counselor.

14  Q.   How much extra time did they give you?

15  A.   Time-and-a-half.

16  Q.   And then what did you do after college?

17  A.   I applied for medical school and didn't get in the first

18  time.  So then I tried to do some things to like build up my

19  resume, my application.  And I was still interested in autism,

20  so I did some research, genetic research in autism.  First I

21  was a volunteer, but then I ended up getting paid for it later

22  on, towards the end.  And then I always worked at a bar in town

23  because I wasn't getting paid for most of the time.  And then I

24  danced with a local modern dance company.  And then I reapplied

25  for med school.

1   Q.   Did you take the MCAT?

2   A.   Yes.

3   Q.   Did you have accommodations for the MCAT?

4   A.   No.

5   Q.   Why not?

6   A.   By the time that I was diagnosed, it was right before my

7   test was scheduled, my MCAT was scheduled.  And I didn't know

8   that they even offered accommodations until someone said

9   something to me about it.  And I sent an email to -- I looked

10  it up once I heard that it was a thing.  And I -- it said that

11  there were these requirements for documentation that you had to

12  submit in order to request accommodation.  And one of them was

13  an evaluation by a -- like a licensed evaluator or something.

14  And I wasn't sure if Dr. Smiy's evaluation counted, so I

15  emailed them to ask.  And they responded kind of generically,

16  like please see our guidelines, and they didn't really offer

17  any advice as to whether or not his evaluation would be

18  adequate.

19      And so then I met with my ODS advisor to see if she

20  thought that it was adequate.  And she said, in our experience,

21  no, that's not going to be adequate.  They want to see like a

22  neuropsych evaluation, which your primary care doctor didn't

23  refer you to do.

24      And she also recommended that I not apply for

25  accommodations, because at that time they were flagged.  So

1  like if I -- when I got my score report or when the schools

2  that I applied to received my score report, it would say that I

3  received accommodations and that it would probably, like,

4  negatively impact my application regardless of how I did on the

5  test.

6  Q.  How did you do on the test, on the MCAT?

7  A.  I got a 30M.

8  Q.  On which section did you get a 30M?

9  A.  That's all of them.  That's the score.  30 is the

10  cumulative score and the M is the writing score.

11  Q.  Okay.  So did you get scores for different parts of the

12  test or was there only one score?

13  A.  There were subscores for each section.  And like there's

14  physical sciences and then verbal reasoning and biological

15  sciences.  And then a writing section, which was like two

16  passages -- two prompts, and you write two essays.

17  Q.  After you took the MCAT, you testified that you did not

18  get into medical school initially?

19  A.  No.

20  Q.  And then did you reapply?

21  A.  Yes.

22  Q.  And what happened the second time?

23  A.  I initially was waitlisted for a couple places.  First

24  waitlisted for interviews.  And then I got an interview at my

25  school, like Ohio State.  And then later got an interview at

1  Western Michigan University, their school.  And then I was

2  waitlisted for both after my interview.

3       And in I think May, I got accepted to Western Michigan

4  University and then much later in the summer I got rejected

5  from OSU.  And I guess my only option -- I could go to Western

6  Michigan, which I did, or not go.  And obviously, I went.

7  Q.   So what is the USMLE?

8  A.   It's a testing agency for med schools.  I think the MD

9  degree, not the DO degree.  And they write the Step exams.

10 Q.   How many parts of this exam are there?

11 A.   There's Step 1, Step 2 clinical knowledge, Step 2 clinical

12 skills and Step 3.  But Step 3 is taken during residency.

13 Q.   So when do you have to take -- when in your medical school

14 education do you take Step 1?

15 A.   I think it varies by school, and it also varied in my

16 school, because my school was new, like brand new.  And so our

17 class had to take it after third year, but the class after us

18 took it sometime in the middle of third year.  And the class

19 after them took it at a different time.  So it changes.  But I

20 think right now their policy -- my school's policy is that you

21 are supposed to take it before you start -- you're supposed to

22 pass it before you start fourth year.

23 Q.   What happens if you don't pass it before you start fourth

24 year?

25 A.   You either have to go on leave or you don't start fourth

1  year until you do pass it.

2  Q.    Are you allowed to take the test as many times as you

3  want?

4  A.    No.

5  Q.    What are the limits on taking the test?

6  A.    Our school only allows a student to take it three times

7  before they're dismissed from the school if they don't pass it.

8  But I think that the NBME or the USMLE only allows six.

9  Q.    How are the scores used in terms of getting residency?

10  A.    So the Step 1 score is usually the most heavily weighted

11  or the most commonly used factor to evaluate, at least

12  initially.  So when you submit your application for residency,

13  a lot of times the first thing they look at is your Step

14  1 score, and whether or not you passed it but also was your

15  score competitive.  And by competitive it needs to be like

16  higher, in the higher range for whatever field you're applying

17  for.  And if you have a failed attempt, then that is a big red

18  flag usually for most programs.  And so if they have a -- if

19  you have a failed attempt, you know, they may give you a chance

20  and ask you what happened, or they just may not look at the

21  rest of your application.

22  Q.    So when did you -- when were you supposed to take the Step

23  1 of the USMLE?

24  A.    I was supposed to take it after my -- completing my third

25  year.  And we were allowed to take it after starting fourth

1    year, as long as like we passed it before I think they gave us

2    like September 9th is when our school wanted us to pass it by.

3    Q.    Is there any preparation that you do as part of your

4    medical school education to be prepared to take the Step 1?

5    A.    Pretty much all of med school, like the first two years in

6    particular are the basic sciences.  And then the third year is

7    like the clinical sciences so you take clinical rotations but

8    we're also still learning the basic sciences to -- like

9    integrated and medicine.  And --

10          What was the question?  I'm sorry.

11   Q.    Let me ask you this:  What is the shelf exam?

12   A.    A shelf exam is an exam that's specific for the

13   rotation -- the clinical rotation you're on.  So like there's

14   an internal medicine exam and there's like a family medicine.

15   That would be pediatrics, psych and surgery.  And they're

16   written by the NBME to test that.  So they're standardized

17   across all medical schools.

18   Q.    Did you have accommodations on those shelf exams?

19   A.    Yes.

20   Q.    What accommodations did you have?

21   A.    I had double testing time, a separate room and I think --

22   oh, and they let me use colored dry erase markers on a

23   laminated -- not on a laminated -- on a laminated sheet they

24   give to everybody but usually everybody just has a black

25   marker.

1  Q.   How did you do on those shelf exams?

2  A.   It varied by the content, like the type of course.  The

3  first one that I had was internal medicine, which is known to

4  be a pretty hard exam.  It covers a lot of material, and it's

5  pretty intricate, like, medicine-wise.

6       And because it was my first clinical rotation and we

7  didn't have a class ahead of us to like give us pointers or

8  anything, I was kind of just thrown into a new context I had

9  never really been in before.  And so I wasn't able to get to a

10  lot of material during the course, like the reading that was

11  assigned, but I learned a lot in clinic.  And so I didn't score

12  as well as probably other ones, but I passed.  And like I think

13  my OB and my peds I did -- and psych I did really well on

14  because I was able to get to the material during the course and

15  I was able to show that I knew that.

16       But on the OB one, I -- we also have OSCEs that go with

17  the shelf exams in order to pass the course.  And that's a

18  clinical test.  So we have a standardized patient, and we go in

19  and see this patient.  And then we have to write a note that --

20  it's like the history is a paragraph and the physical findings

21  are a paragraph.  And then you list your differential

22  diagnosis, so what you think it could be.  And then you also

23  have to list the support for each diagnosis, and you're

24  supposed to list -- so there's three -- like you can put three

25  differential diagnoses.  You can put more but I never got that

1   far.  And then you are supposed to put at least three support,

2   whether it's historical findings or physical findings, for each

3   diagnosis that you put.  And then there's a line for any

4   diagnostic tests that you want to order.

5       And -- so it's a lot of writing.  And so even if I got all

6   the information in the clinical encounter, I usually didn't

7   have enough time on the OSCE to like get my thoughts out and

8   organize it and put it in the framework.  And when I type, I

9   still mess things up.  So I spent a lot of time trying to make

10  sure I had the right words, like it said what I was trying to

11  say.

12      And so usually I would run out of time.  And on that one,

13  the OB one, I learned that if you put diagnoses in the

14  diagnostic part -- the diagnosis part but you don't put the

15  support that you have in that support part also in the

16  paragraphs, it doesn't count.  And so I failed that OSCE.

17      And then I also failed a neuro OSCE twice because I hadn't

18  gotten to the reading that the OSCE was based off of.

19      And so my clerkship director after I failed the first one

20  met with me and said you did a phenomenal job on the patient

21  encounter, you asked all the right questions.  I think you're a

22  like little too specific in your -- what you think it might be

23  and maybe like make it broader, but I can't give you much more

24  because it would give it away.

25      And so I tried again.  The same thing happened.  And she

1  was like, I'm sorry, you failed this again.  Why don't you take
2  a look at this reading specifically and then, you know, come
3  back in a week and we'll try again.
4      And so after I had been pointed to a specific reading and
5  I had the time to like have it read to me with my computer,
6  then I passed.
7  Q.  You said that you didn't get to the reading initially.
8      Why was that?
9  A.  There's just too much reading and we were in clinic a lot
10 or like our clinical hours were -- like we had long days.  And
11 so at the end I would do as much reading or studying as I could
12 get to without compromising like my health, because I needed to
13 sleep in order to take care of patients.  I didn't want to
14 compromise my decision-making ability, like when I'm taking
15 care of other patients.  So I would do as much reading as I
16 could each night, and if I had like a lunch break during the
17 day, but I just didn't get to all of the reading.
18     And like in the clinic, if I don't have my computer, I
19 don't have access to the software that I use to read to me, so
20 it's like I am stuck trying to use this method, which, you
21 know, doesn't really work if you only have like ten minutes to
22 read in between cases or something.  So I didn't get to a lot
23 of the reading assignments.  And that was one that I didn't get
24 to.
25 Q.  So you testified earlier that you applied for

1   accommodations for Step 1 of the USMLE.

2        Can you tell me how you did that?

3   A.   Sorry, can you repeat that?

4   Q.   You testified that you applied for accommodations to take

5   Step 1.

6        What did you do to apply for accommodations?

7   A.   So I -- there's like an application that they -- form that

8   they have online.  And I printed that out, and I had the

9   guidelines that they publish.  And I filled that out, and

10  there's also a form that the school has to fill out that

11  certifies that I received accommodations there.  And --

12  Q.   We can actually take a moment, Your Honor.  We have

13  binders, and I don't think that we've given them yet, with the

14  exhibits prepared.

15            THE COURT:  Sure.

16            MS. VARGAS:  Shall we provide that to you?

17            THE COURT:  Yeah.  You can leave a copy here and make

18  sure your witness has a copy so that she can identify the

19  exhibits.  Let's move along.

20            MS. VARGAS:  May I approach?

21            THE COURT:  Give it to your witness first.  I can get

22  it later.  Watch yourself.  Don't hurt yourself.

23            MS. VARGAS:  On the clerk's bench?

24            THE COURT:  That would be fine.  Thank you.

25            Are we going to need our markers or pencils

1  or anything like that?

2          MS. VARGAS:  No.  We can put those away.

3          THE COURT:  Very good.

4          THE WITNESS:  Sorry.

5  BY MS. VARGAS:

6  Q.   So the book of documents in front of you is open to the

7  document that I'd like you to look at.

8          Do you know what that document is?

9  A.   I think that was an email I sent to the USMLE or NBME

10 disability services asking about like what I would need to do

11 to apply for accommodations.

12         THE COURT:  What exhibit number is that?

13         THE WITNESS:  1?

14         THE COURT:  Very good.  Continue, Counsel.

15 BY MS. VARGAS:

16 Q.   So this is Exhibit 1 in the binder.

17         If you could look through that first exhibit and let us

18 know if you know what the entirety of the first exhibit is.

19 A.   You want me to say what things are as I get to them?

20 Q.   Right.

21 A.   So after the email is the form that I filled out to submit

22 my request, which is the NBME's form.  Sorry, at the top it

23 says USMLE form, but that I submitted for my request.

24         And then the next one is the one my school sent that said

25 what I received at school in terms of accommodations.  And

1    there are five, that I received them.

2    Q.   So, okay.  On page 8 of 83, the numbers are at the very

3    bottom right, what is that document?

4    A.   It says it's the USMLE's certification of prior test

5    accommodation.

6    Q.   Okay.  And then what's the next page?

7    A.   That is my personal statement that I submitted with it.

8    Q.   Did you write your personal statement?

9    A.   Yes, with help.

10   Q.   How did you write your personal statement?

11   A.   A lot of -- like I would try to write my ideas out,

12   usually like either in a table or a bulleted list.  And then my

13   mom would help me expand that and put it in words.  And then I

14   would go back through and try to add more to it and make it

15   meet the guidelines that they published.  And then my mom would

16   go back and edit it.  And we would just go back and forth until

17   it was like cohesive and made sense.

18   Q.   How much time did you spend writing this personal

19   statement approximately?

20   A.   Probably more than a month, maybe months.

21   Q.   Turning to the next document in this exhibit, on page 18

22   of 83.

23   A.   Do you want me to identify it?

24   Q.   What is that?

25   A.   That is the -- my medical school's request for

1  accommodation that I filled out.  And then I think the

2  following pages are the supplemental writing -- things that I

3  submitted.

4  Q.  Turning to page 32 of 83, you do you recognize that

5  document?

6  A.  Yeah.

7  Q.  What is that?

8  A.  That is Dr. Tanguay's letter from when I was in like first

9  or second grade.

10  Q.  What comes after that in this document?  What else did you

11  submit?

12  A.  There's another letter from her, from like three years

13  later.  Page 34 is a physical exam that my primary care

14  provider at the time filled out and -- as part of my med school

15  like entry requirements.  Then the following page is Dr. Smiy's

16  notes, records that I had from when I requested accommodations

17  at OSU.  And so they -- I sent those because they talked about

18  the ADHD.

19       And then -- do you want me to keep going?

20  Q.  If you could just flip through this and let me know if

21  this is all of the information that you provided to the NBME

22  when you first requested accommodations.

23       MS. VARGAS:  Your Honor, do we need to have these

24  admitted into evidence?

25       THE COURT:  You can move them in at the conclusion of

1    the hearing.

2            MS. VARGAS:  Okay.

3            THE COURT:  That's if you want them to be considered.

4    That's your call.

5            THE WITNESS:  There seems to be mostly everything.

6    And then there's also the email of receipt from the NBME.  And

7    they asked for my MCATs score report.

8    BY MS. VARGAS:

9    Q.   And did you provide that?

10   A.   Yes.

11           MS. VARGAS:  I'd like to move to have this admitted

12   into evidence as Exhibit 1.

13           MR. BURGOYNE:  We don't have any objection.  In the

14   interest of sort of moving more quickly through this two-day

15   hearing, my assumption was we weren't going to go through every

16   document and try to prove it up and get it into evidence, but

17   we haven't had a chance to discuss that with counsel.

18           I don't know if Your Honor has a preference.

19           THE COURT:  Very well.  I'll grant the admission of

20   this document and you can talk about it during our break and

21   reduce the time process that we're here.

22           MR. BURGOYNE:  Thank you, Your Honor.

23           THE COURT:  Sure.

24           (Exhibit P-1 admitted.)

25   BY MS. VARGAS:

1  Q.   What happened after you submitted this application for

2  accommodations the first time?

3  A.   I waited more than the 60 days that they recommend.  And

4  then I got denied the accommodations.

5  Q.   Did the NBME give you any accommodations at all?

6  A.   No.

7  Q.   And what did you do?

8  A.   Then I talked to my school and asked them what I should

9  do, whether I should try to appeal or reapply or like if they

10 thought I should just take the exam.  And everybody that I

11 talked to in the like student affairs or the testing people

12 said that I should take the exam to try to stay on track with

13 my expected graduation.

14 Q.   Did you do that?

15 A.   I did.

16 Q.   And what happened?

17 A.   I failed.

18 Q.   When did you find out that you failed?

19 A.   A month after I took it.  And I believe I took it in July

20 of 2017 and found out in August.

21 Q.   So then what did you do?

22 A.   So then I tried to figure out what my best option to move

23 forward was.  And I knew that I needed the accommodations that

24 I had requested to be able to show my knowledge on the exam.

25 And so I tried to find an evaluator who could do the testing

1  like that I thought was needed to show that I did have these

2  disabilities and the need for the accommodations I had

3  requested since the NBME had said that I didn't have the

4  documentation showing this.

5       And I scheduled an appointment with the first available

6  person who had an availability who was willing to do the

7  testing.  And that was several months out, I believe in like

8  the fall.  And then I had to wait for the actual testing after

9  meeting with them.  And then had to wait several months just to

10  get the report from -- it's Dr. Lewandowski who did the

11  evaluation.

12       And then I was also waiting for letters of support from

13  the school, because they had found a document about applying

14  for accommodations and provided that to me.  And in there was a

15  description of schools providing a letter of support, so I

16  asked the school to do that.  And they did.  And so I was

17  waiting for that.  And I was waiting for the letter from Dr.

18  Ruekberg and Dr. Houtman to describe why I needed

19  accommodations and what they -- and how they helped.

20       And so once I got all of those pieces in like June, I

21  submitted my second application.

22  Q.   Okay.  And what did your school do when they found out

23  that you failed Step 1?

24  A.   Well, first they made me drop all of the courses I was in.

25  And then because I was the first person to fail Step 1, I was

1   in the first class of -- I was the first.  And they didn't

2   really know what to do.  And in their policy manual -- well,

3   now it's called the policy manual, but their handbook at the

4   time said that the test should be retaken in three months

5   unless there were extenuating circumstances.  And they thought

6   that mine was an extenuating circumstance.  And they wanted me

7   to be able to get the accommodations that I need.  And so they

8   had me go on a leave of absence, which by the time they figured

9   this out was in March.  And so they backdated the leave of

10  absence to August when I found out I failed.  And so that they

11  would pause the timeline that requires me to take it in the

12  three months but also the timeline for how long we have to

13  complete our school -- our education.

14  Q.    So then when did you submit your second application for

15  accommodations?

16  A.    I believe that was June of 2018.

17  Q.    And what did you ask the NBME to provide?

18  A.    Double testing time and a separate room and extra break

19  time at that time.

20  Q.    And what was the purpose of the double time?

21  A.    To give me the time that I need to work through and read

22  each question and the answer choices, since I can't read all of

23  the questions in that -- the given time.  And also to, like,

24  have time to read aloud and use the compensatory mechanisms

25  that I do use and to move around when I need to and especially

1    like because I have the clotting disorder, to walk when I need

2    to so that I don't increase my risk of having another clot.

3    And to be able to like fidget and read aloud and do the things

4    that may be distracting but also things that I need and not

5    take away time from the exam.

6         And then -- did you only ask about the time?

7    Q.   And then what happened with your second request for

8    accommodation to the NBME?

9    A.   They approved the room and the -- the separate room and

10   the break time, but they denied the additional testing time.

11   Q.   And what were the disabilities that you had listed as

12   needing accommodation when you applied for accommodation to the

13   NBME?

14   A.   The first time or the second time?

15   Q.   Second time.

16   A.   ADHD, dyslexia, migraines with aura, and DVT with

17   postthrombotic syndrome and my clotting disorder.

18            THE COURT:  And the first time was it ADHD and

19   dyslexia?

20            THE WITNESS:  Yeah, dyslexia and ADHD because I didn't

21   know at that time that I could request accommodations for

22   clotting disorder, DVT and the migraines.

23   BY MS. VARGAS:

24   Q.   When do you get migraines?

25            THE COURT:  Go ahead.  I was going to ask one further

1  question.

2          MS. VARGAS:  I'm sorry.

3          THE COURT:  In reference to your failing the first

4  test, you failed the first test by 1; is that correct?

5          THE WITNESS:  That is correct.

6          THE COURT:  You had a what, 160 or 159?

7          THE WITNESS:  I had 191, and it needed 192 to pass.

8          THE COURT:  And that's without any accommodations at

9  all?

10         THE WITNESS:  Yes.

11         THE COURT:  Very well.  You can continue, Counsel.

12 BY MS. VARGAS:

13 Q.  So what happened with your second request for

14 accommodations?

15 A.  They approved the room and the break time but not the

16 additional testing time.

17 Q.  So what did you do?

18 A.  So I -- in their denial letter, they had said that I

19 didn't have sufficient documentation of my -- or objective data

20 of my slow reading, which I figured was something I could

21 provide, so I got additional testing to address that.  And so I

22 did that, and I -- I don't remember if I wrote another personal

23 statement or not, but I submitted that.  And they denied --

24 they still denied my request.

25 Q.  Who provided this new testing?

1  A.   Dr. Smith.

2  Q.   Where is he employed?

3  A.   Michigan Dyslexia Institute.

4  Q.   How did the testing that he provided compare to other

5  testing that you received from -- over the years?

6  A.   It was different.  It actually tested like -- it was

7  reading specific versus testing my head before.  It was more

8  like just cognitive ability in general.  And so he had me read

9  a lot of -- a lot of just like paragraphs or questions

10  sometimes versus like before the tests were like one word, like

11  can you read this one word, which if it's one word, I can

12  generally like sound it out or if I -- it's something I

13  recognize, I might know it.  But it's also not crowded by like

14  being in the middle of a block of text.  And usually the prior

15  ones weren't timed, and some of Dr. Smith's were timed.  And

16  then he had like different computer based tests for, like --

17  before I had one where you click on the letter X and then it

18  shows you some other stuff in between.  And then Dr. Smith's

19  was both like visual and audio, so I had headphones.  And they

20  said or showed the number 1 or the number 2, and then I had to

21  click I think for number 1 whether it was said or showed.

22  Q.   And what happened after you submitted Dr. Smith's

23  documentation and your -- to the NBME?

24  A.   They denied it.

25  Q.   And then what did you do?

1  A.   And then I filed the complaint.  Well, actually, we

2  submitted a letter for reconsideration, and they denied it

3  again.  And then we filed a complaint.

4          MS. VARGAS:  Your Honor, I have -- all of her

5  applications for accommodations are in this binder.  I'd like

6  them to be in evidence, but rather than taking all the time to

7  go through all of them, if counsel doesn't object and Your

8  Honor is amenable, I propose that we just admit to evidence all

9  of the applications for accommodation, which are Exhibit 1, 2,

10  3 and 4.

11          MR. BURGOYNE:  I don't have any objection to that,

12  Your Honor.

13          THE COURT:  Very well.  They're admitted.

14          (Exhibits P-2, P-3 and P-4 admitted.)

15          MS. VARGAS:  Thank you, Your Honor.

16          Your Honor, might we take a break?

17          THE COURT:  I wanted to go 15 more minutes before we

18  break for lunch.  I have a conference call in another case that

19  I have to take at 1:00, and so I'm trying to have a lunch and

20  do business also.  Okay?

21          MS. VARGAS:  Are you okay for another 15 minutes?

22          THE WITNESS:  Yeah.

23  BY MS. VARGAS:

24  Q.   If you could turn to Exhibit 19.

25  A.   Okay.

RAMSAY - DIRECT

1  Q.   And then do you recognize what this is?

2  A.   I believe it is the MCAT or a version.

3  Q.   If you could turn to page 7 of that exhibit.  The numbers

4  are on the very bottom right corner of the page.

5  A.   Okay.

6  Q.   Could you explain how you took the MCAT without

7  accommodations?

8  A.   Sure.  Do you want me to like walk you through overall, or

9  do you want me to go through a question?

10 Q.   Well, look at a question.

11      Why don't you start with the first question.

12 A.   Okay.

13 Q.   How would you go about answering the first question?

14 A.   Is this the same exhibit that the NBME had in their

15 deposition with me?

16 Q.   Yes.

17 A.   I have notes on that.  Can I use those to help me describe

18 it?

19 Q.   Would that help you remember how to -- how you answered

20 these questions?

21 A.   Yeah.

22      MS. VARGAS:  Your Honor, may I show her?  And I have a

23 copy for everyone.

24      THE COURT:  Yes.

25      MR. BURGOYNE:  I've never seen the notes before, Your

1   Honor, so that would be great.

2          MR. BERGER:  It's just an annotation.

3          MS. VARGAS:  May I approach, Your Honor.

4          THE COURT:  Sure.  And counsel need not ask permission

5   to approach your witness to give her an exhibit to assist in

6   this testimony.

7          THE WITNESS:  Okay.  So generally when I go through --

8   BY MS. VARGAS:

9   Q.   Can you explain -- go ahead.

10  A.   Like if I were going to do the first passage, I would skip

11  ahead to the question, and I would -- there's like a number of

12  questions.  And then I would read the last line, but in this

13  case this only has one line, so I would read the line.  And I

14  would do it -- if it was something I could answer without

15  reading the passage, I would.  If it was something like that I

16  needed maybe numbers to do, so like it's math, which like here

17  I talk about -- and I highlighted it in blue, which means it's

18  a formula, like a math formula.  And so I knew that there would

19  be numbers in the passage that I would have to use to solve it.

20  And I don't think my comments that were on here show up, but I

21  had written where on the page went with each number.

22      But I would pretty much look.  And it says in the

23  question, based on the passage, the volume of the collected $CO_2$

24  gas at the -- and then I can't see what's there -- was closest

25  to which of the following.  And then it gives like one of the

1  variables.  And so I would basically look for where it's CO2

2  gas, and then it says -- I basically would find the numbers

3  there.  And then because numbers stand out as opposed to a

4  chunk of words, I would highlight those.  And then I would plug

5  them into a formula.  And I pretty much didn't read any of the

6  passage.

7      And then I would move on to the next question, and I would

8  read that.  And if I knew that without having to read anything,

9  I would answer that.

10      And then in the third question, where there is like a

11  couple lines, I would still start with the last line.  And it

12  says, like, compared to the volume and reaction and to the

13  volume in reaction 1 and the volume in reaction 3 would -- and

14  then so I saw where there was three reactions.  And so based on

15  that, I would see if I could answer it, which I couldn't.  So

16  then I would look to see if I could see where it said something

17  about reaction 2, because that's what it's referencing, like

18  the reference point.  And at the bottom of the page, there's

19  like a number 2.

20      So I saw that it was reaction 2, and then I read that

21  reaction 2 was best.  And so if it was best, then I would

22  probably guess that the other two were lower U.  So --

23  Q.  So when you took the MCAT, did you have time to read the

24  entire test?

25  A.  No.

1  Q.   Do you know if other students had time to read the entire

2  test?

3  A.   Yes.

4        MR. BURGOYNE:  Objection, Your Honor.  I don't think

5  there's any foundation for that testimony.

6        THE COURT:  I'm going to sustain the objection.

7  BY MS. VARGAS:

8  Q.   Did you take any test prep courses --

9  A.   Yes.

10  Q.   -- before taking the MCAT?

11       And what test-taking strategies did you use, did you learn

12  in that class?

13  A.   I didn't necessarily learn any new ones, but I -- the ones

14  that I pretty much used my whole life to kind of do the minimum

15  reading possible, which was read the question line and then the

16  answer choices and then if needed go back and read something

17  from a passage.  That's how they recommended reading it in

18  order to be able to answer the questions that didn't require a

19  lot of reading first and get through as many of those as

20  possible.  And then if you have time, go back and do the other

21  ones that required more reading.

22  Q.   How many multiple choice options for answers are there on

23  the MCAT, the questions?

24  A.   Four.

25  Q.   Is that different from Step 1?

1  A.   Yeah.

2  Q.   How many multiple choice answers are there on Step 1

3  questions?

4  A.   It varies.  There can be anywhere from four to like

5  whatever J or K is, so like ten or more.

6  Q.   Ten or more options to answer?

7  A.   On some, yeah.

8  Q.   And so did you use other self-mitigation strategies to

9  take the MCAT beyond what you learned in your test-taking prep

10  course?

11  A.   I mostly used that -- like the how to answer, not read.

12  So I read the question without reading a lot of the passages.

13  And then because there wasn't like a guessing penalty like

14  there was on the ACT, you know, when it would get to like the

15  five-minute warning at the end, I would just go back and select

16  answers to make sure that all of them were filled so at least I

17  would have a chance of getting credit for some of the ones I

18  couldn't get to.  And then with like the remaining five

19  minutes, try to go back and read if I could to maybe get one or

20  two of the answers more.

21      I wasn't allowed to like read aloud or anything.  I

22  would -- like on the scrap paper, I think there was a paper for

23  the MCAT, I would like draw things to help me like understand

24  or work through math or anything like that.

25  Q.   And those mitigation techniques that you used on the MCAT,

1  were you able to use those on Step 1?

2  A.   No, not really.

3  Q.   Why not?

4  A.   Well, I can't skip reading on Step 1 all of like -- it's

5  set up differently, so it's not just like one long passage and

6  then like six or seven questions.  It's like a passage as a

7  question and then the answers.  And it's like that for each

8  question, but some questions have videos or pictures or you

9  have to listen to a heart murmur in addition to like a

10  paragraph that you have to analyze.  And everything in that

11  paragraph is important.  And you have to take that information

12  and like consider all of it in order to be able to answer the

13  question.  And so I can't just skip reading on the MCAT -- I'm

14  sorry, the USMLE Step 1.

15  Q.   When you took Step 1, what was your strategy?  How did you

16  go about taking that test?

17  A.   So I mean, I can walk you through it again, but it's kind

18  of the same, like.  I would start at the beginning, so we only

19  had like an hour per block.  And if I could understand, I would

20  read the last line of the question prompt or whatever, which

21  was the question line generally.  And if I understood what it

22  was asking and I could answer it, I would -- like if it was

23  something I knew what it was asking, I would read the answer

24  choices so I knew what to look for in the body of the question,

25  and then I would read the body of the question and highlight

1  the key things related to the answer choices that would help me

2  decide between them.  And then I would answer.  And because I

3  didn't have a lot of time, I didn't take a lot of time to like,

4  you know, second guess myself and would move on to the next

5  question.  And I would do as much as I could.  And then if I

6  got to a question that was -- like I couldn't understand or I

7  was confused by the question line, I knew not to spend a lot of

8  time trying to figure that out and I would move on to the next

9  one.

10      If the question body was particularly long, then I would,

11  you know, move on to the next one.  And then generally I

12  would -- that would be a first pass of the questions.  And that

13  would maybe take like -- I'm not sure.  I have notes on that

14  too, of how I went through the test.

15      But I would go back, and I would have like half, around

16  half of the time left and a lot of the questions left.  And

17  then I would go back to the ones I hadn't got to, and then they

18  would probably be the longer ones.  And I would try to read

19  the -- I would go through it the same way and read the question

20  line.  If I understood it, I would read the answers and then

21  try to look for the information in the body paragraph that

22  would help me distinguish between them as I read the body and

23  then answer the question.

24      And because I knew I didn't have a lot of time, I wouldn't

25  spend a lot of time second guessing or anything like that.  I

1   would move on to the next one.

2        And then I would get through the second pass.  And then if

3   I would maybe have, I don't know, 10, 12 minutes left and have

4   probably 20-some questions left.  And -- or like around 20

5   questions left.  And then I would take the last 10, 12 minutes

6   to go through the ones that were confusing to me at the

7   beginning and see if this time when I read the question line I

8   understood it.  And if so, I would do the same thing and go

9   through and pick an answer.  And then when the timer gets to

10  five minutes, it flashes on your screen and it makes you select

11  to -- like it pops up in the middle, and you have to ignore it.

12       And then -- so at five minutes, I knew there were five

13  minutes left.  And I would go and put an answer for any that I

14  haven't gotten an answer for or hadn't had the chance to read

15  the whole question.  And then I would -- after doing that,

16  would try to go back through to the ones that I hadn't gotten

17  to and still try to read as much as I could and maybe answer

18  one or two.

19  Q.   Did you have the time that you needed to show what you

20  knew on Step 1?

21  A.   No.

22  Q.   If you could turn to Exhibit 20 --

23       THE COURT:  We'll take our break now.  We'll be in

24  recess until 1:30.  All right?  And enjoy your lunch today.

25       (Luncheon recess at 12:45 p.m. **until 1:30 p.m.**)

1          THE COURT:  You may be seated.

2          Are we ready to proceed?

3          MS. VARGAS:  Yes, Your Honor.

4          THE COURT:  Ma'am, would you resume the witness stand,

5   please.

6          And I'll remind you, you are still under oath from

7   previously being sworn in.  Do you understand that?

8          THE WITNESS:  Yes.

9          THE COURT:  And this pitcher here is for you along

10  with the water.  If you want it down there, that's fine.  If

11  not, I'll move it so I can watch you.

12          THE WITNESS:  Perfect.  Sorry.

13          MS. VARGAS:  Your Honor, we had been discussing

14  Exhibit 19 and 20, and I would like to move to have Exhibits 19

15  and 20 moved into evidence?

16          THE COURT:  I take it there's no objection thereto?

17          MR. BURGOYNE:  Certainly not to 19, Your Honor.

18          THE COURT:  What is 20?

19          MS. VARGAS:  It's the Step 1.

20          THE COURT:  Sample test questions?

21          MR. BURGOYNE:  That's fine.  I didn't realize we had

22  gotten to those.  Thank you.

23          THE COURT:  Very well.  They're both admitted.

24          (Exhibits P-19 and P-20 admitted.)

25          THE WITNESS:  Are we looking at one of them?

1  BY MS. VARGAS:

2  Q.   Jessie, if you could look at Exhibit 19, about halfway

3  through that exhibit, it says Verbal Reasoning Section.  And

4  it's page 29 of 74.

5  A.   Okay.

6  Q.   And if you could turn to page 31 of 74.

7       What is this?

8  A.   This is a passage, the first passage.

9  Q.   How would you go about answering this passage?

10 A.   Well, I would --

11 Q.   Answering the questions about this passage, I should say.

12 A.   I would go to the questions.  And similarly, I had like a

13 marked-up, annotated version from before.  But I would do the

14 same thing.  I would read the last line, the question line.

15 And if there was something that was like -- said like referred

16 to, paragraph whatever or line whatever, and what does this

17 word within that mean, or something like that, then I would do

18 those first, because it told me where to go.  So I wouldn't

19 have to read all of the passage.  And then if there were other

20 questions that I could answer or reason through without

21 reading, I would answer those.

22      And then if there were things that were like italicized

23 words or something that would be a little easier for me to

24 visually find in a passage that were talked about in the

25 question, then I would try to find those and just read around

1  those in the passage.  And I think in my notes, I highlighted

2  to show where I would read and where I wouldn't.

3  Q.  Would it help you remember how you answered these

4  questions if I showed you your annotated notes?

5  A.  Yes.

6       MS. VARGAS:  May I do that, Your Honor?  I'm happy to

7  provide copies.

8       MR. BURGOYNE:  I don't have any objection, Your Honor.

9  I don't know that this is an annotation of how she actually

10  answered her questions on the MCAT.  It's something they

11  created for the purposes of today.

12       THE COURT:  Very well.  You'll have an opportunity to

13  cross-examine the witness on it.

14       MR. BURGOYNE:  That's fine.

15       THE WITNESS:  Thank you.

16  BY MS. VARGAS:

17  Q.  So Jessie, can you explain what you did with this

18  document?

19  A.  Yes.  So after it was provided in the deposition, I tried

20  to explain how I would go through, but it didn't seem to be

21  very clear.  So I annotated the document, and I went through --

22  like for the physical sciences, I went through and kind of

23  showed like the order I would go through and how I would do

24  that.

25       But for the verbal reasoning, where it was pretty much all

RAMSAY - DIRECT

1   reading, it was harder for me to just -- there was no formulas

2   really for me to show like what formula I would use.  So I went

3   through, and I basically had to take this in order to annotate

4   it.

5        And so I went through like I would go through it if I were

6   taking it, and then tried to annotate what I was doing as I did

7   it.

8        And so for like 43, I would read it, which says:  Which of

9   the following developments would be least likely to be useful

10  to photo trappers?  And then I would read the answer choices

11  and see if there were anything that I could rule out.

12       But since I don't really know what photo trappers are, I

13  would probably look back at this document and see if I could

14  find where it was in there.

15       And just kind of glancing, I saw where there were like

16  two dashes in the fourth paragraph, which kind of caught my

17  attention.  And then I saw next to it was photo trapper.  And

18  so then I recognized that and said so.  And then would have

19  read a little bit around there.

20       But -- and then I went through and did kind of the same

21  thing for each question.  But apparently when I did this for

22  real, I probably, because I didn't know what photo trappers

23  were, I went to 44 and then started with that one.  And it

24  said:  What was the main purpose of the fourth paragraph of --

25  I'm sorry, the main purpose of the fourth paragraph of the

1  passages to.  And then -- so because it pointed to the fourth

2  paragraph, I would go through and read the fourth paragraph and

3  then recognize the photo trapper from the first question.  And

4  then reading that paragraph, I think I would have guessed on

5  the main purpose.  And I ruled out A and B, and then I would

6  have guessed on D.

7       Do you want me to reason through that or --

8  Q.   No.  So looking at the passage, how much of that passage

9  would you have read in order to answer the questions?

10 A.   Well, I tried to show where I would read by like

11 underlining or describing where I would start reading or -- and

12 reading.  And so I calculated -- sorry.

13      I calculated like how many words versus how many words

14 were in the whole passage.  And I did that by copying the

15 passage and putting it in Word and using word count.  And then

16 where I would start reading and end reading on here, I would

17 highlight that in the Word document and have it do the word

18 count for me.  So I would figure out how many words I actually

19 read of the actual passage, which is at the top of the page.

20 And I did that for each passage.

21 Q.   So all of the cross-throughs and the highlights and the

22 red words that are on this document, who wrote those?

23 A.   I did.

24 Q.   Did anybody help you with that?

25 A.   No.

1          MS. VARGAS:  Your Honor, I would like to move to admit

2     her annotated verbal reasoning section into evidence.

3          THE COURT:  Okay.  No objections, it will be admitted

4     into evidence.

5          MR. BURGOYNE:  You're correct, Your Honor.  No

6     objection.

7          THE COURT:  Very good.

8          (Exhibit P-19A admitted.)

9          MS. VARGAS:  Is that 19A?

10         THE COURT:  Is this an additional number that you're

11    submitting?  What was the last number?

12         MS. VARGAS:  This was an annotation of Exhibit 19.

13         THE COURT:  Right.  So you want to have it marked as

14    19A?

15         MS. VARGAS:  Yes, please.  Thank you.

16         THE COURT:  Very well.  We'll mark it as 19A.

17         MS. VARGAS:  Thank you.

18         Should I give a copy to the Court?

19         THE COURT:  Sure.  Put it right down there.  And we'll

20    include it in our -- that's fine.

21    BY MS. VARGAS:

22    Q.  If you could turn to Exhibit 13.

23    A.  Okay.

24    Q.  Do you recognize that document?

25    A.  Yes.  That's our medical student policy manual or our

1  handbook.

2  Q.   And is this the handbook that's in effect currently at

3  your medical school?

4  A.   I believe so.

5        MS. VARGAS:  I would like to move to have Exhibit 13

6  admitted into evidence.

7        MR. BURGOYNE:  No objection, Your Honor.

8        THE COURT:  It's admitted.

9        (Exhibit P-13 admitted.)

10 BY MS. VARGAS:

11 Q.   And then turning to Exhibit 14.

12 A.   Okay.

13 Q.   If you could turn to page 8 of 13.

14 A.   Okay.

15 Q.   Do you recognize this document?

16 A.   Yes.

17 Q.   What is this?

18 A.   This is a letter from my school, specifically from Dr. Z

19 or Ziemkowski in response to my request for an extension to my

20 leave of absence.

21 Q.   And what was the school's response to your last request

22 for a leave of absence?

23 A.   That they would only extend it until March 2nd.

24 Q.   And after March 2nd what happens?

25 A.   If I can't get accommodations and take the test by then, I

1   will be forced to withdraw or I will be dismissed from the

2   program and I will be done.

3   Q.   What happens if you withdraw from the program?

4   A.   Technically, I can reapply, although I was told very --

5   they made a point of telling me that doesn't mean that they

6   will re -- like re-accept me to the school, just that I have

7   the opportunity to reapply, versus if I was dismissed from the

8   school, then I would not be allowed to reapply.

9   Q.   Would you be able to apply to other schools if you were

10  dismissed from Western Michigan?

11  A.   I could apply, but the chances of me being accepted

12  because I had already been enrolled in another school and been

13  forced to withdraw or withdrawn and I had not already passed

14  Step 1, then I would have a very -- it would be very unlikely

15  for me to be accepted anywhere.

16        MS. VARGAS:  I would like to move to have Exhibit 14

17  admitted into evidence.  This is the packet of leave of absence

18  documents.

19        MR. BURGOYNE:  No objection, Your Honor.

20        THE COURT:  Very well.  It's admitted.

21        (Exhibit P-14 admitted.)

22  BY MS. VARGAS:

23  Q.   Jessie, why is it important to you to have accommodations

24  on Step 1?

25  A.   Because the accommodations I requested are the

1    accommodations I need in order to be able to read all of the

2    questions and therefore have the opportunity to answer the

3    questions based on my knowledge.  And if I don't have the

4    opportunity to read all of the questions, then the score that I

5    get isn't an accurate representation of what I actually know

6    and my competency of the material.  And if I don't have the

7    opportunity to show that, then my score doesn't accurately

8    reflect -- like if I pass, I should be able to know that I

9    passed because I knew the material.  And if I fail, I should be

10   able to know that I failed because I didn't know the material,

11   not because I wasn't able to read the questions and have an

12   opportunity to answer them, like other students get to.

13   Q.   And what importance, if any, does your score have on

14   residency match?

15   A.   It's huge.  That's the first thing that programs look at.

16   And if you failed, they may not even look at the rest of your

17   application.  It may get filtered out before they even see your

18   name.  And if you have -- if you have a low score even, like if

19   you pass and have a low score, they still may filter you out.

20   So it's huge.

21   Q.   If you had received a 192 on Step 1 without accommodation,

22   do you believe that would have been representative of your

23   ability?

24   A.   No.

25   Q.   Why not?

1  A.   Because it would have been a score based on me only

2  getting to read part of -- like some of the questions and not

3  all of them.  So they don't know whether I don't know that

4  material or I never got to see the questions and didn't answer

5  the questions based on my knowledge, so they were just random

6  guesses.

7       So when my score is compared to everyone else, my score

8  looks like -- they take it at face value, like that was my

9  ability.  And they don't know that I didn't get to answer or

10 see -- read the questions for a large portion of the test, and

11 they don't know that I actually do know the material and I can

12 do this.  And they think that I am not as competent as other

13 students, and so they don't give me the opportunity to show

14 that.

15 Q.   What will you do if you can't take Step 1 by March 2nd?

16 A.   I don't know.  I haven't gotten that far.

17 Q.   How many of the questions on your Step 1 attempt do you

18 estimate that you could read completely?

19 A.   On Step 1?

20 Q.   Uh-huh.

21 A.   I believe it was 65, about 65 percent, to 70.

22 Q.   How do you make that estimate?

23 A.   When I was going through the test, based on how I had gone

24 through, you have an option to like mark the question.  So by

25 the time I hit that five-minute warning and I had to fill in

1    guesses, the ones that I had guessed on, I marked.  And I like

2    kept track of about how many I had marked or had -- that were

3    left when I guessed on them for each section.  And it was

4    roughly overall about 65 percent of the ones -- sorry, like

5    35 percent I had guessed on.  And I had only gotten to about

6    65 percent, an average over all of the sections.

7    Q.   How did you prepare, study for Step 1?

8    A.   I did a lot of things.  I listened to Pathoma lectures and

9    watched them.  And they show you pictures and they talk about

10   it and they relate everything to not only a clinical context

11   but the test and how it -- like how it's important to the test.

12   And I used First Aid, which is a book -- a review book that's

13   well known.  All of these sources are well known for medical

14   students.  But it's like the bible of studying for Step 1.  And

15   it is a review source.

16       And then I also used the UWorld question bank and Kaplan

17   question bank.  And I would go through those questions and then

18   answer them.  And if I got them wrong, or even if I got them

19   right but maybe didn't know exactly why it was right or I

20   wasn't confident on the material, it would give an explanation.

21   And I would read and process that explanation.  And then I

22   would write it into my First Aid book and draw pictures like in

23   the relevant section.  And then if there wasn't enough room to

24   fit it there, I would do it on notebook paper and shove that in

25   my book in there, so it would be in there.

RAMSAY - DIRECT

1      And then I would watch a lot of online videos, like

2  OnlineMedEd or the Pathoma, which breaks things down but it

3  walks you through.  And it's visual, and somebody is talking to

4  me so I don't have to read it, so it helps me process and

5  review a lot faster than if I were to have to read it.  And

6  then I compile all of this, and I write it down and I keep

7  doing questions and I repeat.

8      We would do practice questions with like friends who were

9  also studying -- or sorry, practice tests.  And they would read

10  the question and then we would both like separately select our

11  answer and then go through the explanation.

12  Q.  What do you mean, they would read the question?

13  A.  My friends who are supportive of me and study with me,

14  they read the questions out loud so that I don't have to read

15  them.  And also it doesn't slow them down waiting for me to

16  read the question and get to my answer while they've already

17  read it and got their answer.  And since it's like a -- it's a

18  really fast-paced time.  Everybody is trying to cram as much

19  knowledge into their brains as possible before they take Step 1

20  over like the course of a couple months.

21      And so if I'm there slowing them down, like that's not

22  okay.  And so they would read it so that I could get the

23  material and answer the question.  And they could do it, so...

24  Q.  Have you done any preparation for Step 2?

25  A.  Yes.

1  Q.   What is Step 2, Step 2CK?

2  A.   CK is clinical knowledge, which is a similar test to Step

3  1 in that it's computerized, like written test, like multiple

4  choice questions.  But it is more clinically focused, but

5  because of that, the questions are longer and have more

6  information in them that you have to like analyze in order to

7  answer the question.

8  Q.   Can you explain what you mean by the questions are longer?

9  As compared to Step 1, how much longer are they?

10 A.   I'm not sure exactly, but I just know that looking at the

11 screen, like if a Step 1 question is like this, the Step 2 can

12 be anywhere from like a paragraph to like sometimes they're

13 like a page.  And they have more information, like labs and

14 stuff, whereas the Step 1 does have labs and stuff that you

15 have to coordinate or consider in coordination with the other

16 information sometimes, but Step 2 has a lot of more of that,

17 because it's more clinical.  So there's a lot -- there's more

18 information you have to integrate to answer the question.

19 Q.   Will you need accommodations for Step 2?

20 A.   Yes.

21 Q.   What accommodations will you need for Step 2?

22 A.   Specifically CK?

23 Q.   Yes, I'm sorry, for CK.

24 A.   I will need double time and I will need a separate room

25 and break time, just like I do for Step 1.

1  Q.   At any point did you request that the NBME provide speech

2  reading for your test?

3  A.   No.

4  Q.   Why not?

5  A.   I didn't know that it was allowed.  I didn't know it was

6  something they offered.  It was a fairly new thing.  I didn't

7  know it was available for a long time as an accommodation in

8  general.  And so by the time I found out, it was pretty -- I

9  think I was in my -- as a test accommodation, let's see -- I

10 think it was in med school when I realized it was a thing.  So

11 I didn't know I was allowed to ask for it.

12 Q.   Would that help you?

13 A.   I believe -- I believe it would, but I would have to know

14 the system that was used.  Like I wouldn't -- I wouldn't -- it

15 would help me to have something read to me as opposed to me

16 struggling to read through it, but if I didn't know how to use

17 the system that they use on the test before going into the

18 test, then I wouldn't want to like waste time trying to figure

19 that out on the test, if that makes sense.

20 Q.   Did you ever request that the NBME provide you with paper

21 tests rather than a computerized version?

22 A.   Not -- I don't think for Step 1, but for the other NBME

23 exams that our school receives or gives, like the shelf exams

24 or the -- they're called like CBSE exams, the comprehensive

25 basic science exams that our school gave, they had requested

1  from the NBME that the test be given on paper because that's

2  how they provided their exams to me.  And the NBME responded to

3  them that that wasn't allowed, they don't give anyone tests on

4  paper, because it's a computerized exam.  And so I assumed that

5  that was not allowed at all, so I didn't request that for my

6  Step 1 exam.

7  Q.   What accommodations -- did you have accommodations for the

8  other NBME exams you took that you just mentioned?

9  A.   The CBSE ones?

10 Q.   Yes.

11 A.   For the ones that counted for our -- either like moving on

12 into third year, the clinical year, or the ones that were like

13 shelf exams, I did have accommodations.

14 Q.   What did you have?

15 A.   I had the double time, the separate room and the colored

16 dry erase markers.  And then my meds and the water bottle and

17 the granola bar in the room.  But I didn't use -- there was a

18 couple exams at the end after my third year -- after I had

19 found out that I was not receiving accommodations because the

20 NBME had denied them but before I took Step 1 -- that our

21 school had us take the CBSE again as a formative exam, which is

22 their term for it doesn't count as a grade, it's only for like

23 informing us -- seeing how we would do on Step 1.  It was sort

24 of a benchmark.

25      And then I had been approved for the same accommodations

1  that I received on all the other NBME exams, but because I knew

2  I wasn't receiving accommodations for the Step 1 exam, I

3  decided to try to simulate a timed -- a standard timed exam.

4  So I had the proctor tell me when it was five minutes to the

5  end of a normal block, which I believe is an hour, and then I

6  would do the same thing as I would and mark whatever I hadn't

7  and pick an answer, whatever I hadn't gotten to.  And when it

8  was 60 minutes, the proctor would tell me, and I would submit

9  that section and move on.  So I tried to simulate what my Step

10  1 would be like.

11  Q.   Did you have enough time?

12  A.   No.

13  Q.   Did you say that you -- did you testify that you took

14  practice exams for Step 2?

15  A.   Yes.

16  Q.   And how much -- did you have a sense of how much you were

17  able to read of the questions on the sample Step 2 exam?

18  A.   Yeah.  It was like 50 at most.  The questions are a lot

19  longer, so I couldn't read as many of them.

20        MS. VARGAS:  I have no further questions.

21        THE COURT:  Very well.

22        Cross-examination.

23        MR. BURGOYNE:  Thank you, Your Honor.

24        Good morning, Jessica.

25        THE COURT:  Afternoon.

1          THE WITNESS:  Good morning.  Afternoon.

2          MR. BURGOYNE:  Afternoon, yes.  Where has the day

3   gone?

4                    CROSS-EXAMINATION

5   BY MR. BURGOYNE:

6   Q.   Let me ask you a few questions for follow-up before we get

7   into another line of inquiry.

8          Specifically relating to your status in medical school, as

9   I understand it, you've been told by your medical school that

10  you are required to take the Step 1 exam prior to March 2,

11  2020; is that correct?

12  A.   I am required to -- in order to return to the curriculum,

13  I have to take Step 1, but in order to stay in the curriculum,

14  I have to pass Step 1.

15  Q.   But by the date March 2, that's when you have to take the

16  exam?

17  A.   Yeah.

18  Q.   And the medical school has told you that you have the

19  option of voluntarily withdrawing?

20  A.   Yes.

21  Q.   And you can apply for readmission if you were to do that?

22  A.   Yes.  They have said that.

23  Q.   There was a little bit of testimony there at the end about

24  the Step 2 CK exam.

25         Are you registered to take the Step 2 CK exam?

1  A.    Not anymore.

2  Q.    Were you ever registered to take the Step 2 CK?

3  A.    Yes.

4  Q.    When were you registered?

5  A.    I'm not exactly sure, but it was shortly after -- the

6  first time was shortly after I was registered for the Step 1

7  exam the first time, so it would have been I think in the fall

8  of 2017.  But I didn't get to take it because I failed Step 1.

9  And then I may have registered another time, but I don't know.

10 I don't remember.

11 Q.    And there's nothing in the letter that you received from

12 your school regarding your leave of absence that relates to the

13 Step 2 CK exam.  Is that --

14 A.    Not that I recall, there isn't anything.

15 Q.    Let me make sure I understand your allegations regarding

16 the impairments that you've experienced and the impact they've

17 had on you.

18       I'll bring you a different set of exhibits, because

19 they're -- and I'll try to work out of these so you don't have

20 to go back and forth.

21       Let me get that out of your way.

22            MS. MEW:  Your Honor, would you like these?

23            THE COURT:  Yes.  Just put them down there.

24 BY MR. BURGOYNE:

25 Q.    Here is the RDX number.  This will be Exhibit 1.  And then

1    I'll be asking you sometimes about tabs that are within an

2    exhibit, to help orient you.

3        Let's look at one of the personal statements that you

4    provided in support of your accommodation requests.  If you

5    look at the first exhibit, and then go to Tab A.

6    A.    Okay.

7    Q.    And then will you go to page 9 of that document.  This is

8    your June 6, 2018 personal statement.

9    A.    Page 9?

10   Q.    Page 9, yes.

11   A.    Okay.

12   Q.    At the bottom.

13   A.    What about it?

14   Q.    Okay.  You found that page?

15   A.    Yeah.

16   Q.    Okay.  And this is the personal statement you described

17   earlier as something you had worked on for a month or longer?

18   A.    Is this the first one or second one I filed?

19   Q.    This is your second one.

20   A.    I believe I spent about a month on it, if not more.

21   Q.    And if you look at the second paragraph here, there's a

22   statement that reads:  The effects that ADHD and learning

23   disabilities have on my life are most quantifiable when

24   assessing my academic performance, but they do not just affect

25   school.  For me they are a 24 /7 thing.

1        Are those accurate statements?

2   A.   Yes.

3   Q.   Look at Exhibit 1, Tab C, if you would, please.

4   A.   Okay.

5   Q.   And do you recognize this document?

6   A.   I believe this is Dr. Smith's report.

7   Q.   Right.  And he's the doctor you went to see in support of

8   your request for reconsideration when you were denied

9   accommodations?

10  A.   The -- yes.  The third time.  Yeah.

11  Q.   And look, if you would, please, at page 4 of his report.

12  And you'll have to look at the top of the document for the page

13  numbers.

14  A.   Okay.

15  Q.   And there's a statement that says that Ms. Ramsay,

16  Jessica, had a history of academic struggle that began from

17  hers first days in school --

18  A.   I'm sorry, where are you?

19  Q.   Right under School History.

20  A.   Okay.

21  Q.   Do you see that language?

22  A.   Yes.

23  Q.   So it reads:  Ms. Ramsay, Jessica, has a history of

24  academic struggles that began from her first day in school and

25  has consistently required accommodation such as extended time

1    on tests and assignments, altered grading schemes, frequent

2    breaks and a private space for testing and completing class

3    work in order to compensate for distractibility, impaired

4    attention and concentration, impaired reading comprehension,

5    impaired reading speed and hyperactivity.

6        Is that information you provided to Dr. Smith?

7    A.    I provided my history and current symptoms at the time

8    that he evaluated me, and he put the information he thought was

9    relevant or important into the report.

10   Q.    A slightly different question, but are those statements

11   accurate?

12   A.    Yes.

13   Q.    So you've had a history of academic struggle that began

14   from your first day in school?

15   A.    From what I remember, yeah, from the beginning of school.

16   Q.    And then look, if you would, please, at page 5, the next

17   page here.

18   A.    Okay.

19   Q.    And there's an additional discussion of your symptoms and

20   impairment.

21        And beginning in the first paragraph, there's a statement

22   discussing your experience in third grade at Carrollton-Farmers

23   Branch Public School System.  That was in Texas.  Correct?

24   A.    Yeah.

25   Q.    And you attended Carrollton-Farmers public schools through

1  the fifth grade?

2  A.   Through part of fifth grade, yeah.

3  Q.   And then you moved to Michigan?

4  A.   Yes.

5  Q.   And then there's a statement there that you were still

6  struggling with reading, writing and spelling when compared to

7  your peers, and your mother informed your teachers about your

8  history and what prior teachers had done to help Jessica.

9       Are those accurate statements?

10  A.   Yes.

11  Q.   And then the next paragraph states that Jessica and her

12  mother, Jerri Shold also reported that beginning in her

13  earliest school years and continuing through elementary school

14  and beyond, Jessica had severe problems in the following areas.

15  And then they walk through the various areas where you had been

16  experiencing severe problems?

17  A.   Okay.

18  Q.   Are those statements accurate?

19  A.   Where are they on the page?

20  Q.   Second full paragraph.

21  A.   Which ones are you asking about?

22  Q.   Well, we'll look at all of them.

23       Were you having severe problems with making mistakes in

24  your school work?

25  A.   Yes.

1  Q.   Were you having severe problems sustaining attention when

2  you were doing tasks or activities at school?

3  A.   Yeah.

4  Q.   Did you have severe problems finishing your school work

5  both at home and at school?

6  A.   Yeah.

7  Q.   Were you having severe problems procrastinating and losing

8  attention and being distractible?

9  A.   Yes.

10 Q.   If you go to the next paragraph, the last sentence,

11 there's a statement that your first, second, third and fourth

12 grade teachers noticed that Jessica had difficulty with

13 reading, spelling and writing, and each teacher provided extra

14 individual but informal remedial spelling and writing

15 instruction during those grades.

16      Are those accurate statements?

17 A.   Yes.  And with reading.

18 Q.   So they were also providing assistance with reading that

19 was referenced here?

20 A.   Yeah.

21 Q.   And are you aware of any written evidence to support those

22 statements, or is that based on information you provided to Dr.

23 Smith?

24 A.   I believe it was both some comments on either report cards

25 or progress reports or something that we had at the time, and

1    as well as the history provided by myself and my mom who had

2    better memory of what happened when -- at least with the

3    teachers, or discussion with the teachers when I was younger.

4    Q.    So the struggles began in elementary school.  They

5    involved reading, writing and spelling.  Your teachers were

6    aware of those struggles?

7    A.    I believe so, which would be why they would work with me.

8    Q.    And your parents were aware of those struggles?

9    A.    I think in some ways.  I don't know if they knew the

10   extent.

11   Q.    And so I take it you were not able to mask the problems

12   you were having by virtue of your intelligence or your

13   knowledge of a given subject, they were still aware of the

14   issues you were having?

15   A.    Again, I don't think they knew the extent.  I think they

16   were aware that I was struggling to read because I was an

17   extremely slow reader or would struggle to read like story

18   problems for math, so they would read it to me.  But I think

19   because I was working hard and trying to do the things, they

20   helped me to do them.  And so they were aware that I needed

21   extra help to do these things.

22   Q.    Look, if you would, at your personal statement that you

23   provided in support of your initial request for accommodations

24   on the Step 1 exam, which is Defendant's Exhibit 4, Tab B.

25   A.    You said B?  You said Tab B?

1  Q.   Tab B as in boy, yes.

2  A.   Okay.

3  Q.   In that document, you'll look at page 2, first full

4  paragraph.  There's a discussion of a teacher in the second

5  grade who had noticed trouble that you were experiencing with

6  letter reversals.

7  A.   Uh-huh.

8  Q.   And then it goes on to say that she provided you with an

9  alphabet chart?

10  A.   Uh-huh.

11         THE COURT:  That's a yes?

12         THE WITNESS:  Yes, sorry.

13  BY MR. BURGOYNE:

14  Q.   And then put you in what's referred to here as a time-out

15  desk?

16  A.   Yes.

17  Q.   I believe in your testimony earlier, you said that was

18  your first grade teacher.  Is it in fact your second grade

19  teacher?

20  A.   No.  I believe it was actually my first grade.  My memory

21  at the time that I wrote this, I wasn't sure.  But then when he

22  looked back at the timeline of everything, figured out that it

23  was my first grade teacher.  But I also had these things -- the

24  alphabet chart and the separate desk in second grade, so I

25  remembered having it in second grade too.

1   Q.   Look at the last two, three sentences of this paragraph,
2   if you would, please.
3        After discussing those accommodations that you received
4   from the teacher -- and you're saying that was in both the
5   first grade and the second grade?
6   A.   And later too, but...
7   Q.   And these were informal accommodations.  Right?
8   A.   Correct.
9   Q.   They weren't anything that the school had officially
10  approved for you?
11  A.   I wouldn't know.  I just know that the teacher provided
12  them.
13  Q.   Okay.  Well, in fact you say in your next sentence here,
14  you address that issue.  You say:  Unfortunately, these
15  accommodations were unofficial, enacted by my teacher rather
16  than the school, so I do not have any record that they were
17  provided.  Other than this visual testing --
18       And you're referring there to the evaluation you had by
19  Dr. Tanguay; is that correct?
20  A.   Yes.
21  Q.   And you say:  Other than this visual testing, I was not
22  evaluated for learning disabilities until 2009 and so did not
23  receive any other aid or accommodation.  Consequently, I have
24  little supporting documentation from my childhood.
25       Was it accurate, as you said in this report, that you did

1  not receive any other aid or accommodation, informal or formal,

2  during your educational years?

3  A.    I believe in my mind when I wrote this, I was referring to

4  formal accommodations, because I didn't receive other formal

5  accommodations.  I did receive informal accommodations

6  throughout my education.

7  Q.    But this paragraph, you agree, is dealing with informal

8  accommodations that you received?

9  A.    Are you asking if it's talking about I did not receive any

10  other informal accommodations?

11  Q.    No.  When you were discussing the alphabet charts and the

12  time-out chair, that was an informal accommodation?

13  A.    Yeah.  That's what I remember.  We don't have

14  documentation of them.

15  Q.    Look at the bottom of this paragraph.  And there's some

16  discussion that overlaps with some testimony you gave this

17  morning.

18        First of all, at the end of that paragraph that begins

19  "growing up," there's a statement:  I rarely got an exam grade

20  that accurately reflected how much I knew.

21        Was that an accurate statement?

22  A.    Yes.

23  Q.    You then go on to discuss your -- then you had tested into

24  the ACE, Academic Creative Education program in elementary

25  school when you lived in Texas.

1        And that was an accelerated program, I think you said, for

2   math?

3   A.   I believe it was accelerated and it was math.

4   Q.   Then you go on to say that when you moved to Michigan, you

5   had to wait until the end of the year to test into an

6   accelerated program that started in the sixth grade in Michigan

7   and continued through high school.

8        So were you in an accelerated educational program from

9   sixth grade through high school while you were in Michigan?

10  A.   Just in math.

11  Q.   Just in math.  You were first diagnosed with dyslexia in

12  2018 by Dr. Smith.  Correct?

13  A.   Yes.

14  Q.   And how old were you at that time?

15  A.   I would have been 28 probably, depending on the month.  I

16  think that was in the fall, so yeah, 28.

17  Q.   And you were first diagnosed with ADHD in 2009 by Dr.

18  Smiy?

19  A.   Yes.

20  Q.   And at that point you were a sophomore in college?

21  A.   I believe so.

22  Q.   Look again, if you would, please, at your personal

23  statement, which was Defendant's Exhibit 1, Tab A.  And this is

24  again a personal statement that you sent to NBME in support of

25  your second request for accommodations?

 1  A.    Okay.

 2  Q.    Look at page 8, if you would, and the second full

 3  paragraph that begins "in 2009."

 4  A.    Under the asterisks?

 5  Q.    Yes.

 6  A.    Okay.

 7  Q.    Do you see that paragraph?

 8  A.    Yes.

 9  Q.    Did you see the statement:  Dr. Smiy also clinically

10  diagnosed me with dyslexia but did not recommend further

11  workup.

12         Did accurate that Dr. Smiy clinically diagnosed you with

13  dyslexia in 2009?

14  A.    I'm sorry, where is it, the sentence you're talking about?

15  Q.    The last sentence in that paragraph.

16  A.    Okay.  And then what was your question again?

17  Q.    Whether Dr. Smiy clinically diagnosed you with dyslexia,

18  as you informed the NBME in 2008?

19  A.    Yes.

20  Q.    Okay.  So which is it?  I thought you were first diagnosed

21  with dyslexia by Dr. Smith or -- Dr. Smith in 2018, and here

22  you're referring to having been diagnosed by Dr. Smiy in 2009?

23  A.    My understanding at that time was that it could be

24  clinically diagnosed not just with neuropsychological testing.

25  And so I -- from my understanding, he had clinically diagnosed

1  me with dyslexia.  He just hadn't referred me for the

2  neuropsychological evaluation which later was provided by Dr.

3  Smith in...

4  Q.  And what's the documentation that you can point us to that

5  reflects his clinical diagnosis?

6  A.  When he filled out the form for OSU and wrote on there.

7  Q.  And that's a form that was verifying the fact that you had

8  ADHD?

9  A.  Yes.

10 Q.  Look if you would, please, at Defendant's Exhibit 8 and

11 let's go through some of your educational records.

12 A.  You said 8?

13 Q.  Defendant's Exhibit 8.  This colorful page with stickers.

14     Do you recognize Exhibit 8 as records that you obtained

15 from your kindergarten years?

16 A.  Yes.

17 Q.  And you don't have to spend much time on these, but was it

18 the general practice that if you were doing everything you were

19 supposed to do and exhibiting proper behavior, you would get a

20 sticker for that week?

21 A.  I don't know about everything, but generally if you

22 weren't misbehaving or causing too many problems, you would get

23 a sticker.  I mean, it's kindergarten, so...

24 Q.  There are various comments provided in the kindergarten

25 report by your teachers?

```
 1  A.    I'm sorry, what was the question?

 2  Q.    Yeah.  Your teachers in kindergarten provided comments,

 3  didn't they?

 4  A.    Sometimes.

 5  Q.    Look, if you would, at Defendant's Exhibit 9.

 6        And I believe you testified earlier that some of your

 7  particular struggles were occurring in grades 1 through 4; is

 8  that correct?

 9  A.    They were always occurring.

10  Q.    Okay.

11  A.    But they were probably -- I received the most help in

12  grades 1 through 4.

13  Q.    Let's look at Exhibit 9, which is in fact your report card

14  from kindergarten.

15  A.    Okay.

16  Q.    Do you see there's comments on the left side?

17  A.    Yes.

18  Q.    Jessica is a wonderful student, works hard in class,

19  always does her best.  Making good progress in all areas.

20  Becoming more assertive and independent, doing well in class,

21  very nice girl.

22        And is that your mother's signature there?

23  A.    Yes.

24  Q.    And then the next page is your grades for that year?

25  A.    Okay.
```

1   Q.    And then it has your general work habits over there and

2   your social development.

3         And were there any work habits such as adequately paying

4   attention, your adequate attention span, or showing personal

5   organization in which you were given anything other than

6   excellent progress?

7   A.    Just under the social development and conduct one,

8   there's --

9   Q.    That has to do with self-confidence.  Right?

10  A.    Yeah.

11  Q.    Look if you would, please, at Defendant's Exhibit 10.

12        Is this a first grade report that you provided?

13  A.    Yes.

14  Q.    And look at the second page of this document for me.

15  A.    Okay.

16  Q.    And again, are these the grades that you received in first

17  grade?

18  A.    Yes.

19  Q.    And you got a grade for phonics, which was a 94.  And your

20  reading grade was E at that time, and that reflected excellent

21  progress?

22  A.    Yeah, excellent progress.

23  Q.    Defendant's Exhibit 11 is your second grade report card

24  from kindergarten or from Sunset Oaks Academy; is that correct?

25  A.    Yes.

1   Q.   And then on page 2, are those your grades from the -- from

2   that grade?

3   A.   Yes.

4   Q.   And you had a 94 in phonics, S plus in reading and then 97

5   in spelling; is that correct?

6   A.   Yes.

7   Q.   Exhibit 12 is the report card you produced.  And this is

8   your physical education report card which just addresses your

9   conduct in physical education; is that right?

10  A.   Yes.

11  Q.   Exhibit 13.  Now we're at Carrollton-Farmers Branch School

12  District, which was the school we discussed a few minutes ago

13  in Texas where you indicated that I believe you had time --

14  were struggling there as well?

15  A.   Yes.

16  Q.   And the first one is your grade 3 report card; is that

17  correct?

18  A.   Yes.

19  Q.   And on the bottom left of the first page, does that

20  indicate that you had achieved mastery in reading?

21  A.   I'm sorry, yes.

22  Q.   And then there's a place where it looks like where your

23  mother could indicate whether you needed any tutorials.

24       And did she indicate at that time that you needed any

25  tutorials?

1  A.   I'm not sure if it was my mom who circled or the teacher

2  who circled, but there were no tutorials that were indicated.

3  Q.   Fair enough.  So whether it was your mom or your teachers,

4  nobody apparently believed you needed tutorials at that point

5  in your education?

6  A.   Apparently not.

7  Q.   Then we get to your grades on the next page.

8       Would you agree with me in grade 3, you had all A's?

9  A.   Where?

10 Q.   On the left side for your academic areas.  For your final

11 grades?

12 A.   Yes.

13 Q.   And then one of your academic areas was reading, where you

14 achieved grades of 86, 91, 93, 92, 96 and 96.

15      And those were all grades that you received certainly

16 without any formal accommodations?

17 A.   Yeah, without formal accommodations.

18 Q.   Now, this is an interesting report card, because it

19 indicates whether you're receiving additional classroom

20 supports.

21      So look at the right, if you would, where's there's a

22 reference to additional programs and support.

23 A.   Okay.

24 Q.   And was there any indication at this time that you were

25 taking any classes in the learning center?

 1  A.    No.

 2  Q.    Was there any indication that you were getting specialized

 3  reading support from anyone?

 4  A.    There are no check marks in that area, so no.

 5  Q.    And was there any indication that your grades were based

 6  on intensive teacher assistance?

 7  A.    Again, there's no check marks in any of those, so no.

 8  Q.    And this is one of the grades where you testified you were

 9  receiving special assistance from your teachers on virtually a

10  daily basis?

11  A.    Yes.  I was still receiving help then.

12  Q.    Is there any indication at this time that you were getting

13  special tutoring?

14  A.    No.

15  Q.    Look at DX-14, which is your fourth grade report card

16  while you were at Carrollton?

17  A.    Okay.

18  Q.    Did anyone indicate, either your mother or your teachers,

19  that tutorials were needed when you were in the fourth grade?

20  A.    The only one that's circled is for the number 2, which is

21  no.  For the rest, I can't say.

22  Q.    There are no yeses circled, are there?

23  A.    No.

24  Q.    Then on the second page are your grades from grade 4.

25  A.    Okay.

1    Q.    And you had straight A's as your final grades for this

2    academic year as well?

3    A.    Yes.

4    Q.    Again, your reading level was shown to be on level for all

5    semesters, for all parts of the calendar year; is that correct?

6    A.    Yes.

7    Q.    And your reading grades were -- the last two were 94 and

8    94?

9    A.    Yes.

10   Q.    And again, if we can go to the additional program support,

11   there's nothing here indicating that you were getting

12   specialized reading support; is that correct?

13   A.    That's correct.

14   Q.    And nothing indicating that your grades were based on any

15   sort of intensive teacher assistance.  Correct?

16   A.    That's correct.

17   Q.    And the one thing that is indicated here is the ACE is

18   circled, and that's a reference to I believe the accelerated

19   program in math that you testified to earlier?

20   A.    Yes.

21   Q.    DX-15.  I believe this is the year that you testified that

22   you moved -- fifth grade you moved from Texas to Michigan.

23        Is this the report card from the first half of your school

24   year when you were still in Texas?

25   A.    Yes.

1    Q.    And are those your grades on the second page there for the

2    first two -- I don't know, what do they call them, semesters,

3    but the first two parts of the academic year when you were

4    still at Carrollton?

5    A.    Yes.

6    Q.    At that time your reading grades it looked like were 97

7    and 94?

8    A.    Yes.

9    Q.    And on the right side, was there any indication that in

10   the fifth grade you were receiving specialized reading support?

11   A.    No.

12   Q.    And again, no indication you were getting intensive

13   teacher assistance?

14   A.    No.

15   Q.    Defendant's Exhibit 16.  This is your report card from St.

16   Joseph's Public School at Brown Elementary School for the

17   second half of grade 5; is that correct?

18   A.    Yes, I believe so.

19   Q.    Is it correct, you have straight A's on the right side?

20   A.    A's and A minuses and O.

21   Q.    And O stands for outstanding; is that correct?  The key to

22   the grades, middle of the page, bottom.

23   A.    Yes.

24   Q.    Do you see there's some comments provided on the second

25   semester next to your language course, there's a comment, and

1  just there's a little code, it says O under COM?  And you see

2  the comments are at the bottom?

3  A.  Okay.

4  Q.  And O stands for excellent study skills?

5  A.  Okay.

6  Q.  What class was that?

7  A.  I would assume language arts.

8  Q.  And then your reading grade was an A?

9  A.  Yes.

10  Q.  And you were not receiving any type of formal

11  accommodations from the school at that time?

12  A.  No formal accommodations, no.

13  Q.  And this was a public school?

14  A.  Yes.

15  Q.  So to your knowledge, did they have individual education

16  programs available for students?

17  A.  I would assume so.

18  Q.  Look at the last page on this document, which are comments

19  from your teachers.

20  A.  Okay.

21  Q.  Second marking period:  Jessica is doing beautiful work in

22  all subject areas!

23      Then the fourth period:  You're doing fine work in all

24  subject areas all semester.  Jessica, congratulations for

25  winning second place in the original book category and expo.

1    Keep on writing creatively and consider working on the school

2    paper.

3         And is it your testimony that this was a time when you

4    were struggling with reading and writing at school?

5    A.    Yes.

6    Q.    Exhibit 17 is your report card from grade 6.  Looks like

7    you're now at Upton Middle School?

8    A.    Yes.

9    Q.    And did you have straight A's both semesters in the sixth

10   grade?

11   A.    A's and A minuses, yeah.

12   Q.    And again, this was at a time when you were not receiving

13   any formal accommodations from the school?

14   A.    Correct.

15   Q.    Exhibit 18, is this a report card reflecting your grades

16   from grades 9, 10, 11 and 12, so basically your high school

17   grades from St. Joseph's High School?

18   A.    Yes.

19   Q.    And it shows that -- it looks basically like you have all

20   A's and an occasional B plus; is that correct?

21   A.    I see several B's and B pluses and B minuses.

22   Q.    I see one B minus.

23        In any event, all A's and B's?

24   A.    Yes.

25   Q.    And your final grade point average was a 3.747 on the

1  right side?

2  A.   Yes.

3  Q.   And your class rank was 28 out of 225 students?

4  A.   That's what it says.

5  Q.   Look at some of these courses you were taking in high

6  school.

7       It looks like you were taking an Honors English class in

8  the ninth grade?

9  A.   Yes.

10  Q.   And you were taking Honors Algebra?

11  A.   Yes.

12  Q.   And again, in 10th grade and 11th grade you also took

13  Honors English classes?

14  A.   Yes.

15  Q.   And you received A's in both semesters for those two

16  courses?

17  A.   For 10th and 11th you're talking?

18  Q.   Yes.

19  A.   Yeah.  For 10th was A's and 11th was A minuses.

20  Q.   And then you also took Advanced Placement US History?

21  A.   Yes.

22  Q.   In the 11th grade?

23  A.   Yes.

24  Q.   And then it looks like you were taking Honors Chemistry

25  and Honors Physics as well; is that correct?

RAMSAY - CROSS

1   A.   Yes.

2   Q.   And then it looks like in 10th grade you were taking

3   Honors Trigonometry and Honors Biology?

4   A.   Yes.

5   Q.   And while you were getting all of these good grades, you

6   were also participating in extracurricular activities?

7   A.   Sometimes.  It depends on like the season.

8   Q.   Look at Defendant's Exhibit 19 for me.

9   A.   Okay.

10  Q.   And you'll see these, this is a document captioned Alumni

11  History from St. Joseph's High School.  And it's got your name

12  there, and 2008.

13       2008 was the year you graduated?

14  A.   Yes.

15  Q.   And then it looks like for your years -- why don't you

16  just tell us, what years were you a varsity swimmer at St.

17  Joseph's High School?

18  A.   All four years.

19  Q.   And what years did you play on the soccer team at high

20  school?

21  A.   On -- does it matter which one?

22  Q.   Doesn't matter.

23  A.   All four.

24  Q.   And were you a captain of swim team your senior year?

25  A.   Yes.

1  Q.  And it also looks like you played volleyball?

2  A.  Freshman -- sorry, freshman and JV, so for two years.

3  Q.  And then look if you would at Defendant's Exhibit 20,

4  which is a senior athletic awards --

5  A.  Yes.

6  Q.  -- document.  And if you look at the page that says at the

7  bottom right-hand corner NBME 1033.  It's a little harder to

8  read.  I apologize.

9  A.  Okay.

10  Q.  Do you recall that you were -- you see your name under the

11  last award section for the Southwestern Michigan Athletic

12  Conference Academic Conference Members with a GPA of 3.5 or

13  better?

14  A.  Yes.

15  Q.  And then it looks like right above that, you also got a

16  senior athletic plaque award.

17      What did the plaque award symbolize or represent?

18  A.  I'm not sure, to be honest.

19  Q.  Look at DX-56 -- a little trickier -- which is your other

20  notebook.

21  A.  Okay.

22  Q.  While you're looking at that, DX-56 is an electronic

23  admission application that you submitted to the University of

24  Wisconsin in Madison, Wisconsin in 2008; is that correct?

25  A.  This may have been a draft.  I don't know if it's what was

 1   actually submitted.

 2   Q.   Go, if you would, to the page which, if you're looking at

 3   the top, is page 7.

 4        And here's an additional listing of activities that you

 5   participated in in high school.  Do you see that?  Section 8,

 6   Activities?

 7   A.   Yeah.  Yes.

 8   Q.   And so again, it's got soccer, swimming, captain, Coach's

 9   Award, varsity four years.  You were also a member of the

10   National Honor Society?

11   A.   Yes.

12   Q.   It looks like you were a volunteer at a Miracle Baseball

13   League?

14   A.   Yes.

15   Q.   You were in the Key Club.

16        What's the Key Club?

17   A.   I don't really remember.  I think it -- I didn't really go

18   to the meetings.  So I think I went to a couple of them.  And

19   then we volunteered I think a couple times as a group.

20   Q.   And then you were in the Spanish Club, and you were also

21   the men's swim team manager.  And it looks like you devoted

22   approximately 15 hours a week when you were doing that?

23   A.   Yeah.

24   Q.   And it looks like when you were playing soccer, that was

25   taking you 12 hours a week, and swimming was taking you about

1  20 hours per week?

2  A.    Yeah.    These were averages, but yeah.

3  Q.    Okay.    And then you also tutored at some point.    It looks

4  like you spent two hours a week tutoring somebody, for two

5  years.

6        What were you tutoring, what subject?

7  A.    I don't remember.    But I know it was somebody else

8  younger, like in maybe fourth grade.    It was probably math or

9  science.

10  Q.    And then babysitting, you spent five hours a week

11  babysitting?

12  A.    Approximately.    But again, it's an average.

13  Q.    If you go to the page that says page 10 at the top.    It

14  was an essay you wrote where the school was trying to get a

15  better sense of you?

16  A.    Yes.

17  Q.    And is this an essay you sent to or prepared for the

18  University of Wisconsin?

19  A.    Again, I don't know if it was the final, but yes.

20  Q.    And in this essay, were you walking through a typical day

21  in your life?

22  A.    Not a typical day, but it was a day that I thought showed

23  some of my skills.

24  Q.    And then in this discussion, it has you getting up at 5:45

25  a.m., getting to morning swim practice at 6:00 a.m.    7:00 a.m.

1  into the showers.  8:00 a.m. school starts.  Then you go to

2  Honors English, Honors Chemistry, eat lunch, on to AP History,

3  AP Calculus.  End of the school day, school is over.  Pack, get

4  ready, back into the pool.  Another two-hour practice.  Drive,

5  determination, get a ride, practice is over.  Change.  Change

6  into shin guards and socks, cleats, 20 minutes to soccer

7  practice.  Soccer practice till 8:00 p.m.  Drive 20 minutes

8  home.  Then begin to work on your homework, research paper,

9  Spanish translation and exercises, pre-lab chemistry problems,

10  chapter review questions.  Take a break for food, back to

11  homework.  Continue with a 35-page history chapter and 15

12  extremely hard calculus problems.  2:00 a.m., done for the day.

13  Not quite done with homework.

14       Did you have days like that in high school?

15  A.   Some, yes.

16  Q.   And then in fact, on the next page, there's a

17  certification of accuracy saying the information that you had

18  provided in your application was accurate?

19  A.   Okay.

20  Q.   Correct?

21  A.   Yes.

22  Q.   Look, if you would, at DX-7.

23  A.   7?

24  Q.   7.  These are I believe some interrogatory responses you

25  provided to us in discovery.

RAMSAY - CROSS

1  A.   Okay.

2  Q.   And we'll go through them all again, but does this also

3  include a discussion of your extracurricular activities?

4  A.   What page?

5  Q.   Page 14.  And these look like extracurricular activities

6  after you graduated from high school.  Do you see that?

7          MR. BERGER:  I'm sorry, where are we in this document?

8          MR. BURGOYNE:  The first one -- there's two spots.

9  The first one is on page 14, discussion of jobs and activities

10 that she performed after high school.

11         THE WITNESS:  The one on 14, the date ranges are from

12 like present, so while I've been on leave.  And I think it goes

13 backwards.

14 BY MR. BURGOYNE:

15 Q.   Actually, the ones I really want to ask you about are

16 the -- turn to page 22, if you would.

17 A.   Okay.

18 Q.   And again these are just additional activities that you

19 participated in while you were in high school; is that correct?

20 A.   Mostly in high school.  Some of them were outside of high

21 school.

22 Q.   One of the things that it looks like you did is you

23 participated in acting, paid and unpaid?

24 A.   Yes.

25 Q.   And it looks like you said about two to three hours per

1   week for a couple of weeks.

2       It also says you were a lifeguard for several years?

3   A.   Yes.

4   Q.   And did you do that both in the school year but mostly in

5   the summers?

6   A.   A lot of these were mostly in the summers.  And then if I

7   had time like over a winter break or something, would pick up a

8   shift.

9   Q.   And you both -- you were responsible for the safety of the

10  people in the pool when you were the lifeguard?

11  A.   Yes.

12  Q.   And then you also taught lessons?

13  A.   Yes.  But not while I was lifeguarding.

14  Q.   That was separate from --

15  A.   Yeah.  It might be there were two guards on duty if I had

16  lessons or maybe my shift that day was only lessons.

17  Q.   And then it looks like you were also in an indie film at

18  some point in 11th grade?

19  A.   As part of the acting.  That was over the summer.

20  Q.   You did some modeling and then also participated in dance

21  as a high school elective?

22  A.   Yes.

23  Q.   Then at this point on the strength of your grades and your

24  ACT score, which we'll discuss in a minute, you were admitted

25  to Ohio State University?

1    A.    I'm sure they weighed a lot of parts of my application.

2    They didn't tell me what it was based off of, but I would

3    assume grades and extracurricular activities and essays and

4    letters of recommendation.

5    Q.    And then you began attending Ohio State in the fall of

6    2008.  Correct?

7    A.    Yes.

8    Q.    Let's look at Dr. Smiy's evaluation.  He's the one who

9    diagnosed you with ADHD.  Correct?

10    A.    Yes.

11    Q.    Let's look at -- it's DX-41 in the notebooks you have.

12         And this is the first time you've been diagnosed with a

13    disability that led to accommodations; is that correct?

14    A.    Formal accommodations, yeah.

15    Q.    And Exhibit 41, this is the record of your visit to Dr.

16    Smiy; is that correct?

17    A.    I believe so.

18    Q.    And you testified, I believe, that you went to see him

19    because you wanted to get documentation to support

20    accommodations at Ohio State University?

21    A.    I believe.  I believe so.

22    Q.    And you also testified that you were having problems, as I

23    recall, that were identified by maybe an organic chemistry

24    teacher and a Spanish teacher?

25    A.    Uh-huh.

1  Q.    Why didn't they give you informal accommodations?  Why did

2  you feel the need to get formal accommodations?  Why didn't

3  they just give you extra time?

4  A.    Because apparently they weren't allowed to because they

5  told me such, that they wish they could but they can't just do

6  that and it has to go through the university, so they

7  recommended going through the appropriate channels.

8  Q.    And then you went to see Dr. Smiy, and he had -- he was

9  your primary care physician at this point and had been for

10  several years?

11  A.    Yes.

12  Q.    And if you look -- well, let's get the date on here for

13  our bearings.

14        This is March 24, 2009, and it reflects an office visit.

15  And next to it he has -- someone has typed in ADD/ADHD?

16            MR. BERGER:  What page are you on?

17            MR. BURGOYNE:  The first page.

18            THE WITNESS:  Yes.

19  BY MR. BURGOYNE:

20  Q.    Do you see that?

21  A.    Yes.

22  Q.    And then on page 2, there's a history of the present

23  illness.

24        At this time you spent -- all the time that you spent with

25  him was just spent talking with him; is that correct?

1   A.   I'm sure he did a physical exam, but otherwise, yes.

2   Q.   Okay.  He didn't administer any diagnostic assessments?

3   A.   He asked me questions, but I -- he didn't do testing like

4   Dr. Smith did.

5   Q.   And he didn't have you fill out any symptom checklists or

6   anything like that?

7   A.   Not that I remember.  I just remember him asking

8   questions, which may have been part of a checklist.

9   Q.   Then if you see under the history of present illness, and

10   it says, reasons for visit, see chief complaint.  Chief

11   complaint, ADD/ADHD?

12   A.   Are we on the same page?

13   Q.   Page 2 at the bottom.

14        Do you see that?

15   A.   Yes.

16   Q.   There's a discussion right below that, high school, no

17   problems?

18   A.   Yes.

19   Q.   Do you see that?  Is that information you provided to him

20   during your discussion?

21   A.   Not that I remember.

22   Q.   And then the next page, there's the statement:  College

23   stress is making her switch letters around a bit, always a slow

24   reader, takes a lot of concentration for her to read, has to

25   reread a lot to get to the point.  Not as good of a test taker,

1  better orally, names are a problem for her, procrastinates,

2  reading especially, multitasking okay.

3      Is that information you provided to him during your

4  evaluation?

5  A.   I think that it is some of the information I provided and

6  that he interpreted and made notes of in his notes.

7  Q.   Turn to the next page, if you would, please.

8      And at the bottom there's an assessment that he makes?

9  A.   Okay.

10 Q.   Do you see that he has comments, and it says:  ADD versus

11 possible dyslexia.  Patient has more focus issues than dyslexic

12 tendencies.  Recommend a trial of Ritalin as prescribed.

13     At this point did he place you on Ritalin?

14 A.   Yes.

15 Q.   Was that the first time in your life you had been taking

16 Ritalin or any other type of medication to address any

17 attention-related issues?

18 A.   Yes.

19 Q.   You were never on Ritalin when you were in high school,

20 elementary school, any of those places?

21 A.   No.

22 Q.   And it looks like he gave you an ADD survey and

23 literature.

24     Do you recall him doing that?

25 A.   I don't.  I don't recall.  I think he gave a pamphlet.

1  Q.   And then it says:  Face to face time with the patient, 30

2  minutes.

3       Is that consistent with your recollection of how long you

4  spent with Dr. Smiy?

5  A.   Yeah, I think that's probably about what it was.

6  Q.   Look to Exhibit 42 for me, if you would.

7       Is this a form that you had to get Dr. Smiy to complete in

8  support of your request for accommodations at Ohio State?

9  A.   Yes.

10  Q.   Did you complete the first part -- is that your

11  handwriting on the first part of page 2, the student

12  information?

13  A.   Yeah.  Yes.

14  Q.   And then did you provide this form to Dr. Smiy's office to

15  complete the diagnostic information?

16  A.   I believe that it was faxed to him from the office of

17  disability services.

18  Q.   Here he does assign a formal diagnosis to you.  He

19  diagnoses you with -- he says 314, predominantly inattentive.

20       Did you understand that to be predominantly inattentive

21  type of ADHD?

22  A.   At this time I believe that's what he thought.

23  Q.   And he didn't indicate there was an issue with

24  hyperactivity or impulsivity?

25  A.   He didn't check those.

1  Q.   Okay.  And then in the next box he tells us how he arrived

2  at his diagnosis; is that correct?

3  A.   That's what that category is, and then he checked.

4  Q.   And what did he check under there?

5  A.   Developmental history, medical history, structured or

6  unstructured, clinical interview with the student.

7  Q.   Then on the next page, there is a statement, what is the

8  severity of the condition, and he checked moderate; is that

9  correct?

10  A.   I'm sorry, you said the next page?

11  Q.   Yes.  It's page 3 at the bottom.

12  A.   At the bottom?

13  Q.   Yes.  It says page 3 on the bottom of the page, and the

14  reference to the severity is at the top.

15       Do you see that?

16  A.   Sorry.  Yes.

17  Q.   And he identified the severity of your condition as

18  moderate?

19  A.   Yes.

20  Q.   Then the next one in terms of your ADHD history, he states

21  no hyperactivity component known.

22       And then above that he states that his first contact with

23  you was in February of 2003 and his last contact with you was

24  July 2010.

25       So he had been your primary care physician at least as of

1  that point for about seven years?

2  A.   At that point, yes, but I can't really read his

3  handwriting very well, so --

4         THE COURT:   Counsel, before you go to another exhibit

5  or another page, we're going to take a brief break now.   We'll

6  be in recess for 15 minutes.   I have a conference call.

7         MR. BURGOYNE:   Thank you, Your Honor.

8         (Recess at 3:00 p.m. until 3:16 p.m.)

9         THE COURT:   All right.   Let us proceed.

10        And again, I'll remind you you're still under oath

11 from previously being sworn earlier.

12        THE WITNESS:   Yes, Your Honor.

13        THE COURT:   Counsel, you may proceed.

14 BY MR. BURGOYNE:

15 Q.   Jessica, we are still looking at your ADHD verification

16 form.   And if you could look at page 4 of that document for me.

17 A.   Okay.

18 Q.   And do you see in the middle of the page, there's a

19 heading called educational history?

20 A.   Yes.

21 Q.   And it says:   Provide a history of the use of any

22 educational accommodations and services related to this

23 disability?

24 A.   Okay.

25 Q.   And what did Dr. Smiy provide in response to that

1  question?

2  A.   The first word is "none."  And I don't know what --

3  something date, to date.

4  Q.   It might say none known to date?

5  A.   Yeah, none known to date.

6  Q.   And then the bottom of the page, he identifies some ADHD

7  symptoms that in his view you were currently exhibiting.

8       And do you see he's marked some but not all of the

9  symptoms for inattention on the bottom of page 4?

10 A.   Yes.

11 Q.   And then on the bottom -- the top of page 5, for your

12 hyperactivity symptoms, he appears to have indicated NA, not

13 applicable, and the same for impulsivity; is that correct?

14 A.   Yes.

15 Q.   I believe you indicated, actually, they started approving

16 accommodations for you at Ohio State before you submitted the

17 verification form?

18 A.   Yes.  They had temporary accommodations.

19 Q.   Those temporary accommodations were provided in the May

20 time period of your sophomore year?

21 A.   I'm not sure exactly when those started.

22 Q.   In any event, at some point during your sophomore year?

23 A.   Yes.

24 Q.   Look at DX-22, if you would, for me.

25      Is this your transcript from Ohio State University?

1  A.    Yes.

2  Q.    I think you testified that when you got to college, you

3  encountered a lot more reading?

4  A.    Yes.

5  Q.    So college was harder than high school was?

6  A.    I think it depends on the class, because if it was like

7  dance, it wasn't really reading.  But in general, the content

8  was harder, and the reading, there was more reading, but I

9  didn't necessarily get to the reading.

10  Q.    And you indicated -- I think you testified you couldn't

11  handle it, you were drowning, you couldn't keep up once you got

12  to college.

13        Is that your testimony earlier?

14  A.    Yes.

15  Q.    Look at your transcript for the first quarter.

16        So Ohio State was on the quarter system?

17  A.    Yes.

18  Q.    So in the autumn 2008 quarter, it looks like you made

19  Dean's List?

20  A.    Where does it say?

21  Q.    Right above winter 2009 quarter to the left.

22  A.    Yes.

23  Q.    And it shows your cumulative GPA after your first quarter

24  was -- it looks like a 3.566?

25  A.    Yes.

1  Q.   Correct?

2  A.   Yes.

3  Q.   And you were not receiving any accommodations at that

4  time?

5  A.   No.

6  Q.   Likewise --

7  A.   Not formal accommodations.

8  Q.   I thought we established earlier you weren't getting

9  informal accommodations at Ohio State because they couldn't

10 just give them to you?

11 A.   Again, it would depend on what it was, like whether they

12 were helping me explain something versus on testing, something

13 on grades or not.

14 Q.   So they weren't giving you extra testing time in all

15 events, were they?

16 A.   No.

17 Q.   Then likewise for the winter quarter, you again made

18 Dean's List.  And at that time you were not receiving any

19 extended testing time or any other accommodation along those

20 lines?

21 A.   I did receive -- or I was on the Dean's List.  That was

22 your first question.  Right?

23 Q.   Right.

24 A.   And then I had, again, like I said, informal

25 accommodations but no extended time on testing, like formal

1  accommodations.

2  Q.   And it looks like you've got all A's and B's up to through

3  the winter 2010 quarter.  And your cumulative GPA at that point

4  was a 3.635; is that correct?

5  A.   After the winter quarter?

6  Q.   After your winter 2010 quarter.

7  A.   Yes.

8  Q.   And then it was -- it looks like in the spring quarter,

9  perhaps you got accommodations on your year-end exams.  Is this

10  when you would have started getting accommodations, in the

11  spring?

12  A.   I definitely had them by the spring.  I don't know, like I

13  said, when the temporary kicked in.

14  Q.   Then if you look at your grades afterwards, it looks like

15  they stayed A's and B's after you started receiving

16  accommodations with the exception of one C; is that correct?

17  A.   Are we on the other page?

18  Q.   Yes.  Two pages over, I'm sorry.

19  A.   Yes.

20  Q.   Let's look a little bit at your standardized testing

21  history.

22       You've taken several standardized tests over the course of

23  your lifetime; is that correct?

24  A.   Yes.

25  Q.   And they began in kindergarten?

 1  A.   I think so.

 2  Q.   Look at Defendant's Exhibit 24.

 3  A.   Okay.

 4  Q.   And you see this is a Stanford Early School Achievement

 5  test?

 6  A.   Yes.

 7  Q.   And it has your name on the right side?

 8  A.   Yes.

 9  Q.   And kindergarten, it appears the date of testing was April

10  1996 and you were at Sunset Oaks Academy at that time?

11  A.   Yes.

12  Q.   And what was your percentile rank for your total reading

13  score on that exam?

14  A.   96.

15  Q.   And then word reading, you were in the 86th percentile?

16  A.   Yes.

17  Q.   And by 96th percentile, that means you were in the top

18  4 percent of the individuals who were taking that test for some

19  period of time?

20  A.   I believe so.

21  Q.   And you didn't receive any accommodations on this

22  standardized test, did you?

23  A.   I don't remember taking this test, so...

24  Q.   Fair enough.  Exhibit 25, another standardized test.  You

25  took this one in the first grade.  And your total reading score

1  was what percentile?

2  A.   70.

3  Q.   70th percentile.  And then Exhibit 26, another Stanford

4  Achievement Test.  You're in the second grade.  I believe you

5  indicated this was one of the grades when you were getting

6  informal accommodations?

7  A.   Yes.

8  Q.   And your total reading, you were in the 88th percentile in

9  the second grade?

10  A.   Yes, yes.

11  Q.   And your reading comprehension was at the 76th percentile?

12  A.   Yes.

13  Q.   Correct?

14      And again, at this point you were not receiving any formal

15  accommodations?

16  A.   Correct.

17  Q.   Let's look at Defendant's Exhibit 27, which is the Iowa

18  Test of Basic Skills and Cognitive Abilities Test.

19  A.   Okay.

20  Q.   Do you recall reviewing this document when you were

21  preparing your materials to submit to the NBME?

22  A.   Not the first time, but I think it would have been after

23  the second.

24  Q.   Perhaps in connection with one of the reconsideration

25  requests?

1   A.   Are you talking about like before the third one?

2   Q.   Yeah.  At any point did you consider whether you should

3   submit this document to the NBME?

4   A.   I think I asked if this was relevant but also I probably

5   did ask if it was something that I should submit.

6   Q.   Who did you ask?

7   A.   I don't recall specifically, but if it was something I

8   found before seeing Dr. Smith or in the time that I knew Dr.

9   Smith, then I probably sent it to him and asked if it was

10  relevant to documenting -- the documentation that should be

11  submitted.

12  Q.   And eventually, this document was never provided to NBME,

13  was it?

14  A.   It was provided during the discovery.

15  Q.   Discovery, but not in support of any of your accommodation

16  requests?

17  A.   No.

18  Q.   Okay.  And this is from -- what grade were you in here?

19  This is the sixth grade, it looks like.  The sixth grade.

20       Do you see that in the upper right-hand corner?

21  A.   I believe so, yeah.

22  Q.   And do you see that the basic skills that you were

23  evaluated for at that time included vocabulary, reading

24  comprehension and then a reading total?  Do you see that on the

25  left side?

1  A.   Yes.

2  Q.   And do you see on the top of obtained scores there's a

3  heading that says NPR, national percentile rank?  Do you see

4  that?

5  A.   Yeah, yes.

6  Q.   And what was your national percentile rank for your

7  vocabulary?

8  A.   83.

9  Q.   All right.  And how about your reading comprehension?

10 A.   66.

11 Q.   And then your reading total was what?

12 A.   74.

13 Q.   And then if you go down, there's a composite score

14 reflecting your performance on all of the subtests and

15 components of this exam.

16      What was your composite national percentile score?

17 A.   In the same table?

18 Q.   Yes.  It's right above math computation.

19 A.   86.

20 Q.   And you did not receive any formal accommodations on this

21 test?

22 A.   Not that I remember.

23 Q.   Look at Exhibit 28, which is a document provided by St.

24 Joseph's High School reflecting your test results while you

25 were in high school?

1   A.   Okay.

2   Q.   You see there's a reference on the left side to the PLAN

3   test.

4   A.   Yes.

5   Q.   Is that a standardized ACT exam?

6   A.   I think it's a practice ACT exam that's probably

7   standardized.

8   Q.   And then we'll look at these in a minute but right below

9   that are your ACT scores.

10       You took the ACT exam twice?

11  A.   Yes.

12  Q.   And then there's also a reference here to the PSAT/NMSQT.

13       What is the PSAT exam?

14  A.   I'm not sure.  I don't remember taking it.

15  Q.   And the PSAT exam, also a standardized test, reflects

16  critical reading as one of its evaluated components.  And I

17  know it's a little small, but what was your percentile

18  performance in critical reading on the PSAT exam in the 10th

19  grade?

20  A.   Is that the first or second?  You said 10th grade?

21  Q.   10th grade, yes.

22  A.   For critical reading?  71.

23  Q.   And then for critical reading in the 11th grade, what was

24  your percentile rank?

25  A.   70.

RAMSAY - CROSS

1   Q.   And you were in the 95th percentile in your math

2   performance in that one?

3   A.   In the second one?

4   Q.   Yes.

5   A.   Yes.

6   Q.   Is that correct?

7   A.   Yes.

8   Q.   Look at DX-29.

9        And this is your actual PLAN score report from ACT --

10  A.   Yes.

11  Q.   -- reflecting a test date of November 2, 2005?

12  A.   Yes.

13  Q.   Do you see that?

14  A.   Yes.

15  Q.   Then what was your composite score on the ACT PLAN test

16  percentile?

17  A.   20 -- oh, percentile.  97.  No, wait.  Is it on the left

18  column?

19  Q.   Yes.

20  A.   Yeah, 97.

21  Q.   So for this PLAN, you were in the top 3 percentile of

22  everybody who took the PLAN in the United States?

23  A.   I believe so.

24  Q.   Okay.  English, you were in the 98th percentile, so the

25  top 2 percent?

 1  A.   I believe so.

 2  Q.   Reading, you were in the top 73 percent?  I'm sorry, you

 3  were in the 73rd percentile, the top 27 percent of all

 4  examinees?

 5  A.   Yes.

 6  Q.   And then there's -- there's a column that indicates your

 7  college readiness in the middle of the page.

 8       What does it indicate your college readiness was for

 9  English and reading?

10  A.   15 and 19 -- or, sorry, 15 and 17.

11  Q.   So you were above in both categories?

12  A.   Yes.

13  Q.   Of where you would be in college, individuals going to

14  college?

15  A.   Yes, it says above.

16  Q.   Please look at Exhibit 30.

17       You did not get extended testing time on the ACT PLAN

18  test?

19  A.   I'm sorry, on the PLAN?

20  Q.   Yes.

21  A.   I don't believe so.

22  Q.   And you didn't take that on a computer with Kurzweil

23  software or anything like that?

24  A.   I don't know if it was taken on a computer.  I think it

25  was a test booklet.

1  Q.  And on Exhibit 30 is your ACT test?

2  A.  Yes.

3  Q.  And this is the first time you took the test, which -- I

4  think you took it when you were a junior in high school, March

5  2007.

6      And what percentile were you in for your composite score

7  when you took the ACT exam?

8  A.  You said percentile?

9  Q.  Yes.

10 A.  89th.

11 Q.  Well, 89 in your state.

12     What about in the United States?

13 A.  Oh, sorry.  90.

14 Q.  So you're in the top 10th percentile in the United States.

15     Do you know how many students take the ACT exam each year?

16 A.  No.

17 Q.  Would it surprise you if it was over a million?

18 A.  Probably not.

19 Q.  And then there's also a reading score.

20     And what was your percentile rank in reading?

21 A.  87.

22 Q.  And you took the ACT test without extended time, without a

23 private room and without any other accommodations?

24 A.  Yes.

25 Q.  And you took that in a test room with other students?

1  A.    Yes.

2  Q.    Exhibit 31.  Is this your ACT score report for when you

3  took the ACT exam in October 2007?

4  A.    Yes.

5  Q.    And it looks like you'd improved your score here.

6      What was your percentile performance for examinees in the

7  United States on this exam?

8  A.    97th.

9  Q.    And what percentile were you in nationally for reading?

10 A.    91st.

11 Q.    So you were in the top 9 percent of all individuals on the

12 ACT exam that year across the country?

13 A.    It would appear so.

14 Q.    Look at the next page.  It's Defendant's Exhibit 32.

15     When you were asked about the MCAT earlier today?

16 A.    Yes.

17 Q.    And so this is your actual score report from the MCAT?

18 A.    Yes.

19 Q.    And it shows you took this exam in April 2011.  And for

20 your composite score, what percentile were you on this exam?

21 A.    79th.

22 Q.    And do you see that at the bottom there's a footnote that

23 discusses what that percentile rank is reflecting?  And do you

24 see the last sentence, it says:  The percentile ranks are based

25 on tests administered from January 2012 through September 2014.

1       Do you know how many individuals take the MCAT each year?

2  A.   No.  But I took it in 2011.  Right?  Or MCAT?  Okay, no.

3  I'm sorry.  That was the ACT.

4  Q.   So it also breaks down your individual test scores,

5  physical sciences, you were in the 79th percentile, and that

6  was one of the parts of the test that you annotated; is that

7  correct?

8  A.   Sorry, can we back up?  I think I just said that it was

9  for the ACT.

10      2011 is when I took the MCAT.

11 Q.   Correct.

12 A.   Yes.  And this said -- these percentile ranks are for 2012

13 through 2014.

14 Q.   That's what it says, yes.

15 A.   Okay.  And then what was your next question, I'm sorry?

16 Q.   So physical sciences, you were in the 79th percentile?

17 A.   Yes.

18 Q.   Verbal reasoning, you were in the 67th percentile.  And

19 then biological sciences, you were in the 88th percentile?

20 A.   Yes.

21 Q.   And the MCAT was a computer-based examination when you

22 took it?

23 A.   It was when I took it.

24 Q.   And it's all multiple choice.  There's also a writing

25 component?

1  A.   Correct.

2  Q.   But the three sections we just looked at, physical

3  sciences, verbal reasoning and biological sciences, those are

4  all multiple choice questions?

5  A.   Along with passages, yes.

6  Q.   And it's an exam that lasts, total time, somewhere around

7  four to five hours total exam time?

8  A.   I don't remember exactly, but that sounds about right.

9  Q.   And you didn't receive extended testing time on the MCAT?

10  A.   No.

11  Q.   You didn't use any screen reading software?

12  A.   I didn't know it was available at that time.

13  Q.   You didn't read aloud when you took the exam?

14  A.   I wasn't allowed to, but I mouthed it or read with my

15  mouth without making any noise.

16  Q.   And you didn't test in a separate testing room?

17  A.   No.

18  Q.   Exhibit 33, just to round out your standardized testing,

19  this is your Step 1 score report?

20  A.   Yes.

21  Q.   And you failed the exam by 1 point?

22  A.   Yes.

23  Q.   And then on the second page, there's a performance

24  profile.

25       Do you see that?

1  A.   Yes.

2  Q.   And the middle of the exam is sort of borderline

3  performance?

4  A.   Yes.

5  Q.   And then the stars on the right side indicate you

6  performed higher in those subjects?

7  A.   Yes.

8  Q.   And on the left it looks like it indicates you had lower

9  performance on those subjects?

10  A.   Yes.

11  Q.   And you had performance, depending on the subject, that

12  was on both sides of borderline performance, some lower and

13  some higher?

14  A.   Yes.  Mostly lower.

15  Q.   Look, if you would, please, at -- look at DX-2, paragraphs

16  20 and 21.

17       And this is the declaration that you submitted in support

18  of your preliminary injunction.

19  A.   Sorry, what page?

20  Q.   Go to DX-2.

21  A.   Yes.

22  Q.   And then go to -- it's page 6.

23       Do you see in paragraph 20 you describe the ACT exam?

24  A.   Yes.

25  Q.   And you state:  For the ACT, the intrinsic nature of the

1   test made it possible to answer many of the questions without

2   reading the question prompt, which allowed me to get through

3   enough of the questions to score well enough to get into

4   college, though my score did not adequately reflect my

5   knowledge or reasoning ability.

6       On the last ACT you took, you were in the 97th percentile.

7       So is it your testimony you should have been in a higher

8   percentile than that?

9   A.   It's my testimony that I didn't get to read all of the

10  questions, so I didn't get to show all of my knowledge on all

11  of the questions.

12  Q.   Okay.  You go on to state:  Most of the questions required

13  little reading in order to find the answers, and therefore, I

14  was able to answer enough questions to achieve an acceptable

15  score -- top 3 percent -- even though I was not able to read

16  all of the questions.  And due to the guessing penalty that is

17  applied in scoring the ACT, I had to leave some questions

18  unanswered.

19      What do you mean there by the guessing penalty?

20  A.   On the ACT, if you are wrong, like if you fill in an

21  answer and you are wrong, you have -- there's a negative point

22  value that's associated with that, so it actually takes away

23  points from your score.

24  Q.   Then in paragraph 22, you state:  For the MCAT, as for the

25  ACT, many of the questions could be answered without reading

1  and gathering information from the passages.

2      Is that an accurate statement?

3  A.   Yes.

4  Q.   Look at DX-1, Tab A, which is your personal statement.

5      And again, you're discussing the ACT and the MCAT here, do

6  you see that, in the second full paragraph, page 3?

7  A.   I see where I write ACT and MCAT a bunch.

8  Q.   And in that first sentence, it says:  I was able to avoid

9  reading strategically for some prior standardized tests like

10  the MCAT and the -- the ACT and MCAT because the tests were

11  designed so that many of the questions could be answered

12  without reading the whole question.

13      What was the basis for your statement that the ACT and

14  MCAT were designed so that people could answer the questions

15  without reading the whole passage?

16  A.   A couple things.  When I had taken the prep courses or --

17  like for the ACT, the school provided a prep course.  They let

18  us know that a lot of the questions could be answered without

19  reading the passages that were associated.  And so they advised

20  doing that.  And since that's how I normally take tests anyway,

21  that seemed to fit.

22      And when we took the practice exams that they gave us, it

23  seemed to be like they were right.

24      And so when I took it, it was the same thing.

25  Q.   But does that go to how the questions were designed?

RAMSAY - CROSS

1  A.   I'm sorry, what?

2  Q.   I'm wondering where you got the basis for your statement

3  that the questions were designed so they could be answered that

4  way?

5  A.   That's what the -- they had told us, and that's what the

6  booklet said.

7  Q.   The test booklet?

8  A.   Yeah.

9  Q.   Then you go on to say:  Additionally, due to the guessing

10  penalty, I had to leave the questions I was not able to read

11  unanswered.

12       And that's referring to the ACT exam?

13  A.   Yes.

14  Q.   Look at DX-60 for me, please.

15  A.   Okay.

16  Q.   DX-60 is a document captioned -- titled the ACT, preparing

17  for the ACT 2007-2008.

18       And do you recall seeing this document or a document like

19  this when you were preparing for taking the ACT exam?

20  A.   Yeah.  They probably gave this in their prep course.

21  Q.   Okay.  And what year did you take the ACT exam?

22  A.   2007.

23  Q.   And then this book includes complete practice tests.  But

24  turn to page 3, if you would, for me where there's a discussion

25  of general test-taking strategies for the ACT.

1  A.   Okay.

2  Q.   And do you see on the top right-hand side, where the

3  advice given is to read each question carefully?

4  A.   Okay.

5  Q.   And then there's the next statement, answer the easy

6  questions first.

7       Is that similar to what you testified you did when -- as a

8  test-taking strategy?

9  A.   I don't know if I would say easy, but answerable, but...

10 Q.   It goes on to say:  Answer every question.  There is no

11 penalty for guessing.

12      So when you said in your various papers that you left

13 answers unanswered on the ACT test because there was a guessing

14 penalty, that was simply -- that was just a mistake?

15 A.   As far as I remember, to my best recollection, there was a

16 guess penalty and we were told not to guess.

17 Q.   Go to page 8, if you would, please.  And there's a

18 description of the reading test, which is one of the components

19 of the ACT exam.

20 A.   You said 8?

21 Q.   Page 8, yes.

22 A.   Okay.

23 Q.   There's a statement:  The ACT reading test is a

24 40-question, 35-minute test that measures your reading

25 comprehension.

1  A.   Okay.

2  Q.   So you've got less than a minute to answer each of the

3  questions?

4  A.   Okay.

5  Q.   And then over on the right, it states, first full

6  sentence:  The test compromises four prose passages that are

7  representative of the level and kinds of texts commonly

8  encountered in first year college curricula?

9  A.   Okay.

10  Q.   And then you go on down, and there are tips for taking the

11  ACT reading test.

12       And read the second heading for me, please?

13  A.   The second one underneath?

14  Q.   Yes.

15  A.   Read the passage carefully.

16  Q.   Correct.  And right below that it says:  Before you begin

17  answering a question, read the entire passage thoroughly.  It

18  is important that you read every sentence rather than skim the

19  text.

20  A.   Okay.

21  Q.   Do you recall receiving that advice before you took the

22  ACT exam?

23  A.   Not receiving that advice.

24  Q.   And then under the ACT science test, under the next page,

25  9, do you see again the advice provided is to read the passage

1  carefully and that it is important to read the entire text and

2  examine any graphs, tables or figures?  Do you see that on the

3  bottom left-hand side?

4  A.   Not specifically.

5  Q.   It's the first two sentences under the heading read the

6  passage carefully.

7  A.   Okay.

8  Q.   So now let's actually look at what the reading test was.

9       And again, this is a test where you scored in the

10 90-something percentile?

11 A.   Okay.

12 Q.   First passage:  This is an exam which has passages

13 followed by several questions.

14 A.   What page are you on?

15 Q.   Page 34.  And this first one is -- involves prose fiction,

16 the first passage.

17 A.   Okay.

18 Q.   Now, I understood you to say the first thing you would do

19 is read the last sentence in the passage?

20 A.   Not the passage, the question.  So like if --

21 Q.   Let's go to the next page then.

22      So we've got ten questions tied to that passage.

23 A.   All right.

24 Q.   Tell me what you would do here.  What's the first thing

25 you would read on this page?

1    A.    Well, I would start with the first question and read the

2    last line of that question, which in this case there's only

3    one.  And then -- you want me to keep going?

4    Q.    So the first question, the main theme of this passage

5    concerns the -- right?

6    A.    Okay.

7    Q.    So you'd read that.

8         And is that a question you could answer without reading

9    the passage?

10   A.    Not that one, so I would move on to the next one.

11   Q.    All right.  Which of the following questions is not

12   answered by information in the passage.

13        Is that a question you could answer without reading the

14   passage?

15   A.    Nope.  So I would move on to the next question.

16   Q.    The narrator draws which of the following comparisons

17   between the old couple and Eugene's parents.

18        Is that one you could answer without going through the

19   passage?

20   A.    Probably not, but I probably wouldn't have to read the

21   whole passage.

22   Q.    The next one, in terms of developing the narrative, the

23   last two paragraphs, line 67 and 87, primarily serve to -- so

24   that's one you could go to and just read that amount of text?

25   A.    That's what I would do, yes.

1   Q.   Question 5, it can most reasonably be inferred from the

2   passage that when the narrative says X, she is most nearly

3   indicating that, and then it goes on.

4        Is that one you could read or answer without reading the

5   passage?

6   A.   Number 5?

7   Q.   Yes.

8   A.   That has lines that it shows -- lines 30 and 31, so I

9   would read those.

10  Q.   If you go on -- let me ask you something.  The length of

11  the passage here in the reading test, is this longer than the

12  questions you encountered on Step 1?

13       MS. VARGAS:  I'm going to object.  I'm not sure what

14  the relevance of this is, because this isn't a test she ever

15  took.  This is a sample question you've selected, so --

16       MR. BURGOYNE:  Well, yeah.  But we went through the

17  same exercise with the MCAT.

18       MS. VARGAS:  She actually took the MCAT.

19       MR. BURGOYNE:  She didn't take that MCAT.  That was a

20  publicly disclosed MCAT exam from 2010.

21       MS. VARGAS:  That took some of the same questions that

22  were on her exam.  This is a practice book that you've selected

23  out of --

24       MR. BURGOYNE:  I've selected it, Judge, just because

25  it was the practice book for her year and it has the practice

1  ACT test on it and it illustrates the type of questions she

2  encountered.

3          THE COURT:  If you want me to rule on it or if you

4  want to continue your discussion without me, I'll allow you to

5  continue the discussion.  But if there's an objection before

6  the Court, I'll rule on it.

7          Overruled.

8          All right.  Let's move on.

9          MR. BURGOYNE:  Thank you, Your Honor.

10  BY MR. BURGOYNE:

11  Q.  So my question to you, Ms. Ramsay, was, is the passage

12  that's reflected here on page 34, one-page passage, is this

13  content longer than the content that you encountered in a

14  typical Step 1 question?

15  A.  Since this is associated with ten questions, I'm not sure

16  how much of the reading is for which question, but the passage

17  itself is probably longer than the typical Step 1 question.

18  Q.  And there are passages throughout the reading section of

19  the test, is that correct, on the ACT exam?

20  A.  Yes.

21  Q.  In fact, if you go to the English test that is on page 14,

22  it also includes passages; is that correct?

23  A.  That looks like it does.

24  Q.  And that looks like the math test was a 60-minute test

25  with 60 questions, some of which are problems and others of

1  which contained text.

2      If you look at page 26 of the exam, do you recall having

3  to read text when answering some of the math questions on the

4  ACT exam?

5  A.   I don't recall specifically.  I am sure there were some

6  where I had to read some text, but most of them were like

7  solving the math problems.

8  Q.   And then the science part of this test, page 42, that also

9  included passages that you had to read and then answer a series

10  of questions; is that correct?

11  A.   Yes, yes.  Sorry.

12  Q.   Let's look -- while we're here, let's look at the Step 1

13  sample questions, which is DX-61.  You looked at a version of

14  the same document when Ms. Vargas was asking you some

15  questions.

16  A.   Okay.

17  Q.   Did you practice with these sample test questions?

18  A.   These specific ones?

19  Q.   Or something like this from the NBME website?

20  A.   I did a lot of practice.  I'm sure I did a similar -- the

21  sample questions that were out at the time that I did them, and

22  I'm sure I did a lot of other question banks.

23      MR. BERGER:  I just want to note for the record, this

24  is not exactly the same.  I certainly haven't compared it

25  question by question.  But this one appears to say that it was

1    updated in February 2017, and I believe that the one that we

2    marked and was referred to earlier was updated in February

3    2019.

4    BY MR. BURGOYNE:

5    Q.   In all events, you've seen a version of these practice

6    questions?

7    A.   Yes.

8    Q.   And you practiced with a version of these practice

9    questions?

10   A.   I did some of them as part of my practice, yes.

11   Q.   And when you take the Step 1 exam, each question is a

12   distinct question, in other words, there's not a passage

13   followed by a series of questions?

14   A.   Generally that is the case.  There are paired questions

15   sometimes, which isn't like a passage and then multiple

16   questions.  It's like a question like I described earlier for

17   Step 1 where you have to read all of it and figure out the

18   answer and you can't see the second question until you answer

19   the first.  And so it's like a gatekeeper, because if you see

20   the second question, that gives away something to help you

21   answer the first, so like that's why they don't let you see it.

22   Q.   Let's just look at a sample questionnaire.  Just to turn

23   to page 8.  And you see question 3?

24   A.   Yes.

25   Q.   It's a three-sentence question with a photograph?

1  A.  Yes.

2  Q.  Is that a common type of question that you encounter on

3  the Step 1 exam, a photograph, then a description, and then a

4  series of questions or a question tied to that photograph?

5  A.  It is one of the types.

6  Q.  And are these questions generally representative of the

7  questions you saw on the Step 1 exam?

8  A.  I can't really say without looking at all of them, but I

9  know that they can't be completely representative because the

10  Step 1 questions sometimes have videos or sound clips

11  associated with them along with the question.  And it's not

12  just like identify this murmur.  It's a clinical question

13  similar to, you know, like one of these on the page probably,

14  along with the clip.  And you have to spend the time listening

15  to or watching the clip and then reading the question and

16  answering the question.

17  Q.  And in fact, to page 3, it points out that those

18  audio-type questions are not represented here?

19  A.  Page 3.  Okay.

20  Q.  See the note at page 3.

21      Let's look at some of the MCAT questions that you

22  discussed earlier.  And we can work right off the ones that you

23  indicated.

24  A.  Okay.

25  Q.  First of all, when did you do these annotations?

RAMSAY - CROSS

1  A.    Within the last couple days.

2  Q.    And make sure I understand exactly what you did here.

3        It looks like the physical sciences section.

4        Is this the entire section for physical sciences that

5  you've annotated?

6  A.    I believe so.

7  Q.    And then you've got highlighting here.

8        What is this highlighting supposed to indicate?  For

9  example, the blue highlighting on page 5.

10  A.    That's where I would have looked at, read.

11  Q.    And when you took the actual MCAT, were you able to

12  highlight on the screen?

13  A.    I don't remember, but possibly.

14  Q.    And then when you do a different color highlighting here,

15  the green, what is that supposed to tell us?

16  A.    That's probably showing for your benefit like the color

17  that associates with the question to show you where I read for

18  that question.

19  Q.    Again, that's not anything you were actually doing when

20  you took the MCAT?

21  A.    No.  I was demonstrating to show you where I was reading.

22  Q.    And then all these comments here, these comments,

23  completely passage independent, can answer based on prior

24  knowledge, essentially passage independent, could/would answer

25  solely based on the tiny bit I would have read to answer number

1    1.

2        Those are just comments you provided throughout this

3    document?

4    A.    Yes, so you could see how I would go through that document

5    and take it.

6    Q.    Then where there's information crossed out, what does that

7    indicate when you've crossed out an answer?

8    A.    As an interruption, that's my thought process of ruling

9    out an answer.

10   Q.    So in all these questions, I take it you would have read

11   at least the answer choices?

12   A.    Yes.  If I got that far.  I did it as if I would have

13   gotten that far.  And I think I commented about that in there.

14   Q.    Some of these are kind of -- let's look at the verbal

15   reasoning next, Exhibit 19A.

16       And again, you went through the same exercise here.  I'm

17   looking at page 34.  And there's ten sets of comments sort of

18   explaining to me or the Court how you would have gone about

19   answering this question?

20   A.    Yeah.  So for the verbal section, I did it slightly

21   different than the physical sciences because I couldn't just

22   say here's a formula and that's the formula I used.  So I had

23   to pretty much take it like I would take it, except for that I

24   didn't limit the time because then I wouldn't be able to

25   annotate.  And then because of that, I went through the tests

1  as if I had gotten to all of that.  But I just showed you what

2  I would have done had I been in that testing scenario.

3  Q.    You even got to the point where you would go through and

4  count the total number of words in the passage and then

5  estimate how many passages you actually would have read when

6  you were taking the exam?

7  A.    That's incorrect.  I copy-and-pasted the passage into a

8  Word document and used word count to find the number of words.

9         And then if I read a part of it or a couple words or

10  whatever, I would highlight that and get the word count of

11  that.  But that was after I had already gone through.  I did

12  that after I had gone through the document.

13  Q.    And this work was all your independent work, nobody helped

14  you?

15  A.    Correct.

16  Q.    And how long did it take you to do that?

17  A.    Days.  And I didn't finish.  I haven't gotten to the

18  biological sciences.  And I didn't do the writing sample.

19  Q.    Let's look at Exhibit 58, please.  And it's still relating

20  to the MCAT exam.

21         And this says Second Edition, The Official Guide to the

22  MCAT Exam?

23  A.    Okay.

24  Q.    And have you seen this document before?

25  A.    I'm not sure.

1    Q.   Or a version of the official guide for the MCAT?

2    A.   I'm sure I've seen a version.

3    Q.   I thought you had told me that you owned a copy of this or

4    a similar version at one point?

5    A.   Yes.  I think -- if this is the one that I thought had the

6    practice questions in it, that's what I thought it was, when we

7    were in deposition.

8    Q.   And I'll tell you, it does include -- this is not -- this

9    is excerpts from the book.

10   A.   Okay.

11   Q.   And the book does include practice questions.

12   A.   Then yeah, then I probably own...

13   Q.   And you'll see on page 2, it has got a 2011 copyright, and

14   that was the year that you took the MCAT?

15   A.   Okay.  Yes.

16   Q.   Look at page 13.  And there's a discussion of the role of

17   the exam, and it indicates the MCAT exam is taken by more than

18   70,000 students each year.

19   A.   Okay.

20   Q.   Do you recall I had asked you the number, and you weren't

21   sure about that?

22   A.   Yes.

23   Q.   And then there's a breakdown.  If you look at page 15,

24   there's a little summary of the exam.

25   A.   Okay.

1  Q.   Do you see that?

2       And it's just a good shorthand here?

3       So in the physical science areas, there's seven passages

4  and 52 questions.

5  A.   Okay.

6  Q.   And then verbal reasoning, again, seven passages, 40

7  questions.  Biological science, 70 -- or seven passages and 52

8  questions.

9       So in all three of the multiple choice sections, there are

10 passage-based questions; is that correct?

11 A.   Yes.  Except for the writing sample.

12 Q.   I think you indicated that at least one of the reasons you

13 didn't request accommodations on the MCAT was because you

14 didn't know they were available?

15 A.   Yeah.  I didn't find out they were available or even that

16 they existed until shortly before I took the MCAT.

17 Q.   And I assume at some point when you were registering for

18 the MCAT, you went to their website?

19 A.   Probably, yeah.

20 Q.   You didn't see the references there for taking

21 accommodated tests?

22 A.   No.  I don't remember seeing them.

23 Q.   Look at page 24, which is headed What is Accommodated

24 Testing and Who Needs to Apply.

25      Do you recall reading this section in which AAMC discusses

1    the availability of accommodations on the exam?

2    A.    I don't recall specifically reading it.  I probably -- I

3    may have seen it.  I probably paged through the beginning of

4    this book, but I don't know if I saw this specifically.

5    Q.    Let's look at your request for accommodations on Step 1.

6          Turn to DX-4, Tab A.

7    A.    Okay.

8    Q.    And this should be your first request for accommodations,

9    which I think you testified to or about this morning.

10    A.    Okay.

11    Q.    Turn to page 4, if you would, please.

12          And you see there's a section here that asks for

13    information about your impairment?

14    A.    Yes.

15    Q.    And section D1X asks you to check the box that best

16    describes the nature of your impairment and list the year it

17    was first diagnosed by a qualified professional.

18          All right?  And what's the first box you checked?

19    A.    Reading.

20    Q.    Is that under the learning impairment category?

21    A.    Yes.

22    Q.    And did Dr. Tanguay, the optometrist, diagnose you with a

23    learning disability?

24    A.    Not a learning disability, but at the time that I filled

25    this out and submitted it, I didn't know that she was not able

1   to diagnose a learning disability with the DSM criteria, but

2   she did diagnose that I had problems with reading.

3   Q.   Were the problems she diagnosed you with, were they vision

4   related as opposed to a cognitive issue?  I mean, she's an

5   optometrist?

6   A.   She's an optometrist, so I don't know if she could say.

7   She said to the best of her ability that I had issues with the

8   flipping and I think she said like visual perception, which

9   perception implies how you perceive that information.

10  Q.   Then the next thing, you also reference dyslexia here.

11  And you refer to a provisional diagnosis by Dr. Smiy?

12  A.   Yes.

13  Q.   And we already looked at his documentation.

14       You also reference here as another impairment migraines.

15  Right?  Here at the bottom?

16  A.   Yes.

17  Q.   And you said you were diagnosed with those in 1997.  And

18  the next one asks you to list the current diagnoses for which

19  you're requesting accommodations.  And here you listed only

20  ADHD and dyslexia and did not include the migraines you

21  referenced above?

22  A.   Yes.  And as I said before, I didn't know that I could

23  request accommodations for migraines or at that time DVT

24  either.

25  Q.   Look at the next page for me.

1  A.   Okay.

2  Q.   And do you see there's a reference to the accommodations

3  that you have received previously in post-secondary education.

4  And you state, you identified for NBME the accommodations you

5  received at Ohio State University.

6       Do you see that?

7  A.   Yes.

8  Q.   And one of the things you indicate is that you received

9  double testing time from Ohio State.

10      That isn't accurate, is it?

11 A.   That is inaccurate, like not accurate.  That was probably

12 a mistake on my part.

13 Q.   You were getting time-and-a-half at Ohio State?

14 A.   Yeah.

15 Q.   Over on the right you said you were receiving

16 accommodations from Ohio State from 2009 to 2013.  That was

17 also inaccurate, wasn't it?

18 A.   I'm not sure, because I don't know when the temporary

19 kicked in.

20 Q.   I think --

21 A.   That probably was more 2010, but I don't know.  It could

22 have been the end of 2009.

23 Q.   Turn to the next page for me.  There is a discussion of

24 accommodations you received in primary and secondary school.

25 Do you see that?

RAMSAY - CROSS

1    A.    Okay.

2    Q.    It asks you to provide each school and all formal

3    accommodations that you received and when you received them.

4          Do you see that heading?

5    A.    Yes.

6    Q.    You indicate in high school, none.  Middle school, none.

7    And then in elementary school, you referred to the alphabet

8    chart again that we discussed earlier, and the distraction

9    reduced space, which we discussed earlier, extra time for

10   writing and reading.  These were provided by the teacher, not

11   the school, so I do not have records confirming them.  And you

12   refer to a single year in which you receive those

13   accommodations; is that right?

14   A.    I think I was trying to provide the dates that I remember

15   it starting, but --

16   Q.    It states dates provided?

17   A.    Yeah.  I probably misread it or wasn't paying attention.

18   Q.    And although they asked for formal accommodations, you

19   chose to provide informal accommodations as part of your

20   answer?

21   A.    Yeah, probably for the same reasons.

22   Q.    And those were the accommodations that you received in

23   Sunset Oaks Academy, second or first grade?

24   A.    Yeah.  And carried on through some of them.

25   Q.    And no reference to similar informal accommodations in

1  high school or middle school that you reported to NBME on your

2  first application?

3  A.   On this form, but I did discuss some of them in my

4  personal statement.  But I also didn't know that I needed to

5  list, like, every type of thing that my teachers would do to

6  help me.  I thought that was kind of overkill and unnecessary,

7  so I left a lot of that stuff out on this form at the time that

8  I first applied.

9  Q.   Okay.  I think you already testified to your test-taking

10  strategies, the Step 1 exam?

11  A.   Okay, yes.

12  Q.   Do you recall that?

13      At some point did you -- let me make sure I understand

14  this.

15      The test-taking strategies that you report that you used

16  on the MCAT or the Step 1 exam, did you say those were

17  strategies that were also recommended by a test prep program

18  that you took?

19  A.   So I use -- I can't use the exact same testing strategy

20  that I used for the MCAT on Step 1 because I have to -- we have

21  to read the entire question for Step 1 questions to get the

22  information needed to answer the question, whereas that wasn't

23  true for most of the questions for the MCAT.

24      And I have developed that strategy of reading as little as

25  possible because I couldn't read everything on most tests, like

1   early on.  I don't even know if I could say when I first

2   started doing that.  But that's typically something that test

3   prep people recommend.  And so it was -- it confirmed what I

4   did, or validated it.

5   Q.   Okay.  Let's shift gears now to your testing experience

6   when you took the Step 1 exam in July of 2017.

7        Look at DX-1, which is the Complaint, and page 9.

8        And do you see paragraph 40 there?  I'm sorry.

9   A.   Yes.

10  Q.   In paragraph 40, the middle sentence begins with "because

11  of her dyslexia."

12       Do you see that?

13  A.   Okay.

14  Q.   Because of her dyslexia and ADHD, Ramsay was only able to

15  read about 60 to 70 percent of the questions in each block and

16  had to enter guesses for the remaining questions without

17  reading them.

18       Is that an accurate statement?

19  A.   Yes.

20  Q.   And for every question on Step 1, did you spend at least

21  some time reading the question, including the passage?

22  A.   I -- can you clarify passage?

23  Q.   Well, the vignette, the lead-in, the stem to the question?

24  A.   I think I -- I don't know if I can say every question, but

25  I know that I tried to read the last line of the vignette and

1   possibly the answer choices for the questions if I could get

2   there.  But I don't know if I could say I did -- was able to

3   successfully do that for all of the questions for all of the

4   sections.

5   Q.   Let me make sure I understand.  For the 30 to 40 percent

6   of the questions that you say you didn't have time to read, is

7   it your testimony that you didn't read any of the question for

8   30 to 40 percent of the exam?

9   A.   I probably was able to look at and at least start the last

10  line.  I may not have read the whole last line or I may not

11  have read anything else.

12  Q.   In your Complaint you said without reading them?

13  A.   Without fully reading them, reading the whole question.

14  Q.   Look at DX-2, paragraph 28.

15  A.   Okay.

16  Q.   And this is your declaration in this case?

17  A.   Is it?  I think so.

18  Q.   And have you located paragraph 28?

19  A.   Yes.

20  Q.   And in this paragraph, you state in the middle of the

21  paragraph:  I did not have time to read all of the questions

22  and in the last minute of each block was forced to blindly

23  select answer choices for about 30 to 35 percent of the

24  questions.

25       So is it your testimony that for 30 to 35 percent of the

1   questions, you simply chose an answer without reading any of

2   the passage?

3   A.   Like I said before, I may have started or possibly read

4   the last line of the passage if I got to it, but I may not have

5   read -- been able to read the question, the whole question to

6   answer the question, the whole vignette to answer the question.

7   Q.   Let me ask you to look on -- just to make sure we're

8   understanding each other here, is it now your testimony that

9   you might have read some of the content and all of the

10  questions, some of the questions?

11  A.   So I -- okay.  I read the last line or started reading the

12  last line if I could, if I got to that many.  I may not have

13  read it for all -- I may not have read the whole line or any of

14  it for all of the questions.  I don't know if I could

15  specifically say or definitively say for all of them.  But I

16  tried for most of them to at least see if it was something I

17  understood the question line of.

18  Q.   Let me hand you your deposition transcript.

19       The reason I'm asking this is because throughout your

20  court papers, there is the suggestion that you weren't able to

21  read 35 to 40 percent of the test questions.

22  A.   Correct.

23       THE COURT:  Counsel, would you direct your opposing

24  counsel to what page and line.

25       MR. BURGOYNE:  Yes.  I'm sorry, Your Honor.

 1          THE COURT:  Sure.

 2          MR. BURGOYNE:  Page 136 of the transcript, lines 1

 3  through 5.

 4          MR. BERGER:  Page 136?

 5          MR. BURGOYNE:  Page 136, yes.

 6  BY MR. BURGOYNE:

 7  Q.   One more notebook.  Right here.

 8       And do you recall me asking you in the deposition:  Does

 9  that mean for 30 to 35 percent the questions, you just chose an

10  answer without reading any of the passage?

11       And what was your answer?

12  A.   My answer was yes.

13  Q.   And is that different than your answer today?

14  A.   Yes, I -- in the instance that we're talking about fully

15  reading the passage or any of the passage, yes.  Or reading

16  part of the passage, the question line.  And also because we're

17  referring to a vignette and using the word "passage."

18  Q.   I don't think I'll need to give this to you again.  If I

19  do, I'll bring it back.

20  A.   Okay.

21  Q.   Let's transition to your second request for

22  accommodations.

23       And in support -- this is DX-4, Tab J.

24  A.   Okay.

25  Q.   And on this accommodation request, you relied upon your

1   migraines and your clotting disorder as additional disabilities

2   in support of your request for accommodations; is that correct?

3   A.   This is the second one?

4   Q.   Yeah.  Your second request for accommodations.

5   A.   Those were additional diagnoses that I included, yes.

6   Q.   And that was June 2018?

7   A.   Yes.

8   Q.   And you submitted a fair amount of paper to NBME in

9   support of that accommodation request; is that correct?  I

10  think you referenced, for example --

11  A.   Yes.

12  Q.   -- you got a letter from your school?

13  A.   A letter of support, yes.

14  Q.   And that was Dean Overton or Associate Dean Overton?

15  A.   Again, I'm not sure what his title is for sure, but it's

16  Dr. Overton.

17  Q.   You also submitted a document from a Dr. Ruekberg?

18  A.   Yes.

19  Q.   And then you also submitted a letter of support from a Dr.

20  Houtman?

21  A.   Yes.

22  Q.   And before we get into those documents, NBME granted some

23  accommodations for that request; is that correct?

24  A.   They granted the separate room and the -- and extra break

25  time based on my migraines and DVT with post-thrombotic

1    syndrome and clotting disorder.

2    Q.    And you were going to be allowed to test over two days?

3    A.    Yes.

4    Q.    And as a result of testing over two days, each testing

5    block was going to last how long?

6    A.    I'm not sure.  I don't know.  I think -- I don't know if I

7    was ever told this, but I think maybe 30 minutes.

8    Q.    And how long is the standard test block?

9    A.    60 minutes.

10   Q.    So you would now be allowed to test over two days, but

11   only you would have to sit or stand for half an hour for each

12   test block?

13   A.    Correct.

14   Q.    And you were in a private room, and if you wanted to talk

15   aloud, you could talk aloud?

16   A.    Yes.

17   Q.    Look, if you would, please -- first of all, who is Dr.

18   Ruekberg?

19   A.    My treating psychiatrist.

20   Q.    And he's never conducted a diagnostic evaluation of you,

21   has he, similar to what you went through with Dr. Smith?

22   A.    No.

23   Q.    Look at Exhibit 64.

24         And I'm assuming Dr. Ruekberg's letter is in one of the

25   documents that were admitted this morning because you submitted

1   that letter to NBME in support of your second request for

2   accommodations?

3   A.   I believe so.

4   Q.   Exhibit 64 is a series of email messages that extends from

5   Ramsay -- the Bates number on the right -- 26 through 102.

6        Do you recall having extensive communications back and

7   forth with Dr. Ruekberg after you asked him to submit a letter

8   supporting your request for accommodations?

9   A.   I'm sorry, you said through 102?

10  Q.   Yes.  Basically the entire exhibit consists of a series of

11  emails with attachments.

12  A.   A lot of those are -- like I just flip to a page, like

13  page 73, and that's from my school.  Maybe not.  I'm sorry.

14  That's the heading.  I'm sorry.

15       Okay.  And what was your question?  Sorry.

16  Q.   My question was whether or not you and your lawyer worked

17  with Dr. Ruekberg over the course of several months to prepare

18  a letter that you then -- to prepare the letter that you then

19  sent to NBME?

20       MS. VARGAS:  Objection, attorney-client privilege and

21  work product.

22       THE COURT:  I'm going to sustain the question as it's

23  raised at this point in time.  You can try to rephrase it.

24       MR. BURGOYNE:  Sure.

25  BY MR. BURGOYNE:

1  Q.   Look at the first two pages, actually, it's the first

2  three pages, Defendant's Exhibit 64.

3  A.   Okay.

4  Q.   And the first -- bottom there, is that an email from you

5  to Dr. Ruekberg in December 2017 thanking him for his help on

6  your request for accommodations?

7  A.   Yes.

8  Q.   And then the next three pages are sort of a three-page

9  document.

10       Is that an initial draft that Dr. Ruekberg prepared of his

11  letter?

12  A.   Yes.  It was a very early draft of like some of what his

13  thoughts were for including into his letter.

14  Q.   At the bottom of this document, he says that in his

15  opinion, you should be given 50 percent additional testing time

16  over two days?

17  A.   What page?

18  Q.   That's 27.

19  A.   Where?

20  Q.   The very bottom.  "In my professional opinion, therefore."

21  A.   Okay.

22  Q.   And he recommended 50 percent extra time?

23  A.   Okay.

24  Q.   In his draft; is that correct?

25  A.   It looks like that.

RAMSAY - CROSS

1   Q.   Then on the top of the next page, there's a paragraph that

2   reads:  Even if the board does not find Jessica meets criteria

3   for accommodations for ADHD, in my professional opinion, the

4   board should approve Jessica for accommodation for reading and

5   writing learning disabilities.

6   A.   Okay.

7   Q.   Do you recall seeing that paragraph in one of his early

8   drafts?

9   A.   Not specifically, but I remember talking about it, about

10  how he -- that even if you didn't want to provide

11  accommodations for ADHD, that I should definitely get them for

12  dyslexia.

13  Q.   And when he submitted his final letter, he recommended

14  100 percent extra time; is that correct?

15  A.   Yes.

16  Q.   And when he submitted his final letter, this paragraph

17  wasn't in the final letter discussing the difference between

18  your ADHD and your LD?

19  A.   Which paragraph?

20  Q.   The paragraph that just read about even if the board does

21  not find Jessica meets criteria for accommodations for ADHD?

22  A.   I don't know for sure if it is, but I would assume that

23  you're asking because it wasn't.

24  Q.   All right.  Then we go two more pages, and let's start

25  with page 32.

1        THE COURT:  Counsel, we'll be adjourning the day at a

2    quarter of 5:00, so everyone knows.

3        MR. BURGOYNE:  Okay.

4    BY MR. BURGOYNE:

5    Q.    The document that says 32.  And then you'll see there's a

6    series of highlighted text, some blue, some yellow, and the

7    three-page letter is now a five-page letter.

8        Is this a revised draft or comments that you sent to him?

9    A.    I know it's a second draft or another draft.  I don't know

10   if I sent it to him or if he sent it to me.

11   Q.    Look at page 52.  And do you see it says final draft at

12   the top.  And it looks to be draft version number 4 under the

13   attachments.  And you state here:  Dear Dr. Ruekberg, sorry it

14   is so long.  I had to add a lot of support to each of the

15   points in the NBME guidelines.

16       Do you recall providing substantive content to Dr.

17   Ruekberg for his letter?

18   A.    I recall adding a lot of the details because he hadn't

19   included them, but it wasn't anything that he didn't already

20   know.  And I wanted to make sure that the facts that he had in

21   there were correct and that they met the guidelines that are

22   published by the NBME, because after going through, I realized

23   that was important to meet those guidelines.  So I wanted to

24   make sure that his letter met the guidelines, but also at any

25   point if he didn't agree with any of it, he wouldn't have

RAMSAY - CROSS

1  signed it or he would have taken it out.

2  Q.   Look at page 71 for me.  Do you see this is a document --

3  this document and the next page, 71 and 72, do you see a lot of

4  text has been redacted here?

5        MS. VARGAS:  Objection, attorney-client privilege and

6  work product.

7        THE COURT:  Not to this question.  Your objection is

8  noted as overruled.

9        Do you notice that?

10       THE WITNESS:  I do notice that.

11       THE COURT:  Next question.

12  BY MR. BURGOYNE:

13  Q.   Is this an email from your attorney to Dr. Ruekberg?

14       MS. VARGAS:  Objection, attorney-client privilege and

15  work product.

16       THE COURT:  I'll sustain the objection.

17       MR. BURGOYNE:  Your Honor, I'm not asking about the

18  content, I'm just asking about --

19  BY MR. BURGOYNE:

20  Q.   I'll ask this, who is Lawrence Berger?

21  A.   He's one of my lawyers.

22  Q.   Is this email from him?

23       THE COURT:  If you know.

24       THE WITNESS:  Yeah.  It looks like that.

25  BY MR. BURGOYNE:

1   Q.   Who is the email sent to?

2   A.   Dr. Ruekberg.

3   Q.   The next page, the entire page is redacted.

4        Who is this email from?

5   A.   It looks like it's from Mr. Berger.

6   Q.   And Mr. Berger is your lawyer.

7        And who was this email sent to?

8   A.   It looks like Dr. Ruekberg.

9   Q.   And you are a correct on the letter?  You were copied on

10  the letter?

11  A.   Yes.

12  Q.   Then look at page 93 for me.

13       And this is content that's also been redacted.  And it's

14  on the actual school letterhead.

15       Do you know why these redactions were made?

16  A.   I do not.

17  Q.   And then finally, on page 102, there's an additional email

18  with the entire text of the email redacted.

19       Is this an email from Lawrence Berger to Bruce Ruekberg?

20           MS. VARGAS:  Objection, Your Honor.  We continue to

21  object on attorney-client privilege and work product.

22           THE COURT:  So noted.

23           These sections of the communications that have been

24  deleted, so to speak, are not in evidence.  The communications

25  as to who they are will be allowed.  All right?

1          Anything else?

2          MR. BURGOYNE:  Final question for the day, Your Honor.

3     BY MR. BURGOYNE:

4     Q.   Ms. Ramsay, are you able to tell us which parts of Dr.

5     Ruekberg's letter reflect your input versus your lawyer's input

6     versus Dr. Ruekberg's input?

7          MS. VARGAS:  Objection, attorney-client privilege and

8     work product, to the extent it asks for input by attorneys.

9          THE COURT:  Yes, but I don't think the question asked

10    that.  It asked as to which part she had input in.

11         Can you answer that question yes or no, ma'am?

12         THE WITNESS:  I can answer it.

13         THE COURT:  You can answer it?

14         THE WITNESS:  I can answer with I don't know.  I

15    couldn't tell you which parts were, like, things I edited and

16    which parts Dr. Ruekberg wrote at this time.

17         MR. BURGOYNE:  Okay.  I have no further questions for

18    today, Your Honor.

19         THE COURT:  Very well.

20         Counsel, just before we adjourn, how long do you

21    anticipate this to go?  I only had tomorrow blocked off for

22    further testimony, and at this pace that we're going at today,

23    I don't know how much further you have.

24         Don't everybody speak at once.

25         MR. BURGOYNE:  I suppose I ought to speak first, Your

1  Honor, since I've got to wrap up Ms. Ramsay and then they've

2  got rebuttal.

3          So I would guess I probably have another half hour to

4  45 minutes with Ms. Ramsay.

5          THE COURT:  And you'll have redirect to rehabilitate

6  your witness and potentially there's some recross.

7          How many other witnesses do you propose calling?

8          MS. VARGAS:  We only intend to call one other witness,

9  Your Honor.

10          THE COURT:  And that witness will be approximately how

11  long?

12          MS. VARGAS:  That's Dr. Smith, so I would imagine it

13  would be fairly lengthy.

14          THE COURT:  And then after Dr. Smith testifies, how

15  long is, if any, defense?  We're not even getting into cross

16  examination at this juncture.

17          MR. BURGOYNE:  For us, Your Honor, one witness.  Ms.

18  Farmer has already submitted a declaration.  If we let that be

19  her testimony, I could strike her.  And then we've got the two

20  external reviewers who reviewed the documentation, so...

21          MS. VARGAS:  Your Honor, in that case --

22          MR. BURGOYNE:  And one other witness, I'm sorry, Your

23  Honor, one other witness.

24          THE COURT:  Very well.  Yes, ma'am?

25          MS. VARGAS:  We had understood in communication

1  between counsel in advance that defense would be calling Dr.

2  Farmer.  If defense is not calling Dr. Farmer, we would.

3          THE COURT:  You will be.

4          MR. BURGOYNE:  I'm happy to call her, Your Honor.  I

5  don't have a problem with that.

6          THE COURT:  You try your own cases in front of me,

7  Counsel.

8          All right.  We'll reconvene tomorrow at 9:30, and I'll

9  let you know as to the remainder of this week if at all.  All

10 right?

11         MR. BURGOYNE:  Your Honor, one point of clarification.

12 One of our experts needs to -- he understood originally it was

13 going to be a one-day hearing.  He's got to get back to New

14 York.

15         THE COURT:  How did he understand it was going to be a

16 one-day hearing?

17         MR. BURGOYNE:  That's what the order said.  And then

18 we called up and learned after the fact that it in fact was on

19 the docket for two.  So he's got to be back in New York.  He's

20 on a 12:00 train.

21         Are you okay if plaintiffs are okay with us taking a

22 witness out of order?

23         THE COURT:  I don't have any problems with it at all.

24         How long do you anticipate it?

25         MR. BURGOYNE:  Hour.  We'll try to tighten it up.

1            THE COURT:  All right.  We'll see.  9:30 tomorrow

2    morning.  And we're adjourned.

3            (Proceedings concluded at 4:47 p.m.)

4

5

6

7            I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10    _____

11    Ann Marie Mitchell, CRR, RDR, RMR
     Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            -   -   -

 2                         I N D E X

 3                            -   -   -

 4
        Witness           Direct      Cross      Redirect      Recross
 5
        JESSICA RAMSAY    14          84
 6

 7

 8                            -   -   -

 9                         E X H I B I T S

10                            -   -   -

11
        NO.                              ADMITTED PAGE
12
        P-1                              52
13
        P-2                              59
14
        P-3                              59
15
        P-4                              59
16
        P-13                             74
17
        P-14                             75
18
        P-19                             68
19
        P-19A                            73
20
        P-20                             68
21

22

23

24

25
```

**/7** [1] - 86:25
**08033** [1] - 1:17
**1** [84] - 1:6, 4:14, 11:11, 16:23, 16:25, 42:11, 42:14, 43:10, 43:14, 43:23, 44:4, 48:1, 48:5, 49:13, 49:16, 52:12, 52:24, 54:23, 54:25, 57:4, 58:20, 58:21, 59:9, 62:13, 63:25, 64:2, 65:1, 65:4, 65:14, 65:15, 67:20, 68:19, 75:14, 75:24, 76:21, 77:15, 77:17, 77:19, 78:7, 78:14, 79:19, 80:3, 80:9, 80:11, 80:14, 80:25, 81:22, 82:6, 82:20, 82:23, 83:2, 83:10, 84:10, 84:13, 84:14, 85:6, 85:8, 85:25, 87:3, 91:24, 95:23, 98:7, 98:12, 136:19, 136:21, 145:12, 146:14, 146:17, 147:12, 148:11, 148:17, 149:3, 149:7, 149:10, 151:1, 155:5, 159:10, 159:16, 159:20, 159:21, 160:6, 160:20, 163:2, 176:12
**10** [6] - 2:4, 67:3, 67:5, 99:11, 106:16, 111:13
**100** [1] - 168:14
**102** [3] - 166:5, 166:9, 171:17
**1033** [1] - 109:7
**10:44** [2] - 1:10, 3:1
**10th** [8] - 107:12, 107:17, 107:19, 108:2, 130:18, 130:20, 130:21, 133:14
**11** [2] - 99:23, 106:16
**11th** [6] - 107:12, 107:17, 107:19, 107:22, 114:18, 130:23
**12** [5] - 67:3, 67:5, 100:7, 106:16, 110:25
**12:00** [1] - 174:20
**12:45** [1] - 67:25
**13** [7] - 73:22, 74:5, 74:9, 74:13, 100:11, 153:16, 176:19
**136** [3] - 163:2, 163:4, 163:5
**13th** [1] - 2:11
**14** [9] - 74:11, 75:16, 75:21, 113:5, 113:9, 113:11, 146:21, 176:5, 176:20
**15** [8] - 59:17, 59:21, 110:22, 112:11, 121:6, 132:10, 153:23
**159** [1] - 57:6
**16** [1] - 104:15
**160** [1] - 57:6
**17** [2] - 106:6, 132:10
**18** [2] - 50:21, 106:15
**19** [11] - 1:16, 59:24, 68:14, 68:17, 68:24, 69:2, 73:12,

108:8, 132:10, 176:16
**191** [1] - 57:7
**19106** [1] - 1:9
**192** [2] - 57:7, 76:21
**1996** [1] - 126:10
**1997** [1] - 156:17
**19A** [6] - 73:8, 73:9, 73:14, 73:16, 151:15, 176:18
**1:00** [1] - 59:19
**1:30** [2] - 67:24, 67:25
**2** [35] - 4:14, 11:11, 42:11, 58:20, 59:9, 59:14, 62:17, 62:19, 62:20, 62:21, 79:24, 80:1, 80:11, 80:16, 80:19, 80:21, 83:14, 83:17, 84:10, 84:15, 84:24, 84:25, 85:2, 85:13, 92:3, 100:1, 102:20, 116:22, 117:13, 119:11, 131:11, 131:25, 153:13, 176:13
**20** [14] - 67:4, 67:22, 68:14, 68:15, 68:18, 68:24, 109:3, 111:1, 112:6, 112:7, 131:17, 137:16, 137:23, 176:17
**20-some** [1] - 67:4
**20/13** [1] - 29:21
**20002** [1] - 2:5
**20005** [1] - 2:12
**2003** [1] - 120:23
**2005** [1] - 131:11
**2007** [3] - 133:5, 134:3, 140:22
**2007-2008** [1] - 140:17
**2008** [7] - 5:24, 96:18, 108:12, 108:13, 109:24, 115:6, 123:18
**2009** [10] - 10:8, 93:22, 95:17, 96:3, 96:13, 96:22, 116:14, 123:21, 157:16, 157:22
**2010** [5] - 120:24, 125:3, 125:6, 145:20, 157:21
**2011** [4] - 134:19, 135:2, 135:10, 153:13
**2012** [2] - 134:25, 135:12
**2013** [1] - 157:16
**2014** [2] - 134:25, 135:13
**2016** [1] - 12:13
**2017** [5] - 53:20, 85:8, 148:1, 160:6, 167:5
**2018** [6] - 10:6, 55:16, 86:8, 95:12, 96:21, 164:6
**2019** [2] - 1:10, 148:3
**202** [2] - 2:5, 2:12
**2020** [3] - 4:14, 11:11, 84:11
**21** [1] - 137:16
**22** [2] - 113:16, 138:24
**225** [1] - 107:3
**24** [4] - 86:25, 116:14, 126:2, 154:23

**248-5092** [1] - 2:5
**25** [1] - 126:24
**26** [3] - 127:3, 147:2, 166:5
**267** [1] - 1:23
**27** [3] - 127:17, 132:3, 167:18
**28** [6] - 95:15, 95:16, 107:3, 129:23, 161:14, 161:18
**29** [4] - 34:1, 34:10, 34:11, 69:4
**299-7250** [1] - 1:23
**2:00** [1] - 112:12
**2:19-cv-02002** [1] - 1:3
**2CK** [1] - 80:1
**2nd** [3] - 74:23, 74:24, 77:15
**3** [20] - 1:10, 35:24, 42:12, 59:10, 59:14, 62:13, 100:16, 101:8, 120:11, 120:13, 131:21, 138:15, 139:6, 140:24, 148:23, 149:17, 149:19, 149:20, 176:14
**3.5** [1] - 109:12
**3.566** [1] - 123:24
**3.635** [1] - 125:4
**3.747** [1] - 106:25
**30** [13] - 33:24, 41:9, 119:1, 132:16, 133:1, 145:8, 161:5, 161:8, 161:23, 161:25, 163:9, 165:7
**30M** [2] - 41:7, 41:8
**30th** [2] - 34:3, 34:11
**31** [3] - 69:6, 134:2, 145:8
**314** [1] - 119:19
**32** [4] - 51:4, 134:14, 168:25, 169:5
**33** [1] - 136:18
**34** [4] - 51:13, 143:15, 146:12, 151:17
**35** [5] - 78:5, 161:23, 161:25, 162:21, 163:9
**35-minute** [1] - 141:24
**35-page** [1] - 112:11
**354-5640** [1] - 1:17
**3:00** [2] - 35:3, 121:8
**3:16** [1] - 121:8
**3rd** [1] - 7:16
**4** [13] - 59:10, 59:14, 87:11, 91:24, 98:7, 98:12, 102:24, 121:16, 122:9, 126:18, 155:11, 169:12, 176:15
**40** [6] - 154:6, 160:8, 160:10, 161:5, 161:8, 162:21
**40-question** [1] - 141:24
**41** [1] - 115:15
**42** [2] - 119:6, 147:8
**43** [1] - 71:8
**44** [1] - 71:23
**45** [1] - 173:4
**4:47** [1] - 175:3
**5** [7] - 88:16, 104:17, 122:11,

145:1, 145:6, 150:9, 163:3
**50** [3] - 83:18, 167:15, 167:22
**504** [1] - 30:11
**52** [4] - 154:4, 154:7, 169:11, 176:12
**58** [1] - 152:19
**59** [3] - 176:13, 176:14, 176:15
**5:00** [1] - 169:2
**5:45** [1] - 111:24
**6** [3] - 86:8, 106:6, 137:22
**60** [6] - 33:19, 53:3, 83:8, 146:25, 160:15, 165:9
**60-minute** [1] - 146:24
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**64** [3] - 165:23, 166:4, 167:2
**65** [4] - 77:21, 78:4, 78:6
**654-6200** [1] - 2:12
**66** [1] - 129:10
**67** [1] - 144:23
**67th** [1] - 135:18
**68** [2] - 176:16, 176:17
**6:00** [1] - 111:25
**7** [4] - 60:3, 110:3, 112:23, 112:24
**70** [5] - 77:21, 127:2, 130:25, 154:7, 160:15
**70,000** [1] - 153:18
**700** [1] - 2:11
**70th** [1] - 127:3
**71** [3] - 130:22, 170:2, 170:3
**72** [1] - 170:3
**73** [3] - 132:2, 166:13, 176:18
**73rd** [1] - 132:3
**74** [4] - 69:4, 69:6, 129:12, 176:19
**75** [1] - 176:20
**76th** [1] - 127:11
**79th** [4] - 11:1, 134:21, 135:5, 135:16
**7:00** [1] - 111:25
**8** [12] - 50:2, 74:13, 96:2, 97:10, 97:12, 97:13, 97:14, 110:5, 141:17, 141:20, 141:21, 148:23
**83** [4] - 50:2, 50:22, 51:4, 129:8
**84** [1] - 176:5
**856** [1] - 1:17
**86** [2] - 101:14, 129:19
**86th** [1] - 126:15
**87** [2] - 133:21, 144:23
**88th** [2] - 127:8, 135:19
**89** [1] - 133:11
**89th** [1] - 133:10
**8:00** [1] - 112:1, 112:7
**9** [9] - 86:7, 86:9, 86:10, 98:5, 98:13, 106:16, 134:11,

142:25, 160:7
**90** [1] - 133:13
**90-something** [1] - 143:10
**91** [1] - 101:14
**91st** [1] - 134:10
**92** [1] - 101:14
**93** [2] - 101:14, 171:12
**94** [5] - 99:19, 100:4, 103:7, 103:8, 104:7
**95th** [2] - 10:24, 131:1
**96** [3] - 101:14, 126:14
**96th** [1] - 126:17
**97** [4] - 100:4, 104:6, 131:17, 131:20
**97th** [2] - 134:8, 138:6
**98th** [1] - 131:24
**9:30** [2] - 174:8, 175:1
**9th** [1] - 44:2
**A's** [12] - 101:8, 103:1, 104:19, 104:20, 106:9, 106:11, 106:20, 106:23, 107:15, 107:19, 125:2, 125:15
**a.m** [7] - 1:10, 3:1, 111:25, 112:1, 112:12
**AAMC** [1] - 154:25
**AB** [1] - 28:7
**Abilities** [1] - 127:18
**ability** [7] - 4:12, 47:14, 58:8, 76:23, 77:9, 138:5, 156:7
**able** [43] - 11:4, 11:14, 13:9, 17:7, 17:25, 18:6, 18:11, 20:13, 25:7, 33:11, 33:25, 34:5, 34:22, 34:25, 45:9, 45:14, 45:15, 53:24, 55:7, 56:3, 63:18, 65:1, 65:12, 75:9, 76:1, 76:8, 76:10, 76:11, 83:17, 91:11, 138:14, 138:15, 139:8, 140:10, 150:11, 151:24, 155:25, 160:14, 161:2, 161:9, 162:5, 162:20, 172:4
**above-entitled** [1] - 175:8
**absence** [9] - 14:5, 17:9, 55:8, 55:10, 74:20, 74:22, 75:17, 85:12
**Academic** [2] - 94:24, 109:12
**academic** [12] - 7:3, 7:5, 7:8, 12:24, 86:24, 87:16, 87:24, 88:13, 101:10, 101:13, 103:2, 104:3
**Academy** [3] - 99:24, 126:10, 158:23
**accelerated** [7] - 33:10, 33:14, 95:1, 95:3, 95:6, 95:8, 103:18
**accept** [2] - 33:14, 75:6
**acceptable** [1] - 138:14
**accepted** [3] - 42:3, 75:11, 75:15

**access** [2] - 39:13, 47:19
**accommodated** [1] - 154:21
**Accommodated** [1] - 154:23
**accommodation** [21] - 4:7, 40:12, 50:5, 51:1, 56:8, 56:12, 59:9, 76:21, 81:7, 81:9, 86:4, 87:25, 93:23, 94:1, 94:12, 124:19, 128:15, 163:25, 164:9, 168:4
**accommodations** [129] - 4:2, 6:12, 7:5, 7:7, 7:22, 8:7, 8:8, 8:10, 9:20, 10:11, 10:14, 11:13, 12:21, 16:22, 16:25, 17:2, 17:7, 17:11, 17:13, 18:16, 19:23, 37:24, 38:24, 38:25, 40:3, 40:8, 40:25, 41:3, 44:18, 44:20, 48:1, 48:4, 48:6, 48:11, 49:11, 49:25, 51:16, 51:22, 53:2, 53:4, 53:5, 53:23, 54:2, 54:14, 54:19, 55:7, 55:15, 56:21, 57:8, 57:14, 59:5, 60:7, 74:25, 75:23, 75:25, 76:1, 80:19, 80:21, 82:7, 82:13, 82:19, 82:25, 83:2, 87:9, 91:23, 93:3, 93:7, 93:15, 94:4, 94:5, 94:8, 94:10, 95:25, 101:16, 101:17, 105:11, 105:12, 106:13, 115:13, 115:14, 115:20, 116:1, 116:2, 119:8, 121:22, 122:16, 122:18, 122:19, 124:3, 124:7, 124:9, 124:25, 125:1, 125:9, 125:10, 125:16, 126:21, 127:6, 127:15, 129:20, 133:23, 154:13, 155:1, 155:5, 155:8, 156:19, 156:23, 157:2, 157:4, 157:16, 157:24, 158:3, 158:13, 158:18, 158:19, 158:22, 158:25, 163:22, 164:2, 164:4, 164:23, 166:2, 166:8, 167:6, 168:3, 168:11, 168:21
**accomplished** [3] - 8:12, 8:21, 11:1
**accuracy** [1] - 112:17
**accurate** [14] - 76:5, 87:1, 88:11, 89:9, 89:18, 90:16, 93:25, 94:21, 96:12, 112:18, 139:2, 157:10, 157:11, 160:18
**accurately** [2] - 76:7, 94:20
**ACE** [5] - 33:3, 33:4, 33:10, 94:24, 103:17
**achieve** [2] - 7:8, 8:13, 138:14
**achieved** [3] - 3:24, 100:20, 101:14

**Achievement** [2] - 126:4, 127:4
**Act** [4] - 5:24, 7:19, 12:6, 12:23
**ACT** [45] - 10:23, 64:14, 114:24, 130:5, 130:6, 130:9, 130:10, 131:9, 131:15, 132:17, 133:1, 133:7, 133:15, 133:22, 134:2, 134:3, 134:12, 135:3, 135:9, 137:23, 137:25, 138:6, 138:17, 138:20, 138:25, 139:5, 139:7, 139:10, 139:13, 139:17, 140:12, 140:16, 140:17, 140:19, 140:21, 140:25, 141:13, 141:19, 141:23, 142:11, 142:22, 142:24, 146:1, 146:19, 147:4
**acting** [3] - 19:10, 113:23, 114:19
**ACTION** [1] - 1:3
**actions** [2] - 23:15
**Activities** [1] - 110:6
**activities** [9] - 7:10, 90:2, 108:6, 110:4, 113:3, 113:5, 113:9, 113:18, 115:3
**activity** [2] - 5:12, 9:21
**actual** [7] - 11:22, 54:8, 72:19, 131:9, 134:17, 150:11, 171:14
**ad** [1] - 34:25
**ADA** [7] - 5:24, 7:5, 7:19, 9:19, 11:23, 12:6, 12:22
**add** [2] - 50:14, 169:14
**ADD** [4] - 38:12, 39:1, 118:10, 118:22
**ADD/ADHD** [2] - 116:15, 117:11
**added** [2] - 30:23, 30:24
**Adderall** [3] - 19:9, 19:11, 38:22
**adding** [1] - 169:18
**addition** [1] - 65:9
**additional** [17] - 7:11, 8:18, 39:10, 56:10, 57:16, 57:21, 73:10, 88:19, 101:19, 101:22, 103:10, 110:4, 113:18, 164:1, 164:5, 167:15, 171:17
**additionally** [1] - 140:9
**address** [3] - 57:21, 93:14, 118:16
**addresses** [1] - 100:8
**adequate** [5] - 39:2, 40:18, 40:20, 40:21, 99:4
**adequately** [2] - 99:3, 138:4
**ADHD** [26] - 5:2, 10:8, 10:10, 10:13, 19:12, 38:12, 38:17, 39:1, 51:18, 56:16, 56:18,

56:20, 86:22, 95:17, 97:8, 115:9, 119:21, 120:20, 121:15, 122:6, 156:20, 160:14, 168:3, 168:11, 168:18, 168:21
**adjourn** [1] - 172:20
**adjourned** [1] - 175:2
**adjourning** [1] - 169:1
**adjusted** [1] - 38:22
**adjusting** [1] - 15:10
**administer** [1] - 117:2
**administered** [2] - 7:23, 134:25
**administers** [1] - 4:4
**administration** [1] - 4:8
**admission** [2] - 52:19, 109:23
**Admission** [2] - 10:23, 10:25
**admit** [2] - 59:8, 73:1
**ADMITTED** [1] - 176:11
**admitted** [17] - 51:24, 52:11, 52:24, 59:13, 59:14, 68:23, 68:24, 73:3, 73:8, 74:6, 74:8, 74:9, 75:17, 75:20, 75:21, 114:24, 165:25
**adults** [1] - 24:5
**advance** [1] - 174:1
**Advanced** [1] - 107:20
**advice** [5] - 40:17, 141:3, 142:21, 142:23, 142:25
**advised** [3] - 16:24, 20:7, 139:19
**advisor** [2] - 37:21, 40:19
**affairs** [1] - 53:11
**affect** [1] - 86:24
**afternoon** [3] - 83:25, 84:1, 84:2
**afterwards** [1] - 125:14
**agency** [1] - 42:8
**ago** [3] - 16:19, 20:9, 100:12
**agree** [3] - 94:7, 101:8, 169:25
**agreed** [6] - 8:15, 15:3, 16:25, 45:7, 56:25, 61:9, 61:11
**Aid** [2] - 78:12, 78:22
**aid** [2] - 93:23, 94:1
**aided** [1] - 1:25
**Algebra** [1] - 107:10
**all-nighters** [1] - 32:15
**allegations** [1] - 85:15
**allow** [2] - 21:18, 146:4
**allowed** [18] - 17:5, 21:25, 22:1, 22:2, 43:2, 43:25, 64:21, 75:8, 81:5, 81:11, 82:3, 82:5, 116:4, 136:14, 138:2, 165:2, 165:10, 171:25
**allows** [3] - 8:19, 43:6, 43:8
**almost** [2] - 4:17, 26:8
**aloud** [6] - 55:24, 56:3,

64:21, 136:13, 165:15
**alphabet** [6] - 28:2, 28:24, 92:9, 92:24, 94:11, 158:7
**alter** [1] - 12:11
**altered** - 88:1
**Alumni** [1] - 108:10
**ameliorative** [1] - 6:22
**amenable** [1] - 59:8
**Amendments** [4] - 5:24, 7:19, 12:6, 12:22
**amount** [5] - 5:14, 11:16, 32:17, 144:24, 164:8
**analysis** [2] - 6:3, 6:19
**analyze** [2] - 65:10, 80:6
**Ann** [2] - 1:22, 175:11
**annotate** [4] - 17:18, 71:3, 71:6, 151:25
**annotated** [6] - 69:13, 70:4, 70:21, 73:2, 135:6, 150:5
**annotation** [3] - 61:2, 70:9, 73:12
**annotations** [1] - 149:25
**answer** [71] - 34:13, 55:22, 61:14, 62:9, 62:15, 63:16, 63:18, 64:6, 64:11, 65:12, 65:22, 65:23, 66:1, 66:2, 66:23, 67:9, 67:13, 67:14, 67:17, 69:20, 69:21, 71:10, 72:9, 76:2, 76:12, 77:4, 77:9, 78:18, 79:11, 79:16, 79:17, 79:23, 80:7, 80:18, 83:7, 138:1, 138:14, 138:21, 139:14, 141:5, 141:10, 142:2, 144:8, 144:13, 144:18, 145:4, 147:9, 148:18, 148:21, 150:23, 150:24, 150:25, 151:7, 151:9, 151:11, 158:20, 159:22, 161:1, 161:23, 162:1, 162:6, 163:10, 163:11, 163:12, 163:13, 172:11, 172:12, 172:13, 172:14
**answerable** [1] - 141:9
**answered** [8] - 60:19, 70:3, 70:10, 138:25, 139:11, 139:18, 140:3, 144:12
**answering** [8] - 15:21, 60:13, 69:9, 69:11, 142:17, 147:3, 149:16, 151:19
**answers** [9] - 34:3, 63:22, 64:2, 64:16, 64:20, 65:7, 66:20, 138:13, 141:13
**anticipate** [2] - 172:21, 174:24
**anticipated** [1] - 12:10
**anxiety** [1] - 19:22
**anyway** [1] - 139:20
**AP** [2] - 112:2, 112:3
**apologize** [1] - 109:8

**appeal** [1] - 53:9
**appear** [1] - 134:13
**APPEARANCES** [2] - 1:14, 2:1
**applicable** [1] - 122:13
**application** [13] - 39:19, 41:4, 43:12, 43:21, 48:7, 53:1, 54:21, 55:14, 76:17, 109:23, 112:18, 115:1, 159:2
**applications** [2] - 59:5, 59:9
**applied** [8] - 16:22, 39:17, 41:2, 47:25, 48:4, 56:12, 138:17, 159:8
**apply** [7] - 6:10, 40:24, 48:6, 49:11, 75:9, 75:11, 84:21
**Apply** [1] - 154:24
**applying** [3] - 8:8, 43:16, 54:13
**appointment** [2] - 37:21, 54:5
**approach** [3] - 48:20, 61:3, 61:5
**appropriate** [1] - 116:7
**approve** [1] - 168:4
**approved** [5] - 11:14, 56:9, 57:15, 82:25, 93:10
**approving** [1] - 122:15
**April** [2] - 126:9, 134:19
**area** [3] - 12:3, 16:2, 102:4
**areas** [8] - 89:14, 89:15, 98:19, 101:10, 101:13, 105:22, 105:24, 154:3
**arrived** [1] - 120:1
**arrows** [3] - 22:23, 23:3
**articles** [1] - 19:3
**arts** [3] - 31:1, 31:3, 105:7
**aspirin** [3] - 19:25, 20:2, 20:7
**assertive** [1] - 98:20
**assessing** [1] - 86:24
**assessment** [1] - 118:8
**assessments** [1] - 117:2
**assign** [1] - 119:18
**assigned** [5] - 19:3, 32:1, 32:8, 37:21, 45:11
**assignment** [2] - 28:17, 31:7
**assignments** [7] - 27:19, 27:21, 29:24, 30:6, 31:6, 47:23, 88:1
**assist** [1] - 61:5
**assistance** [6] - 6:13, 90:18, 102:6, 102:9, 103:15, 104:13
**Associate** [1] - 164:14
**associated** [4] - 138:22, 139:19, 146:15, 149:11
**associates** [1] - 150:17
**assume** [5] - 105:7, 105:17, 115:3, 154:17, 168:22
**assumed** [1] - 82:4
**assuming** [1] - 165:24

**assumption** [1] - 52:15
**asterisks** [1] - 96:4
**athletic** [2] - 109:4, 109:16
**Athletic** [1] - 109:11
**attachments** [2] - 166:11, 169:13
**attempt** [3] - 43:17, 43:19, 77:17
**attempted** [1] - 17:2
**attended** [1] - 88:25
**attending** [1] - 115:5
**attention** [9] - 31:9, 71:17, 88:4, 90:1, 90:8, 99:4, 118:17, 158:17
**attention-related** [1] - 118:17
**attorney** [6] - 166:20, 170:5, 170:13, 170:14, 171:21, 172:7
**attorney-client** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**attorneys** [1] - 172:8
**audio** [2] - 58:19, 149:18
**audio-type** [1] - 149:18
**August** [3] - 5:7, 53:20, 55:10
**aura** [1] - 56:16
**autism** [2] - 39:19, 39:20
**autistic** [1] - 14:19
**autumn** [1] - 123:18
**availability** [2] - 54:6, 155:1
**available** [6] - 54:5, 81:7, 105:16, 136:12, 154:14, 154:15
**average** [4] - 10:21, 78:6, 106:25, 111:12
**averages** [1] - 111:2
**avoid** [2] - 6:4, 139:8
**award** [4] - 3:21, 109:11, 109:16, 109:17
**Award** [1] - 110:9
**awards** [1] - 109:4
**aware** [7] - 30:12, 90:21, 91:6, 91:8, 91:13, 91:16, 91:20
**B's** [4] - 106:21, 106:23, 125:2, 125:15
**babysitting** [2] - 111:10, 111:11
**backdated** [1] - 55:9
**backwards** [2] - 28:2, 113:13
**bacteria** [1] - 24:12
**bank** [2] - 78:16, 78:17
**banks** [1] - 147:22
**bar** [3] - 17:23, 39:22, 82:17
**Baseball** [1] - 110:12
**based** [18] - 46:18, 58:16, 61:23, 62:14, 76:3, 77:1, 77:5, 77:23, 90:22, 102:5, 103:14, 115:2, 134:24,

135:21, 150:23, 150:25, 154:10, 164:25
**basic** [5] - 4:7, 44:6, 44:8, 81:25, 128:22
**Basic** [1] - 127:18
**basis** [3] - 102:10, 139:13, 140:2
**Bates** [1] - 166:5
**bearings** [1] - 116:13
**beautiful** [1] - 105:21
**became** [1] - 14:23
**become** [1] - 8:21
**becoming** [1] - 98:20
**BEFORE** [1] - 1:12
**began** [6] - 87:16, 87:24, 88:13, 91:4, 115:5, 125:25
**begin** [3] - 4:20, 112:8, 142:16
**beginning** [10] - 18:11, 18:17, 18:18, 32:8, 65:18, 67:7, 88:15, 88:21, 89:12, 155:3
**begins** [3] - 94:18, 96:3, 160:10
**behavior** [1] - 97:19
**behind** [1] - 27:2
**below** [3] - 117:16, 130:8, 142:16
**bench** [1] - 48:23
**benchmark** [1] - 82:24
**bend** [1] - 14:6
**benefit** [1] - 150:16
**benign** [1] - 24:19
**BERGER** [7] - 1:16, 3:7, 61:2, 113:7, 116:16, 147:23, 163:4
**Berger** [5] - 3:16, 170:20, 171:5, 171:6, 171:19
**best** [12] - 7:24, 8:3, 16:24, 26:16, 27:11, 53:22, 62:21, 98:19, 141:15, 155:15, 156:7
**better** [9] - 16:14, 31:15, 35:20, 37:11, 91:2, 109:13, 111:15, 118:1
**between** [9] - 28:12, 29:13, 47:22, 58:18, 66:2, 66:22, 144:17, 168:17, 174:1
**beyond** [4] - 8:18, 11:18, 64:9, 89:14
**Bibber** [1] - 12:14
**bible** [1] - 78:14
**big** [1] - 43:17
**binder** [2] - 49:16, 59:5
**binders** [1] - 48:13
**biological** [5] - 41:14, 135:19, 136:3, 152:18, 154:7
**Biology** [1] - 108:3
**biopsies** [1] - 23:9
**bit** [6] - 38:19, 71:19, 84:23, 117:23, 125:20, 150:25

**black** [1] - 44:24
**blank** [1] - 37:15
**blindly** [1] - 161:22
**block** [8] - 58:14, 65:19, 83:5, 160:15, 161:22, 165:5, 165:8, 165:12
**blocked** [1] - 172:21
**blood** [4] - 20:1, 20:2, 20:5, 20:7
**blue** [9] - 23:7, 23:8, 23:11, 26:4, 61:17, 150:9, 169:6
**BOARD** [1] - 1:5
**Board** [5] - 3:5, 4:4, 9:2, 11:23, 12:15
**board** [3] - 168:2, 168:4, 168:20
**boat** [1] - 28:6
**body** [7] - 14:17, 30:18, 65:24, 65:25, 66:10, 66:21, 66:22
**book** [13] - 20:17, 49:6, 78:12, 78:22, 78:25, 105:25, 140:23, 145:22, 145:25, 153:9, 153:11, 155:4
**booklet** [3] - 132:25, 140:6, 140:7
**borderline** [2] - 137:2, 137:12
**bottle** [2] - 17:22, 82:16
**bottom** [23] - 50:3, 60:4, 62:18, 86:12, 94:15, 100:19, 104:22, 105:2, 109:7, 117:13, 118:8, 120:11, 120:12, 120:13, 122:6, 122:9, 122:11, 134:22, 143:3, 156:15, 167:4, 167:14, 167:20
**box** [4] - 13:16, 120:1, 155:15, 155:18
**boy** [1] - 92:1
**brains** [1] - 79:19
**Branch** [2] - 88:23, 100:11
**brand** [1] - 42:16
**break** [14] - 8:2, 47:16, 52:20, 55:18, 56:10, 57:15, 59:16, 59:18, 67:23, 80:25, 112:10, 114:7, 121:5, 164:24
**breakdown** [1] - 153:23
**breaks** [3] - 79:2, 88:2, 135:4
**breath** [1] - 23:12
**brief** [2] - 3:13, 121:5
**briefly** [1] - 3:15
**brilliant** [1] - 5:1
**bring** [5] - 13:18, 19:15, 31:6, 85:18, 163:19
**broader** [2] - 12:10, 46:23
**broadly** [1] - 6:20
**brothers** [1] - 14:19
**brought** [1] - 39:8
**brown** [2] - 24:12

**Brown** [1] - 104:16
**Bruce** [1] - 171:19
**Bs** [2] - 10:18, 30:10
**build** [3] - 20:21, 20:23, 39:18
**built** [1] - 14:22
**bulleted** [1] - 50:12
**bunch** [1] - 139:7
**burden** [4] - 9:7, 9:9, 9:14, 10:1
**Burgoyne** [3] - 5:6, 9:1, 33:6
**BURGOYNE** [54] - 2:10, 3:6, 9:1, 52:13, 52:22, 59:11, 60:25, 63:4, 68:17, 68:21, 70:8, 70:14, 73:5, 74:7, 75:19, 83:23, 84:2, 84:5, 85:24, 92:13, 113:8, 113:14, 116:17, 116:19, 121:7, 121:14, 145:16, 145:19, 145:24, 146:9, 146:10, 148:4, 162:25, 163:2, 163:5, 163:6, 166:24, 166:25, 169:3, 169:4, 170:12, 170:17, 170:19, 170:25, 172:2, 172:3, 172:17, 172:25, 173:17, 173:22, 174:4, 174:11, 174:17, 174:25
**business** [1] - 59:20
**Buspar** [1] - 19:21
**but..** [3] - 21:13, 93:6, 141:9
**Byrne** [1] - 1:8
**calculated** [2] - 72:12, 72:13
**Calculus** [1] - 112:3
**calculus** [1] - 112:12
**calendar** [1] - 103:5
**candidate** [2] - 7:1, 7:24
**captain** [2] - 108:24, 110:8
**captioned** [2] - 108:10, 140:16
**card** [11] - 98:13, 99:23, 100:7, 100:8, 100:16, 101:18, 102:15, 103:23, 104:15, 106:6, 106:15
**cards** [1] - 90:24
**care** [9] - 3:22, 10:9, 38:2, 40:22, 47:13, 47:15, 51:13, 116:9, 120:25
**career** [1] - 4:16
**carefully** [4] - 141:3, 142:15, 143:1, 143:6
**Caroline** [1] - 9:3
**CAROLINE** [1] - 2:10
**CAROLLA** [1] - 1:15
**carried** [1] - 158:24
**Carrollton** [5] - 88:22, 88:25, 100:11, 102:16, 104:4
**Carrollton-Farmers** [3] - 88:22, 88:25, 100:11
**carry** [1] - 24:21

**case** [18] - 8:11, 8:14, 9:7, 9:13, 9:14, 12:5, 12:12, 12:13, 12:14, 12:15, 12:22, 12:23, 59:18, 61:13, 144:2, 148:14, 161:16, 173:21
**cases** [2] - 47:22, 174:6
**categories** [1] - 132:11
**category** [3] - 105:25, 120:3, 155:20
**caught** [1] - 71:16
**causing** [2] - 30:2, 97:22
**CBSE** [3] - 81:24, 82:9, 82:21
**cell** [1] - 23:20
**cells** [2] - 23:19, 23:21
**center** [1] - 101:25
**certain** [3] - 11:7, 11:15, 16:2
**certainly** [4] - 8:22, 68:17, 101:15, 147:24
**certification** [2] - 50:4, 112:17
**certifies** [1] - 48:11
**certify** [1] - 175:7
**chair** [1] - 94:12
**chambers** [1] - 5:7
**chance** [5] - 34:21, 43:19, 52:17, 64:17, 67:14
**chances** [1] - 75:11
**change** [5] - 5:25, 6:3, 6:14, 112:5
**changed** [1] - 12:6
**changes** [2] - 6:5, 42:19
**channels** [1] - 116:7
**chapter** [2] - 112:10, 112:11
**chart** [5] - 28:2, 28:24, 92:9, 92:24, 158:8
**charts** [1] - 94:11
**check** [5] - 102:4, 102:7, 119:25, 120:4, 155:15
**checked** [4] - 29:2, 120:3, 120:8, 155:18
**checklist** [1] - 117:8
**checklists** [1] - 117:5
**chemicals** [1] - 23:14
**chemistry** [5] - 36:23, 36:25, 37:2, 112:9, 115:23
**Chemistry** [2] - 107:24, 112:2
**chest** [2] - 23:8, 26:5
**Chestnut** [1] - 1:16
**chief** [2] - 117:10
**child** [1] - 4:1
**childhood** [1] - 93:24
**children** [1] - 24:4
**choice** [7] - 3:14, 63:22, 64:2, 80:4, 135:24, 136:4, 154:9
**choices** [8] - 55:22, 63:16, 65:24, 66:1, 71:10, 151:11, 161:1, 161:23

**chose** [3] - 158:19, 162:1, 163:9
**chunk** [3] - 25:14, 25:22, 62:4
**circled** [5] - 101:1, 101:1, 102:20, 102:22, 103:18
**circumstance** [1] - 55:6
**circumstances** [1] - 55:5
**CIVIL** [1] - 1:3
**CK** [7] - 80:2, 80:22, 80:23, 84:24, 84:25, 85:2, 85:13
**clarification** [1] - 174:11
**clarify** [2] - 20:12, 160:22
**class** [20] - 17:1, 27:18, 27:20, 28:19, 31:2, 31:8, 36:2, 42:17, 42:18, 45:7, 55:1, 63:12, 88:2, 98:18, 98:20, 105:6, 107:3, 107:7, 123:6
**classes** [2] - 101:25, 107:13
**classroom** [1] - 101:19
**clear** [3] - 11:15, 14:9, 70:21
**clearly** [1] - 13:9
**cleats** [1] - 112:6
**clerk** [1] - 15:8
**clerk's** [1] - 48:23
**clerkship** [1] - 46:19
**click** [2] - 58:17, 58:21
**client** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**clinic** [4] - 16:13, 45:11, 47:9, 47:18
**clinical** [18] - 16:8, 18:2, 42:11, 44:7, 44:13, 45:6, 45:18, 46:6, 47:10, 78:10, 80:2, 80:17, 82:12, 97:5, 120:6, 149:12
**clinically** [6] - 80:4, 96:9, 96:12, 96:17, 96:24, 96:25
**clip** [2] - 149:14, 149:15
**clips** [1] - 149:10
**close** [1] - 36:14
**closest** [1] - 61:24
**clot** [1] - 56:2
**clotting** [6] - 20:4, 56:1, 56:17, 56:22, 164:1, 165:1
**Club** [3] - 110:15, 110:16, 110:20
**cmew@perkinscoie.com** [1] - 2:13
**CO2** [2] - 61:23, 62:1
**Coach's** [1] - 110:8
**code** [1] - 105:1
**cognitive** [2] - 58:8, 156:4
**Cognitive** [1] - 127:18
**cohesive** [1] - 50:17
**COIE** [1] - 2:9
**colleague** [1] - 9:3
**collected** [1] - 61:23

**College** [2] - 10:23, 10:25
**college** [21] - 4:24, 9:24,
10:12, 10:15, 10:16, 14:25,
35:10, 35:11, 36:2, 39:16,
95:20, 117:22, 123:2, 123:5,
123:12, 132:7, 132:8,
132:13, 132:14, 138:4, 142:8
**color** [7] - 22:20, 22:21,
22:25, 23:23, 24:2, 150:14,
150:16
**colored** [3] - 22:18, 44:22,
82:15
**colorful** [1] - 97:13
**colors** [7] - 21:2, 21:8, 21:11,
25:8, 25:13, 26:8, 26:9
**column** [3] - 29:8, 131:18,
132:6
**COM** [1] - 105:1
**coming** [2] - 13:16, 16:15
**Commencing** [1] - 1:10
**comment** [1] - 104:25
**commented** [1] - 151:13
**comments** [14] - 61:20,
90:24, 97:24, 98:2, 98:16,
104:24, 105:2, 105:18,
118:10, 150:22, 151:2,
151:17, 169:8
**common** [1] - 149:2
**commonly** [2] - 43:11, 142:7
**communication** [1] - 173:25
**communications** [3] - 166:6,
171:23, 171:24
**company** [1] - 39:24
**compare** [2] - 34:16, 58:4
**compared** [11] - 9:22, 9:23,
9:24, 9:25, 12:8, 12:19,
62:12, 77:7, 80:9, 89:6,
147:24
**comparisons** [1] - 144:16
**compensate** [1] - 88:3
**compensatory** [1] - 55:24
**competency** [1] - 76:6
**competent** [1] - 77:12
**competing** [1] - 5:11
**competitive** [2] - 43:15
**compile** [1] - 79:6
**Complaint** [2] - 160:7,
161:12
**complaint** [4] - 59:1, 59:3,
117:10, 117:11
**complete** [7] - 29:24, 33:24,
55:13, 119:7, 119:10,
119:15, 140:23
**completed** [1] - 3:20
**completely** [3] - 77:18,
149:9, 150:23
**completing** [2] - 43:24, 88:2
**component** [1] - 36:3,
120:21, 135:25
**components** [3] - 129:15,

130:16, 141:18
**composite** [5] - 129:13,
129:16, 131:15, 133:6,
134:20
**comprehension** [6] - 11:3,
88:4, 127:11, 128:24, 129:9,
141:25
**comprehensive** [1] - 81:24
**compromise** [1] - 47:14
**compromises** [1] - 142:6
**compromising** [1] - 47:12
**computation** [1] - 129:18
**computer** [9] - 1:25, 17:17,
39:11, 47:5, 47:18, 58:16,
132:22, 132:24, 135:21
**computer-aided** [1] - 1:25
**computer-based** [1] - 135:21
**computerized** [2] - 80:3,
81:21, 82:4
**concentration** [2] - 88:4,
117:24
**concern** [1] - 28:20
**concerned** [1] - 38:5
**concerns** [1] - 144:5
**concluded** [1] - 175:3
**conclusion** [3] - 8:9, 30:19,
51:25
**condition** [2] - 120:8, 120:17
**conduct** [2] - 99:7, 100:9
**conducted** [1] - 165:20
**Conference** [2] - 109:12
**conference** [2] - 59:18,
121:6
**confidence** [1] - 99:9
**confident** [2] - 34:2, 78:20
**confirmed** [1] - 160:3
**confirming** [1] - 158:11
**confused** [1] - 66:7
**confusing** [1] - 67:6
**congratulations** [1] - 105:24
**Congress** [2] - 6:17, 12:10
**Congressional** [1] - 7:19
**connection** [1] - 127:24
**consequently** [1] - 93:23
**consider** [4] - 65:12, 80:15,
106:1, 128:2
**considered** [1] - 52:3
**consisted** [1] - 12:21
**consistent** [1] - 119:3
**consistently** [1] - 87:25
**consists** [1] - 166:10
**consultants** [1] - 5:17
**contact** [2] - 120:22, 120:23
**contained** [1] - 147:1
**content** [8] - 45:2, 123:7,
146:13, 162:9, 169:16,
170:18, 171:13
**context** [3] - 5:20, 45:8,
78:10

**continue** [7] - 15:15, 49:14,
57:11, 112:11, 146:4, 146:5,
171:20
**continued** [1] - 95:7
**CONTINUED** [1] - 2:1
**continuing** [1] - 89:13
**conversationally** [1] - 36:4
**coordinate** [1] - 80:15
**coordination** [1] - 80:15
**copied** [1] - 171:9
**copies** [1] - 70:7
**copy** [6] - 48:17, 48:18,
60:23, 73:18, 152:7, 153:3
**copy-and-pasted** [1] - 152:7
**copying** [1] - 72:14
**copyright** [1] - 153:13
**core** [1] - 11:9
**corner** [3] - 60:4, 109:7,
128:20
**correct** [60] - 57:4, 57:5,
73:5, 84:11, 88:23, 93:8,
93:19, 95:12, 98:8, 99:24,
100:5, 100:17, 103:5,
103:12, 103:13, 103:15,
103:16, 104:17, 104:19,
104:21, 106:14, 106:20,
107:25, 109:24, 112:20,
113:19, 115:6, 115:9,
115:13, 115:16, 116:25,
120:2, 120:9, 122:13, 124:1,
125:4, 125:16, 125:23,
127:13, 127:16, 131:6,
135:7, 135:11, 136:1,
142:16, 146:19, 146:22,
147:10, 152:15, 154:10,
162:22, 164:2, 164:9,
164:23, 165:13, 167:24,
168:14, 169:21, 171:9, 175:7
**cost** [2] - 8:15, 8:18
**costs** [1] - 4:9
**could/would** [1] - 150:24
**counsel** [5] - 3:18, 13:7,
52:17, 59:7, 61:4, 121:4,
121:13, 162:23, 162:24,
169:1, 174:1
**Counsel** [2] - 3:4, 8:25,
13:25, 49:14, 57:11, 172:20,
174:7
**counselor** [1] - 39:13
**count** [7] - 46:16, 72:15,
72:18, 82:22, 152:4, 152:8,
152:10
**counted** [2] - 40:14, 82:11
**country** [1] - 134:12
**couple** [13] - 19:5, 29:16,
41:23, 62:11, 79:20, 82:18,
110:18, 110:19, 114:1,
139:16, 144:17, 150:1, 152:9
**course** [11] - 45:2, 45:10,
45:14, 45:17, 64:10, 79:20,

104:25, 125:22, 139:17,
140:20, 166:17
**courses** [5] - 54:24, 63:8,
107:5, 107:16, 139:16
**COURT** [3] - 1:1, 13:22, 15:7
**court** [1] - 162:20
**Court** [7] - 1:22, 3:1, 4:13,
6:2, 7:20, 9:5, 175:11
**Courthouse** [1] - 1:8
**courtroom** [2] - 6:9, 6:15
**covers** [1] - 45:4
**cram** [1] - 79:18
**created** [1] - 70:11
**creative** [1] - 33:6
**Creative** [1] - 94:24
**creatively** [1] - 106:1
**credit** [2] - 34:8, 64:17
**criteria** [3] - 156:1, 168:2,
168:21
**critical** [5] - 8:1, 130:16,
130:18, 130:22, 130:23
**critically** [1] - 5:21
**Cross** [1] - 176:4
**CROSS** [1] - 84:4
**cross** [4] - 70:13, 72:21,
83:22, 173:15
**cross-examination** [1] -
83:22
**CROSS-EXAMINATION** [1] -
84:4
**cross-examine** [1] - 70:13
**cross-throughs** [1] - 72:21
**crossed** [2] - 151:6, 151:7
**crowded** [1] - 58:13
**CRR** [2] - 1:22, 175:11
**cumulative** [3] - 41:10,
123:23, 125:3
**curiosity** [1] - 21:19
**current** [3] - 14:3, 88:7,
156:18
**curricula** [1] - 142:8
**curriculum** [3] - 33:12,
84:12, 84:13
**CURTIS** [1] - 1:12
**D1X** [1] - 155:15
**dad** [1] - 32:6
**daily** [1] - 102:10
**Dalzell** [2] - 12:14, 12:23
**dance** [3] - 39:24, 114:20,
123:7
**danced** [1] - 39:24
**dashes** [1] - 71:16
**data** [1] - 57:19
**date** [9] - 84:15, 113:11,
116:12, 122:3, 122:4, 122:5,
126:9, 131:11
**dates** [2] - 158:14, 158:16
**DAY** [1] - 1:6
**days** [11] - 8:16, 47:10, 53:3,

87:17, 112:14, 150:1, 152:17, 165:2, 165:4, 165:10, 167:16
**DC** [2] - 2:5, 2:12
**dealing** [1] - 94:7
**Dean** [2] - 164:14
**Dean's** [3] - 123:19, 124:18, 124:21
**dear** [1] - 169:13
**December** [2] - 1:10, 167:5
**decide** [1] - 66:2
**decided** [5] - 12:14, 12:22, 14:24, 15:18, 83:3
**deciding** [1] - 12:23
**decipher** [1] - 21:5
**decision** [1] - 47:14
**decision-making** [1] - 47:14
**decisions** [3] - 6:2, 12:2, 12:4
**declaration** [3] - 137:17, 161:16, 173:18
**decode** [1] - 20:19
**Defendant** [2] - 1:6, 2:14
**Defendant's** [14] - 91:24, 95:23, 97:10, 97:13, 98:5, 99:11, 99:23, 104:15, 108:8, 109:3, 126:2, 127:17, 134:14, 167:2
**defense** [3] - 173:15, 174:1, 174:2
**defer** [2] - 6:24, 11:24
**defined** [1] - 6:20
**definitely** [3] - 29:23, 125:12, 168:11
**definition** [1] - 6:19
**definitively** [1] - 162:15
**degree** [2] - 42:9
**delay** [1] - 11:8
**deleted** [1] - 171:24
**demonstrated** [1] - 8:7
**demonstrating** [1] - 150:21
**denial** [1] - 57:18
**denied** [9] - 19:22, 53:4, 56:10, 57:23, 57:24, 58:24, 59:2, 82:20, 87:8
**deny** [1] - 13:2
**Department** [6] - 5:21, 6:12, 6:23, 7:15, 11:16, 11:17
**depended** [1] - 25:19
**deposition** [6] - 33:5, 60:15, 70:19, 153:7, 162:18, 163:8
**describe** [4] - 21:12, 54:18, 60:17, 137:23
**described** [3] - 9:6, 86:16, 148:16
**describes** [1] - 155:16
**describing** [1] - 72:11
**description** [3] - 54:15, 141:18, 149:3
**designed** [4] - 139:11,

139:14, 139:25, 140:3
**desire** [2] - 14:16, 14:21
**desk** [6] - 27:16, 27:17, 28:11, 28:24, 92:15, 92:24
**despite** [4] - 3:24, 4:10, 8:13
**details** [1] - 169:18
**determination** [2] - 6:18, 112:5
**determined** [1] - 6:21
**determining** [2] - 6:1, 7:18
**developed** [2] - 26:7, 159:24
**developing** [1] - 144:22
**development** [2] - 99:2, 99:7
**developmental** [1] - 120:5
**developments** [1] - 71:9
**devoted** [1] - 110:21
**diagnose** [4] - 38:13, 155:22, 156:1, 156:2
**diagnosed** [19] - 10:6, 10:10, 10:13, 12:16, 40:6, 95:11, 95:17, 96:10, 96:12, 96:17, 96:20, 96:22, 96:24, 96:25, 115:9, 115:12, 155:17, 156:3, 156:17
**diagnoses** [5] - 45:25, 46:13, 119:19, 156:18, 164:5
**diagnosing** [1] - 38:12
**diagnosis** [10] - 12:17, 36:15, 45:22, 45:23, 46:3, 46:14, 97:5, 119:18, 120:2, 156:11
**diagnostic** [7] - 23:8, 26:3, 46:4, 46:14, 117:2, 119:15, 165:20
**difference** [2] - 16:10, 168:17
**different** [14] - 5:4, 21:11, 29:10, 41:11, 42:19, 58:6, 58:16, 63:25, 85:18, 88:10, 150:14, 151:21, 163:13
**differential** [2] - 45:21, 45:25
**differently** [1] - 65:5
**difficult** [2] - 26:16, 26:24
**difficulty** [4] - 4:25, 27:8, 90:12
**direct** [1] - 162:23
**Direct** [1] - 176:4
**DIRECT** [1] - 14:1
**direction** [2] - 22:24, 31:22
**directly** [1] - 14:7
**director** [1] - 46:19
**disabilities** [10] - 5:20, 5:22, 8:4, 8:14, 54:2, 56:11, 86:23, 93:22, 164:1, 168:5
**Disability** [1] - 36:18
**disability** [16] - 5:9, 6:2, 6:18, 6:19, 7:4, 7:6, 7:8, 7:18, 7:25, 49:10, 115:13, 119:17, 121:23, 155:23, 155:24, 156:1

**disabled** [3] - 6:20, 9:19, 12:20
**disagree** [3] - 9:15, 9:17, 9:18
**disclosed** [1] - 145:20
**discovery** [2] - 112:25, 128:14, 128:15
**discriminating** [1] - 29:13
**discuss** [4] - 52:17, 94:23, 114:24, 159:3
**discussed** [5] - 16:23, 100:12, 149:22, 158:8, 158:9
**discusses** [2] - 134:23, 154:25
**discussing** [6] - 68:13, 88:22, 93:3, 94:11, 139:5, 168:17
**discussion** [15] - 17:21, 88:19, 91:3, 92:4, 94:16, 111:24, 113:3, 113:9, 117:16, 117:20, 140:24, 146:4, 146:5, 153:16, 157:23
**disease** [3] - 23:4, 23:16, 24:4, 24:7
**diseases** [1] - 22:22
**dismissed** [6] - 4:15, 4:19, 43:7, 75:1, 75:7, 75:10
**disorder** [6] - 20:5, 56:1, 56:17, 56:22, 164:1, 165:1
**disorders** [1] - 22:22
**disrespectful** [1] - 31:11
**distinct** [1] - 148:12
**distinguish** [3] - 22:23, 22:24, 66:22
**distract** [1] - 17:25
**distracted** [2] - 19:15, 27:22
**distractibility** [1] - 88:3
**distractible** [1] - 90:8
**distracting** [1] - 56:4
**distraction** [1] - 158:8
**District** [1] - 100:12
**DISTRICT** [2] - 1:1, 1:1
**DO** [1] - 42:9
**docket** [1] - 174:19
**doctor** [6] - 4:12, 8:21, 8:22, 40:22, 87:7
**document** [45] - 49:7, 49:8, 50:3, 50:21, 51:5, 51:10, 52:16, 52:20, 54:13, 70:18, 70:21, 71:13, 72:17, 72:22, 73:24, 74:15, 86:7, 87:5, 87:12, 92:3, 99:14, 105:18, 108:10, 109:6, 113:7, 121:16, 127:20, 128:3, 128:12, 129:23, 140:16, 140:18, 147:14, 151:3, 151:4, 152:8, 152:12, 152:24, 164:17, 167:9, 167:14, 169:5, 170:2, 170:3
**documentary** [1] - 8:6

**documentation** [12] - 4:6, 40:11, 54:4, 57:19, 58:23, 93:24, 94:14, 97:4, 115:19, 128:10, 156:13, 173:20
**documenting** [1] - 128:10
**documents** [5] - 11:20, 49:6, 75:18, 164:22, 165:25
**DOJ** [2] - 11:20, 11:25
**done** [7] - 18:6, 75:2, 79:24, 89:8, 112:12, 112:13, 152:2
**door** [1] - 7:23
**dose** [1] - 38:22
**double** [8] - 17:14, 18:9, 44:21, 55:18, 55:20, 80:24, 82:15, 157:9
**down** [13] - 13:9, 22:22, 28:12, 68:10, 73:19, 79:2, 79:6, 79:15, 79:21, 85:23, 129:13, 135:4, 142:10
**Dr** [61] - 29:2, 29:5, 38:3, 40:14, 51:8, 51:15, 54:10, 54:17, 54:18, 58:1, 58:15, 58:18, 58:22, 74:18, 87:6, 88:6, 90:22, 93:19, 95:12, 95:17, 96:9, 96:12, 96:17, 96:21, 96:22, 97:2, 115:8, 115:15, 116:8, 117:4, 119:4, 119:7, 119:14, 121:25, 128:8, 155:22, 156:11, 164:16, 164:17, 164:19, 165:17, 165:21, 165:24, 166:7, 166:17, 167:5, 167:10, 169:13, 169:16, 170:13, 171:2, 171:8, 172:4, 172:6, 172:16, 173:12, 173:14, 174:1, 174:2
**draft** [9] - 109:25, 167:10, 167:12, 167:24, 169:8, 169:9, 169:11, 169:12
**drafted** [1] - 6:13
**drafts** [2] - 30:21, 168:8
**drastic** [1] - 9:6
**draw** [3] - 21:3, 64:23, 78:22
**drawn** [1] - 16:8
**draws** [1] - 144:16
**drive** [2] - 112:4, 112:7
**drop** [2] - 17:6, 54:24
**drowning** [2] - 35:16, 123:11
**drug** [1] - 23:5
**drugs** [1] - 23:15
**dry** [2] - 44:22, 82:16
**DSM** [2] - 5:9, 156:1
**due** [2] - 138:16, 140:9
**duly** [1] - 13:20
**during** [14] - 28:19, 34:21, 34:22, 42:12, 45:10, 45:14, 47:16, 52:20, 90:15, 94:2, 117:20, 118:3, 122:22, 128:14
**duty** [1] - 114:15

**DVT** [5] - 20:3, 56:16, 56:22, 156:23, 164:25
**DX-1** [2] - 139:4, 160:7
**DX-14** [1] - 102:15
**DX-15** [1] - 103:21
**DX-2** [3] - 137:15, 137:20, 161:14
**DX-22** [1] - 122:24
**DX-29** [1] - 131:8
**DX-4** [2] - 155:6, 163:23
**DX-41** [1] - 115:11
**DX-56** [2] - 109:19, 109:22
**DX-60** [2] - 140:14, 140:16
**DX-61** [1] - 147:13
**DX-7** [1] - 112:22
**Dyslexia** [1] - 58:3
**dyslexia** [22] - 5:2, 10:6, 10:7, 10:13, 12:16, 38:5, 38:25, 56:16, 56:19, 56:20, 95:11, 96:10, 96:13, 96:17, 96:21, 97:1, 118:11, 156:10, 156:20, 160:11, 160:14, 168:12
**dyslexic** [2] - 38:13, 118:11
**earliest** [1] - 89:13
**Early** [1] - 126:4
**early** [5] - 30:5, 32:14, 160:1, 167:12, 168:7
**easier** [1] - 69:23
**EASTERN** [1] - 1:1
**easy** [3] - 37:5, 141:5, 141:9
**eat** [1] - 112:2
**echelon** [1] - 10:21
**edit** [2] - 31:23, 50:16
**edited** [1] - 172:15
**Edition** [1] - 152:21
**Education** [1] - 94:24
**education** [10] - 11:9, 42:14, 44:4, 55:13, 94:6, 100:8, 100:9, 101:5, 105:15, 157:3
**educational** [5] - 94:2, 95:8, 97:11, 121:19, 121:22
**educations** [1] - 9:25
**effect** [3] - 24:17, 24:18, 74:2
**effects** [2] - 6:22, 86:22
**effort** [2] - 7:11, 19:17
**either** [8] - 4:2, 32:14, 42:25, 50:12, 82:11, 90:24, 102:18, 156:24
**elective** [1] - 114:21
**electronic** [1] - 109:22
**Elementary** [1] - 104:16
**elementary** [11] - 26:11, 28:20, 29:22, 30:8, 30:13, 32:14, 89:13, 91:4, 94:24, 118:20, 158:7
**email** [14] - 40:9, 49:9, 49:21, 52:6, 166:4, 167:4, 170:13, 170:22, 171:1, 171:4, 171:7, 171:17, 171:18, 171:19

**emailed** [1] - 40:15
**emails** [2] - 19:5, 166:11
**embarrassing** [2] - 26:24, 27:17
**employed** [1] - 58:2
**enacted** [1] - 93:15
**enacting** [1] - 7:19
**encounter** [5] - 18:6, 18:8, 46:6, 46:21, 149:2
**encountered** [5] - 123:3, 142:8, 145:12, 146:2, 146:13
**encourage** [1] - 13:1
**end** [18] - 4:15, 9:13, 10:11, 10:15, 20:3, 32:15, 39:22, 47:11, 64:15, 72:16, 82:18, 83:5, 84:23, 94:18, 95:5, 112:3, 125:9, 157:22
**ended** [4] - 18:20, 31:15, 38:11, 39:21
**enforce** [1] - 11:21
**enforcement** [1] - 12:9
**English** [6] - 107:7, 107:13, 112:2, 131:24, 132:9, 146:21
**enjoy** [2] - 36:21, 67:24
**enjoyed** [1] - 14:17
**enrolled** [1] - 75:12
**ensures** [1] - 7:24
**enter** [1] - 160:16
**entire** [5] - 5:25, 62:24, 63:1, 142:17, 143:1, 150:4, 159:21, 166:10, 171:3, 171:18
**entirely** [2] - 4:18, 5:4
**entirety** [1] - 49:18
**entities** [2] - 6:24, 7:21
**entitled** [5] - 7:4, 9:12, 9:20, 12:20, 175:8
**entry** [1] - 51:15
**enzyme** [4] - 23:16, 25:18, 26:2
**erase** [2] - 44:22, 82:16
**erasers** [1] - 22:20
**especially** [4] - 27:19, 29:25, 55:25, 118:2
**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10
**essay** [3] - 111:14, 111:17, 111:20
**essays** [2] - 41:16, 115:3
**essentially** [1] - 150:24
**establish** [2] - 9:7, 11:14
**established** [1] - 11:5, 124:8
**estimate** [3] - 77:18, 77:22, 152:5
**Eugene's** [1] - 144:17
**evaluate** [2] - 5:19, 43:11
**evaluated** [6] - 37:23, 39:7, 88:8, 93:22, 128:23, 130:16
**evaluation** [11] - 38:1, 40:13, 40:14, 40:17, 40:22, 54:11,

93:18, 97:2, 115:8, 118:4, 165:20
**evaluator** [2] - 40:13, 53:25
**evening** [2] - 19:21, 19:24
**event** [2] - 106:23, 122:22
**events** [2] - 124:15, 148:5
**eventually** [1] - 128:12
**evidence** [18] - 4:11, 5:13, 5:14, 8:6, 10:2, 10:5, 51:24, 52:12, 52:16, 59:6, 59:8, 68:15, 73:2, 73:4, 74:6, 75:17, 90:21, 171:24
**evolved** [1] - 14:16
**exact** [1] - 159:19
**exactly** [8] - 28:22, 78:19, 80:10, 85:5, 122:21, 136:8, 147:24, 150:2
**exam** [79] - 9:22, 11:1, 11:2, 11:11, 12:17, 12:18, 16:23, 23:12, 42:10, 44:11, 44:12, 44:14, 45:4, 51:13, 53:10, 53:12, 53:24, 56:5, 82:4, 82:6, 82:21, 83:2, 83:3, 83:17, 84:10, 84:16, 84:24, 84:25, 85:7, 85:13, 91:24, 94:19, 117:1, 126:13, 129:15, 130:5, 130:6, 130:10, 130:13, 130:15, 130:18, 133:7, 133:15, 134:3, 134:7, 134:12, 134:19, 134:20, 136:6, 136:7, 136:13, 136:21, 137:2, 137:23, 140:12, 140:19, 140:21, 141:19, 142:22, 143:12, 145:20, 145:22, 146:19, 147:2, 147:4, 148:11, 149:3, 149:7, 152:6, 152:20, 153:17, 153:24, 155:1, 159:10, 159:16, 160:6, 161:8
**Exam** [1] - 152:22
**Examination** [1] - 4:5
**EXAMINATION** [2] - 14:1, 84:4
**examination** [2] - 83:22, 135:21, 173:16
**examine** [2] - 70:13, 143:2
**examined** [4] - 4:22, 5:23, 6:25, 13:21
**examinee's** [1] - 11:24
**examinees** [2] - 132:4, 134:6
**EXAMINERS** [1] - 1:6
**Examiners** [5] - 3:5, 4:4, 9:2, 11:24, 12:15
**example** [4] - 7:7, 7:16, 150:9, 164:10
**exams** [19] - 9:21, 18:2, 18:10, 42:9, 44:18, 45:1, 45:17, 81:23, 81:24, 81:25, 82:2, 82:8, 82:13, 82:18,

83:1, 83:14, 125:9, 139:22
**excellence** [1] - 3:22
**excellent** [5] - 10:17, 99:6, 99:20, 99:22, 105:4
**except** [2] - 151:23, 154:11
**exception** [1] - 125:16
**excerpts** [1] - 153:9
**excuse** [2] - 15:8, 17:20
**exercise** [2] - 145:17, 151:16
**exercises** [1] - 112:9
**exhibit** [13] - 49:12, 49:17, 49:18, 50:21, 52:24, 60:3, 60:14, 61:5, 69:3, 86:2, 86:5, 121:4, 166:10
**Exhibit** [50] - 49:16, 52:12, 59:9, 59:24, 67:22, 68:14, 69:2, 73:8, 73:12, 73:22, 74:5, 74:9, 74:11, 75:16, 75:21, 85:25, 87:3, 91:24, 95:23, 97:10, 97:13, 97:14, 98:5, 98:13, 99:11, 99:23, 100:7, 100:11, 104:15, 106:6, 106:15, 108:8, 109:3, 115:15, 119:6, 126:2, 126:24, 127:3, 127:17, 129:23, 132:16, 133:1, 134:2, 134:14, 136:18, 151:15, 152:19, 165:23, 166:4, 167:2
**exhibiting** [2] - 97:19, 122:7
**Exhibits** [3] - 59:14, 68:14, 68:24
**exhibits** [2] - 48:14, 48:19, 85:18
**existed** [1] - 154:16
**expand** [1] - 50:13
**expected** [2] - 31:4, 53:13
**expensive** [1] - 38:15
**experience** [3] - 40:20, 88:22, 160:5
**experienced** [1] - 85:16
**experiencing** [2] - 89:16, 92:5
**expert** [3] - 4:22, 10:6, 10:7
**expertise** [1] - 12:3
**experts** [3] - 5:10, 12:1, 174:12
**explain** [8] - 21:8, 21:17, 60:6, 61:9, 70:17, 70:20, 80:8, 124:12
**explaining** [1] - 151:18
**explanation** [3] - 78:20, 78:21, 79:11
**expo** [1] - 105:25
**extend** [2] - 17:9, 74:23
**extended** [10] - 8:1, 8:2, 8:17, 12:21, 87:25, 124:19, 124:25, 132:17, 133:22, 136:9
**extends** [1] - 166:4

**extension** [1] - 74:19
**extensive** [2] - 6:18, 166:6
**extent** [3] - 91:10, 91:15, 172:8
**extenuating** [2] - 55:5, 55:6
**external** [3] - 12:1, 12:3, 173:20
**extra** [18] - 4:2, 5:15, 18:10, 27:14, 28:14, 29:22, 30:6, 33:21, 39:14, 55:18, 90:13, 91:21, 116:3, 124:14, 158:9, 164:24, 167:22, 168:14
**extracurricular** [4] - 108:6, 113:3, 113:5, 115:3
**extraordinary** [5] - 3:19, 3:23, 5:14, 8:10, 9:16
**extreme** [1] - 9:6
**extremely** [4] - 10:22, 26:16, 91:17, 112:12
**face** [5] - 5:14, 31:22, 77:8, 119:1
**fact** [11] - 10:17, 12:1, 92:18, 93:13, 97:7, 98:13, 112:16, 146:21, 149:17, 174:18
**factor** [3] - 9:15, 11:5, 43:11
**factors** [2] - 9:8, 24:3
**facts** [1] - 169:20
**faculty** [1] - 4:23
**fail** [2] - 54:25, 76:9
**failed** [19] - 6:7, 17:3, 17:5, 21:21, 43:17, 43:19, 46:16, 46:17, 46:19, 47:1, 53:17, 53:18, 54:23, 55:10, 57:4, 76:10, 76:16, 85:8, 136:21
**failing** [1] - 57:3
**fair** [4] - 11:16, 101:3, 126:24, 164:8
**fairly** [2] - 81:6, 173:13
**fall** [4] - 54:8, 85:7, 95:16, 115:5
**familiar** [1] - 3:10
**family** [1] - 44:14
**far** [5] - 46:1, 77:16, 141:15, 151:12, 151:13
**Farmer** [1] - 173:18, 174:2
**Farmers** [3] - 88:22, 88:25, 100:11
**fast** [1] - 79:18
**fast-paced** [1] - 79:18
**faster** [1] - 79:5
**faxed** [1] - 119:16
**February** [3] - 120:23, 148:1, 148:2
**felt** [1] - 35:16
**few** [5] - 16:19, 18:10, 19:9, 84:6, 100:12
**fiction** [1] - 143:15
**fidget** [1] - 56:3
**fidgety** [1] - 19:19
**field** [1] - 43:16

**fifth** [7] - 30:14, 33:1, 33:13, 89:1, 89:2, 103:22, 104:10
**figure** [12] - 20:20, 20:22, 20:23, 28:7, 28:12, 32:2, 32:4, 53:22, 66:8, 72:18, 81:18, 148:17
**figured** [4] - 22:25, 55:8, 57:20, 92:22
**figures** [1] - 143:2
**figuring** [1] - 37:4
**filed** [3] - 59:1, 59:3, 86:18
**fill** [5] - 39:6, 48:10, 77:25, 117:5, 138:20
**filled** [7] - 48:9, 49:21, 51:1, 51:14, 64:16, 97:6, 155:24
**film** [1] - 114:17
**filter** [1] - 76:19
**filtered** [1] - 76:17
**final** [9] - 101:10, 103:1, 106:25, 111:19, 168:13, 168:16, 168:17, 169:11, 172:2
**finally** [3] - 7:14, 7:21, 171:17
**findings** [6] - 23:9, 23:11, 26:5, 45:20, 46:2
**fine** [8] - 3:14, 29:21, 48:24, 68:10, 68:21, 70:14, 73:20, 105:23
**finish** [6] - 17:5, 28:17, 28:18, 32:16, 34:8, 152:17
**finished** [1] - 15:21
**finishing** [1] - 90:4
**first** [114] - 6:17, 9:14, 10:7, 10:8, 13:5, 16:22, 18:18, 19:23, 26:6, 27:14, 27:15, 28:23, 34:10, 35:21, 39:17, 39:20, 41:23, 43:13, 44:5, 45:3, 45:6, 46:19, 48:21, 49:17, 49:18, 51:8, 51:22, 53:2, 54:5, 54:24, 54:25, 55:1, 56:14, 56:18, 57:3, 57:4, 60:11, 60:13, 61:10, 63:19, 66:12, 69:8, 69:18, 72:3, 76:15, 85:6, 85:7, 86:5, 86:18, 87:17, 87:24, 88:14, 88:21, 90:11, 92:3, 92:18, 92:20, 92:23, 93:5, 94:18, 95:11, 95:17, 96:20, 99:12, 99:16, 100:16, 100:19, 103:23, 104:2, 104:3, 113:8, 113:9, 115:12, 116:17, 118:15, 119:10, 119:11, 120:22, 122:2, 123:15, 123:23, 124:22, 126:25, 127:22, 130:20, 133:3, 139:8, 141:6, 142:5, 142:8, 143:5, 143:12, 143:15, 143:16, 143:18, 143:24, 144:1, 144:4, 148:19,

148:21, 149:25, 155:8, 155:17, 155:18, 158:23, 159:2, 159:8, 160:1, 165:17, 167:1, 167:4, 172:25
**First** [2] - 78:12, 78:22
**fit** [3] - 37:5, 78:24, 139:21
**five** [11] - 50:1, 64:15, 64:18, 67:10, 67:12, 77:25, 83:4, 111:10, 136:7, 169:7
**five-minute** [2] - 64:15, 77:25
**five-page** [1] - 169:7
**fix** [3] - 14:18, 24:23, 38:9
**fixing** [1] - 15:10
**flag** [1] - 43:18
**flagged** [1] - 40:25
**flashes** [1] - 67:10
**flip** [2] - 51:20, 166:12
**flipped** [1] - 37:12
**flipping** [1] - 156:8
**focus** [9] - 3:25, 6:1, 19:14, 19:18, 27:23, 35:4, 38:18, 38:19, 118:11
**focused** [1] - 80:4
**focusing** [1] - 19:16
**follow** [2] - 18:22, 84:6
**follow-up** [1] - 84:6
**followed** [2] - 143:13, 148:13
**following** [7] - 51:2, 51:15, 61:25, 71:9, 89:14, 144:11, 144:16
**follows** [1] - 13:21
**food** [1] - 112:10
**footnote** [1] - 134:22
**forced** [3] - 75:1, 75:13, 161:22
**foregoing** [1] - 175:7
**forget** [1] - 33:5
**forgetting** [2] - 31:5, 31:6
**form** [15] - 39:6, 39:7, 48:7, 48:10, 49:21, 49:22, 49:23, 97:6, 97:7, 119:7, 119:14, 121:16, 122:17, 159:3, 159:7
**formal** [18] - 30:11, 94:1, 94:4, 101:16, 101:17, 105:10, 105:12, 106:13, 115:14, 116:2, 119:18, 124:7, 124:25, 127:14, 129:20, 158:2, 158:18
**formally** [2] - 4:2, 10:13
**formative** [1] - 82:21
**formula** [6] - 61:18, 62:5, 71:2, 151:22
**formulas** [1] - 71:1
**forth** [3] - 50:16, 85:20, 166:7
**forward** [2] - 34:5, 53:23
**foster** [1] - 14:21
**fought** [1] - 8:13
**foundation** [1] - 63:5

**four** [8] - 9:8, 63:24, 64:4, 108:18, 108:23, 110:9, 136:7, 142:6
**fourth** [17] - 17:4, 30:14, 30:15, 42:22, 42:23, 42:25, 43:25, 71:16, 71:24, 71:25, 72:1, 72:2, 90:11, 102:15, 102:19, 105:23, 111:8
**framework** [1] - 46:8
**frequent** [1] - 88:1
**frequently** [1] - 31:12
**freshman** [2] - 109:2
**Friday** [1] - 32:9
**friends** [4] - 34:17, 34:20, 79:8, 79:13
**front** [2] - 49:6, 174:6
**frustrated** [4] - 34:24, 35:7, 35:18, 36:10, 36:20
**full** [5] - 89:20, 92:3, 96:2, 139:6, 142:5
**fully** [2] - 161:13, 163:14
**functioning** [2] - 23:17, 24:1
**fungi** [1] - 24:11
**future** [1] - 4:12
**gas** [2] - 61:24, 62:2
**gatekeeper** [1] - 148:19
**gathering** [1] - 139:1
**gears** [1] - 160:5
**gene** [3] - 23:24, 24:1
**general** [11] - 9:23, 9:25, 12:8, 12:19, 30:23, 58:8, 81:8, 97:18, 99:1, 123:7, 140:25
**generally** [8] - 21:1, 58:12, 61:7, 65:21, 66:11, 97:21, 148:14, 149:6
**generically** [1] - 40:15
**genes** [1] - 23:24
**genetic** [1] - 39:20
**genetics** [4] - 14:23, 14:24, 14:25, 23:23
**girl** [1] - 98:21
**given** [9] - 29:23, 30:6, 48:13, 55:23, 82:1, 91:13, 99:5, 141:3, 167:15
**glancing** [1] - 71:15
**glasses** [1] - 29:18
**goofing** [1] - 30:2
**GPA** [3] - 109:12, 123:23, 125:3
**grade** [67] - 7:17, 27:15, 28:23, 30:14, 30:15, 31:1, 33:1, 33:13, 33:16, 33:25, 34:10, 34:12, 36:14, 51:9, 82:22, 88:22, 89:1, 89:2, 90:12, 92:5, 92:18, 92:20, 92:23, 92:24, 92:25, 93:5, 94:19, 95:6, 95:9, 99:12, 99:17, 99:19, 99:20, 99:23, 100:2, 100:16, 101:8,

102:15, 102:19, 102:24, 103:22, 104:10, 104:17, 105:8, 106:6, 106:10, 106:25, 107:8, 107:12, 107:22, 108:2, 111:8, 114:18, 126:25, 127:4, 127:9, 128:18, 128:19, 130:19, 130:20, 130:21, 130:23, 158:23
**graded** [1] - 34:9
**grades** [30] - 7:16, 30:8, 90:15, 98:7, 98:12, 98:24, 99:16, 100:1, 101:7, 101:11, 101:14, 101:15, 102:5, 102:8, 102:24, 103:1, 103:7, 103:14, 104:1, 104:6, 104:22, 106:15, 106:16, 106:17, 108:5, 114:23, 115:3, 124:13, 125:14, 127:5
**grading** [1] - 88:1
**graduate** [1] - 17:1
**graduated** [2] - 108:13, 113:6
**graduation** [1] - 53:13
**GRAN** [1] - 1:15
**granola** [2] - 17:23, 82:17
**grant** [1] - 52:19
**granted** [3] - 18:13, 164:22, 164:24
**graphs** [1] - 143:2
**gray** [1] - 24:9
**great** [2] - 36:5, 61:1
**green** [2] - 23:3, 150:15
**group** [1] - 110:19
**grow** [1] - 26:20
**growing** [2] - 14:19, 94:19
**guards** [2] - 112:6, 114:15
**guess** [9] - 23:25, 31:3, 32:13, 42:5, 62:22, 66:4, 141:16, 173:3
**guessed** [5] - 72:4, 72:6, 78:1, 78:3, 78:5
**guesses** [3] - 77:6, 78:1, 160:16
**guessing** [7] - 64:13, 66:25, 138:16, 138:19, 140:9, 141:11, 141:13
**guidance** [4] - 11:17, 11:18, 11:20, 11:25
**Guide** [1] - 152:21
**guide** [1] - 153:1
**guidelines** [8] - 6:12, 40:16, 48:9, 50:15, 169:15, 169:21, 169:23, 169:24
**habits** [2] - 99:1, 99:3
**Haddonfield** [1] - 1:17
**half** [11] - 10:10, 18:5, 37:14, 39:15, 66:15, 66:16, 103:23, 104:17, 157:13, 165:11, 173:3

**halfway** [1] - 37:6, 69:2
**hand** [7] - 25:18, 25:22, 109:7, 128:20, 141:2, 143:3, 162:18
**handbook** [3] - 55:3, 74:1, 74:2
**handle** [1] - 123:11
**handwriting** [2] - 119:11, 121:3
**hang** [2] - 34:22, 34:25
**hanging** [2] - 34:20, 34:24
**happier** [1] - 16:15
**happy** [2] - 70:6, 174:4
**hard** [17] - 4:10, 8:20, 9:17, 21:12, 26:15, 30:1, 30:15, 30:24, 31:13, 32:1, 35:17, 37:1, 38:6, 45:4, 91:19, 98:18, 112:12
**harder** [4] - 38:8, 71:1, 109:7, 123:5, 123:8
**harm** [5] - 11:5, 11:8, 11:9, 11:15
**harmed** [1] - 11:6
**hate** [1] - 22:18
**head** [1] - 58:7
**headache** [1] - 24:19
**headed** [1] - 154:23
**heading** [6] - 121:19, 129:3, 142:12, 143:5, 158:4, 166:14
**headphones** [1] - 58:19
**health** [1] - 47:12
**hear** [5] - 3:9, 5:3, 10:2, 10:6, 13:9
**heard** [1] - 40:10
**HEARING** [1] - 1:6
**hearing** [5] - 3:11, 52:1, 52:15, 174:13, 174:16
**heart** [1] - 65:9
**heavily** [1] - 43:10
**held** [1] - 12:19
**help** [35] - 17:18, 25:8, 27:9, 27:13, 29:18, 29:19, 31:13, 31:16, 31:17, 31:20, 31:25, 32:4, 32:20, 32:22, 37:13, 38:18, 50:9, 50:13, 60:17, 60:19, 64:23, 66:1, 66:22, 70:3, 72:24, 81:12, 81:15, 86:2, 89:8, 91:21, 98:11, 102:11, 148:20, 159:6, 167:5
**helped** [5] - 27:6, 38:23, 54:19, 91:20, 152:13
**helping** [2] - 35:4, 124:12
**helps** [7] - 19:14, 19:15, 19:17, 19:18, 22:14, 23:1, 79:4
**hemorrhaging** [1] - 24:16
**high** [26] - 7:8, 9:24, 10:14, 34:15, 35:23, 36:1, 95:7, 95:9, 106:16, 107:5, 108:19, 110:5, 112:14, 113:6,

113:10, 113:19, 113:20, 114:21, 117:16, 118:19, 123:5, 129:25, 133:4, 158:6, 159:1
**High** [4] - 106:17, 108:11, 108:17, 129:24
**higher** [6] - 9:9, 43:16, 137:6, 137:13, 138:7
**highlight** [5] - 62:4, 65:25, 72:17, 150:12, 152:10
**highlighted** [3] - 61:17, 70:1, 169:6
**highlighters** [2] - 17:18, 21:9
**highlighting** [4] - 150:7, 150:8, 150:9, 150:14
**highlights** [2] - 18:22, 72:21
**hired** [1] - 5:17
**histology** [2] - 23:19, 23:22
**historical** [1] - 46:2
**history** [22] - 7:3, 7:5, 7:16, 8:7, 12:16, 12:24, 45:20, 87:16, 87:23, 88:7, 88:13, 89:8, 91:1, 112:11, 116:22, 117:9, 120:5, 120:20, 121:19, 121:21, 125:21
**History** [4] - 87:19, 107:20, 108:11, 112:2
**hit** [1] - 77:25
**hold** [2] - 22:9, 22:17
**home** [9] - 16:14, 16:15, 31:6, 31:7, 31:12, 34:6, 35:1, 90:5, 112:8
**homeroom** [1] - 31:3
**homework** [7] - 32:5, 34:25, 35:2, 35:9, 112:8, 112:11, 112:13
**honest** [1] - 109:18
**honor** [1] - 3:21
**Honor** [52] - 3:3, 3:6, 3:7, 3:15, 9:1, 9:4, 10:18, 13:1, 13:6, 13:13, 21:16, 22:3, 48:12, 51:23, 52:18, 52:22, 59:4, 59:8, 59:12, 59:15, 59:16, 60:22, 61:1, 61:3, 63:4, 68:3, 68:13, 68:17, 70:6, 70:8, 73:1, 73:5, 74:7, 75:19, 83:23, 85:22, 110:10, 121:7, 121:12, 146:9, 162:25, 170:17, 171:20, 172:2, 172:18, 173:1, 173:9, 173:17, 173:21, 173:23, 174:4, 174:11
**HONORABLE** [1] - 1:12
**Honors** [9] - 107:7, 107:10, 107:13, 107:24, 107:25, 108:3, 112:2
**honors** [1] - 3:21
**hopefully** [1] - 20:24
**hospital** [1] - 16:13
**hour** [7] - 10:10, 65:19, 83:5,

112:4, 165:11, 173:3, 174:25
**hours** [9] - 31:21, 47:10, 110:22, 110:25, 111:1, 111:4, 111:10, 113:25, 136:7
**Houtman** [2] - 54:18, 164:20
**huge** [2] - 76:15, 76:20
**hurt** [1] - 48:22
**hyperactivity** [4] - 88:5, 119:24, 120:21, 122:12
**ideas** [1] - 50:11
**identified** [4] - 10:8, 115:23, 120:17, 157:4
**identifies** [1] - 122:6
**identify** [4] - 10:7, 48:18, 50:23, 149:12
**IEP** [1] - 30:11
**ignore** [1] - 67:11
**illness** [2] - 116:23, 117:9
**illustrates** [1] - 146:1
**imagine** [1] - 173:12
**immediate** [2] - 11:7, 11:15
**impact** [3] - 11:18, 41:4, 85:16
**impacts** [1] - 12:11
**impaired** [3] - 88:3, 88:4, 88:5
**impairment** [7] - 5:12, 12:4, 88:20, 155:13, 155:16, 155:20, 156:14
**impairments** [1] - 85:16
**implies** [1] - 156:9
**importance** [1] - 76:13
**important** [10] - 5:22, 24:7, 25:24, 65:11, 75:23, 78:11, 88:9, 142:18, 143:1, 169:23
**importantly** [1] - 8:19
**impossible** [1] - 4:18
**impress** [1] - 26:22
**improve** [1] - 38:19
**improved** [2] - 38:18, 134:5
**impulsivity** [2] - 119:24, 122:13
**in..** [1] - 97:3
**inaccurate** [2] - 157:11, 157:17
**inattention** [1] - 122:9
**inattentive** [2] - 119:19, 119:20
**incline** [1] - 13:17
**include** [5] - 73:20, 113:3, 153:8, 153:11, 156:20
**included** [4] - 128:23, 147:9, 164:5, 169:19
**includes** [2] - 140:23, 146:22
**including** [3] - 10:22, 160:21, 167:13
**inconsistent** [1] - 7:18
**incorrect** [1] - 152:7
**increase** [1] - 56:2

**incredibly** [1] - 8:20
**independent** [4] - 98:20, 150:23, 150:24, 152:13
**indicate** [11] - 100:20, 100:23, 100:24, 102:18, 119:23, 132:8, 137:5, 150:8, 151:7, 157:8, 158:6
**indicated** [9] - 100:13, 101:2, 103:17, 122:12, 122:15, 123:10, 127:5, 149:23, 154:12
**indicates** [4] - 101:19, 132:6, 137:8, 153:17
**indicating** [3] - 103:11, 103:14, 145:3
**indication** [6] - 101:24, 102:2, 102:5, 102:12, 104:9, 104:12
**indie** [1] - 114:17
**individual** [4] - 5:23, 90:14, 105:15, 135:4
**individuals** [5] - 9:24, 126:18, 132:13, 134:11, 135:1
**infection** [1] - 24:16
**inferred** [1] - 145:1
**informal** [13] - 90:14, 93:7, 94:1, 94:5, 94:7, 94:10, 94:12, 116:1, 124:9, 124:24, 127:6, 158:19, 158:25
**informally** [1] - 4:3
**information** [23] - 46:6, 51:21, 65:11, 66:21, 80:6, 80:13, 80:16, 80:18, 88:6, 88:8, 90:22, 112:17, 117:19, 118:3, 118:5, 119:12, 119:15, 139:1, 144:12, 151:6, 155:13, 156:9, 159:22
**informed** [2] - 89:7, 96:18
**informing** [1] - 82:23
**inheritance** [1] - 23:25
**initial** [2] - 91:23, 167:10
**INJUNCTION** [1] - 1:6
**injunction** [7] - 3:11, 9:5, 9:8, 9:10, 11:6, 13:3, 137:18
**input** [7] - 12:1, 12:4, 172:5, 172:6, 172:8, 172:10
**inquiry** [1] - 84:7
**instance** [1] - 163:14
**instead** [3] - 17:16, 30:16, 39:11
**Institute** [1] - 58:3
**instruction** [1] - 90:15
**instructions** [1] - 18:12
**integrate** [1] - 80:18
**integrated** [1] - 44:9
**intelligence** [1] - 91:12
**intend** [1] - 173:8
**intended** [1] - 6:4
**intensive** [3] - 102:6, 103:15,

104:12
**intent** [1] - 7:19
**interest** [3] - 8:12, 8:23, 52:14
**interested** [2] - 14:23, 39:19
**interesting** [1] - 101:18
**interests** [1] - 16:3
**internal** [2] - 44:14, 45:3
**interpreted** [2] - 6:3, 118:6
**interrogatory** [1] - 112:24
**interruption** [1] - 151:8
**interview** [4] - 41:24, 41:25, 42:2, 120:6
**interviews** [1] - 41:24
**intricate** [1] - 45:5
**intrinsic** [1] - 137:25
**intro** [1] - 30:18
**involved** [1] - 91:5
**involves** [1] - 143:15
**Iowa** [1] - 127:17
**irreparable** [4] - 11:5, 11:8, 11:9, 11:15
**irreparably** [1] - 11:6
**issue** [5] - 11:8, 11:18, 93:14, 119:23, 156:4
**issues** [4] - 91:14, 118:11, 118:17, 156:7
**italicized** [1] - 69:22
**itself** [3] - 11:17, 21:2, 146:17
**James** [1] - 1:8
**January** [1] - 134:25
**Jerry** [1] - 89:12
**Jersey** [1] - 1:17
**Jessica** [18] - 3:17, 3:19, 13:14, 13:24, 83:24, 87:16, 87:23, 89:8, 89:11, 89:14, 90:12, 98:18, 105:21, 105:24, 121:15, 168:2, 168:4, 168:21
**JESSICA** [1] - 1:3, 13:20, 176:5
**Jessie** [4] - 31:9, 69:2, 70:17, 75:23
**job** [1] - 46:20
**jobs** [1] - 113:9
**Joseph's** [5] - 104:16, 106:17, 108:11, 108:17, 129:24
**JOYNER** [1] - 1:12
**Judge** [3] - 12:14, 12:23, 145:24
**July** [3] - 53:19, 120:24, 160:6
**juncture** [1] - 173:16
**June** [4] - 54:20, 55:16, 86:8, 164:6
**junior** [1] - 133:4
**Justice** [5] - 5:21, 6:12, 6:23, 7:15, 11:17

**Justice's** [1] - 11:17
**JV** [1] - 109:2
**Kaplan** [1] - 78:16
**keep** [4] - 14:9, 18:19, 28:16, 35:13, 35:17, 51:19, 79:6, 106:1, 123:11, 144:3
**keeping** [1] - 35:14
**kept** [1] - 78:2
**key** [5] - 6:16, 11:5, 24:6, 66:1, 104:21
**Key** [2] - 110:15, 110:16
**kicked** [2] - 125:13, 157:19
**kids** [1] - 16:7
**kind** [29] - 6:21, 8:21, 8:22, 14:22, 15:2, 15:4, 16:12, 18:25, 19:8, 19:15, 20:7, 25:10, 27:13, 30:11, 31:9, 31:20, 33:1, 36:19, 36:22, 40:15, 45:8, 63:14, 65:17, 70:22, 71:15, 71:16, 71:20, 151:14, 159:6
**kindergarten** [8] - 97:15, 97:23, 97:24, 98:2, 98:14, 99:24, 125:25, 126:9
**kinds** [1] - 142:7
**kitchen** [1] - 35:4
**Kleenex** [1] - 27:1
**knowledge** [12] - 26:23, 42:11, 53:24, 76:3, 77:5, 79:19, 80:2, 91:13, 105:15, 138:5, 138:10, 150:24
**known** [6] - 45:3, 78:13, 120:21, 122:4, 122:5
**knows** [2] - 8:3, 169:2
**Kurzweil** [4] - 18:20, 18:25, 20:9, 132:22
**lab** [1] - 112:9
**laborious** [1] - 5:1
**labs** [3] - 23:8, 80:13, 80:14
**laminated** [1] - 44:23
**language** [8] - 11:22, 25:10, 30:25, 31:3, 87:21, 104:25, 105:7
**large** [1] - 77:10
**Larry** [1] - 3:16
**larry@rcglawoffices.com** [1] - 1:18
**last** [31] - 15:24, 15:25, 36:24, 61:12, 62:11, 65:20, 67:5, 69:14, 73:11, 74:21, 90:10, 93:1, 96:15, 103:7, 105:18, 109:11, 120:23, 134:24, 138:6, 143:19, 144:2, 144:23, 150:1, 160:25, 161:9, 161:10, 161:22, 162:4, 162:11, 162:12, 165:5
**lasts** [1] - 136:6
**late** [3] - 31:5, 32:14, 32:15
**law** [8] - 4:16, 5:25, 6:3, 6:6,

6:10, 6:17, 8:5, 8:8
**Lawrence** [2] - 170:20, 171:19
**LAWRENCE** [1] - 1:16
**lawyer** [2] - 166:16, 171:6
**lawyer's** [1] - 172:5
**lawyers** [1] - 170:21
**LD** [1] - 168:18
**lead** [1] - 160:23
**lead-in** [1] - 160:23
**League** [1] - 110:13
**learn** [7] - 7:12, 14:22, 26:13, 27:10, 27:12, 63:11, 63:13
**learned** [4] - 45:11, 46:13, 64:9, 174:18
**learning** [21] - 5:20, 5:22, 7:8, 7:11, 14:17, 16:9, 25:10, 25:13, 26:13, 26:20, 26:21, 27:8, 44:8, 86:22, 93:22, 101:25, 155:20, 155:23, 155:24, 156:1, 168:5
**least** [11] - 43:11, 46:1, 64:16, 71:9, 91:2, 120:25, 151:11, 154:12, 160:20, 161:9, 162:16
**leave** [16] - 14:5, 16:19, 17:9, 17:10, 42:25, 48:17, 55:8, 55:9, 74:20, 74:22, 75:17, 85:12, 113:12, 138:17, 140:10
**lectures** [1] - 78:8
**led** [1] - 115:13
**left** [19] - 29:8, 66:16, 67:3, 67:4, 67:5, 67:13, 78:3, 98:16, 100:19, 101:10, 123:21, 128:25, 130:2, 131:17, 137:8, 141:12, 143:3, 159:7
**left-hand** [1] - 143:3
**legal** [2] - 11:18, 12:7
**legislative** [1] - 6:8
**length** [1] - 145:10
**lengthy** [1] - 173:13
**less** [2] - 5:25, 142:2
**lessons** [4] - 35:24, 114:12, 114:16
**letter** [34] - 28:1, 28:3, 28:4, 51:8, 51:12, 54:15, 54:17, 57:18, 58:17, 59:2, 74:18, 85:11, 92:6, 164:12, 164:13, 164:19, 165:24, 166:1, 166:7, 166:18, 167:11, 167:13, 168:13, 168:16, 168:17, 169:7, 169:17, 169:24, 171:9, 171:10, 172:5
**letterhead** [1] - 171:14
**letters** [9] - 27:9, 27:25, 29:1, 31:22, 36:7, 38:6, 54:12, 115:4, 117:23
**level** [4] - 7:8, 103:4, 142:7

**Lewandowski** [1] - 54:10
**licensed** [1] - 40:13
**Licensing** [1] - 4:5
**licensing** [3] - 9:20, 12:17, 12:18
**life** [12] - 4:3, 5:12, 7:10, 9:21, 14:21, 16:17, 16:18, 25:19, 63:14, 86:23, 111:21, 118:15
**lifeguard** [2] - 114:2, 114:10
**lifeguarding** [1] - 114:13
**lifetime** [3] - 3:24, 8:3, 125:23
**light** [3] - 10:1, 15:4, 23:11
**likelihood** [3] - 8:10, 9:15, 11:15
**likely** [1] - 71:9
**likewise** [2] - 124:6, 124:17
**limit** [1] - 151:24
**limited** [4] - 5:8, 7:9, 9:21, 12:8
**limits** [2] - 5:12, 43:5
**line** [29] - 18:24, 23:20, 46:3, 61:12, 61:13, 62:11, 63:15, 65:20, 65:21, 66:7, 66:20, 67:7, 69:14, 69:16, 84:7, 144:2, 144:23, 160:25, 161:10, 162:4, 162:11, 162:12, 162:13, 162:17, 162:24, 163:16
**lines** [5] - 62:11, 124:20, 145:8, 163:2
**list** [7] - 45:21, 45:23, 45:24, 50:12, 155:16, 156:18, 159:5
**List** [3] - 123:19, 124:18, 124:21
**listed** [2] - 56:11, 156:19
**listen** [1] - 65:9
**listened** [1] - 78:8
**listening** [1] - 149:14
**listing** [1] - 110:4
**literally** [1] - 4:11
**literature** [1] - 118:23
**lived** [2] - 35:24, 94:25
**LLP** [3] - 1:15, 2:2, 2:9
**local** [1] - 39:24
**located** [1] - 161:18
**look** [91] - 5:9, 19:4, 23:19, 25:25, 43:13, 43:20, 47:2, 49:7, 49:17, 60:10, 61:22, 62:1, 62:16, 65:24, 66:21, 69:2, 71:13, 76:15, 76:16, 86:3, 86:5, 86:21, 87:3, 87:11, 87:12, 88:16, 89:22, 91:22, 92:3, 93:1, 94:15, 95:22, 96:2, 97:10, 98:5, 98:13, 99:11, 99:14, 101:21, 102:15, 105:18, 107:5, 108:8, 109:3, 109:6, 109:19, 112:22, 113:5, 115:8,

115:11, 116:12, 119:6, 121:16, 122:24, 123:15, 125:14, 125:20, 126:2, 127:17, 129:23, 130:8, 131:8, 132:16, 134:14, 137:15, 139:4, 140:14, 143:8, 147:2, 147:12, 148:22, 149:21, 151:14, 152:19, 153:16, 153:23, 154:23, 155:5, 156:25, 160:7, 161:9, 161:14, 162:7, 165:17, 165:23, 167:1, 169:11, 170:2, 171:12
**looked** [12] - 12:23, 28:1, 29:9, 37:12, 39:8, 40:9, 92:22, 104:6, 136:2, 147:13, 150:10, 156:13
**looking** [11] - 22:23, 22:25, 23:1, 68:25, 72:8, 80:10, 109:22, 110:2, 121:15, 149:8, 151:17
**looks** [36] - 21:4, 23:13, 77:8, 100:22, 106:6, 106:19, 107:7, 107:24, 108:2, 108:15, 109:1, 109:15, 110:12, 110:21, 110:24, 111:3, 113:22, 113:25, 114:17, 118:22, 123:18, 123:24, 125:2, 125:8, 125:14, 128:19, 134:5, 137:8, 146:23, 146:24, 150:3, 167:25, 169:12, 170:24, 171:5, 171:8
**losing** [2] - 4:12, 90:7
**loud** [4] - 14:9, 15:15, 32:20, 79:14
**loudly** [1] - 13:9
**loved** [1] - 16:7
**low** [2] - 76:18, 76:19
**lower** [4] - 62:22, 137:8, 137:12, 137:14
**lunch** [5] - 47:16, 59:18, 59:19, 67:24, 112:2
**Luncheon** [1] - 67:25
**ma'am** [4] - 14:6, 68:4, 172:11, 173:24
**mad** [1] - 31:8
**Madison** [1] - 109:24
**main** [4] - 71:24, 71:25, 72:5, 144:4
**maintain** [1] - 20:7
**major** [3] - 5:12, 7:10, 9:21
**manage** [1] - 35:13
**management** [1] - 23:4
**manager** [1] - 110:21
**mandates** [1] - 8:9
**mandatory** [1] - 9:10
**manual** [3] - 55:2, 55:3, 73:25
**March** [10] - 4:14, 11:11,

55:9, 74:23, 74:24, 77:15, 84:10, 84:15, 116:14, 133:4
**Marie** [2] - 1:22, 175:11
**mark** [3] - 73:16, 77:24, 83:6
**marked** [7] - 36:7, 69:13, 73:13, 78:1, 78:2, 122:8, 148:2
**marked-up** [1] - 69:13
**marker** [2] - 24:22, 44:25
**markers** [10] - 17:17, 21:9, 21:14, 21:17, 21:20, 22:12, 39:12, 44:22, 48:25, 82:16
**Market** [1] - 1:9
**marking** [1] - 105:21
**marks** [2] - 102:4, 102:7
**MARY** [1] - 2:3
**Mary** [1] - 3:16
**mary.vargas@steinvargas.com** [1] - 2:6
**mask** [1] - 91:11
**mastery** [1] - 100:20
**match** [1] - 76:14
**material** [11] - 37:9, 45:4, 45:10, 45:14, 76:6, 76:9, 76:10, 77:4, 77:11, 78:20, 79:23
**materials** [1] - 127:21
**math** [23] - 31:25, 32:3, 33:9, 33:10, 33:11, 33:12, 33:14, 33:25, 61:16, 61:18, 64:24, 91:18, 95:2, 95:3, 95:10, 95:11, 103:19, 111:8, 129:18, 131:1, 146:24, 147:3, 147:7
**matter** [5] - 13:12, 16:11, 108:21, 108:22, 175:8
**maximize** [1] - 38:23
**MCAT** [46] - 40:1, 40:3, 40:7, 41:6, 41:17, 60:2, 60:6, 62:23, 63:10, 63:23, 64:9, 64:23, 64:25, 65:13, 70:10, 134:15, 134:17, 135:1, 135:2, 135:10, 135:21, 136:9, 138:24, 139:5, 139:7, 139:10, 139:14, 145:17, 145:18, 145:19, 145:20, 149:21, 150:11, 150:20, 152:20, 152:22, 153:1, 153:14, 153:17, 154:13, 154:16, 154:18, 159:16, 159:20, 159:23
**MCATs** [1] - 52:7
**MD** [1] - 42:8
**mean** [21] - 7:6, 20:12, 20:17, 21:8, 21:24, 25:11, 26:9, 26:10, 28:22, 30:5, 30:9, 36:13, 65:17, 69:17, 75:5, 79:12, 80:8, 97:23, 138:19, 156:4, 163:9
**meaning** [3] - 21:5, 25:7,

25:25
**meanings** [2] - 21:3, 21:12
**means** [8] - 20:21, 20:22, 20:24, 22:21, 25:16, 26:1, 61:17, 126:17
**meant** [2] - 6:19, 20:25
**meantime** [1] - 11:13
**measures** [3] - 6:22, 12:25, 141:24
**mechanism** [1] - 23:15
**mechanisms** [2] - 23:14, 55:24
**med** [7] - 20:4, 26:7, 39:25, 42:8, 44:5, 51:14, 81:10
**MEDICAL** [1] - 1:5
**Medical** [7] - 3:5, 4:4, 4:5, 9:2, 10:25, 11:23, 12:15
**medical** [31] - 3:20, 4:15, 4:17, 4:18, 4:21, 4:23, 9:18, 9:23, 11:9, 14:5, 14:15, 15:19, 16:20, 17:11, 18:16, 20:10, 25:1, 39:17, 41:18, 42:13, 44:4, 44:17, 50:25, 73:25, 74:3, 78:13, 84:8, 84:9, 84:18, 120:5
**medically** [1] - 38:18
**medication** [4] - 17:24, 19:7, 19:8, 118:16
**medications** [1] - 19:20
**medicine** [7] - 4:13, 16:3, 44:9, 44:14, 45:3, 45:5
**medicine-wise** [1] - 45:5
**meds** [2] - 17:23, 82:16
**meet** [4] - 9:14, 10:1, 50:15, 169:23
**meeting** [1] - 54:9
**meetings** [1] - 110:18
**meets** [3] - 9:19, 168:2, 168:21
**member** [1] - 110:9
**Members** [1] - 109:12
**memorandums** [1] - 3:12
**memory** [2] - 91:2, 92:20
**men** [1] - 24:4
**men's** [1] - 110:21
**mental** [1] - 19:17
**mentioned** [2] - 19:7, 82:8
**merits** [3] - 8:11, 9:12, 9:15
**mess** [2] - 21:4, 46:9
**messages** [1] - 166:4
**met** [9] - 5:7, 5:19, 10:9, 34:7, 39:7, 40:19, 46:20, 169:21, 169:24
**method** [1] - 47:20
**metoprolol** [1] - 19:23
**Mew** [1] - 9:3
**MEW** [2] - 2:10, 85:22
**mic** [2] - 14:6, 15:12
**MICHAEL** [1] - 2:3
**michael.stein@**

**steinvargas.com** [1] - 2:6
**Michigan** [12] - 33:13, 42:1, 42:3, 42:6, 58:3, 75:10, 89:3, 95:4, 95:6, 95:9, 103:22, 109:11
**microphone** [1] - 15:7
**microscope** [1] - 23:20
**middle** [13] - 32:14, 33:13, 42:18, 58:14, 67:11, 104:22, 121:18, 132:7, 137:2, 158:6, 159:1, 160:10, 161:20
**Middle** [1] - 106:7
**might** [8] - 5:5, 25:21, 46:22, 58:13, 59:16, 114:15, 122:4, 162:9
**migraine** [1] - 19:24
**migraines** [8] - 56:16, 56:22, 56:24, 156:14, 156:20, 156:23, 164:1, 164:25
**million** [1] - 133:17
**mind** [1] - 94:3
**mine** [1] - 55:6
**minimum** [1] - 63:14
**minus** [1] - 106:22
**minuses** [4] - 104:20, 106:11, 106:21, 107:19
**minute** [6] - 64:15, 77:25, 114:24, 130:8, 142:2, 161:22
**minutes** [21] - 16:19, 18:11, 47:21, 59:17, 59:21, 64:19, 67:3, 67:5, 67:10, 67:12, 67:13, 83:4, 83:8, 100:12, 112:6, 112:7, 119:2, 121:6, 165:7, 165:9, 173:4
**Miracle** [1] - 110:12
**misbehaving** [1] - 97:22
**misread** [1] - 158:17
**missing** [1] - 38:10
**mistake** [2] - 141:14, 157:12
**mistakes** [5] - 22:19, 24:22, 35:15, 39:9, 89:23
**Mitchell** [2] - 1:22, 175:11
**mitigating** [1] - 6:22
**mitigation** [3] - 6:21, 64:8, 64:25
**mock** [1] - 32:10
**mode** [1] - 23:25
**modeling** [1] - 114:20
**moderate** [2] - 120:8, 120:18
**modern** [1] - 39:24
**molecules** [1] - 37:4
**mom** [13] - 28:25, 31:13, 31:14, 31:17, 31:21, 32:18, 34:6, 35:3, 50:13, 50:15, 91:1, 101:1, 101:3
**moment** [3] - 17:20, 20:9, 48:12
**month** [5] - 50:20, 53:19, 86:17, 86:20, 95:15
**months** [7] - 50:20, 54:7,

54:9, 55:4, 55:12, 79:20, 166:17
**morning** [13] - 3:2, 3:3, 14:3, 16:12, 19:21, 35:3, 83:24, 84:1, 94:17, 111:25, 155:9, 165:25, 175:2
**most** [22] - 7:2, 8:19, 9:18, 9:22, 12:8, 12:19, 18:19, 18:23, 39:23, 43:10, 43:11, 43:18, 83:18, 86:23, 98:11, 138:12, 145:1, 145:2, 147:6, 159:23, 159:25, 162:16
**mostly** [8] - 10:18, 17:14, 52:5, 64:11, 113:20, 114:4, 114:6, 137:14
**mother** [5] - 31:20, 89:7, 89:12, 100:23, 102:18
**mother's** [1] - 98:22
**motion** [1] - 9:4
**mouth** [1] - 136:15
**mouthed** [1] - 136:14
**move** [20] - 3:14, 48:19, 51:25, 52:11, 53:22, 55:25, 62:7, 66:4, 66:8, 66:11, 67:1, 68:11, 68:14, 73:1, 74:5, 75:16, 83:9, 144:10, 144:15, 146:8
**moved** [6] - 33:13, 68:15, 89:3, 95:4, 103:22
**moving** [2] - 52:14, 82:11
**MR** [59] - 3:6, 3:7, 9:1, 52:13, 52:22, 59:11, 60:25, 61:2, 63:4, 68:17, 68:21, 70:8, 70:14, 73:5, 74:7, 75:19, 83:23, 84:2, 84:5, 85:24, 92:13, 113:7, 113:8, 113:14, 116:16, 116:17, 116:19, 121:7, 121:14, 145:16, 145:19, 145:24, 146:9, 146:10, 147:23, 148:4, 162:25, 163:2, 163:4, 163:5, 163:6, 166:24, 166:25, 169:3, 169:4, 170:12, 170:17, 170:19, 170:25, 172:2, 172:3, 172:17, 172:25, 173:17, 173:22, 174:4, 174:11, 174:17, 174:25
**MS** [64] - 3:15, 13:6, 13:11, 13:13, 14:2, 14:14, 15:14, 18:15, 21:16, 22:6, 22:10, 27:4, 48:16, 48:20, 48:23, 49:2, 49:5, 49:15, 51:23, 52:2, 52:8, 52:11, 52:25, 56:23, 57:2, 57:12, 59:4, 59:15, 59:21, 59:23, 60:22, 61:3, 61:8, 63:7, 68:3, 68:13, 68:19, 69:1, 70:6, 70:16, 73:1, 73:9, 73:12, 73:15, 73:17, 73:21, 74:5, 74:10,

75:16, 75:22, 83:20, 85:22, 145:13, 145:18, 145:21, 166:20, 170:5, 170:14, 171:20, 172:7, 173:8, 173:12, 173:21, 173:25
**multiple** [10] - 5:15, 30:21, 31:1, 63:22, 64:2, 80:3, 135:24, 136:4, 148:15, 154:9
**multitasking** [1] - 118:2
**murmur** [2] - 65:9, 149:12
**must** [4] - 4:13, 7:12, 8:12, 8:14
**mutated** [2] - 23:25, 24:1

**N**

**NA** [1] - 122:12
**nail** [1] - 8:13
**name** [8] - 3:15, 12:14, 13:22, 25:17, 76:18, 108:11, 109:10, 126:7
**names** [2] - 23:5, 118:1
**narrative** [2] - 144:22, 145:2
**narrator** [1] - 144:16
**narrowly** [2] - 6:1, 6:3
**national** [3] - 129:3, 129:6, 129:16
**NATIONAL** [1] - 1:5
**National** [7] - 3:5, 4:4, 9:2, 10:18, 11:23, 12:14, 110:10
**nationally** [1] - 134:9
**nature** [2] - 137:25, 155:16
**NBME** [47] - 5:16, 5:17, 6:5, 6:13, 7:20, 8:15, 9:20, 11:13, 11:25, 12:2, 12:18, 17:16, 43:8, 44:16, 49:9, 51:21, 52:6, 53:5, 54:3, 55:17, 56:8, 56:13, 58:23, 60:14, 81:1, 81:20, 81:22, 82:1, 82:2, 82:8, 82:20, 83:1, 95:24, 96:18, 109:7, 127:21, 128:3, 128:12, 147:19, 157:4, 159:1, 164:8, 164:22, 166:1, 166:19, 169:15, 169:22
**NBME's** [1] - 49:22
**NE** [1] - 2:4
**nearly** [1] - 145:2
**necessarily** [3] - 36:19, 63:13, 123:9
**need** [33] - 19:17, 19:18, 21:1, 24:22, 25:5, 28:7, 31:13, 37:10, 37:16, 37:20, 38:14, 38:16, 38:20, 39:2, 39:3, 48:25, 49:10, 51:23, 54:2, 55:7, 55:21, 55:25, 56:1, 56:4, 61:4, 76:1, 80:19, 80:21, 80:24, 116:2, 163:18
**needed** [23] - 17:3, 17:24, 29:24, 30:4, 31:25, 34:5, 37:23, 38:25, 47:12, 53:23, 54:1, 54:18, 57:7, 61:16, 63:16, 67:19, 91:20, 100:23, 100:24, 101:4, 102:19,

159:4, 159:22
**needing** [1] - 56:12
**Needs** [1] - 154:24
**needs** [6] - 5:15, 8:7, 8:9, 14:20, 43:15, 174:12
**negative** [3] - 24:15, 24:18, 138:21
**negatively** [1] - 41:4
**neuro** [1] - 46:17
**neuropsych** [1] - 40:22
**neuropsychological** [2] - 96:24, 97:2
**never** [10] - 10:14, 34:18, 34:25, 45:9, 45:25, 60:25, 77:4, 118:19, 128:12, 165:20
**nevertheless** [1] - 7:9
**new** [7] - 30:22, 42:16, 45:8, 57:25, 63:13, 81:6
**New** [3] - 1:17, 174:13, 174:19
**next** [43] - 39:5, 49:24, 50:6, 50:21, 62:7, 66:4, 66:8, 66:11, 67:1, 71:17, 88:16, 89:11, 90:10, 93:13, 98:24, 101:7, 104:25, 112:16, 116:15, 117:22, 118:7, 120:1, 120:7, 120:10, 120:20, 134:14, 135:15, 141:5, 142:24, 143:21, 144:10, 144:15, 144:22, 151:15, 156:10, 156:18, 156:25, 157:23, 167:8, 168:1, 170:3, 170:11, 171:3
**nice** [1] - 98:21
**night** [4] - 32:8, 32:9, 34:19, 47:16
**nighters** [1] - 32:15
**ninth** [1] - 107:8
**NO** [2] - 1:3, 176:11
**nobody** [2] - 101:4, 152:13
**noise** [1] - 136:15
**nominated** [1] - 3:21
**none** [5] - 122:2, 122:4, 122:5, 158:6
**nonsmokers** [1] - 24:5
**normal** [1] - 83:5
**normally** [1] - 139:20
**notably** [1] - 7:2
**note** [6] - 18:5, 18:6, 18:10, 45:19, 147:23, 149:20
**notebook** [3] - 78:24, 109:20, 163:7
**notebooks** [1] - 115:11
**noted** [2] - 170:8, 171:22
**notes** [9] - 25:12, 51:16, 60:17, 60:25, 66:13, 70:1, 70:4, 118:6
**nothing** [9] - 4:8, 4:9, 11:23, 11:25, 12:6, 25:22, 85:11, 103:11, 103:14

**notice** [2] - 170:9, 170:10
**noticed** [3] - 38:9, 90:12, 92:5
**notwithstanding** [1] - 10:17
**November** [1] - 131:11
**NPR** [1] - 129:3
**number** [18] - 49:12, 58:20, 58:21, 61:11, 61:21, 62:19, 73:10, 73:11, 85:25, 102:20, 145:6, 150:25, 152:4, 152:8, 153:20, 166:5, 169:12
**numbers** [7] - 50:2, 60:3, 61:16, 61:19, 62:2, 62:3, 87:13
**NW** [1] - 2:11
**Oaks** [3] - 99:24, 126:10, 158:23
**oath** [2] - 68:6, 121:10
**OB** [3] - 45:13, 45:16, 46:13
**object** [3] - 59:7, 145:13, 171:21
**objected** [1] - 6:5
**objection** [17] - 52:13, 59:11, 63:4, 63:6, 68:16, 70:8, 73:6, 74:7, 75:19, 146:5, 166:20, 170:5, 170:7, 170:14, 170:16, 171:20, 172:7
**objections** [1] - 73:3
**objective** [3] - 10:5, 12:25, 57:19
**obligations** [2] - 11:20, 11:21
**obtained** [3] - 10:11, 97:14, 129:2
**obviously** [2] - 3:10, 42:6
**occasional** [1] - 106:20
**occasionally** [1] - 10:18
**occupation** [1] - 14:4
**occurred** [1] - 17:21
**occurring** [2] - 98:7, 98:9
**October** [1] - 134:3
**ODS** [7] - 36:16, 36:17, 37:17, 37:21, 39:6, 39:13, 40:19
**offer** [1] - 40:16
**offered** [2] - 40:8, 81:6
**offering** [2] - 5:16, 5:17
**office** [3] - 116:14, 119:14, 119:16
**Office** [1] - 36:18
**Official** [3] - 1:22, 152:21, 175:11
**official** [1] - 153:1
**officially** [1] - 93:9
**Ohio** [13] - 41:25, 114:25, 115:5, 115:20, 119:8, 122:16, 122:25, 123:16, 124:9, 157:5, 157:9, 157:13, 157:16
**old** [2] - 95:14, 144:17

**once** [8] - 4:18, 22:25, 34:23, 35:1, 40:10, 54:20, 123:11, 172:24
**one** [105] - 5:8, 5:16, 7:9, 10:12, 11:2, 20:20, 24:10, 24:13, 26:7, 27:17, 28:8, 28:12, 28:23, 29:8, 29:9, 34:3, 34:9, 35:21, 40:12, 41:12, 45:3, 45:16, 46:12, 46:13, 46:19, 47:23, 49:24, 56:25, 58:10, 58:11, 58:17, 61:13, 61:25, 64:19, 65:5, 66:9, 66:11, 67:1, 67:18, 68:25, 71:23, 86:3, 86:18, 86:19, 99:7, 100:16, 101:13, 102:8, 102:20, 103:17, 106:22, 108:21, 113:8, 113:9, 113:11, 113:22, 115:8, 120:20, 125:16, 126:25, 127:5, 127:24, 128:1, 130:16, 131:2, 131:3, 135:6, 141:18, 142:13, 143:15, 144:3, 144:10, 144:18, 144:22, 144:24, 145:4, 146:12, 147:25, 148:1, 149:5, 149:13, 153:4, 153:5, 154:12, 156:18, 157:8, 163:7, 164:3, 165:24, 168:7, 170:21, 173:8, 173:17, 173:22, 173:23, 174:11, 174:12, 174:13, 174:16
**one-day** [2] - 174:13, 174:16
**one-page** [1] - 146:12
**ones** [19] - 45:12, 58:15, 63:13, 63:21, 64:17, 66:17, 66:18, 67:6, 67:16, 78:1, 78:4, 82:9, 82:11, 82:12, 89:21, 113:15, 147:18, 149:22
**online** [3] - 19:4, 48:8, 79:1
**OnlineMedEd** [1] - 79:2
**open** [1] - 49:6
**opening** [1] - 3:13
**ophthalmologist** [1] - 29:3
**opinion** [4] - 6:25, 167:15, 167:20, 168:3
**opportunity** [7] - 70:12, 75:7, 76:2, 76:4, 76:7, 76:12, 77:13
**opposed** [4] - 17:16, 62:3, 81:15, 156:4
**opposing** [1] - 162:23
**opposite** [1] - 23:3
**option** [6] - 11:10, 16:24, 42:5, 53:22, 77:24, 84:19
**options** [2] - 63:22, 64:6
**optometrist** [4] - 29:3, 155:22, 156:5, 156:6
**oral** [3] - 36:2, 36:3, 36:5

**orally** [1] - 118:1
**orange** [3] - 23:14, 23:17, 26:2
**orangish** [1] - 24:13
**orangish-tan** [1] - 24:13
**order** [24] - 3:1, 5:3, 11:6, 26:17, 33:25, 36:8, 36:9, 40:12, 45:17, 46:4, 47:13, 63:18, 65:12, 70:23, 71:3, 72:9, 76:1, 80:6, 84:12, 84:13, 88:3, 138:13, 174:17, 174:22
**organic** [2] - 36:23, 37:1, 115:23
**organization** [1] - 99:5
**organize** [2] - 32:23, 46:8
**organizing** [1] - 35:14
**orient** [1] - 86:2
**original** [1] - 105:25
**originally** [1] - 174:12
**OSCE** [5] - 18:4, 46:7, 46:16, 46:17, 46:18
**OSCEs** [3] - 18:3, 18:14, 45:16
**Osteopathic** [1] - 12:15
**OSU** [3] - 42:5, 51:17, 97:6
**otherwise** [3] - 9:12, 25:5, 117:1
**ought** [2] - 5:10, 172:25
**outcome** [1] - 12:11
**outside** [1] - 113:20
**outstanding** [1] - 104:21
**overall** [3] - 10:25, 60:8, 78:4
**overkill** [1] - 159:6
**overlaps** [1] - 94:16
**overruled** [2] - 146:7, 170:8
**Overton** [3] - 164:14, 164:16
**own** [4] - 12:2, 26:23, 30:20, 174:6
**own..** [1] - 153:12
**owned** [1] - 153:3

**p.m** [6] - 67:25, 112:7, 121:8, 175:3
**PA** [1] - 1:9
**pace** [1] - 172:22
**paced** [1] - 79:18
**pack** [1] - 112:3
**packet** [1] - 75:17
**PAGE** [1] - 176:11
**page** [124] - 21:6, 25:15, 25:18, 26:2, 30:17, 50:2, 50:6, 50:21, 51:4, 51:13, 51:15, 60:3, 60:4, 61:21, 62:18, 69:4, 69:6, 72:19, 74:13, 80:13, 86:7, 86:9, 86:10, 86:14, 87:11, 87:12, 88:16, 88:17, 89:19, 92:3, 96:2, 97:13, 98:24, 99:14, 100:1, 100:19, 101:7, 102:24, 104:1, 104:22,

105:18, 109:6, 110:2, 110:3, 111:13, 112:16, 113:4, 113:5, 113:9, 113:16, 116:16, 116:17, 116:22, 117:12, 117:13, 117:22, 118:7, 119:11, 120:7, 120:10, 120:11, 120:13, 121:5, 121:16, 121:18, 122:6, 122:9, 122:11, 125:17, 132:7, 134:14, 136:23, 137:19, 137:22, 139:6, 140:24, 141:17, 141:21, 142:24, 143:14, 143:15, 143:21, 143:25, 146:12, 146:21, 147:2, 147:8, 148:23, 149:13, 149:17, 149:19, 149:20, 150:9, 151:17, 153:13, 153:16, 153:23, 154:23, 155:11, 156:25, 157:23, 160:7, 162:24, 163:2, 163:4, 163:5, 166:12, 166:13, 167:8, 167:17, 168:1, 168:25, 169:7, 169:11, 170:2, 170:3, 171:3, 171:12, 171:17
**paged** [1] - 155:3
**pages** [6] - 51:2, 125:18, 167:1, 167:2, 167:8, 168:24
**paid** [3] - 39:21, 39:23, 113:23
**painfully** [1] - 10:20
**paired** [1] - 148:14
**pamphlet** [1] - 118:25
**paper** [12] - 17:16, 32:24, 39:11, 64:22, 78:24, 81:20, 82:1, 82:4, 106:2, 112:8, 164:8
**papers** [6] - 5:18, 30:18, 32:16, 32:22, 141:12, 162:20
**paragraph** [42] - 20:24, 30:17, 45:20, 45:21, 65:10, 65:11, 66:21, 69:16, 71:16, 71:24, 71:25, 72:2, 72:4, 80:12, 86:21, 88:21, 89:11, 89:20, 90:10, 92:4, 93:1, 94:7, 94:15, 94:18, 96:3, 96:7, 96:15, 137:23, 138:24, 139:6, 160:8, 160:10, 161:14, 161:18, 161:20, 161:21, 168:1, 168:7, 168:16, 168:19, 168:20
**paragraphs** [6] - 19:5, 30:19, 46:16, 58:9, 137:15, 144:23
**pardon** [1] - 21:23
**parents** [3] - 26:23, 91:8, 144:17
**part** [22] - 3:23, 7:2, 36:5, 44:3, 46:14, 46:15, 51:14, 77:2, 89:2, 114:19, 117:8,

119:10, 119:11, 147:8, 148:10, 152:9, 157:12, 158:19, 163:16, 172:10
**partial** [1] - 34:8
**participated** [6] - 6:5, 10:19, 110:5, 113:19, 113:23, 114:20
**participating** [1] - 108:6
**particular** [3] - 24:4, 44:6, 98:7
**particularly** [3] - 14:23, 26:15, 66:10
**parts** [9] - 41:11, 42:10, 103:5, 104:3, 115:1, 135:6, 172:4, 172:15, 172:16
**partway** [1] - 37:7
**pass** [12] - 42:22, 42:23, 43:1, 43:7, 44:2, 45:17, 57:7, 66:12, 67:2, 76:8, 76:19, 84:14
**passage** [59] - 61:10, 61:15, 61:19, 61:23, 62:6, 63:17, 65:5, 65:6, 69:8, 69:9, 69:11, 69:19, 69:24, 70:1, 72:8, 72:14, 72:15, 72:19, 72:20, 139:15, 142:15, 142:17, 142:25, 143:6, 143:12, 143:16, 143:19, 143:20, 143:22, 144:4, 144:9, 144:12, 144:14, 144:19, 144:21, 145:2, 145:5, 145:11, 146:11, 146:12, 146:16, 148:12, 148:15, 150:23, 150:24, 152:4, 152:7, 154:10, 160:21, 160:22, 162:2, 162:4, 163:10, 163:15, 163:16, 163:17
**passage-based** [1] - 154:10
**passages** [15] - 41:16, 64:12, 72:1, 136:5, 139:1, 139:19, 142:6, 143:12, 146:18, 146:22, 147:9, 152:5, 154:3, 154:6, 154:7
**passed** [7] - 5:24, 43:14, 44:1, 45:12, 47:6, 75:13, 76:9
**passionate** [1] - 16:5
**pasted** [1] - 152:7
**Pathoma** [2] - 78:8, 79:2
**patient** [5] - 45:18, 45:19, 46:20, 118:11, 119:1
**patients** [4] - 3:22, 18:3, 47:13, 47:15
**pause** [1] - 55:11
**paying** [3] - 31:9, 99:3, 158:17
**PDFs** [1] - 18:21
**pediatrics** [4] - 16:4, 16:6, 16:11, 44:15

**peds** [1] - 45:13
**peers** [4] - 3:21, 9:23, 34:16, 89:7
**pen** [2] - 22:18, 24:22
**penalty** [7] - 64:13, 138:16, 138:19, 140:10, 141:11, 141:14, 141:16
**pencils** [3] - 22:12, 22:18, 48:25
**PENNSYLVANIA** [1] - 1:1
**pens** [1] - 22:12
**people** [9] - 9:22, 12:8, 12:19, 21:4, 34:22, 53:11, 114:10, 139:14, 160:3
**per** [3] - 65:19, 111:1, 113:25
**perceive** [1] - 156:9
**percent** [20] - 77:21, 78:4, 78:5, 78:6, 126:18, 131:25, 132:2, 132:3, 134:11, 138:15, 160:15, 161:5, 161:8, 161:23, 161:25, 162:21, 163:9, 167:15, 167:22, 168:14
**percentile** [37] - 10:24, 11:1, 126:12, 126:15, 126:17, 127:1, 127:3, 127:8, 127:11, 129:3, 129:6, 129:16, 130:17, 130:24, 131:1, 131:16, 131:17, 131:21, 131:24, 132:3, 133:6, 133:8, 133:14, 133:20, 134:6, 134:9, 134:20, 134:23, 134:24, 135:5, 135:12, 135:16, 135:18, 135:19, 138:6, 138:8, 143:10
**perception** [3] - 29:7, 156:8, 156:9
**perfect** [1] - 68:12
**performance** [11] - 12:24, 86:24, 129:14, 130:18, 131:2, 134:6, 136:23, 137:3, 137:9, 137:11, 137:12
**performed** [3] - 10:21, 113:10, 137:6
**perhaps** [2] - 125:9, 127:24
**period** [4] - 105:21, 105:23, 122:20, 126:19
**PERKINS** [1] - 2:9
**permanent** [1] - 22:19
**permission** [1] - 61:4
**person** [9] - 5:23, 6:20, 7:3, 7:4, 7:6, 7:22, 24:18, 54:6, 54:25
**personal** [14] - 50:7, 50:8, 50:10, 50:18, 57:22, 86:3, 86:8, 86:16, 91:22, 95:22, 95:24, 99:4, 139:4, 159:4
**phenomenal** [1] - 46:20
**Philadelphia** [1] - 1:9
**phonics** [2] - 99:19, 100:4

**photo** [5] - 71:10, 71:12, 71:17, 71:22, 72:3
**photograph** [3] - 148:25, 149:3, 149:4
**physical** [18] - 23:6, 23:11, 23:12, 41:14, 45:20, 46:2, 51:13, 70:22, 100:8, 100:9, 117:1, 135:5, 135:16, 136:2, 150:3, 150:4, 151:21, 154:3
**physician** [3] - 10:9, 116:9, 120:25
**Physics** [1] - 107:25
**pick** [3] - 67:9, 83:7, 114:7
**picked** [1] - 14:25
**pictures** [7] - 21:3, 25:13, 29:7, 29:11, 65:8, 78:9, 78:22
**piece** [2] - 25:23
**pieces** [1] - 54:20
**pink** [2] - 24:15, 24:20
**pitcher** [1] - 68:9
**place** [3] - 100:22, 105:25, 118:13
**Placement** [1] - 107:20
**places** [2] - 41:23, 118:20
**Plaintiff** [3] - 1:3, 1:18, 2:7
**plaintiff** [3] - 3:17, 12:16, 13:14
**plaintiff's** [1] - 12:24
**plaintiffs** [1] - 174:21
**plan** [1] - 30:11
**PLAN** [7] - 130:2, 131:9, 131:15, 131:21, 131:22, 132:17, 132:19
**plaque** [2] - 109:16, 109:17
**play** [2] - 35:1, 108:19
**played** [1] - 109:1
**playing** [1] - 110:24
**pleadings** [1] - 3:12
**plug** [1] - 62:4
**plus** [2] - 100:4, 106:20
**pluses** [1] - 106:21
**point** [30] - 4:9, 10:12, 62:18, 75:5, 81:1, 95:20, 97:4, 101:4, 106:25, 111:3, 114:18, 114:23, 116:9, 117:25, 118:13, 121:1, 121:2, 122:22, 125:3, 127:14, 128:2, 136:21, 138:21, 152:3, 153:4, 154:17, 159:13, 166:23, 169:25, 174:11
**pointed** [2] - 47:4, 72:1
**pointers** [1] - 45:7
**points** [5] - 6:16, 38:10, 138:23, 149:17, 169:15
**policy** [5] - 42:20, 55:2, 55:3, 73:25
**pool** [2] - 112:4, 114:10
**pops** [1] - 67:11

**population** [5] - 9:23, 9:25, 11:2, 12:9, 12:19
**portion** [3] - 18:5, 18:10, 77:10
**possible** [6] - 63:15, 63:20, 79:19, 118:11, 138:1, 159:25
**possibly** [3] - 150:13, 161:1, 162:3
**post** [2] - 157:3, 164:25
**post-secondary** [1] - 157:3
**post-thrombotic** [1] - 164:25
**postthrombotic** [1] - 56:17
**potentially** [1] - 173:6
**practice** [23] - 4:13, 79:8, 79:9, 83:14, 97:18, 111:25, 112:4, 112:5, 112:7, 130:6, 139:22, 140:23, 145:22, 145:25, 147:17, 147:20, 148:5, 148:8, 148:10, 153:6, 153:11
**practiced** [1] - 148:8
**pre** [1] - 112:9
**pre-lab** [1] - 112:9
**precipice** [1] - 4:12
**precluded** [3] - 21:19, 21:22, 21:24
**predominantly** [2] - 119:19, 119:20
**preference** [2] - 13:7, 52:18
**PRELIMINARY** [1] - 1:5
**preliminary** [6] - 9:5, 9:8, 9:10, 11:6, 13:2, 137:18
**prep** [7] - 63:8, 64:9, 139:16, 139:17, 140:20, 159:17, 160:3
**preparation** [2] - 44:3, 79:24
**prepare** [3] - 78:7, 166:17, 166:18
**prepared** [5] - 1:24, 44:4, 48:14, 111:17, 167:10
**preparing** [3] - 127:21, 140:16, 140:19
**prescribed** [1] - 118:12
**present** [3] - 113:12, 116:22, 117:9
**pretty** [21] - 19:2, 19:5, 21:4, 22:13, 23:4, 24:24, 26:8, 29:23, 34:22, 35:16, 35:23, 38:7, 44:5, 45:4, 45:5, 61:22, 62:5, 63:14, 70:25, 81:8, 151:23
**prevails** [1] - 9:12
**prevention** [1] - 19:24
**previously** [3] - 68:7, 121:11, 157:3
**primarily** [2] - 12:21, 144:23
**primary** [7] - 10:9, 38:2, 40:22, 51:13, 116:9, 120:25, 157:24
**principal** [1] - 34:7

**printed** [1] - 48:8
**priority** [1] - 39:12
**private** [3] - 88:2, 133:23, 165:14
**privilege** [5] - 166:20, 170:5, 170:14, 171:21, 172:7
**problem** [4] - 26:14, 29:12, 118:1, 174:5
**problems** [19] - 32:1, 89:14, 89:16, 89:23, 90:1, 90:4, 90:7, 91:11, 91:18, 97:22, 112:9, 112:12, 115:22, 117:17, 146:25, 147:7, 156:2, 156:3, 174:23
**proceed** [6] - 3:5, 13:5, 13:25, 68:2, 121:9, 121:13
**proceedings** [1] - 175:8
**Proceedings** [2] - 1:24, 175:3
**process** [15] - 4:20, 5:4, 6:5, 6:8, 17:8, 17:10, 20:19, 21:1, 23:16, 32:20, 37:9, 52:21, 78:21, 79:4, 151:8
**procrastinates** [1] - 118:1
**procrastinating** [1] - 90:7
**proctor** [2] - 83:4, 83:8
**produced** [1] - 100:7
**product** [5] - 166:21, 170:6, 170:15, 171:21, 172:8
**professional** [4] - 11:24, 155:17, 167:20, 168:3
**professionals** [2] - 6:25, 12:3
**professor** [2] - 36:4, 36:23
**profile** [1] - 136:24
**program** [16] - 14:25, 33:3, 33:4, 33:10, 33:15, 33:25, 34:14, 75:2, 75:3, 94:24, 95:1, 95:6, 95:8, 103:10, 103:19, 159:17
**programs** [4] - 43:18, 76:15, 101:22, 105:16
**progress** [5] - 90:25, 98:19, 99:6, 99:21, 99:22
**prohibits** [1] - 11:25
**prompt** [4] - 18:7, 18:12, 65:20, 138:2
**prompts** [1] - 41:16
**promulgated** [1] - 6:11
**proofread** [2] - 30:20, 31:24
**proper** [1] - 97:19
**prophylaxis** [1] - 19:25
**propose** [2] - 59:8, 173:7
**prose** [2] - 142:6, 143:15
**protozoa** [1] - 24:9
**prove** [1] - 52:16
**provide** [17] - 4:7, 4:9, 7:21, 48:16, 52:9, 55:17, 57:21, 70:7, 81:1, 81:20, 119:14, 121:21, 121:25, 158:2,

158:14, 158:19, 168:10
**provided** [37] - 4:11, 18:23, 51:21, 54:14, 57:25, 58:4, 70:19, 82:2, 86:4, 88:6, 88:7, 90:13, 90:22, 91:1, 91:23, 92:8, 93:11, 93:17, 97:2, 97:24, 98:2, 99:12, 104:24, 112:18, 112:25, 117:19, 118:3, 118:5, 122:19, 128:12, 128:14, 129:23, 139:17, 142:25, 151:2, 158:10, 158:16
**provider** [2] - 38:2, 51:14
**providing** [4] - 18:20, 54:15, 90:18, 169:16
**provisional** [1] - 156:11
**PSAT** [3] - 130:13, 130:15, 130:18
**PSAT/NMSQT** [1] - 130:12
**psych** [2] - 44:15, 45:13
**psychiatrist** [1] - 165:19
**public** [4] - 8:12, 8:23, 88:25, 105:13
**Public** [2] - 88:23, 104:16
**publicly** [1] - 145:20
**publish** [1] - 48:9
**published** [2] - 50:15, 169:22
**pull** [1] - 32:15
**punctuation** [1] - 31:24
**purple** [3] - 23:18, 23:22
**purpose** [5] - 5:25, 55:20, 71:24, 71:25, 72:5
**purposes** [1] - 70:11
**put** [20] - 10:10, 20:25, 25:8, 27:16, 28:12, 32:23, 45:24, 45:25, 46:1, 46:3, 46:8, 46:13, 46:14, 49:2, 50:13, 67:13, 73:19, 85:23, 88:8, 92:14
**putting** [4] - 28:24, 36:8, 37:3, 72:15
**qualified** [2] - 6:25, 155:17
**quantifiable** [1] - 86:23
**quarter** [11] - 123:15, 123:16, 123:18, 123:21, 123:23, 124:17, 125:3, 125:5, 125:6, 125:8, 169:2
**questionnaire** [1] - 148:22
**questions** [114] - 33:19, 34:2, 37:8, 38:11, 46:21, 55:23, 58:9, 60:20, 61:12, 63:18, 63:23, 64:3, 65:6, 65:8, 66:12, 66:16, 67:4, 67:5, 68:20, 69:11, 69:12, 69:20, 70:4, 70:10, 72:9, 76:2, 76:3, 76:4, 76:11, 77:2, 77:4, 77:5, 77:10, 77:17, 78:17, 79:7, 79:8, 79:14, 80:4, 80:5, 80:8, 83:17, 83:18, 83:20, 84:6, 112:10, 117:3, 117:8, 136:4,

138:1, 138:3, 138:10, 138:11, 138:12, 138:14, 138:16, 138:17, 138:25, 139:11, 139:14, 139:18, 139:25, 140:3, 140:10, 141:6, 142:3, 143:13, 143:22, 144:11, 145:12, 145:21, 146:1, 146:15, 146:25, 147:3, 147:10, 147:13, 147:15, 147:17, 147:21, 148:6, 148:9, 148:13, 148:14, 148:16, 149:4, 149:6, 149:7, 149:10, 149:18, 149:21, 151:10, 153:6, 153:11, 154:4, 154:7, 154:8, 154:10, 159:21, 159:23, 160:15, 160:16, 161:1, 161:3, 161:6, 161:21, 161:24, 162:1, 162:10, 162:14, 162:21, 163:9, 172:17
**quickly** [3] - 6:16, 17:25, 52:14
**quite** [1] - 112:13
**quizzes** [1] - 27:19
**raise** [1] - 28:20
**raised** [1] - 166:23
**RAMSAY** [3] - 1:3, 13:20, 176:5
**Ramsay** [28] - 3:5, 3:17, 3:19, 3:23, 4:1, 4:22, 5:8, 5:18, 5:19, 7:13, 8:1, 9:7, 9:16, 10:5, 11:4, 13:14, 13:15, 13:24, 14:3, 14:15, 87:15, 87:23, 146:11, 160:14, 166:5, 172:4, 173:1, 173:4
**Ramsay's** [1] - 6:9
**ran** [2] - 34:1, 34:4
**random** [1] - 77:5
**range** [1] - 43:16
**ranges** [1] - 113:11
**rank** [7] - 107:3, 126:12, 129:3, 129:6, 130:24, 133:20, 134:23
**ranks** [2] - 134:24, 135:12
**rarely** [1] - 94:19
**rash** [2] - 23:13
**rather** [4] - 59:6, 81:21, 93:15, 142:18
**ray** [1] - 26:5
**rays** [1] - 23:9
**rburgoyne@perkinscoie. com** [1] - 2:13
**RDR** [2] - 1:22, 175:11
**RDX** [1] - 85:25
**re** [2] - 75:6
**re-accept** [1] - 75:6
**reaction** [6] - 62:12, 62:13, 62:17, 62:20, 62:21

**reactions** [1] - 62:14
**read** [142] - 5:3, 7:2, 7:12, 17:18, 18:7, 18:11, 19:2, 19:17, 19:18, 20:10, 20:16, 21:12, 22:14, 24:25, 26:17, 27:8, 28:10, 28:11, 28:13, 30:23, 32:3, 32:19, 38:20, 47:5, 47:19, 47:22, 55:21, 55:22, 55:24, 56:3, 58:8, 58:11, 61:12, 61:13, 62:5, 62:8, 62:20, 62:23, 63:1, 63:15, 63:16, 64:11, 64:12, 64:19, 64:21, 65:20, 65:23, 65:25, 66:18, 66:19, 66:20, 66:22, 67:7, 67:14, 67:17, 69:14, 69:19, 69:25, 70:2, 71:8, 71:10, 71:19, 72:2, 72:9, 72:10, 72:19, 76:1, 76:4, 76:11, 77:2, 77:10, 77:18, 78:21, 79:4, 79:5, 79:9, 79:12, 79:14, 79:16, 79:17, 79:22, 81:15, 81:16, 83:17, 83:19, 91:16, 91:17, 91:18, 109:8, 117:24, 121:2, 136:13, 136:14, 138:9, 138:15, 140:10, 141:3, 142:12, 142:15, 142:17, 142:18, 142:25, 143:1, 143:5, 143:19, 143:25, 144:1, 144:7, 144:20, 144:24, 145:4, 145:9, 147:3, 147:6, 147:9, 148:17, 150:10, 150:17, 150:25, 151:10, 152:5, 152:9, 159:21, 159:25, 160:15, 160:25, 161:6, 161:7, 161:10, 161:11, 161:21, 162:3, 162:5, 162:9, 162:11, 162:13, 162:21, 168:20
**reader** [3] - 29:1, 91:17, 117:24
**readiness** [2] - 132:7, 132:8
**reading** [138] - 3:24, 4:25, 5:1, 5:13, 7:10, 8:4, 11:3, 18:19, 18:20, 18:23, 18:25, 19:1, 19:3, 20:11, 20:13, 25:6, 26:14, 27:20, 28:21, 32:16, 32:18, 32:21, 35:12, 35:14, 37:3, 38:7, 38:19, 45:10, 46:18, 47:2, 47:4, 47:7, 47:9, 47:11, 47:15, 47:17, 47:23, 57:20, 58:7, 61:15, 63:15, 63:17, 63:19, 63:21, 64:12, 65:4, 65:13, 69:21, 71:1, 72:4, 72:11, 72:12, 72:16, 81:2, 88:4, 88:5, 89:6, 90:13, 90:17, 90:18, 91:5, 99:20, 100:4, 100:20, 101:13, 102:3, 103:4, 103:7, 103:12, 104:6,

104:10, 105:8, 106:4, 118:2, 123:3, 123:7, 123:8, 123:9, 126:12, 126:15, 126:25, 127:8, 127:11, 128:23, 128:24, 129:9, 129:11, 130:16, 130:18, 130:22, 130:23, 132:2, 132:9, 133:19, 133:20, 134:9, 136:11, 138:2, 138:13, 138:25, 139:9, 139:12, 139:15, 139:19, 141:18, 141:23, 141:24, 142:11, 143:8, 144:8, 144:13, 145:4, 145:11, 146:16, 146:18, 149:15, 150:21, 154:25, 155:2, 155:19, 156:2, 158:10, 159:24, 160:17, 160:21, 161:12, 161:13, 162:1, 162:11, 163:10, 163:15, 168:4

**readmission** [1] - 84:21
**reads** [5] - 18:21, 18:22, 86:22, 87:23, 168:2
**ready** [3] - 3:4, 68:2, 112:4
**real** [6] - 8:5, 10:1, 10:4, 12:24, 71:22
**realize** [2] - 19:15, 68:21
**realized** [3] - 29:19, 81:10, 169:22
**really** [50] - 5:10, 5:16, 14:17, 15:2, 16:4, 16:5, 18:17, 18:18, 18:19, 24:5, 25:6, 26:13, 26:23, 27:16, 27:24, 29:18, 29:19, 30:1, 30:15, 30:25, 31:4, 34:2, 34:4, 34:18, 34:21, 35:12, 35:18, 35:22, 36:1, 36:5, 36:24, 37:1, 37:5, 37:18, 38:15, 40:16, 45:9, 45:13, 47:21, 55:2, 65:2, 71:2, 71:12, 79:18, 110:17, 113:15, 121:2, 123:7, 149:8
**reapplied** [1] - 39:24
**reapply** [6] - 11:12, 41:20, 53:9, 75:4, 75:7, 75:8
**reason** [5] - 6:4, 38:8, 69:20, 72:7, 162:19
**reasonable** [1] - 32:17
**reasonably** [1] - 145:1
**Reasoning** [1] - 69:3
**reasoning** [8] - 41:14, 70:25, 73:2, 135:18, 136:3, 138:5, 151:15, 154:6
**reasons** [5] - 3:10, 13:1, 117:10, 154:12, 158:21
**rebuttal** [1] - 173:2
**receipt** [1] - 52:6
**receive** [15] - 16:23, 17:7, 17:11, 17:13, 29:22, 93:23, 94:1, 94:4, 94:5, 94:9,

124:21, 126:21, 129:20, 136:9, 158:12
**received** [24] - 4:2, 10:14, 41:2, 41:3, 48:11, 49:25, 50:1, 58:5, 76:21, 83:1, 85:11, 93:3, 94:8, 98:11, 99:16, 101:15, 107:15, 157:3, 157:5, 157:8, 157:24, 158:3, 158:22
**receives** [1] - 81:23
**receiving** [7] - 10:18, 18:9, 82:19, 83:2, 101:19, 102:9, 102:11, 104:10, 105:10, 106:12, 124:3, 124:18, 125:15, 127:14, 142:21, 142:23, 157:15
**Recess** [1] - 121:8
**recess** [6] - 28:16, 28:18, 67:24, 67:25, 121:6
**recognize** [9] - 25:15, 51:4, 58:13, 60:1, 72:3, 73:24, 74:15, 87:5, 97:14
**recognized** [4] - 4:25, 5:21, 27:7, 71:18
**recollection** [2] - 119:3, 141:15
**recommend** [6] - 29:17, 36:11, 53:3, 96:10, 118:12, 160:3
**recommendation** [1] - 115:4
**recommended** [9] - 23:5, 29:1, 29:14, 40:24, 63:17, 116:7, 159:17, 167:22, 168:13
**reconsideration** [3] - 59:2, 87:8, 127:24
**reconvene** [1] - 174:8
**record** [7] - 10:2, 13:23, 17:21, 93:16, 115:15, 147:23, 175:8
**records** [4] - 51:16, 97:11, 97:14, 158:11
**recross** [1] - 173:6
**Recross** [1] - 176:4
**red** [3] - 22:22, 43:17, 72:22
**redacted** [4] - 170:4, 171:3, 171:13, 171:18
**redactions** [1] - 171:15
**redirect** [1] - 173:5
**Redirect** [1] - 176:4
**reduce** [1] - 52:21
**reduced** [1] - 158:9
**refer** [4] - 39:4, 40:23, 156:11, 158:12
**reference** [14] - 3:11, 11:16, 29:8, 57:3, 62:18, 101:22, 103:18, 120:14, 130:2, 130:12, 156:10, 156:14, 157:2, 158:25
**referenced** [3] - 90:19,

156:21, 164:10
**references** [1] - 154:20
**referencing** [1] - 62:17
**referred** [7] - 10:4, 29:2, 69:15, 92:14, 97:1, 148:2, 158:7
**referring** [6] - 33:3, 93:18, 94:3, 96:22, 140:12, 163:17
**reflect** [3] - 76:8, 138:4, 172:5
**reflected** [3] - 94:20, 99:20, 146:12
**reflecting** [5] - 106:15, 129:14, 129:24, 131:11, 134:23
**reflects** [3] - 97:5, 116:14, 130:15
**refused** [1] - 4:6
**regard** [1] - 6:21
**regarding** [2] - 85:12, 85:15
**regardless** [1] - 41:4
**registered** [5] - 84:25, 85:2, 85:4, 85:6, 85:9
**registering** [1] - 154:17
**regrettably** [1] - 10:20
**regular** [1] - 33:12
**regulations** [5] - 6:6, 6:11, 7:21, 8:6, 11:19
**regulatory** [1] - 11:22
**rehabilitate** [1] - 173:5
**REISMAN** [1] - 1:15
**rejected** [1] - 42:4
**relate** [1] - 78:10
**related** [4] - 66:1, 118:17, 121:22, 156:4
**relates** [1] - 85:12
**relating** [2] - 84:8, 152:19
**relevance** [1] - 145:14
**relevant** [5] - 9:22, 78:23, 88:9, 128:4, 128:10
**reliance** [2] - 7:15, 7:17
**relied** [1] - 163:25
**relief** [2] - 9:9, 9:11
**remainder** [1] - 174:9
**remaining** [2] - 64:18, 160:16
**remedial** [1] - 90:14
**remedy** [1] - 9:6
**remember** [27] - 20:25, 25:12, 26:9, 27:15, 30:9, 33:6, 35:21, 57:22, 60:19, 70:3, 85:10, 88:15, 94:13, 110:17, 111:7, 117:7, 117:21, 126:23, 129:22, 130:14, 136:8, 141:15, 150:13, 154:22, 158:14, 168:9
**remembered** [2] - 31:7, 92:25
**remind** [5] - 31:16, 31:17,

68:6, 121:10
**repeat** [3] - 27:3, 48:3, 79:7
**repeated** [1] - 4:6
**rephrase** [1] - 166:23
**report** [27] - 41:1, 41:2, 52:7, 54:10, 87:6, 87:11, 88:9, 90:24, 93:25, 97:25, 98:13, 99:12, 99:23, 100:7, 100:8, 100:16, 101:18, 102:15, 103:23, 104:15, 106:6, 106:15, 131:9, 134:2, 134:17, 136:19, 159:15
**reported** [2] - 89:12, 159:1
**REPORTER** [2] - 13:22, 15:7
**reporter** [1] - 13:8
**Reporter** [2] - 1:22, 175:11
**reports** [1] - 90:25
**represent** [2] - 3:17, 109:17
**representation** [1] - 76:5
**representative** [4] - 76:22, 142:7, 149:6, 149:9
**represented** [1] - 149:18
**Representing** [3] - 1:18, 2:7, 2:14
**request** [32] - 9:9, 13:2, 40:12, 49:22, 49:23, 50:25, 56:7, 56:21, 57:13, 57:24, 74:19, 74:21, 81:1, 81:20, 82:5, 87:8, 91:23, 95:25, 119:8, 154:13, 155:5, 155:8, 156:23, 163:21, 163:25, 164:2, 164:4, 164:9, 164:23, 166:1, 166:8, 167:6
**requested** [8] - 8:8, 18:8, 51:16, 51:22, 53:24, 54:3, 75:25, 81:25
**requesting** [1] - 156:19
**requests** [4] - 4:6, 86:4, 127:25, 128:16
**require** [3] - 6:18, 8:17, 63:18
**required** [6] - 4:1, 63:21, 84:10, 84:12, 87:25, 138:12
**requirements** [2] - 40:11, 51:15
**requires** [3] - 7:7, 11:23, 55:11
**reread** [3] - 28:10, 28:13, 117:25
**research** [4] - 19:3, 39:20, 112:8
**residency** [4] - 42:12, 43:9, 43:12, 76:14
**respect** [1] - 6:24
**respects** [1] - 12:13
**responded** [2] - 40:15, 82:2
**RESPONSE** [1] - 3:3
**response** [3] - 74:19, 74:21, 121:25
**responses** [1] - 112:24

responsible [1] - 114:9
rest [5] - 23:1, 32:19, 43:21, 76:16, 102:21
rests [1] - 4:13
result [1] - 165:4
results [1] - 129:24
resume [2] - 39:19, 68:4
retaken [1] - 55:4
return [1] - 84:12
reversals [2] - 27:25, 92:6
reversing [1] - 28:25
review [4] - 78:12, 78:15, 79:5, 112:10
reviewed [2] - 5:18, 173:20
reviewers [1] - 173:20
reviewing [1] - 127:20
revised [1] - 169:8
ride [1] - 112:5
right-hand [3] - 109:7, 128:20, 141:2
risk [2] - 24:3, 56:2
Ritalin [6] - 10:10, 38:21, 118:12, 118:13, 118:16, 118:19
RMR [2] - 1:22, 175:11
Robert [1] - 9:1
ROBERT [1] - 2:10
role [1] - 153:16
room [19] - 8:2, 17:14, 17:23, 18:12, 39:10, 44:21, 55:18, 56:9, 57:15, 78:23, 80:24, 82:15, 82:17, 133:23, 133:25, 136:16, 164:24, 165:14
rotation [6] - 16:11, 17:4, 17:6, 44:13, 45:6
rotations [2] - 16:8, 44:7
roughly [1] - 78:4
round [1] - 136:18
Ruekberg [14] - 54:18, 164:17, 165:18, 166:7, 166:17, 167:5, 167:10, 169:13, 169:17, 170:13, 171:2, 171:8, 171:19, 172:16
Ruekberg's [3] - 165:24, 172:5, 172:6
rule [3] - 71:11, 146:3, 146:6
ruled [1] - 72:5
ruling [1] - 151:8
run [1] - 46:12
sad [1] - 36:21
safety [1] - 114:9
sample [9] - 68:20, 83:17, 145:15, 147:13, 147:17, 147:21, 148:22, 152:18, 154:11
saw [9] - 3:11, 30:3, 38:10, 62:14, 62:20, 71:15, 71:17, 149:7, 155:4
scenario [1] - 152:2

scheduled [3] - 40:7, 54:5
scheduling [1] - 39:13
schemes [1] - 88:1
Schoal [1] - 89:12
school [137] - 3:20, 4:15, 4:16, 4:17, 4:18, 4:21, 4:23, 9:18, 9:23, 9:24, 10:14, 11:10, 11:12, 14:15, 15:19, 16:20, 16:24, 17:6, 17:8, 17:11, 17:15, 18:8, 18:9, 18:16, 18:20, 20:4, 20:10, 26:7, 26:9, 26:11, 26:22, 26:25, 27:5, 28:20, 29:22, 30:8, 30:13, 32:14, 34:16, 34:21, 35:23, 36:1, 39:17, 39:25, 41:18, 41:25, 42:1, 42:13, 42:15, 42:16, 43:6, 43:7, 44:2, 44:4, 44:5, 48:10, 49:24, 49:25, 51:14, 53:8, 54:13, 54:16, 54:22, 55:13, 74:3, 74:18, 75:6, 75:8, 75:12, 81:10, 81:23, 81:25, 82:21, 84:8, 84:9, 84:18, 85:12, 86:25, 87:17, 87:24, 88:14, 88:15, 89:13, 89:24, 90:2, 90:4, 90:5, 91:4, 93:9, 93:16, 94:25, 95:7, 95:9, 100:12, 103:23, 105:11, 105:13, 106:1, 106:4, 106:13, 106:16, 107:6, 108:20, 110:5, 111:14, 112:1, 112:3, 112:14, 113:6, 113:10, 113:19, 113:20, 113:21, 114:4, 114:21, 117:16, 118:19, 118:20, 123:5, 129:25, 133:4, 139:17, 157:24, 158:2, 158:6, 158:7, 158:11, 159:1, 164:12, 166:13, 171:14
School [11] - 87:19, 88:23, 100:11, 104:16, 106:7, 106:17, 108:11, 108:17, 126:4, 129:24
school's [3] - 42:20, 50:25, 74:21
schools [7] - 14:25, 41:1, 42:8, 44:17, 54:15, 75:9, 88:25
science [6] - 81:25, 111:9, 142:24, 147:8, 154:3, 154:7
sciences [15] - 41:14, 41:15, 44:6, 44:7, 44:8, 70:22, 135:5, 135:16, 135:19, 136:3, 150:3, 150:4, 151:21, 152:18
score [38] - 10:25, 41:1, 41:2, 41:9, 41:10, 41:12, 43:10, 43:14, 43:15, 45:11, 52:7, 76:4, 76:7, 76:13, 76:18, 76:19, 77:1, 77:7, 114:24,

126:13, 126:25, 129:13, 129:16, 131:9, 131:15, 133:6, 133:19, 134:2, 134:5, 134:17, 134:20, 136:19, 138:3, 138:4, 138:15, 138:23
scored [2] - 10:24, 143:9
scores [6] - 41:11, 43:9, 129:2, 130:9, 135:4
scoring [1] - 138:17
scrap [1] - 64:22
screamed [1] - 16:16
screen [4] - 67:10, 80:11, 136:11, 150:12
season [1] - 108:7
seated [2] - 3:2, 68:1
Second [1] - 152:21
second [53] - 10:24, 20:4, 36:22, 37:14, 37:19, 41:22, 51:9, 54:21, 55:14, 56:7, 56:14, 56:15, 57:13, 66:4, 66:25, 67:2, 86:18, 86:19, 86:21, 89:20, 90:11, 92:4, 92:18, 92:24, 92:25, 93:5, 95:25, 96:2, 99:14, 99:23, 102:24, 104:1, 104:17, 104:24, 105:21, 105:25, 127:4, 127:9, 127:23, 130:20, 131:3, 136:23, 139:6, 142:12, 142:13, 148:18, 148:20, 158:23, 163:21, 164:3, 164:4, 166:1, 169:9
secondary [2] - 157:3, 157:24
section [16] - 41:8, 41:13, 41:15, 73:2, 78:3, 78:23, 83:9, 109:11, 110:5, 146:18, 150:3, 150:4, 151:20, 154:25, 155:12, 155:15
Section [1] - 69:3
sections [5] - 78:6, 136:2, 154:9, 161:4, 171:23
see [91] - 10:9, 15:11, 16:25, 22:9, 22:17, 23:1, 25:15, 25:21, 26:2, 26:4, 34:7, 34:9, 38:2, 40:16, 40:19, 40:21, 45:19, 61:24, 62:15, 62:16, 67:7, 71:11, 71:13, 76:17, 77:4, 77:10, 81:9, 87:7, 87:21, 96:7, 96:9, 98:16, 104:24, 105:1, 106:21, 106:22, 108:10, 109:10, 110:5, 113:6, 115:18, 116:8, 116:20, 117:9, 117:10, 117:14, 117:19, 118:10, 120:15, 121:18, 122:8, 126:4, 128:20, 128:22, 128:24, 129:2, 129:3, 130:2, 131:13, 134:22, 134:24, 136:25, 137:23, 139:6,

139:7, 141:2, 142:25, 143:2, 148:18, 148:19, 148:21, 148:23, 149:20, 151:4, 153:13, 154:1, 154:20, 155:12, 157:2, 157:6, 157:25, 158:4, 160:8, 160:12, 162:16, 169:5, 169:11, 170:2, 170:3, 175:1
seeing [5] - 82:23, 128:6, 140:18, 154:22, 168:7
seeking [1] - 9:10
seem [2] - 15:7, 70:20
select [4] - 64:15, 67:10, 79:10, 161:23
selected [3] - 145:15, 145:22, 145:24
self [3] - 6:21, 64:8, 99:9
self-confidence [1] - 99:9
self-mitigation [2] - 6:21, 64:8
semester [2] - 104:25, 105:24
semesters [4] - 103:5, 104:2, 106:9, 107:15
senior [3] - 108:24, 109:4, 109:16
sense [6] - 25:6, 32:24, 50:17, 81:19, 83:16, 111:15
sent [13] - 40:9, 49:9, 49:24, 51:17, 95:24, 111:17, 128:9, 166:19, 169:8, 169:10, 171:1, 171:7
sentence [14] - 20:22, 20:23, 90:10, 93:13, 96:14, 96:15, 134:24, 139:8, 142:6, 142:18, 143:19, 148:25, 160:10
sentences [2] - 93:1, 143:5
separate [13] - 8:2, 17:14, 27:18, 39:10, 44:21, 55:18, 56:9, 80:24, 82:15, 92:24, 114:14, 136:16, 164:24
separately [1] - 79:10
September [5] - 5:7, 44:2, 134:25
series [6] - 147:9, 148:13, 149:4, 164:4, 166:10, 169:6
serve [1] - 144:23
services [3] - 49:10, 119:17, 121:22
Services [1] - 36:18
set [4] - 31:16, 37:20, 65:5, 85:18
sets [1] - 151:17
seven [5] - 65:6, 121:1, 154:3, 154:6, 154:7
several [8] - 54:7, 54:9, 106:21, 114:2, 116:10, 125:22, 143:13, 166:17
severe [6] - 89:14, 89:16,

89:23, 90:1, 90:4, 90:7
**severity** [3] - 120:8, 120:14, 120:17
**shall** [1] - 48:16
**shapes** [1] - 29:13
**sheet** [1] - 44:23
**shelf** [7] - 44:11, 44:12, 44:18, 45:1, 45:17, 81:23, 82:13
**shift** [3] - 114:8, 114:16, 160:5
**shin** [1] - 112:6
**shorthand** [1] - 154:2
**shortly** [3] - 85:5, 85:6, 154:16
**shortness** [1] - 23:12
**shout** [1] - 14:10
**shove** [1] - 78:24
**show** [19] - 5:13, 8:3, 11:7, 39:9, 45:15, 53:24, 54:1, 60:22, 61:20, 67:19, 70:2, 71:2, 72:10, 76:7, 77:13, 78:9, 138:10, 150:17, 150:21
**showed** [6] - 58:20, 58:21, 70:4, 70:23, 111:22, 152:1
**showers** [1] - 112:1
**showing** [7] - 5:15, 7:25, 21:13, 54:4, 99:4, 150:16
**shown** [2] - 10:5, 103:4
**shows** [5] - 58:18, 106:19, 123:23, 134:19, 145:8
**siblings** [2] - 14:21
**side** [12] - 24:17, 98:16, 101:10, 104:9, 104:19, 107:1, 126:7, 128:25, 130:2, 137:5, 141:2, 143:3
**sides** [1] - 137:12
**sight** [1] - 17:23
**signature** [1] - 98:22
**signed** [1] - 170:1
**significantly** [1] - 5:5
**similar** [9] - 12:15, 12:18, 80:2, 141:7, 147:20, 149:13, 153:4, 158:25, 165:21
**similarly** [1] - 69:12
**simply** [3] - 11:12, 141:14, 162:1
**simulate** [2] - 83:3, 83:9
**single** [1] - 158:12
**sit** [3] - 19:19, 32:9, 165:11
**sits** [1] - 13:7
**sitting** [1] - 35:3
**six** [2] - 43:8, 65:6
**sixth** [7] - 33:16, 33:25, 95:6, 95:9, 106:9, 128:19
**Skills** [1] - 127:18
**skills** [4] - 42:12, 105:4, 111:23, 128:22
**skim** [1] - 142:18
**skin** [1] - 23:21

**skip** [3] - 61:10, 65:4, 65:13
**slacking** [1] - 30:2
**sleep** [1] - 47:13
**slight** [1] - 13:16
**slightly** [2] - 88:10, 151:20
**slow** [6] - 5:1, 29:1, 57:20, 79:15, 91:17, 117:23
**slowing** [1] - 79:21
**slowly** [1] - 28:13
**small** [2] - 4:1, 130:17
**Smith** [13] - 58:1, 88:6, 90:23, 95:12, 96:21, 97:3, 117:4, 128:8, 128:9, 165:21, 173:12, 173:14
**Smith's** [4] - 58:15, 58:18, 58:22, 87:6
**Smiy** [12] - 38:3, 95:18, 96:9, 96:12, 96:17, 96:22, 115:16, 116:8, 119:4, 119:7, 121:25, 156:11
**Smiy's** [4] - 40:14, 51:15, 115:8, 119:14
**smokers** [1] - 24:5
**so..** [5] - 16:18, 79:23, 97:23, 126:23, 173:20
**soccer** [5] - 108:19, 110:8, 110:24, 112:6, 112:7
**social** [2] - 99:2, 99:7
**society** [1] - 3:22
**Society** [2] - 10:19, 110:10
**socks** [1] - 112:6
**software** [7] - 18:21, 18:23, 19:1, 20:14, 47:19, 132:23, 136:11
**solely** [1] - 150:25
**solidified** [1] - 16:10
**solve** [2] - 26:14, 61:19
**solving** [1] - 147:7
**someone** [6] - 7:7, 12:7, 26:1, 38:9, 40:8, 116:15
**sometime** [1] - 42:18
**sometimes** [9] - 19:5, 58:10, 80:12, 80:16, 86:1, 98:4, 108:7, 148:15, 149:10
**somewhere** [1] - 136:6
**sophomore** [5] - 10:12, 10:15, 95:20, 122:20, 122:22
**sorry** [48] - 15:5, 18:18, 22:12, 23:7, 23:18, 23:23, 27:1, 44:10, 47:1, 48:3, 49:4, 49:22, 57:2, 65:14, 68:12, 71:25, 72:12, 78:4, 79:9, 80:23, 87:18, 92:12, 96:14, 98:1, 100:21, 109:2, 113:7, 120:10, 120:16, 125:18, 132:2, 132:10, 132:19, 133:13, 135:3, 135:8, 135:15, 137:19, 140:1, 147:11, 160:8, 162:25, 166:9, 166:13, 166:14,

166:15, 169:13, 173:22
**sort** [7] - 16:10, 52:14, 82:23, 103:15, 137:2, 151:17, 167:8
**sought** [1] - 6:6
**sound** [3] - 28:6, 58:12, 149:10
**sounds** [1] - 136:8
**source** [1] - 78:15
**sources** [3] - 4:23, 5:15, 78:13
**Southwestern** [1] - 109:11
**space** [2] - 88:2, 158:9
**span** [1] - 99:4
**Spanish** [8] - 35:21, 35:23, 35:24, 36:2, 36:21, 110:20, 112:9, 115:24
**speaking** [1] - 7:10
**special** [4] - 14:20, 33:2, 102:9, 102:13
**specialized** [3] - 102:2, 103:12, 104:10
**specific** [10] - 21:3, 23:5, 23:16, 23:20, 24:7, 44:12, 46:22, 47:4, 58:7, 147:18
**specifically** [20] - 5:22, 6:23, 24:10, 24:12, 26:7, 27:15, 30:9, 30:15, 34:18, 47:2, 74:18, 80:22, 84:8, 128:7, 143:4, 147:5, 155:2, 155:4, 162:15, 168:9
**speech** [3] - 18:25, 20:13, 81:1
**speed** [1] - 88:5
**spell** [2] - 26:18, 28:5
**spellcheck** [1] - 31:24
**spelling** [13] - 26:15, 27:21, 28:9, 31:23, 32:7, 32:10, 36:8, 36:14, 89:6, 90:13, 90:14, 91:5, 100:5
**spend** [8] - 7:12, 28:13, 50:18, 66:7, 66:25, 97:17, 149:14, 160:20
**spending** [1] - 34:19
**spent** [10] - 27:14, 31:21, 46:9, 86:20, 111:4, 111:10, 116:24, 116:25, 119:4
**spoken** [1] - 35:25
**sport** [1] - 35:2
**sports** [2] - 10:19, 35:1
**spots** [1] - 113:8
**spring** [2] - 125:8, 125:11, 125:12
**St** [5] - 104:15, 106:17, 108:11, 108:16, 129:23
**stand** [3] - 62:3, 68:4, 165:11
**standard** [5] - 9:19, 12:7, 12:11, 83:3, 165:8
**standardized** [15] - 7:17, 10:19, 10:22, 18:3, 44:16, 45:18, 125:20, 125:22,

126:22, 126:24, 130:5, 130:7, 130:15, 136:18, 139:9
**standing** [2] - 4:20, 25:20
**stands** [6] - 13:7, 24:8, 25:23, 33:5, 104:21, 105:4
**Stanford** [2] - 126:4, 127:3
**stars** [1] - 137:5
**start** [15] - 26:6, 33:14, 33:16, 42:21, 42:22, 42:23, 42:25, 60:11, 62:11, 65:18, 72:11, 72:16, 144:1, 161:9, 168:24
**started** [17] - 18:4, 19:22, 28:23, 30:5, 30:6, 32:14, 34:3, 38:11, 71:23, 95:6, 122:15, 122:21, 125:10, 125:15, 160:2, 162:3, 162:11
**starting** [3] - 10:11, 43:25, 158:15
**starts** [1] - 112:1
**state** [8] - 13:22, 133:11, 137:25, 138:12, 138:24, 157:4, 161:20, 169:13
**State** [13] - 41:25, 114:25, 115:5, 115:20, 119:8, 122:16, 122:25, 123:16, 124:9, 157:5, 157:9, 157:13, 157:16
**statement** [29] - 3:13, 50:7, 50:8, 50:10, 50:19, 57:23, 86:8, 86:16, 86:22, 87:15, 88:21, 89:5, 90:11, 91:22, 94:19, 94:21, 95:23, 95:24, 96:9, 117:22, 120:7, 139:2, 139:4, 139:13, 140:2, 141:5, 141:23, 159:4, 160:18
**statements** [7] - 86:3, 87:1, 88:10, 89:9, 89:18, 90:16, 90:22
**States** [7] - 4:5, 5:20, 6:11, 131:22, 133:12, 133:14, 134:7
**STATES** [1] - 1:1
**states** [5] - 89:11, 120:20, 120:22, 142:5, 158:16
**status** [1] - 84:8
**statute** [2] - 11:19, 12:10
**statutory** [1] - 11:22
**stay** [4] - 13:12, 17:1, 53:12, 84:13
**stayed** [1] - 125:15
**STEIN** [2] - 2:2, 2:3
**stem** [1] - 160:23
**stenographically** [1] - 1:24
**Step** [84] - 4:14, 11:11, 16:23, 16:25, 17:7, 42:9, 42:11, 42:12, 42:14, 43:10, 43:13, 43:22, 44:4, 48:1, 48:5, 54:23, 54:25, 63:25, 64:2, 65:1, 65:4, 65:14,

65:15, 67:20, 68:19, 75:14,
75:24, 76:21, 77:15, 77:17,
77:19, 78:7, 78:14, 79:19,
79:24, 80:1, 80:2, 80:9,
80:11, 80:14, 80:16, 80:19,
80:21, 80:25, 81:22, 82:6,
82:20, 82:23, 83:2, 83:9,
83:14, 83:17, 84:10, 84:13,
84:14, 84:24, 84:25, 85:2,
85:6, 85:8, 85:13, 91:24,
136:19, 145:12, 146:14,
146:17, 147:12, 148:11,
148:17, 149:3, 149:7,
149:10, 155:5, 159:10,
159:16, 159:20, 159:21,
160:6, 160:20
**step** [1] - 13:16
**STEVEN** [1] - 2:3
**stick** [1] - 24:6
**sticker** [2] - 97:20, 97:23
**stickers** [1] - 97:13
**still** [29] - 7:4, 8:17, 15:4,
15:23, 15:25, 17:10, 18:7,
19:19, 20:24, 30:22, 31:19,
36:20, 38:6, 39:19, 44:8,
46:9, 57:24, 62:11, 67:17,
68:6, 76:19, 89:5, 91:13,
102:11, 103:24, 104:4,
121:10, 121:15, 152:19
**stood** [1] - 33:7
**stop** [1] - 15:3
**story** [2] - 32:1, 91:17
**straight** [4] - 14:7, 103:1,
104:19, 106:9
**strategically** [1] - 139:9
**strategies** [6] - 63:11, 64:8,
140:25, 159:10, 159:15,
159:17
**strategy** [4] - 65:15, 141:8,
159:19, 159:24
**Street** [4] - 1:9, 1:16, 2:4,
2:11
**strength** [1] - 114:23
**stress** [3] - 30:24, 31:10,
117:23
**strict** [2] - 30:25, 31:4
**strike** [1] - 173:19
**strong** [1] - 11:2
**structured** [1] - 120:5
**struggle** [3] - 87:16, 88:13,
91:17
**struggled** [5] - 26:18, 26:24,
26:25, 27:5, 27:24
**struggles** [8] - 37:22, 38:4,
38:7, 87:24, 91:4, 91:6, 91:8,
98:7
**struggling** [13] - 3:24, 18:7,
18:18, 18:19, 30:23, 31:19,
32:22, 37:8, 81:16, 89:6,
91:16, 100:14, 106:4

**stuck** [1] - 47:20
**student** [11] - 4:17, 4:19,
7:24, 10:18, 14:5, 43:6,
53:11, 73:25, 98:18, 119:11,
120:6
**student's** [1] - 7:16
**students** [11] - 9:18, 25:1,
63:1, 76:12, 77:13, 78:14,
105:16, 107:3, 133:15,
133:25, 153:18
**study** [4] - 14:24, 78:7,
79:13, 105:4
**studying** [4] - 26:10, 47:11,
78:14, 79:9
**stuff** [13] - 17:18, 18:21,
21:10, 30:20, 31:5, 36:6,
36:10, 38:10, 39:12, 58:18,
80:14, 159:7
**stupid** [1] - 36:7
**subject** [6] - 26:16, 91:13,
105:22, 105:24, 111:6,
137:11
**subjects** [2] - 137:6, 137:9
**submit** [10] - 40:12, 43:12,
49:21, 51:11, 55:14, 83:8,
127:21, 128:3, 128:5, 166:7
**submitted** [22] - 5:18, 49:23,
50:7, 51:3, 53:1, 54:21,
57:23, 58:22, 59:2, 109:23,
110:1, 122:16, 128:11,
137:17, 155:25, 164:8,
164:17, 164:19, 165:25,
168:13, 168:16, 173:18
**submitting** [1] - 73:11
**subscores** [1] - 41:13
**substantial** [1] - 5:12
**substantially** [3] - 7:9, 9:21,
12:8
**substantive** [1] - 169:16
**subtests** [1] - 129:14
**success** [5] - 7:4, 7:6, 7:9,
8:11, 9:15
**successful** [1] - 31:18
**successfully** [2] - 3:20,
161:3
**suffer** [1] - 11:7
**sufficient** [1] - 57:19
**suggestion** [1] - 162:20
**suggestions** [1] - 35:20
**Suite** [2] - 2:4, 2:11
**summary** [1] - 153:24
**summer** [3] - 34:23, 42:4,
114:19
**summers** [2] - 114:5, 114:6
**Sunset** [3] - 99:24, 126:10,
158:23
**super** [1] - 24:7
**supplemental** [1] - 51:2
**support** [30] - 8:12, 8:14, 9:8,
45:23, 46:1, 46:15, 54:12,

54:15, 86:4, 87:7, 90:21,
91:23, 95:24, 101:22, 102:3,
103:10, 103:12, 104:10,
115:19, 119:8, 128:15,
137:17, 163:23, 164:2,
164:9, 164:13, 164:19,
166:1, 169:14
**supporting** [3] - 8:23, 93:24,
166:8
**supportive** [1] - 79:13
**supports** [1] - 101:20
**suppose** [1] - 172:25
**supposed** [16] - 16:16,
19:16, 30:18, 30:20, 31:22,
31:25, 33:24, 42:21, 43:22,
43:24, 45:24, 46:1, 97:19,
150:8, 150:15
**Supreme** [2] - 6:2, 9:5
**surgery** [1] - 44:15
**surprise** [1] - 133:17
**survey** [1] - 118:22
**sustain** [3] - 63:6, 166:22,
170:16
**sustaining** [1] - 90:1
**swelling** [1] - 24:19
**swim** [4] - 35:17, 108:24,
110:21, 111:25
**swimmer** [1] - 110:8
**swimming** [2] - 110:8,
110:25
**switch** [1] - 117:23
**switched** [1] - 38:22
**switching** [3] - 27:8, 27:25,
38:5
**sworn** [3] - 13:20, 68:7,
121:11
**symbolize** [1] - 109:17
**symptom** [1] - 117:5
**symptoms** [7] - 23:12, 24:15,
88:7, 88:19, 122:7, 122:9,
122:12
**syndrome** [2] - 56:17, 165:1
**System** [1] - 88:23
**system** [7] - 21:11, 22:20,
25:7, 26:6, 81:14, 81:17,
123:16
**Tab** [9] - 86:5, 87:3, 91:24,
91:25, 92:1, 95:23, 139:4,
155:6, 163:23
**table** [4] - 3:18, 35:4, 50:12,
129:17
**tables** [1] - 143:2
**tabs** [1] - 86:1
**taker** [1] - 117:25
**tan** [1] - 24:13
**Tanguay** [4] - 29:2, 29:5,
93:19, 155:22
**Tanguay's** [1] - 51:8
**tap** [1] - 15:12
**tasks** [1] - 90:2

**taught** [1] - 114:12
**teacher** [25] - 27:15, 28:23,
30:25, 31:1, 31:3, 31:4,
35:21, 36:22, 37:10, 37:18,
90:13, 92:4, 92:18, 92:19,
92:23, 93:4, 93:11, 93:15,
101:1, 102:6, 103:15,
104:13, 115:24, 158:10
**teachers** [20] - 4:24, 26:22,
27:6, 27:13, 29:25, 31:1,
35:19, 89:7, 89:8, 90:12,
91:3, 91:5, 97:25, 98:2,
101:3, 102:9, 102:18,
105:19, 159:5
**teal** [1] - 23:23
**team** [3] - 108:19, 108:24,
110:21
**tears** [1] - 31:12
**technical** [2] - 6:13, 11:20
**technically** [1] - 75:4
**techniques** [1] - 64:25
**temporary** [5] - 37:24,
122:18, 122:19, 125:13,
157:18
**ten** [7] - 32:7, 47:21, 64:5,
64:6, 143:22, 146:15, 151:17
**tendencies** [1] - 118:12
**term** [1] - 82:22
**terms** [4] - 43:9, 49:25,
120:20, 144:22
**test** [108] - 4:8, 7:17, 8:16,
8:17, 11:13, 17:24, 18:1,
21:20, 26:4, 28:9, 32:9, 33:8,
33:15, 33:17, 33:18, 33:19,
33:21, 34:1, 36:3, 36:9,
37:12, 40:7, 41:5, 41:6,
41:12, 43:2, 43:5, 44:16,
45:18, 50:4, 55:4, 57:4,
62:24, 63:2, 63:8, 63:11,
64:9, 65:16, 66:14, 68:20,
74:25, 77:10, 77:23, 78:11,
80:2, 80:3, 81:2, 81:9, 81:17,
81:18, 81:19, 82:1, 95:5,
117:25, 126:5, 126:18,
126:22, 126:23, 126:24,
129:21, 129:24, 130:3,
130:15, 131:11, 131:15,
132:18, 132:25, 133:1,
133:3, 133:22, 133:25,
135:4, 135:6, 136:16, 138:1,
140:7, 140:25, 141:8,
141:13, 141:18, 141:23,
141:24, 142:6, 142:11,
142:24, 143:8, 143:9,
145:11, 145:14, 146:1,
146:19, 146:21, 146:24,
147:8, 147:17, 159:9,
159:15, 159:17, 160:2,
162:21, 165:2, 165:8,
165:10, 165:12

Test [5] - 10:23, 10:25, 127:4, 127:18
test-taking [6] - 63:11, 64:9, 140:25, 141:8, 159:9, 159:15
tested [2] - 58:6, 94:23
testified [17] - 13:21, 16:19, 20:9, 41:17, 47:25, 48:4, 98:6, 102:8, 103:19, 103:21, 115:18, 115:22, 123:2, 123:10, 141:7, 155:9, 159:9
testifies [1] - 173:14
testify [1] - 83:13
testifying [1] - 15:18
testimony [17] - 5:4, 5:17, 13:10, 61:6, 63:5, 84:23, 92:17, 94:16, 106:3, 123:13, 138:7, 138:9, 161:7, 161:25, 162:8, 172:22, 173:19
Testing [1] - 154:24
testing [51] - 6:12, 6:24, 7:5, 7:7, 7:21, 7:23, 8:18, 12:22, 29:7, 29:20, 33:2, 38:14, 39:2, 39:4, 42:8, 44:21, 53:11, 53:25, 54:7, 54:8, 55:18, 56:10, 57:16, 57:21, 57:25, 58:4, 58:5, 58:7, 88:2, 93:17, 93:21, 96:24, 117:3, 124:12, 124:14, 124:19, 124:25, 125:20, 126:9, 132:17, 136:9, 136:16, 136:18, 152:2, 157:9, 159:19, 160:5, 165:4, 167:15
tests [35] - 10:20, 10:22, 17:14, 17:15, 17:16, 23:8, 27:19, 27:21, 29:6, 29:22, 29:24, 32:11, 37:5, 37:7, 38:10, 39:8, 39:10, 39:11, 46:4, 58:10, 58:16, 79:9, 81:21, 82:3, 88:1, 125:22, 134:25, 139:9, 139:10, 139:20, 140:23, 151:25, 154:21, 159:25
Texas [7] - 33:9, 35:25, 88:23, 94:25, 100:13, 103:22, 103:24
text [14] - 21:2, 23:2, 25:14, 25:22, 58:14, 142:19, 143:1, 144:24, 147:1, 147:3, 147:6, 169:6, 170:4, 171:18
textbooks [1] - 19:3
texts [1] - 142:7
thanking [1] - 167:5
The court [104] - 3:2, 3:4, 3:8, 5:6, 6:10, 8:25, 9:11, 10:2, 12:18, 13:2, 13:4, 13:6, 13:8, 13:12, 13:15, 13:19, 13:25, 14:6, 14:9, 14:12, 15:3, 15:6, 15:8, 15:12, 17:20, 21:18, 21:23, 21:25, 22:2, 22:4, 22:7, 27:2, 48:15,

48:17, 48:21, 48:24, 49:3, 49:12, 49:14, 51:25, 52:3, 52:19, 52:23, 56:18, 56:25, 57:3, 57:6, 57:8, 57:11, 59:13, 59:17, 60:24, 61:4, 63:6, 67:23, 68:1, 68:4, 68:9, 68:16, 68:18, 68:20, 68:23, 70:12, 73:3, 73:7, 73:10, 73:13, 73:16, 73:18, 73:19, 74:8, 75:20, 83:21, 83:25, 85:23, 92:11, 121:4, 121:9, 121:13, 146:3, 146:6, 151:18, 162:23, 163:1, 166:22, 169:1, 170:7, 170:11, 170:16, 170:23, 171:22, 172:9, 172:13, 172:19, 173:5, 173:10, 173:14, 173:24, 174:3, 174:6, 174:15, 174:23, 175:1
the witness [40] - 13:16, 13:18, 13:24, 14:8, 14:11, 14:13, 15:5, 17:22, 21:16, 21:22, 21:24, 22:1, 22:3, 22:5, 22:8, 27:3, 49:4, 49:13, 52:5, 56:20, 57:5, 57:7, 57:10, 59:22, 61:7, 68:4, 68:8, 68:12, 68:25, 70:13, 70:15, 84:1, 92:12, 113:11, 116:18, 121:12, 170:10, 170:24, 172:12, 172:14
theme [1] - 144:4
therapy [3] - 23:5, 23:6, 29:14
therefore [4] - 12:20, 76:2, 138:13, 167:20
thereto [1] - 68:16
they've [4] - 8:15, 79:16, 85:16, 173:1
thinner [3] - 20:1, 20:6, 20:8
thinners [1] - 20:2
third [13] - 16:8, 18:14, 42:17, 42:18, 43:24, 44:6, 62:10, 82:12, 82:18, 87:10, 88:22, 90:11, 128:1
third-year [1] - 18:14
thoroughly [1] - 142:17
thoughts [4] - 32:23, 46:7, 167:13
three [18] - 3:20, 43:6, 45:24, 46:1, 51:12, 55:4, 55:12, 62:14, 93:1, 113:25, 136:2, 148:25, 154:9, 167:2, 167:8, 169:7
three-page [2] - 167:8, 169:7
three-sentence [1] - 148:25
thrombotic [1] - 164:25
throughout [7] - 4:3, 19:14, 19:19, 94:6, 146:18, 151:2, 162:19
throughs [1] - 72:21

thrown [1] - 45:8
tied [2] - 143:22, 149:4
tighten [1] - 174:25
time-and-a-half [3] - 18:5, 39:15, 157:13
time-out [5] - 27:16, 27:17, 28:24, 92:14, 94:12
timed [4] - 58:15, 83:3
timeline [3] - 55:11, 55:12, 92:22
timer [1] - 67:9
tiny [1] - 150:25
tips [1] - 142:10
tissues [1] - 27:2
title [2] - 29:3, 164:15
titled [1] - 140:16
today [12] - 3:11, 5:19, 9:2, 9:4, 10:3, 15:8, 67:24, 70:11, 134:15, 163:13, 172:18, 172:22
together [5] - 3:16, 20:25, 37:3, 37:4, 37:5
tomorrow [3] - 172:21, 174:8, 175:1
ton [1] - 22:19
took [44] - 10:19, 10:23, 27:11, 41:17, 42:18, 42:19, 53:19, 60:6, 62:23, 65:15, 82:8, 82:20, 83:13, 107:12, 107:20, 126:25, 130:10, 131:22, 133:3, 133:4, 133:7, 133:22, 133:25, 134:3, 134:19, 135:2, 135:10, 135:22, 135:23, 136:13, 138:6, 139:22, 139:24, 142:21, 145:15, 145:18, 145:21, 150:11, 150:20, 153:14, 154:16, 159:18, 160:6
tooth [1] - 8:13
top [19] - 49:22, 72:19, 87:12, 110:3, 111:13, 120:14, 122:11, 126:17, 129:2, 131:21, 131:25, 132:2, 132:3, 133:14, 134:11, 138:15, 141:2, 168:1, 169:12
total [8] - 126:12, 126:25, 127:8, 128:24, 129:11, 136:6, 136:7, 152:4
towards [1] - 39:22
town [1] - 39:22
trace [1] - 11:21
track [5] - 17:1, 34:13, 35:15, 53:12, 78:2
train [1] - 174:20
transcript [5] - 122:25, 123:15, 162:18, 163:2, 175:7
transcription [1] - 1:25
transfer [2] - 4:16, 4:20
transition [1] - 163:21

translate [3] - 21:6, 25:11, 25:14
translation [1] - 112:9
trapper [2] - 71:17, 72:3
trappers [3] - 71:10, 71:12, 71:22
treat [1] - 38:17
treating [3] - 4:23, 11:24, 165:19
treatment [2] - 23:4, 29:17
trial [1] - 118:12
trialed [1] - 38:21
trickier [1] - 109:19
tried [13] - 25:19, 27:9, 31:15, 39:18, 46:25, 53:22, 53:25, 70:19, 71:6, 72:10, 83:9, 160:25, 162:16
Trigonometry [1] - 108:3
trouble [4] - 28:25, 30:3, 31:11, 92:5
true [1] - 159:23
trusted [1] - 37:18
try [23] - 15:16, 16:25, 20:22, 22:9, 27:22, 38:17, 47:3, 50:11, 50:14, 52:16, 53:9, 53:12, 64:19, 66:18, 66:21, 67:16, 67:17, 69:25, 83:3, 85:19, 166:23, 174:6, 174:25
trying [15] - 4:20, 6:8, 6:14, 28:5, 35:16, 46:9, 46:10, 47:20, 59:19, 66:8, 79:18, 81:18, 91:19, 111:14, 158:14
turn [13] - 59:24, 60:3, 67:22, 69:6, 73:22, 74:13, 113:16, 118:7, 140:24, 148:22, 155:6, 155:11, 157:23
turned [1] - 34:11
turning [4] - 31:5, 50:21, 51:4, 74:11
tutor [2] - 37:10, 37:13
tutored [1] - 111:3
tutorials [5] - 100:23, 100:25, 101:2, 101:4, 102:19
tutoring [3] - 102:13, 111:4, 111:6
twice [4] - 10:23, 34:23, 46:17, 130:10
two [38] - 5:16, 5:17, 7:14, 8:16, 8:17, 20:6, 41:15, 41:16, 44:5, 52:14, 62:22, 64:20, 67:18, 71:16, 93:1, 103:7, 104:2, 104:3, 107:15, 109:2, 111:4, 112:4, 113:8, 113:25, 114:15, 125:18, 143:5, 144:23, 165:2, 165:4, 165:10, 167:1, 167:16, 168:24, 173:19, 174:19
two-day [2] - 8:17, 52:14
two-hour [1] - 112:4
type [9] - 45:2, 46:8, 105:10,

118:16, 119:21, 146:1, 149:2, 149:18, 159:5
**typed** [1] - 116:15
**types** [1] - 149:5
**typical** [4] - 111:20, 111:22, 146:14, 146:17
**typically** [2] - 22:22, 160:2
**U.S** [1] - 1:8
**ultimate** [1] - 12:7
**ultimately** [2] - 12:17, 12:18
**unanswered** [3] - 138:18, 140:11, 141:13
**under** [16] - 7:5, 23:19, 68:6, 87:19, 96:4, 99:7, 105:1, 109:10, 117:9, 120:4, 121:10, 142:24, 143:5, 155:20, 169:12
**undergrad** [1] - 15:1
**underlining** [1] - 72:11
**underneath** [1] - 142:13
**understood** [8] - 5:4, 65:21, 66:20, 67:8, 143:18, 162:17, 173:25, 174:12
**unfortunately** [1] - 93:14
**unheard** [1] - 4:17
**UNITED** [1] - 1:1
**United** [7] - 4:5, 5:20, 6:11, 131:22, 133:12, 133:14, 134:7
**University** [8] - 42:1, 42:4, 109:23, 111:18, 114:25, 115:20, 122:25, 157:5
**university** [1] - 116:6
**unless** [3] - 25:20, 36:15, 55:5
**unlikely** [1] - 75:14
**unnecessary** [1] - 159:6
**unofficial** [1] - 93:15
**unpaid** [1] - 113:23
**unstructured** [1] - 120:6
**unusual** [1] - 4:8
**up** [42] - 10:15, 13:15, 14:9, 14:19, 18:19, 18:20, 19:4, 20:21, 20:23, 22:9, 22:17, 23:3, 26:21, 31:15, 31:16, 32:15, 35:2, 35:5, 35:13, 35:17, 37:21, 38:11, 39:18, 39:21, 40:10, 46:9, 52:16, 61:20, 65:5, 67:11, 69:13, 84:6, 94:19, 111:24, 114:7, 123:11, 125:2, 135:8, 173:1, 174:18, 174:25
**updated** [2] - 148:1, 148:2
**upper** [2] - 10:21, 128:20
**upset** [3] - 31:12, 34:4, 34:6
**Upton** [1] - 106:7
**US** [1] - 107:20
**useful** [1] - 71:9
**USMLE** [9] - 4:5, 4:14, 42:7, 43:8, 43:23, 48:1, 49:9,

49:23, 65:14
**USMLE's** [1] - 50:4
**utilizing** [1] - 1:24
**UWorld** [1] - 78:16
**validated** [1] - 160:4
**value** [2] - 77:8, 138:22
**Vargas** [3] - 3:16, 10:4, 147:14
**VARGAS** [65] - 2:2, 2:3, 3:15, 13:6, 13:11, 13:13, 14:2, 14:14, 15:14, 18:15, 21:16, 22:6, 22:10, 27:4, 48:16, 48:20, 48:23, 49:2, 49:5, 49:15, 51:23, 52:2, 52:8, 52:11, 52:25, 56:23, 57:2, 57:12, 59:4, 59:15, 59:21, 59:23, 60:22, 61:3, 61:8, 63:7, 68:3, 68:13, 68:19, 69:1, 70:6, 70:16, 73:1, 73:9, 73:12, 73:15, 73:17, 73:21, 74:5, 74:10, 75:16, 75:22, 83:20, 145:13, 145:18, 145:21, 166:20, 170:5, 170:14, 171:20, 172:7, 173:8, 173:12, 173:21, 173:25
**variables** [1] - 62:1
**varied** [2] - 42:15, 45:2
**varies** [2] - 42:15, 64:4
**various** [3] - 89:15, 97:24, 141:12
**varsity** [3] - 10:19, 108:16, 110:9
**Verbal** [1] - 69:3
**verbal** [8] - 41:14, 70:25, 73:2, 135:18, 136:3, 151:14, 151:20, 154:6
**verification** [2] - 121:15, 122:17
**verifying** [1] - 97:7
**version** [10] - 60:2, 69:13, 81:21, 147:13, 148:5, 148:8, 153:1, 153:2, 153:4, 169:12
**versus** [10] - 24:5, 58:7, 58:10, 72:13, 75:7, 118:10, 124:12, 172:5, 172:6
**videos** [3] - 65:8, 79:1, 149:10
**view** [1] - 122:7
**vignette** [4] - 160:23, 160:25, 162:6, 163:17
**virtually** [1] - 102:9
**virtue** [1] - 91:12
**viruses** [1] - 24:14
**vision** [3] - 29:20, 29:21, 156:3
**visit** [3] - 115:15, 116:14, 117:10
**visual** [7] - 29:6, 37:2, 58:19, 79:3, 93:17, 93:21, 156:8

**visually** [2] - 25:20, 69:24
**vocabulary** [2] - 128:23, 129:7
**voice** [1] - 14:9
**volleyball** [1] - 109:1
**volume** [4] - 61:23, 62:12, 62:13
**voluntarily** [1] - 84:19
**volunteer** [2] - 39:21, 110:12
**volunteered** [1] - 110:19
**Vyvanse** [1] - 19:9
**wait** [4] - 54:8, 54:9, 95:5, 131:17
**waited** [1] - 53:3
**waiting** [4] - 54:12, 54:17, 79:15
**waitlisted** [3] - 41:23, 41:24, 42:2
**walk** [5] - 10:20, 56:1, 60:8, 65:17, 89:15
**walking** [1] - 111:20
**walks** [1] - 79:3
**wants** [2] - 8:23, 27:17
**warning** [2] - 64:15, 77:25
**Washington** [2] - 2:5, 2:12
**waste** [1] - 81:18
**watch** [4] - 13:15, 48:22, 68:11, 79:1
**watched** [1] - 78:9
**watching** [1] - 149:15
**water** [4] - 13:18, 17:22, 68:10, 82:16
**ways** [2] - 31:16, 91:9
**wealth** [1] - 4:6
**wear** [1] - 29:19
**website** [2] - 147:19, 154:18
**week** [10] - 32:8, 47:3, 97:20, 110:22, 110:25, 111:1, 111:4, 111:10, 114:1, 174:9
**weekends** [1] - 34:23
**weeks** [1] - 114:1
**weighed** [1] - 115:1
**weighted** [1] - 43:10
**Western** [4] - 42:1, 42:3, 42:5, 75:10
**whereas** [2] - 80:14, 159:22
**whole** [12] - 38:8, 63:14, 67:15, 72:14, 139:12, 139:15, 144:21, 161:10, 161:13, 162:5, 162:6, 162:13
**willing** [1] - 54:6
**winning** [1] - 105:25
**winter** [6] - 114:7, 123:21, 124:17, 125:3, 125:5, 125:6
**Wisconsin** [3] - 109:24, 111:18
**wise** [1] - 45:5
**wish** [1] - 116:5
**wishes** [1] - 6:14

**Wite** [2] - 24:21, 24:23
**Wite-Out** [2] - 24:21, 24:23
**withdraw** [4] - 11:12, 75:1, 75:3, 75:13
**withdrawing** [1] - 84:19
**withdrawn** [1] - 75:13
**witness** [11] - 13:5, 48:18, 48:21, 61:5, 173:6, 173:8, 173:10, 173:17, 173:22, 173:23, 174:22
**Witness** [1] - 176:4
**witnesses** [1] - 173:7
**woman** [5] - 3:19, 5:2, 8:13, 8:20, 9:16
**women** [1] - 24:4
**wonderful** [1] - 98:18
**wondering** [1] - 140:2
**word** [16] - 20:20, 20:21, 25:24, 28:13, 58:10, 58:11, 69:17, 72:15, 72:17, 122:2, 126:15, 152:8, 152:10, 163:17
**Word** [3] - 72:15, 72:17, 152:8
**words** [18] - 18:22, 25:11, 28:10, 32:7, 32:23, 36:9, 46:10, 50:13, 62:4, 69:23, 72:13, 72:18, 72:22, 148:12, 152:4, 152:8, 152:9
**workload** [2] - 34:15, 34:16
**works** [2] - 14:18, 98:18
**workup** [1] - 96:11
**world** [6] - 4:8, 8:5, 10:2, 10:4, 10:5, 12:24
**wrap** [1] - 173:1
**write** [20] - 7:12, 18:6, 21:1, 24:21, 25:12, 26:17, 28:8, 30:18, 30:19, 30:23, 32:7, 41:16, 42:9, 45:19, 50:8, 50:10, 50:11, 78:22, 79:6, 139:7
**writing** [33] - 7:10, 18:5, 18:10, 22:18, 26:16, 26:18, 27:20, 27:25, 28:1, 28:3, 28:4, 30:16, 30:17, 31:23, 32:22, 36:7, 37:3, 41:10, 41:15, 46:5, 50:18, 51:2, 89:6, 90:13, 90:14, 91:5, 106:1, 106:4, 135:24, 152:18, 154:11, 158:10, 168:5
**written** [8] - 6:10, 17:15, 36:5, 36:9, 44:16, 61:21, 80:3, 90:21
**wrote** [8] - 31:24, 57:22, 72:22, 92:21, 94:3, 97:6, 111:14, 172:16
**x-ray** [1] - 26:5
**x-rays** [1] - 23:9
**Xarelto** [1] - 20:5

**year** [44] - 10:12, 10:15, 16:8,
17:4, 18:14, 18:17, 18:18,
20:4, 30:16, 34:21, 42:17,
42:18, 42:22, 42:24, 43:1,
43:25, 44:1, 44:6, 82:12,
82:18, 95:5, 98:24, 103:2,
103:5, 103:21, 103:24,
104:3, 108:13, 108:24,
114:4, 122:20, 122:22,
125:9, 133:15, 134:12,
135:1, 140:21, 142:8,
145:25, 153:14, 153:18,
155:16, 158:12
**year-end** [1] - 125:9
**years** [21] - 3:20, 10:14,
10:15, 20:6, 29:16, 44:5,
51:12, 58:5, 89:13, 94:2,
97:15, 108:15, 108:16,
108:18, 108:19, 109:2,
110:9, 111:5, 114:2, 116:10,
121:1
**yeast** [1] - 24:11
**yellow** [5] - 24:3, 24:8, 24:10,
24:11, 169:6
**yeses** [1] - 102:22
**York** [2] - 174:14, 174:19
**young** [5] - 3:19, 5:2, 8:12,
8:19, 9:16
**younger** [3] - 4:24, 91:3,
111:8
**yourself** [3] - 20:11, 48:22
**Ziemkowski** [1] - 74:19
**ZUBA** [1] - 1:15

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                        -  -  -

 3   JESSICA RAMSAY,              :  CIVIL ACTION NO.
            Plaintiff,           :  2:19-cv-02002
 4                               :
      v.                         :
 5                               :
     NATIONAL BOARD OF MEDICAL   :  PRELIMINARY
 6   EXAMINERS,                  :  INJUNCTION HEARING
            Defendant.           :  DAY 2
 7   _____

 8
                              James A. Byrne U.S. Courthouse
 9                            601 Market Street
                              Philadelphia, PA 19106
10                            December 4, 2019
                              Commencing at 9:29 a.m.
11   _____

12           BEFORE THE HONORABLE J. CURTIS JOYNER

13   _____

14
     APPEARANCES:
15
             REISMAN CAROLLA GRAN & ZUBA, LLP
16           BY:  LAWRENCE D. BERGER, ESQUIRE
             19 Chestnut Street
17           Haddonfield, New Jersey 08033
             (856) 354-5640
18           larry@rcglawoffices.com
             Representing the Plaintiff
19

20

21                        -  -  -

22           Ann Marie Mitchell, CRR, RDR, RMR
                   Official Court Reporter
23                    (267) 299-7250

24
     Proceedings taken stenographically and prepared utilizing
25   computer-aided transcription
```

```
 1   APPEARANCES CONTINUED:

 2
           STEIN & VARGAS LLP
 3         BY:  MICHAEL STEVEN STEIN, ESQUIRE
           BY:  MARY C. VARGAS, ESQUIRE
 4         10 G Street NE
           Suite 600
 5         Washington, DC 20002
           (202) 248-5092
 6         michael.stein@steinvargas.com
           mary.vargas@steinvargas.com
 7         Representing the Plaintiff

 8

 9
           PERKINS COIE LLP
10         BY:  ROBERT A. BURGOYNE, ESQUIRE
           BY:  CAROLINE M. MEW, ESQUIRE
11         700 - 13th Street, NW
           Suite 600
12         Washington, DC 20005
           (202) 654-6200
13         rburgoyne@perkinscoie.com
           cmew@perkinscoie.com
14         Representing the Defendant

15

16                          -  -  -

17

18

19

20

21

22

23

24

25
```

1              (Court called to order at 9:29 a.m.)

2              THE COURT:  Good morning.

3              Are we ready to proceed?

4              MS. VARGAS:  Yes, Your Honor.

5              THE COURT:  Very well.  You may resume the stand, Ms.

6    Ramsay.

7              Oh, you're calling somebody out of order?

8              MR. BURGOYNE:  Your Honor, he was going to defend a

9    thesis today and his student notified him last night that she

10   is not coming, so we don't have to go out of order.

11             THE COURT:  I'm sorry to hear that from the student.

12             MR. BURGOYNE:  Yeah, it was a little -- not a good way

13   to start on your getting your thesis reviewed.

14             THE COURT:  No.  All right, Ms. Ramsay, then we can

15   proceed with the continuation of your testimony.

16             MS. VARGAS:  Your Honor, if I could just ask briefly

17   about scheduling.

18             There was some discussion at the end of the day

19   yesterday that we might not finish today and what that --

20             THE COURT:  If you don't finish today, then we'll

21   finish tomorrow.

22             MS. VARGAS:  Okay.  Thank you, Your Honor.

23             THE COURT:  I hope.

24             And, Ms. Ramsay, I'll remind you you're still under

25   oath from previously being sworn in yesterday.

1          Do you understand that, ma'am?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Very well.  We have the same situation

4  with the mics today.  I'm working without my clerk.  She has a

5  family matter this week, so I'm lonely.

6          MR. BURGOYNE:  Jessica, I'm going to start with

7  Exhibit 73, if you want to turn to that.

8          THE WITNESS:  Thank you.  I think it's on.

9          THE COURT:  Great.  There it is.  All right.  Let's

10  proceed.

11                    CROSS-EXAMINATION

12  BY MR. BURGOYNE:

13  Q.  All right.  Good morning, Jessica.  I just mentioned,

14  let's start with Exhibit 73, please.

15  A.  Okay.

16  Q.  And as you can see, this is an email from you to Dr.

17  Ruekberg, who we were -- an individual we were discussing

18  yesterday.  And he is your psychologist?

19  A.  Psychiatrist.

20  Q.  Treating psychiatrist?

21  A.  Yes.

22  Q.  Okay.  And he provided a letter in support of your second

23  request for accommodations on Step 1.  Correct?

24  A.  Yes.

25  Q.  Okay.  In this letter dated January 26, 2018, you tell

 1  him:  Sorry for not getting this to you sooner, I was trying to

 2  get at least a little bit in each section and get rid of a lot

 3  of extra details to make the information clearer.

 4        And then you attach a table --

 5  A.   Yes.

 6  Q.   -- to this document.  And we're going to look at several

 7  exhibits today in which you have such tables.  And I'll note to

 8  you these weren't produced to us by you in discovery, these

 9  were produced to us by Dr. Ruekberg.

10  A.   Okay.

11  Q.   Okay?

12        What is the table that you were preparing and working on

13  in these various communications to Dr. Ruekberg, starting on

14  the second page?

15  A.   This table was something I used to help me write my

16  personal statement.  And he asked to see it, because I had a

17  hard time communicating everything he was asking about or

18  everything that the guidelines asked about.  And so he asked me

19  to put it -- or to send him the table that I had used.  But I

20  wasn't quite done with it, so it took me longer than expected

21  to get it to him.

22  Q.   Okay.  And this is seven or eight pages, but there's sort

23  of pictures included in the table?

24  A.   Yeah.

25  Q.   Where did you get this document that you were working

1  from?  I assume you didn't go in and paste these pictures of

2  clocks and things like that in here.

3  A.   Yeah, I did.

4  Q.   Okay.  So this is a document you created entirely?

5  A.   Yes.

6  Q.   And on the last page -- I'm sorry, these pages aren't

7  numbered, but it's the next to the last page in this document.

8  A.   Okay.

9  Q.   And you see on the first column, it just has, how will

10 each accommodation alleviate functional limitations.  And then

11 on the right, you've provided a statement regarding how much

12 extra time you thought you needed.

13      And what amount of extra time did you include in the chart

14 at that time?

15 A.   50 percent.

16      MR. BURGOYNE:  And the Bates number, Your Honor, for

17 that page is 2248.

18 BY MR. BURGOYNE:

19 Q.   And if you turn, Jessica, if you would, please, to

20 Exhibit 74, is this an email message that you sent Dr. Ruekberg

21 in February of 2018?

22 A.   Yes.

23 Q.   And you're forwarding another copy of the table that you

24 had prepared?

25 A.   It appears so.

1  Q.   And then in addition to the table, it looks like you've

2  gone in and now prepared comments in the right-hand margins for

3  him to review?

4  A.   Yes.

5  Q.   And then on the page that's the second page of this

6  document, I'm sorry, it's the page that says 231 at the bottom.

7  A.   Okay.

8  Q.   Your first comment, the last comment in that block, you

9  state:  To help with Step 2 CS requests later, it may also be

10  beneficial to mention at least how -- and I can't read it

11  because it's blue -- is even more of a struggle because I not

12  only have to translate my thoughts into words but I have to

13  read and reread what I've written using the process I've

14  described.

15  A.   Okay.

16  Q.   And that's -- were you attempting at this point to have

17  him include language that might help you get accommodations on

18  Step 2 CS?

19  A.   I don't think language was the issue, it was whether or

20  not to include the writing as part of the explanation with --

21  for what I struggle with, because I didn't know if reapplying

22  for Step 2 CS, if I would have the opportunity to include that

23  then, because I haven't been through this process that far

24  before.

25  Q.   And then if you look at the page that says 239 at the

1  bottom, Bates number.

2  A.   Okay.

3  Q.   All right.  And the last sentence in this page states:  I

4  think a separate testing room, 50 percent additional testing

5  time with additional break time over two days would best

6  equalize my access to the exam.

7  A.   Okay.

8  Q.   All right.  And those were words you wrote?

9  A.   At the time, yes.

10 Q.   And those were words you wrote in, what, 2018, February

11 2018?

12 A.   Yes.

13 Q.   And that was after you'd taken Step 1 the first time?

14 A.   Yes.

15 Q.   And out of those, at this point, you have a separate

16 testing room?

17 A.   Yes.

18 Q.   You have additional break time?

19 A.   Yes.

20 Q.   And you have testing over two days?

21 A.   Yes.

22 Q.   So the one thing you don't have is any additional time,

23 50 percent?

24 A.   Correct.

25 Q.   Look at the next page.  It's Exhibit 75, rather.

1  A.    Okay.

2  Q.    And do you recall that in connection with working with

3  Dr. Ruekberg in his preparation of a supporting letter, you and

4  your mother and your fiancé completed ADHD symptom checklists?

5  A.    Yes.

6  Q.    And would you confirm for me that Exhibit 75 contains the

7  symptom checklist that you provided and your mother provided

8  and your fiancé provided to Dr. Ruekberg?

9  A.    Yes.

10  Q.    And the first one, page -- Bates page 223, it says at the

11  top, Jerri mom.

12      Is that your handwriting?

13  A.    I can't really tell, but I think so.

14  Q.    Okay.  And it reappears on the next page.  I don't know if

15  that makes it easier to confirm that's your handwriting?

16  A.    I believe so.

17  Q.    Okay.  And so the first two pages reflect what your mom

18  was reporting regarding your ADHD symptoms?

19  A.    Yes.  I had to do this over the phone with her, so I had

20  to ask her -- I sent her the list.

21  Q.    Okay.  And it looks like there's a total of 18 symptoms

22  described in this chart?

23  A.    Yes.

24  Q.    And it looks like she indicated on here that you had all

25  18 symptoms and that the degree of severity for all of them was

1  severe; is that correct?

2  A.   It appears so, yes.

3  Q.   And then you also filled out a prompt or a symptom report

4  for Dr. Ruekberg.  Is that on the third page at 225?

5  A.   Yes.

6  Q.   And it looks like you likewise indicated that you have all

7  18 symptoms, and again indicated that they were -- assigned to

8  each of them the most severe rating possible?

9  A.   In the major categories, yes, but I also ranked each

10  individual prompt separately.

11  Q.   But relative to the 18 categories, you assigned maximum

12  severity to each one?

13  A.   Yes.

14  Q.   The last two pages starting on 227, are these the ratings

15  provided by your fiancé?

16  A.   Yes.

17  Q.   And his name is Neil?

18  A.   Correct.

19  Q.   And it looks like he's assigned sort of varying degrees of

20  symptoms.  Some he indicates, for example, can't organize, he

21  indicates you have no symptoms in that regard.  Others he

22  indicates you have moderate symptoms.  And then some he

23  indicates you have severe symptoms; is that correct?

24  A.   Yes.

25  Q.   Look at Exhibit 76 for me.

 1  A.   Okay.

 2  Q.   And would you just confirm this is another chart that you

 3  prepared, an updated chart that you sent Dr. Ruekberg in March

 4  2018?

 5  A.   It appears so.

 6  Q.   And it looks like on the page 219, as of March 2018,

 7  you're still indicating that you need 50 percent additional

 8  time?

 9  A.   Where is that?

10  Q.   Requested accommodations on page 219.

11  A.   Can you point or tell me where again, please?

12  Q.   Sure.

13  A.   On the table that you're referring to?

14  Q.   Do you see on the left-hand side, the first column, it

15  says requested accommodations, middle of the page?

16  A.   Okay.  Yeah.  It says 50 percent.

17  Q.   Okay.  So at that time, as of March, you still thought

18  50 percent --

19  A.   I don't know if I thought that.  I think I was asking for

20  advice on whether -- if I decreased the amount of time I was

21  requesting, if it would be more likely to be approved.  And so

22  I had been talking to people to see if they had any experience

23  with that.  So at that time, I was considering it.

24  Q.   The last page of this document, you say the same thing:  I

25  think the separate testing room, 50 percent additional testing

 1  time, additional break time over two days would equalize my

 2  access to the exam.

 3  A.   It appears unchanged from the one in February, so yes.

 4  Q.   Exhibit 77.  Is this an email from you to Dr. Ruekberg in

 5  March of 2018?

 6  A.   Yes.

 7  Q.   In the second line you say:  To make it easier for you and

 8  the school to support my request for accommodations, I worked

 9  really hard to condense my reasoning down to the bare minimum.

10  I've attached the document to this email and also sent one to

11  the school so they would be working from the same information.

12       And then is the document that follows that, you've now got

13  a two-page document.  Is that a document you prepared and sent

14  to Dr. Ruekberg?

15  A.   I believe so.

16  Q.   And again, you've indicated 50 percent additional testing

17  time over two days.  Page 207.

18  A.   Where in the...

19  Q.   The paragraph begins, "Simplified versions of the main

20  things I want to say to support each accommodation I am

21  requesting."

22  A.   Oh, okay.  Yes.

23  Q.   And the working diagnoses you identified to him at this

24  time in support of the accommodations you wanted were ADHD,

25  combined presentation, and then learning disability nonverbal

1  with impairment in reading with impairment in written

2  expression.  And you say over on the right:  I'm still not sure

3  which to use for now.  I've included the one Dr. Lewandowski

4  gave as well as the ones we've talked about.

5  A.    Where was that?

6  Q.    Your comment on the right.

7  A.    On the same page?

8  Q.    Same page.  You didn't mention migraines at this time?

9  A.    Not apparently in this document, but I haven't read the

10  whole thing.

11       What was your first question about that, about the

12  comment?

13  Q.    Yeah.  That's a comment you wrote in there saying you were

14  still not sure which learning disability to identify in support

15  of your accommodation?

16  A.    Yes.  I wasn't sure if the learning disability that Dr.

17  Lewandowski had diagnosed was encompassed by the one that -- or

18  the couple that Dr. Ruekberg had diagnosed clinically.

19  Q.    And again, we established yesterday, Dr. Ruekberg didn't

20  perform any diagnostic evaluation of you, he didn't administer

21  the type of assessments Dr. Smith did?

22  A.    No.  But I didn't know that that made a difference at that

23  point.

24  Q.    The next exhibit is Exhibit 78.  We're now into April

25  2018.

1      Is this another email from you to Dr. Ruekberg?

2  A.   Yes.

3  Q.   All right.  And you say in this email:  Sending the

4  document to you so you have it to make changes if needed during

5  the appointment.  Sorry I'm not completely done with it.  I

6  tried.

7  A.   Okay.

8  Q.   All right.  And then the document that follows goes from

9  page 194 to 202 -- or 1, basically.

10      And is this your revised version of Dr. Ruekberg's initial

11 letter?

12 A.   I don't know if it's technically my revised version.  I

13 think I had help with that from other people.

14 Q.   Which other people did you have help with on that?

15      MS. VARGAS:  Objection, attorney-client privilege and

16 work product.

17 BY MR. BURGOYNE:

18 Q.   Putting aside your lawyers, who else helped you?

19      THE COURT:  He's withdrawn the question.

20 BY MR. BURGOYNE:

21 Q.   Putting aside your lawyers --

22      THE COURT:  He's rephrased question.  All right?

23      MS. VARGAS:  Thank you.

24      THE COURT:  All right.

25      THE WITNESS:  Maybe my mom helped me with editing and

1  stuff.

2  BY MR. BURGOYNE:

3  Q.   And then the document that follows, there's comments over

4  in the right and highlighting.

5       Are those comments and highlighting that you provided?

6  A.   I don't know if all of them are all from me.

7  Q.   Well, they said Comment JR.

8  A.   I may have been communicating some.

9  Q.   You typed them in, in all events; is that correct?  Is

10  this a document you prepared and then sent to Dr. Ruekberg,

11  since it has your initials in the comments?

12  A.   He wrote the letter.  I had typed the comments.

13  Q.   Okay.  And the comments go -- like you have 38 comment

14  boxes that you provided to him.  I take it, in order to provide

15  those comments, you were closely reading this letter?

16  A.   I had the Kurzweil to help with that.

17  Q.   And it looks like some of your comments on page 198?

18  A.   Okay.

19  Q.   You'll recall at the top there was a paragraph I asked you

20  about yesterday that was in his initial draft, stating:  Even

21  if the board does not find Jessica meets criteria for

22  accommodations for ADHD, in my professional opinion, the board

23  should approve Jessica for accommodations for reading and

24  writing learning disabilities.

25  A.   Okay.

1  Q.   Do you remember our discussion in that paragraph

2  yesterday?

3  A.   Yes.

4  Q.   And then I asked whether you had suggested that that be

5  deleted or changed.

6  A.   Okay.

7  Q.   Okay.  And you see on one of your comments here you tell

8  him that you would rephrase that paragraph; is that correct?

9  A.   Yes.

10  Q.   And then your next comment is:  May be smart to say

11  something along the lines of, quote, In all future exams of a

12  similar nature to help the process moving forward.

13  A.   Yes.

14  Q.   And then there's -- a sentence has been inserted

15  addressing informal accommodations, stating:  She has

16  received -- she received informal accommodations starting in

17  the second grade, including a secluded testing area and extra

18  time to work on assignments.  Throughout elementary, middle and

19  high school, there were multiple instances where working with

20  her teachers and sometimes needing to involve her mother,

21  Jessica received informal accommodations.

22       And do you see over on the right you say:  I added this

23  sentence, but you can change it?

24  A.   Which comment?

25  Q.   21.

1  A.    Okay.

2  Q.    And do you recall making that suggestion to Dr. Ruekberg

3  for an addition?

4  A.    I don't recall doing it specifically, but it says here.

5  Q.    Then on page 2200 at the top, it looks like you were

6  correcting spelling and grammar errors, one of your comments?

7  A.    Again, my mom helped me with editing.

8  Q.    Exhibit 79.

9  A.    Okay.

10  Q.    And you said, this is April 20:  Dear Dr. Ruekberg, Here

11  is the final draft of the letter.  Sorry it is so long.  I had

12  to add a lot to support each of the points in the NBME

13  guidelines.

14       And then what follows is a nine-page, small-font document.

15       Is that the document you sent him in April 2018?

16  A.    I'm sorry, because it's not dated, but I would assume so

17  if it was attached.

18  Q.    And if we go to Exhibit 64, page 42 -- I'm sorry, page 27,

19  Jessica.

20       THE COURT:  Three strikes, you're out, Counsel.

21       MR. BURGOYNE:  Pardon me?

22       THE COURT:  Is that your phone ringing?

23       MR. BURGOYNE:  Well, I actually was wondering that,

24  Your Honor.

25       I apologize, Your Honor.

1   BY MR. BURGOYNE:

2   Q.   Page 27.

3   A.   Okay.

4   Q.   Okay.  And I think we established yesterday, this was an

5   early draft from Dr. Ruekberg of his letter; is that correct?

6   A.   Yes.  I believe this is the one that I said was his early

7   thoughts in the draft, yeah.

8   Q.   And now if we go to 79, that two-and-a-half page letter

9   has become the nine-page letter that was eventually sent to

10  NBME?

11  A.   I'm sorry, Exhibit 79?

12  Q.   Yes.

13  A.   Okay.

14  Q.   Is that correct?

15  A.   Your question was, the attachment is nine pages?

16  Q.   Yeah.  That's what, at least at that time, was the final

17  version of the letter?

18  A.   At that time, yes.

19  Q.   Okay.  Then if you go to Exhibit 80, we're now into May

20  2018.  And you're forwarding suggestions for Dr. Ruekberg's

21  letter?

22       MS. VARGAS:  Your Honor, this exhibit includes

23  attorney-client privilege and attorney work product.  It's

24  actually documented that way on the exhibit and was disclosed

25  inappropriately.  And so to the extent you would be seeking to

1  put before the Court privileged material, we would object.

2          MR. BURGOYNE:  Your Honor, this is the letter that was

3  produced to us in discovery by Dr. Ruekberg.  They were aware

4  of it.  It's been in our exhibit book.

5          THE COURT:  Your objection at this time is overruled.

6          I'm going to allow questions on it.  This is not a

7  proceeding where a jury is sitting.  I can remove the

8  considerations that are attorney-client from any considerations

9  that I may have in reference to the preliminary injunction or

10  the permanent injunction.

11          MS. VARGAS:  Thank you, Your Honor.

12          THE COURT:  So it's overruled at this time.  All

13  right?

14          MR. BURGOYNE:  Thank you.

15          THE WITNESS:  What was your question again?

16  BY MR. BURGOYNE:

17  Q.  The question was, at this point in this email from May

18  2018, are you forwarding suggested changes to Dr. Ruekberg's

19  letter from your attorney?

20  A.  I think so.

21  Q.  It looks like at the bottom there were also comments

22  provided on your draft letter from a Dr. Sorrentino.

23          Who is Dr. Sorrentino?

24          MS. VARGAS:  Your Honor, he's asking work product and

25  attorney-client privilege.  I recognize what you've said, but

1  he's now asking directly about communication from the attorney

2  in the court record.

3        THE COURT:  I'm going to sustain the objection to this

4  question.

5        MR. BURGOYNE:  And I'll just note, Your Honor, this

6  isn't -- presumably it's not attorney-client privilege because

7  it was sent to Dr. Ruekberg and any privilege would have been

8  waived.  It might be work product, but it was prepared in

9  connection with a request for reconsideration, not in

10 connection with this lawsuit, so I'm not sure there's a valid

11 work product.  Notwithstanding that, I'll accept your ruling

12 and move on.

13       THE COURT:  I find it to be a work product.  And I

14 sustain the objection, so move on.

15 BY MR. BURGOYNE:

16 Q.  Exhibit 81.  Actually, you don't even have to worry about

17 Exhibit 81.

18       MR. BURGOYNE:  I apologize, Judge.

19       THE WITNESS:  Okay.

20 BY MR. BURGOYNE:

21 Q.  We're now up to Exhibit 82.  And this looks like what is

22 in fact the final draft of the letter.

23       THE COURT:  And again, this is work product?

24       MS. VARGAS:  Yes, it is, Your Honor.  It's directly

25 discussing communication with the attorney.

1          THE COURT:  Very well.  It's sustained.

2          Next.

3   BY MR. BURGOYNE:

4   Q.   Exhibit 85.  We've now gotten to the point, it's September

5   22, 2018.  You submitted your second request for accommodations

6   in June, and that request was denied.  And you're now working

7   with your attorney on a request for reconsideration at this

8   time.  Is that accurate?

9   A.   Okay.

10  Q.   Is that timing accurate?

11  A.   In June we're working on it, is that what you said?

12  Q.   No.  In June you had submitted your second request.

13  A.   Yes.

14  Q.   It was subsequently granted in part and denied in part.

15          And at this point, September, you're working with your

16  attorney on a request for reconsideration; is that correct?

17  A.   Yes.

18  Q.   Okay.  And is this a letter -- an email from you to

19  Dr. Ruekberg?

20  A.   Yes.

21  Q.   And it looks like in the third bullet point you're

22  reporting that you had had a preliminary telephone conversation

23  with Dr. Smith and that he is someone you identified --

24  A.   For the third -- like left side bullet?

25  Q.   They're dark bullet points, yes.

1  A.   Sorry, what was your question again?

2  Q.   First of all, did you identify Dr. Smith by doing an

3  internet search?

4  A.   I did originally, yes.

5  Q.   Okay.  And then the bottom of this, you say:  Separately,

6  my lawyer also received a recommendation for Dr. Smith for a

7  colleague who has worked with medical students applying for

8  accommodations from the NBME.

9       MS. VARGAS:  Your Honor, work product.

10      THE COURT:  Overruled.

11 BY MR. BURGOYNE:

12 Q.   And then first indented bullet point, it looks like you're

13 saying:  Here are some highlights from our conversation that

14 might interest you.

15      And that's referring to your telephone -- was that a

16 telephone conversation you had with Dr. Smith initially?

17 A.   I believe it was.

18 Q.   And then that first bullet point, you say:  He stated that

19 the testing Dr. Lewandowski performed is used to show deficits

20 incurred from trauma, CVA or brain tumors and is generally not

21 helpful in showing ADHD and not at all appropriate for

22 evaluating possible learning disorders and that he should have

23 done appropriate testing.

24      Is that information that you received from Dr. Smith?

25 A.   It may not be a direct quote, but it's the impression that

1  I received.

2  Q.   And you met in person with Dr. Lewandowski on two

3  occasions?

4  A.   I believe so, yes.

5  Q.   All right.  And the first time was I think maybe a one- to

6  two-hour evaluation, just discussion and interview?

7  A.   I don't know if it was two hours, but I know that it was

8  longer than like -- I know it was longer than half an hour.  I

9  don't know exactly how long it was.

10 Q.   Longer than you spent with Dr. Smiy?

11 A.   Yes.

12 Q.   And then you came back a second time to see him, and he

13 performed a series of assessments?

14 A.   His technician did.

15 Q.   Okay.  And he's a licensed neuropsychologist?

16 A.   I believe so.

17 Q.   And at this point you had already sent -- Dr. Ruekberg's

18 letter had already been sent to the NBME.  For the record, the

19 final version of that letter was included in PX-2 at page 37.

20 But you attached to this document another edited document with

21 redlines and comments.

22      What were you contemplating that Dr. Ruekberg was going to

23 do in September 2018?  Why did you send him this information?

24 A.   To the best of my recollection, I think this was when we

25 were considering having him write a follow-up letter to address

1  the points that the denial letter had said -- had said, but

2  since they didn't really acknowledge anything from

3  Dr. Ruekberg, we decided against it.

4  Q.   On page 152, comment 9, looks like you're discussing the

5  severity of certain symptoms you experienced there on the

6  bottom where the draft letter was?

7  A.   Okay.

8  Q.   And you state:  We can support moderate with the fact that

9  I have to have Neil, other people, read for me at home, outside

10  of school, and I require accommodations for reading and writing

11  at school.  We could even support severe because I can neither

12  read nor write efficiently at home, school or work.

13  A.   Okay.

14  Q.   What were you communicating -- why were you making those

15  comments to Dr. Ruekberg at that time?

16  A.   I don't remember at this time.  I'm assuming it had to do

17  with whatever conversations we were having at the time.

18  Q.   You also submitted a letter from a Dr. Houtman?

19  A.   Yes.

20  Q.   And that letter is included in the record at PX-2, page

21  45.

22       Did you and your lawyer also work with Dr. Houtman in

23  crafting her letter?

24  A.   Not crafting it, no.

25  Q.   Preparing it, drafting it?

1   A.   She sent us the letter almost written, and we asked her

2   to -- or, well, actually, she had forgotten a section, and we

3   asked her to put that back in.  And she had already, like, said

4   she had forgotten, so she added that section too.  And then I

5   think we may have helped with editing at the end.

6   Q.   Okay.  Look at Exhibit 65, please.  And confirm for me, if

7   you will, that these are a series of emails and attachments

8   that were on your computer and you forwarded to or you provided

9   to us in discovery?

10  A.   You said 65?

11  Q.   65, yeah.  Starting with Ramsay 0003.

12  A.   Okay.

13       Okay.

14  Q.   And is this a document you sent to Dr. Houtman in May 2018

15  with a description of the symptoms that you -- and impairments

16  that you thought supported accommodation?

17  A.   I believe it was the same list we looked at earlier.

18  Q.   Reminds me, you said a moment -- in one of your emails,

19  you said, I have simplified everything that I've put together,

20  Dr. Ruekberg, and I'm getting this to you and to the school so

21  that everybody has the same information, words to that effect.

22       Who was it you were sending that simplified version of

23  your background to when you referred to the school?

24  A.   My best guess would have been that it was to Erin Dafoe.

25  Q.   Erin Dafoe is the individual who drafted the letter that

1  eventually went out over Mr. Overton's or Dean Overton's

2  signature?

3  A.   I believe so.

4  Q.   Look at page -- the page that says 8 at the bottom.

5  A.   Okay.

6  Q.   All right.  And I'll explain to you that, as I understand

7  the manner in which these documents were produced to us, the

8  attachments came first and then the email that was forwarding

9  the attachments.

10       So if you look at page 8, this is an email from Dr.

11  Houtman to you saying:  Here is my first attempt.  Let me know

12  what needs changing and I'll get it on letterhead.

13       Is that an email you received from Dr. Houtman?

14  A.   It appears so.

15  Q.   And then if you go back to pages 6 and 7, is this her

16  initial draft that you referenced a minute ago?

17  A.   If that was the one attached to the email, then yes.

18  Q.   It looks like she sent this to you on June 3, 2018 at

19  almost 6:00; is that right?

20  A.   It looks like it.

21  Q.   If you then go to page 17, which is the same date, her

22  letter came to you about 6:00, and it looks at 9:17 p.m. you've

23  sent back the redlined document that is found at pages 14

24  through 16.

25  A.   I'm sorry, can you say that again?

1  Q.   Sure.  On page 17, is this an email, in the middle of the

2  page, that you sent to Dr. Houtman?

3  A.   Yes.

4  Q.   All right.  It's dated June 3rd, 9:17 p.m.?

5  A.   Okay.

6  Q.   And it's got a paragraph here where you say:  Thanks so

7  much for writing the letter!  There's then a redacted sentence,

8  presumably on work product grounds.  And then you explain to

9  her the changes you've made to the letter.

10      And then if you look at the three pages preceding that

11  email, are those changes that you forwarded to her on that

12  date?

13  A.   I don't know if they're all changes or just areas that I

14  highlighted with changes, but...

15  Q.   In all events, they're comments you made after reviewing

16  her letter and reading that letter?

17  A.   I don't know if they were my comments.  I typed them, like

18  you stated before.

19  Q.   Okay.  And if they weren't your comments, whose comments

20  would they be?

21  A.   My lawyer's.

22  Q.   And the final letter we mentioned was the letter from Dean

23  Overton.

24          MR. BURGOYNE:  Which is PX-2, Your Honor, at page 50.

25  BY MR. BURGOYNE:

1  Q.   And if you look at Exhibit 63.

2  A.   Okay.

3  Q.   And at the bottom of the page, is this an email from you

4  to Erin Dafoe on April 11, 2018?

5  A.   Yes.

6  Q.   And you say:  I lied.  I read it and I am so impressed you

7  were able to organize the mess of thoughts and words I gave you

8  into something so well put together.  I only have a few

9  corrections/editing requests.

10  A.   Okay.

11  Q.   So did you prepare the initial draft of the letter for Ms.

12  Dafoe, or did she prepare an initial draft using information

13  you gave her?

14  A.   She prepared the letter, the initial draft.

15  Q.   When that request was denied in June, as you said, you

16  went to see Dr. Smith.  Correct?

17  A.   Denied in June?

18  Q.   You submitted it in June, and it was subsequently denied.

19  A.   In September, I think, yes.

20  Q.   To make sure we have that in the record, would you look at

21  DX-4, Tab M, and just confirm that this is the letter you

22  received from NBME granting certain accommodations but denying

23  extended time.  And specifically the accommodations you were

24  approved for are on page 3 of the letter.

25  A.   This is the letter, yeah.

1  Q.   So just in terms of time, it's September 11, 2018 was when

2  you learned the decision from NBME?

3  A.   That one, yes.

4  Q.   And then very soon thereafter, you went to see Dr. Smith.

5  Correct?  I believe you saw him on September 25th for an

6  evaluation?

7  A.   That sounds right.

8  Q.   And you went to see him specifically to get an evaluation

9  report that would support your request for extended testing

10  time?

11  A.   No.  I went there specifically for testing that measured

12  reading speed, because the letter had said something about not

13  having objective measurements of my reading speed.  And since I

14  went to Lewandowski for the same thing but he didn't do those

15  tests, I looked for someone who could do those tests.

16  Q.   Okay.  But you wanted that testing in order to support

17  your request for extended testing time on Step 1?

18  A.   Since I hadn't -- since I was told basically I didn't have

19  enough documentation to support it, yes.

20  Q.   And then you and your attorney worked with Dr. Smith on

21  his letter; is that correct?

22  A.   I don't know necessarily if I did, but I know that we

23  communicated about making sure all the facts were correct.

24  Q.   And Dr. Smith in fact sent drafts of his report to both

25  you and your counsel for review?

 1          MS. VARGAS:  Objection, Your Honor, work product.

 2          THE COURT:  Yes.

 3          MS. VARGAS:  Dr. Smith is an expert witness we'll be

 4     calling to the stand next.

 5          THE COURT:  And you'll be able to cross-examine.  Very

 6     well.

 7     BY MR. BURGOYNE:

 8     Q.   Exhibit 48, 49 and 50, would you just confirm for us that

 9     these are all emails either to or from you and Dr. Smith?

10     A.   I'm sorry, was that -- what numbers?

11     Q.   I'm sorry, Jessica.  48, 49 and 50.

12     A.   Thank you.

13     Q.   So we can start with 48.

14          And then pages 40 -- the first two pages, it says 45 and

15     46 in the Bates numbers.

16     A.   Okay.

17     Q.   Is that information you sent to Dr. Smith for his

18     consideration to be included in his report?

19     A.   I believe so.

20     Q.   And then 49, Exhibit 49, is this an email from Dr. Smith

21     to you and Lawrence Berger forwarding a draft of the report?

22     A.   Yes.

23          MS. VARGAS:  Objection, work product.

24          THE COURT:  Again, it's work product, Counsel.

25     BY MR. BURGOYNE:

 1  Q.   Exhibit 50.  Can you just confirm these are email

 2  exchanges between you and Dr. Smith?

 3  A.   Yes.

 4  Q.   Turn to Exhibit 57, if you would.

 5       Would you confirm that this is a secondary application

 6  that you prepared for the University of Wisconsin's medical

 7  school?

 8  A.   I don't know if it was the final one, but possibly.  But

 9  it was for the University of Wisconsin.

10  Q.   And did you end up applying to medical school in

11  Wisconsin?

12  A.   Which year?

13  Q.   Any year.

14  A.   I think so.

15  Q.   And then if you look at page -- the page it says at the

16  bottom, Ramsay 47.

17       And is this a discussion of your employers and activities?

18  A.   That's the title of the table, yes.

19  Q.   It looks like you have a description of your lifeguarding

20  job.  As a guard, I have to react quickly and intelligently in

21  emergency situations, provide necessary care.  And you were

22  also providing swim instructions over a four-year period, it

23  looks like.

24       And this is after high school, 2008 to 2012?

25  A.   Yes, yes.

1 Q.   And then it looks -- if you turn the page, it looks like

2 when you were at Ohio State, for the first description here,

3 you were teaching a chemistry lab at school?

4 A.   Yes.

5 Q.   And you were tutoring students in both general and organic

6 chemistry?

7 A.   Yes.

8 Q.   And you were guiding students in proper lab procedures?

9 A.   Yes.

10 Q.   And grading lab reports, assignments and quizzes and

11 exams?

12 A.   Yes.

13 Q.   And the next one, it looks like you have a different

14 title, you're now an instructor's assistant and head teaching

15 assistant?

16 A.   It was the same job, it just had different names.

17 Q.   Okay.  And this is post-graduation, it looks like?

18 A.   Yes.

19 Q.   And you were working full time in this position?

20 A.   They included the grading hours I believe in that, so yes.

21 Q.   On the left side you indicate 40 hours per week?

22 A.   Yeah.  That was within the job description.

23 Q.   Okay.  And it looks like you had this job not quite a

24 year?

25 A.   Yeah, yes.

1  Q.  And you were, in this position, it says you were teaching

2  three lab sections.

3      How many students were in each lab section?

4  A.  No more than 20.

5  Q.  So you were teaching three sections.  You were also head

6  TA for one section each week and that you managed six sections.

7      Did that mean you supervised sections that were under the

8  responsibility of other teaching assistants?

9  A.  Yes.  But mostly I was supposed to be in the chemistry

10  supply window so that if anything went wrong for those labs,

11  then I could be there to help out or answer questions for

12  students who came by.

13  Q.  Look at DX-4, Tab L.  We discussed a little bit your time

14  with Dr. Lewandowski.

15  A.  Okay.

16  Q.  And in this document, it's probably easiest to look at --

17  there's no page in numbers or Bates numbers.  So look at the

18  top of the page and go to the page that says page 79 of 106.

19  A.  Okay.

20  Q.  And this is page 5 of the document.

21      And this is a letter from Dr. Lewandowski on a

22  consultation dated October 25, 2017.

23  A.  Okay.

24  Q.  And you see in the last paragraph there, he says:  I spent

25  approximately 120 minutes with a patient today in individual

1  examination consulting with her mother, providing a detailed

2  neurobehavioral cognitive status examination and preparing this

3  consultation.

4  A.   Okay.

5  Q.   Does that refresh your recollection regarding the amount

6  of time you spent with him?  Easier way to say it, you don't

7  have any reason to disagree with his summary of how long he

8  spent with you?

9  A.   I don't know if that's the time he spent with me, but it

10  could have been between me and his note.

11  Q.   Okay.  On page 2 of this document, there is a discussion

12  of some of the background information he obtained from you at

13  the time.

14  A.   Okay.

15  Q.   Do you see that, social history?

16  A.   Sorry.

17  Q.   And in your social history, there's a section called

18  avocational.  And this is on page 76 of 106.

19       Do you see that?

20  A.   Can you say where on the page?

21  Q.   It's right above medical.

22  A.   Okay.

23  Q.   All right.  And do you recall discussing with Dr.

24  Lewandowski your interests?

25  A.   Somewhat.  He kind of didn't really let me talk a lot, but

1  he would say, do you like this, do you like this.  And then if

2  he hit something that I said yes to, then he would ask more

3  details about that, but quickly.  So I do remember somewhat

4  those things.

5  Q.  And he lists -- you reported to him that your interests

6  include sports, art, painting acrylics, drawing, ceramics,

7  camping, reading, paper making.

8      Are those all interests that you communicated to him

9  during your evaluation?

10 A.  No.  I would have never said reading.  I think in fact I

11 said that I hated reading.  But I like being read to is

12 probably something I would have said.

13 Q.  Let me ask you to flip to your deposition.

14          THE COURT:  Page and line?

15          MR. BURGOYNE:  Page 232.

16          MR. BERGER:  Give us a moment, please.

17          THE COURT:  One moment.  Let him get to that before

18 you ask your question.  That's the proper procedure before you

19 ask the question, Counsel.

20          MR. BURGOYNE:  Okay.  And, Larry, it's line 2, page

21 232.

22          THE WITNESS:  Okay.

23 BY MR. BURGOYNE:

24 Q.  In looking at line 2 from your deposition, my question

25 was:  On page 2, there's a list of your avocational interests.

 1      You said:  Where you highlighted.  Okay.

 2      And I go on and say:  And then avocational.  Sports, art,

 3  painting, acrylics, drawing, ceramics, camping, reading, paper

 4  making.

 5      And I then asked you:  Is that all information you

 6  provided to him?

 7      And what was your answer at that point?

 8  A.  Can you tell me what line the --

 9  Q.  Line 12.  It's the answer immediately after the question I

10  put to you.

11  A.  Okay.  It says:  He asked me what my interests were, so I

12  would assume so because that's all stuff I like to do.

13  Q.  I'll take that back from you.

14      Exhibit 52.  This is a copy of your CV; is that correct?

15  A.  It's a working copy.

16  Q.  And then on page 2, there's a list of publications and

17  presentations.  Correct?

18  A.  Okay.  Yes.

19  Q.  And it looks like you've been a co-author on four

20  publications?

21  A.  That's correct.

22  Q.  And are those all peer-reviewed, do you know?

23  A.  I'm not sure.

24  Q.  And then let's just look at a couple of them.

25      Exhibit 53.

1  A.   Okay.

2  Q.   And it's a research article from 2015 entitled "Genetic

3  Influences on Nicotinic A5 Receptor," and the title continues

4  on.

5       And on this particular article, you are the lead author in

6  terms of which author is listed first.

7       What is the significance of being the lead author on a

8  publication?

9  A.   Generally -- it can vary, but generally it's the person

10 who put in the most work or had the idea for the research,

11 whether the most work was the paper itself or the research,

12 like the experiments that went into it.

13 Q.   And then Exhibit 54, is this a second article that you

14 were the lead author on, it's titled "Organic Acid Disorders"?

15 A.   Yes.

16 Q.   And it looks like this was from 2018?

17 A.   Yes.

18 Q.   You scored on the Step 1 exam a 191.  Correct?

19 A.   Yes.

20 Q.   And then your attorney asked you, if you had gotten a

21 passing score of 192, would that have been representative of

22 your knowledge and abilities.  And I believe you answered no?

23 A.   When was this?

24 Q.   Yesterday.

25 A.   I believe that's correct.

1  Q.   Okay.  Would a 195 have been representative of your

2  knowledge and abilities?

3  A.   It's impossible to tell, because I wasn't able to read all

4  of the -- each question.

5  Q.   Well, if you received a 195, would you think that was a

6  reasonable representation of your abilities?

7  A.   It's impossible to know.  I would have to read all of the

8  questions and answer them to know what my score would be.  That

9  would be representative.

10 Q.   Okay.  Because you were able to answer at 192, because you

11 can't answer at 195?

12 A.   The score isn't -- my ability to read isn't based on the

13 score.  The score is based on my ability to read.

14 Q.   Look at Exhibit 66 for me.

15      Yesterday you testified a few times during your direct

16 about exams that you took in medical school and you referred to

17 them as NBME exams.

18 A.   Okay.

19 Q.   Those are subject matter exams or shelf exams that NBME

20 prepares but that schools can use; is that correct?

21 A.   Some of them are.

22 Q.   And any decision regarding accommodations on those exams,

23 those are made by your school, not NBME.  Correct?

24 A.   I'm not sure about that.

25 Q.   Do you have any reason to think that NBME was involved in

1  deciding whether you got accommodations on your subject matter

2  exams?

3  A.    Yes.

4  Q.    What's your basis for that?

5  A.    Because my school told me that when they contacted NBME

6  to like request and provide the accommodations, that when I

7  initially requested that they be on paper, the test be provided

8  on paper like I was receiving at school, the NBME had told my

9  school that they can't do that and -- because they only provide

10 the test on the computer.  And so that is what happened.  I

11 still had to take the test on a computer.

12 Q.    Okay.  So other than whether or not there was a paper

13 version of these tests, was NBME involved at all in deciding

14 whether or not you could get accommodations when you took those

15 exams at your medical school?

16 A.    I don't know.  That's just what my school told me.  So as

17 far as I knew, they had been asking NBME.

18 Q.    Okay.  And you weren't involved in any of those

19 discussions?  Those were discussions that your school said they

20 had with NBME?

21 A.    I believe so, yes.

22 Q.    Okay.  Let's look at Exhibit 66.

23 A.    Okay.

24 Q.    And this is a document captioned Customized Examination

25 Performance Profile.  Examination name:  NBME CAS 1.

1  A.   Okay.

2  Q.   What is this document?  What subjects were you being

3  evaluated for under this exam, do you recall?

4  A.   I know this was one of the first exams that we had in -- I

5  believe it was after our first term in our first year.  And we

6  would have only had our first few classes, so I believe that

7  the topics selected were to be representative -- or not

8  representative, to be only from those subjects that we had --

9  courses we had taken.

10  Q.   Okay.  Let's look at the next page then, which is 27,

11  Ramsay 27.

12  A.   Okay.

13  Q.   And this is a customized examination performance profile

14  for an exam that you took, it looks like it says organic,

15  maybe, I'm not sure, but you took this exam in 2015, June.

16  That was your second year of medical school?

17  A.   Nope.

18  Q.   When was that?

19  A.   That would have been the end of my first year.

20  Q.   End of your first year.  And did you take this examination

21  with accommodations?

22  A.   I believe so.

23  Q.   And that would have included double testing time?

24  A.   I believe so, yeah.

25  Q.   The second page, does this reflect your performance on the

1  exam?

2  A.   At that time, I believe it would.

3  Q.   Okay.  And so with accommodations, you got 66 percent of

4  the questions correct it looks like.

5       And does this indicate that you were below average

6  performance in several areas, for example, cardiovascular?

7  A.   In a couple of them, yes.

8  Q.   Physiology, yes, it looks like you didn't do as well?

9  A.   Yes.

10  Q.   Look, please, at NBME -- or Defendant's Exhibit 67, which

11  is a document captioned NBME Comprehensive Basic Science

12  Self-Assessment.

13  A.   Okay.

14  Q.   And it looks like this was a test you took in 2016.

15       This was also your first year?

16  A.   2016 would have been my second year.

17  Q.   Your second year.  Okay.

18       All right.  And is this an assessment you took with

19  extended testing time?

20  A.   I believe so.

21  Q.   Okay.  And likewise, with whatever other accommodations

22  your school provided, including a private testing room?

23  A.   Yes.

24  Q.   And this was an exam you took on computer?

25  A.   Yes.

1  Q.  And do you see it's broken down, performance profile,

2  lower performance, borderline performance and then higher

3  performance?

4  A.  Yes.

5  Q.  And would you agree that in several areas your performance

6  was below borderline?

7  A.  Yes.

8  Q.  And whatever reason that was, it didn't have to do with

9  how much testing time you were provided on that testing?

10 A.  No.  At that time, I don't believe so.  That was right

11 after I had my DVT and had to make up my neuro course.

12 Q.  If you look over on the page that says Ramsay 33 --

13 A.  I'm sorry, you said Ramsay 33?

14 Q.  Yeah.

15 A.  Okay.

16 Q.  And on this particular test, you achieved a score of 310

17 with accommodations.

18     And do you see on this page there's a sort of rough

19 forecasting of, if you achieve a particular score on this exam,

20 here's the approximate Step 1 exam?

21 A.  Okay.

22 Q.  And what was the approximate Step 1 exam you would have

23 achieved with a 310 on this?

24 A.  It says 188 as approximate.

25 Q.  That's slightly below what you actually achieved with no

1  accommodations when you took Step 1?

2  A.    At this time, yes.

3  Q.    How many times did you take that test?  Once or more than

4  once?

5  A.    Which test?

6  Q.    The one we just looked at, the comprehensive.

7  A.    I don't know because I don't know what version that was.

8  And the one we just looked at was a self-assessment.

9  Q.    Okay.  In this same assessment, it looks like you took it

10  again, if you look at page 57.  And it looks like the test date

11  of this document is captioned NBME Comprehensive Basic Science

12  Self-Assessment Performance Profile.  And the test date is June

13  2017.

14  A.    Okay.

15  Q.    And you took it a second time and you got the identical

16  score, it looks like, 310?

17  A.    It looks like it.  And this is a CB -- okay.  Okay.  Yes.

18  Q.    And again, an exam you took with all the accommodations

19  that the school provided?

20  A.    No.

21  Q.    This one you did not have accommodations on?

22  A.    I didn't -- not use the time because I had already been

23  denied accommodations, and so I was trying to simulate what

24  would happen if I had standard time, but I still used the room

25  and -- I think just the room.

1  Q.   So you had a private testing room with no extended time?

2  A.   Yes.

3  Q.   Did the test with no extended time?

4  A.   I didn't test with extended time.

5  Q.   And your score at this point was the same, but you had

6  slightly different testing in that situation?

7  A.   Right.  And it was also after third year and it was the

8  day after my surgery rotation ended, so didn't have time to

9  study for it.

10 Q.   Look at Exhibit 68.  Is this a subject matter exam that

11 you took as part of your surgery course at school or rotation?

12 A.   Yes.

13 Q.   And this is dated April of 2017 on the second page where

14 it says 174?

15 A.   Okay.

16 Q.   It looks like you got a 67 percent score.

17      And again, would you agree with me that most of your

18 performance was below average on the score report?

19 A.   For surgery, yes, which is Step 2 content.

20 Q.   And then did I understand you to say that you thought you

21 did better in psychiatry than you did in surgery?

22 A.   I believe so, at least in the overall grade.

23 Q.   Turn to the next page, if you would, 175.

24 A.   Okay.

25 Q.   And is this the results of your psychiatry examination

1  that you took after your subject matter or for your course?

2  A.   Yes.

3  Q.   And if you look at page 2, is this your score report for

4  how you did on that exam?

5  A.   Yes.

6  Q.   Are subject matter exams taken on a computer?

7  A.   Yes.

8  Q.   And this is an exam you took with double testing time?

9  A.   Yes.

10  Q.   And whatever other accommodations the school provided?

11  A.   Yes.

12  Q.   And would you look at your performance there.  Would you

13  agree that in many, if not most, of the categories here, mental

14  disorders, mechanisms of disease, management, emergency

15  department, patient groups for females, your performance was

16  below average?

17  A.   Some of those you listed were on the average performance,

18  but yes, some of those were below.

19  Q.   Look if you would, please, at the page that says 262.

20       And now it looks like a subject matter exam from August

21  2016 for family medicine?

22  A.   Yes.

23  Q.   Again, this is a standardized exam you took with extended

24  testing time?

25  A.   Yes.

1  Q.   And other accommodations.  And it looks like your score

2  was a 60.

3       And would you agree that most of your performance

4  categories on this exam, you performed below average?

5  A.   Yes.

6  Q.   So whatever the reason for that performance was, it didn't

7  have anything to do with how much testing time you were allowed

8  on that day to take the exam?

9  A.   No.  It had to do with the difficulty of the questions,

10 because they were pretty ambiguous.

11 Q.   And then finally, looking at your medicine exam on page

12 264.

13 A.   Okay.

14 Q.   Is this an exam you took to evaluate your knowledge and

15 abilities after taking your medicine course at school?

16 A.   Sorry, it was -- you were asking about the medicine

17 course, yes.

18 Q.   Yeah.  What is this exam evaluating?  What had you just

19 completed before taking this exam?

20 A.   The internal medicine rotation, which was my first

21 clinical.

22 Q.   And again, would you agree that your performance was below

23 average on most of the subject areas?

24 A.   It's below on five of them.  The rest are below average or

25 average.

1   Q.   And that was an exam you took with the school's

2   accommodations?

3   A.   Yes.

4   Q.   Look at Exhibit 70 for me.

5   A.   Exhibit or page?

6   Q.   I'm sorry.  It's Exhibit 70.

7   A.   Okay.  Thank you.

8        Okay.

9   Q.   All right.  And what is this document?

10  A.   This is what is called a student dashboard at my school.

11  Q.   And tell the Court what a student dashboard is.

12  A.   It shows a box and whisker, I think it's called, graph of

13  performance on exams relative to other students.

14  Q.   Is that other students at your medical school?

15  A.   Within my class.

16  Q.   Within your class.

17       What did you have, approximately 50 students in your

18  class?

19  A.   It varied at the time of year, but approximately.

20  Q.   Okay.  All right.  And what does the red dot signify on

21  the first page, page 87?

22  A.   The red dot is my score.

23  Q.   And what does the sort of dark shaded gray area indicate

24  on each?

25  A.   Those would be the middle quartiles.

1   Q.   So on many of these, it looks like two of them you're in

2   the bottom, but in more of those you were below the bottom

3   quartile in each of these subject areas as of this date?

4   A.   Yes.

5            MR. BURGOYNE:  Your Honor, I have no other questions.

6            THE COURT:  Very well.  Why don't we take --

7            MR. BURGOYNE:  Oh, I'm sorry, we have just mechanics

8   of getting our exhibits in.

9            THE COURT:  Okay.  I'll give you a chance to do that

10  in your case.

11           MR. BURGOYNE:  Okay.

12           THE COURT:  All right.  Why don't we take our morning

13  break now.  We'll be in recess till 11:00.

14           (Recess at 10:47 a.m. until 11:01 a.m.)

15           THE COURT:  Let's proceed.

16           Ms. Ramsay, please resume the witness stand.

17                      REDIRECT EXAMINATION

18  BY MS. VARGAS:

19  Q.   Good morning, Ms. Ramsay.

20       You had testified a few moments ago before our break about

21  your performance on the shelf exams.

22       Can you tell us a little bit about your experience in the

23  rotations that ended with those shelf exams?

24  A.   Sure.  So first of all, our school is a new medical

25  school, and I was in the first class originally.  And so this

1    was kind of a test run for everybody.  And because of that, we

2    didn't have a class ahead of us to kind of show us the ropes or

3    give us pointers on how to manage everything.  So we were kind

4    of on our own.  And so like I said, my first couple rotations,

5    clinical rotations, were quite a new experience for me, and

6    there was a huge learning curve with that.  And because of

7    that, not only because of that, but also just the sheer amount

8    of time we were expected to be in either the clinic or the

9    hospital, didn't leave a lot of time for reading or studying.

10        And because I am a slow reader and not everything was

11   available in a format that could be -- the Kurzweil could be

12   used on.  Or if I was at the hospital, some of their computers

13   didn't have software to read to me.  And that's the only place

14   I would get -- be able to have access to whatever that

15   information was, I didn't necessarily get to see all of the

16   information that was being tested on.

17        In some of the lighter rotations where there was either

18   less reading or there was more time to read for me, I got to

19   more of the material and did -- was able to show that I had

20   gotten to that material because I knew it.

21        And there -- so it varied based on the rotation.

22        There was also a rotation at the end which was the

23   psychiatry one, which they didn't tell us that neurology would

24   be included on that and we had our neurology as part of our

25   internal medicine rotation.  At least our clinical part was

1   during our internal medicine, and so I didn't study that part

2   of it before taking that exam.

3       It's just stuff like that.  Because it's their first year,

4   it's our first year, and so there was a lot of like

5   miscommunication.  But in general, if I had access to the

6   material and had time to access the material, I would do what I

7   could to learn it.  And I generally did a decent job.

8       But on the -- the testing week, the final week of our

9   block, we had not only the shelf exams, which are the written

10  exams on the computer, we also had OSCEs.  And those are

11  clinical tests for like -- with standardized patients where I

12  talked about yesterday, the setup of the note that we had to

13  write.  And a lot of times those were based off of reading too.

14  And if I hadn't gotten to the reading for those, then it made

15  it harder for me to state the diagnosis or support that they

16  were looking for in the words that they were looking for.  Even

17  if I was close or had the right reasoning or the right

18  question -- I had asked the right questions and done the right

19  exam in the encounter, and that was some of the feedback that I

20  got from my clerkship directors, when I hadn't passed either in

21  the writing portion or the -- coming up with the right

22  diagnosis or the expected diagnosis for that encounter.

23      And then so that particularly was the neuro OSCE.  And I

24  failed it twice.  And then the clerkship director pointed me to

25  the reading that the case was from, and I passed it.

1       In my OB rotation, I also failed that note because I

2  didn't have time to write everything.  And so I made sure -- I

3  had the diagnosis and support, but I didn't put that support

4  also in the other paragraphs because I didn't have time.  And

5  so I didn't even get credit for that.  And she told me that I

6  had a great exam, physical exam, and great questioning of the

7  patient and she could follow my logic there, but -- and those

8  are videotaped for them to view, to grade us.  She said I did

9  really well through that, but it just wasn't in my note

10  because -- and she could only grade the note.  She couldn't

11  grade what I had asked for the note writing portion.

12       So I had to redo that one, but...

13  Q.   So you also testified that you had a DVT?

14  A.   I did.

15  Q.   Can you explain what happened?

16  A.   I was at the beginning of my neurology rotation in my --

17  at the end of my second year, and I -- and during the -- one of

18  the lectures, my leg was bothering me or had been bothering me.

19  And I sort of had this feeling that like, watch, this is

20  probably a DVT.  And it was like a kind of a joke in the back

21  of my head.  But then it still kept bothering me.  So I told

22  Neil about it.  And then after -- that was like a Tuesday.  And

23  by Friday, my leg -- it had changed.  My leg had hurt a lot

24  more and had traveled up my leg.

25       And then so by Friday evening, my leg was extremely

1    swollen and very visibly swollen compared to my other leg.  And

2    so we went to the emergency department Saturday.  And they did

3    an ultrasound and said that I had a clot from my foot up to my

4    hip, basically, all the way up.  And they didn't even check the

5    other leg.  And they didn't check my IVC, which is the vein

6    that goes back to your heart.  And so it could have gone all

7    the way up.  And if it had gone all the way up to my heart, I

8    would have died.

9         So we caught it before that, but they had to put me on

10   blood thinners, Xarelto, which I was on for two years after

11   that.  But I was in a lot of pain from that for quite a while,

12   and I missed school for like three weeks.

13        And in this process, I was trying -- I had to go to a

14   bunch of doctor appointments to try to figure out what was

15   going on, why the clot happened, and dealing with the pain.

16   And I had initially tried to study while I was off to try to

17   keep up with the course, but I realized that with the pain and

18   the meds that I was on, I couldn't do that.

19        So then I worked it out with my school that during the

20   summer break, which is more intended -- it's a study break that

21   the students -- the rest of my class had before they took

22   the -- that exam, I don't know if it was a CBSSA or the CBSE,

23   but the one that we took in the following June, I believe --

24   Q.   I'm sorry to interrupt.

25        What is the purpose of that test?

1   A.   That was to see whether -- if we pass that, we could start
2   our clinical exams -- or, sorry, clinical rotations for third
3   year.  And if we didn't, then we had to spend one rotation of
4   that doing independent study to study for it and pass it before
5   beginning our clinical rotations.  And it would have been a
6   study program with the school.
7        And so I -- instead of getting that time to study for that
8   exam, that month, which my -- the rest of my class got, I spent
9   that time having to make up my neurology rotation, both the
10  class work and the anatomy part.
11       And so I -- and then in the very last week of that, I
12  was -- like right before we started school, was the exam.
13  Q.   So yesterday defense counsel reviewed your report cards
14  all the way back to kindergarten.
15       Did you obtain those grades with or without accommodation?
16  A.   I have -- I attained those with the informal
17  accommodations and all of the help and support I was getting
18  from friends and family and my teachers.
19  Q.   And whose idea was it to provide you with those informal
20  accommodations?
21  A.   My teachers.
22  Q.   Do you know why the teachers decided to provide you those
23  informal accommodations?
24  A.   I don't know for a fact, but I assume it's because they
25  realized I was struggling or needed some extra help,

1   specifically that help that they could provide to allow me to

2   do the best work that I could.

3   Q.   Defense counsel also asked you about receiving

4   accommodations at OSU in college.

5        Whose idea was it for you to get those accommodations?

6   A.   Initially it was recommended by my Spanish professor and

7   then again by my organic chemistry professor.

8   Q.   Do you know why they made those recommendations?

9   A.   Both had said that when I had asked them about what I

10  could do to do better in the class or achieve, like just show

11  better what I knew or even learn more to do better, they looked

12  at my coursework and my -- and in the case of my Spanish

13  teacher, my oral tests with her.  And both said in a way that,

14  you know, there wasn't much else I could do because I knew the

15  material and it was clear that I knew it by the other things

16  that I had shown, which weren't necessarily timed, and that

17  they thought that just having the extra time would give me the

18  opportunity I needed to show what I knew.

19  Q.   Turning for a moment to the ACT.

20       On the ACT, did you read everything that was on the test?

21  A.   No.

22  Q.   What did you do when you encountered questions that

23  required you to read the entire question or passage?

24  A.   Moved on to the next question that maybe didn't require

25  that.

1  Q.   And what types of questions based on the reading were you

2  able to answer without reading the passage?

3  A.   A lot of the ones that had formulas or math that I could

4  do, or if it was just factual knowledge, so if I knew the

5  answer based on something I had learned without having to read

6  the passage, which maybe the passage restated what I already

7  knew, but I didn't read it if I didn't have to, so I wouldn't

8  be able to say specifically.

9       But then for like the verbal or -- I don't know what the

10  section titles are for the ACT.  But for the ones that were

11  reading based, a lot of the times it would say a line or a

12  paragraph to go to or a specific word even to think about, so I

13  would focus on those and just read those.

14  Q.   How would you compare your experience taking the ACT with

15  your experience taking the MCAT?

16  A.   Well, for one, the MCAT was like a lot longer time wise.

17  There were more sections with more questions that I remember.

18  And the content was more difficult because it was something for

19  college students.  And it included more like sciences, like

20  biology and physics and chemistry, but it also had a writing

21  section and a verbal section.

22       And from my recollection, the ACT had a guess penalty,

23  guessing penalty.  And I'm pretty sure both of them had

24  passages with multiple questions associated with them, and that

25  both of them had multiple questions within the passage, related

1  questions, not just the ones labeled as passage independent,

2  that you could answer without any or very little reading of the

3  passages.

4  Q.   Do you recall how you scored on the writing sample on the

5  MCAT?

6  A.   I got a score of M, which is kind of a weird scoring

7  system.

8  Q.   Do you remember your percentile rank?

9  A.   I believe it was 31 -- 31st percentile.

10 Q.   Defense counsel asked you yesterday about Step 1.

11 A.   Yes.

12 Q.   How would you compare Step 1 with the MCAT?

13 A.   Well, even though the MCAT had like some topics of science

14 and health, the Step 1 is mostly like health-related.  And

15 sometimes there's statistics or social -- social health

16 questions, but that's a very small portion of the questions.

17 It's mostly all health related.  And it's -- the questions

18 themselves are not related to a passage.  They are the

19 question.  And in order to evaluate the information in the

20 passage -- or sorry, evaluate the information in the question

21 for Step 1, in order to answer the question, you have to read

22 the whole question for each question.  And you can't skip

23 information.  There's no like line it directs you to.  It's all

24 information related to that patient or that disease or whatever

25 it's trying to have you analyze in order to answer the

1  question.  And so you can't skip reading like you could with

2  the MCAT or the ACT that had a long passage and then several

3  questions associated with it.

4  Q.   You testified earlier this morning that you enjoy being

5  read to?

6  A.   Yes.

7  Q.   Who reads to you?

8  A.   Neil, sometimes my parents, my friends will.  I had a

9  friend in -- when I was between undergrad and middle --

10 undergrad and medical school who was reading the Game of

11 Thrones book series, and so every now and then she would invite

12 me over and she would read the Game of Thrones series to me.

13 And she would do like the little voices for each character,

14 which was cool.  And a lot of my friends read -- like if I'm

15 watching a movie, they know that if there's captions at the

16 bottom, that I can't read fast enough.  My parents do this too.

17 But they'll read it for me.  That's less enjoyable and more

18 necessity, but it's a lot more enjoyable to watch the movie if

19 they're doing it and I don't have to pause it to do it.

20      Yeah.  I've pretty much always enjoyed -- like I enjoy the

21 story, pretty much like I feel anybody would, except for that.

22 It's -- I don't know.  There's that personal connection, too,

23 with somebody reading to you.

24 Q.   Do you ever read for pleasure on your own?

25 A.   No.

1  Q.   Why is that?

2  A.   It's work for me.  It's hard work.  And even if I want the

3  story, that act of reading it is not enjoyable and it takes

4  forever.  And so it's not -- it's not an activity that I would

5  choose to do for fun or leisure or however people describe it.

6  It's work for me.

7  Q.   If you withdraw from medical school, can you be readmitted

8  if you have not passed Step 1?

9  A.   No.

10  Q.   And can you take Step 1 if you're not enrolled in medical

11  school?

12  A.   No.

13        MS. VARGAS:  No further questions.

14        THE COURT:  Any recross?

15        MR. BURGOYNE:  Just a couple of quick questions, Your

16  Honor.

17                    RECROSS-EXAMINATION

18  BY MR. BURGOYNE:

19  Q.   Ms. Ramsay, you testified about your performance on the

20  writing section of the MCAT exam?

21  A.   Yes.

22  Q.   And you performed I think at the 31st percentile.

23       There's no writing component to the Step 1 exam, is there?

24  A.   Not Step 1.

25  Q.   And then I think you indicated on the ACT exam, if you got

1  to a question that you couldn't answer, you just moved on to

2  the next question if it required reading?

3  A.   Yes.

4  Q.   And do you recall you scored in the 97th percentile on the

5  ACT exam?

6  A.   Yes.

7  Q.   And your reading scores in arts and literature were in the

8  99th percentile?

9  A.   Yes.

10  Q.   You said the MCAT is a longer exam than the ACT, and it

11  also includes some science and biology?

12  A.   With longer, I think I was referring to the time that it

13  was scheduled.

14  Q.   Okay.  The amount of time the test takes?

15  A.   Yeah.  I don't know about word count because I don't have

16  access to those exams.

17  Q.   And again, you refer to a guessing penalty, but do you

18  recall yesterday we saw in the ACT booklet that ACT says there

19  is no guessing penalty on the exam?

20  A.   That's what it says, but, again, my recollection is that

21  there was.

22       MR. BURGOYNE:  Okay.  No further questions.

23       THE COURT:  Very well.  You may step down now, ma'am.

24  Watch your step.

25       Next witness.

1           MR. BURGOYNE:  Your Honor, we have I guess a

2   scheduling question.

3           Our preference is to sort of continue on with

4   plaintiffs putting on their case and us putting ours on.  Our

5   experts aren't available tomorrow but are available a week from

6   Friday, or Friday.  We can have at least one of them available

7   Friday, I think.

8           THE COURT:  Surely you jest.

9           Why wouldn't they be available pursuant to us

10  scheduling this hearing for this week?

11          MR. BURGOYNE:  Well, again, Your Honor, it was our

12  understanding initially it was a one-day and then it was a

13  two-day hearing, so it wasn't our understanding it could

14  continue for a third, so I apologize.

15          THE COURT:  Well, this is a second day, and so where

16  are they?

17          MR. BURGOYNE:  They're here, Your Honor.

18          THE COURT:  All right.  We can get to them.

19          MR. BURGOYNE:  All right.  We'll take them out of

20  order and we'll put ours on next?

21          THE COURT:  If necessary, but you can't --

22          MR. BURGOYNE:  Okay.

23          THE COURT:  You're looking at my scheduling and you're

24  attempting on a Friday and that's not conceivable.

25          MR. BURGOYNE:  Okay.  That's fine, Your Honor.  We

1   thought we would check with you and see if that was a

2   possibility.

3           THE COURT:  Very well.  Yes.

4           MR. BERGER:  Yes.  And we will accommodate that.  But

5   I then need a moment to consult with Dr. Smith, who would

6   otherwise be the next expert, because he has to rearrange his

7   schedule.

8           THE COURT:  Fine.

9           MR. BERGER:  So if I could just have two minutes --

10          THE COURT:  You've got two minutes right now.

11          MR. BERGER:  Thank you very much.

12          MR. BURGOYNE:  And we'll get our witness.

13          THE COURT:  You said they're not going to be long in

14  any case?

15          MR. BURGOYNE:  One is very short.  The other one is a

16  little longer.

17          (A discussion off the record occurred.)

18          THE COURT:  Let's proceed.  We'll have you call your

19  witness out of order.

20          How long is your expert witness, just out of

21  curiosity?

22          MR. BERGER:  I estimate that his direct will be

23  between an hour and an hour-and-a-half, but I think closer to

24  an hour.  And I don't know about their cross, obviously.

25          THE COURT:  Cross-examination.

1          Very well.  Why don't you call your witness.

2          MS. MEW:  Thank you, Your Honor.  The defense calls

3    Dr. Benjamin Lovett.

4          THE COURT:  All right.  Watch your step coming around

5    there and around this.

6          THE WITNESS:  Thank you.

7          DR. BENJAMIN LOVETT, after having been duly sworn, was

8    examined and testified as follows:

9          COURT REPORTER:  State your name for the record.

10         THE WITNESS:  Benjamin Lovett.

11                    DIRECT EXAMINATION

12   BY MS. MEW:

13   Q.   Good morning, Dr. Lovett.

14   A.   Good morning.

15   Q.   Are you an external consultant for NBME?

16   A.   Yes.

17   Q.   And how long have you been serving in that role?

18   A.   I believe it's been nine years.  I think I started in

19   2010.

20   Q.   And briefly, what do you do in that role?

21   A.   For NBME, I review cases that are sent to them,

22   applications for accommodations.  So typically I'll get an

23   email that asks me to go to a secure website.  I download a

24   file that has the documents that the applicant has submitted,

25   review those and write a review with some sort of

1  recommendation.  Or if I can't provide one, I give it still a

2  summary of the documents.

3  Q.   And what questions does NBME ask you to answer as you're

4  reviewing accommodation requests on the USMLE?

5  A.   One thing I consider is whether or not the applicant meets

6  criteria for the diagnoses that they have requested

7  accommodations under.  If they have, then I also ask a question

8  of whether or not they're substantially limited in any major

9  life activities that are relevant to taking whatever tests

10  they've asked for accommodations on.  And then, if appropriate,

11  I recommend or summarize evidence with regard to what

12  accommodations, if any, are indicated based on the evidence

13  that's been submitted.

14  Q.   And did you review Jessica Ramsay's request for

15  accommodations in the US MLE?

16  A.   I did.  I wasn't an initial reviewer, so I saw I believe

17  it was her request for reconsideration.

18  Q.   And is it your understanding in reviewing that request for

19  reconsideration that you saw her entire file, all of the

20  documentation she had submitted to the NBME up to that point in

21  support of her requests?

22  A.   It is, yes, that I saw all the evidence that she had

23  submitted up to that point.

24  Q.   And did you provide a written analysis and recommendation

25  to NBME with respect to her request?

1  A.   I did.

2  Q.   And then did you also provide a declaration in this

3  litigation relating to Ms. Ramsay's testing accommodation

4  request?

5  A.   Yes.

6  Q.   Dr. Lovett, I'm going to ask you to turn to Exhibit 6 in

7  the defense exhibit book, which should be a black binder, the

8  first volume.

9  A.   Okay.  Let's see.  Okay.

10       Okay.  I'm there.

11  Q.   You're going to be quicker than I am.

12  A.   That's okay.

13  Q.   Do you recognize this exhibit with the beginning document,

14  the declaration that you submitted in this litigation?

15  A.   Yes.

16  Q.   And then Tab A to Exhibit 6, do you recognize this as your

17  CV?

18  A.   Yes.  As of the time the declaration was submitted.

19  Q.   Understood.  And then Exhibit B, is this the letter that

20  you submitted to NBME containing your analysis and

21  recommendation on initially reviewing Ms. Ramsay's request for

22  reconsideration?

23  A.   Yes.  That's my review of the documentation.

24       MS. MEW:  Your Honor, this is in the record in terms

25  of being filed in support of our preliminary injunction

1  opposition, but we'd also ask to admit Exhibit 6 to the record

2  today.

3          THE COURT:  Very well.  Hearing no objection.

4          MR. BURGOYNE:  No objection.

5          THE COURT:  It's admitted.

6          (DX-6 admitted.)

7  BY MS. MEW:

8  Q.  Dr. Lovett, we are going to get into more details very

9  shortly, but could you briefly state the opinion that you

10  reached regarding Ms. Ramsay's request for testing

11  accommodations based on the materials that she submitted to

12  NBME in support of her request?

13  A.  Sure.  Ms. Ramsay had requested accommodations under

14  several different conditions or diagnoses.  And my expertise is

15  in learning disabilities and ADHD, so I reviewed with regard to

16  those.  And that really applies to pretty much all of the

17  testimony that I'm giving.

18      And my conclusion is that there was insufficient evidence

19  supporting learning disabilities or ADHD.  And there was

20  actually some pretty significant evidence undermining those

21  diagnoses, arguing against the learning disabilities in

22  particular.

23  Q.  And then since the time that you even prepared your

24  declaration in this case, have you reviewed additional material

25  that's been produced during the discovery?  And I'm speaking

1  specifically with regard to Ms. Ramsay's school records, the

2  report cards and additional standardized test scores that we've

3  been discussing in the hearing.

4  A.   Yes.  Those have been provided to me, and I have reviewed

5  them.

6  Q.   Have the opinions that you expressed in your declaration

7  and in your written report for NBME changed in any respect with

8  regard to this additional information?

9  A.   No.  The school records and especially the standardized

10  test scores actually really strengthen the argument against the

11  learning disabilities.  And things like the excellent scores

12  for attention or excellent ratings by teachers for attention in

13  the report cards further weaken the argument for ADHD and more

14  undermine that diagnosis as well.

15  Q.   And we're going to get again into a little more detail of

16  that, but before we do so, I'd like to talk just a bit about

17  your background and credentials.

18       We can reference your CV, which is Exhibit 6A, Defense

19  Exhibit 6A.

20       If you'll just briefly state your educational background.

21  A.   I have a bachelor's degree in psychology from Penn State

22  University, a master's degree in psychology from Syracuse and a

23  doctoral degree, a PhD in school psychology, from Syracuse as

24  well.

25  Q.   And where do you currently work?

1  A.   Teachers College, Columbia University in New York City.

2  Q.   And how long have you been in that position?

3  A.   Just for a few months.  I've -- since September 1, 2019

4  officially, as it says on the CV.

5  Q.   Okay.  And where were you before then?

6  A.   Before then, for five years, I was a professor achieving

7  tenure at the State University of New York at Cortland.  Before

8  that, I taught for seven years at a small liberal arts college,

9  Elmira College.

10 Q.   Do you have any particular specialties in your work?

11 A.   Learning disabilities and ADHD, specifically their

12 diagnostic assessment.  And also the provision of testing

13 accommodations to students with disabilities.  Most of my work,

14 pretty much all of my current work, is on one of those two

15 things or both.

16 Q.   And what are your primary job responsibilities as a

17 professor?

18 A.   As a professor, teaching, research and service.  They're

19 sort of the three things professors do.  So I teach classes at

20 Teachers College, I train graduate students who are becoming

21 certified school psychologists, and some of them will become

22 researchers as well.  So I teach courses on law and ethics for

23 school psychologists, for instance.

24      I was brought there, really, to take over the assessment

25 courses, and so I'll start those in the spring semester.  So

1   that's teaching.

2        In terms of research, I present at conferences, giving --

3   I do talks.  I publish in peer-reviewed journals.  I published

4   a book on testing accommodations.

5        And then with regard to service, that involves things like

6   sitting on committees, advising students, other sorts of

7   informal mentoring and that sort of thing.

8   Q.   Focusing particularly on your research work, if we could

9   look at Exhibit 6A, which is your CV, pages 2 through 9.

10       Is this a listing of your publications and works in

11  progress, including publications in peer-reviewed journals?

12  A.   Yes.

13  Q.   And focusing specifically on your peer-reviewed journal

14  articles, does any of this research pertain to learning

15  disabilities or ADHD?

16  A.   Yes.  Many of the articles are about learning disabilities

17  and/or ADHD.

18  Q.   And what types of journals are you publishing in?

19  A.   Journals in the fields of psychology and education,

20  specifically journals on assessment issues, journal on school

21  psychology, things like that.

22  Q.   And you mentioned that you have been invited to give -- to

23  speak to different groups.

24       Now, can you give examples of some of the groups that

25  you've been invited to present to?

1   A.   Sure.  Currently a lot of the talks that I give are

2   actually to schools.  So I speak to teachers.  I speak to

3   school administrators, groups of school psychologists.  In

4   addition, I've done continuing education workshops for

5   psychologists, those who do evaluations, things like that.

6   I've also given invited talks beyond that to reviewers, for

7   instance, of documentation.  I've given invited talks at

8   conferences, things like that.

9   Q.   And just briefly, focusing on your teaching, if we look at

10  page 16 of your CV, is this an accurate listing of the courses

11  you have taught?

12  A.   As of that date, yes.

13  Q.   So you might have some additional courses you're now

14  teaching at Columbia?

15  A.   Right.  There's one this semester.

16  Q.   And do you teach classes that address learning

17  disabilities and ADHD?

18  A.   Yes.  And I have for many years now.

19  Q.   Dr. Lovett, are you a licensed psychologist?

20  A.   I am.

21  Q.   What does it mean to be a licensed psychologist?

22  A.   In New York state, at least, the requirements for

23  licensure are education, experience and examination passing.

24       So you have to have a doctoral degree from an appropriate

25  institution.  You have to have thousands of hours of experience

 1  supervised doing various sorts of psychological practice,

 2  assessment consultation and intervention.  And then you also

 3  have to pass a licensure exam.

 4  Q.   Do you see patients or clients as part of your work?

 5  A.   I don't.  I don't have a clinical practice.  I

 6  occasionally do clinical consultation, but I don't have a

 7  clinical practice.

 8  Q.   And do you currently perform diagnostic evaluations as

 9  part of your work?

10  A.   No.

11  Q.   Have you ever performed diagnostic evaluations?

12  A.   I've been part of teams certainly in school and clinical

13  settings doing them, but not presently.  And that was during my

14  training as part of that supervised experience.

15  Q.   Are you familiar, nevertheless, with the diagnostic tests

16  that were administered to Ms. Ramsay by Dr. Smith and her other

17  evaluators?

18  A.   Yes.  I've given many of them myself for research

19  purposes, for training purposes.  And even those that I haven't

20  given myself, I'm familiar with their content and format in

21  general.

22       MS. MEW:  Your Honor, the defense offers Dr. Lovett as

23  an expert witness in the evaluation and diagnosis of

24  individuals with learning disabilities, ADHD, as well as the

25  provision of accommodations and testing and academic

1  environments and research related to this.

2        THE COURT:  Very well.

3        MR. BERGER:  Your Honor, I think my comments have more

4  to do with weight than overall expertise.  So certainly we

5  acknowledge that by education and training, Dr. Lovett has

6  expertise in these areas Counsel has brought out.  And he does

7  acknowledge that he does not have a clinical practice.  And

8  that will, of course, be something that I will examine about

9  and will give -- there will be some arguments, therefore, about

10 the weight.

11       So with all that, we don't object to allowing this to

12 proceed, but I may have particular points to make later on

13 about his expertise in particular areas.

14       THE COURT:  Very well.  We find the witness to be an

15 expert in the area that has been stated by counsel.

16       You may proceed.

17       MS. MEW:  Thank you, Your Honor.

18                   DIRECT EXAMINATION

19 BY MS. MEW:

20 Q.  Dr. Lovett, when you are reviewing a request for

21 accommodations on the USMLE like Ms. Ramsay's, do you meet with

22 that individual in person as part of your review?

23 A.  No.

24 Q.  So how are you able to assess whether that individual has

25 an impairment or should be receiving testing accommodations on

1  the test?

2  A.   Based on the documentation that they've provided.  And

3  that documentation virtually always involves records and

4  reports from individuals who have met with them personally.

5       So I can't think of a case of a diagnosis of learning

6  disabilities or ADHD where an applicant has not submitted

7  letters or reports, records, from someone who performed an

8  evaluation personally.

9  Q.   And so you are looking to the information that they

10 themselves have put forth in support of their request?

11 A.   Exactly.  For NBME in particular, I believe that I see all

12 of the documents that are submitted even if there's email

13 correspondence between the applicant and NBME.

14 Q.   And are you familiar with other -- in other contexts where

15 there are other reviews of individuals' impairments or levels

16 of disability for purposes of receiving services in other

17 contexts where the review might be solely based on paper, as

18 opposed to an in-person meeting?

19 A.   Generally, yes.  I have colleagues who review for

20 disability, not so much under ADA but workmen's compensation

21 and other sorts of things.  And my understanding is that at

22 times there's no personal evaluation.

23 Q.   And let's focus now on your review of Ms. Ramsay's file.

24      And just starting first with logistics, how did NBME reach

25 out to you to review her file?

1  A.    In her case, I believe, just like in virtually all cases

2  with NBME, I got an email one day asking me to log in to a

3  secure website because there was a review that had been

4  deposited for me to look at.  And so I went to that website,

5  logged in and downloaded a file of documentation, a PDF file of

6  all the papers that had been submitted.

7  Q.    And did you have any communication with NBME about the

8  substance of this file before you began your review?

9  A.    I don't believe so.  I don't recall any communication in

10  this case.  And the years that I've been working with NBME, I

11  can only remember a handful of times when I've communicated

12  with them about a file before writing a report.  In those

13  cases, it's because there's a piece of paper that's illegible

14  or there's a piece a paper that seems to be like missing a page

15  or something like that, maybe when it was photocopied.  And in

16  this case, I certainly don't recall anything like that.

17  Q.    And then between the time you reviewed the file and you

18  wrote the report that was attached as Exhibit B to your

19  declaration, did you have any communications with NBME?

20  A.    Again, I don't recall any, and it would have been

21  extremely unusual.

22  Q.    And then after you submitted your report to NBME, did they

23  suggest any revisions or changes to the report that you wrote?

24  A.    Just the same thing, I don't recall any.  I don't believe

25  there were any communications at that point.  And it would be

1  extremely unusual to hear anything.  In the vast, vast majority

2  of cases after I turn in a review, I don't hear anything at

3  all.

4  Q.   When Ms. Ramsay requested accommodations on the USMLE,

5  which diagnoses or impairments were the basis for her request?

6  A.   She requested accommodations under learning disabilities

7  and reading and writing, ADHD, headaches and a clotting

8  disorder.

9  Q.   And as you previously stated, your testimony today is

10 focusing on the learning disabilities and ADHD.  Correct?

11 A.   Exactly.

12 Q.   Okay.  Can you very briefly explain the diagnostic

13 features of ADHD?

14 A.   Sure.  To have ADHD, someone not only needs to have

15 episodes or instances where they have trouble paying attention

16 or impulsive or overactive/hyperactive, but they have to be

17 often and they have to be frequent.  They have to be to a level

18 that's atypical and very unusual for their age.  And so that's

19 just one of the criteria.  You have to have very high levels of

20 symptoms.

21      The second criterion is that they have to start early in

22 life.  So they have to be present -- you have to have some

23 symptoms by age 12.

24      The third criterion is that they have to be present in

25 multiple settings.  If someone is only showing symptoms at

1  school, for instance, that's not ADHD.

2      A fourth criterion is that they have to interfere with

3  someone's performance.  If someone has those symptoms but

4  they're doing fine, that's not ADHD.  It may be a personality

5  profile or a personality trait or set of traits, but it's not a

6  disorder.  Disorders involve impairment.

7      And then finally, it can't be due to something else.  So

8  if someone is having high levels of those symptoms because

9  of -- just because of drug use or something like that, we

10  wouldn't call that ADHD.  So those are the five criterion for

11  ADHD.

12      For learning disabilities, the core sort of --

13  Q.  Let me stop you.  Let's stay on ADHD for just a minute.

14  A.  Okay.

15  Q.  What are some of the traits or characteristics that are

16  represented in the sort of symptom criteria for ADHD?

17  A.  Sure, yeah.  So there are 18 symptoms that are listed in

18  the DSM for ADHD.  Nine of them have to do with inattention.

19  Those are things like making careless mistakes, being easily

20  distracted.  The other nine have to do with hyperactivity and

21  impulsiveness.  Those are things like talking excessively, you

22  know, being impulsive, reacting before you should, things like

23  that.

24  Q.  How do you differentiate individuals who have these types

25  of traits, maybe not to a clinical level, in individuals who

1  experience these traits to something that would constitute

2  ADHD?

3  A.   Yeah, these are things that I had sort of mentioned

4  earlier.  So one is certainly the frequency.  Again, everyone

5  has experiences where they have trouble paying attention in

6  certain settings, where they have to work harder than others to

7  pay attention or focus.  We all have experiences where we feel

8  jittery.  We all have experiences where we act impulsively and

9  then regret it later and things like that.  But the frequency

10 is one thing.  So frequency and severity, we can sort of put

11 those together.

12      And then another feature would be the impairment, the fact

13 that it's actually causing problems for someone, if they are

14 experiencing significant negative consequences and then the

15 symptoms continue.

16      So for most of us, when we experience significant enough

17 negative consequences, we learn, we adapt, we change sort of

18 the way that we're behaving.  For individuals with ADHD, those

19 negative consequences bother them.  They really cause them some

20 distress, but they continue to engage in those behaviors.  And

21 so it's something that really causes a substantial level of

22 impairment typically.

23 Q.   And what would be an example of a substantial level of

24 impairment?

25 A.   So depending on the symptoms, it would differ, but for

1    someone who, for instance, a schoolchild with ADHD, we would

2    expect them to be doing poorly in school.  So if someone has

3    ADHD to a significant degree such that they meet the criteria

4    for clinical diagnosis, we would expect that they have trouble

5    remembering to turn in work, to the point where their grades

6    are affected, but they continue to not turn in work despite

7    those negative consequence.  We would expect that they're not

8    paying attention to the teacher and so they're actually not

9    getting instruction in the sense.  So we would expect that to

10   be reflected in terms of their school performance as well.

11   Those are the sorts of things for a schoolchild, for instance,

12   with inattention.

13   Q.   And we were speaking about school, but is ADHD a learning

14   disability?

15   A.   No, no.  Technically ADHD would not be considered a

16   learning disability.  Those are separate categories in the

17   classification system.

18   Q.   So could someone have ADHD and have no functional

19   impairment, say, in reading or writing?

20   A.   Yes.  I certainly have seen cases where folks who I think

21   have a valid diagnosis of ADHD nonetheless do well in reading

22   and writing for various reasons.

23   Q.   And then you were starting on this and I stopped you.  But

24   now if you could just briefly discuss the diagnostic criteria

25   for specific learning disorders?

1  A.    Yeah, absolutely.  So learning disabilities involve

2  trouble acquiring academic skills initially, reading, math or

3  writing skills or some grouping of those.  And in addition,

4  that's reflected in terms of poor performance on standardized

5  tests.  That's actually something that's in the diagnostic

6  criteria as well as poor performance in real world settings,

7  educational or occupational performance.  Those things are

8  noted in the criteria.

9        And then also those deficits can't be due to another

10  disorder or another problem.  Like, for instance, if someone

11  has a general low ability, then that could explain academic

12  problems, but we wouldn't call that a learning disability.

13  Q.    And so what kind of objective evidence are you looking for

14  in determining whether someone meets a diagnostic criteria for

15  a learning disability?

16  A.    There are really two types of evidence that I look for as

17  a reviewer.  One is evidence from diagnostic tests that are

18  administered by, you know, an evaluator, and then the second

19  sort of evidence is from real world settings, because we really

20  need both.  So the real world evidence would include things

21  like grades on real world standardized tests that are taken for

22  admission purposes or for, you know, group tests that are given

23  in schools but under a standardized set of conditions, as well

24  as grades and other records of school performance.  Those are

25  in that second grouping of real world evidence.

1  Q.  If an individual has sort of uneven strengths and

2  weaknesses, let's say, really superior math skills or above

3  average math skills but perhaps just average reading skills, is

4  that sufficient to show a learning disability?

5  A.  No, absolutely not.  It is typical to have a profile of

6  strengths and weaknesses in the sense of having some things

7  that you're better at than other things.  We all have some

8  personal strengths, we all have some personal weaknesses in

9  that sense of the term.  And so if your math skills are better

10  that your reading skills, that by itself doesn't mean anything.

11     I should also mention individuals with higher levels of

12  ability tend to have more variability across areas.

13  Q.  Are you familiar with the concept of individuals who are

14  both gifted and learning disabled?

15  A.  Absolutely.

16  Q.  What does it mean to be gifted?

17  A.  Traditionally giftedness was defined rather narrowly based

18  on a high IQ score, an IQ score above 120 or 130 in some cases.

19  There's no official definition of giftedness in a diagnostic

20  manual.  And these days, different school districts have

21  different criteria for entry into giftedness programs.  Many

22  still use IQ tests, but they also may use tests of academic

23  skills, creativity tests as well, parent and teacher ratings,

24  things like that.

25  Q.  Is it possible to be both gifted and learning disabled?

1   A.   Absolutely.  There's no reason why someone, you know,

2   cannot have significant deficits in academic skills even if

3   they meet those various criteria to be called gifted.

4   Q.   And how would you expect that to present itself?

5   A.   We would see evidence of both meeting the gifted criteria

6   and also separately distinctly meeting the criteria for a

7   learning disability.

8        So whatever your preferred definition or whatever a school

9   district is using as a gifted criteria set, they would be

10  meeting those, and in addition, they would meet the

11  requirements for a learning disability separately.

12  Q.   And does a learning disability require some level of

13  impaired performance?

14  A.   It's the core definition of it.  Academic skills are

15  substantially and quantifiably impaired.  Substantially and

16  quantifiably is the term in the diagnostic criteria.

17  Q.   What is the discrepancy theory?

18  A.   For a long time, starting back when the concept of

19  learning disabilities was first developed, it was thought

20  initially that learning disabilities should be diagnosed by

21  looking at a discrepancy between someone's IQ and someone's

22  level of achievement.

23       And so for a long period of time, the diagnostic criteria,

24  the clinical diagnostic criteria for learning disabilities

25  involved some sort of calculation of that discrepancy.  So you

LOVETT - DIRECT

1 would administer an IQ test, you would administer a test of

2 academic skills.  And if there was an area where there was a

3 significant gap between IQ and achievement, then that was part

4 of the criteria for a learning disability.

5     Research accumulated over the course of a decade showing

6 that those discrepancies are not reliable and also that they're

7 not a valid indicator for many reasons.  And so when the

8 diagnostic manual that's most commonly used, the DSM, was

9 revised, it was actually revised specifically to address that

10 problem.  And so the discrepancy criteria are gone.  And that's

11 been since 2013 at the latest, at least.  But the discrepancy

12 approach has been under attack by researchers whose data

13 continue not to support it for decades.

14 Q.   And just for the record, when you're referring to the DSM,

15 what are you referring to?

16 A.   That's the Diagnostic and Statistical Manual of Mental

17 Disorders, currently in its fifth edition, so that would be the

18 DSM-5.

19 Q.   And so if I understand it correctly, under the discrepancy

20 theory, someone could potentially be diagnosed with a learning

21 disability if they had an IQ in the 95th percentile but

22 academic scores in the average range?

23 A.   In theory, yes.  When the discrepancy formulas and the

24 discrepancy criteria were originally developed, it was never

25 anticipated, I think, but it would be applied to folks like

1  that.  The thought was that to be referred for an evaluation to

2  see if someone has a learning disability in the first place,

3  they would actually be doing poorly academically, they would

4  actually have low academic skills.  And I think it was a later

5  application or misapplication to individuals who were not

6  impaired academically.

7       But it is true that under the discrepancy approach to

8  diagnosis, in theory, someone certainly could have average

9  range achievement and still qualify as having a learning

10 disability because they were not performing up to their

11 ability.  The idea was that IQ was the sort of measure of your

12 potential and you were entitled to perform in every area up to

13 your IQ.  We know for a lot of reasons that's wrong.

14 Q.  So within your profession, that is no longer an accepted

15 method for diagnosis?

16      MR. BERGER:  Objection.  I think at this point, on a

17 question like that, that counsel is leading her own witness

18 more than is appropriate.

19      THE COURT:  You can rephrase your question.

20 BY MS. MEW:

21 Q.  Is the discrepancy model currently accepted in your

22 profession?

23 A.  I don't know any researchers who would endorse it, folks

24 who specialize in looking at evidence and conducting scientific

25 studies of learning disabilities.  Are there practitioners, are

1  there evaluators who use it, at times, yes.

2  Q.   Are ADHD and specific learning disabilities

3  neurodevelopmental disorders?

4  A.   Yes.  That's the category in the DSM that they're called,

5  neurodevelopmental disorders, because they are understood to be

6  brain based and to start early in childhood.

7  Q.   Okay.  You anticipated my second question.  Thanks.

8       So now focusing back on your review of accommodation

9  requests, what type of information are you looking for when you

10  review a file for a candidate who requests accommodations on

11  the USMLE?

12  A.   Well, it depends on the disorder.  So, again, for learning

13  disabilities, it's the two types of evidence that I just -- I

14  discussed earlier.  So one thing that I look for is evidence

15  from standardized diagnostic tests that are given by an

16  evaluator showing scores that are below the average range in

17  terms of academic skills, and then the second type of evidence

18  that I look for is real world evidence.  So evidence of poor

19  grades, evidence of poor performance on real world tests that

20  are taken without accommodations.

21  Q.   Ms. Ramsay submitted a report from Dr. Robert Smith in

22  support of her request for reconsideration.

23       Are you familiar with that report?

24  A.   Yes.

25  Q.   If you'll turn to Defendant's Exhibit 3 and Tab B behind

1   that.

2   A.   Okay.  I'm there.

3   Q.   Is this the report from Dr. Smith that you reviewed as

4   part of your review of her file?

5   A.   Yes.

6   Q.   Looking at the first page of this report, Dr. Smith lists

7   a number of sources of information.  And focusing here on the

8   items in caps, I'm going to take them a bit out of order.  I'm

9   just going to ask you to just very briefly explain what some of

10  these tests are.

11       One of them is the Nelson-Denny Reading Test.

12  A.   Uh-huh.

13  Q.   Is this a diagnostic test?

14  A.   The Nelson-Denny, that one is a little bit complicated

15  because it was -- it's generally interpreted to be a screening

16  test, but it can provide useful evidence relating to a

17  diagnosis of reading problems.

18  Q.   And what does it measure?

19  A.   It measures reading skills.  It has a component that looks

20  at someone's ability to take a vocabulary test through reading.

21  It has another component that looks at reading comprehension,

22  where someone reads passages and then answers multiple choice

23  questions about the passages.  And it generates sort of a

24  supplemental score, called reading rate, that is really not

25  reliable even according to the Nelson-Denny manual, but that's

1  part of the comprehension portion.

2  Q.   Did Ms. Ramsay obtain any below average scores on this

3  test?

4  A.   Yes.

5  Q.   And if it helps, you can refer to pages 22 to 23.  And

6  it's of the report, not -- the page in the actual report, not

7  the page numbers on the top that show the court filing.

8  A.   Okay.  Yes, I'm there.

9  Q.   What were Ms. Ramsay's below average scores on this test?

10 A.   So according to this report, her vocabulary score was

11 below average at the 11th percentile.  The 11th percentile

12 would generally be considered, in many tests, the low average

13 range, I should say.  And that 11th percentile score did

14 compare her to graduating college seniors.  But compared to

15 that group, her scores were below average.

16     I should mention, in the DSM -- the performance doesn't

17 just have to be below average, it has to be below average

18 compared to age expectations.

19     And so the Nelson-Denny doesn't directly show any sort of

20 age comparison.  Dr. Smith also compared Ms. Ramsay's

21 performance to those of graduating high school seniors.  And

22 that's often done for the purposes of getting something that

23 roughly approximates a general population sort of comparison.

24     That showed that her comprehension score was low average

25 at the 18th percentile.  And her reading rate score, the

1  unreliable score, as I mentioned, even the manual shows to be

2  so, was at the 1st percentile, at the very bottom.

3  Q.   Why does the manual state that that reading rate score is

4  unreliable?

5  A.   Well, there are ways of calculating a test's reliability.

6  And here it was done, I believe, by correlating the two forms

7  of the Nelson-Denny test.  And the correlation between those

8  two forms was below what's generally considered to be a

9  minimally accepted level of reliability.

10       So .7 is often described as minimally acceptable.  And if

11  I recall correctly from the manual, I think the reliability of

12  the reading rate score is .68.

13  Q.   And how is the reading rate score measured?

14  A.   So during the comprehension portion of the Nelson-Denny,

15  someone starts reading the first passage on the test.  And one

16  minute in, you stop them and ask them basically to indicate

17  where they are.

18       So it's a -- it's -- you're essentially asking someone how

19  far they've gotten, but there's no check on their comprehension

20  for that reading rate score.  And it's just based on one minute

21  of their silent reading with no comprehension check.

22  Q.   And so if these scores, the ones that you mentioned, the

23  reading rate score in particular, if the 1 percent score is

24  accepted at face value, what would it reflect?

25  A.   If we put aside the issues with reliability, it would

1  suggest that her reading speed is in the bottom 1 percent, even

2  compared to high school students, high school seniors in this

3  case.

4  Q.   And did Dr. Smith also administer the Wechsler Individual

5  Achievement Test, Third Edition?

6  A.   Yes.

7  Q.   And is that commonly referred to by acronyms, like WIAT,

8  WIAT?

9  A.   Yes, I've always heard the WIAT, or that's how I was

10  trained, but WIAT is another pronunciation.

11  Q.   W-I-A-T.  What does this test measure?

12  A.   The WIAT is a general achievement battery, so it measures

13  academic skills in a bunch of areas, reading, math, writing, as

14  well as oral language.

15  Q.   Did Ms. Ramsay obtain any below average scores on this

16  test?  And if it helps, I think this is page 18.

17  A.   Okay.  Yes, she did.  On the WIAT, the main score that I

18  would say was below average, in this case described as far

19  below average, was her oral reading fluency score.

20  Q.   And what was that score?

21  A.   That was based on her reading passages aloud and looking

22  at the speed that she took to read those passages.

23  Q.   And then what actual score did she receive?

24  A.   She received a 67, where 100 is average.  And so that was

25  at the 1st percentile.

1          MR. BERGER:  Can I just ask for a page reference?

2          MS. MEW:  Oh, I'm sorry, yes.  Page 18 of 31.  I'm

3     using the report page numbers, not the court filing numbers.

4          THE WITNESS:  There's a table of scores there.

5     BY MS. MEW:

6     Q.   And so if we took that score at face value, what would it

7     indicate?

8     A.   That would, again, suggest that her reading speed or

9     fluency, which includes, actually, a bit of comprehension, was

10    in the bottom 1 percent.  And the WIAT compared her to age

11    peers.  So that would have been compared to other folks her age

12    at the time, her reading fluency was in the bottom 1 percent of

13    the population approximately.

14    Q.   Did Ms. Ramsay also take the Woodcock-Johnson IV Tests of

15    Achievement?

16    A.   Portions of those tests, yes.

17    Q.   Which portions did she take?  Which portions did Dr. Smith

18    administer?

19    A.   Let me look for them.

20    Q.   And this is page 21.

21    A.   Okay.  So she took, at the very least, the

22    sentence reading fluency test and -- the sentence reading

23    fluency test and the word fluency reading test.  And together

24    the scores on those two tests are used to make an overall

25    composite score called reading rate.

1  Q.   And did Ms. Ramsay obtain any below average scores on

2  these tests?

3  A.   All of her scores, the overall reading rate and the two

4  subscores that it's made of, are below the average range

5  certainly, even below the low average range.

6       Her overall score for reading rate is at the 1st

7  percentile.  So again, that would be the -- approximately the

8  bottom 1 percent of the population.

9  Q.   And when you say the population, is that age based or --

10 A.   In this case she was, again, compared to age peers.

11 Q.   So this is saying that she's performing at the 1 percent

12 level, 99 percent of her same age peers perform better?

13 A.   Taken at value, that's approximately -- taken at face

14 value, that's approximately the interpretation here.

15 Q.   That's what it would be.

16      And then did Dr. Smith also administer the Gray Oral

17 Reading Test, or the GORT?

18 A.   Yes.

19 Q.   Okay.  This is pages 21 and 22.

20      And what does this test measure?

21 A.   This test measures oral reading skills, both with regard

22 to accuracy and fluency, as well as comprehension.

23 Q.   And how does it measure that?

24 A.   So the individual reads a series of passages that get

25 progressively longer and more difficult.  And after each

1  passage, after reading it aloud, the passage is removed and the

2  individual answers comprehension questions about it.  While the

3  client is reading the passages, the examiner notes whether or

4  not errors are made, as well as the time that's taken, things

5  like that.

6  Q.  And did Ms. Ramsay obtain any below average scores on

7  these GORT tests?

8  A.  Yes.  So her rate score was 3, which is at the first

9  percentile.  Her accuracy score, in terms of errors being made,

10  was also below average.  Her fluency score is made up of the

11  rate and accuracy scores, so it, too, unsurprisingly then is

12  below average.  And her comprehension score was also very low,

13  a 3, where 10 is average in this case.  And her score was 3

14  and, that was at the 1st percentile as well.

15  Q.  And so again, taken at face value, what would these scores

16  reflect?

17  A.  Extremely poor reading skills with regard to a variety of

18  different areas of reading.  Not just the speed, but also

19  things like accuracy and comprehension.

20  Q.  And falling at the 1 percentile, who is that compared to?

21  A.  That was compared, not exactly to age peers, because the

22  GORT doesn't quite go up to Ms. Ramsay's age range, but to a

23  sample of the general population, I believe, of 19 to 23 year

24  olds.

25  Q.  So with respect to the below average scores on these

1  various tests we just discussed, in your opinion, are those

2  scores credible?

3  A.   No.

4  Q.   And what do you mean first when we're talking about --

5  credible, what do you mean when you're discussing a credible

6  score?

7  A.   Yeah.  Non-credible is a term that's used in the

8  scientific research literature with regard to assessment.  So

9  when someone takes diagnostic tests and they get scores that,

10  for whatever reason, are not accurate representations of their

11  true skill levels, that could be called a set of non-credible

12  scores.

13  Q.   And so why is it your opinion that these scores are not

14  credible?

15  A.   Because of the overwhelming real world evidence to the

16  contrary.

17  Q.   And what real world evidence are you speaking of?

18  A.   Things like performance on admissions tests, like the ACT

19  and MCAT that were taken without accommodations.  Performance

20  on group administered standardized achievement tests in school,

21  in Ms. Ramsay's K to 12 education, grades, things like that.

22  Q.   So what should an evaluator do when faced with

23  inconsistencies between real world performance and results of

24  diagnostic testing?

25  A.   Well, there are a number of reasons that can cause

1  non-credible data, and so you want to think about what

2  mechanism might explain them in a particular case.

3       So, for instance, if you're evaluating someone who is just

4  recovering from the flu, then you're probably not getting an

5  accurate representation of their skills, if you see that they

6  perform much worse on a diagnostic test that day than they do

7  in the real world during most of their life.  And so that would

8  be one thing to consider.  It doesn't seem to be operating in

9  this case.

10      Another mechanism that would have to be considered is

11  motivation.  So in real world contexts, especially in

12  admissions tests, the individual is motivated usually to

13  perform as well as they possibly can.  The goal is to do

14  something like get into college, get into a good medical

15  school, things like that.

16      In contrast, that motivation, that incentive, is not there

17  in diagnostic testing.  And sometimes in diagnostic testing

18  it's the opposite.  So if someone is already contemplating

19  getting accommodations, if someone already believes that they

20  need accommodations, then if they perform well during the

21  diagnostic testing, then they're not going to get a

22  recommendation for accommodations.

23  Q.   Are there ways that the clinician can test for this

24  motivation?

25  A.   There are specialized assessment measures that have been

1  developed to try to look at someone's motivation or effort

2  level during an assessment, but the discrepancy between the

3  real world evidence and the diagnostic testing would actually

4  be to me the most clear evidence that there's something wrong

5  with the diagnostic test scores.  But there are specialized

6  assessment measures that have been developed.

7  Q.    What are performance validity tests?

8  A.    Performance validity tests are a type of those measures

9  that look at someone's motivation or effort during diagnostic

10 testing.  And they were generally developed to look at feigned

11 memory problems or exaggerated memory problems or otherwise

12 non-credible memory problems.  A lot of them were developed for

13 use or have been used in civil litigation where someone is

14 alleging an injury that may have occurred, say, during a car

15 accident, someone says that they have memory problems

16 afterwards.  And that test is given to detect if their memory

17 problems are genuine or exaggerated or feigned.

18 Q.    And so did Dr. Smith administer one of these types of

19 tests?

20 A.    He did.  He gave the Test of Memory Malingering, which, as

21 its title suggests, was developed to look at feigned memory

22 problems or exaggerated or non-credible memory problems.

23 Q.    And how -- very briefly, how does this -- what does this

24 test measure?  How are you --

25 A.    In the Test of Memory Malingering, you show someone -- to

1  make it very simple line -- drawings of different common

2  objects, like a door or a saw or something like that.  And you

3  show them sets of these and then ask which they've seen before

4  and which they haven't, things like that.

5  Q.   Is there any reading involved on this test?

6  A.   No.

7  Q.   How did Ms. Ramsay perform on this test of memory

8  malingering?

9  A.   In Dr. Smith's report, he describes the two parts of the

10  Test of Memory Malingering that are typically used to score at,

11  Trial 2 and the Retention trial.  And I believe she got perfect

12  scores on both of those, suggesting that she -- if those are

13  taken to mean what the Test of Memory Malingering normally

14  means, it suggests that she was not exaggerating or feigning

15  any memory problems.

16  Q.   So in this case, does that explain away the discrepancy

17  between the diagnostic tests and the real world performance

18  that you referred to?

19  A.   No, it would have nothing to do with that.  In this case,

20  especially by the time that Ms. Ramsay saw Dr. Smith, as she

21  testified to earlier today, she needed evidence of slow

22  reading.  She obtained evidence of slow reading.  The Test of

23  Memory Malingering never would have picked up on slow reading,

24  whether it was genuine, exaggerated, feigned, credible,

25  non-credible.

1  Q.   Focusing now, or switching to ADHD, Dr. Smith administered

2  or utilized assessments relating to attention; is that correct?

3  A.   Yes.

4  Q.   What are the adult ADHD rating scales?  And you know what?

5  Let's look at Defendant's Exhibit -- let's look at Defendant's

6  Exhibit 76.

7  A.   Okay.  76.  I'm there.

8  Q.   Oh, 46, 46.  My apologies, all.

9  A.   Okay.  I'm at 46.

10  Q.   You still beat me there.

11       So are these the adult ADHD rating scales with adult

12  prompts?

13  A.   Yes.

14  Q.   And so just briefly explain, what are these rating scales

15  used for?

16  A.   So these are used as part of a diagnostic assessment for

17  ADHD.  So I had mentioned earlier that there are 18 official

18  symptoms of ADHD in the DSM.  And you see those listed here.

19       And in addition, you see more specific prompts, questions

20  that can be asked that are more adult specific.  So the ADHD

21  criteria were originally developed long ago for children.  It

22  was thought of as a childhood disorder.  We know that certainly

23  there are cases where it continues to adulthood.  It still has

24  to have childhood onset, but it has to -- but it can continue

25  to adulthood.  And so there have been criteria for -- or I

1  should say there have been assessment measures developed that

2  have more adult-specific examples of DSM symptoms.

3  Q.   If you look at pages 60 and 61 of Exhibit 46, it looks

4  like these are Ms. Ramsay's scores that she applied on this

5  rating scale.

6       What do these ratings convey in terms of her symptoms and

7  the level of severity?

8  A.   It appears that when Ms. Ramsay rated each of her 18

9  symptoms in a sort of overall way, she reported that 17 of them

10 were experienced to a severe degree and one of them was

11 reported as being present to a mild degree.

12 Q.   What type of day-to-day behavior would you expect to see

13 from someone who is endorsing this number and level of severity

14 of symptoms of ADHD?

15 A.   Well, some of that is contained in the individual prompt,

16 so there are times when Ms. Ramsay reports having severe

17 problems with, for instance, forgetting things.  There are

18 other times when we would just expect to see general pretty

19 significant life impairment.  To have a diagnosis of ADHD, you

20 only actually have to have five symptoms under the current

21 criteria if you're 17 or older.  And so reporting 17 out of the

22 18 symptoms as being present to a severe degree, we would

23 expect someone to be grossly impaired.  We would expect someone

24 to not be able to function in school or work settings.  We

25 would expect someone to have deficits that I would expect to be

LOVETT - DIRECT

1  visible in terms of everyday behavior in life, to have that

2  many more symptoms than are needed for a diagnosis.

3  Q.   In your opinion, are Ms. Ramsay's reports as to the level

4  and degree of her symptoms credible based on the other records

5  that you see?

6  A.   At the very least, I would say they're not adequately

7  supported by objective evidence.

8  Q.   What is the Integrated Visual and Auditory Continuous

9  Performance Test?

10 A.   That's a computerized test that's often given as part of

11 ADHD evaluations, where someone has to press keys at certain

12 times during the task and then withhold pressing during other

13 times.  So it's supposed to look at both attention as well as

14 self-control.

15 Q.   And is this another test that Dr. Smith administered?

16 A.   He did.

17 Q.   How did Ms. Ramsay perform on this test?

18 A.   Just to be precise, I'd have to go back to --

19 Q.   Please do.  I'm sorry.

20 A.   Let's see.  So I'm back in Dr. Smith's report.

21      Okay.  Dr. Smith actually administered the test that you

22 mentioned twice, it's listed.  And there were a number of very

23 low scores both times.

24 Q.   And if you wait just a minute, Dr. Lovett.

25      THE COURT:  What page?

1          MS. MEW:  Page 12, page 11, beginning on page 11.

2          THE WITNESS:  This is page 11 to 14 of the report

3   where it says page X of 31.

4          MS. MEW:  Just hold on for one minute.

5          THE WITNESS:  Sure.

6          MS. MEW:  So this is Exhibit 3B.

7          MR. BERGER:  Okay.  Thank you.

8   BY MS. MEW:

9   Q.   So if you could continue.

10         How did Ms. Ramsay perform on this?

11   A.   Well, the tests that we're describing, it's known as the

12   IVA, or I-V-A, for short.  It generates many scores.  Dozens of

13   scores, actually.  But the overall scores are the ones that I

14   think -- total scores or composites are the ones that are, in

15   some sense, most important, or easily interpretable.  Ms.

16   Ramsay's performance was far below the average range at the 1st

17   percentile.  It appears that, again, if these scores were taken

18   at face value, her attention skills and her self-control skills

19   would be very, very poor, in the bottom 1 percent of the

20   population.

21   Q.   Do you consider these scores to be credible?

22   A.   I don't consider them to be adequately supported.

23   Q.   Dr. Lovett, is it appropriate to diagnose a learning

24   disability or ADHD based solely on scores of diagnostic,

25   in-office assessments, diagnostic assessments?

1  A.    No.  It's in the criteria for both types of disorders.  If

2  you look at the DSM criteria for both learning disabilities and

3  ADHD, you see reference to things in real world settings,

4  educational and occupational functioning, in the case of

5  learning disabilities, academic, social and occupational

6  situations for ADHD.  So you see reference to things outside of

7  the diagnostic context.

8  Q.    Do you remember, from your review of Dr. Smith's report,

9  whether he had any, what you've discussed as real world

10 evidence that he considered as part of his report?

11 A.    Yes.  I remember at the very least there were report

12 cards, selected report cards that at least he had listed as

13 reviewing.  And there may be more.  I can go to the listing of

14 things.

15 Q.    Okay.  So we're back to Exhibit 3B on the first page,

16 first and second page.

17 A.    So the records that he describes as having reviewed

18 include an MCAT score report, the ACT score report.  So those

19 two, obviously, very important, real world standardized tests,

20 taken without accommodations.  He reports the report cards that

21 I had mentioned earlier, a high school transcript, an

22 undergraduate college transcript, as well as the Step 1 score

23 report.

24 Q.    And how did Dr. Smith treat this real world evidence in

25 his analysis?

1   A.   At one point in the report, I believe he described the

2   report cards and the real world records, something like that,

3   as not clearly showing impairment or not clearly showing

4   problems academically.  Let me see.  It may have been in the

5   summary.

6        Perhaps it's in the background history.

7   Q.   And that's fine.  I don't think you need to look for a

8   direct quote if that's your...

9   A.   Yeah.  I remember at one point there was an admission that

10  there wasn't clear evidence from the report cards of problems.

11  And with regard to some of the other evidence that I mentioned,

12  the MCAT as well as -- well, for the MCAT at the very least,

13  there's a description on page 7 of the report about reading

14  strategy involving not reading any of the passages until you

15  first answer the questions that you could without reading the

16  passage, something we've heard about a number of times already.

17       So the evidence from the real world was discussed.  I

18  don't believe it was interpreted correctly, but it was

19  reviewed.

20  Q.   If you look on page 29 of the report, the first full

21  paragraph, is that what you were looking for?

22  A.   Yes, that's actually the exact passage I was thinking of.

23  In the first full paragraph, the only full paragraph on that

24  page, the available school records do not clearly reflect

25  academic struggles in elementary, middle or high school.  And

1  then Dr. Smith provides what he feels is a sort of explaining

2  away of that.  This is the result of the family obtaining help,

3  et cetera, which we've heard already in the hearing.

4  Q.   In the records that you reviewed relating for Ms. Ramsay's

5  school records that we've discussed in this hearing, did you

6  see any indication in those records that she had received

7  informal accommodations?

8  A.   I did not.  Even when there were places on the report

9  cards where there were spots for the teacher to indicate that

10 specifically, any sort of unusual or additional or atypical

11 support or help.  So no, absolutely not.

12 Q.   Dr. Lovett, are you familiar with the ACT exam?

13 A.   Generally, yes.

14 Q.   Can you generally describe its content?

15 A.   It's a test that's used for college admission.  It has

16 different sections that yield scores in a variety of areas.

17 And the overall scores include English, math, science and

18 reading.

19 Q.   Is the ACT a test used for diagnosing learning

20 disabilities?

21 A.   It's not a test that was designed to diagnose learning

22 disabilities through a clinical evaluation, but it can provide

23 very helpful evidence, because, remember, the learning

24 disability criteria involve real world functioning.  So it can

25 provide evidence that's certainly relevant to making a

1  diagnosis.  And if someone has a learning disability, we would

2  expect it to be reflected on that test, so long as it's taken

3  without accommodations.

4      I should also mention the ACT has a writing portion, I

5  don't think I mentioned that earlier, as part of the scores.

6  Q.   Well, we can turn to -- why don't you turn to Defendant's

7  Exhibits 30 and 31, so you have the scores.

8  A.   Okay.  I'm there.

9  Q.   Do you know how many individuals take the ACT exam each

10 year?

11 A.   I understand that it's been somewhere between a million

12 and 2 million and may have surpassed 2 million recently.

13 Q.   And how does the cohort of individuals who take the ACT

14 compare to the general population?

15 A.   In a rough way, I would describe it as reflecting the

16 general population at that age and grade level.

17 Q.   How did Ms. Ramsay perform on the ACT?

18 A.   So the -- when she took it in March of 2007, her overall

19 score was at the 90th percentile, so in the top 10 percent of

20 that cohort that we described.  And her reading score, in

21 particular, the overall reading score was at the 87th

22 percentile, so in the top 13 percent of that --

23 Q.   And you're looking at Exhibit 30?

24 A.   I am.  So that was the March 2007 administration of the

25 ACT.

**Appx362**

1    And then she took it again in October of 2007.  Her

2    overall score was at the 97th percentile, so in the top

3    3 percent of individuals in that cohort.  And then the reading

4    score in particular was at the 91st percentile, so in the top

5    9 percent of the individuals in the population there.

6    Q.   And you're looking now at Defendant's Exhibit 31?

7    A.   Yes.

8    Q.   Would Ms. Ramsay's performance to perform at this level on

9    the ACT exam, would Ms. Ramsay need to read with fluency?

10   A.   I believe so, yes.

11   Q.   Would she need to read with automaticity?

12   A.   Some degree of it, yes, absolutely.

13   Q.   What does Ms. Ramsay's performance on the ACT tell us with

14   respect to her alleged learning disabilities, ADHD?

15   A.   It's among many pieces of evidence that really undermine

16   those diagnoses.  To have a learning disability and to be

17   performing in the top 3 percent on a college admissions test

18   that is a reading-based test, with some writing, to --

19       MR. BERGER:  Your Honor, I'm going to object at this

20   point because of lack of foundation, because all that Dr.

21   Lovett has said is that he's generally familiar with the ACT.

22   We don't know if he's familiar with the ACT as it was

23   administered when Ms. Ramsay was taking it.  We don't know the

24   extent of his familiarity.  We don't know --

25       THE COURT:  If that's a form of an objection,

1    overruled.

2           MR. BERGER:  Yes, sir.

3           THE COURT:  You'll have an opportunity to

4    cross-examine the witness.

5           You may continue, sir.

6    BY MS. MEW:

7    Q.   What does Ms. Ramsay's performance on the ACT tell us with

8    respect to whether she's substantially limited in any major

9    life activity relevant to taking standardized tests?

10   A.   Well, with regard to the tests that she -- it suggests

11   that she is generally not substantially limited in that regard.

12          Considering the Step 1 exam, which she's applied for

13   accommodations on, one skill that's needed when you're taking

14   that test is reading comprehension skills under timed

15   conditions.  And those were measured in the ACT and found to be

16   not only adequate but well above average.

17   Q.   Let's turn now to Defendant's Exhibit 32, which is Ms.

18   Ramsay's MCAT score report.

19          Are you familiar with the Medical College Admission Test?

20   A.   Again, generally.  I have seen sample items that have been

21   disclosed by the Association for American Medical Colleges, the

22   group that administers the test.  I'm familiar with the

23   different sections and what the formats of the items are like.

24   Q.   Can you very briefly describe its consent?

25   A.   Yeah.  So the MCAT has changed over time.  The version

1   that Ms. Ramsay took yielded scores in four areas, physical

2   sciences, verbal reasoning, biological sciences and then a

3   writing sample.  So the physical sciences, verbal reasoning and

4   biological sciences involve multiple choice questions.  And of

5   those three sections that are multiple choice based, the

6   physical sciences and biological sciences are what I would call

7   content intensive, content heavy, in the sense that they are

8   relying on specific premedical knowledge that you're supposed

9   to have.  You're applying to get into medical school.

10       The verbal reasoning portion I would not describe as

11  content heavy in that sense.  You're not expected to be

12  familiar with a lot of specific background content for the

13  different passages.  Instead, you're supposed to be able to

14  read, comprehend and analyze them under the timed conditions

15  under the standard administration conditions of the test.

16  Q.   Is the MCAT a test that can be used to -- as a diagnostic

17  test for learning disabilities?

18  A.   Again, I wouldn't call it a diagnostic test.  It wasn't

19  designed for the purpose of diagnosis of learning disabilities,

20  but it's absolutely a test where we would expect learning

21  disabilities to be reflected.  It certainly is a part of the

22  information that should be considered during a diagnostic

23  assessment of learning disabilities.

24  Q.   How does the cohort who takes the MCAT compare to the

25  general population?

1  A.   Well, if you're taking the MCAT, you're typically applying

2  to medical school.  And so if you're a medical school

3  applicant, you may be a junior or senior in college.  You may

4  have graduated from college.  We would expect individuals who

5  are taking the MCAT to be above average compared to the general

6  population in terms of their academic skills.

7  Q.   And how did Ms. Ramsay's performance compare to this above

8  average cohort?

9  A.   Her overall score on the MCAT was at the 79th percentile.

10 So better than 79 percent of that select group to begin with.

11      Her verbal reasoning score, which, again, is the one that

12 really represents that timed reading comprehension, that was at

13 the 67th percentile.  So her performance was better than

14 two-thirds of that select group when it comes to timed reading

15 comprehension.

16 Q.   Does performance at this level on the MCAT require reading

17 with fluency?

18 A.   I believe it does.

19 Q.   And does performance at this level of the MCAT require

20 reading with automaticity?

21 A.   I do believe so, some degree of automaticity.

22 Q.   What does Ms. Ramsay's performance on the MCAT tell us

23 with respect to her diagnosis of learning disabilities and

24 ADHD?

25 A.   Certainly with regard to the learning disability diagnoses

1  that she's applied for accommodations under reading and

2  writing, it severely undermines those diagnoses.  She performed

3  in the average range on the writing sample and she performed

4  above -- well, she performed in the average range again on

5  verbal reasoning, compared to that highly select group.

6  Q.   What does Ms. Ramsay's performance on the MCAT tell us

7  with respect to whether she is substantially limited in any

8  major life activity relevant to taking a standardized test?

9        MR. BERGER:  Objection to legal conclusion.

10       THE COURT:  Overruled.

11       THE WITNESS:  It suggests that she does not have those

12 limitations with regard to tests that are similar in format in

13 terms of what you have to do on the MCAT, at least.  You know,

14 a reading-based test where you're responding to multiple choice

15 questions.

16 BY MS. MEW:

17 Q.   Just shifting gears a bit.

18      We've alluded to this before, but in the course of this

19 litigation, have you reviewed additional school and

20 standardized test records for Ms. Ramsay?

21 A.   Again, yes.

22 Q.   And you were here for the testimony yesterday, so you were

23 following along and I don't need to go through --

24 A.   I was.  Some of those I had seen and others I had not.

25 Q.   In Ms. Ramsay's case, did the results of the diagnostic

1  testing conducted by Dr. Smith, with respect to where the

2  scores were exceptionally low, match with what you've seen and

3  heard about in her school and other standardized test history?

4  A.   They directly and thoroughly contradict each other.

5  Q.   In your opinion, does Ms. Ramsay meet the diagnostic

6  criteria for any specific learning disability?

7  A.   No, I don't believe so.

8  Q.   In your opinion, does Ms. Ramsay meet the diagnostic

9  criteria for ADHD?

10 A.   I don't believe there is sufficient evidence to conclude

11 that ADHD is present.  And there also is some evidence that

12 suggests the opposite, that it is not.

13 Q.   In your opinion, again based on the materials you've

14 reviewed, is Ms. Ramsay substantially limited in any major life

15 activity relevant to taking the USMLE?

16 A.   At least with regard to the learning disabilities and

17 ADHD, again, I could not find sufficient evidence that she is.

18 Q.   Or that she requires extra time on the USMLE?

19 A.   Exactly, yes.  That I cannot find -- that I wasn't able to

20 find sufficient evidence, certainly, of a need for additional

21 time.

22 Q.   Dr. Lovett, I think you testified at the start of your

23 testimony that when you make recommendations to NBME, sometimes

24 you recommend denying, sometimes you recommend granting,

25 sometimes you make no recommendation at all.  Is this a close

1 case, is this a borderline case between yes or no?

2 A.   Even based on the initial documentation, I would say no,

3 it's not a close case.  So given that even when I first

4 reviewed the case, there were multiple pieces of clear real

5 world evidence of adequate or above average performance on

6 timed measures of reading comprehension, from the real world, I

7 would say no.  And since I have seen some additional documents

8 and even, honestly, having sat here for this hearing, I've

9 heard even more that really undermines both the diagnoses, as

10 well as the accommodation needs, relative to the standard that

11 we use.

12          MS. MEW:  Thank you, Dr. Lovett.

13          THE COURT:  Very well.  Cross-examination.

14          MR. BERGER:  Your Honor, it's 12:30 --

15          THE COURT:  I'm aware of the time.

16          Are you ready to proceed, Counsel?

17          MR. BERGER:  Do you want me to --

18          THE COURT:  Yes.  I said before we resumed that we

19 would be taking lunch at a quarter of 1:00.

20          MR. BERGER:  Okay.

21          THE COURT:  And we'll be in lunch until 1:30.

22          MR. BERGER:  Right.

23          THE COURT:  I want to use this time as much as I can.

24          MR. BERGER:  Yes.

25          THE COURT:  So I don't have to spend your time and my

1  time any longer than necessary.

2          MR. BERGER:  Absolutely.

3          THE COURT:  All right?

4          MR. BERGER:  I apologize, I missed that.

5          THE COURT:  No problem.  I'm just trying to make sure

6  it's clear.

7                    CROSS-EXAMINATION

8  BY MR. BERGER:

9  Q.  Dr. Lovett, good afternoon.

10 A.  Good afternoon.

11 Q.  You recall that several weeks ago I took your deposition.

12 Correct?

13 A.  Yes.

14 Q.  And I asked you at that time several questions about the

15 tests that Dr. Smith administered to Ms. Ramsay and the results

16 that he got.

17     And I may want to refer to some of those, again,

18 specifically, but generally, I asked you, for example, with

19 respect to the WIAT-III, which you discussed in your testimony,

20 whether you had any doubt that Dr. Smith had actually

21 administered that test.  And let me ask you that question now.

22     Do you have any doubt that he administered the portions of

23 the WIAT-III that he described in his report?

24 A.  I have no reason to doubt that, no.

25 Q.  And do you have any doubt that he -- that the results of

1  his administration of that test were as he reported?

2  A.   No.  I haven't rescored them, but I have no reason to

3  doubt that the scores, you know, were calculated correctly in

4  the sense that Ms. Ramsay obtained those scores on those tests.

5  Q.   And I asked you also I believe with respect to the

6  WIAT-III whether you would agree that that was an appropriate

7  test to administer in a case where there was consideration of a

8  dyslexia diagnosis.

9  A.   Yeah.

10 Q.   And what's your answer to that?

11 A.   I believe it was what I'm going to say it is now as well,

12 which is that it can certainly contribute useful information

13 towards that diagnosis.  Like any piece of evidence, it has to

14 be interpreted correctly, but to give that during a diagnostic

15 battery would not be inappropriate.

16 Q.   And that's generally consistent with your testimony so far

17 today.  Correct?

18 A.   I hope so.

19 Q.   And the same -- let me just quickly review the same set of

20 questions with respect to the Woodcock-Johnson IV.

21      Do you have any doubt that Dr. Smith administered those

22 portions of the Woodcock-Johnson IV that he described?

23 A.   No.

24 Q.   And do you have any doubt that the results from his

25 administration were what he reported?

1  A.   I have no reason to doubt that the scores were

2  miscalculated.

3  Q.   And again, is that a test that is appropriate for a

4  situation where a diagnosis of dyslexia is being considered?

5  A.   As I had said in the deposition and as I had said with

6  regard to other tests that were described, it can certainly

7  contribute useful evidence when one is assessing the presence

8  of learning disabilities if it's properly interpreted.

9  Q.   All right.  And the same question then with respect -- or

10  series of questions with respect to the Gray Oral Reading Test,

11  or GORT.

12     Do you have any doubt that he administered the GORT as he

13  described?

14  A.   No.

15  Q.   And do you have any doubt that he -- that the results were

16  what he reported?

17  A.   Again, I have no reason to doubt it.  I haven't rescored

18  it, but I have no reason to doubt that those scores were

19  correctly calculated.

20  Q.   And is the GORT an appropriate test to administer in a

21  case where a diagnosis of dyslexia is being considered?

22  A.   As with the others, it can contribute useful information

23  if it's interpreted properly.

24  Q.   Now, I don't believe that in the deposition I asked the

25  same question with respect to the IVA or IVA+Plus.  That test,

1   as I understand it, is one that relates to the diagnosis of

2   ADHD; is that correct?

3   A.   Yes.

4   Q.   And do you have any reason to doubt that Dr. Smith

5   administered that test as he described in the report?

6   A.   No.

7   Q.   And do you have any reason to doubt that he achieved the

8   results that he reported?

9   A.   No.

10  Q.   And is that an appropriate test to consider when

11  considering a diagnosis in an adult like Ms. Ramsay of ADHD?

12  A.   Although it's not a primary source of evidence, I don't

13  think it's inappropriate to include that in a battery for ADHD.

14  Q.   Do you recall from Dr. Smith's report whether Ms. Ramsay

15  took her ADHD medication on the day that he tested her, that

16  Dr. Smith tested her?

17  A.   If I recall correctly, she did not take her ADHD

18  medication on that day.  I would have to check the report, but

19  I recall that --

20  Q.   Yes, I think you're recalling correctly.  I think that's

21  what the test said -- what the report says.

22       Is that an appropriate procedure when you are testing

23  someone for ADHD?

24  A.   There are debates about that.  There's no consensus among

25  clinicians in my experience, so there are reasons why you might

1  want to have someone on medication, there are reasons why you

2  might want to have them off medication.  I don't think it was

3  inappropriate to ask Ms. Ramsay not to take medication or to

4  test her off medication.

5  Q.   Do you know, and this is kind of a legal question, so I

6  will apologize in advance, but I think certainly you have some

7  familiarity with the ADA.

8       Do you know what the ADA provides as to whether mitigating

9  measures like medication should be considered in determining

10 whether somebody has a disability?

11 A.   My understanding is that it differs with regard to the

12 issue of disability versus accommodation needs.  And for the

13 purposes of disability, I understand the current version of the

14 ADA as amended to indicate that determination of disability, as

15 opposed to accommodation needs, should be made without

16 reference to mitigating factors, with the exception of

17 eyeglasses, I believe.  Accommodation needs being another

18 matter.

19 Q.   So when Dr. Smith tested Ms. Ramsay based on what he has

20 reported, she was not, on that day, getting whatever benefit

21 she gets from the ADHD medication that's been prescribed for

22 her; is that correct?

23 A.   I'm sorry, could you repeat that question?

24 Q.   Let me try and restate it.

25      On the day when Dr. Smith tested her and based on what he

LOVETT - CROSS

1  said in his report, on that day she did not have the ADHD

2  medication, so that mitigating measure was not in play when he

3  tested her?

4  A.   Correct.

5  Q.   All right.  You mentioned with respect to ADHD that one of

6  the criteria is the presence of symptoms prior to the age of

7  12.

8       Is that generally correct?

9  A.   Yes.

10  Q.   Is it also true that ADHD can be diagnosed for the first

11  time when somebody is an adult?

12  A.   It can certainly be diagnosed for the first time when

13  there's evidence of the symptom prior to age 12.

14  Q.   And the DSM-5 specifically says that it can be diagnosed

15  in an adult?

16  A.   I know that there are -- I mean, I would have to check the

17  DSM, but I certainly, you know, know that the DSM-5

18  acknowledges adult ADHD-related issues.  I don't think there's

19  any problem diagnosing it in an adult.  It can even be

20  diagnosed, as I say, for the first time in an adult, but,

21  again, it has to show symptoms much earlier on.

22  Q.   The group of people who apply for accommodations for USMLE

23  Step 1 are not a group of people that is the same as the

24  general population, would you agree with me?

25  A.   I would certainly -- I would not expect them to be.

1  Q.   They are all people who have been accepted to a medical

2  school.  Correct?

3  A.   I believe so.

4  Q.   And they're all people -- and it varies from one school to

5  another, but they are all people who have completed either

6  generally two years or three years of medical school.  Correct?

7  A.   I would have to check the exact requirements for taking

8  the Step 1 exam, but as a general rule, they are, at the very

9  least I believe enrolled in medical school.  As you say, it

10 would vary from school to school, but as a whole, yes.

11 Q.   Okay.  And my -- last question before we break.

12      On your direct testimony, you discussed the fact that in

13 cases that NBME sends you for review, that in some cases you do

14 recommend that an accommodation be granted, and in some cases

15 you recommend against that.

16      What would you estimate is the percentage of cases in

17 which you recommend that an accommodation be granted?

18 A.   I don't keep track of that.  I couldn't estimate that.

19 And as I say, in some cases I don't even make a recommendation,

20 I might just summarize things.  I also review for other testing

21 agencies and so it's hard to think about what was NBME versus

22 other things.

23 Q.   Okay.  One other -- one other question.

24      What other testing agencies do you currently review for?

25 A.   I review regularly for the National Board of Osteopathic

1  Medical Examiners, the New York State Board of Law Examiners,

2  for the New York Bar Exam and the Law School Admissions

3  Council, for the LSAT.  Those I would say are the regular

4  agencies.  Occasionally I also will review by special request

5  for an agency that has a particular issue and have reviewed for

6  others in the past.

7         MR. BERGER:  Your Honor, I think this is a good time.

8         THE COURT:  Very good.  We shall be in recess till

9  1:30.  And enjoy your lunch today.

10        And sir, I will advise you you're under

11 cross-examination now and you cannot consult with counsel in

12 reference to your testimony.  You can talk to them about

13 anything, lunch or the game last night or whatever or this

14 weekend, but not about your testimony because you're under

15 cross-examination.

16        THE WITNESS:  Thank you.

17        THE COURT:  We'll be in recess.

18        (Luncheon recess at 12:46 p.m. until 1:31 p.m.)

19        THE COURT:  You may be seated.

20        You can resume the witness stand, sir.

21        THE WITNESS:  Thank you.

22        THE COURT:  And I'll remind you, you are still under

23 oath from previously being sworn in this afternoon.

24        THE WITNESS:  I understand.

25        THE COURT:  You may proceed, Counsel.

1  BY MR. BERGER:

2  Q.   In teaching students who are training to become

3  psychologists, who are studying to become psychologists, do you

4  teach courses about assessment or have you taught courses about

5  assessment?

6  A.   I will be starting the graduate courses for school

7  psychologists in the spring.  I've certainly taught courses for

8  undergraduates on assessment, and some of them are in education

9  or other fields where they are administering achievement

10  measures, things like that.

11  Q.   Would you teach your students that they should administer

12  a test like the ACT in order to help them in reaching a

13  diagnosis?

14  A.   I would definitely tell them they need to review someone's

15  ACT scores when making a diagnosis.  The ACT is not a test

16  that's given in a one-to-one format from a clinical evaluator,

17  so it's information that would need to be reviewed on making a

18  diagnosis, and I certainly have taught that.

19  Q.   And I assume that the same would be true for the MCAT?

20  A.   Exactly.

21  Q.   Do you believe based on your knowledge of ADHD that

22  someone with ADHD can be successful in school?

23  A.   With intervention and accommodation, I certainly think

24  that's possible, and I've seen it happen.

25  Q.   And do you believe, again, based on your knowledge and

LOVETT - CROSS

1  experience, that someone with dyslexia can be successful in

2  school?

3  A.   Dyslexia is a little tougher, because if the intervention

4  is effective, there's a question of whether or not the person

5  really still has dyslexia or a learning disability in reading

6  or anything like that.  But I would say that with

7  accommodations and interventions, I've seen students who at

8  least at some point have had a diagnosis of dyslexia, or a

9  profile of scores that may indicate a learning disability in

10  reading, be successful in school with appropriate measures.

11  That really depends on the exact data for that individual.

12  Q.   Well, in the case of a person with dyslexia, would a

13  possible accommodation be to allow that person additional time

14  to read whatever had to be read?

15  A.   It really would depend on the person's profile.  I can see

16  that being one of the things, but for a child who has dyslexia,

17  at least as it's generally understood as a learning disability

18  in reading, the term "dyslexia" is used somewhat more flexibly,

19  so it's a little harder to speak about dyslexia.  But if we're

20  talking about what qualifies as a learning disability in

21  reading, at least under the DSM, extended time would not be the

22  first thing that would come to mind.  If someone has trouble,

23  especially as a child with a learning disability in reading,

24  then I would expect that they would actually need a more

25  intensive accommodation, like a reader or something like that,

1  on tests.  But extended time could be part of a package of

2  accommodations that are given to a student with dyslexia.

3  Q.   All right.  So Ms. Ramsay -- and you were present during

4  Ms. Ramsay's testimony.  Correct?  And she testified that she

5  has, in some situations, been able to use the Kurzweil program.

6       Are you familiar with that?

7  A.   Generally, yes, uh-huh.

8  Q.   All right.  So if someone who had dyslexia was permitted

9  to use a Kurzweil -- the Kurzweil program, would that person

10  still be a person with dyslexia?

11  A.   Well, first of all, since you're referring to Ms. Ramsay's

12  testimony, I don't recall a period of time during which she

13  reported having had access to Kurzweil or having used it.

14       Putting that aside, an individual who has a learning

15  disability in reading or some sort of reading problems, could

16  certainly be assisted by the Kurzweil technology.

17  Q.   Do you believe that people with ADHD can be successful in

18  work or in their careers?

19  A.   Again, if someone has appropriate intervention, then they

20  certainly may be able to.

21  Q.   And do you believe that somebody with dyslexia can be

22  successful in work or in a career?

23  A.   Well, again, there, if the intervention is successful, I

24  don't know if I would use the term "dyslexia" or a learning

25  disability in reading to describe them anymore.  Those sorts of

1  problems can sometimes be treated very effectively.  But can

2  someone who has one point has a diagnosis or some sort of

3  reading problems later become successful through appropriate

4  intervention?  Absolutely.

5  Q.   Aren't there in fact very well known business and

6  political leaders who have been widely reported as having

7  either ADHD or dyslexia?

8  A.   I don't think that relates to your prior question, because

9  I would just say in those cases, we rarely have the sort of

10 evidence to review to know whether or not that's the case.

11 Historical figures are often said to have had dyslexia or ADHD.

12 We never know that to be the case.

13 Q.   Okay.  Well, whether -- forget about my previous question.

14 Answer this question.

15      Isn't it true that there are well known political and

16 business figures who have been widely reported as having either

17 ADHD or dyslexia?

18 A.   I certainly have heard of famous people who it is claimed

19 have ADHD or dyslexia.

20 Q.   I believe that there have been such reports about Charles

21 Schwab, for example?

22 A.   I have heard of that.

23 Q.   And about Sir Richard Branson?

24 A.   I heard of that as well.

25 Q.   And about David Boies, the attorney?

1  A.   Yes.

2  Q.   Leading attorney.

3  A.   I have heard that claim.

4  Q.   And one that I remember from long ago in my life, former

5  vice president and former governor Rockefeller.  Correct?

6  A.   I don't know that I've heard of that particular case of

7  purported disability or dyslexia or ADHD.  I don't know the

8  details of what you're referring to there.

9  Q.   Do you believe that somebody who has ADHD can successfully

10  become a physician?

11  A.   I don't think there's anything about having ADHD per se

12  that would prevent someone from becoming a physician.  ADHD is

13  heterogenous in terms of its level of severity.  And again,

14  with appropriate intervention, and at times accommodations, I

15  don't think that it would be impossible for someone to both

16  meet the criteria at some point, perhaps, prior to

17  intervention, and then be able to be a physician.

18  Q.   Do you believe that -- same question for dyslexia.  Do you

19  believe that somebody with dyslexia could successfully complete

20  training and practice as a physician?

21  A.   Again, with dyslexia, I'm hesitant to say much about that

22  term, but for a learning disability in reading with appropriate

23  intervention, someone who at one point -- or accommodations,

24  someone who at one point met criteria for a learning disability

25  in reading may well be able to be a successful physician.

1  Q.  Have you in your work as a reviewer for NBME ever made a

2  recommendation for an extended testing time accommodation --

3  A.  I'm sure --

4  Q.  -- for a student on any of the step exams?

5  A.  I'm sure I have.

6  Q.  And do you remember what -- what the diagnosis was that

7  the request was based on in that case or in those cases?

8  A.  I am sure there have been multiple times when I've

9  recommended it.  The diagnoses would vary, but, I mean, I don't

10 remember -- we're not talking about a particular instance, so I

11 typically review cases where learning disabilities and ADHD are

12 at least part of the list of diagnoses that someone is

13 requesting accommodations under, but I can't --

14 Q.  So again, just in general, not right now specifically

15 referring to Ms. Ramsay, can extended testing time be an

16 appropriate accommodation for someone who has ADHD?

17 A.  There are times when that would be an appropriate

18 accommodation.

19 Q.  And can extended testing time be an appropriate

20 accommodation for somebody with dyslexia?

21 A.  Yes, there are times when that would be an appropriate

22 accommodation.

23 Q.  We discussed earlier some of the tests that Dr. Smith did.

24 I think we talked about the WIAT-information and the

25 Nelson-Denny and the GORT and also I think the Woodcock-Johnson

1   IV.

2       Are any of those tests tests for which somebody can study,

3   that is, the person who is taking the tests, who is being

4   evaluated, can you study for that test?

5   A.   I mean, if by study you mean prepare, I'm trying to think

6   about how one would study for those sorts of tests.

7       Unless you found -- I suppose you could find out

8   information by looking them up, but I don't think of those as

9   tests that people typically study for.

10  Q.   And actually, isn't it true that the publishers of those

11  tests go to great lengths to make sure that the tests are not

12  publicly disclosed?

13  A.   It's true.  I mean, some tests there are available things

14  online about them, the Nelson-Denny in particular.  But it's

15  true that some of those tests would not generally be studied

16  for.  I wouldn't expect that to be typical.

17  Q.   By contrast to those tests, the MCAT is a test for which

18  you could study.  Correct?

19  A.   Yes.

20  Q.   And the ACT is a test for which you could study?

21  A.   Yes.

22  Q.   Were you present yesterday when Ms. Ramsay testified about

23  the way in which she took the MCAT?

24  A.   I believe so.

25  Q.   And particularly, you might recall -- and I don't know

1  whether you've had an opportunity to see this, but there was an

2  exhibit that was marked in which she had marked up a form of

3  the verbal reasoning section of the MCAT.

4      Have you see that exhibit?

5  A.  I have not.  I remember being present when it was

6  discussed, but I haven't seen it.

7      MR. BERGER:  Your Honor, the exhibit to which I'm

8  referring -- and, Professor Lovett -- Professor Lovett, the

9  exhibit to which I'm referring was marked as P-19A yesterday.

10 It's not in the binders, so I don't know whether a copy is

11 readily available.  I have one copy that I can show the

12 witness, and I can --

13     THE COURT:  Did you give it to the Court?

14     MR. BERGER:  Yes, yes, we did.  We did give a copy to

15 the reporter.

16     This is it.

17     THE COURT:  All right.  Take it up to him.

18 BY MR. BERGER:

19 Q.  Have you reviewed this exhibit before?

20 A.  No.

21 Q.  All right.  Let me direct your attention to the pages that

22 have the numbers 29 and 30.

23 A.  Okay.

24 Q.  And you'll see that on page 29 is a copy of a -- is a

25 reading passage.  And then on page 30, there are several

LOVETT - CROSS

1  questions that are based on the reading passage.

2  A.   I see.

3  Q.   In each of these, Ms. Ramsay had marked up the document.

4  This was, by the way, a document that was marked during her

5  deposition.  And so she took that and marked up a copy of it as

6  she explained yesterday to indicate how she would have

7  approached these questions.

8       Look at page 30 and question number 44.

9  A.   Okay.

10  Q.   And Ms. Ramsay in her comments said she would have tried

11  to answer this one first.  And that you see the question itself

12  refers to the fourth paragraph, so the question gives you a

13  specific reference, and she would have read the fourth

14  paragraph and answered based on that.

15      Is that approach to a question like this that would reduce

16  the amount of reading that she would have had to do?

17  A.   Well, with regard to the question -- with regard to

18  question 44, reading the fourth paragraph to answer that as

19  opposed to reading the whole paragraph -- or rather the whole

20  passage would be less reading, so...

21  Q.   All right.  And then she indicates that she would then

22  have tried question 43 based on having read paragraph 4 and so

23  forth.

24      I mean, my general -- what I'm trying to get at here, and

25  I think now let's refer back to your report, the report that

LOVETT - CROSS

1    you submitted.  It will just take me a little bit, because I

2    have to find it in the defendant's binder.  And I think it's

3    Exhibit 6 and Tab B.

4        You knew from --

5    A.   I'm at Defendant's 6, B now.

6    Q.   All right.  Now, the exhibit we were looking at a moment

7    ago was part of the verbal reasoning test, the MCAT verbal

8    reasoning test.

9            THE COURT:  Is that a question or a statement?

10           MR. BERGER:  I'm just reminding the witness of what we

11   were talking about.

12   BY MR. BERGER:

13   Q.   We were looking at Exhibit P-19A.  That is Ms. Ramsay's

14   notes about the verbal reasoning test, about an MCAT verbal

15   reasoning test.

16   A.   I can't speak to what it is.  I don't know that you

17   described, and I don't recall from yesterday whether this is a

18   release test or a practice test, so I can't comment on that,

19   but...

20   Q.   All right.  In Ms. Ramsay's request for accommodations,

21   she commented about the MCAT.

22       Do you remember what generally she said about her

23   performance on the MCAT?

24   A.   I remember more I think from the testimony that I've

25   heard -- and it's hard to distinguish whether there was a

1  difference between those two things, but I remember her

2  describing strategies that she used to try to avoid significant

3  reading --

4  Q.   All right.

5  A.   -- on the MCAT, which she reports having used.

6  Q.   All right.  Now, you, in your report -- and now I am

7  referring to DX-5, Tab B, which is your report.

8  A.   I think it's DX-6.

9  Q.   I'm sorry, DX6.  Which is your report at -- it's page 2 of

10  your report, page 35 of the overall, but page 2 of your report.

11      In the carryover paragraph at the top of page 2, you say

12  that you were extremely skeptical that Ms. Ramsay possesses a

13  special way of answering ACT and MCAT items without actually

14  reading relevant text.  And you go on to say, still quoting,

15  and it is disappointing that her credulous advocates have

16  accepted her explanation, unquote.

17      But we just reviewed something that shows that you could

18  answer at least one question on the MCAT without reading the

19  entire reading test.

20      Do you agree?

21  A.   I agree that for item I believe 44 it was that -- I don't

22  believe that I said that in my testimony.  I think I agreed

23  that it would be less reading to read the fourth paragraph than

24  to read the entire passage, which is I believe what you had

25  asked.

1  Q.   No, that is what you said.  And --

2  A.   And so I don't believe that I made any comment about

3  whether or not any of these strategies were used and whether or

4  not they could be used to take the MCAT in its entirety.

5  Q.   Well, you don't know, do you?  You've never taken the

6  MCAT.  Correct?

7  A.   I haven't taken the MCAT.

8  Q.   And you've never been a reviewer for the MCAT, have you?

9  A.   I've never reviewed accommodation requests for the MCAT.

10  Q.   But one of the things that you emphasized in your report

11  as what you called a real world example that showed that -- or

12  that caused you to question whether Ms. Ramsay had dyslexia,

13  one of the things that you cited in your report was her score

14  on the MCAT.  Correct?

15  A.   Yes.

16  Q.   And yet you're telling me that you haven't taken the MCAT

17  yourself?

18  A.   I've never applied to medical school.

19  Q.   Okay.  And you don't know -- is this -- let me approach

20  this a different way.

21      I think you have said or someone from NBME has said that,

22  oh, yes, everybody uses that strategy, something like that, the

23  strategy of not reading as much.  I don't know whether that's

24  in your report.  I can look for it.

25      But is that, to your knowledge, a widely used strategy for

LOVETT - CROSS

1  people taking a test like the MCAT?

2  A.   I'm familiar with different strategies of taking tests,

3  and I've even done some research on it.  I know that it's

4  common, as I say in my report, for people to read questions

5  first and then go to the passage afterwards, and as I say, to

6  search for relevant information in the passage.  So I believe

7  that is common.  And I've done some research consistent with

8  that, that has demonstrated that.  But as I say in my report,

9  that still involves reading a substantial amount of text.

10  Q.   Can that strategy be used in the USMLE Step 1?

11  A.   I don't know that there's a difference between those.  I

12  can't really speak to the differences with regard to what

13  strategies would and would not work in that regard.  As was

14  discussed so far, the questions have a somewhat different

15  format, but -- in that they tend to be a single vignette about

16  a patient followed by a question about the scenario.  But

17  beyond that, I've never actually considered whether or not

18  different strategies would be appropriate.

19  Q.   All right.  Do you recall that Dr. Smith in his report

20  referred to several different measures of reading fluency?

21  A.   Yes.

22  Q.   And I think that we reviewed some of these or NBME's

23  counsel reviewed some of these with you before today.  But do

24  you recall, for example, that he found that -- and I can refer

25  you to pages, if that would be helpful.  But he found reading

LOVETT - CROSS

1   comprehension and fluency according to the WIAT-information, he

2   found at the 4th percentile.  Correct?

3   A.   I would have to check the specifics about the 4th

4   percentile, but I remember that there were low scores on --

5   Q.   Okay.  It's DX-3 and Tab B, which is his report, Dr.

6   Smith's report.  Tell me when you're there.

7   A.   I think it's Tab B?

8   Q.   Yeah, I'm sorry.

9   A.   Okay.

10  Q.   I think that's what I said, Tab B.

11  A.   Okay.  I'm at the WIAT-information table of scores on page

12  18 of 31 of the report.

13  Q.   Well, yes.  Actually, there are references both -- I was

14  looking at page 16, but, yes, there are references on page 18.

15  And that's fine.

16      So reading comprehension and fluency, 4th percentile?

17  A.   Yes.  I don't know that we discussed that particular score

18  earlier, but I'm just reading fluency, that's reading

19  comprehension and fluency, that was at the 4th percentile.

20  Q.   Yeah.  And he also refers to the GORT-5 and to -- and I

21  think we did discuss these before.  I think you referred in

22  your testimony before to the little table that's in the middle.

23  Oh, that -- I'm sorry, that's Woodcock-Johnson still.  So let's

24  look at that too.

25      In the middle of page 21 of the report, there is a table

1    of scores from the Woodcock-Johnson.  And that shows a reading

2    rate score at the 1st percentile.  Correct?

3    A.    Yes.

4    Q.    And a sentence reading fluency at the 7th percentile and

5    word reading fluency at the 0.2 percentile?

6    A.    Yes.

7    Q.    And then on the same page below that, there is a

8    discussion of the rate score from the GORT on the last

9    paragraph on the page, rate score of 3, which is at the 1st

10   percentile and an accuracy score of 5, which is at the 5th

11   percentile.  And then over on to the next page, on to page 22,

12   fluency measure, which is from combining the rate and accuracy

13   scores.  And that's at the 2nd percentile.

14       So we have three different assessments that Dr. Smith

15   administered.  And you accept that he administered them, you

16   accept -- haven't personally confirmed, but you accept that

17   he's reporting accurately how Ms. Ramsay performed.  And I

18   think you also testified before the break that these were all

19   appropriate things to consider in considering a diagnosis of

20   dyslexia.

21       Does the fact that there are three different instruments

22   that he administered would show a consistent pattern of

23   results, is that something that should be considered in making

24   this decision?

25   A.    Should it be considered, absolutely.  In this particular

1    case, this does not suggest that there is a learning disability

2    in reading.  Should all of the scores be considered, certainly.

3    Q.   In looking at a result like the MCAT result in Ms.

4    Ramsay's case, or the ACT result in Ms. Ramsay's case, is it

5    important to know how she got whatever score she got?

6    A.   It's important to consider -- I believe it's important to

7    consider all of the information that an applicant provides when

8    they submit a request for an accommodation.  And so if someone

9    describes a strategy which they report having used when they

10   took a test, it certainly is something that should be

11   considered and that I do consider.  Like any information, it

12   has to be weighted with regard to its credibility, its

13   accuracy, its consistency with other information.

14   Q.   All right.  You spoke this morning about her report cards

15   from elementary school.  And I think you must have heard her

16   testify yesterday and today about the informal help, not

17   documented, but the informal help that her teachers provided

18   for her.

19        And in this proceeding, it's not for you or me to decide

20   who is telling the truth and who is not telling the truth.

21   That's the judge's job.

22        But if what Ms. Ramsay testified is true about the way in

23   which her teachers helped her, is that something that should be

24   considered in looking at those report cards?

25   A.   When I review the request, I certainly consider all

1  information -- I guess I should say when I reviewed the

2  request, I don't believe I had access to the report cards.  So

3  I apologize, could you ask your question again?

4  Q.   Well, but you did refer to the report cards in your

5  testimony this morning.

6  A.   Yes, uh-huh.

7  Q.   And you heard Ms. Ramsay's testimony about how her

8  teachers assisted her during those grades.  So is that

9  something that should be considered in evaluating those report

10 cards?

11 A.   Descriptions of people's experiences, what their teachers

12 in the school, should certainly be considered when making any

13 sort of decision about diagnosis or accommodation needs.  And

14 as with other information, like test scores, it has to be

15 weighted with regard to its credibility, accuracy and

16 consistency.

17 Q.   And you did have information about Ms. Ramsay's

18 experiences in primary school in her personal statement.

19 Correct?

20 A.   I believe so.  I'd have to check, but I believe that there

21 were reports relating to her childhood.  I would have to check

22 again my report or her submission.

23 Q.   I believe that you said that you have been working as a

24 reviewer for NBME for nine or ten years?

25 A.   Yeah, I believe it's been about nine maybe.

1  Q.   And how are you paid for your services to NBME?

2  A.   For reviewing requests, I'm paid by the hour.  Currently I

3  received $200 an hour for reviewing requests.

4  Q.   And for testifying?

5  A.   For testifying, instead it's based on days and half --

6  it's a day rate, so it's $2,000 for a full day, $1,000 for a

7  half day, I believe.

8  Q.   Does NBME have an annual conference for its reviewer

9  consultants?

10  A.   It has a meeting, yes.

11  Q.   And have you attended those conferences?

12  A.   Most years for the past nine, I believe so.

13  Q.   Okay.  Let me just ask you to look very briefly

14  at exhibit -- and this is in the plaintiff's binder, so I may

15  need to help find that for you, but it's P-34 that I want you

16  to look at very briefly.

17  A.   I think I just have the defendant's exhibits.

18  Q.   Not in -- and 34, P-34.

19  A.   Okay.  I'm there.

20  Q.   All right.  Can you identify for the record what P-34 is?

21  A.   This appears to be slides from a presentation for NBME and

22  its outside consultants about ADA.

23  Q.   And what was the date?

24  A.   December 5, 2016.

25  Q.   Who was the presenter?

1  A.    Robert Burgoyne.

2  Q.    And do you recall attending the conference that year?

3  A.    Not specifically, but I was likely there.  As I said, I've

4  attended the vast majority of the meetings since I've been

5  working with them.

6  Q.    Do you know if Professor Zecker also attends those

7  conferences?

8  A.    Yes.

9  Q.    And Mr. Burgoyne is NBME's counsel.  Correct?

10  A.    I know that he represents NBME in some cases.  I don't

11  know the exact title or relationship.

12         THE COURT:  We can take notice of that, Counsel.

13  Moving along.

14  BY MR. BERGER:

15  Q.    Am I right that prior to yesterday when Ms. Ramsay

16  testified and you were in court, you had never met Ms. Ramsay

17  before?

18  A.    Yes.

19  Q.    And you've never done yourself any evaluation of Ms.

20  Ramsay by administering testing instruments to her or

21  interviewing her, anything of that kind.  Correct?

22  A.    No.  That is correct.

23  Q.    In your review of her application, what consideration did

24  you give to the fact that her medical school had provided her

25  with various testing accommodations?

1  A.   I certainly gave that, you know, some weight in terms of

2  considering someone's history of accommodations.  I always

3  consider that.  It's really impossible to interpret the data in

4  someone's file without knowing their history of accommodations.

5  When you're looking at someone's history of performance, you

6  have to know when did they receive them, when did they not

7  receive them.  So to me that's very important information.

8  Q.   And would you say the same thing with respect to the

9  accommodations she received from Ohio State University?

10  A.   Yes.  Again, it doesn't mean the likely -- the information

11  about the medical school, it doesn't mean that someone needed

12  them then or needs them now, but it certainly is very important

13  information to know when you're interpreting everything in the

14  file.

15  Q.   Do you know whether Ms. Ramsay was taking ADHD medication

16  at the time that she took the MCAT?

17  A.   I don't recall whether that information was in the

18  documentation.

19        MR. BERGER:  Your Honor, can I just have one minute to

20  consult with my colleagues?

21        THE COURT:  Sure.

22        MR. BERGER:  Your Honor, I would like to offer in

23  evidence P-34, which is the presentation from the 2016 NBME

24  consultants meeting that Professor Lovett testified about.

25        THE COURT:  Any objections?

1          MS. MEW:  No objection, Your Honor.

2          THE COURT:  It's admitted.

3          (Exhibit P-34 admitted into evidence.)

4          MR. BERGER:  I have no further questions.

5          THE COURT:  Very well.  Any redirect?

6          MS. MEW:  No redirect, Your Honor.

7          THE COURT:  Very well.  So you may step down.

8          And Counsel, this witness can be excused?

9          MS. MEW:  Thank you, Your Honor.

10         Is that all right with plaintiffs?

11         THE COURT:  Yes.  I'm asking counsel, is there any

12    reason to keep this witness around?

13         MR. BERGER:  No.

14         THE COURT:  You can be excused, sir.

15         THE WITNESS:  Thank you, Your Honor.

16         THE COURT:  Next.

17         MS. MEW:  Your Honor, the defense would like to call

18    Dr. Steven Zecker.

19         THE COURT:  Very well.

20         Watch your step coming around there, sir, and also

21    around here.

22         DR. STEVEN ZECKER, after having been duly sworn, was

23    examined and testified as follows:

24         COURT REPORTER:  Please state your name.

25         THE WITNESS:  Steven Zecker.

 1                    DIRECT EXAMINATION

 2  BY MS. MEW:

 3  Q.   Good afternoon, Dr. Zecker.

 4  A.   Good afternoon.

 5  Q.   Are you an external consultant for NBME?

 6  A.   Yes, I am.

 7  Q.   And how long have you served in that capacity?

 8  A.   16 years, I believe.

 9  Q.   And can you briefly explain what you do in that role?

10  A.   As Professor Lovett described, I receive documentation

11  submitted by applicants for accommodations and review it and

12  provide my professional opinion about that.

13  Q.   Did you review Jessica Ramsay's request for testing

14  accommodations on the USMLE?

15  A.   Yes, I did.

16  Q.   And just to get the timeline in your role, I understand

17  that you reviewed her first request in December 2016.

18  A.   Yes.

19  Q.   Correct?

20       And then she submitted another request in June of 2018.

21       Did you review that request?

22  A.   Yes.

23  Q.   And then when she sought reconsideration, that's the

24  request that Dr. Lovett reviewed; is that correct?

25  A.   Yes.

1  Q.  For your reviews, did you provide a written analysis and

2  recommendation for NBME following review?

3  A.  I did.

4  Q.  If you will please look at volume 1 of the defendant's

5  exhibits, we're going back to the black binders.

6      Dr. Zecker, if you would please turn to Exhibit 5.  That's

7  Exhibit 5.

8  A.  Okay.

9  Q.  Do you recognize this document?

10  A.  Yes.

11  Q.  And is this a declaration that you prepared in connection

12  with this litigation?

13  A.  Correct.

14  Q.  And then Tab A to Exhibit 5, is this a copy of your CV at

15  the time you submitted this declaration in August of 2019?

16  A.  Yes, it is.

17  Q.  Then Exhibit B, is this your January 13, 2017

18  recommendation letter to NBME for Ms. Ramsay's first question

19  for testing accommodations?

20  A.  Yes, it is.

21  Q.  And finally, turning to Exhibit C, is this your July 19,

22  2018 recommendation letter to NBME with respect to Ms. Ramsay's

23  second request for testing accommodations?

24  A.  Yes, it is.

25  Q.  Dr. Ramsay (sic), are the opinions expressed in these

1  documents, do they remain your opinions today?

2  A.   Yes.

3        MS. MEW:  Your Honor, the defendants would like to

4  offer Exhibit 5 to the record.

5        THE COURT:  Hearing no objections, they're admitted.

6        (Exhibit DX-5 admitted.)

7  BY MS. MEW:

8  Q.   Dr. Zecker, we did just discuss that Ms. Ramsay

9  subsequently sought reconsideration and she submitted an

10  additional report from Dr. Robert Smith in support of that

11  request.

12       Since the time you prepared your reports, have you

13  subsequently reviewed Dr. Smith's report?

14  A.   I have subsequently, yes.

15  Q.   Has anything in that report changed your opinions with

16  respect to Ms. Ramsay's request for testing accommodations?

17  A.   No.

18  Q.   And have you also reviewed the school -- the additional

19  report cards and standardized test scores that have been

20  discussed in the hearing the last two days and were produced in

21  discovery in this litigation?

22  A.   Yes, I have.

23  Q.   And have your opinions expressed in your prior reports

24  changed in any way in light of this new information?

25  A.   No.

1  Q.   Dr. Zecker, we're just going to briefly discuss your

2  credentials.  And if you'd like, you may turn back to

3  Exhibit 5A, which is your CV.

4  A.   Uh-huh.

5  Q.   Could you just briefly explain your educational

6  background?

7  A.   Yes.  I have a bachelor's degree in psychology and

8  sociology from the University of Michigan and a master's and

9  PhD in psychology from Wayne State University.

10 Q.   And where do you currently work?

11 A.   At Northwestern University.

12 Q.   And what is your position there?

13 A.   I am professor in communication sciences and disorders.

14 Q.   And how long have you held this position?

15 A.   35 years.

16 Q.   Do you have any particular specialties?

17 A.   My specialties are learning disabilities and ADHD.

18 Q.   And in your role at Northwestern, do you teach classes?

19 A.   I do teach multiple classes, yes.

20 Q.   If we can turn to page 12 of Exhibit 5A.  And that's 12 in

21 the lower right-hand corner.

22 A.   Yes.

23 Q.   Is this a listing here on page 12 of courses that you have

24 taught?

25 A.   Yes.

1  Q.   Have you taught courses specifically relating to learning

2  disabilities?

3  A.   I have.

4  Q.   So I'm looking down here.

5  A.   I am currently, in fact.

6  Q.   So it looks like you've been teaching a learning

7  disabilities class for the past ten years?

8  A.   Correct.

9  Q.   And another one, it looks like attention deficit disorder

10 and related behavior disorders.

11      How long have you been teaching this class?  It might

12 require --

13 A.   20 -- 25-plus years.

14 Q.   And do you perform any research in the area of learning

15 disabilities or ADHD?

16 A.   In both areas I do, yes, uh-huh.

17 Q.   If we could also turn to page 7 in your CV.

18 A.   Uh-huh.

19 Q.   It looks like this list, invited presentations, can you

20 just very briefly describe the types of groups that you give

21 presentations to and on what topics?

22 A.   I give presentations to a variety of groups, to parent

23 groups, to school districts, to -- at professional conferences,

24 primarily those.

25 Q.   And do you also have a clinical practice, Dr. Zecker?

1  A.   Correct.

2  Q.   Are you a licensed psychologist?

3  A.   Yes, I am.

4  Q.   How long have you been seeing patients or clients -- do

5  you use patients or clients?

6  A.   Oh, since the -- since around 1990.

7  Q.   Do you perform diagnostic evaluations of individuals for

8  learning disabilities and ADHD as part of this practice?

9  A.   I do.  That's my primary focus, yes.

10  Q.   And then do I understand that you also supervise the

11  clinic at Northwestern?

12  A.   Correct.

13  Q.   And what clinic is that?

14  A.   It's currently called the speech language and learning

15  clinic.  For many years it was called the learning disabilities

16  clinic.

17  Q.   And are you supervising diagnostic evaluations at this

18  clinic?

19  A.   I am a consultant at this point with that.  I supervised

20  the clinic for about 20 years or so.

21  Q.   And so who are you supervising?

22  A.   Primarily graduate students who are working on their

23  masters degrees and who plan to work in the field of learning

24  disabilities.

25  Q.   And what are you supervising them on?

1  A.   We would have a weekly diagnostic evaluation that would

2  cover two days.  And they would learn the various techniques

3  involved in proper evaluation and diagnosis of learning

4  disabilities.

5  Q.   And if we could also turn to page 11 in your CV.  We're

6  still in Exhibit 5A.

7  A.   Uh-huh.

8  Q.   Down at the bottom you list some professional memberships.

9  And it carries over to page 12.  But I wanted to ask about just

10  a couple of these -- a few of these organizations.

11       What is the Learning Disabilities Association of America?

12  A.   That is a group of professionals, largely professionals,

13  who have a shared interest in the field of learning

14  disabilities and meet for an annual meeting to discuss current

15  topics in the field.

16  Q.   And are you a member of this group?

17  A.   Yes.

18  Q.   And you're also a member of the International Dyslexia

19  Association?

20  A.   I am.

21  Q.   And what is this group?

22  A.   That is a worldwide group that does essentially the same

23  thing, gets together on an annual basis and presents results of

24  research and talks about current trends in the field.

25  Q.   And then Children and Adults With Attention Deficit

1    Disorder.

2        What is this group?

3    A.    That is a group that was initially started by parents and

4    is both a parent and professional organization that provides

5    parents with opportunities to learn about ADHD and allows

6    professionals in the field to interact with each other and

7    discuss contemporary issues.

8            MS. MEW:  Your Honor, the defendants offer Dr. Zecker

9    as an expert witness in the evaluation and diagnosis of

10   individuals with learning disabilities and ADHD, as well as the

11   review of accommodation requests on standardized tests.

12           THE COURT:  Very well.

13           Counsel, any questions as to qualifications?

14           MR. BERGER:  No.  I think that there are particular

15   areas that we may question, but -- as we said with Professor

16   Lovett.

17           THE COURT:  Very well.  It goes to the weight of the

18   consideration of the expertise.

19           We find this witness to be an expert in those fields.

20           MS. MEW:  Thank you, Your Honor.

21                       DIRECT EXAMINATION

22   BY MS. MEW:

23   Q.  With my apologies for switching notebooks, if you could

24   get the plaintiff's white notebook exhibits back, please.

25           MR. BURGOYNE:  Can I do this, Your Honor?

1         THE COURT:  Yes, Counsel.

2         MR. BURGOYNE:  Which one do you want?

3         MS. MEW:  33, please.

4  BY MS. MEW:

5  Q.   Dr. Zecker, are you now looking at Plaintiff's Exhibit 33?

6  A.   Yes.

7  Q.   Do you recognize this document?

8  A.   Yes.  This is an article that I wrote for a journal in I

9  believe 1999 or 2000.

10  Q.   And what is the title of this article?

11  A.   "Underachievement and Learning Disabilities in Children

12  who are Gifted."

13  Q.   If you turn to page 2 of this article, sort of midway

14  through this page, you give an example of a boy who you named

15  Lucas with an IQ at the 99th percentile and then reading

16  decoding skills at an average range in the 50th percentile.

17       Do you see where I am?

18  A.   Yes.

19  Q.   Here you state that:  Despite the fact that Lucas is

20  decoding at a grade appropriate level, by virtually any

21  definition of a learning disability, he's underachieving and he

22  would be considered learning disabled.

23       What theory are you applying there in this conclusion?

24  A.   Yes.  That was based on the discrepancy model, which was

25  discussed earlier today, which, at the time that this was

1  written, was still the prevailing model being used in Illinois,

2  where most of the consumers of this information would have

3  been.

4  Q.  And do you go on to state that:  Even if Lucas was

5  performing, if his decoding score was in the 75th percentile,

6  he would still qualify for -- as being learning disabled.

7      And that, again, is that also under the discrepancy

8  analysis?

9  A.  Correct.  And was applicable to school-aged children.

10 Q.  And I know that Dr. Lovett covered this, we don't need to

11 go through it again, but in your professional opinion, is the

12 discrepancy theory now applicable in diagnosing learning

13 disabilities?

14 A.  Correct.

15 Q.  I'm sorry, is it still applicable or not applicable?

16 A.  Oh, no, I'm sorry.  It's not applicable anymore, yes.

17 Q.  And even if you were to accept this example that someone

18 had the discrepancy between IQ and achievement, where the IQ is

19 at the 99th percentile and achievement is at the 50th

20 percentile, would this individual be substantially limited in

21 the major life activity of reading?

22 A.  No.

23 Q.  How did NBME reach out to you to review Ms. Ramsay's first

24 request for testing accommodations?

25 A.  In the same manner that Professor Lovett described

1  earlier.  I received an email and accessed the secure website

2  where the documentation that Ms. Ramsay had submitted was

3  contained.

4  Q.    Did you have any communication with NBME between the time

5  you received this file and the time that you submitted your

6  letter report?

7  A.    No.

8  Q.    And then how did -- after you submitted that letter

9  report, did NBME contact you in any way and ask you to make any

10 changes or revisions to your report?

11 A.    No.

12 Q.    And then how did NBME reach out to you to ask you to

13 review Ms. Ramsay's June 2018 request for accommodations?

14 A.    In an identical manner.

15 Q.    Did you have any communications with NBME between the time

16 that they reached out to you and the time you submitted your

17 second letter report?

18 A.    No.

19 Q.    And did NBME reach out to you after receiving that second

20 report and ask you to make any changes or revisions to your

21 recommendations?

22 A.    No.

23 Q.    We're going to primarily stand on the written reports in

24 the interest of time.

25        So can you just very briefly state what conclusions you

1  reached regarding Ms. Ramsay's request for testing

2  accommodations on the USMLE?

3  A.   I -- in both instances or --

4  Q.   Yes.

5  A.   Okay, yeah.  It's essentially the same in both.  I had

6  reviewed all of the materials and did not believe that they

7  demonstrated that she had a substantial limitation in either

8  attention or reading and did not believe that accommodations --

9  an extended time accommodation was warranted.

10 Q.   And again, we mentioned or you mentioned that you've since

11 reviewed Dr. Smith's report, you've reviewed the additional

12 school records and standardized testing scores that have been

13 discussed in this hearing.

14      Does that remain your opinion today?

15 A.   I have reviewed those, yes.

16 Q.   And does it remain your opinion that Ms. Ramsay is not

17 substantially limited in a major life activity relative to --

18 A.   My opinion has not changed from that, no.

19           MS. MEW:  I don't have any further questions.

20           THE COURT:  Cross-examination.

21                    CROSS-EXAMINATION

22 BY MR. BERGER:

23 Q.   Professor Zecker, in your clinical practice, do you see

24 primarily children or primarily adults or both?

25 A.   Primarily school-aged kids, starting at around age 7 up

1  through young adults.  An occasional older adult, but it's

2  unusual.

3  Q.   Would you look at Exhibit 5 again.  That is your

4  declaration.  And I'm referring to the declaration itself now,

5  so not one of the tabs.

6       Do you have that volume there, or do I need to help you?

7  A.   I don't think I do.

8            MR. BURGOYNE:  Which one are you asking about?

9            MR. BERGER:  Exhibit 5, D-5.

10           THE WITNESS:  I am there.

11  BY MR. BERGER:

12  Q.   Okay.  Just one more question before we get to that.

13       I think you said in your answer just now that you

14  generally saw children starting with age 7?

15  A.   6 or 7, yeah.

16  Q.   6 or 7.

17       Why don't you see children younger than that?

18  A.   The diagnosis of learning disabilities and ADHD is

19  notoriously unreliable at those ages.  Good instruments to

20  assess and diagnose are not prevalent.

21  Q.   In your declaration, I want to refer you to paragraph 3.

22  And you can read the whole paragraph to yourself if you want,

23  but the part that I want to read is actually just the last

24  sentence of paragraph 3, which begins on page 2.  And let me

25  just read that into the record.

1       As part of my work I frequently meet with young adults who

2   have diagnoses of learning and attention problems to assess

3   both their self-reported symptoms and their objective

4   performance on various tests of cognitive, academic and

5   behavioral functioning.

6       Do you see that sentence?

7   A.   Yes.

8   Q.   Who wrote that sentence?

9   A.   As I recall, I did.  Well, it was edited to some degree,

10  but I provided most of this.

11  Q.   All right.  Would you now look at Exhibit 6, which is

12  Professor Lovett's declaration.

13  A.   Yes.

14  Q.   And also paragraph 3.  And the last sentence of Professor

15  Lovett's paragraph 3 reads:  As part of my work, I frequently

16  meet with young adults who have diagnoses of learning and

17  attention problems, and I assess both their self-reported

18  symptoms and their objective performance on various tests of

19  cognitive, academic and behavioral functioning.

20  A.   Yes, I see that.

21  Q.   Okay.  I think the two sentences that I just read to you

22  are word for word the same.

23  A.   They appear to be.

24  Q.   So I'll ask again, who wrote the sentence as it appears in

25  your declaration?

1  A.   I wrote parts of it.  I don't recall exactly that

2  sentence, but I certainly reviewed it all and agreed with it

3  all.

4  Q.   You have testified that you have been a reviewer for NBME

5  for some time.  I don't remember exactly how many years you

6  said.

7  A.   16 or so.

8  Q.   16 years.  And I guess you heard Professor Lovett testify

9  about the annual meetings that he attends?

10 A.   Yes.

11 Q.   And do you also attend those meetings?

12 A.   Most of them, yeah.  I have missed several, but most of

13 them.

14 Q.   All right.  You said that you had reviewed Dr. Smith's --

15 let me start the question again.

16      As I understand it, you were not asked by NBME to do a

17 written review of Dr. Smith's report but that you had read it

18 at some point?

19 A.   Yes.  I saw it fairly recently, yes.

20 Q.   Okay.  And do you understand Dr. Smith to be a clinical

21 psychologist engaged in private practice?

22 A.   Yes.

23 Q.   Do you think that people like Dr. Smith who are -- whose

24 main activity is clinical practice are inherently biased in

25 favor of the people that they evaluate?

1  A.   I can't speak for Dr. Smith in that regard.

2  Q.   In general.

3  A.   There has been some research to show that practitioners

4  are biased in some regards, yes.

5  Q.   So when you're doing your work as a reviewer for NBME, if

6  you receive a report from a private practitioner evaluating the

7  student, you assume that the practitioner is biased in favor of

8  the student.  Right?

9  A.   No.

10  Q.   Okay.  What do you assume?

11  A.   I assume that the person who was conducting the evaluation

12  was doing so in a straightforward and unbiased manner.

13  Q.   From your review of Dr. Smith's report, is there any

14  reason why you question that in this case?

15  A.   Question bias?

16  Q.   Question in this case whether he was performing his work

17  in an unbiased and professional manner.

18  A.   I don't have any question about that, no.

19  Q.   Is there a consensus about the discrepancy model

20  currently, or is it still a matter of discussion?

21  A.   It has largely fallen into disfavor.  It varies from state

22  to state, and even from school district to school district, but

23  it is not commonly used anymore.

24  Q.   What about -- I'm sorry.

25  A.   There's been a substantial amount of research that has

1  discredited the validity of it.

2  Q.   Just for the record, because I'm not trying to be cute or

3  tricky about this, is Illinois the only state in which you are

4  licensed as a psychologist?

5  A.   Yes.

6  Q.   Have you ever been licensed in another state?

7  A.   No.

8  Q.   So you're not licensed in Texas?

9  A.   I am not.

10 Q.   Or in Michigan?

11 A.   Correct.

12 Q.   All right.  Do you know whether the discrepancy model

13 is -- well, I'm sorry.  Strike that.

14      Are you familiar with a manual that is known as the ICD or

15 International Classification of Diseases?

16 A.   I am.

17 Q.   And do you know what the current edition of ICD is?

18 A.   10.

19 Q.   And is ICD-10 also a widely used manual for diagnosing,

20 among other things, not just this, but among other things,

21 learning disorders and conditions like ADHD?

22 A.   Yes.  It is -- as the name says, it's the international

23 classification.  And as a result, it is more commonly used in

24 other countries than in the United States, but, yes, it is

25 used.

1  Q.  Are you a reviewer for the MCAT?

2  A.  Yes.

3  Q.  And how long have you been a reviewer for the MCAT?

4  A.  About ten years.  I'm not sure exactly, I'd have to look

5  it up.

6  Q.  Let me ask you to look at -- we're going back now to

7  Exhibit 5, which is your declaration, and Tab B, which I think

8  you have identified as the report.

9  A.  Is that this one?

10  Q.  Exhibit DX-5 and Tab B, which is the report that you did

11  for NBME in January of 2017.

12  A.  Oh, DX-5.  Correct.  Yes, I have it.

13  Q.  And on the second page of Tab B, the paragraph that starts

14  about in the middle of the page, you comment twice about --

15  well, you're generally commenting about Ms. Ramsay's personal

16  statement here.

17      What's the personal statement in the USMLE accommodations

18  application?  What role does that play?

19  A.  It is weighed along with everything else as a factor in

20  the decision.

21  Q.  That's something that NBME asks students to provide.

22  Correct?

23  A.  Yes.  All students provide one.

24  Q.  And you comment in the paragraph to which I just referred

25  in the first line that Ms. Ramsay's personal statement was

1  lengthy?

2  A.   Yes.

3  Q.   And then about in the middle of the paragraph, you

4  describe it as her well-written, nine page long personal

5  statement?

6  A.   Yes.

7  Q.   Can a student with ADHD write something that is lengthy?

8  A.   Sure.

9  Q.   Can a student with ADHD write something which is well

10  written?

11  A.   Yes.

12  Q.   Do you know how long it took Ms. Ramsay to write her

13  personal statement?

14  A.   I have heard that discussed over the last two days.  I did

15  not know that at this time.

16  Q.   I don't recall the exact amount, but it was an extended

17  effort?

18  A.   Yes.  I think she said a month or so, yes.

19  Q.   Is that different from or the same as taking a test like

20  the USMLE?

21  A.   I'm sorry, is writing a personal statement --

22  Q.   Yes.

23  A.   -- the same as taking a test?  No.

24  Q.   And how is it different?

25  A.   Well, one has as much time as they need to do it, can go

1 back and edit, revise, rewrite, ask for assistance from other

2 individuals on it, all things that are not possible on a

3 standardized test.

4 Q.   In the same paragraph, you refer to the fact that Ms.

5 Ramsay was in a gifted program through fifth grade?

6 A.   Uh-huh, yes.

7 Q.   Do you recall or do you know what subject the gifted

8 program was in?

9 A.   In math.

10 Q.   Okay.  Could somebody with dyslexia succeed in a gifted

11 program in math?

12 A.   Yes.  As Dr. Lovett was referring to earlier, that most

13 people have patterns of strengths and weaknesses, and one can

14 be very strong in one area and weaker in another, yes.

15 Q.   So the fact that Ms. Ramsay is gifted in math doesn't

16 indicate that she doesn't have dyslexia?

17 A.   It in and of itself doesn't preclude that, no.

18 Q.   All right.  You wrote in the same paragraph -- well, let

19 me just read a couple of sentences and ask you about them.

20      You wrote, and this is about in the middle of the

21 paragraph:  Ms. Ramsay indicates that writing is "pure agony"

22 for her and she experiences "panic and despair" and "awareness

23 of the impending doom" while working on tests.  Such

24 descriptions, in my professional opinion, are highly suggestive

25 of a significant effective component to her described

 1  struggles, although as I will indicate, this has never been

 2  explored in any evaluation.

 3       All right.  Did you ever evaluate Ms. Ramsay personally?

 4  A.  No.

 5  Q.  And are you aware that Dr. Smith did evaluate her in

 6  person?

 7  A.  Yes.

 8  Q.  Let's go to Tab C now, which is the second review that you

 9  did.

10  A.  Yes.

11  Q.  If you look at the second page -- actually, it starts on

12  the first page and continues over, but you're listing a number

13  of things that were submitted as part of Ms. Ramsay's

14  application.  Correct?

15  A.  Yes.

16  Q.  And am I right in understanding this was a whole new

17  application that she submitted?

18  A.  Yes.  That also contained some of -- the documentation

19  that was submitted earlier, yes.

20  Q.  So she submitted the first application and that was turned

21  down.  Right?

22  A.  Yes.

23  Q.  And now she in -- at this time has submitted a brand new

24  application.

25       And one of the things you list around the middle of the

1  carryover paragraph on page 2 is a letter from Dr. Ruekberg?

2  A.    Which point number is that?

3  Q.    It is page -- 2nd of Tab C.

4  A.    No, no, no, I'm looking at that, but each of these

5  documents is numbered here.

6  Q.    Yeah.

7  A.    I was just asking you which number it was.

8  Q.    Yeah.  The page numbers at the top are a different thing.

9        So about in the middle.

10  A.    Oh, yes.  Okay.

11  Q.    Okay.  Do you remember reviewing Dr. Ruekberg's letter?

12  A.    I'm sure I did.  I don't specifically remember it.

13  Q.    Okay.  Do you remember if Dr. Ruekberg said anything about

14  whether Ms. Ramsay's difficulties were the result of, as you

15  called it, an effective disorder as opposed to dyslexia and

16  ADHD?

17  A.    I do not recall.

18  Q.    Okay.  Do you know whether Dr. Ruekberg had met with Ms.

19  Ramsay in person?

20  A.    I would assume he did.  And I have heard today that he

21  did.

22  Q.    Still on Tab C, your second review report, you comment

23  near the bottom of the page about Ms. Ramsay's MCAT score

24  report.

25  A.    Yes.

1  Q.  Is the MCAT an appropriate diagnostic instrument for

2  dyslexia?

3  A.  No.

4  Q.  Have you ever administered the MCAT to somebody who you

5  were evaluating?

6  A.  No.

7  Q.  If I asked you the same questions about the ACT exam,

8  would you give the same answers?

9  A.  Yes.

10  Q.  All right.  You said that you had reviewed Dr. Smith's

11  report.  And since I think you were in the courtroom when

12  Professor Lovett testified, you might recall that I reviewed

13  with Professor Lovett several of the tests that Dr. Smith

14  performed.

15  A.  Correct.

16  Q.  And in general, from your review of Dr. Smith's report, do

17  you have any reason to question that he actually administered

18  the tests that he said that he administered?

19  A.  No.

20  Q.  Or got the results that he reported?

21  A.  I'm sorry?

22  Q.  Or got the results that he reported in his report?

23  A.  Oh, no.  No, I do not.

24  Q.  Okay.  Would you agree with Professor Lovett that one of

25  those tests, the WIAT-information, is an appropriate test to

1 administer when a diagnosis of dyslexia is being considered?

2 A.   Sure.  It is among the measures that are appropriate, yes.

3 Q.   And also that the GORT-5 is an appropriate test to

4 administer in such a case?

5 A.   Yes.  With the caveat there that the norms were not

6 completely appropriate given the age, but yes.

7 Q.   And the Woodcock-Johnson IV reading rate cluster, is that

8 an appropriate test to administer?

9 A.   Yes.

10 Q.   And the Nelson-Denny reading test, is that an appropriate

11 test to administer?

12 A.   Well, as Dr. Lovett pointed out, it is not -- the

13 Nelson-Denny is not considered a good diagnostic measure due to

14 its technical weaknesses, but as a screening measure, yes.

15 Q.   I also asked Professor Lovett about a test called the

16 IVA+Plus.

17      Are you familiar with that test?

18 A.   I am.

19 Q.   And you know from your review of Dr. Smith's report that

20 he administered that test.  Correct?

21 A.   Twice as I recall, yes.

22 Q.   Why did he administer it twice?

23 A.   He indicated he was looking for consistency of results.

24 Q.   And do you agree that that's an appropriate test to

25 administer in a case where an ADHD diagnosis is being

1  considered?

2  A.   Yes.  It can supplement the other information obtained,

3  yes.

4  Q.   And you don't have any reason to doubt that he actually

5  did administer that test or that he got the results that he

6  described?

7  A.   Correct.

8  Q.   I also asked Professor Lovett about whether these are

9  tests, the WIAT and the Woodcock-Johnson and the GORT, that

10  somebody can study for before they're administered.

11  A.   No, I do not believe it is.  Those are measures of

12  acquired knowledge, acquired skills, and as such really can't

13  be studied for.

14  Q.   And they're different in that way from the MCAT.  Correct?

15  A.   Yes.

16  Q.   When NBME sends you a case to review, do they set any kind

17  of time limit on the review?

18  A.   Yes.

19  Q.   Do you recall what that was in the case of your first

20  review of Ms. Ramsay?

21  A.   I believe ten days.

22  Q.   Is that typical in your experience?

23  A.   Yes.

24  Q.   And was it similar for the second review?

25  A.   Yes.

1  Q.   Your first review, which is Tab B, I think, in Exhibit 5,

2  is dated January 13, 2017.

3  A.   Yes, it is.

4  Q.   All right.  Am I right that you did not -- at least not at

5  that time, see whatever letter NBME sent to Ms. Ramsay?

6  A.   Correct, I did not.

7  Q.   If I refer to that as a decision letter, do you --

8  A.   Yes.

9  Q.   Do you know when the decision letter was sent?

10 A.   Offhand, no, I do not.

11 Q.   Okay.  And looking at Tab C, your review letter is dated

12 July the 19th, 2018; is that correct?

13 A.   Correct.

14 Q.   And do you know when in that case NBME sent the decision

15 letter to Ms. Ramsay?

16 A.   I do not.

17 Q.   If a young child is thought to be underachieving for

18 whatever reason, would you still say that parents of such a

19 child should consider looking for help for that child even if

20 some people think the discrepancy model is no longer any good?

21 A.   Certainly individuals who have a discrepancy as we were

22 discussing earlier can be assisted by appropriate interventions

23 and so on, sure.

24 Q.   So if there is a discrepancy, that could be an indication

25 that the person has a learning disability?

 1  A.   Not under -- well, it would depend on the level at which

 2  they were functioning, but it could be the case.

 3  Q.   I'm not asking at this point whether that's a diagnostic

 4  standard.  I'm just saying is that something that would lead

 5  you to -- if you were speaking to a parent and the parent told

 6  you my son is really, really smart but he can't read very

 7  quickly, a very, very slow reader, would that be a reason that

 8  you would suggest the parent get the child evaluated?

 9  A.   Yes.

10  Q.   All right.  If that same child got informal help that

11  allowed him to function in school without an evaluation, would

12  you say that means he doesn't have a disability?

13  A.   It depends on what you mean by informal help, I think.

14       If a child is able to function at an appropriate level,

15  then I would say they're not disabled, yes.

16  Q.   Well, some of the help that was described by Ms. Ramsay in

17  her testimony was the teacher giving her an alphabet chart, the

18  teacher reading things to her, other people reading things to

19  her.  If Ms. Ramsay had dyslexia and if Ms. Ramsay nevertheless

20  had a high level of intelligence, is that kind of help

21  something that would help her to do well in school?

22  A.   In some aspects.  In the area -- for example, she received

23  very good grades in reading.  And having someone read to her

24  would not lead to a grade of A in reading, I would presume.

25  That it's based on her own reading that would lead to that

1  grade.

2  Q.   Do you know whether any of the grades for reading at that

3  level were for timed reading tests?

4  A.   I do not know.

5        MR. BERGER:  Your Honor, may I have a moment to

6  consult?

7        THE COURT:  Yes, Counsel.  As a matter of fact, you

8  can have a break.  We'll be in recess for 15 minutes.

9        (Recess at 3:04 p.m. until 3:18 p.m.)

10       THE COURT:  Are we ready to proceed?

11       MR. BERGER:  Yes, Your Honor.

12       THE COURT:  Very well.

13       MR. BERGER:  We have no further questions for

14  Professor Zecker.

15       THE COURT:  Excellent.  Any redirect?

16       MS. MEW:  No, Your Honor.

17       THE COURT:  And is there any reason why this witness

18  can't be excused?

19       MR. BERGER:  No, Your Honor.

20       MS. MEW:  No.

21       THE COURT:  Very well.  This witness is done.  And,

22  sir, you can be excused.

23       THE WITNESS:  Thank you.

24       THE COURT:  And that completes your expert witnesses

25  that you needed to call out of order?

1          MS. MEW:  Yes, that is correct.  Thank you, Your

2    Honor.

3          THE COURT:  Very well.  And now back to the

4    plaintiff's case in chief.

5          MS. VARGAS:  Your Honor, we already consulted with

6    defense, and they have no objection.  Would it be all right

7    with the Court if Ms. Ramsay stood in the back?  She has been

8    sitting for a long time and is having leg issues.

9          THE COURT:  Sure.  There's no requirement that she

10   even be here, you know.

11         MS. VARGAS:  Okay.

12         THE COURT:  This is not a criminal case or anything.

13   She's a plaintiff.  I've had cases where the plaintiff missed a

14   day or two, so it's not necessary.

15         Whatever makes you feel comfortable, ma'am.

16         MS. RAMSAY:  Thank you.

17         MR. BERGER:  Your Honor, plaintiff calls Dr. Robert

18   Smith as our next witness.

19         THE COURT:  Very well.  Come forward, sir, watch your

20   step coming around the corner there and also around the corner

21   by the witness box.  There's an incline and a decline.

22         DR. ROBERT SMITH, after having been duly sworn, was

23   examined and testified as follows:

24         THE COURT REPORTER:  Please state your name for the

25   record.

1       THE WITNESS:  Robert Dean Smith.

2                 DIRECT EXAMINATION

3   BY MR. BERGER:

4   Q.   Dr. Smith, I am going to begin by asking you some

5   questions about the declaration that you submitted in this case

6   and the various exhibits to that.  So let me make sure that you

7   have the right document in front of you.

8       MR. BERGER:  May I approach, Your Honor?

9       THE COURT:  Yes.

10  BY MR. BERGER:

11  Q.   Dr. Smith, do you have plaintiff's exhibit binder in front

12  of you?  And I have turned to Tab 21.

13      Would you look at Exhibit P-21 and tell me if you

14  recognize that as being the declaration that you submitted in

15  this case?

16  A.   Yes, it is.

17  Q.   And that is your signature on page 10.  Correct?

18  A.   Yes.

19  Q.   And if you turn past that, you come to Exhibit A, which is

20  your curriculum vitae; is that correct?

21  A.   Yes.

22  Q.   Can you briefly describe for the court your educational

23  history.

24  A.   I have a bachelor's degree in psychology from Central

25  Michigan University, a master of arts in clinical psychology

1  from Central Michigan University and a PhD in counseling

2  psychology from Michigan State University.

3  Q.   Did you also complete a post-doctoral program at Fielding

4  University?

5  A.   Yes.  At the time was called Fielding Institute.  It's now

6  called Fielding University.  It's a two-year post-doc in

7  neuropsychology.

8  Q.   And can you briefly describe your work history after you

9  completed the post doctoral program in 1999?

10  A.   At that time I was in private practice and a part of the

11  time at that time, about a third of the time as a consultant

12  for the Michigan Dyslexia Institute.

13  Q.   Are you licensed as a psychologist?

14  A.   Yes.

15  Q.   In what state are you licensed in?

16  A.   Michigan.

17  Q.   And how long have you been licensed?

18  A.   Since 1986.

19  Q.   Are you a member of any professional associations that

20  relate to your work as a psychologist?

21  A.   The American Psychological Association and the National

22  Academy of Neuropsychology.

23  Q.   What are the membership requirements for the National

24  Academy of Neuropsychology?

25  A.   To be a full member, you have to complete what's a

1   recognized -- a program that follows policies that they have in

2   terms of what they recognize as the appropriate training

3   regimen.  Then you have to be recommended by somebody who is a

4   member, who knows your work.

5   Q.   You have already heard testimony since you've been in the

6   courtroom about something called the Diagnostic and Statistical

7   Manual of Mental Disorders?

8   A.   Yes.

9   Q.   Are you familiar with that?

10  A.   Yes.

11  Q.   And are you familiar with the current edition of DSM?

12  A.   5.

13  Q.   DSM-5?

14  A.   Yes.

15  Q.   Are you also familiar with something called the

16  International Classification of Diseases?

17  A.   Yes.

18  Q.   And what is the current edition of the ICD?

19  A.   That's 10, Clinical Modification.

20  Q.   And am I right that the ICD-10 Clinical Modification is a

21  version that is specifically designed for use in the United

22  States?

23  A.   Yes.

24  Q.   Are you familiar with a condition that is known as

25  dyslexia?

1  A.   Yes.

2  Q.   What is dyslexia?

3  A.   Dyslexia is a physiological and neurological disorder that

4  interferes with acquiring and applying basic reading skills.

5  Q.   What is it like for a dyslexic person to try to read or

6  understand a written text?

7  A.   They have difficulty recognizing the words, regardless of

8  what the meaning of the word is, just identify correctly what

9  the word is.  And it takes a lot of mental energy, even after

10  remediation, to correctly identify those words.  A lot of their

11  mental effort has to go into that.  And that, of course, does

12  interfere with reading comprehension, although reading

13  comprehension may frequently function in the average range.

14  Q.   How do you go about assessing a person for dyslexia?

15  A.   Well, primarily it's through -- dyslexia is primarily

16  defined as an impairment of acquiring basic reading skills,

17  which is -- and developing what's called automaticity or oral

18  fluency.  And you administer tests that primarily measure those

19  skills.  You also administer reading comprehension, but the

20  disorder is defined by the difficulty of acquiring the basic

21  reading skills.

22  Q.   Are you familiar also with a condition that is known as

23  attention-deficit/hyperactivity disorder or ADHD?

24  A.   Yes.

25  Q.   And what is ADHD?

1 A.   Well, ADHD, there are several presentations.  But ADHD is

2 difficulty focusing attention, being excessively distracted,

3 disorganized, misunderstanding directions.  There are some

4 other criteria which I don't recall off the top of my head.

5      Then the other category, which are hyperactivity,

6 impulsivity symptoms.  Primarily hyperactivity symptoms.  There

7 are three impulsive symptoms.  Basically difficulty, for an

8 adult, sitting still or feeling restless even when they do sit

9 still; talking too much, interrupting other people, difficulty

10 waiting in line, abnormal impatience, that kind of thing.

11 Q.   And how do you assess a person for ADHD?

12 A.   You acquire through interview, questionnaires, rating

13 scales, a description of their current functioning.  And in

14 particular, you're looking for signs of theses symptoms and how

15 frequent they are and whether those symptoms also appeared when

16 they were before the age of 12.  It doesn't require the -- that

17 for them to -- it's difficult to establish the range of

18 symptoms that occurred before the age of 12, because recall is

19 often not entirely accurate.  So it only requires that some of

20 the symptoms were present then.  And it causes significant

21 interference in functioning.

22 Q.   Is it common or uncommon for somebody with dyslexia to

23 also have ADHD?

24 A.   It's very common.

25 Q.   And by the way, can you -- over the course of your career,

1  can you estimate how many assessments you've done in which

2  you've evaluated a person for dyslexia or for ADHD or both?

3  A.   Together, about 1,300, since around 1995.

4  Q.   Based on your experience with doing that, with evaluating

5  people with both or one or the other, how is somebody affected

6  if he has or she has both of these conditions?

7  A.   Well, they feed on each other.  They make each one worse.

8  Can't distinguish -- reliably it's a matter of opinion about

9  how much of the problem is due to the attention deficit and how

10 much is due to the dyslexia, because they overlap a lot and

11 they just make each other worse, exacerbate the problems in

12 each condition.

13 Q.   As you know, the case that brings us to court today is a

14 case about testing accommodations for a test, for the USMLE.

15      In any of the assessments that you've done, have you ever

16 made a recommendation about whether an individual had a

17 disability that affected her ability to take a timed test like

18 the USMLE?

19 A.   Yes.  That's the most common problem for somebody who has

20 either dyslexia or attention deficit disorder.  That's the most

21 standard, common accommodation.

22      Some people with dyslexia read so poorly that they also

23 have to have things read to them.  Particularly the extended

24 time is primarily applying to people who have developed

25 compensatory strategies, either on their own or through formal

1  kinds of instruction, to strength their reading skills.

2        MR. BERGER:  Your Honor, we would like to offer Dr.

3  Smith as an expert witness on the assessment of individuals

4  with ADHD and dyslexia and how those conditions affect their

5  ability to take timed tests.

6        THE COURT:  Very well.  Any questions as to

7  qualifications?

8        MR. BURGOYNE:  No objection, Your Honor.

9        THE COURT:  Very well.  We so find.

10                DIRECT EXAMINATION

11  BY MR. BERGER:

12  Q.   When someone comes to you for an assessment, what do you

13  do?

14  A.   I do the interview.  Well, we have some questionnaires

15  that we send out to them and ask for them to fill them in

16  before they come in.  And that helps guide me in the interview

17  to ask additional information from what they respond there.

18        They try to, first of all, size up how likely is it that

19  they have that condition and should we go forward and do

20  testing.  It's not uncommon where I've -- basically, we've

21  stopped at the end of the interview because I've concluded or

22  recommended to them -- I'm generally willing to consider doing

23  the evaluation, but I usually make a recommendation whether

24  testing is really going to be beneficial to them or clarify

25  things based on what I learn from the interview.

1    And whatever records they may have, I ask them to bring

2    those in, because that helps make -- any past testing that's

3    been done provides information about -- even more information

4    about how likely they are to have the condition, either ADHD or

5    dyslexia.

6    Q.   So does it ever occur after this initial interview that

7    you don't go forward or the individual doesn't go forward with

8    getting the full assessment?

9    A.   Yes.

10   Q.   You, I know, are acquainted with Ms. Ramsay, the plaintiff

11   in this case.

12        When did you first meet her?

13   A.   Face to face, that would have been on September 25, 2018.

14   I spoke with her on the phone somewhat prior to that.

15   Q.   And what did she tell you about what she was coming to

16   speak to you about?

17   A.   Well, she described to me that she was a medical student

18   and had been denied accommodations.  And she'd had other

19   evaluations done.  And that she was doing an appeal and that

20   she was looking for somebody who was capable of doing that kind

21   of an evaluation, who was experienced or familiar with it.  And

22   I asked her to send me whatever data she had so I could look it

23   over to see what's been done in the past and whether or not

24   there was things that were done in the past that would

25   basically tell me whether or not right off the bat whether she

1  was likely to have it or not have it.

2      It's not uncommon for me, when I get a phone call like

3  that -- if I get enough information that tells me that, you

4  know, I don't think this is really going to do for you what you

5  want it to do and it's -- you know, because there's evidence

6  here that shows otherwise, I usually discourage people from

7  going forward with the evaluation.

8  Q.   So in the case -- in Ms. Ramsay's case, what did you tell

9  her at this stage?

10 A.   Well, when I looked it over, nobody had done the kind of

11 testing that you need to do to even check into dyslexia.  The

12 only thing that they had done was a couple of brief things and

13 then a couple of reading comprehension tests, which don't

14 really tell you whether somebody has dyslexia or not.

15     In regards to the attention deficit, I thought some of the

16 work that was done, particularly by Dr. Ruekberg, seemed pretty

17 okay.  But the reports, from my experience, didn't try to

18 address more specifically what the DSM-5 requires and what

19 people generally expect to see in one of these reports if

20 you're making that kind of an application.

21 Q.   Okay.  When you refer to the report in that last answer,

22 were you referring to Dr. Lewandowski's report?

23 A.   In -- well, yes.  That was the one that -- he didn't --

24 there wasn't much of a write-up.  And he didn't -- as far as --

25 he didn't address specifically the DSM-5 criteria and how she

1    met it.  And in regards to dyslexia or reading, the tests that

2    he administered was inadequate for evaluating that.  It was a

3    reading -- no, I'm sorry, it wasn't a reading comprehension.

4    It was a screening test, the WRAT5, I think, which is just a

5    screening.  That's not considered an adequate battery for

6    evaluating a learning disability.

7        Let me add, dyslexia is the most common learning

8    disability, although that is not the title -- the terminology

9    that is typically used.  It's mentioned in the DSM-5.  But the

10   labeling in the DSM-5 refers to specific learning disorders in

11   either reading, writing or math.  And you could have basic

12   reading or a disorder in reading comprehension.  They are kind

13   of mutually exclusive -- not mutually exclusive.  You can have

14   one or the other.  You can have both.  You can have both, but

15   you can have one or the other.

16   Q.   And what's the terminology in ICD-10 for dyslexia?

17   A.   I don't recall the specific -- I don't recall the specific

18   language, something along the lines of a -- I don't remember,

19   scholastic learning disorder, something like that.

20   Q.   So --

21   A.   Or academic learning disorder.

22   Q.   -- after having this conversation with Ms. Ramsay, you

23   told her, as I understand it, that you thought there were some

24   additional tests that you could do that hadn't been done

25   before.  Right?

1   A.   Yes.   That are a part of actually a standard battery that

2   if you're going to do dyslexia, these are the tests that are

3   agreed upon by dyslexia experts you should do.   And none of

4   those were done.

5   Q.   When you spoke to her, you didn't know what the results of

6   those tests would be; is that --

7   A.   Oh, no, not at all.

8   Q.   And did you tell her that?

9   A.   Yes.

10   Q.   And what did she decide about whether she wanted to go

11   ahead?

12   A.   Well, she decided to go forward.   Now, I did emphasize to

13   her that I didn't know and it might not turn out -- you know,

14   it might not really show that she has dyslexia.

15   Q.   All right.   You still should have Exhibit P21 in front of

16   you.   And turn, please, to page 15 of the overall document.

17       And tell me what appears at page 15?

18   A.   Well, her name, date, when the test was done and when the

19   report was completed; a list of the -- what I referred to are

20   sources of information, but that includes --

21   Q.   Okay.   Well, I'm ahead of myself.   You're ahead of me.

22   A.   Okay.

23   Q.   Just what I just wanted to actually identify -- and I

24   didn't ask it the right way -- pages 15 through 45 of P-21 are

25   your report, are they not?

 1  A.   Yes.

 2  Q.   And that's your signature on page 45?

 3  A.   Yes.

 4  Q.   So this is the report that you created after you had met

 5  with Ms. Ramsay and done the tests.  Right?

 6  A.   Yes.

 7  Q.   All right.  I'm going to ask now just briefly about some

 8  of the sections.  And the first section, which I think you

 9  started to talk about, is sources of information.

10        So what is that section about?

11  A.   Well, it's just listing that I did an interview with her

12  and her mother and then the tests that I administered.

13  Q.   All right.  And then the next section -- oh, by the way,

14  those tests that you describe under sources of information, are

15  those all tests that you administered yourself?

16  A.   Yes, I administered all the tests.  I don't have a

17  technician.

18  Q.   All right.  The next section which starts on page 15 and

19  continues over is called records reviewed?

20  A.   Yes.

21  Q.   And what's that section about generally?

22  A.   Well, that's about all the documents I asked her to bring

23  in for me, as much as I can get, to look over both -- primarily

24  before the interview and during the interview.  The ones that

25  she sent to me, plus anything extra she brought to the

1  interview that I would then interview as part of the -- I would

2  review as part of the interview.

3  Q.   And there's a section then -- I'm going to skip over the

4  reason for referral, because I think we've already covered

5  that, that Ms. Ramsay came to see you because of her problems

6  with the USMLE.

7       But the next section, which starts history and interview

8  information.  And this is a long section, so I'm not asking you

9  to describe it in detail, but what generally is the purpose of

10 the section and of the interview?

11 A.   To summarize the information that I gathered from her

12 through the questionnaires and interview and even reviewing

13 some of the records about her history of her problems and

14 describe the problems that she's had leading up to the present

15 time.

16 Q.   And this was an in-person interview.  Correct?

17 A.   Yes.

18 Q.   Do you remember approximately how long the interview

19 lasted?

20 A.   Yes.  Well, these interviews -- I schedule out an hour,

21 and they usually take two before we even consider doing --

22 that's a lot of stuff to go through.  And before we even start

23 doing the testing.

24 Q.   All right.  As part of the history and interview

25 information, if you turn to page 18 of Exhibit P-21.  And it's

1   page 4 of your report.

2       There's a section that starts on that page called school

3   history?

4   A.   Yeah.

5   Q.   And what generally is the purpose of that section?

6   A.   Well, similar to what I just described, except related to

7   her experiences in school, difficulty she's had in school, what

8   she's done to try to address it up to the present time.

9   Q.   What did you find out about whether Ms. Ramsay had formal

10  accommodations while she was in elementary school?

11  A.   I found out that she hadn't had any formal -- she hadn't

12  had any really evaluation and had not had any formal

13  accommodations.

14  Q.   And what did you -- and if I ask the same question about

15  middle school and high school, would it be the same answer?

16  A.   Yes.

17  Q.   Is that unusual for people, adults with dyslexia that

18  hasn't previously been diagnosed?

19  A.   No.  I might qualify that.  That happens -- in my

20  experience, that happens fairly frequently.  I mean, it's not

21  like half the time.  If I put a figure -- make up a figure,

22  maybe 10 or 15 percent of the time that people come in with

23  that kind of a history.

24  Q.   On page 8 of the report --

25  A.   Page 8?

1  Q.   Yes.  It's page 22 of the total document, but it's page 8

2  of the report, the section at the top of the page, mental

3  status and observations.

4  A.   Okay, yeah.

5  Q.   What generally is the purpose of that section?

6  A.   You know, I'm still looking for that section, I'm sorry.

7       What page are you talking about?

8  Q.   It should -- well, it should say -- at the top, it should

9  say page 22 of 60.  And at the bottom --

10  A.   Oh, never mind.  I got it.

11  Q.   Well, and then there's the actual -- so it's page 8 of the

12  report?

13  A.   Sure.  I'm there now.

14  Q.   We have too many page numbers in this case.

15       All right.  So you've got the page that has mental status

16  and observations at the top?

17  A.   Right.

18  Q.   And what generally is the purpose of that section?

19  A.   It's to describe her general functioning, to review some

20  questions that I would ask her about her sleep and just my

21  observations about how she handled herself.  These are

22  screening things that -- these kind of observations are used to

23  screen -- initial screening for whether you have a severe kind

24  of behavioral disorder or something that stands out, a

25  psychological disorder that we might need to look into further.

1  It's not the end of it, but it's the beginning part of checking

2  into that.

3  Q.   During your interview or all of your testing of Ms.

4  Ramsay, did you observe anything that would affect her ability

5  to respond to your questions or respond to the instruments that

6  you were giving her?

7  A.   No.  And I left -- it's not just a description of her

8  psychological functioning.  I'm also including in there general

9  statements about what she was like during the interview and how

10  she interacted with me so that I could make some kind of an

11  assessment or comment about how she responded to the tasks I

12  asked her to do.

13  Q.   Okay.  Toward the bottom of the same page, there is a

14  section entitled intellectual functioning.  And that continues

15  over to page 11 of your report, which is page 25 of the overall

16  document.

17       What generally was the purpose of that section?

18  A.   Well, number one is to make sure she doesn't have low

19  ability, which her history says that's probably not the case.

20  She's in medical school, so I didn't think she got -- but it's

21  to double check that.

22       But also, since I'm evaluating for attention deficit

23  disorder and cognitive functioning in general, it's to get a

24  general sense of what is her cognitive functioning like to

25  begin with.  And this reflects functioning in four basic

1    domains that are generally associated with the IQ score,

2    although not necessarily intelligence.

3    Q.    So you're referring, I think, to -- or let me see if I've

4    got this right.  You're referring to verbal comprehension?  You

5    said for --

6    A.    Yes, I'm referring to verbal comprehension.  It's called

7    perceptual reasoning, but most people would think of it as and

8    it used to be called nonverbal reasoning.  Working memory,

9    which is actively processing information in your head.  And

10   processing speed, which is really an attention-related

11   condition.  It's kind of a -- the terminology, it's evolved --

12   historically that's the terminology that they've used.  But the

13   nature of the subtests that are done really tap into

14   difficulties with attention.

15   Q.    Now I'd like to ask you about some of the specific

16   findings that are contained in your report.

17          And look first, if you would, at page 16 through page 18.

18   A.    Which page --

19   Q.    So it's page 30 of the document, starting with page 30 of

20   the document, 30 through 32.

21   A.    All right.

22   Q.    Now, you refer in these pages and some other places to

23   fluency.

24          And can you tell me how you're using the word "fluency" in

25   your report?

1  A.   Fluency -- oral reading fluency, which is what we're

2  referring to there, is the speed and accuracy with which a

3  person can read words and oftentimes referred to as

4  automaticity, which is a reflection of how -- the non-dyslexic

5  reader reads effortlessly in doing this.  The dyslexic reader,

6  even when they had remediation, substantial remediation, still

7  stumbles and is slow and often makes a lot of mistakes in doing

8  this, as opposed to the non-dyslexic or non-impaired reader who

9  does it without thinking, or not thinking very much.

10 Q.   So as part of the testing you did, were there some

11 measurements of fluency?

12 A.   Several.  Both silent and oral.

13 Q.   So on page 18 of the report, there is a summary of scores

14 from the WIAT-information?

15 A.   Yes.

16 Q.   I think it's been referred to before in the hearing, but

17 just for the record, what is WIAT-information an abbreviation

18 for?

19 A.   The Wechsler Individual Achievement Test, Third Edition,

20 most recent edition.  Although they're coming out with a new

21 one next year.

22 Q.   All right.  And is there information on page 18 of the

23 report, page 32 of the document, about fluency?

24 A.   Yes.

25 Q.   Describe that.

1  A.   Oral reading fluency.  She had to read -- she ended up

2  reading three passages.  You only use -- the reason for that

3  was the way that the WIAT sets things up is that you start off

4  at a level of difficulty that is expected that a person of her

5  age would be able to read fairly efficiently within a certain

6  time limit.

7      If they go over that time limit, regardless of the

8  mistakes, you don't score that.  You stop that testing,

9  although you're allowed to continue, because I've found it

10  awkward to stop somebody.  It's embarrassing for them to be

11  stopped.  But you don't score that.

12      You then revert to -- somewhat easier, the next two easier

13  passages and do that.  And the first one that she does, she has

14  to do that within a certain maximum time limit.  And if she

15  does that, then you administer the next one in the order.  And

16  those are the two that are used for scoring.  And you're --

17  there are two scores, both the speed with which she does it and

18  then the number of errors, although the oral -- this score, the

19  oral reading fluency, is a combination of the speed with which

20  she does it and some of the errors but not all of the errors.

21      There's another -- am I getting ahead of myself?

22  Q.   No.  That's -- I think it's a good thing to explain at

23  this point.

24  A.   I should stop?

25  Q.   No, no, no.  Go ahead and explain how the errors are

1  treated.

2  A.    The nature of the scoring for the WIAT, in terms of

3  scoring errors, you do have another -- there's a subscore.  You

4  have a speed score, which is how fast did she do it, and then

5  you have another score considering accuracy.  The accuracy

6  score, which is a component score, you count the times that she

7  omitted a word, misread a word and didn't correct it, added a

8  word.  Is there another one in there?  No, that's it.  And that

9  ends up with that score.  However, in terms of the errors that

10  are counted to come up with the primary oral reading, the only

11  errors that factor in there are the times that she added a word

12  or misread a word and didn't correct it.  If you turn around

13  and correct it, it doesn't count as an error.

14  Q.    So -- and I think that if I have this right, that we're on

15  page 18 of the report.  But on page 16, you talk about the oral

16  reading accuracy score being average and at the 55th

17  percentile.  Correct?

18  A.    Let me find it again.

19      Yes, 55th percentile.

20  Q.    Okay.  So generally speaking, on this test, subject to the

21  explanation you gave of how this test treats accuracy,

22  generally speaking, she read accurately but slowly?

23  A.    On this test.  The Gray Oral is scored differently, so it

24  produces a different score with a different meaning.

25  Q.    Okay.  So we'll talk about that too.

1    But -- and I think you explained generally how this is

2    scored, but on page 18 for oral reading fluency, it says that

3    the standard score was 67?

4    A.   Yes.

5    Q.   And that the percentile rank was 1?

6    A.   1.

7    Q.   Okay.  And I think we all have been talking about

8    percentile for two days, but just to put it in the record here,

9    when you say that a score is in the 1st percentile, what does

10   that mean?

11   A.   That means her performances was only as good or high as

12   1 percent of other people her age.  Now, conversely that means

13   that 99 percent of people her age were better at her than that.

14   Q.   And for the WIAT-information, this is an age-based

15   comparison?

16   A.   Yes.

17   Q.   You're comparing her with other like-aged people?

18   A.   That's correct.  This goes up to age 50.

19        MR. BERGER:  Your Honor, at this point I had planned

20   to try to play some of the recordings that Dr. Smith made of

21   Ms. Ramsay's actual performance.  And we have yet to master the

22   technical difficulties of playing them, so I'm going to pass

23   over that for now.

24        THE COURT:  That's a good idea.

25   BY MR. BERGER:

1  Q.   So on this fluency score that we've just been talking

2  about, the oral reading fluency score on the WIAT-information,

3  is that -- is it fair to say that is determined mainly by

4  reading speed?

5  A.   On this test it is.  It is much more influenced by speed

6  than the errors that are made, unless you make a whole bunch of

7  errors.  She didn't make enough of those -- primarily speed is

8  influenced on that particular score.

9  Q.   And I think one of the things you said is if you make an

10  error and then correct it, then it isn't counted as an error.

11  Right?

12  A.   That's correct.

13  Q.   Okay.  All right.  Well, then let's talk about the GORT,

14  because you've mentioned that.  And the GORT is discussed in

15  your report, I believe starting at page 21 of the report, but

16  page 35 of the document.

17  A.   Yup.  Okay.

18  Q.   And that discussion continues on over to the next page

19  too.  So on the GORT, according to your report, Ms. Ramsay had

20  an accuracy score that was at the 5th percentile.

21  A.   Right.

22  Q.   And a rate score that was at -- well, and then it goes on

23  to say the fluency score.  The fluency score, that was at the

24  2nd percentile.  That's over on the next page.

25  A.   Uh-huh.

1  Q.   And you say in your report, she was able to correctly read

2  most of the words but her reading was slow.

3  A.   Where is that at here?

4  Q.   That's on page 22 of the report, third line.

5  A.   All right.  Let me look at that.

6       22, the third line?

7       Read most of the words but her reading was slow.

8       Yes.  That's reflecting -- the way that the Gray Oral was

9  scored, she made a lot of corrections.  She would read a word

10 wrong and then would correct it.  Unlike the WIAT, those are

11 not counted as errors on the WIAT.  Those are counted as errors

12 on the GORT, because it reflects stumbling and awkwardness and

13 misreading something at first and then having to go back and

14 correct it.

15 Q.   And in fact, you went on in this same page to give a

16 description in your report of the manner in which she read?

17 A.   Correct.

18 Q.   Can you just summarize that very briefly?

19 A.   Well, she read in short phrases, two- and four-word

20 phrases, halting, a lot of hesitations, a lot of

21 self-corrections, a lot of rereading of a phrase or a

22 four-word -- a four-word phrase throughout the passages that

23 she was reading.  So it reflects a lot of hesitation and

24 uncertainty about what's the correct word.

25 Q.   Okay.  Let's just turn back one page to page 21 of the

1  report.  And there's a discussion there at the top of the page

2  and then a table in the middle of the page of results from the

3  Woodcock-Johnson IV?

4  A.   Yes.

5  Q.   And first can you just summarize what you found about

6  reading rate and sentence reading fluency and word reading

7  fluency?

8  A.   Those are -- well, sentence reading fluency is a silent

9  reading task.  And what you do is basically you're reading

10 simple sentences, they're not really difficult words to read,

11 and you're marking whether they're true or false, yes or no.

12 Like, for instance, a bird writes books, is that false or true.

13 Well, you know, that's pretty simple.  And so -- and then you

14 get three minutes to do as many of those as you can.

15      Every error you make gets counted against you.  It

16 detracts from your score.

17      The word reading fluency is you have a -- rows of four

18 words.  Two of the words are related, like shoe, stone, sock

19 and pencil.  Well, shoe and sock would be the ones that are

20 related.  And she has to mark those.  And then she's allowed to

21 skip -- like in the silent reading, the instructions are skip

22 anything you're not sure about.  You can go back for it later

23 if you have time.  Most people don't finish the whole task in

24 the three minutes.  And the same is the true for the word

25 reading.  You can skip anything you're not sure about.  Get as

1  many done as you can as fast as you can.

2  Q.   So we've reviewed so far three different tests that you

3  did, the WIAT-information --

4  A.   Let me also add that those -- you're reading those

5  silently.  Unlike the WIAT and the GORT-5 where you're reading

6  out loud, those you're reading silently.

7  Q.   Okay.  So anyhow, three different tests, the WIAT and the

8  Woodcock-Johnson and the GORT-5.

9       And your results for all three of those, for three

10  different tests, and you've described the tests, showed low

11  scores for fluency?

12  A.   Very low scores.

13  Q.   And then there also is a test that you did called the

14  Nelson-Denny?

15  A.   Yes.

16  Q.   And you can see a reference to that on page 30 of the

17  report, which is page 44 of the document.

18       And what generally did the Nelson-Denny testing tell you

19  about Jessica's performance?

20  A.   Well, let me look at this -- I'm at the wrong -- you said

21  44 of the doc?

22  Q.   Yes.  It's the page with the title recommendations at the

23  top.

24  A.   I'm confused.  You're referring to the Nelson-Denny.  I'm

25  not -- and that's not in this part, I don't think, is it?

1  Q.  Well, it's discussed as part --

2  A.  Oh, yeah.  I see that I referred to the Nelson-Denny.

3  Q.  Correct.  There may -- I mean, if you want to look for a

4  different reference to the Nelson-Denny, that's fine, but --

5  A.  I'll do that, because it's -- I go into a little more

6  detail earlier than that.

7      So what's your question again, please?

8  Q.  Just what -- whether the Nelson-Denny was another piece of

9  evidence about Ms. Ramsay's reading ability.

10 A.  Yes.  Mostly I'm focusing on the reading comprehension

11 test, which you get 20 minutes for.  Like Dr. Lovett said

12 earlier, I take -- the rate score, I take with a grain of salt.

13 It's not terribly -- it's not terribly reliable the way it's

14 conducted.  It's only one minute reading and silently.

15     But what she did was she answered 95 percent of the

16 questions that she attempted correctly.  But I think it was

17 only 40 -- she only attempted 42 percent of the questions that

18 were there before the time ran out.

19 Q.  And that's because she ran out of time?

20 A.  Yes.  Most adult -- most -- there was some research done

21 on this that most high school seniors can finish the whole 38

22 questions in the 20-minute time limit.  But that's not part of

23 the scoring.  That's just some supplemental testing that was

24 done on high school seniors.

25 Q.  Now, there's evidence in the case about various

1  standardized tests that Ms. Ramsay took over time, especially

2  the ACT, which is a college admissions test, and the MCAT.

3  A.   Uh-huh.

4  Q.   How would you compare the kinds of tests that we've just

5  been discussing, the WIAT-information, the GORT-5, the

6  Woodcock-Johnson IV and the Nelson-Denny, with a test like the

7  ACT or the MCAT?

8  A.   Those are not diagnostic reading tests.  They primarily

9  rely on reading comprehension.  And they don't give us any

10 information about what was going on for the person in order to

11 accomplish what they accomplished on it.

12 Q.   You have testified generally and your report refers to the

13 fact that you reviewed early school records --

14 A.   Yes.

15 Q.   -- for Jessica.  I think report cards?

16 A.   Yes.

17 Q.   And would you say that there is any indication in those

18 records of a reading problem?

19 A.   No, not much.  Actually, none.

20 Q.   Is it common or uncommon for dyslexia to be unrecognized

21 in early school records?

22 A.   Yes.  I mean, it's common in my experience.  I don't find

23 those kind of school records to be all that accurate of a

24 reflection of what was going on.  They typically don't say

25 much.  I mean, they give the grades and they make a few

1   comments, but my impression about most -- over these years

2   about most teachers is that they're -- if the student is

3   managing to accomplish the tasks and get a good grade, no

4   matter how they do it, the teacher wants to be encouraging and

5   positive and they don't want to focus on anything that's

6   negative.

7          MR. BURGOYNE:  Lack of foundation, Your Honor,

8   objection.

9          THE COURT:  Overruled.  We'll grant him some expert

10  license.

11         THE WITNESS:  If I could say one more thing about

12  that?

13  BY MR. BERGER:

14  Q.   Yes.

15  A.   My experience, again, is that I look for those things,

16  because sometimes there's something there that says something.

17  But the absence of something there doesn't -- doesn't tell me

18  that something wasn't going on.  That's the basic -- what I'm

19  trying to say.

20  Q.   I want to show you now an exhibit from defendant's exhibit

21  book.  So let me help find that for you, but I'm going to be

22  referring to D-27.

23       Dr. Smith, D27 appears to be a report on a test called the

24  Iowa Test of Basic Skills that Ms. Ramsay took when she was 11

25  years old.

1  A.   Yes.

2  Q.   Do you see that?

3       And have you reviewed this before?

4  A.   I don't think that was available to me when I did my

5  evaluation, but I have looked at it subsequently.

6  Q.   And is there any information on this report that relates

7  to the difference between Jessica's performance and her

8  cognitive ability?

9  A.   Yes.

10  Q.   Could you describe that?

11  A.   The Iowa Test is frequently done in combination with a

12  test called the Cognitive Abilities Test, which is a

13  group-administered test trying to measure IQ or intelligence.

14  And it's not as -- considered as precise as the individually

15  administered tests like the Wechsler, but it's commonly done.

16  I remember when I was this age doing it.  Or remember looking

17  at these things at that.

18       And what this does, though, is that for the cog, it gives

19  a -- for the cog ability test, it provides a combination -- I

20  mean, percentile ranks, scores in relation to other children

21  her age, as well as other children in the same grade.  And

22  those are mentioned here.  They're both far above average.

23       And what it says, though, is that her -- the measurements

24  of her -- this is a standardized group administered test.  What

25  this says is that like her -- a number -- well, I'll just read

1   what it says here.

2        That a number of her academic skills are significantly

3   below what they would have expected given her cognitive

4   abilities test.  The vocabulary reading comprehension,

5   spelling, capitalization, punctuation, social studies and math

6   computation, they represent areas in which Jessica is not doing

7   as well as she might be expected.

8        The measures of her intelligence are -- the overall

9   measure for the grade -- they're using the grade -- well,

10  they're both -- they're using the grade score here.  That's at

11  the 98th percentile.  And her reading score is at the 74th

12  percentile.  And although that's a good score compared to other

13  kids, that's far below what you would expect for somebody with

14  that of a cognitive ability.

15  Q.   When Professor Lovett and Professor Zecker testified,

16  there was some discussion about what they called the

17  discrepancy model.

18       Do you recall that?

19  A.   Yes, yes.

20  Q.   Is the discrepancy model still recognized either in DSM-5

21  or ICD-10?

22  A.   It's recognized in ICD-10.

23  Q.   And are there also scholars in the field that have

24  advocated for the discrepancy model?

25  A.   Yes.  The problem with the discrepancy model is that there

1  is a lot of controversy about that, a lot of debate among

2  expert researchers about this thing, some for it, some against

3  it.  And leading to a lot of criticism about the DSM-5

4  eliminating it.  The problem with the discrepancy model is that

5  with children with learning disabilities frequently didn't

6  exhibit a significant discrepancy.  And then they were ruled

7  out from having a learning disability when in fact they were

8  struggling.

9       But the presence of a discrepancy is a meaningful thing.

10 And that's what these other experts are saying, is that the

11 absence of it, we should eliminate it for that reason and not

12 disqualify somebody if they don't have that discrepancy,

13 because there's an interactive effect that can happen where

14 your learning disability can actually depress the development

15 of your intellectual abilities.  But if you happen to have one,

16 that's still meaningful.  That's what the criticism is, that

17 that shouldn't have been thrown out for that reason in order to

18 solve the other problem.

19      That's particularly promoted by Drs. Bennett and Sally

20 Shaywitz at the Yale University Dyslexia Center in their

21 research on the connections and the importance of the IQ and

22 discrepancy.

23 Q.  And in your report, did you consider whether there were

24 discrepancies between Jessica's performance and her cognitive

25 ability?

1  A.   Yes.  And let me add to that.  It's not enough to have a

2  discrepancy.  That can happen just by the nature of the test.

3  The issue then is if you have a discrepancy, it means that,

4  well, it didn't happen just because of the sloppiness of the

5  test, but you also have to look how frequently does that occur

6  in the general population for it to be clinically meaningful.

7  It needs to be unusual.  And generally the cut for that is

8  generally anything 15 percent or less is considered unusual,

9  therefore, abnormal.

10  Q.   And did you consider that in your report?

11  A.   Yes, absolutely.

12  Q.   Is page 11 the right reference in your report?  That's

13  page 25 of the overall document, page 11 of your report.

14       And I can help you find it if that --

15  A.   As long as I don't knock things over here.

16       What page?

17  Q.   It's page 11 of the report.

18  A.   That should be at the end of the academic discussion.

19  Q.   Yep.

20  A.   That's usually where I -- no.  That would be at the end of

21  the WIAT, because that's really the only one I use for that.

22  That's the only one -- they did studies on -- they did

23  develop -- I call it the WIAT.  The WIAT, the WIAT.

24       Where they -- in the standardization sample, they do like

25  5,000 kids and adults to measure how frequently these kind of

1    discrepancies occur in the population sample.  And that's where

2    those figures come from.  And it's a big enough sample that we

3    can make a generalization that that probably reflects what

4    occurs out there with the whole population in general.

5    Q.    Okay.

6    A.    You want me to find that?  Is that what you're looking for

7    here?

8    Q.    I don't think we need --

9    A.    I'm there now, so if you want me to refer to it.

10   Q.    No.

11   A.    I did it in two ways.  Because there's a -- I used the IQ,

12   even though I don't think that's a valid measure of her

13   intelligence.  And I use it with the General Ability Index,

14   which is a preferred measure among the -- many of the

15   organizations that deal with gifted, because -- especially the

16   gifted learning disabled, because they often do have these

17   discrepancies in some of these other domains, like processing

18   speed and working memory index.

19        And those are also -- these discrepancies, that's also

20   important, because base rate, how frequently does that occur

21   with people at that level?  So, again, it has to be unusual,

22   lower than 15 percent.  So it's not like it just occurs all the

23   time for people.  It's not occurring very often, therefore,

24   it's unusual and, therefore, abnormal.

25        And so that's where the General Ability Index doesn't use

1  those.  The working memory index and the processing speed index

2  are actually attention-related components.  And so when you

3  factor those out, the verbal comprehension and the perceptual

4  reasoning are solving problems, both verbally and nonverbally,

5  which is what most people would think of as intelligence to

6  begin with.  And it would represent your optimal -- well, a

7  better estimate of your intelligence when you're able to use

8  all of your compensatory strategies that you may have.

9  Q.   And what's the reason why, in Ms. Ramsay's case, the

10 General Ability Index is a better measure than IQ?

11 A.   Well, because her -- the unusual discrepancies between her

12 verbal comprehension index and her performance reasoning index

13 and her -- in particular, the processing speed index.  That --

14 I could -- I need to go back to the IQ or the Wechsler

15 intelligence scale to comment on it.

16      Do you want me to do that?

17 Q.   Yes.

18 A.   How frequently that was?  I mean, that's important.  It's

19 not enough to have a discrepancy.  I said that.

20 Q.   I think page 9 of your report, if I'm looking at the right

21 thing.

22 A.   Thank you.  Page 9.

23      The -- and we're comparing her against other -- in this

24 instance, against other people who have an IQ of 117.

25      And I did some comparisons.  I'm -- I didn't include it in

1 the report.  We're making kind of an arbitrary decision about

2 which group are we going to calculate these things.

3      If I calculated it based on how frequently do these kind

4 of discrepancies occur with people with an even higher IQ,

5 which would be where people typically think of gifted, with an

6 IQ score, they occur even less frequently.  But it's pretty

7 infrequently here.

8      This is -- the difference between her performance

9 reasoning index and processing speed occurred in only

10 1.3 percent of the population of people at that level.  That's

11 pretty uncommon.

12 Q.   What page are you?

13 A.   I'm on page 24 of 60 of the exhibit.

14 Q.   Okay.

15 A.   Or 10 of 31 of my report.

16 Q.   Okay.  I want to change the subject now and talk about the

17 diagnosis of ADHD --

18 A.   Okay.

19 Q.   -- in Jessica's case, in Ms. Ramsay's case.

20      What generally did you base the diagnosis on in her case?

21 A.   The descriptions that she and her mother and her fiancé

22 Neil gave and their responses to the rating scales that I asked

23 them to fill out, which I asked him -- her mother -- pretty

24 sure -- yes, I did.  I asked her mother to fill out that rating

25 scale, about how Jessica was when she was under the age of 12,

1  during her elementary school years.  And that's primarily how

2  you conclude about an attention deficit.

3        There are no -- you want me to get into this?

4  Q.   Well, let me just ask this:  Was there a specific test

5  that you did with respect to ADHD?

6  A.   Yes.

7  Q.   And what test was that?

8  A.   That was the IVA, the Integrated Visual and Auditory

9  Attention -- Continuous Performance Test.

10 Q.   And what were the findings from it?

11 A.   She was extremely low, both administrations.

12 Q.   Well, for example, in your report on -- in your report,

13 you begin the discussion of the -- let's just have it in the

14 record at this point, what you're referring to.  The full name

15 is the Integrated Visual and Auditory Continuous Performance

16 Test.  Correct?

17 A.   Yes.

18 Q.   Sometimes called the IVA or the IVA+Plus?

19 A.   The IVA+Plus is the term.

20 Q.   And that begins at page 11 of the report.  And then at

21 page 12 you begin to explain the findings.  And you said that

22 you administered it twice?

23 A.   Yes.

24 Q.   And why did you administer it twice?

25 A.   Because the scores were so low, I wanted to see if I would

1  get a similar result to see how reliable that was.

2      Trying to factor in some of the test error that are built

3  into some of these kind of tests.  So offset it to see if I get

4  it, a similar kind of result or something drastically

5  different.

6  Q.  All right.  So on page 13 of the report, around the middle

7  of the page, where you're just describing the first time you

8  administered it -- and actually, there are a number -- let me

9  just review them quickly.

10     On page 12, you talk about the Full Scale Response Control

11 Quotient?

12 A.  Yeah.

13 Q.  And you say that that was -- got you a score of 44, which

14 was in the extremely impaired range.  Correct?

15 A.  Let me just move this before I knock it over.

16     What page?

17 Q.  Page 12 of the report, and near the bottom.

18 A.  Okay.  All right.

19 Q.  There's a global quotient scale score you report on the

20 first time you administered the test of 44?

21 A.  Yes.

22 Q.  And you say that fell in the extremely impaired range?

23 A.  Yes.

24 Q.  And then you also describe her auditory response control

25 quotient scale was 38?

1  A.   Oh, wait a minute.  Auditory response.

2  Q.   And the visual response control quotient scale on the next

3  page.

4  A.   That's 38 for the auditory and 65 for the visual.

5  Q.   Okay.  And you say they both fell into the -- or all three

6  of those fell into the extremely impaired range?

7  A.   Yes.  Well, one is extremely and one is severely.  I don't

8  know if they're different.  They're both bad.

9  Q.   All right.  And on the next page you described something

10  called the Full Scale Attention Quotient?

11  A.   Uh-huh.

12  Q.   Also in the extremely impaired range?

13  A.   Uh-huh.  Oh, you're asking the question?

14  Q.   Yeah, yeah.

15  A.   What's the question again?

16  Q.   Just to confirm that you described the Full Scale

17  Attention Quotient as falling in the severely impaired range?

18  A.   Yes.

19  Q.   And the visual attention quotient also in the extremely

20  impaired range?

21  A.   Yes.

22  Q.   And the next paragraph down, you refer to the combined

23  sustained attention scale also in the extremely impaired range

24  and the visual sustained attention quotient scale also in the

25  extremely impaired range?

1  A.   Could I -- well --

2  Q.   And without going through the second administration in as

3  much detail, did those findings generally confirm the findings

4  from the first administration?

5  A.   Yes.

6  Q.   So was this additional evidence that you considered as

7  part of your ADHD diagnosis?

8  A.   Yes.  Just as a note, these kind of tests, there are

9  several on the market, they're all patterned after air traffic

10  controllers sitting in front of a screen watching something

11  that's extremely boring and having to keep their attention on

12  it because these are very boring.  Most people with attention

13  deficit hate doing this test.  It's miserable for them to sit

14  through 15 minutes of this.

15  Q.   Let's look at page 8 of your report.  It's page 22 of the

16  big document but page 8 of the report, page 8 of 31.

17       And I'm going to be discussing this section called --

18  under the heading symptom validity.

19  A.   Yes.

20  Q.   You describe that you administered a test called a Test of

21  Memory Malingering, or TOMM?

22  A.   Yes.

23  Q.   Why did you administer the TOMM in this case?

24  A.   It's one of the most commonly used tests, it has a lot of

25  research behind it, beyond being experimental.

1       And I'm assessing for both attention deficit and dyslexia.

2   And it's one of the most frequently used tests that's used.

3   Q.   Besides the TOMM, is there anything else that you relied

4   on in considering whether Ms. Ramsay was making genuine effort

5   during all this testing?

6   A.   Yes.  Well, her general demeanor -- well, primarily her

7   general demeanor.  And she came across to me as a very sincere

8   person who was trying her best.  And the symptom validity

9   test -- actually, they used to be called symptom validity

10  tests, but they're actually referred to as performance validity

11  tests now.  It's a supplement to try to see if there's any --

12  to supplement what my own judgment was about her, her efforts.

13  Q.   But you did also choose to do the TOMM, the Test of Memory

14  Malingering in this case.  You didn't rely just on your

15  clinical --

16  A.   No, no.  I choose to do this.  And this has been -- it's

17  been used in studies with -- to examine people who have reading

18  disabilities in addition to memory or attention deficit.  It's

19  been used in a broad range of neuropsychological dysfunction,

20  brain dysfunction, attention deficit, learning disabilities,

21  dyslexia.  And so it's been researched in those areas as being

22  effective.

23  Q.   Taking account of everything that we've reviewed this

24  afternoon and everything that you've described in your report,

25  what conclusion did you reach about whether Jessica Ramsay has

1   dyslexia?

2   A.   I had no question about it.

3   Q.   And would you -- could you briefly summarize your reasons

4   for that conclusion?

5   A.   Well, her performance on the test that actually measured

6   dyslexia, the measures of basic reading, oral reading fluency,

7   silent reading speed, those are the primary tests that reflect

8   whether or not you have dyslexia.

9   Q.   And based on everything that you've described and in your

10  report, what conclusion did you reach about whether she had

11  ADHD?

12  A.   I concluded that she did have ADHD.  By the description

13  from her mother and her, it seemed credible to me.  The

14  explanation for why it doesn't -- what they did for her when

15  she was a youngster in elementary school seemed credible to me

16  and was -- supported that those symptoms were there.

17  Q.   You're aware and you describe in your report about prior

18  professional evaluations of whether she had ADHD or not.

19  A.   Uh-huh.

20  Q.   By Dr. Smiy?

21  A.   Yes.

22  Q.   And also by Dr. Ruekberg?

23  A.   Yes.

24  Q.   And did you consider their findings in reaching your

25  conclusion about ADHD?

1  A.    Not so much Dr. Smiy.  And I don't mean that in a negative

2  way toward him, but a general office practice doesn't go into a

3  lot of detail.  They're making the best guess they can with the

4  limited time they have.  They're going to treat them.  They get

5  to make that decision.  And then they're going to see how well

6  they respond.  That's typically what happens in a doctor's

7  office.

8       Dr. Ruekberg, from what I read, did more of what a typical

9  evaluation for attention deficit is, which is the collection of

10 interviews, information and the filling out of rating scales

11 that pertain to the symptoms of attention deficit.

12      Actually, that is what is primarily -- I mean, you collect

13 as much history as you can.  I use these -- like the IVA tests,

14 I use that.  And I look at patterns of the Wechsler to see if

15 that's consistent.  There are other conditions that can produce

16 that pattern, so that's not a -- they're not specific to that.

17      But no professional organizations have approved any

18 neuropsychological tests as a primary determinant of attention

19 deficit, either for or against having it.  And they have to

20 basically collect what information you can about their history,

21 the frequency of their symptoms that you gather from them and

22 other people who know them, and you make your best professional

23 judgment.  It's a lot less -- it's primarily not test driven.

24      So for instance, if she had scored well on the IVA, that

25 wouldn't matter, because those kind of tests in general have

1   been found to have a very high false negative rate.  I mean,

2   they've failed to detect it, roughly speaking, about 50 percent

3   of the time when in fact it's there.  If they happen to find

4   something, they're right about 90 percent of the time.  That

5   doesn't mean that they have attention deficit.  It means they

6   have impaired attention, which could be from psychosis,

7   depression, brain damage, a whole host of many things, having

8   the flu, taking medicine.  But then based on the history, you

9   could make an inference about, well, what could that be about,

10  why did they perform in the impaired range.

11  Q.   And Ms. Ramsay didn't have any of those --

12  A.   No, she did not have anything going on.  And she didn't

13  take any medication because what good would it do to do a test

14  of attention if she's getting the treatment for it?

15  Q.   Based on your testing, everything in your report,

16  everything you've described this afternoon, is it your opinion

17  that Ms. Ramsay needs testing accommodations for timed written

18  tests like the USMLE?

19  A.   Yes.

20  Q.   And what accommodations do you believe that she needs?

21  A.   I think she needs to have double the usual time because of

22  those measures of reading speed and oral reading fluency and

23  other tests like the Nelson-Denny that reflected very slow

24  reading on a reading comprehension test.  I don't mean the

25  rate.  I mean the number of questions she was able to attempt

1  in the 20-minute time limit.

2         MR. BERGER:  Thank you.  That concludes our direct

3  examination, Your Honor.

4         THE COURT:  All right, Counsel.  Rather than get

5  started with cross-examination this afternoon, let's start

6  tomorrow morning at 9:30.  All right?

7         MR. BURGOYNE:  Thank you, Your Honor.

8         THE COURT:  We're adjourned.

9         (Proceedings concluded at 4:38 p.m.)

10

11

12

13         I certify that the foregoing is a correct transcript

14  from the record of proceedings in the above-entitled matter.

15

16  _____

17  Ann Marie Mitchell, CRR, RDR, RMR
    Official Court Reporter
18

19

20

21

22

23

24

25

```
 1                           -   -   -

 2                      I N D E X

 3                           -   -   -

 4
         Witness          Direct      Cross      Redirect      Recross
 5
         JESSICA RAMSAY               4          48            58
 6
         DR. BENJAMIN      62
 7       LOVETT - VOIR
         DIRE
 8
         DR. BENJAMIN      71         110
 9       LOVETT

10       DR. STEVEN        139
         ZECKER - VOIR
11       DIRE

12       DR. STEVEN        146        150
         ZECKER
13
         DR. ROBERT        168
14       SMITH - VOIR
         DIRE
15
         DR. ROBERT        174
16       SMITH

17

18                           -   -   -

19                      E X H I B I T S

20                           -   -   -

21
         NO.                              ADMITTED PAGE
22
         DX-5                             141
23
         DX-6                             65
24
         P-34                             138
25
```

**$1,000** [1] - 135:6
**$2,000** [1] - 135:6
**$200** [1] - 135:3
**0.2** [1] - 132:5
**0003** [1] - 25:11
**08033** [1] - 1:17
**1** [35] - 4:23, 8:13, 14:9, 29:17, 37:18, 39:25, 42:20, 42:22, 43:1, 56:10, 56:12, 56:14, 56:21, 58:8, 58:10, 58:23, 58:24, 67:3, 86:23, 87:1, 88:10, 88:12, 89:8, 89:11, 90:20, 98:19, 99:22, 104:12, 115:23, 116:8, 130:10, 140:4, 188:5, 188:6, 188:12
**1,300** [1] - 173:3
**1.3** [1] - 202:10
**10** [8] - 2:4, 90:13, 102:19, 155:18, 168:17, 170:19, 181:22, 202:15
**100** [1] - 87:24
**106** [2] - 33:18, 34:18
**10:47** [1] - 48:14
**11** [12] - 28:4, 29:1, 98:1, 98:2, 145:5, 183:15, 195:24, 199:12, 199:13, 199:17, 203:20
**110** [1] - 212:8
**117** [1] - 201:24
**11:00** [1] - 48:13
**11:01** [1] - 48:14
**11th** [3] - 85:11, 85:13
**12** [16] - 36:9, 74:23, 91:21, 98:1, 115:7, 115:13, 142:20, 142:23, 145:9, 172:16, 172:18, 202:25, 203:21, 204:10, 204:17
**120** [2] - 33:25, 79:18
**12:30** [1] - 109:14
**12:46** [1] - 117:18
**13** [4] - 102:22, 140:17, 164:2, 204:6
**130** [1] - 79:18
**138** [1] - 212:24
**139** [1] - 212:10
**13th** [1] - 2:11
**14** [2] - 26:23, 98:2
**141** [1] - 212:22
**146** [1] - 212:12
**15** [9] - 166:8, 178:16, 178:17, 178:24, 179:18, 181:22, 199:8, 200:22, 206:14
**150** [1] - 212:12
**152** [1] - 24:4
**16** [8] - 26:24, 69:10, 131:14, 139:8, 153:7, 153:8, 184:17, 187:15
**168** [1] - 212:13

**17** [5] - 26:21, 27:1, 96:9, 96:21
**174** [2] - 44:14, 212:15
**175** [1] - 44:23
**18** [18] - 9:21, 9:25, 10:7, 10:11, 75:17, 87:16, 88:2, 95:17, 96:8, 96:22, 131:12, 131:14, 180:25, 184:17, 185:13, 185:22, 187:15, 188:2
**188** [1] - 42:24
**18th** [1] - 85:25
**19** [3] - 1:16, 90:23, 140:21
**191** [1] - 37:18
**19106** [1] - 1:9
**192** [2] - 37:21, 38:10
**194** [1] - 14:9
**195** [3] - 38:1, 38:5, 38:11
**198** [1] - 15:17
**1986** [1] - 169:18
**1990** [1] - 144:6
**1995** [1] - 173:3
**1999** [2] - 147:9, 169:9
**19th** [1] - 164:12
**1:00** [1] - 109:19
**1:30** [2] - 109:21, 117:9
**1:31** [1] - 117:18
**1st** [8] - 86:2, 87:25, 89:6, 90:14, 98:16, 132:2, 132:9, 188:9
**2** [21] - 1:6, 7:9, 7:18, 7:22, 34:11, 35:20, 35:24, 35:25, 36:16, 44:19, 45:3, 68:9, 94:11, 102:12, 128:9, 128:10, 128:11, 147:13, 151:24, 160:1
**20** [5] - 17:10, 33:4, 143:13, 144:20, 193:11
**20-minute** [2] - 193:22, 211:1
**2000** [1] - 147:9
**20002** [1] - 2:5
**20005** [1] - 2:12
**2007** [3] - 102:18, 102:24, 103:1
**2008** [1] - 31:24
**2010** [1] - 62:19
**2012** [1] - 31:24
**2013** [1] - 81:11
**2015** [2] - 37:2, 40:15
**2016** [6] - 41:14, 41:16, 45:21, 135:24, 137:23, 139:17
**2017** [6] - 33:22, 43:13, 44:13, 140:17, 156:11, 164:2
**2018** [23] - 4:25, 6:21, 8:10, 8:11, 11:4, 11:6, 12:5, 13:25, 17:15, 18:20, 19:18, 21:5, 23:23, 25:14, 26:18, 28:4, 29:1, 37:16, 139:20, 140:22, 149:13, 164:12, 175:13

**2019** [3] - 1:10, 67:3, 140:15
**202** [3] - 2:5, 2:12, 14:9
**207** [1] - 12:17
**21** [7] - 16:25, 88:20, 89:19, 131:25, 168:12, 189:15, 190:25
**219** [2] - 11:6, 11:10
**22** [9] - 21:5, 85:5, 89:19, 132:11, 182:1, 182:9, 190:4, 190:6, 206:15
**2200** [1] - 17:5
**223** [1] - 9:10
**2248** [1] - 6:17
**225** [1] - 10:4
**227** [1] - 10:14
**23** [2] - 85:5, 90:23
**231** [1] - 7:6
**232** [2] - 35:15, 35:21
**239** [1] - 7:25
**24** [1] - 202:13
**248-5092** [1] - 2:5
**25** [4] - 33:22, 175:13, 183:15, 199:13
**25-plus** [1] - 143:13
**25th** [1] - 29:5
**26** [1] - 4:25
**262** [1] - 45:19
**264** [1] - 46:12
**267** [1] - 1:23
**27** [4] - 17:18, 18:2, 40:10, 40:11
**29** [3] - 100:20, 125:22, 125:24
**299-7250** [1] - 1:23
**2:19-cv-02002** [1] - 1:3
**2nd** [3] - 132:13, 160:3, 189:24
**3** [13] - 26:18, 28:24, 83:25, 90:8, 90:13, 103:3, 103:17, 132:9, 151:21, 151:24, 152:14, 152:15
**30** [9] - 102:7, 102:23, 125:22, 125:25, 126:8, 184:19, 184:20, 192:16
**31** [8] - 56:9, 88:2, 98:3, 102:7, 103:6, 131:12, 202:15, 206:16
**310** [3] - 42:16, 42:23, 43:16
**31st** [2] - 56:9, 58:22
**32** [3] - 104:17, 184:20, 185:23
**33** [4] - 42:12, 42:13, 147:3, 147:5
**34** [1] - 135:18
**35** [3] - 128:10, 142:15, 189:16
**354-5640** [1] - 1:17
**37** [1] - 23:19
**38** [1] - 15:13, 193:21,

204:25, 205:4
**3:04** [1] - 166:9
**3:18** [1] - 166:9
**3B** [2] - 98:6, 99:15
**3rd** [1] - 27:4
**4** [4] - 1:10, 126:22, 181:1, 212:5
**40** [3] - 30:14, 32:21, 193:17
**42** [2] - 17:18, 193:17
**43** [1] - 126:22
**44** [7] - 126:8, 126:18, 128:21, 192:17, 192:21, 204:13, 204:20
**45** [4] - 24:21, 30:14, 178:24, 179:2
**46** [5] - 30:15, 95:8, 95:9, 96:3
**47** [1] - 31:16
**48** [4] - 30:8, 30:11, 30:13, 212:5
**49** [4] - 30:8, 30:11, 30:20
**4:38** [1] - 211:9
**4th** [4] - 131:2, 131:3, 131:16, 131:19
**5** [12] - 33:20, 132:10, 135:24, 140:6, 140:7, 140:14, 141:4, 151:3, 151:9, 156:7, 164:1, 170:12
**5,000** [1] - 199:25
**50** [15] - 6:15, 8:4, 8:23, 11:7, 11:16, 11:18, 11:25, 12:16, 27:24, 30:8, 30:11, 31:1, 47:17, 188:18, 210:2
**50th** [2] - 147:16, 148:19
**52** [1] - 36:14
**53** [1] - 36:25
**54** [1] - 37:13
**55th** [2] - 187:16, 187:19
**57** [2] - 31:4, 43:10
**58** [1] - 212:5
**5A** [3] - 142:3, 142:20, 145:6
**5th** [2] - 132:10, 189:20
**6** [9] - 26:15, 64:6, 64:16, 65:1, 127:3, 127:5, 151:15, 151:16, 152:11
**60** [4] - 46:2, 96:3, 182:9, 202:13
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**61** [1] - 96:3
**62** [1] - 212:6
**63** [1] - 28:1
**64** [1] - 17:18
**65** [5] - 25:6, 25:10, 25:11, 205:4, 212:23
**654-6200** [1] - 2:12
**66** [3] - 38:14, 39:22, 41:3
**67** [4] - 41:10, 44:16, 87:24, 188:3

**67th** [1] - 106:13
**68** [2] - 44:10, 86:12
**6:00** [2] - 26:19, 26:22
**6A** [3] - 66:18, 66:19, 68:9
**7** [8] - 26:15, 86:10, 100:13, 143:17, 150:25, 151:14, 151:15, 151:16
**70** [2] - 47:4, 47:6
**700** [1] - 2:11
**71** [1] - 212:8
**73** [2] - 4:7, 4:14
**74** [1] - 6:20
**74th** [1] - 197:11
**75** [2] - 8:25, 9:6
**75th** [1] - 148:5
**76** [4] - 10:25, 34:18, 95:6, 95:7
**77** [1] - 12:4
**78** [1] - 13:24
**79** [5] - 17:8, 18:8, 18:11, 33:18, 106:10
**79th** [1] - 106:9
**7th** [1] - 132:4
**8** [9] - 26:4, 26:10, 181:24, 181:25, 182:1, 182:11, 206:15, 206:16
**80** [1] - 18:19
**81** [2] - 20:16, 20:17
**82** [1] - 20:21
**85** [1] - 21:4
**856** [1] - 1:17
**87** [1] - 47:21
**87th** [1] - 102:21
**9** [5] - 24:4, 68:9, 103:5, 201:20, 201:22
**90** [1] - 210:4
**90th** [1] - 102:19
**91st** [1] - 103:4
**95** [1] - 193:15
**95th** [1] - 81:21
**97th** [2] - 59:4, 103:2
**98th** [1] - 197:11
**99** [2] - 89:12, 188:13
**99th** [3] - 59:8, 147:15, 148:19
**9:17** [2] - 26:22, 27:4
**9:29** [2] - 1:10, 3:1
**9:30** [1] - 211:6
**a.m** [4] - 1:10, 3:1, 48:14
**A5** [1] - 37:3
**abbreviation** [1] - 185:17
**abilities** [6] - 37:22, 38:2, 38:6, 46:15, 197:4, 198:15
**Abilities** [1] - 196:12
**ability** [15] - 38:12, 38:13, 78:11, 79:12, 82:11, 84:20, 173:17, 174:5, 183:4, 183:19, 193:9, 196:8, 196:19, 197:14, 198:25

**Ability** [3] - 200:13, 200:25, 201:10
**able** [21] - 28:7, 30:5, 38:3, 38:10, 49:14, 49:19, 55:2, 55:8, 71:24, 96:24, 105:13, 108:19, 120:5, 120:20, 122:17, 122:25, 165:14, 186:5, 190:1, 201:7, 210:25
**abnormal** [3] - 172:10, 199:9, 200:24
**above-entitled** [1] - 211:14
**absence** [2] - 195:17, 198:11
**absolutely** [11] - 78:1, 79:5, 79:15, 80:1, 101:11, 103:12, 105:20, 110:2, 121:4, 132:25, 199:11
**academic** [19] - 70:25, 78:2, 78:11, 79:22, 80:2, 80:14, 81:2, 81:22, 82:4, 83:17, 87:13, 99:5, 100:25, 106:6, 152:4, 152:19, 177:21, 197:2, 199:18
**academically** [3] - 82:3, 82:6, 100:4
**Academy** [2] - 169:22, 169:24
**accept** [5] - 20:11, 132:15, 132:16, 148:17
**acceptable** [1] - 86:10
**accepted** [6] - 82:14, 82:21, 86:9, 86:24, 116:1, 128:16
**access** [8] - 8:6, 12:2, 49:14, 50:5, 50:6, 59:16, 120:13, 134:2
**accessed** [1] - 149:1
**accident** [1] - 93:15
**accommodate** [1] - 61:4
**accommodation** [28] - 6:10, 12:20, 13:15, 25:16, 53:15, 63:4, 64:3, 83:8, 109:10, 114:12, 114:15, 114:17, 116:14, 116:17, 118:23, 119:13, 119:25, 123:2, 123:16, 123:18, 123:20, 123:22, 129:9, 133:8, 134:13, 146:11, 150:9, 173:21
**accommodations** [88] - 4:23, 7:17, 11:10, 11:15, 12:8, 12:24, 15:22, 15:23, 16:15, 16:16, 16:21, 21:5, 22:8, 24:10, 28:22, 28:23, 38:22, 39:1, 39:6, 39:14, 40:21, 41:3, 41:21, 42:17, 43:1, 43:18, 43:21, 43:23, 45:10, 46:1, 47:2, 53:17, 53:20, 53:23, 54:4, 54:5, 62:22, 63:7, 63:10, 63:12, 63:15, 65:11, 65:13, 67:13, 68:4, 70:25, 71:21, 71:25, 74:4,

74:6, 83:10, 83:20, 91:19, 92:19, 92:20, 92:22, 99:20, 101:7, 102:3, 104:13, 107:1, 115:22, 119:7, 120:2, 122:14, 122:23, 123:13, 127:20, 136:25, 137:2, 137:4, 137:9, 139:11, 139:14, 140:19, 140:23, 141:16, 148:24, 149:13, 150:2, 150:8, 156:17, 173:14, 175:18, 181:10, 181:13, 210:17, 210:20
**accomplish** [2] - 194:11, 195:3
**accomplished** [1] - 194:11
**according** [4] - 84:25, 85:10, 131:1, 189:19
**account** [1] - 207:23
**accumulated** [1] - 81:5
**accuracy** [14] - 89:22, 90:9, 90:11, 90:19, 132:10, 132:12, 133:13, 134:15, 185:2, 187:5, 187:16, 187:21, 189:20
**accurate** [7] - 21:8, 21:10, 69:10, 91:10, 92:5, 172:19, 194:23
**accurately** [2] - 132:17, 187:22
**achieve** [2] - 42:19, 54:10
**achieved** [4] - 42:16, 42:23, 42:25, 113:7
**achievement** [8] - 80:22, 81:3, 82:9, 87:12, 91:20, 118:9, 148:18, 148:19
**Achievement** [3] - 87:5, 88:15, 185:19
**achieving** [1] - 67:6
**Acid** [1] - 37:14
**acknowledge** [3] - 24:2, 71:5, 71:7
**acknowledges** [1] - 115:18
**acquainted** [1] - 175:10
**acquire** [1] - 172:12
**acquired** [2] - 163:12
**acquiring** [4] - 78:2, 171:4, 171:16, 171:20
**acronyms** [1] - 87:7
**acrylics** [2] - 35:6, 36:3
**act** [2] - 58:3, 76:8
**ACT** [35] - 54:19, 54:20, 55:10, 55:14, 55:22, 57:2, 58:25, 59:5, 59:10, 59:18, 91:18, 99:18, 101:12, 101:19, 102:4, 102:9, 102:13, 102:17, 102:25, 103:9, 103:13, 103:21, 103:22, 104:7, 104:15, 118:12, 118:15, 124:20, 128:13, 133:4, 161:7, 194:2,

194:7
**ACTION** [1] - 1:3
**actively** [1] - 184:9
**activities** [2] - 31:17, 63:9
**activity** [7] - 58:4, 104:9, 107:8, 108:15, 148:21, 150:17, 153:24
**actual** [4] - 85:6, 87:23, 182:11, 188:21
**ADA** [5] - 72:20, 114:7, 114:8, 114:14, 135:22
**adapt** [1] - 76:17
**add** [4] - 17:12, 177:7, 192:4, 199:1
**added** [4] - 16:22, 25:4, 187:7, 187:11
**addition** [7] - 7:1, 17:3, 69:4, 78:3, 80:10, 95:19, 207:18
**additional** [23] - 8:4, 8:5, 8:18, 8:22, 11:7, 11:25, 12:1, 12:16, 65:24, 66:2, 66:8, 69:13, 101:10, 107:19, 108:20, 109:7, 119:13, 141:10, 141:18, 150:11, 174:17, 177:24, 206:6
**address** [6] - 23:25, 69:16, 81:9, 176:18, 176:25, 181:8
**addressing** [1] - 16:15
**adequate** [3] - 104:16, 109:5, 177:5
**adequately** [2] - 97:6, 98:22
**ADHD** [103] - 9:4, 9:18, 12:24, 15:22, 22:21, 65:15, 65:19, 66:13, 67:11, 68:15, 68:17, 69:17, 70:24, 72:6, 74:7, 74:10, 74:13, 74:14, 75:1, 75:4, 75:10, 75:11, 75:13, 75:16, 75:18, 76:2, 76:18, 77:1, 77:3, 77:13, 77:15, 77:18, 77:21, 83:2, 95:1, 95:4, 95:11, 95:17, 95:18, 95:20, 96:14, 96:19, 97:11, 98:24, 99:3, 99:6, 103:14, 106:24, 108:9, 108:11, 108:17, 113:2, 113:11, 113:13, 113:15, 113:17, 113:23, 114:21, 115:1, 115:5, 115:10, 115:18, 118:21, 118:22, 120:17, 121:7, 121:11, 121:17, 121:19, 122:7, 122:9, 122:11, 122:12, 123:11, 123:16, 137:15, 142:17, 143:15, 144:8, 146:5, 146:10, 151:18, 155:21, 157:7, 157:9, 160:16, 162:25, 171:23, 171:25, 172:1, 172:11, 172:23, 173:2, 174:4, 175:4, 202:17, 203:5, 206:7,

208:11, 208:12, 208:18, 208:25

**ADHD-related** [1] - 115:18

**adjourned** [1] - 211:8

**administer** [22] - 13:20, 81:1, 87:4, 88:18, 89:16, 93:18, 111:7, 112:20, 118:11, 162:1, 162:4, 162:8, 162:11, 162:22, 162:25, 163:5, 171:18, 171:19, 186:15, 203:24, 206:23

**administered** [32] - 70:16, 78:18, 91:20, 95:1, 97:15, 97:21, 103:23, 110:15, 110:21, 110:22, 111:21, 112:12, 113:5, 132:15, 132:22, 161:4, 161:17, 161:18, 162:20, 163:10, 177:2, 179:12, 179:15, 179:16, 196:13, 196:15, 196:24, 203:22, 204:8, 204:20, 206:20

**administering** [2] - 118:9, 136:20

**administers** [1] - 104:22

**administration** [6] - 102:24, 105:15, 111:1, 111:25, 206:2, 206:4

**administrations** [1] - 203:11

**administrators** [1] - 69:3

**Admission** [1] - 104:19

**admission** [3] - 78:22, 100:9, 101:15

**Admissions** [1] - 117:2

**admissions** [4] - 91:18, 92:12, 103:17, 194:2

**admit** [1] - 65:1

**ADMITTED** [1] - 212:21

**admitted** [6] - 65:5, 65:6, 138:2, 138:3, 141:5, 141:6

**adult** [14] - 95:4, 95:11, 95:20, 96:2, 113:11, 115:11, 115:15, 115:18, 115:19, 115:20, 151:1, 172:8, 193:20

**adult-specific** [1] - 96:2

**adulthood** [2] - 95:23, 95:25

**adults** [6] - 150:24, 151:1, 152:1, 152:16, 181:17, 199:25

**Adults** [1] - 145:25

**advance** [1] - 114:6

**advice** [1] - 11:20

**advise** [1] - 117:10

**advising** [1] - 68:6

**advocated** [1] - 197:24

**advocates** [1] - 128:15

**affect** [2] - 174:4, 183:4

**affected** [3] - 77:6, 173:5, 173:17

**afternoon** [8] - 110:9,

110:10, 117:23, 139:3, 139:4, 207:24, 210:16, 211:5

**afterwards** [2] - 93:16, 130:5

**age** [27] - 74:18, 74:23, 85:18, 85:20, 88:10, 88:11, 89:9, 89:10, 89:12, 90:21, 90:22, 102:16, 115:6, 115:13, 150:25, 151:14, 162:6, 172:16, 172:18, 186:5, 188:12, 188:13, 188:14, 188:18, 196:16, 196:21, 202:25

**age-based** [1] - 188:14

**aged** [3] - 148:9, 150:25, 188:17

**agencies** [3] - 116:21, 116:24, 117:4

**agency** [1] - 117:5

**ages** [1] - 151:19

**ago** [6] - 26:16, 48:20, 95:21, 110:11, 122:4, 127:7

**agony** [1] - 158:21

**agree** [11] - 42:5, 44:17, 45:13, 46:3, 46:22, 111:6, 115:24, 128:20, 128:21, 161:24, 162:24

**agreed** [3] - 128:22, 153:2, 178:3

**ahead** [6] - 49:2, 178:11, 178:21, 186:21, 186:25

**aided** [1] - 1:25

**air** [1] - 206:9

**alleged** [1] - 103:14

**alleging** [1] - 93:14

**alleviate** [1] - 6:10

**allow** [3] - 19:6, 54:1, 119:13

**allowed** [4] - 46:7, 165:11, 186:9, 191:20

**allowing** [1] - 71:11

**allows** [1] - 146:5

**alluded** [1] - 107:18

**almost** [2] - 25:1, 26:19

**aloud** [1] - 87:21, 90:1

**alphabet** [1] - 165:17

**ambiguous** [1] - 46:10

**amended** [1] - 114:14

**America** [1] - 145:11

**American** [2] - 104:21, 169:21

**amount** [9] - 6:13, 11:20, 34:5, 49:7, 59:14, 126:16, 130:9, 154:25, 157:16

**analysis** [5] - 63:24, 64:20, 99:25, 140:1, 148:8

**analyze** [2] - 56:25, 105:14

**anatomy** [1] - 53:10

**Ann** [2] - 1:22, 211:17

**annual** [4] - 135:8, 145:14, 145:23, 153:9

**answer** [22] - 33:11, 36:7,

36:9, 38:8, 38:10, 38:11, 55:2, 55:5, 56:2, 56:21, 56:25, 59:1, 63:3, 100:15, 111:10, 121:14, 126:11, 126:18, 128:18, 151:13, 176:21, 181:15

**answered** [3] - 37:22, 126:14, 193:15

**answering** [1] - 128:13

**answers** [3] - 84:22, 90:2, 161:8

**anticipated** [2] - 81:25, 83:7

**anyhow** [1] - 192:7

**apologies** [2] - 95:8, 146:23

**apologize** [6] - 17:25, 20:18, 60:14, 110:4, 114:6, 134:3

**appeal** [1] - 175:19

**appear** [1] - 152:23

**APPEARANCES** [2] - 1:14, 2:1

**appeared** [1] - 172:15

**applicable** [5] - 148:9, 148:12, 148:15, 148:16

**applicant** [6] - 62:24, 63:5, 72:6, 72:13, 106:3, 133:7

**applicants** [1] - 139:11

**application** [9] - 31:5, 82:5, 136:23, 156:18, 159:14, 159:17, 159:20, 159:24, 176:20

**applications** [1] - 62:22

**applied** [5] - 81:25, 96:4, 104:12, 107:1, 129:18

**applies** [1] - 65:16

**apply** [1] - 115:22

**applying** [7] - 22:7, 31:10, 105:9, 106:1, 147:23, 171:4, 173:24

**appointment** [1] - 14:5

**appointments** [1] - 52:14

**approach** [5] - 81:12, 82:7, 126:15, 129:19, 168:8

**approached** [1] - 126:7

**appropriate** [34] - 22:21, 22:23, 63:10, 69:24, 82:18, 98:23, 111:6, 112:3, 112:20, 113:10, 113:22, 119:10, 120:19, 121:3, 122:14, 122:22, 123:16, 123:17, 123:19, 123:21, 130:18, 132:19, 147:20, 161:1, 161:25, 162:2, 162:3, 162:6, 162:8, 162:10, 162:24, 164:22, 165:14, 170:2

**approve** [1] - 15:23

**approved** [3] - 11:21, 28:24, 209:17

**approximate** [3] - 42:20, 42:22, 42:24

**approximates** [1] - 85:23

**April** [5] - 13:24, 17:10, 17:15, 28:4, 44:13

**arbitrary** [1] - 202:1

**area** [6] - 16:17, 47:23, 71:15, 81:2, 82:12, 143:14, 158:14, 165:22

**areas** [16] - 27:13, 41:6, 42:5, 46:23, 48:3, 71:6, 71:13, 79:12, 87:13, 90:18, 101:16, 105:1, 143:16, 146:15, 197:6, 207:21

**arguing** [1] - 65:21

**argument** [2] - 66:10, 66:13

**arguments** [1] - 71:9

**art** [2] - 35:6, 36:2

**article** [6] - 37:2, 37:5, 37:13, 147:8, 147:10, 147:13

**articles** [2] - 68:14, 68:16

**arts** [3] - 59:7, 67:8, 168:25

**aside** [4] - 14:18, 14:21, 86:25, 120:14

**aspects** [1] - 165:22

**assess** [5] - 71:24, 151:20, 152:2, 152:17, 172:11

**assessing** [3] - 112:7, 171:14, 207:1

**Assessment** [2] - 41:12, 43:12

**assessment** [21] - 41:18, 43:8, 43:9, 67:12, 67:24, 68:20, 70:2, 91:8, 92:25, 93:2, 93:6, 95:16, 96:1, 105:23, 118:4, 118:5, 118:8, 174:3, 174:12, 175:8, 183:11

**assessments** [8] - 13:21, 23:13, 95:2, 98:25, 132:14, 173:1, 173:15

**assigned** [3] - 10:7, 10:11, 10:19

**assignments** [2] - 16:18, 32:10

**assistance** [1] - 158:1

**assistant** [2] - 32:14, 32:15

**assistants** [1] - 33:8

**assisted** [3] - 120:16, 134:8, 164:22

**associated** [3] - 55:24, 57:3, 184:1

**Association** [4] - 104:21, 145:11, 145:19, 169:21

**associations** [1] - 169:19

**assume** [9] - 6:1, 17:16, 36:12, 53:24, 118:19, 154:7, 154:10, 154:11, 160:20

**assuming** [1] - 24:16

**attach** [1] - 5:4

**attached** [5] - 12:10, 17:17, 23:20, 26:17, 73:18

**attachment** [1] - 18:15

**attachments** [3] - 25:7, 26:8,

26:9

**attack** [1] - 81:12
**attained** [1] - 53:16
**attempt** [2] - 26:11, 210:25
**attempted** [2] - 193:16, 193:17
**attempting** [2] - 7:16, 60:24
**attend** [1] - 153:11
**attended** [2] - 135:11, 136:4
**attending** [1] - 136:2
**attends** [2] - 136:6, 153:9
**Attention** [4] - 145:25, 203:9, 205:10, 205:17
**attention** [38] - 66:12, 74:15, 76:5, 76:7, 77:8, 95:2, 97:13, 98:18, 125:21, 143:9, 150:8, 152:2, 152:17, 171:23, 172:2, 173:9, 173:20, 176:15, 183:22, 184:10, 184:14, 201:2, 203:2, 205:19, 205:23, 206:24, 206:11, 206:12, 207:1, 207:18, 207:20, 209:9, 209:11, 209:18, 210:5, 210:6, 210:14
**attention-deficit/
hyperactivity** [1] - 171:23
**attention-related** [2] - 184:10, 201:2
**attorney** [15] - 14:15, 18:23, 19:8, 19:19, 19:25, 20:1, 20:6, 20:25, 21:7, 21:16, 29:20, 37:20, 121:25, 122:2
**attorney-client** [5] - 14:15, 18:23, 19:8, 19:25, 20:6
**atypical** [2] - 74:18, 101:10
**Auditory** [3] - 97:8, 203:8, 203:15
**auditory** [3] - 204:24, 205:1, 205:4
**August** [2] - 45:20, 140:15
**author** [5] - 36:19, 37:5, 37:6, 37:7, 37:14
**automaticity** [5] - 103:11, 106:20, 106:21, 171:17, 185:4
**available** [9] - 49:11, 60:5, 60:6, 60:9, 100:24, 124:13, 125:11, 196:4
**average** [44] - 41:5, 44:18, 45:16, 45:17, 46:4, 46:23, 46:24, 46:25, 79:3, 81:22, 82:8, 83:16, 85:2, 85:9, 85:11, 85:12, 85:15, 85:17, 85:24, 87:15, 87:18, 87:19, 87:24, 89:1, 89:4, 89:5, 90:6, 90:10, 90:12, 90:13, 90:25, 98:16, 104:16, 106:5, 106:8, 107:3, 107:4, 109:5, 147:16, 171:13, 187:16, 196:22

**avocational** [3] - 34:18, 35:25, 36:2
**avoid** [1] - 128:2
**aware** [4] - 19:3, 109:15, 159:5, 208:17
**awareness** [1] - 158:22
**awkward** [1] - 186:10
**awkwardness** [1] - 190:12
**bachelor's** [3] - 66:21, 142:7, 168:24
**background** [7] - 25:23, 34:12, 66:17, 66:20, 100:6, 105:12, 142:6
**bad** [1] - 205:8
**Bar** [1] - 117:2
**bare** [1] - 12:9
**base** [2] - 200:20, 202:20
**based** [41] - 38:12, 38:13, 49:21, 50:13, 55:1, 55:5, 55:11, 63:12, 65:11, 72:2, 72:17, 79:17, 83:6, 86:20, 87:21, 89:9, 97:4, 98:24, 103:18, 105:5, 107:14, 108:13, 109:2, 114:19, 114:25, 118:21, 118:25, 123:7, 126:1, 126:14, 126:22, 135:5, 147:24, 165:25, 173:4, 174:25, 188:14, 202:3, 208:9, 210:8, 210:15
**basic** [7] - 171:4, 171:16, 171:20, 177:11, 183:25, 195:18, 208:6
**Basic** [3] - 41:11, 43:11, 195:24
**basis** [3] - 39:4, 74:5, 145:23
**bat** [1] - 175:25
**Bates** [5] - 6:16, 8:1, 9:10, 30:15, 33:17
**battery** [5] - 87:12, 111:15, 113:13, 177:5, 178:1
**beat** [1] - 95:10
**become** [6] - 18:9, 67:21, 118:2, 118:3, 121:3, 122:10
**becoming** [2] - 67:20, 122:12
**BEFORE** [1] - 1:12
**began** [1] - 73:8
**begin** [6] - 106:10, 168:4, 183:25, 201:6, 203:13, 203:21
**beginning** [5] - 51:16, 53:5, 64:13, 98:1, 183:1
**begins** [2] - 12:19, 151:24, 203:20
**behaving** [1] - 76:18
**behavior** [3] - 96:12, 97:1, 143:10
**behavioral** [3] - 152:5, 152:19, 182:24
**behaviors** [1] - 76:20

**behind** [2] - 83:25, 206:25
**believes** [1] - 92:19
**below** [33] - 41:5, 42:6, 42:25, 44:18, 45:16, 45:18, 46:4, 46:22, 46:24, 48:2, 83:16, 85:2, 85:9, 85:11, 85:15, 85:17, 86:8, 87:15, 87:18, 87:19, 89:1, 89:4, 89:5, 90:6, 90:10, 90:12, 90:25, 98:16, 132:7, 197:3, 197:13
**beneficial** [2] - 7:10, 174:24
**benefit** [1] - 114:20
**Benjamin** [2] - 62:3, 62:10
**BENJAMIN** [3] - 62:7, 212:6, 212:8
**Bennett** [1] - 198:19
**BERGER** [51] - 1:16, 35:16, 61:4, 61:9, 61:11, 61:22, 71:3, 82:16, 88:1, 98:7, 103:19, 104:2, 107:9, 109:14, 109:17, 109:20, 109:22, 109:24, 110:2, 110:4, 110:8, 117:7, 118:1, 125:7, 125:14, 125:18, 127:10, 127:12, 136:14, 137:19, 137:22, 138:4, 138:13, 146:14, 150:22, 151:9, 151:11, 166:5, 166:11, 166:13, 166:19, 167:17, 168:3, 168:8, 168:10, 174:2, 174:11, 188:19, 188:25, 195:13, 211:2
**Berger** [1] - 30:21
**best** [7] - 8:5, 23:24, 25:24, 54:2, 207:8, 209:3, 209:22
**better** [12] - 44:21, 54:10, 54:11, 79:7, 79:9, 89:12, 106:10, 106:13, 188:13, 201:7, 201:10
**between** [23] - 31:2, 34:10, 57:9, 61:23, 72:13, 73:17, 80:21, 81:3, 86:7, 91:23, 93:2, 94:17, 102:11, 109:1, 128:1, 130:11, 148:18, 149:4, 149:15, 196:7, 198:24, 201:11, 202:8
**beyond** [2] - 69:6, 130:17, 206:25
**bias** [1] - 154:15
**biased** [3] - 153:24, 154:4, 154:7
**big** [2] - 200:2, 206:16
**binder** [4] - 64:7, 127:2, 135:14, 168:11
**binders** [2] - 125:10, 140:5
**biological** [3] - 105:2, 105:4, 105:6
**biology** [2] - 55:20, 59:11

**bird** [1] - 191:12
**bit** [9] - 5:2, 33:13, 48:22, 66:16, 84:8, 84:14, 88:9, 107:17, 127:1
**black** [2] - 64:7, 140:5
**block** [2] - 7:8, 50:9
**blood** [1] - 52:10
**blue** [1] - 7:11
**BOARD** [1] - 1:5
**board** [2] - 15:21, 15:22
**Board** [2] - 116:25, 117:1
**Boies** [1] - 121:25
**book** [5] - 19:4, 57:11, 64:7, 68:4, 195:21
**booklet** [1] - 59:18
**books** [1] - 191:12
**borderline** [3] - 42:2, 42:6, 109:1
**boring** [2] - 206:11, 206:12
**bother** [1] - 76:19
**bothering** [3] - 51:18, 51:21
**bottom** [22] - 7:6, 8:1, 19:21, 22:5, 24:6, 26:4, 28:3, 31:16, 48:2, 57:16, 86:2, 87:1, 88:10, 88:12, 89:8, 98:19, 145:8, 160:23, 182:9, 183:13, 204:17
**box** [2] - 47:12, 167:21
**boxes** [1] - 15:14
**boy** [1] - 147:14
**brain** [4] - 22:20, 83:6, 207:20, 210:7
**brand** [1] - 159:23
**Branson** [1] - 121:23
**break** [10] - 8:5, 8:18, 12:1, 48:13, 48:20, 52:20, 116:11, 132:18, 166:8
**brief** [1] - 176:12
**briefly** [23] - 3:16, 62:20, 65:9, 66:20, 69:9, 74:12, 77:24, 84:9, 93:23, 95:14, 104:24, 135:13, 135:16, 139:9, 142:1, 142:5, 143:20, 149:25, 168:22, 169:8, 179:7, 190:18, 208:3
**bring** [2] - 175:1, 179:22
**brings** [1] - 173:13
**broad** [1] - 207:19
**broken** [1] - 42:1
**brought** [3] - 67:24, 71:6, 179:25
**built** [1] - 204:2
**bullet** [5] - 21:21, 21:24, 21:25, 22:12, 22:18
**bunch** [3] - 52:14, 87:13, 189:6
**Burgoyne** [2] - 136:1, 136:9
**BURGOYNE** [50] - 2:10, 3:8, 3:12, 4:6, 4:12, 6:16, 6:18, 14:17, 14:20, 15:2, 17:21,

17:23, 18:1, 19:2, 19:14, 19:16, 20:5, 20:15, 20:18, 20:20, 21:3, 22:11, 27:24, 27:25, 30:7, 30:25, 35:15, 35:20, 35:23, 48:5, 48:7, 48:11, 58:15, 58:18, 59:22, 60:1, 60:11, 60:17, 60:19, 60:22, 60:25, 61:12, 61:15, 65:4, 146:25, 147:2, 151:8, 174:8, 195:7, 211:7
**business** [2] - 121:5, 121:16
**but..** [3] - 27:14, 51:12, 127:19
**Byrne** [1] - 1:8
**calculate** [1] - 202:2
**calculated** [3] - 111:3, 112:19, 202:3
**calculating** [1] - 86:5
**calculation** [1] - 80:25
**camping** [2] - 35:7, 36:3
**candidate** [1] - 83:10
**cannot** [2] - 80:2, 108:19, 117:11
**capable** [1] - 175:20
**capacity** [1] - 139:7
**capitalization** [1] - 197:5
**caps** [1] - 84:8
**captioned** [3] - 39:24, 41:11, 43:11
**captions** [1] - 57:15
**car** [1] - 93:14
**cardiovascular** [1] - 41:6
**cards** [16] - 53:13, 66:2, 66:13, 99:12, 99:20, 100:2, 100:10, 101:9, 133:14, 133:24, 134:2, 134:4, 134:10, 141:19, 194:15
**care** [1] - 31:21
**career** [2] - 120:22, 172:25
**careers** [1] - 120:18
**careless** [1] - 75:19
**CAROLINE** [1] - 2:10
**CAROLLA** [1] - 1:15
**carries** [1] - 145:9
**carryover** [2] - 128:11, 160:1
**CAS** [1] - 39:25
**case** [60] - 48:10, 50:25, 54:12, 60:4, 61:14, 65:24, 72:5, 73:1, 73:10, 73:16, 87:3, 87:18, 89:10, 90:13, 92:2, 92:9, 94:16, 94:19, 99:4, 107:25, 109:1, 109:3, 109:4, 111:7, 112:21, 119:12, 121:10, 121:12, 122:6, 123:7, 133:1, 133:4, 154:14, 154:16, 162:4, 162:25, 163:16, 163:19, 164:14, 165:2, 167:4, 167:12, 168:5, 168:15, 173:13, 173:14, 175:11,

176:8, 182:14, 183:19, 193:25, 201:9, 202:19, 202:20, 206:23, 207:14
**cases** [17] - 62:21, 73:1, 73:13, 74:2, 77:20, 79:18, 95:23, 116:13, 116:14, 116:16, 116:19, 121:9, 123:7, 123:11, 136:10, 167:13
**categories** [5] - 10:9, 10:11, 45:13, 46:4, 77:16
**category** [2] - 83:4, 172:5
**caught** [1] - 52:9
**caused** [1] - 129:12
**causes** [2] - 76:21, 172:20
**causing** [1] - 76:13
**caveat** [1] - 162:5
**CB** [1] - 43:17
**CBSE** [1] - 52:22
**CBSSA** [1] - 52:22
**Center** [1] - 198:20
**Central** [2] - 168:24, 169:1
**ceramics** [2] - 35:6, 36:3
**certain** [6] - 24:5, 28:22, 76:6, 97:11, 186:5, 186:14
**certainly** [32] - 70:12, 71:4, 73:16, 76:4, 77:20, 82:8, 89:5, 95:22, 101:25, 105:21, 106:25, 108:20, 111:12, 112:6, 114:6, 115:12, 115:17, 115:25, 118:7, 118:18, 118:23, 120:16, 120:20, 121:18, 133:2, 133:10, 133:25, 134:12, 137:1, 137:12, 153:2, 164:21
**certified** [1] - 67:21
**certify** [1] - 211:13
**cetera** [1] - 101:3
**chance** [1] - 48:9
**change** [3] - 16:23, 76:17, 202:16
**changed** [7] - 16:5, 51:23, 66:7, 104:25, 141:15, 141:24, 150:18
**changes** [9] - 14:4, 19:18, 27:9, 27:11, 27:13, 27:14, 73:23, 149:10, 149:20
**changing** [1] - 26:12
**character** - 57:13
**characteristics** [1] - 75:15
**Charles** [1] - 121:20
**chart** [5] - 6:13, 9:22, 11:2, 11:3, 165:17
**check** [13] - 52:4, 52:5, 61:1, 86:19, 86:21, 113:18, 115:16, 116:7, 131:3, 134:20, 134:21, 176:11, 183:21
**checking** [1] - 183:1
**checklist** [1] - 9:7

**checklists** - 9:4
**chemistry** [5] - 32:3, 32:6, 33:9, 54:7, 55:20
**Chestnut** [1] - 1:16
**chief** [1] - 167:4
**child** [8] - 119:16, 119:23, 164:17, 164:19, 165:8, 165:10, 165:14
**childhood** [4] - 83:6, 95:22, 95:24, 134:21
**children** [8] - 95:21, 148:9, 150:24, 151:14, 151:17, 196:20, 196:21, 198:5
**Children** [2] - 145:25, 147:11
**choice** [4] - 84:22, 105:4, 105:5, 107:14
**choose** [3] - 58:5, 207:13, 207:16
**cited** [1] - 129:13
**City** [1] - 67:1
**civil** [1] - 93:13
**CIVIL** [1] - 1:3
**claim** [1] - 122:3
**claimed** [1] - 121:18
**clarify** [1] - 174:24
**class** [11] - 47:15, 47:16, 47:18, 48:25, 49:2, 52:21, 53:8, 53:10, 54:10, 143:7, 143:11
**classes** [5] - 40:6, 67:19, 69:16, 142:18, 142:19
**Classification** [2] - 155:15, 170:16
**classification** [2] - 77:17, 155:23
**clear** [5] - 54:15, 93:4, 100:10, 109:4, 110:6
**clearer** [1] - 5:3
**clearly** [3] - 100:3, 100:24
**clerk** [1] - 4:4
**clerkship** [2] - 50:20, 50:24
**client** [6] - 14:15, 18:23, 19:8, 19:25, 20:6, 90:3
**clients** [3] - 70:4, 144:4, 144:5
**clinic** [7] - 49:8, 144:11, 144:13, 144:15, 144:16, 144:18, 144:20
**Clinical** [2] - 170:19, 170:20
**clinical** [23] - 46:21, 49:5, 49:25, 50:11, 53:2, 53:5, 70:5, 70:6, 70:7, 70:12, 71:7, 75:25, 77:4, 80:24, 101:22, 118:16, 143:25, 150:23, 153:20, 153:24, 168:25, 207:15
**clinically** [2] - 13:18, 199:6
**clinician** [1] - 92:23
**clinicians** [1] - 113:25
**clocks** [1] - 6:2

**close** [3] - 50:17, 108:25, 109:3
**closely** [1] - 15:15
**closer** [1] - 61:23
**clot** [2] - 52:3, 52:15
**clotting** [1] - 74:7
**cluster** [1] - 162:7
**cmew@perkinscoie.com** [1] - 2:13
**co** [1] - 36:19
**co-author** [1] - 36:19
**cog** [2] - 196:18, 196:19
**cognitive** [9] - 34:2, 152:4, 152:19, 183:23, 183:24, 196:8, 197:3, 197:14, 198:24
**Cognitive** [1] - 196:12
**cohort** [5] - 102:13, 102:20, 103:3, 105:24, 106:8
**COIE** [1] - 2:9
**colleague** [1] - 22:7
**colleagues** [2] - 72:19, 137:20
**collect** [2] - 209:12, 209:20
**collection** [1] - 209:9
**College** [4] - 67:1, 67:9, 67:20, 104:19
**college** [11] - 54:4, 55:19, 67:8, 85:14, 92:14, 99:22, 101:15, 103:17, 106:3, 106:4, 194:2
**Colleges** [1] - 104:21
**Columbia** [2] - 67:1, 69:14
**column** [2] - 6:9, 11:14
**combination** [3] - 186:19, 196:11, 196:19
**combined** [2] - 12:25, 205:22
**combining** [1] - 132:12
**comfortable** [1] - 167:15
**coming** [7] - 3:10, 50:21, 62:4, 138:20, 167:20, 175:15, 185:20
**Commencing** [1] - 1:10
**Comment** [1] - 15:7
**comment** [16] - 7:8, 13:6, 13:12, 13:13, 15:13, 16:10, 16:24, 24:4, 127:18, 129:2, 156:14, 156:24, 160:22, 183:11, 201:15
**commented** [1] - 127:21
**commenting** [1] - 156:15
**comments** [20] - 7:2, 15:3, 15:5, 15:11, 15:12, 15:13, 15:15, 15:17, 16:7, 17:6, 19:21, 23:21, 24:15, 27:15, 27:17, 27:19, 71:3, 126:10, 195:1
**committees** [1] - 68:6
**common** [10] - 94:1, 130:4, 130:7, 172:22, 172:24, 173:19, 173:21, 177:7,

194:20, 194:22

**commonly** [6] - 81:8, 87:7, 154:23, 155:23, 196:15, 206:24

**communicated** [3] - 29:23, 35:8, 73:11

**communicating** [3] - 5:17, 15:8, 24:14

**communication** [6] - 20:1, 20:25, 73:7, 73:9, 142:13, 149:4

**communications** [4] - 5:13, 73:19, 73:25, 149:15

**compare** [7] - 55:14, 56:12, 85:14, 102:14, 105:24, 106:7, 194:4

**compared** [13] - 52:1, 85:14, 85:18, 85:20, 87:2, 88:10, 88:11, 89:10, 90:20, 90:21, 106:5, 107:5, 197:12

**comparing** [2] - 188:17, 201:23

**comparison** [4] - 85:20, 85:23, 188:15

**comparisons** [1] - 201:25

**compensation** [1] - 72:20

**compensatory** [2] - 173:25, 201:8

**complete** [3] - 122:19, 169:3, 169:25

**completed** [5] - 9:4, 46:19, 116:5, 169:9, 178:19

**completely** [2] - 14:5, 162:6

**completes** [1] - 166:24

**complicated** [1] - 84:14

**component** [5] - 58:23, 84:19, 84:21, 158:25, 187:6

**components** [1] - 201:2

**composite** [1] - 88:25

**composites** [1] - 98:14

**comprehend** [1] - 105:14

**comprehension** [32] - 84:21, 85:1, 85:24, 86:14, 86:19, 86:21, 88:9, 89:22, 90:2, 90:12, 90:19, 104:14, 106:12, 106:15, 109:6, 131:1, 131:16, 131:19, 171:12, 171:13, 171:19, 176:13, 177:3, 177:12, 184:4, 184:6, 193:10, 194:9, 197:4, 201:3, 201:12, 210:24

**comprehensive** [1] - 43:6

**Comprehensive** [2] - 41:11, 43:11

**computation** [1] - 197:6

**computer** [7] - 1:25, 25:8, 39:10, 39:11, 41:24, 45:6, 50:10

**computer-aided** [1] - 1:25

**computerized** [1] - 97:10

**computers** [1] - 49:12

**conceivable** [1] - 60:24

**concept** [2] - 79:13, 80:18

**conclude** [2] - 108:10, 203:2

**concluded** [3] - 174:21, 208:12, 211:9

**concludes** [1] - 211:2

**conclusion** [7] - 65:18, 107:9, 147:23, 207:25, 208:4, 208:10, 208:25

**conclusions** [1] - 149:25

**condense** [1] - 12:9

**condition** [6] - 170:24, 171:22, 173:12, 174:19, 175:4, 184:11

**conditions** [9] - 65:14, 78:23, 104:15, 105:14, 105:15, 155:21, 173:6, 174:4, 209:15

**conducted** [2] - 108:1, 193:14

**conducting** [2] - 82:24, 154:11

**conference** [2] - 135:8, 136:2

**conferences** [5] - 68:2, 69:8, 135:11, 136:7, 143:23

**confirm** [10] - 9:6, 9:15, 11:2, 25:6, 28:21, 30:8, 31:1, 31:5, 205:16, 206:3

**confirmed** [1] - 132:16

**confused** [1] - 192:24

**connection** [5] - 9:2, 20:9, 20:10, 57:22, 140:11

**connections** [1] - 198:21

**consensus** [2] - 113:24, 154:19

**consent** [1] - 104:24

**consequence** [1] - 77:7

**consequences** [3] - 76:14, 76:17, 76:19

**consider** [17] - 63:5, 92:8, 98:21, 98:22, 113:10, 132:19, 133:6, 133:7, 133:11, 133:25, 137:3, 164:19, 174:22, 180:21, 198:23, 199:10, 208:24

**consideration** [4] - 30:18, 111:7, 136:23, 146:18

**considerations** [2] - 19:8

**considered** [25] - 77:15, 85:12, 86:8, 92:10, 99:10, 105:22, 112:4, 112:21, 114:9, 130:17, 132:23, 132:25, 133:2, 133:11, 133:24, 134:9, 134:12, 147:22, 162:1, 162:13, 163:1, 177:5, 196:14, 199:8, 206:6

**considering** [8] - 11:23,

23:25, 104:12, 113:11, 132:19, 137:2, 187:5, 207:4

**consistency** [3] - 133:13, 134:16, 162:23

**consistent** [4] - 111:16, 130:7, 132:22, 209:15

**constitute** [1] - 76:1

**consult** [4] - 61:5, 117:11, 137:20, 166:6

**consultant** [4] - 62:15, 139:5, 144:19, 169:11

**consultants** [3] - 135:9, 135:22, 137:24

**consultation** [4] - 33:22, 34:3, 70:2, 70:6

**consulted** [1] - 167:5

**consulting** [1] - 34:1

**consumers** [1] - 148:2

**contact** [1] - 149:9

**contacted** [1] - 39:5

**contained** [4] - 96:15, 149:3, 159:18, 184:16

**containing** [1] - 64:20

**contains** [1] - 9:6

**contemplating** [2] - 23:22, 92:18

**contemporary** [1] - 146:7

**content** [8] - 44:19, 55:18, 70:20, 101:14, 105:7, 105:11, 105:12

**context** [1] - 99:7

**contexts** [3] - 72:14, 72:17, 92:11

**continuation** [1] - 3:15

**continue** [10] - 60:3, 60:14, 76:15, 76:20, 77:6, 81:13, 95:24, 98:9, 104:5, 186:9

**CONTINUED** [1] - 2:1

**continues** [6] - 37:3, 95:23, 159:12, 179:19, 183:14, 189:18

**continuing** [1] - 69:4

**Continuous** [3] - 97:8, 203:9, 203:15

**contradict** [1] - 108:4

**contrary** [1] - 91:16

**contrast** [2] - 92:16, 124:17

**contribute** [3] - 111:12, 112:7, 112:22

**Control** [1] - 204:10

**control** [4] - 97:14, 98:18, 204:24, 205:2

**controllers** [1] - 206:10

**controversy** [1] - 198:1

**conversation** [4] - 21:22, 22:13, 22:16, 177:22

**conversations** [1] - 24:17

**conversely** [1] - 188:12

**convey** [1] - 96:6

**cool** [1] - 57:14

**copy** [9] - 6:23, 36:14, 36:15, 125:10, 125:11, 125:14, 125:24, 126:5, 140:14

**core** [2] - 75:12, 80:14

**corner** [3] - 142:21, 167:20

**correct** [81] - 4:23, 8:24, 10:1, 10:18, 10:23, 15:9, 16:8, 18:5, 18:14, 21:16, 28:16, 29:5, 29:21, 29:23, 36:14, 36:17, 36:21, 37:18, 37:25, 38:20, 38:23, 41:4, 74:10, 95:2, 110:12, 111:17, 113:2, 114:22, 115:4, 115:8, 116:2, 116:6, 120:4, 122:5, 124:18, 129:6, 129:14, 131:2, 132:2, 134:19, 136:9, 136:21, 136:22, 139:19, 139:24, 140:13, 143:8, 144:1, 144:12, 148:9, 148:14, 155:11, 156:12, 156:22, 159:14, 161:15, 162:20, 163:7, 163:14, 164:6, 164:12, 164:13, 167:1, 168:17, 168:20, 180:16, 187:7, 187:12, 187:13, 187:17, 188:18, 189:10, 189:12, 190:10, 190:14, 190:17, 190:24, 193:3, 203:16, 204:14, 211:13

**correcting** [1] - 17:6

**corrections** [2] - 190:9, 190:21

**corrections/editing** [1] - 28:9

**correctly** [12] - 81:19, 86:11, 100:18, 111:3, 111:14, 112:19, 113:17, 133:20, 171:8, 171:10, 190:1, 193:16

**correlating** [1] - 86:6

**correlation** [1] - 86:7

**correspondence** [1] - 72:13

**Cortland** [1] - 67:7

**Council** [1] - 117:3

**counsel** [10] - 29:25, 53:13, 54:3, 56:10, 71:15, 82:17, 117:11, 130:23, 136:9, 138:11

**Counsel** [1] - 17:20, 30:24, 35:19, 71:6, 109:16, 117:25, 136:12, 138:8, 146:13, 147:1, 166:7, 211:4

**counseling** [1] - 169:1

**count** [3] - 59:15, 187:6, 187:13

**counted** [5] - 187:10, 189:10, 190:11, 191:15

**countries** [1] - 155:24

**couple** [9] - 13:18, 36:24, 41:7, 49:4, 58:15, 145:10,

158:19, 176:12, 176:13
**course** [11] - 42:11, 44:11, 45:1, 46:15, 46:17, 52:17, 71:8, 81:5, 107:18, 171:11, 172:25
**courses** [11] - 40:9, 67:22, 67:25, 69:10, 69:13, 118:4, 118:6, 118:7, 142:23, 143:1
**coursework** [1] - 54:12
**Court** [3] - 1:22, 3:1, 211:17
**court** [2] - 136:16, 173:13
**COURT** [3] - 1:1, 62:9, 138:24
**Courthouse** [1] - 1:8
**courtroom** [2] - 161:11, 170:6
**cover** [1] - 145:2
**covered** [2] - 148:10, 180:4
**crafting** [2] - 24:23, 24:24
**created** [2] - 6:4, 179:4
**creativity** [1] - 79:23
**credentials** [2] - 66:17, 142:2
**credibility** [2] - 133:12, 134:15
**credible** [15] - 91:2, 91:5, 91:7, 91:11, 91:14, 92:1, 93:12, 93:22, 94:24, 94:25, 97:4, 98:21, 208:13, 208:15
**credit** [1] - 51:5
**credulous** [1] - 128:15
**criminal** [1] - 167:12
**criteria** [33] - 15:21, 63:6, 74:19, 75:16, 77:3, 77:24, 78:6, 78:8, 78:14, 79:21, 80:3, 80:5, 80:6, 80:9, 80:16, 80:23, 80:24, 81:4, 81:10, 81:24, 95:21, 95:25, 96:21, 99:1, 99:2, 101:24, 108:6, 108:9, 115:6, 122:16, 122:24, 172:4, 176:25
**criterion** [4] - 74:21, 74:24, 75:2, 75:10
**criticism** [2] - 198:3, 198:16
**Cross** [1] - 212:4
**cross** [9] - 30:5, 61:24, 61:25, 104:4, 109:13, 117:11, 117:15, 150:20, 211:5
**CROSS** [3] - 4:11, 110:7, 150:21
**cross-examination** [6] - 61:25, 109:13, 117:11, 117:15, 150:20, 211:5
**CROSS-EXAMINATION** [3] - 4:11, 110:7, 150:21
**cross-examine** [2] - 30:5, 104:4
**CRR** [2] - 1:22, 211:17
**CS** [3] - 7:9, 7:18, 7:22
**curiosity** [1] - 61:21

**current** [9] - 67:14, 96:20, 114:13, 145:14, 145:24, 155:17, 170:11, 170:18, 172:13
**curriculum** [1] - 168:20
**CURTIS** [1] - 1:12
**curve** [1] - 49:6
**Customized** [1] - 39:24
**customized** [1] - 40:13
**cut** [1] - 199:7
**cute** [1] - 155:2
**CV** [10] - 36:14, 64:17, 66:18, 67:4, 68:9, 69:10, 140:14, 142:3, 143:17, 145:5
**CVA** [1] - 22:20
**D-27** [1] - 195:22
**D-5** [1] - 151:9
**D27** [1] - 195:23
**Dafoe** [4] - 25:24, 25:25, 28:4, 28:12
**damage** [1] - 210:7
**dark** [2] - 21:25, 47:23
**dashboard** [2] - 47:10, 47:11
**data** [5] - 81:12, 92:1, 119:11, 137:3, 175:22
**date** [8] - 26:21, 27:12, 43:10, 43:12, 48:3, 69:12, 135:23, 178:18
**dated** [7] - 4:25, 17:16, 27:4, 33:22, 44:13, 164:2, 164:11
**David** [1] - 121:25
**DAY** [1] - 1:6
**day-to-day** [1] - 96:12
**days** [11] - 8:5, 8:20, 12:1, 12:17, 79:20, 135:5, 141:20, 145:2, 157:14, 163:21, 188:8
**DC** [2] - 2:5, 2:12
**deal** [1] - 200:15
**dealing** [1] - 52:15
**Dean** [3] - 26:1, 27:22, 168:1
**Dear** [1] - 17:10
**debate** [1] - 198:1
**debates** [1] - 113:24
**decade** [1] - 81:5
**decades** [1] - 81:13
**December** [3] - 1:10, 135:24, 139:17
**decent** [1] - 50:7
**decide** [2] - 133:19, 178:10
**decided** [3] - 24:3, 53:22, 178:12
**deciding** [2] - 39:1, 39:13
**decision** [10] - 29:2, 38:22, 132:24, 134:13, 156:20, 164:7, 164:9, 164:14, 202:1, 209:5
**declaration** [16] - 64:2, 64:14, 64:18, 65:24, 66:6, 73:19, 140:11, 140:15, 151:4, 151:21, 152:12,

152:25, 156:7, 168:5, 168:14
**decline** [1] - 167:21
**decoding** [3] - 147:16, 147:20, 148:5
**decreased** [1] - 11:20
**defend** [1] - 3:8
**Defendant** [2] - 1:6, 2:14
**defendant's** [4] - 127:2, 135:17, 140:4, 195:20
**Defendant's** [8] - 41:10, 83:25, 95:5, 102:6, 103:6, 104:17, 127:5
**defendants** [2] - 141:3, 146:8
**Defense** [1] - 66:18
**defense** [8] - 53:13, 54:3, 56:10, 62:2, 64:7, 70:22, 138:17, 167:6
**deficit** [14] - 143:9, 173:9, 173:20, 176:15, 183:22, 203:2, 206:13, 207:1, 207:18, 207:20, 209:9, 209:11, 209:19, 210:5
**Deficit** [1] - 145:25
**deficit/hyperactivity** [1] - 171:23
**deficits** [4] - 22:19, 78:9, 80:2, 96:25
**defined** [3] - 79:17, 171:16, 171:20
**definitely** [1] - 118:14
**definition** [4] - 79:19, 80:8, 80:14, 147:21
**degree** [15] - 9:25, 66:21, 66:22, 66:23, 69:24, 77:3, 96:10, 96:11, 96:22, 97:4, 103:12, 106:21, 142:7, 152:9, 168:24
**degrees** [2] - 10:19, 144:23
**deleted** [1] - 16:5
**demeanor** [2] - 207:6, 207:7
**demonstrated** [2] - 130:8, 150:7
**denial** [1] - 24:1
**denied** [7] - 21:6, 21:14, 28:15, 28:17, 28:18, 43:23, 175:18
**Denny** [8] - 84:11, 84:14, 84:25, 85:19, 86:7, 86:14, 123:25, 124:14, 162:10, 162:13, 192:14, 192:18, 192:24, 193:2, 193:4, 193:8, 194:6, 210:23
**denying** [2] - 28:22, 108:24
**department** [2] - 45:15, 52:2
**deposited** [1] - 73:4
**deposition** [6] - 35:13, 35:24, 110:11, 112:5, 112:24, 126:5
**depress** [1] - 198:14

**depression** [1] - 210:7
**describe** [19] - 58:5, 101:14, 102:15, 104:24, 105:10, 120:25, 143:20, 157:4, 168:22, 169:8, 179:14, 180:9, 180:14, 182:19, 185:25, 196:10, 204:24, 206:20, 208:17
**described** [25] - 7:14, 9:22, 86:10, 87:18, 100:1, 102:20, 110:23, 111:22, 112:6, 112:13, 113:5, 127:17, 139:10, 148:25, 158:25, 163:6, 165:16, 175:17, 181:6, 192:10, 205:9, 205:16, 207:24, 208:9, 210:16
**describes** [3] - 94:9, 99:17, 133:9
**describing** [3] - 98:11, 128:2, 204:7
**description** [9] - 25:15, 31:19, 32:2, 32:22, 100:13, 172:13, 183:7, 190:16, 208:12
**descriptions** [3] - 134:11, 158:24, 202:21
**designed** [3] - 101:21, 105:19, 170:21
**despair** [1] - 158:22
**despite** [2] - 77:6, 147:19
**detail** [5] - 66:15, 180:9, 193:6, 206:3, 209:3
**detailed** [1] - 34:1
**details** [4] - 5:3, 35:3, 65:8, 122:8
**detect** [2] - 93:16, 210:2
**determinant** [1] - 209:18
**determination** [1] - 114:14
**determined** [1] - 189:3
**determining** [2] - 78:14, 114:9
**detracts** [1] - 191:16
**develop** [1] - 199:23
**developed** [10] - 80:19, 81:24, 93:1, 93:6, 93:10, 93:12, 93:21, 95:21, 96:1, 173:24
**developing** [1] - 171:17
**development** [1] - 198:14
**diagnose** [3] - 98:23, 101:21, 151:20
**diagnosed** [9] - 13:17, 13:18, 80:20, 81:20, 115:10, 115:12, 115:14, 115:20, 181:18
**diagnoses** [13] - 12:23, 63:6, 65:14, 65:21, 74:5, 103:16, 106:25, 107:2, 109:9, 123:9, 123:12, 152:2, 152:16

**diagnosing** [4] - 101:19, 115:19, 148:12, 155:19
**diagnosis** [39] - 50:15, 50:22, 51:3, 66:14, 70:23, 72:5, 77:4, 77:21, 82:8, 82:15, 84:17, 96:19, 97:2, 102:1, 105:19, 106:23, 111:8, 111:13, 112:4, 112:21, 113:1, 113:11, 118:13, 118:15, 118:18, 119:8, 121:2, 123:6, 132:19, 134:13, 145:3, 146:9, 151:18, 162:1, 162:25, 202:17, 202:20, 206:7
**Diagnostic** [2] - 81:16, 170:6
**diagnostic** [45] - 13:20, 67:12, 70:8, 70:11, 70:15, 74:12, 77:24, 78:5, 78:14, 78:17, 79:19, 80:16, 80:23, 80:24, 81:8, 83:15, 84:13, 91:9, 91:24, 92:6, 92:17, 92:21, 93:3, 93:5, 93:9, 94:17, 95:16, 98:24, 98:25, 99:7, 105:16, 105:18, 105:22, 107:25, 108:5, 108:8, 111:14, 144:7, 144:17, 145:1, 161:1, 162:13, 165:3, 194:8
**died** [1] - 52:8
**differ** [1] - 76:25
**difference** [5] - 13:22, 128:1, 130:11, 196:7, 202:8
**differences** [1] - 130:12
**different** [31] - 32:13, 32:16, 44:6, 65:14, 68:23, 79:20, 79:21, 90:18, 94:1, 101:16, 104:23, 105:13, 129:20, 130:2, 130:14, 130:18, 130:20, 132:14, 132:21, 157:19, 157:24, 160:8, 163:14, 187:24, 192:2, 192:7, 192:10, 193:4, 204:5, 205:8
**differentiate** [1] - 75:24
**differently** [1] - 187:23
**differs** [1] - 114:11
**difficult** [4] - 55:18, 89:25, 172:17, 191:10
**difficulties** [3] - 160:14, 184:14, 188:22
**difficulty** [8] - 46:9, 171:7, 171:20, 172:2, 172:7, 172:9, 181:7, 186:4
**DIRE** [3] - 212:7, 212:11, 212:14
**direct** [7] - 22:25, 38:15, 61:22, 100:8, 116:12, 125:21, 211:2
**DIRECT** [6] - 62:11, 71:18, 139:1, 146:21, 168:2, 174:10

**Direct** [1] - 212:4
**directions** [1] - 172:3
**directly** [4] - 20:1, 20:24, 85:19, 108:4
**director** [1] - 50:24
**directors** [1] - 50:20
**directs** [1] - 56:23
**disabilities** [50] - 15:24, 65:15, 65:19, 65:21, 66:11, 67:11, 67:13, 68:15, 68:16, 69:17, 70:24, 72:6, 74:6, 74:10, 75:12, 78:1, 80:19, 80:20, 80:24, 82:25, 83:2, 83:13, 99:2, 99:5, 101:20, 101:22, 103:14, 105:17, 105:19, 105:21, 105:23, 106:23, 108:16, 112:8, 123:11, 142:17, 143:2, 143:7, 143:15, 144:8, 144:15, 144:24, 145:4, 145:14, 146:10, 148:13, 151:18, 198:5, 207:18, 207:20
**Disabilities** [2] - 145:11, 147:11
**disability** [46] - 12:25, 13:14, 13:16, 72:16, 72:20, 77:14, 77:16, 78:12, 78:15, 79:4, 80:7, 80:11, 80:12, 81:4, 81:21, 82:2, 82:10, 98:24, 101:24, 102:1, 103:16, 106:25, 108:6, 114:10, 114:12, 114:13, 114:14, 119:5, 119:9, 119:17, 119:20, 119:23, 120:15, 120:25, 122:7, 122:22, 122:24, 133:1, 147:21, 164:25, 165:12, 173:17, 177:6, 177:8, 198:7, 198:14
**disabled** [6] - 79:14, 79:25, 147:22, 148:6, 165:15, 200:16
**disagree** [1] - 34:7
**disappointing** [1] - 128:15
**disclosed** [3] - 18:24, 104:21, 124:12
**discourage** [1] - 176:6
**discovery** [5] - 5:8, 19:3, 25:9, 65:25, 141:21
**discredited** [1] - 155:1
**discrepancies** [7] - 81:6, 198:24, 200:1, 200:17, 200:19, 201:11, 202:4
**discrepancy** [33] - 80:17, 80:21, 80:25, 81:10, 81:11, 81:19, 81:23, 81:24, 82:7, 82:21, 93:2, 94:16, 147:24, 148:7, 148:12, 148:18, 154:19, 155:12, 164:20, 164:21, 164:24, 197:17,

197:20, 197:24, 197:25, 198:4, 198:6, 198:9, 198:12, 198:22, 199:2, 199:3, 201:19
**discuss** [6] - 77:24, 131:21, 141:8, 142:1, 145:14, 146:7
**discussed** [18] - 33:13, 83:14, 91:1, 99:9, 100:17, 101:5, 110:19, 116:12, 123:23, 125:6, 130:14, 131:17, 141:20, 147:25, 150:13, 157:14, 189:14, 193:1
**discussing** [9] - 4:17, 20:25, 24:4, 34:23, 66:3, 91:5, 164:22, 194:5, 206:17
**discussion** [13] - 3:18, 16:1, 23:6, 31:17, 34:11, 61:17, 132:8, 154:20, 189:18, 191:1, 197:16, 199:18, 203:13
**discussions** [2] - 39:19
**disease** [2] - 45:14, 56:24
**Diseases** [2] - 155:15, 170:16
**disfavor** [1] - 154:21
**Disorder** [1] - 146:1
**disorder** [17] - 74:8, 75:6, 78:10, 83:12, 95:22, 143:9, 160:15, 171:3, 171:20, 171:23, 173:20, 177:12, 177:19, 177:21, 182:24, 182:25, 183:23
**disorders** [11] - 22:22, 45:14, 75:6, 77:25, 83:3, 83:5, 99:1, 142:13, 143:10, 155:21, 177:10
**Disorders** [3] - 37:14, 81:17, 170:7
**disorganized** [1] - 172:3
**disqualify** [1] - 198:12
**distinctly** [1] - 80:6
**distinguish** [2] - 127:25, 173:8
**distracted** [2] - 75:20, 172:2
**distress** [1] - 76:20
**DISTRICT** [2] - 1:1, 1:1
**district** [3] - 80:9, 154:22
**districts** [2] - 79:20, 143:23
**doc** [2] - 169:6, 192:21
**doctor** [1] - 52:14
**doctor's** [1] - 209:6
**doctoral** [4] - 66:23, 69:24, 169:3, 169:9
**document** [45] - 5:6, 5:25, 6:4, 6:7, 7:6, 11:24, 12:10, 12:12, 12:13, 13:9, 14:4, 14:8, 15:3, 15:10, 17:14, 17:15, 23:20, 25:14, 26:23, 33:16, 33:20, 34:11, 39:24, 40:2, 41:11, 43:11, 47:9,

64:13, 126:3, 126:4, 140:9, 147:7, 168:7, 178:16, 182:1, 183:16, 184:19, 184:20, 185:23, 189:16, 192:17, 199:13, 206:16
**documentation** [12] - 29:19, 63:20, 64:23, 69:7, 72:2, 72:3, 73:5, 109:2, 137:18, 139:10, 149:2, 159:18
**documented** [2] - 18:24, 133:17
**documents** [8] - 26:7, 62:24, 63:2, 72:12, 109:7, 141:1, 160:5, 179:22
**domains** [2] - 184:1, 200:17
**done** [31] - 5:20, 14:5, 22:23, 50:18, 69:4, 85:22, 86:6, 130:3, 130:7, 136:19, 166:21, 173:1, 173:15, 175:3, 175:19, 175:23, 175:24, 176:10, 176:12, 176:16, 177:24, 178:4, 178:18, 179:5, 181:8, 184:13, 192:1, 193:20, 193:24, 196:11, 196:15
**doom** [1] - 158:23
**door** [1] - 94:2
**dot** [2] - 47:20, 47:22
**double** [4] - 40:23, 45:8, 183:21, 210:21
**doubt** [15] - 110:20, 110:22, 110:24, 110:25, 111:3, 111:21, 111:24, 112:1, 112:12, 112:15, 112:17, 112:18, 113:4, 113:7, 163:4
**down** [8] - 12:9, 42:1, 59:23, 138:7, 143:4, 145:8, 159:21, 205:22
**download** [1] - 62:23
**downloaded** [1] - 73:5
**dozens** [1] - 98:12
**Dr** [150] - 4:16, 5:9, 5:13, 6:20, 9:3, 9:8, 10:4, 11:3, 12:4, 12:14, 13:3, 13:16, 13:18, 13:19, 13:21, 14:1, 14:10, 15:10, 17:2, 17:10, 18:5, 18:20, 19:3, 19:18, 19:22, 19:23, 20:7, 21:19, 21:23, 22:2, 22:6, 22:16, 22:19, 22:24, 23:2, 23:10, 23:17, 23:22, 24:3, 24:15, 24:18, 24:22, 25:14, 25:20, 26:10, 26:13, 27:2, 28:16, 29:4, 29:20, 29:24, 30:3, 30:9, 30:17, 30:20, 31:2, 33:14, 33:21, 34:23, 61:5, 62:3, 62:13, 64:6, 65:8, 69:19, 70:16, 70:22, 71:5, 71:20, 83:21, 84:3, 84:6, 85:20, 87:4, 88:17, 89:16,

93:18, 94:9, 94:20, 95:1, 97:15, 97:20, 97:21, 97:24, 98:23, 99:8, 99:24, 101:1, 101:12, 103:20, 108:1, 108:22, 109:12, 110:9, 110:15, 110:20, 111:21, 113:4, 113:14, 113:16, 114:19, 114:25, 123:23, 130:19, 131:5, 132:14, 138:18, 139:3, 139:24, 140:6, 140:25, 141:8, 141:10, 141:13, 142:1, 143:25, 146:8, 147:5, 148:10, 150:11, 153:14, 153:17, 153:20, 153:23, 154:1, 154:13, 158:12, 159:5, 160:1, 160:11, 160:13, 160:18, 161:10, 161:13, 161:16, 162:12, 162:19, 167:17, 168:4, 168:11, 174:2, 176:16, 176:22, 188:20, 193:11, 195:23, 208:20, 208:22, 209:1, 209:8

**DR** [9] - 62:7, 138:22, 167:22, 212:6, 212:8, 212:10, 212:12, 212:13, 212:15

**draft** [12] - 15:20, 17:11, 18:5, 18:7, 19:22, 20:22, 24:6, 26:16, 28:11, 28:12, 28:14, 30:21

**drafted** [1] - 25:25

**drafting** [1] - 24:25

**drafts** [1] - 29:24

**drastically** [1] - 204:4

**drawing** [2] - 35:6, 36:3

**drawings** [1] - 94:1

**driven** [1] - 209:23

**Drs** [1] - 198:19

**drug** [1] - 75:9

**DSM** [11] - 75:18, 81:8, 81:14, 83:4, 85:16, 95:18, 96:2, 99:2, 115:17, 119:21, 170:11

**DSM-5** [10] - 81:18, 115:14, 115:17, 170:13, 176:18, 176:25, 177:9, 177:10, 197:20, 198:3

**due** [5] - 75:7, 78:9, 162:13, 173:9, 173:10

**duly** [3] - 62:7, 138:22, 167:22

**during** [27] - 14:4, 35:9, 38:15, 50:1, 51:17, 52:19, 65:25, 70:13, 86:14, 92:7, 92:20, 93:2, 93:9, 93:14, 97:12, 105:22, 111:14, 120:3, 120:12, 126:4, 134:8, 179:24, 183:3, 183:9, 203:1,

207:5

**DVT** [3] - 42:11, 51:13, 51:20

**DX-3** [1] - 131:5

**DX-4** [2] - 28:21, 33:13

**DX-5** [5] - 128:7, 141:6, 156:10, 156:12, 212:22

**DX-6** [3] - 65:6, 128:8, 212:23

**DX6** [1] - 128:9

**dysfunction** [2] - 207:19, 207:20

**dyslexia** [60] - 111:8, 112:4, 112:21, 119:1, 119:3, 119:5, 119:8, 119:12, 119:16, 119:18, 119:19, 120:2, 120:8, 120:10, 120:21, 120:24, 121:7, 121:11, 121:17, 121:19, 122:7, 122:18, 122:19, 122:21, 123:20, 129:12, 132:20, 158:10, 158:16, 160:15, 161:2, 162:1, 165:19, 170:25, 171:2, 171:3, 171:14, 171:15, 172:22, 173:2, 173:10, 173:20, 173:22, 174:4, 175:5, 176:11, 176:14, 177:1, 177:7, 177:16, 178:2, 178:3, 178:14, 181:17, 194:20, 207:1, 207:21, 208:1, 208:6, 208:8

**Dyslexia** [3] - 145:18, 169:12, 198:20

**dyslexic** [4] - 171:5, 185:4, 185:5, 185:8

**early** [4] - 18:5, 18:6, 74:21, 83:6, 194:13, 194:21

**easier** [5] - 9:15, 12:7, 34:6, 186:12

**easiest** [1] - 33:16

**easily** [2] - 75:19, 98:15

**EASTERN** [1] - 1:1

**edit** [1] - 158:1

**edited** [2] - 23:20, 152:9

**editing** [3] - 14:25, 17:7, 25:5

**edition** [5] - 81:17, 155:17, 170:11, 170:18, 185:20

**Edition** [2] - 87:5, 185:19

**education** [6] - 68:19, 69:4, 69:23, 71:5, 91:21, 118:8

**educational** [5] - 66:20, 78:7, 99:4, 142:5, 168:22

**effect** [2] - 25:21, 198:13

**effective** [4] - 119:4, 158:25, 160:15, 207:22

**effectively** [1] - 121:1

**efficiently** [2] - 24:12, 186:5

**effort** [5] - 93:1, 93:9, 157:17, 171:11, 207:4

**effortlessly** [1] - 185:5

**efforts** [1] - 207:12

**eight** [1] - 5:22

**either** [14] - 30:9, 49:8, 49:17, 50:20, 116:5, 121:7, 121:16, 150:7, 173:20, 173:25, 175:4, 177:11, 197:20, 209:19

**elementary** [6] - 16:18, 100:25, 133:15, 181:10, 203:1, 208:15

**eliminate** [1] - 198:11

**eliminating** [1] - 198:4

**Elmira** [1] - 67:9

**email** [21] - 4:16, 6:20, 12:4, 12:10, 14:1, 14:3, 19:17, 21:18, 26:8, 26:10, 26:13, 26:17, 27:1, 27:11, 28:3, 30:20, 31:1, 62:23, 72:12, 73:2, 149:1

**emails** [3] - 25:7, 25:18, 30:9

**embarrassing** [1] - 186:10

**emergency** [3] - 31:21, 45:14, 52:2

**emphasize** [1] - 178:12

**emphasized** [1] - 129:10

**employers** [1] - 31:17

**encompassed** [1] - 13:17

**encounter** [2] - 50:19, 50:22

**encountered** [1] - 54:22

**encouraging** [1] - 195:4

**end** [11] - 3:18, 25:5, 31:10, 40:19, 40:20, 49:22, 51:17, 174:21, 183:1, 199:18, 199:20

**ended** [3] - 44:8, 48:23, 186:1

**endorse** [1] - 82:23

**endorsing** [1] - 96:13

**ends** [1] - 187:9

**energy** [1] - 171:9

**engage** [1] - 76:20

**engaged** [1] - 153:21

**English** [1] - 101:17

**enjoy** [3] - 57:4, 57:20, 117:9

**enjoyable** [3] - 57:17, 57:18, 58:3

**enjoyed** [1] - 57:20

**enrolled** [2] - 58:10, 116:9

**entire** [4] - 54:23, 63:19, 128:19, 128:24

**entirely** [2] - 6:4, 172:19

**entirety** [1] - 129:4

**entitled** [4] - 37:2, 82:12, 183:14, 211:14

**entry** [1] - 79:21

**environments** [1] - 71:1

**episodes** [1] - 74:15

**equalize** [2] - 8:6, 12:1

**Erin** [3] - 25:24, 25:25, 28:4

**error** [5] - 187:13, 189:10, 191:15, 204:2

**errors** [14] - 17:6, 90:4, 90:9, 186:18, 186:20, 186:25, 187:3, 187:9, 187:11, 189:6, 189:7, 190:11

**especially** [6] - 66:9, 92:11, 94:20, 119:23, 194:1, 200:15

**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10

**essentially** [3] - 86:18, 145:22, 150:5

**establish** [1] - 172:17

**established** [2] - 13:19, 18:4

**estimate** [5] - 61:22, 116:16, 116:18, 173:1, 201:7

**et** [1] - 101:3

**ethics** [1] - 67:22

**evaluate** [6] - 46:14, 56:19, 56:20, 153:25, 159:3, 159:5

**evaluated** [4] - 40:3, 124:4, 165:8, 173:2

**evaluate** [10] - 22:22, 46:18, 92:3, 134:9, 154:6, 161:5, 173:4, 177:2, 177:6, 183:22

**evaluation** [23] - 13:20, 23:6, 29:6, 29:8, 35:9, 70:23, 72:8, 72:22, 82:1, 101:22, 136:19, 145:1, 145:3, 146:9, 154:11, 159:2, 165:11, 174:23, 175:21, 176:7, 181:12, 196:5, 209:9

**evaluations** [8] - 69:5, 70:8, 70:11, 97:11, 144:7, 144:17, 175:19, 208:18

**evaluator** [4] - 78:18, 83:16, 91:22, 118:16

**evaluators** [2] - 70:17, 83:1

**evening** [1] - 51:25

**events** [2] - 15:9, 27:15

**eventually** [2] - 18:9, 26:1

**everyday** [1] - 97:1

**evidence** [51] - 63:11, 63:12, 63:22, 65:18, 65:20, 78:13, 78:16, 78:17, 78:19, 78:20, 78:25, 80:5, 82:24, 83:13, 83:14, 83:17, 83:18, 83:19, 84:16, 91:15, 91:17, 93:3, 93:4, 94:21, 94:22, 97:7, 99:10, 99:24, 100:10, 100:11, 100:17, 101:23, 101:25, 103:15, 108:10, 108:11, 108:17, 108:20, 109:5, 111:13, 112:7, 113:12, 115:13, 121:10, 137:23, 138:3, 176:5, 193:9, 193:25, 206:6

**evolved** [1] - 184:11

**exacerbate** [1] - 173:11

**exact** [5] - 100:22, 116:7,
119:11, 136:11, 157:16
**exactly** [9] - 23:9, 72:11,
74:11, 90:21, 108:19,
118:20, 153:1, 153:5, 156:4
**exaggerated** [4] - 93:11,
93:17, 93:22, 94:24
**exaggerating** [1] - 94:14
**exam** [44] - 8:6, 12:2, 37:18,
40:3, 40:14, 40:15, 41:1,
41:24, 42:19, 42:20, 42:22,
43:18, 44:10, 45:4, 45:8,
45:20, 45:23, 46:4, 46:8,
46:11, 46:14, 46:18, 46:19,
47:1, 50:2, 50:19, 51:6,
52:22, 53:8, 53:12, 58:20,
58:23, 58:25, 59:5, 59:10,
59:19, 70:3, 101:12, 102:9,
103:9, 104:12, 116:8, 161:7
**Exam** [1] - 117:2
**examination** [14] - 34:1,
34:2, 39:25, 40:13, 40:20,
44:25, 61:25, 69:23, 109:13,
117:11, 117:15, 150:20,
211:3, 211:5
**Examination** [1] - 39:24
**EXAMINATION** [11] - 4:11,
48:17, 58:17, 62:11, 71:18,
110:7, 139:1, 146:21,
150:21, 168:2, 174:10
**examine** [4] - 30:5, 71:8,
104:4, 207:17
**examined** [3] - 62:8, 138:23,
167:23
**examiner** [1] - 90:3
**Examiners** [2] - 117:1
**EXAMINERS** [1] - 1:6
**example** [11] - 10:20, 41:6,
76:23, 110:18, 121:21,
129:11, 130:24, 147:14,
148:17, 165:22, 203:12
**examples** [2] - 68:24, 96:2
**exams** [19] - 16:11, 32:11,
38:16, 38:17, 38:19, 38:22,
39:2, 39:15, 40:4, 45:6,
47:13, 48:21, 48:23, 50:9,
50:10, 53:2, 59:16, 123:4
**excellent** [3] - 66:11, 66:12,
166:15
**except** [2] - 57:21, 181:6
**exception** [1] - 114:16
**exceptionally** [1] - 108:2
**excessively** [2] - 75:21,
172:2
**exchanges** [1] - 31:2
**exclusive** [2] - 177:13
**excused** [4] - 138:8, 138:14,
166:18, 166:22
**Exhibit** [73] - 4:7, 4:14, 6:20,
8:25, 9:6, 10:25, 12:4, 13:24,

17:8, 17:18, 18:11, 18:19,
20:16, 20:17, 20:21, 21:4,
25:6, 28:1, 30:8, 30:20, 31:1,
31:4, 36:14, 36:25, 37:13,
38:14, 39:22, 41:10, 44:10,
47:4, 47:5, 47:6, 64:6, 64:16,
64:19, 65:1, 66:18, 66:19,
68:9, 73:18, 83:25, 95:5,
95:6, 96:3, 98:6, 99:15,
102:23, 103:6, 104:17,
127:3, 127:13, 138:3, 140:6,
140:7, 140:14, 140:17,
140:21, 141:4, 141:6, 142:3,
142:20, 145:6, 147:5, 151:3,
151:9, 152:11, 156:7,
156:10, 164:1, 168:13,
168:19, 178:15, 180:25
**exhibit** [18] - 13:24, 18:22,
18:24, 19:4, 64:7, 64:13,
125:2, 125:4, 125:7, 125:9,
125:19, 127:6, 135:14,
168:11, 195:20, 198:6,
202:13
**exhibits** [6] - 5:7, 48:8,
135:17, 140:5, 146:24, 168:6
**Exhibits** [1] - 102:7
**expect** [19] - 77:2, 77:4, 77:7,
77:9, 80:4, 96:12, 96:18,
96:23, 96:25, 102:2, 105:20,
106:4, 115:25, 119:24,
124:16, 176:19, 197:13
**expectations** [1] - 85:18
**expected** [7] - 5:20, 49:8,
50:22, 105:11, 186:4, 197:3,
197:7
**experience** [18] - 11:22,
48:22, 49:5, 55:14, 55:15,
69:23, 69:25, 70:14, 76:1,
76:16, 113:25, 119:1,
163:22, 173:4, 176:17,
181:20, 194:22, 195:15
**experienced** [3] - 24:5,
96:10, 175:21
**experiences** [7] - 76:5, 76:7,
76:8, 134:11, 134:18,
158:22, 181:7
**experiencing** [1] - 76:14
**experimental** [1] - 206:25
**experiments** [1] - 37:12
**expert** [11] - 30:3, 61:6,
61:20, 70:23, 71:15, 146:9,
146:19, 166:24, 174:3,
195:9, 198:2
**expertise** [5] - 65:14, 71:4,
71:6, 71:13, 146:18
**experts** [3] - 60:5, 178:3,
198:10
**explain** [4] - 26:6, 27:8,
51:15, 74:12, 78:11, 84:9,
92:2, 94:16, 95:14, 139:9,

142:5, 186:22, 186:25,
203:21
**explained** [2] - 126:6, 188:1
**explaining** [1] - 101:1
**explanation** [4] - 7:20,
128:16, 187:21, 208:14
**explored** [1] - 159:2
**expressed** [3] - 66:6, 140:25,
141:23
**expression** [1] - 13:2
**extended** [16] - 28:23, 29:9,
29:17, 41:19, 44:1, 44:3,
44:4, 45:23, 119:21, 120:1,
123:2, 123:15, 123:19,
150:9, 157:16, 173:23
**extent** [2] - 18:25, 103:24
**external** [2] - 62:15, 139:5
**extra** [8] - 5:3, 6:12, 6:13,
16:17, 53:25, 54:17, 108:18,
179:25
**extremely** [15] - 51:25,
73:21, 74:1, 90:17, 128:12,
203:11, 204:14, 204:22,
205:6, 205:7, 205:12,
205:19, 205:23, 205:25,
206:11
**eyeglasses** [1] - 114:17

**face** [7] - 86:24, 88:6, 89:13,
90:15, 98:18, 175:13
**faced** [1] - 91:22
**fact** [19] - 20:22, 24:8, 29:24,
35:10, 53:24, 76:12, 116:12,
121:5, 132:21, 136:24,
143:5, 147:19, 158:4,
158:15, 166:7, 190:15,
194:13, 198:7, 210:3
**factor** [4] - 156:19, 187:11,
201:3, 204:2
**factors** [1] - 114:16
**facts** [1] - 29:23
**factual** [1] - 55:4
**failed** [3] - 50:24, 51:1, 210:2
**fair** [1] - 189:3
**fairly** [3] - 153:19, 181:20,
186:5
**fallen** [1] - 154:21
**falling** [2] - 90:20, 205:17
**false** [3] - 191:11, 191:12,
210:1
**familiar** [21] - 70:15, 70:20,
72:14, 79:13, 83:23, 101:12,
103:21, 103:22, 104:19,
104:22, 105:12, 120:6,
130:2, 155:14, 162:17,
170:9, 170:11, 170:15,
170:24, 171:22, 175:21
**familiarity** [1] - 103:24, 114:7
**family** [4] - 4:5, 45:21, 53:18,
101:2
**famous** [1] - 121:18

**far** [11] - 7:23, 39:17, 86:19,
87:18, 98:16, 111:16,
130:14, 176:24, 192:2,
196:22, 197:13
**fast** [3] - 57:16, 187:4, 192:1
**favor** [2] - 153:25, 154:7
**feature** [1] - 76:12
**features** [1] - 74:13
**February** [3] - 6:21, 8:10,
12:3
**feed** [1] - 173:7
**feedback** [1] - 50:19
**feigned** [3] - 93:10, 93:17,
93:21, 94:24
**feigning** [1] - 94:14
**fell** [3] - 204:22, 205:5, 205:6
**females** [1] - 45:15
**few** [7] - 28:8, 38:15, 40:6,
48:20, 67:3, 145:10, 194:25
**fiancé** [4] - 9:4, 9:8, 10:15,
202:21
**field** [6] - 144:23, 145:13,
145:15, 145:24, 146:6,
197:23
**Fielding** [3] - 169:3, 169:5,
169:6
**fields** [3] - 68:19, 118:9,
146:19
**fifth** [2] - 81:17, 158:5
**figure** [3] - 52:14, 181:21
**figures** [3] - 121:11, 121:16,
200:2
**file** [14] - 62:24, 63:19, 72:23,
72:25, 73:5, 73:8, 73:12,
73:17, 83:10, 84:4, 137:4,
137:14, 149:5
**filed** [1] - 64:25
**filing** [2] - 85:7, 88:3
**fill** [3] - 174:15, 202:23,
202:24
**filled** [1] - 10:3
**filling** [1] - 209:10
**final** [7] - 17:11, 18:16,
20:22, 23:19, 27:22, 31:8,
50:8
**finally** [3] - 46:11, 75:7,
140:21
**findings** [6] - 184:16, 203:10,
203:21, 206:3, 208:24
**fine** [6] - 60:25, 61:8, 75:4,
100:7, 131:15, 193:4
**finish** [5] - 3:19, 3:20, 3:21,
191:23, 193:21
**first** [69] - 6:9, 7:8, 8:13,
9:10, 9:17, 11:14, 13:11,
22:2, 22:12, 22:18, 23:5,
26:8, 26:11, 30:14, 32:2,
37:6, 40:4, 40:5, 40:6, 40:19,
40:20, 41:15, 46:20, 47:21,
48:24, 48:25, 49:4, 50:3,

50:4, 64:8, 72:24, 80:19,
82:2, 84:6, 86:15, 90:8, 91:4,
99:15, 99:16, 100:15,
100:20, 100:23, 109:3,
115:10, 115:12, 115:20,
119:22, 120:11, 126:11,
130:5, 139:17, 140:18,
148:23, 156:25, 159:12,
159:20, 163:19, 164:1,
174:18, 175:12, 179:8,
184:17, 186:13, 190:13,
191:5, 204:7, 204:20, 206:4
**five** [4] - 46:24, 67:6, 75:10,
96:20
**flexibly** [1] - 119:18
**flip** [1] - 35:13
**flu** [2] - 92:4, 210:8
**fluency** [39] - 87:19, 88:9,
88:12, 88:22, 88:23, 89:22,
90:10, 103:9, 106:17,
130:20, 131:1, 131:16,
131:18, 131:19, 132:4,
132:5, 132:12, 171:18,
184:23, 184:24, 185:1,
185:11, 185:23, 186:1,
186:19, 188:2, 189:1, 189:2,
189:23, 191:6, 191:7, 191:8,
191:17, 192:11, 208:6,
210:22
**focus** [5] - 55:13, 72:23,
76:7, 144:9, 195:5
**focusing** [9] - 68:8, 68:13,
69:9, 74:10, 83:8, 84:7, 95:1,
172:2, 193:10
**folks** [4] - 77:20, 81:25,
82:23, 88:11
**follow** [2] - 23:25, 51:7
**follow-up** [1] - 23:25
**followed** [1] - 130:16
**following** [3] - 52:23, 107:23,
140:2
**follows** [8] - 12:12, 14:8,
15:3, 17:14, 62:8, 138:23,
167:23, 170:1
**font** [1] - 17:14
**foot** [1] - 52:3
**forecasting** [1] - 42:19
**foregoing** [1] - 211:13
**forever** [1] - 58:4
**forget** [1] - 121:13
**forgetting** [1] - 96:17
**forgotten** [2] - 25:2, 25:4
**form** [2] - 103:25, 125:2
**formal** [4] - 173:25, 181:9,
181:11, 181:12
**format** [5] - 49:11, 70:20,
107:12, 118:16, 130:15
**formats** [1] - 104:23
**former** [2] - 122:4, 122:5
**forms** [2] - 86:6, 86:8

**formulas** [2] - 55:3, 81:23
**forth** [2] - 72:10, 126:23
**forward** [7] - 16:12, 167:19,
174:19, 175:7, 176:7, 178:12
**forwarded** [2] - 25:8, 27:11
**forwarding** [5] - 6:23, 18:20,
19:18, 26:8, 30:21
**foundation** [1] - 103:20,
195:7
**four** [8] - 31:22, 36:19, 105:1,
183:25, 190:19, 190:22,
191:17
**four-word** [3] - 190:19,
190:22
**four-year** [1] - 31:22
**fourth** [5] - 75:2, 126:12,
126:13, 126:18, 128:23
**frequency** [4] - 76:4, 76:9,
76:10, 209:21
**frequent** [2] - 74:17, 172:15
**frequently** [13] - 152:1,
152:15, 171:13, 181:20,
196:11, 198:5, 199:5,
199:25, 200:20, 201:18,
202:3, 202:6, 207:2
**Friday** [6] - 51:23, 51:25,
60:6, 60:7, 60:24
**friend** [1] - 57:9
**friends** [3] - 53:18, 57:8,
57:14
**front** [4] - 168:7, 168:11,
178:15, 206:10
**full** [8] - 32:19, 100:20,
100:23, 135:6, 169:25,
175:8, 203:14
**Full** [2] - 204:10, 205:10,
205:16
**fun** [1] - 58:5
**function** [4] - 96:24, 165:11,
165:14, 171:13
**functional** [2] - 6:10, 77:18
**functioning** [13] - 99:4,
101:24, 152:5, 152:19,
165:2, 172:13, 172:21,
182:19, 183:8, 183:14,
183:23, 183:24, 183:25
**future** [1] - 16:11
**game** [1] - 117:13
**Game** [2] - 57:10, 57:12
**gap** [1] - 81:3
**gather** [1] - 209:21
**gathered** [1] - 180:11
**gears** [1] - 107:17
**General** [3] - 200:13, 200:25,
201:10
**general** [28] - 32:5, 50:5,
70:21, 78:11, 85:23, 87:12,
90:23, 96:18, 102:14,
102:16, 105:25, 106:5,
115:24, 116:8, 123:14,

126:24, 154:2, 161:16,
182:19, 183:8, 183:23,
183:24, 199:6, 200:4, 207:6,
207:7, 209:2, 209:25
**generalization** [1] - 200:3
**generally** [42] - 22:20, 37:9,
50:7, 72:19, 84:15, 85:12,
86:8, 93:10, 101:13, 101:14,
103:21, 104:11, 104:20,
110:18, 111:16, 115:8,
116:6, 119:17, 120:7,
124:15, 127:22, 151:14,
156:15, 174:22, 176:19,
179:21, 180:9, 181:5, 182:5,
182:18, 183:17, 184:1,
187:20, 187:22, 188:1,
192:18, 194:12, 199:7,
199:8, 202:20, 206:3
**generates** [2] - 84:23, 98:12
**Genetic** [1] - 37:2
**genuine** [3] - 93:17, 94:24,
207:4
**gifted** [3] - 79:14, 79:16,
79:25, 80:3, 80:5, 80:9,
158:5, 158:7, 158:10,
158:15, 200:15, 200:16,
202:5
**Gifted** [1] - 147:12
**giftedness** [3] - 79:17, 79:19,
79:21
**given** [13] - 69:6, 69:7, 70:18,
70:20, 78:22, 83:15, 93:16,
97:10, 109:3, 118:16, 120:2,
162:6, 197:3
**global** [1] - 204:19
**goal** [1] - 92:13
**GORT** [13] - 89:17, 90:7,
90:22, 112:11, 112:12,
112:20, 123:25, 132:8,
163:9, 189:13, 189:14,
189:19, 190:12
**GORT-5** [5] - 131:20, 162:3,
192:5, 192:8, 194:5
**governor** [1] - 122:5
**grade** [15] - 16:17, 44:22,
51:8, 51:10, 51:11, 102:16,
147:20, 158:5, 165:24,
166:1, 195:3, 196:21, 197:9,
197:10
**grades** [10] - 53:15, 77:5,
78:21, 78:24, 83:19, 91:21,
134:8, 165:23, 166:2, 194:25
**grading** [2] - 32:10, 32:20
**graduate** [3] - 67:20, 118:6,
144:22
**graduated** [1] - 106:4
**graduating** [2] - 85:14, 85:21
**graduation** [1] - 32:17
**grain** [1] - 193:12
**grammar** [1] - 17:6

**GRAN** [1] - 1:15
**grant** [1] - 195:9
**granted** [3] - 21:14, 116:14,
116:17
**granting** [2] - 28:22, 108:24
**graph** [1] - 47:12
**gray** [1] - 47:23
**Gray** [4] - 89:16, 112:10,
187:23, 190:8
**great** [4] - 4:9, 51:6, 124:11
**grossly** [1] - 96:23
**grounds** [1] - 27:8
**group** [18] - 78:22, 85:15,
91:20, 104:22, 106:10,
106:14, 107:5, 115:22,
115:23, 145:12, 145:16,
145:21, 145:22, 146:2,
146:3, 196:13, 196:24, 202:2
**group-administered** [1] -
196:13
**grouping** [2] - 78:3, 78:25
**groups** [7] - 45:15, 68:23,
68:24, 69:3, 143:20, 143:22,
143:23
**guard** [1] - 31:20
**guess** [6] - 25:24, 55:22,
60:1, 134:1, 153:8, 209:3
**guessing** [2] - 55:23, 59:17,
59:19
**guide** [1] - 174:16
**guidelines** [2] - 5:18, 17:13
**guiding** [1] - 32:8
**Haddonfield** [1] - 1:17
**half** [6] - 18:8, 23:8, 61:23,
135:5, 135:7, 181:21
**halting** [1] - 190:20
**hand** [3] - 7:2, 11:14, 142:21
**handful** [1] - 73:11
**handled** [1] - 182:21
**handwriting** [2] - 9:12, 9:15
**hard** [5] - 5:17, 12:9, 58:2,
116:21, 127:25
**harder** [3] - 50:15, 76:6,
119:19
**hate** [1] - 206:13
**hated** [1] - 35:11
**head** [5] - 32:14, 33:5, 51:21,
172:4, 184:9
**headaches** [1] - 74:7
**heading** [1] - 206:18
**health** [4] - 56:14, 56:15,
56:17
**health-related** [1] - 56:14
**hear** [3] - 3:11, 74:1, 74:2
**heard** [17] - 87:9, 100:16,
101:3, 108:3, 109:9, 121:18,
121:22, 121:24, 122:3,
122:6, 127:25, 133:15,
134:7, 153:8, 157:14,
160:20, 170:5

**hearing** [1] - 60:10, 60:13, 65:3, 66:3, 101:3, 101:5, 109:8, 141:5, 141:20, 150:13, 185:16
**HEARING** [1] - 1:6
**heart** [2] - 52:6, 52:7
**heavy** [2] - 105:7, 105:11
**held** [1] - 142:14
**help** [26] - 5:15, 7:9, 7:17, 14:13, 14:14, 15:16, 16:12, 33:11, 53:17, 53:25, 54:1, 101:2, 101:11, 118:12, 133:16, 133:17, 135:15, 151:6, 164:19, 165:10, 165:13, 165:16, 165:20, 165:21, 195:21, 199:14
**helped** [5] - 14:18, 14:25, 17:7, 25:5, 133:23
**helpful** [3] - 22:21, 101:23, 130:25
**helps** [4] - 85:5, 87:16, 174:16, 175:2
**herself** [1] - 182:21
**hesitant** [1] - 122:21
**hesitation** [1] - 190:23
**hesitations** [1] - 190:20
**heterogenous** [1] - 122:13
**high** [6] - 16:19, 31:24, 74:19, 75:8, 79:18, 85:21, 87:2, 99:21, 100:25, 165:20, 181:15, 188:11, 193:21, 193:24, 210:1
**higher** [3] - 42:2, 79:11, 202:4
**highlighted** [2] - 27:14, 36:1
**highlighting** [2] - 15:4, 15:5
**highlights** [1] - 22:13
**highly** [2] - 107:5, 158:24
**hip** [1] - 52:4
**historical** [1] - 121:11
**historically** [1] - 184:12
**history** [18] - 34:15, 34:17, 100:6, 108:3, 137:2, 137:4, 137:5, 168:23, 169:8, 180:7, 180:13, 180:24, 181:3, 181:23, 183:19, 209:13, 209:20, 210:8
**hit** [1] - 35:2
**hold** [1] - 98:4
**home** [2] - 24:9, 24:12
**honestly** [1] - 109:8
**Honor** [57] - 3:4, 3:8, 3:16, 3:22, 4:2, 6:16, 17:24, 17:25, 18:22, 19:2, 19:11, 19:24, 20:5, 20:24, 22:9, 27:24, 30:1, 48:5, 58:16, 60:1, 60:11, 60:17, 60:25, 62:2, 64:24, 70:22, 71:3, 71:17, 103:19, 109:14, 117:7, 125:7, 137:19, 137:22,

138:1, 138:6, 138:9, 138:15, 138:17, 141:3, 146:8, 146:20, 146:25, 166:5, 166:11, 166:16, 166:19, 167:2, 167:5, 167:17, 168:8, 174:2, 174:8, 188:19, 195:7, 211:3, 211:7
**HONORABLE** [1] - 1:12
**hope** [2] - 3:23, 111:18
**hospital** [2] - 49:9, 49:12
**host** [1] - 210:7
**hour** [8] - 23:6, 23:8, 61:23, 61:24, 135:2, 135:3, 180:20
**hour-and-a-half** [1] - 61:23
**hours** [4] - 23:7, 32:20, 32:21, 69:25
**Houtman** [6] - 24:18, 24:22, 25:14, 26:11, 26:13, 27:2
**huge** [1] - 49:6
**hurt** [1] - 51:23
**hyperactivity** [3] - 75:20, 172:5, 172:6
**ICD** [3] - 155:14, 155:17, 170:18
**ICD-10** [5] - 155:19, 170:20, 177:16, 197:21, 197:22
**idea** [3] - 37:10, 53:19, 54:5, 82:11, 188:24
**identical** [2] - 43:15, 149:14
**identified** [3] - 12:23, 21:23, 156:8
**identify** [6] - 13:14, 22:2, 135:20, 171:8, 171:10, 178:23
**III** [3] - 110:19, 110:23, 111:6
**illegible** [1] - 73:13
**Illinois** [2] - 148:1, 155:3
**immediately** [1] - 36:9
**impaired** [15] - 80:13, 80:15, 82:6, 96:23, 185:8, 204:14, 204:22, 205:6, 205:12, 205:17, 205:20, 205:23, 205:25, 210:6, 210:10
**impairment** [11] - 13:1, 71:25, 75:6, 76:12, 76:22, 76:24, 77:19, 96:19, 100:3, 171:16
**impairments** [3] - 25:15, 72:15, 74:5
**impatience** [1] - 172:10
**impending** [1] - 158:23
**importance** [1] - 198:21
**important** [9] - 98:15, 99:19, 133:5, 133:6, 137:7, 137:12, 200:20, 201:18
**impossible** [4] - 38:3, 38:7, 122:15, 137:3
**impressed** [1] - 28:6
**impression** [2] - 22:25, 195:1

**impulsive** [3] - 74:16, 75:22, 172:7
**impulsively** [1] - 76:8
**impulsiveness** [1] - 75:21
**impulsivity** [1] - 172:6
**in-office** [1] - 98:25
**in-person** [2] - 72:18, 180:16
**inadequate** [1] - 177:2
**inappropriate** [3] - 111:15, 113:13, 114:3
**inappropriately** [1] - 18:25
**inattention** [2] - 75:18, 77:12
**incentive** [1] - 92:16
**incline** [1] - 167:21
**include** [10] - 6:13, 7:17, 7:20, 7:22, 35:6, 78:20, 99:18, 101:17, 113:13, 201:25
**included** [9] - 5:23, 13:3, 23:19, 24:20, 30:18, 32:20, 40:23, 49:24, 55:19
**includes** [4] - 18:22, 59:11, 88:9, 178:20
**including** [4] - 16:17, 41:22, 68:11, 183:8
**inconsistencies** [1] - 91:23
**incurred** [1] - 22:20
**indented** [1] - 22:12
**independent** [2] - 53:4, 56:1
**Index** [3] - 200:13, 200:25, 201:10
**index** [7] - 200:18, 201:1, 201:12, 201:13, 201:13, 202:9
**indicate** [12] - 32:21, 41:5, 47:23, 86:16, 88:7, 101:9, 114:14, 119:9, 126:6, 158:16, 159:1
**indicated** [7] - 9:24, 10:6, 10:7, 12:16, 58:25, 63:12, 162:23
**indicates** [6] - 10:20, 10:21, 10:22, 10:23, 126:21, 158:21
**indicating** [1] - 11:7
**indication** [3] - 101:6, 164:24, 194:17
**indicator** [1] - 81:7
**individual** [16] - 4:17, 10:10, 25:25, 33:25, 71:22, 71:24, 79:1, 89:24, 90:2, 92:12, 96:15, 119:11, 120:14, 148:20, 173:16, 175:7
**Individual** [2] - 87:4, 185:19
**individually** [1] - 196:14
**individuals** [18] - 70:24, 72:4, 75:24, 75:25, 76:18, 79:11, 79:13, 82:5, 102:9, 102:13, 103:3, 103:5, 106:4, 144:7, 146:10, 158:2, 164:21, 174:3
**individuals'** [1] - 72:15

**inference** [1] - 210:9
**influenced** [2] - 189:5, 189:8
**Influences** [1] - 37:3
**informal** [12] - 16:15, 16:16, 16:21, 53:16, 53:19, 53:23, 68:7, 101:7, 133:16, 133:17, 165:10, 165:13
**information** [64] - 5:3, 12:11, 22:24, 23:23, 25:21, 28:12, 30:17, 34:12, 36:5, 49:15, 49:16, 56:19, 56:20, 56:23, 56:24, 66:8, 72:9, 83:9, 84:7, 105:22, 111:12, 112:22, 118:17, 123:24, 124:8, 130:6, 131:1, 131:11, 133:7, 133:11, 133:13, 134:1, 134:14, 134:17, 137:7, 137:10, 137:13, 137:17, 141:24, 148:2, 161:25, 163:2, 174:17, 175:3, 176:3, 178:20, 179:9, 179:14, 180:8, 180:11, 180:25, 184:9, 185:14, 185:17, 185:22, 188:14, 189:2, 192:3, 194:5, 194:10, 196:6, 209:10, 209:20
**infrequently** [1] - 202:7
**inherently** [1] - 153:24
**initial** [10] - 14:10, 15:20, 26:16, 28:11, 28:12, 28:14, 63:16, 109:2, 175:6, 182:23
**initials** [1] - 15:11
**INJUNCTION** [1] - 1:6
**injunction** [3] - 19:9, 19:10, 64:25
**injury** [1] - 93:14
**inserted** [1] - 16:14
**instance** [12] - 67:23, 69:7, 75:1, 77:1, 77:11, 78:10, 92:3, 96:17, 123:10, 191:12, 201:24, 209:24
**instances** [3] - 16:19, 74:15, 150:3
**instead** [3] - 53:7, 105:13, 135:5
**Institute** [2] - 169:5, 169:12
**institution** [1] - 69:25
**instruction** [2] - 77:9, 174:1
**instructions** [2] - 31:22, 191:21
**instructor's** [1] - 32:14
**instrument** [1] - 161:1
**instruments** [4] - 132:21, 136:20, 151:19, 183:5
**insufficient** [1] - 65:18
**Integrated** [3] - 97:8, 203:8, 203:15
**intellectual** [2] - 183:14, 198:15
**intelligence** [8] - 165:20,

184:2, 196:13, 197:8, 200:13, 201:5, 201:7, 201:15
**intelligently** [1] - 31:20
**intended** [1] - 52:20
**intensive** [2] - 105:7, 119:25
**interact** [1] - 146:6
**interacted** [1] - 183:10
**interactive** [1] - 198:13
**interest** [3] - 22:14, 145:13, 149:24
**interests** [5] - 34:24, 35:5, 35:8, 35:25, 36:11
**interfere** [2] - 75:2, 171:12
**interference** [1] - 172:21
**interferes** [1] - 171:4
**internal** [3] - 46:20, 49:25, 50:1
**international** [1] - 155:22
**International** [3] - 145:18, 155:15, 170:16
**internet** [1] - 22:3
**interpret** [1] - 137:3
**interpretable** [1] - 98:15
**interpretation** [1] - 89:14
**interpreted** [5] - 84:15, 100:18, 111:14, 112:8, 112:23
**interpreting** [1] - 137:13
**interrupt** [1] - 52:24
**interrupting** [1] - 172:9
**intervention** [9] - 70:2, 118:23, 119:3, 120:19, 120:23, 121:4, 122:14, 122:17, 122:23
**interventions** [2] - 119:7, 164:22
**interview** [21] - 23:6, 172:12, 174:14, 174:16, 174:21, 174:25, 175:6, 179:11, 179:24, 180:1, 180:2, 180:7, 180:10, 180:12, 180:16, 180:18, 180:24, 183:3, 183:9
**interviewing** [1] - 136:21
**interviews** [2] - 180:20, 209:10
**invite** [1] - 57:11
**invited** [5] - 68:22, 68:25, 69:6, 69:7, 143:19
**involve** [5] - 16:20, 75:6, 78:1, 101:24, 105:4
**involved** [6] - 38:25, 39:13, 39:18, 80:25, 94:5, 145:3
**involves** [3] - 68:5, 72:3, 130:9
**involving** [1] - 100:14
**Iowa** [2] - 195:24, 196:11
**IQ** [21] - 79:18, 79:22, 80:21, 81:1, 81:3, 81:21, 82:11, 82:13, 147:15, 148:18, 184:1, 196:13, 198:21,

200:11, 201:10, 201:14, 201:24, 202:4, 202:6
**issue** [4] - 7:19, 114:12, 117:5, 199:3
**issues** [5] - 68:20, 86:25, 115:18, 146:7, 167:8
**item** [1] - 128:21
**items** [4] - 84:8, 104:20, 104:23, 128:13
**itself** [6] - 37:11, 79:10, 80:4, 126:11, 151:4, 158:17
**IV** [7] - 88:14, 111:20, 111:22, 124:1, 162:7, 191:3, 194:6
**IVA** [7] - 98:12, 112:25, 203:8, 203:18, 209:13, 209:24
**IVA+Plus** [4] - 112:25, 162:16, 203:18, 203:19
**IVC** [1] - 52:5
**James** [1] - 1:8
**January** [4] - 4:25, 140:17, 156:11, 164:2
**Jerri** [1] - 9:11
**Jersey** [1] - 1:17
**Jessica** [14] - 4:6, 4:13, 6:19, 15:21, 15:23, 16:21, 17:19, 30:11, 63:14, 139:13, 194:15, 197:6, 202:25, 207:25
**JESSICA** [2] - 1:3, 212:5
**Jessica's** [4] - 192:19, 196:7, 198:24, 202:19
**jest** [1] - 60:8
**jittery** [1] - 76:8
**job** [7] - 31:20, 32:16, 32:22, 32:23, 50:7, 67:16, 133:21
**Johnson** [11] - 88:14, 111:20, 111:22, 123:25, 131:23, 132:1, 162:7, 163:9, 191:3, 192:8, 194:6
**joke** [1] - 51:20
**journal** [3] - 68:13, 68:20, 147:8
**journals** [5] - 68:3, 68:11, 68:18, 68:19, 68:20
**JOYNER** [1] - 1:12
**JR** [1] - 15:7
**Judge** [1] - 20:18
**judge's** [1] - 133:21
**judgment** [2] - 207:12, 209:23
**July** [2] - 140:21, 164:12
**June** [13] - 21:6, 21:11, 21:12, 26:18, 27:4, 28:15, 28:17, 28:18, 40:15, 43:12, 52:23, 139:20, 149:13
**junior** [1] - 106:3
**jury** [1] - 19:7
**keep** [4] - 52:17, 116:18,

138:12, 206:11
**kept** [1] - 51:21
**keys** [1] - 97:11
**kids** [3] - 150:25, 197:13, 199:25
**kind** [29] - 34:25, 49:1, 49:2, 49:3, 51:20, 56:6, 78:13, 114:5, 136:21, 163:16, 165:20, 172:10, 175:20, 176:10, 176:20, 177:12, 181:23, 182:22, 182:23, 183:10, 184:11, 194:23, 199:25, 202:1, 202:3, 204:3, 204:4, 206:8, 209:25
**kindergarten** [1] - 53:14
**kinds** [2] - 174:1, 194:4
**knock** [2] - 199:15, 204:15
**knowing** [1] - 137:4
**knowledge** [9] - 37:22, 38:2, 46:14, 55:4, 105:8, 118:21, 118:25, 129:25, 163:12
**known** [6] - 98:11, 121:5, 121:15, 155:14, 170:24, 171:22
**knows** [1] - 170:4
**Kurzweil** [7] - 15:16, 49:11, 120:5, 120:9, 120:13, 120:16
**lab** [5] - 32:3, 32:8, 32:10, 33:2, 33:3
**labeled** [1] - 56:1
**labeling** [1] - 177:10
**labs** [1] - 33:10
**lack** [2] - 103:20, 195:7
**language** [5] - 7:17, 7:19, 87:14, 144:14, 177:18
**largely** [2] - 145:12, 154:21
**Larry** [1] - 35:20
**larry@rcglawoffices.com** [1] - 1:18
**last** [17] - 3:9, 6:6, 6:7, 7:8, 8:3, 10:14, 11:24, 33:24, 53:11, 116:11, 117:13, 132:8, 141:20, 151:23, 152:14, 157:14, 176:21
**lasted** [1] - 180:19
**latest** [1] - 81:11
**Law** [2] - 117:1, 117:2
**law** [1] - 67:22
**LAWRENCE** [1] - 1:16
**Lawrence** [1] - 30:21
**lawsuit** [1] - 20:10
**lawyer** [2] - 22:6, 24:22
**lawyer's** [1] - 27:21
**lawyers** [2] - 14:18, 14:21
**lead** [6] - 37:5, 37:7, 37:14, 165:4, 165:24, 165:25
**leaders** [1] - 121:6
**leading** [4] - 82:17, 122:2, 180:14, 198:3
**learn** [6] - 50:7, 54:11, 76:17,

145:2, 146:5, 174:25
**learned** [2] - 29:2, 55:5
**Learning** [2] - 145:11, 147:11
**learning** [100] - 12:25, 13:14, 13:16, 15:24, 22:22, 49:6, 65:15, 65:19, 65:21, 66:11, 67:11, 68:14, 68:16, 69:16, 70:24, 72:5, 74:6, 74:10, 75:12, 77:13, 77:16, 77:25, 78:1, 78:12, 78:15, 79:4, 79:14, 79:25, 80:7, 80:11, 80:12, 80:19, 80:20, 80:24, 81:4, 81:20, 82:2, 82:9, 82:25, 83:2, 83:12, 98:23, 99:2, 99:5, 101:19, 101:21, 101:23, 102:1, 103:14, 103:16, 105:17, 105:19, 105:20, 105:23, 106:23, 106:25, 108:6, 108:16, 112:8, 119:5, 119:9, 119:17, 119:20, 119:23, 120:14, 120:24, 122:22, 122:24, 123:11, 133:1, 142:17, 143:1, 143:6, 143:14, 144:8, 144:14, 144:15, 144:23, 145:3, 145:13, 146:10, 147:21, 147:22, 148:6, 148:12, 151:18, 152:2, 152:16, 155:21, 164:25, 177:6, 177:7, 177:10, 177:19, 177:21, 198:5, 198:7, 198:14, 200:16, 207:20
**least** [22] - 5:2, 7:10, 18:16, 44:22, 49:25, 60:6, 69:22, 81:11, 88:21, 97:6, 99:11, 99:12, 100:12, 107:13, 108:16, 116:9, 119:8, 119:17, 119:21, 123:12, 128:18, 164:4
**leave** [1] - 49:9
**lectures** [1] - 51:18
**left** [4] - 11:14, 21:24, 32:21, 183:7
**left-hand** [1] - 11:14
**leg** [8] - 51:18, 51:23, 51:24, 51:25, 52:1, 52:5, 52:5, 167:8
**legal** [2] - 107:9, 114:5
**leisure** [1] - 58:5
**lengths** [1] - 124:11
**lengthy** [2] - 157:1, 157:7
**less** [7] - 49:18, 57:17, 126:20, 128:23, 199:8, 202:6, 209:23
**letter** [55] - 4:22, 4:25, 9:3, 14:11, 15:12, 15:15, 17:11, 18:5, 18:8, 18:9, 18:17, 18:21, 19:2, 19:19, 19:22, 20:22, 21:18, 23:18, 23:19,

23:25, 24:1, 24:6, 24:18, 24:20, 24:23, 25:1, 25:25, 26:22, 27:7, 27:9, 27:16, 27:22, 28:11, 28:14, 28:21, 28:24, 28:25, 29:12, 29:21, 33:21, 64:19, 140:18, 140:22, 149:6, 149:8, 149:17, 160:1, 160:11, 164:5, 164:7, 164:9, 164:11, 164:15

**letterhead** [1] - 26:12
**letters** [1] - 72:7
**level** [25] - 74:17, 75:25, 76:21, 76:23, 80:12, 80:22, 86:9, 89:12, 93:2, 96:7, 96:13, 97:3, 102:16, 103:8, 106:16, 106:19, 122:13, 147:20, 165:1, 165:14, 165:20, 166:3, 186:4, 200:21, 202:10
**levels** [5] - 72:15, 74:19, 75:8, 79:11, 91:11
**Lewandowski** [8] - 13:3, 13:17, 22:19, 23:2, 29:14, 33:14, 33:21, 34:24
**Lewandowski's** [1] - 176:22
**liberal** [1] - 67:8
**license** [1] - 195:10
**licensed** [10] - 23:15, 69:19, 69:21, 144:2, 155:4, 155:6, 155:8, 169:13, 169:15, 169:17
**licensure** [2] - 69:23, 70:3
**lied** [1] - 28:6
**life** [11] - 63:9, 74:22, 92:7, 96:19, 97:1, 104:9, 107:8, 108:14, 122:4, 148:21, 150:17
**lifeguarding** [1] - 31:19
**light** [1] - 141:24
**lighter** [1] - 49:17
**like-aged** [1] - 188:17
**likely** [6] - 11:21, 136:3, 137:10, 174:18, 175:4, 176:1
**likewise** [2] - 10:6, 41:21
**limit** [6] - 163:17, 186:6, 186:7, 186:14, 193:22, 211:1
**limitation** [1] - 150:7
**limitations** [2] - 6:10, 107:12
**limited** [8] - 63:8, 104:8, 104:11, 107:7, 108:14, 148:20, 150:17, 209:4
**line** [13] - 12:7, 35:14, 35:20, 35:24, 36:8, 36:9, 55:11, 56:23, 94:1, 156:25, 172:10, 190:4, 190:6
**lines** [2] - 16:11, 177:18
**list** [9] - 9:20, 25:17, 35:25, 36:16, 123:12, 143:19, 145:8, 159:25, 178:19

**listed** [6] - 37:6, 45:17, 75:17, 95:18, 97:22, 99:12
**listing** [6] - 68:10, 69:10, 99:13, 142:23, 159:12, 179:11
**lists** [2] - 35:5, 84:6
**literature** [2] - 59:7, 91:8
**litigation** [6] - 64:3, 64:14, 93:13, 107:19, 140:12, 141:21
**LLP** [3] - 1:15, 2:2, 2:9
**log** [1] - 73:2
**logged** [1] - 73:5
**logic** [1] - 51:7
**logistics** [1] - 72:24
**lonely** [1] - 4:5
**look** [67] - 5:6, 7:25, 8:25, 10:25, 25:6, 26:4, 26:10, 27:10, 28:1, 28:20, 31:15, 33:13, 33:16, 33:17, 36:24, 38:14, 39:22, 40:10, 41:10, 42:12, 43:10, 44:10, 45:3, 45:12, 45:19, 47:4, 68:9, 69:9, 73:4, 78:16, 83:14, 83:18, 88:19, 93:1, 93:9, 93:10, 93:21, 95:5, 96:3, 97:13, 99:2, 100:7, 100:20, 126:8, 129:24, 131:24, 135:13, 135:16, 140:4, 151:3, 152:11, 156:4, 156:6, 159:11, 168:13, 175:22, 179:23, 182:25, 184:17, 190:5, 192:20, 193:3, 195:15, 199:5, 206:15, 209:14
**looked** [7] - 25:17, 29:15, 43:6, 43:8, 54:11, 176:10, 196:5
**looking** [34] - 35:24, 46:11, 50:16, 60:23, 72:9, 78:13, 80:21, 82:24, 83:9, 84:6, 87:21, 100:21, 102:23, 103:6, 124:8, 127:6, 127:13, 131:14, 133:3, 133:24, 137:5, 143:4, 147:5, 160:4, 162:23, 164:11, 164:19, 172:14, 175:20, 182:6, 196:16, 200:6, 201:20
**looks** [43] - 7:1, 9:21, 9:24, 10:6, 10:19, 11:6, 15:17, 17:5, 19:21, 20:21, 21:21, 22:12, 24:4, 26:18, 26:20, 26:22, 31:19, 31:23, 32:1, 32:13, 32:17, 32:23, 36:19, 37:16, 40:14, 41:4, 41:8, 41:14, 43:9, 43:10, 43:16, 43:17, 44:16, 45:20, 46:1, 48:1, 84:19, 84:21, 96:3, 143:6, 143:9, 143:19
**loud** [1] - 192:6

**Lovett** [34] - 62:3, 62:10, 62:13, 64:6, 65:8, 69:19, 70:22, 71:5, 71:20, 97:24, 98:23, 101:12, 103:21, 108:22, 109:12, 110:9, 125:8, 137:24, 139:10, 139:24, 146:16, 148:10, 148:25, 153:8, 158:12, 161:12, 161:13, 161:24, 162:12, 162:15, 163:8, 193:11, 197:15
**LOVETT** [3] - 62:7, 212:7, 212:9
**Lovett's** [2] - 152:12, 152:15
**low** [14] - 78:11, 82:4, 85:12, 85:24, 89:5, 90:12, 97:23, 108:2, 131:4, 183:18, 192:10, 192:12, 203:11, 203:25
**lower** [3] - 42:2, 142:21, 200:22
**LSAT** [1] - 117:3
**Lucas** [3] - 147:15, 147:19, 148:4
**lunch** [4] - 109:19, 109:21, 117:9, 117:13
**Luncheon** [1] - 117:18
**ma'am** [3] - 4:1, 59:23, 167:15
**main** [3] - 12:19, 87:17, 153:24
**major** [7] - 10:9, 63:8, 104:8, 107:8, 108:14, 148:21, 150:17
**majority** [2] - 74:1, 136:4
**Malingering** [7] - 93:20, 93:25, 94:10, 94:13, 94:23, 206:21, 207:14
**malingering** [1] - 94:8
**manage** [1] - 49:3
**managed** [1] - 33:6
**management** [1] - 45:14
**managing** [1] - 195:3
**manner** [6] - 26:7, 148:25, 149:14, 154:12, 154:17, 190:16
**manual** [8] - 79:20, 81:8, 84:25, 86:1, 86:3, 86:11, 155:14, 155:19
**Manual** [2] - 81:16, 170:7
**March** [6] - 11:3, 11:6, 11:17, 12:5, 102:18, 102:24
**margins** [1] - 7:2
**Marie** [2] - 1:22, 211:17
**mark** [1] - 191:20
**marked** [6] - 125:2, 125:9, 126:3, 126:4, 126:5
**Market** [1] - 1:9
**market** [1] - 206:9
**marking** [1] - 191:11

**MARY** [1] - 2:3
**mary.vargas@steinvargas. com** [1] - 2:6
**master** [2] - 168:25, 188:21
**master's** [2] - 66:22, 142:8
**masters** [1] - 144:23
**match** [1] - 108:2
**material** [7] - 19:1, 49:19, 49:20, 50:6, 54:15, 65:24
**materials** [3] - 65:11, 108:13, 150:6
**math** [12] - 55:3, 78:2, 79:2, 79:3, 79:9, 87:13, 101:17, 158:9, 158:11, 158:15, 177:11, 197:5
**matter** [14] - 4:5, 38:19, 39:1, 44:10, 45:1, 45:6, 45:20, 114:18, 154:20, 166:7, 173:8, 195:4, 209:25, 211:14
**maximum** [2] - 10:11, 186:14
**MCAT** [53] - 55:15, 55:16, 56:5, 56:12, 56:13, 57:2, 58:20, 59:10, 91:19, 99:18, 100:12, 104:18, 104:25, 105:16, 105:24, 106:1, 106:5, 106:9, 106:16, 106:19, 106:22, 107:6, 107:13, 118:19, 124:17, 124:23, 125:3, 127:7, 127:14, 127:21, 127:23, 128:5, 128:13, 128:18, 129:4, 129:6, 129:7, 129:8, 129:9, 129:14, 129:16, 130:1, 133:3, 137:16, 156:1, 156:3, 160:23, 161:1, 161:4, 163:14, 194:2, 194:7
**mean** [29] - 33:7, 69:21, 79:10, 79:16, 91:4, 91:5, 94:13, 115:16, 123:9, 124:5, 124:13, 126:24, 137:10, 137:11, 165:13, 181:20, 188:10, 193:3, 194:22, 194:25, 196:20, 201:18, 209:1, 209:12, 210:1, 210:5, 210:24, 210:25
**meaning** [2] - 171:8, 187:24
**meaningful** [3] - 198:9, 198:16, 199:6
**means** [6] - 94:14, 165:12, 188:11, 188:12, 199:3, 210:5
**measure** [17] - 82:11, 84:18, 87:11, 89:20, 89:23, 93:24, 115:2, 132:12, 162:13, 162:14, 171:18, 196:13, 197:9, 199:25, 200:12, 200:14, 201:10
**measured** [4] - 29:11, 86:13, 104:15, 208:5
**measurements** [3] - 29:13, 185:11, 196:23

**measures** [17] - 84:19, 87:12, 89:21, 92:25, 93:6, 93:8, 96:1, 109:6, 114:9, 118:10, 119:10, 130:20, 162:2, 163:11, 197:8, 208:6, 210:22
**mechanics** [1] - 48:7
**mechanism** [2] - 92:2, 92:10
**mechanisms** [1] - 45:14
**MEDICAL** [1] - 1:5
**medical** [24] - 22:7, 31:6, 31:10, 34:21, 38:16, 39:15, 40:16, 47:14, 48:24, 57:10, 58:7, 58:10, 92:14, 105:9, 106:2, 116:1, 116:6, 116:9, 129:18, 136:24, 137:11, 175:17, 183:20
**Medical** [3] - 104:19, 104:21, 117:1
**medication** [11] - 113:15, 113:18, 114:1, 114:2, 114:3, 114:4, 114:9, 114:21, 115:2, 137:15, 210:13
**medicine** [8] - 45:21, 46:11, 46:15, 46:16, 46:20, 49:25, 50:1, 210:8
**meds** [1] - 52:18
**meet** [11] - 71:21, 77:3, 80:3, 80:10, 108:5, 108:8, 122:16, 145:14, 152:1, 152:16, 175:12
**meeting** [7] - 72:18, 80:5, 80:6, 80:10, 135:10, 137:24, 145:14
**meetings** [3] - 136:4, 153:9, 153:11
**meets** [3] - 15:21, 63:5, 78:14
**member** [5] - 145:16, 145:18, 169:19, 169:25, 170:4
**membership** [1] - 169:23
**memberships** [1] - 145:8
**memory** [13] - 93:11, 93:12, 93:15, 93:16, 93:21, 93:22, 94:7, 94:15, 184:8, 200:18, 201:1, 207:18
**Memory** [7] - 93:20, 93:25, 94:10, 94:13, 94:23, 206:21, 207:13
**mental** [5] - 45:13, 171:9, 171:11, 182:2, 182:15
**Mental** [2] - 81:16, 170:7
**mention** [5] - 7:10, 13:8, 79:11, 85:16, 102:4
**mentioned** [17] - 4:13, 27:22, 68:22, 76:3, 86:1, 86:22, 95:17, 97:22, 99:21, 100:11, 102:5, 115:5, 150:10, 177:9, 189:14, 196:22
**mentoring** [1] - 68:7

**mess** [1] - 28:7
**message** [1] - 6:20
**met** [7] - 23:2, 72:4, 122:24, 136:16, 160:18, 177:1, 179:4
**method** [1] - 82:15
**MEW** [34] - 2:10, 62:2, 62:12, 64:24, 65:7, 70:22, 71:17, 71:19, 82:20, 88:2, 88:5, 98:1, 98:4, 98:6, 98:8, 104:6, 107:16, 109:12, 138:1, 138:6, 138:9, 138:17, 141:3, 141:7, 146:8, 146:20, 146:22, 147:3, 147:4, 150:19, 166:16, 166:20, 167:1
**MICHAEL** [1] - 2:3
michael.stein@
steinvargas.com [1] - 2:6
**Michigan** [7] - 142:8, 155:10, 168:25, 169:1, 169:2, 169:12, 169:16
**mics** [1] - 4:4
**middle** [16] - 11:15, 16:18, 27:1, 47:25, 57:9, 100:25, 131:22, 131:25, 156:14, 157:3, 158:20, 159:25, 160:9, 181:15, 191:2, 204:6
**midway** [1] - 147:13
**might** [18] - 3:19, 7:17, 20:8, 22:14, 69:13, 72:17, 92:2, 113:25, 114:2, 116:20, 124:25, 143:11, 161:12, 178:13, 178:14, 181:19, 182:25, 197:7
**migraines** [1] - 13:8
**mild** [1] - 96:11
**million** [3] - 102:11, 102:12
**mind** [2] - 119:22, 182:10
**minimally** [2] - 86:9, 86:10
**minimum** [1] - 12:9
**minute** [9] - 26:16, 75:13, 86:16, 86:20, 97:24, 98:4, 137:19, 193:14, 205:1
**minutes** [8] - 33:25, 61:9, 61:10, 166:8, 191:14, 191:24, 193:11, 206:14
**misapplication** [1] - 82:5
**miscalculated** [1] - 112:2
**miscommunication** [1] - 50:5
**miserable** [1] - 206:13
**misread** [2] - 187:7, 187:12
**misreading** [1] - 190:13
**missed** [4] - 52:12, 110:4, 153:12, 167:13
**missing** [1] - 73:14
**mistakes** [3] - 75:19, 185:7, 186:8
**misunderstanding** [1] - 172:3

**Mitchell** [2] - 1:22, 211:17
**mitigating** [3] - 114:8, 114:16, 115:2
**MLE** [1] - 63:15
**model** [11] - 82:21, 147:24, 148:1, 154:19, 155:12, 164:20, 197:17, 197:20, 197:24, 197:25, 198:4
**moderate** [2] - 10:22, 24:8
**Modification** [2] - 170:19, 170:20
**mom** [4] - 9:11, 9:17, 14:25, 17:7
**moment** [7] - 25:18, 35:16, 35:17, 54:19, 61:5, 127:6, 166:5
**moments** [1] - 48:20
**month** [2] - 53:8, 157:18
**months** [1] - 67:3
**morning** [10] - 3:2, 4:13, 48:12, 48:19, 57:4, 62:13, 62:14, 133:14, 134:5, 211:6
**most** [36] - 10:8, 37:10, 37:11, 44:17, 45:13, 46:3, 46:23, 67:13, 76:16, 81:8, 92:7, 93:4, 98:15, 135:12, 148:2, 152:10, 153:12, 158:12, 173:19, 173:20, 177:7, 184:7, 185:20, 190:2, 190:7, 191:23, 193:20, 193:21, 195:1, 195:2, 201:5, 206:12, 206:24, 207:2
**mostly** [4] - 33:9, 56:14, 56:17, 193:10
**mother** [9] - 9:4, 9:7, 16:20, 34:1, 179:12, 202:21, 202:23, 202:24, 208:13
**motivated** [1] - 74:2
**motivation** [5] - 92:11, 92:16, 92:24, 93:1, 93:9
**move** [3] - 20:12, 20:14, 204:15
**moved** [2] - 54:24, 59:1
**movie** [2] - 57:15, 57:18
**moving** [2] - 16:12, 136:13
**MR** [99] - 3:8, 3:12, 4:6, 4:12, 6:16, 6:18, 14:17, 14:20, 15:2, 17:21, 17:23, 18:1, 19:2, 19:14, 19:16, 20:5, 20:15, 20:18, 20:20, 21:3, 22:11, 27:24, 27:25, 30:7, 30:25, 35:15, 35:16, 35:20, 35:23, 48:5, 48:7, 48:11, 58:15, 58:18, 59:22, 60:1, 60:11, 60:17, 60:19, 60:22, 60:25, 61:4, 61:9, 61:11, 61:12, 61:15, 61:22, 65:4, 71:3, 82:16, 88:1, 98:7, 103:19, 104:2, 107:9, 109:14, 109:17, 109:20,

109:22, 109:24, 110:2, 110:4, 110:8, 117:7, 118:1, 125:7, 125:14, 125:18, 127:10, 127:12, 136:14, 137:19, 137:22, 138:4, 138:13, 146:14, 146:25, 147:2, 150:22, 151:8, 151:9, 151:11, 166:5, 166:11, 166:13, 166:19, 167:17, 168:3, 168:8, 168:10, 174:2, 174:8, 174:11, 188:19, 188:25, 195:7, 195:13, 211:2, 211:7
**MS** [51] - 3:4, 3:16, 3:22, 14:15, 14:23, 18:22, 19:11, 19:24, 20:24, 22:9, 30:1, 30:3, 30:23, 48:18, 58:13, 62:2, 62:12, 64:24, 65:7, 70:22, 71:17, 71:19, 82:20, 88:2, 88:5, 98:1, 98:4, 98:6, 98:8, 104:6, 107:16, 109:12, 138:1, 138:6, 138:9, 138:17, 139:2, 141:3, 141:7, 146:8, 146:20, 146:22, 147:3, 147:4, 150:19, 166:16, 166:20, 167:1, 167:5, 167:11, 167:16
**multiple** [11] - 16:19, 55:24, 55:25, 74:25, 84:22, 105:4, 105:5, 107:14, 109:4, 123:8, 142:19
**must** [1] - 133:15
**mutually** [2] - 177:13
**name** [8] - 10:17, 39:25, 62:9, 138:24, 155:22, 167:24, 178:18, 203:14
**named** [1] - 147:14
**names** [1] - 32:16
**narrowly** [1] - 79:17
**National** [3] - 116:25, 169:21, 169:23
**NATIONAL** [1] - 1:5
**nature** [4] - 16:12, 184:13, 187:2, 199:2
**NBME** [64] - 17:12, 18:10, 22:8, 23:18, 28:22, 29:2, 38:17, 38:19, 38:23, 38:25, 39:5, 39:8, 39:13, 39:17, 39:20, 39:25, 41:10, 41:11, 43:11, 62:15, 62:21, 63:3, 63:20, 63:25, 64:20, 65:12, 66:7, 72:11, 72:13, 72:24, 73:2, 73:7, 73:10, 73:19, 73:22, 108:23, 116:13, 116:21, 123:1, 129:21, 134:24, 135:1, 135:8, 135:21, 136:10, 137:23, 139:5, 140:2, 140:18, 140:22, 148:23, 149:4, 149:9, 149:12, 149:15,

149:19, 153:4, 153:16, 154:5, 156:11, 156:21, 163:16, 164:5, 164:14
**NBME's** [2] - 130:22, 136:9
**NE** [1] - 2:4
**near** [2] - 160:23, 204:17
**necessarily** [4] - 29:22, 49:15, 54:16, 184:2
**necessary** [4] - 31:21, 60:21, 110:1, 167:14
**necessity** [1] - 57:18
**need** [20] - 11:7, 61:5, 78:20, 92:20, 100:7, 103:9, 103:11, 107:23, 108:20, 118:14, 118:17, 119:24, 135:15, 148:10, 151:6, 157:25, 176:11, 182:25, 200:8, 201:14
**needed** [9] - 6:12, 14:4, 53:25, 54:18, 94:21, 97:2, 104:13, 137:11, 166:25
**needing** [1] - 16:20
**needs** [12] - 26:12, 74:14, 109:10, 114:12, 114:15, 114:17, 134:13, 137:12, 199:7, 210:17, 210:20, 210:21
**negative** [7] - 76:14, 76:17, 76:19, 77:7, 195:6, 209:1, 210:1
**Neil** [5] - 10:17, 24:9, 51:22, 57:8, 202:22
**Nelson** [18] - 84:11, 84:14, 84:25, 85:19, 86:7, 86:14, 123:25, 124:14, 162:10, 162:13, 192:14, 192:18, 192:24, 193:2, 193:4, 193:8, 194:6, 210:23
**Nelson-Denny** [18] - 84:11, 84:14, 84:25, 85:19, 86:7, 86:14, 123:25, 124:14, 162:10, 162:13, 192:14, 192:18, 192:24, 193:2, 193:8, 194:6, 210:23
**neuro** [2] - 42:11, 50:23
**neurobehavioral** [1] - 34:2
**neurodevelopmental** [2] - 83:3, 83:5
**neurological** [1] - 171:3
**neurology** [4] - 49:23, 49:24, 51:16, 53:9
**neuropsychological** [2] - 207:19, 209:18
**neuropsychologist** [1] - 23:15
**neuropsychology** [1] - 169:7
**Neuropsychology** [2] - 169:22, 169:24
**never** [13] - 35:10, 81:24, 94:23, 121:12, 129:5, 129:8,

129:9, 129:18, 130:17, 136:16, 136:19, 159:1, 182:10
**nevertheless** [2] - 70:15, 165:19
**New** [6] - 1:17, 67:1, 67:7, 69:22, 117:1, 117:2
**new** [6] - 48:24, 49:5, 141:24, 159:16, 159:23, 185:20
**next** [29] - 6:7, 8:25, 9:14, 13:24, 16:10, 21:2, 30:4, 32:13, 40:10, 44:23, 54:24, 59:2, 59:25, 60:20, 61:6, 132:11, 138:16, 167:18, 179:13, 179:18, 180:7, 185:21, 186:12, 186:15, 189:18, 189:24, 205:2, 205:9, 205:22
**Nicotinic** [1] - 37:3
**night** [2] - 3:9, 117:13
**nine** [10] - 17:14, 18:9, 18:15, 62:18, 75:18, 75:20, 134:24, 134:25, 135:12, 157:4
**nine-page** [2] - 17:14, 18:9
**NO** [2] - 1:3, 212:21
**nobody** [1] - 176:10
**non** [9] - 91:7, 91:11, 92:1, 93:12, 93:22, 94:25, 185:4, 185:8
**non-credible** [6] - 91:7, 91:11, 92:1, 93:12, 93:22, 94:25
**non-dyslexic** [2] - 185:4, 185:8
**non-impaired** [1] - 185:8
**none** [2] - 178:3, 194:19
**nonetheless** [1] - 77:21
**nonverbal** [2] - 12:25, 184:8
**nonverbally** [1] - 201:4
**normally** [1] - 94:13
**norms** [1] - 162:5
**Northwestern** [3] - 142:11, 142:18, 144:11
**note** [9] - 5:7, 20:5, 34:10, 50:12, 51:1, 51:9, 51:10, 51:11, 206:8
**notebook** [1] - 146:24
**notebooks** [1] - 146:23
**noted** [1] - 78:8
**notes** [2] - 90:3, 127:14
**nothing** [1] - 94:19
**notice** [1] - 136:12
**notified** [1] - 3:9
**notoriously** [1] - 151:19
**notwithstanding** [1] - 20:11
**number** [17] - 6:16, 8:1, 84:7, 91:25, 96:13, 97:22, 100:16, 126:8, 159:12, 160:2, 160:7, 183:18, 186:18, 196:25, 197:2, 204:8, 210:25

**numbered** [2] - 6:7, 160:5
**numbers** [10] - 30:10, 30:15, 33:17, 85:7, 88:3, 125:22, 160:8, 182:14
**NW** [1] - 2:11
**oath** [2] - 3:25, 117:23
**OB** [1] - 51:1
**object** [3] - 19:1, 71:11, 103:19
**objection** [15] - 14:15, 19:5, 20:3, 20:14, 30:1, 30:23, 65:3, 65:4, 82:16, 103:25, 107:9, 138:1, 167:6, 174:8, 195:8
**objections** [2] - 137:25, 141:5
**objective** [5] - 29:13, 78:13, 97:7, 152:3, 152:18
**objects** [1] - 94:2
**observations** [4] - 182:3, 182:16, 182:21, 182:22
**observe** [1] - 183:4
**obtain** [5] - 53:15, 85:2, 87:15, 89:1, 90:6
**obtained** [4] - 34:12, 94:22, 111:4, 163:2
**obtaining** [1] - 101:2
**obviously** [2] - 61:24, 99:19
**occasional** [1] - 151:1
**occasionally** [2] - 70:6, 117:4
**occasions** [1] - 23:3
**occupational** [3] - 78:7, 99:4, 99:5
**occur** [6] - 175:6, 199:5, 200:1, 200:20, 202:4, 202:6
**occurred** [4] - 61:17, 93:14, 172:18, 202:9
**occurring** [1] - 200:23
**occurs** [2] - 200:4, 200:22
**October** [2] - 33:22, 103:1
**offer** [4] - 137:22, 141:4, 146:8, 174:2
**offers** [1] - 70:22
**offhand** [1] - 164:10
**office** [3] - 98:25, 209:2, 209:7
**Official** [2] - 1:22, 211:17
**official** [2] - 79:19, 95:17
**officially** [1] - 67:4
**offset** [1] - 204:3
**often** [9] - 74:17, 85:22, 86:10, 97:10, 121:11, 172:19, 185:7, 200:16, 200:23
**oftentimes** [1] - 185:3
**Ohio** [2] - 32:2, 137:9
**old** [1] - 195:25
**older** [2] - 96:21, 151:1
**olds** [1] - 90:24

**omitted** [1] - 187:7
**once** [2] - 43:3, 43:4
**one** [108] - 8:22, 9:10, 10:12, 12:3, 12:10, 13:3, 13:17, 16:7, 17:6, 18:6, 23:5, 25:18, 26:17, 29:3, 31:8, 32:13, 33:6, 35:17, 40:4, 43:6, 43:8, 43:21, 49:23, 51:12, 51:17, 52:23, 53:3, 55:16, 60:6, 60:12, 61:15, 63:1, 63:5, 67:14, 69:15, 73:2, 74:19, 76:4, 76:10, 78:17, 83:14, 84:11, 84:14, 86:15, 86:20, 92:8, 93:18, 96:10, 98:4, 100:1, 100:9, 104:13, 106:11, 112:7, 113:1, 115:5, 116:4, 116:23, 118:16, 119:16, 121:2, 122:4, 122:23, 122:24, 124:6, 125:11, 126:11, 128:18, 129:10, 129:13, 137:19, 143:9, 147:2, 151:5, 151:8, 151:12, 156:9, 156:23, 157:25, 158:13, 158:14, 159:25, 161:24, 173:5, 173:7, 176:19, 176:23, 177:14, 177:15, 183:18, 185:21, 186:13, 186:15, 187:8, 189:9, 190:25, 193:14, 195:11, 198:15, 199:21, 199:22, 205:7, 206:24, 207:2
**one-day** [1] - 60:12
**one-to-one** [1] - 118:16
**ones** [9] - 13:4, 55:3, 55:10, 56:1, 86:22, 98:13, 98:14, 179:24, 191:19
**online** [1] - 124:14
**onset** [1] - 95:24
**operating** [1] - 92:8
**opinion** [16] - 15:22, 65:9, 91:1, 91:13, 97:3, 108:5, 108:8, 108:13, 139:12, 148:11, 150:14, 150:16, 150:18, 158:24, 173:8, 210:16
**opinions** [5] - 66:6, 140:25, 141:1, 141:15, 141:23
**opportunities** [1] - 146:5
**opportunity** [4] - 7:22, 54:18, 104:3, 125:1
**opposed** [5] - 72:18, 114:15, 126:19, 160:15, 185:8
**opposite** [2] - 92:18, 108:12
**opposition** [1] - 65:1
**optimal** [1] - 201:6
**oral** [16] - 54:13, 87:14, 87:19, 89:21, 171:17, 185:1, 185:12, 186:1, 186:18, 186:19, 187:10, 187:15,

188:2, 189:2, 208:6, 210:22
**Oral** [4] - 89:16, 112:10, 187:23, 190:8
**order** [16] - 3:1, 3:7, 3:10, 15:14, 29:16, 56:19, 56:21, 56:25, 60:20, 61:19, 84:8, 118:12, 166:25, 186:15, 194:10, 198:17
**organic** [3] - 32:5, 40:14, 54:7
**Organic** [1] - 37:14
**organization** [1] - 146:4
**organizations** [3] - 145:10, 200:15, 209:17
**organize** [2] - 10:20, 28:7
**originally** [4] - 22:4, 48:25, 81:24, 95:21
**OSCE** [1] - 50:23
**OSCEs** [1] - 50:10
**Osteopathic** [1] - 116:25
**OSU** [1] - 54:4
**otherwise** [3] - 61:6, 93:11, 176:6
**outside** [3] - 24:9, 99:6, 135:22
**overactive/hyperactive** [1] - 74:16
**overall** [17] - 44:22, 71:4, 88:24, 89:3, 89:6, 96:9, 98:13, 101:17, 102:18, 102:21, 103:2, 106:9, 128:10, 178:16, 183:15, 197:8, 199:13
**overlap** [1] - 173:10
**overruled** [6] - 19:5, 19:12, 22:10, 104:1, 107:10, 195:9
**Overton** [1] - 27:23
**Overton's** [2] - 26:1
**overwhelming** [1] - 91:15
**own** [6] - 49:4, 57:24, 82:17, 165:25, 173:25, 207:12
**P-19A** [2] - 125:9, 127:13
**P-21** [3] - 168:13, 178:24, 180:25
**P-34** [6] - 135:15, 135:18, 135:20, 137:23, 138:3, 212:24
**p.m** [7] - 26:22, 27:4, 117:18, 166:9, 211:9
**P21** [1] - 178:15
**PA** [1] - 1:9
**package** [1] - 120:1
**page** [192] - 5:14, 6:6, 6:7, 6:17, 7:5, 7:6, 7:25, 8:3, 8:25, 9:10, 9:14, 10:4, 11:6, 11:10, 11:15, 11:24, 12:13, 12:17, 13:7, 13:8, 14:9, 15:17, 17:5, 17:14, 17:18, 18:2, 18:8, 18:9, 23:19, 24:4, 24:20, 26:4, 26:10, 26:21,

27:1, 27:2, 27:24, 28:3, 28:24, 31:15, 32:1, 33:17, 33:18, 33:20, 34:11, 34:18, 34:20, 35:14, 35:15, 35:20, 35:25, 36:16, 40:10, 40:25, 42:12, 42:18, 43:10, 44:13, 44:23, 45:3, 45:19, 46:11, 47:5, 47:21, 69:10, 73:14, 84:6, 85:6, 85:7, 87:16, 88:1, 88:2, 88:3, 88:20, 97:25, 98:1, 98:2, 98:3, 99:15, 99:16, 100:13, 100:20, 100:24, 125:24, 125:25, 126:8, 128:9, 128:10, 128:11, 131:11, 131:14, 131:25, 132:7, 132:9, 132:11, 142:20, 142:23, 143:17, 145:5, 145:9, 147:13, 147:14, 151:24, 156:13, 156:14, 157:4, 159:11, 159:12, 160:1, 160:3, 160:8, 160:23, 168:17, 178:16, 178:17, 179:2, 179:18, 180:25, 181:1, 181:2, 181:24, 181:25, 182:1, 182:2, 182:7, 182:9, 182:11, 182:14, 182:15, 183:13, 183:15, 183:17, 184:18, 184:19, 185:13, 185:22, 185:23, 187:15, 188:2, 189:15, 189:16, 189:18, 189:24, 190:4, 190:15, 190:25, 191:1, 191:2, 192:16, 192:17, 192:22, 199:12, 199:13, 199:16, 199:17, 201:20, 201:22, 202:12, 202:13, 203:20, 203:21, 204:6, 204:7, 204:10, 204:16, 204:17, 205:3, 205:9, 206:15, 206:16
**PAGE** [1] - 212:21
**pages** [18] - 5:22, 6:6, 9:17, 10:14, 18:15, 26:15, 26:23, 27:10, 30:14, 68:9, 85:5, 89:19, 96:3, 125:21, 130:25, 178:24, 184:22
**paid** [1] - 135:1, 135:2
**pain** [3] - 52:11, 52:15, 52:17
**painting** [2] - 35:6, 36:3
**panic** [1] - 158:22
**paper** [9] - 35:7, 36:3, 37:11, 39:7, 39:8, 39:12, 72:17, 73:13, 73:14
**papers** [1] - 73:6
**paragraph** [31] - 12:19, 15:19, 16:1, 16:8, 27:6, 33:24, 55:12, 100:21, 100:23, 126:12, 126:14, 126:18, 126:19, 126:22,

128:11, 128:23, 132:9, 151:21, 151:22, 151:24, 152:14, 152:15, 156:13, 156:24, 157:3, 158:4, 158:18, 158:21, 160:1, 205:22
**paragraphs** [1] - 51:4
**pardon** [1] - 17:21
**parent** [2] - 79:23, 143:22, 146:4, 165:5, 165:8
**parents** [5] - 57:8, 57:16, 146:3, 146:5, 164:18
**part** [40] - 7:20, 21:14, 44:11, 49:24, 49:25, 50:1, 53:10, 70:4, 70:9, 70:12, 70:14, 71:22, 81:3, 84:4, 85:1, 95:16, 97:10, 99:10, 102:5, 105:21, 120:1, 123:12, 127:7, 144:8, 151:23, 152:1, 152:15, 159:13, 169:10, 178:1, 180:1, 180:2, 180:24, 183:1, 185:10, 192:25, 193:1, 193:22, 206:7
**particular** [23] - 37:5, 42:16, 42:19, 65:22, 67:10, 71:12, 71:13, 72:11, 86:23, 92:2, 102:21, 103:4, 117:5, 122:6, 123:10, 124:14, 131:17, 132:25, 142:16, 146:14, 172:14, 189:8, 201:13
**particularly** [6] - 50:23, 68:8, 124:25, 173:23, 176:16, 198:19
**parts** [2] - 94:9, 153:1
**pass** [4] - 53:1, 53:4, 70:3, 188:22
**passage** [20] - 54:23, 55:2, 55:6, 55:25, 56:1, 56:18, 56:20, 57:2, 86:15, 90:1, 100:16, 100:22, 125:25, 126:1, 126:20, 128:24, 130:5, 130:6
**passages** [13] - 55:24, 56:3, 84:22, 84:23, 87:21, 87:22, 89:24, 90:3, 100:14, 105:13, 186:2, 186:13, 190:22
**passed** [3] - 50:20, 50:25, 58:8
**passing** [2] - 37:21, 69:23
**past** [7] - 117:6, 135:12, 143:7, 168:19, 175:2, 175:23, 175:24
**paste** [1] - 6:1
**patient** [5] - 33:25, 45:15, 51:7, 56:24, 130:16
**patients** [4] - 50:11, 70:4, 144:4, 144:5
**pattern** [2] - 132:22, 209:16
**patterned** [1] - 206:9
**patterns** [2] - 158:13, 209:14

**pause** [1] - 57:19
**pay** [1] - 76:7
**paying** [3] - 74:15, 76:5, 77:8
**PDF** [1] - 73:5
**peer** [4] - 36:22, 68:3, 68:11, 68:13
**peer-reviewed** [4] - 36:22, 68:3, 68:11, 68:13
**peers** [4] - 88:11, 89:10, 89:12, 90:21
**penalty** [4] - 55:22, 55:23, 59:17, 59:19
**pencil** [1] - 191:19
**Penn** [1] - 66:21
**PENNSYLVANIA** [1] - 1:1
**people** [43] - 11:22, 14:13, 14:14, 24:9, 58:5, 115:22, 115:23, 116:1, 116:4, 116:5, 120:17, 121:18, 124:9, 130:1, 130:4, 153:23, 153:25, 158:13, 164:20, 165:18, 172:9, 173:5, 173:22, 173:24, 176:6, 176:19, 181:17, 181:22, 184:7, 188:12, 188:13, 188:17, 191:23, 200:21, 200:23, 201:5, 201:24, 202:4, 202:5, 202:10, 206:12, 207:17, 209:22
**people's** [1] - 134:11
**per** [2] - 32:21, 122:11
**percent** [34] - 6:15, 8:4, 8:23, 11:7, 11:16, 11:18, 11:25, 12:16, 41:3, 44:16, 86:23, 87:1, 88:10, 88:12, 89:8, 89:11, 89:12, 98:19, 102:19, 102:22, 103:3, 103:5, 103:17, 106:10, 181:22, 188:12, 188:13, 193:15, 193:17, 199:8, 200:22, 202:10, 210:2, 210:4
**percentage** [1] - 116:16
**percentile** [48] - 56:8, 56:9, 58:22, 59:4, 59:8, 81:21, 85:11, 85:13, 85:25, 86:2, 87:25, 89:7, 90:9, 90:14, 90:20, 98:17, 102:19, 102:22, 103:2, 103:4, 106:9, 106:13, 131:2, 131:4, 131:16, 131:19, 132:2, 132:4, 132:5, 132:10, 132:11, 132:13, 147:15, 147:16, 148:5, 148:19, 148:20, 187:17, 187:19, 188:5, 188:8, 188:9, 189:20, 189:24, 196:20, 197:11, 197:12
**perceptual** [2] - 184:7, 201:3
**perfect** [1] - 94:11
**perform** [15] - 13:20, 70:8,

82:12, 89:12, 92:6, 92:13, 92:20, 94:7, 97:17, 98:10, 102:17, 103:8, 143:14, 144:7, 210:10
**Performance** [5] - 39:25, 43:12, 97:9, 203:9, 203:15
**performance** [57] - 40:13, 40:25, 41:6, 42:1, 42:2, 42:3, 42:5, 44:18, 45:12, 45:15, 45:17, 46:3, 46:6, 46:22, 47:13, 48:21, 58:19, 75:3, 77:10, 78:4, 78:6, 78:7, 78:24, 80:13, 83:19, 85:16, 85:21, 91:18, 91:19, 91:23, 93:7, 93:8, 94:17, 98:16, 103:8, 103:13, 104:7, 106:7, 106:13, 106:16, 106:19, 106:22, 107:6, 109:5, 127:23, 137:5, 152:4, 152:18, 188:21, 192:19, 196:7, 198:24, 201:12, 202:8, 207:10, 208:5
**performances** [1] - 188:11
**performed** [11] - 22:19, 23:13, 46:4, 58:22, 70:11, 72:7, 107:2, 107:3, 107:4, 132:17, 161:14
**performing** [5] - 82:10, 89:11, 103:17, 148:5, 154:16
**perhaps** [3] - 79:3, 100:6, 122:16
**period** [3] - 31:22, 80:23, 120:12
**PERKINS** [1] - 2:9
**permanent** [1] - 19:10
**permitted** [1] - 120:8
**person** [23] - 23:2, 37:9, 71:22, 72:18, 119:4, 119:12, 119:13, 120:9, 120:10, 124:3, 154:11, 159:6, 160:19, 164:25, 171:5, 171:14, 172:11, 173:2, 180:16, 185:3, 186:4, 194:10, 207:8
**person's** [1] - 119:15
**personal** [12] - 5:16, 57:22, 72:22, 79:8, 134:18, 156:15, 156:17, 156:25, 157:4, 157:13, 157:21
**personality** [2] - 75:4, 75:5
**personally** [4] - 72:4, 72:8, 132:16, 159:3
**pertain** [2] - 68:14, 209:11
**PhD** [3] - 66:23, 142:9, 169:1
**Philadelphia** [1] - 1:9
**phone** [4] - 9:19, 17:22, 175:14, 176:2
**photocopied** [1] - 73:15
**phrase** [2] - 190:21, 190:22
**phrases** [2] - 190:19, 190:20

**physical** [4] - 51:6, 105:1, 105:3, 105:6
**physician** [5] - 122:10, 122:12, 122:17, 122:20, 122:25
**physics** [1] - 55:20
**physiological** [1] - 171:3
**physiology** [1] - 41:8
**picked** [1] - 94:23
**pictures** [2] - 5:23, 6:1
**piece** [4] - 73:13, 73:14, 111:13, 193:8
**pieces** [2] - 103:15, 109:4
**place** [2] - 49:13, 82:2
**places** [2] - 101:8, 184:22
**plaintiff** [4] - 167:13, 167:17, 175:10
**Plaintiff** [3] - 1:3, 1:18, 2:7
**Plaintiff's** [1] - 147:5
**plaintiff's** [4] - 135:14, 146:24, 167:4, 168:11
**plaintiffs** [2] - 60:4, 138:10
**plan** [1] - 144:23
**planned** [1] - 188:19
**play** [3] - 115:2, 156:18, 188:20
**playing** [1] - 188:22
**pleasure** [1] - 57:24
**plus** [1] - 179:25
**point** [33] - 7:16, 8:15, 11:11, 13:23, 19:17, 21:4, 21:15, 21:21, 22:12, 22:18, 23:17, 36:7, 44:5, 63:20, 63:23, 73:25, 77:5, 82:16, 100:1, 100:9, 103:20, 119:8, 121:2, 122:16, 122:23, 122:24, 144:19, 153:18, 160:2, 165:3, 186:23, 188:19, 203:14
**pointed** [2] - 50:24, 162:12
**pointers** [1] - 49:3
**points** [4] - 17:12, 21:25, 24:1, 71:12
**policies** [1] - 170:1
**political** [2] - 121:6, 121:15
**poor** [6] - 78:4, 78:6, 83:18, 83:19, 90:17, 98:19
**poorly** [3] - 77:2, 82:3, 173:22
**population** [16] - 85:23, 88:13, 89:8, 89:9, 90:23, 98:20, 102:14, 102:16, 103:5, 105:25, 106:6, 115:24, 199:6, 200:1, 200:4, 202:10
**portion** [7] - 50:21, 51:11, 56:16, 85:1, 86:14, 102:4, 105:10
**portions** [5] - 88:16, 88:17, 110:22, 111:22

**position** [5] - 32:19, 33:1, 67:2, 142:12, 142:14
**positive** [1] - 195:5
**possesses** [1] - 128:12
**possibility** [1] - 61:2
**possible** [6] - 10:8, 22:22, 79:25, 118:24, 119:13, 158:2
**possibly** [2] - 31:8, 92:13
**post** [4] - 32:17, 169:3, 169:6, 169:9
**post-doc** [1] - 169:6
**post-doctoral** [1] - 169:3
**post-graduation** [1] - 32:17
**potential** [1] - 82:12
**potentially** [1] - 81:20
**practice** [13] - 70:1, 70:5, 70:7, 71:7, 122:20, 127:18, 143:25, 144:8, 150:23, 153:21, 153:24, 169:10, 209:2
**practitioner** [2] - 154:6, 154:7
**practitioners** [2] - 82:25, 154:3
**preceding** [1] - 27:10
**precise** [2] - 97:18, 196:14
**preclude** [1] - 158:17
**preference** [1] - 60:3
**preferred** [2] - 80:8, 200:14
**preliminary** [2] - 19:9, 21:22, 64:25
**PRELIMINARY** [1] - 1:5
**premedical** [1] - 105:8
**preparation** [1] - 9:3
**prepare** [3] - 28:11, 28:12, 124:5
**prepared** [12] - 1:24, 6:24, 7:2, 11:3, 12:13, 15:10, 20:8, 28:14, 31:6, 65:23, 140:11, 141:12
**prepares** [1] - 38:20
**preparing** [3] - 5:12, 24:25, 34:2
**prescribed** [1] - 114:21
**presence** [3] - 112:7, 115:6, 198:9
**present** [14] - 68:2, 68:25, 74:22, 74:24, 80:4, 96:11, 96:22, 108:11, 120:3, 124:22, 125:5, 172:20, 180:14, 181:8
**presentation** [3] - 12:25, 135:21, 137:23
**presentations** [5] - 36:17, 143:19, 143:21, 143:22, 172:1
**presenter** [1] - 135:25
**presently** [1] - 70:13
**presents** [1] - 145:23
**president** [1] - 122:5

**press** [1] - 97:11
**pressing** [1] - 97:12
**presumably** [2] - 20:6, 27:8
**presume** [1] - 165:24
**pretty** [13] - 46:10, 55:23, 57:20, 57:21, 65:16, 65:20, 67:14, 96:18, 176:16, 191:13, 202:6, 202:11, 202:23
**prevailing** [1] - 148:1
**prevalent** [1] - 151:20
**prevent** [1] - 122:12
**previous** [1] - 121:13
**previously** [4] - 3:25, 74:9, 117:23, 181:18
**primarily** [18] - 143:24, 144:22, 149:23, 150:24, 150:25, 171:15, 171:18, 172:6, 173:24, 179:23, 189:7, 194:8, 203:1, 207:6, 209:12, 209:23
**primary** [7] - 67:16, 113:12, 134:18, 144:9, 187:10, 208:7, 209:18
**private** [5] - 41:22, 44:1, 153:21, 154:6, 169:10
**privilege** [5] - 14:15, 18:23, 19:25, 20:6, 20:7
**privileged** [1] - 19:1
**problem** [10] - 78:10, 81:10, 110:5, 115:19, 173:9, 173:19, 194:18, 197:25, 198:4, 198:18
**problems** [24] - 76:13, 78:12, 84:17, 93:11, 93:12, 93:15, 93:17, 93:22, 94:15, 96:17, 100:4, 100:10, 120:15, 121:1, 121:3, 152:2, 152:17, 173:11, 180:5, 180:13, 180:14, 201:4
**procedure** [2] - 35:18, 113:22
**procedures** [1] - 32:8
**proceed** [10] - 3:3, 3:15, 4:10, 48:15, 61:18, 71:12, 71:16, 109:16, 117:25, 166:10
**proceeding** [2] - 19:7, 133:19
**proceedings** [1] - 211:14
**Proceedings** [2] - 1:24, 211:9
**process** [4] - 7:13, 7:23, 16:12, 52:13
**processing** [6] - 184:9, 184:10, 200:17, 201:1, 201:13, 202:9
**produce** [1] - 209:15
**produced** [6] - 5:8, 5:9, 19:3, 26:7, 65:25, 141:20

**produces** [1] - 187:24
**product** [12] - 14:16, 18:23, 19:24, 20:8, 20:11, 20:13, 20:23, 22:9, 27:8, 30:1, 30:23, 30:24
**profession** [2] - 82:14, 82:22
**professional** [12] - 15:22, 139:12, 143:23, 145:8, 146:4, 148:11, 154:17, 158:24, 169:19, 208:18, 209:17, 209:22
**professionals** [3] - 145:12, 146:6
**professor** [7] - 54:6, 54:7, 67:6, 67:17, 67:18, 142:13, 150:23
**Professor** [18] - 125:8, 136:6, 137:24, 139:10, 146:15, 148:25, 152:12, 152:14, 153:8, 161:12, 161:13, 161:24, 162:15, 163:8, 166:14, 197:15
**professors** [1] - 67:19
**Profile** [2] - 39:25, 43:12
**profile** [6] - 40:13, 42:1, 75:5, 79:5, 119:9, 119:15
**program** [9] - 53:6, 120:5, 120:9, 158:5, 158:8, 158:11, 169:3, 169:9, 170:1
**programs** [1] - 79:21
**progress** [1] - 68:11
**progressively** [1] - 89:25
**promoted** [1] - 198:19
**prompt** [3] - 10:3, 10:10, 96:15
**prompts** [2] - 95:12, 95:19
**pronunciation** [1] - 87:10
**proper** [3] - 32:8, 35:18, 145:3
**properly** [2] - 112:8, 112:23
**provide** [17] - 15:14, 31:21, 39:6, 39:9, 53:19, 53:22, 54:1, 63:1, 63:24, 64:2, 84:16, 101:22, 101:25, 139:12, 140:1, 156:21, 156:23
**provided** [21] - 4:22, 6:11, 9:7, 9:8, 10:15, 15:5, 15:14, 19:22, 25:8, 36:6, 39:7, 41:22, 42:9, 43:19, 45:10, 66:4, 72:2, 133:17, 136:24, 152:10
**provides** [6] - 101:1, 114:8, 133:7, 146:4, 175:3, 196:19
**providing** [2] - 31:22, 34:1
**provision** [2] - 67:12, 70:25
**psychiatrist** [2] - 4:19, 4:20
**psychiatry** [3] - 44:21, 44:25, 49:23
**Psychological** [1] - 169:21

**psychological** [3] - 70:1, 182:25, 183:8
**psychologist** [8] - 4:18, 69:19, 69:21, 144:2, 153:21, 155:4, 169:13, 169:20
**psychologists** [7] - 67:21, 67:23, 69:3, 69:5, 118:3, 118:7
**psychology** [10] - 66:21, 66:22, 66:23, 68:19, 68:21, 142:7, 142:9, 168:24, 168:25, 169:2
**psychosis** [1] - 210:6
**publication** [1] - 37:8
**publications** [4] - 36:16, 36:20, 68:10, 68:11
**publicly** [1] - 124:12
**publish** [1] - 68:3
**published** [1] - 68:3
**publishers** [1] - 124:10
**publishing** [1] - 68:18
**punctuation** [1] - 197:5
**pure** [1] - 158:21
**purported** [1] - 122:7
**purpose** [7] - 52:25, 105:19, 180:9, 181:5, 182:5, 182:18, 183:17
**purposes** [6] - 70:19, 72:16, 78:22, 85:22, 114:13
**pursuant** [1] - 60:9
**put** [15] - 5:19, 19:1, 25:3, 25:19, 28:8, 36:10, 37:10, 51:3, 52:9, 60:20, 72:10, 76:10, 86:25, 181:21, 188:8
**putting** [5] - 14:18, 14:21, 60:4, 120:14
**PX-2** [3] - 23:19, 24:20, 27:24

**Q**

**qualifications** [2] - 146:13, 174:7
**qualifies** [1] - 119:20
**qualify** [3] - 82:9, 148:6, 181:19
**quantifiably** [2] - 80:15, 80:16
**quarter** [1] - 109:19
**quartile** [1] - 48:3
**quartiles** [1] - 47:25
**questioning** [1] - 51:6
**questionnaires** [3] - 172:12, 174:14, 180:12
**questions** [47] - 19:6, 33:11, 38:8, 41:4, 46:9, 48:5, 50:18, 54:22, 55:1, 55:17, 55:24, 55:25, 56:1, 56:16, 56:17, 57:3, 58:13, 58:15, 59:22, 63:3, 84:23, 90:2, 95:19, 100:15, 105:4, 107:15, 110:14, 111:20, 112:10, 126:1, 126:7, 130:4, 130:14, 138:4, 146:13, 150:19,

161:7, 166:13, 168:5, 174:6, 182:20, 183:5, 193:16, 193:17, 193:22, 210:25
**quick** [1] - 58:15
**quicker** [1] - 64:11
**quickly** [5] - 31:20, 35:3, 111:19, 165:7, 204:9
**quite** [5] - 5:20, 32:23, 49:5, 52:11, 90:22
**quizzes** [1] - 32:10
**quote** [3] - 16:11, 22:25, 100:8
**Quotient** [3] - 204:11, 205:10, 205:17
**quotient** [5] - 204:19, 204:25, 205:2, 205:19, 205:24
**quoting** [1] - 128:14
**RAMSAY** [3] - 1:3, 167:16, 212:5
**Ramsay** [83] - 3:6, 3:14, 3:24, 25:11, 31:16, 40:11, 42:12, 42:13, 48:16, 48:19, 58:19, 65:13, 70:16, 74:4, 83:21, 85:2, 87:15, 88:14, 89:1, 90:6, 94:7, 94:20, 96:8, 96:16, 97:17, 98:10, 102:17, 103:9, 103:23, 105:1, 107:20, 108:5, 108:8, 108:14, 110:15, 111:4, 113:11, 113:14, 114:3, 114:19, 120:3, 123:15, 124:22, 126:3, 126:10, 128:12, 129:12, 132:17, 133:22, 136:15, 136:16, 136:20, 137:15, 140:25, 141:8, 149:2, 150:16, 157:12, 158:5, 158:15, 158:21, 159:3, 160:19, 163:20, 164:5, 164:15, 165:16, 165:19, 167:7, 175:10, 177:22, 179:5, 180:5, 181:9, 183:4, 189:19, 194:1, 195:24, 207:4, 207:25, 210:11, 210:17
**Ramsay's** [48] - 63:14, 64:3, 64:21, 65:10, 66:1, 71:21, 72:23, 85:9, 85:20, 90:22, 91:21, 96:4, 97:3, 98:16, 101:4, 103:8, 103:13, 104:7, 104:18, 106:7, 106:22, 107:6, 107:25, 120:4, 120:11, 127:13, 127:20, 133:4, 134:7, 134:17, 139:13, 140:18, 140:22, 141:16, 148:23, 149:13, 150:1, 156:15, 156:25, 159:13, 160:14, 160:23, 176:8, 188:21, 193:9, 201:9, 202:19

**ran** [2] - 193:18, 193:19
**range** [23] - 81:22, 82:9, 83:16, 85:13, 89:4, 89:5, 90:22, 98:16, 107:3, 107:4, 147:16, 171:13, 172:17, 204:14, 204:22, 205:6, 205:12, 205:17, 205:20, 205:23, 205:25, 207:19, 210:10
**rank** [2] - 56:8, 188:5
**ranked** [1] - 10:9
**ranks** [1] - 196:20
**rarely** [1] - 121:9
**rate** [24] - 84:24, 85:25, 86:3, 86:12, 86:13, 86:20, 86:23, 88:25, 89:3, 89:6, 90:8, 90:11, 132:2, 132:8, 132:9, 132:12, 135:6, 162:7, 189:22, 191:6, 193:12, 200:20, 210:1, 210:25
**rated** [1] - 96:8
**rather** [4] - 8:25, 79:17, 126:19, 211:4
**rating** [10] - 10:8, 95:4, 95:11, 95:14, 96:5, 172:12, 202:22, 202:24, 209:10
**ratings** [4] - 10:14, 66:12, 79:23, 96:6
**rburgoyne@perkinscoie. com** [1] - 2:13
**RDR** [2] - 1:22, 211:17
**reach** [6] - 72:24, 148:23, 149:12, 149:19, 207:25, 208:10
**reached** [3] - 65:10, 149:16, 150:1
**reaching** [1] - 118:12, 208:24
**react** [1] - 31:20
**reacting** [1] - 75:22
**read** [59] - 7:10, 7:13, 13:9, 24:9, 24:12, 28:6, 35:11, 38:3, 38:7, 38:12, 38:13, 49:13, 49:18, 54:20, 54:23, 55:5, 55:7, 55:13, 56:21, 57:5, 57:12, 57:14, 57:16, 57:17, 57:24, 87:22, 103:9, 103:11, 105:14, 119:14, 126:13, 126:22, 128:23, 128:24, 130:4, 151:22, 151:23, 151:25, 152:21, 153:17, 158:19, 165:6, 165:23, 171:5, 173:22, 173:23, 185:3, 186:1, 186:5, 187:22, 190:1, 190:7, 190:9, 190:16, 190:19, 191:10, 196:25, 209:8
**reader** [6] - 49:10, 119:25, 165:7, 185:5, 185:8
**readily** [1] - 125:11
**reading** [181] - 13:1, 15:15,

15:23, 24:10, 27:16, 29:12, 29:13, 35:7, 35:10, 35:11, 36:3, 49:9, 49:18, 50:13, 50:14, 50:25, 55:1, 55:2, 55:11, 56:2, 57:1, 57:10, 57:23, 58:3, 59:2, 59:7, 74:7, 77:19, 77:21, 78:2, 79:3, 79:10, 84:17, 84:19, 84:20, 84:21, 84:24, 85:25, 86:3, 86:12, 86:13, 86:15, 86:20, 86:21, 86:23, 87:1, 87:13, 87:19, 87:21, 88:8, 88:12, 88:22, 88:23, 88:25, 89:3, 89:6, 89:21, 90:1, 90:3, 90:17, 90:18, 94:5, 94:22, 94:23, 100:13, 100:14, 100:15, 101:18, 102:20, 102:21, 103:3, 103:18, 104:14, 106:12, 106:14, 106:16, 106:20, 107:1, 107:14, 109:6, 119:5, 119:10, 119:18, 119:21, 119:23, 120:15, 120:25, 121:3, 122:22, 122:25, 125:25, 126:1, 126:16, 126:18, 126:19, 126:20, 128:3, 128:14, 128:18, 128:19, 128:23, 129:23, 130:9, 130:20, 130:25, 131:16, 131:18, 132:1, 132:4, 132:5, 133:2, 147:15, 148:21, 150:8, 162:7, 162:10, 165:18, 165:23, 165:24, 165:25, 166:2, 166:3, 171:4, 171:12, 171:16, 171:19, 171:21, 174:1, 176:13, 177:1, 177:3, 177:11, 177:12, 185:1, 186:1, 186:2, 186:19, 187:10, 187:16, 188:2, 189:2, 189:4, 190:2, 190:7, 190:23, 191:6, 191:8, 191:9, 191:17, 191:21, 191:25, 192:4, 192:5, 192:6, 193:9, 193:10, 193:14, 194:8, 194:9, 194:18, 197:4, 197:11, 207:17, 208:6, 208:7, 210:22, 210:24
**Reading** [3] - 84:11, 89:17, 112:10
**reading-based** [2] - 103:18, 107:14
**readmitted** [1] - 58:7
**reads** [5] - 57:7, 84:22, 89:24, 152:15, 185:5
**ready** [3] - 3:3, 109:16, 166:10
**real** [24] - 78:6, 78:19, 78:20, 78:21, 78:25, 83:18, 83:19, 91:15, 91:17, 91:23, 92:7,

92:11, 93:3, 94:17, 99:3, 99:9, 99:19, 99:24, 100:2, 100:17, 101:24, 109:4, 109:6, 129:11
**realized** [2] - 52:17, 53:25
**really** [34] - 9:13, 12:9, 24:2, 34:25, 51:9, 65:16, 66:10, 67:24, 76:19, 76:21, 78:16, 78:19, 79:2, 84:24, 103:15, 106:12, 109:9, 119:5, 119:11, 119:15, 130:12, 137:3, 163:12, 165:6, 174:24, 176:4, 176:14, 178:14, 181:12, 184:10, 184:13, 191:10, 199:21
**reappears** [1] - 9:14
**reapplying** [1] - 7:21
**rearrange** [1] - 61:6
**reason** [25] - 34:7, 38:25, 42:8, 46:6, 80:1, 91:10, 110:24, 111:2, 112:1, 112:17, 112:18, 113:4, 113:7, 138:12, 154:14, 161:17, 163:4, 164:18, 165:7, 166:17, 180:4, 186:2, 198:11, 198:17, 201:9
**reasonable** [1] - 38:6
**reasoning** [17] - 12:9, 50:17, 105:2, 105:3, 105:10, 106:11, 107:5, 125:3, 127:7, 127:8, 127:14, 127:15, 184:7, 184:8, 201:4, 201:12, 202:9
**reasons** [7] - 77:22, 81:7, 82:13, 91:25, 113:25, 114:1, 208:3
**recalling** [1] - 113:20
**receive** [5] - 87:23, 137:6, 137:7, 139:10, 154:6
**received** [6] - 16:16, 16:21, 22:6, 22:24, 23:1, 26:13, 28:22, 38:5, 87:24, 101:6, 135:3, 137:9, 149:1, 149:5, 165:22
**receiving** [5] - 39:8, 54:3, 71:25, 72:16, 149:19
**recent** [1] - 185:20
**recently** [2] - 102:12, 153:19
**Receptor** [1] - 37:3
**recess** [5] - 48:13, 117:8, 117:17, 117:18, 166:8
**Recess** [2] - 48:14, 166:9
**recognize** [7] - 19:25, 64:13, 64:16, 140:9, 147:7, 168:14, 170:2
**recognized** [3] - 170:1, 197:20, 197:22
**recognizing** [1] - 171:7
**recollection** [4] - 23:24, 34:5, 55:22, 59:20

**recommend** [6] - 63:11, 108:24, 116:14, 116:15, 116:17
**recommendation** [13] - 22:6, 63:1, 63:24, 64:21, 92:22, 108:25, 116:19, 123:2, 140:2, 140:18, 140:22, 173:16, 174:23
**recommendations** [4] - 54:8, 108:23, 149:21, 192:22
**recommended** [4] - 54:6, 123:9, 170:3, 174:22
**reconsideration** [9] - 20:9, 21:7, 21:16, 63:17, 63:19, 64:22, 83:22, 139:23, 141:9
**record** [18] - 20:2, 23:18, 24:20, 28:20, 61:17, 62:9, 64:24, 65:1, 81:14, 135:20, 141:4, 151:25, 155:2, 167:25, 185:17, 188:8, 203:14, 211:14
**recordings** [1] - 188:20
**records** [21] - 66:1, 66:9, 72:3, 72:7, 78:24, 97:4, 99:17, 100:2, 100:24, 101:4, 101:5, 101:6, 107:20, 150:12, 175:1, 179:19, 180:13, 194:13, 194:18, 194:21, 194:23
**recovering** [1] - 92:4
**Recross** [1] - 212:4
**recross** [1] - 58:14
**RECROSS** [1] - 58:17
**RECROSS-EXAMINATION** [1] - 58:17
**red** [2] - 47:20, 47:22
**redacted** [1] - 27:7
**REDIRECT** [1] - 48:17
**redirect** [3] - 138:5, 138:6, 166:15
**Redirect** [1] - 212:4
**redlined** [1] - 26:23
**redlines** [1] - 23:21
**redo** [1] - 51:12
**reduce** [1] - 126:15
**refer** [13] - 59:17, 85:5, 110:17, 126:25, 130:24, 134:4, 151:21, 158:4, 164:7, 176:21, 184:22, 200:9, 205:22
**reference** [11] - 19:9, 66:18, 88:1, 99:3, 99:6, 114:16, 117:12, 126:13, 192:16, 193:4, 199:12
**referenced** [1] - 26:16
**references** [2] - 131:13, 131:14
**referral** [1] - 180:4
**referred** [13] - 25:23, 38:16, 82:1, 87:7, 94:18, 130:20,

131:21, 156:24, 178:19, 185:3, 185:16, 193:2, 207:10
**referring** [21] - 11:13, 22:15, 59:12, 81:14, 81:15, 120:11, 122:8, 123:15, 125:8, 125:9, 128:7, 151:4, 158:12, 176:22, 184:3, 184:4, 184:6, 185:2, 192:24, 195:22, 203:14
**refers** [4] - 126:12, 131:20, 177:10, 194:12
**reflect** [6] - 9:17, 40:25, 86:24, 90:16, 100:24, 208:7
**reflected** [5] - 77:10, 78:4, 102:2, 105:21, 210:23
**reflecting** [2] - 102:15, 190:8
**reflection** [2] - 185:4, 194:24
**reflects** [4] - 183:25, 190:12, 190:23, 200:3
**refresh** [1] - 34:5
**regard** [24] - 10:21, 63:11, 65:15, 66:1, 66:8, 68:5, 89:21, 90:17, 91:8, 100:11, 104:10, 104:11, 106:25, 107:12, 108:16, 112:6, 114:11, 126:17, 130:12, 130:13, 133:12, 134:15, 154:1
**regarding** [6] - 6:11, 9:18, 34:5, 38:22, 65:10, 150:1
**regardless** [2] - 171:7, 186:7
**regards** [3] - 154:4, 176:15, 177:1
**regimen** [1] - 170:3
**regret** [1] - 76:9
**regular** [1] - 117:3
**regularly** [1] - 116:25
**REISMAN** [1] - 1:15
**relate** [1] - 169:20
**related** [13] - 55:25, 56:14, 56:17, 56:18, 56:24, 71:1, 115:18, 143:10, 181:6, 184:10, 191:18, 191:20, 201:2
**relates** [3] - 113:1, 121:8, 196:6
**relating** [6] - 64:3, 84:16, 95:2, 101:4, 134:21, 143:1
**relation** [1] - 196:20
**relationship** [1] - 136:11
**relative** [4] - 10:11, 47:13, 109:10, 150:17
**release** [1] - 127:18
**relevant** [7] - 63:9, 101:25, 104:9, 107:8, 108:15, 128:14, 130:6
**reliability** [4] - 86:5, 86:9, 86:11, 86:25
**reliable** [4] - 81:6, 84:25, 193:13, 204:1

**reliably** [1] - 173:8
**relied** [1] - 207:3
**rely** [2] - 194:9, 207:14
**relying** [1] - 105:8
**remain** [3] - 141:1, 150:14, 150:16
**remediation** [3] - 171:10, 185:6
**remember** [26] - 16:1, 24:16, 35:3, 55:17, 56:8, 73:11, 99:8, 99:11, 100:9, 101:23, 122:4, 123:6, 123:10, 125:5, 127:22, 127:24, 128:1, 131:4, 153:5, 160:11, 160:12, 160:13, 177:18, 180:18, 196:16
**remembering** [1] - 77:5
**remind** [2] - 3:24, 117:22
**reminding** [1] - 127:10
**reminds** [1] - 25:18
**remove** [1] - 19:7
**removed** [1] - 90:1
**repeat** [1] - 114:23
**rephrase** [2] - 16:8, 82:19
**rephrased** [1] - 14:22
**report** [139] - 10:3, 29:9, 29:24, 30:18, 30:21, 44:18, 45:3, 53:13, 66:2, 66:7, 66:13, 73:12, 73:18, 73:22, 73:23, 83:21, 83:23, 84:3, 84:6, 85:6, 85:10, 88:3, 94:9, 97:20, 98:2, 99:8, 99:10, 99:11, 99:12, 99:18, 99:20, 99:23, 100:1, 100:2, 100:10, 100:13, 100:20, 101:8, 104:18, 110:23, 113:5, 113:14, 113:18, 113:21, 115:1, 126:25, 128:6, 128:7, 128:9, 128:10, 129:10, 129:13, 129:24, 130:4, 130:8, 130:19, 131:5, 131:6, 131:12, 131:25, 133:9, 133:14, 133:24, 134:2, 134:4, 134:9, 134:22, 141:10, 141:13, 141:15, 141:19, 149:6, 149:9, 149:10, 149:17, 149:20, 150:11, 153:17, 154:6, 154:13, 156:8, 156:10, 160:22, 160:24, 161:11, 161:16, 161:22, 162:19, 176:21, 176:22, 178:19, 178:25, 179:4, 181:1, 181:24, 182:2, 182:12, 183:15, 184:16, 184:25, 185:13, 185:23, 187:15, 189:15, 189:19, 190:1, 190:4, 190:16, 191:1, 192:17, 194:12, 194:15, 195:23, 196:6, 198:23,

199:10, 199:12, 199:13, 199:17, 201:20, 202:1, 202:15, 203:12, 203:20, 204:6, 204:17, 204:19, 206:15, 206:16, 207:24, 208:10, 208:17, 210:15
**reported** [15] - 35:5, 96:9, 96:11, 111:1, 111:25, 112:16, 113:8, 114:20, 120:13, 121:6, 121:16, 152:3, 152:17, 161:20, 161:22
**Reporter** [2] - 1:22, 211:17
**reporter** [1] - 125:15
**REPORTER** [3] - 62:9, 138:24, 167:24
**reporting** [4] - 9:18, 21:22, 96:21, 132:17
**reports** [14] - 32:10, 72:4, 72:7, 96:16, 97:3, 99:20, 121:20, 128:5, 134:21, 141:12, 141:23, 149:23, 176:17, 176:19
**represent** [2] - 197:6, 201:6
**representation** [2] - 38:6, 92:5
**representations** [1] - 91:10
**representative** [5] - 37:21, 38:1, 38:9, 40:7, 40:8
**represented** [1] - 75:16
**Representing** [3] - 1:18, 2:7, 2:14
**represents** [2] - 106:12, 136:10
**request** [41] - 4:23, 12:8, 20:9, 21:5, 21:6, 21:7, 21:12, 21:16, 28:15, 29:9, 29:17, 39:6, 63:14, 63:17, 63:18, 63:25, 64:4, 64:21, 65:10, 65:12, 71:20, 72:10, 74:5, 83:22, 117:4, 123:7, 127:20, 133:8, 133:25, 134:2, 139:13, 139:17, 139:20, 139:21, 139:24, 140:23, 141:11, 141:16, 148:24, 149:13, 150:1
**requested** [7] - 11:10, 11:15, 39:7, 63:6, 65:13, 74:4, 74:6
**requesting** [3] - 11:21, 12:21, 123:13
**requests** [10] - 7:9, 28:9, 63:4, 63:21, 83:9, 83:10, 129:9, 135:2, 135:3, 146:11
**require** [7] - 24:10, 54:24, 80:12, 106:16, 106:19, 143:12, 172:16
**required** [2] - 54:23, 59:2
**requirement** [1] - 167:9
**requirements** [4] - 69:22, 80:11, 116:7, 169:23

**requires** [3] - 108:18, 172:19, 176:18
**reread** [1] - 7:13
**rereading** [1] - 190:21
**rescored** [2] - 111:2, 112:17
**research** [20] - 37:2, 37:10, 37:11, 67:18, 68:2, 68:8, 68:14, 70:18, 71:1, 81:5, 91:8, 130:3, 130:7, 143:14, 145:24, 154:3, 154:25, 193:20, 198:21, 206:25
**researched** [1] - 207:21
**researchers** [4] - 67:22, 81:12, 82:23, 198:2
**respect** [19] - 63:25, 66:7, 90:25, 103:14, 104:8, 106:23, 107:7, 108:1, 110:19, 111:5, 111:20, 112:9, 112:10, 112:25, 115:5, 137:8, 140:22, 141:16, 203:5
**respond** [4] - 174:17, 183:5, 209:6
**responded** [1] - 183:11
**responding** [1] - 107:14
**Response** [1] - 204:10
**response** [3] - 204:24, 205:1, 205:2
**responses** [1] - 202:22
**responsibilities** [1] - 67:16
**responsibility** [1] - 33:8
**rest** [3] - 46:24, 52:21, 53:8
**restate** [1] - 114:24
**restated** [1] - 55:6
**restless** [1] - 172:8
**result** [8] - 101:2, 133:3, 133:4, 155:23, 160:14, 204:1, 204:4
**results** [17] - 44:25, 91:23, 107:25, 110:15, 110:25, 111:24, 112:15, 113:8, 132:23, 145:23, 161:20, 161:22, 162:23, 163:5, 178:5, 191:2, 192:9
**resume** [3] - 3:5, 48:16, 117:20
**resumed** [1] - 109:18
**Retention** [1] - 94:11
**revert** [1] - 186:12
**review** [52] - 7:3, 29:25, 62:21, 62:25, 63:14, 64:23, 71:22, 72:17, 72:19, 72:23, 72:25, 73:3, 73:8, 74:2, 83:8, 83:10, 84:4, 99:8, 111:19, 116:13, 116:20, 116:24, 116:25, 117:4, 118:14, 121:10, 123:11, 133:25, 136:23, 139:11, 139:13, 139:21, 140:2, 146:11, 148:23, 149:13, 153:17,

154:13, 159:8, 160:22, 161:16, 162:19, 163:16, 163:17, 163:20, 163:24, 164:1, 164:11, 180:2, 182:19, 204:9
**reviewed** [42] - 3:13, 36:22, 53:13, 65:15, 65:24, 66:4, 68:3, 68:11, 68:13, 73:17, 84:3, 99:17, 100:19, 101:4, 107:19, 108:14, 109:4, 117:5, 118:17, 125:19, 128:17, 129:9, 130:22, 130:23, 134:1, 139:17, 139:24, 141:13, 141:18, 150:6, 150:11, 150:15, 153:2, 153:14, 161:10, 161:12, 179:19, 192:2, 194:13, 196:3, 207:23
**reviewer** [6] - 63:16, 78:17, 123:1, 129:8, 134:24, 135:8, 153:4, 154:5, 156:1, 156:3
**reviewers** [1] - 69:6
**reviewing** [10] - 27:15, 63:4, 63:18, 64:21, 71:20, 99:13, 135:2, 135:3, 160:11, 180:12
**reviews** [2] - 72:15, 140:1
**revise** [1] - 158:1
**revised** [4] - 14:10, 14:12, 81:9
**revisions** [3] - 73:23, 149:10, 149:20
**rewrite** [1] - 158:1
**Richard** [1] - 121:23
**rid** [1] - 5:2
**right-hand** [2] - 7:2, 142:21
**ringing** [1] - 17:22
**RMR** [2] - 1:22, 211:17
**Robert** [5] - 83:21, 136:1, 141:10, 167:17, 168:1
**ROBERT** [4] - 2:10, 167:22, 212:13, 212:15
**Rockefeller** [1] - 122:5
**role** [6] - 62:17, 62:20, 139:9, 139:16, 142:18, 156:18
**room** [7] - 8:4, 8:16, 11:25, 41:22, 43:24, 43:25, 44:1
**ropes** [1] - 49:2
**rotation** [10] - 44:8, 44:11, 46:20, 49:21, 49:22, 49:25, 51:1, 51:16, 53:3, 53:9
**rotations** [6] - 48:23, 49:4, 49:5, 49:17, 53:2, 53:5
**rough** [2] - 42:18, 102:15
**roughly** [2] - 85:23, 210:2
**rows** [1] - 191:17
**Ruekberg** [30] - 4:17, 5:9, 5:13, 6:20, 9:3, 9:8, 10:4, 11:3, 12:4, 12:14, 13:18, 13:19, 14:1, 15:10, 17:2, 17:10, 18:5, 19:3, 20:7,

21:19, 23:22, 24:3, 24:15, 25:20, 160:1, 160:13, 160:18, 176:16, 208:22, 209:8

**Ruekberg's** [5] - 14:10, 18:20, 19:18, 23:17, 160:11

**rule** [1] - 116:8

**ruled** [1] - 198:6

**ruling** [1] - 20:11

**run** [1] - 49:1

**Sally** [1] - 198:19

**salt** [1] - 193:12

**sample** [8] - 56:4, 90:23, 104:20, 105:3, 107:3, 199:24, 200:1, 200:2

**sat** [1] - 109:8

**Saturday** [1] - 52:2

**saw** [9] - 29:5, 59:18, 63:16, 63:19, 63:22, 94:2, 94:20, 151:14, 153:19

**scale** [6] - 96:5, 201:15, 202:25, 204:19, 204:25, 205:2, 205:23, 205:24

**Scale** [2] - 204:10, 205:10, 205:16

**scales** [6] - 95:4, 95:11, 95:14, 172:13, 202:22, 209:10

**scenario** [1] - 130:16

**schedule** [2] - 61:7, 180:20

**scheduled** [1] - 59:13

**scheduling** [4] - 3:17, 60:2, 60:10, 60:23

**scholars** [1] - 197:23

**scholastic** [1] - 177:19

**school** [107] - 12:8, 12:11, 16:19, 24:10, 24:11, 24:12, 25:20, 25:23, 31:7, 31:10, 31:24, 32:3, 38:16, 38:23, 39:5, 39:8, 39:9, 39:15, 39:16, 39:19, 40:16, 41:22, 43:19, 44:11, 45:10, 46:15, 47:10, 47:14, 48:24, 48:25, 52:12, 52:19, 53:6, 53:12, 57:10, 58:7, 58:11, 66:1, 66:9, 66:23, 67:21, 67:23, 68:20, 69:3, 70:12, 75:1, 77:2, 77:10, 77:13, 78:24, 79:20, 80:8, 85:21, 87:2, 91:20, 92:15, 96:24, 99:21, 100:24, 100:25, 101:5, 105:9, 106:2, 107:19, 108:3, 116:2, 116:4, 116:6, 116:9, 116:10, 118:6, 118:22, 119:2, 119:10, 129:18, 133:15, 134:12, 134:18, 136:24, 137:11, 141:18, 143:23, 148:9, 150:12, 150:25, 154:22, 165:11, 165:21, 181:2, 181:7,

181:10, 181:15, 183:20, 193:21, 193:24, 194:13, 194:21, 194:23, 203:1, 208:15

**School** [1] - 117:2

**school's** [1] - 47:1

**school-aged** [2] - 148:9, 150:25

**schoolchild** [2] - 77:1, 77:11

**schools** [3] - 38:20, 69:2, 78:23

**Schwab** [1] - 121:21

**science** [3] - 56:13, 59:11, 101:17

**Science** [2] - 41:11, 43:11

**sciences** [8] - 55:19, 105:2, 105:3, 105:4, 105:6, 142:13

**scientific** [2] - 82:24, 91:8

**score** [91] - 37:21, 38:8, 38:12, 38:13, 42:16, 42:19, 43:16, 44:5, 44:16, 44:18, 45:3, 46:1, 47:22, 56:6, 79:18, 84:24, 85:10, 85:13, 85:24, 85:25, 86:1, 86:3, 86:12, 86:13, 86:20, 86:23, 87:17, 87:19, 87:20, 87:23, 88:6, 88:25, 89:6, 90:8, 90:9, 90:10, 90:12, 90:13, 91:6, 94:10, 99:18, 99:22, 102:19, 102:20, 102:21, 103:2, 103:4, 104:18, 106:9, 106:11, 129:13, 131:17, 132:2, 132:8, 132:9, 132:10, 133:5, 148:5, 160:23, 184:1, 186:8, 186:11, 186:18, 187:4, 187:5, 187:6, 187:9, 187:16, 187:24, 188:3, 188:9, 189:1, 189:2, 189:8, 189:20, 189:22, 189:23, 191:16, 193:12, 197:10, 197:11, 197:12, 202:6, 204:13, 204:19

**scored** [7] - 37:18, 56:4, 59:4, 187:23, 188:2, 190:9, 209:24

**scores** [60] - 59:7, 66:2, 66:10, 66:11, 81:22, 83:16, 85:2, 85:9, 85:15, 86:22, 87:15, 88:4, 88:24, 89:1, 89:3, 90:6, 90:11, 90:15, 90:25, 91:2, 91:9, 91:12, 91:13, 93:5, 94:12, 96:4, 97:23, 98:12, 98:13, 98:14, 98:17, 98:21, 98:24, 101:16, 101:17, 102:5, 102:7, 105:1, 108:2, 111:3, 111:4, 112:1, 112:18, 118:15, 119:9, 131:4, 131:11, 132:1, 132:13, 133:2, 134:14, 141:19, 150:12, 185:13,

186:17, 192:11, 192:12, 196:20, 203:25

**scoring** [5] - 56:6, 186:16, 187:2, 187:3, 193:23

**screen** [2] - 182:23, 206:10

**screening** [6] - 84:15, 162:14, 177:4, 177:5, 182:22, 182:23

**se** [1] - 122:11

**search** [2] - 22:3, 130:6

**seated** [1] - 117:19

**secluded** [1] - 16:17

**second** [32] - 4:22, 5:14, 7:5, 12:7, 16:17, 21:5, 21:12, 23:12, 37:13, 40:16, 40:25, 41:16, 41:17, 43:15, 44:13, 51:17, 60:15, 74:21, 78:18, 78:25, 83:7, 83:17, 99:16, 140:23, 149:17, 149:19, 156:13, 159:8, 159:11, 160:22, 163:24, 206:2

**secondary** [1] - 31:5

**section** [29] - 5:2, 25:2, 25:4, 33:3, 33:6, 34:17, 55:10, 55:21, 58:20, 125:3, 179:8, 179:10, 179:13, 179:18, 179:21, 180:3, 180:7, 180:8, 180:10, 181:2, 181:5, 182:2, 182:5, 182:6, 182:18, 183:14, 183:17, 206:17

**sections** [7] - 33:2, 33:5, 33:6, 33:7, 55:17, 101:16, 104:23, 105:5, 179:8

**secure** [3] - 62:23, 73:3, 149:1

**see** [60] - 4:16, 5:16, 6:9, 11:14, 11:22, 16:7, 16:22, 23:12, 28:16, 29:4, 29:8, 33:24, 34:15, 34:19, 42:1, 42:18, 49:15, 53:1, 61:1, 64:9, 70:4, 72:11, 80:5, 82:2, 92:5, 95:18, 95:19, 96:12, 96:18, 97:5, 97:20, 99:3, 99:6, 100:4, 101:6, 119:15, 125:1, 125:4, 125:24, 126:2, 126:11, 147:17, 150:23, 151:17, 152:6, 152:20, 164:5, 175:23, 176:19, 180:5, 184:3, 192:16, 193:2, 196:2, 203:25, 204:1, 204:3, 207:11, 209:5, 209:14

**seeing** [1] - 144:4

**seeking** [1] - 18:25

**seem** [1] - 92:8

**select** [3] - 106:10, 106:14, 107:5

**selected** [2] - 40:7, 99:12

**self** [6] - 43:8, 97:14, 98:18, 152:3, 152:17, 190:21

**Self** [2] - 41:12, 43:12

**self-assessment** [1] - 43:8

**Self-Assessment** [2] - 41:12, 43:12

**self-control** [2] - 97:14, 98:18

**self-corrections** [1] - 190:21

**self-reported** [2] - 152:3, 152:17

**semester** [2] - 67:25, 69:15

**send** [4] - 5:19, 23:23, 174:15, 175:22

**Sending** [1] - 14:3

**sending** [1] - 25:22

**sends** [2] - 116:13, 163:16

**senior** [1] - 106:3

**seniors** [5] - 85:14, 85:21, 87:2, 193:21, 193:24

**sense** [8] - 77:9, 79:6, 79:9, 98:15, 105:7, 105:11, 111:4, 183:24

**sent** [23] - 6:20, 9:20, 11:3, 12:10, 12:13, 15:10, 17:15, 18:9, 20:7, 23:17, 23:18, 25:1, 25:14, 26:18, 26:23, 27:2, 29:24, 30:17, 62:21, 164:5, 164:9, 164:14, 179:25

**sentence** [15] - 8:3, 16:14, 16:23, 27:7, 88:22, 132:4, 151:24, 152:6, 152:8, 152:14, 152:24, 153:2, 191:6, 191:8

**sentences** [3] - 152:21, 158:19, 191:10

**separate** [4] - 8:4, 8:15, 11:25, 77:16

**separately** [3] - 10:10, 80:6, 80:11

**Separately** [1] - 22:5

**September** [8] - 21:4, 21:15, 23:23, 28:19, 29:1, 29:5, 67:3, 175:13

**series** [6] - 23:13, 25:7, 57:11, 57:12, 89:24, 112:10

**served** [1] - 139:7

**service** [2] - 67:18, 68:5

**services** [2] - 72:16, 135:1

**serving** [1] - 62:17

**set** [6] - 75:5, 78:23, 80:9, 91:11, 111:19, 163:16

**sets** [2] - 94:3, 186:3

**settings** [7] - 70:13, 74:25, 76:6, 78:6, 78:19, 96:24, 99:3

**setup** [1] - 50:12

**seven** [2] - 5:22, 67:8

**several** [14] - 5:6, 41:6, 42:5, 57:2, 65:14, 110:11, 110:14, 125:25, 130:20, 153:12, 161:13, 172:1, 185:12, 206:9

**severe** [8] - 10:1, 10:8,

10:23, 24:11, 96:10, 96:16, 96:22, 182:23

**severely** [3] - 107:2, 205:7, 205:17

**severity** [7] - 9:25, 10:12, 24:5, 76:10, 96:7, 96:13, 122:13

**shaded** [1] - 47:23

**shall** [1] - 117:8

**shared** [1] - 145:13

**Shaywitz** [1] - 198:20

**sheer** [1] - 49:7

**shelf** [4] - 38:19, 48:21, 48:23, 50:9

**shifting** [1] - 107:17

**shoe** [2] - 191:18, 191:19

**short** [3] - 61:15, 98:12, 190:19

**shortly** [1] - 65:9

**show** [16] - 22:19, 49:2, 49:19, 54:10, 54:18, 79:4, 85:7, 85:19, 93:25, 94:3, 115:21, 125:11, 132:22, 154:3, 178:14, 195:20

**showed** [3] - 85:24, 129:11, 192:10

**showing** [6] - 22:21, 74:25, 81:5, 83:16, 100:3

**shown** [1] - 54:16

**shows** [5] - 47:12, 86:1, 128:17, 132:1, 176:6

**sic** [1] - 140:25

**side** [3] - 11:14, 21:24, 32:21

**signature** [3] - 26:2, 168:17, 179:2

**significance** [1] - 37:7

**significant** [11] - 65:20, 76:14, 76:16, 77:3, 80:2, 81:3, 96:19, 128:2, 158:25, 172:20, 198:6

**significantly** [1] - 197:2

**signify** [1] - 47:20

**signs** [1] - 172:14

**silent** [5] - 86:21, 185:12, 191:8, 191:21, 208:7

**silently** [3] - 192:5, 192:6, 193:14

**similar** [6] - 16:12, 107:12, 163:24, 181:6, 204:1, 204:4

**simple** [3] - 94:1, 191:10, 191:13

**Simplified** [1] - 12:19

**simplified** [2] - 25:19, 25:22

**simulate** [1] - 43:23

**sincere** [1] - 207:7

**single** [1] - 130:15

**sit** [2] - 172:8, 206:13

**sitting** [5] - 19:7, 68:6, 167:8, 172:8, 206:10

**situation** [3] - 4:3, 44:6,

112:4

**situations** [3] - 31:21, 99:6, 120:5

**six** [1] - 33:6

**size** [1] - 174:18

**skeptical** [1] - 128:12

**skill** [2] - 91:11, 104:13

**skills** [30] - 78:2, 78:3, 79:2, 79:3, 79:9, 79:10, 79:23, 80:2, 80:14, 81:2, 82:4, 83:17, 84:19, 87:13, 89:21, 90:17, 92:5, 98:18, 104:14, 106:6, 147:16, 163:12, 171:4, 171:16, 171:19, 171:21, 174:1, 197:2

**Skills** [1] - 195:24

**skip** [4] - 56:22, 57:1, 180:3, 191:21, 191:25

**sleep** [1] - 182:20

**slides** [1] - 135:21

**slightly** [2] - 42:25, 44:6

**sloppiness** [1] - 199:4

**slow** [9] - 49:10, 94:21, 94:22, 94:23, 165:7, 185:7, 190:2, 190:7, 210:23

**slowly** [1] - 187:22

**small** [3] - 17:14, 56:16, 67:8

**small-font** [1] - 17:14

**smart** [2] - 16:10, 165:6

**SMITH** [3] - 167:22, 212:14, 212:16

**Smith** [55] - 13:21, 21:23, 22:2, 22:6, 22:16, 22:24, 28:16, 29:4, 29:20, 29:24, 30:3, 30:9, 30:17, 30:20, 31:2, 61:5, 70:16, 83:21, 84:3, 84:6, 85:20, 87:4, 88:17, 89:16, 93:18, 94:20, 95:1, 97:15, 97:21, 99:24, 101:1, 108:1, 110:15, 110:20, 111:21, 113:4, 113:16, 114:19, 114:25, 123:23, 130:19, 132:14, 141:10, 153:20, 153:23, 154:1, 159:5, 161:13, 167:18, 168:1, 168:4, 168:11, 174:3, 188:20, 195:23

**Smith's** [13] - 94:9, 97:20, 99:8, 113:14, 131:6, 141:13, 150:11, 153:14, 153:17, 154:13, 161:10, 161:16, 162:19

**Smiy** [3] - 23:10, 208:20, 209:1

**so..** [1] - 126:20

**social** [6] - 34:15, 34:17, 56:15, 99:5, 99:5, 197:5

**sociology** [1] - 142:8

**sock** [2] - 191:18, 191:19

**software** [1] - 49:13

**solely** [2] - 72:17, 98:24

**solve** [1] - 198:18

**solving** [1] - 201:4

**someone** [53] - 21:23, 29:15, 72:7, 74:14, 74:25, 75:3, 75:8, 76:13, 77:1, 77:2, 77:18, 78:10, 78:14, 80:1, 81:20, 82:2, 82:8, 84:22, 86:15, 86:18, 91:9, 92:3, 92:18, 92:19, 93:13, 93:15, 93:25, 96:13, 96:23, 96:25, 97:11, 102:1, 113:23, 114:1, 118:22, 119:1, 119:22, 120:8, 120:19, 121:2, 122:12, 122:15, 122:23, 122:24, 123:12, 123:16, 129:21, 133:8, 137:11, 148:17, 165:23, 174:12

**sometimes** [10] - 16:20, 56:15, 57:8, 92:17, 108:23, 108:24, 108:25, 121:1, 195:16, 203:18

**somewhat** [6] - 34:25, 35:3, 119:18, 130:14, 175:14, 186:12

**somewhere** [1] - 102:11

**son** [1] - 165:6

**soon** [1] - 29:4

**sooner** [1] - 5:1

**Sorrentino** [2] - 19:22, 19:23

**sorry** [35] - 3:11, 5:1, 6:6, 7:6, 14:5, 17:11, 17:16, 17:18, 18:11, 22:1, 26:25, 30:10, 30:11, 34:16, 42:13, 46:16, 47:6, 48:7, 52:24, 53:2, 56:20, 88:2, 97:19, 114:23, 128:9, 131:8, 131:23, 148:15, 148:16, 154:24, 155:13, 157:21, 161:21, 177:3, 182:6

**sort** [29] - 5:22, 10:19, 42:18, 47:23, 51:19, 60:3, 62:25, 67:19, 68:7, 75:12, 75:16, 76:3, 76:10, 76:17, 78:19, 79:1, 80:25, 82:11, 84:23, 85:19, 85:23, 96:9, 101:1, 101:10, 120:15, 121:2, 121:9, 134:13, 147:13

**sorts** [6] - 68:6, 70:1, 72:21, 77:11, 120:25, 124:6

**sought** [2] - 139:23, 141:9

**sounds** [1] - 29:7

**source** [1] - 113:12

**sources** [4] - 84:7, 178:20, 179:9, 179:14

**Spanish** [2] - 54:6, 54:12

**speaking** [7] - 65:25, 77:13, 91:17, 165:5, 187:20, 187:22, 210:2

**special** [2] - 117:4, 128:13

**specialize** [1] - 82:24

**specialized** [2] - 92:25, 93:5

**specialties** [3] - 67:10, 142:16, 142:17

**specific** [16] - 55:12, 77:25, 83:2, 95:19, 95:20, 96:2, 105:8, 105:12, 108:6, 126:13, 177:10, 177:17, 184:15, 203:4, 209:16

**specifically** [21] - 17:4, 28:23, 29:8, 29:11, 54:1, 55:8, 66:1, 67:11, 68:13, 68:20, 81:9, 101:10, 110:18, 115:14, 123:14, 136:3, 143:1, 160:12, 170:21, 176:18, 176:25

**specifics** [1] - 131:3

**speech** [1] - 144:14

**speed** [20] - 29:12, 29:13, 87:1, 87:22, 88:8, 90:18, 184:10, 185:2, 186:17, 186:19, 187:4, 189:4, 189:5, 189:7, 200:18, 201:1, 201:13, 202:9, 208:7, 210:22

**spelling** [2] - 17:6, 197:5

**spend** [2] - 53:3, 109:25

**spent** [6] - 23:10, 33:24, 34:6, 34:8, 34:9, 53:8

**sports** [2] - 35:6, 36:2

**spots** [1] - 101:9

**spring** [2] - 67:25, 118:7

**stage** [1] - 176:9

**stand** [5] - 3:5, 30:4, 48:16, 117:20, 149:23

**standard** [7] - 43:24, 105:15, 109:10, 165:4, 173:21, 178:1, 188:3

**standardization** [1] - 199:24

**standardized** [20] - 45:23, 50:11, 66:2, 66:9, 78:4, 78:21, 78:23, 83:15, 91:20, 99:19, 104:9, 107:8, 107:20, 108:3, 141:19, 146:11, 150:12, 158:3, 194:1, 196:24

**stands** [1] - 182:24

**start** [13] - 3:13, 4:6, 4:14, 30:13, 53:1, 67:25, 74:21, 83:6, 108:22, 153:15, 180:22, 186:3, 211:5

**started** [5] - 53:12, 62:18, 146:3, 179:9, 211:5

**starting** [12] - 5:13, 10:14, 16:16, 25:11, 72:24, 77:23, 80:18, 118:6, 150:25, 151:14, 184:19, 189:15

**starts** [6] - 86:15, 156:13, 159:11, 179:18, 180:7, 181:2

**state** [18] - 7:9, 24:8, 50:15, 62:9, 65:9, 66:20, 69:22,

86:3, 138:24, 147:19, 148:4, 149:25, 154:21, 154:22, 155:3, 155:6, 167:24, 169:15

**State** [7] - 32:2, 66:21, 67:7, 117:1, 137:9, 142:9, 169:2

**statement** [10] - 5:16, 6:11, 127:9, 134:18, 156:16, 156:17, 156:25, 157:5, 157:13, 157:21

**statements** [1] - 183:9

**States** [2] - 155:24, 170:22

**STATES** [1] - 1:1

**states** [1] - 8:3

**stating** [2] - 15:20, 16:15

**Statistical** [2] - 81:16, 170:6

**statistics** [1] - 56:15

**status** [3] - 34:2, 182:3, 182:15

**stay** [1] - 75:13

**STEIN** [2] - 2:2, 2:3

**stenographically** [1] - 1:24

**Step** [24] - 4:23, 7:9, 7:18, 7:22, 8:13, 29:17, 37:18, 42:20, 42:22, 43:1, 44:19, 56:10, 56:12, 56:14, 56:21, 58:8, 58:10, 58:23, 58:24, 99:22, 104:12, 115:23, 116:8, 130:10

**step** [7] - 59:23, 59:24, 62:4, 123:4, 138:7, 138:20, 167:20

**Steven** [2] - 138:18, 138:25

**STEVEN** [4] - 2:3, 138:22, 212:10, 212:12

**still** [33] - 3:24, 11:7, 11:17, 13:2, 13:14, 39:11, 43:24, 51:21, 63:1, 79:22, 82:9, 95:10, 95:23, 117:22, 119:5, 120:10, 128:14, 130:9, 131:23, 145:6, 148:1, 148:6, 148:15, 154:20, 160:22, 164:18, 172:8, 172:9, 178:15, 182:6, 185:6, 197:20, 198:16

**stone** [1] - 191:18

**stood** [1] - 167:7

**stop** [5] - 75:13, 86:16, 186:8, 186:10, 186:24

**stopped** [3] - 77:23, 174:21, 186:11

**story** [2] - 57:21, 58:3

**straightforward** [1] - 154:12

**strategies** [7] - 128:2, 129:3, 130:2, 130:13, 130:18, 173:25, 201:8

**strategy** [6] - 100:14, 129:22, 129:23, 129:25, 130:10, 133:9

**Street** [4] - 1:9, 1:16, 2:4, 2:11

**strength** [1] - 174:1

**strengthen** [1] - 66:10

**strengths** [4] - 79:1, 79:6, 79:8, 158:13

**strike** [1] - 155:13

**strikes** [1] - 17:20

**strong** [1] - 158:14

**struggle** [2] - 7:11, 7:21

**struggles** [2] - 100:25, 159:1

**struggling** [2] - 53:25, 198:8

**student** [12] - 3:9, 3:11, 47:10, 47:11, 120:2, 123:4, 154:7, 154:8, 157:7, 157:9, 175:17, 195:2

**students** [20] - 22:7, 32:5, 32:8, 33:3, 33:12, 47:13, 47:14, 47:17, 52:21, 55:19, 67:13, 67:20, 68:6, 87:2, 118:2, 118:11, 119:7, 144:22, 156:21, 156:23

**studied** [2] - 124:15, 163:13

**studies** [4] - 82:25, 197:5, 199:22, 207:17

**study** [16] - 44:9, 50:1, 52:16, 52:20, 53:4, 53:6, 53:7, 124:2, 124:4, 124:5, 124:6, 124:9, 124:18, 124:20, 163:10

**studying** [2] - 49:9, 118:3

**stuff** [4] - 15:1, 36:12, 50:3, 180:22

**stumbles** [1] - 185:7

**stumbling** [1] - 190:12

**subject** [11] - 38:19, 39:11, 44:10, 45:1, 45:6, 45:20, 46:23, 48:3, 158:7, 187:20, 202:16

**subjects** [2] - 40:2, 40:8

**submission** [1] - 134:22

**submit** [1] - 133:8

**submitted** [33] - 21:5, 21:12, 24:18, 28:18, 62:24, 63:13, 63:20, 63:23, 64:14, 64:18, 64:20, 65:11, 72:6, 72:12, 73:6, 73:22, 83:21, 127:1, 139:11, 139:20, 140:15, 141:9, 149:2, 149:5, 149:8, 149:16, 159:13, 159:17, 159:19, 159:20, 159:23, 168:5, 168:14

**subscore** [1] - 187:3

**subscores** [1] - 89:4

**subsequently** [6] - 21:14, 28:18, 141:9, 141:13, 141:14, 196:5

**substance** [1] - 73:8

**substantial** [6] - 76:21, 76:23, 130:9, 150:7, 154:25, 185:6

**substantially** [9] - 63:8, 80:15, 104:8, 104:11, 107:7,

108:14, 148:20, 150:17

**subtests** [1] - 184:13

**succeed** [1] - 158:10

**successful** [2] - 118:22, 119:1, 119:10, 120:17, 120:22, 120:23, 121:3, 122:25

**successfully** [2] - 122:9, 122:19

**sufficient** [4] - 79:4, 108:10, 108:17, 108:20

**suggest** [5] - 73:23, 87:1, 88:8, 133:1, 165:8

**suggested** [2] - 16:4, 19:18

**suggesting** [1] - 94:12

**suggestion** [1] - 17:2

**suggestions** [1] - 18:20

**suggestive** [1] - 158:24

**suggests** [5] - 93:21, 94:14, 104:10, 107:11, 108:12

**Suite** [2] - 2:4, 2:11

**summarize** [6] - 63:11, 116:20, 180:11, 190:18, 191:5, 208:3

**summary** [4] - 34:7, 63:2, 100:5, 185:13

**summer** [1] - 52:20

**superior** [1] - 79:2

**supervise** [1] - 144:10

**supervised** [4] - 33:7, 70:1, 70:14, 144:19

**supervising** [3] - 144:17, 144:21, 144:25

**supplement** [3] - 163:2, 207:11, 207:12

**supplemental** [2] - 84:24, 193:23

**supply** [1] - 33:10

**support** [23] - 4:22, 12:8, 12:20, 12:24, 13:14, 17:12, 24:8, 24:11, 29:9, 29:16, 29:19, 50:15, 51:3, 53:17, 63:21, 64:25, 65:12, 72:10, 81:13, 83:22, 101:11, 141:10

**supported** [4] - 25:16, 97:7, 98:22, 208:16

**supporting** [2] - 9:3, 65:19

**suppose** [1] - 124:7

**supposed** [4] - 33:9, 97:13, 105:8, 105:13

**surely** [1] - 60:8

**surgery** [4] - 44:8, 44:11, 44:19, 44:21

**surpassed** [1] - 102:12

**sustain** [2] - 20:3, 20:14

**sustained** [3] - 21:1, 205:23, 205:24

**swim** [1] - 31:22

**switching** [2] - 95:1, 146:23

**swollen** [2] - 52:1

**sworn** [5] - 3:25, 62:7, 117:23, 138:22, 167:22

**symptom** [8] - 9:4, 9:7, 10:3, 75:16, 115:13, 206:18, 207:8, 207:9

**symptoms** [41] - 9:18, 9:21, 9:25, 10:7, 10:20, 10:21, 10:22, 10:23, 24:5, 25:15, 74:20, 74:23, 74:25, 75:3, 75:8, 75:17, 76:15, 76:25, 95:18, 96:2, 96:6, 96:9, 96:14, 96:20, 96:22, 97:2, 97:4, 115:6, 115:21, 152:3, 152:18, 172:6, 172:7, 172:14, 172:15, 172:18, 172:20, 208:16, 209:11, 209:21

**Syracuse** [2] - 66:22, 66:23

**system** [2] - 56:7, 77:17

**TA** [1] - 33:6

**Tab** [19] - 28:21, 33:13, 64:16, 83:25, 127:3, 128:7, 131:5, 131:7, 131:10, 140:14, 156:7, 156:10, 156:13, 159:8, 160:3, 160:22, 164:1, 164:11, 168:12

**table** [14] - 5:4, 5:12, 5:15, 5:19, 5:23, 6:23, 7:1, 11:13, 31:18, 88:4, 131:11, 131:22, 131:25, 191:2

**tables** [1] - 5:7

**tabs** [1] - 151:5

**talks** [5] - 68:3, 69:1, 69:6, 69:7, 145:24

**tap** [1] - 184:13

**task** [3] - 97:12, 191:9, 191:23

**tasks** [2] - 183:11, 195:3

**taught** [7] - 67:8, 69:11, 118:4, 118:7, 118:18, 142:24, 143:1

**teach** [7] - 67:19, 67:22, 69:16, 118:4, 118:11, 142:18, 142:19

**teacher** [7] - 54:13, 77:8, 79:23, 101:9, 165:17, 165:18, 195:4

**teachers** [11] - 16:20, 53:18, 53:21, 53:22, 66:12, 69:2, 133:17, 133:23, 134:8, 134:11, 195:2

**Teachers** [2] - 67:1, 67:20

**teaching** [12] - 32:3, 32:14, 33:1, 33:5, 33:8, 67:18, 68:1, 69:9, 69:14, 118:2, 143:6, 143:11

**teams** [1] - 70:12

**technical** [2] - 162:14, 188:22

technically [2] - 14:12, 77:15
technician [2] - 23:14, 179:17
techniques [1] - 145:2
technology [1] - 120:16
telephone [3] - 21:22, 22:15, 22:16
ten [4] - 134:24, 143:7, 156:4, 163:21
tend [2] - 79:12, 130:15
tenure [1] - 67:7
term [8] - 40:5, 79:9, 80:16, 91:7, 119:18, 120:24, 122:22, 203:19
terminology [4] - 177:8, 177:16, 184:11, 184:12
terms [17] - 29:1, 37:6, 64:24, 68:2, 77:10, 78:4, 83:17, 90:9, 96:6, 97:1, 106:6, 107:13, 122:13, 137:1, 170:2, 187:2, 187:9
terribly [2] - 193:13
test [132] - 39:7, 39:10, 39:11, 41:14, 42:16, 43:3, 43:5, 43:10, 43:12, 44:3, 44:4, 49:1, 52:25, 54:20, 59:14, 66:2, 66:10, 72:1, 81:1, 84:13, 84:16, 84:20, 85:3, 85:9, 86:7, 86:15, 87:11, 87:16, 88:22, 88:23, 89:20, 89:21, 92:6, 92:23, 93:5, 93:16, 93:24, 94:5, 94:7, 97:10, 97:15, 97:17, 97:21, 101:15, 101:19, 101:21, 102:2, 103:17, 103:18, 104:14, 104:22, 105:15, 105:16, 105:17, 105:18, 105:20, 107:8, 107:14, 107:20, 108:3, 110:21, 111:1, 111:7, 112:3, 112:20, 112:25, 113:5, 113:10, 113:21, 114:4, 118:12, 118:15, 124:4, 124:17, 124:20, 127:7, 127:8, 127:14, 127:15, 127:18, 128:19, 130:1, 133:10, 134:14, 141:19, 157:19, 157:23, 158:3, 161:25, 162:3, 162:8, 162:10, 162:11, 162:15, 162:17, 162:20, 162:24, 163:5, 173:14, 173:17, 177:4, 178:18, 187:20, 187:21, 187:23, 189:5, 192:13, 193:11, 194:2, 194:6, 195:23, 196:12, 196:13, 196:19, 196:24, 197:4, 199:2, 199:5, 203:4, 203:7, 204:2, 204:20, 206:13, 206:20, 207:9,

208:5, 209:23, 210:13, 210:24
Test [19] - 84:11, 87:5, 89:17, 93:20, 93:25, 94:10, 94:13, 94:22, 97:9, 104:19, 112:10, 185:19, 195:24, 196:11, 196:12, 203:9, 203:16, 206:20, 207:13
test's [1] - 86:5
tested [6] - 49:16, 113:15, 113:16, 114:19, 114:25, 115:3
testified [20] - 38:15, 48:20, 51:13, 57:4, 58:19, 62:8, 94:21, 108:22, 120:4, 124:22, 132:18, 133:22, 136:16, 137:24, 138:23, 153:4, 161:12, 167:23, 194:12, 197:15
testify [2] - 133:16, 153:8
testifying [2] - 135:4, 135:5
testimony [19] - 3:15, 65:17, 74:9, 107:22, 108:23, 110:19, 111:16, 116:12, 117:12, 117:14, 120:4, 120:12, 127:24, 128:22, 131:22, 134:5, 134:7, 165:17, 170:5
testing [67] - 8:4, 8:16, 8:20, 11:25, 12:16, 16:17, 22:19, 22:23, 29:9, 29:11, 29:16, 29:17, 40:23, 41:19, 41:22, 42:9, 44:1, 44:6, 45:8, 45:24, 46:7, 50:8, 64:3, 65:10, 67:12, 68:4, 70:25, 71:25, 91:24, 92:17, 92:21, 93:3, 93:10, 108:1, 113:22, 116:20, 116:24, 123:2, 123:15, 123:19, 136:20, 136:25, 139:13, 140:19, 140:23, 141:16, 148:24, 150:1, 150:12, 173:14, 174:20, 174:24, 175:2, 176:11, 180:23, 183:3, 185:10, 186:8, 192:18, 193:23, 207:5, 210:15, 210:17
Tests [1] - 88:14
tests [93] - 29:15, 39:13, 50:11, 54:13, 63:9, 70:15, 78:5, 78:17, 78:21, 78:22, 79:22, 79:23, 83:15, 83:19, 84:10, 85:12, 88:16, 88:24, 89:2, 90:7, 91:1, 91:9, 91:18, 91:20, 92:12, 93:7, 93:8, 93:19, 94:17, 98:11, 99:19, 104:9, 104:10, 107:12, 110:15, 111:4, 112:6, 120:1, 123:23, 124:2, 124:3, 124:6, 124:9, 124:11, 124:13,

124:15, 124:17, 130:2, 146:11, 152:4, 152:18, 158:23, 161:13, 161:18, 161:25, 163:9, 166:3, 171:18, 174:5, 176:13, 177:1, 177:24, 178:2, 178:6, 179:5, 179:12, 179:14, 179:15, 179:16, 192:2, 192:7, 192:10, 194:1, 194:4, 194:8, 196:15, 204:3, 206:8, 206:24, 207:2, 207:10, 207:11, 208:7, 209:13, 209:18, 209:25, 210:18, 210:23
Texas [1] - 155:8
text [3] - 128:14, 130:9, 171:6
The court [110] - 3:2, 3:5, 3:11, 3:14, 3:20, 3:23, 4:3, 4:9, 14:19, 14:22, 14:24, 17:20, 17:22, 19:1, 19:5, 19:12, 20:2, 20:3, 20:13, 20:23, 21:1, 22:10, 30:2, 30:5, 30:24, 35:14, 35:17, 47:11, 48:6, 48:9, 48:12, 48:15, 58:14, 59:23, 60:8, 60:15, 60:18, 60:21, 60:23, 61:3, 61:8, 61:10, 61:13, 61:18, 61:25, 62:4, 65:3, 65:5, 71:2, 71:14, 82:19, 85:7, 88:3, 97:25, 103:25, 104:3, 107:10, 109:13, 109:15, 109:18, 109:21, 109:23, 109:25, 110:3, 110:5, 117:8, 117:17, 117:19, 117:22, 117:25, 125:13, 125:17, 127:9, 136:12, 137:21, 137:25, 138:2, 138:5, 138:7, 138:11, 138:14, 138:16, 138:19, 141:5, 146:12, 146:17, 147:1, 150:20, 166:7, 166:10, 166:12, 166:15, 166:17, 166:21, 166:24, 167:3, 167:7, 167:9, 167:12, 167:19, 167:24, 168:9, 168:22, 174:6, 174:9, 188:24, 195:9, 211:4, 211:8
The witness [28] - 4:2, 4:8, 14:25, 19:15, 20:19, 35:22, 48:16, 62:6, 62:10, 71:14, 88:4, 98:2, 98:5, 104:4, 107:11, 117:16, 117:20, 117:21, 117:24, 125:11, 127:10, 138:15, 138:25, 151:10, 166:23, 167:21, 168:1, 195:11
the.. [1] - 12:18
themselves [2] - 56:18, 72:10

theory [6] - 80:17, 81:20, 81:23, 82:8, 147:23, 148:12
thereafter [1] - 29:4
therefore [4] - 71:9, 199:9, 200:23, 200:24
theses [1] - 172:14
thesis [2] - 3:9, 3:13
they've [6] - 63:10, 72:2, 86:19, 94:3, 184:12, 210:2
thinking [3] - 100:22, 185:9
thinners [1] - 52:10
third [10] - 10:4, 21:21, 21:24, 44:7, 53:2, 60:14, 74:24, 169:11, 190:4, 190:6
Third [2] - 87:5, 185:19
thirds [1] - 106:14
thoroughly [1] - 108:4
thoughts [3] - 7:12, 18:7, 28:7
thousands [1] - 69:25
three [19] - 17:20, 27:10, 33:2, 33:5, 52:12, 67:19, 105:5, 116:6, 132:14, 132:21, 172:7, 186:2, 191:14, 191:24, 192:2, 192:7, 192:9, 205:5
Thrones [2] - 57:11, 57:12
throughout [2] - 16:18, 190:22
thrown [1] - 198:17
timed [10] - 54:16, 104:14, 105:14, 106:12, 106:14, 109:6, 166:3, 173:17, 174:5, 210:17
timeline [1] - 139:16
timing [1] - 21:10
title [8] - 31:18, 32:14, 37:3, 93:21, 136:11, 147:10, 177:8, 192:22
titled [1] - 37:14
titles [1] - 55:10
today [18] - 3:9, 3:19, 3:20, 4:4, 5:7, 33:25, 65:2, 74:9, 94:21, 111:17, 117:9, 130:23, 133:16, 141:1, 147:25, 150:14, 160:20, 173:13
together [6] - 25:19, 28:8, 76:11, 88:23, 145:23, 173:3
TOMM [4] - 206:21, 206:23, 207:3, 207:13
tomorrow [3] - 3:21, 60:5, 211:6
took [35] - 5:20, 38:16, 39:14, 40:14, 40:15, 41:14, 41:18, 41:24, 43:1, 43:9, 43:15, 43:18, 44:11, 45:1, 45:8, 45:23, 46:14, 47:1, 52:21, 52:23, 87:22, 88:6, 88:21, 102:18, 103:1, 105:1,

110:11, 113:15, 124:23, 126:5, 133:10, 137:16, 157:12, 194:1, 195:24
**top** [18] - 9:11, 15:19, 17:5, 33:18, 85:7, 102:19, 102:22, 103:2, 103:4, 103:17, 128:11, 160:8, 172:4, 182:2, 182:8, 182:16, 191:1, 192:23
**topics** [4] - 40:7, 56:13, 143:21, 145:15
**total** [3] - 9:21, 98:14, 182:1
**tougher** [1] - 119:3
**toward** [2] - 183:13, 209:2
**towards** [1] - 111:13
**track** [1] - 116:18
**traditionally** [1] - 79:17
**traffic** [1] - 206:9
**train** [1] - 67:20
**trained** [1] - 87:10
**training** [6] - 70:14, 70:19, 71:5, 118:2, 122:20, 170:2
**trait** [1] - 75:5
**traits** [4] - 75:5, 75:15, 75:25, 76:1
**transcript** [3] - 99:21, 99:22, 211:13
**transcription** [1] - 1:25
**translate** [1] - 7:12
**trauma** [1] - 22:20
**traveled** [1] - 51:24
**treat** [2] - 99:24, 209:4
**treated** [2] - 121:1, 187:1
**treating** [1] - 4:20
**treatment** [1] - 210:14
**treats** [1] - 187:21
**trends** [1] - 145:24
**Trial** [1] - 94:11
**trial** [1] - 94:11
**tricky** [1] - 155:3
**tried** [4] - 14:6, 52:16, 126:10, 126:22
**trouble** [5] - 74:15, 76:5, 77:4, 78:2, 119:22
**true** [12] - 82:7, 91:11, 115:10, 118:19, 121:15, 124:10, 124:13, 124:15, 133:22, 191:11, 191:12, 191:24
**truth** [2] - 133:20
**try** [11] - 52:14, 52:16, 93:1, 114:24, 128:2, 171:5, 174:18, 176:17, 181:8, 188:20, 207:11
**trying** [12] - 5:1, 43:23, 52:13, 56:25, 110:5, 124:5, 126:24, 155:2, 195:19, 196:13, 204:2, 207:8
**Tuesday** [1] - 51:22
**tumors** [1] - 22:20
**turn** [25] - 4:7, 6:19, 31:4,

32:1, 44:23, 64:6, 74:2, 77:5, 77:6, 83:25, 102:6, 104:17, 140:6, 142:2, 142:20, 143:17, 145:5, 147:13, 168:19, 178:13, 178:16, 180:25, 187:12, 190:25
**turned** [2] - 159:20, 168:12
**turning** [2] - 54:19, 140:21
**tutoring** [1] - 32:5
**twice** [7] - 50:24, 97:22, 156:14, 162:21, 162:22, 203:22, 203:24
**two** [43] - 8:5, 8:20, 9:17, 10:14, 12:1, 12:13, 12:17, 18:8, 23:2, 23:6, 23:7, 30:14, 48:1, 52:10, 60:13, 61:9, 61:10, 67:14, 78:16, 83:13, 86:6, 86:8, 88:24, 89:3, 94:9, 99:19, 106:14, 116:6, 128:1, 141:20, 145:2, 152:21, 157:14, 167:14, 169:6, 180:21, 186:12, 186:16, 186:17, 188:8, 190:19, 191:18, 200:11
**two-and-a-half** [1] - 18:8
**two-day** [1] - 60:13
**two-hour** [1] - 23:6
**two-page** [1] - 12:13
**two-thirds** [1] - 106:14
**two-year** [1] - 169:6
**type** [5] - 13:21, 83:9, 83:17, 93:8, 96:12
**typed** [3] - 15:9, 15:12, 27:17
**types** [8] - 55:1, 68:18, 75:24, 78:16, 83:13, 93:18, 99:1, 143:20
**typical** [4] - 79:5, 124:16, 163:22, 209:8
**typically** [10] - 62:22, 76:22, 94:10, 106:1, 123:11, 124:9, 177:9, 194:24, 202:5, 209:6
**U.S** [1] - 1:8
**ultrasound** [1] - 52:3
**unbiased** [2] - 154:12, 154:17
**uncertainty** [1] - 190:24
**unchanged** [1] - 12:3
**uncommon** [5] - 172:22, 174:20, 176:2, 194:20, 202:11
**under** [26] - 3:24, 33:7, 40:3, 63:7, 65:13, 72:20, 74:6, 78:23, 81:12, 81:19, 82:7, 96:20, 104:14, 105:14, 105:15, 107:1, 117:10, 117:14, 117:22, 119:21, 123:13, 148:7, 165:1, 179:14, 202:25, 206:18
**underachievement** [1] - 147:11

**underachieving** [2] - 147:21, 164:17
**undergrad** [2] - 57:9, 57:10
**undergraduate** [1] - 99:22
**undergraduates** [1] - 118:8
**undermine** [2] - 66:14, 103:15
**undermines** [2] - 107:2, 109:9
**undermining** [1] - 65:20
**understood** [2] - 64:19, 83:5, 119:17
**uneven** [1] - 79:1
**United** [2] - 155:24, 170:21
**UNITED** [1] - 1:1
**University** [15] - 31:6, 31:9, 66:22, 67:1, 67:7, 137:9, 142:8, 142:9, 142:11, 168:25, 169:1, 169:2, 169:4, 169:6, 198:20
**unless** [2] - 124:7, 189:6
**unlike** [2] - 190:10, 192:5
**unquote** [1] - 128:16
**unrecognized** [1] - 194:20
**unreliable** [3] - 86:1, 86:4, 151:19
**unsurprisingly** [1] - 90:11
**unusual** [11] - 73:21, 74:1, 74:18, 101:10, 151:2, 181:17, 199:7, 199:8, 200:21, 200:24, 201:11
**up** [36] - 20:21, 23:25, 31:10, 42:11, 50:21, 51:24, 52:3, 52:4, 52:7, 52:17, 53:9, 63:20, 63:23, 82:10, 82:12, 90:10, 90:22, 94:23, 124:8, 125:2, 125:17, 126:3, 126:5, 150:25, 156:5, 174:18, 176:24, 180:14, 181:8, 181:21, 186:1, 186:3, 187:9, 187:10, 188:18
**updated** [1] - 11:3
**US** [1] - 63:15
**useful** [4] - 84:16, 111:12, 112:7, 112:22
**uses** [1] - 129:22
**USMLE** [16] - 63:4, 71:21, 74:4, 83:11, 108:15, 108:18, 115:22, 130:10, 139:14, 150:2, 156:17, 157:20, 173:14, 173:18, 180:6, 210:18
**usual** [1] - 210:21
**utilized** [1] - 95:2
**utilizing** [1] - 1:24
**valid** [4] - 20:10, 77:21, 81:7, 200:12
**validity** [7] - 93:7, 93:8, 155:1, 206:18, 207:8, 207:9, 207:10

**value** [6] - 86:24, 88:6, 89:13, 89:14, 90:15, 98:18
**VARGAS** [19] - 2:2, 2:3, 3:4, 3:16, 3:22, 14:15, 14:23, 18:22, 19:11, 19:24, 20:24, 22:9, 30:1, 30:3, 30:23, 48:18, 58:13, 167:5, 167:11
**variability** [1] - 79:12
**varied** [2] - 47:19, 49:21
**varies** [2] - 116:4, 154:21
**variety** [3] - 90:17, 101:16, 143:22
**various** [11] - 5:13, 70:1, 77:22, 80:3, 91:1, 136:25, 145:2, 152:4, 152:18, 168:6, 193:25
**vary** [3] - 37:9, 116:10, 123:9
**varying** [1] - 10:19
**vast** [3] - 74:1, 136:4
**vein** [1] - 52:5
**verbal** [16] - 55:9, 55:21, 105:2, 105:3, 105:10, 106:11, 107:5, 125:3, 127:7, 127:14, 184:4, 184:6, 201:3, 201:12
**verbally** [1] - 201:4
**version** [10] - 14:10, 14:12, 18:17, 23:19, 25:22, 39:13, 43:7, 104:25, 114:13, 170:21
**versions** [1] - 12:19
**versus** [2] - 114:12, 116:21
**vice** [1] - 122:5
**videotaped** [1] - 51:8
**view** [1] - 51:8
**vignette** [1] - 130:15
**virtually** [3] - 72:3, 73:1, 147:20
**visible** [1] - 97:1
**visibly** [1] - 52:1
**visual** [4] - 205:2, 205:4, 205:19, 205:24
**Visual** [3] - 97:8, 203:8, 203:15
**vitae** [1] - 168:20
**vocabulary** [3] - 84:20, 85:10, 197:4
**voices** [1] - 57:13
**VOIR** [3] - 212:7, 212:10, 212:14
**volume** [3] - 64:8, 140:4, 151:6
**W-I-A-T** [1] - 87:11
**wait** [2] - 97:24, 205:1
**waiting** [1] - 172:10
**waived** [1] - 20:8
**wants** [1] - 195:4
**warranted** [1] - 150:9
**Washington** [2] - 2:5, 2:12
**watch** [6] - 51:19, 57:18, 59:24, 62:4, 138:20, 167:19

watching [2] - 57:15, 206:10
**Wayne** [1] - 142:9
**ways** [3] - 86:5, 92:23, 200:11
**weaken** [1] - 66:13
**weaker** [1] - 158:14
**weaknesses** [5] - 79:2, 79:6, 79:8, 158:13, 162:14
**website** [4] - 62:23, 73:3, 73:4, 149:1
**Wechsler** [5] - 87:4, 185:19, 196:15, 201:14, 209:14
**week** [8] - 4:5, 32:21, 33:6, 50:8, 53:11, 60:5, 60:10
**weekend** [1] - 117:14
**weekly** [1] - 145:1
**weeks** [2] - 52:12, 110:11
**weighed** [1] - 156:19
**weight** [4] - 71:4, 71:10, 137:1, 146:17
**weighted** [2] - 133:12, 134:15
**weird** [1] - 56:6
**well-written** [1] - 157:4
**whisker** [1] - 47:12
**white** [1] - 146:24
**whole** [12] - 13:10, 56:22, 116:10, 126:19, 151:22, 159:16, 189:6, 191:23, 193:21, 200:4, 210:7
**WIAT** [31] - 87:7, 87:8, 87:9, 87:10, 87:12, 87:17, 88:10, 110:19, 110:23, 111:6, 123:24, 131:1, 131:11, 161:25, 163:9, 185:14, 185:17, 186:3, 187:2, 188:14, 189:2, 190:10, 190:11, 192:3, 192:5, 192:7, 194:5, 199:21, 199:23
**WIAT-III** [3] - 110:19, 110:23, 111:6
**WIAT-information** [10] - 123:24, 131:1, 131:11, 161:25, 185:14, 185:17, 188:14, 189:2, 192:3, 194:5
**widely** [4] - 121:6, 121:16, 129:25, 155:19
**willing** [1] - 174:22
**window** [1] - 33:10
**Wisconsin** [2] - 31:9, 31:11
**Wisconsin's** [1] - 31:6
**wise** [1] - 55:16
**withdraw** [1] - 58:7
**withdrawn** [1] - 14:19
**withhold** [1] - 97:12
**Witness** [1] - 212:4
**witness** [16] - 30:3, 59:25, 61:12, 61:19, 61:20, 62:1, 70:23, 82:17, 138:8, 138:12, 146:9, 146:19, 166:17,

166:21, 167:18, 174:3
**witnesses** [1] - 166:24
**wondering** [1] - 17:23
**Woodcock** [11] - 88:14, 111:20, 111:22, 123:25, 131:23, 132:1, 162:7, 163:9, 191:3, 192:8, 194:6
**Woodcock-Johnson** [11] - 88:14, 111:20, 111:22, 123:25, 131:23, 132:1, 162:7, 163:9, 191:3, 192:8, 194:6
**word** [22] - 55:12, 59:15, 88:23, 132:5, 152:22, 171:8, 171:9, 184:24, 187:7, 187:8, 187:11, 187:12, 190:9, 190:19, 190:22, 190:24, 191:6, 191:17, 191:24
**words** [14] - 7:12, 8:8, 8:10, 25:21, 28:7, 50:16, 171:7, 171:10, 185:3, 190:2, 190:7, 191:10, 191:18
**workmen's** [1] - 72:20
**works** [1] - 68:10
**workshops** [1] - 69:4
**world** [24] - 78:6, 78:19, 78:20, 78:21, 78:25, 83:18, 83:19, 91:15, 91:17, 91:23, 92:7, 92:11, 93:3, 94:17, 99:3, 99:9, 99:19, 99:24, 100:2, 100:17, 101:24, 109:5, 109:6, 129:11
**worldwide** [1] - 145:22
**worry** [1] - 20:16
**worse** [3] - 92:6, 173:7, 173:11
**WRAT5** [1] - 177:4
**write** [10] - 5:15, 23:25, 24:12, 50:13, 51:2, 62:25, 157:7, 157:9, 157:12, 176:24
**write-up** [1] - 176:24
**writes** [1] - 191:12
**writing** [24] - 7:20, 15:24, 24:10, 27:7, 50:21, 51:11, 55:20, 56:4, 58:20, 58:23, 73:12, 74:7, 77:19, 77:22, 78:3, 87:13, 102:4, 103:18, 105:3, 107:2, 107:3, 157:21, 158:21, 177:11
**written** [14] - 7:13, 13:1, 25:1, 50:9, 63:24, 66:7, 140:1, 148:1, 149:23, 153:17, 157:4, 157:10, 171:6, 210:17
**wrote** [12] - 8:8, 8:10, 13:13, 15:12, 73:18, 73:23, 147:8, 152:8, 152:24, 153:1, 158:18, 158:20
**Xarelto** [1] - 52:10
**Yale** [1] - 198:20

**year** [22] - 31:12, 31:13, 31:22, 32:24, 40:5, 40:16, 40:19, 40:20, 41:15, 41:16, 41:17, 44:7, 47:19, 50:3, 50:4, 51:17, 53:3, 90:23, 102:10, 136:2, 169:6, 185:21
**years** [22] - 52:10, 62:18, 67:6, 67:8, 69:18, 73:10, 116:6, 134:24, 135:12, 139:8, 142:15, 143:7, 143:13, 144:15, 144:20, 153:5, 153:8, 156:4, 195:1, 195:25, 203:1
**yesterday** [20] - 3:19, 3:25, 4:18, 13:19, 15:20, 16:2, 18:4, 37:24, 38:15, 50:12, 53:13, 56:10, 59:18, 107:22, 124:22, 125:9, 126:6, 127:17, 133:16, 136:15
**yield** [1] - 101:16
**yielded** [1] - 105:1
**York** [5] - 67:1, 67:7, 69:22, 117:1, 117:2
**young** [4] - 151:1, 152:1, 152:16, 164:17
**younger** [1] - 151:17
**youngster** [1] - 208:15
**your..** [1] - 100:8
**yourself** [4] - 129:17, 136:19, 151:22, 179:15
**yup** [1] - 189:17
**Zecker** [13] - 136:6, 138:18, 138:25, 139:3, 140:6, 141:8, 142:1, 143:25, 146:8, 147:5, 150:23, 166:14, 197:15
**ZECKER** [3] - 138:22, 212:10, 212:12
**ZUBA** [1] - 1:15

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                       -  -  -

 3    JESSICA RAMSAY,            :  CIVIL ACTION NO.
              Plaintiff,         :  2:19-cv-02002
 4                              :
      v.                         :
 5                              :
      NATIONAL BOARD OF MEDICAL  :  PRELIMINARY
 6    EXAMINERS,                 :  INJUNCTION HEARING
              Defendant.         :  DAY 3
 7    _____

 8
                              James A. Byrne U.S. Courthouse
 9                            601 Market Street
                              Philadelphia, PA 19106
10                            December 5, 2019
                              Commencing at 9:30 a.m.
11    _____

12            BEFORE THE HONORABLE J. CURTIS JOYNER

13    _____

14
      APPEARANCES:
15
              REISMAN CAROLLA GRAN & ZUBA, LLP
16            BY:  LAWRENCE D. BERGER, ESQUIRE
              19 Chestnut Street
17            Haddonfield, New Jersey 08033
              (856) 354-5640
18            larry@rcglawoffices.com
              Representing the Plaintiff
19

20

21                       -  -  -

22            Ann Marie Mitchell, CRR, RDR, RMR
                   Official Court Reporter
23                    (267) 299-7250

24
      Proceedings taken stenographically and prepared utilizing
25    computer-aided transcription
```

1    APPEARANCES CONTINUED:

2

         STEIN & VARGAS LLP
3        BY:  MICHAEL STEVEN STEIN, ESQUIRE
         BY:  MARY C. VARGAS, ESQUIRE
4        10 G Street NE
         Suite 600
5        Washington, DC 20002
         (202) 248-5092
6        michael.stein@steinvargas.com
         mary.vargas@steinvargas.com
7        Representing the Plaintiff

8

9

         PERKINS COIE LLP
10       BY:  ROBERT A. BURGOYNE, ESQUIRE
         BY:  CAROLINE M. MEW, ESQUIRE
11       700 - 13th Street, NW
         Suite 600
12       Washington, DC 20005
         (202) 654-6200
13       rburgoyne@perkinscoie.com
         cmew@perkinscoie.com
14       Representing the Defendant

15

16                              -   -   -

17

18

19

20

21

22

23

24

25

1                (Court called to order at 9:30 a.m.)

2                THE COURT:  Good morning.  You may be seated.

3                MR. BERGER:  Your Honor, just one brief thing before

4    Mr. Burgoyne proceeds.  And that is that when Dr. Smith

5    testified on direct yesterday, I don't believe that I formally

6    moved exhibit P-21, which is his declaration and which was

7    covered in the testimony, into evidence, so I would like to

8    offer it into evidence now.

9                THE COURT:  Very well.  Any objection?

10               MR. BURGOYNE:  No objection, Your Honor.

11               THE COURT:  It's admitted.

12               (Exhibit P-21 admitted.)

13               THE COURT:  Sir, will you come and take the stand.

14   Sir, I'll remind you you're still under oath from previously

15   being sworn in yesterday.

16               Do you understand that?

17               THE WITNESS:  Yes.

18               THE COURT:  Very well.  Let's proceed.

19               (A discussion off the record occurred.)

20               THE COURT:  Now, check your mic and make sure it's

21   operating.

22               THE WITNESS:  No.

23               THE COURT:  This is what happens when your staff is

24   not here to do all these things before you come out, talking

25   about my deputy clerk, who is out this week.

1          Let's proceed.

2          MR. BURGOYNE:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. BURGOYNE:

5    Q.   Again, good morning, Dr. Smith.

6    A.   Good morning.

7    Q.   Jessica Ramsey came to see you in the fall of 2008 because

8    she wanted to obtain an evaluation to support her request for

9    accommodations on the Step 1 exam.  Correct?

10   A.   Yes.

11   Q.   And you'd never seen or treated her prior to that time?

12   A.   No.

13   Q.   And you have a reputation in this area of providing

14   evaluation reports for students seeking accommodations on

15   standardized tests?

16   A.   Yes.

17   Q.   And I think Ms. Ramsay testified she came across your name

18   on the internet.

19        Would you look at Defense Exhibit 34, which should be the

20   page that is up.

21   A.   It is.

22   Q.   Is this the home page for your website?

23   A.   Yes.

24   Q.   So this is the first page someone will see when they go to

25   your website?

1  A.   Yes.

2  Q.   And on the top it says you specialize in the assessment

3  and treatment options for dyslexia, ADD, ADHD, learning

4  disorders.

5       And then what's the fourth area in which you specialize?

6  A.   Extended time and accommodations for standardized tests.

7  Q.   And then in the first bullet point it states that adults

8  and teens with learning disabilities may be able to get

9  additional time and other accommodations in high-stakes testing

10  situations, and you refer to the SAT, the ACT, the MCAT, the

11  LSAT, the GRE, the GMAT, et cetera.  And you state you offer

12  neuropsychological evaluations to individuals who are seeking

13  documentation as part of their application to request more time

14  and/or other accommodations.

15      Prior to Ms. Ramsay, had you evaluated anyone for

16  accommodations on the Step 1 exam?

17  A.   I'm not sure.  I think so.  I'm not sure.  I evaluated a

18  previous medical student.

19  Q.   Then would you read the last bullet point or the last

20  sentence in the second bullet point for us.

21  A.   An official DSM-5 Diagnostic and Statistical Manual of

22  Mental Disorders diagnosis is necessary when you are trying to

23  qualify for services at school or work.

24  Q.   I believe you testified about the DSM-5 yesterday?

25  A.   Yes.

1  Q.    Did you evaluate Ms. Ramsay in accordance with the

2  criteria in the DSM-5 manual?

3  A.    Yes.

4  Q.    Turn to -- actually, I'm sorry, stay on Exhibit 34.  And

5  confirm for me that the second page here is a page from your

6  website that discusses evaluation for developmental dyslexia

7  and ADHD?

8  A.    Yes, that's my website.

9  Q.    You see there's a discussion about problems with IQ

10 testing?

11 A.    Yes.

12 Q.    And it states:  Principally, the principal method of

13 diagnosing learning disabilities such as dyslexia has been to

14 compare measured intelligence and achievement levels such as

15 reading?

16 A.    Yes.

17 Q.    Is that a reference to the so-called discrepancy model

18 that we were discussing yesterday?

19 A.    It is.

20 Q.    And then you go on to say:  However, there are serious

21 problems with this approach that are frequently not considered

22 in a diagnostic evaluation?

23 A.    Yes.

24 Q.    And at the bottom you identify some problems with ADHD or

25 ADD testing?

 1  A.   Yes.

 2  Q.   And the first sentence says:  There's considerable

 3  controversy at the present time over what are the core symptoms

 4  of ADHD or ADD.

 5       Is that an accurate statement?

 6  A.   Yes.

 7  Q.   And then the last sentence in that paragraph says:

 8  Evaluations require -- and it says a care review, but that

 9  means a careful review?

10  A.   Yep.

11  Q.   A careful review of all tests, histories, grade reports,

12  teacher reports and parent reports?

13  A.   Yes.

14  Q.   Is that a statement you concur in until today?

15  A.   Yes.

16  Q.   Exhibit 35, please.  I think you mentioned this document

17  yesterday but I don't think we looked at it.

18       Is this the intake interview form that you have clients

19  fill out before they come to see you?

20  A.   Yes.

21  Q.   And was this the form that Ms. Ramsay completed?

22  A.   Yes.

23  Q.   And on the front page it says she's coming to see you to

24  get appropriate diagnosis and testing accommodations?

25  A.   Yes.

1  Q.  On page 2 of this document, which is Smith-33, there's a

2  section that says at the top, thinking back to growing up to

3  your school days, do you remember having trouble, and then

4  there's several activities that you describe here?

5  A.  Yes.

6  Q.  Is this relating to possible ADHD or LD or both?

7  A.  Both.

8  Q.  And Ms. Ramsay indicated that she remembered having

9  problems in all of these areas?

10  A.  Yes.

11  Q.  You're being compensated for your work in this case.

12  Correct?

13  A.  Yes.

14  Q.  And I believe you told me your rate is $125 per hour for

15  travel and waiting time?

16  A.  Yes.

17  Q.  From the time you leave home till the time you get home?

18  A.  Well, not quite.  That's not quite how I interpret it.

19       When I get to a hotel room where I would normally be at

20  home, I'm not going to count that, that kind of thing.

21  Q.  And then you're receiving I believe either 350 or $375 per

22  hour for --

23  A.  It's 350.

24  Q.  350.

25  A.  I looked back at the document.

 1  Q.   Okay.  And that's for your deposition time and your time

 2  in court?

 3  A.   Just the deposition time.

 4       I'm sorry, I misunderstood.  My deposition time and the

 5  time testifying here.

 6  Q.   We looked briefly at your resume yesterday.

 7       Have you done any research relating to requests for

 8  accommodations on high-stakes standardized tests?

 9  A.   When you say research you mean studies?

10  Q.   Yes.

11  A.   No.

12  Q.   And have you written any articles or other publications on

13  that subject?

14  A.   No.

15  Q.   You were the first professional to diagnose Ms. Ramsay

16  with dyslexia.  Correct?

17  A.   Yes.

18  Q.   You also diagnosed her with ADHD?

19  A.   Yes.

20  Q.   Both of those impairments are neurodevelopmental diseases.

21  Right?

22  A.   Yes.

23  Q.   And that means they're lifelong impairments?

24  A.   Yes.

25  Q.   When you evaluate someone for a possible learning

1  disorder, what do you rely upon in making your diagnosis?

2  A.   Any documents I can get from any previous evaluations,

3  any -- the history that I can get from the client and anybody

4  else, and then of course my test results.

5  Q.   Do you also want to see report cards and grades and

6  teacher comments if they're available?

7  A.   Yes.

8  Q.   And do you also want to see performance on standardized

9  tests that were taken in elementary school?

10 A.   Yes.

11 Q.   And that would include tests such as the Iowa Tests of

12 Basic Skills?

13 A.   Yes.

14 Q.   And do you also want to see results from performance on

15 standardized tests such as the ACT, the SAT and the MCAT?

16 A.   Yes.

17 Q.   Why do you want to see report cards if they're available?

18 A.   In case there's something there that's informative about

19 what was going on for them at that time.

20 Q.   I think you told me in your deposition, you want to see if

21 there's anything that would indicate the presence or absence of

22 unusual struggle.  Is that an accurate statement of reasons you

23 want to see --

24 A.   I don't remember what I said then, but from my experience,

25 as I said yesterday, it's more about is there something that

1  indicates the presence.

2  Q.   And why do you want to see teacher comments?

3  A.   For the same purpose, in case they mention something.

4  Q.   Why do you want to know about someone's standardized

5  testing history?

6  A.   To get some kind of idea how they perform in such a

7  situation.

8  Q.   In your deposition in response to that question you

9  indicated that you want to see how they performed on other

10  kinds of tasks that are related to what you're evaluating.

11       Do you think performance on standardized tests like the

12  ACT and the MCAT are related to what you're evaluating when

13  you're doing an ADHD or LD evaluation?

14  A.   Yes, but not closely related.

15  Q.   And you also indicated that you like to see something

16  objective when you're doing an evaluation; is that correct?

17  A.   Yes.

18  Q.   And would teacher reports and teacher comments and grades

19  and performance on standardized tests be the type of objective

20  information you're looking for?

21  A.   The performance on standardized tests is more objective.

22  I don't really regard some of the information on the report

23  cards as necessarily truly objective.

24  Q.   What is the biggest risk in relying upon a patient's

25  self-report with information that's provided to you during an

1  interview?

2  A.   The biggest risk is that they're not presenting it

3  accurately, either deliberately or they're just a poor

4  reporter.

5  Q.   What do you rely upon when evaluating whether someone

6  meets the diagnostic criteria for ADHD?

7  A.   Primarily -- well, if there is something in the history

8  and records that would indicate that kind of dysfunction, but

9  primarily with the client and anybody else that they know --

10  any questionnaires or reading skills have filled out, that

11  information primarily.

12  Q.   I believe you testified in both your deposition and

13  yesterday that the assessments that are sometimes used in

14  evaluating ADHD are not very reliable?

15  A.   No.

16      I'm sorry, yes.  They're not -- I don't consider them very

17  precise instruments.

18  Q.   Okay.  When Ms. Ramsay came to you, she knew she was

19  undergoing diagnostic testing, the results of which would

20  affect whether or not she got accommodations on the Step 1

21  exam?

22  A.   Yes.

23  Q.   Likewise, when she filled out ratings scales, she knew

24  that that information would influence whether she got

25  accommodations on the Step 1 exam?

1  A.   Yes.

2  Q.   You testified yesterday I think that the DSM-5 requires

3  that an individual diagnosed with ADHD has experienced multiple

4  symptoms in multiple settings and with early onset.  Is that --

5  A.   Yes.

6  Q.   All of those are part of the diagnostic criteria?

7  A.   Yes.

8  Q.   Other than the self-report by Ms. Ramsay and her mother,

9  what evidence did you see of early onset of ADH symptoms with

10 Ms. Ramsay?

11 A.   Primarily it was the report from Ms. Ramsay and her

12 mother.

13 Q.   And what evidence did you see other than self-report of

14 impairment in multiple settings?

15 A.   Primarily it was the report from Ms. Ramsay and her

16 mother.

17 Q.   And likewise regarding the presence of multiple ADH

18 symptoms, was that primarily the report of Ms. Ramsay and her

19 mother and her fiancé?

20 A.   Yes.

21 Q.   Before your deposition in this case, you reviewed some

22 articles relating to detecting performance validity problems.

23 Correct?

24 A.   Yes.

25 Q.   Why did you review those articles?

1  A.   I'm sorry, could you repeat your question for me?

2  Q.   Sure.  You testified in your deposition that before your

3  deposition, you reviewed some articles dealing with detecting

4  performance validity issues.

5       So my question is why you had done that?

6  A.   To see if I overlooked something.

7  Q.   What are performance validity problems?

8  A.   Problems?

9  Q.   Yeah.  Why does one perform a performance validity test?

10 What are you trying to evaluate?

11 A.   Well, we're trying to evaluate whether they make a good

12 effort or whether they're deliberately trying to exaggerate

13 their problems and their symptoms.

14 Q.   What does the term "malingering" mean in the diagnostic

15 context?

16 A.   Typically it means deliberately exaggerating your

17 symptoms.

18 Q.   Do individuals sometimes exaggerate or not perform to

19 their maximum in order to obtain certain external incentives?

20 A.   Yes.

21 Q.   An example might be, for example, getting Ritalin or other

22 medications which students often believe will help them?

23 A.   Yes.

24 Q.   And would another incentive be the opportunity to obtain

25 accommodations in school or on a standardized test?

1  A.   Yes.

2  Q.   How would a person malinger in order to be diagnosed with

3  a specific learning disorder?

4  A.   They use whatever knowledge they have about what the

5  condition is and try to mimic what the symptoms or performance

6  that would be expected based on what they know.

7  Q.   Is one possibility to try to do poorly on tests of

8  phonological processing?

9  A.   Yes.

10 Q.   And what are examples of tests that evaluate phonological

11 processing?

12 A.   The -- in the WIAT, the -- I get the names confused

13 sometimes between the two tests.  Pseudo word decoding I think

14 is how they title it there.

15 Q.   What other tests might you administer to try to evaluate

16 phonological process?

17 A.   If I -- well, I could use the Woodcock Johnson, the

18 Kaufman test -- test of educational achievement.  I didn't use

19 those particular tests in this instance.

20 Q.   Could a person also read very slowly when taking a

21 diagnostic assessment in order to produce a result that might

22 not reflect full effort?

23 A.   Yes.

24 Q.   And what are examples of diagnostic tests on which slow

25 reading would influence the outcome?

1  A.   Well, let me think of which ones.  On the WIAT, the oral

2  reading fluency subtest, the word reading subtest, there's a

3  supplemental measure of how fast you read those words.  Again,

4  it relates to how fast you read the words.  The Gray Oral.  The

5  Nelson-Denny, anything that has any kind of timed fact around

6  it.

7  Q.   You mentioned the Gray Oral.  That's the GORT that we were

8  referring to yesterday?

9  A.   The GORT-5, yes.

10 Q.   Nelson-Denny.  So the WIAT, the GORT and the Nelson-Denny,

11 those are all assessments that you administered to Ms. Ramsay?

12 A.   Yes.

13 Q.   How would one go about malingering in the context of an

14 ADHD diagnosis?

15 A.   I guess they would report -- based on what they know, they

16 would report the symptoms being frequently experienced.

17 Q.   What about in terms of reports that you obtained from

18 other individuals, would those individuals likewise need to

19 report significant symptoms?

20 A.   Yes.

21 Q.   Look at Exhibit 51, please.  And that's in the other

22 notebook, I apologize.  DX-51.

23 A.   Okay.

24 Q.   And this is an article entitled "An Investigation of

25 Methods to Detect Feigned Reading Disabilities."

1   A.   Yes.

2   Q.   Is this one of the articles you reviewed in advance of

3   your deposition?

4   A.   Yes.

5   Q.   Let's look at your evaluation report for Ms. Ramsay.  And

6   if you'll look at DX-3, it's attached to your declaration.  It

7   is Tab B.

8   A.   DX what.

9   Q.   3?

10  A.   It's back in the other notebook?

11  Q.   Yes.  I apologize.

12  A.   It's okay.

13  Q.   I'll try to avoid that.

14  A.   You said DX-3.  Correct?

15  Q.   It's DX-3, Tab B.

16  A.   I'm sorry, DX-3, what?

17  Q.   Tab B as in boy.

18  A.   Got it.  All right.

19  Q.   We covered some of this yesterday with Mr. Berger in terms

20  of the types of information that you considered.

21       In your listing of records reviewed, is this a complete

22  list of the records you reviewed as part of your evaluation?

23  A.   Yes.

24  Q.   On page 2 of this, this exhibit, there's a reference to

25  the personal statement regarding Ms. Ramsay's need for

1   accommodations?  It's the second item listed.

2   A.  Yes, I see it.

3   Q.  It's dated June 6, 2018.

4   A.  Yes.

5   Q.  And did she give you her personal statement from 2016?

6   A.  I don't recall.  It's not here.  I don't recall getting

7   it.

8   Q.  And did she give you a copy of her request for

9   accommodations that she submitted to the NBME in 2016?

10  A.  I don't recall doing it, if it's not here.  I either

11  overlooked it or...

12  Q.  On the next page, page 4, you discussed this a little bit

13  yesterday, but Ms. Ramsay's school history?

14  A.  Yes.

15  Q.  And there's a statement that said she had academic

16  struggles that began from the first days in school and

17  consistently required accommodations, such as extended time on

18  tests and assignments, altered grading schemes, frequent

19  breaks, private space for testing and completing class work in

20  order to compensate for distractibility, impaired attention and

21  concentration, impaired reading comprehension, impaired reading

22  speed and hyperactivity.

23       Is that information that you relied upon in making your

24  evaluation?

25  A.  Yes.

1  Q.  Look at DX-4, Tab A for me.

2  A.  Okay.

3  Q.  And if you would go, please, to page 6 of this document.

4  A.  All right.

5  Q.  And this is Ms. Ramsay's initial request for

6  accommodations.  And you see on the top there, there's a

7  section where she discusses her accommodations in primary and

8  secondary school?

9  A.  Yes.

10 Q.  And then if you look at elementary school, there's a

11 reference to accommodations she received in one school year,

12 1996-1997?

13 A.  Yes.

14 Q.  And there's a reference to her getting an alphabet chart,

15 distraction reduced space, extra time for writing and reading.

16 And then she says:  These were provided by the teacher, not the

17 school, so I do not have records confirming them.

18     Had you ever seen this document as part of your

19 evaluation?

20 A.  I don't recall it, no.

21 Q.  And you see she doesn't list any other informal or formal

22 accommodations here?

23 A.  Yes.

24 Q.  Look at Exhibit -- back to Exhibit 3.

25     Actually, keep that one open.  I apologize.  Let me get to

1  your report here.  And take a look at DX-4, Tab B, the same

2  document you were just in.

3  A.   Just a minute.  DX-4, Tab B.  Right?

4       All right.

5  Q.   And this is Ms. Ramsay's personal statement from 2016.

6  And it's not listed in your documents you reviewed, so I take

7  it that means you had not seen this document previously?

8  A.   I don't -- well, I'm not sure.  There were so many, it's

9  possible that I have it and didn't realize there were two

10  different versions.

11  Q.   Okay.  And then on page 2 of this document in the first

12  full paragraph, there's a discussion of Ms. Ramsay experiencing

13  reversals and distinguishing between similar-appearing

14  characters when reading and writing?

15  A.   Yes.

16  Q.   First of all, are reversals something you commonly see

17  with dyslexia, or is that something people just assume happens?

18  Is that a common trait with dyslexia?

19  A.   It's common to dyslexia but not exclusive to dyslexia.

20  Q.   And then she goes on to discuss that she had been placed

21  in a time-out desk to avoid distractions and also received an

22  alphabet chart.  And then at the very last sentence, she says:

23  Unfortunately, these accommodations were unofficial, enacted by

24  my teacher rather than the school, so I do not have any record

25  that they were provided.

1       Sorry, that was the third from the last sentence?

2       Other than this visual testing, I was not evaluated for

3  learning disabilities until 2009 and so did not receive any

4  other aid or accommodation.

5       Is that language you had seen before today?

6  A.   Not that I recall.

7  Q.   In your report you also reference some prior evaluation

8  reports that you looked at, including reports from a Dr.

9  Lewandowski?

10 A.   Yes.

11 Q.   And Dr. Lewandowski is a board certified

12 neuropsychologist.  Correct?

13 A.   Yes.

14 Q.   And he personally evaluated Ms. Ramsay?

15 A.   Yes.

16 Q.   He didn't just do a paper review, in other words?

17 A.   No.

18 Q.   And I believe you concluded that the assessments he

19 administered were inappropriate?

20 A.   I wouldn't use the word "inappropriate."  If I did, I

21 shouldn't have used the word "inappropriate."

22 Q.   I will show you, you did, but --

23 A.   No, I imagine I did.  But that was a poor choice of words.

24 Not applicable, insufficient for the kind of thing he was

25 trying to evaluate.

1  Q.   I think yesterday you put it as inadequate testing?

2  A.   I wouldn't use that word again, because of the pejorative

3  nature of it.  But insufficient.

4  Q.   Okay.  I think you testified in your deposition that based

5  on the evaluation he did of Ms. Ramsay, you don't believe he

6  could have arrived at a proper diagnosis regarding a learning

7  disability?

8  A.   No.

9  Q.   No meaning you don't think he could have?

10  A.   That's correct.  Yes.

11  Q.   That was despite the fact that he met with her in person

12  and was a licensed neuropsychologist?

13  A.   Yes.

14  Q.   Look at DX-3, your same document, and Tab D, which I

15  believe is Dr. Lewandowski's evaluation --

16  A.   Yes.

17  Q.   -- report.

18       And on -- at the page -- it's page 3 of his report.

19  A.   Yes.

20  Q.   He indicates normal achievement study, reading, spelling

21  and arithmetic are normal to above normal and consistent with

22  past education.

23       What assessment did he administer to arrive at that

24  conclusion?

25  A.   The -- I believe he administered only the WRAT5, the Wide

 1  Range Achievement Test, Fifth Edition.

 2  Q.   Regarding the diagnosis of -- actually, let me back up and

 3  ask you first about there's a reference here to Dr. Livingston

 4  in your report.

 5  A.   What page are you on?

 6  Q.   In fact, not Dr. Livingston, just Charles Livingston, MA.

 7  A.   Where page are we on?

 8  Q.   That's page 2 of your report.

 9  A.   Of my report.  Where is that?

10  Q.   Page 2 at the top where you've listed the records.

11          THE COURT:  What's the exhibit number?

12          THE WITNESS:  Exhibit number.

13          MR. BURGOYNE:  It's Tab B, I'm sorry, Your Honor.

14          THE COURT:  He's asking.

15          MR. BURGOYNE:  No, I apologize.

16          THE WITNESS:  I'm sorry, what's the Exhibit and what's

17  the Tab?

18  BY MR. BURGOYNE:

19  Q.   It's Exhibit 3 and Tab B.  So it's your report.

20  A.   So D?

21  Q.   B as in boy.

22  A.   D-2, Tab B?

23  Q.   D-3.

24  A.   D-3 and Tab B, thank you.

25          All right.  I'm there.

1   Q.   Okay.  And again, you're listing documents you reviewed.

2   And one of the documents you reviewed was some series of

3   reports from a Charles Livingston.

4        Do you see that reference?

5   A.   Yes.

6   Q.   And I think your opinion regarding his evaluation is that

7   it was incomplete and concluded -- and included the

8   administration of the out-of-date assessment version of the

9   WIAT?

10  A.   Yes.

11  Q.   And that based on that, you overall discounted his

12  evaluation?

13  A.   I discounted that -- those results of the WIAT that he --

14  the subtest that he administered.

15  Q.   And those results reflected what level of reading

16  comprehension, do you recall?

17  A.   You want me to look at the -- I recall in general, but --

18  Q.   Give us your general recollection of what he found.

19  A.   Well above average for a reading comprehension -- the

20  reading comprehension subtest of the old WIAT.

21  Q.   I believe you also mentioned briefly yesterday

22  Dr. Ruekberg in connection with ADHD?

23  A.   Yes.

24  Q.   And I think you said you thought his report seemed okay?

25  A.   Yes.

1  Q.   Let's streamline this a little for you.

2       I'm going to hand you two sets of documents.  I tried to

3  streamline things regarding her academic history and

4  standardized tests.

5            MR. BURGOYNE:  Your Honor.

6            THE COURT:  Thank you.

7  BY MR. BURGOYNE:

8  Q.   And so the first one is a listing of her standardized

9  testing history.  The second one is a listing of some of the

10 results you found.

11 A.   Yes.

12 Q.   And the third one is just a listing of her academic

13 history.  Let me ask you a few questions about these.

14 Hopefully this will avoid the need for you to go back and forth

15 through documents.

16      You referenced in your report Ms. Ramsay's performance on

17 the MCAT, and then also you indicated you reviewed her ACT

18 score reports and her high school transcript and her college

19 transcript and her report cards from elementary school, or at

20 least some of them?

21 A.   Yes.

22 Q.   And did her ACT and MCAT scores raise any questions in

23 your mind relative to her performance on the diagnostic

24 assessments you administered?

25 A.   How do you mean?

1  Q.  Well, did they cause you to say, there's something not

2  matching up here in terms of what I'm seeing on her MCAT scores

3  and ACT scores and what I'm seeing in her diagnostic results?

4  A.  Yes, it caused me to take a deeper look at that.

5          MR. BERGER:  Your Honor, as to this document that Mr.

6  Burgoyne is using, I have every reason to believe that he's

7  copied all the numbers accurately, and I am fine with trying to

8  expedite in this way.  I'm just going to say this has got to be

9  subject to our eventually having the opportunity -- and we can

10 do it when we break -- to check against the actual numbers.

11         THE COURT:  Sure.  If he's moving this as an exhibit,

12 before it's admitted I'll give you an opportunity to place any

13 objection you may have.

14         It appears to be a summary of the information as

15 contained in the record.  This is a common exhibit that's shown

16 to witnesses in criminal and civil cases.  So we'll proceed,

17 and we'll allow you to entertain an objection at a later point.

18 All right?

19         You may proceed.

20         MR. BURGOYNE:  Thank you, Your Honor.  And I certainly

21 attempted to capture everything accurately and happy to be

22 corrected if not.

23         THE COURT:  We shall see.

24 BY MR. BURGOYNE:

25 Q.  How did you go about addressing the questions that arose

1    in your mind regarding the MCAT and the ACT scores relative to

2    what you were seeing on your diagnostic assessments?

3    A.   Well, there are two steps.  One is when I first saw them,

4    it raised a question in my mind.  But there was enough from the

5    other -- the other evaluations that really didn't address

6    things adequately as I thought.  So I thought, okay, let's do

7    the evaluation and see what I get.  And then afterwards, trying

8    to think through, well, what's going on here, how would this

9    be, that these scores could be true and that these scores could

10   be true.

11   Q.   Okay.  And what did you do to answer that question in your

12   mind?

13   A.   Well, the first one was I was confident about the scores

14   that I got were accurate, an accurate representation of her

15   true functioning.  And in looking at the overall pattern of

16   scores in her history, the combination of her intelligence,

17   what I know about partially remediated dyslexic readers and how

18   they can perform on these kinds of standardized tests, the --

19   my conclusion was that -- and my judgment of her and her

20   effort, that my judgment was that this would be not unexpected

21   for that person of that intelligence and effort to be able to

22   perform usually compensatory strategies, to perform well on

23   these kinds of tests.

24   Q.   And by compensatory strategies, are those the test-taking

25   strategies that Ms. Ramsay testified to yesterday?

1  A.   All of the things she's described in terms of strategies
2  that she learned and that she's described.
3  Q.   Did you make any effort to go and retrieve either ACT
4  questions or Step 1 questions or MCAT questions before you
5  prepared your report?
6  A.   I did not.
7  Q.   And do you know whether the MCAT is a computer-based test
8  or a paper-based test?
9  A.   I think it's a computer-based test.
10  Q.   Do you know how long it lasts?
11  A.   That version?
12  Q.   Yes.  The version she took.
13  A.   I think it lasts about 200 minutes total, not including
14  the writing section.
15  Q.   I believe when I deposed you, you said you weren't very
16  familiar about the MCAT or the Step 1 but you were familiar
17  with the ACT test?
18  A.   Well, yes, I said that, but I'm not that familiar with it.
19  They are standard -- ACT in particular is a standardized test.
20  The formats are very common.
21  Q.   You would agree that there's a substantial amount of
22  reading involved on that exam?
23  A.   Yes.
24  Q.   And you didn't discuss with Ms. Ramsay her test-taking
25  strategy on the ACT exam, did you?

 1  A.   Yeah, I did, but only in a cursory way to get some idea

 2  that she'd applied the strategies that she had generally talked

 3  about.

 4  Q.   Look again, if you would, please, or look for the first

 5  time at the list of standardized tests that I've given you.

 6  A.   Yes.

 7  Q.   All of which she took without accommodations?

 8  A.   Yes.

 9  Q.   Do you recall reviewing these score reports during your

10  deposition?

11  A.   I don't recall having these.

12       Oh, I'm sorry, deposition.  I was thinking report.

13  Q.   Let's back up.

14  A.   Yes, deposition.

15  Q.   You don't recall having all of these as part of your

16  evaluation?

17  A.   No.

18  Q.   Okay.  But you did review these during your deposition?

19  A.   Yes.

20  Q.   And for example, one of the exams that you had not seen as

21  part of your evaluation was the Iowa Tests?

22  A.   Yes.  I had not seen them.

23  Q.   And you were asked questions about that test yesterday.

24  Correct?

25  A.   Yes.

1  Q.   And I think you testified that there were instances in

2  which her -- certain of her scores, she did not perform at the

3  level that one would have anticipated?

4  A.   Yes.

5  Q.   Even as to those scores, however, were the scores that she

6  obtained average or above average on the Iowa Tests?

7  A.   Yes.

8  Q.   And her composite score in fact was at the 86th

9  percentile?

10 A.   Yes.

11 Q.   And that's an above average score?

12 A.   That one is, yes.

13 Q.   And then her reading score was at the 74th percentile?

14 A.   Yes.

15 Q.   Meaning she was in the top 26 percent.  That's an average

16 score?

17 A.   That -- the way you're wording it doesn't sound right.

18      When you say top 26, her score was higher than 74 percent,

19 which would mean lower than 26 percent.  It means she's not in

20 the top 26, she's just below the top 26.

21 Q.   If she's in the 74th percentile, she did better than

22 76 percent of the people --

23 A.   74.

24 Q.   74.

25 A.   Yeah.  She did better than 74 percent of the people that

1    took the test.

2    Q.    If I was misphrasing that, I apologize.

3    A.    That's okay.

4    Q.    In any event, she achieved an average score?

5    A.    Yes.

6    Q.    And you'd agree that on all of these assessments from

7    kindergarten through the MCAT exam, she performed in the

8    average or above average range?

9    A.    Yes.

10          MR. BERGER:  I'm going to object here because the

11    document does omit one part of the MCAT exam, the writing

12    sample.  And if I remember --

13          THE COURT:  You'll have an opportunity to

14    cross-examine on that point -- redirect on that point, Counsel.

15          You may proceed, Counsel.

16    BY MR. BURGOYNE:

17    Q.    You were asked if the MCAT and the ACT test were

18    diagnostic tests for dyslexia, and I think you said no?

19    A.    Correct.

20    Q.    Would you agree they nevertheless provide relevant

21    information regarding someone's ability to think, read and

22    concentrate when taking a standardized test?

23    A.    Yes.

24    Q.    Putting aside the diagnostic assessments that she took in

25    your office in order to get a report for testing accommodations

1  that included extra time, are you aware of any testing results

2  from Ms. Ramsay that reflect the reading deficits that you

3  identified in your report?

4  A.    Could you restate that for me, please.

5  Q.    Sure.  Putting aside the diagnostic assessment results

6  that you obtained, are you aware of any documents reflecting

7  Ms. Ramsay's performance on standardized assessments that

8  reflect that -- reading deficits that you found in your

9  evaluation?

10 A.    Yes.

11 Q.    And what are those?

12 A.    Any of the standardized tests where she was in the average

13 range or the -- because that's substantially below where I

14 would have expected a person who is at the 98th percentile

15 intellectually.

16 Q.    So your testimony is she was average everywhere but that

17 was still below what you would have expected her to achieve?

18 A.    Yes.  And it seems to be below areas that are not reading

19 related.

20 Q.    Let me ask you to look at your deposition when I asked you

21 a similar question.

22 A.    Okay.

23 Q.    It's page 92 of your deposition, Dr. Smith.

24 A.    Is that coming up here?

25        MS. MEW:  It's coming up.

1          THE WITNESS:  Page what?

2    BY MR. BURGOYNE:

3    Q.   It's page 92, line 7.

4    A.   Okay.

5          MR. BERGER:  Okay.

6    BY MR. BURGOYNE:

7    Q.   And in line 7, my question to you was:  Putting aside the

8    diagnostic assessments that she's taken in order to get

9    accommodations, are you aware of any testing that reflects

10   reading deficits comparable to what you identified in your

11   diagnostic assessments?

12        Do you see that question?

13   A.   Yes.

14   Q.   Do you see there's a series of objections by Mr. Berger?

15   A.   Yes.

16   Q.   And then what was your answer in line 16?

17   A.   No.

18   Q.   You define dyslexia, I believe, as a neurological disorder

19   that interferes with acquiring basic reading skills?

20   A.   Yes.

21   Q.   Do you need basic reading skills to take the ACT exams?

22   A.   To take it or to --

23   Q.   To perform well.

24   A.   Yes.

25   Q.   And do you need basic reading skills to perform well on

1  the MCAT?

2  A.    Yes.  Let me revise that, the term "performing well."

3  Clearly you can have impaired basic reading skills and perform

4  well.  The question is, what does it mean.

5  Q.    What does what mean?

6  A.    What does the score mean, you know, is it an accurate

7  representation of what they were trying to measure.

8  Q.    And the other document I gave you includes a summary of

9  her report cards and teacher comments from kindergarten up

10 through I think Ohio State before she start --

11 A.    Yes.

12 Q.    This is in the handout I gave you, the little document

13 there.

14 A.    Yes.

15 Q.    And I think you testified both yesterday and in your

16 deposition that you didn't see anything in those documents that

17 reflected an impairment in learning or an impairment in

18 attention?

19 A.    Correct.

20 Q.    You indicated that in your experience it's not uncommon

21 for teachers not to make a notation about someone who is

22 struggling if their grades are good?

23 A.    Yes.

24 Q.    And did you have any factual basis for whether that

25 happened in this case regarding Ms. Ramsay's teachers?  Do you

1  have any knowledge one way or the other regarding why they did

2  or didn't put anything on these reports?

3  A.   No.

4  Q.   And one of the -- do you recall that Ms. Ramsay reported

5  struggling when she was in the third, fourth and fifth grades?

6  A.   Yes.

7  Q.   And do you recall her saying she required almost daily

8  attention from her teachers?

9  A.   Yes.

10 Q.   Look at DX-13, 14 and 15 for me.

11 A.   Again, which ones, DX what?

12 Q.   13, 14 and 15.  These are her report cards from the third,

13 fourth and fifth grades.

14 A.   Okay.

15 Q.   And I believe these were among the records that you had

16 when you prepared your report?

17 A.   Yes.

18 Q.   So you are familiar with these report cards?

19 A.   Yes.

20 Q.   And then on page 2 of each of these report cards, let's

21 start with 13.

22      And these are a little unusual relative to the other

23 report cards because they have a specific category that asks

24 for information regarding any additional support the student

25 was receiving.

1        Do you see that on the right side?

2    A.    Yes.

3    Q.    And you would agree, I take it, that there's no indication

4    on any of these forms in this category that Ms. Ramsay was

5    receiving specialized reading support or that her grades were

6    based on intensive teacher assistance?

7    A.    Yes.

8    Q.    Did you discuss that with Ms. Ramsay?

9    A.    Not that particular -- only the general absence of things

10   showing up in there, I asked her about that.

11   Q.    You circulated drafts of your evaluation report to Ms.

12   Ramsay and her attorney.  Correct?

13   A.    Yes.

14   Q.    And you set up a system they could use to provide comments

15   and feedback on that report?

16   A.    Yes.

17   Q.    And Ms. Ramsay and her attorney did in fact provide input

18   on the report?

19        MR. BERGER:  Objection to the extent that this is

20   calling for work product.

21   BY MR. BURGOYNE:

22   Q.    I don't want to know what the input was, just yes or no

23   questions.

24   A.    Yes.

25        THE COURT:  Overruled.

1    BY MR. BURGOYNE:

2    Q.   Let's look at the handout I gave you.

3         On page 2 of the stapled document, these are some of the

4    results that you obtained and which you testified to yesterday.

5    A.   Yes.

6    Q.   And what I want to do is try to make sure we and the Court

7    have an understanding what assessments produced those results.

8    Okay?

9         It starts with the Nelson-Denny.  We can start with that

10   one.

11   A.   This right here?

12   Q.   Yes.

13        THE COURT:  You didn't just put that on my --

14        MR. BURGOYNE:  I'm sorry, Your Honor.  I was trying to

15   make sure I didn't put it somewhere it wasn't going to fall.

16        THE COURT:  Here.  We'll put it here.

17        MR. BURGOYNE:  That's fine.  That's good.

18        THE COURT:  You'll be moving me out of here in a

19   moment, won't you?

20        MR. BURGOYNE:  Your Honor, I have to get rid of some

21   of these notebooks.

22   BY MR. BURGOYNE:

23   Q.   Looking at this document, please.

24        MR. BERGER:  Before we look at this document, this

25   document is a compilation of things which we have not seen

**Appx536**

1   before.  I think some of them do correspond with exhibits that

2   counsel identified.

3          THE COURT:  Do you need a moment to review this

4   counsel?

5          MR. BERGER:  Yes, yes.  Thank you.

6          THE COURT:  Sure.

7          MR. BURGOYNE:  While he's doing that, Your Honor, I'll

8   just help speed things along a little -- the only document in

9   here --

10         THE COURT:  Hold on.  He has to listen to the

11  questions that you're posing to the witness.

12         MR. BURGOYNE:  No, no.  I was telling him what was in

13  here so he could know exactly what he wasn't seen before.

14         THE COURT:  Okay.  Go ahead.

15         MR. BURGOYNE:  The only one in here that wasn't an

16  exhibit, Larry, is the Nelson-Denny sample questions.

17         MR. BERGER:  Okay.  Just give me an minute.

18         THE WITNESS:  Is this an exact copy of the test?

19         MR. BERGER:  No, no.  This is one that someone uses to

20  help people prepare for an employment context.

21         MR. BURGOYNE:  All set?

22         MR. BERGER:  I think we may need to check some of this

23  at another time, but I'm okay with letting Mr. Burgoyne go

24  ahead.

25         THE COURT:  Proceed with his questions.  Very well.

1          MR. BERGER:  Thank you, Your Honor.

2   BY MR. BURGOYNE:

3   Q.   Let's look first at the summary of some of your diagnostic

4   assessments that we prepared.

5          And you see one of the things you have on here is the

6   Nelson-Denny reading rate, page --

7   A.   Yes.

8   Q.   Last one?

9   A.   Yeah.

10  Q.   And that was 1 percent.  I think you testified yesterday

11  that you agreed with Dr. Lovett that that reading rate test

12  isn't a very reliable instrument?

13  A.   Correct.

14  Q.   I think you also said you place greater reliance on the

15  Nelson-Denny comprehension test?

16  A.   Yes.

17  Q.   Reading comprehension.

18         And that's a test that consists of 38 multiple choice

19  questions?

20  A.   Yes.

21  Q.   And if you just look at the tab that's Nelson-Denny sample

22  questions.

23         And as it's indicated at the top, these are not actual

24  Nelson-Denny questions.  These were questions that the Texas

25  government provided to prospective police officers who were

1  going to take the Nelson-Denny.

2       And all I want you to do is just confirm for me whether

3  these two questions are roughly representative of the type of

4  questions that appear on the Nelson-Denny in terms of length

5  and format?

6  A.   Very roughly.  They don't look quite right.  They don't

7  look quite long enough.

8  Q.   Okay.

9  A.   And I certainly don't know about the content.

10 Q.   I think you testified yesterday regarding the Nelson-Denny

11 that you had seen research showing that -- I think it was most

12 high school graduates --

13 A.   Yes.

14 Q.   -- were able to answer all 38 questions.

15 A.   Yes.  I said most.  More like 75 percent of high school

16 graduates.  That was an imprecision on -- can complete most of

17 the questions.

18 Q.   If I told you the technical manual for the Nelson-Denny

19 reflected that 62 percent of grade 16 level students were able

20 to complete all 38 questions, would that be consistent with

21 your --

22 A.   Yeah.

23 Q.   So some number, not quite 40 percent, do not answer all

24 the questions?

25 A.   Yeah.

1  Q.   The next document in here is the TOMM score sheet.

2       And is this Ms. Ramsay's score sheet?

3  A.   Yes.

4  Q.   And this is the test you administered to evaluate whether

5  or not she was providing maximum effort?

6  A.   Yes.

7  Q.   And as the TOMM score sheet reflects, there is a column A

8  and a column B and then a check mark, and there's the word

9  "spinning wheel" and then "cookie"?

10 A.   Yes.

11 Q.   Just going down, "pennant," "boat."

12      Does this exam consist just of a series of pictures that

13 you show to the --

14 A.   Yes.

15 Q.   -- patient?

16      So there's no words on the TOMM exam?

17 A.   Correct.

18 Q.   And then the individual just has to remember which picture

19 they've seen previously?

20 A.   Yes.

21 Q.   And does the speed with which someone takes the TOMM have

22 any impact on the result?

23 A.   No.

24 Q.   And I apologize, Your Honor, Defendant's Exhibit 36 is

25 what we're looking at here.

1      And you in fact administered the TOMM to Ms. Ramsay three

2  times.  Correct?

3  A.   There are three subtests for it, yes.

4  Q.   So it was one administration, but you administered it

5  three times on that occasion?

6  A.   Well, the test is structured with three different

7  administrations that you can administer.

8  Q.   And you discussed yesterday the latter two scores on which

9  she achieved perfect scores, 50?

10 A.   Yes.

11 Q.   And then on the initial test, she achieved a 42?

12 A.   Yes.

13 Q.   Would that be an unusually low score for someone?

14 A.   No.

15 Q.   If you got that score on the latter two performances,

16 would that raise any concerns in your mind regarding whether or

17 not someone might not be exercising maximum effort?

18 A.   Yes.

19 Q.   And the Test of Memory Malingering, that was developed to

20 indicate malingering in the memory area?

21 A.   Yes.

22 Q.   Let's look at the next one.  Let's look at the GORT

23 results.  This is DX-40.

24      And this doesn't have Ms. Ramsay's name on it, but would

25 you confirm that this is her GORT-5 booklet?

1  A.   Yes.

2  Q.   And at the bottom here, there's a reference to oral

3  reading percentile rank?

4  A.   Yes.

5  Q.   1 percent?

6       And is that the result that you testified to yesterday?

7  A.   Yes.

8  Q.   And that's reflected in this chart that I've handed you --

9  actually, let me ask you.  There's two results that you had at

10 1 percent, the GORT-5 reading rate and the GORT-5

11 comprehension, and then GORT-5 fluency you had at the second

12 percentile?

13 A.   The GORT -- okay.  Let me compare this.

14      The reading rate, that's at the first percentile.

15 Comprehension is at the first percentile.  Fluency is at the

16 second.  Yes.

17 Q.   And what are the assessments that she answered in order to

18 produce the reading rate score?

19 A.   I'm confused.  Could you --

20 Q.   Actually, let me just ask you this:  It looks like there

21 are 11 stories in this assessment, so-called stories at the

22 top, which consist of text?

23 A.   There are 16 stories.  And when a person gets a certain

24 score that's below on two of the passages, it's assumed they've

25 signed out that they won't be able to complete the others

1  adequately.

2  Q.   So the fact that this document ends at 11 means that Ms.

3  Ramsay maxed out at story 11?

4  A.   That's right.

5  Q.   And when you administer this test, do you read the

6  questions to her or does she read the questions out loud?

7  A.   I read them to her.

8  Q.   And then what happens after you read the questions to her?

9  A.   Then she gives me an answer, and I mark whether it's

10 correct.  I try to -- in particularly, if they give me an

11 incorrect answer, I try to make a quick note on what it was.

12 Sometimes I don't get them all down, but I try to make a note

13 on what the incorrect answers were.

14 Q.   Let's look at story 2 to we make sure we understand how

15 this works.

16      Then the first line says:  Our cat Mimi likes to sit on

17 the roof.

18 A.   Yes.

19 Q.   And then Mimi goes up the tall tree by the house.

20 A.   Yep.

21 Q.   Then she jumps on the roof.  She sits and looks at birds,

22 but she always comes down when it is time to eat.

23      So those sentences you read to Ms. Ramsay?

24 A.   No.  She reads those out loud.

25 Q.   She reads those out loud.  And then what happens?

1  A.   Then I take the book away from her.  The instructions are

2  for her to read as quickly as she can but as accurately as she

3  can.

4       Then I time the time it takes her to finish that, to get

5  to the end, take the book away from her and then I ask her the

6  questions and she orally responds.

7  Q.   And then the time below there, it looks like it's 23

8  seconds?

9  A.   Yes.

10  Q.   And that reflects how long it took her to --

11  A.   To complete that.

12  Q.   Let's look at the sample WIAT-III questions.  I apologize,

13  these are tough to read.

14       But would you confirm that the document, which is

15  Defendant's Exhibit 38?

16  A.   Yes.

17  Q.   And then starting at the second page, the third page, and

18  then the fourth page, are these the three reading passages

19  which made up the WIAT-III?

20  A.   Yes.

21  Q.   And are these the passages that resulted in the oral

22  reading fluency score that's reflected in your sheet?

23  A.   Yes.

24  Q.   Would she read these questions out loud?

25  A.   Yes.

1  Q.  The next one is the Woodcock-Johnson IV.  And although

2  there is no name on this booklet, is this Ms. Ramsay's response

3  booklet?

4  A.  Yes.

5  Q.  And the handwriting on this document, I take it, is yours?

6  A.  Yes.

7  Q.  And then it looks like there are two sections here.  One

8  is sentence reading fluency and one is word reading fluency?

9  A.  Correct.

10  Q.  Do those two assessments in combination produce the

11  reading rate cluster?

12  A.  Yes.

13  Q.  And that's one of the clusters you report in your document

14  as her performing at the first percentile?

15  A.  Yes.

16  Q.  And if we look at sentence reading fluency, let's look at

17  the second page, it looks like first there's a page where there

18  are some samples provided to the individual?

19  A.  Correct.  They have to do it so I can make sure they

20  understand the directions.

21  Q.  The next page is her actual performance on this test?

22  A.  Yes.

23  Q.  And the sentences she's reading are:  Ants are small?

24  A.  Yes.

25  Q.  Children are all different ages?

1  A.   Yes.

2  Q.   And what is -- and it says, yes or no?

3  A.   Yes.

4  Q.   Is that just basically true or false?

5  A.   Correct.

6  Q.   It looks like there are 88 of those questions?

7  A.   Yes.  Oh, wait a minute.  Yes.

8  Q.   And then for word reading fluency, again there's a page

9  with sample items?

10  A.   Yes.

11  Q.   And I think you testified about this one yesterday.  It

12  looks like there are four words in each line.  If we look at

13  the first one on the actual assessment page, which is page 25,

14  the first line is cat, read, dog, boy?

15  A.   Yes.

16  Q.   And the individual is told to mark the two that are

17  similar?

18  A.   Yes.

19          MR. BERGER:  I apologize.  Which --

20          MR. BURGOYNE:  It's Smith 107.

21          MR. BERGER:  Okay.  Thank you.

22  BY MR. BURGOYNE:

23  Q.   And again, that's your handwriting at the top, it looks

24  like?

25  A.   Yes.

1  Q.   What does that say there?

2  A.   31 correct, zero wrong.

3  Q.   And is --

4  A.   If you get any wrong, you get deducted.  That lowers the

5  score.

6  Q.   This was Defendant's Exhibit 39.

7       It looks like there were 64 questions of which she

8  answered -- got through 31?

9  A.   Correct.

10 Q.   And this is a timed assessment?  She was told to stop at

11 some point?

12 A.   3 minutes.

13 Q.   You also testified regarding the IVA+Plus Continuous

14 Performance Report?

15 A.   Yes.

16 Q.   And I think you testified you administered it twice

17 because her scores were so low?

18 A.   Yes.

19 Q.   What did you mean by that?  Were you concerned about the

20 score being so low for some reason on the first administration?

21 A.   They were unusually low.

22 Q.   If the scores were low because of lack of effort, would

23 you anticipate any different result the second time it's

24 administered?

25 A.   It might not be different if somebody -- due to lack of

1  effort or they had a profound disorder.

2  Q.    Had Ms. Ramsay taken a similar continuous performance test

3  before for Dr. Lewandowski?

4  A.    Yes.

5  Q.    And how did she perform on that assessment?

6  A.    She performed in the average range in all but one score.

7  Q.    And again, in all events, these are the type of

8  assessments that you don't believe are very reliable?

9  A.    Yes, in general.  Let me qualify that if I could.

10 Q.    Sure.

11 A.    Their reliability is -- what wording do I want?  They're

12 not awful, but they're not as great as like the WIAT, which is

13 a more rigorous -- not rigorous.  Rigorous isn't the right

14 word.

15       Those -- the statistics for those have a much higher

16 reliability rating, where almost certainly when you -- if you

17 could repeat them again, you'd get almost the same score.

18       With scores like -- in neuropsych testing, in general

19 neuropsych testing, the scores are less reliable, so it tends

20 to be more of difference if you could repeat them again.

21 Q.    Okay.  I think you also testified that in general, you

22 place greater reliance on symptom checklists and your

23 interview?

24 A.    That's what the research says is the most applicable.

25 Q.    And so when you do that, do you get information from the

1  patient?

2  A.   Yes.

3  Q.   And then you also try to obtain information from

4  individuals who know the patient well?

5  A.   Yes.

6  Q.   That could be a family member?

7  A.   It almost always has to be a family member to know them

8  well enough to make a comment.

9  Q.   Is it sometimes a teacher?

10  A.   Sometimes.  Not generally for adults, because they just

11  don't seem to have the familiarity -- they don't know the adult

12  well enough.

13  Q.   Do you ever get information from primary care physicians?

14  A.   Generally not.

15  Q.   When you were looking at the symptom checklist that you

16  received from Ms. Ramsay, I think we saw yesterday she

17  identified 17 of 18 symptoms with maximum severity?

18  A.   Yes.

19  Q.   And did you compare that information with the information

20  that Dr. Smiy had provided when he evaluated her in 2009?

21  A.   Not closely, no.

22  Q.   Let's look at DX-42 if you would, please.

23  A.   DX-42.  I guess I'm in the wrong book.

24  Q.   It's in the other book.  I should have told you that, I'm

25  sorry.

1  A.   42.  Right?

2  Q.   Yes.  Thank you.

3  A.   Okay.

4  Q.   And this Exhibit 42 is the ADD/ADHD verification form that

5  Dr. Smiy submitted to Ohio State on behalf of Ms. Ramsay?

6  A.   Yes.

7  Q.   And just to help you a little bit, this is included as one

8  of the documents that you identified in your report as

9  something you reviewed?

10  A.   Yes.

11  Q.   If you look at page 2 of this document, that's where he

12  provides his DSM diagnosis?

13  A.   Yes.

14  Q.   And he diagnosed her as having ADHD, predominantly

15  inattentive.

16       Is that different from what you diagnosed her with?

17  A.   Yes.

18  Q.   I think you diagnosed her as having the combined type?

19  A.   Yes.

20  Q.   And that means she had both inattentive and hyperactive

21  impairment?

22  A.   Yes.

23  Q.   He indicates below that he arrived at his diagnosis

24  through developmental history.

25       What does that mean?

1  A.   I'm sorry, he arrived at his diagnosis?

2  Q.   Yes.  He says he arrived at it, on this document, through

3  first developmental history?

4  A.   I presume he asked her the same types of questions I was

5  asking her about developmental history.

6  Q.   And then what's the difference between that and medical

7  history, which he also indicated he had relied upon?

8  A.   I think medical history would be more related to a

9  diagnosis that she previously had and physical complaints, that

10  kind of thing.

11  Q.   And then he said, structured or unstructured clinical

12  interview with the student?

13  A.   Yes.

14  Q.   Is that similar to what you would have done as well?

15  A.   Yes.

16  Q.   The next page, he indicates how long he has had contact

17  with the student, and it looks like he began treating Ms.

18  Ramsay in 2003, and his last contact was 2010.

19       Did you understand that he was her primary care physician?

20  A.   Yes.

21  Q.   And then if you go to page 4, he walks through all of the

22  symptoms that were part of the ADHD diagnostic criteria under

23  the DSM-IV?

24  A.   Yes.

25  Q.   And so we're clear here, the DSM-IV is the version of the

1  Diagnostic and Statistical Manual that preceded the current

2  manual?

3  A.    Correct.

4  Q.    And how many symptoms did you need to have under that

5  version of the DSM in order to meet the diagnostic criteria for

6  ADHD?

7  A.    The criteria, there is not a strict number that you have

8  to have.  The recommended is 6.  You're allowed to deviate, but

9  then you're deviating.

10  Q.    And he identified five symptoms in this report?

11  A.    Yes.

12  Q.    And then he identified no issues with hyperactivity or

13  impulsivity?

14  A.    Yes.

15  Q.    And again, did you consider this information or discuss

16  this information with Ms. Ramsay to the extent that it was

17  inconsistent with what you were seeing on her --

18  A.    I did not discuss it with her.  I did consider it.

19        MR. BURGOYNE:  Your Honor, we have no further

20  questions.

21        THE COURT:  Very well.

22        Do you want to start with redirect now, or do you want

23  to take a break now?  Mr. Berger, it's your call.

24        MR. BERGER:  I think it would be a good time to take a

25  break.

1          THE COURT:  Very well.  We'll be in recess for 15

2   minutes then.

3          (Recess at 10:47 a.m. until 11:03 a.m.)

4          THE COURT:  You may be seated.

5          And you may proceed.

6                    REDIRECT EXAMINATION

7   BY MR. BERGER:

8   Q.   Dr. Smith, in Mr. Burgoyne's questioning, he referred you

9   to something on your web page about problems with the

10  discrepancy model?

11  A.   Yes.

12  Q.   What as you see it are the problems with the discrepancy

13  model?

14  A.   Well, actually, I don't think that page was saying there

15  was a problem with the discrepancy model.  I was referring to

16  the issues -- there's a long history of issues about IQ testing

17  and the accuracy of it and what scores should be used and that

18  kind of thing.

19       Oftentimes people get a score that doesn't really truly

20  reflect their abilities and then that is reported as if it's

21  accurate.  And then a person makes future decisions based on

22  that.

23  Q.   So if I understand correctly, there could be a case in

24  which someone had a relatively low intelligence score and there

25  would not be a discrepancy between that score and --

1   A.   That's correct.  That page, unfortunately, I have not

2   updated my website in quite a while.  That's referring to

3   DSM-IV issues and the importance of having -- the DSM-IV

4   required that you have a discrepancy and you be below average.

5   And if you don't have a discrepancy, you're out of luck.  And

6   the lack of a discrepancy is frequently because the IQ score is

7   depressed for these other reasons because it's not a really

8   true measure of your intelligence.

9   Q.   As applied to this case, however, there was in fact some

10  discrepancy in Ms. Ramsay's case.  Correct?

11  A.   Yes.

12  Q.   There is also a discussion about the fact in -- both in

13  your report and in your web page at the fact that you look for

14  early -- information about childhood problems?

15  A.   Please repeat that for me.

16  Q.   Just generally, you indicated in your report that you

17  consult records from Ms. Ramsay's childhood --

18  A.   Yes.

19  Q.   -- to look for information there?

20       And is one of the pieces of information that you looked at

21  the information from Dr. Tanguay, the optometrist who --

22  A.   Oh, yes.

23  Q.   Did that information from Dr. Tanguay, was that

24  information that you considered in evaluating and arriving at

25  your diagnoses?

1   A.   Yes.

2   Q.   And we know of course that Dr. Tanguay was an optometrist

3   and not a psychologist, but -- and so she couldn't evaluate a

4   reading -- a learning disorder, but is the fact that there was

5   something someone thought was a vision problem early on, is

6   that something that could be considered as part of your review

7   of the early records?

8   A.   Yes.

9   Q.   Is it easy to fake dyslexia?

10  A.   No.

11  Q.   You performed and there is some discussion about the TOMM,

12  the Test of Memory Malingering?

13  A.   Yes.

14  Q.   When you administered the TOMM to Ms. Ramsay, what did you

15  tell her that the purpose of that test was?

16  A.   That it was to measure a component of cognitive

17  functioning that was important for reading.  Just a general

18  statement to try to link the two together.

19  Q.   Just one moment.  Let me -- just so we also have the

20  reference to your report, if you would look at Exhibit DX-3.  I

21  can help you find it if --

22  A.   I'm sure I can find it.

23  Q.   And it's Tab B, which is your report.

24  A.   Hold on.  DX-3.  Tab B you said?

25  Q.   Tab B, which is your report.

1  A.   All right.

2  Q.   And it's page 23 of the report, although the page number

3  at the top will be different.  But it's under the discussion

4  and summary section, page 23 of 31.

5  A.   I am there.

6  Q.   All right.  So am I -- you've explained the purpose of

7  doing the TOMM, which is to check to see if Ms. Ramsay was

8  making genuine effort?

9  A.   Yes.

10  Q.   Did you tell her that?

11  A.   No.  In terms of administering the TOMM?  No.

12  Q.   Yeah.  And what did you tell her?

13  A.   About what?

14  Q.   About what the purpose was for that test.

15  A.   That it was going -- measuring a component of cognitive

16  memory function, I think I put memory in there, that's

17  important for adequate reading, something like that.

18  Q.   So if she was trying to fake a reading problem, would that

19  have affected her performance on the TOMM?

20  A.   I would have expected it to, yes.

21  Q.   Okay.  But you found that in fact that she was making

22  genuine effort?

23  A.   Yes.

24  Q.   I asked you a moment ago whether it was hard to fake

25  dyslexia or easy to fake dyslexia, something like that, and you

1  said no, that it was difficult, but would you explain that a

2  little further.  Why is it difficult?

3  A.   Well, people have misconceptions about what dyslexia is.

4  The most common misconception that persists with most people

5  is, number one, it's a visual disorder when it's not and it's

6  about flipping of letters.  And it's -- like I said earlier in

7  previous testimony that that's not exclusive to dyslexia.  So

8  they make those kinds -- so basically if people try to fake --

9  they're going to make those kind of errors and misread things

10 that are easy, because it's expected.

11 Q.   Mr. Burgoyne showed you a list of standardized exams that

12 Ms. Ramsay had taken.  One of them was the MCAT.  And I just

13 want to make part of the record at this point the other part of

14 the MCAT, the part that wasn't discussed, and that is the

15 writing sample.

16      Do you remember looking at the score for the writing

17 sample?

18 A.   Do I remember the score?

19 Q.   Yeah.

20 A.   Not for sure.  I think it was around the 31st percentile.

21 Q.   I believe that's correct.  There was also some discussion

22 this morning about DX-27.  And I think that's in the same

23 binder.  And that is a report of a test that was administered

24 to Ms. Ramsay in the sixth grade.  And we discussed it a little

25 bit yesterday.  Tell me when you've found it.

1  A.   All right.  I do.

2  Q.   We discussed it a little bit yesterday, and this morning

3  Mr. Burgoyne pointed out that the overall scores were above

4  average.  And that's correct.

5       And this isn't -- I think I'm right that you may not have

6  seen this test when you were doing your report; is that

7  correct?

8  A.   That is correct.

9  Q.   Okay.  But what is the thing that was of interest to you

10 when you did review this?

11 A.   Well, that a number of her scores, most of them related to

12 reading, were significantly below expectation or -- based on

13 the intelligence measure that they also administered, which

14 they point out in the score report here.

15 Q.   When Ms. Ramsay originally came to you and you discussed

16 the testing that Dr. Lewandowski had done, what did you say

17 about the testing that he had done and the question of dyslexia

18 which Ms. Ramsay was asking you about?

19 A.   I would have said something in general about the kind of

20 tests that needed to be done to examine that weren't done.

21 Q.   And when you gave Ms. Ramsay those tests -- and I think

22 they're generally the ones we discussed this morning, like the

23 WIAT and the Woodcock-Johnson and the GORT.  And when you

24 administered those tests to Ms. Ramsay, as far as you know, was

25 that the first time that anyone had ever administered those

1   tests to Ms. Ramsay?

2   A.   Yes.

3   Q.   And Dr. Smiy didn't do any of those tests either, did he?

4   A.   No.

5   Q.   And Dr. Smiy was a general physician, so those aren't

6   tests that he could have done.  Am I right?

7   A.   No.  Yes, you're correct.

8   Q.   Mr. Burgoyne discussed a little with you the Conners'

9   Continuous Performance Test --

10  A.   Yes.

11  Q.   -- that Dr. Lewandowski had done?

12  A.   Yes.

13  Q.   And is a test like the Conners' or a test like the

14  IVA+Plus that you did, are those tests that can provide helpful

15  information on a diagnosis of ADHD?

16  A.   Yes.

17  Q.   And what is the right way to use those tests, and what is

18  the problem with using those tests?

19  A.   Well, they are -- they supplement what you gather from

20  history and symptom counts from questionnaires and what the

21  people report.  They provide some -- sometimes provide some

22  kind of an objective support for whether there's a problem

23  related -- an attention problem.

24       The drawback from my reading of the literature is that

25  they -- of these types of tests in general is that they too

1  often fail to detect a problem when it's actually there.  And

2  that when they indicate that there's an impaired problem, that

3  doesn't automatically means it's attention deficit.  It means

4  there's an impaired problem with attention.

5       But the most problem is they're not sensitive enough to

6  pick up a problem frequently when in fact it's there.  That's

7  one of the reasons why they haven't been accepted as a core

8  diagnostic evaluation procedure.

9  Q.  Is there some literature that suggests that those tests

10  can lead to false negatives?

11  A.  Yes.

12  Q.  But that is not what happened in Ms. Ramsay's case.

13  Correct?

14  A.  Correct.

15  Q.  When you tested Ms. Ramsay, we covered this yesterday, but

16  just again to put this morning's testimony in context, was she

17  on her ADHD medication that day?

18  A.  No, she was not.

19          MR. BERGER:  I have no further questions.

20          THE COURT:  Any recross?

21          MR. BURGOYNE:  Just two, three, Your Honor.  Real

22  quick.

23                    RECROSS-EXAMINATION

24  BY MR. BURGOYNE:

25  Q.  Dr. Smith, would you look real quick at Defendant's

1 Exhibit 51.  It's in the second notebook of the two notebooks.

2 A.   Yes.

3 Q.   And you'll recall this is the article regarding detecting

4 feigned reading disabilities?

5 A.   Yes.

6 Q.   Would you read for us -- you were asked during your

7 questioning by Mr. Berger whether or not, you put it, it's

8 difficult to fake or feign dyslexia?

9 A.   Yes.

10 Q.   And you answered no, it was not, in your opinion?

11 A.   No.  I asked yes, that it was difficult.

12 Q.   It was difficult.  Right.  Sorry.  Double negative.

13      In your opinion it is difficult to feign dyslexia?

14 A.   Yes.

15 Q.   Would you read to us the last sentence in this research

16 article on page 1.

17 A.   On page 1?

18      Until recently, most clinicians assumed that students

19 could not feign a specific LD such as a reading disability.

20 And they quote an article.  And that the base rate for such

21 malingering in psychoeducational assessments was very low.

22      Do you want me to continue on to the next page?

23 Q.   Yes.

24 A.   However, this has proven not to be the case.

25      Continue?

1  Q.   No, that's good.

2       Again, have you done any research in this area?

3  A.   No.  I've not studied -- well, I mean, I've not done any

4  research articles or anything like that.

5  Q.   Quickly on the TOMM, just to confirm, there's no reading

6  on that assessment?

7  A.   Correct.

8  Q.   And it doesn't matter how long she takes to answer those

9  questions regarding the pictures she sees?

10 A.   Correct.

11 Q.   Then finally you were asked about her performance on the

12 MCAT, and I think -- on the writing sample.  And you said

13 performed at the 31st percentile?

14 A.   That's what I said, yes.

15 Q.   Is that an average score?

16 A.   It's in a lower part of the average range.

17      MR. BURGOYNE:  No further questions, Your Honor.

18      THE COURT:  Very well.  You may step down, sir, and

19 watch your step.

20      MR. BERGER:  And I promised Dr. Smith that I would ask

21 Your Honor whether he is also excused.

22      THE COURT:  Sure.  I see no reason why you can't be

23 excused.  You're excused, sir.

24      THE WITNESS:  Thank you.

25      THE COURT:  Thank you.  Have a good day.

 1            Any witnesses on behalf of plaintiff?

 2            MR. BERGER:  Your Honor, plaintiff rests.

 3            THE COURT:  Very well.  I'll give you leave to admit

 4  whatever exhibits have not been entered in at the conclusion of

 5  the testimony.  All right?

 6            So saying, defense.

 7            MR. BURGOYNE:  We call Dr. Cathy Farmer.

 8            THE COURT:  Very well.

 9            And watch your step coming around, ma'am, and also

10  around the witness box.

11            DR. CATHERINE FARMER, after having been duly sworn,

12  was examined and testified as follows:

13            COURT REPORTER:  State your name for the record.

14            THE WITNESS:  Catherine Farmer, F-A-R-M-E-R.

15                          DIRECT EXAMINATION

16  BY MR. BURGOYNE:

17  Q.  Good morning, Ms. Farmer.

18  A.  Good morning.

19  Q.  Could you state your job title, please.

20  A.  I'm the director of disability services and the ADA

21  compliance services at the National Board.

22  Q.  And the National Board, that's the National Board of

23  Medical Examiners?

24  A.  It is.

25  Q.  And are your offices located here in Philadelphia?

1  A.   Yes.

2  Q.   How long have you had that job position?

3  A.   Since 2006.

4  Q.   Would you give us a brief summary of your educational

5  background.

6  A.   Originally I was a licensed practical nurse.  I earned a

7  bachelor's degree in biology, a master's in health education

8  and a doctorate in clinical psychology.

9  Q.   Are you a licensed psychologist?

10 A.   No.

11 Q.   And you're not -- you don't have a practice where you see

12 patients?

13 A.   I don't.

14 Q.   Do your responsibilities include reviewing requests for

15 accommodations on the Step 1 examination?

16 A.   Yes.

17 Q.   Did you receive a request from Jessica Ramsay?

18 A.   Yes.

19 Q.   How many requests for disability-related accommodations

20 does NBME receive in a given year, just order of magnitude?

21 A.   Last year 1,700 requests.

22 Q.   And are some of those duplicate requests from the same

23 individual?

24 A.   They could be, yes.

25 Q.   And do you have any rough approximation of how many

1  individuals receive at least one of the accommodations they

2  request?

3  A.    In a given year, roughly 60, 65 percent.

4  Q.    Briefly describe the process by which someone requests

5  accommodations and then you go about evaluating that request in

6  making your decision.

7  A.    The process actually begins with our website where we post

8  information for students and applicants on how to make a

9  request, guidelines for documentation that would be helpful to

10 support their requests, forms for them to fill out or have

11 their school fill out.

12      When they send those documents to us, we ask that they be

13 registered for the examination at that time.

14      In-house, we have staff that go over the submission just

15 to make sure all the forms are there, signed, legible.

16      Then I have a group of professional staff who are

17 psychologists, and we do an audit.  They'll do an audit of the

18 file to make sure that the information that's provided that's

19 clinically based has enough information for us to make an

20 informed decision about the request.

21      We may or may not send it out to external consultants,

22 subject matter experts, to review.  If we're able to, based on

23 the submission, grant the request, we'll do so without sending

24 it out for review.  If we're not clear that we see a

25 substantial limitation in a major life activity, we'll send the

1  submission out for consultant review.

2  Q.   Let me ask you there, do you ever deny a request without

3  sending it out to an external expert?

4  A.   Not typically, no.

5  Q.   And examinees request accommodations based on both

6  physical and mental impairments?

7  A.   Yes.

8  Q.   Do the mental impairments include impairments such as

9  learning disabilities and attention deficit disorder?

10 A.   They do.

11 Q.   Do those type of requests tend to take longer to review

12 than a request for accommodations based on a physical

13 impairment?

14 A.   They typically include a lot more documentation for us to

15 look through, yes.

16 Q.   What is the impairment that constitutes the largest

17 percentage of requests that you get?

18 A.   Probably attention-deficit/hyperactivity disorder and/or a

19 learning disability in reading or dyslexia.

20 Q.   Is it fairly common to see both of those diagnoses in a

21 request?

22 A.   It is.

23 Q.   How long do you tell examinees that it will take you to

24 process their accommodation request?

25 A.   On the request form we ask them to allow at least 60 days

1  for us to review.  And that's from the point where we've

2  received complete information from them.

3  Q.   And are you able in some instances to do it more quickly

4  than 60 days?

5  A.   Yes.

6  Q.   And likewise, are there instances in which you don't meet

7  your 60-day target?

8  A.   Yes.

9  Q.   Look at Exhibit DX-4, which is your declaration.

10  A.   I have it.

11  Q.   And would you confirm for us that's your signature on the

12  last page of this document.

13  A.   Yes.

14  Q.   And this is a declaration you submitted in connection with

15  this case?

16  A.   It is.

17  Q.   Let's walk through your attachments here and make sure we

18  understand what these are.

19       Attachment A, Tab A?

20  A.   Have it.

21  Q.   This is Ms. Ramsay's initial request for accommodations?

22  A.   Yes.

23  Q.   And it looks like she signed this November 28, 2016.

24       Is that when you received this?

25  A.   No.  I believe this was received in January, around

1  January 6th.

2  Q.   Look at Tab B for me.  It will suggests to me maybe you

3  received it a little earlier.

4       Is that stamp on Tab B, is this Ms. Ramsay's personal

5  statement, is that an NBME stamp that says received there?

6  A.   Yes.

7  Q.   And that indicates that that document at least was

8  received December 12th?

9  A.   Yes.

10 Q.   Does that refresh your recollection that perhaps you

11 received this request sooner than January?

12 A.   I apologize, you're right.  There is a stamp on the

13 request form I see.

14 Q.   The one on the request form was hard to read.

15 A.   Yes.

16 Q.   You received this it looks like December 12th?

17 A.   Yes.

18 Q.   And then Tab B, as indicated, that's a personal statement

19 that Ms. Ramsay submitted?

20 A.   It is.

21 Q.   You routinely ask candidates to submit a personal

22 statement?

23 A.   Yes.

24 Q.   And then Tab C, this is some high school grades that Ms.

25 Ramsay submitted to you?

1  A.   Yes.

2  Q.   Tab D is at least a partial transcript from Ohio State

3  University that she submitted to you?

4  A.   I see that, yes.

5  Q.   Tab E is her MCAT score report?

6  A.   Yes.

7  Q.   Do you recall whether you received that later than her

8  initial submission?

9  A.   I don't recall.  There is a date stamped here, but I'm not

10 sure I can read.

11 Q.   And then Exhibit F, this is the report that Dr. Smiy -- or

12 at least a record of Dr. Smiy's visit in which he diagnosed Ms.

13 Ramsay with ADHD?

14 A.   Yes.

15 Q.   And then Exhibit G is the Ohio State verification form of

16 ADHD?

17 A.   That's correct.

18 Q.   And then H is a document from Mr. Livingston?

19 A.   Yes.

20 Q.   And then finally we get to your decision letter, which is

21 March 2017.

22 A.   I see it.

23 Q.   And I'll represent to you that the Livingston documents

24 included a supplement indicating that he provided documents to

25 you on January 5, 2017.

1      Do you recall asking for supplemental documents from Mr.

2  Livingston?

3  A.   Dr. Goldberg did, yes.

4  Q.   Dr. Goldberg was someone on your stuff?

5  A.   Who did the initial audit, requested the supplemental

6  information to clarify Mr. Livingston's initial report.

7  Q.   So that documentation, it looks like, came to you January

8  5, 2017.

9      Would that be when the 60 days would ordinarily begin to

10 run?

11 A.   Yes, if that was the final document that she submitted and

12 we determined or she determined that that submission was now

13 complete.

14 Q.   And then I'll represent to you that Dr. Zecker submitted a

15 report to you that was dated January 13th.

16     He's one of your external reviewers?

17 A.   Correct.

18 Q.   And you asked him to perform the initial review of Ms.

19 Ramsay's request?

20 A.   Yes.

21 Q.   Then we just looked at your decision letter March 10th.

22     So it looks like in this instance it took you just over 60

23 days to respond to her first request?

24 A.   That's correct.  60 calendar days, yes.

25 Q.   Is that what you do, 60 calendar days?  Is that what you

1  tell people?  Or is it 60 --

2  A.   Actually, at this point in time we didn't -- we didn't say

3  either or.  So we tried to make that a little bit more clear

4  now.

5  Q.   Exhibit J, is this Ms. Ramsay's second request for

6  accommodations?

7  A.   It is.

8  Q.   And this is dated above her signature it looks like June

9  6, 2018?

10  A.   It is.

11  Q.   And K is the personal statement she submitted, also dated

12  June 6, 2018, in support of this request?

13  A.   That's correct.

14  Q.   And then Exhibit L reflects some documentation provided by

15  Dr. Lewandowski?

16  A.   That's correct.

17  Q.   And if you look in that tab at the page number at the top

18  it says page 89 of 106.

19  A.   Yes.

20  Q.   And you see there's a document in here from Dr.

21  Lewandowski that's dated June 20, 2018, which was subsequent to

22  Ms. Ramsay's initial submission?

23  A.   That's correct.

24  Q.   Do you recall receiving supplemental documentation from

25  Dr. Lewandowski?

 1  A.   I do.  After my initial audit of the documentation,

 2  including Dr. Lewandowski's evaluation, I asked for

 3  clarification of his score sheet and this is -- this submission

 4  that he made to supplement.

 5  Q.   And you referenced Dr. Goldberg a minute ago.

 6       She performed the review and sent the decision letter out

 7  on the initial request?

 8  A.   That's correct.

 9  Q.   And you did so on the second request?

10  A.   Yes.

11  Q.   Again, you sent this request out to Dr. Zecker; is that

12  correct?

13  A.   Yes.

14  Q.   And I'll represent to you that you got a letter from Dr.

15  Zecker that was dated July 19, 2018.

16  A.   That sounds about right.

17  Q.   And then if you'll look at Exhibit M, please.

18  A.   Yes.

19  Q.   Is this the decision letter that you prepared?

20  A.   Yes, it is.

21  Q.   Okay.  At this time it looks like something just over 80

22  days have gone by since you received the last piece of

23  supporting documentation and almost two months after you

24  received Dr. Zecker's letter recommending that extended testing

25  time be denied?

1  A.   I believe we received Dr. Lewandowski's -- notwithstanding

2  his date on the document, I think we received it around the

3  27th of the month.  So I believe it was around 77, a little

4  less than 80 days, for us to get a decision letter.  Yes.

5  Q.   So 77 or 80 days after you got the last piece of

6  documentation but almost two months after Dr. Zecker said he

7  recommended denying extra testing time?

8  A.   Yes.

9  Q.   Why did it take you so long to tell Ms. Ramsay what your

10  decision was?

11  A.   The way that requests are coming in, it's in a rolling

12  schedule.  So individuals are submitting requests every day.

13  They are in various stages of the process.  They all go through

14  the same process but at their own pace.  So we're reviewing

15  initial submissions for clarity and completeness.  Then we're

16  doing an audit.  We may ask for more information.  So there's

17  fits and stops in the process.  But this is going on

18  concurrently for dozens if not hundreds of requests for

19  information.

20      We have made a promise to students that we'll take them in

21  the order which they are received.  And so we are attempting to

22  respond to folks as quickly as possible but not have people

23  sort of jumping the queue.  And in this case we had -- my best

24  recollection is a number of requests that had come in before

25  Ms. Ramsay's.

1  Q.   And when you tell students your decision, do you simply

2  tell them yes or no, or do you attempt to provide an

3  explanation?

4  A.   If we're not granting everything that they've requested,

5  we make an effort to provide very specific detailed information

6  about why we can't grant what they requested.

7  Q.   Does that sometimes require you to pick up a file you

8  haven't looked at in a while in order to refresh your

9  recollection on the facts of that case?

10  A.   Almost always requires that, yes.

11  Q.   In this particular instance, you granted some

12  accommodations the second time but again denied extra testing

13  time?

14  A.   That's correct.

15  Q.   Let's look exactly at what you did grant.  And that's on

16  the third page of your letter.

17  A.   I see it.

18  Q.   Do you see that?

19      And it looks like you granted additional break time and

20  testing over two days.

21      Explain for the Court, if you would, exactly how that

22  would work compared to standard administration.

23  A.   So the standard Step 1 examination is an eight-hour day,

24  seven one-hour test blocks.  It's about 40 questions per hour.

25  For additional break time, we actually break the exam into two

1  days, break the exam blocks into two.  So it's shorter blocks.

2  It's just 30 minutes, half the number of items, 20 items per

3  half hour, and again, spread out over two days.  And then in

4  addition to the standard 45 minutes of break time, we give

5  additional break time.  So you have more opportunities for

6  breaks, additional break time in between -- in between test

7  blocks.

8  Q.    And how long is each test day when it's broken out over

9  two days?

10 A.    In this case, for the Step 1 exam, the first day would

11 be -- would have been five hours and 15 -- five hours in

12 length.  And the second day would have been four hours and 45

13 minutes, a little less than five.

14 Q.    And with 20 questions per block, at that point once Ms.

15 Ramsay completed that block, she had the opportunity to take a

16 break?

17 A.    Correct.

18 Q.    And there's also a reference here to separate testing

19 room.

20       Does that mean she would be testing by herself?

21 A.    Yes.

22 Q.    And would she be able to stand, walk around?

23 A.    It's a fairly small room, but yes, she could get up,

24 stand, stretch, change her position.

25 Q.    Do those testing rooms ordinarily have standing desks or

1 are they seated?

2 A.   Only the separate testing room has a desk that is usually

3 adjustable, so one can stand and take the test or sit and take

4 the test.

5 Q.   And then the final accommodation you granted was

6 permission to read aloud.

7      Back up a little.  Extra time or extra breaks and separate

8 room, were those based on her physical impairments that she had

9 relied upon in seeking accommodations the second time?

10 A.   Yes.

11 Q.   And those were I think deep vein thrombosis and then she

12 had also referenced migraines?

13 A.   That's correct.

14 Q.   And then your last accommodation you approved was

15 permission to read aloud.

16      Did that have anything to do with the physical

17 impairments?

18 A.   No, it didn't.  She had I think written in her personal

19 statements that reading aloud helps her, that she likes to do

20 that.

21      In the standard testing room, it's a room with 10 or 12

22 testing carrels, people sitting on either side and behind you.

23 One would not be able to read out loud or even subvocalize

24 without interfering with other examinees.  In a separate room

25 there is nobody to interrupt, and so she could potentially read

1  aloud if she wanted to.  However, the test proctors are alert

2  to any activities.  And we wouldn't -- I would not want them to

3  think that was suspicious behavior, so this provides an

4  official accommodation that she has our permission to do that

5  so that the proctors would be informed.

6  Q.   Okay.  Now you're referencing proctors.

7       Individuals take your exams in testing centers that are

8  operated by another company?

9  A.   Correct.  The Prometric Test Centers.

10 Q.   So when you're referencing proctors, those are the

11 Prometric employees?

12 A.   That's correct.

13 Q.   And you say for security, you wouldn't want the Prometric

14 employees to think Ms. Ramsay was doing something inappropriate

15 if she was reading out loud?

16 A.   Correct.  Or interrupt her to tell her to stop doing that.

17 Q.   Is it fair to say that NBME devotes significant resources

18 to evaluating accommodation requests?

19 A.   I think so, yes.

20 Q.   Why don't you simply approve whatever accommodations that

21 an examinee requests if it's supported by documentation from a

22 professional who seems to be qualified?

23 A.   Well, it's a -- the USMLE is a national standardized

24 licensure exam for medical licensure in this country.  And so

25 we're -- we have folks tell us what accommodations they need

1   and then provide supporting documentation.  So we're going to

2   look through every piece of information that they provide,

3   whether they had accommodations previously.  And so just one

4   evaluation or more evaluations that recommend accommodations

5   wouldn't be sufficient for us to grant.

6   Q.   Do you believe most examinees might like extended testing

7   time on an exam like this?

8   A.   I believe so, yes.

9   Q.   And do you attempt to administer your program in a

10  rigorous but fair manner for all examinees?

11  A.   Absolutely, yes.

12         MR. BURGOYNE:  No further questions.

13         THE COURT:  Cross-examination.

14                         CROSS-EXAMINATION

15  BY MS. VARGAS:

16  Q.   Good morning, Dr. Farmer.

17  A.   Good morning.

18  Q.   Did I hear you correctly that you testified you are the

19  ADA compliance officer?

20  A.   For test requirement, yes.

21  Q.   Who is Brendan Berger?

22  A.   He is a USMLE candidate.

23  Q.   And did you testify against him receiving extended time

24  during 2019?

25  A.   Did I testify against him?  In a hearing, yes.

1    Q.    What disabilities was he alleging he had?

2    A.    I believe ADHD and reading disorder.

3    Q.    What was the reason the NBME denied him the accommodations

4    that he requested?

5    A.    Because his documentation did not demonstrate a

6    substantial limitation in a major life activity.

7    Q.    Specifically what documentation from Brendan Berger did

8    the NBME rely on to make that conclusion?

9    A.    I believe we reviewed all of the documentation he provided

10   over the course of his applications, looked at every piece of

11   data that he supplied and made the conclusion based on that.

12   Q.    I guess I'm asking something different.

13        Of all the data that he provided, what data did you agree

14   with?  What data did you credit?

15            MR. BURGOYNE:  I'm going to object to this.

16            That was a different case with a different candidate

17   with different documentation.  I don't see its relevance to the

18   manner in which --

19            THE COURT:  Yeah.  Where are we going with this,

20   Counsel?

21            MS. VARGAS:  Dr. Farmer is the person who is -- I

22   believe she will testify, and she did in deposition, that she

23   was responsible for making the determination to deny

24   accommodations to Ms. Ramsay.  And we were going to get to the

25   point that she testified against Mr. Berger, and the Court

1  ordered a preliminary injunction in that case against the NBME

2  for the very same reasons that it's now trying to put forward

3  in this Court.

4           MR. BURGOYNE:  Your Honor, they've cited that in their

5  briefs.  You can read it.

6           THE COURT:  Yes.  We can take judicial notice of that.

7           MS. VARGAS:  Thank you.  Will you take judicial notice

8  of that?

9           THE COURT:  Any objection?

10          MR. BURGOYNE:  Your Honor, it's a published decision.

11          THE COURT:  It's a published decision by a court.

12          MS. VARGAS:  Thank you, Your Honor.

13          THE COURT:  Very well.

14 BY MS. VARGAS:

15 Q.   You testified a moment ago that in granting Ms. Ramsay

16 permission to read aloud that you were doing that because you

17 were concerned the proctors might think it was suspicious

18 behavior if she read aloud or mouthed as she read.

19      Why would that be suspicious?

20 A.   Well, during the examination the proctors are observing

21 all of the examinees to make sure that they are not

22 surreptitiously either taking information out or bringing

23 information in to the exam.

24 Q.   That's not something that medical students ordinarily do

25 when they're taking the USMLE; is that correct?

1  A.   Take information out or bring information in?  We

2  certainly hope not.

3  Q.   Is it typical for medical students when they take the

4  USMLE to read out loud the questions?

5  A.   They're not able to, no.

6  Q.   So it would be unusual behavior for a medical student to

7  be reading the questions on the USMLE out loud during the test

8  administration?

9  A.   It would be, yes.

10  Q.   The NBME grants more than double time.  Correct?

11  A.   Occasionally, yes.

12  Q.   For example, students have requested and the NBME has

13  granted triple time.  Right?

14  A.   Yes.

15  Q.   Jessie Ramsay didn't ask for that triple time, did she?

16  A.   No.

17  Q.   She only requested the time that she received in medical

18  school.  Right?

19  A.   She requested double time.

20  Q.   Was that the time that she received in medical school?

21  A.   I believe she does receive double time, yes.

22  Q.   You're not licensed to perform psychoeducational

23  evaluations in Michigan.  Correct?

24  A.   In Michigan, no.

25  Q.   In fact, you're not licensed to perform psychoeducational

1  evaluations anywhere, are you?

2  A.   No.

3  Q.   You've admitted in deposition that you're not an expert in

4  dyslexia.  Correct?

5  A.   Correct.

6  Q.   And you also admitted in deposition that you're not an

7  expert in ADHD.  Correct?

8  A.   That's correct.

9  Q.   You were the one who made the decision to deny Ms. Ramsay

10 the accommodations she's received?

11 A.   Yes.

12 Q.   At what point was her file transferred to you?

13 A.   I'm not sure.  Which file, which time?

14 Q.   You testified that Dr. Goldberg initially had her file,

15 and at some point you took charge of it.

16      Why did you take charge of it?

17 A.   So Dr. Goldberg was the one who made the audit and the

18 review of her first request in 2016, I believe.  When the next

19 one came in, it was assigned to me.

20 Q.   Why was that?

21 A.   They're really just assigned based on the volume.

22 Q.   Do you recall testifying in deposition that whenever a

23 candidate is represented by a lawyer, that that file is

24 automatically transferred to you?

25 A.   Oh, I don't recall that that was -- that she was

1  represented by an attorney at that time.

2  Q.   You don't recall if she was represented by an attorney in

3  June of 2018?

4  A.   Yes.  Forgive me, I didn't recall that she had been.  Yes.

5  Q.   So is that why the file was transferred to you, because

6  she was now represented by an attorney?

7  A.   I would normally respond to folks represented by

8  attorneys, yes.

9  Q.   Even though you have no expertise in ADHD or dyslexia?

10 A.   That's correct.

11 Q.   So your decision to rely on Ms. Ramsay's MCAT scores as a

12 basis for denying her request for extended time, that wasn't

13 based on any research, was it?

14 A.   The decision was to deny her request based on all of the

15 documentation that she provided and our consultant, expert

16 consultant reviews.

17 Q.   I'm asking a little bit of a different question.  I'm

18 asking about your mental process in making the decision to deny

19 her extended time.

20      Your decision to deny her extended time, it wasn't based

21 on any research, was it?

22 A.   No.

23 Q.   And in your deposition in fact you testified it was based

24 on common sense.  Correct?

25 A.   I don't recall stating that, no.

1          MS. VARGAS:  I'm sorry, Your Honor.  One moment.

2          THE COURT:  That's all right.

3          MS. VARGAS:  We'll come back to that in the interest

4    of time.

5    BY MS. VARGAS:

6    Q.   So in addition not having a license to conduct

7    comprehensive psychoeducational evaluation, you testified -- I

8    asked you some questions at deposition about your knowledge of

9    the MCAT.  Correct?

10   A.   I believe so, yes.

11   Q.   And your knowledge of the MCAT was, is it fair to say,

12   fairly limited?

13   A.   Yes.

14   Q.   And in deposition -- would it be fair to say that based on

15   the testimony you gave in deposition that your knowledge of

16   Step 1 and Step 2 are also fairly limited?

17   A.   I wouldn't say that it's limited.  I work for the National

18   Board.  I don't work for the AAMC who publishes the MCAT.

19   Q.   Now I'm talking about Step 1 and Step 2 of the USMLE.

20        Is that administered by the NBME?

21   A.   Yes.

22   Q.   And do you work for them?

23   A.   I do.

24   Q.   Your knowledge of Step 1 and Step 2 is actually fairly

25   limited, isn't it?

1  A.   I don't believe it's limited.

2  Q.   So in your deposition do you recall how you testified when

3  I asked you about the number of multiple choice options, for

4  example, that there were on Step 1, that's a fairly basic

5  question about an exam.  Correct?

6  A.   Sure, uh-huh.  It's basic.

7  Q.   And do you recall what you answered?

8  A.   No.

9  Q.   Well, I believe you testified -- would it surprise you if

10 you testified that you thought there were maybe four multiple

11 choice answers or five multiple choice answers?

12 A.   No, it doesn't surprise me.

13 Q.   Is that correct?

14 A.   I don't know.

15 Q.   Is it possible that there are as many as, say, 10 or 12

16 multiple choice answers?

17 A.   On some items, sure.

18       THE COURT:  Now you may ask your next question.

19 BY MS. VARGAS:

20 Q.   So if there were 10 or 12 answers on a multiple choice

21 question, how would that compare, if you know, to an MCAT with

22 only four multiple choice answers in difficulty for somebody

23 with reading challenges?

24 A.   Well, I'm not sure the number of answer options has any

25 bearing on that, the difficulty of the item, the difficulty of

1  the reading.

2  Q.   Would you have to read all of the answers to answer a

3  question on an exam?

4  A.   Yes.

5  Q.   And so if there were four multiple choice options on the

6  MCAT versus as many as 10 or 12 on a Step 1 or Step 2 question

7  on the USMLE, that would be a big difference between the two

8  tests, wouldn't it?

9  A.   It would.

10  Q.   Do you agree that the MCAT is not designed for diagnosing

11  dyslexia?

12  A.   Yes.

13  Q.   Do you agree it's inappropriate to diagnose an individual

14  with dyslexia solely on the basis of diagnostic tests?

15  A.   Yes.

16  Q.   The NBME doesn't have any direct knowledge of Ms. Ramsay's

17  diagnosis, does it?

18  A.   We have only knowledge of the documentation that she

19  provided, yeah.

20  Q.   Is Dr. Zecker licensed to perform comprehensive

21  psychoeducational evaluations in Michigan?

22  A.   Not in Michigan, no.

23  Q.   Is Dr. Lovett licensed to perform psychoeducational

24  evaluations in Michigan?

25  A.   No.

1  Q.   Has Dr. Lovett testified for the NBME before in cases

2  involving denial of extended time?

3  A.   Yes.

4  Q.   In response to Ms. Ramsay's second request for

5  accommodation, you granted her permission to read the question

6  aloud.  We were discussing this a moment ago.

7       And that isn't an accommodation that's granted for DVT, is

8  it?

9  A.   No.

10 Q.   And that's not an accommodation that's granted for

11 migraines, is it?

12 A.   No.

13 Q.   In your experience, does it take longer to read something

14 out loud than it does to read it silently?

15 A.   I don't have experience, no.

16 Q.   How quickly after registering for Step 1 can nondisabled

17 students take Step 1?

18 A.   It depends on the eligibility period that they chose.

19 Q.   Well, let's say that a medical student registered for the

20 USMLE and chose the first available exam period.

21      What's the longest they would have to wait to take the

22 exam if they chose the first available?

23 A.   As soon as their eligibility -- their -- they get a

24 scheduling permit.  As long as that is within six months of the

25 test date, their permit is released and they can call Prometric

1  to schedule an exam at their discretion.

2  Q.  So how many days after submitting their registration for

3  Step 1 of the USMLE can a nondisabled student schedule that

4  test?

5  A.  I don't know.  It could be a matter of days or weeks.

6  Q.  So could it be a day or two?

7  A.  I don't know if it would be a day or two, but it could

8  probably be a few days.

9  Q.  Could it be under a week?

10 A.  Potentially.

11 Q.  How long does it take the USMLE, if you know, to provide

12 test results to medical students without disabilities who

13 take -- or any student who takes the USMLE?

14 A.  I believe it's somewhere around six weeks after their

15 exam.

16 Q.  Would it surprise you if your website says it was three to

17 four weeks?

18 A.  No.

19 Q.  Would you have any reason to think that your website was

20 incorrect?

21 A.  No.

22 Q.  Do you know how many students take the USMLE in the United

23 States in a year?

24 A.  No, not offhand.

25 Q.  Would it surprise you, taking just one year, say 2017,

1  would it surprise you to learn that there were 145,003 students

2  that took some part of the USMLE in 2017?

3  A.  No.

4  Q.  And the NBME is able to turn around all of those scores in

5  three to four weeks?

6  A.  I don't know that it's all of the scores, no.

7  Q.  With respect to Ms. Ramsay's first request for

8  accommodation, how long did it take you to decide her first

9  request?

10  A.  Again, I believe we had the decision letter sent to her in

11  about 65, 64 days.

12  Q.  I guess it depends on what you count as the first date.

13      How many days from the time she submitted her application

14  did it take for the NBME to make a final decision in her case?

15  A.  I don't recall.  I think it was more than the 65 days.

16  Q.  It was a couple months?

17  A.  Possibly, yes.

18  Q.  And with respect to her second request for accommodations,

19  do you recall how long it took from the time she submitted her

20  paperwork to the time that you wrote her a letter denying

21  testing accommodations?

22  A.  It was over 77 days.

23  Q.  A lot over 70 days?

24  A.  I don't recall.

25  Q.  Is it correct that you issued your decision letter

1  September 11, 2018?

2  A.   Yes.

3  Q.   And she submitted her documentation the beginning of June

4  2018?

5  A.   That's correct.

6  Q.   And you submitted her information to one of your paid

7  outside consultants in July of 2018.  Correct?

8  A.   Correct.

9  Q.   And did that consultant have a time limit for how long

10  they had to review her file?

11  A.   Yes.

12  Q.   Approximately what is that time limit?

13  A.   It's generally a week or two.

14  Q.   Did that consultant turn around that documentation in

15  time?

16  A.   As best as I recall, yes.

17  Q.   So then in July 2018, you had already decided to deny Ms.

18  Ramsay the testing accommodations that she had requested.

19  Correct?

20  A.   Possibly, yes.  Uh-huh.

21  Q.   I believe you testified in deposition that you typically

22  decide within two to three days of receiving an outside

23  consultant's report whether you're going to accept or deny --

24  whether you're going to provide the accommodations or not; is

25  that right?

1  A.   Yes.

2  Q.   And so in July 2018 you had already made a decision to

3  deny Ms. Ramsay testing accommodations.  Correct?

4  A.   Correct.

5  Q.   And the clock was running on her ability to be a doctor.

6  Correct?

7  A.   Correct.

8  Q.   And so what happened between July of 2018 and September of

9  2018?

10  A.   So because we are processing requests from hundreds of

11  examinees, we are taking those requests in the order in which

12  they are received.  And so what happened was, we were

13  processing and making decisions and writing letters to respond

14  to all the examinees who made the request prior to Ms. Ramsay's

15  request.

16  Q.   I believe you testified a few minutes ago that any request

17  where a candidate is represented by counsel goes to you.

18  Correct?

19  A.   It does.

20  Q.   It goes to you only?

21  A.   That's correct.

22  Q.   Is it possible if there were more individuals who could

23  review the requests for accommodation, that the requests for

24  accommodation could be turned around more quickly?

25  A.   Well, I guess I could qualify that, requests that are from

1  individuals represented are not the only requests that I get.

2  So the requests are distributed across all of the available

3  staff as equally as possible.

4  Q.   So you have responsibility for your share of all of the

5  requests for accommodation that come into the NBME.  Those are

6  divided among the staff that works on this issue.  Right?

7  A.   Correct.

8  Q.   And in addition to that, you also handle all of the

9  requests where the person is represented by counsel.  Correct?

10 A.   That is correct.

11 Q.   So if there were more than one of you, is it possible that

12 the students might get an answer more quickly about whether

13 they can take the test with the accommodations that they need?

14 A.   That's true, yes.

15 Q.   Do you have a sense of why the NBME hasn't dedicated more

16 resources in order to allow students with disabilities to have

17 an equitable opportunity to take the test as quickly as

18 students without disabilities receive?

19 A.   We actually have hired additional staff and are currently

20 recruiting for additional staff to do just that.

21 Q.   Do you do hiring?

22 A.   I'm sorry?

23 Q.   Do you do hiring for that position?

24 A.   I would be, yes.

25 Q.   And how many people are you looking to hire?

1  A.   Currently we have one position open.

2  Q.   Just one?

3  A.   Yes.

4  Q.   Are you familiar with the NBME's revenue for -- let's pick

5  a year, 2017?

6  A.   Not generally, no.

7  Q.   Would it surprise you to learn that their revenue was just

8  shy of $143 million in 2017?

9  A.   Again, I have no frame of reference for that, so --

10  Q.   If I provide you a copy of the 990, would that --

11  A.   I don't doubt your representation.

12  Q.   So the NBME has more resources.  It could hire more than

13  just you to handle the requests from attorneys and more than

14  one more person to process these requests that are taking, in

15  Ms. Ramsay's case, many months to process, to her detriment.

16  Correct?

17  A.   Yes.

18  Q.   How would you compare the resources of the NBME that I've

19  just described to the resources of somebody who is working as a

20  babysitter?

21  A.   I'm not sure I understand the question.

22  Q.   Would you think that $143 million --

23  A.   Oh.

24  Q.   -- resources was more than somebody who is working as a

25  babysitter?

1    A.   Of course, yes.

2    Q.   You agreed in your deposition that Dr. Smith was qualified

3    to perform a comprehensive psychoeducational evaluation.

4    Correct?

5    A.   Yes.

6    Q.   And you don't disagree with the battery of tests that he

7    administered?

8    A.   No.

9    Q.   And I believe you testified at deposition that there was

10   no test that he should have done that he didn't do.  Right?

11   A.   No.

12   Q.   You agree with what I said?

13   A.   We don't actually prescribe a battery of tests.

14   Q.   Right, but in your deposition do you recall testifying

15   that there was no test that Dr. Smith should have given that he

16   didn't give?

17   A.   Correct.

18   Q.   So your decision, which you testified in deposition -- and

19   I can show you the page if it's helpful -- was based on common

20   sense, your interpretation that her performance on the MCAT

21   common sense meant she didn't have dyslexia.  That wasn't

22   consistent with the decision that was made by Ms. Ramsay's

23   medical school about accommodations, was it?

24        MR. BURGOYNE:  Your Honor, I don't think there was

25   foundation for that characterization of her testimony either or

1    in deposition.  I'm happy to have her show the deposition,

2    but --

3         THE COURT:  Very well.

4         MS. VARGAS:  I'm happy to do that.

5    BY MS. VARGAS:

6    Q.   If you could turn, please, to page 139 of your deposition.

7         And once you're on page 139...

8    A.   I'm there.

9    Q.   If you could begin reading at line 1, just so we have the

10   full context of what you testified.

11   A.   Question:  Is it your testimony that the MCAT scores are a

12   more reliable indicator than the comprehensive educational

13   evaluation in determining whether Ms. Ramsay has a disability?

14        Answer:  They're a good indicator of her ability to read

15   under time constraints content that most people -- or I'm

16   sorry, that the reference group, whether it's high school

17   students or medical applicants, have to read.

18        Question:  How do you know that?

19        Answer:  By the scores that they -- by the scores that

20   they obtain.

21        Question:  How do you know that the MCAT is testing

22   reading?

23        Answer:  They had to read it.  They had to read the exam

24   to answer that question.

25        Question:  Is there any research to support what you're

1  saying?

2    Answer:  It's common sense.

3  Q.  Thank you.  So your decision to deny Ms. Ramsay extended

4  time, that decision was not consistent with the decision made

5  by her medical school about the need for extended time, was it?

6  A.  Correct.

7  Q.  Your decision was also not consistent with the decision

8  that was made by Ohio State University about her need for

9  extended testing time.  Correct?

10  A.  Correct.

11  Q.  And your decision was also not consistent with any of the

12  doctors or specialists who actually examined Ms. Ramsay, was

13  it?

14  A.  If they recommended accommodations, no, it was not.

15  Q.  Did they recommend accommodations?

16  A.  I believe all of them -- I'm not sure if all of them did.

17  Q.  Let's talk about how you weighted the documentation that

18  Ms. Ramsay submitted in support of her request for

19  accommodations.

20    Did you defer to the comprehensive in-person evaluation by

21  Dr. Smith in reaching your decision?

22  A.  No.  We carefully considered it, but we don't

23  automatically defer to it, no.

24  Q.  I'm not asking if you do it automatically.  I'm talking

25  about your end result.

```
 1  A.   No.

 2  Q.   Did you defer to his, Dr. Smith's, conclusions?

 3  A.   No.

 4  Q.   Did you defer to the conclusions of any of the other

 5  individuals who provided -- who tested Ms. Ramsay?

 6  A.   No.

 7  Q.   Did you refer to the report of Dr. Lewandowski?

 8  A.   I'm sorry?

 9  Q.   Did you defer to the report of Dr. Lewandowski?

10  A.   No.

11  Q.   And he had examined Ms. Ramsay.  Correct?

12  A.   Correct.

13  Q.   Did you defer to the documentation provided by Mr.

14  Livingston?

15  A.   No.

16  Q.   Did you defer to the documentation provided by Dr. Smiy?

17  A.   No.

18  Q.   Did you defer to the documentation provided by

19  Dr. Ruekberg?

20  A.   No.

21  Q.   Did you defer to the documentation provided by Dr. Tanguay

22  referencing evaluations that were done of Ms. Ramsay when she

23  was in early elementary school?

24  A.   I believe that was the optometrist who diagnosed vision

25  impairments?  I don't recall that she made any --
```

1 Q.  Do you recall that Dr. Tanguay, when she was a child in

2 early elementary school, did testing as an optometrist and

3 concluded that her reading time was slow?  Do you recall that?

4 A.  Initially, yes.

5 Q.  Did you defer to that?

6 A.  No.

7 Q.  If you could turn, please, to plaintiff's exhibit binder.

8 And I'm going to be asking you about Exhibit 34.

9         THE COURT:  It's all right.

10         THE WITNESS:  I'm sorry, Your Honor.

11         THE COURT:  You're looking for plaintiff's exhibit --

12         THE WITNESS:  I am, Your Honor.

13         THE COURT:  Here.

14         THE WITNESS:  Thank you.

15         THE COURT:  Sure.  There's one down there.

16 BY MS. VARGAS:

17 Q.  Let me know when you're ready.  It's Exhibit 34, please.

18 A.  34.  I have it.

19 Q.  Have you seen this before?

20 A.  This is the PowerPoint presentation, is that what you're

21 referring to?

22 Q.  Yes.

23 A.  I have.

24 Q.  And what was the title of this PowerPoint?

25 A.  ADA Legal Update for NBME and Its Outside Consultants by

1    Robert Burgoyne.

2    Q.   And do you see at the top right of the first PowerPoint

3    slide Norton Rose Fulbright.

4         Is that who prepared this PowerPoint presentation?

5    A.   That is the law firm that Mr. Burgoyne worked --

6    Q.   That Mr. Burgoyne works for?

7    A.   At the time, yes.

8    Q.   And how is this PowerPoint used?

9    A.   This was a presentation to a meeting of our consultants,

10   our disability consultants, in December 2016.

11   Q.   And why was this PowerPoint presentation shown to your

12   outside consultants?

13   A.   This is information that we asked Mr. Burgoyne to present

14   on the ADA for their information.

15   Q.   Why was it important for the outside consultants to have

16   information about the ADA?

17   A.   They're making reviews of requests for accommodations

18   on -- for the USMLE examination.  This is information they are

19   very interested in.

20   Q.   If you can turn, please, in that same exhibit to page 4.

21   And if you could read that page for me, please.

22   A.   "DOJ's implementing regulations," that one?

23   Q.   Yes.

24   A.   Any private entity offering an examination covered by this

25   section must assure that the examination is selected and

1    administered so as to best ensure that when the examination is

2    administered to an individual with a disability that impairs

3    sensory, manual or speaking skills, the examination results

4    accurately reflect the individual's aptitude or achievement

5    level or whatever other factor the examination purports to

6    measure, rather than reflecting the individual's impaired

7    sensory, manual or speaking skills, except where those skills

8    are the factors that the examination purports to measure.

9    Q.   Do you believe that's an accurate statement of the

10   regulations as the NBME applies it to its review of requests

11   for accommodations?

12   A.   Yes.

13   Q.   What did the NBME do to best ensure that Ms. Ramsay's test

14   results showed her ability rather than her disability?

15            MR. BURGOYNE:  Your Honor, I'm going to object.  She's

16   skipping a step in the process here.  This regulation

17   applies -- of course she's asking her about a regulation.  This

18   regulation applies only if you first determined that the

19   individual has a disability.  And it's at that point that

20   you're obligated to best ensure that the exam measures what

21   you're attempting to measure and not the disability.

22            So until NBME decides --

23            THE COURT:  Can this witness answer that?

24            MR. BURGOYNE:  Pardon me?

25            THE COURT:  Can't the witness testify?

1          MR. BURGOYNE:  She's not an attorney, Your Honor.  I

2  just don't want there to be this line of questions regarding

3  what the ADA requires.  And I don't believe that's within her

4  central purview.

5          THE COURT:  Then she can tell us that.  She's a

6  professional.

7          MR. BURGOYNE:  Thank you, Your Honor.

8          THE COURT:  Your objection is noted as overruled.

9          THE WITNESS:  I'm sorry, would you restate the

10 question?

11         MS. VARGAS:  Could we read the question back, please.

12         (The court reporter read the requested portion of the

13 record.)

14         THE WITNESS:  We did not make a finding that Ms.

15 Ramsay had a disability within the meaning of the ADA.

16 BY MS. VARGAS:

17 Q.  So do I understand your answer to mean that you never

18 applied the regulation that would require you to best ensure

19 that her test results reflected ability rather than disability?

20 A.  Not any more or less than we expect the exam for all

21 examinees will reflect their ability.  In other words, she had

22 a standard examination.

23 Q.  Turning to page 7 of that document, 7 of 35.

24         Could you read me, starting at section 1 of the DOJ

25 implementing regulation.

1  A.   Any private entity offering an examination covered by this

2  section must assure that when considering requests for

3  accommodations, the entity gives considerable weight to

4  documentation of past modifications, accommodations or

5  auxiliary aids or services received in similar testing

6  situations, as well as such modifications, accommodations or

7  related aids and services provided in response to an

8  individualized education program or IEP or a plan describing

9  the services provided pursuant to a Section 504 plan.

10  Q.   So do you see where in the middle of what you just read

11  the words "similar testing situations" is bold?

12  A.   Yes.

13  Q.   Why was that put into bold, do you know?

14  A.   I did not prepare these slides, no.

15  Q.   So would the fact that Ms. Ramsay had extended time on

16  NBME shelf exams, would that be a similar testing situation?

17  A.   Perhaps, yes.

18  Q.   Did you give considerable weight to that?

19  A.   Yes.

20  Q.   How did you give considerable weight to that?

21  A.   We noted it.  That was documentation she provided.

22  Q.   Beyond noting that she provided that documentation, how

23  did you give considerable weight to the fact that she had

24  received double time on the NBME shelf exams?

25  A.   We gave considerable weight to all of the documentation

1    that she provided, including the scores on measures that she

2    did not receive accommodations, such as the MCAT and the ACT.

3    Q.    Turning to the next page, page 8 of 35.

4          It says that the entity responds -- any private entity

5    offering an examination covered by this section must assure

6    that the entity responds in a timely manner to requests for

7    modifications, accommodations, et cetera.

8          Did you respond in a timely manner to Ms. Ramsay's request

9    for accommodation?

10   A.    I believe so, yes.

11   Q.    Turning to page 10 and 11 of this exhibit, what's the

12   import of these pages in the presentation for the consultants?

13   A.    Again, I did not prepare these slides, so I don't know why

14   they were included other than for our information and

15   discussion.

16   Q.    Are you responsible for the consultants at the NBME

17   dealing with requests for accommodation?

18   A.    Yes.

19   Q.    Do you think it was important for them to know about the

20   US Department of Justice's ADA rulemaking?

21   A.    Again, we asked Mr. Burgoyne to make a presentation on

22   what was happening in the legal environment at the time.

23   Q.    And I believe page 11 is talking about what was happening

24   in the legal environment at the time.

25         What was that?  What was happening that you're

1   referencing?

2   A.   I'm sorry, I'm missing your question, what was happening

3   at the time.

4   Q.   I can ask it differently.

5        What was the import of the ADA Amendments Acts on the

6   definition of disability in your role, if you can answer as the

7   ADA compliance officer for the defendant?

8   A.   I'm sorry, I'm still not understanding the question that

9   you're asking.  What was the import of it?

10  Q.   Right.  What changed in terms of the definition of

11  disability with the passage of the ADA Amendments Act?

12  A.   So the definition didn't change much.  It was still a

13  substantial limitation in a major life activity compared to

14  most people in the general population.  The amendments added

15  things like enumerating major life activities that weren't in

16  the previous versions, talked about mitigating measures.  So

17  there were a number of things that were updated in the

18  regulations to comport with the Amendments Act.

19  Q.   What was the purpose, the Congressional purpose, behind

20  passage of the ADA Amendments Act?

21       What was the Congressional purpose?

22  A.   I'm going to fix this first.

23       The Congressional purpose of the Amendments Act?

24  Q.   Yes.

25  A.   It was to ensure that there was broad coverage of the ADA,

1   the Americans with Disabilities Act.

2   Q.   I believe you testified in deposition that the purpose of

3   the ADA Amendments Act was to -- in response to Supreme Court

4   decisions.  Correct?

5   A.   That was true as well, yes.

6   Q.   And that the Congressional intent in amending the ADA was

7   so that the determination of whether somebody has or doesn't

8   have a disability should not be demanding extensive analysis;

9   is that correct?

10  A.   That's true.  Right.  It did not require a demanding

11  standard.  Yes.

12  Q.   And did the NBME oppose that change to the law?

13  A.   Not that I'm aware of.

14  Q.   Looking at the very top of this document that I've showed

15  you, do you see where it says the National Board of Medical

16  Examiners?

17  A.   I do.

18  Q.   And what is the date on this document?

19  A.   July 14, 2008.

20  Q.   And who is this letter addressed to?

21  A.   This is to Senators Kennedy, Harkins, Specter, Stevens and

22  Enzi.

23  Q.   And what was the subject line?  It says regarding.  What

24  was that?  What was it regarding?

25  A.   The ADA Restoration Act of 2007.

1  Q.   Have you seen this document before?

2  A.   It looks familiar.

3  Q.   So you wouldn't be surprised to learn that prior to

4  passage of the ADA Amendments Act, the NBME objected to exactly

5  the definition of disability that is being used against Ms.

6  Ramsay.  Correct?

7        MR. BURGOYNE:  I'm not sure that's an accurate

8  characterization, Your Honor, but obviously the letter says

9  whatever it says.

10       THE COURT:  Very well.  And I'll interpret it pursuant

11  to what it says.  All right.

12       And this letter has not -- this exhibit has not been

13  marked as an exhibit.  You've just shown her a document.

14       MS. VARGAS:  Thank you, Your Honor.  I would like to

15  mark it as an exhibit.

16       THE COURT:  Would you like to give it a number or a

17  letter.

18       MS. VARGAS:  Number 40.

19       THE COURT:  What is it?

20       MS. VARGAS:  Number 40.

21       THE COURT:  And write it on there or put a sticker on

22  it.

23       MS. VARGAS:  May I just write it on hers?

24       THE COURT:  Sure.

25  BY MS. VARGAS:

1  Q.   So after the NBME submitted this letter, the ADA Amendment

2  Act were passed, correct, and broadened the definition of

3  disability?

4  A.   Again, I'm not sure that it broadened the definition of a

5  disability.  Many things were included or changed, but the

6  definition remained a physical or mental impairment that

7  substantially limits a major life activity.

8  Q.   But you agree that the Congressional purpose in amending

9  the ADA was so that the determination of whether an individual

10 had a disability would not, quote, demand extensive analysis?

11 A.   So that it did not include a demanding standard, that's

12 correct.

13 Q.   So Congress rejected the NBME's position in passing the

14 ADA Amendments Act.  Correct?

15            THE COURT:  If you know.

16            THE WITNESS:  I don't know.  I could not answer that

17 question.

18 BY MS. VARGAS:

19 Q.   So then after passage of the ADA Amendments Act, are you

20 aware that the Department of Justice held notice and comment,

21 rulemaking?

22 A.   Yes.

23 Q.   And did the NBME submit comments to the notice and

24 comment, rulemaking on the ADA Amendments Act?

25 A.   I don't know.  Not that I'm aware.

1           THE COURT:  Why don't we put an exhibit number on it

2    prior to showing it to the witness.

3           MS. VARGAS:  41?

4           MR. BERGER:  Yes.

5           THE COURT:  This is normally done before court.

6           MS. VARGAS:  Apologies.

7           THE COURT:  That's all right.

8    BY MS. VARGAS:

9    Q.   Have you seen this letter before?

10   A.   One moment.  I just need to make space.

11        May I take a moment?

12   Q.   Absolutely.

13   A.   I can't say for sure whether I've seen it before.  It's

14   dated 2014.

15   Q.   And what letterhead is this letter on?

16   A.   Norton Rose Fulbright.

17   Q.   And is that Mr. Burgoyne's letterhead?

18   A.   It is the former law firm, yes.

19   Q.   And turning to the last page of this document, can you

20   tell me who signed it as having written it?

21   A.   Robert A. Burgoyne.

22   Q.   If you could please turn -- you agree that the subject of

23   the letter dated March 31, 2014 says:  ADA notice of proposed

24   rulemaking.  Correct?

25   A.   It does.

1  Q.   So would you agree that this is the NBME's comments as

2  part of the notice of proposed rulemaking for the ADA

3  Amendments Act?

4  A.   It looks like it lists a number of testing organizations,

5  yes.

6  Q.   But the NBME was one of them?

7  A.   It is.

8  Q.   And it was written by your lawyer.  Correct?

9  A.   That's correct.

10  Q.   And you see on the second page, the National Board of

11  Medical Examiners is described and listed as a signatory to the

12  letter.  Correct?

13  A.   I see that, yes.

14  Q.   Turning to page 5 of this document, could you read the

15  last paragraph, please.

16  A.   DOJ's first rule of construction states that substantially

17  limits is not meant to be a demanding standard.  This language

18  goes too far in implementing Congress's intent to broaden

19  coverage under the ADA.  It suggests incorrectly that

20  substantially limits is a negligible requirement and conflicts

21  with the more common sense, ordinary meaning of substantial.

22  Q.   Thank you.  And if you could please turn to page 7.

23       About in the middle of the page do you see the paragraph

24  that begins "the testing entities"?

25  A.   Yes.

1 Q.   Could you read that, please.

2 A.   The testing entities.  The testing entities have no

3 suggested changes to either of these proposed rules.  They are

4 concerned, however, about the following statements made by DOJ

5 in discussing the proposed rules.

6      Learned behavioral or adaptive neurological modifications

7 include those strategies developed by an individual to lessen

8 the impact of an impairment.  Reasonable modifications include

9 informal or undocumented accommodations and modifications as

10 well as those provided through a formal process.

11 Self-mitigating measures or undocumented modifications or

12 accommodations or students with impairments that affect

13 learning, reading or concentrating may include measures such as

14 devoting a far larger portion of the day, weekends and/or

15 holidays to study than students without disabilities.  Teaching

16 one's self strategies to facilitate reading connected texts or

17 mnemonics to remember facts, receiving extra time to complete

18 tests, receiving modified homework assignments or being

19 permitted to take exams in a different format or in a less

20 stressful or anxiety-provoking setting, each of these

21 mitigating measures, whether formal or informal, documented or

22 undocumented, can lessen the impact of or improve the academic

23 function of a student having to deal with a substantial

24 limitation in a major life activity such as concentrating,

25 reading, speaking, learning or writing.  Nevertheless, these

1   are only temporary supports.  The individual still has a

2   substantial limitation in a major life activity and would be a

3   person with a disability under the ADA.

4   Q.   Okay.  I'll just stop you there.

5   A.   Thank you.

6   Q.   Is it fair to say that the NBME's comment, which begins

7   right after that extensive quote, is that these comments are

8   problematic?  That was the NBME's position, the consideration

9   of self-mitigation?

10          MR. BURGOYNE:  Your Honor, again, she's already said

11  she doesn't know -- she doesn't have familiarity with this

12  letter.  The letter again says whatever it says.

13          THE COURT:  And the document will speak for itself as

14  best evidence.

15          THE WITNESS:  Excuse me.  I'm parched now, Your Honor.

16          THE COURT:  That's all right.

17          MR. BURGOYNE:  Again, I guess our objection is to

18  having her walk through a letter that she has not testified

19  she's seen previously and asking her to read text that Your

20  Honor is going to have the time and opportunity to read.

21          THE COURT:  Fine.  But there's another aspect of that,

22  Counsel, also.  It's the defendant's stated position in that

23  letter that counsel is bringing out.

24          MR. BURGOYNE:  No objection to that, Your Honor.  If

25  she wants to ask a question about it, that's fine, just to the

1   extent she has knowledge of it.

2          THE COURT:  Very well.  Moving on.

3   BY MS. VARGAS:

4   Q.   Turning to page 8, do you see the fifth paragraph down

5   that begins with "DOJ should"?

6   A.   Yes.

7   Q.   Do you agree that in this paragraph, the NBME was asking

8   the DOJ to consider disability with the mitigating measures

9   rather than whether somebody had a substantial limitation

10  without mitigating measures?

11  A.   I'm going to read it real quick first before I answer.

12         So I believe this is saying, if I'm reading this

13  correctly, DOJ should also add a regulation that notes that --

14  is that the sentence you're talking about?

15  Q.   Yes.

16  A.   Although mitigating measures are not to be considered in

17  assessing whether a person has a disability, it is appropriate

18  to consider such measures in determining whether accommodations

19  are needed.  The purpose of accommodation --

20  Q.   If I could just interrupt you, you're reading the NBME's

21  position, not the DOJ's position.  Correct?

22  A.   Again, I haven't read the entire document, so I'm kind of

23  out of context here.

24  Q.   Fair enough.

25  A.   I'm guessing it was all of the organizations represented

1    in this letter.

2    Q.    Turning to page 10, do you see where it says Section 5?

3    A.    So I know, page 10, Section --

4    Q.    It's about halfway down the page, it says Section 5 and

5    then it has the regulation cite on page 10?

6    A.    I'm sorry, you may have to indulge me here where that is.

7    Section 5?

8    Q.    The paragraph starts with "DOJ's discussion."

9    A.    I see that.

10   Q.    If you could please read that section out loud.

11   A.    -- DOJ's discussion --

12   Q.    Yes.

13   A.    -- of the condition, manner and duration, in quotes,

14   concept of Section 36.105D3, Subsection 3, includes the

15   following language:  In determining whether an individual has a

16   disability under the, quote, actual disability or, quote,

17   record of prongs of the definition of disability, the focus is

18   on how a major life activity is substantially limited and not

19   on what outcomes an individual can achieve.  For example,

20   someone with a learning disability may achieve a high level of

21   academic success but may nevertheless be substantially limited

22   in one or more major life activities, including, but not

23   limited to, reading, writing, speaking or learning because of

24   the additional time or effort he or she must spend to read,

25   write, speak or learn compared to most people in the general

1    population.

2    Q.    And if you could just read the first sentence, what the

3    NBME had to say about that regulation.

4    A.    This language discounts the relevance of an individual's,

5    quote, high level of academic success.

6    Q.    So would you agree that the NBME is asking DOJ to make a

7    student's high level of academic success a consideration in

8    determining whether they have a disability?

9    A.    Again, this letter speaks for itself.  I can't comment one

10   way or the other on it.

11   Q.    Turning to page 11, if you could read that to yourself.

12   You don't need to read it out loud.

13   A.    Read what?

14   Q.    Page 11, Section D.

15   A.    Okay.  It's about DOJ providing technical assistance, that

16   paragraph?

17   Q.    Would you agree that in this section, Mr. Burgoyne on

18   behalf of the NBME and other testing entities is asking the DOJ

19   to issue technical assistance on testing accommodations?

20   A.    Again, I wouldn't interpret this to mean anything other

21   than what it says.

22   Q.    Just using common sense, if you look at the first sentence

23   of the last paragraph, the testing entities believe that DOJ

24   should issue a supplemental NPRM that proposes clear and

25   balanced regulations on referenced topics.

1     First paragraph, faults DOJ for not issuing new technical

2  assistance on testing accommodations.  And the paragraph below

3  that, to the best of our knowledge, no additional technical

4  assistance on any of the reference subjects has been posted by

5  DOJ.  The testing entities had hoped that DOJ would address at

6  least some of these subjects.

7          THE COURT:  Is that what it states?

8          THE WITNESS:  That is what it says.

9          THE COURT:  Okay.  Moving on.

10          MR. BURGOYNE:  Just to point out, Your Honor, it was

11  the Government Ability Office that criticized DOJ for not

12  issuing technical guidance.  It wasn't the testing agency.  And

13  that's what I was following up on.

14          THE COURT:  You'll have the opportunity to put that on

15  the record.

16          Anything else?

17          MS. VARGAS:  Yes.

18  BY MS. VARGAS:

19  Q.   Turning back to Exhibit 34, page 11.

20          MR. BURGOYNE:  Your Honor, I'll just note that we're

21  getting a series of exhibits that weren't designated in advance

22  of this hearing and which are not in fact impeachment exhibits.

23          THE COURT:  Is that an objection?

24          MR. BURGOYNE:  That is the objection, Your Honor.  We

25  went through the exercise of exchanging exhibits in advance of

 1  this hearing, and obviously it would have been appreciated to
 2  get some of these.
 3          THE COURT:  Most definitely.
 4          MR. BURGOYNE:  They say whatever they say.
 5          MS. VARGAS:  Can I respond?
 6          THE COURT:  Yes.  For sure.  I will give you an
 7  opportunity.
 8          MS. VARGAS:  This is the Federal Register, and I'm
 9  asking about it because it goes directly to the information
10  that is provided in Exhibit 34 to train the consultants who
11  evaluated Ms. Ramsay.
12          THE COURT:  But it's still considered an exhibit.
13  Isn't that correct, Counsel?
14          MS. VARGAS:  Yes.
15          THE COURT:  That you want to show this witness.
16  Right?
17          MS. VARGAS:  Yes, please.
18          THE COURT:  Shouldn't they have had an opportunity to
19  be given that exhibit before this hearing?
20          MS. VARGAS:  This is impeachment material, so I'm not
21  sure that we needed to provide this in advance in the same way
22  they didn't need to provide the summaries they created.
23          THE COURT:  This is impeachment material?
24          MS. VARGAS:  Yes, it is.
25          THE COURT:  Or is it defining what is already in

 1  another document?

 2          MS. VARGAS:  I believe that it's impeachment.

 3          THE COURT:  We'll see.

 4          THE WITNESS:  I'm sorry, which exhibit are we?

 5          MS. VARGAS:  I'll bring it to you.

 6          THE COURT:  As a matter of fact, why don't we take our

 7  break now before we get started.  It's lunchtime.  We'll be in

 8  recess until 1:30.

 9          And ma'am, I'll remind you, Ms. Farmer, that you're

10  under cross-examination and as such you cannot discuss your

11  testimony with counsel for defendant.  You can talk about

12  anything else, but not your testimony and your responses

13  thereto.

14          THE WITNESS:  Thank you, Your Honor.

15          THE COURT:  We're in recess.

16          (Luncheon recess at 12:43 p.m. until 1:32 p.m.)

17          THE COURT:  Good afternoon.

18          RESPONSE:  Good afternoon, Your Honor.

19          THE COURT:  Let's proceed.

20          And I'll remind you you're still under oath after

21  previously being sworn in.  Let us proceed.

22          THE WITNESS:  Yes, Your Honor.

23  BY MS. VARGAS:

24  Q.  Good afternoon, Dr. Farmer.

25  A.  Good afternoon.

1  Q.  Did you communicate with counsel during lunch break?

2  A.  No.

3  Q.  Not at all?

4  A.  We had some words, yes.

5  Q.  So you did communicate with counsel during lunch break?

6  A.  Yes.

7  Q.  Exhibit 34, in plaintiff's exhibit binder, could you

8  please turn to the first page of that exhibit.

9  A.  The first page?

10  Q.  The first page.  If you could, what is the date on --

11  we're looking at the PowerPoint that was used, you testified,

12  to train outside consultants.  What's the date on this

13  PowerPoint?

14  A.  December 5, 2016.

15  Q.  So this PowerPoint was training consultants after passage

16  after the ADA Amendments Act.  Correct?

17  A.  It was presented at a meeting after that, yes.

18  Q.  And it was also after the Department of Justice issued its

19  final regulations for the ADA Amendments Act, wasn't it?

20  A.  Yes.

21  Q.  So turning to page 11, my understanding is that page 11,

22  page 12, a few pages after that, beginning on page 11, this is

23  training the consultants about the results of the new

24  regulations that had just come out.  Correct?

25  A.  It's informing them about that, yes.

1  Q.   And again, you testified earlier that the Congressional

2  intent behind passage of the ADA Amendments Act was so that

3  determination of disability wouldn't take substantial analysis.

4  Correct?

5  A.   Right.  That it didn't require a demanding standard.

6  Q.   So looking at the fifth bullet down, could you read that

7  to me, please?

8  A.   On which page?

9  Q.   I'm sorry, on page 11.

10  A.   Notice stated that many ADHD diagnoses may not meet the

11  clinical definition and thus would not qualify for an

12  accommodation under the revised definition of disability

13  (prompting DOJ to reduce its estimate of the number of

14  individuals with ADHD by 30 percent.)

15  Q.   So I understand the part in parentheses there at the end

16  to be -- correct me if I'm wrong -- that DOJ in its final rule

17  corrected some calculations on what they anticipated the number

18  of individuals with ADHD to be.  Correct?

19  A.   Perhaps.  I'm not exactly sure what this refers to.

20  Q.   But in terms of training your consultants about what the

21  import was of the new law and the new regulations that had just

22  gone into effect, do you think the most important thing to

23  teach them was that many ADHD diagnoses may not meet the

24  clinical definition and thus would not qualify for an

25  accommodation?

1  A.   No, it's not the most important thing.

2  Q.   In fact, that's really directly contrary to the entire

3  point of the law and regulations, wasn't it?

4  A.   Again, I didn't prepare these, so I didn't put any import

5  on one bullet or another.  This was a presentation.

6  Q.   So this was prepared by Mr. Burgoyne, your counsel?

7  A.   Uh-huh.

8  Q.   Or NBME's counsel?

9  A.   Correct.

10  Q.   Correct?

11  A.   (Witness nods head.)

12  Q.   Do you train consultants not to send emails to the NBME?

13  A.   No, not necessarily.

14  Q.   Could you turn to page 33 of this exhibit and read me the

15  last two lines.

16  A.   I'm sorry?

17  Q.   Page 33.  The heading is Usual Advice, Usual Advice for

18  External Reviewers.

19      And the fourth bullet, what was your usual advice for your

20  consultants?

21  A.   It reads:  Emails are particularly challenging because of

22  their informality.

23  Q.   What did you mean by that?

24  A.   I did not author this, so I don't know.

25  Q.   What did it mean to you?

1  A.   We ask for -- at least for the National Board our

2  reviewers submit something through their full review with all

3  of the information in it.

4       For me this means don't send it as an email, send it

5  through our official system that's a secure portal, it's not

6  informal.  Secure.

7  Q.   So I believe you've testified that the NBME has a system

8  of any time a person is represented by counsel, their file is

9  transferred to you.  Correct?

10 A.   Correct.

11 Q.   And the NBME has a system of saying, emails are

12 particularly challenging because of informality.  So you have

13 reviewers --

14         MR. BURGOYNE:  Your Honor, we've established multiple

15 times, I wrote this document.  NBME didn't write this document.

16         THE COURT:  She's asking a general question now.

17         MR. BURGOYNE:  Okay.

18         THE COURT:  Your objection is overruled.

19         You can complete your question, if there was a

20 question.

21 BY MS. VARGAS:

22 Q.   So instead of having your consultants email to communicate

23 with you, you testified in deposition that you have them call

24 you or you call them; is that correct?

25 A.   No.  They submit their review, their written review --

1  they upload it to a secure portal so we get the written review.

2  Q.   Do you recall testifying in deposition that you

3  communicate with your consultants sometimes by telephone?

4  A.   Oh, yes, uh-huh.

5  Q.   Turning back to page 11 of the PowerPoint, and it goes

6  through a few pages after that, up to page -- up to and

7  including page 15 where this PowerPoint is training consultants

8  on the DOJ's new rulemaking, do you see anywhere in that

9  training about the ADA rulemaking, do you see anywhere where it

10 says anything about disability not demanding extensive

11 analysis?

12 A.   Again, Ms. Vargas, it says what it says, so I -- if it's

13 not --

14 Q.   It's not there.  Correct?

15 A.   If it's not on the page, it's not on the page.

16 Q.   So the new regulations to the ADA Amendments Act, they

17 didn't go into effect until October of 2016.  Correct?

18 A.   I believe so.  I don't recall exactly.

19 Q.   So is it possible that students who were taking

20 standardized tests prior to the new law and then the new

21 regulations going into effect might have had a different result

22 had they requested accommodation than students submitting after

23 the change in the law and regulations?

24 A.   Because of what?  Because of --

25 Q.   Because the law changed?

1   A.   I don't know if it's possible -- you're asking would they

2   have had a different outcome if it was in a different -- you

3   know, the old or the new regulations?  Is that what you're

4   asking?

5   Q.   Yes.

6   A.   I don't know.

7   Q.   Would disability have been determined for a student

8   requesting testing accommodations differently prior to the new

9   regulations going into effect on the ADA Amendments Act?

10  A.   It would have in terms of, again, what the changes were in

11  the revisions to the regulations and the ADA amendments had to

12  do with delineating additional information about what major

13  life activities were, what mitigating measures were, when they

14  could be used.  So yes, things could have been different before

15  than after.

16  Q.   In this section on the ADA rulemaking, does it anywhere

17  say that the DOJ rejected the NBME's request to focus on or add

18  language about the importance of outcomes, tests and

19  standardized tests and grades and that kind of thing?  Do you

20  tell the consultants any of that here?

21  A.   I don't know.  I'm not familiar with all of the

22  information that's in the pages.

23       If you'd like me to review it or --

24  Q.   Sure.  It would be I believe pages 11 through 15.

25  A.   And again your question was, does it say what?

1    Q.   Does it inform the consultants, does it train the

2    consultants that the NBME's request to focus on grades and

3    performance on standardized tests, on outcomes, was explicitly

4    rejected by the Department of Justice in adopting the

5    regulations?

6    A.   I don't see anything to that effect.

7    Q.   Is it true that the Department of Justice explicitly

8    rejected Mr. Burgoyne's and the NBME's request to focus on and

9    add language about outcomes and grades and standardized test

10   performance in assessing a student's request for

11   accommodations?

12   A.   Again, I'm not sure if that's what the National Board

13   requested and I'm not sure what the Department of Justice

14   rejected or accepted.

15          MS. VARGAS:  Your Honor, I only have one question

16   about this document that we were just discussing prior to

17   lunch.

18          THE COURT:  What document is that?

19          MS. VARGAS:  It was the Federal Register cite that

20   goes directly to what this witness is testifying about right

21   now.

22          THE COURT:  And you said that goes to -- what's the

23   purpose of it?

24          MS. VARGAS:  May I read it?

25          THE COURT:  This is a document that you failed to give

1  opposing counsel because you say it's impeachment evidence?

2          MS. VARGAS:  This Federal Register cite is.  However,

3  the other documents that were part of this we did not receive

4  in discovery from defendants, and we literally found them at

5  1:00 in the morning last night, so that's why they weren't

6  disclosed earlier.  And we would have been happy to disclose

7  and we certainly would have had they produced them, but they

8  didn't.

9          MR. BURGOYNE:  They were never the subject of a

10 request that we did not respond to either by saying here's what

11 we're going to produce or these are relevant.  They don't have

12 anything to do with Jessica Ramsay's accommodation process.

13 And those were the documents we produced on an expedited basis

14 in connection with this hearing.

15         THE COURT:  Well, I'm going to overrule your objection

16 at this time.  I'll allow you to ask the question.  I'll

17 determine during the course of my deliberations and

18 determination in this case whether to accept or reject it in

19 whole or in part.

20         MS. VARGAS:  Thank you.

21 BY MS. VARGAS:

22 Q.  I'm showing you what's been marked as Exhibit 42, Dr.

23 Farmer.

24         Have you seen this document before?

25 A.  Yes.

1  Q.   What is it?

2  A.   It is the Federal Register Volume 81, Number 155,

3  Thursday, August 11, 2016, Rules and Regulations.

4  Q.   Is this the final rule adopting the regulations

5  implementing the ADA Amendments Act?

6  A.   Final as of August 11, 2016, yes.

7  Q.   If you could please turn to page 53237.

8  A.   53237?

9  Q.   Correct.

10  A.   I have it.

11  Q.   And if you look at the second paragraph beginning with

12  "organizations," could you read that, please, the first few

13  sentences?

14  A.   Organizations representing testing and educational

15  entities asked the department to add regulatory language

16  including that tested related --

17  Q.   I'm sorry, I think that was misread.

18       Would you mind taking a look at that again?

19  A.   I'm sorry, it's a little -- small print.

20       Organizations representing testing and educational

21  entities asked the department to add regulatory language

22  indicating that testing-related outcomes such as grades and

23  test scores are relevant to disability determination under the

24  ADA.  The department has considered this proposal and declines

25  to adopt it because it is inconsistent with Congressional

1   intent.

2   Q.   Okay.   Thank you.   You don't need to read any more.

3        So my question is, did you train your consultants, the

4   ones who evaluated Ms. Ramsay's request for accommodation, that

5   the Department of Justice had specifically rejected a reliance

6   on standardized test scores and grades in determining

7   disability?

8   A.   No.

9   Q.   Why not?

10  A.   You know, again, what we're training them to do, we're

11  asking the consultants to do as professionals in medicine,

12  psychology, is to review the documentation and to make a

13  determination of whether the individual has a substantial

14  limitation in a major life activity.

15       So their area of expertise is -- we're asking for their

16  clinical expertise, not to make a legal decision or even a

17  decision about accommodations, just to answer the questions

18  about whether the documentation supported the diagnoses that

19  were assigned, demonstrated impairment that substantially

20  limited a person in a major life activity compared to most

21  people, and if the accommodations that were requested seemed to

22  be supported.

23  Q.   And turning to page 21 of this document --

24  A.   I'm sorry, 21 of which document now?

25  Q.   Exhibit 34, I'm sorry.

1  A.   I have it.

2  Q.   Does the NBME comply with the DOJ's technical assistance

3  on testing accommodations?

4  A.   My understanding is that the technical assistance does not

5  supersede the ADA Amendments Act itself or the regulations.

6  It's technical assistance.  It's not law or regulation.

7  Q.   But that's not what I asked.  What I asked was:  Does the

8  NBME comply with the Department of Justice's technical

9  assistance on testing accommodations when it evaluates requests

10  like Ms. Ramsay's?

11  A.   So again, we review it, we understand that it is to

12  make -- to have assistance, but we comply with the law and the

13  regulations.

14  Q.   Let me ask you a yes or no question.

15  A.   Uh-huh.

16  Q.   Does the NBME follow the DOJ technical assistance on

17  testing accommodations when it evaluates student requests for

18  accommodations?

19  A.   In what regard?  Because nothing everything in there --

20  I'm sorry.  No.  Not everything in there is something that we

21  can do.

22  Q.   So I believe you testified earlier that you were familiar

23  with Mr. Burgoyne's letter of March 2014 as part of the

24  rulemaking on behalf of the NBME?

25  A.   The 2008 letter?

1  Q.   No.  The 2014 letter by Mr. Burgoyne on behalf of the NBME

2  about disability and testing accommodations.  And you are the

3  ADA compliance officer and in charge of disability

4  accommodation requests at the NBME.  Correct?

5  A.   I am.

6  Q.   And you're familiar with the 2014 letter from Mr. Burgoyne

7  on behalf of the NBME that we discussed earlier.  Correct?

8  A.   Again, I believe I may have seen it at the time.  I don't

9  recall.

10 Q.   And we talked earlier about the fact that on behalf of the

11 NBME, Mr. Burgoyne -- and he noted the GAO had talked about

12 need for technical assistance on testing accommodations.  But

13 then he went a step further and said that it was needed, that

14 the NBME wanted technical assistance on testing accommodations.

15 Correct?

16 A.   I don't recall what he said, I'm sorry.

17 Q.   It says:  The testing entities believe the DOJ should

18 issue supplemental NPRM.  Prior to that, to the best of our

19 knowledge, no additional technical assistance on any of the

20 reference subjects has been posted by DOJ on its website and

21 otherwise released, even though two-and-a-half years have

22 passed.  Since the letter was sent, the testing entities had

23 hoped that DOJ would address at least some of these subjects,

24 but it hasn't done so.

25      So you understood that Mr. Burgoyne was asking the

1  Department of Justice to issue technical assistance on testing

2  accommodations?

3  A.   Again, I'm not sure what he was asking for, whether -- I

4  haven't read the letter in detail.  It's out of context.  I'm

5  not sure I can answer your question.

6  Q.   Are you aware that at some time after March 31, 2014, the

7  Department of Justice issued technical assistance on testing

8  accommodations?

9  A.   Yes.

10 Q.   And what is your view on whether that technical assistance

11 matters?

12 A.   Well, again, it's not that it doesn't -- on whether it

13 matters.  The technical assistance I believe is addressed to

14 individuals making requests for accommodations.  So it's

15 actually addressed to the individual who is making the request.

16 Q.   So it was something that the NBME wanted until it came

17 out, and then the NBME all of a sudden didn't have to follow it

18 anymore?

19 A.   Again, I'm not sure that the NBME wanted it or asked for

20 it.  I don't...

21 Q.   Turning to page 21 of Exhibit 34 that we're on.

22 A.   21?

23 Q.   21.

24 A.   Uh-huh.

25 Q.   Could you read the heading and first bullet, please.

1  A.   DOJ's, quote, technical assistance regarding testing

2  accommodations.  First bullet, what is the legal significance

3  of such, quote, technical assistance.

4  Q.   Could you continue reading the rest of the first bullet,

5  please.

6  A.   Sure.  It's not the law in the sense a statute or

7  regulation is law.  It is not entitled to the type of deference

8  that courts generally give to agency interpretations of a

9  statute of their own regulations.  Courts might afford a degree

10 of deference to the agency guidance, or they might disregard

11 the guidance altogether.

12 Q.   And so when I asked you a moment ago about whether the

13 NBME follows that technical assistance on testing

14 accommodations in evaluating, let's say, as Ms. Ramsay's

15 request, you testified no.  And here you're training your

16 examiners that it's not a law in the sense a statute or

17 regulation is.  It's not entitled to deference.  This seems

18 inconsistent, doesn't it, with it Mr. Burgoyne's letter asking

19 the Department of Justice to issue that exact document?

20 A.   I'm not sure if that's what his letter was asking.

21 Q.   Turning to page 22, is there some part of that page that's

22 bolded?

23 A.   Yes.

24 Q.   Do you know if that was something that -- this is not a

25 quotation.  Correct?

1  A.    I don't know.  I didn't -- I did not prepare this slide.

2  It's not in quotes.

3  Q.    So would you agree that the parts of a presentation that

4  are bolded are the parts that are supposed to be emphasized to

5  the people who are being trained?

6  A.    I imagine some would interpret it that way, sure.

7  Q.    So there's only one thing bolded on this page that's

8  headed DOJ's Technical Assistance.

9       And what part's bolded?

10 A.    In determining whether --

11 Q.    No, that's not bolded.  What part is bolded?

12 A.    I'm getting there.  In determining whether an individual

13 is substantially limited in a major life activity, it may be

14 useful to consider, and then in bold, when compared to most

15 people in the general population the conditions under which the

16 individual performs the activity or the manner in which the

17 activity is performed.

18 Q.    So you're familiar with the DOJ technical assistance on

19 testing accommodations?

20 A.    I am.

21 Q.    Is it your sense that the most important thing in that

22 document that needed to be bolded for your trainers is when

23 compared to most people in the general population?  There

24 wasn't anything else that was more important to tell your

25 trainers?

1  A.   Again, I didn't prepare this.  I don't know what the

2  intent was of bolding that.

3  Q.   Turning to page 24.

4        MS. VARGAS:  And I'm almost done, Your Honor.

5        THE WITNESS:  24?

6  BY MS. VARGAS:

7  Q.   Page 24, yes.  Do you agree that this is about the

8  examples of types of documentation that a person could submit?

9  A.   That's what it says, yes.

10 Q.   So let's go through each of them.  It says:

11 Recommendations of qualified professionals.

12       Did Ms. Ramsay submit that?

13 A.   Yes.

14 Q.   It says:  Proof of past testing accommodations.

15       Did Ms. Ramsay submit proof of past testing accommodations

16 on the NBME shelf exams?

17 A.   She did.

18 Q.   And on her medical school exams?

19 A.   Yes.

20 Q.   And in her college training?

21 A.   That's correct.

22 Q.   Then it says:  Observations by educators.

23       Did she submit that?

24 A.   That I don't recall.

25 Q.   You don't recall if she submitted her report cards?

1  A.   Well, that's not an observation, but she did submit her

2  college transcript and her high school report card, yes.

3  Q.   What about the letter of support from Dr. Houtman, wasn't

4  that an observation by an educator?

5  A.   I believe she was also reporting her -- that she was her

6  physician.

7  Q.   So Dr. Houtman was both a treating source and on the

8  faculty teaching her as a medical student as well.  She had

9  both of those roles?

10  A.   I believe she did.

11  Q.   So they saw this young woman in multiple settings when she

12  was motivated to do her best.  Correct?

13  A.   I would assume so.

14  Q.   And what did Dr. Houtman tell the NBME about her need for

15  accommodations?

16  A.   That she did recommend extra time and breaks.

17  Q.   Did she say that she saw her struggling and she needed the

18  accommodations?

19  A.   I believe so.

20  Q.   What about the letter from Dr. Overton, one of the deans

21  at Western Michigan at the medical school, did Ms. Ramsay

22  submit that to the NBME?

23  A.   I don't recall whether that was submitted or not.

24  Q.   Would it surprise you that a dean at her medical school

25  reported to the NBME that they strongly supported that she

1   receive the accommodations she needed, including extended time,

2   double time?

3   A.   That wouldn't surprise me, no.

4   Q.   Did Ms. Ramsay submit results of psychoeducational or

5   other professional evaluations?

6   A.   Yes.

7   Q.   Did she submit an applicant's history of diagnosis?

8   A.   Yes.

9   Q.   Did she submit a statement about her history regarding

10  testing accommodations?

11  A.   She did.

12  Q.   So she submitted not one or two but every single bullet of

13  the type of accommodations that the NBME should have

14  considered.  Correct?

15  A.   She did submit documentation that we considered.  That's

16  correct.

17  Q.   And in your deposition you actually admitted that there

18  was nothing Jessie could provide the NBME to prove to you that

19  she needed the accommodations she requested.  Isn't that true?

20  A.   I believe the question was what else could she have

21  provided, and I said I don't know what else that she had that

22  she didn't provide for us that would have demonstrated that she

23  was substantially limited.

24  Q.   I believe I asked you a follow-up question after that.

25       Do you remember that?

1  A.   Not offhand, no.

2  Q.   Do you remember saying that there was nothing?

3  A.   Again, in the context of my original answer, sure, yes.

4        MS. VARGAS:  No further questions.

5        THE COURT:  Any redirect?

6                    REDIRECT EXAMINATION

7  BY MR. BURGOYNE:

8  Q.   Just one very short question.

9        You were asked about the accommodation that you approved

10  for reading out loud.

11       Is that an accommodation that had anything to do with the

12  learning disability diagnosis or the attention deficit

13  diagnosis?

14  A.   No.  It was really just to give official permission so we

15  could tell Prometric that she was allowed to do it.

16       MR. BURGOYNE:  Nothing else, Your Honor.

17       THE COURT:  Very well.  Any redirect -- I mean, any

18  recross in reference to that limited area?

19       MS. VARGAS:  No, Your Honor.

20       THE COURT:  Very good.

21       You may step down now, ma'am, and watch your step.

22       Next witness.

23       MR. BURGOYNE:  I would call, Your Honor, Mike Jodoin

24  to the stand.

25       MICHAEL GLENN JODOIN, after having been duly sworn,

1  was examined and testified as follows:

2        THE COURT:  You may be seated.

3        COURT REPORTER:  For the record, would you state your

4  name.

5        THE WITNESS:  Sure.  Michael Glenn Jodoin.

6        THE COURT:  Will you bring that microphone --

7        THE WITNESS:  Sure.

8        THE COURT:  Perfect.  You may proceed.

9                    DIRECT EXAMINATION

10 BY MR. BURGOYNE:

11 Q.  Mr. Jodoin, would you state your job title, please.

12 A.  I'm vice president for psychometrics and data analysis.

13 Q.  Would you give us a brief summary of your educational

14 background.

15 A.  Sure.  I have bachelor's degrees in mathematics and

16 mathematics education from the University of Alberta; a

17 master's degree in psychometrics and measurement, also from the

18 University of Alberta; a PhD from the University of

19 Massachusetts in psychology but it again focuses on

20 psychometrics.

21 Q.  And what is a short summary of your job responsibilities

22 at the National Board of Medical Examiners?

23 A.  My primary responsibilities are to oversee the processes

24 leading to scoring and score reporting at the NBME.

25 Q.  And does that include scoring and score reporting for the

1  USMLE exams?

2  A.   USMLE and all other exams that the NBME administers.

3  Q.   How many questions are on the Step 1 exam?

4  A.   280.

5  Q.   And are those questions broken into blocks?

6  A.   They are.  Seven blocks.

7  Q.   And how many questions in each block?

8  A.   40.

9  Q.   And how long do examinees have to answer each question?

10 A.   On average 90 seconds.

11 Q.   And are you aware that Jessica Ramsay, the plaintiff in

12 this case, took the Step 1 exam in 2017?

13 A.   I am.

14 Q.   You have two notebooks up there.  Would you find the one

15 that is volume 2 for me?

16      THE COURT:  There's a folder up here.  I don't know if

17 that's it.

18      MR. BURGOYNE:  It's one of the big ones.

19      THE WITNESS:  I've got it.

20 BY MR. BURGOYNE:

21 Q.   You've got it.

22      Have you found Exhibit 71?

23 A.   I have.

24 Q.   What is this document?

25 A.   Pardon me?

1   Q.   What is this document?

2   A.   This is a printout of an Excel document that contains data

3   captured during Jessica's administration.

4   Q.   And that's Jessica's name on the left column?

5   A.   Yep.

6   Q.   And starting -- and then the third column, it says Step 1.

7        So this is outcome data from when she took the Step 1 exam

8   in 2017?

9   A.   Correct.

10  Q.   And then what are the next two columns?

11  A.   The column labeled Examinee Response is the answer that

12  Ms. Ramsay selected during the administration.  The correct

13  answer is the response that's keyed for that item.

14  Q.   And then explain the next column.

15  A.   The item duration column is a record of the number of

16  seconds that that item was up on Ms. Ramsay's computer screen

17  during the administration.

18  Q.   And explain so we have a careful understanding.  If an

19  examinee gets to a question, looks at it on their screen, do

20  they have the ability to mark it and then come back to it

21  afterwards?

22  A.   So the interface --

23            MR. BERGER:  Objection, lack of foundation.

24            THE COURT:  Do you want to establish some foundation

25  as to how he knows that?

1          MR. BURGOYNE:  Sure.  I'd be happy to, Your Honor.

2          THE COURT:  Sure.

3    BY MR. BURGOYNE:

4    Q.    Mr. Jodoin, you're familiar with the NBME's relationship

5    with Prometric?

6    A.    I am.

7    Q.    And is Prometric your test vendor?

8    A.    They are.

9    Q.    As your test vendor, does Prometric, as part of the

10   computer-based test administration, capture electronic data

11   relating to the examinee's performance?

12   A.    The software that delivers the -- the software that

13   delivers the test is actually NBME software that is operated

14   within the Prometric Test Center.

15   Q.    So it's your software that captures that data?

16   A.    It is.

17   Q.    And then does Prometric send that data to you for every

18   examinee after an exam is administered?

19   A.    They do.

20   Q.    And does that information include the answers that the

21   candidate provided?

22   A.    It does.

23   Q.    And does it also include information regarding how long a

24   given question was on a candidate's screen?

25   A.    It does.

JODOIN - DIRECT

1  Q.   And are you familiar with the manner in which candidates

2  take the examination at a Prometric Test Center?

3  A.   I am.

4  Q.   And are you familiar with whether or not candidates have

5  the ability to mark a question and come back to it

6  subsequently?

7  A.   I am.

8         MR. BURGOYNE:  Your Honor, may I proceed?

9         THE COURT:  I think there's a sufficient foundation to

10 ask the next question.

11        MR. BURGOYNE:  Thank you, Your Honor.

12        THE COURT:  Sure.

13 BY MR. BURGOYNE:

14 Q.   Okay.  So again, when a question is on the screen when a

15 candidate is testing and they mark that question, they can come

16 back to it later?

17 A.   Uh-huh.

18        THE COURT:  That's a yes?

19        THE WITNESS:  Yes, sorry.

20        THE COURT:  That's all right.

21 BY MR. BURGOYNE:

22 Q.   And if the candidate does come back to it later during

23 that period when it hasn't been on the screen, is that time

24 included in the Item Duration time here?

25 A.   It's not.

JODOIN - DIRECT

1  Q.  So the Item Duration column strictly reflects time when

2  the information is on the screen?

3  A.  Uh-huh.

4  Q.  And you don't know -- NBME doesn't know what the candidate

5  is doing during that time, you just know that question is on

6  the screen?

7  A.  We do.

8  Q.  And then what's the next column tell us?

9  A.  Block.  So that represents the block -- the block in which

10  this item was administered to Ms. Ramsay.

11  Q.  And then Item Duration, that's stated in seconds?

12  A.  It is.

13  Q.  And what was the amount of time you said that was the

14  average amount of time for a question?

15  A.  The allotted time is 90 seconds.

16  Q.  90 seconds.  Did Ms. Ramsay answer all of the questions on

17  her exam?

18  A.  She did.

19  Q.  And do you know how many questions she answered correctly?

20  A.  169.

21  Q.  And how many did she answer incorrectly?

22  A.  111 I think that leaves.

23  Q.  For the questions she answered correctly, do you know how

24  much time she spent on each question?

25  A.  Just over 76 seconds.

1  Q.  And how much time --

2       MR. BERGER:  Your Honor, he's testifying to

3  information that I don't believe is in this document, and he

4  hasn't -- I guess this is a foundation objection again, but I

5  haven't heard how he knows that information.

6  BY MR. BURGOYNE:

7  Q.  Are those calculations that either you performed --

8       THE COURT:  You're withdrawing the previous question?

9       MR. BURGOYNE:  Yes, Your Honor.

10      THE COURT:  Very well.

11      MR. BURGOYNE:  I'll lay a foundation, I apologize.

12 BY MR. BURGOYNE:

13 Q.  Did you prepare this document?

14 A.  I did not.

15 Q.  Was it prepared by someone that you supervise?

16 A.  It was.

17 Q.  And have you subsequently independently reviewed the data

18 in this table?

19 A.  I have.

20 Q.  And have you subsequently performed calculations or

21 performed evaluations to determine either how many questions

22 were answered correctly or incorrectly or the amount of time

23 that was spent on the questions?

24 A.  I have.

25 Q.  And going back to my last question, for the questions she

1   answered incorrectly, do you know how much time she spent on

2   each question on average?

3   A.   For the incorrect questions, just over 107 seconds per

4   question.

5           MR. BERGER:  I'm sorry, could I hear that again?

6           THE WITNESS:  For the incorrect questions, the average

7   time was just over 107 seconds.

8   BY MR. BURGOYNE:

9   Q.   If someone is randomly answering a large number of

10   questions on Step 1, what would you expect to see in their

11   outcome data?

12          MR. BERGER:  Objection, speculative, lack of

13   foundation.

14          THE COURT:  I'm going to sustain the objection.  You

15   have to put a little bit more out there for me.

16   BY MR. BURGOYNE:

17   Q.   Are you familiar with the concept of examinees randomly

18   answering questions?

19   A.   I am.

20   Q.   And does that reflect the fact that for whatever reason,

21   they're answering a question without reading the entire

22   question?

23   A.   There are a number of reasons why candidates might answer

24   a question randomly.

25   Q.   What are those reasons?

1  A.   So --

2         MR. BERGER:  Objection, lack of foundation.

3         THE COURT:  And he's trying to establish a foundation.

4  Overruled.  And you'll have an opportunity to cross, and you'll

5  have a continuing objection in that regard.  Let's move on,

6  Counsel.

7         MR. BERGER:  Thank you.

8  BY MR. BURGOYNE:

9  Q.   So again, if someone -- what are the reasons why someone

10 might randomly guess at a question?

11 A.   At least a couple.  One is that people are running out of

12 time and want to randomly select answers relatively quickly in

13 the hopes of getting correct responses.  Another option is

14 people want to complete the exam at the end, sometimes without

15 demonstrating their best behavior or their true performance.

16 Q.   Is there a guessing penalty on the Step 1 exam?

17 A.   There is no guessing penalty.

18 Q.   And if someone randomly answers questions because they're

19 running out of time, is there a certain amount of time that you

20 would anticipate seeing in their outcome data?

21        MR. BERGER:  Objection, lack of foundation.

22        THE COURT:  Overruled.

23        THE WITNESS:  That means I can answer?

24        THE COURT:  Yes, you can answer that.

25        THE WITNESS:  Thank you.

1        So traditionally people will look at rapid responses

2   looking at something less than 10 seconds or more recently some

3   work has looked at less than 20 seconds.

4   BY MR. BURGOYNE:

5   Q.   And how many questions from Ms. Ramsay's 2017 Step 1 exam

6   reflect that she spent less than 20 seconds with the item on

7   her screen?

8   A.   Four.

9   Q.   And did she get those answers right or wrong?

10  A.   All four were correct.

11  Q.   And how many questions from her exam reflected that a

12  question was open less than 40 seconds?

13  A.   25.

14  Q.   And how did she perform on those 25?

15  A.   20 of those 25 questions were correct.

16  Q.   Occasionally when you see possible indications of random

17  guessing because someone runs out of time, does that

18  necessarily occur at the end of an item block?

19  A.   That's the most frequent way it is represented.  People

20  will work through the first part of the exam, run out of time,

21  and towards the end will rapidly guess on the questions towards

22  the end of a block.  That's the most common manifestation.

23  Q.   Okay.  It doesn't happen all the time?

24  A.   It doesn't happen all the time.

25  Q.   And on Ms. Ramsay's seven blocks, if you look at the last

1    five questions on each of those blocks, how many of the

2    questions did she spend less than 40 seconds on in the last

3    four questions -- five questions in each of the blocks?

4    A.    So across those 35 questions there was one that had a

5    duration of less than 40 seconds.

6    Q.    And did she get that question right or wrong?

7    A.    She did, got it correct.

8    Q.    She got it correct.

9        Look at Defendant's Exhibit 1, please.  It's going to be

10   in the other notebook.

11   A.    I got it.

12   Q.    Defendant's Exhibit 1 is the Complaint that Ms. Ramsay

13   filed in this case.

14       And if you look at paragraph 40 for me.

15   A.    On page 9 or further back?

16   Q.    It's numbered paragraph 40.  I'll have to check the page.

17       It is page 9, yes.

18   A.    Okay.

19   Q.    Do you see the third sentence in this paragraph, it reads:

20   Because of her dyslexia and ADHD, Ramsey was only able to read

21   about 60 to 70 percent of the questions in each block and had

22   to enter guesses for the remaining questions without reading

23   them.

24       Is the outcome data that you've reviewed consistent with

25   that statement?

1  A.   It is not.

2  Q.   Why is that?

3  A.   As I testified earlier about the amount of time that the

4  screen was up, it seems likely that the candidate was able to

5  look at, presumably read and consider all of the questions, the

6  vast majority of them for more than 40 seconds.

7  Q.   Did you see any indication that 30 to 40 percent of the

8  questions had not been read by Ms. Ramsay?

9  A.   No.

10  Q.   Look at Exhibit 2, please.

11       And this is going to be paragraph 28.

12  A.   Found it.

13  Q.   And this is a declaration Ms. Ramsay provided in this

14  case.  And in paragraph 28, she makes the following statement.

15  It's towards the end of the second line.  I did not have enough

16  time to read all of the questions and in the last minute of

17  each block was forced to blindly select answer choices for

18  about 30 to 35 percent of the questions.

19       Was Ms. Ramsay's outcome data consistent with that

20  statement?

21  A.   It was not.

22       MR. BERGER:  Objection, lack of foundation.  I'll

23  cover this in cross, but --

24       THE COURT:  Your objection is noted.  It's overruled.

25  BY MR. BURGOYNE:

1  Q.   So again, was the outcome data that you reviewed

2  consistent with the assertion in Ms. Ramsay's declaration that

3  in the last minute of each block she blindly selected answer

4  choices for about 30 to 35 percent of the questions?

5  A.   No, it was not.

6  Q.   And why is that?

7  A.   As we talked about before, the questions at the end of the

8  block, but overall across all the questions, there was a

9  reasonable amount of time where that item was open and

10 available for consideration, presumably for reading by the --

11 by Ms. Ramsay.

12           MR. BURGOYNE:  No further questions, Your Honor.

13                          CROSS-EXAMINATION

14 BY MR. BERGER:

15 Q.   Would you turn back to Exhibit 71, the outcome data.

16 A.   I have it right here.

17 Q.   You testified that this was a spreadsheet --

18 A.   Uh-huh.

19 Q.   -- of data relating to Ms. Ramsay's performance?

20 A.   I believe I said this was a printout of a spreadsheet.

21 Q.   Does this present all of the data that NBME has in its

22 possession concerning Ms. Ramsay's performance on the Step 1

23 examination?

24 A.   It does not.  It does not.

25 Q.   It does not.  Does NBME have data about the order in which

1   Ms. Ramsay accessed the questions on the examination?

2   A.   It does.

3   Q.   It does?

4   A.   Uh-huh.

5   Q.   And that is not presented in this exhibit.  Correct?

6   A.   It is not.

7   Q.   You said that you have some familiarity with the Step 1

8   examination.

9        Are there questions on the Step 1 examination which are

10  paired in the sense that you cannot look at the second question

11  in the pair until you have answered the first question?

12  A.   I don't believe there are any of those questions on Step 1

13  currently.

14  Q.   I'm sorry?

15  A.   I don't believe there are any of those questions on the

16  Step 1 exam currently.

17  Q.   Were you present when Ms. Ramsay testified about her

18  experience in taking the Step 1 examination?

19  A.   I was not.

20  Q.   And has anyone related to you what she testified about the

21  way in which she attempted to answer the questions of the Step

22  1 examination?

23  A.   No.  The limited information I had heard about was a few

24  of the paragraphs that have already been referenced.

25  Q.   In addition -- I'm sorry, did I ask whether NBME has -- I

1  think I did ask and you said that NBME does have data about the

2  order in which she accessed the questions?

3  A.   Uh-huh.

4  Q.   So Mr. Burgoyne asked you, for example, about questions at

5  the end of the block, and you gave an answer indicating that

6  she had answered those accurately?

7  A.   I believe what I said was that in the last 35 questions,

8  there was only one which she didn't have 40 seconds in total to

9  consider, and that that question was answered correctly.

10  Q.   Do you know --

11       THE COURT:  You have to allow the witness to complete

12  his answer before you cut him off, Counsel.

13       Were you finished with your response?

14       THE WITNESS:  I was.

15       THE COURT:  Let's proceed.

16  BY MR. BERGER:

17  Q.   Do you know in which order Ms. Ramsay read the questions

18  that were at the end of the block?

19  A.   When you say at the end of the block, which questions

20  she -- are you referring to the questions she navigated to last

21  in the time limit allowed for each block?

22  Q.   I thought you testified that she had been -- that she

23  had -- let's look in the exhibit at page 2 of the exhibit.

24  A.   Okay.

25  Q.   And by the way, there is a column on this exhibit, Item

1  Presentation Sequence.  What does that represent?

2  A.    That represents the order in which the items were

3  presented to Ms. Ramsay.

4  Q.    It doesn't represent the order in which Ms. Ramsay or any

5  other student for that matter actually read the questions?

6  A.    It does not necessarily.

7  Q.    You could read question 1 and then skip to question 30.

8  There's nothing to stop you from doing that?

9  A.    You can start at question 40 and work backwards if you

10 wanted to.

11 Q.    And perhaps I didn't hear your testimony correctly.

12      I thought you were making some statement about the

13 questions at the end of each block?

14 A.    I was -- I believe I was asked whether people who run out

15 of time, the most traditional way run out of time towards the

16 questions at the end of the exam, and I said that that was

17 true.

18 Q.    But you don't know whether that happened in Ms. Ramsay's

19 case?  At least you don't know it from this exhibit?

20 A.    Correct.

21 Q.    But you do have data -- NBME does have data that would

22 shows which were the questions she answered last.

23 A.    We do.

24 Q.    But that data is not presented in this exhibit?

25 A.    It's not.

1  Q.   Is the data relating to Ms. Ramsay's performance, both

2  what is presented in this exhibit and what is not presented in

3  this exhibit, is that maintained in a database of some kind?

4  A.   Repeat the question?  Are you saying whether this data and

5  other data about her?

6  Q.   About her individual performance.

7  A.   It is stored in a database.

8  Q.   It is in a database.  And so what we have here is selected

9  data from that database?

10 A.   Yes.

11 Q.   Ms. Ramsay took the examination in July 2017.  Correct?

12 A.   I assume that that's true.  I don't have the date on this

13 data.  I didn't -- I didn't look at that data.

14 Q.   I think we'll all agree that that is correct.

15      Given that she took the examination in July '17, 2017, I

16 can look up the exact date, but that doesn't really matter for

17 this question.  Let's say July 15th.

18      How soon after that would NBME have had access to the

19 database that contains this data and the other data that you

20 have not presented?

21 A.   It probably would be loaded to that database within a week

22 or less.  It depends a little bit on transmission time.

23      MR. BERGER:  Your Honor, I am going to object to this

24 exhibit on a number of grounds.  First of all, I believe that

25 this could best be described as being a summary of voluminous

1  data, an extract of a summary of voluminous data.  And as Your

2  Honor knows, the rules allow for such a summary to be

3  presented, but only when the proponent makes the originals or

4  duplicates available for examination or copying or both by

5  other parties at a reasonable time and place.  An that's

6  Rule 1006.

7          THE COURT:  And did you request that before you came

8  into this courtroom with this matter?

9          MR. BERGER:  Your Honor, this exhibit was provided to

10 us by defendants last Tuesday, and that was the first time it

11 was ever provided.  We had made a discovery request for

12 information about Ms. Ramsay's examination.  It wasn't

13 specifically for data like this, but we had made a general

14 request for information about her taking of the examination.

15 That was objected to as irrelevant and it was objected to also

16 because we were asking for the text of the questions, and that

17 was said to be confidential and proprietary.

18         THE COURT:  Let's get back to this issue, though.  All

19 right?

20         MR. BERGER:  All right.

21         THE COURT:  You're going to skew it.

22         MR. BERGER:  But we only got this exhibit last

23 Tuesday, and we immediately objected to it.

24         THE COURT:  So you've had it at least a week?

25         MR. BERGER:  We've had it for a week.

1          THE COURT:  And you made no indication to the Court

2    that there was this issue out there and that I could at least

3    order you -- order that disclosure before this witness took the

4    witness stand?  Potentially.  Right?

5          MR. BERGER:  Well, not to the Court.  That's correct.

6          THE COURT:  So --

7          MR. BERGER:  We did notify counsel of our objection.

8          THE COURT:  Okay.  So I've been sitting here, and you

9    haven't said at any point in this proceeding that you feel

10   prejudiced by not having this.

11         So you have an option.  All right?  You can get this

12   order produced.

13         How long will it take approximately?

14         THE WITNESS:  A few days.

15         THE COURT:  A few days.  And then you can also present

16   that -- after you get it and receive it, then you can put on

17   any additional testimony or evidence on the record relating

18   thereto.

19         And if need be -- you're local.  Right?

20         THE WITNESS:  Sure.

21         THE COURT:  When I say you're local, I mean you're in

22   the Continental United States?

23         THE WITNESS:  I am.

24         THE COURT:  All right.  You can have a video

25   deposition of him to further supplement the record or you can

 1  bring him back here whenever we have time for the rest of this

 2  hearing and put that testimony on.

 3          MR. BERGER:  Your Honor, as you know, this is a

 4  preliminary injunction proceeding.  And for Ms. Ramsay, it's a

 5  very urgent one.  We received this exhibit on -- was it the

 6  Tuesday evening before Thanksgiving.  We did notify counsel of

 7  our objection.  I don't want to delay proceeding in any way.  I

 8  think I've adequately stated our objection.  And if Your Honor

 9  is allowing the exhibit, then I accept that.

10          I note my exception, but I accept your ruling.

11          THE COURT:  I will note your exceptions, and we will

12  continue on.

13          Just out of some sense of curiosity, have you had an

14  opportunity to examine the results that counsel has asked you

15  about that was not produced?

16          THE WITNESS:  No, I have not.

17          THE COURT:  So you don't know whether or not they

18  support the testimony that you just gave in reference to the

19  other aspect of the test?

20          THE WITNESS:  I don't know that conclusively.  I'm not

21  sure -- given the amount of time that each item was presented

22  to the candidate, it is not consistent with rapid guessing

23  behavior, regardless of the order in which they were actually

24  answered by the candidate.

25          THE COURT:  Viewed?  Okay.  Very well.

1  BY MR. BERGER:

2  Q.   Okay.  I think we've covered the fact that although you

3  have data about the order in which Ms. Ramsay accessed the

4  questions, that data is not included in this exhibit.  Correct?

5  A.   Correct.

6  Q.   How was the exhibit prepared?  Who gave the direction as

7  to what should be included?

8  A.   One of my staff asked one -- one of the psychometricians

9  in my group asked the data analyst whose primary responsibility

10 is Step 1 to pull this data from the database and to format it

11 in a way that was readily accessible to people outside of our

12 proprietary systems.

13 Q.   Looking at this document and looking at what Ms. Ramsay

14 said in this declaration that Mr. Burgoyne asked you about, can

15 you determine whether in the last minute of each block -- this

16 is what she says in paragraph 28 of her declaration, that she

17 blindly selected answer choices?  Can you determine that?

18 A.   It seems unlikely that someone could navigate to

19 30 percent of the questions and select a response in a minute.

20 Q.   All right.  Well, suppose that she -- suppose it was --

21 suppose it was two minutes, suppose it was three minutes.

22      I mean, my point is, can you determine from the data that

23 you've looked at, which may be more than the data that I have,

24 can you determine from the data that you looked at whether she

25 spent the last minute -- or whether it was a minute or two

JODOIN - CROSS                                                          159

1  minutes or three minutes making random guesses, blindly

2  choosing answers?

3  A.   So just to be clear, I have not looked at other data

4  outside of what you have here with you.  I think I stated -- I

5  testified to that before.  I want to be clear, I've only looked

6  at the data in this Excel spreadsheet.

7       Was there a follow-on question?

8  Q.   No, no.  That's fine.  That's fine.

9       Do you have any training and experience in the area of

10 learning disabilities?

11 A.   That's not an area of expertise, no.

12 Q.   Do you have any training or experience in the area of

13 attention-deficit/hyperactivity disorder?

14 A.   No.

15 Q.   Do you have any training or experience as to how people

16 with those conditions would answer questions on an examination

17 like Step 1?

18 A.   No.

19          MR. BERGER:  No further questions.

20          THE COURT:  Any redirect?

21          MR. BURGOYNE:  No, Your Honor.

22          THE COURT:  Then you may step down now, sir.

23          Any reason why this witness can't be excused?

24          MR. BERGER:  No.

25          THE COURT:  Very well.

```
 1              Next.
 2              MR. BURGOYNE:  Your Honor, that's the conclusion of
 3    our case.  We just need to offer into evidence our exhibits --
 4              THE COURT:  Very well.
 5              MR. BURGOYNE:  -- and we're done with our case.
 6              THE COURT:  Okay.  I'll entertain your admissions,
 7    starting out -- plaintiff wants to go first or...
 8              MR. BURGOYNE:  Do you have any others?
 9              THE COURT:  Do you want me to give you some time so
10    that you can use it wisely instead of me sitting here and
11    watching you?
12              MR. BERGER:  Ten minutes, Your Honor.
13              MR. BURGOYNE:  Ten minutes.
14              THE COURT:  Sure.  We'll reconvene at a quarter of
15    3:00.
16              And then tell me, Counsel, what is your pleasure after
17    you've moved these exhibits in?
18              Do you want to argue before the Court, or do you want
19    to submit a memorandum supporting your respective positions?
20    You tell me.
21              MS. VARGAS:  We've already submitted briefing, Your
22    Honor.  And this is obviously from our perspective time
23    sensitive, so our preference would be argument rather than
24    briefing.
25              THE COURT:  Okay.  And I take it --
```

 1          MR. BURGOYNE:  Your Honor, I actually thought it would

 2     be helpful to get the record and have briefing.  The other

 3     briefing was done some time ago.  I thought it would be helpful

 4     if we relatively promptly got you briefs that brought the

 5     evidence that came in at this hearing into the briefing.

 6          THE COURT:  I'll hear arguments.  I think that's

 7     probably a quicker process, because this has taken a little

 8     while to get to this point.

 9          And I'll hear arguments after we move the admissions.

10     All right?  Of the evidence.

11          We'll be in recess for at least ten minutes.

12          And you can get all of these exhibits and everything

13     in order around here.

14          (Recess at 2:36 p.m. until 2:49 p.m.)

15          THE COURT:  Now, Counsel, are we ready for the

16     exhibits to be moved that have not been moved?

17          MR. BERGER:  Yes, Your Honor.

18          I would like just to -- most of what we want to offer,

19     I believe, has been offered and admitted, and I am just going

20     to note what those are in case there's any difference.  But I

21     don't think there will be.

22          We believe that P-1 through P-4 have been admitted.

23          I'm not sure about the next ones, so we would like to

24     offer P-5, which is the NBME decision letter from March 2017.

25          P-6 --

1          THE COURT:  And hearing no objection -- unless I hear

2    an objection to an exhibit that you're moving at this point in

3    time --

4          MR. BERGER:  All right.

5          THE COURT:  -- it's admitted.  All right?

6          If he has an objection --

7          MR. BERGER:  P-5, the decision letter.  P-6, the

8    decision letter.  P-7, also a decision letter, February 2019.

9    And P-8, a decision on the second appeal.  So we want to offer

10   those.

11         (Exhibits P-5, P-6, P-7 and P-8 admitted into

12   evidence.)

13         MR. BERGER:  I believe the next two exhibits I'm going

14   to mention have been admitted.  They are P-13, which are

15   excerpts from the medical school student policy manual, and

16   P-14, which are documents relating to Ms. Ramsay's leave of

17   absence.

18         I believe that P-19, the MCAT form, has been admitted,

19   and also P-19A, which are the verbal reasoning section

20   questions that Ms. Ramsay annotated and testified about.

21         I also believe that P-20, the sample one -- Step 1

22   sample questions has been admitted.  And P-21, which is Dr.

23   Smith's declaration, has been admitted.

24         (Exhibit P-20 admitted into evidence.)

25         I would like to offer P-22, which is the decision

1  letter on the February 2019 -- that may be a duplicate, but

2  just to be sure.

3          (Exhibit P-22 admitted into evidence.)

4          MR. BERGER:  I would like to offer -- there was

5  testimony about it, but I don't think it was offered, P-33,

6  which is Professor Zecker's article.

7          (Exhibit P-33 admitted into evidence.)

8          MR. BERGER:  I believe that P-34, which is the

9  PowerPoint from the NBME consultants meeting, has been

10 admitted.

11         And finally, I would like to offer P-40, P-41 and

12 P-42, which are the documents that Ms. Vargas examined Dr.

13 Farmer about, the letter from the examination organizations,

14 the letter from Mr. Burgoyne to the Department of Justice and

15 the excerpt from the Federal Register.

16         (Exhibits P-40, P-41 and P-42 admitted into evidence.)

17         THE COURT:  Very well.

18         MR. BURGOYNE:  No objection.

19         THE COURT:  And they're all admitted.

20         Moving to defense.

21         MS. MEW:  Thank you, Your Honor.  We had quite a few

22 that were discussed but not admitted, so please bear with me.

23         We would like to admit Defendant's Exhibit 1, which

24 was the Complaint with exhibits.

25         (Exhibit DX-1 admitted into evidence.)

1          MS. MEW:  Defendant's Exhibit 2, which is the

2   declaration of Jessica Ramsay and exhibits.

3          (Exhibit DX-2 admitted into evidence.)

4          MS. MEW:  Defendant's Exhibit 3, which is the

5   declaration of Robert Smith and exhibits.

6          (Exhibit DX-3 admitted into evidence.)

7          MS. MEW:  Defendant's Exhibit 4, which is the

8   declaration of Catherine Farmer and exhibits.

9          (Exhibit DX-4 admitted into evidence.)

10         MS. MEW:  I believe 5 and 6 have already been

11  admitted.

12         Defendant's Exhibit 7, plaintiff's answers and

13  objections to defendant's first set of interrogatories.

14         (Exhibit DX-7 admitted into evidence.)

15         MS. MEW:  And to make this go faster, can I just go by

16  number or would you like to --

17         MR. BERGER:  I prefer -- I prefer to have a brief

18  description.

19         MS. MEW:  That's fine.  We'll keep going.

20         Defendant's Exhibit 8, kindergarten behavior report.

21         Defendant's Exhibit 9, kindergarten progress report.

22         Defendant's Exhibit 10, first grade progress report.

23         Defendant's Exhibit 11, second grade progress report.

24         Defendant's Exhibit 12, the physical education report

25  card.

```
1              Defendant's Exhibit 13, report card for third grade.

2              Defendant's Exhibit 14, report card for fourth grade.

3              Defendant Exhibit's 15, report card for Texas.

4              (Exhibits DX-8, DX-9, DX-10, DX-11, DX-12, DX-13,

5    DX-14 and DX-15 admitted into evidence.)

6         THE COURT:  Are you going through each one of the

7    numbered ones there?  Have you taken any out so far?

8         MS. MEW:  Eventually.  It's going to be most of them.

9    That's why I was wondering if I could go through large chunks.

10        THE COURT:  That would be faster.

11        MR. BERGER:  Sure, sure.

12        MS. MEW:  You know what, if you want to come look over

13   my shoulder, if it makes it easier for you.

14        MR. BERGER:  No.  If you just tell --

15        THE COURT:  The numbers.  Indicate the exhibits that

16   you're moving in a block.

17        MS. MEW:  Yes.

18        THE COURT:  From exhibit number what?

19        MS. MEW:  So now we're on to 16 through 20.

20        THE COURT:  Give him an opportunity to review those.

21        Hearing no objections.

22        (Exhibits DX-16, DX-17, DX-18, DX-19 and DX-20

23   admitted into evidence.)

24        MS. MEW:  Then 22, and then 24 through 36.

25        THE COURT:  Give him an opportunity.
```

1            MR. BERGER:  Your Honor, if -- so you're offering 24
2    through 26 but not 27?
3            MS. MEW:  24 through 36.  We didn't discuss 37.  I
4    don't know if we feel strongly --
5            MR. BERGER:  I'm sorry, you're offering 24 through --
6            MS. MEW:  36.
7            MR. BERGER:  Through 36, okay.
8            No objection.
9            (Exhibits DX-22, DX-24, DX-25, DX-26, DX-27, DX-28,
10   DX-29, DX-30, DX-31, DX-32, DX-33, DX-34, DX-35 and DX-36
11   admitted into evidence.)
12           MS. MEW:  38 through 42.
13           MR. BERGER:  Okay.
14           (Exhibits DX-38, DX-39, DX-40, DX-41 and DX-42
15   admitted into evidence.)
16           MS. MEW:  46.
17           MR. BERGER:  All right.
18           (Exhibit DX-46 admitted into evidence.)
19           MS. MEW:  48 through 54.
20           MR. BERGER:  Some of these, without reviewing them
21   individually, it's possible that some of these -- obviously
22   they contain references to Ms. Ramsay's attorney, and Your
23   Honor did generally sustain our objections as to work product.
24   I think that generally those exhibits are redacted, but if
25   there are any which are not redacted, then we would object to

1  that extent.

2          THE COURT:  Very well.

3          MS. MEW:  And just to clarify, I do think, Mr. Berger,

4  that you had objected to 49 on work product grounds, but it was

5  a document that you had produced, I believe.

6          THE COURT:  And I think they indicated it was by

7  accident or something?

8          MR. BERGER:  That's okay.

9          THE COURT:  No objections?  Okay.  Very well.

10          (Exhibits DX-48, DX-49, DX-50, DX-51, DX-52, DX-53 and

11  DX-54 admitted into evidence.)

12          MR. BERGER:  So we're up to --

13          MS. MEW:  So that took us from 48 to 54.

14          Now 56 through 61.

15          MR. BERGER:  All right.

16          (Exhibits DX-56, DX-57, DX-58, DX-59, DX-60 and DX-61

17  admitted into evidence.)

18          MS. MEW:  And then 63 through 68.

19          MR. BERGER:  I'm sorry, 6 --

20          MS. MEW:  63 through 68.

21          MR. BERGER:  Okay.  Again, there is potentially some

22  work product matter in there that was not -- I think without

23  reviewing individually, I can't say, but I think those are

24  things that were produced by Dr. Ruekberg or whoever produced

25  on behalf of Dr. Ruekberg.

```
1            MS. MEW:  If you'll look at this, Mr. Berger, for 63
2   through 67.  I guess 63, 64, 65, those all have Bates numbers
3   showing plaintiffs produced those documents.
4            MR. BERGER:  But -- okay.  Yes.  All right.  But these
5   are all --
6            Subject to the specific objections we made during the
7   hearing which Your Honor ruled upon, we have no other
8   objections.
9            THE COURT:  Very well.  They're admitted.
10           (Exhibits DX-63, DX-64, DX-65, DX-66, DX-67 and DX-68
11   admitted into evidence.)
12           MS. MEW:  Then Exhibits 70 and 71.
13           MR. BERGER:  We object to Exhibit 71.
14           THE COURT:  What's 71?
15           MR. BERGER:  That's the outcome data exhibit we were
16   just reviewing with the witness.
17           THE COURT:  And your objection is noted.  It's
18   overruled.
19           (Exhibits DX-70 and DX-71 admitted into evidence.)
20           MS. MEW:  Then Exhibit 73 through 80.
21           MR. BERGER:  Your Honor, I think that this material
22   generally speaking is things that were produced by Dr. Ruekberg
23   of communications between him and Ms. Ramsay.  And to that
24   extent, we would not object to its admission.
25           I don't think in here that there are any work product
```

 1  areas, but I can't be sure without reviewing every page.  And

 2  to the extent there are, Your Honor has ruled already.

 3          THE COURT:  Very well.

 4          MR. BERGER:  So subject to that, we have no objection.

 5          THE COURT:  With that notation, the exhibits are

 6  admitted.

 7          (Exhibits DX-73, DX-74, DX-75, DX-76, DX-77, DX-78,

 8  DX-79 and DX-80 admitted into evidence.)

 9          THE COURT:  Next?

10          MS. MEW:  85.

11          MR. BERGER:  Same as for the prior emails with

12  Dr. Ruekberg.

13          THE COURT:  Very well.

14          (Exhibit DX-85 admitted into evidence.)

15          MS. MEW:  And then, Your Honor, we would like to go

16  ahead and introduce -- they're in my hands -- as Defendant's

17  Exhibits 86 and 87 the charts that Mr. Burgoyne was using in I

18  believe in his questioning of Dr. Smith this morning, the --

19          THE COURT:  Summaries?

20          MS. MEW:  The summaries.

21          MR. BERGER:  Your Honor, I don't see why that is

22  evidence.  It's just a chart of evidence.

23          THE COURT:  Yeah.  It helps or aids the viewer, the

24  finder of fact, to look at this rather than the totality of all

25  the documents to sort through and get to the final issue.

1           Is there something in the charts or summaries that you
2   disagreed with in total or in part, Counsel?
3           MR. BERGER:  Well, if I have to review it right now,
4   if I have to review it right now.  If I can have -- you know, I
5   will.
6           Which one specifically are you --
7           MS. MEW:  This one.
8           MR. BERGER:  Your Honor, I think for the record I have
9   to object because we haven't had a chance to review them.
10          THE COURT:  You can object.  Your objection is
11  overruled.  If there is something in these summaries that you
12  find are incorrect, you can contact counsel, make them aware,
13  send me a notification and I'll consider it.  All right?
14          MR. BERGER:  Thank you.
15          (Exhibits DX-86 and DX-87 admitted into evidence.)
16          THE COURT:  Let's move on.
17          Anything else from the defense?
18          MS. MEW:  No, Your Honor.
19          THE COURT:  All right.  I'll hear the plaintiff.
20          MS. VARGAS:  Thank you, Your Honor.
21          So what happened to Jessie Ramsay over the last three
22  years and what played out in this courtroom this week was
23  exactly what the ADA was amended to prevent, passed to prevent,
24  the ADA Amendments Act.
25          And in passing that law, as we heard testimony,

1  Congress specifically instructed that the question of

2  whether -- and I'm quoting, the question of whether an

3  individual's impairment is a disability under the ADA should

4  not demand extensive analysis.  Instead, the ADA, and in turn

5  its regulations, directed that the definition of disability --

6  and again quoting -- shall be construed in favor of broad

7  coverage and also to the maximum extent permitted.

8         Here defense argues that it need not defer to the

9  report of a qualified professional who actually examined Ms.

10 Ramsay, that it must only provide access to a test rather than

11 best ensuring that the test shows the student's ability and

12 potential and not their disability.  And that it should be able

13 to look at Ms. Ramsay's test scores on certain standardized

14 tests and grades while not looking at the accommodations that

15 Ms. Ramsay actually had on the NBME's own shelf exams at

16 medical school.  That it wants to disregard.

17        And as we made clear in the deposition I hope of Dr.

18 Farmer, this is not the first time that the NBME has made these

19 arguments.  These arguments were made prior to the passage of

20 the ADA Amendments Act, and they were rejected with the passage

21 of the law.  They were made prior to the adoption of

22 regulations by the Department of Justice, by Mr. Burgoyne on

23 the behalf of the NBME, and they were explicitly rejected in

24 the executive summary of the final rule as being inconsistent

25 with the Congressional history of the ADAA.

1          And then of course they requested and the NBME

2    requested that the DOJ should go ahead and issue technical

3    assistance on testing accommodations in order to provide

4    guidance to everybody on how these accommodations requests

5    would be -- should be processed and evaluated.

6          And that entire document is fully supportive of Ms.

7    Ramsay.  And it is only after that document was issued and did

8    not adopt the arguments that the NBME has continually tried to

9    push forward before Congress and before the agency, only then

10   was it something that they weren't interested in actually

11   applying.  And I do have copies of the technical assistance if

12   the Court would like me to provide those.

13         So the Department has considered -- the Department of

14   Justice has considered the arguments that were made here and

15   rejected them, and here we are.

16         Jessie Ramsay has to take and pass Step 1 of the USMLE

17   by March 2, 2020.  She can't simply withdraw from medical

18   school, because once she withdraws from medical school, she is

19   no longer eligible to take the USMLE.  And she has no guarantee

20   that if she applies to medical school again, especially after

21   what's transpired in the last three years, that she'll be

22   admitted.  So she asks only for the accommodations that she's

23   needed and has been granted in the past in medical school,

24   accommodations that she received at OSU.

25         THE COURT:  What other accommodations has -- the only

1  one is the time, as I understand it now, because the other

2  accommodations have been granted by defendants?

3        MS. VARGAS:  Yes, yes.  It's only the issue --

4        THE COURT:  So we're talking about now additional time

5  to complete the reading process?

6        MS. VARGAS:  Right.  Your Honor, it's only the issue

7  of double time, the extended time that she needs.

8        THE COURT:  Right.

9        MS. VARGAS:  And she didn't ask for the maximum amount

10 of extended time that NBME offers.  They offer triple time.

11 She didn't ask for that.  She asked for double time.  And the

12 reason is because -- and I hope you saw that when she

13 testified -- is that she wants to pass or fail on her own

14 merit, not because of her disability but because she knows the

15 material or because she doesn't.

16        So the law is clear.  It says that licensing

17 examinations -- and I'm going to quote the regulations -- must

18 be administered so as to best ensure that when the examination

19 is administered to an individual with a disability, the

20 examination results accurately reflect the individual's

21 aptitude or achievement level or whatever other factor the

22 examination purports to measure rather than reflecting the

23 individual's impaired sensory, manual or speaking skills.

24        THE COURT:  And her disability is her reading?

25        MS. VARGAS:  Yes.

1          THE COURT:  As you relate to it.

2          MS. VARGAS:  Reading and attention as well.

3          And as we heard from Dr. Smith, those disabilities

4    interact.  It takes her much more concentration than it would

5    your average person to read and focus.  At the same time she

6    has ADHD, so she lacks the ability to read and focus that she

7    requires.

8          THE COURT:  And as I recall the testimony, he was the

9    first and only one that diagnosed her with the -- with that

10   condition?

11         MS. VARGAS:  Well, there were diagnoses before, a

12   prior diagnosis of learning disability.

13         THE COURT:  Learning disability.

14         MS. VARGAS:  But as Dr. Smith said -- and we

15   acknowledge that that examination, they didn't do the tests

16   that were needed to show learning disability, so it was Dr.

17   Smith who did the comprehensive battery and got those results.

18         THE COURT:  And those tests that were taken of your

19   client, they were more -- I guess they were her actual conduct

20   of the reading and understanding?  There was no test that she

21   performed in a -- by any type of machine or any type of test,

22   written test, that demonstrated these conditions other than his

23   observing her and the conduct that she exhibited in reading and

24   understanding and responding?

25         MS. VARGAS:  There had been documentation all the way

1  back into early or mid elementary school that her reading was

2  slow and that there was an issue for her, both from

3  Dr. Tanguay, which is in I believe Plaintiff's Exhibit 1, which

4  is the first application for --

5          THE COURT:  And that's the optometrist?

6          MS. VARGAS:  She was an optometrist, but she

7  recognized that there was something wrong with the way Jessie

8  was reading.

9          And then obviously there's Ms. Ramsay's own testimony

10  and Dr. Smith's interview of her and the input that he got from

11  her mother historically about how she was as a child and also

12  from her fiancé.  But it was Dr. Smith who was the first one to

13  do the testing that was necessary to show dyslexia.

14          What's really important about that is that the law

15  requires that disability be determined without mitigation.  So

16  when somebody is using learned behavioral conduct, when

17  somebody is taking medication for ADHD, that's mitigation.

18  You're supposed to take that out of the equation and consider

19  sort of -- I don't know if naked is the right word, but the

20  person without any of that, do they have a disability without

21  any of that.

22          None of the tests that had been done up until Dr.

23  Smith did that.  That's the import of all of this battery of

24  comprehensive psychological testing.

25          Two things:  One, that it took out the mitigation and

1  it looked at what she's actually able to do without regard for

2  what kind of tricks she's doing in order to skip the reading on

3  tests or how she had informal accommodations so she was at a

4  table alone or only parts of her test were graded in elementary

5  school.  It screens all of that out, so it's important for that

6  reason.

7       It's also important because she was administered a

8  number of different tests by Dr. Smith.  And across those

9  tests, not just within those tests, they were remarkably

10  consistent.  She was tested without her ADHD medication.  She

11  was tested actually on what would show up for dyslexia.  And it

12  wasn't that she had one test that showed something and one test

13  that didn't, consistently across the board in each test, there

14  were very strikingly similar results where she had to rely on

15  reading, particularly in a timed setting, where that showed her

16  weakness.  And that weakness unmitigated isn't going to show up

17  on other kinds of tests that either aren't timed or where she's

18  allowed to use those, you know, medications and self-mitigation

19  that we aren't supposed to consider, according to the

20  regulations and according to the technical assistance from the

21  Department of Justice.

22       So I keep referencing the technical assistance.  There

23  are just a few parts of it I'd like to highlight.

24       THE COURT:  Sure.

25       MS. VARGAS:  But I think they're all critically

1  important because they're the rules we're all supposed to play

2  by.

3          So one of the things that the technical assistance on

4  testing accommodations says is a person with a history of

5  academic success may still be a person with a disability who is

6  entitled to testing accommodations under the ADA.

7          A history of academic success does not mean that a

8  person does not have a disability that requires testing

9  accommodations.  For example, someone with a learning

10 disability may achieve a high level of academic success but may

11 nevertheless be substantially limited in one or more of the

12 major life activities of reading, writing, speaking or learning

13 because of the additional time or effort he or she must spend

14 to read, write, speak or learn compared to most people in the

15 general population.

16         Second, the testing -- I mentioned this before.

17 Testing entity, and this is a quote, must administer its exams

18 so it accurately reflects an individual's aptitude, achievement

19 level or the skill that the exam purports to measure rather

20 than the individual's impairment.

21         Three, again a quote.  Proof of past testing

22 accommodations in similar test settings is generally sufficient

23 to support a request for the same testing accommodation for

24 current standardized exams or other high-stakes tests.

25         We heard a lot from the defendants about the ACT and

1    the MCAT.  And Your Honor heard from Ms. Ramsay, her

2    explanation of how it was that she was able to circumvent some

3    of the reading on those tests and self-mitigate.

4        What we don't hear from the defendants is any talk

5    about the fact that Ms. Ramsay --

6        THE COURT:  Ohio State and the medical school gave her

7    accommodations in reference to her testing.  Yes.

8        MS. VARGAS:  Right.  Yes, sir.  Including on their

9    tests.

10        THE COURT:  On their tests.

11        MS. VARGAS:  And then furthermore that -- again a

12    quote, an absence of previous formal testing accommodations

13    does not preclude a candidate from receiving testing

14    accommodations.  In the absence of documentation of prior

15    testing accommodations, testing entities should consider the

16    entirety of a candidate's history, including informal testing

17    accommodations, to determine whether that history indicates a

18    current need.

19        And lastly -- and this is really critically

20    important -- is that -- and this is a quote, testing entities

21    should defer to the documentation from a qualified professional

22    who has made an individualized assessment of the candidate that

23    supports the need for the requested testing accommodation.

24    Candidates who submit documentation such as reports,

25    evaluations or letters that is based on careful consideration

1  of the candidate by a qualified professional should not be

2  required by testing entities to submit additional

3  documentation.  A testing entity should generally accept such

4  documentation and provide the recommended testing

5  accommodation.

6           THE COURT:  And who would that qualified expert be?

7           MS. VARGAS:  Dr. Smith.

8           THE COURT:  So you would say Dr. Smith?

9           MS. VARGAS:  Dr. Smith.

10          THE COURT:  Even though those tests might be based on

11 conduct that is manipulated, let's say?

12          I'm looking at the position that the defense is

13 clearly considering by the questions that they proposed to the

14 expert testifying.  Clearly we have an individual that's highly

15 intelligent, without any question or exceptions about that.  I

16 observed her testify for almost -- a whole day almost.  And I

17 saw how she was directed to go to different pages, to look at

18 the questions that were being posed to her.  She was able to

19 read them and respond to the questions.

20          This is a person, plaintiff, who is studying medicine,

21 who has the wherewithal to understand the test that she was

22 going to be taking and perform on those tests that she was

23 going to be requested to take.

24          So there is the possibility that those tests could be

25 manipulated, but I'm not saying she did.  I'm not saying she

1  did.  But I have to rely on the expert's representation that

2  was given to support her position.

3        MS. VARGAS:  Yes, Your Honor.  And that is exactly why

4  the technical assistance directs -- it is particularly

5  important in the context of learning disabilities, which are

6  difficult to diagnose, particularly in gifted students where

7  they can be masked through early education.  That's why the

8  Department of Justice says that it's really important to

9  actually put eyes on the person and talk to them and understand

10  how they approach the test and how that they did it, because

11  from a distance where all you have is paperwork, those kind of

12  scores by definition in a bright person with learning

13  disability, they're going to look just like Ms. Ramsay's.  You

14  have to have somebody who is trained, who is actually

15  communicating with her, who is actually looking at the validity

16  of what she's saying and the sincerity of her effort in drawing

17  a conclusion.  And that's not something that can be done in

18  learning disabilities on paper.  And that's certainly what the

19  technical assistance says.

20        THE COURT:  Very well.

21        MS. VARGAS:  So defendant has I think admitted pretty

22  clearly that it did none of the things in the technical

23  assistance despite the fact that that technical assistance is

24  entitled to deference.  The US Supreme Court in Bragdon v.

25  Abbott said that there should be deference given.  And courts

1  of appeals have held that unless the technical assistance is

2  directly contrary to the regulation itself, which they aren't

3  in this case, that they should be afforded deference.

4        And certainly it was something that Mr. Burgoyne

5  thought was worth asking for, because he did ask for it on

6  behalf of his client until he didn't like the result, and then

7  he trained the consultants, the ones who evaluated Ms. Ramsay,

8  in a version of the law that they would have preferred to have.

9        So we talked briefly about the fact that the NBME has

10 extraordinary resources.  And after Your Honor rules, whenever

11 that is, they will go about their business.  Their business

12 will go on.

13        It is a very different story for Ms. Ramsay.  If Ms.

14 Ramsay doesn't get the double time, her future as a doctor is

15 quite literally over.  It doesn't matter how much determination

16 she put in to succeed in medical school.  It doesn't matter how

17 smart she is.  It doesn't matter how hard she worked if she

18 doesn't have a fair opportunity to show what she knows.  And

19 the only way she can do that is if she has the extended time

20 that somebody with extraordinary respected credentials who

21 defendant's own people have acknowledged did everything he was

22 supposed to do, and they have no question with how he did it

23 and what he tested, unless his report is given more

24 credibility, than how this young woman did.  Did she get a

25 sticker on her kindergarten report card for good behavior?  We

1  don't have the benefit of bringing in her kindergarten teacher.

2  So certainly the few words they might have chosen to put in

3  kindergarten on her report card, certainly those words can't

4  damn her future as a doctor.

5         And so we've already briefed the standards for what's

6  required for a preliminary injunction.  I don't think we need

7  to belabor that.  But I would just submit to the Court that we

8  leave it to you to determine what's in the public interest

9  here.

10         THE COURT:  Thank you, Counsel.

11         Defense?

12         MR. BURGOYNE:  Yes, Your Honor.  And with apologies, I

13  don't have a copy of the technical assistance guidance with me,

14  so with your indulgence, I hate to use a cell phone, but I have

15  the guidance pulled up.

16         THE COURT:  That's fine.

17         MR. BURGOYNE:  One of the things that wasn't read to

18  you with all the reading on technical assistance was the last

19  page of that document.

20         And the last page of that document states as follows:

21  This guidance document is not intended to be a final agency

22  action, has no legally binding effect and may be rescinded or

23  modified in the department's complete discretion in accordance

24  with applicable laws.  The department's guidance documents,

25  including this document, do not establish legally enforceable

1  responsibilities beyond what is required by the terms of the

2  applicable statutes, the regulations or judicial precedent.

3        And as a consequence, it is not surprising that much

4  of what you're hearing is based on the technical guidance.  In

5  fact, what the ADA requires that the testing entities like the

6  National Board of Medical Examiners administer their exams in a

7  place and manner that is accessible to individuals with

8  disabilities.  In order to be entitled to those accommodations,

9  an individual has to be disabled within the meaning of the ADA.

10 And to be disabled within the meaning of the ADA, you have to

11 be substantially limited in one or more major life activities

12 as compared to most people in the general population.

13       And the evidence in this case did not show that Ms.

14 Ramsay is in fact substantially limited in any major life

15 activities that are relevant to taking the test like the Step 1

16 exam as compared to most people in the general population.

17       The evidence that Ms. Ramsay offered was primarily Dr.

18 Smith's testimony.  And Dr. Smith in turn had reviewed

19 information from other professionals, but as you pointed out,

20 acknowledged he that was the first one to diagnose her with

21 dyslexia, a lifelong impairment, and that he had done that in

22 2018 in connection with her desire to get accommodations on the

23 Step 1 exam.

24       The first diagnosis of ADHD was in 2009.  ADHD, also a

25 lifelong impairment, but she was diagnosed with that in her

1   second year at Ohio State after she had already achieved a
2   3.56 grade point average with no accommodations.
3         Dr. Smith's testimony was that in his opinion, Dr.
4   Smiy's ADHD diagnosis was not thorough enough to have resulted
5   in an ADHD diagnosis in accordance with the DSM criteria.
6         Dr. Smith also addressed the documentation from Dr.
7   Lewandowski, which, as was acknowledged here, was not
8   sufficient to produce a reliable diagnosis regarding a learning
9   disability.
10        And then finally he said he discounted Mr.
11   Livingston's documentation because he had administered an
12   outdated test and had otherwise performed insufficient
13   evaluation of Ms. Ramsay.
14        Dr. Smith acknowledged that he saw nothing in the
15   educational records or the standardized testing history that
16   indicated that Ms. Ramsay experienced any issues in learning or
17   attention kindergarten to high school.  He acknowledged that
18   all of Ms. Ramsay's standardized test results reflected average
19   or above average results in reading.  He acknowledged that to
20   do well on the ACT and the MCAT one would have to have basic
21   reading skills.  And he defined dyslexia as the absence of
22   basic reading skills.
23        Regarding ADHD, he acknowledged that the evidence of
24   Ms. Ramsay experiencing multiple symptoms in multiple settings
25   and -- beginning in childhood, as would be required to make a

1  diagnosis under the DSM, came from Ms. Ramsay, her mother and
2  her fiancé.
3       The severe symptoms that Ms. Ramsay reported to Dr.
4  Smith were inconsistent with the symptoms that had been
5  referenced in the documentation from Dr. Smiy in 2009.
6       On the other side of the ledger, as I said, is the
7  history and -- on both standardized testing and academic
8  performance, real world objective evidence that NBME and the
9  external experts that it relied upon reviewed in making a
10 determination regarding her entitlement to accommodations.
11      At some point along the way, reading deficiencies and
12 attention deficiencies at the level Ms. Ramsay described would
13 have shown up in some form or fashion in records from
14 kindergarten to the 12th grade.  It isn't just a question of
15 stickers on her kindergarten report.  It's a question of
16 whether or not if someone is receiving daily attention from
17 teachers and a parent because of severe problems, whether one
18 would logically and reasonably anticipate that would show up
19 somewhere, either in someone's academic performance, someone's
20 performance on standardized tests, some of which include
21 lengthier content than the Step exam, and in the comments the
22 teachers provide.
23      Dr. Smith said in his experience you'll often see
24 teachers simply not make a comment there because so long as the
25 student is getting by, they don't want to communicate negative

1  information.  On the other hand, we know that at least three

2  years she had report cards that specifically captured

3  information and asked teachers to provide information on

4  whether or not the grades the student was receiving reflected

5  any intensive instruction from a teacher, any extra

6  instruction, any special guidance, and none of that showed up

7  in those records.  It is not unreasonable to rely on real world

8  evidence, nor is it unlawful to do so.

9          Ms. Vargas referenced the "best ensured" language and

10  said testing entities like NBME are required to administer

11  their exams to best ensure they're evaluating knowledge and

12  skills, not the disability.  That is certainly what the

13  regulation says, but that regulation kicks in after you've made

14  a determination whether someone is disabled within the meaning

15  of the ADA.  If someone is disabled within the meaning of the

16  ADA, it's at that point you have to identify appropriate

17  accommodations in order to best ensure that you measure their

18  abilities and knowledge and not the disability.

19          THE COURT:  Counsel, what do you say in reference

20  to -- here we have at least two higher institutions of learning

21  that when confronted with the plaintiff, they acknowledge,

22  without reservation or hesitation or pause, that she in fact

23  needs accommodations to matriculate in these environments.  And

24  that's the educational foundation that she proceeds with to

25  take the ultimate exam that you present to her.  And I think

1  she has accommodations in medical school in reference to a part

2  of the exam that she took.

3       What do you say in reference to why they meet -- why

4  she meets these criteria in these levels and fails to meet it

5  in your client's?

6       MR. BURGOYNE:  Well, two periods that you're referring

7  to, Your Honor.

8       The first instance was the Ohio State University

9  context where as a sophomore in college, she got accommodations

10  from the university.  As you heard, she got those

11  accommodations on the strength of an ADHD diagnosis that was a

12  made in a half an hour evaluation in which Dr. Smith said was

13  not sufficient to support a diagnosis.

14       Colleges vary in their liberalness with which they

15  will provide accommodations in an academic context.  In this

16  particular instance, Ohio State was willing to accept an ADHD

17  diagnosis, which we have now heard in this Court would not

18  support a diagnosis under the DSM-5 criteria.  And that's fine.

19  That's their prerogative.

20       When she gets into medical school, at that point of

21  course she's relying in part on the fact that she got

22  accommodations from Ohio State.  So there's a history of

23  accommodations, so the medical school says we know you've got

24  that.

25       She also says, well, I've got this additional

1  documentation here from Mr. Livingston, and this supports my

2  need for accommodations.

3       Well, then we have this trial and we hear, well, Mr.

4  Livingston's documentation is insufficient as well.  And again,

5  that's the medical school's prerogative.  They've admitted Ms.

6  Ramsay to medical school, and they have every reason to want to

7  see her succeed.  And that's great.  But that's very different

8  from a standardized testing context where exams are

9  purposefully standardized and where NBME, as the Second Circuit

10  has said, is obligated on the one hand to administer

11  accommodations when people show they're entitled to them.  At

12  the same time, it also has an obligation to ensure that it does

13  not provide accommodations if an individual has not

14  demonstrated a need for accommodations, and more importantly,

15  entitlement to accommodations under the ADA, because that's not

16  fair to other examinees.  Every examinee who takes this

17  challenging exam under time constraints would love to have the

18  exam taken over two days with half hour blocks instead of an

19  hour block and with the benefit of a less stressful testing

20  environment.

21       Your Honor, there was a question about the ADA

22  Amendments Act.  We don't dispute for a minute that that

23  statute broadened the coverage provided by the ADA.  On the

24  other hand, it didn't get rid of the requirement that someone

25  still has to establish substantial limitation in a major life

1  activity as compared to a person in the general population.

2        You never heard Dr. Smith once testify that she is

3  substantially limited in a major life activity as compared to

4  most people in the general population.  He testified that based

5  on her dyslexia, he believes she needs extended testing time.

6  That's a different issue than meeting the standard under the

7  ADA for disability.

8        Multiple courts subsequent to the ADA Amendments Act

9  have held that it is reasonable and appropriate in a case

10  directly like this for you to consider performance on

11  standardized tests like the MCAT, the GRE, the ACT, precisely

12  because they do tell you something.

13        The Bibber case I referenced earlier by Judge Dalzell

14  where again, a very similar case, I think the plaintiff was

15  deaf, had been diagnosed early with dyslexia, came to court

16  with two qualified professionals who testified on her behalf.

17  The testing organization had experts.  And at the end of the

18  day, Judge Dalzell said, you know, there is much that is very

19  compelling in this case and difficult, but at the end of the

20  day, I have to provide and apply the law as it is stated, which

21  is there has to be substantial limitation compared to most

22  people, and he didn't find it in that case, again, looking in

23  large part at performance on external measures of real life

24  examinations.

25        There is the Black v. The National Board of Medical

1   Examiners case out of Florida, which again where the court
2   looked to performance on real life measures, performance in
3   college, performance in high school, in middle school and
4   performance on other standardized tests.
5          And then there's the Healy case we cited in our briefs
6   out of -- I believe it's Indiana, where again the court looked
7   at those externals.
8          There's also an earlier case, Love v. Law School
9   Admission Council, decided by the Eastern District of
10  Pennsylvania, where again the court looked to performance on
11  other standardized tests in evaluating whether or not there was
12  substantial limitation.
13         There was the suggestion that because Dr. Smith
14  personally evaluated her, more weight should be given to that.
15  There was also testimony that Dr. Lewandowski personally
16  evaluated her, yet there was an acknowledgment that the fact
17  that you personally evaluate somebody doesn't necessarily mean
18  that your opinion is correct or sound or at the end of the day
19  should carry controlling weight.
20         Briefly, Your Honor, on the question of irreparable
21  harm, in order to meet that requirement of the preliminary
22  injunction standard, it has to be immediate and certain.
23  Certainly at this point it has not been shown that she is
24  certain to fail the exam if she tests next week with testing
25  over two days and the other accommodations that were provided.

1  Likewise, the harm, which I don't mean to minimize, but the

2  harm is a delay in her graduate education.  And this court and

3  other courts have held that's not sufficient for irreparable

4  harm.

5        We think the case ultimately, Your Honor, should be

6  decided on the basis that Ms. Ramsay has not shown a clear

7  likelihood of succeeding on the merits under a burden where

8  she's seeking a mandatory preliminary injunction which is

9  perhaps the highest requirement in terms of the evidentiary

10 burden when someone is seeking that type of relief.

11        Thank you, Your Honor.

12        THE COURT:  Very well.  Yes, counsel.  I know you're

13 jumping up.  Rebuttal argument.

14        MS. VARGAS:  I'll keep it brief.  I promise.

15        THE COURT:  Sure.

16        MS. VARGAS:  I would draw the Court's attention

17 obviously to the court cases cited in our brief, in particular

18 Featherstone v. Pacific Northwest University of Health

19 Sciences.  That was a case in which a deaf student was admitted

20 to medical school and then requested interpreters and

21 captioning in order to understand the content.  After that

22 request was made, the medical school withdrew his admission and

23 considered -- well, first it considered for a year whether it

24 should do that, and then it ultimately withdrew his admission.

25        We represented Mr. Featherstone, and Mr. Featherstone

1  filed for a preliminary injunction.  And that injunction was

2  granted on the day of hearing.  And in the decision, the judge

3  referenced that the delay in being able to practice to one's

4  chosen profession was in and of itself discrimination, that it

5  was irreparable harm.

6       We have more than that here.  March 2nd is not

7  distant.  It is not uncertain.  It is an absolute deadline by

8  which she has to take this test.  And the ADA does not require

9  that you take it and fail it and you take it and you fail it

10  again and you try this and you fail it again.  The ADA requires

11  that having provided documentation from a qualified

12  professional, as well as a wealth of other documentation that

13  we haven't spoken about in the last few minutes but there was

14  testimony provided about it at length over the past few days,

15  that the accommodations should be provided so that you can show

16  what you know, not whether you're limited by disability.

17       And I would cite specifically to Dr. Farmer's

18  testimony that was at deposition that she -- we discussed when

19  she was in cross-examination that there was no documentation

20  that Ms. Ramsay could provide that would change their minds.

21  There was nothing she could do.

22       And it's not just about passing.  It's about the

23  ability to even get a residency.  If you pass by a point or

24  two, your ability to get a residency is irrevocably harmed.

25  You can't claw that back.  You can't somehow get a different

1   score later and substitute that.  That doesn't happen with

2   medical school residency programs and the match.  She only has

3   one chance.  And that chance is over in this courtroom with the

4   relief that the Court either grants or doesn't grant.

5          I would also say that yes, we did talk about the

6   technical assistance and manual a lot.  That's because they

7   testified that they didn't apply it and we think it's so

8   clearly applicable.  But the law and the regulations, they also

9   support what we testified and what's in the technical

10  assistance manual.

11         Finally we heard a lot about their theme of the real

12  world, the real world being MCAT and the ACT.  And it's

13  tempting for us as well to look at Ms. Ramsay and make our own

14  determinations about was she able to read that, was she not

15  able to read that.

16         Dyslexia is not that simple.  If it were, it would be

17  diagnosed every time somebody had it when they were in second

18  grade.  And the research shows that it actually is very

19  frequently, particularly in gifted students, diagnosed very

20  late when there is this sort of perfect collision between the

21  inability of their mitigation to overcome the complexity of the

22  reading and the time requirements that are necessary to read

23  that kind of complex meaning and process it and actually show

24  what you know.

25         So whether Ms. Ramsay can understand an exhibit that

1 she wrote herself and has seen before in the courtroom, I would

2 ask the Court -- I would submit that that's not the appropriate

3 determination.  We are not neuropsychologists.  Dr. Smith is.

4 And I think he was credible in acknowledging -- you know, I

5 often see experts who say all of her testing is good, all of

6 the prior diagnosis is good.  I've rarely seen an expert in the

7 courtroom say very even-handedly, this testing, I don't think

8 this was the right test.  Or this testing, I don't think it was

9 enough.  And he did that.  And then he explained why his

10 testing was valid and what he did to ensure it was valid and

11 what he did to ensure that there wasn't some kind of

12 malingering going on.  And he concluded that there wasn't.

13       And we weren't in a position any more than the

14 external evaluators who are only looking at the documentation

15 based on Mr. Burgoyne's training of what the law requires

16 making a determination.  What matters is somebody who has the

17 expertise, what that person has concluded based on a very

18 comprehensive, extensive evaluation, using multiple testing

19 modalities that all consistently, without mitigation,

20 considered support what Ms. Ramsay at great length testified.

21       And let me say that it is incredibly difficult to

22 testify about your weaknesses.  And what we often see is that

23 very often students with disabilities, they hide them.  They

24 don't ask for what they need for a long time until they have no

25 other choice.

1          And in this case it wasn't until her professors told

2    her there is something wrong, you need to go see disability

3    services, you need testing, contrary to Mr. Burgoyne's

4    representation of colleges and medical schools passing out

5    accommodations like candy.  I assure you that is not how that

6    works.  I would be out of a job.  That's not what medical

7    schools do.  Medical schools are putting forward a student at

8    the end of four years that they believe can safely practice

9    medicine.  And they would not put forward and provide

10   accommodations if they believed that the person was not doing

11   the work and showing what they know.  They would not put a

12   finger on the scale unless it was necessary.

13         And so I would urge you to find that Ms. Ramsay has

14   shown that she is an individual with a disability, which is the

15   only question that Mr. Burgoyne when we met back in your

16   chambers two months ago, three months ago, to schedule this

17   hearing, that was the only issue he raised was whether she was

18   an individual with a disability.  I would ask you to find that

19   she is and to allow her to take the accommodations so that her

20   career doesn't end today.

21         THE COURT:  Very good.  Thank you.

22         MR. BURGOYNE:  Nothing further, Your Honor.

23         THE COURT:  I'll tell you, I'll take it under

24   advisement.  And I hope to have something for you shortly.

25         In any case, thank you for your presentation of the

1   evidence in this case.

2          And good luck to you.

3          MS. RAMSAY:  Thank you.

4          MR. BURGOYNE:  Thank you, Your Honor.

5          THE COURT:  We are adjourned.

6          Oh, make sure we have -- okay.  I have the plaintiff's

7   exhibits, the defense exhibits.  And additional exhibits that

8   you included from the witnesses today.

9          MR. BURGOYNE:  I think that's right, Your Honor.

10  We'll double check.

11         THE COURT:  And I have the summaries here from the

12  defense.

13         MS. MEW:  Do we leave in everything or should we take

14  out the ones --

15         THE COURT:  Just leave it right there.

16         Leave just the documents that are admitted into

17  evidence.

18         MS. MEW:  Okay.  All right.

19         THE COURT:  So go through your exhibit book and reduce

20  them.  And don't forget to take everything else out of the

21  courtroom.  All right.

22         MS. VARGAS:  Your Honor.

23         THE COURT:  Yes, ma'am.

24         MS. VARGAS:  Would you like me to provide a copy of

25  the technical assistance manual?

1          THE COURT:  Sure.  You can leave that here.

2          MR. BURGOYNE:  I don't mind a copy if it has the last

3 page.

4          MS. VARGAS:  It's a complete copy.

5          THE COURT:  As long as counsel has seen it and has the

6 totality of it, that's fine.

7          (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13          I certify that the foregoing is a correct transcript

14 from the record of proceedings in the above-entitled matter.

15

16 _____

17 Ann Marie Mitchell, CRR, RDR, RMR
   Official Court Reporter
18

19

20

21

22

23

24

25

```
1                              -  -  -

2                         I N D E X

3                              -  -  -

4
     Witness          Direct      Cross      Redirect      Recross
5
     DR. ROBERT                     4         54            61
6    SMITH

7    DR. CATHERINE     64          79        137
     FARMER
8
     MICHAEL GLENN     138         150
9    JODOIN

10

11
                              -  -  -
12
                         E X H I B I T S
13
                              -  -  -
14

15       NO.                          ADMITTED PAGE

16       P-21                         3

17       P-5                          162

18       P-6                          162

19       P-7                          162

20       P-8                          162

21       P-20                         162

22       P-22                         163

23       P-33                         163

24       P-40                         163

25       P-41                         163
```

| | | |
|---|---|---|
| 1 | P-42 | 163 |
| 2 | DX-1 | 163 |
| 3 | DX-2 | 164 |
| 4 | DX-3 | 164 |
| 5 | DX-4 | 164 |
| 6 | DX-7 | 164 |
| 7 | DX-8 | 165 |
| 8 | DX-9 | 165 |
| 9 | DX-10 | 165 |
| 10 | DX-11 | 165 |
| 11 | DX-12 | 165 |
| 12 | DX-13 | 165 |
| 13 | DX-14 | 165 |
| 14 | DX-15 | 165 |
| 15 | DX-16 | 165 |
| 16 | DX-17 | 165 |
| 17 | DX-18 | 165 |
| 18 | DX-19 | 165 |
| 19 | DX-20 | 165 |
| 20 | DX-22 | 166 |
| 21 | DX-24 | 166 |
| 22 | DX-25 | 166 |
| 23 | DX-26 | 166 |
| 24 | DX-27 | 166 |
| 25 | DX-28 | 166 |

| 1 | DX-29 | 166 |
| 2 | DX-30 | 166 |
| 3 | DX-31 | 166 |
| 4 | DX-32 | 166 |
| 5 | DX-33 | 166 |
| 6 | DX-34 | 166 |
| 7 | DX-35 | 166 |
| 8 | DX-36 | 166 |
| 9 | DX-38 | 166 |
| 10 | DX-39 | 166 |
| 11 | DX-40 | 166 |
| 12 | DX-41 | 166 |
| 13 | DX-42 | 166 |
| 14 | DX-46 | 166 |
| 15 | DX-48 | 167 |
| 16 | DX-49 | 167 |
| 17 | DX-50 | 167 |
| 18 | DX-51 | 167 |
| 19 | DX-52 | 167 |
| 20 | DX-53 | 167 |
| 21 | DX-54 | 167 |
| 22 | DX-56 | 167 |
| 23 | DX-57 | 167 |
| 24 | DX-58 | 167 |
| 25 | DX-59 | 167 |

| | | |
|---|---|---|
| 1 | DX-60 | 167 |
| 2 | DX-61 | 167 |
| 3 | DX-63 | 168 |
| 4 | DX-64 | 168 |
| 5 | DX-65 | 168 |
| 6 | DX-66 | 168 |
| 7 | DX-67 | 168 |
| 8 | DX-68 | 168 |
| 9 | DX-70 | 168 |
| 10 | DX-71 | 168 |
| 11 | DX-73 | 169 |
| 12 | DX-74 | 169 |
| 13 | DX-75 | 169 |
| 14 | DX-76 | 169 |
| 15 | DX-77 | 169 |
| 16 | DX-78 | 169 |
| 17 | DX-79 | 169 |
| 18 | DX-80 | 169 |
| 19 | DX-85 | 169 |
| 20 | DX-86 | 170 |
| 21 | DX-87 | 170 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**$125** [1] - 8:14
**$143** [2] - 94:8, 94:22
**$375** [1] - 8:21
**'17** [1] - 154:16
**08033** [1] - 1:17
**1** [49] - 4:9, 5:16, 12:20, 12:25, 28:4, 28:16, 39:10, 43:5, 43:10, 62:16, 62:17, 65:15, 75:23, 76:10, 85:16, 85:19, 85:24, 86:4, 87:6, 88:16, 88:17, 89:3, 96:9, 102:24, 139:3, 139:12, 140:6, 140:7, 145:10, 146:16, 147:5, 148:9, 148:12, 150:23, 151:8, 151:10, 151:13, 151:17, 151:19, 151:23, 153:8, 158:11, 159:18, 162:22, 163:24, 172:17, 175:4, 183:16, 183:24
**1,700** [1] - 65:21
**10** [11] - 2:4, 77:21, 86:15, 86:20, 87:6, 104:11, 114:2, 114:3, 114:5, 147:2, 164:23
**1006** [1] - 155:7
**106** [1] - 72:18
**107** [3] - 47:20, 145:3, 145:7
**10:47** [1] - 54:3
**10th** [1] - 71:21
**11** [18] - 43:21, 44:2, 44:3, 91:1, 104:11, 104:23, 115:11, 115:14, 116:19, 119:21, 119:22, 120:9, 123:5, 124:24, 127:3, 127:6, 164:24
**111** [1] - 143:22
**11:03** [1] - 54:3
**12** [6] - 77:21, 86:15, 86:20, 87:6, 119:22, 164:25
**12:43** [1] - 118:16
**12th** [3] - 69:8, 69:16, 185:15
**13** [1] - 35:12, 35:21, 165:2
**137** [1] - 198:7
**138** [1] - 198:8
**139** [1] - 96:6
**139..** [1] - 96:7
**13th** [2] - 2:11, 71:15
**14** [1] - 35:10, 35:12, 106:19, 165:3
**145,003** [1] - 90:1
**15** [7] - 35:10, 35:12, 54:1, 76:11, 123:7, 124:24, 165:4
**150** [1] - 198:8
**155** [1] - 127:2
**15th** [1] - 154:18
**16** [4] - 33:16, 40:19, 43:23, 165:20
**162** [5] - 198:17, 198:18, 198:19, 198:20, 198:21
**163** [5] - 198:22, 198:23,

**198:24, 198:25, 199:1
**164** [5] - 199:2, 199:3, 199:4, 199:5, 199:6
**165** [13] - 199:7, 199:8, 199:9, 199:10, 199:11, 199:12, 199:13, 199:14, 199:15, 199:16, 199:17, 199:18, 199:19
**166** [20] - 199:20, 199:21, 199:22, 199:23, 199:24, 199:25, 200:1, 200:2, 200:3, 200:4, 200:5, 200:6, 200:7, 200:8, 200:9, 200:10, 200:11, 200:12, 200:13, 200:14
**167** [13] - 200:15, 200:16, 200:17, 200:18, 200:19, 200:20, 200:21, 200:22, 200:23, 200:24, 200:25, 201:1, 201:2
**168** [8] - 201:3, 201:4, 201:5, 201:6, 201:7, 201:8, 201:9, 201:10
**169** [10] - 143:20, 201:11, 201:12, 201:13, 201:14, 201:15, 201:16, 201:17, 201:18, 201:19
**17** [1] - 50:17
**170** [2] - 201:20, 201:21
**18** [1] - 50:17
**19** [2] - 1:16, 73:15
**19106** [1] - 1:9
**1996-1997** [1] - 19:12
**1:00** [1] - 126:5
**1:30** [1] - 118:8
**1:32** [1] - 118:16
**2** [18] - 8:1, 17:24, 20:11, 23:8, 23:10, 35:20, 37:3, 44:14, 51:11, 85:16, 85:19, 85:24, 87:6, 139:15, 149:10, 152:24, 164:2, 172:18
**20** [7] - 72:21, 76:2, 76:14, 147:3, 147:6, 147:15, 165:20
**200** [1] - 28:13
**20002** [1] - 2:5
**20005** [1] - 2:12
**2003** [1] - 52:18
**2006** [1] - 65:3
**2007** [1] - 106:25
**2008** [3] - 4:7, 106:19, 129:25
**2009** [4] - 21:3, 50:20, 183:25, 185:6
**2010** [1] - 52:18
**2014** [6] - 109:14, 109:23, 129:23, 130:1, 130:6, 131:6
**2016** [10] - 18:5, 18:9, 20:5, 68:23, 83:18, 100:10, 119:14, 123:17, 127:3, 127:6
**2017** [13] - 70:21, 70:25, 71:8, 89:25, 90:2, 94:5, 94:8,

**139:12, 140:8, 147:5, 154:12, 154:16, 161:25
**2018** [14] - 18:3, 72:9, 72:12, 72:21, 73:15, 84:3, 91:1, 91:4, 91:7, 91:17, 92:2, 92:8, 92:9, 183:23
**2019** [4] - 1:10, 79:24, 162:9, 163:2
**202** [2] - 2:5, 2:12
**2020** [1] - 172:18
**21** [5] - 128:23, 128:24, 131:21, 131:22, 131:23
**22** [2] - 132:21, 165:25
**23** [3] - 45:7, 57:2, 57:4
**24** [7] - 134:3, 134:5, 134:7, 165:25, 166:2, 166:4, 166:6
**248-5092** [1] - 2:5
**25** [4] - 47:13, 147:13, 147:14, 147:15
**26** [6] - 30:15, 30:18, 30:19, 30:20, 166:3
**267** [1] - 1:23
**27** [1] - 166:3
**27th** [1] - 74:3
**28** [4] - 68:23, 149:11, 149:14, 158:17
**280** [1] - 139:4
**299-7250** [1] - 1:23
**2:19-cv-02002** [1] - 1:3
**2:36** [1] - 161:15
**2:49** [1] - 161:15
**2nd** [1] - 192:7
**3** [9] - 1:6, 17:9, 19:24, 22:18, 23:19, 48:12, 114:14, 164:5, 198:16
**3.56** [1] - 184:3
**30** [7] - 76:2, 120:14, 149:7, 149:18, 150:4, 153:8, 158:20
**31** [5] - 48:2, 48:8, 57:4, 109:23, 131:6
**31st** [2] - 58:20, 63:13
**33** [2] - 121:14, 121:17
**34** [10] - 4:19, 6:4, 99:8, 99:17, 99:18, 116:19, 117:10, 119:7, 128:25, 131:21
**35** [7] - 7:16, 102:23, 104:3, 148:4, 149:18, 150:4, 152:8
**350** [3] - 8:21, 8:23, 8:24
**354-5640** [1] - 1:17
**36** [5] - 41:24, 165:25, 166:4, 166:7, 166:8
**36.105D3** [1] - 114:14
**37** [1] - 166:4
**38** [5] - 39:18, 40:14, 40:20, 45:15, 166:13
**39** [1] - 48:6
**3:00** [1] - 160:16
**3:47** [1] - 197:8
**4** [5] - 18:12, 52:21, 100:20,

**164:8, 198:5
**40** [14] - 40:23, 75:24, 107:18, 107:20, 139:8, 147:12, 148:2, 148:5, 148:14, 148:16, 149:6, 149:7, 152:9, 153:10
**41** [1] - 109:3
**42** [5] - 42:11, 51:1, 51:4, 126:22, 166:13
**45** [2] - 76:4, 76:12
**46** [1] - 166:17
**48** [2] - 166:20, 167:14
**49** [1] - 167:5
**5** [9] - 1:10, 70:25, 71:8, 110:14, 114:2, 114:4, 114:7, 119:14, 164:11
**50** [1] - 42:9
**504** [1] - 103:9
**51** [2] - 16:21, 62:1
**53237** [2] - 127:7, 127:8
**54** [3] - 166:20, 167:14, 198:5
**56** [1] - 167:15
**6** [7] - 18:3, 19:3, 53:8, 72:9, 72:12, 164:11, 167:20
**60** [9] - 66:3, 67:25, 68:4, 71:9, 71:22, 71:24, 71:25, 72:1, 148:21
**60-day** [1] - 68:7
**600** [2] - 2:4, 2:11
**601** [1] - 1:9
**61** [2] - 167:15, 198:5
**62** [1] - 40:19
**63** [4] - 167:19, 167:21, 168:2, 168:3
**64** [4] - 48:7, 90:11, 168:3, 198:7
**65** [4] - 66:3, 90:11, 90:15, 168:3
**654-6200** [1] - 2:12
**67** [1] - 168:3
**68** [2] - 167:19, 167:21
**6th** [1] - 69:1
**7** [6] - 33:3, 33:7, 102:23, 110:22, 164:13
**70** [3] - 90:23, 148:21, 168:13
**700** [1] - 2:11
**71** [5] - 139:22, 150:16, 168:13, 168:14, 168:15
**73** [1] - 168:21
**74** [4] - 30:18, 30:23, 30:24, 30:25
**74th** [2] - 30:13, 30:21
**75** [1] - 40:15
**76** [2] - 30:22, 143:25
**77** [3] - 74:3, 74:5, 90:22
**79** [1] - 198:7
**8** [3] - 104:3, 113:4, 164:21
**80** [4] - 73:21, 74:4, 74:5, 168:21

**81** [1] - 127:2
**85** [1] - 169:11
**856** [1] - 1:17
**86** [1] - 169:18
**86th** [1] - 30:8
**87** [1] - 169:18
**88** [1] - 47:6
**89** [1] - 72:18
**9** [3] - 148:15, 148:17, 164:22
**90** [3] - 139:10, 143:15, 143:16
**92** [2] - 32:23, 33:3
**98th** [1] - 32:14
**990** [1] - 94:10
**9:30** [2] - 1:10, 3:1
**a.m** [4] - 1:10, 3:1, 54:3
**AAMC** [1] - 85:18
**Abbott** [1] - 181:1
**abilities** [2] - 54:20, 186:19
**ability** [12] - 31:21, 92:5, 96:14, 101:14, 102:19, 102:21, 140:20, 142:5, 171:12, 174:7, 192:24, 192:25
**Ability** [1] - 116:11
**able** [20] - 5:8, 27:21, 40:14, 40:19, 43:25, 66:22, 68:3, 76:22, 77:23, 82:5, 90:4, 148:20, 149:4, 171:13, 176:2, 178:3, 179:19, 192:4, 193:15, 193:16
**above-entitled** [1] - 197:15
**absence** [6] - 10:21, 36:9, 162:18, 178:13, 178:15, 184:22
**absolute** [1] - 192:8
**absolutely** [2] - 79:11, 109:12
**academic** [13] - 18:15, 25:3, 25:12, 111:22, 114:21, 115:5, 115:7, 177:6, 177:8, 177:11, 185:8, 185:20, 187:16
**accept** [6] - 91:23, 126:18, 157:10, 157:11, 179:4, 187:17
**accepted** [2] - 61:7, 125:14
**access** [2] - 154:19, 171:11
**accessed** [3] - 151:2, 152:3, 158:4
**accessible** [2] - 158:12, 183:8
**accident** [1] - 167:8
**accommodation** [27] - 21:4, 67:24, 77:5, 77:14, 78:4, 78:18, 88:5, 88:7, 88:10, 90:8, 92:23, 92:24, 93:5, 104:9, 104:17, 113:19, 120:12, 120:25, 123:22, 126:12, 128:4, 130:4, 137:9,

137:11, 177:24, 178:24, 179:6
**accommodations** [125] - 4:9, 4:14, 5:6, 5:9, 5:14, 5:16, 7:24, 9:8, 12:20, 12:25, 14:25, 18:1, 18:9, 18:17, 19:6, 19:7, 19:11, 19:22, 20:23, 29:7, 31:25, 33:9, 65:15, 65:19, 66:1, 66:5, 67:5, 67:12, 68:21, 72:6, 75:12, 77:9, 78:20, 78:25, 79:3, 79:4, 80:3, 80:24, 83:10, 90:18, 90:21, 91:18, 91:24, 92:3, 93:13, 95:23, 97:14, 97:15, 97:19, 100:17, 101:11, 103:3, 103:4, 103:6, 104:2, 104:7, 111:9, 111:12, 113:18, 115:19, 116:2, 124:8, 125:11, 128:17, 128:21, 129:3, 129:9, 129:17, 129:18, 130:2, 130:12, 130:14, 131:2, 131:8, 131:14, 132:2, 132:14, 133:19, 134:14, 134:15, 135:15, 135:18, 136:1, 136:10, 136:13, 136:19, 171:15, 172:4, 172:5, 172:23, 172:25, 173:1, 173:3, 176:4, 177:5, 177:7, 177:10, 177:23, 178:8, 178:13, 178:15, 178:16, 178:18, 183:9, 183:23, 184:3, 185:11, 186:18, 186:24, 187:2, 187:10, 187:12, 187:16, 187:23, 187:24, 188:3, 188:12, 188:14, 188:15, 188:16, 191:1, 192:16, 195:6, 195:11, 195:20
**accordance** [3] - 6:1, 182:24, 184:6
**according** [2] - 176:20, 176:21
**accuracy** [1] - 54:17
**accurate** [8] - 7:5, 10:22, 27:14, 34:6, 54:21, 101:9, 107:7
**accurately** [8] - 12:3, 26:7, 26:21, 45:2, 101:4, 152:7, 173:21, 177:19
**achieve** [4] - 32:17, 114:19, 114:20, 177:11
**achieved** [4] - 31:4, 42:9, 42:11, 184:2
**achievement** [6] - 6:14, 15:18, 22:20, 101:4, 173:22, 177:19
**Achievement** [1] - 23:1
**acknowledge** [2] - 174:16, 186:22

**acknowledged** [7] - 181:22, 183:21, 184:8, 184:15, 184:18, 184:20, 184:24
**acknowledging** [1] - 194:5
**acknowledgment** [1] - 190:17
**acquiring** [1] - 33:19
**Act** [24] - 105:11, 105:18, 105:20, 105:23, 106:1, 106:3, 106:25, 107:4, 108:2, 108:14, 108:19, 108:24, 110:3, 119:16, 119:19, 120:2, 123:16, 124:9, 127:5, 129:5, 170:25, 171:21, 188:23, 189:9
**ACT** [18] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:3, 27:1, 28:3, 28:17, 28:19, 28:25, 31:17, 33:21, 104:2, 178:1, 184:21, 189:12, 193:13
**action** [1] - 182:23
**ACTION** [1] - 1:3
**activities** [8] - 8:4, 78:2, 105:15, 114:22, 124:13, 177:13, 183:12, 183:16
**activity** [14] - 66:25, 80:6, 105:13, 108:7, 111:24, 112:2, 114:18, 128:14, 128:20, 133:13, 133:16, 133:17, 189:2, 189:4
**Acts** [1] - 105:5
**actual** [6] - 26:10, 39:23, 46:21, 47:13, 114:16, 174:20
**ADA** [56] - 64:20, 79:19, 99:25, 100:14, 100:16, 102:3, 102:15, 104:20, 105:5, 105:7, 105:11, 105:20, 105:25, 106:3, 106:6, 106:25, 107:4, 108:1, 108:9, 108:14, 108:19, 108:24, 109:23, 110:2, 110:19, 112:3, 119:16, 119:19, 120:2, 123:9, 123:16, 124:9, 124:11, 124:16, 127:5, 127:24, 129:5, 130:3, 170:24, 170:25, 171:4, 171:5, 171:21, 177:7, 183:6, 183:10, 183:11, 186:16, 186:17, 188:16, 188:22, 188:24, 189:8, 189:9, 192:9, 192:11
**ADAA** [1] - 172:1
**adaptive** [1] - 111:6
**add** [5] - 113:13, 124:17, 125:9, 127:15, 127:21
**ADD** [3] - 5:3, 6:25, 7:4
**ADD/ADHD** [1] - 51:4
**added** [1] - 105:14
**addition** [4] - 76:4, 85:6,

93:8, 152:1
**additional** [18] - 5:9, 35:24, 75:19, 75:25, 76:5, 76:6, 93:19, 93:20, 114:24, 116:3, 124:12, 130:19, 156:18, 173:5, 177:14, 179:3, 188:1, 196:8
**address** [3] - 27:5, 116:5, 130:23
**addressed** [4] - 106:20, 131:13, 131:15, 184:7
**addressing** [1] - 26:25
**adequate** [1] - 57:17
**adequately** [3] - 27:6, 44:1, 157:9
**ADH** [2] - 13:9, 13:17
**ADHD** [37] - 5:3, 6:7, 6:24, 7:4, 8:6, 9:18, 11:13, 12:6, 12:14, 13:3, 16:14, 24:22, 51:14, 52:22, 53:6, 60:15, 61:17, 70:13, 70:16, 80:2, 83:7, 84:9, 120:10, 120:14, 120:18, 120:23, 148:20, 174:7, 175:18, 176:11, 183:25, 184:5, 184:6, 184:24, 187:12, 187:17
**adjourned** [1] - 196:6
**adjustable** [1] - 77:3
**administer** [9] - 15:15, 22:23, 42:7, 44:5, 79:9, 177:18, 183:7, 186:11, 188:11
**administered** [25] - 16:11, 21:19, 22:25, 24:14, 25:24, 41:4, 42:1, 42:4, 48:16, 48:24, 56:14, 58:23, 59:13, 59:24, 59:25, 85:20, 95:7, 101:1, 101:2, 141:18, 143:10, 173:19, 173:20, 176:8, 184:12
**administering** [1] - 57:11
**administers** [1] - 139:2
**administration** [7] - 24:8, 42:4, 48:20, 75:22, 82:8, 140:3, 140:12, 140:17, 141:10
**administrations** [1] - 42:7
**admission** [3] - 168:25, 191:23, 191:25
**Admission** [1] - 190:10
**admissions** [2] - 160:7, 161:10
**admit** [2] - 64:3, 163:24
**ADMITTED** [1] - 198:15
**admitted** [46] - 3:11, 3:12, 26:12, 83:3, 83:6, 136:17, 161:20, 161:23, 162:6, 162:12, 162:15, 162:19, 162:23, 162:24, 162:25, 163:4, 163:8, 163:11,

163:17, 163:20, 163:23, 164:1, 164:4, 164:7, 164:10, 164:12, 164:15, 165:6, 165:24, 166:12, 166:16, 166:19, 167:12, 167:18, 168:10, 168:12, 168:20, 169:7, 169:9, 169:15, 170:16, 172:23, 180:22, 188:6, 191:20, 196:17
**adopt** [2] - 127:25, 172:9
**adopting** [2] - 125:4, 127:4
**adoption** [1] - 171:22
**adult** [1] - 50:11
**adults** [2] - 5:7, 50:10
**advance** [4] - 17:2, 116:21, 116:25, 117:21
**Advice** [2] - 121:17
**advice** [1] - 121:19
**advisement** [1] - 195:25
**affect** [2] - 12:20, 111:12
**affected** [1] - 57:19
**afford** [1] - 132:9
**afforded** [1] - 181:4
**afternoon** [4] - 118:17, 118:18, 118:24, 118:25
**afterwards** [2] - 27:7, 140:21
**agency** [5] - 116:12, 132:8, 132:10, 172:10, 182:22
**ages** [1] - 46:25
**ago** [9] - 57:24, 73:5, 81:15, 88:6, 92:16, 132:12, 161:4, 195:17
**agree** [17] - 28:21, 31:6, 31:20, 36:3, 80:13, 87:10, 87:13, 95:12, 108:8, 109:22, 110:1, 113:7, 115:6, 115:17, 133:3, 134:7, 154:15
**agreed** [2] - 39:11, 95:2
**ahead** [4] - 38:14, 38:24, 169:17, 172:3
**aid** [1] - 21:4
**aided** [1] - 1:25
**aids** [3] - 103:5, 103:7, 169:24
**Alberta** [2] - 138:16, 138:18
**alert** [1] - 78:1
**alleging** [1] - 80:1
**allotted** [1] - 143:15
**allow** [7] - 26:17, 67:25, 93:16, 126:16, 152:12, 155:3, 195:20
**allowed** [4] - 53:8, 137:15, 152:22, 176:19
**allowing** [1] - 157:10
**almost** [10] - 35:7, 49:16, 49:17, 50:7, 73:23, 74:6, 75:10, 134:4, 179:17
**alone** [1] - 176:5
**aloud** [7] - 77:6, 77:15, 77:19, 78:1, 81:16, 81:18,

88:6
**alphabet** [2] - 19:14, 20:22
**altered** [1] - 18:18
**altogether** [1] - 132:11
**amended** [1] - 170:24
**amending** [2] - 106:6, 108:8
**Amendment** [1] - 108:1
**Amendments** [22] - 105:5, 105:11, 105:18, 105:20, 105:23, 106:3, 107:4, 108:14, 108:19, 108:24, 110:3, 119:16, 119:19, 120:2, 123:16, 124:9, 127:5, 129:5, 170:25, 171:21, 188:23, 189:9
**amendments** [2] - 105:14, 124:11
**Americans** [1] - 106:1
**amount** [9] - 28:21, 143:13, 143:14, 144:22, 146:19, 149:3, 150:9, 157:22, 173:10
**analysis** [6] - 106:8, 108:10, 120:3, 123:11, 138:12, 171:5
**analyst** [1] - 158:10
**Ann** [2] - 1:22, 197:18
**annotated** [1] - 162:21
**answer** [38] - 27:11, 33:16, 40:14, 40:23, 44:9, 44:11, 63:8, 86:24, 87:2, 93:12, 96:14, 96:19, 96:23, 96:24, 97:2, 101:23, 102:17, 105:6, 108:16, 113:11, 128:17, 131:5, 137:3, 139:9, 140:11, 140:13, 143:16, 143:21, 145:23, 146:23, 146:24, 149:17, 150:3, 151:22, 152:6, 152:13, 158:18, 159:17
**answered** [13] - 43:17, 48:8, 62:10, 86:7, 143:19, 143:23, 144:22, 145:1, 151:12, 152:7, 152:10, 153:23, 157:25
**answering** [3] - 145:9, 145:18, 145:21
**answers** [13] - 44:13, 86:11, 86:16, 86:20, 86:22, 87:2, 141:20, 146:12, 146:18, 147:9, 159:3, 164:13
**anticipate** [3] - 48:23, 146:20, 185:19
**anticipated** [2] - 30:3, 120:17
**ants** [1] - 46:23
**anxiety** [1] - 111:20
**anxiety-provoking** [1] - 111:20
**apologies** [2] - 109:6, 182:13
**apologize** [10] - 16:22, 17:11, 19:25, 23:15, 31:2, 41:24, 45:12, 47:19, 69:12,

144:11
**appeal** [1] - 162:10
**appeals** [1] - 181:2
**appear** [1] - 40:4
**APPEARANCES** [2] - 1:14, 2:1
**appearing** [1] - 20:13
**applicable** [5] - 21:24, 49:24, 182:25, 183:3, 193:9
**applicant's** [1] - 136:7
**applicants** [2] - 66:8, 96:17
**application** [5] - 5:13, 90:13, 175:5
**applications** [1] - 80:10
**applied** [3] - 29:2, 55:9, 102:18
**applies** [4] - 101:10, 101:17, 101:18, 172:21
**apply** [2] - 189:21, 193:8
**applying** [1] - 172:12
**appreciated** [1] - 117:1
**approach** [2] - 6:21, 180:11
**appropriate** [5] - 7:24, 113:17, 186:17, 189:10, 194:3
**approve** [1] - 78:20
**approved** [2] - 77:14, 137:9
**approximation** [1] - 65:25
**aptitude** [3] - 101:4, 173:22, 177:19
**area** [9] - 4:13, 5:5, 42:20, 63:2, 128:15, 137:18, 159:10, 159:12, 159:13
**areas** [3] - 8:9, 32:18, 169:2
**argue** [1] - 160:19
**argues** [1] - 171:9
**argument** [2] - 160:24, 191:14
**arguments** [6] - 161:7, 161:10, 171:20, 172:9, 172:15
**arithmetic** [1] - 22:21
**arose** [1] - 26:25
**arrive** [1] - 22:23
**arrived** [4] - 22:6, 51:23, 52:1, 52:2
**arriving** [1] - 55:24
**article** [5] - 16:24, 62:3, 62:16, 62:20, 163:7
**articles** [6] - 9:12, 13:22, 13:25, 14:3, 17:2, 63:4
**aside** [3] - 31:24, 32:5, 33:7
**aspect** [2] - 112:21, 157:20
**assertion** [1] - 150:2
**assessing** [2] - 113:17, 125:10
**assessment** [11] - 5:2, 15:21, 22:23, 24:8, 32:5, 43:21, 47:13, 48:10, 49:5, 63:6, 178:23

**assessments** [16] - 12:13, 16:11, 21:18, 25:24, 27:2, 31:6, 31:24, 32:7, 33:8, 33:11, 37:7, 39:4, 43:17, 46:10, 49:8, 62:21
**assigned** [3] - 83:19, 83:21, 128:19
**assignments** [2] - 18:18, 111:18
**assistance** [37] - 36:6, 115:15, 115:19, 116:2, 116:4, 129:2, 129:4, 129:6, 129:9, 129:12, 129:16, 130:12, 130:14, 130:19, 131:1, 131:7, 131:10, 131:13, 132:1, 132:3, 132:13, 133:18, 172:4, 172:12, 176:21, 176:23, 177:4, 180:5, 180:20, 180:24, 181:2, 182:14, 182:19, 193:7, 193:11, 197:1
**Assistance** [1] - 133:8
**assume** [3] - 20:17, 135:13, 154:13
**assumed** [2] - 43:24, 62:18
**assure** [4] - 100:25, 103:2, 104:5, 195:6
**attached** [1] - 17:6
**attachment** [1] - 68:19
**attachments** [1] - 68:17
**attempt** [2] - 75:2, 79:9
**attempted** [2] - 26:21, 151:22
**attempting** [2] - 74:21, 101:21
**attention** [15] - 18:20, 34:18, 35:8, 60:23, 61:3, 61:4, 67:9, 67:18, 137:12, 159:14, 174:3, 184:18, 185:13, 185:17, 191:17
**attention-deficit/ hyperactivity** [2] - 67:18, 159:14
**attorney** [7] - 36:12, 36:17, 84:1, 84:2, 84:6, 102:1, 166:23
**attorneys** [2] - 84:8, 94:13
**audit** [6] - 66:17, 71:5, 73:1, 74:16, 83:17
**August** [2] - 127:3, 127:6
**author** [1] - 121:24
**automatically** [4] - 61:3, 83:24, 97:23, 97:24
**auxiliary** [1] - 103:5
**available** [7] - 10:6, 10:17, 88:20, 88:22, 93:2, 150:10, 155:5
**average** [23] - 24:19, 30:6, 30:11, 30:15, 31:4, 31:8, 32:12, 32:16, 49:6, 55:4,

59:4, 63:15, 63:16, 139:10, 143:14, 145:2, 145:6, 174:6, 184:3, 184:19, 184:20

**avoid** [3] - 17:13, 20:21, 25:14

**aware** [9] - 32:1, 32:6, 33:9, 106:13, 108:20, 108:25, 131:6, 139:11, 170:13

**awful** [1] - 49:12

**babysitter** [2] - 94:20, 94:25

**bachelor's** [2] - 65:7, 138:15

**background** [2] - 65:5, 138:14

**backwards** [1] - 153:10

**balanced** [1] - 115:25

**base** [1] - 62:20

**based** [30] - 15:6, 16:15, 22:4, 24:11, 28:7, 28:8, 28:9, 36:6, 54:21, 59:12, 66:19, 66:22, 67:5, 67:12, 77:8, 80:11, 83:21, 84:13, 84:14, 84:20, 84:23, 85:14, 95:19, 141:10, 179:1, 179:11, 183:5, 189:5, 194:16, 194:18

**basic** [8] - 33:19, 33:21, 33:25, 34:3, 86:4, 86:6, 184:21, 184:23

**Basic** [1] - 10:12

**basis** [5] - 34:24, 84:12, 87:14, 126:13, 191:7

**Bates** [1] - 168:3

**battery** [4] - 95:6, 95:13, 174:18, 175:24

**bear** [1] - 163:23

**bearing** [1] - 86:25

**BEFORE** [1] - 1:12

**began** [2] - 18:16, 52:17

**begin** [2] - 71:9, 96:9

**beginning** [4] - 91:3, 119:22, 127:11, 185:1

**begins** [4] - 66:7, 110:24, 112:6, 113:5

**behalf** [11] - 51:5, 64:1, 115:18, 129:24, 130:1, 130:7, 130:10, 168:1, 171:24, 181:7, 189:17

**behavior** [7] - 78:3, 81:18, 82:6, 146:15, 157:24, 164:21, 182:1

**behavioral** [2] - 111:6, 175:17

**behind** [3] - 77:22, 105:19, 120:2

**belabor** [1] - 182:8

**believes** [1] - 189:6

**below** [10] - 30:20, 32:13, 32:17, 32:18, 43:24, 45:7, 51:23, 55:4, 59:12, 116:2

**benefit** [2] - 182:2, 188:20

**Berger** [9] - 17:19, 33:14,

53:23, 62:7, 79:21, 80:7, 80:25, 167:4, 168:2

**BERGER** [72] - 1:16, 3:3, 26:5, 31:10, 33:5, 36:19, 37:24, 38:5, 38:17, 38:19, 38:22, 39:1, 47:19, 47:21, 53:24, 54:7, 61:19, 63:20, 64:2, 109:4, 140:23, 144:2, 145:5, 145:12, 146:2, 146:7, 146:21, 149:22, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:25, 160:13, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15

**best** [17] - 74:23, 91:16, 101:1, 101:13, 101:20, 102:18, 112:14, 116:3, 130:18, 135:12, 146:15, 155:1, 171:12, 173:19, 186:10, 186:12, 186:18

**better** [2] - 30:21, 30:25

**between** [10] - 15:13, 20:13, 52:6, 54:25, 76:6, 87:7, 92:8, 168:24, 193:21

**beyond** [2] - 103:22, 183:2

**Bibber** [1] - 189:14

**big** [2] - 87:7, 139:18

**biggest** [2] - 11:24, 12:2

**binder** [3] - 58:23, 99:7, 119:7

**binding** [1] - 182:23

**biology** [1] - 65:7

**birds** [1] - 44:21

**bit** [8] - 18:12, 51:7, 58:25, 59:2, 72:3, 84:17, 145:15, 154:23

**Black** [1] - 190:1

**blindly** [4] - 149:17, 150:3, 158:18, 159:2

**block** [20] - 76:14, 76:15, 139:7, 143:9, 147:18, 147:22, 148:21, 149:17, 150:3, 150:8, 152:6, 152:19, 152:20, 152:22, 153:14, 158:16, 165:17, 188:20

**blocks** [10] - 75:24, 76:1, 76:7, 139:5, 139:6, 147:25, 148:1, 148:3, 188:19

**BOARD** [1] - 1:5

**board** [2] - 21:11, 176:14

**Board** [11] - 64:21, 64:22, 85:18, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1

**boat** [1] - 41:11

**bold** [3] - 103:11, 103:13, 133:14

**bolded** [7] - 132:22, 133:4, 133:7, 133:9, 133:11, 133:22

**bolding** [1] - 134:2

**book** [5] - 45:1, 45:5, 50:23, 50:24, 196:20

**booklet** [3] - 42:25, 46:2, 46:3

**bottom** [2] - 6:24, 43:2

**box** [1] - 64:10

**boy** [3] - 17:17, 23:21, 47:14

**Bragdon** [1] - 180:25

**break** [14] - 26:10, 53:23, 53:25, 75:19, 75:25, 76:1, 76:4, 76:5, 76:6, 76:16, 118:7, 119:1, 119:5

**breaks** [4] - 18:19, 76:6, 77:7, 135:16

**Brendan** [2] - 79:21, 80:7

**brief** [6] - 3:3, 65:4, 138:13, 164:18, 191:15, 191:18

**briefed** [1] - 182:6

**briefing** [5] - 160:22, 160:25, 161:3, 161:4, 161:6

**briefly** [5] - 9:6, 24:21, 66:4, 181:10, 190:21

**briefs** [3] - 81:5, 161:5, 190:6

**bright** [1] - 180:13

**bring** [4] - 82:1, 118:5, 138:6, 157:2

**bringing** [3] - 81:22, 112:23, 182:2

**broad** [2] - 105:25, 171:7

**broaden** [1] - 110:18

**broadened** [3] - 108:2, 108:4, 188:24

**broken** [2] - 76:8, 139:5

**brought** [1] - 161:5

**bullet** [10] - 5:7, 5:19, 5:20, 120:6, 121:5, 121:19, 131:25, 132:2, 132:4, 136:12

**burden** [2] - 191:8, 191:11

**BURGOYNE** [89] - 2:10, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:20, 26:24, 31:16, 33:2, 33:6, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 38:7, 38:12, 38:15, 38:21, 39:2, 47:20, 47:22, 53:19, 61:21, 61:24, 63:17, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 112:10,

112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14, 122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:6, 144:9, 144:11, 144:12, 145:8, 145:16, 146:8, 147:4, 149:25, 150:12, 159:22, 160:3, 160:6, 160:9, 160:14, 161:2, 163:19, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3

**Burgoyne** [25] - 3:4, 26:6, 38:23, 58:11, 59:3, 60:8, 100:1, 100:5, 100:6, 100:13, 104:21, 109:21, 115:17, 121:6, 130:1, 130:6, 130:11, 130:25, 152:5, 158:15, 163:15, 169:18, 171:23, 181:5, 195:16

**Burgoyne's** [7] - 54:8, 109:17, 125:8, 129:23, 132:18, 194:16, 195:4

**business** [1] - 181:12

**Byrne** [1] - 1:8

**calculations** [3] - 120:17, 144:7, 144:20

**calendar** [2] - 71:24, 71:25

**candidate** [14] - 79:22, 80:16, 83:23, 92:17, 141:21, 142:15, 142:22, 143:4, 149:4, 157:23, 157:25, 178:14, 178:23, 179:2

**candidate's** [2] - 141:24, 178:17

**Candidates** [1] - 178:25

**candidates** [4] - 69:21, 142:1, 142:4, 145:23

**candy** [1] - 195:6

**cannot** [2] - 118:10, 151:11

**captioning** [1] - 191:22

**capture** [2] - 26:21, 141:10

**captured** [2] - 140:3, 186:3

**captures** [1] - 141:15

**card** [7] - 135:2, 165:1, 165:2, 165:3, 165:4, 182:1, 182:4

**cards** [11] - 10:5, 10:17, 11:23, 25:19, 34:9, 35:12, 35:18, 35:20, 35:23, 134:25, 186:3

**care** [3] - 7:8, 50:13, 52:19

**career** [1] - 195:21

**careful** [4] - 7:9, 7:11, 140:18, 179:1

**carefully** [1] - 97:22

**CAROLINE** [1] - 2:10

**CAROLLA** [1] - 1:15

**carrels** [1] - 77:22
**carry** [1] - 190:20
**case** [41] - 8:11, 10:18, 11:3, 13:21, 34:25, 54:23, 55:9, 55:10, 61:12, 62:24, 68:15, 74:23, 75:9, 76:10, 80:16, 81:1, 90:14, 94:15, 126:18, 139:12, 148:13, 149:14, 153:20, 160:4, 160:6, 161:21, 181:4, 183:14, 189:10, 189:14, 189:15, 189:20, 189:23, 190:2, 190:6, 190:9, 191:6, 191:20, 195:2, 196:1, 196:2
**cases** [3] - 26:16, 88:1, 191:18
**cat** [2] - 44:16, 47:14
**category** [2] - 35:23, 36:4
**CATHERINE** [2] - 64:11, 198:7
**Catherine** [2] - 64:14, 164:9
**Cathy** [1] - 64:7
**caused** [1] - 26:4
**cell** [1] - 182:15
**Center** [2] - 141:14, 142:2
**centers** [1] - 78:7
**Centers** [1] - 78:9
**central** [1] - 102:4
**certain** [7] - 14:19, 30:2, 43:23, 146:19, 171:14, 190:23, 190:25
**certainly** [11] - 26:20, 40:9, 49:16, 82:2, 126:7, 180:19, 181:5, 182:3, 182:4, 186:13, 190:24
**certified** [1] - 21:11
**certify** [1] - 197:14
**cetera** [2] - 5:11, 104:7
**challenges** [1] - 86:23
**challenging** [3] - 121:21, 122:12, 188:18
**chambers** [1] - 195:17
**chance** [3] - 170:10, 193:4
**change** [5] - 76:24, 105:12, 106:12, 123:23, 192:21
**changed** [2] - 105:10, 108:5, 123:25
**changes** [2] - 111:3, 121:10
**characterization** [2] - 95:25, 107:8
**characters** [1] - 20:14
**charge** [3] - 83:15, 83:16, 130:3
**Charles** [2] - 23:6, 24:3
**chart** [4] - 19:14, 20:22, 43:8, 169:23
**charts** [2] - 169:18, 170:2
**check** [7] - 3:20, 26:10, 38:22, 41:8, 57:7, 148:16, 196:11

**checklist** [1] - 50:15
**checklists** [1] - 49:22
**Chestnut** [1] - 1:16
**child** [2] - 99:1, 175:12
**childhood** [3] - 55:14, 55:17, 185:1
**children** [1] - 46:25
**choice** [10] - 21:23, 39:18, 86:3, 86:11, 86:16, 86:20, 86:22, 87:5, 195:1
**choices** [3] - 149:17, 150:4, 158:18
**choosing** [1] - 159:3
**chose** [3] - 88:18, 88:20, 88:22
**chosen** [2] - 182:3, 192:5
**chunks** [1] - 165:10
**Circuit** [1] - 188:10
**circulated** [1] - 36:11
**circumvent** [1] - 178:3
**cite** [4] - 114:5, 125:19, 126:2, 192:18
**cited** [3] - 81:4, 190:6, 191:18
**CIVIL** [1] - 1:3
**civil** [1] - 26:16
**clarification** [1] - 73:3
**clarify** [2] - 71:6, 167:4
**clarity** [1] - 74:15
**class** [1] - 18:19
**claw** [1] - 193:1
**clear** [9] - 52:25, 66:24, 72:3, 115:24, 159:4, 159:6, 171:18, 173:17, 191:7
**clearly** [5] - 34:3, 179:14, 179:15, 180:23, 193:9
**client** [4] - 10:3, 12:9, 174:20, 181:7
**client's** [1] - 187:6
**clients** [1] - 7:18
**clinical** [5] - 52:11, 65:8, 120:11, 120:24, 128:16
**clinically** [1] - 66:19
**clinicians** [1] - 62:18
**clock** [1] - 92:5
**closely** [2] - 11:14, 50:21
**cluster** [1] - 46:11
**clusters** [1] - 46:13
**cmew@perkinscoie.com** [1] - 2:13
**cognitive** [2] - 56:16, 57:15
**COIE** [1] - 2:9
**college** [5] - 25:18, 134:20, 135:2, 187:10, 190:4
**colleges** [2] - 187:15, 195:5
**collision** [1] - 193:21
**column** [10] - 41:7, 41:8, 140:4, 140:6, 140:11, 140:14, 140:15, 143:1,

143:8, 153:1
**columns** [1] - 140:10
**combination** [2] - 27:16, 46:10
**combined** [1] - 51:18
**coming** [5] - 7:23, 32:24, 32:25, 64:9, 74:11
**Commencing** [1] - 1:10
**comment** [6] - 50:8, 108:20, 108:24, 112:6, 115:9, 185:25
**comments** [9] - 10:6, 11:2, 11:18, 34:9, 36:14, 108:23, 110:1, 112:7, 185:22
**common** [13] - 20:18, 20:19, 26:15, 28:20, 58:4, 67:20, 84:24, 95:19, 95:21, 97:2, 110:21, 115:22, 147:22
**commonly** [1] - 20:16
**communicate** [5] - 119:1, 119:5, 122:22, 123:3, 186:1
**communicating** [1] - 180:16
**communications** [1] - 168:24
**company** [1] - 78:8
**comparable** [1] - 33:10
**compare** [5] - 6:14, 43:13, 50:19, 86:21, 94:18
**compared** [12] - 75:22, 105:13, 114:25, 128:20, 133:14, 133:23, 177:15, 183:13, 183:17, 189:2, 189:4, 189:22
**compelling** [1] - 189:20
**compensate** [1] - 18:20
**compensated** [1] - 8:11
**compensatory** [2] - 27:22, 27:24
**compilation** [1] - 37:25
**Complaint** [2] - 148:12, 163:25
**complaints** [1] - 52:9
**complete** [14] - 17:21, 40:16, 40:20, 43:25, 45:11, 68:2, 71:13, 111:17, 122:19, 146:14, 152:12, 173:6, 182:24, 197:5
**completed** [2] - 7:21, 76:15
**completeness** [1] - 74:15
**completing** [1] - 18:19
**complex** [1] - 193:24
**complexity** [1] - 193:22
**compliance** [4] - 64:21, 79:19, 105:7, 130:3
**comply** [3] - 129:2, 129:8, 129:12
**component** [2] - 56:16, 57:15
**comport** [1] - 105:18
**composite** [1] - 30:8
**comprehension** [8] - 18:21,

24:16, 24:19, 24:20, 39:15, 39:17, 43:11, 43:15
**comprehensive** [8] - 85:7, 87:20, 95:3, 96:12, 97:20, 174:18, 175:25, 194:19
**computer** [5] - 1:25, 28:7, 28:9, 140:16, 141:10
**computer-aided** [1] - 1:25
**computer-based** [3] - 28:7, 28:9, 141:10
**concentrate** [1] - 31:22
**concentrating** [2] - 111:13, 111:24
**concentration** [2] - 18:21, 174:5
**concept** [2] - 114:14, 145:17
**concerned** [3] - 48:19, 81:17, 111:4
**concerning** [1] - 150:23
**concerns** [1] - 42:16
**concluded** [6] - 21:18, 24:7, 99:3, 194:13, 194:18, 197:8
**conclusion** [7] - 22:24, 27:19, 64:4, 80:8, 80:11, 160:3, 180:18
**conclusions** [2] - 98:2, 98:4
**conclusively** [1] - 157:21
**concur** [1] - 7:14
**concurrently** [1] - 74:18
**condition** [3] - 15:5, 114:13, 174:11
**conditions** [3] - 133:15, 159:17, 174:23
**conduct** [5] - 85:6, 174:20, 174:24, 175:17, 179:12
**confident** [1] - 27:13
**confidential** [1] - 155:18
**confirm** [6] - 6:5, 40:2, 42:25, 45:14, 63:5, 68:11
**confirming** [1] - 19:17
**conflicts** [1] - 110:20
**confronted** [1] - 186:22
**confused** [2] - 15:12, 43:19
**Congress** [3] - 108:13, 171:2, 172:10
**Congress's** [1] - 110:18
**Congressional** [8] - 105:19, 105:21, 105:23, 106:6, 108:8, 120:1, 127:25, 172:1
**connected** [1] - 111:16
**connection** [4] - 24:22, 68:14, 126:14, 183:23
**Conners'** [2] - 60:8, 60:13
**consequence** [1] - 183:4
**consider** [3] - 12:16, 53:15, 53:18, 113:8, 113:18, 133:14, 149:5, 152:10, 170:14, 175:19, 176:20, 178:16, 189:11
**considerable** [6] - 7:2,

103:3, 103:18, 103:20, 103:23, 103:25
consideration [4] - 112:8, 115:7, 150:10, 179:1
considered [15] - 6:21, 17:20, 55:24, 56:6, 97:22, 113:16, 117:12, 127:24, 136:14, 136:15, 172:14, 172:15, 191:24, 194:21
considering [2] - 103:2, 179:14
consist [2] - 41:12, 43:22
consistent [11] - 22:21, 40:20, 95:22, 97:4, 97:7, 97:11, 148:24, 149:19, 150:2, 157:23, 176:11
consistently [3] - 18:17, 176:14, 194:20
consists [1] - 39:18
constitutes [1] - 67:16
constraints [2] - 96:15, 188:18
construction [1] - 110:16
construed [1] - 171:7
consult [1] - 55:17
consultant [5] - 67:1, 84:15, 84:16, 91:9, 91:14
consultant's [1] - 91:23
consultants [25] - 66:21, 91:7, 100:9, 100:10, 100:12, 100:15, 104:12, 104:16, 117:10, 119:12, 119:15, 119:23, 120:20, 121:12, 121:20, 122:22, 123:3, 123:7, 124:20, 125:1, 125:2, 128:3, 128:11, 163:10, 181:8
Consultants [1] - 99:25
contact [3] - 52:16, 52:18, 170:13
contain [1] - 166:23
contained [1] - 26:15
contains [2] - 140:2, 154:20
content [4] - 40:9, 96:15, 185:22, 191:22
context [12] - 14:15, 16:13, 38:20, 61:16, 96:10, 113:23, 131:4, 137:3, 180:6, 187:10, 187:16, 188:9
Continental [1] - 156:23
continually [1] - 172:9
continue [4] - 62:22, 62:25, 132:4, 157:13
CONTINUED [1] - 2:1
continuing [1] - 146:5
Continuous [2] - 48:13, 60:9
continuous [1] - 49:2
contrary [3] - 121:2, 181:3, 195:4
controlling [1] - 190:20
controversy [1] - 7:3

cookie [1] - 41:9
copied [1] - 26:7
copies [1] - 172:12
copy [7] - 18:8, 38:18, 94:10, 182:14, 196:25, 197:3, 197:5
copying [1] - 155:5
core [2] - 7:3, 61:7
correct [130] - 4:9, 8:12, 9:16, 11:16, 13:23, 17:14, 21:12, 22:10, 29:24, 31:19, 34:19, 36:12, 39:13, 41:17, 42:2, 44:10, 46:9, 46:19, 47:5, 48:2, 48:9, 53:3, 55:1, 55:10, 58:21, 59:4, 59:7, 59:8, 60:7, 61:13, 61:14, 63:7, 63:10, 70:17, 71:17, 71:24, 72:13, 72:16, 72:23, 73:8, 73:12, 75:14, 76:17, 77:13, 78:9, 78:12, 78:16, 81:25, 82:10, 82:23, 83:4, 83:5, 83:7, 83:8, 84:10, 84:24, 85:9, 86:5, 86:13, 90:25, 91:5, 91:7, 91:8, 91:19, 92:3, 92:4, 92:6, 92:7, 92:18, 92:21, 93:7, 93:9, 93:10, 94:16, 95:4, 95:17, 97:6, 97:9, 97:10, 98:11, 98:12, 106:4, 106:9, 107:6, 108:2, 108:12, 108:14, 109:24, 110:8, 110:9, 110:12, 113:21, 117:13, 119:16, 119:24, 120:4, 120:16, 120:18, 121:9, 121:10, 122:9, 122:10, 122:24, 123:14, 123:17, 127:9, 130:4, 130:7, 130:15, 132:25, 134:21, 135:12, 136:14, 136:16, 140:9, 140:12, 146:13, 147:10, 147:15, 148:7, 148:8, 151:6, 153:21, 154:12, 154:15, 156:6, 158:5, 158:6, 190:19, 197:14
corrected [2] - 26:22, 120:17
correctly [8] - 54:23, 79:18, 113:13, 143:19, 143:23, 144:22, 152:10, 153:12
correspond [1] - 38:1
Council [1] - 190:10
Counsel [11] - 31:14, 31:15, 80:20, 112:22, 117:13, 146:6, 152:13, 160:17, 161:16, 170:3, 182:11
counsel [9] - 38:2, 38:4, 92:17, 93:9, 112:23, 118:11, 119:1, 119:5, 121:6, 121:8, 122:8, 126:1, 156:8, 157:7, 157:15, 170:13, 186:20, 191:13, 197:6
count [2] - 8:20, 90:12

country [1] - 78:24
counts [1] - 60:20
couple [2] - 90:16, 146:11
course [8] - 10:4, 56:2, 80:10, 95:1, 101:17, 126:17, 172:2, 187:22
COURT [3] - 1:1, 64:13, 138:3
Court [7] - 1:22, 3:1, 81:3, 106:3, 180:25, 187:18, 197:18
court [5] - 9:2, 81:11, 109:5, 189:16, 191:3
Court's [1] - 191:17
Courthouse [1] - 1:8
courtroom [6] - 155:9, 170:23, 193:4, 194:2, 194:8, 196:22
courts [5] - 132:8, 132:9, 181:1, 189:9, 191:4
cover [1] - 149:23
coverage [4] - 105:25, 110:19, 171:8, 188:24
covered [3] - 3:7, 17:19, 61:15, 100:24, 103:1, 104:5, 158:3
created [1] - 117:22
credentials [1] - 181:21
credibility [1] - 181:25
credible [1] - 194:5
credit [1] - 80:14
criminal [1] - 26:16
criteria [9] - 6:2, 12:6, 13:6, 52:22, 53:5, 53:7, 184:6, 187:5, 187:19
critically [2] - 177:1, 178:20
criticized [1] - 116:11
Cross [1] - 198:4
cross [6] - 31:14, 79:13, 118:10, 146:4, 149:23, 192:20
CROSS [3] - 4:3, 79:14, 150:13
cross-examination [3] - 79:13, 118:10, 192:20
CROSS-EXAMINATION [3] - 4:3, 79:14, 150:13
cross-examine [1] - 31:14
CRR [2] - 1:22, 197:18
curiosity [1] - 157:14
current [1] - 53:1, 177:25, 178:19
cursory [1] - 29:1
CURTIS [1] - 1:12
cut [1] - 152:13
D-2 [1] - 23:22
D-3 [2] - 23:23, 23:24
daily [2] - 35:7, 185:17
Dalzell [2] - 189:14, 189:19
damn [1] - 182:5

data [45] - 80:11, 80:13, 80:14, 138:12, 140:2, 140:7, 141:10, 141:15, 141:17, 144:17, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 150:20, 150:22, 151:1, 152:2, 153:22, 153:25, 154:2, 154:5, 154:6, 154:10, 154:14, 154:20, 155:2, 155:14, 158:4, 158:5, 158:10, 158:11, 158:23, 158:24, 158:25, 159:4, 159:7, 168:16
database [7] - 154:4, 154:8, 154:9, 154:10, 154:20, 154:22, 158:11
date [10] - 24:8, 70:9, 74:2, 88:25, 90:12, 106:18, 119:10, 119:12, 154:13, 154:17
dated [8] - 18:3, 71:15, 72:8, 72:11, 72:21, 73:15, 109:14, 109:23
DAY [1] - 1:6
days [29] - 8:3, 18:16, 67:25, 68:4, 71:9, 71:23, 71:24, 71:25, 73:22, 74:4, 74:5, 75:20, 76:1, 76:3, 76:9, 89:2, 89:5, 89:8, 90:11, 90:13, 90:15, 90:22, 90:23, 91:22, 156:15, 156:16, 188:19, 191:1, 192:15
DC [2] - 2:5, 2:12
deadline [1] - 192:8
deaf [2] - 189:16, 191:20
deal [1] - 111:23
dealing [2] - 14:3, 104:17
dean [1] - 135:24
deans [1] - 135:20
December [5] - 1:10, 69:8, 69:16, 100:10, 119:14
decide [2] - 90:8, 91:22
decided [3] - 91:17, 190:10, 191:7
decides [1] - 101:22
decision [38] - 66:6, 66:20, 70:20, 71:21, 73:6, 73:19, 74:4, 74:10, 75:1, 81:10, 81:11, 83:9, 84:11, 84:14, 84:18, 84:20, 90:10, 90:14, 90:25, 92:2, 95:18, 95:22, 97:3, 97:4, 97:7, 97:11, 97:21, 128:16, 128:17, 161:25, 162:8, 162:9, 162:10, 163:1, 192:3
decisions [3] - 54:21, 92:13, 106:4
declaration [12] - 3:6, 17:6, 68:9, 68:14, 149:13, 150:2, 158:15, 158:17, 162:24,

164:3, 164:6, 164:9
**declines** [1] - 127:24
**decoding** [1] - 15:13
**dedicated** [1] - 93:15
**deducted** [1] - 48:4
**deep** [1] - 77:11
**deeper** [1] - 26:4
**Defendant** [2] - 1:6, 2:14
**defendant** [4] - 105:7, 118:11, 165:4, 180:22
**Defendant's** [19] - 41:24, 45:15, 48:6, 61:25, 148:9, 148:12, 163:24, 164:2, 164:5, 164:8, 164:13, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 169:17
**defendant's** [3] - 112:22, 164:14, 181:22
**defendants** [5] - 126:4, 155:11, 173:3, 178:1, 178:5
**Defense** [1] - 4:19
**defense** [8] - 64:6, 163:21, 170:18, 171:9, 179:13, 182:12, 196:8, 196:13
**defer** [12] - 97:20, 97:23, 98:2, 98:4, 98:9, 98:13, 98:16, 98:18, 98:21, 99:5, 171:9, 178:22
**deference** [6] - 132:7, 132:10, 132:17, 180:25, 181:1, 181:4
**deficiencies** [2] - 185:12, 185:13
**deficit** [3] - 61:3, 67:9, 137:12
**deficit/hyperactivity** [2] - 67:18, 159:14
**deficits** [3] - 32:2, 32:8, 33:10
**define** [1] - 33:18
**defined** [1] - 184:22
**defining** [1] - 117:25
**definitely** [1] - 117:3
**definition** [13] - 105:6, 105:10, 105:12, 107:5, 108:2, 108:4, 108:6, 114:17, 120:11, 120:12, 120:24, 171:6, 180:13
**degree** [3] - 65:7, 132:9, 138:17
**degrees** [1] - 138:15
**delay** [3] - 157:8, 191:3, 192:4
**deliberately** [3] - 12:3, 14:12, 14:16
**deliberations** [1] - 126:17
**delineating** [1] - 124:12
**delivers** [2] - 141:12, 141:13
**demand** [1] - 108:10, 171:5

**demanding** [6] - 106:8, 106:10, 108:11, 110:17, 120:5, 123:10
**demonstrate** [1] - 80:5
**demonstrated** [4] - 128:19, 136:22, 174:23, 188:15
**demonstrating** [1] - 146:15
**denial** [1] - 88:2
**denied** [3] - 73:25, 75:12, 80:3
**Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18
**deny** [10] - 67:2, 80:23, 83:9, 84:14, 84:18, 84:20, 91:17, 91:23, 92:3, 97:3
**denying** [3] - 74:7, 84:12, 90:20
**Department** [17] - 104:20, 108:20, 119:18, 125:4, 125:7, 125:13, 128:5, 129:8, 131:1, 131:7, 132:19, 163:15, 171:23, 172:14, 176:22, 180:9
**department** [3] - 127:15, 127:21, 127:24
**department's** [2] - 182:24, 182:25
**deposed** [1] - 28:15
**deposition** [42] - 9:1, 9:3, 9:4, 10:20, 11:8, 12:12, 13:21, 14:2, 14:3, 17:3, 22:4, 29:10, 29:12, 29:14, 29:18, 32:20, 32:23, 34:16, 80:22, 83:3, 83:6, 83:22, 84:23, 85:8, 85:14, 85:15, 86:2, 91:21, 95:2, 95:9, 95:14, 95:18, 96:1, 96:6, 106:2, 122:23, 123:2, 136:17, 157:1, 171:18, 192:19
**depressed** [1] - 55:7
**deputy clerk** [1] - 3:25
**describe** [2] - 8:4, 66:4
**described** [6] - 28:1, 28:2, 94:19, 110:11, 155:1, 185:13
**describing** [1] - 103:8
**description** [1] - 164:19
**designated** [1] - 116:21
**designed** [1] - 87:10
**desire** [1] - 183:23
**desk** [2] - 20:21, 77:2
**desks** [1] - 76:25
**despite** [2] - 22:11, 180:24
**detail** [1] - 131:4
**detailed** [1] - 75:5
**detect** [1] - 61:1
**Detect** [1] - 16:25
**detecting** [3] - 13:22, 14:3, 62:3

**determination** [12] - 80:23, 106:7, 108:9, 120:3, 126:18, 127:23, 128:13, 181:16, 185:11, 186:15, 194:4, 194:17
**determinations** [1] - 193:15
**determine** [8] - 126:17, 144:21, 158:16, 158:18, 158:23, 158:25, 178:18, 182:9
**determined** [5] - 71:12, 101:18, 124:7, 175:16
**determining** [7] - 96:13, 113:18, 114:15, 115:8, 128:6, 133:10, 133:12
**detriment** [1] - 94:15
**developed** [2] - 42:19, 111:7
**developmental** [4] - 6:6, 51:24, 52:3, 52:5
**deviate** [1] - 53:8
**deviating** [1] - 53:9
**devotes** [1] - 78:17
**devoting** [1] - 111:14
**diagnose** [4] - 9:15, 87:13, 180:7, 183:21
**diagnosed** [13] - 9:18, 13:3, 15:2, 51:14, 51:16, 51:18, 70:12, 98:24, 174:10, 184:1, 189:16, 193:18, 193:20
**diagnoses** [6] - 55:25, 67:20, 120:10, 120:23, 128:18, 174:12
**diagnosing** [2] - 6:13, 87:10
**diagnosis** [26] - 5:22, 7:24, 10:1, 16:14, 22:6, 23:2, 51:12, 51:23, 52:1, 52:9, 60:15, 87:17, 136:7, 137:12, 137:13, 174:13, 183:25, 184:5, 184:6, 184:9, 185:2, 187:12, 187:14, 187:18, 187:19, 194:7
**diagnostic** [20] - 6:22, 12:6, 12:19, 13:6, 14:14, 15:21, 15:24, 25:23, 26:3, 27:2, 31:18, 31:24, 32:5, 33:8, 33:11, 39:3, 52:22, 53:5, 61:8, 87:14
**Diagnostic** [2] - 5:21, 53:1
**difference** [4] - 49:20, 52:6, 87:7, 161:21
**different** [23] - 20:10, 42:6, 46:25, 48:23, 48:25, 51:16, 57:3, 80:12, 80:16, 80:17, 84:17, 111:19, 123:21, 124:2, 124:14, 176:9, 179:18, 181:14, 188:8, 189:7, 193:1
**differently** [2] - 105:4, 124:8
**difficult** [9] - 58:1, 58:2, 62:8, 62:11, 62:12, 62:13, 180:7,

189:20, 194:22
**difficulty** [3] - 86:22, 86:25
**DIRECT** [2] - 64:15, 138:9
**direct** [2] - 3:5, 87:16
**Direct** [1] - 198:4
**directed** [2] - 171:6, 179:18
**direction** [1] - 158:7
**directions** [1] - 46:20
**directly** [5] - 117:9, 121:2, 125:20, 181:3, 189:11
**director** [1] - 64:20
**directs** [1] - 180:5
**disabilities** [16] - 5:8, 6:13, 21:3, 62:4, 67:9, 80:1, 89:12, 93:16, 93:18, 111:15, 159:11, 174:4, 180:6, 180:19, 183:9, 194:24
**Disabilities** [2] - 16:25, 106:1
**disability** [60] - 22:7, 62:19, 64:20, 65:19, 67:19, 96:13, 100:10, 101:2, 101:14, 101:19, 101:21, 102:15, 102:19, 105:6, 105:11, 106:8, 107:5, 108:3, 108:5, 108:10, 112:3, 113:8, 113:17, 114:16, 114:17, 114:20, 115:8, 120:3, 120:12, 123:10, 124:7, 127:23, 128:7, 130:2, 130:3, 137:12, 171:4, 171:6, 171:13, 173:15, 173:20, 173:25, 174:13, 174:14, 174:17, 175:16, 175:21, 177:6, 177:9, 177:11, 180:14, 184:10, 186:13, 186:19, 189:8, 192:17, 195:3, 195:15, 195:19
**disability-related** [1] - 65:19
**disabled** [4] - 183:10, 183:11, 186:15, 186:16
**disagree** [1] - 95:6
**disagreed** [1] - 170:3
**disclose** [1] - 126:6
**disclosed** [1] - 126:6
**disclosure** [1] - 156:4
**discounted** [3] - 24:11, 24:13, 184:11
**discounts** [1] - 115:4
**discovery** [2] - 126:4, 155:12
**discrepancy** [9] - 6:17, 54:10, 54:12, 54:15, 54:25, 55:4, 55:5, 55:6, 55:10
**discretion** [2] - 89:1, 182:24
**discrimination** [1] - 192:5
**discuss** [7] - 20:20, 28:24, 36:8, 53:15, 53:18, 118:10, 166:4
**discussed** [11] - 18:12, 42:8, 58:14, 58:24, 59:2, 59:15, 59:22, 60:8, 130:7, 163:23,

192:19
**discusses** [2] - 6:6, 19:7
**discussing** [4] - 6:18, 88:6, 111:5, 125:16
**discussion** [10] - 3:19, 6:9, 20:12, 55:12, 56:11, 57:3, 58:21, 104:15, 114:8, 114:11
**diseases** [1] - 9:20
**disorder** [10] - 10:1, 15:3, 33:18, 49:1, 56:4, 58:5, 67:9, 67:18, 80:2, 159:14
**disorders** [1] - 5:4
**Disorders** [1] - 5:22
**dispute** [1] - 188:23
**disregard** [2] - 132:10, 171:17
**distance** [1] - 180:12
**distant** [1] - 192:8
**distinguishing** [1] - 20:13
**distractibility** [1] - 18:20
**distraction** [1] - 19:15
**distractions** [1] - 20:21
**distributed** [1] - 93:2
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 190:10
**divided** [1] - 93:6
**doctor** [3] - 92:5, 181:15, 182:5
**doctorate** [1] - 65:8
**doctors** [1] - 97:12
**document** [64] - 7:16, 8:1, 8:25, 19:3, 19:18, 20:2, 20:7, 20:11, 22:14, 26:5, 31:11, 34:8, 34:12, 37:3, 37:23, 37:24, 37:25, 38:8, 41:1, 44:2, 45:14, 46:5, 46:13, 51:11, 52:2, 68:12, 69:7, 70:18, 71:11, 72:20, 74:2, 102:23, 106:14, 106:18, 107:1, 107:13, 109:19, 110:14, 112:13, 113:22, 118:1, 122:15, 125:16, 125:18, 125:25, 126:24, 128:23, 128:24, 132:19, 133:22, 139:24, 140:1, 140:2, 144:3, 144:13, 158:14, 167:6, 172:7, 172:8, 182:20, 182:21, 182:22, 183:1
**documentation** [47] - 5:13, 66:9, 67:14, 71:7, 72:14, 72:24, 73:1, 73:23, 74:6, 78:21, 79:1, 80:5, 80:7, 80:9, 80:17, 84:15, 87:18, 91:3, 91:14, 97:17, 98:13, 98:16, 98:18, 98:21, 103:4, 103:21, 103:22, 103:25, 128:12, 128:18, 134:8, 136:15, 175:1, 178:15, 178:22, 178:25, 179:4, 179:5, 184:7,

184:12, 185:6, 188:2, 188:5, 192:12, 192:13, 192:20, 194:15
**documented** [1] - 111:21
**documents** [21] - 10:2, 20:6, 24:1, 24:2, 25:2, 25:15, 32:6, 34:16, 51:8, 66:12, 70:23, 70:24, 71:1, 126:3, 126:13, 162:17, 163:13, 168:4, 170:1, 182:25, 196:17
**dog** [1] - 47:14
**DOJ** [22] - 102:24, 111:4, 113:5, 113:8, 113:13, 115:6, 115:15, 115:18, 115:23, 116:1, 116:5, 116:11, 120:13, 120:16, 124:17, 129:16, 130:17, 130:20, 130:23, 133:18, 172:3
**DOJ's** [9] - 100:22, 110:16, 113:21, 114:8, 114:11, 123:8, 129:2, 132:1, 133:8
**don't..** [1] - 131:20
**done** [21] - 9:7, 14:5, 52:14, 59:16, 59:17, 59:20, 60:6, 60:11, 63:2, 63:3, 95:10, 98:22, 109:5, 130:24, 134:4, 160:6, 161:4, 175:23, 180:18, 183:22
**double** [10] - 62:12, 82:10, 82:19, 82:21, 103:24, 136:2, 173:8, 173:12, 181:15, 196:11
**doubt** [1] - 94:11
**down** [10] - 41:11, 44:12, 44:22, 63:18, 99:15, 113:4, 114:4, 120:6, 137:21, 159:23
**dozens** [1] - 74:18
**DR** [3] - 64:11, 198:5, 198:7
**Dr** [97] - 3:4, 4:5, 21:8, 21:11, 22:15, 23:3, 23:6, 24:22, 32:23, 39:11, 49:3, 50:20, 51:5, 54:8, 55:21, 55:23, 56:2, 59:16, 60:3, 60:5, 60:11, 61:25, 63:20, 64:7, 70:11, 70:12, 71:3, 71:4, 71:14, 72:15, 72:20, 72:25, 73:2, 73:5, 73:11, 73:14, 73:24, 74:1, 74:6, 79:16, 80:21, 83:14, 83:17, 87:20, 87:23, 88:1, 95:2, 95:15, 97:21, 98:2, 98:7, 98:9, 98:16, 98:19, 98:21, 99:1, 118:24, 126:22, 135:3, 135:7, 135:14, 135:20, 162:23, 163:13, 167:25, 168:1, 168:23, 169:13, 169:19, 171:18, 174:4, 174:15, 174:17, 175:4, 175:11, 175:13, 175:23, 176:9, 179:8, 179:9, 179:10,

183:18, 183:19, 184:4, 184:7, 184:15, 185:4, 185:6, 185:24, 187:13, 189:3, 190:14, 190:16, 192:18, 194:4
**drafts** [1] - 36:11
**draw** [1] - 191:17
**drawback** [1] - 60:24
**drawing** [1] - 180:17
**DSM** [8] - 51:12, 52:23, 52:25, 53:5, 55:3, 184:6, 185:2
**DSM-5** [5] - 5:21, 5:24, 6:2, 13:2, 187:19
**DSM-IV** [4] - 52:23, 52:25, 55:3
**due** [1] - 48:25
**duly** [2] - 64:11, 137:25
**duplicate** [2] - 65:22, 163:2
**duplicates** [1] - 155:5
**Duration** [3] - 142:24, 143:1, 143:11
**duration** [3] - 114:13, 140:15, 148:5
**during** [16] - 11:25, 29:9, 29:18, 62:6, 79:24, 81:20, 82:7, 119:1, 119:5, 126:17, 140:3, 140:12, 140:17, 142:22, 143:5, 168:7
**DVT** [1] - 88:7
**DX** [2] - 17:8, 35:11
**DX-1** [2] - 164:1, 199:2
**DX-10** [2] - 165:5, 199:9
**DX-11** [2] - 165:5, 199:10
**DX-12** [2] - 165:5, 199:11
**DX-13** [3] - 35:10, 165:5, 199:12
**DX-14** [2] - 165:6, 199:13
**DX-15** [2] - 165:6, 199:14
**DX-16** [2] - 165:23, 199:15
**DX-17** [2] - 165:23, 199:16
**DX-18** [2] - 165:23, 199:17
**DX-19** [2] - 165:23, 199:18
**DX-2** [2] - 164:4, 199:3
**DX-20** [2] - 165:23, 199:19
**DX-22** [2] - 166:10, 199:20
**DX-24** [2] - 166:10, 199:21
**DX-25** [2] - 166:10, 199:22
**DX-26** [2] - 166:10, 199:23
**DX-27** [3] - 58:22, 166:10, 199:24
**DX-28** [2] - 166:10, 199:25
**DX-29** [2] - 166:11, 200:1
**DX-3** [9] - 17:6, 17:14, 17:15, 17:16, 22:14, 56:20, 56:24, 164:7, 199:4
**DX-30** [2] - 166:11, 200:2
**DX-31** [2] - 166:11, 200:3
**DX-32** [2] - 166:11, 200:4

**DX-33** [2] - 166:11, 200:5
**DX-34** [2] - 166:11, 200:6
**DX-35** [2] - 166:11, 200:7
**DX-36** [2] - 166:11, 200:8
**DX-38** [2] - 166:15, 200:9
**DX-39** [2] - 166:15, 200:10
**DX-4** [6] - 19:1, 20:1, 20:3, 68:9, 164:10, 199:5
**DX-40** [3] - 42:23, 166:15, 200:11
**DX-41** [2] - 166:15, 200:12
**DX-42** [4] - 50:22, 50:23, 166:15, 200:13
**DX-46** [2] - 166:19, 200:14
**DX-48** [2] - 167:11, 200:15
**DX-49** [2] - 167:11, 200:16
**DX-50** [2] - 167:11, 200:17
**DX-51** [3] - 16:22, 167:11, 200:18
**DX-52** [2] - 167:11, 200:19
**DX-53** [2] - 167:11, 200:20
**DX-54** [2] - 167:12, 200:21
**DX-56** [2] - 167:17, 200:22
**DX-57** [2] - 167:17, 200:23
**DX-58** [2] - 167:17, 200:24
**DX-59** [2] - 167:17, 200:25
**DX-60** [2] - 167:17, 201:1
**DX-61** [2] - 167:17, 201:2
**DX-63** [2] - 168:11, 201:3
**DX-64** [2] - 168:11, 201:4
**DX-65** [2] - 168:11, 201:5
**DX-66** [2] - 168:11, 201:6
**DX-67** [2] - 168:11, 201:7
**DX-68** [2] - 168:11, 201:8
**DX-7** [2] - 164:15, 199:6
**DX-70** [2] - 168:20, 201:9
**DX-71** [2] - 168:20, 201:10
**DX-73** [2] - 169:8, 201:11
**DX-74** [2] - 169:8, 201:12
**DX-75** [2] - 169:8, 201:13
**DX-76** [2] - 169:8, 201:14
**DX-77** [2] - 169:8, 201:15
**DX-78** [2] - 169:8, 201:16
**DX-79** [2] - 169:9, 201:17
**DX-8** [2] - 165:5, 199:7
**DX-80** [2] - 169:9, 201:18
**DX-85** [2] - 169:15, 201:19
**DX-86** [2] - 170:16, 201:20
**DX-87** [2] - 170:16, 201:21
**DX-9** [2] - 165:5, 199:8
**dysfunction** [1] - 12:8
**dyslexia** [32] - 5:3, 6:6, 6:13, 9:16, 20:17, 20:18, 20:19, 31:18, 33:18, 56:9, 57:25, 58:3, 58:7, 59:17, 62:8, 62:13, 67:19, 83:4, 84:9, 87:11, 87:14, 95:21, 148:20, 175:14, 176:12, 183:22, 184:22, 189:6, 189:16,

193:17
**dyslexic** [1] - 27:17
**early** [10] - 13:4, 13:9, 55:14, 56:5, 56:7, 98:23, 99:2, 175:2, 180:8, 189:16
**earned** [1] - 65:6
**easier** [1] - 165:14
**Eastern** [1] - 190:10
**EASTERN** [1] - 1:1
**easy** [3] - 56:9, 57:25, 58:10
**eat** [1] - 44:22
**Edition** [1] - 23:1
**education** [7] - 22:22, 65:7, 103:8, 138:16, 164:25, 180:8, 191:3
**educational** [8] - 15:18, 65:4, 96:12, 127:14, 127:20, 138:13, 184:16, 186:25
**educator** [1] - 135:4
**educators** [1] - 134:22
**effect** [6] - 120:22, 123:17, 123:21, 124:9, 125:6, 182:23
**effort** [15] - 14:12, 15:22, 27:20, 27:21, 28:3, 41:5, 42:17, 48:22, 49:1, 57:8, 57:22, 75:5, 114:24, 177:14, 180:17
**eight** [1] - 75:23
**eight-hour** [1] - 75:23
**either** [16] - 8:21, 12:3, 18:10, 28:3, 60:3, 72:3, 77:22, 81:22, 95:25, 111:3, 126:10, 144:7, 144:21, 176:18, 185:20, 193:5
**electronic** [1] - 141:10
**elementary** [7] - 10:9, 19:10, 25:19, 98:23, 99:2, 175:2, 176:5
**eligibility** [2] - 88:18, 88:23
**eligible** [1] - 172:20
**email** [2] - 122:4, 122:22
**emails** [4] - 121:12, 121:21, 122:11, 169:12
**emphasized** [1] - 133:4
**employees** [2] - 78:11, 78:14
**employment** [1] - 38:20
**enacted** [1] - 20:23
**end** [19] - 45:5, 97:25, 120:15, 146:14, 147:18, 147:21, 147:22, 149:15, 150:7, 152:6, 152:19, 152:20, 153:14, 153:17, 189:18, 189:20, 190:19, 195:9, 195:21
**ends** [1] - 44:2
**enforceable** [1] - 183:1
**ensure** [11] - 101:1, 101:13, 101:20, 102:18, 105:25, 173:19, 186:12, 186:18, 188:13, 194:11, 194:12

**ensured** [1] - 186:10
**ensuring** [1] - 171:12
**enter** [1] - 148:22
**entered** [1] - 64:4
**entertain** [2] - 26:17, 160:7
**entire** [4] - 113:22, 121:2, 145:21, 172:7
**entirety** [1] - 178:17
**entities** [15] - 110:24, 111:2, 115:18, 115:23, 116:5, 127:15, 127:21, 130:17, 130:22, 178:16, 178:21, 179:3, 183:6, 186:11
**entitled** [8] - 16:24, 132:7, 132:17, 177:7, 180:25, 183:9, 188:12, 197:15
**entitlement** [2] - 185:11, 188:16
**entity** [8] - 100:24, 103:1, 103:3, 104:4, 104:6, 177:18, 179:4
**enumerating** [1] - 105:15
**environment** [3] - 104:22, 104:24, 188:21
**environments** [1] - 186:24
**Enzi** [1] - 106:22
**equally** [1] - 93:3
**equation** [1] - 175:19
**equitable** [1] - 93:17
**errors** [1] - 58:9
**especially** [1] - 172:21
**ESQUIRE** [5] - 1:16, 2:3, 2:3, 2:10, 2:10
**establish** [4] - 140:24, 146:3, 183:1, 189:1
**established** [1] - 122:14
**estimate** [1] - 120:13
**et** [2] - 5:11, 104:7
**evaluate** [10] - 6:1, 9:25, 14:10, 14:11, 15:10, 15:15, 21:25, 41:4, 56:3, 190:18
**evaluated** [11] - 5:15, 5:17, 21:2, 21:14, 50:20, 117:11, 128:4, 172:6, 181:8, 190:15, 190:17
**evaluates** [2] - 129:9, 129:17
**evaluating** [10] - 11:10, 11:12, 12:5, 12:14, 55:24, 66:5, 78:18, 132:14, 186:12, 190:12
**evaluation** [30] - 4:8, 4:14, 6:6, 6:22, 11:13, 11:16, 17:5, 17:22, 18:24, 19:19, 21:7, 22:5, 22:15, 24:6, 24:12, 27:7, 29:16, 29:21, 32:9, 36:11, 61:8, 73:2, 79:4, 85:7, 95:3, 96:13, 97:20, 184:14, 187:13, 194:19
**evaluations** [13] - 5:12, 7:8, 10:2, 27:5, 79:4, 82:23, 83:1,

87:21, 87:24, 98:22, 136:5, 144:21, 179:1
**evaluators** [1] - 194:15
**even-handedly** [1] - 194:8
**evening** [1] - 157:7
**event** [1] - 31:4
**events** [1] - 49:7
**eventually** [2] - 26:9, 165:9
**everywhere** [1] - 32:16
**evidence** [41] - 3:7, 3:8, 13:9, 13:13, 112:14, 126:1, 156:18, 160:4, 161:6, 161:11, 162:13, 162:25, 163:4, 163:8, 163:17, 164:1, 164:4, 164:7, 164:10, 164:15, 165:6, 165:24, 166:12, 166:16, 166:19, 167:12, 167:18, 168:12, 168:20, 169:9, 169:15, 169:23, 170:16, 183:14, 183:18, 184:24, 185:9, 186:9, 196:2, 196:18
**evidentiary** [1] - 191:10
**exact** [3] - 38:18, 132:16, 154:17
**exactly** [8] - 38:13, 75:15, 75:21, 107:4, 120:19, 123:18, 170:24, 180:4
**exaggerate** [2] - 14:12, 14:18
**exaggerating** [1] - 14:16
**exam** [46] - 4:9, 5:16, 12:21, 12:25, 28:22, 28:25, 31:7, 31:11, 41:12, 41:16, 75:25, 76:1, 76:10, 78:24, 79:7, 81:23, 86:5, 87:3, 88:20, 88:22, 89:1, 89:15, 96:23, 101:20, 102:20, 139:3, 139:12, 140:7, 141:18, 143:17, 146:14, 146:16, 147:5, 147:11, 147:20, 151:17, 153:17, 177:20, 183:17, 183:24, 185:22, 187:1, 187:3, 188:18, 188:19, 190:25
**examination** [35] - 65:15, 66:13, 75:23, 79:13, 81:20, 100:18, 100:24, 100:25, 101:1, 101:3, 101:5, 101:8, 102:22, 103:1, 104:5, 118:10, 142:2, 150:24, 151:2, 151:9, 151:10, 151:19, 151:23, 154:12, 154:16, 155:5, 155:13, 155:15, 159:17, 163:14, 173:19, 173:21, 173:23, 174:16, 192:20
**EXAMINATION** [8] - 4:3, 54:6, 61:23, 64:15, 79:14, 137:6, 138:9, 150:13
**examinations** [2] - 173:18,

189:25
**examine** [3] - 31:14, 59:20, 157:15
**examined** [6] - 64:12, 97:12, 98:11, 138:1, 163:13, 171:10
**Examinee** [1] - 140:11
**examinee** [4] - 78:21, 140:19, 141:18, 188:17
**examinee's** [1] - 141:11
**examinees** [12] - 67:5, 67:23, 77:24, 79:6, 79:10, 81:21, 92:11, 92:14, 102:21, 139:9, 145:17, 188:17
**EXAMINERS** [1] - 1:6
**examiners** [1] - 132:16
**Examiners** [6] - 64:23, 106:16, 110:11, 138:22, 183:7, 190:2
**example** [8] - 14:21, 29:20, 82:12, 86:4, 114:19, 152:5, 177:10
**examples** [3] - 15:10, 15:24, 134:8
**exams** [17] - 29:20, 33:21, 58:11, 78:7, 103:16, 103:24, 111:19, 134:16, 134:18, 139:1, 139:2, 171:16, 177:18, 177:25, 183:7, 186:12, 188:9
**Excel** [2] - 140:2, 159:7
**except** [1] - 101:7
**exception** [1] - 157:11
**exceptions** [2] - 157:12, 179:16
**excerpt** [1] - 163:16
**excerpts** [1] - 162:16
**exchanging** [1] - 116:25
**exclusive** [2] - 20:19, 58:7
**excuse** [1] - 112:15
**excused** [4] - 63:21, 63:23, 159:24
**executive** [1] - 171:25
**exercise** [1] - 116:25
**exercising** [1] - 42:17
**exhibit** [41] - 3:6, 17:24, 23:11, 23:12, 26:11, 26:15, 38:16, 99:7, 99:11, 100:20, 104:11, 107:12, 107:13, 107:15, 109:1, 117:12, 117:19, 118:4, 119:7, 119:8, 121:14, 151:6, 152:24, 153:1, 153:20, 153:25, 154:3, 154:4, 154:25, 155:10, 155:23, 157:6, 157:10, 158:5, 158:7, 162:3, 165:19, 168:16, 194:1, 196:20
**Exhibit** [59] - 3:12, 4:19, 6:4, 7:16, 16:21, 19:24, 23:16, 23:19, 41:24, 45:15, 48:6,

51:4, 56:20, 62:1, 68:9, 70:11, 70:15, 72:5, 72:14, 73:17, 99:8, 99:17, 116:19, 117:10, 119:7, 126:22, 128:25, 131:21, 139:22, 148:9, 148:12, 149:10, 150:16, 162:25, 163:4, 163:8, 163:24, 164:1, 164:2, 164:4, 164:5, 164:7, 164:8, 164:10, 164:13, 164:15, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 166:19, 168:14, 168:21, 169:15, 175:4

**Exhibit's** [1] - 165:4
**exhibited** [1] - 174:24
**exhibits** [20] - 38:1, 64:4, 116:21, 116:22, 116:25, 160:4, 160:18, 161:13, 161:17, 162:14, 163:25, 164:3, 164:6, 164:9, 165:16, 166:25, 169:6, 196:8
**Exhibits** [14] - 162:12, 163:17, 165:5, 165:23, 166:10, 166:15, 167:11, 167:17, 168:11, 168:13, 168:20, 169:8, 169:18, 170:16
**expect** [2] - 102:20, 145:10
**expectation** [1] - 59:12
**expected** [5] - 15:6, 32:14, 32:17, 57:20, 58:10
**expedite** [1] - 26:8
**expedited** [1] - 126:13
**experience** [9] - 10:24, 34:20, 88:13, 88:15, 151:19, 159:10, 159:13, 159:16, 185:24
**experienced** [3] - 13:3, 16:16, 184:17
**experiencing** [2] - 20:12, 184:25
**expert** [7] - 67:3, 83:3, 83:7, 84:15, 179:7, 179:15, 194:7
**expert's** [1] - 180:2
**expertise** [5] - 84:9, 128:15, 128:16, 159:12, 194:18
**experts** [4] - 66:22, 185:10, 189:18, 194:6
**explain** [4] - 58:1, 75:21, 140:14, 140:18
**explained** [2] - 57:6, 194:10
**explanation** [2] - 75:3, 178:3
**explicitly** [3] - 125:3, 125:7, 171:24
**extended** [18] - 5:6, 18:17, 73:24, 79:6, 79:23, 84:12, 84:19, 84:20, 88:2, 97:3, 97:5, 97:9, 103:15, 136:1, 173:8, 173:11, 181:20, 189:6

**extensive** [6] - 106:8, 108:10, 112:7, 123:10, 171:5, 194:19
**extent** [7] - 36:19, 53:16, 113:1, 167:2, 168:25, 169:3, 171:8
**external** [7] - 14:19, 66:21, 67:3, 71:16, 185:10, 189:24, 194:15
**External** [1] - 121:18
**externals** [1] - 190:8
**extra** [9] - 19:15, 32:1, 74:7, 75:12, 77:7, 111:17, 135:16, 186:6
**extract** [1] - 155:2
**extraordinary** [2] - 181:11, 181:21
**eyes** [1] - 180:10
**F-A-R-M-E-R** [1] - 64:14
**facilitate** [1] - 111:16
**fact** [32] - 16:5, 22:11, 23:6, 30:8, 36:17, 42:1, 44:2, 55:9, 55:12, 55:13, 56:4, 57:21, 61:6, 82:25, 84:23, 103:15, 103:23, 116:22, 118:6, 121:2, 130:10, 145:20, 158:3, 169:25, 178:6, 180:24, 181:10, 183:6, 183:15, 186:23, 187:22, 190:17
**factor** [2] - 101:5, 173:22
**factors** [1] - 101:8
**facts** [2] - 75:9, 111:17
**factual** [1] - 34:24
**faculty** [1] - 135:8
**fail** [6] - 61:1, 173:14, 190:25, 192:10, 192:11
**failed** [1] - 125:25
**fails** [1] - 187:5
**fair** [8] - 78:17, 79:10, 85:11, 85:14, 112:6, 113:24, 181:19, 188:17
**fairly** [6] - 67:20, 76:23, 85:12, 85:16, 85:24, 86:4
**fake** [6] - 56:9, 57:18, 57:24, 57:25, 58:8, 62:8
**fall** [2] - 4:7, 37:15
**false** [2] - 47:4, 61:10
**familiar** [14] - 28:16, 28:18, 35:18, 94:4, 107:2, 124:21, 129:22, 130:6, 133:18, 141:4, 142:1, 142:4, 145:17
**familiarity** [3] - 50:11, 112:11, 151:8
**family** [2] - 50:6, 50:7
**far** [4] - 59:24, 110:18, 111:14, 165:8
**Farmer** [1] - 64:7, 64:14, 64:17, 79:16, 80:21, 118:9, 118:24, 126:23, 163:14,

164:9, 171:19
**FARMER** [2] - 64:11, 198:7
**Farmer's** [1] - 192:18
**fashion** [1] - 185:14
**fast** [2] - 16:3, 16:4
**faster** [2] - 164:16, 165:11
**faults** [1] - 116:1
**favor** [1] - 171:7
**Featherstone** [3] - 191:19, 192:1
**February** [2] - 162:9, 163:2
**Federal** [5] - 117:8, 125:19, 126:2, 127:2, 163:16
**feedback** [1] - 36:15
**feign** [3] - 62:8, 62:13, 62:19
**Feigned** [1] - 16:25
**feigned** [1] - 62:4
**few** [14] - 25:13, 89:8, 92:16, 119:22, 123:6, 127:12, 151:24, 156:15, 156:16, 163:22, 176:24, 182:3, 192:14, 192:15
**fiancé** [3] - 13:19, 175:13, 185:3
**fifth** [4] - 35:5, 35:13, 113:4, 120:6
**Fifth** [1] - 23:1
**file** [9] - 66:18, 75:7, 83:12, 83:13, 83:14, 83:23, 84:5, 91:10, 122:8
**filed** [2] - 148:13, 192:2
**fill** [3] - 7:19, 66:10, 66:11
**filled** [2] - 12:10, 12:23
**final** [10] - 71:11, 77:5, 90:14, 119:19, 120:16, 127:4, 127:6, 170:1, 171:25, 182:22
**finally** [5] - 63:11, 70:20, 163:12, 184:11, 193:12
**finder** [1] - 169:25
**fine** [10] - 26:7, 37:17, 112:21, 112:25, 159:9, 164:20, 182:17, 187:19, 197:7
**finger** [1] - 195:13
**finish** [1] - 45:4
**finished** [1] - 152:14
**firm** [2] - 100:5, 109:18
**first** [61] - 4:24, 5:7, 7:2, 9:15, 18:16, 20:11, 20:16, 23:3, 25:8, 27:3, 27:13, 29:4, 39:3, 43:14, 43:15, 44:16, 46:14, 46:17, 47:13, 47:14, 48:20, 52:3, 59:25, 71:23, 76:10, 83:18, 88:20, 88:22, 90:7, 90:8, 90:12, 100:2, 101:18, 105:22, 110:16, 113:11, 119:8, 119:9, 119:10, 127:12, 131:25, 132:2, 132:4, 147:20, 151:12,

154:25, 155:11, 160:8, 164:14, 164:23, 171:19, 174:10, 175:5, 175:13, 183:21, 183:25, 187:9, 191:24
**fits** [1] - 74:17
**five** [7] - 53:10, 76:11, 76:13, 86:11, 148:1, 148:3
**fix** [1] - 105:22
**flipping** [1] - 58:6
**Florida** [1] - 190:2
**fluency** [8] - 16:2, 43:11, 43:15, 45:22, 46:8, 46:16, 47:8
**focus** [6] - 114:17, 124:17, 125:2, 125:8, 174:6, 174:7
**focuses** [1] - 138:19
**folder** [1] - 139:16
**folks** [3] - 74:22, 78:25, 84:7
**follow** [4] - 129:16, 131:17, 136:24, 159:8
**follow-on** [1] - 159:8
**follow-up** [1] - 136:24
**following** [4] - 111:4, 114:15, 116:13, 149:14
**follows** [4] - 64:12, 132:13, 138:1, 182:21
**forced** [1] - 149:17
**foregoing** [1] - 197:14
**forget** [1] - 196:21
**forgive** [1] - 84:4
**form** [9] - 7:18, 7:21, 51:4, 67:25, 69:13, 69:14, 70:15, 162:19, 185:14
**formal** [4] - 19:21, 111:10, 111:21, 178:13
**formally** [1] - 3:5
**format** [3] - 40:5, 111:19, 158:11
**formats** [1] - 28:20
**former** [1] - 109:18
**forms** [3] - 36:4, 66:10, 66:15
**forth** [1] - 25:14
**forward** [4] - 81:2, 172:10, 195:8, 195:10
**foundation** [12] - 95:25, 140:23, 140:24, 142:9, 144:4, 144:11, 145:13, 146:2, 146:3, 146:21, 149:22, 186:25
**four** [11] - 47:12, 76:12, 86:10, 86:22, 87:5, 89:17, 90:5, 147:8, 147:10, 148:3, 195:9
**fourth** [6] - 5:5, 35:5, 35:13, 45:18, 121:19, 165:3
**frame** [1] - 94:9
**frequent** [2] - 18:18, 147:19
**frequently** [5] - 6:21, 16:16, 55:6, 61:6, 193:20

**front** [1] - 7:23
**Fulbright** [2] - 100:3, 109:16
**full** [4] - 15:22, 20:12, 96:10, 122:2
**fully** [1] - 172:7
**function** [2] - 57:16, 111:23
**functioning** [2] - 27:15, 56:17
**furthermore** [1] - 178:12
**future** [3] - 54:21, 181:15, 182:5
**GAO** [1] - 130:11
**gather** [1] - 60:19
**general** [21] - 24:17, 24:18, 36:9, 49:9, 49:18, 49:21, 56:17, 59:19, 60:5, 60:25, 105:14, 114:25, 122:16, 133:15, 133:23, 155:14, 177:16, 183:13, 183:17, 189:2, 189:5
**generally** [13] - 29:2, 50:10, 50:14, 55:16, 59:22, 91:13, 94:6, 132:8, 166:24, 166:25, 168:23, 177:23, 179:4
**genuine** [2] - 57:8, 57:22
**gifted** [2] - 180:7, 193:20
**given** [12] - 29:5, 65:20, 66:3, 95:15, 117:19, 141:24, 154:16, 157:22, 180:3, 181:1, 181:24, 190:15
**GLENN** [2] - 137:25, 198:8
**Glenn** [1] - 138:5
**GMAT** [1] - 5:11
**Goldberg** [5] - 71:3, 71:4, 73:5, 83:14, 83:17
**GORT** [5] - 16:7, 16:10, 42:22, 43:13, 59:23
**GORT-5** [5] - 16:9, 42:25, 43:10, 43:11
**Government** [1] - 116:11
**government** [1] - 39:25
**grade** [10] - 7:11, 40:19, 58:24, 164:23, 164:24, 165:2, 165:3, 184:3, 185:15, 193:19
**graded** [1] - 176:5
**grades** [14] - 10:5, 11:18, 34:22, 35:5, 35:13, 36:5, 69:24, 124:19, 125:2, 125:9, 127:22, 128:6, 171:15, 186:5
**grading** [1] - 18:18
**graduate** [1] - 191:3
**graduates** [2] - 40:12, 40:16
**GRAN** [1] - 1:15
**grant** [5] - 66:23, 75:6, 75:15, 79:5, 193:5
**granted** [10] - 75:11, 75:19, 77:5, 82:13, 88:5, 88:7, 88:10, 172:24, 173:3, 192:3
**granting** [2] - 75:4, 81:15

**grants** [2] - 82:10, 193:5
**Gray** [2] - 16:4, 16:7
**GRE** [2] - 5:11, 189:12
**great** [3] - 49:12, 188:8, 194:21
**greater** [2] - 39:14, 49:22
**grounds** [2] - 154:25, 167:5
**group** [3] - 66:16, 96:16, 158:10
**growing** [1] - 8:2
**guarantee** [1] - 172:20
**guess** [11] - 16:15, 50:23, 80:12, 90:12, 92:25, 112:17, 144:4, 146:10, 147:21, 168:3, 174:20
**guesses** [2] - 148:22, 159:2
**guessing** [5] - 113:25, 146:16, 146:17, 147:17, 157:23
**guidance** [10] - 116:12, 132:10, 132:11, 172:5, 182:14, 182:16, 182:22, 182:25, 183:5, 186:7
**guidelines** [1] - 66:9
**Haddonfield** [1] - 1:17
**half** [5] - 76:2, 76:3, 130:21, 187:13, 188:19
**halfway** [1] - 114:4
**hand** [4] - 25:2, 186:2, 188:11, 188:25
**handed** [1] - 43:8
**handedly** [1] - 194:8
**handle** [2] - 93:8, 94:13
**handout** [2] - 34:12, 37:2
**hands** [1] - 169:17
**handwriting** [4] - 46:5, 47:23, 126:6, 141:1
**happy** [5] - 26:21, 96:1, 96:4, 126:6, 141:1
**hard** [3] - 57:24, 69:14, 181:18
**Harkins** [1] - 106:21
**harm** [5] - 190:22, 191:2, 191:3, 191:5, 192:6
**harmed** [1] - 192:25
**hate** [1] - 182:15
**head** [1] - 121:11
**headed** [1] - 133:8
**heading** [2] - 121:17, 131:25
**health** [1] - 65:7
**Health** [1] - 191:19
**Healy** [1] - 190:6
**hear** [9] - 79:18, 145:5, 153:12, 161:7, 161:10, 162:2, 170:20, 178:5, 188:4
**heard** [10] - 144:5, 151:24, 171:1, 174:4, 178:1, 178:2, 187:11, 187:18, 189:3, 193:12
**HEARING** [1] - 1:6
**hearing** [13] - 79:25, 116:22,

117:1, 117:19, 126:14, 157:3, 161:6, 162:2, 165:22, 168:8, 183:5, 192:3, 195:18
**held** [4] - 108:20, 181:2, 189:10, 191:4
**help** [5] - 14:22, 38:8, 38:20, 51:7, 56:21
**helpful** [5] - 60:14, 66:9, 95:19, 161:3, 161:4
**helps** [2] - 77:19, 169:24
**herself** [2] - 76:20, 194:2
**hesitation** [1] - 186:23
**hide** [1] - 194:24
**high** [15] - 5:9, 9:8, 25:18, 40:12, 40:15, 69:24, 96:16, 114:20, 115:5, 115:7, 135:2, 177:11, 177:25, 184:18, 190:4
**high-stakes** [3] - 5:9, 9:8, 177:25
**higher** [3] - 30:18, 49:15, 186:21
**highest** [1] - 191:10
**highlight** [1] - 176:24
**highly** [1] - 179:15
**hire** [2] - 93:25, 94:12
**hired** [1] - 93:19
**hiring** [2] - 93:21, 93:23
**historically** [1] - 175:12
**histories** [1] - 7:11
**history** [25] - 10:3, 11:5, 12:7, 18:13, 25:3, 25:9, 25:13, 27:16, 51:24, 52:3, 52:5, 52:7, 52:8, 54:16, 60:20, 136:7, 136:9, 172:1, 177:5, 177:8, 178:17, 178:18, 184:16, 185:8, 187:23
**hold** [2] - 38:10, 56:24
**holidays** [1] - 111:15
**home** [4] - 4:22, 8:17, 8:20
**homework** [1] - 111:18
**Honor** [87] - 3:3, 3:10, 4:2, 23:13, 25:5, 26:5, 26:20, 37:14, 37:20, 38:7, 39:1, 41:24, 53:19, 61:21, 63:17, 63:21, 64:2, 81:4, 81:10, 81:12, 85:1, 95:24, 99:10, 99:12, 101:15, 102:1, 102:7, 107:8, 107:14, 112:10, 112:15, 112:20, 112:24, 116:10, 116:20, 116:24, 118:14, 118:18, 118:22, 122:14, 125:15, 134:4, 137:16, 137:19, 137:23, 141:1, 142:8, 142:11, 144:2, 144:9, 150:12, 154:24, 155:3, 155:10, 157:4, 157:9, 159:22, 160:3, 160:13, 160:23, 161:2, 161:18,

163:22, 166:2, 166:24, 168:8, 168:22, 169:3, 169:16, 169:22, 170:9, 170:19, 170:21, 173:7, 178:2, 180:4, 181:11, 182:13, 187:8, 188:22, 190:21, 191:6, 191:12, 195:23, 196:5, 196:10, 196:23
**HONORABLE** [1] - 1:12
**hope** [4] - 82:2, 171:18, 173:13, 195:25
**hoped** [2] - 116:5, 130:23
**hopefully** [1] - 25:14
**hopes** [1] - 146:13
**hotel** [1] - 8:19
**hour** [9] - 8:14, 8:22, 75:23, 75:24, 76:3, 187:13, 188:19, 188:20
**hours** [3] - 76:11, 76:12
**house** [2] - 44:19, 66:14
**Houtman** [3] - 135:3, 135:7, 135:14
**hundreds** [2] - 74:18, 92:10
**hyperactive** [1] - 51:20
**hyperactivity** [2] - 18:22, 53:12
**idea** [2] - 11:6, 29:1
**identified** [7] - 32:3, 33:10, 38:2, 50:17, 51:8, 53:10, 53:12
**identify** [2] - 6:24, 186:17
**IEP** [1] - 103:8
**III** [2] - 45:12, 45:19
**imagine** [2] - 21:23, 133:6
**immediate** [1] - 190:23
**immediately** [1] - 155:24
**impact** [3] - 41:22, 111:8, 111:22
**impaired** [8] - 18:20, 18:21, 34:3, 61:2, 61:4, 101:6, 173:24
**impairment** [13] - 13:14, 34:17, 51:21, 67:13, 67:16, 108:6, 111:8, 128:19, 171:4, 177:21, 183:22, 184:1
**impairments** [9] - 9:20, 9:23, 67:6, 67:8, 77:8, 77:17, 98:25, 111:12
**impairs** [1] - 101:2
**impeachment** [5] - 116:22, 117:20, 117:23, 118:2, 126:1
**implementing** [4] - 100:22, 102:25, 110:18, 127:5
**import** [6] - 104:12, 105:5, 105:9, 120:21, 121:4, 175:24
**importance** [2] - 55:3, 124:18
**important** [15] - 56:17, 57:17, 100:15, 104:19, 120:22,

121:1, 133:21, 133:24, 175:15, 176:6, 176:8, 177:2, 178:21, 180:6, 180:9

**importantly** [1] - 188:15

**imprecision** [1] - 40:16

**improve** [1] - 111:22

**impulsivity** [1] - 53:13

**in-house** [1] - 66:14

**in-person** [1] - 97:20

**inability** [1] - 193:22

**inadequate** [1] - 22:1

**inappropriate** [5] - 21:19, 21:20, 21:21, 78:14, 87:13

**inattentive** [2] - 51:15, 51:20

**incentive** [1] - 14:24

**incentives** [1] - 14:19

**include** [12] - 10:11, 65:14, 67:8, 67:14, 108:11, 111:7, 111:8, 111:13, 138:25, 141:20, 141:23, 185:21

**included** [10] - 24:7, 32:1, 51:7, 70:24, 104:14, 108:5, 142:24, 158:5, 158:8, 196:9

**includes** [2] - 34:8, 114:14

**including** [11] - 21:8, 28:13, 73:2, 104:1, 114:22, 123:7, 127:16, 136:1, 178:9, 178:17, 183:1

**incomplete** [1] - 24:7

**inconsistent** [5] - 53:17, 127:25, 132:18, 171:25, 185:5

**incorrect** [6] - 44:11, 44:13, 89:20, 145:3, 145:6, 170:13

**incorrectly** [4] - 110:19, 143:21, 144:22, 145:1

**incredibly** [1] - 194:22

**independently** [1] - 144:17

**Indiana** [1] - 190:7

**indicate** [5] - 10:21, 12:8, 42:20, 61:2, 165:16

**indicated** [11] - 8:8, 11:9, 11:15, 25:17, 34:20, 39:23, 52:7, 55:16, 69:18, 167:7, 184:17

**indicates** [1] - 147:16

**indicating** [3] - 70:24, 127:22, 152:6

**indication** [3] - 36:3, 149:7, 156:2

**indications** [1] - 147:16

**indicator** [2] - 96:12, 96:14

**individual** [24] - 13:3, 41:18, 46:18, 47:16, 65:23, 87:13, 101:2, 101:19, 108:9, 111:7, 112:1, 114:15, 114:19, 128:13, 131:15, 133:12, 133:16, 154:7, 173:20, 179:15, 183:10, 188:14,

195:15, 195:19

**individual's** [8] - 101:4, 101:6, 115:4, 171:4, 173:21, 173:24, 177:19, 177:21

**individualized** [2] - 103:8, 178:23

**individually** [2] - 166:22, 167:24

**individuals** [15] - 5:12, 14:18, 16:18, 50:4, 66:1, 74:12, 78:7, 92:22, 93:1, 98:5, 120:14, 120:18, 131:14, 183:8

**indulge** [1] - 114:6

**indulgence** [1] - 182:15

**influence** [2] - 12:24, 15:25

**inform** [1] - 125:1

**informal** [6] - 19:21, 111:9, 111:21, 122:6, 176:4, 178:17

**informality** [1] - 121:22, 122:12

**information** [59] - 11:20, 11:22, 11:25, 12:11, 12:24, 17:20, 18:23, 26:14, 31:21, 35:24, 49:25, 50:3, 50:13, 50:19, 53:15, 53:16, 55:14, 55:19, 55:20, 55:21, 55:23, 55:24, 60:15, 66:8, 66:18, 66:19, 68:2, 71:6, 74:16, 74:19, 75:5, 79:2, 81:22, 81:23, 82:1, 91:6, 100:13, 100:14, 100:16, 100:18, 104:14, 117:9, 122:3, 124:12, 124:22, 141:20, 141:23, 143:2, 144:3, 144:5, 151:24, 155:13, 155:15, 183:20, 186:2, 186:4

**informative** [1] - 10:18

**informed** [2] - 66:20, 78:5

**informing** [1] - 119:25

**initial** [7] - 19:5, 42:11, 68:21, 70:8, 71:5, 71:6, 71:18, 72:22, 73:1, 73:7, 74:15

**INJUNCTION** [1] - 1:6

**injunction** [7] - 81:1, 157:5, 182:7, 190:23, 191:9, 192:2

**input** [3] - 36:17, 36:22, 175:11

**instance** [5] - 15:19, 71:22, 75:11, 187:9, 187:17

**instances** [3] - 30:1, 68:3, 68:6

**instead** [4] - 122:22, 160:11, 171:5, 188:19

**institutions** [1] - 186:21

**instructed** [1] - 171:2

**instruction** [2] - 186:6, 186:7

**instructions** [1] - 45:1

**instrument** [1] - 39:12

**instruments** [1] - 12:17

**insufficient** [4] - 21:24, 22:3, 184:13, 188:5

**intake** [1] - 7:18

**intellectually** [1] - 32:15

**intelligence** [6] - 6:14, 27:16, 27:21, 54:24, 55:8, 59:13

**intelligent** [1] - 179:16

**intended** [1] - 182:22

**intensive** [2] - 36:6, 186:6

**intent** [5] - 106:6, 110:18, 120:2, 128:1, 134:2

**interact** [1] - 174:5

**interest** [3] - 59:9, 85:3, 182:9

**interested** [2] - 100:19, 172:11

**interface** [1] - 140:22

**interferes** [1] - 33:19

**interfering** [1] - 77:24

**internet** [1] - 4:18

**interpret** [4] - 8:18, 107:10, 115:20, 133:6

**interpretation** [1] - 95:20

**interpretations** [1] - 132:8

**interpreters** [1] - 191:21

**interrogatories** [1] - 164:14

**interrupt** [3] - 77:25, 78:16, 113:20

**interview** [5] - 7:18, 12:1, 49:23, 52:12, 175:11

**introduce** [1] - 169:17

**Investigation** [1] - 16:24

**involved** [1] - 28:22

**involving** [1] - 88:2

**Iowa** [3] - 10:11, 29:21, 30:6

**IQ** [3] - 6:9, 54:16, 55:6

**irrelevant** [1] - 155:16

**irreparable** [3] - 190:21, 191:4, 192:6

**irrevocably** [1] - 192:25

**issue** [15] - 93:6, 115:19, 115:24, 130:18, 131:1, 132:19, 155:19, 156:3, 170:1, 172:3, 173:4, 173:7, 175:3, 189:7, 195:18

**issued** [4] - 90:25, 119:18, 131:7, 172:8

**issues** [6] - 14:4, 53:12, 54:16, 55:3, 184:17

**issuing** [2] - 116:1, 116:12

**item** [10] - 18:1, 86:25, 140:13, 140:15, 140:16, 143:10, 147:6, 147:18, 150:9, 157:22

**Item** [4] - 142:24, 143:1, 143:11, 153:1

**items** [5] - 47:9, 76:2, 86:17, 153:3

**itself** [5] - 112:13, 115:9,

129:5, 181:3, 192:5

**IV** [5] - 46:1, 52:23, 52:25, 55:3

**IVA+Plus** [2] - 48:13, 60:14

**James** [1] - 1:8

**January** [6] - 68:25, 69:1, 69:11, 70:25, 71:7, 71:15

**Jersey** [1] - 1:17

**Jessica** [5] - 4:7, 65:17, 126:12, 139:11, 164:3

**JESSICA** [1] - 1:3

**Jessica's** [2] - 140:3, 140:4

**Jessie** [5] - 82:15, 136:18, 170:22, 172:17, 175:8

**job** [5] - 64:19, 65:2, 138:11, 138:21, 195:7

**Jodoin** [4] - 137:23, 138:5, 138:11, 141:4

**JODOIN** [2] - 137:25, 198:9

**Johnson** [3] - 15:17, 46:1, 59:23

**JOYNER** [1] - 1:12

**judge** [1] - 192:3

**Judge** [2] - 189:14, 189:19

**judgment** [2] - 27:19, 27:20

**judicial** [2] - 81:6, 81:7, 183:3

**July** [9] - 73:15, 91:7, 91:17, 92:2, 92:8, 106:19, 154:12, 154:16, 154:18

**jumping** [2] - 74:23, 191:14

**jumps** [1] - 44:21

**June** [6] - 18:3, 72:8, 72:12, 72:21, 84:3, 91:3

**Justice** [14] - 108:20, 119:18, 125:4, 125:7, 125:13, 128:5, 131:1, 131:7, 132:19, 163:15, 171:23, 172:15, 176:22, 180:9

**Justice's** [2] - 104:20, 129:8

**Kaufman** [1] - 15:18

**keep** [4] - 19:25, 164:20, 176:23, 191:15

**Kennedy** [1] - 106:21

**keyed** [1] - 140:13

**kicks** [1] - 186:14

**kind** [17] - 8:20, 11:6, 12:8, 16:5, 21:24, 52:10, 54:18, 58:9, 59:19, 60:22, 113:22, 124:19, 154:4, 176:3, 180:12, 193:24, 194:12

**kindergarten** [10] - 31:7, 34:9, 164:21, 164:22, 182:1, 182:2, 182:4, 184:18, 185:15, 185:16

**kinds** [5] - 11:10, 27:18, 27:23, 58:8, 176:18

**knowledge** [13] - 15:4, 35:1, 85:8, 85:11, 85:15, 85:24, 87:16, 87:18, 113:1, 116:3,

130:19, 186:12, 186:19
**knows** [5] - 140:25, 144:5, 155:3, 173:15, 181:19
**labeled** [1] - 140:11
**lack** [8] - 48:22, 48:25, 55:6, 140:23, 145:12, 146:2, 146:21, 149:22
**lacks** [1] - 174:7
**language** [9] - 21:5, 110:17, 114:15, 115:4, 124:18, 125:9, 127:15, 127:21, 186:10
**large** [2] - 145:9, 165:10, 189:24
**larger** [1] - 111:14
**largest** [1] - 67:16
**Larry** [1] - 38:16
**larry@rcglawoffices.com** [1] - 1:18
**last** [36] - 5:19, 7:7, 20:22, 21:1, 39:8, 52:18, 62:15, 65:21, 68:12, 73:22, 74:5, 77:14, 109:19, 110:15, 115:23, 121:15, 126:5, 144:25, 147:25, 148:2, 149:16, 150:3, 152:8, 152:21, 153:23, 155:11, 155:23, 158:16, 159:1, 170:22, 172:22, 182:19, 182:21, 192:14, 197:3
**lastly** [1] - 178:20
**lasts** [2] - 28:10, 28:13
**late** [1] - 193:21
**latter** [2] - 42:8, 42:15
**law** [21] - 100:5, 106:12, 109:18, 120:21, 121:3, 123:20, 123:23, 123:25, 129:6, 129:12, 132:6, 132:7, 132:16, 171:1, 171:22, 173:17, 175:15, 181:9, 189:21, 193:9, 194:16
**Law** [1] - 190:9
**LAWRENCE** [1] - 1:16
**laws** [1] - 182:25
**lawyer** [2] - 83:23, 110:8
**lay** [1] - 144:11
**LD** [3] - 8:6, 11:13, 62:19
**lead** [1] - 61:10
**leading** [1] - 138:24
**learn** [5] - 90:1, 94:7, 107:3, 114:25, 177:15
**learned** [3] - 28:2, 111:6, 175:17
**learning** [28] - 5:3, 5:8, 6:13, 9:25, 15:3, 21:3, 22:6, 34:17, 56:4, 67:9, 67:19, 111:13, 111:25, 114:20, 114:23, 137:12, 159:11, 174:13, 174:14, 174:17, 177:10, 177:13, 180:6, 180:13,

180:19, 184:9, 184:17, 186:21
**least** [16] - 25:20, 66:1, 67:25, 69:7, 70:2, 70:12, 116:6, 122:1, 130:23, 146:11, 153:20, 155:25, 156:3, 161:12, 186:2, 186:21
**leave** [8] - 8:17, 64:3, 162:17, 182:9, 196:14, 196:16, 196:17, 197:2
**leaves** [1] - 143:22
**ledger** [1] - 185:7
**left** [1] - 140:4
**legal** [4] - 104:22, 104:24, 128:16, 132:2
**Legal** [1] - 99:25
**legally** [2] - 182:23, 183:1
**legible** [1] - 66:15
**length** [4] - 40:4, 76:12, 192:15, 194:21
**lengthier** [1] - 185:22
**less** [13] - 49:19, 74:4, 76:13, 102:20, 111:19, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 154:23, 188:20
**lessen** [2] - 111:7, 111:22
**letter** [43] - 70:20, 71:21, 73:6, 73:14, 73:19, 73:24, 74:4, 75:16, 90:10, 90:20, 90:25, 106:20, 107:8, 107:12, 107:17, 108:1, 109:9, 109:15, 109:23, 110:12, 112:12, 112:18, 112:23, 114:1, 115:9, 129:23, 129:25, 130:1, 130:6, 130:22, 131:4, 132:18, 132:20, 135:3, 135:20, 161:25, 162:8, 162:9, 163:2, 163:14, 163:15
**letterhead** [2] - 109:15, 109:17
**letters** [3] - 58:6, 92:13, 179:1
**letting** [1] - 38:23
**level** [11] - 24:15, 30:3, 40:19, 101:5, 114:20, 115:5, 115:7, 173:22, 177:11, 177:20, 185:13
**levels** [2] - 6:14, 187:5
**Lewandowski** [12] - 21:9, 21:11, 49:3, 59:16, 60:11, 72:15, 72:21, 72:25, 98:7, 98:9, 184:8, 190:16
**Lewandowski's** [3] - 22:15, 73:2, 74:1
**liberalness** [1] - 187:15
**license** [1] - 85:6
**licensed** [7] - 22:12, 65:6, 65:9, 82:22, 82:25, 87:20, 87:23

**licensing** [1] - 173:17
**licensure** [2] - 78:24
**life** [20] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:13, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4, 189:24, 190:3
**lifelong** [3] - 9:23, 183:22, 184:1
**likelihood** [1] - 191:8
**likely** [1] - 149:4
**likewise** [5] - 12:23, 13:17, 16:18, 68:6, 191:2
**limit** [3] - 91:9, 91:12, 152:22
**limitation** [10] - 66:25, 80:6, 105:13, 111:24, 112:2, 113:9, 128:14, 189:1, 189:22, 190:13
**limited** [18] - 85:12, 85:16, 85:17, 85:25, 86:1, 114:18, 114:21, 114:23, 128:20, 133:13, 136:23, 137:18, 151:24, 177:12, 183:12, 183:15, 189:4, 192:17
**limits** [3] - 108:7, 110:17, 110:20
**line** [10] - 33:3, 33:7, 33:16, 44:16, 47:12, 47:14, 96:9, 102:2, 106:23, 149:15
**lines** [1] - 121:15
**link** [1] - 56:18
**list** [4] - 17:22, 19:21, 29:5, 58:11
**listed** [4] - 18:1, 20:6, 23:10, 110:11
**listen** [1] - 38:10
**listing** [5] - 17:21, 24:1, 25:8, 25:9, 25:12
**lists** [1] - 110:4
**literally** [2] - 126:4, 181:16
**literature** [2] - 60:24, 61:9
**Livingston** [9] - 23:3, 23:6, 24:3, 70:18, 70:23, 71:2, 98:14, 188:2
**Livingston's** [3] - 71:6, 184:12, 188:5
**LLP** [3] - 1:15, 2:2, 2:9
**loaded** [1] - 154:22
**local** [2] - 156:20, 156:22
**located** [1] - 64:25
**logically** [1] - 185:19
**longest** [1] - 88:21
**look** [61] - 4:19, 16:21, 17:5, 17:6, 19:1, 19:10, 19:24, 20:1, 22:14, 24:17, 26:4, 29:4, 32:20, 35:10, 37:2, 37:24, 39:3, 39:21, 40:6, 40:7, 42:22, 44:14, 45:12,

46:16, 47:12, 50:22, 51:11, 55:13, 55:19, 56:20, 61:25, 67:15, 68:9, 69:2, 72:17, 73:17, 75:15, 79:2, 115:22, 127:11, 127:18, 147:1, 147:25, 148:9, 148:14, 149:5, 149:10, 151:11, 152:24, 154:14, 154:17, 165:13, 168:2, 169:25, 171:14, 179:18, 180:14, 193:14
**looked** [17] - 7:17, 8:25, 9:6, 21:8, 55:20, 71:21, 75:8, 80:10, 147:3, 158:24, 158:25, 159:4, 159:6, 176:2, 190:3, 190:7, 190:11
**looking** [19] - 11:20, 27:15, 37:23, 41:25, 50:15, 58:16, 93:25, 99:11, 106:14, 119:11, 120:6, 147:2, 158:14, 171:15, 179:13, 180:16, 189:23, 194:15
**looks** [20] - 43:20, 44:21, 45:7, 46:7, 46:17, 47:6, 47:12, 47:23, 48:7, 52:17, 68:23, 69:16, 71:7, 71:22, 72:8, 73:21, 75:19, 107:2, 110:4, 140:19
**loud** [12] - 44:6, 44:24, 44:25, 45:24, 77:23, 78:15, 82:4, 82:7, 88:14, 114:10, 115:12, 137:10
**love** [1] - 188:18
**Love** [1] - 190:9
**Lovett** [3] - 39:11, 87:23, 88:1
**low** [7] - 42:13, 48:17, 48:20, 48:21, 48:22, 54:24, 62:21
**lower** [2] - 30:19, 63:16
**lowers** [1] - 48:4
**LSAT** [1] - 5:11
**luck** [2] - 55:5, 196:3
**lunch** [3] - 119:1, 119:5, 125:17
**Luncheon** [1] - 118:16
**lunchtime** [1] - 118:7
**MA** [1] - 23:6
**ma'am** [4] - 64:9, 118:9, 137:21, 196:24
**machine** [1] - 174:22
**magnitude** [1] - 65:20
**maintained** [1] - 154:4
**major** [18] - 66:25, 80:6, 105:13, 105:15, 108:7, 111:24, 112:2, 114:18, 114:22, 124:12, 128:14, 128:20, 133:13, 177:13, 183:12, 183:15, 189:1, 189:4
**majority** [1] - 149:6
**malinger** [1] - 15:2

**Malingering** [2] - 42:19, 56:12

**malingering** [5] - 14:14, 16:13, 42:20, 62:21, 194:13

**mandatory** [1] - 191:9

**manifestation** [1] - 147:22

**manipulated** [2] - 179:12, 180:1

**manner** [8] - 79:10, 80:18, 104:6, 104:8, 114:13, 133:16, 142:1, 183:8

**Manual** [2] - 5:21, 53:1

**manual** [10] - 6:2, 40:18, 53:2, 101:3, 101:7, 162:16, 173:24, 193:7, 193:11, 197:1

**March** [8] - 70:21, 71:21, 109:23, 129:23, 131:6, 161:25, 172:18, 192:7

**Marie** [2] - 1:22, 197:18

**mark** [7] - 41:8, 44:9, 47:16, 107:15, 140:20, 142:5, 142:15

**marked** [2] - 107:13, 126:22

**Market** [1] - 1:9

**MARY** [1] - 2:3

**mary.vargas@steinvargas. com** [1] - 2:6

**masked** [1] - 180:8

**Massachusetts** [1] - 138:19

**master's** [2] - 65:7, 138:17

**match** [1] - 193:3

**matching** [1] - 26:2

**material** [4] - 117:20, 117:23, 168:22, 173:16

**mathematics** [2] - 138:15, 138:16

**matriculate** [1] - 186:24

**matter** [12] - 63:8, 66:22, 89:5, 118:6, 153:6, 154:17, 155:9, 167:23, 181:16, 181:17, 181:18, 197:15

**matters** [3] - 131:11, 131:13, 194:17

**maxed** [1] - 44:3

**maximum** [6] - 14:19, 41:5, 42:17, 50:17, 171:8, 173:10

**MCAT** [34] - 5:10, 10:15, 11:12, 25:17, 25:22, 26:2, 27:1, 28:4, 28:7, 28:16, 31:7, 31:11, 31:17, 34:1, 58:12, 58:14, 63:12, 70:5, 84:11, 85:9, 85:11, 85:18, 86:21, 87:6, 87:10, 95:20, 96:11, 96:21, 104:2, 162:19, 178:2, 184:21, 189:12, 193:13

**mean** [21] - 9:9, 14:14, 25:25, 30:19, 34:4, 34:5, 34:6, 48:19, 51:25, 63:3, 76:20, 102:17, 115:20, 121:23, 121:25, 137:17, 156:22,

158:23, 177:8, 190:18, 191:2

**meaning** [9] - 22:9, 30:15, 102:15, 110:21, 183:10, 183:11, 186:15, 186:16, 193:24

**means** [7] - 7:9, 9:23, 14:16, 20:7, 30:19, 44:2, 51:20, 61:3, 122:4, 146:23

**meant** [2] - 95:21, 110:17

**measure** [11] - 16:3, 34:7, 55:8, 56:16, 59:13, 101:6, 101:8, 101:21, 173:23, 177:20, 186:18

**measured** [1] - 6:14

**measurement** [1] - 138:17

**measures** [13] - 101:20, 104:1, 105:16, 111:11, 111:13, 111:21, 113:8, 113:10, 113:16, 113:18, 124:13, 189:24, 190:3

**measuring** [1] - 57:15

**MEDICAL** [1] - 1:5

**Medical** [6] - 64:23, 106:15, 110:11, 138:22, 183:7, 190:1

**medical** [37] - 5:18, 52:6, 52:8, 78:24, 81:24, 82:3, 82:6, 82:17, 82:20, 88:19, 89:12, 95:23, 96:17, 97:5, 134:18, 135:8, 135:21, 135:24, 162:16, 171:17, 172:18, 172:19, 172:21, 172:24, 178:7, 181:17, 187:2, 187:21, 187:24, 188:6, 188:7, 191:21, 191:23, 193:3, 195:5, 195:7, 195:8

**medication** [3] - 61:17, 175:18, 176:11

**medications** [2] - 14:22, 176:19

**medicine** [3] - 128:11, 179:21, 195:10

**meet** [7] - 53:5, 68:6, 120:10, 120:23, 187:4, 187:5, 190:22

**meeting** [4] - 100:9, 119:17, 163:10, 189:7

**meets** [2] - 12:6, 187:5

**member** [2] - 50:6, 50:7

**memorandum** [1] - 160:20

**Memory** [2] - 42:19, 56:12

**memory** [2] - 42:20, 57:16

**mental** [4] - 67:6, 67:8, 84:18, 108:6

**Mental** [1] - 5:22

**mention** [2] - 11:3, 162:15

**mentioned** [4] - 7:16, 16:7, 24:21, 177:17

**merit** [1] - 173:15

**merits** [1] - 191:8

**met** [2] - 22:11, 195:16

**method** [1] - 6:12

**Methods** [1] - 16:25

**MEW** [33] - 2:10, 32:25, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 196:14, 196:19

**mic** [1] - 3:20

**Michael** [1] - 138:5

**MICHAEL** [3] - 2:3, 137:25, 198:8

**michael.stein@ steinvargas.com** [1] - 2:6

**Michigan** [6] - 82:23, 82:24, 87:21, 87:22, 87:24, 135:21

**microphone** [1] - 138:6

**mid** [1] - 175:2

**middle** [3] - 103:10, 110:23, 190:4

**might** [15] - 14:21, 15:15, 15:21, 42:17, 48:25, 79:6, 81:17, 93:12, 123:21, 132:9, 132:10, 145:23, 146:10, 179:11, 182:3

**migraines** [2] - 77:12, 88:11

**Mike** [1] - 137:23

**million** [2] - 94:8, 94:22

**Mimi** [2] - 44:16, 44:19

**mimic** [1] - 15:5

**mind** [7] - 25:23, 27:1, 27:4, 27:12, 42:16, 127:18, 197:3

**minds** [1] - 192:21

**minimize** [1] - 191:2

**minute** [11] - 20:3, 38:17, 47:7, 73:5, 149:16, 150:3, 158:16, 158:20, 159:1, 188:23

**minutes** [15] - 28:13, 48:12, 54:2, 76:2, 76:4, 76:13, 92:16, 158:22, 159:2, 160:13, 160:14, 161:12, 192:14

**misconception** [1] - 58:4

**misconceptions** [1] - 58:3

**misphrasing** [1] - 31:2

**misread** [2] - 58:9, 127:17

**missing** [1] - 105:2

**misunderstood** [1] - 9:4

**Mitchell** [2] - 1:22, 197:18

**mitigate** [1] - 178:4

**mitigating** [7] - 105:16, 111:11, 111:21, 113:8, 113:10, 113:16, 124:13

**mitigation** [7] - 112:9,

175:16, 175:18, 176:1, 176:19, 193:22, 194:20

**mnemonics** [1] - 111:17

**modalities** [1] - 194:20

**model** [4] - 6:17, 54:10, 54:13, 54:15

**modifications** [7] - 103:4, 103:6, 104:7, 111:6, 111:8, 111:9, 111:11

**modified** [2] - 111:18, 182:24

**moment** [10] - 37:19, 38:3, 56:19, 57:24, 81:15, 85:1, 88:6, 109:10, 109:11, 132:12

**month** [1] - 74:3

**months** [7] - 73:23, 74:6, 88:24, 90:16, 94:15, 195:17

**morning** [12] - 3:2, 4:5, 4:6, 58:22, 59:2, 59:22, 64:17, 64:18, 79:16, 79:17, 126:5, 169:19

**morning's** [1] - 61:16

**most** [30] - 40:11, 40:15, 40:16, 49:24, 58:4, 59:11, 61:5, 62:18, 79:6, 96:15, 105:14, 114:25, 117:3, 120:22, 121:1, 128:20, 133:14, 133:21, 133:23, 147:19, 147:22, 153:16, 161:19, 165:9, 177:15, 183:13, 183:17, 189:5, 189:22

**mother** [6] - 13:8, 13:12, 13:16, 13:19, 175:12, 185:2

**motivated** [1] - 135:12

**mouthed** [1] - 81:18

**move** [3] - 146:5, 161:10, 170:17

**moved** [4] - 3:6, 160:18, 161:17

**moving** [7] - 26:11, 37:18, 113:2, 116:9, 162:3, 163:21, 165:17

**MR** [159] - 3:3, 3:10, 4:2, 4:4, 23:13, 23:15, 23:18, 25:5, 25:7, 26:5, 26:20, 26:24, 31:10, 31:16, 33:2, 33:5, 33:6, 36:19, 36:21, 37:1, 37:14, 37:17, 37:20, 37:22, 37:24, 38:5, 38:7, 38:12, 38:15, 38:17, 38:19, 38:21, 38:22, 39:1, 39:2, 47:19, 47:20, 47:21, 47:22, 53:19, 53:24, 54:7, 61:19, 61:21, 61:24, 63:17, 63:20, 64:2, 64:7, 64:16, 79:12, 80:15, 81:4, 81:10, 95:24, 101:15, 101:24, 102:1, 102:7, 107:7, 109:4, 112:10, 112:17, 112:24, 116:10, 116:20, 116:24, 117:4, 122:14,

122:17, 126:9, 137:7, 137:16, 137:23, 138:10, 139:18, 139:20, 140:23, 141:1, 141:3, 142:8, 142:11, 142:13, 142:21, 144:2, 144:6, 144:9, 144:11, 144:12, 144:5, 145:8, 145:12, 145:16, 146:2, 146:7, 146:8, 146:21, 147:4, 149:22, 149:25, 150:12, 150:15, 152:17, 154:24, 155:10, 155:21, 155:23, 156:1, 156:6, 156:8, 157:4, 158:2, 159:20, 159:22, 159:25, 160:3, 160:6, 160:9, 160:13, 160:14, 161:2, 161:18, 162:5, 162:8, 162:14, 163:5, 163:9, 163:19, 164:18, 165:12, 165:15, 166:2, 166:6, 166:8, 166:14, 166:18, 166:21, 167:9, 167:13, 167:16, 167:20, 167:22, 168:5, 168:14, 168:16, 168:22, 169:5, 169:12, 169:22, 170:4, 170:9, 170:15, 182:13, 182:18, 187:7, 195:23, 196:5, 196:10, 197:3

**MS** [102] - 32:25, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 163:22, 164:2, 164:5, 164:8, 164:11, 164:16, 164:20, 165:9, 165:13, 165:18, 165:20, 165:25, 166:4, 166:7, 166:13, 166:17, 166:20, 167:4, 167:14, 167:19, 167:21, 168:2, 168:13, 168:21, 169:11, 169:16, 169:21, 170:8, 170:19, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:4, 196:14, 196:19, 196:23, 196:25, 197:5

**multiple** [18] - 13:3, 13:4,

13:14, 13:17, 39:18, 86:3, 86:10, 86:11, 86:16, 86:20, 86:22, 87:5, 122:14, 135:11, 184:25, 189:9, 194:19

**must** [8] - 100:25, 103:2, 104:5, 114:24, 171:11, 173:18, 177:14, 177:18

**naked** [1] - 175:20

**name** [6] - 4:17, 42:24, 46:2, 64:13, 138:4, 140:4

**names** [1] - 15:12

**national** [1] - 78:23

**NATIONAL** [1] - 1:5

**National** [11] - 64:21, 64:22, 85:17, 106:15, 110:10, 122:1, 125:12, 138:22, 183:7, 190:1

**nature** [1] - 22:3

**navigate** [1] - 158:19

**navigated** [1] - 152:21

**NBME** [78] - 18:9, 65:20, 69:5, 78:17, 80:3, 80:8, 81:1, 82:10, 82:12, 85:20, 87:16, 88:1, 90:4, 90:14, 93:5, 93:15, 94:12, 94:18, 99:25, 101:10, 101:13, 101:22, 103:16, 103:24, 104:16, 106:12, 107:4, 108:1, 108:23, 110:6, 113:7, 115:3, 115:6, 115:18, 121:12, 122:7, 122:11, 122:15, 129:2, 129:8, 129:16, 129:24, 130:1, 130:4, 130:7, 130:11, 130:14, 131:16, 131:17, 131:19, 132:13, 134:16, 135:14, 135:22, 135:25, 136:13, 136:18, 138:24, 139:2, 141:13, 143:4, 150:22, 151:1, 152:1, 152:2, 153:22, 154:19, 161:25, 163:10, 171:19, 171:24, 172:2, 172:9, 173:11, 181:10, 185:9, 186:11, 188:10

**NBME's** [12] - 94:4, 108:13, 110:1, 112:6, 112:8, 113:20, 121:8, 124:17, 125:2, 125:8, 141:4, 171:16

**NE** [1] - 2:4

**necessarily** [5] - 11:23, 121:13, 147:18, 153:7, 190:18

**necessary** [4] - 5:22, 175:14, 193:23, 195:13

**need** [29] - 16:18, 17:25, 25:14, 33:21, 33:25, 38:3, 38:22, 53:4, 78:25, 93:13, 97:5, 97:8, 109:10, 115:12, 117:22, 128:2, 130:12, 135:14, 156:20, 160:4,

171:9, 178:19, 178:24, 182:7, 188:3, 188:15, 194:25, 195:3, 195:4

**needed** [10] - 59:20, 113:19, 117:21, 130:13, 133:22, 135:17, 136:1, 136:19, 172:24, 174:17

**needs** [3] - 173:8, 186:24, 189:6

**negative** [2] - 62:12, 186:1

**negatives** [1] - 61:10

**negligible** [1] - 110:20

**Nelson** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18

**Nelson-Denny** [13] - 16:5, 16:10, 37:9, 38:16, 39:6, 39:15, 39:21, 39:24, 40:1, 40:4, 40:10, 40:18

**neurodevelopmental** [1] - 9:20

**neurological** [2] - 33:18, 111:6

**neuropsych** [2] - 49:18, 49:19

**neuropsychological** [1] - 5:12

**neuropsychologist** [2] - 21:12, 22:12

**neuropsychologists** [1] - 194:4

**never** [4] - 4:11, 102:17, 126:9, 189:3

**nevertheless** [4] - 31:20, 111:25, 114:21, 177:12

**new** [10] - 116:1, 119:23, 120:21, 123:8, 123:16, 123:20, 124:3, 124:8

**New** [1] - 1:17

**next** [20] - 18:12, 41:1, 42:22, 46:1, 46:21, 52:16, 62:22, 83:18, 86:18, 104:3, 137:22, 140:10, 140:14, 142:10, 143:8, 160:2, 161:24, 162:14, 169:10, 190:25

**night** [1] - 126:5

**NO** [2] - 1:3, 198:15

**nobody** [1] - 77:25

**nondisabled** [2] - 88:16, 89:3

**none** [3] - 175:23, 180:23, 186:7

**normal** [3] - 22:20, 22:21

**normally** [3] - 8:19, 84:7, 109:5

**Northwest** [1] - 191:19

**Norton** [2] - 100:3, 109:16

**notation** [2] - 34:21, 169:6

**note** [6] - 44:11, 44:12,

116:20, 157:11, 157:12, 161:21

**notebook** [4] - 16:22, 17:10, 62:1, 148:10

**notebooks** [3] - 37:21, 62:1, 139:14

**noted** [5] - 102:8, 103:21, 130:11, 149:24, 168:18

**notes** [1] - 113:13

**nothing** [8] - 129:19, 136:18, 137:2, 137:16, 153:9, 184:15, 192:22, 195:23

**notice** [7] - 81:6, 81:7, 108:20, 108:23, 109:23, 110:2, 120:10

**notification** [1] - 170:14

**notify** [2] - 156:8, 157:7

**noting** [1] - 103:22

**notwithstanding** [1] - 74:1

**November** [1] - 68:23

**NPRM** [2] - 115:24, 130:18

**number** [27] - 23:11, 23:12, 40:23, 53:7, 57:2, 58:5, 59:11, 72:17, 74:24, 76:2, 86:3, 86:24, 105:17, 107:16, 107:18, 107:20, 109:1, 110:4, 120:13, 120:17, 140:15, 145:9, 145:23, 154:25, 164:17, 165:19, 176:9

**Number** [1] - 127:2

**numbered** [2] - 148:16, 165:8

**numbers** [4] - 26:7, 26:10, 165:16, 168:3

**nurse** [1] - 65:6

**NW** [1] - 2:11

**oath** [2] - 3:14, 118:20

**object** [9] - 31:10, 80:15, 101:15, 154:24, 167:1, 168:14, 168:25, 170:10, 170:11

**objected** [5] - 107:4, 155:16, 155:24, 167:5

**objection** [33] - 3:9, 3:10, 26:13, 26:17, 36:19, 81:9, 102:8, 112:17, 112:24, 116:23, 116:24, 122:18, 126:15, 140:23, 144:4, 145:12, 145:14, 146:2, 145:6, 146:21, 149:22, 149:24, 156:8, 157:8, 157:9, 162:2, 162:3, 162:7, 163:19, 166:9, 168:18, 169:5, 170:11

**objections** [7] - 33:14, 164:14, 165:22, 166:24, 167:10, 168:7, 168:9

**objective** [6] - 11:16, 11:19, 11:21, 11:23, 60:22, 185:9

**obligated** [2] - 101:20,

188:11
**obligation** [1] - 188:13
**observation** [2] - 135:1, 135:4
**observations** [1] - 134:22
**observed** [1] - 179:17
**observing** [2] - 81:20, 174:24
**obtain** [5] - 4:8, 14:19, 14:24, 50:3, 96:20
**obtained** [4] - 16:17, 30:6, 32:6, 37:4
**obviously** [6] - 107:8, 117:1, 160:23, 166:22, 175:10, 191:18
**occasion** [1] - 42:5
**occasionally** [2] - 82:11, 147:16
**occur** [1] - 147:18
**occurred** [1] - 3:19
**October** [1] - 123:17
**offer** [10] - 3:8, 5:11, 160:4, 161:19, 161:25, 162:10, 163:1, 163:5, 163:12, 173:11
**offered** [3] - 161:20, 163:6, 183:18
**offering** [5] - 100:24, 103:1, 104:5, 166:2, 166:6
**offers** [1] - 173:11
**offhand** [2] - 89:24, 137:1
**Office** [1] - 116:11
**office** [1] - 31:25
**officer** [3] - 79:19, 105:7, 130:3
**officers** [1] - 39:25
**offices** [1] - 64:25
**official** [4] - 5:21, 78:4, 122:5, 137:14
**Official** [2] - 1:22, 197:18
**often** [6] - 14:22, 61:1, 185:24, 194:6, 194:23, 194:24
**oftentimes** [1] - 54:19
**Ohio** [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23
**old** [2] - 24:20, 124:3
**omit** [1] - 31:11
**once** [4] - 76:14, 96:7, 172:19, 189:3
**one** [96] - 3:3, 14:9, 15:7, 16:13, 17:2, 19:11, 19:25, 24:2, 25:8, 25:9, 25:12, 27:3, 27:13, 29:20, 30:3, 30:12, 31:11, 35:1, 35:4, 37:10, 38:15, 38:19, 39:5, 39:8, 42:4, 42:22, 46:1, 46:7, 46:8, 46:13, 47:11, 47:13, 49:6, 51:7, 55:20, 56:19, 58:5, 58:12, 61:7, 66:1, 69:14,

71:16, 75:24, 77:3, 77:23, 79:3, 83:9, 83:17, 83:19, 85:1, 89:25, 91:6, 93:11, 94:1, 94:2, 94:14, 99:15, 100:22, 109:10, 110:6, 114:22, 115:9, 121:5, 125:15, 133:7, 135:20, 136:12, 137:8, 139:14, 139:18, 146:11, 148:4, 152:9, 157:6, 158:9, 162:22, 165:7, 170:7, 170:8, 173:2, 174:10, 175:13, 176:1, 176:13, 177:4, 177:12, 182:18, 183:12, 183:21, 184:21, 185:18, 188:11, 193:4
**one's** [2] - 111:16, 192:4
**one-hour** [1] - 75:24
**ones** [9] - 16:1, 35:11, 59:22, 128:4, 139:18, 161:24, 165:8, 181:8, 196:15
**onset** [2] - 13:4, 13:9
**open** [4] - 19:25, 94:1, 147:12, 150:9
**operated** [2] - 78:8, 141:13
**operating** [1] - 3:21
**opinion** [5] - 24:6, 62:10, 62:13, 184:4, 190:19
**opportunities** [1] - 76:5
**opportunity** [15] - 14:24, 26:9, 26:12, 31:13, 76:15, 93:17, 112:20, 116:14, 117:7, 117:18, 146:4, 157:15, 165:21, 166:1, 181:19
**oppose** [1] - 106:12
**opposing** [1] - 126:1
**option** [2] - 146:13, 156:12
**options** [4] - 5:3, 86:3, 86:24, 87:5
**optometrist** [6] - 55:21, 56:2, 98:24, 99:2, 175:6, 175:7
**or..** [2] - 18:11, 160:8
**oral** [3] - 16:1, 43:2, 45:21
**Oral** [2] - 16:4, 16:7
**orally** [1] - 45:6
**order** [31] - 3:1, 14:19, 15:2, 15:21, 18:20, 31:25, 33:8, 43:17, 53:5, 65:20, 74:21, 75:8, 92:11, 93:16, 151:1, 152:3, 152:18, 153:3, 153:5, 156:4, 156:13, 157:24, 158:4, 161:14, 172:4, 176:3, 183:9, 186:18, 190:22, 191:22
**ordered** [1] - 81:1
**ordinarily** [3] - 71:9, 76:25, 81:24
**ordinary** [1] - 110:21
**organization** [1] - 189:18

**organizations** [6] - 110:4, 113:25, 127:12, 127:14, 127:20, 163:14
**original** [1] - 137:3
**originally** [2] - 59:15, 65:6
**originals** [1] - 155:4
**OSU** [1] - 172:25
**otherwise** [2] - 130:21, 184:13
**out-of-date** [1] - 24:8
**outcome** [9] - 15:25, 124:2, 140:7, 145:11, 146:20, 148:24, 149:19, 150:1, 150:16, 168:16
**outcomes** [5] - 114:19, 124:18, 125:3, 125:9, 127:22
**outdated** [1] - 184:13
**Outside** [1] - 99:25
**outside** [7] - 91:7, 91:22, 100:12, 100:15, 119:12, 158:12, 159:5
**overall** [4] - 24:11, 27:15, 59:3, 150:8
**overcome** [1] - 193:22
**overlooked** [2] - 14:6, 8:11
**overrule** [1] - 126:15
**overruled** [8] - 36:25, 102:8, 122:18, 146:4, 146:22, 149:24, 168:19, 170:12
**oversee** [1] - 138:23
**overton** [1] - 135:20
**own** [7] - 74:14, 132:9, 171:16, 173:14, 175:10, 181:22, 193:14

**P-1** [1] - 161:23
**P-13** [1] - 162:15
**P-14** [1] - 162:17
**P-19** [1] - 162:19
**P-19A** [1] - 162:20
**P-20** [3] - 162:22, 162:25, 198:21
**P-21** [4] - 3:6, 3:12, 162:23, 198:16
**P-22** [4] - 163:1, 163:4, 198:22
**P-33** [3] - 163:6, 163:8, 198:23
**P-34** [1] - 163:9
**P-4** [1] - 161:23
**P-40** [3] - 163:12, 163:17, 198:24
**P-41** [3] - 163:12, 163:17, 198:25
**P-42** [3] - 163:13, 163:17, 199:1
**P-5** [4] - 161:25, 162:8, 162:12, 198:17
**P-6** [4] - 162:1, 162:8, 162:12, 198:18
**P-7** [3] - 162:9, 162:12,

198:19
**P-8** [3] - 162:10, 162:12, 198:20
**p.m** [5] - 118:16, 161:15, 197:8
**PA** [1] - 1:9
**pace** [1] - 74:14
**Pacific** [1] - 191:19
**PAGE** [1] - 198:15
**page** [105] - 4:20, 4:22, 4:24, 6:5, 7:23, 8:1, 17:24, 18:12, 19:3, 20:11, 22:18, 23:5, 23:7, 23:8, 23:10, 32:23, 33:1, 33:3, 35:20, 37:3, 39:6, 45:17, 45:18, 46:17, 46:21, 47:8, 47:13, 51:11, 52:16, 52:21, 54:9, 54:14, 55:1, 55:13, 57:2, 57:4, 62:16, 62:17, 62:22, 68:12, 72:17, 72:18, 75:16, 95:19, 96:6, 96:7, 100:20, 100:21, 102:23, 104:3, 104:11, 104:23, 109:19, 110:10, 110:14, 110:22, 110:23, 113:4, 114:2, 114:3, 114:4, 114:5, 115:11, 115:14, 116:19, 119:8, 119:9, 119:10, 119:21, 119:22, 120:8, 120:9, 121:14, 121:17, 123:5, 123:6, 123:7, 123:15, 127:7, 128:23, 131:21, 132:21, 133:7, 134:3, 134:7, 148:15, 148:16, 148:17, 152:24, 169:2, 182:20, 182:21, 197:4
**pages** [6] - 104:12, 119:22, 123:6, 124:22, 124:24, 179:18
**paid** [1] - 91:6
**pair** [1] - 151:12
**paired** [1] - 151:11
**paper** [3] - 21:16, 28:8, 180:19
**paper-based** [1] - 28:8
**paperwork** [2] - 90:20, 180:12
**paragraph** [18] - 7:7, 20:12, 110:15, 110:23, 113:4, 113:7, 114:8, 115:16, 115:23, 116:1, 116:2, 127:11, 148:14, 148:16, 148:19, 149:11, 149:14, 158:17
**paragraphs** [1] - 151:25
**parched** [1] - 112:15
**pardon** [2] - 101:24, 139:25
**parent** [2] - 7:12, 185:18
**parentheses** [1] - 120:15
**part** [27] - 5:13, 13:6, 17:22, 19:18, 29:15, 29:21, 31:11,

52:22, 56:6, 58:13, 58:14, 63:16, 90:2, 110:2, 120:15, 126:3, 126:19, 129:23, 132:21, 133:11, 141:9, 147:20, 170:3, 187:2, 187:22, 189:24

**part's** [1] - 133:9

**partial** [1] - 70:2

**partially** [1] - 27:17

**particular** [6] - 15:19, 28:19, 36:9, 75:11, 187:17, 191:18

**particularly** [7] - 44:10, 121:21, 122:12, 176:16, 180:5, 180:7, 193:20

**parties** [1] - 155:6

**parts** [4] - 133:3, 133:4, 176:5, 176:24

**pass** [3] - 172:17, 173:14, 192:24

**passage** [8] - 105:11, 105:20, 107:4, 108:19, 119:15, 120:2, 171:20, 171:21

**passages** [3] - 43:24, 45:18, 45:21

**passed** [3] - 108:2, 130:22, 170:24

**passing** [4] - 108:13, 171:1, 192:23, 195:5

**past** [7] - 22:22, 103:4, 134:14, 134:15, 172:24, 177:22, 192:15

**patient** [3] - 41:15, 50:1, 50:4

**patient's** [1] - 11:24

**patients** [1] - 65:12

**pattern** [1] - 27:15

**pause** [1] - 186:23

**pejorative** [1] - 22:2

**penalty** [2] - 146:16, 146:17

**pennant** [1] - 41:11

**Pennsylvania** [1] - 190:11

**PENNSYLVANIA** [1] - 1:1

**people** [34] - 20:17, 30:22, 30:25, 38:20, 54:19, 58:3, 58:4, 58:8, 60:21, 72:1, 74:22, 77:22, 93:25, 96:15, 105:14, 114:25, 128:21, 133:5, 133:15, 133:23, 146:11, 146:14, 147:1, 147:19, 153:15, 158:12, 159:16, 177:15, 181:22, 183:13, 183:17, 188:12, 189:5, 189:23

**per** [6] - 8:14, 8:21, 75:24, 76:2, 76:14, 145:3

**percent** [18] - 30:15, 30:18, 30:19, 30:22, 30:25, 39:10, 40:15, 40:19, 40:23, 43:5, 43:10, 66:3, 120:14, 148:21, 149:7, 149:18, 150:4, 158:20

**percentage** [1] - 67:17

**percentile** [11] - 30:9, 30:13, 30:21, 32:14, 43:3, 43:12, 43:14, 43:15, 46:14, 58:20, 63:13

**perfect** [2] - 42:9, 138:8, 193:21

**perform** [19] - 11:6, 14:9, 14:18, 27:18, 27:22, 30:2, 33:23, 33:25, 34:3, 49:5, 71:18, 82:22, 82:25, 87:20, 87:23, 95:3, 147:14, 179:23

**Performance** [2] - 48:14, 60:9

**performance** [36] - 10:8, 10:14, 11:11, 11:19, 11:21, 13:22, 14:4, 14:7, 14:9, 15:5, 25:16, 25:23, 32:7, 46:21, 49:2, 57:19, 63:11, 95:20, 125:3, 125:10, 141:11, 146:15, 150:20, 150:23, 154:2, 154:7, 185:9, 185:20, 185:21, 189:11, 189:24, 190:3, 190:4, 190:5, 190:11

**performances** [1] - 42:15

**performed** [12] - 11:9, 31:7, 49:6, 56:11, 63:13, 73:6, 133:17, 144:7, 144:20, 144:21, 174:22, 184:13

**performing** [2] - 34:2, 46:14

**performs** [1] - 133:16

**perhaps** [5] - 69:10, 103:17, 120:19, 153:12, 191:10

**period** [2] - 88:18, 88:20, 142:23

**periods** [1] - 187:7

**PERKINS** [1] - 2:9

**permission** [6] - 77:6, 77:15, 78:4, 81:16, 88:5, 137:14

**permit** [2] - 88:24, 88:25

**permitted** [2] - 111:19, 171:8

**persists** [1] - 58:4

**person** [27] - 15:2, 15:20, 22:11, 27:21, 32:14, 43:23, 54:21, 80:21, 93:9, 94:14, 97:20, 112:3, 113:17, 122:8, 128:20, 134:8, 174:6, 175:21, 177:5, 177:6, 177:9, 179:21, 180:10, 180:13, 189:2, 194:18, 195:11

**personal** [8] - 17:25, 18:5, 20:5, 69:4, 69:18, 69:21, 72:11, 77:18

**personally** [4] - 21:14, 190:15, 190:16, 190:18

**perspective** [1] - 160:23

**PhD** [1] - 138:18

**Philadelphia** [2] - 1:9, 64:25

**phone** [1] - 182:15

**phonological** [3] - 15:8,

15:10, 15:16

**physical** [7] - 52:9, 67:6, 67:12, 77:8, 77:16, 108:6, 164:25

**physician** [3] - 52:19, 60:5, 135:6

**physicians** [1] - 50:13

**pick** [3] - 61:6, 75:7, 94:4

**picture** [1] - 41:18

**pictures** [2] - 41:12, 63:9

**piece** [4] - 73:22, 74:5, 79:2, 80:10

**pieces** [1] - 55:20

**place** [5] - 26:12, 39:14, 49:22, 155:6, 183:8

**placed** [1] - 20:20

**Plaintiff** [3] - 1:3, 1:18, 2:7

**plaintiff** [8] - 64:1, 64:2, 139:11, 160:8, 170:20, 179:21, 186:22, 189:15

**plaintiff's** [5] - 99:7, 99:11, 119:7, 164:13, 196:7

**Plaintiff's** [1] - 175:4

**plaintiffs** [1] - 168:4

**plan** [2] - 103:8, 103:9

**play** [1] - 177:2

**played** [1] - 170:23

**pleasure** [1] - 160:17

**point** [28] - 5:7, 5:19, 5:20, 26:17, 31:14, 48:11, 58:13, 59:14, 68:1, 72:2, 76:14, 80:25, 83:12, 83:15, 101:19, 116:10, 121:3, 156:10, 158:23, 161:9, 162:3, 184:3, 185:12, 186:17, 187:21, 190:24, 192:24

**pointed** [2] - 59:3, 183:20

**police** [1] - 39:25

**policy** [1] - 162:16

**poor** [2] - 12:3, 21:23

**poorly** [1] - 15:7

**population** [9] - 105:14, 115:1, 133:15, 133:23, 177:16, 183:13, 183:17, 189:2, 189:5

**portal** [2] - 122:5, 123:1

**portion** [2] - 102:12, 111:14

**posed** [1] - 179:19

**posing** [1] - 38:11

**position** [12] - 65:2, 76:24, 93:23, 94:1, 108:13, 112:8, 112:22, 113:21, 179:13, 180:3, 194:14

**positions** [1] - 160:20

**possession** [1] - 150:23

**possibility** [2] - 15:7, 179:25

**possible** [12] - 8:6, 9:25, 20:9, 74:22, 86:15, 92:22, 93:3, 93:11, 123:19, 124:1, 147:16, 166:22

**possibly** [2] - 90:17, 91:20

**post** [1] - 66:7

**posted** [2] - 116:4, 130:20

**potential** [1] - 171:13

**potentially** [4] - 77:25, 89:10, 156:5, 167:22

**PowerPoint** [12] - 99:20, 99:24, 100:2, 100:4, 100:8, 100:11, 119:11, 119:13, 119:15, 123:5, 123:7, 163:10

**practical** [1] - 65:6

**practice** [3] - 65:11, 192:4, 195:9

**preceded** [1] - 53:1

**precedent** [1] - 183:3

**precise** [1] - 12:17

**precisely** [1] - 189:12

**preclude** [1] - 178:14

**predominantly** [1] - 51:14

**prefer** [2] - 164:18

**preference** [1] - 160:24

**preferred** [1] - 181:9

**prejudiced** [1] - 156:11

**preliminary** [6] - 81:1, 157:5, 182:7, 190:22, 191:9, 192:2

**PRELIMINARY** [1] - 1:5

**prepare** [7] - 38:20, 103:14, 104:13, 121:4, 133:1, 134:1, 144:13

**prepared** [9] - 1:24, 28:5, 35:16, 39:4, 73:19, 100:4, 121:6, 144:15, 158:7

**prerogative** [2] - 187:20, 188:6

**prescribe** [1] - 95:13

**presence** [3] - 10:21, 11:1, 13:17

**present** [6] - 7:3, 100:13, 150:22, 151:18, 156:16, 187:1

**Presentation** [1] - 153:2

**presentation** [9] - 99:20, 100:4, 100:9, 100:11, 104:12, 104:21, 121:5, 133:3, 196:1

**presented** [9] - 119:17, 151:6, 153:4, 153:25, 154:3, 154:21, 155:4, 157:22

**presenting** [1] - 12:2

**president** [1] - 138:12

**presumably** [2] - 149:5, 150:10

**presume** [1] - 52:4

**pretty** [1] - 180:22

**prevent** [2] - 170:24

**previous** [6] - 5:18, 10:2, 58:7, 105:16, 144:8, 178:13

**previously** [7] - 3:14, 20:7, 41:19, 52:9, 79:3, 112:19, 118:21

**primarily** [7] - 12:7, 12:9, 12:11, 13:11, 13:15, 13:18, 183:18
**primary** [5] - 19:7, 50:13, 52:19, 138:23, 158:10
**principal** [1] - 6:12
**principally** [1] - 6:12
**print** [1] - 127:19
**printout** [2] - 140:2, 150:21
**private** [4] - 18:19, 100:24, 103:1, 104:4
**problem** [11] - 54:15, 56:5, 57:18, 60:18, 60:22, 60:23, 61:1, 61:2, 61:4, 61:5, 61:6
**problematic** [1] - 112:8
**problems** [12] - 6:9, 6:21, 6:24, 8:9, 13:22, 14:7, 14:8, 14:13, 54:9, 54:12, 55:14, 185:18
**procedure** [1] - 61:8
**proceed** [12] - 3:18, 4:1, 26:16, 26:19, 31:15, 38:25, 54:5, 118:19, 118:21, 138:8, 142:8, 152:16
**proceeding** [3] - 156:10, 157:5, 157:8
**proceedings** [1] - 197:15
**Proceedings** [1] - 1:24, 197:8
**proceeds** [2] - 3:4, 186:25
**process** [16] - 15:16, 66:4, 66:7, 67:24, 74:13, 74:14, 74:17, 84:18, 94:14, 94:15, 101:16, 111:10, 126:12, 161:8, 173:6, 193:24
**processed** [1] - 172:6
**processes** [1] - 138:23
**processing** [4] - 15:8, 15:11, 92:10, 92:13
**proctors** [6] - 78:1, 78:5, 78:6, 78:10, 81:17, 81:20
**produce** [5] - 15:21, 43:18, 46:10, 126:11, 184:9
**produced** [10] - 37:7, 126:7, 126:13, 156:13, 157:16, 167:6, 167:25, 168:4, 168:23
**product** [5] - 36:20, 166:24, 167:5, 167:23, 169:1
**profession** [1] - 192:5
**professional** [9] - 9:15, 66:16, 78:22, 102:6, 136:5, 171:10, 178:22, 179:2, 192:13
**professionals** [4] - 128:11, 134:11, 183:20, 189:17
**Professor** [1] - 163:7
**professors** [1] - 195:2
**profound** [1] - 49:1
**program** [2] - 79:9, 103:8
**programs** [1] - 193:3

**progress** [3] - 164:22, 164:23, 164:24
**Prometric** [11] - 78:9, 78:11, 78:13, 88:25, 137:15, 141:5, 141:7, 141:9, 141:14, 141:17, 142:2
**promise** [2] - 74:20, 191:15
**promised** [1] - 63:20
**prompting** [1] - 120:13
**promptly** [1] - 161:5
**prongs** [1] - 114:17
**proof** [3] - 134:14, 134:15, 177:22
**proper** [1] - 22:6
**proponent** [1] - 155:4
**proposal** [1] - 127:24
**proposed** [5] - 109:23, 110:2, 111:3, 111:5, 179:14
**proposes** [1] - 115:24
**proprietary** [2] - 155:18, 158:13
**prospective** [1] - 39:25
**prove** [1] - 136:18
**proven** [1] - 62:24
**provide** [29] - 31:20, 36:14, 36:17, 60:14, 60:21, 75:2, 75:5, 79:1, 79:2, 89:11, 91:24, 94:10, 117:21, 117:22, 136:18, 136:22, 171:11, 172:4, 172:13, 179:5, 185:23, 186:4, 187:16, 188:14, 189:21, 192:21, 195:10, 196:25
**provided** [35] - 11:25, 19:16, 20:25, 39:25, 46:18, 50:20, 66:18, 70:24, 72:14, 80:9, 80:13, 84:15, 87:19, 98:5, 98:13, 98:16, 98:18, 98:21, 103:7, 103:9, 103:21, 103:22, 104:1, 111:10, 117:10, 136:21, 141:21, 149:13, 155:10, 155:12, 188:24, 191:1, 192:12, 192:15, 192:16
**provides** [2] - 51:12, 78:3
**providing** [3] - 4:13, 41:5, 115:15
**provoking** [1] - 111:20
**pseudo** [1] - 15:13
**psychoeducational** [8] - 62:21, 82:22, 82:25, 85:7, 87:21, 87:23, 95:3, 136:4
**psychological** [1] - 175:25
**psychologist** [2] - 56:3, 65:9
**psychologists** [1] - 66:17
**psychology** [3] - 65:8, 128:12, 138:19
**psychometricians** [1] - 158:9
**psychometrics** [3] - 138:12,

138:17, 138:20
**public** [1] - 182:9
**publications** [1] - 9:12
**published** [2] - 81:10, 81:11
**publishes** [1] - 85:18
**pull** [1] - 158:11
**pulled** [1] - 182:16
**purports** [4] - 101:5, 101:8, 173:23, 177:20
**purpose** [12] - 11:3, 56:15, 57:6, 57:14, 105:19, 105:21, 105:23, 106:2, 108:8, 113:19, 125:23
**purposefully** [1] - 188:10
**pursuant** [2] - 103:9, 107:10
**purview** [1] - 102:4
**push** [1] - 172:10
**put** [22] - 22:1, 35:2, 37:13, 37:15, 37:16, 57:16, 61:16, 62:7, 81:2, 103:13, 107:21, 109:1, 116:14, 121:4, 145:15, 156:17, 157:3, 180:10, 181:17, 182:3, 195:10, 195:12
**putting** [4] - 31:24, 32:5, 33:7, 195:8
**qualified** [9] - 78:22, 95:2, 134:11, 171:10, 178:22, 179:2, 179:7, 189:17, 192:12
**qualify** [5] - 5:23, 49:9, 92:25, 120:11, 120:24
**quarter** [1] - 160:15
**questioning** [3] - 54:8, 62:7, 169:19
**questionnaires** [2] - 12:10, 60:20
**questions** [101] - 25:13, 25:22, 26:25, 28:4, 29:23, 36:23, 38:11, 38:16, 38:25, 39:19, 39:22, 39:24, 40:3, 40:4, 40:14, 40:17, 40:20, 40:24, 44:6, 44:8, 45:6, 45:12, 45:24, 47:6, 48:7, 52:4, 53:20, 61:19, 63:9, 63:17, 75:24, 76:14, 79:12, 82:4, 82:7, 85:8, 102:2, 128:17, 137:4, 139:3, 139:5, 139:7, 143:16, 143:19, 143:23, 144:21, 144:23, 144:25, 145:3, 145:6, 145:10, 145:18, 146:18, 147:5, 147:11, 147:15, 147:21, 148:1, 148:2, 148:3, 148:4, 148:21, 148:22, 149:5, 149:8, 149:16, 149:18, 150:4, 150:7, 150:8, 150:12, 151:2, 151:10, 151:13, 151:16, 151:22, 152:3, 152:5, 152:8, 152:18, 152:20, 152:21, 153:6,

153:14, 153:17, 153:23, 155:17, 158:5, 158:20, 159:17, 159:20, 162:21, 162:23, 179:14, 179:19, 179:20
**queue** [1] - 74:23
**quick** [4] - 44:11, 61:22, 61:25, 113:11
**quicker** [1] - 161:8
**quickly** [9] - 45:2, 63:5, 68:3, 74:22, 88:16, 92:24, 93:12, 93:17, 146:12
**quite** [8] - 8:18, 40:6, 40:7, 40:23, 55:2, 163:22, 181:16
**quotation** [1] - 132:25
**quote** [13] - 62:20, 108:10, 112:7, 114:16, 115:5, 132:1, 132:3, 173:18, 177:18, 177:22, 178:13, 178:21
**quotes** [2] - 114:13, 133:2
**quoting** [2] - 171:3, 171:7
**raise** [2] - 25:22, 42:16
**raised** [2] - 27:4, 195:18
**RAMSAY** [2] - 1:3, 196:4
**Ramsay** [116] - 4:17, 5:15, 6:1, 7:21, 8:8, 9:15, 12:18, 13:8, 13:10, 13:11, 13:15, 13:18, 16:11, 17:5, 20:12, 21:14, 22:5, 27:25, 28:24, 32:2, 35:4, 36:4, 36:8, 36:12, 36:17, 42:1, 44:3, 44:23, 49:2, 50:16, 51:5, 52:18, 53:16, 56:14, 57:7, 58:12, 58:24, 59:15, 59:18, 59:21, 59:24, 60:1, 61:15, 65:17, 69:19, 69:25, 70:13, 74:9, 76:15, 78:14, 80:24, 81:15, 82:15, 83:9, 91:18, 92:3, 96:13, 97:3, 97:12, 97:18, 98:5, 98:11, 98:22, 102:15, 103:15, 107:6, 117:11, 134:12, 134:15, 135:21, 136:4, 139:11, 140:12, 143:10, 143:16, 148:12, 149:8, 149:13, 150:11, 151:2, 151:18, 152:18, 153:4, 153:5, 154:12, 157:5, 158:4, 158:14, 162:21, 164:3, 168:24, 170:22, 171:11, 171:16, 172:8, 172:17, 178:2, 178:6, 181:8, 181:14, 181:15, 183:15, 183:18, 184:14, 184:17, 184:25, 185:2, 185:4, 185:13, 188:7, 191:7, 192:21, 193:14, 194:1, 194:21, 195:14
**Ramsay's** [48] - 17:25, 18:13, 19:5, 20:5, 25:16, 32:7, 34:25, 41:2, 42:24, 46:2,

55:10, 55:17, 61:12, 68:21, 69:4, 71:19, 72:5, 72:22, 74:25, 84:11, 87:16, 88:4, 90:7, 92:14, 94:15, 95:22, 101:13, 104:8, 126:12, 128:4, 129:10, 132:14, 140:16, 147:5, 147:25, 149:19, 150:2, 150:20, 150:23, 153:19, 154:2, 155:13, 162:17, 166:23, 171:14, 175:10, 180:14, 184:19

**Ramsey** [2] - 4:7, 148:20

**random** [2] - 147:16, 159:2

**randomly** [6] - 145:9, 145:17, 145:24, 146:10, 146:12, 146:18

**range** [4] - 31:8, 32:13, 49:6, 63:16

**Range** [1] - 23:1

**rank** [1] - 43:3

**rapid** [2] - 147:1, 157:23

**rapidly** [1] - 147:21

**rarely** [1] - 194:7

**rate** [8] - 8:14, 39:6, 39:11, 43:10, 43:14, 43:18, 46:11, 62:20

**rather** [10] - 20:24, 101:6, 101:14, 102:19, 113:9, 160:24, 169:25, 171:11, 173:23, 177:20

**rating** [1] - 49:16

**ratings** [1] - 12:23

**rburgoyne@perkinscoie. com** [1] - 2:13

**RDR** [2] - 1:22, 197:18

**reaching** [1] - 97:21

**read** [74] - 5:19, 15:20, 16:3, 16:4, 31:21, 44:5, 44:6, 44:7, 44:8, 44:23, 45:2, 45:13, 45:24, 47:14, 62:6, 62:15, 69:14, 70:10, 77:6, 77:15, 77:23, 77:25, 81:5, 81:16, 81:18, 82:4, 87:2, 88:5, 88:13, 88:14, 96:14, 96:17, 96:23, 100:21, 102:11, 102:12, 102:24, 103:10, 110:14, 111:1, 112:19, 112:20, 113:11, 113:22, 114:10, 114:24, 115:2, 115:11, 115:12, 115:13, 120:6, 121:14, 125:24, 127:12, 128:2, 131:4, 131:25, 148:20, 149:5, 149:8, 149:16, 152:18, 153:6, 153:8, 174:6, 174:7, 177:15, 179:20, 182:18, 193:15, 193:16, 193:23

**readers** [1] - 27:17

**readily** [1] - 158:12

**reading** [86] - 6:15, 12:10, 15:25, 16:2, 18:21, 19:15, 20:14, 22:20, 24:15, 24:19, 24:20, 28:22, 30:13, 32:2, 32:8, 32:18, 33:10, 33:19, 33:21, 33:25, 34:3, 36:5, 39:6, 39:11, 39:17, 43:3, 43:10, 43:14, 43:18, 45:18, 45:22, 46:8, 46:11, 46:16, 46:23, 47:8, 56:4, 56:17, 57:17, 57:18, 59:12, 60:24, 62:4, 62:19, 63:5, 67:19, 77:19, 78:15, 80:2, 82:7, 86:23, 87:1, 96:9, 96:22, 99:3, 111:13, 111:16, 111:25, 113:12, 113:20, 114:23, 132:4, 137:10, 145:21, 148:22, 150:10, 173:6, 173:25, 174:3, 174:21, 174:24, 175:2, 175:9, 176:3, 176:16, 177:13, 178:4, 182:19, 184:20, 184:22, 184:23, 185:12, 193:23

**Reading** [1] - 16:25

**reads** [4] - 44:24, 44:25, 121:21, 148:19

**ready** [2] - 99:17, 161:16

**real** [9] - 61:21, 61:25, 113:11, 185:9, 186:8, 189:24, 190:3, 193:12, 193:13

**realize** [1] - 20:9

**really** [11] - 11:22, 27:5, 54:19, 55:7, 83:21, 121:2, 137:14, 154:17, 175:15, 178:20, 180:9

**reason** [10] - 26:6, 48:20, 63:22, 80:3, 89:19, 145:20, 159:24, 173:13, 176:7, 188:7

**reasonable** [4] - 111:8, 150:9, 155:6, 189:10

**reasonably** [1] - 185:19

**reasoning** [1] - 162:20

**reasons** [7] - 10:22, 55:7, 61:7, 81:2, 145:23, 145:25, 146:9

**rebuttal** [1] - 191:14

**receive** [10] - 21:3, 65:17, 65:20, 66:1, 82:21, 93:18, 104:2, 126:3, 136:1, 156:17

**received** [25] - 19:11, 20:21, 50:16, 68:2, 68:24, 68:25, 69:3, 69:5, 69:8, 69:11, 69:16, 70:7, 73:22, 73:24, 74:1, 74:2, 74:21, 82:17, 82:20, 83:10, 92:12, 103:5, 103:24, 157:6, 172:25

**receiving** [11] - 8:21, 35:25, 36:5, 72:24, 79:23, 91:22,

111:17, 111:18, 178:14, 185:17, 186:5

**recently** [2] - 62:18, 147:2

**recess** [5] - 54:1, 118:8, 118:15, 118:16, 161:12

**Recess** [2] - 54:3, 161:15

**recognized** [1] - 175:8

**recollection** [4] - 24:18, 69:10, 74:24, 75:9

**recommend** [3] - 79:4, 97:15, 135:16

**recommendations** [1] - 134:11

**recommended** [4] - 53:8, 74:7, 97:14, 179:5

**recommending** [1] - 73:24

**reconvene** [1] - 160:15

**record** [16] - 3:19, 20:24, 26:15, 58:13, 64:13, 70:12, 102:13, 114:17, 116:15, 138:3, 140:15, 156:18, 157:1, 161:3, 170:9, 197:15

**records** [11] - 12:8, 17:21, 17:22, 19:17, 23:10, 35:15, 55:17, 56:7, 184:16, 185:14, 186:8

**recross** [2] - 61:20, 137:18

**Recross** [1] - 198:4

**RECROSS** [1] - 61:23

**RECROSS-EXAMINATION** [1] - 61:23

**recruiting** [1] - 93:20

**redacted** [2] - 166:25, 167:1

**REDIRECT** [2] - 54:6, 137:6

**redirect** [5] - 31:14, 53:22, 137:5, 137:17, 159:21

**Redirect** [1] - 198:4

**reduce** [2] - 120:13, 196:20

**reduced** [1] - 19:15

**refer** [2] - 5:10, 98:7

**reference** [20] - 6:17, 17:24, 19:11, 19:14, 21:7, 23:3, 24:4, 43:2, 56:20, 76:18, 94:9, 96:16, 116:4, 130:20, 137:18, 157:19, 178:8, 186:20, 187:2, 187:4

**referenced** [9] - 25:16, 73:5, 77:12, 115:25, 151:25, 185:6, 186:10, 189:14, 192:4

**references** [1] - 166:23

**referencing** [5] - 78:6, 78:10, 98:22, 105:1, 176:23

**referred** [1] - 54:8

**referring** [6] - 16:8, 54:15, 55:2, 99:21, 152:21, 187:7

**refers** [1] - 120:19

**reflect** [9] - 15:22, 32:2, 32:8, 54:20, 101:4, 102:21, 145:20, 147:6, 173:21

**reflected** [9] - 24:15, 34:17,

40:19, 43:8, 45:22, 102:19, 147:11, 184:19, 186:5

**reflecting** [3] - 32:6, 101:6, 173:23

**reflects** [6] - 33:9, 41:7, 45:10, 72:14, 143:17, 177:19

**refresh** [2] - 69:10, 75:8

**regard** [4] - 11:22, 129:19, 146:5, 176:2

**regarding** [25] - 13:17, 17:25, 22:6, 23:2, 24:6, 25:3, 27:1, 31:21, 34:25, 35:1, 35:24, 40:10, 42:16, 48:13, 62:3, 63:9, 102:2, 106:23, 106:24, 132:1, 136:9, 141:23, 184:9, 184:24, 185:11

**regardless** [1] - 157:24

**Register** [5] - 117:8, 125:19, 126:2, 127:2, 163:16

**registered** [2] - 66:13, 88:19

**registering** [1] - 88:16

**registration** [1] - 89:2

**regulation** [14] - 101:16, 101:17, 101:18, 102:18, 102:25, 113:13, 114:5, 115:3, 129:6, 132:7, 132:17, 181:3, 186:14

**Regulations** [1] - 127:3

**regulations** [25] - 100:22, 101:10, 105:18, 115:25, 119:19, 119:24, 120:21, 121:3, 123:16, 123:21, 123:23, 124:3, 124:9, 124:11, 125:5, 127:4, 129:5, 129:13, 132:9, 171:6, 171:23, 173:18, 176:21, 183:3, 193:9

**regulatory** [2] - 127:15, 127:21

**REISMAN** [1] - 1:15

**reject** [1] - 126:18

**rejected** [9] - 108:13, 124:17, 125:4, 125:8, 125:14, 128:5, 171:21, 171:24, 172:16

**relate** [1] - 174:2

**related** [12] - 11:10, 11:12, 11:14, 32:19, 52:8, 59:11, 60:23, 65:19, 103:7, 127:16, 127:22, 151:21

**relates** [1] - 16:4

**relating** [8] - 8:6, 9:7, 13:22, 141:11, 150:20, 154:2, 156:18, 162:17

**relationship** [1] - 141:4

**relative** [3] - 25:23, 27:1, 35:22

**relatively** [3] - 54:24, 146:12, 161:5

**released** [2] - 88:25, 130:21

**relevance** [2] - 80:17, 115:4

relevant [4] - 31:20, 126:11, 127:23, 183:16
reliability [2] - 49:11, 49:16
reliable [6] - 12:14, 39:12, 49:8, 49:19, 96:12, 184:9
reliance [3] - 39:14, 49:22, 128:5
relied [4] - 18:23, 52:7, 77:9, 185:10
relief [2] - 191:11, 193:5
rely [7] - 10:1, 12:5, 80:8, 84:11, 176:15, 180:2, 186:8
relying [2] - 11:24, 187:22
remained [1] - 108:6
remaining [1] - 148:22
remarkably [1] - 176:10
remediated [1] - 27:17
remember [9] - 8:3, 10:24, 31:12, 41:18, 58:16, 58:18, 111:17, 136:25, 137:2
remembered [1] - 8:8
remind [3] - 3:14, 118:9, 118:20
repeat [5] - 14:1, 49:17, 49:20, 55:15, 154:5
report [73] - 10:5, 10:17, 11:22, 11:25, 13:8, 13:11, 13:13, 13:15, 13:18, 16:15, 16:16, 16:19, 17:5, 20:1, 21:7, 22:17, 22:18, 23:4, 23:8, 23:9, 23:19, 24:24, 25:16, 25:19, 28:5, 29:12, 31:25, 32:3, 34:9, 35:12, 35:16, 35:18, 35:20, 35:23, 36:11, 36:15, 36:18, 46:13, 51:8, 53:10, 55:13, 55:16, 56:20, 56:23, 56:25, 57:2, 58:23, 59:6, 59:14, 60:21, 70:5, 70:11, 71:6, 71:15, 91:23, 98:7, 98:9, 134:25, 135:2, 164:21, 164:22, 164:23, 164:24, 164:25, 165:2, 165:3, 165:4, 171:10, 181:24, 182:1, 182:4, 185:16, 186:3
Report [1] - 48:14
reported [4] - 35:4, 54:20, 135:25, 185:4
REPORTER [2] - 64:13, 138:3
Reporter [2] - 1:22, 197:18
reporter [2] - 12:4, 102:12
reporting [3] - 135:5, 138:24, 138:25
reports [13] - 4:14, 7:11, 7:12, 11:18, 16:17, 21:8, 24:3, 25:18, 29:9, 35:2, 178:25
represent [5] - 70:23, 71:14, 73:14, 153:2, 153:5

representation [5] - 27:14, 34:7, 94:11, 180:2, 195:5
representative [1] - 40:3
represented [12] - 83:23, 84:1, 84:2, 84:6, 84:7, 92:17, 93:1, 93:9, 113:25, 122:8, 147:19, 192:1
representing [2] - 127:14, 127:20
Representing [3] - 1:18, 2:7, 2:14
represents [2] - 143:9, 153:3
reputation [1] - 4:13
request [52] - 4:8, 5:13, 18:8, 19:5, 65:17, 66:2, 66:5, 66:9, 66:20, 66:23, 67:2, 67:5, 67:12, 67:21, 67:24, 67:25, 68:21, 69:11, 69:13, 69:14, 71:19, 71:23, 72:5, 72:12, 73:7, 73:9, 73:11, 83:18, 84:12, 84:14, 88:4, 90:7, 90:9, 90:18, 92:14, 92:15, 92:16, 97:18, 104:8, 124:17, 125:2, 125:8, 125:10, 126:10, 128:4, 131:15, 132:15, 155:8, 155:12, 155:15, 177:24, 191:23
requested [18] - 71:5, 75:4, 75:6, 80:4, 82:12, 82:17, 82:19, 91:18, 102:12, 123:22, 125:13, 128:21, 136:19, 172:2, 172:3, 178:24, 179:24, 191:21
requesting [1] - 124:8
requests [36] - 9:7, 65:14, 65:19, 65:21, 65:22, 66:4, 66:10, 67:11, 67:17, 74:11, 74:12, 74:18, 74:24, 78:18, 78:21, 92:10, 92:11, 92:23, 92:25, 93:1, 93:2, 93:5, 93:9, 94:13, 94:14, 100:17, 101:10, 103:2, 104:6, 104:17, 129:9, 129:17, 130:4, 131:14, 172:5
require [6] - 7:8, 75:7, 102:18, 106:10, 120:5, 192:9
required [8] - 18:17, 35:7, 55:4, 179:3, 182:7, 183:2, 185:1, 186:11
requirement [5] - 79:20, 110:20, 188:25, 190:22, 191:10
requirements [1] - 193:23
requires [9] - 13:2, 75:10, 102:3, 174:8, 175:16, 177:9, 183:6, 192:11, 194:16
rescinded [1] - 182:23
research [11] - 9:7, 9:9, 40:11, 49:24, 62:15, 63:2, 63:4, 84:13, 84:21, 96:25,

193:19
reservation [1] - 186:23
residency [3] - 192:24, 192:25, 193:3
resources [7] - 78:17, 93:16, 94:12, 94:18, 94:19, 94:24, 181:11
respect [2] - 90:7, 90:18
respected [1] - 181:21
respective [1] - 160:20
respond [8] - 71:23, 74:22, 84:7, 92:13, 104:8, 117:5, 126:10, 179:20
responding [1] - 174:25
responds [3] - 45:6, 104:4, 104:6
response [8] - 11:8, 46:2, 88:4, 103:7, 106:3, 140:13, 152:14, 158:20
RESPONSE [1] - 118:18
Response [1] - 140:11
responses [3] - 118:12, 146:13, 147:1
responsibilities [4] - 65:14, 138:21, 138:23, 183:2
responsibility [2] - 93:4, 158:10
responsible [2] - 80:23, 104:16
rest [2] - 132:4, 157:2
restate [2] - 32:4, 102:9
Restoration [1] - 106:25
rests [1] - 64:2
result [7] - 15:21, 41:22, 43:6, 48:23, 97:25, 123:21, 181:7
resulted [2] - 45:21, 184:5
results [25] - 10:4, 10:14, 12:19, 24:13, 24:15, 25:10, 26:3, 32:1, 32:5, 37:4, 37:7, 42:23, 43:9, 89:12, 101:3, 101:14, 102:19, 119:23, 136:4, 157:15, 173:21, 174:18, 176:15, 184:19, 184:20
resume [1] - 9:6
retrieve [1] - 28:3
revenue [2] - 94:4, 94:7
reversals [2] - 20:13, 20:16
review [31] - 7:8, 7:9, 7:11, 13:25, 21:16, 29:18, 38:3, 56:6, 59:10, 66:22, 66:24, 67:1, 67:11, 68:1, 71:18, 73:6, 83:18, 91:10, 92:23, 101:10, 122:2, 122:25, 123:1, 124:23, 128:12, 129:11, 165:21, 170:4, 170:5, 170:10
reviewed [16] - 13:21, 14:3, 17:2, 17:21, 17:22, 20:6,

24:1, 24:2, 25:17, 51:9, 80:9, 144:17, 148:24, 150:1, 183:19, 185:10
Reviewers [1] - 121:18
reviewers [3] - 71:16, 122:2, 122:13
reviewing [7] - 29:9, 65:14, 74:14, 166:21, 167:24, 168:17, 169:2
reviews [2] - 84:16, 100:17
revise [1] - 34:2
revised [1] - 120:12
revisions [1] - 124:11
rid [2] - 37:20, 188:25
rigorous [4] - 49:13, 79:10
risk [2] - 11:24, 12:2
Ritalin [1] - 14:21
RMR [2] - 1:22, 197:18
Robert [1] - 100:1, 109:21, 164:6
ROBERT [2] - 2:10, 198:5
role [1] - 105:6
roles [1] - 135:9
rolling [1] - 74:11
roof [2] - 44:17, 44:21
room [8] - 8:19, 76:19, 76:23, 77:2, 77:8, 77:21, 77:24
rooms [1] - 76:25
Rose [2] - 100:3, 109:16
rough [1] - 65:25
roughly [3] - 40:3, 40:6, 66:3
routinely [1] - 69:21
Ruekberg [6] - 24:22, 98:19, 167:25, 168:1, 168:23, 169:13
Rule [1] - 155:7
rule [4] - 110:16, 120:16, 127:4, 171:25
ruled [2] - 168:8, 169:3
rulemaking [9] - 104:20, 108:21, 108:24, 109:24, 110:2, 123:8, 123:9, 124:16, 129:24
rules [5] - 111:3, 111:5, 155:3, 177:2, 181:11
Rules [1] - 127:3
ruling [1] - 157:11
run [4] - 71:10, 147:20, 153:15, 153:16
running [3] - 92:5, 146:11, 146:19
runs [1] - 147:17
safely [1] - 195:9
sample [10] - 31:12, 38:16, 39:21, 45:12, 47:9, 58:15, 58:17, 63:12, 162:22, 162:23
samples [1] - 46:18
SAT [2] - 5:10, 10:15
saw [2] - 27:3, 50:16, 135:11, 135:17, 173:13, 179:18,

184:15
**scale** [1] - 195:13
**scales** [1] - 12:23
**schedule** [4] - 74:12, 89:1, 89:3, 195:17
**scheduling** [1] - 88:24
**schemes** [1] - 18:18
**School** [1] - 190:9
**school** [48] - 5:23, 8:3, 10:9, 14:25, 18:13, 18:16, 19:8, 19:10, 19:11, 19:17, 20:24, 25:18, 25:19, 40:12, 40:15, 66:11, 69:24, 82:18, 82:20, 95:23, 96:16, 97:5, 98:23, 99:2, 134:18, 135:2, 135:21, 135:24, 162:16, 171:17, 172:19, 172:21, 172:24, 175:2, 176:6, 178:7, 181:17, 184:18, 187:2, 187:21, 187:24, 188:7, 190:4, 191:21, 191:23, 193:3
**school's** [1] - 188:6
**schools** [3] - 195:5, 195:8
**Sciences** [1] - 191:20
**score** [34] - 25:18, 29:9, 30:8, 30:11, 30:13, 30:16, 30:18, 31:4, 34:6, 41:1, 41:2, 41:7, 42:13, 42:15, 43:18, 43:24, 45:22, 48:5, 48:20, 49:6, 49:17, 54:19, 54:24, 54:25, 55:6, 58:16, 58:18, 59:14, 63:15, 70:5, 73:3, 138:24, 138:25, 193:2
**scores** [31] - 25:22, 26:2, 26:3, 27:1, 27:9, 27:13, 27:16, 30:2, 30:5, 42:8, 42:9, 48:17, 48:22, 49:18, 49:19, 54:17, 59:3, 59:11, 84:11, 90:4, 90:6, 96:11, 96:19, 104:1, 127:23, 128:6, 171:14, 180:13
**scoring** [2] - 138:24, 138:25
**screen** [9] - 140:16, 140:19, 141:24, 142:14, 142:23, 143:2, 143:6, 147:7, 149:4
**screens** [1] - 176:6
**seated** [4] - 3:2, 54:4, 77:1, 138:2
**second** [26] - 5:20, 6:5, 18:1, 25:9, 43:11, 43:16, 45:17, 46:17, 48:23, 62:1, 72:5, 73:9, 75:12, 76:12, 77:9, 88:4, 90:18, 110:10, 127:11, 149:15, 151:11, 162:10, 164:24, 177:17, 184:2, 193:18
**Second** [1] - 188:10
**secondary** [1] - 19:8
**seconds** [17] - 45:8, 139:10, 140:16, 143:11, 143:15,

143:16, 143:25, 145:3, 145:7, 147:2, 147:3, 147:6, 147:12, 148:2, 148:5, 149:6, 152:9
**Section** [6] - 103:9, 114:2, 114:3, 114:4, 114:14, 115:14
**section** [13] - 8:2, 19:7, 28:14, 57:4, 100:25, 102:24, 103:2, 104:5, 114:7, 114:10, 115:17, 124:16, 162:20
**sections** [1] - 46:7
**secure** [3] - 122:5, 122:6, 123:1
**security** [1] - 78:13
**see** [65] - 4:7, 4:24, 6:9, 7:19, 7:23, 10:5, 10:8, 10:14, 10:17, 10:20, 10:23, 11:2, 11:9, 11:15, 13:9, 13:13, 14:6, 18:2, 19:6, 19:21, 20:16, 24:4, 26:23, 27:7, 33:12, 33:14, 34:16, 36:1, 39:5, 54:12, 57:7, 63:22, 65:11, 66:24, 67:20, 69:13, 70:4, 70:22, 72:20, 75:17, 75:18, 80:17, 100:2, 103:10, 106:15, 110:10, 110:13, 110:23, 113:4, 114:2, 114:9, 118:3, 123:8, 123:9, 125:6, 145:10, 147:16, 148:19, 149:7, 169:22, 185:24, 188:8, 194:6, 194:23, 195:3
**seeing** [5] - 26:2, 26:3, 27:2, 53:17, 146:20
**seeking** [5] - 4:14, 5:12, 77:9, 191:9, 191:11
**seem** [1] - 50:11
**sees** [1] - 63:9
**select** [3] - 146:12, 149:17, 158:20
**selected** [5] - 100:25, 140:12, 150:3, 154:9, 158:18
**self** [8] - 11:25, 13:8, 13:13, 111:11, 111:16, 112:9, 176:19, 178:4
**self-mitigate** [1] - 178:4
**self-mitigating** [1] - 111:11
**self-mitigation** [2] - 112:9, 176:19
**self-report** [3] - 11:25, 13:8, 13:13
**Senators** [1] - 106:21
**send** [8] - 66:12, 66:21, 66:25, 121:12, 122:4, 141:17, 170:14
**sending** [2] - 66:23, 67:3
**sense** [12] - 84:24, 93:15, 95:20, 95:21, 97:2, 110:21, 115:22, 132:6, 132:16, 133:21, 151:11, 157:14
**sensitive** [2] - 61:5, 160:24

**sensory** [3] - 101:3, 101:7, 173:24
**sent** [4] - 73:6, 73:11, 90:10, 130:22
**sentence** [12] - 5:20, 7:2, 7:7, 20:22, 21:1, 46:8, 46:16, 62:15, 113:14, 115:2, 115:22, 148:19
**sentences** [3] - 44:23, 46:23, 127:13
**separate** [4] - 76:18, 77:2, 77:7, 77:24
**September** [2] - 91:1, 92:8
**Sequence** [1] - 153:2
**series** [4] - 24:2, 33:14, 41:12, 116:21
**serious** [1] - 6:20
**services** [7] - 5:23, 64:20, 64:21, 103:5, 103:7, 103:9, 195:4
**set** [3] - 36:14, 38:21, 164:14
**sets** [1] - 25:2
**setting** [2] - 111:20, 176:16
**settings** [5] - 13:4, 13:14, 135:11, 177:23, 184:25
**seven** [2] - 75:24, 139:6, 147:25
**several** [1] - 8:4
**severe** [2] - 185:4, 185:18
**severity** [1] - 50:17
**shall** [2] - 26:23, 171:7
**share** [1] - 93:4
**sheet** [5] - 41:1, 41:2, 41:7, 45:22, 73:3
**shelf** [4] - 103:16, 103:24, 134:16, 171:16
**short** [2] - 137:8, 138:21
**shorter** [1] - 76:1
**shortly** [1] - 195:25
**shoulder** [1] - 165:14
**show** [15] - 21:22, 41:13, 95:19, 96:1, 117:15, 174:17, 175:14, 176:12, 176:17, 181:19, 183:14, 185:19, 188:12, 192:16, 193:24
**showed** [6] - 58:11, 101:14, 106:14, 176:13, 176:16, 186:7
**showing** [6] - 36:10, 40:11, 109:2, 126:22, 168:4, 195:12
**shown** [7] - 26:15, 100:11, 107:13, 185:14, 190:24, 191:7, 195:15
**shows** [3] - 153:23, 171:12, 193:19
**shy** [1] - 94:8
**side** [3] - 36:1, 77:22, 185:7
**signatory** [1] - 110:11
**signature** [2] - 68:11, 72:8
**signed** [4] - 43:25, 66:15,

68:23, 109:20
**significance** [1] - 132:2
**significant** [2] - 16:19, 78:17
**significantly** [1] - 59:12
**silently** [1] - 88:14
**similar** [11] - 20:13, 32:21, 47:17, 49:2, 52:14, 103:5, 103:11, 103:16, 176:15, 177:23, 189:15
**similar-appearing** [1] - 20:13
**simple** [1] - 193:17
**simply** [4] - 75:1, 78:20, 172:18, 185:25
**sincerity** [1] - 180:17
**single** [1] - 136:12
**sit** [2] - 44:16, 77:3
**sits** [1] - 44:21
**sitting** [3] - 77:22, 156:9, 160:11
**situation** [2] - 11:7, 103:16
**situations** [3] - 5:10, 103:6, 103:11
**six** [2] - 88:24, 89:14
**sixth** [1] - 58:24
**skew** [1] - 155:22
**skill** [1] - 177:20
**Skills** [1] - 10:12
**skills** [12] - 12:10, 33:19, 33:21, 33:25, 34:3, 101:3, 101:7, 173:24, 184:22, 184:23, 186:13
**skip** [2] - 153:8, 176:3
**skipping** [1] - 101:16
**slide** [2] - 100:3, 133:1
**slides** [2] - 103:14, 104:13
**slow** [3] - 15:24, 99:3, 175:3
**slowly** [1] - 15:20
**small** [3] - 46:23, 76:23, 127:19
**smart** [1] - 181:18
**Smith** [30] - 3:4, 4:5, 32:23, 47:20, 54:8, 61:25, 63:20, 95:2, 95:15, 97:21, 164:6, 169:19, 174:4, 174:15, 174:18, 175:13, 175:24, 176:9, 179:8, 179:9, 179:10, 183:19, 184:7, 184:15, 185:5, 185:24, 187:13, 189:3, 190:14, 194:4
**SMITH** [1] - 198:6
**Smith's** [5] - 98:2, 162:24, 175:11, 183:19, 184:4
**Smith-33** [1] - 8:1
**Smiy** [7] - 50:20, 51:5, 60:3, 60:5, 70:11, 98:16, 185:6
**Smiy's** [2] - 70:12, 184:5
**so-called** [2] - 6:17, 43:21
**software** [4] - 141:12, 141:13, 141:15
**solely** [1] - 87:14

someone [26] - 4:24, 9:25, 12:5, 34:21, 38:19, 41:21, 42:13, 42:17, 54:24, 56:5, 66:4, 71:4, 114:20, 144:15, 145:9, 146:9, 146:18, 147:17, 158:19, 177:10, 185:17, 186:15, 186:16, 188:25, 191:11
sometimes [10] - 12:13, 14:18, 15:13, 44:12, 50:9, 50:10, 60:21, 75:7, 123:3, 146:14
somewhere [3] - 37:15, 89:14, 185:20
soon [2] - 88:23, 154:19
sooner [1] - 69:11
sophomore [1] - 187:10
sorry [37] - 6:4, 9:4, 12:16, 14:1, 17:16, 21:1, 23:13, 23:16, 29:12, 37:14, 50:25, 52:1, 62:12, 85:1, 93:22, 96:16, 98:8, 99:10, 102:9, 105:2, 105:8, 114:6, 118:4, 120:9, 121:16, 127:17, 127:19, 128:24, 128:25, 129:20, 130:16, 142:19, 145:5, 151:15, 152:1, 166:6, 167:20
sort [4] - 74:23, 170:1, 175:20, 193:21
sound [2] - 30:17, 190:19
sounds [1] - 73:16
source [1] - 135:7
space [3] - 18:19, 19:15, 109:10
speaking [7] - 101:3, 101:7, 111:25, 114:23, 168:23, 173:24, 177:13
speaks [1] - 115:9
special [1] - 186:7
specialists [1] - 97:12
specialize [2] - 5:2, 5:5
specialized [1] - 36:5
specific [5] - 15:3, 35:23, 62:19, 75:5, 168:7
specifically [7] - 80:7, 128:5, 155:14, 170:7, 171:2, 186:3, 192:18
Specter [1] - 106:21
speculative [1] - 145:12
speed [3] - 18:22, 38:8, 41:21
spelling [1] - 22:20
spend [3] - 114:24, 148:2, 177:14
spent [5] - 143:24, 144:23, 145:1, 147:6, 159:1
spinning [1] - 41:9
spoken [1] - 192:14
spread [1] - 76:3

spreadsheet [3] - 150:18, 150:21, 159:7
staff [8] - 3:23, 66:14, 66:16, 93:3, 93:6, 93:19, 93:20, 158:9
stages [1] - 74:13
stakes [3] - 5:9, 9:8, 177:25
stamp [3] - 69:4, 69:5, 69:12
stamped [1] - 70:9
stand [6] - 3:13, 76:22, 76:24, 77:3, 137:24, 156:5
standard [12] - 28:19, 75:22, 75:23, 76:4, 77:21, 102:22, 106:11, 108:11, 110:17, 120:5, 189:7, 190:23
standardized [36] - 4:15, 5:6, 9:8, 10:8, 10:15, 11:4, 11:11, 11:19, 11:21, 14:25, 25:4, 25:8, 27:18, 28:19, 29:5, 31:22, 32:7, 32:12, 58:11, 78:23, 123:20, 124:19, 125:3, 125:9, 128:6, 171:14, 177:25, 184:16, 184:19, 185:8, 185:21, 188:9, 188:10, 189:12, 190:5, 190:12
standards [1] - 182:6
standing [1] - 76:25
stapled [1] - 37:3
start [5] - 34:10, 35:21, 37:9, 53:22, 153:10
started [1] - 118:7
starting [4] - 45:17, 102:24, 140:6, 160:8
starts [2] - 37:9, 114:8
state [5] - 5:11, 64:13, 64:19, 138:3, 138:11
State [10] - 34:10, 51:5, 70:2, 70:15, 97:8, 178:7, 184:2, 187:9, 187:17, 187:23
statement [18] - 7:5, 7:14, 10:22, 17:25, 18:5, 18:15, 20:5, 56:18, 69:5, 69:18, 69:22, 72:11, 101:9, 136:9, 148:25, 149:14, 149:20, 153:13
statements [2] - 77:19, 111:4
States [2] - 89:23, 156:23
states [5] - 5:7, 6:12, 110:16, 116:7, 182:21
STATES [1] - 1:1
stating [1] - 84:25
Statistical [2] - 5:21, 53:1
statistics [1] - 49:15
statute [4] - 132:6, 132:9, 132:16, 188:24
statutes [1] - 183:3
stay [1] - 6:4
STEIN [2] - 2:2, 2:3
stenographically [1] - 1:24

step [8] - 63:18, 63:19, 64:9, 101:16, 130:13, 137:21, 159:23
Step [42] - 4:9, 5:16, 12:20, 12:25, 28:4, 28:16, 65:15, 75:23, 76:10, 85:16, 85:19, 85:24, 86:4, 87:6, 88:16, 88:17, 89:3, 139:3, 139:12, 140:6, 140:7, 145:10, 146:16, 147:5, 150:23, 151:8, 151:10, 151:13, 151:17, 151:19, 151:22, 158:11, 159:18, 162:22, 172:17, 183:16, 183:24, 185:22
steps [1] - 27:3
STEVEN [1] - 2:3
Stevens [1] - 106:21
sticker [2] - 107:21, 182:1
stickers [1] - 185:16
still [9] - 3:14, 32:17, 105:8, 105:12, 112:1, 117:12, 118:20, 177:6, 189:1
stop [4] - 48:10, 78:16, 112:4, 153:9
stops [1] - 74:17
stored [1] - 154:8
stories [3] - 43:21, 43:23
story [3] - 44:3, 44:14, 181:14
strategies [7] - 27:22, 27:24, 27:25, 28:1, 29:2, 111:7, 111:16
strategy [1] - 28:25
streamline [2] - 25:1, 25:3
Street [4] - 1:9, 1:16, 2:4, 2:11
strength [1] - 187:12
stressful [2] - 111:20, 188:20
stretch [1] - 76:24
strict [1] - 53:7
strictly [1] - 143:1
strikingly [1] - 176:15
strongly [2] - 135:25, 166:5
structured [2] - 42:6, 52:11
struggle [1] - 10:22
struggles [1] - 18:16
struggling [3] - 34:22, 35:5, 135:17
student [18] - 5:18, 35:24, 52:12, 52:17, 82:6, 88:19, 89:3, 89:13, 111:23, 124:7, 129:17, 135:8, 153:6, 162:16, 186:1, 186:5, 191:20, 195:8
student's [3] - 115:7, 125:10, 171:12
students [25] - 4:14, 14:22, 40:19, 62:18, 66:8, 74:20, 75:1, 81:24, 82:3, 82:12,

88:17, 89:12, 89:22, 90:1, 93:12, 93:16, 93:18, 96:17, 111:12, 111:15, 123:19, 123:22, 180:7, 193:20, 194:24
studied [1] - 63:3
studies [1] - 9:9
study [2] - 22:20, 111:15
studying [1] - 179:21
stuff [1] - 71:4
subject [8] - 9:13, 26:9, 66:22, 106:23, 109:22, 126:9, 168:7, 169:5
subjects [4] - 116:4, 116:6, 130:20, 130:23
submission [7] - 66:14, 66:23, 67:1, 70:8, 71:12, 72:22, 73:3
submissions [1] - 74:15
submit [19] - 69:21, 108:23, 122:2, 122:25, 134:8, 134:12, 134:15, 134:23, 135:1, 135:22, 136:4, 136:7, 136:9, 136:15, 160:20, 178:25, 179:3, 182:8, 194:3
submitted [19] - 18:9, 51:5, 68:14, 69:19, 69:25, 70:3, 71:11, 71:14, 72:11, 90:13, 90:19, 91:3, 91:6, 97:18, 108:1, 134:25, 135:23, 136:12, 160:22
submitting [3] - 74:12, 89:2, 123:22
Subsection [1] - 114:14
subsequent [2] - 72:21, 189:9
subsequently [3] - 142:6, 144:17, 144:20
substantial [13] - 28:21, 66:25, 80:6, 105:13, 110:21, 111:23, 112:2, 113:9, 120:3, 128:13, 189:1, 189:22, 190:13
substantially [13] - 32:13, 108:7, 110:16, 110:20, 114:18, 114:21, 128:19, 133:13, 136:23, 177:12, 183:12, 183:15, 189:4
substitute [1] - 193:2
subtest [4] - 16:2, 24:14, 24:20
subtests [1] - 42:3
subvocalize [1] - 77:23
succeed [2] - 181:17, 188:8
succeeding [1] - 191:8
success [6] - 114:21, 115:5, 115:7, 177:6, 177:8, 177:11
sudden [1] - 131:17
sufficient [6] - 79:5, 142:9, 177:23, 184:9, 187:14, 191:4

**suggested** [1] - 111:3
**suggestion** [1] - 190:14
**suggests** [3] - 61:9, 69:2, 110:19
**Suite** [2] - 2:4, 2:11
**summaries** [6] - 117:22, 169:20, 169:21, 170:2, 170:12, 196:12
**summary** [11] - 26:14, 34:8, 39:3, 57:4, 65:4, 138:13, 138:21, 155:1, 155:2, 155:3, 171:25
**supersede** [1] - 129:5
**supervise** [1] - 144:15
**supplement** [4] - 60:19, 70:24, 73:4, 157:1
**supplemental** [6] - 16:3, 71:1, 71:5, 72:24, 115:24, 130:18
**supplied** [1] - 80:11
**support** [16] - 4:8, 35:24, 36:5, 60:22, 66:10, 72:12, 96:25, 97:18, 135:3, 157:19, 177:24, 180:3, 187:14, 187:19, 193:10, 194:21
**supported** [4] - 78:21, 128:18, 128:22, 135:25
**supporting** [3] - 73:23, 79:1, 160:20
**supportive** [1] - 172:7
**supports** [3] - 112:1, 178:24, 188:2
**suppose** [4] - 158:21, 158:22
**supposed** [5] - 133:4, 175:19, 176:20, 177:2, 181:23
**Supreme** [2] - 106:3, 180:25
**surprise** [8] - 86:9, 86:12, 89:16, 89:25, 90:1, 94:7, 135:24, 136:3
**surprised** [1] - 107:3
**surprising** [1] - 183:4
**surreptitiously** [1] - 81:22
**suspicious** [3] - 78:3, 81:17, 81:19
**sustain** [2] - 145:14, 166:24
**sworn** [4] - 3:15, 64:11, 118:21, 137:25
**symptom** [3] - 49:22, 50:15, 60:20
**symptoms** [16] - 7:3, 13:4, 13:9, 13:18, 14:13, 14:17, 15:5, 16:16, 16:19, 50:17, 52:22, 53:4, 53:10, 184:25, 185:4, 185:5
**system** [4] - 36:14, 122:5, 122:7, 122:11
**systems** [1] - 158:13
**Tab** [21] - 17:7, 17:15, 17:17, 19:1, 20:1, 20:3, 22:14,

23:13, 23:17, 23:19, 23:22, 23:24, 56:23, 56:24, 56:25, 68:19, 69:2, 69:4, 69:18, 69:24, 70:2
**tab** [3] - 39:21, 70:5, 72:17
**table** [2] - 144:18, 176:5
**tall** [1] - 44:19
**Tanguay** [6] - 55:21, 55:23, 56:2, 98:21, 99:1, 175:4
**target** [1] - 68:7
**tasks** [1] - 11:10
**teach** [1] - 120:23
**teacher** [12] - 7:12, 10:6, 11:2, 11:18, 19:16, 20:24, 34:9, 36:6, 50:9, 182:2, 186:6
**teachers** [7] - 34:21, 34:25, 35:8, 185:18, 185:23, 185:25, 186:4
**teaching** [2] - 111:15, 135:8
**technical** [38] - 40:18, 115:15, 115:19, 116:1, 116:3, 116:12, 129:2, 129:4, 129:6, 129:8, 129:16, 130:12, 130:14, 130:19, 131:1, 131:7, 131:10, 131:13, 132:1, 132:3, 132:13, 133:18, 172:3, 172:12, 176:21, 176:23, 177:4, 180:5, 180:20, 180:23, 180:24, 181:2, 182:14, 182:19, 183:5, 193:7, 193:10, 197:1
**Technical** [1] - 133:8
**teens** [1] - 5:8
**telephone** [1] - 123:3
**temporary** [1] - 112:1
**tempting** [1] - 193:14
**ten** [3] - 160:13, 160:14, 161:12
**tend** [1] - 67:11
**tends** [1] - 49:19
**term** [2] - 14:14, 34:2
**terms** [16] - 16:17, 17:19, 26:2, 28:1, 40:4, 57:11, 105:10, 120:20, 124:10, 183:2, 191:10
**test** [75] - 10:4, 14:9, 14:25, 15:18, 27:24, 28:7, 28:8, 28:9, 28:17, 28:19, 28:24, 29:23, 31:1, 31:17, 31:22, 38:18, 39:11, 39:15, 39:18, 41:4, 42:6, 42:11, 44:5, 46:21, 49:2, 56:15, 57:14, 58:23, 59:6, 60:13, 75:24, 76:6, 76:8, 77:3, 77:4, 78:1, 79:20, 82:7, 88:25, 89:4, 89:12, 93:13, 93:17, 95:10, 95:15, 101:13, 102:19, 125:9, 127:23, 128:6, 141:7,

141:9, 141:10, 141:13, 157:20, 171:11, 171:12, 171:14, 174:21, 174:22, 174:23, 176:5, 176:13, 176:14, 177:23, 179:22, 180:11, 183:16, 184:13, 184:19, 192:9, 194:9
**Test** [7] - 23:1, 42:19, 56:12, 60:9, 78:9, 141:14, 142:2
**test-taking** [2] - 27:24, 28:24
**tested** [6] - 61:15, 98:5, 127:16, 176:11, 176:12, 181:24
**testified** [56] - 3:5, 4:17, 5:24, 12:12, 13:2, 14:2, 22:4, 27:25, 30:1, 34:15, 37:4, 39:10, 40:10, 43:6, 47:11, 48:13, 48:16, 49:21, 64:12, 79:18, 80:25, 81:15, 83:14, 84:23, 85:7, 86:2, 86:9, 86:10, 88:1, 91:21, 92:16, 95:9, 95:18, 96:10, 106:2, 112:18, 119:11, 120:1, 122:7, 122:23, 129:22, 132:15, 138:1, 149:3, 150:18, 151:18, 151:21, 152:23, 159:6, 162:21, 173:14, 189:5, 189:17, 193:8, 193:10, 194:21
**testify** [7] - 79:23, 79:25, 80:22, 101:25, 179:17, 189:3, 194:23
**testifying** [7] - 9:5, 83:22, 95:14, 123:2, 125:20, 144:2, 179:15
**testimony** [23] - 3:7, 32:16, 58:7, 61:16, 64:5, 85:15, 95:25, 96:11, 118:11, 118:12, 153:12, 156:18, 157:3, 157:19, 163:6, 171:1, 174:9, 175:10, 183:19, 184:4, 190:16, 192:15, 192:19
**testing** [106] - 5:9, 6:10, 6:25, 7:24, 11:5, 12:19, 18:19, 21:2, 22:1, 25:9, 31:25, 32:1, 33:9, 49:18, 49:19, 54:16, 59:16, 59:17, 73:24, 74:7, 75:12, 75:20, 76:18, 76:20, 76:25, 77:2, 77:21, 77:22, 78:7, 79:6, 90:21, 91:18, 92:3, 96:21, 97:9, 99:2, 103:5, 103:11, 103:16, 110:4, 110:24, 111:2, 115:18, 115:19, 115:23, 116:2, 116:5, 116:12, 124:8, 127:14, 127:20, 127:22, 129:3, 129:9, 129:17, 130:2, 130:12, 130:14, 130:17, 130:22, 131:1, 131:7, 132:1,

132:13, 133:19, 134:14, 134:15, 136:10, 142:15, 172:4, 175:14, 175:25, 177:5, 177:7, 177:9, 177:17, 177:18, 177:22, 177:24, 178:8, 178:13, 178:14, 178:16, 178:17, 178:21, 178:24, 179:3, 179:4, 179:5, 183:6, 184:16, 185:8, 186:11, 188:9, 188:20, 189:6, 189:18, 190:25, 194:6, 194:8, 194:9, 194:11, 194:19, 195:4
**testing-related** [1] - 127:22
**tests** [64] - 4:15, 5:6, 7:11, 9:8, 10:9, 10:11, 10:15, 11:11, 11:19, 11:21, 15:7, 15:10, 15:13, 15:15, 15:19, 15:24, 18:18, 25:4, 27:18, 27:23, 29:5, 31:18, 32:12, 59:20, 59:21, 59:24, 60:1, 60:3, 60:6, 60:14, 60:17, 60:18, 60:25, 61:9, 87:8, 87:14, 95:6, 95:13, 111:18, 123:20, 124:18, 124:19, 125:3, 171:15, 174:16, 174:19, 175:23, 176:4, 176:9, 176:10, 176:18, 177:25, 178:4, 178:10, 178:11, 179:11, 179:23, 179:25, 185:21, 189:12, 190:5, 190:12, 190:25
**Tests** [3] - 10:11, 29:21, 30:6
**Texas** [2] - 39:24, 165:4
**text** [3] - 43:22, 112:19, 155:17
**texts** [1] - 111:16
**Thanksgiving** [1] - 157:7
**The court** [198] - 3:2, 3:9, 3:11, 3:13, 3:18, 3:20, 3:23, 23:11, 23:14, 25:6, 26:11, 26:23, 31:13, 36:25, 37:6, 37:13, 37:16, 37:18, 38:3, 38:6, 38:10, 38:14, 38:25, 53:21, 54:1, 54:4, 61:20, 63:18, 63:22, 63:25, 64:3, 64:8, 75:21, 79:13, 80:19, 80:25, 81:6, 81:9, 81:11, 81:13, 85:2, 86:18, 96:3, 99:9, 99:11, 99:13, 99:15, 101:23, 101:25, 102:5, 102:8, 102:12, 107:10, 107:16, 107:19, 107:21, 107:24, 108:15, 109:1, 109:5, 109:7, 112:13, 112:16, 112:21, 113:2, 116:7, 116:9, 116:14, 116:23, 117:3, 117:6, 117:12, 117:15, 117:18, 117:23, 117:25, 118:3,

118:6, 118:15, 118:17, 118:19, 122:16, 122:18, 125:18, 125:22, 125:25, 126:15, 137:5, 137:17, 137:20, 138:2, 138:6, 138:8, 139:16, 140:24, 141:2, 142:9, 142:12, 142:18, 142:20, 144:8, 144:10, 145:14, 146:3, 146:22, 146:24, 149:24, 152:12, 152:16, 155:8, 155:19, 155:22, 155:25, 156:2, 156:6, 156:7, 156:9, 156:16, 156:22, 156:25, 157:12, 157:18, 158:1, 159:21, 159:23, 160:1, 160:5, 160:7, 160:10, 160:15, 160:19, 161:1, 161:7, 161:16, 162:2, 162:6, 163:18, 163:20, 165:7, 165:11, 165:16, 165:19, 165:21, 166:1, 167:3, 167:7, 167:10, 168:10, 168:15, 168:18, 169:4, 169:6, 169:10, 169:14, 169:20, 169:24, 170:11, 170:17, 170:20, 172:13, 173:1, 173:5, 173:9, 173:25, 174:2, 174:9, 174:14, 174:19, 175:6, 176:25, 178:7, 178:11, 179:7, 179:9, 179:11, 180:21, 182:8, 182:11, 182:17, 186:20, 190:2, 190:7, 190:11, 191:13, 191:16, 191:18, 193:5, 194:3, 195:22, 195:24, 196:6, 196:12, 196:16, 196:20, 196:24, 197:2, 197:6
**The witness** [40] - 3:17, 3:22, 23:12, 23:16, 33:1, 38:11, 38:18, 63:24, 64:10, 64:14, 99:10, 99:12, 99:14, 101:25, 102:9, 102:14, 108:16, 109:2, 112:15, 116:8, 118:4, 118:14, 118:22, 134:5, 138:5, 138:7, 139:19, 142:19, 145:6, 146:23, 146:25, 152:12, 152:15, 156:4, 156:15, 156:21, 156:24, 157:17, 157:21, 168:17
**theme** [1] - 193:12
**thereto** [2] - 118:13, 156:19
**they've** [5] - 41:19, 43:24, 75:4, 81:4, 188:6
**thinking** [2] - 8:2, 29:12
**third** [9] - 21:1, 25:12, 35:5, 35:12, 45:17, 75:16, 140:6, 148:19, 165:2
**thorough** [1] - 184:5

**three** [16] - 42:1, 42:3, 42:5, 42:6, 45:18, 61:21, 89:16, 90:5, 91:22, 158:22, 159:2, 170:22, 172:22, 177:22, 186:2, 195:17
**thrombosis** [1] - 77:11
**Thursday** [1] - 127:3
**time-out** [1] - 20:21
**timed** [4] - 16:5, 48:10, 176:16, 176:18
**timely** [2] - 104:6, 104:8
**title** [4] - 15:14, 64:19, 99:24, 138:11
**today** [4] - 7:14, 21:5, 195:21, 196:9
**together** [1] - 56:18
**TOMM** [11] - 41:1, 41:7, 41:16, 41:21, 42:1, 56:11, 56:14, 57:7, 57:11, 57:19, 63:5
**took** [17] - 28:12, 29:7, 31:1, 31:24, 45:10, 71:22, 83:15, 90:2, 90:19, 139:12, 140:7, 154:12, 154:16, 156:4, 167:14, 176:1, 187:3
**top** [15] - 5:2, 8:2, 19:6, 23:10, 30:15, 30:18, 30:20, 39:23, 43:22, 47:23, 57:3, 72:17, 100:2, 106:14
**topics** [1] - 115:25
**total** [3] - 28:13, 152:9, 170:3
**totality** [2] - 169:25, 197:7
**tough** [1] - 45:13
**towards** [4] - 147:21, 149:15, 153:16
**traditional** [1] - 153:16
**traditionally** [1] - 147:1
**train** [5] - 117:10, 119:12, 121:12, 125:1, 128:3
**trained** [3] - 133:5, 180:15, 181:8
**trainers** [2] - 133:22, 133:25
**training** [12] - 119:15, 119:23, 120:20, 123:7, 123:9, 128:10, 132:15, 134:20, 159:10, 159:13, 159:16, 194:16
**trait** [1] - 20:18
**transcript** [5] - 25:18, 25:19, 70:2, 135:2, 197:14
**transcription** [1] - 1:25
**transferred** [4] - 83:12, 83:24, 84:5, 122:9
**transmission** [1] - 154:23
**transpired** [1] - 172:22
**travel** [1] - 8:15
**treated** [1] - 4:11
**treating** [2] - 52:17, 135:7
**treatment** [1] - 5:3
**tree** [1] - 44:19

**trial** [1] - 188:4
**tricks** [1] - 176:3
**tried** [3] - 25:2, 72:3, 172:9
**triple** [3] - 82:13, 82:15, 173:11
**trouble** [1] - 8:3
**true** [13] - 27:9, 27:10, 27:15, 47:4, 55:8, 93:14, 106:5, 106:10, 125:7, 136:19, 146:15, 153:18, 154:13
**truly** [2] - 11:23, 54:19
**try** [12] - 15:5, 15:7, 15:15, 17:13, 37:6, 44:10, 44:11, 44:12, 50:3, 56:18, 58:8, 192:11
**trying** [12] - 5:22, 14:10, 14:11, 14:12, 21:25, 26:7, 27:7, 34:7, 37:14, 57:18, 81:2, 146:3
**Tuesday** [3] - 155:11, 155:24, 157:7
**turn** [14] - 6:4, 90:4, 91:14, 96:6, 99:7, 100:20, 109:22, 110:22, 119:8, 121:14, 127:7, 150:16, 171:5, 183:19
**turned** [1] - 92:24
**turning** [15] - 102:23, 104:3, 104:11, 109:19, 110:14, 113:4, 114:2, 115:11, 116:19, 119:21, 123:5, 128:23, 131:21, 132:21, 134:3
**twice** [1] - 48:16
**two** [43] - 15:13, 20:9, 25:2, 27:3, 40:3, 42:8, 42:15, 43:9, 43:24, 46:7, 46:10, 47:16, 56:18, 61:21, 62:1, 73:23, 74:6, 75:20, 75:25, 76:1, 76:3, 76:9, 87:7, 89:6, 89:7, 91:13, 91:22, 121:15, 130:21, 136:12, 139:14, 140:10, 158:22, 159:1, 162:14, 176:1, 186:21, 187:7, 188:19, 189:17, 191:1, 192:25, 195:17
**two-and-a-half** [1] - 130:21
**type** [10] - 11:19, 40:3, 49:7, 51:18, 67:11, 132:7, 136:13, 174:22, 191:11
**types** [4] - 17:20, 52:4, 60:25, 134:8
**typical** [1] - 82:3
**typically** [4] - 14:16, 67:4, 67:14, 91:21
**U.S** [1] - 1:8
**ultimate** [1] - 187:1
**ultimately** [2] - 191:6, 191:25
**uncertain** [1] - 192:8
**uncommon** [1] - 34:20
**under** [23] - 3:14, 52:22,

53:4, 57:3, 89:9, 96:15, 110:19, 112:3, 114:16, 118:10, 118:20, 120:12, 127:23, 133:15, 171:4, 177:7, 185:2, 187:19, 188:16, 188:18, 189:7, 191:8, 195:24
**undergoing** [1] - 12:19
**understood** [1] - 130:25
**undocumented** [3] - 111:9, 111:11, 111:22
**unexpected** [1] - 27:20
**unfortunately** [2] - 20:23, 55:1
**United** [2] - 89:22, 156:23
**UNITED** [1] - 1:1
**university** [1] - 187:11
**University** [7] - 70:3, 97:8, 138:16, 138:18, 187:9, 191:19
**unlawful** [1] - 186:9
**unless** [4] - 162:2, 181:2, 181:24, 195:13
**unlikely** [1] - 158:19
**unmitigated** [1] - 176:17
**unofficial** [1] - 20:23
**unreasonable** [1] - 186:8
**unstructured** [1] - 52:11
**unusual** [3] - 10:22, 35:22, 82:6
**unusually** [2] - 42:13, 48:21
**up** [34] - 4:20, 8:2, 23:2, 26:2, 29:13, 32:24, 32:25, 34:9, 36:10, 36:14, 44:19, 45:19, 61:6, 75:7, 76:23, 77:7, 116:13, 123:6, 136:24, 139:14, 139:16, 140:16, 149:4, 154:17, 167:13, 175:23, 176:12, 176:17, 182:16, 185:14, 185:19, 186:7, 191:14
**Update** [1] - 99:25
**updated** [2] - 55:2, 105:17
**upload** [1] - 123:1
**urge** [1] - 195:14
**urgent** [1] - 157:6
**US** [2] - 104:20, 180:25
**useful** [1] - 133:14
**uses** [1] - 38:19
**USMLE** [18] - 78:23, 79:22, 81:25, 82:4, 82:7, 85:19, 87:7, 88:20, 89:3, 89:11, 89:13, 89:22, 90:2, 100:18, 139:1, 139:2, 172:17, 172:20
**Usual** [2] - 121:17
**usual** [1] - 121:19
**utilizing** [1] - 1:24
**valid** [2] - 194:11
**validity** [5] - 13:22, 14:4, 14:7, 14:9, 180:16

**Vargas** [3] - 123:12, 163:13, 186:10
**VARGAS** [71] - 2:2, 2:3, 79:15, 80:21, 81:7, 81:12, 81:14, 85:1, 85:3, 85:5, 86:19, 96:4, 96:5, 99:16, 102:11, 102:16, 107:14, 107:18, 107:20, 107:23, 107:25, 108:18, 109:3, 109:6, 109:8, 113:3, 116:17, 116:18, 117:5, 117:8, 117:14, 117:17, 117:20, 117:24, 118:2, 118:5, 118:23, 122:21, 125:15, 125:19, 125:24, 126:2, 126:20, 126:21, 134:4, 134:6, 137:4, 137:19, 160:22, 170:21, 173:4, 173:7, 173:10, 174:1, 174:3, 174:12, 174:15, 175:1, 175:7, 177:1, 178:9, 178:12, 179:8, 179:10, 180:4, 180:22, 191:15, 191:17, 196:23, 196:25, 197:5
**various** [1] - 74:13
**vary** [1] - 187:15
**vast** [1] - 149:6
**vein** [1] - 77:11
**vendor** [2] - 141:7, 141:9
**verbal** [1] - 162:20
**verification** [2] - 51:4, 70:15
**version** [6] - 24:8, 28:11, 28:12, 52:25, 53:5, 181:9
**versions** [2] - 20:10, 105:16
**versus** [1] - 87:6
**vice** [1] - 138:12
**video** [1] - 156:25
**view** [1] - 131:10
**viewed** [1] - 158:1
**viewer** [1] - 169:24
**vision** [2] - 56:5, 98:24
**visit** [1] - 70:12
**visual** [2] - 21:2, 58:5
**volume** [2] - 83:21, 139:15
**Volume** [1] - 127:2
**voluminous** [2] - 155:1, 155:2
**wait** [2] - 47:7, 88:21
**waiting** [1] - 8:15
**walk** [3] - 68:17, 76:22, 112:18
**walks** [1] - 52:21
**wants** [4] - 112:25, 160:8, 171:17, 173:14
**Washington** [2] - 2:5, 2:12
**watch** [3] - 63:19, 64:9, 137:21
**watching** [1] - 160:12
**weakness** [2] - 176:17
**weaknesses** [1] - 194:23

**wealth** [1] - 192:13
**web** [2] - 54:9, 55:13
**website** [9] - 4:22, 4:25, 6:6, 6:8, 55:2, 66:7, 89:16, 89:19, 130:20
**week** [8] - 3:25, 89:9, 91:13, 154:22, 155:25, 156:1, 170:23, 190:25
**weekends** [1] - 111:14
**weeks** [4] - 89:5, 89:14, 89:17, 90:5
**weight** [7] - 103:3, 103:18, 103:20, 103:23, 103:25, 190:15, 190:20
**weighted** [1] - 97:17
**Western** [1] - 135:21
**wheel** [1] - 41:9
**wherewithal** [1] - 179:22
**whole** [2] - 126:19, 179:17
**WIAT** [10] - 15:12, 16:1, 16:10, 24:9, 24:13, 24:20, 45:12, 45:19, 49:12, 59:23
**WIAT-III** [2] - 45:12, 45:19
**Wide** [1] - 22:25
**willing** [1] - 187:17
**wisely** [1] - 160:11
**withdraw** [1] - 172:18
**withdrawing** [1] - 144:8
**withdraws** [1] - 172:19
**withdrew** [2] - 191:23, 191:25
**Witness** [2] - 121:11, 198:4
**witness** [6] - 101:23, 117:15, 125:20, 137:22, 156:4, 159:24
**witnesses** [3] - 26:16, 64:1, 196:9
**woman** [2] - 135:11, 181:25
**wondering** [1] - 165:10
**Woodcock** [3] - 15:17, 46:1, 59:23
**Woodcock-Johnson** [2] - 46:1, 59:23
**word** [10] - 15:13, 16:2, 21:20, 21:21, 22:2, 41:8, 46:8, 47:8, 49:14, 175:20
**wording** [2] - 30:17, 49:11
**words** [11] - 16:3, 16:4, 21:16, 21:23, 41:16, 47:12, 102:21, 103:11, 119:4, 182:3, 182:4
**works** [4] - 44:15, 93:6, 100:6, 195:7
**world** [4] - 185:9, 186:8, 193:13
**worth** [1] - 181:6
**WRAT5** [1] - 22:25
**write** [5] - 107:21, 107:23, 114:25, 122:15, 177:15
**writing** [11] - 19:15, 20:14,

28:14, 31:11, 58:15, 58:16, 63:12, 92:13, 111:25, 114:23, 177:13
**written** [7] - 9:12, 77:18, 109:20, 110:8, 122:25, 123:1, 174:23
**wrote** [3] - 90:20, 122:15, 194:2
**year** [9] - 19:11, 65:20, 65:21, 66:3, 89:23, 89:25, 94:5, 184:2, 191:24
**years** [5] - 130:21, 170:23, 172:22, 186:3, 195:9
**yesterday** [27] - 3:5, 3:15, 5:24, 6:18, 7:17, 9:6, 10:25, 12:13, 13:2, 16:8, 17:19, 18:13, 22:1, 24:21, 27:25, 29:23, 34:15, 37:4, 39:10, 40:10, 42:8, 43:6, 47:11, 50:16, 58:25, 59:2, 61:15
**young** [2] - 135:11, 181:25
**yourself** [1] - 115:11
**Zecker** [5] - 71:14, 73:11, 73:15, 74:6, 87:20
**Zecker's** [2] - 73:24, 163:7
**zero** [1] - 48:2
**ZUBA** [1] - 1:15