Appeal No. 20-1058

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the Eastern District of Pennsylvania, Case No. 19-CV-2002

**JOINT APPENDIX
VOLUME III: APPX726-1027**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

## Volume I: Appx1-62

                                                            **Page**

District Court Docket......................................................Appx1

Notice of Appeal (Jan. 7, 2020)....................................Appx7

District Court Order Granting Preliminary
Injunction (Dec. 31, 2019).............................................Appx9

District Court Order Denying Motion to Stay
(Feb. 4, 2020)...............................................................Appx62

## Volume II: Appx63-725

Preliminary Injunction Hearing Transcript
(Dec. 3-5, 2019)........................................................ Appx63

## Volume III: Appx726-1027

Complaint (May 8, 2019) ..........................................Appx726

Answer to Complaint (July 8, 2019)........................Appx747

Declaration of Catherine Farmer, Psy.D. ...............Appx762

Declaration & Resume of Steven G. Zecker,
Ph.D. .........................................................................Appx771

Declaration & Resume of Benjamin J. Lovett,
Ph.D. .........................................................................Appx795

Declaration & Resume of Robert D. Smith,
Ph.D. .........................................................................Appx827

Declaration of Jessica Ramsay .................................Appx840

Resume of Jessica Ramsay .....................................Appx854

Kindergarten Progress Reports & Test Record
(1995-96) ..............................................................Appx857

First Grade Progress Report & Test Record
(1996-97) ..............................................................Appx871

Second Grade Progress Reports & Test Record
(1997-98) ..............................................................Appx875

Third Grade Report Card (1998-99) .........................Appx879

Tanguay Letters & Notes (1997, 2000) ....................Appx881

Fourth Grade Report Card (1990-2000)...................Appx886

Fifth Grade Report Cards (2000-01) ........................Appx888

Sixth Grade Report Card & Test Report
(2001-02) ..............................................................Appx892

High School Transcript & Alumni History
(2004-08) ..............................................................Appx895

Standardized Test Results (2007) ...........................Appx897

High School Athletic Awards (2008) ........................Appx899

Plan ACT Score Report (2005).................................Appx904

ACT Score Report (March 2007)..............................Appx908

ACT Score Report (Oct. 2007).................................Appx909

College Application to UW-Madison (2007).............Appx910

Ohio State University Transcript (2008-12)............Appx922

Academic & Standardized Testing History
Summaries..................................................................Appx926

Letter from Testing Organizations to Senator
Kennedy & Others (2008) .........................................Appx929

Smiy Office Visit Report (2009)...............................Appx934

Ohio State ADD/ADHD Verification Form
(2010) .........................................................................Appx939

Letter from R. Burgoyne to Disability Rights
Section (2014) ...........................................................Appx945

MCAT Score Report (2011) ......................................Appx962

Livingston Evaluation & Addendum
(2014, 2016) ..............................................................Appx963

Score Reports for Subject-Matter Examinations
(2014-17)....................................................................Appx969

Medical School Student Dashboard (2016)............Appx1003

Lewandowski Evaluations & Correspondence
(2017-18) ..................................................................Appx1006

## Volume IV: Appx1028-1366

USMLE Step 1 Score Report (2017).......................Appx1028

Ramsay Step 1 Outcome Data (2017) ....................Appx1030

Secondary Application to University of
Wisconsin ...............................................................Appx1039

Articles: *Genetic Influences on Nicotine α5
Receptor* (2015), *Organic Acid Disorders* (2018)....Appx1047

NBME Accommodations Request Form &
Personal Statement (2016) .....................................Appx1068

PowerPoint from NBME Consultants Meeting
(2016) ....................................................................Appx1083

Zecker Review of Ramsay Request (Jan. 2017) .....Appx1118

Letter from NBME to Ramsay (March 2017) ........Appx1125

NBME Accommodations Request Form &
Personal Statement (2018) .....................................Appx1127

Correspondence between Dafoe & Ramsay
(2018) ....................................................................Appx1231

Correspondence between Ramsay, Reukberg,
and/or Berger (2017-18) ........................................Appx1235

**Volume V: Appx1367-1683**

Correspondence between Ramsay & Houtman
(2018) ....................................................................Appx1367

Zecker Review of Ramsay Request (July 2018) .....Appx1392

Letter from NBME to Ramsay (Sept. 2018)...........Appx1401

Michigan Dyslexia Institute Intake Interview
(2018) ....................................................................Appx1404

ADHD Symptoms Checklist (prepared by Ramsay
& Hughes)..............................................................Appx1411

Correspondence between Ramsay, Smith,
and/or Berger (2018) ..............................................Appx1415

Smith Evaluation (2018).........................................Appx1431

Smith Website Homepage.......................................Appx1462

Reconsideration Request from Berger to NBME
(Dec. 2018) ...............................................Appx1464

Lovett Review of Ramsay Request
(Dec. 2018) ...............................................Appx1507

Letter from NBME to Ramsay (Feb. 2019)............Appx1511

Leave of Absence Paperwork (2018-19) .................Appx1513

Reconsideration Request from Berger to NBME
(March 2019) .............................................Appx1526

Correspondence from NBME to Ramsay
(March 2019) .............................................Appx1533

Article: *An Investigation of Methods to Detect
Feigned Reading Disabilities* (2010) ......................Appx1535

Western Michigan University Medical Student
Policy Manual...........................................Appx1545

USMLE Website (2017): *Step 1* ..............................Appx1558

Sample Step 1 Test Questions (2017) ....................Appx1559

ACT: Preparing for the Exam & Sample Test
Questions (2007-08) .................................Appx1605

## Volume VI: Appx1684-1883

Sample MCAT Exam (2010) ...................................Appx1684

MCAT: *The Official Guide to the MCAT Exam*
(excerpts) (2011) .......................................Appx1758

MCAT Verbal Reasoning Questions with
Ramsay's Annotations ............................................Appx1780

WIAT-III Item Data .................................................Appx1798

Woodcock Johnson IV Diagnostic Test Records ....Appx1817

Gray Oral Reading Test Records ("GORT-V") .......Appx1824

TOMM Score Sheet .................................................Appx1836

Article: *Underachievement & Learning
Disabilities in Children Who Are Gifted
(1999-2000)* ...........................................................Appx1839

Federal Register (excerpts)....................................Appx1844

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed this Appendix with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JESSICA RAMSAY,                         :
            Plaintiff          :
                       :
          v.              :    CIVIL ACTION NO.
                       :
NATIONAL BOARD OF MEDICAL               :
EXAMINERS,                              :
            Defendant          :

## COMPLAINT

Plaintiff Jessica Ramsay ("Ramsay") brings this action under the Americans with

Disabilities Act ("ADA"), and the Rehabilitation Act:  for preliminary and permanent injunctive

relief to enjoin and restrain defendant National Board of Medical Examiners ("NBME") from

refusing to grant testing accommodations that are required to enable Ramsay, a person with

reading and attentional disabilities, to have equal access to examinations administered by

NBME; for declaratory relief concerning Ramsay's right to receive such accommodations; for

the monetary damages that Ramsay has sustained as a result of NBME's wrongful refusal; and

for the costs of suit including reasonable attorneys' fees and costs.

## Jurisdiction, Parties and Venue

1.      Ramsay is a citizen of Michigan, residing at 6862 Tall Oaks Drive, Apt. 3B,

Kalamazoo, Michigan, and is a student in the M.D. program at Homer Stryker M.D. School of

Medicine of Western Michigan University ("WMed").

2.      NBME is a non-profit corporation, organized and existing under the laws of the

District of Columbia, with its principal place of business at 3750 Market Street, Philadelphia,

Pennsylvania.



DEFENDANT'S
EXHIBIT
1

3.      NBME is a recipient of Federal financial assistance, including but not limited to funds from the U.S. Department of Defense and the U.S. Department of Veterans Affairs, and is therefore subject to Section 504 of the Rehabilitation Act.

4.      Ramsay's claims against NBME arise under the ADA, 42 U.S.C. §§12101 *et seq.,* including 42 U.S.C. §12189, and under Section 504 of the Rehabilitation Act, , 29 U.S.C. §794. This Court has jurisdiction of this action under 28 U.S.C. §§1331 and 1343(a)(4).

5.      Venue is proper because NBME is a resident of this District.

### Facts Giving Rise to Ramsay's Claims Against NBME

#### a.  Ramsay is a person with disabilities, which affect her ability to read questions on written examinations within the allotted time

6.      Ramsay has been diagnosed with dyslexia and attention deficit hyperactivity disorder and has a history of significant reading difficulties and distractability throughout her educational career.

7.      Ramsay's impairments with respect to reading and attention substantially limit her in the major life activities of thinking, learning, reading, concentrating, studying, writing, processing information, and taking examinations, as compared with most people.

8.      In Ramsay's most recent application to NBME for testing accommodations, she provided a "Personal Statement" as required by the NBME.  A copy of Ramsay's most recent Personal Statement, marked Exhibit A, is attached hereto and incorporated herein by reference. As set forth in Ramsay's Personal Statement:

a.      Ramsay has "always struggled with flipping, merging, and tangling letters, characters, and words both when reading and writing."  Personal Statement at 1.

b.      Ramsay also has "trouble distinguishing between words and characters that have similar shapes."  *Id.*

c.     Ramsay also has particular difficulty with "technical material like the material on the USMLE Step 1 test, [and] must spend a lot of time and effort to untangle the words and decode each one, identifying their individual meanings.  Then I must piece them together in the correct sequence, building them up to get the meaning of the text as a whole.  This process requires me to reread text multiple times before I can fully comprehend what I am reading.  Usually, I also need to read the text aloud, or have it read to me by a person or computer program, to help me interpret the words within the context of the sentence, and then within the paragraph." *Id.* at 1-2.

d.     Ramsay is also significantly impaired with respect to "distractibility and impulsivity" which "make[s] it very difficult to focus on just one idea at a time, causing me to jump quickly from one thought to another, which makes it difficult to maintain my train of thought." *Id.* at 4.

9.     Even before she began attending college, Ramsay struggled with school work and needed to use mitigating strategies including extra studying time and reading avoidance strategies.

10.     While attending college at Ohio State University ("Ohio State") in 2009, Ramsay experienced additional difficulty with school work, because of reading difficulties, including but not limited to slow reading speed and also distractibility.  An Ohio State professor recommended that she be evaluated to determine whether she had any behavioral or learning disorder that affected her performance in school and on examinations.

11.     Following the recommendation by her Ohio State professor, Ramsay consulted a physician who diagnosed her with Attention Deficit Disorder inattentive type, and who also reported symptoms of dyslexia.

12.    Learning disorders like dyslexia and Attention Deficit Disorder are described in an American Psychological Association publication, the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), and also in a publication of the World Health Organization, the International Classification of Diseases ("ICD").  The current version of the DSM is DSM-5, and the current version of the ICD is ICD-10.  In DSM-5 and ICD-10, "Attention Deficit Disorder" is now called "Attention Deficit Hyperactivity Disorder" or "ADHD," and dyslexia is now called "Specific Learning Disorder – Reading" (DSM-5) or "Specific Reading Disorder" (ICD-10).  For convenience of reference, the terms "ADHD" and "dyslexia" and the current classifications from DSM-5 and ICD-10 will be used in this Complaint as appropriate.

13.    Ramsay has long planned to attend medical school and become a practicing physician, and is well qualified, but needs reasonable accommodations to overcome the barrier presented by defendant's examinations.  Ramsay possesses the knowledge and drive and passion to be successful, but because of her slow reading speed and distractibility, she needs extended testing time in order to access the USMLE step examinations.

### b.    The United States Medical Licensing Examination

14.    NBME develops and administers a series of standardized written examinations, known collectively as the United States Medical Licensing Examination ("USMLE"), which are administered throughout the United States.

15.    As described more specifically below, the USMLE step examinations are required in order to receive the degree of Doctor of Medicine (M.D.), and also in order to apply for medical residency training programs, and to become licensed as a physician.

16.    Ramsay was required by WMed Medical School to take and pass USMLE Step 1 at or near the end of her third year of medical school.  Scores on USMLE Step 1 are also an important selection criterion used by medical residency training programs throughout the United

States to rank candidates in the highly competitive residency match process. Therefore, a student who receives a low score on Step 1 – even if it is a passing score – will be unable to compete for many residency programs, and sometimes may fail to be selected for any residency program.

17.    Step 2 of the USMLE, which consists of two parts – Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills) – must be taken and passed by M.D. students prior to graduation from medical school, including WMed Medical School.

18.    Step 3 of the USMLE must generally be taken and passed by graduates of M.D. degree programs, prior to licensing as physicians.

19.    NBME is obligated to provide students with disabilities with reasonable testing accommodations so that such students can demonstrate their knowledge and ability on the USMLE step examinations.

20.    All of the USMLE step examinations are "timed," *i.e.* must be completed within a set time.

21.    NBME must provide additional time to individuals with disabilities where necessary to best ensure that the examination results accurately reflect the individual's aptitude rather than reflecting the individual's disability.

22.    NBME has provided double time for medical students with dyslexia on the USMLE.

23.    The skills that are required in order to completely read the questions on the USMLE step examinations under standard timing conditions include the ability to read fluently and with automaticity, *i.e.,* the ability to recognize words quickly and accurately, and without conscious thought or hesitation.

24.     The USMLE step examinations require students to read passages – sometimes referred to as "vignettes" – which are longer and more complex than reading passages on the SAT, ACT, MCAT and other pre-medical school examinations.

25.     For examinations that are administered before medical school, including the ACT and MCAT, a student may be able to answer the questions correctly without reading all of the narrative prompts, but for the USMLE step examinations, this is generally not possible.

26.     If Ramsay does not receive appropriate accommodations for the UMSLE step examinations, her examination results will not adequately reflect what she knows but will rather be a reflection of the barriers of her disability and the failure of the NBME to provide appropriate test accommodations.

27.     In fact, Ramsay has already failed USMLE Step 1 on one occasion, because NBME refused to provide the testing accommodations that she needed in order to be able to access the examination on a basis that was equal to people without disabilities.

28.     WMed Medical School limits the number of times that a student is permitted to take the Step 1 examination.

### c. Ramsay has previously received the same or similar accommodations to what she is seeking from NBME from her college and medical school.

29.     After receiving  a diagnosis of ADHD from her primary care physician in 2009, Ramsay registered with the Office of Disability Services at Ohio State, and Ohio State granted her several accommodations including 50 percent additional testing time, and testing in a reduced-distraction testing space.

30.     Ramsay's reading and attentional disabilities were further evaluated when she began attending WMed Medical School in 2014, and WMed Medical School provided additional accommodations including "double time" (100 percent extended testing time) on examinations.

31.     Throughout her medical education at WMed Medical School, Ramsay has taken numerous examinations – including subject matter examinations that are developed by NBME but administered by individual medical schools like WMed – and has utilized 100 percent extended testing time.  Ramsay has always received 100 percent extended testing time for the NBME-developed subject matter examinations, which are the examinations that are most similar to the USMLE step examinations.

32.     The USMLE Step examinations are far more reading intensive than the standardized examinations that Ramsay took prior to medical school.  As further explained below in paragraphs 58 and 59, Ramsay needs 100 percent extended testing time as a reasonable accommodation, to permit her to access the USMLE Step examinations on a basis that is equal to students without disabilities.

33.     If NBME had granted accommodations to Ramsay, when she first requested such accommodations, she could have graduated from medical school in 2018 and been placed in a medical residency program, through the National Residency Matching Program ("NMRP").  As a result of NBME's failure to provide accommodations, Ramsay's graduation and hence her

ability to begin employment as a medical resident, and eventually as a physician, have been

delayed, and she has permanently lost and will continue to lose income as a result.

34.     Ramsay has also suffered from humiliation and embarrassment as a result of

being denied reasonable accommodations and therefore failing the Step 1 examination, and any

further delay in receiving accommodations and therefore being able to continue her education

will permanently affect her employability and income in the future.

### d.  NBME is refusing to provide the accommodations that Ramsay needs because of her dyslexia and ADHD.

35.     On or about November 28, 2016, during her third year of medical school at

WMed, Ramsay submitted an application to NBME for test accommodations, namely for

"double time" to take the Step 1 examination, *i.e.,* 100 percent additional test time, which was

one of the accommodations that she was already receiving from WMed Medical School.

36.     With her November 28, 2016 application, Ramsay also submitted various

supporting documents required by NBME, including a Personal Statement, and evaluation

reports from treating physicians and psychologists.  Ramsay submitted reports from Alan Smiy,

M.D., who diagnosed her with ADHD in 2010 and recommended a trial of ADHD medication;

and Charles Livingston, M.A., a psychologist, who also diagnosed her with ADHD in September

2014.

37.     NBME did not respond to the November 28, 2016 request for more than three

months.  Then, on March 10, 2017, NBME denied Ramsay's application ("first denial") in a

letter from Michelle Goldberg, Ph.D., Manager, Disability Services ("Goldberg").

38.     NBME permits students to request reconsideration, after denial of a request for

accommodations, a process which also is sometimes referred to as an "appeal."  As part of this

process, NBME states that students seeking reconsideration must submit "new" information.

39.    Ramsay was forced to take the Step 1 examination in July 2017 without accommodations, and without requesting reconsideration at that time, because she did not have time to gather new information, or wait for a new NBME decision without delaying her fourth year of medical school.

40.    Ramsay took the Step 1 examination on July 20, 2017.  When taken without accommodations, the Step 1 examination is divided into seven "blocks" of 60 minutes each, with up to 40 questions in each block.[1]  Because of her dyslexia and ADHD, Ramsay was only able to read about 60 to 70 percent of the questions in each block, and had to enter guesses for the remaining questions without reading them.[2]  The passing score set by NBME for the examination was 192, and Ramsay received a failing score of 191.  (NBME subsequently increased the passing score for Step 1 to 194.)

41.    As a result of failing USMLE Step 1, Ramsay has been required by WMed Medical School to take a leave of absence effective beginning in August 2017.  That leave of absence is continuing, and Ramsay's medical education has already been delayed by about 20 months.

42.    After her unsuccessful attempt to pass the USMLE Step 1 examination without accommodations, Ramsay began to prepare a new application for accommodations to NBME.

43.    As part of her preparation for a second application, Ramsay obtained an additional evaluation from a neuropsychologist, Alan G. Lewandowski, Ph.D. in Kalamazoo, Michigan.  Dr. Lewandowski diagnosed her with ADHD and "learning disability, nonverbal

---

[1] *See* www.usmle.org/step-1/, "Overview."  A copy is attached as Exhibit B.

[2] NBME informs students that "If unsure about an answer, it is better to guess since unanswered questions are automatically counted as wrong answers."  *See* Step 1 Sample Test Questions, found on the Internet at www.usmle.org/pdfs/step-1/samples_step1.pdf.

(abnormal scanning and processing speed)," a disability which is related to and which supports the diagnosis of dyslexia.

44.     As part of her preparation for a second application, Ramsay also obtained an evaluation from a psychiatrist, Bruce Ruekberg, M.D., also in Kalamazoo, Michigan, who diagnosed her with ADHD Combined Type (DSM-5 314.01; ICD-10 F90.2); and specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 FSl.81).

45.     As part of her preparation for a second application, Ramsay also obtained documentation for two medical problems that she experienced during the Step 1 examination in July 2017, namely:  migraine with aura; and deep vein thrombosis ("DVT").  "Migraine with aura" (also called classic migraine) is a headache that strikes after or along with sensory disturbances called aura.  DVT is caused by a blood clotting disorder.  Ramsay obtained a report from her treating physician, Jennifer Houtman, M.D., who confirmed Dr. Lewandowski's and Dr. Ruekberg's diagnoses, and also confirmed Ramsay's diagnosis of "migraines with aura," and "clotting disorder with recent Deep Venous Thrombosis."

46.     Ramsay submitted her new application on or about June 7, 2018.

47.     Once again, NBME did not respond to Ramsay's application for more than 3 months.

48.     On September 11, 2018, NBME denied Ramsay's second application for extended testing time ("second denial") in a letter to Ramsay, signed by Catherine Farmer, Psy.D., Director, Disability Services ("Farmer").

49.     NBME's September 11, 2018 letter did grant Ramsay's other requests, namely the request for extended break time, and the request for a "separate testing room in which you may stand, walk or stretch during exam."  NBME also stated that Ramsay had "permission to read aloud."  NBME's letter stated that these requests were granted on the basis of "documentation of a history of DVT and migraines."

50.     However, NBME did not grant any accommodations based on the diagnoses of dyslexia and ADHD that Ramsay submitted.

51.     The accommodations that NBME did grant – extended break time, a separate testing room, and permission to read aloud – are not sufficient to enable Ramsay to take the USMLE step examinations on an equal basis with students who do not have disabilities, because she has dyslexia and ADHD which affect her reading speed, and comprehension of the written word.

52.     Ramsay therefore consulted with a neuropsychologist, Dr. Robert Smith ("Dr. Smith"), for the purpose of having a further evaluation of her reading and attentional problems.

53.     Dr. Smith is a licensed psychologist, Michigan License # 6301003249, who received the degree of Doctor of Philosophy in Counseling Psychology from Michigan State University in 1984.  Dr. Smith has more than 25 years of experience with neuropsychological assessment of children and adults.

54.     Ramsay met with, and was evaluated and tested by Dr. Smith, at his office, on September 25, 2018.  A copy of Dr. Smith's report of his evaluation of Ramsay is attached hereto and incorporated herein by reference as Exhibit C.

55.    Based upon the in-person evaluation, and diagnostic testing as described in his report, Dr. Smith diagnosed Ramsay with "Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition," DSM-5 315.00 and ICD-10 F81.0.

56.    Based upon his in-person evaluation, and diagnostic testing as described in his report, Dr. Smith also diagnosed Ramsay with Attention-Deficit/ Hyperactivity Disorder Combined Presentation," DSM-5 314.01 and ICD-10 F90.2.

57.    In his report, Dr. Smith explained that, on prior examinations such as the ACT and MCAT, Ramsay was able to use mitigating strategies to answer many questions without having to completely read the question.  On the MCAT and prior standardized examinations, Ramsay could sometimes answer multiple choice questions by reading only the answer choices, and not reading the prompt:

> [S]he relied on strategies suggested by her Princeton Review instructors in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested that Jessica not read the passages until she had first answered all the questions she could without reading the passage. Only then with any remaining time, she could go back and try to answer the passage-dependent questions starting with the shortest passages. Finally, with the last minute, it was recommended that she randomly fill in answers to any questions she wasn't able to get to.

Smith Report at 7.

58.    Dr. Smith's report also demonstrates why double or 100% extended testing time is the appropriate accommodation for Ramsay, as opposed to any lesser amount.  Using standardized assessment measures which are widely used and generally accepted for such assessments, Dr. Smith found the following:

     a.     Ramsay's WAIS-IV[3]-Processing Speed Index is at the 8th percentile, *i.e.,* is greater than only 8 percent of same-aged individuals, a score which is 53 points (3.5 standard deviations) below her GAI[4] score of 132. Smith Report at 10.

     b.     Ramsay's WIAT-III[5] Oral Reading Fluency is at the 1st percentile.  Smith Report at 16 and 18.

     c.     Ramsay's WJ4[6] Reading Rate is at the 1st percentile.  Smith Report at 21.

     d.     Ramsay's WJ4 Reading Rate Cluster score of 66 is in the Far Below Average range, range which is higher than only 1% of other individuals her age.  Smith Report at 21.

     e.     Ramsay's GORT-5[7] Fluency is at the 2nd percentile.  Smith Report at 22.

     f.     Ramsay "was only able to attempt 47% of the Nelson-Denny[8] Comprehension items during the standard time limit."  Smith Report at 30.

59.     In addition to the evidence of Ms. Ramsay's slow reading speed and distractibility, her need for additional extended time is shown by two of the accommodations which NBME has already granted – namely, a separate testing room in which Ms. Ramsay "may stand, walk or stretch" during the examination, and "permission to read aloud."  If Ms. Ramsay needs to "stand, walk or stretch" and "read aloud" during the examination, as NBME has

---

[3] Wechsler Adult Intelligence Scale – 4th Edition.

[4] General Ability Index, which is calculated from the Verbal Comprehension Index and the Perceptual Reading Index.

[5] Wechsler Individual Achievement Test – 3d Edition.

[6] Woodcock Johnson IV Tests of Achievement.

[7] Gray Oral Reading Tests – 5th Edition.

[8] Nelson Denny Reading Test.

recognized, then NBME must also recognize that these compensatory strategies require more time. NBME must grant the additional time which is needed.

60.    Ramsay submitted an "appeal" / "request for reconsideration" to NBME on December 12, 2018 which included Dr. Smith's report.

61.    NBME responded to Ramsay's appeal in a letter dated February 14, 2019 ("third denial"), a copy of which is attached hereto and incorporated herein by reference as Exhibit D.

62.    NBME's third denial admitted that Ramsay's "scores on timed reading tests administered for the purpose of requesting test accommodations" were "exceptionally low."

63.    The only reason stated in NBME's third denial, for disregarding Ramsay's "exceptionally low" scores, was that her "average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college and medical school demonstrate that [her] skills are better than most people in the general population,"

64.    NBME's third denial paraphrased Dr. Smith's comment that Ramsay had "relied on strategies such as answering questions before reading the passages" when she took the prior standardized tests, and NBME characterized such strategies as "a common strategy recommended by prep courses and utilized by savvy students."  Thus, NBME implied that since Ramsay utilized compensatory strategies on prior examinations, she did not need the reasonable accommodation of extended testing time that she requested for the USMLE Step examinations.

65.    NBME's third denial also ignored Ramsay's own explanation, in the Personal Statement required by NBME and submitted as part of her request for accommodations, that:

> "The NBME and USMLE exams are different from the standardized exams I took before medical school. For these exams, I must read the entire prompt for each of the questions in order to gather all of the information necessary to correctly decide on an answer. This requires far more reading than either the ACT or the MCAT did. To have the same opportunity as the other students taking this exam to read and gather the

necessary information from each prompt, I need the accommodations that
I am requesting."

Personal Statement at 3.

66.     In citing Ramsay's use of mitigating strategies, as justification to deny Ramsay's
request for accommodations, NBME's third denial violated the ADA as amended, under which
NBME is required to disregard "learned behavioral . . . modifications," like the strategy of
"answering questions before reading the passages" in order to mitigate a reading disability.  42
U.S.C. §12102(4)(E)(i)(IV).

67.     Neither Goldberg who signed NBME's first denial, nor Farmer who signed
NBME's second and third denials, nor any other employee or consultant of NBME, have ever
interviewed Ramsay in person.

68.     On March 19, 2019, Ramsay's attorney wrote to NBME and requested further
reconsideration of NBME's second and third denials of Ramsay's request for accommodations.
A copy of the March 19, 2019 letter from Ramsay's attorney, marked Exhibit E, is attached
hereto and incorporated herein by reference.

69.     The March 19, 2019 request to NBME for further reconsideration stated, among
other things that:  (a) NBME had summarily refused to consider the information in the Smith
report; (b) NBME's wrongful denial was based on Ramsay's use of mitigating measures during
prior examinations, a consideration which the ADA expressly forbids; (c) NBME had wrongfully
refused to grant Ramsay the reasonable accommodation of extended testing time on the basis of
NBME's irrelevant and erroneous contention that "all" students benefit from extended time; and
(d)  Dr. Smith's evaluation results and report demonstrated that Ramsay was entitled to the
accommodation of 100 percent extended testing time which she had requested.

70.     On March 27, 2019, NBME responded to the March 19, 2019 request for further reconsideration with an e-mail signed by Farmer ("fourth denial").  A copy of NBME's fourth denial, marked Exhibit F, is attached hereto and incorporated herein by reference.

71.     NBME's fourth denial merely repeated in summary fashion the content of NBME's third denial, and NBME continued, and has continued, to deny Ramsay the requested reasonable accommodation of extended testing time for the Step 1 examination.

### e.  How Ramsay is harmed by NBME's refusal to provide extended testing time as an accommodation.

72.     Ramsay has suffered and, unless NBME is enjoined and restrained from continuing to wrongfully deny extended testing time as a reasonable accommodation for her disabilities, will continue to suffer immediate and irreparable harm, for which there is no adequate remedy at law, in that:

a.     Ramsay cannot continue with her medical education until and unless she passes USMLE Step 1.

b.     Until and unless Ramsay can pass USMLE Step 1, her medical education will continue to be delayed, and her ability to eventually be licensed as a physician will be endangered.

c.     If Ramsay receives appropriate accommodations and passes USMLE Step 1 now, her graduation will still be delayed until at least June 2020, which is two years later than she could have graduated if she had received appropriate accommodations and passed USMLE Step 1 in 2017.

d.     Unless Ramsay is provided with the reasonable accommodation of extended testing time, her score on Step 1 will not accurately reflect her level of knowledge and will adversely affect her chance of being accepted into a medical

residency program through the National Residency Match Program ("NRMP"), or otherwise, which is a precondition for licensing as a physician.

e.    USMLE scores are heavily weighted in the NRMP process, and placement in a selective residency program is a major determinant for eventual professional success as a physician.  Unless and until NBME provides Ramsay with all of the accommodations which she needs to take the USMLE Step examinations on a fair and equal basis with other students, any eventual placement in a residency program will be adversely affected.

f.    Ramsay will also need extended testing time as a reasonable accommodation for subsequent USMLE Step examinations, namely, USMLE Step 2-CK, Step 2-CS, and Step 3.  The USMLE Step 2-CK and Step 3 examinations are even more reading intensive than Step 1.  For example, on practice tests for USMLE Step 2-CK, taken with standard time, Ramsay has generally been unable to read even 50 percent of the questions.  The USMLE Step 2-CS examination also requires the student to write notes based on a simulated patient examination, for which Ramsay also requires extended time.

g.    On information and belief, NBME generally refuses to provide extended testing time on subsequent step examinations, for a student who receives a passing score on an earlier step examination without extended time.  Thus, even assuming that Ramsay were to be able to pass Step 1 with a minimal passing score, the effect would be to further diminish her chance to obtain the extended testing time that she needs for USMLE Step 2-CK, Step 2-CS, and Step 3.

h.    If Ramsay fails to pass any of the USMLE step examinations, or is unable to obtain scores that allow her to fully demonstrate her ability and knowledge, she may be unable to be licensed as a physician.

## COUNT I – VIOLATION OF THE ADA

73.    Plaintiff incorporates the preceding paragraphs herein by reference.

74.    Ramsay is an individual with disabilities within the meaning of the ADA.  42 U.S.C. §12101 *et seq.,*

75.    Ramsay meets all the eligibility criteria for USMLE Step 1 and, upon successful completion of Step 1 and other requirements, USMLE Step 2-CK, Step 2-CS, and Step 3.

76.    Ramsay is a qualified individual with a disability.

77.    Ramsay needs appropriate testing accommodations to participate in the USMLE Step examinations on a fair and equal basis.

78.    The ADA requires NBME to offer these examinations in a manner accessible to persons with disabilities.  42 U.S.C. §12189.

79.    Title III of the ADA states in pertinent part, "a failure to make reasonable modifications in policies, practices, and procedures when . . . necessary to provide such services . . . to individuals with disabilities" constitutes discrimination.  42 U.S.C. §12182(b)(2)(A)(ii).

80.    Regulations issued by the United States Department of Justice, pursuant to the ADA and applicable to NBME, require that "Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities."  28 C.F.R. §36.309(a).

81.    The Department of Justice regulations also require that NBME must "assure" that:

(i)     The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

* * * *

(v)     When considering requests for modifications, accommodations, or auxiliary aids or services, the entity gives considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations. . . .

(vi)    The entity responds in a timely manner to requests for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

28 C,F,R, §36.309(b)(1).  By wrongfully denying Ramsay's requests for extended testing time, NBME has failed to "best ensure" that the examination results "accurately reflect [her] achievement level," has failed to give any weight to documentation of past accommodations, and has failed to respond in a timely manner to Ramsay's requests.

82.     By disregarding the reports of Ramsay's prior neuropsychological assessments, and particularly the recent assessment by Dr. Smith, NBME has also disregarded written guidance from the Department of Justice which states that "[r]eports from experts who have personal familiarity with the candidates should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."  28 C.F.R. pt. 36, app. A, at 796.

83.     Defendant has discriminated, and continues to discriminate against Plaintiff on the basis of her disabilities by denying her an equal opportunity to demonstrate her aptitude and

achievement level on the USMLE step examinations in violation of the ADA, specifically 42

U.S.C. §§12182, 12189 and 28 C.F.R. §36.309.

## COUNT II – VIOLATION OF THE REHABILIATION ACT

84.    Plaintiff incorporates the preceding paragraphs herein by reference.

85.    Section 504 of the Rehabilitation Act, 29 U.S.C. §794, prohibits discrimination

against people with disabilities in any "program or activity receiving Federal financial

assistance." NBME is such a program, and the USMLE step examinations are such an activity.

86.    NBME's refusal to grant Ramsay the reasonable accommodation of extended

testing time for the USMLE step examinations is a violation of Section 504.

WHEREFORE, Ramsay demands judgment against NBME as follows:

A.    For preliminary and permanent injunctions enjoining and restraining NBME from

refusing to grant Ramsay the reasonable accommodation of 100% extended testing time (double

time) for the USMLE Step 1 examination;

B.    For preliminary and permanent injunctions requiring that, for purposes of the

USMLE Step 2-CK, Step 2-CS and Step 3 examinations, NBME should evaluate Ramsay's

request for testing accommodations based upon her having received 100% extended testing time

(double time) for the USMLE Step 1 examination, and with due consideration for the evaluations

of her disabilities which NBME has wrongfully ignored;

C.    For a Declaratory Judgment that Ramsay has the right to receive testing

accommodations from NBME for each of the USMLE step examinations, including 100%

extended testing time;

D.    For the damages she has sustained as the result of NBME's prior wrongful

refusals of testing accommodations, and as a result of NBME's unreasonable delays in

responding to Ramsay's request for testing accommodations;

E.    For the costs of suit, including reasonable attorneys' fees; and

F.    For such other further relief as the Court shall deem just.

Respectfully submitted,

/s/    Lawrence D. Berger
        Lawrence D. Berger (ID No. 16028)
Larry@rcglawoffices.com
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ  08033
(856) 354-0021

Attorney for Plaintiff

Of Counsel:

Mary C. Vargas (ID No. 324005)
Michael S. Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
(202) 248-5092

Dated:  May 8, 2019

**Appx746**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JESSICA RAMSAY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 2:19-cv-02002-JCJ** |
| ) | |
| **NATIONAL BOARD OF MEDICAL** ) | |
| **EXAMINERS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**DEFENDANT NBME'S ANSWER**

Defendant National Board of Medical Examiners ("NBME"), by and through its attorneys, hereby answers Plaintiff's Complaint.  NBME denies that it violated any law with respect to Plaintiff's request for testing accommodations on the United States Medical Licensing Examination ("USMLE"), denies that plaintiff has provided documentation that supports her contention that she has "reading and attentional disabilities," denies that it discriminated against Plaintiff, denies that Plaintiff is entitled to the relief requested or any relief herein, and responds to the specific allegations in the correspondingly numbered paragraphs of the Complaint as follows:

**Jurisdiction, Parties and Venue**

1.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1, and therefore denies them.

2.      NBME admits the allegations in paragraph 2.

3.      NBME denies the allegations in paragraph 3.

4.     In response to the allegations in the first sentence paragraph 4, NBME admits

Plaintiff purports to assert claims under the Americans with Disabilities Act ("ADA") and Section

504 of the Rehabilitation Act but denies that Plaintiff is entitled to relief under either statute.  The

allegations in the second sentence of paragraph 4 are legal conclusions that NBME is not required

to admit or deny, but if so required, NBME admits that the Court has subject matter jurisdiction

over this action.

5.     The allegations in paragraph 5 constitute legal conclusions that NBME is not

required to admit or deny, but if so required, NBME admits that it is deemed a resident of the

Eastern District of Pennsylvania and that venue is proper in this district.

### "Facts Giving Rise to Ramsay's Claims Against NBME"[1]

**a.     "Ramsay is a person with disabilities, which affect her ability to read
      questions on written examinations within the allotted time"[2]**

6.     NBME admits that Plaintiff has submitted paperwork to NBME indicating that she

has been diagnosed with Specific Learning Disorder with impairment in reading/dyslexia and

Attention-Deficit/Hyperactivity Disorder ("ADHD") but denies that the documentation submitted

by Plaintiff supports these diagnoses and denies the remaining allegations in paragraph 6.

7.     NBME denies the allegations in paragraph 7.

8.     NBME admits that Plaintiff submitted the Personal Statement attached at Exhibit

A to her Complaint with her June 6, 2018, request for testing accommodations.  NBME admits

that Plaintiff correctly quotes from her personal statement in the remaining allegations in paragraph

---

[1] For ease of reference, NBME repeats the section headers of Plaintiff's complaint herein, but in doing so, does not admit to the allegations in the headers and refers to its specific responses to the allegations in each numbered paragraph of the Complaint.

[2] NBME denies the allegations in this sub-header.

- 2 -

**Appx748**

8 but is without knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.  To the extent that Plaintiff purports to incorporate her Personal Statement "by reference" into her Complaint, NBME states that it is without knowledge or information sufficient to form a belief as to the truth of the statements therein, and therefore denies them.

9.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9, and therefore denies them.

10.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10, and therefore denies them.

11.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11, and therefore denies them.

12.    NBME admits that the Diagnostic and Statistical Manual of Mental Disorders ("DSM") provides a classification of mental disorders with associated criteria, that the current version of the DSM is the DSM-5, and that the DSM-5 sets out diagnostic criteria for Attention-Deficit/Hyperactivity Disorder (ADHD) and Specific Learning Disorder, including Specific Learning Disorder with impairment in reading (which is sometimes referred to as dyslexia). NBME denies that the DSM is published by the American Psychological Association.  NBME denies that Specific Learning Disorder, "Attention Deficit Disorder" or ADHD are "learning disorders."  NBME admits that the International Classification of Diseases ("ICD") is a publication of the World Health Organization and that the ICD-10 sets out diagnostic codes for ADHD and specific reading disorder, or dyslexia.  NBME denies that the ICD-10 is the current version of the ICD on the grounds that it is vague, and states that the ICD-11 was published in June 2018 but is

144707815.1

not fully implemented.    NBME denies the remaining allegations in paragraph 12 on the grounds that they are generalized and vague.

13.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 that "Ramsay has long planned to attend medical school and become a practicing physician, and is well qualified" and "Ramsay possesses the knowledge and drive and passion to be successful," and therefore denies the allegations.  NBME denies the remaining allegations in paragraph 13.

**b.    "The United States Medical Licensing Examination"**

14.    In response to the allegations in paragraph 14, NBME admits that it develops the United States Medical Licensing Examination ("USMLE"), offers the USMLE together with the Federation of State Medical Boards, and administers the USMLE through a third-party vendor. NBME admits that the USMLE is a series of standardized examinations, and that the USMLE is administered throughout the United States.  NBME denies that all parts of the USMLE are written.

15.    In response to the allegations in paragraph 15, NBME admits that the USMLE is relied upon by jurisdictions across the United States in making decisions regarding medical licensure.    NBME denies the remaining allegations in paragraph 15, which are vague and generalized.

16.    In response to the allegations in the second sentence of paragraph 16, NBME admits on information and belief that scores on USMLE Step 1 are considered by medical residency training programs during the residency selection process.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16, and therefore denies them.

144707815.1

17.    NBME admits that the USMLE includes a Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills) examination.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 17, and therefore denies them.

18.    NBME admits the allegations in paragraph 18 on information and belief, with respect to licensure as an allopathic physician.

19.    The allegations in paragraph 19 are legal conclusions that NBME is not required to admit or deny, but if so required, NBME admits that it is governed by 42 U.S.C. § 12189 with respect to its offering the USMLE, and denies the remaining allegations in paragraph 19 on the grounds that they are vague and generalized.

20.    NBME admits the allegations in paragraph 20.

21.    The allegations in paragraph 21 are legal conclusions that NBME is not required to admit or deny, but if so required, NBME denies that the generalized paraphrasing in paragraph 21 reflects NBME's obligations under 42 U.S.C. § 12189.

22.    NBME denies the allegations in paragraph 22 on the grounds that they are vague, and states that NBME provides reasonable and appropriate accommodations on the USMLE for individuals with documented disabilities within the meaning of the ADA, including individuals who have been diagnosed with dyslexia.

23.    NBME denies the allegations in paragraph 23 on the grounds that they are vague and generalized.

24.    NBME denies the allegations in paragraph 24 on the grounds that they are vague and generalized.

144707815.1

25.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25, and therefore denies them.

26.    NBME denies the allegations in paragraph 26.

27.    NBME admits that Plaintiff did not pass USMLE Step 1 on her first attempt. NBME denies the remaining allegations in paragraph 27.

28.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28, and therefore denies them.

**"c.    Ramsay has previously received the same or similar accommodations to what she is seeking from NBME from her college and medical school."[3]**

29.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29, and therefore denies them.

30.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30, and therefore denies them.

31.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31, and therefore denies them.

32.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 32, and therefore denies them.  NBME denies the allegations in the second sentence of paragraph 32.

33.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 33, and therefore denies them.  NBME denies the remaining allegations in paragraph 33.

---

[3] NBME is without knowledge or information sufficient to form a belief as to the truth of this allegation and therefore denies it.

144707815.1

34.     NBME denies the allegations in paragraph 34.

**d.      "NBME is refusing to provide the accommodations that Ramsay needs because of her dyslexia and ADHD."[4]**

35.     NBME denies that Plaintiff submitted an application for testing accommodations on November 28, 2016, and states that on December 12, 2016, it received a request dated November 28, 2016, for double-time testing accommodations on Step 1 and Step 2 CK of the USMLE from Plaintiff.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 35, and therefore denies them.

36.     NBME admits that Plaintiff submitted a Personal Statement and reports from Alan Smiy, M.D. and Charles Livingston, M.A., with her December 12, 2016 request.  NBME denies that the allegations in paragraph 36 are a complete description of the referenced reports and denies that Smiy diagnosed Plaintiff with ADHD in 2010.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36, and therefore denies them.

37.     NBME admits that it denied Plaintiff's request for accommodations by letter dated March 10, 2017, from Michelle M. Goldberg, Ph.D., Manager, Disability Services.  NBME denies the remaining allegations in paragraph 37.

38.     In response to the allegations in paragraph 38, NBME admits that individuals may request that NBME reconsider its decision regarding test accommodations by submitting a signed and dated letter requesting reconsideration accompanied by new substantive supporting documentation.  NBME denies the remaining allegations in paragraph 38 on the grounds that they are vague.

---

[4] NBME denies this allegation.

144707815.1

39.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 39, and therefore denies them.

40.      NBME admits the allegations in the first two sentences and in the fourth and fifth sentences of paragraph 40 and admits the allegations in footnotes 1 and 2.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40, and therefore denies them.

41.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 41, and therefore denies them.

42.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42, and therefore denies them.

43.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 43, and therefore denies them.  NBME denies the allegations in the second sentence of paragraph 43.

44.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44, and therefore denies them.

45.      NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 45, and therefore denies them.

46.      NBME admits the allegations in paragraph 46.

47.      NBME denies the allegations in paragraph 47.

48.      NBME admits the allegations in paragraph 48.

49.      NBME admits the allegations in first two sentences of paragraph 49.  NBME denies the allegations in the third sentence of as stated and refers to its letter of September 11, 2018 for a full recitation of NBME's decision.

144707815.1

50.    NBME denies the allegations in paragraph 50 on the grounds that they are vague and refers to its letter of September 11, 2018 for a full recitation of NBME's decision.

51.    NBME denies the allegations in paragraph 51.

52.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 52, and therefore denies them.

53.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53, and therefore denies them.

54.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 54, and therefore denies them.  In response to the allegations in the second sentence of paragraph 54, NBME admits that Plaintiff has attached a copy of a 31-page November 6, 2018 Neuropsychological Evaluation as Exhibit C to her Complaint.  To the extent that Plaintiff purports to incorporate this entire document into her complaint "by reference," NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in the document, and therefore denies them.

55.    NBME admits that the Neuropsychological Evaluation at Exhibit C includes the diagnosis stated in paragraph 55.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 55 and therefore denies them

56.    NBME admits that the Neuropsychological Evaluation at Exhibit C includes the diagnosis stated in paragraph 56.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 56 and therefore denies them

57.    NBME admits that Plaintiff accurately quotes from Exhibit C in paragraph 57.  NBME is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 57, and therefore denies them.

- 9 -

58.    NBME denies the allegations in the first sentence of paragraph 58. NBME denies the allegations in the second sentence of paragraph 58, which are vague and generalized. In response to the remaining allegations in paragraph 58, NBME denies that Plaintiff has fully and accurately reported the contents of Dr. Smith evaluation.

59.    NBME denies the allegations in paragraph 59.

60.    In response to the allegations in paragraph 60, NBME admits that Plaintiff submitted a letter dated December 12, 2018, from her lawyer, Lawrence Berger, which sought reconsideration of NBME's September 11, 2018 decision denying Plaintiff's request for additional testing time. NBME admits that the November 6, 2018 report from Robert Smith was included with this letter. NBME denies the remaining allegations in paragraph 60.

61.    In response to the allegations in paragraph 61, NBME admits that, by letter dated February 14, 2018, it informed Plaintiff that it had not changed its decision communicated in its September 11, 2018 decision letter.

62.    In response to the allegations in paragraph 62, NBME admits that Plaintiff has selectively quoted from NBME February 14, 2019 letter but denies the characterization of this as an "admission" by NBME and denies the remaining allegations in paragraph 62.

63.    NBME denies the allegations in paragraph 63.

64.    NBME denies the allegations in paragraph 64 and refers to its letter of February 14, 2019, for a full recitation of NBME's decision.

65.    NBME denies the allegations in paragraph 65.

66.    NBME denies the allegations in paragraph 66.

67.    NBME denies the allegations in paragraph 67 on the grounds that they are vague.

68.     In response to the allegations in paragraph 68, NBME admits that Plaintiff's lawyer wrote to NBME by letter dated March 19, 2019 (received on March 21, 2019) to seek further reconsideration of NBME's September 11, 2018 and February 14, 2019 letters, to the extent that they denied Plaintiff's request for extended testing time.  NBME denies the remaining allegations in the first sentence of paragraph 68.  To the extent that Plaintiff purports to incorporate this entire March 19, 2019 letter into her complaint "by reference," NBME generally denies the arguments and conclusions made in the letter.

69.     To the extent that the allegations in paragraph 69 purport to paraphrase from the document attached at Exhibit E, NBME refers to the document for a complete statement of its content, and NBME denies the allegations to the extent that they purport to represent the truth of such allegations.

70.     NBME admits that it responded to Plaintiff's March 19, 2019 letter by email dated March 27, 2019, and that a copy of this response is attached as Exhibit F to the Complaint.  NBME denies that this email constituted a "fourth denial."

71.     NBME admits that it did not grant Plaintiff's request for extended testing time and denies the remaining allegations in paragraph 71.

     **e.**     **"How Ramsay is harmed by NBME's refusal to provide extended testing time as an accommodation."[5]**

72.     NBME denies the allegations in paragraph 72.

### **COUNT I[6]**

73.     NBME restates and incorporates by reference its responses to paragraphs 1-72.

---

[5] NBME denies that Plaintiff has been harmed by NBME's decision to deny her request for extended testing time on Step 1 of the USMLE.

[6] NBME denies that it has violated the ADA.

- 11 -

74.    NBME denies the allegations in paragraph 74.

75.    NBME is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75, and therefore denies them.

76.    NBME denies the allegations in paragraph 76.

77.    NBME denies the allegations in paragraph 77.

78.    In response to the allegations in paragraph 78, NBME admits that it is subject to the requirements of 42 U.S.C. § 12189 with respect to its offering the USMLE.

79.    In response to the allegations in paragraph 79, NBME denies that Plaintiff accurately quotes from 42 U.S.C. § 12182(b)(2)(A)(ii) and denies that this provision is "pertinent" to this dispute.

80.    In response to the allegations in paragraph 80, NBME denies that Plaintiff has included the complete provision found at 28 C.F.R. § 36.309(a) but admits that this regulation applies to NBME with respect to its offering the USMLE.

81.    NBME admits that Plaintiff accurately quotes from portions of 28 C.F.R. § 36.309(b)(1) and denies the remaining allegations in paragraph 81.

82.    NBME denies the allegations in paragraph 82.

83.    NBME denies the allegations in paragraph 83.

## COUNT II[7]

84.    NBME restates and incorporates by reference its responses to paragraphs 1-83.

---

[7] NBME denies that the Rehabilitation Act applies and that it has violated the Rehabilitation Act.

144707815.1

85.    NBME denies that the first sentence of paragraph 85 contains a complete and accurate description of Section 504 of the Rehabilitation Act and specifically the provision found at 29 U.S.C. § 794.  NBME denies the allegations in the second sentence of paragraph 85.

86.    NBME denies the allegations in paragraph 86.

The remaining allegations in Plaintiff's complaint constitute a prayer for relief as to which no response is required, but NBME denies that Plaintiff is entitled to the relief requested or to any relief.

**ALL ALLEGATIONS NOT SPECIFICALLY ADMITTED HEREIN ARE DENIED.**

### AFFIRMATIVE DEFENSES

1.    Plaintiff's claims are barred by the statute of limitations to the extent that they are based on any actions taken by NBME outside the limitations period.

NBME presently has insufficient knowledge or information on which to form a belief as to whether it may have any additional affirmative defenses available.  NBME reserves the right to assert additional affirmative defenses in the event discovery, further analysis, or future events indicate that additional unknown or unstated defenses are applicable.

WHEREFORE, NBME prays for judgment as follows:

1.    That Plaintiff take nothing and be denied all relief requested in her Complaint;

2.    That Plaintiff's Complaint be dismissed with prejudice on the merits;

3.    That NBME recover its fees and costs incurred herein; and

4.    That NBME be awarded such other and further relief as the Court deems just and proper.

144707815.1

Dated:  July 8, 2019                          Respectfully submitted,


                                              /s/   Nancy L. Goldstein
                                              Nancy L. Goldstein (Pa. Bar No. 40019)
                                              Hamburg & Golden, P.C.
                                              1601 Market Street, Suite 3310
                                              Philadelphia, PA 19103-1443
                                              Phone: 215-255-8590
                                              Facsimile:  215-255-8583
                                              goldsteinnl@hamburg-golden.com

                                              Robert A. Burgoyne
                                              (Pro hac vice application forthcoming)
                                              Perkins Coie LLP
                                              700 Thirteenth Street, N.W. Suite 600
                                              Washington, D.C.  20005-3960
                                              Phone:  202-654-1744
                                              Facsimile:  202-654-6211
                                              RBurgoyne@perkinscoie.com

                                              Counsel for Defendant NBME

144707815.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was electronically filed on July 8, 2019, via the Court's CM/ECF System, which will send notification of such filing to counsel of record for Plaintiff and have sent a copy by e-mail to the following on the date below:

Lawrence D. Berger, Esquire
Reisman Carolla Gran & Zuba, LLP
19 Chestnut Street
Haddonfield, N.J. 08033
***larry@rcglawoffices.com***

Counsel for Plaintiff

Mary C. Vargas
Michael D. Stein
Stein &Vargas LLP
10 G Street NE, Suite 600
Washington D.C. 20002
***mary.vargas@steinvargas.com***
Counsel for Plaintiff

s/  Nancy L. Goldstein
Nancy L. Goldstein

Counsel for Defendant NBME

July 8, 2019

144707815.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JESSICA RAMSAY,**     )
                        )
     **Plaintiff,**     )
                        )
     **v.**     )     **Civil Action No. 2:19-cv-02002-JCJ**
                        )
**NATIONAL BOARD OF MEDICAL**     )
**EXAMINERS,**     )
                        )
     **Defendant.**     )
                        )

## DECLARATION OF CATHERINE FARMER, PSY.D.

1.     My name is Catherine Farmer. I am over eighteen (18) years of age and, unless indicated otherwise, I have personal knowledge of the facts stated below.

2.     I am employed by the National Board of Medical Examiners ("NBME") as Director of Disability Services. I hold a Doctor of Psychology degree.

3.     The NBME is a not-for-profit organization located in Philadelphia, Pennsylvania that provides assessment services for physicians and other the health professions. Its mission is to help protect the public through state-of-the-art assessment of the knowledge and skills of health professionals.

4.     Together with the Federation of State Medical Boards, the NBME sponsors the United States Medical Licensing Examination ("USMLE"), which is a standardized examination used to evaluate applicants' competence for medical licensure in the United States and its territories. The USMLE is designed to assess a physician's ability to apply knowledge, concepts, and principles, and to demonstrate fundamental patient-centered skills, that constitute the basis of safe and effective patient care.



DEFENDANT'S
EXHIBIT
**4**

5.      Medical licensing authorities across the country rely upon the USMLE to help evaluate the qualifications of individuals seeking an initial license to practice medicine.

6.      There are three "Steps" to the USMLE, all of which must be passed before an individual with an M.D. degree is eligible to apply for an unrestricted license to practice medicine in the United States. Step 1 is a one-day, computer-based multiple-choice examination that assesses understanding and application of basic science concepts important to the practice of medicine. Step 2 has two components: Step 2 CK (Clinical Knowledge), and Step 2 CS (Clinical Skills). Step 2 CK is a one-day, computer-based multiple-choice examination that assesses the application of medical knowledge, skills, and understanding of clinical science for the provision of patient care under supervision. Step 2 CS uses standardized patients to assess an examinee's ability to gather information from patients, perform physical examinations, and communicate his or her findings. Step 3 is a two-day, computer-based examination that assesses whether examinees can apply medical knowledge and understanding of biomedical and clinical science essential for the unsupervised practice of medicine.

7.      The USMLE is administered under standard conditions, and NBME has policies and procedures in place that are intended to ensure that no examinee or group of examinees receives an unfair advantage on the examination.

8.      Examinees take the USMLE Step examinations under the same testing conditions, including standard testing time. There is an exception to this policy, however, for individuals who have documented disabilities within the meaning of the Americans with Disabilities Act ("ADA"), who demonstrate that they need reasonable accommodations to access the examination(s).

9.    Testing accommodations are available on the USMLE for examinees with a disability, as defined under the ADA.  All requests for accommodations are individually reviewed and, when warranted (*i.e.*, when the examinee demonstrates that he or she is disabled within the meaning of the ADA and needs reasonable accommodations to access the examination), reasonable and appropriate accommodations are provided.

10.    Accommodations are denied when the submitted documentation fails to demonstrate that the examinee has a disability within the meaning of the ADA or that the requested accommodations are needed for access to the examination.  NBME denies requests for extra testing time or other accommodations that have not been shown to be warranted, to help ensure that its testing program is fair for all examinees and to protect the reliability of USMLE scores.

11.    NBME often seeks input from independent professionals with expertise in the relevant disability when evaluating an accommodation request.  When it does so, NBME asks the external professional to review all the supporting documentation submitted by the examinee and provide a written report on whether the documentation demonstrates the presence of a physical or mental impairment (as identified by the examinee); if so, whether the impairment substantially limits the examinee's ability to perform one or more major life activities that are relevant to taking the USMLE; and, if so, to make a recommendation on whether the requested accommodations are appropriate.

12.    On December 12, 2016, NBME received a request from Jessica Ramsay for testing accommodations on Step 1 and Step CK of the USMLE.  She requested accommodations based on diagnoses of Attention-Deficit/Hyperactivity Disorder (ADHD) and dyslexia and sought 100% additional test time (double time) over two days on both tests; a separate,

- 3 -

distraction-free exam space; [extra] laminated paper; colored, dry-erase markers in addition to black; and the ability to drink water and eat a snack with medications during the test. Her application informed NBME that she took the ACT and/or SAT and the Medical College Admission Test (MCAT) without accommodations. She also informed NBME that her medical school -- Western Michigan University Homer Stryker M.D. School of Medicine -- allowed her to take medical school exams with accommodations, including exams that NBME prepared for use by medical schools. Ms. Ramsay's medical school, not NBME, determined whether Ms. Ramsay would be allowed to test with accommodations on these examinations. Ms. Ramsay also reported receiving accommodations in college at The Ohio State University (between 2009 and 2013). She reported that she did not receive any accommodations in high school or middle school and received accommodations in elementary school only during the 1996-1997 school year. A true and correct copy of Ms. Ramsay's 2016 request form for Step 1 and Step 2 CK is attached at **Exhibit A**.

13.    Ms. Ramsay provided a personal statement in support of her 2016 accommodation request. A true and correct copy of this personal statement is attached at **Exhibit B**.

14.    Ms. Ramsay provided a copy of a Scholastic Record from St. Joseph High School with her 2016 accommodation request. A true and correct copy of this transcript is attached at **Exhibit C**.

15.    Ms. Ramsay provided a copy of what appears to be an unofficial transcript from The Ohio State University with her 2016 accommodation request. A true and correct copy of this transcript is attached at **Exhibit D**.

16.    In response to a request from NBME, Ms. Ramsay provided a copy of an MCAT Score Report for the MCAT examination she took on April 9, 2011 without accommodations,

which NBME reviewed as part of her 2016 accommodation request. A true and correct copy of this MCAT Score Report is attached at **Exhibit E**.

17. Ms. Ramsay provided a March 24, 2009 "Office Visit" medical record from Alan Smiy, M.D., in support of her 2016 accommodation request. A true and correct copy of this document is attached at **Exhibit F**.

18. Ms. Ramsay provided an ADD/ADHD Verification Form for The Ohio State University apparently filled out by Dr. Smiy in support of her 2016 accommodation request. A true and correct copy of this document is attached at **Exhibit G**.

19. Ms. Ramsay provided a September 22, 2014 evaluation report and September 2, 2016 Addendum to this report from Charles Livingston, M.A., in support of her 2016 accommodation request. She also provided, at NBME's request, a two-page score summary from Mr. Livingston. True and correct copies of these documents are attached at **Exhibit H**.

20. Ms. Ramsay included other materials in support of her 2016 accommodation request.

21. NBME thoroughly reviewed all documents submitted by Ms. Ramsay in support of her request for test accommodations. It also provided Ms. Ramsay's file to an external expert reviewer, Steven G. Zecker, Ph.D., for review and recommendation. After discussing the documentation in the file, Dr. Zecker wrote in his report, "Given my conclusions, which in my professional opinion do not indicate that Ms. Ramsay is substantially limited in functioning in a manner that warrants accommodations, I recommend that you deny her request for USMLE Step 1 and Step 2-CK accommodations."

22. Following its review of Ms. Ramsay's request, and based on Dr. Zecker's recommendations and an independent review of the file by Michelle Goldberg, Ph.D., the

Manager of Disability Services at that time, NBME concluded that Ms. Ramsay's documentation did not demonstrate a substantial limitation in her ability to perform any major life activity as compared to most people in the general population, or that her requested accommodations were needed to take Step 1 and Step 2 CK in an accessible manner. NBME therefore denied Ms. Ramsay's request for accommodations. A true and correct copy of the March 10, 2017 letter from Michelle Goldberg, Ph.D., Manager, Disability Services, to Ms. Ramsay in response to her December 12, 2016 accommodation request is attached at **Exhibit I**.

23.    On July 20, 2017, Ms. Ramsay took Step 1 without accommodations, and did not pass. With a score of 191, Ms. Ramsay was 1 point below the minimum passing score of 192. Her score was reported on August 9, 2017.

24.    On June 7, 2018, NBME received a new request from Ms. Ramsay for testing accommodations on USMLE Step 1. Ms. Ramsay sought 100% additional testing time (double time) over two days, a private testing room, and additional break time. Her request was based on a 2017 diagnosis of learning disabilities of reading and writing (with abnormal scanning and processing speed); a 2009 diagnosis of ADHD, combined type; a 1997 diagnosis of migraines with aura; and a 2016 diagnosis of a clotting disorder with deep-vein thrombosis and post-thrombotic syndrome. A true and correct copy of Ms. Ramsay's June 2018 accommodation request form for Step 1 is attached at **Exhibit J**.

25.    Ms. Ramsay submitted a new personal statement in support of this request. A true and correct copy of her 2018 personal statement is attached at **Exhibit K**.

26.    Ms. Ramsay submitted an October 25, 2017 neurocognitive consultation report and a December 7, 2017 neurocognitive examination report from Alan Lewandowski, Ph.D., in support of her June 2018 accommodation request. In response to a request from NBME, Ms.

Ramsay also provided a June 20, 2018 raw data addendum from Dr. Lewandowski. True and correct copies of these documents are attached at **Exhibit L.**

27.     Ms. Ramsay submitted other documents in support of her June 2018 request, including a letter from her lawyer, Mr. Berger. She did not include all the documents that she submitted in support of her 2016 accommodation request, but it is NBME's practice to consider a candidate's entire file, including any documents submitted in support of an earlier testing accommodation request, in reviewing any request for testing accommodations.

28.     NBME thoroughly reviewed all documents submitted in support of Ms. Ramsay's 2018 request for test accommodations. It also provided Ms. Ramsay's entire file, included the new documents, to Dr. Zecker for review and recommendation. Dr. Zecker's review was limited to Ms. Ramsay's diagnoses of ADHD and specific learning disabilities. After discussing the documentation in the file, Dr. Zecker wrote in his report, "To summarize, my review of the documentation [Ms. Ramsay] has submitted indicates that in my professional opinion she does not have a disability that according to the ADA qualifies her for the accommodations she has requested on the Step 1 examination."

29.     Following its review of Ms. Ramsay's request, and based on Dr. Zecker's recommendations and my independent review of the file, NBME concluded that Ms. Ramsay's documentation did not demonstrate that she is substantially limited in her ability to perform any major life activity as compared to most people or that 100% additional testing time was an appropriate modification of her USMLE Step 1 test administration. NBME therefore denied Ms. Ramsay's request for extra testing time. NBME did, however, approve Ms. Ramsay's requests for additional break time, testing over two days, and a separate testing room in which she may stand, walk or stretch during the exam in order to address the issues related to migraine headache

- 7 -

and DVT described in a May 29, 2018 letter from Jennifer N. Houtman, M.D. Because Ms. Ramsey would be testing in a separate testing room and she reported that she usually reads text aloud, she was granted permission to read aloud as a courtesy. A true and correct copy of my September 11, 2018 letter to Ms. Ramsay in response to her June 2018 accommodation request is attached at **Exhibit M**.

30.   Ms. Ramsay submitted a request for reconsideration of the denial of her request for 100% additional time on the Step 1 exam through a letter from her lawyer, Lawrence Berger, on December 12, 2018. Ms. Ramsay again provided additional documents, including a new diagnostic evaluation from Dr. Robert Smith. It is my understanding that a copy of the report from Dr. Smith has been provided as an exhibit to Ms. Ramsay's court papers, so a copy is not attached here.

31.   NBME again carefully reviewed Ms. Ramsay's request and all documents submitted in support of her request for reconsideration. It also provided Ms. Ramsay's file to an additional external expert, Benjamin Lovett, Ph.D., for review and recommendation. Dr. Lovett's review was limited to Ms. Ramsay's diagnoses of ADHD and specific learning disabilities. After discussing the documentation in the file, Dr. Lovett's report summarized Ms. Ramsay's documentation regarding learning disabilities and ADHD as follows: "(a) there is no objective evidence of poor academic skills or significant ADHD symptoms and impairment in real-world settings where most people in the general population are expected to do well, (b) Ms. Ramsay and her advocates attempt to explain away her good real-world performance using unpersuasive arguments, (c) the data from her 2018 diagnostic evaluation are not credible, (d) her 2017 and 2014 diagnostic evaluations did not involve the collection of sufficient data to justify any diagnoses, and (e) her ACT and MCAT performance suggests an ability to access

tests without accommodations, at least based on neurodevelopmental disorders such as ADHD and learning disabilities which would have been present by the time that those tests were taken."

32.     Following its review of Ms. Ramsay's request, and based on Dr. Lovett's recommendations and my independent review of the file, NBME concluded that there was no new substantive information or evidence that warranted a different decision than the decision applicable to Step 1 as communicated in my September 11, 2018 letter to Ms. Ramsay.  NBME therefore informed Ms. Ramsay by letter dated February 14, 2019 that she was not approved for extra time accommodations.  A true and correct copy of my February 14, 2019 letter to Ms. Ramsay is attached at **Exhibit N**.

33.     By letter dated March 19, 2019, Ms. Ramsay, through her attorney, requested further reconsideration of our decision regarding her request for extra time accommodations.  No new substantive information or evidence was provided by Ms. Ramsay or her lawyer for NBME's consideration, and NBME's decision did not change.  A true and correct copy of NBME's March 27, 2019 email response is attached at **Exhibit O**.

34.     Birth dates and social security numbers have been redacted from the attached documents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 29, 2019

_____
Catherine Farmer

- 9 -

**Appx770**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JESSICA RAMSAY, | ) |
| Plaintiff, | ) |
| v. | )     Civil Action No. 2:19-cv-02002-JCJ |
| NATIONAL BOARD OF MEDICAL EXAMINERS, | ) |
| Defendant. | ) |

### DECLARATION OF STEVEN G. ZECKER, PH.D.

I, Steven G. Zecker, declare as follows:

1.     My name is Steven G. Zecker. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2.     I am a licensed clinical psychologist. I am also an Associate Professor in the Department of Communication Sciences and Disorders at Northwestern University. Courses that I have taught or am teaching include "Psychoeducational Assessment and Testing Principles" and "Attention Deficit Disorder and Related Behavior Disorders." A true and correct copy of my curriculum vitae is attached at **Exhibit A**.

3.     My professional expertise relates to the diagnosis and performance of individuals with disordered learning conditions and research into those conditions, particularly learning disabilities (LD) and Attention Deficit-Hyperactivity Disorder (ADHD). I have published articles and delivered many paper presentations on these topics. Much of my research involves ADHD, auditory processing in children with reading disabilities, giftedness and LD, and the development of spelling. I oversee the clinical practice at Northwestern's Speech, Language and Learning

DEFENDANT'S EXHIBIT

5

diagnostic clinic. As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems to assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

4.    I have served for more than ten years as an independent professional reviewer for organizations that administer or rely upon standardized tests, in connection with requests for testing accommodations by prospective examinees that are based, at least in part, on an ADHD or LD diagnosis. For each of these organizations, my objective is to provide a neutral, professionally sound evaluation of whether the documentation submitted by the prospective examinee in support of the accommodations request demonstrates the existence of one or more impairments, diagnosed in accordance with applicable professional standards, that result in substantial functional limitations in the candidate's ability to read, learn, or perform other major life activities, as compared to most people in the general population.

5.    I was asked by NBME to perform an independent review of two requests for testing accommodations that NBME received from Jessica E. Ramsay for the United States Medical Licensing Examination. I prepared two reports for NBME based on my reviews. A true and correct copy of my January 13, 2017 letter report is attached at **Exhibit B**. A true and correct copy of my July 19, 2018 letter report is attached at **Exhibit C**. The documents that I reviewed are set out in those letter reports, and my discussion below is based on my conclusions from reviewing those documents. My review and the opinions addressed in my reports and below are restricted to Ms. Ramsay's ADHD and LD diagnoses, not her reports of migraines with aura and CDPTS diagnoses.

6.    I have reviewed these reports and reaffirm my belief in the opinions expressed therein. The discussion that follows addresses some of the points set out in my letter reports to NBME.

*Ms. Ramsay's Early Development and Acquisition of Basic Academic Skills*

7.    When arriving at a diagnosis of a specific learning disability, it is crucial to establish early difficulties in the development and acquisition of basic academic skills. According to the documents I reviewed, however, Ms. Ramsay did not submit report cards or school records from any part of her kindergarten through eighth grade education to NBME to review. Such documentation could have provided evidence of an early impairment in functioning, essential to the diagnosis of ADHD and LD, neurodevelopmental disorders with an onset of symptoms in childhood.

8.    Although Ms. Ramsay's personal statement identifies difficulties that she says have existed "since [she] was little," Ms. Ramsay also reported that she was in a gifted program through fifth grade and in an accelerated academic program from sixth grade through high school. In high school, Ms. Ramsay obtained mostly "A" grades, with no grade below "B+" in the transcript that she provided, and had earned a 3.75 GPA throughout her first three years. According to documents I reviewed, this high level of academic success was achieved in the absence of any formal accommodations.

9.    According to the college transcript that she submitted, Ms. Ramsay graduated from Ohio State with a 3.58 GPA, with grades in the "A/B" range in all but one course. Based on the documents I reviewed, it does not appear that Ms. Ramsay began receiving accommodations at Ohio State until May 2010.

- 3 -

**Appx773**

10.    According to the documents I reviewed, Ms. Ramsay took the MCAT in 2011 without any accommodations. Her score (30M) placed her at the 79th percentile, an above-average score in comparison with other medical school aspirants.

11.    According to the documents I reviewed, Ms. Ramsay took the Step 1 exam in July 2017 under standard administration conditions and obtained a score (191) that was one point below the passing criterion.

*Evaluation History*

12.    According to the documents I reviewed, Ms. Ramsay was evaluated in 1997, when she was seven years old and in second grade, by an optometrist, Dr. Tanguay, because of concerns about letter reversals. Dr. Tanguay did not issue a report but wrote a half-page letter in which she summarized her findings. Dr. Tanguay apparently administered a single test, the Test of Visual-Perceptual Skills, which was incorrectly administered and incompletely scored. Ms. Ramsay reportedly underwent perceptual skills training with Dr. Tanguay for four months in 1998, after which Dr. Tanguay reported that Ms. Ramsay "scored above age level in all categories when retested" and that her comprehension and perceptual skills were "excellent." Dr. Tanguay apparently never administered any reading tests for Ms. Ramsay and did not diagnose Ms. Ramsay with a reading disorder (nor would such a diagnosis have been appropriate).

13.    According to May 2010 notes of a March 2009 office visit that I reviewed, Ms. Ramsay visited Dr. Alan Smiy for a 30-minute appointment because of a complaint of "ADD/ADHD." In his brief history, Dr. Smiy writes that Ms. Ramsay reported "no problems" in high school (contrary to Ms. Ramsay's personal statements submitted to NBME) and that "college stress" is causing her to "switch letters around a bit." Dr. Smiy apparently did not

- 4 -

**Appx774**

administer any tests and summarized his assessment by writing "add vs. possible dyslexia—pt has more focus issues than dyslexic tendencies." He recommended a trial of Ritalin. However, given the absence of any formal testing during this brief appointment, no formal diagnosis was provided, and none was appropriate in my professional opinion.

14.    According to the documents I reviewed, Dr. Smiy completed an "ADD/ADHD Verification Form" from Ohio State University for Ms. Ramsay on August 13, 2010. He indicated that Ms. Ramsay qualified for the diagnosis of ADHD-Inattentive Type and was currently taking Adderall because methylphenidate had "failed" to treat her difficulties. Dr. Smiy indicated that Ms. Ramsay was exhibiting five of the nine DSM-IV (Diagnostic and Statistical Manual of Mental Disorders, 4th Edition) symptoms of inattention, and none of the nine DSM-IV Hyperactivity/Impulsivity symptoms. I note that DSM-IV required at least six symptoms in either category for a valid ADHD diagnosis to be provided, and thus, based on these results, Ms. Ramsay failed to qualify for an ADHD-Inattentive diagnosis. Dr. Smiy did not provide a specific recommendation for an extended time accommodation, writing only that she "may need additional time."

15.    According to the documents I reviewed, Mr. Charles Livingston, a licensed social worker and limited licensed psychologist in Michigan, evaluated Ms. Ramsay in September 2014, by which time she was in medical school. Mr. Livingston did not generate a complete report of his testing; instead he provided a one-page summary of results and conclusions to Dr. Ziemkowski at Ms. Ramsay's medical school. He indicated that Ms. Ramsay reported that she was tired and stressed and concerned that her school grades did not show her knowledge. In an "Addendum" to his initial summary (provided in 2016), Mr. Livingston indicates that he administered a mental ability test, the Wechsler Adult Intelligence Scale-IV (WAIS-IV) and an

- 5 -

achievement test, the Weschler Individual Achievement Test (WIAT). These tests did not directly assess attentional functioning, although Mr. Livingston indicates that Ms. Ramsay scored at the 63rd percentile on the WAIS-IV Working Memory Index, a composite score based on the results of two subtests most dependent on intact attention. In the "Addendum" to his report, Mr. Livingston discussed other documentation that he said supported an ADHD diagnosis, but in my opinion, none of this provided strong support for a formal diagnosis of ADHD. I also note that, although Mr. Livingston indicated "there is historical information that suggests a likelihood of dyslexia," the only documentation of reading achievement (the WIAT Reading Comprehension test that Mr. Livingston administered) yielded an above average (99th percentile) score.

16.     In the report, Mr. Livingston concluded that the results of his evaluation supported the diagnosis of ADHD-I (Inattentive type), severe; however, the WAIS-IV measures most dependent on attentional functioning that he reported placed her above the mean and he never demonstrated that Ms. Ramsay met the complete set of diagnostic criteria for a diagnosis of ADHD, including an onset of symptoms in childhood and impairment in multiple domains of daily living. He wrote that an extended time accommodation on tests "should be considered," despite apparently having not identified a deficit in academic fluency. Further, despite Ms. Ramsay's comments to Mr. Livingston that she was stressed, he conducted no testing of her psychological functioning. In my professional opinion, this testing was not adequate for establishing a diagnosis of ADHD-I or for supporting the provision of accommodations, including extended time.

17.     According to the documentation I reviewed, Dr. Alan Lewandowski evaluated Ms. Ramsay in October 2017, also while she was in medical school. Because she had not been

- 6 -

approved for Step 1 accommodations, Ms. Ramsay was seeking a more comprehensive assessment. Despite having described herself as experiencing "chronic academic disability" to Dr. Lewandowski, Ms. Ramsay also reported to Dr. Lewandowski that she graduated from high school with a 3.8 GPA and scored "between 27 and 30" on the ACT under standard administration conditions. She also indicated that she had seen a counseling psychologist for unexplained reasons (although she acknowledged some situational dysphoria) and that the counseling resulted in a "very positive outcome." Dr. Lewandowski reported that Ms. Ramsay presented "in mild distress" but did not elaborate other than to write that her mood was anxious and she was frustrated. She reported that she had been taking an antidepressant (fluoxetine) but it had been discontinued. She reported taking seven other medications, including Adderall (for ADHD), Buspar and Xanax (anti-anxiety medications), and Ambien (apparently to aid sleep). Despite Ms. Ramsay's description of herself in her personal statement to NBME as always moving, Dr. Lewandowski described her motor movements as "normal for age", and he makes no mention of any hyperactive behaviors during the course of the evaluation.

18. According to the documents I reviewed, based on this brief two-hour consultation, Dr. Lewandowski did not provide any diagnosis but indicated he would be conducting comprehensive testing in the future to "better clarify" Ms. Ramsay's status.

19. According to the documents I reviewed, Dr. Lewandowski subsequently saw Ms. Ramsay in December 2017 and generated a report of the "Neurocognitive Examination" that he conducted. The report consists mainly of a table of test scores, with minimal discussion. Dr. Lewandowski did not provide the names of any of the tests he administered in this report, which is highly unusual. He indicated that Ms. Ramsay's overall mental ability was high average, with the various domains of cognitive functioning ranging from below average to above average. All

- 7 -

measures of academic functioning resulted in scores at or above the 73rd percentile. Nine unspecified neuropsychological test results were presented; seven placed Ms. Ramsay in the normal range and two were "abnormal." Among six measures of attentional functioning, four resulted in normal scores and two were below average. Psychological testing indicated moderate depression, inefficient thinking. and health concerns. Based on these results, Dr. Lewandowski diagnosed Ms. Ramsay with Attention Deficit Disorder, Hyperactive, moderate (ADHD-H/I) and Learning Disability (LD), nonverbal (abnormal scanning and processing speed). Notably, he did not diagnose her with any affective disorder, although a substantial part of his recommendations refer to Ms. Ramsay's "mood disturbance" and ongoing affective struggles. Further, Dr. Lewandowski failed to indicate on what basis the diagnosis of an attention deficit was made, given that Ms. Ramsay performed largely within the normal range on the test assessing attention that he administered to her. He also provided no indication that Ms. Ramsay met the complete set of criteria for an ADHD diagnosis. Similarly, Dr. Lewandowski did not provide a rationale for his LD diagnosis, and in the absence of specific tests that were administered and a discussion of the findings, there was no basis for such a diagnosis in my professional opinion.

20.     According to the documents I reviewed, in a February 2018 "Addendum," Dr. Lewandowski provided the names of the tests he had administered during the December testing, and in a June 2018 letter to Ms. Ramsey, Dr. Lewandowski again provided the names of the tests as well as tables and plots of results from his earlier testing, but no additional discussion of his findings. In my professional opinion, the information presented in this additional documentation supports the conclusion that the results of Dr. Lewandowski's testing did not support the diagnosis of a disabling condition that warranted accommodations under the ADA.

- 8 -

*Conclusion*

21.    The documentation discussed above and in my two letter reports does not, in my professional opinion, indicate that Ms. Ramsay has a disability within the meaning of the ADA.

22.    Ms. Ramsay's academic history prior to medical school and her exceptional unaccommodated standardized test performance, in my professional opinion, provide strong evidence that Ms. Ramsay is not substantially impaired in a major life function in a manner that warrants accommodations on the USMLE under the ADA.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 30, 2019.

Steven G. Zecker, Ph.D.

# EXHIBIT A

CURRICULUM VITAE

**NAME:**    Steven G. Zecker

**UNIVERSITY ADDRESS:**

Northwestern University
The Roxelyn and Richard Pepper Department of Communication Sciences and Disorders
The Frances Searle Building
2240 Campus Drive #2-331
Evanston, Illinois  60208-3560
(847) 491-2477
e-mail:  zecker@northwestern.edu

**CURRENT POSITION:**

Associate Professor of Communication Sciences and Disorders

**EDUCATION:**

| | | | |
|---|---|---|---|
| B.A. | 1974 | The University of Michigan | Sociology and Psychology |
| M.A. | 1978 | Wayne State University | Psychology (Cognitive Processes) |
| Ph.D. | 1981 | Wayne State University | Psychology (Cognitive Processes) |

Certification: Illinois Registered Clinical Psychologist #071-003595

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| 1974 | Teaching Fellow, Psychology, The University of Michigan |
| 1976 | Instructor, Psychology, Wayne State University |
| 1975-1980 | Graduate Assistant, Psychology, Wayne State University |
| 1980-1981 | Visiting Instructor, Psychology, Hamilton College |
| 1981-1983 | Visiting Assistant Professor, Psychology, Hamilton College |
| 1983-1985 | Visiting Assistant Professor, Psychology, Colgate University |
| 1985-1991 | Assistant Professor, Department of Communication Sciences and Disorders, Northwestern University |
| 1991-Present | Associate Professor, Department of Communication Sciences and Disorders, Northwestern University |

**AWARDS**

High Distinction, The University of Michigan, 1974
National Institute of Mental Health Traineeship, 1975-1978

**AWARDS (continued)**

Psi Chi Distinguished Service Award, 1983

Clarence Simon Excellence in Teaching Award, Northwestern University, 2010

## RESEARCH GRANTS RECEIVED

Identifying Specific Deficits Among "Garden Variety" Poor Readers: A Pilot Study. Northwestern University Research Grants Committee (4/1/91-3/31/92) with Joanne Carlisle.  Total amount of grant: $700.

Auditory Assessment with AEPs in Children. National Institutes of Health (7/1/93 to 6/30/96) Co-Investigator (with N. Kraus (PI), T. McGee and T. Carrell). Total amount of grant: $756,878. Renewal.  Funded 01/97-12/00.  Second renewal 1/01 to 12/03.

Neural Representation of Acoustic Elements of Speech. National Institutes of Health (7/1/02 to 6/30/06) Co-Investigator (PI: N. Kraus). Total amount of grant: $2,860,508.

Reformulating Hearing Assessment: Translating Recent Discoveries Through a Large-Scale Study in the Audiology Clinic.  National Institutes of Deafness and Other Communication Disorders (3/1/07 to 2/28/12) Co-Investigator (P.I.: S. Dhar). Total amount of grant: $2,983,904.

NIH Toolbox for Assessment of Behavioral and Neurological Function.  National Institutes of Health (10/1/06 to 9/30/11) Consultant and Steering Committee Member (P.I.: R. Gershon)

A Preschool Biomarker for Literacy. National Institutes of Child Health and Human Development (04/01/12 to 03/31/17). Co-Investigator (P.I.: N. Kraus)

## EDITORIAL RESPONSIBILITIES

Editorial Board,  Learning Disabilities: Research and Practice

Ad hoc Reviewer,  Brain and Language

Ad hoc Reviewer,  Journal of Reading Behavior

Ad hoc Reviewer,  Reading and Writing

Ad hoc Reviewer,  American Educational Research Journal

Ad hoc Reviewer, Journal of Speech, Language and Hearing Research

Ad hoc Reviewer, Journal of Medical Screening

## PUBLICATIONS: SELECTED ARTICLES

Zecker,  S.G. and Glaros, A.G. (1983). Validation of a proper control for subvocal electromyographic minimization paradigms. Journal of General Psychology, 107, 297-298.

Zecker, S.G., Tanenhaus, M.K., Glaros, A.G., & Whitman, R.D. (1984). Subvocal motor activity and contextual processing. Journal of Psycholinguistic Research, 13(3), 177-193.

Zecker, S.G., & DuMont, M. (1984). A shift from phonological recoding to direct access in reading as a result of previous exposure. Journal of Reading Behavior, 16(2), 145-158.

August 30, 2019 - 2

Zecker, S.G., Tanenhaus, M.K., Alderman, L., & Siqueland, L. (1986). Laterality of lexical codes in auditory word recognition. Brain and Language, 29, 372-389.

Zecker, S.G., & Zinner, T.E. (1987). Semantic code deficit for reading disabled children on an auditory lexical decision task. Journal of Reading Behavior, 19(2), 177-189.

Zecker, S.G. (1990). Visual similarity effects in detecting letter rhymes. Journal of General Psychology, 117(2), 171-179.

Driscoll, M.S., & Zecker, S.G. (1991). Attention deficit disorder (ADD): Are there subtypes? Learning Disabilities, 2(2), 52-63.

Zecker, S.G. (1991). Orthographic code development in normally achieving and learning disabled children. Annals of Dyslexia, 41, 178-192.

Trommer, B.L., Hoeppner, J.B., & Zecker, S.G. (1991). The go no-go test in attention deficit disorder (ADD) is sensitive to methylphenidate. Journal of Child Neurology, 6(Suppl.), 128-131.

Kraus, N., McGee, T. J., Carrell, T. D., Zecker, S. G., Nicol, T. B., & Koch, D. B. (1996). Auditory neurophysiologic responses and discrimination deficits in children with learning problems. Science, 273, 971-973.

Smith, C., Logemann, J., Burghardt, W., Carrell, T., & Zecker, S. G. (1997). Oral sensory discrimination of fluid viscosity. Dysphagia, 12, 68-73.

Tremblay, K., Kraus, N., McGee, T., & Zecker, S. (1998 June). The time course of auditory learning: Neurophysiologic changes during speech-sound training. Proceedings of the 16 International Congress on Acoustics. 2023-2024.

Bowen, R.W., Wright, B.A., Zecker, S.G. & Rudden, D. (1999). Temporal pattern-masking functions in dyslexic and normal observers. Investigative Ophthalmology and Visual Science, 40, 533.

Bowen, R., Wright, B., & Zecker, S.G. (1999). Dyslexic observers show a backward time shift in masking of patterns of low spatial frequency. In Vision Science and Its Applications, O.S.A. Technical Digest (Optical Society of America, Washington, D.C.), 161-164.

Bradlow, A.R., Kraus, N., Nicol, T., McGee, T., Cunningham, J, Zecker, S.G. & Carrell, T. (1999). Effect of lengthened formant transition duration on discrimination and representation of CV syllables by normal and learning disabled children. Journal of the Acoustical Society of America, 104(4), 2086-2096.

Wright, B.A., Bowen, R.W. & Zecker, S.G. (2000). Nonlinguistic perceptual deficits associated with reading and language disorders. Current Opinion in Neurobiology, 10, 482-486.

Zecker, S.G. (2000) Underachievement and learning disabilities in children who are gifted. Talent Development, Spring, 18-23.

Cunningham, J., Nicol, T., Zecker, S. & Kraus, N. (2000) Speech-evoked neurophysiologic responses in children with learning problems: Development and behavioral correlates of perception. Ear and Hearing, 21(6), 554-568.

Hemmer, S.A., Pasternak, J.F., Zecker, S.G. & Trommer, B.L. (2001). Stimulant therapy and

seizure risk in children with ADHD. Pediatric Neurology, 24(2), 99-102.

Bowen, R.W., Wright, B.A. & Zecker, S.G. (2001). Pattern masking deficits associated with dyslexia: An analysis of psychometric functions, in Vision Science and Its Applications, OSA Technical Digest (Optical Society of America, Washington, D.C.), 60-63.

Cunningham, J., Nicol, T., Zecker, S.G., Bradlow, A. & Kraus, N. (2001). Neurobiologic responses to speech in noise in children with learning problems: Deficits and strategies for improvement. Clinical Neurophysiology, 112, 758-767.

Cunningham, J., Nicol, T., King, C., Zecker, S.G. & Kraus, N (2002). Effects of noise and cue enhancement on neural responses to speech in auditory midbrain, thalamus and cortex. Hearing Research, 169, 97-111.

Hayes, E.A., Warrier, C.M., Nicol, T.G., Zecker, S.G. & Kraus, N. (2003). Neural plasticity following auditory training in children with learning problems. Clinical Neurophysiology, 113 , 1-12.

Wright, B.A., Zecker, S.G. & Reid, M.D. (2003). Learning problems, delayed perceptual development, and puberty. The Journal of the Acoustical Society of America, 113, 4(2), 2208.

Zecker, S. G. (2004). Attention-deficit/hyperactivity disorder: Information for school-based practitioners . Neurophysiology and Neurogenic Speech and Language Disorders, October, 8-14.

Wright, B. A. and Zecker, S. G. (2004). Learning problems, delayed development, and puberty. Proceedings of the National Academy of Sciences USA, 101(26), 9942-9946.

Banai, K., Nicol, T., Zecker, S. G. & Kraus, N (2005). Brainstem timing: Implications for cortical processing and literacy. Journal of Neuroscience, 25(43), 9850-9857.

Russo, N., Nicol, T., Zecker, S. G., Hayes, E. & Kraus, N. (2005) Auditory training improves neural timing in the human brainstem. Behavioural Brain Research, 156, 95-103.

Smith, C.H., Logemann, J.A., Burghardt, W. R., Zecker, S.G. & Rademaker, A.W. (2006) Oral and oropharyngeal perceptions of fluid viscosity across the age span. Dysphagia 21(4), 209-217.

Vogel, S.A., Leyser, Y., Burgstahler, S., Sligar, S. R. & Zecker, S. G. (2006). Faculty knowledge and practices regarding students with disabilities in three contrasting institutions of higher education. Journal of Postsecondary Education and Disability, 18(2), 109-123.

Wright, B. & Zecker, S.G. (2006) Learning problems, delayed development and puberty. American Association of Child and Adolescent Psychiatry Proceedings, 44.

Abrams, D.A., Nicol, T., Zecker, S.G. & Kraus, N. (2007) Auditory brainstem timing predicts cerebral asymmetry for speech. The Journal of Neuroscience, 26, 11131-11137.

August 30, 2019 - 4

Johnson, K.L., Nicol, T.G., Zecker, S.G. & Kraus, N. (2007) Auditory brainstem correlates of perceptual timing deficits. Journal of Cognitive Neuroscience, 19, 376-385.

Russo, N.M., Bradlow, A.R., Skoe, E., Trommer, B.L., Nicol, T, Zecker, S.G. & Kraus, N. (2008). Deficient brainstem encoding of pitch in children with autistic spectrum disorders. Clinical Neurophysiology, 119(8), 1720-1731.

Johnson, K.L., Nicol, T. Zecker, S.G., Bradlow, A.R., Skoe, E. & Kraus, N. (2008). Brainstem encoding of voiced consonant-vowel stop syllables. Clinical Neurophysiology, 119(11), 2623-2635.

Abrams, D., Nicol, T. Zecker, S.G. & Kraus, N. (2008). Right-hemisphere auditory cortex is dominant for coding syllable patterns in speech. Journal of Neuroscience, 28(15), 3958-3965.

Banai, K., Hornickel, J., Skoe, E., Nicol, T., Zecker, S. & Kraus, N. (2009). Reading and subcortical auditory function. Cerebral Cortex, 19(11), 2699-2707.

Russo, N., Zecker, S., Trommer, B., Chen, J. & Kraus, N. (2009). Effects of background noise on cortical encoding of speech in autism spectrum disorders. Journal of Autism and Developmental Disorders, 39(8), 1185-1196.

Hornickel, J., Skoe, E., Nicol, T., Zecker, S. & Kraus, N. (2009). Subcortical differentiation of stop consonants relates to reading and speech-in-noise perception. Proceedings of the National Academy of Sciences, 106(31), 13022-13027.

Russo, N., Nicol, T., Trommer, B, Zecker, S. & Kraus, N. (2009). Brainstem transcription of speech is disrupted in children with autism spectrum disorders. Developmental Science, 12(4), 557-567.

Abrams, D., Nicol, T., Zecker, S. & Kraus, N. (2010). Rapid acoustic processing in the auditory brainstem is not related to the cortical asymmetry for the syllable rate of speech. Clinical Neurophysiology, 121(8), 1343-1350.

Anderson S., Skoe E., Chandrasekaran B., Zecker S. & Kraus N. (2010) Brainstem correlates of speech-in-noise perception in children. Hearing Research. 270:151-157.

Hornickel J., Chandrasekaran B., Zecker S., Kraus N. (2010) Auditory brainstem measures predict reading and speech-in-noise perception in school-aged children. Behavioural Brain Research. 216: 597-605.

Russo N.M., Hornickel J., Nicol T., Zecker S., & Kraus N. (2010) Biological changes in auditory function following training in children with autism spectrum disorders. Behavioral and Brain Functions 6:60.

Abrams D., Nicol T., Zecker S. & Kraus, N. (2011) A possible role for a paralemniscal auditory pathway in the coding of slow temporal information. Hearing Research, 272, 125-134.

Hornickel J., Chandrasekaran B., Zecker S. & Kraus N. (2011) Auditory brainstem measures predict   reading and speech-in-noise perception in school-aged children.  Behavioural Brain Research, 216, 597-605.

Hornickel J., Zecker S., Bradlow A. & Kraus N. (2012) Assistive listening devices drive neuroplasticity in children with dyslexia. Proceedings of the National Academy of Sciences, 109(41): 16731–16736.

Lee, J., Dhar, S., Abel, R., Banakis, R., Grolley, E., Zecker, S. & Siegel, J  (2012) Behavioral hearing thresholds between 0.125 and 20 kHz measured using a clinically-viable calibration measure. Ear and Hearing, 33 (3), 315-329.

Zecker, S., Hoffman, H., Frisina, R., Dubno, J., Dhar, S., Wallhagen, M., Kraus, N., Griffith, J., Walton, J., Eddins, D., Newman, C., Victorson, D., Warrier, C., & Wilson, R. (2013) Audition assessment using the NIH Toolbox. Neurology 80, Suppl 3, 1-4.

Rogus-Pulia, N., Pierce, M., Mittal, B., Zecker, S. & Logemann, J. (2014) Changes in swallowing physiology and patient perception of swallowing function following chemoradiation for head and neck cancer. Dysphagia, 29(2), 223-233.

Rogus-Pulia, N., Pierce, M., Mittal, B., Zecker, S. & Logemann, J. (2015) Bolus effects on patient awareness of swallowing difficulty and swallow physiology after chemoradiation for head and neck cancer. Head and Neck, 37(8), 1122-1129.

White-Schwoch, T., Carr, K., Thompson, E., Anderson, S., Nicol, T., Bradlow, A., Zecker, S., & Kraus, N. (2015) Auditory processing in noise: A preschool biomarker for literacy. PLOS Biology, 10.1371/journal.pbio.1002196.

Nativ-Zeltzer, N., Logemann, J., Zecker, S. & Kahrilas, P. (2016) Pressure topography metrics for high-resolution pharyngeal-esophageal manofluorography—a normative study of younger and older adults. Neurogastroenterology and Motility, 26, 1-11.

Lam, S., White-Schwoch, T., Zecker, S., Hornickel, J. & Kraus, N. (2017) Neural stability: A reflection of automaticity in reading. Neuropsychologia, 103, 162-167.

Abrams, D., Nicol, T., White-Schwoch, T. Zecker, S. & Kraus, N. (2017) Population responses in primary auditory cortex simultaneously represent the temporal envelope and periodicity features in natural speech. Hearing Research, 1-15.

## PUBLICATIONS: BOOK CHAPTER

Johnson, D.J., & Zecker, S.G. (1991). Visual processing and dyslexia. In J. Stein, (Ed.), Vision and visual dysfunction, Vol. 13. London: MacMillan.

**PRESENTATIONS: INVITED (SINCE 2002)**

(2002) <u>Doubly exceptional: Learning and attention problems in children who are gifted</u>.  At Center for Talent Development Lecture Series, Northwestern University, Evanston, IL

(2002) <u>Attention-Deficit/Hyperactivity Disorder and Related Behavior Disorders of Childhood and Adolescence: Identification, Diagnosis and Treatment.</u>  At the International Conference on Special Education, Taipei, Taiwan, Republic of China.

(2002) <u>Attention-Deficit/Hyperactivity Disorder in the Classroom.</u>  At Chia-Yi National University, Chia-Yi, Taiwan, Republic of China.

(2003) <u>Diagnosis and Treatment of ADHD in College-Age Students.</u>  Keynote Speaker at South Suburban College Faculty Development Day, South Holland, Illinois.

(2003) <u>Auditory Processing and Listening Comprehension Disorders: Diagnosis and Treatment.</u>  At the International Conference on Special Education, Taipei, Taiwan, Republic of China.

(2003) <u>Mathematics Disorder in Children: Deficient Processes Underlying Learning.</u>  At Swiss-German International School, Hong Kong.

(2004). <u>Approaches in the identification of learning disabilities and their implications.</u>  At Escuela Lincoln, San Isidro, Buenos Aires, Argentina.

(2004). <u>Planning in-school accommodations for children with attention-deficit/hyperactivity disorder.</u>  At Belgrano Day School, Buenos Aires, Argentina.

(2004). <u>Mathematics disabilities: Procedural and retrieval deficits.</u>  At Hyde Park Day School, Chicago, Illinois.

(2006) <u>Learning problems, delayed development and puberty</u>. At the Annual Meeting of the American Association of Child and Adolescent Psychiatry and Asociacion Mexicana de Psiquiatria Infantil, San Diego, CA, October  2006. (with B.A. Wright)

(2006) <u>Underachievement and Twice-Exceptional Children</u>.  At Northwestern University Center for Talent Development *Opportunities for the Future Conference,* Evanston, Illinois.

(2008) <u>Listening and Literacy: A Biological Marker of Auditory Processing.</u>  At The Center for Research in Speech and Language Processing, Chulalongkorn University, Bangkok, Thailand, August 2008.

(2008) <u>Brainstem Transcription of Speech in Autism Spectrum Disorder.</u> At International Meeting for Autism Research, London, UK, May.  (with N. Russo et al).

(2008) <u>Mathematics Disabilities: Underlying Causes and Effective Interventions</u>. Keynote speech at Association of Educational Therapists Conference, Chicago, February.

(2008) <u>BioMARK: A Biological Marker for Auditory Processing Disorder</u>. At Nebraska Speech-Language Hearing Association Annual Convention, Kearney, NE, October.

(2010) <u>Technology to Enhance Differentiation.</u>  At Chicago Public Schools Meaningful Science Consortium Showcase, Evanston, IL, February.

(2010) <u>AHDH in High School Students who are Gifted.</u>  At Northside Preparatory High School, Chicago, IL, February.

(2011) <u>Mathematics Disability in the Early Years: Assessment and Intervention.</u> At Learning Disabilities Association Conference, Jacksonville, FL, February.

(2011) Classroom FM System Use and Reading Disorders: Biological and Learning Outcomes (with J. Hornickel and N. Kraus) at Educational Audiology Association Annual Meeting, Nashville, TN, August.

(2014) The New DSM-5: Implications for Diagnosis and Remediation of Neurodevelopmental Disorders. At American Educational Therapists Conference, Chicago, April.

(2015) Support for Children with Learning Challenges in Early Childhood. At Learning Disabilities Association Conference, Chicago, February.

(2015) How and Why We Need to Assess Reading for Children with Speech and Language Impairment. At Innovations in Science and Practice Conference, Evanston, Illinois, April.

(2015) Anxiety Disorders and Testing Accommodations Requests: Is the Emperor Wearing Any Clothes? At Twelfth Annual Testing Agencies Disability Forum, Bloomington, MN, September.

(2015) Best Practice: Assessment of Reading and Reading-Related Processes in Children with Language Impairment. At Chicago Public Schools, Chicago, November.

(2016) Interventions that work for students with ADHD, at North Shore Country Day School, Winnetka, Illinois, October and November.

(2016) Speech and Language Impairments and Their Relationship to Disorders of Reading and Written Language, to Chicago Public Schools Special Educators, September.

(2016) Interventions that Work for Students with ADHD, at North Shore Country Day School, Winnetka, Illinois, October and November.

(2017) How the Brain Learns Math, at Professionals in Learning Disabilities, Chicago, October

## PRESENTATIONS: CONTRIBUTED (LAST 15 YEARS)

(2001). Pattern masking deficits associated with dyslexia. At Association for Research in Vision and Ophthalmology, Monterey, CA. (with R. Bowen and B. Wright).

(2001). Auditory processing and neural plasticity in response to auditory-perceptual training in children with learning problems. At Association for Research in Otolaryngology, St. Petersburg Beach, FL: (with E. Hayes, B. Wible, and N. Kraus).

(2002). Audiovisual integration of speech in children with learning disabilities: The McGurk effect. At Association for Research in Otolaryngology, St. Petersburg Beach, FL: (with E. Hayes, K. Tiippana, M. Sams and N. Kraus).

(2002). Patterns of cortical hemispheric asymmetry to speech sounds in normal and learning-impaired children. At Association for Research in Otolaryngology, St. Petersburg Beach, FL. (with D. Abrams, T. Nicol and N. Kraus).

(2002). Long-term perceptual and neurophysiological changes following auditory training in children with learning problems. At Cognitive Neuroscience Annual Meeting, San Francisco, CA. (with E. Hayes and N. Kraus).

(2003) Encoding of speech sounds in quiet and background noise in the brainstem: Normal and learning-impaired children. At Association for Research in Otolaryngology, Daytona Beach, FL. (with N. Russo, G. Musacchia, T. Nicol and N. Kraus).

(2003) Learning problems, delayed perceptual development and puberty. Acoustical Society of America, 145th Meeting, Nashville, TN. (with B. Wright and M. Reid).

(2003). The relationship between auditory processing and academic achievement. At American Speech-Language Hearing Association, Chicago. IL.

(2003). <u>Normal and learning-impaired children's brainstem response to speech.</u> At American Speech-Language Hearing Association, Chicago. IL. (with G.A. Musacchia, N. Russo, T. Nicol, & N. Kraus).

(2003). <u>Training of learning impaired children: Cognitive, perceptual and physiologic change.</u> At American Speech-Language Hearing Association, Chicago. IL. (with E. Hayes, D. Abrams, T. Nicol, C. Warrier & N. Kraus).

(2003). <u>Delayed perceptual development and auditory-based learning disabilities.</u> At American Speech-Language Hearing Association, Chicago. IL. (with B. Wright and M. Reid).

(2004). <u>Brainstem timing in learning disabled children with excessive auditory backward masking.</u> At Association for Research in Otolaryngology, Daytona Beach, FL (with K. Johnson, T. Nicol, B. Wright & N. Kraus).

(2004). <u>Auditory training improves neural timing in the human brainstem.</u> At Association for Research in Otolaryngology, Daytona Beach, FL (with N. Russo, T. Nicol, E. Hayes & N. Kraus).

(2005). <u>Speech evoked brainstem deficits in learning impaired children with poor temporal resolution.</u> At American Audiological Society, Phoenix, AZ (with K. Johnson, T. Nicol & N. Kraus).

(2005) <u>Cortical and cognitive consequences of brainstem timing deficits.</u> At Association for Research in Otolaryngology, New Orleans, LA.

(2006) <u>What can brainstem timing teach us about learning disabilities?</u> At Association for Research in Otolaryngology, Baltimore, Maryland (with Banai, K., Russo, N, Nicol, T. & Kraus, N.).

(2006) <u>BioMAP: Neurotechnology for diagnosing and treating auditory processing disorders.</u> At Learning Disabilities Association of America Annual Meeting, Jacksonville, Florida. (with Nicol, T. & Kraus, N.).

(2006). <u>The integrity of the brainstem response in autism.</u> At Society for Neuroscience, Atlanta, Georgia.(with Russo, N., Skoe, E., Bradlow, A., Trommer, B. & Kraus, N).

(2007). <u>Developmental changes in the temporal and spectral encoding of speech in early childhood.</u> At International Evoked Response Audiometry Study Group, Bled, Slovenia. (with Johnson, K.L. and Kraus, N.).

(2007). <u>Brainstem encoding of acoustic characteristics of voiced stop consonants.</u> At American Auditory Society, Scottsdale, Arizona. (with Johnson, K.J., Skoe, E. & Kraus, N).

(2007). <u>Primary and non-primary cortical encoding of the speech envelope: Implications for neural representation and perception in humans.</u> At Association for Research in Otolaryngology Midwinter Meeting, Denver, Colorado. (with Abrams, D., Nicol, T., Hartmann, M. and Kraus, N.).

(2007) <u>Gestural influences on spatial representation in children with learning disabilities.</u> At Midwestern Psychological Association Annual Meeting, Chicago, Illinois (with Meyer, A.).

(2008) <u>BioMAP: A biological marker of auditory processing.</u> At the Department of Otolaryngology, Ramathibodi Hospital, Mahidol University, Bangkok Thailand.

(2008) <u>Effects of classroom Edulink use on neural and behavioral function.</u> At the American Speech-Language Hearing Association Meeting, Chicago, February. (with J. Hornickel and N. Kraus).

(2008) <u>Reading and subcortical auditory function.</u> At 10th Annual International Conference on Cognitive Neuroscience, Bodrum, Turkey, July. (with K. Banai et al).

(2008) <u>The Audition Toolbox.</u> At Building the NIH Toolbox: Research in Cognitive, Motor, Emotion and Sensation Function, Bethesda, MD, October.

(2009) <u>Behavioral audiograms measured in humans using a multipurpose instrument.</u> At Association for Research in Otolaryngology Midwinter Meeting, Baltimore, MD, February. (with Abel, R. et al).

(2009) <u>Brainstem encoding of speech and noise and its relationship to reading and listening in Noise.</u> Association for Research in Otolaryngology Midwinter Meeting, Baltimore, MD, February. (with Hornickel, J. et al).

(2009) Reading and auditory processing: A biological perspective. At American Auditory Society, Scottsdale, AZ, March. (with Hornickel, J. et al.).

(2009) <u>Identifying relationships among neural measures using reading and structural equation modeling.</u> At 13th Annual Research Forum, Northwestern University, Evanston, IL, September. (with J. Hornickel et al.).

(2009) The NIH Toolbox and the Assessment of Auditory Function. At the American Speech-Hearing-Language Association, New Orleans, Louisiana, November.

(2010) Identifying relationships among neural responses to speech, hearing speech in noise, and reading using structural equation modeling. 2010 MidWinter Meeting for the Association for Research in Otolaryngology, Anaheim, CA, March. (with J. Hornickel et al.).

(2010) Subcortical neural markers of reading and speech-in-noise impairments in children. 2010 Society for the Scientific Study of Reading, Berlin, Germany, July. (with J. Hornickel, et al)

(2011) Classroom FM System Use and Reading Disorders: Biological and Learning Outcomes at 18th Annual Meeting of the Society for the Scientific Study of Reading. St. Pete Beach, FL, August (with J. Hornickel and N. Kraus).

(2011) FM System Use Impacts Reading Skills and Neural Function. Presented at 15th Annual CSD Research Forum, Evanston, September (with J. Hornickel and N. Kraus).

(2011) Adults with ADHD and Remembering the Future. Presented at 15th Annual CSD Research Forum, Evanston, September (with D. Karidi).

(2012) Prospective Memory, Aging and ADHD. Presented at Cognitive Aging Conference, Atlanta, GA, April (with D. Karidi and P. Rendell).

(2013) Adults with ADHD, Prospective Memory and Executive Function. Presented at ADHD Worldwide, Tel Aviv, Israel, February (with D. Karidi and P. Rendell).

(2013) The NIH Toolbox Measures of Hearing: Initial Norming Data. Presented at American Auditory Society, Scottsdale, AZ, February (with H. Hoffman, J. Dubno and 10 others).

(2013) The NIH Toolbox Measures of Hearing: Normative Data. Presented at the American Speech-Language-Hearing Association Conference, Chicago, IL, November (with J. Griffith, R. Wilson and 10 others).

(2013) Prospective Memory Error Type of Adults with and without ADHD. Presented at Psychonomic Society Annual Meeting, Toronto, Ontario, Canada (with D. Karidi and P. Rendell).

(2018) Optimal Nipples for Efficient Barium Expression During the Videofluoroscopic Swallow Exam at Dysphagia Research Society 2018 Annual Meeting, Baltimore, March (with K. McGrattan Thakhar, A. and Martin-Harris, B.)

(2018) Supporting Your Gifted Child's School Performance: Identifying and Meeting the Special Learning Challenges of Gifted Children. Keynote Address at the Northwestern Center for Talent Development Opportunities Conference, June.

(2018) Language Impairment and Academic Achievement: Relations and Interventions. At the Northwestern 4th Annual CSD Connect Conference, April.

(2018) Optimum Nipples for Barium Expression During the Videoflouroscopic Swallow Exam. Poster presented at ASHA Annual Convention, November. (with Thakkar, A., Martin-Harris, B. & McGrattan, K.

## RESEARCH IN PROGRESS

Zecker, S., Trinh, J. and Hosterman, J.  Extended time accommodations requested and received on the GED:  Too much time on their hands?

Van Santen, F. & Zecker, S.  Appropriate procedures for determining proper amounts of extended time in testing.  Manuscript in preparation

## COMMITTEES: DEPARTMENT AND UNIVERSITY

| | |
|---|---|
| 1985-1988 | Member, Communication Sciences and Disorders Basic Science Committee. |
| 1985-1999 | Member, Communication Sciences and Disorders Aging Committee. |
| 1985-2003 | Member, Communication Sciences and Disorders Computer Committee. |
| 1992-2012 | Member, Communication Sciences and Disorders Curriculum Committee (Chair, 1994-1996 and 2002-2004) |
| 1991-1996 | Member, School of Speech Honors Convocation Committee |
| 1992-present | Member, University Parking and Traffic Committee (Chair, 1994-2002) |
| 1998-1999 | Member, Evanston Campus Planning Committee |
| 2001-2005 | Member, School of Communication Facilities Committee |
| 2004-2010 | Member, Communication Sciences and Disorders Doctoral Education Committee (Chair 2006-2008) |
| 2005 | Member, Strategic Planning Committee |
| 2006-present | Member, University Services Advisory Committee |
| 2010-2014 | Member, Speech, Language and Learning Program Committee |
| 2011-2014 | Member, Speech, Language and Learning Clinic Committee |
| 2013-2015 | CSD Clinic Space Planning Committee |
| 2014 | Member, School of Communication Faculty Innovations Small Grants Committee |
| 2014-present | Member, Communication Sciences and Disorders PhD Program Committee |
| 2014-present | Member, University Senate |
| 2016-present | Member, University Senate Student Affairs subcommittee |

## PROFESSIONAL MEMBERSHIPS

Learning Disabilities Association of America

International Dyslexia Association

Children and Adults with Attention Deficit Disorder

Midwest Neuropsychology Group

Midwestern Psychological Association

Professionals in Learning Disabilities and Special Education

Fellow, International Association for Research in Learning Disabilities

## COURSES TAUGHT

Information Processing and Learning Disabilities (Spring and Summer 1986-1988, Spring 1991)

Psychological and Educational Evaluation in Learning Disabilities (Fall 1985-1988, 1990-2009)

Advanced Statistics (Spring 1986-2000, 2003-8, 2018)

Experimental Design in Communicative Disorders (Winter 1986-2000, 2006-2008)

School-Age Diagnostic Clinic (Winter 1986-1999)

Brain and Cognition (Spring and Summer, 1989; Spring 1998)

Development and Disorders of Mathematics (Summer 1990-1991, 1993, 1995-2000, 2004, 2006, 2008; Spring 1992, 1994, 2001, 2003, 2005, 2007, 2009; Winter 2011-2016)

Attention Deficit Disorder and Related Behavior Disorders (Summer 1992-2017, Spring 2018-2019)

Advanced Seminar on Attention (Fall 1994)

Psychoeducational Assessment and Testing Principles (Fall 1985-1997, 2001-2009)

Diagnostic Procedures for Exceptional Children (Fall 1998-2000, 2008-2009)

Processes and Pathologies of Human Communication (Winter 1996-98, 2004-2006, 2012-2015)

Foundations of Research in Learning Disabilities (Winter 2001-2002)

Experimental and Theoretical Aspects of Learning Disabilities (Spring 2001-2002)

Nature and Measurement of Intelligence (Spring 2000, 2002, Winter 2004, 2006)

Research Procedures in Communication Sciences & Disorders (Winter 2005-2009, Fall 2010-2011)

Learning Disabilities (Winter 2009-2019)

Diagnostic and Remedial Procedures for Children with Learning Disabilities (Fall 2010-2012)

Language Disorders Overview (Winter 2013-2015)

Language Disorders (Spring 2012-2014)

Statistics in CSD (Fall 2013-2017)

## DISSERTATION COMMITTEES: CHAIRED

| | | |
|---|---|---|
| 1989 | Karen Hux | Performance on Selected Measures of Linguistic and Verbal Problem Solving Skills Following Severe Closed Head Injury. |
| 1991 | Randy Partridge | Individual Differences in the Neuropsychology of Reading. |
| 1991 | Nancy Smith | Self-Concept in College Students with Learning Disabilities. |

August 30, 2019 - 12

**Appx792**

| | | |
|---|---|---|
| 1993 | Donald Compton | The Effect of Word Frequency and Orthographic Redundancy on Word Recognition of Children Who are Good and Poor Readers. |
| 1993 | Charise Mita | Acquisition of Event Knowledge by Young Children: Effects of Differential Exposure and Elicitation Procedures. |
| 1994 | Mark Driscoll | The Development of an Objective Assessment Tool for Attention Deficit Disorder |
| 1994 | Liane Grayson | Lexical Representation and Access: What do We Do with Compounds? |
| 1997 | Jane Drueck | Conceptual Understanding and Solution Procedures for Double-Digit Addition and Subtraction in Average Math Achievers, Low Math Achievers, and Low Math Achievers at Risk for Learning Disabilities. |
| 1999 | Hsiu-Fei Lee | Factors Influencing Early Computational Skills in Taiwanese Children with Average and Below Average Achievement in Mathematics. |
| 2001 | Cynthia Dupuy | The Role of Working Memory and Transcription Automaticity in Written Language Among Adolescents with Learning Disabilities: A Comparison of Production by Hand and by Computer |
| 2001 | Victor Chang | The Assessment of Attention/Deficit Hyperactivity Disorder: An Investigation of Diagnostic Practice and Specific Areas of Concern Across Health Care Providers |
| 2002 | Sarah Valliath | The Efficacy of a Computer-Based Phonological Awareness Training Program: Effects on Phonological Awareness, Reading and Spelling |
| 2012 | Frank van Santen | Cognitive Processing Profiles of School-Age Children who Meet Low-Achievement, IQ-Discrepancy, or Both Criteria for Underachievement in Basic Reading Skills. |
| 2012 | Diane Morean | Effects of Semantic Weight on Verb Recognition and Retrieval in Aphasia: Implications for the Lexical Conceptual Structure of Verbs. |
| 2012 | Daphne Sajous-Brady | African-American English and Reading Achievement: The Relationships Among Dialect Awareness, Dialect Shifting and Reading Development. |
| 2013 | Daniella Karidi | The Effects of Task Features and Executive Functioning on Prospective Memory Performance of Adults with ADHD |
| 2014 | Saja Jamjoom | Story Reading and Literary Arabic Vocabulary Acquisition in Kindergartners |

## OTHER UNIVERSITY ACTIVITIES

| | |
|---|---|
| 1985-2011 | Member, Program in Language and Cognition |
| 2002-2011 | Member, Cognitive Science Program |
| 2003-2009 | Program Head, Language and Cognition |
| 1986-1989 | Program Coordinator, Human Communication Sciences |
| 1989-1992 | Faculty Associate, Communications Residential College |
| 1991-1999 | Faculty Advisor, Human Communication Sciences |
| 1992-1999 | Faculty Associate, Willard Residential College |
| 2002-2011 | Coordinator, Professional Concentration in Learning Disabilities |
| 1992-2004 | Chair, University Parking and Traffic Committee |
| 2012-present | Member, University Parking and Traffic Committee |
| 2015-present | Member, University Faculty Senate |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 1995-1996 | Grant reviewer, National Science Foundation, Instrumentation and Laboratory Improvement Competition, Arlington, VA. |
| 1996, 1998 | Grant reviewer, National Science Foundation, Course and Curriculum Development Competition, Arlington, VA. |
| 1998-2005 | Board of Professional Advisors, Cognitive Concepts, Inc., Evanston, Illinois. |
| 2001, 2003 | Grant Reviewer, International Dyslexia Association Grant Program. |
| 2002-present | Editorial Review Board, Learning Disabilities: Research and Practice |
| 2003-present | Disabilities Consultant, National Board of Medical Examiners, Philadelphia, PA |
| 2006-present | Disabilities Consultant, Association of American Medical Colleges, Washington, DC |
| 2007-present | Professional Board of Advisors, The Hyde Park Day Schools, Chicago and Northbrook, IL |
| 2013-2015 | Research Director, Camp STAR, Highland Park, IL |
| 2015-present | Disabilities Consultant, National Board of Osteopathic Medical Examiners, Chicago, Illinois |
| 2018-present | Disabilities Consultant, Law School Advisory Council, Newtown, PA |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JESSICA RAMSAY,<br><br>    **Plaintiff,**<br><br>    **v.**<br><br>**NATIONAL BOARD OF MEDICAL EXAMINERS,**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Civil Action No. 2:19-cv-02002-JCJ** |

### DECLARATION OF BENJAMIN J. LOVETT, PH.D.

I, Benjamin J. Lovett, declare as follows:

1.      My name is Benjamin J. Lovett. I am over 18 years of age and, unless otherwise stated, I have personal knowledge of the matters addressed herein.

2.      Through August 31, 2019, I am an Associate Professor of Psychology at the State University of New York (SUNY) at Cortland and an Adjunct Professor of Psychology at Syracuse University. As of September 1, 2019, I will be Associate Professor of Psychology and Education at Teachers College, Columbia University. I am a licensed psychologist. A true and correct copy of my curriculum vitae is attached at Tab A.

3.      My professional expertise is in the diagnosis and management of neurodevelopmental conditions, particularly learning disabilities (LD) and Attention Deficit/ Hyperactivity Disorder (ADHD). I have published numerous articles and book chapters on these topics. As part of my work, I frequently meet with young adults who have diagnoses of learning and attention problems, and I assess both their self-reported symptoms and their objective performance on various tests of cognitive, academic, and behavioral functioning.

DEFENDANT'S
EXHIBIT
**6**

4.    Much of my research involves testing accommodations for students with disabilities, and the American Psychological Association has published a book that I co-authored on that topic, Testing Accommodations for Students with Disabilities: Research-Based Practice.

5.    In addition to my faculty and research responsibilities, I have served as an independent reviewer for numerous organizations that administer or rely upon standardized tests, including the National Board of Medical Examiners (NBME), the National Board of Osteopathic Medical Examiners (NBOME), and the New York State Board of Law Examiners.  For each of these organizations, among others, I have reviewed documentation submitted by examinees seeking testing accommodations based, at least in part, on ADHD and/or LD diagnoses.

6.    It is a common practice for testing entities to seek input from external experts regarding disability-based requests for testing accommodations.  The external professionals have expertise in the areas of impairment that provide the basis for an accommodation request.  The external professionals are asked to review documentation submitted in support of an accommodation request and to advise on matters of disability assessment and diagnosis, the level of functional impairment experienced by an applicant, and the appropriateness of specific test accommodations in a given case.  The practice of reviewing supporting documentation and providing an opinion based upon that documentation is both well established and, in my opinion, professionally sound.

7.    For cognitive impairments, certain documentation is routinely anticipated (e.g., school records reflecting a learning disability or ADHD, or medical records on a brain injury), and reviewers will generally ask to have such materials submitted.  By reviewing a complete historical record, an evaluator can determine the extent to which objective evidence supports the

- 2 -

disability diagnosis and demonstrates that the individual is substantially limited in one or more major life activities.

8.    I was asked by NBME to review Jessica Ramsay's request for 100% extra time (i.e., double the amount of standard testing time) accommodations on Step 1 of the USMLE in December 2018. At that time, I concluded that there was insufficient evidence to support Ms. Ramsay's diagnoses of learning disabilities or ADHD or to support any accommodations based on those disorders, and I prepared a report for NBME based on my review of this information. A true and correct copy of my report is attached at Tab B. The documents that I reviewed are listed on page one of the report. I have reviewed this report and reaffirm my belief in the conclusions expressed in the report.

**Ms. Ramsay's Learning Disability Diagnosis**

9.    The current official diagnostic criteria for LD require that someone have academic skills that are below the average range for age expectation and that cause problems performing in real-world settings. These academic skill weaknesses would have been present in the person's childhood and would not be better accounted for by other factors (e.g., general low intelligence). Typically, young adults with valid LD diagnoses can point to evidence of their disorder that includes report cards from their K-12 schooling showing low grades or other indicia of poor performance in the area of their LD (e.g., reading), special education records showing the specialized instruction and related services they were provided, and reports from professional evaluations showing below-average scores on diagnostic achievement tests in the area of their LD.

10.    When applicants request testing accommodations, it is also helpful to review their history of taking other timed standardized tests, and whether they tested with or without

- 3 -

**Appx797**

accommodations. A consistent history of receiving accommodations throughout one's educational history is evidence that generally supports the need for such accommodations. Conversely, past performance on such tests where the applicant did *not* receive accommodations provides evidence regarding the individual's ability to read, concentrate and think in the specific context of taking a standardized test and may support the conclusion that accommodations are not needed.

11.     In Ms. Ramsay's case, two important pieces of information in her record are her score reports from the Medical College Admission Test (MCAT) and the ACT.

12.     The MCAT is a rigorous admission test taken by those applying for entry into medical school. The test has a strict time limit, and Ms. Ramsay took the test without any accommodations. One of the MCAT sections, "Verbal Reasoning," involves reading passages and answering questions about the passages under the applicable strict time limit. According to the documents that I reviewed, Ms. Ramsay's Verbal Reasoning score on the MCAT fell in the 67th percentile — better than most medical school applicants taking that test (a group that is well above-average to begin with, compared to the general population).

13.     Similarly, according to the documents that I reviewed, Ms. Ramsay reportedly performed well above the average range (between 27 and 30) on the ACT without accommodations.

14.     Ms. Ramsay offered the following explanation for her performance on the MCAT and ACT without accommodations in her Personal Statement to NBME:

> Because reading and writing are such tedious and draining processes for me, I avoid both as much as possible. I was able to do this strategically for some prior standardized tests like the ACT and MCAT because the tests were designed so that many of the questions could be answered without reading the whole question. For the ACT, I was not able to read all of the questions and could not accurately demonstrate my knowledge.

- 4 -

Additionally, due to the guessing penalty, I had to leave the questions I was not able to read unanswered. However, because most of the questions required little reading to find the answers, I was able to answer enough questions to achieve an acceptable score. Likewise, for the MCAT, many of the questions could be answered without reading and gathering information from the passages, so I knew to answer passage-independent questions first, and then used any time left to try to read the passages with the most unanswered questions remaining. Being able to skip much of the reading made [it] possible for me to correctly answer enough questions to achieve an acceptable score.

15.    Respectfully, based on my clinical and research experience and general awareness of the content of the MCAT and ACT examinations, this explanation is not credible. Although it is common for students to read test questions and answer options first and then search for relevant information in the corresponding passage, this still requires a significant amount of reading under time-pressured conditions. Without reading at least a substantial portion of the passages, it is highly unlikely that an examinee could answer many questions correctly. It is also my understanding that the test items in the MCAT Verbal Reasoning section generally ask for students to identify or interpret themes, perspectives, and arguments from a passage. In my opinion, an examinee could not consistently find the correct answers to questions in this section of the test without referencing the passage. Finally, although Ms. Ramsay refers to her ACT and MCAT scores as "acceptable," her performance on the ACT was in fact better than the vast majority of her peers, and her MCAT performance was better than that of most medical school applicants—a high-achieving group to begin with. These test scores, obtained without accommodations, are not consistent with someone who is unable to read and comprehend text under time pressure.

16.    Because learning disabilities are neurologically based, lifelong impairments, they would be expected to cause significant problems in school during childhood. No records were submitted to NBME showing that Ms. Ramsay experienced difficulties in school. Her evaluator,

- 5 -

**Appx799**

Dr. Robert Smith, reported reviewing Ms. Ramsay's report cards for grades K, 2, 3, 4, 5, and 6 as well as her high school and college transcripts, and concluded that "the available school records do not clearly reflect academic struggles in elementary, middle, or high school." (Evaluation at 2, 29). Ms. Ramsay and her mother apparently reported that Ms. Ramsay received informal accommodations some of the time in school and specialized help from the family at home, but there are no records of this, and it is not clear why or how often informal accommodations were provided (if they were in fact provided).

17.    According to the records submitted to NBME, Ms. Ramsay also completed diagnostic evaluations in 2014, 2017, and 2018.

18.    A key indicator of learning disabilities is academic skills that are significantly below average. According to the documents that I reviewed, in the 2014 and 2017 evaluations, Ms. Ramsay's evaluators did not perform comprehensive assessments of her academic skills and did not adequately evaluate her academic skills under time-pressured conditions. Nevertheless, all of her academic skills scores as measured in those evaluations were in the average range or above.

19.    According to the documents that I reviewed, after Ms. Ramsay's request for extended time accommodations was twice denied by NBME, she underwent another diagnostic evaluation in 2018 with Dr. Robert Smith. During that evaluation, she was given several measures of academic skills that were time-pressured, and her scores reflected low performance in several areas. I understand that Dr. Smith is emphasizing in this litigation specific results including the following:

   a.  An Oral Reading Fluency score in the 1st percentile on the Wechsler Individual Achievement Test-3rd Edition (WIAT-III).

- 6 -

**Appx800**

b. A Reading Rate Cluster score of 66 at the 1st percentile on the Woodcock Johnson IV Tests of Achievement (WJ4).

c. A Gray Oral Reading Test-5th Edition (GORT-5) Fluency score at the 2nd percentile.

20.    Respectfully, these scores are not credible.  These extremely low scores would superficially suggest that Ms. Ramsay's reading skills are worse than those of almost anyone else (except for 1 or 2% of the population).  Reading skills at that level are fundamentally contradicted by Ms. Ramsay's academic history and her performance on standardized tests such as the ACT and MCAT.

21.    On the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT), Ms. Ramsay's score was at the 2nd percentile, at the estimated level of a child in eighth grade.  Respectfully, Dr. Smith appears to have been inappropriately credulous by accepting Ms. Ramsay's NDRT score as valid and by his claim that Ms. Ramsay can employ special strategies to perform well on the extremely challenging MCAT but not on the NDRT, a test developed to be accessible even to high school students.

22.    In my opinion, the 2018 testing data reported by Dr. Smith regarding Ms. Ramsay's academic skills under timed conditions are not credible.  They are squarely contradicted by Ms. Ramsay's average and above average scores on the ACT and MCAT, with no accommodations, and by her apparent excellent grades in high school and in college (even before documented accommodations were provided in the latter).  Ms. Ramsay's performance on the ACT and MCAT reflects her ability to access timed, unaccommodated, high-stakes examinations that require reading abilities under real-world conditions.  The scores that Ms. Ramsay obtained on the ACT and MCAT would not be obtained by someone with timed reading comprehension skills typical of a student in elementary or middle school.

- 7 -

23. According to the documents that I reviewed, Dr. Smith argues that the diagnostic test scores that Ms. Ramsay obtained during his evaluation can be trusted because she performed well on the Test of Memory Malingering (TOMM). The TOMM, however, was developed to identify people feigning or exaggerating *memory* problems, not to identify people working slowly on academic tests or reporting more ADHD symptoms than they actually experience. The TOMM is not designed to measure speed, so a client may do very well on the TOMM while still obtaining scores on timed diagnostic tests that are not reflective of full effort and motivation. Respectfully, Dr. Smith's reliance on the TOMM performance apparently led him to be far too credulous of Ms. Ramsay's evaluation data, especially given the stark contrasts between her real-world performance in school and on the ACT and MCAT compared to her performance during his evaluation.

24. Performance Validity Tests (PVTs) are assessment tools that are designed to ensure that a client (here, Ms. Ramsay) is putting forth sufficient effort and appropriate motivation during an evaluation. There are PVTs other than the TOMM that Dr. Smith could have administered to provide a more relevant measure of Ms. Ramsay's motivation in taking her 2018 diagnostic tests. Some PVTs are designed to measure speed, which would specifically address the situation in which the individual is being evaluated because he or she is seeking extended time accommodations. Dr. Smith did not administer any of these types of PVTs.

**Ms. Ramsay's ADHD Diagnosis**

25. The current official diagnostic criteria for ADHD require that someone have unusually high levels of symptoms of inattention and/or hyperactivity/impulsiveness that begin in childhood (by age 12), occur across settings, and interfere with real-world functioning. In addition, the symptoms should not be better explained by a different disorder (e.g., an anxiety

- 8 -

disorder). Typically, young adults with valid ADHD diagnoses can point to evidence of their disorder that includes ratings of their symptoms by other parties who know them well (e.g., parents, friends, significant others), documented problems in school (e.g., low grades, problem behavior, or difficulty completing tasks and complying with teacher requests), and significant difficulties with current everyday life responsibilities that most people in the general population can successfully perform.

26.    According to the documents that I reviewed, there is not clear, consistent evidence of ADHD from Ms. Ramsay's clinical evaluations. Ms. Ramsay also has not provided real-world records (e.g., school records, teacher comments, work evaluations) showing significant ADHD symptoms or related functional impairment in school or work settings.

27.    Dr. Smith diagnosed Ms. Ramsay with ADHD in his 2018 evaluation. There is, however, no objective evidence that Ms. Ramsay "has a long history of inattention, distractibility and hyperactivity that have significantly interfered with academic functioning since early childhood," as Dr. Smith states in his report. (Report at 28). As discussed above, there is no objective evidence in the record that Ms. Ramsay experienced any interference in any of her academic functioning. The limited records that were provided instead reflect consistent and strong academic functioning.

28.    Beyond academic problems, I would expect someone with untreated ADHD (Ms. Ramsay was not diagnosed with ADHD as a child) to exhibit significant impairment in social and everyday life settings as a child. Ms. Ramsay has claimed such impairments and her mother also made such claims, but there is no objective record of such impairment. When Ms. Ramsay was a child in the 1990s, ADHD was a well-known condition. I would expect there to be a record of consultations with a physician or mental health practitioner during childhood given the

- 9 -

level of impairment during this time now reported by Ms. Ramsay and her mother. But there is no such record here.

29.     In her 2018 evaluation, after having been denied accommodations by NBME, Ms. Ramsay claimed to have almost every possible symptom of ADHD, and her mother and fiancé also described her as having many symptoms of ADHD, well above the clinical thresholds for the disorder. I do not find these reports to be credible, given the lack of objective evidence of any issues of inattention or distractibility in school or other settings during Ms. Ramsay's primary and secondary school years (remembering that ADHD is a neurodevelopmental disorder with childhood onset), and the discrepancy between these reported symptoms and the lack of objective records showing poor performance as an adult in real-world settings where most people in the general population can perform well.

30.     According to the documents that I reviewed, on a computerized test of ADHD symptoms that Dr. Smith administered to Ms. Ramsay (the IVA+Plus Continuous Performance Test),[1] her performance was extremely poor. The test generates many scores, and for each score, average performance is 100, and the vast majority of people (about 98%) obtain scores of 70 or above. All of Ms. Ramsay's scores from this test mentioned in Dr. Smith's report are below 70. (Report at 12-14). This is a highly unusual result, suggesting much worse performance than I would expect even if someone had verified ADHD. When Ms. Ramsay took a similar continuous performance test in 2017 as part of her evaluation with Dr. Lewandowski (the Conners

---

[1] Continuous performance tests (CPTs) administer a series of game-like tasks that are designed to measure an individual's ability to maintain attention over time and carefully choose when to respond and when not to respond to visual or auditory stimuli. For example, one CPT task flashes a series of digits, one at a time, on an electronic display, and the examinee is instructed to press a button every time a "1" is followed by a "9." The test machine records the number of correct responses, incorrect responses, and failures to respond.

Continuous Performance Test, Third Edition), her scores were all in the normal range, with the exception of one mildly abnormal score.  Dr. Smith did not address this performance discrepancy in his report.

**Disability Status and Testing Accommodation Needs**

31.    As discussed above, there is insufficient credible evidence that Ms. Ramsay has a learning disability or ADHD.  For similar reasons, there is insufficient evidence that Ms. Ramsay is disabled within the meaning of the Americans with Disabilities Act.

32.    Individuals who are substantially limited in a major life activity due to an LD or ADHD generally have extensive documentation in their academic and/or employment histories, and in their medical records, reflecting such substantial limitations, because both categories of impairment have childhood onsets.  There are many such students in our schools today with learning disabilities and/or ADHD, and they commonly have school records from early grades forward that show the extent of their skill deficits (in reading, writing, or math) and/or behavior problems.  It is typical for students with a reading disorder or other LD and students with ADHD to have an historical record of their disability and resulting impairment.

33.    Here, there is insufficient evidence that Ms. Ramsay is substantially limited in her ability to read or engage in any other activity that is relevant to taking the USMLE, when she is compared to most people in the general population, at least with regard to LD/ADHD issues.  There are no historical school or work records reflecting such limitations.  Although at times Ms. Ramsay has obtained scores during diagnostic evaluations that would superficially suggest possible substantial limitations, those scores (and other evidence from the diagnostic evaluations) are not supported by—and are often inconsistent with—other important evidence, including her performance on real-world timed tests that required significant amounts of reading.

- 11 -

34.    There is also insufficient evidence that Ms. Ramsay requires any accommodations to access the USMLE, at least due to LD/ADHD issues (as opposed to the physical conditions that she mentions in her documentation).  Given her performance on other, similar high-stakes standardized tests, including the ACT and the MCAT, there is insufficient credible evidence of deficits in Ms. Ramsay's access skills (e.g., timed reading comprehension and concentration) relative to most people in the general population, that would make accommodations appropriate.

35.    Although it may seem puzzling for evaluators to ignore real-world evidence that suggests diagnostic test scores to be untrustworthy, research has shown that many evaluators view their role as helping a client to secure accommodations.[2]  This sometimes results in evaluators focusing on specific diagnostic results in their reports while de-emphasizing or ignoring other results, dismissing real-world academic and standardized testing performance for reasons that are not credible, or failing to evaluate whether a client is attempting to maximize his or her performance when being evaluated.


I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 30, 2019.

Benjamin J. Lovett, Ph.D.

---

[2] See Gordon, M., Lewandowski, L., Murphy, K., & Dempsey, K., "ADA-based accommodations in higher education: A survey of clinicians about documentation requirements and diagnostic standards," *Journal of Learning Disabilities, 35*(4), 357-363 (2002).  For a more recent study with similar findings, see Harrison, A.G., Lovett, B.J. & Gordon, M., "Documenting disabilities in postsecondary settings:  Diagnosticians' understanding of legal regulations and diagnostic standards," *Canadian Journal of School Psychology, 28*(4), 303-322 (2013).

- 12 -

# TAB A

# Benjamin J. Lovett, Ph.D.

**Address before September 1, 2019:**
Department of Psychology
SUNY Cortland
PO Box 2000
Cortland, NY 13045
607-753-2040 (office)
Benjamin.Lovett@cortland.edu

**Address after September 1, 2019**
Department of Health and Behavior Studies
Teachers College, Columbia University
525 W. 120th Street
New York, NY 10027
BL2799@tc.columbia.edu

**Current Appointments:**
> Associate Professor of Psychology, SUNY Cortland, Cortland, NY
> Adjunct Professor of Psychology, Syracuse University, Syracuse, NY

**Licensure:**
> Psychologist (New York State) – License #020865

**Education:**
> Ph.D. in School Psychology, 2007
> Syracuse University, Syracuse, NY
> (APA-Accredited Program)
>
> M.S. in Psychology, 2005
> Syracuse University, Syracuse, NY
>
> B.A. in Psychology, 2002, *summa cum laude*, with honors in psychology
> Minor in Educational Policy Studies
> Pennsylvania State University, University Park, PA

**Previous Academic and Clinical Appointments (selected):**
> *July 2007 – June 2014*
>> Associate Professor of Psychology, Elmira College, Elmira, NY
>> (Assistant Professor of Psychology from July 2007 to June 2013)
>
> *August 2006 – June 2007*
>> School Psychology Intern, Jamesville-DeWitt Schools
>> Psychological Evaluator, Elmcrest Children's Center
>
> *September 2005 – June 2006*
>> Psychology Extern, Jamesville-Dewitt Middle School
>
> *September 2003 – December 2005*
>> Senior Research Analyst, Dept. of Psychiatry, SUNY Upstate Medical University
>> (ADHD Clinic Coordinator, from 2003 to 2004)

*Summers 2000 - 2003*
> Instructional Staff, Center for Talented Youth, Johns Hopkins University
> (Instructor for 2003; Teaching Assistant from 2000 to 2002)

## Publications – total $N$ = 83, and as of 6/1/19, an $h$ index of 24 (2404 total citations)

### Publications: Book ($n$ = 1)

1. **Lovett, B. J.,** & Lewandowski, L. J. (2015). *Testing accommodations for students with disabilities: Research-based practice.* Washington, DC: American Psychological Association Press.

### Publications: Peer-Reviewed Journal Articles ($n$ = 54)

2. Harrison, A. G., **Lovett, B. J.,** Keiser, S., & Armstrong, I. (in press). Learning disability documentation submitted by osteopathic medical students. *Applied Neuropsychology: Adult.*

3. **Lovett, B. J.,** & Bizub, A. L. (2019). Pinpointing disability accommodation needs: Which evidence is most relevant? *Psychological Injury and Law, 12,* 42-51.

4. **Lovett, B. J.,** & Jordan, A. H. (in press). Are ADHD screeners safe to use? *Journal of Attention Disorders.*

5. **Lovett, B. J.,** Lewandowski, L. J., & Carter, L. (in press). Separate room testing accommodations for students with and without ADHD. *Journal of Psychoeducational Assessment.*

6. Nelson, J. M., & **Lovett, B. J.** (2019). Assessing ADHD in college students: Integrating multiple evidence sources with symptom and performance validity data. *Psychological Assessment, 31,* 793-804.

7. Wood, W. L. M., Lewandowski, L. J., & **Lovett, B. J.** (in press). Profiles of diagnosed and undiagnosed college students meeting ADHD symptom criteria. *Journal of Attention Disorders.*

8. **Lovett, B. J.,** & Nelson, J. M. (2018). Assessing adults for ADHD: A systematic, evidence-based protocol. *Journal of Health Service Psychology, 44,* 48-52.

9. **Lovett, B. J.** (2017). For balance in the historiography of psychology. *History of Psychology, 20,* 218-224.

10. **Lovett, B. J.,** & Davis, K. M. (2017). Adult ADHD assessment: An integrated clinical-forensic perspective. *Professional Psychology: Research & Practice, 48,* 438-444.

11. **Lovett, B. J.,** & Nelson, J. M. (2017). Test anxiety and the Americans with Disabilities

Act. *Journal of Disability Policy Studies, 28,* 99-108.

12. **Lovett, B. J.,** Lewandowski, L. J., & Potts, H. E. (2017). Test-taking speed: Predictors and implications. *Journal of Psychoeducational Assessment, 35,* 351-360.

13. Wood, W. L. M., Lewandowski, L. J., **Lovett, B. J.,** & Antshel, K. M. (2017). Executive dysfunction and functional impairment associated with sluggish cognitive tempo in college students. *Journal of Attention Disorders, 21,* 691-700.

14. Wood, W. L. M., Potts, H. E., Lewandowski, L., & **Lovett, B. J.** (2017). Sluggish cognitive tempo and speed of performance. *Journal of Attention Disorders, 21,* 684-690.

15. Lewandowski, L. J., Berger, C., **Lovett, B. J.,** & Gordon, M. (2016). Test-taking skills of high school students with and without learning disabilities. *Journal of Psychoeducational Assessment, 34,* 566-576.

16. **Lovett, B. J.,** & Leja, A. M. (2015). ADHD symptoms and benefit from extended time testing accommodations. *Journal of Attention Disorders, 19,* 167-172.

17. **Lovett, B. J.,** Nelson, J. M., & Lindstrom, W. (2015). Documenting hidden disabilities in higher education: Analysis of recent guidance from the Association on Higher Education and Disability (AHEAD). *Journal of Disability Policy Studies, 26,* 44-53.

18. Lewandowski, L. J., Lambert, T. L., **Lovett, B. J.,** Panahon, C., & Sytsma, M. (2014). College students' preferences for test accommodations. *Canadian Journal of School Psychology, 29,* 116-126.

19. **Lovett, B. J.** (2014). Testing accommodations under the amended ADA: The voice of empirical research. *Journal of Disability Policy Studies, 25,* 81-90.

20. Sparks, R. S., & **Lovett, B. J.** (2014). Learning disability documentation in higher education: What are students submitting? *Learning Disability Quarterly, 37,* 54-62.

21. Harrison, A. G., **Lovett, B. J.,** & Gordon, M. (2013). Documenting disabilities in postsecondary settings: Diagnosticians' understanding of legal regulations and diagnostic standards. *Canadian Journal of School Psychology, 28,* 303-322.

22. Lewandowski, L. J., Cohen, J., & **Lovett, B. J.** (2013). Effects of extended time allotments on reading comprehension performance of college students with and without learning disabilities. *Journal of Psychoeducational Assessment, 31,* 326-336.

23. Lewandowski, L. J., Gathje, R. A., **Lovett, B. J.,** & Gordon, M. (2013). Test-taking skills in college students with and without ADHD. *Journal of Psychoeducational Assessment, 31,* 41-52.

24. **Lovett, B. J.** (2013). The science and politics of gifted students with learning disabilities:

A social inequality perspective. *Roeper Review, 35,* 136-143.

25. **Lovett, B. J.,** & Leja, A. (2013). Students' perceptions of testing accommodations: What we know, what we need to know, and why it matters. *Journal of Applied School Psychology, 29,* 72-89.

26. **Lovett, B. J.,** & Sparks, R. S. (2013). The identification and performance of gifted students with learning disabilities: A quantitative synthesis. *Journal of Learning Disabilities, 46,* 304-316.

27. Sparks, R. S., & **Lovett, B. J.** (2013). Applying objective diagnostic criteria to students in a college support program for learning disabilities. *Learning Disability Quarterly, 36,* 231-241.

28. Jordan, A. H., **Lovett, B. J.,** & Sweeton, J. L. (2012). The social psychology of interracial interactions: Implications for culturally competent practice. *Journal of Multicultural Counseling and Development, 40,* 132-143.

29. **Lovett, B. J.,** Jordan, A. H., & Wiltermuth, S. (2012). Individual differences in the moralization of everyday life. *Ethics and Behavior, 22,* 248-257.

30. Jordan, A. H., Monin, B., Dweck, C. S., **Lovett, B. J.,** John, O. P., & Gross, J. J. (2011). Misery has more company than people think: Underestimating the prevalence of others' negative emotions. *Personality and Social Psychology Bulletin, 37,* 120-135.

31. **Lovett, B. J.** (2011). Auditory processing disorder: School psychologist beware? *Psychology in the Schools, 48,* 855-867.

32. **Lovett, B. J.** (2011). On the diagnosis of learning disabilities in gifted students. *Gifted Child Quarterly, 55,* 149-151.

33. **Lovett, B. J.,** & Hood, S. B. (2011). Realism and operationism in psychiatric diagnosis. *Philosophical Psychology, 24,* 207-222.

34. **Lovett, B. J.,** & Johnson, T. L. (2011). The impact of presentation level on SCAN-A test performance. *Contemporary Issues in Communication Sciences and Disorders, 38,* 135-139.

35. Hood, S. B., & **Lovett, B. J.** (2010). Network models of psychopathology and comorbidity: Philosophical and practical considerations. *Behavioral and Brain Sciences, 33,* 159-160.

36. **Lovett, B. J.** (2010). Extended time testing accommodations for students with disabilities: Answers to five fundamental questions. *Review of Educational Research, 80,* 611-638.

37. **Lovett, B. J.,** & Jordan, A. H. (2010). Levels of moralization: An alternative conception of moral sensitivity. *Journal of Moral Education, 39,* 175-189.

38. **Lovett, B. J.,** Lewandowski, L. J., Berger, C. A., & Gathje, R. A. (2010). Effects of response mode and time allotment on college students' writing. *Journal of College Reading and Learning, 40*(2), 64-79.

39. **Lovett, B. J.,** & Eckert, T. L. (2009). Reinforcement sensitivity and responsiveness to performance feedback: A preliminary investigation. *Journal of Applied School Psychology, 25,* 204-219.

40. **Lovett, B. J.,** & Sparks, R. S. (2010). Exploring the diagnosis of "Gifted/LD": Characterizing postsecondary students with learning disability diagnoses at different IQ levels. *Journal of Psychoeducational Assessment, 28,* 91-101.

41. Sparks, R. S., & **Lovett, B. J.** (2009). Objective criteria for classification of postsecondary students as learning disabled: Effects on prevalence rates and group characteristics. *Journal of Learning Disabilities, 42,* 230-239.

42. Sparks, R. S., & **Lovett, B. J.** (2009). College students with learning disability diagnoses: Who are they, and how do they perform? *Journal of Learning Disabilities, 42,* 494-510.

43. DiGennaro-Reed, F. D., & **Lovett, B. J.** (2008). Views on the efficacy and ethics of punishment: Results from a national survey. *International Journal of Behavioral Consultation and Therapy, 4*(1), 61-67.

44. Lewandowski, L. J., **Lovett, B. J.,** Codding, R. S., & Gordon, M. (2008). Symptoms of ADHD and academic concerns in college students with and without ADHD diagnoses. *Journal of Attention Disorders, 12,* 156-161.

45. Lewandowski, L. J., **Lovett, B. J.,** & Rogers, C. L. (2008). Extended time as a testing accommodation for students with reading disabilities: Does a rising tide lift all ships? *Journal of Psychoeducational Assessment, 26,* 315-324.

46. Mogle, J. A., **Lovett, B. J.,** Stawski, R. S., & Sliwinski, M. J. (2008). What's so special about working memory? An examination of the relationships between working memory, secondary memory, and fluid intelligence. *Psychological Science, 19,* 1071-1077.

47. Jordan, A. H., & **Lovett, B. J.** (2007). Stereotype threat and test performance: A primer for school psychologists. *Journal of School Psychology, 45,* 45-59.

48. Lewandowski, L. J., **Lovett, B. J.,** Parolin, R. A., Gordon, M., & Codding, R. S. (2007). Extended time accommodations and the mathematics performance of students with and without ADHD. *Journal of Psychoeducational Assessment, 25,* 17-28.

49. **Lovett, B. J.,** Eckert, T. L., Talge, N. M., & Akin-Little, K. A. (2007). Attachment

intervention programs: Implications for school psychologists. *Journal of Early Child and Infant Psychology*, *3*, 25-43.

50. **Lovett, B. J.**, & Sheffield, R. (2007). Affective empathy deficits in aggressive children and adolescents: A critical review. *Clinical Psychology Review*, *27*, 1-13.

51. **Lovett, B. J.** (2006). The new history of psychology: A review and critique. *History of Psychology*, *9*, 17-37.

52. **Lovett, B. J.**, & Lewandowski, L. J. (2006). Gifted students with learning disabilities: Who are they? *Journal of Learning Disabilities*, *36*, 515-527.

53. **Lovett, B. J.** (2005). A defense of prudential moralism. *Journal of Applied Philosophy*, *22*, 159-168.

54. **Lovett, B. J.**, & Jordan, A. H. (2005). Moral values, moralism, and the 2004 presidential election. *Analyses of Social Issues and Public Policy*, *5*, 165-175.

55. Akin-Little, K. A., Eckert, T. L., **Lovett, B. J.**, & Little, S. G. (2004). Extrinsic reinforcement in the classroom: Bribery or best practice? *School Psychology Review*, *33*, 343-361.

**Publications: Contributions to Edited Books (*n* = 17)**

56. **Lovett, B. J.**, & Nelson, J. M. (in press). Assessment in educational settings. In J. A. Suhr & M. Sellbom (Eds.), *Cambridge Handbook of Clinical Assessment and Diagnosis*. New York: Cambridge University Press.

57. **Lovett, B. J.**, & Kilpatrick, D. A. (2018). Differential diagnosis of SLD [Specific Learning Disability] versus other difficulties. In D. P. Flanagan & V. C. Alfonso (Eds.), *Essentials of specific learning disability assessment* (2nd ed., pp. 549-571). Hoboken, NJ: Wiley.

58. Lewandowski, L. J., **Lovett, B. J.**, & Gordon, M. (2016). Measurement of symptom severity and impairment. In S. Goldstein & J. A. Naglieri (Eds.), *Assessing impairment: From theory to practice* (2nd ed., pp. 229-245). New York: Springer.

59. **Lovett, B. J.**, Gordon, M., & Lewandowski, L. J. (2016). Legal conceptions of impairment: Implications for the assessment of psychiatric disabilities. In S. Goldstein & J. A. Naglieri (Eds.), *Assessing impairment: From theory to practice* (2nd ed., pp. 125-139). New York: Springer.

60. **Lovett, B. J.**, & Spenceley, L. A. (2016). Use of the Woodcock-Johnson IV in the diagnosis of specific learning disabilities in adulthood. In D. P. Flanagan & V. C. Alfonso (Eds.), *WJ-IV clinical use and interpretation: Scientist-practitioner perspectives* (pp. 253-270). Cambridge, MA: Academic Press.

61. Gordon, M., Lewandowski, L. J., & **Lovett, B. J.** (2015). Assessment and management of ADHD in educational and workplace settings in the context of ADA accommodations. In R. A. Barkley (Ed.), *Attention-Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment* (4th ed., pp. 774-794). New York: Guilford.

62. Lewandowski, L. J., & **Lovett, B. J.** (2014). Learning disabilities. In E. J. Mash & R. A. Barkley (Eds.), *Child psychopathology* (3rd ed., pp. 625-669). New York: Guilford.

63. **Lovett, B. J.,** & Hood, S. B. (2014). Comorbidity in child psychiatric diagnosis: Conceptual complications. In C. Perring & L. Wells (Eds.), *Diagnostic dilemmas in child and adolescent psychiatry* (pp. 80-97). New York: Oxford University Press.

64. Eckert, T. L., & **Lovett, B. J.** (2013). Principles of behavioral assessment. In D. H. Saklofske, C. R. Reynolds, & V. L. Schwean (Eds.), *Oxford Handbook of Child Psychological Assessment* (pp. 366-384). New York: Oxford University Press.

65. Ferrier, D. E., **Lovett, B. J.,** & Jordan, A. H. (2011). Construct-irrelevant variance in achievement test scores: A social cognitive perspective. In L. E. Madsen (Ed.), *Achievement tests: Types, interpretations, and uses* (pp. 89-108). Hauppauge, NY: Nova Science.

66. Lewandowski, L. J., **Lovett, B. J.,** & Gordon, M. (2009). Measurement of symptom severity and impairment. In S. Goldstein & J. Naglieri (Eds.), *Assessment of impairment: From theory to practice* (pp. 5-14). New York: Springer.

67. **Lovett, B. J.** (2009). The science of cheating: A psychologist's perspective. In T. Twomey, H. White, & K. Sagendorf (Eds.), *Pedagogy, not policing: Positive approaches to academic integrity at the university* (pp. 43-48). Syracuse, NY: Syracuse University Press.

68. **Lovett, B. J.,** Gordon, M., & Lewandowski, L. J. (2009). Measuring impairment in disability evaluations: Legal and ethical issues. In S. Goldstein & J. Naglieri (Eds.), *Assessment of impairment: From theory to practice* (93-103). New York: Springer.

69. Jordan, A. H., & **Lovett, B. J.** (2008). Self-theories of intelligence: Implications for school psychology. In D. H. Molina (Ed.), *School psychology: 21st century issues and challenges* (pp. 345-355). Hauppauge, NY: Nova Science.

70. Lewandowski, L. J., & **Lovett, B. J.** (2008). Introduction to neuropathology and brain-behavior relationships. In L. C. Hartlage & R. C. D'Amato (Eds.), *Essentials of neuropsychological assessment: Treatment planning for rehabilitation.* (2nd ed., pp. 31-55).

71. Eckert, T. L., **Lovett, B. J.,** Rosenthal, B. D., Jiao, J., Ricci, L. J., & Truckenmiller, A. J. (2006). Class-wide instructional feedback: Improving children's academic skill

Page 7

**Appx814**

development. In S. V. Randall (Ed.), *Learning disabilities: New research* (pp. 167-185). Hauppauge, NY: Nova Science Publishers.

72. Gordon, M., Barkley, R. A., & **Lovett, B. J.** (2006). Tests and observational measures. In R. A. Barkley (Ed.), *Attention-Deficit Hyperactivity Disorder: A handbook for diagnosis and treatment*. (3rd ed., pp. 369-388). New York: Guilford.

**Publications: Articles in Newsletters and Magazines, and Invited Articles (*n* = 11)**

73. **Lovett, B. J.,** & Harrison, A. G. (2019). Forensic thinking in disability assessment: An introduction to a special issue. *Psychological Injury and Law*, *12*, 1-6.

74. Spenceley. L. M., **Lovett, B. J.,** & Lewandowski, L. J. (2017). Assessing response validity: For SAT accommodation requests and beyond? *New York School Psychologist*, *35*, 41-43.

75. Lewandowski, L. J., Wood, W. L. M., & **Lovett, B. J.** (2016). Sluggish cognitive tempo in college students: Now you see it, now you don't. *ADHD Report*, *24*(1), 1-5.

76. Nelson, J. M., **Lovett, B. J.,** & Lindstrom, W. (2015). Assessing, documenting, and accommodating ADHD in college students. *ADHD Report*, *23*(6), 7-11.

77. Lewandowski, L. J., & **Lovett, B. J.** (2014). The new *Diagnostic and Statistical Manual of Mental Disorders, DSM-5*: Implications for accommodations requests. *Bar Examiner*, *83*(1), 42-54.

78. **Lovett, B. J.** (2013). Who needs more time (on tests)? *Better: Evidence-Based Education*, *5*(3), 14-15.

79. **Lovett, B. J.** (2011). The divorce of behavior analysis and psychology: Think of the children! *(APA) Division 25 Recorder*, *39*(1), 4-6.

80. **Lovett, B. J.** (2011). Extended time testing accommodations: What does the research say? *NASP Communiqué*, *39*(8), 1, 14-15.

81. **Lovett, B. J.,** Lewandowski, L. J., & Miller, L. (2010). Auditory processing disorder and ADHD: What's the relationship? *ADHD Report*, *18*(3), 7-11.

82. Lewandowski, L. J., **Lovett, B. J.,** Gordon, M., & Antshel, K. M. (2006). The case for clinical impairment in the DSM-V criteria for ADHD. *ADHD Report*, *14*(6), 8-16.

83. **Lovett, B. J.,** & Gordon, M. (2005). Test score discrepancies as a basis for the assessment of learning disabilities and ADHD. *ADHD Report*, *13*(3), 1-4.

**Work in Progress**

Hothersall, D., & **Lovett, B. J.** (in preparation). *History of psychology*. [Book manuscript, under contract with Cambridge University Press]

**Lovett, B. J.**, & Spenceley, L. M., & Lewandowski, L. J. (in preparation). Symptom and performance validity: Implications for school-based psychoeducational assessments.

**Lovett, B. J.**, & Nelson, J. M. (in preparation). Adult ADHD: Recent findings and controversies.

**Lovett, B. J.**, Nelson, J. M., & Peck, J. A. (in preparation). Should ADHD evaluations be conducted while a client is on ADHD medication?

**Lovett, B. J.**, & Lewandowski, L. J. (in preparation). Measuring trait distractibility in college students.

**Book, Film, and Test Reviews (selected):**

**Lovett, B. J.** (2019). Review of the book *Learning disabilities: From identification to intervention*. *NASP Communiqué*, *47*(7), 38.

**Lovett, B. J.** (2017). Review of the book *Psychological and psychoeducational assessment of deaf and hard of hearing children*. *Journal of Psychoeducational Assessment*, *35*, 807-810.

**Lovett, B. J.** (2013, January). Review of the film *The D Word*. *The School Psychologist*, *67*(1), 81-83.

**Lovett, B. J.** (2011, August 9). Review of the book *The Science of ADHD*. *Metapsychology Online Reviews*, *15*(32).

**Lovett, B. J.**, & Johnson, T. L. (2010). Review of the test *SCAN-3*. *Journal of Psychoeducational Assessment*, *28*, 603-607.

**Lovett, B. J.** (2010, April 13). Review of the book *Treating ADHD and comorbid disorders*. *Metapsychology Online Reviews*, *14*(15).

**Lovett, B. J.** (2007, March 27). Review of the book *The Last normal child: Essays on the intersection of kids, culture, and psychiatric drugs*. *Metapsychology Online Reviews*, *11*(13).

**Lovett, B. J.** (2005). Review of the book *Assessment for intervention*. *NASP Communiqué*, *34*(4), 13

**Invited Talks (selected):**

Lovett, B. J. (2019, April). "Anxiety and Discomfort during Testing: A Cause for Accommodations?" Invited talk given at the Educational Testing Service, Princeton, NJ.

Lovett, B. J. (2018, May). "Testing Accommodations: From Research to Practice." Invited talk given at the Winsor School, Boston, MA.

Lovett, B. J. (2017, December). "Test Anxiety and the ADA." Invited talk given at the National Board of Medical Examiners, Philadelphia, PA.

Lovett, B. J. (2017, October). "Speededness: What is it Good For?" Invited talk given at the Time Limits and Testing Conference, Philadelphia, PA.

Lovett, B. J. (2017, April). "Testing Accommodations for Students with Disabilities: Myth, Reality, and Practice." Invited talk given to the New Jersey Principals and Supervisors Association, Monroe, NJ.

Lovett, B. J. (2017, March). "Test Anxiety: Assessment, Documentation, Accommodations?" Invited talk given at the High-Incidence Disabilities in Higher Education conference, Toronto, ON.

Lovett, B. J. (2016, October). "Psychoeducational Assessment: An Integrated Clinical-Forensic Perspective." Invited talk given at the Southern Ontario Regional Assessment and Resource Centre, Kingston, ON.

Lovett, B. J. (2016, May). "Testing Accommodations: From Research to Practice." Invited talk given at Academics West, New York, NY.

Lovett, B. J. (2016, May). "The Science and Ethics of Testing Accommodations." Invited talk given at the Masters School, Dobbs Ferry, NY.

Lovett, B. J. (2016, March). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk, given with L. J. Lewandowski, at the Fayetteville-Manlius Central School District, Fayetteville, NY.

Lovett, B. J. (2016, March). "Developments in Testing Accommodations Research: A Year in Review." Invited talk given at the Association of American Medical Colleges, Washington, DC.

Lovett, B. J. (2015, November). "Putting the History of Psychology into Introductory Psychology." Invited talk given to Syracuse University Project Advance, New York, NY.

Lovett, B. J. (2015, October). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk, given with L. J. Lewandowski, at the convention of the New York Association of School Psychologists, Verona, NY.

**Lovett, B. J.** (2015, October). "Testing Accommodations for People with Disabilities: Research-Based Practice." Clinician's Corner Webinar, given at the headquarters of the American Psychological Association, Washington, DC.

**Lovett, B. J.** (2015, August). "Testing Accommodations for People with Disabilities: Research-Based Practice." Continuing Education Workshop, with L. J. Lewandowski, given at the convention of the American Psychological Association, Toronto, ON.

**Lovett, B. J.** (2015, March). "Testing Accommodations for Students with High-Incidence Disabilities: Research Informing Practice." Invited talk given to the Department of Counseling and Educational Psychology, University at Albany, SUNY, Albany, NY.

**Lovett, B. J.** (2015, March). "Extended Time Requests on the MCAT: The Need for Rigorous Review." Invited talk given at the American Association of Medical Colleges, Washington, DC.

**Lovett, B. J.** (2014, August). "Testing Accommodations for Students with Disabilities: Research-Based Practice" Continuing Education Workshop, with L. J. Lewandowski, given at the convention of the American Psychological Association, Washington, DC.

**Lovett, B. J.** (2013, November). "Should Medical Licensure Exams Be Timed?" Invited talk given at the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2013, November). "The Advantages and Disadvantages of Timed Tests." Invited talk given at the Research Advisory Forum of the National Board of Osteopathic Medical Examiners, Conshohocken, PA.

**Lovett, B. J.** (2013, May). "Auditory Processing Disorders: From Research to Practice: The View from School Psychology." Invited talk given to the National Centre for Audiology, London, Ontario.

**Lovett, B. J.** (2013, April). "Learning Disabilities and the Use of Expert Consultants." Invited talk given (with Dr. Lawrence Lewandowski) to the National Conference of Bar Examiners, Boston, MA.

**Lovett, B. J.** (2012, October). "The Science of Testing Accommodations for Students with Disabilities." Invited talk given to the Psychology Department at Suffolk University, Boston, MA.

**Lovett, B. J.** (2012, August). "Testing Accommodations: From Research to Practice." Invited talk to be given at the meeting of the College Board's Office of Services for Students with Disabilities, Seattle, WA.

**Lovett, B. J.** (2012, May). "Classroom Management: A Behavioral Perspective." Invited talk to student-teachers currently in school-based practica at Elmira College, Elmira, NY.

Page 11

**Lovett, B. J.** (2012, May). "Testing Accommodations for Students with Disabilities: Research-Based Practice." Invited talk at the conference High-Incidence Disabilities in Higher Education: Current Issues and Best Practices, Toronto, ON.

**Lovett, B. J.** (2012, March). "The Psychology of Accomplishment." Invited talk given to the Elmira College Chapter of Phi Beta Kappa, Elmira, NY.

**Lovett, B. J.,** & Sparks, R. S. (2011, December). "Gifted Students with Learning Disabilities: Implications for Testing Accommodations." Invited talk given to the National Board of Medical Examiners, Philadelphia, PA.

**Lovett, B. J.** (2011, April). "The Science and Ethics of Accommodating Employees with Psychiatric Disabilities." Invited talk given at the Tuck School of Business, Dartmouth College, Hanover, NH.

**Lovett, B. J.** (2010, October). "Diagnosing Learning Disabilities in Postsecondary Students." Invited talk given to the Southern Ontario Regional Assessment and Resource Centre, Huntsville, Ontario.

**Lovett, B. J.,** & Sparks, R. S. (2009, November). "Gifted Students with Learning Disabilities: Current Concepts and Controversies." Invited talk at the Test Agencies Disability Forum, Educational Testing Service, Princeton, NJ.

**Lovett, B. J.,** & Johnson T. L. (2009, October). "Auditory Processing Disorder: An Applied Primer for School Psychologists." Invited talk to the Psychology Department, Syracuse University, Syracuse, NY.

**Lovett, B. J.** (2007, March). "Testing Accommodations for Students with Disabilities: Asking the Hard Questions." Presentation to the Jamesville-DeWitt School District, Jamesville, NY.

**Lovett, B. J.** (2005, November). "Putting Statistics into Introductory Psychology: Activities that Work." Presentation to Syracuse University's Project Advance, New York, NY.

**Lovett, B. J.** (2005, October). "Direct Observation: The Royal Road to Child Psychiatric Diagnosis?" Presentation at Child Psychiatry Grand Rounds, Department of Psychiatry, SUNY Upstate Medical University, Syracuse, NY.

**Refereed Conference Presentations (selected):**
Carter, L., & **Lovett, B. J.** (2019, March). Separate room testing accommodations for students with and without ADHD. Poster presented at the Eastern Psychological Association convention, New York, NY.

Page 12

**Appx819**

Johnson, T. L., **Lovett, B. J.,** & White, E. (2018, November). SLP hearing screening: Variability in accuracy and consistency. Poster presented at the convention of the American Speech-Language-Hearing Association, Boston, MA.

Nelson, J. M., & **Lovett, B. J.** (2018, August). Data discrepancies and poor symptom validity in ADHD evaluations of college students. Presented at the annual meeting of the American Psychological Association, San Francisco, CA.

**Lovett, B. J.,** Carter, L., & Porto, A. (2018, March). Predictors of timed test performance in students with disabilities. Poster presented at the Eastern Psychological Association convention, Philadelphia, PA.

Wood, W. L. M., Spenceley, L. A., Scott, M., Marshall, E., & **Lovett, B. J.** (2018, February). Assessment of effort: WJ IV COG clusters as embedded validity indicators. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

Johnson, T., **Lovett, B. J.,** & Dillmuth-Miller, S. (2016, November). Attitudes towards noise exposure: CSD vs. non-CSD students. Poster presented at the convention of the American Speech-Language-Hearing Association, Philadelphia, PA.

**Lovett, B. J.,** & Nelson, J. M. (2016, June). Test anxiety: Assessment, Documentation, and Management. Paper presented at the University of Connecticut Center for Postsecondary Education and Disability Postsecondary Training Institute, Philadelphia, PA.

Wood, W., Lewandowski, L. J., & **Lovett, B. J.** (2016, February). Contrasting the impairment profiles of sluggish cognitive tempo and ADHD. Poster presented at the convention of the National Association of School Psychologists, New Orleans, LA.

**Lovett, B. J.,** Drymond, M., & Vita, L. (2015, March). Determinants of college students' time needed to complete a test. Poster presented at the convention of the Eastern Psychological Association, Philadelphia, PA.

Potts, H. E., Lewandowski, L. J., & **Lovett, B. J.** (2015, February). Can we predict time needed on a reading comprehension test? Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Potts, H. E., Wood, W. L., Lewandowski, L. J., & **Lovett, B. J.** (2015, February). Does sluggish mean slower test performance? A pilot study. Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Spielberger, S., Lewandowski, L. J., **Lovett, B. J.,** & Potts, H. E. (2015, February). Effects of expressive writing on test anxiety and classroom tests. Poster presented at the convention of the National Association of School Psychologists, Orlando, FL.

Wood, W. L., Lewandowski, L. J., & **Lovett, B. J.** (2014, February). Impairment and executive

functioning associated with sluggish cognitive tempo. Poster presented at the convention of the National Association of School Psychologists, Washington, DC.

Sparks, R. S., & **Lovett, B. J.** (2013, November). Examining documentation and applying objective diagnostic criteria to college students in a learning disability support program. Paper presented at the Convention of the International Dyslexia Association, New Orleans, LA.

Leja, A. M., & **Lovett, B. J.** (2013, February). Extended time testing accommodations: Do ADHD symptoms matter? Poster presented at the convention of the National Association of School Psychologists, Seattle, WA.

Johnson, T. L., **Lovett, B. J.,** Widen, S., & Amsterdam, R. (2012, March). Attitudes towards hearing protection among U.S. college students. Poster presented at the convention of the Pennsylvania Speech-Language-Hearing Association, Lancaster, PA.

Lewandowski, L., **Lovett, B. J.,** Panahon, C. J., Lambert, T., & Systma, M. R. (2012, February). Test accommodation preferences in college students. Poster presented at the convention of the National Association of School Psychologists, Philadelphia, PA.

**Lovett, B. J.,** Fredericks, D., Leja, A., & Sparks, R. S. (2012, February). Gifted students with learning disabilities: A quantitative synthesis. Poster presented at the convention of the National Association of School Psychologists, Philadelphia, PA.

Sparks, R. S., & **Lovett, B. J.** (2011, November). The identification and performance of gifted students with learning disabilities: A quantitative synthesis. Poster presented at the convention of the International Dyslexia Association, Chicago, IL.

Johnson, T. L., **Lovett, B. J.,** Kingman, R., & Cronin, C. (2010, November). The measurement of auditory processing: Does presentation level affect performance? Poster presented at the convention of the American Speech-Language-Hearing Association, Philadelphia, PA.

**Lovett, B. J.,** & Johnson, T. L. (2010, March). Auditory processing disorder: A role for the school psychologist. Paper presented at the convention of the National Association of School Psychologists, Chicago, IL.

Cohen, J. A., Lewandowski. L. J., & **Lovett, B. J.** (2010, March). Differences between extended time allotments for learning disabled college students. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

Hendricks, K., Lewandowski, L. J., & **Lovett, B. J.** (2010, March). The use of Testtracker for students with ADHD. Poster presented at the convention of the National Association of School Psychologists, Chicago, IL.

**Lovett, B. J.,** & Hood, S. B. (2009, November). Realism and operationism in psychiatric diagnosis. Paper presented at the convention of the Florida Philosophical Association, Gainesville, FL.

**Lovett, B. J.,** Ells, L., & Lewandowski, L. J. (2008, November). Why do you think you need extra time? Poster presented at the convention of the New York Association of School Psychologists, Rochester, NY.

Berger, C., Lewandowski, L. J., **Lovett, B. J.,** Gathje, R. A., & Cohen, J. A. (2008, February). Writing on a computer: No longer a testing accommodation. Poster presented at the convention of the National Association of School Psychologists, New Orleans, LA.

**Lovett, B. J.,** Lewandowski, L. J., Kleinmann, A. E., & Rogers. C. R. (2007, March). Testing accommodations for students with disabilities. Symposium presented at the convention of the National Association of School Psychologists, New York, NY.

Berger, C., Gathje, R. A., Lewandowski, L. J., **Lovett, B. J.** (2007, March). Extended time and laptop format as accommodations for written language tests. Poster presented at the convention of the National Association of School Psychologists, New York, NY.

DiGennaro, F. D., & **Lovett, B. J.** (2006, May). Is punishment effective? Is it ethical? Views of ABA members. Poster presented at the convention of the Association for Behavior Analysis, Atlanta, GA.

Eckert, T. L., **Lovett, B. J.,** & Jiao, J. (2006, March). Does performance feedback serve as reinforcement? Poster presented at the convention of the National Association of School Psychologists, Anaheim, CA.

Lewandowski, L. J., Sheffield, R., & **Lovett, B. J.** (2006, March). "Symptomatic" versus "impaired": Which is more important in ADHD diagnosis? Paper presented at the convention of the National Association of School Psychologists, Anaheim, CA.

Lewandowski, L. J., Parolin, R., **Lovett, B. J.,** & Gordon, M. (2006, March). Effects of extended time on math performance for students with ADHD. Poster presented at the convention of the National Association of School Psychologists, Anaheim, CA.

**Lovett, B. J.,** & Lewandowski, L. J. (2005, March). The gifted/learning disabled child: A critique of current assessment practices. Poster presented at the convention of the National Association of School Psychologists, Atlanta, GA.

**Lovett, B. J.,** & Stawski, R. S. (2004, November). Ergodicity in psychoeducational assessment. Paper presented at the Gardner Conference on Measurement and Statistics, Auburn, NY.

**Lovett, B. J.,** & DiGennaro, F. D. (2004, May). Punishment and aversive interventions, 1980-2000: Change and continuity. Poster presented at the convention of the Association for Behavior Analysis, Boston, MA.

**Courses Taught:**

> *Undergraduate Level*
> > Introductory Psychology
> > Abnormal Psychology
> > Child Psychopathology
> > Personality Psychology
> > Health Psychology
> > History and Systems of Psychology
> > Psychological Testing
> > Research Methods in Psychology
> > Educational Psychology
> > Psychology of Children with Exceptionalities
> > Assessment of Students with Disabilities
> > Psychology of Learning
> > Applied Behavior Analysis
> > Introduction to School Psychology
> > Psychology of Intelligence and Creativity
> > Seminar: The Psychology of Moral Judgment
> > Seminar: Great Experiments in Psychology
> > Seminar: Controversies in Child Psychopathology
> > Applying Research Methods in Psychology: ADHD
> > Supervised Research Experience in Psychology
> > Interdisciplinary Freshman Core Course: Order & Chaos

> *Graduate Level*
> > Statistics in Educational Research
> > Applied Behavior Analysis
> > History and Systems of Psychology

**Masters Thesis Committee Service:**
Kaitlin Hendricks (Syracuse University, 2010)
Justin Cohen (Syracuse University, 2010)
Whitney Wood (Syracuse University, 2013)
Stephanie Spielberger (Syracuse University, 2015)
Heather Potts (Syracuse University, 2016)

**Doctoral Dissertation Committee Service:**
Mara Jane Schutz (University of NewCastle, 2008)
Kaitlin Hendricks (Syracuse University, 2013)
Laura Miller (Syracuse University, 2014)
Whitney Wood (Syracuse University, 2015)

**Editorial Review Work:**

Editorial board member, *Journal of Psychoeducational Assessment* (2007 - Present)

Editorial board member, *Journal of School Psychology* (2011 - 2014)

Ad-hoc reviewer for:
> *American Educational Research Journal*
> *British Journal of Educational Psychology*
> *Canadian Journal of School Psychology*
> *Clinical Psychology Review*
> *Educational Assessment*
> *European Journal of Psychology of Education*
> *High Ability Studies*
> *History of Psychology*
> *Journal of Adolescence*
> *Journal of Applied School Psychology*
> *Journal of Attention Disorders*
> *Journal of Behavioral Education*
> *Journal of Business Ethics*
> *Journal of Child and Family Studies*
> *Journal of Learning Disabilities*
> *Journal of School Psychology*
> *Journal of Social and Clinical Psychology*
> *Neuropsychology*
> *Psychological Science*
> *Research in Developmental Disabilities*
> *Research in Social and Administrative Pharmacy*
> *Roeper Review*
> *School Psychology Review*
> *Sociology Compass*

Textbook reviewer/consultant for:
> McGraw-Hill Higher Education
> Sage Publications
> John Wiley Publishers
> Worth Publishers
> *Choice* (academic library acquisitions service)

**Service to the Profession:**
Conference proposal reviewer, New York Association of School Psychologists (2006)
Assessment Consultant, ARC of Chemung County, NY (2007 - 2014)
Grant Reviewer, Netherlands Organisation for Scientific Research, (2014)
Grant Reviewer, Michigan State University (2016)

Page 17

**Institutional Service:**
At SUNY Cortland (2014-)
Chair, Psychology Department Personnel Committee (2018 - )
Chair, Committee on Teaching Effectiveness (2018 - )
FDC Mentor to Haiyan Zhang (2017-2018)
Psychology Club Advisor (2016-2018)
Member, College Writing Committee (2017 - 2018)
Chair, Educational Psychology Faculty Search Committee (2017 - 2018)
Psychology Department Assessment Committee (2016 - 2017)
Sherlach Scholarship Award Committee (2016 - )
Psychology Department Curriculum Committee (2014 - 2016)
Efficiencies Advisory Committee (2016)
FDC Mentor to Dr. Katherine Bonafide (2015-2016)
Psychology Department Writing-Intensive Course Committee (2015 - )
Psychology of Children with Exceptionalities Committee (2014 -)
Chair, Clinical Psychology Faculty Search Committee (2014 - 2015)
Member, Applied Psychology Faculty Search Committee (2014)
Ad Hoc Committee on the 25th Anniversary of the ADA (2014 - 2015)

At Elmira College (2007-2014)
Co-Advisor, Elmira College Chapter of Psi Chi (2009 - 2010)
Co-Chair, Human Research Review Board, Elmira College (2008 - 2014)
Teacher Education Advisory Group, Elmira College (2007 - 2009)
Faculty Development Committee, Elmira College (2008 - 2010; Chair, 2009 - 2010)
Academic Assessment Committee, Elmira College (2008 - 2011)
Advising Committee, Elmira College (2012 – 2014)
Psychology Faculty Search Committee, Internal Member (2008 - 2009)
Nursing Faculty Search Committees, Outside Member (2010, 2012, 2013)
Criminal Justice Search Committee, Outside Member (2012)
Education (Literacy) Search Committee, Outside Member (2012)
Reviewer of Tenure-Track Faculty:
        2008-2009 – Dr. Megan Kennedy, 1st year review
        2009-2010 – Dr. Christopher Terry, 1st year review
        2010-2011 – Dr. Lauren Shaw, 3rd year review
        2013-2014 – Dr. Mark Pinter, 3rd year review

**Awards, Grants, and Honors:**
At SUNY Cortland (2014-)
Fine Teaching Development Award, 2017
Faculty Development Center Small Grant, 2014, 2016
Teaching Innovation Grant, 2015
College Assessment Committee Grant, 2015
UUP Individual Development Award Grant, 2016

At Elmira College (2007-2014)
Summer Faculty Development Research Grant, 2009, 2010, 2011, 2012
Honorary Inductee (student-elected), Phi Eta Sigma National Honor Society, 2009
Psi Chi Faculty Advisor Research Grant, 2010
Journal of School Psychology Editorial Appreciation Award, 2013
Joseph Stein Junior Faculty Prize, 2013

At Syracuse University (Ph.D. student, 2002-2007)
University Fellowship Award, 2002-2003 and 2005-2006
Psychology Department Allport Research Grant, 2004, 2005
College of Arts and Sciences Creative Project Award, 2005
Syracuse University Outstanding Teaching Award, 2005

At the Pennsylvania State University (undergraduate student, 1998-2002)
Induction into Psi Chi, National Honor Society for Psychology, 2000
3rd Place Prize, Social Science Division, Undergraduate Research Fair, 2001
Induction into Phi Beta Kappa, 2002

Appx826

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JESSICA RAMSAY,                                :
             Plaintiff           :
                              :
           v.                     :      CIVIL ACTION NO. 19-2002
                              :
NATIONAL BOARD OF MEDICAL       :
EXAMINERS,                                      :
             Defendant          :

**DECLARATION OF ROBERT D. SMITH, Ph.D.,**
**IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

I, Robert D. Smith, declare as follows:

1.      The facts in this Declaration are based on my personal knowledge, including my evaluation of the plaintiff, Jessica Ramsay described below, as well as my training and experience as a psychologist.  A copy of my professional *curriculum vitae* is attached hereto as Exhibit A.

2.      As set forth in my *curriculum vitae,* I have earned the degrees of Bachelor of Science in Psychology from Central Michigan University (1972), Master of Arts in Psychology also from Central Michigan University (1974), and Doctor of Philosophy in Counseling Psychology from Michigan State University (1984).  I completed a two year post-doctoral training program in neuropsychology through the Fielding Institute (now Fielding Graduate University, Santa Barbara CA) in 1999.  I am licensed as a Psychologist by the Michigan Board of Psychology, License #6301003249.  I have more than 25 years experience in conducting neuropsychological assessments of people with learning disorders and Attention-Deficit / Hyperactivity Disorder ("ADHD").



DEFENDANT'S
EXHIBIT
**3**

3.　　　　Since 1994, I have worked as a Consultant at the Michigan Dyslexia Institute.  In this position, I regularly conduct assessments of both children and adults with learning disorders including dyslexia, and ADHD.

4.　　　　On September 25, 2018, I conducted a Neuropsychological Evaluation of Jessica Ramsay at the Michigan Dyslexia Institute in Lansing, Michigan.

5.　　　　I subsequently prepared a written report of the Ramsay evaluation, which is attached hereto as Exhibit B.

6.　　　　My evaluation and my report applied generally accepted standards for evaluation of mental disorders, as set forth in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), published by the American Psychiatric Association, and the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10-CM"), which is the clinical modification by the National Center for Health Statistics (NCHS) for use in the United States of the International Classification of Diseases, published by the World Health Organization.

7.　　　　As part of the Ramsay evaluation, I interviewed Ms. Ramsay and her mother Jerri Shold.

8.　　　　As part of the Ramsay evaluation, I administered a number of standard assessment instruments including:  the Adult ADHD-Rating Scale-IV With Adult Prompts; the Nelson-Denny Reading Test; the Wechsler Individual Achievement Test-Third Edition (WIAT-III); the Woodcock-Johnson IV Tests Of Achievement (WJ-4) (Selected Subtests); the Gray Oral Reading Tests-Fifth Edition (GORT-5); and the Integrated Visual & Auditory Continuous Performance Test (IVA+Plus).

9.    As part of the Ramsay evaluation, I also reviewed school records, and records of prior evaluations by Drs. Lewandowski and Mr. Livingston, Ms. Ramsay's Personal Statement in support of her request to the National Board of Medical Examiners ("NBME") for testing accommodations on the United States Medical Licensing Examination ("USMLE"), and other correspondence relating to the request for accommodations.  These are listed at pages 1-2 of my Report.

10.    When I met with Ms. Ramsay on September 25, 2018, I was aware that she had previously made requests to NBME for extended testing time as an accommodation for the "Step 1" examination which is part of the USMLE, and that NBME had denied her request. Ms. Ramsay informed me that it was her belief that she needed extended testing time for this examination because of extremely slow reading speed.

11.    I also was aware that Ms. Ramsay had submitted evaluations by Dr. Lewandowski and Mr. Livingston in support of her prior requests to NBME.

12.    Before conducting the evaluation, I informed Ms. Ramsay that I did not know, until I carried out the assessment procedures, whether she actually had a learning disorder such as developmental dyslexia and/ or ADHD or that I would find additional evidence of dyslexia and ADHD beyond what Dr. Lewandowski and Mr. Livingston had found.

## Dyslexia

13.    The efficient reading skills of the non-impaired (non-dyslexic) adult reader reflect the acquisition and integration of multiple components and subskills.  No single reading test measures these component reading skills.  Leading researchers and specialists in the field of dyslexia, such as Sally Shaywitz, M.D., Bruce Pennington, Ph.D., and Robin Peterson, Ph.D., recommend that a comprehensive evaluation of a reading disorder such as dyslexia include tests

that are designed to measure these component skills needed for efficient, practical reading.  The

battery of reading tests I utilized to evaluate Ms. Ramsay reflect such a battery of tests.

14.     After I conducted the evaluation, I concluded, and stated in my report, that

"Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic

readers who have developed strategies to compensate for their reading impairment."  Report at

26.  Further, "She has been able to acquire an average level of reading comprehension skills

when allowed sufficient time to employ compensatory strategies, but exhibits persistently

impaired reading rate and reading fluency compared to other adults her age, as reflected in WJ-4

Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension

scores."  *Id.* at 26-27.

15.     I also considered the September 11, 2018 letter from Catherine Farmer, Psy.D.,

Director of Disability Services of NBME, which denied Ms. Ramsay's requests for extended test

time.  A copy of Dr. Farmer's September 11, 2018 letter is attached hereto as Exhibit C.

16.     Dr. Farmer stated that the 2017 evaluation by Dr. Lewandowski reported that

Ms. Ramsay's "reading, spelling and arithmetic are normal to above normal,."  Farmer letter,

Exhibit C, at 2.  A copy of Dr. Lewandowski's report is attached hereto as Exhibit D.  Although

Dr. Farmer did not comment about any of Dr. Lewandowski's specific results, the only measure

of reading skills used by Dr. Lewandowski was the Wide Range Achievement Test-4th Edition

(WRAT-4), which does not measure reading speed, reading fluency or the impact of these on

comprehension.  The USMLE Guidelines for Testing Accommodations specifically state that the

Wide Range Achievement Test is not "considered acceptable if used as the sole measure of

reading ability or academic skills."[1]  Consequently, the WRAT-4 is also insufficient to indicate the absence of a reading disorder.  Since Dr. Farmer is employed by the NBME to review accommodation requests, I had assumed that Dr. Farmer would be aware that any WRAT-4 scores would be an insufficient measure of the presence or absence of adequate reading skills. The WRAT-4 measure of "Reading" is an untimed simple test, which only measures one of the component subskills of reading and simply requires the examinee to read from a list of words, which allows for optimum use of compensatory strategies under untimed conditions.  The WRAT-4 is therefore  not a measure of speed, efficiency of word recognition or comprehension. The WRAT-4 Reading Test is simply a subtest that measures accuracy of single word identification under untimed conditions, which therefore allows for dyslexic reader to make optimum use of compensatory strategies.

17.    When I reviewed Dr. Lewandowski's report, I found that he had administered the Wechsler Adult Intelligence Scale – 4th Edition ("WAIS-IV") which showed that Ms. Ramsay's WAIS-IV Processing Speed Index was at the 8th percentile, *i.e.,* was greater than only 8 percent of same-aged individuals.  *See* my Report at 29.  In other words, this result indicates that only 8 percent of same-aged individuals have a processing speed that is as low or lower than Ms. Ramsay.  As discussed in my Report at pages 23-24, the designation of "average" and "below average" is arbitrary, and fails to recognize that clinical judgment is allowed, and should be used.  The same is true with respect to general designations such as "normal" and "below normal."

---

[1] Found on the Internet (7/18/2019) at https://www.usmle.org/test-accommodations/guidelines.html#guidelines-learning-disorders.  A prior online version of USMLE guidelines, quoted at page 27 of my Report, stated that "WRAT-4 is considered to be an insufficient instrument as the primary assessment of reading, writing, or math skills."

18.    Therefore, and to further address Dr. Farmer's comments, I administered additional tests to Ms. Ramsay, in order to obtain additional information concerning her reading speed, reading fluency and comprehension.  The results are described in detail in my report, and include the following:

    a.    Ms. Ramsay's WIAT-III[2] Oral Reading Fluency was at the 1st percentile, *i.e.* greater than only 1 percent of same-aged individuals and far below average.  Report at 16 and 18.

    b.    Ms. Ramsay's WJ4[3] Reading Rate Cluster score of 66 was at the 1st percentile, and far below average.  Report at 21.

    c.    Ms. Ramsay's GORT-5[4] Fluency was at the 2nd percentile, and well below average.  Report at 22.

    d.    Ms. Ramsay "was only able to attempt 47% of the Nelson-Denny[5] Comprehension items during the standard time limit."  Report at 30.

19.    In her February 14, 2019 letter denying Ms. Ramsay's request for reconsideration, Dr. Farmer implied that these results, which she characterized as "exceptionally low scores," were not "valid" or "credible" because Ms. Ramsay took other standardized tests without accommodations, namely the American College Test or "ACT," a test which is used in the college admissions process, and the Medical College Admissions Test or "MCAT," a test which is used in the medical school admissions process.  February 14, 2019 letter (attached hereto as Exhibit E) at 2.  As I stated in my report, the ACT and MCAT are not a scientifically validated

---

[2] Wechsler Individual Achievement Test – 3d Edition.

[3] Woodcock Johnson IV Tests of Achievement.

[4] Gray Oral Reading Tests – 5th Edition.

[5] Nelson Denny Reading Test.

diagnostic measure of reading skills.  Report at 27.  By contrast, the Wechsler Individual

Achievement Test-Third Edition, Woodcock-Johnson IV Tests of Achievement, and Gray Oral

Reading Tests-Fifth Edition are scientifically validated measures of overall reading and measures

of component subskills designed by reading experts and the Nelson Denny Reading Test is a

supplementary test specifically designed to measure component reading skills.

20.     I also stated in my report that the ACT and MCAT "scores [Ms. Ramsay]

managed to attain are as much a reflection of the compensatory effects of her superior intellect

rather than an absence of reading impairment."  Report at 27-28.  However, her MCAT score

was depressed by her reading disability and did not accurately reflect her true knowledge and

ability, and thus limited her choice of schools and excluded her from consideration for

admittance to a wider range of educational and career options.

21.     Dr. Farmer stated that "your evaluator appears to accept your exceptionally low

scores on timed reading tests administered for the purpose of requesting test accommodations as

valid and credible."  Farmer letter, Exhibit E, at 2.  However, Dr. Farmer did not offer an opinion

about why those scores were not valid and credible, but simply dismissed them as not being

credible.  Questions about the validity or credibility of scores are commonly attributed to less

than optimum effort on the examinee's part.  To address such questions, evaluations typically

include administration of a so-called validity test as part of the battery of tests, which I did as

discussed in the next paragraph, and which Dr. Farmer failed to consider.

22.     Thus, Dr. Farmer failed to consider that, as part of my evaluation, I administered a

test called the "Test of Memory Malingering" or TOMM, which is a measurement of symptom

validity.  As stated in my report:

> The examinee is not informed as to the purpose of this measure and in fact
> was told that it measured an important memory component underlying

> reading skill. The absence of indication of suboptimal effort on the
> TOMM is an indication that Jessica's effort was not suboptimal. . . .
> Jessica's overall demeanor and pattern of test scores reflect maximum
> effort on her part and it is concluded that her current test scores are an
> accurate measure of her functioning.

Report at 23. Dr. Farmer's letter does not mention or discuss the results of the TOMM. The

results of the TOMM administered to Ms. Ramsay showed that Ms. Ramsay was making strong

effort on not only the TOMM but also the other tests that I administered. In this regard, I also

stated in my report that, "In the context of her request for accommodations due to a reading

impairment, the reading and writing scores that are within the average range are inconsistent

with poor effort from either conscious or unconscious intent. Jessica's overall demeanor and

pattern of test scores reflect maximum effort on her part and it is concluded that her current test

scores are an accurate measure of her functioning." Report at 23.

23.    In summary, and as stated in my report, my evaluation of Ms. Ramsay supports a

diagnosis of Specific Learning Disorder with impairment in reading (developmental dyslexia):

reading comprehension, severely impaired reading rate and fluent word recognition, 315.00 in

DSM-5 and F81.0 in ICD-10-CM.

### <u>Attention-Deficit/ Hyperactivity Disorder</u>

24.    Part of the process for diagnosing ADHD in an adult is an interview with the

person being evaluated, when possible in the presence of a partner and/or family member. As

stated above, I interviewed Ms. Ramsay together with her mother.

25.    As stated in my Report, Ms. Ramsay stated during the diagnostic interview that

she has exhibited 9 of 9 criteria associated with the "predominantly inattentive" presentation of

ADHD, and 8 of 9 criteria associated with the "predominantly hyperactive-impulsive

presentation of ADHD. Ms. Ramsay's mother endorsed 8 of the 9 inattentive symptoms, and 6

of the 9 hyperactive/ impulsive symptoms. Ms. Ramsay's fiancé (who was not interviewed, but

did complete a checklist) endorsed 7 of the inattentive symptoms and 5 of the hyperactive/ impulsive symptoms.  Report at 14-15.  The DSM-5 requires only 5 inattention or 5 hyperactive-impulsive symptoms to be frequently and persistently present over the previous six months, in order to receive a diagnosis of ADHD.

26.    My interview with Ms. Ramsay and her mother, Ms. Shold, also confirmed that these symptoms of inattention, distractibility and hyperactivity were present since Ms. Ramsay's earliest school years, which is also a DSM-5 criteria for ADHD.  My interview with Ms. Ramsay and Ms. Shold, also confirmed that these symptoms were present in several different settings including home, school, and interpersonal relationships.  *See, e.g,* Report at 28-29.  Prior evaluations by Mr. Livingstone and Dr. Lewandowski also confirmed these symptoms.

27.    I also administered the Integrated Visual & Auditory Continuous Performance Test (IVA+Plus), a computerized test of sustained attention and distractibility.  As described in detail at pages 13-14 of my report, many of Ms. Ramsay's IVA+Plus scores fell at the 1st percentile, which is far below average, and supports a diagnosis of Attention-Deficit/Hyperactivity Disorder Combined Presentation, 314.01 in DSM-5 and F90.2 in ICD-10-CM.

28.    Dr. Farmer's letter does not mention or discuss the diagnosis of ADHD, except for the unexplained conclusion that Ms. Ramsay does not have "pervasive ADHD symptoms that limited any major life activity compared to most people in the general population."  Farmer letter at 2.  I disagree.  If Dr. Farmer's conclusion is based on her comments about ACT and MCAT scores, then these tests also are not diagnostic measures of ADHD.

29.    Dr. Farmer's letter stated, "[Ms. Ramsay's] documentation with regard to learning disabilities and ADHD offers no objective evidence of impaired reading or pervasive ADHD

symptoms that limited any major life activity compared to most people in the general population." Farmer letter, Exhibit E, at 2. Ample evidence was presented that Jessica exhibits most of the ADHD criteria and has done so for most of her life. The DSM-5 states that symptoms ". . . interfere with, or reduce the quality of, social, academic, or occupational functioning. . . ." Dr, Farmer's statement also ignores the recognition by Ohio State University, the Western Michigan University Medical School and multiple professional opinions that her symptoms significantly interfere with her functioning and that she required many accommodations, including extended time for tests.

30.    In addition, Ms. Ramsay's accomplishments and scores on selective tests to which Dr. Farmer refers have been achieved through the mitigating effects of the compensatory test taking strategies she learned through test preparation courses and the mitigating effects of the ADHD medication she began in 2009. Substantial multiple and substantive objective evidence was offered, including my own report, that appears to have been rejected without credible explanation by Dr. Farmer. In my professional opinion, the information presented in my report and the clarifications presented in this Declaration present more than ample evidence for reasonable people to conclude that the accommodations Ms. Ramsay has requested are more than justified.

* * * *

I declare under penalty of perjury that the foregoing is true and correct.

_Robert D. Smith_ 7-18-19

Robert D. Smith, Ph.D.

Dated: 7-18-19

10

**Appx836**

**Exhibits to Declaration of Robert D. Smith, Ph.D.**

A    Curriculum vitae of Robert D. Smith, Ph.D.

B    Robert D. Smith, Ph.D., Neuropsychological Evaluation Report dated 11/6/2018

C    Letter from Constance Farmer, Psy.D., dated 9/11/2018

D    A. Lewandowski, Neurocognitive Examination Report dated 12/7/2017

E    Letter from Constance Farmer, Psy.D., dated 2/14/2019

**Exhibit A**

**Curriculum vitae of Robert D. Smith, Ph.D.**

**ROBERT D. SMITH, PH.D.**

Office: 3505 Coolidge Rd. E.Lansing, MI 48823                     Office: (517)349-5987  Home: (517)339-5067
Birthdate: January 11, 1950                                       Marital Status: Married

www.neuro-psychologyservices.com

## EDUCATION

| | | |
|---|---|---|
| Ph.D. Counseling Psychology  (APA Approved) | Michigan State University | 1984 |
| M.A.  Clinical Psychology | Central Michigan University | 1974 |
| B.S.  Psychology | Central Michigan University | 1972 |
| Certificate of Specialization in Clinical Neuropsychology (2yr post-doctoral) | Fielding University | 1999 |

## LICENSE

Fully Licensed Psychologist,   Board of Psychology, State of Michigan License # 6301003249

## PROFESSIONAL EXPERIENCE

Michigan Dyslexia Institute                     Psychologist                     1994-Present
532 Shiawassee Street Lansing, MI 48933
3384 West 12 Mile, Berkley, MI 48072
  Consultant -Conduct neuropsychological assessments of children and adults with central nervous system dysfunction:  learning
  disorders,  ADHD.   25 hours per week.

Independent Private Practice                     Psychologist                     1992-Present
  Neuropsychological Assessment of children and adults with traumatic brain damage, brain damage due to toxic and
  disease.  Individual Psychotherapy with adolescents and adults.   25 hours per week

Okemos Counseling Center                     Psychologist                     1991-1992
4123 Okemos Rd. Okemos,MI 48864
  Psychological Assessment and Psychotherapy with adults

Michigan Psychotherapy                     Psychologist                     1988-1991
335 N. Seymour Lansing, MI 48933
  Psychological Assessment, Individual and Group Psychotherapy, Supervision of other staff psychologists and interns.

Psychological Counseling Center                     Psychologist                     1986-1988
1004 W.Michigan Ave. Jackson,MI 49202
  Psychological Assessment, Psychotherapy with children and adults

Ingham County Community Mental Health
808-B Southland Lansing, MI 48910                     Psychologist                     1977-1988
  Psychological Assessment, Individual and Group Psychotherapy,  Consultation with social services,  vocational rehabilitation
  services and physicians.  Supervised doctoral psychology interns and taught weekly psychotherapy seminar for APA
  Approved Professional Psychology Internship.

Huron County Community Mental Health
Bad Axe, Michigan 48413                     Psychologist                     1974 -1976
  Psychological Assessment, Individual and Group Psychotherapy,  play therapy, crisis intervention, consultation with public
  schools  and with the agency supported pre-school program and consultation with the partial hospitalization program.

Central Michigan University                     Graduate Assistant                     1972 -1974
  Lectured undergraduate students in psychological testing, prepared presentations and graded papers

## COMMUNITY INVOLVEMENT

| | |
|---|---|
| Member, Mothers Against Drunk Driving-Ingham County Chapter | 1992 -1994 |
| Board of Directors , Mothers Against  Drunk Driving-Ingham County Chapter | 1990 -1992 |
| Board of Directors, Lansing Concert Band | 2005- 2007 |

## PROFESSIONAL AFFILIATION

American Psychological Association, Division:Neuropsychology
National Academy of Neuropsychology

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JESSICA RAMSAY,<br>       Plaintiff | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 19-2002 |
| | : | |
| NATIONAL BOARD OF MEDICAL<br>EXAMINERS,<br>       Defendant | :<br>:<br>: | |

**DECLARATION OF JESSICA RAMSAY IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

I, Jessica Ramsay, declare as follows:

1.     The facts in this Declaration are based on my personal knowledge.

2.     I am 28 years old and reside in Kalamazoo, Michigan.

3.     For more than 10 years, I have dreamed of and worked very hard toward

attending medical school and becoming a physician.  I am now a student at the Homer Stryker

M.D. School of Medicine which is part of Western Michigan University in Kalamazoo,

Michigan ("WMed").  I entered WMed with the first entering class in 2014, with an expected

graduation date of 2018, and I have completed the first three years of the four year M.D.

program.  I was chosen by the members of my entering class for membership in the Upjohn

Humanism Honor Society, an honor society made up of medical students who have been

identified as possessing outstanding clinical and interpersonal skills. *See* www.gold-

foundation.org/programs/ghhs/.[1]

---

[1] The members of my class were not eligible for the Gold Humanism Honor Society
("GHHS"), which is a national organization, because we were the first WMed class.  The GHHS
suggested that WMed could create its own society for our class, using the same criteria, and this
became the Upjohn Humanism Honor Society.

DEFENDANT'S
EXHIBIT
**2**

4.    However, because of the problems with the examinations that are administered by defendant, the National Board of Medical Examiners ("NBME"), that are the subject of this litigation, I did not graduate with my class in 2018.  The other members of my class have not only graduated, but have gone on to medical residency programs, which are the next stage of physician training.  By contrast, I have been compelled to take a leave of absence.  My potential graduation date has been delayed for 3 years.  If I can eventually overcome the problems with NBME, and resume my studies at WMed, I still will have lost the opportunity to graduate with my fellow students from the class of 2018.

5.    For my entire life, including primary and secondary school, college and medical school, I have had to struggle with the obstacle of very slow reading speed and problems with attention and distractibility.

6.    These disabilities are a problem for me not only in taking timed and standardized written tests, like the tests involved in this proceeding, but also in everyday life.

7.    The average person is able to scan documents, read and write, and process, recall and organize information efficiently, but I cannot.  In order to do any of these things, I must spend much more time and energy every day than most people need to.  Furthermore, the additional time and energy spent on these tasks takes away from the time, energy, and focus needed to manage other important life responsibilities like cooking, eating, cleaning, paying bills, running errands, doing laundry, sleeping, and self-care.

8.    I have always struggled with flipping, merging, and tangling letters, characters, and words both when reading and writing. I also have trouble distinguishing between words and characters that have similar shapes – characters such as qbdp, 96, wunm, JL, 3E, gy, 5sae, 4A, and words like united/untied, serves/verses/reverse/server/severe/reserve, quite/quiet, from/form,

2

**Appx841**

reared/reread, and though/thought/through/trough/tough – so it takes me a long time to isolate and correctly identify them. Sometimes I am unable to tell them apart without help from others or use of supportive tools.

9.      In order to read anything, especially technical material like the material on the USMLE Step 1 test, I must spend a lot of time and effort to untangle the words and decode each one, identifying their individual meanings. Then I must piece them together in the correct sequence, building them up to get the meaning of the text as a whole. This is completely different from the way that most people read. Most people read with "automaticity," *i.e.,* with fast accurate word recognition. I cannot read in the way that most people read. Instead, I need to reread text multiple times before I can fully comprehend what I am reading. Usually, I also need to read the text aloud, or have it read to me by a person or computer program, to help me interpret the words within the context of the sentence, and then within the paragraph.

10.     In addition to the problems with reading described above, I also have long suffered with distractibility, which reduces my ability to focus or maintain attention, especially for extended periods, and causes me to be very easily distracted by sounds, movement, and flashes of light, as well as my own thoughts and sensations, like hunger, restlessness, pain, and temperature. These distractions pull my focus away from my current thought or task.

11.     In my early school years, my parents and teachers worked with me on a daily basis to help me with reading, spelling and writing. They did not pursue formal evaluation or accommodations for learning disabilities, attention problems or distractibility because I worked very hard every day to mask my mistakes, both at school and elsewhere. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day. The reality

3

was that I was spending a very abnormal and excessive amount of time and effort to perform or work around these functions every day.

12.    In the Personal Statement that I submitted to NBME with my second application for testing accommodations, I described these problems with reading speed and distractibility in more detail, and a copy of the Personal Statement is attached hereto as Exhibit A and incorporated by reference.

13.    Although I did not have formal accommodations for my problems with reading speed, attention and distractibility before college, I needed, and sometimes received, informal accommodations in order to be successful and pass my classes. For example, I remember a timed, multiple-choice test in 5th grade, on which we had to get at least 30 out of 60 questions right to pass. All but one other person finished early. I used all of the allotted time, and I was still the only person to answer less than 30 questions. I had only been able to get through 29 of them and was working on the 30th when time ran out. I went home crying because I felt stupid and slow. I told my mom that I knew how to do all the questions, but I just did not have enough time. Eventually, they made informal accommodations for me by grading the work I had shown for the 30th question, which was correct and allowed me to achieve the minimum passing score. Similar situations have occurred all throughout my schooling, even several times since I began receiving formal accommodations in college.

14.    During my undergraduate studies at Ohio State University, the demands of school, work and life finally began outweighing my ability to self-accommodate, requiring more time and energy than I had. In addition, as the academics became more challenging, longer hours of studying and other self-accommodations were no longer enough to compensate for my slow reading speed and distractibility. I was having much more trouble focusing throughout the

day, and was losing track of things more frequently. I was even having trouble speaking –
mixing the beginnings or ends of neighboring words, or just not being able to find the right
words at all – which happens much more often when I am fatigued. For many of the tasks that I
needed to do on a daily basis, I knew the steps needed to accomplish each task and that I was
capable of doing each step, but I never had enough time to do all of them, even if I planned
ahead.

15.    In 2009, at the suggestion of a professor, I sought help from my primary care
physician, Dr. Allen Smiy, who diagnosed me with Attention Deficit Disorder, inattentive type,
for which he began medical management. At that time, I did not associate my restlessness and
constant need to be moving with being hyperactive – I just thought I was active.

16.    Dr. Smiy also commented about "possible dyslexia" but did not recommend
further work-up because it would have been time-consuming and expensive, and would not have
changed the treatment and accommodations that he recommended on the basis of his diagnosis of
Attention Deficit Disorder. Dr. Smiy also said that, if I was not granted the accommodations I
needed based on the diagnosis of ADD alone, he could refer me for further evaluation of
dyslexia. As explained in the next paragraph, I did receive accommodations from Ohio State on
the basis of Dr. Smiy's report, and therefore did not pursue further evaluation at that time.

17.    After I received Dr. Smiy's diagnosis, I registered with Ohio State's Office of
Disability Services (ODS) and began receiving formal accommodations in 2010, which included
50% additional testing time and a distraction-reduced testing space. (I also received other
accommodations such as the use of colored pencils, pens and highlighters, which are not
available for computer-based tests like the USMLE Step examinations.)

18.     Once I started receiving accommodations, I was able to perform better on my exams because I had more time to read, write, and work through questions. However, even with the extra time and reduced distractions, I still had to rush to try to finish the tests. On exams with essays or questions with lengthy prompts, which require a lot of writing or reading, I still ran out of time before I could finish. My grades for timed examinations still did not fully reflect my level of knowledge, even with 50% extended time (time-and-a-half).

19.     For standardized exams that I took before medical school like the ACT for college admission, and the MCAT for medical school admission, I was able to answer many of the questions without reading the entire question.

20.     For the ACT, the intrinsic nature of the test made it possible to answer many of the questions without reading the question prompt, which allowed me to get through enough of the questions to score well enough to get into college, though my score did not adequately reflect my knowledge or reasoning ability. Most of the questions required little reading in order to find the answers, and therefore, I was able to answer enough questions to achieve an acceptable score, even though I was not able to read all of the questions, and (due to the guessing penalty that is applied in scoring the ACT), I had to leave some questions unanswered.

21.     I did not request accommodations for the MCAT because, at the time that I took the MCAT, scores were "flagged" if the student received disability accommodations, and many advisors, mentors and test prep instructors told me that identification as a person with disabilities would hurt my chances for admission. Subsequently, the practice of flagging MCAT scores was discontinued, but this was after I had already taken the exam.

22.     For the MCAT, as for the ACT, many of the questions could be answered without reading and gathering information from the passages, so I knew that I should answer these

passage independent questions first, and then use any remaining time to try to read and answer as many as I could of the remaining questions that required more reading. Then, in the last minute of each section, I blindly selected answers for the questions I was not able to get to because, unlike the ACT, there was no guessing penalty, so I did not have to leave them blank. Again, being able to skip much of the reading made it possible for me to correctly answer enough questions to achieve an acceptable score, but not a score that adequately reflected my knowledge and reasoning skills.

23.     When I began medical school in 2014, and requested accommodations, I was required by my school (WMed) to undergo a neuropsychology evaluation, for which the school recommended Charles Livingston, an M.A. psychologist working in the Kalamazoo, Michigan area where WMed is located. I submitted Mr. Livingston's report with my request for accommodations. Based on the results of Mr. Livingston's evaluation and his recommended accommodations, WMed approved accommodations including 100% extended testing time (double time) and testing in a private room as well as additional accommodations for paper-based tests.

24.     Though these initial accommodations helped greatly on tests, I needed more accommodations to meet the increased curricular demands. I was unable to keep up with the required reading assignments. I was still taking the weekly computerized quizzes (called "individual Readiness Assurance Tests" or "iRATs") under standard conditions with the rest of my class; I was unable to read all 10 questions in the 15 minutes provided and had to select random answers for the remaining questions when the time was up. Due to these continued challenges caused by my slow reading speed, and problems with attention and distractibility, I requested that the existing accommodations including 100% additional testing time and a private

7

**Appx846**

testing room also be extended to weekly quizzes (iRATs).  (I also requested additional accommodations for reading assignments and general studying.)  WMed approved these additional accommodations.

25.    Throughout my time in medical school, I also had to adjust my requests, or make new ones, as I encountered new situations in the classroom and the clinic.  For example, medical students are required to take "objective structured clinical examinations" ("OSCEs") which are simulated clinical encounters in which a student interviews and assesses a standardized "patient" who is following a set script.  The student then prepares a patient note, based on the simulated encounter.  These OSCE's are modeled after, and used as preparation for, the USMLE Step 2 CS ("Clinical Skills") Exam, which I am required to pass in order to graduate.

26.    During my 2nd year of medical school, I struggled to complete simple subjective/objective encounter notes for our OSCE assessments within the 10-minute limit, and so I was granted 50% additional time for the notewriting.  As the year progressed and I and the other students gained more clinical knowledge, the prompts (patient scenarios and instructions for that encounter) that we had to read before entering the patient room became longer, and we were required to include more in our encounter notes as well.  At this point, I was no longer able to type enough within the 15 minutes (1.5 times standard OSCE note-writing time) to pass my OSCE's, and depending on the length of the prompt, sometimes I did not have enough encounter time left after reading the prompt to complete what the instructions asked for.  For these reasons, I had to request that my note-writing time be increased from 15 to 20 minutes (1.5 time to double time), as well as 2 additional minutes at the beginning of the encounter to read the prompt before entering the patient room.

8

**Appx847**

27.    The USMLE exams are different from the standardized exams I took before medical school. For these exams, I must read the entire prompt for each of the questions in order to gather and analyze all of the information necessary to correctly decide on an answer. This requires far more reading than either the ACT or the MCAT did. I cannot use the methods that I used for the ACT or MCAT and avoid or minimize reading in order to get through enough questions to obtain an acceptable score. To have the same opportunity as the other students taking this exam to read and gather the necessary information from each prompt, and to be able to demonstrate my knowledge and reasoning ability, I need to read the complete prompt for each of the questions. To read and analyze the complete prompt for each question, I need the extended testing time accommodation that I am requesting.

28.    When NBME rejected my request for accommodations in 2017, and I did attempt to take the Step 1 examination under standard conditions, I did not have enough time to read all of the questions and, in the last minute of each block, was forced to blindly select answer choices for about 30 to 35 percent of the questions. (Unlike the ACT, as referenced above in paragraph 20, the scoring of the USMLE examinations does not apply a penalty for wrong answers, and so I did not have to leave unread questions blank. However, random guessing is not the same as answering a question that I have time to read ) Additionally, because I was rushed to get through as many questions as possible during the allowed time for each block, I did not have enough time to thoroughly decode, analyze and process many of the questions, or to organize my thoughts before having to select an answer.

29.    The Step 2 CK examination includes prompts which are much longer and denser than the Step 1 examination. While I was able to read 65 to 70 percent of the questions on the

9

Step 1 examination, I can only read about 45 percent of the questions on timed practice tests for the Step 2 CK examination.

30.    Double exam time – which I have received from my school, but not from NBME – gives me the opportunity to use the methods and supports that I need to effectively read through each question while compensating for effects of my learning disabilities. I need this time to ensure I have the opportunity to read, understand, and gather information from each question; to apply my knowledge and preparation to process the information and decide on an answer choice; and to correctly distinguish between answer choices so I can select the appropriate answer choice for my intended answer.

31.    I have been hurt, and continue to be hurt, by the delay that I am experiencing because of NBME's refusal to allow me to have the extended testing time that I need. NBME's refusal is delaying my education, and jeopardizing my ability to begin my professional career as a physician. I have already spent nearly three years trying to obtain testing accommodations, and specifically extended testing time, from NBME.

32.    My school requires that I take the Step 1 examination before beginning my final year of medical school. I began medical school in 2014, and therefore was scheduled to begin my fourth and final year in July 2017. To allow adequate time for NBME to consider my application, I first applied for accommodations in December 2016. NBME turned my application down in March 2017. My school advised me to attempt to take the examination without accommodations in order to try to stay on track for graduation with my class, and I did so in July 2017 but because of my slow reading speed, I was only able to read about 65 to 70 percent of the questions in each block. Although I felt comfortable with my ability to answer the

questions that I had time to read, I had to fill in random guesses for 30 to 35 percent of the questions, and I missed the passing score cutoff of 192.

33. After I failed to pass Step 1 without accommodations in July 2017, I consulted a neuropsychologist, Dr. Lewandowski, in order to obtain an additional evaluation of my need for accommodations for the USMLE Step examinations. I submitted a new application, including Dr. Lewandowski's report, in June 2018. NBME again denied my request for extended testing time in September 2018. I pursued the NBME "appeal" process, in which NBME itself reviews its own decision. In order to satisfy NBME guidelines, which require that a student seeking to "appeal" (or "request reconsideration") must submit "new substantive supporting documentation,"[2] I obtained an additional neuropsychological evaluation to address and respond to NBME's stated reasons for refusing to grant extended testing time. The new evaluation, by Dr. Robert Smith, was submitted with my NBME "appeal" on December 12, 2018. NBME rejected my appeal on February 14, 2019, and rejected my request for further reconsideration on March 27, 2019. With no other choice, I filed this action against NBME on May 8, 2019.

34. If NBME had granted my original request for accommodations, I believe that I could have passed the Step 1 examination, and also the additional step examinations – Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills)[3] that are required for graduation by WMed and other allopathic[4] medical schools. Successful completion of Step 1, Step 2 CK and Step 2 CS is also required for participation in the National Residency Match Program

---

[2] Found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html, "Reconsideration."

[3] I may request additional accommodations for the Step 2 CS examination, similar to the accommodations that WMed has granted for OSCE examinations. *See* above, paragraphs 25-26.

[4] Allopathic is the term for schools like WMed that grant the M.D. degree, as distinguished from osteopathic schools which grant the D.O. degree.

("NRMP"). If I had received the accommodations that I need, and had passed the Step examinations on schedule, I could have graduated from WMed and matched into a residency program more than a year ago. Because of NBME's continuing refusals to grant extended testing time, I had to file this lawsuit, and to request from WMed an extension of my leave of absence. A copy of WMed's letter granting an additional leave of absence to March 2, 2002 is attached hereto as Exhibit B.

35.     Because of this delay, I will probably not be able to graduate until, at the earliest, May 2021 which is three years later than my original graduation date. Further delay could jeopardize even this already very delayed schedule.

36.     Preparation for and scheduling of USMLE Step examinations requires substantial lead time. The normal scheduling window is three months. Therefore, I need to have a decision about accommodations for the Step 1 examination at least three months prior to March 2. 2020.

37.     I am also now in jeopardy of losing my future entirely. I had to take an extended leave of absence because of NBME's withholding of necessary accommodations. That leave of absence has been extended several times, and now runs out in March 2020. If I am unable to take the step exam with the necessary accommodations before March 2, 2020, I will be dismissed from medical school. If I am dismissed from medical school because of the facts and circumstances alleged, despite being well-regarded by the faculty and chosen by my peers for the Upjohn Humanism Honor Society, the medical career, to which I have aspired for more than 10 years, would be over before it began. Moreover, even if I am able to take and pass Step 1 prior to the exhaustion of my leave of absence, my ability to get a residency position is now compromised and I will be forced to disclose my disability to explain why I had to take such an

extended leave of absence. Every day of additional delay by NBME results in further delay before I can achieve my goal of becoming a physician.

\* \* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Jessie Ramsay

Jessica Ramsay

Dated: 7/22/19

13

**Exhibits to Declaration of Jessica Ramsay**

A    Personal Statement submitted to National Board of Medical Examiners as part of request for testing accommodations

B    Letter from Peter Ziemkowski, M.D., Associate Dean for Student Affairs, Homer Stryker, M.D. School of Medicine of Western Michigan University, dated 6/24/2019, re extension of leave of absence

Curriculum Vitae

# Jessica E Ramsay

6862 Tall Oaks Dr, Apt 3B
Kalamazoo, MI 49009
Cell: 269-932-8214
Email: Jessica.Ramsay@med.wmich.edu

## EDUCATION

| | |
|---|---|
| 08/2014 – Present | **Western Michigan University Homer Stryker M.D. School of Medicine**, Kalamazoo, MI<br>**M.D. Candidate**, Expected Graduation: May 2020 |
| 01/2013 – 05/2013 | **The Ohio State University**, Columbus, OH<br>**Continuing Education**, Anatomy Lecture and Lab |
| 09/2008 – 06/2012 | **The Ohio State University**, Columbus, OH<br>**B.S., *Cum Laude* Graduate**<br>    Major: Molecular Genetics<br>    Minors: General Business, Dance |

## HONORS & AWARDS

| | |
|---|---|
| 2017 | **Upjohn Humanism Honor Society**, WMed, Kalamazoo, MI<br>*Equivalent to Gold Humanism Honor Society* |
| 2014 – 17 | **WMed Merit Scholarship**, Kalamazoo, MI |
| 2010 – 2012 | **Sharp Memorial Scholar Award**, OSU, Columbus, OH |
| 2008 – 2012 | **Dean's List**, OSU, Columbus, OH |
| 2008 – 2012 | **National Buckeye Scholar Award**, OSU, Columbus, OH |
| 2008 – 2012 | **Provost Scholarship Award**, OSU, Columbus, OH |
| 2008 | **Whirlpool Foundation Sons & Daughters Honor Award**, St. Joseph, MI |

## TEACHING & MENTORSHIP EXPERIENCE

| | |
|---|---|
| 2014 – Present | **Peer Mentor and Advocate for students with disabilities**, WMed, Kalamazoo, MI |
| 08/2012 – 05/2013 | **Lead Teacher's Assistant and Tutor**, Organic Chemistry, OSU, Columbus, OH |
| 01/2011 – 06/2011 | **Teacher's Assistant**, Organic chemistry, OSU, Columbus, OH |

## WORK EXPERIENCE

| | |
|---|---|
| 02/2013 – 08/2014 | **Research Assistant**, Pharmacogenomics, OSU, Columbus, OH<br>Primary Investigator: Ryan M. Smith, Ph.D.<br>*Explored the effects of SNPs on gene expression in human brain and adipose tissue in relation to cognitive-behavioral disorders; performed gene sequencing, RNA isolation, cDNA amplification, polymerase chain reactions and Western blots.* |
| 12/2013 – 08/2014 | **Server**, Bar 145, Columbus, OH |
| 05/2012 – 12/2013 | **Principal Dancer**, CoMo Dance Company, Columbus, OH |
| 01/2010 – 08/2012 | **Home Care Provider and Applied Behavioral Analyst (ABA)** for children and adolescents with autism spectrum disorder and other special needs, Ohio Department of Job & Family Services, Franklin County, OH |
| 07/2006 – 03/2012 | **Lifeguard & Swim Lesson Instructor**, South Shore Health & Racquet Club, Benton Harbor, MI<br>*Taught private and group lessons; oversaw regular pool therapy sessions for a class of individuals with autism and special needs from Berrien RESA – Lighthouse Education Center.* |

## LICENSURE & CERTIFICATIONS

| | |
|---|---|
| Planned XX/20XX | **USMLE Step 2 Clinical Skills**, [Pass] |
| Planned XX/20XX | **USMLE Step 2 Clinical Knowledge**, XXX (passing: 210) |
| 05/2019 | **BLS Certification**, American Heart Association, Kalamazoo, MI |
| 04/2019 | **Point of Care Ultrasound Certification**, WMU Homer Stryker M.D. School of Medicine, Kalamazoo, MI |
| 07/2017, XX/20XX | **USMLE Step 1**, 191 (passing: 192), XXX (passing: 195) |
| 10/2017 | **Smiles for Life**, WMU Homer Stryker M.D. School of Medicine, Kalamazoo, MI |
| 12/2016 | **Institute for Healthcare Improvement** (IHI), WMU Homer Stryker M.D. School of Medicine, Kalamazoo, MI |

RAMSAY27-0001

DEFENDANT'S EXHIBIT
52

Appx854

## PUBLICATIONS & PRESENTATIONS

**Publications**

Kanungo S, Samuel S, **Ramsay J** et al: Newborn Screening. In: Greydanus DE, Merrick J eds. *Caring for the Newborn: A Comprehensive Guide for the Clinician (Pediatric, Child and Adolescent Health)*. 2nd Edition, New York: Nova Publisher (submitted for publication)

**Ramsay J**, Morton J, Norris M, Kanungo S. Organic acid disorders. Ann Transl Med 2018;6(24):472. doi:10.21037/atm.2018.12.39

Patel DR, Feucht C, Brown K, **Ramsay J**. Pharmacological treatment of anxiety disorders in children and adolescents: a review for practitioners. *Translational Pediatrics*. 2018;7(1):23-35. doi:10.21037/tp.2017.08.05.

**Ramsay JE**, Rhodes CH, Thirtamara-Rajamani K, Smith RM. Genetic influences on nicotinic α5 receptor (CHRNA5) CpG methylation and mRNA expression in brain and adipose tissue. *Genes and Environment*. 2015. 37:14.
*Cited twice since publication.*

**Presentations**

Melgar T, Doherty B, Driscoll R, et al. *Escalating Care in Resource-Poor Settings: Experiences from the Amazon*. Oral case presentation at: WMed Global Health Grand Rounds, April 3, 2018; Kalamazoo, MI.

Sadaps SV; Redinger MJ; **Ramsay JE**; Maas M; Longstreet, PL. *Zolpidem in Treatment of Refractory Catatonia*. Poster presentation at: The 35th Annual Kalamazoo Community Medical and Health Sciences Research Day, May 2, 2017; Kalamazoo, MI.

Fidrocki DM, **Ramsay JE**, Sadingh N. *Low vaccination rates for the human papilloma virus (HPV) in Kalamazoo, Michigan*. Poster presentation at: The 34th Annual Kalamazoo Community Medical and Health Sciences Research Day, May 4, 2016; Kalamazoo, MI.

## RESEARCH EXPERIENCE

10/2014 – 05/2016    **Co-Investigator**, Community HPV Vaccination Rates, Family Health Center, Kalamazoo, MI
Mentor: Cheryl Dickson, M.D., Associate Dean for Health Equity and Community Affairs at WMed

*Analyzed local HPV vaccination rates, explored potential causes of discordance between actual rates and physician and patient perceptions.*

05/2012 – 08/2012    **Research Assistant**, Radiation Oncology, The James Comprehensive Cancer Center, OSU, Columbus, OH
Primary Investigator: Naduparambil Jacob, Ph.D.

*Identified potential biomarkers for early prediction of the delayed effects of normal tissue injury following radiation exposure; performed RNA isolation, cDNA amplification, polymerase chain reactions and Western blots.*

## COMMITTEE ASSIGNMENTS

2016 – 2017    **WMed Active Citizenship Steering Committee**, Kalamazoo, MI
*Provided student perspective for restructuring of the WMed Active Citizenship curriculum.*

2016 – 2017    **WMed Learning/Working Environment Committee**, Kalamazoo, MI
*Contributed feedback and developed strategies for continued improvement of the clinical learning and working environment for WMed students, residents and faculty at participating hospitals and clinics.*

2015 – 2018    **WMed Library Committee**, Kalamazoo, MI
*Evaluated progress and ongoing efforts to better meet current and future needs.*

## PROFESSIONAL SOCIETY MEMBERSHIPS

2018 – Present    **Society of Healthcare Professionals with Disabilities**
2017 – Present    **American Medical Association** (AMA)
2016 – Present    **American College of Physicians** (ACP)
2015 – Present    **American Medical Women's Association** (AMWA) and Mentorship Program, Kalamazoo, MI
10/2016 *National AMWA Conference, Kalamazoo, MI – Co-designed promotional artwork*
2014 – Present    **American Medical Student Association** (AMSA)

RAMSAY27-0002

## VOLUNTEERING & ACTIVITIES

| | |
|---|---|
| 2018 & 2019 | **Perú Medical Mission Trip**, WMed Global Health & Amazon Promise Foundation, Perú – |
| | 02/2019 – 03/2019 *2 weeks at Hospital Regional de Loreto in Iquitos, Perú – rotated through Pediatric ICU, Infectious disease, Emergency, and Laboratory; 2 weeks in the Amazon jungle bringing care to native villages along the Amazon and Ucayali Rivers, and connecting patients with urgent conditions to more advanced care centers.* |
| | 02/2018 – 03/2018 *1 week at Hospital Regional de Loreto in Iquitos, Perú – rotated through Pediatric ICU, Pediatric Emergency, and Neonatal ICU; 2 weeks in the Amazon jungle.* |
| | 09/2017 – 02/2018 ***WMed Tropical Medicine*** elective online modules |
| 11/2018 – 03/2019 | **Physician Shadowing**, Outpatient Pediatrics, WMed Clinics, Kalamazoo, MI |
| | Preceptor: Dilip Patel, M.D. |
| 07/2018 – Present | **Early Childhood Education and Childcare** |
| | *Create individualized educational and life skills lessons and activities for preschool-aged children and provide childcare when needed.* |
| 06/2018 – 08/2018 | **Physician Shadowing,** Gynecology-Oncology, West Michigan Cancer Center, Kalamazoo, MI |
| | Preceptor: Anna Hoekstra, M.D. |
| 01/2017 – 02/2017 | **WMed Gift of Life Michigan Campus Challenge, Co-coordinator** and weekly event volunteer. |
| 04/2016 | **The Links Incorporated of Kalamazoo and Battle Creek, MI** |
| | *Performed skits, facilitated discussions and questions to help educate local high school women about STIs, prevention, treatment and the roles of positive and negative peer pressure.* |
| 2015 – 2017 | **WMed Club Microbe** |
| | *Constructed clinical cases and high-yield review of important pathogens for peers.* |
| 2015 – 2017 | **WMed Latino Medical Student Association**; formerly **WMed Medical Spanish Interest Group** |
| 2015 – 2017 | **WMed Global Health Interest Group** |
| 2014 – 2017 | **WMed Pediatrics Interest Group, Founding Board Member** 2014 – 2016 |
| 2014 – 2017 | **WMed Student Ambassador** |
| 2014 – 2017 | **WMed Internal Medicine Interest Group** |
| 2003 – Present | **Autism Spectrum Disorder Advocate and Community Educator** |
| | 2015 – 2017 *World Autism Awareness Day, Kalamazoo, MI – Coordinated and promoted "Light It Up Blue in Kalamazoo" events at WMed, designed promotional material, and educated about the importance of advocacy in the clinical setting and in the community.* |
| | 2009 – 2014 ***Campus Outreach Committee, Autism Speaks OSU Chapter****, Columbus, OH Collaborated at monthly meetings, volunteered at campus and community events such as annual Walk Now for Autism.* |
| | 2003 – 2008 *Presented at local schools to raise community awareness.* |
| 2001 – 2014 | **Teammate "Buddy", Miracle League Baseball**, Coloma, MI |
| | *Assisted and supported players with special needs both on and off the field.* |

## HOBBIES & INTERESTS

Medical and conversational Spanish: intermediate understanding, reading, writing, speaking.
Sports and physical fitness.
Camping, hiking, archery, and outdoor activities.
Art and design.

Jessica E Ramsay | jessica.ramsay@med.wmich.edu

RAMSAY27-0003

# Jessica Ramsay

**BEHAVIOR REPORT**
AUG. 14 - SEP. 22

K-Steele

| AUG. 14 | AUG. 15 | AUG. 16 | AUG. 17 | AUG. 18 |
|---|---|---|---|---|
| AUG. 21 | AUG. 22 | AUG. 23 | AUG. 24 | AUG. 25 — GREAT WEEK! |
| AUG. 28 | AUG. 29 | AUG. 30 | AUG. 31 | DYNAMITE |
| SEP. 4 — No School | SEP. 5 | SEP. 6 | SEP. 7 | STAR |
| SEP. 11 — SUPER | SEP. 12 — SUPER | SEP. 13 — SUPER | SEP. 14 — SUPER | well done |
| SEP. 18 | SEP. 19 | SEP. 20 | SEP. 21 | Fantastic |

**EXPECTED BEHAVIORS:**
1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

A child demonstrating proper behavior receives a sticker/stamp for the day. A child not demonstrating proper behavior receives a number to indicate the problem area.

Please initial the Friday block each week after reviewing your child's folder.

RAMSAY4-0004

Jessica Ramsay

K-54cc16

SEPT. 11-15

Jessica is a wonderful student. She is very sweet and nice to everyone. She works very hard at all times. We are beginning to do some individual work. She participates nicely in class.

RAMSAY4-0005

# Jessica Ramsay

## BEHAVIOR REPORT
### SEP 25 - NOV 3



EXPECTED BEHAVIORS:

1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

A child demonstrating proper behavior receives a sticker/stamp for the day. A child not demonstrating proper behavior receives a number to indicate the problem area.

Please initial the Friday block each week after reviewing your child's folder.

RAMSAY4-0006

Jessica Ramsay

## BEHAVIOR REPORT
### NOV. 6 - DEC. 20

| NOV. 6 | NOV. 7 | NOV. 8 | NOV. 9 | NOV. 10 |
|---|---|---|---|---|
| No School | | | | |
| NOV. 13 Great! | NOV. 14 reat! | NOV. 15 Great! | NOV. 16 Great! | NOV. 17 Great! |
| NOV. 20 | NOV. 21 | NOV. 22 | WELL DONE | NOV. 24 |
| NOV. 27 Absent | NOV. 28 Absent | NOV. 29 | NOV. 30 | DEC. 1 100% |
| DEC. 4 | DEC. 5 | DEC. 6 | DEC. 7 GREAT | |
| DEC. 11 | DEC. 12 | DEC. 13 | DEC. 14 | DEC. 15 |
| DEC. 18 | DEC. 19 | DEC. 20 | No School | No School |

**EXPECTED BEHAVIORS:**
1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

**A child demonstrating proper behavior receives a sticker/stamp for the day. A child not demonstrating proper behavior receives a number to indicate the problem area.**

**Please initial the Friday block each week after reviewing your child's folder.**

RAMSAY4-0007

Dec 4-8

Jessica is doing a great job in class! She is becoming more confident and assertive. She is a wonderful student!

Thank you telling us! We are very pleased with her progress.

RAMSAY4-0008

Jessica Ramsay

**BEHAVIOR REPORT**
Jan. 9 - Feb. 17

| | JAN. 9 | JAN. 10 | JAN. 11 | JAN. 12 |
|---|---|---|---|---|
| No school | | | | |
| JAN. 15 | JAN. 16 | JAN. 17 | JAN. 18 | JAN. 19 |
| No school | | | | |
| JAN. 22 | JAN. 23 | JAN. 24 | JAN. 25 | |
| | | | | Nice Job |
| JAN. 29 | JAN. 30 | JAN. 31 | | |
| FEB. 5 | FEB. 6 | FEB. 7 | | STAR |
| FEB. 12 | FEB. 13 | FEB. 14 | FEB. 15 | EXCELLENT |

**EXPECTED BEHAVIORS:**

1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

A child demonstrating proper behavior receives a sticker/stamp for the day. A child not demonstrating proper behavior receives a number to indicate the problem area.

Please initial the Friday block each week after reviewing your child's folder.

Kdg - Steele

RAMSAY4-0009

Jun 9-13

Jessica is a good example for the
other children. She is kind and
considerate toward others.

Jan 19-13

Jessica continues to blossom. She really
stands up for herself. She has excellent
work habits!

RAMSAY4-0010

# Jessica Ramsay

## BEHAVIOR REPORT
### Feb. 19 - Apr. 12

| FEB. 19 | FEB. 20 | FEB. 21 | FEB. 22 | FEB. 23 | |
|---------|---------|---------|---------|---------|---|
| No School! | | | | | |
| FEB. 26 | FEB. 27 | FEB. 28 | FEB. 29 | GREAT | |
| No School! | | | | | |
| MAR. 4 | MAR. 5 | MAR. 6 | MAR. 7 | HOORAY | |
| Mar. 11 - Mar. 15 | SPRING | BREAK | | HOORAY | |
| MAR. 18 | MAR. 19 | MAR. 20 | MAR. 21 | sharp student! | |
| MAR. 25 | MAR. 26 | MAR.-27 | MAR. 28 | | |
| GREAT APR. 8 | GOOD | TOPS | GREAT APR. 11 | No School | |
| | | APR. 10 | | GREAT | |

## EXPECTED BEHAVIORS:
1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

A child demonstrating proper behavior receives a sticker/stamp for the day.  A child not demonstrating proper behavior receives a number to indicate the problem area.

Please initial the Friday block each week after reviewing your child's folder.

RAMSAY4-0011

March 4-8

Jessica is doing great in class. She is developing (or showing) quite a lively personality.

April 6 :
How is Jessie doing in Reading & Math? Overall & in relation to the class? Are there any difficulties? Strengths?

RAMSAY4-0012

# Jessica Ramsay

## BEHAVIOR REPORT
### APR. 15 - MAY 23

| APR. 15 | APR. 16 | APR. 17 | APR. 18 | APR. 19 |
|---------|---------|---------|---------|---------|
| APR. 22 | APR. 23 | APR. 24 | APR. 25 | INSERVICE |
| APR. 29 | APR. 30 | MAY 1 | MAY 2 | MAY 3 |
| MAY 6 | MAY 7 | MAY 8 | MAY 9 | MAY 10 |
| MAY 13 | MAY 14 | MAY 15 | MAY 16 | MAY 17 |
| MAY 20 | MAY 21 | MAY 22 | MAY 23 KINDERGARTEN GRADUATION | |

back

**EXPECTED BEHAVIORS:**

1. Demonstrates respect for others.
2. Cooperates with others.
3. Follows directions.
4. Completes work on time.
5. Uses time wisely.

A child demonstrating proper behavior receives a sticker/stamp for the day. A child not demonstrating proper behavior receives a number to indicate the problem area.

Please initial the Friday block each week after reviewing your child's folder.

RAMSAY4-0013

Jessica Ramsay

April 2<sup>a</sup>- May 3

Jessica is doing well in all areas.
She always has a great
attitude and puts forth her
best effort!

RAMSAY4-0014

Case: 20-1058    Document: 23    Page: 151    Date Filed: 03/23/2020

**Comments:**

First six weeks: Jessica is a wonderful student. She works hard in class and always does her best.

Second six weeks: Jessica is making good progress in all areas. She is beginning to "open

Third six weeks: up" in class

Jessica is continuing to make good progress. She is becoming more

Fourth six weeks: assertive and independent.

Jessica is making good progress in Reading. She is "opening up" more in

Fifth six weeks: class.

Jessica is doing well in class. She is a very nice girl.

Sixth six weeks:

Have a wonderful summer!

**PARENT'S SIGNATURE**

1. _Terri Shot_ 10/1/95
2. _Terri Shot_ 11/15/95
3. _Terri Shot_ 1/14/96
4. _Terri Shot_ 4/21/96
5. _____
6. _____

Retain in grade _____ Promoted to 1st grade

_Judy Price_                5-23-96
Director                    Date



**SUNSET OAKS ACADEMY**

**Kindergarten Progress Report**

Jessica Ramsay

Teacher _Mrs Steele_

Director _Mrs Price_



**DEFENDANT'S EXHIBIT**

**9**

RAMSAY4-0015

Case: 20-1058    Document: 23    Page: 152    Date Filed: 03/23/2020

Jessica Ramsay

| | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E- | E | E |
| Phonics | E | E | E | E | E | E | E |
| Writing | E | E | E | E | E | E | E |
| Math | E | E | E | E- | E | E | E |
| Art | E | E | E | E | E | E | E |
| Music | / | / | E | E | E | E | E |
| Physical Education | E | E | E | E | S+ | E | E |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | / | / | / | S+ | S+ | E | S+ |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | E | E | E | E | E | E |
| Used time wisely | E | E | E | E | E | E |
| Follows directions | E | E | E | E | E | E |
| Completes work | E | E | E | E | E | E |
| Works independently | E | E | E | E | E | E |
| Shows personal organization | E | E | E | E | E | E |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | E | E | E | E | E | E |
| Displays self-confidence | S+ | E | E | E | E | E |
| Is dependable | E | E | E | E | E | E |
| Has self discipline | E | E | E | E | E | E |
| Contributes to the group | E | E | E | E | E | E |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 0 | 2 | 2 | 0 | 1 | 1 |
| Times tardy | 0 | 3 | 1 | 0 | 1 | 0 |

**EXPLANATION OF MARKS**

E  = Excellent progress
S+ = Satisfactory plus progress
S  = Satisfactory progress
I  = Needs improvement
U  = Unsatisfactory progress

RAMSAY4-0016

Appx869

# STANFORD

## Early School Achievement Test *Third Edition*

**SESAT 2**
**Form J**

## Test Record

| | |
|---|---|
| Name | Jessica Ramsay |
| Teacher | Mrs. Steele |
| School | Sunset Oaks Academy |
| Grade | K    Date of Testing 4-96 |
| Norms | ☐ Fall    ☐ Midyear    ☑ Spring |

| | Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
|---|---|---|---|---|---|---|
| 1 | TOTAL READING /110    (2 + 3 + 4) | 94 | 491 | 1.6 | 96 | 9 |
| 2 | Sounds and Letters /40 | 38 | 520 | 1.7 | 95 | 8 |
| 3 | Word Reading /40 | 33 | 475 | 1.4 | 86 | 7 |
| 4 | Sentence Reading /30 | 23 | 491 | 1.6 | 97 | 9 |
| 5 | Mathematics /44 | 26 | 505 | 1.6 | 91 | 8 |
| 6 | Environment /40 | 33 | 564 | 2.1 | 82 | 7 |
| 7 | Listening to Words and Stories /45 | 40 | 586 | 2.6 | 90 | 8 |
| 8 | Basic Battery /199    (1 + 5 + 7) | 170 | 510 | 1.6 | 96 | 9 |
| 9 | Complete Battery /239    (6 + 8) | 203 | 517 | 1.7 | 96 | 9 |

DEFENDANT'S
EXHIBIT
**24**

8 9 10 11 12    B C D E

Copyright © 1989 by Harcourt Brace Jovanovich, Inc. Standardization edition copyright © 1988 by Harcourt Brace Jovanovich, Inc. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. "The Psychological Corporation" and the "PSI" logo are registered trademarks of The Psychological Corporation. Printed in the United States of America.

RAMSAY1-0001

Case: 20-1058    Document: 23    Page: 154    Date Filed: 03/23/2020

## Comments:

**First six weeks:** Jessica is a pleasure to have in my classroom.

**Second six weeks:** I will help her with the switching of letters.

**Third six weeks:** Jessica is working hard in class.

**Fourth six weeks:** Jessica is doing a super job!

**Fifth six weeks:** Jessica is progressing nicely in her academic subjects.

**Sixth six weeks:**

Have a great summer!

**PARENT'S SIGNATURE**

1. _Terri Short_
2. _Terri Short_
3. _Terri Short_
4. _Terri Short_
5. _Terri Short_
6. _____

Retain in grade _____    Promoted to _2nd grade_

_Judy Price_          _5-22-97_
**Director**              **Date**

**SUNSET OAKS ACADEMY**



**First Grade Progress Report**

_Jessica Ramsay_

Teacher _Mrs Sullins_

Director _Mrs Price_

DEFENDANT'S EXHIBIT
**10**

RAMSAY4-0018

Case: 20-1058     Document: 23     Page: 155     Date Filed: 03/23/2020

| | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E | E | E |
| Phonics | 95 | 94 | 93 | 96 | 95 | 93 | 94 |
| Writing | E | E | E | E | E | E | E |
| Math | 100 | 95 | 99 | 96 | 98 | 97 | 98 |
| Art | E | S+ | S+ | E | E | E | E |
| Music | E | S+ | S+ | E | E | E | E |
| Physical Education | S+ | | | | | | |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | E | E | E | E | E | E | E |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | S+ | E | E | E | E | E |
| Used time wisely | S+ | E | E | E | E | E |
| Follows directions | S+ | E | E | E | E | E |
| Completes work | S+ | E | E | E | E | E |
| Works independently | S+ | E | E | E | E | E |
| Shows personal organization | S+ | E | E | E | E | E |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | S+ | E | E | E | E | E |
| Displays self-confidence | S+ | E | E | E | E | E |
| Is dependable | S+ | E | E | E | E | E |
| Has self discipline | S+ | E | E | E | E | E |
| Contributes to the group | S+ | S+ | E | E | E | E |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 1 | 1 | 1 | 0 | 2 | 2 |
| Times tardy | 0 | 1 | 0 | 0 | 1 | 2 |

**EXPLANATION OF MARKS**

E = Excellent progress
S+ = Satisfactory plus progress
S = Satisfactory progress
I = Needs improvement
U = Unsatisfactory progress

| Spanish | S+ | E | E | E | E | E | E |
|---|---|---|---|---|---|---|---|
| Spelling | 80 | 90 | 97 | 92 | 98 | 98 | 93 |

Appx872

RAMSAY4-0019

# STANFORD
## Achievement Test
### Eighth Edition

**Primary 1   Form J**
**Complete Battery**

## Test Record

Name _Jessica Ramsey_ ~~T_____~~

Teacher _Mrs Sullins_

School _Sunset Oaks Academy_

Grade _1st_     Date of Testing _4-7/ 4-11-97_

Norms    ☐ Fall    ☐ Midyear    ☒ Spring

| | Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
|---|---|---|---|---|---|---|
| 1 | TOTAL READING /106  (2 + 3 + 4) | 87 | 545 | 2.2 | 70 | 6 |
| 2 | Word Study Skills /36 | 36 | 658 | 6.9 | 98 | 9 |
| 3 | Word Reading /30 | 13 | 463 | 1.3 | 13 | 3 |
| 4 | Reading Comprehension /40 | 38 | 605 | 3.5 | 92 | 8 |
| 5 | TOTAL MATHEMATICS /90  (6 + 7 + 8) | 79 | 566 | 3.0 | 90 | 8 |
| 6 | Concepts of Number /34 | 33 | 629 | 5.2 | 99 | 9 |
| 7 | Mathematics Computation /26 | 20 | 533 | 2.3 | 69 | 6 |
| 8 | Mathematics Applications /30 | 26 | 560 | 2.7 | 83 | 7 |
| 9 | Language /44 | 37 | 574 | 2.6 | 78 | 7 |
| 10 | Spelling /30 | 29 | 616 | 4.3 | 95 | 8 |
| 11 | Environment /40 | 33 | 592 | 3.6 | 88 | 7 |
| 12 | Listening /45 | 35 | 589 | 2.7 | 78 | 7 |
| 13 | Basic Battery /315  (1 + 5 + 9 + 10 + 12) | 267 | 563 | 2.5 | 86 | 7 |
| 14 | Complete Battery /355  (11 + 13) | 300 | 566 | 2.7 | 87 | 7 |

**DEFENDANT'S EXHIBIT**
**25**

89 10 11 12 A B C D E

# STANFORD ACHIEVEMENT TEST

*INTERPRETING THE TYPES OF SCORES*

**RAW SCORES:**

A raw score is the number of questions a student has answered correctly.

**NORM-REFERENCED SCORES:**

Percentile Ranks:  Percentile ranks range from a low of 1 to a high of 99, with 50 denoting average performance.  The percentile rank corresponding to a given score indicates the percentage of a reference group obtaining scores equal to or less than that score.  For example, a student who performed as well as or better than 75% of the students in the reference group would earn a percentile rank of 75.

Percentile ranks indicate relative standing of a student in comparison with students in the same grade in the norm (reference) group who took the test at a comparable time.

Stanines:  Stanines are scores that range from a low of 1 to a high of 9, with 5 designating average performance.  Stanines, like percentile ranks, indicates a student's relative standing in a reference group.  Stanine scores of 1,2, and 3 are usually considered to reflect below-average performance; 4,5 and 6 are generally thought of as average; and 7,8 and 9 are above average.

Grade Equivalents:  A grade equivalent is a score that represents the average performance of students tested in a given month of the school year.  The Stanford grade equivalent scale ranges from K.0 (beginning kindergarten) to 12.9 designated PHS (post high school).  The numeral to the left of the decimal point refers to the grade for which the score is typical, and the numeral to the right of the decimal point represents one tenth of the school year, or one month.

Scaled Scores:  Scaled scores have the advantage of representing approximately equal units on a continuous scale; that is, a difference of 5 points between two students' scores represents the same amount of difference in performance wherever it occurs on the scale.  The Stanford scaled scores express performance on all forms of a given subtest on a single scale.  The scaled score system for this series also links together the levels at which content domains are tested, yielding a scale across levels on each subtest and total that is common to those levels.

RAMSAY1-0006

Case: 20-1058    Document: 23    Page: 158    Date Filed: 03/23/2020

**Comments:**

First six weeks:
Jessica has gotten off to an excellent start!

Second six weeks: Jessica has made great improvements in getting her work done on time!!

Third six weeks:
Jessica continues to do well with completing her work on time & her confidence continues to grow.

Fourth six weeks:
Jessica needs to focus on getting her work done on time.

Fifth six weeks:
I am very proud of Jessica's efforts to improve her work habits!

Sixth six weeks:
Have a great summer!

**PARENT'S SIGNATURE**

1. _Chris Spielt_
2. _Chris Spielt_
3. _Chris Spielt_
4. _Chris Spielt_
5. _Chris Spielt_
6. _____

Retain in grade _____  Promoted to _3rd_

_Judy Price_ — _5-21-98_
Director — Date

**SUNSET OAKS ACADEMY**



**Second Grade Progress Report**

_Jessica Ramsay_

Teacher _Mrs. Hare_

Director _Mrs. Price_

DEFENDANT'S
EXHIBIT
**11**

RAMSAY4-0021

Appx875

Case: 20-1058    Document: 23    Page: 159    Date Filed: 03/23/2020

| | 1st | 2nd | 3rd | 4th | 5th | 6th | FINAL |
|---|---|---|---|---|---|---|---|
| Social Studies | E | E | E | E | E | E | E |
| Phonics | 93 | 92 | 95 | 93 | 92 | 96 | 94 |
| Writing | S+ | S | S+ | S | S+ | S+ | S+ |
| Math | 99 | 98 | 95 | 97 | 97 | 97 | 97 |
| Art | E | E | E | E | E | E | E |
| Music | | | | | | | |
| Physical Education | | | | | | | |
| Health | E | E | E | E | E | E | E |
| Science | E | E | E | E | E | E | E |
| Reading | S+ | S+ | S+ | S+ | S+ | S+ | S+ |
| Spelling | 100 | 100 | 98 | 96 | 96 | 97 | 97 |
| Spanish | | E | E | | E | | E |

| GENERAL WORK HABITS | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Adequate attention span | S | S+ | S+ | S+ | S+ | S |
| Used time wisely | I | S | S+ | S | S+ | S |
| Follows directions | E | E | E | E | E | E |
| Completes work | I | S | S+ | S | S+ | S |
| Works independently | S+ | S+ | S+ | S+ | E | E |
| Shows personal organization | S+ | S+ | S+ | S+ | S+ | S+ |

| SOCIAL DEVELOPMENT AND CONDUCT | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Respects authority | E | E | E | E | E | E |
| Cooperates in work/play | E | E | E | E | E | E |
| Displays self-confidence | S | S+ | S+ | S+ | E | E |
| Is dependable | E | E | E | E | E | E |
| Has self discipline | S | S+ | S+ | S | S+ | S+ |
| Contributes to the group | S+ | S+ | S+ | S+ | S+ | S+ |

| | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Days absent | 5 | 0 | 1 | 3 | 0 | 1 |
| Times tardy | 0 | 0 | 0 | 0 | 0 | 0 |

### EXPLANATION OF MARKS

E = Excellent progress
S+ = Satisfactory plus progress
S = Satisfactory progress
I = Needs improvement
U = Unsatisfactory progress

RAMSAY4-0022

Appx876

Case: 20-1058    Document: 23    Page: 160    Date Filed: 03/23/2020

# Sunset Oaks Academy
## Physical Education
## Report Card

Name:  Jessica Ramsay
Grade:  2nd
Classroom Teacher:  Mrs. Hare

E = Excellent
S  = Satisfactory
N  = Needs Improvement
U = Unsatisfactory

| | 1st | 2nd | 3rd | 4th | 5th | 6th |
|---|---|---|---|---|---|---|
| Listens carefully, follows directions and stays on task | E | E | E | E | E | E |
| Participation and performance of skills are age appropriate | E | E | E | E | E | E |
| Models respect and courtesy for the teacher | E | E | E | E | E | E |
| Demonstrates good sportsmanship and gets along with classmates | E | E | E | E | E | E |

RAMSAY4-0020

DEFENDANT'S EXHIBIT
12

Appx877

# STANFORD
## Achievement Test
*Eighth Edition*

**Primary 2    Form J**
**Complete Battery**

## Test Record

Name: Jessica Ramsay

Teacher: Michele Hare

School: Sunset Oaks Academy

Grade: 2      Date of Testing: 4/98

Norms: ☐ Fall    ☐ Midyear    ☑ Spring

| Tests/Number of Items | Number Right | Scaled Score | Grade Equivalent | Percentile Rank | Stanine |
|---|---|---|---|---|---|
| 1  TOTAL READING /128   (2 + 3 + 4) | 113 | 633 | 5.4 | 88 | 7 |
| 2  Word Study Skills /48 | 45 | 649 | 5.8 | 88 | 7 |
| 3  Reading Vocabulary /40 | 36 | 638 | 5.5 | 88 | 7 |
| 4  Reading Comprehension /40 | 32 | 621 | 4.8 | 76 | 6 |
| 5  TOTAL MATHEMATICS /105   (6 + 7 + 8) | 95 | 626 | 5.3 | 96 | 9 |
| 6  Concepts of Number /34 | 32 | 638 | 5.5 | 95 | 8 |
| 7  Mathematics Computation /36 | 32 | 622 | 4.9 | 91 | 8 |
| 8  Mathematics Applications /35 | 31 | 621 | 4.9 | 92 | 8 |
| 9  Language /44 | 38 | 611 | 3.6 | 70 | 6 |
| 10  Spelling /30 | 24 | 603 | 3.6 | 71 | 6 |
| 11  Environment /40 | 33 | 607 | 4.4 | 87 | 7 |
| 12  Listening /45 | 33 | 597 | 3.2 | 59 | 5 |
| 13  Basic Battery /352   (1 + 5 + 9 + 10 + 12) | 303 | 615 | 4.4 | 89 | 8 |
| 14  Complete Battery /392   (11 + 13) | 336 | 614 | 4.4 | 92 | 8 |

**DEFENDANT'S EXHIBIT 26**

567891011 1 2 A B C D E

Copyright © 1989 by The Psychological Corporation. Standardization edition copyright © 1988 by The Psychological Corporation. All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher. "The Psychological Corporation" and "PSI" logo are registered trademarks of The Psychological Corporation. Printed in the United States of America.

RAMSAY1-0007

Case: 20-1058    Document: 23    Page: 162    Date Filed: 03/23/2020

**Promotion Requirements**:

To be promoted to the next grade level, a student must meet **all** of the following criteria:

- Mastery of Texas Essential Knowledge and Skills (TEKS)
- Final grade average of 70 or above in Mathematics
- Final grade average of 70 or above in Language Arts (average of reading and composition grades)
- Final grade average of 70 or above in Mathematics, Language Arts, Science and Social Studies
- **Master Texas Assessment of Academic Skills (TAAS)** *Policy EIED (Local) and EKB (Local)*
- 90% or above attendance

On-level performance indicates a student is performing at the state and local expectations for the assigned grade level. Students may receive differentiation in their program in order to attain mastery of objectives in accordance with their academic needs. Only students functioning on grade level or above may be considered for promotion. Special education students will be promoted according to the achievement of their Individual Education Plan (IEP) goals.

|   | Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|---|
|   |   | yes | no | yes | no |
| 1. | *Corri Shod* | yes | (no) | yes | no |
| 2. | *Corri Shod* | yes | (no) | yes | no |
| 3. | *Corri Shod* | yes | (no) | yes | no |
| 4. | *Corri Shod* | yes | (no) | yes | no |
| 5. | *Corri Shod* | yes | (no) | yes | no |

(Promoted)/Placed in grade _____ 4

Summer School needed: Yes/(No)
Summer School required: Yes/(No)
TAAS mastery: Reading    Writing    Mathematics
(if applicable)  (Yes/No)   Yes/No   Yes/No

Form No. 113360   Rev. 7/98

# CARROLLTON-FARMERS BRANCH
# INDEPENDENT SCHOOL DISTRICT

## Report Card
## for
## Grades 1 through 5

## 19 *98* to *99*

Student's Name   RAMSAY          JESSICA    E
                 E. L. KENT ELEMENTARY
Student I.D. Num 262344
                 JOHNSON      A   (301)
                 LINDA HAWKINS
Grade Level _____

Teacher _____

Elementary School _____

Principal _____



Carrollton · Farmers Branch
Independent School District

DEFENDANT'S EXHIBIT
13

RAMSAY4-0023

Name: *Jessica*  Grade: 3  School Year: *98-99*

Date Filed: 03/23/2020   Page: 163   Document: 23   Case: 20-1058

| Evaluation Scales (recorded numerically only) | |
|---|---|
| Grades 1-2 Academic Areas and Character Education,<br>Grades 3-5 Character Education only,<br>Grades 1-5 PE, Music, and Art will be graded as: | Grades 3-5<br>Academic Areas<br>will be graded as: |
| 4 = Performs at excellent level consistently<br>3 = Performs at standard expectations consistently<br>2 = Performs slightly below standard expectations,<br>    but makes continuous progress<br>1 = Performs at beginning level or below<br><br>Grades will not be assigned in shaded areas | 90-100  = A<br>80-89  = B<br>75-79  = C<br>70-74  = D<br>69-below = F |

| ACADEMIC AREAS | | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | | 92 |
| Reading | | 86 | 91 | 93 | 92 | 96 | 96 | |
| Reading Level: | Above | | | | | | | |
| (check one) | On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓+ | |
| | Below | | | | | | | |
| Composition | | 87 | 92 | 88 | 92 | 86 | 95 | |
| Spelling | | 95 | 97 | 94 | 94 | 90 | 98 | |
| Math | | 88 | 89 | 88 | 91 | 90 | 95 | 90 |
| Math Level: | Above | | | | | | | |
| (check one) | On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓+ | |
| | Below | | | | | | | |
| Science/Health | | 89 | 91 | 94 | 89 | 89 | 93 | 91 |
| Social Studies | | 97 | 86 | 94 | 86 | 90 | 95 | 91 |
| Music | | 4 | 4 | 4 | 4 | 4 | 4 | |
| Art | | 4 | 4 | 4 | 4 | 4 | 4 | |
| Physical Education | | 4 | 4 | 4 | 4 | 4 | 4 | |

Applicable for students learning English:

| ESL (English as a Second Language) | | | | | | |
|---|---|---|---|---|---|---|

| CHARACTER EDUCATION | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| PRIDE - produces quality work; completes assigned tasks | 3 | 4 | 4 | 4 | 4 | 4 |
| CITIZENSHIP/SERVICE- follows school and class rules | 4 | 4 | 3 | 4 | 4 | 4 |
| RESPONSIBILITY - makes appropriate choices; accepts responsibility for choices | 4 | 4 | 4 | 3 | 3 | 3 |
| INTEGRITY - demonstrates honesty and fairness to others | 4 | 4 | 4 | 4 | 4 | 4 |
| COOPERATION - works well with others | 4 | 4 | 4 | 4 | 4 | 4 |
| RESPECT - appreciates others' diversity, demonstrates consideration for self, peers, and authority | 4 | 4 | 4 | 4 | 4 | 4 |

## ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the time service began.

| | |
|---|---|
| _____ Special Education | _____ ACE/LEAP |
| _____ English as a Second Language | _____ Bilingual |
| _____ Learning Center | _____ 504 |
| _____ Speech | _____ Tutoring |
| _____ Specialized Reading Support: _____ | |
| _____ Grades based on intensive teacher assistance | |

| NUMBER OF DAYS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
| Absences | — | 1 | 2 | 3 | 1 | — | 7 |
| Tardies | — | — | 1 | — | 1 | — | 2 |

RAMSAY4-0024

In accordance with state law, students must be in attendance for at least 90% of the days of the school year to be promoted to the next grade level.

Appx880

# Dr. Mary Alice A. Tanguay

## OPTOMETRIST

1850 Rosemeade
P.O. Box 116239
Carrollton, Texas 75011-6239
(214) 492-6588

December 11, 1997

TO WHOM IT MAY CONCERN

REF:  JESSICA RAMSEY

Jessica Ramsey was seen in our office for a full eye examination on
October 23, 1997.   At that time it was noted that she had problems
with reversals in her school work.  Jessica has been wearing glasses
for accommodative inflexibility and hyperopea.

On December 11, 1997 we did a perceptual skills evaluation and we
enclose the results of this evaluation.

Jessica scored above her age level in visual sequential memory and
visual closure.  She was just below her age level for visual form
constancy and visual figure-ground.  She showed substantial deficits
in the areas of visual-spatial relationships and visual discrimination.
She was also lacking in visual memory.

If you have any programs that can work on these areas, I think they
would be to Jessica's advantage.  If I can provide any further information
to help with her work, please feel free to contact me.

Yours sincerely,

Dr. Mary Alice A. Tanguay
Therapeutic Optometrist

enc

MAT/mws

NBME00293

**Appx881**

# Dr. Mary Alice A. Tanguay

OPTOMETRIST

1850 Rosemeade
P.O. Box 116239
Carrollton, Texas 75011-6239
(214) 492-6588

1106782    5-366-431-4
Tanguary, M. 1/27/00-Lett

January 27, 2000

To Whom It May Concern:
Re: Jessica Ramsay

Jessica Ramsay was seen in our office for a full eye examination on October 23, 1997.
At that time it was noted that she had problems with reversals in her schoolwork. Jessica
had been wearing glasses for accommodative inflexibility and hyperopia.

On December 11, 1997, we did a perceptual skills evaluation. Enclosed are the results of
this evaluation.

Jessica scored above her age level in visual sequential memory and visual closure. She
was just below her age level for visual form constancy and visual figure-ground. She
showed substantial deficits in the areas of visual-spatial relationships and visual
discrimination. She was also lacking in visual memory.

Jessica returned to our office for perceptual skills training from February 1998 through
May 1998. She scored above age level in all categories when retested.

At this time, her comprehension and perceptual skills are excellent. She still has the
original vision problem, which may slightly reduce her reading speed.

If any further information is needed, please feel free to give us a call.

Yours sincerely,

Dr. Mary Alice A. Tanguay
Therapeutic Optometrist

RECEIVED

DEC 12 2016

Disability Services

NBME00281

DR. MARY ALICE A. TANGUAY
OPTOMETRIST
1850 ROSEMEADE PARKWAY
P.O. BOX 116239
CARROLLTON, TEXAS 75011-6239

Date _December 11, 1997_

To whom it may concern:

1106785    5-366-431-4
Tanguary, M. 12/11/97-Med

_Jessica Ramsey_____, was in Dr. Tanguay's
office from _8:45 — 10:15_____ for Visual Care.

Dr. Mary Alice Tanguay
Therapeutic Optometrist

RECEIVED

DEC 12 2016

Disability Services

On December 11, 1997 we did a perceptual
enclose the results of this evaluation.

Jessica scored above her age level in vi
visual closure. She was just below her
constancy and visual figure-ground. She
in the areas of visual-spatial relations
She was also lacking in visual memory.

If you have any programs that can work o
would be to Jessica's advantage. If I c
to help with her work, please feel free

Yours sincerely,

Dr. Mary Alice A. Tanguay
Therapeutic Optometrist

enc

MAT/mws

*[handwritten notes:]*

Perceptual
- Visual Sequential
  Memory    11 yr 1 mo.
✗ Visual Discrimination
          5 yr 2 mo
✗ Visual Spacial Relation
  Ships    6 yr 2 mo
✗ Visual Memory  5 yr 5 mo
[Bldg blocks for learning]

— 9 yr 6 mo Visual Closure
— 7 yr 0 mo  "  Form Constancy
— 6 yr 1 mo  "  Fig ground
→ take to school - program
Ext. II) 905 946 3066   Binocular
  code #  Dysfunction
  @ 99215  @ 368.30 →

NBME00292

Referred by: _____

Reason for Referral: _____

_____

Description of Child's Behavior: _____

_____

## TEST OF VISUAL-PERCEPTUAL SKILLS (non-motor)

Morrison F. Gardner
Children's Hospital, San Francisco

*Individual Record Form*

Name: ____JESSICA RAMSEY_____ Sex: _F_ Grade: _2_

School: __Sunset Oaks Academy__ Examiner: _Dr. M.A. Tanguay_

| Date of Test: | 1997 | 12 | 11 |
|---|---|---|---|
| | year | month | day |
| Date of Birth: | 1990 | 08 | 7 |
| | year | month | day |
| Chronological Age: | 7 | | |
| | year | month | day* |

\* If the number of days exceeds 15, consider as a full month and increase the months by one.

### TVPS Profile Chart (Scaled Scores)

| %<br>Rank | VD | VM | VSR | VFC | VSM | VFG | VC | %<br>Rank |
|---|---|---|---|---|---|---|---|---|
| 99.9 | 19 | 19 | 19 | 19 | 19 | 19 | 19 | 99.9 |
| 99.6 | 18 | 18 | 18 | 18 | 18 | 18 | 18 | 99.6 |
| 99 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 99 |
| 98 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 98 |
| 95 | 15 | 15 | 15 | 15 | 15 | 15 | 15 | 95 |
| 91 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 91 |
| 84 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 84 |
| 75 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 75 |
| 63 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 63 |
| 50 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 50 |
| 37 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 37 |
| 25 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 25 |
| 16 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 16 |
| 9 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 9 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 2 |
| 1 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 1 |
| 0.4 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 0.4 |
| 0.1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0.1 |

| TEST RESULTS: | Raw<br>Scores | Perceptual<br>Ages | Scaled<br>Scores | Percentile<br>Ranks |
|---|---|---|---|---|
| Visual Discrimination | 5 | 5-2 | | |
| Visual Memory | 4 | 5-5 | | |
| Visual-Spatial Relations | 6 | 5-2 | | |
| Visual Form Constancy | 7 | 7-0 | | |
| Visual Sequential Memory | 14 | 11-1 | | |
| Visual Figure-Ground | 6 | 6-1 | | |
| Visual Closure | 10 | 9-6 | | |
| *Sum of Scaled Scores:* | | | *Percentile Rank:* | |
| *Perceptual Quotient:* | | | *Median Perceptual Age:* | |

Use for charting a child's visual-perceptual areas of functioning based on scaled scores.

Copyright © 1988, by Health Publishing Company, a division of Northern California Medical Services, Inc., in affiliation with Children's Hospital of San Francisco.

All rights reserved. Printed in the United States of America. No part or parts of this booklet may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical photocopying, recording or otherwise, without the prior written permission of the publisher and authors.

NBME00294

**Appx884**

*Basal:* No basal is required. Give all items until ceiling is established.
*Ceiling:* Established by three failures out of four consecutive responses if subtest has four choices, or four failures out of five consecutive responses if subtest has five choices.

To obtain the raw score, count the number of correct answers for each subtest and record at the bottom of each subtest column. Each total should then be recorded on the face sheet, under "test results."

| Visual Discrimination | | Visual Memory | | Visual-Spatial Relationships | | Visual Form Constancy | | Visual Sequential Memory | | Visual Figure-Ground | | Visual Closure | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A 3 (3) | | A 3 (3) | | A 2 (2) | | A 5 (5) | | A 1 (1) | | A 2 (2) | | A 4 (4) | |
| 1 1 (5) | | 1 2 (2) | | 1 5 (1) | | 1 5 (5) | | 1 2 (1) | | 1 1 (2) | | 1 1 (1) | |
| 2 1 (4) | | 2 1 (3) | | 2 3 (3) | | 2 1 (1) | | 2 4 (4) | | 2 1 (1) | | 2 1 (4) | |
| 3 1 (1) | | 3 5 (4) | | 3 1 (4) | | 3 1 (4) | | 3 3 (3) | | 3 1 (1) | | 3 4 (3) | |
| 4 3 (3) | | 4 2 (1) | | 4 4 (4) | | 4 34 (4) | | 4 3 (3) | | 4 1 (2) | | 4 2 (2) | |
| 5 5 (1) | | 5 1 (1) | | 5 2 (1) | | 5 2 (2) | | 5 4 (4) | | 5 4 (4) | | 5 3 (3) | |
| 6 3 (3) | | 6 3 (4) | | 6 5 (5) | | 6 2 (2) | | 6 2 (2) | | 6 4 (3) | | 6 1 (1) | |
| 7 5 (1) | | 7 1 (5) | | 7 2 (2) | | 7 1 (4) | | 7 2 (2) | | 7 4 (1) | | 7 3 (3) | |
| 8 4 (4) | | 8 3 (4) | | 8 4 (3) | | 8 4 (4) | | 8 4 (4) | | 8 2 (1) | | 8 1 (1) | |
| 9 3 (2) | | 9 4 (1) | | 9 5 (4) | | 9 3 (4) | | 9 1 (1) | | 9 1 (1) | | 9 2 (1) | |
| 10 1 (5) | | 10 1 (1) | | 10 3 (5) | | 10 1 (1) | | 10 2 (2) | | 10 3 (4) | | 10 2 (2) | |
| 11 3 (3) | | 11 3 (2) | | 11 5 (4) | | 11 5 (3) | | 11 3 (3) | | 11 3 (3) | | 11 4 (4) | |
| 12 4 (5) | | 12 1 (4) | | 12 2 (2) | | 12 2 (5) | | 12 4 (4) | | 12 4 (3) | | 12 1 (1) | |
| 13 2 (4) | | 13 3 (2) | | 13 2 (5) | | 13 4 (2) | | 13 3 (3) | | 13 1 (4) | | 13 1 (1) | |
| 14 3 (5) | | 14 3 (5) | | 14 1 (1) | | 14 5 (1) | | 14 4 (3) | | 14 1 (3) | | 14 3 (4) | |
| 15 1 (5) | | 15 4 (5) | | 15 1 (2) | | 15 5 (2) | | 15 1 (1) | | 15 2 (2) | | 15 3 (1) | |
| 16 5 (2) | | 16 1 (1) | | 16 2 (3) | | 16 5 (2) | | 16 2 (2) | | 16 2 (4) | | 16 1 (3) | |
| Number Correct 5 | | Number Correct 4 | | Number Correct 6 | | Number Correct 7 | | Number Correct 14 | | Number Correct 6 | | Number Correct 10 | |
| 5=3 | | 3=5 | | 5-2 | | 7-0 | | 11-1 | | 6-1 | | 9-6 | |

NBME00295

**Appx885**

Case: 20-1058   Document: 23   Page: 169   Date Filed: 03/23/2020

**Promotion Requirements**:

To be promoted to the next grade level, a student must meet **all** of the following criteria:

- Mastery of Texas Essential Knowledge and Skills (TEKS)
- Final grade average of 70 or above in Mathematics
- Final grade average of 70 or above in Language Arts (average of reading and composition grades)
- Final grade average of 70 or above in Mathematics, Language Arts, Science and Social Studies
- **Master Texas Assessment of Academic Skills (TAAS)**
  *Policy EIED (Local) and EKB (Local)*
- 90% or above attendance

On-level performance indicates a student is performing at the state and local expectations for the assigned grade level. Students may receive differentiation in their program in order to attain mastery of objectives in accordance with their academic needs. Only students functioning on grade level or above may be considered for promotion. Special education students will be promoted according to the achievement of their Individual Education Plan (IEP) goals.

| | Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|---|
| 1. | | yes | no | yes | no |
| 2. | | yes | no | yes | no |
| 3. | | yes | no | yes | no |
| 4. | | yes | no | yes | no |
| 5. | | yes | no | yes | no |

**Promoted to/Placed in grade** _5_

| | | | |
|---|---|---|---|
| Summer School needed: | Yes/No | | |
| Summer School required: | Yes/No | | |
| TAAS mastery: Reading | Writing | Mathematics | |
| (if applicable) Yes/No | Yes/No | Yes/No | |

Form No. 113360   Rev. 7/98

---

## CARROLLTON-FARMERS BRANCH INDEPENDENT SCHOOL DISTRICT

### Report Card
### for
### Grades 1 through 5

19___ to _____

Student's Name __ RAMSAY      JESSICA    E
                 E. L. KENT ELEMENTARY
Student I.D. Numt  262544
                 DEWITT      K  (400)
Grade Level_____ LINDA HAWKINS _____

Teacher_____

Elementary School_____

Principal_____



Carrollton · Farmers Branch
Independent School District

**RAMSAY4-0025**

Appx886

Name: Jessica    Grade: 4    School Year: 99-00

Date Filed: 03/23/2020    Page: 170    Document: 23    Case: 20-1058

| Evaluation Scales (recorded numerically only) | |
|---|---|
| **Grades 1-2 Academic Areas and Character Education, Grades 3-5 Character Education only, Grades 1-5 PE, Music, and Art will be graded as:** | **Grades 3-5 Academic Areas will be graded as:** |
| 4 = Performs at excellent level consistently | 90-100 = A |
| 3 = Performs at standard expectations consistently | 80-89 = B |
| 2 = Performs slightly below standard expectations, but makes continuous progress | 75-79 = C |
| 1 = Performs at beginning level or below | 70-74 = D |
| | 69-below = F |
| Grades will not be assigned in shaded areas | |

| ACADEMIC AREAS | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | 92 |
| Reading | 91 | 91 | 87 | 94 | 94 | 94 | |
| Reading Level: Above | | | | | | | |
| (check one) On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Below | | | | | | | |
| Composition | 90 | 92 | 91 | 90 | 94 | 90 | |
| Spelling | 91 | 97 | 94 | 93 | 94 | 94 | |
| Math | 93 | 93 | 91 | 90 | 91 | 97 | 93 |
| Math Level: Above | | | | | | | |
| (check one) On | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | |
| Below | | | | | | | |
| Science/Health | 93 | 96 | 93 | 90 | 90 | 100 | 94 |
| Social Studies | 97 | 92 | 94 | 91 | 98 | 96 | 95 |
| Music | 4 | 4 | 4 | 4 | 4 | 4 | |
| Art | 4 | 4 | 4 | 4 | 4 | 4 | |
| Physical Education | 4 | 4 | 4 | 4 | 4 | 4 | |

Applicable for students learning English:

| ESL (English as a Second Language) | | | | | | | |
|---|---|---|---|---|---|---|---|

| CHARACTER EDUCATION | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| *PRIDE* - produces quality work; completes assigned tasks | 4 | 3 | 4 | 4 | 4 | 4 |
| *CITIZENSHIP/SERVICE* - follows school and class rules | 4 | 4 | 4 | 4 | 4 | 4 |
| *RESPONSIBILITY* - makes appropriate choices; accepts responsibility for choices | 3 | 3 | 3 | 3 | 4 | 4 |
| *INTEGRITY* - demonstrates honesty and fairness to others | 4 | 4 | 4 | 4 | 4 | 4 |
| *COOPERATION* - works well with others | 4 | 4 | 4 | 4 | 4 | 4 |
| *RESPECT* - appreciates others' diversity, demonstrates consideration for self, peers, and authority | 4 | 4 | 4 | 4 | 4 | 4 |

## ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the time service began.

| _____ Special Education | ✓ 2-00 ACE/LEAP |
|---|---|
| _____ English as a Second Language | _____ Bilingual |
| _____ Learning Center | _____ 504 |
| _____ Speech | _____ Tutoring |
| _____ Specialized Reading Support: _____ | |
| _____ Grades based on intensive teacher assistance | |

| NUMBER OF DAYS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
| Absences | 1 | 0 | 1 | 4 | 0 | 0 | 6 |
| Tardies | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

In accordance with state law, students must be in attendance for at least 90% of the days of the school year to be promoted to the next grade level.

RAMSAY4-0026

Appx887

Date Filed: 03/23/2020   Page: 171   Document: 23   Case: 20-1058

**romotion Requirements:**

o be promoted to the next grade level, a student must meet all of the
llowing criteria:

Mastery of the Texas Essential Knowledge and Skills (TEKS)
Mathematics final grade average of 70 or above in grades 3-5; or 2 or
above in grades 1-2
Language Arts final grade average of 70 or above in grades 3-5; or 2 or
above in grade 1-2 (average of reading [60%], composition [30%], and
spelling [10%] grades)
Mathematics, Language Arts, Science and Social Studies final composite
grade average of 70 or above in grades 3-5; or 2 or above in grade 1-2
Pass the Texas Assessment of Academic Skills (TAAS) *Policy EIED*
*(Local) and EKB (Local)* in grades 3-5
90% or above attendance

| Parent Signature | Tutorials Needed | | Tutorials Approved | |
|---|---|---|---|---|
| | yes | no | yes | no |
| *(signature)* | yes | no | yes | no |
| *(signature)* | yes | no | yes | no |
| | yes | no | yes | no |
| | yes | no | yes | no |

**Promoted to/Placed in grade** _____

| | | |
|---|---|---|
| nmer School recommended: | Yes | No |
| nmer School required: | Yes | No |

| AS mastery:<br>pplicable) | Reading<br>Yes / No | Writing<br>Yes / No | Mathematics<br>Yes / No |

m No. 113360  Rev. 8/99



## Carrollton · Farmers Branch
### Independent School District

**Report Card
for
Grades 1 through 5**

_2000_ to _2001_

Student's Name _____

Ramsay, Jessica   262544
Delsignore

Student I.D. Number _____

Grade Level _____

Teacher _____

Elementary School _____Kent_____

Principal _____Linda Hawkins_____

RAMSAY4-0027

Appx888

Case: 20-1058   Document: 23   Page: 172   Date Filed: 03/23/2020

me: *Jessica*   Grade: 5   School Year 2000-01

| Evaluation Scales (recorded numerically only) | |
|---|---|
| rades 1-2 Academic Areas and Character Education, rades 3-5 Character Education only, rades 1-5 PE, Music, and Art will be graded as: | Grades 3-5 Academic Areas will be graded as: |

4 = Performs at excellent level consistently     90-100 = A
3 = Performs at standard expectations consistently     80-89 = B
2 = Performs slightly below standard expectations,     75-79 = C
but makes continuous progress     70-74 = D
1 = Performs at beginning level or below     69-below = F

A child who receives a grade of 1 in an academic area is required to attend tutorials. If a 2 is received in an academic area, tutorials are strongly recommended.

Grades will not be assigned in the shaded areas below.

| ACADEMIC AREAS | | 1 | 2 | 3 | 4 | 5 | 6 | Final |
|---|---|---|---|---|---|---|---|---|
| Language Arts | | | | | | | | |
| Reading | | | | | | | | |
| Reading Level: | Above | | | | | | | |
| (check one) | On | / | 97 | 94 | | | | |
| | Below | | | | | | | |
| Composition | | 88 | 92 | | | | | |
| Spelling | | 97 | 96 | | | | | |
| Math | | | | | | | | |
| Math Level: | Above | / | 100 | 91 | | | | |
| (check one) | On | | | | | | | |
| | Below | | | | | | | |
| Science/Health | | 98 | 89 | | | | | |
| Social Studies | | 87 | 93 | | | | | |
| Music | | 4 | 4 | | | | | |
| Art | | 4 | 4 | | | | | |
| Physical Education | | 4 | 4 | | | | | |

On-level performance indicates a student is performing at the state and local expectations for the assigned grade level. Students may receive differentiation in their instructional program in order to attain mastery of objectives in accordance with their academic needs. Only students functioning on grade level or above should be considered for promotion. Special education students will be promoted according to the achievement of their Individual Education Plan (IEP) goals.

Applicable for students learning English only:

| ESL (English as a Second Language) | | | | | | |
|---|---|---|---|---|---|---|

| CHARACTER EDUCATION (Applicable for all students) | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| *PRIDE* - produces quality work; completes assigned tasks | 4 | 4 | | | | |
| *CITIZENSHIP/SERVICE* - follows school and class rules | 4 | 4 | | | | |
| *RESPONSIBILITY* - makes appropriate choices; accepts responsibility for choices | 4 | 4 | | | | |
| *INTEGRITY* - demonstrates honesty and fairness to others | 4 | 4 | | | | |
| *COOPERATION* - works well with others | 4 | 4 | | | | |
| *RESPECT* - appreciates others' diversity; demonstrates consideration for self, peers, and authority | 4 | 4 | | | | |

### ADDITIONAL PROGRAMS/SUPPORT

Check indicates student is being served by the specialized program. Date indicates the time service began.

| | | | |
|---|---|---|---|
| _____ Special Education | ✓ ACE/LEAP |
| _____ English as a Second Language | _____ Bilingual |
| _____ Learning Center | _____ 504 |
| _____ Speech | _____ Tutoring |
| _____ Specialized Reading Support:_____ | |
| _____ Grades based on intensive teacher assistance | |

| NUMBER OF DAYS | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
| Absences | 1 | 0 | | | | | |
| Tardies | 0 | 0 | | | | | |

In accordance with state law, students must be in attendance for at least 90% of the days of the school year to be considered for promotion to the next grade level.

RAMSAY 4-0028

Appx889

| SCHOOL NAME | ST. JOSEPH PUBLIC SCHOOLS REPORT CARD | STUDENT NAME | STUDENT CODE |
|---|---|---|---|
| Brown Elementary | | RAMSAY JESSICA E | 487963 |

**SCHOOL MISSION STATEMENT:** We will prepare today's child to meet tomorrow's challenges.

YEAR: **2000-01**

CURRENT GRADE: **05**

HOMEROOM TEACHER: **S STOBBELAAR**

### ATTENDANCE RECORD

| MARKING PERIOD | 1 | 2 | 3 | 4 | TOTAL |
|---|---|---|---|---|---|
| PRESENT | 43.0 | 48.0 | | | 91.0 |
| ABSENT | .5 | | | | .5 |
| TARDY | | | | | |

PROMOTE TO: **06**
RETAINED IN:

| COURSE NUMBER | SUBJECT | TEACHER NAME | FIRST SEMESTER 1 GR | COM | FIRST SEMESTER 2 GR | COM | SECOND SEMESTER 1 GR | COM | SECOND SEMESTER 2 GR | COM | FINAL GRADE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10115 | LANGUAGE | STOBBELAAR | | | | | A | | A | | A |
| 10215 | READING | STOBBELAAR | | | | | A | | A | 0 | A |
| 10315 | SPELLING | STOBBELAAR | | | | | A | | A | | A |
| 10415 | HANDWRITING | STOBBELAAR | | | | | O | | O | | O |
| 10561 | MATHEMATICS | ROMMEL | | | | | A- | | A | | A |
| 10622 | SOCIAL STUDIES | LINGL | | | | | A- | 0 2 | A- | | A- |
| 10715 | SCIENCE/HEALTH | STOBBELAAR | | | | | A- | | A- | 1 | A- |
| 10864 | ART 5TH | DUNCAN | | | A- | | A | | A | | A |
| 10930 | VOCAL MUSIC 5 | SCHNEBLY | | | B+ | 2 | A- | 2 3 | A | | A- |
| 11004 | INSTRUM MUSIC | ENGLEMAN | | | | | A | | A | | A |
| 11158 | PHYS EDUC | SAYLOR | | | | | A | | A | 2 | A |
| | CITIZENSHIP ------> | | | | | O | O | | O | | |

### ADDRESS

RAMSAY      JESSICA    E
1438   OLD FARM LANE
ST. JOSEPH      MI 49085

"Citizenship" refers to the extent to which an individual displays positive attitudes, responsible behaviors, and respect for self and others.

### KEY TO GRADES(GR)

| | |
|---|---|
| A | Excellent |
| B | Above Average |
| C | Average |
| D | Below Average |
| E | Failing |
| N | Needs Improvement |
| | |
| O | Outstanding |
| S | Satisfactory |
| U | Unsatisfactory |

### COMMENTS(COM)

0 Excellent study skills
1 Positive class involvement
2 Is making a good effort
3 Shows Improvement
4 Performs poorly on tests
5 Does not follow directions
6 Incomplete work/Poor preparation
7 Inattentive/Poor use of time
8 Not working to ability
9 Does not know basic facts/skills

* MODIFIED PROGRAM          S. E. DESIGNATES SPECIAL EDUCATION

DEFENDANT'S EXHIBIT 16

RAMSAY-0036

BCISD FORM DP-SG-101

Appx890

Date Filed: 03/23/2020    Page: 173    Document: 23    Case: 20-1058

# ST. JOSEPH PUBLIC SCHOOLS

STUDENT _Jessica Ramsay_          SCHOOL _Brown_

GRADE _5_     SCHOOL YEAR _2000-01_     TEACHER _Stotlhar_

COMMENTS:

**1st Marking Period**

**2nd Marking Period** Jessica is doing beautiful work in all subject areas! It is a pleasure to work with her and I anticipate an excellent semester. If I were to grade her for this short period (2 weeks & ½), she'd have (A in Reading,

**3rd Marking Period** Language, Spelling and Science (Handwriting = C) :)
(23 of 30 Challenge spelling words correct)

(16 of 25 Challenge words correct)

**4th Marking Period** You've done fine work in all subject areas all semester, Jessica. Congratulations on winning second place in the original fiction category at our Science Expo! Keep on writing creatively and consider working on the school paper at Upton.

RAMSAY4-0037

# REPORT CARD

| SCHOOL NAME | STUDENT NAME | STUDENT CODE |
|---|---|---|
| **St. Joseph Public Schools** | RAMSAY JESSICA E | 000487963 |

| School | School Year | Home Room | Grade |
|---|---|---|---|
| Upton Middle | 2001-02 | 0207 | 06 |

| COURSE NUMBER | COURSE DESCRIPTION | TEACHER NAME | FIRST SEMESTER 1 CIT | GR | COM | FIRST SEMESTER 2 CIT | GR | COM | Exam | Final | SECOND SEMESTER 1 CIT | GR | COM | SECOND SEMESTER 2 CIT | GR | COM | Exam | Final |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60302 | READING | STRAUB | 5 | A- | 9 9 | 5 | A | 6 9 | | A | 5 | A- | 9 6 | 5 | A- | 9 7 | | A- |
| 63102 | BAND BRASS/B | ENGLEMAN | 5 | A | 9 | 5 | A | | | A | 5 | A- | 9 7 6 | 5 | A | 9 | | A |
| 69103 | PHYS ED | VANDERMEULEN | 5 | A | 9 | 5 | A | 6 | | A | 5 | A- | 9 | 5 | A | 6 | | A |
| 64006 | ART | WILSCHKE | 5 | A | 9 | | | | | A | | | | | | | | |
| 60707 | SOC STUD | MATZKE | 5 | A- | 9 6 | 5 | A | 7 9 | | A | 5 | A- | 9 6 | 5 | A | 6 9 | | A |
| 60207 | LANG ARTS | STRAUB | 5 | A- | 9 7 6 | 5 | A | 9 7 | | A | 5 | A- | 9 7 | 5 | A | 9 6 | | A |
| 62907 | COMPUTERS | WINTER | | | | 5 | A | 7 | | A | | | | | | | | |
| 61707 | SCIENCE | MATZKE | 5 | A | 9 6 | 5 | A | 7 9 | | A | 5 | A | 9 6 | 5 | A | 7 9 | | A |
| 65008 | MUSIC | WRIGHT | | | | | | | | | 5 | A | | | | | | A |
| 62509 | HOME EC | MANN | | | | | | | | | | | | 5 | A- | 9 | | A- |
| 71210 | TRANS MATH | MILLER | 5 | A- | 9 | 5 | A | 9 | | A | 5 | A- | 9 | 5 | A | 9 | | A |
| 62010 | IND ED | SONNEVIL | | | | | | | | | | | | 5 | A | 9 | | A |
| 10014 | HOMEROOM - 6 | MATZKE | | | | | | | | | 5 | | | | | | | |

## KEY TO GRADES (GR)
- A Excellent
- B Above Average
- C Average
- CR Credit
- D Below Average
- F Failing
- I Incomplete
- N No Mark

## KEY TO CITIZENSHIP
Student demonstrates self control, respect for adults, peers, and property, and observes classroom rules.
- 5 Always
- 4 Usually
- 3 Sometimes
- 2 Seldom
- 1 Never

## ADDITIONAL TEACHER COMMENTS

## KEY TO COMMENTS (COM)
- 9 Good Effort
- 8 Showing Improvement
- 7 Positive Attitude
- 6 Positive Class Participation
- 5 Needs to Improve Class Behavior
- 4 Not Prepared for Class/Missing Assignments
- 3 Not Working Up to Ability
- 2 Low Test Scores
- 1 Absences Affect Work
- 0 Modified Expectations

## Attendance information

| | 1 | 2 | TOTAL | 1 | 2 | TOTAL |
|---|---|---|---|---|---|---|
| Days Absent | 4.5 | 4.0 | 8.5 | 9.5 | 2.5 | 12.0 |

PROMOTED: 07
RETAINED:
PLACED IN:

PARENT'S SIGNATURE

DEFENDANT'S EXHIBIT 17

BCISD FORM RAMSAY-0039

Case: 20-1058    Document: 23    Page: 175    Date Filed: 03/23/2020

Iowa Tests of Basic Skills
and
Cognitive Abilities Test

Service 2a:
Profile Narrative Report
Parent Copy

| Student: | RAMSAY, JESSICA | Sex: F | Grade: 6 |
|---|---|---|---|
| I.D. No.: | | Brth Date: | REDACTED |
| Class/Group: | MATZKE | Age: 11 Yrs | 1 Mos |
| Building: | UPTON MIDDLE SCHOOL | Lvl/Form: 12/K | D/5 |
| Bldg. Code: | 5793 | Test Date: | 9/01 |
| System: | ST JOSEPH PUBLIC SCH | Norms: | FALL 1992 |
| Order No.: | 000-A1011171-00-001 | | Page: 119 |

| Iowa Tests of Basic Skills | Predicted Scores PGE PNPR | Obtained Scores NS NCE NPR | National Percentile Rank |
|---|---|---|---|
| Vocabulary | 10.2 95 | 7 70 83 | |
| Rdg. Comprehension | 12.1 85 | 6 59 66 | |
| Reading Total | 11.1 96 | 6 64 74 | |
| Spelling | 10.3 90 | 5 48 46 | |
| Capitalization | 13.0 92 | 5 55 59 | |
| Punctuation | 13.5 95 | 6 61 69 | |
| Usage & Expression | 13.4 95 | 9 88 97 | |
| Language Total | 12.9 97 | 6 63 74 | |
| Concepts/Estimate | 11.0 96 | 9 86 96 | |
| Probs/Data Interp. | 12.8 97 | 9 94 98 | |
| Math Total | 12.1 98 | 9 93 98 | |
| Core Total | 12.2 97 | 7 73 87 | |
| Social Studies | 12.5 95 | 5 49 48 | |
| Science | 12.6 94 | 8 82 94 | |
| Maps & Diagrams | 13.3 96 | 8 78 91 | |
| Reference Mat'ls | 12.5 96 | 8 76 89 | |
| Sources of Info Total | 12.9 97 | 8 79 92 | |
| Composite | 12.5 99 | 7 73 86 | |
| Math Computation | 9.8 94 | 6 61 70 | |

PGE=Pred Grade Equivalent, PNPR=Pred Nat'l %ile Rank, NS=Nat'l Sta9, NCE=Normal Curve Equivalent, NPR=Nat'l %ile Rank

| Cognitive Abilities Tests | N Items | N. Att | Raw Score | Age Scores SAS AS APR | Grade Scores NPR | National Grade Percentile Rank |
|---|---|---|---|---|---|---|
| Verbal | 65 | 65 | 61 | 134 9 98 | 98 | |
| Quantitative | 60 | 57 | 53 | 130 9 97 | 97 | |
| Nonverbal | 65 | 62 | 61 | 133 9 98 | 98 | |
| Composite | | | | 136 9 99 | 98 | |

SAS=Standard Age Score, AS=Nat'l Age Sta9, APR=Nat'l Age %ile Rank

Jessica was given the Iowa Tests of Basic Skills in September, 2001. She is in sixth grade at Upton Middle School in St Joseph Public Sch.

Jessica's Composite score is the score that best describes her overall achievement on the tests. Jessica's Composite national percentile rank of 86 means that she scored higher than 86 percent of sixth grade students nationally. Her overall achievement appears to be above average for sixth grade.

A student's scores can be compared with each other to determine relative strengths and weaknesses. The following are areas of relative strength for Jessica: Usage & Expression, Math Concepts & Estimation, and Math Problems & Data Interpretation. Some of these strengths might be used to help improve other areas. The following areas are relative weaknesses which may need the most work: Reading Comprehension, Spelling, Capitalization, Punctuation, Social Studies, and Math Computation.

Different students bring different patterns and levels of abilities to learning tasks. She was given the Cognitive Abilities Test to help find out about her abilities. Jessica's national percentile rank of 98 on verbal ability means that, compared with other sixth grade students nationally, Jessica scored higher than 98 percent. Jessica appears to be high in verbal ability. Jessica's national percentile rank is 97 in quantitative ability and 98 in nonverbal ability. Jessica seems to be high in quantitative ability and high in nonverbal ability. Jessica's composite national percentile rank of 98 is a general statement of her ability. She seems to be high in overall cognitive ability.

How are Jessica's achievement scores compared to her cognitive abilities scores? Jessica's actual achievement is lower than expected in seven test areas. These are Vocabulary, Reading Comprehension, Spelling, Capitalization, Punctuation, Social Studies, and Math Computation. These represent areas in which Jessica is not doing as well as she might be expected. Jessica might do better in these areas with additional effort and with continued encouragement.

RAMSAY1-0013


Riverside Publishing
A HOUGHTON MIFFLIN COMPANY

© 1996, 1993 The Riverside Publishing Company. All rights reserved.

Date Filed: 03/23/2020   Page: 176   Document: 23   Case: 20-1058

# Interpreting the Profile Narrative Report

The Profile Narrative Report displays the test scores of an individual student on the *Iowa Tests of Basic Skills (ITBS), Iowa Tests of Educational Development (ITED), Tests of Achievement and Proficiency (TAP),* or *Cognitive Abilities Test (CogAT).* This report is intended mainly to help parents, teachers, and students understand what the test results mean.

## The Graphic Display

The test names that appear on the left side of the report can vary depending on which grade the student is in and whether an achievement test or ability test (or both) was administered.

The *ITBS* batteries measure student achievement in kindergarten through grade 9. Three different batteries (Complete, Core, and Survey) measure reading, language, and mathematics achievement. In addition, the Complete Battery measures listening and word analysis in grades K–2 and social studies, science, and sources of information in grades 3–9.

The *ITED* Complete and Survey Batteries measure student achievement in grades 8–12 in reading, expression, and quantitative thinking. The Complete Battery also includes tests in literary materials, social studies, science, and sources of information.

The *TAP* Complete and Survey Batteries measure student achievement in grades 8–12 in reading, written expression, and mathematics. The Complete Battery also includes tests in social studies, science, and information processing.

The *CogAT* measures students' ability to reason and solve various types of problems. Verbal, quantitative, and nonverbal exercises are used to assess students' cognitive development.

In the columns next to the test names, any of several types of scores might be reported, depending on which ones your school ordered.

The grade equivalent (GE) describes a student's test performance in terms of grade levels in school. A GE of 4.5 means the student scored like the typical fourth-grade student who has just finished the fifth month of grade 4. The national percentile rank (NPR) tells what percent of the students in the nation in this same grade obtained a lower score than this student. A percentile rank of 37 means that 37 percent of students in the U.S. in this grade obtained lower scores than this student. The developmental standard score (SS) used with the achievement batteries describes students' academic development. Average scores obtained during spring testing are 200 in grade 4, 250 in grade 8, and 275 in grade 11. The stanine is like a nine-step ladder that goes from a low of one to a high of nine. It is used to compare a student's score with the scores of others in the same grade. The standard age score (SAS), used with *CogAT*, compares a student's measured ability to do school work with the abilities of other students in the nation who are the same age.

The graph of national percentile ranks shows either a bar graph or a set of percentile-rank confidence bands for each test listed on the left. When bar graphs are shown, the longest bars show the student's strongest areas, and the shortest bars show the weakest. When confidence bands are displayed, the student's relative strengths and weaknesses can be observed in much the same way. Furthermore, the score bands help to show that all test scores have some amount of error in them. In this case, there is a 50% probability that the student's true (error-free) percentile rank is within the band shown.

## The Written Interpretation

The first box describes the testing situation—the test name, date taken, grade, and school. In the second box, overall performance is described using the Composite (or Core Total) score. This score is based on averaging scores from most of the other test areas. The Composite grade equivalent and national percentile rank are both used to show what this student's test performance is like. On the reports of some students, a local percentile rank (LPR) permits a comparison with their grade peers in the local school system.

On achievement reports, the next box describes the student's reading performance compared with others in the same grade from throughout the nation. For younger students, Vocabulary and Listening performance might also be described. The next box identifies test areas that are considered strengths or weaknesses for this particular student. Even a student with very high overall achievement may have an area that could be regarded as a "relative" weakness. Likewise, a student with fairly low overall performance may have an area of "relative" strength. Note that the relative strengths or weaknesses are determined by comparing a student's separate test scores with his or her own overall (Composite) performance, not with the scores of other students.

When the *CogAT* has been taken, one box describes ability scores, and another compares the student's achievement scores with those predicted by the student's *CogAT* scores. When the actual and predicted achievement scores differ, we say that the student achieved over or under the level we would have predicted using her or his own *CogAT* scores. Because many factors other than ability influence a student's achievement, it is not unusual for actual achievement scores and predicted scores to differ. Further interpretive questions should be directed to the school.

RAMSAY1-0014

Case: 20-1058    Document: 23    Page: 177    Date Filed: 03/23/2020

Case: 20-1058    Document: 23    Page: 178    Date Filed: 03/23/2020

St Joseph 001

NBME01014

**GRADE 9**

RAMSAY JESSICA E
N: 1438 OLD FARM LANE
ST JOSEPH.    MI  49085
BIRTH DATE:    REDACTED

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 9 | SCHOOL YEAR 04-05 |
| 487963 ST JOSEPH SR | GRADES 1ST SEM / 2ND SEM | UNIT OF CREDIT | | TEACHER NAME |

| | 1ST SEM | 2ND SEM | CREDIT | TEACHER |
|---|---|---|---|---|
| AMER GOVT | A- | A- | 1.00 | ETTER |
| H ENGLISH 9 | A- | A | 1.00 | RADENBAUG |
| SPANISH 1-2 | A | A | 1.00 | MCCOMBER |
| H ALGEBRA 3- | A- | B+ | 1.00 | FOSTER |
| ART 3 | A- | | .50 | CLARK |
| ART 4 | | A | .50 | CLARK |
| TECH DRAWING | A | A | 1.00 | BERRY, J |
| PE/HEALTH (G | A | A | 1.00 | ZUHL |

| SCHOOL 11020010 | DAYS ABSENT .7.0 | TAKEN | POINT AVERAGE 3.81 | TOTAL CREDIT 7.00 |

**GRADE 10**

first    middle    birth date

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 10 | SCHOOL YEAR 05-06 |
| 487963 ST JOSEPH SR | GRADES 1ST SEM / 2ND SEM | UNIT OF CREDIT | | TEACHER NAME |

| | 1ST SEM | 2ND SEM | CREDIT | TEACHER |
|---|---|---|---|---|
| H ENGLISH 10 | A | A | 1.00 | DUMKE |
| SPANISH 3-4 | A- | A | 1.00 | MCCOMBER |
| WORLD HIST 1 | A | | .50 | CHURCH |
| WRLD.HIST 2 | | A | .50 | CHURCH |
| H TRIG/PRECA | A | B+ | 1.00 | MOORE |
| ARCH DRAW 1H | A | A | 1.00 | BERRY, J |
| H BIOLOGY 1- | A- | A- | 1.00 | SCHILLIO |

| SCHOOL 11020010 | DAYS ABSENT .7.0 | TARDY | POINT AVERAGE 3.86 | TOTAL CREDIT 6.00 |

## ST. JOSEPH HIGH SCHOOL
### 2521 Stadium Drive
### St. Joseph, Michigan 49085

Accredited-North Central Association
University of Michigan since 1892
Michigan Secondary School
since 1947
Dept. Public Instruction –
State of Michigan

G.P.A.  3.747

CLASS RANK  28  OUT OF 225

DATE ENTERED:_____

DATE OF LEAVING:_____

DATE OF GRADUATION: 6/1/08

**GRADE 11**

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 11 | SCHOOL YEAR 06-07 |
| 487963 ST JOSEPH SR | GRADES 1ST SEM / 2ND SEM | UNIT OF CREDIT | | TEACHER NAME |

| | 1ST SEM | 2ND SEM | CREDIT | TEACHER |
|---|---|---|---|---|
| H ENGLISH 11 | A- | A- | 1.00 | HUNTER |
| SPANISH 5-6 | A- | A- | 1.00 | SHEPPARD |
| AM CRIM JUST | A | | .50 | STINE |
| ECONOMICS | | A | .50 | CHURCH |
| AP US HISTOR | A- | A- | 1.00 | COLE |
| AP CALC AB | B+ | B+ | 1.00 | FOSTER |
| H CHEMISTRY | B+ | B- | 1.00 | LUCKRITZ |

| SCHOOL 11020010 | DAYS ABSENT 4.5 | TARDY | POINT AVERAGE 3.56 | TOTAL CREDIT 6.00 |

**GRADE 12**

| PUPIL NAME RAMSAY JESSICA E | | | GRADE 12 | SCHOOL YEAR 07-08 |
| 487963 ST JOSEPH SR | GRADES 1ST SEM / 2ND SEM | UNIT OF CREDIT | | TEACHER NAME |

| | 1ST SEM | 2ND SEM | CREDIT | TEACHER |
|---|---|---|---|---|
| IS SPANISH 7 | A- | A | 1.00 | SHEPPARD |
| COLLEGE WRIT | A | | .50 | NEALER |
| COLLEGE WRIT | | A- | .50 | NEALER |
| AP CALC BC | B | B+ | 1.00 | NIESSE |
| DANCE | | A | .50 | GRAZIANO |
| DANCE | A | | .50 | GRAZIANO |
| DANCE-INTERM | A | | .50 | GRAZIANO |
| DANCE-INTERM | | A | .50 | GRAZIANO |
| H PHYSICS 1- | A- | A | 1.00 | NICHOLIE |

| SCHOOL 11020010 | DAYS ABSENT 8.0 | TARDY | POINT AVERAGE 3.73 | TOTAL CREDIT 6.00 |

**Grading Scale:**

| | | | |
|---|---|---|---|
| A | Superior | = | 4.000 |
| A- | | = | 3.667 |
| B+ | | = | 3.333 |
| B | Good | = | 3.000 |
| B- | | = | 2.667 |
| C+ | | = | 2.333 |
| C | Average | = | 2.000 |
| C- | | = | 1.667 |
| D+ | | = | 1.333 |
| D | Poor | = | 1.000 |
| D- | | = | .667 |
| F | Failure | = | 0 |
| Cr | "Credit" | = | 0 |
| N | "No Mark" | = | 0 |

Signature of High School Principal

see reverse side for possible additional documentation

DEFENDANT'S EXHIBIT
**18**

Appx895

**Alumni History**

St. Joseph H.S.
2521 Stadium Drive
Saint Joseph, MI 49085

Kevin J. Guzzo
School Phone: 269-926-3220
Fax: 269-983-1470
kguzzo@sjschools.org

# RAMSAY, JESSICA                    2008

| | | | |
|---|---|---|---|
| **Fall**<br>Girls Varsity JV Swim | School Year: 04-05 | | Lttr, Chev 1, #'s, bear |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 04-05 | 17 | cert |
| **Winter**<br>Girls Freshman Volleyball | School Year: 04-05 | 4 | Cert |
| **Fall**<br>Girls Varsity JV Swim | School Year: 05-06 | | Chev 2 |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 05-06 | 14 | Cert |
| **Winter**<br>Girls Junior Varsity Volleyball | School Year: 05-06 | 24 | cert    MH |
| **Fall**<br>Girls Varsity JV Swim | School Year: 06-07 | | Chev 3 |
| **Spring**<br>Girls Junior Varsity Soccer | School Year: 06-07 | 14 | cert |
| **Fall**<br>Girls Varsity JV Swim | School Year: 07-08 | | Chev 4, Captain Star |
| **Spring**<br>Girls Varsity Soccer | School Year: 07-08 | 14 | Chev 1 |

Schedule Star



St. Joseph 015

NBME01028

St. Joseph 003

NBME01016

Case: 20-1058    Document: 23    Page: 180    Date Filed: 03/23/2020

RAMSAY, JESSICA E.
1438 OLD FARM LANE
ST. JOSEPH   MI. 49085

**TEST RESULTS**
(CEEB: 233385)

**ST. JOSEPH HIGH SCHOOL**
2521 Stadium Drive
St. Joseph, MI 49085

MALE____ FEMALE____ DATE OF BIRTH:_____

**STUDENT NUMBER:** _____

## PLAN

| RAMSAY   JESSICA E | | | | | ID NUMBER | |
|---|---|---|---|---|---|---|
| NAME OF STUDENT | | | | | | |

| plan | ENG | MATH | READ | SCI | COMP | TEST DATE | 11/02/05 |
|---|---|---|---|---|---|---|---|
| | | | | | | ENGLISH 1 SUB SCORES | MATH SUB SCORES |
| SCALE SCORES | 26 | 27 | 18 | 20 | 23 | 14 | 13 | 14 | 15 |
| % AT OR BELOW | 98 | 99 | 73 | 88 | 97 | U/M | RS | ALG | GEOM |

## ACT

| RAMSAY, JESSICA E | | | | | REDACTED | | REDACTED |
|---|---|---|---|---|---|---|---|
| NAME OF STUDENT | | | | | SOCIAL SECURITY NUMBER | | DATE OF BIRTH |

| The ACT® | | | | | COMBINED ENGLISH/ WRITING | WRITING (SCORE RANGE 2-12) | TEST DATE & TEST TYPE |
|---|---|---|---|---|---|---|---|
| | ENGLISH | MATH | READING | SCIENCE | COMPOSITE | | | |
| SCORES: | 31 | 25 | 28 | 24 | 27 | 27 | 06 | 03/07 |
| PERCENT AT OR BELOW NAT'L COMP: | | | | | 98 | | | STATE |

| RAMSAY, JESSICA E | | | | | REDACTED | | REDACTED |
|---|---|---|---|---|---|---|---|
| NAME OF STUDENT | | | | | SOCIAL SECURITY NUMBER | | DATE OF BIRTH |

| The ACT® | | | | | COMBINED ENGLISH/ WRITING | WRITING (SCORE RANGE 2-12) | TEST DATE & TEST LOCATION |
|---|---|---|---|---|---|---|---|
| | ENGLISH | MATH | READING | SCIENCE | COMPOSITE | | | |
| SCORES: | 30 | 30 | 30 | 31 | 30 | 28 | 08 | 10/07 |
| PERCENT AT OR BELOW NAT'L COMP: | | | | | 97 | | | NATIONAL |

### PSAT/NMSQT

| Last RAMSAY | | First JESSICA | | M.I. E |
|---|---|---|---|---|
| | Scores | | Percentiles | |
| Critical Reading | 49 | | 71 | Year 05 |
| Math | 79 | | 99 | Grade 10 |
| Writing Skills | 44 | | 49 | Optional Code |
| Selection Index | 163 * | | 71 | School Code 233385 |

**PSAT/NMSQT**

| Last RAMSAY | | First JESSICA | | M.I. E |
|---|---|---|---|---|
| | Scores | | Percentiles | |
| Critical Reading | 54 | | 70 | Year 06 |
| Math | 68 | | 95 | Grade 11 |
| Writing Skills | 50 | | 65 | Optional Code |
| Selection Index | 172 | | 82 | School Code 233385 |

**PSAT/NMSQT**

### SAT I

### SAT II

RAMSAY                    JESSICA    E
AP EXAM GRADES   REDACTED
08: CALBC    3
08: AB SUB   4
07: USHI     2
07: CALAB    3

*St. Joseph High School*
**OFFICIAL SEAL**

| RAMSAY, JESSICA E | | | | | | | | −W07;529033| |
|---|---|---|---|---|---|---|---|---|---|
| ST JOSEPH PUBLIC HS | | | | | | | 03/2007 | | |

| WorkKeys | Applied Math (3-7) | Applied Tech (3-6) | Listening (1-5) | Locating Info (3-6) | Observation (3-6) | Reading (3-7) | Teamwork (3-6) | Writing (1-5) |
|---|---|---|---|---|---|---|---|---|
| SCORES: | 6 | x | x | x | x | 6 | x | x |

Note: Score ranges are in parentheses; X = assessment not taken.

St. Joseph 004

# HIGH SCHOOL PROFIENCY TEST (HSPT) SCORES

| Ramsay, Jessica.E. | | | 11020 ST. JOSEPH PUBLIC SCHOOLS<br>03783 ST. JOSEPH HIGH SCHOOL |
| --- | --- | --- | --- |
| UIC# 9751308446<br>STU# 000487963<br>DOB REDACTED<br>Gander- F.<br>Ethnic- 5.<br>Grade- 11<br>Spring 2007<br>*mme*™ | Subject | Scale Score | Performance Level |
| | ELA Total | 1143 | 2-Met Standards |
| | Reading | 1145 | 2-Met Standards |
| | Writing | 1140 | 2-Met Standards |
| | Mathematics | 1127 | 2-Met Standards |
| | Science | 1140 | 2-Met Standards |
| | Social Studies | 1157 | 1-Exceeded Standards |

*OTHER TEST INFORMATION*

NBME01017



2008

# Senior Athletic

# Awards

## May 19, 2008

St. Joseph 06

DEFENDANT'S
EXHIBIT
**20**



**2008**
**Senior Athletic Awards Night**
**Monday, May 19, 2008**
**St. Joseph High School Auditorium**

I.  Introduction

II. Senior Class Athletic Honors—2004 through 2008

2008 Senior Class—281 Students          Average GPA   2.98
2008 Senior Class—93 Athletes           Average GPA   3.18

**STATE TITLES**
Men's Tennis                     Fall 2007

**REGIONAL TITLES**
Men's Tennis                     2005, 2006, Spring 2007, Fall 2007
Women's Cross Country            2004
Women's Track                    2005, 2007
Baseball                         2005
Football                         2007

**DISTRICT CHAMPIONS**
Volleyball                       2004, 2006
Men's Basketball                 2005, 2006
Baseball                         2005, 2006
Men's Soccer                     2005
Football                         2007

**DIVISION CHAMPIONS**
Men's Soccer                     2004, 2005, 2006
Women's Track                    2005, 2006, 2007
Baseball                         2005
Men's Tennis                     2005, 2006, 2007
Women's Tennis                   2004, 2005
Competitive Cheer                2004, 2005, 2006
Volleyball                       2005, 2006
Women's Cross Country            2004
Men's Cross Country              2004, 2005, 2006, 2007
Women's Golf                     2004
Men's Swim                       2005, 2006
Men's Track                      2008

**CONFERENCE CHAMPIONS**
Men's Tennis                     2005, 2007 Spring, 2007 Fall
Men's Swim                       2005, 2006
Women's Tennis                   2006

St. Joseph 017

NBME01030

# STATE HONORS

## STATE CHAMPION

| | | |
|---|---|---|
| Matthew Gregory | Men's Swimming–100 Butterfly | 2008 |
| Michael Sendor | Men's Tennis–#1 Doubles | Fall 2007 |
| Henrique Niehues | Men's Tennis–#1 Doubles | Fall 2007 |

## ALL STATE

| | | |
|---|---|---|
| Matthew Gregory | Men's Swimming | 2007, 2008 |
| Jacob Pallas | Men's Swimming | 2008 |
| Kelsey Lutz | Competitive Cheer | 2008 |
| Vikram Arora | Men's Tennis | Spring 2007, Fall 2007 |
| Michael Sendor | Men's Tennis | Spring 2007, Fall 2007 |
| Henrique Niehues | Men's Tennis | Spring 2007, Fall 2007 |
| Bradley Guinane | Football | 2007 |
| Ethan Schwein | Football | 2007 |
| Alicia Sarola | Competitive Cheer | 2008 Honorable Mention |
| Kevin O'Connell | Men's Soccer | 2007 Honorable Mention |

## ALL REGIONAL

| | | |
|---|---|---|
| Kelsey Lutz | Competitive Cheer | 2008 |
| Alicia Sarola | Competitive Cheer | 2008 |
| Katelyn Galles | Competitive Cheer | 2008 |
| Kevin O'Connell | Men's Soccer | 2007 |

## ALL DISTRICT

| | | |
|---|---|---|
| Sara Cobb | Softball | 2007 |
| Deborah Larsen | Women's Soccer | 2007 |
| Kyle Fellows | Men's Soccer | 2007 |
| Scott Giffels | Men's Soccer | 2007 |
| George Kolettis | Men's Soccer | 2007 |

## ACADEMIC ALL STATE

| | | |
|---|---|---|
| Football Team | 2006 | |
| Men's Soccer Team | 2006 | |
| Women's Soccer Team | 2007 | |
| Men's Swimming Team | 2007 | |
| Women's Golf | 2007 | |
| Men's Cross Country Team | 2007 | |
| Deborah Larsen | Women's Soccer | 2008 |
| Jessica Ramsay | Women's Soccer | 2008 |
| Emily Cook | Women's Golf | 2007 |
| Olivia Starks | Women's Golf | 2007 |
| Meghan Vukorpa | Women's Golf | 2007 |
| Matthew Gregory | Men's Swimming | 2007 |
| Benjamin Damschroder | Men's Swimming | 2007 |
| Jacob Pallas | Men's Swimming | 2007 |
| Vikram Arora | Men's Tennis | 2005, 2006, Spring 2007, Fall 2007 |
| Kerim Kaylan | Men's Tennis | 2005, 2006, Spring 2007, Fall 2007 |
| Michael Sendor | Men's Tennis | 2005, 2006, Spring 2007, Fall 2007 |
| Benjamin Baumgartner | Men's Tennis | 2005, 2006, Spring 2007, Fall 2007 |
| Henrique Niehues | Men's Tennis | Spring 2007, Fall 2007 |
| Kevin Yircott | Men's Tennis | Fall 2007 |
| Benjamin Damschroder | Men's Cross Country | 2007 |
| Philip Brown | Men's Cross Country | 2007 |
| George Kolettis | Men's Soccer | 2007 |
| Kyle Fellows | Men's Soccer | 2007 |

St. Joseph 018

NBME01031

# BIG 16 ALL CONFERENCE AND DIVISION TEAM MEMBERS

| | | |
|---|---|---|
| Men's Basketball | Burnell Granderson | 2008 |
| | Bradley Guinane | 2006, 2007, 2008 |
| | Kevin O'Connell | 2007 Honorable Mention, 2008 |
| Women's Basketball | Emily Laukus | Fall 2007 Honorable Mention |
| Competitive Cheer | Katelyn Galles | 2008 |
| | Kelsey Lutz | 2008 |
| | Alicia Sarola | 2008 |
| Men's Cross Country | Ben Damschroder | 2006, 2007 |
| Football | Benjamin Baumgartner | 2006 Honorable Mention |
| | Anthony Grandberry | 2006 Honorable Mention, 2007 |
| | Bradley Guinane | 2005, 2006, 2007 |
| | Michael Mavis | 2007 |
| | Justin Puckett | 2006, 2007 |
| | Andrew Rosenthal | 2007 |
| | Patrick Schalk | 2007 |
| | Ethan Schweir | 2004, 2006, 2007 |
| | Brett Virgil | 2005, 2007 |
| Women's Golf | Emily Cook | 2007 |
| Men's Soccer | Kyle Fellows | 2007 |
| | Scott Giffels | 2007 Honorable Mention |
| | George Kolettis | 2007 Honorable Mention |
| | Kevin O'Connell | 2006 Honorable Mention, 2007 |
| | Eric Phillips | 2007 Honorable Mention |
| Women's Soccer | Kelli Celmer | 2005 HM, 2006 HM, 2007 HM |
| | Deborah Larsen | 2007 |
| Softball | Sara Cobb | 2007 |
| Men's Swimming | Benjamin Damschroder | 2008 |
| | Matthew Gregory | 2005, 2006, 2008 |
| | Jacob Pallas | 2006, 2007, 2008 |
| Women's Swimming | Cori Maychsazk | 2007 |
| Men's Tennis | Vikram Arora | 2005, 2006, Spring 2007, Fall 2007 |
| | Henrique Niehues | Spring 2007, Fall 2007 |
| | Michael Sendor | Spring 2007, Fall 2007 |
| Volleyball | Sella Gambrell | 2006 HM, Winter 2007, Fall 2007 |
| | Emily Laukus | Winter 2007, Fall 2007 Honorable Mention |
| Wrestling | Ivon Hays | 2007 |
| | Jay Pendergrass | 2007 Honorable Mention |

St Joseph 019

NBME01032

III.    DIVISIONAL COACHES OF THE YEAR

Mark Laukus            Men's Track
Pat Hoffmann           Men's Tennis
Mike Mahler            Men's Cross Country
Elliot Uzelac          Football
Gregg Schaffer         Men's Basketball—co-winner

IV.    SENIOR ATHLETIC PLAQUE AWARDS

| | | |
|---|---|---|
| Vikram Arora | Benjamin Baumgartner | Cameron Brogan |
| Philip L. Brown | Danielle Burk | Lori Chen |
| Sara Cobb | Emily Cook | Benjamin Damschroder |
| Christopher Davis | Jordan Edwards | Laura Fields |
| Joshua Fisher | Kevin Foster | Selia Gambrell |
| Burnell Granderson | Matthew Gregory | Bradley Guinane |
| Ivon Hays | Kerim Kaylan | Katlin Knaak |
| Deborah Larsen | Emily Laukus | Kelsey Lutz |
| Cori Maychszak | Kevin O'Connell | Jacob Pallas |
| Jessica Ramsay | Alicia Sarola | Ethan Schweir |
| Michael Sendor | Brett Virgil | Joseph Wasserman |

V.    SOUTHWESTERN MICHIGAN ATHLETIC CONFERENCE
       ACADEMIC ALL CONFERENCE MEMBERS
       GPA OF 3.5 OR BETTER

| | | | |
|---|---|---|---|
| Vikram Arora | Kelly Brash | Marie Burkard | Lori Chen |
| Michael Curtis | Emily Cook | Jordan Edwards | Ignacio Espino |
| Selia Gambrell | Scott Giffels | Matthew Gregory | Bryan Henriquez |
| Kerim Kaylan | George Kolettis | Deborah Larsen | Benjamin Lubbers |
| Kelsey Lutz | Sylwia Migas | Eric Phillips | Justin Puckett |
| Jessica Ramsay | Sergiy Rogalin | Patrick Russell | Patrick Schalk |
| Elisha Schoeplein | Ethan Schweir | Leslie Shellito | Brett Virgil |
| Stephanie Voss | Meghan Vukorpa | Joseph Wasserman | Ryan Woods |
| Kevin Yircott | Ashley Zebell | | |

St. Joseph 30

NBME01033

# Your *plan* Score Report

DEFENDANT'S EXHIBIT
**29**

RAMSAY, JESSICA E
1438 OLD FARM LANE
SAINT JOSEPH, MI 49085

**GRADE: 10**
**SORT CODE: 032**

**SCHOOL NAME:** SAINT JOSEPH HIGH SCHOOL    **SCHOOL CODE:** 233385    **TEST FORM:** 28B    **TEST DATE:** November 2, 2005

**ACT**



| | Score Range (1-32) | In the U.S. (Fall 10th) | In Your School | In Your District | In Your State | College-Bound 10th |
|---|---|---|---|---|---|---|
| **Composite Score** | 23 | 97% | | | | 96% |
| **English** | 26 | 98% | | | | 98% |
| Usage/Mechanics (1-16) | 14 | 97% | | | | 97% |
| Rhetorical Skills (1-16) | 13 | 96% | | | | 95% |
| **Mathematics** | 27 | 99% | | | | 96% |
| Pre-Alg./Algebra (1-16) | 14 | 97% | | | | 96% |
| Geometry (1-16) | 15 | 99% | | | | 99% |
| **Reading** | 18 | 73% | | | | 69% |
| **Science** | 20 | 88% | | | | 85% |

More Info at www.planstudent.org

**Your Estimated ACT Composite Score Range**
**24-28**
Use this score range to help plan for college.

**Your Educational Plans for After High School**
Graduate/Professional Studies

## Your High School Course Plans Compared to Core

Core means minimum number of high school courses recommended to prepare for college.



| | 0 Years | 1 Year | 2 Years | 3 Years | 4 Years | 5+ Years |
|---|---|---|---|---|---|---|
| English | You: / Core: | | | | | |
| Mathematics | You: / Core: | | | | | |
| Social Studies | You: / Core: | | | | | |
| Science | You: / Core: | | | | | |

**About Your Course Plans.** You are planning to take all of the recommended courses—excellent! Prepare for your future by following through on these plans.

## College Readiness

Students scoring at or above these PLAN benchmark scores, and taking college prep courses throughout high school, will likely be ready for first-year college courses. How do your scores compare?

| | PLAN Benchmark Scores | Your score is: Below | At | Above |
|---|---|---|---|---|
| English | 15 | | | ✓ |
| Mathematics | 19 | | | ✓ |
| Reading | 17 | | | ✓ |
| Science | 21 | ✓ | | |

**About Your Scores.** One or more of your PLAN scores fall below the benchmark scores that show readiness for college-level work. Suggestions for improving your skills are listed on the back of this report. Also, talk to your counselor or teacher about courses that can improve your skills. Check college websites to learn more about their admission requirements.

## Admission Standards

Colleges differ in their admission standards. For example, most students in "selective" colleges have ACT Composite scores in the range of 21 to 26. Some admitted students may have scores outside the range.

| Admission Standard | Typical Scores |
|---|---|
| Open | 16–21 |
| Traditional | 18–24 |
| Selective | 21–26 |
| Highly Selective | 25–30 |

## Profile for Success

**Your Career Area Preference**
Engineering & Technologies

Successful college sophomores in majors related to your preferred Career Area typically have ACT Composite scores of:
23-27
See *Using Your PLAN Results.*

RAMSAY1-0015

**Your reported needs**
- Making plans for my education, career, and work after high school
- ✓ Improving my writing skills
- ✓ Improving my reading speed and comprehension
- Improving my study skills
- Improving my mathematical skills
- Improving my computer skills
- Improving my public speaking skills

Case: 20-1058    Document: 23    Page: 187    Date Filed: 03/23/2020

## Your Career Possibilities

### STEP 1: You and the World of Work

The World-of-Work Map is your key to hundreds of jobs in the work world. The Map shows 26 Career Areas (groups of similar jobs) according to their basic work tasks involving people, things, data, and ideas.

The Map is divided into 12 regions. Each region has a different mix of work tasks. For example, Career Area P (Natural Science & Technologies) mostly involves working with ideas and things.

### STEP 2: Your Interests

When you completed PLAN you were asked to:
• choose a Career Area you would like.
• complete an interest inventory.

Your results are shown on the World-of-Work Map below.
• You chose Career Area O: Engineering & Technologies.
• Your interests fall in region 99. This means that your interests do not show a clear direction right now.

### STEP 3: Exploring Career Options

The Career Area List below shows examples of jobs in each of the 26 Career Areas. Review all of the Career Areas, especially the one that is shaded.

Circle at least two Career Areas that have jobs you might like best.

Find out more about jobs that are right for you. Use the tips in your booklet, or go to www.planstudent.org.

### World-of-Work Map



**Information for Counselors**  Scores: R6 I5 A6 S6 E3 C6
%Like, Indifferent, Dislike: 42—0—58

### Career Area List

**A. Employment-Related Services**
Human Resources Manager; Recruiter; Interviewer

**B. Marketing & Sales**
Agents (Insurance, Real Estate, etc.); Retail Salesworker

**C. Management**
Executive; Office Manager; Hotel/Motel Manager

**D. Regulation & Protection**
Food Inspector; Police Officer; Detective

**E. Communications & Records**
Secretary; Court Reporter; Office Clerk

**F. Financial Transactions**
Accountant; Bank Teller; Budget Analyst

**G. Distribution & Dispatching**
Warehouse Supervisor; Air Traffic Controller

**H. Transport Operation & Related**
Truck/Bus/Cab Drive; Ship Captain; Pilot

**I. Agriculture, Forestry & Related**
Farmer; Nursery Manager; Forester

**J. Computer & Information Specialties**
Programmer; Systems Analyst; Desktop Publisher; Actuary

**K. Construction & Maintenance**
Carpenter; Electrician; Bricklayer

**L. Crafts & Related**
Cabinetmaker; Tailor; Chef/Cook; Jeweler

**M. Manufacturing & Processing**
Tool & Die Maker; Machinist; Welder; Dry Cleaner

**N. Mechanical & Electrical Specialties**
Auto Mechanic; Aircraft Mechanic; Office Machine Repairer

**O. Engineering & Technologies**
Engineers (Civil, etc.); Technicians (Laser, etc.); Architect

**P. Natural Science & Technologies**
Physicist; Biologist; Chemist; Statistician

**Q. Medical Technologies (also see Area W)**
Pharmacist; Optician; Dietitian; Technologists (Surgical, etc.)

**R. Medical Diagnosis & Treatment (also see Area W)**
Physician; Pathologist; Dentist; Veterinarian; Nurse Anesthetist

**S. Social Science**
Sociologist; Political Scientist; Economist; Urban Planner

**T. Applied Arts (Visual)**
Artist; Illustrator; Photographer; Interior Designer

**U. Creative & Performing Arts**
Writer; Musician; Singer; Dancer; TV/Movie Director

**V. Applied Arts (Written & Spoken)**
Reporter; Columnist; Editor; Librarian

**W. Health Care (also see Areas Q and R)**
Recreational Therapist; Dental Assistant; Licensed Practical Nurse

**X. Education**
Administrator; Athletic Coach; Teacher

**Y. Community Services**
Social Worker; Lawyer; Paralegal; Counselor; Clergy

**Z. Personal Services**
Waiter/Waitress; Barber; Cosmetologist; Travel Guide

RAMSAY1-0016

© 2005 by ACT, Inc. All rights reserved.

## Your Skills

**More Info at www.planstudent.org**

Review Your Answers — "+" = correct answer, "o" = no response.
Ask for your test booklet so you can see the questions.

Suggestions for improving your skills are based on your scores.

### English

**SUBSCORE AREA** (u = Usage; r = Rhetorical Skills)

| Question | Correct Answer | Your Answer | Subscore | Question | Correct Answer | Your Answer | Subscore | Question | Correct Answer | Your Answer | Subscore |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | D | + | u | 18 | F | + | u | 35 | B | + | u |
| (2) | H | F | r | 19 | D | + | u | 36 | H | + | u |
| 3 | B | + | r | 20 | F | + | r | 37 | D | + | r |
| 4 | G | + | u | 21 | B | + | u | 38 | G | + | u |
| 5 | C | + | u | 22 | G | + | u | 39 | D | + | u |
| 6 | H | + | u | 23 | D | + | u | (40) | H | G | r |
| 7 | G | + | u | 24 | H | + | u | (41) | A | B | u |
| 8 | G | + | u | 25 | B | + | r | 42 | G | + | u |
| 9 | D | + | r | 26 | F | + | r | 43 | D | + | r |
| 10 | F | + | u | 27 | C | + | r | 44 | F | + | u |
| 11 | D | + | u | 28 | J | + | u | 45 | D | + | u |
| 12 | F | + | u | 29 | A | + | r | 46 | J | + | r |
| 13 | C | + | r | 30 | F | + | u | 47 | B | + | u |
| 14 | H | + | r | (31) | D | A | u | 48 | H | G | u |
| 15 | C | + | r | 32 | F | + | u | 49 | A | B | r |
| 16 | G | + | r | 33 | C | + | u | 50 | H | + | r |
| 17 | A | + | r | 34 | F | + | r | | | | |

*guessed b/c run out of time*

- You correctly answered 44 out of 50 questions.
- You omitted 0 questions.
- You incorrectly answered 6 questions.

| Content Areas | To improve your skills you can: |
|---|---|
| Topic Development | try to reread your paper the way you think your audience would, asking yourself whether more or less information would be helpful |
| | use a dictionary or thesaurus to become better aware of the *connotations*, or associations, conveyed by the words you use |
| Organization | improve paragraphs by clarifying the transition words or phrases within and between paragraphs |
| | revise and reorder sentences and paragraphs to shape a paper into a clear, orderly whole |
| | move sentences and paragraphs within a paper to make it easier to understand |
| Word Choice | make sure your writing is not unnecessarily repetitive, especially in formal papers |
| | write the same idea one way, then another, searching for the best language |
| | use precise, descriptive words to help readers see your idea (for example, "an antique four-poster bed with a handmade quilt") |
| Sentence Structure | combine short sentences into a series with conjunctions and punctuation |
| | reread the entire paper to make sure the verb tenses and pronouns are logical and consistent, or vary for a good reason |
| Usage | write sentences using *its* and *it's*, *your* and *you're*, *who* and *whom* to learn correct use |
| | check subject-verb agreement in more sophisticated sentences |
| Punctuation | use commas to set off nonessential clauses (for example, "Franklin, who experimented with lightning, was a founding father of the nation.") |
| | write correctly punctuated sentences that save the main idea for the end (for example, "Earnestly, in his old bathrobe, in the garage, Joe spoke with the ghost.") |

### Mathematics

**SUBSCORE AREA** (a = Algebra; g = Geometry)

| Question | Correct Answer | Your Answer | Subscore | Question | Correct Answer | Your Answer | Subscore | Question | Correct Answer | Your Answer | Subscore |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | D | + | a | 15 | A | + | g | 29 | D | + | g |
| (2) | H | K | a | 16 | F | + | g | 30 | K | + | a |
| 3 | B | + | g | 17 | C | + | a | 31 | C | + | a |
| 4 | H | + | a | 18 | H | + | g | 32 | H | + | a |
| 5 | C | + | a | 19 | A | + | g | 33 | C | + | a |
| 6 | K | + | a | 20 | F | + | a | 34 | K | + | g |
| 7 | C | + | a | 21 | D | + | a | 35 | C | + | a |
| 8 | J | + | g | (22) | G | F | a | 36 | F | + | g |
| 9 | E | + | a | 23 | E | + | a | 37 | C | B | g |
| 10 | F | + | g | 24 | J | + | a | 38 | G | J | g |
| 11 | B | + | g | 25 | B | + | a | 39 | D | C | g |

| Content Areas | To improve your skills you can: |
|---|---|
| Basic Operations | perform multiple conversions of units (for example, miles per hour to feet per second, and gallons per mile to liters per kilometer) |
| | calculate the price of items discounted several times |
| Probability | roll a 6-sided fair number cube and flip 2 coins—one possible outcome is 6HT and another is 3TT; determine the total number of outcomes using an organized list and practice calculating probabilities (for example, probability of an even number with 1 head and 1 tail) |
| Numbers: Concepts and Properties | practice applying number properties to express numbers in different ways (for example, $8x^3 = (2x)^3$) |
| Expressions, Equations, and Inequalities | discuss with your teacher how to work with expressions, equations, and inequalities (for example, $\frac{1}{2}x + \frac{1}{2} = -18$ is equivalent to $9x + 10 = -216$) |
| | practice solving linear inequalities that require multiplication or division of a negative (for example, $-2y > -4x + 8$; $y < 2x - 4$) |
| | practice solving absolute value equations (for example, $|3x| = 9$, so $x = 3$ or $x = -3$) |
| Graphical | draw coordinate maps of your school, home, town, etc., and determine the distances between |

**RAMSAY1-0017**

| 12 | F | a | 26 | G | H | a | 40 | J | K | g |
| 13 | E | a | 27 | D | a | | | | | |
| 14 | K | a | 28 | F | g | | | | | |

*guessed b/c ran out of time*

| Representations | points using the distance formula; physically check your distance calculation |
| | practice writing equations of a line using the concepts of parallel and perpendicular slopes (for example, $y = 3x - 6$ is parallel to $y = 3x + 102$) |
| Properties of Plane Figures | look for opportunities to identify and use similar or congruent shapes to solve problems (for example, using similar triangles to find the unknown height) |
| Measurement | calculate lengths of unknown dimensions of geometric figures when given their area or perimeter |

- You correctly answered 33 out of 40 questions.
- You omitted 0 questions.
- You incorrectly answered 7 questions.

## Reading

| Question | Correct Answer | Your Answer | Question | Correct Answer | Your Answer | Question | Correct Answer | Your Answer |
|---|---|---|---|---|---|---|---|---|
| 1 | C | + | 10 | F | + | 19 | C | A |
| 2 | F | G | 11 | A | + | 20 | F | J |
| 3 | B | + | 12 | G | + | 21 | D | A |
| 4 | J | F | 13 | B | + | 22 | G | H |
| 5 | B | + | 14 | F | + | 23 | C | B |
| 6 | G | + | 15 | C | + | 24 | G | F |
| 7 | A | + | 16 | J | + | 25 | A | D |
| 8 | J | + | 17 | D | B | | | |
| 9 | A | C | 18 | J | H | | | |

*guessed bc ran out of time*

| Content Areas | To improve your skills you can: |
| Main Ideas and Author's Approach | decide whether a paragraph in a short story or novel has its own main idea or serves mainly to support another point |
| Supporting Details | explain in your own words why certain facts or details are important to the meaning of an essay, a film, an ad, a picture, etc. |
| Relationships | highlight words or phrases in a cartoon strip, short story, or novel that suggest what happened first, second, etc. |
| | pick an event in a piece of writing and find statements that clearly show the reason(s) it happened and the final result(s) |
| Meanings of Words | figure out the meaning of words or descriptive phrases by looking for clues in the writing (for example, how the word is used [noun, verb, etc.]; if other sentences define or provide hints about its meaning; if the word looks like other words you know) |
| Generalizations and Conclusions | review a variety of materials, looking for statements that oversimplify ideas or stereotype people (for example, "All girls want to get married and have children.") |
| | identify details in a challenging text that support or challenge conclusions drawn by the author or narrator and by you or your friends |

- You correctly answered 13 out of 25 questions.
- You omitted 0 questions.
- You incorrectly answered 12 questions.

## Science

| Question | Correct Answer | Your Answer | Question | Correct Answer | Your Answer | Question | Correct Answer | Your Answer |
|---|---|---|---|---|---|---|---|---|
| 1 | C | D | 11 | C | + | 21 | A | C |
| 2 | G | + | 12 | G | F | 22 | J | H |
| 3 | D | + | 13 | C | D | 23 | C | A |
| 4 | J | + | 14 | J | + | 24 | H | G |
| 5 | B | + | 15 | D | + | 25 | B | + |
| 6 | F | + | 16 | F | + | 26 | H | + |
| 7 | C | + | 17 | A | + | 27 | A | + |
| 8 | G | + | 18 | H | J | 28 | G | F |
| 9 | A | D | 19 | D | + | 29 | D | A |
| 10 | F | + | 20 | G | + | 30 | J | + |

*skipped went back + guessed bc ran out of time*

| Content Areas | To improve your skills you can: |
| Interpretation of Data | write a math expression that shows how two variables are related, as in $V = I \times R$ |
| | find a value between two data points on a line graph |
| | read and discuss science data in the media |
| | tell how changing the value of one variable changes the value of another in a complex table |
| | tell how newly discovered simple information changes the way you interpret a set of data |
| Scientific Investigation | do an experiment with two or more steps, as in form a precipitate, then filter and analyze it |
| | create a multistep experiment that will answer a specific question |
| | look at the results of an experiment, then predict the result of an additional trial |
| | read about an experiment, then describe how to change it to get new, specific results |
| Evaluation of Models, Inferences, and Experimental Results | make conclusions or predictions using the data from one or more experiments |
| | tell how two opinions about an observation differ and which opinion is best supported by data |
| | describe how the data from an experiment you performed supports a prediction |

- You correctly answered 19 out of 30 questions.
- You omitted 0 questions.
- You incorrectly answered 11 questions.

RAMSAY1-0018

# The ACT® Plus Writing
## Student Report

DEFENDANT'S EXHIBIT **30**



STUDENT'S NAME: JESSICA E RAMSAY
SCHOOL NAME: SAINT JOSEPH HIGH SCHOOL
SCHOOL CODE: 233-385

SSN/ACT ID: -62079560

TEST DATE & TYPE: MAR 2007 STATE

## Your ACT Scores



Rank: Approximate percent of ACT-tested students at or below your score

|  | In Your State | In the U.S. |
|---|---|---|
| **Composite Score 27** | 89% | 90% |
| **ENGLISH** 31 | | 96% |
| Usage/Mechanics 18 | | 99% |
| Rhetorical Skills 15 | | 94% |
| **MATHEMATICS** 25 | | 80% |
| Pre-Algebra/Elem. Algebra 14 | | 83% |
| Algebra/Coord. Geometry 14 | | 93% |
| Plane Geometry/Trig. 11 | | 63% |
| **READING** 28 | | 87% |
| Social Studies/Sciences 15 | | 89% |
| Arts/Literature 15 | | 86% |
| **SCIENCE** 24 | | 80% |
| **COMBINED ENGLISH/WRITING** 27 | | 85% |
| Writing (score range 2 to 12) 06 | | 25% |

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.
- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.
- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.
- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

**COMMENTS ON YOUR ESSAY:** YOUR ESSAY RESPONDED TO THE PROMPT BY TAKING A CLEAR POSITION ON THE ISSUE. YOUR ESSAY USED SOME SPECIFIC DETAILS, REASONS, AND EXAMPLES, BUT IT NEEDED MORE OF THEM.



Looking for more information about your individual strengths and test preparation? Go to www.actstudent.org.

## Your College Planning

Your scores from this test date are being reported to the colleges shown below. College planning information is provided for the first four choices you listed when you registered or tested. (Fifth and sixth choices, if any, appear just above your first choice.) To view additional college planning information or to send additional reports, visit www.actstudent.org.

| College Name and Code | What is the profile of enrolled 1st-year students at this college? | | | Is the program of study you prefer offered? | What are the approximate annual tuition and fees? | | What percent of 1st-year students receive financial aid based on: | |
|---|---|---|---|---|---|---|---|---|
| | High School Class Rank | ACT Composite Score | High School Grade Point Average | | In-state | Out-of-state | Need? | Merit? |
| CORNELL UNIVERSITY 2726 ITHACA NY 607/255-5046 www.cornell.edu | Majority in top 10% | Middle 50% between 28-32 | -- | -- | $31,500 | $31,500 | 49% | -- |
| U OF MICH-ANN ARBOR 2062 ANN ARBOR MI 734/936-2462 www.umich.edu | Majority in top 10% | Middle 50% between 26-31 | 3.72 | -- | -- | $27,800 | -- | -- |
| PURDUE U 1230 WEST LAFAYETTE IN 765/494-1776 www.purdue.edu | Majority in top 25% | Middle 50% between 23-28 | 3.40 | -- | -- | -- | 63% | 28% |
| MICHIGAN STATE UNIV 2032 EAST LANSING MI 17/355-8332 www.msu.edu | Majority in top 25% | Middle 50% between 22-27 | 3.58 | -- | $7,900 | $19,700 | 36% | 42% |

| Your Information | Your Class Rank | Your Composite Score | Your High School GPA | Your Selected Major | |
|---|---|---|---|---|---|
| | -- | 27 | 3.94 | NOT PROVIDED | **RAMSAY1-0021** |

Check with colleges for recent changes in information.    A dash (—) indicates information was not provided or could not be calculated.    *Comprehensive fee including room and board.    © 2006 by ACT, Inc. All rights reserved.

N6069001-000007793

# The ACT ® Plus Writing
## Student Report

DEFENDANT'S EXHIBIT 31



STUDENT'S NAME: JESSICA E RAMSAY
SCHOOL NAME: SAINT JOSEPH HIGH SCHOOL
SCHOOL CODE: 233-385

ACT ID: -62079560
SSN: NOT PROVIDED
TEST DATE & TYPE: OCT 2007 NATIONAL

## Your ACT Scores

Rank: Approximate percent of ACT-tested students at or below your score



| | | In Your State | In the U.S. |
|---|---|---|---|
| **Composite Score** | **30** | 96% | 97% |
| ENGLISH | 30 | | 94% |
| Usage/Mechanics | 17 | | 98% |
| Rhetorical Skills | 15 | | 94% |
| MATHEMATICS | 30 | | 96% |
| Pre-Algebra/Elem. Algebra | 15 | | 88% |
| Algebra/Coord. Geometry | 15 | | 96% |
| Plane Geometry/Trig. | 16 | | 98% |
| READING | 30 | | 91% |
| Social Studies/Sciences | 13 | | 76% |
| Arts/Literature | 18 | | 99% |
| SCIENCE | 31 | | 98% |
| **COMBINED ENGLISH/WRITING** | **28** | | 90% |
| Writing (score range 2 to 12) | 08 | | 77% |

The Combined English/Writing score ranges from 1 to 36 and is a combined measure of the Writing and English tests. The Writing score ranges from 2 to 12. Your ranks for these two scores are based on recent ACT-tested students who took the Writing test.

COMMENTS ON YOUR ESSAY: YOUR ESSAY MAINTAINED FOCUS ON THE SPECIFIC ISSUE IN THE PROMPT.

- ACT® test scores and the Composite score range from 1 to 36; subscores range from 1 to 18.
- Your Composite score is the average of your scores on the four subject area tests. Subscores do not necessarily add up to your score for a subject area test.
- Your ranks tell you the approximate percentages of recent high school graduates in the U.S. and your state who took the ACT and received scores that are the same as or lower than yours. A rank of 70, for example, means that 70% of students received scores that are the same as or lower than your score.
- Your test scores are only estimates, not precise measures, of your educational development. You will find more information about interpreting your scores in the booklet you received with this report and at www.actstudent.org.



**Looking for more information about your individual strengths and test preparation?**
Go to www.actstudent.org.

**Your College Readiness:** If your scores are at or above the following ACT benchmark scores, you will likely be ready for first-year college courses—English 18, Mathematics 22, Reading 21, Science 24.

## Your College Reports

At your direction, your scores from this test date are being reported to the colleges shown below. College planning information is provided for the first four choices you listed when you registered or tested. (Fifth and sixth choices, if any, appear just above your first choice.) Your GPA was calculated from the grades you reported. To view additional college planning information or to send additional reports, visit www.actstudent.org.



| College Name and Code | What is the profile of enrolled 1st-year students at this college? | | | Is the program of study you prefer offered? | What are the approximate annual tuition and fees? | | What percent of 1st-year students receive financial aid based on: | |
|---|---|---|---|---|---|---|---|---|
| | High School Class Rank | ACT Composite Score | High School Grade Point Average | | In-state | Out-of-state | Need? | Merit? |
| YOU DID NOT PROVIDE CODES FOR ANY COLLEGES TO WHICH TO REPORT SCORES. | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Your Information** ➡

| Your Class Rank | Your Composite Score | Your Calculated GPA | Your Selected Major | |
|---|---|---|---|---|
| TOP 25% | 30 | 3.83 | MICROBIOLOGY | RAMSAY1-0022 |

Check with colleges for recent changes in information.    A dash (—) indicates information was not provided or could not be calculated.    *Comprehensive fee including room and board.    © 2007 by ACT, Inc. All rights reserved.

N7143001-000021356

**UW System Electronic Application for Undergraduate Admission
for U.S. Citizens/Permanent Residents**

---

# Submitted to UW-Madison for Fall 2008

To print this page, click your browser Print button or select Print from the browser menu.   Print

---

## SECTION 1: PERSONAL INFORMATION

1. Legal Name (First, Middle, Last/Family):  **Jessica Erin Ramsay**
   [ ]I hereby declare that my name has changed as shown above and authorize

   the University to change my records (if applicable)
2. Previous Name(s) (First, Middle, Last/Family):
3. Social Security Number: REDACTED
4. Date of Birth (month/day/year):  REDACTED
5. Birth Place (City, State/Country):  REDACTED **TX United States**
6. Gender: (**X**)Female    ( )Male
7. Racial / Ethnic Heritage:
   [ ]African American or Black
   [ ]American Indian or Alaska Native. Tribal Affiliation: _____
   [ ]Hawaiian or Pacific Islander
   [ ]Cambodian
   [ ]Hmong
   [ ]Laotian
   [ ]Vietnamese
   [ ]Other Asian
   [ ]Mexican, Mexican American, or Chicano/a
   [ ]Puerto Rican
   [ ]Cuban
   [ ]Other Hispanic or Latino/a
   [**X**]White or Caucasian
   [ ]Other, specify:
   [ ]I choose not to respond
8. Are you a U.S. Citizen? (**X**)Yes ( )No
   If no, Country of Citizenship:
   If no, Alien Status:
   [ ]Refugee / Granted Political Asylum
   [ ]Resident Alien: (permanent resident)
      Application for Alien Registration No. (month/day/year): ___/ /___
      or Alien Registration No.: **A**
                           [ ]Pending   [ ]Unknown
   [ ]Non-immigrant Alien, Visa Type:
   [ ]Requesting Student Visa: [ ]F1  [ ]J1  [ ]Unknown
9. Have you served on active duty in the U.S. Armed Forces? ( )Yes (**X**)No
10. Have either of your parents earned a four-year college/university degree? (**X**)Yes ( )No

**DEFENDANT'S
EXHIBIT
56**

## SECTION 2: ADDRESS

https://apps22.uwex.edu/pls/ea/ea App. Submit Completion

1. E-Mail Address:
   Preferred: **5ramsays@sbcglobal.net**
2. Permanent Home Address:
   Since: (month/year) **Dec 1999**
   Address:           **1438 Old Farm Lane**
   City:              **St. Joseph**
   County:            (for Wisconsin addresses only)
   State/Province:    **MI**
   Zip/Postal Code:   **49085**
   Country:           **United States**
   Phone Number:      **1-269-556-2277**
3. Mailing Address (if different):
   [X] Same as permanent home address
   Effective From:                    (month/day/year):
   Effective To:                      (month/day/year):
            or         [ ] Indefinite
   Address:
   City:
   State/Province:
   Zip/Postal Code:
   Country:
   Phone Number:

## SECTION 3: EDUCATION PART 1: HIGH SCHOOL, EXAMS

1. Were you home schooled at any point in grades 9-12?
   ( )Yes **(X)**No
2. High School of Graduation or Its Equivalent: (select one)
   ( ) Wisconsin High School:
        Name: _____   ACT/ETS Code: _____
        City: _____
   **(X)**Out-of-State High School:
        Name: **St. Joseph High School**   ACT/ETS Code: **233-385**
        Location: **St. Joseph, MI**
   ( ) Academic program taught in a home setting (home schooled)
        State in Which You Were Home Schooled: (if U.S.) **MI**
   ( ) GED/HS Equivalency Diploma (HSED)
        ( )GED   ( )HSED
        Issued by State of: ____
        Test date (month/year): ____ ____
   ( ) None of the above
3. Are you currently enrolled in high school?   **(X)**Yes ( )No
4. Date of High School or Home School Graduation:  **May/2008**  (month/year)
5. ACT/SAT Date taken or scheduled:  (month/year)
   ACT: **3/2007, 10/2007**      SAT: __/__
6. If you have attended any high school(s) other than the school you will graduate or have
   graduated from (in question 2), please provide the following:

Name of School: _____
City/State/Country: _____, _____
Years Attended:    From: _____ To: _____

Name of School: _____
City/State/Country: _____, _____
Years Attended:    From: _____ To: _____

## SECTION 4: EDUCATION PART 2: HIGHER EDUCATION

List all institutions, both U.S. and foreign, of higher education attended (even if you
withdrew) including name of college for courses taken in high school, colleges, universities,
vocational-technical schools, the institution you are currently attending, extension programs,
etc., and any degree(s) earned.
*Failure to list all institutions may result in disciplinary action, recision of admission, and/or
invalidation of credits or degrees earned.*

Name of School: _____
City/State/Country: _____, _____
Dates:    From: ___ / ___ (month/year)   To: ___ / ___
Degree Earned: _____   Year: _____

## SECTION 5A: RESIDENCY FOR TUITION DETERMINATION
**Residency Declaration for Fee and Tuition Assessment**
1. Are you a legal Wisconsin resident and/or do you claim legal Wisconsin residence for
   tuition purposes?
   ( )Yes  **(X)**No
2. Have you, your spouse or parents recently moved to Wisconsin to begin full-time
   employment, or do you expect to do so before the beginning of the term for which you
   are applying?
   ( )Yes  **(X)**No

If Yes to either (1) OR (2) above, proceed to the following questions. You may be asked to
provide further information.

If No to both (1) AND (2) above, you may skip to the next section .

3. I have lived continuously and only in Wisconsin since:
   Month/Year: _____
4. During the past TWO YEARS, have you lived at a different address than the one you
   listed in Section 2?
   ( )Yes  ( )No
   If Yes, list former addresses during the last two years.
   Former address #1

   _____
   _____, _____
   From: /_____   To: /_____
5. Do you hold a valid Wisconsin driver's license?
   ( )Yes  ( )No
   **If yes,** since (month/year): _____

RAMSAY25-0011
10/21/2007

6. Have you registered a motor vehicle(s) only in Wisconsin?
   ( )Yes ( )No
   **If yes,** since (month/year):
7. Have you last voted or registered to vote in Wisconsin?
   ( )Yes ( )No
   **If yes,** since (month/year):
8. Have you filed a Wisconsin state income (not property) tax return as a resident for the past two years?
   ( )Yes ( )No
   **If yes,** what years?
9. I am listed as a dependent on income tax forms of:
   ( )Claim my own exemption since: (year)
   ( )Father
   ( )Mother
   ( )Father and Mother
   ( )Spouse
   ( )Other, specify:

## SECTION 5B: RESIDENCY (CONT.): EMPLOYMENT
**List your employment history and/or activities (other than school) for the last two years.**
[ ] I have no employment history to report

| 1. Employer: | **Southshore Health and Raquet Club** |
|---|---|
| Occupation/Activity: | **Lifeguard** |
| City: | **St. Joseph** |
| State/Country: | **MI** |
| From (month/year): | **Jun/2007** |
| To (month/year): | or [X]Still employed here |

| 2. Employer: | **YMCA** |
|---|---|
| Occupation/Activity: | **Lifeguard** |
| City: | **St. Joseph** |
| State/Country: | **MI** |
| From (month/year): | **May/2007** |
| To (month/year): | or [X]Still employed here |

## SECTION 5C: RESIDENCY (CONT.): PARENT/GUARDIAN
**Please Note:** Parent/Guardian information is essential if you are still a dependent of the parent/guardian; it can be also a determinant of WI residency status (for tuition purposes) for all students regardless of dependent status or applicant age.

Check the appropriate box to indicate the relationship of the individuals described below and provide the required information:

(X)Father    ( )Stepfather    ( )Legal Guardian

Is he living? (X)Yes ( )No

RAMSAY25-0012
10/21/2007

**Appx913**

Name (First, Middle Init, Last/Family):

    **Scott A Ramsay**

Present Home Address:

    [ ] Same as applicant

    Address:    **1438 Old Farm Lane**

    City:    **St. Joseph**

    State/Province:  **MI**

    Zip/Postal Code: **49085**

    Country:    **United States**

    Since:    **Dec/1999** (month/year)

Previous Home Address:

    Address:

    City:

    State/Province:

    Country:

    Since:    (month/year)

Has he filed a Wisconsin state income (not property) tax return as a resident within the past TWO years?

    ( )Yes  (X)No    If yes, what years:

Occupation:  **Whirlpool Corperation, Sales**

U.S. Citizen? (X)Yes ( )No

    If a Resident Alien, send a copy of Resident Alien Card (both sides) with your application payment.

Where and when did he last vote or register to vote?

    State: **Michigan** (if U.S.)

    Date: **Mar/2007** (month/year)

---

        (X)Mother   ( )Stepmother    ( )Legal Guardian

---

Is she living? (X)Yes ( )No

Name (First, Middle Init, Last/Family):

    **Jerri L Shold**

Present Home Address:

    [ ] Same as applicant

    Address:    **1438 Old Farm Lane**

    City:    **St. Joseph**

    State/Province:  **MI**

    Zip/Postal Code: **49085**

    Country:    **United States**

    Since:    **Dec/1999** (month/year)

Previous Home Address:

    Address:

    City:

    State/Province:

RAMSAY25-0013

Country:

Since:                    (month/year)

Has she filed a Wisconsin state income (not property) tax return as a resident within the past TWO years?

( )Yes  (X)No     If yes, what years:

Occupation:  **Radix Communication, Documentation**

U.S. Citizen? (X)Yes ( )No

    If a Resident Alien, send a copy of Resident Alien Card (both sides) with your application payment.

Where and when did she last vote or register to vote?

    State: **Michigan** (if U.S.)

    Date: **Mar/2007** (month/year)

## SECTION 6: HIGH SCHOOL COURSES IN PROGRESS

Are you enrolled in the Wisconsin Youth Apprenticeship Program?

  ( )Yes (X)No

If yes, please identify program name:

If you plan to attend summer session, indicate name of school:

[ ]I am not enrolled in high school **or** I will not complete any additional high school courses prior to my enrollment in college

| Semester/Term | Year | Department Name, Course Title | # of Credits |
|---|---|---|---|
| **Acad Year** | **2007-08** | Dept: **Physical Education/Fine Arts** Title: **Dance** | **2** |
| **Acad Year** | **2007-08** | Dept: **Foreign Language** Title: **Spanish 7-8** | **1** |
| **Acad Year** | **2007-08** | Dept: **Math** Title: **AP Calculus BC** | **1** |
| **Acad Year** | **2007-08** | Dept: **English** Title: **College Writing** | **1** |
| **Acad Year** | **2007-08** | Dept: **Science** Title: **Honors Physics** | **1** |

## SECTION 7: COLLEGE COURSES IN PROGRESS

If you are attending a UW Colleges campus, Wisconsin Technical College or other two-year/community college, will you have earned an associate degree prior to enrolling at the campus for which you are completing this application?

  ( )Yes ( )No

  If yes, date expected: (mo/year) ___ / ___

RAMSAY25-0014
10/21/2007

**Appx915**

If you plan to attend summer session, indicate name of school:

[ ]    I am not currently enrolled in college courses

| Name of first college or university (enter courses for another college/university in the next set): List courses in which you are currently enrolled or officially registered for at this institution: | | | |
|---|---|---|---|
| Semester/Term | Year | Department Name, Course Number, Course Title | # of Credits |
| | | Dept:                  Course#: Title: | |

| Name of additional college or university you are currently attending or plan to attend prior to the term for which you are applying (if applicable): List courses in which you are currently enrolled or officially registered for at this institution: | | | |
|---|---|---|---|
| Semester/Term | Year | Department Name, Course Number, Course Title | # of Credits |
| | | Dept:                  Course#: Title: | |

## SECTION 8: ACTIVITIES

Please list below, **in order of importance to you**, your principal extracurricular, community and/or volunteer activities, as well as honors/awards earned. You may include involvement with school organizations, religious and service organizations, family obligations, employment, and/or participation in the arts, athletics, publications, etc.

Activity #1:                    **Soccer**
Leadership Position,            **JV Captain for 2 years, Intensity Award**
   Honors and/or Awards:
Approx. Hours per Week:  **12**          Number of Years:  **10**

Activity #2:                    **Swimming**
Leadership Position,            **Captain, Coach's Award, Varsity for 4 years**
   Honors and/or Awards:
Approx. Hours per Week:  **20**          Number of Years:  **10**

Activity #3:                    **National Honor Society**
Leadership Position,
   Honors and/or Awards:
Approx. Hours per Week:  **1.5**          Number of Years:  **2**

Activity #4:                    **Miracle League Baseball Volunteer**
Leadership Position,            **buddy to a child with special needs**
   Honors and/or Awards:
Approx. Hours per Week:  **2**           Number of Years:  **4**

Activity #5:

RAMSAY25-0015

**Appx916**

| | | |
|---|---|---|
| Leadership Position, | **Academic Award** | |
| Honors and/or Awards: | | |
| Approx. Hours per Week: | | Number of Years:  4 |

| | | |
|---|---|---|
| Activity #6: | **Key Club** | |
| Leadership Position, | | |
| Honors and/or Awards: | | |
| Approx. Hours per Week:  1 | | Number of Years:  2 |

| | | |
|---|---|---|
| Activity #7: | **Spanish club** | |
| Leadership Position, | | |
| Honors and/or Awards: | | |
| Approx. Hours per Week: | | Number of Years:  2 |

| | | |
|---|---|---|
| Activity #8: | **Men's Swim Team Manager** | |
| Leadership Position, | | |
| Honors and/or Awards: | | |
| Approx. Hours per Week:  15 | | Number of Years:  2 |

| | | |
|---|---|---|
| Activity #9: | **Tutoring** | |
| Leadership Position, | | |
| Honors and/or Awards: | | |
| Approx. Hours per Week:  2 | | Number of Years:  2 |

| | | |
|---|---|---|
| Activity #10: | **Babysitting** | |
| Leadership Position, | | |
| Honors and/or Awards: | | |
| Approx. Hours per Week:  5 | | Number of Years:  7 |

Briefly explain (in 50-100 words) how you decided which activity above was the most important to you.

> **Soccer is my passion. I love the intensity and pressure of being the goalie - the last defense between the ball and the back of the net. The adrenaline from stopping each shot pulses through**
> **me, knowing a shot could be taken at any second - making or breaking the game.**

## CAMPUS-SPECIFIC SECTION: UW-Madison Information

1. Name of institution you wish to enter:  UW-Madison

2. Are you currently enrolled at or have you previously attended UW-Madison?
     ( )Yes  (X)No
     If yes, as:
          [ ]Undergraduate
          [ ]Graduate
          [ ]Nondegree/Special Student

RAMSAY25-0016

https://apps22.uwex.edu/pls/ea/ea_App_Submit_Completion                    10/21/2007

**Appx917**

If yes, attendance dates: (mo/year)
    From: ___/___    To: ___/___
    [ ] Check here if dates are unknown

3. Applying as:
    (X) New Freshman
    ( ) Transfer
    ( ) Reentry
    ( ) Nondegree/Special Student
    ( ) Summer Only
    ( ) 2nd Undergraduate Degree
    ( ) Additional Major/Minor/Certification

4. Semester you plan to enter:  **Fall 2008**

5. Intended Major or Field of Study:
    Genetics

6. School or College you wish to enter at the university:
    Agricultural and Life Sciences (College of)

7. Undergrad Degree Sought:
    (X)Bachelor of Science (B.S.)
    ( )None
    ( )Unknown

8. Do you plan to teach?
    ( )Yes  (X)No
    If yes, check one:
        ( )Elementary (specify grade(s)):
        ( )Secondary
        ( )Vocational / Technical
        ( )Other
        ( )Clear above selection

9. Campus from which you expect to graduate:  **UW-Madison**

10. Enrollment:
    (X)Full-time (Planning to enroll for 12 or more credits per semester)
    ( ) Part-time (Planning to enroll for fewer than 12 credits per semester)

11. Do you plan to apply for financial aid (loans, grants, work study)?
    (X)Yes ( )No

12. Do you plan to live on campus?
    (X)Yes ( )No

13. Did any of the following members of your family graduate from UW-Madison?
    [ ] Father
    [ ] Mother

RAMSAY25-0017

[ ] Grandparent
[ ] Sibling
[ ] Spouse

---

STATEMENTS

14. The University values an educational environment that provides all members of the campus community with opportunities to grow and develop intellectually, personally, culturally and socially. In order to give us a more complete picture of you as an individual, please tell us about the particular life experiences, perspectives, talents, commitments and/or interests you will bring to our campus. In other words, how will your presence enrich our community?

**BEEP! BEEP! BEEP! My alarm goes off. Why? Confused anger is running through my head. 5:45 A.M.**
**I have 15 minutes to get to morning practice. DEDICATION. 6:00 A.M. I hit the icy water that makes me forget everything as my body works to regain the heat it lost. I swim, repeating the motions I've done so many times. INSANITY. 7:00 A.M. 30 girls fight for six barely warm showers,**
**four mirrors, three sinks, and two outlets. 8:00 A.M. School starts. I sit through six long hours of academic subjects, fighting the weight of my eyelids made heavier with every practice and**
**late night. Honors English, third year Spanish, Honors Chemistry, and finally 25 minutes for lunch. It isn't the best food, but I scarf it down anyway. HUNGER. AP US History and AP Calculus**
**end my school day, forcing more knowledge into my head. 3:05 P.M. School is over, and I have 25 minutes to shove 45 pounds of books into my back pack, get help from teachers, meet with friends, change, and get into the pool by 3:30. SPEED. Another two-hour practice in the same icy water; this time, I am awake, pushing harder, racing the clock and the girl next to me, trying to catch the one in front of me. DRIVE. LOVE. DETERMINATION. 5:30 P.M. Practice is over, my muscles**
**burn, they are on fire. I don't feel like I have the energy to get out of the pool, but I drag myself out. SATISFACTION. I change quickly, pull on my shin guards, socks, and cleats, say 'bye to my team, and drive 20 minutes to Bridgman for soccer practice. I cram any food I have into my mouth. I spend two hours diving for balls that seem impossible to catch, only to feel the thrill pulse through my body when I catch them. PAIN. ADRENALINE. PASSION. 8:00 P.M. Practice is**
**over, and I drive another 20 minutes home. I grab whatever food I can as I crawl through the door and start my homework – a research paper, Spanish translations and excercises, a pre-lab and chemistry problems, and chapter review questions. Starving, I take a break for more food. Back to homework, I continue with a 35-page history chapter and 15 extremely hard calculus problems. 2:00**
**A.M. Not quite done with homework, but I can't keep my eyes open. I use what's left of my energy to fall into bed. EXHAUSTION. REPEAT. College? Hit me with everything you've got.**

15. If there is additional information you would like us to consider in reviewing your application, please share this with us as well. This is your opportunity to tell us things about yourself that have not been asked elsewhere, if you believe they will help us become acquainted with you in ways different from courses, grades, and test scores.

RAMSAY25-0018

I have led a life far from the normal lives of other teens. I have two adopted brothers, Shaun (13 years) and Joey (9 years). Shaun and Joey have been diagnosed with ADHD, Obsessive Compulsive
Disorder, Oppositional Defiance Disorder, Sensory Integration Disorder, and Autism. Joey also has
Epilepsy and is still not potty trained.
Because a lot of people don't know how to handle people that are "different", we don't have family friends, we don't take family vacations, we can't find a babysitter, my friends don't like to come over, and a lot more.
This might not seem like a big deal, but think of all the times you have family friends over to your house and how many times you have gone to theirs. Think of relaxing vacations that take you away from school and stress. Think of all the bonfires, sleepovers, and pick-up football games you've had with your friends. Now think of how your life would change if none of that existed - not that it didn't exist at all - it just didn't exist for you. Picture hearing your friends talking about these things while you wish you had them. If the feeling hasn't hit you by now, it's the feeling of standing outside in cold rain, looking through a window, while your friends are having a party inside. I have grown up with this feeling.
Because I've grown up surrounded by stress, I work very well in high pressure situations. I don't get upset over small things. I'm very down-to-earth, and I look at the whole picture. I'm determined, hard working, and passionate about everything I do. I have good time management skills
and extreme personal drive to acheive everything I can; I don't give up. I'm always positive and make sure I enjoy life. When I'm handed an opportunity to better myself, like college, I take it and run.

## CERTIFICATION OF ACCURACY OF INFORMATION

By completing the following, I certify that the information I have provided is true and complete to the best of my knowledge and I understand that inaccurate information may affect my enrollment, tuition or financial aid status. I agree to notify the admissions office, in writing, if there is a change to any of the information, including my permanent home address. I also understand that if I have applied for financial assistance, information concerning the amount of financial aid I may be offered may be released to other agencies that may also be considering me for assistance. Further, I authorize my secondary school to release a transcript of my secondary school record and any other pertinent information to the University of Wisconsin System. If I enroll at this university, I will abide by its rules and regulations. This application and supporting documents become the property of the University of Wisconsin System.

Applicant Last Name: **Ramsay**
First Name:          **Jessica**
Middle Name:         **Erin**
Date (month/day/year): **10/21/2007**



RAMSAY25-0019
10/21/2007

https://apps22.uwex.edu/pls/ea/ea.App.Submit Completion

**Appx920**

If you have questions or problems, you may contact us by phone
(Monday - Thursday 8am - 6pm, Friday 8am - 4:30pm CST) or e-mail.

**Voice:** 1-800-442-6459 or 1-608-263-4567
**Deaf/HoH:** via 711 Relay
**E-Mail:** eapp@learn.uwsa.edu

---

When you finish using this application, please click the **Quit** button.

*Copyright © 1997 University of Wisconsin*
*Production 5.50, 1-Sep-2004*

RAMSAY25-0020
10/21/2007

**Appx921**



**OFFICIAL TRANSCRIPT OF ACADEMIC RECORD**

*Jack Miner*
Jack Miner
University Registrar

Name: Jessica Ramsay          OSU 001
Student: 100234048
DOB: ████ ***
Print Date: 10/29/2019
Page 1 of 2
OSUOF

Perkins Coie LLP
Robert A. Burgoyne
Suite 600
700 13th St., NW
Washington DC 20005

**Institutions Attended**

Lake Michigan College
The Ohio State University
Saint Joseph High School

**External Degrees**

Saint Joseph High School
High School Diploma    May 1, 2008

**OSU Degrees Awarded**

Degree:          Bachelor of Science
Confer Date:     Jun 10, 2012
Degree Honors:   Cum Laude
Plan:            Molecular Genetics Major
Plan:            General Business Minor
Plan:            Dance Minor

**Beginning of Undergraduate Record**

Autumn 2008 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOSCI | 100 | Bio Sci Survey | 1.00 | 1.00 | S | 0.000 |
| CHEM | 121 | General Chemistry | 5.00 | 5.00 | B+ | 16.500 |
| MATH | 152 | Calc&Analyt Geom 2 | 5.00 | 5.00 | A- | 18.500 |
| SPANISH | 103.66 | Intensive Review 2 | 5.00 | 5.00 | A- | 18.500 |

Test Credits Applied Toward Biological Sciences

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| MATH | 150 | Elemertry Functns | 0.00 | 5.00 | EM | 0.000 |
| MATH | 151 | Calc&Analyt Geom 1 | 0.00 | 5.00 | EM | 0.000 |
| SPANISH | 101.01 | Elemntry 1:Classrm | 0.00 | 5.00 | EM | 0.000 |
| Test Trans GPA: | | 0.000 | Transfer Totals: | 0.00 | 15.00 | 0.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.566 Term Totals | 15.00 | 31.00 | 53.500 |
| Cum GPA | 3.566 Cum Totals | 15.00 | 31.00 | 53.500 |

Dean's List

Winter 2009 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOLOGY | 113 | Energy Transfr&Dvl | 5.00 | 5.00 | B+ | 16.500 |
| CHEM | 122 | General Chemistry | 5.00 | 5.00 | B+ | 16.500 |
| DANCE | 201.01 | Modern Technique | 2.00 | 2.00 | A | 8.000 |
| SPANISH | 104 | Intermed Span 2 | 5.00 | 5.00 | A | 20.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.588 Term Totals | 17.00 | 17.00 | 61.000 |
| Cum GPA | 3.578 Cum Totals | 32.00 | 48.00 | 114.500 |

Dean's List

Spring 2009 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major
Plan:      General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| BIOLOGY | 114 | Form,Functn&Ecolgy | 5.00 | 5.00 | A- | 18.500 |
| CHEM | 123 | General Chemistry | 5.00 | 5.00 | B- | 13.500 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |

| DANCE | 202.01 | Modern Technique | 2.00 | 2.00 | A | 8.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.428 Term Totals | 14.00 | 14.00 | 48.000 |
| Cum GPA | 3.532 Cum Totals | 46.00 | 62.00 | 162.500 |

Summer 2009 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major
Plan:      General Business Minor

Transfer Credit from Lake Michigan College
Applied Toward Biological Sciences

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| ECON | 200 | Prin Microeconomc | 0.00 | 4.00 | K | 0.000 |
| ENGLISH | 110.01 | First-Yr Engl Comp | 0.00 | 5.00 | K | 0.000 |
| Course Trans GPA: | | 0.000 | Transfer Totals: | 0.00 | 9.00 | 0.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 0.000 Term Totals | 0.00 | 9.00 | 0.000 |
| Cum GPA | 3.532 Cum Totals | 46.00 | 71.00 | 162.500 |

Autumn 2009 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major
Plan:      General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 251 | Organic Chemistry | 4.00 | 4.00 | A- | 14.800 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |
| PHYSICS | 111 | Mechanics & Heat | 5.00 | 5.00 | A | 20.000 |
| SOCIOL | 370 | Soc Fact Persnalty | 5.00 | 5.00 | A | 20.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.925 Term Totals | 16.00 | 16.00 | 62.800 |
| Cum GPA | 3.633 Cum Totals | 62.00 | 87.00 | 225.300 |

Dean's List

Winter 2010 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major
Plan:      General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 252 | Organic Chemistry | 4.00 | 4.00 | B+ | 13.200 |
| CHEM | 254 | Organic Chem Lab | 3.00 | 3.00 | A- | 12.000 |
| PHYSICS | 112 | Elec Magnetsm & Lt | 5.00 | 5.00 | A- | 18.500 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.641 Term Totals | 12.00 | 12.00 | 43.700 |
| Cum GPA | 3.635 Cum Totals | 74.00 | 99.00 | 269.000 |

Dean's List

Spring 2010 Quarter
Program:   Biological Sciences
Plan:      Molecular Genetics Major
Plan:      General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|---|---|---|---|---|---|---|
| CHEM | 253H | Organic Chemistry | 4.00 | 4.00 | A | 16.000 |
| CHEM | 255 | Organic Chem Lab | 3.00 | 3.00 | A- | 11.100 |
| CSE | 100 | Intro Computing Tch | 3.00 | 3.00 | A- | 11.100 |
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |

| | GPA Hours | Earned | Points |
|---|---|---|---|
| Term GPA | 3.850 Term Totals | 12.00 | 12.00 | 46.200 |
| Cum GPA | 3.665 Cum Totals | 86.00 | 111.00 | 315.200 |

CREDENTIALS SECURITY SEAL (𝒞) IN THE CORNER SHOULD TEMPORARILY DISAPPEAR WHEN RUBBED OR BREATHED ON

CONFIDENTIAL RECORD ISSUED IN ACCORDANCE WITH THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974

A BLACK AND WHITE DOCUMENT IS NOT OFFICIAL    A SECURITY STATEMENT APPEARS WHEN PHOTOCOPIED

DEFENDANT'S
EXHIBIT
22

NBME01035



**THE OHIO STATE UNIVERSITY**

OFFICE OF THE UNIVERSITY REGISTRAR
STUDENT ACADEMIC SERVICE BUILDING, 5TH FLOOR    OSU 002
281 WEST LANE AVENUE
COLUMBUS, OH 43210-1132
TELEPHONE: 614-292-9330
EMAIL: REGISTRAR@OSU.EDU

## TRANSCRIPT KEY

### RELEASE OF INFORMATION

This transcript cannot be released to another person, agency or organization except to officials internal to your own organization or agency who have a reasonable business use for the information. Release to other parties requires written consent of the student.

### ACCREDITATION

The Ohio State University (Columbus, Lima, Mansfield, Marion, Newark and the Agricultural Technical Institute, Wooster, Ohio) is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools as a degree-granting institution at the associate, baccalaureate, masters, professional and doctoral levels.

### DETAILED TRANSCRIPT KEY

For a more detailed version of this transcript key including information on good standing, probation, dismissal and the definition of enrollment status, please visit www.registrar.osu.edu/alumni/transcriptkey.asp.

### GRADING SYSTEM

| | | | | |
|---|---|---|---|---|
| A | • Excellent....................4.0 Pts | K | • Transferred Credit.............0 Pts |
| A- | • Excellent....................3.7 Pts | I | • Incomplete....................0 Pts |
| B+ | • Above Average...............3.3 Pts | IP | • In Progress...................0 Pts |
| B | • Above Average...............3.0 Pts | IX | • Extension of Incomplete.......0 Pts |
| B- | • Above Average...............2.7 Pts | P | • Progress......................0 Pts |
| C+ | • Average.....................2.3 Pts | PA | • Pass..........................0 Pts |
| C | • Average.....................2.0 Pts | NP | • Non-pass......................0 Pts |
| C- | • Average.....................1.7 Pts | R | • Registered to Audit...........0 Pts |
| D+ | • Poor........................1.3 Pts | S | • Satisfactory..................0 Pts |
| D | • Poor........................1.0 Pts | U | • Unsatisfactory................0 Pts |
| E | • Failure.......................0 Pts | W | • Withdrew......................0 Pts |
| EM | • Examination Credit.........0 Pts | NG | • Grade unreported by instructor...0 Pts |
| EN | • Failure-Non Attendance.....0 Pts | NEN | • EN grade for PA/NP course.....0 Pts |
| | | UEN | • EN grade for S/U course.......0 Pts |

# notation denotes a course involved in the forgiveness or substitution of grades - see Recalculation of Grades

### SPECIAL COURSE NUMBER NOTATIONS

E suffix   Honors embedded course
H suffix   Honors course or honors version of a course
S suffix   Service Learning course
T suffix   Technical course (part of a two year technical program)

### RECALCULATION OF GRADES

FORGIVENESS OR SUBSTITUTION OF GRADES: Students may petition their enrollment unit to repeat a course, and after completing the course the second time, have the original course credit and grade excluded from the calculation of the student's cumulative point-hour ratio, but remain on the student's official permanent record. The course or courses being substituted or repeated will bear the symbol "#" to the left of the grade.

PERMITTED TO RESTART GPA or FRESH START: An undergraduate student who enrolls in the university after an absence of five or more years may petition to have his/her GPA recalculated. If the petition is approved, the student resumes his/her academic program with no cumulative GPA. All courses taken will remain on the permanent record.

### CALENDAR

• The semester system replaced the quarter system for the university in autumn 2012
• The semester system replaced the quarter system for the College of Law in autumn 1984.

### UNIVERSITY CLASS RANKING SYSTEM

Student rank in all undergraduate colleges is based on total credit hours completed and recorded. Graduate students are not ranked. Professional students are ranked according to progress within their curriculum.

| Semester Calendar | | | | Quarter Calendar | | | |
|---|---|---|---|---|---|---|---|
| Rank | Earned Hours | | | Rank | Earned Hours | | |
| Freshman | 0 | through | 29 | Freshman | 0 | through | 44 |
| Sophomore | 30 | through | 59 | Sophomore | 45 | through | 89 |
| Junior | 60 | through | 89 | Junior | 90 | through | 134 |
| Senior | 90 | and up | | Senior | 135 | and up | |

### COURSE NUMBERING SYSTEM

#### SEMESTER CALENDAR

| | |
|---|---|
| 1000-1099 | UG (Undergraduate) - Non Credit Courses |
| | Non-credit courses for orientation, remedial, or other non-college-level experiences. These are courses in addition to a program's graduation requirements. |
| 1100-1999 | UG - Introductory Level Undergraduate Courses |
| | Basic courses providing undergraduate credit, but not to be counted toward major or field of specialization in a department. Courses at this level are beginning courses, required or elective courses that may be a prerequisite to other courses. |
| 2000-2999 | UG - Intermediate Level Undergraduate Courses |
| | Intermediate courses providing undergraduate credit and may be counted toward a major or field of specialization. |
| 3000-3999 | UG - Upper Level Undergraduate Courses |
| | Upper Level courses providing undergraduate credit that may be counted toward a major or field of specialization. |
| 4000-4999 | UG - Advanced Level Undergraduate Courses |
| | Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Graduate students may enroll in and receive graduate credit for 4000-level courses outside their own graduate program. |
| 5000-5999 | UG and G (Graduate) - Dual Career Level Courses |
| | Courses that are regularly offered for both graduate credit and undergraduate credit. Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Foundational coursework and research providing graduate or professional credit. |
| 6000-6999 | G - Foundational Level Graduate and Professional Courses |
| | Foundational courses and research providing graduate or professional credit. |
| 7000-7999 | G - Intermediate Level Graduate and Professional Courses |
| | Intermediate courses and research providing graduate or professional credit. |
| 8000-8999 | G - Advanced Level Graduate and Professional Courses |
| | Advanced courses and research providing graduate or professional credit. |

#### Quarter Calendar

| | |
|---|---|
| 000-099 | Non-Credit Courses (except certain seminars and colloquia) for orientation, remedial, or other non-college-level experiences. Credit is not applicable to Graduation Requirements. |
| 100-199 | Basic Courses providing undergraduate Credit but not to be counted on a major or field of specialization in any department. Beginning Courses, Required, or Elective Courses that may be prerequisite to other courses. |
| 200-299 | Basic Courses providing Undergraduate Credit and may be counted on a major or field of specialization. |
| 300-499 | Intermediate Courses providing Undergraduate Credit or Basic Professional Credit that may be counted on a major or field of specialization. |
| 500-599 | Intermediate Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization and may provide Graduate Credit only in other departments. |
| 600-699 | Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization, and may provide Graduate Credit (in all departments). |
| 700-799 | Advanced Courses providing Undergraduate, Graduate, or Professional Credit. |
| 800-999 | Courses providing Graduate Credit and are open to undergraduates only with the approval of the Vice Provost for Research and Dean of the Graduate School. |

TO TEST FOR AUTHENTICITY - If you vigorously rub or breathe on the Credentials security seal located in the corner of the page adjacent to the barcode, the image will fade. This document is printed on DocuCheck WATERMARK® security paper and contains multiple overt and covert security features. Hold the page to the light to see the translucent DocuCheck WATERMARK® image. When photocopied, a security statement may appear with the word VOID throughout the face of the document. If solvents & certain other chemicals are applied to this document, the paper will stain.

In accordance with USC 438 (6) (4) (8), The Family Educational Rights and Privacy Act of 1974 (FERPA), you are hereby notified that this Official Transcript is provided upon the condition that you, your agent or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

0714417

NBME01036



**OFFICIAL TRANSCRIPT OF ACADEMIC RECORD**

Jack Miner
University Registrar

OHIO STATE UNIVERSITY 1870

Name: Jessica Ramsay          OSU 003
Student: 100234048
DOB: ********
Print Date: 10/29/2019
Page 2 of 2
OSUOF

### Autumn 2010 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| ACCTMIS | 310 | Foundatns Of Accl | 5.00 | 5.00 | B | 15.000 |
| BIOCHEM | 511 | Intro To Biol Chem | 5.00 | 5.00 | C+ | 11.500 |
| HISTORY | 506 | His Erly Christnty | 5.00 | 5.00 | B- | 13.500 |
| PHYSICS | 113 | Modern Physics | 5.00 | 5.00 | A- | 18.500 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 2.925 Term Totals | 20.00 | 20.00 | 58.500 |
| Cum GPA | 3.525 Cum Totals | 106.00 | 131.00 | 373.700 |

### Winter 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| BUSMHR | 400 | Foundations Of Mhr | 4.00 | 4.00 | A | 16.000 |
| DANCE | 200 | Concert Dnce Hstry | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 605 | Molec Genetics 1 | 4.00 | 4.00 | B | 12.000 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.692 Term Totals | 13.00 | 13.00 | 48.000 |
| Cum GPA | 3.543 Cum Totals | 119.00 | 144.00 | 421.700 |

Dean's List

### Spring 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| BUSMGT | 430 | Fndtn Operatns Mgt | 4.00 | 4.00 | A | 16.000 |
| DANCE | 367.01 | Writng About Dance | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 606 | Molec Genetics 2 | 4.00 | 4.00 | B+ | 13.200 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.784 Term Totals | 13.00 | 13.00 | 49.200 |
| Cum GPA | 3.567 Cum Totals | 132.00 | 157.00 | 470.900 |

Dean's List

### Autumn 2011 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| DANCE | 201.06 | Hip Hop Dance | 2.00 | 2.00 | A | 8.000 |
| DANCE | 671.31 | Somatic Prct. Yoga | 2.00 | 2.00 | A | 8.000 |
| MICRBIOL | 520 | Gen Microbiology 1 | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 607 | Cell Biology | 3.00 | 3.00 | B+ | 9.900 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.825 Term Totals | 12.00 | 12.00 | 45.900 |
| Cum GPA | 3.588 Cum Totals | 144.00 | 169.00 | 516.800 |

Dean's List

### Winter 2012 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| AFAMAST | 121 | Afr Civilizatn 1870 | 5.00 | 5.00 | A | 20.000 |
| BUSFIN | 420 | Fndtns Of Finance | 4.00 | 4.00 | B | 12.000 |
| DANCE | 211.04 | Improvisation | 2.00 | 2.00 | A | 8.000 |
| ENGLISH | 367.02 | US Exper: Lit | 5.00 | 5.00 | A | 20.000 |

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| MICRBIOL | 649 | Introdctn Virology | 5.00 | 5.00 | B | 15.000 |
| MOLGEN | 606 | Genes/Development | 3.00 | 3.00 | B | 9.000 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.500 Term Totals | 24.00 | 24.00 | 84.000 |
| Cum GPA | 3.576 Cum Totals | 168.00 | 193.00 | 600.800 |

Dean's List

### Spring 2012 Quarter

Program: Biological Sciences
Plan: Molecular Genetics Major
Plan: General Business Minor
Plan: Dance Minor

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| BUSML | 450 | Fndtns Of Mktg Mgt | 4.00 | 4.00 | B | 12.000 |
| DANCE | 211.03 | Mstrs Intro Compstn | 2.00 | 2.00 | A- | 7.400 |
| DANCE | 671.10 | Kinesiology Dance | 3.00 | 3.00 | A | 12.000 |
| EEOB | 632 | Neurobiology | 3.00 | 3.00 | A- | 11.100 |
| MOLGEN | 602 | Euk Cel & Dev B Lb | 5.00 | 5.00 | A | 20.000 |
| MOLGEN | 733 | Human Genetics | 3.00 | 3.00 | B+ | 9.900 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.620 Term Totals | 20.00 | 20.00 | 72.400 |
| Cum GPA | 3.580 Cum Totals | 188.00 | 213.00 | 673.200 |

Dean's List

Semester Transition
The comparison below shows the conversion of your academic record.

| Cumulative QTR Totals | | GPA Hours | Earned | Points |
|-----------------------|--|-----------|--------|--------|
| QTR  GPA: | 3.580 | QTR  Totals | 188.00 | 213.00 | 673.200 |
| SEM  GPA: | 3.580 | SEM  Totals | 125.96 | 142.71 | 451.044 |

### Spring 2013 Semester

Program: Undergraduate Non-Degree
Plan: Undergraduate Non Degree Major

| Course | | Description | Attempted | Earned | Grade | Points |
|--------|--|-------------|-----------|--------|-------|--------|
| ANATOMY | 2300.01 | Human Anatomy | 4.00 | 4.00 | B | 12.000 |

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Term GPA | 3.000 Term Totals | 4.00 | 4.00 | 12.000 |
| Cum GPA | 3.552 Cum Totals | 129.96 | 146.71 | 463.044 |

Undergraduate Career Totals

| | | GPA Hours | Earned | Points |
|--|--|-----------|--------|--------|
| Cum GPA: | 3.562 Cum Totals | 129.96 | 146.71 | 463.044 |

***End of UndergraduateTranscript***

CREDENTIALS SECURITY SEAL (☙) IN THE CORNER SHOULD TEMPORARILY DISAPPEAR WHEN RUBBED OR BREATHED ON

CONFIDENTIAL RECORD ISSUED IN ACCORDANCE WITH THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974

A BLACK AND WHITE DOCUMENT IS NOT OFFICIAL          A SECURITY STATEMENT APPEARS WHEN PHOTOCOPIED

NBME01037



## THE OHIO STATE UNIVERSITY

OFFICE OF THE UNIVERSITY REGISTRAR
STUDENT ACADEMIC SERVICE BUILDING, 5TH FLOOR    OSU 004
281 WEST LANE AVENUE
COLUMBUS, OH 43210-1132
TELEPHONE: 614-292-9330
EMAIL: REGISTRAR@OSU.EDU

## TRANSCRIPT KEY

### RELEASE OF INFORMATION

This transcript cannot be released to another person, agency or organization except to officials internal to your own organization or agency who have a reasonable business use for the information. Release to other parties requires written consent of the student.

### ACCREDITATION

The Ohio State University (Columbus, Lima, Mansfield, Marion, Newark and the Agricultural Technical Institute, Wooster, Ohio) is accredited by the Higher Learning Commission of the North Central Association of Colleges and Schools as a degree-granting institution at the associate, baccalaureate, masters, professional and doctoral levels.

### DETAILED TRANSCRIPT KEY

For a more detailed version of this transcript key including information on good standing, probation, dismissal and the definition of enrollment status, please visit www.registrar.osu.edu/alumni/transcriptkey.asp.

### GRADING SYSTEM

| | | | | |
|---|---|---|---|---|
| A | • Excellent...............4.0 Pts | K | • Transferred Credit.............0 Pts |
| A- | • Excellent...............3.7 Pts | I | • Incomplete.....................0 Pts |
| B+ | • Above Average.......3.3 Pts | IP | • In Progress....................0 Pts |
| B | • Above Average.......3.0 Pts | IX | • Extension of Incomplete........0 Pts |
| B- | • Above Average.......2.7 Pts | P | • Progress.......................0 Pts |
| C+ | • Average...............2.3 Pts | PA | • Pass...........................0 Pts |
| C | • Average...............2.0 Pts | NP | • Non-pass.......................0 Pts |
| C- | • Average...............1.7 Pts | R | • Registered to Audit............0 Pts |
| D+ | • Poor..................1.3 Pts | S | • Satisfactory...................0 Pts |
| D | • Poor..................1.0 Pts | U | • Unsatisfactory.................0 Pts |
| E | • Failure................0 Pts | W | • Withdrew.......................0 Pts |
| EM | • Examination Credit.....0 Pts | NG | • Grade unreported by instructor...0 Pts |
| EN | • Failure-Non Attendance....0 Pts | NEN | • EN grade for PA/NP course.....0 Pts |
| | | UEN | • EN grade for S/U course........0 Pts |

# notation denotes a course involved in the forgiveness or substitution of grades - see Recalculation of Grades

### SPECIAL COURSE NUMBER NOTATIONS

E suffix     Honors embedded course
H suffix     Honors course or honors version of a course
S suffix     Service Learning course
T suffix     Technical course (part of a two year technical program)

### RECALCULATION OF GRADES

FORGIVENESS OR SUBSTITUTION OF GRADES: Students may petition their enrollment unit to repeat a course, and after completing the course the second time, have the original course credit and grade excluded from the calculation of the student's cumulative point-hour ratio, but remain on the student's official permanent record. The course or courses being substituted or repeated will bear the symbol "#" to the left of the grade.

PERMITTED TO RESTART GPA or FRESH START: An undergraduate student who enrolls in the university after an absence of five or more years may petition to have his/her GPA recalculated. If the petition is approved, the student resumes his/her academic program with no cumulative GPA. All courses taken will remain on the permanent record.

### CALENDAR

• The semester system replaced the quarter system for the university in summer 2012
• The semester system replaced the quarter system for the College of Law in autumn 1984.

### UNIVERSITY CLASS RANKING SYSTEM

Student rank in all undergraduate colleges is based on total credit hours completed and recorded. Graduate students are not ranked. Professional students are ranked according to progress within their curriculum.

| Semester Calendar | | | Quarter Calendar | | |
|---|---|---|---|---|---|
| Rank | Earned Hours | | Rank | Earned Hours | |
| Freshman | 0 | through 29 | Freshman | 0 | through 44 |
| Sophomore | 30 | through 59 | Sophomore | 45 | through 89 |
| Junior | 60 | through 89 | Junior | 90 | through 134 |
| Senior | 90 | and up | Senior | 135 | and up |

### COURSE NUMBERING SYSTEM

#### SEMESTER CALENDAR

**1000-1099**    UG (Undergraduate) - Non Credit Courses
Non-credit courses for orientation, remedial, or other non-college-level experiences. These are courses in addition to a program's graduation requirements.

**1100-1999**    UG - Introductory Level Undergraduate Courses
Basic courses providing undergraduate credit, but not to be counted toward major or field of specialization in any department. Courses at this level are beginning courses, required or elective courses that may be a prerequisite to other courses.

**2000-2999**    UG - Intermediate Level Undergraduate Courses
Intermediate courses providing undergraduate credit and may be counted toward a major or field of specialization.

**3000-3999**    UG - Upper Level Undergraduate Courses
Upper Level courses providing undergraduate credit that may be counted toward a major or field of specialization.

**4000-4999**    UG - Advanced Level Undergraduate Courses
Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Graduate students may enroll in and receive graduate credit for 4000-level courses outside their own graduate program.

**5000-5999**    UG and G (Graduate) - Dual Career Level Courses
Courses that are regularly offered for both graduate credit and undergraduate credit. Advanced Level courses providing undergraduate credit that may be counted toward a major or field of specialization. Foundational coursework and research providing graduate or professional credit.

**6000-6999**    G - Foundational Level Graduate and Professional Courses
Foundational courses and research providing graduate or professional credit.

**7000-7999**    G - Intermediate Level Graduate and Professional Courses
Intermediate courses and research providing graduate or professional credit.

**8000-8999**    G - Advanced Level Graduate and Professional Courses
Advanced courses and research providing graduate or professional credit.

#### Quarter Calendar

**000-099**    Non-Credit Courses (except certain seminars and colloquia) for orientation, remedial, or other non-college-level experiences. Credit is not applicable to Graduation Requirements.

**100-199**    Basic Courses providing undergraduate Credit but not to be counted on a major or field of specialization in any department. Beginning Courses, Required, or Elective Courses that may be prerequisite to other courses.

**200-299**    Basic Courses providing Undergraduate Credit and may be counted on a major or field of specialization.

**300-499**    Intermediate Courses providing Undergraduate Credit or Basic Professional Credit that may be counted on a major or field of specialization.

**500-599**    Intermediate Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization and may provide Graduate Credit only in other departments.

**600-699**    Courses providing Undergraduate or Professional Credit that may be counted on a major or field of specialization, and may provide Graduate Credit (in all departments).

**700-799**    Advanced Courses providing Undergraduate, Graduate, or Professional Credit.

**800-999**    Courses providing Graduate Credit and are open to undergraduates only with the approval of the Vice Provost for Research and Dean of the Graduate School.

TO TEST FOR AUTHENTICITY - If you vigorously rub or breathe on the Credentials security seal located in the corner of the page adjacent to the barcode, the image will fade. This document is printed on DocuCheck WATERMARK® security paper and contains multiple overt and covert security features. Hold the page to the light to see the translucent DocuCheck WATERMARK® image. When photocopied, a security statement may appear with the word VOID throughout the face of the document. If solvents & certain other chemicals are applied to this document, the paper will stain.

In accordance with USC 438 (6) (4) (8), The Family Educational Rights and Privacy Act of 1974 (FERPA), you are hereby notified that this Official Transcript is provided upon the condition that you, your agent or employees will not permit any other party access to this record without consent of the student. Alteration of this transcript may be a criminal offense.

0714416

NBME01038

**Appx925**

## JESSICA RAMSAY PRE-MEDICAL SCHOOL STANDARDIZED TESTS
### TAKEN WITHOUT ANY ACCOMMODATIONS

| | | |
|---|---|---|
| Kindergarten (DX 24) | Stanford Early School Achievement Test | **Complete Battery: 96th %**<br>**Total Reading:    96th %** |
| First Grade (DX 25) | Stanford Achievement Test | **Complete Battery: 87th %**<br>**Total Reading:    70th %** |
| Second Grade (DX 27) | Stanford Achievement Test | **Complete Battery: 92nd %**<br>**Total Reading:    88th %** |
| Sixth Grade (DX 27) | Iowa Tests of Basic Skills and Cognitive Abilities Test | **Composite:      86th %**<br>**Reading Total:  74th %** |
| Tenth Grade (DX 29) | ACT Plan exam | **Composite:      97th %**<br>**English:        98th %**<br>**Reading:        73rd %** |
| Tenth Grade (DX 28) | PSAT/NMSQT | **Composite:        71st %**<br>**Critical Reading:  71st %** |
| Eleventh Grade (DX 28) | PSAT/NMSQT | **Composite:        82nd %**<br>**Critical Reading:  70th %** |
| Eleventh Grade (DX 30) | ACT Exam | **Composite:      90th %**<br>**English:        96th %**<br>**Reading:        87th %** |
| Twelfth Grade (DX 31) | ACT Exam | **Composite:      97th %**<br>**English:        94th %**<br>**Reading:        91st %** |
| College (DX 32) | MCAT Exam | **Composite:      79th %**<br>**Verbal Reasoning:    67th %**<br>**Physical Sciences:   79th %**<br>**Biological Sciences: 88th %** |

## JESSICA RAMSAY PERFORMANCE
## ON DIAGNOSTIC ASSESSMENTS

| Dr. Smith Evaluation Report (11/6/2018) (DX 3, Ex. B) | WIAT-III Oral Reading Fluency | **1st %** |
| | WJ-4 Reading Rate Cluster | **1st %** |
| | GORT-5 Reading Rate | **1st %** |
| | GORT-5 Comprehension | **1st %** |
| | GORT-5 Fluency | **2nd %** |
| | Nelson-Denny Reading Rate | **1st %** |

## JESSICA RAMSAY ACADEMIC HISTORY

| Kindergarten (DX 9) | Sunset Oaks Academy | **Grades:  All E's and S+'s** |
|---|---|---|
| First grade (DX 10) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94 in phonics, 93/spelling and 98/math)** |
| Second grade (DX 11) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94/phonics, 97/spelling, 97/math)** |
| Third grade (DX 13) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"** |
| Fourth grade (DX 14) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
| Fifth grade (DX 15, DX 16) | Carrolton-Farmers Branch | **Grades:  Mostly A's, two B's**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
|  | Brown Elementary School | **Grades:   All A's (final grades)** |
| Sixth Grade (DX 17) | Upton Middle School | **Grades:  All A's** |
| High School (9th - 12 grades) (DX 18) | Saint Joseph's High School | **Cumulative GPA:  3.747**<br><br>**Class rank:  28 out of 225 (top 12%)** |
| College (DX 22) | Ohio State University (No accommodations approved until May of second year) | **Cumulative GPA:        3.57**<br><br>**First Year GPA:         3.53**<br><br>**Second Year GPAs, Autumn & Winter:        3.925 & 3.641** |

ACT, Inc.
**Association of American Medical Colleges**
**Federation of State Medical Boards of the United States, Inc.**
**Graduate Management Admission Council**
**Law School Admission Council**
**National Board of Medical Examiners**
**National Conference of Bar Examiners**
**National Council of Examiners for Engineering and Surveying**

July 14, 2008

The Honorable Edward Kennedy
Chairman, Health, Education, Labor
   and Pensions Committee
United States Senate
Washington, D.C.  20515

The Honorable Thomas Harkin
United States Senate
Washington, D.C.  20515

The Honorable Arlen Specter
United States Senate
Washington, D.C.  20515

The Honorable Ted Stevens
United States Senate
Washington, D.C.  20515

cc:

The Honorable Michael B. Enzi
Ranking Member, Health, Education, Labor
   and Pensions Committee
United States Senate
Washington, D.C.  20515

Re:  S. 1881/The ADA Restoration Act of 2007; and H.R. 3195/ADA Amendments Act of 2008

Dear Senators:

     As the leaders of eight organizations involved in standardized testing and higher education, we write to express our strong concern regarding S. 1881, the ADA Restoration Act of 2007 ("ADARA"), which each of you has sponsored.

     A bill similar to S. 1881 was introduced in the House of Representatives last year as H.R. 3195.  On June 25, 2008, the House passed a substitute version of H.R. 3195, now titled the "ADA Amendments Act of 2008" (the "ADAMA").  While the substitute version is an improvement, we still have significant concerns about the ADAMA.  We would like to share those concerns with you, as we understand that the Senate will now consider whether S. 1881 should be amended or replaced along the lines reflected in the ADAMA.

80247665 1

July 14, 2008
Page 2

S. 1881 is a proposed legislative response to decisions of the United States Supreme Court that are viewed as interpreting the Americans with Disabilities Act ("ADA") too narrowly. The Supreme Court decisions in question all arose in the employment context and involved Title I of the ADA; as a result, the discussions that have occurred to date regarding the ADARA and the ADAMA have focused on its likely impact on employers and employees. There has been very little consideration of the proposed legislation's impact relative to obligations that are imposed under Titles II and III of the ADA. Title II applies to services provided by state and local governments. Title III applies to public accommodations such as hotels, restaurants, and "places of education." It also applies to organizations that administer certain types of examinations.

The ADAMA apparently resulted from informal "compromise negotiations" between representatives of certain employer advocacy groups on the one hand and certain disability advocacy groups on the other. We do not know how these groups came to be identified as appropriate proxies for the traditional deliberation by committee members. In all events, entities that are covered by other Titles of the ADA, such as state governments (Title II), colleges and universities (II and III), testing organizations (Titles II and III), and public accommodations (Title III) were not included in those negotiations—even though they, too, would be directly affected by the changes contemplated in the proposed legislation. Representatives of the testing and higher education communities were able to provide only limited input when they learned about the ongoing negotiations between employer and disability representatives, and the concerns raised by these communities were not addressed in the language of the ADAMA.

The purpose of this letter and its attachments is to share some significant concerns regarding the adverse impact that the ADAMA would have—outside the Title I employment context—on public and private entities that administer or rely upon standardized tests; on higher education institutions and their students; and on the public that is served by the physicians, lawyers, engineers, and other professionals whose certification and licensing depends, in part, on the results achieved on such examinations. (The adverse impact would be even greater under the ADARA.) The concerns arise in large part because the ADA imposes affirmative obligations on covered entities to provide accommodations to individuals who fall within the statute's reach. These affirmative obligations make the ADA very different from other civil rights laws, such as the ADEA and Titles VI and VII of the Civil Rights Act. Those statutes prohibit covered entities from taking adverse actions against individuals based upon their protected status, but they do not impose a duty to provide (and to incur the costs of) benefits, aids, services, and other accommodations to individuals in the protected class.

Because of the ADA's accommodation requirements, testing entities and higher education institutions have to deal with ADA issues on a daily basis. They routinely have departments and personnel dedicated to handling ADA matters, and they incur significant costs in complying with the ADA. In contrast, some employers may never have to deal with an ADA issue, and most employers will do so only episodically. The ADAMA is thus of particular interest and concern to the testing and higher education communities.

July 14, 2008
Page 3

## The ADA and Standardized Tests

Millions of standardized examinations are administered every year in a variety of contexts, including admission to colleges, universities, and professional schools; professional licensure; and skills certification. In each context, the standardized examinations provide an objective and important means of comparing candidates or evaluating the competency of an individual.

Under Titles II and III of the ADA, testing organizations and public entities that administer standardized examinations must make the exams accessible to all examinees. The Department of Justice ("DOJ") has interpreted this statutory obligation to require not just physical access, but also exam modifications or auxiliary aids in certain situations. As a result, many individuals who take standardized exams request testing accommodations under the ADA. The number of individuals requesting accommodations would increase even further if the ADARA or ADAMA were enacted.

Testing accommodations raise three main areas of concern: score comparability, fairness, and issues of public health and welfare. When examinees request accommodations, they are asking to take an exam under conditions that are different from the conditions under which all other examinees must test. This has important implications beyond just the substantial costs incurred by testing organizations to provide such accommodations. These requests often involve, in some way, the very cognitive skills (such as thinking and concentrating) that a standardized exam is attempting to measure. The provision of such accommodations— especially extra testing time—can affect the comparability of the resulting scores and scores achieved under standard testing conditions. Research has shown that scores from nonstandard administrations often do not have the same meaning as scores from a standard administration. Accommodations can thus undermine the very purpose of a "standardized" examination. Compromising the standardized nature of these exams raises fairness issues for individuals who test without accommodations and compromises the ability of entities that rely upon test scores to assess an individual's achievement, competency, or aptitude. It can also affect the interests of the general public if the exams in question are licensing exams or exams that are taken to gain access to professional schools such as medical school or law school. Attachment B to this letter discusses in more detail the reasons why the undersigned organizations strongly oppose the proposed legislation.

## The ADA and Higher Education

With regard to the negative financial and programmatic impacts that the ADAMA would have on the higher education community, the American Council on Education ("ACE") has previously communicated its concerns to members of the House, and we understand that ACE has or soon will communicate with members of the Senate. These concerns, which are shared by AAMC's medical school members and the business schools that are members of GMAC, are summarized in Attachment B to this letter.

80247665.1

July 14, 2008
Page 4

On the assumption that the Senate will now consider whether it is appropriate to amend the ADARA in a manner similar to the ADAMA, which was recently passed by the House, we have included as Attachment C a discussion of the ADAMA provisions that are of particular concern to us. Attachment C also provides suggested language for a further amendment to the ADA that would help address these concerns. Additional amendments may be appropriate.

## CONCLUSION

Neither the current version of S. 1881 nor the House version reflected in the ADAMA should be enacted. If the ADA is amended because of concerns relating to its application in the employment context, the final version of that legislation should address the concerns noted in this letter relating to the ADA's application in the testing and higher education contexts.

Thank you very much for considering these views.

80247665.1

July 14, 2008
Page 5

Respectfully yours,

Richard L. Ferguson
Chief Executive Officer and Chairman
*ACT, Inc.*

Daniel O. Bernstine
President
*Law School Admission Council*

Dr. Darrell G. Kirch
President
*Association of American Medical Colleges*

Dr. Donald E. Melnick
President
*National Board of Medical Examiners*

Dr. James N. Thompson
President and Chief Executive Officer
*Federation of State Medical Boards
of the United States, Inc.*

Erica Moeser
President
*National Conference of Bar Examiners*

David A. Wilson
President and Chief Executive Officer
*Graduate Management Admission Council*

W. Gene Corley
President
*National Council of Examiners for
Engineering and Surveying*

80247665.1

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
Page 1
Chart Document

**Jessica E. Ramsay**
Female  DOB:08/29/1990
WH.BH.29

1697-0470001

: 556-2277
Ins: Whirlpoo (Whirlpool Corp) Grp:

**03/24/2009 - Office Visit: ADD/ADHD**
**Provider: Alan N. Smiy, MD**
**Location of Care: Genesis Family Health Center**

**Office Visit**

**Vital Signs**
Height: 66.50 inches
Weight: 132 pounds
Temperature: 98.4 degrees  F (tympanic)
Pulse rate: 70
Pulse rhythm: regular
Respirations: 16

Blood Pressure: 112/74 mm Hg

Select the immunization & enter the necessary information to document the immunization.

Immunization Record
Nursing Comments
Immunizations Due

Immunization Record

Reason for visit: ADD/ADHD

**Laceration/Wound**

Objective

cm

**Assessment:**

**Plan:**
Rx:
METHYLPHENIDATE HCL 10 MG TABS 1 po q am x 4 days, then 1 po bid prn.

DEFENDANT'S
EXHIBIT
**41**

Ramsay20-0041

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
Page 2
**Chart Document**

**Jessica E. Ramsay**
Female  DOB:08/29/1990
WH.BH.29

1697-0470001

: 556-2277
Ins: Whirlpoo (Whirlpool Corp) Grp:

**Workability/Return to Work Report**
**Employee:** Jessica  Ramsay     DOB: 08/29/1990

\*
\*
\*

**Headache History**

**Physical Exam**
**General**
General appearance: well nourished, well hydrated, no acute distress

**Ears, Nose and Throat**
External ear: normal, no lesions or deformities
Hearing: grossly intact
External nose: normal, no lesions or deformities

**Neck**
Neck: supple, no masses, trachea midline

**Chest**
Auscultation: no rales, rhonchi, or wheezes

**Cardiovascular**
Auscultation: S1, S2, no murmur, rub, or gallop
Peripheral vascular: no cyanosis, clubbing, edema, or varicosities

**Neurologic**
Cranial nerves: II - XII grossly intact

**Mental Status Exam**
Mood and affect: no depression, anxiety, or agitation

**History of Present Illness**
Reason for visit: see chief complaint
Chief Complaint: ADD/ADHD
History of Present Illness: needs help with yaz for mail in.

high school no problems

**Ramsay20-0042**

**Genesis Family Health Center**
3916 Stonegate Park  St. Joseph, MI 49085
269-428-8000  Fax: 269-428-2700

*May 17, 2010*
Page 3
Chart Document

**Jessica E. Ramsay**
Female  DOB:08/29/1990
WH.BH.29

1697-0470001

: 556-2277
Ins: Whirlpoo (Whirlpool Corp) Grp:

college stress is making her switch letters around a bit.
always a slow reader
takes alot of concentration for her to read.
has to re-read alot to get the point
not a a good of a test taker, better orally.
names are a problem for her
procrastinates – reading especially
multi tasking is 'ok'

**Risk Factors**
Seatbelt use: 100 %

**Health Status** reviewed - no changes required

**Past, Family, and Social History**
**Past History (reviewed - no changes required):** Sinus Infections
No surgeries indicated
hx of mono x 2
secondary amenorrhea
plantar wart
acne
**Social History (reviewed - no changes required):** To be in eighth grade fall of 2003.
Active in school sports - swimmer, volleyball, soccer

**Review of Systems**
**General:** denies fevers, chills, sweats, anorexia, fatigue, malaise, weight loss
**Eyes:** denies blurring, diplopia, irritation, discharge, vision loss, eye pain, photophobia
**Ears/Nose/Throat:** denies ear pain or discharge, tinnitus, decreased hearing, nasal obstruction or discharge, nosebleeds, sore throat, hoarseness, dysphagia
**Cardiovascular:** denies chest pains, palpitations, syncope, dyspnea on exertion, orthopnea, PND, peripheral edema
**Respiratory:** denies cough, dyspnea, excessive sputum, hemoptysis, wheezing
**Gastrointestinal:** denies nausea, vomiting, diarrhea, constipation, change in bowel habits, abdominal pain, melena, hematochezia, jaundice
**Genitourinary:** denies vaginal discharge, incontinence, dysuria, hematuria, urinary frequency, amenorrhea, menorrhagia, abnormal vaginal bleeding, pelvic pain
**Musculoskeletal:** denies back pain, joint pain, joint swelling, muscle cramps, muscle weakness, stiffness, arthritis
**Skin:** denies rash, itching, dryness, suspicious lesions
**Neurologic:** denies transient paralysis, weakness, paresthesias, seizures, syncope, tremors, vertigo
**Psychiatric:** focus issues at school and outside of same.
**Endocrine:** denies cold intolerance, heat intolerance, polydipsia, polyphagia, polyuria, weight change
**Heme/lymphatic:** denies abnormal bruising, bleeding, enlarged lymph nodes
**Allergic/Immunologic:** denies urticaria, hay fever, persistent infections, HIV exposure

**Physical Exam**
**General appearance:** well nourished, well hydrated, no acute distress

Ramsay20-0043

MAY-17-2010  14:12      GENESIS HEALTH                    269 428 2700    P.033

**Genesis Family Health Center**                    *May 17, 2010*
3916 Stonegate Park  St. Joseph, MI 49085                    Page 4
269-428-8000  Fax: 269-428-2700                    Chart Document

**Jessica E. Ramsay**                                    : 556-2277
Female  DOB:08/29/1990           1697-0470001    Ins: Whirlpoo (Whirlpool Corp) Grp:
**WH.BH.29**

**Eyes**
**External:** conjunctivae and lids normal
**Pupils:** equal, round, reactive to light and accommodation

**Ears, Nose and Throat**
**External ears:** normal, no lesions or deformities
**External nose:** normal, no lesions or deformities
**Hearing:** grossly intact

**Neck**
**Neck:** supple, no masses, trachea midline

**Respiratory**
**Respiratory effort:** no intercostal retractions or use of accessory muscles
**Auscultation:** no rales, rhonchi, or wheezes

**Cardiovascular**
**Auscultation:** S1, S2, no murmur, rub, or gallop
**Periph. circulation:** no cyanosis, clubbing, edema, or varicosities

**Lymphatic**
**Neck:** no cervical adenopathy

**Musculoskeletal**
**Gait and station:** normal, can undergo exercise testing and/or participate in exercise program
**Digits and nails:** no clubbing, cyanosis, petechiae, or nodes
**RUE:** normal ROM and strength, no joint enlargement or tenderness
**LUE:** normal ROM and strength, no joint enlargement or tenderness

**Skin**
**Inspection:** no rashes, lesions, or ulcerations

**Neurologic**
**Cranial nerves:** II - XII grossly intact

**Mental Status Exam**
**Mood and affect:** no depression, anxiety, or agitation

**Assessment**
**Comments:** add vs possible dyslexia - pt has more focus issues than dyslexic tendencies.  recommend
trial of ritalin as precsribed.  risks/benefits, side effects outlined with pt who verbalizes understanding.  f/u
when she returns from school in may.  pt will advise how she is doing in a few weeks.  add survery and Ramsay20-0044
literature provided.
face to face time with patient = 30 minutes

**Genesis Family Health Center**
3916 Stonegate Park St. Joseph, MI 49085
269-428-8000 Fax: 269-428-2700

*May 17, 2010*
Page 5
Chart Document

**Jessica E. Ramsay**
Female DOB:08/29/1990
WH.BH.29

1697-0470001

: 556-2277
Ins: Whirlpoo (Whirlpool Corp) Grp:

## Plan

**New Prescriptions/Refills:**
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid prn  #60 x 0 : Alan N. Smiy, MD (03/24/2009)
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily  #90 x 3 : Alan N. Smiy, MD (03/24/2009)

**Updated Medication List:**
ALLEGRA-D 12 HOUR 60-120 MG TB12 (FEXOFENADINE-PSEUDOEPHEDRINE) 1 PO QAM
ALBUTEROL SULFATE HFA 108 MCG/ACT AERS (ALBUTEROL SULFATE) 2 puffs q 6 hrs prn
* GUARDASIL IMMUNIZATION X 3 This rx is for three guardasil immunizations at the scheduled times.
MINOCYCLINE HCL 100 MG CAPS (MINOCYCLINE HCL) 1 po qd for acne
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily
RHINOCORT AQUA 32 MCG/ACT SUSP (BUDESONIDE (NASAL)) 2 sprays each nostril bid
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid prn

**Prescriptions:**
METHYLPHENIDATE HCL 10 MG TABS (METHYLPHENIDATE HCL) 1 po q am x 4 days, then 1 po bid prn  #60 x 0
　　Entered and Authorized by:　　Alan N. Smiy, MD
　　Signed by:　　Alan N. Smiy, MD on 03/24/2009
　　Method used:　　Print then Give to Patient
YAZ 3-0.02 MG TABS (DROSPIRENONE-ETHINYL ESTRADIOL) 1 tab daily  #90 x 3
　　Entered and Authorized by:　　Alan N. Smiy, MD
　　Signed by:　　Alan N. Smiy, MD on 03/24/2009
　　Method used:　　Print then Give to Patient

**Motor Vehicle Accident**
**Subjective**

Immediately:

**Signed by Alan N. Smiy, MD on 03/24/2009 at 2:19 PM**

Ramsay20-0045



Office for Disability Services

Office of Student Life
150 Pomerene Hall
1760 Neil Avenue
Columbus, OH 43210-1297

Phone (614) 292-3307
Fax (614) 292-4190
TDD (614) 292-0901
www.ods.osu.edu

# ADD / ADHD Verification Form

The Office for Disability Services (ODS) provides academic services and accommodations for students with diagnosed disabilities. The documentation provided regarding the disability diagnosis must demonstrate a disability covered under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act (ADA) of 1990. The ADA defines a disability as a physical or mental impairment that substantially limits one or more major life activities. In addition, in order for a student to be considered eligible to receive academic accommodations, the documentation must show functional limitations that impact the individual in the academic setting.

ODS requires current and comprehensive documentation in order to determine appropriate services and accommodations. The outline below has been developed to assist the student in working with the treating or diagnosing healthcare professional(s) in obtaining the specific information necessary to evaluate eligibility for academic accommodations.

**A. The healthcare professional(s) conducting the assessment and/or making the diagnosis must be qualified to do so.** These persons are generally trained, certified or licensed psychologists or members of a medical specialty.

**B. All parts of the form must be completed as thoroughly as possible.** Inadequate information, incomplete answers and/or illegible handwriting will delay the eligibility review process by necessitating follow up contact for clarification. *It is recommended that this form be completed by typing the information into the editable PDF version of the form available on our website at http://ods.osu.edu/posts/documents/ADHD.pdf* .

**C. The healthcare provider should attach any reports which provide additional related information** (e.g. psycho-educational testing, neuropsychological test results, etc.). If a comprehensive diagnostic report is available that provides the requested information, copies of that report can be submitted for documentation instead of this form. *Please do not provide case notes or rating scales without a narrative that explains the results.*

**D. After completing this form, sign it, complete the Healthcare Provider Information section on the last page and mail or fax it to us at the address provided in our letterhead.** The information you provide will *not* become part of the student's educational records, but it will be kept in the student's file at ODS, where it will be held strictly confidential. This form may be released to the student at his/her request. In addition to the requested information, please attach any other information you think would be relevant to the student's academic adjustment.

If you have questions regarding this form, please call the ODS office at 614-292-3307. Thank you for your assistance.

DEFENDANT'S EXHIBIT
**42**

RAMSAY5-0003

## STUDENT INFORMATION
### (Please Print Legibly or Type)

Name (Last, First, Middle): _Ramsay, Jessica, Erin_

Date of Birth: ~~8/29~~ 8/29/1990        Last 4 Digits of SSN: 4372

Status (check one): ☒current student  ☐transfer student  ☐prospective student

Local phone: (_____)-_____-_____        Cell phone: (269)-930-3001

Address (street, city, state and zip code): 1438 Old Farm Lane

St. Joseph, MI 49085

If OSU Student, OSU E-Mail address: _ramsay.32_  @OSU.EDU

E-mail address: _____

## DIAGNOSTIC INFORMATION
### (Please Print Legibly or Type)

*Please provide responses to the following items by typing or writing in a legible fashion.*
*Illegible forms will delay the documentation review process for the student.*

1. DSM-IV diagnosis:
   - ☒ 314.00
   - ☒ Predominantly Inattentive
   - ☐ Predominantly Hyperactive-Impulsive
   - ☐ 314.01  Combined type
   - ☐ 314.9  Not otherwise specified

2. In addition to DSM-IV criteria, how did you arrive at your diagnosis?
   - ☐ Behavioral observations
   - ☒ Developmental history
   - ☐ Rating scales
   - ☒ Medical history
   - ☒ Structured or unstructured clinical interview with the student
   - ☐ Interviews with other persons
   - ☐ Neuropsychological testing (dates of testing) _____
       (Please attach diagnostic report of testing)
   - ☐ Other (Please specify) _____

3. Please state date of diagnosis: _3-24-09_

RAMSAY5-0004

2

**Appx940**

4. What is the severity of the condition?  Please check one:
☐ mild    ☒ moderate    ☐ severe

Explain severity: _comprehension difficulty, mild dyslexic_
_tendencies, chronic procrastination_

State the following:
a. date of first contact with student: _2-27-03_

b. date of last contact with student: _7-13-10_

5. Student's History:

a) **ADHD History**:  Evidence of inattention and/or hyperactivity during childhood and presence of symptoms prior to age seven.  Provide information supporting the diagnosis obtained from the student/parents/and teachers.  Indicate the ADHD symptoms that were present during early school years (e.g. daydreamer, spoke out of turn, unable to sit still, difficulty following directions, etc.)

- NO HYPERACTIVITY COMPONENT KNOWN
- SLOW READER, SOME DYSLEXIC TENDENCIES,
  DECREASED COMPREHENSION SPEED

b) **Psychosocial History**:  Provide relevant information obtained from the student/parent(s)/guardian(s) regarding the student's psychosocial history (e.g. often engaged in verbal or physical confrontation, history of not sustaining relationships, history of employment difficulties, history of educational difficulties, history of risk-taking or dangerous activities, history of impulsive behaviors, social inappropriateness, history of psychological treatment, etc.).

SUPPORTIVE FAMILY
GOOD SOCIAL DEVELOPMENT
GOOD EFFORT IN ALL TASKS

RAMSAY5-0005

**Appx941**

c) **Pharmacological History:**  Provide relevant pharmacological history including
an explanation of the extent to which the medication has mitigated the symptoms
of the disorder in the past.  Also include any *current medication(s)* that the
student's currently prescribed including dosage, frequency of use, the adverse side
effects, and the effectiveness of the medication.

CURRENT MEDS:   ADDERALL 20mg bid

FAILED MED :  METHPHONDATE  10mg bid

d) **Educational History:**  Provide a history of the use of any educational
accommodations and services related to this disability.

NONE KNOWN TO DATE

6. Student's Current Specific Symptoms

Please check all ADHD symptoms listed in the DSM-IV that the student *currently* exhibits:

**Inattention:**
☐ often fails to give close attention to details or makes careless mistakes in
schoolwork, work or other activities.
☒ often has difficulty sustaining attention in tasks or play activities.
☐ often does not seem to listen when spoken to directly.
☐ often does not follow through on instructions and details to finish schoolwork,
chores, or duties in the workplace (not due to oppositional behavior or failure to
understand instructions).
☒ often has difficulty organizing tasks and activities.
☒ often avoids, dislikes, or is reluctant to engage in tasks (such as schoolwork or
homework) that require sustained mental effort.
☐ often loses things necessary for tasks or activities (e.g. school assignments, pencils,
books, tools, etc.)
☒ is often easily distracted by extraneous stimuli.
☒ often forgetful in daily activities.

RAMSAY5-0006

4

**Hyperactivity:** N|A

☐ often fidgets with hands or feet or squirms in seat
☐ often leaves (or greatly feels the need to leave) seat in classroom or in other situations in which remaining seated is expected.
☐ often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness).
☐ often has difficulty playing or engaging in leisure activities that are more sedate.
☐ is often "on the go" or often acts as if "driven by a motor".
☐ often talks excessively.

**Impulsivity** N|A

☐ often blurts out answers before questions have been completed
☐ often has difficulty awaiting turn
☐ often interrupts or intrudes on others (e.g. butts into conversations or games).

7. State the student's *functional limitations* based on the ADHD diagnosis, specifically in a classroom or educational setting.

   _May need Additional time Allotted to provide for comprehension._

8. State specific recommendations regarding academic accommodations for this student, and a rationale as to why these accommodations/services are warranted based upon the student's functional limitations. Indicate why the accommodations are necessary (e.g. if a note taker is suggested, state the reasons for this request related to the student's diagnosis).

   _MAY NEED ADDITIONAL TIME ALLOTTED FOR WRITTEN TESTS._

RAMSAY5-0007

9. If current treatments (e.g. medications, counseling, etc.) are successful, state the reasons why the above academic adjustments/accommodations/services are necessary.  Please be specific.

N/A

## HEALTHCARE PROVIDER INFORMATION

**(Please sign & date below and fill in all other fields completely using PRINT or TYPE)**

Provider Signature: _____    Date: 8/13/10

Provider Name (Print): _____

Title: _____

License or Certification #: 4301073629 MICHIGAN

Address: _____

Phone Number: (_____)-_____-_____

FAX Number: (_____)-_____-_____

> GENESIS FAMILY HEALTH CENTER, PLC
> ALAN N. SMIY, MD
> 3916 STONEGATE PARK
> ST. JOSEPH, MICHIGAN 49085
> PH: 269-429-8000 / FX: 269-429-2700

**Important: After documentation is reviewed, ODS will send an email notification to the students OSU email account, (e.g. miller.6789@osu.edu), acknowledging receipt of documentation and the eligibility status.  Prospective students that do not yet have an OSU email account will be notified via paper letter sent to their home address.**

RAMSAY5-0008

PX-40
41



**NORTON ROSE FULBRIGHT**

March 31, 2014

**VIA ELECTRONIC SUBMISSION**

Fulbright & Jaworski LLP
801 Pennsylvania Avenue, NW
Washington, D.C. 20004-2623
United States

Direct line +1 202 662 4513
robert.burgoyne@nortonrosefulbright.com

Zita Johnson-Betts
Deputy Chief
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
1425 New York Avenue, N.W.
Suite 4039
Washington, D.C. 20005

Tel +1 202 662 0200
Fax +1 202 662 4643
nortonrosefulbright.com

Re:    ADA Notice of Proposed Rulemaking ("NPRM"):  DOJ CRT Docket No. 124 (RIN 1190-AA59)

Dear Ms. Johnson-Betts:

The referenced NPRM proposes amendments to the U.S. Department of Justice ("DOJ") regulations that implement Titles II and III of the Americans with Disabilities Act ("ADA").  The purpose of the proposed amendments is to "incorporate the statutory changes to the ADA set forth in the ADA Amendments Act of 2008." *See* 79 Fed. Reg. 4839 (Jan. 30, 2014).

As you know, Title III of the ADA includes a provision that applies to private entities that administer tests relating to "applications, licensing, certification or credentialing for secondary or post-secondary educational, professional, or trade purposes...." 42 U.S.C. § 12189. Section 12189 requires testing entities to administer their tests "in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." *Id.*

The DOJ regulation that implements Section 12189 is 28 C.F.R. § 36.309. The NPRM does not propose any amendments to this regulation. Likewise, there is no mention of standardized tests in the regulations that DOJ is proposing to amend. *See* 79 Fed. Reg. at 4857-60 (proposed amendments to Title II regulations, found at 28 C.F.R. Part 35), *and* 4860-62 (proposed amendments to Title III regulations, found at 28 C.F.R. Part 36). Nevertheless, the NPRM includes an extensive discussion of the proposed regulations' anticipated impact on "national examinations."

Our firm has represented a number of testing organizations on ADA-related matters since the statute's enactment in 1990.  These organizations deal with ADA issues on a daily basis and thus have a significant interest in how DOJ interprets the ADA. Unfortunately, compliance is not always a straightforward matter because of the ambiguities of key statutory terms and the absence of technical guidance on many important issues.

We submit these comments on behalf of the following organizations (collectively, "the Testing Entities"), each of which administers a nationwide standardized testing program, and each of which is covered by Section 12819 of the ADA and its implementing regulations.

Fulbright & Jaworski LLP is a limited liability partnership registered under the laws of Texas.

Fulbright & Jaworski LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP, Norton Rose Fulbright South Africa (incorporated as Deneys Reitz, Inc.), each of which is a separate legal entity, are members of Norton Rose Fulbright Verein, a Swiss Verein.  Details of each entity, with certain regulatory information, are at nortonrosefulbright.com. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients.

NORTON ROSE FULBRIGHT

***Association of American Medical Colleges ("AAMC")***:  AAMC is a not-for-profit organization whose mission is to improve the nation's health by supporting academic medicine. Founded in 1876, AAMC represents all 141 accredited U.S. medical schools, 17 accredited Canadian medical schools, nearly 400 major teaching hospitals and health systems, faculty members in various academic and scientific centers, 51 Veterans Administration medical centers, and thousands of medical students and resident physicians.

Among other activities, AAMC develops and administers the Medical College Admission Test ("MCAT").  The MCAT exam is used by admission committees around the country to help fill the limited number of seats that are available each year in medical schools.  The MCAT exam is a standardized, multiple-choice examination designed to assess critical thinking, problem solving, and knowledge of science concepts and principles that are prerequisite to the study of medicine.  Approximately 101,242 MCAT exams were administered in 2013.[1]

***Graduate Management Admission Council***:  Founded in 1953, GMAC is a not-for-profit educational organization that assists business schools and graduate business programs around the world, as well as their students and prospective students.  GMAC currently has 211 member schools in 27 countries.

GMAC develops and administers the Graduate Management Admission Test ("GMAT"), a standardized, computer-based test which measures verbal, mathematical, analytical writing and integrated reasoning skills.  More than 1,600 universities and graduate business programs around the world rely upon GMAT scores as one factor among many in making admissions decisions.  Approximately 263,000 GMAT exams were administered in 2013.

***National Board of Medical Examiners***:  Founded in 1915, the NBME is an independent, not-for-profit organization whose mission is to protect the health of the public through the development and administration of high-quality examinations for the health profession.

Together with the Federation of State Medical Boards, NBME sponsors the United States Medical Licensing Examination ("USMLE").  The USMLE is designed to assess a physician's ability to apply knowledge, concepts, principles and fundamental patient-centered skills that constitute the basis of safe and effective patient care.  It is relied upon state licensing authorities as part of the determination whether to grant an initial license to practice medicine. Approximately 41,224 USMLE Step 1 exams were administered in 2013, 35,563 Step 2 Clinical Knowledge exams, 33,652 Step 2 Clinical Skills exams, and 30,720 Step 3 exams.

***National Conference of Bar Examiners***:  Founded in 1931, NCBE is a not-for-profit corporation whose mission includes providing high-quality standardized tests for evaluating applicants for admission to the practice of law. Two such exams are the Multistate Bar Examination ("MBE") and the Multistate Professional Responsibility Examination ("MBE"), both of which are used by jurisdictions across the United States as part of their attorney licensure process.  NCBE administers the MPRE examinations, and the user jurisdictions administer the MBE.  Approximately 75,000 MBEs and 63,000 MPREs were administered in 2013.

---

[1] The numbers shown above reflect the number of exams administered, not the number of test-takers. For most testing programs, individuals can take an exam more than one time in a given testing year.

50745547.1

Disability Rights Section
March 31, 2014
Page 3

NORTON ROSE FULBRIGHT

## I.    The NPRM's Discussion of "National Examinations"

Although DOJ has not proposed any amendments to 28 C.F.R. § 36.309, the NPRM includes an extensive discussion of how the ADA Amendments Act and DOJ's proposed implementing regulations will affect "national examination test takers (e.g., CPA, LSAT, and other professional examinations...."  79 Fed. Reg.  at 4840; *see also id.* at 4854 (again identifying "national examination test takers" by referencing "e.g., Certified Public Accountant Examination, Law School Admission Test, and other professional examinations").[2]

Millions of standardized examinations are administered each year in various contexts.  In the education area, standardized test scores are relied upon by undergraduate colleges and universities and professional schools across the country to help make admission decisions. Standardized tests provide an objective means of comparing candidates with vastly different educational backgrounds.  Examples of such admission tests include the SAT, ACT, LSAT, MCAT and GMAT.  Standardized examinations are also used in other educational contexts.

Standardized examinations are also relied upon by a wide range of state entities in the licensure process, which protects the public by evaluating the competency of doctors, lawyers, engineers, nurses, and other professionals.  Standardized examinations assess the minimum competency of examinees and play an important role in that process.  Examples of these exams are the USMLE (taken by prospective doctors) and the MBE (taken by prospective lawyers).

Standardized tests are also used for certification purposes as a means of demonstrating competency in an employment field that is not subject to state licensing requirements.

## II.    Comments On The Proposed Regulations

The Testing Entities strongly endorse DOJ's statement that the regulatory framework should be "predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA."  79 Fed. Reg. at 4861.  The comments that follow reflect this fundamental proposition, to which we encourage DOJ to be faithful as it promulgates new rules.

All affected parties would benefit from clear and balanced agency guidance on how the ADA applies to requests for accommodation on standardized tests. The Testing Entities believe that this guidance should come primarily from regulations that have gone through notice-and-comment rulemaking, and to a lesser extent from informal agency guidance, and not through agency enforcement actions.  They therefore appreciate having the opportunity to comment on DOJ's proposed Title III regulations.[3]

---

[2]  The Law School Admission Test, or "LSAT," is not actually a "professional examination" as that term is generally used.  Professional examinations are used for purposes of licensure or certification within a given profession.  In contrast, the LSAT is used in the higher education context to assist law schools in making admission decisions.

[3]  These comments address the proposed Title III regulations because private testing entities are governed by ADA Section 12189, which is found in Title III. To the extent the regulations commented upon have analogs in the Title II regulations, these comments are also be relevant to those regulations given DOJ's interest in promoting "consistency in the application of the ADA." 79 Fed. Reg. at 4840.

Disability Rights Section
March 31, 2014
Page 4

NORTON ROSE FULBRIGHT

A. **"Primary object of attention in cases brought under the ADA"**

DOJ proposes to include the following language in 28 C.F.R. § 36.101(b):

The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

*See* 79 Fed. Reg. at 4860.

We recognize that this language is similar to language found in the "Purposes" section of the ADA Amendments Act, 42 U.S.C. § 12101(b)(5). Nevertheless, because the language cannot be operationalized in a meaningful way, the quoted language should not be retained in Section 36.101(b).

Neither a court nor a covered entity can determine whether the entity has "complied with" its ADA obligations without first considering whether any such obligations exist. There can be no discrimination unless the person who has purportedly been discriminated against meets the statutory definition of disability. The question whether an individual is "disabled" is thus a necessary part of any inquiry into whether a covered entity has "complied with" its obligations under the ADA, and "whether discrimination has occurred."

It is particularly difficult to operationalize DOJ's proposed rule in the context of a request for accommodations. If an individual requests accommodations on a standardized test,[4] it is impossible to determine if the entity "complied with its obligations" without first determining "whether the individual meets the definition of disability." Indeed, in cases involving denials of testing accommodations, the latter question must be the "primary object of attention," because there is no dispute that accommodations were denied and a denial of reasonable accommodations constitutes discrimination -- *if* the prospective test-taker has a qualifying disability.

Every ADA case requires an individualized analysis. *See* 79 Fed. Reg. at 4846 (referencing the "hallmark individualized assessment required by the ADA"). Therefore, in every case in which an individual requests accommodations, it is both lawful and appropriate for the courts and the covered entity to consider in the first instance whether the individual seeking accommodations has a qualifying disability. Only then can the inquiry proceed to whether any resulting functional limitations warrant accommodations and, if so, what those accommodations should be. While the inquiry may not "demand extensive analysis" for some impairments, such as blindness or mobility impairments, that is not the case for every impairment. Mental impairments, for example, can be very challenging to assess, and many impairments result in functional limitations that can vary broadly not only from person to person but also for the same person over time.

---

[4] The term "accommodations" is used in these comments to refer collectively to services, auxiliary aids, modifications and accommodations that might be needed to make an examination accessible.

50745547.1

Disability Rights Section
March 31, 2014
Page 5

NORTON ROSE FULBRIGHT

In light of these issues, the language quoted above from Section 36.101(b) should be withdrawn. Similar language is contained in one of DOJ's proposed rules of construction (*see* 28 C.F.R. § 36.105(d)(1)(iii)), as discussed below, and should also be withdrawn.

### B. Not all impairments constitute disabilities

While it seems self-evident, having a diagnosed impairment does not automatically mean that someone is disabled within the meaning of the ADA. This remains true after enactment of the ADA Amendments Act. To establish coverage under the ADA, an individual must still show that he or she is substantially limited in his ability to perform a major life activity.

There is a common misperception that having a diagnosed impairment automatically triggers coverage under the ADA. To prevent confusion and avoid unnecessary disputes, DOJ should expressly state in its regulations that not all diagnosed impairments will constitute disabilities within the meaning of the ADA, even as amended.

The addition of such language would be consistent with Congress' desire to expand coverage under the ADA, while also respecting Congress' continued direction that impairments must result in "substantial" limitations in order to trigger rights under the ADA. The new language could be added as a new Section 36.101(c) that simply mirrors statements in the legislative history of the ADA Amendments Act (Statement of the Managers to Accompany S. 3406, 154 Cong. Rec. at S8345), as follows:

(c)  *Not all impairments are covered disabilities.*  By retaining the essential elements of the definition of disability, including the key term 'substantially limits,' Congress reaffirmed that not every individual with a physical or mental impairment is covered by the ADA definition of disability. An impairment that does not substantially limit a major life activity is not a disability. That has not changed after enactment of the ADA Amendments Act, nor has the necessity of making this determination on an individual basis.

This proposed language should not be controversial, given DOJ's desire to promulgate regulations that reflect the "clear mandates of the legislative history." See 79 Fed. Reg. at 4845.

### C.    Defining covered disabilities:  "substantially limits"

DOJ has proposed several "rules of construction" for applying the core concept of a "substantial" limitation. *See* 79 Fed. Reg. at 4858. Most of the rules reasonably implement the ADA Amendments Act. There are a few rules, however, as to which the Testing Entities offer the following comments and suggestions.

#### i.  28 C.F.R. § 36.105(d)(1)(i)

DOJ's first rule of construction states that "'Substantially limits is not meant to be a demanding standard." This language goes too far in implementing Congress' intent to broaden coverage under the ADA. It suggests, incorrectly, that "substantially limits" is a negligible requirement and conflicts with the common sense, ordinary meaning of "substantial."

50745547.1

NORTON ROSE FULBRIGHT

No such language is included in the corresponding "rule of construction" found in the ADA Amendment Act's definition of "disability." The statutory rule includes the first sentence from proposed Section 36.105(d)(1)(i) but not the second. *See* 42 U.S.C. § 12102(4)(a) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.")

Nor is the proposed language found in the "Purposes" section of the ADA Amendments Act, which states that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." 42 U.S.C. § 12101(b)(5). To say that determining whether someone has a "disability" should not "demand extensive analysis" is very different from saying that the standard for having a "disability" is not a "demanding standard."

It is clear that Congress rejected the "demanding standard" articulated by the Supreme Court in *Toyota*. It is also clear, however, that Congress did not intend to replace that standard with a toothless standard. The legislative history makes clear that, even "after enactment of the ADA Amendments Act," an "impairment that does not substantially limit a major life activity is not a disability." Statement of the Managers, 154 Cong. Rec. at S8345.

DOJ should therefore delete the last sentence in proposed Section 36.105(d)(1)(i).

### ii.    28 C.F.R. § 36.105(d)(1)(iii)

DOJ has proposed the following rule of construction:

> The primary object of attention in cases brought under title III of the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

DOJ should withdraw the first sentence. It has the same inherent analytical problems as the similar language found under the heading "Purpose and broad coverage," discussed above. In addition, it is inconsistent with the first sentence in the next rule of construction and therefore causes unnecessary ambiguity: "The determination of whether an impairment substantially limits a major life activity *requires* an individualized assessment." 28 C.F.R. § 36.105(d)(1)(iv) (emphasis added).

Elsewhere in the NPRM, DOJ correctly states that "covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity." 79 Fed. Reg. at 4847-48. If DOJ decides to retain the first sentence in proposed Section 36.105(d)(1)(iii) notwithstanding the noted problems, it should add a new sentence at the end of this proposed rule along the following lines:

> In all cases, however, covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has

offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity.

The second sentence in proposed Section 36.105(d)(1)(iii) is largely unobjectionable, as it is similar to language found in the ADA Amendments Act (42 U.S.C. § 12101(b)(5)). However, the sentence is not accurate with respect to *all* impairments (*e.g.*, many types of mental impairments). DOJ should therefore revise the second sentence to read as follows:

> Accordingly, *in many instances*, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

### iii.  28 C.F.R. §§ 36.105(d)(1)(vi) and 36.105(d)(4)

DOJ proposes to add a rule which states that the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 28 C.F.R. § 36.105(d)(1)(vi). A second proposed rule provides examples of "mitigating measures." *Id.* at § 36.105(d)(4).

The Testing Entities have no suggested changes to either of these proposed rules. They are concerned, however, about the following statements made by DOJ in discussing the proposed rules:

> Learned behavioral or adaptive neurological modifications include those strategies developed by an individual to lessen the impact of an impairment. Reasonable modifications include *informal or undocumented accommodations* and modifications as well as those provided through a formal process.
>
> *Self-mitigating measures or undocumented modifications or accommodations* for students with impairments that affect learning, reading, or concentrating, may include measures such as *devoting a far larger portion of the day,* weekends, and holidays to study than students without disabilities; *teaching oneself strategies to facilitate reading connected text or mnemonics to remember facts;* receiving extra time to complete tests; receiving modified homework assignments; or being permitted to take exams in a different format or in a less stressful or anxiety-provoking setting. Each of these mitigating measures, whether *formal or informal, documented or undocumented*, can lessen the impact of, and improve the academic function of a student having to deal with a substantial limitation in a major life activity such as concentrating, reading, speaking, learning, or writing. Nevertheless, these are only temporary supports; the individual still has a substantial limitation in a major life activity and would be a person with a disability under the ADA.

*See* 79 Fed. Reg. at 4848 (emphasis added). These comments are problematic for at least three reasons.

First, they go well beyond the examples of mitigating measures found in the ADA Amendments Act. *See* 42 U.S.C. § 12102(4)(e).

50745547.1

NORTON ROSE FULBRIGHT

Second, they include routine reading and learning techniques as examples of "informal accommodations" and "self-mitigating measures" that an individual can rely upon to explain why he or she should be viewed as substantially limited in activities relating to learning despite having a history of strong academic success. For example, teachers routinely teach students "strategies to facilitate reading connected text" and often encourage them to use "mnemonics to remember facts." Developing such strategies and techniques is not an example of "self-mitigating" the impact of an impairment, it is what learning is all about – for everyone. And because the strategies and techniques have been learned, they cannot reasonably be characterized as "temporary supports."

Third, the use of "self-mitigating measures or undocumented modifications or accommodations" is generally supported only by self-report. Information from the individual seeking accommodations regarding is always relevant. However, as DOJ notes elsewhere in the NPRM, *see* 79 Fed. Reg. at 4852 and n.11, self-reports are often inaccurate and often at odds with objective evidence regarding a student's functional limitations.

Standardized testing entities frequently receive requests for extra testing time and other accommodations from students with exceptional academic records and no history of formal accommodations. The requests are almost always based on impairments that involve lifelong conditions such as learning disabilities or attention deficit disorders that generally have effects throughout one's academic continuum. DOJ should not suggest that covered entities should disregard or give less weight to objective evidence of academic success whenever individuals say that they self-mitigated the impact of their impairments – *e.g.*, by working hard – or relied on informal or undocumented accommodations or modifications.

To address this issue, DOJ should withdraw its comments regarding "self-mitigating measures or undocumented modifications or accommodations" when it issues its final rule. Alternatively, DOJ should state that covered entities may consider objective evidence of an individual's history of academic success when evaluating whether the individual is substantially limited in a major life activity relating to learning, but should also consider any evidence of informal accommodations or modifications.

DOJ should also add a regulation which notes that, although mitigating measures are not to be considered in assessing whether a person has a disability, it is appropriate to consider such measures in determining whether accommodations are needed. The purpose of accommodations is to address an individual's functional limitations. If mitigating measures already address an individual's functional limitations, there is no need for accommodations.

To the best of our knowledge, this point has not been noted by DOJ in any of its ADA guidance. It has been noted by the EEOC, however, in a set of "Questions and Answers" published as part of its ADA Amendments Act rulemaking:

> **Can the positive or negative effects of mitigating measures be considered when assessing whether someone is entitled to reasonable accommodation or poses a direct threat?**
>
> Yes. The ADAAA's prohibition on assessing the positive effects of mitigating measures applies only to the determination of whether an individual meets the

50745547.1

NORTON ROSE FULBRIGHT

> definition of "disability." All other determinations – including the need for reasonable accommodation and whether an individual poses a direct threat – can take into account the positive and negative effects of a mitigating measure. For example, if an individual with a disability uses a mitigating measure which eliminates the need for a reasonable accommodation, then an employer will have no obligation to provide one.

*See* Questions and Answers on the Notice of Proposed Rulemaking for the ADA Amendments Act of 2008, Q 11 (2009). This point is not made in DOJ's proposed regulations. It should be. Language similar to the language quoted above could be added as a new provision, or it could be added at the end of proposed Section 36.105(d)(vi), as follows:

> The prohibition on assessing the ameliorative effects of mitigating measures applies only to the determination of whether an individual meets the definition of "disability." All other determinations, including the need for reasonable accommodation or auxiliary aids, can take into account the positive and negative effects of a mitigating measure. For example, if an individual with a disability uses a mitigating measure which eliminates the need for a reasonable accommodation, then a covered entity will have no obligation to provide one.

### iv. 28 C.F.R. § 36.105(d)(2)(ii)

Under the heading, "Predictable assessments," DOJ proposes to include a list of impairments that, according to DOJ, "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity," and for which the "necessary individualized assessment should be particularly simple and straightforward." *See* 28 C.F.R. § 36.105(d)(2)(ii).

Many of the examples on DOJ's list involve physical disabilities that are obvious or relatively easy to confirm. Several of the impairments, however, are not obvious or "simple" to assess, and will not, as a factual matter, virtually always be found to result in a substantial limitation in a major life activity. Listed impairments that fall in the latter category include autism, depression, post-traumatic stress disorder, and obsessive compulsive disorder.[5]

As noted above, the legislative history makes clear that, while a much broader reach is intended, an "impairment that does not substantially limit a major life activity is not a disability," and it is still necessary under the ADA Amendments Act to make the substantial limitation "determination on an individual basis." Statement of the Managers, 154 Cong. Rec. at S8345. The legislative history also reflects that Congress considered adopting a list of *per se* disabilities but rejected that approach during the compromise negotiations.

Proposed Section 36.105(d)(2) is inconsistent with this background. It appears to suggest that there is a list of *per se* disabilities. At the very least, there is a danger it will be so

---

[5] *See, e.g., Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681, 689 (8th Cir. 1998) (noting that, "'when mental impairments are involved,'" the "'disability, resulting limitations, and necessary reasonable accommodations [often] are not open, obvious, and apparent to the employer'") (citation omitted).

NORTON ROSE FULBRIGHT

interpreted. This would contradict the Congressional directive to consider each individual on an individualized basis.

To address this issue, DOJ should delete Section 36.105(d)(2) in its entirety. Alternatively, fewer impairments should be included in the list. The list should not include any mental or physical impairments that are not obvious, and as to which the resulting functional limitations do not invariably rise to the level of a substantial limitation or can change over time. As the EEOC correctly noted in its enforcement guidance on the ADA and psychiatric disabilities, "[t]he determination that a particular individual has a substantially limiting impairment should be based on information about how the impairment affects that individual and not on generalizations about the condition." *See* EEOC Notice No. 915.002 (discussion of the term "Substantial Limitation," just before Q&A 5).

In addition, if it retains some version of Section 36.105(d)(2), DOJ should add a new sub-section (iii) at the end of this rule, along the following lines:

> (iii) The fact that a person has an impairment that is listed above does not mean that the person needs or is automatically entitled to accommodations, modifications, or auxiliary aids. As is the case for all impairments, it must still be shown that accommodations, modifications or auxiliary aids are needed by the individual in order to address a functional limitation that is relevant to the activity in question, in which event the covered entity is required to provide reasonable accommodations, modifications and/or auxiliary aids that will enable the individual to access the covered entity's goods or services.

### v. 28 C.F.R. 36.105(d)(3)(iii)

DOJ's discussion of the "condition, manner and duration" concept in Section 36.105(d)(3)(iii) includes the following language:

> In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

This language discounts the relevance of an individual's "high level of academic success." If similar language is included in the final rule, DOJ should also include language which makes clear that covered entities may consider all relevant information when evaluating whether someone is substantially limited in a major life activity, including objective evidence that an individual has achieved a high level of academic success, with or without accommodations.

NORTON ROSE FULBRIGHT

As DOJ correctly notes elsewhere in the NPRM, "covered entities may defeat a showing of substantial limitation by ... offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity." 79 Fed. Reg. at 4847-48. It is therefore inappropriate to suggest that a covered entity should not "focus" on the "outcomes" that an individual has actually achieved in evaluating whether a diagnosed impairment has substantially limited the individual's ability to perform related major life activities. In evaluating the impact of a claimed impairment, it is entirely reasonable to look at objective measures of what a person has been able to accomplish – as well as what they are unable to do or have difficulty doing. Thus, the fact that a person has been able to achieve a "high level of academic success" despite having a diagnosed impairment is a relevant piece of information. It is an objective indicator of the extent to which a learning disability has caused substantial limitations on the individual's ability to read, write, speak or learn. Looking to objective evidence of what a person can do is at least as reliable an indication of any functional limitation caused by a claimed learning disability as a person's subjective and after-the-fact assessment of how much time or effort it took him to achieve the high level of academic success that the records reflect.

**D.     DOJ should amend 28 C.F.R. § 36.309**

In November 2011, DOJ's Civil Rights Division sent a letter to the U.S. Government Accountability Office ("GAO") providing the Division's response to GAO Report No. GAO-12-40, "Higher Education and Disability: Improved Federal Enforcement Needed to Better Protect Students' Rights to Testing Accommodations" (cited by DOJ in the NPRM at 79 Fed. Reg. at 4851 n.6, 4852 n.13, and 4853 n.20). Among other things, the letter communicated DOJ's agreement with GAO that DOJ should provide more "technical assistance on testing accommodations." Report at 41. DOJ told GAO that it would develop "additional technical assistance in the near future to be provided on our website in an accessible format." *Id.* DOJ further informed GAO that, "[a]mong the areas of technical assistance the Department is considering are test takers' use of emerging technologies, test score flagging, and requirements by testing entities regarding recency of expert evaluation material and documentation." *Id.*

To the best of our knowledge, no additional technical assistance on any of the referenced subjects has been posted by DOJ on its website or otherwise released, even though two and half years have passed since the letter was sent. The Testing Entities had hoped that DOJ would address at least some of these subjects in its NPRM, but it has not done so.

The Testing Entities believe that DOJ should issue a supplemental NPRM that proposes clear, balanced regulations that address each of the referenced topics: (i) the use of emerging technologies, (ii) test score flagging, (iii) the recency of expert evaluation material, and (iv) documentation requirements. All affected parties would benefit from such regulations, and all affected parties should have an opportunity to provide input to DOJ on these subjects. DOJ has acknowledged that additional guidance is needed, and now is an opportune time to generate such guidance by way of notice-and-comment rulemaking.

Disability Rights Section
March 31, 2014
Page 12

NORTON ROSE FULBRIGHT

### III.    Comments on DOJ's Discussion of Costs and Benefits

DOJ has requested information "to assist the Department in improving the estimates of the costs and benefits of implementing the ADA Amendments Act" as set forth in DOJ's proposed rules. 79 Fed. Reg. at 4855. The discussion that follows responds to that request.

The Testing Entities believe that DOJ's estimates are not sufficiently "comprehensive," because many covered entities other than "post-secondary institutions and national examinations" will incur costs to implement "the Act's changes to titles II and II of the ADA." *See* 79 Fed. Reg. at 4855. Title II applies to governmental entities. Those entities will be affected by the expanded definition of "disabled" in all aspects of their operations, not just in the employment context, whenever they receive accommodation requests based upon impairments that, prior to the ADA Amendments Act, would not meet the definition of disability. For example, state courts may be asked to accommodate attorneys, jurors or witnesses, and state agencies may be asked to provide accommodations or auxiliary aids to citizens attending public meetings or otherwise interacting with the agencies. The same is true for "public accommodations" covered under Title III, such as movie theatres, hotels, restaurants, museums, grocery stores and auditoriums. The more broadly the term "disability" is defined, the greater the number of accommodation requests that can be anticipated for such entities, and many of those accommodations will have costs. Moreover, all entities covered by Titles II and III of the ADA will incur what DOJ refers to as "one-time costs to adapt training and procedures" in light of the new legal requirements. *See* 79 Fed. Reg. at 4853.

The Testing Entities also believe that DOJ's estimates of the resulting costs for entities that administer "national examinations" are inaccurate and unreliable. DOJ estimates that approximately 80,000 additional test-takers will receive accommodations each year who would not have received accommodations prior to the ADA Amendments Act, 79 Fed. Reg. at 4853, 4854, and that the total resulting cost to testing entities to provide those accommodations will be between $1.5 million and $2.7 million. DOJ then allocates these total costs across the 1,397 entities that it believes will be affected by the new rules, and concludes that the total annual cost for each testing entity will range from "a little over $850" for "small national testing entities," to "approximately $11,818 per medium/large national testing center establishment." *Id.* at 4857.

The unfortunate reality is that little weight can be assigned to DOJ's estimates. The proposed rules clearly will result in costs that are not addressed in the estimates, and the annual costs to affected testing entities will easily exceed both the total cost estimated by DOJ ($1.5 to $2.7 million) and the per-testing entity cost ($850 to $11,818).

The first problem with DOJ's estimates is acknowledged by DOJ: the information it relies upon to derive the number of affected testing entities (1,397), the number of individuals who take standardized tests each year (9,287,619),[6] and the number of individuals who will now

---

[6] DOJ states that the "figure of 9.2 million test takers is a summation" of statistical information found in various sources cited in the NPRM. *See* 79 Fed. Reg. at 4853 n.17. The referenced sources, however, involve only seven testing programs -- a minute fraction of the 1,397 testing entities that DOJ says are affected by the ADA Amendments Act. And the total number of test takers shown in the referenced source material is 552,079, not "9,2387,619." GAO's November 2011 report on accommodations in the context of standardized tests used an estimate of "7.7 million test takers" for the number of individuals who took one of the nine tests referenced by GAO in connection with its estimate. *See* GAO-12-40 at 9.

NORTON ROSE FULBRIGHT

receive testing accommodations that they would not have received pre-ADA Amendments Act (between 54,729 and 98,512) is not "robust."

The second problem is that DOJ's estimates consider only individuals with "a learning disability or ADD." 79 Fed. Reg. at 4853. While those impairments make up the largest percentage of accommodation requests on standardized tests, accommodations are also requested based upon numerous other mental and physical impairments. No costs are reflected in DOJ's estimates for accommodating individuals with these other impairments.

The third problem is that DOJ's estimates assume, incorrectly, that the only accommodations that an individual with learning disabilities or ADHD would request is the accommodation of extra test-taking time. Id. Individuals with learning disabilities or ADHD often request other accommodations, in addition to extra testing time. Examples include a private testing room, extra breaks, and being allowed to take the exam over multiple testing days. These accommodations can result in additional test-administration costs. There are also instances in which technology-based aids or accommodations have been requested, such as a request to take a paper-based test on a computer equipped with screen-reading software. That accommodation resulted in costs for the testing entity of roughly $5,000 for one administration – laptop supplied by testing entity (to protect exam security), software license, staff time to load and proof the test, additional staff time to allow the examinee to become familiar with the laptop and software, etc.

The fourth problem is that DOJ relies on "the average hourly wage for test proctors" as the only cost metric in its analysis. See 79 Fed. Reg. at 4853 n.23. There are at least two issues with this:

(i) DOJ appears to assume that all tests are administered in a paper-and-pencil format. However, many tests are administered in a computer-based format, with the cost of test delivery based primarily on the hours of "seat time." This is true for the exams developed by three of the four Testing Entities (AAMC, GMAC and NBME). The hourly cost of seat time varies depending on such factors as the nature of the test, the testing volume, and the terms negotiated by the testing entity and the vendor that provides the computer-based testing facilities. The notion of a "proctor" is this context, paid at the average hourly rate for proctors, does not fit.

(ii) Proctor time (or seat-time in the case of computer-based tests) is not the only cost incurred by testing entities in connection with requests for extended testing time. Testing entities incur significant costs for staff time, including reviewing accommodation requests, engaging in an interactive process with examinees, and coordinating delivery of the exam with the approved accommodations (reasonably estimated to cost $125/hour or more, based on salaries, benefits and overhead). The more requests that have to be processed, the greater that cost. Testing entities also incur significant costs to have accommodation requests reviewed by independent, external experts (whose rates can range from $100 to over $300 per hour of review time). These costs are not reflected in DOJ's estimates.

The fifth problem with DOJ's estimates is that they discount only the number of individuals with ADHD diagnoses, and not the number of individuals who claim to be disabled based upon a learning disability diagnosis. See 79 Fed. Reg. at 4852. DOJ notes that "[r]esearchers have estimated that nearly 25%-50% of students self-identifying with ADD many

not necessarily meet the clinical definition of the disorder and thus would still not qualify for an accommodation under the revised definition of disability." *Id.* at n.11 (citing Jasinski and Ranseen).[7]    Based upon this consideration, DOJ reduces its estimate of the number of individuals who actually have "ADD (as a primary disability) by 30%." *Id.* at 4852.

As discussed below, similar diagnostic issues arise with respect to learning disability diagnoses, but DOJ neither notes this fact nor makes any adjustment to its cost/benefit calculations to reflect it. It should do so when it releases its final rules.

Although it has been largely discredited, including by the federal government,[8] the so-called "discrepancy" model has been a common method for diagnosing learning disabilities and remains widely used. An "astute diagnostician can qualify between 50% and 80% of a random sample of the population as having a learning disability" by employing discrepancy-based diagnostic models. J. Brackett & A. McPherson, "Learning Disabilities Diagnosis in Postsecondary Students: A Comparison of Discrepancy-Based Models," in *Adults with Learning Disabilities: Theoretical and Practical Perspectives*, at 70 (1996);[9] *see also* W. Mehrens, J. Millman & P. Sackett, "Accommodations for Candidates with Disabilities," 63 The Bar Examiner, No. 4, at 33, 36 (1994) ("There is great difficulty in accurately diagnosing a learning disability, and it is well known that many [such diagnoses] are done … in error.") (citing, among others, a study which found that "approximately 60 percent of the pupils identified [in the study] as learning disabled were misclassified").[10]

The risk of misdiagnoses resulting from flaws in the diagnostic models and from incomplete or inadequate professional evaluations is compounded by the fact that some

---

[7] *See also* J. Joy *et al.*, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations for the National Board of Osteopathic Medical Examiners COMLEX Exam," 14(2) J. of Attention Deficit Disorders 104,  106 (2010) (independent professional review of requests for testing accommodations from 50 individuals who claimed to have ADHD; of the 50 files reviewed, "only 14% (7 out of 50) of applicants provided sufficient clinical information to meet the criteria for ADHD".).

[8] *See, e.g.,* U.S. Senate Report 185, 108th Cong., 1st Sess. (Nov. 3, 2003) (stating, in the context of amendments to the IDEA, that "There is no evidence that the IQ-achievement discrepancy formula can be applied in a consistent and educationally meaningful (i.e., reliable and valid) manner").

[9] *See also* S. Dombrowski, C. Reynolds & R. Kamphaus, "After the Demise of the Discrepancy: Proposed Learning Disabilities Diagnostic Criteria," *Professional Psychology: Research and Practice*, Vol. 35, No. 4, 364, 366 (2004) ("[T]he discrepancy approach has become inextricably linked to the LD definition and has become a generally accepted diagnostic heuristic…. Unfortunately, the discrepancy model represents an assessment heuristic that appears to lack validity and reliability.  Research indicates that it cannot distinguish those who have LD from those who do not in actual diagnostic practice…. Even though it lacks diagnostic validity, it is still used ubiquitously but in an idiosyncratic and perhaps even haphazard fashion.").

[10] *See also* M. Gordon, L. Lewandowski & S. Keiser, "The LD Label for Relatively Well-Functioning Students," 32(6)  *J. Learning Disabilities* 485, 488 (1999) (noting that "[d]iagnosticians are now routinely identifying learning disabilities in postsecondary students who never encountered meaningful impairment during high school or, in many cases, even college," even though learning disabilities are lifelong conditions that should become manifest in childhood).

Disability Rights Section
March 31, 2014
Page 15

NORTON ROSE FULBRIGHT

individuals have been found to exaggerate their symptoms in order to obtain the desired diagnosis and the associated "secondary gain potentials," particularly in the academic context.[11] It is an unfortunate reality that, in the context of standardized tests, as in other contexts, some individuals will exaggerate or feign impairments in order to obtain the benefits that flow from a finding that one is "disabled" within the meaning of a federal statute.[12]

The sixth problem with DOJ's cost estimates relates to the "one-time costs" that DOJ believes testing entities will incur to revise their policies (which typically exist in paper and electronic formats) and to train personnel. DOJ estimates these costs at $500/per testing entity, based on "the cost of 5 hours of management time, valued at $100 an hour." 79 Fed. Reg. at 4854. This estimate is far too low. Testing entities are likely to incur (and/or have incurred) in excess of $2,500 in costs for these activities, and even that may be too low an estimate.

Finally, DOJ's cost/benefit analysis does not consider other costs that might result from its proposed regulations. DOJ correctly notes that many significant benefits result from the ADA, both for those protected by the ADA and broader society. It is equally true, however, that there are potential costs for the broader society. Those costs can take various forms in the context of standardized tests, none of which are noted or accounted for in the proposed rules.

When examinees request accommodations, they are asking to take a standardized exam under conditions that are different from the conditions under which all other examinees must test.[13] This has important implications. Research has shown that scores from nonstandard administrations often do not have the same meaning as scores from a standard administration. Accommodations can thus undermine the very purpose of a "standardized"

---

[11] *See, e.g.,* B. Sullivan, K. May & L. Galbally, "Symptom Exaggeration by College Adults in Attention-Deficit Hyperactivity Disorder and Learning Disorder Assessments," *Applied Neuropsychology*, Vol. 14, No. 3, 189 (2007) (examining LD and ADHD diagnoses for students at a mid-size college over a four-year period, and concluding that "significant numbers of college students demonstrate poor effort in the context of ADHD and LD evaluations, and that such poor effort is an indication of symptom magnification motivated by secondary gain potentials").

[12] *Cf. "Prosecuting Title II Cases: Protecting The Social Security Trust Funds from Fraud,"* U.S. Attorneys Bulletin 2, 3 (Nov. 2004) ("A key risk factor in Title II programs are individuals who feign or exaggerate symptoms to become eligible for disability benefits.... Eligibility for the Title II programs is often complex and difficult to verify, and SSA's ability to properly determine a recipient's initial and continued eligibility ... is directly dependent upon SSA's ongoing access to accurate and current information regarding the recipient."); GAO Report HEHS-99-151, "Supplemental Security Income: Additional Actions Needed to Reduce Program Vulnerability to Fraud and Abuse," at 6 (Sept. 1999) (noting that the SSI program "is inherently vulnerable to people who, with the help of others, feign their impairments to obtain benefits," and finding that "[o]ver 60 percent of SSI disability cases from an SSA statistical sample involved impairments that are difficult to objectively verify, and thousands of SSI recipients in the six states we studied used suspicious medical providers to gain access to the program").

[13] "When directions to examinees, testing conditions, and scoring procedures follow the same detailed procedures, the test is said to be standardized. Without such standardization, the accuracy and comparability of score interpretations would be reduced. For tests designed to assess the examinee's knowledge, skills, or abilities, standardization helps to ensure that all examinees have the same opportunity to demonstrate their competencies." *Standards for Educational & Psychological Testing, infra,* at 61.

NORTON ROSE FULBRIGHT

examination. This raises fairness issues for individuals who test without accommodations, and for the many entities that rely upon test scores as reliable indicators of an individual's achievement, competency, or aptitude.[14]

From a testing perspective, accommodations raise concerns that scores from non-standard administrations may not have the same meaning as scores from standard administrations. "Comparability of scores may be compromised, and the test may ... not measure the same constructs for all test takers." *Standards for Educational and Psychological Testing*, at 61 (1999) (published by the American Educational Research Association, the American Psychological Association, and the National Council on Measurement in Education).

For many standardized tests, scores achieved with extra testing time tend to over-predict subsequent performance. Providing additional testing time to an individual could thus give that individual "an undue advantage over those tested under regular conditions." *Standards for Testing* at 105. For tests used for admissions purposes, this would have a negative impact on students who are competing with that individual for a limited number of positions in a given college or professional school. It would also have a negative impact on the schools themselves, because they rely upon the test scores to provide an objective means of comparing candidates who attended different educational institutions, from across the country if not around the world, teaching different courses and using different grading systems.[15]

For licensure and certification tests, the inappropriate provision of extra testing time or other accommodations could affect the general public. When it comes to a licensing exam for physicians, lawyers, nurses, engineers and other professions, the public welfare can be affected if someone passes an exam because of an inappropriate alteration of the standard exam conditions. This may be particularly true for licensure exams in the healthcare field, where the

---

[14] *See, e.g., Powell v. Nat'l Board of Medical Examiners*, 364 F.3d 79, 88-89 (2d Cir. 2004) ("[NBME's accommodation] procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination. As administrator of the national exam used by a number of states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it."); *Murray v. Educational Testing Service*, 170 F.3d 514, 517 (5th Cir. 1999) ("ETS provides a valuable service to colleges and universities by providing a standardized measure of students' ability. Accordingly, ETS has an obligation to provide, or use its best efforts to provide, only valid scores to the colleges and universities that rely on ETS's services. Moreover, ETS has a right to protect its own reputation by assuring the reliability of the information it provides. Finally, 'the other test-takers are entitled to assurance that no examinee enjoys an unfair advantage in scoring.'") (citations omitted).

[15] Additional fairness concerns have been expressed in light of the demographics of individuals who tend to make up a large percentage of the pool of individuals who request accommodations on high-stakes tests. A report by the California State Auditor, for example, found that students in California who received extra testing time on the SAT "were more likely to come from an affluent family or attend a private school," and that many of those students (perhaps as high as 18.2% of the sample) "may have received unwarranted extra time on standardized tests, possibly giving them an unfair advantage over other students taking the same tests." Audit Report 2000-108, California State Auditor, "Standardized Tests." *See also* C. Lerner, "'Accommodations' for the Learning Disabled: A Level Playing Field or Affirmative Action for Elites?," 57 *Vand. L. Rev.* 1041 (2004).

"process of granting special accommodations is a serious matter with public health implications."[16] This fact was noted in the legislative history of the ADA Amendments Act:

> Licensing boards have the responsibility to accurately measure an applicant's skills and abilities to practice in a professional field. The purpose of standardized examinations is to create a set environment in which to carefully determine and ensure that applicants have the knowledge, skill, and ability to perform in the real world.... When a testing organization or a licensing board has made a decision in good faith about an appropriate accommodation, the decision should be given great deference. This is particularly true in light of the important role these examinations play in the licensing process and the safety of the general public. It is important that the integrity of standardized tests for the licensing of professionals in the field of medicine is maintained.

*See* Cong. Rec. S8355 (Sept. 11, 2008)(statement of Senator Barrasso).

When it issues its final rules, DOJ should acknowledge the legitimate need of testing organizations to ensure that accommodations are warranted, given the important purposes served by standardized tests and the need to protect the fairness of the testing process for all affected constituencies. This of course includes disabled test-takers, but it also includes other test-takers, score users, and the general public.

Thank you very much for considering these comments.

Very truly yours,

Robert A. Burgoyne

---

[16] J. Joy *et al.*, "Assessment of ADHD Documentation from Candidates Requesting [ADA] Accommodations," *supra*, 14(2) J. of Attention Deficit Disorders at 104.

# MCAT Score Report

**Name** JESSICA ERIN RAMSAY
**Verification Code** CYE7-PLI7-VHW4-DX8H
**URL \*** https://apps.aamc.org/score-reporting-web/#/report/verify
*\* This report will no longer be able to be verified after 03/13/2017*

**AAMC ID** 13215693
**Date of Birth** REDACTED

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores

### For exams taken after January 31, 2015

No Scores Available

## MCAT Scores

### For exams taken before January 31, 2015

| | | | MCAT Total | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Exam Date | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
| 04/09/2011 | 30M | 28 to 32 | 79% | 10 | 79% | 09 | 67% | M | 31% | 11 | 88% |

### Notes

[1] Test scores, like other measurements, are not perfectly precise. The confidence bands that are shown for the Total Scores above mark the ranges in which the test taker's true scores probably lie. To obtain the confidence band for each section score, subtract one point from and add one point to the score (or, in the case of the Writing Sample, subtract and add one letter).

[2] The percentile ranks of scores are the percentages of test takers who received the same scores or lower scores. The percentile ranks are based on tests administered from January 2012 through September 2014.

Copyright Â©1995-2015 | Association of American Medical Colleges

**DEFENDANT'S EXHIBIT**
**32**

**RAMSAY1-0024**



1107651        5-366-431-4
Livingston, C. 9/22/14-Ev

**Charles Livingston,** M.A.

Licensed Masters Social Worker
Limited Licensed Psychologist

| | |
|---|---|
| **TO:** | Dr. Ziemkowski, M.D. @ WMED |
| **RE:** | Jessica Ramsay, DOB ▇▇▇▇ age 24 |
| **DATE:** | September 22, 2014 |

An evaluation was requested due to "tired...stressed...always more to do...I don't think in words...self-corrected a lot...slow reader...comprehension okay...lowered grades do not show my knowledge...." For the purpose of this evaluation, there was a diagnostic interview, psychological testing of intellectual ability plus academic achievement in reading, and a follow-up consultation with Jessie. Based on the results, the conclusions and recommendations are as follows:

DIAGNOSTIC IMPRESSION: ADHD, inattentive type, severe, 314.00, see #4 below

1. At the time of the interview, Jessie recalled good grades until 4th grade when difficulty with reading and writing plus headaches and eye fatigue led to various testing in elementary and middle school. She indicated that an ophthalmological exam identified poor focus. She stated that untimed tests in the classroom resulted in better achievement. As an undergraduate, she was diagnosed with ADHD and Dyslexia by her primary care physician. She has used various accommodations and adaptations including distraction-reduced testing milieus, extra time for tests, an e-reader, highlighters, colored pencils, and ear plugs. She has used prescribed medication, currently Adderall 40 mg. TR in the AM plus 20 mg. in the PM. Finally, she indicated that she has always loved learning and has developed strong motivation and self-discipline.

2. On measures of intellectual ability, there was a broad range in the results, compared to other people of a similar age. Composite scores for verbal comprehension and perceptual (non-verbal) reasoning were both at the 96th percentile. Strengths included abstract verbal reasoning, practical comprehension, visuospatial reasoning, and long-term memory. The composite score for working memory, attention, and concentration was at the 63rd percentile. The composite score for processing speed was at the 10th percentile. Individuals with similar scores spend so much time and energy in basic data entry tasks, so to speak, that there is little left for higher order fluid reasoning and synthesizing. Jessie's exceptionally bright reasoning abilities and long-term memory stand in contrast to relatively low attention and concentration and very low processing speed. Her native intelligence has been some compensation for low abilities in the identified areas.

3. On measures of academic achievement, Jessie's reading comprehension was above average. (In the case of this subtest, the norms currently available extend to age 20.)

4. The biographical information and objective test results support the diagnosis. At the follow-up consultation, Jessie demonstrated her awareness of adaptive software and technological tools, such as Kurzweil 3000 software, smart pens, and Livescribe pens. Active use of all three modalities (visual, audio, manipulative) in studying could be emphasized. She was also encouraged to consider using many short study periods that respect her particular profile of abilities. At the discretion of WMED, the familiar accommodations of distraction-free testing milieus, paper testing materials, extended time, and audio recordings could be considered. Finally, it can be noted that throughout the evaluation Jessie showed a good tolerance for frustration, good motivation, and the effective use of humor for stress.

Cc: Jessica Ramsay

**Charles Livingston,** M.A.
Licensed Masters Social Worker
Limited Licensed Psychologist

9-23-14

**Telephone:** 269.226.2623
The Marlborough, Suite 41C
471 W. South Street
Kalamazoo, MI 49007

Licensed Masters Social Worker
Limited Licensed Psychologist



1107650    5-366-431-4
Addendum or Report of 9/2

**Charles Livingston, M.A.**

Licensed Masters Social Worker
Limited Licensed Psychologist

ADDENDUM OR REPORT OF SEPTEMBER 22, 2014

REGARDING JESSICA RAMSAY

SEPTEMBER 02, 2016

This addendum addresses a request for more information for the purpose of testing accommodations as requested by USMLE and NBME.

1. In response to Item 3, i.e. "Documentation necessary to substantiate ADHD....", a review of written medical records indicates difficulties with focus and headaches as early as age five. In second grade, accommodations included a secluded testing area and the use of an alphabet board to enhance letter identification. Migraines were diagnosed in third grade and led to daily prophylactic medication and adaptive eyewear. At age seven, notes from optometrist Dr. Tanquay, indicate "she showed substantial deficits in the areas of visual-spatial relationships and visual discrimination...was also lacking in verbal memory." Notes from the chart of Dr. Allan Smiy, MD, from 03-24-09 state "focus issues at school and outside of same...takes a lot of concentration to read...always a slow reader...college stress is making her switch letters around a bit...ADHD with possible Dyslexia." A review of written records from the Ohio State University Office of Disability Services dated 08-16-10 endorses a diagnosis of ADHD, inattentive type, 314.00 and recommends additional time for all exams and a distraction-reduced space. A review of written records dated 08-29-90 from the Western Michigan University Homer Stryker MD School of Medicine indicates "you will be allowed up to 1.5X time for completing your write-ups after clinical OSCE's." In addition, written records from the medical school approve the following accommodations for written exams: Kurtzweil 3000, 2X test time, separate room for tests and studying, use of extra scrap paper, plus colored pencils/highlighters, and paper tests when available.

2. In response to Item 4, i.e. "Relevant Assessment Batteries," the results on measures of intellectual ability cited in Item 2 on the report of September 22, 2014 were taken from the WAIS-IV, both standard and supplemental subtests. The results on measures of academic achievement cited in Item 3 on the report of September 22, 2014 were taken from the WIAT.

3. The diagnosis of ADHD, predominantly inattentive, severe, 314.00 is supported by the written records, self-report, and objective test results. There has been a persistent pattern of careless mistakes in daily activities and schoolwork, difficulty sustaining attention in tasks and academics, lapses in focus when spoken to directly, incomplete follow-through on instructions and tasks of daily living, being easily sidetracked, struggling to meet deadlines, trouble keeping materials and belongings in order, avoiding reading and writing tasks requiring sustained mental effort, losing things, and being easily distracted by extraneous stimuli. The symptoms are not better described or indicated by a neurotic or psychotic disorder or substance abuse. There is historical information that suggests a likelihood of dyslexia.

**Charles Livingston, M.A.**
Licensed Masters Social Worker
Limited Licensed Psychologist

**Telephone: 269.226.2623**
The Marlborough, Suite 41C
471 W. South Street
Kalamazoo, MI 49007

Page 2—Addendum—J. Ramsay

4. The recommendations of 09-22-14 plus the additional record review clearly show distractibility, difficulties in sequencing, and significantly lowered processing speed (10th percentile rank). Therefore, accommodations that address these features should include but are not limited to 2X testing time in a distraction-free space, extra scrap paper, colored markers, and food to take with prescribed medications during testing. Extra testing time follows from the lowered processing speed. A distraction-free space addresses the marked tendency to be easily sidetracked. Extra scrap paper and colored markers are visual and motor modalities that allow for the full expression of excellent perceptual reasoning (96th percentile). Finally, food with the prescribed medications is simply following the Dr.'s treatment recommendations.

Respectfully,

Charles Livingston, M.A.

Charles Livingston, M.A.

Licensed Masters Social Worker
Limited Licensed Psychologist

Disability Services

## RESUME

| | |
|---|---|
| CREDENTIALS | LICENSED MASTERS SOCIAL WORKER #6801065088 |
| | LIMITED LICENSED PSYCHOLOGIST #6301005851 |

**EDUCATION**

M.A.  WESTERN MICHIGAN UNIVERSITY, 1983
B.A.  KALAMAZOO COLLEGE/WESTERN MICHIGAN UNIVERSITY, 1972

**EXPERIENCE**

CLINICAL SOCIAL WORKER/PSYCHOLOGIST
- Provide psychological evaluations pertaining to attention/learning problems, disability, developmental delays, substance abuse, social maturity, child custody, pre-sentencing, parenting, psychosis, and psychopathology
- Provide counseling for children, adolescents, adults, families, and couples
- Conduct group therapy, consultations, public presentations, training, and education
- Private practitioner 1986-present, public clinic 1983-1986, internship 1982-1983, residential treatment 1972-1973, inpatient psychiatric hospital 1970 and 1983

COLLEGE TEACHING
- Kalamazoo College:  General Psychology, Adolescent Development, Personality Theory; 2006-2010
- Kalamazoo Valley Community College:  Introduction to Psychology, Developmental Psychology, Abnormal Psychology, Families in Transition Seminars; 1999-present

**MEMBERSHIPS**

American Psychological Association, 1987-1998
Western Michigan Psychological Association, 1981-1996
        Ethics Chairperson, 1990-1996
Michigan Association of Professional Psychologists, 1998-2000
Omicron Delta Kappa—honorary fraternity for academic excellence
Phi Lambda--Kalamazoo College social/service society
Michigan Dynamometer Association, 1990-present

**VOLUNTEER**

Girl Scouts, AYSO Soccer, Chamber of Commerce, Public and Private Schools, Girls on the Run

---

**Charles Livingston, M.A.**
Licensed Masters Social Worker
Limited Licensed Psychologist

Telephone: 269.226.2623
The Marlborough, Suite 41C
471 W. South Street
Kalamazoo, MI 49007

# WAIS-IV    Record Form

1107984    5-366-431-4
WAIS-IV Score Report-Eval

WECHSLER ADULT INTELLIGENCE SCALE®—FOURTH EDITION

|  | Year | Month | Day |
|---|---|---|---|
| Test Date | 14 | 9 | 12 |
| Birth Date | | | |
| Test Age | | | |

Examinee Name: Jessica Ramsay

Examiner Name: Charles Livingston, MA, LLP, LMSW
471 W. South St., 41-C    *Under the Supervision of*
Kalamazoo, MI 49007    Dr. Wassink, Ed.D.
(269) 226-2693    *Licensed Psychologist*

## Total Raw Score to Scaled Score Conversion

All Group: 593

### Subtest Scaled Score Profile

| Subtest | Raw Score | Scaled Score | Alt. Scaled Score |
|---|---|---|---|
| Block Design Fast | 63 | 16 | |
| Similarities | 31 | 14 | |
| Digit Span 5,4 | 25 | 8 | |
| Matrix Reasoning | 23 | 13 | |
| Vocabulary | 48 | 15 | |
| Arithmetic | 20 | 15 | |
| Symbol Search | 25 | 7 | |
| Visual Puzzles | | | |
| Information | 21 | 15 | |
| Coding | 48 | 6 | |
| Ltter-Number Seq.* | 21 | (10) | ( ) |
| Figure Weights* | | ( ) | ( ) |
| Comprehension | 29 | (13) | |
| Cancellation* | | | ( ) |
| Picture Completion | 20 | (15) | ( ) |

Sum of Scaled Scores    44  44  22  13

*16–69 only    Verbal Comp. | Perc. Reng. | Work. Mem. | Proc. Speed | Full Scale



## Sum of Scaled Scores to Composite Score Conversion

| Scale | Sum of Scaled Scores | | Composite Score | Percentile Rank | Confidence Interval* 90% or 95% |
|---|---|---|---|---|---|
| Verbal Comprehension | 44 | VCI | 127 | 96 | |
| Perceptual Reasoning | 44 | PRI | 127 | 96 | |
| Working Memory | 22 | WMI | 105 | 63 | |
| Processing Speed | 13 | PSI | 81 | 10 | |
| Full Scale | | FSIQ | | | |

*or *SEMs* used to calculate confidence intervals, refer to Table 4.3 of the Technical and Interpretive Manual.

### Composite Score Profile



Copyright © 2008 NCS Pearson, Inc.
All rights reserved.
Product Number 0154980900

PEARSON

RECEIVED
JAN 05 2017
Disability Soci...

Appx967



# Record Form

## Summary

Child's Name: Jessika Ramsay     Sex: F

School: n/a     Grade: n/a

Teacher: n/a     Examiner: Livingston M?

Referral Source: Dr. Ziemkowski MD     Wassink Ed D

Reason for Referral: Academic stressors

Behavioral Observations: Oriented x4, Logical, Coherent, Memory Intact

| | Year | Month | Day |
|---|---|---|---|
| Date Tested | 14 | 09 | 12 |
| Date of Birth | | | |
| Age | 24 | | |

## WIAT Subtests

☒ Age  ☐ Grade

| | Raw Scores | Standard Score | Confidence Interval ___% | Percentile | Other ___ ☒ Equivalent ☐ NCE |
|---|---|---|---|---|---|
| Basic Reading | | | — | | |
| Mathematics Reasoning | | | — | | |
| Spelling | | | — | | |
| Reading Comprehension | | 134 | — | 98% | 717 ≤ 30 |
| Numerical Operations | | | — | | |
| Listening Comprehension | | | — | | |
| Oral Expression | | | — | | |
| Written Expression | | | — | | |

## Composites

☐ Age  ☐ Grade

| | Reading | Mathematics | Language | Writing | Total Composite |
|---|---|---|---|---|---|
| Sum of Raw Scores | + | + | + | = | |
| Standard Score | | | | | |
| Confidence Interval ___% | — | — | — | — | |
| Percentile | | | | | |
| Other ___ ☐ Equivalent ☐ NCE | | | | | |

Ⓦ THE PSYCHOLOGICAL CORPORATION®
*Harcourt Brace & Company*
——— SAN ANTONIO ———
• Boston • New York • Chicago • San Francisco • Atlanta • Dallas
• Diego • Philadelphia • Austin • Fort Worth • Toronto • London

Copyright © 1992 by The Psychological Corporation
Standardization edition copyright © 1990 by The Psychological Corporation
All rights reserved. Printed in the United States of America.

09-972076



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS 1 M114

**Test Date: 12/19/2014**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 12/18/2014

**Total Test Scaled Score:** 70
**Total Test Percent Correct Score:** 74

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area; narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

DEFENDANT'S
EXHIBIT
**66**

RAMSAY1-0025

 **National Board of Medical Examiners**
**Customized Examination**
**Performance Profile**

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS 1 M114

**Test Date: 12/19/2014**

**ID:**    **1164440**
**Name:**    **RAMSAY, JESSICA ERIN**                    **Total Test Scaled Score:**    **70**
**Scaling Group: 12/18/2014**                    **Total Test Percent Correct Score:**    **74**



RAMSAY1-0026

 **NBME®**

# National Board of Medical Examiners
## Customized Examination
### Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 06/22/2015

**Total Test Scaled Score:** 67
**Total Test Percent Correct Score:** 66

---

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

RAMSAY1-0027



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 06/22/2015

**Total Test Scaled Score:** 67
**Total Test Percent Correct Score:** 66



RAMSAY1-0028



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** 201516 M2 CAS3

**Test Date: 01/04/2016**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN                    **Total Test Scaled Score:** 69
**Scaling Group:** 01/04/2016                    **Total Test Percent Correct Score:** 70

---

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance onthe total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

RAMSAY1-0029



# National Board of Medical Examiners
## Customized Examination
## Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** 201516  M2  CAS3

**Test Date:** 01/04/2016

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 01/04/2016

**Total Test Scaled Score:** 69
**Total Test Percent Correct Score:** 70



RAMSAY1-0030

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)
## Performance Profile

**Name: Jessica Ramsay**

**Test Date: 4/5/2016**
**Assessment Score: 310**



The material presented in this self-assessment is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE®. Rather, the CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences.

The score you received, indicated above in the top right hand corner, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools.

The Performance Profile is provided to aid in self-assessment. The shaded region defines a borderline level of performance for each content area. Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* (www.usmle.org).



DEFENDANT'S
EXHIBIT
**67**

RAMSAY1-0031

Appx975

Case: 20-1058     Document: 23     Page: 258     Date Filed: 03/23/2020

**National Board of Medical Examiners®**
**Self-Assessment Services**

**Score Interpretation Guide**
**NBME® Comprehensive Basic Science Self-Assessment (CBSSA)**

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 220 to 230 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at www.usmle.org for the most current information about the level of proficiency required to pass Step 1.

RAMSAY1-0032

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 292 | 400 | 207 |
| 790 | 290 | 390 | 205 |
| 780 | 288 | 380 | 202 |
| 770 | 286 | 370 | 200 |
| 760 | 283 | 360 | 198 |
| 750 | 281 | 350 | 196 |
| 740 | 279 | 340 | 194 |
| 730 | 277 | 330 | 192 |
| 720 | 275 | 320 | 190 |
| 710 | 273 | 310 | 188 |
| 700 | 271 | 300 | 185 |
| 690 | 269 | 290 | 183 |
| 680 | 266 | 280 | 181 |
| 670 | 264 | 270 | 179 |
| 660 | 262 | 260 | 177 |
| 650 | 260 | 250 | 175 |
| 640 | 258 | 240 | 173 |
| 630 | 256 | 230 | 170 |
| 620 | 254 | 220 | 168 |
| 610 | 251 | 210 | 166 |
| 600 | 249 | 200 | 164 |
| 590 | 247 | 190 | 162 |
| 580 | 245 | 180 | 160 |
| 570 | 243 | 170 | 158 |
| 560 | 241 | 160 | 156 |
| 550 | 239 | 150 | 153 |
| 540 | 237 | 140 | 151 |
| 530 | 234 | 130 | 149 |
| 520 | 232 | 120 | 147 |
| 510 | 230 | 110 | 145 |
| 500 | 228 | 100 | 143 |
| 490 | 226 | 90 | 141 |
| 480 | 224 | 80 | 139 |
| 470 | 222 | 70 | 136 |
| 460 | 220 | 60 | 134 |
| 450 | 217 | 50 | 132 |
| 440 | 215 | 40 | 130 |
| 430 | 213 | 30 | 128 |
| 420 | 211 | 20 | 126 |
| 410 | 209 | 10 | < 126 |

RAMSAY1-0033

Appx977

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions. *Academic Medicine*, Vol. 79, No. 10/ October Supplement 2004

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine*, 85(10):S98-S101, October 2010.

RAMSAY1-0034

Date Filed: 03/23/2020    Page: 262    Document: 23    Case: 20-1058

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

### Longitudinal Performance Profile
### History of Performance Across Multiple Completed Tests

**Name: Jessica Ramsay**                                      **Report Date: 4/6/2016**

| Take | Test Date | Timing | Assessment Score |
|------|-----------|--------|------------------|
| 1 | 4/5/2016 | Non-Standard | 310 |

The material presented in this report is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE. The CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences. This report provides a history of your performance on the last six assessments you have completed, along with test date and timing information. The test date corresponds to the date you completed each assessment. The Assessment Score that you received on each completed test as indicated in the table above, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools. A score interpretation guide has been included at the end of this report to help you interpret your Assessment Scores.

The graphical performance profiles are provided to aid in self-assessment and are a compilation of profiles for up to the six most recently completed assessments started on or after March 2, 2016*. The performance profile graphs provide an indicator of your performance across multiple completed assessments for each content area. The shaded region defines a borderline level of performance for each content area. Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A row of asterisks indicate that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance should be interpreted as similar. Because the CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *Step 1 Content Description and Sample Test Materials* (www.usmle.org).

*BSCSA exams started on or after March 2, 2016 cannot be longitudinally compared against those started before March 2, 2016.

RAMSAY1-0035

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

### Longitudinal Performance Profile
### History of Performance Profiles Across Multiple Completed Tests

**Name:  Jessica Ramsay**

**Report Date:  4/6/2016**

Date Filed: 03/23/2020   Page: 263   Document: 23   Case: 20-1058

| Performance Profile Bands | |
|---|---|
| L | Lower Performance |
| B (shaded area) | Borderline Performance |
| H | Higher Performance |



RAMSAY1-0036

Case: 20-1058     Document: 23     Page: 264     Date Filed: 03/23/2020



RAMSAY1-0037

Case: 20-1058    Document: 23    Page: 265    Date Filed: 03/23/2020

### National Board of Medical Examiners®
### Self-Assessment Services

### Score Interpretation Guide
### NBME® Comprehensive Basic Science Self-Assessment (CBSSA)

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 220 to 230 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at *www.usmle.org* for the most current information about the level of proficiency required to pass Step 1.

RAMSAY1-0038

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 292 | 400 | 207 |
| 790 | 290 | 390 | 205 |
| 780 | 288 | 380 | 202 |
| 770 | 286 | 370 | 200 |
| 760 | 283 | 360 | 198 |
| 750 | 281 | 350 | 196 |
| 740 | 279 | 340 | 194 |
| 730 | 277 | 330 | 192 |
| 720 | 275 | 320 | 190 |
| 710 | 273 | 310 | 188 |
| 700 | 271 | 300 | 185 |
| 690 | 269 | 290 | 183 |
| 680 | 266 | 280 | 181 |
| 670 | 264 | 270 | 179 |
| 660 | 262 | 260 | 177 |
| 650 | 260 | 250 | 175 |
| 640 | 258 | 240 | 173 |
| 630 | 256 | 230 | 170 |
| 620 | 254 | 220 | 168 |
| 610 | 251 | 210 | 166 |
| 600 | 249 | 200 | 164 |
| 590 | 247 | 190 | 162 |
| 580 | 245 | 180 | 160 |
| 570 | 243 | 170 | 158 |
| 560 | 241 | 160 | 156 |
| 550 | 239 | 150 | 153 |
| 540 | 237 | 140 | 151 |
| 530 | 234 | 130 | 149 |
| 520 | 232 | 120 | 147 |
| 510 | 230 | 110 | 145 |
| 500 | 228 | 100 | 143 |
| 490 | 226 | 90 | 141 |
| 480 | 224 | 80 | 139 |
| 470 | 222 | 70 | 136 |
| 460 | 220 | 60 | 134 |
| 450 | 217 | 50 | 132 |
| 440 | 215 | 40 | 130 |
| 430 | 213 | 30 | 128 |
| 420 | 211 | 20 | 126 |
| 410 | 209 | 10 | < 126 |

RAMSAY1-0039

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions. *Academic Medicine*, Vol. 79, No. 10/ October Supplement 2004

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine*, 85(10):S98-S101, October 2010.

RAMSAY1-0040

# National Board of Medical Examiners®

## NBME® Comprehensive Basic Science Self-Assessment (CBSSA)
## Performance Profile

**Name:  Jessica Ramsay**

**Test Date:  6/6/2017**
**Assessment Score:  310**



**If you would like to view a report that will provide a longitudinal performance profile that displays a tabular history of your performance and graphical profiles for each content area for the last six self-assessments you have taken, please click here.**

The material presented in this self-assessment is provided by the National Board of Medical Examiners (NBME®) for educational purposes only. The CBSSA is not intended to predict a participant's performance on USMLE®. Rather, the CBSSA is designed to serve as a tool to determine areas of relative strength and weakness in the basic sciences.

The score you received, indicated above in the top right hand corner, ranges from 10 to 800. It is scaled to have a mean of 500 and a standard deviation of 100 in a reference group of USMLE Step 1 first-takers from accredited U.S. medical schools.

The Performance Profile is provided to aid in self-assessment. The shaded region defines a borderline level of performance for each content area.  Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSSA is designed to be integrative, many items contribute to more than one content area. Thus, caution should be used when interpreting differences in performance across content areas. While not all content areas are included in every form, overall content coverage is comparable in the various forms of CBSSA.

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* (www.usmle.org).

RAMSAY1-0057

**National Board of Medical Examiners®**
**Self-Assessment Services**

**Score Interpretation Guide**
**NBME® Comprehensive Basic Science Self-Assessment (CBSSA)**

This guide will help you interpret the Assessment Score you received on your CBSSA Performance Profile. While the CBSSA is provided by the NBME for educational purposes only and is not intended to predict performance on Step 1, NBME research demonstrates that under certain circumstances there is a moderate relationship between performance on CBSSA and subsequent Step 1[1][2].

Step 1 scores are reported on a three-digit scale with a mean ranging from 228 to 229 and a standard deviation of approximately 20. CBSSA scores are scaled to have a mean of 500 and a standard deviation of 100. Both means are based on the performance of USMLE Step 1 first-time examinees from accredited US medical schools. The following information is provided in response to user requests to "translate" the CBSSA score scale to the USMLE score scale. The NBME does not warrant that any individual performance on CBSSA will predict performance on USMLE Step 1 and cautions users of CBSSA against making any predictive inferences.

In the following table, locate your CBSSA score and find the approximate corresponding Step 1 score in the adjacent column. (For example, if your CBSSA score is 390, it approximates a Step 1 three-digit score of 205.)

The level of proficiency required to pass USMLE Step examinations is reviewed periodically and may be adjusted at any time. Visit the USMLE website at www.usmle.org for the most current information about the level of proficiency required to pass Step 1.

On the Performance Profile: MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement.

RAMSAY1-0058

| CBSSA Score | Approximate Step 1 Three-Digit Score | CBSSA Score | Approximate Step 1 Three-Digit Score |
|---|---|---|---|
| 800 | 290 | 400 | 207 |
| 790 | 288 | 390 | 205 |
| 780 | 286 | 380 | 203 |
| 770 | 284 | 370 | 200 |
| 760 | 282 | 360 | 198 |
| 750 | 280 | 350 | 196 |
| 740 | 277 | 340 | 194 |
| 730 | 275 | 330 | 192 |
| 720 | 273 | 320 | 190 |
| 710 | 271 | 310 | 188 |
| 700 | 269 | 300 | 186 |
| 690 | 267 | 290 | 184 |
| 680 | 265 | 280 | 182 |
| 670 | 263 | 270 | 180 |
| 660 | 261 | 260 | 178 |
| 650 | 259 | 250 | 175 |
| 640 | 257 | 240 | 173 |
| 630 | 255 | 230 | 171 |
| 620 | 252 | 220 | 169 |
| 610 | 250 | 210 | 167 |
| 600 | 248 | 200 | 165 |
| 590 | 246 | 190 | 163 |
| 580 | 244 | 180 | 161 |
| 570 | 242 | 170 | 159 |
| 560 | 240 | 160 | 157 |
| 550 | 238 | 150 | 155 |
| 540 | 236 | 140 | 153 |
| 530 | 234 | 130 | 150 |
| 520 | 232 | 120 | 148 |
| 510 | 230 | 110 | 146 |
| 500 | 228 | 100 | 144 |
| 490 | 225 | 90 | 142 |
| 480 | 223 | 80 | 140 |
| 470 | 221 | 70 | 138 |
| 460 | 219 | 60 | 136 |
| 450 | 217 | 50 | 134 |
| 440 | 215 | 40 | 132 |
| 430 | 213 | 30 | 130 |
| 420 | 211 | 20 | 128 |
| 410 | 209 | 10 | < 128 |

November 2016

[1] Using the NBME Self-Assessments to Project Performance on USMLE Step 1 and Step 2: Impact of Test Administration Conditions, *Academic Medicine*, Vol. 79, No. 10/ October Supplement 2004

[2] Relationship Between Performance on the NBME Comprehensive Basic Sciences Self-Assessment and USMLE Step 1 for U.S. and Canadian Medical School Students. *Academic Medicine*, 85(10):S98-S101, October 2010.

RAMSAY1-0059

# NBME® National Board of Medical Examiners
## Subject Examination Program

## Score Interpretation Guide for Examinees

### Surgery Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

DEFENDANT'S
EXHIBIT
**68**

Appx988

NBME00173

 **NBME** **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

Surgery

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 04/27/2017

Total Equated Percent Correct Score*: 67

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀II or II▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Cardiovascular Disorders | | ▓▓▓▓▓▓▓▓ | |
| Diseases of the Respiratory System | ▓▓▓▓▓▓▓▓▓▓ | | |
| Nutritional & Digestive Disorders | ▓▓▓▓▓ | | |
| Renal, Urinary & Male Reproductive Systems | ▓▓▓▓▓▓▓▓▓ | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | ▓▓▓▓▓▓ | | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | ◀II▓▓▓▓▓▓▓ | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | ▓▓▓▓▓▓▓ | | |
| Diagnosis | ▓▓▓▓ | | |
| Management | ▓▓▓▓▓▓ | | |
| **Site of Care** | | | |
| Ambulatory | ▓▓▓▓▓▓▓▓ | | |
| Emergency Department | ▓▓▓▓▓ | | |
| In-Patient | ▓▓▓▓▓▓▓▓ | | |
| **Patient Group** | | | |
| Male | ▓▓▓▓▓ | | |
| Female | ▓▓▓▓▓ | | |
| Geriatric | | ▓▓▓▓▓▓▓ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Page 2 of 2

Appx989

NBME00174



**NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

### Score Interpretation Guide for Examinees

#### Psychiatry Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

##### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 80 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

##### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

**Appx990**

NBME00175

 **NBME**® **National Board of Medical Examiners**
**Subject Examination Program**

**Examinee Performance Profile**

Psychiatry

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 03/03/2017

Total Equated Percent Correct Score*: 72

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀ll or ll▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Mental Disorders | ▓▓▓▓▓▓▓▓▓▓ | | |
| Diseases of the Nervous System & Special Senses | | ▓▓▓▓▓▓▓▓▓▓▓▓ | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | ◀ll▓▓▓▓▓▓▓▓▓ | | |
| Diagnosis | | ▓▓▓▓▓▓▓▓▓▓▓ | |
| Management | ▓▓▓▓▓▓▓▓▓▓▓ | | |
| **Site of Care** | | | |
| Ambulatory | | ▓▓▓▓▓▓▓▓▓ | |
| Emergency Department | ▓▓▓▓▓▓▓▓▓▓ | | |
| **Patient Group** | | | |
| Male | | ▓▓▓▓▓▓▓▓▓ | |
| Female | ◀ll▓▓▓▓▓▓▓▓ | | |
| Child | | | ▓▓▓▓▓ll▶ |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Appx991

NBME00176



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Pediatrics Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 77 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00177



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

**Pediatrics**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440          Test Date(s): 12/22/2016

Name: RAMSAY JESSICA ERIN          Total Equated Percent Correct Score*: 79

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▋ or ▋▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | ◀▋▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | ▬ | |
| Nutritional & Digestive Disorders | | ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | |
| Renal, Urinary & Male Reproductive Systems | | ▬▬▬▬▬▬▬▬▬▬▬▬ | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | ▬▬▬▬▬▬▬▬▬▬ | |
| Cardiovascular Disorders and Diseases of the Respiratory System | | ▬▬▬▬▬▬▬▬▬▬▬▬▬ | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | | | ▬▬▬▬▬▬▬▬▬▶ |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | ▬▬▬▬▬▬▬▬▬▬ | |
| Diagnosis | | ▬▬▬▬▬▬▬▬ | |
| Health Maintenance and Management | | ▬▬▬▬▬▬▬▬▬▬▬▬▬▬ | |
| **Site of Care** | | | |
| Ambulatory | | ▬▬▬▬▬▬▬▬ | |
| Emergency Department | | ▬▬▬▬▬▬▬▬▬▬▬▬ | |
| In-Patient | | ▬▬▬▬▬▬▬▬▬▬▬ | |
| **Patient Group** | | | |
| Male | | ▬▬▬▬▬▬▬▬▬▬ | |
| Female | | ▬▬▬▬▬▬▬▬ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Page 2 of 2

NBME00178



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

**Obstetrics and Gynecology**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440                                                  Test Date(s): 10/21/2016
Name: RAMSAY JESSICA ERIN                     Total Equated Percent Correct Score*: 81

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◄▒ or ▒► symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Gynecologic Disorders | | ▓▓▓▓▓▓▓▓ | |
| Disorders of Pregnancy and Childbirth | | ▓▓▓▓▓▓▓ | |
| Gynecologic Disorders: Mechanisms of Disease | ▓▓▓▓▓▓▓▓▓▓▓▓ | | |
| Disorders of Pregnancy: Mechanisms of Disease | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | | |
| Gynecologic Disorders: Diagnosis | | ▓▓▓▓▓▓▓▓▓▓▓▓▓ | ▓► |
| Disorders of Pregnancy: Diagnosis | | ▓▓▓▓▓▓▓▓▓▓▓ | |
| Gynecologic Disorders: Health Maintenance and Management | | ▓▓▓▓▓▓▓▓▓ | |
| Disorders of Pregnancy: Health Maintenance and Management | | ▓▓▓▓▓▓▓▓ | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | | ▓▓▓▓▓▓▓▓▓ | |
| Mechanisms of Disease | | ▓▓▓▓▓▓▓ | |
| Diagnosis | | ▓▓▓▓▓▓▓▓▓▓▓▓ | ▓► |
| Management | | ▓▓▓▓▓▓▓ | |
| **Site of Care** | | | |
| Ambulatory | | ◄▓▓▓▓▓ | |
| In-Patient | | ▓▓▓▓▓▓▓ | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Page 2 of 2

Appx994                                                                    NBME00260

# NBME® National Board of Medical Exan
## Subject Examination Program

1106774      5-366-431-4
NBME Modular Family Med.

## Score Interpretation Guide for Examinees

### Modular Family Medicine Core Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on this examination were written and reviewed by national test committees. Prior to publication, test forms are reviewed by a panel of course directors from this discipline. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

#### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

#### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 5 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 70 and 80 (75 - 5 and 75 + 5).

RECEIVED

DEC 1 2 2016

Disability Services

**Appx995**

NBME00261

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

**Modular Family Medicine Core**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440                                                                  Test Date(s): 08/26/2016
Name: RAMSAY JESSICA ERIN                              FamC Equated Percent Correct Score*: 60

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀‖ or ‖▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Diseases of Skin and Musculoskeletal Systems | | | |
| Cardiovascular Disorders & Diseases of the Respiratory System | ◀‖ | | |
| Mental Disorders and Diseases of the Nervous System | ◀‖ | | |
| Gynecologic Disorders & Renal, Urinary, Male Reproductive Systems | | | |
| **Physician Tasks** | | | |
| Chronic Care | ◀‖ | | |
| Health and Health Maintenance | ◀‖ | | |
| Management | | | |
| Diagnosis including Mechanisms of Disease | ◀‖ | | |
| **Patient Group** | | | |
| Pediatric (0 - 17) | ◀‖ | | |
| Adult (18 - 65) | ◀‖ | | |
| Geriatric (66 and older) | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00262



# NBME® National Board of Medical Examiners
## Subject Examination Progra

**Score Interpretation Guide for Exam**

106775        5-366-431-4
NBME Medicine Exam—Test S

### Medicine Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

RECEIVED

DEC 1 2 2016

Disability Services

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

### Examinee Performance Profile

#### Medicine

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 06/24/2016

Total Equated Percent Correct Score*: 65

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◁ or ▷ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | | | |
| Cardiovascular Disorders | | | |
| Diseases of the Respiratory System | | | |
| Nutritional & Digestive Disorders | | | |
| Renal, Urinary & Male Reproductive Systems | | | |
| Endocrine & Metabolic Disorders | | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| In-Patient | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Geriatric | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Appx998

NBME00264

# NBME® National Board of Medical Ex
## Subject Examination Prog

1126187     5-366-431-4
NBME Subject Exams (some

## Score Interpretation Guide for Students

## NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 - 3 and 60 + 3).

### Approximate USMLE Performance Equivalents

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

### Approximate Step 1 Equivalents

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|-------|-------------------|-------|-------------------|
| ≥ 94  | ≥ 260             | 68    | 195               |
| 94    | 260               | 66    | 190               |
| 92    | 255               | 64    | 185               |
| 90    | 250               | 62    | 180               |
| 88    | 245               | 60    | 175               |
| 86    | 240               | 58    | 170               |
| 84    | 235               | 56    | 165               |
| 82    | 230               | 54    | 160               |
| 80    | 225               | 52    | 155               |
| 78    | 220               | 50    | 150               |
| 76    | 215               | 48    | 145               |
| 74    | 210               | 46    | 140               |
| 72    | 205               | ≤ 46  | ≤ 140             |
| 70    | 200               |       |                   |

DEFENDANT'S EXHIBIT 69

Appx999

NBME00171



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile
**Comprehensive Basic Science**
**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440                                                 Test Date(s): 04/28/2017
Name: RAMSAY JESSICA ERIN                                   Total Scaled Score: 66

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◄‖‖ or ‖►  symbol  indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

|  | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | |
| Biochemistry | | | |
| Gross Anatomy & Embryology | | | |
| Histology & Cell Biology | | | |
| Microbiology & Immunology | | | |
| Pathology | | | |
| Pharmacology | | | |
| Physiology | | | |
| **System** | | | |
| General Principles of Foundational Science | | | |
| Behavioral Health and Nervous Systems/Special Senses | | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | |
| Cardiovascular System | | | |
| Respiratory System | | | |
| Gastrointestinal System | | | |
| Renal/Urinary System | | | |
| Multisystem Processes & Disorders | | | |

NBME00172



**NBME** National Board of Medical Exam...
Subject Examination Program...
NBME Compreh. Basic Scien

## Score Interpretation Guide for Students

## NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

### *Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 - 3 and 60 + 3).

### *Approximate USMLE Performance Equivalents*

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

### Approximate Step 1 Equivalents

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|---|---|---|---|
| ≥ 94 | ≥ 260 | 68 | 195 |
| 94 | 260 | 66 | 190 |
| 92 | 255 | 64 | 185 |
| 90 | 250 | 62 | 180 |
| 88 | 245 | 60 | 175 |
| 86 | 240 | 58 | 170 |
| 84 | 235 | 56 | 165 |
| 82 | 230 | 54 | 160 |
| 80 | 225 | 52 | 155 |
| 78 | 220 | 50 | 150 |
| 76 | 215 | 48 | 145 |
| 74 | 210 | 46 | 140 |
| 72 | 205 | ≤ 46 | ≤ 140 |
| 70 | 200 | | |

RECEIVED

OCT 1 2 2016

Disability Services

**Appx1001**

NBME00269

 **NBME** National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

**Comprehensive Basic Science**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440            Test Date(s): 04/11/2016

Name: RAMSAY JESSICA ERIN            Total Scaled Score: 68

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀‖ or ‖▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | |
| Biochemistry | | | |
| Gross Anatomy & Embryology | | | |
| Histology & Cell Biology | | | |
| Microbiology & Immunology | | | |
| Pathology | | | |
| Pharmacology | | | |
| Physiology | | | |
| **System** | | | |
| General Principles of Foundational Science | | | |
| Behavioral Health and Nervous Systems/Special Senses | | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | |
| Cardiovascular System | | | |
| Respiratory System | | | |
| Gastrointestinal System | | | |
| Renal/Urinary System | | | |
| Multisystem Processes & Disorders | | | |

Appx1002            NBME00270



# Student: Ramsay, Jessica

## Performance by Summative Exam

(Corrected)

Exam Score

Courses

As of February 15, 2016

DEFENDANT'S EXHIBIT 70

RAMSAY4-0087

Case: 20-1058   Document: 23   Page: 286   Date Filed: 03/23/2020

Appx1003

Case: 20-1058   Document: 23   Page: 287   Date Filed: 03/23/2020

**Student: Ramsay, Jessica**

**Course Performance**



As of February 15, 2016

RAMSAY4-0088

**Appx1004**



**Student: Ramsay, Jessica**

**Performance by Discipline**

Scores by Discipline

Disciplines

As of February 15, 2016

RAMSAY4-0089

1126193    5-366-431-4
Neurocognitive Consultati

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE CONSULTATION

**PATIENT NAME:** Jessica Ramsay
**DOB:**
**DATE:** 10/25/17

**REFERRING:** Self
**CONSULTING:** A. Lewandowski, PHD, FACPN

### REASON FOR STUDY

Jessica Ramsay is a 27-year-old right-handed female with mixed dominance who presents for neurocognitive diagnostic study pursuant to academic difficulties of undetermined etiology and uncertain severity. She is accompanied today by her mother, Jerri Shold, who assists with her history. The patient's primary care up to age 19 has been Dr. Alan Smiy in St. Joe, Michigan. More recently, the patient's primary care has been provided by Dr. Jennifer Houtman. She reports, "I've had accommodations since I was an undergrad. I hate reading. I haven't bought a textbook since undergrad."

### HISTORY OF PRESENT ILLNESS

The patient describes a chronic academic disability without progressive pattern for a number of years that has compromised her ability for educational success. She describes a history of ADD for which she was able to self-accommodate for many years, and reports being evaluated for ADD and dyslexia in 2014 by a therapist (credentials unknown). Given the patient's description of the evaluation, this counselor administered an intellectual and achievement assessment, but is uncertain whether a complete examination was conducted or if an abbreviated and prorated approach was taken. As a result, she reports she was provided accommodations throughout medical school but was denied accommodations for the United States Medical License Examination (USMLE), Step 1. The patient presents today requesting a more comprehensive assessment in order to obtain accommodations similar to that which she was allowed throughout medical school. "I want accommodations so I can keep going. I figure the best way is to get the paperwork done properly." The patient describes herself as having a "unique learning style." She describes that throughout medical school she watched videos and attended lectures and when taking notes uses multiple colored pencils to code information in order to enhance her learning and recall. She provides an example of some notebooks this afternoon. The patient reports she has a history of "reversing my numbers," and her mother describes that as a child she had difficulty differentiating between (lowercase) b, d, p, and q. "I can't remember the name of an enzyme, but I can remember the concepts and what to do with it." In addition, the patient describes word-finding problems that exacerbate her inefficient learning and recall. With regard to the patient's attention and overactivity, she reports, "I can't stop moving. I always have to be doing something." In the past, she was prescribed Adderall and notes, "It works when I remember to take it. I can tell when the first dose is wearing off."

RE: Jessica Ramsay
Page 2

## SOCIAL HISTORY

General. Born and reared in Texas by both parents and moved to Michigan as a 10-year-old. Her father is as 56-year-old in sales who has a BA degree and no reported history of ADD or LD. Her mother is a 67-year-old who is a retired art educator with an MA in art education and a history of dyslexia and ADHD. The patient has two adopted brothers, one who is 22 years old and is diagnosed with Asperger's that works at an Applebee's and a 19-year-old who lives at home and suffers from Prader-Willi syndrome and ASD.

Family and Marital. The patient is single, has never been married, and lives with her fiancé for the past two years in an apartment in Kalamazoo.

Education. The patient completed public high school in St. Joe, Michigan with a 3.8 GPA and an ACT score between 27 and 30 (unable to recall). She reports that she was never diagnosed with ADD in high school, but her mother reports her inattention symptoms were observed as early as a second grader. She describes that her daughter's intellectual abilities allowed her to self-accommodate and thus additional services/specialized services were not necessarily required. The patient completed a BS from Ohio State University with a 3.65 GPA majoring in genetics with minors in business and dance.

Employment. The patient is currently a her third year half-time student at WMU Homer Stryker School of Medicine.

Military. None.

Legal. None.

Avocational. Sports, art, painting (acrylics), drawing, ceramics, camping, reading, papermaking.

## MEDICAL

Records. No medical records were available to review at the time of this consultation.

Psychologic. The patient's mother reports that as a three- or four-year-old, she had some type of academic or behavioral testing. Her mother doesn't recall the credentials of the individual who administered the tests, what was administered, or for what reason the tests were administered. The patient reports consultation with a counselor 3+ years ago who provided an abbreviated intellectual and achievement examination approximately. In addition, the patient has seen a counseling psychologist, Dr. Mary Wassink with a very positive outcome.

Developmental. The patient's mother reports a normal pregnancy and delivery with no complications or fetal distress. She reports that her daughter achieved all neurodevelopmental milestones at age-appropriate intervals. She had no past SLP, OT, PT or audiologic assistance. She played soccer as a child and adolescent and estimates she may have had two past possible concussions complicated by very brief PTA, but she does not recall any type hospitalization.

RE: Jessica Ramsay
Page 3

<u>General Review of Systems.</u> The patient's general medical history is best known to her and her mother, and her primary care who is Dr. Jennifer Houtman. For the completeness of this report, the patient describes a history of sinusitis, frequent stress-associated hives, occasional palpitations induced by stress, exercise-induced asthma, lactose intolerance, past fracture of her ankle, anemia, Factor V Leiden. She had a past DVT diagnosed in the ED and was prescribed rivaroxaban. She reports no history of CNS disease, insult or injury as a young adult. She reports a history of migraine headache for the past 20+ years, occurring as often as a weekly or daily basis, complicated by photosensitivity, hyperacusis, nausea but not necessarily emesis. The patient reports an aura by way of visual blind spots. In addition to the above minor and insignificant concussions, the patient reports she had viral meningitis diagnosed as 20-year-old student at OSU and was hospitalized for one day.

<u>Neurodiagnostics.</u> The patient has had MR as a study volunteer, and she reports findings were normal.

<u>Surgeries.</u> T&A, wisdom teeth, root canal.

<u>Allergies.</u> NKDA. The patient reports some difficulties with the use of loratadine by way of decreased hearing acuity.

<u>Medications.</u> Adderall, BuSpar, Xarelto, metoprolol, Ambien p.r.n., Xanax p.r.n., tramadol.

<u>Risk Factors.</u> Occasional and social use of alcohol with no history of overuse.

**CLINICAL EXAMINATION**

<u>Appearance.</u> Upon examination this afternoon, the patient presents as a normally developed young adult female who presents in mild distress. Head is normocephalic and atraumatic. Eyes are symmetrical and EOMs are intact. She is well groomed and casually dressed and appears her stated age with long dark blond/brown hair and brown/hazel eyes. She is approximately 5'8" and weighs 115 lbs., has relaxed posture throughout the examination, and her facial expression is responsive with normal variability.

<u>Behavior.</u> Eye contact is normal and maintained throughout the examination. The patient's station is steady and her gait is normal for tandem heel-to-toe walk. Upper extremity general motor movements for fine and gross actions are normal for age and bilaterally coordinated as evidenced by tapping and alternating finger-to-thumb touch. Speech is normal. The patient's tone is feminine. Amplitude is soft and normal. Pitch is normal, as is rate. There is no evidence of rapid or pressured speech. Quality reflects good articulation and there is no evidence of difficulty with pronunciation. Patterns are normal and there is no evidence of phonologic or paraphasic errors. Interpersonal skills are well developed, and the patient is compliant and appropriate throughout the examination. Her attitude is cooperative and motivation is good. Sleeping patterns are described to reflect early and middle insomnia. The patient occasionally uses zolpidem to assist with sleep. Appetite is described as variable, but there is no significant change in weight. There is no history of pathognomonic eating problems such as purging or binging. Energy is described as poor and fatigued. The patient notes, "I'm restless, and I'm usually very fatigued." ADLs are not affected.

RE: Jessica Ramsay
Page 4

**Emotional Regulation.** The patient's emotions are appropriate to thought content. Mood is anxious, and this seems to be situational and associated with school performance. Mood and affect are congruent. She is very pleasant in the examination but occasionally frustrated and worried about her school and health status. There is no evidence of acute stress or past traumatic stress. She is certainly frustrated, but she does not endorse neurovegetative symptoms or diurnal variation. The duration of her situational symptoms has been for the past number of months, suggesting a short-term concern. In the past, she notes she had some situational dysphoria "on and off" since completing high school. In the past, she has used an SSRI (fluoxetine), but this was discontinued after two months as the patient reports it was not fully effective and not particularly necessary. Rather, she coped by additional study, sports and socialization. In this manner, she describes the employment of adaptive behaviors.

**Sensorium.** A cursory review of cognitive functioning today reflects the patient is fully alert and oriented to person, place, time and purpose. There is no present evidence of history of unusual perceptual distortions. Her immediate recall is only four of five words with one trial. Her visual recall is four of four objects. The patient's delayed verbal recall is four of five words with one additional word recalled with cuing. Delayed visual recall is four of four. Simple attention and concentration are normal by way of digit sequencing and letter identification. She was able to produce six digits forward, and this is adequate. She is able to produce five digits backwards, and this is borderline given her age and educational level. She has minor difficulties with serial 7s and makes errors that she self-corrects. There are no problems with simple reversals. Calculations are above average, and her answers are both quick and accurate. There are no difficulties with long-term recall of overlearned information or personal history. Abstract reasoning is normal by way of verbal proverbs and verbal and visual similarities. Fund of knowledge is above average for both verbally and visually mediated tasks. Comprehension is also intact for both single and multiple tasks. Visual reasoning is normal for cursory tasks associated with problem solving, synthesis and attention to detail. Executive reasoning is intact for critical judgment and general decision making. Insight is good and age appropriate.

**Thought Processes.** The patient's stream of thought reveals no acute confusion or any significant psychiatric disorganization. There is no evidence of any type of slowing or acceleration of thought flow. She reports no history of suicidal ideation, and there are no risk factors observed. There is no evidence of any type of other-directed harm, unusual ideation, or unusual thought content.

**CLINICAL IMPRESSION (ICD-10)**

1. By history:
    a. Attention deficit disorder.
    b. Learning difficulties/questionable dyslexia.
    c. Situational distress also affected by both transitional anxiety and depression.
2. Difficulties with mental status, etiology and severity uncertain.
3. Rule out ADD vs. ADHD vs. dyslexia vs. dyscalculia vs. spelling dyspraxia vs. mood disorder vs. anxiety condition/GAD vs. adjustment disorder vs. normal examination.

RE: Jessica Ramsay
Page 5

**SUMMARY AND PLAN**

Jessica Ramsay is a 27-year-old right-handed female with some mixed dominance in her third year of medical school who presents for neurocognitive diagnostic study pursuant to a request for accommodations for standardized testing with the USMLE Step 1. The patient's neurological history is noted for two minor and insignificant concussions associated with brief PTA but with no long-term residual consequences. Neuroimaging of the brain has not been medically necessary but was completed as a part of the patient being a test volunteer; findings are reported by the patient to be normal. The patient's general medical history with *possible* implications for cognitive dysfunction is unremarkable. The patient's preexisting psychological history is noted for worry, apprehension and anxiety associated with concern about her educational progress as a third-year medical student. Current medications include Adderall, BuSpar, metoprolol, Xarelto, Ambien, Xanax (p.r.n.), and tramadol.

I will proceed with a standardized and more comprehensive neurocognitive diagnostic study to better clarify the patient's mental status and the severity of symptoms to assist with medical decision making, care coordination, and support accommodations as appropriate. I will schedule the patient for two half sessions depending on her availability and academic demands, and provide the patient with a copy of findings as well as a copy to her primary care provider who is Dr. Jennifer Houtman. I will review findings with the patient.

I spent approximately 120 minutes with the patient today in individual examination, consulting with her mother, providing a detailed neurobehavioral cognitive status examination, and preparing this consultation. I remain available to Dr. Houtman at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified Neuropsychologist
Clinical Assistant Professor
Western Michigan University School of Medicine

AGL:tlw



1126192    5-366-431-4
Neurocognitive exam 2017-

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Helene Pilnick, PHD
*Pediatric Neuropsychology*
JoLynn Cole, MA
*Psychotherapist*

Morris Edwards, PHD
*Certified in Biofeedback*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE EXAMINATION

| | |
|---|---|
| **Name:** | Jessica Ramsay |
| **DOB:** | |
| **Procedure:** | Neurocognitive Study |
| **Review date:** | December 7, 2017 |
| **Referred by:** | Self |
| **Performed by:** | A. Lewandowski, Ph. D., FACPN |

**Reason for Exam** Twenty-seven-year-old right-handed female with 19 years education (3 years medical school) presents for comprehensive neurocognitive diagnostic recheck pursuant to attention and learning difficulties with undetermined etiology and uncertain severity. The primary care physician is Dr. Jennifer Houtman. The preexisting neurological history is unremarkable for CNS disease, insult or injury as a child, adolescent or young adult. Neuroimaging has been completed with MRI and findings are reported to be WNL. The general medical history with *possible* implications for cognitive dysfunction is remarkable for anemia and daily migraines. The psychological history is noted for some type of cognitive testing as a 3 or 4-year-old child and more recently, a consultation three years previously with a counselor who supervised the administration of an abbreviated IQ-achievement test (records not available for review). Current medications include Adderall, Ambien, Tramadol, Xanax and Buspar.

**Technique** Comprehensive neurocognitive examination with HRNB and allied procedures with study date on November 9, 2017. Findings and report are based on test results integrated with additional data including records, behavioral observations of the patient and all other available relevant clinical data. Additional time spent with report analysis, interpretation and integration of test data and results completed on November 16, 2017.

**Findings** See attached graphs and summary table below for raw data.

Jessica Ramsay
Page 2

## Report

*Bold indicates low normal/abnormal findings*

| | Functional Area | Range | Findings | Guideline |
|---|---|---|---|---|
| **Intellectual Functioning** | Verbal Comprehension | 100 +/- 15 | 125 | Superior |
| | Perceptual Reasoning | 100 +/- 15 | 131 | Very superior |
| | Working Memory | 100 +/- 15 | 111 | High average |
| | **Processing Speed** | 100 +/- 15 | 79 | **Borderline impaired** |
| | General abilities (GAI) | 100 +/- 15 | 132 | Very superior |
| | Cognitive efficiency (CPI) | 100 +/- 15 | 94 | Average |
| | Overall Intellect (FSIQ) | 100 +/- 15 | 117 | High average |
| **Academic** | Reading | 100 +/- 15 | 114 | High average |
| | Spelling | 100 +/-15 | 109 | Average |
| | Written arithmetic | 100 +/- 15 | 110 | High average |
| **Neuropsychological** | Sensory speed: dominant | 50T +/- 10 | 50 | Normal |
| | Sensory speed: non-dominant | 50T +/- 10 | 47 | Normal |
| | Motor speed: dominant | 50T +/- 10 | 50 | Normal |
| | Motor speed: non-dominant | 50T +/- 10 | 48 | Normal |
| | Psychomotor: bilateral abilities | 50T +/- 10 | 47 | Normal |
| | Psychomotor: response speed | 50T +/- 10 | 55 | Normal |
| | **Sequencing: simple** | 50T +/- 10 | 35 | **Abnormal** |
| | **Sequencing: complex** | 50T +/- 10 | 27 | **Abnormal** |
| | Executive reasoning | 50T +/- 10 | 60 | Normal |
| **Attention** | Attention: complex (language) | 50T +/- 10 | 60 | Normal |
| | **Attention: complex (non-language)** | 50T +/- 10 | 35 | **Abnormal** |
| | Inattentiveness | 50T +/- 10 | 50/46/51/49/52/49 | Normal |
| | Impulsivity | 50T +/- 10 | 49/51/48 | Normal |
| | Sustained difficulties | 50T +/- 10 | 47 | Normal |
| | **Vigilance difficulties** | 50T +/- 10 | 69 | **Abnormal** (mild) |
| **Memory** | Verbal recall: immediate | 50T +/- 10 | 66 | Normal |
| | Verbal recall: short and long delay | 50T +/- 10 | 65/65 | Normal |
| | Visual recall: immediate | 50T +/- 10 | 61 | Normal |
| | **Visual recall: short and long delay** | 50T +/- 10 | 58/38 | Normal/**Abnormal** |

Jessica Ramsay
Page 3

| | | | | |
|---|---|---|---|---|
| **Psychological** | Health concerns | 50T +/- 10 | 64 | **Abnormal: mild** |
| | Anxiety: generalized | 50T +/- 10 | 47 | Normal |
| | Anxiety: focused | 50T +/- 10 | 51 | Normal |
| | Depression | 50T +/- 10 | 67 | **Abnormal: moderate** |
| | Acute stress | 50T +/- 10 | 41 | Normal |
| | Inefficient thinking | 50T +/- 10 | 73 | **Abnormal: significant** |

**Summary**

1. Abnormal intellectual study
   a. Intellectual *ability* is in the *Very Superior* range (98th percentile) compared to same-aged peers.
   b. Intellectual *efficiency* is only *Average* (34th percentile) compared to same-aged peers, hence reflects a statistically significant weakness in the intellectual study.
   c. The profile suggests equal bilateral aptitude on tasks known to be sensitive to both the left and right cerebral hemispheres.
   d. The pattern reflects a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions.
   e. The IQ pattern is consistent with the patient's/parent's report of premorbid functioning, suggesting a preexisting developmental delay.

2. Normal achievement study. Reading, spelling and arithmetic are normal to above normal and consistent with past education.

3. Borderline abnormal neurocognitive study.
   a. Abnormal performance is observed on measures of sequencing/cognitive shifting, sustained complex attention, and quickness of thinking (as noted above) affecting mental flexibility, cognitive efficiency and inattention with subsequent implications for learning new information and responding to assessments under timed conditions.
   b. Performance is otherwise consistent with or supersedes age-, gender-, and education-weighed norms.

Jessica Ramsay
Page 4

    4. Abnormal psychological study
        a. Elevations are observed on clinical scales associated with ill health and depression.
        b. Subscale analysis reflects significant focus and worry about personal health, feelings of failure, indecisiveness and difficulties with concentration (cognitive inefficiency), physiological symptoms associated with depression (low energy, sleep/appetite disturbance, and difficulties with concentration, decision-making, memory/learning).
        c. Emotional difficulties exacerbate the above-noted existing limitations (thought processes), and have subsequent implications for learning new information and responding to assessments under timed conditions.

**Clinical Impression**

    1. By history:

        a. Attention deficit disorder
        b. Learning difficulties affecting ability to pass standardized testing

    2. By diagnostic testing:

        a. Attention deficit disorder, hyperactive, moderate (F90.1)
        b. Learning disability, nonverbal (abnormal scanning and processing speed) (F81.9)

**Plan**

    1. Graphic findings and report to patient.
    2. Copy of findings to patient.
    3. Continue with specialized cognitive medication (dextroamphetamine) to assist with inattention, if not medically contraindicated. I defer to the patient's primary care provider who is Dr. Houtman for consideration of this recommendation. Alternatively, I can provide psychiatric consultation through my clinic as part of a conjoint psychotherapy-psychiatric treatment for the patient.
    4. Continue with medication to address emotional difficulties (zolpidem, alprazolam, and buspirone).
        a. The present study indicates that the patient's current psychological medication regimen is adequately effective, as elevations on clinical scales of depression are only approximately one and a half standard deviations greater than the average range.
        b. At present, these medications are provided by Dr. Houtman.
        c. If needed, I am happy to provide psychiatric assistance though my clinic as part of conjoint psychotherapy-psychiatric medication treatment for the patient.

Jessica Ramsay
Page 5

5. Consider psychotherapy to address mood disturbance and modulate affect.
6. Patient requests accommodations and written responses to a series of guidelines toward test accommodations for the United States Medical Licensing Examination (USMLE), Step 1. Guidelines provided by the patient were reviewed and the following accommodations are recommended:
   a. Fifty percent additional time to complete the examination or 100 percent additional time (double time) for an exam given over two days to compensate for slowed thought processing
   b. Two additional breaks during the examination to compensate for difficulties managing mood/stress.
   c. A separate and/or quiet area to complete the examination to compensate for inattention and distractibility.
7. The patient did not have accommodations for the MCAT and as a result scores reflect her inefficiency and slowed reading.
8. The patient is not at risk for operating a motor vehicle.
9. Consider a memory notebook to assist with organization and improve attention.
10. Recheck in 12 months to assist primary care in monitoring mental status.
11. Consider re-examination in 24 months for comparative analysis to baseline.
12. Discussed issues of safety and surrogate decision making, provided education regarding the diagnosis and management of health behavior changes, and directed to additional resources for support.
13. I remain available to patient regarding assessment and treatment needs.
14. I remain available to Dr. Houtman as the patient's primary care physician at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified in Neuropsychology
Clinical Assistant Professor, Western Michigan University
   Department of Psychiatry, Western Michigan University School of Medicine
   Psychology Department
   Department of Counseling Psychology and Counselor Education
   College of Health and Human Services (SPADA)
   Department of Military Science and Leadership

AGI: la

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## Addendum

Name: Jessica Ramsay (DOB: ▮▮▮▮▮▮▮ )
Date: February 7, 2018

Re: Names of specific measures used in the neuropsychological examination of Jessica
Ramsay on December 7, 2017

Weschler Adult Intellectual Scale, 4th edition, Wide Range Achievement Test 4th edition,
Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number
Writing Test, Tactile Form Recognition Test, California Verbal Learning Test, 2nd edition,
Rey Osterrieth Complex Figure Test, Tactile Form Recognition Test, Grip Strength Test,
Finger Oscillation, Tactual Performance Test, Trail Making Test A, Trail Making Test B,
Category Test, Seashore Rhythm Test, Speech Sounds Perception Test, Personality
Assessment Inventory, Aphasia Screening Test.

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

May 23, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Dear Jessica,

I am responding to your request for further clarification on the neuropsychological examination completed December 7, 2017. Regarding accommodations for the USMLE Step 1, and given your additional description of the requirements of the examination, my recommendations should have read, 100% additional testing time (double time), plus additional break time.

Alan Lewandowski, PhD, FACPN
Board Certified Neuropsychologist

1126531        5-366-431-4
Raw data table 11.9.17 Ne

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pitnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

June 20, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Re:Additional raw data tables for November 9, 2017 Neuropsychological Examination

Dear Ms. Ramsay:

Attached to this letter is an additional compilation of the findings from your recent neuropsychological assessment formatted as a table. The Raw Data Addendum constitutes a complete picture of the <u>entire</u> data set from your assessment. As such, it is a comprehensive representation of your evaluation that includes tests administered, the normative sample group, mean scores, your individual (patient) scores, and a guideline to assist with interpretation.

Previously, you were provided with a set of graphs. These graphs that were attached to the initial report were provided to you *only* as a general and cursory guide, to be used during our review in order to assist you in understanding the findings. They were never/are not intended to be a comprehensive representation of all of the measures employed, functional areas assessed, and the general corresponding scores. They were never/are not intended for broader distribution or to be used in your request for accommodations.

Alan G. Lewandowski, Ph. D., FACPN
Clinical Psychologist
Board Certified Neuropsychologist

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 1

### Raw Data Addendum

| Tests Administered | | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Weschler Adult Intellectual Scale, 4th Edition (Standard Scores) | Similarities | 1 | 10 | 13 | High average |
| | Vocabulary | 1 | 10 | 14 | Superior |
| | Information | 1 | 10 | 16 | Very superior |
| | Comprehension | 1 | 10 | 15 | Superior |
| | Digit span | 1 | 10 | 12 | High average |
| | Arithmetic | 1 | 10 | 12 | High average |
| | Block design | 1 | 10 | 15 | Superior |
| | Matrix reasoning | 1 | 10 | 16 | Very superior |
| | Visual puzzles | 1 | 10 | 15 | Superior |
| | Figure weights | 1 | 10 | 15 | Superior |
| | Picture completion | 1 | 10 | 14 | Superior |
| | Symbol search | 1 | 10 | 7 | Low average |
| | Coding | 1 | 10 | 5 | Borderline Impaired |
| | Cancellation | 1 | 10 | 9 | Average |
| | Verbal Comprehension Index | 1 | 100 | 125 | Superior |
| | Perceptual Reasoning Index | 1 | 100 | 131 | Very superior |
| | Working Memory Index | 1 | 100 | 111 | High average |
| | Processing Speed Index | 1 | 100 | 79 | Borderline impaired |
| | General Abilities Index | 1 | 100 | 132 | Very superior |
| | Cognitive Efficiency Index | 1 | 100 | 94 | Average |
| | Overall Intellect Index | 1 | 100 | 117 | High average |
| Wide Range Achievement Test, 4th Edition (Standard Scores) | Reading | 1 | 100 | 114 | High average |
| | Spelling | 1 | 100 | 109 | Average |
| | Written arithmetic | 1 | 100 | 110 | High average |
| California Verbal Learning Test, 2nd edition (T-Scores) | Memory: immediate recall | 4 | 50 | 66 | Normal |
| | Memory: short delay free recall | 4 | 50 | 65 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 60 | Normal |
| | Memory: long delay free recall | 4 | 50 | 65 | Normal |
| | Memory: long delay cued recall | 4 | 50 | 60 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 2

| | | Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|---|
| Halstead Reitan Neuropsychological Battery (T-Scores) | | Tactile form recognition: dominant | 3 | 50 | 50 | Normal |
| | | Tactile form recognition: non-dominant | 3 | 50 | 47 | Normal |
| | | Finger oscillation: dominant | 3 | 50 | 50 | Normal |
| | | Finger oscillation: non-dominant | 3 | 50 | 48 | Normal |
| | | Tactile Performance: dominant | 3 | 50 | 64 | Normal |
| | | Tactile Performance: non-dominant | 3 | 50 | 50 | Normal |
| | | Tactile Performance: bilateral abilities | 3 | 50 | 47 | Normal |
| | | Tactile Performance: response speed | 3 | 50 | 55 | Normal |
| | | Tactile Performance: memory | 3 | 50 | 54 | Normal |
| | | Tactile Performance: localization | 3 | 50 | 72 | Normal |
| | | Trail A: simple sequencing | 3 | 50 | 35 | Abnormal |
| | | Trail B: complex sequencing | 3 | 50 | 27 | Abnormal |
| | | Executive reasoning | 3 | 50 | 60 | Normal |
| | | Seashore rhythm | 3 | 50 | 35 | Abnormal |
| | | Speech sounds perception | 3 | 50 | 60 | Normal |
| Conner' s Continuous Performance Test, 3rd Edition (T-Scores) | | Attention: detectability | 1 | 50 | 50 | Normal |
| | | Attention: omissions | 1 | 50 | 46 | Normal |
| | | Attention: commissions | 1 | 50 | 51 | Normal |
| | | Attention: perseverations | 1 | 50 | 48 | Normal |
| | | Attention: hit reaction time | 1 | 50 | 49 | Normal |
| | | Attention: hit reaction time SD | 1 | 50 | 52 | Normal |
| | | Attention: hit reaction variability | 1 | 50 | 49 | Normal |
| | | Attention: hit reaction time block change | 1 | 50 | 47 | Normal |
| | | Attention: hit reaction time ISI change | 1 | 50 | 69 | Abnormal (mild) |
| Rey Osterrieth Complex Figure (T-Scores) | | Memory: immediate recall | 4 | 50 | 61 | Normal |
| | | Memory: short delay free recall | 4 | 50 | 58 | Normal |
| | | Memory: short delay cued recall | 4 | 50 | 38 | Abnormal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 3

| Test Administered | | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Personality Assessment Inventory (T-Scores) | Health concerns | 2 | 50 | 64 | Abnormal |
| | Anxiety: generalized/focused | 2 | 50 | 47/51 | Normal |
| | Depression | 2 | 50 | 67 | Abnormal |
| | Acute stress | 2 | 50 | 41 | Normal |
| | Cognitive inefficiency | 2 | 50 | 53 | Normal |
| | Conversion | 2 | 50 | 51 | Normal |
| | Somatization | 2 | 50 | 57 | Normal |
| | Obsessive-compulsive | 2 | 50 | 54 | Normal |
| | Phobias | 2 | 50 | 54 | Normal |
| | Traumatic stress | 2 | 50 | 45 | Normal |
| | Depression: cognitive | 2 | 50 | 67 | Abnormal |
| | Depression: affective | 2 | 50 | 50 | Normal |
| | Depression: physiological | 2 | 50 | 74 | Abnormal |
| | Activity level | 2 | 50 | 51 | Normal |
| | Grandiosity | 2 | 50 | 49 | Normal |
| | Irritability | 2 | 50 | 43 | Normal |
| | Hypervigilance | 2 | 50 | 48 | Normal |
| | Persecution | 2 | 50 | 48 | Normal |
| | Resentment | 2 | 50 | 44 | Normal |
| | Psychotic experiences | 2 | 50 | 36 | Normal |
| | Social detachment | 2 | 50 | 46 | Normal |
| | Thinking disorder/difficulty | 2 | 50 | 73 | Abnormal |
| | Affective instability | 2 | 50 | 39 | Normal |
| | Identity problems | 2 | 50 | 44 | Normal |
| | Negative relationships | 2 | 50 | 40 | Normal |
| | Self-harm | 2 | 50 | 45 | Normal |
| | Antisocial behaviors | 2 | 50 | 43 | Normal |
| | Egocentricity | 2 | 50 | 42 | Normal |
| | Stimulus-seeking | 2 | 50 | 53 | Normal |
| | Aggressive attitude | 2 | 50 | 34 | Normal |
| | Aggression: verbal and physical | 2 | 50 | 37/42 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

1128565    5-366-431-4
Colored Image 1-Evaluatio

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

1126566    5-366-431-4
Colored Image 2-Evaluatio

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski