Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**JOINT APPENDIX
VOLUME IV: APPX1028-1366**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

## Volume I: Appx1-62

                                                                    Page

District Court Docket....................................................Appx1

Notice of Appeal (Jan. 7, 2020)....................................Appx7

District Court Order Granting Preliminary
Injunction (Dec. 31, 2019).............................................Appx9

District Court Order Denying Motion to Stay
(Feb. 4, 2020)..............................................................Appx62

## Volume II: Appx63-725

Preliminary Injunction Hearing Transcript
(Dec. 3-5, 2019)........................................................... Appx63

## Volume III: Appx726-1027

Complaint (May 8, 2019) ..........................................Appx726

Answer to Complaint (July 8, 2019)........................Appx747

Declaration of Catherine Farmer, Psy.D. ...............Appx762

Declaration & Resume of Steven G. Zecker,
Ph.D. ......................................................................Appx771

Declaration & Resume of Benjamin J. Lovett,
Ph.D. ......................................................................Appx795

Declaration & Resume of Robert D. Smith,
Ph.D. ......................................................................Appx827

Declaration of Jessica Ramsay ...................................Appx840

Resume of Jessica Ramsay  ......................................Appx854

Kindergarten Progress Reports & Test Record
(1995-96) .................................................................Appx857

First Grade Progress Report & Test Record
(1996-97) .................................................................Appx871

Second Grade Progress Reports & Test Record
(1997-98) .................................................................Appx875

Third Grade Report Card (1998-99) .........................Appx879

Tanguay Letters & Notes (1997, 2000) ....................Appx881

Fourth Grade Report Card (1990-2000)....................Appx886

Fifth Grade Report Cards (2000-01) ........................Appx888

Sixth Grade Report Card & Test Report
(2001-02) .................................................................Appx892

High School Transcript & Alumni History
(2004-08) .................................................................Appx895

Standardized Test Results (2007) ............................Appx897

High School Athletic Awards (2008) ........................Appx899

Plan ACT Score Report (2005)..................................Appx904

ACT Score Report (March 2007)...............................Appx908

ACT Score Report (Oct. 2007)...................................Appx909

College Application to UW-Madison (2007).............Appx910

Ohio State University Transcript (2008-12)............Appx922

Academic & Standardized Testing History
Summaries.................................................................Appx926

Letter from Testing Organizations to Senator
Kennedy & Others (2008) .........................................Appx929

Smiy Office Visit Report (2009)...............................Appx934

Ohio State ADD/ADHD Verification Form
(2010) .......................................................................Appx939

Letter from R. Burgoyne to Disability Rights
Section (2014) ...........................................................Appx945

MCAT Score Report (2011) .....................................Appx962

Livingston Evaluation & Addendum
(2014, 2016) .............................................................Appx963

Score Reports for Subject-Matter Examinations
(2014-17)...................................................................Appx969

Medical School Student Dashboard (2016)............Appx1003

Lewandowski Evaluations & Correspondence
(2017-18) .................................................................Appx1006

## Volume IV: Appx1028-1366

USMLE Step 1 Score Report (2017).......................Appx1028

Ramsay Step 1 Outcome Data (2017) ....................Appx1030

Secondary Application to University of
Wisconsin ...............................................................Appx1039

Articles: *Genetic Influences on Nicotine α5
Receptor* (2015), *Organic Acid Disorders* (2018)....Appx1047

NBME Accommodations Request Form &
Personal Statement (2016) ....................................Appx1068

PowerPoint from NBME Consultants Meeting
(2016) ......................................................................Appx1083

Zecker Review of Ramsay Request (Jan. 2017) .....Appx1118

Letter from NBME to Ramsay (March 2017) ........Appx1125

NBME Accommodations Request Form &
Personal Statement (2018) ....................................Appx1127

Correspondence between Dafoe & Ramsay
(2018) ......................................................................Appx1231

Correspondence between Ramsay, Reukberg,
and/or Berger (2017-18) .........................................Appx1235

## Volume V: Appx1367-1683

Correspondence between Ramsay & Houtman
(2018) ......................................................................Appx1367

Zecker Review of Ramsay Request (July 2018) .....Appx1392

Letter from NBME to Ramsay (Sept. 2018)...........Appx1401

Michigan Dyslexia Institute Intake Interview
(2018) ......................................................................Appx1404

ADHD Symptoms Checklist (prepared by Ramsay
& Hughes).................................................................Appx1411

Correspondence between Ramsay, Smith,
and/or Berger (2018) ...............................................Appx1415

Smith Evaluation (2018).........................................Appx1431

Smith Website Homepage.......................................Appx1462

Reconsideration Request from Berger to NBME
(Dec. 2018) .............................................................Appx1464

Lovett Review of Ramsay Request
(Dec. 2018) .............................................................Appx1507

Letter from NBME to Ramsay (Feb. 2019)............Appx1511

Leave of Absence Paperwork (2018-19) .................Appx1513

Reconsideration Request from Berger to NBME
(March 2019) ..........................................................Appx1526

Correspondence from NBME to Ramsay
(March 2019) ..........................................................Appx1533

Article: *An Investigation of Methods to Detect
Feigned Reading Disabilities* (2010) ......................Appx1535

Western Michigan University Medical Student
Policy Manual........................................................ Appx1545

USMLE Website (2017): *Step 1* ..............................Appx1558

Sample Step 1 Test Questions (2017) ....................Appx1559

ACT: Preparing for the Exam & Sample Test
Questions (2007-08) ...............................................Appx1605

**Volume VI: Appx1684-1883**

Sample MCAT Exam (2010) ...................................Appx1684

MCAT: *The Official Guide to the MCAT Exam*
(excerpts) (2011) .....................................................Appx1758

MCAT Verbal Reasoning Questions with
Ramsay's Annotations ............................................Appx1780

WIAT-III Item Data .................................................Appx1798

Woodcock Johnson IV Diagnostic Test Records ....Appx1817

Gray Oral Reading Test Records ("GORT-V") .......Appx1824

TOMM Score Sheet .................................................Appx1836

Article: *Underachievement & Learning
Disabilities in Children Who Are Gifted
(1999-2000)* ...........................................................Appx1839

Federal Register (excerpts).....................................Appx1844

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed this Appendix with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne



US·MLE
United States
Medical
Licensing
Examination ®

# UNITED STATES MEDICAL LICENSING EXAMINATION ®

## STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Ramsay, Jessica Erin**

**USMLE ID:  5-366-431-4**                              **Test Date:  July 20, 2017**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying  health, disease, and modes of  therapy.  The inclusion of  Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score§ represents your result for the administration of Step 1 on the test date shown above.

| FAIL | This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions. |
|---|---|

| 191 | This score is determined by your overall performance on Step 1. For  administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 192 is set  by  USMLE to pass  Step 1. The standard error of measurement (SEM)‡ for this scale is six points. |
|---|---|

§Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

‡Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.

## INFORMATION PROVIDED FOR EXAMINEE USE ONLY

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

## USMLE STEP 1 PERFORMANCE PROFILE

|  | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **PHYSICIAN TASK** | | | |
| MK: Applying Foundational Science Concepts | xxxxxxxxx | | |
| PC: Diagnosis | | xxxxxxxxxxxxx | |
| PC: Management | | xxxxxxxxxxxxxxxx | |
| PBLI: Evidence-Based Medicine | xxxxxxxxxxxxxxxxx | | |
| **DISCIPLINE** | | | |
| Behavioral Sciences | | xxxxxxxxxxxxxxxxxx | |
| Biochemistry & Nutrition | *xxxxxxx | | |
| Genetics | xxxxxxxxxxxxxxxxx | | |
| Gross Anatomy & Embryology | | xxxxxxxxxxxxxxxx | |
| Histology & Cell Biology | *xxxxxxxxxxxxxxx | | |
| Microbiology & Immunology | *xxxxxxxxxx | | |
| Pathology | | xxxxxxxxx | |
| Pharmacology | | xxxxxxxxxxxx | |
| Physiology | | xxxxxxxxxxx | |
| **SYSTEM** | | | |
| General Principles | *xxxxxxxxxxx | | |
| Blood & Lymphoreticular and Immune Systems | | xxxxxxxxxxxxxxxx | |
| Behavioral Health & Nervous Systems/Special Senses | xxxxxxxxxxxxxxxx | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | xxxxxxxxxxxxxxxxxx |
| Cardiovascular System | xxxxxxxxxxxxxxxx | | |
| Respiratory and Renal/Urinary Systems | | xxxxxxxxxxxxxxx | |
| Gastrointestinal System | | xxxxxxxxxxxxxxxxx | |
| Reproductive & Endocrine Systems | | xxxxxxxxxxxxxx | |
| Multisystem Processes & Disorders | xxxxxxxxxxxxxxxx | | |
| Biostatistics & Epidemiology/Population Health | xxxxxxxxxxxxxxxxxx | | |

The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

**This profile should not be compared to those from other Step 1 administrations.**

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials.*

MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_RESPONSE | CORRECT_ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_SEQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | E | D | 45.600 | 1 | 1 |
| Ramsay | Jessica Erin | STEP1 | B | E | 147.800 | 1 | 2 |
| Ramsay | Jessica Erin | STEP1 | C | C | 101.200 | 1 | 3 |
| Ramsay | Jessica Erin | STEP1 | C | B | 80.600 | 1 | 4 |
| Ramsay | Jessica Erin | STEP1 | E | D | 53.100 | 1 | 5 |
| Ramsay | Jessica Erin | STEP1 | B | B | 62.200 | 1 | 6 |
| Ramsay | Jessica Erin | STEP1 | E | E | 49.100 | 1 | 7 |
| Ramsay | Jessica Erin | STEP1 | C | E | 83.700 | 1 | 8 |
| Ramsay | Jessica Erin | STEP1 | D | D | 50.600 | 1 | 9 |
| Ramsay | Jessica Erin | STEP1 | B | D | 70.100 | 1 | 10 |
| Ramsay | Jessica Erin | STEP1 | F | F | 95.700 | 1 | 11 |
| Ramsay | Jessica Erin | STEP1 | B | A | 104.100 | 1 | 12 |
| Ramsay | Jessica Erin | STEP1 | B | B | 46.600 | 1 | 13 |
| Ramsay | Jessica Erin | STEP1 | D | A | 140.800 | 1 | 14 |
| Ramsay | Jessica Erin | STEP1 | C | E | 103.600 | 1 | 15 |
| Ramsay | Jessica Erin | STEP1 | C | A | 129.300 | 1 | 16 |
| Ramsay | Jessica Erin | STEP1 | A | C | 147.800 | 1 | 17 |
| Ramsay | Jessica Erin | STEP1 | D | D | 35.000 | 1 | 18 |
| Ramsay | Jessica Erin | STEP1 | B | B | 45.100 | 1 | 19 |
| Ramsay | Jessica Erin | STEP1 | E | D | 206.900 | 1 | 20 |
| Ramsay | Jessica Erin | STEP1 | A | A | 92.700 | 1 | 21 |
| Ramsay | Jessica Erin | STEP1 | E | E | 92.800 | 1 | 22 |
| Ramsay | Jessica Erin | STEP1 | F | F | 66.100 | 1 | 23 |
| Ramsay | Jessica Erin | STEP1 | A | A | 132.800 | 1 | 24 |
| Ramsay | Jessica Erin | STEP1 | D | D | 59.100 | 1 | 25 |
| Ramsay | Jessica Erin | STEP1 | F | F | 122.200 | 1 | 26 |
| Ramsay | Jessica Erin | STEP1 | D | A | 101.700 | 1 | 27 |
| Ramsay | Jessica Erin | STEP1 | C | C | 81.700 | 1 | 28 |
| Ramsay | Jessica Erin | STEP1 | D | D | 99.700 | 1 | 29 |
| Ramsay | Jessica Erin | STEP1 | D | D | 41.100 | 1 | 30 |
| Ramsay | Jessica Erin | STEP1 | D | D | 35.100 | 1 | 31 |
| Ramsay | Jessica Erin | STEP1 | D | D | 19.500 | 1 | 32 |

DEFENDANT'S EXHIBIT

71

NBME01988

Appx1030

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_RESPONSE | CORRECT_ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_SEQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | E | E | 111.700 | 1 | 33 |
| Ramsay | Jessica Erin | STEP1 | C | C | 27.600 | 1 | 34 |
| Ramsay | Jessica Erin | STEP1 | B | B | 83.200 | 1 | 35 |
| Ramsay | Jessica Erin | STEP1 | D | E | 168.000 | 1 | 36 |
| Ramsay | Jessica Erin | STEP1 | D | C | 68.600 | 1 | 37 |
| Ramsay | Jessica Erin | STEP1 | D | D | 148.400 | 1 | 38 |
| Ramsay | Jessica Erin | STEP1 | D | D | 96.300 | 1 | 39 |
| Ramsay | Jessica Erin | STEP1 | D | D | 93.700 | 1 | 40 |
| Ramsay | Jessica Erin | STEP1 | E | E | 100.100 | 2 | 41 |
| Ramsay | Jessica Erin | STEP1 | C | D | 82.300 | 2 | 42 |
| Ramsay | Jessica Erin | STEP1 | D | A | 116.300 | 2 | 43 |
| Ramsay | Jessica Erin | STEP1 | C | C | 98.700 | 2 | 44 |
| Ramsay | Jessica Erin | STEP1 | C | C | 70.100 | 2 | 45 |
| Ramsay | Jessica Erin | STEP1 | B | G | 125.300 | 2 | 46 |
| Ramsay | Jessica Erin | STEP1 | E | E | 99.700 | 2 | 47 |
| Ramsay | Jessica Erin | STEP1 | E | E | 85.200 | 2 | 48 |
| Ramsay | Jessica Erin | STEP1 | E | E | 118.700 | 2 | 49 |
| Ramsay | Jessica Erin | STEP1 | D | D | 74.100 | 2 | 50 |
| Ramsay | Jessica Erin | STEP1 | C | D | 147.800 | 2 | 51 |
| Ramsay | Jessica Erin | STEP1 | E | A | 131.700 | 2 | 52 |
| Ramsay | Jessica Erin | STEP1 | A | D | 101.600 | 2 | 53 |
| Ramsay | Jessica Erin | STEP1 | A | E | 98.800 | 2 | 54 |
| Ramsay | Jessica Erin | STEP1 | E | D | 93.800 | 2 | 55 |
| Ramsay | Jessica Erin | STEP1 | D | D | 108.100 | 2 | 56 |
| Ramsay | Jessica Erin | STEP1 | D | A | 84.700 | 2 | 57 |
| Ramsay | Jessica Erin | STEP1 | E | A | 103.200 | 2 | 58 |
| Ramsay | Jessica Erin | STEP1 | A | A | 64.600 | 2 | 59 |
| Ramsay | Jessica Erin | STEP1 | C | C | 53.600 | 2 | 60 |
| Ramsay | Jessica Erin | STEP1 | F | F | 64.100 | 2 | 61 |
| Ramsay | Jessica Erin | STEP1 | E | E | 114.700 | 2 | 62 |
| Ramsay | Jessica Erin | STEP1 | C | A | 174.900 | 2 | 63 |
| Ramsay | Jessica Erin | STEP1 | B | E | 79.700 | 2 | 64 |

NBME01989

Appx1031

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_ RESPONSE | CORRECT_ ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_S EQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | D | D | 43.100 | 2 | 65 |
| Ramsay | Jessica Erin | STEP1 | D | D | 29.600 | 2 | 66 |
| Ramsay | Jessica Erin | STEP1 | F | F | 86.200 | 2 | 67 |
| Ramsay | Jessica Erin | STEP1 | A | C | 112.700 | 2 | 68 |
| Ramsay | Jessica Erin | STEP1 | B | D | 44.000 | 2 | 69 |
| Ramsay | Jessica Erin | STEP1 | B | B | 43.100 | 2 | 70 |
| Ramsay | Jessica Erin | STEP1 | B | B | 84.700 | 2 | 71 |
| Ramsay | Jessica Erin | STEP1 | C | E | 70.100 | 2 | 72 |
| Ramsay | Jessica Erin | STEP1 | F | H | 60.200 | 2 | 73 |
| Ramsay | Jessica Erin | STEP1 | B | C | 50.700 | 2 | 74 |
| Ramsay | Jessica Erin | STEP1 | C | D | 67.700 | 2 | 75 |
| Ramsay | Jessica Erin | STEP1 | B | A | 118.300 | 2 | 76 |
| Ramsay | Jessica Erin | STEP1 | C | C | 51.600 | 2 | 77 |
| Ramsay | Jessica Erin | STEP1 | D | D | 31.600 | 2 | 78 |
| Ramsay | Jessica Erin | STEP1 | F | A | 135.700 | 2 | 79 |
| Ramsay | Jessica Erin | STEP1 | B | F | 111.200 | 2 | 80 |
| Ramsay | Jessica Erin | STEP1 | D | D | 54.100 | 3 | 81 |
| Ramsay | Jessica Erin | STEP1 | B | B | 65.100 | 3 | 82 |
| Ramsay | Jessica Erin | STEP1 | D | A | 168.300 | 3 | 83 |
| Ramsay | Jessica Erin | STEP1 | A | A | 34.100 | 3 | 84 |
| Ramsay | Jessica Erin | STEP1 | C | A | 168.900 | 3 | 85 |
| Ramsay | Jessica Erin | STEP1 | E | A | 31.500 | 3 | 86 |
| Ramsay | Jessica Erin | STEP1 | D | D | 143.300 | 3 | 87 |
| Ramsay | Jessica Erin | STEP1 | A | B | 74.600 | 3 | 88 |
| Ramsay | Jessica Erin | STEP1 | E | E | 68.700 | 3 | 89 |
| Ramsay | Jessica Erin | STEP1 | D | D | 90.600 | 3 | 90 |
| Ramsay | Jessica Erin | STEP1 | D | B | 79.700 | 3 | 91 |
| Ramsay | Jessica Erin | STEP1 | B | A | 197.900 | 3 | 92 |
| Ramsay | Jessica Erin | STEP1 | B | B | 17.500 | 3 | 93 |
| Ramsay | Jessica Erin | STEP1 | E | E | 46.200 | 3 | 94 |
| Ramsay | Jessica Erin | STEP1 | A | A | 109.800 | 3 | 95 |
| Ramsay | Jessica Erin | STEP1 | A | B | 121.600 | 3 | 96 |

NBME01990

Appx1032

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_RESPONSE | CORRECT_ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_SEQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | C | C | 74.100 | 3 | 97 |
| Ramsay | Jessica Erin | STEP1 | A | A | 90.200 | 3 | 98 |
| Ramsay | Jessica Erin | STEP1 | E | E | 47.200 | 3 | 99 |
| Ramsay | Jessica Erin | STEP1 | B | C | 28.000 | 3 | 100 |
| Ramsay | Jessica Erin | STEP1 | A | A | 75.100 | 3 | 101 |
| Ramsay | Jessica Erin | STEP1 | B | B | 68.600 | 3 | 102 |
| Ramsay | Jessica Erin | STEP1 | A | D | 104.800 | 3 | 103 |
| Ramsay | Jessica Erin | STEP1 | D | A | 85.700 | 3 | 104 |
| Ramsay | Jessica Erin | STEP1 | B | A | 89.700 | 3 | 105 |
| Ramsay | Jessica Erin | STEP1 | D | D | 98.200 | 3 | 106 |
| Ramsay | Jessica Erin | STEP1 | A | A | 152.800 | 3 | 107 |
| Ramsay | Jessica Erin | STEP1 | A | A | 82.100 | 3 | 108 |
| Ramsay | Jessica Erin | STEP1 | E | B | 138.700 | 3 | 109 |
| Ramsay | Jessica Erin | STEP1 | D | D | 91.200 | 3 | 110 |
| Ramsay | Jessica Erin | STEP1 | E | E | 76.100 | 3 | 111 |
| Ramsay | Jessica Erin | STEP1 | E | E | 64.600 | 3 | 112 |
| Ramsay | Jessica Erin | STEP1 | C | E | 111.200 | 3 | 113 |
| Ramsay | Jessica Erin | STEP1 | E | E | 125.900 | 3 | 114 |
| Ramsay | Jessica Erin | STEP1 | C | C | 50.100 | 3 | 115 |
| Ramsay | Jessica Erin | STEP1 | B | B | 48.100 | 3 | 116 |
| Ramsay | Jessica Erin | STEP1 | D | D | 44.100 | 3 | 117 |
| Ramsay | Jessica Erin | STEP1 | E | E | 61.100 | 3 | 118 |
| Ramsay | Jessica Erin | STEP1 | A | A | 76.100 | 3 | 119 |
| Ramsay | Jessica Erin | STEP1 | D | C | 178.200 | 3 | 120 |
| Ramsay | Jessica Erin | STEP1 | E | B | 131.200 | 4 | 121 |
| Ramsay | Jessica Erin | STEP1 | B | D | 59.100 | 4 | 122 |
| Ramsay | Jessica Erin | STEP1 | B | E | 59.600 | 4 | 123 |
| Ramsay | Jessica Erin | STEP1 | E | E | 159.800 | 4 | 124 |
| Ramsay | Jessica Erin | STEP1 | E | E | 98.700 | 4 | 125 |
| Ramsay | Jessica Erin | STEP1 | A | A | 82.700 | 4 | 126 |
| Ramsay | Jessica Erin | STEP1 | A | A | 62.600 | 4 | 127 |
| Ramsay | Jessica Erin | STEP1 | F | A | 107.200 | 4 | 128 |

NBME01991

Appx1033

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_RESPONSE | CORRECT_ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_SEQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | A | D | 97.800 | 4 | 129 |
| Ramsay | Jessica Erin | STEP1 | C | C | 96.600 | 4 | 130 |
| Ramsay | Jessica Erin | STEP1 | B | A | 73.100 | 4 | 131 |
| Ramsay | Jessica Erin | STEP1 | D | D | 51.000 | 4 | 132 |
| Ramsay | Jessica Erin | STEP1 | E | D | 101.200 | 4 | 133 |
| Ramsay | Jessica Erin | STEP1 | B | B | 95.200 | 4 | 134 |
| Ramsay | Jessica Erin | STEP1 | B | B | 121.700 | 4 | 135 |
| Ramsay | Jessica Erin | STEP1 | B | B | 41.600 | 4 | 136 |
| Ramsay | Jessica Erin | STEP1 | C | A | 100.200 | 4 | 137 |
| Ramsay | Jessica Erin | STEP1 | E | D | 108.700 | 4 | 138 |
| Ramsay | Jessica Erin | STEP1 | E | E | 177.900 | 4 | 139 |
| Ramsay | Jessica Erin | STEP1 | B | B | 63.600 | 4 | 140 |
| Ramsay | Jessica Erin | STEP1 | E | E | 129.900 | 4 | 141 |
| Ramsay | Jessica Erin | STEP1 | B | B | 28.500 | 4 | 142 |
| Ramsay | Jessica Erin | STEP1 | A | A | 50.100 | 4 | 143 |
| Ramsay | Jessica Erin | STEP1 | B | B | 281.300 | 4 | 144 |
| Ramsay | Jessica Erin | STEP1 | C | A | 61.100 | 4 | 145 |
| Ramsay | Jessica Erin | STEP1 | C | C | 81.200 | 4 | 146 |
| Ramsay | Jessica Erin | STEP1 | C | C | 69.100 | 4 | 147 |
| Ramsay | Jessica Erin | STEP1 | B | B | 77.200 | 4 | 148 |
| Ramsay | Jessica Erin | STEP1 | B | E | 96.700 | 4 | 149 |
| Ramsay | Jessica Erin | STEP1 | E | A | 129.200 | 4 | 150 |
| Ramsay | Jessica Erin | STEP1 | A | A | 28.100 | 4 | 151 |
| Ramsay | Jessica Erin | STEP1 | C | C | 14.000 | 4 | 152 |
| Ramsay | Jessica Erin | STEP1 | E | E | 46.100 | 4 | 153 |
| Ramsay | Jessica Erin | STEP1 | D | E | 109.200 | 4 | 154 |
| Ramsay | Jessica Erin | STEP1 | D | D | 70.200 | 4 | 155 |
| Ramsay | Jessica Erin | STEP1 | A | A | 82.700 | 4 | 156 |
| Ramsay | Jessica Erin | STEP1 | E | C | 49.600 | 4 | 157 |
| Ramsay | Jessica Erin | STEP1 | D | D | 64.100 | 4 | 158 |
| Ramsay | Jessica Erin | STEP1 | I | I | 96.300 | 4 | 159 |
| Ramsay | Jessica Erin | STEP1 | A | A | 86.200 | 4 | 160 |

NBME01992

Appx1034

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_RESPONSE | CORRECT_ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_SEQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | C | C | 28.100 | 5 | 161 |
| Ramsay | Jessica Erin | STEP1 | A | A | 50.600 | 5 | 162 |
| Ramsay | Jessica Erin | STEP1 | D | D | 134.300 | 5 | 163 |
| Ramsay | Jessica Erin | STEP1 | C | C | 94.600 | 5 | 164 |
| Ramsay | Jessica Erin | STEP1 | C | D | 136.800 | 5 | 165 |
| Ramsay | Jessica Erin | STEP1 | E | E | 102.200 | 5 | 166 |
| Ramsay | Jessica Erin | STEP1 | E | E | 19.000 | 5 | 167 |
| Ramsay | Jessica Erin | STEP1 | C | E | 106.700 | 5 | 168 |
| Ramsay | Jessica Erin | STEP1 | E | E | 48.100 | 5 | 169 |
| Ramsay | Jessica Erin | STEP1 | E | E | 38.100 | 5 | 170 |
| Ramsay | Jessica Erin | STEP1 | B | B | 65.600 | 5 | 171 |
| Ramsay | Jessica Erin | STEP1 | A | B | 102.200 | 5 | 172 |
| Ramsay | Jessica Erin | STEP1 | B | B | 51.100 | 5 | 173 |
| Ramsay | Jessica Erin | STEP1 | D | E | 74.100 | 5 | 174 |
| Ramsay | Jessica Erin | STEP1 | E | E | 48.600 | 5 | 175 |
| Ramsay | Jessica Erin | STEP1 | E | E | 51.100 | 5 | 176 |
| Ramsay | Jessica Erin | STEP1 | E | B | 118.200 | 5 | 177 |
| Ramsay | Jessica Erin | STEP1 | E | C | 49.200 | 5 | 178 |
| Ramsay | Jessica Erin | STEP1 | C | C | 103.600 | 5 | 179 |
| Ramsay | Jessica Erin | STEP1 | B | C | 99.600 | 5 | 180 |
| Ramsay | Jessica Erin | STEP1 | E | E | 114.700 | 5 | 181 |
| Ramsay | Jessica Erin | STEP1 | D | D | 122.700 | 5 | 182 |
| Ramsay | Jessica Erin | STEP1 | D | F | 201.800 | 5 | 183 |
| Ramsay | Jessica Erin | STEP1 | E | E | 122.700 | 5 | 184 |
| Ramsay | Jessica Erin | STEP1 | D | D | 78.100 | 5 | 185 |
| Ramsay | Jessica Erin | STEP1 | D | E | 91.200 | 5 | 186 |
| Ramsay | Jessica Erin | STEP1 | F | E | 159.800 | 5 | 187 |
| Ramsay | Jessica Erin | STEP1 | C | C | 67.200 | 5 | 188 |
| Ramsay | Jessica Erin | STEP1 | E | E | 43.100 | 5 | 189 |
| Ramsay | Jessica Erin | STEP1 | E | D | 101.200 | 5 | 190 |
| Ramsay | Jessica Erin | STEP1 | E | D | 52.600 | 5 | 191 |
| Ramsay | Jessica Erin | STEP1 | B | B | 72.100 | 5 | 192 |

NBME01993

Appx1035

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_ RESPONSE | CORRECT_ ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_S EQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | D | D | 60.100 | 5 | 193 |
| Ramsay | Jessica Erin | STEP1 | B | B | 48.100 | 5 | 194 |
| Ramsay | Jessica Erin | STEP1 | D | D | 103.700 | 5 | 195 |
| Ramsay | Jessica Erin | STEP1 | C | C | 147.200 | 5 | 196 |
| Ramsay | Jessica Erin | STEP1 | F | F | 86.600 | 5 | 197 |
| Ramsay | Jessica Erin | STEP1 | B | A | 124.200 | 5 | 198 |
| Ramsay | Jessica Erin | STEP1 | D | E | 162.900 | 5 | 199 |
| Ramsay | Jessica Erin | STEP1 | B | B | 59.600 | 5 | 200 |
| Ramsay | Jessica Erin | STEP1 | B | C | 75.600 | 6 | 201 |
| Ramsay | Jessica Erin | STEP1 | C | D | 182.900 | 6 | 202 |
| Ramsay | Jessica Erin | STEP1 | E | E | 75.700 | 6 | 203 |
| Ramsay | Jessica Erin | STEP1 | B | B | 61.100 | 6 | 204 |
| Ramsay | Jessica Erin | STEP1 | E | C | 127.800 | 6 | 205 |
| Ramsay | Jessica Erin | STEP1 | C | C | 72.700 | 6 | 206 |
| Ramsay | Jessica Erin | STEP1 | D | E | 92.100 | 6 | 207 |
| Ramsay | Jessica Erin | STEP1 | E | E | 81.600 | 6 | 208 |
| Ramsay | Jessica Erin | STEP1 | F | F | 57.100 | 6 | 209 |
| Ramsay | Jessica Erin | STEP1 | A | A | 64.200 | 6 | 210 |
| Ramsay | Jessica Erin | STEP1 | B | B | 40.100 | 6 | 211 |
| Ramsay | Jessica Erin | STEP1 | E | E | 58.100 | 6 | 212 |
| Ramsay | Jessica Erin | STEP1 | C | A | 123.400 | 6 | 213 |
| Ramsay | Jessica Erin | STEP1 | D | B | 76.200 | 6 | 214 |
| Ramsay | Jessica Erin | STEP1 | A | A | 77.600 | 6 | 215 |
| Ramsay | Jessica Erin | STEP1 | F | F | 90.300 | 6 | 216 |
| Ramsay | Jessica Erin | STEP1 | A | A | 104.300 | 6 | 217 |
| Ramsay | Jessica Erin | STEP1 | A | A | 46.600 | 6 | 218 |
| Ramsay | Jessica Erin | STEP1 | C | C | 109.800 | 6 | 219 |
| Ramsay | Jessica Erin | STEP1 | A | E | 111.700 | 6 | 220 |
| Ramsay | Jessica Erin | STEP1 | C | C | 61.600 | 6 | 221 |
| Ramsay | Jessica Erin | STEP1 | A | E | 100.200 | 6 | 222 |
| Ramsay | Jessica Erin | STEP1 | D | C | 196.900 | 6 | 223 |
| Ramsay | Jessica Erin | STEP1 | C | C | 22.500 | 6 | 224 |

NBME01994

Appx1036

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_ RESPONSE | CORRECT_ ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_S EQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | F | C | 199.400 | 6 | 225 |
| Ramsay | Jessica Erin | STEP1 | D | D | 70.700 | 6 | 226 |
| Ramsay | Jessica Erin | STEP1 | A | D | 65.200 | 6 | 227 |
| Ramsay | Jessica Erin | STEP1 | C | E | 86.200 | 6 | 228 |
| Ramsay | Jessica Erin | STEP1 | A | E | 83.300 | 6 | 229 |
| Ramsay | Jessica Erin | STEP1 | C | C | 60.100 | 6 | 230 |
| Ramsay | Jessica Erin | STEP1 | A | C | 110.200 | 6 | 231 |
| Ramsay | Jessica Erin | STEP1 | E | E | 73.600 | 6 | 232 |
| Ramsay | Jessica Erin | STEP1 | E | E | 45.600 | 6 | 233 |
| Ramsay | Jessica Erin | STEP1 | D | D | 93.700 | 6 | 234 |
| Ramsay | Jessica Erin | STEP1 | D | D | 53.100 | 6 | 235 |
| Ramsay | Jessica Erin | STEP1 | D | C | 128.200 | 6 | 236 |
| Ramsay | Jessica Erin | STEP1 | A | A | 112.700 | 6 | 237 |
| Ramsay | Jessica Erin | STEP1 | D | C | 105.700 | 6 | 238 |
| Ramsay | Jessica Erin | STEP1 | C | C | 102.200 | 6 | 239 |
| Ramsay | Jessica Erin | STEP1 | B | B | 45.100 | 6 | 240 |
| Ramsay | Jessica Erin | STEP1 | E | D | 90.700 | 7 | 241 |
| Ramsay | Jessica Erin | STEP1 | D | C | 77.100 | 7 | 242 |
| Ramsay | Jessica Erin | STEP1 | B | D | 89.200 | 7 | 243 |
| Ramsay | Jessica Erin | STEP1 | C | C | 144.800 | 7 | 244 |
| Ramsay | Jessica Erin | STEP1 | D | D | 80.200 | 7 | 245 |
| Ramsay | Jessica Erin | STEP1 | D | D | 70.100 | 7 | 246 |
| Ramsay | Jessica Erin | STEP1 | E | E | 99.200 | 7 | 247 |
| Ramsay | Jessica Erin | STEP1 | E | E | 28.000 | 7 | 248 |
| Ramsay | Jessica Erin | STEP1 | C | C | 67.600 | 7 | 249 |
| Ramsay | Jessica Erin | STEP1 | A | E | 192.400 | 7 | 250 |
| Ramsay | Jessica Erin | STEP1 | E | A | 82.600 | 7 | 251 |
| Ramsay | Jessica Erin | STEP1 | D | C | 269.500 | 7 | 252 |
| Ramsay | Jessica Erin | STEP1 | D | E | 81.700 | 7 | 253 |
| Ramsay | Jessica Erin | STEP1 | A | A | 38.000 | 7 | 254 |
| Ramsay | Jessica Erin | STEP1 | A | A | 63.100 | 7 | 255 |
| Ramsay | Jessica Erin | STEP1 | F | F | 67.200 | 7 | 256 |

NBME01995

Appx1037

| LAST_NAME | FIRST_NAME | EXAM | EXAMINEE_ RESPONSE | CORRECT_ ANSWER | ITEM_DURATION | BLOCK | ITEM_PRESENTATION_S EQUENCE |
|---|---|---|---|---|---|---|---|
| Ramsay | Jessica Erin | STEP1 | E | E | 23.500 | 7 | 257 |
| Ramsay | Jessica Erin | STEP1 | D | D | 21.000 | 7 | 258 |
| Ramsay | Jessica Erin | STEP1 | E | A | 23.500 | 7 | 259 |
| Ramsay | Jessica Erin | STEP1 | A | E | 36.600 | 7 | 260 |
| Ramsay | Jessica Erin | STEP1 | D | B | 58.600 | 7 | 261 |
| Ramsay | Jessica Erin | STEP1 | C | C | 47.600 | 7 | 262 |
| Ramsay | Jessica Erin | STEP1 | E | E | 78.100 | 7 | 263 |
| Ramsay | Jessica Erin | STEP1 | E | E | 76.700 | 7 | 264 |
| Ramsay | Jessica Erin | STEP1 | E | E | 84.600 | 7 | 265 |
| Ramsay | Jessica Erin | STEP1 | D | D | 92.200 | 7 | 266 |
| Ramsay | Jessica Erin | STEP1 | D | B | 172.300 | 7 | 267 |
| Ramsay | Jessica Erin | STEP1 | C | E | 116.300 | 7 | 268 |
| Ramsay | Jessica Erin | STEP1 | B | B | 39.500 | 7 | 269 |
| Ramsay | Jessica Erin | STEP1 | A | A | 91.700 | 7 | 270 |
| Ramsay | Jessica Erin | STEP1 | A | E | 74.700 | 7 | 271 |
| Ramsay | Jessica Erin | STEP1 | D | D | 143.900 | 7 | 272 |
| Ramsay | Jessica Erin | STEP1 | C | B | 232.500 | 7 | 273 |
| Ramsay | Jessica Erin | STEP1 | B | B | 74.600 | 7 | 274 |
| Ramsay | Jessica Erin | STEP1 | B | C | 39.100 | 7 | 275 |
| Ramsay | Jessica Erin | STEP1 | E | B | 74.600 | 7 | 276 |
| Ramsay | Jessica Erin | STEP1 | E | E | 55.600 | 7 | 277 |
| Ramsay | Jessica Erin | STEP1 | D | A | 118.400 | 7 | 278 |
| Ramsay | Jessica Erin | STEP1 | D | D | 178.200 | 7 | 279 |
| Ramsay | Jessica Erin | STEP1 | D | D | 47.100 | 7 | 280 |

NBME01996

Appx1038

**DEFENDANT'S EXHIBIT 57**

University of Wisconsin - School of Medicine and Public Health
### Secondary Application
## Jessica E. Ramsay

Data Sheet Parts A, B, C & D

## A. Entering Class

| Entering Class: | 2013 |
|---|---|
| | *Are you reapplying to the Medical School with this application?* No |

## B. Contact Information

| | Last Name | First Name | MI |
|---|---|---|---|
| Name: | Ramsay | Jessica | E |
| Previous Name: | | | |
| | *I hereby declare that my name has changed and I wish this change on my UW-Madison records:* No |||
| Phone Number: | 269-932-8214 |||
| Email Address: | ramsay.32@buckeyemail.osu.edu |||
| Student ID #: | |||

## C. Birth Date and Place

| Birth Date: | REDACTED |
|---|---|
| Birth City: | REDACTED |
| Birth County: | Dallas |
| Birth State: | TX |

## D. Citizenship and Racial/Ethnic Heritage

| Citizenship: | X  US Citizen |
|---|---|
| | _  Permanent Resident |
| | _  Non-immigrant Alien |
| Ethnic Heritage: | Are you of Hispanic or Latino origin? No |
| | _  Cuban |
| | _  Mexican, Mexican American, or Chicano |
| | _  Puerto Rican |
| | _  Other Hispanic or Latino |
| | _  I choose not to respond |
| Racial Heritage: | _  African-American/Black |
| | _  American Indian/Alaskan Native |
| | _  Native Hawaiian/Pacific Islander |
| | _  Cambodian |
| | _  Hmong |
| | _  Laotian |
| | _  Vietnamese |
| | _  Other Asian |
| | X  White |
| | _  I choose not to respond |
| Gender: | Female |
| Social Security #: | *** ** **** |

RAMSAY20-0044

09-30-2012 15:34

Appx1039

University of Wisconsin - School of Medicine and Public Health
**Secondary Application**
## Jessica E. Ramsay

Data Sheet Parts E & F

### E. Addresses

| Type | Number and Street | City | State | Zip | From | To |
|------|-------------------|------|-------|-----|------|-----|
| Present | 2623 Aschinger Blvd. | Columbus | OH | 43212 | 07-2012 | |
| Permanent | 1438 Old Farm Lane | Saint Joseph | MI | 49085 | 01-2001 | |
| Previous | 39 Chittenden Ave | Columbus | OH | 43201 | 08-2009 | 07-2012 |

### F. Educational History

| Name of High School | Year of Graduation | City | State |
|---------------------|--------------------|------|-------|
| Saint Joseph Public High Sch | 2008 | St Joseph | MI |

| Name of College or University | City | State | From | To |
|-------------------------------|------|-------|------|-----|
| The Ohio State University Main Campus | Columbus | OH | 09-01-2008 | 06-01-2012 |
| Lake Michigan College | Benton Harbor | MI | 07-01-2009 | 08-01-2009 |

RAMSAY26-0045

Appx1040

University of Wisconsin - School of Medicine and Public Health
*Secondary Application*

## Jessica E. Ramsay

### .:ecord of Residence

## Residence Status For Tuition Purposes

Are you a Wisconsin resident and/or do you claim legal Wisconsin residence for tuition purposes? No

RAMSAY26-0046

09-30-2012 15:34

**Appx1041**



University of Wisconsin - School of Medicine and Public Health
*Secondary Application*

## Jessica E. Ramsay

## Life Activities



| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| The Ohio State University Main Campus | | | | | | | | ▬ | ▬ | ▬ | ▬ |
| Lake Michigan College | | | | | | | | I | | | |
| Miracle League Baseball Buddy | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | ▬ | |
| Lifeguard/Swim Lesson Instructor | | | | | | | ▬ | ▬ | ▬ | ▬ | ▬ |
| Home Care Provider | | | | | | | | | ▬ | ▬ | |
| Teacher's Assistant | | | | | | | | | ■ | | |
| Instructor's Assistant/Head TA | | | | | | | | | | | ■ |
| Professional Dance | | | | | | | | | | | ■ |
| Autism Awareness | | | | | | | | | | | ■ |
| Volunteer Research Assistant | | | | | | | | | | | ■ |
| Intramural Volleyball | | | | | | | | I | | | |
| Intramural Soccer | | | | | | | | | | I | |
| Blood Donor | | | | | | | | ▬ | ▬ | ▬ | ▬ |
| Diagnostic Transporter | | | | | | | | | | | I |
| Running | | | | | | | | ▬ | ▬ | ▬ | ▬ |

### Employers & Activities

| Name & Details | Description |
|---|---|
| **Miracle League Baseball Buddy** <br> *Loc:* Coloma, MI <br> *Hrs/Wk:* 4 <br> *From:* 05-2002 <br> *To:* 06-2011 | Miracle League is an organization that allows children and teens with special needs to play both competitive and non-competitive baseball, providing each individual with the accommodations they need in order to play. From 2002-08, every May, I volunteered as a Buddy for about 4 hours every Tuesday for the duration of the 2-month Miracle League baseball season. The last 4 years, I have continued buddying when I have been home, which on average was 4 of the 8 weeks. As a buddy, I helped players with everything from catching, throwing, and batting, to pushing their wheelchair to the next base to putting a helmet on. |
| **Lifeguard/Swim Lesson Instructor** <br> *Loc:* St. Joseph, MI <br> *Hrs/Wk:* 25 <br> *From:* 06-2008 <br> *To:* 03-2012 | Lifeguarding and teaching swim lessons require certification in Lifeguarding, First Aid, CPR, AED, and WSI. Once I graduated high school, I worked between 20 and 34 hours per week in the summers, depending on the amount of swim lessons given each week. During winter and spring breaks, I would pick up guarding hours and give lessons as I could while home. As a guard, I have had to react quickly and intelligently in emergency situations, and provide any necessary care. As a swim lesson instructor, I have worked with individuals of all ages, skills, and water comfort levels, including the autistic classes from the local school district and Coast Guard Poolees. Understanding that people learn in different ways, I have been able to alter the way I teach and motivate to fit each individual. |
| **Home Care Provider** <br> *Loc:* Columbus, OH <br> *Hrs/Wk:* N/A <br> *From:* 01-2010 <br> *To:* 09-2012 | From January, 2010 to December, 2011, I worked about 6 hours per week, except when I went home for summer break. I stopped working when my class schedule did not allow enough time for the family's needs. I began working with another family in June, 2012 on an as-needed basis, averaging about 5 hours each month. As a home care provider, I provide medical, behavioral, and academic support as they are required. Other responsibilities, specified in each individual's program, include providing transportation to and from the individual's home, school, and various activities, guiding the individual in practicing valuable life skills, and developing independence. |

**RAMSAY26-0047**

**Appx1042**

University of Wisconsin - School of Medicine and Public Health
**Secondary Application**
## Jessica E. Ramsay

| Name & Details | Description |
|---|---|
| **Teacher's Assistant**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 12<br>*From:* 01-2011<br>*To:* 06-2011 | I taught one organic chemistry lab at OSU during each of the 2011 winter and spring quarters, which included tutoring students in both the General and Organic Chemistry series; guiding students in proper lab procedure, experimentation, and in recovering after experimental mistakes; and grading lab reports, assignments, quizzes, and exams. My class schedule prevented me from teaching labs during the 2011-12 academic year, but I continued to tutor students and grade exams for the Chemistry Department. |
| **Instructor's Assistant/Head TA**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 40<br>*From:* 08-2012<br>*To:* 05-2013 | After graduation, I was rehired full-time by OSU's Chemistry Department as an Instructor's Assistant, which includes teaching three lab sections and being Head TA for one section each week. As a head TA I manage six sections, helping TAs as needed, troubleshooting, maintenance, and fixing problems as they arise, tutoring students, and helping out in the chemistry lab supply room. |
| **Professional Dance**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 3<br>*From:* 05-2012<br>*To:* 10-2012 | After minoring in Dance at OSU, I auditioned for a few local choreographers in Columbus, and was cast in two pieces. I have performed twice since then, and will have one final performance October 13th, 2012. Both choreographers are working on additional pieces that will provide me with opportunities to continue dancing. Dance has provided great joy and stress relief to balance out the more tedious aspects of life, and I plan to continue integrating dance into my life as I pursue a career in the medical field. |
| **Autism Awareness**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* N/A<br>*From:* 05-2009<br>*To:* 09-2012 | Though I have always been active in raising awareness of autism and other special needs, in college I was fortunate to find and get involved in the OSU chapter of Autism Speaks: attending meetings, volunteering at events, participating in activities, collaborating with the OSU and Community Outreach Committees, and participating in the annual Walk for Autism in Columbus. Though I am no longer a student at OSU, I am still actively involved in the club as a faculty member at OSU. |
| **Volunteer Research Assistant**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 20<br>*From:* 06-2012<br>*To:* 09-2012 | Early in June of this year, I began working under Dr. Naduparambil Jacob in his research in radiation oncology at the James Cancer Center at OSU. I have been building off of previous lab experience, setting up, running, and analyzing various DNA, RNA, miRNA, and protein assays. Beginning in October, I will be assisting in an RNA-based Amplicon Sequencing project in Autism Spectrum Disorder under Dr. Ryan Smith in Dr. Wolfgang's lab at OSU. It will be an exciting project to be a part of. |
| **Intramural Volleyball**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 3<br>*From:* 04-2009<br>*To:* 05-2009 | After playing volleyball in high school, I joined an intramural volleyball team during the spring quarter of my freshman year at OSU. I was voted captain by the team at our first game. |
| **Intramural Soccer**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 3<br>*From:* 04-2011<br>*To:* 05-2011 | My friends and I made an intramural soccer team during the spring quarter of my junior year at OSU. After just having taken the MCAT that April, playing soccer with friends provided a great stress reliever and allowed me to continued playing a sport I have always been passionate about. |
| **Blood Donor**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* N/A<br>*From:* 04-2009<br>*To:* 09-2012 | I donate blood as often as I can, and frequently spread the word about local blood drives even when I am unable to donate. |
| **Diagnostic Transporter**<br>*Loc:* Columbus, OH<br>*Hrs/Wk:* 25<br>*From:* 07-2012<br>*To:* 08-2012 | I worked as a diagnostic transporter at the OSU Wexner Medical Center for about a month before a conflict within the Hospital and Chemistry HR departments forced me to choose between my IA and transporter positions, and I chose the IA position. Had I been allowed to, I would have continued working both jobs throughout the year. |

RAMSAY26-0048

Appx1043

University of Wisconsin - School of Medicine and Public Health
**Secondary Application**
## Jessica E. Ramsay

| Name & Details | Description |
|---|---|
| **Running**<br>**Loc:** Columbus, OH<br>**Hrs/Wk:** 3<br>**From:** 06-2008<br>**To:** 09-2012 | I generally run about three times a week. I adjust my mileage based on what my knee can handle and the amount of time I have available. My goal is to work towards running a half marathon without re-injuring my knee. |

RAMSAY26-0049

09-30-2012 15:34

Appx1044

University of Wisconsin - School of Medicine and Public Health
**Secondary Application**

## Jessica E. Ramsay

**Optional Essay**

*Keeping in mind the Admissions Committee's goal that the supplemental information is to gain additional insight into the applicant as an individual and as a whole person, what additional information, if any, do you wish to provide the Admissions Committee that may be important in the evaluation of your candidacy? You may include anything in this essay that you feel is relevant.*

*For example, many applicants have encountered various challenges in their backgrounds (e.g., coming from a low-income family, having to work a large number of hours per week while going to college, experiencing educational disadvantages in their pre-college years, following an unusually difficult course of study, changes in schools, time away from school, having a privileged background and providing extensive service, etc.). The Admissions Committee takes many factors into consideration when assessing performance. If your path to medicine has not been direct, please elaborate. If you feel that you have encountered significant disadvantages and would like the Admissions Committee to take them into consideration, you are invited (not required) to provide this additional information. (Limit response to 500 words.)*

In kindergarten, I was made to write with my right hand, even though I was left-handed, which is thought to have affected the way I think and learn. Since then, various signs of ADD and dyslexia were present, but were typically missed or overlooked because I was intelligent and had advanced reasoning and motor skills for my age, so the possibility of me having a learning disability was never considered. My dyslexic tendencies were noticed in second grade because I struggled with distinguishing between lower case Bs and Ds. Every time we had writing assignments, I was given an isolated desk and an alphabet chart to reference. The experience was traumatizing; I was embarrassed and felt extremely stupid in comparison to the other students. After some testing, my doctor said that my intelligence did not seem to be affected, and that basic processing of mirror images would come. In third grade, I worked incredibly hard to correct myself when I wrote letters backwards or out of order so that my teachers and classmates would not think I was as stupid as I felt, but in doing so, it took me much longer to read and write than the other students. That same year, I was diagnosed with chronic migraines, which the doctor attributed to eye strain while reading.

Putting in extra effort to perform at the same level as other students in these areas became second nature, and I made it ough the rest of school this way, until my brain finally met its match during my sophomore year in college. Exhausted from the stress of school and life, it became harder to focus and correct my mistakes, which was affecting my grades, especially in classes requiring a lot of reading or writing. The frustration from constantly working to improve and getting nowhere finally drove me to talk to my family doctor. I was diagnosed with ADD and dyslexia, started on medical treatment, and given advice on how to approach schoolwork in a field that requires a lot of studying and dedication.

Over the last few years, I have realized how hard my I have made my eyes and brain work, and how my self-confidence has been affected over time. Identifying why reading and writing were so difficult for me finally allowed me to find my strengths as well as my limitations, and to develop more efficient ways to learn and study so that I can make the most of my education. Though I have been through many academic setbacks and tough blows to my self-esteem, I have come out of every single situation more motivated and driven to improve. I am aware that I will have to power through a lot of tedious reading and studying in medical school, but I also know that I will only be more determined to find my own way to succeed when the traditional way does not come naturally.

RAMSAY26-0050

Appx1045

University of Wisconsin - School of Medicine and Public Health
**Secondary Application**
## Jessica E. Ramsay

### Legal/Disciplinary Action

**Have you ever been charged with or convicted of any legal offense (other than minor traffic offenses, such as parking tickets) including offenses where the records have been sealed or expunged?**

No

**Have any disciplinary actions/proceedings been initiated against you by any colleges or universities?**

No

RAMSAY26-0051

09-30-2012 15:34

Ramsay et al. Genes and Environment (2015) 37:14
DOI 10.1186/s41021-015-0020-x

Genes and Environment

**RESEARCH ARTICLE**    **Open Access**

# Genetic influences on nicotinic α5 receptor (*CHRNA5*) CpG methylation and mRNA expression in brain and adipose tissue



DEFENDANT'S
EXHIBIT
**53**

Jessica E. Ramsay[1,2], C. Harker Rhodes[3], Keerthi Thirtamara-Rajamani[2] and Ryan M. Smith[1,2*]

## Abstract

**Introduction:** The nicotinic α5 receptor subunit, encoded by *CHRNA5*, harbors multiple functional single nucleotide polymorphisms (SNPs) that affect mRNA expression and alter the encoded protein. These polymorphisms are most notably associated with drug-taking behaviors and cognition. We previously identified common SNPs in a distant regulatory element (DRE) that increase *CHRNA5* mRNA expression in the human prefrontal cortex (PFC) and confer risk for nicotine dependence. Genome-wide epigenetic studies in PFC and adipose tissue find strong effects of the DRE SNPs on CpG methylation. However, it is unclear whether DRE SNPs influence CpG methylation *en route* to modulating *CHRNA5* mRNA expression. It is also unclear whether these polymorphisms affect expression in other brain regions, especially those mediating drug-taking behaviors.

**Results:** By measuring total and allelic *CHRNA5* mRNA expression in human habenula and putamen autopsy tissues, we found that *CHRNA5* DRE variants considerably increase mRNA expression by up to 3.5-fold in both brain regions. Our epigenetic analysis finds no association between CpG methylation and *CHRNA5* mRNA expression in the PFC or adipose tissues.

**Conclusions:** These finding suggests the mechanisms responsible for the genetic modulation of CpG methylation and mRNA expression are independent despite the DRE SNPs being highly associated with both measures. Our findings support a strong association between the DRE SNPs and mRNA expression or CpG methylation in the brain and periphery, but the independence of the two measures leads us to conclude that environmental factors affecting CpG methylation do not appear to directly modulate gene expression.

**Keywords:** Nicotinic receptors, Nicotine, mRNA expression, Enhancer, Repressor, Silencer, Methylation, Epigenetics, Expression quantitative trait loci, eQTL, Functional polymorphism, Allelic expression

## Introduction

Previous studies found that allelic variation in the α5/α3/β4 neuronal nicotinic acetylcholine receptor (nAChR) subunit gene cluster on chromosome region 15q25.1 significantly increases risk for addiction to multiple classes of drugs [1–9], but confers a protective effect for cocaine addiction [8, 10]. This region also confers risk for lung cancer and chronic obstructive pulmonary disease (COPD) [2, 11–13]. A non-synonymous single nucleotide

polymorphism (SNP), rs16969968, in the gene encoding the α5 subunit (*CHRNA5*) is most commonly implicated in this gene cluster. Functional analysis of this SNP suggests it reduces ligand-mediated signaling [14, 15]. In addition to rs16969968 affecting protein function, SNPs in a *cis*-acting distal regulatory element (DRE), located ~15 kb upstream of *CHRNA5*, increase mRNA expression in the prefrontal cortex (PFC) up to 4-fold [9]. This DRE harbors a cluster of six SNPs (rs7164030, rs1979905, rs1979906, rs1979907, rs880395, and rs905740) in near complete linkage disequilibrium (LD). Joint analysis of rs880395 in the DRE with rs16969968 in the Collaborative Genetic Study of Nicotine Dependence (COGEND) finds increased risk for nicotine dependence compared to risk associated with either SNP alone [9], suggesting that both

* Correspondence: smith.4051@osu.edu
[1]Center for Pharmacogenomics, The Ohio State University, Columbus, OH 43210, USA
[2]Department of Pharmacology, The Ohio State University, 5184A Graves Hall, 333. W. 10th Ave, Columbus, OH 43210, USA
Full list of author information is available at the end of the article



© 2015 Ramsay et al. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly credited. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

Ramsay et al. Genes and Environment (2015) 37:14

SNPs can influence phenotypes associated with this genomic region.

Knockout mouse studies examining the behavioral effects of habenular and ventral tegmental area (VTA) Chrna5 mRNA expression find that mice with a null mutation for Chrna5 significantly increase nicotine intake [15, 16] and exhibit attenuated nicotine-induced locomotion [17]. Re-expressing Chrna5 in the medial habenula (MHb) reduces nicotine consumption to wild-type levels [16], suggesting that α5 nAChR mRNA expression in the MHb mediates negative reward signaling through the habenulo-interpenduncular pathway. Expression of the α5 receptor subunit in GABAergic neurons of the interpeduncular nucleus (IPN) was found to further modulate this MHb output to serotonergic brain regions [18]. The medial and lateral habenula are also connected to brain regions classically associated with drug-taking behaviors that express CHRNA5 mRNA. This includes afferent connections from the nucleus accumbens and efferent connections to the VTA and substantia nigra, which go on to innervate the PFC and striatum, respectively [19]. In the VTA, Chrna5 modulates the sensitivity of dopaminergic neurons to acute nicotine [15] but not ethanol administration [20]. Furthermore, rs16969968 interacts with a splicing SNP in the dopamine D2 receptor gene (DRD2), also implicated in addiction [21], to affect multiple aspects of prefrontal cortex physiology and behavior [22]. Together, these results demonstrate a pervasive functional profile for CHRNA5 in brain regions central to addiction and cognition. Despite strong evidence for altered Chrna5 expression in the rodent habenula affecting addiction phenotypes, and the association of regulatory DRE SNPs with nicotine addiction, it is unknown whether the DRE SNPs affect CHRNA5 mRNA expression in the human habenula. However, evidence that they modulate expression in the PFC, amygdala, and nucleus accumbens [5, 6, 9, 23], suggests the DRE exerts influence in cortical and subcortical brain regions.

CpG methylation in the CHRNA5 locus is strongly influenced by the DRE polymorphisms according to genome-wide scans of cis-methylation quantitative trait loci (cis-mQTLs) in the prefrontal cortex [24] and biopsied adipose [25] tissue. Moreover, specific CpG sites within the CHRNA5 promoter are hypermethylated in response to adverse childhood events [26]. These same adverse events confer risk for nicotine dependence, even exhibiting an genotype x environment interaction specifically for rs16969968 [27]. While it is reasonably hypothesized that environmental factors affect methylation, which then influences expression, this relationship has not been formally tested. Thus, the relationship between genotype, methylation, and expression remains unclear and needs to be resolved in order to identify the mechanisms underlying substance abuse with respect to CHRNA5.

Here, we have tested the influence of the DRE variants modulate on CHRNA5 mRNA expression in the human habenula and putamen, by measuring total and allelic CHRNA5 mRNA expression. We also compared expression and CpG methylation across DRE genotypes using publicly available genome-wide expression data from BrainCloud [28], BrainCloudMethyl [24], and the Multiple Tissue Human Expression Resource [25, 29]. We find the DRE SNPs modulate expression in the putamen and habenula. However, in PFC and adipose tissues where we have measures of both expression and methylation from the same individuals, we find that methylation does not appear to directly influence CHRNA5 expression.

## Materials and methods
### Tissue samples
Twenty-one human habenula autopsy samples were dissected by a trained neuropathologist (CRH) or obtained from the NICHD Brain and Tissue Bank for Developmental Disorders, while 57 human posterior putamen autopsy samples were obtained through the University of Miami Brain Endowment Bank. Demographics for these human tissues are presented in Table 1. Post-mortem tissue collection was performed in accordance with local Institutional Review Board approvals. The overall study described here was performed in accordance with the Institutional Review Board of The Ohio State University.

### Nucleic acid isolation & complementary DNA (cDNA) synthesis
Genomic DNA (gDNA) was isolated from all human tissues using a 'salting out' method adjusted for lipid-rich brain tissue, as previously described [9]. Total RNA was isolated by homogenizing the tissues in TRIzol and precipitating the RNA from the aqueous phase using isopropanol. We further purified the RNA using RNeasy Mini Kit spin columns (Qiagen, Germantown, MD) and digested latent gDNA on the column with recombinant DNaseI, as previously described [9]. cDNA preparations were made using 0.5 μg total RNA for each sample. Gene-specific primers (25 nM) supplemented with Oligo-dT (5 μM) were used to prime the reverse transcription reaction.

### Sample genotyping
SNPs rs16969968, rs615470, and rs7164030 were genotyped by restriction fragment length polymorphism (RFLP) methods. rs16969968 and rs615470 serve as marker SNPs for measuring allelic mRNA expression, which were chosen because of their high minor allele frequencies, high likelihood to be present in the mature mRNA, and LD pattern which suggests their minor alleles are present on different haplotypes. rs7164030 serves as the representative marker of DRE, which

Ramsay et al. Genes and Environment (2015) 37:14

**Table 1** Demographic characteristics for habenula and posterior putamen tissues

| Tissue (n) | Sex | Race[a] | Nicotine use | Cocaine use | Age (Avg. ± S.D.) | PMI (Avg. ± S.D.) | RIN (Avg. ± S.D.) |
|---|---|---|---|---|---|---|---|
| Habenula (21) | Male: 12 | FA: 19 | Users: 5 | Users: N/A | 57.5 ± 18.6 | 35.6 ± 38.0 | 5.2 ± 1.4 |
| | Female: 9 | AA: 2 | Non-users: 7 | Non-users: N/A | | | |
| | | | Unknown: 9 | | | | |
| Putamen (55) | Male: 46 | EA: 34 | Users: 24 | Users: 22 | 35.6 ± 8.9 | 16.7 ± 5.4 | N/A |
| | Female: 9 | AA: 10 | Non-users: 31 | Non-users: 33 | | | |
| | | Other: 11 | | | | | |

[a]EA: European-American, AA: African-American, Other: Mixed race and/or Hispanic
*Abbreviations: PMI post-mortem interval, RIN RNA Integrity Number, as measured by Agilent Bioanalyzer 2100, N/A data not available*

include 5 additional SNPs in high LD (rs1979907, rs1979906, rs1979905, rs880395, and rs905740). The gDNA regions surrounding these SNPs were amplified using primers tagged with a fluorophore (6-FAM or HEX) and the resultant amplicons were cut with restriction enzymes (rs16969968-Taq1a; rs615470-CviQI; rs7164030-Tsp509I) that recognize only one of the two alleles resulting from the presence of the polymorphism. Fragments were resolved on an ABI 3730 DNA Analyzer (Life Technologies) or by standard gel electrophoresis (1.5 % agarose).

**Total and allelic mRNA expression measurement**

Total CHRNA5 and β-actin (ACTB) mRNA expression was measured in all human and mouse tissues by qPCR using an ABI 7500 Fast Sequence Detection System (Life Technologies). In addition, we measured the expression of two highly-enriched habenula markers, POU4F1 and CHRNB3, in the habenula samples to determine the purity of the dissections. The relative quantity of CHRNA5 mRNA was normalized within each sample to ACTB mRNA expression for statistical analysis. The influences of available covariates (age, sex, race, post-mortem interval, RNA integrity number, nicotine use, or habenula purity) were tested using stepwise linear regression on ACTB-normalized total CHRNA5 mRNA expression in each brain region using stepwise linear regression.

We quantified allelic mRNA expression in habenula and putamen samples heterozygous for rs16969968 or rs615470 using a fluorescent primer extension method (SNaPshot), as previously described [9]. Fluorescently-labeled primer extension fragments, representing the two different alleles of rs16969968 or rs615470, were resolved on an ABI 3730. The fluorescent peak heights for each allele, determined using GeneMapper 4.0 Software (Life Technologies), were used to calculate relative allelic expression ratios (ancestral/variant allele). For each sample, at least two separate measurements were used to calculate allelic expression imbalance (AEI). Allelic ratios for cDNA were normalized against the overall average ratio calculated for gDNA for each marker SNP. We

subsequently compared the absolute magnitude of the allelic expression in samples heterozygous for rs7164030 *versus* homozygotes for either allele.

**CHRNA5 mRNA expression and CpG methylation using BrainCloud and MuTHER**

We utilized existing repositories of transcriptome-wide mRNA expression, genome-wide methylation profiles, and SNP genotypes in postnatal PFC (BrainCloud; http://braincloud.jhmi.edu/) and adipose tissue (MuTHER; http://www.muther.ac.uk/) to test interactions between DRE SNPs, expression, and CpG methylation. Detailed methods for these studies are available in their primary publications [24, 25, 28, 29]. Source data can be obtained from the Gene Expression Omnibus (Accession: GSE30272), dbGAP (Accession: phs000417), EMBL-EBI ArrayExpress (Accessions: E-TABM-1140 and E-MTAB-1866), and by applying to the TwinsUK Consortium (http://www.twinsuk.ac.uk/).

Briefly, samples were genotyped with a variety of Illumina arrays (HumanHap300, HumanHap610Q, Human Hap650Y, Human 1 M-Duo, and Human 1.2 MDuo 1 M) and imputed to 1000 Genomes populations using IMPUTE2. From the imputed data, we used rs7164030 as a surrogate marker of the DRE to test genetic effects on expression and methylation. Samples were also measured for genome-wide CpG methylation, using the Infinium HumanMethylation450k BeadChip assay, and transcriptome-wide mRNA expression, using Illumina 49 K Oligo Arrays (BrainCloud) or HumanHT-12 v3 BeadChips (MuTHER). For analyses, we used CpG probes cg22563815 and cg17108064, which measures methylation at CpG sites 913 and 802 nucleotides upstream of the annotated CHRNA5 gene (hg19 chr15: 78856949 and chr15:78857060), respectively. Although these CpG probes are ~12 kb downstream from the DRE SNPs, they are among the highest scoring mQTLs for the DRE SNPs in the CHRNA5 gene region. For expression, we used probes hHC002196 (BrainCloud) and ILMN_1770044 (MuTHER), which hybridize to CHRNA5 mRNA in the 3′ untranslated region and exon 5, respectively.

Ramsay et al. Genes and Environment (2015) 37:14

### Statistical analyses

Statistical analyses were performed in $R$ (x64 v.3.1.0) with standardized $\beta$-coefficients calculated by the QuantPsyc package. For all datasets, we used interquartile range (IQR) to exclude extreme outliers, defined as data points below $Q1 - 3 \times IQR$ or above $Q3 + 3 \times IQR$. Next, we identified significant covariates using stepwise linear regression and AIC, using the [step] function to reach a minimal adequate model. We subsequently included significant covariates in analyses of rs7164030 genotype on expression and methylation or as interaction terms in linear regression models of expression and methylation. Potential covariates in our putamen and habenula expression datasets included age, sex, race, smoking history, cocaine use, and post-mortem interval. Potential covariates in the BrainCloud data included sex, age, race, and an estimate of neuron enrichment that was specific to methylation data [30]. Age and batch-specific effects were considered as a potential covariate in the MuTHER dataset. We tested for an overall effect of methylation on expression using linear regression across the entire BrainCloud or MuTHER sample populations and report the standardized $\beta$-coefficient for the methylation measure. We further tested this relationship within each rs7164030 genotype group to identify any genotype-specific effect that could be obscured when examining the population as a whole.

### Results

#### Total and allelic CHRNA5 mRNA expression in putamen and habenula

Two putamen samples were excluded from analyses due to poor RNA quality as indicated by $ACTB$ expression >2 standard deviations above the mean of the remaining samples, leaving 55 total putamen samples. Stepwise linear regression revealed sex as a significant covariate of $CHRNA5$ mRNA expression measured via qPCR in the putamen. We found a significant effect of the representative DRE SNP rs7164030 genotype on putamen expression ($n$=55, $F$=28.90, $p$=1.82×10$^{-6}$; Fig. 1), whereby homozygous minor "G" allele samples expressed 3.5-fold more $CHRNA5$ mRNA than homozygous major "A" allele samples, consistent with our previous findings in PFC [9]. Examining the influence of rs7164030 on habenular $CHRNA5$ mRNA expression via qPCR with race as a significant covariate revealed no significant effect of genotype, although the direction of the genotypic effect is consistent with our findings in the putamen and PFC. We also noted that the purity of the habenula dissection, as determined by $POU4F1$ or $CHRNB3$ expression, did not influence $CHRNA5$ mRNA expression. A comparative analysis of habenula $CHRNA5$ mRNA expression with previously measured PFC expression found no enrichment in the habenula relative to the PFC in humans, consistent



**Fig. 1** $CHRNA5$ mRNA expression in the putamen compared across rs7164030 genotypes, as measured by qPCR. Samples homozygous for the major "A" allele (A/A) of rs7164030 have approximately 3.5-fold less $CHRNA5$ mRNA versus samples homozygous for the minor "G" allele, with heterozygotes exhibiting intermediate levels (ANOVA p=1.82×10$^{-6}$)

with previous reports of generally low expression in these areas in rodents [18, 31].

We measured allelic mRNA expression in 21 of 55 putamen samples heterozygous for either rs16969968 or rs615470 (9 co-heterozygous) and 9 of 21 habenula samples heterozygous for rs16969968. The low expression of $CHRNA5$ in both tissues required us to average the allelic ratio measurements at the two marker SNPs, as done for the putamen, or take an increased number of measurements at the same SNP, as done for the habenula. Thus, the averaged data is only presented for the 9 co-heterozygous putamen samples, while the data for all habenula samples is presented for marker SNP rs16969968. Samples heterozygous for rs7164030 exhibited AEI ranging from 2.1 to 6.5-fold differences between the expression of the two alleles, while samples homozygous for either allele of rs7164030 all displayed AEI of <2-fold, consistent across both brain regions. We observed greater expression for the major allele of rs16969968 relative to the minor allele in all but one sample exhibiting >2-fold AEI, consistent with the major allele for rs16969968 residing on the high expressing DRE haplotype. Comparing the absolute magnitude of AEI across rs7164030 genotype, we find heterozygotes exhibit significantly greater AEI versus homozygotes ($F$=7.99, $p$=0.012; Fig. 2), supporting the hypothesis that the DRE SNPs exert their function in both the habenula and putamen.

#### DRE SNPs, CHRNA5 expression, and methylation in BrainCloud and MuTHER

$CHRNA5$ mRNA expression differed significantly across rs7164030 genotype in the BrainCloud dataset ($F$=28.57,

Ramsay et al. Genes and Environment  (2015) 37:14



**Fig. 2** Absolute allelic expression imbalance in putamen (filled markers) and habenula (open markers) compared across rs7164030 genotype. Samples heterozygous for rs7164030 exhibit significantly greater AEI than samples homozygous for rs7164030 (ANOVA $p$=0.012), consistent with the expectation that AEI is observed in samples heterozygous for the functional allele. Samples homozygous for either DRE allele are not expected to exhibit AEI

$p$=2.30×10⁻⁷; age and sex included as significant covariates). Consistent with our previous study in the PFC [9], samples homozygous for the variant G allele of rs7164030 expressed 3.67-fold more *CHRNA5* mRNA than samples homozygous for the ancestral A allele (Fig. 3a). rs7164030 genotype was also significantly associated with *CHRNA5* expression in MuTHER ($F$=13.06, $p$=3.28×10⁻⁴; Fig. 3b).

Methylation in the BrainCloud dataset significantly differed across rs7164030 genotype in the PFC for both CpG probes (cg22563815: $F$=109.17, $p$=5.87×10⁻²¹; race, age, and neuron enrichment estimate as significant covariates; cg17108064: $F$=191.06, $p$=1.77×10⁻³¹; race as a significant covariate). Here, samples homozygous for the variant G allele of rs7164030 had significantly greater CpG methylation at both probes relative to the ancestral A allele homozygotes (Fig. 3c and e). Methylation was also significantly higher across both probes for the variant G allele carriers in the MuTHER dataset (cg22563815: $F$ = 1703.48, $p$=5.54×10⁻¹⁷²; bisulfite conversion gDNA concentration and efficiency included as covariates; cg17108064: $F$=614.33, $p$=3.73×10⁻⁹²; batch and bisulfite conversion efficiency included as covariates; Fig. 3d and f).

Because the DRE SNPs are associated with significant increases in both expression and methylation, we further

asked if the increased expression can be predicted by greater methylation using linear regression. In both the BrainCloud and MuTHER datasets, we found that methylation at either probe did not significantly predict *CHRNA5* expression. The linear model for cg22563815 in BrainCloud (Expression ~ sex + cg22563815*methylation*race*age*neuron count estimate*rs7164030) found no significant effect for methylation at cg22563815 ($t$ = 0.42, $p$=0.67 β=0.30; Fig. 4a). Similarly, the model for cg17108064 (Expression ~ sex + age + cg17108064*race*rs7164030) also revealed no significant effect for methylation ($t$=−0.84, $p$=0.40 β=−0.11; Fig. 4b). In the MuTHER dataset, the linear model for methylation at cg22563815 (Expression ~ cg22563815*bisulfite conversion concentration*bisulfite conversion efficiency*rs7164030) showed a trend towards significance ($t$=−1.95, $p$=0.051, β= −2.34; Fig. 4c), while methylation at cg17108064 (Expression ~ cg17108064*batch*bisulfite conversion efficiency* rs7164030) did not predict expression ($t$=1.48, $p$=0.14, β=0.99; Fig. 4d).

Evident in each of our linear models is the confounding influence of genotype on both methylation and expression (Fig. 4). Although we accounted for this influence statistically in the model examining all samples, we subsequently tested whether it was still possible for methylation to influence expression on specific genetic backgrounds (*i.e.* if one were to carry the DRE SNPs), which could be obscured in the full linear model. Thus, we performed linear regression within each of the rs7164030 genotype groups, finding no evidence that methylation at either probe affects expression in any of the genetic backgrounds defined by the DRE SNPs (Table 2).

## Discussion

Our findings reveal pervasive influence of the DRE SNPs on *CHRNA5* mRNA expression and methylation in brain and adipose tissue, whereby the minor DRE alleles are associated with greater expression and methylation. This genotypic difference is consistent with our findings in the PFC for both the BrainCloud dataset and in our previous study [9]. The habenula did not show a main effect of the DRE SNPs on total *CHRNA5* expression, but we observed strong allelic differences in the habenula that perfectly correlate with the DRE SNPs, consistent with the interpretation that they modulate *CHRNA5* expression in the habenula. While significant, the influence of the DRE SNPs on *CHRNA5* expression is not as strong in adipose tissue. We previously reported no influence of the DRE SNPs in lymphoblastoid cell lines (LCLs), but other studies with larger sample sizes have found *cis*-eQTLs for *CHRNA5*, implicating the DRE SNPs in peripheral whole blood [32], monocytes [33], and lung [34]. Thus, it is likely that the DRE SNPs are modulating

Ramsay *et al. Genes and Environment* (2015) 37:14

Page 6 of 10



**Fig. 3** Expression and methylation across rs7164030 genotype in BrainCloud and MuTHER. The major "A" allele of rs7164030 was significantly and consistently associated with lower *CHRNA5* mRNA expression in the BrainCloud (**a**) and MuTHER (**b**) datasets. The "A" allele was also associated with lower CpG methylation measured at two different probes (cg22563815 and cg17108064) in the BrainCloud prefrontal cortex (**c** and **e**) and the MuTHER adipose tissue (**d** and **f**)

expression of *CHRNA5* in peripheral tissues, but exert less influence relative to their impact in the brain.

The location and epigenetic histone markings in the *CHRNA5* locus harboring the DRE SNPs previously led us to propose they act in an enhancer [9]. Data from the ENCyclopedia Of DNa Elements (ENCODE) Project [35] viewed on the UCSC Genome Browser [36] shows

histone modifications in a lymphocyte cell line (GM12878) consistent with enhancers, including histone 3 lysine 4 monomethylation (H3K4Me1) and light trimethylation (H3K4Me3), and H3 lysine 27 acetylation (H3K27Ac). However, when a portion of the DRE containing rs880395, rs905740, and rs7164030 was sub-cloned into a vector upstream of a minimal promoter, it acted as a repressor, with

Ramsay et al. Genes and Environment (2015) 37:14



**Fig. 4** Scatterplots for CpG methylation and *CHRNA5* mRNA expression in BrainCloud and MuTHER. *CHRNA5* expression is moderately correlated with CpG methylation measured in the BrainCloud prefrontal cortex data by probes cg22563815 (**a**) and cg17108064 (**b**). Similar results were obtained for the same probes in the MuTHER adipose tissue (**c** and **d**). However, the correlation between expression and CpG methylation is explained by rs7164030 genotype, apparent by the stratification of the genotype groups in the scatterplots (A/A = red circles, A/G = blue squares, G/G = black diamonds). Furthermore, linear regression performed within each genotype group finds no significant relationship between methylation and expression, arguing against direct modulation of expression by methylation

no significant expression differences between DRE haplo-types [23]. Given these contradictory results, we find it possible that the DRE contains both enhancer and repressor elements. A dual enhancer/repressor mechanism is not novel. Perhaps the most well-known example is the RE-1 Silencing Transcription Factor (REST), which silences neuronal genes in the periphery [37], but has the ability to enhance gene expression in the brain [38, 39]. Evolutionary studies of *cis*-acting enhancer elements supports the possibility that multiple variants affecting enhancer function can arise together within a population to high frequency [40],

sometimes co-opting cryptic or existing regulatory sequences to derive their new functions [41], as we would assume occurred for the DRE SNPs in *CHRNA5*. A more thorough analysis of the evolutionary constraints on the *CHRNA5* locus could provide clues about the adaptive evolution of regulatory elements in humans.

In addition to the epigenetic histone modifications present in the *CHRNA5* locus, CpG methylation is strongly associated with *CHRNA5* SNPs. Since CpG methylation can repress transcription [42] it led us to examine *CHRNA5* CpG methylation and mRNA expression using BrainCloud

Ramsay et al. Genes and Environment (2015) 37:14

Page 8 of 10

**Table 2** Linear regression results for CpG methylation and *CHRNA5* gene expression across rs7164030 genotypes

| Dataset | CpG probe | rs7164030 genotype (n) | Standardized β coefficient for methylation | t-value | p-value |
|---|---|---|---|---|---|
| BrainCloud | cg22563815 | A/A (118) | 0.267 | 0.363 | 0.717 |
| | cg22563815 | A/G (77) | 1.166 | 0.390 | 0.698 |
| | cg22563815 | G/G (25) | −16.837 | −0.397 | 0.700 |
| | cg17108064 | A/A (118) | −0.171 | −1.424 | 0.157 |
| | cg17108064 | A/G (77) | 0.153 | 1.072 | 0.288 |
| | cg17108064 | G/G (25) | 0.024 | −0.040 | 0.969 |
| MuTHER | cg22563815 | A/A (184) | 4.069 | 0.528 | 0.598 |
| | cg22563815 | A/G (270) | 0.010 | 0.014 | 0.989 |
| | cg22563815 | G/G (111) | −2.964 | −1.718 | 0.089 |
| | cg17108064 | A/A (184) | 0.981 | 0.398 | 0.691 |
| | cg17108064 | A/G (270) | −1.288 | −0.813 | 0.417 |
| | cg17108064 | G/G (111) | −2.510 | −0.639 | 0.524 |

and MuTHER. Because the DRE SNPs were strongly associated with increased methylation and expression in both datasets, we expected methylation to be positively correlated with expression, thus providing mechanistic evidence linking epigenetic modulation of the *CHRNA5* locus and gene expression. Instead, we found that methylation and expression were independent when accounting for DRE genotype and other significant covariates. Evidence that *CHRNA5* expression and methylation are independent is important for delineating mechanisms underlying drug addiction that is associated with this gene locus, since both methylation and expression apparently influence addiction risk. One explanation that unifies expression and methylation, that also serves as a caveat of this study, is that methylation influences the expression of *CHRNA5* in a way that was not detected here. Such scenarios could include changes in alternative splicing or transcription start site usage which do not change the overall levels of *CHRNA5* mRNA, but alter the makeup of the mRNA. The GEN-CODE project has annotated an alternatively spliced transcript (ENST00000559554.1), but it has only been observed as an expressed sequence tag in a neuroblastoma cell line.

Methylation at the *CHRNA5* locus is sensitive to environmental factors, as demonstrated by childhood adverse events (CA). CA results in hypermethylation and increased risk for drug dependence [26, 27]. Males carrying rs16969968 who experience CA are at greater risk for dependence relative to those without rs16969968 [27]. In the context of our findings, we do not find it likely that hypermethylation changes mRNA expression, although we cannot rule out that CA-induced hypermethylation can be much greater than observed in our samples and subsequently affect expression. Reanalyzing existing CA studies to include the DRE SNPs in addition to rs16969968 could shed some light on the relationships between CA, methylation, and smoking risk. However, a study examining environmental factors, CpG

methylation, mRNA expression, and drug dependence would be ideal for resolving the risk conferred by 15q25.1.

Finally, the strong impact of *Chrna5* expression in mouse MHb and VTA on nicotine consumption despite low levels of mRNA expression in mice and humans signifies the importance of the specific cell types on which these receptors are expressed. The MHb afferents that express the α5 subunit project to the interpeduncular nucleus [19], which also contains GABAergic neurons expressing the α5 subunit [18], modulating aversiveness associated with nicotine intake [16] and withdrawal [43]. Dopaminergic neurons in the VTA express the α5 receptor subunit [44] and project to multiple addiction-related brain regions, including the cortex and insula via the mesocortical pathway and limbic areas, the nucleus accumbens, lateral habenula, and amygdala through the mesolimbic pathway [45]. Finding ways to modulate the firing of the cells expressing *CHRNA5*, directly or indirectly, without targeting nicotinic α5-containing receptors could provide avenues for treating addictive behaviors that circumvent the inherent challenges of developing small molecules for nicotinic receptors. Identifying promising new targets will require a firm understanding of addiction neurocircuitry and of genetic expression within specific cell types in the habenula, IPN, and VTA, in order to exploit the aversive signaling properties of these cells in the context of drug abuse.

## Conclusions

Our findings support pervasive but independent influence of the *CHRNA5* DRE SNPs on mRNA expression and CpG methylation in the brain and periphery. With evidence that environmental influences modulate CpG methylation in this region, we advocate for future studies to incorporate environmental, epigenetic, and genetic factors in the pathogenesis of addiction associated with

Ramsay et al. Genes and Environment (2015) 37:14

*CHRNA5*. Finally, clinical and molecular genetic studies of the *CHRNA5/A3/B4* locus suggest the presence of unaccounted for functional regulatory variants [46], requiring additional studies to delineate the exact functional variant(s) and their phenotypic impact to further disentangle disease risk conferred by 15q25.1.

**Competing interests**
The authors declare no competing financial interests related to the work described here.

**Authors' contributions**
JER performed studies, wrote and revised the manuscript. CHR dissected tissue, designed studies, and revised the manuscript. KTR performed studies and revised the manuscript. RMS designed studies, analyzed data, wrote and revised the manuscript. All authors read and approved the final manuscript.

**Acknowledgements**
The authors thank Dr. Elin Grundberg at McGill University and Dr. Andrew Jaffe at the Lieber Institute for Brain Development for their help in accessing and analyzing the MuTHER and BrainCloud datasets.

**Funding and disclosure**
This study was supported by a grant from the US National Institutes of Health, General Medical Sciences, U01 GM092655.
MuTHER via TwinsUK. The study was funded by the Wellcome Trust;
European Community's Seventh Framework Programme (FP7/2003-2013).
The study also receives support from the National Institute for Health Research (NIHR) - funded BioResource, Clinical Research Facility and Biomedical Research Centre based at Guy's and St Thomas' NHS Foundation Trust and King's College London. SNP Genotyping was performed by The Wellcome Trust Sanger Institute and National Eye Institute via NIH/CIDR.

**Author details**
[1]Center for Pharmacogenomics, The Ohio State University, Columbus, OH 43210, USA. [2]Department of Pharmacology, The Ohio State University, 5184A Graves Hall, 333. W. 10th Ave., Columbus, OH 43210, USA. [3]National Institute of Mental Health, Human Brain Collection Core, 10 Center Drive, Rm. 4N306, Bethesda, MD, USA.

Received: 2 March 2015 Accepted: 13 July 2015
Published online: 01 October 2015

**References**
1. Saccone NL, Culverhouse RC, Schwantes-An TH, Cannon DS, Chen X, Cichon S, et al. Multiple independent loci at chromosome 15q25.1 affect smoking quantity: A meta-analysis and comparison with lung cancer and COPD. PLoS Genet. 2010;6, e1001053.
2. Saccone SF, Hinrichs AL, Saccone NL, Chase GA, Konvicka K, Madden PA, et al. Cholinergic nicotinic receptor genes implicated in a nicotine dependence association study targeting 348 candidate genes with 3713 SNPs. Hum Mol Gen. 2007;16:36–49.
3. Berrettini W, Yuan X, Tozzi F, Song K, Francks C, Chilcoat H, et al. Alpha-5/ alpha-3 nicotinic receptor subunit alleles increase risk for heavy smoking. Mol Psychiatry. 2008;13:368–73.
4. Schlaepfer IR, Holt NR, Collins AC, Corley RP, Hewitt JK, Hopfer CJ, et al. The CHRNA5/A3/B4 gene cluster variability as an important determinant of early alcohol and tobacco initiation in young adults. Biol Psychiatry. 2008;63:1039–46.
5. Wang JC, Cruchaga C, Saccone NL, Bertelsen S, Liu P, Budde JP, et al. Risk for nicotine dependence and lung cancer is conferred by mRNA expression levels and amino acid change in CHRNA5. Hum Mol Gen. 2009;18:3125–35.
6. Wang JC, Grucza R, Cruchaga C, Hinrichs AL, Bertelsen S, Budde JP, et al. Genetic variation in the CHRNA5 gene affects mRNA levels and is associated with risk for alcohol dependence. Mol Psychiatry. 2009;14:501–10.
7. Erlich PM, Hoffman SN, Rukstalis M, Han JJ, Chu X, Linda Kao WH, et al. Nicotinic acetylcholine receptor genes on chromosome 15q25.1 are associated with nicotine and opioid dependence severity. Hum Genet. 2010;128:491–9.
8. Sherva R, Kranzler HR, Yu Y, Logue MW, Poling J, Arias AJ, et al. Variation in nicotinic acetylcholine receptor genes is associated with multiple substance dependence phenotypes. Neuropsychopharmacology. 2010;35:1921–31.
9. Smith RM, Alachkar H, Papp AC, Wang D, Mash DC, Wang JC, et al. Nicotinic alpha5 receptor subunit mRNA expression is associated with distant 5' upstream polymorphisms. Eur J Hum Genet. 2011;19:76–83.
10. Grucza RA, Wang JC, Stitzel JA, Hinrichs AL, Saccone SF, Saccone NL, et al. A risk allele for nicotine dependence in CHRNA5 is a protective allele for cocaine dependence. Biol Psychiatry. 2008;64:922–9.
11. Amos CI, Wu X, Broderick P, Gorlov IP, Gu J, Eisen T, et al. Genome-wide association scan of tag SNPs identifies a susceptibility locus for lung cancer at 15q25.1. Nat Genet. 2008;40:616–22.
12. Hung RJ, McKay JD, Gaborieau V, Boffetta P, Hashibe M, Zaridze D, et al. A susceptibility locus for lung cancer maps to nicotinic acetylcholine receptor subunit genes on 15q25. Nature. 2008;452:633–7.
13. Wilk JB, Shrine NR, Loehr LR, Zhao JH, Manichaikul A, Lopez LM, et al. Genome-wide association studies identify CHRNA5/3 and HTR4 in the development of airflow obstruction. Am J Respir Crit Care Med. 2012;186:622–32.
14. Bierut LJ, Stitzel JA, Wang JC, Hinrichs AL, Grucza RA, Xuei X, et al. Variants in nicotinic receptors and risk for nicotine dependence. Am J Psychiatry. 2008;165:1163–71.
15. Morel C, Fattore L, Pons S, Hay YA, Marti F, Lambolez B, et al. Nicotine consumption is regulated by a human polymorphism in dopamine neurons. Mol Psychiatry. 2014;19:930–6.
16. Fowler CD, Lu Q, Johnson PM, Marks MJ, Kenny PJ. Habenular alpha5 nicotinic receptor subunit signalling controls nicotine intake. Nature. 2011;471:597–601.
17. Salas R, Orr-Urteger A, Broide RS, Beaudet A, Paylor R, De Biasi M. The nicotinic acetylcholine receptor subunit alpha 5 mediates short-term effects of nicotine in vivo. Mol Pharmacol. 2003;3:1059–66.
18. Hsu YW, Tempest L, Quina LA, Wei AD, Zeng H, Turner EE. Medial habenula output circuit mediated by alpha5 nicotinic receptor-expressing gabaergic neurons in the interpeduncular nucleus. J Neurosci. 2013;33:18022–35.
19. Bianco IH, Wilson SW. The habenular nuclei: a conserved asymmetric relay station in the vertebrate brain. Philos Trans R Soc Lond B Biol Sci. 2009;364:1005–20.
20. Chatterjee S, Santos N, Holgate J, Haass-Koffler CL, Hopf FW, Kharazia V, et al. The α5 subunit regulates the expression and function of α4*-containing neuronal nicotinic acetylcholine receptors in the ventral-tegmental area. PLoS One. 2014;8, e68300.
21. Moyer RA, Wang D, Papp AC, Smith RM, Duque L, Mash DC, et al. Intronic polymorphisms affecting alternative splicing of human dopamine D2 receptor are associated with cocaine abuse. Neuropsychopharmacology. 2011;36:753–62.
22. Di Giorgio A, Smith RM, Fazio L, D'Ambrosio E, Gelao B, Tomasicchio A, et al. DRD2/CHRNA5 interaction on prefrontal biology and physiology during working memory. PLoS One. 2014;9, e95997.
23. Doyle GA, Wang MJ, Chou AD, Oleynick JJ, Arnold SE, Buono RJ, et al. In vitro and ex vivo analysis of chrna3 and chrna5 haplotype expression. PLoS One. 2011;6, e23373.
24. Numata S, Ye T, Hyde TM, Guitart-Navarro X, Tao R, Wininger M, et al. DNA methylation signatures in development and aging of the human prefrontal cortex. Am J Hum Genet. 2012;90:260–72.
25. Grundberg E, Meduri E, Sandling JK, Hedman AK, Keildson S, Buil A, et al. Global analysis of DNA methylation variation in adipose tissue from twins reveals links to disease-associated variants in distal regulatory elements. Am J Hum Genet. 2013;93:876–90.
26. Zhang H, Wang F, Kranzler HR, Zhao H, Gelernter J. Profiling of childhood adversity-associated DNA methylation: changes in schizoid patients and healthy controls. PLoS One. 2013;8, e65648.
27. Xie P, Kranzler HR, Zhang H, Oslin D, Anton RF, Farrer LA, et al. Childhood adversity increases risk for nicotine dependence and interacts with alpha5 nicotinic acetylcholine receptor genotype specifically in males. Neuropsychopharmacology. 2012;37:669–76.
28. Colantuoni C, Lipska BK, Ye T, Hyde TM, Tao R, Leek JT, et al. Temporal dynamics and genetic control of transcription in the human prefrontal cortex. Nature. 2011;478:519–23.
29. Grundberg E, Small KS, Hedman ÅK, Nica AC, Buil A, Keildson S, et al. Mapping cis and trans regulatory effects across multiple tissues in twins. Nat Genet. 2012;44:1084–9.

Ramsay *et al. Genes and Environment* (2015) 37:14

30. Guintivano J, Aryee MJ, Kaminsky ZA. A cell epigenotype specific model for the correction of brain cellular heterogeneity bias and its application to age, brain region and major depression. Epigenetics. 2013;8:290–302.
31. Han ZY, Le Novere N, Zoli M, Hill Jr JA, Champtiaux N, Changeux JP. Localization of nAChR subunit mRNAs in the brain of macaca mulatta. Eur J Neurosci. 2000;12:3664–74.
32. Westra HJ, Peters MJ, Esko T, Yaghootkar H, Schurmann C, Kettunen J, et al. Systematic identification of trans eQTLs as putative drivers of known disease associations. Nat Genet. 2013;45:1238–43.
33. Zeller T, Wild P, Szymczak S, Rotival M, Schillert A, Castagne R, et al. Genetics and beyond – The transcriptome of human monocytes and disease susceptibility. PLoS One. 2010;5, e10693.
34. Hao K, Bossé Y, Nickle DC, Paré PD, Postma DS, Laviolette M, et al. Lung eQTLs to help reveal the molecular underpinnings of asthma. PLoS Genet. 2012;8, e1003029.
35. Rosenbloom KR, Sloan CA, Malladi VS, Dreszer TR, Learned K, Kirkup VM, et al. Encode data in the UCSC genome browser: Year 5 update. Nucleic Acids Res. 2013;41:D56–63.
36. Kent WJ, Sugnet CW, Furey TS, Roskin KM, Pringle TH, Zahler AM, et al. The human genome browser at UCSC. Genome Res. 2002;12:996–1006.
37. Schoenherr CJ, Anderson DJ. The neuron-restrictive silencer factor (NRSF): A coordinate repressor of multiple neuron-specific genes. Science. 1995;267:1360–3.
38. Bessis A, Champtiaux N, Chatelin L, Changeux JP. The neuron-restrictive silencer element: A dual enhancer/silencer crucial for patterned expression of a nicotinic receptor gene in the brain. Proc Natl Acad Sci U S A. 1997;94:5906–11.
39. Seth KA, Majzoub JA. Repressor element silencing transcription factor/ neuron-restrictive silencing factor (REST/NRSF) can act as an enhancer as well as a repressor of corticotropin-releasing hormone gene transcription. J Biol Chem. 2001;276:13917–23.
40. Rebeiz M, Pool JE, Kassner VA, Aquadro CF, Carroll SB. Stepwise modification of a modular enhancer underlies adaptation in a drosophila population. Science. 2009;326:1663–7.
41. Rebeiz M, Jikomes N, Kassner VA, Carroll SB. Evolutionary origin of a novel gene expression pattern through co-option of the latent activities of existing regulatory sequences. Proc Natl Acad Sci U S A. 2011;108:10036–43.
42. Curradi M, Izzo A, Badaracco G, Landsberger N. Molecular mechanisms of gene silencing mediated by DNA methylation. Mol Cell Biol. 2002;22:3157–73.
43. Salas R, Sturm R, Boulter J, De Biasi M. Nicotinic receptors in the habenulo-interpeduncular system are necessary for nicotine withdrawal in mice. J Neurosci. 2009;29:3014–8.
44. Klink R, de Kerchove d'Exaerde A, Zoli M, Changeux JP. Molecular and physiological diversity of nicotinic acetylcholine receptors in the midbrain dopaminergic nuclei. J Neurosci. 2001;21:1452–63.
45. Russo SJ, Nestler EJ. The brain reward circuitry in mood disorders. Nat Rev Neurosci. 2013;14:609–25.
46. Schwantes-An TH, Culverhouse R, Duan W, Ramnarine S, Rice JP, Saccone NL. Interpreting joint SNP analysis results: When are two distinct signals really two distinct signals? Genet Epidemiol. 2013;37:301–9.

**Submit your next manuscript to BioMed Central and take full advantage of:**

- Convenient online submission
- Thorough peer review
- No space constraints or color figure charges
- Immediate publication on acceptance
- Inclusion in PubMed, CAS, Scopus and Google Scholar
- Research which is freely available for redistribution

Submit your manuscript at
www.biomedcentral.com/submit


BioMed Central



Review Article on Inborn Errors of Metabolism

# Organic acid disorders

Jessica Ramsay[1], Jacob Morton[1], Marie Norris[2], Shibani Kanungo[1]

[1]Department of Pediatric and Adolescent Medicine, Western Michigan University Homer Stryker MD School of Medicine, Kalamazoo, Michigan, USA; [2]Biochemical Genetics & Nutrition, Seattle Children's Hospital, Seattle, Washington, USA

*Contributions*: (I) Conception and design: S Kanungo; (II) Administrative support: S Kanungo; (III) Provision of study materials or patients: S Kanungo, M Norris; (IV) Collection and assembly of data: S Kanungo, J Ramsay; (V) Data analysis and interpretation: None; (VI) Manuscript writing: All authors; (VII) Final approval of manuscript: All authors.

*Correspondence to:* Shibani Kanungo, MD, MPH. Department of Pediatric and Adolescent Medicine, Western Michigan University Homer Stryker MD School of Medicine, 1000 Oakland Drive, Kalamazoo, MI 49008, USA. Email: Shibani.Kanungo@med.wmich.edu.

**Abstract:** Organic acids (OAs) are intermediary products of several amino acid catabolism or degradation via multiple biochemical pathways for energy production. Vitamins or co-factors are often quintessential elements in such degradation pathways and OA metabolism. OAs that result from enzyme defects in these pathways can be identified in body fluids utilizing gas chromatography-mass spectrometry techniques (GC/MS). OAs are silent contributor to acid base imbalance and can affect nitrogen balance and recycling. Since OA production occurs in distal steps of a specific amino acid catabolism, offending amino acid accumulation is not characteristic. OA disorders as inborn errors of metabolism (IEM) are included in differential diagnosis of metabolic acidosis, as the common mnemonic MUDPILES taught in medical schools. High anion gap metabolic acidosis with hyperammonemia is a characteristic OA biochemical finding. VOMIT (valine, odd chain fatty acids, methionine, isoleucine, and threonine) is a smart acronym and a common clinical presentation of OA disorders and can present as early life-threatening illness, prior to Newborn Screening results availability. Easy identification and available medical formula make the field of metabolic nutrition vital for management of OA disorders. Treatment strategies also involve cofactor/ vitamin utilization to aid specific pathways and disorder management. Optimal metabolic control and regular monitoring is key to long-term management and prevention of morbidity, disability and mortality. Prompt utilization of acute illness protocol (AIP) or emergency protocol and disorder specific education of family members or caregivers, primary care physicians and local emergency health care facilities; cautiously addressing common childhood illnesses in patients with OA disorders, can help avoid poor short- and long-term morbidity, disability and mortality outcomes.

**Keywords:** Organic acids (OAs); valine, odd chain fatty acids, methionine, isoleucine, and threonine (VOMIT); high anion gap metabolic acidosis; hyperammonemia; neutropenia

Submitted Dec 17, 2018. Accepted for publication Dec 17, 2018.

doi: 10.21037/atm.2018.12.39

View this article at: http://dx.doi.org/10.21037/atm.2018.12.39

DEFENDANT'S
EXHIBIT
**54**

## Introduction

Inborn errors of metabolism (IEM) affecting enzymes and/ or transport proteins required for catabolism of amino acids (AAs), lipids, or carbohydrates lead to pathologic buildup of upstream substrates/metabolites resulting in the clinical manifestations of organic acid disorders (OADs), also known as organic acidemias or acidurias. More than 65 specific

organic acids (OAs) affecting these pathways have been identified (1). The "classical OAs" refer the most common inborn errors of branched chain AA (BCAA) catabolism, which include maple syrup urine disease (MSUD) and the isovaleric (IVA), propionic (PA), and methylmalonic (MMA) acidemias (or acidurias) (1,2).

Propiogenic essential AA (valine, methionine, isoleucine, and threonine) and odd chain fatty acids imbalance are

© Annals of Translational Medicine. All rights reserved.

often characteristic biochemical finding with initial clinical findings of vomiting. These both biochemical and clinical finding characteristic of classical OA ingeniously allotted a mnemonic VOMIT (valine, odd chain fatty acids, methionine, isoleucine, and threonine) was promoted by Dr. Georgianne Arnold as a common learning tool for all future Biochemical Genetics fellows in the USA (S Kanungo personal communication with IEM expert, Professors Carol Greene and Georgianne Arnold).

IEM involving lysine, its derivative hydroxylysine, tryptophan in the mitochondrial matrix leads to OA disorder with devastating neurological impairment—glutaric aciduria/acidemia type I (GA-I) and can often confused with nontraumatic brain injury or child abuse. Common childhood illnesses can lead to severe metabolic decompensation in patients with this disorder and lasting basal ganglia degeneration, even with early identification and optimal metabolic control and compliance.

Incidence of these IEM ranges from about 1 in 1,000,000 to 1 in 10,000 live births, with overall combined incidence of about 1 in 3,000 live births (1).

There is a wide range of clinical presentations, including onset and severity, however, OAs most commonly present in the neonatal period as acute metabolic collapse, though chronic progressive forms can present later in childhood as unexplained developmental delay with recurrent episodes of metabolic decompensation, and asymptomatic forms identified by newborn screen (NBS) are also common (1-3). The characteristic symptoms of OAs, includes poor feeding, vomiting, failure to thrive, developmental delay, liver disease, neutropenia, thrombocytopenia, osteomalacia and osteoporosis, lethargy, hypotonia, seizures, ataxia, coma. Though clinical presentation varies greatly, severe and persistent metabolic acidosis of unexplained origin, elevated anion gap and severe neurologic manifestations, such as encephalopathy or seizures, remain strong diagnostic indicators of OA (1,4).

Twenty-five percent of human protein depends on the essential BCAAs—leucine, isoleucine, and valine, which compose 3 of the 9 essential AAs obtained through the diet, and are responsible for 35–40% of essential AAs in body protein and 14% of the total AAs found in skeletal muscle (2,4). The BCAAs share common membrane transport systems and enzymes for the first two steps in their catabolism, transamination to their respective ketoacids and irreversible oxidation to their coenzyme A (CoA) derivatives, which occur in the mitochondria (2). The many analogous, or even shared, enzymes between the converging

catabolic pathways attributes to the characteristic clinical presentations that are common to OAs and other IEM (*Figure 1*).

The ketoacids conversion to their CoA derivatives through oxidative decarboxylation and coupled thioesterification by branched chain ketoacid dehydrogenase (BCKD) complex, is irreversible (2,4). Multiple subunits, including E1, a thiamine pyrophosphate-dependent decarboxylase; E2, a lipoate-dependent transacylase; and E3, a dehydrogenase, make up the BCKD enzyme complex, which is similar in structure to both pyruvate and $\alpha$-ketoglutarate dehydrogenases due to the common subunit (E3) that is shared by all 3 of the enzyme complexes (2,4).

BCKD plays a key role in nitrogen metabolism and, like its analogous dehydrogenases, it is tightly regulated by a kinase/phosphatase system. End-products of their metabolism, succinyl-CoA and/or acetyl-CoA, can then enter the Krebs cycle for energy production and gluconeogenesis, or to be recycled as acetyl-CoA and acetoacetate to serve as precursors for lipogenesis and synthesis of ketone bodies (2,4). In this way, the BCAAs can be glucogenic (valine), ketogenic (leucine) or both (isoleucine) (4).

All OAs can be diagnosed by gas chromatography-mass spectrometry (GC/MS) or tandem MS (MS/MS) identification of OA profiles of urine, serum, or cerebrospinal fluid (CSF), though they are present in highest concentration in the urine (1,2). Collectively, over 100 OAs can be identified in abnormal amounts in the urine due to OAs. GC/MS and tandem MS may also be used to clinically assess functional status, including mitochondrial energy production efficiency, neurotransmitter metabolism, functional vitamin, mineral and AA deficiencies, and metabolic disequilibrium and toxicity, particularly during episodes of metabolic decompensation. Other forms of analysis are available, such as capillary electrophoresis and high-resolution proton nuclear magnetic resonance, but are not widely used (1).

Early detection by the NBS with tandem MS allows for early intervention and better outcomes in all of the classical disorders of BCAA catabolism (2-4).

In this article, we will review some of the common IEMs associated with BCAA and lysine, tryptophan catabolism with emphasis on the neurodevelopmental aspects of the clinical presentation and course.

MSUD will not be reviewed in this article as covered in another article topic in this issue [AA disorders by Aliu *et al.* (5)].

© Annals of Translational Medicine. All rights reserved.        atm.amegroups.com        *Ann Transl Med* 2018;6(24):472



**Figure 1** Overview of organic acid (OA) metabolism. Enzyme names are represented in italics and corresponding intra-mitochondrial enzyme deficiencies are shown in the red star shapes. Green line represents mitochondrial membrane. MSUD, maple syrup urine disease; IBDD, isobutyryl-CoA dehydrogenase deficiency; HIBCHD, β-hydroxybutyryl-CoA dehydrogenase deficiency; MMSDHD, methylmalonate semialdehyde dehydrogenase deficiency; DLDD, Dihydrolipoamide dehydrogenase deficiency; MCCD, β-methylcrotonyl-CoA carboxylase deficiency; MGCA, β-methylglutaconic aciduria; HMGCLD, HMG-CoA lyase deficiency; GCDH, glutaryl-CoA dehydrogenase deficiency.

## IVA

### Clinical

IVA was the first condition recognized as an OAD. Diagnosed in infants with acute episodic encephalopathy when the characteristic odor of "sweaty feet" was shown to be caused by an accumulation of unconjugated isovaleric acid due to a defect in isovaleryl-CoA dehydrogenase (IVD) (1-3,6).

IVA generally has two symptomatic forms and an asymptomatic form that is commonly picked up by NBS. The "acute neonatal form" is most common, and presents as an acute episode of fulminant metabolic ketoacidosis, accompanied by lethargy, poor feeding, vomiting, bone marrow failure, hyperammonemia, encephalopathy, and the characteristic "sweaty foot" odor. The "chronic intermittent" form presents later in childhood with developmental delay, with or without recurrent episodes of

ketoacidosis during periods of catabolic stress (3,4,6).

Neurocognitive outcome is better associated with the age at diagnosis than with the number or severity of metabolic decompensations, suggesting that oxidative stress from chronic, persistent buildup of isovaleric acid is more neurologically detrimental than acute buildup. Early neonatal presentation is highly associated with mortality rate but, for infants that survive, early diagnosis is associated with far better outcomes than later diagnosis, even when diagnosed at symptomatic presentation rather than by NBS. IVA seems to have much milder effects on neurocognitive development, leading to a more favorable long-term outcome with 62% attaining normal or near normal neurocognitive functioning, and only 4% having severe developmental delay, consistent with past results (3).

Frequency of metabolic decompensation seems higher in the neonatal—infancy period and decreases with age by

Case: 20-1058    Document: 24    Page: 41    Date Filed: 03/23/2020

late childhood or adolescence; which may be secondary to acquired immunity to common childhood illnesses or infections. Other co-morbidities include failure to thrive, myeloproliferative syndrome, pancytopenia, seizure, liver dysfunction, cardiopulmonary disorders, pancreatitis, Angelman and Fanconi syndromes (1,6-10).

### Metabolic findings and diagnosis

Metabolic ketoacidosis with an unexplained anion gap is typical in IVA (1). OA analysis by GC/MS is typically positive for isovalerylglycine and 3-hydroxyisovaleric acid. Other abnormal levels of metabolites can include lactic acid, 3-hydroxybutyric acid, acetoacetic acid, 3-hydroxyisovaleric acid, isovalerylglutamic acid (1,2).

IVA is caused by a deficiency of IVD, a mitochondrial enzyme which catalyzes the third step in leucine catabolism (dehydrogenation of isovaleryl-CoA to 3-methylcrotonyl-CoA) and subsequent buildup of isovaleryl-CoA and its derivatives. Isovaleryl-CoA is generally conjugated and excreted as nontoxic isovalerylglycine. However, during events which trigger episodes of metabolic decompensation, such as infection, pregnancy, protein ingestion, or breakdown with heavy dieting or exercise, the concentration of isovaleryl-CoA exceeds the liver's esterifying capacity, resulting in accumulation of isovaleryl-CoA as isovaleric and 3-hydroxyisovaleric acids (2).

Isovaleryl-CoA functions as an N-acetyl-glutamate synthetase (NAGS) inhibitor leading to urea cycle impairment and hyperammonemia. Accumulation of isovalerylcarnitine (a C5 acylcarnitine) may also be identified with acylcarnitine analysis. Apart from biochemical analytes; IVD enzyme activity in leukocytes and cultured fibroblasts can also confirm diagnosis (1,2).

Patients with IVA can be detected by NBS prior to the onset of symptoms, and allows for significant reduction of symptom severity, morbidity and mortality through early intervention and appropriate preventative therapy. For this reason, early diagnosis by NBS is beneficial even for forms of IVA that do not manifest until later in childhood (3,4).

### Treatment

Protein restriction to reduce the load of the toxic metabolites along with glycine and/or carnitine supplementation to promote the synthesis and excretion of less toxic conjugates continues along with use of leucine restricted metabolic formula seems to be the core treatment for OADs (3,4).

Additionally, common childhood illness associated preventive measures and prompt use of acute illness or emergency protocol during metabolic decompensations prevent poor outcomes, reduce morbidity and mortality.

### Genetics and epidemiology

IVA is an autosomal recessive disorder, due to mutations in IVD gene encoding IVD enzyme, located on chromosome 15q15.1 (2). NBS helped us understand that the common missense mutation p.A282 V, leading to increased metabolite levels in plasma and urine, but has little or no risk of clinical disease. While some forms remain asymptomatic and go undiagnosed even into adulthood (1,2). Other chromosome 15 disorders, such as Angelman syndrome, involving uniparental disomy (UPD) can be seen in rare cases of IVA (10).

## PA

### Clinical

Like the rest of the classical OAs, there are two PA clinical presentation—most common acute neonatal onset, and a late-onset chronic intermittent form. The neonatal onset occurs within the first few days of life beginning with ketoacidosis, poor feeding and vomiting, and then progresses to encephalopathy, lethargy, seizures, coma, and death. Late-onset PA develops chronically and presents with recurrent episodes of ketoacidosis similar to that of neonatal onset but with developmental regression, protein intolerance, chronic vomiting, failure to thrive, and hypotonia. Atypical presentations, such as movement disorders without metabolic decompensations, also occur (1,2,4,11,12).

Neurodevelopmental outcome is generally poor compared to that of IVA or MMA, with >70% of affected individuals reported to have cognitive deficit, movement disorders, and/or developmental delay in gross motor skill, fine motor skill and language skill. Attention deficit-hyperactivity disorder (ADHD), autism spectrum disorder (ASD) are also reported (12). Common neurological manifestations include seizures (most commonly generalized tonic-clonic), extrapyramidal symptoms, movement disorders, hallucinations and psychosis, and optic and brain atrophy. Basal ganglia lesions with stroke-like symptoms also occur, but are more common with MMA. These complications lead to poor neurocognitive outcomes,

© Annals of Translational Medicine. All rights reserved.                               Ann Transl Med 2018;6(24):472

typically worse than IVA or MMA, with chronic intellectual disability and movement disorders (1-4,11,12).

Cardiac complications are more frequent in PA than MMA, and commonly include cardiomyopathy with or without acute heart failure, and arrhythmias, particularly prolonged QTc interval. Other late complications include recurrent pancreatitis, anorexia, failure to thrive, dermatitis and hearing loss (1,2,4,11,12).

## Metabolic findings and diagnosis

Urine OA analysis and serum acylcarnitine profile help differentiate PA from other OAs, such as MMA, and metabolic diseases (1,4,12,13).

During metabolic crisis, urine OA analysis typically shows elevated 3-hydroxypropionic, methylcitric acids (2-MCAs), propionylglycine, tyglylglycine, and the abnormal ketone bodies that result from inclusion of propionyl-CoA in place of acyl-CoA (1,2). Acylcarnitine analysis commonly can reveals increased glycine and propionylcarnitine (C3 carnitine). Other nonspecific metabolites can also be present (1,2,12). But, MCA presence anytime is a diagnostic marker (1).

Prenatal diagnosis of a PA can be made in the fetus by demonstrating deficiency of propionyl-CoA carboxylase (PCC) activity in cultured amniocytes or chorionic villus cells. NBS by tandem MS effectively identifies PA in neonates, though early diagnosis and intervention do not prevent neurodevelopmental manifestations, though it usually decreases severity (4,12). Current therapy options seem inadequate in preventing long-term complications. Diagnostic confirmation is achieved by DNA sequencing of PCCA and PCCB genes or, less commonly, by enzyme assay of cultured leukocyte or fibroblasts (1,2,12).

## Treatment

Treatment approaches for PA include sufficient caloric and non-propiogenic protein intake to support normal growth and development. This can often be accomplished by formulas devoid of propiogenic AAs valine, isoleucine, methionine, and threonine (2,4,11,14). Dietary restriction of odd-chain fatty acids, another propionic acid precursor, may also be needed (12).

During metabolic crisis, acute illness protocol with parenteral caloric sources and slow transition to non-propiogenic protein intake can prevent further protein catabolism. Additionally, carglumic acid ("carbaglu") as an ammonia scavenger helps acute hyperammonemia resulting from urea cycle NAGS inhibition (2,12,14,15).

Carnitine supplementation can address secondary carnitine deficiency, caused by increased excretion of propionyl-CoA as propionylcarnitine, a less toxic metabolite (2,4,12,14).

Intermittent treatment with antibiotics with poor enteral absorption, such as neomycin or metronidazole, can be used to decrease the propionic acid produced by bowel flora and absorbed in the gastrointestinal (GI) tract (2,11,16).

Ultimately, liver transplantation can be used to decrease the frequency and severity of metabolic decompensations, though catabolic ketoacidosis and related neurological events may still recur with propionic acid accumulation (2,4,11,12).

## Genetics and epidemiology

PA is one of the most common life-threatening OAs, with a global incidence of about 1 in 100,000 live births (11,17). It is an autosomal recessive disorder due to mutations in PCCA gene on chromosome 13q32.3 and PCCB gene on chromosome 3q22.3. These lead to deficient PCC activity, a mitochondrial biotin-dependent carboxylase enzyme. PCC is a heterododecamer with six α-subunits (encoded by PCCA gene) that contain biotin binding sites, and six β-subunits (encoded by PCCB gene) (1,2). PCC help conversion of propionyl-CoA to methylmalonyl-CoA in the catabolism of VOMIT.

## MMAs

### Clinical

MMA disorders are a group of IEM caused by deficient activity of methylmalonyl-CoA mutase (MCM) and/or PCC, enzymes of the propionyl-CoA catabolic pathway, leading to accumulation of propionic acid and/or methylmalonic acid. These disorders can present as an isolated defect in propionyl-CoA catabolism, or in combination with other inherited metabolic defects (1,2,11).

Isolated MMA has varying phenotypes with wide ranges of onset and severity. The acute/neonatal form is most common and presents within the first few days of life with life-threatening ketoacidosis, hyperammonemia, hyperglycemia, hypoglycemia, vomiting, respiratory distress, lethargy, hypotonia, hypothermia, neutropenia and thrombocytopenia. In the infantile/B12-unresponsive phenotype, infants are normal at birth, but develop lethargy, vomiting, dehydration, hypotonia, hepatomegaly, encephalopathy, and failure to thrive within a few weeks

© Annals of Translational Medicine. All rights reserved.

to months after birth, usually triggered by protein load when feeding is initiated. The intermediate B12-responsive phenotype generally presents in the first few months to years of life with developmental delay, hypotonia, anorexia, sometimes with protein aversion and/or vomiting and lethargy after protein intake, and failure to thrive. Atypical and "benign" adult phenotypes are usually diagnosed by NBS, or later identified incidentally, but typically remain asymptomatic with only mildly increased urinary methylmalonate. All of the phenotypes are associated with intermittent episodes of metabolic decompensation, which can resemble diabetic ketoacidosis (DKA) or septic shock, triggered by hypercatabolic states, such as infections, stress, pregnancy, and intense dieting and exercise (1,2,4,11,18,19).

The most common long-term manifestations of MMA are developmental delay and neurocognitive impairment. With the exception of vitamin B12-responsive subtypes, MMA is associated with poorer neurodevelopmental and overall long-term outcomes than IVA, commonly resulting in early death or severe neurocognitive impairment (3,11). "Metabolic stroke" with acute and chronic lesions of the basal ganglia, particularly the globus pallidus can also occur, but is more common with PA, and which may be associated with a disabling movement disorder with choreoathetosis, dystonia, and other extrapyramidal symptoms, and/or spastic para/quadriparesis. Other movement disorders may also be present, but are still more common in PA (4,11).

Additionally, individuals with MMA are likely to develop tubulointerstitial nephritis with progressive renal failure—a complication that is almost exclusive to MMA (1,3,4,11,18,20).

Other common complications are similar to those seen with PA, and include recurrent pancreatitis, osteoporosis, cardiopulmonary disorders, neutro- and pancytopenias with functional immune impairment, growth failure, and failure to thrive (1-4,11,18). Less common complications include dermatitis, hearing loss, optic neuropathy and "bullseye" visual field defects (4,11,18).

MMA with homocystinuria (MMA-HC) is a combined disorder that typically presents acutely with failure to thrive, hypotonia and other neurodevelopmental complications, and hematologic abnormalities, such as macrocytic anemia and megaloblastosis. Hemolytic-uremic syndrome can also occur but is less common (1,2,11,20). Combined malonic aciduria and MMA (CMAMMA) disorders are typically mild (2). More detailed reviews on intracellular cobalamin metabolism disorders with MMA findings can be found in GeneReviews (21).

*Metabolic findings and diagnosis*

MCM converts L-methylmalonyl-CoA to succinyl-CoA, and is a key enzyme in catabolism of VOMIT and cholesterol side chains (1,2,4,11,18). MMA disorders can result directly from defects in MCM, or indirectly from inhibition of MCM activity, both of which ultimately result in accumulation of methylmalonic acid in many tissues and body fluids (1,2,18).

In addition to urine/plasma OA analysis for diagnosis of suspected MMA, $^{14}$C-propionate incorporation studies; vitamin B12 responsiveness and distribution assays; and plasma levels of homocysteine, malonic acid, and cobalamin, are important for excluding differential diagnoses, including PA and acquired vitamin B12 deficiency, and for distinguishing between isolated MMA subtypes and combined disorders (1,2,4,11,18,22).

Urinary OA analysis shows elevated methylmalonic acid, especially in subtypes resulting from MCM defects, as well as elevated tiglylglycine, a metabolic derivative from the isoleucine pathway, 3-hydroxypropionic acid, 2-MCA, and the same ketone bodies identified in PA. The elevations in 3-hydroxypropionic and 2-MCA occur due to compensatory activation of propionyl-CoA oxidation pathways secondary to inhibition of PCC (1,2,11,17,18). Glycine and propionylcarnitine are also elevated, but less than in PA (2).

Diagnosis of MMA is generally confirmed by DNA sequencing of associated genes, with confirmation of carrier status in the parents, and less commonly by complementation analysis of cultured patient fibroblasts (1,2,11,18).

Elevated 2-MCA, 3-methylglutaconic acid (3-MGA), 3-hydroxyisovaleric acid, succinate, fumarate, 2-oxoglutaric acid, and succinylcarnitine esters may also be increased in patients with a succinyl-CoA ligase (SUCL) defect (1,2,4).

NBS with tandem MS is effective in identifying MMA, though the benefit of NBS and subsequent clinical intervention is not as clear for MMA as it is for IVA. For defects that lead to milder isolated and combined presentations, such as partial MCM deficiency (mut⁻) and defects of cobalamin A and B, early diagnosis by NBS may positively impact the clinical course. However, NBS may be less beneficial in the most severe, early-onset forms of MMA, with immense metabolite accumulation and hyperammonemia before NBS is done or NBS results availability, resulting in significant brain damage or even death before intervention can be attempted (4,11,18).

© Annals of Translational Medicine. All rights reserved.   atm.amegroups.com

Annals of Translational Medicine, Vol 6, No 24 December 2018

## Treatment

The treatment approaches of MMA disorders are the same as those for PA as noted above, with the addition of vitamin B12/cobalamin supplementation for the B12-responsive subtypes of MMA, which are further discussed below (1,2,4,11).

Accompanying conditions in other presentations of MMA are not addressed in this article and can be found in GeneReviews (21).

## Genetics and epidemiology

Before specific gene mutations were identified, many defects in B12 metabolism which lead to MMA were classified using genetic complementation methods, and include Mut, Cbl types A, B, C, D, Dv2, F, J, and X (2,20,21). The mutations associated with these defects follow autosomal recessive inheritance, except CblX, which is an X-linked mutation in the HCFC1 transcription factor encoded by the CBLC gene. Few labs continue to use diagnostic enzyme complementation (1,2).

Isolated MMA is associated with mutations in 1 of 5 genes, MMUT, MMAA, MMAB, MCEE, and MMADHC, with MMUT being the most common. Direct mutations in MMUT, can cause complete (mut⁰) or partial (mut⁻) deficiency of MCM, resulting in phenotypes that are unresponsive to vitamin B12 supplementation. Deficient cofactor 5'-deoxyadenosylcobalamin (AdoCbl), which is required for function of MCM, is associated with the vitamin B12-responsive cblA, B, and D complementation groups, encoded by MMAA, MMAB, and MMADHC, respectively. Deficiency of methylmalonyl-CoA epimerase, encoded by MCEE, is a very rare form of isolated MMA (1,2,4,18).

Combined MMA presentations can be seen with homocystinuria, malonic aciduria, mitochondrial DNA depletion syndrome, and deficient methylmalonate semialdehyde dehydrogenase (MMSDH) or cell surface transcobalamin receptor (CD320) (1,18).

Combined MMA and homocystinuria (MMA-HC) disorders arise from other defects in cobalamin metabolism involving several genes, including MMACHC, MMADHC, LMBRD1 (a lysosomal membrane transporter), and ABCD4. Mutations in LMBRD1 and ABCD4 result in failure of lysosomes to release vitamin B12. These autosomal recessive mutations cause impaired hepatic conversion of dietary cobalamin to methylcobalamin and adenosylcobalamin, resulting in decreased activity of MCM and methionine synthase (1,2,4,18).

CMAMMA disorders can result from deficiencies in various pathways. Causative defects have been identified in members of the acyl-CoA synthetase family, most commonly member 3 (ACSF3), a methylmalonyl- and malonyl-CoA synthetase that produces the malonyl-CoA required for fatty acid synthesis. Plasma and urinary OA analysis detects elevations of both malonic acid and methylmalonic acid (1). Deficiency of malonyl-CoA decarboxylase has also been tied to MMA or CMAMMA with markedly increased malonic acid, but only small elevations of methylmalonic acid (2).

Mitochondrial DNA depletion resulting in loss of the (SUCL subunits SUCLA2, SUCLG1, and SUCLG2 of the succinyl-CoA synthetase complex is a mechanism outside methylmalonic catabolism that has been shown to cause forms of mild to moderate MMA (1,2,18).

The incidence of MMA in the general population was estimated to be about 1 in 50,000 (11).

## Glutaric acidemia type I (GA-I)

Dysfunction in the mitochondrial matrix enzyme, glutaryl-CoA dehydrogenase (GCDH), necessary for conversion of glutaryl-CoA to crotonyl-CoA in the catabolism of AAs lysine, hydroxylysine and tryptophan leads to accumulation of glutaric acid—a potent neurotoxin leading to the neurodegenerative presentation of GA-I (23).

## Clinical

Typical findings include early infancy onset of macrocephaly with delay in developmental milestone achievements. Progression of condition in untreated patient culminate in progressive dystonia and dyskinesia in toddlerhood. Common childhood illnesses/stress can trigger acute and rapid metabolic decompensation leading to encephalopathy and devastating striatal injury even in treated patients, making GA-I a difficult NBS condition to manage. Once basal ganglia injury occurs, neurological symptoms remain static mimicking extrapyramidal cerebral palsy. Often, findings of subdural hematoma resulting from decreasing cerebral parenchymal volume and stress/tearing of the bridging veins along with retinal hemorrhage can be confused with non-accidental trauma or child abuse, posing socio-legal disadvantage to an otherwise loving family.

## Metabolic findings and diagnosis

As seen in other OADs, high anion gap metabolic

© Annals of Translational Medicine. All rights reserved.
Ann Transl Med 2018;6(24):472

ketoacidosis, hyperammonemia, pancreatic enzyme abnormalities, elevated CSF proteins; with elevation in saccharopine; low free carnitine are non-specific biomarkers. While increase in glutarylcarnitine and characteristic OAs such as glutaric, 3-OH glutaric and glutaconic acids are the specific biomarkers. These elevations are direct result of faulty GCDH dehydrogenation and decarboxylation activity required for glutaryl-CoA and glutaconyl-CoA conversion to crotonyl-CoA in the lysine, hydroxylysine and tryptophan catabolism in the mitochondrial matrix (*Figure 1*). GCDH enzyme analysis in leukocytes and fibroblasts can help diagnosis but molecular analysis of *GCDH* gene can with prognostic and management approaches. NBS detection of glutarylcarnitine (C5DC) helps early detection of GA-I though identification of derivatized or underivatized C5DC did not seem to affect diagnostic confirmation (24).

### Treatment

Main treatment approaches as noted in other OAD is restricted offending AA metabolic formula, L-carnitine supplementation and prompt implementation of acute illness protocol with parenteral caloric supplementation with common childhood illnesses or stressors with ultimate goal of striatal/basal ganglia injury prevention.

### Genetics and epidemiology

GA-I is an autosomal recessive disorder, caused by mutations in the *GCDH* gene, on chromosome 19p13.13, encoding the GCDH enzyme. GA-I is a commonly associated condition within Older Order Amish community in Pennsylvania, USA. GA-I global prevalence is 1:100,000 but a more recent US NBS data in found it to be 1:89,438 (24).

### 3-methylglutaconic acidurias/acidemias (3MGA)

#### Clinical

This is a group of disorders of various causes which collectively lead to accumulation and excretion of 3-MGA. Traditionally there have been five subtypes, though, more recent classification divides them into primary and secondary causes (2). Clinical features and age of onset are remarkably variable, and include cardiomyopathy, optic atrophy, Leigh syndrome, hyperammonemia, and lactic acidemia (2,4).

### Metabolic findings and diagnosis

Urinary OA analysis shows elevated 3-methylglutaconic (3-MGC) and 3-methylglutaric acids, derivatives of the 3-MGC-CoA that accumulates due to deficient 3-methylglutaconic-CoA hydratase activity. Elevated 3-hydroxyisovaleric acid and normal 3-hydroxy-3-methylglutaric acid are also present (2,4). Enzyme activity of 3-MGC-CoA hydratase (encoded by the *AUH* gene) can be measured in fibroblasts (2).

### Treatment

There is some evidence to support dietary leucine restriction and supplementation with L-carnitine, although treatment remains mostly supportive (2,4).

### Genetics and epidemiology

In addition to type I/primary 3MGA, several pathogenic variants have been identified as secondary causes, including type II/Barth syndrome (*TAZ* gene), type III/Costeff optic atrophy syndrome (*OPA3* gene), MEGDEL syndrome (*SERAC1* gene), type V/dilated cardiomyopathy with ataxia syndrome (*DNAJC19* gene), and type IV, including defects in the *TMEM70* gene and disorders of unknown origin (2,4). Other OADs affecting isoleucine catabolism are 2-methyl-bytyryl-CoA dehydrogenase [aka. short/branched chain acyl-CoA dehydrogenase (SBCAD)] deficiency; 2-methyl-acetoacetyl-CoA thiolase deficiency. Other OADs affecting valine catabolism are isobutyryl-CoA dehydrogenase (IBD) deficiency. These can be reviewed in omim (www.omim.org), GeneReviews and Scriver's OMMBID.

### Nutrition management of organic acidemias

The goal of nutrition management for a patient with an organic acidemia is to reduce the accumulation of toxic metabolites, provide adequate nutrients to maintain normal growth and development, maintain normal plasma AA concentrations, and prevent catabolism. Metabolic nutritional formula that restricts propiogenic AAs and medications/supplements such as Levocarnitine (binds with toxic acyl-CoA metabolites); nitrogen scavengers (during hyperammonemia); biotin (cofactor for use in PA); IM-hydroxycobalamin (cofactor for use in MMA); and riboflavin and pantothenic acid (cofactors for use in GA-I) are main

© Annals of Translational Medicine. All rights reserved.

Table 1 Specialty medical foods

| Company | Infant products | Pediatric/adult products | |
| --- | --- | --- | --- |
| | | Nutritionally complete | Nutritionally incomplete (lower fat and/or carb) |
| **MMA/PA** | | | |
| Nutricia | MMA/PA Anamix Early Years™ | MMA/PA Anamix Next™ | Maxamaid XMTVI™ |
| Abbott | Propimex-1™ | Propimex-2™ | – |
| Mead Johnson | OA1™ | OA2™ | – |
| Vitaflo | – | – | MMA/PA gel™ (1–10 yo) |
| | | | MMA/PA express™ (3 yo–adults) |
| | | | MMA/PA cooler™ (3 yo–adults) |
| Cambrooke | – | Promactin AA Plus™–Berry | – |
| **IVA** | | | |
| Nutricia | IVA Anamix Early Years™ | IVA Anamix Next™ | XLEU Maxamum™ |
| Abbott | I-Valex-1™ | I-Valex-2™ | – |
| Mead Johnson | LMD™ | LMD™ | – |
| Cambrooke | – | Isovactin AA plus™ Berry | – |
| **GA-1** | | | |
| Nutricia | GA-1 Anamix Early Years™ | Glutarade GA-1 Junior™ | Glutarade GA-1 Amino Acid Blend™ |
| | | GlutarAde Essential GA-1™ (3 yo–adults) | |
| Abbott | Glutarex-1™ | Glutarex-2™ | – |
| Mead Johnson | GA™ | GA™ | – |
| Vitaflo | – | – | GA gel™ (1–10 yo) |
| | | | GA express™ (3 yo–adults) |

Nutricia North America, Rockville, MD; Abbott Nutrition, Lake Forest, IL; Mead Johnson Nutrition, Evansville, IN; Vitaflo USA, Alexandria, VA; Cambrooke Therapeutics, Ayer, MA. yo, years old.

stay of management. Individualized metabolic nutrition prescriptions determined by metabolic dietitian to balance the use of propiogenic AA-restricted medical foods (*Table 1*) combined with a prescribed amount of intact protein (breast milk, standard infant formula, meat, eggs, dairy etc.) are necessary for optimal growth and development.

A current shift in the nutrition management of organic acidemias, especially MMA and PA, involve maximizing intact protein tolerance instead of over reliance on medical foods (25).

The nutrition management of GA-1 is additionally challenging because good biomarkers to guide treatment have not been identified and there is lack of agreement for how long and to what degree to restrict propiogenic AAs as

the patients age through childhood (26).

Metabolic decompensation with any illness requires aggressive management using intravenous fluids with 10% dextrose at 1.5 times maintenance plus 20% Intralipid® at 2 g/kg to prevent catabolism. During illness, propiogenic AA intake will elevate ammonia further and is therefore eliminated or reduced to 50% for 24–48 hours. Poor metabolic control can cause loss of appetite and many patients require a nasogastric (NG) tube upon admission to start enteral nutrition. Protein-free calories are increased to meet patient's energy needs to suppress catabolism. After 24–48 hours, it is important to reintroduce enteral intact protein and medical food because over restriction of protein can result in endogenous protein catabolism and refractory

© Annals of Translational Medicine. All rights reserved.

hyperammonemia. If oral or enteral intake is difficult, parenteral nutrition with 10% AAs can meet necessary protein needs.

Most metabolic clinics trend diagnostic biochemical analytes for individual OA as noted above apart from plasma AAs, acylcarnitine profile, OAs, and several other micronutrients on a routine basis to adjust management.

## Thoughts on future direction

Much of the pathology in disorders of BCAA metabolism is known to be caused by oxidative damage by reactive oxygen species (ROS). Continued research is needed to identify additional therapies, with a particular focus on possible targeted therapies for mitochondrial dysfunction and the associated oxidative damage seen in the OAs (1,4,11,17).

In addition, gut microbiome plays a key role in the amount of BCAAs absorbed, thus treatments for dysbiosis of the gut microbiome may play an increasing role in OAD management. Few studies have been published regarding the relationship between the microbiome and clinical manifestations of OAs, which opens up the possibility of specific therapeutic probiotics being used in the future to help manage the metabolic derangements (27,28).

The majority of people with OADs are affected by neurodevelopmental manifestations, most commonly cognitive deficit and developmental delays in gross motor, fine motor, and language skills, ADHD and ASD make integrated behavioral health (IBH) model clinic important for best long-term outcome and treatment compliance.

## Acknowledgements

None.

## Footnote

*Conflicts of Interest:* The authors have no conflicts of interest to declare.

## References

1.  Villani GR, Gallo G, Scolamiero E, et al. "Classical organic acidurias": diagnosis and pathogenesis. Clin Exp Med 2017;17:305-23.
2.  Vockley J. Disorders of Branched Chain Amino and Organic Acid Metabolism. In: Kline MW. editor. Rudolph's Pediatrics. 23 edition. New York, NY: McGraw-

Hill Education, 2018.
3.  Grünert SC, Wendel U, Lindner M, et al. Clinical and neurocognitive outcome in symptomatic isovaleric acidemia. Orphanet J Rare Dis 2012;7:9.
4.  Manoli I, Venditti CP. Disorders of branched chain amino acid metabolism. Transl Sci Rare Dis 2016;1:91-110.
5.  Aliu E, Kanungo S, Arnold GL. Amino acid disorders. Ann Transl Med 2018. doi: 10.21037/atm.2018.12.12. [In press].
6.  Najafi R, Hashemipour M, Mostofizadeh N, et al. Demographic and Clinical Findings in Pediatric Patients Affected by Organic Acidemia. Iran J Child Neurol 2016;10:74-81.
7.  Qadi AM, Hamadah HK, Jijeh AM, et al. Ebstein cardiac anomaly, functional pulmonary atresia and isovaleric acidemia: A case report. J Saudi Heart Assoc 2014;26:170-3.
8.  Mantadakis E, Chrysafis I, Tsouvala E, et al. Acute pancreatitis with rapid clinical improvement in a child with isovaleric acidemia. Case Rep Pediatr 2013;2013:721871.
9.  Sag E, Cebi AH, Kaya G, et al. A Rare Cause of Recurrent Acute Pancreatitis in a Child: Isovaleric Acidemia with Novel Mutation. Pediatr Gastroenterol Hepatol Nutr 2017;20:61-4.
10. Lambrecht A, Pichard S, Maurey H, et al. Angelman syndrome and isovaleric acidemia: What is the link? Mol Genet Metab Rep 2015;3:36-8.
11. Baumgartner MR, Hörster F, Dionisi-Vici C, et al. Proposed guidelines for the diagnosis and management of methylmalonic and propionic acidemia. Orphanet J Rare Dis 2014;9:130.
12. Wongkittichote P, Ah Mew N, Chapman KA. Propionyl-CoA carboxylase - A review. Mol Genet Metab 2017;122:145-52.
13. Aldubayan SH, Rodan LH, Berry GT, et al. Acute Illness Protocol for Organic Acidemias: Methylmalonic Acidemia and Propionic Acidemia. Pediatr Emerg Care 2017;33:142-6.
14. Fraser JL, Venditti CP. Methylmalonic and propionic acidemias: clinical management update. Curr Opin Pediatr 2016;28:682-93.
15. Valayannopoulos V, Baruteau J, Delgado MB, et al. Carglumic acid enhances rapid ammonia detoxification in classical organic acidurias with a favourable risk-benefit profile: a retrospective observational study. Orphanet J Rare Dis 2016;11:32.
16. Rafique M. Emerging trends in management of propionic acidemia. Arq Bras Endocrinol Metabol 2014;58:237-42.
17. Richard E, Gallego-Villar L, Rivera-Barahona A, et al.

© Annals of Translational Medicine. All rights reserved.

Annals of Translational Medicine, Vol 6, No 24 December 2018

Altered Redox Homeostasis in Branched-Chain Amino Acid Disorders, Organic Acidurias, and Homocystinuria. Oxid Med Cell Longev 2018;2018:1246069.

18. Manoli I, Sloan JL, Venditti CP. Isolated Methylmalonic Acidemia. GeneReviews®. University of Washington, Seattle, 1993.

19. Saini N, Malhotra A, Chhabra S, et al. Methylmalonic acidemia mimicking diabetic ketoacidosis and septic shock in infants. Indian J Crit Care Med 2015;19:183-5.

20. Liu J, Peng Y, Zhou N, et al. Combined methylmalonic acidemia and homocysteinemia presenting predominantly with late-onset diffuse lung disease: a case series of four patients. Orphanet J Rare Dis 2017;12:58.

21. Sloan JL, Carrillo N, Venditti CP, et al. Disorders of Intracellular Cobalamin Metabolism [Internet]. GeneReviews®. University of Washington, Seattle, 1993.

22. Keyfi F, Talebi S, Varasteh AR. Methylmalonic Acidemia Diagnosis by Laboratory Methods. Rep Biochem Mol Biol 2016;5:1-14.

23. Goodman SI, Frank F. Organic Acidemias Due to Defects in Lysine Oxidation: 2-Ketoadipic Acidemia and Glutaric Acidemia | The Online Metabolic and Molecular Bases of Inherited Disease | OMMBID | McGraw-Hill Medical. In: Valle D, Beaudet AL, Gibson K, et al. editors. The Online Metabolic and Molecular Bases of Inherited Disease. McGraw-Hill, 2014.

24. Kanungo S, Feuchtbaum L, Sermba L, et al. Glutaric Aciduria Type 1 (GA-I). California newborn screening (NBS) program experience on detection, with and without derivatization, and long term clinical outcome. 12th ICIEM (2013), Barcelona, Workshop 5; W-017: Outcome of patients detected through expanded newborn screening. J Inherit Metab Dis 2013;36:55. Available online: https://doi.org/10.1007/s10545-013-9635-x

25. Manoli I, Myles JG, Sloan JL, et al. A critical reappraisal of dietary practices in methylmalonic acidemia raises concerns about the safety of medical foods. Part 1: isolated methylmalonic acidemias. Genet Med 2016;18:386-95.

26. Bernstein LE, Rohr F, Helm JR. editors. Nutrition Management of Inherited Metabolic Diseases. Cham: Springer International Publishing, 2015.

27. Colonetti K, Roesch LF, Schwartz IVD. The microbiome and inborn errors of metabolism: Why we should look carefully at their interplay? Genet Mol Biol 2018;41:515-32.

28. Wishart DS. Emerging applications of metabolomics in drug discovery and precision medicine. Nat Rev Drug Discov 2016;15:473-84.

**Cite this article as:** Ramsay J, Morton J, Norris M, Kanungo S. Organic acid disorders. Ann Transl Med 2018;6(24):472. doi: 10.21037/atm.2018.12.39

© Annals of Translational Medicine. All rights reserved.



1105800    5-366-431-4
**Step 1 and Step 2 CK-Mult**

United States Medical Licensing Examination® (USMLE®)

## REQUEST FOR TEST ACCOMMODATIONS

*Use this form if you are requesting accommodations on USMLE for the first time* Disability Services

---

**The National Board of Medical Examiners® (NBME®) processes requests for test accommodations on behalf of the USMLE program**

If you have a documented disability covered under the Americans with Disabilities Act (ADA), you must notify the USMLE in writing <u>each time</u> you apply for a Step examination for which you require test accommodations. Submitting this form constitutes your official notification.

- Review the USMLE Guidelines for Test Accommodations at www.usmle.org for a detailed description of how to document a need for accommodation.

- Complete all sections of this request form and submit it together with all required documentation at the same time you submit your Step exam application.

- Incomplete, illegible, or unsigned request forms and/or insufficient supporting documentation will delay processing of your request.

- Do not send originals. Please retain the originals of all documentation that you submit as we are unable to return submissions or provide duplicate copies to third parties.

- Submitting duplicate and/or bound documentation may delay processing of your request.

- NBME will acknowledge receipt of your request by e-mail and audit your submission for completeness. If you do not receive an e-mail acknowledgement within a few days of submitting your request, please contact Disability Services at 215-590-9700. You may be asked to submit additional documentation to complete your request.

- Requests are processed in the order in which they are received. Allow at least 60 days for processing of your request. Processing cannot begin until sufficient information is received by NBME and your Step exam registration is complete.

- The outcome of our review will not be released via telephone. All official communications regarding your request will be made in writing. If you wish to modify or withdraw a request for test accommodations, contact Disability Services by e-mail at disabilityservices@nbme.org or by telephone at 215-590-9700.

---

**You MUST provide supporting documentation verifying your current functional impairment.**

☝ In order to document your need for accommodation, <u>**submit**</u> the following with this form:

✓ A <u>personal statement</u> describing your disability and its impact on your daily life and educational functioning.

✓ <u>**Supporting documentation**</u> such as psychoeducational evaluations; medical records; copies of report cards, academic and score transcripts; faculty or supervisor feedback; job performance evaluations; clerkship/clinical course evaluations; verification of prior academic/test accommodations; etc.

✓ A <u>**complete and comprehensive evaluation**</u>. Reports from qualified professionals must be typewritten on letterhead, signed and include the professional's qualifications.

USMLE® Request for Test Accommodations

## Section A: Exam Information

Place a check next to the examination(s) for which you are currently registered and requesting test accommodations: (Check all that apply)

☑ Step 1

☑ Step 2 CK (Clinical Knowledge)

☐ Step 2 CS (Clinical Skills)

☐ Step 3

## Section B: Biographical Information
**Please type or print.**

B1. Name: **Ramsay**                          **Jessica**                          **E**
        Last                                   First                             Middle Initial

B2. Gender:    ☐ Male      ☑ Female

B3. Date of Birth: ▇▇▇▇▇▇

B4. USMLE # **5** - **3 6 6** - **4 3 1** - **4** (required)

B5. Address:
**6862 Tall Oaks Dr., Apt. 3B**
Street

**Kalamazoo**                          **MI**                          **49009**
City                                    State/Province             Zip/Postal Code

**United States**
Country

**(269) 932-8214**
Daytime Telephone Number

_____
Alternate Telephone Number

**jessica.ramsay@med.wmich.edu**
E-mail address

B6. Medical School Name: **Western Michigan University Homer Stryker M.D. School of Medicine**

Country of Medical School: **United States**          Date of Medical School Graduation: **05/13/18**

**USMLE® Request for Test Accommodations**

### Section C: Accommodations Information

**C1.** Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, and you require an adjustable height computer table, indicate the number of inches required from the bottom of the table to the floor: _____

**C2.** Describe the accommodation(s) you are requesting. Accommodations must be appropriate to the impairment within the context of the examination task and setting:
100% additional test time (Double time) over 2 days, separate, distraction-free exam space, extra laminated paper,

colored dry-erase markers in addition to black, water and snack to be taken with medications during the test.

**C3.** Check **ONLY ONE** box for the exam(s) for which you are registered.

#### STEP 1:
**Additional Break Time**
☐ Additional break time over 1 day

☐ Additional break time over 2 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 2 days

☐ 50% Additional test time (Time and 1/2) over 2 days

☑ 100% Additional test time (Double time) over 2 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

#### STEP 2 CK:
**Additional Break Time**
☐ Additional break time over 2 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 2 days

☐ 50% Additional test time (Time and 1/2) over 2 days

☑ 100% Additional test time (Double time) over 2 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 2 days

#### STEP 3:
**Additional Break Time**
☐ Additional break time over 4 days

**Additional Testing Time**
☐ 25% Additional test time (Time and 1/4) over 3 days

☐ 50% Additional test time (Time and 1/2) over 4 days

☐ 100% Additional test time (Double time) over 5 days

☐ Additional break time <u>and</u> 50% Additional test time (Time and 1/2) over 4 days

#### STEP 2 CS:
Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter/note**.

☐ Patient Encounter:_____

☐ Patient Note:_____

**Appx1070**

USMLE® Request for Test Accommodations

## Section D: Information About Your Impairment

**D1.** Check the box that best describes the **nature of your impairment** and list the **year** it was first diagnosed by a qualified professional. Check only those for which you are requesting accommodations.

**Sensory**                                    **Year first diagnosed**
☐ Hearing
☐ Vision
☐ Other (specify):_____

**Learning**
☑ Reading                                     1997 Dr. Mary Alice A. Tanguay, Therapeutic Optometrist
☐ Writing
☐ Mathematics
☑ Other (specify): Dyslexia                   2009 Provisional Dr. Alan Smiy, M.D.

**Language**
☐ Expressive
☐ Receptive
☐ Other (specify):_____

**Physical**
☐ Mobility/motor
☐ Endocrine
☐ Neurological
☐ Other (specify):_____

**Psychiatric**
☐ Anxiety Disorder
☐ Depression/Mood Disorder
☑ Attention Deficit/Hyperactivity Disorder    2009
☐ Other (specify):_____

**Other Impairment** (specify) Migraines       1997

**D2.** List your **current** DSM/ICD diagnosis/diagnoses for which you are requesting accommodations:

ADHD, Dyslexia

## D3. Personal Statement

⟲ **Attach a signed and dated personal statement describing your impairments(s) and their impact on daily life.** Narratives should **not** be confined to standardized test performance. The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limit your current functioning in a major life activity. In your own words, discuss how your impairment(s) would interfere with your access to the relevant USMLE Step and how the specific accommodation(s) you are requesting will alleviate this impact.

**Appx1071**

USMLE® Request for Test Accommodations

## Section E: Accommodation History

### STANDARDIZED EXAMINATIONS

**E1.** List accommodations you received for all standardized examinations such as college, graduate and professional school admissions tests and professional licensure and certification examinations. If no accommodations were provided, write NONE.

- ♢ **Attach copies of official documentation from each testing agency confirming the test accommodations they provided.**

- ♢ **Attached a copy of your official examination score report(s).**

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☐ SAT®, ACT® | | None |
| ☐ MCAT® | | None |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | | |
| ☐ DAT® | | |
| ☐ COMLEX® | | |
| ☐ Bar Examination(s) | | |
| ☐ Other(s) NBME | 12/19/14, 6/22/15, 1/4/16, 4/11/16, 6/24/16, 8/26/16, 10/21/16 | 2x testing time, separate distraction-free testing room, extra laminated paper & colored dry-erase markers, water & snack with medications. |

### POSTSECONDARY EDUCATION

**E2.** List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

- ♢ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | Western Michigan University Homer Stryker M.D. School of Medicine | 2x testing time, separate distraction-free exam room, hard (paper) copy of tests if possible, extra scrap paper/laminated sheets, colored pencils & highlighters/dry-erase markers; water, snack & meds in room with me. | 2014-Current |
| Undergraduate School | The Ohio State University | 2x testing time, separate room or distraction-free testing area, hard (paper) copy of tests if possible, extra scrap paper, colored pencils & highlighters, water & snack in room with meds. | 2009-2013 |

### E3. Certification of Prior Test Accommodations

- ♢ If you receive/received accommodations in medical school and/or residency, the appropriate official at your medical school/residency must complete and submit the **Certification of Prior Test Accommodations** form available at www.usmle.org.

**Appx1072**

USMLE® Request for Test Accommodations

## PRIMARY AND SECONDARY SCHOOL

E4. List each school and all formal accommodations you received, and the dates accommodations were provided:

☼ **Attach copies of official records from the school(s) listed confirming the accommodations they provided.**

|  | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| **High School** | St. Joseph High School | None |  |
| **Middle School** | Upton Middle School | None |  |
| **Elementary School** | Sunset Oaks Academy | Alphabet chart, distraction-reduced space, extra time for writing and reading. These were provided by the teacher, not the school, so I do not have records confirming them. | 1996-1997 school year |

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information (see "Indeterminate Scores and Irregular Behavior"), if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): ___Jessica Ramsay___

Signature: _Jessie Ramsay_          Date:__11/28/2016__

**Appx1073**

1106799    5-366-431-4
Personal Statement

Jessica Ramsay
Dec 11, 2016

## Personal Statement

To adjust for my learning disabilities, ADHD and Dyslexia, I am requesting accommodations for the USMLE Step exams, specifically:

- 100% additional exam time (double time) over 2 days
- a separate (secluded), distraction-reduced testing room
- various colored dry-erase markers to use on the laminated paper
- alarm or timer (in the room, visible on the computer screen, or a visual signal or verbal reminder from a proctor), water and a snack in the room with me for taking my necessary medications at the correct times

In addition to these requests for the Step 1 and Step 2 CK exams, I will also apply for accommodations for the written portion of Step 2 CS at the time of registration.

RECEIVED

*  *  *

DEC 1 2 2016

Disability Services

Being ADHD, I have a difficult time sitting still and am easily distracted by the simplest external stimulus in addition to my own thoughts. A separate testing space helps me to stay focused on the exam and what the questions are asking without the distraction of other test-takers. It also allows me to briefly stand up and stretch without distracting others, which keeps my thoughts from constantly being pulled away from the exam to suppress the urge to move. Colored dry erase markers help me to correct for my dyslexic errors and avoid misreading questions as well as to differentiate between answer choices, especially when they are similarly worded. Double exam time gives me the opportunity to read through each question while compensating for the effects of my learning disabilities so that I am able to answer the questions based on the same information as my peers and make sure that I am selecting the appropriate answer choice for my intended answer, instead of mixing them up or missing a key "*not*" that makes the answer choice the opposite of what I want. Having an alarm or timer in the room to remind me to take my prescriptions, along with water and a small snack to take with the meds are reasonable requests – especially if the snacks are unwrapped and in a clear plastic bag, and the water in a label-less clear plastic bottle, all of which can be checked by a proctor before entering the exam room. If my dosing times do not happen to line up with the exam section breaks, trying to remember and keep track of when to take my meds, having to take an unscheduled break, followed by the whole process of scanning in and out of the room to do so, takes up a large chunk of my exam time while adding another whole layer of unnecessary distraction during the exam. Instead, being able to just reach over, take the meds with a few sips and a couple bites and then get right back to the exam with minimal interruption allows me to devote more of my time and focus to the test itself.

Prior to college, I was generally able to force myself to sit still, pay attention, and recognize and correct my dyslexic errors throughout the school day because the work load was easier and there was much less of it. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day but found relief in sports and extracurricular activities, where my weaknesses in the classroom now played to my advantage. My parents and teachers never considered the possibility that I might have a learning disability

- 1 -

**Appx1074**

because I worked hard and was able to mask my mistakes at school, and at home, I appeared to be extraordinarily normal next to my two brothers who have autism and multiple other special needs.

I did have one teacher in 2nd grade who noticed I had trouble with "reversals" and distinguishing between similar-appearing characters when reading and writing – such as qbdp, 96, wunm, JL, 3E, gy, sae and 4A, which were even worse with cursive: *munmdlollhd* or *gqgy*. I was then referred to a therapeutic optometrist, Dr. Mary Alice Tanguay, to be evaluated for my "reversals," but she identified my difficulties as "substantial deficits in the areas of visual-spatial relationships and visual discrimination" rather than as "dyslexia." At school, for writing assignments and spelling tests, my teacher began putting me at the "time-out desk" in a cubicle in the corner of the room and gave me an alphabet chart to help me keep my letters straight, which was all extremely embarrassing for me. Because I did not fully understand what was going on, it felt as if I were being punished for being slower and having more difficulties than my classmates because everyone else only sat at that desk if they were in trouble. However, I did recognize that this early form of "accommodations" did help and ultimately reduced distractions and gave me enough time to learn how to catch and correct my own mistakes, developing more efficient compensatory skills. The summary letters from Dr. Tanguay's evaluations before and after my teacher provided her accommodations demonstrate the progress I made as I learned to more quickly self-correct, but also noted that I would likely always be a slow reader. Unfortunately, these "accommodations" were unofficial, enacted by my teacher rather than the school, so I do not have any record that they were provided. Other than this visual testing, I was not evaluated for learning disabilities until 2009, and so did not receive any other aid or accommodation. Consequently, I have little supporting documentation from my childhood.

Growing up, my friends would always get mad at me for not being able to hang out in the evenings because they did not believe that I was still doing homework. I always wondered how everyone finished their homework, especially essays and research papers, so much faster than I did. They always seemed to have so much free time when I was constantly up past midnight trying to finish my homework. My mom would get frustrated when I was trying to write a paper because it would take me FOREVER and we only had one computer in the house. And if I had to read something online, I would get yelled at for tying up the phone line (we had dial-up service at that time). No one ever believed me when I said I was actually trying to work the whole time. They assumed I was wasting time on social media or messaging on AIM, but I rarely ever was. The worst part for me was test-taking. No matter how much I studied or how hard I worked, I rarely got an exam grade that accurately reflected how much I knew.

I had tested into the ACE (Academic Creative Education) program in elementary school when I lived in Texas, but when we moved to Michigan in the middle of 5th grade, my new school did not recognize the ACE program, so I was not allowed to participate in the Stanford EPGY (Education Program for Gifted Youth), the accelerated track used at my elementary school at the time. Instead, I had to wait until the end of the year to test into the accelerated program that started in 6th grade and continued through high school. I distinctly remember that it was a timed, multiple-choice test and we had to get at least 30 out of about 60 questions right to be accepted into the program. All but one other person finished early, but I was the only person to answer less than 30 questions. I had finished 29 and was working on the 30th when time ran out. I went home crying because I felt stupid and slow – everyone was going to know I wasn't smart enough to make it into the

- 2 -

program. I told my mom that I *knew* how to do all the questions, but I just did not have enough *time*. I was positive that I had gotten the 29 correct that I had finished and was almost certain that if they just graded the work I had done in the test booklet, they would see that I was going to get the right answer on the 30th. My mom called the school and asked if they could grade the work for the last question and count it in my score. They agreed and, if I got all of them correct, would give me a trial period in the program to see if I could keep up. My answers were all correct, so I was able to participate in the accelerated track "trial period" when it began in 6th grade. I did very well, understood everything and was able to do the homework, so I was allowed to stay in the program. Fortunately, there were not any timed tests to reveal my weakness until later in the program.

In 7th grade Algebra, which was part of the accelerated track, I had maintained an A- in the class from all of my homework assignments but ended up getting a C- on the exam – I forgot my calculator at home, even though I had set it out the night before, and ended up running out of time. I knew how to do all the problems, but just did not have enough time to work through them, especially without a calculator. My mom and I met with the teacher who allowed me to retake it with a calculator. I still ran out of time and ended up getting a B+ on the retake as well as for the final class grade. The same thing happened in Pre-Calculus in 10th grade, but this time I had not forgotten my calculator; I just ran out of time. I had an A- going into the final but got a D on the final exam. Devastatingly, my teacher did not allow me to retake that exam, so I ended up with a significantly lower grade in the class than I was originally on track for.

These disheartening experiences were not limited to math class; those were just more upsetting since I liked and was good at math. But timed tests have been my downfall in all of my classes, making me look unprepared and feel incredibly stupid. Being dyslexic and ADHD has caused me to struggle with words, making me a slow reader and writer both in and outside of testing. Since the beginning of my academic career, I have rarely been able to finish assigned readings for any class by the time they were due. I have always loathed reading; it is an agonizing battle of deciphering words on a page. Like most students, I would procrastinate when it came to doing homework, though in my case, it was usually only to avoid any reading or writing. Instead of watching TV or getting lost in social media, I would work on homework in other subjects or try to cross something off my running to-do list. Even with procrastinating, I actually spent a good chunk of the time between getting home and going to bed, attempting to get through the readings. Many times I was up until 3 or 4 AM just trying to finish.

In English and Literature classes, we usually had a paper due in place of exams. However, the few times we there was an exam, I would never have enough time to finish, but would usually get through enough to pass, just not enough to demonstrate what I actually knew. One monumental exception is the final exam I took for my History of Early Christianity course in undergrad. Just prior to the exam, the professor gave us the exam format (15 multiple-choice, 10 short essay and two long essay questions) as well as the two prompts for the long essays, and the option to bring a 3x5 index card into the exam containing any information we thought would be helpful. For each of the long essays, we were expected to have an introduction paragraph; three body paragraphs, each containing their own argument and supporting evidence; and a conclusion. Panicking, knowing my weakness, I went home and wrote both essays completely, then condensed them to "outlines" containing only the necessary information, and then hand wrote them on the index card... I must have written

- 3 -

in 6-point font. By doing all of this, I had thoroughly prepared not only for the essay prompts, but for the entire exam. I knew the content forwards and backwards, and could have **verbally** answered any question that could have been asked. But somehow, despite pushing myself to move as fast as possible and spending every second answering questions and consciously trying to redirect any distracting thoughts back to the exam, I had already used up half my time when I had completed only eight of the 10 short essay questions. At this point I chose to sacrifice the last two short essays to get started on the long essays. In the remaining time, even with the use of my prepared index card, I only managed to finish half of the first long essay. I will never forget the feeling that hit when time was up. I have never felt more stupid or inadequate. It was physically painful. I hated myself for being so inept. *Why wasn't anyone else having this problem?* I ended up emailing my professor the second I got home to let her know what happened, not to ask her to be lenient, but because I did not want her to think I had been lazy and come so unprepared. Fortunately, she was understanding enough to grade my exam only out of the sections I had started. Again, I had a solid A going into the final and came out with a B-. This episode actually happened after I had already been approved for accommodations, so I ran out of time even with 1.5x testing time and a distraction-reduced space.

For *anything* written, not just exams or papers, the process of writing is pure agony for me. Even though I know I can turn out a decent final product, the struggle to get there – keeping track of and organizing my thoughts, translating them into words, finding the *right* words to convey the intended meaning, trying to get it all typed out before I forget how I worded it, and then working to get the jumbled mess of words on the paper into a logical, cohesive order, all while on constant lookout for dyslexic errors unnoticed by spell-check – is extremely frustrating and draining. With every writing assignment, whether one paragraph or many pages, I get hit by an immediate tidal wave of dread towards doing the assignment and involuntary dislike of the person assigning this "cruel punishment." If the content can be factual and straightforward, such as for patient encounter notes where I only have to describe what I heard and observed, I can shake off the panic and despair enough to get the writing done. But when the assignment requires synthesis of words from my own thoughts, feelings and experiences, my subconscious mind just says, "Nope. **REJECTED!**" Then it flips a switch that shuts down any part of my brain it feels could be subjected to the torment of writing.

The disconnect between my awareness of the impending doom, my desire to get the assignment done and over with, and my brain's self-protection lockdown causes enough depression and anxiety to destroy any further chance of productivity no matter how focused and productive I was before. I am unable to move forward with anything that requires mental effort, much less anything to do with words. I know everything that needs to be done, I want to do it, but I can no longer generate a thought process to get me from A to B. It feels like, all at once, I am trying to ride a bike uphill, peddling like crazy, without realizing the bike has no chain; "grasping at straws" through a sheet of Plexiglas; and trying to run a marathon when I am stuck in quicksand at the starting line. Everything becomes impossible. No matter what I try to do or how hard I work at it, I get absolutely nothing useful done. The smallest tasks are now beyond overwhelming, and all the while, I am very aware that I am just wasting precious time and I can't do anything about it, which only adds to my overall stress.

While struggling to make any bit of progress, I inevitably reach a tipping point a few days, sometimes only hours, before the due date, when the stress of the situation causes my cortisol level to shoot through the roof,

- 4 -

overriding my brain-induced lockdown. At this point I can manage to get something done, still much slower than the average person, and will usually have to pull a few all-nighters in the process. The more important an assignment is to my grade, my applications, or my future, the more likely this last-minute crunch time will happen.

My mind is still scarred by the torture I have endured with every assignment, so that now, whenever I sit down to write, I *literally* cannot think of words. *Any* words. It is not writer's block or procrastination. Rather, the dread and mental paralysis that occur just from *knowing* I have to write more than a sentence, especially about myself, is essentially a form of PTSD. I once tried to explain how this feels to my friend, who brilliantly concluded, "Oh, like the dementors in *Harry Potter* – or when he has to wear the horcrux – they sort of suck the happiness out of him? ... So, writing is *your* horcrux." In combination with various school assignments, clerkship hours, studying for the Shelf and Step 1 exams, and managing my own medical problems and family demands, this "horcruxing" as my friend calls it, is a large part of why it has taken me so long to complete this personal statement.

\* \* \*

During undergrad, the demands of school, work and life finally broke past my threshold, requiring more time and energy than I could muster. I had been stretched beyond my limit and was left feeling like a tornado had torn through my brain, leaving behind random, broken fragments of all the things that had so far allowed me to keep up with my peers. More than ever, I was repeatedly misplacing things and losing track of homework, and sometimes completely forgetting to bring in the assignments I had shockingly remembered to do. I was no longer able to force myself to focus or to catch and correct my dyslexic errors, and was even having trouble speaking – mixing the beginnings or ends of neighboring words or just not being able to find the right words at all. The worst part was knowing what needed to be accomplished to move forward, that I was capable of doing all of it, but was somehow never able to get it all done fast enough, even if I planned ahead. Despite making a valiant effort to stay organized and get everything done on time, I would always find a way to miss a crucial step, knocking myself back to square one.

I was spending all my waking hours just trying to get through the bare necessities for school, so that the slightest addition to my to-do list was enough weight to drag me far below the surface. If I tried to get through enough material to at least pass my classes, I had no time left to spend on myself to maintain my physical, emotional and social well-being. So, choosing to take a little time for myself, even to get some much-needed sleep, was choosing to sacrifice other important aspects of my life. It was so frustrating to not be able to just finish everything I needed to get done. Even worse, I was making exponentially more "dumb" mistakes than usual – like circling "b" instead of "d"; missing the crucial "*not*" or "*least* likely" and ending up with the exact opposite answer; or altogether misunderstanding a question because I mixed up some of the words – so that my grades were becoming an even poorer representation of my knowledge and hard work than I was already used to.

A few key things tipped me off that I might have a problem and that a common underlying cause might be to blame for all my current struggles. One was in my Spanish course, when I could not get above an A- on my

- 5 -

written tests, even though all my answers were "technically correct." It was clear I knew the answers because I would get an A on every oral test, but couldn't seem to transfer it to paper. I was getting so many marks off for "spelling" because I was still switching letters or words around, but was no longer able to catch it like I had before. I was so frustrated with constant mistakes, so I talked to my professor about it, explaining that I had always had this problem, but I didn't know why it was affecting me more now. Unfortunately, she was not able to do anything to help me unless I had an official diagnosis and was registered with the Office of Disability Services (ODS).

The second tip-off was around the same time. I had actually managed to get into the Honors section in the last Organic Chemistry class of the series. Although I was still pressed for time on these exams, I enjoyed and did well in this series because it was more visual and image-based than many of my other basic science courses, which better fit my learning style. Because of this, I was particularly alarmed and embarrassed when I had to turn in the first midterm exam for this course with four pages of unanswered questions at the end, simply because I ran out of time. After working so hard to get where I was and then watching as grades started slipping, I decided to get help. I asked my organic chemistry professor if he thought getting a tutor would help, but he surprised me by saying no. Again, I had gotten almost everything correct that I had answered, so he suspected lack of understanding was not the issue. He recommended talking to ODS to get more time on my exams. I did. ODS provided me with temporary accommodations while I sought evaluation and treatment from my doctor.

* * *

At my appointment, I answered questions from my primary care provider, Dr. Allen Smiy, about my current and past experiences with school, home life, sleep and possible feelings of anxiety and depression. This made me think about how much more time I was *actually* spending on a daily basis than my friends and classmates to cover the same material and do the same assignments and *how much harder* I had to work during that time to "keep up" and pay attention. Looking back now, the disparity is painfully obvious, but it was not so back then. With only vague complaints from classmates about how long they spent doing homework, and without having "normally functioning" siblings at home to compare myself to, I had no way to develop a meaningful awareness of how disproportionate my sacrifices were.

When Dr. Smiy asked if I had trouble sitting through class or if I tended to be hyperactive, I answered "probably no more than the rest of the class," because it had not occurred to me that most people did *not* struggle to sit still through class or an entire movie without fidgeting or getting up to do something else. At the time, my understanding of "hyperactivity" was running in circles around the room, climbing onto and jumping off of furniture, and more inappropriate and childish behaviors – which I did not do, so I did not associate my restlessness and the fact that I am always moving with being *hyper*active – I just thought I was *active*. I did not recognize my constant need to be up and about or doing something as out of the ordinary, nor associate these symptoms with signs of hyperactivity, until a few years ago, when I began studying and living with other med students who would get annoyed because I "just never stop moving" and "can't sit still."

- 6 -

At the end of the visit, Dr. Smiy diagnosed me with ADHD inattentive type (now established as combined type) and provisionally with dyslexia, discussed some accommodations and coping strategies that might help, and started treatment. Prior to this visit, I was unaware that most of my symptoms and daily struggles could all be related and were likely caused by the learning disabilities as opposed to the assumed intrinsic laziness, forgetfulness, disinterest or selective hearing. I asked why no one had suspected I might have a learning disability before now and if it was commonly missed in others, to which he responded that being diagnosed later in life was common in intelligent individuals because, like me, they are able to mask or make up for their deficits. He further explained that these individuals generally have to work much harder than their peers to function at the same level and usually reach a "breaking point" when the challenges presented by school and life finally outweigh their ability to keep up. Dr. Smiy also pointed out that it is common to get headaches while at school or doing homework from forcing themselves to focus for long periods of time without proper support, and that this may be contributing to my frequent headaches.

\* \* \*

When I originally applied for testing accommodations from ODS, I only requested extra time on tests because I had no idea there was anything more I could ask for. I had never received accommodations nor been educated on the wide range of possible support services for both school and non-academic needs. After we discussed my difficulties and concerns, my newly assigned ODS advisor suggested some additional accommodations she thought would be beneficial. Once we agreed upon a combination of services, I was approved for accommodations which included the option to take all quizzes, tests and exams in a distraction-reduced space (usually a separate room) with 1.5x testing time; use of visual aids (scrap paper, colored pencils, highlighters, etc.); and continued access to my ODS counselor, who served as an advocate while providing academic and emotional support.

I was astonished by how much my exam scores improved and stress levels decreased with the accommodations, which finally gave me the opportunity to prove I actually *was* prepared; I *had* worked incredibly hard and I *did* know the material. After getting only a C- and B without accommodations on the preceding Honors Organic Chemistry midterms, I scored a solid A on the comprehensive final exam, earning an A in the course overall. From there, my grades continued to improve, most notably on exams with multiple-choice and/or short-answer formats, especially when I was permitted to draw pictures in place of writing long explanations.

Even with the extra time and focus aids, I still had to rush to finish most exams, yet would still run out of time before I was able to complete exams with lengthy question prompts, long essays, or multiple shorter ones – the most notable example being my History of Early Christianity final. Devastating blows to my confidence, such as that one, have pushed me to firmly evaluate my weaknesses and develop a better awareness of my learning "disabilities" and the help I need to overcome them. To me, learning "disability" is a misnomer because the fact that I *can* overcome them means that I am a "differently abled" learner, not "disabled."

Now, in medical school, having accommodations has made it possible for me to keep up with my peers. As I encounter new situations in the classroom and the clinic, I am constantly reflecting on my performance and

- 7 -

reassessing my strengths, weaknesses and needs, sometimes requiring alterations to my current accommodations. Although I am part of the inaugural class, my school has appropriately adjusted their provisions to meet my evolving needs. For example, during 2nd year, in the strictly timed environment of our OSCE clinical skills assessments, I struggled to complete simple subjective/objective encounter notes within the 10-minute limit. After discussing my needs with the accommodations committee, my request for 1.5x time was approved. However, since beginning 3rd-year clerkships, we have moved to using the Step 2 CS-style SOAP notes for our clerkship OSCE assessments. Even though I have been thriving in the clinical environment, successfully completing full patient encounter notes in a reasonable time, I am now struggling to complete this more advanced OSCE note within the 15 minutes I am currently provided and will be requesting double time.

The effects that learning disabilities have on my life are most quantifiable when assessing my academic performance, but they do not just affect school; for me, they are a 24/7 thing. Growing up, I constantly got in trouble for "being lazy" or "ignoring" directions – failing to do simple things like hanging my jacket in the closet rather than on the back of a kitchen chair, pushing my chair in when I got up from the table, making my bed, or putting things completely away – because no matter how many times my mom asked or what I tried to make myself remember, I always got distracted halfway through, forgot what I was doing and moved on to something else.

Since being diagnosed in 2009, I have gotten better at recognizing my hyperactive and inattentive trend, which has expanded and become more apparent as I have taken on more responsibility as an adult and medical student. I have learned the hard way that it is necessary for me to spend a bit more effort to create reminders, backup reminders, and backup-backup reminders to avoid the negative domino-effects from making repetitive and perpetual "careless" mistakes, such as:

> completely forgetting I was supposed to meet my friend for lunch 3 hours ago because I was trying to study – OR – wanting to let my friend know I am running late, but too bad, I left my phone who-knows-where... *again* – OR –actually remembering I am supposed to meet a friend and even getting up early to give myself extra time to preemptively correct for the inevitable "dumb" mistakes... but *of course*, losing track of time and just happening to look at a clock only *three* minutes before I have to be at the restaurant, grabbing my phone and keys, throwing on my shoes, running out the door and shutting it behind me, only to discover I have no way of locking it because my keys found a way to magically disappear in the 15 seconds it took me to don my shoes and cross the threshold.

Knowing what to watch out for, I generally make a conscious effort to keep track of due dates and important things – usually by setting a copious number of alarms on my phone and computer and placing Post-Its all around my apartment reminding me of bill or assignment due dates, upcoming appointments, or social commitments. If something is really important for me to remember, I will even ask several other people to remind me.

But with normal daily activities, there are no motherly reminders to keep me on track. One minute I can be hurriedly throwing some leftovers in the microwave because I just realized I am starving and on the verge of

- 8 -

passing out, and the next minute I am looking up from a random project wondering why the microwave is beeping at me.

Already struggling to manage my life and having to surrender *much* more time and effort to studying and completing assignments, the learning disabilities intrinsically add a disproportionate amount of hoops for me to jump through than most individuals ever have to deal with, such as:

- Every time I move or my physician retires, I must immediately find a new physician and research who accepts my insurance, is actually taking new patients, and is willing to prescribe my medications.
- To get my medications, I have to call my doctor for refills EVERY 30 days, drive to their office to personally pick up the script, drive to the pharmacy, either wait for the script to be filled or drive back later just to pick it up... because a 90-day supply is not allowed in my state.
- To even be eligible to continue receiving my prescriptions, I must have a doctor visit every three to six months, depending on provider policy, which means I also have to *schedule* these appointments and actually remember to do so.
- When requesting services, because of the way our society is structured, my claim of having learning disabilities is never just taken at face value – I repeatedly have to call doctors' offices and ask that official records be sent as proof of my disabilities, then apply for accommodations and torture myself with writing support for each request.
- When current records are not enough, I have to locate a qualified psychologist, schedule an appointment, and spend several hours in a behavioral psychology evaluation.
- And, of course, I have to keep track of and pay the bills for each of these costs.

Keep in mind, the pure nature of these disabilities makes managing just ONE of these tasks, not to mention ALL of them, more difficult and time-consuming than for the average person. Every minute I spend keeping my disability affairs in order is time taken away from family, friends, recreational activities, self-maintenance, sleep and studying.

For me, managing my life is like having the contents of a ball pit dropped from the ceiling, all at once, and being expected to not let a single one hit the ground. It is impossible without help. Finally being diagnosed and receiving treatment was like being given a shopping cart to catch more balls in, and receiving academic accommodations, a second shopping cart. Sometimes my friends and family help out – each catching a few more – by reminding me about upcoming deadlines, or being patient and understanding when I jump from one thought to the next without finishing the previous one or I have to ask what we were just talking about after losing track mid-sentence.

I wish I did not need more time or accommodations, just like I wish I did not have to sacrifice the things I enjoy to make time for things I dread, but I do. Without them, in the context of the USMLE Step exams, I would not have the opportunity to get through as much content or as many questions as everyone else taking the tests, and would not be able to demonstrate all that I have learned and accomplished thus far. If given the extra time, a quiet room and colored dry-erase markers, I will invest the additional energy, and I will succeed.

Jessica Ramsay, Dec 11, 2016
*Jessie Ramsay* 12/11/2016

- 9 -

Case: 20-1058    Document: 24    Page: 64    Date Filed: 03/23/2020

NBME00782



Financial institutions
Energy
Infrastructure, mining and commodities
Transport
Technology and innovation
Life sciences and healthcare

# NORTON ROSE FULBRIGHT

# ADA LEGAL UPDATE FOR NBME AND ITS OUTSIDE CONSULTANTS

Robert A. Burgoyne
Norton Rose Fulbright US LLP
December 5, 2016

CONFIDENTIAL

NBME00783

# LAWS
## *you need to*
# KNOW

**NORTON ROSE FULBRIGHT**

Date Filed: 03/23/2020    Page: 66    Document: 24    Case: 20-1058

# THE ADA:  RELEVANT STATUTORY LANGUAGE

**42 U.S.C. § 12189**:  "Any person that offers examinations … related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations … in **a place and manner accessible to persons with disabilities** or offer alternative accessible arrangements for such individuals"

NORTON ROSE FULBRIGHT

3 |

NBME00785

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):** (1) Any private entity offering an examination covered by this section must assure that--

(i) The examination is selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level or whatever other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure);

NORTON ROSE FULBRIGHT

4

NBME00786

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):** (1) Any private entity offering an examination covered by this section must assure that--

(ii) An examination that is designed for individuals with impaired sensory, manual, or speaking skills is offered at equally convenient locations, as often, and in as timely a manner as are other examinations; and

(iii) The examination is administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements are made.

NORTON ROSE FULBRIGHT

5

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):** (1) Any private entity offering an examination covered by this section must assure that--

(iv) Any request for **documentation**, if such documentation is required, **is reasonable and limited to the need for the modification, accommodation, or auxiliary aid or service requested**.

NORTON ROSE FULBRIGHT

6

NBME00788

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):** (1) Any private entity offering an examination covered by this section must assure that--

(v) When considering requests for …accommodations, … the entity gives **considerable weight** to documentation of past modifications, accommodations, or auxiliary aids or services received in **similar testing situations**, as well as such modifications, accommodations, or related aids and services provided in response to an Individualized Education Program (IEP) … or a plan describing services provided pursuant to … a Section 504 Plan….

NORTON ROSE FULBRIGHT

7

NBME00789

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):** (1) Any private entity offering an examination covered by this section must assure that--

(vi) The entity **responds in a timely manner to requests** for modifications, accommodations, or aids to ensure equal opportunity for individuals with disabilities.

NORTON ROSE FULBRIGHT

8

Case: 20-1058    Document: 24    Page: 72    Date Filed: 03/23/2020

# DOJ's IMPLEMENTING REGULATION

**28 C.F.R. § 36.309(b):**

(2) Required modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given.

(3) A private entity offering an examination covered by this section shall provide appropriate auxiliary aids for persons with impaired sensory, manual, or speaking skills, unless that private entity can demonstrate that offering a particular auxiliary aid would fundamentally alter the measurement of the skills or knowledge the examination is intended to test or would result in an undue burden....

9 |

NORTON ROSE FULBRIGHT

# U.S. Department of Justice's ADA Rulemaking



NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 74    Date Filed: 03/23/2020

# DOJ's Title II and Title III ADA Rulemaking

- **Notice of Proposed Rulemaking**: **1/30/14** (79 Fed. Reg. 483)

- **Purpose**: "to incorporate the statutory changes to the ADA set forth in the **ADA Amendments Act of 2008**"

- **No proposed changes to 28 C.F.R. § 36.309**

- Nevertheless, extensive discussion of how the proposed new rules would affect testing entities

- Notice stated that **many ADHD diagnoses may not "meet the clinical definition** ... and thus **would not qualify for an accommodation** under the revised definition of disability" (prompting DOJ to reduce its estimate of the **#** of individuals with ADHD by 30%)

- **New regulations released** by DOJ on **Aug. 11, 2016**, with an effective date of Oct. 11, 2016:  81 Fed. Reg. 53204 (8/16/16)

11 |

NORTON ROSE FULBRIGHT

NBME00793

# DOJ's Title II and Title III ADA Rulemaking

- "The Department is making several major revisions to the meaning and interpretation of the term ``disability'' contained in the title II and title III ADA regulations in order to implement the ADA Amendments Act….

- The revised language clarifies that the term 'disability' shall be interpreted broadly and explains that the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations not to discriminate based on disability and that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."

12 |

NORTON ROSE FULBRIGHT

# DOJ's Title II and Title III ADA Rulemaking

- "The revisions also add **rules of construction** to be applied when determining whether an impairment substantially limits a major life activity," including:

- --That the term **"substantially limits" shall be construed broadly** in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA;

- --That an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity **as compared to most people in the general population**;

- --That the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence.

13 |

NORTON ROSE FULBRIGHT

# DOJ's Title II and Title III ADA Rulemaking

- In response to comments on the proposed rule, DOJ added ADHD as an example of a physical or mental impairment that can constitute a covered disability

- Notes that, in estimating the cost impact of the new regulations on testing entities and colleges when it published its Notice of Proposed Rulemaking, DOJ "had assumed based on some available research that 30 percent of those who self-identify as having ADHD as their primary disability would not need additional testing time because they would not meet the clinical definition of the disability."

- DOJ retreated from that approach in the final rule, because of concerns raised by some commenters

14 |

NORTON ROSE FULBRIGHT

NBME00796

# DOJ's Title II and Title III ADA Rulemaking

- "One commenter raised concern about presenting a specific percentage of students with ADHD who would not meet that clinical definition, because that number might inadvertently become a benchmark for postsecondary institutions and national testing entities to deny accommodations to a similar percentage of applicants requesting additional exam time because of their ADHD."

- "The Department did not intend for this percentage to establish a benchmark.  Covered entities should continue to evaluate requests for additional exam time by all individuals with disabilities on an individualized basis. In direct response to these concerns, the Department has decided not to reduce the number of individuals with ADHD who could now receive testing accommodations as a direct result of the ADA Amendments Act [in estimating the financial impact of the new regulations."

NORTON ROSE FULBRIGHT

15 |

Case: 20-1058    Document: 24    Page: 79    Date Filed: 03/23/2020

NBME00797

# LSAC Consent Decree and "Best Practices" Report



NORTON ROSE FULBRIGHT

# *DFEH & DOJ v. LSAC* (N.D. Cal.)

- **March 15, 2012**:  California Dept. of Fair Employment & Housing **("DFEH") sued LSAC** in California under state law

- **DOJ intervened**, asserted nationwide ADA claims

- **Core allegations**:

    (1) LSAC requested **too much supporting documentation**;

    (2) LSAC should have **granted accommodations to certain  individuals**;

    (3) LSAC's practice of **annotating scores** achieved with extra testing time harmed examinees and was unlawful

17 |

NORTON ROSE FULBRIGHT

NBME00799

# Consent Decree:  Overview

- Consent Decree entered:  **5/29/2014**

- LSAC agreed to **stop annotating test scores**

- LSAC agreed to **automatically grant** extra testing time (up to double time) & other accommodations based upon prior receipt of equivalent  accommodations on another standardized admission test

- Parties agreed upon **eight guiding principles** for LSAC's review of requests not entitled to automatic approval

- Parties agreed to have a **panel of experts establish "best practices"** with regard to specific aspects of LSAC accommodation process

NORTON ROSE FULBRIGHT

18

NBME00800

# The "Best Practices" Report

- LSAC is obligated to follow the Panel's recommended practices, as modified by Magistrate Judge Spero, during the term of the Consent Decree, which ends May 29, 2018

- LSAC is the only testing entity that is legally bound by the Panel's "best practices":

  ➤ DOJ/DFEH Response to Amicus Curiae Letter (5/15/15):  "Plaintiffs certainly believe that the Panel's recommendations embody model practices that operationalize the letter and spirit of the ADA regarding testing accommodations.  And we hope that other testing entities adopt those pieces of the Best Practices that are portable and applicable to their respective situations.  **However, while all testing entities are required to comply with the ADA, only LSAC is contractually bound to implement the Best Practices.**" (Emphasis added.)

NORTON ROSE FULBRIGHT

19

Date Filed: 03/23/2020     Page: 83     Document: 24     Case: 20-1058

# DOJ's "Technical Assistance" Regarding Testing Accommodations

- <u>Released</u> on 9/8/2015

- "This publication provides technical assistance on testing accommodations for individuals with disabilities who take standardized exams and other high-stakes tests."

- Final page of the technical assistance refers readers to a link where they will find what DOJ describes as "Model Testing Accommodation Practices Resulting from Recent Litigation" (the link is to the "Best Practices" majority report from the LSAC litigation)

20

NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 84    Date Filed: 03/23/2020

# DOJ's "Technical Assistance" Regarding Testing Accommodations

- What is the legal significance of such "technical assistance"?

  - It is not "law" in the sense that a statute or a regulation is law
  - It is not entitled to the type of deference that courts generally give to agency interpretations of a statute or their own regulations
  - Courts might afford a degree of deference to the agency guidance, or they might disregard the guidance altogether

- *Perez v. Mortgage Bankers Ass'n,* 135 S. Ct. 1199 (U.S. 2015): "The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'"

21 |

NORTON ROSE FULBRIGHT

NBME00803

# DOJ's Technical Assistance

- "*Who Is Eligible To Receive Testing Accommodations*?

- Individuals with disabilities are eligible to receive necessary testing accommodations....

- [A]n individual with a disability is a person who has a physical or mental impairment that substantially limits a major life activity ... or major bodily function....

- The determination of whether an individual has a disability generally should not demand extensive analysis....

- In determining whether an individual is substantially limited in a major life activity, it may be useful to consider, **when compared to most people in the general population**, the conditions under which the individual performs the activity or the manner in which the activity is performed.

- A person with a history of academic success may still be a person with a disability who is entitled to testing accommodations under the ADA."

NORTON ROSE FULBRIGHT

22

Case: 20-1058   Document: 24   Page: 86   Date Filed: 03/23/2020

## DOJ's Technical Assistance

- *"What Kind of Documentation Is Sufficient To Support A Request For Testing Accommodations?*

- Any documentation ... must be reasonable and limited to the need for the requested testing accommodations. Requests for ... documentation should be narrowly tailored to the information needed to determine the nature of the candidate's disability and his or her need for the requested testing accommodation."

23

NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 87    Date Filed: 03/23/2020

# DOJ's Technical Assistance

- "Examples of types of documentation include:
    - ■ Recommendations of qualified professionals;
    - ■ Proof of past testing accommodations;
    - ■ Observations by educators;
    - ■ Results of psycho-educational or other professional evaluations;
    - ■ An applicant's history of diagnosis; and
    - ■ An applicant's statement of his or her history regarding testing accommodations."

- "Depending on the particular ... accommodation request and the nature of the disability, however, a testing entity may only need one or two of the above documents to determine the nature of the candidate's disability and his or her need for the requested ... accommodation.  If so, a testing entity should generally limit its request ... to those one or two items … without requiring further documentation."



24 |

Case: 20-1058      Document: 24      Page: 88      Date Filed: 03/23/2020

# DOJ's Technical Assistance

- "Past Testing Accommodations.  Proof of past testing accommodations in similar test settings is generally sufficient to support a request for the same testing accommodations for a current standardized exam or other high-stakes test."

- "So, for example, a person with a disability who receives a testing accommodation to sit for the SAT should generally get the same testing accommodation to take the GRE, LSAC, or MCAT."

- "Formal Public School Accommodations. If a candidate previously received testing accommodations under an ... (IEP) or a Section 504 Plan, he ... should generally receive the same testing accommodations for a current standardized exam or high-stakes test."

- "Private School Testing Accommodations.  If a candidate received testing accommodations in private school for similar tests under a formal policy, he or she should generally receive the same testing accommodations for a current standardized exam or high-stakes test."

NORTON ROSE FULBRIGHT

Case: 20-1058     Document: 24     Page: 89     Date Filed: 03/23/2020

# DOJ's Technical Assistance

- "First Time Requests or Informal Classroom Testing Accommodations. An absence of previous formal testing accommodations does not preclude a candidate from receiving testing accommodations."

- "Qualified Professionals. Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate…."

- "Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate … accommodations."

- "[I]f a candidate submits documentation … that demonstrates a consistent history of a reading disorder diagnosis and that recommends the candidate receive double time on standardized exams based on a personal evaluation of the candidate, a testing entity should provide the candidate with double time."

26 |

NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 90    Date Filed: 03/23/2020

# Recent ADA Cases

*Bibber v. Nat'l Bd. of Osteopathic Med. Examiners*, 2016 U.S. Dist. LEXIS 48181 (E.D. Pa. April 11, 2016)

- <u>Held</u>, NBOME did ***not*** violate the ADA or the New Jersey Law Against Discrimination by denying extra time on the COMLEX I exam

- Plaintiff had dyslexia: accommodations in high school, on the SAT and AP exams, in college and graduate school, and in medical school; got "average" scores on the GRE and MCAT ***without*** accommodations

- Two experts testified for NBOME, two for plaintiff – including one who often consults for testing entities

27 |

NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 91    Date Filed: 03/23/2020

NBME00809

## Recent ADA Cases

*Bibber v. Nat'l Bd. Of Osteopathic Med. Examiners* (cont'd)

- "An analysis as to whether one's impairment substantially limits her performance in a major life activity must compare the individual's abilities to those of most people in the general population. It is inappropriate under the ADA to compare an individual to her academic peer group or, in the case of standardized tests, to other test-takers who are not representative of the general population."

- Quoted (but did not defer to) DOJ's informal guidance for testing accommodations

NORTON ROSE FULBRIGHT

28

Case: 20-1058    Document: 24    Page: 92    Date Filed: 03/23/2020

NBME00810

## Recent ADA Cases (Cont'd)

*Bibber v. Nat'l Bd. Of Osteopathic Med. Examiners*

- "This case presents us with two possible outcomes, neither of which is wholly satisfactory. We can deny Bibber's request for accommodations after she has demonstrated a lifelong struggle with dyslexia and that she has a history of receiving accommodations throughout her formal education. Conversely, we can grant her request for accommodations after she achieved average scores on all of her post-college standardized tests, without accommodations, and has presented us, through her own experts, with psychometric data that shows she reads at an average level. While recognizing the troubling nature both conclusions pose, we find that Ms. Bibber's dyslexia does not <u>substantially limit</u> her ability to read or process information as compared to the general population, and thus we hold that she is not a disabled person under the ADA." (original emphasis)

NORTON ROSE FULBRIGHT

29

NBME00811

**Recent ADA Cases (Cont'd)**

*Black v. NBME* (M.D. Fla. Filed 7/22/16)

- Plaintiff sought extra testing time on the USMLE based on a diagnosis of ADHD; alleges that she was first diagnosed in 2009, after graduating from college and while preparing to attend medical school

- Graduate of Princeton University, where she majored in History and Latin Studies; good grades, no accommodations

- Took MCAT without accommodations

30 |

NORTON ROSE FULBRIGHT

Case: 20-1058    Document: 24    Page: 94    Date Filed: 03/23/2020

**Recent ADA Cases (Cont'd)**

*Black v. NBME* (cont'd)

- Complaint alleges, among other things, that NBME violated the ADA "[b]y generally requiring all applicants for reasonable testing accommodations, and specifically requiring applicants requesting accommodations pursuant to a diagnosis of ADHD, to submit documentation identifying and including a specific diagnosis made by an appropriate professional according to now-outdated diagnostic criteria outlined in DSM-IV (1994)"

- Alleges that NBME should instead be relying upon the criteria set forth in DSM-5, which "'more accurately characterize the experience of affected adults"

31 |

**NORTON ROSE FULBRIGHT**

Case: 20-1058    Document: 24    Page: 95    Date Filed: 03/23/2020

NBME00813

**Recent ADA Cases (Cont'd)**

*Silverman v. NBME* (D.S.C. Filed 11/18/2016)

- Plaintiff sought extra testing time on the USMLE Step 1 exam based on diagnoses of ADHD and LD; late diagnoses

- Graduate of Skidmore College (no information on his grades); accommodations at Skidmore, not at Tulane or at a community college that he attended previously

- Took MCAT without accommodations, scored in the 96th percentile

- Seeking a preliminary injunction requiring NBME to give him 50% extra testing time

32

NORTON ROSE FULBRIGHT

Case: 20-1058     Document: 24     Page: 96     Date Filed: 03/23/2020

## USUAL ADVICE FOR EXTERNAL REVIEWERS

- Be objective

- Focus on professional standards not legal requirements (keeping in mind, of course, that the ADA sets forth the broad inquiry you are being asked to address)

- Remember that anything you put in writing might be an exhibit in a deposition or at trial – so avoid typos in your reports, and make sure you would not be uncomfortable because of anything in your communications or in your reports

- Emails are particularly challenging because of their informality

33

NORTON ROSE FULBRIGHT

NORTON ROSE FULBRIGHT

NBME00815

# Disclaimer

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients.

References to 'Norton Rose Fulbright', 'the law firm' and 'legal practice' are to one or more of the Norton Rose Fulbright members or to one of their respective affiliates (together 'Norton Rose Fulbright entity/entities'). No individual who is a member, partner, shareholder, director, employee or consultant of, in or to any Norton Rose Fulbright entity (whether or not such individual is described as a 'partner') accepts or assumes responsibility, or has any liability, to any person in respect of this communication. Any reference to a partner or director is to a member, employee or consultant with equivalent standing and qualifications of the relevant Norton Rose Fulbright entity.

The purpose of this communication is to provide general information of a legal nature. It does not contain a full analysis of the law nor does it constitute an opinion of any Norton Rose Fulbright entity on the points of law discussed. You must take specific legal advice on any particular matter which concerns you. If you require any advice or further information, please speak to your usual contact at Norton Rose Fulbright.



**Steven G. Zecker, Ph.D.**
**Clinical Psychologist**
**2103 Ridge Avenue**
**Evanston, Illinois 60201**
**(847) 866-6933**

January 13, 2017

Cathy Farmer, Psy.D.
National Board of Medical Examiners
Disability Services
3750 Market Street
Philadelphia, PA 19104

Dear Dr. Farmer:

I am writing concerning the materials submitted to your office by Jessica E. Ramsay (USMLE # 5-366-431-4) of Kalamazoo, Michigan, and subsequently forwarded to me for my professional opinion. Ms. Ramsay is a student at the Western Michigan University Homer Stryker School of Medicine (WMUHSSoM). She has requested testing accommodations for taking Step 1 and Step 2-Clinical Knowledge (Step 2-CK) of the United States Medical Licensing Examination (USMLE). Specifically, in her accommodations request, Ms. Ramsay states that she has been diagnosed with Attention Deficit Hyperactivity Disorder-Inattentive Type (ADHD-I) and Reading Disorder (RD), and that as a result of these disabilities she requires a double time extended-time testing accommodation, testing over two days in a distraction-reduced environment, use of laminated paper and colored dry-erase markers, and access to water and a snack to be taken with her medications in order to successfully complete the Step 1 and Step 2-CK examinations.

In support for her claim that she has a disability that qualifies her for USMLE Step 1 and Step 2-CK accommodations, Ms. Ramsay has submitted the following documentation for review: 1) a November 28, 2016 *'USMLE Request for Test Accommodations'* form; 2) a personal statement, dated December 11, 2016, in which she describes the history of her attention and learning difficulties and their impact on her learning and academic functioning; 3) three letters from Dr. M. A. Tanguay, an optometrist in Carrollton, Texas, dated December 11, 1997, December 11, 1997 and January 27, 2000, in which she describes the results of a perceptual skills evaluation she conducted on December 11, 1997; 4) a photocopy of the protocol for the Test of Visual-Perceptual Skills (TVPS), administered by Dr. Tanguay on December 11, 1997; 5) a September 2, 2016 *'Addendum or (sic) Report of September 22, 2014 Regarding Jessica Ramsay'* provided by C. Livingston, M.A., of Kalamazoo, Michigan; 6) a September 22, 2014 letter to 'Dr. Ziemkowski' from Mr. Livingston, in which he indicates that his testing had yielded an ADHD-I diagnosis; 7) a copy of Mr. Livingston's resume; 8) a photocopy of the protocol for the Wechsler Adult Intelligence Scale-IV (WAIS-IV), administered by Mr. Livingston on September 12, 2014; 9) a May 17, 2010 medical chart, including a history and description of current symptoms for Ms. Ramsay from A. Smiy, M.D. of Genesis Family Health Center in St. Joseph, Michigan; 10) results of a physical examination conducted on Ms. Ramsay on July 29, 2014 by K. Turner, M.D., of Village Family Medicine in Columbus, Ohio; 11) an *'ADD/ADHD Verification Form'* completed for the Office for Disability Services at Ohio State University (OSU) by Dr. Smiy on August 13, 2010; 12) an *'Access Plan'* for Ms. Ramsay from the OSU Office for Disability Services, dated May 17, 2010; 13) an *'Exam Proctor Sheet'* from the OSU Office for Disability Services, dated May 18, 2010; 14) three *'Essential Abilities for Completion of the Medical Curriculum Attestation'* forms from WMUHSSoM, dated July 16, 2014, June 4, 2015 and June 8, 2016; 15) a *'Request for Reasonable Accommodation'* form from WMUHSSoM,

1

dated August 6, 2014; 16) a *'Reasonable Accommodation Outcome Form'* from WMUHSSoM, dated November 16, 2015; 17) a November 3, 2015 *'To Whom It May Concern'* letter from Ms. Ramsay in which she requests that her current accommodations be extended to include clinical skills courses at WMUHSSoM; 18) Ms. Ramsay's undated *'My Student Dashboard'* form; 19) June 3, 2015 and April 14, 2016 letters from Ms. Ramsay in which she requests a continuation and expansion of the accommodations she had been receiving at WMUHSSoM; 20) NBME *'Subject Examination Program'* results from four examinations in 2016; 21) a September 20, 2016 *'Certification of Prior Test Accommodations'* form completed by D. Overton, M.D., Associate Dean at WMUHSSoM, in which he states that a double time extended-time accommodation and testing in a distraction limited room have been provided for Ms. Ramsay since October, 2014; 22) a copy of Ms. Ramsay's transcript from St. Joseph High School in St. Joseph, Michigan (2004-2008); 23) a copy of Mr. Ramsay's undergraduate transcript from Ohio State University (2008-2012); 24) an *'MCAT Score Report'*, providing scores from one administration of the test in 2011; and 25) copies of December 2016 email correspondence between Ms. Ramsay and M. Goldberg, Ph.D., and J. Cohen, both of the NBME.

In her *'USMLE Request for Test Accommodations'* form, Ms. Ramsay states that she was diagnosed with a reading disorder in 1997 and was given a "provisional" dyslexia diagnosis in 2009. As I will discuss in subsequent sections of this letter, neither of these statements is supported by the documentation she submitted. She also states that she was provided a double-time accommodation throughout her time as an undergraduate and medical student; these claims are also not supported by the documentation I will be reviewing.

Ms. Ramsay writes in her lengthy December 11, 2016 personal statement that her ADHD and dyslexia have caused her academic difficulties since early elementary school, although she was never accommodated until college. She writes that as a second grader she reversed letters when reading and writing, which resulted in an evaluation by a therapeutic optometrist, M. Tanguay, whose testing indicated difficulties in visual-spatial processing and visual discrimination. This testing apparently did not result in any intervention or formal accommodations being implemented. Ms. Ramsay writes that she was in a gifted program through fifth grade when she lived in Texas and in an accelerated academic program from sixth grade through high school after moving to Michigan. She describes various struggles she says she experienced at different points of her education, but she also states that prior to college she was able to function adequately because "the work load was easier and there was much less of it". Although she indicates that she was able to function successfully through high school, she also states that she is "scarred" by the "torture" that every assignment created. I note that despite having produced a well-written nine-page-long personal statement, Ms. Ramsay indicates that writing is "pure agony" for her and she experiences "panic and despair" and "awareness of the impending doom" while working on tasks. Such descriptions in my professional opinion are highly suggestive of a significant affective component to her described struggles, although as I will indicate, this has never been explored in any evaluation. As an undergraduate, Ms. Ramsay writes that the demands of school left her "feeling like a tornado had torn through my brain, leaving behind random, broken fragments" and resulted in her being unable to apply the corrective measures to her work as she had been able to do in the past. Apparently the tipping points that led her to seek an evaluation were her inability to earn a grade above 'A-' in a Spanish class and her inability to complete an organic chemistry midterm. This resulted in her receiving "temporary accommodations" until she underwent testing. This 2009 testing, with Dr. Smiy, resulted in an ADHD diagnosis and, "provisionally", a dyslexia diagnosis. She began receiving a time and one-half extended time accommodation, among other accommodations, following this evaluation, but indicates that this was still inadequate on some tests and assignments. Ms. Ramsay indicates that her grades improved following the implementation of accommodations, and that the accommodations have remained essential to her success as a medical student.

2

Dr. Tanguay conducted the first evaluation submitted by Ms. Ramsay in December 1997, at which time Ms. Ramsay was 7 years old and in second grade. This testing apparently did not result in a report; rather, Dr. Tanguay wrote a half-page-long letter on which she summarizes her findings. She also provides a photocopy of the protocol for the Test of Visual-Perceptual Skills (TVPS), which was apparently the only test she administered. Unfortunately she provides only age-equivalent results for each subtest (and fails to provide standard scores or percentiles) and she does not calculate an overall Perceptual Quotient for the test. I also note that Dr. Tanguay incorrectly administered several of the TVPS subtests by failing to observe the ceiling rules for stopping after a prescribed number of errors. Dr. Tanguay summarizes her results by indicating that Ms. Ramsay performed "above age level" on two subtests, "just below her age level" on two subtests and showed "substantial deficits" on two subtests. She provides no diagnosis, and none is appropriate in my opinion, given that only a single measure was administered and it was administered incorrectly and incompletely scored. I note that in her *'USMLE Request for Test Accommodations'* form, Ms. Ramsay indicated that Dr. Tanguay diagnosed her with a reading disorder based on this testing, but her 1997 report of testing makes no mention of a reading problem and Dr. Tanguay apparently never assessed reading during testing. In her January 27, 2000 *'To Whom It May Concern'* letter, Dr. Tanguay indicates that additional testing in 1998 revealed that Ms. Ramsay "scored above average in all categories" when retested, and stated that her "comprehension and perceptual skills are excellent". She also indicated that Ms. Ramsay's hyperopia (for which she had been wearing glasses) might "slightly reduce" her reading speed.

Ms. Ramsay's next testing was conducted by Mr. Livingston 17 years later, in September 2014, at which time she was in medical school. Again this evaluation failed to yield a comprehensive report of testing; rather Mr. Livingston summarizes the results in a one-page letter to 'Dr. Ziemkowski' at WMUHSSoM. He indicates that his evaluation consisted of a diagnostic interview and testing of intellectual ability and reading. I note that the history that Ms. Ramsay provided for Mr. Livingston is markedly different than that which she reported in her personal statement. For example, while she indicates in her personal statement that she performed well in accelerated programs through high school and had not been tested after Dr. Tanguay's evaluation, she told Mr. Livingston she had good grades only until 4th grade and that she had "various testing" in elementary and middle school. She also told Mr. Livingston that "an ophthalmological exam" revealed "poor focus". Ms. Ramsay further indicated that she had been diagnosed with ADHD and Dyslexia by her primary care physician while she was an undergraduate. Ms. Ramsay submitted the protocol from the Wechsler Adult Intelligence Scale-IV (WAIS-IV), which was administered during testing. Her overall ability was not calculated due to the variability among WAIS-IV Index scores, which ranged from superior (Verbal Comprehension (VCI): 127 and Perceptual Reasoning (PRI): 127) to low average (Processing Speed (PSI): 81). Among the 12 WAIS-IV subtests that were administered, eight were above average, two were average and two were low average. Mr. Livingston also assessed Ms. Ramsay's reading comprehension with an unidentified test on which she scored in the above average range (no actual score was provided). Based on this very limited information, Mr. Livingston diagnoses Ms. Ramsay with ADHD Inattentive Type (ADHD-I), severe. Among his recommendations, he states that "at the discretion of" WMUHSSoM, Ms. Ramsay "could be considered for" extended time. However, there is no indication from Mr. Livingston's brief letter to Dr. Ziemkowski that he evaluated Ms. Ramsay's attentional functioning with either subjective or objective tools; as a result it is unclear how he arrived at the ADHD-I diagnosis. Further, despite Ms. Ramsay's comments to Mr. Livingston that she was stressed, he conducted no testing of her psychological functioning. In my professional opinion this testing was not adequate for establishing a diagnosis of ADHD-I or for supporting the provision of accommodations, including extended time.

In his September 2, 2016 *'Addendum or Report of September 22, 2014 Regarding Jessica Ramsay'*, Mr. Livingston addresses a request for more information regarding his 2014 testing and his recommendation that Ms. Ramsay be provided with accommodations. He states that the ADHD-I

3

diagnosis was based in part on her reported "difficulties with focus and headaches as early as age five". He also cites Dr. Tanguay's testing as supporting the diagnosis, but as I have discussed, a) she never addressed attention in her evaluation, and b) subsequent testing by Dr. Tanguay revealed that Ms. Ramsay "scored above average in all categories" and that her "comprehension and perceptual skills are excellent". Mr. Livingston further refers to 2009 notes from Dr. Smiy stating that she was "always a slow reader" (a conclusion unsupported by any test results) and had "focus issues". Her also mentions that fact that Ms. Ramsay was accommodated at both Ohio State and WMUHSSoM as support for his diagnostic conclusions, but the provision of accommodations does not demonstrate a disability in the absence of diagnostic evidence for a substantial impairment in functioning. Mr. Livingston also provides some additional information about the reading test he administered, stating that it was the Wechsler Individual Achievement Test (WIAT). He concludes this letter by stating that his ADHD-I diagnosis is supported by "objective test results", but as I have discussed, neither his nor Dr. Tanguay's testing assessed attentional functioning objectively. He also indicates that "there is historical information that suggests a likelihood of dyslexia", despite the fact that the only documentation of reading achievement (his own testing with the WIAT) yielded an above average score. In my opinion Mr. Livingston's points in the letter do not adequately address my previously stated concern that he failed to have sufficient evidence to support the diagnosis of a disability.

The 2010 medical history and description of current symptoms from Dr. Smiy indicate that Ms. Ramsay was in good general health at that time. I note that, in contrast to what she had told Mr. Livingston, Ms. Ramsay indicated that she had "no problems" in high school. She also stated that "college stress is causing her to switch letters around a bit", which in my professional opinion points to a disorder in affective functioning and not reading, given that she did not report this problem prior to medical school. There is no indication from these medical records that Dr. Smiy administered either subjective or objective measures of attention or any test assessing Ms. Ramsay's reading in the 30 minutes he indicates he spent with her. Dr. Smiy never provides a firm diagnosis in this record; rather he writes "add vs possible dyslexia—pt has more focus issues than dyslexic tendencies. recommend trial of Ritalin as prescribed". He adds that "add survey and literature provided", which suggests to me that Ms. Ramsay did not complete any rating scales during the office visit. In my professional opinion, this brief office visit did not provide sufficient support for an ADHD diagnosis (or 'add' as Dr. Smiy refers to it), and I believe that he also was sufficiently uncertain about the diagnosis that he declined to provide one definitively.

The one-page July 29, 2014 physical examination conducted by Dr. Turner reveal that Ms. Ramsay was in generally good health but had been experiencing migraine headaches. This report also indicates that Ms. Ramsay has ADHD and Dyslexia; it does not appear that this was based on any testing conducted by Dr. Turner but rather was based on Ms. Ramsay's self-report of a history of these diagnoses.

The 'ADD/ADHD Verification Form' completed for Ohio State on August 13, 2010 by Dr. Smiy indicates that he arrived at an ADHD-I diagnosis based on developmental and medical history and an interview, although documentation of this was not provided in his chart information. He reiterates that Ms. Ramsay has "comprehension difficulty" (despite her above average comprehension score in Mr. Livingston's testing) and "dyslexic tendencies" (although it appears he had never asked her to read). He indicates that Ms. Ramsay was exhibiting five of the nine DSM-IV symptoms of inattention, and none of the nine DSM-IV Hyperactivity/Impulsivity symptoms. I note that DSM-IV required that at least six symptoms in either category needed to be present in order for an ADHD diagnosis to be provided; thus, based on these results, Ms. Ramsay failed to qualify for an ADHD-I diagnosis. He also comments that she "may need additional time" on tests. In my opinion, this qualified suggestion is without support from any of the information that Dr. Smiy had obtained. Thus, in my professional opinion, this form indicates

4

that Ms. Ramsay did not meet the DSM-IV criteria for ADHD and was not substantially impaired in fucntioning, and support for the recommended accommodations was lacking.

The *'Access Plan'* for Ms. Ramsay from the OSU Office for Disability Services is dated May 17, 2010, which means that it was completed (and she was approved for accommodations) three months before Dr. Smiy completed the *'ADD/ADHD Verification Form'*. This plan indicates that Ms. Ramsay was approved for a time and one-half extended-time accommodation and preferential registration. The May 18, 2010 *'Exam Proctor Sheet'* from the OSU Office for Disability Services indicates that she utilized accommodations during the Spring Quarter 2010.

The three annual *'Essential Abilities for Completion of the Medical Curriculum Attestation'* forms from WMUHSSoM indicate that Ms. Ramsay understood the abilities and skills that the school states are "essential and necessary" for success in the program and indicated each time that she was not capable of meeting these abilities in the absence of accommodations. In her August 4, 2014 *'Request for Reasonable Accommodation'* form, Ms. Ramsay states that she requires accommodations because of "ADHD/ADD, Dyslexia and Migraines". She writes that she utilized accommodations on many (but not all) exams and found them "very helpful". She reiterates that she was diagnosed with ADHD and Dyslexia in her sophomore year of college, but as I have discussed, Dr. Smiy never tested her reading achievement or provided her with a Dyslexia diagnosis. In her June 3, 2015 request, she asks for a continuation of the accommodations provided in the past year, with an increase in the extended-time accommodation to double time. In Ms. Ramsay's April 4, 2016 request she repeats her request for double time and adds a request for the ability to use dry-erase markers and take her medications during exams. The November 16, 2015 *'Reasonable Accommodation Outcome Form'* from WMUHSSoM indicates that Ms. Ramsay was approved for a time and one-half extended time accommodation for completing write-ups. In her November 13, 2015 *'To Whom It May Concern'* letter, Ms. Ramsay states that due to "recent challenges" she is requesting an extension of her accommodations to also include her Clinical Skills courses. She indicates that because of her claimed Dyslexia, it takes her "considerably longer" to enter information into her notes.

The four 2016 NBME *'Subject Examination Program'* results forms reveal that Ms. Ramsay's performance on them has been quite variable and ranged from "Lower Performance" to "Higher Performance" across the various tests and domains.

Ms. Ramsay submitted results from one unaccommodated MCAT administration in 2011 for review. Her score (30M) placed her in the above average range in comparison with other medical school aspirants. Her scores on the four sections of the test ranged from average (Writing and Verbal Reasoning) to above average (Physical Sciences and Biological Sciences). Despite her claim that she is incapable of completing standardized tests within the standard time limits provided, in my professional opinion the fact that she was able to perform very well on the MCAT in the absence of accommodations provides strong evidence that she is not substantially impaired in functioning and is thus able to fully access the Step 1 and Step 2-CK examinations without accommodations.

Ms. Ramsay submitted her St. Joseph High School and Ohio State transcripts for review. Her high school transcript reveals that she obtained mostly 'A' grades, with no grade below 'B+' during her four years at the school, and she graduated with a 3.75 GPA. This high level of academic success was achieved in the absence of accommodations. Ms. Ramsay's Ohio State transcript indicates that she obtained grades in the 'A/B' range in all but one course and she graduated with a 3.58 GPA. Ms. Ramsay was unaccommodated during her first year at Ohio State; although she indicates in her personal statement that her academic performance improved after she began receiving accommodations, I note that her GPA during her freshman year was essentially the same as her overall GPA when she graduated.

5

In his September 20, 2016 *'Certification of Prior Test Accommodations'* form, Dr. Overton indicates that a time and one-half extended-time accommodation on clinical skills exams and a double time accommodation on written exams, along with other accommodations including testing in a private room have been provided for Ms. Ramsay since October 2014. He indicates that these accommodations are being provided because of Ms. Ramsay's ADHD <u>and</u> ADD.

In Ms. Cohen's December 12, 2016 email to Ms. Ramsay, she indicates that her request for accommodations is considered incomplete and describes the additional documentation (her MCAT score report) needed to complete her submission. I note that the requested documentation was submitted and is part of what I have been reviewing in this letter. In Dr. Goldberg's December 29, 2016 email to Ms. Ramsay, she writes that Mr. Livingstone's letter to Dr. Ziemkowski, which I discussed previously, lacked test results and a summary of Ms. Ramsay's relevant history and functioning. She requests a copy of the report of the evaluation that Mr. Livingston conducted. No such report for submitted for review.

No additional documentation was provided for my review of Ms. Ramsay's accommodations request. To summarize, my review of the documentation she submitted does not in my professional opinion indicate that she at this time has a disability that qualifies her for accommodations according to the Americans with Disabilities Act, as amended (ADAA). She was apparently a strong student from kindergarten through high school in the absence of accommodations. Ms. Ramsay's diagnostic history is very poorly documented, but based on the information she supplied for review, she was initially evaluated in 1997 as a 7 year-old by an optometrist, Dr. Tanguay, who administered a single visual processing test that was incompletely scored and portrayed Ms. Ramsay as having variable skills in the visual domain. Her testing with the same test a year later apparently resulted in "above average performance in all areas", although no report of that testing was submitted for review. I note that Dr. Tanguay apparently never administered any tests of reading to Ms. Ramsay, nor did she diagnose Ms. Ramsay with a reading disorder, but Ms. Ramsay has repeatedly indicated that this testing yielded such a diagnosis. In 2009 Dr. Smiy saw Ms. Ramsay for a 30-minute period and writes in her chart that he believes that she has 'ADD', although she appears to have not met the diagnostic criteria for the diagnosis of an attention deficit. I note that Dr. Smiy never formally provided that diagnosis and apparently did not produce a formal report of his evaluation. Ms. Ramsay's most recent testing, with Mr. Livingston in 2014, similarly did not yield an evaluation report. Mr. Livingston administered only a test of mental ability (which indicated average or higher ability overall as well as on 10 of 12 subtests) and a reading test (which indicated above average comprehension). He provided an ADHD-I diagnosis for Ms. Ramsay, but he did not indicate that he evaluated Ms. Ramsay's attentional functioning with either subjective or objective measures. Thus, Ms. Ramsay has never undergone testing that resulted in a formal report of the evaluation, and there is in my opinion no support for the ADHD, reading disability and Dyslexia diagnoses that she claims to have received. Importantly, Ms. Ramsay was a highly successful elementary and high school student in the absence of accommodations, and she also achieved at a high level at Ohio State prior to the implementation of accommodations. Further, she obtained an above average unaccommodated MCAT score in 2011. Her score on this test under standard administration conditions is inconsistent with Ms. Ramsay's statements that she has been unable to complete any tests within their time limits, and in my professional opinion it provides strong evidence that she is not disabled in a manner that prevents her form being able to fully access the Step 1 and Step 2-CK exams in the absence of accommodations. Given my conclusions, which in my professional opinion do not indicate that Ms. Ramsay is substantially limited in functioning in a manner that warrants accommodations, I recommend that you deny her request for USMLE Step 1 and Step 2-CK accommodations.

Please feel free to contact me again if I may provide you with any additional information

6

regarding Jessica Ramsay's request for USMLE Step 1 and Step 2-CK accommodations.

Sincerely;

*/By typing my name below I am confirming my intent to sign this document on 1/13/2017/*

Steven G. Zecker, Ph.D.
Clinical Psychologist

7



111197    5-366-431-4
Denial- Step 1 and Step 2

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

March 10, 2017

Jessica E. Ramsay
6862 Tall Oaks Dr., Apt. 3B
Kalamazoo, MI 49009

RE: USMLE Step 1 and 2 CK                    USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

We have thoroughly reviewed all of the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1 and Step 2 Clinical Knowledge (CK). We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request to be Attention-Deficit/Hyperactivity Disorder (ADHD) and Dyslexia, diagnosed in 2009, and note a 1997 diagnosis of *"migraines."* In your personal statement, you report a history of forgetfulness, distractibility, and reading problems that have impacted your ability to learn and complete tasks, particularly in the academic setting. You describe feelings of self-doubt, *"impending doom,"* being *"overwhelmed"* by small tasks, and state that writing assignments are *"pure agony"* and *"torment."* You write that you first sought academic assistance during college after you *"could not get above an A-"* in a Spanish course and turned in an Honors Organic Chemistry mid-term with blank pages. You state that since receiving accommodation in college, your exam scores have improved and stress levels have decreased. For Step 1, you requested 100% additional test time, a separate testing room, colored dry erase markers, and an alarm/timer, snack, and water in the testing room.

In a January 27, 2000 letter addressed, *"To Whom It May Concern,"* Dr. Mary Alice A. Tanguay, an optometrist, writes that a 1997 examination indicated *"substantial deficits in the areas of visual-spatial relationships and visual discrimination"* for which you received perceptual skills training in 1998. Reportedly, when you were retested after the training, you *"scored above age level in all categories."* In 2000, she writes, *"At this time, her comprehension and perceptual skills are excellent. She still has the original vision problem, which may slightly reduce her reading speed."* However, Dr. Tanguay does not report administering any measure of reading speed or skill, and no other information was provided about your reading ability.

In a September 2, 2016 document titled, *"Addendum or Report of September 22, 2014,"* Charles Livingston, M.A. provides information about your history and refers to a brief one-page *"report"* of an evaluation that he conducted on September 22, 2014. He assigns the diagnosis of *"ADHD, predominantly inattentive, severe"* and in the 2016 letter he recommends several accommodations including *"2x testing time"* due to your reported *"distractibility, difficulties in sequencing, and significantly lowered processing speed (10th percentile)."* Although your evaluator places great emphasis on your relatively low performance on the *Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV)* Processing Speed Index in 2014, his diagnostic conclusions do not seem to account for your overall academic and cognitive functioning or academic history, and the brief evaluation and report do not sufficiently support the diagnostic conclusions.

As you may know, ADHD is a neurodevelopmental disorder that begins in childhood. Even if not formally diagnosed at a young age, the essential feature of ADHD is a persistent pattern of inattention and/or

hyperactivity-impulsivity that interferes with functioning or development over time and across situations. According to the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, manifestation of the disorder must be present in more than one setting (e.g., home and school, work). It must be documented beyond self-report that symptoms have consistently and pervasively disrupted functioning in multiple behavioral domains. Overall, the documents you provided do not demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that has substantially impaired your functioning during your development or currently.

Like ADHD, specific learning disorder is a neurodevelopmental disorder that first manifests during early school years and is characterized by persistent and impairing difficulties with learning foundational academic skills. In adults, ongoing difficulties in literacy skills are indicated by cumulative evidence from school reports, evaluated portfolios of work, or previous assessments. Your documentation does not reflect a developmental history of problems with reading or learning that impacted your academic functioning or limited a major life activity, and the information provided by your evaluator, Mr. Livingston, is not indicative of significant impairment in any academic skill area.

Despite your reported history of difficulties, your documentation shows that you progressed through primary and secondary school without grade retention, evaluation, or services and with an academic record and scores on timed standardized tests sufficient to gain admission to college, all without accommodations. With regard to timed standardized testing, your records show that under standard conditions in 2011 you earned an MCAT Total Score of 30M, better than 79% of a highly select group of medical school applicants. Overall, these data do not demonstrate impaired functioning relative to most people or that standard testing conditions are a barrier to your access to the USMLE.

The ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities. Accommodations are intended to provide access to the USMLE testing program for individuals with a documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee that identical accommodations are indicated or will be available in all future settings and circumstances. The ADA covers individuals who are substantially limited in a major life activity. Determination of whether an individual is substantially limited in functioning as compared to most people in the general population is based on assessment of the current impact of the identified impairment.

Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 1 or Step 2 CK test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations.

We will advise Applicant Services to process your exam applications without test accommodations. You may inquire at usmlereg@nbme.org or call Applicant Services directly at (215) 590 9700 with any questions about your scheduling permits. Please note that food and drink are not permitted in the secure testing room. All examinees are assigned a locker at the center in which you may store a snack/beverage and other personal items and access them during authorized break time. Information about personal items that are permitted in the testing rooms for medical needs can be found here: **http://www.usmle.org/test-accommodations/PIEs.html**

Sincerely,

Michelle M. Goldberg, Ph.D.
Manager, Disability Services

**USMLE® Request for Test Accommodations**

## Section A: Exam Information

Place a check next to the examination(s) for which you are **currently registered** *and* requesting test accommodations: (Check all that apply)

☑  Step 1

☐  Step 2 CK (Clinical Knowledge)

☐  Step 2 CS (Clinical Skills)

☐  Step 3*

*Please be aware that additional test time for Step 3 may involve 3 to 5 days of testing, depending on the requested accommodation (See Section C1).

## Section B: Biographical Information
**Please type or print.**

**B1.** Name: Ramsay                    Jessica                    E

          Last                         First                      Middle Initial

**B2.** Gender:   ☐ Male   ☑ Female

**B3.** Date of Birth: 08/29/1990

**B4.** USMLE # 5 - 3 6 6 - 4 3 1 - 4 (required)

**B5.** Address:
6862 Tall Oaks Dr, Apt 3B

Street

Kalamazoo                    MI                    49009

City                    State/Province    Zip/Postal Code

USA

Country

(269) 932-8214

Preferred Telephone Number

Jessica.Ramsay@med.wmich.edu

E-mail address

**B6.** Medical School Name: Western Michigan University Homer Stryker M.D. School of Medicine

Country of Medical School: USA                    Date of Medical School Graduation: 5/12/19

NBME00233

Appx1127

USMLE® Request for Test Accommodations

**Section C: Accommodations Information**

**C1.    Step 1, Step 2 CK, or Step 3 (computer-based examinations)**

Check the appropriate box to indicate the accommodations you are requesting. Check **ONLY ONE** box for the exam(s) for which you are currently registered:

**STEP 1:**

| Additional Break Time | Additional Testing Time |
|---|---|
| ❑ Additional break time over 1 day | ❑ 25% Additional test time (Time and 1/4) over 2 days |
| ❑ Additional break time over 2 days | ❑ 50% Additional test time (Time and 1/2) over 2 days |
| | ☑ 100% Additional test time (Double time) over 2 days |

❑ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 2 CK:**

| Additional Break Time | Additional Testing Time |
|---|---|
| ❑ Additional break time over 2 days | ❑ 25% Additional test time (Time and 1/4) over 2 days |
| | ❑ 50% Additional test time (Time and 1/2) over 2 days |
| | ❑ 100% Additional test time (Double time) over 2 days |

❑ Additional break time and 50% Additional test time (Time and 1/2) over 2 days

**STEP 3:**

| Additional Break Time | Additional Testing Time |
|---|---|
| ❑ Additional break time over 4 days | ❑ 25% Additional test time (Time and 1/4) over 3 days |
| | ❑ 50% Additional test time (Time and 1/2) over 4 days |
| | ❑ 100% Additional test time (Double time) over 5 days |

❑ Additional break time and 50% Additional test time (Time and 1/2) over 4 days

**Describe** any other accommodation(s) you are requesting for **Step 1, Step 2 CK,** or **Step 3**.

Private testing room and additional break time.

**C2.    STEP 2 CS (Clinical Skills)**
Review the Step 2 CS Onsite Orientation video and Step 2 CS Content Description and General Information Booklet at www.usmle.org for detailed information about the format and delivery of the Step 2 CS examination.

Describe the accommodations you are requesting for each section of Step 2 CS (i.e., patient encounter, patient note). If you are requesting additional time, state the **amount** of additional time you require in **minutes per encounter or note**.

❑ Patient Encounter:_____

❑ Patient Note:_____

NBME00234

USMLE® Request for Test Accommodations

**C3.**    Do you require wheelchair access at the examination facility? ☐ Yes ☑ No
If yes, please indicate the number of inches required from the bottom of the table to the floor: _____

## Section D: Information About Your Impairment

**D1.** List the **specific DSM/ICD diagnostic code(s) and disability** for which you are requesting accommodations and report the year that it was **first** diagnosed.

| DIAGNOSTIC CODE | DISABILITY | YEAR DIAGNOSED |
|---|---|---|
| ICD-10/DSM-5: F81.0/315.00, F81.81/315.2, F81.9/— | Learning Disabilities of Reading and Writing (with abnormal Scanning and Processing Speed) | 2017 |
| ICD-10 F90.2/DSM-5 314.01 | ADHD, Combined Type | 2009 |
| ICD-10 G43.09 | Migraines with aura, without status migranosus | 1997 |
| ICD-10 I87.009, D69.8 | Clotting disorder with recent deep vein thrombosis and Post-thrombotic syndrome | 2016 |

### D2.  Personal Statement

🖎 **Attach a signed and dated personal statement describing your impairment(s) and how a major life activity is substantially limited.** The personal statement is your opportunity to tell us how your physical or mental impairment(s) substantially limits your current functioning in a major life activity and how the standard examination conditions are insufficient for your needs. In your own words, describe the impact of your disability on your daily life (do not confine your statement to standardized test performance) and provide a rationale for why the specific accommodation(s) you are requesting are necessary in the context of this examination.

## Section E:  Accommodation History

### E1. Standardized Examinations

🖎 **Attach copies of your score report(s) for any previous standardized examination taken.**

🖎 **If accommodations were provided, attach official documentation from each testing agency confirming the test accommodations they provided.**

List the accommodations received for previous standardized examinations such as college, graduate, or professional school admissions tests and professional licensure or certification examinations (if no accommodations were provided, write NONE).

| | DATE(S) ADMINISTERED | ACCOMMODATION(S) PROVIDED |
|---|---|---|
| ☑ SAT®, ACT® | March 2007, October 2007 | None, None |
| ☑ MCAT® | 4/11/11 | None |
| ☐ GRE® | | |
| ☐ GMAT® | | |
| ☐ LSAT® | USMLE Step 1 exam 7/20/17 | None |
| ☐ DAT® | NBME exams: CAS1 12/14/14; CAS2 6/24/15; | Double testing and break time; private testing room; extra |
| ☐ COMLEX® | CAS3 1/4/16; CBSE 4/11/16; IM Shelf 6/24/16; FM Shelf 8/26/16; OB-Gyn Shelf 10/21/16; | laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room (*except for 4/28/17 NBME CBSE, |
| ☑ Other (specify) | Peds Shelf 12/22/16; Psych Shelf 3/3/17; formative CBSE* 4/28/17 | which taken under simulated standard testing time for formative purposes) |

NBME00235

USMLE® Request for Test Accommodations

### E2. Postsecondary Education

List each school and all formal accommodations you receive/received, and the dates accommodations were provided:

⌗ **Attach copies of official records from each school(s) confirming the accommodations they provided.**

⌗ **If you receive/received accommodations in medical school and/or residency, have the appropriate official at your medical school/residency complete and submit the USMLE Certification of Prior Test Accommodations form available at www.usmle.org.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| Medical/Graduate/ Professional School | WMU Homer Stryker M.D SOM | 2x testing time, private testing room, exams on paper when possible, extra scrap paper/laminated sheets, colored pencils & highlighters/dry-erase markers; water, snack & meds in room (See attached documentation for specifics) | 2014 - Present |
| Undergraduate School | Ohio State University | 2x testing time; separate, distraction-reduced testing room; exams on paper when possible; extra scrap paper; colored pencils & highlighters; additional accommodations approved by course instructor (See attached documentation for specifics) | 2010 - 2013 |

### E3. Primary and Secondary School

List each school and all formal accommodations you received, and the dates accommodations were provided:

⌗ **Attach copies of official records from each school listed confirming the accommodations they provided.**

| | SCHOOL | ACCOMMODATIONS PROVIDED | DATES PROVIDED |
|---|---|---|---|
| High School | | | |
| Middle School | | | |
| Elementary School | | | |

NBME00236

Appx1130

USMLE® Request for Test Accommodations

## Section F: Certification and Authorization

To the best of my knowledge and belief, the information recorded on this request form is true and accurate. I understand that my request for accommodations, including this form and all supporting documentation, must be received by the NBME sufficiently in advance of my anticipated test date in order to provide adequate time to evaluate and process my request.

I acknowledge and agree that any information submitted by me or on my behalf may be used by the USMLE program for the following purposes:

- Evaluating my eligibility for accommodations. When appropriate, my information may be disclosed to qualified independent reviewers for this purpose.
- Conducting research. Any disclosure of my information by the USMLE program will not contain information that could be used to identify me individually; information that is presented in research publications will be reported only in the aggregate.

I authorize the National Board of Medical Examiners (NBME) to contact the entities identified in this request form, and the professionals identified in the documentation I am submitting in connection with it, to obtain further information. I authorize such entities and professionals to provide NBME with all requested further information.

I further understand that the USMLE reserves the right to take action, as described in the Bulletin of Information, if it determines that false information or false statements have been presented on this request form or in connection with my request for test accommodations.

Name (print): Jessica Ramsay

Signature: _Jessica Ramsay_                                          Date: 06/06/2018

**E-mail (as a pdf), fax or mail your completed request form and supporting documents to the address below at the same time you submit your Step examination application.**

**Disability Services**
**National Board of Medical Examiners**
**3750 Market Street**
**Philadelphia, PA 19104-3190**
**Telephone: (215) 590-9700**
**Facsimile: (215) 590-9422**
**E-mail: disabilityservices@nbme.org**

NBME00237

June 6, 2018                    USMLE# 5-366-431-4                    Jessica Ramsay

Included Supportive Documentation for Accommodations Request for USMLE Step 1

| Document |
|---|
| USMLE Request for Test Accommodations form |
| Personal Statement |
| Letter of Support from Larry Berger |
| Consult Report and Neurocognitive Evaluation Results & Summary from Dr. Lewandowski |
| Clinical Summary from Dr. Ruekberg |
| Clinical Summary from Dr. Houtman |
| |
| WMed USMLE Certification of Prior Test Accommodation Form |
| WMed Essential Abilities Committee – Approvals for Reasonable Accommodations 2014-2017 |
| WMed Letter of Support for NBME Accommodations |
| USMLE Step 1 Score Report |
| NBME Score reports for CBSE and Shelf Exams administered at WMed |
| Accommodations provided: double testing and break time; private testing room; extra laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room |
| 12/14/2014 NBME CAS1 |
| 06/24/2015 NBME CAS2 |
| 01/04/2016 NBME CAS3 |
| 04/11/2016 NBME CBSE |
| 06/24/2016 NBME Medicine Shelf |
| 08/26/2016 NBME Modular Family Medicine Core Shelf |
| 10/21/2016 NBME Obstetrics and Gynecology Shelf |
| 12/22/2016 NBME Pediatrics Shelf |
| 03/03/2017 NBME Psychiatry Shelf |
| 04/27/2017 NBME Surgery Shelf |
| Accommodations provided: private testing room; extra laminated scrap paper; colored dry-erase markers; medications, water and granola bar in room |
| 04/28/2017 NBME CBSE (Formative) |
| MCAT Score Report (30M) |
| OSU ODS ADHD Verification Form (completed by Dr. Smiy in 2010) |
| OSU ODS Access Plan |

NBME00238

June 6, 2018                           USMLE# 5-366-431-4                           Jessica Ramsay

### Personal Statement

I am submitting this Personal Statement to describe the functional impairments and symptoms I experience as a result of my learning disabilities, Attention Deficit/Hyperactivity Disorder, migraines, and residual symptoms from my deep vein thrombosis. These symptoms make it impossible for me to fully read and answer all of the questions on an equal basis with non-disabled students under the standard testing conditions.  The accommodations that I am requesting are:

- 100% additional exam time (double time)

- Extra break time

- a private, distraction-reduced testing room

                                        * * *

There are many tasks in everyday life that require scanning, reading, writing, information processing, recall, and organization, which the average person does effectively and efficiently. Because of my disabilities, I am unable to do these important tasks with normal effectivity or efficiency, or sometimes even at all. These disabilities also interfere with my ability to learn, remember, recall, and express information efficiently and effectively. In order to perform any of these functions, I must spend much more time and energy every day than most people need to. Furthermore, the additional time and energy spent on these tasks takes away from the time, energy, and focus needed to manage other important life responsibilities like cooking, eating, cleaning, paying bills, running errands, doing laundry, sleeping, and self-care.

In addition, the methods I have developed over time in order to be able to read, study and manage my disabilities are only effective if I have an appropriate space and the necessary time. Let me explain.

- I have always struggled with flipping, merging, and tangling letters, characters, and words both when reading and writing. I also have trouble distinguishing between words and characters that have similar shapes – characters such as qbdp, 96, wunm, JL, 3E, gy, ssae, 4A, and words like united/untied, serves/verses/reverse/server/severe/reserve, quite/quiet, from/form, reared/reread, and though/thought/trough/tough – so it takes me a long time to isolate and correctly identify them. Sometimes I am unable to tell them apart without help from others or use of supportive tools. These tasks are progressively more difficult with stylized fonts, handwriting, and cursive – *nmwuwnw, gggy, delbhh* – which I usually need someone else to read to me because I cannot read it on my own. This interferes with my ability to do many common, everyday tasks like reading handwritten instructions, phone numbers, reminders, or feedback on an assignment, and sometimes cannot even read something I wrote myself, like reminders or class notes.

- In order to read anything, especially technical material like the material on the USMLE Step 1 test, I must spend a lot of time and effort to untangle the words and decode each one, identifying their individual meanings. Then I must piece them together in the correct sequence, building them up to get the meaning of the text as a whole. This process requires me to reread text multiple times before I can fully comprehend what I am reading. Usually, I also need to read the text aloud, or have it read to me by a person or computer program, to help me

                                        - 1 -

NBME00223

interpret the words within the context of the sentence, and then within the paragraph. Hearing the words aloud also helps me to avoid making as many mistakes overall because, when I hear something that sounds out of place, I can backtrack and try again. Though this process is very slow and tedious, it makes it possible for me to read with adequate comprehension. Additionally, there are times when I also need to physically act out or demonstrate what I am reading so that I can make sense of the information. This technique is helpful for working through information but requires adequate time and an appropriate space for me to be able to physically move around in a way that is not possible in a shared testing room without disturbing other examinees.

- When I need to read but do not have adequate time or support to properly untangle and work through the words or process the information, I miss important details, or even large chunks of information, and misinterpret the message. This leads to many, and often crucial, misunderstandings and communication errors that can have negative impacts on the personal, social, academic and professional aspects of my life, the severity of each varying depending on the situation. For example, calling someone Ashley when their name tag says Ainsley can appear careless, or even rude, leading to a bad first impression, or even loss of a potential job offer. Misreading instructions and messages, subsequently causing me to pass along an incorrect message or to unintentionally fail to follow directions, has gotten me in trouble at home, with friends, and sometimes even at work. In restaurants, it takes me a long time to read the menu, so I hold everyone up when they are ready to order. When movies and shows have subtitles, they are not on the screen long enough for me to able to read them, so I either need someone to read the captions to me or I have to pause the movie with every line so that I can give myself adequate time to read each line, which really annoys other viewers. When I do not have someone to read the captions to me, or the option to pause so I can read, I completely miss what is going on.

- When I need to read for complete understanding and learning, I mark up the text by drawing and writing directly on the page with colored pens, pencils, and highlighters. When I am not able to use colors to draw and write directly on the exam, such as for computerized exams including USMLE Step 1, I must rely on a combination of other methods, though this is generally less effective. The following are some examples of these methods:

  o  Drawing and writing on scrap paper, which is less effective because I have to go back and forth between the text and scrap paper, causing me to more frequently lose my place and make mistakes. It is also much less efficient because it takes much more time to go back and forth between text and scrap paper than it does to mark directly on the text, and I require more time to check for and correct my mistakes;

  o  Reading and thinking aloud which allows me to hear the words as I read to better comprehend and process the information and, importantly, to better recognize when I have made sequencing errors. This method requires a private environment so as not to interrupt other test-takers when I am talking;

  o  Physically acting out or demonstrating what I am reading. This helps me to make sense of the information I am reading but requires adequate time to work through the information. Without a private room in which I can read aloud and move about the room, I will be a hindrance and distraction to other test takers.

- 2 -

NBME00224

My learning disabilities also impair my ability to effectively and efficiently express information through writing due to the switching, merging, and tangling of letters, characters, and words, similar to that which I experience while reading. Because this is a request for accommodations for Step 1, I will not describe my difficulty with writing in as much detail, but it will be relevant when I apply for accommodations for Step 2 CS.

Because reading and writing are such tedious and draining processes for me, I avoid both as much as possible. I was able to do this strategically for some prior standardized tests like the ACT and MCAT because the tests were designed so that many of the questions could be answered without reading the whole question. For the ACT, I was not able to read all of the questions and could not accurately demonstrate my knowledge. Additionally, due to the guessing penalty, I had to leave the questions I was not able to read unanswered. However, because most of the questions required little reading to find the answers, I was able to answer enough questions to achieve an acceptable score. Likewise, for the MCAT, many of the questions could be answered without reading and gathering information from the passages, so I knew to answer passage-independent questions first, and then used any time left to try to read the passages with the most unanswered questions remaining. Being able to skip much of the reading made in possible for me to correctly answer enough questions to achieve an acceptable score.

The NBME and USMLE exams are different from the standardized exams I took before medical school. For these exams, I must read the entire prompt for each of the questions in order to gather all of the information necessary to correctly decide on an answer. This requires far more reading than either the ACT or the MCAT did. To have the same opportunity as the other students taking this exam to read and gather the necessary information from each prompt, I need the accommodations that I am requesting.

In other non-testing situations, I can use videos, pictures, diagrams, interactive models, physical demonstrations, dictation, audio books, conversations, context clues, lectures, and many other sources in addition to, or even in place of, reading and writing. These sources format information in a way that I can understand, process, remember, and use more effectively and efficiently, making it easier for me to process, learn, study, communicate, and demonstrate information. When I am required to read or write without the option or opportunity to use these other formats, I require much more time and support than most people, and I am not able to understand, learn, study, memorize, or communicate information, nor demonstrate my knowledge and competency as effectively.

* * *

In addition to ADHD, learning disabilities, and migraines, I also had a deep vein thrombosis (DVT) the full length of my leg in 2016 and was later diagnosed with a clotting disorder (*See* letter from Jennifer Houtman, M.D.). The DVT damaged the circulation in my legs, causing post-thrombotic syndrome, meaning that sitting or standing still for long periods causes my legs to swell and become painful, which adds to my inability to focus. During my Step 1 attempt, having to sit still for long periods without a private environment to briefly move or walk around as necessary to maintain circulation during the exam blocks caused my leg to swell and become painful, further distracting me from the exam. During the breaks, I did not have enough time to sufficiently walk around to reduce the swelling and pain that had built up during the exam. Because of my clotting disorder and DVT, I must take frequent breaks throughout the day, and briefly during the exam blocks, to move and walk around in order to maintain adequate circulation in my legs, reduce swelling and pain, and decrease the risk of forming another DVT as a result of my clotting disorder.

ADHD inhibits my ability to focus or maintain attention, especially for extended periods, and causes me to be very easily distracted by sounds, movement, and flashes of light, as well as my own thoughts and sensations, like hunger, restlessness, pain, and temperature. These distractions pull my focus away from my current

- 3 -

NBME00225

June 6, 2018                                    USMLE# 5-366-431-4                                    Jessica Ramsay

thought or task. As a result, ADHD impairs my ability to do anything that requires sustained mental effort, such as thinking, maintaining conversation, remembering obligations and assignments, getting organized, staying on track, and completing tasks and projects.

I am unable to keep track of things because I set them down and forget where I put them, which is especially problematic when I am outside my home, and with important things like my, wallet, keys, assignments, phone, and legal documents. In addition to distractibility and inattention, ADHD also causes me to be impulsive, which makes it difficult to wait my turn, especially in conversations. As a result, I unintentionally interrupt others, or blurt out my thoughts before fully thinking them through or appropriately filtering them for the situation.

The restlessness, distractibility, and inability to focus caused by my ADHD exacerbate the effects of my learning disabilities, further impairing my ability to scan, read, write, learn and process information.

My inattention, distractibility, and impulsivity make it very difficult to focus on just one idea at a time, causing me to jump quickly from one thought to another, which makes it difficult to maintain my train of thought. This frequently causes me to forget things I need to do, forget steps in a process, forget what someone just told me, and forget what I am saying when I am talking. My inattention, distractibility, and impulsivity also cause me to be unable to organize my thoughts without the adequate time or the tools I need. This is especially true for things like telling stories or writing essays and clinical notes, which must be logically presented to others.

For exams, getting lost in my thought process causes me to lose track of what the question is really asking so that I end up working only part way to or even past the answer the question was actually asking for. Many times, on multiple choice exams, the answer that I come up with is often one of the incorrect options. Without adequate time to reread the question and double check that the answer I select fits what the question is really asking, I am unable to effectively answer questions even when I correctly understand the material.

Also due to my ADHD, I constantly need to be moving around or doing something. I have always had an extremely difficult time sitting still, especially for extended periods. When I am expected or required to sit for prolonged periods, I become very restless and start shifting around in my seat, fidgeting, and doodling on my papers, which can be disruptive to others around me and has gotten me in trouble in school. Not being able to sit still for extended periods interferes with my ability to study and work on assignments, maintain professional behavior at work, and complete tasks or even watch shows to relax at home. Being able to take frequent breaks with adequate time to rest my mind while stretching and walking around helps me manage my restlessness and recharge so I have the energy focus and try to sit still when I get back to the task at hand.

I also need frequent breaks with adequate time to give my mind a rest from straining to focus and read. If I do not have adequate opportunities or time to do this, I become overly fatigued, which exacerbates the symptoms I experience related to my learning disorders and ADHD. Taking frequent breaks to give my mind a chance to rest allows me to recover before the next block so that I have the energy I need to be able to focus, read, process and remember information, and demonstrate my knowledge.

Additional break time will also help me with avoiding migraine symptoms. When I get migraines, the associated blind spots affect my ability to see and therefore to read. The headache itself, along with the associated nausea and hypersensitivity to light, sound, and temperature make it impossible for me to focus, which interferes with my ability to read, think, process, and answer questions. Because my migraines are triggered by excessive fatigue from trying to focus, read, and process the questions, having frequent breaks with adequate time to recuperate between blocks reduces the likelihood that I will get a migraine during the exam.

- 4 -

NBME00226

June 6, 2018                          USMLE# 5-366-431-4                          Jessica Ramsay

During my first Step 1 attempt, the standard break time allowed did not provide enough time after basic needs had been addressed for my mind to adequately recover between blocks. As a result, the effort needed to focus on the exam and suppress urges to move over the course of the exam cause me to become fatigued, triggering a migraine. I began experiencing aura symptoms during the 6th block, disrupting my focus and interfering with my ability see, read, and think, and had to wait until the block was over to use the remaining break time to retrieve and take my medications. Having to wait almost a full hour after experiencing aura symptoms before I could take the abortive medications, the aura developed into a full migraine during the 7th block, which further impaired my ability to concentrate, see, read, and think.

If I start experiencing migraine aura symptoms, I need to take medications right away to avoid getting a full migraine. The process of retrieving and taking medications during my breaks takes away from the time I need to manage my restlessness and get re-energized and refocused before the next block (*See* letter from Jennifer Houtman, M.D.).

Additionally, during breaks, I also need adequate time to stretch, move, and walk around to reduce the restlessness and leg swelling and pain I experience during the exam. Having adequate time to address these symptoms helps me get refocused before starting next block.

The standard exam space is a problem in many ways. When in the room, examinees are required to remain seated and to refrain from activities that might distract other test-takers, such as moving, tapping, or talking. In order to abide by these rules and respect the other examinees in the shared testing space, I cannot use the supportive tools and methods I require to effectively read or interpret the questions because I am not allowed to read or think aloud or briefly step away from my computer in order to make sense of question.

Sharing the space with other test-takers also significantly increases the distractions I experience during my exam, further impairing my ability to focus. If I cannot focus, I cannot read, process or recall information, nor organize my thoughts effectively. As expected, this is what I experienced during my first Step 1 attempt. Additionally, throughout several blocks, many people in the room were required to type for their exam and were typing so furiously that my desk was shaking, which completely inhibited me from being able to focus on my exam or read the questions. I could not understand the words on the screen and I could not think through anything. The effort I spent trying to focus and read during this time caused me to fatigue even more, contributing to the migraine I developed in the last two blocks.

Also, to avoid disrupting other test-takers in the standard shared testing space, I must continuously suppress the urges to get up, move around, and fidget, which greatly increases the restlessness, stress, and fatigue I experience during the exam. Additionally, while sharing a testing space, I cannot adequately manage the restlessness, swelling or pain caused by sitting for long periods because I am not allowed to briefly stand up to move, stretch, or walk around.

Additional break time, and a private room, will be helpful, but not enough, unless I also have extended testing time. As I have explained, I am easily distractible and have learning difficulties that cause me to be a very slow reader, with slow processing speed and inefficient thinking, compared to the average person. I require additional time and tools to be able to untangle and process words, effectively interpret and understand what I am reading, to organize my thoughts and information, and get back on track after distractions.

During my first Step 1 attempt, like my previous unaccommodated testing experiences, I did not have enough time to read all of the questions and, in the last minute of each block, was forced to blindly select answer choices for a significant number of un-read questions. Additionally, because I was rushed to get through as many questions as possible during the allowed time for each block, I did not have enough time to thoroughly

- 5 -

NBME00227

analyze and process many of the questions, or to organize my thoughts before having to select an answer. Since I cannot mark directly on the exam, I more frequently lose my place, misinterpret the question, and forget or misunderstand what the question is really asking. For example, If I misread a question as 'which thing is expected to **DE**crease due to a disease process,' when the question is actually asking 'which thing is expected to **IN**crease,' I will get the question wrong even though I understand how the disease process works. To be able to effectively read and understand the questions, I need to have sufficient time to untangle and process the words, to use supportive methods, and to re-read questions. When I am reading and thinking aloud, I need to have sufficient time and a private environment so that I am not a disruption and hindrance to other test-takers.

Double exam time gives me the opportunity to use the methods and supports I require to effectively read through each question while compensating for effects of my learning disabilities. I need this time to ensure I have the opportunity to read, understand, and gather information from each question; to apply my knowledge and preparation to process the information and decide on an answer choice; and to distinguish between answer choices so I can select the appropriate answer choice for my intended answer.

Double exam time also gives me adequate time to get refocused after getting distracted and to manage the additional symptoms caused by ADHD and post-thrombotic syndrome. Without this time, these symptoms interfere with my ability to focus, and taking time to appropriately address them takes time away from the time I need to read and process the questions.

* * *

My learning disabilities, ADHD and migraines affect all aspects of my life, and I have been struggling with them since I was little. Since beginning school, I have always had a lot of trouble sitting still and focusing, which interferes with my ability to pay attention in class, study, and complete homework, class assignments, papers, and exams, especially under timed conditions. My distractibility, lack of focus, and difficulty with letter reversals and tangled words causes me to make a lot of mistakes that would have been avoidable for most people. This has always been extremely frustrating because I would understand the material and would put a lot of effort into my work but would still miss tons of points for "careless" mistakes. Additionally, it has always taken me significantly more time and effort than everyone else to read, write, and process the information, so that I rarely have time or energy for anything else. In time-limited situations, like exams, I almost never have the opportunity to completely and accurately demonstrate my knowledge or hard work because I do not have enough time or access to the supports I need to adequately read, process, and answer each of the questions.

Growing up, my friends would always get mad at me for not being able to hang out in the evenings because they did not believe that I was still doing homework when they had already been done for hours. They always seemed to have so much free time when I was constantly up past midnight trying to finish my homework. In middle and high school, my mom would get frustrated when I was trying to write a paper because it would take me FOREVER and we only had one computer in the house, and she would always have to help me proof-read my work, many times at three or four in the morning. Because I am such a slow reader, whenever I had to read something online, it would take me so long that I would get yelled at for tying up the phone line (we had dial-up service at that time).

Prior to college, my parents and teachers never pursued evaluation for learning disabilities or ADHD because I worked hard and was able to mask my mistakes at school. After using my energy to concentrate on these tasks, I was always mentally exhausted at the end of the day. At home, having two brothers who have autism and multiple other special needs created an inaccurate comparative illusion that I could pay attention, sit still,

- 6 -

NBME00228

read, process, study, organize, and write normally. But the reality was that I was spending a very abnormal and excessive amount of time and effort to perform or work around these functions every day.

In 2nd grade, my teacher did notice that I still had trouble with letter and number "reversals" and distinguishing between similar-appearing characters and words when reading and writing. She began providing informal accommodations which included putting me at an isolated desk in a cubicle in the corner of the room to help reduce distractions, gave me extra time to complete classwork, and provided an alphabet chart to help me keep my letters straight for reading, writing, and spelling assignments.

After I was trialed on glasses, which did not help, I was referred to a therapeutic optometrist, Dr. Mary Alice Tanguay, to be evaluated for my "reversals." She identified my "substantial deficits in the areas of visual-spatial relationships and visual discrimination." In 1998, Dr. Tanguay provided visual perceptual skills training. This training did not eliminate my difficulty with character reversals, tangling, identification or discrimination, nor with spelling or reading speed. The training only helped me to develop some skills that I still use to work around the effects caused by my now formally diagnosed learning disabilities, which accounts for the improvements in the measured visual perceptual skills Dr. Tanguay mentions in her 2000 summary letter. Importantly, Dr. Tanguay also noted that even with these improved skills, I would likely always be a slow reader. Other than this visual testing, I was not evaluated for learning disabilities until 2009, and so did not receive any other formal aid or accommodation.

The effort required for me to focus and to suppress impulses so that I could sit still, pay attention in class, and avoid interrupting people has caused me to get frequent headaches since I started going to school. In third grade, when reading and writing became more prevalent, the added effort from trying to read and write for prolonged periods in addition to concentrating and sitting still started causing me to have daily migraines. Because the associated blind spots, nausea, and hypersensitivity to light, sound and temperature inhibited my ability to participate in school, I was given prophylactic treatment for about a year until the frequency of migraines decreased. When I started medical school, the increased time and effort required for me to meet expectations and complete requirements caused me to again have daily migraines requiring prophylactic treatment.

Throughout my academic career, I have required informal accommodations in order to complete and pass assignments and exams so that I could advance through school. Timed tests have been my downfall in all of my classes, because I do not have time to read and process the questions, or accurately demonstrate my knowledge and preparation, which makes me look unprepared and feel incredibly stupid. I distinctly remember a timed, multiple-choice test in 5th grade, on which we had to get at least 30 out of 60 questions right. All but one other person finished early. I was the only person to answer less than 30 questions. I had only been able to get through 29 of them and was working on the 30th when time ran out. I went home crying because I felt stupid and slow. I told my mom that I *knew* how to do all the questions, but I just did not have enough *time*. Eventually, they made informal accommodations for me by grading the work I had shown for the 30th question, which was correct and allowed me to achieve the minimum passing score. Similar situations have occurred all throughout my schooling, even several times since I began receiving formal accommodations in college.

My learning disabilities have caused me to struggle with words, making me a slow reader and writer. This is especially problematic in time-limited situations. Since the beginning of my academic career, I have almost never been able to finish assigned readings for any class by the time they were due, even when I would stay up til 3 or 4 in the morning trying to finish. If I wasn't up late trying to read, I was up late trying to write an essay. Many times, I had to pull several all-nighters in a row to get a paper done in time. For *anything* written, not just exams or papers, the process of writing is pure agony for me. Even though I know I can turn out a

- 7 -

NBME00229

June 6, 2018                    USMLE# 5-366-431-4                    Jessica Ramsay

decent final product, the struggle to get there – keeping track of and organizing my thoughts, translating them into words, finding the *right* words to convey the intended meaning, trying to get it all typed out before I forget how I worded it, and then working to get the jumbled mess of words on the paper into a logical, cohesive order, all while on constant lookout for dyslexic errors unnoticed by spell-check – is extremely frustrating and draining, and many times triggers migraines. For these reasons, I have always loathed reading and writing; they are agonizing battles of trying to decipher words and express and organize thoughts on a page, so I avoid doing either when possible.

* * *

During my undergraduate studies at Ohio State University, the demands of school, work and life finally began outweighing my ability to self-accommodate, requiring more time and energy than I had. I was having even more trouble focusing throughout the day. I would repeatedly misplace things and lose track of assignments. I was no longer able to catch and correct the numerous errors I made – like circling "b" instead of "d"; missing the crucial "*not*" or "*least* likely" and ending up with the exact opposite answer; or altogether misunderstanding a question because I mixed up some of the words. I was even having trouble speaking, mixing the beginnings or ends of neighboring words, or just not being able to find the right words at all, which happens much more often when I am fatigued. For many of the tasks, I knew the steps needed to accomplish each task and that I was capable of doing each step, but never had enough time to do them, even if I planned ahead. Despite making a valiant effort, I could not organize everything going on and would often miss a crucial step. It took so much time to do these things that I didn't have any time left to spend on other important tasks, like paying bills, cooking, cleaning, or activities to maintain my physical, emotional and social well-being.

In 2009, at the suggestion of a professor, I sought help from my primary care physician, Dr. Allen Smiy, who diagnosed me with ADD, inattentive type, for which he began medical management. Before this, I did not associate my restlessness and constant need to be moving with being *hyper*active – I just thought I was *active.* Dr. Smiy also clinically diagnosed me with dyslexia but did not recommend further work-up because it would not have changed the treatment.

A few months later, I registered with OSU's Office of Disability Services (ODS) and began receiving formal accommodations in 2010, which included the following:

- Priority class scheduling
- Access to an assigned ODS advisor
- 50% additional testing time, a distraction-reduced testing space, and ear plugs for all quizzes and tests
- Any supportive materials that were recommended or approved by my professors, such as extra scrap paper, colored pencils, highlighters, chemistry model kit, or a note sheet.

Once I started receiving accommodations, I was able to perform better on my exams because I had more time to read, write, and work through questions. Though, even with the extra time and reduced distractions, I still had to rush to try to finish the tests. On exams with essays or questions with lengthy prompts, which require a lot of writing and reading, I still ran out of time before I could finish.

In medical school, I received more accommodations to meet the increased curricular demands. Most notably, I was granted 100% additional testing time, unlimited free printing, and Kurzweil 3000 text-to-speech software.

- 8 -

NBME00230

I have had to adjust my requests, or make new ones, as I've encountered new situations in the classroom and the clinic. For example, during my 2nd year, I struggled to complete simple subjective/objective encounter notes for our OSCE assessments within the 10-minute limit, so was granted 50% additional time for the note-writing. When we started doing Step 2 CS-style encounters and notes for our clerkship OSCEs, I struggled to complete the added writing requirements in 15 minutes, so was granted 20 minutes, with an additional 2 minutes at the beginning of the encounter so that I had enough time to read the encounter prompt and instructions.

The effects that ADHD and learning disabilities have on my life are most quantifiable when assessing my academic performance, but they do not just affect school; for me, they are a 24/7 thing. Growing up, I constantly got in trouble for "being lazy" or "ignoring" directions – failing to do simple things like hanging my jacket in the closet rather than on the back of a kitchen chair, pushing my chair in when I got up from the table, making my bed, or putting things completely away – because no matter how many times my mom asked or what I tried to make myself remember, I always got distracted halfway through, forgot what I was doing and moved on to something else.

Since being diagnosed in 2009, I have gotten better at recognizing my hyperactive and inattentive trend, which has expanded and become more apparent as I have taken on more responsibility as an adult and medical student. I have learned the hard way that it is necessary for me to spend more effort to create reminders, backup reminders, and backup-backup reminders to avoid the negative domino-effects from making repetitive and perpetual "careless" mistakes, such as: forgetting appointments, forgetting to bring things that I need (like my wallet, phone, or paperwork), and losing track of time. However, even with the extra efforts to manage these effects, they are still apparent. For example, I still struggle with impulsively blurting things out without thinking, sometimes interrupting or offending others, and must actively try not to. I still have difficulty getting and staying organized, which is obvious with my cluttered apartment. I still mis-schedule and forget social, work, and academic obligations. I start tasks and projects, get distracted, and leave them unfinished. For example, I frequently forget that I started laundry and will then leave wet clothes in the washer for days before realizing it.

Already struggling to manage my life and having to surrender *much* more time and effort to studying and completing assignments, the learning disabilities intrinsically add a disproportionate number of hoops for me to jump through, such as:

- Remembering to request a new prescription every 30 days so that I can fill it before I run out.

- Taking off from school so that I can have medication checks every three to six months.

- Requesting academic accommodations, which is never a simple process – I have to track down old documentation and get new evaluations, and torture myself with writing support for each request.

- Keeping track of documentation and paying bills for each of these extra things.

These things may seem simple, but the pure nature of the disabilities I struggle with makes managing just one of these tasks, not to mention ALL of them, more difficult and time-consuming than for the average person. Every minute I spend keeping my disability affairs in order is time taken away from family, friends, recreational activities, self-maintenance, sleep and studying.

NBME00231

June 6, 2018                    USMLE# 5-366-431-4                    Jessica Ramsay

For me, managing my life is like having a large bag of balls dropped from the ceiling, all at once, and being expected to not let a single one hit the ground. It is impossible without help. Finally being diagnosed and receiving treatment was like being given a shopping cart to catch more balls in, and receiving academic accommodations, a second shopping cart. Sometimes my friends and family help out – each catching a few more – by reminding me about upcoming deadlines and being patient and understanding when I jump from one thought to the next without finishing the previous one, or when I have to ask what we were just talking about after losing track mid-sentence.

I wish I did not need more time or accommodations, just like I wish I did not have to sacrifice the things I enjoy to make time for things I dread, but I do. In the context of the USMLE Step exams, without appropriate accommodations, I will not have the opportunity to get through as many questions or as much content as everyone else taking the tests, and I will not be able to accurately demonstrate all that I have learned thus far.


Sincerely,

*Jessica Ramsay*

Jessica Ramsay, 06/06/18

NBME00232

# REISMAN ▪ CAROLLA ▪ GRAN LLP

*19 Chestnut Street*
*Haddonfield, NJ 08033*
*T: 856.354.0071*
*F: 856.354.0040*
*www.rcglawoffices.com*


1126183        5-366-431-4
Berger, L. 6/7/18-Attorne

*Catherine Merino Reisman+*
*Amelia Carolla+*
*Judith A. Gran++*
*Sarah Y. Zuba++*

*+Admitted in NJ & PA*
*++Admitted in PA*

Lawrence D. Berger*
*Of Counsel*
*larry@rcglawoffices.com*
*direct dial: 856.354.0021*

June 7, 2018

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA  19104-3102

> Re:     **Application of Jessica Ramsay**
> **USMLE Step 1**
> **USMLE ID#: 5-366-431-4**

Dear Disability Services:

     I write in support of the application of Jessica Ramsay for testing accommodations for the USMLE Step 1 examination.  Although this is a new application, and not an appeal of NBME's prior decision on Ms. Ramsay's 2017 application, Ms. Ramsay has requested that I address in this letter the manner in which her current application responds to the reasons given in Dr. Goldberg's March 10, 2017 letter for denying the prior application.  Ms. Ramsay has also requested that I discuss the requirements of the Americans With Disabilities Act as they relate to and support her application.

     As you know, after NBME denied the prior application, Ms. Ramsay sat for the examination without accommodations on July 20, 2017, and received a failing score of 191.  Ms. Ramsay continues to believe that she needs appropriate testing accommodations in order to have a fair and equal opportunity to demonstrate her knowledge on the Step 1 examination, and she has accordingly taken several additional steps:

     •    First, Ms. Ramsay has obtained additional testing and evaluation from Alan Lewandowski, Ph.D., FACPN, a Board-certified Neuropsychologist.  Dr. Lewandowski's report dated December 7, 2017, is provided with Ms. Ramsay's new application, and confirms a diagnosis of "Attention deficit disorder, hyperactive," and "Learning disability, nonverbal."  Dr. Lewandowski has recommended 100% extended testing time (double time), and additional break

NBME00147

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -2-

time; *see* letter dated May 23, 2018, also provided with the application.
Dr. Lewandowski's report is discussed further below.

• Second, Ms. Ramsay is also submitting a letter from Bruce Ruekberg, M.D., her
treating psychiatrist. Dr. Ruekberg is writing on the basis of his own direct
clinical observation, Ms. Ramsay's current symptoms, clinical history and
childhood history, to independently confirm the diagnoses of ADHD and learning
disabilities in reading and written expression. Dr. Ruekberg's letter is discussed
further below.

• Third, Ms. Ramsay has also obtained a letter from her primary physician,
Dr. Jennifer Houtman, who is also her medical school mentor and who was the
instructor for Ms. Ramsay's Clinical Skills course. Dr. Houtman provides
comments on the physical disabilities for which she is treating Ms. Ramsay and
which were not described in Ms. Ramsay's previous request for accommodations,
namely Migraines, and Clotting Disorder with recent Deep Venous Thrombosis.
Dr. Houtman also provides comments about her observations as a medical school
mentor and instructor for Ms. Ramsay which are pertinent to the request for
testing accommodations.

• Fourth, Ms. Ramsay has also updated her Personal Statement.

In response to the specific comments in Dr. Goldberg's March 10, 2017 letter:

**1.    Ms. Ramsay Has Obtained New Testing And A New Evaluation From
Dr. Lewandowski Which Thoroughly Documents His Diagnoses of Attention
Deficit Disorder, Hyperactive, And Learning Disability, Nonverbal.**

NBME's prior letter asserted that "the brief evaluation and report" of a prior evaluator
"do not sufficiently support the diagnostic conclusions." Ms. Ramsay has now obtained a
thorough evaluation by Dr. Alan Lewandowski who has confirmed the diagnoses of Attention
Deficit Disorder, Hyperactive," and "Learning disability, nonverbal (abnormal scanning and
processing speed)." His report also shows specific ways in which these disabilities affect
Ms. Ramsay's performance on the Step 1 examination, including the following:

• Ms. Ramsay's processing speed was "borderline impaired" and fell more than
1 standard deviation below the mean;

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -3-

- Sequencing: simple, Sequencing: complex, Attention: complex (non-language),
  Vigilance difficulties, Visual recall: long delay; and Inefficient thinking, were all
  found to be abnormal;

- Health concerns and depression are abnormal, which "exacerbate the above-noted
  existing limitations (thought processes), and have subsequent implications for
  learning new information and responding to assessments under timed conditions."
  Lewandowski (December 7, 2017) at 4. As discussed below in connection with
  the separate report of Dr. Ruekberg, these health concerns and depression are the
  partly the result of Ms. Ramsay's efforts to manage her life-long struggle with
  ADHD and learning disabilities, and the delay in her medical school education
  resulting from the barrier of taking USMLE Step 1 without accommodations.

- Accordingly, Dr. Lewandowski recommended "100% additional testing time
  (double time), plus additional break time" for the Step 1 examination. *See*
  Dr. Lewandowski's May 23, 2018 letter.

Please review Dr. Lewandowski's complete report for further analysis, and Ms. Ramsay's
Personal Statement, as well as the letters from Drs. Ruekberg and Houtman, for an explanation
of how these issues affect her performance on USMLE Step 1 and similar examinations.

**2.   Ms. Ramsay's Updated Personal Statement As Well As Dr. Ruekberg's
Report Provide Substantial Documentation For Ms. Ramsay's Lifelong
History of ADHD and Learning Disability.**

NBME's prior letter asserted that "the documents [Ms. Ramsay] provided do not
demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral
regulation, or distractibility that has substantially impaired [her] functioning during [her]
development or currently." NBME's letter also commented that ADHD "begins in childhood,"
"must be present in more than one setting (e.g., home and school)," and "must be documented
beyond self-report."

NBME's letter did not acknowledge that ADHD is often first diagnosed in adults, but this
is well established, and has been authoritatively confirmed in DSM-5. *See* "Attention-Deficit/
Hyperactivity Disorder (ADHD)," Centers for Disease Control and Prevention, Department of
Health & Human Services.[1]

---

[1] Found on the Internet at https://www.cdc.gov/ncbddd/adhd/diagnosis.html.

NBME00149

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -4-

---

In her new application, Ms. Ramsay has revised her Personal Statement to provide additional information, and Dr. Ruekberg has taken detailed histories, including interviews and completion of Adult ADHD symptom checklists by Ms. Ramsay's mother and significant other: "[A]ll strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation." Ruekberg letter at 7. ADHD can be diagnosed in adults, when inattentive or hyperactive-impulsive symptoms were present before 12 years of age. Such symptoms are corroborated in Ms. Ramsay's case by the history taken by Dr. Ruekberg from Ms. Ramsay's mother,[2] and by the informal accommodations provided by teachers as early as 2d grade as described both in Ms. Ramsay's Personal Statement, the history given by her mother and by Dr. Ruekberg.[3] Dr. Ruekberg also confirms, on the basis of his own observations, the diagnosis of "Specific learning disorder of 'abnormal scanning and processing speed' (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)." Ruekberg letter, id.

Please review Dr. Ruekberg's complete letter for further analysis.

**3.    NBME Should Defer To The Recommendations Of Drs. Lewandowski And Ruekberg Who Have Evaluated Ms. Ramsay Face-to-Face.**

The Department of Justice, Civil Rights Division, has stated in its publication "Testing Accommodations," found on the Internet at www.ada.gov/regs2014/testing_accommodations.html, that testing entities like NBME "should defer to documentation from a qualified

---

[2] See Ruekberg letter at 2-3, "Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type" and 3, "[a]t school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, 'always moving or doing something' like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around."

[3] See Ruekberg letter at 5, "Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g. extra time, quiet environment, altered grading schemes, redo opportunities, etc.) . . . ." See also Personal Statement at 6.

NBME00150

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -5-

professional who has made an individualized assessment of the candidate that supports the need for the required testing accommodations." In this case, therefore, NBME should defer to the findings of Drs. Lewandowski and Ruekberg.

As the Department of Justice explained:

- This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.

"Testing Accommodations," *supra*. For the reasons stated by the Department of Justice, NBME should give considerable weight to the findings of by Drs. Lewandowski and Ruekberg – qualified professionals who evaluated Ms. Ramsay face-to-face – and grant the accommodations that they have recommended.

4. **NBME Must Consider Ms. Ramsay's Application Without Regard To Self-Accommodations That She Used For Prior Tests Which Are Not As Reading-Intensive As The USMLE Step Examinations.**

A history of self-accommodating does not demonstrate that extra time is not needed. Indeed, the ADA was specifically amended in 2008 to make this clear. The ADA Amendments Act of 2008, 42 U.S.C. §12102(4)(E)(i), provides that "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . learned behavioral or adaptive neurological modifications."

Moreover, a prior history of academic success under different conditions does not mean that accommodations (or greater accommodations) are not needed when the conditions are different. As the Department of Justice, Civil Rights Division, has stated in its publication "Testing Accommodations," found on the Internet at www.ada.gov/regs2014/testing_accommodations.html:

> **A person with a history of academic success may still be a person with a disability who is entitled to testing accommodations under the ADA.** A history of academic success does not mean that a person does not have a disability that requires testing accommodations. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning, because of the

NBME00151

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -6-

additional time or effort he or she must spend to read, write, speak, or
learn compared to most people in the general population.

"Testing Accommodations," *supra* (boldface in original). The Department of Justice specifically
rejected language that would have elevated the importance of scores on prior examinations. 81
Fed. Register 53237 (Aug. 11, 2016).

USMLE Step 1 is significantly different from prior tests which Ms. Ramsay took under
standard conditions. As pointed out in Ms. Ramsay's Personal Statement:

Because reading and writing are such tedious and draining processes for
me, I avoid both as much as possible. I was able to do this strategically for
some prior standardized tests like the ACT and MCAT because the tests
were designed so that many of the questions could be answered without
reading the whole question. . . .

The NBME and USMLE are different from the standardized exams
I took before medical school. For these exams, I must read the entire
prompt for each of the questions in order to gather all of the information
necessary to correctly decide on an answer. This requires far more reading
than either the ACT or the MCAT did. To have the same opportunity as
the other students taking this exam to read and gather the necessary
information from each prompt, I need the accommodations that I am
requesting.

Personal Statement at 3, and *see also* Dr. Ruekberg's report at 4-5. Therefore, the fact that
Ms. Ramsay took prior tests under standard conditions is not dispositive of her need for
accommodations for Step 1.

5.    **Ms. Ramsay Is Also Presenting Additional Information In Her Personal
      Statement And From Dr. Houtman Concerning Physical Disabilities, Namely
      Migraines and Clotting Disorder.**

In her prior request for accommodations, Ms. Ramsay provided information about
ADHD and Learning disabilities, as assessed by the prior evaluator. That information has been
updated and is discussed above. In this request, Ms. Ramsay is also providing information about
two physical disabilities, Migraines and Clotting Disorder, that was not included in her prior
request. These conditions also contribute to Ms. Ramsay's need for the testing accommodations
that she is now requesting. As described in the Personal Statement and in Dr. Houtman's letter:
(a) the time pressure for the Step 1 examination may lead to Migraine symptoms during the

NBME00152

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -7-

examination, as they did when Ms. Ramsay attempted Step 1 without accommodations in 2017;
(b) Ms. Ramsay is also susceptible to symptoms of Clotting Disorder unless she has an
opportunity to be physically active from time to time, during the examination, which requires
additional break time and a private room. *See* Dr. Houtman's letter at 4, and Ms. Ramsay's
Personal Statement at 3-5 and 7. As noted, Ms. Ramsay experienced Migraine symptoms when
she took Step 1 without accommodations in 2017. Personal Statement at 4-5.

Dr. Houtman, in her other role as a medical school mentor and instructor, also provides
several specific examples of situations in medical school where testing accommodations –
similar to those that Ms. Ramsay is requesting from NBME – have made it possible for
Ms. Ramsay to better demonstrate her knowledge and ability. Ms. Ramsay should receive the
same accommodations in order to have a fair opportunity to demonstrate her knowledge and
ability on the Step 1 examination.

6. **Ms. Ramsay Needs All Three Of The Accommodations That She Is
   Requesting, Because These Accommodations Work Together To Enable Her
   To Have Fair Access To The Examination.**

The new and additional information that Ms. Ramsay is submitting shows that she needs
all three of the accommodations that she is requesting. Extended testing time is necessary
because of her ADHD and slow reading speed, and also to avoid triggering Migraine and
Clotting Disorder symptoms as occurred during her 2017 attempt to sit for the Step 1
examination without accommodations. Extended testing time is also necessary because her self-
accommodations, including reading aloud and moving around, require additional time.
However, extended testing time will not be a sufficient accommodation unless additional break
time and a private testing room are also provided. Likewise, additional break time or a private
testing room will not be a sufficient accommodation unless extended testing time is also
provided. Additional break time reduces the risk of Migraine and Clotting Disorder symptoms,
and makes it possible for Ms. Ramsay to take medication, and also to regain focus, during the
examination. A private testing room makes it possible for Ms. Ramsay to speak aloud and move
around. Additional break time, and a private testing room, are necessary, but not sufficient
without extended testing time, because they do require additional time.

\*\*\*

NBME00153

REISMAN CAROLLA GRAN LLP

Disability Services
June 7, 2018
Page -8-

Please consider this additional information in reviewing Ms. Ramsay's application.

Very truly yours,

Lawrence D. Berger

NBME00154



1126192          5-366-431-4
Neurocognitive exam 2017-

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Helane Pilnick, PHD
*Pediatric Neuropsychology*
JoLynn Cole, MA
*Psychotherapist*

Morris Edwards, PHD
*Certified in Biofeedback*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE EXAMINATION

**Name:**            Jessica Ramsay
**DOB:**             August 29, 1990
**Procedure:**       Neurocognitive Study
**Review date:**     December 7, 2017
**Referred by:**     Self
**Performed by:**    A. Lewandowski, Ph. D., FACPN

**Reason for Exam**   Twenty-seven-year-old right-handed female with 19 years
                      education (3 years medical school) presents for comprehensive
                      neurocognitive diagnostic recheck pursuant to attention and
                      learning difficulties with undetermined etiology and uncertain
                      severity. The primary care physician is Dr. Jennifer Houtman. The
                      preexisting neurological history is unremarkable for CNS disease,
                      insult or injury as a child, adolescent or young adult. Neuroimaging
                      has been completed with MRI and findings are reported to be WNL.
                      The general medical history with *possible* implications for cognitive
                      dysfunction is remarkable for anemia and daily migraines. The
                      psychological history is noted for some type of cognitive testing as
                      a 3 or 4-year-old child and more recently, a consultation three years
                      previously with a counselor who supervised the administration of an
                      abbreviated IQ-achievement test (records not available for review).
                      Current medications include Adderall, Ambien, Tramadol, Xanax
                      and Buspar.

**Technique**         Comprehensive neurocognitive examination with HRNB and allied
                      procedures with study date on November 9, 2017. Findings and
                      report are based on test results integrated with additional data
                      including records, behavioral observations of the patient and all
                      other available relevant clinical data. Additional time spent with
                      report analysis, interpretation and integration of test data and
                      results completed on November 16, 2017.

**Findings**          See attached graphs and summary table below for raw data.

NBME00210

Jessica Ramsay
Page 2

## Report

*Bold indicates low normal/abnormal findings*

| | Functional Area | Range | Findings | Guideline |
|---|---|---|---|---|
| **Intellectual Functioning** | Verbal Comprehension | 100 +/- 15 | 125 | Superior |
| | Perceptual Reasoning | 100 +/- 15 | 131 | Very superior |
| | Working Memory | 100 +/- 15 | 111 | High average |
| | **Processing Speed** | 100 +/- 15 | 79 | **Borderline impaired** |
| | General abilities (GAI) | 100 +/- 15 | 132 | Very superior |
| | Cognitive efficiency (CPI) | 100 +/- 15 | 94 | Average |
| | Overall Intellect (FSIQ) | 100 +/- 15 | 117 | High average |
| **Academic** | Reading | 100 +/- 15 | 114 | High average |
| | Spelling | 100 +/-15 | 109 | Average |
| | Written arithmetic | 100 +/- 15 | 110 | High average |
| **Neuropsychological** | Sensory speed: dominant | 50T +/- 10 | 50 | Normal |
| | Sensory speed: non-dominant | 50T +/- 10 | 47 | Normal |
| | Motor speed: dominant | 50T +/- 10 | 50 | Normal |
| | Motor speed: non-dominant | 50T +/- 10 | 48 | Normal |
| | Psychomotor: bilateral abilities | 50T +/- 10 | 47 | Normal |
| | Psychomotor: response speed | 50T +/- 10 | 55 | Normal |
| | **Sequencing: simple** | 50T +/- 10 | 35 | **Abnormal** |
| | **Sequencing: complex** | 50T +/- 10 | 27 | **Abnormal** |
| | Executive reasoning | 50T +/- 10 | 60 | Normal |
| **Attention** | Attention: complex (language) | 50T +/- 10 | 60 | Normal |
| | **Attention: complex (non-language)** | 50T +/- 10 | 35 | **Abnormal** |
| | Inattentiveness | 50T +/- 10 | 50/46/51/49/52/49 | Normal |
| | Impulsivity | 50T +/- 10 | 49/51/48 | Normal |
| | Sustained difficulties | 50T +/- 10 | 47 | Normal |
| | **Vigilance difficulties** | 50T +/- 10 | 69 | **Abnormal** (mild) |
| **Memory** | Verbal recall:  immediate | 50T +/- 10 | 66 | Normal |
| | Verbal recall: short and long delay | 50T +/- 10 | 65/65 | Normal |
| | Visual recall: immediate | 50T +/- 10 | 61 | Normal |
| | **Visual recall**: short and long delay | 50T +/- 10 | 58/38 | Normal/**Abnormal** |

NBME00211

Jessica Ramsay
Page 3

| | | | | |
|---|---|---|---|---|
| **Psychological** | Health concerns | 50T +/- 10 | 64 | **Abnormal: mild** |
| | Anxiety: generalized | 50T +/- 10 | 47 | Normal |
| | Anxiety: focused | 50T +/- 10 | 51 | Normal |
| | Depression | 50T +/- 10 | 67 | **Abnormal: moderate** |
| | Acute stress | 50T +/- 10 | 41 | Normal |
| | Inefficient thinking | 50T +/- 10 | 73 | **Abnormal: significant** |

**Summary**

1. Abnormal intellectual study
   a. Intellectual *ability* is in the *Very Superior* range (98th percentile) compared to same-aged peers.
   b. Intellectual *efficiency* is only *Average* (34th percentile) compared to same-aged peers, hence reflects a statistically significant weakness in the intellectual study.
   c. The profile suggests equal bilateral aptitude on tasks known to be sensitive to both the left and right cerebral hemispheres.
   d. The pattern reflects a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions.
   e. The IQ pattern is consistent with the patient's/parent's report of premorbid functioning, suggesting a preexisting developmental delay.

2. Normal achievement study. Reading, spelling and arithmetic are normal to above normal and consistent with past education.

3. Borderline abnormal neurocognitive study.
   a. Abnormal performance is observed on measures of sequencing/cognitive shifting, sustained complex attention, and quickness of thinking (as noted above) affecting mental flexibility, cognitive efficiency and inattention with subsequent implications for learning new information and responding to assessments under timed conditions.
   b. Performance is otherwise consistent with or supersedes age-, gender-, and education-weighed norms.

NBME00212

Jessica Ramsay
Page 4

4. Abnormal psychological study
    a. Elevations are observed on clinical scales associated with ill health and depression.
    b. Subscale analysis reflects significant focus and worry about personal health, feelings of failure, indecisiveness and difficulties with concentration (cognitive inefficiency), physiological symptoms associated with depression (low energy, sleep/appetite disturbance, and difficulties with concentration, decision-making, memory/learning).
    c. Emotional difficulties exacerbate the above-noted existing limitations (thought processes), and have subsequent implications for learning new information and responding to assessments under timed conditions.

**Clinical Impression**

1. By history:
    a. Attention deficit disorder
    b. Learning difficulties affecting ability to pass standardized testing

2. By diagnostic testing:
    a. Attention deficit disorder, hyperactive, moderate (F90.1)
    b. Learning disability, nonverbal (abnormal scanning and processing speed) (F81.9)

**Plan**

1. Graphic findings and report to patient.
2. Copy of findings to patient.
3. Continue with specialized cognitive medication (dextroamphetamine) to assist with inattention, if not medically contraindicated. I defer to the patient's primary care provider who is Dr. Houtman for consideration of this recommendation. Alternatively, I can provide psychiatric consultation through my clinic as part of a conjoint psychotherapy-psychiatric treatment for the patient.
4. Continue with medication to address emotional difficulties (zolpidem, alprazolam, and buspirone).
    a. The present study indicates that the patient's current psychological medication regimen is adequately effective, as elevations on clinical scales of depression are only approximately one and a half standard deviations greater than the average range.
    b. At present, these medications are provided by Dr. Houtman.
    c. If needed, I am happy to provide psychiatric assistance though my clinic as part of conjoint psychotherapy-psychiatric medication treatment for the patient.

NBME00213

Jessica Ramsay
Page 5

5. Consider psychotherapy to address mood disturbance and modulate affect.
6. Patient requests accommodations and written responses to a series of guidelines toward test accommodations for the United States Medical Licensing Examination (USMLE), Step 1. Guidelines provided by the patient were reviewed and the following accommodations are recommended:
   a. Fifty percent additional time to complete the examination or 100 percent additional time (double time) for an exam given over two days to compensate for slowed thought processing
   b. Two additional breaks during the examination to compensate for difficulties managing mood/stress.
   c. A separate and/or quiet area to complete the examination to compensate for inattention and distractibility.
7. The patient did not have accommodations for the MCAT and as a result scores reflect her inefficiency and slowed reading.
8. The patient is not at risk for operating a motor vehicle.
9. Consider a memory notebook to assist with organization and improve attention.
10. Recheck in 12 months to assist primary care in monitoring mental status.
11. Consider re-examination in 24 months for comparative analysis to baseline.
12. Discussed issues of safety and surrogate decision making, provided education regarding the diagnosis and management of health behavior changes, and directed to additional resources for support.
13. I remain available to patient regarding assessment and treatment needs.
14. I remain available to Dr. Houtman as the patient's primary care physician at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified in Neuropsychology
Clinical Assistant Professor, Western Michigan University
    Department of Psychiatry, Western Michigan University School of Medicine
    Psychology Department
    Department of Counseling Psychology and Counselor Education
    College of Health and Human Services (SPADA)
    Department of Military Science and Leadership

AGI: la

NBME00214

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## Addendum

Name: Jessica Ramsay (DOB: 08/29/1990)
Date: February 7, 2018

Re: Names of specific measures used in the neuropsychological examination of Jessica
Ramsay on December 7, 2017


Weschler Adult Intellectual Scale, 4th edition, Wide Range Achievement Test 4th edition,
Sensory Perceptual Examination, Tactile Finger Recognition Test, Finger-tip Number
Writing Test, Tactile Form Recognition Test, California Verbal Learning Test, 2nd edition,
Rey Osterrieth Complex Figure Test, Tactile Form Recognition Test, Grip Strength Test,
Finger Oscillation, Tactual Performance Test, Trail Making Test A, Trail Making Test B,
Category Test, Seashore Rhythm Test, Speech Sounds Perception Test, Personality
Assessment Inventory, Aphasia Screening Test.

NBME00215

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

May 23, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Dear Jessica,

I am responding to your request for further clarification on the neuropsychological examination completed December 7, 2017. Regarding accommodations for the USMLE Step 1, and given your additional description of the requirements of the examination, my recommendations should have read, 100% additional testing time (double time), plus additional break time.

Alan Lewandowski, PhD, FACPN
Board Certified Neuropsychologist



1126193    5-366-431-4
Neurocognitive Consultati

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helena Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

## NEUROCOGNITIVE CONSULTATION

**PATIENT NAME:** Jessica Ramsay
**DOB:** 8/29/90
**DATE:** 10/25/17

**REFERRING:** Self
**CONSULTING:** A. Lewandowski, PHD, FACPN

### REASON FOR STUDY

Jessica Ramsay is a 27-year-old right-handed female with mixed dominance who presents for neurocognitive diagnostic study pursuant to academic difficulties of undetermined etiology and uncertain severity. She is accompanied today by her mother, Jerri Shold, who assists with her history. The patient's primary care up to age 19 has been Dr. Alan Smiy in St. Joe, Michigan. More recently, the patient's primary care has been provided by Dr. Jennifer Houtman. She reports, "I've had accommodations since I was an undergrad. I hate reading. I haven't bought a textbook since undergrad."

### HISTORY OF PRESENT ILLNESS

The patient describes a chronic academic disability without progressive pattern for a number of years that has compromised her ability for educational success. She describes a history of ADD for which she was able to self-accommodate for many years, and reports being evaluated for ADD and dyslexia in 2014 by a therapist (credentials unknown). Given the patient's description of the evaluation, this counselor administered an intellectual and achievement assessment, but is uncertain whether a complete examination was conducted or if an abbreviated and prorated approach was taken. As a result, she reports she was provided accommodations throughout medical school but was denied accommodations for the United States Medical License Examination (USMLE), Step 1. The patient presents today requesting a more comprehensive assessment in order to obtain accommodations similar to that which she was allowed throughout medical school. "I want accommodations so I can keep going. I figure the best way is to get the paperwork done properly." The patient describes herself as having a "unique learning style." She describes that throughout medical school she watched videos and attended lectures and when taking notes uses multiple colored pencils to code information in order to enhance her learning and recall. She provides an example of some notebooks this afternoon. The patient reports she has a history of "reversing my numbers," and her mother describes that as a child she had difficulty differentiating between (lowercase) b, d, p, and q. "I can't remember the name of an enzyme, but I can remember the concepts and what to do with it." In addition, the patient describes word-finding problems that exacerbate her inefficient learning and recall. With regard to the patient's attention and overactivity, she reports, "I can't stop moving. I always have to be doing something." In the past, she was prescribed Adderall and notes, "It works when I remember to take it. I can tell when the first dose is wearing off."

NBME00217

RE: Jessica Ramsay
Page 2

## SOCIAL HISTORY

**General.** Born and reared in Texas by both parents and moved to Michigan as a 10-year-old. Her father is as 56-year-old in sales who has a BA degree and no reported history of ADD or LD. Her mother is a 67-year-old who is a retired art educator with an MA in art education and a history of dyslexia and ADHD. The patient has two adopted brothers, one who is 22 years old and is diagnosed with Asperger's that works at an Applebee's and a 19-year-old who lives at home and suffers from Prader-Willi syndrome and ASD.

**Family and Marital.** The patient is single, has never been married, and lives with her fiancé for the past two years in an apartment in Kalamazoo.

**Education.** The patient completed public high school in St. Joe, Michigan with a 3.8 GPA and an ACT score between 27 and 30 (unable to recall). She reports that she was never diagnosed with ADD in high school, but her mother reports her inattention symptoms were observed as early as a second grader. She describes that her daughter's intellectual abilities allowed her to self-accommodate and thus additional services/specialized services were not necessarily required. The patient completed a BS from Ohio State University with a 3.65 GPA majoring in genetics with minors in business and dance.

**Employment.** The patient is currently a her third year half-time student at WMU Homer Stryker School of Medicine.

**Military.** None.

**Legal.** None.

**Avocational.** Sports, art, painting (acrylics), drawing, ceramics, camping, reading, papermaking.

## MEDICAL

**Records.** No medical records were available to review at the time of this consultation.

**Psychologic.** The patient's mother reports that as a three- or four-year-old, she had some type of academic or behavioral testing. Her mother doesn't recall the credentials of the individual who administered the tests, what was administered, or for what reason the tests were administered. The patient reports consultation with a counselor 3+ years ago who provided an abbreviated intellectual and achievement examination approximately. In addition, the patient has seen a counseling psychologist, Dr. Mary Wassink with a very positive outcome.

**Developmental.** The patient's mother reports a normal pregnancy and delivery with no complications or fetal distress. She reports that her daughter achieved all neurodevelopmental milestones at age-appropriate intervals. She had no past SLP, OT, PT or audiologic assistance. She played soccer as a child and adolescent and estimates she may have had two past possible concussions complicated by very brief PTA, but she does not recall any type hospitalization.

NBME00218

RE: Jessica Ramsay
Page 3

**General Review of Systems.** The patient's general medical history is best known to her and her mother, and her primary care who is Dr. Jennifer Houtman. For the completeness of this report, the patient describes a history of sinusitis, frequent stress-associated hives, occasional palpitations induced by stress, exercise-induced asthma, lactose intolerance, past fracture of her ankle, anemia, Factor V Leiden. She had a past DVT diagnosed in the ED and was prescribed rivaroxaban. She reports no history of CNS disease, insult or injury as a young adult. She reports a history of migraine headache for the past 20+ years, occurring as often as a weekly or daily basis, complicated by photosensitivity, hyperacusis, nausea but not necessarily emesis. The patient reports an aura by way of visual blind spots. In addition to the above minor and insignificant concussions, the patient reports she had viral meningitis diagnosed as 20-year-old student at OSU and was hospitalized for one day.

**Neurodiagnostics.** The patient has had MR as a study volunteer, and she reports findings were normal.

**Surgeries.** T&A, wisdom teeth, root canal.

**Allergies.** NKDA. The patient reports some difficulties with the use of loratadine by way of decreased hearing acuity.

**Medications.** Adderall, BuSpar, Xarelto, metoprolol, Ambien p.r.n., Xanax p.r.n., tramadol.

**Risk Factors.** Occasional and social use of alcohol with no history of overuse.

**CLINICAL EXAMINATION**

**Appearance.** Upon examination this afternoon, the patient presents as a normally developed young adult female who presents in mild distress. Head is normocephalic and atraumatic. Eyes are symmetrical and EOMs are intact. She is well groomed and casually dressed and appears her stated age with long dark blond/brown hair and brown/hazel eyes. She is approximately 5'8" and weighs 115 lbs., has relaxed posture throughout the examination, and her facial expression is responsive with normal variability.

**Behavior.** Eye contact is normal and maintained throughout the examination. The patient's station is steady and her gait is normal for tandem heel-to-toe walk. Upper extremity general motor movements for fine and gross actions are normal for age and bilaterally coordinated as evidenced by tapping and alternating finger-to-thumb touch. Speech is normal. The patient's tone is feminine. Amplitude is soft and normal. Pitch is normal, as is rate. There is no evidence of rapid or pressured speech. Quality reflects good articulation and there is no evidence of difficulty with pronunciation. Patterns are normal and there is no evidence of phonologic or paraphasic errors. Interpersonal skills are well developed, and the patient is compliant and appropriate throughout the examination. Her attitude is cooperative and motivation is good. Sleeping patterns are described to reflect early and middle insomnia. The patient occasionally uses zolpidem to assist with sleep. Appetite is described as variable, but there is no significant change in weight. There is no history of pathognomonic eating problems such as purging or binging. Energy is described as poor and fatigued. The patient notes, "I'm restless, and I'm usually very fatigued." ADLs are not affected.

NBME00219

RE: Jessica Ramsay
Page 4

**Emotional Regulation.** The patient's emotions are appropriate to thought content. Mood is anxious, and this seems to be situational and associated with school performance. Mood and affect are congruent. She is very pleasant in the examination but occasionally frustrated and worried about her school and health status. There is no evidence of acute stress or past traumatic stress. She is certainly frustrated, but she does not endorse neurovegetative symptoms or diurnal variation. The duration of her situational symptoms has been for the past number of months, suggesting a short-term concern. In the past, she notes she had some situational dysphoria "on and off" since completing high school. In the past, she has used an SSRI (fluoxetine), but this was discontinued after two months as the patient reports it was not fully effective and not particularly necessary. Rather, she coped by additional study, sports and socialization. In this manner, she describes the employment of adaptive behaviors.

**Sensorium.** A cursory review of cognitive functioning today reflects the patient is fully alert and oriented to person, place, time and purpose. There is no present evidence of history of unusual perceptual distortions. Her immediate recall is only four of five words with one trial. Her visual recall is four of four objects. The patient's delayed verbal recall is four of five words with one additional word recalled with cuing. Delayed visual recall is four of four. Simple attention and concentration are normal by way of digit sequencing and letter identification. She was able to produce six digits forward, and this is adequate. She is able to produce five digits backwards, and this is borderline given her age and educational level. She has minor difficulties with serial 7s and makes errors that she self-corrects. There are no problems with simple reversals. Calculations are above average, and her answers are both quick and accurate. There are no difficulties with long-term recall of overlearned information or personal history. Abstract reasoning is normal by way of verbal proverbs and verbal and visual similarities. Fund of knowledge is above average for both verbally and visually mediated tasks. Comprehension is also intact for both single and multiple tasks. Visual reasoning is normal for cursory tasks associated with problem solving, synthesis and attention to detail. Executive reasoning is intact for critical judgment and general decision making. Insight is good and age appropriate.

**Thought Processes.** The patient's stream of thought reveals no acute confusion or any significant psychiatric disorganization. There is no evidence of any type of slowing or acceleration of thought flow. She reports no history of suicidal ideation, and there are no risk factors observed. There is no evidence of any type of other-directed harm, unusual ideation, or unusual thought content.

**CLINICAL IMPRESSION (ICD-10)**

1. By history:
    a. Attention deficit disorder.
    b. Learning difficulties/questionable dyslexia.
    c. Situational distress also affected by both transitional anxiety and depression.
2. Difficulties with mental status, etiology and severity uncertain.
3. Rule out ADD vs. ADHD vs. dyslexia vs. dyscalculia vs. spelling dyspraxia vs. mood disorder vs. anxiety condition/GAD vs. adjustment disorder vs. normal examination.

NBME00220

RE: Jessica Ramsay
Page 5

## SUMMARY AND PLAN

Jessica Ramsay is a 27-year-old right-handed female with some mixed dominance in her third year of medical school who presents for neurocognitive diagnostic study pursuant to a request for accommodations for standardized testing with the USMLE Step 1. The patient's neurological history is noted for two minor and insignificant concussions associated with brief PTA but with no long-term residual consequences. Neuroimaging of the brain has not been medically necessary but was completed as a part of the patient being a test volunteer; findings are reported by the patient to be normal. The patient's general medical history with *possible* implications for cognitive dysfunction is unremarkable. The patient's preexisting psychological history is noted for worry, apprehension and anxiety associated with concern about her educational progress as a third-year medical student. Current medications include Adderall, BuSpar, metoprolol, Xarelto, Ambien, Xanax (p.r.n.), and tramadol.

I will proceed with a standardized and more comprehensive neurocognitive diagnostic study to better clarify the patient's mental status and the severity of symptoms to assist with medical decision making, care coordination, and support accommodations as appropriate. I will schedule the patient for two half sessions depending on her availability and academic demands, and provide the patient with a copy of findings as well as a copy to her primary care provider who is Dr. Jennifer Houtman. I will review findings with the patient.

I spent approximately 120 minutes with the patient today in individual examination, consulting with her mother, providing a detailed neurobehavioral cognitive status examination, and preparing this consultation. I remain available to Dr. Houtman at any time regarding these findings.

Alan G. Lewandowski, PHD, FACPN
Clinical Psychologist
Board Certified Neuropsychologist
Clinical Assistant Professor
Western Michigan University School of Medicine

AGL:tlw



1126184    5-356-431-4
Ruekberg, B. 6/4/18—Lette

WESTERN MICHIGAN UNIVERSITY

PSYCHIATRY

ROBERT D. STRUNG, MD, CHAIR

MARK KANZAWA, DO
RESIDENCY PROGRAM DIRECTOR

JOSEPH L. CALLES, JR., MD

KEVIN KUNZER, MD

MARITZA LAGOS, MD

PETER LONGSTREET, MD
CLERKSHIP DIRECTOR

B. K. RAMESH, MD

MICHAEL REDINGER, MD, MA

BRUCE RUEKBERG, MD

REBECCA SHERWOOD, MD
OUTPATIENT CLINIC DIRECTOR

RUQIYA TAREEN, MD

PERRY WESTERMAN, MD

ELMIRA YESSENGALIYEVA, MD

MATTHEW ZARANTONELLO,
PhD

NANCY J. LENZ, C-TAGME
PROGRAM COORDINATOR


1717 SHAFFER STREET
SUITE 010
DEPT. 66G
KALAMAZOO, MI
49048-1623
RESIDENCY (269) 337-6375
FAX: (269) 337-6378
www.med.wmich.edu

June 4, 2018

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's application for accommodations for her retake of the United States Medical License Examination Step 1 exam.

**History of present illness:**

Currently, Ms. Ramsay is on academic leave of absence from her 4th year of medical school due to Western Michigan Homer Stryker Medical School's requirement, which prevents students from advancement after failing their initial USMLE Step 1. Jessica's failed attempt at her initial unaccommodated Step 1 exam resulted in a significant delay in her participating in the residency match and in graduating.

Jessica's initial request for accommodations for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would place her at a disadvantage and would not provide her an equal opportunity to demonstrate her competency. After NBME denied her disability, Jessica elected to take Step 1 before pursuing an appeal for accommodations, hoping she might pass and be able to a remain on track for the match and graduation. Jessica believes that the lack of accommodations on Step 1, her ADHD symptoms, and deficits due to her learning disabilities greatly affected her ability to perform at her best on Step 1.

She believes that the accommodations (double time, separate room) which she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school were sufficient to overcome the barriers caused by standard conditions. With accommodations, there is a decrease in ambient distractions and she is able to read/think aloud and briefly step away from the computer to process the information, as well as manage her restlessness and hyperactivity without disrupting other test-takers. Ms. Ramsay states she needs additional time to be able to overcome her disabilities and to be able to read each of the questions and process the information, and apply her knowledge to make an educated choice for each answer on the exam. In doing so, she believe she will receive a score that accurately reflects her comprehension of the material and her abilities. In hopes to accomplish this, she has pursued comprehensive testing and documentation in order to meet the NBME guidelines to support her renewed request for appropriate accommodations for the USMLE Step exams.

NBME00155

<u>Clinical history:</u>

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around these functional deficiencies.

In order to read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. Jessica also isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical errors and has a hard time proofreading her own work, and when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to express them clearly. To help her learn and communicate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these difficulties, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to execute them effectively.

Because reading and writing take her a very long time and require great mental effort, her learning disabilities are further exacerbated by her focus, inattention and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing symptoms of anxiety and feelings of inadequacy when faced with reading or writing that may determine whether she may advance in her academic and occupational goals. Her anxiety and frustration stem from experiences when she did not have enough time or a supportive environment, and therefore did not allow her to demonstrate her capabilities.

Information provided by Jessica's significant other, with whom she has been living for three years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and hardworking. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so. These difficulties

2

NBME00156

Appx1164

are due to her letter reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

Her second-grade teacher was first to note that at the age of 7 Jessica still reversed letters and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessments for behavioral problems or learning disabilities were not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence

With written assignments, Jessica needed help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty. Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations, including extra time and a secluded workspace for assignments, for distractibility and slow reading and writing in the second grade. On multiple occasions throughout her academic career, Jessica required informal accommodations (extra time, altered grading scheme, and/or redo opportunity) to complete tests, reading, and writing assignments because she was not able to satisfactorily do so in the regular time provided.

At home, Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does."

3

NBME00157

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening that was consistent with ADHD. Jessica was started on stimulant medication and had some improvement of her ADHD symptoms, but her underlying learning deficits did not improve. Since college Jessica has remained on a regimen of ADHD stimulant to help her function in school and relationships. Her difficulties, however, in test situations under standard conditions remain despite taking stimulant medications.

In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

**Standardized Testing History:**

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, and so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it., Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions, but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and there was a major drop-off in Writing (33%).

NBME Exams: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable in this case to use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions, and manage her symptoms without distracting other test takers. The CBSE taken on 4/28/17, provided by the school as formative practice for Step 1, for which Ms. Ramsay chose to attempt in a private testing room but without the extra time, is

4

NBME00158

the only exception. She chose to do this because her initial Step 1 accommodations request had been denied and she wanted to see if she would be able to read enough questions to pass. Even with the private environment, she did not have the opportunity to read about 10 of the questions within the standard 60 minutes provided for each block.

<u>USMLE Exams</u>: During her Step 1 exam experience, the standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction provided by other test-takers being in the same room, which she could not simply "tune out" due to her attention difficulties and distractibility. In the standard environment, she was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without distracting others. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section, and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

Under timed test conditions Jessica consistently scored significantly lower on unaccommodated exams compared to practice exams taken in a quiet environment with sufficient time, or under formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time.

Due to her disabilities, in my professional opinion  by taking the NBME exams under standard exam settings and time limits, Jessica does not have an equal opportunity to read all of the questions (compared to other test takers without a disability) ,and this impedes her ability to accurately demonstrate her knowledge and preparation.

<u>Accommodations History:</u>

Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) necessary to level the playing field, giving Jessica the opportunity to demonstrate her competency.

Since Dr. Charles Livingston's neuropsychological assessment in 2014 confirmed her diagnosis of ADHD, Jessica has received testing accommodations throughout medical school, including for OSCEs and standardized NBME (CBSE and Shelf) exams, which provided more equal opportunity for her to access her exams. Accommodations received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

5

NBME00159

The formal accommodations she received during the previous standardized NBME (CBSE and clinical Shelf) exams, listed above, removed excessive barriers imposed by standard conditions because they sufficiently decreased ambient distractions and permitted Jessica to read and think aloud and to briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

**Family history:**

Significant for mother with ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

**Assessments:**

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory.

In 2014 Jessica had an initial formal neuropsychology assessment performed by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. His assessment confirmed the clinical diagnosis of severe ADHD, for which he recommended the medical school disability office provide accommodations. Dr. Livingston chose not to perform an evaluation for dyslexia as he thought Jessica's diagnosis of severe ADHD would be sufficient to warrant reasonable accommodation by the school, which would allow her symptoms of both ADHD and dyslexia to be addressed.

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with ADHD and a nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9). When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81). Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98- percentile) but also had a marked drop-off in intellectual efficiency (34- percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

6

NBME00160

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

<u>Differential and Rule-out Diagnoses:</u>

For completeness, Jessica has been evaluated for medical conditions, sleep disorders, and primary disorders of mood and anxiety as possible causes of Jessica's reported symptoms of inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed, anxiety, and feelings of inadequacy.

A sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause her inattentiveness, distractibility, or slow processing speed. In addition, thyroid function tests, CBC and screening labs are negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, or slow processing speed.

Since learning she did not pass Step I of the NBME and that her school required to sit out classes until she passed step I, Jessica has exhibited mild depression and anxiety symptoms appropriate to her situation. I do not feel she has a primary mood or anxiety disorder.

<u>Clinical Impression:</u>

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. Based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other, Jessica meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81).**

Due to the nature of these disorders, there is some degree of overlap between them with regards to symptoms, history, objective findings, and recommended treatment and academic/occupational accommodations.

After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81).**

<u>Summary and Plan:</u>

While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the

7

NBME00161

complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam:

- **100% additional test time (double time)** for inattention, distractibility, and slow information processing and reading speeds.
- **Additional break time** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, as well as to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.
- **A private, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

In my professional opinion, due to her functional limitations due to **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2) and specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81),** Jessica, without question, is a qualified person with disabilities under the ADA, and therefore be granted reasonable accommodation, per her request, to provide her with access to the United States Medical Licensing Examination Step 1 exam.

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

8

NBME00162



1126185        5-366-431-4
Houtman, J. 5/29/18-Lette

Internal Medicine
& Pediatrics –
Lifetime Wellness



May 29, 2018

To Whom It May Concern:

I am writing this letter of support for Jessica Ramsay in regard to her requested accommodations for NBME examinations. I have had the unique opportunity to be her primary care physician for the past two years, and her medical school mentor and Clinical Skills course instructor for the two years prior to that. I can confirm from my personal observation of her as a patient, and as a student, that she has the following diagnoses that require accommodations:

- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)
- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)
  - With impairment in reading (DSM-5 315.00, ICD-10 F81.0)
  - With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)
- Migraines with aura, without status migranosus (ICD-10 G43.09)
- Clotting disorder with recent Deep Venous Thrombosis (ICD-10 I87.009)/Post-thrombotic syndrome (ICD-10 D69.8)

Jessica's first request is 100% additional time for examinations. This accommodation is for her ADHD and learning disabilities. The additional exam time will allow her to be able to read and re-read exam questions and answers to help her comprehend what she is reading. It will also allow her to use her compensatory mechanisms that she has developed to help her clarify her thoughts and answer the questions properly. It will also allow her to redirect her thoughts when she gets distracted. All of these things require extra time. We are treating her ADHD with medications and she has worked over years to develop compensatory mechanisms, but these compensatory mechanisms require additional time, and therefore, can only be used if extended testing time is provided.

4613 W. Main St., Suite A
Kalamazoo, MI 49006
269.488.8672
269.488.8673 fax
bronsonhealth.com

NBME00163





Internal Medicine
& Pediatrics –
Lifetime Wellness

The stress of timed examinations also leads to further distraction as she worries about her issues rather than being able to fully focus on the exam itself. As Jessica's Clinical Skills course instructor, I have had the opportunity to watch her work both in timed exams and in untimed exams – both writing notes and in examination/interviewing of patients. During the first part of her first year, she did not yet have accommodations in place. On several occasions without time restrictions, I witnessed her interview the patient well and complete the required portions of the physical exam in a reasonable amount of time similar to her peers. However, even without a strict time limit, Jessica still struggled to finish her note in the time permitted. When she was allowed double the allotted time, she was able to successfully organize her thoughts and complete her note. During formal OSCE examinations with time restraints, I would see her get flustered, forget important steps and miss key portions of the physical exam. Most notably, with the formal time limits, Jessica was unable to complete the note portion because was unable to organize her thoughts and type them out. Jessica initially requested only 50% additional time for the note-writing portion of her OSCEs because she felt it was important not to request more than she thought necessary. However, she continued to struggle with completing the note portion even with the 50% additional time, so she requested and was granted 100% additional time for the note portion, which allowed her to be successful.

Additionally, in her third year, the OSCE prompts and instructions became more detailed and lengthy so that she was unable fully read and comprehend them without taking too much time away from the patient encounter, so she was also granted 2 additional minutes at the beginning of the patient encounter to enable her to do so. Once all of these accommodations were in place, her OSCE performance improved remarkably, more adequately reflecting the clinical skills that I had previously witnessed her demonstrate.

4613 W. Main St., Suite A
Kalamazoo, MI 49006
269.488.8672
269.488.8673 fax

bronsonhealth.com

NBME00164





Internal Medicine
& Pediatrics –
Lifetime Wellness

As part of the second-year Clinical Skills course, in addition to OSCE examinations, students were also assigned a hospital patient and were allowed 3 hours to complete a History and Physical (H&P), and Jessica always used this time completely while several of her colleagues saw it as an opportunity to have an early dismissal. I was also in charge of grading Jessica's write-ups from these encounters. Again, I noticed a significant difference in the quality and thoroughness of her write-ups once she was given sufficient time to complete them and turn them in.

I can say with certainty that the testing accommodations (extended time and private room) given to her in medical school has allowed her to perform at her best potential. Jessica and I have discussed the time constraints inherent in seeing patients and completing charts/tasks in medicine and she realizes that she will likely have to pick a practice setting that will allow her more time with each patient so that she will have the time she needs to successfully complete documentation. We have also discussed that in a productivity-driven medical climate, this may impact her financial productivity. She understands that her ADHD and learning disabilities have and will continue to give her struggles in her career, but with adequate extra time, she will be able to do her best, display her knowledge more appropriately, and in the long run, provide better patient care. I highly support her request for 100% extra examination time.

Jessica's second request is for increased break time during examinations. This accommodation is also for her ADHD and learning disabilities – the extra break time allows her a chance to relax and refocus between sections, and to take an additional dose of her medication if needed in the afternoon to help manage her restlessness, distractibility, and inability to focus. The extra

4613 W. Main St., Suite A
Kalamazoo, MI 49006
269.488.8672
269.488.8673 fax

bronsonhealth.com

NBME00165





Internal Medicine
& Pediatrics –
Lifetime Wellness

break time is also to help with her migraines.  Prolonged focusing is a trigger for her migraines and frequent breaks allow her to avoid this trigger.  Jessica's migraine headaches are preceded by an aura that includes nausea, blind spots that obscure her vision, photophobia, and phonophobia, and which continues throughout the migraine. If she does begin experiencing an aura during the exam, the extra break time will also allow her to take medication to prevent a migraine from fully developing, which would definitely be a further distraction for her ADHD, and also would impede her performance.  The increased break time is also an accommodation for her clotting disorder and post-thrombotic syndrome, which were diagnosed after she experienced a significant lower extremity deep vein thrombosis (DVT) in 2016. Prolonged inactivity increases her risk for developing another DVT.  Since having a DVT, she develops leg pain and swelling with prolonged sitting, which becomes a further distraction for her.  Extra break time would allow her enough time to walk around to prevent pain, swelling and the development of another clot.  I fully support Jessica's request for extra break time for all of these reasons.

Jessica's third request is for a private testing room. This accommodation is for her ADHD and learning disabilities. The private environment removes the added distraction caused by other test-takers in a shared testing environment, which is necessary for Jessica to be able to focus because she is much more easily distracted than most people due to her ADHD. The private room would allow her to read out loud or move around as needed to cope with her learning disabilities so that she can read and comprehend the questions without being a distraction to other test-takers in a shared room. The private room is also an accommodation for her clotting disorder and post-thrombotic syndrome. A private room would allow Jessica to get up and walk

4613 W. Main St., Suite A
Kalamazoo, MI 49006
269.488.8672
269.488.8673 fax
bronsonhealth.com





Internal Medicine
& Pediatrics –
Lifetime Wellness

around as necessary during her exam to prevent pain, swelling and the development of another clot. I entirely support her request for a private testing environment for all of these reasons.

I have gotten to know Jessica on both personal and professional levels over the past four years. I have seen first-hand the potential and knowledge that she has that will make her an excellent physician. Her experiences with her own disabilities will allow her to empathize with, and show compassion for, her patients that some physicians will never experience or understand. I am excited to see where her medical career takes her. I fully support her requests for accommodations to allow her to perform at her maximum potential, which will allow her access to a higher quality of residency training and excellence in her future medical practice. If you have any further questions, I would be happy to discuss these issues further and can be reached by phone or email (see contact information below).

Sincerely,

Jennifer N. Houtman, MD
Family Medicine Physician, Bronson Lifetime Wellness
(269) 760-3148
jenhoutman@charter.net

4613 W. Main St., Suite A
Kalamazoo, MI 49006
269.488.8672
269.488.8673 fax

bronsonhealth.com

NBME00167



1126186        5-366-431-4
Overton, D. 4/12/18-Lette



WESTERN MICHIGAN UNIVERSITY
Homer Stryker M.D.
SCHOOL OF MEDICINE

April 12, 2018

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-31901

To Whom It May Concern:

This letter is in support of Jessica Ramsay's (USMLE ID: 5-366-431-4) application for accommodations for the Step 1 and Step 2 CK examinations. Ms. Ramsay has received accommodations for her medical education starting upon matriculation at Western Michigan University Homer Stryker M.D. School of Medicine (WMed) in August 2014, and has benefited significantly since.

Ms. Ramsay was originally diagnosed with Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder in 2009. Upon the release of the DSM-5, Ms. Ramsay's diagnosis was altered to Attention Deficit Hyperactivity Disorder, Combined presentation reflecting further evaluation, clinical history, and neurological and psychological testing since her original diagnosis. Currently, Ms. Ramsay's full diagnosis is Attention Deficit/Hyperactivity Disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2), and Learning Disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9) with impairment in reading (DSM-5 315.00, ICD-10 F81.0), and impairment in written expression (DSM-5 315.2, ICD-10 F81.81).

Given her diagnosis, Ms. Ramsay has been granted the following accommodations during her time at WMed:

General:
  − Access to a counselor provided through Student Affairs

Basic Science and Clinical Coursework and Study:
  − Additional free printing allowance
  − Text-to-speech software (Kurzweil 3000)

Multiple Choice and Written Exams, including iRATs (individual readiness assessment tests):
  − Private, quiet testing room with no other students
  − Double testing time (100% additional time)
  − Exams provided on paper instead of computerized format

1000 Oakland Drive Kalamazoo, MI 49008-8010
PHONE 269.337.6059

NBME00168

- Use of calculator and assorted colored pencils and highlighters (provided for testing use only, kept by testing staff when not testing)
- Extra scrap paper
- Allowed to have granola bar, water, and medications in exam room

Clinical Skills (OSCE) Exams:
- Two additional minutes at the beginning of the OSCE patient encounter to read the prompt and instructions
- Double time (100%, or 10 minutes, additional time) on the note-writing portion

Some of the above accommodations for class and clinical coursework have been in effect for Ms. Ramsay since she matriculated in August 2014. During her first year, Ms. Ramsay received double time for summative examinations, which has continued throughout her time at WMed. After formative, and then graded OSCEs in her first and second year, Ms. Ramsay requested the minimum amount of extra examination time specifically for her OSCEs, time and one half (50% additional time), which was granted. However, even with this additional time, Ms. Ramsay still encountered difficulty with passing OSCEs. Subsequently, she reapplied for additional examination time, including double time (100% additional time) for the exam and an additional two minutes at the beginning of the patient encounter to read the prompt. Ms. Ramsay's request was approved. Although Ms. Ramsay was able to pass her OSCEs with these accommodations, she still struggles with the time limit.

Due to her disability, Ms. Ramsay has significant difficulty with reading comprehension and organization of her thoughts, especially under time constraints. She requires additional time to read prompts and questions on examinations to thoroughly understand what the material is asking, and then time to organize her thoughts to identify the answer. When Ms. Ramsay does not have adequate time to comprehend and organize, she becomes anxious, which further impairs her ability to organize her thoughts. Furthermore, Ms. Ramsay needs additional break time during examinations to refocus her thoughts and reenergize her mind for the exam.

To combat the issues stemming from her ADHD and learning disability, Ms. Ramsay takes medication. The medication helps reduce her distractibility during exams, but having additional time to read and comprehend the material, and then time to organize her thoughts is what has made her prosperous in medical school. Ms. Ramsay's medication offers the initial foundation for her to pass examinations, but she irrefutably needs the additional time on examinations in order to be truly successful. This is especially true for prolonged examination periods, such as Step 1 and Step 2 CK, where multiple doses of medication are necessary. Ms. Ramsay requires additional testing time for reading comprehension and organizing thoughts, but she also needs additional break allotments. Additional breaks allow her to take her medication with food, and time to get up and walk away to reset her mind.

It is important to note that although Ms. Ramsay has been granted accommodations, and has passed her coursework and continued to progress in the curriculum in their advent, she still struggles with course and clinical examinations. Ms. Ramsay's medical knowledge and abilities are much deeper than her examination scores would suggest. The granted accommodations offer her an opportunity to showcase a small piece of what she truly knows. Without accommodations, Ms. Ramsay does not have an equal opportunity to that of her peers to prove her medical acumen.

1000 Oakland Drive Kalamazoo, MI 49008-8010
PHONE 269.337.6059

NBME00169

I strongly advocate granting Jessica Ramsay accommodations for Step 1 and Step 2 CK examinations. Ms. Ramsay is a dedicated, hard-working student who works above her means to be successful in an academically rigorous environment that is inherently disadvantageous for someone with her disabilities. Ms. Ramsay's disabilities function as a barrier to her ability to be successful in an exam setting, even though she understands the material and draws from a solid fund of knowledge. When given proper accommodations, Ms. Ramsay has proven she can be successful. The accommodations granted by WMed have offered Ms. Ramsay a more level playing field; one that should be provided during Step 1 and Step 2 CK examinations.

Any questions regarding Ms. Ramsay's accommodations may be directed to me via email at david.overton@med.wmich.edu or phone at 269-337-6059.

Respectfully,

David Overton, MD, MBA
Associate Dean
Chair, Essential Abilities Committee
Western Michigan University Homer Stryker M.D. School of Medicine

NBME00170



1126194    5-366-431-4
/Person. State./CPTA-Step

United States Medical Licensing Examination® (USMLE®)

### Certification of Prior Test Accommodations

**Please type or print.** To be completed and signed by medical school official responsible for student disability services.

Applicant Name: Jessica Ramsay _____    USMLE ID#: 5 - 3 6 6 - 4 3 1 - 4

I certify that **WMU Homer Stryker M.D. SoM** _____ has officially approved and continuously
Name of School

provided the following accommodations for the above applicant beginning on _**10/14**_
Date (Month/Year)

1. Accommodation(s) provided for <u>classroom and clinical coursework</u>: iRAT (individualized readiness assessment) quiz on paper; additional free print allowance

   Reason for accommodation(s): Attention Deficit Hyperactivity Disorder; Attention Deficit Disorder

2. Accommodation(s) provided for <u>written exams</u>: Private room with no other students present; double time for exams; Granola bar/water/colored pencils/highlighters, and calculator for exams; additional free print allowance; text to speech software; counselor provided by student Affairs; written exams on paper
   Reason for accommodation(s): Attention Deficit Hyperactivity Disorder; Attention Deficit Disorder

3. Accommodation(s) provided for <u>clinical skills exams</u>: Double time on OSCE exams, specifically 2 additional minutes at the beginning of the OSCE patient encounter to read the prompt and double time on the note-writing portion of the OSCE. Potentially be in the same space as other students when writing the documentation during OSCE.
   Reason for accommodation(s): Attention Deficit Hyperactivity Disorder; Attention Deficit Disorder

Name of School Official: David Overton MD _____    Title: Associate Dean _____
Print Name of Official                                        Title of Official

Signature of Official: _____    Date: 06/01/2018

Telephone Number: (269) 337-6556 _____

---

**Mail, fax, or e-mail completed form to:**

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3190
Telephone: (215) 590-9700
FAX: (215) 590-9422
E-mail: disabilityservices@nbme.org
Call or e-mail to verify receipt of Fax and mail submissions

---

CPTA 2011

**DECISION OF THE ESSENTIAL ABILITIES COMMITTEE STUDENT**
**REQUEST FOR REASONABLE ACCOMMODATIONS**

1126190        5-366-431-4
WMU Homer Stryker-Testing

**Student Name:** Jessica Ramsay

**Date Completed Accommodations Application Submitted:** 10/17/14

**Date of Essential Abilities Committee Meeting:** 10/17/14

**Requested Accommodations:**

Extra time/unlimited time for exams; distraction-free testing space; use of visual aides (scrap paper, colored pencils, highlighters) for tests; paper tests, water

& granola allowed during exams; access to counselor; free printing for notes/slideshows; software or apps that can read text aloud to her

**The following Requested Accommodations were approved:**

- [✓] Private room for exams
  - [✓] No other student present
  - [ ] Other students with accommodations may be present
- [ ] Time and a half for exams
- [✓] Double time for exams
- [✓] Other *(describe in detail additional accommodations e.g., instructions for food/drinks in testing room, colored pencils, markers, etc.)*

  Granolabar/water/colored pencils/highlighters/calculator for exams;additional free print allowance; text to speech software;counsel>OSA

  **Approved accommodations pertain to the following**
  - [✓] Summative Exam
    - [ ] Computer
    - [✓] Paper
  - [✓] Anatomy Practical
  - [✓] NBME Exam (computer only available)
  - [✓] iRAT
    - [ ] Computer
    - [✓] Paper
  - [✓] OSCE

**If accommodation request was not approved or partially approved, provide reason(s):**

NOTE: student will be allowed time and one half for the written documentation portion of the OSCE (both practice and test OSCE's). She will potentially be

in the same space as other students when writing her documentation for OSCE.

**Committee Decision communicated to student by:** David Overton, MD
**Date:** 10/18/14

**Committee Decision communicated to Educational Affairs by:** David Overton
**Date:** 10/18/14

**Initial Accommodations Effective from** 10/18/14 **to** 5/1/15 **(date)**

**Permanent Accommodations Effective from** 10/18/14 **to** 5/1/15 **(date)**

**Annual Review of Approved Accommodations Completed:**

**Date:** 6/3/15    **Outcome:** Above accommodations extended until end of MS2 year (4/29/15)

DECISION OF THE ESSENTIAL ABILITIES COMMITTEE STUDENT
REQUEST FOR REASONABLE ACCOMMODATIONS

**Student Name:** Jessica Ramsay

**Date Completed Accommodations Application Submitted:** 11/3/15 (additional request submitted)

**Date of Essential Abilities Committee Meeting:** 11/12/15

**Requested Accommodations:**

Jessie is requesting time and one half for completing the written note documentation requirement for her OSCEs.

**The following Requested Accommodations were approved:**
- ☐ Private room for exams
    - ☐ No other student present
    - ☐ Other students with accommodations may be present
- ☑ Time and a half for exams
- ☐ Double time for exams
- ☐ Other *(describe in detail additional accommodations e.g., instructions for food/drinks in testing room, colored pencils, markers, etc.)*

**Approved accommodations pertain to the following**
- ☐ Summative Exam
    - ☐ Computer
    - ☐ Paper
- ☐ Anatomy Practical
- ☐ NBME Exam (computer only available)
- ☐ iRAT
    - ☐ Computer
    - ☐ Paper
- ☑ OSCE

**If accommodation request was not approved or partially approved, provide reason(s):**

NOTE: Jessie is approved for time and one half for written note documentation of OSCE (both the practice and real OSCE). This does NOT mean a separate environment for writing her notes or increased time for the actual H&P with the patient.

**Committee Decision communicated to student by:** Ernest Yoder, MD
**Date:** 11/16/15

**Committee Decision communicated to Educational Affairs by:** Harriet Roelof
**Date:** 11/13/15

**Initial Accommodations Effective from** _____ **to** _____ **(date)**

**Permanent Accommodations Effective from** 11/14/15 **to** 4/29/15 **(date)**

**Annual Review of Approved Accommodations Completed:**

**Date:** _____ **Outcome:** _____

NBME00197

**Appx1181**

**DECISION OF THE ESSENTIAL ABILITIES COMMITTEE STUDENT
REQUEST FOR REASONABLE ACCOMMODATIONS**

**Student Name:** Jessica Ramsay

**Date Completed Accommodations Application Submitted:** 4/29/16

**Date of Essential Abilities Committee Meeting:** 6/2/16

**Requested Accommodations:**

Extra time/unlimited time for exams; distraction-free testing space; use of visual aides (scrap paper, colored pencils, highlighters) for tests; paper tests; water

& granola allowed during exams; access to counselor; free printing for notes/slideshows; software or apps that can read text aloud to her

**The following Requested Accommodations were approved:**

[✓] Private room for exams
   [✓] No other student present
   [ ] Other students with accommodations may be present
[ ] Time and a half for exams
[✓] Double time for exams
[✓] Other *(describe in detail additional accommodations e.g., instructions for food/drinks in testing room, colored pencils, markers, etc.)*

Granolabar/water/colored pencils/highlighters/calculator for exams;additional free print allowance; text to speech software;counsel>OSA

**Approved accommodations pertain to the following**

[✓] Summative Exam
   [ ] Computer
   [✓] Paper
[✓] Anatomy Practical
[✓] NBME Exam (computer only available)
[✓] IRAT
   [ ] Computer
   [✓] Paper
[✓] OSCE

**If accommodation request was not approved or partially approved, provide reason(s):**

NOTE: student will be allowed time and one half for the written documentation portion of the OSCE (both practice and test OSCE's). She will potentially be

in the same space as other students when writing her documentation for OSCE.

**Committee Decision communicated to student by:** David Overton, MD
**Date:** 6/2/16

**Committee Decision communicated to Educational Affairs by:** Trischa Carr
**Date:** 6/6/16

**Initial Accommodations Effective from** 5/4/16 **to** 4/30/17 **(date)**

**Permanent Accommodations Effective from** _____ **to** _____ **(date)**

**Annual Review of Approved Accommodations Completed:**

**Date:** _____ **Outcome:** _____

NBME00198

DECISION OF THE ESSENTIAL ABILITIES COMMITTEE
STUDENT REQUEST FOR REASONABLE ACCOMMODATIONS

**Student Name:**  Jessica Ramsay

**Date Completed Accommodations Application Submitted:**  3/1/2017

**Date of Essential Abilities Committee Meeting:**  3/3/2017

**Requested Accommodations:**

1-2 additional minutes at the beginning of the patient encounter to allow [the student] to fully read the prompt, and 2x the original time given for the note-writing portion for all remaining OSCEs.

**The following Requested Accommodations were approved:**

- [ ] Private room for exams
  - [ ] No other student present
  - [ ] Other students with accommodations may be present
- [ ] Time and a half for exams
- [✓] Double time for exams
- [✓] Other *(describe in detail additional accommodations e.g., instructions for food/drinks in testing room, colored pencils, markers, etc.)*

  Jessie will receive 2 additional minutes at the beginning of the patient encounter during the OSCE to read the prompt.

  **Approved accommodations pertain to the following**
  - [ ] Summative Exam
    - [ ] Computer
    - [ ] Paper
  - [ ] Anatomy Practical
  - [ ] NBME Exam (computer only available)
  - [ ] iRAT
    - [ ] Computer
    - [ ] Paper
  - [✓] OSCE

**If accommodation request was not approved or partially approved, provide reason(s):**

**Committee Decision communicated to student by:** Erin Defoe

**Date:**  3/3/2017

**Committee Decision communicated to Educational Affairs by:**  Erin Defoe

**Date:**  3/3/2017

**Initial Accommodations Effective from** 3/3/2017 **to** June 1, 2017 **(date)**

**Annual Review of Approved Accommodations Completed:**

**Date:**  _____   **Outcome:**  _____

NBME00199

## DECISION OF THE ESSENTIAL ABILITIES COMMITTEE
## STUDENT REQUEST FOR REASONABLE ACCOMMODATIONS

**Student Name:** Jessica Ramsay

**Date Completed Accommodations Application Submitted:** 4-24-2017

**Date of Essential Abilities Committee Meeting:** 4-26-2017

**Requested Accommodations:**

Extra/unlimited time for exams; distraction-free testing space; use of visual aides (scrap paper, colored pencils, highlighters) for tests; paper tests; water & granola allowed during exams; access to counselor;

free printing for notes/slideshows; software or apps that can read text aloud; 1-2 additional minutes at the beginning of the OSCE patient encounter, and two times the original time given for the note-writing

portion for all remaining OSCEs.

**The following Requested Accommodations were approved:**

- [✓] Private room for exams
  - [✓] No other student present
  - [ ] Other students with accommodations may be present
- [ ] Time and a half for exams
- [✓] Double time for exams
- [✓] Other *(describe in detail additional accommodations e.g., instructions for food/drinks in testing room, colored pencils, markers, etc.)*

  Granola bar/water/exira penalties/highlighters/distraction-free area; additional free prep allowance; text to speech software; approval NGSA; 2 additional minutes at the beginning of the OSCE patient encounter to read prompt; 2x original time on note-writing portion of OSCE

  **Approved accommodations pertain to the following**
  - [✓] Summative Exam
    - [ ] Computer
    - [✓] Paper
  - [✓] Anatomy Practical
  - [✓] NBME Exam (computer only available)
  - [✓] iRAT
    - [ ] Computer
    - [✓] Paper
  - [✓] OSCE

**If accommodation request was not approved or partially approved, provide reason(s):**

_____

_____

_____

**Committee Decision communicated to student by:** Erin Dafoe

**Date:** 4-27-2017

**Committee Decision communicated to Educational Affairs by:** Erin Dafoe

**Date:** 4-27-2017

**Initial Accommodations Effective from** 4-27-2017 **to** 5-13-2018 **(date)**

**Annual Review of Approved Accommodations Completed:**

**Date:** _____ **Outcome:** _____

NBME00200



1126186    5-366-431-4
Overton, D. 4/12/18-Lette



WESTERN MICHIGAN UNIVERSITY
Homer Stryker M.D.
SCHOOL OF MEDICINE

April 12, 2018

Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-31901

To Whom It May Concern:

This letter is in support of Jessica Ramsay's (USMLE ID: 5-366-431-4) application for accommodations for the Step 1 and Step 2 CK examinations. Ms. Ramsay has received accommodations for her medical education starting upon matriculation at Western Michigan University Homer Stryker M.D. School of Medicine (WMed) in August 2014, and has benefited significantly since.

Ms. Ramsay was originally diagnosed with Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder in 2009. Upon the release of the DSM-5, Ms. Ramsay's diagnosis was altered to Attention Deficit Hyperactivity Disorder, Combined presentation reflecting further evaluation, clinical history, and neurological and psychological testing since her original diagnosis. Currently, Ms. Ramsay's full diagnosis is Attention Deficit/Hyperactivity Disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2), and Learning Disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9) with impairment in reading (DSM-5 315.00, ICD-10 F81.0), and impairment in written expression (DSM-5 315.2, ICD-10 F81.81).

Given her diagnosis, Ms. Ramsay has been granted the following accommodations during her time at WMed:

General:
   − Access to a counselor provided through Student Affairs

Basic Science and Clinical Coursework and Study:
   − Additional free printing allowance
   − Text-to-speech software (Kurzweil 3000)

Multiple Choice and Written Exams, including iRATs (individual readiness assessment tests):
   − Private, quiet testing room with no other students
   − Double testing time (100% additional time)
   − Exams provided on paper instead of computerized format

1000 Oakland Drive Kalamazoo, MI 49008-8010
PHONE 269.337.6059

NBME00168

- Use of calculator and assorted colored pencils and highlighters (provided for testing use only, kept by testing staff when not testing)
- Extra scrap paper
- Allowed to have granola bar, water, and medications in exam room

Clinical Skills (OSCE) Exams:
- Two additional minutes at the beginning of the OSCE patient encounter to read the prompt and instructions
- Double time (100%, or 10 minutes, additional time) on the note-writing portion

Some of the above accommodations for class and clinical coursework have been in effect for Ms. Ramsay since she matriculated in August 2014. During her first year, Ms. Ramsay received double time for summative examinations, which has continued throughout her time at WMed. After formative, and then graded OSCEs in her first and second year, Ms. Ramsay requested the minimum amount of extra examination time specifically for her OSCEs, time and one half (50% additional time), which was granted. However, even with this additional time, Ms. Ramsay still encountered difficulty with passing OSCEs. Subsequently, she reapplied for additional examination time, including double time (100% additional time) for the exam and an additional two minutes at the beginning of the patient encounter to read the prompt. Ms. Ramsay's request was approved. Although Ms. Ramsay was able to pass her OSCEs with these accommodations, she still struggles with the time limit.

Due to her disability, Ms. Ramsay has significant difficulty with reading comprehension and organization of her thoughts, especially under time constraints. She requires additional time to read prompts and questions on examinations to thoroughly understand what the material is asking, and then time to organize her thoughts to identify the answer. When Ms. Ramsay does not have adequate time to comprehend and organize, she becomes anxious, which further impairs her ability to organize her thoughts. Furthermore, Ms. Ramsay needs additional break time during examinations to refocus her thoughts and reenergize her mind for the exam.

To combat the issues stemming from her ADHD and learning disability, Ms. Ramsay takes medication. The medication helps reduce her distractibility during exams, but having additional time to read and comprehend the material, and then time to organize her thoughts is what has made her prosperous in medical school. Ms. Ramsay's medication offers the initial foundation for her to pass examinations, but she irrefutably needs the additional time on examinations in order to be truly successful. This is especially true for prolonged examination periods, such as Step 1 and Step 2 CK, where multiple doses of medication are necessary. Ms. Ramsay requires additional testing time for reading comprehension and organizing thoughts, but she also needs additional break allotments. Additional breaks allow her to take her medication with food, and time to get up and walk away to reset her mind.

It is important to note that although Ms. Ramsay has been granted accommodations, and has passed her coursework and continued to progress in the curriculum in their advent, she still struggles with course and clinical examinations. Ms. Ramsay's medical knowledge and abilities are much deeper than her examination scores would suggest. The granted accommodations offer her an opportunity to showcase a small piece of what she truly knows. Without accommodations, Ms. Ramsay does not have an equal opportunity to that of her peers to prove her medical acumen.

1000 Oakland Drive Kalamazoo, MI 49008-8010
PHONE 269.337.6059

NBME00169

I strongly advocate granting Jessica Ramsay accommodations for Step 1 and Step 2 CK examinations. Ms. Ramsay is a dedicated, hard-working student who works above her means to be successful in an academically rigorous environment that is inherently disadvantageous for someone with her disabilities. Ms. Ramsay's disabilities function as a barrier to her ability to be successful in an exam setting, even though she understands the material and draws from a solid fund of knowledge. When given proper accommodations, Ms. Ramsay has proven she can be successful. The accommodations granted by WMed have offered Ms. Ramsay a more level playing field; one that should be provided during Step 1 and Step 2 CK examinations.

Any questions regarding Ms. Ramsay's accommodations may be directed to me via email at david.overton@med.wmich.edu or phone at 269-337-6059.

Respectfully,

David Overton, MD, MBA
Associate Dean
Chair, Essential Abilities Committee
Western Michigan University Homer Stryker M.D. School of Medicine

NBME00170



# UNITED STATES MEDICAL LICENSING EXAMINATION ®

## STEP 1 SCORE REPORT

This score report is provided for the use of the examinee.
Third party users of USMLE information are advised to rely solely on official USMLE transcripts.

**Ramsay, Jessica Erin**

**USMLE ID:   5-366-431-4**                    **Test Date:  July 20, 2017**

The USMLE is a single examination program consisting of three Steps designed to assess an examinee's understanding of and ability to apply concepts and principles that are important in health and disease and that constitute the basis of safe and effective patient care. Step 1 is designed to assess whether an examinee understands and can apply important concepts of the sciences basic to the practice of medicine, with special emphasis on principles and mechanisms underlying health, disease, and modes of therapy. The inclusion of Step 1 in the USMLE sequence is intended to ensure mastery of not only the sciences underlying the safe and competent practice of medicine in the present, but also the scientific principles required for maintenance of competence through lifelong learning. Results of the examination are reported to medical licensing authorities in the United States and its territories for use in granting an initial license to practice medicine. This score§ represents your result for the administration of Step 1 on the test date shown above.

| | |
|---|---|
| **FAIL** | This result is based on the minimum passing score recommended by USMLE for Step 1. Individual licensing authorities may accept the USMLE-recommended pass/fail result or may establish a different passing score for their own jurisdictions. |

| | |
|---|---|
| **191** | This score is determined by your overall performance on Step 1. For administrations between Jan 1, 2016 and Dec 31, 2016, the mean and standard deviation for first-time examinees from U.S. and Canadian medical schools were approximately 228 and 21, respectively, with most scores falling between 140 and 260. A score of 192 is set by USMLE to pass Step 1. The standard error of measurement (SEM)‡ for this scale is six points. |

§Effective April 1, 2013, test results are reported on a three-digit scale only. Test results reported as passing represent an exam score of 75 or higher on a two-digit scoring scale.

‡Your score is influenced both by your general understanding of the basic biomedical sciences and the specific set of items selected for this Step 1 examination. The Standard Error of Measurement (SEM) provides an index of the variation in scores that would be expected to occur if an examinee were tested repeatedly using different sets of items covering similar content.

NBME00194



**NBME** National Board of Medical Ex[...]
Subject Examination Prog[...] NBME Subject Exams (some

## Score Interpretation Guide for Students

## NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 – 3 and 60 + 3).

### Approximate USMLE Performance Equivalents

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

### Approximate Step 1 Equivalents

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|---|---|---|---|
| ≥ 94 | ≥ 260 | 68 | 195 |
| 94 | 260 | 66 | 190 |
| 92 | 255 | 64 | 185 |
| 90 | 250 | 62 | 180 |
| 88 | 245 | 60 | 175 |
| 86 | 240 | 58 | 170 |
| 84 | 235 | 56 | 165 |
| 82 | 230 | 54 | 160 |
| 80 | 225 | 52 | 155 |
| 78 | 220 | 50 | 150 |
| 76 | 215 | 48 | 145 |
| 74 | 210 | 46 | 140 |
| 72 | 205 | ≤ 46 | ≤ 140 |
| 70 | 200 | | |

NBME00171



**NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

Examinee Performance Profile

Comprehensive Basic Science

023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 04/28/2017
Total Scaled Score: 66

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▌ or ▐▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | |
| Biochemistry | | | |
| Gross Anatomy & Embryology | | | |
| Histology & Cell Biology | | | |
| Microbiology & Immunology | | | |
| Pathology | | | |
| Pharmacology | | | |
| Physiology | | | |
| **System** | | | |
| General Principles of Foundational Science | | | |
| Behavioral Health and Nervous Systems/Special Senses | | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | |
| Cardiovascular System | | | |
| Respiratory System | | | |
| Gastrointestinal System | | | |
| Renal/Urinary System | | | |
| Multisystem Processes & Disorders | | | |

NBME00172



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Surgery Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### *Subject Examination Scores*

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### *Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00173



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

#### Surgery

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 04/27/2017

Total Equated Percent Correct Score*: 67

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▮ or ▮▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.



| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Cardiovascular Disorders | | | |
| Diseases of the Respiratory System | | | |
| Nutritional & Digestive Disorders | | | |
| Renal, Urinary & Male Reproductive Systems | | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| In-Patient | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Geriatric | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00174



## NBME° National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Psychiatry Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

#### *Subject Examination Scores*

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 80 and 8, respectively**.

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

#### *Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your 'true' proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00175



**NBME®** National Board of Medical Examiners
Subject Examination Program

Examinee Performance Profile

Psychiatry

023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 03/03/2017
Total Equated Percent Correct Score*: 72

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀|| or ||▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.



| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Mental Disorders | | | |
| Diseases of the Nervous System & Special Senses | | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Child | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00176

Appx1194



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Pediatrics Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### *Subject Examination Scores*

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 77 and 8, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### *Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00177



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile
#### Pediatrics
#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 12/22/2016
Total Equated Percent Correct Score*: 79

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀I or I▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | | | |
| Nutritional & Digestive Disorders | | | |
| Renal, Urinary & Male Reproductive Systems | | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | | |
| Cardiovascular Disorders and Diseases of the Respiratory System | | | |
| Gynecologic, Obstetric and Endocrine and Metabolic Disorders | | | |
| **Physician Tasks** | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Health Maintenance and Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| In-Patient | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00178



**NBME® National Board of Medical Examiners**
**Subject Examination Program**

### Score Interpretation Guide for Examinees

### Obstetrics and Gynecology Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

#### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 76 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

#### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your 'true' proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00179

 **NBME®** **National Board of Medical Examiners**
**Subject Examination Program**

**Examinee Performance Profile**

**Obstetrics and Gynecology**

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440
Name: RAMSAY JESSICA ERIN

Test Date(s): 10/21/2016
Total Equated Percent Correct Score*: 81

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀II or II▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Gynecologic Disorders | | | |
| Disorders of Pregnancy and Childbirth | | | |
| Gynecologic Disorders: Mechanisms of Disease | | | |
| Disorders of Pregnancy: Mechanisms of Disease | | | |
| Gynecologic Disorders: Diagnosis | | | |
| Disorders of Pregnancy: Diagnosis | | | |
| Gynecologic Disorders: Health Maintenance and Management | | | |
| Disorders of Pregnancy:  Health Maintenance and Management | | | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| In-Patient | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

Page 2 of 2

NBME00180

**Appx1198**



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Modular Family Medicine Core Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on this examination were written and reviewed by national test committees. Prior to publication, test forms are reviewed by a panel of course directors from this discipline. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

*Subject Examination Scores*

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively.**

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

*Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 5 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 70 and 80 (75 - 5 and 75 + 5).

NBME00181

Appx1199



**NBME®** National Board of Medical Examiners
**Subject Examination Program**

### Examinee Performance Profile

#### Modular Family Medicine Core

#### 023070 - Western Michigan U Homer Stryker MD SOM

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 08/26/2016

FamC Equated Percent Correct Score*: 60

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀❙❙ or ❙❙▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Diseases of Skin and Musculoskeletal Systems | | | |
| Cardiovascular Disorders & Diseases of the Respiratory System | | | |
| Mental Disorders and Diseases of the Nervous System | | | |
| Gynecologic Disorders & Renal, Urinary, Male Reproductive Systems | | | |
| **Physician Tasks** | | | |
| Chronic Care | | | |
| Health and Health Maintenance | | | |
| Management | | | |
| Diagnosis including Mechanisms of Disease | | | |
| **Patient Group** | | | |
| Pediatric (0 - 17) | | | |
| Adult (18 - 65) | | | |
| Geriatric (66 and older) | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00182



# NBME° National Board of Medical Examiners
## Subject Examination Program

### Score Interpretation Guide for Examinees

#### Medicine Examination

The enclosed performance report lists your subject examination score and provides a performance profile to aid in self-assessment. NBME® subject examinations provide medical schools with a tool for measuring examinees' understanding of the clinical sciences. Questions on the examinations were written and reviewed by national test committees preparing material for Step 2 Clinical Knowledge (CK) of the United States Medical Licensing Examination®. Prior to publication, test forms are reviewed by a panel of course directors representing the content of each examination. While these examinations are designed to be broadly appropriate as part of overall examinee assessment, since course objectives vary across schools, the congruence between subject examination content and course objectives should be considered when interpreting test scores.

### Subject Examination Scores

The subject examination score is an equated percent correct score that represents mastery of the content domain assessed by the examination. It is calculated as a percentage of items in the total content domain that would be answered correctly based on an examinee's proficiency level on the test. The subject examination scores are equated across test administrations and are statistically adjusted for variations in test form difficulty. Consequently, these scores can be used to compare and track school and examinee performance over time.

The subject examination scores are placed on a classic percent correct metric to ease interpretation and use. This scale provides a useful tool for comparing your performance with that of a nationally representative group taking this examination as an end-of-clerkship assessment. **For recent administrations, the mean and standard deviation for first-time examinees from LCME-accredited U.S. and Canadian medical schools were approximately 73 and 9, respectively**.

Please note that these scores cannot be compared to scores reported prior to August 2015 because they were on a different score scale.

### Precision of Scores

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score you earn on the examination is likely to stray from your "true" proficiency level. The SEM is approximately 4 for this examination.

Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if your true proficiency on the examination is 75, the score you achieved on the examination will usually (two times out of three) fall between 71 and 79 (75 - 4 and 75 + 4).

NBME00183



## NBME® National Board of Medical Examiners
### Subject Examination Program

**Examinee Performance Profile**

Medicine

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 06/24/2016

Total Equated Percent Correct Score*: 65

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The profile provides information regarding your performance compared to the performance of a comparison group of examinees on the major content areas of the examination. The comparison group includes first-time takers from LCME-accredited medical schools who took this examination as a final clerkship examination under standard testing conditions. The mean performance of the comparison group is represented by the vertical line.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀ll or ll▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Because many of the content areas are based on a relatively small number of items, small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Please note that many items may contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

| | Lower Performance | Average Performance | Higher Performance |
|---|---|---|---|
| **Organ Systems** | | | |
| Immunologic Disorders and Diseases of the Blood | | | |
| Cardiovascular Disorders | | | |
| Diseases of the Respiratory System | | | |
| Nutritional & Digestive Disorders | | | |
| Renal, Urinary & Male Reproductive Systems | | | |
| Endocrine & Metabolic Disorders | | | |
| Diseases of Skin and the Nervous and Musculoskeletal Systems | | | |
| **Physician Tasks** | | | |
| Health and Health Maintenance | | | |
| Mechanisms of Disease | | | |
| Diagnosis | | | |
| Management | | | |
| **Site of Care** | | | |
| Ambulatory | | | |
| Emergency Department | | | |
| In-Patient | | | |
| **Patient Group** | | | |
| Male | | | |
| Female | | | |
| Geriatric | | | |

*Please note that equated percent correct scores cannot be compared to scores reported prior to August 2015 which were on a different score scale.

NBME00184



**NBME® National Board of Medical Examiners
Subject Examination Program**

### Score Interpretation Guide for Students

### NBME® Comprehensive Basic Science Examination

The enclosed Performance Report lists your Subject Test score on the Comprehensive Basic Science Examination and provides a Performance Profile to aid in self-assessment. The content covered on the Comprehensive Basic Science Examination (CBSE) is based on the United States Medical Licensing Examination® (USMLE®) Step 1. The CBSE is basically a shorter version of Step 1 that covers material that is typically learned during basic science medical education. Subject test scores are scaled so that a score of 70 on the CBSE is approximately equivalent to a score of 200 on USMLE Step 1. The vast majority of scores range from 45 to 95, and although the scores have the "look and feel" of percent-correct scores, they are not. Because the Comprehensive Basic Science Examination and Step 1 cover similar content, this scale provides a useful tool for comparing your performance with that of a large, nationally representative group taking the licensing exam at the end of the second year of medical school. Additional information about the relationship between CBSE scores and Step 1 scores is provided in the table below.

*Precision of Scores*

Measurement error is present on all tests, and the standard error of measurement (SEM) provides an index of the (im)precision of scores. The SEM indicates how far the score a student earns on the examination is likely to stray from his/her "true" proficiency level. The SEM is approximately 3 points for the CBSE Subject Examination scores. Using the SEM, it is possible to calculate a score interval that indicates how much a score might vary across repeated testing using different sets of items covering the same content. An interval that will encompass about two thirds of the observed scores for a given true score may be found by adding the SEM to a score and subtracting it from that score. For example, if a student's true proficiency on the Subject Examination is 60, the score he/she achieved on the examination will usually (two times out of three) fall between 57 and 63 (60 - 3 and 60 + 3).

*Approximate USMLE Performance Equivalents*

The table to the right provides approximate performance equivalents for USMLE Step 1, making it possible for you to translate your Subject Test score to the scale used for Step 1. *Specific information on Step 1 and the current minimum passing score is available on the web site for USMLE (http://www.usmle.org).*

To use the table, locate your Subject Test score in the associated column and note the entry in the column headed "Step 1 Equivalent". For example, if your score is 62, the corresponding entry of 180 indicates that your performance on the Subject Test is approximately equivalent to a Step 1 score of 180.

NOTE: This examination is not intended to predict performance on USMLE. Rather, it is intended to be used as a tool to determine your relative areas of strength and weakness in general topic areas.

**Approximate Step 1 Equivalents**

| Score | Step 1 Equivalent | Score | Step 1 Equivalent |
|---|---|---|---|
| ≥ 94 | ≥ 260 | 68 | 195 |
| 94 | 260 | 66 | 190 |
| 92 | 255 | 64 | 185 |
| 90 | 250 | 62 | 180 |
| 88 | 245 | 60 | 175 |
| 86 | 240 | 58 | 170 |
| 84 | 235 | 56 | 165 |
| 82 | 230 | 54 | 160 |
| 80 | 225 | 52 | 155 |
| 78 | 220 | 50 | 150 |
| 76 | 215 | 48 | 145 |
| 74 | 210 | 46 | 140 |
| 72 | 205 | ≤ 46 | ≤ 140 |
| 70 | 200 | | |

NBME00185



# NBME® National Board of Medical Examiners
## Subject Examination Program

### Examinee Performance Profile

#### Comprehensive Basic Science

**023070 - Western Michigan U Homer Stryker MD SOM**

ID: 1164440

Name: RAMSAY JESSICA ERIN

Test Date(s): 04/11/2016

Total Scaled Score: 68

The score you received on this examination is shown above. This Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test of USMLE® Step 1. (See NOTE on Page 1.)

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. A ◀▮▮ or ▮▮▶ symbol indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because CBSE is designed to be integrative, many items contribute to more than one content area. Use caution when interpreting differences in performance across content areas.

Additional information about the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials* at www.usmle.org. An explanation of your score along with a table of approximate USMLE Step 1 performance equivalents for CBSE scores is included in the *Score Interpretation Guide for Students*.

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **Discipline** | | | |
| Behavioral Sciences | | | |
| Biochemistry | | | |
| Gross Anatomy & Embryology | | | |
| Histology & Cell Biology | | | |
| Microbiology & Immunology | | | |
| Pathology | | | |
| Pharmacology | | | |
| Physiology | | | |
| **System** | | | |
| General Principles of Foundational Science | | | |
| Behavioral Health and Nervous Systems/Special Senses | | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | |
| Cardiovascular System | | | |
| Respiratory System | | | |
| Gastrointestinal System | | | |
| Renal/Urinary System | | | |
| Multisystem Processes & Disorders | | | |

NBME00186

**Appx1204**

 **National Board of Medical Examiners**
Customized Examination
Performance Profile

School: 023070 - Western Michigan U Homer Stryker MD SOM
Examination Name: 201516 M2 CAS3

Test Date: 01/04/2016

ID: 1164440
Name: RAMSAY, JESSICA ERIN                     Total Test Scaled Score:    69
Scaling Group: 01/04/2016                      Total Test Percent Correct Score:    70

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

NBME00187

Appx1205


**NBME®** National Board of Medical Examiners
Customized Examination
Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** 201516 M2 CAS3

**Test Date: 01/04/2016**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group: 01/04/2016**

**Total Test Scaled Score:** 69
**Total Test Percent Correct Score:** 70



NBME00188

**Appx1206**

 **NBME®**

### National Board of Medical Examiners
#### Customized Examination
#### Performance Profile

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

ID:     1164440
Name:   RAMSAY, JESSICA ERIN                    Total Test Scaled Score:    67
Scaling Group: 06/22/2015                       Total Test Percent Correct Score:    66

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance on the total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area; narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

NBME00189

 **National Board of Medical Examiners**
**Customized Examination**
**Performance Profile**

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS2 Organ 201516 M2

**Test Date: 06/22/2015**

**ID:** 1164440
**Name:** RAMSAY, JESSICA ERIN
**Scaling Group:** 06/22/2015

**Total Test Scaled Score:** 67
**Total Test Percent Correct Score:** 66



NBME00190

Appx1208

 **NBME®**

**National Board of Medical Examiners**
Customized Examination
Performance Profile

School: 023070 - Western Michigan U Homer Stryker MD SOM
Examination Name: NBME CAS 1 M114

Test Date: 12/19/2014

ID:     1164440
Name:   RAMSAY, JESSICA ERIN                    Total Test Scaled Score:   70
Scaling Group:  12/18/2014                      Total Test Percent Correct Score:   74

NBME customized examinations provide medical schools with a tool for measuring students' understanding of a series of content areas defined by each school. Your total test scaled and percent correct scores on this customized examination appear above. Total test scaled scores are scaled to have a mean of 70 and a standard deviation of 8 for the scaling group of examinees selected by your school. The total test percent correct score represents the percentage of items answered correctly on the examination and has been rounded to the nearest whole number.

The performance profile on the following page is provided to aid in self-assessment. It summarizes your performance onthe total test and in the content areas defined by your school. The vertical line in the center of the profile indicates the average level of performance in each content area for the scaling group of examinees selected by your school that completed this customized assessment. Areas of relative strength and weakness are indicated by the positioning of the performance bands. The width of each band reflects the precision of measurement for the associated content area;narrower bands indicate greater precision. An asterisk at either end of the performance band indicates that your performance band extends beyond the displayed portion of the scale. Small differences in relative position of bands should not be overinterpreted. If two bands overlap, performance in the associated content areas should be interpreted as similar. Please note that items may contribute to the calculation of scores in more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

The total test scaled score and this performance profile should not be compared to those from other NBME examinations. The scaling group that your school selected for this administration can be compared to other administrations if this same exam that used the same scaling group.

NBME00191

Appx1209

 **NBME®** **National Board of Medical Examiners**
**Customized Examination**
**Performance Profile**

**School:** 023070 - Western Michigan U Homer Stryker MD SOM
**Examination Name:** NBME CAS 1 M114

**Test Date: 12/19/2014**

ID:    1164440
Name:  RAMSAY, JESSICA ERIN                          **Total Test Scaled Score:    70**
Scaling Group:  12/18/2014                    **Total Test Percent Correct Score:    74**



NBME00192

**Appx1210**



1126189          5-366-431-4
MCAT, USMLE Step 1-Test S

# MCAT Score Report

**Name** JESSICA ERIN RAMSAY

**Verification Code** CYE7-PLI7-VHW4-DX8H

**AAMC ID** 13215693

**Date of Birth** 08/29/1990

**URL** * https://apps.aamc.org/score-reporting-web/#/report/verify

*\* This report will no longer be able to be verified after 03/13/2017*

In order to verify these scores, you will be directed to create a user name and password. When visiting this page, select "Register for an AAMC Account" to begin this process.

## MCAT Scores
### For exams taken after January 31, 2015
No Scores Available

## MCAT Scores
### For exams taken before January 31, 2015

| Exam Date | MCAT Total | | | Physical Sciences | | Verbal Reasoning | | Writing Sample | | Biological Sciences | |
| | Total Score | Confidence Band [1] | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] | Score | Percentile Rank of Score [2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04/09/2011 | 30M | 28 to 32 | 79% | 10 | 79% | 09 | 67% | M | 31% | 11 | 88% |

## Notes

[1] ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... Scores ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... Writing Sample ... ... ... ...

[2] ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... percentile rank are based on ... ... ... ... from January 2012 through December 2014.

Copyright ©1995-2015 | Association of American Medical Colleges

## INFORMATION PROVIDED FOR EXAMINEE USE ONLY

The Performance Profile below is provided solely for the benefit of the examinee.
These profiles are developed as self-assessment tools for examinees only and will not be reported or verified to any third party.

## USMLE STEP 1 PERFORMANCE PROFILE

| | Lower Performance | Borderline Performance | Higher Performance |
|---|---|---|---|
| **PHYSICIAN TASK** | | | |
| MK: Applying Foundational Science Concepts | xxxxxxxxx | | |
| PC: Diagnosis | | xxxxxxxxxxxxx | |
| PC: Management | | xxxxxxxxxxxxxxxx | |
| PBLI: Evidence-Based Medicine | xxxxxxxxxxxxxxxxxx | | |
| **DISCIPLINE** | | | |
| Behavioral Sciences | | xxxxxxxxxxxxxxxxxx | |
| Biochemistry & Nutrition | *xxxxxxx | | |
| Genetics | xxxxxxxxxxxxxxxxxx | | |
| Gross Anatomy & Embryology | | xxxxxxxxxxxxxxxxx | |
| Histology & Cell Biology | *xxxxxxxxxxxxxxxx | | |
| Microbiology & Immunology | *xxxxxxxxxxx | | |
| Pathology | | xxxxxxxxx | |
| Pharmacology | | xxxxxxxxxxxx | |
| Physiology | | xxxxxxxxxxx | |
| **SYSTEM** | | | |
| General Principles | *xxxxxxxxxxx | | |
| Blood & Lymphoreticular and Immune Systems | | xxxxxxxxxxxxxxx | |
| Behavioral Health & Nervous Systems/Special Senses | xxxxxxxxxxxxxxxx | | |
| Musculoskeletal, Skin, & Subcutaneous Tissue | | | xxxxxxxxxxxxxxxxxx |
| Cardiovascular System | xxxxxxxxxxxxxxxx | | |
| Respiratory and Renal/Urinary Systems | | xxxxxxxxxxxxxx | |
| Gastrointestinal System | | xxxxxxxxxxxxxxxxx | |
| Reproductive & Endocrine Systems | | xxxxxxxxxxxxxx | |
| Multisystem Processes & Disorders | xxxxxxxxxxxxxxxxx | | |
| Biostatistics & Epidemiology/Population Health | xxxxxxxxxxxxxxxxxx | | |

The above Performance Profile is provided to aid in self-assessment. The shaded area defines a borderline level of performance for each content area; borderline performance is comparable to a HIGH FAIL/LOW PASS on the total test.

Performance bands indicate areas of relative strength and weakness. Some bands are wider than others. The width of a performance band reflects the precision of measurement: narrower bands indicate greater precision. The band width for a given content area is the same for all examinees. An asterisk indicates that your performance band extends beyond the displayed portion of the scale. Small differences in the location of bands should not be over-interpreted. If two bands overlap, performance in the associated areas should be interpreted as similar. Because Step 1 is designed to be integrative, many items contribute to more than one content area. As a consequence, caution should be used when interpreting differences in performance across content areas.

**This profile should not be compared to those from other Step 1 administrations.**

Additional information concerning the topics covered in each content area can be found in the *USMLE Step 1 Content Description and Sample Test Materials.*

MK—Medical Knowledge; PC—Patient Care; PBLI—Practice-based Learning and Improvement

NBME00195



1126191    5-366-431-4
ADD/ADHD Verification For



Office for Disability Services

Office of Student Life
150 Pomerene Hall
1760 Neil Avenue
Columbus, OH 43210-1297

Phone (614) 292-3307
Fax (614) 292-4190
TDD (614) 292-0901
www.ods.osu.edu

# ADD / ADHD Verification Form

The Office for Disability Services (ODS) provides academic services and accommodations for students with diagnosed disabilities. The documentation provided regarding the disability diagnosis must demonstrate a disability covered under Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act (ADA) of 1990. The ADA defines a disability as a physical or mental impairment that substantially limits one or more major life activities. In addition, in order for a student to be considered eligible to receive academic accommodations, the documentation must show functional limitations that impact the individual in the academic setting.

ODS requires current and comprehensive documentation in order to determine appropriate services and accommodations. The outline below has been developed to assist the student in working with the treating or diagnosing healthcare professional(s) in obtaining the specific information necessary to evaluate eligibility for academic accommodations.

**A. The healthcare professional(s) conducting the assessment and/or making the diagnosis must be qualified to do so.** These persons are generally trained, certified or licensed psychologists or members of a medical specialty.

**B. All parts of the form must be completed as thoroughly as possible.** Inadequate information, incomplete answers and/or illegible handwriting will delay the eligibility review process by necessitating follow up contact for clarification. *It is recommended that this form be completed by typing the information into the editable PDF version of the form available on our website at http://ods.osu.edu/posts/documents/ADHD.pdf .*

**C. The healthcare provider should attach any reports which provide additional related information** (e.g. psycho-educational testing, neuropsychological test results, etc.). If a comprehensive diagnostic report is available that provides the requested information, copies of that report can be submitted for documentation instead of this form. *Please do not provide case notes or rating scales without a narrative that explains the results.*

**D. After completing this form, sign it, complete the Healthcare Provider Information section on the last page and mail or fax it to us at the address provided in our letterhead.** The information you provide will *not* become part of the student's educational records, but it will be kept in the student's file at ODS, where it will be held strictly confidential. This form may be released to the student at his/her request. In addition to the requested information, please attach any other information you think would be relevant to the student's academic adjustment.

If you have questions regarding this form, please call the ODS office at 614-292-3307. Thank you for your assistance.

NBME00201

**STUDENT INFORMATION**
(Please Print Legibly or Type)

Name (Last, First, Middle): Ramsay, Jessica, Erin

Date of Birth: ~~8/8~~ 8/29/1990          Last 4 Digits of SSN: 4372

Status (check one): ☒current student  ☐transfer student  ☐prospective student

Local phone: (_____)-_____-_____          Cell phone: (269)-930-3001

Address (street, city, state and zip code): 1438 Old Farm Lane

St. Joseph, MI 49085

If OSU Student, OSU E-Mail address: ramsay.32          @OSU.EDU

E-mail address: _____

**DIAGNOSTIC INFORMATION**
(Please Print Legibly or Type)

*Please provide responses to the following items by typing or writing in a legible fashion.*
*Illegible forms will delay the documentation review process for the student.*

1.  DSM-IV diagnosis:

    ☒ 314.00
    ☒ Predominantly Inattentive
    ☐ Predominantly Hyperactive-Impulsive
    ☐ 314.01 Combined type
    ☐ 314.9 Not otherwise specified

2.  In addition to DSM-IV criteria, how did you arrive at your diagnosis?

    ☐ Behavioral observations
    ☒ Developmental history
    ☐ Rating scales
    ☒ Medical history
    ☒ Structured or unstructured clinical interview with the student
    ☐ Interviews with other persons
    ☐ Neuropsychological testing (dates of testing) _____
        (Please attach diagnostic report of testing)
    ☐ Other (Please specify) _____

3.  Please state date of diagnosis: _____3-24-09_____

2

NBME00202

Appx1214

4. What is the severity of the condition?  Please check one:
   ☐ mild    ☒ moderate    ☐ severe

Explain severity:

   _comprehension difficulty, not dyslexic_
   _tendencies, chronic procrastination_

State the following:

   a. date of first contact with student:    2-27-03

   b. date of last contact with student:    7-13-10

5. Student's History:

   a) **ADHD History**: Evidence of inattention and/or hyperactivity during childhood and presence of symptoms prior to age seven.  Provide information supporting the diagnosis obtained from the student/parents/and teachers.  Indicate the ADHD symptoms that were present during early school years (e.g. daydreamer, spoke out of turn, unable to sit still, difficulty following directions, etc.)

   - NO HYPERACTIVITY COMPONENT KNOWN
   - SLOW REACTION, SOME DYSLEXIC TENDENCIES,
     DECREASED COMPREHENSION SPEED

   b) **Psychosocial History**: Provide relevant information obtained from the student/parent(s)/guardian(s) regarding the student's psychosocial history (e.g. often engaged in verbal or physical confrontation, history of not sustaining relationships, history of employment difficulties, history of educational difficulties, history of risk-taking or dangerous activities, history of impulsive behaviors, social inappropriateness, history of psychological treatment, etc.).

   SUPPORTIVE FAMILY
   GOOD SOCIAL DEVELOPMENT
   GOOD EFFORT IN ALL TASKS

3

NBME00203

Appx1215

c) **Pharmacological History**:  Provide relevant pharmacological history including an explanation of the extent to which the medication has mitigated the symptoms of the disorder in the past.  Also include any *current medication(s)* that the student's currently prescribed including dosage, frequency of use, the adverse side effects, and the effectiveness of the medication.

CURRENT MEDS:  ADDERALL 20mg bid

FAILED MED:  METHPHONIATE 10mg bid

d) **Educational History**:  Provide a history of the use of any educational accommodations and services related to this disability.

NONE KNOWN TO DATE

6.  Student's Current Specific Symptoms

Please check all ADHD symptoms listed in the DSM-IV that the student *currently* exhibits:

**Inattention:**

☐ often fails to give close attention to details or makes careless mistakes in schoolwork, work or other activities.

☒ often has difficulty sustaining attention in tasks or play activities.

☐ often does not seem to listen when spoken to directly.

☐ often does not follow through on instructions and details to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions).

☒ often has difficulty organizing tasks and activities.

☒ often avoids, dislikes, or is reluctant to engage in tasks (such as schoolwork or homework) that require sustained mental effort.

☐ often loses things necessary for tasks or activities (e.g. school assignments, pencils, books, tools, etc.)

☒ is often easily distracted by extraneous stimuli.

☒ often forgetful in daily activities.

4

NBME00204

**Hyperactivity:** N/A

- [ ] often fidgets with hands or feet or squirms in seat
- [ ] often leaves (or greatly feels the need to leave) seat in classroom or in other situations in which remaining seated is expected.
- [ ] often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness).
- [ ] often has difficulty playing or engaging in leisure activities that are more sedate.
- [ ] is often "on the go" or often acts as if "driven by a motor".
- [ ] often talks excessively.

**Impulsivity** N/A

- [ ] often blurts out answers before questions have been completed
- [ ] often has difficulty awaiting turn
- [ ] often interrupts or intrudes on others (e.g. butts into conversations or games).

7. State the student's *functional limitations* based on the ADHD diagnosis, specifically in a classroom or educational setting.

    MAy need Additional time Allotted to provide for comprehension.

8. State specific recommendations regarding academic accommodations for this student, and a rationale as to why these accommodations/services are warranted based upon the student's functional limitations. Indicate why the accommodations are necessary (e.g. if a note taker is suggested, state the reasons for this request related to the student's diagnosis).

    MAY NEED ADDITIONAL TIME ALLOTTED for WRITTEN TESTS.

5

9. If current treatments (e.g. medications, counseling, etc.) are successful, state the reasons why the above academic adjustments/accommodations/services are necessary. Please be specific.

N/A

## HEALTHCARE PROVIDER INFORMATION

(Please sign & date below and fill in all other fields completely using PRINT or TYPE)

Provider Signature: _____ Date: 8/13/10

Provider Name (Print): _____

Title: _____

License or Certification #: 4301073629 MICHIGAN

Address: _____

Phone Number: (_____)-_____-_____

FAX Number: (_____)-_____-_____

GENESIS FAMILY HEALTH CENTER, PLC
ALAN N. SMIY, MD
3916 STONEGATE PARK
ST. JOSEPH, MICHIGAN 49085
PH: 269-428-8000 / FX: 269-428-2700

**Important: After documentation is reviewed, ODS will send an email notification to the students OSU email account, (e.g. miller.6789@osu.edu), acknowledging receipt of documentation and the eligibility status. Prospective students that do not yet have an OSU email account will be notified via paper letter sent to their home address.**

6

NBME00206

Appx1218

PERM

**The Ohio State University    Office for Disability Services**
**Access Plan**

TEMP
(through date)

Student Name _____Jessica Ramsay_____    Date _5/7/10_

### A. Accommodation Authorization

I understand that I have been authorized for the following accommodations by my ODS counselor based on my current disability documentation and functional limitations:

**Exams**

- [X] 50% extra time for _ALL_ (subject/s) exams
- [ ] ___% extra time for _____ (subject/s) exams
- [ ] ___% extra time for _____ (subject/s) exams
- [ ] Distr. Red. 1    [ ] Distr. Red. 2
- [ ] Reader    [ ] Scribe
- [ ] CCTV    [ ] ZoomText
- [ ] Word Processing    [ ] Dragon Software
- [ ] Braille    [ ] Breaks
- [ ] Raised Table    [ ] JAWS
- [ ] Taped Exam    [ ] Large print-electronic
- [ ] Test Talker Exam    [ ] Large print-paper
- [ ] Other_____

**Alternative Media**

- [ ] Audio Output
- [ ] Braille / Tactile Images
- [ ] Print Enlargement

**Assistive Technology**

- [ ] WYNN / Read & Write
- [ ] Voice Recognition Software
- [ ] Screen Enlargement Software
- [ ] Refreshable Braille
- [ ] Adaptive Keyboard / Mouse
- [ ] Other _____

**Additional Accommodations**

- [X] Priority Registration    [ ] Counseling    [ ] Advocacy
- [ ] Note Taking Assistance    [ ] Interpreting / Transcribing    [ ] Phonic Ear/ FM System
- [ ] Handivan Transportation    [ ] Lab Assistance    [ ] Other _____

### B. Agreement of Understanding of Services

I, _____Jessica Ramsay_____,
(print name)

- [X] have received the student handbook and have been advised and trained in accessing appropriate accommodations.

- [X] understand that it is my responsibility to request appropriate accommodations in a timely manner and follow ODS policy and procedures as outlined in the student handbook.

- [X] have been informed of the faculty/staff role in providing accommodations and give my permission for ODS to discuss the implementation of my accommodations with appropriate OSU faculty and staff if necessary.

- [X] have been informed of the opportunity to register to vote through the Office for Disability Services. _(initial)_

_____    3/17/11    _____    5/17/10
Student Signature    Date    Counselor Signature    Date

WHITE: ODS
YELLOW: STUDENT

O:\Access Plans\Current\Access Plan 5.5.08

NBME00207

# The Ohio State University - Office for Disability Services

## EXAM ACCOMMODATIONS CONTRACT

This contract is to ensure that academic integrity standards are maintained at ODS and that all students authorized for the use of exam accommodations are aware of these important guidelines. Please read and initial each guideline to signify that the policy has been explained to you by your ODS Counselor, that you understand the policy and that you will abide by the policy.

1. Student must show picture ID to ODS exam staff when checking in to take an exam. BUCK-ID's and driver's licenses are acceptable.

2. Student is responsible for turning in completed Proctor Sheets to ODS within 5 business days in advance of exam date. Incomplete proctor sheets will be returned to the student.

3. Student is expected to show up on time for their exam. Student arriving late for exam must use the remaining time **or** reschedule exam with the instructor (via the Rescheduling Authorization Form or an e-mail from the instructor). There is no guarantee that the instructor will permit a make up exam.

4. Unauthorized notes, books, book bags, purses and hats/ball caps are not permitted in the exam space. Communication devices including cell phones and PDA's are not permitted. Unauthorized electronic devices are not permitted. Cell phones brought to exams must be turned off and stored at the ODS service counter or in the student's book bag. ODS is not responsible for cell phones stored at the counter.

5. All ODS exam studios are monitored by ODS staff via a closed-circuit video monitoring system. Students observed utilizing any unauthorized resource during an exam will be reported to the OSU Committee on Academic Misconduct and the instructor.

6. ODS exam proctors may inspect the exam environment (randomly or otherwise) to ensure academic integrity.

7. Students may not leave exam site while exam is in progress or the exam will be terminated (exception is bathroom break).

8. Students using a reader assistant may not ask the assistant for any exam information other than to repeat the exam question exactly as it is written, including paraphrasing of questions.

9. ODS cannot guarantee students a specific type of test environment – students with distraction reduced environment accommodation are not guaranteed a room by themselves.

10. Student must complete exam 15 minutes prior to closing. Fall, Winter and Spring Quarter exams are administered Monday through Thursday from 7:30am – 8:15pm and Friday, 7:30am - 4:45pm. Summer Quarter exams are administered Monday through Friday from 7:30am – 4:15pm.

_____     _____     _____
Student Name (Print)               Student Signature            Date

_____     5/17/10
Staff/Counselor Signature              Date

White – Perm File
Yellow – Student

O:Exam Contract/exam contract 8-07

NBME00208

 NBME

National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**

June 12, 2018

Jessica E. Ramsay
6862 Tall Oaks Dr
Apt 3B
Kalamazoo, MI 49009

RE: USMLE Step 1                    USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

The National Board of Medical Examiners (NBME) processes requests for test accommodations on behalf of the United States Medical Licensing Examination (USMLE) program. After a preliminary audit of your request for test accommodations for USMLE Step 1 and documentation, we found that additional information is needed in order for us to make an informed decision about your request.

In a December 7, 2017 report of Neurocognitive Examination, Alan Lewandowski, Ph.D. writes that he administered a comprehensive neurocognitive examination with HRNB and allied procedures on November 9, 2017.  He writes, *"See attached graphs and summary table below for raw data."*  The only data provided, however, is a table listing subtests by functional area and a column labeled 'Findings' which presumably are scores.  In a February 7, 2018 Addendum, Dr. Lewandowski provides a list of the measures administered on December 7, 2017.  However, he does not identify the normative sample used to compute your scores.

Please refer your evaluator to the USMLE Guidelines to Request Test Accommodations at www.usmle.org/test-accommodations/guidelines.html#guidelines-learning-disorders for information and instruction on how to document a disability and request that he provide the following information about his December 2017 evaluation:
- identify each test/subtest administered and the normative sample used to compute your scores
- provide age-based standard scores where available
- provide the 'graphs' referred to in his report

The information we are requesting will assist us in determining whether you are substantially limited within the meaning of the Americans with Disabilities Act (ADA) related to accessing a computer-based examination and what, if any, accommodations are appropriate in the context of this examination.

The requested information may be submitted as pdf file attachment(s) via e-mail to disabilityservices@nbme.org or by mail to Disability Services, 3750 Market St. Philadelphia, PA

19104-3102 or fax to 215-590-9422 (call 215-590-9700 to verify receipt). Do not send duplicate copies of documentation that has already been submitted.

Please notify your Disability Services Specialist, Jennifer Cohen, via telephone at 215-590-9700 or email at disabilityservices@nbme.org when you have submitted all of the documentation that you would like us to review and you consider your submission to be complete.

Sincerely,

Catherine Farmer

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

NBME00145

1126531    5-366-431-4
Rau data table 11.9.17 Ne

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

June 20, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Re: Additional raw data tables for November 9, 2017 Neuropsychological Examination

Dear Ms. Ramsay:

Attached to this letter is an additional compilation of the findings from your recent
neuropsychological assessment formatted as a table. The Raw Data Addendum constitutes
a complete picture of the <u>entire</u> data set from your assessment. As such, it is a
comprehensive representation of your evaluation that includes tests administered, the
normative sample group, mean scores, your individual (patient) scores, and a guideline to
assist with interpretation.

Previously, you were provided with a set of graphs. These graphs that were attached to the
initial report were provided to you *only* as a general and cursory guide, to be used during
our review in order to assist you in understanding the findings. They were never/are not
intended to be a comprehensive representation of all of the measures employed, functional
areas assessed, and the general corresponding scores. They were never/are not intended
for broader distribution or to be used in your request for accommodations.

Alan G. Lewandowski, Ph. D., FACPN
Clinical Psychologist
Board Certified Neuropsychologist

NBME00136

Appx1223

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 1

## Raw Data Addendum

| Tests Administered | | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Weschler Adult Intellectual Scale, 4th Edition (Standard Scores) | Similarities | 1 | 10 | 13 | High average |
| | Vocabulary | 1 | 10 | 14 | Superior |
| | Information | 1 | 10 | 16 | Very superior |
| | Comprehension | 1 | 10 | 15 | Superior |
| | Digit span | 1 | 10 | 12 | High average |
| | Arithmetic | 1 | 10 | 12 | High average |
| | Block design | 1 | 10 | 15 | Superior |
| | Matrix reasoning | 1 | 10 | 16 | Very superior |
| | Visual puzzles | 1 | 10 | 15 | Superior |
| | Figure weights | 1 | 10 | 15 | Superior |
| | Picture completion | 1 | 10 | 14 | Superior |
| | Symbol search | 1 | 10 | 7 | Low average |
| | Coding | 1 | 10 | 5 | Borderline impaired |
| | Cancellation | 1 | 10 | 9 | Average |
| | Verbal Comprehension Index | 1 | 100 | 125 | Superior |
| | Perceptual Reasoning Index | 1 | 100 | 131 | Very superior |
| | Working Memory Index | 1 | 100 | 111 | High average |
| | Processing Speed Index | 1 | 100 | 79 | Borderline impaired |
| | General Abilities Index | 1 | 100 | 132 | Very superior |
| | Cognitive Efficiency Index | 1 | 100 | 94 | Average |
| | Overall Intellect Index | 1 | 100 | 117 | High average |
| Wide Range Achievement Test, 4th Edition (Standard Scores) | Reading | 1 | 100 | 114 | High average |
| | Spelling | 1 | 100 | 109 | Average |
| | Written arithmetic | 1 | 100 | 110 | High average |
| California Verbal Learning Test, 2nd edition (T-Scores) | Memory: immediate recall | 4 | 50 | 66 | Normal |
| | Memory: short delay free recall | 4 | 50 | 65 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 60 | Normal |
| | Memory: long delay free recall | 4 | 50 | 65 | Normal |
| | Memory: long delay cued recall | 4 | 50 | 60 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

NBME00137

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 2

| | Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| **Halstead Reitan Neuropsychological Battery (T-Scores)** | Tactile form recognition: dominant | 3 | 50 | 50 | Normal |
| | Tactile form recognition: non-dominant | 3 | 50 | 47 | Normal |
| | Finger oscillation: dominant | 3 | 50 | 50 | Normal |
| | Finger oscillation: non-dominant | 3 | 50 | 48 | Normal |
| | Tactile Performance: dominant | 3 | 50 | 64 | Normal |
| | Tactile Performance: non-dominant | 3 | 50 | 50 | Normal |
| | Tactile Performance: bilateral abilities | 3 | 50 | 47 | Normal |
| | Tactile Performance: response speed | 3 | 50 | 55 | Normal |
| | Tactile Performance: memory | 3 | 50 | 54 | Normal |
| | Tactile Performance: localization | 3 | 50 | 72 | Normal |
| | Trail A: simple sequencing | 3 | 50 | 35 | Abnormal |
| | Trail B: complex sequencing | 3 | 50 | 27 | Abnormal |
| | Executive reasoning | 3 | 50 | 60 | Normal |
| | Seashore rhythm | 3 | 50 | 35 | Abnormal |
| | Speech sounds perception | 3 | 50 | 60 | Normal |
| **Conner's Continuous Performance Test, 3rd Edition (T-Scores)** | Attention: detectability | 1 | 50 | 50 | Normal |
| | Attention: omissions | 1 | 50 | 46 | Normal |
| | Attention: commissions | 1 | 50 | 51 | Normal |
| | Attention: perseverations | 1 | 50 | 48 | Normal |
| | Attention: hit reaction time | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time SD | 1 | 50 | 52 | Normal |
| | Attention: hit reaction variability | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time block change | 1 | 50 | 47 | Normal |
| | Attention: hit reaction time ISI change | 1 | 50 | 69 | Abnormal (mild) |
| **Rey Osterrieth Complex Figure (T-Scores)** | Memory: immediate recall | 4 | 50 | 61 | Normal |
| | Memory: short delay free recall | 4 | 50 | 58 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 38 | Abnormal |

1. Age-based norms
2. Age and gender based norms
3. Age, gender, and educational level based norms
4. Age and educational level based norms

NBME00138

Appx1225

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 3

| Test Administered | | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Personality Assessment Inventory (T-Scores) | Health concerns | 2 | 50 | 64 | Abnormal |
| | Anxiety: generalized/focused | 2 | 50 | 47/51 | Normal |
| | Depression | 2 | 50 | 67 | Abnormal |
| | Acute stress | 2 | 50 | 41 | Normal |
| | Cognitive inefficiency | 2 | 50 | 53 | Normal |
| | Conversion | 2 | 50 | 51 | Normal |
| | Somatization | 2 | 50 | 57 | Normal |
| | Obsessive-compulsive | 2 | 50 | 54 | Normal |
| | Phobias | 2 | 50 | 54 | Normal |
| | Traumatic stress | 2 | 50 | 45 | Normal |
| | Depression: cognitive | 2 | 50 | 67 | Abnormal |
| | Depression: affective | 2 | 50 | 50 | Normal |
| | Depression: physiological | 2 | 50 | 74 | Abnormal |
| | Activity level | 2 | 50 | 51 | Normal |
| | Grandiosity | 2 | 50 | 49 | Normal |
| | Irritability | 2 | 50 | 43 | Normal |
| | Hypervigilance | 2 | 50 | 48 | Normal |
| | Persecution | 2 | 50 | 48 | Normal |
| | Resentment | 2 | 50 | 44 | Normal |
| | Psychotic experiences | 2 | 50 | 36 | Normal |
| | Social detachment | 2 | 50 | 46 | Normal |
| | Thinking disorder/difficulty | 2 | 50 | 73 | Abnormal |
| | Affective instability | 2 | 50 | 39 | Normal |
| | Identity problems | 2 | 50 | 44 | Normal |
| | Negative relationships | 2 | 50 | 40 | Normal |
| | Self-harm | 2 | 50 | 45 | Normal |
| | Antisocial behaviors | 2 | 50 | 43 | Normal |
| | Egocentricity | 2 | 50 | 42 | Normal |
| | Stimulus-seeking | 2 | 50 | 53 | Normal |
| | Aggressive attitude | 2 | 50 | 34 | Normal |
| | Aggression: verbal and physical | 2 | 50 | 37/42 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

NBME00139

Appx1226

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME00140

Appx1227

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME00141



1126565    5-366-431-4
Colored Image 1-Evaluatio

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME00142



1126566    5-366-431-4
Colored Image 2-Evaluatio

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME00143

**Re: Letter of support**

Jessica Ramsay
Thu 4/12/2018 11:10 AM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
Hey Erin,

Just wanted to let you know that I will be there at 12, maybe a little after. Sorry I wasn't able to make it this morning like I anticipated, I had to help my family with something.

See you in a bit,

Jessie

**From:** Erin Dafoe
**Sent:** Wednesday, April 11, 2018 2:37:17 PM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

I am going to be in meetings for the rest of the day today, but I have some free time tomorrow if that works for you! My schedule is open 8-11, and then 12-3.

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

**From:** Jessica Ramsay
**Sent:** Wednesday, April 11, 2018 2:27 PM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Re: Letter of support

I lied! I read it and am so impressed you were able to organize the mess of thoughts and words I gave you into something so well put together! I only have a few corrections/editing requests. I tried to flag them using "post-its" within the PDF but they wouldn't save correctly, so if you have time, I can stop by your office and just tell you what they are - let me know if that works for you! But for the bulleted list it was just easier to retype:

- General:

  - Access to a counselor provided through student affairs

- Basic Science and Clinical Coursework and Study:

  - Additional free printing allowance
  - Text-to-speech software (Kurzweil 3000)

- Multiple Choice and Written Exams, including iRATs (individual readiness assessment tests):

  - Private, quiet testing room with no other students
  - Double testing time (100% additional time)

DEFENDANT'S
EXHIBIT
**63**

RAMSAY19-0068

- ○ Exams provided on paper instead of computerized format
- ○ Use of calculator and assorted colored pencils and highlighters (provided for testing use only, kept by testing staff when not testing)
- ○ Extra scrap paper
- ○ Allowed to have granola bar, water, and medications in exam room

- • Clinical Skills (OSCE) Exams:

- ○ Two additional minutes at the beginning of the OSCE patient encounter to read the prompt and instructions
- ○ Double time (100%, or 10 minutes, additional time) on the note-writing portion

Thanks SO much for everything.

Jessie

**From:** Erin Dafoe
**Sent:** Wednesday, April 11, 2018 1:01:58 PM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

No problem, Jessie! Just let me know.

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

**From:** Jessica Ramsay
**Sent:** Wednesday, April 11, 2018 1:01 PM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Re: Letter of support

Great! Thank you so much! I will review it today and let you know ASAP if anything needs to be edited. I have an appointment from 4-5, so I will most likely have it back to you by tomorrow.

Jessie

**From:** Erin Dafoe
**Sent:** Wednesday, April 11, 2018 12:30:37 PM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

Letter is attached! Dr. Overton has signed it, but if you see any glaring issues, I can still make edits.

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

RAMSAY19-0069

**From:** Jessica Ramsay
**Sent:** Wednesday, April 11, 2018 11:28 AM

**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Re: Letter of support

If he hasn't already signed it, that is. I just want to make sure everything is cohesive.

---

**From:** Erin Dafoe
**Sent:** Wednesday, April 11, 2018 9:44:21 AM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

Great! I have sent the final draft to Dr. Overton for his signature, and will send it to you when I receive it back.

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

**From:** Jessica Ramsay
**Sent:** Wednesday, April 11, 2018 9:32 AM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Re: Letter of support

Yep, that is correct!

---

**From:** Erin Dafoe
**Sent:** Wednesday, April 11, 2018 9:15:57 AM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

Sounds good! Just one additional question- you would like this letter to apply to Step 1 and Step 2 CK, correct?

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

**From:** Jessica Ramsay
**Sent:** Tuesday, April 10, 2018 5:54 PM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Re: Letter of support

Hi Erin,

Thanks for getting back to me and for putting all of the work that you have into it. I really appreciate it. You would give the final signed, dated version to me, but it has to be on official letterhead. Then I send everything in together.

Is there anything you need help with or want to go over?

**RAMSAY19-0070**

We're almost done with this!!!!!!!

Jessie

**From:** Erin Dafoe
**Sent:** Tuesday, April 10, 2018 4:43:20 PM
**To:** Jessica Ramsay
**Subject:** RE: Letter of support

Hi Jessie,

Sorry for the delay! I wanted to make sure I got the letter as fine-tuned as I could before sending it to you! I also asked two of the physicians on the Essential Abilities Committee to look over the letter and give feedback- one is a psychiatrist, so his input was valuable.

Only one question- do I provide you with the final version, or do I send it to NBME directly?

Thanks,
Erin

**Erin Dafoe, MSEd**
**Director of Student Life**
Western Michigan University Homer Stryker M.D. School of Medicine
269-337-6159
erin.dafoe@med.wmich.edu

**From:** Jessica Ramsay
**Sent:** Thursday, April 05, 2018 5:26 PM
**To:** Erin Dafoe <erin.dafoe@med.wmich.edu>
**Subject:** Letter of support

Hi Erin,

Just checking in to see how the letter of support is coming along. Is there anything you need from me at this time to help you with it?

Jessie

RAMSAY19-0071

**Re: Jessica Ramsay**

Jessica Ramsay
Mon 12/18/2017 3:31 PM
**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>
I'm glad! Thanks for looking through everything and for letting me know you received it.

Jessie

---

**From:** Bruce Ruekberg
**Sent:** Friday, December 15, 2017 10:53:40 AM
**To:** Jessica Ramsay
**Subject:** Re: Jessica Ramsay

Jessica

Very helpful
Thanks
Dr. R

---

**From:** Jessica Ramsay
**Sent:** Thursday, December 14, 2017 3:15:11 PM
**To:** Bruce Ruekberg
**Subject:** Jessica Ramsay

Hi Dr. Ruekberg,

Thanks again for all of your help, and for letting my mom and Neil join us and give their input after we started. I have gone through everything I have related to this and have attached the several prior evaluations, including the medical records from my original diagnosis by my PCP, as well as my temporary approval when I first requested accommodations from OSU, followed by their evaluation from that my PCP completed. Unfortunately I do not have a copy of OSU's final approval. This is all of the early documentation that I have, and I am working on getting a complete file from WMed.

I hope these are helpful. Please let me know if there is anything else that you may find helpful for completing your assessment and write up for the NBME accommodations.

I hope you have a great weekend and enjoy the upcoming holidays!

Jessie



DEFENDANT'S
EXHIBIT
**64**

Ramsay14-0026

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her retake of her United States Medical License Examination step I exam, and for her step II exam.

In my professional opinion, Ms. Ramsay meets DSM criteria for Attention Deficit and Hyperactivity Disorder, Combined type. Her childhood history obtained from her mother is consistent with ADHD. In Kindergarten through grammar school Jessica manifested difficulty with focus and attention.  She received informal accommodations starting in the second grade including a secluded testing area.  Her mother and Jessica report she experience inattentiveness, restlessness and distractibility from early childhood that has continued to the present time.

While attending college at Ohio State University she began experiencing difficulty concentrating and keeping up with her reading requirements due to letter switching, focus, and procrastination. Her primary care doctor considered   ADHD and, or, dyslexia and started her after ADHD screen in the office on Ritalin, and later switched to Adderall as it was better tolerated and showed better effectiveness. She responded well to Adderall, and has remained on an Adderall preparation since. She is currently on Vyvanse 60 MG.

An initial formal neuropsychology assessment occurred in 2014 by Charles Livingston, a licensed social worker and limited licensed psychologist confirmed the clinical diagnosis on ADHD. He recommended accommodations to the medical school disability office for ADHD at that time. Since that assessment, she has received accommodations in medical school and has performed very well on exams.

Dr. Lewandowski did a second neuropsychology test 12/7/18 confirming the diagnosis of ADHD. I He diagnosed ADHD both clinically and by clinical history and by neuropsychology testing.

Jessica's mother and significant other provided collateral historical support the diagnosis of ADHD, combined type. Recent DSM –IV symptom checklists with prompts completed by Jessica, her significant other and her mother all strongly support ADHD, combined type.

Ms. Ramsay's MCAT scores were quite lower that her practice tests and she did much better in her mathematics compared to her verbal scores, and a major drop off her performance occurred in her writing portions. I believe these results are quite consistent with her clinical history and neuropsychology tests.

In my professional opinion therefore, Jessica meets the United States Medical Licensing guidelines and I recommend, after review of neuropsychology testing and conferring with Jessica, the following accommodations for NBME Step I and Step II CK exams:
a.     Fifty percent additional time for exam over two days
b.     Additional break time over two days
c.     A separate quiet area to complete the examination for inattention and distractibility

Ramsay14-0027

Even if the Board does not find Jessica meets criteria for accommodations for ADHD, in my professional opinion the Board should approve Jessica for accommodation for reading and writing learning disabilities

In addition to ADHD, the medical record, family history, her symptoms and neuropsychological testing support a learning disability she has grappled with since starting to read and write as a young child. After reviewing her records, I believe she meets a diagnosis of a learning disability of writing and reading.

Jessica's second grade teacher first noted her reverse her letters and allowed her to use an alphabet board to enhance her letter identification. Due to the reading difficult, her teacher recommended testing and she was referred at the age of 7 to Dr. Mary Alice A. Tanguay, a therapeutic Optometrist. Dr. Tanguay performed a visual-perceptual skill test and found significant deficits in Jessica's visual spatial relationships, visual discrimination and visual memory. Report attached.

Jessica under time conditions is limited by a reading disability. Due to this reading disability she must take several compensatory steps to assure the accuracy of the words she is reading and the comprehension of the word's meaning. For Jessica, reading takes great mental effort and additional time and further exacerbating her focused and attentive, particularly in timed examinations.

I believe Dr. Lewandowski's testing is consistent with a reading learning disability.
His assessment found Jessica tested very superior in intellectual ability (98th percentile) but testing also showed she had a marked drop off is intellectual efficiency (34th percentile) and as Dr. Lewandowski noted this reflected "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions. Dr. Lewandowski, moreover, noted her IQ pattern "is consistent with the patient's and parents reports of premorbid functioning, and consistent with a pre-existing developmental delay. Jessica tested abnormal on Dr. Lewandowski's on specific cognitive tasks including sequencing and cognitive shifting, sustained complex attention and quickness of thinking again affecting her ability to perform under timed conditions."

Mr. Livingston's assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possessed a very superior IQ but has a marked drop off in her intellectual efficiency.

In addition to a reading learning disability, in my professional opinion, based on clinical history Jessica had a writing learning disability. Jessica reports a lifelong difficulty formulating her

Ramsay14-0028

thoughts to put down on paper, picking the words to use and to assure accuracy of their meaning, and using the words in a understandable sentence. In addition, she has difficulty with legibility of her writing and makes frequent spelling, and grammatical errors.
Due to her reading and writing disability she request the same accommodations for the Step II CK exam as she has requested for ADHD for the Step I retake examination.

Ms. Ramsey was able to succeed in her academic career in spite her disabilities through sheer grit and will. Only by her is intelligence, motivation, and determination has she been able to persevere. She self-accommodated for several years until the complexity of the material in college led her to seek medical evaluation.

Like many with limitations in certain realms of cognitive function, Jessica has developed major strengths in areas not easily measured by multiple-choice questions.   While she may not excel on timed tests requiring fast reading comprehension and identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills.

Should the Board have any questions concerning Jessica Ramsay do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

Ramsay14-0029

## Re: Accommodations

**Bruce Ruekberg**
Fri 4/6/2018 5:12 PM
**To:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

📎 1 attachments (18 KB)
Jessica draft 2.docx;

Let me know you got this to review
send back corrections or suggestion
sorry for the delay
Dr R

---

**From:** Jessica Ramsay
**Sent:** Thursday, April 5, 2018 5:28 PM
**To:** Bruce Ruekberg
**Subject:** Accommodations

Hi Dr. Ruekberg,

I hope your weekend went well and call wasn't too crazy. I just wanted to check in to see how the write up is going. Is there anything you need from me?

Thanks,

Jessie

Ramsay14-0030

↩ Reply  ⌄    🗑 Delete    🚫 Junk    Block    ⋯

## Re: Accommodations

JR    **Jessica Ramsay**
      Fri 4/6/2018 6:20 PM
      Bruce Ruekberg ⪢                                👍  ↩  ↞  →  ⋯

Got it! And will do! I'll try to have it back to you by Monday. I really appreciate everything you've done to help me with this.

Have a great weekend!

Jessie

---

**From:** Bruce Ruekberg
**Sent:** Friday, April 6, 2018 5:12:33 PM
**To:** Jessica Ramsay
**Subject:** Re: Accommodations

Let me know you got this to review
send back corrections or suggestion
sorry for the delay
Dr R

---

**From:** Jessica Ramsay
**Sent:** Thursday, April 5, 2018 5:28 PM
**To:** Bruce Ruekberg
**Subject:** Accommodations

Hi Dr. Ruekberg,

I hope your weekend went well and call wasn't too crazy. I just wanted to check in to see how the write up is going. Is there anything you need from me?

Thanks,

Jessie

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination Step 1 retake and her Step 2 CK exams.

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for Attention Deficit and Hyperactivity Disorder, Combined type (CODE) based on clinical, academic, family and social histories, direct observation, neuropsychological evaluation, and collateral information gathered from her significant other, whom she lives with, and her mother.

Family history is significant for mother with ADHD and mild dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

Her childhood history obtained from her mother along with Jessica's reported history and symptoms are consistent with ADHD. At home Jessica was always moving and doing something, hardly ever still, and even during mealtimes and leisure activities like watching a movie she would "find reasons to get up and move." She would also commonly forget to do or complete her chores, which came across as being lazy or disrespectful. Socially, Jessica struggled with waiting her turn, blurting out thoughts and interrupting others in conversation. In Kindergarten through grammar school Jessica manifested difficulty with focus and attention. At school, teachers always noted her to be a very bright student, but always an "incredibly slow" reader and writer and a "bad test-taker," consistent with Jessica's reported history and current symptoms. was a "bad test-taker" and often missed points for seemingly careless mistakes, or forgot to take home, complete, or turn in assignments. She received informal accommodations starting in the second grade including a secluded testing area and extra time to work on assignments. Throughout elementary, middle and high school, there were multiple instances where, working with her teachers and sometimes needing to involve her mother, Jessica received informal accommodations including extra time and altered grading schemes because she could not complete tests, reading, or writing assignments in the regular time provided. Jessica and her mother both report she experienced inattentiveness, restlessness and distractibility from early childhood that has continued to the present time.

While attending college at Ohio State University she began recognizing her difficulty concentrating, finishing timed quizzes and tests, and keeping up with reading and writing requirements due to letter switching, slow reading and writing, inability to focus, and procrastination. In 2009, her primary care doctor considered ADHD and/or dyslexia, completed an ADHD screening in office, and started her on Ritalin. She was later switched to Adderall as it was better tolerated and showed better effectiveness. She responded well to Adderall and has remained on an Adderall preparation since. She is currently on Vyvanse 60 MG to help her manage her symptoms throughout the long days required in medical school. In 2010, at the recommendation of a professor, Jessica met with a OSU Disability Services and was granted temporary accommodations, which were fully approved upon receipt of supportive documentation from her primary care provider. With these accommodations, Jessica had better

Ramsay14-0032

access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, even with the accommodations, Jessica still encountered multiple exams on which she could not get to significant portions in the time allowed because they required large amounts of reading or writing. On several such occasions, Jessica was given additional informal accommodations by her professors, including altered grading schemes and extra time, that allowed her to pass those exams and courses.

In 2014, Jessica had an initial formal neuropsychology assessment performed by Charles Livingston, a licensed social worker and limited licensed psychologist, in order to receive accommodations in medical school. His assessment confirmed the clinical diagnosis of ADHD, for which recommended the medical school disability office provide accommodations.

Since that assessment, Jessica has received reasonable accommodations throughout medical school allowing her to adequately access and pass her exams. These accommodations include: private room and double time for standardized NBME (CBSE and Shelf) exams; extra time to read instructions and patient information and write the patient note for OSCEs; double time and quiet environment for anatomy lab practicals; and all WMed-administered exams and quizzes provided as a printed hard copy with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time.

Since then, Dr. Lewandowski completed a more comprehensive neuropsychology evaluation (12/7/17), which reconfirmed the diagnosis of ADHD. I He diagnosed ADHD both clinically and by clinical history and neuropsychology testing.

Additionally, collateral history provided by Jessica's mother and significant other, and recent DSM-IV symptom checklists with prompts completed by Jessica, her significant other and her mother, all strongly support Jessica's diagnosis of ADHD, combined type (CODE), and her need for accommodation.

In addition to ADHD, Jessica's medical record, symptoms, family history and neuropsychological testing also support presence of learning disabilities she has grappled with since beginning to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of learning disabilities of reading and writing (CODE).

Under timed conditions, in addition to her difficulty with attention, distractibility and restlessness, Jessica is limited by a reading disability. Due to this reading disability, she must take multiple compensatory steps to assure the accuracy of each word she reads and her comprehension of its meaning. For Jessica, reading takes great mental effort and additional time, which further exacerbates her focus and attention difficulties, particularly in time-limited situations and when required to read for extended periods.

In addition to the reading learning disability, in my professional opinion, based on clinical history, Jessica also has a writing learning disability. Jessica also reports a lifelong difficulty formulating her thoughts to put down on paper, selecting the words to use and assuring accuracy of their meaning, and using the words in an understandable sentence, so she needs more time than the average person to complete these processes. Additionally, Jessica has difficulty with legibility of her writing and makes frequent spelling and grammatical errors.

Jessica's second grade teacher first noted Jessica reversed her letters and so allowed her to use an alphabet board with extra time during spelling, reading, and writing activities as informal accommodations for Jessica to enhance her letter identification.  Due to the letter reversals and reading difficulty at the age of 7, her teacher also recommended vision testing, for which Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic Optometrist. Dr. Tanguay performed a visual-perceptual skill test and found significant deficits in Jessica's visual spatial relationships, visual discrimination and visual memory.

With the results of her most recent neuropsychological testing on 12/7/17, Dr. Lewandowski diagnosed Jessica with a nonverbal learning disability of "abnormal scanning and processing speed" (F81.9). I believe that his findings, when put into context of Jessica's clinical history, support and are consistent with the more specific clinical diagnoses of learning disabilities in reading (F81.0) and written expression (F81.81). His assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking" again affecting her ability to perform under timed conditions.

Mr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings.  Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency.

Due to her reading and writing disabilities, she requests the same accommodations for the Step 2 CK exam as she has requested for ADHD for the Step 1 retake examination.

Because the effects of her learning disabilities on her ability to access the USMLE Step 1 and Step 2 CK exams under standard conditions are similar to and somewhat overlap those caused by her ADHD, the accommodations she has requested would allow her to appropriately compensate for the symptoms [**elaborate specific symptoms**] caused by both ADHD and her learning disabilities.

It is clear that though Ms. Ramsay did not seek formal accommodations until undergrad, she was able to progress in her academic career in spite of her disabilities, compensating through her intelligence, motivation and determination. Only by sheer will and grit has she been able to persevere. While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation.

In review of past standardized test results, though she had been diagnosed with ADHD and possible dyslexia prior to the MCAT, Ms. Ramsay was not aware that she could apply for accommodations. Because Jessica knew the test was designed so that many of the questions can be answered without reading the passages, she is strategically answered those questions first, and if she had time remaining she tried to read to answer the passage-dependent questions. Does she did not have time to read all of the passages and had to select random answers for multiple questions, this format allowed Jessica to access and use her knowledge to answer enough questions to achieve a satisfactory score. However, her limited access to the exam under standard conditions is reflected in her score, which was consistent with her self-assessments on prior MCAT versions under simulated Standard exam time and environment, but was significantly lower than the self-assessment scores she took in an untimed setting and private quiet environment. Also important to note, Jessica's Verbal Reasoning sub-score was significantly lower than her Biological and Physical Sciences sub-scores, and her Writing sub-score showed a major drop off in her performance. I believe these results are quite consistent with her clinical history and neuropsychology tests.

- A differential diagnosis with a discussion of how each possible alternative explanation for the identified problem(s) has been systematically ruled out.
- A rationale for each recommended test accommodation.
- If the report includes a comprehensive psychological, psycho-educational, or neuropsychological evaluation, it should adhere to current professional standards and include:
  - Actual scores obtained for each administered subtest and/or measure reported as age-based standard scores when available from the test publisher.
  - The specific version of each test (e.g., 4th Edition, etc.) along with the specific norms used for scoring (e.g., age-based norms).
  - A summary integrating all obtained test and assessment data with available clinical presentation, behavioral observations, relevant background/historical information, and current functioning to support the diagnostic conclusion.
- If there is no prior history of classroom or test accommodations, an explanation of why accommodations have not been required/provided in the past and why they are necessary at this time.


In my professional opinion therefore, Jessica meets the United States Medical Licensing Examination guidelines for disabilities necessitating reasonable accommodation. After review of clinical history and neuropsychology testing, and conferring with Jessica, I recommend the following accommodations for US MLE Step 1 and Step 2 CK exams:

a.    Fifty percent additional time for exam over two days for inattention, distractibility, slow reading and processing speed

b.    Additional break time over two days

c.    A separate quiet area to complete the examination for inattention and distractibility

Ramsay14-0035

Even if the Board does not find Jessica meets criteria for accommodations for ADHD, in my professional opinion the Board should approve Jessica for accommodation for reading and writing learning disabilities.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

---

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination step I exam retake and her step II exam.

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for Attention Deficit and Hyperactivity Disorder, Combined type (CODE) [based on clinical, academic, family and social histories, direct observation, neuropsychological evaluation, and collateral information. Her childhood history obtained from her mother is consistent with ADHD, and was consistent between home, school and social activities. In Kindergarten through grammar school Jessica manifested difficulty with focus and attention.  She received informal accommodations starting in the second grade including a secluded testing area and extra time to work on assignments. Throughout elementary, middle and high school, there were multiple instances where, working with her teachers and sometimes needing to involve her mother, Jessica received informal accommodations including extra time and altered grading schemes because she could not complete tests, reading, or writing assignments in the regular time provided. Her mother and Jessica report she experienced inattentiveness, restlessness and distractibility from early childhood that has continued to the present time.

While attending college at Ohio State University she began recognizing her difficulty concentrating, finishing timed quizzes and tests, and keeping up with reading and writing requirements due to letter switching, slow reading and writing, inability to focus, and procrastination. Her primary care doctor considered ADHD and, or, dyslexia and started her

after ADHD screen in the office on Ritalin, and later switched to Adderall as it was better tolerated and showed better effectiveness. She responded well to Adderall and has remained on an Adderall preparation since. She is currently on Vyvanse 60 MG to help her manage her symptoms throughout the long days required in medical school. In 2010, at the recommendation of a professor who knew Jessica well, Jessica met with a counselor at OSU Disability Services to discuss her options and was granted temporary accommodations, which were fully approved in upon receipt of supportive documentation from her primary care provider. With these accommodations, Jessica was able to complete more of her exams and quizzes and maintain satisfactory performance in most of her classes. However, even with the accommodations, Jessica had multiple exams in which she still was not able to get to significant portions in the time allowed due to large amounts of reading or writing they contained, and on several occasions, required additional informal accommodations, including altered grading scheme and/or extra time, in order to pass the exam and the course.

Jessica An initial formal neuropsychology assessment occurred in 2014 by Charles Livingston, a licensed social worker and limited licensed psychologist, confirmed the clinical diagnosis of ADHD. He recommended accommodations to the medical school disability office for ADHD at that time.

Since that assessment, she has received accommodations in medical school and has performed very well on exams.

Dr. Lewandowski did a second neuropsychology test 12/7/18 confirming the diagnosis of ADHD. I He diagnosed ADHD both clinically and by clinical history and by neuropsychology testing.

Jessica's mother and significant other provided collateral historical support for the diagnosis of ADHD, combined type. Recent DSM-IV symptom checklists with prompts completed by Jessica, her significant other and her mother all strongly support ADHD, combined type.

** [I moved the 2 paragraphs you had here to the end – I think it makes a stronger statement there] **

In addition to ADHD, Jessica's medical record, family history, symptoms and neuropsychological testing support a learning disability she has grappled with since starting to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of learning disabilities of reading and writing.

Jessica's second grade teacher first noted Jessica reversed her letters and so allowed her to use an alphabet board with extra time during spelling, reading, and writing activities as informal accommodations for Jessica to enhance her letter identification.  Due to the letter reversals and

Ramsay14-0037

reading difficulty at the age of 7, her teacher also recommended vision testing, for which Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic Optometrist. Dr. Tanguay performed a visual-perceptual skill test and found significant deficits in Jessica's visual spatial relationships, visual discrimination and visual memory. Report attached.

Under timed conditions, Jessica is limited by a reading disability. Due to this reading disability she, must take multiple compensatory steps to assure the accuracy of each word she reads and her comprehension of their meaning. For Jessica, reading takes great mental effort and additional time, which further exacerbates her focus and attention difficulties, particularly when required for extended periods and during timed examinations.

Jessica's mother recalls that Jessica's teachers always noted her to be a very bright student, but also that she was always an incredibly slow reader and writer, and a bad test-taker, consistent with Jessica's self-reported history.

I believe the results of Jessica's most recent neuropsychological testing performed by Dr. Lewandowski's (title) on _date___ are consistent with Jessica's clinical diagnosis of learning disabilities in reading and written expression. His assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98$_{th}$ percentile) but also had a marked drop-off in intellectual efficiency (34$_{th}$ percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her IQ pattern "is consistent with the patient's and parents reports of premorbid functioning, and consistent with a pre-existing developmental delay. Jessica tested abnormal on specific cognitive tasks including sequencing and cognitive shifting, sustained complex attention and quickness of thinking again affecting her ability to perform under timed conditions."

Mr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency.

In addition to a reading learning disability, in my professional opinion, based on clinical history, Jessica has a writing learning disability. Jessica reports a lifelong difficulty formulating her thoughts to put down on paper, picking the words to use and to assure accuracy of their

meaning, and using the words in an understandable sentence. In addition, she has difficulty with legibility of her writing and makes frequent spelling, and grammatical errors.

Due to her reading and writing disabilities, she requests the same accommodations for the Step II CK exam as she has requested for ADHD for the Step I retake examination.

Ms. Ramsay was able to succeed in her academic career in spite of her disabilities through sheer will and grit. Only by her intelligence, motivation, and determination has she been able to persevere. She self-accommodated for many years until the complexity of the material in college led her to seek medical evaluation.

Ms. Ramsay's MCAT scores were quite lower that her practice tests and she did much better in her ~~mathematics~~ compared to her Verbal scores, and a major drop off her performance occurred in her writing portions. I believe these results are quite consistent with her clinical history and neuropsychology tests.

Like many with limitations in certain realms of cognitive function, Jessica has developed major strengths in areas not easily measured by multiple-choice questions.   While she may not excel on timed tests requiring fast reading comprehension and identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills.

In my professional opinion therefore, Jessica meets the United States Medical Licensing Examination guidelines and I recommend, after review of neuropsychology testing and conferring with Jessica, the following accommodations for NBME Step I and Step II CK exams:

d.      Fifty percent additional time for exam over two days

e.      Additional break time over two days

f.      A separate quiet area to complete the examination for inattention and distractibility

Even if the Board does not find Jessica meets criteria for accommodations for ADHD, in my professional opinion the Board should approve Jessica for accommodation for reading and writing learning disabilities.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Ramsay14-0039

Bruce Ruekberg, MD

Ramsay14-0040

**Jessica draft 3.docx**

**Bruce Ruekberg (via Google Drive) <ruekber1@gmail.com>**
Wed 4/11/2018 5:14 PM
**To:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

Bruce Ruekberg has shared the following document:

 **Jessica draft 3.docx**

Open

Google Drive: Have all your files within reach from any device.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA



Ramsay14-0041

To Whom It May Concern:

I am writing this letter and clinical summary in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination Step 1 retake and her Step 2 CK exams.

**History of present illness:**

Currently, Ms. Ramsay is pursuing a medical degree but is on academic leave of absence due to inhibited advancement through the curriculum after failing her initial unaccommodated USMLE Step 1 attempt, which has resulted in a subsequent delay of match and graduation. Jessica's initial request for reasonable accommodation for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would not give her equal opportunity to demonstrate her competency because she would not be able to read enough of the questions. However, after discussing her options with the school, Jessica decided to still attempt Step 1 before pursuing an appeal for accommodations in hopes that she might be able to pass and remain on track for match and graduation. Regardless of her score, the symptoms Jessica experienced during her Step 1 attempt due to her ADHD and learning disabilities significantly impeded her access to the exam under standard conditions, consistent with her experiences with previous unaccommodated standardized testing. She feels that the formal accommodations (double time, separate room) she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school sufficiently decreased the excessive barriers normally imposed by standard conditions by decreasing ambient distractions and permitting her to read/think aloud or briefly step away from the computer to process the information and to manage her restlessness and hyperactivity without risk of disrupting other test-takers. Ms. Ramsay states she would like an equal opportunity to read each of the questions and process the information so she can apply her knowledge to choose each answer and to receive a score that accurately reflects her comprehension of the material. In hopes to accomplish this, she has been pursuing more comprehensive testing and documentation to better address the NBME guidelines in order to support her appeal for appropriate accommodations for the USMLE Step exams.

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around functional deficiencies they cause.

In order to accurately read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. To compensate, Jessica isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical

Ramsay14-0042

errors and has a hard time proofreading her own work and, when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to clearly express them. To compensate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these deficiencies, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to effectively execute them.

Because reading and writing take her a very long time and require great mental effort, these difficulties are further exacerbated by her focus and attention problems and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing intermittent feelings of inadequacy resulting in depressed mood, low energy, fatigue, anxiety, and some difficulty sleeping. The symptoms occur at times when she disproportionately struggles to keep up with academic demands compared to her peers, or when she is unable to accurately demonstrate her knowledge and capabilities because she is disadvantaged by required reading and/or writing, especially under limited time and/or unfavorable conditions, and when proving her competency stands in the way of continuing her pursuit of academic and occupational goals.

Information provided by Jessica's significant other, with whom she has been living for two years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and very hard-working. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house so she doesn't forget to do things." She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything." Importantly, as a medical student himself, he states that while studying and doing practice questions together, "she knows the stuff, but if she can't focus when she reads, she'll probably get the question wrong because she misread something. But if you ask her in person, she'll give a correct explanation. She has the clinical knowledge; she's just bad at showing it on standardized tests because she's not standard – her brain works differently."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so, due to her letter

Ramsay14-0043

reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

At home Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

*Socially*, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does." With written assignments, Jessica needed a lot of help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty.

Her mother states that once she started school, "Jessie would almost always get headaches from trying to concentrate to do her home- or schoolwork, especially with reading and writing." Jessica's second-grade teacher was first to note that Jessica still reversed letters at the age of 7, and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessment for behavioral problems or learning disabilities was not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence. Jessica was trialed on glasses for "straining to focus" for about a year, but they did not provide relief for the straining, nor improve her distractibility, or difficulties with reading, spelling, and writing, so she stopped wearing them. Jessica began having migraines in third grade,

Commented [JR1]: You can remove the underlining for "home" "school" and "socially," unless you think it would be beneficial to leave in.

"sometimes she would come home with them, but she would usually get them while trying to do her homework."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed, and procrastination interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening. He did not recommend further testing for ADHD or dyslexia at the time as he did not believe it would change medical management. Jessica was started on a trial of Ritalin, then switched to Adderall a month later, which was better tolerated and showed better effectiveness. She has remained on an Adderall preparation since 2009 and is currently on Vyvanse 60 MG to help her manage her symptoms for the duration needed to complete her academic requirements. In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

**Standardized Testing History:**

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it. Aware of her weaknesses with reading, writing, and timed testing, Jessica took a strategic approach, answering passage-independent questions first, then with any time left, attempted to read the passages with the most remaining questions, and randomly filling in any blank questions in the last minute. This strategy allowed Jessica to apply her knowledge to enough questions in each section to achieve an overall satisfactory score. Notably, Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and a major drop-off in Writing (33%).

Ramsay14-0045

NBME Exams: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions and to manage her symptoms without distracting other test takers. The CBSE taken on 04/28/17, after successful completion of her clinical clerkships, provided by the school as formative practice for Step 1, is the only exception. Because her Step 1 accommodations request had been denied, Ms. Ramsay chose to attempt this practice test still in a separate room, but without the extra time she normally received, to see if she would be able to read enough questions to pass.

USMLE Exams: Unlike most standardized examinations Jessica had taken prior to medical school, for which reading the entire prompt was not required to answer most of the questions, the USMLE exams are designed so that, for nearly all of the questions, the information in the prompt must be assessed to come up with the answer, meaning that Jessica has to read the whole prompt for almost all of the questions in order to apply her knowledge to select an answer. Because of the inherent structure of the USMLE exams, Jessica is severely disadvantaged compared to the average person taking the exams because of her very slow reading (and writing, for Step 2 CS) and information processing speeds, in addition to her inattention, distractibility, restlessness, and hyperactivity. Jessica's experience during her initial Step 1 exam attempt illustrates this disadvantage, along with the additional disadvantages imposed by standard exam conditions. The standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction caused by other test-takers being in the same room, which she could not simply "tune out" due to her distractibility and attention difficulties. She was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without disturbing others in the room. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

In each case, Jessica achieved significantly lower scores on unaccommodated exams than she did on equivalent practice exams taken in a quiet environment with sufficient time, or formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time. This suggests that, under standard exam settings and time limits, Jessica does not have an opportunity to read all of the questions, which impedes her ability to accurately demonstrate her knowledge and preparation, and therefore she does not have equal access to the exam.

Accommodations History:

Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing

difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) for completing tests, reading, and writing assignments because she was unable to satisfactorily do so in the regular time provided.

Since Dr. Charles Livingston's recommendation to the medical school to provide "accommodations of distraction-free testing milieus, paper testing materials, extended time, and audio recordings" following his neuropsychological assessment in 2014, which confirmed Jessica's diagnosis of ADHD, Jessica has received reasonable accommodations throughout medical school which provided more equal access her exams. Accommodations Jessica has received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

Jessica feels the excessive barriers imposed by standard conditions were sufficiently removed by the formal accommodations she received during the previous NBME (CBSE and clinical Shelf) exams because they decreased ambient distractions and permitted Jessica to read/think aloud or briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

**Past Medical History:**

Significant for chronic migraines with aura and photo-/phonophobia beginning in third grade, requiring one year of prophylactic treatment, followed by abortive management with ibuprofen. Ms. Ramsay reports the migraines can be triggered or worsened by stress and/or having to sustain focus and mental effort beyond her threshold, such as when reading or writing. The frequency and severity of migraines increased with academic demands over time until 2015, when daily migraines necessitated prophylactic treatment with low-dose beta blocker. She has continued the beta blocker as effective prophylaxis.

In 2016, Ms. Ramsay was diagnosed with a lower extremity DVT and subsequently identified as a Factor V Leiden heterozygote. Treatment of the DVT with Xarelto led to secondary mild anemia, which resolved with iron supplementation. She has no prior history of anemia or blood clots.

In 2010, Jessica had an episode of viral meningitis, requiring one day of hospitalization for administration of IV fluids, which resolved completely with no lasting effects.

**Family history:**

Ramsay14-0047

Significant for mother with migraines, ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

**Assessments:**

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second-grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found Jessica to have "substantial deficits in the areas of visual-spatial relationships and visual discrimination," and "was also lacking in visual memory." These findings strongly suggest the presence of a learning disability affecting Jessica's ability to read, spell, write, and process information.

Dr. Katherine Turner completed a full physical in 2014, reporting all systems to be normal, with the exception of a history of AHDH, dyslexia, and migraines. Visual acuity testing completed as part of the exam, noted Jessica to have 20/13 vision, uncorrected, in both eyes (normal = 20/20).

An initial formal neuropsychology assessment was performed in 2014 by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. He confirmed the **clinical diagnosis of ADHD,** originally made by Dr. Alan Smiy in 2009, after his assessment using the WAIS-IV showed that Jessica to be in the 96th percentile for verbal comprehension and perceptual (non-verbal) reasoning, but only in the 63rd percentile for working memory, attention, and concentration, and a very significant drop-off with processing speed in the 10th percentile. He did not feel it was necessary at the time to pursue testing to confirm diagnosis of dyslexia as he believed the confirmation of her diagnosis of ADHD was sufficient to necessitate provision of reasonable accommodation. Dr. Livingston states that "Jessie's exceptionally bright reasoning abilities and long-term memory stand in contrast to relatively low attention and concentration and very low processing speed. Her native intelligence has been some compensation for low abilities in the identified areas."

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with ADHD and a nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9). When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81). Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent

with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

<u>Differential and Rule-out Diagnoses:</u>

I have reviewed Jessica's medical and neuropsychological records and have ruled out medical conditions and primary disorders of mood and anxiety as possible causes of Jessica's persistent inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading, writing, and information processing speeds since early childhood, as well as for possible causes of her intermittent symptoms of anxiety and depression, and feelings of inadequacy.

In the context of Jessica's clinical history, the substantial deficits in visual-spatial relationships, visual discrimination, and visual memory reported by Dr. Tanguay in 1997 strongly suggest the presence of a learning disability. The subsequent failure of corrective glasses to relieve Jessica's "straining to focus" and difficulties with reading, spelling, and writing, make vision problems an unlikely cause of her letter reversals, difficulties with written language, and inattention. This conclusion is further supported by the 2014 physical completed by Dr. Turner, which noted Jessica's bilateral visual acuity of 20/13 and completely normal physical exam, ruling out persistence of vision or health problems as a possible cause of persistent letter reversals and difficulties with reading and written expression.

I have ruled out Ms. Ramsay's chronic migraines as a possible cause of her impaired cognitive functions and ADHD symptoms, as her symptoms of inattention, distractibility, restlessness, and difficulty with reading and writing began years before the onset of her migraines and have continued well after their prevention. The same can be said for her brief episode of anemia secondary to medication effects, and her episode of viral meningitis, both of which occurred after diagnosis with ADHD and possible dyslexia.

For completeness, a sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause inattentiveness, distractibility, inefficient thinking or slow processing speed which have persisted since childhood. Likewise, thyroid function tests, CBC, metabolic panels, and screening labs are all negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, inefficient thinking, or slow processing speed.

Ramsay14-0049

Jessica's intermittent feelings of inadequacy resulting in depressed mood, low energy, fatigue, anxiety, and some difficulty sleeping have only been situational, provoked directly by inadequate accommodation, enabling conditions that put her at unequal disadvantage compared to her peers and interfere with her ability to demonstrate her competency. Past episodes occurred due to similar circumstances, and symptoms resolved with successful completion of the situational obstacle, usually facilitated by formal or informal accommodations. The temporary and conditional nature of these episodes rules out primary mood and anxiety disorders as possible causes of her inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed that persisted since childhood.

**Clinical Impression:**

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she also meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)** based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other.

It is not uncommon for ADHD and learning disabilities to co-exist within the same individual, nor is it uncommon for persons with above-average intelligence to successfully advance through school with undiagnosed ADHD and/or learning disabilities, until academic demands outweigh their ability to self-accommodate. I believe this is very much the case for Ms. Ramsay. While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

**Summary and Plan:**

In my professional opinion, Jessica's functional limitations caused by Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2) and specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81) without question meet the definition of disabilities under the ADA, and should absolutely meet the definition set by the National Board of Medical Examiners' guidelines, and should therefore qualify for reasonable accommodation for all United States Medical Licensing Examinations, per

> Commented [JR2]: You can get rid of the bolding and underlining if you would like

her request. This includes her current request pertaining to Step 1 and Step 2 CK exams as well as any future requests for accommodations that she justifies as reasonable and necessary to provide her with equal access to the USMLE exams.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 and Step 2 CK exams:

- **50% additional test time (Time and ½) over 2 days** for inattention, distractibility, and slow information processing and reading speeds.

- **15 minutes additional break time after each block** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, **as well as an additional 10 minutes for the break at the midway point for each of the 2 days** to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.

- **A separate, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

Ramsay14-0051

**Final draft**

## Jessica Ramsay

Fri 4/20/2018 1:34 AM

**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>

📎 1 attachments (37 KB)

2018.04.29_Jessica Ramsay_Clinical Summary_draft 4.docx;

Hi Dr. Ruekberg,

Here is the final draft of the letter. Sorry it is so long... I had to add a lot to support each of the points in the NBME guidelines. Please let me know once you've received it. You can try email, just make sure my last name is spelled with an -AY... Haha. And please, please proofread this to make sure you approve before you sign it, and because I'm obviously prone to mistakes...

You can reformat it as you see fit.

Please call me when you are done editing so I can make sure I get your final, **signed & dated** version **"on official letterhead"** before I stop bothering you. 😊

THANK YOU SOOOOOO MUCH!

Jessie

**Re: Final draft**

## Jessica Ramsay

Fri 4/20/2018 12:51 PM

**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>

Got this message!

Jessie

---

**From:** Bruce Ruekberg
**Sent:** Friday, April 20, 2018 12:50:55 PM
**To:** Jessica Ramsay
**Subject:** Re: Final draft

got the draft
let me know you got this message
Dr R

---

**From:** Jessica Ramsay
**Sent:** Friday, April 20, 2018 1:34 AM
**To:** Bruce Ruekberg
**Subject:** Final draft

Hi Dr. Ruekberg,

Here is the final draft of the letter. Sorry it is so long... I had to add a lot to support each of the points in the NBME guidelines. Please let me know once you've received it. You can try email, just make sure my last name is spelled with an -AY... Haha. And please, please proofread this to make sure you approve before you sign it, and because I'm obviously prone to mistakes...

You can reformat it as you see fit.

Please call me when you are done editing so I can make sure I get your final, **signed & dated** version "**on official letterhead**" before I stop bothering you. 😊

THANK YOU SOOOOOO MUCH!

Jessie

Ramsay14-0053

**Re: Final draft**

**Jessica Ramsay**
Sun 4/22/2018 12:11 PM
**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>
Hi Dr. Ruekberg,

I hope you are having a great weekend! Just checking in - have you had a chance to read through the draft? If you have any questions or would like to talk about any of it, please give me a call.

Thanks again,

Jessie

---

**From:** Bruce Ruekberg
**Sent:** Friday, April 20, 2018 12:50:55 PM
**To:** Jessica Ramsay
**Subject:** Re: Final draft

got the draft
let me know you got this message
Dr R

---

**From:** Jessica Ramsay
**Sent:** Friday, April 20, 2018 1:34 AM
**To:** Bruce Ruekberg
**Subject:** Final draft

Hi Dr. Ruekberg,

Here is the final draft of the letter. Sorry it is so long... I had to add a lot to support each of the points in the NBME guidelines. Please let me know once you've received it. You can try email, just make sure my last name is spelled with an -AY... Haha. And please, please proofread this to make sure you approve before you sign it, and because I'm obviously prone to mistakes...

You can reformat it as you see fit.

Please call me when you are done editing so I can make sure I get your final, **signed & dated** version "**on official letterhead**" before I stop bothering you. 😊

THANK YOU SOOOOOO MUCH!

Jessie

Ramsay14-0054

## Re: JR - Natl. Board of Medical Examiners

**Jessica Ramsay**
Thu 5/24/2018 2:27 PM
**To:** Lawrence D. Berger <larry@rcglawoffices.com>

Redacte

Red



Redacted

Redacted

Ramsay14-0055

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her retake of the United States Medical License Examination Step 1 exam.

**History of present illness:**

Currently, Ms. Ramsay is pursuing a medical degree but is on academic leave of absence due to inhibited advancement through the curriculum after failing her initial unaccommodated USMLE Step 1 attempt, which has resulted in a subsequent delay of match and graduation. Jessica's initial request for reasonable accommodation for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would not give her equal opportunity to demonstrate her competency because she would not be able to read enough of the questions. However, after discussing her options with the school, Jessica decided to still attempt Step 1 before pursuing an appeal for accommodations in hopes that she might be able to pass and remain on track for match and graduation. Jessica feels due to the denial of her request for accommodations on Step 1, her ADHD symptoms and deficits due to her reading disability greatly affected her Step 1 score.

She believes strongly the formal accommodations (double time, separate room) she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school were sufficient to  overcome the excessive barriers of standard conditions. With accommodations there is a decrease in ambient distractions and she is able to to read/think aloud or briefly step away from the computer to process the information and to manage her restlessness and hyperactivity without risk of disrupting other test-takers. Ms. Ramsay states she would like an equal opportunity to read each of the questions and process the information so she can apply her knowledge to choose each answer and to receive a score that accurately reflects her comprehension of the material. In hopes to accomplish this, she has been pursuing more comprehensive testing and documentation to better address the NBME guidelines in order to support her appeal for appropriate accommodations for the USMLE Step exams.

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around functional deficiencies they cause.

In order to accurately read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. To compensate, Jessica isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical errors and has a hard time proofreading her own work and, when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to clearly express them. To compensate, she uses analogies, draws pictures

and diagrams, or physically demonstrates what she is trying to communicate. Due to these deficiencies, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to effectively execute them.

Because reading and writing take her a very long time and require great mental effort, these difficulties are further exacerbated by her focus and attention problems and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing symptoms of anxiety and feelings of inadequacy when faced with reading or writing as part of functional gatekeepers that decide whether or not she may continue pursuing her academic and occupational goals. These symptoms become more severe when she anticipates not having enough time or ability to focus to adequately demonstrate her capabilities based on her past experiences.

Information provided by Jessica's significant other, with whom she has been living for three years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and very hard-working. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house so she doesn't forget to do things." She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything." Importantly, as a medical student himself, he states that while studying and doing practice questions together, "she knows the stuff, but if she can't focus when she reads, she'll probably get the question wrong because she misread something. But if you ask her in person, she'll give a correct explanation. She has the clinical knowledge; she's just bad at showing it on standardized tests because she's not standard – her brain works differently."

**Childhood history** obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and affecting several domains of life, consistent with Jessica's diagnosis of **ADHD, combined type**. She also describes Jessica having a very difficult time with reading and writing since beginning to do so, due to her letter reversals, "mixing up words," and difficulties with recalling specific words, consistent with **learning disabilities in reading and writing**.

Her second grade teacher was first to note that, at the age of 7, Jessica still reversed letters and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual

Ramsay14-0057

memory. At the time, assessment for behavioral problems or learning disabilities was not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence

With written assignments, Jessica needed a lot of help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty. Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations, including extra time and a secluded workspace for assignments, for distractibility and slow reading and writing in the second grade. On multiple occasions throughout her academic career, Jessica required informal accommodations (extra time, altered grading scheme, and/or redo opportunity) to complete tests, reading, and writing assignments because she was not able to satisfactorily do so in the regular time provided.

At home Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and

writing speed interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening that was consistent with ADHD. Jessica was started on stimulant medication and had some improvement of her ADHD symptoms, but her underlying learning deficits did not improve. Since college Jessica has remained on a regiment of ADHD stimulant to help her function in school and relationships. Her difficulties, however, in test situations under standard conditions remain despite taking stimulant medications.

In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

### Standardized Testing History:

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it., Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions, but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and a major drop-off in Writing (33%).

NBME Exams: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions and to manage her symptoms without distracting other test takers. The CBSE taken on 4/11/16, provided by the school as formative practice for Step 1, for which Ms. Ramsay chose to attempt in a private testing room but without the extra time, is the only exception. She chose to do this because her initial Step 1 accommodations request had been denied and she wanted to to see if she would be able to read enough questions to pass. Even

Ramsay14-0059

with the private environment, she did not have the opportunity to read about 10 of the questions within the standard 60 minutes provided for each block.

USMLE Exams: During her Step 1 exam experience, the standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction provided by other test-takers being in the same room, which she could not simply "tune out" due to her attention difficulties and distractibility. In the standard environment, she was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without distracting others. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section, and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

Under timed test conditions Jessica consistently scored significantly lower on unaccommodated exams compared to practice exams taken in a quiet environment with sufficient time, or under formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time.

Due to her disabilities, in my professional opinion  by taking the NBME exams under standard exam settings and time limits, Jessica does not have an equal opportunity to read all of the questions (compared to other test takers without a disability) ,and this impedes her ability to accurately demonstrate her knowledge and preparation.

**Accommodations History:**

Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) necessary to level the playing field, giving Jessica the opportunity to demonstrate her competency.

Since Dr. Charles Livingston's neuropsychological assessment in 2014 confirmed her diagnosis of ADHD, Jessica has received reasonable accommodations throughout medical school, including for OSCEs and standardized NBME (CBSE and Shelf) exams, which provided more equal opportunity for her to access her exams. Accommodations received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

Ramsay14-0060

The formal accommodations she received during the previous standardized NBME (CBSE and clinical Shelf) exams, listed above, removed excessive barriers imposed by standard conditions because they sufficiently decreased ambient distractions and permitted Jessica to read and think aloud and to briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

<u>Family history</u>:

Significant for mother with ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

<u>Assessments:</u>

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory.

In 2014 Jessica had an initial formal neuropsychology assessment performed by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. His assessment confirmed the **clinical diagnosis of severe ADHD**, for which he recommended the medical school disability office provide accommodations. Dr. Livingston chose not to perform an evaluation for dyslexia as he thought Jessica's diagnosis of severe ADHD would be sufficient to warrant reasonable accommodation by the school, which would allow her symptoms of both ADHD and dyslexia to be addressed.

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with **ADHD** and a **nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9)**. When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of **nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81)**. Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Ramsay14-0061

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

<u>**Differential and Rule-out Diagnoses**</u>:

For completeness, Jessica has been evaluated for medical conditions, sleep disorders, and primary disorders of mood and anxiety as possible causes of Jessica's reported symptoms of inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed, anxiety, and feelings of inadequacy.

A sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause her inattentiveness, distractibility, or slow processing speed. In addition, thyroid function tests, CBC and screening labs are negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, or slow processing speed.

Since learning she did not pass Step I of the NBME and that her her school required to sit out classes until she passed step I, Jessica has exhibited mild depression and anxiety symptoms appropriate to her situation. I do not feel she has a primary mood or anxiety disorder.

<u>**Clinical Impression**</u>:

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. Based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other, Jessica meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

Due to the nature of these disorders, there is some degree of overlap between them with regards to symptoms, history, objective findings, and recommended treatment and academic/occupational accommodations.

After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

Ramsay14-0062

**Summary and Plan:**

While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam:

- **100% additional test time (double time)** for inattention, distractibility, and slow information processing and reading speeds.
- **Additional break time** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, as well as to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.
- **A private, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

In my professional opinion, due to her functional limitations due to **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** and **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81),** Jessica, without question, qualifies as disabled under the ADA, and should *absolutely* meet the National Board of Medical Examiners' guidelines for disabilities and should therefore be granted reasonable accommodation, per her request, to meet her needs for the United States Medical Licensing Examinations Step 1 exam. Even if the Board does not find that Jessica meets their criteria for accommodations for ADHD, in my professional opinion, the Board should absolutely approve the requested accommodations for her learning disabilities of reading and written expression.

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Ramsay14-0063

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

---

# Attention-Deficit/Hyperactivity Disorder (ADHD)

In addition to the information described in the *General Guidelines*, a request for test accommodations on the basis of ADHD should include the following:

1. **A report of evaluation by a qualified professional**

   - It is up to each professional to determine an appropriate assessment battery for any given evaluation.

   - The professional report should generally include the following:

     - Relevant aspects of the individual's developmental, educational, family, medical, psychosocial, educational, occupational, and other personal history.

     - A history of the individual's presenting symptoms, with detailed information about how the symptoms have manifested in the home, school, work, and other settings over time.

     - Self-report symptom checklists, behavior rating scales, and continuous performance tests may be useful in diagnosing ADHD. Since adult recall of childhood symptoms tends to be unreliable, the evaluator should seek ancillary information from other sources (e.g., parent, teacher, spouse) as well as examples of current functional impairment in more than one setting.

     - A review of documentation from third-party sources, when available, to establish a history of impairment that goes beyond self-report (e.g., review of academic records; scores from prior standardized exams; previous evaluations or treatment records; feedback from teachers/faculty, advisors, supervisors; etc.).

Ramsay14-0064

- A differential diagnosis with a discussion of how each possible alternative explanation for the identified problem(s) has been systematically ruled out.

- A rationale for each recommended test accommodation.

- If the report includes a comprehensive psychological, psycho-educational, or neuropsychological evaluation, it should adhere to current professional standards and include:

  - Actual scores obtained for each administered subtest and/or measure reported as age-based standard scores when available from the test publisher.

  - The specific version of each test (e.g., 4th Edition, etc.) along with the specific norms used for scoring (e.g., age-based norms).

  - A summary integrating all obtained test and assessment data with available clinical presentation, behavioral observations, relevant background/historical information, and current functioning to support the diagnostic conclusion.

- If there is no prior history of classroom or test accommodations, an explanation of why accommodations have not been required/provided in the past and why they are necessary at this time.

2. **Objective records of impaired functioning**

- While historical records of childhood difficulties may not be obtainable in every case, providing objective documentation demonstrating a history of functional impairment in more than one setting is useful to demonstrate the developmental nature and course of the impairment(s) due to ADHD.

- Records of current/recent real-world functional impairment in academic, social, and/or vocational settings and in daily adaptive functioning demonstrating how a major life activity is substantially limited.

# Specific Learning Disorders

In addition to the information described in the *General Guidelines*, a request for test accommodations on the basis of a Specific Learning Disorder should include the following:

1. A report of evaluation by a qualified professional

- A comprehensive psychological, psycho-educational, or neuropsychological evaluation that adheres to current professional standards. It is up to each evaluator to determine an appropriate assessment battery for any given evaluation.

Ramsay14-0065

- The report of evaluation should generally include the following:
  - Relevant aspects of the individual's developmental, family, medical, and other history including linguistic history, if English is not the first language.
  - A summary of the individual's educational history, experiences, and achievements, quality of instruction, and language of instruction at each level, and trends in academic performance.
  - History of prior academic interventions and classroom or test accommodations.
  - A review of documentation from third-party sources when available (e.g., academic records; scores from prior standardized exams; previous evaluations; feedback from teachers/faculty, tutors, academic advisors, or others; etc.).
  - Data and information from a comprehensive battery of standardized, norm-referenced tests and measures used to assess the individual's cognitive and academic functioning.
    - The Nelson-Denny Reading Test (NDRT) and Wide Range Achievement Test (WRAT) are not comprehensive diagnostic measures of achievement and therefore neither is considered acceptable if used as the sole measure of reading ability or academic skills.
  - Actual scores obtained for each subtest and/or measure administered reported as age-based standard scores when available from the test publisher.
  - The specific version of each test (e.g., 4th Edition, etc.) along with the specific norms used for scoring (e.g., age-based norms).
  - A summary integrating the obtained test and assessment data with relevant background/historical information, previous and current manifestations of the learning impairment, and current academic, occupational, and other life functioning.
  - A differential diagnosis with discussion of how each possible alternative explanation for the learning difficulty has been systematically ruled out (e.g., inadequate match between the individual's ability and instructional demands; cultural or linguistic factors; poor motivation and/or study skills; problems of attention, mood, or anxiety; sensory impairments; etc.)
  - An explanation of how the specific area of impairment is relevant to the examination setting and context and how the standard conditions present a barrier to the individual's access the examination.
  - A rationale for each recommended test accommodation.

Ramsay14-0066

- If there is no prior history of classroom or test accommodations, an explanation of why accommodations have not been required/provided in the past and why they are necessary at this time.

2.  Objective records of impaired functioning

- While historical records of childhood learning difficulties may not be obtainable in every case, providing objective documentation demonstrating a history of academic impairment (e.g., reading, writing) is useful to demonstrate the developmental nature and course of the impairment(s).

- Objective records that reflect current/recent academic, occupational, or other functional impairment that demonstrate how a major life activity is substantially limited relevant to test taking. Refer to the General Guidelines for examples of supporting documentation.

Ramsay14-0067

**Jessica draft 3.docx**

**Bruce Ruekberg (via Google Docs)**
Tue 5/29/2018 9:17 AM

**To:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>



Bruce Ruekberg has shared a link to the following document:

📄 Jessica draft 3.docx

Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because someone shared a document with you from Google
Docs.

**Google**

Ramsay14-0068

**Re: Jessica draft 3.docx**

**Jessica Ramsay**
Tue 5/29/2018 9:26 AM
**To:** Bruce Ruekberg <ruekber1@gmail.com>

Got it! I am able to see it as well. Is this one different than the one you sent a few minutes ago?

Jessie

---

**From:** Bruce Ruekberg (via Google Docs) <ruekber1@gmail.com>
**Sent:** Tuesday, May 29, 2018 9:24:35 AM
**To:** Jessica Ramsay
**Subject:** Jessica draft 3.docx

Bruce Ruekberg has shared a link to the following document:

 Jessica draft 3.docx

    Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because someone shared a document with you from Google
Docs.

Google™

Ramsay14-0069

**Re: Jessica draft 3.docx**

**Jessica Ramsay**
Tue 5/29/2018 12:45 PM
**To:** Bruce Ruekberg <ruekber1@gmail.com>

Hi Dr. Ruekberg,

Redacted

Thanks,

Jessie

---

**From:** Bruce Ruekberg (via Google Docs) <ruekber1@gmail.com>
**Sent:** Tuesday, May 29, 2018 9:24:35 AM
**To:** Jessica Ramsay
**Subject:** Jessica draft 3.docx

Bruce Ruekberg has shared a link to the following document:

📄 Jessica draft 3.docx

[ Open in Docs ]

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because someone shared a document with you from Google
Docs.

**Google**

Ramsay14-0070

**RE: JR - Natl. Board of Medical Examiners**

Lawrence D. Berger

Wed 5/30/2018 12:22 PM

**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>
**Cc:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

Redacted

**Dear Dr. Ruekberg:**



**From:** Lawrence D. Berger <larry@rcglawoffices.com>
**Sent:** Thursday, May 24, 2018 2:16 PM
**To:** Bruce.Ruekberg@med.wmich.edu
**Cc:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**Subject:** JR - Natl. Board of Medical Examiners

Redacted

Redacted

Ramsay14-0072



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

**PSYCHIATRY**

ROBERT D. STRUNG, MD, CHAIR

MARK KANZAWA, DO
RESIDENCY PROGRAM DIRECTOR

JOSEPH L. CALLES, JR., MD

KEVIN KUNZER, MD

MARITZA LAGOS, MD

PETER LONGSTREET, MD
CLERKSHIP DIRECTOR

B. K. RAMESH, MD

MICHAEL REDINGER, MD, MA

BRUCE RUEKBERG, MD

REBECCA SHERWOOD, MD
UTPATIENT CLINIC DIRECTOR

RUQIYA TAREEN, MD

PERRY WESTERMAN, MD

ELMIRA YESSENGALIYEVA, MD

MATTHEW ZARANTONELLO, PHD

NANCY J. LENZ, C-TAGME
PROGRAM COORDINATOR

1717 SHAFFER STREET
SUITE 010
DEPT. 66G
KALAMAZOO, MI
49048-1623
RESIDENCY (269) 337-6375
FAX: (269) 337-6378
www.med.wmich.edu

June 4, 2018

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her retake of the United States Medical License Examination Step 1 exam.

**History of present illness:**

Currently, Ms. Ramsay is on academic leave of absence from her 4th year of medical school due Western Michigan Homer Stryker Medical School's requirement, which prevents students from advancement after failing their initial USMLE Step 1. Jessica has failed attempt at her initial unaccommodated Step 1 exam resulted in a significant delay in her participating in the residency match and in graduating.

Jessica's initial request for accommodations for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would place her at a disadvantage and would not provide her an equal opportunity to demonstrate her competency. After NBME denied her disability, Jessica elected to take Step 1 before pursuing an appeal for accommodations, hoping she might pass and be able to a remain on track for the match and graduation.   Jessica feels due the lack of accommodations on Step 1, her ADHD symptoms, and deficits due to her learning disabilities greatly affected her ability to perform at her best on Step 1.

She believes that the accommodations (double time, separate room) which she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school were sufficient to overcome the barriers caused by standard conditions. With accommodations, there is a decrease in ambient distractions and she is able to read/think aloud and briefly step away from the computer to process the information, as well as manage her restlessness and hyperactivity without disrupting other test-takers. Ms. Ramsay states she needs additional time to be able to overcome her disabilities and to be able to read each of the questions and process the information, and apply her knowledge to make an educated choice for each answer on the exam.  In doing so, she believe she will receive a score that accurately reflects her comprehension of the material and her abilities. In hopes to accomplish this, she has pursued comprehensive testing and documentation in order to meet the NBME guidelines to support her appeal for appropriate accommodations for the USMLE Step exams.

Ramsay14-0073

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around these functional deficiencies.

In order to read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. Jessica also isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical errors and has a hard time proofreading her own work, and when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to express them clearly. To help her learn and communicate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these difficulties, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to execute them effectively.

Because reading and writing take her a very long time and require great mental effort, her learning disabilities are further exacerbated by her focus, inattention and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing symptoms of anxiety and feelings of inadequacy when faced with reading or writing that may determine whether she may advance in her academic and occupational goals. Her anxiety and frustration stem from experiences when she did not have enough time or a supportive environment, and therefore did not allow her to demonstrate her capabilities.

Information provided by Jessica's significant other, with whom she has been living for three years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and hardworking. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and

Ramsay14-0074

affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so. These difficulties are due to her letter reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

Her ==second grade== teacher was first to note that at the age of 7 Jessica still reversed letters and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessments for behavioral problems or learning disabilities were not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence

With written assignments, Jessica needed help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty. Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations, including extra time and a secluded workspace for assignments, for distractibility and slow reading and writing in the ==second grade.== On multiple occasions throughout her academic career, Jessica required informal accommodations (extra time, altered grading scheme, and/or redo opportunity) to complete tests, reading, and writing assignments because she was not able to satisfactorily do so in the regular time provided.

At <u>home</u> Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

<u>Socially</u>, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At <u>school</u>, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed

frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed  interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening that was consistent with ADHD.  Jessica was started  on stimulant medication and had some improvement of her ADHD symptoms, but her underlying learning deficits did not improve. Since college Jessica has remained on a regiment of ADHD stimulant  to help her function in school and relationships. Her difficulties, however, in test situations under standard conditions remain despite taking stimulant medications.

In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

**Standardized Testing History:**

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it., Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions, but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and a major drop-off in Writing (33%).

Ramsay14-0076

NBME Exams: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions and to manage her symptoms without distracting other test takers. The CBSE taken on 4/11/16, provided by the school as formative practice for Step 1, for which Ms. Ramsay chose to attempt in a private testing room but without the extra time, is the only exception. She chose to do this because her initial Step 1 accommodations request had been denied and she wanted to to see if she would be able to read enough questions to pass. Even with the private environment, she did not have the opportunity to read about 10 of the questions within the standard 60 minutes provided for each block.

USMLE Exams: During her Step 1 exam experience, the standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction provided by other test-takers being in the same room, which she could not simply "tune out" due to her attention difficulties and distractibility. In the standard environment, she was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without distracting others. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section, and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

Under timed test conditions Jessica consistently scored significantly lower on unaccommodated exams compared to practice exams taken in a quiet environment with sufficient time, or under formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time.

Due to her disabilities, in my professional opinion  by taking the NBME exams under standard exam settings and time limits, Jessica does not have an equal opportunity to read all of the questions (compared to other test takers without a disability) ,and this impedes her ability to accurately demonstrate her knowledge and preparation.

**Accommodations History:**

Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) necessary to level the playing field, giving Jessica the opportunity to demonstrate her competency.

Since Dr. Charles Livingston's neuropsychological assessment in 2014 confirmed her diagnosis of ADHD, Jessica has received reasonable accommodations throughout medical school, including for OSCEs and standardized NBME (CBSE and Shelf) exams,

Ramsay14-0077

which provided more equal opportunity for her to access her exams. Accommodations received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

The formal accommodations she received during the previous standardized NBME (CBSE and clinical Shelf) exams, listed above, removed excessive barriers imposed by standard conditions because they sufficiently decreased ambient distractions and permitted Jessica to read and think aloud and to briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

**Family history**:

Significant for mother with ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

**Assessments:**

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory.

In 2014 Jessica had an initial formal neuropsychology assessment performed by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. His assessment confirmed the **clinical diagnosis of severe ADHD**, for which he recommended the medical school disability office provide accommodations. Dr. Livingston chose not to perform an evaluation for dyslexia as he thought Jessica's diagnosis of severe ADHD would be sufficient to warrant reasonable accommodation by the school, which would allow her symptoms of both ADHD and dyslexia to be addressed.

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with **ADHD** and a **nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9)**. When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of **nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81)**. Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98. percentile) but also had a marked

Ramsay14-0078

drop-off in intellectual efficiency (34. percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

### Differential and Rule-out Diagnoses:

For completeness, Jessica has been evaluated for medical conditions, sleep disorders, and primary disorders of mood and anxiety as possible causes of Jessica's reported symptoms of inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed, anxiety, and feelings of inadequacy.

A sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause her inattentiveness, distractibility, or slow processing speed. In addition, thyroid function tests, CBC and screening labs are negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, or slow processing speed.

Since learning she did not pass Step I of the NBME and that her her school required to sit out classes until she passed step I, Jessica has exhibited mild depression and anxiety symptoms appropriate to her situation. I do not feel she has a primary mood or anxiety disorder.

### Clinical Impression:

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. Based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other, Jessica meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

Ramsay14-0079

Due to the nature of these disorders, there is some degree of overlap between them with regards to symptoms, history, objective findings, and recommended treatment and academic/occupational accommodations.

After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.


## Summary and Plan:

While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam:

- **100% additional test time (double time)** for inattention, distractibility, and slow information processing and reading speeds.
- **Additional break time** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, as well as to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.
- **A private, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

In my professional opinion, due to her functional limitations due to **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** and **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81),** Jessica, without question, qualifies as disabled under the ADA, and should *absolutely* meet the National Board of Medical Examiners' guidelines for disabilities and should therefore be granted reasonable accommodation, per her request, to meet her needs for the United States Medical Licensing Examinations Step 1 exam. Even if the Board does not find that Jessica meets their criteria for accommodations for ADHD, in my professional opinion, the Board should absolutely approve the requested accommodations for her learning disabilities of reading and written expression.

Ramsay14-0080

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

Ramsay14-0081

## Re: JR - Natl. Board of Medical Examiners

**Bruce Ruekberg**
Mon 6/4/2018 4:00 PM
**To:** Lawrence D. Berger <larry@rcglawoffices.com>
**Cc:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

📎 1 attachments (139 KB)
lawyer copy.docx;

Redacted

Redacted

Redacted

**Dr Ruekberg**

---

**From:** Lawrence D. Berger <larry@rcglawoffices.com>
**Sent:** Wednesday, May 30, 2018 10:06 AM
**To:** Bruce Ruekberg
**Cc:** Jessica Ramsay
**Subject:** RE: JR - Natl. Board of Medical Examiners

Dear Dr. Ruekberg:

Redacted

Redacted

Larry Berger
Of Counsel
Reisman Carolla Gran LLP
Email: Larry@rcglawoffices.com
Mobile Phone: 609-828-8079

**From:** Lawrence D. Berger <larry@rcglawoffices.com>
**Sent:** Thursday, May 24, 2018 2:16 PM
**To:** Bruce.Ruekberg@med.wmich.edu

Ramsay14-0082

Cc: Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**Subject: JR - Natl. Board of Medical Examiners**

**Dear Dr.** Ruekberg:



Redacted

**Larry Berger**
**Of Counsel**
**Reisman Carolla Gran LLP**
Email:  Larry@rcglawoffices.com
Phone:  856-354-0021

**Ramsay14-0083**



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

**PSYCHIATRY**

ROBERT D. STRUNG, MD, CHAIR

MARK KANZAWA, DO
RESIDENCY PROGRAM DIRECTOR

JOSEPH L. CALLES, JR., MD

KEVIN KUNZER, MD

MARITZA LAGOS, MD

PETER LONGSTREET, MD
CLERKSHIP DIRECTOR

B. K. RAMESH, MD

MICHAEL REDINGER, MD, MA

BRUCE RUEKBERG, MD

REBECCA SHERWOOD, MD
OUTPATIENT CLINIC DIRECTOR

RUQIYA TAREEN, MD

PERRY WESTERMAN, MD

ELMIRA YESSENGALIYEVA, MD

MATTHEW ZARANTONELLO,
PhD

NANCY J. LENZ, C-TAGME
PROGRAM COORDINATOR

1717 SHAFFER STREET
SUITE 010
DEPT. 66G
KALAMAZOO, MI
49048-1623
RESIDENCY (269) 337-6375
FAX: (269) 337-6378
www.med.wmich.edu

June 4, 2018

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's application for accommodations for her retake of the United States Medical License Examination Step 1 exam.

**History of present illness:**

Currently, Ms. Ramsay is on academic leave of absence from her 4th year of medical school due to Western Michigan Homer Stryker Medical School's requirement, which prevents students from advancement after failing their initial USMLE Step 1. Jessica's failed attempt at her initial unaccommodated Step 1 exam resulted in a significant delay in her participating in the residency match and in graduating.

Jessica's initial request for accommodations for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would place her at a disadvantage and would not provide her an equal opportunity to demonstrate her competency. After NBME denied her disability, Jessica elected to take Step 1 before pursuing an appeal for accommodations, hoping she might pass and be able to a remain on track for the match and graduation. Jessica believes that the lack of accommodations on Step 1, her ADHD symptoms, and deficits due to her learning disabilities greatly affected her ability to perform at her best on Step 1.

She believes that the accommodations (double time, separate room) which she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school were sufficient to overcome the barriers caused by standard conditions. With accommodations, there is a decrease in ambient distractions and she is able to read/think aloud and briefly step away from the computer to process the information, as well as manage her restlessness and hyperactivity without disrupting other test-takers. Ms. Ramsay states she needs additional time to be able to overcome her disabilities and to be able to read each of the questions and process the information, and apply her knowledge to make an educated choice for each answer on the exam. In doing so, she believe she will receive a score that accurately reflects her comprehension of the material and her abilities. In hopes to accomplish this, she has pursued comprehensive testing and documentation in order to meet the NBME guidelines to support her renewed request for appropriate accommodations for the USMLE Step exams.

Ramsay14-0084

Appx1293

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around these functional deficiencies.

In order to read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. Jessica also isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical errors and has a hard time proofreading her own work, and when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to express them clearly. To help her learn and communicate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these difficulties, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to execute them effectively.

Because reading and writing take her a very long time and require great mental effort, her learning disabilities are further exacerbated by her focus, inattention and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing symptoms of anxiety and feelings of inadequacy when faced with reading or writing that may determine whether she may advance in her academic and occupational goals. Her anxiety and frustration stem from experiences when she did not have enough time or a supportive environment, and therefore did not allow her to demonstrate her capabilities.

Information provided by Jessica's significant other, with whom she has been living for three years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and hardworking. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and

Ramsay14-0085

affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so. These difficulties are due to her letter reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

Her second grade teacher was first to note that at the age of 7 Jessica still reversed letters and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessments for behavioral problems or learning disabilities were not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence

With written assignments, Jessica needed help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty. Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations, including extra time and a secluded workspace for assignments, for distractibility and slow reading and writing in the second grade. On multiple occasions throughout her academic career, Jessica required informal accommodations (extra time, altered grading scheme, and/or redo opportunity) to complete tests, reading, and writing assignments because she was not able to satisfactorily do so in the regular time provided.

At home Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed

Ramsay14-0086

frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed  interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening that was consistent with ADHD.  Jessica was started  on stimulant medication and had some improvement of her ADHD symptoms, but her underlying learning deficits did not improve. Since college Jessica has remained on a regimen of ADHD stimulant  to help her function in school and relationships. Her difficulties, however, in test situations under standard conditions remain despite taking stimulant medications.

In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

**Standardized Testing History:**

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, and so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it., Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions, but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and there was a major drop-off in Writing (33%).

Ramsay14-0087

NBME Exams: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable in this case to use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions, and manage her symptoms without distracting other test takers. The CBSE taken on 4/11/16, provided by the school as formative practice for Step 1, for which Ms. Ramsay chose to attempt in a private testing room but without the extra time, is the only exception. She chose to do this because her initial Step 1 accommodations request had been denied and she wanted to see if she would be able to read enough questions to pass. Even with the private environment, she did not have the opportunity to read about 10 of the questions within the standard 60 minutes provided for each block.

USMLE Exams: During her Step 1 exam experience, the standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction provided by other test-takers being in the same room, which she could not simply "tune out" due to her attention difficulties and distractibility. In the standard environment, she was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without distracting others. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section, and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

Under timed test conditions Jessica consistently scored significantly lower on unaccommodated exams compared to practice exams taken in a quiet environment with sufficient time, or under formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time.

Due to her disabilities, in my professional opinion  by taking the NBME exams under standard exam settings and time limits, Jessica does not have an equal opportunity to read all of the questions (compared to other test takers without a disability) ,and this impedes her ability to accurately demonstrate her knowledge and preparation.

**Accommodations History:**

Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) necessary to level the playing field, giving Jessica the opportunity to demonstrate her competency.

Since Dr. Charles Livingston's neuropsychological assessment in 2014 confirmed her diagnosis of ADHD, Jessica has received testing accommodations throughout medical school, including for OSCEs and standardized NBME (CBSE and Shelf) exams, which

Ramsay14-0088

provided more equal opportunity for her to access her exams. Accommodations received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

The formal accommodations she received during the previous standardized NBME (CBSE and clinical Shelf) exams, listed above, removed excessive barriers imposed by standard conditions because they sufficiently decreased ambient distractions and permitted Jessica to read and think aloud and to briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

**Family history**:

Significant for mother with ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

**Assessments:**

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory.

In 2014 Jessica had an initial formal neuropsychology assessment performed by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. His assessment confirmed the **clinical diagnosis of severe ADHD**, for which he recommended the medical school disability office provide accommodations. Dr. Livingston chose not to perform an evaluation for dyslexia as he thought Jessica's diagnosis of severe ADHD would be sufficient to warrant reasonable accommodation by the school, which would allow her symptoms of both ADHD and dyslexia to be addressed.

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with **ADHD** and a **nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9)**. When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of **nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81)**. Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98. percentile) but also had a marked

drop-off in intellectual efficiency (34 percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

<u>**Differential and Rule-out Diagnoses:**</u>

For completeness, Jessica has been evaluated for medical conditions, sleep disorders, and primary disorders of mood and anxiety as possible causes of Jessica's reported symptoms of inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed, anxiety, and feelings of inadequacy.

A sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause her inattentiveness, distractibility, or slow processing speed. In addition, thyroid function tests, CBC and screening labs are negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, or slow processing speed.

Since learning she did not pass Step I of the NBME and that her school required to sit out classes until she passed step I, Jessica has exhibited mild depression and anxiety symptoms appropriate to her situation. I do not feel she has a primary mood or anxiety disorder.

<u>**Clinical Impression:**</u>

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. Based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other, Jessica meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

Ramsay14-0090

Due to the nature of these disorders, there is some degree of overlap between them with regards to symptoms, history, objective findings, and recommended treatment and academic/occupational accommodations.

After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

## Summary and Plan:

While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam:

- **100% additional test time (double time)** for inattention, distractibility, and slow information processing and reading speeds.
- **Additional break time** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, as well as to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.
- **A private, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

In my professional opinion, due to her functional limitations due to **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** and **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81),** Jessica, without question, is a qualified person with disabilities under the ADA, and therefore be granted reasonable accommodation, per her request, to provide her with access to the United States Medical Licensing Examination Step 1 exam.

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions

Ramsay14-0091

in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD



WESTERN MICHIGAN UNIVERSITY
— Homer Stryker M.D. —
SCHOOL OF MEDICINE

Redacted

**June 4, 2018**

**To Whom It May Concern:**

Redacted

1717 SHAFFER STREET
SUITE 010
DEPT. 66G
KALAMAZOO, MI
49048-1623
RESIDENCY (269) 337-6375
FAX: (269) 337-6378
www.med.wmich.edu

Ramsay 14-0093

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around these functional deficiencies.

In order to read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. Jessica also isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical errors and has a hard time proofreading her own work, and when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to express them clearly. To help her learn and communicate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these difficulties, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to execute them effectively.

Because reading and writing take her a very long time and require great mental effort, her learning disabilities are further exacerbated by her focus, inattention and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing symptoms of anxiety and feelings of inadequacy when faced with reading or writing that may determine whether she may advance in her academic and occupational goals. Her anxiety and frustration stem from experiences when she did not have enough time or a supportive environment, and therefore did not allow her to demonstrate her capabilities.

Information provided by Jessica's significant other, with whom she has been living for three years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and hardworking. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and

Ramsay14-0094

affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so. These difficulties are due to her letter reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

Her second grade teacher was first to note that at the age of 7 Jessica still reversed letters and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessments for behavioral problems or learning disabilities were not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence

With written assignments, Jessica needed help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty. Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations, including extra time and a secluded workspace for assignments, for distractibility and slow reading and writing in the second grade. On multiple occasions throughout her academic career, Jessica required informal accommodations (extra time, altered grading scheme, and/or redo opportunity) to complete tests, reading, and writing assignments because she was not able to satisfactorily do so in the regular time provided.

At home Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed

Ramsay14-0095

frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed  interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening that was consistent with ADHD.  Jessica was started  on stimulant medication and had some improvement of her ADHD symptoms, but her underlying learning deficits did not improve. Since college Jessica has remained on a ~~regiment~~regimen of ADHD stimulant  to help her function in school and relationships. Her difficulties, however, in test situations under standard conditions remain despite taking stimulant medications.

In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

<u>**Standardized Testing History:**</u>

<u>ACT</u>: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, <u>and </u>so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

<u>MCAT</u>: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it., Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions, but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and <u>there was </u>a major drop-off in Writing (33%).

**Ramsay14-0096**

<u>NBME Exams</u>: Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable in this case to use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions, and to manage her symptoms without distracting other test takers. The CBSE taken on 4/11/16, provided by the school as formative practice for Step 1, for which Ms. Ramsay chose to attempt in a private testing room but without the extra time, is the only exception. She chose to do this because her initial Step 1 accommodations request had been denied and she wanted to to see if she would be able to read enough questions to pass. Even with the private environment, she did not have the opportunity to read about 10 of the questions within the standard 60 minutes provided for each block.

<u>USMLE Exams</u>: During her Step 1 exam experience, the standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction provided by other test-takers being in the same room, which she could not simply "tune out" due to her attention difficulties and distractibility. In the standard environment, she was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without distracting others. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section, and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

Under timed test conditions Jessica consistently scored significantly lower on unaccommodated exams compared to practice exams taken in a quiet environment with sufficient time, or under formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time.

Due to her disabilities, in my professional opinion  by taking the NBME exams under standard exam settings and time limits, Jessica does not have an equal opportunity to read all of the questions (compared to other test takers without a disability) ,and this impedes her ability to accurately demonstrate her knowledge and preparation.

<u>**Accommodations History:**</u>

Jessica began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) necessary to level the playing field, giving Jessica the opportunity to demonstrate her competency.

Since Dr. Charles Livingston's neuropsychological assessment in 2014 confirmed her diagnosis of ADHD, Jessica has received reasonabletesting accommodations throughout medical school, including for OSCEs and standardized NBME (CBSE and Shelf) exams,

which provided more equal opportunity for her to access her exams. Accommodations received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;
- extra time to read instructions and patient information and write the patient note for OSCEs;
- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;
- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

The formal accommodations she received during the previous standardized NBME (CBSE and clinical Shelf) exams, listed above, removed excessive barriers imposed by standard conditions because they sufficiently decreased ambient distractions and permitted Jessica to read and think aloud and to briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

<u>Family history</u>:

Significant for mother with ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

<u>Assessments:</u>

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory.

In 2014 Jessica had an initial formal neuropsychology assessment performed by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. His assessment confirmed the **clinical diagnosis of severe ADHD,** for which he recommended the medical school disability office provide accommodations. Dr. Livingston chose not to perform an evaluation for dyslexia as he thought Jessica's diagnosis of severe ADHD would be sufficient to warrant reasonable accommodation by the school, which would allow her symptoms of both ADHD and dyslexia to be addressed.

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with **ADHD** and a **nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9).** When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of **nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81).** Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98. percentile) but also had a marked

Ramsay14-0098

drop-off in intellectual efficiency (34. percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

<u>Differential and Rule-out Diagnoses:</u>

For completeness, Jessica has been evaluated for medical conditions, sleep disorders, and primary disorders of mood and anxiety as possible causes of Jessica's reported symptoms of inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed, anxiety, and feelings of inadequacy.

A sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause her inattentiveness, distractibility, or slow processing speed. In addition, thyroid function tests, CBC and screening labs are negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, or slow processing speed.

Since learning she did not pass Step I of the NBME and that her school required to sit out classes until she passed step I, Jessica has exhibited mild depression and anxiety symptoms appropriate to her situation. I do not feel she has a primary mood or anxiety disorder.

<u>Clinical Impression:</u>

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. Based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other, Jessica meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81).**

Ramsay14-0099

Case: 20-1058    Document: 24    Page: 290    Date Filed: 03/23/2020

Due to the nature of these disorders, there is some degree of overlap between them with regards to symptoms, history, objective findings, and recommended treatment and academic/occupational accommodations.

After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of **specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**.

<u>**Summary and Plan:**</u>

While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam:

- **100% additional test time (double time)** for inattention, distractibility, and slow information processing and reading speeds.
- **Additional break time** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, as well as to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.
- **A private, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

In my professional opinion, due to her functional limitations due to **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2) and specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)**, Jessica, without question, ~~qualifies as disabled~~ is a qualified person with disabilities under the ADA, and ~~should *absolutely* meet the National Board of Medical Examiners' guidelines for disabilities and should~~ therefore be granted reasonable accommodation, per her request, to ~~meet~~ provide her ~~needs for~~ with access to the United States Medical Licensing ~~Examinations~~ Examination Step 1 exam. ~~Even if the Board does not find that Jessica meets their criteria for accommodations for ADHD, in my professional opinion, the Board should absolutely approve the requested accommodations for her learning disabilities of reading and written expression.~~

<div style="border:1px solid">Formatted: Font: Calibri, Font color: Black</div>

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

Ramsay14-0101

## RE: JR - Natl. Board of Medical Examiners

**Lawrence D. Berger**
Tue 6/5/2018 3:04 PM

**To:** Bruce Ruekberg <Bruce.Ruekberg@med.wmich.edu>
**Cc:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

Redacted

Redacted

Redacted

Ramsay14-0102

**From:** Jessica Ramsay
**Sent:** Thursday, March 22, 2018 4:55 PM
**To:** Bruce Ruekberg
**Subject:** Table
**Attachments:** 2017.01.04_Accommodations personal statement table.docx

Hi Dr. Ruekberg,

Here is the most up-to-date chart I am working with. It has a lot of information about symptoms and how work through and process information. You can use anything you think is helpful. Sorry it is so long and disorganized. I am trying to reword and shorten everything but, obviously, this is extremely difficult for me to do, especially because it is important.

Let me know if you need any other information. You can call or email me.

Thank you SO MUCH for all of your help.

Jessie

DEFENDANT'S
EXHIBIT
**76**

NBME02209

1

Accommodations personal statement table:

| Describe the extent to which your ==daily functioning== is ==impaired== (examples of impaired functions) | | | |
|---|---|---|---|
|     | My learning disabilities and ADHD cause many layers of symptoms that significantly affect my ability to think, read, write, learn, communicate, but still, concentrate, and to organize my thoughts or things around me.<br><br>One example of how these symptoms affect me, is when trying to read, write, listen to, or even speak words, the characters and sounds get flipped, broken, tangled, and/or lost, so to capture, decipher, extract, for me to process with a complete and accurate form, it is critical to recognize, write, and speak.<br><br>Incoming information has to be in a format compatible with the way my brain works in order for me to understand, work through, process, learn, and/or use it. Because words are difficult [for me], I rely on experiences, interactions, emotions, videos, pictures, diagrams, and hands-on methods to get information. However, a lot of information is delivered through words, so in order to access the content, I have to put a ton of extra time and effort into either finding a more compatible form of the same information or translating it on my own to something I can understand when alternative sources are not accessible (e.g. during an exam).<br><br>Additionally, to communicate with others, I must translate my thoughts back into words from non-word format. Since I do not think in words, I often have a hard time recalling specific words or names when I need to use them and often mix sounds within and between words when trying to speak. The same thing happens with writing or typing. Regardless of whether it is for an essay or note to myself, I struggle to find the right words for what I want to say, and even when I do find the words I want, I often forget what I'm trying to say. Then when trying to get the words down, I mix up, skip, and/or combine | ADHD causes me to have a hard time concentrating and staying on task, so I struggle with things that require sustained mental effort, especially those which are also affected by my learning disability, like reading, writing, lectures, and conversations.<br><br>Having to sit in one spot and concentrate for extended periods becomes fatiguing unless I take breaks to allow my mind to rest.<br><br>The longer I must focus on one task without breaks, the more my learning disorder and ADHD symptoms are exacerbated, causing me to be slower, more disorganized and inefficient.<br><br>Breaking large time-consuming tasks into smaller ones and having sufficient opportunities to step away to let my mind rest and recharge reduces overall fatigue and helps me to focus better and work more efficiently when I return to the task.<br><br>For example, when studying, reading, or writing a paper, I cannot just sit down and work on the task until I finish because I will run out of stamina. Instead, I set a timer for an hour or 30 minutes, depending on the task, and try to focus until the timer goes off. I then leave a reminder so I can later find where I left off, and then do something that doesn't require much, if any, mental effort, like pushups, yoga, or listening to music. Before coming back to the task, I take a few minutes to remind myself where I left off, set a new timer, and review the end goal for the task so that I can do my best to stay on track. | In addition to my problems with attention and distractibility, ADHD also causes me to need to be constantly moving or doing something, which makes it very difficult to sit still for more than a few minutes at a time.<br>At home, even when watching interesting movies or TV shows, I can only sit for so long before I get up and start doing other things while I watch, which can be disruptive to other viewers.<br><br>When I do have to sit in one place for a long time, such as at movie theatres, or in classes and lectures, I get very restless and end up fidgeting and shifting around a lot in my seat, which can be distracting to others around me.<br><br>Instances when moving and fidgeting are inappropriate, such as during an interview or meeting, I have to expend a lot of mental energy to suppress urges to move and try not to fidget, which draws focus away from whatever I should actually be paying attention to.<br><br>Being able to move and be active helps me cope with stress from work, home, school, and life in general, but also helps me focus when I have to concentrate for long periods.<br>At home, I frequently study standing up or sitting on an exercise ball instead of a chair so that I can bounce and rock around, which allows me to focus for longer periods than if I were trying to sit still.<br>In classes and lectures, I try to sit in the back of the room to be less visible and distracting to others when I move around and fidget. If allowed, I sometimes walk around in the back of the room while listening to the material. When this is not allowed, I sometimes have to make my own breaks by excusing myself or quietly sneaking out to go to the restroom, which gives me a chance to walk around. | **Comment [JR1]:** Learning disability, nonverbal [abnormal scanning and processing speed] (F81.9) [can tie in to having trouble remembering details in ADHD part] People who know me are usually good about helping me figure out the words I need and understanding when I use words with unfitting connotations. But with people who don't know me well, and sometimes even those who do, the wrong choice of words often leads to miscommunication and frustration, or causes me to unintentionally offend them.<br><br>**Comment [JR6]:** Covered in first paragraph in left column<br><br>**Comment [JR7]:** Draining<br><br>**Comment [JR2]:** Need a different word for "Not very compatible"<br><br><br><br><br><br><br><br><br><br><br>**Comment [JR18]:** part of the support for break time. |



letters, words, and parts of words, so I have to constantly proof-read everything as I write/type so it doesn't end up as an unintelligible mess. Even so, I still end up with a lot of smaller mistakes, because I may not be able to see them as I re-read. Because of this process, it takes me much longer than average to write, type, and proof-read. When writing/typing something for a grade (e.g. answers to test questions, essays, etc.), it takes me even longer because I have to get my thoughts reasonably organized, translate them into words, get the words on paper, and re-read my work several times to check for errors, especially when spelling and grammar count.

So with both verbal and written communication, trying to accurately give information takes just as much, or more, time and effort as getting it.

**Comment [JR3]:** Not sure if this fits or if I want to include it.

In conversation, I use context clues (e.g. body language, facial expressions, intonation, etc.) to help gather and interpret incoming information, and use hand gestures, facial expressions, body movements, metaphors, or even drawing pictures to help communicate my thoughts. Daily conversations typically use simple themes and use familiar words, so I am generally able to reformat the incoming information, and retranslate the outgoing, fast enough to maintain a functional conversational flow. At my best, I can usually catch and correct most errors before they are noticed by others, sometimes even before the words make it out of my mouth, but when I am low on energy, even simple conversation becomes a struggle.

**Comment [JR4]:** Might work better after the next paragraph

As topics become less familiar, or more complex, technical, or detailed, the more time and effort it takes for me to process the information. Sometimes I am unable to do this in my head alone, and need to talk, act, or move through concepts, draw pictures, make tables or diagrams, using additional tools (e.g. colored pens/pencils, scrap paper, hands-on models) to help me work through the content.

NBME02211

NBME02212

**When I do not have access to the time or tools I need to reformat and translate content, I cannot effectively receive or communicate information.**

In my struggle with language, written words are more difficult for me to understand than spoken ones because I there are not as many context clues for me to pull from. Many times, am only given text alone, without any pictures or diagrams as reference. When I look at text, words and characters are jumbled and meaningless. My ability to accurately recognize characters and words is significantly affected by the type or font of the text, getting progressively worse with relatively "easy-to-read" typed fonts (like this one), neatly printed handwriting, weird typed fonts, and *messy handwriting. Cursive just looks like a bunch of indistinguishable loops and squiggles,* which are basically impossible to figure out, even if I wrote it.

In order to read anything, I need time to untangle the words and decode each one using visual tools like symbols and colors. Sometimes I also need to read the text out loud or have it read to me by a person or computer program to help me interpret the words within the context of the sentence, and then within the paragraph. This process requires me to re-read things several times, building up the pieces, before I can fully understand them.

When I have to read text that is information-dense and/or uses a lot of uncommon or technical words, I require additional tools to help me comprehend and process the material like drawing pictures, making diagrams or models, demonstrating with my hands, and acting out what I've read.

Though I am able to read using these methods, the whole process requires a lot of extra time and effort for me to do, so it quickly becomes an overwhelming task, especially in time-limited situations. As a result, I avoid

**Comment [JRS]:** And draining?

reading whenever possible, and instead try to get the information from sources that are formatted in ways that are easier for me to process, such as videos, pictures, conversations, and hands-on demonstrations.

Assessments of my skills, knowledge, or abilities that require me to read cause me a lot of anxiety, particularly when I also have limited time to show my proficiency. [...because...]

When I need to read but do not have adequate time to properly untangle and work through the words or process the information, I miss important details or even large chunks of information, and misinterpret the message, which can all lead to misunderstandings and communication errors. Depending on the situation, these errors can have varying negative impacts on the personal, social, academic and professional aspects of my life. For example, calling someone Ashley when their name tag says Ainsley can make a bad first impression. Misinterpreting and unintentionally passing along the wrong message, like a bad game of telephone, has gotten me in trouble at home, with friends, and sometimes even at work. In restaurants, it takes me a long time to read the menu, so I hold everyone up when they're ready to order. Movie subtitles are too fast for me to read, so I either need someone to read the captions to me or I have to pause the movie with every line – which really annoys other viewers – otherwise I completely miss what is going on.

***

ADHD makes it difficult for me to pay attention to things for extended periods, and causes me to be overly distracted by movement, sounds, smells, temperature, my own thoughts, and urges to move. These distractions pull my focus away from my current thought, task or conversation.

[I also have a really hard time getting and staying organized]

**Comment [JR6]:** Not sure if I should combine these. Maybe leave unless I need to shorten

\* Also affects speaking – It is very difficult for me to find the words for what I want to say. Sometimes I am only able to remember sounds or parts of words, or a certain cadence or meaning. Other times, I am unable to recall even common words like "chair" and end up having to work around it with "the thing you sit on" or, when I am really struggling, I might only be able to say "that," while pointing at a chair. Even when I know the phrase I want to say, my words, or parts of words, will get jumbled on the way out, and I am not always able to figure out why it doesn't sound right.

\*\*This would then be a good place to tie in the part about struggling with recall (like names of ...)

\*\*\*To help with Step 2 CS request later, it may also be beneficial to at least mention how writing is even more of a struggle because I not only have to translate my thoughts into words, but I have to read and reread what I have written using the process I've described, which takes much longer than the average person. My difficulty with organizing my thoughts affects this process to, making it really hard to figure out a logical flow.

**Comment [JR7]:** Put organization stuff here

NBMED2214

With **ADHD**, I [also] struggle to focus on just one idea at a time and tend to jump quickly from one thought to another, which makes it difficult to organize myself and my thoughts and to keep things in order.

My distractibility and inattention also make it difficult to keep track of things because I set them down and forget where I put them, which is especially problematic with things like my, wallet, keys, assignments, and legal documents.

If I realize that I am no longer paying attention, it takes extra time and effort for me to refocus and get back on track.

When I get distracted while watching a video or recorded lecture, I have to rewind and figure out what I missed, and usually have to re-watch segments several times.

When I get off track while trying to read, I frequently have to start over at the beginning of the page or top of the screen to avoid unintentionally skipping or missing information, which takes so much time to take more time.

Likewise, when I get distracted during conversations, I typically have to ask people to repeat themselves, sometimes multiple times, which can quickly become frustrating for everyone involved. If I am the one speaking when I get distracted, I tend to forget what I am talking about, sometimes even mid-sentence, and then have to ask, "What was I saying?" to hopefully figure out where I left off. This makes it difficult for me to tell a story or get a point across, and even more difficult for others to follow me. Knowing I struggle with this, I purposely avoid public speaking, but when giving a presentation is required, I get extremely anxious about getting off topic, forgetting what I'm saying, or being unable to adequately support an argument, and how my

Comment [JR8]: First and clearly understand Get organized and keep things in order...

maybe combine all of these and put impulsivity with jumping from one thought to the next (which makes it difficult to maintain my train of thought and effectively answer questions; then difficulty with organization and losing things.

Relate to test taking when getting lost in my thought process, forgetting what the question is really asking, and working only part way to or even past the answer the question was actually asking for.]



grade or job performance will be affected.

I have similar issues when trying to write. Not only do I have a hard time organizing my thoughts and finding appropriate words for what I want to say, but I also frequently get distracted, lose my train of thought, and forget what I meant to write. This makes writing a very time-consuming process. Even text messages take me much longer than the average person to write, so I have to pull exhaustive measures to try to complete essays writing assignments by their deadlines. Having to write anything in a time-limited situation is daunting, and it causes me a lot of stress and anxiety, especially if what I write is going to be evaluated.

Many times, distractions also cause me to lose my train of thought, while I am working through homework problems or exam questions, so I have to start over and try to get reorganized. Additionally, in the process of thinking, I may forget what the question is actually asking, especially with second- and third-order questions, and need time to re-read the question to make sure I do not work towards the wrong answer. Not having time to go back and re-read the question to make sure I am trying to answer the right question impairs my ability to demonstrate my knowledge on the exam. For example, if a question asks which thing is expected to INcrease due to a disease process, but while working through the process I get distracted and end up figuring out which ones DEcrease, I will get the question wrong even though I understand how the disease process works.

Though I work really hard trying to stay on top of things, sometimes after I have been distracted I am unable to get refocused or remember where I left off [without a reminder], so whatever I was in the middle of doing – thinking, talking, working on assignments, doing laundry, putting food back in the fridge – tends to be forgotten and is left unfinished. Accordingly [to help avoid this], I [typically] need frequent [sufficient] cues and

Comment [JR9]: May need to take out unless it ties into support for extra time But would be good support for Step 2 CS later on

Comment [JR10]: Good support for Step 2 CS.

Comment [JR11]: Good point to repeat in next box below

NBMED02216

reminders to do things and to stay on track to complete them.

Similar to jumping from one thought to another, I also tend to impulsively say things as they occur to me and end up unintentionally interrupting others or saying something I shouldn't. Sometimes causes people to get irritated or offended and leads to other negative downstream effects.

**Comment [JR12]:** Wording, may not even need to bring up

Even when I am doing my best to focus, I still have a hard time recalling specific names, numbers, and facts, even if I use that information regularly. For example, I almost always forget someone's name within five seconds of being introduced, and it is even more frustrating when I have known the person for a long time when I draw a blank on their name. My ability to recall these types of specifics is even worse with information I do not regularly use, such as names of specific enzymes, medications, and diseases, especially when they are illogically named, or named after people instead of the subject. This makes it extremely difficult to answer the "simple" recall-type questions that are generally easy for the majority of students to answer, even when I know a lot about the mechanisms, diseases, and treatments and have a functional understanding the concepts. In real life situations, such as working with patients or studying, I am usually able to look up or work around the specific detail I am blanking on, or I have access to assistive cues and time to think about it. However, in isolated, time-limited situations like exams, I generally do not have access to helpful cues or have sufficient time to stop and try to remember.

Outside of exams, my tendency to miss and forget important details makes it especially hard to remember things like dates, times, locations, dress codes, required preparation and materials for meetings, assignments and social events, even if I write them down. So, if

**Comment [JR13]:** Combine with paragraph above or maybe just take out

NBME02217

| | | | | |
|---|---|---|---|---|
| | I don't just completely forget about it, I commonly show up late, at the wrong place, under- or overdressed, and/or unprepared.<br><br>[Relate to exam]<br>(Or sometimes, I remember most of the information, but miss or forget certain details...)<br>For example, when asked or told to do something, I may do most of what someone asked me to do, but may miss or forget certain details, or I start, get distracted, and forget to finish. Growing up, this was a frequent cause of friction at home because I would try to do what was asked but was still always getting in trouble for not doing something – I would clean off the table after dinner, but would forget to push in my chair; fold my clothes, but forget to put them away; or start cleaning my room but forget to finish because I got asked to do something else. This came across like I was being lazy and purposefully not following directions. As an adult, this more commonly causes problems at home with things like forgetting to move wet clothes to the dryer or put food in the back in the fridge; at school and work with forgetting about assignments or delegated tasks; and socially with things like borrowing something and forgetting to give it back, telling friends I'll check my calendar and forgetting to follow up.<br><br><br>Both dyslexia and ADHD cause me to be an inefficient thinker and slow processer. | | | **Comment [JR14]: wording**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**Comment [JR15]: Not sure where this goes<br>Maybe combine with above?** |
| | **Standard Testing Time and Format** (seven 60-minute blocks)<br> | **Standard Break Time** (45 minutes of approved break time, or up to 1 hour if you end the tutorial early) [~8.3 min after each block] | **Standard Exam Environment** (same room as other test takers) | |

NBME02218

| | | **OR** | |
|---|---|---|---|
| How that impairment **interferes** with your **ability to access the exam** under **standard conditions**  | I am easily distractible and have learning difficulties that cause me to be a very slow reader, with slow processing speed and inefficient thinking compared to the average person. I require additional time and tools to be able to untangle and process words, correctly interpret and understand what I am reading, to organize my thoughts and information, and get back on track after distractions. <br><br> During my first Step 1 attempt, like my previous unaccommodated testing experiences, I did not have enough time to read all of the questions and was forced to blindly select answer choices for a significant number of questions at the end of each block. I also did not have enough time to use some of the compensatory methods I need to help me correctly interpret and comprehend what I read. Under standard exam time, these limitations did not allow me to use my knowledge to answer the questions and severely limited my access to the exam. <br><br> Without access to adequate time [and tools] for the exam, I am not able to read and correctly interpret the information presented in the questions and answer choices. This makes it impossible for me to employ the knowledge I have to respond to the questions, which severely impairs my access to the Step 1 and Step 2 CK exams under standard time limits. <br><br> Using the time needed for me to adequately read a few questions means that I will run out of time before I can get to a significant number of questions and will have to blindly select an answer. <br><br> **••••** <br><br> Because I easily get distracted and am unable to scan and find where I left off and get back on track, I end up unintentionally skipping | During my first Step 1 attempt, like my previous unaccommodated testing experiences, I did not have enough time after each block to address my basic needs AND my symptoms related to ADHD. Instead I had to pick between using the restroom, grabbing some water and few bites of a snack, or walking around, and so was not able to adequately manage my symptoms or get properly refocused before the next block. As a result, I experienced more restlessness and anxiety during the exam, which impaired my ability to perform. <br><br> Without adequate time to stretch and walk around and to give my mind a break from the mental effort required to concentrate and read, my ability to get refocused before the next section and maintain focus during the block will be significantly decreased. <br><br> If I am granted the extra time to accommodate my reading difficulties, distractibility, slow processing speed, and inefficient thinking, the exam will end up being over 2 days. Standard break time (45 mins total) broken up over 2 days not enough time to be able to manage my symptoms [of hyperactivity, restlessness, and secondary anxiety] and get refocused for the exam in addition to addressing basic needs. <br><br> [then say that the proposed exam and break structure below will address all of this.] | During my first Step 1 attempt, like my previous unaccommodated testing experiences, the standard testing environment did not allow me to use methods like reading aloud, moving, or talking through my thoughts to help me with comprehension, and with processing and organizing information, as it would have been distracting to other test takers. Likewise, the standard testing environment did not allow me to stand up, stretch, or move around during the exam to manage my hyperactivity, which made me even more restless and fidgety, and much less able to focus. <br><br> [Additionally,] having other test-takers in the same room during my exam exposed me to many distractions that further decreased my ability to concentrate, read, and understand the questions. Even though I used both the noise-canceling headphones AND my ear plugs, it was still not enough to sufficiently decrease the distractions from other testers sniffling, coughing, sneezing, clicking, typing, walking to/from their desks, and shifting in their seats, all of which interrupted my focus so that I lost track of where I was within the question or my thought process. During several sections of the exam, a few people in the room were typing so violently that my desk shook as they pounded each key, which made it impossible for me to maintain focus on my exam. <br><br> As I described, I need to read out loud, or have the text read to me, to help me understand the words within the context of the sentence and then the paragraph. If I am not able to hear the words, I cannot tell when I have missed or incorrectly decoded some of the words, which, in an exam, can drastically change the meaning of the questions and answer choices. Sometimes, I also need to be able to stand up or use movement to help me |

**Marginal comments:**

- Comment [JR19]: Need to address these in the earlier descriptions too
- Comment [JR20]: Appropriately, adequately, sufficiently
- Comment [JR23]: Cope with, relieve, ease, lessen
- Comment [JR21]: Not sure if this goes here or after the next paragraph
- Comment [JR22]: Need to address these in the other areas
- Comment [JR24]: Maybe goes above with description of problem

NBME02219

| | | | |
|---|---|---|---|
| | and/or repeating words, lines and large chunks of text. As a result, I miss key information and misinterpret what I am reading or what a question is asking.<br><br>With standard exam time, I do not have time to reread questions and answer choices as needed for adequate clarification to compensate for frequently losing focus and getting off track. This severely impairs my access to the exam under standard time limits. | | comprehend and work through questions, and/or talk aloud to organize my thoughts. In the standard exam environment, I cannot use these compensatory methods that I need to be able to appropriately access my knowledge or the exam.<br><br>During the exam, I also need to be able to stand up, stretch, and move around to cope with my restlessness and hyperactivity without taking focus away from the exam, and without the risk of disturbing other test takers.<br><br>In the standard testing environment, I am not able to utilize these compensatory techniques to read and process information, or to manage my symptoms of distractibility, hyperactivity and restlessness without disturbing other test takers. This severely limits my access to the Step 1 and Step 2 CK exams in the standard exam environment. |
| **Requested Accommodation** | 50% Additional Testing Time (seven 90-minute blocks for Step 1; eight 90-minute blocks for Step 2 CK) over 2 days | Additional Break Time (*see proposed break structure)<br> | Separate Exam Room<br> |
| Clear rationale for the requested accommodation(s).<br><br>Describe how each requested accommodation will alleviate the functional limitations caused by your disability. | 50% additional testing time will greatly increase my ability to access the exam by providing the time I need to be able to:<br>READ<br>1. untangle and decode each word so I can adequately read through the questions and answer choices, and to be able to<br>COMPREHEND<br>2. use color, symbols, pictures, diagrams, charts, movement, touch, and reading/talking out loud to compensate for and work around the impaired functions resulting from dyslexia and ADHD and help me comprehend what I am reading.<br>PROCESS & INTERPRET<br>3. re-read as necessary so I can process the | Additional break time during the exam allows:<br>REST<br>Being able to take a break between each section will give my mind some rest and will reduce the fatigue I experience secondary to the sustained mental effort required to concentrate, read, and get back on track after distractions. [The fatigue is NOT a result of the extended exam time I have requested.]<br>REDUCE SYMPTOM SEVERITY<br>Having enough time to stretch, move, and walk around, in addition to taking medications, using the restroom, and/or | Taking the exam in a separate room from other test-takers would provide a private environment to:<br>COMPENSATE<br>1. use compensatory methods, like reading out loud, talking through my thoughts, and briefly stepping away from the computer to help me comprehend, process, and organize information without distracting other test-takers.<br>REDUCE STRESS & ANXIETY<br>2. reduce the stress and anxiety associated with [secondary to/resulting from] inability to use compensatory methods that help me process information and organize my thoughts. |

Comment [JR25]: 45 mins each day to break up as I see fit.

Comment [JR28]: Help with comprehension, organization, and processing of information

Appx1322



information and correctly [adequately] interpret the questions and answer choices.
GET ORGANIZED
4. organize my thoughts so that I am better able to avoid getting lost in my thought process, forgetting what the question is really asking, and working only part way to or even past the answer the question was actually asking.
REFOCUS
5. get refocused and back on track after getting distracted.
TEST MY KNOWLEDGE
6. ALL OF THIS makes it possible for me to answer EACH AND EVERY question based on my knowledge and reasoning rather than having to blindly select an answer choice for a significant number of questions in each block.
REDUCE STRESS & ANXIETY
7. WHICH, alleviates much of the excess stress and anxiety I experience before, during, and after exams [secondary to difficulties with focus, reading, and "inefficient thinking" in a time-limited exam setting] when I know I have to read and think through questions, but will have inadequate access to time to do so.

grabbing a small snack when needed, helps me to get refocused before starting the next block and reduce the severity of the restlessness and distractibilty I experience during exam time.

Taking breaks gives my mind a chance to rest and recover so that I have more energy to devote to staying focused and reading when I return to the exam.
I need time to give my mind a break from straining to focus and read so that I do not become overly fatigued, exacerbating the symptoms I experience related to my learning disorder and ADHD. I also need to stretch, move, and walk around, which helps me get refocused before starting next block and helps reduce the restlessness and distractibility I experience during exam time.

REDUCE DISTRACTIONS
3. greatly reduce the number of distractions I experience [due to other test takers being in the same room] so that I am better able to [maintain] focus during the exam.
MANAGE SYMPTOMS
4. help me manage my [the] symptoms of hyperactivity and restlessness [I experience] during the exam by allowing me to fidget, stretch and move around during the exam without distracting/disturbing other test-takers.

**Comment [JR29]:** wording??? "being in the same room as other test-takers …take my exam without the added distractions caused by other test-takers being in the same room.

**Comment [JR26]:** Need a better way to say this – maybe leave out

**Comment [JR27]:** Employ my knowledge and reasoning to answer EACH AND EVERY question

* Proposed exam schedule:
Day 1 – Tutorial (15 min)
  – Block 1 (90 min)
    – 15-min break
  – Block 2 (90 min)
    – 20-min break (Meds and Lunch)
  – Block 3 (90 min)
    – 15-min break
  – Block 4 (90 min) – **End of Day 1** (total time: 7 hours 5 mins)

Day 2 – Block 5 (90 min)
    – 15-min break
  – Block 6 (90 min)
    – 20-min break (Meds and Lunch)
  – Block 7 (90 min) – **End of Day 2** (Step 1; total time: 5 hours 5 mins)
    – 15-min break **(Step 2 CK)**
  – Block 8 (90 min) – **End of Day 2** (Step 2 CK; total time: 6 hours 50 mins)

In undergrad, most exams were 1 hour long, and were generally structured to give most students enough time to get through an exam with enough time to go back through and recheck marked questions. Before receiving accommodations, I struggled to get through most exams even once, having to leave many open-answer questions blank, or randomly picking an answer to multiple-choice questions, because I did not have time to even read them. Once I began receiving accommodations (*see list of previous accommodations), I was able to get through more of my exams, but still had to rush to just barely get through, and there were still a few exams I did not have enough time to get through majority the test. I almost never had enough time complete an exam and have time left to go back to questions I was unsure about – if I did, it was only enough time to check one or two questions at most. Even though these accommodations improved my access to exams, it was still not nearly equal to that of my peers.

my MCAT score report and thought it might be helpful in showing that even though I was able to pass without accommodations, my "access to" and performance on the exam was severely limited without them. I specifically remember that for the Physical and Biological Sciences and the Verbal Reasoning sections, there were 1-2 whole passages that I did not have time to read, so ended up just guessing on most of the associated questions for those passages. My score dropped for Verbal Reasoning compared to the Physical and Biological Sciences, which is consistent with my usual struggle with words. But my scores took a huge dip for the writing when I did not have nearly enough time to organize my thoughts and figure out how to put them into words for each of the 2 prompts. I was only able to write a few sentences for each prompt in the 30 minutes given.

**Comment [JR30]:** Address why I did not request accommodations ; also, wording

For all examinations during medical school, I have had 100% additional testing time in addition to a separate testing room, but this time also includes unstructured break time that I can take as needed so that I can get up and walk around, go to the restroom, take meds and eat a snack as needed during the test.

In my experience, extra time and a separate testing room have helped to level the playing field and provide more equal access to standardized (Clerkship Shelf Exams, NBMEs) and school exams, as well as other timed evaluation methods (OSCEs, I-RATs) throughout my time in medical school. As the demands have increased throughout with my progression to higher levels of education, I have found that accommodations have been increasingly necessary to be able to finish exams. I am not limited by lack of knowledge but by inability to read through instructions, questions and answer choices, as well as organize, process and think through the information in a timely manner, especially with the added distractions caused by other people being in the same room and when the information is not presented in a way that I can easily process (i.e. words on a screen). Being able to use colors or symbols to annotate directly on the test and on scrap paper, talking through my thoughts and using my body to visualize and move to think through and understand the information in a way that better makes sense to me all help increase my access to exams (the exam).

State that the double time given in med school provided much more equal access.

I think a separate testing room, 50% additional testing time with additional break time, over 2 days would best equalize my access to the exam. [because of everything stated in bottom row of table]

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Friday, March 23, 2018 3:35 PM |
| **To:** | Bruce Ruekberg |
| **Subject:** | Shorter more organized document |
| **Attachments:** | 2018.03.23_WMed Letter of Support_Ramsay.docx |

Hi Dr. Ruekberg,

Sorry my other table was such a mess. To make it easier for you and the school to support my request for accommodation, I have worked really hard to condense my reasoning down to the bare minimum. I have attached the document to this email and also sent one to the school so that they would be working from the same information. You can add any other details that you feel are relevant/important to support your recommendations. I hope this makes it easier for you to work.

Please let me know if you need anything else.

Have a great weekend!

Jessie

DEFENDANT'S EXHIBIT

**77**

NBME02206

1

Working diagnoses:
- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)
- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)
  - With impairment in reading (DSM-5 315.00, ICD-10 F81.0)
  - With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)

> **Comment [JR1]:** I'm still not sure which to use... for now, I have included the one Dr. Lewandowski gave as well as the ones we talked about.

NBME/USMLE prompts that I have to answer and give support for:

1. Describe the extent to which your daily functioning is impaired & how that impairment interferes w/ your ability to access the exam under standard conditions.
2. Provide a clear rationale for the requested accommodation(s) & describe how each requested accommodation will alleviate the functional limitations caused by your disability.

Simplified versions of the main things I want to say to support each accommodation I am requesting:

1. "Additional break time and 50% Additional exam time (time and ½) over 2 days"
   a. 50% additional exam time (time and ½):
      i. Provides adequate time to untangle the words and read through each question and answer choice and to process the information within each question so that I have the opportunity use my knowledge to select an answer for each question.
      ii. Allows time to re-read as necessary for clarification and/or to aid in comprehension.
      iii. Provides time to use compensatory methods, such as drawing pictures, reading/talking out loud, or briefly stepping away from the computer, to help me comprehend what I read and organize my thoughts.
      iv. Allows flexibility during the exam to manage my symptoms related to distractibility and hyperactivity, and the opportunity to get refocused.
      v. Decreases the anxiety and mood symptoms I experience as a result of inadequate time to untangle, read, process and answer each question, which interfere with my ability to perform on the exam.
   b. Additional break time (15 minutes after each block + extra 10 minutes for lunch each day, *see proposed exam/break structure below):
      i. Allows appropriate time to address regular needs after each block, take medication with some food and water when needed, and to manage my distractibility and hyperactivity to help reduce the frequency and severity of symptoms I experience during the exam.
      ii. Allows time to manage any anxiety and mood symptoms I do experience so that I can minimize their interference with my exam performance.
2. "Separate testing room"

a. Allows me to use the compensatory techniques I need, such as reading/talking out loud or briefly stepping away from the computer, to effectively read and comprehend each question and organize my thoughts so that I can use my knowledge to select an answer for each question without distracting other test-takers.

b. Reduces the number and severity of distractions I experience during the exam due to other test-takers as a result of my ADHD so that I can better focus on the exam.

c. Allows me to move around and fidget during the exam in order to manage the restlessness and agitation I experience due to ADHD so that I can maximize my ability to perform on the exam without distracting other test-takers.

Please let me know if you need help providing support/reasoning for the other accommodations I receive from WMed.

**\*Proposed break structure:**
**Day 1 –** Tutorial (15 min)
    – Block 1 (90 min)
    – 15-min break
    – Block 2 (90 min)
    – 25-min break (Meds and Lunch)
    – Block 3 (90 min)
    – 15-min break
    – Block 4 (90 min) – **End of Day 1** (total time: 7 hours 10 mins)

**Day 2 –** Block 5 (90 min)
    – 15-min break
    – Block 6 (90 min)
    – 25-min break (Meds and Lunch)
    – Block 7 (90 min) – **End of Day 2 (Step 1**; total time: 5 hours 10 mins)
    – 15-min break (Step 2 CK)
    – Block 8 (90 min) – **End of Day 2 (Step 2 CK**; total time: 6 hours 55 mins)

NBME02208

**From:** Jessica Ramsay
**Sent:** Wednesday, April 11, 2018 3:17 PM
**To:** Bruce Ruekberg
**Attachments:** Jessica draft 3.docx

Hi Dr. Ruekberg,

Sending the document so you have it to make changes if needed during the appointment. Sorry I am not completely done with it, I tried.

See you in a bit,

Jessie

DEFENDANT'S
EXHIBIT
**78**

NBME02193

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination Step 1 retake and her Step 2 CK exams.

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for Attention Deficit and Hyperactivity Disorder, Combined type (CODE) based on clinical, academic, family and social histories, direct observation, neuropsychological evaluation, and collateral information gathered from her significant other, whom she lives with, and her mother.

> **Comment [JR1]:** I added this, I think they want it to be specific

Family history is significant for mother with ADHD and mild dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

Her childhood history obtained from her mother along with Jessica's reported history and symptoms are consistent with ADHD. At home Jessica was always moving and doing something, hardly ever still, and even during mealtimes and leisure activities like watching a movie she would "find reasons to get up and move." She would also commonly forget to do or complete her chores, which came across as being lazy or disrespectful. Socially, Jessica struggled with waiting her turn, blurting out thoughts and interrupting others in conversation. In Kindergarten through grammar school Jessica manifested difficulty with focus and attention. At school, teachers always noted her to be a very bright student, but always an "incredibly slow" reader and writer and a "bad test-taker," consistent with Jessica's reported history and current symptoms. was a "bad test-taker" and often missed points for seemingly careless mistakes, or forgot to take home, complete, or turn in assignments. She received informal accommodations starting in the second grade including a secluded testing area and extra time to work on assignments. Throughout elementary, middle and high school, there were multiple instances where, working with her teachers and sometimes needing to involve her mother, Jessica received informal accommodations including extra time and altered grading schemes because she could not complete tests, reading, or writing assignments in the regular time provided. Jessica and her mother both report she experienced inattentiveness, restlessness and distractibility from early childhood that has continued to the present time.

> **Comment [JR2]:** •Relevant aspects of the individual's developmental, educational, family, medical, psychosocial, educational, occupational, and other personal history.
> •A history of the individual's presenting symptoms, with detailed information about how the symptoms have manifested in the home, school, work, and other settings over time.
> •Self-report symptom checklists, behavior rating scales, and continuous performance tests may be useful in diagnosing ADHD. Since adult recall of childhood symptoms tends to be unreliable, the evaluator should seek ancillary information from other sources (e.g., parent, teacher, spouse) as well as examples of current functional impairment in more than one setting.

> **Comment [JR3]:** Elementary?

While attending college at Ohio State University she began recognizing her difficulty concentrating, finishing timed quizzes and tests, and keeping up with reading and writing requirements due to letter switching, slow reading and writing, inability to focus, and procrastination. In 2009, her primary care doctor considered ADHD and/or dyslexia, completed an ADHD screening in office, and started her on Ritalin. She was later switched to Adderall as it was better tolerated and showed better effectiveness. She responded well to Adderall and has remained on an Adderall preparation since. She is currently on Vyvanse 60 MG to help her manage her symptoms throughout the long days required in medical school. In 2010, at the recommendation of a professor, Jessica met with a OSU Disability Services and was granted temporary accommodations, which were fully approved upon receipt of supportive documentation from her primary care provider. With these accommodations, Jessica had better

> **Comment [JR4]:** May go better after learning disabilities so you only have to say it once. I added this sentence. You can change or take it out as you see fit. I think it is important because it shows that I have needed extra time for tests and reading/writing assignments. I'm pretty sure we have talked about these informal accommodations in earlier visits, but if not, we can discuss them at the next visit. I don't want to put anything in here that you aren't comfortable with.

access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, even with the accommodations, Jessica still encountered multiple exams on which she could not get to significant portions in the time allowed because they required large amounts of reading or writing. On several such occasions, Jessica was given additional informal accommodations by her professors, including altered grading schemes and extra time, that allowed her to pass those exams and courses.

Comment [JR5]: I added all of this. I think it is important to show I received accommodations, but still struggled with reading and writing in a timed setting
**Reword**

In 2014, Jessica had an initial formal neuropsychology assessment performed by Charles Livingston, a licensed social worker and limited licensed psychologist, in order to receive accommodations in medical school. His assessment confirmed the clinical diagnosis of ADHD, for which recommended the medical school disability office provide accommodations.

Comment [JR6]: Quotes for support?

Since that assessment, Jessica has received reasonable accommodations throughout medical school allowing her to adequately access and pass her exams. These accommodations include: private room and double time for standardized NBME (CBSE and Shelf) exams; extra time to read instructions and patient information and write the patient note for OSCEs; double time and quiet environment for anatomy lab practicals; and all WMed-administered exams and quizzes provided as a printed hard copy with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time.

Since then, Dr. Lewandowski completed a more comprehensive neuropsychology evaluation (12/7/17), which reconfirmed the diagnosis of ADHD. I He diagnosed ADHD both clinically and by clinical history and neuropsychology testing.

Comment [JR7]: Should we pull specific quotes from his report?

Comment [JR8]: I'm not sure which one you meant to say here, but you need to get rid of either "I" or "He", I think you meant to say "I"...
Sentence needs to be reworded

Comment [JR9]: Clinical observation and history

Additionally, collateral history provided by Jessica's mother and significant other, and recent DSM-IV symptom checklists with prompts completed by Jessica, her significant other and her mother, all strongly support Jessica's diagnosis of ADHD, combined type (CODE), and her need for accommodation.

In addition to ADHD, Jessica's medical record, symptoms, family history and neuropsychological testing also support presence of learning disabilities she has grappled with since beginning to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of learning disabilities of reading and writing (CODE).

Under timed conditions, in addition to her difficulty with attention, distractibility and restlessness, Jessica is limited by a reading disability. Due to this reading disability, she must take multiple compensatory steps to assure the accuracy of each word she reads and her comprehension of its meaning. For Jessica, reading takes great mental effort and additional time, which further exacerbates her focus and attention difficulties, particularly in time-limited situations and when required to read for extended periods.

Comment [JR10]: Both reading and writing disabilities

Not sure if this is a better conclusion paragraph

In addition to the reading learning disability, in my professional opinion, based on clinical history, Jessica also has a writing learning disability. Jessica also reports a lifelong difficulty formulating her thoughts to put down on paper, selecting the words to use and assuring accuracy of their meaning, and using the words in an understandable sentence, so she needs more time than the average person to complete these processes. Additionally, Jessica has difficulty with legibility of her writing and makes frequent spelling and grammatical errors.

Jessica's second grade teacher first noted Jessica reversed her letters and so allowed her to use an alphabet board with extra time during spelling, reading, and writing activities as informal accommodations for Jessica to enhance her letter identification.  Due to the letter reversals and reading difficulty at the age of 7, her teacher also recommended vision testing, for which Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic Optometrist. Dr. Tanguay performed a visual-perceptual skill test and found significant deficits in Jessica's visual spatial relationships, visual discrimination and visual memory.

With the results of her most recent neuropsychological testing on 12/7/17, Dr. Lewandowski diagnosed Jessica with a nonverbal learning disability of "abnormal scanning and processing speed" (F81.9). I believe that his findings, when put into context of Jessica's clinical history, support and are consistent with the more specific clinical diagnoses of learning disabilities in reading (F81.0) and written expression (F81.81). His assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents reports of premorbid functioning, and consistent with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking" again affecting her ability to perform under timed conditions.

> **Comment [JRI1]:** Do I want to say something about "inefficient thinking"?

Mr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings.  Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency.

Due to her reading and writing disabilities, she requests the same accommodations for the Step 2 CK exam as she has requested for ADHD for the Step 1 retake examination.

> **Comment [JR12]:** Not sure if I should say anything about the CS exam yet, which is what I think he is trying to get at here
>
> In the summary statement, may be smart to say something along the lines of "and all future exams of a similar nature" to help the process moving forward

Because the effects of her learning disabilities on her ability to access the USMLE Step 1 and Step 2 CK exams under standard conditions are similar to and somewhat overlap those caused by her ADHD, the accommodations she has requested would allow her to appropriately compensate for the symptoms [elaborate specific symptoms] caused by both ADHD and her learning disabilities.

> **Comment [JR13]:** Make sure guidelines are addressed:
> Decreased attention, Restlessness and hyperactivity, Distractibility, slow processing speed, slow reading and writing
> Can explain how they are accommodated here

It is clear that though Ms. Ramsay did not seek formal accommodations until undergrad, she was able to progress in her academic career in spite of her disabilities, compensating through her intelligence, motivation and determination. Only by sheer will and grit has she been able to persevere. While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation.

> **Comment [JR14]:** With?
>
> **Comment [JR15]:** Could start paragraph with this sentence

NBME02196

In review of past standardized test results, though she had been diagnosed with ADHD and possible dyslexia prior to the MCAT, Ms. Ramsay was not aware that she could apply for accommodations. Because Jessica knew the test was designed so that many of the questions can be answered without reading the passages, she is strategically answered those questions first, and if she had time remaining she tried to read to answer the passage-dependent questions. Does she did not have time to read all of the passages and had to select random answers for multiple questions, this format allowed Jessica to access and use her knowledge to answer enough questions to achieve a satisfactory score. However, her limited access to the exam under standard conditions is reflected in her score, which was consistent with her self-assessments on prior MCAT versions under simulated Standard exam time and environment, but was significantly lower than the self-assessment scores she took in an untimed setting and private quiet environment. Also important to note, Jessica's Verbal Reasoning sub-score was significantly lower than her Biological and Physical Sciences sub-scores, and her Writing sub-score showed a major drop off in her performance. I believe these results are quite consistent with her clinical history and neuropsychology tests.

- A differential diagnosis with a discussion of how each possible alternative explanation for the identified problem(s) has been systematically ruled out.
- A rationale for each recommended test accommodation.
- If the report includes a comprehensive psychological, psycho-educational, or neuropsychological evaluation, it should adhere to current professional standards and include:
  - Actual scores obtained for each administered subtest and/or measure reported as age-based standard scores when available from the test publisher.
  - The specific version of each test (e.g., 4th Edition, etc.) along with the specific norms used for scoring (e.g., age-based norms).
  - A summary integrating all obtained test and assessment data with available clinical presentation, behavioral observations, relevant background/historical information, and current functioning to support the diagnostic conclusion.
- If there is no prior history of classroom or test accommodations, an explanation of why accommodations have not been required/provided in the past and why they are necessary at this time.

In my professional opinion therefore, Jessica meets the United States Medical Licensing Examination guidelines for disabilities necessitating reasonable accommodation. After review of clinical history and neuropsychology testing, and conferring with Jessica, I recommend the following accommodations for US MLE Step 1 and Step 2 CK exams:

a.    Fifty percent additional time for exam over two days for inattention, distractibility, slow reading and processing speed

b.    Additional break time over two days

c.    A separate quiet area to complete the examination for inattention and distractibility

> **Comment [JR16]:** Their guidelines require you to provide support for each recommendation

NBME02197

Even if the Board does not find Jessica meets criteria for accommodations for ADHD, in my professional opinion the Board should approve Jessica for accommodation for reading and writing learning disabilities.

> **Comment [JR17]:** I would rephrase "in my professional opinion, even if the Board does not find that Jessica meets their criteria for accommodations for ADHD, the Board should approve Jessica for accommodation for her learning disabilities in reading and writing."

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,


Bruce Ruekberg, MD

---

To Whom It May Concern:

I am writing this letter in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination step I exam retake and her step II exam.

> **Comment [JR18]:** May be smart to say something along the lines of "and all future exams of a similar nature" to help the process moving forward

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for Attention Deficit and Hyperactivity Disorder, Combined type (CODE) [based on clinical, academic, family and social histories, direct observation, neuropsychological evaluation, and collateral information. Her childhood history obtained from her mother is consistent with ADHD, and was consistent between home, school and social activities. In Kindergarten through grammar school Jessica manifested difficulty with focus and attention.  She received informal accommodations starting in the second grade including a secluded testing area and extra time to work on assignments. Throughout elementary, middle and high school, there were multiple instances where, working with her teachers and sometimes needing to involve her mother, Jessica received informal accommodations including extra time and altered grading schemes because she could not complete tests, reading, and writing assignments in the regular time provided. Her mother and Jessica report she experienced inattentiveness, restlessness and distractibility from early childhood that has continued to the present time.

> **Comment [JR19]:** I added this, I think they want it to be specific

> **Comment [JR20]:** Elementary?

> **Comment [JR21]:** May go better after learning disabilities so you only have to say it once.
> I added this sentence. You can change or take it out as you see fit. I think it is important because it shows that I have needed extra time for tests and reading/writing assignments. I'm pretty sure we have talked about these informal accommodations in earlier visits, but if not, we can discuss them at the next visit. I don't want to put anything in here that you aren't comfortable with.

While attending college at Ohio State University she began recognizing her difficulty concentrating, finishing timed quizzes and tests, and keeping up with reading and writing requirements due to letter switching, slow reading and writing, inability to focus, and procrastination. Her primary care doctor considered ADHD and or, dyslexia and started her

> **Comment [JR22]:** May sound better to say "Jessica and her mother"

NBME02198

~~after ADHD screen in the office on Ritalin, and later switched to Adderall as it was better tolerated and showed better effectiveness.~~ She responded well to Adderall and has remained on an Adderall preparation since. She is currently on Vyvanse 60 MG to help her manage her symptoms throughout the long days required in medical school. In 2010, at the recommendation of a professor who knew Jessica well, Jessica met with a counselor at OSU Disability Services to discuss her options and was granted temporary accommodations, which were fully approved in upon receipt of supportive documentation from her primary care provider. With these accommodations, Jessica was able to complete more of her exams and quizzes and maintain satisfactory performance in most of her classes. However, even with the accommodations, Jessica had multiple exams in which she still was not able to get to significant portions in the time allowed due to large amounts of reading or writing they contained, and on several occasions, required additional informal accommodations, including altered grading scheme and/or extra time, in order to pass the exam and the course.

Comment [JR23]: This is really difficult for me to read – I think this says what you were trying to say but is a bit easier for me to follow, I also added the clarity of Dx: "In 2009, her primary care doctor considered ADHD and/or dyslexia, completed an ADHD screening in office, and started her on Ritalin. She was later switched to Adderall as it was better tolerated and showed better effectiveness."

Comment [JR24]: I added this. You can take it out if you don't think it is needed.

Comment [JR25]: I added all of this. I think it is important to show I received accommodations, but still struggled with reading and writing in a timed setting
Reword

Jessica ~~An initial formal neuropsychology assessment occurred in 2014 by Charles Livingston, a licensed social worker and limited licensed psychologist, confirmed the clinical diagnosis of ADHD.~~ He recommended accommodations to the medical school disability office for ADHD at that time.

Since that assessment, she has received accommodations ~~in medical school and has performed very well on exams~~.

Comment [JR26]: This sentence is also really hard to read, I tried to rearrange it: "In 2014, an initial formal neuropsychology assessment performed by Charles Livingston, a licensed social worker and limited licensed psychologist, confirmed the clinical diagnosis of ADHD."

Comment [JR27]: Maybe replace with "throughout medical school, including for standardized NBME (CBSE and Shelf) exams, allowing her to adequately access and pass her exams." to show that I also received accommodations on the national/standardized exams, which is important.

Dr. Lewandowski did a second neuropsychology test 12/7/18 confirming the diagnosis of ADHD. I He diagnosed ADHD both clinically and by clinical history and by neuropsychology testing.

Jessica's mother and significant other provided collateral historical support for the diagnosis of ADHD, combined type. Recent DSM-IV symptom checklists with prompts completed by Jessica, her significant other and her mother all strongly support ADHD, combined type.

Comment [JR28]: I'm not sure which one you meant to say here, but you need to get rid of either "I" or "He"

** [I moved the 2 paragraphs you had here to the end -- I think it makes a stronger statement there] **

Comment [JR29]: Set it up like an H&P

In addition to ADHD, Jessica's medical record, family history, symptoms and neuropsychological testing support a learning disability she has grappled with since starting to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she meets criteria for diagnosis of learning disabilities of reading and writing.

Jessica's second grade teacher first noted Jessica reversed her letters and so allowed her to use an alphabet board with extra time during spelling, reading, and writing activities as informal accommodations for Jessica to enhance her letter identification.  Due to the letter reversals and

NBME02199

reading difficulty at the age of 7, her teacher also recommended vision testing, for which Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic Optometrist. Dr. Tanguay performed a visual-perceptual skill test and found significant deficits in Jessica's visual spatial relationships, visual discrimination and visual memory. Report attached.

Comment [JR30]: There were some spelling and grammar errors that I corrected. I reworded things a bit and also added a couple details.

Under timed conditions, Jessica is limited by a reading disability. Due to this reading disability she, must take multiple compensatory steps to assure the accuracy of each word she reads and her comprehension of their meaning. For Jessica, reading takes great mental effort and additional time, which further exacerbates her focus and attention difficulties, particularly when required for extended periods and during timed examinations.

Comment [JR31]: You don't need to say this, they already have the report from my original request for accommodations.

Comment [JR32]: Both reading and writing disabilities

Not sure if this is a better conclusion paragraph

Jessica's mother recalls that Jessica's teachers always noted her to be a very bright student, but also that she was always an incredibly slow reader and writer, and a bad test-taker, consistent with Jessica's self-reported history.

Comment [JR33]: I added this

I believe the results of Jessica's most recent neuropsychological testing performed by Dr. Lewandowski's (title) on _date___ are consistent with Jessica's clinical diagnosis of learning disabilities in reading and written expression. His assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her IQ pattern "is consistent with the patient's and parents reports of premorbid functioning, and consistent with a pre-existing developmental delay. Jessica tested abnormal on specific cognitive tasks including sequencing and cognitive shifting, sustained complex attention and quickness of thinking again affecting her ability to perform under timed conditions."

Comment [JR34]: Make sure quotes are in the right spot

Mr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency.

In addition to a reading learning disability, in my professional opinion, based on clinical history, Jessica has a writing learning disability. Jessica reports a lifelong difficulty formulating her thoughts to put down on paper, picking the words to use and to assure accuracy of their

NBME02200

meaning, and using the words in an understandable sentence. In addition, she has difficulty with legibility of her writing and makes frequent spelling, and grammatical errors.

Due to her reading and writing disabilities, she requests the same accommodations for the Step II CK exam as she has requested for ADHD for the Step I retake examination.

> **Comment [JR35]:** Not sure if I should say anything about the CS exam yet, which is what I think he is trying to get at here

Ms. Ramsay was able to succeed in her academic career in spite of her disabilities through sheer will and grit. Only by her intelligence, motivation, and determination has she been able to persevere. She self-accommodated for many years until the complexity of the material in college led her to seek medical evaluation.

Ms. Ramsay's MCAT scores were quite lower that her practice tests and she did much better in her ~~mathematics~~ compared to her Verbal scores, and a major drop off her performance occurred in her writing portions. I believe these results are quite consistent with her clinical history and neuropsychology tests.

> **Comment [JR36]:** Added some corrections and changed some wording to emphasize the deficit in verbal and writing, rather than how well I performed in the sciences: "At the time, Ms. Ramsay was not aware at the time that she could apply for accommodations for the MCAT, but was able to achieve a satisfactory score despite not being able to read all of the prompts and questions in each section because she was able to answer enough of the questions without reading much of the prompts, and her score ended up being quite lower than she received on multiple practice exams when taking prior versions of the MCAT in an untimed setting. On the subsections, she did significantly worse on her Verbal Reasoning than her Biological and Physical Sciences scores, and a major drop off in her performance occurred in her writing score."

Like many with limitations in certain realms of cognitive function, Jessica has developed major strengths in areas not easily measured by multiple-choice questions. While she may not excel on timed tests requiring fast reading comprehension and identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills.

In my professional opinion therefore, Jessica meets the United States Medical Licensing Examination guidelines and I recommend, after review of neuropsychology testing and conferring with Jessica, the following accommodations for NBME Step I and Step II CK exams:

d.    Fifty percent additional time for exam over two days

e.    Additional break time over two days

f.    A separate quiet area to complete the examination for inattention and distractibility

> **Comment [JR37]:** Their guidelines require you to provide support for each recommendation

Even if the Board does not find Jessica meets criteria for accommodations for ADHD, in my professional opinion the Board should approve Jessica for accommodation for reading and writing learning disabilities.

> **Comment [JR38]:** I would rephrase "in my professional opinion, even if the Board does not find that Jessica meets their criteria for accommodations for ADHD, the Board should approve Jessica for accommodation for her learning disabilities in reading and writing."

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

NBME02201

Bruce Ruekberg, MD

NBME02202

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Friday, April 20, 2018 1:34 AM |
| **To:** | Bruce Ruekberg |
| **Subject:** | Final draft |
| **Attachments:** | 2018.04.29_Jessica Ramsay_Clinical Summary_draft 4.docx |

Hi Dr. Ruekberg,

Here is the final draft of the letter. Sorry it is so long... I had to add a lot to support each of the points in the NBME guidelines. Please let me know once you've received it. You can try email, just make sure my last name is spelled with an -AY... Haha. And please, please proofread this to make sure you approve before you sign it, and because I'm obviously prone to mistakes...

You can reformat it as you see fit.

Please call me when you are done editing so I can make sure I get your final, **signed & dated** version **"on official letterhead"** before I stop bothering you. 😊

THANK YOU SOOOOOO MUCH!

Jessie

DEFENDANT'S
EXHIBIT
**79**

1

NBME02175

To Whom It May Concern:

I am writing this letter and clinical summary in support of Jessica Ramsay's appeal application for accommodations for her United States Medical License Examination Step 1 retake and her Step 2 CK exams.

**History of present illness:**

Currently, Ms. Ramsay is pursuing a medical degree but is on academic leave of absence due to inhibited advancement through the curriculum after failing her initial unaccommodated USMLE Step 1 attempt, which has resulted in a subsequent delay of match and graduation. Jessica's initial request for reasonable accommodation for ADHD and dyslexia for the USMLE Step 1 and 2 CK exams was denied in March 2017. Jessica was aware that taking the exam under standard conditions would not give her equal opportunity to demonstrate her competency because she would not be able to read enough of the questions. However, after discussing her options with the school, Jessica decided to still attempt Step 1 before pursuing an appeal for accommodations in hopes that she might be able to pass and remain on track for match and graduation. Regardless of her score, the symptoms Jessica experienced during her Step 1 attempt due to her ADHD and learning disabilities significantly impeded her access to the exam under standard conditions, consistent with her experiences with previous unaccommodated standardized testing. She feels that the formal accommodations (double time, separate room) she previously received for other standardized NBME (CBSE and clinical Shelf) exams during medical school sufficiently decreased the excessive barriers normally imposed by standard conditions by decreasing ambient distractions and permitting her to read/think aloud or briefly step away from the computer to process the information and to manage her restlessness and hyperactivity without risk of disrupting other test-takers. Ms. Ramsay states she would like an equal opportunity to read each of the questions and process the information so she can apply her knowledge to choose each answer and to receive a score that accurately reflects her comprehension of the material. In hopes to accomplish this, she has been pursuing more comprehensive testing and documentation to better address the NBME guidelines in order to support her appeal for appropriate accommodations for the USMLE Step exams.

**Clinical history:**

Jessica describes symptoms of restlessness and hyperactivity, inattentiveness, distractibility, and slow reading and writing due to letter reversals, "tangled words," and difficulty recalling words to express herself beginning in early childhood and persisting to the present time. She reports spending a large portion of her time and energy each day managing these symptoms and working around functional deficiencies they cause.

In order to accurately read, she must take multiple compensatory steps to correctly identify the sequence of letters and words and comprehend their meanings within context. To compensate, Jessica isolates each word and sometimes replaces them with colors and/or symbols to associate meaning. Due to character switching, she makes frequent spelling and grammatical

NBME02176

errors and has a hard time proofreading her own work and, when possible, relies heavily on "spell check" and help from others. Additionally, she struggles with legibility of her handwriting.

Ms. Ramsay also reports a lifelong difficulty formulating and organizing her thoughts and selecting the words to clearly express them. To compensate, she uses analogies, draws pictures and diagrams, or physically demonstrates what she is trying to communicate. Due to these deficiencies, it takes Jessica a very long time to read, write, and process information. Though she has developed tools and mechanisms to work around these deficiencies, she needs a substantial amount of extra time to effectively execute them.

Because reading and writing take her a very long time and require great mental effort, these difficulties are further exacerbated by her focus and attention problems and distractibility, particularly when required to read or write for extended periods and in time-limited situations. She reports experiencing intermittent feelings of inadequacy resulting in depressed mood, low energy, fatigue, anxiety, and some difficulty sleeping. The symptoms occur at times when she disproportionately struggles to keep up with academic demands compared to her peers, or when she is unable to accurately demonstrate her knowledge and capabilities because she is disadvantaged by required reading and/or writing, especially under limited time and/or unfavorable conditions, and when proving her competency stands in the way of continuing her pursuit of academic and occupational goals.

Information provided by Jessica's significant other, with whom she has been living for two years, details current examples of impaired daily functioning consistent with Jessica's reported symptoms. He describes Jessica as being energetic, motivated, and very hard-working. "She doesn't like to sit still and gets really restless when she can't move around." He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house so she doesn't forget to do things." She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything." Importantly, as a medical student himself, he states that while studying and doing practice questions together, "she knows the stuff, but if she can't focus when she reads, she'll probably get the question wrong because she misread something. But if you ask her in person, she'll give a correct explanation. She has the clinical knowledge; she's just bad at showing it on standardized tests because she's not standard – her brain works differently."

Childhood history obtained from Jessica's mother is significant for symptoms of hyperactivity, restlessness, inattention, and distractibility from a young age and affecting several domains of life, consistent with Jessica's diagnosis of ADHD, combined type. She also describes Jessica having a very difficult time with reading and writing since beginning to do so, due to her letter

NBME02177

reversals, "mixing up words," and difficulties with recalling specific words, consistent with learning disabilities in reading and writing.

At home Jessica was an inquisitive, busy child who was "hardly ever still." Even during mealtimes or leisure activities like watching TV, she would "find reasons to get up and move." She avoided things that required prolonged mental effort or sitting still, especially reading. Due to her inattention and distractibility, she was forgetful and disorganized with everyday tasks, had a cluttered room and many partially completed or forgotten projects.

Comment [JR1]: You can remove the underlining for "home" "school" and "socially," unless you think it would be beneficial to leave in.

Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them.

At school, beginning in Kindergarten, Jessica spent much of her energy suppressing the continuous urge to move and trying to pay attention so that she could learn and avoid getting in trouble. Jessica struggled to sit still during class, "always moving or doing something" like fidgeting or doodling on her papers, and often asked to go to the restroom so she could walk around.

Jessica's distractibility and attention difficulties manifested as forgetfulness and carelessness, forgetting to take home, complete, or turn in assignments, and making frequent "dumb mistakes." Jessica's teachers noted her to be a very bright student, but a very slow reader and writer, as well as a "bad test-taker." Jessica commonly expressed frustration over how much longer it took her to read and write than her classmates, "always being the last one done" with classwork and tests. In middle and high school, she frequently had to stay up late and pull all-nighters to complete homework. Jessica's mother recalls that "even early on, like in middle school, Jessie spent so much time doing homework every night, usually up until the wee hours of the morning trying to get through reading or write an essay," emphasizing, "it's incredible how slow she reads. Her younger brother, who has autism and significant special needs, even reads faster than she does." With written assignments, Jessica needed a lot of help organizing her thoughts, choosing the words, and proofreading due to her character switching and grammar difficulty.

Her mother states that once she started school, "Jessie would almost always get headaches from trying to concentrate to do her home- or schoolwork, especially with reading and writing." Jessica's second-grade teacher was first to note that Jessica still reversed letters at the age of 7, and struggled with reading, spelling, and writing, along with distractibility. The teacher provided informal classroom accommodations (extra time and use of an alphabet board in a secluded space) and recommended she get vision testing. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. At the time, assessment for behavioral problems or learning disabilities was not pursued because Jessica's deficiencies were masked by her hard work and natural intelligence. Jessica was trialed on glasses for "straining to focus" for about a year, but they did not provide relief for the straining, nor improve her distractibility, or difficulties with reading, spelling, and writing, so she stopped wearing them. Jessica began having migraines in third grade,

NBME02178

"sometimes she would come home with them, but she would usually get them while trying to do her homework."

While attending college at Ohio State University, Ms. Ramsay became increasingly frustrated with her letter switching, inability to focus, difficulty organizing thoughts, slow reading and writing speed, and procrastination interfering with her ability to complete timed quizzes and tests, and to keep up with reading and writing requirements. In 2009, when Jessica was no longer able to keep up with her coursework, she brought the issues to the attention of her primary care physician, Dr. Alan Smiy, who considered ADHD and/or dyslexia and completed an in-office ADHD screening. He did not recommend further testing for ADHD or dyslexia at the time as he did not believe it would change medical management. Jessica was started on a trial of Ritalin, then switched to Adderall a month later, which was better tolerated and showed better effectiveness. She has remained on an Adderall preparation since 2009 and is currently on Vyvanse 60 MG to help her manage her symptoms for the duration needed to complete her academic requirements. In 2010, at the recommendation of a professor, Jessica sought and was granted formal accommodations by OSU Disability Services. With these accommodations, Jessica had better access to her exams and quizzes and maintained satisfactory performance in most of her classes. However, for several important exams that required large amounts of reading and/or writing, for which 50% additional time was not enough to give Jessica the opportunity to attempt enough of the exam to possibly achieve a passing score, her professors informally provided additional accommodations (e.g., altered grading schemes), which allowed Jessica to pass those exams and courses.

**Standardized Testing History:**

ACT: At the time she took the ACT, Jessica had not yet been diagnosed with ADHD or learning disabilities, so did not receive accommodations. Even though she did not have the opportunity to read all of the questions in each section, she was able to achieve an acceptable score with her first attempt because most questions required little reading. She was able to retake the exam with some improvement, but both scores were still lower than the practice tests she had taken with unlimited time, suggesting that standard exam time inhibited her ability to accurately demonstrate her knowledge.

MCAT: Jessica was diagnosed with ADHD and possible dyslexia shortly before taking MCAT and was not aware that she could have applied for accommodations until after she had taken it. Aware of her weaknesses with reading, writing, and timed testing, Jessica took a strategic approach, answering passage-independent questions first, then with any time left, attempted to read the passages with the most remaining questions, and randomly filling in any blank questions in the last minute. This strategy allowed Jessica to apply her knowledge to enough questions in each section to achieve an overall satisfactory score. Notably, Ms. Ramsay's official score (30M) was consistent with practice tests taken under simulated standard exam conditions but was significantly lower than her scores on prior MCAT versions taken in a private, untimed setting as self-assessments. Also important to note, Jessica's percentile performance on the subsections were quite consistent with her symptoms, clinical history and neuropsychology testing, as her Verbal Reasoning (67%) was noticeably lower than her Biological (88%) and Physical (79%) Sciences, and a major drop-off in Writing (33%).

NBME02179

**NBME Exams:** Though the NBME did not allow standardized CBSE and clinical Shelf exams to be taken on paper, Jessica did receive double exam time and a separate room for all standardized exams while in medical school. Though she was unable use colors and symbols to replace words to assist with reading accuracy and comprehension, these accommodations did provide a distraction-reduced environment in which she could read and think aloud or move around to work through the questions and to manage her symptoms without distracting other test takers. The CBSE taken on 04/28/17, after successful completion of her clinical clerkships, provided by the school as formative practice for Step 1, is the only exception. Because her Step 1 accommodations request had been denied, Ms. Ramsay chose to attempt this practice test still in a separate room, but without the extra time she normally received, to see if she would be able to read enough questions to pass.

**USMLE Exams:** Unlike most standardized examinations Jessica had taken prior to medical school, for which reading the entire prompt was not required to answer most of the questions, the USMLE exams are designed so that, for nearly all of the questions, the information in the prompt must be assessed to come up with the answer, meaning that Jessica has to read the whole prompt for almost all of the questions in order to apply her knowledge to select an answer. Because of the inherent structure of the USMLE exams, Jessica is severely disadvantaged compared to the average person taking the exams because of her very slow reading (and writing, for Step 2 CS) and information processing speeds, in addition to her inattention, distractibility, restlessness, and hyperactivity. Jessica's experience during her initial Step 1 exam attempt illustrates this disadvantage, along with the additional disadvantages imposed by standard exam conditions. The standard environment significantly impaired Jessica's ability to focus on her exam due to the continuous distraction caused by other test-takers being in the same room, which she could not simply "tune out" due to her distractibility and attention difficulties. She was also unable to read aloud or briefly step away from the computer in order to aid her reading comprehension or manage her symptoms of restlessness and hyperactivity during the exam without disturbing others in the room. With standard exam time, Jessica did not have the opportunity to read all of the questions in each section and was therefore inhibited from using her knowledge to answer a significant number of questions in each section.

In each case, Jessica achieved significantly lower scores on unaccommodated exams than she did on equivalent practice exams taken in a quiet environment with sufficient time, or formally accommodated exams. This pattern is pervasive throughout her exam history, with the scores differing proportionally to the amount of reading and/or writing that is necessary within the allowed time. This suggests that, under standard exam settings and time limits, Jessica does not have an opportunity to read all of the questions, which impedes her ability to accurately demonstrate her knowledge and preparation, and therefore she does not have equal access to the exam.

**Accommodations History:**

Though Jessica did not receive any formal accommodations until college, she began receiving informal accommodations (extra time, use of an alphabet board, and a distraction-reduced space) beginning in second grade for inattention, distractibility, and letter reversals causing

NBME02180

difficulties with reading, spelling, and writing. On numerous occasions throughout the remainder of her academic career prior to medical school, Jessica's teachers provided various forms of informal accommodations (e.g., extra time, quiet environment, altered grading schemes, redo opportunities, etc.) for completing tests, reading, and writing assignments because she was unable to satisfactorily do so in the regular time provided.

Since Dr. Charles Livingston's recommendation to the medical school to provide "accommodations of distraction-free testing milieus, paper testing materials, extended time, and audio recordings" following his neuropsychological assessment in 2014, which confirmed Jessica's diagnosis of ADHD, Jessica has received reasonable accommodations throughout medical school which provided more equal access her exams. Accommodations Jessica has received while attending medical school have included:

- private room and double time for standardized NBME (CBSE and Shelf) exams;

- extra time to read instructions and patient information and write the patient note for OSCEs;

- all WMed-administered exams, quizzes, and lab practicals provided on paper with use of colored pencils, highlighters, and scrap paper in a private environment with double testing time;

- free printing and the use of Kurzweil 3000 text-to-speech software outside of exams to help manage coursework and studying.

Jessica feels the excessive barriers imposed by standard conditions were sufficiently removed by the formal accommodations she received during the previous NBME (CBSE and clinical Shelf) exams because they decreased ambient distractions and permitted Jessica to read/think aloud or briefly step away from the computer to process the information and/or manage her restlessness and hyperactivity without disrupting other test-takers.

<u>Past Medical History:</u>

Significant for chronic migraines with aura and photo-/phonophobia beginning in third grade, requiring one year of prophylactic treatment, followed by abortive management with ibuprofen. Ms. Ramsay reports the migraines can be triggered or worsened by stress and/or having to sustain focus and mental effort beyond her threshold, such as when reading or writing. The frequency and severity of migraines increased with academic demands over time until 2015, when daily migraines necessitated prophylactic treatment with low-dose beta blocker. She has continued the beta blocker as effective prophylaxis.

In 2016, Ms. Ramsay was diagnosed with a lower extremity DVT and subsequently identified as a Factor V Leiden heterozygote. Treatment of the DVT with Xarelto led to secondary mild anemia, which resolved with iron supplementation. She has no prior history of anemia or blood clots.

In 2010, Jessica had an episode of viral meningitis, requiring one day of hospitalization for administration of IV fluids, which resolved completely with no lasting effects.

<u>Family history:</u>

NBME02181

Significant for mother with migraines, ADHD and moderate dyslexic symptoms; father with mild dyslexic symptoms; paternal grandmother with moderate dyslexic symptoms; paternal grandfather with mild ADHD symptoms; two paternal cousins (siblings), one with diagnosed dyslexia and the other with Asperger syndrome.

<u>Assessments:</u>

In 1997, due to her letter reversals and difficulty with reading, spelling, and writing at the age of 7, Jessica was referred by her second-grade teacher to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found Jessica to have "substantial deficits in the areas of visual-spatial relationships and visual discrimination," and "was also lacking in visual memory." These findings strongly suggest the presence of a learning disability affecting Jessica's ability to read, spell, write, and process information.

Dr. Katherine Turner completed a full physical in 2014, reporting all systems to be normal, with the exception of a history of AHDH, dyslexia, and migraines. Visual acuity testing completed as part of the exam, noted Jessica to have 20/13 vision, uncorrected, in both eyes (normal = 20/20).

An initial formal neuropsychology assessment was performed in 2014 by Dr. Charles Livingston, a licensed social worker and limited licensed psychologist, to support her request for accommodations in medical school. He confirmed the **clinical diagnosis of ADHD**, originally made by Dr. Alan Smiy in 2009, after his assessment using the WAIS-IV showed that Jessica to be in the 96th percentile for verbal comprehension and perceptual (non-verbal) reasoning, but only in the 63rd percentile for working memory, attention, and concentration, and a very significant drop-off with processing speed in the 10th percentile. He did not feel it was necessary at the time to pursue testing to confirm diagnosis of dyslexia as he believed the confirmation of her diagnosis of ADHD was sufficient to necessitate provision of reasonable accommodation. Dr. Livingston states that "Jessie's exceptionally bright reasoning abilities and long-term memory stand in contrast to relatively low attention and concentration and very low processing speed. Her native intelligence has been some compensation for low abilities in the identified areas."

In December 2017, Dr. Alan Lewandowski completed a more comprehensive neuropsychology evaluation. Using clinical history, observation, and the results of his neuropsychology testing, he diagnosed Jessica with ADHD and a nonverbal learning disability of "abnormal scanning and processing speed" (ICD-10 F81.9). When put into context of Jessica's clinical history, I believe that, in addition to confirming Jessica's ADHD diagnosis, his findings support and are consistent with a more specific clinical diagnosis of nonverbal learning disability with impairments in reading (ICD-10 F81.0) and written expression (ICD-10 F81.81). Dr. Lewandowski's assessment highlights the effects of these deficient functions on her cognitive processing speed, stating that Jessica tested very superior in intellectual ability (98th percentile) but also had a marked drop-off in intellectual efficiency (34th percentile). Dr. Lewandowski noted that these findings reflect "a statistically significant and clinically relevant weakness on measures contributing to cerebral response speed, with subsequent implications for learning new information and responding to assessments under timed conditions." Dr. Lewandowski, moreover, noted her "IQ pattern is consistent with the patient's and parents' reports of premorbid functioning, and consistent

NBME02182

with a pre-existing developmental delay." Jessica tested abnormal on specific cognitive tasks including "sequencing/cognitive shifting, sustained complex attention and quickness of thinking," again affecting her ability to perform under timed conditions. For her USMLE Step exams, he recommended extra exam time and additional breaks to accommodate her "inefficient thinking" and manage "mood symptoms," as well as a separate testing room to reduce distractions.

Dr. Livingston's 2014 assessment is consistent with Dr. Lewandowski's findings. Their neuropsychology tests revealed Jessica possesses a very superior IQ but has a marked drop-off in her intellectual efficiency, requiring reasonable accommodations in the academic setting, especially under timed conditions.

Recent DSM-IV Adult ADHD symptom checklists with prompts completed by Jessica, her mother, and significant other, all strongly support Jessica's diagnosis of ADHD, combined type (ICD-10 F90.2) with continuation of symptoms to the present time, as well as her need for accommodation.

**<u>Differential and Rule-out Diagnoses</u>:**

I have reviewed Jessica's medical and neuropsychological records and have ruled out medical conditions and primary disorders of mood and anxiety as possible causes of Jessica's persistent inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading, writing, and information processing speeds since early childhood, as well as for possible causes of her intermittent symptoms of anxiety and depression, and feelings of inadequacy.

In the context of Jessica's clinical history, the substantial deficits in visual-spatial relationships, visual discrimination, and visual memory reported by Dr. Tanguay in 1997 strongly suggest the presence of a learning disability. The subsequent failure of corrective glasses to relieve Jessica's "straining to focus" and difficulties with reading, spelling, and writing, make vision problems an unlikely cause of her letter reversals, difficulties with written language, and inattention. This conclusion is further supported by the 2014 physical completed by Dr. Turner, which noted Jessica's bilateral visual acuity of 20/13 and completely normal physical exam, ruling out persistence of vision or health problems as a possible cause of persistent letter reversals and difficulties with reading and written expression.

I have ruled out Ms. Ramsay's chronic migraines as a possible cause of her impaired cognitive functions and ADHD symptoms, as her symptoms of inattention, distractibility, restlessness, and difficulty with reading and writing began years before the onset of her migraines and have continued well after their prevention. The same can be said for her brief episode of anemia secondary to medication effects, and her episode of viral meningitis, both of which occurred after diagnosis with ADHD and possible dyslexia.

For completeness, a sleep study in November of 2017 did not reveal evidence of obstructive sleep apnea or other sleep issues that might cause inattentiveness, distractibility, inefficient thinking or slow processing speed which have persisted since childhood. Likewise, thyroid function tests, CBC, metabolic panels, and screening labs are all negative for possible causes of inattentiveness, distractibility, restlessness, hyperactivity, inefficient thinking, or slow processing speed.

NBME02183

Jessica's intermittent feelings of inadequacy resulting in depressed mood, low energy, fatigue, anxiety, and some difficulty sleeping have only been situational, provoked directly by inadequate accommodation, enabling conditions that put her at unequal disadvantage compared to her peers and interfere with her ability to demonstrate her competency. Past episodes occurred due to similar circumstances, and symptoms resolved with successful completion of the situational obstacle, usually facilitated by formal or informal accommodations. The temporary and conditional nature of these episodes rules out primary mood and anxiety disorders as possible causes of her inefficient thinking, inattention, distractibility, restlessness, hyperactivity, and slow reading and writing speed that persisted since childhood.

## Clinical Impression:

In my professional opinion, Ms. Ramsay meets DSM-5 criteria for **Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2)** based on reported symptoms, clinical, academic, family and social histories, direct observation, neuropsychological evaluation, DSM-IV symptom checklists, and collateral information gathered from her mother and significant other. In addition to ADHD, I believe Jessica has also grappled with a learning disability since beginning to read and write as a young child. After regular meetings with Jessica and reviewing her records, I believe she also meets DSM-5 criteria for **Specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81)** based on her symptoms, clinical and family history, neuropsychological and vision testing, and collateral information gathered from her mother and significant other.

It is not uncommon for ADHD and learning disabilities to co-exist within the same individual, nor is it uncommon for persons with above-average intelligence to successfully advance through school with undiagnosed ADHD and/or learning disabilities, until academic demands outweigh their ability to self-accommodate. I believe this is very much the case for Ms. Ramsay. While she does not perform well on timed tests requiring reading comprehension, writing, or identification of nuances in questions, she is very gifted in nonverbal communication, empathy and implicit memory skills, which allowed her to self-accommodate for many years until the complexity of the material in college led her to seek medical evaluation and formal accommodations. With appropriate accommodation, Jessica's adaptability, dedication, and resilience have allowed her to continue pursuing higher learning and survive the grueling requirements of medical education despite the deficiencies caused by her ADHD and learning disabilities. Only by sheer will and grit has she been able to persevere.

## Summary and Plan:

In my professional opinion, Jessica's functional limitations caused by Attention Deficit and Hyperactivity Disorder, Combined type (DSM-5 314.01; ICD-10 F90.2) and specific learning disorder of "abnormal scanning and processing speed" (ICD-10 F81.9) with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2; ICD-10 F81.81) without question meet the definition of disabilities under the ADA, and should absolutely meet the definition set by the National Board of Medical Examiners' guidelines, and should therefore qualify for reasonable accommodation for **all** United States Medical Licensing Examinations, per

Comment [JR2]: You can get rid of the bolding and underlining if you would like

NBME02184

her request. This includes her current request pertaining to Step 1 and Step 2 CK exams as well as any future requests for accommodations that she justifies as reasonable and necessary to provide her with equal access to the USMLE exams.

After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 and Step 2 CK exams:

- **50% additional test time (Time and ½) over 2 days** for inattention, distractibility, and slow information processing and reading speeds.

- **15 minutes additional break time after each block** to address basic needs and to adequately manage symptoms of restlessness, hyperactivity, focus difficulties, and secondary mood symptoms so that she is better able to focus during the exam, **as well as an additional 10 minutes for the break at the midway point for each of the 2 days** to allow time to eat and take medications without pulling time away from that available to her for managing her symptoms as previously stated.

- **A separate, quiet room in which to take the exam** for inattention and distractibility, and to utilize compensatory mechanisms, such as reading/thinking aloud or briefly stepping away from the computer, to aid in reading comprehension and information processing and to manage her symptoms of restlessness and hyperactivity.

While the accommodations she has requested will not completely remove the barriers imposed by standard conditions or provide entirely equal access to the exam, they will level the playing field by providing Jessica an environment with minimized distractions in which to read/think aloud or briefly step away from the computer so that she is able to process the information and manage her symptoms without risk of disturbing other test-takers, giving her the opportunity to focus on the exam, read each question, and apply her knowledge to choose each answer.

Should you have any questions concerning Jessica Ramsay, do not hesitate to contact me.

Respectfully,

Bruce Ruekberg, MD

NBME02185

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Friday, May 18, 2018 2:23 PM |
| **To:** | Bruce Ruekberg |
| **Subject:** | Fw: suggestions for Dr. Ruekberg's letter |

Hi Dr. Ruekberg,

Here are the initial suggestions from the lawyer regarding your letter.

I also went through the copy you gave me and have a few small suggestions/requests here and there. If you email me the document you are working on, I can put notes with my comments off to the side and send it back to you, and when you are ready, I can also forward it to the lawyer.

Let me know if you have any questions you would like me to pass along, or if you would like to discuss it directly with him.

Let me know if you need me to provide any specific information related to #1 below.

For #2 below: I haven't had any side effects except that if I take adderall without a bit of food/water, I tend to get pretty nauseous. I don't think this needs to be addressed in your letter though.

Thanks for your help,

Jessie

---

**From:** Lawrence D. Berger <larry@rcglawoffices.com>
**Sent:** Friday, May 18, 2018 9:11 AM
**To:** Jessica Ramsay
**Cc:** Dr. Jan Serrantino-Cox
**Subject:** suggestions for Dr. Ruekberg's letter

CONFIDENTIAL
ATTORNEY-CLIENT PRIVILEGE
ATTORNEY WORK PRODUCT
Dear Jessica:
Here are our comments about Dr. Ruekberg's letter. I do understand that he is planning to make his own edits, and of course we will review them too, when received. If he would find it helpful to speak directly to me or Dr. Serrantino, let me know and I can arrange for that.
1.      Dr. Serrantino suggests that he add a few paragraphs explaining his current treatment, and explaining how the feelings of depression, even though situational, affect your longstanding diagnosis of ADHD and specific learning disorder, e.g. how it interferes with concentration, increases distractibility, interferes with sleep, and increases susceptibility to migraines. (These are only suggestions based on our reading of his letter, and for his consideration.)

2

**DEFENDANT'S
EXHIBIT
80**

NBME02169

Appx1349

2.    I understand that Dr. Ruekberg is the prescribing physician for Vyvanse and Adderall.  Of course, these are both medications that you take with the hope of improving your test performance, but do either of them have any side effects that are relevant to your request for additional break time?  (I understand that Dr. Houtman is the prescribing physician for your other medications, and that will be the subject of a separate e-mail.)  If Dr. Ruekberg can make any comments about the drugs that he is prescribing, he should not name the specific medications, but just discuss the schedule on which they are taken, side effects if any, and how this affects your request for additional break time.  And for Vyvanse and Adderall, the answer may be "not at all," in which case there is no need to discuss them.

3.    Of course the final version should be on letterhead, with pagination, and signed.

Larry Berger
Of Counsel
Reisman Carolla Gran LLP
Email:  Larry@rcglawoffices.com
Phone:  856-354-0021

3

NBME02170

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Tuesday, May 15, 2018 2:52 PM |
| **To:** | Bruce Ruekberg |
| **Subject:** | lawyer info |

Hi Dr. Ruekberg,

Here is one of the most recent emails from the lawyer, Larry Berger. I haven't heard anything new from him since I saw you today, but I will keep you updated. I had already responded to his email below, confirming those were the correct documents, but I will send him the updated version of your letter once I receive it from you.

And if you have a chance to ask about a reading speed test, or similar, I would really appreciate it.

Thanks!

Jessie

**From:** Lawrence D. Berger <larry@rcglawoffices.com>
**Sent:** Monday, May 14, 2018 10:45:36 AM
**To:** Jessica Ramsay
**Subject:** RE: consult

Concerning Dr. Ruekberg: if I understand correctly, the two drafts that he wanted me (and Dr. Serrantino) to review are the one that was attached to this e-mail:

2018.04.06_Ruekberg_NBME letter_draft 2.docx

and the most recent draft which reflects changes that you have suggested,
2018.04.29_Ruekberg_Clinical Summary_draft4.docx.

Have I got that right?


Larry Berger
Of Counsel
Reisman Carolla Gran LLP
Email: Larry@rcglawoffices.com

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

NBME02171

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Monday, April 23, 2018 5:18 PM |
| **To:** | Bruce Ruekberg |
| **Subject:** | Hold on signing the appeal letter |

Hi Dr. Ruekberg,

I'm sorry to do this to you, but by chance happened to get connected with a lawyer representing a student with ADHD and a reading disability who is in a similar but slightly better situation than I am. I am discussing strategy with him tomorrow at 2:30, and will hopefully find out what has been successful or not for them.

Depending on the discussion, I may need to make some changes to your letter.

Sorry for the late notice, but hopefully I caught you before you spent too much time on it.

I hope you had a great weekend!

Jessie

Get Outlook for iOS

NBME02172

| | |
|---|---|
| **From:** | Jessica Ramsay |
| **Sent:** | Saturday, September 22, 2018 5:10 PM |
| **To:** | Bruce Ruekberg |
| **Subject:** | Learning specialist & appeal write-up |
| **Attachments:** | 2018.09.19_Ruekberg Letter to NBME.docx; 2018.06.27_Lewandowski Addendum_3.pdf |

Hi Dr. Ruekberg,

Thanks for being so willing to help me out with all of this. Sorry for the crazy long email, but here are several things of interest:

- I have attached the start of an outline that includes the points we discussed during my last appointment, as well the things that would need to be addressed in an appeal letter to the NBME. For the outline:
  - I literally copied the diagnostic criteria from the online version of the DSM-5 for each of the diagnoses you have made.
    - For the criteria I believe I meet, I made the text green and bold.
    - I also tried to give a few additional specific examples if they weren't already listed by the DSM.
    - I commented on areas I expect the NBME to attempt to use in their argument against giving me extended testing time.
  - This outline is by no means anywhere near complete nor comprehensive, but I figured it would help get it started. I would like to keep working on it as much as possible.
- I also attached the additional information Dr. Lewandowski wrote in response to the NBME's request for additional information.


- Both my lawyer and I have done searches and reached out for recommendations for evaluators who specialize in dyslexia/learning disorders. I came across the website of Robert D. Smith, PhD, (http://www.neuro-psychologyservices.com/) who is associated with the Michigan Dyslexia Institute. Separately, my lawyer also received a recommendation for Dr. Smith from a colleague who has also worked with medical students applying for accommodations from the NBME.
  - Because Dr. Smith has prior experience with medical students, NBME, and LDs, and he was specifically recommended, I contacted him to get some more info. Here are some highlights from our conversation that might interest you:

    - He stated that the testing Dr. Lewandowski performed is used to show deficits incurred from trauma, CVA, or brain tumors, and is generally not helpful in showing ADHD and not at all appropriate for evaluating possible learning disorders, and that he should have done appropriate testing.
    - He also said that Dr. Lewandowski's statement that I "can read and, therefore, cannot be dyslexic" was obviously incorrect.
    - Indirectly, he said that LD diagnoses made without 'appropriate' diagnostic testing aren't 'official', and that the NBME likely views the the diagnoses you made this way, which is probably why they completely disregarded your letter.
    - He is going to review my documentation and let me know if he thinks testing would be beneficial.
      - Obviously, he cannot guarantee that I actually have any learning disorders and, even if I do, the tests will accurately demonstrate or measure my impairments (which we already

DEFENDANT'S
EXHIBIT
**85**

NBME02146

**Appx1353**

knew), because neuropsych tests measure specific things out of context, so they frequently mask impairments &/or falsely show that individuals are less affected than they actually are. This is quite common, and is commonly used by the NBME to argue against giving the student needed accommodations.

- If he recommends testing, I will likely pursue it. My family, Neil, and the lawyer agree.
    - The earliest testing date he has available is this Tuesday (9/25) and it would take him 5-6 weeks to complete a writeup suitable for an appeal for accommodations.

2

NBME02147

Things we wanted to address in the letter:

- The DSM states that these diagnoses are to be made based on the clinical picture in its entirety. Neuropsychological testing often does not accurately demonstrate the extent or severity of the effects these diagnoses have on an individual's functionality in the major life areas. Therefore, the individual's need for accommodations cannot appropriately be assessed based solely on objective testing with disregard for the clinical picture as a whole. Denying Jessica's, or any individual's, request for accommodations based solely on select results included in her neuropsychological eval is inappropriate and unjust. [I think it would be smart to include direct quotes from the DSM, ADA, and any related supreme court cases won against the NBME to further (and hopefully inarguably) support this point. I will continue to find some to include.]

- On page 2 of Dr. Farmer's 9/11/18 letter on behalf of the NBME Disability Services, she states in reference to Dr. Lewandowski's neuropsychology evaluation, "Your evaluator's conclusions notwithstanding, he reports that your performances on a computerized measure of attention-related problems, the *Conners Continuous Performance Test, Third Edition (CPT-3)*, are normal." However, she has very clearly neglected Dr. Lewandowski's explicit statement in his 6/20/18 letter regarding this data set, "These graphs that were attached to the initial report were provided to [Ms. Ramsay] *only* as a general and cursory guide, to be used during our review in order to assist you in understanding the findings. They were/are not intended to be a comprehensive representation of all the measures employed, functional areas assessed, and the general corresponding scores. They were/are not intended to broader distribution or to be used in your request for accommodations." [I don't know if this argument will hold much weight, because Dr. Lewandowski also included the raw scores for the CPT-3 in the huge table in his 6/20/18 addendum, and he does say that the one measure is only mildly abnormal, which the NBME considers to still be normal.]

- Dr. Farmer's 9/11/18 letter also neglects the multiple abnormal scores on objective measures of processing speed in Dr. Lewandowski's testing. On the *Halstead Reitan Neuropsychological Battery*, Jessica demonstrated abnormal simple and complex sequencing (Trail A and Trail B) and abnormal *Seashore rhythm* as compared with individuals of the same age. Additionally, on the *Rey Osterrieth Complex Figure*, Jessica demonstrated impaired recognition with abnormal memory: short delay cued recall as compared with individuals of the same age.

**Attention Deficit/Hyperactivity Disorder, Combined Type**
DSM-5 Criteria: (https://dsm-psychiatryonline-org.ezproxy.med.wmich.edu/doi/full/10.1176/appi.books.9780890425596.dsm01)

A. **A persistent pattern of inattention and/or hyperactivity-impulsivity that interferes with functioning** or development, as characterized by (1) and/or (2):

1. **Inattention:** Six (or more) of the following symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities:

   - **Note:** The symptoms are not solely a manifestation of oppositional behavior, defiance, hostility, or failure to understand tasks or

instructions. For older adolescents and adults (age 17 and older), at least five symptoms are required.

  a. Often fails to give close attention to details or makes careless mistakes in schoolwork, at work, or during other activities (e.g., overlooks or misses details, work is inaccurate).
  b. Often has difficulty sustaining attention in tasks or play activities (e.g., has difficulty remaining focused during lectures, conversations, or lengthy reading).
  c. Often does not seem to listen when spoken to directly (e.g., mind seems elsewhere, even in the absence of any obvious distraction).
  d. Often does not follow through on instructions and fails to finish schoolwork, chores, or duties in the workplace (e.g., starts tasks but quickly loses focus and is easily sidetracked).
  e. Often has difficulty organizing tasks and activities (e.g., difficulty managing sequential tasks; difficulty keeping materials and belongings in order; messy, disorganized work; has poor time management; fails to meet deadlines).
  f. Often avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort (e.g., schoolwork or homework; for older adolescents and adults, preparing reports, completing forms, reviewing lengthy papers).
  g. Often loses things necessary for tasks or activities (e.g., school materials, pencils, books, tools, wallets, keys, paperwork, eyeglasses, mobile telephones).
  h. Is often easily distracted by extraneous stimuli (for older adolescents and adults, may include unrelated thoughts).
  i. Is often forgetful in daily activities (e.g., doing chores, running errands; for older adolescents and adults, returning calls, paying bills, keeping appointments).

2. Hyperactivity and impulsivity: Six (or more) of the following symptoms have persisted for at least 6 months to a degree that is inconsistent with developmental level and that negatively impacts directly on social and academic/occupational activities:

  - Note: The symptoms are not solely a manifestation of oppositional behavior, defiance, hostility, or a failure to understand tasks or instructions. For older adolescents and adults (age 17 and older), at least five symptoms are required.
  a. Often fidgets with or taps hands or feet or squirms in seat.
  b. Often leaves seat in situations when remaining seated is expected (e.g., leaves his or her place in the classroom, in the office or other workplace, or in other situations that require remaining in place).
  c. Often runs about or climbs in situations where it is inappropriate. (Note: In adolescents or adults, may be limited to feeling restless.)
  d. Often unable to play or engage in leisure activities quietly.

NBME02149

    e.  **Is often "on the go," acting as if "driven by a motor" (e.g., is unable to be or uncomfortable being still for extended time, as in restaurants, meetings; may be experienced by others as being restless** or difficult to keep up with).

    f.  **Often talks excessively.**

    g.  **Often blurts out an answer before a question has been completed (e.g., completes people's sentences; cannot wait for turn in conversation).**

    h.  Often has difficulty waiting his or her turn (e.g., while waiting in line). **[I typically just avoid things that require waiting]**

    i.  **Often interrupts or intrudes on others (e.g., butts into conversations, games, or activities; may start using other people's things without asking** or receiving permission; for adolescents and adults, may **intrude into** or take over what others are doing).

**B.  Several inattentive or hyperactive-impulsive symptoms were present prior to age 12 years.**

**C.  Several inattentive or hyperactive-impulsive symptoms are present in two or more settings (e.g., at home, school, or work; with friends or relatives; in other activities).**

**D.  There is clear evidence that the symptoms interfere with, or reduce the quality of, social, academic, or occupational functioning.**

E.  The symptoms do not occur exclusively during the course of schizophrenia or another psychotic disorder and are not better explained by another mental disorder (e.g., mood disorder, anxiety disorder, dissociative disorder, personality disorder, substance intoxication or withdrawal). **[Occurs in addition to learning disorders, but any mood/anxiety symptoms occur secondary to having to deal with the problems resulting from ADHD and learning disorders, and the excessive hoops I am made to jump through because of them]**

*Specify* whether:

- **314.01 (F90.2) Combined presentation: If both Criterion A1 (inattention) and Criterion A2 (hyperactivity-impulsivity) are met for the past 6 months.**
- **314.00 (F90.0) Predominantly inattentive presentation:** If Criterion A1 (inattention) is met but Criterion A2 (hyperactivity-impulsivity) is not met for the past 6 months.
- **314.01 (F90.1) Predominantly hyperactive/impulsive presentation:** If Criterion A2 (hyperactivity-impulsivity) is met and Criterion A1 (inattention) is not met for the past 6 months.

*Specify* if:

- **In partial remission:** When full criteria were previously met, fewer than the full criteria have been met for the past 6 months, and the symptoms still result in impairment in social, academic, or occupational functioning.

*Specify* current severity:

- **Mild:** Few, if any, symptoms in excess of those required to make the diagnosis are present, and symptoms result in no more than minor impairments in social or occupational functioning.
- **Moderate:** Symptoms or functional impairment between "mild" and "severe" are present.

NBME02150

- **Severe:** Many symptoms in excess of those required to make the diagnosis, or several symptoms that are particularly severe, are present, or the symptoms result in marked impairment in social or occupational functioning. **[Probably this one, but you can make that judgement]**

**Diagnostic Criteria for Learning Disorders**

A. **Difficulties learning and using academic skills,** as indicated by the presence of at least one of the following symptoms that have **persisted for at least 6 months, despite the provision of interventions that target those difficulties:**

   1. **Inaccurate or slow and effortful word reading (e.g., reads single words aloud incorrectly or slowly and hesitantly, frequently guesses words, has difficulty sounding out words).**

   2. **Difficulty understanding the meaning of what is read (e.g., may read text accurately but not understand the sequence, relationships, inferences, or deeper meanings of what is read).**

   3. **Difficulties with spelling (e.g., may add, omit, or substitute vowels or consonants).**

   4. **Difficulties with written expression (e.g., makes multiple grammatical or punctuation errors within sentences; employs poor paragraph organization; written expression of ideas lacks clarity).**

   5. Difficulties mastering number sense, number facts, or calculation (e.g., has poor understanding of numbers, their magnitude, and relationships; counts on fingers to add single-digit numbers instead of recalling the math fact as peers do; gets lost in the midst of arithmetic computation and may switch procedures).

   6. Difficulties with mathematical reasoning (e.g., has severe difficulty applying mathematical concepts, facts, or procedures to solve quantitative problems).

B. **The affected academic skills are substantially and quantifiably below those expected for the individual's chronological age, and cause significant interference with academic or occupational performance, or with activities of daily living,** as confirmed by individually administered standardized achievement measures and comprehensive clinical assessment. **For individuals age 17 years and older, a documented history of impairing learning difficulties may be substituted for the standardized assessment.**

C. **The learning difficulties begin during school-age years but may not become fully manifest until the demands for those affected academic skills exceed the individual's limited capacities (e.g., as in timed tests, reading or writing lengthy complex reports for a tight deadline, excessively heavy academic loads).**

D. The learning difficulties are not better accounted for by intellectual disabilities, uncorrected visual or auditory acuity, other mental or neurological disorders, psychosocial adversity, lack of proficiency in the language of academic instruction, or inadequate educational instruction.

**Note: The four diagnostic criteria are to be met based on a clinical synthesis of the individual's history** (developmental, medical, family, educational), school reports, and psychoeducational assessment.



**Comment [JR1]:** This most frequently occurs when I am trying to recall specific words, e.g., I will guess "notedly" when I mean "notably," or "grammarly" when I mean "grammatically," etc.

**Comment [JR2]:** I also have a lot of difficulty recalling specific words I have read, or that have been said to me, in addition to my difficulty recalling specific words to express an idea, which requires me to approximate or circumferentially explain the word or concept I mean.

**Comment [JR3]:** The notes I added to #1 also apply here because the same expressive difficulties happen whether I am trying to write or speak. I just have added difficulty with writing due to grammar and punctuation. I always have difficulty organizing thoughts.

**Comment [JR4]:** The NBME will likely use this as an argument. They will probably say that Dr. Tanguay's notes and history gathered from myself and my mom are not enough to support this – I will likely need additional objective testing to show that my skills are "substantially and quantifiably below those expected" for my age.

**Comment [JR5]:** We need to strongly emphasize this point, and relate it to my history, using it to support why I did not seek formal evaluation until college, or accommodations on standardized testing until the Step exams.

**Comment [JR6]:** Emphasize that the diagnoses are not to be made exclusively from objective testing, and that need for accommodation should not be based solely on objective testing with disregard for clinical history.

**Comment [JR7]:** This is likely another argument the NBME will make: that the psychoeducational testing I have had does not adequately support my diagnoses, or at least that they the results do not show I am abnormal enough to warrant provision of additional testing time.

NBME02151

- **Coding note:** Specify all academic domains and subskills that are impaired. When more than one domain is impaired, each one should be coded individually according to the following specifiers.

*Specify* if:
- **315.00 (F81.0) With impairment in reading:**
  - **Word reading accuracy**
  - **Reading rate or fluency**
  - Reading comprehension [I struggle with reading comprehension when I do not have enough time to work through and decode of the words. In untimed settings, such as all of the reading comprehension tests I have had during my psychoeducational testing, I am able to spend extra time and use additional tools to help me comprehend at a level consistent with my education.]
  - **Note:** *Dyslexia* **is an alternative term used to refer to a pattern of learning difficulties characterized by problems with accurate or fluent word recognition, poor decoding, and poor spelling abilities.** If dyslexia is used to specify this particular pattern of difficulties, it is **important also to specify any additional difficulties that are present,** such as difficulties with reading comprehension or math reasoning.
- **315.2 (F81.81) With impairment in written expression:**
  - Spelling accuracy
  - Grammar and punctuation accuracy
  - Clarity or organization of written expression
- ~~**315.1 (F81.2) With impairment in mathematics:**~~
  - ~~Number sense~~
  - ~~Memorization of arithmetic facts~~
  - ~~Accurate or fluent calculation~~
  - ~~Accurate math reasoning~~
  - ~~**Note:** *Dyscalculia* is an alternative term used to refer to a pattern of difficulties characterized by problems processing numerical information, learning arithmetic facts, and performing accurate or fluent calculations. If dyscalculia is used to specify this particular pattern of mathematic difficulties, it is important also to specify any additional difficulties that are present, such as difficulties with math reasoning or word reasoning accuracy.~~

*Specify* current severity:
- **Mild:** Some difficulties learning skills in one or two academic domains, but of mild enough severity that the individual may be able to compensate or function well when provided with appropriate accommodations or support services, especially during the school years.
- **Moderate:** **Marked difficulties learning skills in one or more academic domains,** so that the individual is unlikely to become proficient without some **intervals of intensive and specialized teaching during the school years.** Some accommodations or supportive services at least part of the day at school, in the workplace, or at home may be needed to complete activities accurately and efficiently

**Comment [JR8]:** The NBME will likely use this description to argue against giving extra exam time – They will probably say that based on this description, my LDs are mild because I technically get by WITH accommodations, and therefore that I do not qualify for additional testing time. They will likely ignore the fact that without appropriate testing time, I am much more severely limited by my LDs.

**Comment [JR9]:** We can support "moderate" with the fact that I have to have Nell/other people read for me at home/outside of school, and I require accommodations for reading & writing at school. We could even support "severe" because I can neither read nor write efficiently at home, school, or work.

NBME02152

- o  I received the intensive visual-perceptual skills training with Dr. Tanguay when I was 7 and took a sylvan reading course when I was in high-school
- o  I still have to have Neil/other people read for me at home/outside of school and I require accommodations for reading & writing at school.
- o  I received informal accommodations for reading, writing, and spelling since 2nd grade.
- **Severe:** Severe difficulties learning skills, affecting several academic domains, so that the individual is unlikely to learn those skills without ongoing intensive individualized and specialized teaching for most of the school years. Even with an array of appropriate accommodations or services at home, at school, or in the workplace, the individual may not be able to complete all activities efficiently.

NBME02153

Neuropsychology Associates

*Neuropsychology - Psychiatry - Clinical Psychology*
*4328 West Michigan, Kalamazoo, Michigan 49006 · 375-2222 · Fax: 375-8292*

Alan Lewandowski, PHD, FACPN
*Board Certified in Neuropsychology*
Morris Edwards, PHD
*Certified in Biofeedback*
JoLynn Cole, MA
*Psychotherapist*

Helene Pilnick, PHD
*Pediatric Neuropsychology*
Michael Lyons, PHD
*Clinical Psychology*
Fenimore Johnson, PHD
*Applied Behavior Analysis*

Kevin Kunzer, MD
*Psychiatry*
Bangalore Ramesh, MD
*Psychiatry*
Katelyn Briggs, MA
*Psychotherapist*

June 20, 2018

Jessica Ramsay
6862 Tall Oaks Drive
Kalamazoo, MI 49009

Re: Additional raw data tables for November 9, 2017 Neuropsychological Examination

Dear Ms. Ramsay:

Attached to this letter is an additional compilation of the findings from your recent neuropsychological assessment formatted as a table. The Raw Data Addendum constitutes a complete picture of the <u>entire</u> data set from your assessment. As such, it is a comprehensive representation of your evaluation that includes tests administered, the normative sample group, mean scores, your individual (patient) scores, and a guideline to assist with interpretation.

Previously, you were provided with a set of graphs. These graphs that were attached to the initial report were provided to you *only* as a general and cursory guide, to be used during our review in order to assist you in understanding the findings. They were never/are not intended to be a comprehensive representation of all of the measures employed, functional areas assessed, and the general corresponding scores. They were never/are not intended for broader distribution or to be used in your request for accommodations.

Alan G. Lewandowski, Ph. D., FACPN
Clinical Psychologist
Board Certified Neuropsychologist

NBME02154

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 1

**Raw Data Addendum**

| | Tests Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| **Weschler Adult Intellectual Scale, 4ᵗʰ Edition (Standard Scores)** | Similarities | 1 | 10 | 13 | High average |
| | Vocabulary | 1 | 10 | 14 | Superior |
| | Information | 1 | 10 | 16 | Very superior |
| | Comprehension | 1 | 10 | 15 | Superior |
| | Digit span | 1 | 10 | 12 | High average |
| | Arithmetic | 1 | 10 | 12 | High average |
| | Block design | 1 | 10 | 15 | Superior |
| | Matrix reasoning | 1 | 10 | 16 | Very superior |
| | Visual puzzles | 1 | 10 | 15 | Superior |
| | Figure weights | 1 | 10 | 15 | Superior |
| | Picture completion | 1 | 10 | 14 | Superior |
| | Symbol search | 1 | 10 | 7 | Low average |
| | Coding | 1 | 10 | 5 | Borderline impaired |
| | Cancellation | 1 | 10 | 9 | Average |
| | Verbal Comprehension Index | 1 | 100 | 125 | Superior |
| | Perceptual Reasoning Index | 1 | 100 | 131 | Very superior |
| | Working Memory Index | 1 | 100 | 111 | High average |
| | Processing Speed Index | 1 | 100 | 79 | Borderline impaired |
| | General Abilities Index | 1 | 100 | 132 | Very superior |
| | Cognitive Efficiency Index | 1 | 100 | 94 | Average |
| | Overall Intellect Index | 1 | 100 | 117 | High average |
| **Wide Range Achievement Test, 4ᵗʰ Edition (Standard Scores)** | Reading | 1 | 100 | 114 | High average |
| | Spelling | 1 | 100 | 109 | Average |
| | Written arithmetic | 1 | 100 | 110 | High average |
| **California Verbal Learning Test, 2ⁿᵈ edition (T-Scores)** | Memory: immediate recall | 4 | 50 | 66 | Normal |
| | Memory: short delay free recall | 4 | 50 | 65 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 60 | Normal |
| | Memory: long delay free recall | 4 | 50 | 65 | Normal |
| | Memory: long delay cued recall | 4 | 50 | 60 | Normal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

NBME02155

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 2

| | Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|---|
| Halstead Reitan Neuropsychological Battery (T-Scores) | Tactile form recognition: dominant | 3 | 50 | 50 | Normal |
| | Tactile form recognition: non-dominant | 3 | 50 | 47 | Normal |
| | Finger oscillation: dominant | 3 | 50 | 50 | Normal |
| | Finger oscillation: non-dominant | 3 | 50 | 48 | Normal |
| | Tactile Performance: dominant | 3 | 50 | 64 | Normal |
| | Tactile Performance: non-dominant | 3 | 50 | 50 | Normal |
| | Tactile Performance: bilateral abilities | 3 | 50 | 47 | Normal |
| | Tactile Performance: response speed | 3 | 50 | 55 | Normal |
| | Tactile Performance: memory | 3 | 50 | 54 | Normal |
| | Tactile Performance: localization | 3 | 50 | 72 | Normal |
| | Trail A: simple sequencing | 3 | 50 | 35 | Abnormal |
| | Trail B: complex sequencing | 3 | 50 | 27 | Abnormal |
| | Executive reasoning | 3 | 50 | 60 | Normal |
| | Seashore rhythm | 3 | 50 | 35 | Abnormal |
| | Speech sounds perception | 3 | 50 | 60 | Normal |
| Conner's Continuous Performance Test, 3rd Edition (T-Scores) | Attention: detectability | 1 | 50 | 50 | Normal |
| | Attention: omissions | 1 | 50 | 46 | Normal |
| | Attention: commissions | 1 | 50 | 51 | Normal |
| | Attention: perseverations | 1 | 50 | 48 | Normal |
| | Attention: hit reaction time | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time SD | 1 | 50 | 52 | Normal |
| | Attention: hit reaction variability | 1 | 50 | 49 | Normal |
| | Attention: hit reaction time block change | 1 | 50 | 47 | Normal |
| | Attention: hit reaction time ISI change | 1 | 50 | 69 | Abnormal (mild) |
| Rey Osterrieth Complex Figure (T-Scores) | Memory: immediate recall | 4 | 50 | 61 | Normal |
| | Memory: short delay free recall | 4 | 50 | 58 | Normal |
| | Memory: short delay cued recall | 4 | 50 | 38 | Abnormal |

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

NBME02156

Jessica Ramsay
Addendum Compiled on June 20, 2018
Neuropsychological Exam of November 9, 2017
Page 3

| Test Administered | Normative Group | Mean Score | Patient Score | Guideline |
|---|---|---|---|---|
| Health concerns | 2 | 50 | 64 | Abnormal |
| Anxiety: generalized/focused | 2 | 50 | 47/51 | Normal |
| Depression | 2 | 50 | 67 | Abnormal |
| Acute stress | 2 | 50 | 41 | Normal |
| Cognitive inefficiency | 2 | 50 | 53 | Normal |
| Conversion | 2 | 50 | 51 | Normal |
| Somatization | 2 | 50 | 57 | Normal |
| Obsessive-compulsive | 2 | 50 | 54 | Normal |
| Phobias | 2 | 50 | 54 | Normal |
| Traumatic stress | 2 | 50 | 45 | Normal |
| Depression: cognitive | 2 | 50 | 67 | Abnormal |
| Depression: affective | 2 | 50 | 50 | Normal |
| Depression: physiological | 2 | 50 | 74 | Abnormal |
| Activity level | 2 | 50 | 51 | Normal |
| Grandiosity | 2 | 50 | 49 | Normal |
| Irritability | 2 | 50 | 43 | Normal |
| Hypervigilance | 2 | 50 | 48 | Normal |
| Persecution | 2 | 50 | 48 | Normal |
| Resentment | 2 | 50 | 44 | Normal |
| Psychotic experiences | 2 | 50 | 36 | Normal |
| Social detachment | 2 | 50 | 46 | Normal |
| Thinking disorder/difficulty | 2 | 50 | 73 | Abnormal |
| Affective instability | 2 | 50 | 39 | Normal |
| Identity problems | 2 | 50 | 44 | Normal |
| Negative relationships | 2 | 50 | 40 | Normal |
| Self-harm | 2 | 50 | 45 | Normal |
| Antisocial behaviors | 2 | 50 | 43 | Normal |
| Egocentricity | 2 | 50 | 42 | Normal |
| Stimulus-seeking | 2 | 50 | 53 | Normal |
| Aggressive attitude | 2 | 50 | 34 | Normal |
| Aggression: verbal and physical | 2 | 50 | 37/42 | Normal |

*(Personality Assessment Inventory (T-Scores))*

1. **Age-based norms**
2. **Age and gender based norms**
3. **Age, gender, and educational level based norms**
4. **Age and educational level based norms**

NBME02157

## Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME02158

Neuropsychological Examination: Jessica Ramsay (2017)



Dr. Lewandowski

NBME02159