Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**JOINT APPENDIX
VOLUME V: APPX1367-1683**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# **TABLE OF CONTENTS**

## **Volume I: Appx1-62**

                                                              **Page**

District Court Docket.....................................................Appx1

Notice of Appeal (Jan. 7, 2020)....................................Appx7

District Court Order Granting Preliminary
Injunction (Dec. 31, 2019)............................................Appx9

District Court Order Denying Motion to Stay
(Feb. 4, 2020) ..............................................................Appx62

## **Volume II: Appx63-725**

Preliminary Injunction Hearing Transcript
(Dec. 3-5, 2019) ......................................................... Appx63

## **Volume III: Appx726-1027**

Complaint (May 8, 2019) ..........................................Appx726

Answer to Complaint (July 8, 2019)........................Appx747

Declaration of Catherine Farmer, Psy.D. ...............Appx762

Declaration & Resume of Steven G. Zecker,
Ph.D. .........................................................................Appx771

Declaration & Resume of Benjamin J. Lovett,
Ph.D. .........................................................................Appx795

Declaration & Resume of Robert D. Smith,
Ph.D. .........................................................................Appx827

Declaration of Jessica Ramsay ................................Appx840

Resume of Jessica Ramsay  ....................................Appx854

Kindergarten Progress Reports & Test Record
(1995-96) ..............................................................Appx857

First Grade Progress Report & Test Record
(1996-97) ..............................................................Appx871

Second Grade Progress Reports & Test Record
(1997-98) ..............................................................Appx875

Third Grade Report Card (1998-99) .........................Appx879

Tanguay Letters & Notes (1997, 2000) ....................Appx881

Fourth Grade Report Card (1990-2000)....................Appx886

Fifth Grade Report Cards (2000-01) ........................Appx888

Sixth Grade Report Card & Test Report
(2001-02) ..............................................................Appx892

High School Transcript & Alumni History
(2004-08) ..............................................................Appx895

Standardized Test Results (2007) ...........................Appx897

High School Athletic Awards (2008) ........................Appx899

Plan ACT Score Report (2005)..................................Appx904

ACT Score Report (March 2007)...............................Appx908

ACT Score Report (Oct. 2007)...................................Appx909

College Application to UW-Madison (2007).............Appx910

Ohio State University Transcript (2008-12)............Appx922

Academic & Standardized Testing History
Summaries.................................................Appx926

Letter from Testing Organizations to Senator
Kennedy & Others (2008) .........................Appx929

Smiy Office Visit Report (2009)................................Appx934

Ohio State ADD/ADHD Verification Form
(2010) .........................................................Appx939

Letter from R. Burgoyne to Disability Rights
Section (2014) ...........................................Appx945

MCAT Score Report (2011) ......................................Appx962

Livingston Evaluation & Addendum
(2014, 2016) ...............................................Appx963

Score Reports for Subject-Matter Examinations
(2014-17)....................................................Appx969

Medical School Student Dashboard (2016)............Appx1003

Lewandowski Evaluations & Correspondence
(2017-18) ...................................................Appx1006

## Volume IV: Appx1028-1366

USMLE Step 1 Score Report (2017).......................Appx1028

Ramsay Step 1 Outcome Data (2017) ....................Appx1030

Secondary Application to University of
Wisconsin ..................................................Appx1039

Articles: *Genetic Influences on Nicotine α5
Receptor* (2015), *Organic Acid Disorders* (2018)....Appx1047

NBME Accommodations Request Form &
Personal Statement (2016) ......................................Appx1068

PowerPoint from NBME Consultants Meeting
(2016) .......................................................................Appx1083

Zecker Review of Ramsay Request (Jan. 2017) .....Appx1118

Letter from NBME to Ramsay (March 2017) ........Appx1125

NBME Accommodations Request Form &
Personal Statement (2018) ......................................Appx1127

Correspondence between Dafoe & Ramsay
(2018) .......................................................................Appx1231

Correspondence between Ramsay, Reukberg,
and/or Berger (2017-18) .........................................Appx1235

## Volume V: Appx1367-1683

Correspondence between Ramsay & Houtman
(2018) .......................................................................Appx1367

Zecker Review of Ramsay Request (July 2018) .....Appx1392

Letter from NBME to Ramsay (Sept. 2018)...........Appx1401

Michigan Dyslexia Institute Intake Interview
(2018) .......................................................................Appx1404

ADHD Symptoms Checklist (prepared by Ramsay
& Hughes).................................................................Appx1411

Correspondence between Ramsay, Smith,
and/or Berger (2018) ...............................................Appx1415

Smith Evaluation (2018).........................................Appx1431

Smith Website Homepage........................................Appx1462

Reconsideration Request from Berger to NBME
(Dec. 2018) .............................................................Appx1464

Lovett Review of Ramsay Request
(Dec. 2018) .............................................................Appx1507

Letter from NBME to Ramsay (Feb. 2019)............Appx1511

Leave of Absence Paperwork (2018-19) .................Appx1513

Reconsideration Request from Berger to NBME
(March 2019) ..........................................................Appx1526

Correspondence from NBME to Ramsay
(March 2019) ..........................................................Appx1533

Article: *An Investigation of Methods to Detect
Feigned Reading Disabilities* (2010) ......................Appx1535

Western Michigan University Medical Student
Policy Manual........................................................ Appx1545

USMLE Website (2017): *Step 1* ..............................Appx1558

Sample Step 1 Test Questions (2017) ....................Appx1559

ACT: Preparing for the Exam & Sample Test
Questions (2007-08) ................................................Appx1605

## Volume VI: Appx1684-1883

Sample MCAT Exam (2010) ...................................Appx1684

MCAT: *The Official Guide to the MCAT Exam*
(excerpts) (2011) ......................................................Appx1758

MCAT Verbal Reasoning Questions with
Ramsay's Annotations ............................................Appx1780

WIAT-III Item Data .................................................Appx1798

Woodcock Johnson IV Diagnostic Test Records ....Appx1817

Gray Oral Reading Test Records ("GORT-V") .......Appx1824

TOMM Score Sheet .................................................Appx1836

Article: *Underachievement & Learning
Disabilities in Children Who Are Gifted*
(1999-2000) ............................................................Appx1839

Federal Register (excerpts)....................................Appx1844

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed this Appendix with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

Hi Dr. Houtman,

Here are my main accommodations requests and supportive reasoning. I also included the migraine and DVT explanations at the bottom.     Redacted

**Main Diagnoses:**
- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)
- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)
  - With impairment in reading (DSM-5 315.00, ICD-10 F81.0)
  - With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)

> **Comment [JR1]:** I'm still not sure which to use... for now, I have included the one Dr. Lewandowski gave as well as the ones we talked about.

Simplified versions of the main things I want to say to support each accommodation I am requesting:
1. 100% additional exam time (double time):
   a. Provides adequate time to untangle the words and read through each question and answer choice and to process the information within each question so that I have the opportunity use my knowledge to select an answer for each question.
   b. Allows time to re-read as necessary for clarification and/or to aid in comprehension.
   c. Provides time to use compensatory methods, such as drawing pictures, reading/talking out loud, or briefly stepping away from the computer, to help me comprehend what I read and organize my thoughts.
   d. Allows flexibility during the exam to manage my symptoms related to distractibility and hyperactivity, and the opportunity to get refocused.
   e. Decreases the anxiety and mood symptoms I experience as a result of inadequate time to untangle, read, process and answer each question, which interfere with my ability to perform on the exam.
2. Additional break time

> **Comment [JR2]:** Do we need to request a specific amount?

   a. Allows appropriate time to address regular needs after each block, take medication with some food and water when needed, and to manage my distractibility and hyperactivity to help reduce the frequency and severity of symptoms I experience during the exam.
   b. Allows time to manage any anxiety and mood symptoms I do experience so that I can minimize their interference with my exam performance.
3. Separate testing room
   a. Allows me to use the compensatory techniques I need, such as reading/talking out loud or briefly stepping away from the computer, to effectively read and comprehend each question and organize my thoughts so that I can use my knowledge to select an answer for each question without distracting other test-takers.

DEFENDANT'S EXHIBIT

65

RAMSAY17-0003

    b. Reduces the number and severity of distractions I experience during the exam
due to other test-takers as a result of my ADHD so that I can better focus on the
exam.

    c. Allows me to move around and fidget during the exam in order to manage the
restlessness and agitation I experience due to ADHD so that I can maximize my
ability to perform on the exam without distracting other test-takers.

**Other symptoms to support extra break time:**

- **migraines**: forcing myself to focus for long periods is a trigger for migraines for me; the
aura (blind spots, photo/phonophobia, nausea) and headache interfere with ability to
see and focus; I need to take abortive meds when I start getting the aura to hopefully
prevent experiencing a full migraine, so I need adequate break time/opportunity to help
prevent migraines and to take abortive medications if I feel one coming on.

- **DVT/post-thrombotic syndrome**: I have a clotting disorder and history of lower
extremity DVT with residual symptoms, including lower extremity pain and swelling with
inactivity, which are added distractions. I need enough time to walk around between
blocks to maintain adequate circulation, to reduce risk of clotting as well as swelling and
pain. Compression stockings are also uncomfortable and also distracting.

RAMSAY17-0004

## Jessie's NBME Accommodations

Jessica Ramsay
Thu 5/24/2018 11:28 PM
**To:** jenhoutman@charter.net <jenhoutman@charter.net>

▌ 1 attachments (19 KB)
2018.05.24_Dr. Houtman letter.docx;

Hi Dr. Houtman,

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them. Please let me know if you have any questions ⬚⬚⬚⬚ Redacted ⬚⬚⬚⬚

Thanks you so much for your help and support.

Jessie

RAMSAY17-0005

May 29, 2018

To Whom It May Concern:

I am writing this letter of support for Jessica Ramsay in regards to her requested accommodations for NBME examinations. I have had the unique opportunity to be her primary care physician for the past two years, and her medical school mentor and clinical skills instructor for the two years prior to that. I will verify that she has the following diagnoses that require accommodations:

- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)

- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)

    With impairment in reading (DSM-5 315.00, ICD-10 F81.0)

    With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)

- Migraines

- Clotting disorder with recent Deep Venous Thrombosis/Post-thrombotic syndrome

> **Comment [JR1]:** I'm still not sure which to use... for now, I have included the one Dr. Lewandowski gave as well as the ones we talked about.

Jessica's first request is 100% additional time for examinations. This accommodation is for her ADHD and learning disabilities. The additional exam time will allow her to be able to read and re-read exam questions and answers to help her comprehend what she is reading. It will also allow her to use her compensatory mechanisms that she has developed to help her clarify her thoughts and answer the questions properly. It will also allow her to redirect her thoughts when she gets distracted. All of these things require extra time. We are treating her ADHD with medications and she has worked over years to develop compensatory mechanisms but these do take time. The stress of timed examinations also leads to further distraction as she worries about her issues rather than being able to fully focus on the exam itself. As Jessica's clinical skills instructor, I have had the opportunity to watch her work both in timed exams and in untimed exams – both writing notes and in examination/interviewing of patients. During the first part of her first year, she did not have accommodations in place. I witnessed her on several occasions interview the patient well and complete the specific portion of the exam in a reasonable amount of time similar to her peers. However, during formal examinations with time restraints – I would see her get flustered, forget important steps and miss key portions of the exam. Once her accommodations were in place, her performance improved remarkably, more adequately reflecting the clinical skills that I had witnessed that she had learned. I was also in charge of grading hospital History and Physical write-ups that Jessica did after visiting patients in the hospital. She was able to spend up to 3 hours with a patient in the hospital and always used this time completely while several of her colleagues saw it as an opportunity to have an early dismissal. Again, I noticed a significant difference in the quality and thoroughness of her write-ups once she was given more time to complete them and turn them in. I can say with certainty that the extra time given to her in medical school has allowed her to perform at her best potential. Jessica and I have discussed the time constraints inherent in seeing patients and completing charts/tasks in medicine and she realizes that she will likely have to pick a practice setting that will allow her to take more time with patients and we have also discussed that in a

RAMSAY17-0006

productivity-driven medical climate, this may impact her financial productivity. She understands that her ADHD and learning disabilities have, and will continue to give her struggles in her career but with adequate extra time, she will be able to do her best, display her knowledge more appropriately, and in the long run, provide better patient care. I highly support her request for 100% extra examination time.

Jessica's second request is for increased break time during examinations. This accommodation is also for her ADHD and learning disabilities – the extra break time allows her a chance to relax and refocus between sections and to take more short-acting medication at the end of the day if needed. The extra break time is also to help with her migraines. Prolonged focusing is a trigger for her migraines and frequent breaks allow her to avoid this trigger. If she does get an aura during the exam, the extra break time will also allow her to take medication to prevent a migraine from fully developing which would definitely be a further distraction for her ADHD, and also would impede her performance. The increased break time is also an accommodation for her clotting disorder and post-thrombotic syndrome. Prolonged inactivity increases her risk for developing another deep venous thrombosis. Since she has had a DVT in one leg already, she also develops pain and swelling in that leg with prolonged sitting, which becomes a further distraction for her. Extra break time would allow her to get up and walk around frequently to prevent pain, swelling and the development of another clot. I fully support Jessica's request for extra break time for all of these reasons.

I have gotten to know Jessica on both personal and professional levels over the past four years. I have seen first-hand the potential and knowledge that she has that will make her an excellent physician. Her experiences with her own disabilities will allow her to show compassion her patients that some physicians will never experience or understand. I am excited to see where her medical career takes her. I fully support her requests for accommodations to allow her to perform at her maximum potential, which will allow her access to a higher quality of residency training and excellence in her future medical practice. If you have any further questions, I would be happy to discuss these issues further and can be reached by phone or email (see contact information below).


Sincerely,


Jennifer N. Houtman, MD
Family Medicine physician, Bronson Lifetime Wellness
(269) 760-3148
jenhoutman@charter.net

RAMSAY17-0007

**RE: Jessie's NBME Accommodations**

jenhoutman@charter.net

Sun 6/3/2018 5:52 PM

**To:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

▌ 1 attachments (19 KB)

JRamsayNBME.docx;

Here is my first attempt – let me know what needs changing and I will get it on letter head :)
JNH


-------------------------------------------

From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Thursday May 24 2018 9:28:30PM
Subject: Jessie's NBME Accommodations

Hi Dr. Houtman,

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them.                     Redacted

Thanks you so much for your help and support.

Jessie

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

**RAMSAY17-0008**

May 29, 2018

To Whom It May Concern:

I am writing this letter of support for Jessica Ramsay in regards to her requested accommodations for NBME examinations. I have had the unique opportunity to be her primary care physician for the past two years, and her medical school mentor and Clinical Skills course instructor for the two years prior to that. I will verify that she has the following diagnoses that require accommodations:

- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)

- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)

    With impairment in reading (DSM-5 315.00, ICD-10 F81.0)

    With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)

- Migraines

- Clotting disorder with recent Deep Venous Thrombosis/Post-thrombotic syndrome

Jessica's first request is 100% additional time for examinations. This accommodation is for her ADHD and learning disabilities. The additional exam time will allow her to be able to read and re-read exam questions and answers to help her comprehend what she is reading. It will also allow her to use her compensatory mechanisms that she has developed to help her clarify her thoughts and answer the questions properly. It will also allow her to redirect her thoughts when she gets distracted. All of these things require extra time. We are treating her ADHD with medications and she has worked over years to develop compensatory mechanisms, but these do take time. The stress of timed examinations also leads to further distraction as she worries about her issues rather than being able to fully focus on the exam itself. As Jessica's clinical skills instructor, I have had the opportunity to watch her work both in timed exams and in untimed exams – both writing notes and in examination/interviewing of patients. During the first part of her first year, she did not have accommodations in place. I witnessed her on several occasions interview the patient well and complete the specific required portion of the physical exam in a reasonable amount of time similar to her peers. However, during formal OSCE examinations with time restraints – I would see her get flustered, forget important steps and miss key portions of the exam, and would not have enough time to adequately type her encounter note. Jessica felt it was important to request only the minimum accommodation necessary, and initially requested only 50% additional time for the note-writing portion of her OSCEs. However, 50% additional time still proved to be inadequate for her to be able to properly organize her thoughts and type her note. Additionally, as the encounter prompts and instructions became more detailed and lengthy, she was not able to fully read and comprehend them without taking excessive time away from her patient encounter. Continuing to struggle with passing the note portion of her OSCEs, she requested and was granted 100% additional time for the note portion, as well as 2 additional minutes at the beginning of the patient encounter to enable her to fully read and comprehend the encounter prompt and instructions without. Once these her accommodations were in place, her performance improved remarkably, more adequately reflecting

**Comment [JR1]:** For clarification, I capitalized "Clinical Skills" and added "course"

**Comment [JR2]:** I would delete "will" so that they don't think that you will be providing more documentation after this.

**Comment [JR3]:** I inserted "physical" so that they did not think that I could accomplish the note-writing portion in the same time as my peers.

RAMSAY17-0009

the clinical skills that I had previously witnessed her demonstrate that she had learned. As part of the second-year Clinical Skills course, I was also in charge of grading hospital History and Physical write-ups that Jessica did after visiting patients in the hospital. She was able Students were allowed to spend up to 3 hours with a their assigned hospital patient in the hospital, and Jessica always used this time completely while several of her colleagues saw it as an opportunity to have an early dismissal. Again, I noticed a significant difference in the quality and thoroughness of her write-ups once she was given more sufficient time to complete them and turn them in.

I can say with certainty that the extra time given to her in medical school has allowed her to perform at her best potential. Jessica and I have discussed the time constraints inherent in seeing patients and completing charts/tasks in medicine and she realizes that she will likely have to pick a practice setting that will allow her to take more time with each patients so she can take the time she needs to successfully complete documentation. and We have also discussed that in a productivity-driven medical climate, this may impact her financial productivity. She understands that her ADHD and learning disabilities have, and will continue to give her struggles in her career, but with adequate extra time, she will be able to do her best, display her knowledge more appropriately, and in the long run, provide better patient care. I highly support her request for 100% extra examination time.

Jessica's second request is for increased break time during examinations. This accommodation is also for her ADHD and learning disabilities – the extra break time allows her a chance to relax and refocus between sections and to take an additional dose of more short-acting medication at the end of the day if needed in the afternoon to help manage her restlessness, distractibility, and inability to focus. The extra break time is also to help with her migraines. Prolonged focusing is a trigger for her migraines and frequent breaks allow her to avoid this trigger. Jessica's migraine headaches are preceded by an aura that includes nausea, blind spots that obscure her vision, photophobia, and phonophobia, and which continues throughout the migraine. If she does get begin experiencing an aura during the exam, the extra break time will also allow her to take medication to prevent a migraine from fully developing which would definitely be a further distraction for her ADHD, and also would impede her performance. The increased break time is also an accommodation for her clotting disorder and post-thrombotic syndrome, which were diagnosed after she experienced a significant lower extremity deep vein thrombosis (DVT) in 2016. Prolonged inactivity increases her risk for developing another DVT deep venous thrombosis. Since she has had having a DVT in one leg already, she also develops leg pain and swelling in that leg with prolonged sitting, which becomes a further distraction for her. Extra break time would allow her enough time to get up and walk around frequently to prevent pain, swelling and the development of another clot. I fully support Jessica's request for extra break time for all of these reasons.

Jessica's third request is for a private testing room. This accommodation is for her ADHD and learning disabilities. The private environment removes the added distraction caused by other test-takers in a shared testing environment, which is necessary for Jessica to be able to focus because she is much more easily distracted than most people due to her ADHD. The private room would allow her to read out loud or move around as needed to cope with her learning disabilities so that she can read and comprehend the questions without being a distraction to other test-takers in a shared room. The private room is also

Comment [JR4]: I changed this to clarify that this was not an accommodation, but that I used the time when I had it.

Comment [JR5]: I made this a new paragraph.

Comment [JR6]: I changed the wording because I don't know if we are supposed to give the NBME that much detail about which meds I am taking.

Comment [JR7]: I used your original wording in the next paragraph to support the separate room.

Comment [JR8]: Sorry if I forgot to tell you about this accommodation, but I modeled this paragraph after your other ones.

RAMSAY17-0010

an accommodation for her clotting disorder and post-thrombotic syndrome. A private room would allow Jessica to get up and walk around as necessary during her exam to prevent pain, swelling and the development of another clot. I entirely support her request for a private testing environment for all of these reasons.

I have gotten to know Jessica on both personal and professional levels over the past four years.  I have seen first-hand the potential and knowledge that she has that will make her an excellent physician.  Her experiences with her own disabilities will allow her to show compassion for her patients that some physicians will never experience or understand.  I am excited to see where her medical career takes her.  I fully support her requests for accommodations to allow her to perform at her maximum potential, which will allow her access to a higher quality of residency training and excellence in her future medical practice.  If you have any further questions, I would be happy to discuss these issues further and can be reached by phone or email (see contact information below).


Sincerely,


Jennifer N. Houtman, MD
Family Medicine physician, Bronson Lifetime Wellness
(269) 760-3148
jenhoutman@charter.net

RAMSAY17-0011

## Re: Jessie's NBME Accommodations

**Jessica Ramsay**

Sun 6/3/2018 11:17 PM

To: jenhoutman@charter.net <jenhoutman@charter.net>

📎 1 attachments (23 KB)

2018.06.03_Houtman Letter_Draft 1_Jessie's edits.docx;

Hi Dr. Houtman,

Thank you so much for writing this letter! ░░░░░░░░░░░░░░ Redacted ░░░░░░░░░
░░░░░░░░░░░░░░░░░ If I suggested changing or deleting something, I just left it in but
crossed it out so that you could see exactly what I did. I also have a third request for a private testing
room, which you didn't mention, so I may have forgotten to tell you about it - If so, I'm sorry! But I just
wrote a paragraph similar to your other ones and highlighted the whole thing in yellow so you could tell.
If there are any suggestions you don't like or agree with, please feel free to keep what you had.

Please let me know by the end of the day today (Monday 6/4/18) if you would like to keep my
suggestions or make any changes ░░░░░░░░░░░ Redacted ░░░░░░░░░░
░░░░░░░░░░░░░░ and our goal is to submit everything by Wednesday (6/6/18).

I will need a **signed, dated copy on official letterhead** by Tuesday (6/5/18) so I will have it in time to
submit it on Wednesday. It can be scanned and sent to me via email, or I can pick up a hard copy from
your office, whichever is easiest and most convenient for you.

Thanks so much for your help and support! I really, really appreciate it!

I hope you had a great weekend!

Jessie

---

**From:** jenhoutman@charter.net <jenhoutman@charter.net>
**Sent:** Sunday, June 3, 2018 5:52:47 PM
**To:** Jessica Ramsay
**Subject:** RE: Jessie's NBME Accommodations

Here is my first attempt - let me know what needs changing and I will get it on letter head :)
JNH

----------------------------------------

From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Thursday May 24 2018 9:28:30PM
Subject: Jessie's NBME Accommodations

Hi Dr. Houtman,

RAMSAY17-0012

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them. Please let me know if you have any questions ⬛⬛⬛ Redacted ⬛⬛⬛

Thanks you so much for your help and support.

Jessie

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

RAMSAY17-0013

May 29, 2018

To Whom It May Concern:

I am writing this letter of support for Jessica Ramsay in regards to her requested accommodations for NBME examinations. I have had the unique opportunity to be her primary care physician for the past two years, and her medical school mentor and Clinical Skills course instructor for the two years prior to that. I verify that she has the following diagnoses that require accommodations:

**Comment [JR1]:** For clarification, I capitalized "Clinical Skills" and added "course"

**Comment [JR2]:** I would delete "will" so that they don't think that you will be providing more documentation after this.

- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)
- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)

  With impairment in reading (DSM-5 315.00, ICD-10 F81.0)

  With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)

- Migraines with aura, without status migranosus (ICD-10 G431.09)
- Clotting disorder with recent Deep Venous Thrombosis/Post-thrombotic syndrome (ICD-10 I87.009, D69.8)

Jessica's first request is 100% additional time for examinations. This accommodation is for her ADHD and learning disabilities. The additional exam time will allow her to be able to read and re-read exam questions and answers to help her comprehend what she is reading. It will also allow her to use her compensatory mechanisms that she has developed to help her clarify her thoughts and answer the questions properly. It will also allow her to redirect her thoughts when she gets distracted. All of these things require extra time. We are treating her ADHD with medications and she has worked over years to develop compensatory mechanisms, but these do take time. The stress of timed examinations also leads to further distraction as she worries about her issues rather than being able to fully focus on the exam itself. As Jessica's clinical skills instructor, I have had the opportunity to watch her work both in timed exams and in untimed exams – both writing notes and in examination/interviewing of patients. During the first part of her first year, she did not have accommodations in place. I witnessed her on several occasions interview the patient well and complete the required portion of the physical exam in a reasonable amount of time similar to her peers. However, during formal OSCE examinations with time restraints – I would see her get flustered, forget important steps and miss key portions of the exam, and would not have enough time to adequately type her encounter note. Jessica felt it was important to request only the minimum accommodation necessary, and initially requested only 50% additional time for the note-writing portion of her OSCEs. However, 50% additional time still proved to be inadequate for her to be able to properly organize her thoughts and type her note. Additionally, as the encounter prompts and instructions became more detailed and lengthy, she was not able to fully read and comprehend them without taking excessive time away from her patient encounter. Continuing to struggle with passing the note portion of her OSCEs, she requested and was granted 100% additional time for the note portion, as well as 2 additional minutes at the beginning of the patient encounter to enable her to fully read and comprehend the encounter prompt and instructions without. Once these

**Comment [JR3]:** I inserted "physical" so that they did not think that I could accomplish the note-writing portion in the same time as my peers.

RAMSAY17-0014

accommodations were in place, her performance improved remarkably, more adequately reflecting the clinical skills that I had previously witnessed her demonstrate. As part of the second-year Clinical Skills course, I was also in charge of grading History and Physical write-ups that Jessica did after visiting patients in the hospital. Students were allowed to spend up to 3 hours with their assigned hospital patient, and Jessica always used this time completely while several of her colleagues saw it as an opportunity to have an early dismissal. Again, I noticed a significant difference in the quality and thoroughness of her write-ups once she was given sufficient time to complete them and turn them in.

> **Comment [JR4]:** I changed this to clarify that this was not an accommodation, but that I used the time when I had it.

I can say with certainty that the extra time given to her in medical school has allowed her to perform at her best potential. Jessica and I have discussed the time constraints inherent in seeing patients and completing charts/tasks in medicine and she realizes that she will likely have to pick a practice setting that will allow her more time with each patient-so she can take the time she needs to successfully complete documentation. We have also discussed that in a productivity-driven medical climate, this may impact her financial productivity. She understands that her ADHD and learning disabilities have, and will continue to give her struggles in her career, but with adequate extra time, she will be able to do her best, display her knowledge more appropriately, and in the long run, provide better patient care. I highly support her request for 100% extra examination time.

> **Comment [JR5]:** I made this a new paragraph

Jessica's second request is for increased break time during examinations. This accommodation is also for her ADHD and learning disabilities – the extra break time allows her a chance to relax and refocus between sections and to take an additional dose of her medication if needed in the afternoon to help manage her restlessness, distractibility, and inability to focus. The extra break time is also to help with her migraines. Prolonged focusing is a trigger for her migraines and frequent breaks allow her to avoid this trigger. Jessica's migraine headaches are preceded by an aura that includes nausea, blind spots that obscure her vision, photophobia, and phonophobia, and which continues throughout the migraine. If she does begin experiencing an aura during the exam, the extra break time will also allow her to take medication to prevent a migraine from fully developing which would definitely be a further distraction for her ADHD, and also would impede her performance. The increased break time is also an accommodation for her clotting disorder and post-thrombotic syndrome, which were diagnosed after she experienced a significant lower extremity deep vein thrombosis (DVT) in 2016. Prolonged inactivity increases her risk for developing another DVT. Since having a DVT, she develops leg pain and swelling with prolonged sitting, which becomes a further distraction for her. Extra break time would allow her enough time to walk around to prevent pain, swelling and the development of another clot. I fully support Jessica's request for extra break time for all of these reasons.

> **Comment [JR6]:** I used your original wording in the next paragraph to support the separate room.

Jessica's third request is for a private testing room. This accommodation is for her ADHD and learning disabilities. The private environment removes the added distraction caused by other test-takers in a shared testing environment, which is necessary for Jessica to be able to focus because she is much more easily distracted than most people due to her ADHD. The private room would allow her to read out loud or move around as needed to cope with her learning disabilities so that she can read and comprehend the questions without being a distraction to other test-takers in a shared room. The private room is also an accommodation for her clotting disorder and post-thrombotic syndrome. A private room would allow Jessica to get up and walk around as necessary during her exam to prevent pain, swelling and the

> **Comment [JR7]:** Sorry if I forgot to tell you about this accommodation, but I modeled this paragraph after your other ones.

RAMSAY17-0015

development of another clot. I entirely support her request for a private testing environment for all of these reasons.

I have gotten to know Jessica on both personal and professional levels over the past four years. I have seen first-hand the potential and knowledge that she has that will make her an excellent physician. Her experiences with her own disabilities will allow her to empathize with, and show compassion for her patients that some physicians will never experience or understand. I am excited to see where her medical career takes her. I fully support her requests for accommodations to allow her to perform at her maximum potential, which will allow her access to a higher quality of residency training and excellence in her future medical practice. If you have any further questions, I would be happy to discuss these issues further and can be reached by phone or email (see contact information below).


Sincerely,


Jennifer N. Houtman, MD
Family Medicine physician, Bronson Lifetime Wellness
(269) 760-3148
jenhoutman@charter.net

RAMSAY17-0016

**Re: Jessie's NBME Accommodations**

jenhoutman@charter.net
Mon 6/4/2018 12:56 PM
To: Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>

📎 1 attachments (24 KB)
2018.06.03_Houtman Letter_Draft 2_Jessie.docx;

OK, I made the changes - I forgot to put the third accommodation in - but you did a nice job :) If this is good - then let me know and I will print it off on letter head today - or send back further changes :)
I am so sorry I am a total dud when it comes to calling you back - I have had a crazy couple of weeks and can't seem to get my self together!!!
JNH
----------------------------------------
From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Sunday June 3 2018 9:17:52PM
Subject: Re: Jessie's NBME Accommodations

Hi Dr. Houtman,

Thank you so much for writing this letter!                       Redacted
                                    If I suggested changing or deleting something, I just left it in but crossed it out so that you could see exactly what I did. I also have a third request for a private testing room, which you didn't mention, so I may have forgotten to tell you about it - If so, I'm sorry! But I just wrote a paragraph similar to your other ones and highlighted the whole thing in yellow so you could tell. If there are any suggestions you don't like or agree with, please feel free to keep what you had.

Please let me know by the end of the day today (Monday 6/4/18) if you would like to keep my suggestions or make any changes so I can let the lawyer know. He would like to use some quotes from your letter in his letter, and our goal is to submit everything by Wednesday (6/6/18).

I will need a **signed, dated copy on official letterhead** by Tuesday (6/5/18) so I will have it in time to submit it on Wednesday. It can be scanned and sent to me via email, or I can pick up a hard copy from your office, whichever is easiest and most convenient for you.

Thanks so much for your help and support! I really, really appreciate it!

I hope you had a great weekend!

Jessie

From: jenhoutman@charter.net <jenhoutman@charter.net>
Sent: Sunday, June 3, 2018 5:52:47 PM
To: Jessica Ramsay
Subject: RE: Jessie's NBME Accommodations                    RAMSAY17-0017

Here is my first attempt - let me know what needs changing and I will get it on letter head :)

JNH

------------------------------------------

From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Thursday May 24 2018 9:28:30PM
Subject: Jessie's NBME Accommodations

Hi Dr. Houtman,

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them. Please let me know if you have any questions ~~Redacted~~

Thanks you so much for your help and support.

Jessie

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

RAMSAY17-0018

May 29, 2018

To Whom It May Concern:

I am writing this letter of support for Jessica Ramsay in regard to her requested accommodations for NBME examinations. I have had the unique opportunity to be her primary care physician for the past two years, and her medical school mentor and Clinical Skills course instructor for the two years prior to that. I can confirm from my personal observation of her as a patient, and as a student, that she has the following diagnoses that require accommodations:

- Attention deficit/hyperactivity disorder, Combined presentation (DSM-5 314.01, ICD-10 F90.2)
- Learning disability, nonverbal (abnormal scanning and processing speed) (ICD-10 F81.9)
  - With impairment in reading (DSM-5 315.00, ICD-10 F81.0)
  - With impairment in written expression (DSM-5 315.2, ICD-10 F81.81)
- Migraines with aura, without status migranosus (ICD-10 G43.09)
- Clotting disorder with recent Deep Venous Thrombosis (ICD-10 I87.009)/Post-thrombotic syndrome (ICD-10 D69.8)

Jessica's first request is 100% additional time for examinations. This accommodation is for her ADHD and learning disabilities. The additional exam time will allow her to be able to read and re-read exam questions and answers to help her comprehend what she is reading. It will also allow her to use her compensatory mechanisms that she has developed to help her clarify her thoughts and answer the questions properly. It will also allow her to redirect her thoughts when she gets distracted. All of these things require extra time. We are treating her ADHD with medications and she has worked over years to develop compensatory mechanisms, but these compensatory mechanisms require additional time, and therefore, can only be used if extended testing time is provided.

The stress of timed examinations also leads to further distraction as she worries about her issues rather than being able to fully focus on the exam itself. As Jessica's Clinical Skills course instructor, I have had the opportunity to watch her work both in timed exams and in untimed exams – both writing notes and in examination/interviewing of patients. During the first part of her first year, she did not yet have accommodations in place. On several occasions without time restrictions, I witnessed her interview the patient well and complete the required portions of the physical exam in a reasonable amount of time similar to her peers. However, even without a strict time limit, Jessica still struggled to finish her note in the time permitted. When she was allowed double the allotted time, she was able to successfully organize her thoughts and complete her note. During formal OSCE examinations with time restraints, I would see her get flustered, forget important steps and miss key portions of the physical exam. Most notably,

RAMSAY17-0019

with the formal time limits, Jessica was unable to complete the note portion because was unable to organize her thoughts and type them out. Jessica initially requested only 50% additional time for the note-writing portion of her OSCEs because she felt it was important not to request more than she thought necessary. However, she continued to struggle with completing the note portion even with the 50% additional time, so she requested and was granted 100% additional time for the note portion, which allowed her to be successful.

Additionally, in her third year, the OSCE prompts and instructions became more detailed and lengthy so that she was unable fully read and comprehend them without taking too much time away from the patient encounter, so she was also granted 2 additional minutes at the beginning of the patient encounter to enable her to do so. Once all of these accommodations were in place, her OSCE performance improved remarkably, more adequately reflecting the clinical skills that I had previously witnessed her demonstrate.

As part of the second-year Clinical Skills course, in addition to OSCE examinations, students were also assigned a hospital patient and were allowed 3 hours to complete a History and Physical (H&P), and Jessica always used this time completely while several of her colleagues saw it as an opportunity to have an early dismissal. I was also in charge of grading Jessica's write-ups from these encounters. Again, I noticed a significant difference in the quality and thoroughness of her write-ups once she was given sufficient time to complete them and turn them in.

I can say with certainty that the testing accommodations (extended time and private room) given to her in medical school has allowed her to perform at her best potential. Jessica and I have discussed the time constraints inherent in seeing patients and completing charts/tasks in medicine and she realizes that she will likely have to pick a practice setting that will allow her more time with each patient so that she will have the time she needs to successfully complete documentation. We have also discussed that in a productivity-driven medical climate, this may impact her financial productivity. She understands that her ADHD and learning disabilities have and will continue to give her struggles in her career, but with adequate extra time, she will be able to do her best, display her knowledge more appropriately, and in the long run, provide better patient care. I highly support her request for 100% extra examination time.

Jessica's second request is for increased break time during examinations. This accommodation is also for her ADHD and learning disabilities – the extra break time allows her a chance to relax and refocus between sections, and to take an additional dose of her medication if needed in the afternoon to help manage her restlessness, distractibility, and inability to focus. The extra break time is also to help with her migraines. Prolonged focusing is a trigger for her migraines and frequent breaks allow her to avoid this trigger. Jessica's migraine headaches are preceded

RAMSAY17-0020

by an aura that includes nausea, blind spots that obscure her vision, photophobia, and phonophobia, and which continues throughout the migraine. If she does begin experiencing an aura during the exam, the extra break time will also allow her to take medication to prevent a migraine from fully developing, which would definitely be a further distraction for her ADHD, and also would impede her performance.  The increased break time is also an accommodation for her clotting disorder and post-thrombotic syndrome, which were diagnosed after she experienced a significant lower extremity deep vein thrombosis (DVT) in 2016. Prolonged inactivity increases her risk for developing another DVT.  Since having a DVT, she develops leg pain and swelling with prolonged sitting, which becomes a further distraction for her.  Extra break time would allow her enough time to walk around to prevent pain, swelling and the development of another clot.  I fully support Jessica's request for extra break time for all of these reasons.

Jessica's third request is for a private testing room. This accommodation is for her ADHD and learning disabilities. The private environment removes the added distraction caused by other test-takers in a shared testing environment, which is necessary for Jessica to be able to focus because she is much more easily distracted than most people due to her ADHD. The private room would allow her to read out loud or move around as needed to cope with her learning disabilities so that she can read and comprehend the questions without being a distraction to other test-takers in a shared room. The private room is also an accommodation for her clotting disorder and post-thrombotic syndrome. A private room would allow Jessica to get up and walk around as necessary during her exam to prevent pain, swelling and the development of another clot. I entirely support her request for a private testing environment for all of these reasons.

I have gotten to know Jessica on both personal and professional levels over the past four years. I have seen first-hand the potential and knowledge that she has that will make her an excellent physician.  Her experiences with her own disabilities will allow her to empathize with, and show compassion for, her patients that some physicians will never experience or understand.  I am excited to see where her medical career takes her.  I fully support her requests for accommodations to allow her to perform at her maximum potential, which will allow her access to a higher quality of residency training and excellence in her future medical practice.  If you have any further questions, I would be happy to discuss these issues further and can be reached by phone or email (see contact information below).

Sincerely,


Jennifer N. Houtman, MD

RAMSAY17-0021

Family Medicine Physician, Bronson Lifetime Wellness
(269) 760-3148
jenhoutman@charter.net

RAMSAY17-0022

**Re: Jessie's NBME Accommodations**

**Jessica Ramsay**
Tue 6/5/2018 4:04 PM
**To:** jenhoutman@charter.net <jenhoutman@charter.net>

📎 1 attachments (19 KB)
2018.06.05_Houtman Letter_Draft 5.docx;

Hi Dr. Houtman,

I have attached your letter ⬛⬛⬛ Redacted ⬛⬛⬛ You can review it and make any changes you feel necessary. Once you put the letter on official letterhead, you may also need to adjust the spacing to get all of the signature block on the same page. Lastly, please sign and date it. You can send me an electronic copy or I can come pick up a hard copy - just let me know which is easiest for you. Thank you so much for all of your help and support!!!!!

Jessie

---

**From:** jenhoutman@charter.net <jenhoutman@charter.net>
**Sent:** Monday, June 4, 2018 12:56:21 PM
**To:** Jessica Ramsay
**Subject:** Re: Jessie's NBME Accommodations

OK, I made the changes - I forgot to put the third accommodation in - but you did a nice job :)  If this is good - then let me know and I will print it off on letter head today - or send back further changes :)
I am so sorry I am a total dud when it comes to calling you back - I have had a crazy couple of weeks and can't seem to get my self together!!!
JNH
-------------------------------------------
From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Sunday June 3 2018 9:17:52PM
Subject: Re: Jessie's NBME Accommodations

Hi Dr. Houtman,

Thank you so much for writing this letter! ⬛⬛⬛ Redacted ⬛⬛⬛ If I suggested changing or deleting something, I just left it in but crossed it out so that you could see exactly what I did. I also have a third request for a private testing room, which you didn't mention, so I may have forgotten to tell you about it - If so, I'm sorry! But I just wrote a paragraph similar to your other ones and highlighted the whole thing in yellow so you could tell. If there are any suggestions you don't like or agree with, please feel free to keep what you had.

Please let me know by the end of the day today (Monday 6/4/18) if you would like to keep my suggestions or make any changes ⬛⬛⬛ Redacted ⬛⬛⬛ our goal is to submit everything by Wednesday (6/6/18).   RAMSAY17-0023

I will need a **signed, dated copy on official letterhead** by Tuesday (6/5/18) so I will have it in time to submit it on Wednesday. It can be scanned and sent to me via email, or I can pick up a hard copy from your office, whichever is easiest and most convenient for you.

Thanks so much for your help and support! I really, really appreciate it!

I hope you had a great weekend!

Jessie

**From:** jenhoutman@charter.net <jenhoutman@charter.net>
**Sent:** Sunday, June 3, 2018 5:52:47 PM
**To:** Jessica Ramsay
**Subject:** RE: Jessie's NBME Accommodations

Here is my first attempt – let me know what needs changing and I will get it on letter head :)
JNH

------------------------------------------
From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Thursday May 24 2018 9:28:30PM
Subject: Jessie's NBME Accommodations

Hi Dr. Houtman,

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them. Please let me know if you have any questions        Redacted

Thanks you so much for your help and support.

Jessie

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

**This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.**

RAMSAY17-0024

**Re: Jessie's NBME Accommodations**

Jessica Ramsay
Wed 6/6/2018 9:30 AM
**To:** Jenni Houtman <jenhoutman@charter.net>

Awesome! Thanks so much!!!!

---

**From:** Jenni Houtman <jenhoutman@charter.net>
**Sent:** Wednesday, June 6, 2018 8:39:39 AM
**To:** Jessica Ramsay
**Subject:** Re: Jessie's NBME Accommodations

Will get it ready today!!

Sent from my iPhone

On Jun 5, 2018, at 4:04 PM, Jessica Ramsay <Jessica.Ramsay@med.wmich.edu> wrote:

> Hi Dr. Houtman,
>
> I have attached your letter [Redacted] You can review it and
> make any changes you feel necessary. Once you put the letter on official letterhead, you may
> also need to adjust the spacing to get all of the signature block on the same page. Lastly,
> please sign and date it. You can send me an electronic copy or I can come pick up a hard
> copy - just let me know which is easiest for you. Thank you so much for all of your help and
> support!!!!!
>
> Jessie
>
> **From:** jenhoutman@charter.net <jenhoutman@charter.net>
> **Sent:** Monday, June 4, 2018 12:56:21 PM
> **To:** Jessica Ramsay
> **Subject:** Re: Jessie's NBME Accommodations
>
> OK, I made the changes - I forgot to put the third accommodation in - but you did a
> nice job :) If this is good - then let me know and I will print it off on letter head today -
> or send back further changes :)
> I am so sorry I am a total dud when it comes to calling you back - I have had a crazy
> couple of weeks and can't seem to get my self together!!!
> JNH
> ----------------------------------------
> From: "Jessica Ramsay"
> To: "jenhoutman@charter.net"
> Cc:
> Sent: Sunday June 3 2018 9:17:52PM
> Subject: Re: Jessie's NBME Accommodations
>
> Hi Dr. Houtman,

RAMSAY17-0025

Thank you so much for writing this letter! I made some suggested edits based on things the lawyer has said, which are all highlighted in yellow. If I suggested changing or deleting something, I just left it in but crossed it out so that you could see exactly what I did. I also have a third request for a private testing room, which you didn't mention, so I may have forgotten to tell you about it - If so, I'm sorry! But I just wrote a paragraph similar to your other ones and highlighted the whole thing in yellow so you could tell. If there are any suggestions you don't like or agree with, please feel free to keep what you had.

Please let me know by the end of the day today (Monday 6/4/18) if you would like to keep my suggestions or make any changes ⬛⬛⬛⬛⬛⬛ Redacted ⬛⬛⬛⬛⬛⬛ our goal is to submit everything by Wednesday (6/6/18).

I will need a **signed, dated copy on official letterhead** by Tuesday (6/5/18) so I will have it in time to submit it on Wednesday. It can be scanned and sent to me via email, or I can pick up a hard copy from your office, whichever is easiest and most convenient for you.

Thanks so much for your help and support! I really, really appreciate it!

I hope you had a great weekend!

Jessie

**From:** jenhoutman@charter.net <jenhoutman@charter.net>
**Sent:** Sunday, June 3, 2018 5:52:47 PM
**To:** Jessica Ramsay
**Subject:** RE: Jessie's NBME Accommodations

Here is my first attempt - let me know what needs changing and I will get it on letter head :)
JNH


-----------------------------------------
From: "Jessica Ramsay"
To: "jenhoutman@charter.net"
Cc:
Sent: Thursday May 24 2018 9:28:30PM
Subject: Jessie's NBME Accommodations

Hi Dr. Houtman,

I have attached a document with simplified versions/summaries of what I am requesting and the explanations behind them. Please let me know if you have any questions ⬛⬛ Redacted ⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛

Thanks you so much for your help and support.

Jessie

RAMSAY17-0026

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

<2018.06.05_Houtman Letter_Draft 5.docx>

RAMSAY17-0027

**Steven G. Zecker, Ph.D.**
**Clinical Psychologist**
**2103 Ridge Avenue**
**Evanston, Illinois 60201**
**(847) 866-6933**

July 19, 2018

Cathy Farmer, Psy.D.
National Board of Medical Examiners
Disability Services
3750 Market Street
Philadelphia, PA 19104

Dear Dr. Farmer:

     I am writing concerning the materials submitted to your office by Jessica E. Ramsay (USMLE # 5-366-431-4) of Kalamazoo, Michigan and subsequently forwarded to me for my professional opinion. Ms. Ramsay is a student at the Western Michigan University Homer Stryker School of Medicine (WMUHSSoM). She has requested testing accommodations for taking Step 1 of the United States Medical Licensing Examination (USMLE). Specifically, in her accommodations request Ms. Ramsay states that she has been diagnosed with Attention Deficit Hyperactivity Disorder-Combined Type (ADHD-C), Specific Learning Disability with Impairment in Reading (SLD-R), Specific Learning Disorder with Impairment in Written Language (SLD-W), Migraines with Aura, and Clotting Disorder with Post-Thrombotic Syndrome (CDPTS), and as a result of these disabilities she requires a double time extended-time accommodation and testing over two days with additional break time in a private testing room in order to successfully complete the Step 1 examination. My areas of professional expertise will not allow me to provide an informed opinion concerning the Migraines with Aura and CDPTS diagnoses; I will restrict my opinions to the ADHD-C, SLD-R, and SLD-W diagnoses.

     In support for her claim that she has disabilities that qualify her for USMLE Step 1 accommodations, Ms. Ramsay has submitted the following extensive documentation for review: 1) two *'USMLE Request for Test Accommodations'* forms, dated November 28, 2016 and June 6, 2018; 2) two personal statements, dated December 11, 2016 and June 6, 2018 in which she describes the history of her disabilities and their impact on her past and current functioning; 3) December 11, 1997 and January 27, 2000 *'To Whom It May Concern'* letters from M. Tanguay, a therapeutic optometrist in Carrolton, Texas in which she describes the results of a perceptual skills evaluation she conducted (including test protocol); 4) a summary report of an evaluation conducted in September 2014 by C. Livingston, M.A., a limited licensed psychologist in Kalamazoo, Michigan; 5) an *'Addendum or (sic) Report of September 22, 2014 Regarding Jessica Ramsay'* from Mr. Livingston, dated September 2, 2016 (including copies of two test protocols and Mr. Livingston's résumé); 6) a report of a *'Neurocognitive Consultation'* conducted in October 2017 by A. Lewandowski, Ph.D., a clinical psychologist and Clinical Assistant Professor at WMUHSSoM; 7) a report of a *'Neurocognitive Examination'* conducted in November 2017 by Dr. Lewandowski; 8) a February 7, 2018 *'Addendum'* to Dr. Lewandowski's report; 9) a May 23, 20918 letter to Ms. Ramsay from Dr. Lewandowski in which he clarifies his recommendations for accommodations; 10) a June 20, 2018 letter to Ms. Ramsay from Dr. Lewandowski in which he provides additional test scores and data tables from the November 2017 evaluation; 11) a summary of an office visit with A. Smiy, M.D., of St. Joseph, Michigan in March 2009; 12) a summary of a physical examination conducted

1

by K. Turner, M.D., in July 2014; 13) a May 17, 2010 *'Access Plan'* completed for the Office for Disability Services at Ohio State University 14) an August 13, 2010 *'ADD/ADHD Verification Form'* from the Office for Disability Services at Ohio State University; 15) a Spring 2010 *'Exam Proctor Sheet'* from the Office for Disability Services at Ohio State University; 16) three *'Essential Abilities for Completion of the Medical Curriculum Attestation'* forms from WMUHSSoM, dated July 16, 2014, June 4, 2015 and June 6, 2016; 17) a *'Request for Reasonable Accommodation'* form completed by Ms. Ramsay on August 6, 2014; 18) five *'Decision of the Essential Abilities Committee Student Request for Reasonable Accommodation'* forms, dated between October 2014 and April 2017; 19) a *'Reasonable Accommodation Outcome Form'* from WMUHSSoM, dated November 16, 2015; 20) seven *'Score Interpretation Guide for Examinees'* forms from NBME Subject Examination Program tests taken in 2016 and 2017; 21) two *'NBME Comprehensive Basic Science Examination'* reports from administrations of the test in April 2016 and April 2017; 22) three *'NBME Customized Examination Profile'* forms from tests taken in 2014, 2015 and 2016; 23) four letters written by Ms. Ramsay between 2014 and 2016 and submitted to WMUHSSoM in which she requests accommodations; 24) a *'My Student Dashboard'* form dated December 11, 2016 that summarizes her medical school course and examination performance; 25) her transcript from St. Joseph (MI) High School (2004-2008); 26) her transcript from Ohio State University (2008-2012); 27) a score report from one administration of the MCAT in April 2011; 28) a *'USMLE Step 1 Score Report'* with results from one administration of the test in July 2017; 29) an April 12, 2018 letter to the NBME from D. Overton, M.D., MBA, Associate Dean at WMUHSSoM, in which he states his support for Ms. Ramsay's request for test accommodations; 30) a June 4, 2018 *'To Whom It May Concern'* letter from B. Ruekberg, M.D., a member of the Psychiatry faculty at WMUHSSoM, in which he states his support for Ms. Ramsay's accommodations request; 31) a May 29, 2018 *'To Whom It May Concern'* letter from J. Houtman, M.D., of Bronson Hospital in Kalamazoo, in which she states her support for Ms. Ramsay's accommodations request; 32) two *'USMLE Certification of Prior Test Accommodations'* forms from Dr. Overton, dated September 20, 2016 and June 1, 2018, in which he indicates that Ms. Ramsay has been receiving accommodations at WMUHSSoM since October 2014; 33) a March 10, 2017 letter to Ms. Ramsay from M. Goldberg, Ph.D., Manager, Disability Services at the NBME, in which she is informed that her previous request for Step 1 accommodations had not been approved; 34) a June 7, 2018 letter to the NBME from L. Berger, an attorney with Reisman, Carolla and Gran, LLP, of Haddonfield, New Jersey, in which he summarizes Ms. Ramsay's request for accommodations and requests that the new information she has submitted be carefully considered so that she will be provided accommodations; 35) a December 29, 2016 email to Ms. Ramsay from Dr. Goldberg at the NBME in which additional documentation to support her earlier accommodations request was requested; and 36) December 2016 email correspondence between Ms. Ramsay and J. Cohen, Disability Services Specialist at the NBME in which her MCAT score report is requested to complete her previous request for Step 1 accommodations.

  Ms. Ramsay writes in her two lengthy personal statements and two *'Request for Test Accommodations'* forms that her ADHD-C, Specific Learning Disorders, migraines and residual symptoms from deep vein thrombosis necessitate multiple accommodations. She states that her disabilities make her unable to read and process information "with normal effectivity or efficiency, or sometimes even at all". She indicates that the additional effort she must expend to process information also adversely impacts other basic daily living activities. She states that she has always "struggled with flipping, merging and tangling letters" when reading and writing and that she must laboriously "untangle" each word she encounters. She describes the writing process for her as "pure agony". This, in turn, creates fatigue that impacts her ability to perform well. She reports needing to read material multiple times in order to comprehend it fully. She indicates that she utilizes colored pens, pencils and highlighters, a time-consuming process, to aid her reading, but this is not possible on examinations such at Step 1, necessitating the implementation of other less effective strategies, such as "acting out or demonstrating" what she reads. Ms. Ramsay writes that despite these significant impairments she was

2

successful on past standardized tests such as the SAT and MCAT because "the tests were designed so that many of the questions could be answered without reading the whole question", a statement with which I disagree. Ms. Ramsay indicates that her ADHD causes her to be highly distractible, impulsive and extremely restless. Despite having elaborately described procedures she utilizes to aid her reading and writing, Ms. Ramsay states that her ADHD causes her to forget the steps in a process and forget what she is doing. She states that in 2016 she experienced deep vein thrombosis which damaged the circulation in her legs and necessitates that she be able to move around frequently and not remain seated for extended periods of time; thus she is requesting additional break time in order to be able to get up from her seat and walk around. Ms. Ramsay writes that her migraines create "blind spots" that affect her reading, and that this problem can be avoided by having additional break time. She states that she experienced a migraine during her initial Step 1 attempt a year ago, and this impacted her ability to see, read and think. Ms. Ramsay indicates that the difficulties she describes have been present "since I was little", although I note that she was not accommodated prior to college. She indicates that she was able to "mask" her difficulties through her hard work, but this left her "mentally exhausted" at the end of the day and unable to socialize with friends. I note that in her 2016 personal statement Ms. Ramsay indicates that her struggles have caused stress, depression and anxiety, but in her 2018 statement she makes no mention of any affective difficulties that she has experienced. In 1998 she underwent perceptual skills training with Dr. Tanguay, which she indicates did not improve her reading. I note that there is a lack of evidence supporting the efficacy of such training on reading behavior. She writes that she was informally accommodated in some situations during elementary school because of her inability to complete exams on time. However, in general she indicates that she was able to "force herself" to attend and read adequately. She was in an accelerated curriculum from 6th grade through high school. It was not until she was an undergraduate at Ohio State that the demands of "school, work and life" made it impossible for her to self-accommodate and as a result she consulted with Dr. Smiy in 2009; she states that he diagnosed her with ADHD-Inattentive Type and dyslexia. Based on these diagnoses she began receiving accommodations at Ohio State in 2010. She indicates that with accommodations she was able to perform better academically, although as I will discuss later in this review, her undergraduate GPA actually declined slightly subsequent to the implementation of accommodations. At WMUHSSoM she has continued to receive accommodations, and her extended time accommodation was increased from the 50% she had received as an undergraduate to 100%.

Ms. Ramsay was evaluated by Dr. Tanguay, an optometrist, in 1997 because of concerns about reversals; at the time of testing she was 7 years old. At the time of testing Ms. Ramsay was wearing glasses. In her December 11, 1997 *'To Whom It May Concern'* letter, Dr. Tanguay indicates that her evaluation indicated that Ms. Ramsay "showed substantial deficits" in visual-spatial relationships, visual discrimination and visual memory; this was apparently based on the administration of a single test, the Test of Visual-Perceptual Skills (TVPS). In the TVPS protocol that Ms. Ramsay submitted for review, I note that Dr. Tanguay reported only unreliable Perceptual Age scores and did not calculate scale scores or percentiles, which make it impossible to determine Ms. Ramsay's level of functioning in comparison to her peers. After this evaluation, Ms. Ramsay underwent perceptual skills training with Dr. Tanguay for four months in 1998; subsequent to this training she indicates that Ms. Ramsay "scored above age level in all categories tested", and states that her comprehension and perceptual skills were "excellent". Dr. Tanguay concludes that Ms. Ramsay "still has the original vision problem" that necessitated glasses and writes that this "may slightly reduce her reading speed", but she does not indicate that she had assessed reading speed with any standardized measure.

Dr. Smiy's medical notes from May 2010 indicate that he saw Ms. Ramsay for a 30-minute appointment because of a complaint of 'ADD/ADHD'. In his brief history he writes that in high school there were "no problems" (contrary to Ms. Ramsay's personal statements) and that "college stress" is causing her to "switch letters around a bit". He apparently did not administer any tests and summarizes

3

by writing "add vs. possible dyslexia- pt has more focus issues than dyslexic tendencies". He recommended a trial of Ritalin. However, given the absence of any formal testing during this brief appointment no formal diagnosis was provided, and none was appropriate in my professional opinion.

The next evaluation that Ms. Ramsay submitted for review was conducted by Mr. Livingston in September 2014. Mr. Livingston did not generate a complete report of this testing; rather he provided a one-page summary of results and conclusions to Dr. Ziemkowski at WMUHSSoM. He indicates that Ms. Ramsay reported that she was tired and stressed and concerned that her school grades did not show her knowledge. Mr. Livingston wrote that measures assessing Ms. Ramsay's verbal comprehension and nonverbal reasoning both placed her at the 96th percentile, and that a composite score representing her working memory, attention and concentration fell at the 63rd percentile (which despite being stronger than nearly two-thirds of her peers, was referred to by Mr. Livingston as representing "relatively low" skills in these areas). Processing speed measures yielded a 10th percentile score. Her reading comprehension was described as above average. Mr. Livingston concludes that results support the diagnosis of ADHD-I, severe; however, the measures of attentional functioning that he reported placed her above the mean and he never demonstrated that Ms. Ramsay met the complete set of diagnostic criteria for a diagnosis of ADHD. He writes that an extended time accommodation on tests "should be considered", despite apparently having not demonstrated a deficit in academic fluency. In his September 2, 2016 'Addendum or (sic) Report of September 22, 2014 Regarding Jessica Ramsay', Mr. Livingston writes that documentation supporting the diagnosis of ADHD-I included reported focus problems and headaches at age 5, the results of Dr. Tanguay's vision testing and 2009 notes from Dr. Smiy stating Ms. Ramsay had "focus issues", none of which in my opinion provide strong support for a formal diagnosis of ADHD. He also indicates that Ms. Ramsay's history of accommodations at Ohio State and WMUHSSoM supported the diagnosis. However, in my opinion his testing in 2014 failed to demonstrate that she met the diagnostic criteria for the disorder. Mr. Livingston also identified the mental ability test (the Wechsler Adult Intelligence Scale-IV (WAIS-IV)) and achievement test (Wechsler Individual Achievement Test (WIAT)) that he used in evaluating Ms. Ramsay and provided photocopies of the cover page of each test's protocol, but these results are not relevant to the ADHD-I diagnosis that he provided. I do note that while Ms. Ramsay states that her reading is impaired, she scored at the 99th percentile on the WIAT Reading Comprehension subtest. Mr. Livingston concludes by stating that his testing demonstrated a need for multiple accommodations, including double time on exams, but in my professional opinion his limited testing he conducted did not demonstrate that Ms. Ramsay was substantially impaired in a manner that warranted accommodations under the Americans with Disabilities Act, as amended (ADA).

The next report of testing that Ms. Ramsay submitted was conducted by Dr. Lewandowski in October 2017, at which time she 27 years old and a student at WMUHSSoM. Ms. Ramsay described a history of "chronic academic disability" and described a history of self-accommodated ADD. She indicated that her 2014 evaluation had resulted in diagnoses of ADHD and dyslexia, but as I have discussed, the only measure of reading administered by Mr. Livingston yielded a score at the 99th percentile, a result that is entirely inconsistent with a dyslexia diagnosis. Because she had not been approved for Step 1 accommodations, Ms. Ramsay was seeking a more comprehensive assessment. She indicated that she was forgetful, having word-finding problems and unable to stop moving. Despite having described herself as experiencing "chronic academic disability", Ms. Ramsay reported that she graduated from high school with a 3.8 GPA and scored "between 27 and 30" on the ACT under standard administration conditions. She also indicated that she had seen a counseling psychologist for unexplained reasons (although she acknowledged some situational dysphoria) and reported that the counseling resulted in a "very positive outcome". Dr. Lewandowski reported that Ms. Ramsay presented "in mild distress" but did not elaborate other than to write that her mood was anxious and she was frustrated. She reported that she had been taking an antidepressant (fluoxetine) but it had been discontinued. She was taking seven other medications, including Adderall (for ADHD), Buspar and Xanax (anti-anxiety medications),

4

and Ambien (apparently to aid sleep). Despite Ms. Ramsay's description of herself as always moving, Dr. Lewandowski described her as normal in this regard. She indicated that she experienced insomnia and was "usually very fatigued". Based on this brief two-hour consultation, Dr. Lewandowski does not provide any diagnosis but indicates he will be conducting comprehensive testing in the future to "better clarify" Ms. Ramsay's status.

Dr. Lewandowski subsequently saw Ms. Ramsay in December 2017 and generated a report of the *'Neurocognitive Examination'* he conducted. The report consists mainly of a table of test scores, with minimal discussion. Dr. Lewandowski does not provide the names of any of the tests he administered, which I note is highly unusual. He indicates that Ms. Ramsay's overall mental ability was high average, with the various domains of cognitive functioning ranging from below average to above average. All measures of academic functioning resulted in scores at or above the 73rd percentile. Nine neuropsychological test results are presented; seven placed Ms. Ramsay in the normal range and two were abnormal. Among six measures of attentional functioning, four resulted in normal scores and two were below average. Six memory scores were reported; five placed Ms. Ramsay above the mean and one was low average. Psychological testing indicated moderate depression, inefficient thinking and health concerns. Based on these results, Dr. Lewandowski diagnoses Ms. Ramsay with Attention Deficit Disorder, Hyperactive, moderate (ADHD-H/I) and Learning Disability (LD), nonverbal (abnormal scanning and processing speed). Notably, he did not diagnose her with any affective disorder, although a substantial part of his recommendations refer to Ms. Ramsay's "mood disturbance" and ongoing affective struggles. Moreover, he fails to consider the role that these psychological difficulties may be playing in Ms. Ramsay's attentional functioning and learning. Further, Dr. Lewandowski failed to indicate on what basis the diagnosis of an attention deficit was made, given that she performed largely within the normal range on whatever test assessing attention that he administered to her. He also provided no indication that Ms. Ramsay met the complete set of criteria for an ADHD diagnosis. Similarly, Dr. Lewandowski did not provide a rationale for the LD diagnosis he provided, and in the absence of specific tests that were administered and a discussion of the findings, there was no basis for such a diagnosis in my professional opinion. In his February 7, 2018 *'Addendum'*, Dr. Lewandowski provided the names of the tests he had administered in his December testing. In his June 20, 2018 letter to Ms. Ramsay, Dr. Lewandowski again provides names of tests as well as tables and plots of results from his earlier testing, but no additional discussion of the findings. In my professional opinion this additional information is consistent with my earlier conclusion that the results of Dr. Lewandowski's testing did not support the diagnosis of a disabling condition that warranted accommodations under the ADA. In his May 23, 2018 letter to Ms. Ramsay, Dr. Lewandowski wrote that his recommendation for Step 1 accommodations should have been for double time, but as I have discussed, in my opinion the results he obtained did not support the diagnosis of a disability warranting accommodations.

The July 29, 2014 *'Physical Examination'* report from Dr. Turner that she completed prior to Ms. Ramsay beginning medical school indicates that Ms. Ramsay had a history of migraine headaches, ADHD and dyslexia, but these were by history and she apparently conducted no testing that would have allowed her to make those diagnoses.

The May 17, 2010 *'Access Plan'* from Ohio State indicates that Ms. Ramsay was approved for a time and one-half extended time accommodation and priority registration. In Dr. Smiy's August 13, 2010 *'ADD/ADHD Verification Form'* he indicates that Ms. Ramsay qualified for the diagnosis of ADHD-I and was currently taking Adderall because methylphenidate had "failed" to treat her difficulties. I note that in indicating the DSM-IV criteria for ADHD that Ms. Ramsay met, Dr. Smiy endorses an insufficient number of Inattention symptoms (five) to yield a valid ADHD-I diagnosis, and he indicates that none of the Hyperactive/Impulsive criteria were met. He also does not provide a specific recommendation for an extended time accommodation, writing that she "may need additional time". The Spring 2010 *'Proctor*

5

*Sheet'* from Ohio State indicates that Ms. Ramsay utilized accommodations in one of her courses (the course name is illegible in the photocopy) during that term.

Ms. Ramsay submitted a *'Request for Reasonable Accommodation'* form to WMUHSSoM on August 6, 2014. On August 4, 2014, June 3, 2015 and November 3, 2015 she submitted typed requests for accommodations from the school in which she described her accommodations history and requested specific accommodations. The five *'Decision of the Essential Abilities Committee Student Request for Reasonable Accommodation'* forms, dated between October 2014 and April 2017 indicate that she was approved for accommodations during this period. The extended time accommodation was increased to double time in March 2017, and additional accommodations were approved in April 2017. The November 6, 2015 *'Reasonable Accommodation Outcome Form'* indicates that Ms. Ramsay was approved for a time and one-half extended time accommodation on clinical write-ups. In the three *'Essential Abilities for Completion of the Medical Curriculum Attestation'* forms from 2014, 2015 and 2016, Ms. Ramsay indicated that she was capable of meeting the requirements of the medical school curriculum.

Ms. Ramsay submitted seven *'Score Interpretation Guide for Examinees'* forms from NBME Subject Examination Program tests taken in 2016 and 2017 for review. Her scores on these exams ranged from 60% to 81% correct but they cannot be considered relevant to her request for accommodations. Similarly, the two *'NBME Comprehensive Basic Science Examination'* reports from administrations of the test in April 2016 and April 2017 and the three *'NBME Customized Examination Profile'* forms providing results from tests taken in 2014, 2015 and 2016 are not relevant to her claim that she has disabilities that warrant USMLE Step 1 accommodations.

Ms. Ramsay did not submit report cards or school records from any part of her kindergarten through eighth grade education for review; such documentation could have provided evidence of an early impairment in functioning, essential for the diagnoses of ADHD and SLD, neurodevelopmental disorders with an onset of symptoms in childhood. Her high school transcript from her first three years at St. Joseph High School reveals that her grades were entirely within the 'A/B' range and she had earned a GPA of 3.75, which placed her 27th in her class of 237 students. Importantly, this high level of academic achievement was attained in the absence of accommodations. Her undergraduate transcript from Ohio State reveals she obtained only a single grade outside of the 'A/B' range and she graduated with a B.A. in Biological Sciences and a 3.58 GPA. I note that she did not begin receiving accommodations at Ohio State until May 2010, at which time she had earned a 3.66 GPA. Thus, her grades were actually lower after she began receiving accommodations than they were when she was unaccommodated. Ms. Ramsay did not submit her WMUHSSoM transcript for review; her *'My Student Dashboard'* form summarized her performance across a range of courses and examinations, but in the absence of normative data allowing for comparison to peers I am unable to interpret her performance on these measures

Ms. Ramsay took the ACT prior to college entry under standard administration conditions. She did not submit a report of her performance on the test for review, but indicated to Dr. Lewandowski that she had scored "between 27 and 30" on the exam. Such a level of performance would have placed her in the above average range (between approximately the 85th and 95th percentile). Such a level of performance is in my opinion inconsistent with Ms. Ramsay's claim that she has always been unable to finish timed examinations. Ms. Ramsay's MCAT score report reveals that she completed one administration of the test in April 2011. Her scores on the exam (10/09/M/11: 30M) placed her at the 79th percentile in comparison to other medical school aspirants. This above average MCAT score was also achieved under standard administration conditions. Ms. Ramsay's *'USMLE Step 1 Score Report'* reveals that she took the exam in July 2017 under standard administration conditions and obtained a score (191) that was one point below the passing criterion.

6

Ms. Ramsay submitted two letters from WMUHSSoM faculty in support of her accommodations request. In Dr. Overton's April 12, 2018 letter to the NBME he describes the multiple accommodations that Ms. Ramsay has received since beginning medical school. Dr. Overton indicates that Ms. Ramsay "has significant difficulty with reading comprehension", but I note that this statement is inconsistent with Mr. Livingston's 2014 testing, which placed her at the 99th percentile in this domain. While he states his strong support for Ms. Ramsay's accommodations request, he provides no new information that supports her claim that she is substantially impaired in functioning in a manner that warrants accommodations. In Dr. Ruekberg's June 4, 2018 letter he provides a detailed history of Ms. Ramsay's education. He reports that Ms. Ramsay was unable to complete all ACT items but nonetheless obtained what he refers to as an "acceptable" score (which, as I have indicated, placed her at or above the 85th percentile). Similarly, he suggests that Ms. Ramsay's 30M score on the MCAT, which was also above average, underestimated her ability because she had performed at a higher level on untimed practice exams. However, most people, including those without disabilities, perform at a higher level under untimed conditions. He indicates that Ms. Ramsay elected to take the CBSE examination in April 2017 under standard time conditions and states that she was unable to complete all items. However, he does not indicate how she performed on the test. Ms. Ramsay's *'My Student Dashboard'* form indicates that she obtained a score of approximately 68 on the exam. Dr. Ruekberg provides his clinical impression that Ms. Ramsay has multiple disabilities including ADHD-C, and learning disabilities. He had not tested Ms. Ramsay in order to obtain these diagnoses but rather was summarizing what past evaluators had diagnosed. I note that Ms. Ramsay's evaluation with Dr. Smiy had indicated that she displayed zero hyperactive/impulsive symptoms, which led him to diagnose her with ADHD-I, while Dr. Lewandowski's testing yielded an ADHD-H/I diagnosis because insufficient inattentive symptoms were reported. Dr. Ruekberg had apparently combined the results of these two evaluations to suggest that Ms. Ramsay has ADHD-C, although this diagnosis had never been previously provided.

In Dr. Houtman's May 29, 2018 letter she indicates that she has been Ms. Ramsay's primary care physician for two years and also was her instructor at WMUHSSoM prior to this. She does not indicate that she has evaluated Ms. Ramsay for any of the conditions for which she is seeking multiple accommodations, but states that she can confirm from "personal observation" that they are valid and warrant the accommodations requested. Unlike Drs. Ruekberg and Overton, Dr. Houtman also mentions the stress and "flustered" behaviors that Ms. Ramsay has exhibited during testing situations, but she does not suggest that anxiety and/or depression are factors in her academic and examination performance. She indicates that with extended time Ms. Ramsay's performance improved because this "allowed her to perform at her best potential", but I note that the purpose of accommodations is not to maximize an individual's performance but rather is intended to provide full access to the examination.

The two *'USMLE Certification of Prior Test Accommodations'* forms from Dr. Overton, dated September 20, 2016 and June 1, 2018, indicate that Ms. Ramsay has received eight different accommodations while in medical school. He indicates that these accommodations have been provided because of ADHD only, although I note that a number of the accommodations (e.g., use of a calculator and text-to-speech software) are unrelated to an attention deficit. These accommodations have been provided since October 2014.

In your March 17, 2017 letter to Ms. Ramsay, Dr. Goldberg at the NBME informs her that her earlier request for USMLE Step 1 and Step 2-Clinical Knowledge (Step 2-CK) accommodations had not been approved because the documentation she submitted had not demonstrated that she had a substantial impairment in functioning that warranted accommodations under the ADA. Dr. Goldberg also refers to Ms. Ramsay's high level of early unaccommodated academic success as being inconsistent with the presence of neurodevelopmental disorders such as ADHD and SLD. I concur with Dr. Goldberg's decision and add that in my opinion the new documentation that she has submitted continues to fail to

7

demonstrate a substantial impairment in a major life activity.

In Mr. Berger's June 7, 2018 letter to the NBME he addresses Dr. Goldberg's reasoning in denying Ms. Ramsay's earlier accommodations request, and states his support for her current request for accommodations. I note that Mr. Berger refers in his letter to Ms. Ramsay's depression as a factor in her need for accommodations, but as I have discussed, despite evidence from previous testing that Ms. Ramsay experiences affective struggles she never indicated that she been diagnosed with depression. I will not address all of the specific legal points that Mr. Berger makes in support of Ms. Ramsay's accommodations request; my review is only intended to provide my professional opinion as to whether Ms. Ramsay is substantially impaired in a major life activity in a manner that warrants accommodations under the ADA.

The December 2016 email correspondence between Ms. Ramsay and Dr. Goldberg and Ms. Cohen at the NBME concerns requests for documentation that was not initially submitted in Ms. Ramsay's initial accommodations request. These requested documents were all included in the current submission I am reviewing.

No additional documentation was provided for my review of Ms. Ramsay's accommodations request. To summarize, my review of the documentation she has submitted indicates that in my professional opinion she does not have a disability that according to the ADA qualifies her for the accommodations she has requested on the Step 1 examination. Ms. Ramsay was apparently a successful student in her K-12 years in the absence of any accommodations, and she submitted no documentation to indicate that she experienced impairment due to ADHD or a learning disability during this period, as would be expected given that ADHD and SLD are neurodevelopmental disorders with an onset of symptoms in childhood. Ms. Ramsay has undergone multiple evaluations over the past 20 years, but all were in my professional opinion quite superficial and failed to demonstrate that she is disabled. Dr. Tanguay's visual training in 1998 resulted in above average scores in all areas of visual processing subsequent to the intervention. The brief summary of her 30-minute appointment with Dr. Smiy did not yield a formal diagnosis but rather resulted in Dr. Smiy questioning whether she had ADHD or dyslexia. Mr. Livingston's brief 2014 evaluation yielded a diagnosis of ADHD-I, but as I have discussed, he in my professional opinion failed to demonstrate that she met the complete set of criteria for the disorder, and her strong prior unaccommodated academic record was inconsistent with a disabling attention deficit. Dr. Lewandowski's 2017 evaluation led to a diagnosis of ADHD-H/I, which as I discussed was unexpected because Ms. Ramsay had not endorsed any symptoms in these areas only three years earlier. He also diagnosed Ms. Ramsay with 'Learning Disability, nonverbal' due to abnormal scanning and processing speed, but as I discussed previously, in my opinion there was insufficient support for this diagnosis. Despite the fact that Dr. Lewandowski had administered several subtests that indicated that Ms. Ramsay was depressed and despite her stated ongoing issues with stress and anxiety, neither he nor any of the other evaluators she has seen has ever diagnosed her with an affective functioning disorder. Although she did not submit any score report from the ACT for review, Ms. Ramsay recalled that she had scored at a level higher than at least 85 percent of her peers despite having taken the examination under standard administration conditions. Further, she took the MCAT under standard administration conditions and obtained an above average score in comparison to a select group of medical school aspirants. Such strong levels of unaccommodated standardized test performance in my professional opinion provide strong evidence that Ms. Ramsay is not substantially impaired in a major life function in a manner that warrants accommodations under the ADA.

To summarize, in my professional opinion Ms. Ramsay did not submit documentation that indicated that she is substantially impaired in a major life activity in a manner that warrants accommodations under the ADA. Given my conclusion that Ms. Ramsay is not disabled according to the

8

ADA, I recommend that you deny her request for USMLE Step 1 accommodations.

Please feel free to contact me again if I may provide you with any additional information regarding Jessica Ramsay's request for USMLE Step 1 accommodations.

Sincerely;

*/By typing my name below I am confirming my intent to sign this document on 7/19/2018/*

Steven G. Zecker, Ph.D.
Clinical Psychologist

9



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**Confidential**
**Confirmation of Test Accommodations**

September 11, 2018

**Via E-mail to** jessica.ramsay@med.wmich.edu
Jessica E. Ramsay
6862 Tall Oaks Dr
Apt 3B
Kalamazoo, MI 49009

RE: USMLE Step 1                          USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

We have thoroughly reviewed the documentation provided in support of your request for test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request in accordance with the guidelines set forth in the amended Americans with Disabilities Act (ADA).

You report the basis of your request for double testing time, additional break time, and a private testing room to be Learning Disabilities in Reading and Writing (with abnormal Scanning and Processing Speed) diagnosed in 2017, Attention-Deficit/Hyperactivity Disorder (ADHD) diagnosed in 2009, Migraines with aura, without status migrainosus diagnosed in 1997, and Clotting disorder with recent deep vein thrombosis and Post-thrombotic syndrome diagnosed in 2016.  In your personal statement you write, *"During my undergraduate studies at Ohio State University, the demands of school, work and life finally began outweighing my ability to self-accommodate, requiring more time and energy than I had...In 2009, at the suggestion of a professor, I sought help from my primary care physician, Dr. Allen Smiy, who diagnosed me with ADD, inattentive type, for which he began medical management...Once I started receiving accommodations, I was able to perform better on my exams because I had more time to read, write, and work through questions...In medical school, I received more accommodations to meet the increased curricular demands. Most notably, I was granted 100% additional testing time, unlimited free printing, and Kurzweil 3000 text-to-speech software...In the context of the USMLE Step exams, without appropriate accommodations, I will not have the opportunity to get through as many questions or as much content as everyone else taking the tests, and I will not be able to accurately demonstrate all that I have learned thus far."*

In a June 4, 2018 letter addressed To Whom It May Concern, Bruce Ruekberg, M.D. writes to support your request for accommodations for Step 1. Dr. Ruekbert writes, *"After conferring with Jessica and reviewing her clinical history, collateral information, and neuropsychology testing, I recommend the following accommodations to address her needs for USMLE Step 1 exam: 100% additional testing time...Additional break time...A private, quiet room...In my professional opinion, due to her functional limitations due to Attention Deficit and Hyperactivity Disorder, Combined Type(DSM-5 314.01; ICD-10 F90.2) and specific learning disorder of 'abnormal scanning and processing speed' (ICD-10 F81.9)*

**Exhibit C**

**Appx1401**

*with impairments in reading (DSM-5 315.00; ICD-10 F81.0) and written expression (DSM-5 315.2;
ICD-10 F81.81), Jessica, without question, is a qualified person with disabilities under the ADA...*"

In an October 2017 report of Neurocognitive Consultation and December 2017 report Neurocognitive
Examination conducted when you were a 27-year-old medical student, Alan Lewandowski, Ph.D.
writes*, "The patient describes a chronic academic disability without progressive pattern for a number
of years that has compromised her ability for educational success. She describes a history of ADD for
which she was able to self-accommodate for many years, and reports being evaluated for ADD and
dyslexia in 2014 by a therapist (credentials unknown)...As a result, she reports she was provided
accommodations throughout medical school but was denied accommodations for the United States
Medical License Examination (USMLE) Step 1. The patient presents today requesting a more
comprehensive assessment in order to obtain accommodations similar to that which she was allowed
throughout medical school…The patient describes herself as having a 'unique learning style.'"*  Dr.
Lewandowski provides his clinical impression of Attention deficit disorder and learning difficulties
affecting ability to pass standardized testing by history and Attention deficit disorder, hyperactive,
moderate (F90.1) and Learning disability, nonverbal (abnormal scanning and processing speed) (F81.9)
by diagnostic testing.  Your evaluator's conclusions notwithstanding, he reports that your performances
on a computerized measure of attention-related problems, the *Conners Continuous Performance Test,
Third Edition (CPT-3)*, are normal.  He does not describe how you meet diagnostic criteria for any
*Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)* disorder.

The ICD-10 code F81.9 that Dr. Lewandowski assigned as a result of his 2017 evaluation is described
by the publisher as Developmental disorder of scholastic skills, unspecified. However, your evaluator
notes that your reading, spelling and arithmetic are normal to above normal and consistent with past
education. Furthermore, your documentation does not demonstrate a developmental history of impaired
scholastic skills. Dr. Lewandowski writes that you reported earning a high school GPA of 3.8 and an
ACT Score between 27 and 30. The records provided show that you earned an MCAT score of 30M
under standard conditions in 2011, better than 79% of a highly select group of medical school
applicants. These data do not demonstrate a developmental history of impaired cognitive or academic
functioning or that standard testing time is a barrier to your access to the USMLE.

You write, *"Because of my clotting disorder and DVT, I must take frequent breaks throughout the day,
and briefly during the exam blocks, to move and walk around in order to maintain adequate circulation
in my legs, reduce swelling and pain, and decrease the risk of forming another DVT as a result of my
clotting disorder…Because my migraines are triggered by excessive fatigue from trying to focus, read,
and process the questions, having frequent breaks with adequate time to recuperate between blocks
reduces the likelihood that I will get a migraine during the exam.*

In a May 29, 2018 letter addressed To Who It May Concern, Jennifer N. Houtman, M.D. reports that
additional break time will allow you to relax and refocus between sections, avoid a migraine headache
from prolonged focus, and prevent lower extremity pain, swelling, and development of another blood
clot.

Accommodations are intended to provide access to the USMLE testing program for individuals with a
documented disability as defined by the ADA. A diagnostic label, in and of itself, does not establish
coverage under the ADA, nor does prior receipt of accommodations for a particular activity guarantee
that identical accommodations are indicated or will be available in all future settings and circumstances.
The ADA defines disability as a physical or mental impairment that substantially limits one or more
major life activities compared to most people in the general population.

**Exhibit C**

Jessica E. Ramsay                                                September 11, 2018
USMLE ID#: 5-366-431-4                                           Page **3** of **3**

Accommodations are provided when there is clear documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance. Your documentation does not demonstrate that 100% additional testing time is an appropriate modification of your USMLE Step 1 administration.

Based on a thorough review of all of your documentation, including documentation of a history of DVT and migraines, we will provide the following accommodation(s) for the USMLE Step 1 for which you are currently registered:

- **Additional break time - testing over two days:**  The exam will be administered over two days. Day one will be 5 hours in length and will include a 15 minute tutorial and 7 blocks with approximately 20 questions per block.  Day two will be 4 hours 45 minutes in length and will include 7 blocks with approximately 20 questions per block.  You will have up to 30 minutes to complete each block.  You will receive 75 minutes of break time each day, including lunch.  You may use break time as needed between blocks.  If you complete the tutorial or an examination block in less time than allotted, the unused time will be added to your available break time.

- **Separate testing room in which you may stand, walk or stretch during exam**

- **Permission to read aloud**

You will receive an electronic permit containing the information needed to schedule your exam appointment.  Please call Prometric at the number listed on your scheduling permit as soon as you receive it to schedule your appointment.

These accommodations may not be changed at the test center on your scheduled exam day. If you choose not to use these accommodations, please notify Disability Services immediately at disabilityservices@nbme.org or by calling 215-590-9700 for instructions.

**Information About Requesting Test Accommodations For Subsequent Step Examinations**

You must notify the USMLE in writing each time you apply for a Step examination for which you require test accommodations.  Information and forms to request test accommodations on subsequent USMLE administrations are available at www.usmle.org/test-accommodations/forms.html.
Follow the instructions on the request form to submit your request for test accommodations at the same time you submit your Step exam application to your registration agency.

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Lawrence D. Berger, Esquire to larry@rcglawoffices.com

**Exhibit C**

**Appx1403**

## MICHIGAN DYSLEXIA INSTITUTE – INTAKE INTERVIEW

### ADULT CLIENT

Date: 9/25/2018 _____ Interviewer: _____ Evaluator: _____

## PERSONAL DATA:

Client's name: _____ Ramsay _____ Jessica _____ Erin _____
            (Last)            (First)            (Middle)

Birthdate: REDACTED _____ Age: 28 _____

Address: 6862 Tall Oaks Dr, Apt 3B _____ Kalamazoo _____
                Street                                City

State: MI _____ Zip: 49009 _____ Home phone:( 269 ) 932 - 8214 _____

Employer: _____ Work phone:(_____) _____ - _____

Student: _x_ Yes ____ No  If yes, where: Western Michigan University Homer Stryker MD School of Medicine

_x_ Single _____ Married _____ Divorced _____ Other

Children: None _____

How did your hear about the Institute? Google search, followed by recommendation

_____

## WHAT ARE YOUR REASONS FOR SEEKING THIS EVALUATION?

Why are your having this Language Evaluation done?
To get appropriate diagnosis and testing accommodations

_____

## WHAT LANGUAGE SKILLS ARE DIFFICULT FOR YOU?

Do you presently have trouble:

| | | | |
|---|---|---|---|
| Reading | _x_ Often | _____ Sometimes | _____ Rarely |
| Spelling | _x_ Often | _____ Sometimes | _____ Rarely |

DEFENDANT'S EXHIBIT
**35**

Smith-0032

**Appx1404**

Page 2 – Language Evaluation – Intake Interview

| | Often | Sometimes | Rarely |
|---|---|---|---|
| Understanding what you read | x Often | ____ Sometimes | ____ Rarely |
| Understanding what you hear (speech) | ____ Often | x Sometimes | ____ Rarely |
| Expressing yourself in writing | x Often | ____ Sometimes | ____ Rarely |
| Expressing yourself orally | x Often | ____ Sometimes | ____ Rarely |
| With math | ____ Often | x Sometimes | ____ Rarely |

Especially word problems, having to do math quickly in my head, or remembering the correct order for problems with multiple steps

## THINK BACK TO GROWING UP, TO YOUR SCHOOL DAYS: DO YOU REMEMBER HAVING TROUBLE:

| | Yes | No |
|---|---|---|
| Learning to read | x Yes | ____ No |
| Learning to recognize words in print | x Yes | ____ No |
| Learning to spell | x Yes | ____ No |
| Understanding what you read | x Yes | ____ No |
| Understanding what was said (speech) | x Yes | ____ No |
| Learning to express yourself in writing | x Yes | ____ No |
| Learning to express yourself orally | x Yes | ____ No |
| Learning the days of the week, months, and/or seasons in their proper order | x Yes | ____ No |

Months in particular, still have trouble with, especially going between name and #, e.g. 10 = October, and months with same letters, e.g. March/May, June/July

| | Yes | No |
|---|---|---|
| Quickly pulling words and information you knew from your memory | x Yes | ____ No |
| Learning to tell right from left | x Yes | ____ No |
| Learning to tell time | x Yes | ____ No |
| Following multiple directions | x Yes | ____ No |
| Setting up and following an organized routine and good work habits | x Yes | ____ No |

## EDUCATIONAL HISTORY:

Please give special attention to difficulties you had in learning to read, spell, etc.

Are you a high-school graduate? __x__ Yes _____ No

If yes, what year: __2008_____ If no, highest grade completed: _____

Smith-0033

Page 3 – Language Evaluation – Intake Interview

If you have attended school (technical or college), please explain the nature and extent of that education:

I graduated college in 2012, and began medical school in 2014.

Do you remember having difficulties with reading, spelling, and writing in:

| | | | |
|---|---|---|---|
| (1) | Pre-Kindergarten | _____ Yes | __x__ No |
| (2) | Kindergarten | __x__ Yes | _____ No |
| (3) | In Elementary School | __x__ Yes | _____ No |
| (4) | In Middle School | __x__ Yes | _____ No |
| (5) | In High School | __x__ Yes | _____ No |
| (6) | In other schooling | __x__ Yes | _____ No |

If yes to any of the above questions, please explain:

_____

_____

_____

_____

_____

_____

_____

In school, do you remember teachers describing you as (please check):

Discipline Problem:_____     Daydreamer: x "distracted"     Inattentive:____x____

Hyperactive:_x "busy"     Class Clown:_____     Not trying hard enough:____x____

Also that I was very slow, made frequent careless mistakes, was bad test taker

Did you ever receive special instruction in school to help you in reading or in other areas?

__x__ Yes     _____ No

If yes, please explain_Special instruction, but not special ed. I had several teachers that really worked with me to help

me specifically with reading, spelling, and writing, particularly 2nd-4th grade.

Smith-0034

Page 4 – Language Evaluation – Intake Interview

Did you ever receive special instruction or tutoring outside of school to help you in reading or in other areas?

___x___ Yes    _____ No

If yes, please explain Sylvan reading course prior to taking the ACT in high school

_____

Have you ever been tested by a school, employer, or private agency?

___x___ Yes    _____ No

If yes, please explain preschool, tested by the school

_____

If yes, did you have an IQ test?    ___x___ Yes    _____ No

**WORK HISTORY**: Please give special attention to how problems with reading, spelling, etc. has affected the jobs you have had.

Have you had employment problems because of your reading, spelling, writing etc.?

_____ Yes    _____ No

If yes, please explain:_____

_____

_____

_____

**DEVELOPMENTAL HISTORY**:

Are you left-handed?    _____ Yes    _____ No

Do you do anything both right and left handed?    ___x___ Yes    _____ No

If yes, please explain below

I was originally left-handed, my kindergarten teacher made me switch to my right when I was at school. Initially, I would switch back to my left at home, so could write with both hands, but gradually just switched completely to my right hand as more writing was required for school and was expected to be completed more quickly. Though, when I hurt my right wrist in high school and had to wear a brace for about 2 weeks, I just switched back to using my left hand. It was somewhat slower at first, but after a day or so, was about the same as my right.
I still do a lot of other things with my left, and frequently switch back and forth. I still paint with both hands and switch between hands based on whichever hand has the most convenient angle. In dance, I was mostly left dominant, but in sports like baseball, I can throw, bat, and catch with both hands. Otherwise, I just tend to do things like I was taught, which generally includes their handedness.

*was — Starting (Kindergarten?)
& Kindergarten Teacher forced
her to write with*

## Page 5 – Language Evaluation – Intake Interview

*Right hand but while Low
& Soft — went back T. left?*

Are there other members in your family who are left-handed or use both hands for the same tasks.

__x__ Yes   _____ No   *ambidextrous*   *eventually
Left-dominant for*

If yes, please explain below

*my mom, and both of her sisters, but her sisters were both made to switch to their
right hands, like me. The oldest stutters, the middle is ambidextrous, my mom
is mostly Left – dominant (drawing?)*

Are there any members in your family (mother, father, siblings, other close relatives) who experienced difficulty in learning to read and spell?

__x__ Yes   _____ No   If yes, please indicate who: *yes, maternal aunt; mom, slow reading
and spelling problems; dad spelling problems; paternal cousin, dyslexic (official diagnosis)*

Did your mother have any problems in carrying and delivering you?

_____ Yes   __x__ No   _____ Don't know

Did you have any problems with ear infections or hearing when growing up?

__✓__ Yes   _____ No   _____ Don't remember

If yes, please explain: *some, not extensive* _____

_____

Did you have any problems with learning to speak and/or clearly pronounce words when growing up?

_____ Yes   __x__ No   _____ Don't remember

If yes, please explain: _____

_____

Have you ever been hospitalized for any reason?

__x__ Yes   _____ No

If yes, please explain: June 2010, was admitted for less than a day after being in the ED for about 16 hrs for viral
meningitis. January 2016, was admitted for TPA administration for treatment of DVT in left leg.

Have you ever experienced any kind of neurological seizures (e.g., from epilepsy) or an accident which may have injured the brain?

_____ Yes   __x__ No

If yes, please explain: _____

_____

Smith-0036

Page 6 – Language Evaluation – Intake Interview

Have you ever had any serious emotional or personality problems?

_____Yes    _x_ No

Have you ever had psychological counseling?                    _x_ Yes        _____No

Has it ever been suggested that you were hyperactive?    _x_ Yes        _____No

If yes, please explain:_____

_____

Do you wear glasses or contacts?

_____Yes    _x_ No

If yes, please explain for what purpose_____

_____

When was your last eye examination?            (Year) _____

Would you describe your hearing as good?      _x_ Yes    _____No

When was your last hearing examination?       (Year) _2015_____

Do you suffer from allergies?                          _x_ Yes    _____No

Do you suffer from chronic bronchitis or asthma?     _____Yes    _x_ No

Have you ever had experience with substance abuse? _____Yes    _x_ No

Do you take any medication on a regular basis? _x_ Yes    _____No

If yes, please explain: _Vyvanse and sometimes Adderall IR in the evening as needed for ADHD; Buspar for anxiety;_
_metoprolol for migraine prophylaxis; spironolactone for acne; aspirin 81 mg for DVT prophylaxis; zyrtec; multivitamin_

Will you take any medication the day of the evaluation?    _x_ Yes    _____No

If yes, please explain: _In the AM: spironolactone, buspar, multivitamin; at bedtime after testing: metoprolol, buspar_
_spironolactone, aspirin, zyrtec_

How would you presently describe your over-all health?
_good; mental health, fair. (as result of school problems now)_

_____

_____

## SOCIAL/FAMILY HISTORY:

Do you consider yourself a social and outgoing person?    _x_ Yes    _____No

Smith-0037

Page 7 – Language Evaluation – Intake Interview

Do you get along well with most everyone?    _x_ Yes    _____ No

If no, please explain: _____

_____

Do you feel good about yourself and what you have accomplished?

_x_ Yes    _____ No

If no, please explain: _____

_____

## INTERESTS, ABILITIES, POTENTIAL:

What hobbies and/or recreational activities do you have?

Sports, camping, hiking, art, hanging out with friends + family, hunting, archery
↳ all sports, mostly soccer, running, swimming, volleyball, football, dance, yoga,
weight lifting/working out, going for walks

Do you like to read                _____ Yes    _x_ No

Do you read often                 _____ Yes    _x_ No

When you do read, what do you read?

I pretty much avoid reading if at all possible. I read test questions, and texts, but if those are too long, sometimes I won't

even read those.

## SOURCE OF KNOWLEDGE OF DYSLEXIA:

Do you feel you know something about dyslexia?    ___✓___ Yes    _____ No

If yes, where did you get your information?

med school, my docters/evaluaturs since 2009

_____

_____

5/02 Tests/inadult

Smith-0038

*Jessie 7/26/18*

# Adult ADHD-RS-IV* with Adult Prompts†

The ADHD-RS-IV with Adult Prompts is an 18-item scale based on the *DSM-IV-TR®* criteria for ADHD that provides a rating of the severity of symptoms. The adult prompts serve as a guide to explore more fully the extent and severity of ADHD symptoms and create a framework to ascertain impairment. The first 9 items assess inattentive symptoms and the last 9 items assess hyperactive-impulsive symptoms. Scoring is based on a 4-point Likert-type severity scale: 0 = none, 1 = mild, 2 = moderate, 3 = severe. Clinicians should score the highest score that is generated for the prompts for each item.

Example: If one prompt generates a "2" and all others are a "1," by convention, the rating for that item is still a "2"

Significant symptoms in clinical trials are generally considered at least a "2" – moderate.

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| | 0 | 1 | 2 | 3 |

**1. Carelessness**
Do you make a lot of mistakes (in school or work)? 3
Is this because you're careless? 3
Do you rush through work or activities? 1
Do you have trouble with detailed work? 2
Do you not check your work? 3
Do people complain that you're careless? 3
Are you messy or sloppy? 3
Is your desk or workspace so messy that you have difficulty finding things? 3

**2. Difficulty sustaining attention in activities** — 0 1 2 (3)
Do you have trouble paying attention when watching movies, reading, or attending lectures? 3
Or on fun activities such as sports or board games? 1
Is it hard for you to keep your mind on school or work? Do you have unusual trouble staying focused on boring or repetitive tasks? 3
Does it take a lot longer than it should to complete tasks because you can't keep your mind on the task? 3
Is it even harder for you than some others you know? 2
Do you have trouble remembering what you read and do you need to re-read the same passage several times? 2

**3. Doesn't listen** — 0 1 2 (3)
Do people (spouse, boss, colleagues, friends) complain that you don't seem to listen or respond (or daydream) when spoken to or when asked to do tasks? A lot? 3
Do people have to repeat directions? 3
Do you find that you miss the key parts of conversations because of drifting off in your own thoughts? Does it cause problems? 2

**4. No follow through** — 0 1 2 (3)
Do you have trouble finishing things (such as work or chores)? 3
Do you often leave things half done and start another project? 3
Do you need consequences (such as deadlines) to finish? 2
Do you have trouble following instructions (especially complex, multistep instructions that have to be done in a certain order with different steps)? 2
Do you need to write down instructions, otherwise you will forget them? 2

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| | 0 | 1 | 2 | 3 |

**5. Can't organize** — 0 1 2 (3)
Do you have trouble organizing tasks into ordered steps?
Is it hard prioritizing work and chores? 1
Do you need others to plan for you? 3
Do you have trouble with time management? Does it cause problems? 3
Does difficulty in planning lead to procrastination and putting off tasks until the last moment possible? 3

**6. Avoids/dislikes tasks requiring sustained mental effort** — 0 1 2 (3)
Do you avoid tasks (work, chores, reading, board games) that are challenging or lengthy because it's hard to stay focused on these things for a long time? 3
Do you have to force yourself to do these tasks? 2
How hard is it? 3
Do you procrastinate and put off tasks until the last moment possible? 3

**7. Loses important items** — 0 1 2 (3)
Do you lose things (eg, important work papers, keys, wallet, coats, etc)? A lot? More than others? 3
Are you constantly looking for important items? 3
Do you get into trouble for this (at work or at home)? 3
Do you need to put items (eg, glasses, wallet, keys) in the same place each time, otherwise you will lose them? 2

**8. Easily distractible** — 0 1 2 (3)
Are you ever very easily distracted by events around you such as noise (conversation, TV, radio), movement, or clutter? 3
Do you need relative isolation to get work done? 3
Can almost anything get your mind off of what you are doing, such as work, chores, or if you're talking to someone? 3
Is it hard to get back to a task once you stop? 3

**9. Forgetful in daily activities** — 0 1 2 (3)
Do you forget a lot of things in your daily routine? Like what? Chores? Work? Appointments or obligations? 3
Do you forget to bring things to work, such as work materials or assignments due that day? 3
Do you need to write regular reminders to yourself to do most activities or tasks, otherwise you will forget? 3

DEFENDANT'S
EXHIBIT
**46**

RAMSAY18-0060

Case: 20-1058    Document: 25    Page: 54    Date Filed: 03/23/2020

# Adult ADHD-RS-IV* with Adult Prompts†

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| **10. Squirms and fidgets** | 0 | 1 | 2 | ③ |
| Can you sit still or are you always moving your hands or feet, or fidgeting in your chair? 2 | | | | |
| Do you tap your pencil or your feet? A lot? | | | | |
| Do people notice? 1 | | | | |
| Do you regularly play with your hair or clothing? 3 | | | | |
| Do you consciously resist fidgeting or squirming? 3 | | | | |
| **11. Can't stay seated** | 0 | 1 | 2 | ③ |
| Do you have trouble staying in your seat? At work? 2 | | | | |
| In class? At home (eg, watching TV, eating dinner)? 2 | | | | |
| In church or temple? | | | | |
| Do you choose to walk around rather than sit? 3 | | | | |
| Do you have to force yourself to remain seated? 3 | | | | |
| Is it difficult for you to sit through a long meeting or lecture? 3 | | | | |
| Do you try to avoid going to functions that require you to sit still for long periods of time? 3 | | | | |
| **12. Runs/climbs excessively** | 0 | 1 | 2 | ③ |
| Are you physically restless? 3 | | | | |
| Do you feel restless inside? A lot? 3 | | | | |
| Do you feel more agitated when you cannot exercise on an almost daily basis? 2 | | | | |
| **13. Can't play/work quietly** | 0 | ① | 2 | 3 |
| Do you have a hard time playing/working quietly? 1 | | | | |
| During leisure activity (nonstructured times or on your own such as reading a book, listening to music, playing a board game), are you agitated or dysphoric? 0 | | | | |
| Do you always need to be busy after work or while on vacation? 1 | | | | |
| **14. On the go, "driven by a motor"** | 0 | 1 | 2 | ③ |
| Is it hard for you to slow down? 1 | | | | |
| Do you feel like you (often) have a lot of energy and that you always have to be moving, are always "on the go"? 2 | | | | |
| Do you feel like you're driven by a motor? 0 | | | | |
| Do you feel unable to relax? 3 | | | | |

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| **15. Talks excessively** | 0 | 1 | 2 | ③ |
| Do you talk a lot? All the time? More than other people? 3 | | | | |
| Do people complain about your talking? Is it a problem? 2 | | | | |
| Are you often louder than the people you are talking to? 1 | | | | |
| **16. Blurts out answers** | 0 | 1 | 2 | ③ |
| Do you give answers to questions before someone finishes asking? 3 | | | | |
| Do you say things before it is your turn? 3 | | | | |
| Do you say things that don't fit into the conversation? 0 | | | | |
| Do you do things without thinking? A lot? 1 | | | | |
| **17. Can't wait for turn** | 0 | 1 | 2 | ③ |
| Is it hard for you to wait your turn (in conversation, in lines, while driving)? 2 | | | | |
| Are you frequently frustrated with delays? Does it cause problems? 1 | | | | |
| Do you put a great deal of effort into planning to not be in situations where you might have to wait? 2 | | | | |
| **18. Intrudes/interrupts others** | 0 | 1 | 2 | ③ |
| Do you talk when others are talking, without waiting until you are acknowledged? 3 | | | | |
| Do you butt into others' conversations before being invited? 1 | | | | |
| Do you interrupt others' activities? 3 | | | | |
| Is it hard for you to wait to get your point across in conversations or at meetings? 3 | | | | |

*From ADHD Rating Scale-IV: Checklists, Norms and Clinical Interpretation. Reprinted with permission of The Guilford Press: New York. © 1998 George J. DuPaul, Thomas J. Power, Arthur A. Anastopoulos and Robert Reid. This scale may not be reproduced in any form without written permission of The Guilford Press. www.guilford.com

†Prompts developed by Lenard Adler, MD, Thomas Spencer, MD, and Joseph Biederman, MD.

©2003 New York University and Massachusetts General Hospital. All rights reserved. DO NOT REPRODUCE WITHOUT WRITTEN PERMISSION OF MASSACHUSETTS GENERAL HOSPITAL OR NEW YORK UNIVERSITY.
THERE ARE NO WARRANTIES REGARDING THIS ATTENTION DEFICIT HYPERACTIVITY DISORDER RATING SCALE IV AND ADULT PROMPTS ("SCALE"), EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE; AND ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE HEREBY DISCLAIMED. New York University and the Massachusetts General Hospital shall neither exercise control over nor interfere with the physician-patient relationship of users of this Scale and shall not be responsible for any use made of this Scale, including any medical decisions regarding the care and treatment of patients using the Scale.

S14785    07/16

RAMSAY18-0061

*For Session Summaries*

### *Adult ADHD-RS-IV\* with Adult Prompts†*

Neil *Hughes*    *9/26/18*

The ADHD-RS-IV with Adult Prompts is an 18-item scale based on the *DSM-IV-TR®* criteria for ADHD that provides a rating of the severity of symptoms. The adult prompts serve as a guide to explore more fully the extent and severity of ADHD symptoms and create a framework to ascertain impairment. The first 9 items assess inattentive symptoms and the last 9 items assess hyperactive-impulsive symptoms. Scoring is based on a 4-point Likert-type severity scale: 0 = none, 1 = mild, 2 = moderate, 3 = severe. Clinicians should score the highest score that is generated for the prompts for each item.

   Example: If one prompt generates a "2" and all others are a "1," by convention, the rating for that item is still a "2"
   Significant symptoms in clinical trials are generally considered at least a "2" = moderate.

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| | 0 | 1 | 2 | 3 |

**1. Carelessness**
   Do you make a lot of mistakes (in school or work)? 3
   Is this because you're careless? 0
   Do you rush through work or activities? 1
   Do you have trouble with detailed work? 2
   Do you not check your work? 1
   Do people complain that you're careless? 2
   Are you messy or sloppy? 3
   Is your desk or workspace so messy that you have difficulty finding things? 3
*(Severe circled — score 3)*

**2. Difficulty sustaining attention in activities**    0  1  2  (3)
   Do you have trouble paying attention when watching movies, reading, or attending lectures? 3
   Or on fun activities such as sports or board games? 1
   Is it hard for you to keep your mind on school or work? Do you have unusual trouble staying focused on boring or repetitive tasks? 3
   Does it take a lot longer than it should to complete tasks because you can't keep your mind on the task? 3
   Is it even harder for you than some others you know? 3
   Do you have trouble remembering what you read and do you need to re-read the same passage several times? 3

**3. Doesn't listen**    0  1  2  (3)
   Do people (spouse, boss, colleagues, friends) complain that you don't seem to listen or respond (or daydream) when spoken to or when asked to do tasks? A lot? 1
   Do people have to repeat directions? 2
   Do you find that you miss the key parts of conversations because of drifting off in your own thoughts? Does it cause problems? 3

**4. No follow through**    0  1  2  (3)
   Do you have trouble finishing things (such as work or chores)? 2
   Do you often leave things half done and start another project? 2
   Do you need consequences (such as deadlines) to finish? 3
   Do you have trouble following instructions (especially complex, multistep instructions that have to be done in a certain order with different steps)? 2
   Do you need to write down instructions, otherwise you will forget them? 2

**5. Can't organize**    0  1  (2)  3
   Do you have trouble organizing tasks into ordered steps? 2
   Is it hard prioritizing work and chores? 1
   Do you need others to plan for you? 2
   Do you have trouble with time management? Does it cause problems? 1
   Does difficulty in planning lead to procrastination and putting off tasks until the last moment possible? 1

**6. Avoids/dislikes tasks requiring sustained mental effort**    0  1  2  (3)
   Do you avoid tasks (work, chores, reading, board games) that are challenging or lengthy because it's hard to stay focused on these things for a long time? 3
   Do you have to force yourself to do these tasks? 3
   How hard is it? 2
   Do you procrastinate and put off tasks until the last moment possible? 2

**7. Loses important items**    0  1  (2)  3
   Do you lose things (eg, important work papers, keys, wallet, coats, etc)? A lot? More than others? 2
   Are you constantly looking for important items? 2
   Do you get into trouble for this (at work or at home)? 2
   Do you need to put items (eg, glasses, wallet, keys) in the same place each time, otherwise you will lose them? 2

**8. Easily distractible**    0  1  2  3
   Are you ever very easily distracted by events around you such as noise (conversation, TV, radio), movement, or clutter? 3
   Do you need relative isolation to get work done? 2
   Can almost anything get your mind off of what you are doing, such as work, chores, or if you're talking to someone? 3
   Is it hard to get back to a task once you stop? 3

**9. Forgetful in daily activities**    0  1  2  (3)
   Do you forget a lot of things in your daily routine? Like what? Chores? Work? Appointments or obligations? 3
   Do you forget to bring things to work, such as work materials or assignments due that day? 3
   Do you need to write regular reminders to yourself to do most activities or tasks, otherwise you will forget? 3

## *Adult ADHD-RS-IV\* with Adult Prompts†*

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| **10. Squirms and fidgets** | 0 | 1 | (2) | 3 |
| Can you sit still or are you always moving your hands or feet, or fidgeting in your chair? 1 | | | | |
| Do you tap your pencil or your feet? A lot? 0 | | | | |
| Do people notice? | | | | |
| Do you regularly play with your hair or clothing? 2 | | | | |
| Do you consciously resist fidgeting or squirming? 3 | | | | |
| **11. Can't stay seated** | 0 | 1 | 2 | 3 |
| Do you have trouble staying in your seat? At work? 2 | | | | |
| In class? At home (eg, watching TV, eating dinner)? | | | | |
| In church or temple? | | | | |
| Do you choose to walk around rather than sit? 1 | | | | |
| Do you have to force yourself to remain seated? 2 | | | | |
| Is it difficult for you to sit through a long meeting or lecture? 2 | | | | |
| Do you try to avoid going to functions that require you to sit still for long periods of time? | | | | |
| **12. Runs/climbs excessively** | 0 | 1 | 2 | (3) |
| Are you physically restless? 2 | | | | |
| Do you feel restless inside? A lot? 3 | | | | |
| Do you feel more agitated when you cannot exercise on an almost daily basis? 1 | | | | |
| **13. Can't play/work quietly** | 0 | (1) | 2 | 3 |
| Do you have a hard time playing/working quietly? 1 | | | | |
| During leisure activity (nonstructured times or on your own such as reading a book, listening to music, playing a board game), are you agitated or dysphoric? | | | | |
| Do you always need to be busy after work or while on vacation? 1 | | | | |
| **14. On the go, "driven by a motor"** | 0 | 1 | (2) | 3 |
| Is it hard for you to slow down? 1 | | | | |
| Do you feel like you (often) have a lot of energy and that you always have to be moving, are always "on the go"? 1 | | | | |
| Do you feel like you're driven by a motor? 3 | | | | |
| Do you feel unable to relax? 2 | | | | |

| | None | Mild | Moderate | Severe |
|---|---|---|---|---|
| **15. Talks excessively** | 0 | 1 | 2 | (3) |
| Do you talk a lot? All the time? More than other people? 3 | | | | |
| Do people complain about your talking? Is it a problem? | | | | |
| Are you often louder than the people you are talking to? 0 | | | | |
| **16. Blurts out answers** | 0 | 1 | 2 | (3) |
| Do you give answers to questions before someone finishes asking? | | | | |
| Do you say things before it is your turn? 2 | | | | |
| Do you say things that don't fit into the conversation? 0 | | | | |
| Do you do things without thinking? A lot? 1 | | | | |
| **17. Can't wait for turn** | 0 | 1 | 2 | (3) |
| Is it hard for you to wait your turn (in conversation, in lines, while driving)? 3 | | | | |
| Are you frequently frustrated with delays? Does it cause problems? 2 | | | | |
| Do you put a great deal of effort into planning to not be in situations where you might have to wait? 0 | | | | |
| **18. Intrudes/interrupts others** | 0 | 1 | 2 | (3) |
| Do you talk when others are talking, without waiting until you are acknowledged? 3 | | | | |
| Do you butt into others' conversations before being invited? 2 | | | | |
| Do you interrupt others' activities? 2 | | | | |
| Is it hard for you to wait to get your point across in conversations or at meetings? 3 | | | | |

*From ADHD Rating Scale-IV: Checklists, Norms and Clinical Interpretation. Reprinted with permission of The Guilford Press: New York. © 1998 George J. DuPaul, Thomas J. Power, Arthur A. Anastopoulos and Robert Reid. This scale may not be reproduced in any form without written permission of The Guilford Press. www.guilford.com

†Prompts developed by Lenard Adler, MD, Thomas Spencer, MD, and Joseph Biederman, MD.

©2003 New York University and Massachusetts General Hospital. All rights reserved. DO NOT REPRODUCE WITHOUT WRITTEN PERMISSION OF MASSACHUSETTS GENERAL HOSPITAL OR NEW YORK UNIVERSITY.

THERE ARE NO WARRANTIES REGARDING THIS *ATTENTION DEFICIT HYPERACTIVITY DISORDER RATING SCALE IV AND ADULT PROMPTS* ("SCALE"), EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND ARE HEREBY DISCLAIMED. New York University and the Massachusetts General Hospital shall neither exercise control over nor interfere with the physician-patient relationship of users of this Scale and shall not be responsible for any use made of this Scale, including any medical decisions regarding the care and treatment of patients using the Scale.

S14785    07/16

RAMSAY18-0063

Appx1414

**Re: Yet another question for you**

Jessica Ramsay
Mon 11/5/2018 8:58 PM
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>

From what I have seen so far, I think most of this is covered, so you probably won't have to add much, but feel free to add anything you think will help support my case. I will try really hard to get through this draft tonight, but I don't think I will be able to read all of it. I will send you any notes/corrections asap.

Thank you soooo much!

Jessie

---

**From:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Monday, November 5, 2018 5:47:31 PM
**To:** Jessica Ramsay
**Subject:** Re: Yet another question for you

Although the draft I sent you is essentially the finished report, I can include this in the report.

*Robert Smith,PhD*
*Licensed Psychologist*
*Neuropsychologist*
*Phone:  517-349-5987*
*www.neuro-psychologyservices.com*

DEFENDANT'S
EXHIBIT
**48**

On Monday, November 5, 2018 5:40 PM, Jessica Ramsay <Jessica.Ramsay@med.wmich.edu> wrote:

Hi Dr. Smith,

Sorry I wasn't able to send this earlier, I was shadowing all day. I know you have already sent a draft, but I wanted to send this to you anyway in case you wanted to include any of the information. Thank you so much for working so hard to get a draft to me in a timely manner. I really, really appreciate it.

The comments you included in the last email are correct and relevant. I have copied them below, made some suggested edits (in red), and included some additional examples that you may include as you see fit.

> "Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them."

> "He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and

RAMSAY19-0045

has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything.""

So would it be accurate for me to state this generalization? "As a child, Ms. Ramsay's interrupting others, impatience, losing track of her thoughts in conversation and interrupting annoyed, unintentionally offended friends and family, and at times strained relationships. At home, she would frequently get in trouble for "not listening" and forgetting to complete tasks or parts of tasks, which mother mistook for intentional disregard of requests and instructions."  "Currently, her home surroundings are very cluttered, she regularly loses important items, is forgetful in daily and routine tasks, and is frequently distracted from tasks and leaves them uncompleted. Ms. Ramsay tries to leave numerous written reminder notes around the house and asks her fiance for multiple verbal reminders to avoid forgetting things such as appointments, deadlines, completing housework, or paying bills, however, she continues to struggle with forgetting these things. Conversations with friends, family, and her fiance are sometimes frustrating because she interrupts a lot, has difficulty finding the right words to express her thoughts, frequently loses track of the direction of conversations resulting in unrelated tangents, and frequently forgets what she is saying mid-sentence."


Other examples you may wish to include:

- Jessica commonly gets distracted by surroundings and her own unrelated thoughts during conversation or while receiving instruction, and has to ask people to repeat themselves, sometimes multiple times. This causes Jessica to miss details, misinterpret information, and makes it difficult to accurately follow directions or correctly pass on information.
- Jessica especially forgetful with names, and usually forget people's names within a few seconds of being introduced, even when making direct effort and using little tricks to try to remember the names.
- Her ADHD causes Jessica to get distracted and miss important exits/turns and to forget where she is supposed to be going, , even when driving familiar routes, sometimes causing her to miss or be late to commitments. Similarly, Jessica frequently forgets important stops/errands she is supposed to be making, such as dropping off/picking up prescriptions, getting gas, dropping off the rent check, etc, even after multiple reminders.
- When trying to follow cooking/baking recipes, Jessica frequently misreads amounts and instructions, and/or misses/forgets steps or ingredients, or gets distracted after timer goes off and forgets to take food out of the oven.
- Jessica gets distracted when doing laundry and will forget to move clothes from the washer to the dryer, sometimes for several days.
- Jessica avoids doing tasks that require extended attention or long periods of sitting, such as reading or watching shows/movies. As a result, she often misses important messages from friends and family or disrupts others by constantly getting up to do other things or talking during shows/activities.
- **Compared to most people, Jessica's inattention, easy distractibility, and inability to get refocused causes her to be very inefficient in most daily tasks, requiring significantly more**  RAMSAY19-0046

**time, effort, and assistance from others for even the the most simple tasks. Without adequate time and support, Jessica is unable to keep up with usual demands of adult life**.

These are just some that came to mind off the bat. I will take a look at the draft you sent and let you know if I think of any other good examples.

Jessie

---

**From:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Monday, November 5, 2018 5:44 AM
**To:** Jessica Ramsay
**Subject:** Re: Yet another question for you

Hello Ms. Ramsay

The only reference to the kind of circumstances I am inquiring about are these:

"Socially, Jessica was energetic, with a lot of friends, but her forgetfulness made it difficult to follow through on commitments. She was distractible in conversation, commonly losing track of her thoughts and the topic of conversation. Jessica also struggled with waiting her turn, blurting out thoughts and interrupting others, and sometimes unintentionally offending them."

"He is able to "tell when her meds wear off or when she doesn't take them because she'll change the radio station a million times before we even finish a song, or she talks a lot and interrupts me when I'm talking or concentrating on something." He reports that Jessica has a hard time organizing herself, is cluttered, and that she frequently "loses or forgets things and has to leave written reminders on her mirror and Post-Its around the house" in an effort not to forget these things. She "sometimes needs help finding the words for what she wants to say, especially when she is tired." He notes that, because reading is difficult for her, she avoids it when possible. When Jessica reads aloud, it is difficult to follow her because she "stumbles on words and loses her place." He shares that when they watch movies or shows with subtitles, he has to read them to her "because she can't read fast enough to get everything.""

So would it be accurate for me to state this generalization? "As a child, Ms. Ramsay's interrupting others, impatience, losing track of her thoughts in conversation and interrupting friends annoyed, unintentionally offended friends and at times strained relationships" "Currently, her home surroundings are very cluttered, she frequently loses things around the house, is forgetful and has to leave numerous written reminder notes around the house to avoid forgetting things such as appointments. Conversations with friends and her fiance are sometimes frustrating because she interrupts a lot."

*Robert Smith, PhD*
*Licensed Psychologist*
*Neuropsychologist*
*Phone: 517-349-5987*
*www.neuro-psychologyservices.com*

RAMSAY19-0047

**Your report**

Robert Smith <robertdsmithphd@sbcglobal.net>
Mon 11/5/2018 3:15 PM
**To:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>; Lawrence D. Berger <larry@rcglawoffices.com>
Hello Ms. Ramsay and Mr. Berger

I have sent you a draft of the report attached to an encrypted email system called Zixmail. You will have to create a password and you will have access to the Zixmail for 10 days. Let me know of any factual errors or questions you have. If you have no corrections or revisions that need to be made let me know that too because I will need a few days to finalize the finished report and send it out to you.

*Robert Smith,PhD*
*Licensed Psychologist*
*Neuropsychologist*
*Phone: 517-349-5987*
*www.neuro-psychologyservices.com*

DEFENDANT'S
EXHIBIT
**49**

RAMSAY19-0044

**Appx1418**

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Tuesday, November 13, 2018, 9:13:49 AM EST
**Subject:** Re: Report

Hi Dr. Smith,

I apologize for the late response, Neil and I have been driving most of the last several days to get to some of his interviews. I haven't had a chance to type up the feedback because I get really car sick if I try to focus on anything. I will try to type up the feedback today or tomorrow, and send it to you asap. Once I've sent it to you, just let me know when it would work best for you to talk. Wednesday and Friday are both open and flexible for me, so anytime should work.

Thank you for understanding,

Jessie

---

**From:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Friday, November 9, 2018 1:14:44 PM
**To:** Jessica Ramsay
**Subject:** Re: Report

Hello Ms. Ramsay

I can find times on Wednesday or Friday.  But I would like to have yours [Redacted] feedback first to review.  As soon as I get that we can set up a time to talk.

*Robert Smith, PhD*
*Licensed Psychologist*
*Neuropsychologist*
*Phone: 517-349-5987*
*www.neuro-psychologyservices.com*

DEFENDANT'S
EXHIBIT
**50**

Smith-0351

42

**Appx1419**

On Friday, November 9, 2018 12:00 PM, Jessica Ramsay <Jessica.Ramsay@med.wmich.edu> wrote:

Hi Dr. Smith,

I meant to email you Wednesday, but things have been extremely hectic the last few days. I have been able to review your report and it is very good overall, but I do have some factual corrections and a few questions/need for clarification. Redacted

Redacted

If possible, I would like to talk with you over the phone about some of the questions I had because that will make it easier to go over everything and make sure that we understand each other.

Are you available to talk anytime next week?

Thank you so much for putting the time and effort into writing such a thorough report with specific explanations for everything. It was also helpful for me and my family to understand more about what I am/have been dealing with.

Have a great day!

Jessie

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0352

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Thursday, November 15, 2018, 2:28:45 PM EST
**Subject:** Re: feedback

Thank you, will do!

Jessie

**From:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Thursday, November 15, 2018 4:42:54 AM
**To:** Jessica Ramsay
**Subject:** Re: feedback

No problem. Get it to me when you can.

*Robert Smith, PhD*
*Licensed Psychologist*
*Neuropsychologist*
*Phone: 517-349-5987*
*www.neuro-psychologyservices.com*

On Wednesday, November 14, 2018 11:59 PM, Jessica Ramsay <Jessica.Ramsay@med.wmich.edu> wrote:

Hi Dr. Smith,

I am really sorry. I will not get a chance to type up the feedback until sometime on Thursday. I am trying to finish a research paper that is due tomorrow and I haven't had much time to work on anything between periods of driving.

I realize this means we may not be able to talk this week, but I will still try to get it to you asap.

Smith-0353

Thank you for understanding,

Jessie

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0354

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Tuesday, November 20, 2018, 5:39:16 PM EST
**Subject:** Suggested edits

Hi Dr. Smith,

I have attached a PDF with most of the compiled suggested edits ⸻ Redacted ⸻ written in red. Most of the edits were corrections to the "History" section, and some of them were rewording of sections, which were too difficult to write directly on the report, so I have typed them out below. They are numbered so that they will match the referenced numbers written on the report. I have also attached my dean's letter that will be sent by the school to any residency programs I apply to once I pass my step exams - it has descriptions of my performance on the Shelf exams that are also standardized tests from the NBME, which might be helpful.

- (#1 from bottom of pg 5): With these formal accommodations, Ms. Ramsay was better able to compensate for her inattention, distractibility, hyperactivity, and difficulties in reading and writing. However, there were still many tests that required a lot of reading- and/or writing-that Ms. Ramsay was unable to complete because there was still not adequate time for her to read all of the questions and/or write sufficient responses, though she understood the material being tested. In these instances, Ms. Ramsay reached out to her professors about this continued struggle and, many times, her professors provided additional informal accommodations, such as altered grading schemes or more time to complete unattempted portions, to allow Ms. Ramsay to achieve a grade that better represented her competency.
- (#2 from bottom of pg 5 through top of pg 6): though advised Ms. Ramsay not to apply or take the MCAT with accommodations unless she was unable to achieve an acceptable score after multiple attempts because her score report would show that she had received accommodations and would hurt her chances of getting offered interviews. Ms. Ramsay then made an appointment with her advisor at the OSU Office of Disability Services (ODS) to verify the possibility of receiving accommodations and the affect it would have on her application. Ms. Ramsay's ODS advisor cautioned against taking the MCAT with accommodations for the same reason and also explained that while Ms. Ramsay had

Smith-0355

adequate documentation from her initial diagnosis by Dr. Smiy to qualify for accommodations through OSU, the AAMC would likely require a full neuropsychology evaluation which would be expensive and was unlikely to be completed in time to apply for accommodations before her scheduled MCAT exam. Because Ms. Ramsay receive this same advice against receiving appropriate accommodation from multiple informed sources, she decided to try the MCAT without accommodations. When she took the exam, she relied on strategies suggested by her Princeton Review instructors in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested Ms. Ramsay not read the passages until she had gone through and answered all questions she could without reading the passage, and then with any remaining time, go back and try to answer the passage-dependent questions starting with the shortest passages, and then use the last minute to randomly fill in answers to any questions she wasn't able to get to. Using this strategy, Ms. Ramsay was able to obtain a good score in the 79th percentile (30M) of students who take the exam, but not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. [***Keep last sentence of this paragraph***]

- (#3 from middle of paragraph 2 on pg 6): Given her performance on other standardized tests, such as the NBME Shelf exams, if Ms. Ramsay had been able to take the MCAT with appropriate accommodations, she likely would have achieved a much higher score that more accurately represented her intelligence, understanding of the material, and ability to apply the information. **[I have attached my Dean's letter which discusses my performance on these exams.]**

Some of the Please let me know if you have any questions. I would like to talk on the phone before anything is finalized if possible.

Thank you,

Jessie

---

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0356

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Wednesday, November 28, 2018, 11:11:11 AM EST
**Subject:** Re: phone call to discuss your suggestions

Hi Dr. Smith,

Thanks for getting back to me.                    Redacted

                                    Redacted

I am able to talk anytime before 4 pm today and anytime tomorrow. If necessary, I could probably do Friday afternoon, but I am getting a filling fixed in the morning, so it would depend on how long my face is numb or how much pain I'm in afterwards.

                                    Redacted

Would any of these times work for you?

Jessie

**From:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Wednesday, November 28, 2018 10:02:02 AM
**To:** Jessica Ramsay
**Subject:** phone call to discuss your suggestions

I am available most of the next few days to discuss your suggestions.  When would you like to talk?

*Robert Smith, PhD*
*Licensed Psychologist*

Smith-0357

48

**Appx1425**

*Neuropsychologist*
*Phone:  517-349-5987*
*www.neuro-psychologyservices.com*

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0358

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Wednesday, November 28, 2018, 3:58:37 PM EST
**Subject:**

Hi Dr. Smith,

Thank you again for taking the time to answer my questions and to work with me on the draft. I really appreciate the work and attention to detail that you put into this. I understand this has been a lot of work for you and will definitely pay you for any additional time if needed.

The following includes suggested edits and comments to address my slow writing speed specifically to support my future request for additional time for the note-writing portion of Step 2. Suggested edits to quotes from your draft are in red and my comments within the quotes are blue.
Under your "Recommendations" section:

- #1 mentions "reading and writing" in the first sentence, but the rest of the paragraph goes on to discuss only how reading affects my performance, without discussing writing. I would add "Likewise, Ms. Ramsay's marked weakness in writing can be expected to significantly and substantially interfere with educational and assessment efforts without accommodations such as extended time." just before your 4th-to-last sentence, which reads, "Consequently, it is recommended that she receive at least double the usual [or standard] time allowed for all tests and exams." I used basically the same wording that you used for reading so that it will be consistent between the two.
- The 3rd sentence of #1 has "significant" and "significantly" back-to-back. I would change to "Ms. Ramsay's level of reading impairment is severe and can be expected to significantly..."
- Also in #1, you begin 3 the last 6 sentences of this paragraph with "Consequently, ..." I would change the last sentence to "Therefore, it is recommended that at a minimum she be allowed extended time (double the standard time) for any classroom tests, standardized tests and classroom assignments.

I have a few more comments for #2, but I am busy for the next 2 hours and won't be able to get them to you until after 6:30, so I wanted to get these to you first. Sorry that I am so slow at getting them typed up. I will send you the rest later. Smith-0359

Jessie

---

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0360

Appx1428

**From:** Jessica Ramsay <Jessica.Ramsay@med.wmich.edu>
**To:** Robert Smith <robertdsmithphd@sbcglobal.net>
**Sent:** Wednesday, November 28, 2018, 7:39:40 PM EST
**Subject:** the rest

Hi Dr. Smith,

Here are the remaining comments for the "Recommendations" that I had:

- The first sentence of #2 is a little redundant after you everything in #1. It could probably be reworded/expanded to "A minimum of 100% additional testing time (double time) is also recommended for Ms. Ramsay's inattention, distractibility, and slow information processing speed. This should be used in conjunction with a private, quiet room and additional break time so that Ms. Ramsay can optimally manage her symptoms of ADHD and her medical disorders." Then keep everything after the first sentence.
- In # 3, keep the stuff we already added about needing extra time to use assistive technology for writing while we were on the phone.

Aside from the comments about writing, I forgot to bring up 1 additional comment about your recommendations in general:

- At the end of #1, you say "**at a minimum** she be allowed extended time (double the standard time)," which strongly supports my accommodations requests, but you don't use it elsewhere. I think it is important to consistently include some form of "a minimum of/at a minimum/at least" throughout your recommendations so that the NBME doesn't have an opportunity to selectively use one of your statements that doesn't say "at least" to base their approved accommodations off of. They will likely still try their hardest not to give me extended time, much less double time, but at least our bases will be covered.
- I tried to included these phrases in my edits above but I wanted to explain why.

That's all I have. Sorry for the long explanations.

Smith-0361

Have a great night,

Jessie

---

This electronic message is intended for the named recipient(s) only, and may contain information that is confidential or privileged. If you are not the named recipient, you are hereby notified that any disclosure, copying, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient, please notify us immediately by contacting the sender at the electronic mail address noted above, and delete and destroy all copies of this message. Thank you.

Smith-0362




A nonprofit organization serving children and adults with dyslexia

## NEUROPSYCHOLOGICAL EVALUATION

For Learning Problems

NAME:                    Jessica E. Ramsay
AGE:                     28 years, 0 months
SEX:                     Female
DATE OF BIRTH:           8/29/1990
EXAMINATION DATE:        9/25/2018
REPORT DATE:             11/6/2018
EXAMINER:                Robert D. Smith, PhD
LICENSE:                 6301003249

**Sources of Information:**

Interview with Ms. Ramsay and her mother, Jerri Shold
TEST OF MEMORY MALINGERING (TOMM)
ADULT ADHD-Rating Scale-IV with Adult Prompts
NELSON-DENNY READING TEST
WECHSLER INDIVIDUAL ACHIEVEMENT TEST-THIRD EDITION (WIAT-III)
WOODCOCK-JOHNSON IV TESTS OF ACHIEVEMENT (WJ-4) (Selected subtests)
GRAY ORAL READING TESTS-FIFTH EDITION (GORT-5)
SYMPTOM CHECKLIST-90-REVISED (SCL-90-R)
INTEGRATED VISUAL & AUDITORY CONTINUOUS PERFORMANCE TEST (IVA+PLUS)

**Records Reviewed**

The following records were made available at the time of this examination:
Alan Lewandowski, PhD, FACPN Neurocognitive Consultation (10/25/2017)
Alan Lewandowski, PhD, FACPN Neurocognitive Examination (12/7/2017)
Alan Lewandowski, PhD, FACPN Graphs and Raw Data for Neurocognitive Examination (12/7/2017)
Bruce Ruekberg, MD, letter supporting accommodations application (6/4/2018)
Genesis Family Health Center summary of medical history and status (5/17/2010)
The Ohio State University ADD/ADHD Verification Form (8/13/2010)
Decision letters of Essential Abilities Committee Request for Reasonable Accommodations (2014-2017)
USMLE Certification of Prior Test Accommodations (6/1/2018)
Alan Lewandowski, PhD, FACPN ADDENDUM response for additional information requested by USMLE and NBME (9/2/2016)

*Visit us at www.dyslexia.net*

| Flint Rotary Center | Detroit Metro Center | State Headquarters & Abrams Teaching Laboratory | Northern Michigan Center | St. Clair Center |
|---|---|---|---|---|
| G4225 Miller Road, B-10 | 3384 W. 12 Mile Road. | 532 E. Shiawassee Street | 681 E. Lake Street | 1013 S. Seventh Street |
| Flint, MI 48507-1257 | Berkley, MI 48072-1344 | Lansing, MI 48912-1214 | Harbor Springs, MI 49740-1219 | St. Clair, MI 48079-5043 |
| (810) 732-5850 | (248) 658-0777 | (517) 485-4000 | (231) 526-9282 | (810) 329-7800 |
| Fax (810) 732-1180 | Fax (248) 658-0779 | Fax (517) 485-4076 | Fax (231) 526-8677 | Fax (810) 329-2927 |

**Ramsay v. NBME - Exhibit C**

David Overton, MD, letter supporting request for accommodations (4/12/2018)
Personal Statement regarding need for accommodations (6/6/2018)
NBME letter from Catherine Farmer, PsyD, regarding offered accommodations (9/11/2018)
MCAT Score Report for exams taken (11/4/2011)
Charles Livingston, MA, WAIS-IV score report (9/12/2014), report (9/22/2014), Addendum (9/12/2014)
ACT Score Report (3/2007 & 10/2007)
USMLE Step 1 Score Report (7/017)
Review of report cards for grades K, 2, 3, 4, 5, 6
Review of high school transcript
Review of undergraduate college transcript
Review of letters from Dr. Mary Alice Tanguay, Therapeutic Optometrist (1/27/2000 & 12/1997)

**Reason for Referral**

Ms. Ramsay is currently on academic leave from her fourth year of medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1, which is a requirement for continuing and completing her medical degree. She has formally been granted accommodations, such as extended time for tests and testing in a private room, during her undergraduate years at Ohio State University and at the Western Michigan University Homer Stryker, MD School of Medicine.  Ms. Ramsay applied for the same accommodations from the National Board of Medical Examiners (NBME), which administers the USMLE, but was denied accommodations.  She attempted the USMLE Step 1 without accommodations, but failed.  She is appealing the NBME denial and sought this evaluation as part of her appeal.

**History and Interview Information**

Ms. Ramsay is currently living with her fiancé with whom she has lived for the past two years. She described her health as fair.  She has several health conditions which are being appropriately medically managed. She had a deep vein thrombosis (DVT) the full length of her leg in 2016 and was later diagnosed with a clotting disorder. The DVT damaged the circulation in her legs, and sitting or standing for long periods causes painful swelling in her legs.  Her vision is normal and was screened in August 2014. No hearing problems were reported and her hearing was evaluated in 2015. Ms. Ramsay was born in Texas.  Her family moved to Michigan when she was 10 years of age.  Her father is 57 years old, employed in sales, with a bachelor's degree. Her mother is 68 years old and is a retired art educator with a bachelor's degree in art education and a master's degree in education. She has two adopted brothers, ages 24 and 20. There is no history of substance abuse or severe psychological problems. Ms. Ramsay has had frequent headaches since she was very young, which her mother described as occurring during and after school as early as kindergarten.  Beginning in third grade, she started having daily migraine headaches with blind spots, nausea, and hypersensitivity to light, sound and temperature, which was attributable to the mental strain from reading and writing for extended periods of time.  Subsequent treatment over that next year reduced the frequency of migraines, but she has continued to experience migraine symptoms throughout her academic career.

**Ramsay v. NBME - Exhibit C**

Ms. Ramsay's mother had no problems or complications during pregnancy and Ms. Ramsay had no birth complications when born. There were no problems during her infancy/toddler period. Ms. Ramsay is ambidextrous, but was originally left handed. Her kindergarten teacher made her use her right hand, which was common practice at that time. When home she would use her left hand, but gradually switched to primarily using her right hand for writing tasks. She does many activities with her left hand and frequently switches back and forth.

For leisure activities Ms. Ramsay socializes with friends and family, plays sports and works out. She enjoys camping, hiking, art, hunting, archery, soccer, running, volleyball, watching football, dance, yoga, and weight training.

Ms. Ramsay reported that she tries very hard to succeed at schoolwork. She generally likes herself, though she indicated she is anxious and worried about her future because of having to suspend medical school. She has difficulty falling asleep, but sleeps six to eight hours a night. Her appetite is normal. She has several close friends she can confide in. She is often restless or fidgety and restless. She typically avoids anything that involves waiting. She often makes careless mistakes. Ms. Ramsay often has difficulty getting organized and finishing what she starts. She often has difficulty concentrating on one thing for very long. She is often easily distracted; she tends to forget what she is supposed to do and often loses her personal belongings.

Ms. Ramsay stated that she has marked difficulty sustaining attention, especially for extended periods, is very easily distracted by sounds, movement, and flashes of light, as well as her own thoughts and sensations. These distractions make it difficult to complete tasks that require sustained mental effort, such as thinking, maintaining conversation, remembering obligations and assignments, getting organized, staying on track, and completing tasks and projects. For example, she reported that when voting in an election she has difficulty reading and comprehending proposals she is trying to vote on. She often forgets where she put things such as her wallet, keys, assignments, phone, and legal documents. She also indicated that she is impulsive, has difficulty waiting, including for her turn in conversations. She unintentionally interrupts others, or blurts out her thoughts before fully thinking them through or appropriately filtering them for the situation. It is very difficult for her to focus on one idea at a time and she jumps quickly from one thought to another. She frequently forgets things she needs to do, forgets instruction, forgets what someone just said to her, and loses her train of thought when talking.

During exams and when reading, she will get lost in unrelated thoughts and loses track of what the questions are asking. She often unintentionally completes only part of the question in an exam. Consequently, she tries to compensate by reading and rereading the question aloud and double checking her answer selections. She also is very restless when sitting is required and constantly needs to be moving around or doing something. When expected or required to sit for prolonged periods, she becomes very restless and fidgety, doodles on papers, picks at her hair or clothes, and messes with objects within reach, which can be disruptive to others around her and has caused others at school to complain. Not being able to sit still for extended periods interferes with her ability to study, work on assignments, maintain professional behavior at work, and watch television to relax at home. Consequently, she typically needs to take frequent breaks from these activities to walk around and do something else to help manage her restlessness. Having to perform tasks that require

**Ramsay v. NBME - Exhibit C**

sustained mental effort often results in migraine headaches and associated blind spots, which affect her ability to see and read. The headache itself, along with the associated nausea and hypersensitivity to light, sound, and temperature, exacerbates her difficulty sustaining attention and ability to read, think, process, and answer questions.

*School History*

Ms. Ramsay (Jessica) has a history of academic struggle that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments, altered grading schemes, frequent breaks, and a private space for testing and completing classwork in order to compensate for distractibility, impaired attention and concentration, impaired reading comprehension, impaired reading speed, and hyperactivity.

Jessica's mother, Jerri Shold, recalled having difficulty learning to read when she was in kindergarten (in 1955) and early elementary school and was concerned that Jessica may have similar difficulties. The parenting books Ms. Shold read all recommended beginning sight words early, so Ms. Shold started working with Jessica during her preschool years up until it was time to start kindergarten. When Ms. Shold applied the sight word programs at home, Jessica could correctly identify letters if her mother pointed at specific letters within a sight word.  She could repeat the word correctly when first read aloud by her mother, and could use the word correctly in a sentence.  However, when later presented with the same sight words, Jessica could not recognize the sight words she had been previously exposed to no matter how many times her mother went through the words with her.   Ms. Shold tried all the different methods suggested by these sight word programs, but the words didn't mean anything to Jessica. When Jessica was about four years old, the pre-school she was enrolled in (Prince of Peace) did some developmental and IQ testing to assess whether she was ready to start kindergarten. The evaluation showed that she was intelligent and was mentally ready to start kindergarten, but noted that when shown simple images she had trouble copying them correctly.  It was concluded that Jessica's fine motor skills were not at the level of a five year old. Ms. Shold and her preschool teachers thought her fine motor skills were advanced for her age.  Based on the testing, Jessica was put into kindergarten for half the day, and then went back to preschool for the remainder of the day, five days a week. Her teachers reported that Jessica still was not really grasping the sight words at that point, though she was doing fine in everything else.

Ms. Shold recalled that when she had her own difficulty learning to read she was sent home with packets to help her work on phonics and reading.  Ms. Shold believed that this extra help with phonics made a big difference for her, so she wanted Jessica to have the foundation of phonics so that she would be able to break words down and sound them out if she didn't recognize them. None of the public schools in her area used a phonetic reading program to teach reading. Consequently, Jessica's mother identified a private school that used a phonics-based reading program (Sunset Oaks Academy) and transferred Jessica there, where she was enrolled in fulltime Kindergarten. Ms. Shold believed the phonetic reading program was important for Jessica to progress and also thought the smaller class sizes would allow Jessica to receive more one-on-one reading, spelling and writing instruction than Jessica would receive in the public school system.

**Ramsay v. NBME - Exhibit C**

Jessica attended the Sunset Oaks Academy and received extensive individual instruction in reading, spelling and writing through the phonics-based program from Kindergarten through the second grade. Jessica received informal accommodations of a separate quiet space and extra time to complete tests and assignments. In third grade she transferred to the Carrollton-Farmers Branch Public School System when the family moved. Jessica attended the Carrollton-Farmers Branch Public Schools through the fifth grade. Jessica still struggled with reading, writing, and spelling when compared to her peers and her mother informed her teachers about her history and what prior teachers had done to help Jessica.

Jessica and her mother, Jerri Shold, also reported that beginning in her earliest school years and continuing through elementary school and beyond, Jessica had severe problems in the following areas: making many mistakes in her schoolwork, sustaining attention during tasks or activities, finishing schoolwork and tasks at home, organizing tasks, disliking or procrastinating on tasks that required sustained mental effort, losing things needed for task completion, being easily distractible, being forgetful in daily activities, fidgeting, not staying seated when expected, and not waiting or taking turns. Throughout elementary school, Jessica's teachers verbally commented to Ms. Should that Jessica was very bright, but a slow reader who often forgot to turn in completed assignments.

It has always taken Jessica significantly more time and effort to study and complete assignments than other students. For example, she recalled that friends would become frustrated with her when she would not join them for recreational activities because she would typically be working on homework until bedtime (often past midnight), while her friends completed their homework in the early evening and were free for leisure activities. Ms. Shold confirmed that this was typical of Jessica's evenings from early elementary school through graduation from high school. Her first, second, third and fourth grade teachers noticed that Jessica had difficulty with reading, spelling and writing, and each teacher provided extra individual but informal remedial reading, spelling, and writing instruction during those grades.

Jessica's second grade teacher was concerned enough to recommend that her vision be tested. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. Jessica subsequently received visual perceptual skills training from Dr. Tanguay, though Jessica's school functioning did not improve. Ms. Should, who has a master's degree in education, also worked nightly to remediate Jessica's reading, writing and spelling problems throughout elementary school. She regularly reviewed Jessica's work in middle and high school, as well as her essays throughout college and for medical school applications. Jessica's parents did not pursue an evaluation for her learning problems because her hard work in the evenings and the informal accommodations she received masked the degree of academic struggle she experienced.

Jessica managed to get good grades during her elementary, middle and high school years with the aid of these accommodations, which were provided on an informal basis. While Jessica's elementary, middle school and high school records do not reflect the struggle she reported, the early onset and chronic struggle that necessitated the accommodations, her teachers' verbal descriptions of Jessica's difficulty, and her mother's remedial efforts were corroborated by her mother.

**Ramsay v. NBME - Exhibit C**

Jessica graduated from high school in 2008 with a 3.75 grade point average. Because she did not have any type of formal diagnosis or accommodations, she did not know about the possibility of accommodations such as extended time and did not apply for or receive any type of accommodations when she took the ACT entrance exam for college.

During her freshman undergraduate year at Ohio State University, her compensatory strategies were overwhelmed by academic demands and her personal life. She experienced pronounced difficulty maintaining attention during tasks and activities, repeatedly misplaced things, lost track of completed assignments, made seemingly careless mistakes in her work, often misunderstood test questions and assignment directions and could not organize her tasks and activities. She spent increasingly more time on her schoolwork trying to compensate for these difficulties and neglected other important tasks, such as paying bills, cooking, cleaning, or engaging in leisure, recreational, social activities and sleep.

Jessica subsequently consulted her primary care physician, Dr. Allen Smiy, who diagnosed her with ADHD on March 24, 2009, and began pharmacological treatment. Jessica applied to the college's Office of Disability Services (ODS) and Dr. Smiy completed the Ohio State University ADD/ADHD Verification Form on August 13, 2010, which identified a DSM-IV diagnosis of ADHD, Inattentive Type and stated that Jessica often exhibited the DSM-IV inattention symptoms of having difficulty sustaining attention in tasks or other activities, having difficulty organizing tasks and activities, avoiding or disliking tasks that required sustained mental effort, being easily distracted by extraneous stimuli and being forgetful in daily activities. Jessica was approved by Ohio State University (OSU) to formally receive the accommodations of priority class scheduling, access to an assigned Office of Disabilities Services advisor, 50% additional testing time, a distraction reduced testing space, ear plugs for all quizzes or tests, supportive materials such as scrap paper for notetaking, colored pencils and highlighters to reword and draw diagrams on test questions for better understanding.

Jessica graduated from Ohio State University in 2012 with a 3.56 grade point average. With these formal accommodations, Jessica was better able to compensate for her inattention, distractibility, hyperactivity, and difficulties in reading and writing. However, there were still many tests that required a large amount of reading and/or writing that Jessica was unable to complete because there was still not adequate time for her to read all of the questions and/or write sufficient responses, though she understood the material being tested. In these instances, Jessica reached out to her professors about this continued struggle, and often her professors provided additional informal accommodations such as altered grading schemes or more time to complete unattempt portions, to allow Jessica to achieve a grade that better represented her competency.

Jessica did not find out that applying for accommodations for the MCAT was even a possibility until, near the end of her MCAT prep course through Princeton Review, one of the course instructors mentioned it while discussing Jessica's difficulty with reading. Jessica was advised not to apply or take the MCAT with accommodations unless she was unable to achieve an acceptable score after multiple attempts because her score report would show that she had received accommodations and that would hurt her chances of getting offered interviews. Jessica then made an appointment with her advisor at the OSU Office of Disability Services (ODS) to verify the possibility of receiving accommodations and the affect it would have on her application. Jessica's ODS advisor cautioned against taking the MCAT with accommodations for the same reason and also

**Ramsay v. NBME - Exhibit C**

explained that, while Jessica had adequate documentation from her initial diagnosis by Dr. Smiy to qualify for accommodations through OSU, the AAMC would likely require a full neuropsychology evaluation which would be expensive and was unlikely to be completed in time to apply for accommodations before her scheduled MCAT exam.

Because Jessica receive advice against receiving appropriate accommodation from multiple informed sources, she decided to try the MCAT without accommodations. When she took the exam, she relied on strategies suggested by her Princeton Review instructors in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested that Jessica not read the passages until she had first answered all the questions she could without reading the passage.  Only then with any remaining time, she could go back and try to answer the passage-dependent questions starting with the shortest passages. Finally, with the last minute, it was recommended that she randomly fill in answers to any questions she wasn't able to get to. Using this strategy, Jessica was able to obtain a good score in the 79th percentile (30M) of students who take the exam.  This, however, was not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. Jessica's performance on the MCAT component sections reflected her relative weakness specific to reading tasks with a Verbal Reasoning score at the 67th percentile, a Physical Sciences score at the 79th percentile and a Biological Sciences score at the 88th percentile.

Jessica applied to fourteen medical schools the first year after taking the MCAT and was only offered one interview, but was not accepted.  The next year she again applied to twenty-five schools and received only two interviews. She was placed on a wait list for two schools, one of which, Western Michigan University, ultimately accepted her.  Jessica believes that because she took the MCAT under standard time and with no accommodations for her ADHD, her modest MCAT score did not reflect how much she knew in the three component areas of Physical Sciences, Biological Sciences and Verbal Reasoning. If Jessica had been able to take the MCAT with appropriate accommodations, she likely would have achieved a much higher score that more accurately represented her intelligence, understanding of the material, and ability to apply the information.

Once accepted, Jessica requested accommodations from Western Michigan University Homer Stryker MD School of Medicine because of her ADHD and symptoms of dyslexia when she first began taking classes.  She was referred to Charles Livingston, MA, for an evaluation to support her application for accommodations. Western Michigan University Homer Stryker MD School of Medicine approved her application and she was formally granted the accommodations of double exam time and a separate room to minimize distractions for all standardized NBME CBSE, Shelf exams and other exams written and administered by the school.  Jessica applied for the same accommodations for the USMLE Step 1 exam, administered by the National Board of Medical Examiners (NBME) in 2016, but was denied accommodations. She attempted the USMLE without any accommodations and failed.  Jessica is currently on academic leave from medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1 exam, which is required to continue her fourth year rotations and complete her medical degree.

**Ramsay v. NBME - Exhibit C**

MENTAL STATUS & OBSERVATIONS:    Jessica was neat in appearance and her demeanor was friendly and cooperative throughout the evaluation.  She made good eye contact and her speech was at a normal rate, expressed in a normal manner and readily understood.  Jessica did not have difficulty understanding directions and in the infrequent instances in which she appeared uncertain, she requested directions to be repeated or clarified.  She persisted answering questions and completing tasks for an appropriate amount of time. Her answers to this examiner's questions were clear with appropriate, unguarded elaboration.  Her mood and attitude were normal and her affect was appropriate.  Her thought process and content were normal.  Jessica was oriented to person, place, time and date.  Jessica made a consistently high level of exertion on all tasks and the test results and self-report are an accurate measure of her functioning.  Jessica did not take any of her ADHD medication on the day of the testing so that the results would more accurately reflect her functioning without the mitigating effects of the medications.

**ASSESSMENT RESULTS**

**Symptom Validity**

*Test of Memory Malingering (TOMM)*

The TOMM was administered midway through the exam.   Jessica was told that the TOMM measured important memory skills needed for efficient reading.  Jessica's performance on the TOMM resulted in 50 of 50 items correct on Trial 2 and after a delay of 15 minutes she correctly answered 50 of the 50 items on the Retention Trial.  This pattern of TOMM scores does not reflect suboptimal effort.  Her overall pattern of test scores and behavioral performance reflected strong effort on all tests administered to her.

**Intellectual Functioning**

The following interpretation is based on the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) scores obtained by Alan Lewandowski, PhD, as part of a neuropsychological evaluation conducted on November 9, 2017.  The Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) provides a general overview of Jessica's overall thinking and reasoning skills, encompassing four broad domains:  Verbal, Perceptual, Working Memory, and Processing Speed.  The Verbal Comprehension Index (VCI) provides a measure of how well she did on tasks that required her to listen to questions and give oral responses to them.  The Perceptual Reasoning Index (PRI) indicates how well she did on tasks that required her to examine and think about designs, pictures, and puzzles, and to solve problems without using words.   Her ability to attend to information, to hold and process it in memory, and to give a response is measured by the Working Memory Index (WMI).   The last index, Processing Speed Index (PSI), provides information regarding her ability to process simple visual information quickly and efficiently.   When the Index scores are markedly different from each other, the Full-Scale IQ score is not the best summary of an individual's performance.  Alternate scores or the separate index scores should be used.

The scores show how well Jessica performed compared to a group of individuals of the same age from across the United States.  An individual may have WAIS-IV scores that fall within a wide range from Extremely Low to

**Ramsay v. NBME - Exhibit C**

Very Superior.  Most individuals, however, perform within the Average range.  A percentile rank is also reported.  This shows where the individual's scores rank relative to the national comparison group.  For example, if Jessica's percentile rank (PR) was 45, it would mean that she scored higher than approximately 45 out of 100 individuals her age.

*General Intellectual Ability*

The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range and exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words.  However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores.  Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability.  Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention-related Working Memory Index and Processing Speed Index subtest scores.   Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Her GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

*Verbal Comprehension*

Jessica's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the superior range and above those of approximately 95% of her peers (VCI=125; 95% confidence interval=118-130). The VCI is designed to measure verbal reasoning and concept formation. Jessica's performance on the verbal subtests contributing to the VCI presents a diverse set of verbal abilities; she performed much better on some verbal tasks than others. The degree of variability is unusual and may be noticeable to those who know her well. Examination of Jessica's performance on individual subtests provides additional information regarding her specific verbal abilities.

Jessica achieved her best performance among the verbal reasoning tasks on the Information subtest. Her strong performance on the Information subtest was much better than that of most of her peers. The Information subtest required Jessica to respond orally to questions about common events, objects, places, and people. The subtest is primarily a measure of her fund of general knowledge. Performance on this subtest also may be influenced by cultural experience and quality of education as well as her ability to retrieve information from long-term memory (Information scaled score=16).

*Perceptual Reasoning*

Jessica's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index (PRI) are in the very superior range and above those of approximately 98% of her peers (PRI=131; 95% confidence interval=123-136). The PRI is designed to measure fluid reasoning in the perceptual domain with tasks that assess nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli. Jessica performed comparably on the perceptual reasoning

**Ramsay v. NBME - Exhibit C**

subtests contributing to the PRI, suggesting that her visual-spatial reasoning and perceptual-organizational skills are similarly developed.

*Working Memory*
Jessica's ability to sustain attention, concentrate, and exert mental control is in the high average range. She performed better than approximately 77% of her peers in this area (Working Memory Index [WMI]=111; 95% confidence interval=104-117). Jessica's abilities to sustain attention, concentrate, and exert mental control are a weakness relative to her nonverbal reasoning abilities. At her level of ability, a relative weakness in mental control likely makes the processing of complex information more time consuming for Jessica, draining her mental energies more quickly as compared to others.

*Processing Speed*
Processing speed is an indication of the rapidity with which Jessica can mentally process simple or routine information without making errors. Jessica's ability in processing simple or routine visual material without making errors is in the borderline range when compared to her peers. She performed better than approximately 8% of her peers on the processing speed tasks (Processing Speed Index [PSI]=79; 95% confidence interval=73-89). Processing visual material quickly is an ability that Jessica performs poorly when compared to her verbal and nonverbal reasoning ability.

Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 43 | VCI | 125 | 95 | 118-130 | Superior |
| Perceptual Reasoning | 46 | PRI | 131 | 98 | 123-136 | Very Superior |
| Working Memory | 24 | WMI | 111 | 77 | 104-117 | High Average |
| Processing Speed | 12 | PSI | 79 | 8 | 73-89 | Borderline |
| Full Scale | 125 | FSIQ | 117 | 87 | 113-121 | High Average |
| General Ability | 89 | GAI | 132 | 98 | 126-136 | Very Superior |

Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Ability Level |
|---|---|---|---|---|---|---|
| VCI - PRI | 125 | 131 | -6 | 8.32 | N | 34.3 |
| VCI - WMI | 125 | 111 | 14 | 8.81 | Y | 18.4 |
| VCI - PSI | 125 | 79 | 46 | 10.99 | Y | 2.7 |
| PRI - WMI | 131 | 111 | 20 | 8.81 | Y | 9 |
| PRI - PSI | 131 | 79 | 52 | 10.99 | Y | 1.3 |
| WMI - PSI | 111 | 79 | 32 | 11.38 | Y | 3.7 |
| FSIQ - GAI | 117 | 132 | -15 | 3.51 | Y | 0.4 |

Base rate by ability level.

**Ramsay v. NBME - Exhibit C**

Statistical significance (critical value) at the .05 level.

Verbal Comprehension Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---------|--------------|-----------------|
| Similarities | 13 | 84 |
| Vocabulary | 14 | 91 |
| Information | 16 | 98 |
| (Comprehension) | 15 | 95 |

Perceptual Reasoning Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---------|--------------|-----------------|
| Block Design | 15 | 95 |
| Matrix Reasoning | 16 | 98 |
| Visual Puzzles | 15 | 95 |
| (Figure Weights) | 15 | 95 |
| (Picture Completion) | 14 | 91 |

Working Memory Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---------|--------------|-----------------|
| Digit Span | 12 | 75 |
| Arithmetic | 12 | 75 |

Processing Speed Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---------|--------------|-----------------|
| Symbol Search | 7 | 16 |
| Coding | 5 | 5 |
| (Cancellation) | 9 | 37 |

## Sustained Attention

The IVA+Plus CPT (Integrated Visual & Auditory Continuous Performance Test) is a test of attention that measures responses to 500 intermixed auditory and visual stimuli spaced 1.5 seconds apart. The task is to click the mouse when the stimulus is an auditory or visual "1" and to refrain from clicking when the stimulus is an auditory or visual "2." A correct response is defined as exactly one click to a target stimulus. The individual taking the test must be able to discriminate between 1s and 2s, switch between sensory modalities, and maintain attention for about thirteen minutes. The targets ("1") occur frequently during some sections of the test and rarely during other sections, thus testing attention under both high and low demand conditions. The high demand condition is defined as a "block" of 50 trials when the 1s are frequent. The first two target presentations are excluded from the measurement of performance under high demand conditions and are categorized as being part of the previous low demand conditions block. The reason that these first two

**Ramsay v. NBME - Exhibit C**

**Appx1441**

targets are categorized in this way is that they are still pulling for errors of inattention as the test-taker has not yet made the transition to the mode of rapid clicking that is characteristic of the high demand block.

The quotient scores for all of the IVA+Plus scales are reported as standard scores.  Standard scores have a mean of 100 and a standard deviation of 15. The Wechsler Intelligence tests, which are commonly used in schools to assess Full Scale, Verbal and Performance IQ, also use standard scores (i.e., Mean=100, SD=15).

In addition to reporting standard scores for the IVA+Plus scales, the narrative report below also provides percentile rank.  A person with a standard score of 100 has a percentile rank of 50, meaning that about half the people taking the test scored higher on that scale, and about half scored lower.  In this narrative report, percentile rank is given in the format "(PR=50)" immediately following each standard score that is reported.  For example, "John's Auditory Vigilance Score of 80 (PR=9) fell in the mildly impaired range."

Jessica was administered the IVA+Plus twice, approximately one hour apart, as a check on the consistency of her responses.

*1st Administration*

### VALIDITY OF TEST RESULTS
Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales.  The validity of the IVA+Plus CPT is assessed by determining whether an individual's responses are characteristic of random responding.  The test is considered valid only when the individual's decision to click to targets and inhibit clicking to non-targets is based on self-directed responses in accordance with the test rules.  Statistically, the test results for a specific sensory modality are considered invalid when the probability of the individual's response pattern being self-directed in accordance with the test rules is less than 1 in 1000.

### IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES
A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data.  Jessica's global Response Control quotient scale score indicated an extreme impairment.  In addition, her global Attention quotient scale score fell in the extremely impaired range.  These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

### SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES
The Full-Scale Response Control Quotient is a global measure of the overall ability for Jessica to regulate her responses and respond appropriately.  Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 44 (PR=1).  This score fell in the extremely impaired range.  Her Auditory Response Control quotient scale score was 38 (PR=1).  This global scale score fell in the extremely impaired range.

**Ramsay v. NBME - Exhibit C**

Jessica's Visual Response Control quotient scale score was 65 (PR=1).  This global scale score fell in the severely impaired range.

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain her attention.  This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 50 (PR=1).  This global scale score fell in the extremely impaired range.  Her Auditory Attention quotient scale score was 65 (PR=1) and this global scale score fell in the severely impaired range.   Jessica's Visual Attention quotient scale score was 44 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions.  In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions.  Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1).  This score fell in the extremely impaired range.  Her global Auditory Sustained Attention quotient scale score was 65 (PR=1) and it fell in the severely impaired range.   Jessica's global Visual Sustained Attention quotient scale score was 59 (PR=1). This score was found to fall in the extremely impaired range.

2nd *Administration*

*VALIDITY OF TEST RESULTS*

Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales.

*IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES*

A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data.  Jessica's global Response Control quotient scale score indicated an extreme impairment.  In addition, her global Attention quotient scale score fell in the extremely impaired range.  These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

*SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES*

The Full-Scale Response Control Quotient is a global measure of the overall ability for this individual to regulate her responses and respond appropriately.  Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 37 (PR=1).  This score fell in the extremely impaired range.  Her Auditory Response Control quotient scale score was 48 (PR=1).  This global scale score fell in the extremely impaired range. Jessica's Visual Response Control quotient scale score was 44 (PR=1). This global scale score fell in the severely impaired range.

**Ramsay v. NBME - Exhibit C**

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain attention.  This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 58 (PR=1).  This global scale score fell in the extremely impaired range.  Her Auditory Attention quotient scale score was 72 (PR=3) and this global scale score fell in the severely impaired range.   Jessica's Visual Attention quotient scale score was 50 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions.  In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions. Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1).  This score fell in the extremely impaired range.  Her global Auditory Sustained Attention quotient scale score was 73 (PR=4) and it fell in the severely impaired range.  Jessica's global Visual Sustained Attention quotient scale score was 51 (PR=1). This score was found to fall in the extremely impaired range.

**Behavioral-Psychological Functioning**

During the diagnostic interview, Jessica indicated that she has exhibited nine of the nine criteria associated with attention-deficit hyperactivity disorder, predominantly inattentive presentation, and eight of the nine criteria of ADHD, predominantly hyperactive-impulsive presentation. Jessica endorsed the following symptoms:

- Fails to pay close attention to details or makes careless mistakes
- Has difficulty sustaining attention
- Often does not listen when spoken to directly
- Has trouble following through on instructions and often fails to finish school work, chores or work duties
- Has difficulty organizing tasks and activities
- Avoids tasks that require sustained mental effort
- Loses things needed to finish tasks
- Is easily distracted
- Is forgetful in daily activities
- Often fidgets or squirms in seat
- Has difficulty remaining seated when expected
- Feels very restless most of the time
- Talks excessively
- Has difficulty waiting for her turn
- Interrupts and intrudes on others

Jessica's mother endorsed eight of the inattentive symptoms and six of the hyperactive/impulsive symptoms, which corroborated many of the difficulties Jessica described.  The ratings provided by Jessica's fiancé also

**Ramsay v. NBME - Exhibit C**

confirms that these symptoms are frequently in evidence.  Her fiancé endorsed seven of the inattentive symptoms and five of the hyperactive-impulsive symptoms.

*Symptom Checklist-90-Revised (SCL-90-R)*

Overall, Jessica's SCL-90-R symptom profile is not of a nature or magnitude to be considered in the clinical range. General symptomatic distress levels are average to low-average for her, suggesting good psychological integration, and little global psychological distress. Jessica's report reflects little evidence of psychological distress associated with somatic symptoms, or psychosomatic problems. Levels of obsessive-compulsive symptoms are clearly in the clinical range. However, the symptoms she rated as involving significant distress are all behaviors she described as either difficulty concentrating or behaviors used to compensate for her ADHD symptoms.  The other behaviors from this scale that directly related to obsessive-compulsive symptoms were rated as involving no distress. Depressive symptoms are somewhat above average in this individual's record, but do not appear clinically noteworthy. There are several isolated signs or symptoms of anxiety in the respondent's test protocol. However, they do not appear to represent clinically significant experiences. There is little or no evidence of paranoid thinking in this respondent's record.

|                    | SOM  | O-C  | I-S  | DEP  | ANX  | HOS  | PHOB | PAR  | PSY  | GSI  | PSDI | PST |
|--------------------|------|------|------|------|------|------|------|------|------|------|------|-----|
| Nonpatient T Score:| 41   | 66   | 50   | 56   | 52   | 40   | 44   | 41   | 44   | 55   | 66   | 49  |
| Raw Score:         | 0.08 | 1.50 | 0.22 | 0.54 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.38 | 2.13 | 16  |
| Outpatient T Score:| 34   | 51   | 35   | 36   | 36   | 32   | 38   | 33   | 30   | 35   | 48   | 32  |
| Inpatient T Score: | 35   | 51   | 37   | 37   | 38   | 36   | 37   | 33   | 31   | 37   | 48   | 34  |

*Primary Symptom Dimensions*
*SOM Somatization*
*O-C Obsessive-Compulsive*
*I-S Interpersonal Sensitivity*
*DEP Depression*
*ANX Anxiety*
*HOS Hostility*
*PHOB Phobic Anxiety*
*PAR Paranoid Ideation*
*PSY Psychoticism*
*General Indices*
*GSI Global Severity Index*
*PSDI Positive Symptom Distress Index*
*PST Positive Symptom Total*

**Ramsay v. NBME - Exhibit C**

**Academic Skills**

The Wechsler Individual Achievement Test--Third Edition (WIAT-III) is an individually administered instrument designed to measure academic achievement skills in individuals from age 4 through 50. Descriptive statements are provided, ranging from Far Below Average to Far Above Average, based on the standard score. The scores and statements below are primarily based on age-based norms. A percentile rank is also reported in the table of scores, which shows where the clients score rank compared to a group of clients of the same age from across the United States. For example, if the percentile rank was 45, it would mean that the individual scored higher than approximately 45% of individuals her age.

The Total Reading Composite (TRC) is an overall measure of basic reading, fluency and reading comprehension. It is derived from the Word Reading, Pseudoword Decoding, Reading Comprehension and Oral Reading Fluency subtests. Jessica's Total Reading Composite score of 85 is at the bottom of the low average range and is higher than 16% of individuals her age.

The Basic Reading Composite (BRC) is a measure of applying phonemic knowledge and single word decoding. It is derived from the Word Reading and Pseudoword Decoding subtests. Jessica's Basic Reading Composite score of 96 is average and is higher than 39% of other individuals her age. The *Word Reading* subtest measures speed and accuracy of single word reading. The individual is asked to read aloud from a list of words which yields a score for accuracy and a score for speed. Jessica's Word Reading score of 100 is average and is higher than 50% of other individuals her age. The *Pseudoword Decoding* subtest measures speed and accuracy in applying phonemic knowledge to decode pseudowords. Jessica's Pseudoword Decoding score of 95 is average, which is the percentile rank of 37. The supplemental scores for speed of performing subtests were also calculated. The Word Reading Speed score is the same as or higher than the scores obtained by only 2% of individuals in the normative sample. Ninety-eight percent of students in the normative sample scored higher than Jessica in the Word Reading Speed score. The Pseudoword Decoding Speed score is the same as or higher than the scores obtained by only 5% of students in the normative sample; 95% of individuals in the normative sample scored higher than her Pseudoword Decoding Speed score.

Jessica's Reading Comprehension and Fluency Composite score of 74 is in the well below average range and is higher than only 4% of other individuals her age. The *Reading Comprehension* subtest is untimed and measures literal and influential reading comprehension skills using paragraph passages in which she was verbally asked open-ended questions by the examiner and was allowed to verbally give her answers. The examiner was allowed and asked for elaboration or clarification of her answers as needed. Jessica's Reading Comprehension score of 94 is in the average and is higher than 34% of other individuals her age. The *Oral Reading Fluency* subtest measures oral reading fluency of narrative passages and yields separate scores for overall oral reading accuracy and component scores for oral reading rate and oral reading fluency. Her overall Oral Reading Fluency score of 67 is far below average and is higher than 1% of other individuals her age. Her Oral Reading Rate score of 65 is far below average and is higher than 1% of other individuals her age. Her Oral Reading Accuracy score of 102 is average and is higher than 55% of other individuals her age.

**Ramsay v. NBME - Exhibit C**

**Appx1446**

The Written Expression Composite (WEC) is a measure of overall writing skills.  It is derived from the Spelling, Sentence Composition, and Essay Composition subtests.  The Spelling subtest measures written spelling of single words from dictation.  The Sentence Composition subtest includes sentence combining and sentence building components, which measure sentence formulation skills including grammar, syntax, semantics and mechanics.  Jessica's Written Expression Composite score of 100 is average and is higher than 50% of other individuals her age. Her Spelling score of 108 is average and is higher than 70% of other individuals her age. Jessica's Sentence Composition score of 104 is average and is higher than 61% of other individuals her age.

The Essay Composition subtest measures spontaneous written expression, which involves productivity, theme development, text organization, grammar and mechanics.  The individual listens to instructions about general content the essay is to contain and then must plan, write and finalize an essay within a ten-minute time limit.  The Essay Composition required Jessica to write an essay about her favorite game and include at least three reasons for liking it.  The Essay Composition score is significantly influenced by the number of words produced, regardless of spelling, though theme development and organization contribute to the score.  A separate supplemental component, Theme Development and Text Organization, reflects theme development and organization.  Another supplemental subtest, Grammar and Mechanics, reflects grammar, punctuation, spelling and capitalization.  Jessica's Essay Composition score of 91 is average and is higher than 27% of other individuals her age.  Her Word Count score of 92 is average and higher than 30% of other individuals her age.  Jessica's Theme & Text Organization score of 94 is average and is higher than 34% of other individuals her age.  Her Grammar & Mechanics score of 91 is average and higher than 27% of other individuals her age.

The Mathematics Composite (MC) is an overall measure of ability to calculate a variety of different math procedures and apply math procedures in tasks that require math reasoning.  It is derived from the Numerical Operations and the Math Problem Solving subtests.  The Numerical Operations subtest measures math skills under untimed conditions.  The Math Problem Solving subtest measures mathematics reasoning in solving math problems that are read to the individual. Jessica's Mathematics Composite score of 133 is far above average and higher than 99% of other individuals her age.  Jessica's Numerical Operations score of 125 is well above average and is higher than 95% of other individuals her age.  Her Math Problem Solving score of 136 is far above average and is higher than 99% of other individuals her age.

**Ramsay v. NBME - Exhibit C**

**WIAT-III**                                                          **Age Based Scores: age at testing 28 years, 0 months**

**Composite Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Total Reading | 85 | 81-89 | 16 | Low Average |
| Basic Reading | 96 | 92-100 | 39 | Average |
| Reading Comprehension and Fluency | 74 | 67-81 | 4 | Well Below Average |
| Written Expression | 100 | 94-106 | 50 | Average |
| Mathematics | 133 | 129-137 | 99 | Far Above Average |

**Subtest Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Reading Comprehension | 94 | 84-104 | 34 | Average |
| Math Problem Solving | 136 | 130-142 | 99 | Far Above Average |
| Sentence Composition | 104 | 96-112 | 61 | Average |
| Word Reading | 100 | 94-106 | 50 | Average |
| Essay Composition | 91 | 82-100 | 27 | Average |
| Pseudoword Decoding | 95 | 89-101 | 37 | Average |
| Numerical Operations | 125 | 120-130 | 95 | Well Above Average |
| Oral Reading Fluency | 67 | 61-73 | 1 | Far Below Average |
| Spelling | 108 | 103-113 | 70 | Average |

**Cumulative Percentages**

| | |
|---|---|
| **Word Reading Speed** | The score is the same as or higher than the scores obtained by 2% of students in the normative sample; 98% of students in the normative sample scored higher than this score. |
| **Pseudoword Decoding Speed** | The score is the same as or higher than the scores obtained by 5% of students in the normative sample; 95% of students in the normative sample scored higher than this score. |

**Ramsay v. NBME - Exhibit C**

**Appx1448**

**Subtest Component Score Summary**

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Oral Reading Fluency** | | | |
| Oral Reading Accuracy | 102 | 55 | Average |
| Oral Reading Rate | 65 | 1 | Far Below Average |
| **Essay Composition** | | | |
| Grammar and Mechanics | 91 | 27 | Average |

**Subtest Component Score Summary**

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Sentence Composition** | | | |
| Sentence Combining | 105 | 63 | Average |
| Sentence Building | 104 | 61 | Average |
| **Essay Composition** | | | |
| Word Count | 92 | 30 | Average |
| Theme Development and Text Organization | 94 | 34 | Average |

**Differences Between Composite Standard Scores**

| Comparison | Difference | Critical Value (Significance Level .05) | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|
| Total Reading vs. Basic Reading | -11 | 5.88 | Y | <=5% |
| Total Reading vs. Reading Comprehension and Fluency | 11 | 7.93 | Y | <=10% |
| Total Reading vs. Written Expression | -15 | 6.83 | Y | >15% |
| Total Reading vs. Mathematics | -48 | 5.70 | Y | <=1% |
| Basic Reading vs. Reading Comprehension and Fluency | 22 | 8.06 | Y | <=10% |
| Basic Reading vs. Written Expression | -4 | 6.98 | N | >15% |
| Basic Reading vs. Mathematics | -37 | 5.88 | Y | <=1% |
| Reading Comprehension and Fluency vs. Written Expression | -26 | 8.77 | Y | <=5% |
| Reading Comprehension and Fluency vs. Mathematics | -59 | 7.93 | Y | <=1% |
| Written Expression vs. Mathematics | -33 | 6.83 | Y | <=1% |

***Note.*** A negative difference indicates that the second composite has a higher score than the first composite listed in the comparison.

**Ramsay v. NBME - Exhibit C**

**ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS**

Ability Score:        WAIS-IV FSIQ: 117

**Predicted Difference Method**

|  | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 112 | 85 | 27 | 5.89 | Y | <=1% |
| Basic Reading | 110 | 96 | 14 | 4.83 | Y | <=15% |
| Reading Comprehension and Fluency | 112 | 74 | 38 | 9.26 | Y | <=1% |
| Written Expression | 111 | 100 | 11 | 7.12 | Y | >15% |
| Mathematics | 112 | 133 | -21 | 5.87 | Y* | N/A |

**Note.** Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.
*Indicates that the actual achievement score exceeds the predicted achievement score.

**ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS**

Ability Score:        WAIS-IV GAI: 132

**Predicted Difference Method**

|  | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 121 | 85 | 36 | 6.10 | Y | <=1% |
| Basic Reading | 118 | 96 | 22 | 5.01 | Y | <=5% |
| Reading Comprehension and Fluency | 120 | 74 | 46 | 9.40 | Y | <=1% |
| Written Expression | 119 | 100 | 19 | 7.25 | Y | <=10% |
| Mathematics | 120 | 133 | -13 | 6.05 | Y* | N/A |

**Note.** Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.
*Indicates that the actual achievement score exceeds the predicted achievement score.

**Ramsay v. NBME - Exhibit C**

**Appx1450**

*Woodcock/Johnson IV (WJ-4) Tests of Achievement*

The Woodcock/Johnson IV (WJ-4) Tests of Achievement are untimed, with the exception of the fluency tests, and reflect a person's ability to perform tasks when they are able to use any strategies they have developed to compensate for any weaknesses they may have in information processing.  Descriptive statements are provided, ranging from far below average to very superior, based on the standard score.  Jessica was compared to other adults her age in the general population.

The Reading Rate Cluster provides a measure of automaticity when reading single words and single sentences. It is derived from the Sentence Reading Fluency and Word Reading Fluency subtests.  The Word Reading Fluency subtest allows three minutes for the examinee to read rows of four words and mark two words in each row that are either synonyms, antonyms or members of the same category.  The Sentence Reading Fluency subtest allows three minutes for the examinee to read sentences and mark them as true or false. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range, which is higher than 1% of other individuals her age.  Her Word Reading Fluency score of 58 is in the Far Below Average range, which is higher than 0.2% of other individuals her age.  Her Sentence Reading Fluency score of 78 is in the Well Below Average range, which is higher than 7% of other individuals her age.

**TABLE OF SCORES**

*Woodcock-Johnson IV Tests of Achievement Form B and Extended* (Norms based on age 28-1)

| CLUSTER/Test | GE | RPI | Proficiency | SS (95% Band) | SS Classification | PR |
|---|---|---|---|---|---|---|
| READING RATE | 3.9 | 1/90 | Extremely Limited | 66 (57-75) | Far Below Average | 1 |
| Sentence Reading Fluency | 5.2 | 5/90 | Very Limited | 78 (67-88) | Well Below Average | 7 |
| Word Reading Fluency | 3.0 | 0/90 | Extremely Limited | 58 (45-71) | Far Below Average | 0.2 |

*GRAY-ORAL READING TESTS-FIFTH EDITION*

The Gray-Oral Reading Tests-Fifth Edition (GORT-5) is a comprehensive measure of reading fluency with separate measures for speed, accuracy, overall fluency of combined speed and accuracy, and comprehension. Jessica's performance was compared to a group of individuals aged 19 through 23 years, which is the oldest group available for comparison.  The GORT-5 was administered because it is the most comprehensive and robust measure available that reflects functioning when oral reading fluency and reading comprehension are simultaneously required.  The GORT-5 passages reflect a broader range of complex reading than other measures of oral reading fluency such as the WIAT-III Oral Reading Fluency subtest.

The GORT-5 provides separate measurements of speed, accuracy, comprehension, and an overall measure reflecting the three components combined.  The oldest normative age group available for comparison is a group of 19-year-old to 23 year-11-month-old adults. The GORT-5 scores of Rate, Accuracy, Fluency and Comprehension were demonstrated to have a strong correlation with age in the normative sample until age 13, with the progression of raw score gains getting smaller with each year of age until plateauing in the ages of the oldest normative age group.

Jessica's Rate score of 3 is far below average and is higher than 1% of other individuals in the comparison group. The Accuracy score reflects the number of decoding errors, omitted words, inserted words and repetitions.  Her Accuracy score of 5 is well below average and is higher than 5% of other individuals in the

**Ramsay v. NBME - Exhibit C**

comparison group.  The Fluency measure is derived from combining the Rate and Accuracy scores and is a measure of overall oral reading fluency.  Jessica's Fluency score of 4 is well below average and is higher than 2% of other individuals in the comparison group.  She was able to correctly read most of the words, but her reading was slow.  Jessica read in short two-to-four words phrases and her oral reading was very halting with many repetition of words and self-corrections.  The Comprehension measure is derived from open-ended questions about the content of each passage.  Jessica's Comprehension score of 3 is extremely below average and is higher than 1% of other individuals in the comparison group. The Oral Reading Index (ORI) is derived from the Fluency and Comprehension subtests.  The ORI is an overall measure of oral automaticity and reading comprehension.  Jessica's Oral Reading Index score of 65 is extremely below average and is higher than 1% of other individuals in the comparison group.

*Nelson-Denny Reading Test*

The Nelson-Denny Form H was administered with the standard time administration to Jessica and includes three subtests (Vocabulary, Comprehension and Rate).  The questions are presented in multiple-choice answer options.  Four scores are calculated: Rate, Vocabulary, Comprehension and Total Reading.  The first subtest, Rate, is calculated from the number of words read silently during the first sixty seconds of the Comprehension subtest.   The Vocabulary subtest has a standard time limit of fifteen minutes and consists of 80 multiple-choice items, each with five response options. The words were drawn from high school and college textbooks and vary in difficulty.  The second subtest, Comprehension, has a standard time limit of twenty minutes and requires examinees to read as many of the seven passages as they can (also drawn from high school and college textbooks) and to respond to as many of the total of 38 multiple-choice questions about the contents of these passages. The Total Reading score is derived by summing the Vocabulary raw score with the Comprehension raw score.

Jessica completed Form H and her performance was compared to second semester grade-16 university students.  Jessica's Rate score is far below average, at the 1st percentile rank.  She correctly answered 49 of the 52 Vocabulary items (94%) she was able to attempt during the standard time limit.  Her Vocabulary score is below average, at the 11th percentile rank and is a 13.1 grade-equivalent score.  She correctly answered 17 of the 18 Comprehension items (94%) she was able to attempt during the standard time limit.   Jessica's Comprehension score is far below average, at the 2nd percentile rank and is an 8.7 grade-equivalent score.  Her Total Reading score is well below average, at the 4th percentile rank and is a 10.6 grade-equivalent score.

Jessica's performance was also compared with second semester grade-12 high school students. This comparison resulted in a Rate score that is far below average, at the 1st percentile rank.  Her Vocabulary score is average, at the 54th percentile rank compared to high school seniors.  Jessica's Comprehension score is low average, at the 18th percentile rank compared to high school seniors. Her Total Reading score is average, at the 33rd percentile rank compared to high school seniors.

The Nelson-Denny was originally normed to allow for the individual's performance to be compared to other individuals in grades 9 through 16.  Additional norms for healthcare professionals were developed in 2001. These norms were developed from a group of 635 medical students, 269 dental students, 176 physical therapy students and 42 interns (Haught, P.A., & Walls, R.T. Adult Learners: New Norms on the Nelson-Denny Reading

**Ramsay v. NBME - Exhibit C**

**Appx1452**

Test For Healthcare Professionals. Reading Psychology 2002, 23, 217-238). Jessica's performance was compared to this group.  Her Rate score is in the Far Below Average range, at the 1st percentile rank.  Her Vocabulary score is in the Far Below Average range, at the 1st percentile rank.   Jessica's Comprehension score is also in the Far Below Average range, at the 1st percentile rank.  Her Total Reading score is in the Far Below Average range, at the 1st percentile rank.

**Discussion and Summary**

The Test of Memory Malingering (TOMM) measure is a symptom validity measure and was administered to detect whether Jessica was making suboptimal effort, either consciously or unconsciously. The examinee is not informed as to the purpose of this measure and in fact was told that it measured an important memory component underlying reading skill. The absence of indication of suboptimal effort on the TOMM is an indication that Jessica's effort was not suboptimal.  Her performances on reading and writing tests was also highly variable, ranging from average to below average.  In the context of her request for accommodations due to a reading impairment, the reading and writing scores that are within the average range are inconsistent with poor effort from either conscious or unconscious intent.  Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning.

The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range and exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words.  However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores.  Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability.  Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention related Working Memory Index and Processing Speed Index subtest score.   Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Jessica's GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

Current diagnostic criteria for a diagnosis of a specific learning disorder in the DSM-5 requires that reading, writing or math scores be substantially below average compared to other individuals Jessica's age and cause a significant interference with academic performance.  However, the designation of "average" and "below average" is acknowledged to be arbitrary with no clear cut-off score to indicate what is below average and causes significant interference with academic performance.  A standard score of 78 or less, which is below the 7th percentile, offers the greatest diagnostic certainty.  However, scores vary because of test imprecision, and clinical judgment is allowed.  A more lenient threshold of scores of below one standard deviation (standard score 84 or lower) is applicable when learning difficulties are supported by converging evidence from assessment, academic history and school reports.  While learning difficulties are generally exhibited during the early school years, they may not become evident until later school years when demands on academic skills

**Ramsay v. NBME - Exhibit C**

exceed the individual's restricted capacities.  Some individuals with impaired functioning may obtain average or better grades that are achieved through extraordinarily high levels of effort and support until the pace of completing tasks and assessment mechanisms that rely on the impaired skill exceeds the individual's compensatory strategies.  Consequently, the individual with specific impairments is unable to complete tasks that rely on the impaired skills or demonstrate what she has actually learned through assessment mechanisms that rely on these specific skills. A discrepancy between aptitude and academic achievement scores is no longer a DSM-5 diagnostic criteria indicating a specific learning disorder; however, the presence of substantial discrepancies between aptitude and achievement skill provide important information reflecting an abnormal degree of struggle that persists despite compensatory efforts.

Jessica's Mathematics Composite (MC) score of 133 is in the far above average range and above those of 99% of other adults her age.  Consequently, a specific learning disorder with impairment in mathematics is not indicated.

The specific learning disorder of developmental dyslexia is a neurologically-based condition that results in an unexpected difficulty acquiring an understanding of letter-phoneme relationships, acquiring a capacity for efficiently processing phonological information, or developing rapid, automatic reading fluency (either oral or silent).  A persistent weakness in phonological processing significantly impedes developing accurate word recognition, automatic, effortless word recognition-fluency and reading comprehension. Reading fluency is considered to be a complex capacity to read passages rapidly, smoothly, and automatically, with little effort or conscious attention to the mechanics of reading, which then allows the majority of mental capacity to be directed to reading comprehension. Dyslexic readers may be able to acquire the capacity to accurately identify or decode words through remedial efforts, but typically have difficult acquiring automatic oral reading fluency or rapid silent reading rate.  Some dyslexic readers may develop the capacity for rapid oral reading fluency or rapid silent reading, but typically at the expense of reading comprehension. The dyslexic reader lags behind the non-dyslexic reader in developing automatic word recognition capacity and must use more of his or her attention and working memory capacity to the task of identifying words than the non-dyslexic reader, which interferes with comprehension.

Many dyslexic readers compensate for the limitations in automatic word recognition through over-relying on the use of the context.  The reliance on context results in the reader being hesitant and pausing in order to infer the identity of words from the surrounding words they can identify. They may make an "educated guess" when they reach an unknown word or correct a word they realize they have misread because of their restricted automaticity.  They may also misread a word only to read on and realize their mistake from the context and then reread the phrase or sentence with the correct word (although sometimes a still incorrect word) inserted. The result of such an overreliance on context is a monotone prosody that is characterized by short, choppy word groupings, some word-by-word reading, pauses, omissions, added words, rereading or self-corrections.  By contrast, non-dyslexic readers' phonological skills increase with practice and they become automatic in their word recognition with little need to rely on the context of the words previously identified. Automaticity occurs without conscious thought or effort and leaves more cognitive resources available for attention, comprehension and retention.

**Ramsay v. NBME - Exhibit C**

Dyslexic readers may score well on a test of reading comprehension by using context, but they are spending more of their mental energy to do so than the non-dyslexic reader.  The dyslexic reader's comprehension capacity is therefore fragile and prone to errors.  They may manage to function at seemingly adequate levels during a relatively brief test of reading, but still have difficulty sustaining such comprehension levels because of mental fatigue.  Therefore, reading performance can be erratic.

Impaired dyslexic readers frequently encounters words in print that are within their vocabulary and that they have seen before, but remain unfamiliar when presented in print. In place of oral reading fluency that results from effortless automatic word recognition, the impaired dyslexic reader has to rely on compensatory strategies such as overreliance on the context of the passage and/or repeatedly reading the same passage to identify unrecognized words through inference from surrounding words. As a result, the dyslexic reader may achieve accurate word reading through very slow, careful reading and rereading of passages.  Alternatively, when reading rapidly, uncertainty and impaired oral reading fluency will be revealed through limited voice inflection (prosody), halting two-to-four word phrases, repetitions, omitted words, added words and mispronounced words, which often results in inconsistent reading comprehension.

Jessica exhibited a pattern of reading scores typical of the dyslexic reader described above.  The previous evaluation utilized an instrument that did not provide a comprehensive assessment of the component skills involved in efficient practical reading exhibited by the non-impaired reader, which encompasses most people in the general population. Jessica's basic reading skills are within the average range when not limited by time restrictions as measured by the WIAT-III Basic Reading Composite score of 96, which is higher than 39% of other adults her age.   Jessica's grasp of basic phonics is in the average range as measured by the WIAT-III Pseudoword Decoding score of 95 that is higher than 37% of other adults her age.  Jessica's WIAT-III Word Reading score of 100 is in the average range and she was able to read single words fairly accurately.

The WIAT-III Word Reading and Pseudoword Decoding subtests also have an additional separate component measure of the speed at which she read the list of words.  The examinee is covertly timed on the WIAT-III Basic Reading subtests. The examinee is instructed to read the lists as well as they can, but the instructions specifically avoid any mention of speed, or that they are being timed, and no timing device was visible to Jessica.  The efficiency and speed at which she read these pseudowords was slower than 95% of other adults her age and the efficiency at which she read these real words was slower than 98% of other adults her age.

Jessica's reading rate and level of oral reading fluency was further assessed through four different measures. The WIAT-III Oral Reading Fluency subtest and the Gray-Oral Reading Tests-Fifth Edition measure speed and accuracy of word decoding in passages with conceptually connected content, which allow for observations of her degree of automatic oral word recognition and decoding. The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency, which rely on how many reading comprehension tasks are correctly completed within a set time limit.  Overall, measures of her reading fluency encompassing reading speed resulted in performances that were well below average and far below average compared to other individuals her age and grade level.  Jessica obtained a WIAT-III Oral Reading Fluency score of 67, which is in the far below average range and reflects a relative weakness with oral reading fluency.  Her GORT-5 oral reading was very slow and replete with many accuracy errors. Her GORT-5 Rate scaled score of 3 is higher than

**Ramsay v. NBME - Exhibit C**

1% of other individuals from a group of individuals age 19 years through 23 years, and her Accuracy scaled score of 5 is higher than 5% of other individuals from that group. Her Fluency scaled score of 4, which is a combination of the Rate and Accuracy performance, is in the well below average range and is higher than only 2% of the comparison group.

The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency that rely on the number of correct responses to reading comprehension items completed within a time limit. The WJ-4 Reading Rate Cluster measures reading speed by way of the number of correct responses completed and is derived from the time-limited Sentence Reading Fluency and time-limited Word Reading Fluency subtests. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range and is higher than 1% of other adults her age. Jessica was only able to read three of the seven NDRT passages and attempted only 47% of the 38 Comprehension items on the standard-time Comprehension administration. She correctly answered 94% of the Comprehension items she attempted. A majority of high school seniors were found to be able to read all seven passages and attempt all 38 Comprehension items. In addition, Jessica's Nelson-Denny Rate score was lower than 99% of high school seniors.

Jessica's reading comprehension was measured both by means that were not influenced by being required to read quickly or restricted by time limits and by measures that required her to read quickly or were restricted by time limits. Her reading comprehension performance was in the average range when not impacted by speed or time limits. Her reading comprehension performance was in the below average range when impacted by speed or time limits. The WIAT-III Reading Comprehension subtest reflects reading comprehension under conditions when reading is untimed. She obtained a WIAT-III Reading Comprehension subtest score of 94 that is in the Average range and is higher than 34% of other individuals her age.

The GORT-5 Comprehension subtest and the Nelson-Denny Reading Test reflects reading comprehension under conditions when speed is emphasized or time is restricted. On the GORT-5, Jessica was specifically instructed to read passages out loud "as carefully and as quickly as you can." The GORT-5 passage was then removed from sight after she completed the passage and she was asked five open-ended questions about the content of the passage. Her GORT-5 Comprehension scaled score of 3 is in the far below average range and is higher than only 1% of the comparison group. The Nelson-Denny Reading Test (NDRT) measured her performance on a timed test. She correctly answered 94% of the Comprehension items she was able to attempt during the standard twenty-minute time limit. Jessica's NDRT Comprehension score is near the bottom of the low average range at the 18th percentile compared to grade-12 students, in the Far Below range at the 2nd percentile compared to grade-16 university students, and in the Far Below Average range at the 1st percentile compared to medical and healthcare students.

Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment. Jessica's overall basic reading skills are in the average range as measured by the WIAT-III Basic Reading Composite score of 96, which reflects word decoding skills under untimed conditions. She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits

persistently impaired reading rate and reading fluency compared to other adults her age, as reflected in WJ-4 Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension scores.

Although discrepancies between reading scores and aptitude scores are no longer one of the diagnostic criteria, such discrepancies reflect the frequency of the degree of unexpected struggle that occurs in the general population. Jessica's WIAT-III Total Reading Composite score of 85 is significantly below her Mathematics Composite score of 133 by a very uncommon margin estimated to occur in less than 1% of other individuals in the general population, which is a reflection of the difficulty she has experienced specific to acquiring reading skills. Her WIAT-III Mathematics Composite score of 133 is commensurate with an expected score of 120 predicted by her GAI score. However, all of her WIAT-III reading composite scores are significantly below expectation whether the expectation is measured with the FSIQ or the GAI score. Jessica is expected to have a WIAT-III Reading Comprehension and Fluency Composite score of 112 predicted from her FSIQ score but her actual Reading Comprehension and Fluency Composite score is 74. This is a very uncommon discrepancy of 38 points estimated to occur in 1% or less of other adults. Similar very uncommon discrepancy margins can be seen between her predicted scores and her actual WIAT-III Basic Reading Composite and Reading Comprehension-Fluency Composites with even larger discrepancies based on her GAI score. Jessica's history and pattern of reading scores indicate and warrant a diagnosis of Specific Learning Disorder with impairment in reading that involves reading rate, reading fluency and reading comprehension. Her impairment in reading is exacerbated by the effects of ADHD. The severity of her impairment in reading is severe.

Double the usual time for any timed test is recommended because of Jessica's very slow reading speed and difficulty comprehending the content of passages. The letter of September 11, 2018, from Dr. Farmer denying extended time stated that the 2017 evaluation by Dr. Lewandowski reported that "your reading, spelling and arithmetic are normal to above normal." However, the only test of her reading skills used by Dr. Lewandowski was the Wide Range Achievement Test-4th Edition (WRAT-4), which does not measure reading speed, reading fluency or the impact of these on comprehension. The WRAT-4 is considered to be an insufficient instrument as the primary assessment of reading, writing, or math skills. The USMLE Guidelines for Testing Accommodations specifically states, "The Nelson-Denny Reading Test (NDRT) and Wide Range Achievement Test (WRAT) are not comprehensive diagnostic measures of achievement and therefore neither is considered acceptable if used as the sole measure of reading ability or academic skills."

Dr. Farmer also stated that "documentation does not demonstrate a developmental history of impaired scholastic skills." Although not formally identified in her academic records, the records she provided this examiner reflect specific statements by her (and referred to in Dr. Lewandowski's report) about the difficulty she experienced from her earliest elementary years in acquiring reading and writing skills. Dr. Farmer cited her high school grade point average as proof that she did not reflect developmental history of impaired academic functioning when in fact she stated that she achieved her high grades because of the inordinate amount of time she had to devote to school work when compared to other students, as well as the informal accommodations she received. Dr. Farmer further cited her scores on the ACT and MCAT as proof that her academic functioning was not impaired. The ACT and MCAT are not comprehensive diagnostic measures of reading or other academic skills any more than the WRAT is, and the scores she managed to attain are as

**Ramsay v. NBME - Exhibit C**

much a reflection of the compensatory effects of her superior intellect rather than an absence of reading impairment.  While her scores on the ACT and the MCAT were good, she may have scored significantly higher if she had taken these tests with accommodations of a separate room and extended time.  Consequently, the ACT and MCAT scores do not provide an indication of the negative impact of her reading disability.

It is noteworthy that recent students with her MCAT score, while good at the 79th percentile combined with her college GPA, only had an acceptance rate of 38% according to the Association of American Medical Colleges.   Dr. Farmer also stated in reference to Dr. Lewandowski's evaluation that "Your evaluator's conclusions not withstanding, he reports that her performances on a computerized measure of attention-related problems, the Conners Continuous Performance Test Third Edition (CPT-3) are normal." However, according to a leading ADHD researcher and specialist, "… a sizable minority of adults with ADHD can perform these tests sufficiently well to make for an unacceptable level of false negatives for these tests."[1] The DSM-5 specifically states that, "Inattentive behavior is associated with various underlying cognitive problems on tests of attention, executive function, or memory, although these tests are not sufficiently sensitive or specific to serve as diagnostic indices." Consequently, neuropsychological tests including continuous performance tests, can provide supplementary evidence for ADHD, but seemingly normal performance cannot be used to rule out the condition.

Jessica's writing skills are in the middle of the average range compared to other adults her age as measured by the WIAT-III Written Expression Composite score of 100, which is as high or higher than 50% of other adults her age.  The subtests and component scores are also within the average range for her age.  Consequently, a specific learning disorder with impairment in written expression is not indicated.  However, Jessica's WIAT-III Written Expression Composite score of 100 is significantly below an expected score of 119 predicted by her GAI score of 132 and by an uncommon margin estimated to occur in 10% or less of the general population. This pattern represents a significant relative weakness performing writing tasks, which is presumed to be a consequence of her reading disorder and the ADHD. Jessica can be expected to be relatively slow at organizing and expressing her thoughts in writing at a level commensurate with her intelligence, which is reflected in the distinct weakness she exhibited with general processing speed as measured by the WAIS-IV.   Consequently, additional time is needed on writing tasks in order to perform at a level commensurate with her intelligence.

Jessica Ramsay is a 28-year-old, single female medical student with superior intelligence who has a long history of inattention, distractibility and hyperactivity that have significantly interfered with academic functioning since early childhood.  Jessica has been able to perform well academically, but has had to rely on extraordinary compensatory strategies in order to do so. Jessica's academic and behavioral history reflect DSM-5 diagnostic criteria indicating ADHD, Combined Presentation.

Jessica reported often experiencing 17 of the 18 DSM-5 criteria symptoms associated with ADHD that have persisted for at least the past six months with most having been present since her earliest years in school.  The persistently frequent manifestation of these symptoms was corroborated by her mother and her fiancé.  On a

---

[1] Barkley, R., Murphy, K., Fischer, M. (2008). ADHD IN ADULTS: What The Science Says (p. 433). New York, NY: The Guilford Press.

**Ramsay v. NBME - Exhibit C**

systematic rating score of the frequency of occurrence of the DSM-5 ADHD symptoms, Jessica endorsed 17 (her mother, 14 and fiancé, 11) of the 18 criteria that are associated with a diagnosis of ADHD.  Only 5 inattention or 5 hyperactive-impulsive symptoms are required to be frequently and persistently present over the previous six months.  The ADHD symptoms described or endorsed by Jessica, her mother and fiancé are prominently exhibited at school, at her home and with her interpersonal relationships.  These symptoms were reported by Jessica and corroborated by her mother to have interfered with and reduced the quality of her academic functioning and her daily adaptive functioning since her earliest school years.

The available school records do not clearly reflect academic struggles in elementary, middle or high school, but this is a result of the family obtaining help on an informal basis, which was very successful in preventing poor academic grades, and therefore masked the degree of struggle Jessica experienced during these years. In addition, the specificity of Jessica's descriptions, which are corroborated by her mother, attest to the presence of such struggle. Although Jessica has worked hard at compensating for her deficits, her symptoms have continued to significantly interfere with her life.   Results of the IVA+Plus, a computerized test of sustained attention and distractibility, reflect a severe impairment compared to other adults her age. In addition, her WAIS-IV Processing Speed Index score at only the 8th percentile for her age reflects a weak cognitive efficiency highly associated with ADHD.  Jessica's symptoms are not better explained by any other psychiatric or medical condition.   Her medical exams with her physician do not indicate a physical disorder or disease other than ADHD and a Specific Learning Disorder with impaired reading that would account for her ADHD symptoms or academic difficulties.   Jessica's mental status and the magnitude of her psychological symptoms do not indicate a psychological condition severe enough to account for her ADHD symptoms or her academic difficulty.  Jessica has also experienced longstanding feelings of discouragement, frustration, and anxiety which are best understood to be a direct secondary consequence of her underlying ADHD symptoms. Consequently, a diagnosis of ADHD, Combined Presentation is warranted in addition to a Specific Learning Disorder with impairment in reading.

**Diagnosis:   DSM-5 criteria synchronized with ICD-10-CM numerical coding**

1. Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition, 315.00 (F81.0)

2. Attention-Deficit/Hyperactivity Disorder Combined Presentation 314.01 (F90.2)

**Recommendations:**

1. Jessica's pattern of reading and writing scores is typical of the intelligent dyslexic reader who struggles with efficient decoding and processing of the printed words, but can use her intelligence to substantially compensate and extract seemingly adequate comprehension from passages. However, the intelligent dyslexic reader's reading comprehension is fragile and susceptible to abrupt lapses and failure that interferes with academic achievement commensurate with her intelligence. Jessica's level of reading impairment is severe and can be expected to significantly and substantially interfere with educational efforts without accommodations such as extended time. Her impaired reading skills significantly interfered with her performance on the Nelson-Denny Reading Test because of the standard time limit. Jessica correctly answered most of the items she attempted on Nelson-Denny Reading Test, but she indicated this required her to reread passages multiple times in order to gain adequate comprehension. Consequently, her percentile rank scores were severely limited because of the time constraints. Jessica correctly completed 94% of the Comprehension items she attempted, but was only able to attempt 47% of the Nelson-Denny Comprehension items during the standard time limit.

   Consequently, it is recommended that Jessica receive at least double the standard time allowed for tests and exams. Any classroom test or standardized test administered without the accommodation of extended time (double) will not be an accurate and valid measure of Jessica's knowledge in a given area. Likewise, Jessica's weakness in writing can be expected to significantly and substantially interfere with educational and assessment efforts without accommodations such as extended time. Any tests administered without extended time (at least double) should be regarded a significant and substantial under-representation of Jessica's actual abilities and knowledge, which impairs her access to the exam. Therefore, it is also recommended that at a minimum she be allowed extended time (double the standard time) for any classroom tests, standardized tests and classroom assignments.

2. At least 100% additional test time (double time) is also recommended because of her inattention, distractibility, and slow information processing. This should be used in conjunction with a private, quiet room and additional break time to address basic needs and to adequately manage ADHD symptoms and her medical disorders. Any test administered without these accommodations will not be an accurate measure of what she knows about the subject being assessed.

3. The use of a computer, computer word-processing software with spell-check, and extended time is recommended for any classroom tests or standardized tests that involves writing. The extended time is also necessary to adequately utilize any assistive technology for reading and writing.

4. Reading material should also be provided to Jessica in audio recorded format. An online certification has been completed to allow her to apply for a Learning Ally (learningally.org) membership.

**Ramsay v. NBME - Exhibit C**

page 31 of 31 – Jessica E. Ramsay

5. Tutorial support and assistance from the college academic support services for her reading and writing problems is recommended as needed to help Jessica function at a level commensurate with her intellectual abilities.

6. Remedial reading instruction following the Orton-Gillingham approach may be beneficial for her dyslexia and is recommended for consideration. This is available through MDI.  However, this is a slow process and unlikely to benefit her while she is in medical school.  Also, improvement of reading fluency is uncertain and it is unknown what benefit, if any, she may obtain from such instruction.

7. Continue treatment through her physician for ADHD with medications such as Concerta, Adderall, Intuniv, Strattera, Vyvanse, Wellbutrin or Provigil.


*Robert D. Smith*

Robert D. Smith, PhD
Licensed Psychologist
Neuropsychologist

**Ramsay v. NBME - Exhibit C**



| Welcome | Services | DYSLEXIA Info | ADHD/ADD Info | Credentials | Cost | Contact | Resources |

# Welcome

Specializing in the assessment and treatment options for:

- *DYSLEXIA*
- *ADD/ADHD*
- *LEARNING DISORDERS*
- *EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED EXAMS*
- *IQ OPTIMIZATION*
- *PSYCHOTHERAPY*

## Services Can Be Tax Deductible–Click Here

- Adults and teens with learning disabilities may be able to get additional time and other accommodations in high–stakes testing situations (SAT, ACT, MCAT, LSAT, GRE, GMAT, etc). Dr. Smith offers neuropsychological evaluations to individuals who are seeking documentation as part of their application to request more time and/or other accommdations.

- BEWARE! Some websites offer so–called evaluations at a much lower cost. However, many of these so–called "diagnoses" are not real because the practicioners are not licensed to provide a real diagnosis and use definitions that are not officially recognized and are therefore not real. An official DSM–5 (Diagnostic and Statistical Manual of Mental Disorders) diagnosis is necessary when you are trying to qualify for services at school or work.

- Dr. Smith is a licensed psychologist and neuropsychologist and is a consultant for the Michigan Dyslexia Institute and provides comprehensive neuropsychological evaluations for Dyslexia, ADHD and other Learning Disorders at the Michigan Dyselxia Institute Abrams Teaching Laboratory in Lansing and at the Michigan Dyselxia Institute Detroit Metro Center in Berkley Michigan.

- Not sure if an evaluation is right place you or your child? All evaluations by Dr. Smith consider a braod range of causes for reading and other learning idsorders, not just Dyslexia. During the Intake Interview your history and previous evaluations, if you have them, are reviewed to determine what tests need to be administered to address your concerns and Dr. Smith will evaluate for other types of conditions that are indicated. All of this will be discussed thoroughly with you after the Intake Interview and before any testing so you can make an informed decision about what's best for you.

- Please feel free to call Dr. Smith's office if you are interested in an evaluation or services and have any questions. There are many possible considerations depending on your situation. Dr. Smith has tried to anticipate as many questions as possible throughout this website, but if you can't find what you need, please call Dr. Smith's office at 517–349–5987.

- The Michigan Dyslexia Institute, Inc. (MDI) is a nonprofit organization, funded by a combination of grants, donations and fee for service programs serving children and adults through five regional centers throughout Michigan. MDI provides teacher training, cooperative programs with school districts and state agencies, public information about dyslexia, diagnostic evaluation and remedial reading instruction.

Michigan Dyslexia Institute

DEFENDANT'S
EXHIBIT

**34**

----------------------------------------------------------------

Various forms of payment are accepted, including check, Visa, Mastercard, American Express.

Dyslexia, ADHD, ADD, Learning Disabilities, IQ, intelligence Testing

**Robert D. Smith, PhD**

*Diagnosis & Treatment for Dyslexia, ADD & Learning Disorders*
**IQ Optimization**
*Children & Adults*

| Welcome | Services | DYSLEXIA Info | ADHD/ADD Info | Credentials | Cost | Contact | Resources |

## NEUROPSYCHOLOGICAL EVALUATION FOR DEVELOPMENTAL DYSLEXIA AND ADHD (ADD)
(cost $2030) (procedure codes 96132, 96133, 96136, 96137)

This is for the purpose of determining whether a child or adult has the reading problem that meets the criteria to receive a formal diagnosis of a Reading Disorder (developmental dyslexia ) and attention deficit disorder ( ADD or ADHD ). It involves an assessment of overall cognitive functioning, tests of attention, questionnaires, rating scales and reading tests. A formal diagnosis is necessary if you are seeking insurance reimbursement or are trying to obtain special accommodations under the American with Disabilities Act in school, for standardized testing or for employment purposes. This evaluation results in an integrated written report.

### Problems with IQ Testing:

Traditionally, the principal method of diagnosing learning disabilities, such as dyslexia, has been to compare measured intelligence and achievement level such as reading. It is expected that the reading score for instance, will be significantly below the IQ score if dyslexia is present. Other factors are also considered, but he center piece to diagnosis is this discrepancy in scores. However, there are serious problems with this approach that are frequently not considered in a diagnostic evaluation.

First, the concept of intelligence being a single ability accurately represented by a single score such as IQ has been seriously challenged by research. The overall functioning that is represented by IQ is actually the result of at least four, (and possibly more) separate cognitive abilities. The are most commonly identified as verbal reasoning, nonverbal reasoning, working memory and processing speed. When these are all functioning at the same level, then a single score such as the IQ can be regarded as validly representing a person's intelligence. However, It is not uncommon for people with learning disabilities to have very uneven functioning in these four areas, perhaps ranging from very low to very high. Consequently, a child or adult's reasoning and learning abilities may be much higher than what is reflected in the IQ score. Unfortunately, it is the lower IQ score that is often used in calculating the discrepancy between ability and achievement such as reading resulting in a discrepancy that is deemed within normal limits. Consequently, the learning disability that is actually present is not detected. Failing to detect a problem that is actually present is called a false negative.

There are additional consequences in not properly interpreting intelligence tests. Working memory and processing speed are considered aspects of attention and are closely associated with some type of attention deficit disorder. Impairments in these areas strongly suggests that an evaluation for ADHD or ADD is in order. Relying on the traditional IQ score may mask actual impairments and result in failure to detect a problem, when in fact a problem is present. Again a false negative. This can also result in serious under measurement of actual ability or potential. Unfortunately many psychologists are only trained to use the traditional IQ score and ignore indications that a traditional IQ score is invalid.

### Problems with Testing Reading:

Automaticity is acquired in the latter stage of reading acquisition when decoding of words is automatic and therefore rapid, which allows more mental resources to be directed to the task of reading comprehension. Automaticity is necessary for practical reading typical non-dyslexic readers. However, the extra steps and mental effort the dyslexic reader must use to perform basic decoding continues to reflect the ongoing interference that their dyslexia has with practical reading. Most reading tests that are used to evaluate for dyslexia are untimed and do not require Automaticity of decoding and will often fail to detect the presence of dyslexia in a person who has had substantial remediation. People with dyslexia who have had substantial amount of remedial reading instruction can often perform well on these untimed tests. Consequently, it is important to administer reading tests that require Automaticity of decoding for the evaluation to have a reasonable chance of detecting dyslexia. Unfortunately, such tests are often not included in an evaluation, which may result in a false negative diagnostic conclusion.

### Problems with ADHD or ADD testing:

There is considerable controversy at the present time over what are the core symptoms of ADHD or ADD. ADD, which is ADHD, Predominantly Inattentive Type, is particularly difficult to diagnose because hyperactivity or impulsiveness are not the primary symptoms. People with ADD are not disruptive and are often well behaved in classrooms. Their symptoms involve internal, silent problems of mental processing of information that results in poor academic performance. Because their symptoms are not readily noticed by observers, their condition often goes undetected despite the suspicion that something is just not right. Because of the controversy regarding the core symptoms and the difficulty detecting symptoms evaluations often result in false negatives when in fact there is a problem. Evaluations require a care review of all tests, history, grade reports, teacher reports and parent reports.

# REISMAN ▪ CAROLLA ▪ GRAN LLP

*19 Chestnut Street*
*Haddonfield, NJ 08033*
*: 856.354.0021*
*F: 856.873.5640*
*www.rcglawoffices.com*


1130464      5-366-431-4
Dupl. Hard Copy-Attorney

*Catherine Merino Reisman*\*
*Amelia Carolla*\*
*Judith A. Gran*\*\*
*Sarah E. Zuba*\*

\**Admitted in NJ & PA*
\*\**Admitted in PA*

*Lawrence D. Berger\**
*Of Counsel*
*larry@rcglawoffices.com*
*direct dial: 856.354.0021*

December 12, 2018

**<u>By priority mail and by e-mail to disabilityservices@nbme.org</u>**
Catherine Farmer, Psy.D.
Director, Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

RECEIVED

DEC 1 3 2018

Disability Services

Re:    Appeal of Jessica Ramsay
       USMLE Step 1
       USMLE ID#: 5-366-431-4

Dear Dr. Farmer:

I represent Jessica Ramsay and I am submitting this letter and additional enclosures on her behalf to request that the National Board of Medical Examiners ("NBME") reconsider your September 11, 2018 letter ("NBME Letter"), to the extent you denied Ms. Ramsay's request for extended testing time.

In the NBME letter, you granted Ms. Ramsay's request for additional break time, and a separate testing room, and also granted permission to read aloud. However, you denied the request for additional test time (double time), and we request reconsideration of this decision, for the reasons stated in this letter.

The request for reconsideration is based on an additional evaluation by Robert D. Smith, Ph.D. ("Smith Report"), which is enclosed and which further supports the diagnoses of Specific Learning Disorder with impairment in reading, and Attention-Deficit/ Hyperactivity Disorder.

NBME00035

Dr. Farmer
December 12, 2018
Page 2

### Summary of Dr. Smith's Report.

Ms. Ramsay obtained an additional evaluation by Dr. Smith to address NBME's stated reasons for denying her request for extended testing time. Dr. Smith evaluated Ms. Ramsay's disabilities face-to-face. He interviewed Ms. Ramsay and her mother concerning her history. He reviewed the results of previous testing, and obtained additional testing. Based on all of this information, he arrived at a diagnosis of Specific Learning Disorder with impairment in reading, and Attention-Deficit/ Hyperactivity Disorder Combined Presentation. In his report, Dr. Smith reviews the DSM-5 diagnostic criteria for these disorders, based on both the history and test results. He also addresses each of the reasons stated in the NBME Letter for denying Ms. Ramsay's request. Dr. Smith's report supports Ms. Ramsay's request for the accommodation of extended test time (double time).

Some examples of the additional testing obtained by Dr. Smith, all of which are reported according to age-based norms except as noted, include the following:

- Ms. Ramsay's WIAT-III[1] word reading speed score is at the 2d percentile. (Smith Report at p. 16.)

- Ms. Ramsay's WIAT-III pseudoword decoding speed score is at the 5th percentile (*Id.*)

- Ms. Ramsay's WIAT-III reading comprehension and fluency composite score is at the 4th percentile. (*Id.*)

- Ms. Ramsay's WIAT-III oral reading fluency score is at the 1st percentile. (*Id.*)

- Ms. Ramsay's WIAT-III oral reading rate score is also at the 1st percentile. (*Id.*)

- Ms. Ramsay's WJ-4[2] reading rate cluster score is at the 1st percentile. (Smith Report at p. 21.)

- Ms. Ramsay's WJ-4 word reading fluency score is at the 0.2 percentile. (*Id.*)

- Ms. Ramsay's WJ-4 sentence reading fluency score is at the 7th percentile. (*Id.*)

---

[1] Wechsler Individual Achievement Test, 3d edition.

[2] Woodcock-Johnson IV Tests of Achievement.

NBME00036

Dr. Farmer
December 12, 2018
Page 3

- Ms. Ramsay's GORT-5[3] rate score is at the 1st percentile. (Smith Report, p. 21.)

- Ms. Ramsay's GORT-5 accuracy score is at the 5th percentile. (*Id.*)

- Ms. Ramsay's GORT-5 fluency score is at the 2d percentile. (*Id.* at 22.)

- Ms. Ramsay's GORT-5 comprehension score is at the 1st percentile. (*Id.*)

- Ms. Ramsay's GORT-5 oral reading index score is at the 1st percentile. (*Id.*)

- Ms. Ramsay's NDRT[4] Rate score is at the 1st percentile (Smith Report at p. 22.)

- Ms. Ramsay's NDRT Vocabulary score is at the 11th percentile (*Id.*)

- Ms. Ramsay's NDRT comprehension score is at the 2d percentile. (*Id.*)

- Ms. Ramsay's NDRT total reading score is at the 4th percentile. (*Id.*)

- The NDRT has also developed norms for healthcare professionals, and when analyzed on the basis of these norms, her rate score, vocabulary score, comprehension score and total reading score are all at the 1st percentile. (Smith Report at pp. 22-23.)

The results of these tests support Dr. Smith's diagnosis of Specific Learning Disorder with impairment in reading, and Attention Deficit/ Hyperactivity Disorder, Combined Presentation, and the diagnostic criteria are discussed in Dr. Smith's report at pages 26-28, and 28-29, respectively.

---

[3] Gray-Oral Reading Tests, 5th edition, "the most comprehensive and robust measure available that reflects functioning when oral reading fluency and reading comprehension are simultaneously required." Smith Report at p. 21. As Dr. Smith explains, for the GORT-5, "The oldest normative age group available for comparison is a group of 19-year-old to 23 year-11-month-old adults. The GORT-5 scores of Rate, Accuracy, Fluency and Comprehension were demonstrated to have a strong correlation with age in the normative sample until age 13, with the progression of raw score gains getting smaller with each year of age until plateauing in the ages of the oldest normative age group." Smith Report at p. 21. Therefore, the use of the 19-year old to 23 year-11 month-old group is appropriate in this case.

[4] Nelson-Denny Reading Test, Form H. *See* Smith Report at p. 22. The NDRT is normed based on school and university grades, and Ms. Ramsay's scores are compared to university grade 16 (*i.e.,* college seniors), the closest available. As discussed below, Ms. Ramsay's scores are also compared to the NDRT scores for healthcare professionals. Both of these comparisons are appropriate. The comparisons are also congruent with the age-based comparisons for other instruments.

NBME00037

Dr. Farmer
December 12, 2018
Page 4

### NBME Should Reconsider Its Prior Decision And Grant
### The Extended Testing Time Requested By Ms. Ramsay.

**1.    Dr. Smith's Face-to-Face Evaluation.**

Dr. Smith's face-to-face evaluation of Ms. Ramsay is entitled to preferential consideration. As the Department of Justice has stated in the publication "Testing Accommodations":[5]

> Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because *face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.*

Testing Accommodations at 7 (italics added). *See also Bartlett v. New York State Board of Law Examiners,* 2001 U.S Dist. Lexis 11926 (S.D.N.Y. 2001) at *68 ("learning disabilities cannot be captured by psychometric measures alone and . . . *clinical observations are essential to a diagnosis of learning disabilities*") (italics added).

Thus, Dr. Smith's face-to-face evaluation should be given precedence.

**2.    Dr. Smith Has Addressed Each of NBME's Stated Reasons
For Denying Ms. Ramsay's Request for Additional Testing Time.**

In his report, Dr. Smith has addressed each of NBME's stated reasons for denying Ms. Ramsay's request for additional testing time:

- Referring to the prior evaluation by Dr. Lewandowski, you stated, "He does not describe how [Ms. Ramsay] meet[s] diagnostic criteria for any Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5) disorder."

(NBME Letter at 2.) Dr. Smith does discuss the diagnostic criteria for both Specific Learning Disorder and Attention Deficit/ Hyperactivity Disorder in his report at pages 26-28, and 28-29, respectively. Dr. Smith states that Ms. Ramsay "exhibited a pattern of reading scores typical of the dyslexic reader described" in his report. Smith Report at 25. "Overall, measures of her reading fluency encompassing reading speed resulted in performances that were well below average and far below average compared to other individuals her age and grade level." *Id.* at 25. With respect to Attention Deficit/ Hyperactivity Disorder Combined Presentation, Dr. Smith's interviews with Ms. Ramsay, her mother and her fiancé all confirmed the diagnostic criteria

---

[5] Found on the Internet at http://www.ada.gov/regs2014/testing_accommodations.pdf

Dr. Farmer
December 12, 2018
Page 5

specified in DSM-5. Smith Report at 14-15 and 29. In addition, "Results of the IVA+Plus,[6] a computerized test of sustained attention and distractibility, reflect a severe impairment compared to other adults her age. In addition, her WAIS-IV[7] Processing Speed Index score at only the 8th percentile for her age reflects a weak cognitive efficiency highly associated with ADHD. Jessica's symptoms are not better explained by any other psychiatric or medical condition." Smith Report at 29.

- Referring again to Dr. Lewandowski's evaluation, you stated, "The ICD-10 code F81.9 that Dr. Lewandowski assigned as a result of his 2017 evaluation is described by the publisher as Developmental disorder of scholastic skills, unspecified. However, your evaluator notes that your reading, spelling and arithmetic are normal to above normal and consistent with past education."

(NBME Letter, *id.*) Dr. Smith's report shows – to the contrary – that Ms. Ramsay's evaluation results are far below normal on numerous measures that are highly relevant to her ability to access the Step 1 examination (as well as subsequent Step examinations) including, for example, reading speed, decoding speed, reading fluency, and timed reading comprehension. *See* Smith Report at pp. 16, 21 and 22 and discussion above. Dr. Smith further explained:

> Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment. Jessica's overall basic reading skills are in the average range as measured by the WIAT-III Basic Reading Composite score of 96, which reflects word decoding skills under *untimed* conditions. She has been able to acquire an average level of reading comprehension skills *when allowed sufficient time to employ compensatory strategies*, but exhibits *persistently impaired reading rate and reading fluency compared to other adults her age*, as reflected in WJ-4 Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension scores.

Smith Report at 26-27 (italics added).

- Referring again to Dr. Lewandowski's evaluation, you stated, "Your evaluator's conclusions notwithstanding, he reports that your performances on a computerized measure of attention-related problems, the Conners Continuous Performance Test, Third Edition (CPT-3), are normal."

---

[6] Integrated Visual & Auditory Continuous Performance Test, discussed in Dr. Smith's Report at pp. 12-16 and 29.

[7] Wechsler Adult Intelligence Scale – Fourth Edition, discussed in Dr. Smith's Report at pp. 8-11 and 29.

Dr. Farmer
December 12, 2018
Page 6

(NBME Letter at 2.)  Dr. Smith has responded in his Report at p. 28, explaining that tests like the
Conners frequently yield false negatives and cannot be used to rule out ADHD.  As Dr. Smith
states:

> However, according to a leading ADHD researcher and specialist, "… a
> sizable minority of adults with ADHD can perform these tests sufficiently
> well to make for an *unacceptable level of false negatives* for these tests."[8]
> The DSM-5 specifically states that, "Inattentive behavior is associated
> with various underlying cognitive problems on tests of attention, executive
> function, or memory, although these tests are *not sufficiently sensitive or
> specific to serve as diagnostic indices*." Consequently, neuropsychological
> tests including continuous performance tests, can provide supplementary
> evidence for ADHD, but *seemingly normal performance* [on tests like the
> Conners] *cannot be used to rule out the condition*."

Smith Report at p. 28 (italics added).

- Finally, you state: "Furthermore, your documentation does not demonstrate a
developmental history of impaired scholastic skills. Dr. Lewandowski writes that
you reported earning a high school GPA of 3.8 and an ACT Score between 27 and
30. The records provided show that you earned an MCAT score of 30M under
standard conditions in 2011, better than 79% of a highly select group of medical
school applicants. These data do not demonstrate a developmental history of
impaired cognitive or academic functioning or that standard testing time is a
barrier to your access to the USMLE."

(NBME Letter at 2.)  Dr. Smith has provided information in his report based on his interviews
with Ms. Ramsay and her mother, which does demonstrate such a history, and which supports his
conclusion that the standard testing time for the Step 1 examination is a barrier for Ms. Ramsay.

Specifically, Dr. Smith reports that Ms. Ramsay experienced "17 of the 18 DSM-5
criteria symptoms associated with ADHD that have persisted for at least the past six months with
most having been present since her earliest years in school. The persistently frequent
manifestation of these symptoms was corroborated by her mother and her fiancé." Smith Report
at 28. Dr. Smith continues:

> These symptoms were reported by Jessica and corroborated by her mother
> to have interfered with and reduced the quality of her academic
> functioning and her daily adaptive functioning since her earliest school
> years.

---

[8] [Smith Report at 28 n.1:]  Barkley, R., Murphy, K., Fischer, M. (2008). ADHD IN
ADULTS: What The Science Says (p. 433). New York, NY: The Guilford Press

NBME00040

Dr. Farmer
December 12, 2018
Page 7

> The available school records do not clearly reflect academic struggles in
> elementary, middle or high school, but this is a result of the family
> obtaining help on an informal basis, which was very successful in
> preventing poor academic grades, and therefore masked the degree of
> struggle Jessica experienced during these years. In addition, the specificity
> of Jessica's descriptions, which are corroborated by her mother, attest to
> the presence of such struggle. Although Jessica has worked hard at
> compensating for her deficits, her symptoms have continued to
> significantly interfere with her life. Results of the IVA+Plus, a
> computerized test of sustained attention and distractibility, reflect a severe
> impairment compared to other adults her age. In addition, her WAIS-IV
> Processing Speed Index score at only the 8th percentile for her age reflects
> a weak cognitive efficiency highly associated with ADHD. Jessica's
> symptoms are not better explained by any other psychiatric or medical
> condition.

*Id.* at 29.

Ms. Ramsay's prior academic success – less than would be predicted by her IQ – is not
inconsistent with the existence of a significant disability which now interferes with her accessing
exams like the Step 1 exam. Ms. Ramsay's Personal Statement, and the history taken by
Dr. Smith demonstrate that Ms. Ramsay was able to self-accommodate her disability prior to
medical school. Dr. Smith reports that Ms. Ramsay stated:

> that she achieved her high grades because of the inordinate amount of time
> she had to devote to school work when compared to other students, as well
> as the informal accommodations she received. Dr. Farmer further cited her
> scores on the ACT and MCAT as proof that her academic functioning was
> not impaired. The ACT and MCAT are not comprehensive diagnostic
> measures of reading or other academic skills any more than the WRAT is,
> and the scores she managed to attain are as much a reflection of the
> compensatory effects of her superior intellect rather than an absence of
> reading impairment. While her scores on the ACT and the MCAT were
> good, she may have scored significantly higher if she had taken these tests
> with accommodations of a separate room and extended time.
> Consequently, the ACT and MCAT scores do not provide an indication of
> the negative impact of her reading disability.

Smith Report at pp. 27-28.

                    NBME00041

Dr. Farmer
December 12, 2018
Page 8

Moreover, under the Americans with Disabilities Act Amendments Act of 2009 ("ADAAA"), P.L. 110-325, NBME is required to disregard the effect of such self-accommodations.[9]  *See also* pages 10-11, below.

In short:  Ms. Ramsay has a disability which directly impacts her performance on USMLE Step 1.  Her Personal Statement, as well as Dr. Smith's report, confirm that in medical school – unlike grade school, high school and college – she can no longer self-accommodate or avoid the effects of her disability.  Therefore, the ADA and the ADAAA require that NBME provide her with the requested accommodation of extended testing time, in addition to the accommodations that have been granted.

### 3.    A History Of Passing Prior Examinations Without Accommodations Does Not Demonstrate That Accommodations Are Not Required Now.

An additional reason to reconsider your conclusion, that extended testing time is not required because of Ms. Ramsay's prior academic record, is stated in the decision of Judge, now Justice, Sotomayor, in *Bartlett v. New York State Board of Law Examiners, supra.*  Judge Sotomayor stated that a decision about accommodations "must look at how [the student] achieved these results."  *Id.* at *123.  In *Bartlett*, for example, the Court observed:

> [P]laintiff's scores, without the accompanying clinical observations about how plaintiff went about achieving the scores, tell nothing about how plaintiff achieved those results, including whether she reads with automaticity, whether she reads slowly, and whether reading causes her fatigue.

*Bartlett, supra*, at *124.  As Judge Sotomayor also remarked:  "While many of these [self-accommodating or mitigating] measures increase[d] plaintiff's decoding accuracy, they do so at the cost of speed and cognitive energy."  *Id.* at *114.

The ways in which plaintiff Bartlett self-accommodated were similar to the ways that Ms. Ramsay self-accommodated prior to medical school.  Like Ms. Bartlett, she avoided reading as much as possible as she stated in her Personal Statement:

> Because reading and writing are such tedious and draining processes for me, *I avoid both as much as possible*.  I was able to do this strategically for some prior standardized tests like the ACT and MCAT because the

---

[9] "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

\* \* \* \*

(IV) learned behavioral or adaptive neurological modifications."

42 U.S.C. §12102(4)(E)(i)(IV).

Dr. Farmer
December 12, 2018
Page 9

tests were designed so that *many of the questions could be answered
without reading the whole question.* For the ACT, I was not able to read
all of the questions and could not accurately demonstrate my knowledge.
Additionally, due to the guessing penalty, I had to leave the questions I
was not able to read unanswered. However, because *most of the questions
required little reading to find the answers*, I was able to answer enough
questions to achieve an acceptable score. *Likewise, for the MCAT, many of
the questions could be answered without reading and gathering
information from the passages*, so I knew to answer passage-independent
questions first, and then used any time left to try to read the passages with
the most unanswered questions remaining. *Being able to skip much of the
reading made it possible for me to correctly answer enough questions to
achieve an acceptable score.*

Personal Statement at 3 (italics added). But the USMLE is different, as Ms. Ramsay also stated,
and this self-mitigation strategy of avoiding reading is not possible:

*The NBME and USMLE exams are different* from the standardized exams
I took before medical school. *For these exams [i.e., USMLE], I must read
the entire prompt for each of the questions in order to gather all of the
information necessary to correctly decide on an answer.* This requires far
more reading than either the ACT or the MCAT did. To have the same
opportunity as the other students taking this exam to read and gather the
necessary information from each prompt, I need the accommodations that
I am requesting.

*Id.* (italics added).

Ms. Ramsay has also utilized reading aloud as a self-accommodation, which NBME has
now specifically permitted by granting her the accommodations of a private testing room and
permission to read aloud. Reading aloud is a technique which inherently requires more time, and
therefore is an additional reason to grant Ms. Ramsay's request for additional time.

As the Department of Justice, Civil Rights Division, has stated in its publication "Testing
Accommodations," *supra*:

**A person with a history of academic success may still be a person with
a disability who is entitled to testing accommodations under the ADA.**
A history of academic success does not mean that a person does not have a
disability that requires testing accommodations. For example, someone
with a learning disability may achieve a high level of academic success,
but may nevertheless be substantially limited in one or more of the major
life activities of reading, writing, speaking, or learning, because of the
additional time or effort he or she must spend to read, write, speak, or
learn compared to most people in the general population.

NBME00043

Dr. Farmer
December 12, 2018
Page 10

\* \* \* \*

> **First Time Requests or Informal Classroom Testing Accommodations.**
> **An absence of previous formal testing accommodations does not**
> **preclude a candidate from receiving testing accommodations.**
> Candidates who are individuals with disabilities and have never previously
> received testing accommodations may also be entitled to receive them for
> a current standardized exam or high-stakes test. In the absence of
> documentation of prior testing accommodations, testing entities should
> consider the entirety of a candidate's history, including informal testing
> accommodations, to determine whether that history indicates a current
> need for testing accommodations.

"Testing Accommodations," *supra*, at 3 and 6-7 (boldface in original).

### 4. NBME Failed To Give Any Consideration Or Weight To The Accommodations Ms. Ramsay Received In College And Medical School.

Ms. Ramsay **has** received accommodations, both in college (at Ohio State University)
and in medical school, as reflected in her original NBME application. Ms. Ramsay is requesting
the same accommodations from NBME that she previously requested and received from her
medical school, including for the Comprehensive Basic Science Examination and NBME-
prepared shelf examinations. The Department of Justice guidance states that a candidate should
generally receive the same accommodations as on prior standardized examinations:

> If a candidate [who] requests the same testing accommodations he or she
> previously received on a similar standardized exam or high-stakes test,
> provides proof of having received the previous testing accommodations,
> and certifies his or her current need for the testing accommodations due to
> disability, then a testing entity *should generally grant the same testing*
> *accommodations for the current standardized exam or high-stakes test*
> *without requesting further documentation from the candidate*.

"Testing Accommodations," *supra*, at 5 (italics added). Indeed, NBME is required to "*give[ ]*
*considerable weight* to documentation of past modifications, accommodations, or auxiliary aids
or services received in similar testing situations. . . ." 28 CFR §36.309(b)(1)(v) (italics added).

NBME gave no weight at all to the accommodations received by Ms. Ramsay, and this is
contrary to the Department of Justice guidance cited above.

NBME00044

Dr. Farmer
December 12, 2018
Page 11

**5.    NBME Is Required To Disregard Mitigating Strategies Which Allowed Ms. Ramsay To Pass Examinations Prior To Medical School, And Mitigating Strategies That Are Not Effective For The USMLE Step Exams.**

The ADA Amendments Act ("ADAAA"), and its implementing regulations, specifically provide that the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," such as "medication" and "learned behavioral or adaptive neurological modifications." ADAAA, 42 U.S.C. §12102(4)(E)(i) (*superseding Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)). Ms. Ramsay's prior academic success was achieved through use of such mitigating measures, and is therefore irrelevant.

### Conclusion

For the reasons stated in this letter, in Dr. Smith's report, and Ms. Ramsay's original request, I request that NBME grant Ms. Ramsay's appeal, and provide her with the additional accommodation of extended test time (double time) which she has requested.

Very truly yours,

Lawrence D. Berger

Enclosed Exhibits:

(A)    Neuropsychological Evaluation Report of Robert D. Smith, Ph.D. dated December 6, 2018

(B)    Robert D. Smith, Ph.D., curriculum vitae

**Appx1474**

NBME00045

  

**Michigan Dyslexia Institute, Inc.**
*Dyslexia Association of America*

1130465    5-386-431-4
Dupl. Exhibit A & B- Hard

A nonprofit organization serving children and adults with dyslexia

## NEUROPSYCHOLOGICAL EVALUATION

For Learning Problems

NAME:                    Jessica E. Ramsay
AGE:                     28 years, 0 months
SEX:                     Female
DATE OF BIRTH:           8/29/1990
EXAMINATION DATE:        9/25/2018
REPORT DATE:             11/6/2018
EXAMINER:                Robert D. Smith, PhD
LICENSE:                 6301003249

### Sources of Information:

Interview with Ms. Ramsay and her mother, Jerri Shold
TEST OF MEMORY MALINGERING (TOMM)
ADULT ADHD-Rating Scale-IV with Adult Prompts
NELSON-DENNY READING TEST
WECHSLER INDIVIDUAL ACHIEVEMENT TEST-THIRD EDITION (WIAT-III)
WOODCOCK-JOHNSON IV TESTS OF ACHIEVEMENT (WJ-4) (Selected subtests)
GRAY ORAL READING TESTS-FIFTH EDITION (GORT-5)
SYMPTOM CHECKLIST-90-REVISED (SCL-90-R)
INTEGRATED VISUAL & AUDITORY CONTINUOUS PERFORMANCE TEST (IVA+PLUS)

### Records Reviewed

The following records were made available at the time of this examination:
Alan Lewandowski, PhD, FACPN Neurocognitive Consultation (10/25/2017)
Alan Lewandowski, PhD, FACPN Neurocognitive Examination (12/7/2017)
Alan Lewandowski, PhD, FACPN Graphs and Raw Data for Neurocognitive Examination (12/7/2017)
Bruce Ruekberg, MD, letter supporting accommodations application (6/4/2018)
Genesis Family Health Center summary of medical history and status (5/17/2010)
The Ohio State University ADD/ADHD Verification Form (8/13/2010)
Decision letters of Essential Abilities Committee Request for Reasonable Accommodations (2014-2017)
USMLE Certification of Prior Test Accommodations (6/1/2018)
Alan Lewandowski, PhD, FACPN ADDENDUM response for additional information requested by USMLE and NBME (9/2/2016)

*Visit us at www.dyslexia.net*

Flint Rotary Center
G4225 Miller Road, Ste. 100
Flint, MI 48507-1227
(810) 732-5500
Fax (810) 732-1180

Detroit Metro Center
3384 W. 12 Mile Road
Berkley, MI 48072-1344
(248) 658-0725
Fax (248) 658-0754

State Headquarters &
Abrams Teaching Laboratory
532 E. Shiawassee Street
Lansing, MI 48912-1214
(517) 485-4000
Fax (517) 485-4076

Northern Michigan Center
601 E. Lake Street
Harbor Springs, MI 49740-1219
(231) 526-9252
Fax (231) 526-8657

St. Clair Center
1013 S. Seventh Street
St. Clair, MI 48079-5611
(810) 329-7890
Fax (810) 329-2927

**Appx1475**

David Overton, MD, letter supporting request for accommodations (4/12/2018)
Personal Statement regarding need for accommodations (6/6/2018)
NBME letter from Catherine Farmer, PsyD, regarding offered accommodations (9/11/2018)
MCAT Score Report for exams taken (11/4/2011)
Charles Livingston, MA, WAIS-IV score report (9/12/2014), report (9/22/2014), Addendum (9/12/2014)
ACT Score Report (3/2007 & 10/2007)
USMLE Step 1 Score Report (7/017)
Review of report cards for grades K, 2, 3, 4, 5, 6
Review of high school transcript
Review of undergraduate college transcript
Review of letters from Dr. Mary Alice Tanguay, Therapeutic Optometrist (1/27/2000 & 12/1997)

**Reason for Referral**

Ms. Ramsay is currently on academic leave from her fourth year of medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1, which is a requirement for continuing and completing her medical degree. She has formally been granted accommodations, such as extended time for tests and testing in a private room, during her undergraduate years at Ohio State University and at the Western Michigan University Homer Stryker, MD School of Medicine. Ms. Ramsay applied for the same accommodations from the National Board of Medical Examiners (NBME), which administers the USMLE, but was denied accommodations. She attempted the USMLE Step 1 without accommodations, but failed. She is appealing the NBME denial and sought this evaluation as part of her appeal.

**History and Interview Information**

Ms. Ramsay is currently living with her fiancé with whom she has lived for the past two years. She described her health as fair. She has several health conditions which are being appropriately medically managed. She had a deep vein thrombosis (DVT) the full length of her leg in 2016 and was later diagnosed with a clotting disorder. The DVT damaged the circulation in her legs, and sitting or standing for long periods causes painful swelling in her legs. Her vision is normal and was screened in August 2014. No hearing problems were reported and her hearing was evaluated in 2015. Ms. Ramsay was born in Texas. Her family moved to Michigan when she was 10 years of age. Her father is 57 years old, employed in sales, with a bachelor's degree. Her mother is 68 years old and is a retired art educator with a bachelor's degree in art education and a master's degree in education. She has two adopted brothers, ages 24 and 20. There is no history of substance abuse or severe psychological problems. Ms. Ramsay has had frequent headaches since she was very young, which her mother described as occurring during and after school as early as kindergarten. Beginning in third grade, she started having daily migraine headaches with blind spots, nausea, and hypersensitivity to light, sound and temperature, which was attributable to the mental strain from reading and writing for extended periods of time. Subsequent treatment over that next year reduced the frequency of migraines, but she has continued to experience migraine symptoms throughout her academic career.

NBME00047

Ms. Ramsay's mother had no problems or complications during pregnancy and Ms. Ramsay had no birth complications when born. There were no problems during her infancy/toddler period. Ms. Ramsay is ambidextrous, but was originally left handed. Her kindergarten teacher made her use her right hand, which was common practice at that time. When home she would use her left hand, but gradually switched to primarily using her right hand for writing tasks. She does many activities with her left hand and frequently switches back and forth.

For leisure activities Ms. Ramsay socializes with friends and family, plays sports and works out. She enjoys camping, hiking, art, hunting, archery, soccer, running, volleyball, watching football, dance, yoga, and weight training.

Ms. Ramsay reported that she tries very hard to succeed at schoolwork. She generally likes herself, though she indicated she is anxious and worried about her future because of having to suspend medical school. She has difficulty falling asleep, but sleeps six to eight hours a night. Her appetite is normal. She has several close friends she can confide in. She is often restless or fidgety and restless. She typically avoids anything that involves waiting. She often makes careless mistakes. Ms. Ramsay often has difficulty getting organized and finishing what she starts. She often has difficulty concentrating on one thing for very long. She is often easily distracted; she tends to forget what she is supposed to do and often loses her personal belongings.

Ms. Ramsay stated that she has marked difficulty sustaining attention, especially for extended periods, is very easily distracted by sounds, movement, and flashes of light, as well as her own thoughts and sensations. These distractions make it difficult to complete tasks that require sustained mental effort, such as thinking, maintaining conversation, remembering obligations and assignments, getting organized, staying on track, and completing tasks and projects. For example, she reported that when voting in an election she has difficulty reading and comprehending proposals she is trying to vote on. She often forgets where she put things such as her wallet, keys, assignments, phone, and legal documents. She also indicated that she is impulsive, has difficulty waiting, including for her turn in conversations. She unintentionally interrupts others, or blurts out her thoughts before fully thinking them through or appropriately filtering them for the situation. It is very difficult for her to focus on one idea at a time and she jumps quickly from one thought to another. She frequently forgets things she needs to do, forgets instruction, forgets what someone just said to her, and loses her train of thought when talking.

During exams and when reading, she will get lost in unrelated thoughts and loses track of what the questions are asking. She often unintentionally completes only part of the question in an exam. Consequently, she tries to compensate by reading and rereading the question aloud and double checking her answer selections. She also is very restless when sitting is required and constantly needs to be moving around or doing something. When expected or required to sit for prolonged periods, she becomes very restless and fidgety, doodles on papers, picks at her hair or clothes, and messes with objects within reach, which can be disruptive to others around her and has caused others at school to complain. Not being able to sit still for extended periods interferes with her ability to study, work on assignments, maintain professional behavior at work, and watch television to relax at home. Consequently, she typically needs to take frequent breaks from these activities to walk around and do something else to help manage her restlessness. Having to perform tasks that require

sustained mental effort often results in migraine headaches and associated blind spots, which affect her ability to see and read. The headache itself, along with the associated nausea and hypersensitivity to light, sound, and temperature, exacerbates her difficulty sustaining attention and ability to read, think, process, and answer questions.

*School History*

Ms. Ramsay (Jessica) has a history of academic struggle that began from her first days in school and has consistently required accommodations such as extended time on tests and assignments, altered grading schemes, frequent breaks, and a private space for testing and completing classwork in order to compensate for distractibility, impaired attention and concentration, impaired reading comprehension, impaired reading speed, and hyperactivity.

Jessica's mother, Jerri Shold, recalled having difficulty learning to read when she was in kindergarten (in 1955) and early elementary school and was concerned that Jessica may have similar difficulties. The parenting books Ms. Shold read all recommended beginning sight words early, so Ms. Shold started working with Jessica during her preschool years up until it was time to start kindergarten. When Ms. Shold applied the sight word programs at home, Jessica could correctly identify letters if her mother pointed at specific letters within a sight word. She could repeat the word correctly when first read aloud by her mother, and could use the word correctly in a sentence. However, when later presented with the same sight words, Jessica could not recognize the sight words she had been previously exposed to no matter how many times her mother went through the words with her. Ms. Shold tried all the different methods suggested by these sight word programs, but the words didn't mean anything to Jessica. When Jessica was about four years old, the pre-school she was enrolled in (Prince of Peace) did some developmental and IQ testing to assess whether she was ready to start kindergarten. The evaluation showed that she was intelligent and was mentally ready to start kindergarten, but noted that when shown simple images she had trouble copying them correctly. It was concluded that Jessica's fine motor skills were not at the level of a five year old. Ms. Shold and her preschool teachers thought her fine motor skills were advanced for her age. Based on the testing, Jessica was put into kindergarten for half the day, and then went back to preschool for the remainder of the day, five days a week. Her teachers reported that Jessica still was not really grasping the sight words at that point, though she was doing fine in everything else.

Ms. Shold recalled that when she had her own difficulty learning to read she was sent home with packets to help her work on phonics and reading. Ms. Shold believed that this extra help with phonics made a big difference for her, so she wanted Jessica to have the foundation of phonics so that she would be able to break words down and sound them out if she didn't recognize them. None of the public schools in her area used a phonetic reading program to teach reading. Consequently, Jessica's mother identified a private school that used a phonics-based reading program (Sunset Oaks Academy) and transferred Jessica there, where she was enrolled in fulltime Kindergarten. Ms. Shold believed the phonetic reading program was important for Jessica to progress and also thought the smaller class sizes would allow Jessica to receive more one-on-one reading, spelling and writing instruction than Jessica would receive in the public school system.

NBME00049

Jessica attended the Sunset Oaks Academy and received extensive individual instruction in reading, spelling and writing through the phonics-based program from Kindergarten through the second grade.  Jessica received informal accommodations of a separate quiet space and extra time to complete tests and assignments.  In third grade she transferred to the Carrollton-Farmers Branch Public School System when the family moved.  Jessica attended the Carrollton-Farmers Branch Public Schools through the fifth grade. Jessica still struggled with reading, writing, and spelling when compared to her peers and her mother informed her teachers about her history and what prior teachers had done to help Jessica.

Jessica and her mother, Jerri Shold, also reported that beginning in her earliest school years and continuing through elementary school and beyond, Jessica had severe problems in the following areas: making many mistakes in her schoolwork, sustaining attention during tasks or activities, finishing schoolwork and tasks at home, organizing tasks, disliking or procrastinating on tasks that required sustained mental effort, losing things needed for task completion, being easily distractible, being forgetful in daily activities, fidgeting, not staying seated when expected, and not waiting or taking turns. Throughout elementary school, Jessica's teachers verbally commented to Ms. Should that Jessica was very bright, but a slow reader who often forgot to turn in completed assignments.

It has always taken Jessica significantly more time and effort to study and complete assignments than other students. For example, she recalled that friends would become frustrated with her when she would not join them for recreational activities because she would typically be working on homework until bedtime (often past midnight), while her friends completed their homework in the early evening and were free for leisure activities. Ms. Shold confirmed that this was typical of Jessica's evenings from early elementary school through graduation from high school.  Her first, second, third and fourth grade teachers noticed that Jessica had difficulty with reading, spelling and writing, and each teacher provided extra individual but informal remedial reading, spelling, and writing instruction during those grades.

Jessica's second grade teacher was concerned enough to recommend that her vision be tested. Jessica was referred to Dr. Mary Alice A. Tanguay, a therapeutic optometrist, who performed visual-perceptual skills testing and found significant deficits in Jessica's visual spatial relationships, visual discrimination, and visual memory. Jessica subsequently received visual perceptual skills training from Dr. Tanguay, though Jessica's school functioning did not improve.  Ms. Should, who has a master's degree in education, also worked nightly to remediate Jessica's reading, writing and spelling problems throughout elementary school. She regularly reviewed Jessica's work in middle and high school, as well as her essays throughout college and for medical school applications.  Jessica's parents did not pursue an evaluation for her learning problems because her hard work in the evenings and the informal accommodations she received masked the degree of academic struggle she experienced.

Jessica managed to get good grades during her elementary, middle and high school years with the aid of these accommodations, which were provided on an informal basis.  While Jessica's elementary, middle school and high school records do not reflect the struggle she reported, the early onset and chronic struggle that necessitated the accommodations, her teachers' verbal descriptions of Jessica's difficulty, and her mother's remedial efforts were corroborated by her mother.

NBME00050

Jessica graduated from high school in 2008 with a 3.75 grade point average. Because she did not have any type of formal diagnosis or accommodations, she did not know about the possibility of accommodations such as extended time and did not apply for or receive any type of accommodations when she took the ACT entrance exam for college.

During her freshman undergraduate year at Ohio State University, her compensatory strategies were overwhelmed by academic demands and her personal life. She experienced pronounced difficulty maintaining attention during tasks and activities, repeatedly misplaced things, lost track of completed assignments, made seemingly careless mistakes in her work, often misunderstood test questions and assignment directions and could not organize her tasks and activities. She spent increasingly more time on her schoolwork trying to compensate for these difficulties and neglected other important tasks, such as paying bills, cooking, cleaning, or engaging in leisure, recreational, social activities and sleep.

Jessica subsequently consulted her primary care physician, Dr. Allen Smiy, who diagnosed her with ADHD on March 24, 2009, and began pharmacological treatment. Jessica applied to the college's Office of Disability Services (ODS) and Dr. Smiy completed the Ohio State University ADD/ADHD Verification Form on August 13, 2010, which identified a DSM-IV diagnosis of ADHD, Inattentive Type and stated that Jessica often exhibited the DSM-IV inattention symptoms of having difficulty sustaining attention in tasks or other activities, having difficulty organizing tasks and activities, avoiding or disliking tasks that required sustained mental effort, being easily distracted by extraneous stimuli and being forgetful in daily activities. Jessica was approved by Ohio State University (OSU) to formally receive the accommodations of priority class scheduling, access to an assigned Office of Disabilities Services advisor, 50% additional testing time, a distraction reduced testing space, ear plugs for all quizzes or tests, supportive materials such as scrap paper for notetaking, colored pencils and highlighters to reword and draw diagrams on test questions for better understanding.

Jessica graduated from Ohio State University in 2012 with a 3.56 grade point average. With these formal accommodations, Jessica was better able to compensate for her inattention, distractibility, hyperactivity, and difficulties in reading and writing. However, there were still many tests that required a large amount of reading and/or writing that Jessica was unable to complete because there was still not adequate time for her to read all of the questions and/or write sufficient responses, though she understood the material being tested. In these instances, Jessica reached out to her professors about this continued struggle, and often her professors provided additional informal accommodations such as altered grading schemes or more time to complete unattempt portions, to allow Jessica to achieve a grade that better represented her competency.

Jessica did not find out that applying for accommodations for the MCAT was even a possibility until, near the end of her MCAT prep course through Princeton Review, one of the course instructors mentioned it while discussing Jessica's difficulty with reading. Jessica was advised not to apply or take the MCAT with accommodations unless she was unable to achieve an acceptable score after multiple attempts because her score report would show that she had received accommodations and that would hurt her chances of getting offered interviews. Jessica then made an appointment with her advisor at the OSU Office of Disability Services (ODS) to verify the possibility of receiving accommodations and the affect it would have on her application. Jessica's ODS advisor cautioned against taking the MCAT with accommodations for the same reason and also

NBME00051

explained that, while Jessica had adequate documentation from her initial diagnosis by Dr. Smiy to qualify for accommodations through OSU, the AAMC would likely require a full neuropsychology evaluation which would be expensive and was unlikely to be completed in time to apply for accommodations before her scheduled MCAT exam.

Because Jessica receive advice against receiving appropriate accommodation from multiple informed sources, she decided to try the MCAT without accommodations. When she took the exam, she relied on strategies suggested by her Princeton Review instructors in addition to her own established methods to compensate for her ADHD and difficulties with reading and writing. Like she had done for prior standardized tests, her Princeton Review instructors suggested that Jessica not read the passages until she had first answered all the questions she could without reading the passage.  Only then with any remaining time, she could go back and try to answer the passage-dependent questions starting with the shortest passages. Finally, with the last minute, it was recommended that she randomly fill in answers to any questions she wasn't able to get to. Using this strategy, Jessica was able to obtain a good score in the 79th percentile (30M) of students who take the exam.  This, however, was not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. Jessica's performance on the MCAT component sections reflected her relative weakness specific to reading tasks with a Verbal Reasoning score at the 67th percentile, a Physical Sciences score at the 79th percentile and a Biological Sciences score at the 88th percentile.

Jessica applied to fourteen medical schools the first year after taking the MCAT and was only offered one interview, but was not accepted.  The next year she again applied to twenty-five schools and received only two interviews. She was placed on a wait list for two schools, one of which, Western Michigan University, ultimately accepted her.  Jessica believes that because she took the MCAT under standard time and with no accommodations for her ADHD, her modest MCAT score did not reflect how much she knew in the three component areas of Physical Sciences, Biological Sciences and Verbal Reasoning. If Jessica had been able to take the MCAT with appropriate accommodations, she likely would have achieved a much higher score that more accurately represented her intelligence, understanding of the material, and ability to apply the information.

Once accepted, Jessica requested accommodations from Western Michigan University Homer Stryker MD School of Medicine because of her ADHD and symptoms of dyslexia when she first began taking classes.  She was referred to Charles Livingston, MA, for an evaluation to support her application for accommodations. Western Michigan University Homer Stryker MD School of Medicine approved her application and she was formally granted the accommodations of double exam time and a separate room to minimize distractions for all standardized NBME CBSE, Shelf exams and other exams written and administered by the school.  Jessica applied for the same accommodations for the USMLE Step 1 exam, administered by the National Board of Medical Examiners (NBME) in 2016, but was denied accommodations. She attempted the USMLE without any accommodations and failed.  Jessica is currently on academic leave from medical school because she failed her initial United States Medical Licensing Exam (USMLE) Step 1 exam, which is required to continue her fourth year rotations and complete her medical degree.

NBME00052

MENTAL STATUS & OBSERVATIONS:    Jessica was neat in appearance and her demeanor was friendly and cooperative throughout the evaluation.  She made good eye contact and her speech was at a normal rate, expressed in a normal manner and readily understood.  Jessica did not have difficulty understanding directions and in the infrequent instances in which she appeared uncertain, she requested directions to be repeated or clarified.  She persisted answering questions and completing tasks for an appropriate amount of time.  Her answers to this examiner's questions were clear with appropriate, unguarded elaboration.  Her mood and attitude were normal and her affect was appropriate.  Her thought process and content were normal.  Jessica was oriented to person, place, time and date.  Jessica made a consistently high level of exertion on all tasks and the test results and self-report are an accurate measure of her functioning.  Jessica did not take any of her ADHD medication on the day of the testing so that the results would more accurately reflect her functioning without the mitigating effects of the medications.

## ASSESSMENT RESULTS

### Symptom Validity

#### Test of Memory Malingering (TOMM)

The TOMM was administered midway through the exam.  Jessica was told that the TOMM measured important memory skills needed for efficient reading.  Jessica's performance on the TOMM resulted in 50 of 50 items correct on Trial 2 and after a delay of 15 minutes she correctly answered 50 of the 50 items on the Retention Trial.  This pattern of TOMM scores does not reflect suboptimal effort.  Her overall pattern of test scores and behavioral performance reflected strong effort on all tests administered to her.

### Intellectual Functioning

The following interpretation is based on the Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) scores obtained by Alan Lewandowski, PhD, as part of a neuropsychological evaluation conducted on November 9, 2017.  The Wechsler Adult Intelligence Scale–Fourth Edition (WAIS-IV) provides a general overview of Jessica's overall thinking and reasoning skills, encompassing four broad domains:   Verbal, Perceptual, Working Memory, and Processing Speed.  The Verbal Comprehension Index (VCI) provides a measure of how well she did on tasks that required her to listen to questions and give oral responses to them.  The Perceptual Reasoning Index (PRI) indicates how well she did on tasks that required her to examine and think about designs, pictures, and puzzles, and to solve problems without using words.   Her ability to attend to information, to hold and process it in memory, and to give a response is measured by the Working Memory Index (WMI).  The last index, Processing Speed Index (PSI), provides information regarding her ability to process simple visual information quickly and efficiently.  When the Index scores are markedly different from each other, the Full-Scale IQ score is not the best summary of an individual's performance.  Alternate scores or the separate index scores should be used.

The scores show how well Jessica performed compared to a group of individuals of the same age from across the United States.  An individual may have WAIS-IV scores that fall within a wide range from Extremely Low to

NBME00053

Very Superior.  Most individuals, however, perform within the Average range.  A percentile rank is also reported.  This shows where the individual's scores rank relative to the national comparison group.  For example, if Jessica's percentile rank (PR) was 45, it would mean that she scored higher than approximately 45 out of 100 individuals her age.

### General Intellectual Ability

The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range and exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words.  However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores.  Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability.  Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention-related Working Memory Index and Processing Speed Index subtest scores.  Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Her GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

### Verbal Comprehension

Jessica's verbal reasoning abilities as measured by the Verbal Comprehension Index (VCI) are in the superior range and above those of approximately 95% of her peers (VCI=125; 95% confidence interval=118-130). The VCI is designed to measure verbal reasoning and concept formation. Jessica's performance on the verbal subtests contributing to the VCI presents a diverse set of verbal abilities; she performed much better on some verbal tasks than others. The degree of variability is unusual and may be noticeable to those who know her well. Examination of Jessica's performance on individual subtests provides additional information regarding her specific verbal abilities.

Jessica achieved her best performance among the verbal reasoning tasks on the Information subtest. Her strong performance on the Information subtest was much better than that of most of her peers. The Information subtest required Jessica to respond orally to questions about common events, objects, places, and people. The subtest is primarily a measure of her fund of general knowledge. Performance on this subtest also may be influenced by cultural experience and quality of education as well as her ability to retrieve information from long-term memory (Information scaled score=16).

### Perceptual Reasoning

Jessica's nonverbal reasoning abilities as measured by the Perceptual Reasoning Index (PRI) are in the very superior range and above those of approximately 98% of her peers (PRI=131; 95% confidence interval=123-136). The PRI is designed to measure fluid reasoning in the perceptual domain with tasks that assess nonverbal concept formation, visual perception and organization, visual-motor coordination, learning, and the ability to separate figure and ground in visual stimuli. Jessica performed comparably on the perceptual reasoning

NBME00054

subtests contributing to the PRI, suggesting that her visual-spatial reasoning and perceptual-organizational skills are similarly developed.

## Working Memory
Jessica's ability to sustain attention, concentrate, and exert mental control is in the high average range. She performed better than approximately 77% of her peers in this area (Working Memory Index [WMI]=111; 95% confidence interval=104-117). Jessica's abilities to sustain attention, concentrate, and exert mental control are a weakness relative to her nonverbal reasoning abilities. At her level of ability, a relative weakness in mental control likely makes the processing of complex information more time consuming for Jessica, draining her mental energies more quickly as compared to others.

## Processing Speed
Processing speed is an indication of the rapidity with which Jessica can mentally process simple or routine information without making errors. Jessica's ability in processing simple or routine visual material without making errors is in the borderline range when compared to her peers. She performed better than approximately 8% of her peers on the processing speed tasks (Processing Speed Index [PSI]=79; 95% confidence interval=73-89). Processing visual material quickly is an ability that Jessica performs poorly when compared to her verbal and nonverbal reasoning ability.

Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 43 | VCI | 125 | 95 | 118-130 | Superior |
| Perceptual Reasoning | 46 | PRI | 131 | 98 | 123-136 | Very Superior |
| Working Memory | 24 | WMI | 111 | 77 | 104-117 | High Average |
| Processing Speed | 12 | PSI | 79 | 8 | 73-89 | Borderline |
| Full Scale | 125 | FSIQ | 117 | 87 | 113-121 | High Average |
| General Ability | 89 | GAI | 132 | 98 | 126-136 | Very Superior |

Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Ability Level |
|---|---|---|---|---|---|---|
| VCI - PRI | 125 | 131 | -6 | 8.32 | N | 34.3 |
| VCI - WMI | 125 | 111 | 14 | 8.81 | Y | 18.4 |
| VCI - PSI | 125 | 79 | 46 | 10.99 | Y | 2.7 |
| PRI - WMI | 131 | 111 | 20 | 8.81 | Y | 9 |
| PRI - PSI | 131 | 79 | 52 | 10.99 | Y | 1.3 |
| WMI - PSI | 111 | 79 | 32 | 11.38 | Y | 3.7 |
| FSIQ - GAI | 117 | 132 | -15 | 3.51 | Y | 0.4 |

Base rate by ability level.

Statistical significance (critical value) at the .05 level.

Verbal Comprehension Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Similarities | 13 | 84 |
| Vocabulary | 14 | 91 |
| Information | 16 | 98 |
| (Comprehension) | 15 | 95 |

Perceptual Reasoning Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Block Design | 15 | 95 |
| Matrix Reasoning | 16 | 98 |
| Visual Puzzles | 15 | 95 |
| (Figure Weights) | 15 | 95 |
| (Picture Completion) | 14 | 91 |

Working Memory Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Digit Span | 12 | 75 |
| Arithmetic | 12 | 75 |

Processing Speed Subtests Summary

| Subtest | Scaled Score | Percentile Rank |
|---|---|---|
| Symbol Search | 7 | 16 |
| Coding | 5 | 5 |
| (Cancellation) | 9 | 37 |

**Sustained Attention**

The IVA+Plus CPT (Integrated Visual & Auditory Continuous Performance Test) is a test of attention that measures responses to 500 intermixed auditory and visual stimuli spaced 1.5 seconds apart. The task is to click the mouse when the stimulus is an auditory or visual "1" and to refrain from clicking when the stimulus is an auditory or visual "2." A correct response is defined as exactly one click to a target stimulus. The individual taking the test must be able to discriminate between 1s and 2s, switch between sensory modalities, and maintain attention for about thirteen minutes. The targets ("1") occur frequently during some sections of the test and rarely during other sections, thus testing attention under both high and low demand conditions. The high demand condition is defined as a "block" of 50 trials when the 1s are frequent. The first two target presentations are excluded from the measurement of performance under high demand conditions and are categorized as being part of the previous low demand conditions block. The reason that these first two

targets are categorized in this way is that they are still pulling for errors of inattention as the test-taker has not yet made the transition to the mode of rapid clicking that is characteristic of the high demand block.

The quotient scores for all of the IVA+Plus scales are reported as standard scores. Standard scores have a mean of 100 and a standard deviation of 15. The Wechsler Intelligence tests, which are commonly used in schools to assess Full Scale, Verbal and Performance IQ, also use standard scores (i.e., Mean=100, SD=15).

In addition to reporting standard scores for the IVA+Plus scales, the narrative report below also provides percentile rank. A person with a standard score of 100 has a percentile rank of 50, meaning that about half the people taking the test scored higher on that scale, and about half scored lower. In this narrative report, percentile rank is given in the format "(PR=50)" immediately following each standard score that is reported. For example, "John's Auditory Vigilance Score of 80 (PR=9) fell in the mildly impaired range."

Jessica was administered the IVA+Plus twice, approximately one hour apart, as a check on the consistency of her responses.

### 1st Administration

#### VALIDITY OF TEST RESULTS

Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales. The validity of the IVA+Plus CPT is assessed by determining whether an individual's responses are characteristic of random responding. The test is considered valid only when the individual's decision to click to targets and inhibit clicking to non-targets is based on self-directed responses in accordance with the test rules. Statistically, the test results for a specific sensory modality are considered invalid when the probability of the individual's response pattern being self-directed in accordance with the test rules is less than 1 in 1000.

#### IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES

A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data. Jessica's global Response Control quotient scale score indicated an extreme impairment. In addition, her global Attention quotient scale score fell in the extremely impaired range. These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

#### SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES

The Full-Scale Response Control Quotient is a global measure of the overall ability for Jessica to regulate her responses and respond appropriately. Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 44 (PR=1). This score fell in the extremely impaired range. Her Auditory Response Control quotient scale score was 38 (PR=1). This global scale score fell in the extremely impaired range.

NBME00057

Jessica's Visual Response Control quotient scale score was 65 (PR=1). This global scale score fell in the severely impaired range.

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain her attention. This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 50 (PR=1). This global scale score fell in the extremely impaired range. Her Auditory Attention quotient scale score was 65 (PR=1) and this global scale score fell in the severely impaired range. Jessica's Visual Attention quotient scale score was 44 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions. In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions. Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1). This score fell in the extremely impaired range. Her global Auditory Sustained Attention quotient scale score was 65 (PR=1) and it fell in the severely impaired range. Jessica's global Visual Sustained Attention quotient scale score was 59 (PR=1). This score was found to fall in the extremely impaired range.

## 2nd *Administration*

### *VALIDITY OF TEST RESULTS*
Jessica demonstrated sufficient understanding of the task for the test results to be considered valid in both the auditory and visual modalities for the Global, Primary and Attribute scales.

### *IVA+Plus DIAGNOSTIC INTERPRETIVE GUIDELINES*
A working diagnosis of Attention-Deficit/Hyperactivity Disorder, combined presentation was supported by the IVA+Plus test data. Jessica's global Response Control quotient scale score indicated an extreme impairment. In addition, her global Attention quotient scale score fell in the extremely impaired range. These impairments on the IVA+Plus test indicate that her pattern of responding is likely to impair her functioning and performance in the home or work environment.

### *SUMMARY OF TEST RESULTS FOR THE IVA+Plus GLOBAL SCALES*
The Full-Scale Response Control Quotient is a global measure of the overall ability for this individual to regulate her responses and respond appropriately. Factors that load on this scale include the ability to inhibit responses to non-targets, the consistency of recognition reaction times and the person's ability to maintain her mental processing speed during the IVA+Plus test. Jessica's overall global quotient scale score for the Full-Scale Response Control scale was 37 (PR=1). This score fell in the extremely impaired range. Her Auditory Response Control quotient scale score was 48 (PR=1). This global scale score fell in the extremely impaired range. Jessica's Visual Response Control quotient scale score was 44 (PR=1). This global scale score fell in the severely impaired range.

The Full-Scale Attention Quotient provides a measure of an individual's overall ability to make accurate responses, stay focused and sustain attention. This global scale's factors include the ability to be attentive and accurately respond under low demand conditions, remain focused and stay reliably "on task," and, at the same time, respond quickly when appropriate. Jessica's overall quotient score on the Full-Scale Attention scale was 58 (PR=1). This global scale score fell in the extremely impaired range. Her Auditory Attention quotient scale score was 72 (PR=3) and this global scale score fell in the severely impaired range. Jessica's Visual Attention quotient scale score was 50 (PR=1). This global scale score was classified as falling in the extremely impaired range.

The Combined Sustained Attention quotient scale score provides a global measure of a person's ability to accurately and quickly respond in a reliable manner to stimuli under low demand conditions. In addition, it includes the ability to sustain attention and be flexible when things change under high demand conditions. Jessica's global quotient score on the Combined Sustained Attention scale was 58 (PR=1). This score fell in the extremely impaired range. Her global Auditory Sustained Attention quotient scale score was 73 (PR=4) and it fell in the severely impaired range. Jessica's global Visual Sustained Attention quotient scale score was 51 (PR=1). This score was found to fall in the extremely impaired range.

### Behavioral-Psychological Functioning

During the diagnostic interview, Jessica indicated that she has exhibited nine of the nine criteria associated with attention-deficit hyperactivity disorder, predominantly inattentive presentation, and eight of the nine criteria of ADHD, predominantly hyperactive-impulsive presentation. Jessica endorsed the following symptoms:

- Fails to pay close attention to details or makes careless mistakes
- Has difficulty sustaining attention
- Often does not listen when spoken to directly
- Has trouble following through on instructions and often fails to finish school work, chores or work duties
- Has difficulty organizing tasks and activities
- Avoids tasks that require sustained mental effort
- Loses things needed to finish tasks
- Is easily distracted
- Is forgetful in daily activities
- Often fidgets or squirms in seat
- Has difficulty remaining seated when expected
- Feels very restless most of the time
- Talks excessively
- Has difficulty waiting for her turn
- Interrupts and intrudes on others

Jessica's mother endorsed eight of the inattentive symptoms and six of the hyperactive/impulsive symptoms, which corroborated many of the difficulties Jessica described. The ratings provided by Jessica's fiancé also

                                   NBME00059

confirms that these symptoms are frequently in evidence.  Her fiancé endorsed seven of the inattentive symptoms and five of the hyperactive-impulsive symptoms.

## Symptom Checklist-90-Revised (SCL-90-R)

Overall, Jessica's SCL-90-R symptom profile is not of a nature or magnitude to be considered in the clinical range. General symptomatic distress levels are average to low-average for her, suggesting good psychological integration, and little global psychological distress. Jessica's report reflects little evidence of psychological distress associated with somatic symptoms, or psychosomatic problems. Levels of obsessive-compulsive symptoms are clearly in the clinical range. However, the symptoms she rated as involving significant distress are all behaviors she described as either difficulty concentrating or behaviors used to compensate for her ADHD symptoms.  The other behaviors from this scale that directly related to obsessive-compulsive symptoms were rated as involving no distress. Depressive symptoms are somewhat above average in this individual's record, but do not appear clinically noteworthy. There are several isolated signs or symptoms of anxiety in the respondent's test protocol. However, they do not appear to represent clinically significant experiences. There is little or no evidence of paranoid thinking in this respondent's record.

|  | SOM | O-C | I-S | DEP | ANX | HOS | PHOB | PAR | PSY | GSI | PSDI | PST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nonpatient T Score: | 41 | 66 | 50 | 56 | 52 | 40 | 44 | 41 | 44 | 55 | 66 | 49 |
| Raw Score: | 0.08 | 1.50 | 0.22 | 0.54 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.38 | 2.13 | 16 |
| Outpatient T Score: | 34 | 51 | 35 | 36 | 36 | 32 | 38 | 33 | 30 | 35 | 48 | 32 |
| Inpatient T Score: | 35 | 51 | 37 | 37 | 38 | 36 | 37 | 33 | 31 | 37 | 48 | 34 |

*Primary Symptom Dimensions*
*SOM Somatization*
*O-C Obsessive-Compulsive*
*I-S Interpersonal Sensitivity*
*DEP Depression*
*ANX Anxiety*
*HOS Hostility*
*PHOB Phobic Anxiety*
*PAR Paranoid Ideation*
*PSY Psychoticism*
*General Indices*
*GSI Global Severity Index*
*PSDI Positive Symptom Distress Index*
*PST Positive Symptom Total*

NBME00060

## Academic Skills

The Wechsler Individual Achievement Test--Third Edition (WIAT-III) is an individually administered instrument designed to measure academic achievement skills in individuals from age 4 through 50. Descriptive statements are provided, ranging from Far Below Average to Far Above Average, based on the standard score. The scores and statements below are primarily based on age-based norms. A percentile rank is also reported in the table of scores, which shows where the clients score rank compared to a group of clients of the same age from across the United States. For example, if the percentile rank was 45, it would mean that the individual scored higher than approximately 45% of individuals her age.

The Total Reading Composite (TRC) is an overall measure of basic reading, fluency and reading comprehension. It is derived from the Word Reading, Pseudoword Decoding, Reading Comprehension and Oral Reading Fluency subtests. Jessica's Total Reading Composite score of 85 is at the bottom of the low average range and is higher than 16% of individuals her age.

The Basic Reading Composite (BRC) is a measure of applying phonemic knowledge and single word decoding. It is derived from the Word Reading and Pseudoword Decoding subtests. Jessica's Basic Reading Composite score of 96 is average and is higher than 39% of other individuals her age. The *Word Reading* subtest measures speed and accuracy of single word reading. The individual is asked to read aloud from a list of words which yields a score for accuracy and a score for speed. Jessica's Word Reading score of 100 is average and is higher than 50% of other individuals her age. The *Pseudoword Decoding* subtest measures speed and accuracy in applying phonemic knowledge to decode pseudowords. Jessica's Pseudoword Decoding score of 95 is average, which is the percentile rank of 37. The supplemental scores for speed of performing subtests were also calculated. The Word Reading Speed score is the same as or higher than the scores obtained by only 2% of individuals in the normative sample. Ninety-eight percent of students in the normative sample scored higher than Jessica in the Word Reading Speed score. The Pseudoword Decoding Speed score is the same as or higher than the scores obtained by only 5% of students in the normative sample; 95% of individuals in the normative sample scored higher than her Pseudoword Decoding Speed score.

Jessica's Reading Comprehension and Fluency Composite score of 74 is in the well below average range and is higher than only 4% of other individuals her age. The *Reading Comprehension* subtest is untimed and measures literal and influential reading comprehension skills using paragraph passages in which she was verbally asked open-ended questions by the examiner and was allowed to verbally give her answers. The examiner was allowed and asked for elaboration or clarification of her answers as needed. Jessica's Reading Comprehension score of 94 is in the average and is higher than 34% of other individuals her age. The *Oral Reading Fluency* subtest measures oral reading fluency of narrative passages and yields separate scores for overall oral reading accuracy and component scores for oral reading rate and oral reading fluency. Her overall Oral Reading Fluency score of 67 is far below average and is higher than 1% of other individuals her age. Her Oral Reading Rate score of 65 is far below average and is higher than 1% of other individuals her age. Her Oral Reading Accuracy score of 102 is average and is higher than 55% of other individuals her age.

NBME00061

The Written Expression Composite (WEC) is a measure of overall writing skills. It is derived from the Spelling, Sentence Composition, and Essay Composition subtests. The Spelling subtest measures written spelling of single words from dictation. The Sentence Composition subtest includes sentence combining and sentence building components, which measure sentence formulation skills including grammar, syntax, semantics and mechanics. Jessica's Written Expression Composite score of 100 is average and is higher than 50% of other individuals her age. Her Spelling score of 108 is average and is higher than 70% of other individuals her age. Jessica's Sentence Composition score of 104 is average and is higher than 61% of other individuals her age.

The Essay Composition subtest measures spontaneous written expression, which involves productivity, theme development, text organization, grammar and mechanics. The individual listens to instructions about general content the essay is to contain and then must plan, write and finalize an essay within a ten-minute time limit. The Essay Composition required Jessica to write an essay about her favorite game and include at least three reasons for liking it. The Essay Composition score is significantly influenced by the number of words produced, regardless of spelling, though theme development and organization contribute to the score. A separate supplemental component, Theme Development and Text Organization, reflects theme development and organization. Another supplemental subtest, Grammar and Mechanics, reflects grammar, punctuation, spelling and capitalization. Jessica's Essay Composition score of 91 is average and is higher than 27% of other individuals her age. Her Word Count score of 92 is average and higher than 30% of other individuals her age. Jessica's Theme & Text Organization score of 94 is average and is higher than 34% of other individuals her age. Her Grammar & Mechanics score of 91 is average and higher than 27% of other individuals her age.

The Mathematics Composite (MC) is an overall measure of ability to calculate a variety of different math procedures and apply math procedures in tasks that require math reasoning. It is derived from the Numerical Operations and the Math Problem Solving subtests. The Numerical Operations subtest measures math skills under untimed conditions. The Math Problem Solving subtest measures mathematics reasoning in solving math problems that are read to the individual. Jessica's Mathematics Composite score of 133 is far above average and higher than 99% of other individuals her age. Jessica's Numerical Operations score of 125 is well above average and is higher than 95% of other individuals her age. Her Math Problem Solving score of 136 is far above average and is higher than 99% of other individuals her age.

NBME00062

**WIAT-III**                                    **Age Based Scores: age at testing 28 years, 0 months**

**Composite Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Total Reading | 85 | 81-89 | 16 | Low Average |
| Basic Reading | 96 | 92-100 | 39 | Average |
| Reading Comprehension and Fluency | 74 | 67-81 | 4 | Well Below Average |
| Written Expression | 100 | 94-106 | 50 | Average |
| Mathematics | 133 | 129-137 | 99 | Far Above Average |

**Subtest Score Summary**

| Composite | Standard Score | 90% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|
| Reading Comprehension | 94 | 84-104 | 34 | Average |
| Math Problem Solving | 136 | 130-142 | 99 | Far Above Average |
| Sentence Composition | 104 | 96-112 | 61 | Average |
| Word Reading | 100 | 94-106 | 50 | Average |
| Essay Composition | 91 | 82-100 | 27 | Average |
| Pseudoword Decoding | 95 | 89-101 | 37 | Average |
| Numerical Operations | 125 | 120-130 | 95 | Well Above Average |
| Oral Reading Fluency | 67 | 61-73 | 1 | Far Below Average |
| Spelling | 108 | 103-113 | 70 | Average |

**Cumulative Percentages**

| | |
|---|---|
| **Word Reading Speed** | The score is the same as or higher than the scores obtained by 2% of students in the normative sample; 98% of students in the normative sample scored higher than this score. |
| **Pseudoword Decoding Speed** | The score is the same as or higher than the scores obtained by 5% of students in the normative sample; 95% of students in the normative sample scored higher than this score. |

## Subtest Component Score Summary

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Oral Reading Fluency** | | | |
| Oral Reading Accuracy | 102 | 55 | Average |
| Oral Reading Rate | 65 | 1 | Far Below Average |
| **Essay Composition** | | | |
| Grammar and Mechanics | 91 | 27 | Average |

## Subtest Component Score Summary

| Subtest Component | Standard Score | Percentile Rank | Qualitative Description |
|---|---|---|---|
| **Sentence Composition** | | | |
| Sentence Combining | 105 | 63 | Average |
| Sentence Building | 104 | 61 | Average |
| **Essay Composition** | | | |
| Word Count | 92 | 30 | Average |
| Theme Development and Text Organization | 94 | 34 | Average |

## Differences Between Composite Standard Scores

| Comparison | Difference | Critical Value (Significance Level .05) | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|
| Total Reading vs. Basic Reading | -11 | 5.88 | Y | <=5% |
| Total Reading vs. Reading Comprehension and Fluency | 11 | 7.93 | Y | <=10% |
| Total Reading vs. Written Expression | -15 | 6.83 | Y | >15% |
| Total Reading vs. Mathematics | -48 | 5.70 | Y | <=1% |
| Basic Reading vs. Reading Comprehension and Fluency | 22 | 8.06 | Y | <=10% |
| Basic Reading vs. Written Expression | -4 | 6.98 | N | >15% |
| Basic Reading vs. Mathematics | -37 | 5.88 | Y | <=1% |
| Reading Comprehension and Fluency vs. Written Expression | -26 | 8.77 | Y | <=5% |
| Reading Comprehension and Fluency vs. Mathematics | -59 | 7.93 | Y | <=1% |
| Written Expression vs. Mathematics | -33 | 6.83 | Y | <=1% |

**Note.** A negative difference indicates that the second composite has a higher score than the first composite listed in the comparison.

NBME00064

## ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS

Ability Score:     WAIS-IV FSIQ: 117

**Predicted Difference Method**

| | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 112 | 85 | 27 | 5.89 | Y | <=1% |
| Basic Reading | 110 | 96 | 14 | 4.83 | Y | <=15% |
| Reading Comprehension and Fluency | 112 | 74 | 38 | 9.26 | Y | <=1% |
| Written Expression | 111 | 100 | 11 | 7.12 | Y | >15% |
| Mathematics | 112 | 133 | -21 | 5.87 | Y* | N/A |

*Note.* Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.

*Indicates that the actual achievement score exceeds the predicted achievement score.

## ABILITY-ACHIEVEMENT DISCREPANCY ANALYSIS

bility Score:     WAIS-IV GAI: 132

**Predicted Difference Method**

| | Predicted WIAT-III Score | Actual WIAT-III Score | Difference | Critical Value .05 | Significant Difference Y/N | Base Rate |
|---|---|---|---|---|---|---|
| **WIAT-III Composite** | | | | | | |
| Total Reading | 121 | 85 | 36 | 6.10 | Y | <=1% |
| Basic Reading | 118 | 96 | 22 | 5.01 | Y | <=5% |
| Reading Comprehension and Fluency | 120 | 74 | 46 | 9.40 | Y | <=1% |
| Written Expression | 119 | 100 | 19 | 7.25 | Y | <=10% |
| Mathematics | 120 | 133 | -13 | 6.05 | Y* | N/A |

*Note.* Base rates and standard deviation discrepancies are not reported when the actual achievement score equals or exceeds the predicted achievement score.

*Indicates that the actual achievement score exceeds the predicted achievement score.

NBME00065

## Woodcock/Johnson IV (WJ-4) Tests of Achievement

The Woodcock/Johnson IV (WJ-4) Tests of Achievement are untimed, with the exception of the fluency tests, and reflect a person's ability to perform tasks when they are able to use any strategies they have developed to compensate for any weaknesses they may have in information processing. Descriptive statements are provided, ranging from far below average to very superior, based on the standard score. Jessica was compared to other adults her age in the general population.

The Reading Rate Cluster provides a measure of automaticity when reading single words and single sentences. It is derived from the Sentence Reading Fluency and Word Reading Fluency subtests. The Word Reading Fluency subtest allows three minutes for the examinee to read rows of four words and mark two words in each row that are either synonyms, antonyms or members of the same category. The Sentence Reading Fluency subtest allows three minutes for the examinee to read sentences and mark them as true or false. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range, which is higher than 1% of other individuals her age. Her Word Reading Fluency score of 58 is in the Far Below Average range, which is higher than 0.2% of other individuals her age. Her Sentence Reading Fluency score of 78 is in the Well Below Average range, which is higher than 7% of other individuals her age.

### TABLE OF SCORES

Woodcock-Johnson IV Tests of Achievement Form B and Extended (Norms based on age 28-1)

| CLUSTER/Test | GE | RPI | Proficiency | SS (95% Band) | SS Classification | PR |
|---|---|---|---|---|---|---|
| READING RATE | 3.9 | 1/90 | Extremely Limited | 66 (57-75) | Far Below Average | 1 |
| Sentence Reading Fluency | 5.2 | 5/90 | Very Limited | 78 (67-88) | Well Below Average | 7 |
| Word Reading Fluency | 3.0 | 0/90 | Extremely Limited | 58 (45-71) | Far Below Average | 0.2 |

## GRAY-ORAL READING TESTS-FIFTH EDITION

The Gray-Oral Reading Tests-Fifth Edition (GORT-5) is a comprehensive measure of reading fluency with separate measures for speed, accuracy, overall fluency of combined speed and accuracy, and comprehension. Jessica's performance was compared to a group of individuals aged 19 through 23 years, which is the oldest group available for comparison. The GORT-5 was administered because it is the most comprehensive and robust measure available that reflects functioning when oral reading fluency and reading comprehension are simultaneously required. The GORT-5 passages reflect a broader range of complex reading than other measures of oral reading fluency such as the WIAT-III Oral Reading Fluency subtest.

The GORT-5 provides separate measurements of speed, accuracy, comprehension, and an overall measure reflecting the three components combined. The oldest normative age group available for comparison is a group of 19-year-old to 23 year-11-month-old adults. The GORT-5 scores of Rate, Accuracy, Fluency and Comprehension were demonstrated to have a strong correlation with age in the normative sample until age 13, with the progression of raw score gains getting smaller with each year of age until plateauing in the ages of the oldest normative age group.

Jessica's Rate score of 3 is far below average and is higher than 1% of other individuals in the comparison group. The Accuracy score reflects the number of decoding errors, omitted words, inserted words and repetitions. Her Accuracy score of 5 is well below average and is higher than 5% of other individuals in the

NBME00066

comparison group. The Fluency measure is derived from combining the Rate and Accuracy scores and is a measure of overall oral reading fluency. Jessica's Fluency score of 4 is well below average and is higher than 2% of other individuals in the comparison group. She was able to correctly read most of the words, but her reading was slow. Jessica read in short two-to-four words phrases and her oral reading was very halting with many repetition of words and self-corrections. The Comprehension measure is derived from open-ended questions about the content of each passage. Jessica's Comprehension score of 3 is extremely below average and is higher than 1% of other individuals in the comparison group. The Oral Reading Index (ORI) is derived from the Fluency and Comprehension subtests. The ORI is an overall measure of oral automaticity and reading comprehension. Jessica's Oral Reading Index score of 65 is extremely below average and is higher than 1% of other individuals in the comparison group.

*Nelson-Denny Reading Test*
The Nelson-Denny Form H was administered with the standard time administration to Jessica and includes three subtests (Vocabulary, Comprehension and Rate). The questions are presented in multiple-choice answer options. Four scores are calculated: Rate, Vocabulary, Comprehension and Total Reading. The first subtest, Rate, is calculated from the number of words read silently during the first sixty seconds of the Comprehension subtest. The Vocabulary subtest has a standard time limit of fifteen minutes and consists of 80 multiple-choice items, each with five response options. The words were drawn from high school and college textbooks and vary in difficulty. The second subtest, Comprehension, has a standard time limit of twenty minutes and requires examinees to read as many of the seven passages as they can (also drawn from high school and college textbooks) and to respond to as many of the total of 38 multiple-choice questions about the contents of these passages. The Total Reading score is derived by summing the Vocabulary raw score with the Comprehension raw score.

Jessica completed Form H and her performance was compared to second semester grade-16 university students. Jessica's Rate score is far below average, at the 1st percentile rank. She correctly answered 49 of the 52 Vocabulary items (94%) she was able to attempt during the standard time limit. Her Vocabulary score is below average, at the 11th percentile rank and is a 13.1 grade-equivalent score. She correctly answered 17 of the 18 Comprehension items (94%) she was able to attempt during the standard time limit. Jessica's Comprehension score is far below average, at the 2nd percentile rank and is an 8.7 grade-equivalent score. Her Total Reading score is well below average, at the 4th percentile rank and is a 10.6 grade-equivalent score.

Jessica's performance was also compared with second semester grade-12 high school students. This comparison resulted in a Rate score that is far below average, at the 1st percentile rank. Her Vocabulary score is average, at the 54th percentile rank compared to high school seniors. Jessica's Comprehension score is low average, at the 18th percentile rank compared to high school seniors. Her Total Reading score is average, at the 33rd percentile rank compared to high school seniors.

The Nelson-Denny was originally normed to allow for the individual's performance to be compared to other individuals in grades 9 through 16. Additional norms for healthcare professionals were developed in 2001. These norms were developed from a group of 635 medical students, 269 dental students, 176 physical therapy students and 42 interns (Haught, P.A., & Walls, R.T. Adult Learners: New Norms on the Nelson-Denny Reading

Test For Healthcare Professionals. Reading Psychology 2002, 23, 217-238). Jessica's performance was compared to this group.  Her Rate score is in the Far Below Average range, at the 1st percentile rank.  Her Vocabulary score is in the Far Below Average range, at the 1st percentile rank.  Jessica's Comprehension score is also in the Far Below Average range, at the 1st percentile rank.  Her Total Reading score is in the Far Below Average range, at the 1st percentile rank.

**Discussion and Summary**

The Test of Memory Malingering (TOMM) measure is a symptom validity measure and was administered to detect whether Jessica was making suboptimal effort, either consciously or unconsciously. The examinee is not informed as to the purpose of this measure and in fact was told that it measured an important memory component underlying reading skill. The absence of indication of suboptimal effort on the TOMM is an indication that Jessica's effort was not suboptimal.  Her performances on reading and writing tests was also highly variable, ranging from average to below average.  In the context of her request for accommodations due to a reading impairment, the reading and writing scores that are within the average range are inconsistent with poor effort from either conscious or unconscious intent.  Jessica's overall demeanor and pattern of test scores reflect maximum effort on her part and it is concluded that her current test scores are an accurate measure of her functioning.

The Full-Scale IQ (FSIQ) composite score is derived from ten subtest scores and is usually considered the most representative estimate of global intellectual functioning. Jessica's FSIQ score is within the high average range )nd exceeds those of approximately 87% of individuals her age (FSIQ=117; 95% confidence interval=113-121). She performed slightly better on nonverbal than on verbal reasoning tasks, but there is no meaningful difference between Jessica's ability to reason with and without the use of words. However, her Processing Speed Index score of 79 is significantly and uncommonly below the Verbal Comprehension Index and the Perceptual Reasoning Index scores.  Consequently, her FSIQ score does not accurately reflect her optimum intellectual ability.  Jessica's optimum intellectual capacity is most accurately reflected in the General Ability Index (GAI), which is calculated from the VCI and PRI subtests and does not include the attention related Working Memory Index and Processing Speed Index subtest score.   Jessica's GAI score is significantly higher than her FSIQ score by a very uncommon margin estimated to occur in only 0.4% of the general population. Jessica's GAI score of 132 is in the very superior range and is higher than 98% of other adults her age.

Current diagnostic criteria for a diagnosis of a specific learning disorder in the DSM-5 requires that reading, writing or math scores be substantially below average compared to other individuals Jessica's age and cause a significant interference with academic performance.  However, the designation of "average" and "below average" is acknowledged to be arbitrary with no clear cut-off score to indicate what is below average and causes significant interference with academic performance.  A standard score of 78 or less, which is below the 7th percentile, offers the greatest diagnostic certainty.  However, scores vary because of test imprecision, and clinical judgment is allowed.  A more lenient threshold of scores of below one standard deviation (standard score 84 or lower) is applicable when learning difficulties are supported by converging evidence from assessment, academic history and school reports.  While learning difficulties are generally exhibited during the early school years, they may not become evident until later school years when demands on academic skills

NBME00068

exceed the individual's restricted capacities. Some individuals with impaired functioning may obtain average or better grades that are achieved through extraordinarily high levels of effort and support until the pace of completing tasks and assessment mechanisms that rely on the impaired skill exceeds the individual's compensatory strategies. Consequently, the individual with specific impairments is unable to complete tasks that rely on the impaired skills or demonstrate what she has actually learned through assessment mechanisms that rely on these specific skills. A discrepancy between aptitude and academic achievement scores is no longer a DSM-5 diagnostic criteria indicating a specific learning disorder; however, the presence of substantial discrepancies between aptitude and achievement skill provide important information reflecting an abnormal degree of struggle that persists despite compensatory efforts.

Jessica's Mathematics Composite (MC) score of 133 is in the far above average range and above those of 99% of other adults her age. Consequently, a specific learning disorder with impairment in mathematics is not indicated.

The specific learning disorder of developmental dyslexia is a neurologically-based condition that results in an unexpected difficulty acquiring an understanding of letter-phoneme relationships, acquiring a capacity for efficiently processing phonological information, or developing rapid, automatic reading fluency (either oral or silent). A persistent weakness in phonological processing significantly impedes developing accurate word recognition, automatic, effortless word recognition-fluency and reading comprehension. Reading fluency is considered to be a complex capacity to read passages rapidly, smoothly, and automatically, with little effort or conscious attention to the mechanics of reading, which then allows the majority of mental capacity to be directed to reading comprehension. Dyslexic readers may be able to acquire the capacity to accurately identify or decode words through remedial efforts, but typically have difficult acquiring automatic oral reading fluency or rapid silent reading rate. Some dyslexic readers may develop the capacity for rapid oral reading fluency or rapid silent reading, but typically at the expense of reading comprehension. The dyslexic reader lags behind the non-dyslexic reader in developing automatic word recognition capacity and must use more of his or her attention and working memory capacity to the task of identifying words than the non-dyslexic reader, which interferes with comprehension.

Many dyslexic readers compensate for the limitations in automatic word recognition through over-relying on the use of the context. The reliance on context results in the reader being hesitant and pausing in order to infer the identity of words from the surrounding words they can identify. They may make an "educated guess" when they reach an unknown word or correct a word they realize they have misread because of their restricted automaticity. They may also misread a word only to read on and realize their mistake from the context and then reread the phrase or sentence with the correct word (although sometimes a still incorrect word) inserted. The result of such an overreliance on context is a monotone prosody that is characterized by short, choppy word groupings, some word-by-word reading, pauses, omissions, added words, rereading or self-corrections. By contrast, non-dyslexic readers' phonological skills increase with practice and they become automatic in their word recognition with little need to rely on the context of the words previously identified. Automaticity occurs without conscious thought or effort and leaves more cognitive resources available for attention, comprehension and retention.

NBME00069

Dyslexic readers may score well on a test of reading comprehension by using context, but they are spending more of their mental energy to do so than the non-dyslexic reader. The dyslexic reader's comprehension capacity is therefore fragile and prone to errors. They may manage to function at seemingly adequate levels during a relatively brief test of reading, but still have difficulty sustaining such comprehension levels because of mental fatigue. Therefore, reading performance can be erratic.

Impaired dyslexic readers frequently encounters words in print that are within their vocabulary and that they have seen before, but remain unfamiliar when presented in print. In place of oral reading fluency that results from effortless automatic word recognition, the impaired dyslexic reader has to rely on compensatory strategies such as overreliance on the context of the passage and/or repeatedly reading the same passage to identify unrecognized words through inference from surrounding words. As a result, the dyslexic reader may achieve accurate word reading through very slow, careful reading and rereading of passages. Alternatively, when reading rapidly, uncertainty and impaired oral reading fluency will be revealed through limited voice inflection (prosody), halting two-to-four word phrases, repetitions, omitted words, added words and mispronounced words, which often results in inconsistent reading comprehension.

Jessica exhibited a pattern of reading scores typical of the dyslexic reader described above. The previous evaluation utilized an instrument that did not provide a comprehensive assessment of the component skills involved in efficient practical reading exhibited by the non-impaired reader, which encompasses most people in the general population. Jessica's basic reading skills are within the average range when not limited by time restrictions as measured by the WIAT-III Basic Reading Composite score of 96, which is higher than 39% of other adults her age.  Jessica's grasp of basic phonics is in the average range as measured by the WIAT-III Pseudoword Decoding score of 95 that is higher than 37% of other adults her age.  Jessica's WIAT-III Word Reading score of 100 is in the average range and she was able to read single words fairly accurately.

The WIAT-III Word Reading and Pseudoword Decoding subtests also have an additional separate component measure of the speed at which she read the list of words.  The examinee is covertly timed on the WIAT-III Basic Reading subtests. The examinee is instructed to read the lists as well as they can, but the instructions specifically avoid any mention of speed, or that they are being timed, and no timing device was visible to Jessica. The efficiency and speed at which she read these pseudowords was slower than 95% of other adults her age and the efficiency at which she read these real words was slower than 98% of other adults her age.

Jessica's reading rate and level of oral reading fluency was further assessed through four different measures. The WIAT-III Oral Reading Fluency subtest and the Gray-Oral Reading Tests-Fifth Edition measure speed and accuracy of word decoding in passages with conceptually connected content, which allow for observations of her degree of automatic oral word recognition and decoding. The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency, which rely on how many reading comprehension tasks are correctly completed within a set time limit. Overall, measures of her reading fluency encompassing reading speed resulted in performances that were well below average and far below average compared to other individuals her age and grade level. Jessica obtained a WIAT-III Oral Reading Fluency score of 67, which is in the far below average range and reflects a relative weakness with oral reading fluency. Her GORT-5 oral reading was very slow and replete with many accuracy errors. Her GORT-5 Rate scaled score of 3 is higher than

NBME00070

1% of other individuals from a group of individuals age 19 years through 23 years, and her Accuracy scaled score of 5 is higher than 5% of other individuals from that group.  Her Fluency scaled score of 4, which is a combination of the Rate and Accuracy performance, is in the well below average range and is higher than only 2% of the comparison group.

The WJ-4 Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency that rely on the number of correct responses to reading comprehension items completed within a time limit.  The WJ-4 Reading Rate Cluster measures reading speed by way of the number of correct responses completed and is derived from the time-limited Sentence Reading Fluency and time-limited Word Reading Fluency subtests. Jessica's Reading Rate Cluster score of 66 is in the Far Below Average range and is higher than 1% of other adults her age. Jessica was only able to read three of the seven NDRT passages and attempted only 47% of the 38 Comprehension items on the standard-time Comprehension administration. She correctly answered 94% of the Comprehension items she attempted.  A majority of high school seniors were found to be able to read all seven passages and attempt all 38 Comprehension items. In addition, Jessica's Nelson-Denny Rate score was lower than 99% of high school seniors.

Jessica's reading comprehension was measured both by means that were not influenced by being required to read quickly or restricted by time limits and by measures that required her to read quickly or were restricted by time limits. Her reading comprehension performance was in the average range when not impacted by speed or time limits. Her reading comprehension performance was in the below average range when impacted by speed or time limits.   The WIAT-III Reading Comprehension subtest reflects reading comprehension under conditions when reading is untimed. She obtained a WIAT-III Reading Comprehension subtest score of 94 that is in the Average range and is higher than 34% of other individuals her age.

The GORT-5 Comprehension subtest and the Nelson-Denny Reading Test reflects reading comprehension under conditions when speed is emphasized or time is restricted. On the GORT-5, Jessica was specifically instructed to read passages out loud "as carefully and as quickly as you can."  The GORT-5 passage was then removed from sight after she completed the passage and she was asked five open-ended questions about the content of the passage. Her GORT-5 Comprehension scaled score of 3 is in the far below average range and is higher than only 1% of the comparison group. The Nelson-Denny Reading Test (NDRT) measured her performance on a timed test.  She correctly answered 94% of the Comprehension items she was able to attempt during the standard twenty-minute time limit.  Jessica's NDRT Comprehension score is near the bottom of the low average range at the 18th percentile compared to grade-12 students, in the Far Below range at the 2nd percentile compared to grade-16 university students, and in the Far Below Average range at the 1st percentile compared to medical and healthcare students.

Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment.  Jessica's overall basic reading skills are in the average range as measured by the WIAT-III Basic Reading Composite score of 96, which reflects word decoding skills under untimed conditions.  She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits

NBME00071

persistently impaired reading rate and reading fluency compared to other adults her age, as reflected in WJ-4 Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension scores.

Although discrepancies between reading scores and aptitude scores are no longer one of the diagnostic criteria, such discrepancies reflect the frequency of the degree of unexpected struggle that occurs in the general population. Jessica's WIAT-III Total Reading Composite score of 85 is significantly below her Mathematics Composite score of 133 by a very uncommon margin estimated to occur in less than 1% of other individuals in the general population, which is a reflection of the difficulty she has experienced specific to acquiring reading skills. Her WIAT-III Mathematics Composite score of 133 is commensurate with an expected score of 120 predicted by her GAI score. However, all of her WIAT-III reading composite scores are significantly below expectation whether the expectation is measured with the FSIQ or the GAI score. Jessica is expected to have a WIAT-III Reading Comprehension and Fluency Composite score of 112 predicted from her FSIQ score but her actual Reading Comprehension and Fluency Composite score is 74. This is a very uncommon discrepancy of 38 points estimated to occur in 1% or less of other adults. Similar very uncommon discrepancy margins can be seen between her predicted scores and her actual WIAT-III Basic Reading Composite and Reading Comprehension-Fluency Composites with even larger discrepancies based on her GAI score. Jessica's history and pattern of reading scores indicate and warrant a diagnosis of Specific Learning Disorder with impairment in reading that involves reading rate, reading fluency and reading comprehension. Her impairment in reading is exacerbated by the effects of ADHD. The severity of her impairment in reading is severe.

Double the usual time for any timed test is recommended because of Jessica's very slow reading speed and difficulty comprehending the content of passages. The letter of September 11, 2018, from Dr. Farmer denying extended time stated that the 2017 evaluation by Dr. Lewandowski reported that "your reading, spelling and arithmetic are normal to above normal." However, the only test of her reading skills used by Dr. Lewandowski was the Wide Range Achievement Test-4th Edition (WRAT-4), which does not measure reading speed, reading fluency or the impact of these on comprehension. The WRAT-4 is considered to be an insufficient instrument as the primary assessment of reading, writing, or math skills. The USMLE Guidelines for Testing Accommodations specifically states, "The Nelson-Denny Reading Test (NDRT) and Wide Range Achievement Test (WRAT) are not comprehensive diagnostic measures of achievement and therefore neither is considered acceptable if used as the sole measure of reading ability or academic skills."

Dr. Farmer also stated that "documentation does not demonstrate a developmental history of impaired scholastic skills." Although not formally identified in her academic records, the records she provided this examiner reflect specific statements by her (and referred to in Dr. Lewandowski's report) about the difficulty she experienced from her earliest elementary years in acquiring reading and writing skills. Dr. Farmer cited her high school grade point average as proof that she did not reflect developmental history of impaired academic functioning when in fact she stated that she achieved her high grades because of the inordinate amount of time she had to devote to school work when compared to other students, as well as the informal accommodations she received. Dr. Farmer further cited her scores on the ACT and MCAT as proof that her academic functioning was not impaired. The ACT and MCAT are not comprehensive diagnostic measures of reading or other academic skills any more than the WRAT is, and the scores she managed to attain are as

NBME00072

much a reflection of the compensatory effects of her superior intellect rather than an absence of reading impairment. While her scores on the ACT and the MCAT were good, she may have scored significantly higher if she had taken these tests with accommodations of a separate room and extended time. Consequently, the ACT and MCAT scores do not provide an indication of the negative impact of her reading disability.

It is noteworthy that recent students with her MCAT score, while good at the 79th percentile combined with her college GPA, only had an acceptance rate of 38% according to the Association of American Medical Colleges. Dr. Farmer also stated in reference to Dr. Lewandowski's evaluation that "Your evaluator's conclusions not withstanding, he reports that her performances on a computerized measure of attention-related problems, the Conners Continuous Performance Test Third Edition (CPT-3) are normal." However, according to a leading ADHD researcher and specialist, "… a sizable minority of adults with ADHD can perform these tests sufficiently well to make for an unacceptable level of false negatives for these tests."[1] The DSM-5 specifically states that, "Inattentive behavior is associated with various underlying cognitive problems on tests of attention, executive function, or memory, although these tests are not sufficiently sensitive or specific to serve as diagnostic indices." Consequently, neuropsychological tests including continuous performance tests, can provide supplementary evidence for ADHD, but seemingly normal performance cannot be used to rule out the condition.

Jessica's writing skills are in the middle of the average range compared to other adults her age as measured by the WIAT-III Written Expression Composite score of 100, which is as high or higher than 50% of other adults her age. The subtests and component scores are also within the average range for her age. Consequently, a specific learning disorder with impairment in written expression is not indicated. However, Jessica's WIAT-III Written Expression Composite score of 100 is significantly below an expected score of 119 predicted by her GAI score of 132 and by an uncommon margin estimated to occur in 10% or less of the general population. This pattern represents a significant relative weakness performing writing tasks, which is presumed to be a consequence of her reading disorder and the ADHD. Jessica can be expected to be relatively slow at organizing and expressing her thoughts in writing at a level commensurate with her intelligence, which is reflected in the distinct weakness she exhibited with general processing speed as measured by the WAIS-IV.   Consequently, additional time is needed on writing tasks in order to perform at a level commensurate with her intelligence.

Jessica Ramsay is a 28-year-old, single female medical student with superior intelligence who has a long history of inattention, distractibility and hyperactivity that have significantly interfered with academic functioning since early childhood. Jessica has been able to perform well academically, but has had to rely on extraordinary compensatory strategies in order to do so. Jessica's academic and behavioral history reflect DSM-5 diagnostic criteria indicating ADHD, Combined Presentation.

Jessica reported often experiencing 17 of the 18 DSM-5 criteria symptoms associated with ADHD that have persisted for at least the past six months with most having been present since her earliest years in school. The persistently frequent manifestation of these symptoms was corroborated by her mother and her fiancé. On a

---

[1] Barkley, R., Murphy, K., Fischer, M. (2008). ADHD IN ADULTS: What The Science Says (p. 433). New York, NY: The Guilford Press.

    NBME00073

systematic rating score of the frequency of occurrence of the DSM-5 ADHD symptoms, Jessica endorsed 17 (her mother, 14 and fiancé, 11) of the 18 criteria that are associated with a diagnosis of ADHD.  Only 5 inattention or 5 hyperactive-impulsive symptoms are required to be frequently and persistently present over the previous six months.  The ADHD symptoms described or endorsed by Jessica, her mother and fiancé are prominently exhibited at school, at her home and with her interpersonal relationships.  These symptoms were reported by Jessica and corroborated by her mother to have interfered with and reduced the quality of her academic functioning and her daily adaptive functioning since her earliest school years.

The available school records do not clearly reflect academic struggles in elementary, middle or high school, but this is a result of the family obtaining help on an informal basis, which was very successful in preventing poor academic grades, and therefore masked the degree of struggle Jessica experienced during these years. In addition, the specificity of Jessica's descriptions, which are corroborated by her mother, attest to the presence of such struggle. Although Jessica has worked hard at compensating for her deficits, her symptoms have continued to significantly interfere with her life.  Results of the IVA+Plus, a computerized test of sustained attention and distractibility, reflect a severe impairment compared to other adults her age. In addition, her WAIS-IV Processing Speed Index score at only the 8th percentile for her age reflects a weak cognitive efficiency highly associated with ADHD.  Jessica's symptoms are not better explained by any other psychiatric or medical condition.  Her medical exams with her physician do not indicate a physical disorder or disease other than ADHD and a Specific Learning Disorder with impaired reading that would account for her ADHD symptoms or academic difficulties.  Jessica's mental status and the magnitude of her psychological symptoms do not indicate a psychological condition severe enough to account for her ADHD symptoms or her academic difficulty.  Jessica has also experienced longstanding feelings of discouragement, frustration, and anxiety which are best understood to be a direct secondary consequence of her underlying ADHD symptoms. Consequently, a diagnosis of ADHD, Combined Presentation is warranted in addition to a Specific Learning Disorder with impairment in reading.

**Diagnosis:  DSM-5 criteria synchronized with ICD-10-CM numerical coding**

1. Specific Learning Disorder with impairment in reading (developmental dyslexia): reading comprehension, severely impaired reading rate and fluent word recognition, 315.00 (F81.0)

2. Attention-Deficit/Hyperactivity Disorder Combined Presentation 314.01 (F90.2)

NBME00074

## Recommendations:

1. Jessica's pattern of reading and writing scores is typical of the intelligent dyslexic reader who struggles with efficient decoding and processing of the printed words, but can use her intelligence to substantially compensate and extract seemingly adequate comprehension from passages. However, the intelligent dyslexic reader's reading comprehension is fragile and susceptible to abrupt lapses and failure that interferes with academic achievement commensurate with her intelligence. Jessica's level of reading impairment is severe and can be expected to significantly and substantially interfere with educational efforts without accommodations such as extended time.  Her impaired reading skills significantly interfered with her performance on the Nelson-Denny Reading Test because of the standard time limit. Jessica correctly answered most of the items she attempted on Nelson-Denny Reading Test, but she indicated this required her to reread passages multiple times in order to gain adequate comprehension.  Consequently, her percentile rank scores were severely limited because of the time constraints.  Jessica correctly completed 94% of the Comprehension items she attempted, but was only able to attempt 47% of the Nelson-Denny Comprehension items during the standard time limit.

   Consequently, it is recommended that Jessica receive at least double the standard time allowed for tests and exams.  Any classroom test or standardized test administered without the accommodation of extended time (double) will not be an accurate and valid measure of Jessica's knowledge in a given area.  Likewise, Jessica's weakness in writing can be expected to significantly and substantially interfere with educational and assessment efforts without accommodations such as extended time. Any tests administered without extended time (at least double) should be regarded a significant and substantial under-representation of Jessica's actual abilities and knowledge, which impairs her access to the exam. Therefore, it is also recommended that at a minimum she be allowed extended time (double the standard time) for any classroom tests, standardized tests and classroom assignments.

2. At least 100% additional test time (double time) is also recommended because of her inattention, distractibility, and slow information processing. This should be used in conjunction with a private, quiet room and additional break time to address basic needs and to adequately manage ADHD symptoms and her medical disorders. Any test administered without these accommodations will not be an accurate measure of what she knows about the subject being assessed.

3. The use of a computer, computer word-processing software with spell-check, and extended time is recommended for any classroom tests or standardized tests that involves writing.  The extended time is also necessary to adequately utilize any assistive technology for reading and writing.

4. Reading material should also be provided to Jessica in audio recorded format.  An online certification has been completed to allow her to apply for a Learning Ally (learningally.org) membership.

5. Tutorial support and assistance from the college academic support services for her reading and writing problems is recommended as needed to help Jessica function at a level commensurate with her intellectual abilities.

6. Remedial reading instruction following the Orton-Gillingham approach may be beneficial for her dyslexia and is recommended for consideration. This is available through MDI. However, this is a slow process and unlikely to benefit her while she is in medical school. Also, improvement of reading fluency is uncertain and it is unknown what benefit, if any, she may obtain from such instruction.

7. Continue treatment through her physician for ADHD with medications such as Concerta, Adderall, Intuniv, Strattera, Vyvanse, Wellbutrin or Provigil.

*Robert D. Smith*

Robert D. Smith, PhD
Licensed Psychologist
Neuropsychologist

NBME00076

## ROBERT D. SMITH, PH.D.

Office: 3505 Coolidge Rd. E.Lansing, MI 48823          Office: (517)349-5987 Home: (517)339-5067
Birthdate: January 11, 1950                           Marital Status: Married

www.neuro-psychologyservices.com

### EDUCATION

| | | |
|---|---|---|
| Ph.D. Counseling Psychology  (APA Approved) | Michigan State University | 1984 |
| M.A.  Clinical Psychology | Central Michigan University | 1974 |
| B.S.  Psychology | Central Michigan University | 1972 |
| Certificate of Specialization in Clinical Neuropsychology | Fielding University | 1999 |
| (2yr post-doctoral) | | |

### LICENSE

Fully Licensed Psychologist,  Board of Psychology, State of Michigan License # 6301003249

### PROFESSIONAL EXPERIENCE

Michigan Dyslexia Institute                         Psychologist                         1994-Present
532 Shiawassee Street Lansing, MI 48933
3384 West 12 Mile, Berkley, MI 48072
   Consultant -Conduct neuropsychological assessments of children and adults with central nervous system dysfunction:  learning
disorders,  ADHD.    25 hours per week.

Independent Private Practice                        Psychologist                         1992-Present
   Neuropsychological Assessment of children and adults with traumatic brain damage, brain damage due to toxic and
disease.  Individual Psychotherapy with adolescents and adults.   25 hours per week

Okemos Counseling Center                            Psychologist                         1991-1992
4123 Okemos Rd. Okemos,MI 48864
   Psychological Assessment and Psychotherapy with adults

Michigan Psychotherapy                              Psychologist                         1988-1991
335 N. Seymour Lansing, MI 48933
   Psychological Assessment, Individual and Group Psychotherapy, Supervision of other staff psychologists and interns.

Psychological Counseling Center                     Psychologist                         1986-1988
1004 W.Michigan Ave. Jackson,MI 49202
   Psychological Assessment, Psychotherapy with children and adults

Ingham County Community Mental Health
808-B Southland Lansing, MI 48910                   Psychologist                         1977-1988
   Psychological Assessment, Individual and Group Psychotherapy,  Consultation with social services,  vocational rehabilitation
   services and physicians.  Supervised doctoral psychology interns and taught weekly psychotherapy seminar for APA
   Approved Professional Psychology Internship.

Huron County Community Mental Health
Bad Axe, Michigan 48413                             Psychologist                         1974 -1976
   Psychological Assessment, Individual and Group Psychotherapy,  play therapy, crisis intervention, consultation with public
   schools  and with the agency supported pre-school program and consultation with the partial hospitalization program.

Central Michigan University                         Graduate Assistant                   1972 -1974
   Lectured undergraduate students in psychological testing, prepared presentations and graded papers

### COMMUNITY INVOLVEMENT

| | |
|---|---|
| Member, Mothers Against Drunk Driving-Ingham County Chapter | 1992 -1994 |
| Board of Directors , Mothers Against  Drunk Driving-Ingham County Chapter | 1990 -1992 |
| Board of Directors, Lansing Concert Band | 2005- 2007 |

### PROFESSIONAL AFFILIATION
American Psychological Association, Division:Neuropsychology
National Academy of Neuropsychology

### Review of Accommodation Request

**Applicant Name:** Jessica Ramsay
**Date of Birth:** _
**Date of Review:** December 25, 2018
**Reviewer:** Benjamin J. Lovett, Ph.D.

This review concerns Jessica Ramsay, who has requested accommodations on Step 1 of the USMLE, on the basis of ADHD, learning disabilities in reading and writing, migraine headaches, and a clotting disorder. Based on prior requests, the NBME has already granted her additional break time over a two-day test administration, a private room, and permission to read aloud to herself. However, she is continuing to also request 100% extended time. She has a history of formal accommodations in medical school and part of college, but not on admissions tests such as the ACT and MCAT. She claims to have received informal accommodations in her K-12 schooling.

I have now reviewed the following documents in Ms. Ramsay's file:
- Completed application forms and personal statements
- Records showing eligibility for accommodations in medical school and in part of college
- A completed verification form for ADHD, used by her college disability services office
- Other documents from applications for accommodations in medical school and college
- Transcripts from high school and college, and a record of performance in medical school
- A signed affirmation of qualifications for the medical school program
- Score reports from NBME exams taken during medical school, including the Step 1 exam
- A score report from the MCAT
- Materials from a 1997 perceptual skills evaluation, including follow-up notes
- Correspondence (letters and e-mails) between Ms. Ramsay and NBME
- Reports from diagnostic evaluations conducted in 2014, 2017, and 2018, along with addenda and information about evaluator credentials
- Letters from an attorney representing Ms. Ramsay
- Letters from a medical school administrator, a primary care provider who also served as a medical school instructor/mentor, and a psychiatry department faculty member at her medical school

Briefly, I believe that there is insufficient evidence to support the diagnoses of learning disabilities or ADHD, or to support any accommodations based on these disorders. I will not comment on Ms. Ramsay's reported diagnoses of headaches and a clotting disorder, due to inadequate specific expertise on these points.

1. Without any accommodations, Ms. Ramsay obtained MCAT scores that were in the average range or above, relative to a group (i.e., medical school applicants) that is already well above average in academic skills, compared to the general population. Similarly, Ms. Ramsay reportedly obtained ACT scores well above the average range (between 27 and 30) without accommodations. She reports an unusual explanation for these scores: that she didn't read a significant amount of the text on these tests, answering the questions without reading the information that the questions were based on. But this does

not make sense. It is common (typical, even) for students to read test questions and answer options first and then search for relevant information in a passage. But this still involves a significant amount of reading under time-pressured conditions. And without such reading, it is often impossible to answer questions. For instance, Ms. Ramsay performed better than most medical school applicants on the MCAT Verbal Reasoning section, a test of timed reading comprehension. It is my understanding that the test items on this section generally asked for students to identify themes, perspectives, and arguments from a passage, meaning that there is no way to find the correct answer without referencing the passage. I am extremely skeptical that Ms. Ramsay possesses a special way of answering ACT and MCAT items without actually reading relevant text, and it is disappointing that her credulous advocates have accepted her explanation.

2. Learning disabilities and ADHD would be expected to cause very significant problems in childhood. No records have been submitted to NBME showing difficulties at school, and even one of Ms. Ramsay's firmest advocates, her recent evaluator Dr. Robert Smith, has had to admit that "the available school records do not clearly reflect academic struggles in elementary, middle, or high school." Ms. Ramsay and her advocates attempt to explain this away by claiming that she received informal accommodations some of the time at school and a great deal of specialized help provided via the family. Of course, there are no records of any of this, and it is not clear how often informal accommodations were provided. Interestingly, I note that before receiving accommodations in college, Ms. Ramsay's letter grades were entirely in the A and B ranges, and she does not appear to be claiming to have received informal accommodations at her large public university. Beyond academic problems, I would expect someone with untreated ADHD to exhibit quite significant impairment in social and everyday life settings as a child. Ms. Ramsay claims such impairment, and during evaluations completed to secure accommodations, her mother has now recalled such impairment, but I am skeptical. If the impairment were half as significant as is now being claimed, why is there no record of such impairment being discussed with a physician or a mental health practitioner during childhood? When Ms. Ramsay was a child in the 1990s, ADHD was a well-known condition; it seems more than a bit odd that her mother (who reportedly has a graduate degree in education) did not consult professionals (at least as documented). In short, there is no evidence of real-world below-average functioning prior to accommodations being provided, and the explanations provided by Ms. Ramsay and her advocates are evasive and unpersuasive.

3. Ms. Ramsay had gone to diagnostic evaluations in 2014 and 2017, and all of her academic skills scores during these evaluations were in the average range or above. However, the evaluators conducting these evaluations did not perform a comprehensive assessment of her academic skills, and specifically they did not really evaluate her academic skills under time-pressured conditions. After her request for extended time accommodations was twice denied by NBME, and she was likely under a great deal of pressure to pass Step 1 to move ahead in medical school (she was represented by an attorney by this point as well), she completed a final diagnostic evaluation with Dr. Robert Smith. During this evaluation, she was given several measures of academic skills that were time-pressured, and her performance was uniformly poor. Many of her scores suggested skills at the level of children in elementary and middle school, placing her

skills in the bottom 5% of the population. These scores are simply not credible, especially considering her average and above average scores on tests like the ACT and MCAT and her good grades in college before accommodations were provided. For instance, on the timed reading comprehension task from the Nelson-Denny Reading Test (NDRT), her score was at the 2nd percentile, at the estimated level of a child in eighth grade. But on the MCAT verbal reasoning section, which has an almost identical format, her performance was at the 67th percentile *compared to other medical school applicants*. That Dr. Smith took the NDRT score as valid suggests that he is inappropriately credulous. It is remarkable that he would claim that on the MCAT, Ms. Ramsay can employ special strategies to do well, but on a diagnostic test developed to be accessible to ninth grade students, she apparently cannot.[1] The 2018 diagnostic testing data regarding Ms. Ramsay's academic skills under timed conditions simply cannot be trusted; they are severely undermined by her real-world performance.

4.   Another discrepancy between real-world performance (at least as shown by objective records) and diagnostic testing is present with regard to ADHD symptoms. During the 2018 diagnostic evaluation, conducted to help secure extended time accommodations after two denials and likely a great deal of pressure, Ms. Ramsay endorsed having almost every symptom of ADHD (far more than most adults with ADHD would endorse!), and her mother and fiancé also described her as having many, many symptoms, well above the clinical thresholds for the disorder. In addition, on a computerized test of ADHD symptoms, her performance in Dr. Smith's evaluation was extremely poor, again much worse than would be expected even for most individuals with ADHD. Interestingly, on a very similar test the previous year, when she was not under as much pressure to secure accommodations, she did well; Dr. Smith never addresses this discrepancy, which would further undermine the results of his evaluation. And again, there are no objective records attesting to significant ADHD symptoms or impairment in real-world settings at any point in Ms. Ramsay's life.

5.   Dr. Smith argues that the data that Ms. Ramsay provided during his evaluation of her can be trusted because she performed well on the Test of Memory Malingering (TOMM). The TOMM was developed to identify people feigning *memory* problems, not to identify people working slowly on academic tests or reporting more ADHD symptoms than they actually have. Dr. Smith's apparent misunderstanding of the TOMM has led him to be far too credulous of Ms. Ramsay's evaluation data, especially given the stark contrasts between her real-world performance and her performance during the evaluation.

To summarize Ms. Ramsay's documentation with regard to learning disabilities and ADHD, (a) there is no objective evidence of poor academic skills or significant ADHD symptoms and impairment in real-world settings where most people in the general population are expected to do

---

[1] The contrast between the NDRT comprehension task and the MCAT verbal reasoning section is especially interesting because the *former* has been criticized for containing items that are easy to answer without reading the passages. In an experimental study, college students were able to often answer many items correctly when they were not even given the passages to read! See Coleman, C., Lindstrom, J., Nelson, J., Lindstrom, W., & Gregg, K. N. (2010). Passageless comprehension on the Nelson-Denny Reading Test: Well above chance for university students. *Journal of Learning Disabilities, 43*(3), 244-249. If there is any test where Ms. Ramsay should have been able to do very well, *at least when she is trying to do well,* it is the Nelson-Denny comprehension task.

well, (b) Ms. Ramsay and her advocates attempt to explain away her good real-world performance using unpersuasive arguments, (c) the data from her 2018 diagnostic evaluation are not credible, (d) her 2017 and 2014 diagnostic evaluations did not involve the collection of sufficient data to justify any diagnoses, and (e) her ACT and MCAT performance suggests an ability to access tests without accommodations, at least based on neurodevelopmental disorders such as ADHD and learning disabilities which would have been present by the time that those tests were taken. Again, let me note that my analysis does not consider the reported problems with headaches and a clotting disorder.


Benjamin J. Lovett, Ph.D.



National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

215-590-9500 phone
www.nbme.org

**<u>Confidential</u>**

February 14, 2019

**<u>Via E-mail to jessica.ramsay@med.wmich.edu</u>**
Jessica E. Ramsay
6862 Tall Oaks Dr
Apt 3B
Kalamazoo, MI 49009

RE: USMLE Step 1                          USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

We have thoroughly reviewed your request for reconsideration of our decision regarding test accommodations for the United States Medical Licensing Examination (USMLE) Step 1. We conducted an individualized review of your request and supporting documentation in accordance with the guidelines set forth in the Americans with Disabilities Act (ADA).

The NBME carefully considers all evidence in determining whether an individual is substantially limited within the meaning of the ADA and what, if any, accommodations are appropriate to the particular Step exam context. Submitted documentation including the individual's personal statements; letters from providers and advocates; and objective information such as school records and scores obtained on high stakes tests taken with and without accommodations are thoroughly reviewed.

Supporting documentation submitted from qualified professionals is a necessary part of any request for accommodations and is carefully reviewed by the NBME. Though not required to defer to the conclusions or recommendations of an applicant's supporting professional, we carefully consider the recommendation of qualified professionals made in accordance with generally accepted diagnostic criteria and supported by reasonable documentation.

In a November 6, 2018 report of Neuropsychological Evaluation for Learning Problems, Robert D. Smith, Ph.D. writes that you sought evaluation as part of your appeal for testing accommodations for the USMLE.  Dr. Smith writes, *"Jessica's basic reading skills are within the average range when not limited by time restriction as measured by the WIAT-III Basic Reading Composite score of 96, which is higher than 39% of other adults her age…The WJ-4 [sic] Reading Rate Cluster and the Nelson-Denny Reading Test are measures of silent reading fluency that rely on the number of correct responses to reading comprehension items competed within a time limit…Jessica was only able to read three of the seven NDRT passages and attempted only 47% of the 38 Comprehension items on the standard-time Comprehension administration. She correctly answered 94% of the Comprehension items she attempted…In addition, Jessica's Nelson-Denny Rate score was lower than 99% of high school seniors…Jessica's pattern of reading scores is consistent with the pattern typically exhibited by dyslexic readers who have developed strategies to compensate for their reading impairment…She has been able to acquire an average level of reading comprehension skills when allowed sufficient time to employ compensatory strategies, but exhibits persistently impaired reading rate and reading fluency compared to other adults her age, as reflected on WJ-4 [sic] Reading Rate Cluster, the GORT-5 Fluency and the Nelson-Denny Rate and Comprehension…Jessica has been able to perform well academically, but has had to rely on extraordinary compensatory strategies in order to do so."*

**<u>Ramsay v. NBME - Exhibit D</u>**

**Appx1511**

Although your evaluator appears to accept your exceptionally low scores on timed reading tests administered for the purpose of requesting test accommodations as valid and credible, your average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college and medical school demonstrate that your skills are better than most people in the general population.  Regarding your performance on the MCAT taken under standard time conditions, Dr. Smith reports that you relied on strategies such as answering questions before reading the passages, a common strategy recommended by prep courses and utilized by savvy students. He writes, *"...Jessica was able to obtain a good score in the 79th percentile (30M) of students who take the exam. This, however, was not the exceptional MCAT scores that would have been expected with her intelligence and understanding of the material. Jessica's performance on the MCAT component sections reflected her relative weakness specific to reading tasks with a Verbal Reasoning score at the 67th percentile, a Physical Sciences score at the 79th percentile and a Biological Sciences score at the 88th percentile...While her scores on the ACT and the MCAT were good, she may have scored significantly higher if she had taken these tests with accommodations of a separate room and extended time."*

It's not uncommon for students to feel disappointed when they do not achieve the score they expected and believe that they could or would have obtained an exceptional score with additional testing time. Benefiting from additional time is not evidence of need for accommodations or evidence of a disability. Research shows that extended time accommodations benefit students without[1] disabilities, and are viewed as beneficial by most nondisabled postsecondary students[2] contemplating taking high-stakes standardized tests.

Accommodations are provided when there is clear and credible documentation of functional impairment and a rationale to demonstrate that the requested accommodation is appropriate to the setting and circumstance.  Your documentation with regard to learning disabilities and ADHD offers no objective evidence of impaired reading or pervasive ADHD symptoms that limited any major life activity compared to most people in the general population. Your request for reconsideration provided no new substantive information or evidence that alters our decision communicated in my September 11, 2018 letter notifying you that you that we will provide the following accommodation(s) for the USMLE Step 1 for which you are currently registered:

- **Additional break time - testing over two days:**  The exam will be administered over two days.  Day one will be 5 hours in length and will include a 15 minute tutorial and 7 blocks with approximately 20 questions per block.  Day two will be 4 hours 45 minutes in length and will include 7 blocks with approximately 20 questions per block.  You will have up to 30 minutes to complete each block.  You will receive 75 minutes of break time each day, including lunch.  You may use break time as needed between blocks.  If you complete the tutorial or an examination block in less time than allotted, the unused time will be added to your available break time.

- **Separate testing room in which you may stand, walk or stretch during exam**

- **Permission to read aloud**

Sincerely,

*Catherine Farmer*

Catherine Farmer, Psy.D.
Director, Disability Services
ADA Compliance Officer, Testing Programs

C: Lawrence D. Berger, Esq. via e-mail to larry@rcglawoffices.com

---

[1] See, for instance, Cahan, S., Nirel, R., & Alkoby, M. (2016). The Extra-Examination Time Granting Policy: A Reconceptualization. *Journal of Psychoeducational Assessment*, *34*(5), 461-472.
[2] See Lewandowski, L., Lambert, T. L., Lovett, B. J., Panahon, C. J., & Sytsma, M. R. (2014). College students' preferences for test accommodations. *Canadian Journal of School Psychology*, *29*(2), 116-126.

**Ramsay v. NBME - Exhibit D**

# LOA Paperwork & Documents

NBME01353



## Leave of Absence Request

**Section 1: To be completed by the Student:**

Student Name: _Jessica Ramsay_          WMed ID#:_1164440_          Date Submitted: _3/15/2018_

This Leave of Absence request is based on the following reason(s):

_Unsuccessful first attempt and subsequent delay in retake of USMLE Step 1 pending appeal._

Type of leave you are requesting:

☐ Academic: to pursue a specified course of study or academic experience.
     Attach a letter of acceptance.

☐ Medical: to address a personal medical condition.
     Attach a certification from a medical professional substantiating the condition requiring leave.

☑ Personal: to address extenuating personal or family circumstances.
     Attach a description of extenuating circumstance.

Dates of requested leave:

Start date: _8/28/2017_          Planned return date: _8/29/2018 (or earlier)_

**Required signatures:** I have discussed my leave request with all of the following.  (Student must obtain signatures before meeting with the associate dean for Student Affairs.)

Faculty:

☑ Review of unofficial transcript and grade changes resulting from this Leave of Absence.

☑ Anticipated graduation date upon returning from this Leave of Absence: _May 12, 2019_

Faculty Representative: _____ (Zienkowski)_ Date: _March 15, 2018_
(May be Scholar-Advisor or assistant dean for Foundations of Medicine for M1 or M2 student, assistant dean for Clinical Applications for M3 or M4 student, or associate dean for Educational Affairs.)

Director of Financial Aid/designee: _Laudu Moore_ Date: _3/15/2018_

Registrar: _Donna Gua_ Date: _3/15/18_

**Student must meet with the associate dean for Student Affairs for approval.  A completed form with appropriate signatures and required documentation is necessary prior to the meeting.**

Revised 2018-01-26                    Filed:  ppv LOA-Readmittance                    Owner: Registrar



WESTERN MICHIGAN UNIVERSITY

## Leave of Absence Request

**Section 2: To be completed by the associate dean for Student Affairs**

**Your leave is:**

☑ Approved: for the requested dates.                    ☐ Denied: for the following reason:

Conditions for return are as follows:

Successful completion of USMLE Step 1 by achieving a passing score.

_____

_____

_____

_____

_____

*(Brocbowski)*                                    March 15, 2018

**Signature of associate dean for Student Affairs/designee**        **Date**

**Section 3: To be completed by the Student following approval of Leave of Absence.**

I understand that I must complete a Request for Return from Leave of Absence form, comply with the above-listed return conditions, and re-confirm my ability to meet the WMed Essential Abilities for Completion of the Medical Curriculum prior to my return to Western Michigan University Homer Stryker M.D. School of Medicine.  I understand that taking this leave may affect my financial aid, disability insurance and health insurance, as well as defer USMLE eligibility and postpone my anticpated graduation and residency match date.

3/22/2018

**Signature of student**                                    **Date**

NBME01355

**Appx1515**

03/21/2018

Extenuating circumstances necessitating leave of absence for Jessica Ramsay:

My initial request for reasonable accommodations for USMLE Steps 1 and 2 CK was denied. I attempted to take Step 1 without any accommodation and failed. After discussing my options with the MSPC and my mentors, it was decided that the best plan of action was for me to appeal for reasonable accommodations prior to retaking Step 1. Out of my control, various factors that required for the appeal have taken much longer than anticipated, resulting in a delay in my ability to schedule my Step 1 retake and my return to 4th-year rotations. This leave of absence allows time for the accommodations appeal to be processed and, once processed, for me sit for the Step 1 exam without negatively affecting my academic progress.

*Jessi Ramsay* 3/22/2018

NBME01356



WESTERN MICHIGAN UNIVERSITY

August 7, 2018

Jessica Ramsay
jessica.ramsay@med.wmich.edu

Jessie,

I appreciate the opportunity to meet with you in person last week to discuss your plans regarding USMLE Step 1. As you know, your planned return date from your Personal Leave of Absence is August 28, 2018. You informed me that you had discussed the possibility of returning from Leave of Absence in order to complete clinical rotations before sitting for a second attempt at USMLE Step 1, with your advisor Dr. Cheryl Dickson, and requested I consider that option.

I have discussed this suituation with Dr. Busha, the associate dean for Educational Affairs, and Dr. Riddle, the assistant dean for Academic Success. We are willing to extend your Leave of Absence for up to one year, until August 28, 2019. Unfortunately, under the stated policies of WMed, I am not able to extend an exception to allow you to start clerkship electives, especially clinical electives, prior to sitting for USMLE Step 1.

As I understand the situation, having not achieved a passing score on USMLE Step 1 on your first attempt, you have requested a set of accomodations from the NBME. The documentation and review necessary to support this request has taken longer than anticipated, resulting in your LoA likely extending past one year. Once you have resolved this issue with the NBME, you plan to sit for USMLE Step 1 in a timely fashion.

I have reviewed the necessary sections of the Medical Student Handbook. It appears that WMed defines a Leave of Absence as "generally for up to one year." (pg 167, version 2017.07.012). This implies that an extension of this term may be made for extenuating circumstances, as applies in your case.

In the section of the Medical Student Handbook dealing with USMLE Step 1 Examination, it states "A student who fails the USMLE Step 1 examination and receives notice after beginning the first required or elective fourth-year clerkship may complete the current clerkship in which the student is enrolled but is not permitted to enroll in another fourth-year required or elective clerkship, at the medical school or elsewhere, until the student takes the USMLE Step 1 examination a second time." (pg 94. Version 2017.07.01) There is no notice of an exception granted for this possibility.

NBME01363

Appx1517

This is not an easy decision for me to make. I recognize your hard work through all parts of the WMed curriculum prior to USMLE Step 1. I especially recognize the clinical excellence leading to your peers identifying you as a member of the WMed chapter of the Gold Humanism Honor Society. I anticipate that upon achieving a passing score on USMLE Step 1, you will demonstrate the same clinical work ethic to complete your education. I appreciate your willingness to work with WMed faculty and staff through this process, and I look forward to supporting your career goals upon your return as a WMed student.

If you have further questions or concerns please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs
Western Michigan University Homer Stryker M.D. School of Medicine
Peter.Ziemkowski@med.wmich.edu

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file



WESTERN MICHIGAN UNIVERSITY

May 16, 2019

Jessica Ramsay
jessica.ramsay@med.wmich.edu

Jessie,

I appreciate the opportunity to meet with you in person recently to discuss your plans regarding USMLE Step 1. As you know, your planned return date from your Personal Leave of Absence is August 28, 2019. You informed me that you were continuing your appeal to the NBME for testing accomodations, and could not insure that they would be completed in time for you to sit for USMLE Step 1 prior to your planned return date.

I have discussed this suituation with Dr. Busha, the associate dean for Educational Affairs, and Dr. Riddle, the assistant dean for Academic Success. As stated in my previous letter dated August 8, 2018, we were willing to extend your Leave of Absence for up to one year, until August 28, 2019. Also as stated, we anticipated that you would resolve any outstanding issue with the NBME and sit for Step 1 in a timely fashion.

I am afraid that given the lack of progress in resolving outstanding issues with the NBME, I am not able to further extend your Leave of Absence beyond August 28, 2019. I encourage you to resolve any outstanding issues as possible and sit for the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by the planned return date.

This is not an easy decision for me to make. I recognize your hard work through all parts of the WMed curriculum. I especially recognize the clinical excellence leading to your peers identifying you as a member of the WMed chapter of the Gold Humanism Honor Society. I anticipate that upon achieving a passing score on USMLE Step 1, you will demonstrate the same clinical work ethic to complete your education. I appreciate your willingness to work with WMed faculty and staff through this process, and I look forward to supporting your career goals upon your return as a WMed student.

If you have further questions or concerns please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file

NBME01365

**Appx1519**



Western Michigan University
Homer Stryker M.D.
SCHOOL OF MEDICINE

June 24, 2019

By email to Jessica.ramsay@med.wmich.edu and by USPS first class mail

Jessica Ramsay
jessica.ramsay@med.wmich.edu
6862 Tall Oaks Dr, Apt 3B
Kalamazoo, MI 49009

Lawrence D. Berger
19 Chestnut St
Haddonfield, NJ 08033

Dear Jessie,

I am in receipt of your request to again extend your leave of absence in order to pursue further accommodations from the NBME. Your original leave of one year duration, August 28, 2017 to August 29, 2018, was offered to allow you to retake USMLE Step 1. It was subsequently extended for up to a year, ending August 29, 2019, with the expectation that you would resolve your issues with the NBME and retake Step 1. Without an end date stated your current request represents an indefinite leave of absence, which is neither allowable under WMed policies, nor reasonable. I cannot extend your leave of absence indefinitely.

I am not able to further extend your Leave of Absence under the current expectations beyond August 29, 2019. As an alternative and in order to support your preparation, I can offer to extend your leave for six months, until March 2, 2020, with the expectation that you will sit for the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by that date.

If you are unable to return to the WMed curriculum by March 2, 2020, under the policies you would be dismissed from medical school. Up until that date, you may voluntarily withdraw from WMed. In either case you would be eligible to apply for readmission at the time you are prepared to take USMLE Step 1. (You must be admitted to medical school to be eligible to schedule and sit for USMLE Step 1.)

As I have stated before, I recognize your hard work through all parts of the WMed curriculum. I especially recognize the clinical excellence leading to your peers identifying you as a member of

NBME01366

**Appx1520**

the WMed chapter of our Humanism Honor Society.  I anticipate that upon achieving a passing score on USMLE Step 1, you will demonstrate the same clinical work ethic to complete your education.  I appreciate your willingness to work with WMed faculty and staff through this process, and I look forward to supporting your career goals upon your return as a WMed student.

If you have further questions or concerns, please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
     David Riddle, PhD
     Student file

NBME01367

**Appx1521**



WESTERN MICHIGAN UNIVERSITY
Homer Stryker M.D.
SCHOOL OF MEDICINE

August 6, 2019

Jessica Ramsay
jessica.ramsay@med.wmich.edu

Jessie,

We are pleased that you have accepted our offer to further extend your leave of absence with the expectation that you would take USMLE Step 1 and return to the WMed curriculum by March 2, 2020. I would like to address each of your questions in turn. These answers are based on the Medical Student Policy Manual dated January 2019, which is available at https://med.wmich.edu/policies-manuals-statements

*Question 1: In your letter, you state, "As an alternative and in order to support your preparation, I can offer to extend your leave for six months, until March 2, 2020, with the expectation that you will sit for the USMLE Step 1 exam in a manner that allows you to return to the WMed curriculum by that date."*

*I would like to confirm that, if I take Step 1 by March 2, 2020, I would be able to return to the curriculum immediately and begin taking rotations starting with the next block following the completion of my exam.*

Answer 1: You may return to the curriculum upon taking Step 1, at the start of the next available rotation block. As stated on pg. 114 of the Medical Student Policy Manual "Following the second USMLE Step 1 attempt, the student may enroll in an advanced required or elective clerkship prior to receiving a score on the second attempt." I cannot, however, guarantee that you are able to take specific elective rotations at specific times. Not all rotations are available in all blocks, and rotations must have sufficient capacity for you to be added as an additional student. You may also need to recertify for specific skills, such as Adavanced Cardiac Life Support (ACLS), before you are eligible for certain rotations. The policies and requirements regarding return from leave of absence, including advance notice, are found starting on pg. 183 of the Medical Student Policy Manual.

*Question 2: I would also like to confirm that if I take Step 1 prior to March 2, 2020, I will re-enter the curriculum in my 4th year where I left off, with 11 weeks of credit for 4th-year electives.*

Answer 2: As noted on page 80 of the Medical Student Policy Manual, the Medical Student Peformance Committee (MSPC) is charged with "the responsibility to monitor learning and performance – academic progress as well as student behavior, and professional and personal conduct

NBME01368

**Appx1522**

– of all medical students, and make faculty recommendations for medical student advancement and graduation."

On your return from leave of absence, the MSPC will review your transcript and determine whether any curricular content must be repeated. Given the gap in clinical care, it is likely that you would benefit from participation in a course such as Transition to Clinical Applications or more appropriately Transition to Advanced Clinical Care (TRAN 9100) prior to restarting clinical rotations, and from a robust set of M4 electives to prepare for residency. However, any specific requirements will be determined by the MSPC upon your return.

*Question 3: I understand that graduation requirements, particularly those pertaining to 4th-year rotations, have changed for each graduating class. If I am able to take Step 1 prior to March 2, 2020 and return to the curriculum, what are the remaining requirements I need to complete in order to graduate?*

Answer 3: Graduation Requirements are detailed starting on page 123 of the Medical Student Policy Manual. Your specific requirements will be determined upon your request to return from Leave of Absence, but at this time a review of your transcript suggests that you will need to complete the following:
TRAN 9100 – Transition to Advanced Clinical Management (2 credits) – You took Tran 9100 when it was 1 credit and titled Clinical Skills. You may need to remediate at least a portion of this course as a part of re-introduction to Clinical Activities.
MEDU 6804 – Advances and Perspectives in Medicine (1 credit)
PROF 9340 – Profession of Medicine 7 (1 credit)
TRAN 9900 – Transition to Residency (2 credits)
EMER 9710 – Advanced Emergency Medicine (4 credits)
98_ _ - Advanced Critical Care (4 credits)
97 _ _ - Advanced Hospital Centered (4 credits)
M4 Electives – you have completed 10 out of the 20 elective credits. (10 credits)

*Question 4: You also state in your letter, "If you are unable to return to the WMed curriculum by March 2, 2020, under the policies you would be dismissed from medical school. Up until that date, you may voluntarily withdraw from WMed. In either case you would be eligible to apply for readmission at the time you are prepared to take USMLE Step 1."*

*Am I correct in assuming that, if circumstances become such that it becomes necessary, voluntarily withdrawing from the program would ultimately be more favorable than being dismissed? How would each of these be noted in my record?*

Answer 4: Official withdrawal and subsequent readmission, which is not assured, are described on page 132 of the Medical Student Policy Manual. In general, students dismissed from WMed are not eligible for readmission, while those who officially withdraw may be so eligible. In either case they may apply for admission to other schools. As currently configured, these actions do not appear on

your transcript, but it would show a gap in coursework for the elapsed time. All gaps in medical education are identified on the Medical Student Performance Evaluation (MSPE or "Dean's Letter"). I cannot state how these actions may be interpreted by other medical schools or residency programs.

*Question 5: Additionally, in the case that I have to withdraw or am dismissed from the program and subsequently must apply for readmission to the program, how would this process differ from first-time application to the program? Would I have to retake the MCAT? Would I have to start the program over completely and enter as an M1, or would I maintain credit for the courses and clinical rotations that I have already passed and re-enter where I left off?*

Question 5: Recommendation for readmission, which would be with advanced standing, would be at the discretion of the Medical Student Performance Committee (MSPC), and the same stipulation on the need to potentially repeat content as noted in the answer to question 2 would apply. This would depend on the amount of time that passed since active participation in medical education at WMed. If a significant amount of time were to elapse prior to return, the curriculum may have changed enough to require that remediation of some content be necessary, and may lead to the need to repeat a course, clerkship or elective.

I doubt that your situation would require retaking the MCAT, and may not require retaking any early coursework, but I cannot say that for certain at this time. If a student were seeking readmission after a prolonged period of time, it is possible that the MCAT may have changed significantly, as it did in 2015, or that the application pool my have changed. In this case a student may need to retake the MCAT prior to readmission.

I am glad to hear that you are working toward a successful return to WMed to complete your medical education. As I have stated previously, and as I believe I speak for the WMed faculty, we look forward to your return and helping you to reach a successful career as a physician.

If you have further questions or concerns please contact me at (269) 337-6111.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    David Riddle, PhD
    Student file

NBME01370

Appx1524



October 23, 2019

Jessica Ramsay
jessica.ramsay@med.wmich.edu

To Whom it May Concern,

Jessica Ramsay is currently on an approved leave of absence from Western Michigan University
Homer Stryker M.D. School of Medicine (WMed).  By WMed policy, she is considered to be enrolled
for the purposes of registering for and taking USMLE exams.

Sincerely,

Peter Ziemkowski, MD
Associate Dean for Student Affairs

Cc: Michael Busha, MD, MBA
    Student file

NBME01374

# REISMAN ▪ CAROLLA ▪ GRAN ▪ ZUBA LLP

19 Chestnut Street
Haddonfield, NJ 08033
P: 856.354.0021
F: 856.873.5640
www.rcglawoffices.com

Catherine Merino Reisman •
Amelia Carolla ⁺
Judith A. Gran **
Sarah E. Zuba *

*Admitted in NJ, PA & NY
⁺Admitted in NJ & PA
**Admitted in PA

Lawrence D. Berger *
Of Counsel
larry@rcglawoffices.com
Direct dial: 856.354.0021

March 19, 2019

*By priority mail and by e-mail to disabilityservices@nbme.org*
Catherine Farmer, Psy.D.
Director, Disability Services
National Board of Medical Examiners
3750 Market Street
Philadelphia, PA 19104-3102

      Re:    **Appeal of Jessica Ramsay**
             **USMLE Step 1**
             **USMLE ID#: 5-366-431-4**

Dear Dr. Farmer:

      I represent Jessica Ramsay and I am submitting this letter on her behalf to request that the National Board of Medical Examiners ("NBME") further reconsider your September 11, 2018 and February 14, 2019 letters, to the extent you denied Ms. Ramsay's request for extended testing time.

      Previously, you have granted Ms. Ramsay's request for additional break time, and a separate testing room, and also granted permission to read aloud. However, you have denied the request for additional test time (double time), and we request further reconsideration of that decision.

      The USMLE web-site states that reconsideration requests must be based on "new substantive supporting documentation."[1] When such documentation is supplied, NBME is therefore obligated to give the new information good faith consideration. Ms. Ramsay spent additional time and resources to obtain such documentation: the report of Dr. Smith. As described in his report, and below, Dr. Smith administered additional assessments to measure Ms. Ramsay's reading speed and reading fluency. Your February 14, 2019 reflects a complete absence of any consideration for the new information submitted by Ms. Ramsay. Therefore, I

---

[1] Found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html.

**Ramsay v. NBME - Exhibit E**

REISMAN CAROLLA GRAN & ZUBA LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 2

am not submitting any additional information, but rather am requesting that NBME now consider the additional information that has been submitted.

Ms. Ramsay has already experienced significant delay because NBME denied her prior application for accommodations. She has already taken Step 1 and could not obtain a passing score because she did not have the accommodations that she needed. Her current application for accommodations was submitted in June 2018, and she then obtained an additional evaluation to meet your objections. As a result of these delays, Ms. Ramsay has already been delayed for over 18 months in continuing her medical education. In addition to my request for prompt and meaningful consideration of Dr. Smith's report, I request that you refer this matter to NBME's trial attorney to avoid further delay.

**1.    NBME Improperly Refused To Grant Additional Test Time, Based Upon Ms. Ramsay's Use Of Mitigating Measures During Prior Examinations, A Consideration Which The ADA As Amended Expressly Forbids.**

Your letter states that you denied Ms. Ramsay's request for accommodations because on prior examinations, she was able to mitigate the effects of her disability by using strategies which reduced the amount of material that she was required to read. This is a legally irrelevant fact. (It is also factually erroneous because these strategies are not effective for the USMLE examinations, which are much more reading intensive.) As a result of your improper consideration of this legally irrelevant fact, you simply ignored the evidence that Ms. Ramsay is a person with a disability. Your stated reason for denying Ms. Ramsay's request is contrary to the express requirements of the Americans with Disabilities Act ("ADA"), and particularly 42 U.S.C. §12102(4)(E) as amended by the ADA Amendments Act of 2008.

The cited provision of the ADA, as added by the ADA Amendments Act, states:

> (i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as —
>
> * * * *
>
> (IV) learned behavioral or adaptive neurological modifications.

42 U.S.C. §12102(4)(E)(i)(IV).

In your February 14, 2019 letter, you expressly acknowledge that Ms. Ramsay's "scores on timed reading tests administered for the purpose of requesting test accommodations" are — using your words – "exceptionally low." You do not challenge the accuracy of Dr. Smith's testing and reporting. As noted by Dr. Smith, he also administered the Test of Memory Malingering ("TOMM"). Ms. Ramsay was told that this was a test that "measured important

**Ramsay v. NBME - Exhibit E**

REISMAN CAROLLA GRAN & ZUBA LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 3

memory skills needed for efficient reading." Smith Report at 8. The TOMM results, combined
with Dr. Smith's observations, led him to conclude that there was no indication of sub-optimal
effort and that Ms. Ramsay made "strong effort on all tests administered to her." *Id.* The
Department of Justice has specifically stated that "Reports from qualified professionals who have
evaluated the candidate should take precedence over reports from testing entity reviewers who
have never conducted the requisite assessment of the candidate for diagnosis and treatment.
This is especially important for individuals with learning disabilities because face-to-face
interaction is a critical component of an accurate evaluation, diagnosis, and determination of
appropriate testing accommodations."[2]

As summarized by Dr. Smith, and quoted by you in your February 14, 2019 letter:

> Jessica's pattern of reading scores is consistent with the pattern typically
> exhibited by dyslexic readers who have developed strategies to
> compensate for their reading impairment. . . . She has been able to acquire
> an average level of reading comprehension skills *when allowed sufficient
> time to employ compensatory strategies,* but exhibits persistently impaired
> reading rate and reading fluency *compared to other adults her age,* as
> reflected on WJ-4 [sic] Reading Rate Cluster, the GORT-5 Fluency and
> the Nelson-Denny Rate and Comprehension.

> \* \* \* \*

> . . . . Jessica has been able to perform well academically, but has had to
> rely on *extraordinary compensatory strategies* in order to do so. . . .

Smith Report at 26 and 28 (emphasis added), quoted in your letter at 1.

Despite Ms. Ramsay's "strong effort," she received "exceptionally low" scores which
corroborate Dr. Smith's diagnosis of Specific Learning Disorder with impairment in reading, and
Attention-Deficit/ Hyperactivity Disorder Combined Presentation. These disabilities prevent
Ms. Ramsay from fairly accessing the Step 1 examination, and therefore demonstrate that she is
entitled to extended testing time as an accommodation. Dr. Smith's findings are consistent with
those of other physicians and evaluators, submitted with Ms. Ramsay's original application, but
are more recent and include additional evaluation instruments to measure Ms. Ramsay's reading
speed and reading fluency.

The only stated reason for ignoring the "exceptionally low" scores, and Dr. Smith's
diagnosis, is that on prior standardized examinations, Ms. Ramsay received scores within the

---

[2] U.S. Department of Justice, "Testing Accommodations," found on the Internet at
www.ada.gov/regs2014/testing_accommodations.html.

**Ramsay v. NBME - Exhibit E**

REISMAN CAROLLA GRAN & ZUBA LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 4

_____

average range which you inaccurately describe as "above average,"[3] by "rel[ying] on strategies such as answering questions before reading the passages, a common strategy recommended by prep courses and utilized by savvy students." In other words, Ms. Ramsay was able to use "learned behavioral . . . modifications" on other exams, to "ameliorat[e]" the effects of her disability. These learned behavioral modifications are precisely what the ADA, as amended, says that NBME must **not** consider. *See Girard v. Lincoln College of New England,* 27 F.Supp.3d 289, 295 (D.Conn. 2014) (plaintiff's status as a person with a disability was not refuted by evidence that she used adaptive strategies, or by evidence that she succeeded in some courses without accommodations). *See also Harty v. City of Sanford,* (M.D.Fla. 2012), No. 6:11-cv-1041 ("While he is able to ameliorate the effects of his disability by doing these things 'in a different way,' the ADAAA does not permit such measures to be considered").

As the Court explained in *Girard,* in making the threshold determination of whether a person requesting accommodations is a person with a disability, a provider like NBME cannot consider the effects of learned behavioral modifications:

> [Defendant's argument that plaintiff was not disabled] is without merit because under the ADA's new definition of disability, ***"[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . learned behavioral or adaptive neurological modifications."*** 42 U.S.C. § 12102(4)(E)(i). Indeed, one of the stated purposes of the ADAA [the ADA Amendments Act] was "to reject the requirement enunciated by the Supreme Court in [*Sutton v. United Air Lines,* 527 U.S. 471(1999)] . . . that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures." 122 Stat. 3553, Sec. 2(b); *see* 42 U.S.C. §12102(4)(B) (requiring courts to interpret term "substantially limits" in accordance with findings and purposes of ADAA). Because Plaintiff's study strategies are "learned behavior" modifications, I cannot consider them in determining whether Plaintiff's ADP [auditory processing disorder] substantially limits a major life activity.

> . . . . The fact that Plaintiff's impairment prompted a request for accommodation in a minority of classes, and proved to be an insurmountable obstacle in only one class in which an adequate accommodation was not provided does not, as a matter of law, mandate a

_____

[3] February 14, 2019 NBME letter at 2. The claim that Ms. Ramsay received "above average" scores is erroneous. On the MCAT, Ms. Ramsay's score fell at the 79th percentile which is within the average range.

**Ramsay v. NBME - Exhibit E**

Reisman Carolla Gran & Zuba LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 5

---

finding that the impairment did not substantially limit Plaintiff. . . . Most importantly, resolution of this question must be guided by the clear congressional intent expressed in the ADAA [the ADA Amendments Act]. In light of the ADAA's findings and purposes, which are set forth in part above and must be considered in determining whether a person is "substantially limited," I find that the evidence in the record raises a genuine issue of material fact as to whether Plaintiff's ADP substantially limits her in any major life activity, ***her partial success in overcoming her disability without accommodation notwithstanding.***

27 F.Supp.3d at 295-96 (emphasis added).

Dr. Smith concluded, and NBME agrees, that Ms. Ramsay was able to obtain an average score on the MCAT because she used such modifications. Yet, this legally irrelevant fact is the only reason given for rejecting Ms. Ramsay's appeal.

You also cite two articles in support of NBME's contention that "extended time accommodations benefit students without disabilities, and are viewed as beneficial by most nondisabled postsecondary students contemplating taking high-stakes standardized tests." February 14, 2019 letter at 2 (footnotes omitted). The question of whether non-disabled students also benefit from extended testing time is irrelevant.[4] Ms. Ramsay is a student with a disability. Even assuming, for the sake of argument, that non-disabled students would derive some benefit from extended test time, "students with disabilities tend to benefit more from accommodations than nondisabled students." Lovett and Lewandowski, Testing Accommodations for Students with Disabilities: Research Based Practice (American Psychological Association 2015) at 226. *See also* S.G. Sireci, *et al.*, "Test Accommodations for Students with Disabilities: An Analysis of the Interaction Hypothesis," Review of Educational Research, Vol. 75 No. 4 (Winter 2005), pp. 457-490 at 481 and 483. As Drs. Sireci, *et al.*, conclude:

This finding suggests that (a) many [students with disabilities] need extra time to demonstrate their true knowledge, skills and abilities; and (b) many educational tests are speeded to some extent.

---

[4] Moreover, the conclusion of Lewandowski *et al.* was not that testing agencies like NBME should deny accommodations to students with disabilities, simply because the accommodations might also benefit non-disabled students. Rather, their conclusion was that "testing agencies and individual test-makers (e.g., classroom teachers and instructors) should consider liberalizing test administration conditions more generally. For instance, ***testing time limits might be made more generous*** . . . ." Lewandowski, *et al.*, "College Students' Preferences for Test Accommodations," Canadian J. of School Psychology 2014, Vol. 29(2) 116 (emphasis added).

**Ramsay v. NBME - Exhibit E**

REISMAN CAROLLA GRAN & ZUBA LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 6

_Id._ at 483.

NBME does grant extended testing time to students with disabilities who require extended time to fairly access the test. The only question is whether Ms. Ramsay is such a student, and given your statement that her "scores on timed reading tests" are "exceptionally low," it is clear that she is.

### 2. Based On Dr. Smith's Report, The Accommodation That NBME Is Required To Provide Is Double Time.

Dr. Smith's report also supports the request for double time, and not any lesser accommodation: "Double the usual time for any timed test is recommended because of Jessica's very slow reading speed and difficulty comprehending the content of passages. . . ." Smith Report at 27. Moreover, "At least 100% additional test time (double time) is also recommended because of her inattention, distractibility, and slow information processing." _Id._ at 30.

Dr. Smith's conclusion is also supported by these specific findings:

- Ms. Ramsay's WAIS-IV Processing Speed Index is at the 8th percentile, which is 53 points (3.5 standard deviations) below her GAI score of 132. Smith Report at 10.

- Ms. Ramsay's WIAT-III Oral Reading Fluency is at the 1st percentile. Smith Report at 16 and 18.

- Ms. Ramsay's WJ4 Reading Rate is at the 1st percentile. Smith Report at 21.

- Ms. Ramsay's WJ4 Reading Rate Cluster score of 66 is in the Far Below Average range, which is higher than only 1% of other individuals her age. Smith Report at 21.

- Ms. Ramsay's GORT-5 Fluency is at the 2nd percentile. Smith Report at 22.

- Ms. Ramsay "was only able to attempt 47% of the Nelson-Denny Comprehension items during the standard time limit." Smith Report at 30.

In addition to the evidence of Ms. Ramsay's slow reading speed and distractibility, her need for additional extended time is shown by two of the accommodations which NBME has already granted – namely, a separate testing room in which Ms. Ramsay "may stand, walk or stretch" during the examination, and "permission to read aloud." If Ms. Ramsay needs to "stand, walk or stretch" and "read aloud" during the examination, as NBME has recognized, then NBME must also recognize that these compensatory strategies require more time. NBME must grant the additional time which is needed.

**Ramsay v. NBME - Exhibit E**

REISMAN CAROLLA GRAN & ZUBA LLP

Catherine Farmer, Psy.D.
March 19, 2019
Page 7

Based on all of these objective findings, the appropriate accommodation is double time.

### Conclusion

For the reasons stated in this letter, in Dr. Smith's report, and Ms. Ramsay's original request and appeal, I request that NBME grant Ms. Ramsay's appeal, and provide her with the additional accommodation of extended test time (double time) which she has requested.

Very truly yours,

Lawrence D. Berger

LDB/clt

**Ramsay v. NBME - Exhibit E**

| | |
|---|---|
| **From:** | disabilityservices@nbme.org |
| **To:** | jessica.ramsay@med.wmich.edu |
| **Cc:** | larry@rcglawoffices.com |
| **Subject:** | RE: USMLE Step 1 USMLE ID#: 5-366-431-4 |
| **Date:** | Wednesday, March 27, 2019 1:32:19 PM |

ref:_00D46pfBg._5004A1awCpn:ref

RE: Step 1                    USMLE ID#: 5-366-431-4

Dear Ms. Ramsay:

We are in receipt of a letter dated March 19, 2019 from your attorney, Mr. Lawrence D. Berger, requesting further reconsideration of our decision regarding test accommodations for the USMLE Step 1 communicated in our letters of September 11, 2018 and February 14, 2019. Although my February 14, 2019 letter is clear with regard to the utility of the exceptionally low scores obtained by Dr. Smith in 2018, it bears repeating. Although your evaluator appears to accept your exceptionally low scores on timed reading tests administered for the purpose of requesting test accommodations as valid and credible, your average and above average range performances on timed standardized tests taken for the purpose of gaining admission to college and medical school demonstrate that your skills are better than most people in the general population.

No new information or supporting documentation was provided for our review or reconsideration. Nevertheless, as requested, Mr. Berger's March 19, 2019 letter has been forwarded to counsel.

All of your submitted documentation, including Dr. Smith's 2018 report of evaluation, was thoroughly reviewed and carefully considered. Our reviews resulted in approval of additional break time over two days and a separate testing room in which you may stand, walk, or stretch during the exam, as well as permission to read aloud. Our records show that you are currently registered for Step 1 with an eligibility period of April 1 through June 30, 2019 and that your scheduling permit was issued to you on or about February 22, 2019.

Sincerely,
Catherine Farmer, Psy.D.
Director Disability Services
ADA Compliance Officer, Testing Programs
NBME

This email message and any attachments may contain privileged and/or confidential business information and are for the sole use of the intended recipient(s). Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please notify the sender immediately by reply email and destroy all copies of the original message and any attachments.

--------------- Original Message ---------------
From: Lawrence D. Berger [larry@rcglawoffices.com]
Sent: 3/19/2019 10:02 AM
To: disabilityservices@nbme.org
Cc: jessica.ramsay@med.wmich.edu
Subject: Appeal of Jessica Ramsay, USMLE Step 1, USMLE ID# 5-366-431-4

<<...>>

Attention: Dr. Farmer

Dear Dr. Farmer:

**Ramsay v. NBME - Exhibit F**

I am attaching to this e-mail my letter requesting further reconsideration of Ms. Ramsay?s request for extended testing time.  A hard copy is also being sent to you by Priority Mail.

For the reasons stated in the letter, I am requesting that NBME give prompt and meaningful consideration to the information in Dr. Smith?s report that has not been addressed, and also refer this matter to NBME?s trial attorney to avoid further delay.

Respectfully,

Lawrence D. Berger

Of Counsel

Reisman Carolla Gran & Zuba LLP

Email:  Larry@rcglawoffices.com

Phone:  856-354-0021

**Ramsay v. NBME - Exhibit F**



OXFORD JOURNALS
OXFORD UNIVERSITY PRESS

Archives of Clinical Neuropsychology 25 (2010) 89–98

Archives
of
CLINICAL
NEUROPSYCHOLOGY

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

# An Investigation of Methods to Detect Feigned Reading Disabilities

Allyson G. Harrison*, Melanie J. Edwards, Irene Armstrong, Kevin C.H. Parker

*Department of Psychology, Queen's University, Kingston, Ontario, Canada*

*Corresponding author at: Department of Psychology, Queen's University, Kingston, Ontario, Canada K7L 3N6. Tel.: +1-613-533-6311; fax: +1-613-533-6564. *E-mail address:* harrisna@queensu.ca (A.G. Harrison).

Accepted 8 December 2009

## Abstract

No clinically proven method currently exists to determine if a test taker is feigning or exaggerating symptoms of a specific reading disability (RD) for potential secondary gain (i.e., extra time on examinations, access to bursary funds, or tax benefits). Our objective was to examine the utility of previously proposed symptom validity measures (i.e., the Dyslexia Assessment of Simulation or Honesty [DASH] and the resulting Feigning Index [FI]) in discriminating students with genuine RDs from sophisticated simulators given ample time to prepare, who were warned that noncredible performance could be detected. The DASH correctly classified almost 83% of coached simulators with no false positives. The FI accurately classified 86% of post-secondary students feigning RD without misidentifying any students with a genuine RD, resulting in 91.8% overall classification accuracy. These two methods show promise as a means of detecting noncredible performance in the assessment of RD.

*Keywords:* Developmental and learning disabilities; Malingering/symptom validity testing; Assessment

## Introduction

Students with disabilities are entering the post-secondary educational sector in increasing numbers (Blackorby & Wagner, 1996; Canadian Association of Disability Service Providers in Postsecondary Education, 1999; Harrison & Wolforth, 2006; McGuire, 1998). Within this population, learning disorders (LDs) are the most frequently accommodated disabilities, affecting almost half of all students receiving services (Harrison & Wolforth, 2006; Ministry of Training, Colleges and Universities, 2008). Normal learning is affected in these individuals due to impairments of neuropsychological processes (Ghelani, Sidhu, Jain, & Tannock, 2004; Kibby, Marks, Morgan, & Long, 2004; Learning Disabilities Association of Ontario, 2003). When those impairments are well accommodated, learning improves substantially. Because of the potential economic and academic benefits of obtaining an LD diagnosis, concerns have been raised regarding the possibility that unimpaired students might feign LDs in order to gain access to these accommodations and supports (Harrison, Edwards, & Parker, 2007; Mullis, 2003; Sullivan, May, & Galbally, 2007).

Students may exaggerate symptoms for a number of reasons and may not always qualify for the label of "malingering" (Kane, 2008). For instance, students seeking updated psychoeducational assessments may be motivated to exaggerate or magnify actual symptoms in order to ensure retention of accommodations provided to them throughout their high-school career (Harrison, Larochette, & Nichols, 2007). These students often come to rely on accommodations such as extra time and a computer and may fear losing them if they now perform adequately on tests of reading speed or decoding. This is of considerable concern because low motivation to perform optimally may invalidate test results and reduce the diagnostic accuracy. Another factor that may interfere with accurate interpretation of test scores and, consequently, incorrect diagnosis is unwillingness to put forth good effort on activities that are frustrating or unappealing (Adelman, Lauber, Nelson, & Smith, 1989).

Until recently, most clinicians assumed that students could not feign a specific LD, such as a reading disability (RD; Alfano & Boone, 2007), and that the base rate for such malingering in psychoeducational assessments was very low; however, this has

© The Author 2010. Published by Oxford University Press. All rights reserved. For permissions, please e-mail: journals.permissions@oxfordjournals.org.
doi:10.1093/arclin/acp104    Advance Access publication on 10 January 2010



EXHIBIT
75

proven not to be the case. Indeed, Sullivan and colleagues (2007) demonstrated that approximately 16% of post-secondary students undergoing evaluations for LD at their clinic failed a relatively easy symptom validity test (SVT), calling the reliability of their remaining scores into question. Similarly, Harrison, Edwards, and Parker (2008) demonstrated that psychological tests commonly employed in the assessment of RD can be easily manipulated by those instructed to feign a disability. For example, on tests of reading speed, phonological decoding, and visual processing, such students returned scores that were equally or more impaired than those produced by students with genuine RD. This clearly demonstrates the need for an SVT specific to those feigning or exaggerating symptoms of an RD and supports the position taken by Alfano and Boone (2007, p. 373) that "Effort in specific populations is best detected by tests designed to address layperson notions of the deficits associated with that population's disorder". Not only will development of such an RD-specific SVT improve diagnostic accuracy, but it will also ensure that those who are not truly disabled cannot easily obtain the academic accommodations, financial supports, and other secondary gains derived from being given this diagnosis. A meta-analysis conducted by Alfano and Boone (2007) found that base rates of malingered LD and/or ADHD in post-secondary settings may equal those found in the medical-legal arena, indicating that the incidence of feigned RD is much greater than initially suspected.

In the field of neuropsychology, it is now generally accepted that SVTs must be included in any assessment occurring in a medico-legal or disability-application context (Bush et al., 2005; Green, 2007; Green et al., 2001; Iverson, 2007; Larrabee, 2003). Unfortunately, most of the currently published tests of effort or symptom validity were developed in the context of evaluating individuals feigning memory impairments and may therefore not be sensitive to individuals feigning a specific RD (Alfano & Boone, 2007). Given that students are successfully able to feign many symptoms of RD (Harrison et al., 2008), the question that remains is how best to identify such behavior when it occurs, so as to accurately interpret test scores.

Osmon, Plambeck, Klein, and Mano (2006) were the first to investigate ways to identify those feigning a reading disorder. In their study, two simulation groups were instructed to feign either reading speed or word decoding impairments. When compared with students told to exert good effort, students simulating an RD showed poor performance on a widely used neuropsychological SVT (Green's Word Memory Test [WMT; Green, 2003]). However, although scores on the WMT were highly specific (96%), they were relatively less sensitive to malingering of RD (65%). In contrast, Osmon and colleagues demonstrated that an experimental SVT, the Word Reading Test, was 90% sensitive in identifying reading simulators and 74% sensitive to speed simulators as well, both with 100% specificity. These researchers concluded that the Word Reading Test was more effective than the WMT in detecting feigned RD and advised that any SVT developed to identify individuals feigning RD must address the layperson's notion of how this disorder presents itself.

A similar study was conducted by Frazier and colleagues (2008), in which they demonstrated that two commonly used SVTs (the Victoria SVT [Slick, Hopp, Strauss, & Thompson, 1997] and the Validity Indicator Profile [Frederick, 2003]) could both differentiate simulated RD students from honest respondents at fairly high rates of specificity and sensitivity. The difficulty with both of these studies, however, is that neither included individuals with RD to ensure that these SVTs are insensitive to the actual cognitive impairments demonstrated by those with this condition. In other words, any SVT to be employed in identification of those feigning or exaggerating symptoms of RD must also ensure a low or nonexistent false-positive rate.

The Dyslexia Assessment of Simulation or Honesty (DASH) and the Feigning Index (FI) derived from it have already shown promise as measures of malingered dyslexia, at least in a preliminary investigation (Harrison et al., 2008). The premise of the DASH is based on the work of Rawlinson (1976), who found that scrambling letters in the middle of words (leaving the first and last letters in place) had little or no effect on the ability of skilled readers to understand the text. Davis (2003) expanded on this early research and noted that adults can read mixed-up words if they are small, if key letters are kept together (like "sh" or "th"), or if the word cannot be confused with many other words. The DASH presents Grade 3 reading level passages adapted from the Gray Oral Reading Test (Wiederholt & Bryant, 2001) that have been randomized in either an easy (letters scrambled according to the principles identified by Davis) or difficult (letters within words scrambled randomly) manner, and also includes two timed practice trials (one with nonscrambled words and one with scrambled words). These passages are presented on paper to subjects, who are instructed to unscramble the words and read the passages out loud as quickly as possible. Although this task appears difficult, preliminary investigations showed that post-secondary level students with RD did not find the practice and easy passages challenging to read and that their rate and accuracy were not substantially different from that of their nondisabled peers (Harrison et al., 2008). In contrast, students feigning RD read these passages more slowly and made significantly more errors on other commonly used achievement tests than did either controls or true RD students.

Harrison and colleagues (2008) developed an FI derived from the DASH and other achievement test scores to compare the performance of both honest responders and students diagnosed with RD to those obtained from analog malingerers asked to feign symptoms of RD. Initial piloting of the DASH showed that although it was not able to accurately identify all naïve simulators feigning RD, the FI demonstrated a 75% hit rate and a 0% false-positive rate. Although a strength

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

in the design of this initial study was the inclusion of actual students diagnosed with RD, it remains unclear whether the FI is able to identify the efforts of more sophisticated malingerers who have researched ways of successfully feigning symptoms. Moreover, recent research suggests that coached simulators in other contexts may be better able to feign a disability and avoid detection (e.g., Frederick, Sarfaty, Johnston, & Powel, 1994; Inman & Berry, 2002; Martin, Bolter, Todd, Gouvier, & Niccolls, 1993; Orey, Cragar, & Berry, 2000; Shum, Gorman, & Alpar, 2004). Further replication of these findings using a different sample of students with RD, as well as a more sophisticated group of malingerers, was therefore necessary.

The present study sought to validate the DASH and the FI to determine how well they could identify individuals who had taken time to research ways to feign RD. We expected that students who invested more time and effort exploring means of feigning RD would be able to avoid detection, especially if they were informed ahead of time that noncredible performance could be detected. It was thought that the DASH and the FI would be less sensitive to these sophisticated simulators compared with the scores returned by naïve simulators as reported by Harrison and colleagues (2008) and that the scores obtained by the sophisticated malingerers on achievement and processing tests would more closely mirror those returned by students with true RD.

## Materials and Methods

### Participants

We recruited two groups of students for the present study, none of whom had been included in the earlier study investigating the DASH. Students in both groups consented to participate in the present ethics-approved study: Group 1 were reading disabled students ($n = 20$) diagnosed at a university-based regional assessment center between 2008 and 2009; Group 2 were sophisticated malingerers ($n = 29$), comprised of upper year education or psychology students who had received a 1-hr guest lecture on learning disabilities and then were invited to take part in a study evaluating their ability to successfully feign an RD. Although each subject in the sophisticated malingering group was informed they would be paid $10 for their participation, they were additionally motivated to perform well by hearing that they could double this amount if they performed in a manner that was credible and avoided detection of malingering (c.f. Frederick et al., 1994; Inman & Berry, 2002; Martin et al., 1993; Orey et al., 2000; Shum et al., 2004). However, all participants received $20 after they completed the task regardless of performance.

None of the sophisticated malingerer group had a current diagnosis of a learning disability nor was any receiving scholastic accommodation, but one participant had been diagnosed with a learning disability at an earlier time. (This participant self-described as a good reader, spoke English as a first language and did not have family members with a learning disability.) All of these students enjoyed reading and only one participant self-described as a poor reader. Two participants' first language was not English and one of these participants also read first in a language other than English. Three participants had family members with a learning disability. These participants were not excluded from the analyses because persons who already have some understanding of reading problems might in fact be better able to dissimulate.

Twenty students were diagnosed with a reading disorder at our clinic during the span of the study, and all agreed to participate. RD students in Group 1 had met the DSM-IV diagnostic criteria for a reading disorder, demonstrating a significant discrepancy between measured intellectual functioning and actual academic achievement. In addition, they also met the more stringent Learning Disabilities Association of Ontario (2003) definition of a specific RD, which requires there also be evidence that the academic discrepancy is logically related to measurable deficits in the processes underlying reading (e.g., phonological awareness, naming, or processing speed [PS]). All tests except the DASH had been administered prior to diagnosis. In an effort to ensure that the pattern of test scores obtained from those with RD was an accurate reflection of actual ability, the validity of the obtained test scores for this group was initially evaluated using the Slick, Sherman, and Iverson (1999) criteria. A diagnosis of RD was rendered only if the subject failed to show evidence of malingered neurocognitive dysfunction, assessed in part by the Green WMT (Green, 2003), an instrument that has been used in many other studies as a proxy measure of test taking effort (e.g., Bauer, O'Bryant, Lynch, McCaffrey, & Fisher, 2007; Flaro, Green, & Robertson, 2007; Iverson, Green, & Gervais, 1999; Suhr et al., 2008; Sullivan et al., 2007). In other words, failure on this or any other of the criteria outlined by Slick and colleagues meant that a diagnosis was not provided as their was reasons to suspect that low effort or motivation may have negatively influenced test performance (c.f. Green, Rohling, Lees-Haley, & Allen, 2001). Furthermore, as an additional safeguard to ensure honest responding, the DASH was administered to RD students only after they had received a diagnosis and had been given their assessment report.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*A.G. Harrison et al. / Archives of Clinical Neuropsychology 25 (2010) 89–98*

*Materials*

In order to estimate overall intelligence, the sophisticated malingering group completed the North American Adult Reading Test (NAART; Uttl, 2002) before receiving specific study instructions. Research has generally reported moderately high correlations between the NAART and the measures of general intellectual ability (Crawford, Stewart, Cochrane, Parker, & Besson, 1989; Strauss, Sherman, & Spreen, 2006; Wiens, Bryan, & Crossen, 1993). RD subjects had already been assessed with the Wechsler Adult Intelligence Scale-III (Wechsler, 1997) as part of their evaluation, and so did not complete the NAART.

Subjects in both groups (RD and sophisticated) completed the newly developed DASH (Harrison et al., 2008), which involves subjects being asked to read a series of Grade 3 reading level passages aloud as quickly and accurately as possible. First, participants read a very short (40 words) nonscrambled practice passage (DASH A), followed by a short (52 words) practice passage (DASH B), where the letters in larger words are scrambled in an easy manner (e.g., baking spelled "bkaing"), but with two- and three-letter words remaining unchanged, allowing for contextual clues to assist in reading the scrambled words (e.g., "The boy was bkaing a cake for moethr"). Next, participants read a set of two scrambled reading passages. Passage 1 was comprised of 104 words, and Passage 2 had 106 words. (To protect the integrity of the DASH, more detail about the content of the passages has not been included in this paper. Interested readers may contact the corresponding author to obtain a copy of the DASH.) Completion times for all of the DASH passages were recorded, as were the number of errors made, number of extra attempts taken, and number of words skipped or passed. (Errors = words pronounced incorrectly; extra attempts = the extra times words were read or partly read either correctly or incorrectly; skips = words inadvertently missed; passes = words the subject openly said would be passed.)

All participants also completed five subtests from the Woodcock Johnson Psychoeducational Battery-III (WJPB-III; Woodcock, McGrew, & Mather, 2001). The reading fluency (RF) test is a time-limited, norm-based measure of reading speed and accuracy. Letter–word identification and word attack measure phonological processing and decoding skills when reading regular and nonsense words, respectively. Weak ability in these areas is often used as evidence of RD. The PS index is comprised of two timed measures, visual matching (VM), and decision speed (DS). The WJPB-III tests were chosen because academic accommodations such as extra time are frequently recommended for students with RD on the basis of poor performance on timed tests or reading and/or PS. It is also true that speed of information processing deficits have been implicated in LD (Weiler et al., 2000), and it would be important to know how vulnerable such tests are to deliberate manipulation.

*Procedure*

Students comprising the sophisticated malingering group initially met with a research assistant who first administered the NAART and then provided them with test instructions. These included information regarding the secondary gains that may be available to students who feign in a believable manner and instructions to use all resources available to them in an effort to research how best to feign an RD in a nondetectable manner (i.e., without being caught; copies of the specific instructions given to these participants may be requested from the corresponding author). We asked that they keep track of the websites from which they derived their information. Similar to the Harrison and colleagues (2008) study, these students were also provided with the DSM-IV criteria for diagnosis of a reading disorder, and a list of common symptoms found in those with RD. All other experimental tasks were administered to the sophisticated malingerers seven days later, after they had had time to research reading disorders.

Malingering participants completed the remaining tasks in the following order: The DASH, letter–word identification, word attack, RF, VM, and DS. Participants were debriefed following completion of these measures. During the debriefing, participants were asked what strategies they used to fake RD, and these responses were recorded. They also answered four post-test questions pertaining to strategies employed when feigning, perceived motivation associated with cash prize, perceived success in feigning, and overall effort invested in the task.

As noted above, all RD subjects had completed these same tests as part of their assessment and were given the DASH only after being provided with a diagnosis of RD.

**Results**

Table 1 shows the demographic information regarding these subjects. The mean level of intelligence in the two groups was not significantly different, $t_{25} = 1.58$, $p > .05$. When scores were collapsed across all scales, the sophisticated malingerers scored lower than the RD group on all WJPB-III scales, $F(1, 45) = 63.6$, $p < .001$, $r = .77$, Cohen's $d = 2.4$. Pairwise comparisons by subtest confirmed the difference (all $ps \leq .001$, *see* Table 2). Using the WJPB-III subtests, we found that the sophisticated malingerers were very good at appearing to have a reading impairment. Given, however, that there was almost no

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*A.G. Harrison et al. / Archives of Clinical Neuropsychology 25 (2010) 89–98*                    93

**Table 1.** Demographic details by instructional group

| | Group | |
|---|---|---|
| | Reading disabled | Sophisticated malingerers |
| *n* | 20 | 29 |
| Age | | |
| *M* | 20.8 | 20.7 |
| *SD* | 3.7 | 1.9 |
| Min | 17 | 19 |
| Max | 32 | 28 |
| Sex | | |
| Percent men | 50 | 34.5 |
| Percent women | 50 | 65.6 |
| FSIQ/NAART | | |
| *M* | 104 | 108.5 |
| *SD* | 12.0 | 5.5 |

**Table 2.** Woodcock Johnson Test Battery Mean Scaled Scores and percentage of participants with scores less than 80 and 85, by group

| Group | Letter–word identification | Word attack | Reading fluency | Processing speed[a] |
|---|---|---|---|---|
| WJPB-III subtest | | | | |
| Reading disabled | 85.1 (11.2) | 80.9 (11.8) | 82.9 (8.5) | 93.3 (8.5) |
| Sophisticated malingerers | 65.6 (18.6)* | 64.7 (19.5)* | 64.4 (8.6)* | 51.8 (21.1)* |
| Scaled scores cut at 80 | | | | |
| Reading disabled | 5 (25%) | 9 (45%) | 9 (45%) | 0 |
| Sophisticated malingerers | 19 (66%)* | 23 (79%)* | 25 (86%)* | 26 (90%)* |
| Scaled scores cut at 85 | | | | |
| Reading disabled | 9 (45%) | 12 (60%) | 13 (65%) | 2 (10%) |
| Sophisticated malingerers | 26 (90%)* | 25 (86%)* | 25 (86%)* | 28 (97%)* |

*Note:* WJPB-III = Woodcock Johnson Psychoeducational Battery-III. $n = 20$ for reading disabled and $n = 29$ for sophisticated malingerers. Values are given in Mean scores (*SD*s).

[a]Combined score based on performance of WJPB-III visual matching and decision speed.

*RD – malingering difference significant at $p \leq .01$.

overlap in test scores between groups, they also appeared to overdo the degree of impairment demonstrated. Cut-off values employed by Harrison and colleagues (2008) for the WJPB-III scaled scores (80 and 85) were again used as proxy measures of impaired reading or processing, corresponding to scores below the 10th percentile and scores greater than 1 *SD* below the mean, respectively. Table 2 provides the percentage of each group flagged as having impaired functioning using both cut-off scores. Of note, the sophisticated malingerers were successful at achieving low scaled scores on each of the four measures using either cut point criterion. Indeed, 66% of the feigners scored below threshold on all four of the WJPB-III scales, whereas only 65% of the RD group scored below threshold on even one of the WJPB-III scales.

Performance on the DASH items varied by group. As seen in Fig. 1, the sophisticated malingering group took more time than the RD group to read both the practice and test passages. As shown in Fig. 2, the sophisticated malingerers made more errors ($p < .001$), skips ($p < .05$), and extra attempts ($p < .01$) than did the RD group. In contrast, malingerers did not make more passes than the RD group ($p > .75$).

We used the raw DASH scores (i.e., time taken for each passage in seconds, number of errors, skips, extra attempts, and passes made) in a discriminant function analysis to investigate classification accuracy of participants. Table 3 shows the result of the "leave out one" classification. No RD participant was incorrectly defined as malingering, and a total of five malingerers were incorrectly defined as Honest, resulting in a total classification accuracy of 89.8%. Variables that contributed most strongly to the discrimination included all of the variables that contribute to the FI were weighted highly in the DFA, as was time to complete the difficult DASH passage. Variables related to the number of passes contributed minimally to the final discrimination.

*Feigning Index*

On the basis of a set of variables that best discriminated between the various groups, Harrison and colleagues (2008) derived an FI from certain DASH variables as well number of errors and abnormally low scores from the WJPB. This index allowed for

Downloaded from https://academic.oup.com/acn/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019



**Fig. 1.** Reading time on the DASH items as a function of passage difficulty and group membership.



**Fig. 2.** Error measures on the DASH items as a function of passage difficulty and group membership.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

classification of an individual test taker as belonging to either the feigning or the honestly performing (including RD students) group. The positive predictive value for this FI was 100%, with a negative predictive value of 65%.

In the present study, the FI correctly classified 91.8% of the total sample with a positive predictive value of 100% and a negative predictive value of 90% (Table 4). These figures were consistent with those reported by Harrison and colleagues. Only four malingerers were incorrectly classified; of these, all but one produced a scaled score below 80 on WJPB subtests for PS and RF, and only one had a score below 80 on WJPB subtests for letter–word recognition and word attack skills; this increased to two participants when the cut score was set at 85. A chi-squared analysis ($\chi^2 = 35.2$ $p < 0.001$, Fishers exact test $p < 0.001$) suggests that the rate of identification of feigners by the FI is better than one would expect by chance alone even in the current sample where feigners outnumbered those with RD.

**Table 3.** Discriminant function analysis using raw DASH values

| Actual group | Predicted group membership | |
|---|---|---|
| | Reading disabled ($n = 20$) | Sophisticated malingerers ($n = 29$) |
| Reading disabled | 20 (100%) | 0 |
| Sophisticated malingerers | 5 (17.2%) | 24 (82.8%) |
| Sensitivity .828 | PPV 1.00 | Canonical correlation .806 |
| Specificity 1.00 | NPV .8 | Wilk's Lambda .351 |
| $df = 12$ | $p < .001$ | |
| 89.8% correctly classified | 77.6% cross-validated | |

*Notes:* DASH = Dyslexia Assessment of Simulation or Honesty; PPV = the probability that an individual who receives a low score is actually malingering; NPV = the probability that an individual with a normal score is responding honestly.

**Table 4.** Discriminant function analysis using the Feigning Index

| Actual group | Predicted group membership | | |
|---|---|---|---|
| | Reading disorder ($n = 20$) | Sophisticated malingerers ($n = 29$) | |
| Reading disorder | 20 | 0 | |
| Sophisticated malingerers | 4 (13.8%) | 25 (86.2%) | |
| Sensitivity = .862 | PPV = 1.00 | Canonical Correlation = .889 | $df = 1$ |
| Specificity = 1.00 | NPV = .901 | Wilk's lambda = .210 | $p < .001$ |

*Notes:* PPV = the probability that an individual who receives a low score is actually malingering; NPV = the probability that an individual with a normal score is responding honestly. Overall cases correctly classified: 91.8%.

**Table 5.** Listing of the strategies (>10%) used by malingering participants to appear dyslexic

| Strategy | Percentage of reporting |
|---|---|
| Reversed, mixed letters, and numbers | 64.3 |
| Use synonyms or made up words | 57.1 |
| Read slowly | 53.6 |
| Read phonetically | 42.9 |
| Skip words, letters, lines | 39.3 |
| Look/act stressed/distracted | 25 |
| Read haltingly, monotone | 17.9 |
| Be accurate with simple words | 17.9 |
| Perform better on nonword tests | 10.7 |

*Strategies Used by the Sophisticated Malingerers*

Participants in the malingering group were asked to describe the amount of time spent learning about RD, the amount of effort they put forth, estimate their success at faking an RD, and whether or not the cash incentive motivated their efforts. Table 5 lists the strategies that were used by at least 10% of the group.

Scores on the FI were not associated with any of the following measures: Participants' estimate of their success at faking dyslexia, the amount of time participants spent researching dyslexia, nor the motivational factor attached to the cash incentive. However, the FI was associated with participants' perception of their effort. Those who perceived their effort to be highest also scored higher on the FI ($r = .39$, $p < .05$). In other words, the harder participants felt they had tried to fake bad, the more easily they were detected.

**Discussion**

We sought to validate the DASH and the FI to determine how well these measures could identify individuals who had taken time to research ways to feign RD in a credible manner in comparison with students with carefully diagnosed reading disabilities.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

In contrast to expectations, sophisticated malingerers were not good at avoiding detection, either by the DASH alone or by using the FI. This was despite the fact that the sophisticated feigning group were better able to produce achievement scores lower than those returned by students with true RD, meaning that on the basis of test scores alone these subjects would have succeeded in feigning RD in almost all cases. The results of the present study therefore provide strong support for the inclusion of an SVT when evaluating post-secondary students for the presence a reading disorder, and point to the vulnerability of such tests to manipulation without the addition of valid measures of effort and motivation.

The DASH appears to work well in large part because those feigning RD tend to overdo the symptoms they are producing, and this tendency has been documented in feigning of other disorders (c.f. Liljequist, Kinder, & Schinka, 1998; Wiggins & Brandt, 1988). In general, those feigning RD read even the easy, nonscrambled practice passages more slowly than did almost all of the true RD subjects, and exaggerated their deficits in an even less credible fashion when asked to decode the scrambled text. Hence, as is true of other popular SVTs, having normative data regarding the performance of those with a true disability allows for even greater classification accuracy when identifying those who are feigning or exaggerating symptoms.

Although the DASH alone achieved an acceptable rate of classifying participants, the present study confirmed that the FI derived from DASH scores plus scores from commonly used WJPB-III subtests produced an even more accurate method of identifying students motivated to feign RD. Although the FI achieved a zero percent false-positive rate, it was also able to accurately classify over 86% of the feigning subjects, a hit rate that is unusual for most SVTs. Further, the 100% positive predictive value coupled with a high negative predictive value is consistent with the previous findings of Harrison and colleagues (2008), indicating the excellent ability of the FI to provide an accurate means of identifying those feigning RD for some reason. Although Osmon and colleagues (2006) were able to correctly classify between 74% and 90% of simulators in comparison with honest students, their experimental Word Reading Test has not yet demonstrated good specificity and sensitivity when discriminating malingerers from genuinely disabled students.

Of those students who successfully avoided detection, one might suppose that they were not very motivated to feign in general, and perhaps simply failed to follow the instructions and just answered all items honestly. This did not prove to be the case, as almost all of those who avoided detection by the FI produced scores on the WJPB subtests that fell within the impaired range as defined in this study. Clearly, there are some students who are able to produce scores that would be interpreted as indicative of an RD and who would also evade detection using the FI. No observable pattern was found in the present study to better identify these individuals; more research is therefore needed to help determine how best to detect such students.

Clinicians may worry that the use of SVTs in psychoeducational assessments could wrongly accuse students of "faking;" however, the results of this investigation show that while simply using achievement scores can indeed result in misclassification of true RD, inclusion of scores from an SVT such as the FI were extremely useful, correctly classifying 86% of the feigning group and 100% of the RD subjects. In this sample, no one would have been falsely accused.

The strategies employed by sophisticated malingerers in an effort to convincingly feign RD differed in interesting ways from those used by the naïve feigners in the Harrison and colleagues (2008) study. Indeed, sophisticated feigners reported that their main strategy was to either reverse or mix up letters or numbers, followed by using synonyms or made up words when reading. Reading slowly was a strategy employed by just over half of the subjects. In contrast, the main feigning strategy reported in the original study (employed by 68% of the students) was to just read more slowly, followed by completing timed tasks more slowly, mispronouncing words, or skipping words, sentences, or lines. This finding echoes that reported by Osmon and colleagues (2006) suggesting that there is no consistency with respect to strategies chosen by those attempting to feign RD, although all strategies employed seem to mirror the lay person's notions of RD. Given that not all who feign RD use the same strategy, it was encouraging to find such a high rate of identification when using the DASH and the FI and suggests that these may be a useful adjunct to any assessment of such disorders.

Unlike studies of sophisticated malingering in the area of brain injury research (e.g., Inman & Berry, 2002; Martin et al., 1993; Orey et al., 2000; Shum et al., 2004), the present study found that none of the information readily accessed by motivated students helped them avoid detection of their deceit. The reason for this may be that although information exists to assist students in producing credible symptom profiles on standard achievement tests, no information is easily available regarding the use of SVTs in psychoeducational assessments. Thus, it is possible that even sophisticated malingerers are currently unaware of the methods used to identify noncredible performance in assessment of RD. Given the research by Ruiz, Drake, Glass, Marcotte, and Van Gorp (2002) showing how easily students could independently discover information on the internet to allow them to escape detection when feigning psychiatric symptoms, it was heartening to discover that similar information about symptom validity testing is not yet widely available in the context of RD assessment. It will therefore be important to protect the integrity of any SVTs developed in this context to minimize the risk that their use becomes widely known and publicized.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

*Limitations*

Although we tried to ensure that all those diagnosed with RD were performing honestly, it is possible that some may not have performed in a credible manner on some aspects of the tests administered. Future studies should therefore administer all WJPB subtests after the diagnosis is rendered to avoid any possible effects of secondary gain on test performance.

It is also possible that the malingering group did not have the same motivation or access to information as would students undergoing a re-assessment to determine whether accommodations will be provided at the post-secondary level. Given that students at the secondary-school level are currently provided with academic accommodations and supports without requiring a formal diagnosis of a disability (Harrison, Larochette, et al., 2007), it is possible that such students fear the academic consequences of losing their long-standing accommodations and may be more savvy regarding the types of deficits expected from persons with RD, especially if they have been working around and writing tests with those who really do have disabilities. Future studies should therefore attempt to include a group of students who have specific knowledge of RD based on first-hand experience. Future studies should also include groups of poor readers to investigate the specificity of the DASH and the FI in such populations.

Given the relatively small sample size and the overrepresentation of those feigning RD, the classification rates may not be stable. Replication with a larger sample is therefore warranted.

In conclusion, our results provide a strong support for the use of the DASH and the FI in the detection of students presenting with noncredible symptoms of a reading disorder. With perfect specificity and a high level of sensitivity, both measures promise to aid clinicians in more accurately diagnosing specific reading disorders when they are present. The utility of the DASH and FI should now be investigated more broadly in a variety of settings with different clinical groups.

**Funding**

Partial funding for this research was generously provided by the National Academy of Neuropsychology Clinical Research Grant. The publication's contents are solely the responsibility of the authors and do not necessarily represent the views of the funding agency.

**Conflict of Interest**

None declared.

**References**

Adelman, H. S., Lauber, B., Nelson, P., & Smith, D. (1989). Minimizing and detecting false positive diagnoses of learning disabilities. *Journal of Learning Disabilities, 22,* 234–244.

Alfano, K., & Boone, K. B. (2007). The use of effort tests in the context of actual versus feigned attention-deficit/hyperactivity disorder and learning disability. In K. B. Boone (Ed.), *Assessment of feigned cognitive impairment: A neuropsychological perspective.* (pp. 366–383). New York: Guilford Press.

Bauer, L., O'Bryant, S. E., Lynch, J. K., McCaffrey, R. J., & Fisher, J. M. (2007). Examining the Test of Memory Malingering Trial 1 and Word Memory Test Immediate Recognition as screening tools for insufficient effort. *Assessment, 14,* 215–222.

Blackorby, J., & Wagner, M. (1996). Longitudinal postschool outcomes of youth with disabilities: Findings from the National Longitudinal Transition Study. *Exceptional Children, 62,* 399–413.

Bush, S., Ruff, R., Troster, A., Barth, J., Koffler, S., Pliskin, N., et al. (2005). Symptom validity assessment: Practice issues and medical necessity. Official position of the National Academy of Neuropsychology. *Archives of Clinical Neuropsychology, 20,* 419–426.

Canadian Association of Disability Service Providers in Postsecondary Education. (1999). *Towards developing professional standards for students with disabilities in postsecondary education in Canada.* Ottawa, ON: Author.

Crawford, J. R., Stewart, L. E., Cochrane, R. H., Parker, D. M., & Besson, J. A. (1989). Construct validity of the National Adult Reading Test: A factor analytic study. *Personality and Individual Differences, 10,* 585–587.

Davis, M. (2003). Acccdrnig to a rscheearch at Cmabrigde Uinervtisy. Retrieved July 25, 2005, from http://www.mrc-cbu.cam.ac.uk/_mattd/Cmabrigde/.

Flaro, L., Green, P., & Robertson, E. (2007). Word Memory Test failure 23 times higher in mild brain injury than in parents seeking custody: The power of external incentives. *Brain Injury, 21,* 373–383.

Frazier, T. W., Frazier, A. R., Busch, R. M., Kerwood, M. A., & Demaree, H. A. (2008). Detection of simulated ADHD and reading disorder using symptom validity measures. *Archives of Clinical Neuropsychology, 23,* 501–509.

Frederick, R. I. (2003). *VIP (Validity Indictor Profile) manual.* Minneapolis, MN: NCS Pearson.

Frederick, R. I., Sarfaty, S. D., Johnston, D. J., & Powel, J. (1994). Validation of a detector of response bias on a forced-choice test of nonverbal ability. *Neuropsychology, 8,* 118–125.

Ghelani, K., Sidhu, R., Jain, U., & Tannock, R. (2004). Reading comprehension and reading related abilities in adolescents with reading disabilities and attention-deficit/hyperactivity disorder. *Dyslexia, 10,* 364–384.

Green, P. (2003). *Word Memory Test for Windows: User's manual and program.* Edmonton, AB: Green's Publishing.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019

Green, P. (2007). Spoiled for choice: Making comparisons between forced-choice effort tests. In K. Boone (Ed.), *Malingering of neurocognitive disorders* (pp. 50–77). New York: Guilford Press.

Green, P., Rohling, M. L., Lees-Haley, P. R., & Allen, L. M. (2001). Effort has a greater effect on test scores than severe brain injury in compensation claimants. *Brain Injury, 15,* 1045–1060.

Harrison, A. G., Edwards, M. J., & Parker, K. C. H. (2007). Identifying students faking ADHD: Preliminary findings and strategies for detection. *Archives of Clinical Neuropsychology, 22,* 577–588.

Harrison, A. G., Edwards, M. J., & Parker, K. C. H. (2008). Identifying students feigning dyslexia: Preliminary findings and strategies for detection. *Dyslexia, 14,* 228–246.

Harrison, A. G., Larochette, A., & Nichols, E. (2007). Students with learning disabilities in postsecondary education: Selected initial characteristics. *Exceptionality Education Canada, 17,* 135–154.

Harrison, A. G., & Wolforth, J. (2006). *Results from a national survey of disability service providers in the Canadian post-secondary system.* Unpublished manuscript.

Inman, T. H., & Berry, D. T. R. (2002). Cross-validation of indicators of malingering: A comparison of nine neuropsychological tests, four tests of malingering and behavioral observations. *Archives of Neuropsychology, 17,* 1–23.

Iverson, G. (2007). Identifying exaggeration and malingering. *Pain Practice, 7,* 94–102.

Iverson, G., Green, P., & Gervais, R. (1999). Using the Word Memory Test to detect biased responding in head injury litigation. *Journal of Cognitive Rehabilitation, 17 (2),* 4–8.

Kane, S. (2008). Minimizing malingering and poor effort in the LD/ADHD evaluation process. *ADHD Report, 16 (5),* 5–9.

Kibby, M. Y., Marks, W., Morgan, S., & Long, C. J. (2004). Specific impairment in developmental reading disabilities: A working memory approach. *Journal of Learning Disabilities, 37,* 349–363.

Larrabee, G. J. (2003). Detection of malingering using atypical performance patterns on standard neuropsychological tests. *Clinical Neuropsychologist, 17,* 410–425.

Learning Disabilities Association of Ontario. (2003). *Recommended best practices for assessment, diagnosis and documentation of learning disabilities.* Retrieved August 4, 2005, from http://www.ldao/resources/education/pei/assessment/Diagnostic%20Criteria_-Sept%2003.pdf.

Liljequist, L., Kinder, B. K., & Schinka, J. (1998). An investigation of malingering post-traumatic stress disorder on the Personality Assessment Inventory. *Journal of Personality Assessment, 71,* 322–336.

Martin, R. C., Bolter, J. F., Todd, M. E., Gouvier, W. D., & Niccolls, R. (1993). Effects of sophistication and motivation on the detection of malingered memory performance using a computerized forced-choice task. *Journal of Clinical and Experimental Neuropsychology, 15,* 867–880.

McGuire, J. M. (1998). Educational accommodations: A university administrator's view. In M. Gordon, & S. Keiser (Eds.), *Accommodations in higher education under the Americans with Disabilities Act (ADA): A no-nonsense guide for clinicians, educators, lawyers and administrators* (pp. 20–45). New York: Guilford.

Ministry of Training, Colleges and Universities: Postsecondary Education Division. (2008). *Disabilities statistics at Ontario universities for discussion at IDIA* (PowerPoint slides).

Mullis, C. (2003). Trouble on the SAT. *PsychologyToday.* Retrieved September 16, 2009, from https://www.psychologytoday.com/articles/200303/trouble-the-sat.

Orey, S. A., Cragar, D. E., & Berry, D. T. R. (2000). The effects of two motivational manipulations on the neuropsychological performance of mildly head injured college students. *Archives of Clinical Neuropsychology, 15,* 335–348.

Osmon, D. C., Plambeck, E. A., Klein, L., & Mano, Q. (2006). The Word Reading Test of effort in adult learning disability: A simulation study. *Clinical Neuropsychologist, 20,* 315–324.

Rawlinson, G. E. (1976). *The significance of letter position in word recognition.* Unpublished doctoral dissertation, University of Nottingham, Nottingham, UK.

Ruiz, M., Drake, E., Glass, A., Marcotte, D., & Van Gorp, W. (2002). Trying to beat the system: Misuse of the internet to assist in avoiding the detection of psychological symptom dissimulation. *Professional Psychology: Research & Practice, 33,* 294–299.

Shum, D. H. K., Gorman, J. G. O., & Alpar, A. (2004). Effects of incentive and preparation time on performance and classification accuracy of standard and malingering-specific memory tests. *Archives of Clinical Neuropsychology, 19,* 817–823.

Slick, D., Hopp, G., Strauss, E., & Thompson, G. B. (1997). *VSVT: Victoria Symptom Validity Test, version 1.0, professional manual.* Odessa, FL: Psychological Assessment Resources.

Slick, D., Sherman, E., & Iverson, G. (1999). Diagnostic criteria for malingered neurocognitive dysfunction: Proposed standards for clinical practice and research. *Clinical Neuropsychologist, 13,* 545–561.

Strauss, E., Sherman, E. M., & Spreen, O. (2006). *A compendium of neuropsychological tests: Administration, norms and commentary* (3rd ed.). New York: Oxford University Press.

Suhr, J., Hammers, D., Dobbins-Buckland, K., Zimak, E., & Hughes, C. (2008). The relationship between malingering test failure to self-reported symptoms and neuropsychological findings in adults referred for ADHD evaluation. *Archives of Clinical Neuropsychology, 23,* 521–530.

Sullivan, B., May, K., & Galbally, L. (2007). Symptom exaggeration by college adults in attention-deficit hyperactivity disorder and learning disorder assessments. *Applied Neuropsychology, 14,* 189–207.

Uttl, B. (2002). North American adult reading test: Age norms, reliability, and validity. *Journal of Clinical and Experimental Neuropsychology, 24,* 1123–1137.

Wechsler, D. (1997). *WAIS-III administration and scoring manual.* San Antonio, TX: Psychological Corporation.

Weiler, M., Harris, N., Marcus, D., Bellinger, D., Kosslyn, S., & Waber, D. (2000). Speed of Information Processing in Children Referred for Learning Problems. *Journal of Learning Disabilities, 33 (6),* 538.

Wiederholt, J. L., & Bryant, B. R. (2001). *GORT 4: Gray Oral Reading Tests Examiner's manual.* Austin, TX: Pro-Ed.

Wiens, A. N., Bryan, J. E., & Crossen, J. R. (1993). Estimating WAIS-R FSIQ from the National Adult Reading Test-Revised in normal subjects. *Clinical Neuropsychologist, 7,* 70–84.

Wiggins, E. C., & Brandt, J. (1988). The detection of simulated amnesias. *Law and Human Behavior, 12,* 57–77.

Woodcock, R. W., McGrew, K. S., & Mather, N. (2001). *The Woodcock-Johnson III.* Itasca, IL: Riverside.

Downloaded from https://academic.oup.com/acn/article-abstract/25/2/89/3358 by guest on 13 November 2019



# Medical Student Policy Manual

## January 2019

*"Education is not the filling of a pail,*

*but the lighting of a fire."*

– William Butler Yeats

applicant to recognize how each may contribute to the medical school learning and working environment and the practice of medicine.

## Admissions Inquiries

The medical school website is the first resource for an interested applicant to learn more about the medical school, our curriculum, and our application and selection processes. The website is regularly updated with new information and frequently asked questions.

All inquiries about admissions to Western Michigan University Homer Stryker M.D. School of Medicine should be directed to the office of Admissions at admissions@med.wmich.edu or 269.337.6103. Staff from the office of Admissions are available to meet with potential applicants individually or in groups during designated times.

Staff from the office of Admissions are available to meet with potential applicants individually or in small groups during designated times. The director of Admissions balances the time for staff spent recruiting and coaching future applicants with management of the application and selection processes.

All applicants are treated consistently following the same defined admissions process that incorporates a holistic review to give consideration to the breadth of life experiences, personal attributes, and academic metrics that reflect the breadth and value that a student brings to the medical school learning and working environment and as a future physician to improve the health of all.

## Transfer Students and Transfer Credit

Our medical school curriculum for the degree of Doctor of Medicine is an integrated curriculum. Basic sciences and clinical sciences are introduced and reinforced throughout the four years of medical school. Because of the highly integrated approach, it is extremely difficult to accommodate advanced placement of medical students from another medical school into this curriculum. The medical school does not consider requests of medical students to transfer with advanced standing, and does not accept transfer credit from other institutions.

### Students

Annually each student in the MD degree program and the MS degree in Biomedical Sciences (Bridge to MD) program must submit the signed form, "Essential Abilities for Completion of the Medical Curriculum Attestation." **Failure to provide a signed form** in a timely manner may delay or prohibit advancement and graduation. Falsification of information on the form is a violation of the Code of Professional Conduct.

### Essential Abilities Committee

The charge of the Essential Abilities Committee is to evaluate and determine whether applicants and students meet the essential abilities for completion of the medical curriculum and, if not, to define the reasonable accommodations tailored to their individual needs and circumstances that would allow them to meet the essential abilities. If the committee determines that an issue is not within the scope of essential abilities, the committee refers the issue to the associate dean for Educational Affairs and associate dean for Student Affairs.

The members of the Essential Abilities Committee include two to three faculty and the director of Human Resources. Members of the committee must disclose conflicts of interest, and recuse themselves from discussions and decisions for an applicant or student if there is a material conflict of interest as determined by the chair. If needed such as for conflicts of interest and non-availability, the dean may appoint ad hoc members as necessary to have at least three voting members for each issue. The chair may seek consultation as needed, including legal counsel, and may invite other individuals to attend meetings.

The chair shall be responsible for calling and conducting all meetings of the committee as needed to address requests for accommodations, requests for revisions to accommodations, and continued review of all accommodations at least annually. A quorum for any committee action shall be three members. Voting may be in person or by telephone in a committee meeting, or by email submitted to the committee chair. A majority vote of the members voting shall be sufficient for passage of any action. The Essential Abilities Committee reviews the Essential Abilities for Completion of the Medical Curriculum annually and as needed, with recommendations for revisions, if any, submitted to the dean.

Essential Abilities Committee members must recuse themselves from participating in the review for students for whom they have provided the student with sensitive health, psychiatric, or psychological care, including as determined solely by the student; served **as the student's private tutor or designated in**dividual mentor; or otherwise have a conflict of interest related to the student.

### Request for Accommodations

The medical school may provide accommodation for a student to learn the same material and achieve the same expectations as for all medical students. An

accommodation changes *how* a student learns the material. The medical school does not make modifications to the curriculum or in testing. Modifications do not change the content that is taught, or the expectations of student learning. If at any time a medical **student requires reasonable accommodation, it is the medical student's responsibility to** notify the office of Student Affairs of the disability in writing, and to provide adequate documentation of the nature and extent of the disability and the functional limitations that are requested to be accommodated. Applicants who are offered admission as well as students whose abilities and skills do not meet these essential abilities for completion of the medical curriculum have an obligation to the medical school to: 1) self-identify and report the presence of a disability or suspected disability; 2) provide appropriate, complete, and accurate documentation of the disability in a timely manner; and 3) self-identify and report the need for reasonable accommodations, including the accommodations that are requested.

It is the **applicant's and student's responsibility to pro**vide complete, accurate, and timely information that documents the nature of the disability, extent of the disability, ramifications of the disability, anticipated progression of the disability, and functional limitations that need to be accommodated, and the specific accommodations that are requested.

Applicants and students acknowledge by seeking accommodations that accommodations provided by the medical school may not be provided by other entities, such as for USMLE examinations. Medical students who are provided accommodations by the medical school are still required to meet all course/clerkship requirements, and advancement and graduation requirements regardless of whether accommodations are provided by the medical school and other entities.

Applicants and students seeking accommodations must submit the Essential Abilities for Completion of the Medical Curriculum Attestation along with a Request for Reasonable Accommodation providing documentation that verifies that the disability substantially limits meeting the essential abilities and that supports the requested accommodation. No other mechanism, whether oral or in writing, constitutes adequate notification by the applicant or student to the medical school of any disability or request for accommodation. Complete documentation, meeting all of the criteria below, must be submitted to the office of Student Affairs at least 20 school days in advance of the requested start date of the proposed accommodation, including temporary accommodation, if requested. A**n applicant's or student's documentation shall be at the applicant's or student's expense and must meet all of the following criteria:**

- <u>Qualified Professional</u>: The documentation must include an evaluation conducted by a qua**lified professional (the "evaluator"). Documentation must include** information about the professional credentials of the evaluator, including their training and licensure for their area of specialization. Additional information about their relevant experience with the diagnosis and treatment of patients with similar disabilities is recommended. An appropriate evaluator for learning disabilities is generally a licensed clinical, educational, or neuropsychologist. The evaluator should not be a family member or have other conflicts of interest with

the student. The committee may request further clarification regarding the qualifications of the evaluator. Final determination of the appropriateness of the evaluator is at the discretion of the Essential Abilities Committee.

- Current Documentation**: The current impact of the disability upon the student's** ability to meet the essential abilities for completion of the medical curriculum, **and the impact on the student's performance to fulfill academic requirements** is the crux of determining an effective reasonable accommodation. As such, documentation and the evaluation must be recent.
  - For accommodation requests for a physical disability, if the physical disability is a permanent and static condition, the committee will consider documentation from any period. If the physical disability is a new or temporary condition, the committee will consider documentation within one year.
  - For accommodation requests for a non-physical disability, documentation must be within two years.
- Comprehensive Evaluation: The evaluation conducted by a qualified professional and submitted by the student must provide information in five areas. The committee may, at its discretion, request additional and/or more recent documentation.
  - A specific medical diagnosis of a physical, mental, or learning disorder.
  - A description of how the diagnosis was confirmed based on established diagnostic criteria. Diagnostic testing and methods must be currently utilized and recognized in professional practices in the relevant field.
  - A description of how the diagnosis affects the essential abilities, and the expected duration of the limitation.
  - The medical and educational history of the disability.
  - Specific, realistic recommendation(s) for accommodations with a rationale for each specific recommendation.

### *Review of Request for Accommodations*

Following submission of the complete required documentation, a student may request consideration for temporary accommodations pending full review by the Essential Abilities Committee. The chair of the Essential Abilities Committee, after preliminary determination by the chair that the documentation is complete, on a case-by-case basis may temporarily approve such a request until the Essential Abilities Committee is able to meet a**nd fully consider the student's request**. Such temporary accommodations are limited to a maximum of 20 school days in duration.

The committee considers the documentation, strives to understand current challenges and foresee the potential future challenges the student might face, and considers creating equivalent opportunities through accommodation. The committee must ensure that the essential aspects of the curriculum as well as the safety of patients, other students, faculty, and staff are given appropriate consideration in the process. Although not limited to the following, the Essential Abilities Committee considers the following aspects:

- Disabilities that are stable or progressive.
- Health issues that are recurring or unpredictable.
- Diseases that may be treatable but where the treatment itself is known to produce a serious impairment of intellectual, physical, psychological, or behavioral function.

In order to determine eligibility, the committee reviews the documentation submitted by the student and the evaluator and determines whether the documentation meets all requirements. If all documentation requirements are met, the committee determines whether the student has a disability that is eligible for an accommodation.

The committee may, at its discretion, require additional documentation, more recent documentation, or an additional evaluation conducted by another qualified professional. The committee must provide the student with an explanation of why further evaluation is required. If the documentation provided by the student is incomplete, the committee may require the student to obtain additional information from the original evaluator, and the medical student bears the cost. If the documentation is deemed by the committee to be complete but the committee requires an additional independent evaluation, the medical school bears the cost. The second evaluator must be a qualified professional and is of the committee's choosing.

If the student is eligible for accommodation, and after discussion with the student and others as needed, the committee determines the appropriate and specific accommodation(s) to be implemented, at the discretion of the committee. The committee should give priority consideration to the specific accommodation requested by the student unless it is deemed not appropriate by the committee because other reasonable accommodations are available. The committee may accept or reject the findings of evaluators in making the final determination regarding accommodations, which is at the discretion of the Essential Abilities Committee.

An accommodation is not reasonable if it: fundamentally alters the nature or integrity of a course, clerkship, program, or event; lowers academic standards; poses a direct threat to the health or safety of the student and/or others; does not meet the requirement that students perform their duties unimpaired by the effects of alcohol, tobacco, and controlled substances (including cannabis or cannabinoids in any form including medical marijuana); poses an undue financial or administrative burden; or requires the use of an intermediary. **The determination of "reasonable" is individually determined by** the Essential Abilities Committee after a student requests accommodation. Each type of disability has variable man**ifestations, and each student's learning needs are different.** Decisions regarding accommodations are made on a case-by-case basis and there is no standard accommodation for any particular type of disability.

The decision of the Essential Abilities Committee is final. The student may request additional review by the committee if there is additional information or a justified concern that the defined process was not followed. The committee determines whether to perform a further review based on the additional information and justification provided by the student.

The committee provides its decisions regarding the need for accommodation, whether reasonable accommodation can be made, and approved accommodations, if any, to the student in writing. The committee findings and approved accommodations are considered confidential.

If accommodations are approved, changed, or terminated, the specific accommodations are provided in writing to the associate dean for Educational Affairs and the associate dean for Student Affairs. This information does not include the underlying basis for the need for accommodation, including sensitive health, psychiatric, or psychological information. The associate dean for Educational Affairs is responsible for implementing the accommodations. The associate dean for Educational Affairs may share the accommodations with course/clerkship directors, other faculty, and staff who need to know the approved accommodations.

The committee reviews the accommodation status of each student with approved accommodations at least annually to ensure that the student is meeting the essential abilities requirements and that the continued accommodation is necessary and sufficient. The committee may, at its discretion, require additional documentation, more recent documentation, or an additional evaluation conducted by another qualified professional to support continued accommodations. The committee must provide the student with a written explanation of the additional required evaluation.

### *Reporting Accommodations*

Requests for accommodations, the minutes and actions of the Essential Abilities Committee, and the accommodations that are provided by the medical school are considered confidential. Information about accommodations, including requests for accommodations, is provided only as needed to faculty and staff, is not reported on transcripts and the Medical Student Performance Evaluation (MSPE), and is not released to outside persons or entities except in response to an order from a court of competent jurisdiction.

## Courses and Clerkships (Course Catalog)

The first and second year, Foundations of Medicine, and the third and fourth year, Clinical Applications, provide the minimum credits and weeks of instruction necessary for advancement and graduation with the MD degree.

This listing of courses and clerkships serves as the course catalog for the medical degree program. This course catalog is complemented by the online course catalog that contains additional course/clerkship information. In addition, the medical student curriculum management system (CLEARvue) provides a full description of each course/clerkship, course/clerkship learning objectives, learning objectives for all events, course/clerkship textbooks and other learning resources, and lists course/clerkship directors with their contact information in the introductory material in CLEARvue for each course/clerkship. Required and recommended textbooks along with the costs are

about any medical student using the online Student Feedback Form. This feedback describes any incident that either reflects exemplary behavior for recognition, or a concern or problem that reflects attitude or behavior. This form is available on each of the medical school intranet portals, including the portals for medical students, faculty, and staff. The feedback is submitted confidentially and reviewed by the associate dean for Student Affairs. Confidentiality is maintained. Individuals must provide a name in order to permit the associate dean for Student Affairs to provide follow up as needed. The medical school does not encourage anonymous feedback.

After review, the associate dean for Student Affairs or designee communicates confidentially with the student, as appropriate, providing positive recognition or discussing the concern or problem, and keeping the identity of the person submitting the feedback anonymous to the student. Based on the assessment, the associate dean for Student Affairs may involve others as needed and may refer significant concerns and problems to the Medical Student Performance Committee for further review. The associate dean for Student Affairs will follow-up with the person who submitted the form, generally within 30 days, to confirm receipt of the feedback and inform them generally of the types of steps taken while also maintaining appropriate confidentiality for the student.

## USMLE Examination Requirements

Passing the USMLE Step 1, Step 2 CK, and Step 2 CS examinations are required for graduation. The National Board of Medical Examiners (NBME) sets the level for passing the steps of the USMLE examinations. Medical students must be enrolled to be eligible to take USMLE examinations, or if on leave of absence must have permission of the associate dean for Educational Affairs.

The USMLE Step 1 and Step 2 CK examinations are administered by computer at Prometric Test Centers. Testing is available throughout the year except for the first two weeks in January. Information of availability of testing times at Prometric is posted at www.prometric.com. Testing for USMLE Step 2 CS is offered at five Clinical Skills Evaluation Collaboration test centers across the country. Information about these locations is posted at usmle.org/step-2-cs/#testcenters.

Students are responsible for scheduling the USMLE Step 1, Step 2 CK (Clinical Knowledge), and Step 2 CS (Clinical Skills) examinations so that they do not interfere with medical school activities and responsibilities. Students are responsible for all examination costs and travel expenses to the testing sites for USMLE testing.

### *USMLE Examination Reporting*

The medical accepts and recognizes only USMLE scores that are received directly from USMLE.

Students may not withhold reporting of scores by USMLE to the medical school. **Reports of "Withheld by student request" or equivalent are managed by the medical** school as a USMLE attempt and a failing examination score.

### *USMLE Examination Preparation*

Our integrated curriculum provides a solid foundation for students to prepare and perform well on the USMLE examinations. Reflecting the integration of basic sciences and clinical sciences even on the USMLE Step 1 exam, in our curriculum clinical experiences begin in the first weeks of medical school, and basic sciences are reinforced during each of the core clerkships. The faculty coordinate and closely align curriculum content with USMLE question content.

Beyond the courses in Foundations of Medicine, events in each of the six core clerkships brings the entire class back together for unique integrative experiences that reinforce basic science principles from the first two years. Students don't "forget" during the core clerkships what they learned in the basic sciences during the first two years because the principles are reinforced with greater clinical context, specifically preparing students for the USMLE Step 1 examination. The medical school contracts with an outside consultant to provide additional strategy-based guidance to students during the core clerkships to prepare for the USMLE Step 1 examination.

The medical school provides comprehensive testing preparation to facilitate medical student success on the USMLE examinations. Many assessments incorporate questions from NBME that mirror actual USMLE questions and provide the most reliable feedback to the student and the medical school about projected performance on the actual USMLE examinations.

During Foundations of Medicine courses, students take both formative and summative examinations. The formative exams are taken weekly. As formative exams, these results are not used for the course grade. They are used by students as formative feedback to confirm that they are learning the course content, and to help students identify individual gaps in knowledge. Summative assessment exams at the end of each course, as well as mid-course summative assessment exams in some courses, are used to as a component of the grading of the course and to provide feedback to the student.

The NBME Comprehensive Basic Science Examination (CBSE) is used to assess the **student's readiness for advancement to Clinical Applications, to guide the student's plan** for individual study during the core clerkships, and in preparation for the USMLE Step 1 examination. The CBSE is taken as a formative examination twice during Foundations of Medicine. Each CBSE has different questions. The CBSE is also taken as a summative examination, once near the end of Foundations of Medicine and again, if necessary or the student desires, as part of the Transition to Clinical Applications course. Students must achieve a passing score on one of these two summative attempts of the CBSE to advance to the core clerkships in Clinical Applications. Each CBSE must be taken as scheduled, or as re-scheduled by the associate dean for Educational Affairs, to maintain

satisfactory academic progress. The CBSE is used as a summative written examination and a grading component of the Transition to Clinical Applications course. Students achieving a passing score on the first summative attempt may be excused from the second summative attempt. Students who fail the first and second summative CBSE attempts, which includes the first attempt taken as part of the Transition to Clinical Applications course, and pass the CBSE on the second attempt during the course receive a grade of pass for the course, and students who fail on the second attempt during the course receive a grade of fail for the course, which may be remediated to a grade of FP (fail/pass) upon successfully passing the CBSE on the third attempt during the course (Figure 9). The CBSE is taken again as a formative examination during Clinical Applications as part of the final preparation for the USMLE Step 1 examination.

The NBME Comprehensive Basic Science Self-Assessment (CBSSA), which resembles the USMLE Step 1 examination, is optional may be taken in preparation for the **examination at the student's expense.** It may be required by the MSPC as part of a learning contract, in which case the medical school pays for the CBSSA. The medical school does not require or use the results of this self-assessment unless it is required as part of a learning contract.

An NBME self-assessment from the NBME Clinical Science Mastery Series is taken during the first core clerkships as a formative assessment and preparation for the format of the NBME Subject Examinations, which are taken at the end of each of the core clerkships and are a component of the grading for each core clerkship.

The NBME Comprehensive Clinical Science Examination can be taken as a formative examination, in preparation for the USMLE Step 2 CK examination, after completion of the core clerkships.

The NBME Comprehensive Clinical Science Self-Assessment (CCSSA) is optional and resembles the USMLE Step 2 CK examination. It may be taken in preparation for the **examination at the student's expense. The medical school does not require or use the** results of this self-assessment unless it is required as part of a learning contract.

### *USMLE Step 1 Examination*

Effective May, 2018, all medical students are required to have a passing score on the USMLE Step 1 examination before advancing to advanced clerkships. Students generally are not permitted by the medical school to take the USMLE Step 1 examination prior to successfully completing three blocks of core clerkships. Exceptions must be approved by the associate dean for Educational Affairs.

A student who fails the USMLE Step 1 examination on the first attempt and receives notice of the result before beginning the first required or elective advanced clerkship is not permitted to begin required or elective advanced clerkships. A student who fails the USMLE Step 1 examination and receives notice after beginning the first required or elective advanced clerkship may complete the current clerkship in which the student is

enrolled but is not permitted to enroll in another advanced required or elective clerkship, at the medical school or elsewhere, until the student takes the USMLE Step 1 examination a second time. The student receives credit for the advanced clerkship if performance was satisfactory and the student receives a minimum grade of pass. The student must work with the Medical Student Performance Committee to define a learning contract that includes a course of study and the schedule to take the USMLE Step 1 examination the second time. The second attempt should occur generally after four weeks of additional study but no later than 12 weeks from the end of the current clerkship. This period may be extended by a leave of absence, which may be part of a learning contract. The student must acknowledge agreement by signing the learning contract and must cooperate fully in completing all of the requirements and elements of the learning contract in accordance with the timetable specified in the learning contract. Failure to comply with all of the requirements and elements of the learning contract results in dismissal from the medical school.

Following the second USMLE Step 1 attempt, the student may enroll in an advanced required or elective clerkship prior to receiving a score on the second attempt. A student who attains a passing score may start or continue an advanced required or elective clerkship. A student who fails the USMLE Step 1 examination on the second attempt may complete a clerkship in which the student is enrolled after the second attempt, but is not permitted to enroll in another advanced required or elective clerkship, at the medical school or elsewhere, until the student attains a passing score on the USMLE Step 1 examination. The student receives credit for the advanced clerkship if performance was satisfactory and they receive a minimum grade of pass. The student must work with Medical Student Performance Committee to define a learning contract including a course of study and the schedule to take the USMLE Step 1 examination the third time. The student must acknowledge agreement by signing the learning contract and must cooperate fully in completing all of the requirements and elements of the learning contract in accordance with the timetable specified in the learning contract. Failure to comply with all of the requirements and elements of the learning contract, or failure to take the USMLE Step 1 examination for a third attempt within the prescribed time period, results in dismissal from the medical school. Upon notification to the medical school of a passing score on the USMLE Step 1 examination the student may resume enrollment in advanced required and elective clerkships. A third failure on the USMLE Step 1 examination results in dismissal from the medical school.

### USMLE Step 2 CK and CS Examinations

All students are required to take the USMLE Step 2 CK and CS examinations by February 1 of the year of graduation, and are strongly encouraged to take the USMLE Step 2 CK examination by September 1 of the year prior to graduation. Passing USMLE Step 2 examinations are prerequisites for taking USMLE Step 3 examination during residency and subsequent licensure. In addition, many residency programs including the military residency programs, require passing USMLE Step 2 CK and CS examinations by a specified date. The medical school must receive confirmation of successfully passing both USMLE Step 2 CK and CS examinations prior to graduation. A

student is permitted to take the USMLE Step 2 CK and CS examinations generally only after passing the USMLE Step 1 examination. Exceptions must be approved by the associate dean for Educational Affairs.

A student is permitted a total of three attempts to pass each the USMLE Step 2 CK and CS examinations. A student who fails the USMLE Step 2 CK or CS examination must work with the Medical Student Performance Committee to define a learning contract that includes a course of study and a schedule to take the USMLE Step 2 CK or CS examination the second time. The student must acknowledge agreement by signing the learning contract and must cooperate fully in completing all of the requirements and elements of the learning contract in accordance with the timetable specified in the learning contract. While preparing to retake the USMLE Step 2 CK or CS examination, the student may remain enrolled in Clinical Applications required and elective clerkships and courses, and may enroll in additional Clinical Applications clerkships and electives if permitted by the learning contract. A third failure on either the USMLE Step 2 CK or CS examination results in dismissal from the medical school.

## Advance Information to Course/Clerkship Directors

In certain circumstances, it is in the best interest of the student for the medical school to provide information to course/clerkship directors in advance of the student beginning the course/clerkship, such as for students who have had significant difficulty in prior academic coursework or professional and personal conduct. The intent of providing advance information is to facilitate early intervention to rectify the area(s) of concern before developing into a sustained or major deficiency that is permanently recorded in the student's transcript. The area(s) of concern may be in any area of evaluation, cognitive or non-cognitive, and may embody a single episode or a pattern of repeated episodes. The objectives for providing advance information are to facilitate early intervention for individualized support and assistance for the student in the area(s) of concern, and to ensure that there is adequate feedback to the student and ongoing evaluation of the area(s) of concern. Course/clerkship directors should use advance information to customize the educational experience of the student to facilitate the student's ability to strengthen and rectify the area(s) of concern. Advance information allows the course/clerkship director to make appropriate group assignments, assign additional tutoring, and directly manage situations that may arise during the course/clerkship regarding the student's performance and interactions with faculty, residents, fellows, and other students.

As part of the continuing evaluation of each student after each course/clerkship, the Medical Student Performance Committee in collaboration with the assistant dean for Academic Success shall make determinations of the need for providing advance information to course/clerkship directors. The Medical Student Performance Committee may make specific recommendations and set specific requirements for each course/clerkship to facilitate addressing the area(s) of concern, including the need for interval reports from the course/clerkship director to the associate dean for Educational Affairs and the Medical Student Performance Committee. The committee shall approve

*Warning Academic Status*

A medical student is placed on warning academic status if the student:

- Fails the initial attempt on more than two course summative examinations within two consecutive terms (as taken by the student) during Foundations of Medicine.
- Receives a grade of fail/pass in more than one course within two consecutive terms (as taken by the student) during Foundations of Medicine.
- Fails more than one core clerkship summative subject examination on the initial attempt; or receives a grade of fail/pass in a core clerkship, advanced clerkship, or elective.

Determination of warning academic status may not be appealed. The student is eligible for financial aid.

A medical student on warning academic status must work with the Medical Student Performance Committee to define a learning contract including a course of study defining key milestones, and a timetable that demonstrates appropriate remediation. The student must acknowledge agreement by signing the learning contract and fully cooperating in completing all of the requirements and elements of the learning contract in accordance with the specified timetable. A student who is repeating a course/clerkship, repeating part or an entire academic year, or preparing to retake a USMLE examination in accordance with the requirements and elements of a learning contract is making satisfactory academic progress. A student who is not meeting all of the requirements and elements of the learning contract in accordance with the specified timetable is not making satisfactory academic progress and is subject to dismissal through a formal hearing conducted by the Medical Student Performance Committee.

A medical student who has not received a passing score on the USMLE Step 1 examination within six months of completing all of the core clerkships is placed on warning academic status. The student is eligible for financial aid. Determination of warning academic status may not be appealed. A student who has not received a passing score on the USMLE Step 1 examination within 12 months of completing the core clerkships has not maintained satisfactory academic progress in the medical school and is subject to dismissal through a formal hearing conducted by the Medical Student Performance Committee.

A student who has not received a passing score on USMLE Step 2 CK and/or CS examinations within 12 months of completing the core clerkships is placed on warning academic status. The student is eligible for financial aid. Determination of warning academic status may not be appealed. A student who has not received a passing score on both the USMLE Step 2 CK and CS examinations within 18 months of completing the core clerkships has not maintained satisfactory academic progress in the medical school and is subject to dismissal through a formal hearing conducted by the Medical Student Performance Committee.

United States Medical Licensing Examination | Step 1



file:///C:/Ramsay/Court%20Complaint/Exhibits%20to%20Complaint/United%20States%20Medical%20Licensing%20Examination%20_%20Step%201.html[5/5/2019 4:34:17 PM]

**Ramsay v. NBME - Exhibit B**

**Appx1558**



US·MLE
United States
Medical
Licensing
Examination ®

SAMPLE TEST QUESTIONS

# Step 1





A Joint Program of the Federation of State Medical Boards of the
United States, Inc., and the National Board of Medical Examiners®
NBME00491

**This booklet updated February 2017.**

Copyright © 2017 by the Federation of State Medical Boards of the United States, Inc. (FSMB), and the National Board of Medical Examiners® (NBME®). All rights reserved.  Printed in the United States of America. The United States Medical Licensing Examination (USMLE®) is a joint program of the FSMB and the NBME.

NBME00492

**CONTENTS**

USMLE Step 1 Test Question Formats …………………………….. 3

Introduction to USMLE Step 1 Sample Test Questions ……………… 4

Normal Laboratory Values ………………………………………….. 5

USMLE Step 1 Sample Test Questions…………………………….. 7

Answer Form for USMLE Step 1 Sample Test Questions…………… 44

Answer Key for USMLE Step 1 Sample Test Questions……………… 45

NBME00493

**Appx1561**

# USMLE Step 1 Test Question Formats

**Single-Item Questions**

A single patient-centered vignette is associated with one question followed by four or more response options. The response options are lettered (A, B, C, D, E). A portion of the questions require interpretation of graphic or pictorial materials. You are required to select the best answer to the question. Other options may be partially correct, but there is only ONE BEST answer. This is the traditional, most frequently used multiple-choice question format on the examination.

**Strategies for Answering Single One-Best-Answer Test Questions**

The following are strategies for answering one-best-answer items:

- Read each patient vignette and question carefully. It is important to understand what is being asked.

- Try to generate an answer and then look for it in the response option list.

- Alternatively, read each response option carefully, eliminating those that are clearly incorrect.

- Of the remaining options, select the one that is most correct.

- If unsure about an answer, it is better to guess since unanswered questions are automatically counted as wrong answers.

**Example Item**

A 32-year-old woman with type 1 diabetes mellitus has had progressive renal failure over the past 2 years. She has not yet started dialysis. Examination shows no abnormalities. Her hemoglobin concentration is 9 g/dL, hematocrit is 28%, and mean corpuscular volume is 94 $\mu m^3$. A blood smear shows normochromic, normocytic cells. Which of the following is the most likely cause?

| | | | |
|---|---|---|---|
| (A) | Acute blood loss | (F) | Microangiopathic hemolysis |
| (B) | Chronic lymphocytic leukemia | (G) | Polycythemia vera |
| (C) | Erythrocyte enzyme deficiency | (H) | Sickle cell disease |
| (D) | Erythropoietin deficiency | (I) | Sideroblastic anemia |
| (E) | Immunohemolysis | (J) | β-Thalassemia trait |

(Answer: D)

**NOTE:** Some item types that appear on the Step 1 examination are NOT depicted in the sample items provided in this booklet, eg, items with multimedia features, such as audio. Also, when additional item formats are added to the exam, notice will be provided at the USMLE Web site: http://www.usmle.org. You must monitor the Web site to stay informed about the types of items that occur in the exam, and you must practice with the downloadable sample test items available on the USMLE Web site to be fully prepared for the examination.

NBME00494

# Introduction to USMLE Step 1 Sample Test Questions

The following pages include 117 sample test questions. Most of these questions are the same as those you can install on your computer from the USMLE Web site. Please note that reviewing the sample questions as they appear on pages 7-43 is not a substitute for practicing with the test software. You should download and run the Step 1 tutorial and practice test items that are provided on the USMLE Web site well before your test date. The sample materials available on the USMLE Web site include additional items and item formats that do not appear in this booklet, such as items with associated audio or video findings. You should become familiar with all item formats that will be used in the actual examination.

Although the sample questions exemplify content on the Step 1 examination overall, they may not reflect the content coverage on individual examinations. In the actual examination, questions will be presented in random order; they will not be grouped according to specific content. The questions will be presented one at a time in a format designed for easy on-screen reading, including use of the Normal Laboratory Values table (included here on pages 5 and 6) and some pictorials. Photographs, charts, and x-rays in this booklet are not of the same quality as the pictorials used in the actual examination. In addition, you will be able to adjust the brightness and contrast of pictorials on the computer screen.

To take the following sample test questions as they would be timed in the actual examination, you should allow a maximum of 1 hour for each 40-item block, and a maximum of 55 minutes, 30 seconds, for the 37-item block, for a total of 2 hours, 55 minutes, 30 seconds. Please note that the third block has 37 items instead of 40 because the multimedia items have been removed, and the recommended time to complete the block has been adjusted accordingly. Please be aware that most examinees perceive the time pressure to be greater during an actual examination. All examinees are strongly encouraged to practice with the downloadable version to become familiar with all item formats and exam timing. An answer form for recording answers is provided on page 44. An answer key is provided on page 45. In the actual examination, answers will be selected on the screen; no answer form will be provided.

NBME00495

<u>LABORATORY VALUES</u>
\* Included in the Biochemical Profile (SMA-12)

| | REFERENCE RANGE | SI REFERENCE INTERVALS |
|---|---|---|
| **BLOOD, PLASMA, SERUM** | | |
| \* Alanine aminotransferase (ALT), serum | 8-20 U/L | 8-20 U/L |
| Amylase, serum | 25-125 U/L | 25-125 U/L |
| \* Aspartate aminotransferase (AST), serum | 8-20 U/L | 8-20 U/L |
| Bilirubin, serum (adult) Total // Direct | 0.1-1.0 mg/dL // 0.0-0.3 mg/dL | 2-17 $\mu$mol/L // 0-5 $\mu$mol/L |
| \* Calcium, serum (Ca$^{2+}$) | 8.4-10.2 mg/dL | 2.1-2.8 mmol/L |
| \* Cholesterol, serum | Rec:<200 mg/dL | <5.2 mmol/L |
| Cortisol, serum | 0800 h: 5-23 $\mu$g/dL // 1600 h: 3-15 $\mu$g/dL | 138-635 nmol/L // 82-413 nmol/L |
| | 2000 h: $\leq$ 50% of 0800 h | Fraction of 0800 h: $\leq$ 0.50 |
| Creatine kinase, serum | Male: 25-90 U/L | 25-90 U/L |
| | Female: 10-70 U/L | 10-70 U/L |
| \* Creatinine, serum | 0.6-1.2 mg/dL | 53-106 $\mu$mol/L |
| Electrolytes, serum | | |
| Sodium (Na$^+$) | 136-145 mEq/L | 136-145 mmol/L |
| \* Potassium (K$^+$) | 3.5-5.0 mEq/L | 3.5-5.0 mmol/L |
| Chloride (Cl$^-$) | 95-105 mEq/L | 95-105 mmol/L |
| Bicarbonate (HCO$_3^-$) | 22-28 mEq/L | 22-28 mmol/L |
| Magnesium (Mg$^{2+}$) | 1.5-2.0 mEq/L | 0.75-1.0 mmol/L |
| Estriol, total, serum (in pregnancy) | | |
| 24-28 wks // 32-36 wks | 30-170 ng/mL // 60-280 ng/mL | 104-590 nmol/L // 208-970 nmol/L |
| 28-32 wks // 36-40 wks | 40-220 ng/mL // 80-350 ng/mL | 140-760 nmol/L // 280-1210 nmol/L |
| Ferritin, serum | Male: 15-200 ng/mL | 15-200 $\mu$g/L |
| | Female: 12-150 ng/mL | 12-150 $\mu$g/L |
| Follicle-stimulating hormone, serum/plasma | Male: 4-25 mIU/mL | 4-25 U/L |
| | Female: premenopause 4-30 mIU/mL | 4-30 U/L |
| | midcycle peak 10-90 mIU/mL | 10-90 U/L |
| | postmenopause 40-250 mIU/mL | 40-250 U/L |
| Gases, arterial blood (room air) | | |
| pH | 7.35-7.45 | [H$^+$] 36-44 nmol/L |
| Pco$_2$ | 33-45 mm Hg | 4.4-5.9 kPa |
| Po$_2$ | 75-105 mm Hg | 10.0-14.0 kPa |
| \* Glucose, serum | Fasting: 70-110 mg/dL | 3.8-6.1 mmol/L |
| | 2-h postprandial: < 120 mg/dL | < 6.6 mmol/L |
| Growth hormone - arginine stimulation | Fasting: < 5 ng/mL | < 5 $\mu$g/L |
| | provocative stimuli: > 7 ng/mL | > 7 $\mu$g/L |
| Immunoglobulins, serum | | |
| IgA | 76-390 mg/dL | 0.76-3.90 g/L |
| IgE | 0-380 IU/mL | 0-380 kIU/L |
| IgG | 650-1500 mg/dL | 6.5-15 g/L |
| IgM | 40-345 mg/dL | 0.4-3.45 g/L |
| Iron | 50-170 $\mu$g/dL | 9-30 $\mu$mol/L |
| Lactate dehydrogenase, serum | 45-90 U/L | 45-90 U/L |
| Luteinizing hormone, serum/plasma | Male: 6-23 mIU/mL | 6-23 U/L |
| | Female: follicular phase 5-30 mIU/mL | 5-30 U/L |
| | midcycle 75-150 mIU/mL | 75-150 U/L |
| | postmenopause 30-200 mIU/mL | 30-200 U/L |
| Osmolality, serum | 275-295 mOsmol/kg H$_2$O | 275-295 mOsmol/kg H$_2$O |
| Parathyroid hormone, serum, N-terminal | 230-630 pg/mL | 230-630 ng/L |
| \* Phosphatase (alkaline), serum (p-NPP at 30°C) | 20-70 U/L | 20-70 U/L |
| \* Phosphorus (inorganic), serum | 3.0-4.5 mg/dL | 1.0-1.5 mmol/L |
| Prolactin, serum (hPRL) | < 20 ng/mL | < 20 $\mu$g/L |
| \* Proteins, serum | | |
| Total (recumbent) | 6.0-7.8 g/dL | 60-78 g/L |
| Albumin | 3.5-5.5 g/dL | 35-55 g/L |
| Globulin | 2.3-3.5 g/dL | 23-35 g/L |
| Thyroid-stimulating hormone, serum or plasma | 0.5-5.0 $\mu$U/mL | 0.5-5.0 mU/L |
| Thyroidal iodine ($^{123}$I) uptake | 8%-30% of administered dose/24 h | 0.08-0.30/24 h |
| Thyroxine (T$_4$), serum | 5-12 $\mu$g/dL | 64-155 nmol/L |
| Triglycerides, serum | 35-160 mg/dL | 0.4-1.81 mmol/L |
| Triiodothyronine (T$_3$), serum (RIA) | 115-190 ng/dL | 1.8-2.9 nmol/L |
| Triiodothyronine (T$_3$) resin uptake | 25%-35% | 0.25-0.35 |
| \* Urea nitrogen, serum | 7-18 mg/dL | 1.2-3.0 mmol/L |
| \* Uric acid, serum | 3.0-8.2 mg/dL | 0.18-0.48 mmol/L |

5

NBME00496

LABORATORY VALUES (continued from previous page)

|  | REFERENCE RANGE | SI REFERENCE INTERVALS |
|---|---|---|

**BODY MASS INDEX (BMI)**

Body mass index ................................... Adult: 19-25 $kg/m^2$

**CEREBROSPINAL FLUID**

| | | |
|---|---|---|
| Cell count | 0-5/$mm^3$ | 0-5 x $10^6$/L |
| Chloride | 118-132 mEq/L | 118-132 mmol/L |
| Gamma globulin | 3%-12% total proteins | 0.03-0.12 |
| Glucose | 40-70 mg/dL | 2.2-3.9 mmol/L |
| Pressure | 70-180 mm $H_2O$ | 70-180 mm $H_2O$ |
| Proteins, total | <40 mg/dL | <0.40 g/L |

**HEMATOLOGIC**

| | | |
|---|---|---|
| Bleeding time (template) | 2-7 minutes | 2-7 minutes |
| Erythrocyte count | Male: 4.3-5.9 million/$mm^3$ | 4.3-5.9 x $10^{12}$/L |
| | Female: 3.5-5.5 million/$mm^3$ | 3.5-5.5 x $10^{12}$/L |
| Erythrocyte sedimentation rate (Westergren) | Male: 0-15 mm/h | 0-15 mm/h |
| | Female: 0-20 mm/h | 0-20 mm/h |
| Hematocrit | Male: 41%-53% | 0.41-0.53 |
| | Female: 36%-46% | 0.36-0.46 |
| Hemoglobin $A_{1c}$ | ≤ 6% | ≤ 0.06 |
| Hemoglobin, blood | Male: 13.5-17.5 g/dL | 2.09-2.71 mmol/L |
| | Female: 12.0-16.0 g/dL | 1.86-2.48 mmol/L |
| Hemoglobin, plasma | 1-4 mg/dL | 0.16-0.62 mmol/L |
| Leukocyte count and differential | | |
| Leukocyte count | 4500-11,000/$mm^3$ | 4.5-11.0 x $10^9$/L |
| Segmented neutrophils | 54%-62% | 0.54-0.62 |
| Bands | 3%-5% | 0.03-0.05 |
| Eosinophils | 1%-3% | 0.01-0.03 |
| Basophils | 0%-0.75% | 0-0.0075 |
| Lymphocytes | 25%-33% | 0.25-0.33 |
| Monocytes | 3%-7% | 0.03-0.07 |
| Mean corpuscular hemoglobin | 25.4-34.6 pg/cell | 0.39-0.54 fmol/cell |
| Mean corpuscular hemoglobin concentration | 31%-36% Hb/cell | 4.81-5.58 mmol Hb/L |
| Mean corpuscular volume | 80-100 $\mu m^3$ | 80-100 fL |
| Partial thromboplastin time (activated) | 25-40 seconds | 25-40 seconds |
| Platelet count | 150,000-400,000/$mm^3$ | 150-400 x $10^9$/L |
| Prothrombin time | 11-15 seconds | 11-15 seconds |
| Reticulocyte count | 0.5%-1.5% | 0.005-0.015 |
| Thrombin time | <2 seconds deviation from control | <2 seconds deviation from control |
| Volume | | |
| Plasma | Male: 25-43 mL/kg | 0.025-0.043 L/kg |
| | Female: 28-45 mL/kg | 0.028-0.045 L/kg |
| Red cell | Male: 20-36 mL/kg | 0.020-0.036 L/kg |
| | Female: 19-31 mL/kg | 0.019-0.031 L/kg |

**SWEAT**

| | | |
|---|---|---|
| Chloride | 0-35 mmol/L | 0-35 mmol/L |

**URINE**

| | | |
|---|---|---|
| Calcium | 100-300 mg/24 h | 2.5-7.5 mmol/24 h |
| Chloride | Varies with intake | Varies with intake |
| Creatinine clearance | Male: 97-137 mL/min | |
| | Female: 88-128 mL/min | |
| Estriol, total (in pregnancy) | | |
| 30 wks | 6-18 mg/24 h | 21-62 μmol/24 h |
| 35 wks | 9-28 mg/24 h | 31-97 μmol/24 h |
| 40 wks | 13-42 mg/24 h | 45-146 μmol/24 h |
| 17-Hydroxycorticosteroids | Male: 3.0-10.0 mg/24 h | 8.2-27.6 μmol/24 h |
| | Female: 2.0-8.0 mg/24 h | 5.5-22.0 μmol/24 h |
| 17-Ketosteroids, total | Male: 8-20 mg/24 h | 28-70 μmol/24 h |
| | Female: 6-15 mg/24 h | 21-52 μmol/24 h |
| Osmolality | 50-1400 mOsmol/kg $H_2O$ | |
| Oxalate | 8-40 μg/mL | 90-445 μmol/L |
| Potassium | Varies with diet | Varies with diet |
| Proteins, total | <150 mg/24 h | <0.15 g/24 h |
| Sodium | Varies with diet | Varies with diet |
| Uric acid | Varies with diet | Varies with diet |

6

NBME00497

USMLE STEP 1 SAMPLE TEST QUESTIONS

BLOCK 1, ITEMS 1-40

1.    An otherwise healthy 26-year-old woman has had petechiae on her legs during the last 24 hours. Laboratory studies show:

| | |
|---|---|
| Hemoglobin | 13.1 g/dL |
| Hematocrit | 39.7% |
| Leukocyte count | 8500/mm$^3$ |
| Neutrophils | 65% |
| Lymphocytes | 30% |
| Monocytes | 5% |
| Mean corpuscular volume | 82.2 μm$^3$ |
| Platelet count | 20,000/mm$^3$ |

A peripheral blood smear shows normal red cell morphology; a bone marrow smear shows mature megakaryocytic hyperplasia. Which of the following is the most likely diagnosis?

(A)  Acute megakaryocytic leukemia
(B)  Acute myelogenous leukemia
(C)  Aplastic anemia
(D)  Immune thrombocytopenic purpura
(E)  Epstein-Barr viral infection
(F)  Papovavirus infection
(G)  Thrombotic thrombocytopenic purpura

2.    An 83-year-old man comes to the physician because of a 2-day history of constant severe pain of his right knee. He had a similar episode 1 year ago that subsided in 1 month without treatment. His temperature is 37.7°C (99.9°F). Examination of the right knee shows swelling; there is no overlying warmth or apparent deformity. Palpation and movement of the right knee produce pain; range of motion is limited by pain. An x-ray of the right knee shows large subchondral cysts and linear meniscal calcifications. Examination of fluid obtained on joint aspiration of the knee shows:

| | |
|---|---|
| Amount | 2 mL |
| Appearance | cloudy with diminished viscosity and crystals present |
| Leukocyte count | 49,000/mm$^3$ |
| Segmented neutrophils | 65% |
| Lymphocytes | 35% |

His pain is moderately improved after the joint aspiration and injection of corticosteroids. Treatment with ibuprofen during the next week significantly improves his condition. Histologic examination of the joint fluid aspirate is most likely to show which of the following types of crystals?

(A)  Calcium pyrophosphate
(B)  Cholesterol
(C)  Oxalic acid
(D)  Potassium phosphate

NBME00498

**Appx1566**



3.    A 16-year-old boy comes to the physician because of a rash on his left inner thigh that first appeared 2 days after he returned from a hunting trip with friends in Minnesota. A photograph of the rash is shown. Without treatment, this patient is at increased risk for which of the following?

    (A)  Carditis
    (B)  Glomerulonephritis
    (C)  Hepatitis
    (D)  Pancreatitis
    (E)  Thrombocytopenia

---

4.    A previously healthy 24-year-old woman comes to the emergency department because of fever and diarrhea for the past 5 days. She has more than 10 bowel movements daily, accompanied by abdominal cramping and the passage of mucus and blood clots. She has not traveled out of the United States. Tympanic temperature is 39°C (102.2°F). Bowel sounds are increased. Test of stool for occult blood is positive. Which of the following is the most likely causal organism?

    (A)  *Bacillus cereus*
    (B)  *Cryptosporidium parvum*
    (C)  *Giardia lamblia*
    (D)  *Shigella sonnei*
    (E)  *Staphylococcus aureus*

5.    An 84-year-old woman who resides in an assisted living facility is brought to the emergency department because of fever and cough for 1 week. The cough has been productive of foul-smelling, yellow-green sputum for 24 hours. She has a 2-year history of dementia, Alzheimer type. Her temperature is 38.5°C (101.3°F), pulse is 80/min, respirations are 20/min, and blood pressure is 116/66 mm Hg. Coarse inspiratory crackles are heard over the right lung field. Laboratory studies show a leukocyte count of 13,500/mm$^3$ (72% segmented neutrophils, 8% bands, 1% eosinophils, 16% lymphocytes, and 3% monocytes). A CT scan shows a cavitary lesion in the superior segment of the right lower lobe. The lesion has a thick wall and an irregular peripheral margin; there is no displacement of the adjacent bronchovascular bundle. Which of the following is the most likely cause of the lung lesion in this patient?

    (A)  Antecedent viral pneumonia
    (B)  Aspiration of gastric contents
    (C)  Bronchial obstruction by metastatic carcinoma
    (D)  Lung infarction secondary to arterial thrombosis
    (E)  Primary carcinoma of the lung
    (F)  Secondary infection of a congenital lung cyst
    (G)  Septic embolism from an extrapulmonary site

NBME00499

**Appx1567**

6.  A 55-year-old man comes to the physician because of a 2-week history of recurrent, widespread blister formation. Physical examination shows lesions that are most numerous in the flexural areas including the axillae and groin. The blisters do not break easily, and there are no oral lesions. These blisters are most likely the result of adhesion failure involving which of the following?

    (A)  Basement membrane
    (B)  Dermal papillae
    (C)  Langerhans cells
    (D)  Melanocytes
    (E)  Merkel cells

7.  A 59-year-old man is brought to the emergency department because of a 4-day history of nausea, vomiting, and diarrhea. He also has been confused and agitated during this period. He has a history of mild hypertension. His current medication is a diuretic. His temperature is 37°C (98.6°F), pulse is 108/min, respirations are 26/min, and blood pressure is 70/47 mm Hg. Physical examination shows delayed capillary refill of the lips and nail beds and cool extremities. His oxyhemoglobin saturation in a central vein is 60% (N=70–75). These findings are most consistent with which of the following types of shock?

    (A)  Cardiogenic
    (B)  Distributive
    (C)  Hypovolemic
    (D)  Obstructive
    (E)  Septic

8.  A 7-month-old infant is brought to the physician's office because of poor weight gain despite large food intake. He has had two episodes of pneumonia and has frequent bulky stools. He coughs frequently. X-rays of the lungs show increased markings and hyperinflation. Trypsin is absent in a fresh stool sample, and the fat content is increased. Which of the following is the most likely cause of this infant's disorder?

    (A)  Autoimmune disorder
    (B)  Defective ion transport at epithelial surfaces
    (C)  Disaccharidase deficiency
    (D)  Inability to synthesize apolipoprotein B
    (E)  Villous atrophy of the jejunum

9.  A 65-year-old man is brought to the emergency department 30 minutes after the onset of acute chest pain at rest that radiates to his left arm. His pulse is 110/min, respirations are 20/min, and blood pressure is 150/80 mm Hg. Physical examination shows diaphoresis. The lungs are clear to auscultation of the chest. An ECG shows a new left bundle branch block. The tentative diagnosis of acute coronary syndrome is made. Treatment with oxygen via nasal cannula, oral aspirin, and sublingual nitroglycerin, followed by an intravenous dose of a β-adrenergic blocker, is begun. Which of the following sets of changes is most likely to occur in this patient after the intravenous dose?

|     | Heart Rate | Myocardial Contractility | Myocardial O$_2$ Consumption |
| --- | --- | --- | --- |
| (A) | No change | increased | increased |
| (B) | No change | increased | decreased |
| (C) | No change | decreased | increased |
| (D) | No change | decreased | decreased |
| (E) | Decreased | increased | decreased |
| (F) | Decreased | decreased | increased |
| (G) | Decreased | decreased | decreased |

9

**Appx1568**

10. A 55-year-old woman with small cell carcinoma of the lung is admitted to the hospital to undergo chemotherapy. Six days after treatment is started, she develops a temperature of 38°C (100.4°F). Physical examination shows no other abnormalities. Laboratory studies show a leukocyte count of 100/mm$^3$ (5% segmented neutrophils and 95% lymphocytes). Which of the following is the most appropriate pharmacotherapy to increase this patient's leukocyte count?

    (A) Darbepoetin
    (B) Dexamethasone
    (C) Filgrastim
    (D) Interferon alfa
    (E) Interleukin-2 (IL-2)
    (F) Leucovorin

11. A technician wants to determine whether cytomegalovirus (CMV) DNA is present in the blood of a bone marrow transplant recipient. DNA purified from the leukocytes of the patient is reacted in a mixture containing oligonucleotides specific for CMV DNA, thermostable DNA polymerase, and nucleotides. Repetitive cycles of heating and cooling are performed, and the reaction product is detected by gel electrophoresis. The technician most likely used which of the following laboratory procedures on this patient's blood?

    (A) Northern blotting
    (B) Polymerase chain reaction
    (C) Reverse transcription
    (D) Southern blotting
    (E) Western blotting

12. Over 1 year, a study is conducted to assess the antileukemic activity of a new tyrosine kinase inhibitor in patients with chronic myeloid leukemia in blast crisis. All patients enrolled in the study are informed that they would be treated with the tyrosine kinase inhibitor. They are assigned to successive dose cohorts of 300 to 1000 mg/day of the drug. Six to eight patients are assigned to each dose. Treatment efficacy is determined based on the results of complete blood counts and bone marrow assessments conducted regularly throughout the study. This study is best described as which of the following?

    (A) Case-control study
    (B) Crossover study
    (C) Open-labeled clinical trial
    (D) Randomized clinical trial
    (E) Single-blind, randomized, controlled trial

NBME00501



13.   A 12-year-old boy is brought to the physician by his mother because of a 1-month history of pain below the left knee. His mother says, "He can usually walk around, but he hasn't been able to play in any of his soccer games since this all began." Examination of the left knee shows warmth, swelling, and tenderness. An x-ray of the knee is shown. Which of the following structures is attached to the abnormal anterior tibial area?

(A)  Anterior cruciate ligament
(B)  Gastrocnemius muscle
(C)  Patellar ligament
(D)  Popliteus muscle
(E)  Posterior cruciate ligament
(F)  Soleus muscle

14.   A 45-year-old man comes to the physician for HIV testing. He says that he has been having an extramarital affair with a woman for 6 months, and he hopes this affair will continue because it has made him very happy. He has no plans to tell his wife about the affair. The wife is also a patient of the physician. Physical examination shows no abnormalities, and the result of a serum HIV antibody test is negative. Which of the following is the most appropriate action by the physician?

(A)  Alert the local public health department to the patient's activities
(B)  Explain to the patient that one of them must tell the wife about the affair for her own safety
(C)  Refer the patient for counseling
(D)  Say nothing about the affair to anyone other than the patient
(E)  Tell the patient's wife about the affair so she can make an informed decision about possibly being placed at risk in the future

NBME00502

**Appx1570**



15.    A 63-year-old homeless man is brought to the emergency department 1 hour after police found him unresponsive. His respirations are 30/min. Crackles are heard over the left upper and the entire right lung fields. Despite appropriate lifesaving measures, he dies. A photomicrograph of a section of the right lung obtained at autopsy is shown. Which of the following mediators is the most likely cause of the position of the cell indicated by the arrow?

    (A)  Bradykinin
    (B)  C5a
    (C)  Histamine
    (D)  Nitrous oxide
    (E)  Prostaglandins

16.    A 63-year-old woman comes to the physician because of a 2-week history of fatigue, malaise, nausea and vomiting, and decreased appetite; these symptoms have worsened during the past week. She was diagnosed with tuberculosis 3 months ago; a multidrug regimen was initiated at that time. Her temperature is 37.1°C (98.8°F). Physical examination shows scleral icterus and tenderness over the right upper quadrant of the abdomen; there is no hepatomegaly. Serum studies show a total bilirubin concentration of 6.5 mg/dL, AST activity of 580 U/L, and ALT activity of 650 U/L. Which of the following drugs is the most likely cause of these findings?

    (A)  Ethambutol
    (B)  Isoniazid
    (C)  Levofloxacin
    (D)  Streptomycin
    (E)  Vitamin $B_6$ (pyridoxine)

17.    A 48-year-old woman comes to the emergency department because of shortness of breath. She has no history of cardiac or pulmonary disease. Her current medication is timolol for glaucoma. Her pulse is 75/min. Diffuse wheezing is heard in the lower lung fields. An ECG shows no abnormalities. In addition to discontinuing timolol, which of the following drugs is the most appropriate treatment to relieve symptoms at this time?

    (A)  Adenosine
    (B)  Albuterol
    (C)  Beclomethasone
    (D)  Cromolyn
    (E)  Propranolol

NBME00503

**Appx1571**

18. A 55-year-old man is brought to the emergency department because of shortness of breath and confusion for 4 hours. He has hypertension and chronic kidney disease requiring hemodialysis. An ECG shows low voltage with electrical alternans. Physical examination is most likely to show which of the following findings?

| | Blood Pressure (mm Hg) | Pulse (/min) | Jugular Venous Pressure | Pulsus Paradoxus |
|---|---|---|---|---|
| (A) | 85/60 | 120 | increased | increased |
| (B) | 85/60 | 120 | increased | normal |
| (C) | 85/60 | 120 | normal | normal |
| (D) | 120/80 | 80 | increased | increased |
| (E) | 120/80 | 80 | normal | increased |
| (F) | 120/80 | 80 | normal | normal |

19. A healthy 28-year-old woman comes to the physician for advice on losing weight. She is 150 cm (4 ft 11 in) tall and weighs 56 kg (124 lb); BMI is 25 kg/m$^2$. Physical examination shows no other abnormalities. The physician recommends a diet that will restrict her daily intake by 500 kilocalories. Which of the following processes is most likely to increase in this patient as a result of following this diet?

(A) Adipocyte glucose uptake
(B) Cerebral ketone utilization
(C) Hepatic lipid oxidation
(D) Muscle glucose uptake
(E) Resting energy expenditure

20. A 14-year-old girl with a 9-year history of type 1 diabetes mellitus is brought to the physician by her mother for a follow-up examination. She has been admitted to the hospital twice in the past 3 months because of diabetic ketoacidosis. She previously had been compliant with monitoring her blood glucose concentration and with her diet and insulin regimen. She acknowledges that, when she is with her peers, she eats whatever she wants and does not check her blood glucose concentration. She adds, "I'm embarrassed to inject myself in front of them." The physician is having a great deal of difficulty with her 15-year-old son who has been truant from school and sneaking out of the house. She says to the patient, "You should be ashamed for not taking care of yourself. We've all worked so hard to keep you healthy." Which of the following terms best describes the physician's reaction to the patient?

(A) Countertransference
(B) Identification with the aggressor
(C) Projection
(D) Splitting
(E) Sublimation

21. A sexually active 23-year-old man with multiple sex partners has dysuria and a yellow urethral exudate. Gram stain of the exudate shows numerous neutrophils, many that contain intracellular gram-negative diplococci. He has had three similar episodes of urethritis over the past 2 years. Which of the following properties of the infecting organism best explains the reinfection?

(A) Antigenic variation
(B) Catalase
(C) Inhibition of B-lymphocyte function
(D) Inhibition of T-lymphocyte function
(E) Polysaccharide capsule

NBME00504

22. A 40-year-old woman receives an intravenous infusion of drug X that selectively constricts the efferent arterioles in her kidneys. Following the infusion, total cardiac output and renal afferent arteriolar tone are unchanged, but renal efferent arteriolar tone and total renal vascular resistance have both increased. Which of the following sets of changes most likely occurred following the infusion of drug X?

|  | Glomerular Filtration Rate | Filtration Fraction | Renal Blood Flow |
|---|---|---|---|
| (A) | ↓ | ↓ | ↑ |
| (B) | ↓ | ↑ | ↓ |
| (C) | ↓ | ↑ | ↔ |
| (D) | ↑ | ↓ | ↔ |
| (E) | ↑ | ↑ | ↓ |

23. A 23-year-old woman comes to the physician for genetic counseling prior to conception. Her brother and maternal uncle had Duchenne muscular dystrophy (DMD) and died at the ages of 28 and 17 years, respectively. Genetic analysis was not performed on either relative prior to death. Serum studies show a muscle creatine kinase concentration of 120 U/L (N=22–198). The patient's 50-year-old mother has a serum muscle creatine kinase concentration of 300 U/L. Which of the following is the most appropriate assessment of this patient's carrier status for this disease?

   (A) The patient has a 50% risk for developing DMD
   (B) The patient has a 50% risk of having a child with DMD
   (C) The patient is a carrier of the disease based on her family history of DMD
   (D) The patient is not a carrier of the DMD based on her normal creatine kinase concentration
   (E) The patient's DMD carrier status is uncertain because of random X inactivation

24. A 45-year-old man comes to the physician because of right shoulder pain that began after he chopped wood 2 days ago. Examination of the right upper extremity shows no obvious bone deformities or point tenderness. The pain is reproduced when the patient is asked to externally rotate the shoulder against resistance; there is no weakness. In addition to the teres minor, inflammation of which of the following tendons is most likely in this patient?

   (A) Infraspinatus
   (B) Pectoralis
   (C) Subscapularis
   (D) Supraspinatus
   (E) Trapezius

25. A 39-year-old woman with a 1-month history of itching, watery eyes, nasal congestion, runny nose, and sneezing undergoes hypersensitivity testing. During the test, allergens are introduced by pricking the skin with lancets coated with pollen and grass extracts. Within 30 minutes, a visible reddening reaction of the skin occurs at the sites of allergen introduction. Which of the following most likely initiates the inflammatory response to these allergens in this patient?

   (A) C3
   (B) IgE
   (C) Interferon gamma
   (D) Interleukin-2 (IL-2)
   (E) Tumor necrosis factor

NBME00505

**Appx1573**

26. A 26-year-old man is brought to the emergency department by ambulance 30 minutes after being shot in the leg. He is unconscious and appears markedly pale. His pulse is 120/min, respirations are 16/min, and blood pressure is 80/60 mm Hg. Compared with a healthy adult, which of the following findings is most likely in this patient?

| | Arterial Baroreceptor Firing Rate | Systemic Vascular Resistance | Pulmonary Vascular Resistance | Systemic Capillary Fluid Transfer |
|---|---|---|---|---|
| (A) | ↑ | ↑ | ↑ | filtration |
| (B) | ↑ | ↓ | ↑ | absorption |
| (C) | ↑ | ↓ | ↓ | filtration |
| (D) | ↓ | ↑ | ↑ | absorption |
| (E) | ↓ | ↑ | ↓ | filtration |
| (F) | ↓ | ↓ | ↓ | absorption |

27. A 1-day-old newborn is evaluated for possible sepsis. Blood cultures grow gram-positive cocci in pairs and chains that agglutinate with group B antiserum. The most likely epidemiologic risk factor for this infection involves bacterial colonization of which of the following?

   (A) Mother's vagina
   (B) Newborn's gastrointestinal tract
   (C) Newborn's nasopharynx
   (D) Placenta
   (E) Umbilical cord remnant

28. A 14-year-old boy is brought to the physician because of a 2-day history of a sore throat and fever that peaks in the late afternoon. He also has a 1-week history of progressive fatigue. He recently began having unprotected sexual intercourse with one partner. He appears ill. His temperature is 39°C (102.2°F). Physical examination shows cervical lymphadenopathy and pharyngeal erythema with a creamy exudate. Which of the following is the most likely diagnosis?

   (A) Candidiasis
   (B) Herpangina
   (C) Infectious mononucleosis
   (D) Mumps
   (E) Syphilis

29. A 50-year-old man comes to the physician because of a persistent cough for the past 2 months. He has had a 5-kg (11-lb) weight loss during this period. He is a poultry farmer. Current medications include atenolol, enalapril, hydrochlorothiazide, and omeprazole for hypertension and gastroesophageal reflux. Physical examination shows no other abnormalities. Laboratory studies show histoplasmosis infection. Itraconazole therapy is initiated and omeprazole is discontinued. Which of the following best describes the reason for removing omeprazole from this patient's medication regimen?

   (A) It decreases distribution volume of itraconazole
   (B) It decreases gastrointestinal absorption of itraconazole
   (C) It decreases partitioning from blood to lung of itraconazole
   (D) It enhances hepatic metabolism of itraconazole
   (E) It enhances protein binding of itraconazole
   (F) It enhances renal elimination of itraconazole

NBME00506

30.  A 25-year-old woman comes to the physician because of a 10-year history of frequent occurrences of fever blisters. Physical examination shows perioral vesicles. Microscopic examination of culture of scrapings from three vesicles shows herpes simplex virus 1. Which of the following patterns in the figure shown was most likely observed when the viral DNA from the cultures was examined by restriction enzyme analysis on polyacrylamide gels?



31.  An investigator is studying the effect of parathyroid hormone (PTH) in experimental animals. During an 8-hour period, Animal X is infused with PTH and Animal Y is infused with 5% dextrose in water. Which of the following sets of findings best describes the most likely serum concentrations in Animal X compared with Animal Y at the end of the infusion?

|     | Calcium | Phosphorus | 1,25-Dihydroxyvitamin D |
|-----|---------|------------|-------------------------|
| (A) | Increased | increased | increased |
| (B) | Increased | increased | decreased |
| (C) | Increased | decreased | increased |
| (D) | Increased | decreased | decreased |
| (E) | Decreased | increased | increased |
| (F) | Decreased | increased | decreased |
| (G) | Decreased | decreased | increased |
| (H) | Decreased | decreased | decreased |

32.  A study of a new antihypertensive drug is being conducted in experimental animals. It is found that one of its pharmacologic effects is a decrease in plasma renin activity and serum angiotensin II concentration. A possible mechanism of action that would produce this effect is blockade of which of the following?

(A)  $\alpha_1$-Adrenoreceptor
(B)  $\beta_1$-Adrenoreceptor
(C)  Angiotensin-converting enzyme
(D)  Angiotensin II AT$_1$ receptor
(E)  Renal tubular Cl$^-$ reabsorption
(F)  Renal tubular Na$^+$ reabsorption

NBME00507

Appx1575

33. A 19-year-old man is brought to the emergency department because of a 12-hour history of severe headache and double vision. He underwent extraction of all four third molars 1 week ago. Ophthalmologic examination shows exophthalmos on the right and weakness with abduction of the right eye. Further studies confirm the diagnosis of cavernous sinus thrombosis. Which of the following is the most likely cause of the diplopia in this patient?

   (A) Compression of the oculomotor nerve
   (B) Compression of the trochlear nerve
   (C) Compression of the ophthalmic division of the trigeminal nerve
   (D) Compression of the abducens nerve
   (E) Infection of the inferior oblique muscle
   (F) Infection of the inferior rectus muscle
   (G) Infection of the lateral rectus muscle
   (H) Infection of the medial rectus muscle
   (I) Infection of the superior oblique muscle
   (J) Infection of the superior rectus muscle

34. A 44-year-old man is brought to the emergency department because of a 2-day history of severe headache and blurred vision. His blood pressure is 185/95 mm Hg. Physical examination shows no other abnormalities. His plasma renin activity is 210 µU/mL (N=5–97). Losartan therapy is initiated. Which of the following sets of findings is most likely in this patient after 28 days of treatment?

|  | Total Peripheral Resistance | Sodium Excretion | Plasma Aldosterone |
|---|---|---|---|
| (A) | Increased | increased | increased |
| (B) | Increased | increased | decreased |
| (C) | Increased | decreased | increased |
| (D) | Decreased | increased | decreased |
| (E) | Decreased | decreased | increased |
| (F) | Decreased | decreased | decreased |

35. A 31-year-old woman comes to the physician because of a 2-week history of malaise, nausea, vomiting, and decreased appetite. She is a known user of intravenous heroin. She appears chronically ill. She is 165 cm (5 ft 5 in) tall and weighs 47 kg (103 lb); BMI is 17 kg/m$^2$. Her temperature is 36.7°C (98.1°F), pulse is 90/min, respirations are 18/min, and blood pressure is 114/68 mm Hg. Physical examination shows scleral icterus and a liver span of 16 cm. The spleen is not palpable. Serum studies show:

| Total bilirubin | 3.2 mg/dL |
|---|---|
| AST | 774 U/L |
| ALT | 820 U/L |
| HIV antibody | negative |
| Hepatitis B surface antigen | negative |
| Hepatitis B surface antibody | positive |
| Anti-hepatitis B core antibody | positive |
| Hepatitis B DNA | negative |
| Anti-hepatitis C virus | positive |
| Hepatitis C RNA | positive |

Which of the following is the most likely outcome of this patient's infection?

   (A) Complete resolution of infection
   (B) Latent infection with intermittent viremia
   (C) Lifelong persistent infection
   (D) Patient death from acute infection

NBME00508

36. A 62-year-old woman comes to the physician because of low back pain for 1 week. Menopause occurred 10 years ago. Physical examination shows localized tenderness over the lumbar spine after movement. X-rays of the spine show a compression fracture of L1-2. A DEXA scan shows decreased bone mineral density. Serum calcium and phosphorus concentrations and serum alkaline phosphatase activity are within the reference ranges. A bisphosphonate drug is prescribed. The expected beneficial effect of this drug is most likely due to which of the following actions?

    (A) Decreased insulin-like growth factor-1 concentration
    (B) Decreased osteoclast activity
    (C) Decreased osteoprotegerin production
    (D) Increased 1,25-dihydroxycholecalciferol concentration
    (E) Increased osteoblast activity
    (F) Increased receptor activator of NF-κB ligand (RANKL) production

37. A 22-year-old woman contacts a medical student and asks if he would like to join her for dinner. The student met the woman when he was assigned to her care during her 2-week hospitalization for treatment of major depressive disorder. He has not treated or seen the patient since she was discharged from the hospital. He is attracted to this former patient and would be interested in dating her. Which of the following is the most appropriate action by the medical student regarding this patient's invitation?

    (A) He can date her because he was a medical student, not a physician, when he contributed to her care
    (B) He can date her because she is no longer his patient
    (C) He can date her, but only after at least 1 year has passed since he treated her
    (D) He cannot date her because she was once his psychiatric patient
    (E) He cannot date her unless she agrees never to seek care at his hospital in the future

38. A 26-year-old woman is brought to the emergency department 3 hours after ingesting approximately 50 tablets of aspirin in a suicide attempt. She is nauseated, confused, and sleepy. Her pulse is 130/min, respirations are 30/min, and blood pressure is 100/60 mm Hg. Which of the following sets of laboratory values is most likely on evaluation of blood obtained before treatment?

|  | Serum HCO$_3^-$ | Arterial Blood pH | PCO$_2$ |
|---|---|---|---|
| (A) | ↑ | ↓ | ↑ |
| (B) | ↓ | ↓ | ↓ |
| (C) | ↑ | ↑ | ↓ |
| (D) | ↓ | ↓ | ↑ |
| (E) | ↑ | ↑ | ↑ |

39. A 32-year-old woman with rheumatoid arthritis comes to the physician for a follow-up examination. Six months ago, she began treatment with a drug that blocks tumor necrosis factor. She says that initially her symptoms improved, but her joint pain has increased during the past 3 weeks. Physical examination shows swollen, tender, stiff joints in the hands and knees. Which of the following is the most likely cause of the loss of drug efficacy in this patient?

    (A) Decreased B-lymphocyte sensitivity to the drug
    (B) Decreased T-lymphocyte sensitivity to the drug
    (C) Development of antibodies to the drug
    (D) Impaired absorption of the drug from the gastrointestinal tract
    (E) Increased elimination of the drug from the body

NBME00509

Appx1577



40.     An otherwise healthy 45-year-old man comes to the physician because of a 3-week history of progressive epigastric heartburn and a 4.5-kg (10-lb) weight loss. The pain tends to be more severe at night and occurs 1 to 3 hours after meals during the day. He has had similar episodes with lesser intensity during the past year. Abdominal examination shows tenderness to deep palpation. Test of the stool for occult blood is positive. Endoscopy shows a bleeding 3-cm ulcer in the antrum of the stomach. A photomicrograph of Steiner silver-stained tissue (400x) from a biopsy of the gastric mucosa adjacent to the ulcer is shown. Which of the following processes is most likely to be involved?

   (A)  Elaboration of proteases and urease with local tissue destruction
   (B)  Hyperacidity and gastric ulcer development
   (C)  Ingestion of preformed toxins in contaminated well water
   (D)  Spirochete invasion of gastric cells

19

USMLE STEP 1 SAMPLE TEST QUESTIONS

BLOCK 2, ITEMS 41-80

41.    A new blood test to detect prostate cancer is evaluated in 300 male volunteers. A needle biopsy of the prostate gland is done on all men with serum prostate-specific antigen concentrations greater than 5 ng/mL (N<4). One hundred men undergo biopsy procedures; 90 are found to have prostate cancer, and five are found to have chronic prostatitis. Which of the following is necessary to calculate the sensitivity of this test?

   (A)   Incidence of chronic prostatitis in the general population
   (B)   Number of men with test results greater than 5 ng/mL and a normal biopsy specimen
   (C)   Prevalence of chronic prostatitis in the general population
   (D)   Prostate biopsies of men with test results equal to or below 5 ng/mL

---



42.    A 64-year-old man comes to the physician because of swelling in his feet for the past 2 years. He says that his skin is dry and itchy and his feet "feel heavy." One of his legs is shown. Which of the following is the most likely cause of his condition?

   (A)   Arteriolar constriction and arteriolar hypertension
   (B)   Arteriolar dilation and venous hypertension
   (C)   Venous constriction and arteriolar constriction
   (D)   Venous hypertension and incompetent valves
   (E)   Venous hypertension and venous constriction

NBME00511

**Appx1579**

43. A 32-year-old woman with HIV infection is brought to the emergency department 15 minutes after she had a generalized tonic-clonic seizure. She has a 1-day history of right-sided weakness. Her temperature is 38.5°C (101.3°F). Muscle strength is 4/5 in the right upper extremities and 4/5 in the right lower extremity. Laboratory studies show a positive anti-*Toxoplasma* IgG and positive anti-cytomegalovirus IgG. Her CD4+ T-lymphocyte count is 32/mm$^3$ (N≥500), and plasma HIV viral load is 84,000 copies/mL. A gadolinium-enhanced MRI of the brain shows multiple ring-enhancing lesions. Infection with which of the following agents is the most likely cause of the findings in this patient?

   (A) *Cryptococcus neoformans*
   (B) Cytomegalovirus
   (C) Epstein-Barr virus
   (D) *Neisseria meningitidis*
   (E) *Streptococcus pneumoniae*
   (F) *Toxoplasma gondii*


44. A previously healthy 27-year-old man is brought to the emergency department 30 minutes after sustaining stab wounds to the right side of his neck and arm. He has lost approximately 1000 mL of blood. His pulse is 110/min, respirations are 22/min, and blood pressure is 95/65 mm Hg. Physical examination shows lacerations of the right side of the neck and right upper extremity. Which of the following responses by the kidneys is most likely?

   (A) Acute tubular necrosis
   (B) Osmotic diuresis
   (C) Sodium wasting
   (D) Vasoconstriction
   (E) Water conservation


45. A 57-year-old man receives radiation therapy for a squamous cell carcinoma of the lung. Despite therapy, the tumor progressively increases in size, and he dies 6 months later. His tumor cells contain a point mutation in the p53 gene (*TP53*), leading to an inactive gene product. Based on this finding, the progressive tumor growth despite irradiation therapy is most likely to be related to a defect in cell cycle arrest in which of the following phases of the cell cycle?

   (A) $G_0$
   (B) $G_1$
   (C) $G_2$
   (D) M
   (E) S


46. A male stillborn is delivered at 32 weeks' gestation to a 30-year-old woman. The pregnancy was complicated by oligohydramnios. Examination of the stillborn shows the absence of a urethral opening. Which of the following additional findings is most likely in this stillborn?

   (A) Congenital diaphragmatic hernia
   (B) Intralobar sequestration
   (C) Pulmonary hypoplasia
   (D) Situs inversus
   (E) Tracheoesophageal fistula

NBME00512

Appx1580



47.   A 36-year-old man with profound intellectual disability is brought to the physician by staff at his facility because of increasing abdominal girth during the past 2 weeks. He is unable to speak, and no medical history is currently available. Physical examination shows a protuberant abdomen with a fluid wave and shifting dullness. There are no signs of trauma to the area. Laboratory studies show no abnormalities. A CT scan of the abdomen is shown. Fluid is present in which of the following areas as indicated by the arrow?

   (A)   Epiploic foramen
   (B)   Gastrosplenic ligament
   (C)   Hepatorenal pouch (of Morison)
   (D)   Omental bursa (lesser sac)
   (E)   Sulcus pericolicus

---

48.   A 59-year-old woman comes to the physician because of yellow skin for 5 days. Physical examination shows jaundice. There is mild epigastric tenderness on deep palpation. Serum studies show:

| | |
|---|---|
| Bilirubin, total | 9.6 mg/dL |
| Direct | 8.9 mg/dL |
| Alkaline phosphatase | 310 U/L |
| AST | 29 U/L |
| ALT | 31 U/L |

A CT scan of the abdomen shows a 3-cm mass at the head of the pancreas. Examination of material from the mass obtained by fine-needle aspiration shows numerous anaplastic cells. These cells most likely originated from which of the following components of the pancreas?

   (A)   Acinar epithelium
   (B)   Duct epithelium
   (C)   Interstitial adipose tissue
   (D)   Interstitial fibrous tissue
   (E)   Islet of Langerhans
   (F)   Vascular endothelium

NBME00513

49.    A full-term female newborn is examined shortly after birth. She appears to be small for gestational age, and she has excess skin on the nape of the neck and lymphedema of the hands and feet. Chromosomal analysis shows some cells with a normal 46,XY karyotype and some cells with a 45,X karyotype. Which of the following mechanisms best explains this cytogenetic abnormality?

(A)    Nondisjunction in mitosis
(B)    Reciprocal translocation
(C)    Robertsonian translocation
(D)    Skewed X-inactivation
(E)    Uniparental disomy

50.    A 49-year-old woman comes to the physician for a follow-up examination. She has a strong family history of coronary artery disease. Her blood pressure has ranged from 150/95 mm Hg to 130/85 mm Hg during the previous three visits within the past 2 months. Her blood pressure today is 140/90 mm Hg. Physical examination shows no other abnormalities. Laboratory studies show:

| | |
|---|---|
| Cholesterol, total | 290 mg/dL |
| HDL-cholesterol | 40 mg/dL |
| LDL-cholesterol | 190 mg/dL |
| Triglycerides | 350 mg/dL |

Treatment with atorvastatin and losartan is initiated. Which of the following serum findings is most likely to occur in this patient?

| | HDL-cholesterol | Triglycerides |
|---|---|---|
| (A) | Decreased | decreased |
| (B) | Decreased | increased |
| (C) | Increased | decreased |
| (D) | Increased | increased |
| (E) | No change | no change |

51.    A 12-year-old boy is brought to the physician by his father because of redness and swelling of his left foot for 24 hours. Three days ago, the boy scraped his foot while wading in a drainage ditch. Examination of the left foot shows a purulent abrasion with edema, erythema, and tenderness on the lateral side. Infection is most likely to next spread from the lateral side of the foot to the regional lymph nodes in which of the following areas?

(A)    Lateral surface of the thigh
(B)    Medial malleolus, posteriorly
(C)    Popliteal fossa
(D)    Sole of the foot
(E)    Superficial inguinal area

52.    A 6-day-old breast-fed boy is brought to the emergency department by his mother because of poor weight gain and irritability since delivery, and a 2-hour history of vomiting. Physical examination shows jaundice and hepatomegaly. A reducing substance test result of the urine is positive, and a glucose oxidase test result is negative. The concentration of which of the following metabolites in liver is most likely increased in this patient?

(A)    Fructose 1,6-bisphosphate
(B)    Galactose 1-phosphate
(C)    Glucose 1-phosphate
(D)    Glucose 6-phosphate

NBME00514

53. A randomized clinical trial is conducted to assess whether statin use decreases mortality due to myocardial infarction (MI). A total of 2000 participants are enrolled: 1000 participants receive treatment with statins, and 1000 participants receive placebo. Participants are followed for an average of 5 years. Results are shown:

|  |  | Fatal MI | | |
| --- | --- | --- | --- | --- |
|  |  | Yes | No | Total |
| **Treatment** | **Statins** | 15 | 985 | 1000 |
|  | **Placebo** | 25 | 975 | 1000 |
|  | **Total** | 40 | 1960 | 2000 |

The investigators calculate that the cost of the drug is $1000 per patient per year. Based on these data, which of the following best represents the cost of the drug to prevent one death due to MI over the 5-year period?

(A) $1500
(B) $5000
(C) $15,000
(D) $50,000
(E) $150,000
(F) $500,000

54. A 68-year-old woman has the sudden onset of weakness in her right arm and leg. She can speak, but her words are not enunciated clearly. Neurologic examination 6 weeks later shows an extensor plantar reflex on the right. When she is asked to protrude her tongue, it deviates to the left, and the muscle in the left side of the tongue shows considerable atrophy. Which of the following labeled areas in the transverse sections of the brain stem is most likely damaged?



Left    E    Right

24

NBME00515

**Appx1583**

55. A placebo-controlled clinical trial is conducted to assess whether a new antihypertensive drug is more effective than standard therapy. A total of 5000 patients with essential hypertension are enrolled and randomly assigned to one of two groups: 2500 patients receive the new drug and 2500 patients receive placebo. If the alpha is set at 0.01 instead of 0.05, which of the following is the most likely result?

    (A) Significant findings can be reported with greater confidence
    (B) The study will have more power
    (C) There is a decreased likelihood of a Type II error
    (D) There is an increased likelihood of statistically significant findings
    (E) There is an increased likelihood of a Type I error

56. A 32-year-old woman and 31-year-old man come to the physician for preconceptional counseling. The man's brother recently started dialysis for polycystic kidney disease at age 42 years. Analysis of the man's urine shows 2+ blood and 10-20 RBC/hpf. Ultrasonography shows multiple cysts in both kidneys. Which of the following best represents the likelihood that this couple will have a child who will develop polycystic kidney disease?

    (A) 0%
    (B) 25%
    (C) 33%
    (D) 50%
    (E) 66%
    (F) 75%
    (G) 100%

57. An investigator is studying the effect of the number of hours watching television (Factor A) on the percent of hemoglobin $A_{1c}$ in people with type 2 diabetes mellitus. Two different variables, Factor A and hemoglobin $A_{1c}$, are compared. The results of the study indicate a correlation coefficient of +0.9. Which of the following graphs shown best corresponds to these results?



NBME00516

**Appx1584**

58. A 35-year-old man who works at a facility processing highly radioactive substances accidentally receives a high, whole-body dose of ionizing radiation estimated to be 1500 rads (15 gray). He dies 1 week later. At autopsy, histologic examination of the skin shows scattered, individual epidermal cells with shrunken, markedly eosinophilic cytoplasm and pyknotic, fragmented nuclei. These morphologic changes most likely indicate which of the following processes?

   (A) Apoptosis
   (B) Coagulation necrosis
   (C) Liquefaction necrosis
   (D) Mutagenesis
   (E) Tumor initiation

 

59. A 47-year-old woman comes to the emergency department because of a 2-week history of intermittent abdominal pain, nausea, and vomiting. She has had similar episodes sporadically during the past 4 years. Physical examination shows dehydration, jaundice, and upper abdominal distention. Laboratory studies show hyperbilirubinemia. A CT scan and upper gastrointestinal series of the abdomen with oral contrast are shown; the arrows indicate the abnormality. Which of the following is the most likely cause of these findings?

   (A) Annular pancreas
   (B) Cirrhosis of the liver
   (C) Duodenal constriction by the portal vein
   (D) Duodenal constriction by the superior mesenteric artery
   (E) Pyloric stenosis

NBME00517

**Appx1585**

60. A 6-year-old boy is brought to the physician by his parents because of a 3-day history of fever, headache, and cough productive of a green, foul-smelling discharge that also exits from his nose. He has had repeated episodes of similar symptoms during the past 4 years. He appears pale and lethargic. His height and weight are both below the 10th percentile. Coarse rhonchi are heard bilaterally. An x-ray of the chest shows scattered peripheral opacities, dilated and thickened airways consistent with bronchiectasis, and a cardiac apex that is directed toward the right. The most likely cause of his recurrent infections is a dysfunction of which of the following cell types?

   (A) Alveolar capillary endothelial cell
   (B) Alveolar macrophage
   (C) Chondrocyte
   (D) Ciliated columnar epithelial cell
   (E) Clara cell
   (F) Goblet cell
   (G) Kulchitsky cell
   (H) Squamous epithelial cell
   (I) Type I pneumocyte
   (J) Type II pneumocyte

61. A 4-year-old boy is brought to the physician because of slow growth during the past year. He has had recurrent urinary tract infections since the age of 1 year. He is at the 10th percentile for height and 25th percentile for weight. Physical examination shows pallor. Laboratory studies show a normochromic, normocytic anemia and increased serum concentrations of urea nitrogen and creatinine. Urinalysis shows a low specific gravity. Which of the following sets of additional serum findings is most likely in this patient?

| | Calcium | Inorganic Phosphorus | 1,25-Dihydroxycholecalciferol | Erythropoietin |
|---|---|---|---|---|
| (A) | ↑ | ↑ | ↑ | ↓ |
| (B) | ↑ | ↑ | ↓ | ↓ |
| (C) | ↑ | ↓ | ↓ | ↑ |
| (D) | ↓ | ↑ | ↑ | ↓ |
| (E) | ↓ | ↑ | ↓ | ↓ |
| (F) | ↓ | ↓ | ↑ | ↑ |

62. A 14-year-old boy is brought to the physician for a physical examination prior to participating in sports. He appears reluctant to remove his shirt for the examination, and says that he is embarrassed because he has grown breasts during the past year. He is at the 50th percentile for height and weight. Physical examination shows bilateral 1.5-cm fibroglandular masses located beneath the nipple-areolar complex and normal penis and testes. Pubic hair development is Tanner stage 3. Serum concentrations of gonadotropic hormones, estrogens, and testosterone are within the reference ranges. Which of the following is the most likely cause of this patient's breast enlargement?

   (A) Breast adenocarcinoma
   (B) Estradiol-secreting Leydig cell tumor
   (C) Peutz-Jeghers syndrome
   (D) Seminiferous tubule dysgenesis (Klinefelter syndrome)
   (E) Normal development

63. A 23-year-old woman with bone marrow failure is treated with a large dose of rabbit antithymocyte globulin. Ten days later, she develops fever, lymphadenopathy, arthralgias, and erythema on her hands and feet. Which of the following is the most likely cause of these symptoms?

   (A) Cytokine secretion by natural killer cells
   (B) Eosinophil degranulation
   (C) Immune complex deposition in tissues
   (D) Polyclonal T-lymphocyte activation
   (E) Widespread apoptosis of B lymphocytes

27

64. A 31-year-old woman with type 2 diabetes mellitus comes to the physician because of an oozing, foul-smelling wound on her foot for 2 days. Physical examination shows a 4-cm, necrotizing wound with a purplish black discoloration over the heel. Crepitant bullae producing profuse amounts of serous drainage are seen. A Gram stain of a tissue biopsy specimen shows gram-positive rods. The causal organism most likely produces which of the following virulence factors?

   (A) Endotoxin
   (B) Fimbriae
   (C) Pneumolysin
   (D) Polysaccharide capsule
   (E) α-Toxin

65. A 35-year-old man comes to the physician because of pain and swelling of his right arm where he scraped it on a tree branch 2 days ago. His temperature is 38.3°C (101°F). Examination of the right forearm shows edema around a fluctuant erythematous lesion at the site of trauma. The area is extremely tender to palpation. Which of the following is most likely the primary mechanism of the development of edema in this patient?

   (A) Degranulation of eosinophils
   (B) Disruption of vascular basement membranes
   (C) Increased hydrostatic pressure
   (D) Release of thromboxane
   (E) Separation of endothelial junctions

66. A 6-month-old male infant is admitted to the hospital for treatment of bacterial pneumonia. Examination shows absence of B lymphocytes and surface immunoglobulins; there are minimal CD3+ T lymphocytes. An x-ray of the chest shows absence of the thymic shadow and a right lower lobe infiltrate. Which of the following is the most likely diagnosis?

   (A) AIDS
   (B) Chronic granulomatous disease
   (C) DiGeorge syndrome
   (D) Severe combined immunodeficiency
   (E) X-linked agammaglobulinemia

67. A 64-year-old man with non-Hodgkin lymphoma comes to the physician because of a 3-week history of progressive numbness in his hands and feet and weakness in his legs when he stands. He received his third course of chemotherapy 4 weeks ago. Physical examination shows areflexia. Which of the following drugs is the most likely cause of these adverse effects?

   (A) Bleomycin
   (B) Cyclophosphamide
   (C) Cytarabine
   (D) Doxorubicin
   (E) Fluorouracil
   (F) Methotrexate
   (G) Vincristine

68. A 45-year-old man has abnormal circadian variation in body temperature, disruption of the sleep-wake cycle, and an impaired nocturnal surge of secretion of melatonin. An MRI of the brain is most likely to show a lesion involving which of the following nuclei?

   (A) Accessory optic
   (B) Lateral preoptic
   (C) Pretectal
   (D) Suprachiasmatic
   (E) Supraoptic

28

69. Six healthy subjects participate in a study of muscle metabolism during which hyperglycemia and hyperinsulinemia is induced. Muscle biopsy specimens obtained from the subjects during the resting state show significantly increased concentrations of malonyl-CoA. The increased malonyl-CoA concentration most likely directly inhibits which of the following processes in these subjects?

   (A) Fatty acid oxidation
   (B) Fatty acid synthesis
   (C) Gluconeogenesis
   (D) Glycogenolysis
   (E) Glycolysis
   (F) Oxidative phosphorylation

70. After being severely beaten and sustaining a gunshot wound to the abdomen, a 42-year-old woman undergoes resection of a perforated small bowel. During the operation, plastic reconstruction of facial fractures, and open reduction and internal fixation of the left femur are also done. Thirty-six hours postoperatively, she is awake but not completely alert. She is receiving intravenous morphine via a patient-controlled pump. She says that she needs the morphine to treat her pain, but she is worried that she is becoming addicted. She has no history of substance use disorder. She drinks one to two glasses of wine weekly. Which of the following initial actions by the physician is most appropriate?

   (A) Reassure the patient that her chance of becoming addicted to narcotics is minuscule
   (B) Maintain the morphine, but periodically administer intravenous naloxone
   (C) Switch the patient to oral acetaminophen as soon as she can take medication orally
   (D) Switch the patient to intramuscular lorazepam
   (E) Switch the patient to intravenous phenobarbital



71. A 42-year-old woman is brought to the emergency department because of double vision that began 20 minutes after she fell from her horse and landed on the left side of her face. Examination of the face shows ecchymoses over the left zygomatic arch. A CT scan of the head is shown. Which of the following arteries is at greatest risk for injury in this patient?

   (A) Facial
   (B) Frontal
   (C) Infraorbital
   (D) Lacrimal
   (E) Ophthalmic

29

NBME00520

Appx1588

72. A 17-year-old girl is brought to the physician by her mother because she has not had a menstrual period for 6 months. The patient is unconcerned about the lack of menses. Menarche occurred at the age of 12 years, and menses had occurred at regular 28-day intervals until they became irregular 1 year ago. She is a member of her high school gymnastics team. She appears emaciated. She is 163 cm (5 ft 4 in) tall and weighs 40 kg (88 lb); BMI is 15 kg/m$^2$. Her pulse is 54/min, and blood pressure is 80/50 mm Hg. Which of the following is the most likely cause of this patient's amenorrhea?

   (A) Hyperthyroidism
   (B) Hypogonadotropic hypogonadism
   (C) Hypothyroidism
   (D) Polycystic ovarian syndrome
   (E) Prolactinoma

73. A 26-year-old woman is brought to the emergency department because of an 8-hour history of severe back and abdominal pain and mild but persistent vaginal bleeding. Ultrasonography of the abdomen shows a 2-cm ectopic pregnancy in the ampulla. The ampulla has ruptured into the surrounding tissue. Fluid from this rupture will most likely be found in which of the following locations?

   (A) Lesser peritoneal cavity
   (B) Mesometrium
   (C) Pouch of Douglas
   (D) Uterine cavity
   (E) Vagina



74. A 30-year-old man is admitted to the hospital for evaluation. He has a 6-week history of colicky abdominal pain and diarrhea with occasional blood. Three days after admission, he suddenly develops peritonitis and sepsis. Despite appropriate care, he dies. At autopsy, examination shows a fibrinous exudate over the peritoneal and serosal surfaces, and a punctate opening is seen in the wall of a thickened loop of small intestine. Several lengths of the small and large intestines are also thickened and adherent to one another, with marked areas of narrowing. Photomicrographs of a section of the colon are shown. Which of the following is the most likely diagnosis?

   (A) Colon cancer
   (B) Crohn disease
   (C) Diverticulitis
   (D) Ischemic necrosis
   (E) Ulcerative colitis

30

NBME00521

75. A 55-year-old man who is a business executive is admitted to the hospital for evaluation of abdominal pain. He is polite to the physician but berates the nurses and other staff. The patient's wife and two of his three adult children arrive for a visit. The patient says with disgust that the missing child is and always has been worthless. Which of the following is the most likely explanation for this patient's behavior?

   (A) Countertransference
   (B) Projection
   (C) Projective identification
   (D) Reaction formation
   (E) Splitting

76. A patient being treated with clindamycin for aspiration pneumonia develops diarrhea. The stool contains a toxin that kills cultured epithelial cells. Stool culture grows an anaerobic gram-positive rod. The same organism is cultured from his bedpan. Which of the following is most likely to sterilize the bedpan?

   (A) Boiling for 45 minutes
   (B) Exposure to benzalkonium chloride for 1 hour
   (C) Exposure to ethyl alcohol for 1 hour
   (D) Exposure to saturated steam (121°C) for 15 minutes
   (E) Heating in an oven at 150°C for 30 minutes

77. A 2-year-old boy is brought to the physician for a well-child examination. He was delivered at term after an uncomplicated pregnancy. His birth weight was 3500 g (7 lb 11 oz), and Apgar scores were 8 and 10 at 1 and 5 minutes, respectively. At the age of 15 months, physical examination showed no abnormalities, but he was not yet talking. Both of his parents had learning difficulties in school, and his mother stopped attending after the 10th grade. He has a maternal uncle with cognitive disabilities. He is at the 25th percentile for height, 15th percentile for weight, and 90th percentile for head circumference. He appears irritable, he resists making eye contact, and he is flapping his hands. Which of the following is the most likely cause of this patient's condition?

   (A) Creation of an alternative splice site
   (B) Frameshift mutation
   (C) Missense mutation
   (D) Nonsense mutation
   (E) Trinucleotide repeat expansion

78. A 17-year-old boy is brought to the emergency department 30 minutes after being found with a "blank stare" and flat facial expression at a party. His pulse is 72/min, and blood pressure is 104/68 mm Hg. He is sitting upright and appears catatonic. Physical examination shows rigidity. During the examination, he becomes hostile and attempts to assault the physician. This patient most likely ingested which of the following drugs?

   (A) Cocaine
   (B) Diazepam
   (C) Methamphetamine
   (D) Oxycodone
   (E) PCP (phencyclidine)

NBME00522

79.  A 52-year-old man with a 15-year history of hypertension, type 1 diabetes mellitus, and hyperlipidemia comes to the physician because of a 2-month history of shortness of breath. He underwent coronary artery bypass grafting 5 years ago. His pulse is 90/min, respirations are 22/min, and blood pressure is 160/86 mm Hg. Jugular venous pressure is 20 cm $H_2O$. There are crackles bilaterally halfway up the chest. Cardiac examination shows a grade 2/6 holosystolic murmur and an $S_3$ gallop at the apex. Which of the following is most likely to be helpful in establishing the most appropriate treatment at this time?

(A)  Assessment of blood pressure readings over the past 2 years
(B)  Determination of hemoglobin $A_{1c}$
(C)  Evaluation of left ventricular ejection fraction
(D)  Measurement of fasting serum cholesterol concentration
(E)  Review of the operative report of the bypass surgery

80.  A previously healthy 40-year-old man is brought to the emergency department because of constant substernal chest pain for 12 hours that is exacerbated by coughing and inspiration. The pain is relieved with sitting up and leaning forward. There is no family history of heart disease. His temperature is 38°C (100.4°F), pulse is 120/min, and blood pressure is 110/60 mm Hg. The lungs are clear to auscultation. Cardiac examination shows distant heart sounds. An ECG shows diffuse ST-segment elevation in all leads. An x-ray of the chest shows normal findings. The most likely cause of his condition is injury to which of the following tissues?

(A)  Aortic intima
(B)  Esophageal sphincter
(C)  Myocardium
(D)  Pericardium
(E)  Pleura

32

NBME00523

USMLE STEP 1 SAMPLE TEST QUESTIONS

BLOCK 3, ITEMS 81-117

81.    A 20-year-old woman comes to the physician because of a 5-year history of heavy bleeding with menses that often requires her to change her sanitary pads three times hourly. Menses occur at regular 28-day intervals. She recently sustained a minor cut to her finger, and the bleeding took longer to stop than usual. She has not had easy bruising or change in weight. She only takes an oral contraceptive, but she has not been sexually active for the past 6 months. Her temperature is 37.5°C (99.5°F), pulse is 72/min, respirations are 12/min, and blood pressure is 120/66 mm Hg. Physical examination shows mildly pale conjunctivae. Pelvic examination shows no abnormalities. Laboratory studies show:

| | |
|---|---|
| Hemoglobin | 10.5 g/dL |
| Hematocrit | 31.3% |
| Mean corpuscular hemoglobin concentration | 28% Hb/cell |
| Mean corpuscular volume | 70 μm$^3$ |
| Leukocyte count | 5500/mm$^3$ |
| Platelet count | 275,000/mm$^3$ |
| Platelet aggregation studies | normal |
| Prothrombin time | 10.5 sec (INR=1.0) |
| Partial thromboplastin time | 28 sec |

A Pap smear shows no abnormalities. Which of the following hematologic disorders is the most likely cause of this patient's menorrhagia?

(A)    Afibrinoginemia
(B)    Hemophilia A
(C)    Intravascular coagulation
(D)    Vitamin K deficiency
(E)    von Willebrand disease

82.    A 40-year-old woman comes to the physician because of a 6-month history of increased facial hair growth. Her last menstrual period was 4 months ago. She is 165 cm (5 ft 5 in) tall and weighs 70 kg (154 lb); BMI is 26 kg/m$^2$. Her pulse is 80/min, and blood pressure is 130/82 mm Hg. Physical examination shows temporal balding and coarse dark hair on the upper lip and chin. Pelvic examination shows clitoral enlargement. Her serum testosterone concentration is increased. Serum concentrations of androstenedione, dehydroepiandrosterone, and urinary 17-ketosteroids are within the reference ranges. Ultrasonography of the pelvis shows a 12-cm ovarian mass. Which of the following best describes this mass?

(A)    Granulosa tumor
(B)    Ovarian carcinoid
(C)    Sertoli-Leydig tumor
(D)    Teratoma
(E)    Thecoma

NBME00524



83.   A 35-year-old man who recently immigrated to the USA from Mexico comes to the physician because of a 6-month history of lesions on his face and chest. He has a history of asthma and atopic dermatitis. Physical examination shows the findings in the photograph. Which of the following cytokines is most likely to be increased in these lesions?

   (A)   Interferon gamma
   (B)   Interleukin-4 (IL-4)
   (C)   IL-12
   (D)   Transforming growth factor (TGF)-α
   (E)   TGF-β

84.   A 45-year-old woman with systemic sclerosis (scleroderma) comes to the physician because of a 3-week history of progressive shortness of breath and nonproductive cough. Her temperature is 36.9°C (98.4°F), pulse is 82/min, respirations are 20/min, and blood pressure is 136/85 mm Hg. Crackles are heard in both lower lung fields. Pulmonary function tests show total lung capacity is 80% of predicted, and diffusing capacity for carbon monoxide, corrected for alveolar volume, is 65% of predicted. Histologic examination of a lung biopsy specimen is most likely to show which of the following findings?

   (A)   Diffuse interstitial fibrosis
   (B)   Intra-alveolar exudates
   (C)   Multiple thromboemboli
   (D)   Necrotizing vasculitis
   (E)   Non-necrotizing interstitial granulomas

85.   A 52-year-old man comes to the emergency department because he has had vomiting, nausea, and abdominal pain for the past 12 hours. He says he attempted suicide 3 days ago by "taking everything in the medicine cabinet." He was stuporous for approximately 12 hours after the overdose but felt better the following day. At this time, he has jaundice and pain in the right upper quadrant. Which of the following drugs is most likely to have caused the pain, vomiting, and jaundice?

   (A)   Acetaminophen
   (B)   Aspirin
   (C)   Cimetidine
   (D)   Diphenhydramine
   (E)   Triazolam

86.   In a cohort study of elderly women, the relative risk ratio for hip fractures among those who exercise regularly is 1.2 (95% confidence interval of 1.1 to 1.8). Which of the following is the most appropriate conclusion about the effect of regular exercise on the risk for hip fracture?

   (A)   Statistically nonsignificant increase in risk
   (B)   Statistically nonsignificant overall decrease in risk
   (C)   Statistically significant overall decrease in risk
   (D)   Statistically significant overall increase in risk

NBME00525

Appx1593

87.     A study is designed to evaluate the feasibility of acupuncture in children with chronic headaches. Sixty children with chronic headaches are recruited for the study. In addition to their usual therapy, all children are treated with acupuncture three times a week for 2 months. Which of the following best describes this study design?

   (A) Case-control
   (B) Case series
   (C) Crossover
   (D) Cross-sectional
   (E) Historical cohort
   (F) Randomized clinical trial

88.     A 52-year-old woman is admitted to the hospital because of breast cancer metastatic to the liver. Her prognosis is poor. She begs her husband to stay with her at the hospital because she is afraid to be left alone. Which of the following defense mechanisms best explains her behavior?

   (A) Denial
   (B) Displacement
   (C) Regression
   (D) Repression
   (E) Sublimation

89.     A 42-year-old man comes to the physician for a follow-up examination 1 week after he passed a renal calculus. X-ray crystallographic analysis of the calculus showed calcium as the primary cation. Physical examination today shows no abnormalities. A 24-hour collection of urine shows increased calcium excretion. Which of the following is the most appropriate pharmacotherapy?

   (A) Carbonic anhydrase inhibitor
   (B) $Na^+$–$Cl^-$ symport inhibitor
   (C) $Na^+$–$K^+$–2$Cl^-$ symport inhibitor
   (D) Osmotic diuretic
   (E) Renal epithelial sodium channel inhibitor

NBME00526

**Appx1594**

90.  A 67-year-old woman is brought to the emergency department 30 minutes after she had a generalized tonic-clonic seizure. Her family says that she seemed mildly confused before her eyes rolled backward and she had the onset of uncontrollable jerking movements of her arms and legs and loss of consciousness. During the seizure, she passed urine and bit her tongue. At the scene, her vital signs were within normal limits. She has a 6-month history of a 7-kg (15-lb) weight loss despite no changes in appetite. She received the diagnosis of small cell carcinoma of the lung last week and has not begun treatment. She has hypertension well controlled with lisinopril. On arrival, she is awake but does not respond to verbal stimuli. She is not in distress. Her temperature is 37°C (98.6°F), pulse is 70/min, and blood pressure is 130/88 mm Hg while supine. Examination shows no abnormalities. Laboratory studies show:

| | |
|---|---|
| Serum | |
| $Na^+$ | 115 mEq/L |
| $K^+$ | 4 mEq/L |
| $Cl^-$ | 81 mEq/L |
| $HCO_3^-$ | 25 mEq/L |
| Urea nitrogen | 9 mg/dL |
| Glucose | 102 mg/dL |
| Creatinine | 0.6 mg/dL |
| Urine | |
| Sodium | 60 mEq/L |
| Potassium | 20 mEq/L |
| Osmolality | 900 mOsmol/kg $H_2O$ |

Which of the following is the most likely diagnosis?

(A)  Adrenal insufficiency
(B)  Diuretic abuse
(C)  Heart failure
(D)  Syndrome of inappropriate secretion of ADH (vasopressin)
(E)  Water intoxication

---

91.  A 15-year-old girl comes to the physician because of a 3-month history of acne. Breast and pubic hair development began at the age of 12 years. Menarche occurred at the age of 14 years. Physical examination shows scattered open and closed comedones over the cheeks and forehead. Breast and pubic hair development are Tanner stage 5. Which of the following is the most likely underlying cause of this patient's acne?

(A)  Decreased parasympathetic stimulation to the sebaceous glands
(B)  Increased estrogen stimulation of the sebaceous glands
(C)  Increased responsiveness of the sebaceous glands to follicle-stimulating hormone
(D)  Increased sympathetic stimulation to the sebaceous glands
(E)  Stimulation of the sebaceous glands by androgens

92.  A 20-year-old man with a history of intermittent asthma comes to the physician because of a 1-week history of chest tightness, wheezing, malaise, and a cough productive of clear sputum. He does not appear to be in distress. His pulse is 72/min, respirations are 14/min, and blood pressure is 120/70 mm Hg. Physical examination shows clear tympanic membranes and no exudates in the oral pharynx. Diffuse expiratory wheezes are heard on auscultation. When asked to take a deep breath, the patient coughs with forced expiration. Which of the following substances is most appropriate to treat this patient's cough at this time?

(A)  Albuterol
(B)  Dextromethorphan
(C)  Guaifenesin
(D)  Pseudoephedrine
(E)  Theophylline

NBME00527

93.  A 62-year-old man comes to the physician for a follow-up examination after he was diagnosed with chronic inflammatory interstitial pneumonitis. Following pulmonary function testing, a biopsy specimen of the affected area of the lungs is obtained. Compared with a healthy man, analysis of this patient's biopsy specimen is most likely to show which of the following patterns of changes in the cell populations of alveoli?

| | Type I Pneumocytes | Type II Pneumocytes | Fibroblasts |
|---|---|---|---|
| (A) | ↑ | ↑ | ↑ |
| (B) | ↑ | ↑ | ↓ |
| (C) | ↑ | ↓ | ↑ |
| (D) | ↑ | ↓ | ↓ |
| (E) | ↓ | ↑ | ↑ |
| (F) | ↓ | ↑ | ↓ |
| (G) | ↓ | ↓ | ↑ |
| (H) | ↓ | ↓ | ↓ |

94.  A 14-year-old girl has had nausea, intermittent diarrhea, and a 2.2-kg (5-lb) weight loss over the past 4 weeks. Examination shows a migrating serpiginous pruritic perianal rash. Her leukocyte count is 8000/mm$^3$ with 20% eosinophils. Which of the following tests is most likely to yield an accurate diagnosis?

(A)  Blood smear
(B)  Bone marrow biopsy
(C)  KOH preparation
(D)  Microscopic examination of the stool
(E)  Skin snip

95.  A 73-year-old woman comes to the physician because of a 2-month history of diffuse weakness and tingling of her arms and legs. Neurologic examination shows weakness of the extensor and flexor muscles of the lower extremities. Knee and ankle deep tendon reflexes are exaggerated. Sensation to vibration and position is decreased in all extremities, but the decrease is more prominent in the lower extremities than in the upper extremities. This patient most likely has a deficiency of which of the following vitamins?

(A)  Niacin
(B)  Vitamin B$_1$ (thiamine)
(C)  Vitamin B$_2$ (riboflavin)
(D)  Vitamin B$_6$ (pyridoxine)
(E)  Vitamin B$_{12}$ (cyanocobalamin)

96.  A 60-year-old woman develops fever and chills 1 week after completing cytotoxic induction chemotherapy for acute myelogenous leukemia. Her temperature is 39°C (102.2°F). Her leukocyte count is 100/mm$^3$ (25% neutrophils and 75% lymphocytes). Physical examination and an x-ray of the chest show no abnormalities. This patient's profound granulocytopenia is most likely to predispose her to infection with which of the following organisms?

(A)  Bacteria
(B)  Dimorphic fungi
(C)  Nontuberculous mycobacteria
(D)  Protozoa
(E)  Viruses

NBME00528

97.  A 42-year-old woman comes to the physician because of anxiety, tremor, and a 5-kg (11-lb) weight loss over the past 4 months despite good appetite. Physical examination shows fine thin hair, exophthalmos, goiter, and warm moist skin. Cardiac examination shows tachycardia and a widened pulse pressure. Which of the following sets of laboratory values is most likely in this patient's serum?

|  | Thyroid-stimulating Hormone | Total Thyroxine ($T_4$) | Free Thyroxine | Thyroid-binding Globulin |
|---|---|---|---|---|
| (A) | ↑ | ↑ | ↑ | ↑ |
| (B) | ↑ | ↑ | normal | ↓ |
| (C) | ↑ | normal | ↑ | ↓ |
| (D) | ↓ | ↑ | ↑ | normal |
| (E) | ↓ | normal | normal | ↑ |
| (F) | ↓ | normal | normal | normal |

98.  A 42-year-old man comes to the physician for a follow-up examination. Four months ago, he underwent repair of a Dupuytren contracture. Physical examination shows decreased range of motion in the affected hand. The patient is upset that his hand has not fully healed, and he files a malpractice suit against the physician. Which of the following is the most likely precipitating factor in this patient's decision to file a malpractice suit?

(A) The patient's perception that the physician is incompetent
(B) The patient's perception that the physician is uncaring
(C) The patient's socioeconomic status
(D) The physician's amount of experience in the medical field
(E) The physician's inability to screen out problem patients

99.  An investigator is studying the incidence of the common cold among medical students at various time points during the school year. Results show an increased incidence of upper respiratory tract infections among these students during finals week. It is hypothesized that the stress of studying for examinations adversely affects the immune system, making the students more susceptible to infection. Which of the following laboratory findings in these students during examination week is most likely to support this hypothesis?

(A) Decreased AM serum cortisol concentration
(B) Decreased macrophage activity
(C) Increased basophil count
(D) Increased lymphocyte count
(E) Increased natural killer cell activity

NBME00529

100.    A 28-year-old man comes to the physician because of a 1-year history of pain with urination that has increased in severity during the past month. He also has had episodes of blood in his urine during the past 5 years. He lived in sub-Saharan Africa until he came to the USA 6 months ago for graduate school. His temperature is 38°C (100.4°F), pulse is 80/min, respirations are 16/min, and blood pressure is 110/84 mm Hg. Physical examination shows suprapubic tenderness. Laboratory studies show:

| | |
|---|---|
| Hemoglobin | 12.3 g/dL |
| Hematocrit | 37% |
| Leukocyte count | 13,400/mm$^3$ |
| Segmented neutrophils | 65% |
| Bands | 5% |
| Eosinophils | 5% |
| Lymphocytes | 22% |
| Monocytes | 3% |
| Serum | |
| Urea nitrogen | 75 mg/dL |
| Creatinine | 3.8 mg/dL |
| Urine | |
| Blood | 3+ |
| RBC | 200/hpf |
| WBC | 100/hpf |
| RBC casts | absent |
| WBC casts | absent |

Imaging studies show bilateral hydroureter and hydronephrosis and foci of calcification in the region of the bladder. A biopsy specimen of the bladder shows marked chronic inflammation with fibrosis and scattered granulomas. Which of the following best explains the biopsy findings?

(A)  Exposure to a chemical toxin
(B)  Interstitial cystitis
(C)  Malacoplakia
(D)  Schistosomiasis
(E)  Vesicoureteral reflux

101.    A 2-day-old male newborn delivered at term develops mild jaundice and scleral icterus. Pregnancy and delivery were uncomplicated. His vital signs are within normal limits. Physical examination shows no other abnormalities. This patient most likely has an excess amount of which of the following in his blood?

(A)  Biliverdin
(B)  Direct bilirubin
(C)  Indirect bilirubin
(D)  Stercobilin
(E)  Urobilin
(F)  Urobilinogen

102.    A 29-year-old man is brought to the physician for removal of a cast from his left leg. He sustained a fracture of the left lower extremity 6 weeks ago and was immobilized in a cast that extended from just below the knee to the foot. At the time of injury, there was severe pain but normal strength in the extremity. When the cast is removed today, physical examination shows a pronounced left footdrop with paresthesia and sensory loss over the dorsum of the left foot and lateral leg. Injury to which of the following nerves is the most likely cause of this patient's condition?

(A)  Common fibular (peroneal)
(B)  Femoral
(C)  Obturator
(D)  Sciatic
(E)  Tibial

NBME00530

**Appx1598**

103. A 16-year-old boy is admitted to the emergency department because of a knife wound to the left side of his chest. An x-ray of the chest shows an air-fluid level in the left side of the chest, partial collapse of the left lung, and elevation of the stomach bubble. The mediastinum is in the midline. Which of the following is the most likely diagnosis?

   (A) Hemopneumothorax, not under tension
   (B) Hemothorax, not under tension
   (C) Pneumothorax, not under tension
   (D) Tension hemopneumothorax
   (E) Tension hemothorax
   (F) Tension pneumothorax

104. A 56-year-old man comes to the emergency department because of a 4-day history of colicky right flank pain that radiates to the groin and hematuria. Ultrasound examination of the kidneys shows right-sided hydronephrosis and a dilated ureter. Which of the following is most likely to be found on urinalysis?

   (A) Erythrocyte casts
   (B) Glucose
   (C) Leukocyte casts
   (D) Oval fat bodies
   (E) Uric acid crystals

105. A 17-year-old girl has never had a menstrual period. Physical examination shows a normal female body habitus, normal breast development, and normal appearing external genitalia. She has no axillary or pubic hair. The patient refuses to have a pelvic or rectal examination. Which of the following is the most likely explanation for the clinical presentation?

   (A) Androgen insensitivity
   (B) Congenital adrenal hyperplasia
   (C) Ectodermal dysplasia
   (D) A psychiatric disorder
   (E) A sex chromosome mosaicism

106. A 52-year-old man with recently diagnosed type 2 diabetes mellitus comes to the physician for a follow-up examination. Physical examination shows no abnormalities. Laboratory studies show an increased hemoglobin $A_{1c}$ despite patient compliance with diet and exercise recommendations. Treatment with a sulfonylurea is started. Which of the following is most likely to occur in this patient?

   (A) Decreased entry of glucose into the muscle cells
   (B) Decreased production of glucose from the liver
   (C) Decreased secretion of insulin from the pancreas
   (D) Decreased speed of carbohydrate absorption from the intestines
   (E) Increased entry of glucose into the muscle cells
   (F) Increased production of glucose from the liver
   (G) Increased secretion of insulin from the pancreas
   (H) Increased speed of carbohydrate absorption from the intestines

NBME00531



107. A 2-year-old boy is brought to the emergency department because of shortness of breath and left-sided abdominal pain for 3 hours. He appears pale. Physical examination shows hypotension and tachycardia. There is splenomegaly with the spleen tip palpated 8 cm below the left costal margin. Laboratory studies show:

| | |
|---|---|
| Hemoglobin | 5.1 g/dL (N=12.1–14.9) |
| Hematocrit | 16% (N=37%–44.4%) |
| Leukocyte count | 4500/mm³ (N=4000–11,500) |
| Platelet count | 87,000/mm³ (N=150,000–400,000) |

A photomicrograph of a Wright-stained peripheral blood smear is shown. Which of the following is the most likely cause of this patient's current condition?

(A) Aplastic crisis
(B) Autoimmune hemolysis
(C) Congestive heart failure
(D) Salmonellal sepsis
(E) Splenic sequestration

---

108. A 42-year-old woman comes to the physician for a routine examination. She says that she has felt well except for occasional episodes of constipation, abdominal discomfort, and mild fatigue. She was treated for a renal calculus 10 years ago and was told she had a "lazy gallbladder." Her pulse is 82/min, and blood pressure is 150/80 mm Hg. Physical examination shows no other abnormalities. Laboratory studies show:

| | |
|---|---|
| Erythrocyte count | 3 million/mm³ |
| Serum | |
| K⁺ | 4.5 mEq/L |
| Cl⁻ | 107 mEq/L |
| Ca²⁺ | 12 mg/dL |
| Phosphorus | 2.2 mg/dL |
| Alkaline phosphatase | 95 U/L |

The most likely cause of this patient's condition is a small, well-defined nodule in which of the following locations?

(A) Adrenal gland
(B) Anterior pituitary gland
(C) Gallbladder
(D) Kidney
(E) Parathyroid gland
(F) Thymus

NBME00532

**Appx1600**

109. A 24-year-old woman comes to the physician for a follow-up examination. One week ago, she was treated in the emergency department after she accidentally spilled hot grease on her left leg while working at a fast-food restaurant. Examination of the left lower extremity shows a 7-cm, pink, soft, granular, edematous wound. The formation of this tissue was most likely caused by increased activity of which of the following?

   (A) Complement C3b
   (B) Glycosylation-dependent cell adhesion molecule-1
   (C) P-selectin
   (D) Stromelysin
   (E) Vascular endothelial growth factor

110. A 37-year-old woman with right lower extremity edema is evaluated because of the sudden onset of shortness of breath and pleuritic chest pain. A diagnosis of pulmonary embolism is made. Which of the following signs, if present on physical examination, would be the most specific indicator of pulmonary arterial hypertension in this patient?

   (A) Increased jugular venous pressure
   (B) $P_2$ louder than $A_2$
   (C) Peripheral edema
   (D) Presence of an $S_3$
   (E) Pulmonary crackles

111. Vascular control is studied in an intact hind extremity of an anesthetized experimental animal. After a normal control period, the blood flow to the extremity is completely occluded for 1 minute. When the occlusion is released, blood flow increases abruptly and exceeds the control value for several minutes (reactive hyperemia). After an appropriate recovery period, the procedure is repeated and the extremity is actively exercised during the occlusion period. Which of the following best describes the reactive hyperemia after the second occlusion compared with that after the first occlusion?

   (A) Abolished
   (B) Decreased but not abolished
   (C) Increased
   (D) Unchanged

112. A 72-year-old man collapses while playing golf. He has a 5-year history of angina and type 2 diabetes mellitus. Paramedics arrive in 10 minutes. Examination shows no respirations or blood pressure; an ECG shows asystole. Cardiopulmonary resuscitation is attempted for 10 minutes without success. Which of the following is the most likely cause of death in this patient?

   (A) Cardiac tamponade
   (B) Embolus to the right middle cerebral artery
   (C) Necrosis of the myocardium
   (D) Rupture of the papillary muscle
   (E) Ventricular fibrillation

113. A previously healthy 3-month-old boy is brought to the physician because of a runny nose and a dry cough for 2 days. Physical examination shows tachypnea, a nasal discharge, and wheezing. An x-ray of the chest shows hyperexpansion but no infiltrates. The causal virus was most likely transmitted by which of the following routes?

   (A) Blood transfusion
   (B) Ingestion of contaminated formula
   (C) Inoculation onto mucous membranes
   (D) Insect bite
   (E) Transplacental transfer

NBME00533

Appx1601

114. An 18-year-old man is brought to the emergency department 30 minutes after sustaining a closed head injury in a motor vehicle collision. Twenty-four hours later, he is noted to be excreting large amounts of urine with an osmolality of 100 mOsmol/kg. His serum sodium concentration is 154 mEq/L. Which of the following portions of the kidney is the most likely site of the excessive loss of fluid in this patient?

    (A) Afferent arterioles
    (B) Collecting duct
    (C) Efferent arterioles
    (D) Glomeruli
    (E) Proximal convoluted tubule

115. A 46-year-old woman receives a non–T-lymphocyte-depleted, allogeneic bone marrow transplant from a matched, unrelated donor. Immunosuppressive therapy with cyclosporine is started. One month later, she has fever. Cytolytic destruction of the skin, gastrointestinal tract, and liver is seen, with associated dermatitis, enteritis, and hepatitis. Which of the following best explains these findings?

    (A) C3b deposition
    (B) Cytomegalovirus infection
    (C) Graft-versus-host disease
    (D) Tolerance induction
    (E) Type I (immediate) hypersensitivity

116. A 33-year-old woman comes to the physician because of a 2-day history of mild nausea, increased urinary urgency and frequency, and constipation. She also has had a 4.5-kg (10-lb) weight loss during the past 2 weeks and a 3-week history of vaginal bleeding. Pelvic examination shows a nodular cervix with an irregular, friable posterior lip, and a rock-hard, irregular, immobile pelvic mass that extends across the pelvis. Examination of biopsy specimens from the cervix and anterior wall of the vagina show well-differentiated keratinizing squamous cell carcinoma. Which of the following best describes the pathogenesis of this patient's disease?

    (A) Inactivation of cellular p53
    (B) Insertion of viral promotors adjacent to cellular growth factor genes
    (C) Specialized transduction
    (D) Transactivation of cellular growth factor genes by *TAX*
    (E) Translocation of *CMYC* to an Ig gene promoter

117. A 5-year-old girl is brought to the physician by her father because of a 6-week history of an increasingly severe itchy rash confined to the crease of the elbows and the back of the knees. She has had intermittent episodes of a similar rash since infancy. Examination of the rash shows erythematous papules and vesicles overlying an erythematous base. Dermal scrapings are negative for fungi and ectoparasites. After a short course of a potent topical corticosteroid, treatment with pimecrolimus cream is begun. Which of the following is the primary mechanism of action of this drug?

    (A) Blockade of histamine-1 receptors on tissue mast cells
    (B) Blockade of leukotriene receptors in inflamed tissue
    (C) Blockade of sodium channels in peripheral sensory nerves
    (D) Inhibition of IgE binding to tissue mast cells and basophils
    (E) Inhibition of phospholipase A activity in cell membranes
    (F) Inhibition of proinflammatory cytokine formation by T lymphocytes

NBME00534

# Answer Form for USMLE Step 1 Sample Test Questions

### Block 1 (Questions 1-40)

| | | | |
|---|---|---|---|
| 1. ___ | 11. ___ | 21. ___ | 31. ___ |
| 2. ___ | 12. ___ | 22. ___ | 32. ___ |
| 3. ___ | 13. ___ | 23. ___ | 33. ___ |
| 4. ___ | 14. ___ | 24. ___ | 34. ___ |
| 5. ___ | 15. ___ | 25. ___ | 35. ___ |
| 6. ___ | 16. ___ | 26. ___ | 36. ___ |
| 7. ___ | 17. ___ | 27. ___ | 37. ___ |
| 8. ___ | 18. ___ | 28. ___ | 38. ___ |
| 9. ___ | 19. ___ | 29. ___ | 39. ___ |
| 10. ___ | 20. ___ | 30. ___ | 40. ___ |

### Block 2 (Questions 41-80)

| | | | |
|---|---|---|---|
| 41. ___ | 51. ___ | 61. ___ | 71. ___ |
| 42. ___ | 52. ___ | 62. ___ | 72. ___ |
| 43. ___ | 53. ___ | 63. ___ | 73. ___ |
| 44. ___ | 54. ___ | 64. ___ | 74. ___ |
| 45. ___ | 55. ___ | 65. ___ | 75. ___ |
| 46. ___ | 56. ___ | 66. ___ | 76. ___ |
| 47. ___ | 57. ___ | 67. ___ | 77. ___ |
| 48. ___ | 58. ___ | 68. ___ | 78. ___ |
| 49. ___ | 59. ___ | 69. ___ | 79. ___ |
| 50. ___ | 60. ___ | 70. ___ | 80. ___ |

### Block 3 (Questions 81-117)

| | | | |
|---|---|---|---|
| 81. ___ | 91. ___ | 101. ___ | 111. ___ |
| 82. ___ | 92. ___ | 102. ___ | 112. ___ |
| 83. ___ | 93. ___ | 103. ___ | 113. ___ |
| 84. ___ | 94. ___ | 104. ___ | 114. ___ |
| 85. ___ | 95. ___ | 105. ___ | 115. ___ |
| 86. ___ | 96. ___ | 106. ___ | 116. ___ |
| 87. ___ | 97. ___ | 107. ___ | 117. ___ |
| 88. ___ | 98. ___ | 108. ___ | |
| 89. ___ | 99. ___ | 109. ___ | |
| 90. ___ | 100. ___ | 110. ___ | |

NBME00535

**Appx1603**

# Answer Key for USMLE Step 1 Sample Test Questions

### Block 1 (Questions 1-40)

| | | | |
|---|---|---|---|
| 1. D | 11. B | 21. A | 31. C |
| 2. A | 12. C | 22. E | 32. B |
| 3. A | 13. C | 23. E | 33. D |
| 4. D | 14. D | 24. A | 34. D |
| 5. B | 15. B | 25. B | 35. C |
| 6. A | 16. B | 26. D | 36. B |
| 7. C | 17. B | 27. A | 37. D |
| 8. B | 18. A | 28. C | 38. B |
| 9. G | 19. C | 29. B | 39. C |
| 10. C | 20. A | 30. A | 40. A |

### Block 2 (Questions 41-80)

| | | | |
|---|---|---|---|
| 41. D | 51. C | 61. E | 71. C |
| 42. D | 52. B | 62. E | 72. B |
| 43. F | 53. F | 63. C | 73. C |
| 44. E | 54. B | 64. E | 74. B |
| 45. B | 55. A | 65. E | 75. E |
| 46. C | 56. D | 66. D | 76. D |
| 47. D | 57. A | 67. G | 77. E |
| 48. B | 58. A | 68. D | 78. E |
| 49. A | 59. A | 69. A | 79. C |
| 50. C | 60. D | 70. A | 80. D |

### Block 3 (Questions 81-117)

| | | | |
|---|---|---|---|
| 81. E | 91. E | 101. C | 111. C |
| 82. C | 92. A | 102. A | 112. E |
| 83. B | 93. E | 103. A | 113. C |
| 84. A | 94. D | 104. E | 114. B |
| 85. A | 95. E | 105. A | 115. C |
| 86. D | 96. A | 106. G | 116. A |
| 87. B | 97. D | 107. E | 117. F |
| 88. C | 98. B | 108. E | |
| 89. B | 99. B | 109. E | |
| 90. D | 100. D | 110. B | |

NBME00536

**Appx1604**



# PREPARING FOR THE ACT

## Contents

1. General Preparation for the ACT® Tests . . . . . . . . . . . 2
2. Strategies for Taking the ACT Tests . . . . . . . . . . . . . . 5
3. What to Expect on Test Day . . . . . . . . . . . . . . . . . . . 11
4. Taking the Practice Tests . . . . . . . . . . . . . . . . . . . . . 12
   Practice Multiple-Choice Tests . . . . . . . . . . . . . . 13
   Practice Writing Test . . . . . . . . . . . . . . . . . . . . . . . 57
5. Scoring Your Tests . . . . . . . . . . . . . . . . . . . . . . . . . . 59
   How to Score the Multiple-Choice Tests. . . . . . . . 59
   How to Score the Writing Test. . . . . . . . . . . . . . . . 67
6. Sample Answer Document . . . . . . . . . . . . . . . . . . . . 73
   Multiple-Choice Tests . . . . . . . . . . . . . . . . . . . . . . 73
   Writing Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

## Additional ACT Preparation Materials

- **ACT Online Prep**™: The only online test preparation program designed by ACT test development professionals. ACT Online Prep has practice test questions, a practice essay with real-time scoring, a diagnostic test, and personalized Study Path. You can access ACT Online Prep via the Internet anywhere and at any time. Visit **www.actonlineprep.com**.
- The **Real ACT Prep Guide** is the official print guide to the ACT. This book includes three practice tests previously used in actual administrations—each with an optional Writing Test, with explanations for all right and wrong answer choices. Go to **www.actstudent.org** to order.

## A Message to Students

This booklet, which is provided **free of charge**, is intended to help you do your best on the ACT. It summarizes general test-taking strategies, describes the content of each test, provides specific tips for each, and lets you know what you can expect on test day. Included in this booklet are **complete practice tests**—"retired" ACT questions that were administered to students on a national test date, including a writing prompt—a sample answer document, and scoring instructions.

Read this booklet carefully and take the practice tests well before test day so you will be familiar with the tests, what they measure, and the strategies you can use to do your best on test day.

ACT is committed to representing the diversity of our society in all its aspects, including race, ethnicity, and gender. Thus, test passages, questions, and writing prompts are deliberately chosen to reflect the range of cultures in our population.

We also are committed to ensuring that test questions and writing prompts are fair—that they do not disadvantage any particular group of examinees. Extensive reviews of the fairness of test materials are rigorously conducted by both ACT staff and external consultants. We also employ statistical procedures to help ensure that our test materials do not unfairly affect the performance of any group.

## 1 General Preparation for the ACT Tests

### Choosing a Test Option

Students may register for one of two Test Options: the ACT, or the ACT Plus Writing, which includes a 30-minute Writing Test for an additional fee. The ACT Writing Test complements the ACT English Test. The combined results from both tests provide information about your understanding of the conventions of standard written English and your ability to produce a direct sample of your writing. Taking the ACT Plus Writing will provide you with two additional scores: a Writing Test subscore and a Combined English/Writing score. Taking the Writing Test does **not** affect your subject area scores or your Composite score.

Not all institutions require or recommend taking the ACT Writing Test. Check directly with the institutions you are considering to find out their requirements, or ask your high school counselor which Test Option you should take. You can also check **www.actstudent.org** for a list of institutions that have provided information to us about their policies—whether they require, recommend, or do not need results from the ACT Writing Test. Consult this list before you register, so you will know which Test Option to select.

The ACT Plus Writing is available on established test dates and for Special and Arranged Testing within the United States during designated testing windows. This Test Option is also available on two international test dates.

ACT endorses the Code of Fair Testing Practices in Education and the Code of Professional Responsibilities in Educational Measurement, guides to the conduct of those involved in educational testing. ACT is committed to ensuring that each of its testing programs upholds the guidelines in each Code. A copy of each Code may be obtained free of charge from ACT Customer Services (68), P.O. Box 1008, Iowa City, IA 52243-1008, 319/337-1429.

9577

© 2007 by ACT, Inc. All rights reserved.

NOTE: This booklet is covered by federal copyright laws that prohibit the reproduction of the test questions without the express, written permission of ACT, Inc.

# Choosing a Test Date

Before you choose a test date, consider the application deadlines of the colleges and scholarship agencies that are of interest to you. It will take three to seven weeks after a test date for ACT to mail your score report to you and to your college or agency choices.

Many college and scholarship agencies recommend that students take the ACT during the spring of their junior year. By this time, students typically have completed most of the coursework covered by the ACT. There are a number of advantages in taking the ACT then:

- You will receive test scores and other information that will help you plan your senior year of high school.
- Many colleges begin contacting prospective students during the summer before their senior year.
- If you do not score as well as you believe you can, there will be opportunities to retake the ACT in the fall of your senior year and still have your new scores available in time to meet admission and scholarship deadlines.

NOTE: You cannot plan on receiving your scores from one test date in time to register for the next.

# General Test-Taking Strategies for the ACT

The ACT contains multiple-choice tests in four areas: English, Mathematics, Reading, and Science. Each of these tests contains questions that offer either four or five answer choices from which you are to choose the correct, or best, answer. The following suggestions apply to all four tests:

### Pace yourself.

The time limits set for each test give nearly everyone enough time to finish all the questions. However, because the English, Reading, and Science Tests contain a considerable amount of text, it is important to pace yourself so you will not spend too much time on one passage. Similarly, try not to spend too much time puzzling over an answer to a specific problem in the Mathematics Test. Go on to the other questions and come back if there is time.

Your supervisor will announce when you have five minutes remaining on each test.

### Read the directions for each test carefully.

Before you begin taking one of the tests, read the directions carefully. The English, Reading, and Science Tests ask for the "best" answer. Do not respond as soon as you identify a correct answer. Read and consider all of the answer choices and choose the answer that *best* responds to the question.

The Mathematics Test asks for the "correct" answer. Read each question carefully to make sure you understand the type of answer required. Then, you may want to work out the answer you feel is correct and look for it among the choices given. If your answer is not among the choices provided, reread the question and consider all of the answer choices.

### Read each question carefully.

It is important that you understand what each question asks. Some questions will require you to go through several steps to find the correct or best answer, while others can be answered more quickly.

### Answer the easy questions first.

The best strategy for taking the tests is to answer the easy questions and skip the questions you find difficult. After answering all of the easy questions, go back and answer the more difficult questions.

### Use logic on more difficult questions.

When you return to the more difficult questions, try to use logic to eliminate incorrect answers to a question. Compare the answer choices to each other and note how they differ. Such differences may provide clues as to what the question requires. Eliminate as many incorrect answers as you can, then make an educated guess from the remaining answers.

### Answer every question.

Your score on the tests will be based on the number of questions that you answer correctly; **there is no penalty for guessing.** Thus, you should answer every question within the time allowed for each test, even if you have to guess. Your supervisor will announce when you have five minutes remaining on each test.

### Review your work.

If there is time left after you have answered every question in a test, go back and check your work on that test. Check to be sure that you marked only one answer to each question. You will not be allowed to go back to any other test or mark answers to a test after time has been called on that test.

### Be precise in marking your answer document.

Be sure that you fill in the correct ovals on your answer document. Check to be sure that the number of the line of ovals on your answer document is the same as the number of the question you are answering and that you mark only one response for each question.

### Erase completely.

If you want to change a multiple-choice answer, be sure to use a soft eraser that will not leave smudges and erase the unintended mark completely. Do not cross out answers or use correction fluid or tape; you must erase. Correction fluid/tape, smudges, or unintended marks may cause errors in scoring.

---

**To students approved to test at national test centers with extended time:**

You will be allowed up to five hours total to work on the multiple-choice tests at your own pace, including breaks between tests. If you are also taking the Writing Test, you will be allowed up to 5 hours and 45 minutes. You will need to pace yourself through each test in order to complete all tests within the time allowed. When you complete each test, notify the supervisor that you are ready to go on to the next test.

---

# General Test-Taking Strategies for the ACT Writing Test

The ACT Writing Test lets you show your skill in planning and composing a short essay. It measures writing proficiencies that are taught in high school and are important for readiness to succeed in entry-level college composition courses.

The following general strategies will help if you take the ACT Writing Test.

### Pace yourself.

You will have 30 minutes to write an essay for the ACT Writing Test. It is important to pace yourself in the way that best suits your personal writing strategy. Many writers do best when they spend part of their time planning their essay, most of their time writing the essay, and the last part of their time reviewing the essay to make corrections and small revisions. There is no formula for the best proportion of time to spend planning, writing, and reviewing: writers, topics, and occasions differ too widely for a universal rule to apply. Keep in mind, however, that you are unlikely to have time to draft, revise, and recopy your essay. Therefore, taking a few minutes to plan your essay is a much better strategy than writing a first draft with the intent to copy it over for the final essay.

In general, budget your time in the way that feels best to you based on your experience in taking essay tests in school and in other circumstances when you've done writing within a time limit. Your supervisor will announce when you have five minutes remaining on the Writing Test.

### Read the directions carefully.

Before you begin taking the Writing Test, read the directions carefully. They tell you the aspects of writing on which your essay will be evaluated and give instructions on how to write in the answer folder.

### Read the writing prompt carefully.

It is important that you understand exactly what the writing prompt asks you to do. A firm grasp of the assignment is as crucial for the Writing Test as it is for writing essays for class. Be sure you have a clear understanding of the issue in the writing prompt and of the question you must respond to before you start to plan and write your essay.

### Write (or print) legibly in the answer folder.

If your readers cannot make out what you have written, they cannot appreciate what you have said, and they will not be able to score your essay. You may write or print your essay, whichever you prefer—but you must do so clearly. You must write your essay using a **soft lead No. 2 pencil** (not a mechanical pencil) and on the lined pages in the answer folder. You may not need all the lined pages, but to ensure you have enough room to finish, do not skip lines.

### Make corrections clear.

If you make corrections by using erasures or cross-outs, do so thoroughly. You may write corrections or additions neatly between the lines of your essay, but do not write in the margins of the lined pages.

# Preparing for Test Day

Although what you know will determine how well you do on the ACT, your attitudes, emotions, and physical state may also influence your performance. The following tips will help you do your best:

- Be confident in your ability to do well on the ACT. You can do well!
- Be prepared to work hard.
- Know what to expect on test day. Familiarize yourself with the information in this booklet, and on **www.actstudent.org**. NOTE: Most procedures in this booklet refer to testing on an established ACT test date. Procedures may differ slightly if you test through another type of testing. For example, for most administrations, you won't need scratch paper because each page of the Mathematics Test will provide a blank column that you can use for scratch work. Otherwise, you will be provided with scratch paper.
- Take the practice tests and review your responses so you will feel comfortable about the approaching test day.
- Prepare well in advance for the tests. Do not leave preparation to the last minute.
- Get plenty of rest the night before the tests so you will be in good physical condition for taking them.
- Bring the following items with you to the test center:
  1. Your test center admission ticket (if you are testing on an established ACT test date).
  2. Acceptable identification. Your admission ticket is **not** identification. See details on your admission ticket or on **www.actstudent.org**. If you do not present acceptable identification at the time of check-in, you will not be admitted to test (you will then have to pay a Test Date Change fee to transfer your registration to a different test date). If you have any questions about acceptable ID, call ACT Test Administration (319/337-1510) *before* test day.
  3. Sharpened soft lead No. 2 pencils with good erasers (no mechanical pencils; no ink, ballpoint, or felt-tip pens). Do **not** bring highlight pens or any other writing instruments; you will not be allowed to use them. If you have registered to take the ACT Writing Test, your essay **must** also be completed in pencil.
  4. A watch so that you can pace yourself during the tests. Do **not** bring a watch that has an alarm function. You will not be allowed to set an alarm because it will disturb other students. Your supervisor will announce when you have five minutes remaining on each test.
  5. A permitted calculator for use on the Mathematics Test, if you wish to use one. (See shaded section on page 5.)

*For students testing on established ACT test dates:*

- If you submit a registration folder, look for your admission ticket about 2 weeks later. If you register online, print your ticket from your student Web account.

- If you misplace your admission ticket or have not received it by 10 days before the test date, sign on to your student Web account to print a copy, or call ACT Registration at 319/337-1270 for assistance.

- Check your admission ticket for your Test Option and the location of the test center to which you have been assigned. If you are unfamiliar with the location, do a practice run to see how to get there and how much time you will need to arrive on time.

- Plan to arrive by the time stated on your admission ticket. If you arrive earlier than 7:45 a.m., you will probably have to wait outside until testing personnel have completed their arrangements.

- Be prepared for testing to start after all examinees present at 8:00 a.m. have been checked in and assigned seats.

- Dress comfortably. To conserve energy, your test center may be considerably warmer or cooler on weekends than during the week. Please dress so that you will be comfortable in a variety of temperatures.

# 2 Strategies for Taking the ACT Tests

The ACT measures the knowledge, understanding, and skills that you have acquired throughout your education. Although the sum total of what a person has learned cannot easily be changed, your performance in a specific area can be affected by adequate preparation, especially if it has been some time since you have taken a course in that area.

There are three strategies that can help you to prepare yourself for the content included in the ACT:

### Familiarize yourself with the content of the ACT tests.

Review the information about the tests that is provided on the following pages. Note which content areas make up a large proportion of the tests and which do not. The specific topics included in each content area are examples of possible topics; they do not include all of the possibilities.

### Refresh your knowledge and skills in the content areas.

Review those content areas you have studied but are not fresh in your mind. Spend your time refreshing your knowledge and skills in the content areas that make up large portions of the tests.

## Use of Calculators on the ACT Mathematics Test

It is your responsibility to bring a permitted calculator. We regularly update information about which calculators are **prohibited**. To be certain your calculator will be permitted on test day, visit **www.actstudent.org** or call **800/498-6481** for a recorded message. If you use a prohibited calculator, you will be dismissed and your answer document will not be scored.

You may use a calculator on the ACT Mathematics Test (but not on any of the other tests in the ACT). You are **not required** to use a calculator. All the problems can be solved without a calculator. If you regularly use a calculator in your mathematics work, you may wish to use one you are familiar with as you take the Mathematics Test. Using a more powerful, but unfamiliar, calculator is not likely to give you an advantage over using the kind you normally use.

You may use any four-function, scientific, or graphing calculator, unless it has features described in the **Prohibited** list. For models on the **Permitted with Modification** list, you will be required to modify some of the calculator's features.

### Prohibited Calculators

The following types of calculators are **prohibited**:

- calculators with built-in computer algebra systems— *Prohibited calculators in this category include:*
  - Texas Instruments: All model numbers that begin with **TI-89** or **TI-92**
  - Hewlett-Packard: **hp 48GII** and all model numbers that begin with **hp 40G, hp 49G**, or **hp 50G**
  - Casio: **Algebra fx 2.0, ClassPad 300**, and all model numbers that begin with **CFX-9970G**
- pocket organizers
- handheld or laptop computers
- electronic writing pads or pen-input devices—The Sharp EL 9600 is permitted.

- calculators built into cell phones or other electronic communication devices
- calculators with a typewriter keypad (keys in QWERTY format)—*Calculators with letter keys **not** in QWERTY format are permitted.*

### Calculators Permitted with Modification

The following types of calculators are **permitted, but only after they are modified as noted**:

- calculators with paper tape—*Remove the tape.*
- calculators that make noise—*Turn off the sound.*
- calculators that can communicate wirelessly with other calculators—*Completely cover the infrared data port with heavy opaque material, such as duct tape or electrician's tape.*
- calculators that have power cords—*Remove all power/electrical cords.*

### On Test Day

Be sure your calculator is working and has reliable batteries. You may bring a backup calculator and extra batteries to the test center. Testing staff will **not** supply batteries or calculators. You will **not** be allowed to share calculators during testing.

Testing staff will check your calculator to verify it is a permitted type, and they will monitor your use of your calculator to ensure that you:

- use it only during the Mathematics Test;
- use your backup calculator only if your primary calculator fails;
- do not share your calculator; and
- do not store test materials in your calculator's memory.

If your calculator has characters one inch high or larger, or a raised display, testing staff may seat you where no other examinee can see your calculator.

*Identify the content areas you have not studied.*

If unfamiliar content areas make up major portions of the tests, consider taking coursework to help you gain knowledge and skills in these areas before you take the ACT. Because the ACT measures knowledge and skills acquired over a period of time, it is unlikely that a "cram" course covering material that is unfamiliar to you will help you improve your scores. Longer-term survey courses will be most helpful to you, because they aim to improve your knowledge through sustained learning and practice.

## ACT English Test

The English Test is a 75-question, 45-minute test that measures your understanding of the conventions of standard written English (punctuation, grammar and usage, and sentence structure) and of rhetorical skills (strategy, organization, and style). Spelling, vocabulary, and rote recall of rules of grammar are not tested. The test consists of five essays, or passages, each of which is accompanied by a sequence of multiple-choice test questions. Different passage types are employed to provide a variety of rhetorical situations. Passages are chosen not only for their appropriateness in assessing writing skills but also to reflect students' interests and experiences.

Some questions refer to underlined portions of the passage and offer several alternatives to the portion underlined. You must decide which choice is most appropriate in the context of the passage. Some questions ask about an underlined portion, a section of the passage, or the passage as a whole. You must decide which choice best answers the question posed. Many questions offer "NO CHANGE" to the passage as one of the choices. The questions are numbered consecutively. Each question number refers to a correspondingly numbered portion underlined in the passage or to a corresponding numeral in a box located at the appropriate point in the passage.

Three scores are reported for the ACT English Test: a total test score based on all 75 questions, a subscore in Usage/Mechanics based on 40 questions, and a subscore in Rhetorical Skills based on 35 questions.

### Tips for Taking the ACT English Test

*Pace yourself.*

The ACT English Test contains 75 questions to be completed in 45 minutes. If you spend 1½ minutes skimming through each passage before responding to the questions, then you will have 30 seconds to answer each question. If possible, spend less time on each question and use the remaining time allowed for this test to review your work and return to the questions on this test that were most difficult for you.

*Be aware of the writing style used in each passage.*

The five passages cover a variety of topics and are written in a variety of styles. It is important that you take into account the writing style used in each passage when you respond to the questions. In responding to a question, be sure to understand the context of the question. Consider how the sentence containing an underlined portion fits in with the surrounding sentences and into the passage as a whole.

*Examine the underlined portions of the passage.*

Before responding to a question with an underlined portion, carefully examine what is underlined in the text. Consider the elements of writing that are included in each underlined portion. Some questions will ask you to base your decision on some specific element of writing, such as the tone or emphasis the text should convey. Some questions will ask you to choose the alternative to the underlined portion that is NOT or LEAST acceptable. The answer choices for each question will contain changes in one or more of those elements of writing.

*Be aware of questions with no underlined portions.*

You will be asked some questions about a section of the passage or about the passage as a whole, in light of a given rhetorical situation. Questions of this type are often identified by a question number in a box located at the appropriate point in the passage. Questions asking global questions about the entire passage are placed at the end of the passage and introduced by a horizontal box enclosing the following instruction: "Questions ___ and ___ ask about the preceding passage as a whole."

*Note the differences in the answer choices.*

Many of the questions in the test will involve more than one aspect of writing. Examine each answer choice and how it differs from the others. Be careful not to select an answer that corrects one error but causes a different error.

*Determine the best answer.*

Two approaches can be taken to determine the best answer to a question in which you are to choose the best alternative to an underlined portion. In the first approach, you can reread the sentence or sentences, substituting each of the possible answer choices for the underlined portion to determine the best choice. In the second approach, you can decide how the underlined portion might best be phrased in standard written English or in terms of the particular question posed. If you think the underlined portion is the best answer, you should select "NO CHANGE." If not, you should check to see whether your phrasing is one of the other answer choices. If you do not find your phrasing, you should choose the best of the answers presented. For questions cued by a number in a box, you must decide which choice is most appropriate in terms of the question posed or the stated rhetorical situation.

*Reread the sentence, using your selected answer.*

Once you have selected the answer you feel is best, reread the corresponding sentence(s) of the passage, inserting your selected answer at the appropriate place in the text to make sure it is the best answer within the context of the passage.

### Content Covered by the ACT English Test

Six elements of effective writing are included in the English Test: punctuation, grammar and usage, sentence structure, strategy, organization, and style. The questions covering punctuation, grammar and usage, and sentence structure make up the Usage/Mechanics subscore. The questions covering strategy, organization, and style make up the Rhetorical Skills subscore. A brief description and the approximate percentage of the test devoted to each element of effective writing are given on the next page.

## USAGE/MECHANICS

*Punctuation (13%).* Questions in this category test your knowledge of the conventions of internal and end-of-sentence punctuation, with emphasis on the relationship of punctuation to meaning (for example, avoiding ambiguity, indicating appositives).

*Grammar and Usage (16%).* Questions in this category test your understanding of agreement between subject and verb, between pronoun and antecedent, and between modifiers and the word modified; verb formation; pronoun case; formation of comparative and superlative adjectives and adverbs; and idiomatic usage.

*Sentence Structure (24%).* Questions in this category test your understanding of relationships between and among clauses, placement of modifiers, and shifts in construction.

## RHETORICAL SKILLS

*Strategy (16%).* Questions in this category test how well you develop a given topic by choosing expressions appropriate to an essay's audience and purpose; judging the effect of adding, revising, or deleting supporting material; and judging the relevancy of statements in context.

*Organization (15%).* Questions in this category test how well you organize ideas and choose effective opening, transitional, and closing sentences.

*Style (16%).* Questions in this category test how well you choose precise and appropriate words and images, maintain the level of style and tone in an essay, manage sentence elements for rhetorical effectiveness, and avoid ambiguous pronoun references, wordiness, and redundancy.

# ACT Mathematics Test

**You may use a calculator on the Mathematics Test. See page 5 for details about permitted and prohibited calculators.**

The ACT Mathematics Test is a 60-question, 60-minute test designed to assess the mathematical skills students have typically acquired in courses taken up to the beginning of grade 12. The test presents multiple-choice questions that require you to use reasoning skills to solve practical problems in mathematics. Most questions are discrete, but on occasion some may belong to sets of several questions (e.g., several questions based on the same graph or chart). Knowledge of basic formulas and computational skills are assumed as background for the problems, but recall of complex formulas and extensive computation is not required. The material covered on the test emphasizes the major content areas that are prerequisites to successful performance in entry-level courses in college mathematics.

Four scores are reported for the ACT Mathematics Test: a total test score based on all 60 questions, a subscore in Pre-Algebra/Elementary Algebra based on 24 questions, a subscore in Intermediate Algebra/Coordinate Geometry based on 18 questions, and a subscore in Plane Geometry/ Trigonometry based on 18 questions.

## Tips for Taking the ACT Mathematics Test

### Pace yourself.

The ACT Mathematics Test contains 60 questions to be completed in 60 minutes. You have an average of 1 minute per question. If possible, spend less time on each question and use the remaining time allowed for this test to review your work and return to the questions on this test that were most difficult for you.

### If you use a calculator, use it wisely.

Remember, all of the mathematics problems can be solved without using a calculator. In fact, some of the problems are best done without a calculator. Use good judgment in deciding when, and when not, to use a calculator. For example, for some problems you may wish to do scratch work to clarify your thoughts on the question before you begin using a calculator to do computations. For many problems, you may not want to use a calculator.

### Solve the problem.

For working out the solutions to the problems, you may usually do scratch work in the space provided in the test booklet, or you will be given scratch paper to use. You may wish to glance over the answer choices after reading the questions. However, working backwards from the answer choices provided can take a lot of time and may not be effective.

### Locate your solution among the answer choices.

Once you have solved the problem, look for your answer among the choices. If your answer is not included among the choices, carefully reread the problem to see whether you missed important information. Pay careful attention to the question being asked. If an equation is to be selected, check to see whether the equation you think is best can be transformed into one of the answer choices provided.

### Make sure you answer the question.

The solutions to many questions in the test will involve several steps. Make sure your answer includes all of the necessary steps. Frequently, questions include answer choices that are based on incomplete solutions.

### Make sure your answer is reasonable.

Sometimes an error in computation will result in an answer that is not practically possible for the situation described. Always think about your answer to determine whether it is reasonable.

### Check your work.

You may arrive at an incorrect solution by making common errors in the problem-solving process. Thus, if there is time available before the end of the Mathematics Test, it is important that you reread the questions and check your answers to make sure they are correct.

## Content Covered by the ACT Mathematics Test

Six content areas are included in the Mathematics Test: pre-algebra, elementary algebra, intermediate algebra, coordinate geometry, plane geometry, and trigonometry. The questions covering pre-algebra and elementary algebra make up the Pre-Algebra/Elementary Algebra subscore. The questions covering intermediate algebra and coordinate geometry make up the Intermediate Algebra/Coordinate Geometry subscore. The questions

7

covering plane geometry and trigonometry make up the Plane Geometry/Trigonometry subscore. A brief description and the approximate percentage of the test devoted to each content area are given below.

## PRE-ALGEBRA/ELEMENTARY ALGEBRA

*Pre-Algebra (23%).* Questions in this content area are based on basic operations using whole numbers, decimals, fractions, and integers; place value; square roots and approximations; the concept of exponents; scientific notation; factors; ratio, proportion, and percent; linear equations in one variable; absolute value and ordering numbers by value; elementary counting techniques and simple probability; data collection, representation, and interpretation; and understanding simple descriptive statistics.

*Elementary Algebra (17%).* Questions in this content area are based on properties of exponents and square roots, evaluation of algebraic expressions through substitution, using variables to express functional relationships, understanding algebraic operations, and the solution of quadratic equations by factoring.

## INTERMEDIATE ALGEBRA/COORDINATE GEOMETRY

*Intermediate Algebra (15%).* Questions in this content area are based on an understanding of the quadratic formula, rational and radical expressions, absolute value equations and inequalities, sequences and patterns, systems of equations, quadratic inequalities, functions, modeling, matrices, roots of polynomials, and complex numbers.

*Coordinate Geometry (15%).* Questions in this content area are based on graphing and the relations between equations and graphs, including points, lines, polynomials, circles, and other curves; graphing inequalities; slope; parallel and perpendicular lines; distance; midpoints; and conics.

## PLANE GEOMETRY/TRIGONOMETRY

*Plane Geometry (23%).* Questions in this content area are based on the properties and relations of plane figures, including angles and relations among perpendicular and parallel lines; properties of circles, triangles, rectangles, parallelograms, and trapezoids; transformations; the concept of proof and proof techniques; volume; and applications of geometry to three dimensions.

*Trigonometry (7%).* Questions in this content area are based on understanding trigonometric relations in right triangles; values and properties of trigonometric functions; graphing trigonometric functions; modeling using trigonometric functions; use of trigonometric identities; and solving trigonometric equations.

# ACT Reading Test

The Reading Test is a 40-question, 35-minute test that measures your reading comprehension. The test questions ask you to derive meaning from several texts by (1) referring to what is explicitly stated and (2) reasoning to determine implicit meanings. Specifically, questions will ask you to use referring and reasoning skills to determine main ideas; locate and interpret significant details; understand sequences of events; make comparisons;

comprehend cause-effect relationships; determine the meaning of context-dependent words, phrases, and statements; draw generalizations; and analyze the author's or narrator's voice and method. The test comprises four prose passages that are representative of the level and kinds of text commonly encountered in first-year college curricula. Each passage is preceded by a heading that identifies what type of passage it is (for example, "Prose Fiction"), names the author, and may include a brief note that helps in understanding the passage. Each passage is accompanied by a set of multiple-choice test questions. These questions do not test the rote recall of facts from outside the passage, isolated vocabulary items, or rules of formal logic.

Three scores are reported for the ACT Reading Test: a total test score based on all 40 questions, a subscore in Social Studies/Sciences reading skills (based on the 20 questions in the social studies and natural sciences sections of the test), and a subscore in Arts/Literature reading skills (based on the 20 questions in the prose fiction and humanities sections of the test).

## Tips for Taking the ACT Reading Test
### *Pace yourself.*
The ACT Reading Test contains 40 questions to be completed in 35 minutes. If you spend 2–3 minutes reading each passage, then you will have about 35 seconds to answer each question. If possible, spend less time on the passages and the questions and use the remaining time allowed for this test to review your work and return to the questions on this test that were most difficult for you.

### *Read the passage carefully.*
Before you begin answering a question, read the entire passage thoroughly. It is important that you read every sentence rather than skim the text. Be conscious of relationships between or among ideas. You may want to make notes about important ideas in the passage either in the test booklet or on scratch paper, if provided.

### *Refer to the passage when answering the questions.*
Answers to some of the questions will be found by referring to what is explicitly stated in the text. Other questions will require you to determine implicit meanings and to draw conclusions, comparisons, and generalizations. Refer to the passage before you answer any question.

## Content Covered by the ACT Reading Test
The Reading Test is based on four types of reading selections: the social studies, the natural sciences, prose fiction, and the humanities. A subscore in Social Studies/Sciences reading skills is based on the questions in the social studies and the natural sciences sections of the test, and a subscore in Arts/Literature reading skills is based on the questions in the prose fiction and humanities sections of the test. A brief description and the approximate percentage of the test devoted to each type of reading selection are given below.

*Social Studies (25%).* Questions in this category are based on passages in the content areas of anthropology, archaeology, biography, business, economics, education, geography, history, political science, psychology, and sociology.

8

*Natural Sciences (25%).* Questions in this category are based on passages in the content areas of anatomy, astronomy, biology, botany, chemistry, ecology, geology, medicine, meteorology, microbiology, natural history, physiology, physics, technology, and zoology.

*Prose Fiction (25%).* Questions in this category are based on intact short stories or excerpts from short stories or novels.

*Humanities (25%).* Questions in this category are based on passages from memoirs and personal essays and in the content areas of architecture, art, dance, ethics, film, language, literary criticism, music, philosophy, radio, television, and theater.

## ACT Science Test

The Science Test is a 40-question, 35-minute test that measures the interpretation, analysis, evaluation, reasoning, and problem-solving skills required in the natural sciences.

The test presents seven sets of scientific information, each followed by a number of multiple-choice test questions. The scientific information is conveyed in one of three different formats: data representation (graphs, tables, and other schematic forms), research summaries (descriptions of several related experiments), or conflicting viewpoints (expressions of several related hypotheses or views that are inconsistent with one another). The questions require you to recognize and understand the basic features of, and concepts related to, the provided information; to examine critically the relationship between the information provided and the conclusions drawn or hypotheses developed; and to generalize from given information to gain new information, draw conclusions, or make predictions. You may **not** use a calculator on the Science Test.

One score is reported for the ACT Science Test: a total test score based on all 40 questions.

### Tips for Taking the ACT Science Test
#### Pace yourself.
The ACT Science Test contains 40 questions to be completed in 35 minutes. If you spend about 2 minutes reading each passage, then you will have about 30 seconds to answer each question. If possible, spend less time on the passages and the questions and use the remaining time allowed for this test to review your work and return to the questions on this test that were most difficult for you.

#### Read the passage carefully.
Before you begin answering a question, read the scientific material provided. It is important that you read the entire text and examine any tables, graphs, or figures. You may want to make notes about important ideas in the information provided, either in the test booklet or on scratch paper, if provided. Some of the information sets will describe experiments. You should consider the experimental design, including the controls and variables, because questions are likely to address this component of scientific research.

#### Note different viewpoints in passages.
Some material will present conflicting points of view, and the questions will ask you to distinguish among the various

viewpoints. It may be helpful for you to make notes summarizing each viewpoint, either next to that section in your test booklet or on scratch paper, if provided. For questions that ask you to compare viewpoints, these notes will help you answer more quickly.

### Content Covered by the ACT Science Test
The content of the Science Test includes biology, chemistry, physics, and the Earth/space sciences (for example, geology, astronomy, and meteorology). Advanced knowledge in these subjects is not required, but knowledge acquired in general, introductory science courses is needed to answer some of the questions. The test emphasizes scientific reasoning skills over recall of scientific content, skill in mathematics, or reading ability. The scientific information is conveyed in one of three different formats.

*Data Representation (38%).* This format presents graphic and tabular material similar to that found in science journals and texts. The questions associated with this format measure skills such as graph reading, interpretation of scatterplots, and interpretation of information presented in tables.

*Research Summaries (45%).* This format provides descriptions of one or more related experiments. The questions focus upon the design of experiments and the interpretation of experimental results.

*Conflicting Viewpoints (17%).* This format presents expressions of several hypotheses or views that, being based on differing premises or on incomplete data, are inconsistent with one another. The questions focus upon the understanding, analysis, and comparison of alternative viewpoints or hypotheses.

## ACT Writing Test (Optional)

If you register for the ACT Plus Writing, you will take the ACT Writing Test (which must be completed in English) after you complete the four multiple-choice tests. Taking the Writing Test will **not** affect your scores on the multiple-choice tests or the Composite score for those tests. Rather, you will receive two additional scores: a Combined English/Writing score on a scale of 1 through 36 and a Writing subscore on a scale of 2 through 12. You will also receive some comments on your essay. And an image of your essay will be available to your high school and the colleges to which we report your scores from that test date.

The Writing Test is a 30-minute essay test that measures your writing skills—specifically those writing skills emphasized in high school English classes and in entry-level college composition courses. The test consists of one writing prompt that will define an issue and describe two points of view on that issue. You are asked to write in response to a question about your position on the issue described in the writing prompt. In doing so, you may adopt one or the other of the perspectives described in the prompt, or you may present a different point of view on the issue. Your essay score will not be affected by the point of view you take on the issue. Prompts are designed to be appropriate for response in a 30-minute timed test and to reflect students' interests and experiences.

Your essay will be evaluated on the evidence it gives of your ability to do the following:

- express judgments by taking a position on the issue in the writing prompt;
- maintain a focus on the topic throughout the essay;
- develop a position by using logical reasoning and by supporting your ideas;
- organize ideas in a logical way; and
- use language clearly and effectively according to the conventions of standard written English.

Your essay will be scored holistically—that is, on the basis of the overall impression created by all the elements of the writing. Two trained readers will score your essay, each giving it a rating from 1 (low) to 6 (high). The sum of those ratings is your Writing subscore. If the readers' ratings disagree by more than one point, a third reader will evaluate your essay and resolve the discrepancy.

## Tips for Taking the ACT Writing Test

### Pace yourself.

The ACT Writing Test gives you 30 minutes to read and think about the issue in the prompt, and to plan and write your essay. When asked to write a timed essay, most writers find it useful to do some planning before they write the essay, and to do a final check of the essay when it is finished. It is unlikely that you will have time to draft, revise, and recopy your essay. Therefore, taking a few minutes to plan your essay is a much better strategy than writing a first draft with the intent to copy it over for the final essay.

### Prewrite.

Some writers like to plunge right in, but this is seldom a good way to do well on a timed essay. Prewriting gets you acquainted with the issue, suggests patterns for presenting your thoughts, and gives you a little breathing room to come up with interesting ideas for introducing and concluding your essay. Before writing, then, carefully consider the prompt and make sure you understand it— reread it if you aren't sure. Decide how you want to answer the question in the prompt. Then jot down your ideas on the topic: this might simply be a list of ideas, reasons, and examples that you will use to explain your point of view on the issue. Write down what you think others might say in opposition to your point of view and think about how you would refute their argument. Think of how best to organize the ideas in your essay. You will be instructed to do your prewriting in your Writing Test booklet. You can refer back to these notes as you write the essay itself on the lined pages in your answer folder.

### Write.

Once you're ready to write your essay in the answer folder, proceed with the confidence that you have prepared well and that you will have attentive and receptive readers who are interested in your ideas. At the beginning of your essay, make sure readers will see that you understand the issue. Explain your point of view in a clear and logical way. If possible, discuss the issue in a broader context or evaluate the implications or complications of the issue. Address what others might say to refute your point of view and present a counterargument. Use specific examples. Vary the structure of your sentences, and use varied and

precise word choices. Make logical relationships clear by using transitional words and phrases. Do not wander off the topic. End with a strong conclusion that summarizes or reinforces your position.

Is it advisable to organize the essay by using a formula, like "the five-paragraph essay"? Points are neither awarded nor deducted for following familiar formulas, so feel free to use one or not as best suits your preference. Some writers find formulas stifling, other writers find them vital, and still other writers just keep them handy in the toolbox to use when needed. The exact numbers of words and paragraphs in your essay are less important than the clarity and development of your ideas. Writers who have something to say usually find that their ideas have a way of sorting themselves out at reasonable length and in the right number of paragraphs.

### Review your essay.

Take a few minutes before time is called to read over your essay. Correct any mistakes in grammar, usage, punctuation, and spelling. If you find any words that are hard to read, recopy them so your readers can read them easily. Make any corrections and revisions neatly, between the lines (but not in the margins). Your readers take into account that you had merely 30 minutes to compose and write your essay. Within that time limit, try to make your essay as polished as you can.

### Practice.

There are many ways to prepare for the ACT Writing Test. You may be surprised that these include reading newspapers and magazines, listening to news analyses on television or radio, and participating in discussions and debates about issues and problems. These activities help you become more familiar with current issues, with different perspectives on those issues, and with strategies that skilled writers and speakers use to present their points of view.

Of course, one of the best ways to prepare for the ACT Writing Test is to practice writing. Practice writing different kinds of texts, for different purposes, with different audiences in mind. The writing you do in your English classes will help you. So will practice in writing essays, stories, poems, plays, editorials, reports, letters to the editor, a personal journal, or other kinds of writing that you do on your own. Because the ACT Writing Test asks you to explain your perspective on an issue in a convincing way, writing opportunities like editorials or letters to the editor of a newspaper are especially helpful. Practicing a variety of different kinds of writing will help make you a versatile writer able to adjust to different writing occasions and assignments.

It is also a good idea to get some practice writing within a time limit. This will help build skills that are important in college-level learning and in the world of work. Taking the practice ACT Writing Test in this booklet will give you a good idea of what timed writing is like and how much additional practice you may need. You might want to take the practice ACT Writing Test even if you do not plan to register for it, because all the writing you do contributes to your skill in expressing yourself.

**Content Covered by the ACT Writing Test**

Writing is where form and content come together. To state that more accurately, writing is where *you* put form and content together. On the ACT Writing Test, we provide the "prompt"—an issue that has been chosen for its appropriateness in a 30-minute test and for its relevance to students' interests and experiences. The prompt defines the topic and sets you the task of focusing on that topic in your essay. But the "content"—the arguments and explanations, the analysis and examples, in all their details—is provided by you. By applying your writing skills to shaping that content, you also provide the "form" of your essay. So, with regard to the content covered by the Writing Test, you are the author.

# 3 What to Expect on Test Day

## Identification Required

You are to report to the test center by the time stated on your admission ticket, normally 8:00 a.m. If your admission ticket does not list a specific room, test center staff or posted signs will direct you to the test room. **At check-in, you will be required to show *BOTH* your admission ticket and acceptable ID.** See ID requirements on your admission ticket, at www.actstudent.org, or in *Registering for the ACT*.

## Dos and Don'ts

In the test room, the supervisor or proctor will direct you to a seat. If you need a left-handed desk, tell your supervisor as you enter. Do not leave the test room after you have been admitted. Only pencils, erasers, a permitted calculator (for the Mathematics Test only), and your admission ticket will be allowed on your desk. You will be required to put all other personal belongings away. You will not be allowed to have scratch paper (unless provided by the test supervisor for certain types of testing), books, dictionaries, notes or other aids, highlighters, colored pens or pencils, mechanical pencils, ink pens, correction fluid, reading material, or any electronic devices other than permitted calculators (examples include pager, timer, beeper, cell phone, media player, PDA, headphones, camera). You may not use tobacco in any form or have food or drink (including water) in the test room. You must abide by the rules of the test center.

Try to relax just before the tests. Take a few deep breaths, tense and relax your muscles, and think about pleasant things.

## Test Preliminaries

The test session will begin as soon as all examinees present at 8:00 a.m. are checked in. Listen carefully to all directions read by the supervisor. Ask questions if you do not understand what you are to do. It is very important that you *follow all directions* carefully. For instance, if you do not copy the matching information from your admission ticket onto your answer document accurately, or fill in the correct ovals, your answer document will not match your

registration record—and the reporting of your scores will take three to five weeks longer than usual to process.

You will receive a different answer document depending on which Test Option you have registered to take. Make sure the answer document you receive matches the Test Option you intend to take.

After you have completed page 1 of the answer document, you will receive a test booklet. You will be told to read the directions printed on the cover, then asked to write the booklet number and test form at the top of page 2 of the answer document. It is extremely important that you fill in the correct ovals for your test booklet number and for the test form you are taking because these determine which answer key will be used to score your answer document. The supervisor will then tell you when to open your test booklet and begin work. If you are taking the ACT Plus Writing, you will receive a Writing Test booklet only after you have completed the four multiple-choice tests.

## Taking the Tests

As you are working, keep your eyes on your own test booklet and answer document. If you have a question, raise your hand, but do not look around. Please remember that as you take the tests you may not use information or materials that cause you to obtain a test score that misrepresents what you have learned.

It is important that you understand what is considered prohibited behavior on the ACT. If you are involved in **any** of the actions listed below, you will be dismissed and your answer document will not be scored. Prohibited behaviors include:

- filling in or altering any ovals or continuing to write the essay after time is called on each test (You must put your pencil down when time is called.)
- looking at another examinee's test booklet or answer document
- giving or receiving assistance
- looking back at a test on which time has been called
- looking ahead in the test booklet
- using highlight pens, colored pens or pencils, notes, dictionaries, or other aids
- using an unauthorized calculator
- using any device to share or exchange information at any time during testing or during breaks (all electronic devices, including cell phones and pagers, must be turned off from the time you are admitted to test until you are dismissed after testing concludes)
- sharing a calculator with another examinee
- using a calculator on any test other than the Mathematics Test
- attempting to remove test materials, including questions or answers, from the test room by any means
- not following instructions or abiding by the rules of the test center
- exhibiting confrontational, threatening, or unruly behavior
- creating a disturbance or allowing an alarm, pager, or phone to sound in the test room

If you engage in **any** of these prohibited behaviors, your answer document will **not** be scored and you will be dismissed from the test center.

If you finish before time is called, review your work on the test you have just finished. Do **not** return to an earlier test and do not work ahead. If you are satisfied with your responses, place your answer document inside your test booklet and close the cover. Sit quietly until the supervisor gives you additional instructions.

You will have a short break after the first two tests. Do not leave the building during the break because some buildings have automatic locking doors, and you may be locked out. You must ask permission to leave the room during testing to go to the restroom; you will not be allowed to make up the time you miss. If you are taking the Writing Test, you will also have a brief break after Test 4 in which to relax and to sharpen your pencils.

On certain test dates, ACT administers test questions for developmental purposes. Responses to such questions are not counted toward your scores.

At the conclusion of the test session, you will be asked to sign a statement and copy a certification in your own handwriting to verify truthful identification of yourself. You will be required to sit quietly until you are dismissed. After all answer documents and test booklets have been collected and counted, the supervisor will dismiss you.

## Special Situations

If, for any reason, you have to leave the center before finishing the ACT, you must decide whether or not you want your answer document scored and inform the supervisor of your decision. If you fail to do so, your answer document will be scored. Or, if you decide *after* you have finished the ACT that you do not want it scored, tell the supervisor *before* you leave the test center. You need not give a reason.

Once you break the seal on your multiple-choice test booklet, you cannot later request a Test Date Change. If you want to take the ACT again, you will have to reregister. See **www.actstudent.org** or *Registering for the ACT*. Once you begin filling out your answer document, you cannot request a Test Option Change on that test date (i.e., you may not change from ACT Plus Writing to the ACT or the reverse).

You may not receive scores from more than one test date per national or international administration (Saturday, non-Saturday, or rescheduled test date arranged by ACT). If you are admitted and allowed to test, you will receive ONLY the scores from your first test administration.

## Test Information Release

On certain national test dates, you may obtain (for an additional fee) a copy of the test questions, a copy of your answers, a list of correct answers, and scoring instructions. This service is not available for all dates or for other types of testing, so if you want it, be sure to check **www.actstudent.org** or *Registering for the ACT*, and register for a test date on which it is available. (Your request must be postmarked no later than three months after the test date.) The information will be mailed about 4 weeks **after** your score report is mailed.

# 4 Taking the Practice Tests

Taking the practice tests can help you become familiar with the ACT. It will be most helpful if you take the tests under conditions that are as similar as possible to those you will experience on test day. The following tips will help you make the most of the practice tests.

- The four multiple-choice tests require a total of 2 hours and 55 minutes. Try to take them in one sitting, with only a short break between Tests 2 and 3. (If you are taking the Writing Test, you may also take a short break after Test 4.)

- Sit at a desk with good lighting. You will need sharpened No. 2 pencils with good erasers. You may not use highlight pens or correction fluid. Remove all books and other aids from your desk. On test day, you will not be allowed to use references or notes. For most administrations, you won't need scratch paper because each page of the Mathematics Test has a blank column that you can use for scratch work. Otherwise, you will be provided with scratch paper.

- If you plan to use a calculator on the Mathematics Test, review the information about permitted and prohibited calculators on page 5.

- Use a digital timer or clock to time yourself on each test. Set your timer for five minutes less than the allotted time for each test so you can get used to the announcement of five minutes remaining. (Students approved for extended time should set a timer for 60-minute warnings up to the total time allowed—5 hours for multiple-choice tests, or 5 hours and 45 minutes if also taking the Writing Test).

- Allow yourself only the time permitted for each test.

- Detach and use the sample multiple-choice answer document on pages 73–74.

- Read the general test directions on the first page of the practice multiple-choice tests. These are the same directions that will appear on your test booklet on test day. After you have read the directions, start your timer and begin with Test 1. Continue through Test 4, taking a short break between Tests 2 and 3. If you do not plan to take the ACT Writing Test, score your multiple-choice tests using the information beginning on page 59.

- If you plan to take the Writing Test, take a short break after Test 4. Then read the directions on the first page of the practice ACT Writing Test (page 57). These are the same directions that will appear on your test booklet on test day. After you have read the directions, start your timer, then carefully read the prompt on page 58. After you have considered what the prompt is asking you to do, use scratch paper to plan your essay and then write your essay on the answer document, pages 75–78. When you have finished, score your essay using the information on pages 66–72.

Appx1616

## Practice Multiple-Choice Tests

Your Signature (do not print): _____

Print Your Name Here: _____

Your Date of Birth:

☐☐ – ☐☐ – ☐☐☐☐

Month    Day    Year

**Form 0661C**

2007 | 2008

# ACT ASSESSMENT®



The **ACT**®


## Directions

This booklet contains tests in English, Mathematics, Reading, and Science. These tests measure skills and abilities highly related to high school course work and success in college. *CALCULATORS MAY BE USED ON THE MATHEMATICS TEST ONLY.*

The questions in each test are numbered, and the suggested answers for each question are lettered. On the answer document, the rows of ovals are numbered to match the questions, and the ovals in each row are lettered to correspond to the suggested answers.

For each question, first decide which answer is best. Next, locate on the answer document the row of ovals numbered the same as the question. Then, locate the oval in that row lettered the same as your answer. Finally, fill in the oval completely. Use a soft lead pencil and make your marks heavy and black. *DO NOT USE A BALLPOINT PEN.*

Mark only one answer to each question. If you change your mind about an answer, erase your first mark thoroughly before marking your new answer. For each question, make certain that you mark in the row of ovals with the same number as the question.

Only responses marked on your answer document will be scored. Your score on each test will be based only on the number of questions you answer correctly during the time allowed for that test. You will NOT be penalized for guessing. *IT IS TO YOUR ADVANTAGE TO ANSWER EVERY QUESTION EVEN IF YOU MUST GUESS.*

You may work on each test ONLY when your test supervisor tells you to do so. If you finish a test before time is called for that test, you should use the time remaining to reconsider questions you are uncertain about in that test. You may NOT look back to a test on which time has already been called, and you may NOT go ahead to another test. To do so will disqualify you from the examination.

Lay your pencil down immediately when time is called at the end of each test. You may NOT for any reason fill in or alter ovals for a test after time is called for that test. To do so will disqualify you from the examination.

Do not fold or tear the pages of your test booklet.

**DO NOT OPEN THIS BOOKLET
UNTIL TOLD TO DO SO.**

**ACT**® P.O. BOX 168
IOWA CITY, IA 52243-0168

©2007 by ACT, Inc. All rights reserved.
NOTE: This booklet is covered by Federal copyright laws that prohibit the reproduction of the test questions without the express, written permission of ACT, Inc.

13





**ENGLISH TEST**

*45 Minutes—75 Questions*

**DIRECTIONS:** In the five passages that follow, certain words and phrases are underlined and numbered. In the right-hand column, you will find alternatives for the underlined part. In most cases, you are to choose the one that best expresses the idea, makes the statement appropriate for standard written English, or is worded most consistently with the style and tone of the passage as a whole. If you think the original version is best, choose "NO CHANGE." In some cases, you will find in the right-hand column a question about the underlined part. You are to choose the best answer to the question.

You will also find questions about a section of the passage, or about the passage as a whole. These questions do not refer to an underlined portion of the passage, but rather are identified by a number or numbers in a box.

For each question, choose the alternative you consider best and fill in the corresponding oval on your answer document. Read each passage through once before you begin to answer the questions that accompany it. For many of the questions, you must read several sentences beyond the question to determine the answer. Be sure that you have read far enough ahead each time you choose an alternative.

---

**PASSAGE I**

### The Music of the O'odham

[1]

For some people, traditional American Indian music is associated and connected with high penetrating vocals
[1]
accompanied by a steady drumbeat. In tribal communities in the southwestern United States, however, one is likely to hear something similar to the polka-influenced dance music of northern Mexico. The music is called "waila." Among the O'odham tribes of Arizona, waila has been popular for more than a century. The music is mainly
[2]

instrumental—the bands generally consist of guitar, bass
[3]
guitar, saxophones, accordion, and drums.

[2]

Unlike some traditional tribal music, waila does not serve a religious or spiritual purpose. It is a social music that performed at weddings, birthday parties,
[4]

1. **A.** NO CHANGE
   **B.** connected by some of them
   **C.** linked by association
   **D.** associated

2. **F.** NO CHANGE
   **G.** popular, one might say, for
   **H.** really quite popular for
   **J.** popular for the duration of

3. Which of the following alternatives to the underlined portion would NOT be acceptable?

   **A.** instrumental; in general, the bands
   **B.** instrumental, the bands generally
   **C.** instrumental. The bands generally
   **D.** instrumental; the bands generally

4. **F.** NO CHANGE
   **G.** music in which it is performed
   **H.** music, performing
   **J.** music, performed

**GO ON TO THE NEXT PAGE.**



**1** ■ ■ ■ ■ ■ ■ ■ ■ ■ **1**

and feasts. The word itself comes from the Spanish
                    5

word for dance, *baile*. Cheek to cheek, the dance is
                                6
performed to the relaxed two-step tempo, and the bands

often play long past midnight. As the dancers step to the
         7

music, they were also stepping in time to a sound that
              8

embodies their unique history and suggests the influence
         9

of outside cultures on their music. [10]

[3]

The O'odham in the 1700s first encountered the
                 11
guitars of Spanish missionaries. In the 1850s the O'odham

have borrowed from the waltzes and mazurkas of
     12
people of European descent on their way to California.

5. **A.** NO CHANGE
   **B.** word, itself,
   **C.** word, itself
   **D.** word itself,

6. **F.** NO CHANGE
   **G.** Couples dance cheek to cheek to the relaxed two-step tempo,
   **H.** A relaxed two-step tempo, the couples dance cheek to cheek,
   **J.** Cheek to cheek, the two-step tempo relaxes dancing couples.

7. **A.** NO CHANGE
   **B.** play long, past,
   **C.** play, long, past,
   **D.** play, long past

8. **F.** NO CHANGE
   **G.** are also stepping
   **H.** have also stepped
   **J.** will also step

9. **A.** NO CHANGE
   **B.** they're
   **C.** it's
   **D.** its'

10. At this point, the writer is considering adding the following true statement:

    > The agricultural practices of the O'odham are similar to those of the Maya.

    Should the writer make this addition here?

    **F.** Yes, because the sentence establishes that the O'odham often borrowed ideas from other groups.
    **G.** Yes, because the sentence provides important information about the O'odham people.
    **H.** No, because the sentence is not supported by evidence of a connection between the O'odham and the Maya.
    **J.** No, because the sentence distracts from the paragraph's focus on waila's uses and influences.

11. All of the following would be acceptable placements for the underlined portion EXCEPT:

    **A.** where it is now.
    **B.** at the beginning of the sentence (revising the capitalization accordingly).
    **C.** after the word *guitars.*
    **D.** after the word *missionaries* (ending the sentence with a period).

12. **F.** NO CHANGE
    **G.** have been borrowing
    **H.** were borrowed
    **J.** borrowed

**GO ON TO THE NEXT PAGE.**

Appx1619



**1**

In the early 1900s the O'odham became acquainted
with marching bands and woodwind instruments
(which explains the presence of saxophones in waila).
                                    13
Around this time the polka music and button accordion

played by German immigrant railroad workers; left their
                                               14
mark on waila.

[4]

It should be no surprise that musicians these days are
adding touches of rock, country, and reggae to waila. Some
listeners fear that an American musical form may soon be
lost. But the O'odham are playing waila with as much
energy and devotion as ever. A unique blend of traditions,
waila will probably continue changing for as long as the
O'odham use it to express their own sense of harmony and
tempo.

**PASSAGE II**

### How Old Am I?

Many people might be surprised to learn that the
American way of computing a person's age differs from
the traditional Korean way. In Korean tradition, a person is
considered to be already one year old at the time of his or
her birth.

As a child growing up in two cultures, I found
this contest a bit confusing. When I was in the fifth
        16
grade, was I ten or eleven years old? To add to the
confusion, every New Year's Day a person according
                                        17
to this Korean counting system, becomes a year

13. Given that all of the choices are true, which one is
    most relevant to the focus of this paragraph?
    A. NO CHANGE
    B. (although fiddles were once widely used in waila
       bands).
    C. (even though they're now often constructed of
       metal).
    D. (which are frequently found in jazz bands also).

14. F. NO CHANGE
    G. workers
    H. workers:
    J. workers,

Question 15 asks about the preceding passage
as a whole.

15. Upon reviewing this essay and finding that some infor-
    mation has been left out, the writer composes the fol-
    lowing sentence incorporating that information:
        Those same German influences helped spawn
        a similar musical form in northern Mexico
        known as *norteño.*
    This sentence would most logically be placed after the
    last sentence in Paragraph:
    A. 1.
    B. 2.
    C. 3.
    D. 4.

16. F. NO CHANGE
    G. change
    H. dispute
    J. difference

17. A. NO CHANGE
    B. person,
    C. person;
    D. person who,



**1**

older, regardless of his or her actual birthday.

Birthdays are important throughout the world. A person
                                                    18
who is sixteen years old on his or her birthday in March

would become seventeen years old on the following New

Year's Day, even though he or she isn't expected to turn

seventeen (in "American" years) until that next birthday

in March. Perhaps the celebration of New Year's Day in

Korean culture is heightened because it is thought of as
                    19

everyone's birthday party. [20]


        Today, after many birthdays and New Year's

Days, I now find meaningful the difference I once

found confusing. Otherwise, this difference points
                   21

to significant underlying cultural values. The practice of
22

advancing a person's age seems to me to reflect the value a
            23

society places on life experience and longevity. Their idea
                                                    24

was demonstrated often when my elderly relatives, who
                        25
took pride in reminding younger folk of their "Korean

age." With great enthusiasm, they added on a year every
      26

---

**18.** **F.** NO CHANGE
  **G.** Most cultures celebrate birthdays.
  **H.** Birthdays focus attention on a culture's youth.
  **J.** DELETE the underlined portion.

**19.** **A.** NO CHANGE
  **B.** raised
  **C.** lifted
  **D.** lighted

**20.** Upon reviewing this paragraph, the writer considers deleting the preceding sentence. If the writer were to delete the sentence, the paragraph would primarily lose:
  **F.** a comment on the added significance of the Korean New Year celebration.
  **G.** a repetitive reminder of what happens every birthday.
  **H.** a defense of the case for celebrating every birthday.
  **J.** an illustration of the Korean counting system.

**21.** **A.** NO CHANGE
  **B.** Though,
  **C.** In fact,
  **D.** Then,

**22.** **F.** NO CHANGE
  **G.** on
  **H.** at
  **J.** DELETE the underlined portion.

**23.** **A.** NO CHANGE
  **B.** persons' age
  **C.** persons age
  **D.** person's age,

**24.** **F.** NO CHANGE
  **G.** One's
  **H.** Its
  **J.** This

**25.** **A.** NO CHANGE
  **B.** by
  **C.** while
  **D.** as if

**26.** Which choice would most clearly communicate the elderly relatives' positive attitude toward this practice?
  **F.** NO CHANGE
  **G.** Duplicating an accepted practice.
  **H.** Living with two birthdays themselves,
  **J.** Obligingly,

---

ACT-61C-PRACTICE

17

**GO ON TO THE NEXT PAGE.**



New Year's Day. By contrast American society has often

been described as one that values the vibrant energy of
<sub>27</sub>

youth over the wisdom and experience gained with age. [28]

After a certain age, many Americans I know would

balk, refuse, and hesitate at the idea of adding a year or
<sub>29</sub>

two to what they regard as their actual age.

Even something as visibly simple or natural as
<sub>30</sub>

computing a person's age can prove to be not so clear-cut.

Traditions like celebrating birthdays reveal how deeply we

are affected by the culture we live in.

27. **A. NO CHANGE**
   B. whose
   C. this
   D. whom

28. If the writer were to delete the phrases "the vibrant energy of" and "the wisdom and experience gained with" from the preceding sentence, the sentence would primarily lose:

   F. its personal and reflective tone.
   G. an element of humor.
   H. details that illustrate the contrast.
   J. the preference expressed by the writer.

29. **A. NO CHANGE**
   B. balk and hesitate
   C. refuse and balk
   D. balk

30. **F. NO CHANGE**
   G. apparently
   H. entirely
   J. fully

---

**PASSAGE III**

### Wearing Jeans in School

In 1970, the school board in Pittsfield,

New Hampshire, approved a dress code that

prohibited students from wearing certain types

of clothing. The school board members believed that
<sub>31</sub>

wearing "play clothes" to school made the students

inefficient toward their school work, while more formal
<sub>32</sub>

attire established a positive educational climate. When

twelve-year-old Kevin Bannister wore a pair of blue jeans

to school, he was sent home for violating the dress code.

31. Given that all of the choices are true, which one would best illustrate the term *dress code* as it is used in this sentence?

   A. NO CHANGE
   B. clothing that was inappropriate.
   C. clothing, including sandals, bell-bottom pants, and "dungarees" (blue jeans).
   D. clothing that is permitted in some schools today.

32. **F. NO CHANGE**
   G. lazy and bored to tears with
   H. blow off
   J. lax and indifferent toward

**GO ON TO THE NEXT PAGE.**

Appx1622



**1**                                                                                      **1**

Kevin and his parents believed that his constitutional
                                                    33
rights had been violated. The United States District
                        33


Court of New Hampshire; agreed to hear Kevin's case.
                    34
His claim was based on the notion of personal liberty—the

right of every individual to the control of his or her own

person—protected by the Constitution's Fourteenth

Amendment. The court agreed with Kevin that a person's

right for wearing clothing of his or her own choosing is,
        35
in fact, protected by the Fourteenth Amendment.


The court noted, however that restrictions may be justified
        36
in some circumstances, such as in the school setting.

        So did Kevin have a right to wear blue jeans to

school? The court determined that the school board had

failed to show that wearing jeans actually inhibited the

educational process, which is guided by authority figures.
                37


Furthermore, the board offered no evidence to back up it's
                                                        38


claim that such clothing created a negative educational
        39
environment. Certainly the school board would

be justified in prohibiting students from wearing

clothing that was unsanitary, revealing, or obscene.


33. Given that all of the choices are true, which one would
    most effectively introduce the main idea of this para-
    graph?
    A. NO CHANGE
    B. The principal said dungarees and blue jeans were
       the same thing, so Kevin should have known
       better.
    C. If Kevin's jeans had been dirty and torn, the prin-
       cipal might have been justified in expelling him.
    D. These events occurred in a time of social unrest,
       and emotions were running high.

34. F. NO CHANGE
    G. Court, of New Hampshire
    H. Court of New Hampshire
    J. Court of New Hampshire,

35. A. NO CHANGE
    B. of wearing
    C. to wear
    D. wearing

36. F. NO CHANGE
    G. court noted, however,
    H. court, noted however,
    J. court noted however,

37. A. NO CHANGE
    B. process, which has undergone changes since the
       1970s.
    C. process, a process we all know well.
    D. process.

38. F. NO CHANGE
    G. they're
    H. its
    J. ones

39. A. NO CHANGE
    B. where
    C. which
    D. in which

**GO ON TO THE NEXT PAGE.**

Appx1623



**1** **1**

The court remained unconvinced, therefore, that
40

when wearing jeans would actually impair the learning
41
process of Kevin or of his fellow classmates.

Kevin Bannister's case was significant in that it
42
was the first in the United States to address clothing
42
prohibitions of a school dress code. His challenge
42

initiated a review, of students' rights and administrative
43

responsibility in public education.
44

---

40. **F.** NO CHANGE
    **G.** thus,
    **H.** moreover,
    **J.** however,

41. **A.** NO CHANGE
    **B.** by wearing
    **C.** wearing
    **D.** having worn

42. Which choice would most effectively open this paragraph and convey the importance of this case?
    **F.** NO CHANGE
    **G.** Therefore, Kevin's case reminds us that you should stand up for your rights, no matter how old you are.
    **H.** The case for personal liberty means the right to speak up must be taken seriously by the courts.
    **J.** All in all, clothing is an important part of our identity.

43. **A.** NO CHANGE
    **B.** review, of students' rights,
    **C.** review of students' rights
    **D.** review of students' rights.

44. **F.** NO CHANGE
    **G.** on
    **H.** with
    **J.** about

---

Question 45 asks about the preceding passage as a whole.

---

45. Suppose the writer's goal had been to write a brief persuasive essay urging students to exercise their constitutional rights. Would this essay fulfill that goal?
    **A.** Yes, because the essay focuses on how Kevin encouraged other students to exercise their constitutional rights.
    **B.** Yes, because the essay focuses on various types of clothing historically worn by students as a freedom of expression.
    **C.** No, because the essay suggests that the right to wear blue jeans was not a substantial constitutional right in the 1970s.
    **D.** No, because the essay objectively reports on one case of a student exercising a particular constitutional right.



**PASSAGE IV**

### The Case of the Trick Photographs

You might think that Sir Arthur Conan Doyle, the writer who invented Sherlock Holmes, the most logical of detectives, would have harbored strictly logical beliefs himself. But the author entertained a variety of fanciful ideas, including a belief in the mythical beings known as fairies. Since that belief, he was fooled in 1920 by two
46

schoolgirl cousins. 47

One day, Elsie Wright and Frances Griffiths returned from a walk in the English countryside with news that they had seen fairies. They had even taken photographs that showed several of the tiny sprites, some dancing in a ring in the grass, some fluttering in front of the girl's faces.
48
Many people were excited when they heard about

this seemingly true and factual proof of the existence of
49
fairies, but Conan Doyle was more excited than most.

To make sure that he wasn't being deceived, Conan Doyle had the original photographic plates examined by experts, however, they found no evidence of
50
double exposures. He then wrote an enthusiastic article

for *Strand* magazine, being the place in which most of his
51
Sherlock Holmes stories had first appeared, and later wrote a book on the subject titled *The Coming of the Fairies.*

**46. F.** NO CHANGE
**G.** Because of
**H.** Concerning
**J.** For

**47.** If the writer were to delete the opening sentence of this paragraph (beginning the essay with "Sir Arthur Conan Doyle entertained a variety of fanciful..."), the essay would primarily lose:

**A.** information that sets up a contrast that follows.
**B.** an irrelevant but humorous digression.
**C.** information that explains Doyle's motivations.
**D.** an important description of the setting.

**48. F.** NO CHANGE
**G.** girls' faces.
**H.** girls faces.
**J.** girls face's.

**49. A.** NO CHANGE
**B.** this seemingly evident but apparent
**C.** what seemed to be an apparent
**D.** this apparent

**50. F.** NO CHANGE
**G.** who
**H.** which
**J.** they

**51. A.** NO CHANGE
**B.** in which the magazine where
**C.** in which
**D.** being where

**GO ON TO THE NEXT PAGE.**

**Appx1625**



**1** ▪ ▪ ▪ ▪ ▪ ▪ ▪ ▪ **1**

Conan Doyle sent a copy of one of the photographs to his friend Harry Houdini, the famous magician and escape artist. Houdini, who devoted considerable effort to exposing hoaxes involving spiritualism and was
<sub>52</sub>

skeptical about the existence of supernatural beings. [53] When Houdini remained unconvinced by the evidence, Conan Doyle became angry. Though the two

remained cordial, but their friendship was damaged
<sub>54</sub>

due to the fact that they had the disagreement.
<sub>55</sub>

Some sixty years later, an elderly Frances Griffiths
<sub>56</sub>

publicly admitted that her and her cousin had staged
<sub>57</sub>
the photographs as a practical joke. Shortly after her revelation, computer enhancement revealed the hatpins
that were used to prop up the cardboard-cutout fairies.
<sub>58</sub>

Scientific analysis, since photography was a new art,
<sub>59</sub>
finally closed the Case of the Trick Photographs.

**52. F.** NO CHANGE
   **G.** spiritualism, being
   **H.** spiritualism, was
   **J.** spiritualism and

**53.** If the writer were to delete the preceding sentence, the paragraph would primarily lose:
   **A.** details that provide an explanation for the friendship between Conan Doyle and Houdini.
   **B.** information that helps set the stage for what happens next in the essay.
   **C.** a description of the reasons behind Houdini's skepticism about the supernatural.
   **D.** nothing at all, since this sentence provides irrelevant information.

**54. F.** NO CHANGE
   **G.** cordial and
   **H.** cordial that
   **J.** cordial,

**55. A.** NO CHANGE
   **B.** because of the fact that they had a
   **C.** due to the fact of their
   **D.** by the

**56. F.** NO CHANGE
   **G.** (Do NOT begin new paragraph) After some
   **H.** (Begin new paragraph) Since some
   **J.** (Begin new paragraph) Some

**57. A.** NO CHANGE
   **B.** her cousin and herself
   **C.** she and her cousin
   **D.** her cousin and her

**58.** Which of the following alternatives to the underlined portion would NOT be acceptable?
   **F.** that had been used
   **G.** the girls used
   **H.** using
   **J.** used

**59.** Which choice would best tie the conclusion of this essay to its opening sentence?
   **A.** NO CHANGE
   **B.** of the kind a modern-day Sherlock Holmes might use,
   **C.** which the great Houdini himself would have appreciated,
   **D.** a methodology that was still in its infancy,

**GO ON TO THE NEXT PAGE.**



Question 60 asks about the preceding passage as a whole.

60. Suppose the writer had decided to write an essay that summarizes how beliefs in the supernatural have influenced the writing of famous authors. Would this essay fulfill the writer's goal?

F. Yes, because the essay makes the point that Conan Doyle's belief in fairies clearly influenced his Sherlock Holmes stories.

G. Yes, because the essay indicates that Conan Doyle's disagreement with Houdini motivated him to write about the supernatural.

H. No, because the essay argues that the author's belief in fairies and the supernatural did not in any way affect his writing.

J. No, because the essay limits its focus to the particular events surrounding one author's reaction to evidence of the supernatural.

**PASSAGE V**

### Her Letters to the World

Emily Dickinson, one of America's great nineteenth-century poets, was a prolific letter writer. Although her physical contact with the world was limited by caring for her invalid mother and by her own poor health, whose correspondence was
61

extensive: over one thousand letters to upwards of one
62
hundred correspondents. These letters provide insight into her daily life and her poetry.

Dickinson's lifetime of letters range from playful to serious. As a young woman she wrote, of pining for a
63

valentine and of visiting the Chinese Museum in Boston.
64
Her letters in later years reveal that she missed friends and

61. A. NO CHANGE
    B. their
    C. Dickinson's
    D. who's

62. F. NO CHANGE
    G. extensive. and over
    H. extensive; over
    J. extensive. Over

63. A. NO CHANGE
    B. (Do NOT begin new paragraph) As a young woman, she wrote
    C. (Begin new paragraph) As a young woman, she wrote,
    D. (Begin new paragraph) As a young woman, she wrote

64. F. NO CHANGE
    G. visiting to
    H. of her visiting to
    J. of her visiting at

**GO ON TO THE NEXT PAGE.**



encouraged them to visit. Dickinson stayed in contact with correspondents for many years. In a teasing letter to her

<u>brother</u>, she bemoaned the fact that a big barn fire couldn't have waited until he returned to see it, since he "enjoyed such things so much." Other letters are <u>solemn; speaking</u>

of relatives and friends <u>whom</u> had died.

Perhaps the correspondent who came to know Dickinson best through their thirty-six-year exchange of letters was Emily's friend, sister-in-law, and neighbor, Susan Gilbert Dickinson. Susan was a spiritual, social, and intellectual companion for Emily. In fact, in one letter, Emily stated that Shakespeare was the only person who had taught her more than Susan had.

One significant aspect of this relationship <u>was: that Susan</u> was perhaps the only reader of Emily's poems-in-progress. Letters between the two suggest that Susan might frequently have given <u>feedback on her</u> work, including some of her most famous

<u>poems, composed at her home in Amherst, Massachusetts.</u> At one point, Emily sent a draft of her poem "Safe in Their Alabaster Chambers" to Susan, who <u>read the poem.</u> As

65. Given that all of the choices are true, which one best develops the paragraph's focus on the roles that letters played in Emily Dickinson's life?

   A. NO CHANGE
   B. Her personal interests also included keen observation of the natural world around her.
   C. Though she produced volumes of letters, none were shared publicly until after her death.
   D. She enjoyed hearing their news and reflecting with them on political events.

66. F. NO CHANGE
   G. solemn they speak
   H. solemn, speaking
   J. solemn. Speaking

67. A. NO CHANGE
   B. who
   C. who they
   D. of whom

68. F. NO CHANGE
   G. was that Susan
   H. was, that Susan
   J. was that Susan,

69. A. NO CHANGE
   B. her feedback on Emily's
   C. Emily feedback on her
   D. her feedback on her

70. F. NO CHANGE
   G. poems, which varied in form, style, and line length.
   H. poems, most without obvious rhyme.
   J. poems.

71. Given that all the choices are true, which one would most clearly describe an interaction between Susan and Emily during Emily's writing process?

   A. NO CHANGE
   B. liked the poem tremendously.
   C. considered and thought about the poem.
   D. praised the poem but suggested revisions.



a result, Emily <u>wrote two other</u> versions of the second
<sub>72</sub>
stanza.

  Dickinson's last twenty years of letters—many over

1,500 words in length—<u>reveals</u> the breadth and depth of
<sub>73</sub>

<u>one's</u> connection to the world through a wide circle of
<sub>74</sub>

correspondents. <u>Perhaps, this legacy of letters,</u> explains
<sub>75</sub>
what she meant when she said that her friends were her

"estate."

72. **F.** NO CHANGE
 **G.** rewrote two other alternate
 **H.** rewrote two additional alternate
 **J.** wrote two alternate revised

73. **A.** NO CHANGE
 **B.** reveal
 **C.** will of revealed
 **D.** would of revealed

74. **F.** NO CHANGE
 **G.** people's
 **H.** her
 **J.** their

75. **A.** NO CHANGE
 **B.** Perhaps this, legacy of letters,
 **C.** Perhaps this legacy of letters,
 **D.** Perhaps this legacy of letters

**END OF TEST 1**

**STOP! DO NOT TURN THE PAGE UNTIL TOLD TO DO SO.**

ACT-61C-PRACTICE

**2** △ △ △ △ △ △ △ △ △ **2**



## MATHEMATICS TEST

### 60 Minutes—60 Questions

**DIRECTIONS:** Solve each problem, choose the correct answer, and then fill in the corresponding oval on your answer document.

Do not linger over problems that take too much time. Solve as many as you can; then return to the others in the time you have left for this test.

You are permitted to use a calculator on this test. You may use your calculator for any problems you choose,

but some of the problems may best be done without using a calculator.

Note: Unless otherwise stated, all of the following should be assumed.

1. Illustrative figures are NOT necessarily drawn to scale.
2. Geometric figures lie in a plane.
3. The word *line* indicates a straight line.
4. The word *average* indicates arithmetic mean.

---

1. Two enterprising college students decide to start a business. They will make up and deliver helium balloon bouquets for special occasions. It will cost them $39.99 to buy a machine to fill the balloons with helium. They estimate that it will cost them $2.00 to buy the balloons, helium, and ribbons needed to make each balloon bouquet. Which of the following expressions could be used to model the total cost for producing $b$ balloon bouquets?

   A. $\$ 2.00b + \$39.99$
   B. $\$37.99b$
   C. $\$39.99b + \$ 2.00$
   D. $\$41.99b$
   E. $\$79.98b$

2. What is the value of the expression $(x - y)^2$ when $x = 5$ and $y = -1$ ?

   F. 4
   G. 6
   H. 16
   J. 24
   K. 36

3. On the first day of school, Mr. Vilani gave his third-grade students 5 new words to spell. On each day of school after that, he gave the students 3 new words to spell. In the first 20 days of school, how many new words had he given the students to spell?

   A. 28
   B. 62
   C. 65
   D. 68
   E. 152

4. Which of the following is equivalent to $(4x^2)^3$ ?

   F. $64x^8$
   G. $64x^6$
   H. $12x^6$
   J. $12x^5$
   K. $4x^6$

5. Which of the following lists all the positive factors of 8 ?

   A. 1, 8
   B. 2, 4
   C. 2, 4, 6
   D. 8, 16, 32
   E. 1, 2, 4, 8

6. Which of the following is an equivalent simplified expression for $2(4x + 7) - 3(2x - 4)$ ?

   F. $x + 2$
   G. $2x + 2$
   H. $2x + 26$
   J. $3x + 10$
   K. $3x + 11$

7. To determine a student's overall test score for the semester, Ms. Lopez throws out the lowest test score and takes the average of the remaining test scores. Victor earned the following test scores in Ms. Lopez's class this semester: 62, 78, 83, 84, and 93. What overall test score did Victor earn in Ms. Lopez's class this semester?

   A. 67.6
   B. 80.0
   C. 83.0
   D. 83.5
   E. 84.5

8. Uptown Cable, a cable TV provider, charges each customer $120 for installation, plus $25 per month for cable programming. Uptown's competitor, Downtown Cable, charges each customer $60 for installation, plus $35 per month for cable programming. A customer who signs up with Uptown will pay the same total amount for cable TV as a customer who signs up with Downtown if each pays for installation and cable programming for how many months?

   F. 3
   G. 6
   H. 10
   J. 18
   K. 30

**GO ON TO THE NEXT PAGE.**

**Appx1630**

**2** △ △ △ △ △ △ △ △ △ **2**

**9.** In the 8-sided figure below, adjacent sides meet at right angles and the lengths given are in meters. What is the perimeter of the figure, in meters?



**A.** 40
**B.** 80
**C.** 120
**D.** 160
**E.** 400

**10.** The sum of the real numbers $x$ and $y$ is 11. Their difference is 5. What is the value of $xy$ ?

**F.** 3
**G.** 5
**H.** 8
**J.** 24
**K.** 55

**11.** For all $x$, $(3x + 7)^2 = ?$

**A.** $6x + 14$
**B.** $6x^2 + 14$
**C.** $9x^2 + 49$
**D.** $9x^2 + 21x + 49$
**E.** $9x^2 + 42x + 49$

**12.** What is the slope of the line through $(-5,2)$ and $(6,7)$ in the standard $(x,y)$ coordinate plane?

**F.** 9
**G.** 5
**H.** $-5$
**J.** $\dfrac{5}{11}$
**K.** $-\dfrac{5}{11}$

**13.** When $\dfrac{1}{3}k + \dfrac{1}{4}k = 1$, what is the value of $k$ ?

**A.** $\dfrac{1}{7}$
**B.** $\dfrac{12}{7}$
**C.** $\dfrac{7}{2}$
**D.** 6
**E.** 12

**14.** What is the length, in feet, of the hypotenuse of a right triangle with legs that are 6 feet long and 7 feet long, respectively?

**F.** $\sqrt{13}$
**G.** $\sqrt{85}$
**H.** 13
**J.** 21
**K.** 42

**15.** Hexagon *ABCDEF* shown below was drawn on a grid with unit squares. Each vertex is at the intersection of 2 grid lines. What is the area of the hexagon, in square units?



**A.** 18
**B.** 19
**C.** 20
**D.** 22
**E.** 25

**16.** In the figure below, $\overline{AD}$ is perpendicular to $\overline{BD}$, $\overline{AC}$ is perpendicular to $\overline{BC}$, and $\overline{AD} \cong \overline{BC}$. Which of the following congruences is NOT necessarily true?

**F.** $\overline{AC} \cong \overline{BD}$
**G.** $\overline{AD} \cong \overline{AE}$
**H.** $\overline{AE} \cong \overline{BE}$
**J.** $\angle DAB \cong \angle CBA$
**K.** $\angle EAB \cong \angle EBA$

**17.** Leticia went into Discount Music to price CDs. All CDs were discounted 23% off the marked price. Leticia wanted to program her calculator so she could input the marked price and the discounted price would be the output. Which of the following is an expression for the discounted price on a marked price of $p$ dollars?

**A.** $p - 0.23p$
**B.** $p - 0.23$
**C.** $p - 23p$
**D.** $p - 23$
**E.** $0.23p$

**18.** In the figure below, $A$, $D$, $B$, and $G$ are collinear. If $\angle CAD$ measures 76°, $\angle BCD$ measures 47°, and $\angle CBG$ measures 140°, what is the degree measure of $\angle ACD$ ?



**F.** 12°
**G.** 14°
**H.** 17°
**J.** 36°
**K.** 43°

**GO ON TO THE NEXT PAGE.**

Appx1631

**2** △ △ △ △ △ △ △ △ △ **2**

19. Ms. Lewis plans to drive 900 miles to her vacation destination, driving an average of 50 miles per hour. How many miles per hour faster must she average, while driving, to reduce her total driving time by 3 hours?

  A. 5
  B. 8
  C. 10
  D. 15
  E. 18

20. For all positive integers $x$, what is the greatest common factor of the 2 numbers $216x$ and $180x$ ?

  F. 6
  G. 72
  H. $x$
  J. $12x$
  K. $36x$

21. The table below shows the price of different quantities of standard-sized lemons at Joe's Fruit Stand. What is the least amount of money needed to purchase exactly 20 standard-sized lemons if the bags must be sold intact and there is no tax charged for lemons?

| Number of lemons: | 1 | bag of 6 | bag of 12 |
|---|---|---|---|
| Total price: | $0.30 | $1.20 | $2.10 |

  A. $3.60
  B. $3.90
  C. $4.20
  D. $4.50
  E. $6.00

22. The diameter, $d$ centimeters, of the metal poles Goodpole Manufacturing produces must satisfy the inequality $|d - 3| \leq 0.001$. What is the maximum diameter, in centimeters, such a metal pole may have?

  F. 1.4995
  G. 1.5005
  H. 2.999
  J. 3.000
  K. 3.001

23. Which of the following is a factored form of the expression $5x^2 - 13x - 6$ ?

  A. $(x - 3)(5x + 2)$
  B. $(x - 2)(5x - 3)$
  C. $(x - 2)(5x + 3)$
  D. $(x + 2)(5x - 3)$
  E. $(x + 3)(5x - 2)$

24. A bag contains 6 red marbles, 5 yellow marbles, and 7 green marbles. How many additional red marbles must be added to the 18 marbles already in the bag so that the probability of randomly drawing a red marble is $\frac{3}{5}$ ?

  F. 12
  G. 16
  H. 18
  J. 24
  K. 36

25. Which of the following trigonometric equations is valid for the side measurement $x$ inches, diagonal measurement $y$ inches, and angle measurement $w°$ in the rectangle shown below?



  A. $\cos w° = \frac{x}{y}$
  B. $\cot w° = \frac{x}{y}$
  C. $\sec w° = \frac{x}{y}$
  D. $\sin w° = \frac{x}{y}$
  E. $\tan w° = \frac{x}{y}$

26. The slope of the line with equation $y = ax + b$ is greater than the slope of the line with equation $y = cx + b$. Which of the following statements *must* be true about the relationship between $a$ and $c$ ?

  F. $a \leq c$
  G. $a < c$
  H. $a = c$
  J. $a > c$
  K. $a \geq c + 1$

27. Minh cuts a board in the shape of a regular hexagon and pounds in a nail at an equal distance from each vertex, as shown in the figure below. How many rubber bands will she need in order to stretch a different rubber band across every possible pair of nails?



  A. 15
  B. 14
  C. 12
  D. 9
  E. 6

28. There are 280 runners registered for a race, and the runners are divided into 4 age categories, as shown in the table below.

| Age category: | under 16 | 16–25 | 26–35 | over 35 |
|---|---|---|---|---|
| Number of runners: | 40 | 76 | 112 | 52 |

The prize committee has 60 prizes to award and wants the prizes to be awarded in proportion to the number of runners registered in each category. How many prizes should be designated for the 26–35 age category?

  F. 15
  G. 17
  H. 24
  J. 36
  K. 40

**GO ON TO THE NEXT PAGE.**

**2** △ △ △ △ △ △ △ △ △ **2**

Use the following information to answer questions 29–32.

The youth center has installed a swimming pool on level ground. The pool is a right circular cylinder with a diameter of 24 feet and a height of 6 feet. A diagram of the pool and its entry ladder is shown below.



**29.** To the nearest cubic foot, what is the volume of water that will be in the pool when it is filled with water to a depth of 5 feet?

(Note: The volume of a cylinder is given by $\pi r^2 h$, where $r$ is the radius and $h$ is the height.)

A. 942
B. 1,885
C. 2,262
D. 9,047
E. 11,310

**30.** A plastic cover is made for the pool. The cover will rest on the top of the pool and will include a wedge-shaped flap that forms a 45° angle at the center of the cover, as shown in the figure below. A zipper will go along 1 side of the wedge-shaped flap and around the arc. Which of the following is closest to the length, in feet, of the zipper?



F. 17
G. 22
H. 24
J. 29
K. 57

**31.** Two hoses are used to fill the pool. Twice as many gallons of water per minute flow through one of the hoses as through the other. Both hoses had been on for 12 hours and had filled the pool to the 4-foot mark when the hose with the faster flow stopped working. The hose with the slower flow then finished filling the pool to the 5-foot mark. Which of the following graphs shows the relationship between the time spent filling the pool and the height of the water in the pool?

A.


B.


C.


D.


E.


**32.** The directions for assembling the pool state that the ladder should be placed at an angle of 75° relative to level ground. Which of the following expressions involving tangent gives the distance, in feet, that the bottom of the ladder should be placed away from the bottom edge of the pool in order to comply with the directions?

F. $\dfrac{6}{\tan 75°}$

G. $\dfrac{\tan 75°}{6}$

H. $\dfrac{1}{6 \tan 75°}$

J. $6 \tan 75°$

K. $\tan(6 \cdot 75°)$

**GO ON TO THE NEXT PAGE.**

Appx1633

**2**          **2**

**33.** For a population that grows at a constant rate of $r\%$ per year, the formula $P(t) = p_o\left(1 + \frac{r}{100}\right)^t$ models the population $t$ years after an initial population of $p_o$ people is counted.

The population of the city of San Jose was 782,000 in 1990. Assume the population grows at a constant rate of 5% per year. According to this formula, which of the following is an expression for the population of San Jose in the year 2000 ?

**A.** $782,000(6)^{10}$
**B.** $782,000(1.5)^{10}$
**C.** $782,000(1.05)^{10}$
**D.** $(782,000 \times 1.5)^{10}$
**E.** $(782,000 \times 1.05)^{10}$

**34.** Tom's long-distance service charges $0.10 per minute from 7:00 P.M. to 7:00 A.M. on weekdays, all day on Saturdays, and all day on holidays; $0.05 per minute all day on Sundays; and $0.25 per minute at all other times. The table below gives his long-distance calls for 1 week, including the date and day of each call, the time it was placed, and the number of minutes it lasted.

| Date and day | Time | Number of minutes |
|---|---|---|
| 11/22 Tuesday | 5:00 P.M. | 8 |
| 11/23 Wednesday | 10:30 A.M. | 10 |
| 11/24 Thursday Thanksgiving holiday | 11:30 A.M. | 15 |
| 11/26 Saturday | 9:30 A.M. | 17 |
| 11/27 Sunday | 12:15 P.M. | 22 |

What did Tom's long-distance service charge him for the calls in the table?

**F.** $7.30
**G.** $7.60
**H.** $7.95
**J.** $8.80
**K.** $9.90

**35.** The parallel sides of the isosceles trapezoid shown below are 10 feet long and 16 feet long, respectively. What is the distance, in feet, between these 2 sides?

 

**A.** 3
**B.** 4
**C.** 5
**D.** 10
**E.** 16

**36.** The inequality $3(x + 2) > 4(x - 3)$ is equivalent to which of the following inequalities?

**F.** $x < -6$
**G.** $x < 5$
**H.** $x < 9$
**J.** $x < 14$
**K.** $x < 18$

**37.** In the standard $(x,y)$ coordinate plane, the midpoint of $\overline{AB}$ is $(4,-3)$ and $A$ is located at $(1,-5)$. If $(x,y)$ are the coordinates of $B$, what is the value of $x + y$ ?

**A.** 19
**B.** 8
**C.** 6
**D.** -1.5
**E.** -3

**38.** For all $x$ in the domain of the function $\frac{x+1}{x^3-x}$, this function is equivalent to:

**F.** $\frac{1}{x^2} - \frac{1}{x^3}$
**G.** $\frac{1}{x^2} - \frac{1}{x}$
**H.** $\frac{1}{x^2-1}$
**J.** $\frac{1}{x^2-x}$
**K.** $\frac{1}{x^3}$

**39.** In the figure below, line $l$ is parallel to line $m$. Transversals $t$ and $u$ intersect at point $A$ on $l$ and intersect $m$ at points $C$ and $B$, respectively. Point $X$ is on $m$, the measure of $\angle ACX$ is 130°, and the measure of $\angle BAC$ is 80°. How many of the angles formed by rays of $l$, $m$, $t$, and $u$ have measure 50° ?



**A.** 4
**B.** 6
**C.** 8
**D.** 10
**E.** 12

**GO ON TO THE NEXT PAGE.**

**2**          **2**

**40.** Tickets for the Senior Talent Show at George Washington Carver High School are $3 for adults and $2 for students. To cover expenses, a total of $600 must be collected from ticket sales for the show. One of the following graphs in the standard $(x,y)$ coordinate plane, where $x$ is the number of adult tickets sold and $y$ is the number of student tickets sold, represents all the possible combinations of ticket sales that cover at least $600 in expenses. Which graph is it?

**F.** 

**J.** 

**G.** 

**K.** 

**H.** 

**41.** What is the median of the following 7 scores?


42, 67, 33, 79, 33, 89, 21

- **A.** 42
- **B.** 52
- **C.** 54.5
- **D.** 56
- **E.** 79

**42.** What are the real solutions to the equation $|x|^2 + 2|x| - 3 = 0$ ?

- **F.** $\pm1$
- **G.** $\pm3$
- **H.** 1 and 3
- **J.** $-1$ and $-3$
- **K.** $\pm1$ and $\pm3$

**43.** The point (2,5) is shown in the standard $(x,y)$ coordinate plane below. Which of the following is another point on the line through the point (2,5) with a slope of $-\frac{2}{3}$ ?



- **A.** $A(-1,3)$
- **B.** $B(\ 0,8)$
- **C.** $C(\ 4,2)$
- **D.** $D(\ 5,3)$
- **E.** $E(\ 5,7)$

**44.** For the triangles in the figure below, which of the following ratios of side lengths is equivalent to the ratio of the perimeter of $\triangle ABC$ to the perimeter of $\triangle DAB$ ?



- **F.** $AB{:}AD$
- **G.** $AB{:}BD$
- **H.** $AD{:}BD$
- **J.** $BC{:}AD$
- **K.** $BC{:}BD$

**45.** In the figure below, 2 nonadjacent sides of a regular pentagon (5 congruent sides and 5 congruent interior angles) are extended until they meet at point $X$. What is the measure of $\angle X$ ?



- **A.** $18°$
- **B.** $30°$
- **C.** $36°$
- **D.** $45°$
- **E.** $72°$

**46.** The edges of a cube are each 3 inches long. What is the surface area, in square inches, of this cube?

- **F.** 9
- **G.** 18
- **H.** 27
- **J.** 36
- **K.** 54

**2** △ △ △ △ △ △ △ △ △ **2**

**47.** A number is increased by 25% and the resulting number is then decreased by 20%. The final number is what percent of the original number?

    **A.** 90%
    **B.** 95%
    **C.** 100%
    **D.** 105%
    **E.** 120%

**48.** Two numbers are *reciprocals* if their product is equal to 1. If $x$ and $y$ are reciprocals and $x > 1$, then $y$ must be:

    **F.** less than $-1$.
    **G.** between 0 and $-1$.
    **H.** equal to 0.
    **J.** between 0 and 1.
    **K.** greater than 1.

**49.** The number line graph below is the graph of which of the following inequalities?



    **A.** $-1 \le x$ and $3 \le x$
    **B.** $-1 \le x$ and $3 \ge x$
    **C.** $-1 \le x$ or $3 \le x$
    **D.** $-1 \ge x$ or $3 \le x$
    **E.** $-1 \ge x$ or $3 \ge x$

**50.** All of the following graphs have equal scales on the axes. One of the graphs shows only points for which the $y$-coordinate is 1 less than the square of the $x$-coordinate. Which one?





**51.** In teaching a lesson on the concept of thirds, Ms. Chu uses a divide-and-set-aside procedure. She starts with a certain number of colored disks, divides them into 3 equal groups, and sets 1 group aside to illustrate $\frac{1}{3}$. She repeats the procedure by taking the disks she had NOT set aside, dividing them into 3 equal groups, and setting 1 of these groups aside. If Ms. Chu wants to be able to complete the divide-and-set-aside procedure at least 4 times (without breaking any of the disks into pieces), which of the following is the minimum number of colored disks she can start with?

    **A.** 12
    **B.** 15
    **C.** 27
    **D.** 54
    **E.** 81

**52.** Which of the following is true for all consecutive integers $m$ and $n$ such that $m < n$ ?

    **F.** $m$ is odd
    **G.** $n$ is odd
    **H.** $n - m$ is even
    **J.** $n^2 - m^2$ is odd
    **K.** $m^2 + n^2$ is even

**53.** A function $P$ is defined as follows:

    for $x > 0$, $P(x) = x^5 + x^4 - 36x - 36$
    for $x < 0$, $P(x) = -x^5 + x^4 + 36x - 36$

What is the value of $P(-1)$ ?

    **A.** $-70$
    **B.** $-36$
    **C.** 0
    **D.** 36
    **E.** 70

**54.** For a project in Home Economics class, Kirk is making a tablecloth for a circular table 3 feet in diameter. The finished tablecloth needs to hang down 5 inches over the edge of the table all the way around. To finish the edge of the tablecloth, Kirk will fold under and sew down 1 inch of the material all around the edge. Kirk is going to use a single piece of rectangular fabric that is 60 inches wide. What is the shortest length of fabric, in inches, Kirk could use to make the tablecloth without putting any separate pieces of fabric together?

    **F.** 15
    **G.** 24
    **H.** 30
    **J.** 42
    **K.** 48

**GO ON TO THE NEXT PAGE.**

**2** △ △ △ △ △ △ △ △ △ **2**

**55.** The equations of the 2 graphs shown below are $y_1(t) = a_1 \sin(b_1 t)$ and $y_2(t) = a_2 \cos(b_2 t)$, where the constants $b_1$ and $b_2$ are both positive real numbers.



Which of the following statements is true of the constants $a_1$ and $a_2$ ?

- **A.** $0 < a_1 < a_2$
- **B.** $0 < a_2 < a_1$
- **C.** $a_1 < 0 < a_2$
- **D.** $a_1 < a_2 < 0$
- **E.** $a_2 < a_1 < 0$

**56.** For $x$ such that $0 < x < \frac{\pi}{2}$, the expression

$$\frac{\sqrt{1 - \cos^2 x}}{\sin x} + \frac{\sqrt{1 - \sin^2 x}}{\cos x} \text{ is equivalent to:}$$

- **F.** 0
- **G.** 1
- **H.** 2
- **J.** $-\tan x$
- **K.** $\sin 2x$

**57.** Consider the functions $f(x) = \sqrt{x}$ and $g(x) = 7x + b$. In the standard $(x,y)$ coordinate plane, $y = f(g(x))$ passes through (4,6). What is the value of $b$ ?

- **A.** 8
- **B.** $-8$
- **C.** $-25$
- **D.** $-26$
- **E.** $4 - 7\sqrt{6}$

**58.** The triangle, $\triangle XYZ$, that is shown below has side lengths of $x$, $y$, and $z$ inches and is not a right triangle. Let $X'$ be the image of $X$ when the triangle is reflected across $\overline{YZ}$. Which of the following is an expression for the perimeter. in inches, of quadrilateral $X'YXZ$ ?



- **F.** $2(y + z) + x$
- **G.** $2(x + y + z)$
- **H.** $2(x + y)$
- **J.** $2(x + z)$
- **K.** $2(y + z)$

**59.** A function $f$ is an *odd* function if and only if $f(-x) = -f(x)$ for every value of $x$ in the domain of $f$. One of the functions graphed in the standard $(x,y)$ coordinate plane below is an odd function. Which one?

**A.**    **D.** 

**B.**    **E.** 

**C.** 

**60.** What is the real value of $x$ in the equation $\log_2 24 - \log_2 3 = \log_5 x$ ?

- **F.** 3
- **G.** 21
- **H.** 72
- **J.** 125
- **K.** 243

**END OF TEST 2**

**STOP! DO NOT TURN THE PAGE UNTIL TOLD TO DO SO.**

**DO NOT RETURN TO THE PREVIOUS TEST.**

Appx1637

**3** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ **3**

## READING TEST

*35 Minutes—40 Questions*

**DIRECTIONS:** There are four passages in this test. Each passage is followed by several questions. After reading a passage, choose the best answer to each question and fill in the corresponding oval on your answer document. You may refer to the passages as often as necessary.

---

### Passage I

**PROSE FICTION:** This passage is adapted from the short story "American History" by Judith Ortiz-Cofer (©1992 by Judith Ortiz-Cofer). The story appeared in the anthology *Iguana Dreams: New Latino Fiction.*

There was only one source of beauty and light for me my ninth grade year. The only thing I had anticipated at the start of the semester. That was seeing Eugene. In August, Eugene and his family had moved
5  into the only house on the block that had a yard and trees. I could see his place from my bedroom window in El Building. In fact, if I sat on the fire escape I was literally suspended above Eugene's backyard. It was my favorite spot to read my library books in the summer.
10  Until that August the house had been occupied by an old couple. Over the years I had become part of their family, without their knowing it, of course. I had a view of their kitchen and their backyard, and though I could not hear what they said, I knew when they were arguing,
15  when one of them was sick, and many other things. I knew all this by watching them at mealtimes. I could see their kitchen table, the sink, and the stove. During good times, he sat at the table and read his newspapers while she fixed the meals. If they argued, he would leave and
20  the old woman would sit and stare at nothing for a long time. When one of them was sick, the other would come and get things from the kitchen and carry them out on a tray. The old man had died in June. The house had stood empty for weeks. I had had to resist the temptation to
25  climb down into the yard and water the flowers the old lady had taken such good care of.

By the time Eugene's family moved in, the yard was a tangled mass of weeds. The father had spent several days mowing, and when he finished, from where I
30  sat, I didn't see the red, yellow, and purple clusters that meant flowers to me. I didn't see this family sit down at the kitchen table together. It was just the mother, a redheaded tall woman who wore a white uniform; the father was gone before I got up in the morning and was
35  never there at dinner time. I only saw him on weekends when they sometimes sat on lawn-chairs under the oak tree, each hidden behind a section of the newspaper; and there was Eugene. He was tall and blond, and he wore glasses. I liked him right away because he sat at
40  the kitchen table and read books for hours. That summer, before we had even spoken one word to each other, I kept him company on my fire escape.

Once school started I looked for him in all my classes, but P. S. 13 was a huge place and it took me
45  days and many discreet questions to discover Eugene. After much maneuvering I managed "to run into him" in the hallway where his locker was—on the other side of the building from mine—and in study hall at the library where he first seemed to notice me, but did not
50  speak; and finally, on the way home after school one day when I decided to approach him directly, though my stomach was doing somersaults.

I was ready for rejection, snobbery, the worst. But when I came up to him and blurted out: "You're
55  Eugene. Right?" he smiled, pushed his glasses up on his nose, and nodded. I saw then that he was blushing deeply. Eugene liked me, but he was shy. I did most of the talking that day. He nodded and smiled a lot. In the weeks that followed, we walked home together. He
60  would linger at the corner of El Building for a few minutes then walk down to his house.

I did not tell Eugene that I could see inside his kitchen from my bedroom. I felt dishonest, but I liked my secret sharing of his evenings. especially now that I
65  knew what he was reading since we chose our books together at the school library.

I also knew my mother was unhappy in Paterson, New Jersey, but my father had a good job at the bluejeans factory in Passaic and soon. he kept assuring us,
70  we would be moving to our own house there. I had learned to listen to my parents' dreams, which were spoken in Spanish, as fairy tales, like the stories about life in Puerto Rico before I was born. I had been to the island once as a little girl. We had not been back there
75  since then, though my parents talked constantly about buying a house on the beach someday, retiring on the island—that was a common topic among the residents of El Building. As for me, I was going to go to college and become a teacher.

80  But after meeting Eugene I began to think of the present more than of the future. What I wanted now was to enter that house I had watched for so many years. I wanted to see the other rooms where the old people had lived, and where the boy spent his time. Most of all, I
85  wanted to sit at the kitchen table with Eugene like two adults, like the old man and his wife had done, maybe drink some coffee and talk about books.

**GO ON TO THE NEXT PAGE.**

# 3 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ 3

1. The main theme of this passage concerns the:
   A. difficulty of first starting and then maintaining a friendship.
   B. process of making a new friend and how the friendship changes the narrator.
   C. problems the narrator has dealing with the loss of her former neighbors.
   D. differences in the lives led by two pairs of adults who at different times lived in the same house.

2. Which of the following questions is NOT answered by information in the passage?
   F. Has the narrator ever walked around inside Eugene's house?
   G. What hobby or interest do Eugene and the narrator share?
   H. What makes Eugene's house different from other houses on the block?
   J. What careers other than teaching has the narrator considered pursuing?

3. The narrator draws which of the following comparisons between the old couple and Eugene's parents?
   A. The old couple were more socially outgoing and had many more friends than Eugene's parents.
   B. Eugene's parents are just as interested in tending the lawn and flowers as the old couple were.
   C. Eugene's parents are less nurturing of each other and spend less time together than the old couple did.
   D. Just like the old man and old woman, both of Eugene's parents appear to have jobs outside the home.

4. In terms of developing the narrative, the last two paragraphs (lines 67–87) primarily serve to:
   F. provide background details about the narrator and her family in order to highlight the narrator's unique and shifting perspective.
   G. describe the narrator's family in order to establish a contrast between her parents and Eugene's parents.
   H. portray the narrator's family in order to show how her friendship with Eugene affected the various members of her family.
   J. depict the hopes and dreams of the narrator's parents in order to show how her parents' aspirations changed over time.

5. It can most reasonably be inferred from the passage that when the narrator says, "I didn't see the red, yellow, and purple clusters that meant flowers to me" (lines 30–31), she is most nearly indicating that:
   A. from her current position, she couldn't see the old woman's flowers, which were still growing near the house.
   B. the flowers grown by the old woman had died because the narrator had stopped watering them.
   C. the flowers grown by the old woman had been cut down when Eugene's father mowed the lawn.
   D. the weeds that had grown up in the old couple's lawn had intertwined with the flowers, making the flowers hard to see.

6. According to the narrator, which of the following statements was true about Eugene at the moment when she first talked to him?
   F. Due to the size of the school, he had not even noticed the narrator until she started talking to him.
   G. He had searched unsuccessfully for the narrator's locker several different times and had been too shy to ask someone where it was.
   H. He had first noticed the narrator in study hall but had been uninterested in her until she introduced herself.
   J. He had apparently taken notice of the narrator at school and had come to like her but felt nervous about introducing himself.

7. When the narrator says, "I began to think of the present more than of the future" (lines 80–81), she most likely means that meeting Eugene led her to:
   A. shift some of her attention away from her career plans and onto the developing friendship.
   B. think more about her own work interests than about the career her parents thought she should pursue.
   C. put off her plans of returning to Puerto Rico for a visit in favor of continuing to prepare for college.
   D. want to spend more time with him instead of helping her parents plan a vacation to Puerto Rico.

8. The narrator most nearly portrays her parents' dreams as:
   F. close to being realized because of her father's good job.
   G. somewhat uncommon among the other residents of the family's building.
   H. ones she has heard about many times but that seem far off and remote to her.
   J. ones she shares with her parents and longs to fulfill.

9. The narrator claims that she felt close to the old couple because she had:
   A. listened in on so many of their conversations over the years.
   B. helped take care of the old woman's flowers after the woman's husband had died.
   C. been able to watch them as they moved through their entire house.
   D. regularly observed them during their mealtimes.

10. Which of the following best describes the narrator's feelings about secretly observing Eugene at his home?
   F. Joy tinged with suspicion
   G. Enjoyment mixed with guilt
   H. Happiness overwhelmed by a sense of betrayal
   J. Pleasure lessened by having actually met him

**GO ON TO THE NEXT PAGE.**

**3** <span style="background:gray"> </span> **3**

## Passage II

**SOCIAL SCIENCE:** This passage is adapted from volume 2 of Blanche Wiesen Cook's biography *Eleanor Roosevelt* (©1999 by Blanche Wiesen Cook).

Eleanor Roosevelt [ER] is the most controversial First Lady in United States history. Her journey to greatness, her voyage out beyond the confines of good wife and devoted mother, involved determination and 5 amazing courage. It also involved one of history's most unique partnerships. Franklin Delano Roosevelt [FDR] admired his wife, appreciated her strengths, and depended on her integrity.

However, ER and FDR had different priorities, 10 occasionally competing goals, and often disagreed. In the White House they ran two distinct and separate courts.

By 1933 [her first year as First Lady], ER was an accomplished woman who had achieved several of her 15 life's goals. With her partners, ER was a businesswoman who co-owned the Val-Kill crafts factory, a political leader who edited and copublished the *Women's Democratic News,* and an educator who co-owned and taught at a New York school for girls.

20 As First Lady, Eleanor Roosevelt did things that had never been done before. She upset race traditions, championed a New Deal for women, and on certain issues actually ran a parallel administration. On housing and the creation of model communities, for 25 example, ER made decisions and engineered policy.

At the center of a network of influential women who ran the Women's Committee of the Democratic Party led by Molly Dewson, ER worked closely with the women who had dominated the nation's social 30 reform struggles for decades. With FDR's election, the goals of the great progressive pioneers, Jane Addams, Florence Kelley, and Lillian Wald, were at last at the forefront of the country's agenda. ER's mentors since 1903, they had battled on the margins of national poli- 35 tics since the 1880s for public health, universal education, community centers, sanitation programs, and government responsibility for the welfare of the nation's poor and neglected people.

Now their views were brought directly into the 40 White House. ER lobbied for them personally with her new administrative allies, in countless auditoriums, as a radio broadcaster, and in monthly, weekly, and, by 1936, daily columns. Called "Eleanor Everywhere," she was interested in everyone.

45 Every life was sacred and worthy, to be improved by education, employment, health care, and affordable housing. Her goal was simple, a life of dignity and decency for all. She was uninterested in complex theories, and demanded action for betterment. She feared 50 violent revolution, but was not afraid of socialism—and she courted radicals.

As fascism and communism triumphed in Europe and Asia, ER and FDR were certain that there was a middle way, what ER called an American "revolution 55 without bloodshed." Her abiding conviction, however, was that nothing good would happen to promote the people's interest unless the people themselves organized to demand government responses. A people's movement required active citizen participation, and 60 ER's self-appointed task was to agitate and inspire community action, encourage united democratic movements for change.

Between 1933 and 1938, while the Depression raged and the New Deal unfolded, ER worked with the 65 popular front. She called for alliances of activists to fight poverty and racism at home, and to oppose isolationism internationally.

Active with the women's peace movement, ER spoke regularly at meetings of the Women's Inter- 70 national League for Peace and Freedom, and the Conference on the Cause and Cure of War. She departed, however, from pacifist and isolationist positions and encouraged military preparedness, collective security, and ever-widening alliances.

75 Between 1933 and 1938 ER published countless articles and six books. She wrote in part for herself, to clear her mind and focus her thoughts. But she also wrote to disagree with her husband. From that time to this, no other First Lady has actually rushed for her pen 80 to jab her husband's public decisions. But ER did so routinely, including in her 1938 essay *This Troubled World,* which was a point-by-point rejection of FDR's major international decisions.

To contemplate ER's life of example and responsi- 85 bility is to forestall gloom. She understood, above all, that politics is not an isolated individualist adventure. She sought alliances, created community, worked with movements for justice and peace. Against great odds, and under terrific pressure, she refused to withdraw 90 from controversy. She brought her network of agitators and activists into the White House, and never considered a political setback a permanent defeat. She enjoyed the game, and weathered the abuse.

11. As she is revealed in the passage, ER is best described as:

   **A.** socially controversial but quietly cooperative.
   **B.** politically courageous and socially concerned.
   **C.** morally strong and deeply traditional.
   **D.** personally driven but calmly moderate.

**GO ON TO THE NEXT PAGE.**

**3** ━━━━━━━━━━━━━━━━━━━━━━━━━━━━ **3**

**12.** The author presents ER's accomplishments as exceptional because ER:

   **F.** brought politically unpopular views to the forefront of the nation's politics.
   **G.** was the first public figure to introduce political roles for women.
   **H.** was a political pioneer struggling alone for social reform.
   **J.** replaced community action with more powerful White House networks.

**13.** According to the passage, ER believed that social reform should include all of the following EXCEPT:

   **A.** promoting community action.
   **B.** developing universal education.
   **C.** supporting affordable housing.
   **D.** establishing involved theories.

**14.** Based on the passage, ER's approach to social reform can best be characterized as:

   **F.** passionate and theoretical.
   **G.** patient and flexible.
   **H.** simplistic and isolationist.
   **J.** progressive and determined.

**15.** It can reasonably be inferred from the passage that at the time ER began working for social reform, the United States was:

   **A.** deeply committed to reforms in education and health care.
   **B.** experiencing a time of national prosperity that contributed to ER's ideals concerning the public welfare.
   **C.** concentrating on affairs at home due to isolationist policies and the spread of democracy overseas.
   **D.** unsupportive of the idea that the government was responsible for the welfare of its poor and neglected.

**16.** According to the last paragraph, which of the following statements would the author most likely make with regard to ER's vision and ideals?

   **F.** ER considered politics a game and played only when she knew she could win.
   **G.** ER worked with agitators and remained dedicated to the pursuit of justice and peace in victory and defeat.
   **H.** ER placed herself in the position of president, making decisions that determined White House policy.
   **J.** ER saw herself as the country's role model and personally responsible for bringing about change.

**17.** In terms of the passage as a whole, one of the main functions of the third paragraph (lines 13–19) is to suggest that:

   **A.** ER's successes in various professional pursuits helped prepare her to take action in the political world.
   **B.** ER had avoided the political spotlight in her personal pursuits.
   **C.** ER had competing and conflicting interests during her first year as first lady.
   **D.** while ER had many personal accomplishments, little could have prepared her for life as the first lady.

**18.** According to the passage, the primary principle underlying ER's goals was that:

   **F.** every person deserved a dignified and decent life.
   **G.** as first lady, she could talk about things that had never been discussed before.
   **H.** through radio and columns, she could show she was interested in every person.
   **J.** she must lead a bloodless American revolution.

**19.** The passage states that ER believed the relationship between a people and their government should be:

   **A.** begun and carried out as if it were an isolated, individualist adventure.
   **B.** formed and modeled by the White House.
   **C.** based on organized, widespread citizen participation.
   **D.** controlled through radio broadcasts and formal channels.

**20.** In the context of the passage, the author's statement that ER "enjoyed the game, and weathered the abuse" (line 93) most nearly means that ER:

   **F.** enjoyed her individualist adventure in politics even if criticized.
   **G.** preferred to be a team player rather than take the lead.
   **H.** embraced the political life and accepted criticism as part of her work.
   **J.** understood political games and so did not take politics or criticism very seriously.

**GO ON TO THE NEXT PAGE.**

**3** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **3**

## Passage III

HUMANITIES: This passage is adapted from the essay "The Interior Life" by Annie Dillard, which appeared in her book *An American Childhood* (©1987 by Annie Dillard).

The interior life is often stupid. Its egoism blinds it and deafens it; its imagination spins out ignorant tales, fascinated. It fancies that the western wind blows on the Self, and leaves fall at the feet of the Self for a reason,
5 and people are watching. A mind risks real ignorance for the sometimes paltry prize of an imagination enriched. The trick of reason is to get the imagination to seize the actual world—if only from time to time.

When I was five, I would not go to bed willingly
10 because something came into my room. My sister Amy, two years old, was asleep in the other bed. What did she know? She was innocent of evil. There was no messiness in her, no roughness for things to cling to, only a charming and charmed innocence that seemed
15 then to protect her, an innocence I needed but couldn't muster. Since Amy was asleep, furthermore, and since when I needed someone most I was afraid to stir enough to wake her, she was useless.

I lay alone and was almost asleep when the thing
20 entered the room by flattening itself against the open door and sliding in. It was a transparent, luminous oblong. I could see the door whiten at its touch; I could see the blue wall turn pale where it raced over it, and see the maple headboard of Amy's bed glow. It was a
25 swift spirit; it was an awareness. It made noise. It had two joined parts, a head and a tail. It found the door, wall, and headboard; and it swiped them, charging them with its luminous glance. After its fleet, searching passage, things looked the same, but weren't.

30 I dared not blink or breathe. If it found another awareness, it would destroy it.

Every night before it got to me it gave up. It hit my wall's corner and couldn't get past. It shrank completely into itself and vanished. I heard the rising roar it
35 made when it died or left. I still couldn't breathe. I knew that it could return again alive that same night.

Sometimes it came back, sometimes it didn't. Most often, restless, it came back. The light stripe slipped in the door, ran searching over Amy's wall,
40 stopped, stretched lunatic at the first corner, raced wailing toward my wall, and vanished into the second corner with a cry. So I wouldn't go to bed.

It was a passing car whose windshield reflected the corner streetlight outside. I figured it out one night.

45 Figuring it out was as memorable as the oblong itself. Figuring it out was a long and forced ascent to the very rim of being, to the membrane of skin that both separates and connects the inner life and the outer world. I climbed deliberately from the depths like a
50 diver who releases the monster in his arms and hauls

himself hand over hand up an anchor chain till he meets the ocean's sparkling membrane and bursts through it; he sights the sunlit, becalmed hull of his boat, which had bulked so ominously from below.

55 I recognized the noise it made when it left. That is, the noise it made called to mind, at last, my daytime sensations when a car passed—the sight and noise together. A car came roaring down hushed Edgerton Avenue in front of our house, stopped, and passed on
60 shrieking as its engine shifted up the gears. What, precisely, came into the bedroom? A reflection from the car's oblong windshield. Why did it travel in two parts? The window sash split the light and cast a shadow.

Night after night I labored up the same long chain
65 of reasoning, as night after night the thing burst into the room where I lay awake.

There was a world outside my window and contiguous to it. Why did I have to keep learning this same thing over and over? For I had learned it a summer ago,
70 when men with jackhammers broke up Edgerton Avenue. I had watched them from the yard. When I lay to nap, I listened. One restless afternoon I connected the new noise in my bedroom with the jackhammer men I had been seeing outside. I understood abruptly that
75 these worlds met, the outside and the inside. "Outside," then, was conceivably just beyond my windows.

The world did not have me in mind. It was a coincidental collection of things and people, of items, and I myself was one such item—a child walking up the side-
80 walk, whom anyone could see or ignore. The things in the world did not necessarily cause my overwhelming feelings; the feelings were inside me, beneath my skin, behind my ribs, within my skull. They were even, to some extent, under my control.

85 I could be connected to the outer world by reason, if I chose, or I could yield to what amounted to a narrative fiction, to a show in light projected on the room's blue walls.

21. Which of the following statements best describes the structure of this passage?

   A. It begins and ends with a series of assertions that surround a story used by the narrator to support and elaborate on those assertions.

   B. It contains a highly detailed anecdote that the narrator uses to show how the claims she makes in the first paragraph are wrong.

   C. It compares and contrasts the narrator's perspective on an incident in her life with the perspectives of several other people, such as her parents.

   D. It consists mainly of a story about a recent event in the narrator's life that she feels taught her an interesting but ultimately insignificant lesson.

**GO ON TO THE NEXT PAGE.**

# 3 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ 3

**22.** In terms of mood, which of the following best describes lines 9–44?

- **F.** A steadily increasing feeling of tension
- **G.** A consistently high level of tension
- **H.** A growing feeling of tension that is finally broken
- **J.** A feeling of tension frequently undermined by the narrator's use of irony and humor

**23.** The narrator develops the third paragraph (lines 19–29) mainly through:

- **A.** detached philosophical musings on the nature of the object she sees.
- **B.** a detailed description of what she did to try to keep the object out of her room.
- **C.** sensory details vividly depicting the object and its movements.
- **D.** imaginative speculation on what might be causing the object to appear.

**24.** The narrator indicates that one reason she did not wake her sister Amy when "something" came into their room was because:

- **F.** Amy had previously asked the narrator to stop waking her up during the night.
- **G.** the narrator knew she could muster her own charmed innocence.
- **H.** Amy had already figured out what the thing was before going to sleep.
- **J.** the narrator was afraid of alerting the thing to her own presence.

**25.** It can reasonably be inferred from the passage that the narrator regards her initial discovery of the truth about the object entering her bedroom as:

- **A.** deflating, because the object turned out to be so ordinary.
- **B.** disappointing, because she felt she should have solved the mystery many years ago.
- **C.** satisfying, because she could at last ignore the object and go to sleep.
- **D.** significant, because solving the mystery led to important insights.

**26.** It can most reasonably be inferred that for the narrator, the image of the diver bursting through "the ocean's sparkling membrane" (line 52) symbolizes her:

- **F.** fear of monsters and of the object in her bedroom.
- **G.** crossing of the boundary separating her inner and outer lives.
- **H.** struggle to maintain the separation between her inner and outer worlds.
- **J.** bitterness at entering reality and leaving behind her comforting memories.

**27.** As it is used in line 87, the phrase "a show in light" most nearly refers to:

- **A.** a fictional story the narrator has read.
- **B.** a movie the narrator saw at a theater.
- **C.** the work of reason in linking a person to the outer world.
- **D.** a fantasy created by the mind.

**28.** The narrator uses the images in lines 3–5 primarily to depict the interior life's tendency to engage in:

- **F.** deceptive self-absorption.
- **G.** vital self-examination.
- **H.** useful analysis of nature.
- **J.** fierce debates with itself.

**29.** Which of the following statements best paraphrases lines 5–8?

- **A.** The imagination lacks value and should be ignored in favor of paying attention to the actual world.
- **B.** Reason can enhance the imagination but at the expense of experience in the actual world.
- **C.** Rather than become isolated, the imagination should connect to the actual world at least occasionally.
- **D.** Reason, not the imagination, is the best way to appreciate and enrich the actual world.

**30.** By her statements in lines 77–80, the narrator is most nearly asserting that:

- **F.** in her world, adults are generally considered more important than children.
- **G.** she, like everyone and everything else, was a small part of a larger world.
- **H.** it still mattered greatly whether people saw or ignored her.
- **J.** she was less valuable than other people in her world.

**GO ON TO THE NEXT PAGE.**

**3** ━━━━━━━━━━━━━━━━━━━ **3**

## Passage IV

NATURAL SCIENCE: This passage is adapted from "Publish and Punish: Science's Snowball Effect" by Jon Van (©1997 by The Chicago Tribune Company).

It's a scientific finding so fundamental that it certainly will make the history books and maybe snag a Nobel Prize if it pans out, but the notion that cosmic snowballs are constantly pelting Earth is something
5 Louis Frank just as soon would have ducked.

Frank is the University of Iowa physicist whose research led him to declare more than a decade ago that Earth is being bombarded by hundreds of house-sized comets day after day that rain water on our planet and
10 are the reason we have oceans. That weather report caused the widely respected scientist to acquire a certain reputation among his colleagues as a bit unstable, an otherwise estimable fellow whose hard work may have pushed him over the edge.

15 Frank and his associate, John Sigwarth, probably went a way toward salvaging their reputations when they presented new evidence that leaves little doubt Earth is indeed being bombarded by *something* in a manner consistent with Frank's small-comet theory.
20 Rather than gloating or anticipating glory, Frank seemed relieved that part of a long ordeal was ending. "I knew we'd be in for it when we first put forth the small-comet theory," Frank conceded, "but I was naive about just how bad it would be. We were outvoted by
25 about 10,000 to 1 by our colleagues. I thought it would have been more like 1,000 to 1."

To the non-scientist this may seem a bit strange. After all, the point of science is to discover information and insights about how nature works. Shouldn't every
30 scientist be eager to overturn existing ideas and replace them with his or her own? In theory, that is the case, but in practice, scientists are almost as loath to embrace radically new ideas as the rest of us.

"Being a scientist puts you into a constant schizo-
35 phrenic existence," contends Richard Zare, chairman of the National Science Board. "You have to believe and yet question beliefs at the same time. If you are a complete cynic and believe nothing, you do nothing and get nowhere, but if you believe too much, you fool your-
40 self."

It was in the early 1980s when the small-comet theory started to haunt Frank and Sigwarth, who was Frank's graduate student studying charged particles called plasmas, which erupt from the sun and cause the
45 aurora borealis (northern lights). As they analyzed photos of the electrical phenomena that accompany sunspots, they noted dark specks appearing in several images from NASA's Dynamics Explorer 1 satellite. They assumed these were caused by static in the trans-
50 mission.

After a while their curiosity about the dark spots grew into a preoccupation, then bordered on obsession.

Try as they did, the scientists couldn't find any plausible explanation of the pattern of dark spots that
55 appeared on their images. The notion that the equipment was picking up small amounts of water entering Earth's upper atmosphere kept presenting itself as the most likely answer.

Based on their images, the Iowa scientists esti-
60 mated 20 comets an hour—each about 30 feet or so across and carrying 100 tons of water—were bombarding the Earth. At that rate, they would produce water vapor that would add about an inch of water to the planet every 10,000 years, Frank concluded. That may
65 not seem like much, but when talking about a planet billions of years old, it adds up.

Such intimate interaction between Earth and space suggests a fundamentally different picture of human evolution—which depends on water—than is com-
70 monly presented by scientists. Frank had great difficulty getting his ideas into a physics journal 11 years ago and was almost hooted from the room when he presented his theory at scientific meetings. Despite the derision, colleagues continued to respect Frank's main-
75 stream work on electrically charged particles in space and the imaging cameras he designed that were taken aboard recent NASA spacecraft to explore Earth's polar regions.

Unbeknown to most, in addition to gathering
80 information on the northern lights, Frank and Sigwarth designed the equipment to be able to snatch better views of any small comets the spacecraft might happen upon. It was those images from the latest flights that caused even harsh critics of the small-comet theory to
85 concede that some water-bearing objects appear to be entering Earth's atmosphere with regularity.

To be sure, it has not been proved that they are comets, let alone that they have anything to do with the oceans. But Frank's evidence opens the matter up to
90 study. Had he been a researcher of lesser standing, his theory probably would have died long ago.

31. Which of the following conclusions about new theories in science can reasonably be drawn from the passage?

   A. Important new theories will eventually be accepted, no matter how controversial they are or who proposes them.
   B. Important but unusual new theories have a better chance at acceptance when they are proposed by well-respected scientists.
   C. Research on new, nontraditional theories is widely respected within the scientific community.
   D. Scientists welcome the opportunity to overturn existing ideas in favor of useful new theories.

**GO ON TO THE NEXT PAGE.**

# 3                                                                                3

32. Which of the following best describes how Frank's colleagues perceived him after he first presented the small-comet theory?

   F. Their doubts about the theory led them to also question his work on particles in space.
   G. They felt his theory had ruined his reputation as a widely respected scientist.
   H. He acquired a reputation among them as someone who had worked hard to develop his theory.
   J. They still respected his traditional research but felt he was overly committed to an improbable theory.

33. The passage indicates that at the time Frank and Sigwarth presented new evidence supporting the small-comet theory, Frank most nearly felt:

   A. relieved but bitter about how he had been treated.
   B. grateful that ridicule of his work would end.
   C. proud that he had been proved right.
   D. satisfied and filled with anticipation of glory.

34. The author uses the fourth paragraph (lines 27–33) primarily to:

   F. continue his earlier criticisms of scientists.
   G. reveal the role science serves in society.
   H. present then undermine common perceptions of scientists.
   J. explain the difference between theoretical and practical scientific research.

35. According to the passage, the research that led to the development of the small-comet theory began with a project originally intended to study:

   A. the electrical activity accompanying sunspots.
   B. water entering Earth's upper atmosphere.
   C. static in satellite transmissions.
   D. specks in satellite images.

36. The main function of lines 64–66 in terms of the eighth paragraph (lines 59–66) as a whole is to:

   F. give a sense of proportion to the numbers provided earlier in the paragraph.
   G. point out the limitations of the evidence provided by the Iowa scientists.
   H. supplement the paragraph's description of the comets with additional details about their size and capacity.
   J. provide readers with a sense of how old the planet really is.

37. It can reasonably be inferred from the passage that within the scientific community the year the passage was published, the small-comet theory was:

   A. tremendously unpopular and condemned for its incompleteness.
   B. widely accepted and seen as conclusive.
   C. regarded as tentative but deemed worthy of consideration.
   D. seen as correct by most scientists but was highly criticized by some.

38. The author italicizes the word *something* in line 18 most likely to emphasize the:

   F. great skepticism with which critics regard Frank and Sigwarth's new evidence.
   G. remaining uncertainty about what exactly is bombarding Earth.
   H. lack of doubt among scientists about the small-comet theory's practical value.
   J. concern among scientists about the usefulness of Frank and Sigwarth's methods of collecting evidence.

39. When Richard Zare says that scientists lead a "constant schizophrenic existence" (lines 34–35), he most nearly means that they:

   A. often suffer psychologically from the demands of their work.
   B. tend to be either complete cynics or people who believe too much.
   C. are often guilty of either doing nothing or of fooling themselves.
   D. have to maintain a balance between accepting and challenging ideas.

40. It can reasonably be inferred that Frank and Sigwarth conducted the study of the dark specks they found with a:

   F. detached, scientific mindset.
   G. casual interest that developed into a mild curiosity.
   H. steadily increasing level of involvement.
   J. great intensity that began when they discovered the specks.

## END OF TEST 3
## STOP! DO NOT TURN THE PAGE UNTIL TOLD TO DO SO.
## DO NOT RETURN TO A PREVIOUS TEST.



**4** ○ ○ ○ ○ ○ ○ ○ ○ ○ **4**

## SCIENCE TEST

*35 Minutes—40 Questions*

**DIRECTIONS:** There are seven passages in this test. Each passage is followed by several questions. After reading a passage, choose the best answer to each question and fill in the corresponding oval on your answer document. You may refer to the passages as often as necessary.

You are NOT permitted to use a calculator on this test.

### Passage I

Many bacteria contain *plasmids* (small, circular DNA molecules). Plasmids can be transferred from 1 bacterium to another. For this to occur, the plasmid *replicates* (produces a linear copy of itself). The relative position of the genes is the same on the original plasmid and on the linear copy, except that the 2 ends of the linear copy do not immediately connect.

While replication is occurring, 1 end of the linear copy leaves the donor bacterium and enters the recipient bacterium. Thus, the order in which the genes are replicated is the same as the order in which they are transferred. Unless this process is interrupted, the entire plasmid is transferred, and its 2 ends connect in the recipient bacterium.

Four students studied the way in which 6 genes (F, X, R, S, A, and G) on a specific plasmid were donated by a type of bacterium (see the figure). The students determined that the entire plasmid is transferred in 90 min and that the rate of transfer is constant. They also determined that the genes are evenly spaced around the plasmid, so 1 gene is transferred every 15 min. They disagreed, however, about the order in which the genes are replicated and thus transferred. Four models are presented.



*Student 1*

Replication always begins between Gene F and Gene X. Gene X is replicated first and Gene F is replicated last.

*Student 2*

Replication always begins between Gene F and Gene X. However, the direction of replication varies. If Gene F is replicated first, Gene X is replicated last. Conversely, if Gene X is replicated first, Gene F is replicated last.

*Student 3*

Replication can begin between any 2 genes. Replication then proceeds around the plasmid in a clockwise direction (with respect to the figure). Thus, if Gene S is replicated first, Gene A is replicated second, and Gene R is replicated last.

*Student 4*

Replication can begin between any 2 genes. Likewise, replication can proceed in either direction. So the order of replication varies.

1. Based on the information presented, if the transfer of the linear copy was interrupted 50 min after transfer began, how many complete genes would have been transferred to the recipient bacterium?
   - A. 2
   - B. 3
   - C. 4
   - D. 5

2. Based on the model presented by Student 3, if all 6 genes are replicated and the first gene replicated is Gene G, the third gene replicated would be:
   - F. Gene F.
   - G. Gene A.
   - H. Gene S.
   - J. Gene X.

ACT-61C-PRACTICE

**GO ON TO THE NEXT PAGE.**

42



**4** ○ ○ ○ ○ ○ ○ ○ ○ ○ **4**

3. Which students believe that any of the 6 genes on the plasmid can be the first gene transferred to a recipient bacterium?

   A. Students 2 and 3
   B. Students 2 and 4
   C. Students 3 and 4
   D. Students 2, 3, and 4

4. Suppose that the model presented by Student 1 is correct and that the transfer of genes between 2 bacteria was interrupted after 45 min. Based on the information provided, which of the following genes would NOT have been transferred from the donor bacterium to the recipient bacterium?

   F. Gene G
   G. Gene X
   H. Gene R
   J. Gene S

5. Suppose that Student 2's model is correct and that the transfer of genes between 2 bacteria was interrupted after 30 min. Under these conditions, which of the following genes would definitely NOT be transferred from the donor bacterium to the recipient bacterium?

   A. Gene A
   B. Gene R
   C. Gene G
   D. Gene X

6. Suppose that all 6 genes are transferred from a donor bacterium to a recipient bacterium. Under this condition, which student(s) would argue that Gene A could be the last gene transferred?

   F. Student 2 only
   G. Student 4 only
   H. Students 2 and 4 only
   J. Students 3 and 4 only

7. Suppose that the transfer of genes between 2 bacteria was interrupted, that the last gene transferred was Gene A, and that no incomplete copies of a gene were transferred. Based on this information, Student 1 would say that transfer was most likely interrupted how many minutes after the transfer began?

   A. 15
   B. 30
   C. 45
   D. 60

Appx1647



**4**  ○  ○  ○  ○  ○  ○  ○  ○  ○  **4**

## Passage II

Color images of the surface of Io, one of Jupiter's moons, show plumes of gas that resemble Earth's geysers and active volcanoes that emit flows of molten material. The materials ejected from Io's volcanoes and plumes rapidly solidify at Io's cold surface temperatures. Scientists believe that these materials may be one of several *allotropes* (forms) of sulfur (S), or a sulfur compound. The following studies were performed to determine the composition of these materials.

### Study 1

In a laboratory, scientists measured the *reflectances* (the fraction of light striking a surface that is reflected by that surface) of 4 allotropes of S (red, white, orange, and brown) and of a sulfur compound (sulfur dioxide [$SO_2$]). Reflectances were measured at visible-light wavelengths between 0.35 μm (micrometers) and 0.60 μm. Figure 1 shows the data for the various S allotropes and for $SO_2$.



Figure 1

Io's *whole-disk reflectance* (the reflectance of Io's entire visible surface measured all at once) was measured at 2 different times. Figure 2 shows these data along with reflectance data calculated using a computer model. This model shows what combination of materials from Figure 1 would produce the closest match to the measured reflectance data. According to the model, the overall composition of Io's surface is 15% $SO_2$, 50% orange S, 20% red S, and 15% white S.



Figure 2

### Study 2

At 2 different times, reflectances were measured of the crater floors of 2 volcanoes on Io: Pele and Surt. Figure 3 shows the reflectance data.



Figure 3

**GO ON TO THE NEXT PAGE.**



**4** ○ ○ ○ ○ ○ ○ ○ ○ ○ **4**

*Study 3*

Reflectance data were taken from several large plumes and several small plumes on Io. The averaged data are in Figure 4.



Figure 4

Figures 1, 3, and 4 adapted from Alfred McEwen and Laurence Soderblom, "Two Classes of Volcanic Plumes on Io." ©1983 by Academic Press, Inc.

Figure 2 adapted from Julianne Moses and Douglas Nash, "Phase Transformations and the Spectral Reflectance of Solid Sulfur: Can Metastable Sulfur Allotropes Exist on Io?" ©1991 by Academic Press, Inc.

8. At the wavelengths used in Study 1, as the wavelength of the light increases, the reflectances of the S allotropes and of $SO_2$ do which of the following?

| | S allotropes | $SO_2$ |
|---|---|---|
| **F.** | Increase only | Increase only |
| **G.** | Increase only | Increase, then decrease |
| **H.** | Decrease only | Decrease only |
| **J.** | Decrease only | Increase, then decrease |

9. According to Study 3, compared with the corresponding average reflectance for small plumes, large plumes on Io have an average reflectance at a given wavelength that is:

    **A.** always higher.
    **B.** always the same.
    **C.** always lower.
    **D.** sometimes higher and sometimes lower.

10. According to Study 1, the reflectance of white S at a wavelength of 0.40 μm is closest to which of the following?

    **F.** 0.0
    **G.** 0.1
    **H.** 0.2
    **J.** 0.3

11. According to Study 1 and Study 2, the crater floor of the volcano Pele has reflectances most similar to which of the following S allotropes?

    **A.** White S
    **B.** Orange S
    **C.** Red S
    **D.** Brown S

12. If the averaged reflectances for large plumes and for small plumes had been measured at a wavelength of 0.61 μm in Study 3, those reflectances would have been closest to which of the following?

| | Large plumes | Small plumes |
|---|---|---|
| **F.** | 0.2 | 0.5 |
| **G.** | 0.5 | 0.2 |
| **H.** | 0.5 | 0.9 |
| **J.** | 0.9 | 0.5 |

13. According to Study 1, white S has a reflectance of 0.98 at a wavelength of 0.60 μm. This means that white S reflects:

    **A.** 2% of the 0.60 μm wavelength light that strikes its surface.
    **B.** 98% of the 0.60 μm wavelength light that strikes its surface.
    **C.** 2% of all the visible light that strikes its surface.
    **D.** 98% of all the visible light that strikes its surface.

**Appx1649**



**4** ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ **4**

## Passage III

An electrical circuit contained a 12-volt (V) battery, a *resistor* (a device that resists the flow of electricity), a *capacitor* (a device that stores electrical charge and electrical energy), a *voltmeter* (an instrument for measuring voltage), and a switch, as shown in Figure 1.



Figure 1

Some students studied the behavior of the circuit.

### Experiment 1

The students used a $1 \times 10^7$ ohm ($\Omega$) resistor and a capacitor with a *capacitance* of $1 \times 10^{-6}$ farad (F). (Capacitance is a measure of the maximum amount of electrical charge and electrical energy a capacitor can store.) The capacitor was initially uncharged. At time zero, the students simultaneously closed the switch and started a stopwatch. At time zero and at 12 sec intervals thereafter, they recorded the voltage across the capacitor. Their results are shown in Table 1.

| Table 1 | |
|---|---|
| Time (sec) | Voltage across capacitor (V) |
| 0 | 0.0 |
| 12 | 8.4 |
| 24 | 10.9 |
| 36 | 11.7 |
| 48 | 11.9 |
| 60 | 12.0 |

### Experiment 2

Using the $1 \times 10^7$ $\Omega$ resistor and several different capacitors, the students determined the length of time from when the switch was closed until the voltage across the capacitor reached 6 V. Their results are shown in Table 2.

| Table 2 | |
|---|---|
| Capacitance ($\times 10^{-6}$ F) | Time to reach 6 V across capacitor (sec) |
| 1.2 | 8.3 |
| 0.6 | 4.2 |
| 0.3 | 2.1 |
| 0.1 | 0.7 |

### Experiment 3

The students conducted the same procedure described in Experiment 2, except that they used a constant capacitance of $1 \times 10^{-6}$ F and several different resistors. Their results are shown in Table 3.

| Table 3 | |
|---|---|
| Resistance ($\times 10^7$ $\Omega$) | Time to reach 6 V across capacitor (sec) |
| 0.75 | 5.2 |
| 0.50 | 3.5 |
| 0.25 | 1.7 |

14. In Experiment 1, the *time constant* of the circuit was the time required for the voltage across the capacitor to reach approximately 7.6 V. The time constant of the circuit used in Experiment 1 was:

   F. less than 12 sec.
   G. between 12 sec and 24 sec.
   H. between 24 sec and 36 sec.
   J. greater than 36 sec.

15. If, in Experiment 2, a $1.5 \times 10^{-6}$ F capacitor had been used, the time required for the voltage across the capacitor to reach 6 V would have been closest to:

   A. 4.2 sec.
   B. 7.0 sec.
   C. 10.5 sec.
   D. 15.0 sec.

**GO ON TO THE NEXT PAGE.**

**4**          **4**

**16.** The main purpose of Experiment 3 was to determine how varying the:

   **F.** battery's voltage affected the resistor's resistance at a given time.

   **G.** capacitor's capacitance affected the time required for the voltage across the capacitor to reach a set value.

   **H.** capacitor's capacitance affected the voltage across the battery at a given time.

   **J.** resistor's resistance affected the time required for the voltage across the capacitor to reach a set value.

**17.** Based on Figure 1. to measure the voltage across the resistor only, which of the following circuits should one use?

**A.**



**B.**



**C.**



**D.**



**18.** Consider a circuit like that shown in Figure 1. Based on Experiments 2 and 3, the voltage across the capacitor will reach a given value in the shortest amount of time if the circuit contains which of the following capacitances and resistances, respectively?

   **F.** $0.1 \times 10^{-6}$ F, $0.3 \times 10^{7}$ Ω

   **G.** $0.1 \times 10^{-6}$ F, $1.0 \times 10^{7}$ Ω

   **H.** $1.2 \times 10^{-6}$ F, $0.3 \times 10^{7}$ Ω

   **J.** $1.2 \times 10^{-6}$ F, $1.0 \times 10^{7}$ Ω

**19.** Consider the following hypothesis: In a circuit arranged as in Figure 1 containing a battery. a capacitor, and a constant resistance, as capacitance increases. the time required to reach a given voltage across the capacitor increases. Do the experiments support this hypothesis?

   **A.** Yes; in Experiment 1, as capacitance increased, the time required to reach a given voltage increased.

   **B.** Yes; in Experiment 2, as capacitance increased, the time required to reach a given voltage increased.

   **C.** No; in Experiment 1. as capacitance increased, the time required to reach a given voltage decreased.

   **D.** No; in Experiment 2. as capacitance increased, the time required to reach a given voltage decreased.

**GO ON TO THE NEXT PAGE.**

**Appx1651**

**4** ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ **4**

### Passage IV

A *bomb calorimeter* is used to determine the amount of heat released when a substance is burned in oxygen (Figure 1). The heat, measured in kilojoules (kJ), is calculated from the change in temperature of the water in the bomb calorimeter. Table 1 shows the amounts of heat released when different foods were burned in a bomb calorimeter. Table 2 shows the amounts of heat released when different amounts of sucrose (table sugar) were burned. Table 3 shows the amounts of heat released when various chemical compounds were burned.

| Table 2 | |
|---|---|
| Amount of sucrose (g) | Heat released (kJ) |
| 0.1 | 1.6 |
| 0.5 | 8.0 |
| 1.0 | 16.0 |
| 2.0 | 32.1 |
| 4.0 | 64.0 |

| Table 3 | | | |
|---|---|---|---|
| Chemical compound | Molecular formula | Mass (g) | Heat released (kJ) |
| Methanol | $CH_3OH$ | 0.5 | 11.4 |
| Ethanol | $C_2H_5OH$ | 0.5 | 14.9 |
| Benzene | $C_6H_6$ | 0.5 | 21.0 |
| Octane | $C_8H_{18}$ | 0.5 | 23.9 |



Figure 1

Figure 1 adapted from Antony C. Wilbraham, Dennis D. Staley, and Michael S. Matta, *Chemistry.* ©1995 by Addison-Wesley Publishing Company, Inc.

| Table 1 | | | |
|---|---|---|---|
| Food | Mass (g) | Change in water temperature (°C) | Heat released (kJ) |
| Bread | 1.0 | 8.3 | 10.0 |
| Cheese | 1.0 | 14.1 | 17.0 |
| Egg | 1.0 | 5.6 | 6.7 |
| Potato | 1.0 | 2.7 | 3.2 |

Table 1 adapted from American Chemical Society, *ChemCom: Chemistry in the Community.* ©1993 by American Chemical Society.

20. According to Tables 1 and 2, as the mass of successive sucrose samples increased, the change in the water temperature produced when the sample was burned most likely:

F. increased only.
G. decreased only.
H. increased, then decreased.
J. remained the same.

**GO ON TO THE NEXT PAGE.**

**4** ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ **4**

**21.** Which of the following graphs best illustrates the relationship between the heat released by the foods listed in Table 1 and the change in water temperature?



A.

B.

C.

D.

**22.** Based on the data in Table 2, one can conclude that when the mass of sucrose is decreased by one-half, the amount of heat released when it is burned in a bomb calorimeter will:

   **F.** increase by one-half.
   **G.** decrease by one-half.
   **H.** increase by one-fourth.
   **J.** decrease by one-fourth.

**23.** Which of the following lists the foods from Tables 1 and 2 in increasing order of the amount of heat released per gram of food?

   **A.** Potato, egg, bread, sucrose, cheese
   **B.** Sucrose, cheese, bread, egg, potato
   **C.** Bread, cheese, egg, potato, sucrose
   **D.** Sucrose, potato, egg, bread, cheese

**24.** Based on the information in Tables 1 and 2, the heat released from the burning of 5.0 g of potato in a bomb calorimeter would be closest to which of the following?

   **F.**  5 kJ
   **G.** 10 kJ
   **H.** 15 kJ
   **J.** 20 kJ

**GO ON TO THE NEXT PAGE.**

Appx1653



**4** ○  ○  ○  ○  ○  ○  ○  ○  ○ **4**

## Passage V

*Density* is defined as the mass of a substance divided by its volume:

$$density = \frac{mass}{volume}$$

Table 1 lists the phases and the densities, in grams per cubic centimeter ($g/cm^3$), of various pure substances at 25°C and 1 atmosphere (atm) of pressure.

| Table 1 | | |
|---------|---|---|
| Substance | Phase | Density ($g/cm^3$) |
| Arsenic | solid | 5.73 |
| Glucose | solid | 1.56 |
| Iron | solid | 7.86 |
| Lead | solid | 11.34 |
| Zinc | solid | 7.14 |
| Ethanol | liquid | 0.79 ' |
| Ethyl ether | liquid | 0.71 |
| Glycerol | liquid | 1.26 |
| Mercury | liquid | 13.59 |
| Freon-12 | gas | 0.00495 |
| Krypton | gas | 0.00343 |
| Methane | gas | 0.00065 |

Figure 1 shows how the density of liquid water changes with temperature.



Figure 1

Figure 2 shows how the density of solid water changes with temperature.



Figure 2

Figures adapted from John C. Kotz and Keith F. Purcell, *Chemistry & Chemical Reactivity.* ©1987 by CBS College Publishing.

25. According to Figure 1, as the temperature of liquid water decreases from 10°C to 0°C, the density:

   A. increases only.
   B. decreases only.
   C. decreases, then increases.
   D. increases, then decreases.

26. A student claimed that "If the masses of 1 $cm^3$ of any solid and 1 $cm^3$ of any liquid are compared, the mass of the solid will be greater." Do the data in Table 1 support his claim?

   F. No; lead has a higher density than any of the liquids listed.
   G. No; mercury has a higher density than any of the solids listed.
   H. Yes; lead has a higher density than any of the liquids listed.
   J. Yes; mercury has a higher density than any of the solids listed.

27. Which of the following hypotheses about the relationship between the temperature and the density of a solid is best supported by the data in Figure 2 ? As the temperature of a solid increases, the density of the solid:

   A. increases only.
   B. decreases only.
   C. increases, then decreases.
   D. decreases, then increases.

ACT-61C-PRACTICE

**GO ON TO THE NEXT PAGE.**

4  ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯  4

28. Equal amounts of ethyl ether, mercury, and water (density = 0.9971 g/cm³) at 25°C are poured into a single beaker. Three distinct layers of liquid form in the beaker. Based on the data in Table 1, which of the following diagrams represents the order, from top to bottom, of the liquids in the beaker?

F.
| Ethyl ether |
| Water |
| Mercury |

G.
| Ethyl ether |
| Mercury |
| Water |

H.
| Mercury |
| Water |
| Ethyl ether |

J.
| Water |
| Ethyl ether |
| Mercury |

29. According to Figure 1, 100 g of water at 4°C would exactly fill a container having which of the following volumes?

A.    1 cm³
B.   10 cm³
C.  100 cm³
D. 1,000 cm³

Appx1655



**4** ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ **4**

## Passage VI

The clearing of rain forests results in *forest fragmentation* (the breakup of large forest tracts into small patches). Researchers predicted that fragmentation would result in a decrease in animal populations and *aboveground tree biomass* (AGTB) in the resulting fragments. They did 4 studies to test this prediction.

### Study 1

The researchers monitored the AGTB of twenty-five 100 m × 100 m forest plots near areas that had recently been cleared of vegetation. The distance from the center of each plot to the nearest clearing was measured. Figure 1 shows the average change per plot in AGTB in metric tons per year (t/yr) over 17 yr.



Figure 1

### Study 2

Twenty-five 100 m × 100 m forest plots were monitored as in Study 1. The center of each of these plots was at least 500 m from the nearest clearing. The average change in AGTB over 17 yr for these 25 plots was 0 t/yr.

### Study 3

Researchers monitored sixteen 100 m × 100 m forest plots near areas that had recently been cleared of vegetation. Each plot was bordered on 1 side by a clearing. Figure 2 shows the average cumulative percent change in AGTB at these plots following fragmentation. (Note: Year 0 represents results prior to fragmentation.)



Figure 2

### Study 4

Researchers trapped and released birds in 10 forest fragments adjacent to areas that had recently been cleared of vegetation. Three types of birds were monitored: insectivores, frugivores (fruit eaters), and hummingbirds. Figure 3 shows the number of captures per 1,000 hours (hr) of trapping. (Note: Year 0 represents results prior to fragmentation.)



Figure 3

Figures adapted from William F. Laurance et al., "Biomass Collapse in Amazonian Forest Fragments." ©1998 by the American Association for the Advancement of Science.

**GO ON TO THE NEXT PAGE.**



**4** ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ ◯ **4**

**30.** In Study 4, as time increased from Year 0 to Year 6, the captures/1,000 hr of frugivores:

F. decreased only.
G. increased only.
H. decreased, then increased.
J. increased, then decreased.

**31.** Based on the results of Study 4, how did fragmentation most likely affect the population sizes of insectivores and hummingbirds in the fragments studied?

A. Fragmentation increased the population sizes of both insectivores and hummingbirds.
B. Fragmentation decreased the population sizes of both insectivores and hummingbirds.
C. Fragmentation increased the population size of insectivores and decreased the population size of hummingbirds.
D. Fragmentation decreased the population size of insectivores and increased the population size of hummingbirds.

**32.** Based on the results of Study 1, if the distance from the center of a 100 m × 100 m plot were 75 m from the nearest clearing, the expected average change in AGTB at the plot over 17 yr would be closest to which of the following values?

F. −1.1 t/yr
G. −2.6 t/yr
H. +1.1 t/yr
J. +2.6 t/yr

**33.** After examining the results of Study 2, a student concluded that the AGTB at each of the 25 plots remained constant. Which of the following alternative explanations is also consistent with the results?

A. The AGTB at all 25 plots increased.
B. The AGTB at all 25 plots decreased.
C. The AGTB at some of the plots increased and the AGTB at some of the plots decreased.
D. The AGTB at plots bounded by forest increased and the AGTB at plots bounded by clearings remained constant.

**34.** Which of the following sets of results from the studies is *least* consistent with the prediction proposed by the researchers?

F. The results of Study 1 for AGTB
G. The results of Study 3 for AGTB
H. The results of Study 4 for frugivores
J. The results of Study 4 for hummingbirds

**35.** In Study 4, the researchers trapped birds for 10,000 hr per year. Thus, how many insectivores were trapped in Year 2 ?

A.   80
B.  100
C.  800
D. 1,000



## Passage VII

Glaciers deposit *till* (a poorly sorted sediment). If glaciers repeatedly advance over an area and then melt back, thick till deposits may form. Figure 1 shows a vertical core taken through layers of till, non-glacial sediments, and bedrock at a site in Canada. The *resistivity* (an electrical property of a material) and $CO_2$ measurements taken along the core are also shown. Resistivity is related to a sediment's particle sizes, compaction, and mineral composition. Table 1 shows the average percent sand, silt, and clay contents and descriptions of the various till layers.



Figure 1

GO ON TO THE NEXT PAGE.

**4** ◯  ◯  ◯  ◯  ◯  ◯  ◯  ◯  ◯ **4**

| Table 1 | | | | |
|---|---|---|---|---|
| | | Average percent by volume of: | | |
| Depth of till layer (m) | Description of till | larger particle → smaller particle | | |
| | | sand | silt | clay |
| 4–9 | brown (oxidized*) | 54.1 | 31.7 | 14.2 |
| 9–14 | gray A | 44.8 | 36.6 | 18.6 |
| 14–19 | yellow (oxidized) | 43.5 | 31.7 | 24.8 |
| 19–24 | gray B | 37.4 | 34.3 | 28.3 |
| 24–35 | olive green and gray | 25.5 | 34.3 | 40.2 |
| 35–55 | gray C | 31.7 | 33.6 | 34.7 |
| 55–85 | gray D | 37.5 | 31.7 | 30.8 |

*Oxidized sediments have at some time been exposed to the air. Sediments that have been *deprived* of oxygen will be gray or green.

Figure 1 and Table 1 adapted from E. A. Christiansen, "Pleistocene Stratigraphy of the Saskatoon Area, Saskatchewan, Canada: An Update." ©1992 by the Geological Association of Canada.

**36.** A sample of gray till was recovered from another core taken from a nearby area. The table below shows the results of an analysis of the sample.

| Percent by volume of: | | | Resistivity (ohms) | $CO_2$ content (mL/g) |
|---|---|---|---|---|
| sand | silt | clay | | |
| 31.5 | 33.7 | 34.8 | 85 | 22 |

Based on these data and the data provided in Figure 1 and Table 1, the sample of gray till corresponds most closely with which till from Figure 1 ?

F. Gray till A
G. Gray till B
H. Gray till C
J. Gray till D

**37.** According to Figure 1, the *oldest* glacial advance in this area deposited which of the following till layers?

A. Gray till A
B. Yellow till
C. Olive green and gray till
D. Gray till D

**38.** According to Figure 1, which of the following statements best describes how the resistivity of the sand and gravel layer compares to the resistivity of the till layers? The resistivity measured in the sand and gravel layer is:

F. lower than the resistivities measured in any of the till layers.
G. higher than the resistivities measured in any of the till layers.
H. the same as the resistivities measured in the surface sediments.
J. lower than the resistivities measured in the bedrock.

**39.** The average resistivity of the bedrock in the core is most similar to the average resistivity of which of the following till layers?

A. Yellow till
B. Gray till B
C. Olive green and gray till
D. Gray till C

**40.** The sediments being deposited at the present time at the site where the core was taken have a much higher $CO_2$ content than any of the tills. Given this information and the information in Figure 1, the $CO_2$ content of sediments recently deposited at the site would most likely be in which of the following ranges?

F. Less than 10 mL/g
G. Between 10 mL/g and 25 mL/g
H. Between 25 mL/g and 35 mL/g
J. Greater than 35 mL/g

**END OF TEST 4**

**STOP! DO NOT RETURN TO ANY OTHER TEST.**

[See Note on page 56.]

ACT-61C-PRACTICE

**Note:** If you plan to take the ACT Writing Test, take a short break and then continue testing on page 57.

If you do not plan to take the ACT Writing Test, turn to page 59 for instructions on scoring your multiple-choice tests.

Appx1660

## Practice Writing Test

Your Signature (do not print): _____

Print Your Name Here: _____

Your Date of Birth:

☐☐ – ☐☐ – ☐☐☐☐

Month    Day    Year

# Form 06A

**ACT ASSESSMENT®**
# WRITING TEST BOOKLET



### Directions

This is a test of your writing skills. You will have thirty (30) minutes to write an essay in English. Before you begin planning and writing your essay, read the writing prompt carefully to understand exactly what you are being asked to do. Your essay will be evaluated on the evidence it provides of your ability to express judgments by taking a position on the issue in the writing prompt; to maintain a focus on the topic throughout the essay; to develop a position by using logical reasoning and by supporting your ideas; to organize ideas in a logical way; and to use language clearly and effectively according to the conventions of standard written English.

You may use the unlined pages in this test booklet to plan your essay. These pages will not be scored. *You must write your essay in pencil on the lined pages in the answer folder.* Your writing on those lined pages will be scored. You may not need all the lined pages, but to ensure you have enough room to finish, do NOT skip lines. You may write corrections or additions neatly between the lines of your essay, but do NOT write in the margins of the lined pages. *Illegible essays cannot be scored, so you must write (or print) clearly.*

If you finish before time is called, you may review your work. Lay your pencil down immediately when time is called.

## DO NOT OPEN THIS BOOKLET UNTIL TOLD TO DO SO.

©2007 by ACT, Inc. All rights reserved.
NOTE: This booklet is covered by Federal copyright laws that prohibit the reproduction of the test questions without the express, written permission of ACT, Inc.

P.O. BOX 168
IOWA CITY, IA 52243-0168

**ACT®**

## ACT Assessment Writing Test Prompt

Many high school libraries use some of their limited funding to subscribe to popular magazines with articles that are interesting to students. Despite limited funding, some educators support this practice because they think having these magazines available encourages students to read. Other educators think school libraries should not use limited funds to subscribe to these magazines because they may not be related to academic subjects. In your opinion, should high school libraries subscribe to popular magazines?

In your essay, take a position on this question. You may write about either one of the two points of view given, or you may present a different point of view on this question. Use specific reasons and examples to support your position.

Note
- Your actual test booklet will have blank space for you to plan your essay. For this practice test, you can use scratch paper.
- You may wish to remove pages 75–78 to respond to this prompt.
- When you have finished, read pages 66–72 for information and instructions on scoring your practice Writing Test.

ACT-06A-PRACTICE

**Appx1662**

# **5** Scoring Your Tests

## How to Score the Multiple-Choice Tests

Follow the instructions below and on the following pages to score the practice multiple-choice tests and to review your performance.

### Raw Scores

The number of questions you answered correctly on each test and in each subscore area is your raw score. Because there are many forms of the ACT, each containing different questions, some forms will be slightly easier (and some slightly harder) than others. A raw score of 67 on one form of the English Test, for example, may be about as difficult to earn as to earn a score of 70 on another form of that test.

To compute your raw scores, check your answers with the scoring keys on pages 60–62. Count the number of correct answers for each of the four tests and seven subscore areas, and enter the number in the blanks provided on those pages. These numbers are your raw scores on the tests and subscore areas.

### Scale Scores

To adjust for the small differences that occur among different forms of the ACT, the raw scores for tests and subscore areas are converted into *scale scores*. Scale scores are printed on the reports sent to you and your college and scholarship choices.

When your raw scores are converted into scale scores, it becomes possible to compare your scores with those of examinees who completed different test forms. For example, a scale score of 26 on the English Test has the same meaning regardless of the form of the ACT on which it is based.

To determine the scale scores corresponding to your raw scores on the practice test, use the score conversion tables on pages 63–64. Table 1 on page 63 shows the raw-to-scale score conversions for the total tests, and Table 2 on page 64 shows the raw-to-scale score conversions for the subscore areas. Because each form of the ACT is unique, each form has somewhat different conversion tables. Consequently, these tables provide only approximations of the raw-to-scale score conversions that would apply if a different form of the ACT were taken. Therefore, the scale scores obtained from the practice tests would not be expected to match precisely the scale scores received from a national administration of the ACT.

### Computing the Composite Score

The Composite score is the average of the four scale scores in English, Mathematics, Reading, and Science. If you left any of these tests blank, a Composite score cannot be calculated. If you take the ACT Plus Writing, your Writing Test results do **not** affect your Composite score.

### Percent At or Below

Even scale scores don't tell the whole story of your test performance. You may want to know how your scores compare to the scores of other students who take the ACT.

The norms table (Table 3 on page 65) enables you to compare your scores on the sample test with the scores of recent high school graduates who tested as sophomores, juniors, or seniors. The numbers reported in Table 3 are cumulative percents. A cumulative percent is the percent of students who scored *at or below* a given score. For example, a Composite score of 20 has a cumulative percent of 50. This means that 50% of the ACT-tested high school students had a Composite score of 20 or lower.

Remember that your scores and percent at or below on the practice test are only *estimates* of the scores that you will obtain on an actual form of the ACT. Test scores are only one indicator of your level of academic knowledge and skills. Consider your scores in connection with your grades, your performance in outside activities, and your career interests.

### College Readiness Standards™

To add to the information you receive about your performance on the ACT, we have developed College Readiness Standards. These Standards help you to more fully understand what your total test score means for each academic area assessed: English, Mathematics, Reading, Science, and Writing. The College Readiness Standards describe the types of skills, strategies, and understandings you will need to make a successful transition from high school to college. For English, Mathematics, Reading, and Science, standards are provided for six score ranges that reflect the progression and complexity of the skills measured by the ACT tests. For Writing, standards are provided for five score ranges. The College Readiness Standards can be found at **www.act.org/standards.**

## Reviewing Your Performance on the Practice Multiple-Choice Tests

After you have determined your scale scores, consider the following as you evaluate how you did on the practice multiple-choice tests.

- Did you run out of time before you completed a test? If so, reread the information in this booklet on pacing yourself. Perhaps you need to adjust the way you used your time in responding to the questions. It is to your advantage to answer every question and pace yourself so that you can do so. Remember there is no penalty for guessing.

- Did you spend too much time trying to understand the directions to the tests? If so, read the directions for each test part thoroughly. The directions for the practice tests are exactly like the directions that will appear in your test booklet on test day. Make sure you understand them now, so you won't have to spend too much time studying them when you take the actual tests.

- Review the questions that you missed. Did you select a response that was an incomplete answer or that did not directly respond to the question being asked? Try to figure out what you overlooked in answering the questions.

- Did a particular type of question confuse you? Did the questions you missed come from a particular subscore area? In reviewing your responses to the practice tests, check to see whether a particular type of question or a particular subscore area was more difficult for you or took more of your time.

59

**Scoring Keys for the ACT Practice Tests**

Use the scoring key for each test to score your answer document for the multiple-choice tests. Mark a "1" in the blank for each question you answered correctly. Add up the numbers in each subscore area and enter the total number correct for each subscore area in the blanks provided. Also enter the total number correct for each test in the blanks provided. The total number correct for each test is the sum of the number correct in each subscore area.

**Test 1: English—Scoring Key**

| | Key | Subscore Area* UM | RH | | Key | Subscore Area* UM | RH | | Key | Subscore Area* UM | RH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | D | | ___ | 26. | F | | ___ | 51. | C | | ___ |
| 2. | F | | ___ | 27. | A | ___ | | 52. | H | ___ | |
| 3. | B | ___ | | 28. | H | | ___ | 53. | B | | ___ |
| 4. | J | ___ | | 29. | D | | ___ | 54. | J | ___ | |
| 5. | A | ___ | | 30. | G | | ___ | 55. | D | | ___ |
| 6. | G | ___ | | 31. | C | | ___ | 56. | J | | ___ |
| 7. | A | ___ | | 32. | J | | ___ | 57. | C | ___ | |
| 8. | G | ___ | | 33. | A | | ___ | 58. | H | ___ | |
| 9. | A | | ___ | 34. | H | ___ | | 59. | B | | ___ |
| 10. | J | | ___ | 35. | C | ___ | | 60. | J | | ___ |
| 11. | C | ___ | | 36. | G | ___ | | 61. | C | ___ | |
| 12. | J | ___ | | 37. | D | | ___ | 62. | F | ___ | |
| 13. | A | | ___ | 38. | H | ___ | | 63. | B | ___ | |
| 14. | G | ___ | | 39. | A | ___ | | 64. | F | | ___ |
| 15. | C | | ___ | 40. | J | | ___ | 65. | D | | ___ |
| 16. | J | | ___ | 41. | C | ___ | | 66. | H | | ___ |
| 17. | B | ___ | | 42. | F | | ___ | 67. | B | ___ | |
| 18. | J | | ___ | 43. | C | ___ | | 68. | G | ___ | |
| 19. | A | | ___ | 44. | F | ___ | | 69. | C | | ___ |
| 20. | F | | ___ | 45. | D | | ___ | 70. | J | | ___ |
| 21. | C | | ___ | 46. | G | | ___ | 71. | D | | ___ |
| 22. | F | ___ | | 47. | A | | ___ | 72. | F | | ___ |
| 23. | A | ___ | | 48. | G | | ___ | 73. | B | ___ | |
| 24. | J | ___ | | 49. | D | | ___ | 74. | H | ___ | |
| 25. | B | ___ | | 50. | G | | ___ | 75. | D | ___ | |

| Number Correct (Raw Score) for: | |
|---|---|
| Usage/Mechanics (UM) Subscore Area | ___ (40) |
| Rhetorical Skills (RH) Subscore Area | ___ (35) |
| Total Number Correct for English Test (UM + RH) | ___ (75) |

* UM = Usage/Mechanics
  RH = Rhetorical Skills

0661C

**Appx1664**

## Test 2: Mathematics—Scoring Key

| | | | Subscore Area* | | | | | | Subscore Area* | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Key | EA | AG | GT | | | Key | EA | AG | GT |
| 1. | A | ____ | | | | 31. | E | | ____ | |
| 2. | K | ____ | | | | 32. | F | | | ____ |
| 3. | B | ____ | | | | 33. | C | ____ | | |
| 4. | G | | ____ | | | 34. | J | ____ | | |
| 5. | E | ____ | | | | 35. | B | | | ____ |
| 6. | H | ____ | | | | 36. | K | | ____ | |
| 7. | E | ____ | | | | 37. | C | ____ | | |
| 8. | G | ____ | | | | 38. | J | ____ | | |
| 9. | B | | | ____ | | 39. | C | | | ____ |
| 10. | J | | ____ | | | 40. | H | | ____ | |
| 11. | E | ____ | | | | 41. | A | ____ | | |
| 12. | J | | ____ | | | 42. | F | | ____ | |
| 13. | B | ____ | | | | 43. | D | | ____ | |
| 14. | G | | | ____ | | 44. | F | | | ____ |
| 15. | C | | | ____ | | 45. | C | | | ____ |
| 16. | G | | | ____ | | 46. | K | | | ____ |
| 17. | A | ____ | | | | 47. | C | ____ | | |
| 18. | H | | | ____ | | 48. | J | ____ | | |
| 19. | C | ____ | | | | 49. | D | | ____ | |
| 20. | K | ____ | | | | 50. | J | | ____ | |
| 21. | B | ____ | | | | 51. | E | ____ | | |
| 22. | K | | ____ | | | 52. | J | ____ | | |
| 23. | A | ____ | | | | 53. | A | | ____ | |
| 24. | F | ____ | | | | 54. | K | | | ____ |
| 25. | D | | | ____ | | 55. | B | | | ____ |
| 26. | J | | ____ | | | 56. | H | | | ____ |
| 27. | A | ____ | | | | 57. | A | | ____ | |
| 28. | H | | | | | 58. | K | | | ____ |
| 29. | C | | | ____ | | 59. | E | | ____ | |
| 30. | G | | | ____ | | 60. | J | | ____ | |

| Number Correct (Raw Score) for: | |
|---|---|
| Pre-Alg./Elem. Alg. (EA) Subscore Area | ____ (24) |
| Inter. Alg./Coord. Geo. (AG) Subscore Area | ____ (18) |
| Plane Geo./Trig. (GT) Subscore Area | ____ (18) |
| Total Number Correct for Math Test (EA + AG + GT) | ____ (60) |

\* EA = Pre-Algebra/Elementary Algebra
  AG = Intermediate Algebra/Coordinate Geometry
  GT = Plane Geometry/Trigonometry

0661C

**Test 3: Reading—Scoring Key**

| | Key | Subscore Area* SS | AL | | Key | Subscore Area* SS | AL | | Key | Subscore Area* SS | AL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | B | | | 15. | D | | | 29. | C | | |
| 2. | J | | | 16. | G | | | 30. | G | | |
| 3. | C | | | 17. | A | | | 31. | B | | |
| 4. | F | | | 18. | F | | | 32. | J | | |
| 5. | C | | | 19. | C | | | 33. | B | | |
| 6. | J | | | 20. | H | | | 34. | H | | |
| 7. | A | | | 21. | A | | | 35. | A | | |
| 8. | H | | | 22. | H | | | 36. | F | | |
| 9. | D | | | 23. | C | | | 37. | C | | |
| 10. | G | | | 24. | J | | | 38. | G | | |
| 11. | B | | | 25. | D | | | 39. | D | | |
| 12. | F | | | 26. | G | | | 40. | H | | |
| 13. | D | | | 27. | D | | | | | | |
| 14. | J | | | 28. | F | | | | | | |

| Number Correct (Raw Score) for: | |
|---|---|
| Social Studies/Sciences (SS) Subscore Area | (20) |
| Arts/Literature (AL) Subscore Area | (20) |
| Total Number Correct for Reading Test (SS + AL) | (40) |

\* SS = Social Studies/Sciences
  AL = Arts/Literature

**Test 4: Science—Scoring Key**

| | Key | | | Key | | | Key | |
|---|---|---|---|---|---|---|---|---|
| 1. | B | | 15. | C | | 29. | C | |
| 2. | J | | 16. | J | | 30. | F | |
| 3. | C | | 17. | A | | 31. | D | |
| 4. | F | | 18. | F | | 32. | G | |
| 5. | A | | 19. | B | | 33. | C | |
| 6. | J | | 20. | F | | 34. | J | |
| 7. | D | | 21. | B | | 35. | C | |
| 8. | G | | 22. | G | | 36. | H | |
| 9. | C | | 23. | A | | 37. | D | |
| 10. | H | | 24. | H | | 38. | G | |
| 11. | D | | 25. | D | | 39. | C | |
| 12. | H | | 26. | G | | 40. | J | |
| 13. | B | | 27. | B | | | | |
| 14. | F | | 28. | F | | | | |

| Number Correct (Raw Score) for: | |
|---|---|
| Total Number Correct for Science Test | (40) |

0661C

# TABLE 1

## Procedures Used to Obtain Scale Scores From Raw Scores for the ACT Practice Tests

On each of the four multiple-choice tests on which you marked any responses, the total number of correct responses yields a raw score. Use the table below to convert your raw scores to scale scores. For each test, locate and circle your raw score or the range of raw scores that includes it in the table below. Then, read across to either outside column of the table and circle the scale score that corresponds to that raw score. As you determine your scale scores, enter them in the blanks provided on the right. The highest possible scale score for each test is 36. The lowest possible scale score for any test on which you marked any response is 1.

Next, compute the Composite score by averaging the four scale scores. To do this, add your four scale scores and divide the sum by 4. If the resulting number ends in a fraction, round it off to the nearest whole number. (Round down any fraction less than one-half; round up any fraction that is one-half or more.) Enter this number in the blank. This is your Composite score. The highest possible Composite score is 36. The lowest possible Composite score is 1.

**Your Scale Score**

| | |
|---|---|
| English | _____ |
| Mathematics | _____ |
| Reading | _____ |
| Science | _____ |
| **Sum of scores** | _____ |
| **Composite score (sum ÷ 4)** | _____ |

NOTE: If you left a test completely blank and marked no items, do not list a scale score for that test. If any test was completely blank, do not calculate a Composite score.

| Scale Score | Test 1 English | Test 2 Mathematics | Test 3 Reading | Test 4 Science | Scale Score |
|---|---|---|---|---|---|
| 36 | 75 | 60 | 38-40 | 40 | 36 |
| 35 | 73-74 | 58-59 | 37 | — | 35 |
| 34 | 71-72 | 56-57 | 36 | 39 | 34 |
| 33 | 70 | 55 | 35 | — | 33 |
| 32 | 69 | 54 | 34 | 38 | 32 |
| 31 | 68 | 52-53 | — | — | 31 |
| 30 | 67 | 50-51 | 33 | 37 | 30 |
| 29 | 65-66 | 48-49 | 32 | 36 | 29 |
| 28 | 64 | 46-47 | 30-31 | 35 | 28 |
| 27 | 62-63 | 43-45 | 29 | 34 | 27 |
| 26 | 60-61 | 41-42 | 28 | 32-33 | 26 |
| 25 | 57-59 | 39-40 | 27 | 30-31 | 25 |
| 24 | 55-56 | 37-38 | 26 | 29 | 24 |
| 23 | 53-54 | 35-36 | 25 | 27-28 | 23 |
| 22 | 50-52 | 33-34 | 24 | 25-26 | 22 |
| 21 | 47-49 | 31-32 | 23 | 23-24 | 21 |
| 20 | 44-46 | 30 | 22 | 21-22 | 20 |
| 19 | 42-43 | 27-29 | 21 | 18-20 | 19 |
| 18 | 39-41 | 25-26 | 20 | 16-17 | 18 |
| 17 | 37-38 | 22-24 | 19 | 14-15 | 17 |
| 16 | 34-36 | 18-21 | 17-18 | 13 | 16 |
| 15 | 30-33 | 15-17 | 16 | 12 | 15 |
| 14 | 28-29 | 12-14 | 14-15 | 10-11 | 14 |
| 13 | 26-27 | 09-11 | 12-13 | 09 | 13 |
| 12 | 24-25 | 08 | 10-11 | 08 | 12 |
| 11 | 22-23 | 06-07 | 08-09 | 07 | 11 |
| 10 | 20-21 | 05 | 07 | 06 | 10 |
| 9 | 18-19 | 04 | 06 | 05 | 9 |
| 8 | 15-17 | — | 05 | 04 | 8 |
| 7 | 13-14 | 03 | — | 03 | 7 |
| 6 | 10-12 | 02 | 04 | — | 6 |
| 5 | 08-09 | — | 03 | 02 | 5 |
| 4 | 06-07 | — | 02 | — | 4 |
| 3 | 04-05 | 01 | — | 01 | 3 |
| 2 | 02-03 | — | 01 | — | 2 |
| 1 | 00-01 | 00 | 00 | 00 | 1 |

*0661C*

# TABLE 2

## Procedures Used to Obtain Scale Subscores from Raw Scores for the ACT Practice Tests

For each of the seven subscore areas, the total number of correct responses yields a raw score. Use the table below to convert your raw score to scale subscores. For each of the seven subscore areas, locate and circle either the raw score or the range of raw scores that includes it in the table below. Then, read across to either outside column of the table and circle the scale subscore that corresponds to that raw score. As you determine your scale subscores, enter them in the blanks provided on the right. The highest possible scale subscore is 18. The lowest possible scale subscore is 1.

If you left a test completely blank and marked no items, do not list any scale subscores for that test.

**Your Scale Subscore**

**English**
Usage/Mechanics (UM) _____
Rhetorical Skills (RH) _____

**Mathematics**
Pre-Algebra/Elem. Algebra (EA) _____
Inter. Algebra/Coord. Geometry (AG) _____
Plane Geometry/Trigonometry (GT) _____

**Reading**
Social Studies/Sciences (SS) _____
Arts/Literature (AL) _____

| Scale Subscore | Test 1 English | | Raw Scores Test 2 Mathematics | | | Test 3 Reading | | Scale Subscore |
|---|---|---|---|---|---|---|---|---|
| | Usage/ Mechanics | Rhetorical Skills | Pre-Algebra/ Elem. Algebra | Inter. Algebra/ Coord. Geometry | Plane Geometry/ Trigonometry | Social Studies/ Sciences | Arts/ Literature | |
| 18 | 39-40 | 35 | 23-24 | 18 | 18 | 19-20 | 20 | 18 |
| 17 | 38 | 33-34 | 22 | 17 | 17 | 17-18 | 19 | 17 |
| 16 | 36-37 | 31-32 | 21 | 16 | 16 | 16 | 18 | 16 |
| 15 | 35 | 30 | 20 | 14-15 | 14-15 | 15 | 17 | 15 |
| 14 | 33-34 | 28-29 | 18-19 | 13 | 13 | 13-14 | 16 | 14 |
| 13 | 31-32 | 26-27 | 17 | 11-12 | 11-12 | 12 | 15 | 13 |
| 12 | 29-30 | 24-25 | 16 | 10 | 10 | — | 14 | 12 |
| 11 | 27-28 | 21-23 | 14-15 | 09 | 09 | 11 | 13 | 11 |
| 10 | 25-26 | 19-20 | 13 | 07-08 | 07-08 | 10 | 12 | 10 |
| 9 | 23-24 | 16-18 | 12 | 06 | 06 | 09 | 11 | 9 |
| 8 | 20-22 | 14-15 | 09-11 | 05 | 05 | 07-08 | 10 | 8 |
| 7 | 17-19 | 12-13 | 07-08 | 04 | 04 | 06 | 09 | 7 |
| 6 | 15-16 | 10-11 | 05-06 | 03 | 03 | 05 | 07-08 | 6 |
| 5 | 13-14 | 08-09 | 03-04 | 02 | — | 04 | 05-06 | 5 |
| 4 | 10-12 | 06-07 | 02 | — | 02 | 03 | 04 | 4 |
| 3 | 08-09 | 04-05 | — | 01 | — | 02 | 03 | 3 |
| 2 | 05-07 | 02-03 | 01 | — | 01 | 01 | 01-02 | 2 |
| 1 | 00-04 | 00-01 | 00 | 00 | 00 | 00 | 00 | 1 |

# TABLE 3

## Norms Table

Use the norms table below to determine your estimated percent at or below for each of your multiple-choice scale scores.

In the far left column, circle your scale score for the English Test (from page 63). Then read across to the percent at or below column for that test; circle or put a check mark beside the corresponding percent at or below. Use the same procedure for each test (from page 63) and subscore area (from page 64). You may find it easier to use the right column of scale scores for your Science Test and Composite scores.

As you mark your percents at or below, enter them in the blanks provided at the right.

You may also find it helpful to compare your performance with the national mean (average) score for each of the four tests, subscore areas, and the Composite as shown at the bottom of the norms table.

**Your Estimated Percent At or Below on Practice Test**

**English**
Usage/Mechanics _____
Rhetorical Skills _____
**Mathematics**
Pre-Algebra/Elem. Alg. _____
Alg./Coord. Geometry _____
Plane Geometry/Trig. _____
**Reading**
Soc. Studies/Sciences _____
Arts/Literature _____
**Science** _____

**Composite** _____

Table 1.2
### National Distributions of Cumulative Percents for ACT Test Scores
### ACT-Tested High School Graduates of 2004, 2005, and 2006

| Score | ENGLISH | Usage/Mechanics | Rhetorical Skills | MATHEMATICS | Pre-Algebra/Elem. Alg. | Alg./Coord. Geometry | Plane Geometry/Trig. | READING | Soc. Studies/Sciences | Arts/Literature | SCIENCE | COMPOSITE | Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | 99 | | | 99 | | | | 99 | | | 99 | 99 | 36 |
| 35 | 99 | | | 99 | | | | 99 | | | 99 | 99 | 35 |
| 34 | 99 | | | 99 | | | | 98 | | | 99 | 99 | 34 |
| 33 | 98 | | | 99 | | | | 97 | | | 99 | 99 | 33 |
| 32 | 97 | | | 98 | | | | 95 | | | 98 | 99 | 32 |
| 31 | 96 | | | 97 | | | | 94 | | | 98 | 98 | 31 |
| 30 | 95 | | | 96 | | | | 92 | | | 97 | 97 | 30 |
| 29 | 93 | | | 95 | | | | 89 | | | 96 | 95 | 29 |
| 28 | 90 | | | 92 | | | | 87 | | | 95 | 93 | 28 |
| 27 | 87 | | | 90 | | | | 83 | | | 93 | 90 | 27 |
| 26 | 84 | | | 85 | | | | 79 | | | 90 | 86 | 26 |
| 25 | 80 | | | 80 | | | | 75 | | | 85 | 81 | 25 |
| 24 | 75 | | | 75 | | | | 70 | | | 80 | 76 | 24 |
| 23 | 70 | | | 69 | | | | 64 | | | 73 | 70 | 23 |
| 22 | 65 | | | 64 | | | | 59 | | | 66 | 64 | 22 |
| 21 | 59 | | | 59 | | | | 53 | | | 58 | 56 | 21 |
| 20 | 52 | | | 54 | | | | 48 | | | 48 | 49 | 20 |
| 19 | 44 | | | 48 | | | | 41 | | | 38 | 41 | 19 |
| 18 | 38 | 99 | 99 | 41 | 99 | 99 | 99 | 35 | 99 | 99 | 29 | 33 | 18 |
| 17 | 32 | 98 | 99 | 34 | 97 | 99 | 99 | 30 | 99 | 97 | 22 | 26 | 17 |
| 16 | 27 | 94 | 98 | 24 | 94 | 98 | 99 | 25 | 93 | 92 | 16 | 19 | 16 |
| 15 | 21 | 90 | 94 | 14 | 89 | 96 | 96 | 19 | 89 | 86 | 11 | 13 | 15 |
| 14 | 15 | 85 | 88 | 07 | 83 | 93 | 91 | 15 | 83 | 79 | 08 | 08 | 14 |
| 13 | 11 | 79 | 81 | 03 | 75 | 85 | 84 | 10 | 76 | 73 | 05 | 05 | 13 |
| 12 | 08 | 73 | 73 | 01 | 66 | 78 | 75 | 05 | 68 | 66 | 03 | 02 | 12 |
| 11 | 06 | 65 | 62 | 01 | 57 | 66 | 63 | 02 | 59 | 55 | 02 | 01 | 11 |
| 10 | 04 | 55 | 50 | 01 | 48 | 54 | 54 | 01 | 50 | 47 | 01 | 01 | 10 |
| 09 | 03 | 45 | 38 | 01 | 39 | 40 | 37 | 01 | 39 | 38 | 01 | 01 | 09 |
| 08 | 02 | 35 | 26 | 01 | 31 | 24 | 25 | 01 | 27 | 29 | 01 | 01 | 08 |
| 07 | 01 | 25 | 16 | 01 | 19 | 15 | 15 | 01 | 17 | 22 | 01 | 01 | 07 |
| 06 | 01 | 17 | 10 | 01 | 08 | 10 | 09 | 01 | 10 | 15 | 01 | 01 | 06 |
| 05 | 01 | 10 | 06 | 01 | 03 | 05 | 05 | 01 | 05 | 08 | 01 | 01 | 05 |
| 04 | 01 | 06 | 03 | 01 | 01 | 03 | 04 | 01 | 03 | 03 | 01 | 01 | 04 |
| 03 | 01 | 02 | 01 | 01 | 01 | 01 | 02 | 01 | 01 | 01 | 01 | 01 | 03 |
| 02 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 02 |
| 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 | 01 |
| Mean | 20.5 | 10.2 | 10.6 | 20.7 | 10.9 | 10.3 | 10.4 | 21.3 | 10.8 | 10.9 | 20.9 | 21.0 | |
| S.D. | 5.9 | 3.7 | 3.1 | 5.0 | 3.4 | 2.9 | 3.0 | 6.0 | 3.5 | 3.6 | 4.6 | 4.8 | |

Note: These norms are the source of national and state norms, for multiple-choice tests, printed on ACT score reports during the 2006-2007 testing year. Sample size: 3,540,499.

# Six-Point Holistic Scoring Rubric for the ACT Writing Test

**Papers at each level exhibit *all* or *most* of the characteristics described at each score point.**

**Score = 6**
**Essays within this score range demonstrate effective skill in responding to the task.**

The essay shows a clear understanding of the task. The essay takes a position on the issue and may offer a critical context for discussion. The essay addresses complexity by examining different perspectives on the issue, or by evaluating the implications and/or complications of the issue, or by fully responding to counterarguments to the writer's position. Development of ideas is ample, specific, and logical. Most ideas are fully elaborated. A clear focus on the specific issue in the prompt is maintained. The organization of the essay is clear: the organization may be somewhat predictable or it may grow from the writer's purpose. Ideas are logically sequenced. Most transitions reflect the writer's logic and are usually integrated into the essay. The introduction and conclusion are effective, clear, and well developed. The essay shows a good command of language. Sentences are varied and word choice is varied and precise. There are few, if any, errors to distract the reader.

**Score = 5**
**Essays within this score range demonstrate competent skill in responding to the task.**

The essay shows a clear understanding of the task. The essay takes a position on the issue and may offer a broad context for discussion. The essay shows recognition of complexity by partially evaluating the implications and/or complications of the issue, or by responding to counterarguments to the writer's position. Development of ideas is specific and logical. Most ideas are elaborated, with clear movement between general statements and specific reasons, examples, and details. Focus on the specific issue in the prompt is maintained. The organization of the essay is clear, although it may be predictable. Ideas are logically sequenced, although simple and obvious transitions may be used. The introduction and conclusion are clear and generally well developed. Language is competent. Sentences are somewhat varied and word choice is sometimes varied and precise. There may be a few errors, but they are rarely distracting.

**Score = 4**
**Essays within this score range demonstrate adequate skill in responding to the task.**

The essay shows an understanding of the task. The essay takes a position on the issue and may offer some context for discussion. The essay may show some recognition of complexity by providing some response to counterarguments to the writer's position. Development of ideas is adequate, with some movement between general statements and specific reasons, examples, and details. Focus on the specific issue in the prompt is maintained throughout most of the essay. The organization of the essay is apparent but predictable. Some evidence of logical sequencing of ideas is apparent, although most transitions are simple and obvious. The introduction and conclusion are clear and somewhat developed. Language is adequate, with some sentence variety and appropriate word choice. There may be some distracting errors, but they do not impede understanding.

**Score = 3**
**Essays within this score range demonstrate some developing skill in responding to the task.**

The essay shows some understanding of the task. The essay takes a position on the issue but does not offer a context for discussion. The essay may acknowledge a counterargument to the writer's position, but its development is brief or unclear. Development of ideas is limited and may be repetitious, with little, if any, movement between general statements and specific reasons, examples, and details. Focus on the general topic is maintained, but focus on the specific issue in the prompt may not be maintained. The organization of the essay is simple. Ideas are logically grouped within parts of the essay, but there is little or no evidence of logical sequencing of ideas. Transitions, if used, are simple and obvious. An introduction and conclusion are clearly discernible but underdeveloped. Language shows a basic control. Sentences show a little variety and word choice is appropriate. Errors may be distracting and may occasionally impede understanding.

**Score = 2**
**Essays within this score range demonstrate inconsistent or weak skill in responding to the task.**

The essay shows a weak understanding of the task. The essay may not take a position on the issue, or the essay may take a position but fail to convey reasons to support that position, or the essay may take a position but fail to maintain a stance. There is little or no recognition of a counterargument to the writer's position. The essay is thinly developed. If examples are given, they are general and may not be clearly relevant. The essay may include extensive repetition of the writer's ideas or of ideas in the prompt. Focus on the general topic is maintained, but focus on the specific issue in the prompt may not be maintained. There is some indication of an organizational structure, and some logical grouping of ideas within parts of the essay is apparent. Transitions, if used, are simple and obvious, and they may be inappropriate or misleading. An introduction and conclusion are discernible but minimal. Sentence structure and word choice are usually simple. Errors may be frequently distracting and may sometimes impede understanding.

**Score = 1**
**Essays within this score range show little or no skill in responding to the task.**

The essay shows little or no understanding of the task. If the essay takes a position, it fails to convey reasons to support that position. The essay is minimally developed. The essay may include excessive repetition of the writer's ideas or of ideas in the prompt. Focus on the general topic is usually maintained, but focus on the specific issue in the prompt may not be maintained. There is little or no evidence of an organizational structure or of the logical grouping of ideas. Transitions are rarely used. If present, an introduction and conclusion are minimal. Sentence structure and word choice are simple. Errors may be frequently distracting and may significantly impede understanding.

**No Score**

**Blank, Off-Topic, Illegible, Not in English, or Void**

## How to Score the Writing Test

Two trained readers will score each essay on the actual Writing Test. These readers are trained by reading examples of papers at each score point and by scoring many practice papers. They are given detailed feedback on the correctness of their scores during practice. During actual scoring, score differences of more than one point will be evaluated by a third trained reader to resolve discrepancies. This method is designed to be as objective and impartial as possible. So—how can you rate your *own* practice Writing Test?

It is difficult to be objective about one's own work, and you have not had the extensive training provided to actual readers of the ACT Writing Test. However, it is to your advantage to read your own writing critically. Becoming your own editor helps you grow as a writer and as a reader. So it makes sense for you to evaluate your own practice essay. That having been said, it may also make sense for you to give your practice essay to another reader to get another perspective: perhaps that of a classmate, a parent, or an English teacher, for example. Thinking and talking with others about writing is good preparation for the Writing Test. To rate your essay, you and your reader(s) should read the scoring guidelines and examples, which begin below and continue through page 71, and then assign your practice essay a score of 1 through 6.

In an actual test, each essay will be scored on a scale from 1 (low) through 6 (high). The score is based on the overall impression that is created by all the elements of the writing. The scores given by the two readers are added together, yielding the score range 2–12 shown in Table 4 on page 72.

### Scoring Guidelines (see page 66)

These are the guidelines that should be used to score your essay. These guidelines are also called a "rubric." Many papers do not fit the exact description at each score point. You should note that the rubric says: "Papers at each level exhibit *all or most* of the characteristics in the descriptors." To score your paper, you should read it and try to determine which paragraph in the rubric best describes most of the characteristics of your essay.

Then (because your Writing Test subscore is the sum of two readers' ratings of your essay), you should multiply your 1–6 score by 2 when you use Table 4, on page 72, to find your Combined English/Writing score. Or, if both you and someone else read and score your practice essay, you could add those scores together.

### Percents At or Below

Norms (cumulative percents) were not yet available for the Practice Writing Test at the time this booklet was printed. However, if you register for and take the ACT Plus Writing, a cumulative percent for your Writing Test scores will be included on your Student Report and will be available on **www.actstudent.org**.

### College Readiness Standards

The College Readiness Standards for Writing (see page 59) can be found at **www.act.org/standards**.

## Example Essays and Scoring Explanations

Readers for the ACT Writing Test practice by scoring many essays before they score "live" essays. Although we cannot provide you with the same extensive training these readers receive, reading the example essays that follow will help you better understand some of the characteristics of essays at each score point. You will also be able to read a brief explanation of how each essay was scored. The example essays are in response to the practice prompt given on page 58.

---

### Score = 1

    The funding should be used to buy magazines. Some magazines are only for entertainment but some talk about politics and the world. Even the more popular magazine for kids will be chosen, its still the best thing to do. Students like to read about what tells them what movie stars lives are like.

### Score Point 1
### Scoring Explanation

    This essay shows little engagement with the prompt task. The writer does take a clear position (*The funding should be used to buy magazines*) but little is developed in support of that position. Two ideas are offered (*Some magazines are only for entertainment but some talk about politics and the world* and *Students like to read about what tells them what movie stars lives are like*). Both ideas are left unexplored and unexplained. No organization is evident. Transitions (*even, still*) are used but are unclear. No introduction or conclusion is present, unless the statement of position is considered an introduction. The essay's language is clear at the beginning, but later becomes hard to understand. Errors and a lack of logical sequencing also are problems.

## Score = 2

Popular magazines would be a good thing, it would pull students into the library and encourage them to read. Some articles in magazines have nothing to do with school, but it still encourages students to read more. Reading is education, no matter if its talking about academics or not.

Many of the subjects in the magazine are school related. If an article is about a girl from another country talking about how she lives, that's school related because it has to do with geography. If it's an article about some part of the body, then that has to do with science.

### Score Point 2
### Scoring Explanation

Essays that earn a score of 2 demonstrate either weak or inconsistent skill in responding to the issue. In this essay, the writer takes a clear position (*Popular magazines would be a good thing*) and offers specific reasons (*it would pull students into the library and encourage them to read* and *Many of the subjects in the magazine are school related*) but development of these reasons is thin. The writer does attempt to explain the second claim with examples (*If an article is about a girl from another country . . . that's . . . geography. If it's . . . the body, then . . . science*), but much more is needed. The second paragraph might be understood to be responding to a counterargument from the prompt that the magazines aren't related to academic subjects. If so, it is a faint reference that should be clearer. The essay indicates organizational structure by separating the two ideas into two separate paragraphs. However, there is no discernible introduction or conclusion. Language use in the essay contains a variety of errors that distract the reader, including a run-on sentence, disagreements of subject and verb, and several misspellings.

## Score = 3

I feel that schools should not subscribe to popular magazines. Sometimes the magazine articles are misleading and don't tell the truth. And some students may not know between right and wrong. I get Seventeen magazine every month. There are some subjects in the articles that I feel should not be allowed, or maybe edited. They put in college searches which are helpful, but other articles have girls talking about things that are not right. Not everybody should be reading them. Why should schools subscribe to magazines that have articles that are not right. These articles could make teenagers spend too much time thinking about things that are misleading or not right or a waist of time. Teenagers are sometimes too young to read some of the articles that the popular magazines have.

Also, popular magazines will not help students to be encouraged to read. Popular magazines have short articles that are based on opinion and gossip and they are filled with quizzes and advertisements and how to loose weight. The advertisements show skinny girls and the articles about loosing weight are not good. They are bad for teenagers to see and to read. And the other articles are a waist of time too because they are full of gossip and mostly pictures. If school libraries really want to help students, they need to subscribe to magazines that are academic, like Time and National Geographic.

There is no reason to subscribe to any other kind of popular magazines. If schools libraries did, they would find that popular magazines give students something to do instead of the research they should use the library for. It would be a perfect excuse for hanging out to just look at magazines with their friends. School libraries should not subscribe to popular magazines, especially when funding is limited.

### Score Point 3
### Scoring Explanation

Essays that earn a score point of 3 show developing skill in responding to the task. This essay takes a clear position but does not provide any context for the discussion. A counterargument taken from the prompt is vaguely referenced and refuted (*popular magazines will not help students to be encouraged to read*), but further clarification is needed to explain why short, gossipy articles are of no use in encouraging students to read. The essay contains limited movement between general statements and specific examples (*They put in college searches which are helpful*). Focus on the specific issue in the prompt wavers because of the somewhat vague discussion the writer gives on the general, negative aspects of popular magazines (*These articles could make teenagers spend too much time thinking about things that are misleading or not right or a waist of time*). All the ideas would benefit from more development. This writer's ideas are grouped logically throughout the essay. There is only a single use of a transition (*Also*). The opening and closing sentences clearly signal an introduction and conclusion, but they lack development. The language usage in this essay demonstrates basic control. Sentences are somewhat varied in length and structure, and words are used correctly. Errors are at times distracting.

**Score = 4**

High school libraries have only a very limited fund. The big question is how do they spend the fund. Some people think only the magazines that are about academics should be bought, but others point out that if students are interested in what is being read, they will read more, learn more and like school more. This second group is exactly right.

First, anytime someone reads, their learning. Studies show that students who read thirty minutes a day in their free time perform better than those who don't. Students are not going to want to pick up Shakespeare in their study hall, theyre going to pick up "Seventeen." If you want them to get in that thirty minutes, you have to give them something they will actually open and look at. Remember its not what we're reading, its just the reading that counts.

Also, popular magazines can help students learn about current events. Its important to keep up with information that hasn't had time to get in the textbooks yet. Many popular magazines contain articles about new health discoveries, wars and events in other countries, and can even provide resources for research papers. This is important for our education.

Most importantly, popular magazines offer a break from the stress of schoolwork. After hours of listening to lectures and taking tests, people need to relax by reading something fun. If their is nothing fun to read, a bad attitude could develop toward libraries and school. This could hurt students much more than it would "hurt" us to read about movie stars and new music during study hall.

In conclusion, for student's mental health, knowledge, and love of reading, popular magazines should stay in our library. While some people may want to debate the issue, the right decision is clear. Interesting magazines are important for students in lots of ways.

**Score Point 4**
**Scoring Explanation**

Essays that earn a score of 4 demonstrate adequate skill in responding to the task. This essay takes a position on the issue presented in the prompt, but first offers a context for the discussion, and recognizes two different perspectives. The essay offers three ideas to support the writer's position (*anytime someone reads, their learning; popular magazines can help students learn about current events; and popular magazines offer a break*) with adequate development of each. The writer moves ably between general statements and some specific details (*Shakespeare/"Seventeen", health discoveries, wars, hours listening to lectures and taking tests*) and maintains focus throughout the discussion. The essay is clearly organized around a simple 5-paragraph framework. The sequencing of ideas is logical, though predictable, and indicated by transitions (*First, Also, Most importantly, In conclusion*). While the transitions are simple and obvious, they are at least effective in moving the reader through the essay systematically. The introduction and conclusion are clear and somewhat developed, with the introduction offering much necessary information to set up the discussion. The conclusion makes very clear the writer's position and reasoning. Language is adequate, with a variety of sentence constructions and correct word usage. Language errors—mostly spelling—are somewhat distracting.

**Score = 5**

High school libraries have a dilemma on their hands. Should they buy popular magazines as well as academic books and publications? In a perfect world, our school library would be able to offer everything that's possible and appropriate. But with budget limits throughout the school system, the administration must be sure they're making the best choices of books and magazines, so magazines like "Teen People" and "YM" should not be paid for instead of educational books and publications.

The purpose of school, and school libraries, is learning. Supporters of popular magazines argue that there is something to be learned from any reading material, but I believe some kinds of learning are more important to students futures than other kinds. If the school library has to choose between teaching teenage girls about the achievements of Harriet Tubman and letting them read about their favorite movie star, I know which one I would vote for.

Furthermore, one of the school library's most important functions is offering students the learning resources they might not be able to find or afford on their own. Everybody would agree the school library should have Internet access for the people who don't have a computer at home. Shouldn't the library also offer full sets of encyclopedia, hard cover books and high quality magazines like "National Geographic" to students who can't buy all these materials, especially when they may only need them for one paper all year? On the other hand, anybody can spend $3.99 at the drugstore to find out about Justin Timberlake's love life if they want to. The school library shouldn't have to finance that. If you're in study hall and you have an urgent celebrity trivia question that just can't wait, you can always use the Internet, at no extra cost to the school.

Reading for pleasure is a great thing, and one of my personal favorite leisure activities, but magazines just for entertainment shouldn't be a priority for school libraries. Learning is the reason for school, and should be first in mind as this decision is made. When funding is so limited, the school library must always put learning materials first.

**Score Point 5**
**Scoring Explanation**

This essay shows a clear understanding of the task. The writer takes a position (*"Teen People" and "YM" should not be paid for instead of educational books and publications*) after establishing a broad context for discussion (*In a perfect world, our school library would be able to offer everything that's possible and appropriate. But with budget limits throughout the school system, the administration must be sure they're making the best choices*). The essay shows recognition of complexity by responding succinctly to counterarguments to the writer's position (*Supporters of popular magazines argue that there is something to be learned from any reading material, but I believe some kinds of learning are more important to students futures than other kinds*). Development of the discussion is specific, with clear movement between claims and the details that explain and support them. Development is also logical, assisted by strong, integrated transitions (*Furthermore, On the other hand*) and carefully sequenced ideas. The introduction and conclusion are both clear and generally well developed, offering necessary context and adding emphasis to clarify the argument. Language is highly competent and engaging, with a lot of sentence variety and some word precision (*urgent celebrity trivia question*). Errors are minimally distracting.

## Score = 6

High schools nowdays are struggling to draw the line between what is "educational" and what is not. School programs are cut based on how much educational content they're perceived to have. Now the administration is trying to purge the libraries of popular magazines because they contain non academic subjects. It's important that the library buy dictionaries and encyclopedias, but education purists need to be reminded that if you separate "academic" from "non-academic" too strictly, you separate school from the real world it's supposed to prepare us for.

Educators are the ones who tell us we should spend more time reading. The only way to build the reading comprehension and vocabulary skills so important for getting into and through college is to practice, and that means reading things other than school assignments. No one ever gained reading proficiency from daily struggles through their Chemistry or History textbooks. We read these because we have to, but we would continue reading—even during precious homework free moments—if we had something interesting to turn to. The magazines that teenagers enjoy reading are the ones that cover our interests and address our concerns, like "Seventeen" or "Teen People". These are the magazines that some would banish from the library.

It's true that not every page in youth magazines is an intellectual challenge. Many pages show models selling zit cream, or contain "dream date" quizzes. But the critics of popular magazines should take a closer look at them. These same magazines have articles on suicide prevention, the spread of AIDS among teens, and college comparisons—subjects that the adult oriented news media doesn't cover.

Even the frivolous features have something to teach the reader who wants to learn. All those "Great Looks Cheap" may be a first step toward becoming a smarter consumer. The silly quiz may open up questions about the nature of "scientific proof" or lead to more self-knowledge.

Learning is where you find it, and students may find it in places administrators and librarians might not think to look. Learning can be found in popular magazines as well as approved academic texts. There should be room in the school library for both.

### Score Point 6
### Scoring Explanation

Essays that earn a score point of 6 demonstrate a clear understanding and effective performance of the persuasive task. The writer takes a clear position, develops it throughout the essay, and states it directly in the conclusion (*Learning can be found in popular magazines as well as approved academic texts*). This position is placed in a wider context without disrupting the essay's focus (*High schools nowdays are struggling to draw the line between what is "educational" and what is not. School programs are cut based on how much educational content they're perceived to have*).

The essay addresses complexity by anticipating counterarguments to the writer's position (*It's true that not every page in youth magazines is an intellectual challenge*) and fully responding to those counterarguments by showing specifically where they are weak (*These same magazines have articles on suicide prevention, the spread of AIDS among teens, and college comparisons—subjects that the adult oriented news media doesn't cover*).

The writer's ideas may not be developed evenly over all the paragraphs, but their development is succinct and logical. The essay elaborates general statements (*Even the frivolous features have something to teach the reader who wants to learn*) by moving to more specific details and examples (*All those "Great Looks Cheap" may be a first step toward becoming a smarter consumer*).

The organization of the essay is clear and the logical sequence of ideas grows out of the writer's intent to persuade. Transitions help the essay flow smoothly from one paragraph to the next (*It's true that not every page in youth magazines is an intellectual challenge.... Even the frivolous features have something to teach the reader who wants to learn*). The introduction is clear and especially well developed, connecting the writer's position to a strong critical claim (*if you separate "academic" from "non-academic" too strictly, you separate school from the real world it's supposed to prepare us for*).

This essay shows a good command of language. Word choice is precise and persuasive (*purge the libraries, frivolous features*). Facility with words and sentence structure enables the writer to maintain a light, amused tone (*The silly quiz may open up questions about the nature of "scientific proof" or lead to more self-knowledge*). There are few errors in this essay, and they scarcely distract the reader.

# TABLE 4

## Calculating Your ACT Combined English/Writing Score

Complete these steps to calculate your Combined English/Writing score for your practice test.

1. Locate your scale score for the English Test on page 63 and enter it here: _____.

2. Enter your Writing Test score (1–6) here _____ and double it to get your Writing Test subscore (2–12): _____ (If two people read and scored your Writing Test, you should add those two scores to get your Writing Test subscore.)

3. Use the table below to find your Combined English/Writing score.
   - First, circle your ACT English Test score in the left column.
   - Second, circle your ACT Writing Test subscore at the top of the table.

- Finally, follow the English Test row across and the Writing Test row down until the two meet. Circle the Combined score where the two columns meet. (For example, if an English Test score were 19 and a Writing Test subscore were 6, the Combined English/Writing score would be 18.)

4. Using the number you circled in the table below, write your Combined English/Writing score here: _____. (The highest possible Combined English/Writing score is 36 and the lowest possible score is 1.)

ACT English Test score                    _____

ACT Writing Test subscore                 _____

_____

**Combined English/Writing Score**        _____
(from table below)

| English Test Score | Combined English/Writing Scale Scores | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Writing Test Subscore | | | | | | | | | | |
| | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 1 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 2 | 2 | 3 | 4 | 5 | 6 | 6 | 7 | 8 | 9 | 10 | 11 |
| 3 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 4 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 5 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 12 | 13 |
| 6 | 5 | 6 | 7 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 7 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 8 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 9 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13 | 14 | 15 | 16 |
| 10 | 8 | 9 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 11 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 12 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 13 | 10 | 11 | 12 | 13 | 14 | 14 | 15 | 16 | 17 | 18 | 19 |
| 14 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 15 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 16 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 20 | 21 |
| 17 | 13 | 14 | 15 | 16 | 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 18 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 19 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 20 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 21 | 22 | 23 | 24 |
| 21 | 16 | 17 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 22 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 23 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 24 | 18 | 19 | 20 | 21 | 22 | 23 | 23 | 24 | 25 | 26 | 27 |
| 25 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 26 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 27 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 28 | 29 |
| 28 | 21 | 22 | 23 | 24 | 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 29 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| 30 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 |
| 31 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 30 | 31 | 32 |
| 32 | 24 | 25 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 |
| 33 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 |
| 34 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 |
| 35 | 26 | 27 | 28 | 29 | 30 | 31 | 31 | 32 | 33 | 34 | 35 |
| 36 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |

You may wish to remove this sample answer document from the booklet to use in a practice test session for the four multiple-choice tests.

© 2007 by ACT, Inc. All rights reserved.    Printed in U.S.A.    IM-(A) 174256-001:654321    I.C.—011 215 08W    PAGE 1

## The ACT® PLUS WRITING *2007-2008 Answer Folder*

**A** NAME, MAILING ADDRESS, AND TELEPHONE
(Please print.)

Last Name    First Name    MI (Middle Initial)

House Number & Street (Apt. No.) or PO Box & No.; or RR & No.

City    State/Province    ZIP/Postal Code

Area Code    Number    Country

### Read the directions below before you begin.

**REGISTERED** examinees MUST complete blocks A, B, C, and D. Print the requested information in block A. Then, enter the MATCHING INFORMATION in blocks B, C, and D EXACTLY as it appears on your admission ticket, even if any of the information is missing or incorrect. Fill in the corresponding ovals. If you do not complete these blocks to match your admission ticket EXACTLY, your scores will be delayed. Leave blocks E and F blank.

**STANDBY** examinees MUST complete blocks A, B, D, E, and F. Print the requested information in block A. Then, enter your identifying information in blocks B and D and fill in the corresponding ovals. Leave block C blank. Enter your Social Security number (SSN) in block E and fill in the corresponding ovals. The SSN will be used to help match your answer document to the registration folder you turned in today. It will be included on reports issued to your college choices. If you do not know your SSN or do not wish to provide it, leave it blank. Fill in the Standby Testing oval in block F.

Do NOT mark in this shaded area.

**B** MATCH NAME
(First 5 letters of last name)

**C** MATCH NUMBER
(Registered examinees only)

**D** DATE OF BIRTH

| | Month | Day | Year |

Jan.
Feb.
March
April
May
June
July
Aug.
Sept.
Oct.
Nov.
Dec.

**↓ STANDBY TESTING ONLY ↓**

**E** SOCIAL SECURITY NUMBER
(Standby examinees only)

**F** STANDBY TESTING

Fill in the oval below ONLY if you turned in a standby registration folder at the test center today.

○ Yes, I am testing as a standby.

**USE A SOFT LEAD NO. 2 PENCIL ONLY.**
(Do NOT use a mechanical pencil, ink, ballpoint, correction fluid, or felt-tip pen.)

Cut Here

**EXAMINEE STATEMENT AND SIGNATURE:** After testing, the test supervisor will instruct you to complete this section. Read the statement below.

**Statement:** I agree to the conditions set forth in the ACT registration booklet or website instructions for this exam, including the arbitration and dispute remedy provisions. I understand that I cannot share any test questions or essay topics with anyone by any form of communication.

Now, copy only the certification below on the lines provided (do not print) and sign your name as you would an official document.

**Certification:** *I agree to the statement above and certify that I am the person whose name and address appear on this form.*

Your Signature    Today's Date

## ACT®

P.O. BOX 168, IOWA CITY, IOWA 52243-0168

PLEASE DO NOT WRITE IN THIS AREA.

**SERIAL #**

**Appx1677**



**Appx1678**

You may wish to remove these sample answer document pages to respond to the practice ACT Writing Test.

PAGE 4

**Please enter the information at the right before beginning the Writing Test.**

**Use a soft lead No. 2 pencil only. Do NOT use a mechanical pencil, ink, ballpoint, or felt-tip pen.**

WRITING TEST BOOKLET NUMBER

Print your 6-digit **Booklet Number** in the boxes at the right.

WRITING TEST FORM

○ 06A

Print your 3-character **Test Form** in the boxes above and fill in the corresponding oval at the right.

**Begin WRITING TEST here.**

If you need more space, please continue on the next page.

IM-174256-001:654321

Do not write in this shaded area.

**Appx1679**

**WRITING TEST**

If you need more space, please continue on the back of this page.

Do not write in this shaded area.

Appx1680

## WRITING TEST

If you need more space, please continue on the next page.

PLEASE DO NOT WRITE IN THIS AREA.

SERIAL #

Appx1681

# Improve Your Test Scores with Strategy, Practice, and Insight


**ACT** *Online Prep*™

**The only test preparation program designed exclusively by ACT test development professionals is now online!**

### Here's what you will find in ACT Online Prep:

- Practice tests with real ACT test questions
- Comprehensive content review for each of the four required tests—English, Math, Reading, and Science
- Practice essays with real-time scoring for the optional ACT Writing Test
- Personalized Study Path
- Anywhere, anytime access via the Internet
- Only $19.95

Visit **www.actonlineprep.com** to order.


# The Real ACT Prep Guide

- This official ACT prep guide is the only one that includes three actual ACT tests
- Get all the facts about the ACT Writing Test
- Develop valuable test-taking strategies
- Learn how to prepare for test day
- Only $25.00 (includes shipping and handling)



Visit **www.actstudent.org** to order.