Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**JOINT APPENDIX**
**VOLUME VI: APPX1684-1883**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

## Volume I: Appx1-62

Page

District Court Docket.....................................................Appx1

Notice of Appeal (Jan. 7, 2020)....................................Appx7

District Court Order Granting Preliminary
Injunction (Dec. 31, 2019)............................................Appx9

District Court Order Denying Motion to Stay
(Feb. 4, 2020).............................................................Appx62

## Volume II: Appx63-725

Preliminary Injunction Hearing Transcript
(Dec. 3-5, 2019)........................................................ Appx63

## Volume III: Appx726-1027

Complaint (May 8, 2019) .........................................Appx726

Answer to Complaint (July 8, 2019)........................Appx747

Declaration of Catherine Farmer, Psy.D. ...............Appx762

Declaration & Resume of Steven G. Zecker,
Ph.D. .......................................................................Appx771

Declaration & Resume of Benjamin J. Lovett,
Ph.D. .......................................................................Appx795

Declaration & Resume of Robert D. Smith,
Ph.D. .......................................................................Appx827

Declaration of Jessica Ramsay ................................. Appx840

Resume of Jessica Ramsay ..................................... Appx854

Kindergarten Progress Reports & Test Record (1995-96) ................................................................. Appx857

First Grade Progress Report & Test Record (1996-97) ................................................................. Appx871

Second Grade Progress Reports & Test Record (1997-98) ................................................................. Appx875

Third Grade Report Card (1998-99) ......................... Appx879

Tanguay Letters & Notes (1997, 2000) ................... Appx881

Fourth Grade Report Card (1990-2000) .................. Appx886

Fifth Grade Report Cards (2000-01) ....................... Appx888

Sixth Grade Report Card & Test Report (2001-02) ................................................................. Appx892

High School Transcript & Alumni History (2004-08) ................................................................. Appx895

Standardized Test Results (2007) ........................... Appx897

High School Athletic Awards (2008) ....................... Appx899

Plan ACT Score Report (2005) ................................ Appx904

ACT Score Report (March 2007) .............................. Appx908

ACT Score Report (Oct. 2007) ................................ Appx909

College Application to UW-Madison (2007) ............ Appx910

Ohio State University Transcript (2008-12) ............ Appx922

Academic & Standardized Testing History
Summaries ..................................................................Appx926

Letter from Testing Organizations to Senator
Kennedy & Others (2008) .........................................Appx929

Smiy Office Visit Report (2009) ...............................Appx934

Ohio State ADD/ADHD Verification Form
(2010) .........................................................................Appx939

Letter from R. Burgoyne to Disability Rights
Section (2014) ...........................................................Appx945

MCAT Score Report (2011) ......................................Appx962

Livingston Evaluation & Addendum
(2014, 2016) ..............................................................Appx963

Score Reports for Subject-Matter Examinations
(2014-17) ...................................................................Appx969

Medical School Student Dashboard (2016) ............Appx1003

Lewandowski Evaluations & Correspondence
(2017-18) ..................................................................Appx1006

## Volume IV: Appx1028-1366

USMLE Step 1 Score Report (2017) .......................Appx1028

Ramsay Step 1 Outcome Data (2017) ....................Appx1030

Secondary Application to University of
Wisconsin ................................................................Appx1039

Articles: *Genetic Influences on Nicotine a5
Receptor* (2015), *Organic Acid Disorders* (2018) ....Appx1047

NBME Accommodations Request Form &
Personal Statement (2016) .....................................Appx1068

PowerPoint from NBME Consultants Meeting
(2016) ....................................................................Appx1083

Zecker Review of Ramsay Request (Jan. 2017) .....Appx1118

Letter from NBME to Ramsay (March 2017) ........Appx1125

NBME Accommodations Request Form &
Personal Statement (2018) .....................................Appx1127

Correspondence between Dafoe & Ramsay
(2018) ....................................................................Appx1231

Correspondence between Ramsay, Reukberg,
and/or Berger (2017-18) .........................................Appx1235

## Volume V: Appx1367-1683

Correspondence between Ramsay & Houtman
(2018) ....................................................................Appx1367

Zecker Review of Ramsay Request (July 2018) .....Appx1392

Letter from NBME to Ramsay (Sept. 2018)...........Appx1401

Michigan Dyslexia Institute Intake Interview
(2018) ....................................................................Appx1404

ADHD Symptoms Checklist (prepared by Ramsay
& Hughes)..............................................................Appx1411

Correspondence between Ramsay, Smith,
and/or Berger (2018) ..............................................Appx1415

Smith Evaluation (2018).........................................Appx1431

Smith Website Homepage.......................................Appx1462

Reconsideration Request from Berger to NBME
(Dec. 2018) ..............................................Appx1464

Lovett Review of Ramsay Request
(Dec. 2018) ..............................................Appx1507

Letter from NBME to Ramsay (Feb. 2019)...........Appx1511

Leave of Absence Paperwork (2018-19) ................Appx1513

Reconsideration Request from Berger to NBME
(March 2019) ...........................................Appx1526

Correspondence from NBME to Ramsay
(March 2019) ...........................................Appx1533

Article: *An Investigation of Methods to Detect
Feigned Reading Disabilities* (2010) ......................Appx1535

Western Michigan University Medical Student
Policy Manual.......................................... Appx1545

USMLE Website (2017): *Step 1* ..............................Appx1558

Sample Step 1 Test Questions (2017) ....................Appx1559

ACT: Preparing for the Exam & Sample Test
Questions (2007-08) ................................Appx1605

## Volume VI: Appx1684-1883

Sample MCAT Exam (2010) ...................................Appx1684

MCAT: *The Official Guide to the MCAT Exam*
(excerpts) (2011) .......................................Appx1758

MCAT Verbal Reasoning Questions with
Ramsay's Annotations ............................................Appx1780

WIAT-III Item Data .................................................Appx1798

Woodcock Johnson IV Diagnostic Test Records ....Appx1817

Gray Oral Reading Test Records ("GORT-V") .......Appx1824

TOMM Score Sheet .................................................Appx1836

Article: *Underachievement & Learning
Disabilities in Children Who Are Gifted*
(1999-2000) ............................................................Appx1839

Federal Register (excerpts)....................................Appx1844

## CERTIFICATE OF SERVICE

I certify that on March 23, 2020, I electronically filed this Appendix with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

# MCAT® Release Form
# for the State of New York

**(Form administered on January 29, 2010)**

# December 2013



© 2013, Association of American Medical Colleges.  All rights reserved.  No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, or any information storage and retrieval system, without permission in writing from the publisher.

MCAT Release Form, State of New York (December 2013)

# TABLE OF CONTENTS

Supplemental Material .................................................................................................1

    Periodic Table of the Elements ...............................................................2

Physical Sciences Section ........................................................................................3

    Physical Sciences Directions ..................................................................4

    Physical Sciences Passages and Questions ...........................................5

    Physical Sciences Answer Key .............................................................25

    Physical Sciences Raw Score to Scale Score Conversion Table .......26

Verbal Reasoning Section ........................................................................................27

    Verbal Reasoning Directions ................................................................28

    Verbal Reasoning Passages and Questions ..........................................29

    Verbal Reasoning Answer Key .............................................................43

    Verbal Reasoning Raw Score to Scale Score Conversion Table .......44

Writing Sample Section ...........................................................................................45

    Writing Sample Directions ....................................................................46

    Writing Sample Prompts .......................................................................47

Biological Sciences Section .....................................................................................49

    Biological Sciences Directions .............................................................50

    Biological Sciences Passages and Questions .......................................51

    Biological Sciences Answer Key ..........................................................70

    Biological Sciences Raw Score to Scale Score Conversion Table .....71

MCAT Release Form, State of New York (December 2013)

---

**SUPPLEMENTAL MATERIAL**

**For Physical Sciences and Biological Sciences Sections**

---

**Supplemental Material for Physical Sciences and Biological Sciences Sections**

When students take the Physical and Biological Sciences sections, they have access to a Periodic Table of the Elements.  They can access this table by clicking a tab on their computer screen.  A copy of this table can be found below.

**Periodic Table of the Elements**

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1<br>**H**<br>1.0 | | | | | | | | | | | | | | | | | 2<br>**He**<br>4.0 |
| 3<br>**Li**<br>6.9 | 4<br>**Be**<br>9.0 | | | | | | | | | | | 5<br>**B**<br>10.8 | 6<br>**C**<br>12.0 | 7<br>**N**<br>14.0 | 8<br>**O**<br>16.0 | 9<br>**F**<br>19.0 | 10<br>**Ne**<br>20.2 |
| 11<br>**Na**<br>23.0 | 12<br>**Mg**<br>24.3 | | | | | | | | | | | 13<br>**Al**<br>27.0 | 14<br>**Si**<br>28.1 | 15<br>**P**<br>31.0 | 16<br>**S**<br>32.1 | 17<br>**Cl**<br>35.5 | 18<br>**Ar**<br>39.9 |
| 19<br>**K**<br>39.1 | 20<br>**Ca**<br>40.1 | 21<br>**Sc**<br>45.0 | 22<br>**Ti**<br>47.9 | 23<br>**V**<br>50.9 | 24<br>**Cr**<br>52.0 | 25<br>**Mn**<br>54.9 | 26<br>**Fe**<br>55.8 | 27<br>**Co**<br>58.9 | 28<br>**Ni**<br>58.7 | 29<br>**Cu**<br>63.5 | 30<br>**Zn**<br>65.4 | 31<br>**Ga**<br>69.7 | 32<br>**Ge**<br>72.6 | 33<br>**As**<br>74.9 | 34<br>**Se**<br>79.0 | 35<br>**Br**<br>79.9 | 36<br>**Kr**<br>83.8 |
| 37<br>**Rb**<br>85.5 | 38<br>**Sr**<br>87.6 | 39<br>**Y**<br>88.9 | 40<br>**Zr**<br>91.2 | 41<br>**Nb**<br>92.9 | 42<br>**Mo**<br>95.9 | 43<br>**Tc**<br>(98) | 44<br>**Ru**<br>101.1 | 45<br>**Rh**<br>102.9 | 46<br>**Pd**<br>106.4 | 47<br>**Ag**<br>107.9 | 48<br>**Cd**<br>112.4 | 49<br>**In**<br>114.8 | 50<br>**Sn**<br>118.7 | 51<br>**Sb**<br>121.8 | 52<br>**Te**<br>127.6 | 53<br>**I**<br>126.9 | 54<br>**Xe**<br>131.3 |
| 55<br>**Cs**<br>132.9 | 56<br>**Ba**<br>137.3 | 57<br>**La\***<br>138.9 | 72<br>**Hf**<br>178.5 | 73<br>**Ta**<br>180.9 | 74<br>**W**<br>183.8 | 75<br>**Re**<br>186.2 | 76<br>**Os**<br>190.2 | 77<br>**Ir**<br>192.2 | 78<br>**Pt**<br>195.1 | 79<br>**Au**<br>197.0 | 80<br>**Hg**<br>200.6 | 81<br>**Tl**<br>204.4 | 82<br>**Pb**<br>207.2 | 83<br>**Bi**<br>209.0 | 84<br>**Po**<br>(209) | 85<br>**At**<br>(210) | 86<br>**Rn**<br>(222) |
| 87<br>**Fr**<br>(223) | 88<br>**Ra**<br>(226) | 89<br>**Ac†**<br>(227) | 104<br>**Rf**<br>(261) | 105<br>**Db**<br>(262) | 106<br>**Sg**<br>(266) | 107<br>**Bh**<br>(264) | 108<br>**Hs**<br>(277) | 109<br>**Mt**<br>(268) | 110<br>**Ds**<br>(281) | 111<br>**Uuu**<br>(272) | 112<br>**Uub**<br>(285) | | 114<br>**Uuq**<br>(289) | | 116<br>**Uuh**<br>(289) | | |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| \* | 58<br>**Ce**<br>140.1 | 59<br>**Pr**<br>140.9 | 60<br>**Nd**<br>144.2 | 61<br>**Pm**<br>(145) | 62<br>**Sm**<br>150.4 | 63<br>**Eu**<br>152.0 | 64<br>**Gd**<br>157.3 | 65<br>**Tb**<br>158.9 | 66<br>**Dy**<br>162.5 | 67<br>**Ho**<br>164.9 | 68<br>**Er**<br>167.3 | 69<br>**Tm**<br>168.9 | 70<br>**Yb**<br>173.0 | 71<br>**Lu**<br>175.0 |
| † | 90<br>**Th**<br>232.0 | 91<br>**Pa**<br>231.0 | 92<br>**U**<br>238.0 | 93<br>**Np**<br>(237) | 94<br>**Pu**<br>(244) | 95<br>**Am**<br>(243) | 96<br>**Cm**<br>(247) | 97<br>**Bk**<br>(247) | 98<br>**Cf**<br>(251) | 99<br>**Es**<br>(252) | 100<br>**Fm**<br>(257) | 101<br>**Md**<br>(258) | 102<br>**No**<br>(259) | 103<br>**Lr**<br>(262) |

**Appx1687**

# PHYSICAL SCIENCES SECTION

# Physical Sciences

Questions 1 – 42

**DIRECTIONS:** Most questions in the Physical Sciences test are organized into groups, each preceded by a descriptive passage. After studying the passage, select the one best answer to each question in the group. Some questions are not based on a descriptive passage and are also independent of each other. You must also select the one best answer to these questions. If you are not certain of an answer, eliminate the alternatives that you know to be incorrect and then select an answer from the remaining alternatives. Indicate your selection by clicking on the answer bubble next to it. A periodic table is provided for your use. You may consult it whenever you wish.

**Passage I (Questions 1-5)**

In a general chemistry laboratory class, the instructor asked students to propose reactions, each depicting $CO_2(g)$ as a product, for the thermal decomposition of $NaHCO_3(s)$. The students proposed reactions 1–3.

$$NaHCO_3(s) \xrightarrow{\Delta} NaOH(s) + CO_2(g)$$
**Reaction 1**

$$2NaHCO_3(s) \xrightarrow{\Delta} Na_2CO_3(s) + CO_2(g) + H_2O(g)$$
**Reaction 2**

$$2NaHCO_3(s) \xrightarrow{\Delta} Na_2O(s) + 2CO_2(g) + H_2O(g)$$
**Reaction 3**

The instructor then set up the apparatus shown in Figure 1 to demonstrate which of reactions 1–3 best represented the thermal decomposition of $NaHCO_3(s)$.



**Figure 1** Experimental apparatus

The room conditions were 25°C and 1 atm with the beaker and the $CO_2(g)$-collection assembly maintained at 25°C and 1 atm. The instructor heated 0.336 g (0.004 mol) of $NaHCO_3(s)$ at a rate of 5°C/min in the reaction flask. During the course of the reaction, liquid water accumulated in the beaker indicating that water vapor was a product of the reaction. The $CO_2(g)$ produced in the reaction was collected by displacing the brine from the graduated cylinder. The instructor also performed a control experiment in which the reaction flask was heated without any $NaHCO_3(s)$ in it.

Based on the observed liquid water accumulation in the beaker during the reaction and the volume of the collected $CO_2(g)$ at the end of the reaction, it was determined that Reaction 2 best represented the thermal decomposition of $NaHCO_3(s)$.

**[Questions 1-5 for Passage I begin on following page.]**

1. **Based on the passage, the volume of the collected $CO_2(g)$ at the end of the reaction was closest to which of the following? (Note: $R$ is equal to 0.082 atm•L•mol$^{-1}$•K$^{-1}$.)**

**A.** 0.05 L

**B.** 0.1 L

**C.** 0.2 L

**D.** 0.4 L

2. **That water is a liquid and $CO_2$ is a gas at 25°C and 1 atm is most attributable to:**

**A.** the hydrogen-bonding capability of water molecules and the hydrogen-bonding incapability of $CO_2$ molecules.

**B.** the absence of double bonds in water molecules and the presence of double bonds in $CO_2$ molecules.

**C.** the molar mass of water being lower than the molar mass of $CO_2$.

**D.** water molecules being smaller than $CO_2$ molecules.

3. **Consider what the volume of the collected $CO_2(g)$ at the end of the reaction would be in each of the three proposed reactions for the thermal decomposition of 0.336 g of $NaHCO_3(s)$ under the conditions described in the passage. Compared to the volume in Reaction 2, the volume in Reaction 1 and the volume in Reaction 3 would:**

**A.** both be lower.

**B.** both be higher.

**C.** be lower and higher, respectively.

**D.** be higher and lower, respectively.

4. **Which of the following is the correct empirical formula of the metal oxide expected to form in the thermal decomposition of an alkaline earth metal carbonate? (Note: M represents the metal.)**

**A.** $M_{1/2}O_{1/2}$

**B.** $M_{1/2}O$

**C.** MO

**D.** $MO_2$

5. **Consider the gaseous product in Reaction 2 that has a molecular dipole moment of 0.0 D. Which of the following is closest to the bond angle in the molecules of this product?**

**A.** 90°

**B.** 120°

**C.** 150°

**D.** 180°

**Passage II (Questions 6-11)**

Objects falling in a vacuum accelerate at a constant rate, independent of the size or shape of the object. For instance, a feather and a lead brick will accelerate at the same rate in a vacuum. However, an object falling in air or in a fluid will reach a constant velocity called the *terminal velocity*. Terminal velocity depends directly on the mass and inversely on the cross-sectional area of the falling object; terminal velocity is also inversely proportional to the density of air or the fluid. When an object reaches terminal velocity, the downward force of gravity is balanced by the upward force of air resistance.

A group of students conducted an experiment to illustrate these principles. The students dropped an egg and a watermelon, objects with very similar densities, and measured the velocity changes with time. Because the egg reached a constant velocity sooner than the watermelon, the students concluded that the egg had a lower terminal velocity in air than did the watermelon. The results are shown in Figure 1.



**Figure 1** Velocity of an egg and watermelon falling in air

**[Questions 6-11 for Passage II begin on following page.]**

Appx1692

6. **According to the passage, two similarly shaped objects will most likely fall in air at the same terminal velocity if they have:**

A. equal volumes and different cross-sectional areas.

B. equal volumes and equal cross-sectional areas.

C. equal weights and different cross-sectional areas.

D. equal weights and equal cross-sectional areas.

7. **Suppose the watermelon described in the passage has a mass of 5 kg, and the egg has a mass of 65 g. If the volume of the watermelon is $5 \times 10^3$ cm$^3$, what is the volume of the egg?**

A. 30 cm$^3$

B. 65 cm$^3$

C. $6.5 \times 10^2$ cm$^3$

D. $3.0 \times 10^3$ cm$^3$

8. **A skydiver with mass *m* jumps from an airplane and then falls without opening a parachute. When the skydiver reaches a terminal velocity of 65 m/s, what is the net force on the skydiver? (Note: The acceleration due to gravity is given by *g*.)**

A. Zero

B. 1*mg* N

C. 2*mg* N

D. 65*mg* N

9. **In Figure 1, the acceleration at any time can be calculated by:**

A. computing *v/t.*

B. computing the total change in velocity divided by the total time.

C. measuring the *y*-intercept of a tangent line at the desired time.

D. measuring the slope of the tangent line at the desired time.

10. **Suppose the egg and the watermelon are dropped into a tall column of a liquid which has a high viscosity. If the liquid's density is greater than that of the egg and the watermelon, which object will reach the higher terminal speed?**

A. The egg

B. The watermelon

C. Neither the egg nor the watermelon will fall through the liquid.

D. Cannot be determined from the information given

11. **Suppose the terminal speed of the watermelon in the passage is found to oscillate sinusoidally. The oscillation is most likely due to the watermelon's:**

A. mass.

B. weight.

C. volume.

D. shape.

**Passage III (Questions 12-18)**

The hydrated copper ion $[Cu(H_2O)_4]^{2+}$ is converted into the complex ion $[Cu(NH_3)_4]^{2+}$ in aqueous ammonia ($NH_3$). The formation of $[Cu(NH_3)_4]^{2+}$ takes place in a stepwise manner with one water molecule being replaced by an ammonia molecule in each step. The sum of all the individual steps gives the overall transformation shown in Equation 1.

$$[Cu(H_2O)_4]^{2+}(aq) + 4NH_3(aq) \rightleftharpoons [Cu(NH_3)_4]^{2+}(aq) + 4H_2O(l)$$

**Equation 1**

The formation constant of $[Cu(NH_3)_4]^{2+}$ is defined as follows:

$$K_f = \frac{[[Cu(NH_3)_4]^{2+}]}{[[Cu(H_2O)_4]^{2+}][NH_3]^4}$$

The value of the formation constant of $[Cu(NH_3)_4]^{2+}$ is $5.6 \times 10^{11}$ at 25°C.

**[Questions 12-18 for Passage III begin on following page.]**

**Appx1695**

**12. [Cu(H$_2$O)$_4$]$^{2+}$ fits which of the following descriptions?**

   **I.    An ion with a charge of +2**
   **II.   A hydrated alkali metal ion**
   **III.  A complex ion**

**A.** I only

**B.** I and II only

**C.** I and III only

**D.** I, II, and III

**13. At 25°C, the formation of [Cu(NH$_3$)$_4$]$^{2+}$ according to Equation 1 is most likely a:**

**A.** spontaneous process with positive $\Delta G°$.

**B.** spontaneous process with negative $\Delta G°$.

**C.** nonspontaneous process with positive $\Delta G°$.

**D** nonspontaneous process with negative $\Delta G°$.

**14. In the stepwise formation of [Cu(NH$_3$)$_4$]$^{2+}$ from [Cu(H$_2$O)$_4$]$^{2+}$, which of the following ions would form in the second step?**

**A.** [Cu(H$_2$O)$_2$(NH$_3$)$_2$]$^{2+}$

**B.** [Cu(H$_2$O)$_2$(NH$_3$)$_3$]$^{2+}$

**C.** [Cu(H$_2$O)$_3$(NH$_3$)]$^{2+}$

**D.** [Cu(H$_2$O)$_3$(NH$_3$)$_2$]$^{2+}$

**15. Which of the following best describes the bonds between Cu$^{2+}$ and the nitrogen atoms of the ammonia molecules in [Cu(NH$_3$)$_4$]$^{2+}$?**

**A.** Ionic

**B.** Covalent

**C.** Coordinate ionic

**D.** Coordinate covalent

**16. Consider the reaction shown in Equation 1 at equilibrium. Would the concentration of [Cu(NH$_3$)$_4$]$^{2+}$ increase if the equilibrium were disturbed by adding hydrochloric acid?**

**A.** Yes, because the equilibrium in Equation 1 would shift to the left

**B.** No, because the equilibrium in Equation 1 would shift to the left

**C.** Yes, because the equilibrium in Equation 1 would shift to the right

**D.** No, because the equilibrium in Equation 1 would shift to the right

**17.  In $[Cu(NH_3)_4]^{2+}$, the subscript 4 indicates which of the following?**

**A.** The oxidation number of Cu only

**B.** The coordination number of $Cu^{2+}$ only

**C.** Both the oxidation number of Cu and the coordination number of $Cu^{2+}$

**D.** Neither the oxidation number of Cu nor the coordination number of $Cu^{2+}$

**18.  Why does $NH_3$ displace $H_2O$ in the formation of $[Cu(NH_3)_4]^{2+}$?**
     **I.**     **$NH_3$ contains more lone pairs of electrons than $H_2O$.**
     **II.**     **$NH_3$ is a stronger Lewis base than $H_2O$.**
     **III.**     **$NH_3$ donates a lone pair of electrons more readily than does $H_2O$.**

**A.** I and II only

**B.** I and III only

**C.** II and III only

**D.** I , II, and III

**Questions 19-23 are NOT related to a passage.**

**19.  A 60-Ω resistor is connected in parallel with a 20-Ω resistor. What is the equivalent resistance of the combination?**

**A.** 80 Ω

**B.** 40 Ω

**C.** 15 Ω

**D.** 3 Ω

**20.  Which of the following elements most likely has a first ionization energy greater than that of Cl?**

**A.** Ar

**B.** Br

**C.** Na

**D.** S

**21.  A glass rod is rubbed with a silk scarf producing a charge of +3.2 × 10⁻⁹ C on the rod. (Recall that the magnitude of the proton and electron charges are 1.6 × 10⁻¹⁹ C.) The glass rod has:**

**A.** $5.1 \times 10^{11}$ protons added to it.

**B.** $5.1 \times 10^{11}$ electrons removed from it.

**C.** $2.0 \times 10^{10}$ protons added to it.

**D.** $2.0 \times 10^{10}$ electrons removed from it.

**22.**



In the above figure, an object O is at a distance of three focal lengths from the center of a convex lens. What is the ratio of the height of the image to the height of the object?

**A.** 1/3

**B.** 1/2

**C.** 2/3

**D.** 3/2

Appx1698

**23. A child pulls on a rope that is attached to a spring scale that is attached to a wagon.**



Which of the following quantities would have the LEAST effect on the spring scale's reading?

**A.** The wagon's mass

**B.** The person's mass

**C.** The wagon's acceleration

**D.** The angle between the rope and the ground

Appx1699

**Passage IV (Questions 24-29)**

Iodine and zinc are the reactants in an experiment to find the stoichiometry of a reaction. Gray, granular zinc metal (2.0 g) and purple iodine crystals (2.0 g) are added to an Erlenmeyer flask containing 25 mL of methanol ($CH_3OH$). The iodine dissolves in the methanol giving a red-brown solution. After 15 min of heating, the solution is pale yellow, and a few gray granules remain at the bottom of the flask. The liquid is decanted into a beaker. The remaining granules are rinsed several times with methanol, and the methanol from each rinse is added to the beaker. The methanol is then evaporated, leaving a solid, yellow-white product of iodide of zinc. The mass of the dry product is obtained. The unreacted zinc granules are also dried and weighed.

A 2/1 ratio of moles of iodine atoms to zinc atoms in the product is consistently obtained. The mass of iodine and reacted zinc equals the mass of product.

The standard reduction potentials for zinc, iodine, and two other substances are given in Table 1.

**Table 1** Standard Reduction Potentials at 25°C

| Oxidizing agent | Electrons gained | | Reducing agent | $E°$ (V) |
|---|---|---|---|---|
| $I_2$ | $+2e^-$ | $\rightarrow$ | $2I^-$ | $+0.54$ |
| $Sn^{2+}$ | $+2e^-$ | $\rightarrow$ | Sn | $-0.14$ |
| $Fe^{2+}$ | $+2e^-$ | $\rightarrow$ | Fe | $-0.44$ |
| $Zn^{2+}$ | $+2e^-$ | $\rightarrow$ | Zn | $-0.76$ |

**[Questions 24-29 for Passage IV begin on following page.]**

**Appx1700**

24. **When the reaction is conducted with 2.0 g of iodine, 0.51 g of zinc is consumed. The balanced chemical equation for the reaction is:**

**A.** $I(s) + Zn(s) \rightarrow ZnI(s)$.

**B.** $I_2(s) + Zn(s) \rightarrow ZnI_2(s)$.

**C.** $4I(s) + Zn(s) \rightarrow ZnI_4(s)$.

**D.** $I(s) + 2Zn(s) \rightarrow Zn_2I(s)$.

25. **The energy of activation for the reaction described in the passage is given by the energy of the:**

**A.** reactants minus energy of products.

**B.** products minus energy of reactants.

**C.** activated complex minus energy of products.

**D.** activated complex minus energy of reactants.

26. **In its lowest-energy electron configuration, zinc has a:**

**A.** filled $3d$ energy level and a filled $4s$ energy level.

**B.** half-filled $3d$ energy level and a filled $4s$ energy level.

**C.** filled $3d$ energy level and a half-filled $4s$ energy level.

**D.** half-filled $3d$ energy level and a half-filled $4s$ energy level.

27. **Based on Table 1, which of the following electrochemical reactions can occur spontaneously?**

**A.** $Zn^{2+} + Fe^{2+} \rightarrow Zn + Fe$

**B.** $Zn^{2+} + Fe \rightarrow Zn + Fe^{2+}$

**C.** $Zn + Fe \rightarrow Zn^{2+} + Fe^{2+}$

**D.** $Zn + Fe^{2+} \rightarrow Zn^{2+} + Fe$

28. **What type of reaction is occurring between $I_2$ and Zn?**

**A.** Acid–base (neutralization)

**B.** Precipitate formation

**C.** Oxidation–reduction

**D.** Chelate formation

**29. Methanol is an effective solvent for the reaction of zinc and iodine because:**

    **I.**      **iodine is soluble in methanol.**
    **II.**     **zinc is soluble in methanol.**
    **III.**    **zinc iodide is soluble in methanol.**

**A.** I only

**B.** II only

**C.** I and III only

**D.** II and III only

**Questions 30-31 are NOT related to a passage.**

**30.  The image of a real object that is formed by a plane mirror is:**

**A.** real and inverted.

**B.** real and erect.

**C.** virtual and inverted.

**D.** virtual and erect.

**31.  Approximately how many liters of oxygen gas are required for the complete combustion of 0.5 liter of methane ($CH_4$) to $CO_2$ and $H_2O$?**

**A.** 0.25 liter

**B.** 0.5 liter

**C.** 1.0 liter

**D.** 2.0 liters

Appx1703

**Passage V (Questions 32-35)**

Electrical generators transform mechanical power into electrical power. Figure 1 is a schematic diagram of a simple generator supplying current to a resistive load, *R*. An external mechanical force rotates a coil of wire in the field of a permanent magnet. An *emf* is induced in the coil that is proportional to the time rate of change of the product of the area of the coil *(A)* times the magnetic field perpendicular to the plane of the coil *(B⊥)*

$$emf = -\Delta(B\perp A)/\Delta t.$$

Figure 2 shows the resultant *emf* waveform versus time when the coil is rotated at a constant rate. This type of generator produces alternating current (ac).



**Figure 1**  Alternating current generator



**Figure 2**  Voltage versus time from a generator

**[Questions 32-35 for Passage V begin on following page.]**

**Appx1704**

**32. A 100% efficient generator consumes mechanical power at a rate of 100 W. What average ac current passes through a 10-Ω resistive load?**

**A.** 0.1 A

**B.** 1.0 A

**C.** 3.2 A

**D.** 10. A

**33. Car batteries (12 V) are recharged by a generator after the engine is started. How long must the generator deliver 1 A at 12 V if the starter motor drew 60 A for 10 s?**

**A.** 600 s

**B.** 100 s

**C.** 50 s

**D.** 10 s

**34. If $T$ is the period and $V_o$ the amplitude, then the *emf* waveform shown in Figure 2 is described mathematically as:**

**A.** $V_o\sin(t/T)$.

**B.** $V_o\cos(t/T)$.

**C.** $V_o\sin(2\pi t/T)$.

**D.** $V_o\cos(2\pi t/T)$.

**35. A current flows through a copper wire moving with velocity $v$ in a magnetic field $B\perp$ because:**

**A.** a force $-evB\perp$ acts on each free electron in the wire.

**B.** a force $+evB\perp$ acts on each free proton in the wire.

**C.** a centripetal force $-mv^2/r$ acts on each charge.

**D.** a centrifugal force $+mv^2/r$ acts on each charge.

Appx1705

**Passage VI (Questions 36-39)**

A 60-kg person stands inside a 20,000-kg railcar that is attached to a locomotive. For experimental purposes, the person has a ball, a string, a 600-nm-wavelength laser, a concave lens, a 100-mF capacitor, and some 12-V, 100-W lightbulbs. The ball and string can be joined to make a pendulum of mass $M$ and length $L$.

After the locomotive releases the railcar, two systems are available to slow the moving railcar. The first system connects an electric generator to the railcar's wheels to charge a 12-V battery mounted on the railcar. Engaging the generator to the wheels puts a decelerating force of 5000 N at 40 m/s, and the force declines linearly with speed. This generator transfers about 80% of the kinetic energy dissipated by this braking force to the battery. The second system allows the person to slow the railcar by the friction of its wheels against a stationary surface in a manner similar to that of the brakes on an automobile. This system can generate a maximum braking force of 14,000 N. The rolling friction of the wheels and the internal friction between the wheels and axles contribute a continuous 1000-N decelerating force any time that the railcar is in motion.

(Note: Use $g = 10$ m/s$^2$ and $c = 3.0 \times 10^8$ m/s, if needed.)

**[Questions 36-39 for Passage VI begin on following page.]**

**Appx1706**

**36. If the coefficient of static friction between the person's shoes and the floor of the railcar is 0.3, which of the following is the minimum acceleration of the railcar that will allow the person's shoes to slip?**

**A.** 2 m/s$^2$

**B.** 4 m/s$^2$

**C.** 6 m/s$^2$

**D.** 8 m/s$^2$

**37. Suppose that the railcar passes by a horn that is emitting a sound with frequency $f$. Which of the following describes the frequency $f'$ that the person on the railcar hears?**

**A.** $f' > f$ before passing the horn, $f' < f$ after passing it

**B.** $f' < f$ before passing the horn, $f' > f$ after passing it

**C.** $f' = f$ before passing the horn, $f' = f$ after passing it

**D.** $f' > f$ before passing the horn, $f' > f$ after passing it

**38. As the railcar brakes with a constant deceleration $a$, the pendulum hangs at rest from the railcar's ceiling with a small angle $\theta$. When the railcar comes to rest, the pendulum will:**

**A.** also remain at rest.

**B.** swing with a frequency dependent on $L$ and $a$ only.

**C.** swing with a frequency dependent on $g$ and $a$ only.

**D.** swing with a frequency dependent on $L$ and $g$ only.

**39. Suppose that the person throws the ball against the front wall of the railcar (that is, in the direction of the railcar's constant velocity), strikes the wall horizontally at a speed $v$, and it bounces elastically back to the person, who catches it. Which of the following represents the net change in the total momentum of the railcar and its contents?**

**A.** $2Mv$

**B.** $Mv$

**C.** Zero

**D.** It cannot be determined from the given information.

**Questions 40-42 are NOT related to a passage.**

40. Which of the following types of orbitals of the central atom are involved in bonding in octahedral compounds?

A. $sp$

B. $sp^3$

C. $p$

D. $d^2sp^3$

41. Which of the following graphs best shows the relationship between the probability of finding 1*s*, 2*p*, and 3*d* electrons as a function of distance from the nucleus?

A.


B.


C.


D.


**Appx1708**

42. **Which of the following is the strongest acid?**

**A.** HF ($K_a = 6.8 \times 10^{-4}$)

**B.** HCN ($K_a = 4.9 \times 10^{-10}$)

**C.** HClO ($K_a = 1.7 \times 10^{-8}$)

**D.** HIO$_3$ ($K_a = 1.7 \times 10^{-1}$)

**End of Physical Sciences Section**

Appx1709

**Physical Sciences Answer Key**

| Question Number | Answer Key |
|:---:|:---:|
| 1 | A |
| 2 | A |
| 3 | B |
| 4 | C |
| 5 | D |
| 6 | D |
| 7 | B |
| 8 | A |
| 9 | D |
| 10 | C |
| 11 | D |
| 12 | C |
| 13 | B |
| 14 | A |
| 15 | D |
| 16 | B |
| 17 | B |
| 18 | C |
| 19 | C |
| 20 | A |
| 21 | D |
| 22 | B |
| 23 | B |
| 24 | B |
| 25 | D |
| 26 | A |
| 27 | D |
| 28 | C |
| 29 | C |
| 30 | D |
| 31 | C |
| 32 | C |
| 33 | A |
| 34 | C |
| 35 | A |
| 36 | B |
| 37 | A |
| 38 | D |
| 39 | C |
| 40 | D |
| 41 | B |
| 42 | D |

**Physical Sciences Raw Score to Scale Score Conversion Table**

| Raw Score | Scale Score |
|---|---|
| 0 | 1 |
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 2 |
| 6 | 2 |
| 7 | 2 |
| 8 | 2 |
| 9 | 3 |
| 10 | 3 |
| 11 | 3 |
| 12 | 3 |
| 13 | 4 |
| 14 | 4 |
| 15 | 5 |
| 16 | 5 |
| 17 | 5 |
| 18 | 5 |
| 19 | 6 |
| 20 | 6 |
| 21 | 6 |
| 22 | 6 |
| 23 | 7 |
| 24 | 7 |
| 25 | 7 |
| 26 | 7 |
| 27 | 8 |
| 28 | 8 |
| 29 | 8 |
| 30 | 9 |
| 31 | 9 |
| 32 | 10 |
| 33 | 10 |
| 34 | 10 |
| 35 | 11 |
| 36 | 11 |
| 37 | 12 |
| 38 | 12 |
| 39 | 13 |
| 40 | 14 |
| 41 | 14 |
| 42 | 15 |

# VERBAL REASONING SECTION

# Verbal Reasoning

Questions 43 – 75

**DIRECTIONS:** There are six passages in the Verbal Reasoning test. Each passage is followed by several questions. After reading a passage, select the one best answer to each question. If you are not certain of an answer, eliminate the alternatives that you know to be incorrect and then select an answer from the remaining alternatives. Indicate your selection by clicking on the answer bubble next to it.

**Appx1713**

**Passage I (Questions 43-47)**

Populations of larger mammals often provide a convenient barometer for the overall health of ecosystems, but in most locations, such wildlife is not easy to view. Lacking firsthand observations, investigators have traditionally relied on indirect evidence such as tracks to confirm the presence of certain species. Although such methods are still employed, a more useful technique is now available for wildlife surveillance: *phototrapping*. This approach makes use of ordinary cameras mounted in rugged enclosures to automatically snap photos of animals that wander into the field of view.

The roots of this technique reach back more than a century. In 1888, George Shiras III perfected a way of photographing wildlife at night with a large-format camera and hand-operated powder flash. He mounted the camera on a rowboat and used a flashlight to find animals on the shore, positioning his boat as close as possible before taking a shot. Later Shiras set up his camera on land, taking pictures remotely by pulling on a long trip wire. Eventually, he rigged the wire so that animals would themselves trigger the picture taking. Shiras's unique photographs were widely disseminated in *National Geographic*, creating great public interest in wildlife. But because the required equipment was cumbersome and expensive, few emulated his techniques.

Decades later, developments sparked renewed use of camera traps. Photography became easier: no more bulky cameras and exploding flash powder. In place of trip wires, a passive infrared detector triggers the camera's shutter when the sensor registers heat in motion. Next, scientists interested in wildlife populations began to apply known statistical methods to camera-trap data. These statistical tools, known as "mark-recapture" or "capture-recapture" methods, have served for decades to estimate populations of rodents and other small animals that can be easily caught, marked, and released. In 1998, K. Ullas Karanth and James D. Nichols showed that camera traps and the appropriate analytical software could be used to estimate the population density of tigers in India. They realized that because every tiger exhibits a unique pattern of stripes, individuals can be identified from photographs. Positive identification normally requires images of both sides of the tiger because these animals are laterally asymmetric. Thus effective monitoring requires pairs of camera traps set up to take photos from either side of the subject.

The main challenge to today's phototrapper is to position the subject—an animal of uncertain type and size—in front of, and at a reasonable distance from, the camera so that useful pictures will be taken. The best strategy is not always apparent. Putting cameras near burrows or dens seems logical: When a resident emerges to forage, a picture will be snapped. The problem is that when this creature returns, another picture will be taken. Indeed, the comings and goings of one animal might be all the camera records, which is not particularly helpful if one's aim is to survey the general population. With experience, however, one can locate traps in less problematic places frequented by animals. One group of researchers in Borneo mounted a camera trap facing a log that had fallen across a small stream, guessing—accurately, as it turned out—that animals would take advantage of this natural bridge to cross over the water.

The views of animals these automatic devices return are ones that even seasoned field biologists will likely never experience directly. Such photographs increase scientific understanding and, despite their often haphazard composition, should boost people's appreciation of nature, just as they did for viewers of Shiras's wildlife photographs over a century ago.

Adapted from J. G. Sanderson and M. Trolle, Monitoring elusive mammals: Unattended cameras reveal secrets of some of the world's wildest places. ©2005 by American Scientist.

**[Questions 43-47 for Passage I begin on following page.]**

**43. Which of the following developments would be LEAST likely to be useful to phototrappers?**

**A.** Increased battery capacity enabling cameras and sensors to operate longer

**B.** Detectors that are sensitive to changes in pressure and moisture as well as heat

**C.** Software that can accurately predict the movements and behavior of a particular species

**D.** Camera lenses capable of capturing a wider field of view than the lenses currently in use

**44. The main purpose of the fourth paragraph of the passage is to:**

**A.** show that the results obtained by Karanth and Nichols have broad applications.

**B.** highlight drawbacks of using phototrapping as a tool in population estimation.

**C.** explain how phototrappers make use of advances in photographic technology.

**D.** suggest that the successful use of phototraps is more complicated than it may at first appear.

**45. The discussion in the passage of Karanth and Nichols's work with tigers suggests that:**

**A.** using phototrapping to estimate tiger populations would be more expensive than other methods.

**B.** the techniques that work with tigers probably will not work with smaller animals.

**C.** truly identifying tigers depends on finding unique features like scars or other unnatural markings.

**D.** some tigers exist that probably have very similar stripe patterns on one side of their bodies.

**46. The passage provides information to answer which of the following questions?**

**A.** Are phototraps a cost-effective method of wildlife surveillance?

**B.** Why did Shiras choose to photograph wildlife at night?

**C.** What enabled the application of mark-recapture techniques to phototrapping?

**D.** Have phototraps been used to identify species that were previously not known to exist?

**47. Which of the following noted advances is most analogous to the changes Shiras made in his wildlife photography technique, as described in the passage?**

**A.** The transistor led to the development of smaller, easily portable electronic devices.

**B.** The vacuum cleaner created the belief that houses would be kept cleaner than previously.

**C.** The cell phone made telephone conversations possible where there were no telephone lines.

**D.** The endoscope allowed doctors to view the inside of the human body without invasive surgery.

**Passage II (Questions 48-52)**

Ireland's Skellig Michael is named for the archangel. The now uninhabited island, a large rock with two peaks jutting up from the sea, lies at the end of a seven-mile voyage across open water—a place of sheer precipices and terrifying landings. The *Skellig*—meaning *rock* or *steep cliff* in Irish Gaelic—was inhabited from perhaps the sixth century into medieval times. High on its easternmost peak, 600 feet above the sea, are ruins of a monastic settlement, five beehive-shaped cells and two small oratories constructed of unmortared stone, their arched roofs still intact, and walled terraces carved from the face of the cliff.

The monastery is reached from the sea by a ladderlike stairway hewn into the rock. It is difficult to understand the monks' choice of this site (or their ability to live here); the place is fit only for birds. Access to the island by wicker boat would have been infrequent and dangerous. The Skellig monks built their tiny windowless cells on a shelf of sandstone hardly wide enough to recline on. They packed seaweed into chinks in the cliff face to make a garden.

From the landing, I climbed hand over hand for 400 feet to a little rope net slung between the two peaks. The path from there is another vertical stairway, this one constructed of stone slabs, 200 steps more to the monastic enclosure, like an eagle's aerie. Most of the rock is too steep for human habitation. At no time could the little cluster of cells have sheltered more than a dozen monks. Of the many monastic communities on the wilder coasts of Europe, this must have been considered the least welcoming. Yet, for nearly a thousand years hermits sat on the Skellig rock and searched the sea for some sign of the Absolute.

The monastery was similar to hermitages that originated in the deserts of Egypt in the early centuries of the Christian era and then spread rapidly over Europe. For a time, every rock and cave from the Red Sea to the coast of Ireland had its saint; every cleft and ledge was a hermitage. The eremitical movement was not unique to Christianity; every religious tradition includes hermits. But during the centuries that the Skellig flourished, the movement was like a frenzy. Young men ran away to solitude as later they would run away to sea, and young women sequestered themselves in convents as evidence of their piety.

In the eighth and ninth centuries, Vikings sacked Skellig Michael numerous times. Why? It could hardly have been worth the effort. Did it simply represent a challenge? Certainly, there is a stubborn sufficiency about the place that is irresistibly attractive. And the community survived. According to legend, Olav Trygvasson, later to become King of Norway and its patron saint, was baptized by a Skellig monk, and his conversion brought an end to the pillaging.

The eremitical fire lasted until the fourteenth century; then the rock reverted to the fish hawks. All across Europe, the dark, shadowy oratories of hermits were superseded by the grandiloquent visual poems of the urban cathedrals. Yet in the eighteenth century the Skellig became a popular place of pilgrimage. Penitents from across Europe not only traveled to the rock but made the grueling 700-foot climb to the Needle's Eye, its precipitous westernmost peak. The ordeal required the devout to crawl onto a horizontal slab of rock that projects with a dizzy precariousness from the summit and kiss a stone cross affixed to the end of the slab.

Adapted from C. Raymo, *Honey From Stone: A Naturalist's Search for God.* ©1987 by C. Raymo.

**[Questions 48-52 for Passage II begin on following page.]**

**48. If the legend about Olav Trygvasson is true, which of the following suppositions about his initial actions at Skellig Michael does passage information support as the most probable?**

**A.** He asked the Father Superior for spiritual guidance.

**B.** He donated booty from elsewhere to the monastery.

**C.** He invited the monks to his coronation in Norway.

**D.** He attacked the monks and looked for valuables.

**49. Suppose that the ruins of a sixteenth-century monastery are discovered on a remote island off the Swedish coast. Why, according to passage information, is this discovery surprising?**

**A.** Few European pilgrims would have been able to reach the site.

**B.** An eremitical motive would have been unlikely at that period.

**C.** The influence of Olav Trygvasson did not spread to Sweden.

**D.** Monks would have been unlikely to learn of such an island.

**50. According to passage information, which of the following reasons was probably determinative in the selection of Skellig Michael as the site for a monastery?**

**A.** Its proximity to the shrine at Needle's Eye

**B.** Its isolation from worldly distractions

**C.** The protection it promised from raiders

**D.** The opportunities it provided for suffering

**51. A visitor to Skellig Michael who kissed its stone cross probably did so for which of the following reasons?**

**A.** To fulfill a qualification for sainthood

**B.** To atone for wrongs committed

**C.** To be spared by Viking marauders

**D.** To be accepted into the monastery

**52. The number of monks who resided on Skellig Michael was probably due to:**

**A.** insufficient food and water in the monastery.

**B.** extreme difficulty in reaching the monastery.

**C.** limited available living space on the site.

**D.** buildings that were precariously situated.

Appx1717

**Passage III (Questions 53-58)**

The exhibition, *The Garry Winogrand Game of Photography*, was a reminder of why so many people consider Winogrand to be one of the great American photographers of the twentieth century. Although they continue to acquire further layers of historical specificity, his street photographs, many of them shot in Midtown Manhattan in the 1950s and 1960s, have lost none of their kinetic immediacy; the best of his animal photographs provide sly, incisive views of the human condition; his pictures from the American road grab the wheel from Walker Evans and Robert Frank to send the genre on an unpredictable detour; in photographing all manner of public events, from antiwar demonstrations to art-world parties to political press conferences, Winogrand added significantly to the pictorial record of midcentury United States history. With his liking for seemingly random compositions and his famous tilted-frame effect, Winogrand made photographs that initially struck many viewers as devoid of formal strengths. Now, however, we can appreciate the subtlety and unexpectedness of his framing and the complex interplay he often achieves between anecdote and form.

In putting together the exhibition, one of the curators, Richard Misrach, decided to focus on an aspect of Winogrand's work to which little attention had been given: the color slides. Winogrand began shooting color photos in the 1950s and continued doing so until the late 1960s. He never explained why he stopped shooting in color, but the difficulty and expense of making color prints and their instability may have contributed to his decision.

Misrach was especially drawn to the photographs Winogrand made at boxing matches in the 1950s, and his selections for the exhibition included eighteen boxing shots. In each, the fighters' bodies are isolated against dark backgrounds and often fragmented by the out-of-focus, quasi-abstract ropes cutting across the frame. In one amazing, weirdly off-center shot, a boxer doubling up from a body blow appears to be ascending into the surrounding void.

This small selection whetted one's appetite for seeing more images from Winogrand's color work. However, it was the slides that caused some of the most heated arguments among curators. Bill Jay objected to the slides being shown in any format because they had never been edited by Winogrand. While the prints in the archive had already been chosen for enlargement by the photographer from contact sheets, Jay pointed out, the slides had undergone no such process. Jay insisted that the archive's hoard of thousands of slides and unproofed negatives should be used only for research and never published or exhibited.

Misrach came to his own defense by saying that if "curatorial laws" were followed, the "real hidden treasures" of the archive would never be seen by anyone. He also observed that Winogrand gave his photographs, slides, and negatives to the Center for Creative Photography without conditions, which implies permission to show and publish the work. If Winogrand didn't want the photographs in his archive to be seen, Misrach argued, he could have simply destroyed them. Indeed, as others remarked, some photographers have sought to exert control over the future of their work by destroying negatives. Furthermore, some curators argued for the importance of posthumous discoveries of artists' work. And taking the discussion into a wider realm, one curator argued that the "artist is not always in the best position to judge his or her work," citing the example of author Franz Kafka asking Max Brod to destroy his manuscripts and how Brod had ignored the request, to the world's benefit.

Adapted from R. Rubinstein, Snap judgments: Exploring the Winogrand Archive. ©2002 by Brant Publications, Inc.

**[Questions 53-58 for Passage III begin on following page.]**

**Appx1718**

**53. The author's use of the term *kinetic immediacy* (paragraph 1) to describe Winogrand's photographs most likely refers to the photographs':**

A. ability to capture the hustle and bustle of the city.

B. incorporation of roadside scenes.

C. historically significant details and context.

D. unique compositional strategies.

**54. If Bill Jay's arguments against the presentation of Winogrand's slides and negatives (paragraph 4) were accepted, which of the following would NOT be a logical outcome?**

A. Less of Winogrand's work would be seen by the general public.

B. Critical opinion of Winogrand's abilities would be lacking in some areas.

C. Winogrand's color photographs would be forgotten by all but specialist scholars.

D. Winogrand's recognition as one of the U.S.'s great photographers would be lessened.

**55. Someone who agreed with Misrach's defense of his choice to show the color slides would be most likely to also approve of:**

A. exhibiting works that an artist had donated to a museum for scholarly purposes only.

B. examining the rest of Winogrand's unprinted photographs and selecting some for display.

C. requiring that artists clearly state their intentions for display and publication when donating works to a museum.

D. organizing an exhibition that included all of Winogrand's work whether previously shown and published or not.

**56. The curator who used the example of Max Brod refusing to destroy the manuscripts of Franz Kafka (final sentence) was most likely implying that:**

A. the individual rights of an artist are sometimes outweighed by the greater public and artistic good.

B. the destruction of an artist's work is never warranted.

C. once a work of art is created, its destruction is almost a crime against humanity.

D. great artists will always attempt to keep their works from being seen and must be prevented from doing so.

**57. By using terms such as *subtlety*, *unexpectedness*, and *complex* in describing Winogrand's work, the author seems to be implying that:**

A. Winogrand was not interested in fame or monetary rewards.

B. Winogrand's talent is not readily apparent to viewers of his work.

C. only photography experts can appreciate Winogrand's work.

D. Winogrand attempted to do too much with his photography.

Appx1719

**58.** **If it were established with certainty that Winogrand did, as the author suggests, stop shooting in color because of the "difficulty and expense of making color prints and their instability" (paragraph 2), this information would best support which of the following arguments?**

**A.** Winogrand would have liked to have his color slides printed once the technology made this feasible.

**B.** Winogrand felt that working in color was stylistically inferior to black and white.

**C.** The color slides should be viewed as finished products and not printed.

**D.** Winogrand would have returned to photographing in color once the technology improved.

**Passage IV (Questions 59-63)**

The soil bacterium *Bt* has remained the cornerstone of natural pest control for over three decades. Its toxins generally kill the bad guys (corn earworm and Colorado potato beetle, among others) and spare the good guys (humans, mammals, and beneficial insects).

But the rapidly growing acreage devoted to corn, cotton, and potatoes that have been genetically altered to produce a *Bt* pesticide is making fears about emerging insect resistance increasingly salient. These crops expose pests to their toxins throughout the growing season, exerting a selection pressure that favors the survival of resistant individuals. In contrast, *Bt* sprays, which are used primarily by home gardeners and farmers who practice organic methods, degrade quickly, making resistance less likely.

A report by the Union of Concerned Scientists advocates the *refuge/high-dose* strategy. Insects are exposed to sufficient levels of *Bt* toxin from crop plants to kill most of them. The rare survivors are then allowed to mate with insects that have been bred in selected areas (refuges) that are not planted with *Bt* crops. Their offspring are susceptible to *Bt* toxins.

The report notes that the need to expand refuges to as much as half of the planted acreage is underlined by the inability of *Bt* cotton to kill more than 90 percent of cotton bollworms. So far, no increase in the level of resistance to genetically engineered *Bt* crops has been documented. But several insect species have evolved resistance in the laboratory, and a vegetable pest, the diamondback moth, has demonstrated resistance after intensive field exposure to *Bt* sprays.

The biggest marketer of *Bt* seeds does not foresee a need to strengthen protective measures nor to require the federal regulation of resistance-management plans, citing the company's mandate that farmers establish refuges for *Bt* corn and potatoes, even without a directive from the Environmental Protection Agency. The director of the company's *Bt* corn sales charges scientists who demand larger refuges with failing to consider the potential for improved genetic engineering. "Resistance is unlikely to happen within five years, and within that time frame we'll offer new technology that will further reduce the likelihood of resistance," according to this executive.

One way for insects to develop resistance is by the alteration of receptors in the gut to which the toxins bind. Several companies are working either on *gene stacking*, the engineering of plants to express multiple toxins that bind to various classes of receptors, or on combining *Bt* toxins with other proteins that disrupt an insect's life cycle. These approaches do not guarantee success. Pests can evolve resistance to multiple *Bt* toxins that target various receptors, and that resistance can evolve as a dominant trait. Furthermore, any pest lacking an enzyme required to activate a toxin would be unaffected by it.

So biopesticides that serve as alternatives to *Bt* crops may be needed. Research recently presented at the Entomological Society of America involved the cloning of genes for a toxin from a bacterium within the gut of nematodes. Just a few of the bacterial cells can kill insects. (An enzyme in the bacterium has the unusual property of making a dying insect glow blue, perhaps warning predators.) One company is trying to insert the cloned genes into various plants, enabling them to produce their own pesticide.

But even if *Bt* alternatives are found, the bugs may ultimately win. Some 500 insect species have developed resistance to synthetic pesticides. Natural selection may prove a match for natural pesticides as well.

Adapted from G. Stix, Resistance fighting: Will natural selection outwit the king of biopesticides? ©1998 by Scientific American.

**[Questions 59-63 for Passage IV begin on following page.]**

**59.  Which of the following attempts to protect dogs from fleas is essentially a refuge/high-dose strategy?**

**A.** Applying a skin solution that changes a dog's blood chemistry so that its fleas migrate to other dogs

**B.** Periodically dipping some dogs in insecticide solutions and then allowing them access to untreated dogs

**C.** Giving a dog a monthly pill that disrupts the fleas' breeding cycle and keeping the dog isolated

**D.** Mating flea-resistant dogs with flea-susceptible dogs and putting flea collars on the puppies

**60.  Why is the high-dose part of the refuge/high-dose strategy necessary, according to passage information?**

**A.** More than 10 percent of the pests may recover from poisoning by toxins present at a constant level.

**B.** If almost all of the pests are killed suddenly, the plants gain time to develop their own defenses.

**C.** A dosage level from which many pests recover will create a large population of resistant pests.

**D.** The residue from a heavily applied pesticide continues to kill successive generations of pests.

**61.  Some Indian meal moths have no sites to which the molecules of *Bt* toxins can bind. Passage information suggests that a gene-stacking solution to this problem would focus on the:**

**A.** engineering of toxic proteins that would bind to other intestinal receptors.

**B.** development of crops that are not attractive to the moth's larvae.

**C.** alteration of receptors in the gut to accept multiple toxins.

**D.** genetic disruption of the moth's reproductive cycle.

**62.  Assume that cotton growers find the refuge/high-dose method inadequate to combat bollworm infestations. What does passage information suggest as their best recourse?**

**A.** Fields of *Bt* cotton should be sprayed with a different form of insecticide.

**B.** Fields devoted to *Bt* cotton should be replanted with conventional cotton strains.

**C.** Refuges should be eliminated so that *Bt*-resistant bollworms have no safe breeding area.

**D.** The *Bt* content of the plants should be varied so that bollworms are less likely to develop resistance.

**63.  According to the author, *Bt* sprays are preferable to *Bt* crops for pest control because sprays:**

**A.** harm the environment less than does a crop.

**B.** destroy more insects than does a crop.

**C.** cost less than does raising a crop.

**D.** act for a shorter time than does a crop.

**Passage V (Questions 64-70)**

People must sometimes perform skillfully on difficult tasks before an audience. Under such circumstances, they often wish to have friends, relatives, and other supporters present. It is worth asking whether a supportive audience is really helpful—or whether it might not instead impair the performance. Previous research shows that the effect of audience support is not simple or uniform. The following study was designed to test competing hypotheses about the effect of a supportive audience on performance.

Because friends are the most common source of social support, Experiment 1 compared the effects of observation by a friend and by a stranger during the performance of a task that previous research had shown to be stressful. This task was to count backward aloud by thirteens, starting from 1,470. Participants were told that their goal was to perform the successive subtraction operations as quickly and accurately as possible during a two-minute trial. At this point in the instructions, the experimenter indicated a one-way "mirror" and a microphone, telling half of the participants that a friend who had accompanied them to the testing room would observe their performance. The experimenter mentioned a fictitious name to the other participants as their observer.

The results suggest that a supportive audience has a detrimental effect. The participants who believed that a friend was watching them made a significantly higher percentage of errors than did those who believed that a stranger was watching them. Yet the number of errors made at particular stages of the performance—e.g., the second subtraction—was almost identical in the two conditions. The decrement in the supportive-audience condition resulted from a slower rate of responding, which meant that the neutral-audience condition produced more responses (with increasing accuracy on the later ones).

The participants' answers to post-experimental questions indicated that they were not aware of the effect of the observer on their performance. In fact, participants in the supportive-audience condition were less likely than those in the neutral-audience condition to report being distracted by the observer or feeling stress while doing the task. Furthermore, the negative effect of a supportive audience is apparently not due to discomfort about being judged: The participants' ratings of their feeling of being evaluated were nearly identical in the two conditions.

The researcher concluded that supportive observers impair the performance of a difficult, skill-based task by promoting a response style that reduces speed without increasing accuracy. Still, the reason for this audience effect was unclear. Friends and strangers differ in many ways, including their knowledge of one's abilities, their desire to witness one's success, and their expectations about one's behavior in a particular situation.

In Experiment 2, all the observers were strangers, and their supposed supportiveness was manipulated. The experimenter told participants in the supportive-audience condition that both they and their observer would receive a cash prize if their speed and accuracy surpassed a certain criterion. Participants in the neutral-audience condition were told that they alone were to receive the prize for a good score. They thus had no reason to suppose that the observer cared about the quality of their performance. Experiment 2 confirmed the prediction that a skilled performance would suffer with a supportive audience.

Other questions remain. Did the difficulty of the task produce an expectation of failure that impeded its performance? Is a supportive audience a special case of an especially attentive audience or one likely to respond emotionally to a performance? And why did performers report feeling less distracted by a friend than by a stranger, when their performance suggested the opposite effect?

Adapted from J. L. Butler and R. F. Baumeister, The trouble with friendly faces: Skilled performance with a supportive audience. ©1998 by the American Psychological Association.

**[Questions 64-70 for Passage V begin on following page.]**

**64. The design of Experiment 1 reveals the researcher's assumption that:**

**A.** participants will not be aware of the quality of their performance.

**B.** most participants will find the mathematical task difficult.

**C.** a supportive audience will impair performance.

**D.** a neutral audience will impair performance.

**65. Which of the following facts constitutes the most serious *objection* to the researcher's conclusion about the effect measured in Experiment 2?**

**A.** The instructions discouraged a cautious performance style.

**B.** The procedure was deceptive, since the observers were fictitious.

**C.** A monetary reward was a factor for performers in both conditions.

**D.** Performers' beliefs about the observer's attitude were not determined.

**66. Suppose that a psychologist is interested in the performance of trial lawyers. On the basis of Experiment 1, the psychologist should predict that a legal argument will be more effectively presented if:**

**A.** the lawyer is serving without compensation than if the case involves a large financial settlement.

**B.** the judge is unknown to the lawyer than if the two have a cordial relationship.

**C.** the courtroom is empty than if it is filled with spectators whose sympathies are unknown.

**D.** jurors watch the trial through a one-way mirror than if they are present in the courtroom.

**67. What is the most likely explanation of the slower rate of performance observed in Experiment 1?**

**A.** A desire to maintain an appearance of relaxed competence before friends

**B.** A feeling of being judged more harshly by friends than by strangers

**C.** An inability to concentrate on mental tasks when friends are present

**D.** A belief that accuracy is more important than speed on certain tasks

**68. What conclusion about the nature of audience support is justified by the results of Experiment 2 alone?**

**A.** Supportive friends can disrupt a performance if they would benefit from its success.

**B.** Supportive strangers can enhance a performance if they would not benefit from its success.

**C.** Strangers can disrupt a performance if they would benefit from its success.

**D.** Strangers can disrupt a performance if its success would benefit the performer.

**Appx1724**

69. **Suppose that Experiment 1 is repeated with the addition of a "hostile-audience" condition and that this condition produces data equivalent to those of the "supportive-audience" condition. Which of the following hypotheses would best accommodate this outcome?**

**A.** A hostile audience does not affect performance.

**B.** A supportive audience impairs performance.

**C.** An involved audience impairs performance.

**D.** A nonhostile audience enhances performance.


70. **Which of the following hypotheses would most reasonably account for the post-experimental statements made by those in the neutral condition?**

**A.** A performer's anxiety need not adversely affect performance.

**B.** A performer's anxiety can be reduced with no effect on performance.

**C.** An audience can affect a performance by reducing performance anxiety.

**D.** An audience can affect a performance by causing performance anxiety.

**Passage VI (Questions 71-75)**

The Greek words *sophos* and *sophia*, usually translated *wise* and *wisdom*, were in common use from the earliest times and, because they stood for an intellectual or spiritual quality, naturally acquired some delicate shades of meaning that can be indicated here only approximately. At first, they referred primarily to skill in a particular craft. A shipwright was described by Homer as "skilled in all sophia"; a steersman, an augur, a sculptor are "sophoi," each in that occupation; Apollo was "sophos with the lyre."

The sophia of a charioteer, shipwright, or musician must have been to a large extent acquired by learning, but Pindar no doubt pleased his royal patron when he wrote that "one who knows much is sophos by nature, in contrast to chattering crows, who have gained their knowledge by learning." "Not the person who knows many things is sophos," said Aeschylus, "but one whose knowledge is useful."

Shortly after this usage was recorded, there crept in a cynical note, a hint that the sophos is too clever and may presume too far. Taxed by the wily Odysseus (whom he had earlier described as "a sophos wrestler") with acting in a way that was not *sophon*, Neoptolemus replied that "what is right and just is better than what is sophon." So we get the oxymoron of a chorus in Euripides: "When mortals set themselves up against the gods, their sophia is not sophon." The verb *sophizesthai*, "to practice sophia," which Hesiod applied to the acquisition of skill in seamanship and Theognis to himself as a poet, suffered a parallel development, until it meant to trick or deceive or to be oversubtle.

Like other groups, the Athenians tended to be wary of intellectuals, pundits, professors, and the like. The qualities of these persons were summarized in a word difficult to translate: *deinotes*, with the adjective *deinos*. Derived from a noun meaning *fear*, it referred to anything terrible or dreadful and was applied by Homer to weapons, the glare of a foe, the whirlpool Charybdis, thunder, and lions. The Egyptians were *deinoi* (terrible fellows) for devising stratagems, Prometheus was *deinos* at wriggling out of difficulties, a good charioteer was *deinos* at his art. It also, and particularly, meant clever in speech or argument.

Anyone who had this quality was a natural object of suspicion to the less clever, as the orator Antiphon said that Thucydides was to the Athenian public "because of his reputation for deinotes." Degenerating, as words in popular usage do, it acquired some of the senses of *sophos*, as when Demosthenes alleged that Aeschines had called him "deinos, sorcerer, sophist, and the like." At this point, *deinos* was expressly coupled with *sophistes* as an insult to be resented.

The word *sophist*, then, had a general sense as well as the special one which I have yet to mention, and in neither sense was it necessarily a term of opprobrium. Because of the vocation of Greek poets as educators, we may conclude that the word that comes nearest to this special sense is in modern English *teacher* or *professor*. It was not until the fifth century C.E. that the term was apparently sometimes pronounced with a depreciatory inflection, as may the words *pundit* or *intellectual* today. In the hands of the conservative Aristophanes, it became definitely a term of abuse, implying charlatanry and deceit, although by no means did it as yet apply exclusively to certain philosophers.

Adapted from W. K. C. Guthrie, *The Sophists*. ©1971 by Cambridge University Press.

**[Questions 71-75 for Passage VI begin on following page.]**

**71. Which of the following words is most analogous to *deinotes* in the way its emotional connotations have changed?**

**A.** *Homely*, which referred to things "appealingly domestic" and came to mean "unattractive"

**B.** *Impact*, which referred to things in "violent collision" and came to mean "any outcome"

**C.** *Inflammable*, which referred to things "capable of burning" and came to mean "not capable of burning"

**D.** *Brave*, which referred to things "ostentatiously colorful" and came to mean "courageous"

**72. The author's tone in discussing the Athenians of ancient Greece is most accurately described as:**

**A.** understanding and sympathetic.

**B.** detached and conscientious.

**C.** critical and disapproving.

**D.** indulgent and sentimental.

**73. One can most reasonably conclude from the passage that the ancient Athenians:**

**A.** were generally indifferent to poetry and philosophy.

**B.** considered intellectuals corrupt for abusing their influence.

**C.** had contradictory feelings about those who seemed clever.

**D.** had greater admiration for Homer than for Demosthenes.

**74. The passage author moves from a discussion of *sophos* to a discussion of *deinotes* to make the point that:**

**A.** they switched meanings because they had similar connotations.

**B.** cleverness has always seemed threatening to those who are not clever.

**C.** ordinary Greeks did not understand the distinction between the two words.

**D.** the connotations of one spread to the other because their meanings overlapped.

**75. Which of the following concepts does the passage author NOT associate with *sophos*?**

**A.** Intellectual guile

**B.** Scholarly learning

**C.** Political intrigue

**D.** Vocational skill

**End of Verbal Reasoning Section**

**Verbal Reasoning Answer Key**

| Question Number | Answer Key |
|---|---|
| 43 | B |
| 44 | D |
| 45 | D |
| 46 | C |
| 47 | D |
| 48 | D |
| 49 | B |
| 50 | B |
| 51 | B |
| 52 | C |
| 53 | A |
| 54 | D |
| 55 | B |
| 56 | A |
| 57 | B |
| 58 | D |
| 59 | B |
| 60 | C |
| 61 | A |
| 62 | A |
| 63 | D |
| 64 | B |
| 65 | D |
| 66 | B |
| 67 | A |
| 68 | C |
| 69 | C |
| 70 | A |
| 71 | A |
| 72 | B |
| 73 | C |
| 74 | D |
| 75 | C |

**Verbal Reasoning Raw Score to Scale Score Conversion Table**

| Raw Score | Scale Score |
|-----------|-------------|
| 0 | 1 |
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 2 |
| 10 | 2 |
| 11 | 3 |
| 12 | 4 |
| 13 | 4 |
| 14 | 5 |
| 15 | 6 |
| 16 | 6 |
| 17 | 6 |
| 18 | 7 |
| 19 | 8 |
| 20 | 8 |
| 21 | 8 |
| 22 | 9 |
| 23 | 9 |
| 24 | 10 |
| 25 | 10 |
| 26 | 11 |
| 27 | 11 |
| 28 | 11 |
| 29 | 12 |
| 30 | 13 |
| 31 | 13 |
| 32 | 14 |
| 33 | 15 |

# WRITING SAMPLE SECTION

# Writing Sample

Questions 76 – 77

**DIRECTIONS:** This is a test of your writing skills. The test consists of two parts, with a total allotted time of 90 minutes: 45 minutes for Part 1 and 45 minutes for Part 2. You may work only on Part 1 during the first 45 minutes of the test. If you finish writing Part 1 before time is up, you may review your work or continue to Part 2. Upon completing Part 2 you will have an optional 10-minute break.

**Appx1731**

**76.** Consider this statement:

**Youth and innovation are more beneficial in politics than are age and experience.**

Write a unified essay in which you perform the following tasks. Explain what you think the above statement means. Describe a specific political situation in which age and experience might be more beneficial than youth and innovation. Discuss what you think determines whether or not youth and innovation are more beneficial in politics than are age and experience.

**77.** Consider this statement:

**Citizens who enjoy a country's benefits during peacetime have a responsibility to support their nation in time of war.**

Write a unified essay in which you perform the following tasks. Explain what you think the above statement means. Describe a specific situation in which citizens might justifiably <u>not</u> support their nation in time of war. Discuss what you think determines whether or not citizens should support their nation in time of war.

**End of Writing Sample Section**

# BIOLOGICAL SCIENCES SECTION

# Biological Sciences

Questions 78 – 119

**DIRECTIONS:** Most questions in the Biological Sciences test are organized into groups, each preceded by a descriptive passage. After studying the passage, select the one best answer to each question in the group. Some questions are not based on a descriptive passage and are also independent of each other. You must also select the one best answer to these questions. If you are not certain of an answer, eliminate the alternatives that you know to be incorrect and then select an answer from the remaining alternatives. Indicate your selection by clicking on the answer bubble next to it. A periodic table is provided for your use. You may consult it whenever you wish.

Appx1735

**Passage I (Questions 78-81)**

The amino acids from which most proteins are made are called the common amino acids. Most share the general formula shown in Figure 1.



**Figure 1**

Amino acids can be classified on the basis of the chemical properties of their R groups. Some have hydrophobic, nonpolar R groups (e.g., valine: $R = -CH(CH_3)_2$); some have polar, uncharged R groups and are hydrophilic (e.g., serine: $R = -CH_2OH$); and others have polar, hydrophilic R groups that are acidic (e.g., aspartic acid: $R = -CH_2COOH$) or basic (e.g., lysine: $R = -CH_2CH_2CH_2CH_2NH_2$).

Ornithine ($R = -CH_2CH_2CH_2NH_2$) is an amino acid that is found in cells, but not incorporated into proteins. In mammals and many other organisms, it can be converted to diaminobutane via the ornithine decarboxylase reaction, an early event in cell division. (See Equation 1.)

$$\text{ornithine} + H_2O \rightarrow H_2NCH_2CH_2CH_2CH_2NH_2 + HCO_3^-$$

**Equation 1**

In the laboratory, the rate of this reaction is measured by an enzyme assay that uses ornithine in which the carboxylic acid carbon is radioactively labeled. The reaction is terminated by acidification of the reaction mixture, which converts the $HCO_3^-$ ion to $CO_2$ and $H_2O$.

Thin-layer chromatography is an effective way of separating amino acids. Table 1 below shows $R_f$ values for four amino acids using various solvents. "Orn" represents ornithine. "X," "Y," and "Z" represent three other amino acids.

**Table 1**

| Amino acid | Solvent 1 | Solvent 2 | Solvent 3 |
|:---:|:---:|:---:|:---:|
| Orn | 0.04 | 0.14 | 0.24 |
| X | 0.15 | 0.47 | 0.74 |
| Y | 0.06 | 0.19 | 0.17 |
| Z | 0.03 | 0.11 | 0.26 |

**[Questions 78-81 for Passage I begin on following page.]**

**Appx1736**

**78. If ornithine were grouped with the common amino acids, how would it be classified?**

**A.** Nonpolar

**B.** Hydrophobic

**C.** Acidic

**D.** Basic

**79. Which of the following statements gives the most fundamental reason why ornithine is unlikely to be found in proteins synthesized in vivo?**

**A.** There is no codon for it in the standard genetic code.

**B.** It cannot form a peptide bond.

**C.** It is not available in the diet.

**D.** It has a net positive charge in aqueous solution.

**80. Which of the following terms best describes the role of ornithine decarboxylase in the reaction shown in Equation 1?**

**A.** Catalyst

**B.** Cofactor

**C.** Substrate

**D.** Activator

**81. If the ornithine decarboxylase assay is carried out as described in the passage, which of the following compounds will be generated in a radioactive form?**

**A.** Ornithine

**B.** Ornithine decarboxylase

**C.** Diaminobutane

**D.** Carbon dioxide

**Passage II (Questions 82-86)**

In order to understand the chemical evolution of life, scientists have studied the production of amino acids under conditions that simulate those of primitive Earth.

Malic acid is thought to have formed via hydrolysis of a cyanohydrin intermediate (Scheme I).



**Scheme I**

Subsequent dehydration of malic acid results in the formation of fumaric acid (mp 286°C) and its cis isomer, maleic acid (mp 130°C).

Ammonia was thought to be a constituent of the early atmosphere, and it was proposed that it reacted with fumaric, maleic, and malic acids to afford a prebiological synthesis of aspartic acid, an amino acid (Scheme II).



**Scheme II**

In an attempt to verify this hypothesis, chemists tried to reproduce the synthesis of aspartic acid under simulated primitive Earth conditions.

An open flask containing malic acid was treated with a continuous ammonia feed, and the mixture was heated at 150°C for 1.5 h. The experiment was repeated with a mixture of fumaric and maleic acids. The results were analyzed by paper chromatography; the $R_f$ values of the reaction mixture were compared to the $R_f$ value of a standard sample of aspartic acid. (Note: $R_f$ = distance moved by compound/distance moved by solvent front.)

**[Questions 82-86 for Passage II begin on following page.]**

**82. In the chromatography of the reaction mixture, water absorbed on cellulose functioned as the stationary phase. What was the principal factor determining the migration of individual components in the sample?**

**A.** Hydrogen bonding

**B.** Solute concentration

**C.** Stationary phase concentration

**D.** Thickness of paper

**83. Fumaric acid and maleic acid have very different melting points because:**

**A.** the melting point of a substance is directly proportional to its polarity.

**B.** trans isomers typically pack closer together, resulting in greater intermolecular forces.

**C.** fumaric acid is stabilized by resonance, and maleic acid is not.

**D.** fumaric acid has a higher molecular weight than maleic acid.

**84. What assumption is being made if scientists conclude that aspartic acid was formed by the prebiological synthesis in the passage?**

**A.** Aspartic acid is unstable at temperatures below 150°C.

**B.** All of the malic acid underwent the dehydration reaction to form fumaric/maleic acid.

**C.** Compound **A** and cyanide were available on primitive Earth.

**D.** The reaction between ammonia and fumaric acid was catalyzed by the presence of water.

**85. Which of the following statements does NOT correctly describe the dehydration of malic acid to fumaric acid and maleic acid?**

**A.** The reaction occurs most readily with tertiary alcohols.

**B.** The reaction involves the loss of a water molecule.

**C.** The reaction has a carbocation intermediate.

**D.** The reaction is stereospecific.

**86. What type of functional group is formed when aspartic acid reacts with another amino acid to form a peptide bond?**

**A.** An amine group

**B.** An aldehyde group

**C.** An amide group

**D.** A carboxyl group

**Passage III (Questions 87-90)**

A patient who complained of weakness in the left leg was examined. Neurological tests confirmed the weakness but also showed a normal ability to sense the presence of touch on that leg and a loss of ability to localize touch to the correct position on the other leg. Her physicians took the following information into account during her treatment.

Although the 10th cranial (vagus) nerve innervates the visceral organs down to the upper gastrointestinal tract, all other organs below the level of the neck are innervated by segmental spinal nerves. Each spinal nerve has two distinct roots connecting it to the spinal cord: one on the posterior side and one on the anterior side. A ganglion that contains the nerve cell bodies distinguishes the posterior root. The cell body of a nerve cell is the site of the nucleus and most protein synthesis.

The cord itself is bilaterally symmetrical. It contains ascending and descending axons in the white matter. The *posterior columns* are tracts of ascending and descending axons in the posterior white matter. When they are severed, the ability to localize touch and the ability to sense vibration are lost. The spinothalamic tracts also transmit sensory signals from spine to thalamus. When the *anterior spinothalamic tract* is cut, sensations of light touch are lost. When the *lateral spinothalamic tract* is cut, sensations of pain and temperature are lost. The *corticospinal tract* transmits signals that control skeletal muscle movements from cortex to spinal levels.



**Figure 1**   Diagram of cross section through spinal cord showing major ascending and descending tracts; illustrated for both sides but labeled only on the left as follows: PC, posterior columns; CS, corticospinal tract; LST, lateral spinothalamic tract; AST, anterior spinothalamic tract.

**[Questions 87-90 for Passage III begin on following page.]**

**87. Damage to what two tracts is suggested by the patient's symptoms?**

**A.** Corticospinal and posterior column

**B.** Posterior column and lateral spinothalamic

**C.** Lateral spinothalamic and anterior spinothalamic

**D.** Anterior spinothalamic and corticospinal

**88. When the anterior roots of an animal are stimulated, contractions of the muscles are observed. When the posterior roots are cut, all sensation is abolished from that spinal level. Which of the following conclusions about the innervation of a spinal level is most consistent with these results?**

**A.** Anterior roots and posterior roots each contain nerve fibers to the muscles.

**B.** Anterior roots and posterior roots each contain some sensory nerve fibers.

**C.** Posterior roots contain nerve fibers that go to the muscles and come from touch receptors in the skin.

**D.** Posterior roots contain all the sensory nerve fibers and could contain nerve fibers to the muscles.

**89. Complete transection of the spinal cord at the lumbar level results in a flaccid bladder and loss of voluntary urinary sphincter control, whereas a right hemisection of the cord between the lumbar and sacral levels does not affect either. The best conclusion from this data is that:**

**A.** hemisection of the cord has no effect on motor control.

**B.** bladder control requires an intact spinal cord.

**C.** nerves controlling the bladder exit the spine at a low lumbar level.

**D.** nervous innervation from the left side is sufficient to regulate the voluntary sphincter.

**90. Otto Loewi placed a frog heart in a chamber filled with a saline solution. The chamber was connected to a second chamber containing another heart. Fluid from the first chamber flowed into the second. Electrical stimulation of the vagus nerve attached to the first heart caused it to beat more slowly. After some delay, the second heart also slowed. The purpose of this experiment was to demonstrate that:**

**A.** a heart placed in saline solution is unable to receive nutrients and eventually begins to slow its rate of beating.

**B.** the action of the vagus nerve paradoxically is to slow the rate of the heart rather than to speed it up.

**C.** the heart can beat without being attached to a nerve as shown by the independent action of the second heart.

**D.** a chemical in the fluid from the first heart is capable of making the second heart slow its rate of beating.

**Questions 91-95 are NOT related to a passage.**

**91. Which of the following acids would yield Compound A (shown below) under esterification conditions?**



**Compound A**

**A.**



**B.**



**C.**



**D.**

Appx1742

**92.**



**What is the relationship between the structures above?**

**A.** Identical

**B.** Mirror images

**C.** Cis-trans (geometrical) isomers

**D.** Diastereomers

**93. The initial filtration step in the glomerulus of the mammalian kidney occurs primarily by:**

**A.** passive flow due to a pressure difference.

**B.** passive flow resulting from a countercurrent exchange system.

**C.** active transport of water, followed by movement of electrolytes along a resulting concentration gradient.

**D.** active transport of electrolytes, followed by passive flow of water along the resulting osmolarity gradient.

**94. A certain bacterium was cultured for several generations in medium containing $^{15}$N, transferred to medium containing $^{14}$N, and allowed to complete two rounds of cell division. Given that the bacterium's genome mass is 5.4 fg when grown in $^{14}$N media and 5.5 fg when grown in $^{15}$N medium, individual bacteria with which of the following genome masses would most likely be isolated from this culture?**

**A.** 5.4 fg only

**B.** 5.4 fg and 5.45 fg

**C.** 5.4 fg and 5.5 fg

**D.** 5.45 fg only

**95.** Assume that *K* and *M* are two unlinked genes that affect hearing. The dominant *K* allele is necessary for hearing, and the dominant *M* allele causes deafness regardless of the other genes present. Given this, what fraction of the offspring of parents with the genotypes *Kk Mm* and *Kk mm* will most likely be deaf?

**A.** 1/4

**B.** 3/8

**C.** 1/2

**D.** 5/8

**Passage IV (Questions 96-102)**

Male guppy fish, *Poecilia reticulata*, have variable numbers of bright spots, whereas female guppies lack spots. Variation in number of spots has a genetic basis. In wild populations, the number of spots is correlated with intensity of predation; guppies have many spots in pools that lack predators, fewer spots in pools with weak predators, and very few spots in pools with strong predators. To test whether predators exert natural selection on guppy color patterns, a scientist constructed ten artificial pools that were designed to mimic pools naturally inhabited by guppies. Guppies were introduced into the pools and allowed to increase in number (guppies reproduce at an age of 5–6 weeks). After six months, a weak guppy predator (*Rivulus hartii*) was introduced into four pools, a strong guppy predator (*Crenicichla alta*) was introduced into four other pools, and two pools were left predator-free. Two censuses were made 5 and 14 months later (Census I and II, respectively) and guppies were scored for number of spots. Based on the results shown below, the investigator concluded that guppies with more spots are seen by *Crenicichla* more easily, and this results in natural selection for a reduction in number of spots.



**Figure 1**    Changes in the number of spots per fish during the course of the greenhouse experiment. Vertical lines are ± 2 SE.

**[Questions 96-102 for Passage IV begin on following page.]**

**Appx1745**

**96.** What assumption did the investigator make *before* concluding that the number of spots decreased in the *Crenicichla* treatment because guppies with more spots were seen by *Crenicichla* more easily?

**A.** *Crenicichla* relies on vision to detect guppies.

**B.** Variation in number of spots per fish is genetically based.

**C.** The number of spots is not subject to natural selection when predators are absent.

**D.** Predators detect guppies with many spots more easily than they detect guppies with few spots.

**97.** Results shown in Figure 1 support which of the following conclusions?

**A.** Predation by both *Rivulus* and *Crenicichla* produced long-term changes in the number of spots per fish.

**B.** Guppy populations were larger in the presence of *Rivulus* than in the presence of *Crenicichla*.

**C.** Only predation by *Crenicichla* resulted in a reduction in the number of spots per fish.

**D.** The number of spots per fish remained unchanged in the absence of predators.

**98.** Based on the hypothesis that the number of spots on male guppies decreases through natural selection as a result of predation intensity, which of the following results would NOT have been predicted?
    **I.**     The number of spots per fish would increase in the predator-free treatment.
    **II.**    The number of spots per fish would differ between the *Rivulus* and *Crenicichla* treatments.
    **III.**   The number of spots per fish would be lower in the presence of *Crenicichla* than in the predator-free treatment.

**A.** I only

**B.** II only

**C.** I and II

**D.** II and III

**99.** In another study, an investigator found that female guppies prefer to mate with more brightly patterned males. This preference may explain:

**A.** the difference between the *Rivulus* and the *Crenicichla* treatments.

**B.** the decrease in number of spots per fish in the presence of *Crenicichla*.

**C.** the difference between the predator-free and the *Crenicichla* treatments.

**D.** the increase in number of spots per fish in the absence of predators.

**100.** Because the size of spots also may affect how easily predators see guppies, the investigator used fine gravel in 2 *Rivulus* pools and 2 *Crenicichla* pools and coarse gravel in the other pools. At the end of the experiment, the guppies in pools with fine gravel had smaller spots than did guppies in pools with coarse gravel. This result demonstrates that:

**A.** guppies with large spots are seen more easily than guppies with small spots.

**B.** background material against which guppies are seen determines the spot size favored by natural selection.

**C.** predators can see guppies more easily against fine gravel than against coarse gravel.

**D.** guppies select pools with background material that matches the size of their spots.

**101. For natural selection to influence guppy color patterns, it is important that variation in number of spots has a genetic basis so that:**

**A.** there can be phenotypic variation in number of spots per fish.

**B.** there will be differences in color pattern between males and females.

**C.** predators can distinguish among guppies with different numbers of spots.

**D.** changes in number of spots per fish are passed from one generation to the next.

**102. Guppy courtship is characterized by a visual display in which males vibrate stiffly in front of females. However, males that display may be seen more easily by predators. Which of the following comparisons provides the best test of the hypothesis that displaying males are more conspicuous to predators?**

**A.** Predation rates on females when males are present versus predation rates on females when males are absent

**B.** Display rates by males when females are present versus display rates when females are absent

**C.** Display rates by males when predators are present versus display rates when predators are absent

**D.** Predation rates on males when females are present versus predation rates on males when females are absent

**Questions 103-104 are NOT related to a passage.**

**103.  Which of the following animal pairs best illustrates the outcome of *convergent* evolution?**

**A.** The dolphin and the shark

**B.** The domestic sheep and the mountain goat

**C.** The polar bear and the panda bear

**D.** The light-colored and the dark-colored forms of the peppered moth

**104.  The boiling point of butyric acid is much higher than that of its isomeric compounds, such as ethyl acetate or 1,4-dioxane.**



ethyl acetate

bp = 77°C

dioxane

bp = 101°C

butyric acid

bp = 164°C

**Which of the following statements explains the differences in the boiling points of these isomers?**

**A.** Van der Waals attraction is greater for acids.

**B.** Carboxylic acids ionize to form carboxylate ions.

**C.** Carboxylic acids form dimers held together by two hydrogen bonds.

**D.** Molecular packing is closer for planar compounds.

Appx1748

**Passage V (Questions 105-109)**

A 52-year-old female patient shows symptoms of generalized weakness, low blood pressure (80/50 mmHg), weight loss, nausea, and an extreme craving for salt. Her adrenal cortex is found to be atrophied and to contain both lymphocytes and adrenal autoantibodies. A diagnosis of primary adrenal gland insufficiency, or *Addison's disease*, is made.

Addison's disease occurs when cells of the adrenal cortex are destroyed, leaving the gland unable to secrete either glucocorticoids or mineralocorticoids. A major function of cortisol, the body's primary glucocorticoid, is to stimulate gluconeogenesis (formation of glucose from noncarbohydrate sources) in the liver by activating DNA transcription to produce liver enzymes and by mobilizing amino acids from muscle tissue. Aldosterone, the primary mineralocorticoid, maintains ionic balance by causing conservation of $Na^+$ and excretion of $K^+$.

Addison's disease may arise either as a result of tuberculosis or as an autoimmune disease. Adrenal autoantibodies are not present when tuberculosis is the cause.

To treat her Addison's disease, this patient must take both glucocorticoids and mineralocorticoids for the remainder of her life. With this medication, her life span is expected to be normal.

**[Questions 105-109 for Passage V begin on following page.]**

**105. The aldosterone deficiency associated with Addison's disease will cause a decrease in the serum levels of all of the following ions EXCEPT:**

**A.** $Na^+$ ions.

**B.** $Cl^-$ ions.

**C.** $K^+$ ions.

**D.** $HCO_3^-$ ions.

**106. Normally, a hypothalamic factor stimulates the release of adrenocorticotropic hormone (ACTH) from the pituitary gland. In a patient with Addison's disease, the secretion of the hypothalamic factor will:**

**A.** be lower than normal.

**B.** be higher than normal.

**C.** be unchanged.

**D.** increase before disease onset and decrease thereafter.

**107. If a patient with Addison's disease is given too high a replacement dose of glucocorticoids, the effect over time will be an increase in:**

**A.** muscle mass.

**B.** muscle weakness.

**C.** red blood cell count.

**D.** heart rate.

**108. The most rapid rate of gluconeogenesis will most likely occur in the body when:**

**A.** blood glucose levels are high.

**B.** cortisol release is inhibited.

**C.** the body's stores of carbohydrates are low.

**D.** the body's stores of proteins are low.

**109. In the complete absence of adrenal cortical secretions, a person with Addison's disease will go into circulatory shock and die. A likely cause of death in this case is:**

**A.** a severe imbalance of plasma $K^+$ concentration, due to lack of aldosterone.

**B.** a greatly increased extracellular fluid volume, due to lack of aldosterone.

**C.** an insufficient energy from carbohydrates, due to lack of cortisol.

**D.** a buildup of toxic protein-degradation products, due to lack of cortisol.

**Passage VI (Questions 110-116)**

A 40-year-old patient developed a constant thirst and a frequent need to urinate. The attending physician suspected the patient had diabetes because in addition to these symptoms, the patient was overweight and had a family history of diabetes, which both are risk factors for the disease.

*Diabetes mellitus* is a condition in which the body cannot produce or is unable to effectively respond to insulin, a peptide hormone made in pancreatic β cells. Normally, insulin promotes facilitated diffusion of glucose into cells from the bloodstream by inducing the translocation of glucose transporter proteins to the plasma membrane. It also helps regulate the metabolism of fatty and amino acids.

In diabetes, the ability of many types of cells to take up glucose is compromised, leading to elevated blood glucose levels. Many tissues then metabolize fatty acids as an alternative energy source, which can lead to *metabolic acidosis*, a condition of low blood pH. Diabetes can also cause protein degradation, resulting in the release of excess amino acids that can be used as substrates for gluconeogenesis, which further increases blood glucose levels. There are two main types of diabetes. Many cases of Type 1 diabetes, in which the body is unable to produce insulin, are caused by an autoimmune response directed against pancreatic β cells. While the body often produces normal-to-elevated amounts of insulin in Type 2 diabetes, its ability to respond to insulin is compromised.

**[Questions 110-116 for Passage VI begin on following page.]**

110. **Glucose transporter proteins in the liver do not require the presence of insulin to facilitate the uptake of glucose. However, insulin does stimulate the first step in the glycolytic pathway within the liver. Therefore, in liver cells, insulin most likely:**

**A.** hinders glucose uptake by increasing the cellular concentration of glucose.

**B.** aids glucose uptake by decreasing the cellular concentration of glucose.

**C.** hinders glucose uptake by using the ATP needed by the glucose transporter proteins.

**D.** aids glucose uptake by providing the ATP needed by the glucose transporter proteins.

111. **Exercise promotes the insulin-independent uptake of glucose in working skeletal muscles. Given this, regular exercise would most likely reduce blood glucose levels in patients with which type(s) of diabetes?**

**A.** Type 1 only

**B.** Type 2 only

**C.** Both Type 1 and Type 2

**D.** Neither Type 1 nor Type 2

112. **A patient with metabolic acidosis will sometimes vomit and/or hyperventilate. This most likely occurs because the mechanisms of vomiting and hyperventilation both:**

**A.** decrease the pH of the body.

**B.** rid the body of excess glucose.

**C.** decrease insulin-dependency.

**D.** rid the body of excess acid.

113. **During the production of insulin, the translated polypeptide is cleaved into the mature form and secreted from the cell. The cleavage most likely takes place in which of the following locations?**

**A.** Nucleus

**B.** Ribosomes

**C.** Endomembrane system

**D.** Cytoplasm

114. **Despite the effects of diabetes, the brains of diabetic patients still receive adequate nourishment. This is most likely because the brain uses:**

**A.** less glucose than do other body tissues.

**B.** insulin-independent transporters for the uptake of glucose.

**C.** fatty acids for energy instead of glucose.

**D.** insulin-dependent transporters for the uptake of glucose.

**115.** **Cell-mediated immune mechanisms are thought to account for pancreatic cell loss in patients with Type 1 diabetes. Given this, which of the following immune cells would directly mediate the death of pancreatic β cells in these patients?**

**A.** Plasma cells

**B.** Cytotoxic T lymphocytes

**C.** B lymphocytes

**D.** Antigen-presenting cells

**116.** **Based on the passage, which of the following is LEAST likely to be a symptom of diabetes mellitus?**

**A.** Loss of appetite

**B.** Sweet-tasting urine

**C.** Unexplained weight loss

**D.** Feelings of fatigue

Questions 117-119 are NOT related to a passage.

117. **The following carbocation undergoes a rearrangement to a more stable species. What is the structure of the rearranged carbocation?**

$$(CH_3)_2CH-^+CH-CH_3$$

**A.** $CH_3{}^+CH-CH_2-CH_3$

**B.** $(CH_3)_2C^+-CH_2-CH_3$

**C.** $(CH_3)_2CH-CH_2-^+CH_2$

**D.** $^+CH_2CH-CH_2-CH_3$
  $\qquad\quad |$
  $\qquad\;\; CH_3$

118. **Which of the following adjectives does NOT apply to any of the true fungi?**

**A.** Autotrophic

**B.** Parasitic

**C.** Spore-bearing

**D.** Symbiotic

119. **For certain genes in specific environments, it has been observed that the order of fitness of individuals is** *Aa > AA > aa,* **where** *A* **is the dominant allele and** *a* **is the recessive allele. In a population in which the** *aa* **genotype is lethal but** *Aa* **individuals are more fit than** *AA* **individuals, the** *a* **allele would be expected to:**

**A.** disappear.

**B.** mutate to the *A* allele.

**C.** persist at some particular level.

**D.** increase in frequency to become the most common allele.

## End of Biological Sciences Section

### Biological Sciences Answer Key

| Question Number | Answer Key |
|:---:|:---:|
| 78 | D |
| 79 | A |
| 80 | A |
| 81 | D |
| 82 | A |
| 83 | B |
| 84 | C |
| 85 | D |
| 86 | C |
| 87 | A |
| 88 | D |
| 89 | D |
| 90 | D |
| 91 | D |
| 92 | A |
| 93 | A |
| 94 | B |
| 95 | D |
| 96 | A |
| 97 | C |
| 98 | A |
| 99 | D |
| 100 | B |
| 101 | D |
| 102 | D |
| 103 | A |
| 104 | C |
| 105 | C |
| 106 | B |
| 107 | B |
| 108 | C |
| 109 | A |
| 110 | B |
| 111 | C |
| 112 | D |
| 113 | C |
| 114 | B |
| 115 | B |
| 116 | A |
| 117 | B |
| 118 | A |
| 119 | C |

**Biological Sciences Raw Score to Scale Score Conversion Table**

| Raw Score | Scale Score |
|---|---|
| 0 | 1 |
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 1 |
| 10 | 1 |
| 11 | 2 |
| 12 | 2 |
| 13 | 3 |
| 14 | 3 |
| 15 | 4 |
| 16 | 4 |
| 17 | 5 |
| 18 | 5 |
| 19 | 6 |
| 20 | 6 |
| 21 | 7 |
| 22 | 7 |
| 23 | 8 |
| 24 | 8 |
| 25 | 8 |
| 26 | 8 |
| 27 | 9 |
| 28 | 9 |
| 29 | 9 |
| 30 | 10 |
| 31 | 10 |
| 32 | 10 |
| 33 | 10 |
| 34 | 11 |
| 35 | 11 |
| 36 | 12 |
| 37 | 12 |
| 38 | 12 |
| 39 | 13 |
| 40 | 14 |
| 41 | 15 |
| 42 | 15 |

**END OF MCAT EXAM**

Appx1757



**MCAT** AAMC
Medical College
Admission Test

## Second Edition

# The Official Guide to the MCAT® Exam



**Includes:**

- Actual MCAT questions from previous exams
- Detailed solutions from the test developers
- Current examinee data
- A look at MCAT scores as part of the admissions decision

…and much more!

DEFENDANT'S
EXHIBIT
**59**

MCAT® is a program of the
Association of American Medical Colleges

# The Official Guide to the MCAT® Exam

Published by
The Association of American Medical Colleges
2450 N Street, N.W.
Washington, DC 20037

©2011 Association of American Medical Colleges (AAMC).

All rights reserved.  No part of this work, including information, data, or any other portions of the work in any format, may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission of the publisher.

Any and all AAMC and MCAT fees, policies, and procedures may change without notice at any time. Up-to-date MCAT fees, policies, and procedures are available at **www.aamc.org/mcat** or you may contact the MCAT Resource Center at 202-828-0690.

AAMC®, Association of American Medical Colleges®, AMCAS®, American Medical College Application Service®, MCAT®, Medical College Admission Test®, and MSAR™ are trademarks or registered trademarks of the Association of American Medical Colleges. Other trademarks used in this publication are the property of the respective owners.

ISBN-978-1-57754-107-3

## PREFACE

*"All glory comes from daring to begin."*
*Eugene F. Ware*

### The MCAT exam.

Did you just shudder? If you're like many of your peers, you probably look upon the Medical College Admission Test as an obstacle to overcome—a barrier that lies between you and medical school. The very breadth of the science topics—from acid derivatives to wave characteristics—already has you feeling overwhelmed, and when you consider that you'll also have to contend with a verbal reasoning segment and a writing sample, "near panic" is probably not an overstatement. The publications and courses that promise to give you the tools to beat the test and be on your way are looking pretty good right about now.

### We've got good news…and we've got bad news.

First, the bad: The test cannot be beat, or at least not in the way you think. There are no secrets to unravel; no mysteries to reveal. There's simply no getting around the fact that if you don't have the fundamental knowledge tested by the MCAT exam, your scores will expose those shortcomings. All the test-taking strategies in the world won't save you.

The good news, though, is that there's plenty you can do to prepare for the exam and bolster your performance. In fact, we here at the MCAT team sometimes like to say that "you can score worse than you should, but not better." What we mean is that while you can't scheme your way through the test if you haven't mastered the material, you can score less well than you could if you haven't geared up effectively. You need to be adept in the biological and physical sciences, of course, but you also must know what to expect from the verbal reasoning section and learn what the writing sample is all about. Beyond that, you will benefit if you become familiar with the structure of the exam itself, get comfortable with both passage-based and independent questions, experiment with and decide which strategies work best for you, analyze why the correct answers are right and the wrong answers are not, and practice . . . practice . . . practice.

Who better to guide you than the developers and administrators of the exam itself? We are in a unique position to provide you with MCAT passages and questions taken from real MCAT exams, along with thoroughly explained solutions written by the test developers themselves. Beyond that, we include a wide range of additional information—from examinee data to a discussion of MCAT scores and their use in the admissions process.

### Welcome to the Official Guide to the MCAT® Exam.

# Chapter 1:

## Overview of the MCAT® Exam

**Questions Answered in this Chapter:**

What Is the Role of the Exam?

Does It Test Knowledge or Reasoning Skills?

What Is the Breakdown of the Exam, and Why Is It So Varied?

One of our MCAT staffers overheard a couple of college juniors commiserating with one another about the MCAT exam that loomed ominously in their futures. After about 20 minutes of nonstop talk about various review courses, prep books, practice options, and the sheer arduousness of it all, one student stopped mid-sentence, looked at the other, and asked with a mix of exasperation and fear, "Why do they DO this to us?" The other student shook her head and shrugged in empathy, but we know the answer. It's amazingly simple:

*Because the MCAT exam does its job.*

### I. What Is the Role of the Exam?

The MCAT exam, taken by more than 70,000 students each year, serves as a reliable screening tool for medical school admissions officers who seek to identify which applicants are most likely to succeed in medical school—and beyond—and which are not. In doing so, admissions officers look not only for students whose base knowledge of scientific concepts will serve as a strong foundation in the early years of medical study, but also for those with strong critical reasoning ability and strong written communications skills. And the MCAT exam spots those students well.

So do college grades. But when admissions officers look at MCAT scores in conjunction with undergraduate GPAs—as opposed to grades alone—their ability to predict who will be successful in medical school increases by as much as 50 percent (gauging by first- and second-year medical school grades).* That explains why virtually every medical school in the United States, and many in Canada, require applicants to submit recent MCAT scores.

---

* Those of you who wish to explore the data might want to review the article, "Validity of the Medical College Admission Test for Predicting Medical School Performance", published in *Academic Medicine* and available online at www.aamc.org/mcatguide.

Now that we've added to what undoubtedly is already a high level of anxiety, we'd like to quell your fears: There's more to passing the admissions hurdle than getting high MCAT scores, and a less-than-stellar showing does not mean you cannot be admitted to medical school. Research shows, in fact, that some students with relatively low scores on one or more sections of the test can gain admittance if other factors, such as a high GPA, tip the scales in their favor. (Conversely, students with high MCAT scores and low grades may not find a berth.)* Among the other factors that enter into the admissions decision are the selectivity of your undergraduate institution, letters of recommendation, the interview, a history of community service and/or medically-related work, and personal character traits such as integrity and determination.

> **The methods by which MCAT scores are used in conjunction with other selection factors are discussed in Chapter 5, "Your MCAT Score as Part of the Decision-Making Process."**

## II. Does It Test Knowledge or Reasoning Skills?

> *"Items should be designed to ascertain not simply the examinee's basic knowledge of science or rote memorization of facts, laws, and definitions, but rather the ability to reason or apply this knowledge to specific situations. The examinee is expected to reason through a problem by applying the background knowledge obtained through introductory-level college coursework."*
> **MCAT Item Writer's Guide, AAMC**

We hear the same argument over and over again. Some insist the MCAT exam is a knowledge-based test, designed to assess your mastery of a full range of science topics. Others claim it is really a thinking test, intended to evaluate your problem-solving capacity.

Everybody's right. The fact is that the exam tests knowledge and thinking. You can take it right off the pages of the MCAT Item Writer's Guide, the guidelines we provide to the writers who develop the actual passages and related questions. (See box at left.)

Before we move on, we'd like to draw your attention to the word "basic" in the excerpt above. The exam, while indeed requiring that you have a foundation of science upon which to draw (most notably biology, chemistry, and physics), tests nothing more than that ordinarily covered in introductory or entry-level classes.

> **There is no proven benefit to advanced coursework when it comes to MCAT scores**
>
> While you may find that higher-level science courses better prepare you for medical school in general, there is no evidence that advanced classes lead to higher MCAT scores specifically.

Other areas of the exam, specifically Verbal Reasoning (VR) and the Writing Sample (WS), have no knowledge to test and are therefore clearly a test of one's reasoning and writing skills. These sections are designed to assess your ability to comprehend, evaluate, and synthesize new material; develop concepts; and present ideas in a logical, well-written manner.

What all of this should tell you is that if you haven't mastered the science that's tested on the exam, you won't be able to score well—no matter how well you try to reason your way through a passage. Conversely, rote knowledge alone isn't sufficient, since you've got to apply that understanding to solve the problem. You've got to "know your stuff" and be able to think things through—two traits that every doctor must have.

*See chart, "Likelihood of Admission," on page 39 for more information.

MCAT® is a program of the
Association of American Medical Colleges

### III. What Is the Breakdown of the Exam, and Why Is It So Varied?

When you look at the format of the exam described below, it's apparent that the purpose of the MCAT exam is to help medical school admissions officers and faculty gauge a student's reasoning skills as well as his or her mastery of basic concepts in biology, general and organic chemistry, and physics. But screening for the two crucial attributes that medical educators have identified as key prerequisites for success—a basic foundation in science and a strong capacity for critical thinking—is just one reason the MCAT exam is structured as it is.

## EXAM STRUCTURE

| Test Section | Number of Passages | Number of Questions | Time |
|---|---|---|---|
| Tutorial (optional) | | | 10 minutes |
| Non-Disclosure Agreement | | | 10 minutes |
| Physical Sciences | 7 | 52 | 70 minutes |
| Break (optional) | | | 10 minutes |
| Verbal Reasoning | 7 | 40 | 60 minutes |
| Break (optional) | | | 10 minutes |
| Writing Sample | | 2 | 60 minutes |
| Break (optional) | | | 10 minutes |
| Biological Sciences | 7 | 52 | 70 minutes |
| Void Question | | | 5 minutes |
| Satisfaction Survey | | | 10 minutes |
| Total Content Time | | | 4 hours, 25 minutes |

**Total "Seat" Time    5 hours, 25 minutes**

**Total time does not include check-in time on arrival at the test center.**

Beyond that, medical school faculty hope to encourage undergraduates with broad educational backgrounds to consider careers in the health professions, and similarly, they want to persuade premed majors to explore a wide variety of courses outside of the natural sciences. That explains why the exam tests for such diverse abilities and knowledge, and why everyone, from English majors to history buffs, has an equal crack at achieving a high score (assuming, of course, they have mastered the entry-level science courses necessary for success on the MCAT exam)*.

## Structure of the Exam

We cover the full outline of topics later in this guide, but for now, we'll give you the overview. The MCAT exam is a computer-based test that lasts just over five hours (including optional breaks) and consists of three multiple-choice sections—Physical Sciences, Biological Sciences, and Verbal Reasoning—along with a writing assessment.

*See chart on page 34, which presents the mean and median scores of applicants by undergraduate major.

Appx1763

Here's a closer look at these sections, described in the order you will receive them in the exam:

## • Physical Sciences: 70 minutes

The Physical Sciences (PS) section covers general chemistry and physics. A total of 52 questions are presented in two formats —passage-based and independent:

- Most questions are based on *passages*, each about 250 words in length, which describe a situation or problem. All told, there are seven passages, each containing from four to seven questions, for a total of 39 passage-based questions.

- In addition, there are 13 *independent* questions—those not associated with a passage.

### How Did We Decide Which Science Topics to Cover?

The decision as to which science topics we cover involved a two-step process:

- We asked medical educators, students, residents, and physicians to rate potential topics on their importance to the study and practice of medicine.

- At the same time, we surveyed faculty members at undergraduate institutions to learn which topics are covered in introductory courses—and to what degree.

The topics that were identified as prerequisite for success in medical school and covered in most undergraduate courses were selected for inclusion in the test.

For this section, you will be tested on your capacity to interpret data presented in graphs and tables, your knowledge of basic physical science concepts and principles, and your ability to solve problems using that knowledge as a foundation.

Please note that each multiple-choice section (PS, VR, and BS) will include some try-out items that do not count toward your score.

### • Verbal Reasoning: 60 minutes

The Verbal Reasoning (VR) section evaluates your ability to understand, evaluate, and apply information and arguments presented in writing. This segment consists of seven passages, each about 600 words long, taken from the humanities and social sciences, and from areas of the natural sciences not tested in the science segments of the exam. Each passage-based set consists of five to seven questions, with some designed to test your basic comprehension of the text and others intended to gauge your ability to analyze information, evaluate the validity of an argument, or apply knowledge gained from the passage itself.

### No Specific Subject Knowledge Required for VR

It's important to realize that you won't be tested for specific subject knowledge in this segment of the exam. Instead, all the information you'll need is contained within the passage itself.

## How Much Does the Writing Sample Count?

The short answer: it depends. The weight assigned to your performance in this segment of the exam varies from school to school. That said, there are indeed situations where your performance on the WS can make a difference. For example, some admissions committees will take a close look at your WS score when your VR score is at the lower end of the scale.

### • Writing Sample: 60 minutes

The Writing Sample (WS) consists of two 30-minute essays, each addressing specific topics that require a written response. This segment of the exam assesses your skill in developing a central idea; synthesizing concepts and ideas; presenting ideas cohesively and logically; and writing clearly, with the ability to follow accepted rules of grammar, syntax, and punctuation.

### • Biological Sciences: 70 minutes

The format of the Biological Sciences (BS) section, which covers biology and organic chemistry, is identical to that of the PS section. It too has seven passages, each containing four to seven questions, for a total of 39, and 13 independent questions. Similarly, this segment tests knowledge of basic biological sciences concepts and the ability to incorporate that knowledge in solving problems.

*For an outline of the science content covered; a description of skills assessed; and sample passages, questions, and solutions, please see Part II.*

## IX. What Is "Accommodated Testing," and Who Needs to Apply?

**Even Orange Juice Counts!**

On occasion, a student will arrive at the test center with an inhaler, or an insulin pump, or even a small container of orange juice—only to learn that he or she should have requested approval for it. So…please be aware…even the most seemingly minor deviation from the standard testing environment is considered accommodated testing and therefore requires pre-approval.

The AAMC is proud to support the policies of the federal government and will provide accommodations to students whose disabilities—or other conditions—necessitate an adjustment to the test or testing environment, pending review and approval from the MCAT Office of Accommodated Testing Services. (Examples of special accommodations include presentation of test material in large font, extra testing time, a separate testing room, or even approval to bring in a piece of hard candy.)

If you would like to take advantage of this opportunity, you will be required to submit documentation of your disability or condition at the time of registration. The four broad categories of disabilities are:

- Learning Disabilities
- ADD/ADHD
- Psychiatric Disabilities
- Physical Disabilities*

**Early Application Encouraged**

It is important to know that the MCAT Office of Accommodated Testing Services may require up to 60 days to process your request for accommodations. You should therefore submit your request and related documentation as far in advance of your desired test date as possible.

We will notify you in writing if your request has been approved. For complete information on accommodated testing and the associated registration process, please visit www.aamc.org/mcat. If you need additional guidance, you may write to us at accommodations@aamc.org.

## X. What Are "Special Permissions"?

As we already mentioned, two circumstances require you to apply for special permission to take the MCAT exam:

- if your purpose is to take the test for any reason other than applying to a health professions school, or
- if you are a currently enrolled medical student

To apply for special permission, e-mail your request to mcat@aamc.org, giving the reason(s) you wish to take the exam. We will review and respond to your request within five business days, if possible.

---

*Applicants with chronic medical conditions (e.g., diabetes, migraines, asthma) or temporarily disabling conditions (such as a broken leg) fall within the Physical Disabilities category.

# Chapter 7:

## The Strategy Mystique:  Debunking the Myths

**Questions Answered in this Chapter:**

What Are Some Shortcomings of MCAT Test-Taking Strategies?

So…What Should I Do When It Comes to Test Preparation?

When we embarked on this guide, we conducted focus groups with students just like you—ones who were preparing for the MCAT exam—to determine what topics would be most valuable to them. We kept everything they said in mind and included, for example, material on registration procedures, scoring and the score release process, the admissions decision, examinee data, considerations on retaking the exam, lots (and lots) of sample questions, and thoroughly explained solutions.

What hung us up, though, was the request that we include the "true" strategies. Students seemed to believe that MCAT staffers, who have the inside track, would certainly know which test-taking approach would give them an edge, and all we needed to do was let them in on it. If only it were that easy….

## I. What Are Some Shortcomings of MCAT Test-Taking Strategies?

After reading the various strategies advocated in MCAT exam prep guides and/or batted around among students, we can understand why you'd want to hear from the "ultimate authority." There seems to be something lacking in many of the current strategies for one of several reasons:

### • They're common sense.

First, there's an entire barrage of so-called strategies out there that are little more than common sense. (You've probably already come across them.) We'd venture a guess that you didn't get this far in your academic career without honing your basic test-taking skills, and you don't need a publication to tell you to "get a good night's sleep the night before," or "focus on the task at hand," or "use a process of elimination to narrow your choice." The best thing we can say about suggestions such as these is that they do no harm.

### • They steer you in the wrong direction.

On the other hand, some "strategies" are harmful. One book suggested you return to the difficult questions you may have skipped if—if!—you have time. In actuality, you should always come back to unanswered questions since there is no penalty for guessing. At worst, you have a 25-percent chance of getting it right, and if you're able to eliminate even one possibility, your odds are 1 in 3. (Remember, though, that you can return to unanswered questions within a section during the time allocated to that particular section only.)

#### What's a "Distractor"?

It's a fancy term for a simple concept: the wrong answer. In the solutions section of this book, we provide you with not only an explanation of the right answer, but a short explanation of the distracters (with some tips on identifying them).

#### Be Careful...

...to practice only with strategies that can be implemented in the actual exam! We recommend that you apply your strategies to an official MCAT Practice Test, which emulates the operational exam precisely. (See Chapter 12 for more information).

### • They're not as useful as they seem.

Then we see strategies that seem to hold some merit. As just one example, there's "advice" floating around to be alert for absolutes such as "all of the above" or "none of the above" in answer choices. The theory here is that answers containing absolutes—all, none, never, always—are less likely to be correct, and, all things being equal, you might do well to eliminate them as possibilities. The catch? If you've heard of this strategy, you can be sure we have also—and that we've instructed our test writers to avoid creating distractors that employ it. (See box at left.) Consequently, even though this bit of advice sounds logical, it's likely to be of little value.

> "Extreme terms, such as unique, always, never, and every, should be avoided in distractors. They signal to test-takers that a response is probably wrong."
>
> MCAT Item Writer's Guide, AAMC

### • They sound good, but who knows?

We'll admit it. Not all strategies are useless (or worse). There are indeed a number of test-taking tactics, many of which you'll come across in guidebooks or commercial prep courses, that may actually work very well for you. The problem with these strategies, though, is that no research or statistics exist that prove their advantage. That's why you'll sometimes come across two strategies in direct conflict with each other:

- Consider the often suggested strategy to highlight key words or phrases. Sounds good, you think, until you come across another book that tells you not to waste time with this approach. Which is right?

MCAT® is a program of the Association of American Medical Colleges

**Appx1768**

- Or reflect on the strategy that recommends you take questions in order, rather than skip around. (This strategy suggests that if you come across a difficult question that stumps you, take your best guess and move on, rather than return to it later.) The other side, as we've already noted, suggests you pass over the difficult questions and come back to answer them at the end of each section. Which is right?

> **So…Which Strategies Are "Right"?**
>
> We don't know. We haven't seen evidence one way or the other. The only way to learn which strategies are "right" is to test them out, making sure your practice sessions most closely replicate the actual exam.

- Or think of the strategy that suggests you approach the passages by reading the first line of each paragraph first. Another advises you to read the passage in its entirety right from the start. Yet another tells you to read the first and last paragraphs initially, and only then return to read the whole passage. Which is right?

The bottom line is that there is no "best" strategy, since an approach that is useful for one individual may be totally ineffective for another. We want to emphasize, however, that we are not discounting strategies such as the ones just addressed above. Indeed, there are dozens of recommendations put out by guidebooks and prep courses that could be helpful. So, with that in mind, we advise you experiment with various tactics. See which—if any—impact your score.

It's all part of effective preparation, which we discuss next.

# Chapter 8:

## Physical Sciences (PS)

**Included in this Chapter:**

Overall Section Format

Types of Passages

The PS Content Outline

Cognitive Skills Assessed

Introduction to Practice Sets for Physical Sciences

Practice Sets of Sample Passages, Questions, and Solutions

The material that follows captures our "must-do" preparation tasks for the Physical Sciences section. We first explain the four different types of passages; next we provide you with a detailed outline of the content; we then describe the cognitive skills assessed; and finally we segue into the review section—which includes dozens and dozens of pages of MCAT passages and questions from *real* MCAT exams, and a comprehensive explanation of the answers (and even "tips" to help you get to them).

**PS Section Recap**

- Covers general chemistry and physics
- 52 questions
  - Seven passages with four to seven questions each, for a total of 39 passage-based questions
  - Thirteen independent questions
- 70 minutes

## I. Overall Section Format

The MCAT Physical Sciences section is composed of 52 multiple-choice questions—either passage-based or discrete*—that test your reasoning in general chemistry and physics. The scientific competencies you will be expected to demonstrate are drawn from basic principles and concepts in these two disciplines and are taught at the introductory level at the vast majority of undergraduate institutions. As we've mentioned elsewhere in this guide, advanced coursework in chemistry and physics is not needed for the test.

**Passage Type Identified in Sample Questions**

The sample passages in this chapter will be identified by type. See page 66 for a description of each type.

## II. Types of Passages

As we just mentioned, the majority of the questions in the two science sections are tied to passages. We thought it might be helpful, therefore, to give you a brief overview of each of the four different passage types you will come across as you work through the exam.

*Discrete questions are not tied to passages but rather are independent. Of the 52 total questions, 39 are passage-based and 13 are discrete.

## A. Information Presentation

Information is presented in a textbook or journal article format. The information assumes appropriate background knowledge but also contains new information or new ways of using information. The questions test your understanding and evaluation of the given information and your ability to use the information in various ways.

## B. Problem Solving

A situation is presented that describes an event or phenomenon in one of the science content areas. The questions require you to determine the probable causes of the situation described and to select an effective method for solving the problem.

## C. Research Study

The passage describes all or a part of the rationale, methods, and results of a particular research project. The questions test your understanding of the project.

## D. Persuasive Argument

Information presented is designed to persuade the reader that a particular perspective, methodology, piece of evidence, or product is correct. The passage may also present an opposing point of view.

Now on to the outline.

## III. The PS Content Outline

The questions in the Physical Sciences section will test your background knowledge of the topics listed in the outline below. You are expected to be able to apply your background knowledge of these topic areas and their subdivisions to situations or problems you may not have previously encountered. Each major topic area is shown in boldface, uppercase font, followed by a brief description of the subject matter.

> **Content Area Identified in Practice Questions**
>
> In the practice questions that follow later in this guide, we identify the specific content area(s) each one tests.

MCAT® is a program of the
Association of American Medical Colleges

**Appx1771**



# Chapter 9:
## Biological Sciences (BS)

### I. Overall Section Format

**Included in this Chapter:**

Overall Section Format

Types of Passages and Cognitive Skills Assessed

the BS Content Outline

Practice Sets of Sample Passages, Questions, and Solutions

The format of the MCAT Biological Sciences section is similar to that of the Physical Sciences section. There are 52 multiple-choice questions—39 are passage-based and 13 are independent—that test reasoning in biology and organic chemistry. Concepts included in the BS section, just like those in the PS section, are considered basic and are taught at the introductory level at the vast majority of undergraduate institutions. Advanced coursework is not required for the test.

**BS Section Recap**

- Covers biology and organic chemistry

- 52 questions

  - Seven passages with four to seven questions each, for a total of 39 passage-based questions

  - Thirteen independent questions

- 70 minutes

### II. Types of Passages and Cognitive Skills Assessed

The four different passage formats in the BS section are the same as those in the PS section. As a reminder, these formats are information presentation, problem solving, research study, and persuasive argument. If you'd like to review these before beginning the BS practice section, please see page 66.

**Passage Type Identified in Sample Questions**

Just as with the PS section, each BS sample in this chapter will be identified by type.

The cognitive skills tested in the BS section are identical to those in the PS section, as well. Please see pages 81 through 84 in the previous chapter for explanations and examples.

We follow with the content outline for the BS section.

**Cognitive Skill Identified in Sample Questions**

Each sample BS question will identify the cognitive skill(s) it tests, such as "Seeking Clarification."

# Chapter 10:

## Verbal Reasoning (VR)

**Included in this Chapter:**

Overall Section Format

Content Areas

Cognitive Skills Assessed

Introduction to Practice Sets for Verbal Reasoning

Practice Sets of Sample Passages, Questions, and Solutions

As we move beyond the two sciences sections and on to Verbal Reasoning, it's obvious we're dealing with very different substance. That's because, unlike the sciences, this part of the exam does not require mastery of any particular subject matter and instead is solely a test of one's reasoning skills. Everything you'll need to answer VR questions can be found within the passages themselves.

**VR Section Recap**

- Seven passages with five to seven questions each, for a total of 40 questions

- 60 minutes

In other words, there's no real content to study.

That's not to say, though, that there's no real way to get ready. Just as with the PS and BS sections, you'll gain by knowing what to expect in terms of content, understanding the skills we're assessing, and preparing with real MCAT passages and questions. Here again, we provide you with those very tools.

## I. Overall Section Format

The Verbal Reasoning section is composed of 40 passage-based, multiple-choice questions that test your ability to read attentively and make reasonable inferences based on the information provided to you. These passages are selected and adapted from a variety of publications intended for well-educated readers—material similar to those a college junior would be assigned.

It's important to realize that you are not expected to have any background knowledge about these subjects or any previous expertise in them. Rather, the correct answer for each question can either be found directly in the passage itself or by applying the information within the passage to any new information contained in the question.

**How General Reading Can Help You Prepare**

Remember the first Shakespeare play you read? Although you initially may have been thrown by the 16th (and early 17th) century English, you probably had a much easier time of it with the next play, and easier still with the one after that. You became accustomed to the language.

The same holds true for reading passages that address a topic within humanities, social sciences, or natural sciences—especially for science majors whose coursework did not involve as much of this type of reading as, say, humanities majors.* You'll become more proficient with it, and these passages will seem less "foreign."

*In fact, some might conjecture that humanities majors score higher in VR than biology majors because the former are more accustomed to this very type of reading!

Appx1773

## II. Content Areas

With that, let's move on to a description of the three broad content areas from which the VR passages are drawn.

### 1. Humanities

Passages in the humanities area are drawn from excerpts in *architecture, art, literature, music, philosophy, popular culture, religion,* and *theater*. Often focusing on relationships between ideas, humanities passages are more likely to be written in a conversational or opinionated style than the passages in the social sciences and the natural sciences and technology areas. You may therefore be required to glean information from the author's tone and word choice in addition to the passage assertions themselves.

> **Tips to Keep in Mind**
>
> Some tips to help you with the VR section....
>
> - Pay attention to any qualifying language. Notice, for example, whether the question asks if something is least or most likely or whether a fact is always, never, or sometimes true about all, a few, or most of something.
>
> - Make sure you answer the questions based solely on the information provided by the author and not on your background knowledge of a subject.
>
> - With seven passages and 60 minutes, you have an average of eight minutes per passage. Pace yourself!

### 2. Social Sciences

Passages in the social sciences focus on *anthropology, archaeology, economics, education, history, linguistics, political science, psychology,* and *sociology*. These excerpts frequently center on the interpretation, implications, or applications of research in the social sciences, and often are based on studies about people in general or particular social groups. Frequently these passages are structured around a central claim that is either being supported or undermined by the information provided by the author. Sometimes the information in these passages can be very "rough" because the passage deals with complex issues and events in an artificially simplified manner.

### 3. Natural Sciences and Technology

With the focus on *astronomy, botany, computer science, ecology, ethology, geology, meteorology, technology,* and *zoology*, passages in the natural sciences and technology area emphasize the significance of scientific and technological issues and advances. Natural sciences passages, which center on factual knowledge and its implications or applications, are often straightforward in their presentation since the claims they support tend to be well defined and clearly circumscribed.

MCAT® is a program of the
Association of American Medical Colleges

Appx1774

## III. Cognitive Skills Assessed

The Verbal Reasoning section of the MCAT is designed to test your ability to **comprehend** information presented in a passage, **evaluate** the relationships between passage information, **apply** passage information to situations outside of the immediate scope of the passage, and **incorporate** additional information into your analysis of passage information. In this section, we describe these four different question types, give examples of each, and provide you with some suggestions or caveats to help you arrive at the best answer.

## A. Comprehension

Comprehension questions are designed to test your ability to recognize the meaning of passage assertions. Some of these questions may ask you to identify information that is explicitly stated in the passage, some questions may ask you to draw valid inferences from passage information, and others may ask you to compare distinct ideas that are presented in the passage. In all cases, however, the emphasis is on your comprehension of the information provided in the passage.

A common comprehension question asks you to identify the central argument, concern, or thesis of the passage. To do so, read the entire passage carefully, paying close attention to how the author has chosen to structure the passage. There is no simple formula you can use to identify the main idea, but it can be helpful to ask yourself the following questions:

- Is there a central argument presented early in the passage that the author supports with subsequent information?

- Does the author conclude the passage with a claim that incorporates earlier passage information?

- Does the body of the passage provide several examples that all support a common claim?

While these questions may not lead you directly to the passage's main idea, they can provide you some insight into what the author may have been thinking when writing the passage.

Of course, there are always caveats. Some sentences that look like summaries of main ideas—for example, sentences late in the passage that begin with words such as *therefore*, *thus*, *in conclusion* —often will address only a minor or tangential point in the passage and should not be mistaken for the broader "main idea."

On the other hand, some comprehension questions will have a narrower focus and will ask you to identify the relationship between two concepts, such as how certain passage information supports other passage information. With questions of this type, the relationship between the items in the question is often explicitly spelled out. This does not mean that the material doing the supporting and the idea being supported are necessarily mentioned near each other in the passage, but the relationships are mentioned in the passage. Comprehension questions of this type are testing your ability to recognize this.

Other common types of comprehension questions will ask you to do one of the following:

- determine, from context, the meaning of significant terminology or vocabulary used in the passage

- recognize a theory that is implicit in the passage

- identify an unstated assumption made by the passage author

- determine an appropriate paraphrase of complex passage information

- recognize a comparative relationship among ideas or pieces of information in the passage sample

A somewhat different sort of comprehension question asks you to identify appropriate questions of clarification. To put it another way, these questions ask you to identify gaps in the passage author's explanation or argument and to recognize what information is needed to fill those gaps.

## B. Evaluation

Evaluation questions—which focus primarily on your ability to identify the relationships between concepts in the passage (such as consistent, relevant, or supporting relationships) and your ability to assess the accuracy, reliability, or credibility of a claim or a source of information—differ from comprehension questions in that the information you are asked to provide is not explicitly mentioned in the passage. You need to read carefully and assess the information provided in the passage with rational analysis. For example, these questions will often direct your attention to an argument or step of reasoning in the passage and then ask you to assess the plausibility of that argument or logic of that step of reasoning.

When approaching these questions, it is important to remember that you are not being asked to provide your opinion. In other words, you may in fact disagree with a conclusion that the author reaches in the passage, even if that conclusion is a reasonable inference from the other passage information. Keep in mind that you are not to base your answers on anything other than the information provided in the passage and the information provided in the questions themselves. You may know of some reason outside of the scope of the passage that makes one of the author's conclusions unreasonable or implausible, but you need to make sure that your answers to evaluation questions—as with all Verbal Reasoning questions—are not based on any information outside of the passage or the question. Other evaluation questions will ask you to judge the credibility of a source of information in the passage.

Because all of the information needed to answer Verbal Reasoning questions is found either in the passage or in the question itself, you need to look for clues in the passage that will give you an objective basis for making assessments of credibility. A credible source is usually someone who has specific expertise in the area about which he or she is speaking. This may be indicated in the passage by the person's title, level of education, or specific research that he or she has conducted. A less credible source may not have any stated background that would equip him or her to address the topic knowledgably. Or if the passage indicates that the source has a

vested interest in the situation—that is, if that person has some bias about the subject—you may think that the source is less credible.

Many evaluation questions ask you to assess the logic of an argument used by the passage author or other people in the passage. Sometimes this will take the form of asking you to identify possible alternative conclusions that can be drawn from passage information. At other times these questions will ask you to evaluate the strength of the evidence provided for a generalization, conclusion, or claim, or to judge the relevance of passage information to an argument or claim.

One of the most common evaluation questions may ask you to distinguish between passage claims that are supported by other information in the passage and those claims which are not so supported. These questions are asking you to identify logical relationships between concepts, independent of how close they appear to each other in the passage. For example, an assertion may be made in one part of the passage, but the author does not support it until much later.

A final common type of evaluation question asks you to infer an attitude, belief, or intention of the author on the basis of passage assertions or word choice. These questions can often be answered by evaluating the tone of the passage. If the passage author frequently refers to some person, idea, or subject in unflattering terms, then you can generally assume that the author disapproves of that person or those things. Usually, though, the author's opinion is derived from subtle, but consistent, treatment of some person, idea, or subject using either a positive or negative tone. These questions will often ask you outright what the author's likely opinion is, and sometimes they will ask what the author most likely meant by using a certain example or figure of speech.

## C. Application

Application questions require you to apply your understanding of the passage information to situations, real or hypothetical, outside the immediate scope of the passage. In these questions, as in all Verbal Reasoning questions, it is important to select which option is the most likely based on the information provided. It is possible that the information presented in the question when combined with passage information will result in several probable outcomes. In these situations, first eliminate any options that lead to improbable outcomes. Then try to determine which of the remaining probable outcomes is the most likely when compared to the other answer options. This may, at times, seem as though you are selecting between subtle shades of difference, but be assured that each question has one answer option that is definitely more likely than the others.

Of the four categories of Verbal Reasoning questions, application questions probably have the most variability in their appearance. Because they present additional material, these questions can come in a countless number of different forms. They will sometimes give you some new information and ask you to determine what conclusion should be drawn from this additional information when combined with the passage. In other instances, these questions may ask you to identify which of the following answer options the passage author would most likely support or most likely agree with on the basis of passage information. Other application questions may provide you with a real or hypothetical scenario and ask you to determine, on the basis of passage information,  the most likely cause of that scenario. Still others may ask you to apply a passage concept to real world situations or to determine the scope of a passage concept.

No matter the form an application question takes, all ask you in some way to apply your understanding of the passage to situations similar to—but beyond the scope of—the passage itself. It is important to remember to base your answers on the information given in the passage and in the question. You may come across situations in which you believe, on the basis of your own knowledge outside of the test, that the author would not agree with something, that a term is not appropriately applied to certain situations, or that a result may not be what the passage suggests. Remember that when you approach a Verbal Reasoning question, you are limited to the world of the passage and the question, whether you agree with it or not.

## D. Incorporation of Information

Incorporation of information questions ask you to reevaluate passage assertions on the basis of new information, true or hypothetical, that is introduced in the question itself. Unlike application questions that ask you how the new information is affected by the information in the passage, incorporation of information questions ask you to determine what modifications might be necessary in the passage in light of this novel element.

These questions usually state some fact or hypothetical statement and ask you what relationship this new information has to other information in the passage. These questions often will ask whether the new information supports, fails to support, or is consistent with other information in the passage. Remember that in situations in which, for example, more than one of the options provides support for other passage information, you need to pick the option that provides the most support (or is the most consistent, or provides the least support, depending on the question type).

A common incorporation of information item asks you to identify which of the answer options would most challenge or would most weaken claims, hypotheses, arguments, or assertions made in the passage. Another type of incorporation of information question tests your understanding of the affect that additional information has on the passage in a different way. Rather than asking you whether the new information weakens, supports, or is consistent with the passage, these questions ask how the author's argument or how other information in the passage should be modified so that it could be made consistent with the new information. These questions can come in a variety of forms. They may ask whether a passage argument would need to be modified to be made consistent with the new information, but most often they ask which of the following modifications would be most appropriate.

When approaching these questions, it is important to identify the relevant detail that the question hinges upon. The information provided in an incorporation of information question usually will be consistent with some, or perhaps most, of the information in the passage. You need to be able to identify what specifically in the passage argument is least consistent with the new information, and identifying it will lead you to the part of the argument that most needs to be modified in light of the new information.

Incorporation of information questions may occasionally take a different approach and ask which of the answer options provided most resembles or is most analogous to a situation or argument that is presented in the passage. For these questions, it is important to identify the

relevant detail of the analogy. Ask yourself whether some of the items are of a similar type or represent an action or an approach to a problem similar to one in the passage? Often it is helpful to first compare the provided answer options with each other, asking yourself how they resemble each other, and in what respects they are different. Analyzing how the answer options relate to one another may help you determine the relevant detail of the analogy.

A similar type of incorporation of information question will ask you to recognize a plausible alternative to a passage hypothesis or solution. These questions usually require you to determine whether some information that supports one theory in the passage may also work well as support for an alternate theory that is not considered in the passage.

## IV. Introduction to Practice Sets for Verbal Reasoning

Although the cognitive classifications we test in VR differ from those in the two science sections and there is no real "content" to test, our approach to the practice sets that follow is the same. Please see page 86 if you'd like a refresher before you begin.

Appx1779

19A

# VERBAL REASONING SECTION

**Appx1780**

## Verbal Reasoning

Questions 43 − 75

**DIRECTIONS:** There are six passages in the Verbal Reasoning test. Each passage is followed by several questions. After reading a passage, select the one best answer to each question. If you are not certain of an answer, eliminate the alternatives that you know to be incorrect and then select an answer from the remaining alternatives. Indicate your selection by clicking on the answer bubble next to it.

My approach for the Verbal section was somewhat different from that for the Physical Sciences section.

For these, generally I would read through all of the questions for each passage, highlighting any specific information that would help me locate the information in the passage (if possible).

After reading through the questions, if a question was specific for a paragraph/line, I would read that paragraph/line and then answer that question. While reading that specific paragraph/line, if I recognized any words/info relating to any of the other questions, I would highlight them.hoping that whatever info I got from reading that specific bit would help me guess for other questions.

After answering those questions with specific lines/paragraphs, if I came across/highlighted information relating to other questions while reading a question-specific line/paragraph, I would try to answer the related questions.

If there were still a lot of questions I couldn't answer, then I would either move on to the next passage, or might read the first line or sentence of each paragraph to see if I came across information relating to any other questions, and then answer those. It would depend on how difficult the reading seemed to be for that passage.

***I went through the passages/questions as I would have when I took the MCAT. I went back after finishing this section and pasted the passages into Word to find the word counts, which I then added to the existing comments.

**Passage I (Questions 43-47)**    Total words in passage = 593; words I actually read = 304 (means I read ~51% of passage, or skipped ~49% of passage, and was able to answer the questions.)

Populations of larger mammals often provide a convenient barometer for the overall health of ecosystems, but in most locations, such wildlife is not easy to view. Lacking firsthand observations, investigators have traditionally relied on indirect evidence such as tracks to confirm the presence of certain species. Although such methods are still employed, a more useful technique is now available for wildlife surveillance: *phototrapping*. This approach makes use of ordinary cameras mounted in rugged enclosures to automatically snap photos of animals that wander into the field of view.    #47. Saw his name because of the numbers on either side. Started reading after his name. ✓

The roots of this technique reach back more than a century. In 1888, George ~~Shiras~~ III perfected a way of photographing wildlife at night with a large-format camera and hand-operated powder flash. He mounted the camera on a rowboat and used a flashlight to find animals on the shore, positioning his boat as close as possible before taking a shot. Later Shiras set up his camera on land, taking pictures remotely by pulling on a long trip wire. ← Stopped here Eventually, he rigged the wire so that animals would themselves trigger the picture taking. Shiras's unique (66 words) photographs were widely disseminated in *National Geographic*, creating great public interest in wildlife. But because the required equipment was cumbersome and expensive, few emulated his techniques.

Decades later, developments sparked renewed use of camera traps. Photography became easier: no more bulky cameras and exploding flash powder. In place of trip wires, a passive infrared detector triggers the camera's shutter when the sensor registers heat in motion. Next, scientists interested in wildlife populations began to apply known statistical methods to camera-trap data. These statistical tools, known as "mark-recapture" or "capture-recapture" methods, have served for decades to estimate populations of rodents and other small animals that can be easily caught, marked, and released. In 1998, K. Ullas Karanth and James D. Nichols showed that camera traps and the appropriate analytical software could be used to estimate the population density of tigers in India. They realized that because every tiger exhibits a unique pattern of stripes, individuals can be identified from photographs. Positive identification normally requires images of both sides of the tiger because these animals are laterally asymmetric. Thus effective monitoring requires pairs of camera traps set up to take photos from either side of the subject.

✓ Would have recognized this word from #43 and would have highlighted it.

The main challenge to today's *phototrapper* is to position the subject—an animal of uncertain type and size—in front of, and at a reasonable distance from, the camera so that useful pictures can be taken. The best strategy is not always apparent. Putting cameras near burrows or dens seems logical: When a resident emerges to forage, a picture will be snapped. The problem is that when this creature returns, another picture will be taken. Indeed, the comings and goings of one animal might be all the camera records, which is not particularly helpful if one's aim is to survey the general population. With experience, however, one can locate traps in less problematic places frequented by animals. One group of researchers in Borneo mounted a camera trap facing a log that had fallen across a small stream, guessing—accurately, as it turned out—that animals would take advantage of this natural bridge to cross over the water.    Would have figured out what "phototrapper" was from this paragraph and then would have gone back and taken my best educated guess for #43.

The views of animals these automatic devices return are ones that even seasoned field biologists will likely never experience directly. Such photographs increase scientific understanding and, despite their often haphazard composition, should boost people's appreciation of nature, just as they did for viewers of Shiras's wildlife photographs over a century ago.

Adapted from J. G. Sanderson and M. Trolle, Monitoring elusive mammals: Unattended cameras reveal secrets of some of the world's wildest places. ©2005 by American Scientist.

[Questions 43-47 for Passage I begin on following page.]

*Handwritten margin notes:*

Just happened to see their → names when scrolling up to look at the passage. Read from their names 'he end of the agraph for #45. (81 words)

Read this → whole paragraph for #44 (157 words)

Appx1782

**43.** Which of the following developments would be __LEAST__ likely to be useful to phototrappers?

A. Increased battery capacity enabling cameras and sensors to operate longer

B. Detectors that are sensitive to changes in pressure and moisture as well as heat

C. Software that can accurately predict the movements and behavior of a particular species

D. Camera lenses capable of capturing a wider field of view than the lenses currently in use

*Would have tried to answer this 2nd*

*Probably would have narrowed it down to B & D, then picked B based on the info I got from paragraph 4 and general logic.*

**44.** The main purpose of the fourth paragraph of the passage is to:

A. show that the results obtained by Karanth and Nichols have broad applications.

B. highlight drawbacks of using phototrapping as a tool in population estimation.

C. explain how phototrappers make use of advances in photographic technology.

D. suggest that the successful use of phototraps is more complicated than it may at first appear.

*Would have tried to answer this one 1st*

*Based on reading the 4th paragraph, I would have picked D. May have rechecked it if I came across helpful info when reading for other question #s.*

**45.** The discussion in the passage of Karanth and Nichols's work with tigers suggests that:

A. using phototrapping to estimate tiger populations would be more expensive than other methods.

B. the techniques that work with tigers probably will not work with smaller animals.

C. truly identifying tigers depends on finding unique features like scars or other unnatural markings.

D. some tigers exist that probably have very similar stripe patterns on one side of their bodies.

*Would look to see if I could quickly find "tigers" or their names and maybe read a little to try to answer.*

**46.** The passage provides __information to answer which__ of the following questions?

A. Are phototraps a cost-effective method of wildlife surveillance?

B. Why did Shiras choose to photograph wildlife at night?

C. What enabled the application of mark-recapture techniques to phototrapping?

D. Have phototraps been used to identify species that were previously not known to exist?

*Would have answered this one last; might have flagged.*

*Made my best guess... didn't see anything about cost or new species in the bit I read, so probably C, since that was what most of what I read was about.*

**47.** Which of the following noted advances is most __analogous__ to the changes Shiras made in his wildlife photography technique, as described in the passage?

A. The transistor led to the development of smaller, easily portable electronic devices.

B. The vacuum cleaner created the belief that houses would be kept cleaner than previously.

C. The cell phone made telephone conversations possible where there were no telephone lines.

D. The endoscope allowed doctors to view the inside of the human body without invasive surgery.

*Based on the info I got in the first few lines after his name (i.e. increasingly less invasive surveillance), I ruled out B, then chose D.*

Only read what is highlighted in yellow.

**Passage II (Questions 48-52)** Total words in passage = 595; words I actually read = 90 (means I read ~15% of passage, or skipped ~85% of passage, and tried to answer the questions.)

Ireland's Skellig Michael is named for the archangel. The now uninhabited island, a large rock with two peaks jutting up from the sea, lies at the end of a seven-mile voyage across open water—a place of sheer precipices and terrifying landings. The *Skellig*—meaning *rock* or *steep cliff* in Irish Gaelic—was inhabited from perhaps the sixth century into medieval times. High on its easternmost peak, 600 feet above the sea, are ruins of a monastic settlement, five beehive-shaped cells and two small oratories constructed of unmortared stone, their arched roofs still intact, and walled terraces carved from the face of the cliff. **(35 words)**

The monastery is reached from the sea by a ladderlike stairway hewn into the rock. It is difficult to understand the monks' choice of this site (or their ability to live here); the place is fit only for birds. Access to the island by wicker boat would have been infrequent and dangerous. The Skellig monks built their tiny windowless cells on a shelf of sandstone hardly wide enough to recline on. They packed seaweed into chinks in the cliff face to make a garden. **(7 words)**

From the landing, I climbed hand over hand for 400 feet to a little rope net slung between the two peaks. The path from there is another vertical stairway, this one constructed of stone slabs, 200 steps more to the monastic enclosure, like an eagle's aerie. Most of the rock is too steep for human habitation. At no time could the little cluster of cells have sheltered more than a dozen monks. Of the many monastic communities on the wilder coasts of Europe, this must have been considered the least welcoming. Yet, for nearly a thousand years hermits sat on the Skellig rock and searched the sea for some sign of the Absolute. **(21 words)**

**Probably would have stopped reading here (maybe earlier), because it is too difficult to find useful info.**

The monastery was similar to hermitages that originated in the deserts of Egypt in the early centuries of the Christian era and then spread rapidly over Europe. For a time, every rock and cave from the Red Sea to the coast of Ireland had its saint; every cleft and ledge was a hermitage. The eremitical movement was not unique to Christianity; every religious tradition includes hermits. But during the centuries that the Skellig flourished, the movement was like a frenzy. Young men ran away to solitude as later they would run away to sea, and young women sequestered themselves in convents as evidence of their piety. **(27 words)**

In the eighth and ninth centuries, Vikings sacked Skellig Michael numerous times. Why? It could hardly have been worth the effort. Did it simply represent a challenge? Certainly, there is a stubborn sufficiency about the place that is irresistibly attractive. And the community survived. According to legend, Olav Trygvasson, later to become King of Norway and its patron saint, was baptized by a Skellig monk, and his conversion brought an end to the pillaging.

The eremitical fire lasted until the fourteenth century; then the rock reverted to the fish hawks. All across Europe, the dark, shadowy oratories of hermits were superseded by the grandiloquent visual poems of the urban cathedrals. Yet in the eighteenth century the Skellig became a popular place of pilgrimage. Penitents from across Europe not only traveled to the rock but made the grueling 700-foot climb to the Needle's Eye, its precipitous westernmost peak. The ordeal required the devout to crawl onto a horizontal slab of rock that projects with a dizzy precariousness from the summit and kiss a stone cross affixed to the end of the slab.

Adapted from C. Raymo, *Honey From Stone: A Naturalist's Search for God.* ©1987 by C. Raymo.

**[Questions 48-52 for Passage II begin on following page.]**

**Appx1784**

None of these questions gave a specific paragraph/line to read, so I tried to quickly find things that stood out visually, but nothing really did, but so I probably would have skipped this and moved on and hoped to come back. But if I did make it back , I probably would have just started reading the first line of each paragraph (sometimes only part of the first line), and then stopped because the writing style made it too difficult to find any information. Would have given up on trying to read read/find info in the passage and would have tried to make guesses based on what I did read (which wasn't much) and would have flagged the questions in case I had time to come back (probably wouldn't get the chance to), so might have filled in random guesses for all of these.

48. If the legend about Olav Trygvasson is true, which of the following suppositions about his initial actions at Skellig Michael does passage information support as the most probable?

A. He asked the Father Superior for spiritual guidance.

B. He donated booty from elsewhere to the monastery.

C. He invited the monks to his coronation in Norway.

D. He attacked the monks and looked for valuables.

*Couldn't find his name quickly, so would either skip or "flag" it to note that I completely guessed and then make a guess (would probably A because it seems most plausible, or least extreme/odd)*

49. Suppose that the ruins of a sixteenth-century monastery are discovered on a remote island off the Swedish coast. Why, according to passage information, is this discovery surprising?

A. Few European pilgrims would have been able to reach the site.

B. An eremitical motive would have been unlikely at that period.

C. The influence of Olav Trygvasson did not spread to Sweden.

D. Monks would have been unlikely to learn of such an island.

*Probably would have ruled out A because from the bits I read, monks didn't seem to be stopped by difficult locations. Then probably would have flagged and picked a random one (probably C because "C" is a statistically common answer)*

50. According to passage information, which of the following reasons was probably determinative in the selection of Skellig Michael as the site for a monastery?

A. Its proximity to the shrine at Needle's Eye

B. Its isolation from worldly distractions

C. The protection it promised from raiders

D. The opportunities it provided for suffering

*Monks are known for isolating themselves.*

51. A visitor to Skellig Michael who kissed its stone cross probably did so for which of the following reasons?

A. To fulfill a qualification for sainthood

B. To atone for wrongs committed

C. To be spared by Viking marauders

D. To be accepted into the monastery

*Seemed to make the most sense or be most likely to happen*

52. The number of monks who resided on Skellig Michael was probably due to:

A. insufficient food and water in the monastery.

B. extreme difficulty in reaching the monastery.

C. limited available living space on the site.

D. buildings that were precariously situated.

*Seemed to make the most sense based on the bits I read.*

**#53, Would start at 1st sentence. Would stop reading after "condition" as it confirms my guess (76 words) —>**

**Passage III (Questions 53–58)** Total words in passage = 583; words I actually read = 268 (means I read ~46% of passage, or skipped ~54% of passage, and was able to answer the questions.)

The exhibition, *The Garry Winogrand Game of Photography*, was a reminder of why so many people consider Winogrand to be one of the great American photographers of the twentieth century. Although they continue to acquire further layers of historical specificity, his street photographs, many of them shot in Midtown Manhattan in the 1950s and 1960s, have lost none of their kinetic immediacy; the best of his animal photographs provide sly, incisive views of the human condition; his pictures from the American road grab the wheel from Walker Evans and Robert Frank to send the genre on an unpredictable detour; in photographing all manner of public events, from antiwar demonstrations to art-world parties to political press conferences, Winogrand added significantly to the pictorial record of midcentury United States history. With his liking for seemingly random compositions and his famous tilted-frame effect, Winogrand made photographs that initially struck many viewers as devoid of formal strengths. Now, however, we can appreciate the subtlety and unexpectedness of his framing and the complex interplay he often achieves between anecdote and form.

In putting together the exhibition, one of the curators, Richard Misrach, decided to focus on an aspect of Winogrand's work to which little attention had been given: the color slides. Winogrand began shooting color photos in the 1950s and continued doing so until the late 1960s. He never explained why he stopped shooting in color, but the difficulty and expense of making color prints and their instability may have contributed to his decision.

Misrach was especially drawn to the photographs Winogrand made at boxing matches in the 1950s, and his selections for the exhibition included eighteen boxing shots. In each, the fighters' bodies are isolated against dark backgrounds and often fragmented by the out-of-focus, quasi-abstract ropes cutting across the frame. In one amazing, weirdly off-center shot, a boxer doubling up from a body blow appears to be ascending into the surrounding void.

**#54, would have read whole 4th paragraph. (100 words)**

**55, would start reading 5th paragraph, would stop after 1st sentence (27 words) —>**

This small selection whetted one's appetite for seeing more images from Winogrand's color work. However, it was the slides that caused some of the most heated arguments among curators. Bill Jay objected to the slides being shown in any format because they had never been edited by Winogrand. While the prints in the archive had already been chosen for enlargement by the photographer from contact sheets, Jay pointed out, the slides had undergone no such process. Jay insisted that the archive's hoard of thousands of slides and unproofed negatives should be used only for research and never published or exhibited.

**#56, —> would have read the last sentence, then the one just before that for additional clarification, then stopped (65 words) & answered the question.**

Misrach came to his own defense by saying that if "curatorial laws" were followed, the "real hidden treasures" of the archive would never be seen by anyone. He also observed that Winogrand gave his photographs, slides, and negatives to the Center for Creative Photography without conditions, which implies permission to show and publish the work. If Winogrand didn't want the photographs in his archive to be seen, Misrach argued, he could have simply destroyed them. Indeed, as others remarked, some photographers have sought to exert control over the future of their work by destroying negatives. Furthermore, some curators argued for the importance of posthumous discoveries of artists' work. And taking the discussion into a wider realm, one curator argued that the "artist is not always in the best position to judge his or her work," citing the example of author Franz Kafka asking Max Brod to destroy his manuscripts and how Brod had ignored the request, to the world's benefit.

Adapted from R. Rubinstein, Snap judgments: Exploring the Winogrand Archive ©2002 by Brant Publications, Inc.

[Questions 53–58 for Passage III begin on following page.]

Appx1786

**Would answer this one 1st.**

53. The author's use of the term *kinetic immediacy* (paragraph 1) to describe Winogrand's photographs most likely refers to the photographs':

A. ability to capture the hustle and bustle of the city.

B. incorporation of roadside scenes.

C. historically significant details and context.

D. unique compositional strategies.

> Would have guessed C (ruled out B&D, A was very specific), before even reading paragraph 1 due to logic & prior knowledge, but would probably read some of paragraph 1 to check to make sure I was on the right track.

54. If Bill Jay's arguments against the presentation of Winogrand's slides and negatives (paragraph 4) were accepted, which of the following would NOT be a logical outcome?

**Would answer this 3rd.**

A. Less of Winogrand's work would be seen by the general public.

B. Critical opinion of Winogrand's abilities would be lacking in some areas.

C. Winogrand's color photographs would be forgotten by all but specialist scholars.

D. Winogrand's recognition as one of the U.S.'s great photographers would be lessened.

> Confusing, lots of "negative" words, (might have flagged) would probably try #56 before coming back to this one. Would try to rule out the answer choices that WOULD be logical outcome if they did NOT present the unedited works. Ruled out A&B, would probably pick D because it is less absolute of the 2.

55. Someone who agreed with Misrach's defense of his choice to show the color slides would be most likely to also approve of:

**Would answer this 4th. Recognized that the "color slides" from 4th para, so would probably ~o back and start ~ading the 5th para.**

A. exhibiting works that an artist had donated to a museum for scholarly purposes only.

B. examining the rest of Winogrand's unprinted photographs and selecting some for display.

C. requiring that artists clearly state their intentions for display and publication when donating works to a museum.

D. organizing an exhibition that included all of Winogrand's work whether previously shown and published or not.

> Would have ruled out A&C, then probably picked B because it is less absolute.

56. The curator who used the example of Max Brod refusing to destroy the manuscripts of Franz Kafka (final sentence) was most likely implying that:

**Would answer this 2nd**

A. the individual rights of an artist are sometimes outweighed by the greater public and artistic good.

B. the destruction of an artist's work is never warranted.

C. once a work of art is created, its destruction is almost a crime against humanity.

D. great artists will always attempt to keep their works from being seen and must be prevented from doing so.

> Would rule out B&D because they have "almost/never", then would pick A because C is basically and absolute statement, even though it has "almost" in it.

57. By using terms such as *subtlety, unexpectedness,* and *complex* in describing Winogrand's work, the author seems to be implying that:

**Would answer this 5th**

A. Winogrand was not interested in fame or monetary rewards.

B. Winogrand's talent is not readily apparent to viewers of his work.

C. only photography experts can appreciate Winogrand's work.

D. Winogrand attempted to do too much with his photography.

> Would have guessed B without going back to read anything else from the passage. I would rely on logic and what I read for the other questions.

58. If it were established with certainty that Winogrand did, as the author suggests, ~~stop shooting in color because of the "difficulty and expense of making color prints and their instability" (paragraph 2)~~, this information would best support which of the following arguments?

A. Winogrand would have liked to have his color slides printed once the technology made this feasible.

B. ~~Winogrand felt that working in color was stylistically inferior to black and white.~~

C. ~~The color slides should be viewed as finished products and not printed.~~

D. Winogrand would have returned to photographing in color once the technology improved.

Actually, didn't see this question until I had already worked through #s 53-57. Still would have probably answered this one without reading anything from the passage, even though it gives a specific paragraph to look at, since it restates the referenced text in the question stem. Would use logic to rule out B&C, would pick D based on logic.

**Passage IV (Questions 59-63)**    Total words in passage = 577; words I actually read = 147 (means I read ~25% of passage, or skipped ~75% of passage, and was able to answer the questions.)

The soil bacterium *Bt* has remained the cornerstone of natural pest control for over three decades. Its toxins generally kill the bad guys (corn earworm and Colorado potato beetle, among others) and spare the good guys (humans, mammals, and beneficial insects).

But the rapidly growing acreage devoted to corn, cotton, and potatoes that have been genetically altered to produce a *Bt* pesticide is making fears about emerging insect resistance increasingly salient. These crops expose pests to their toxins throughout the growing season, exerting a selection pressure that favors the survival of resistant individuals. In contrast, *Bt* sprays, which are used primarily by home gardeners and farmers who practice organic methods, degrade quickly, making resistance less likely. *Saw this when looking for "Bt ___" because it is italicized. Read to the end of the paragraph from here.  v  #59 & #60 (53 words)*

*#63, Read last sentence (23 words)*

A report by the Union of Concerned Scientists advocates the *refuge/high-dose* strategy. Insects are exposed to sufficient levels of *Bt* toxin from crop plants to kill most of them. The rare survivors are then allowed to mate with insects that have been bred in selected areas (refuges) that are not planted with *Bt* crops. Their offspring are susceptible to *Bt* toxins.

*#62, only spot that has Bt "cotton". Read from "inability" to "bollworms" (13 words)*

The report notes that the need to expand refuges to as much as half of the planted acreage is underlined by the inability of *Bt* cotton to kill more than 90 percent of cotton bollworms. So far, no increase in the level of resistance to genetically engineered *Bt* crops has been documented. But several insect species have evolved resistance in the laboratory, and a vegetable pest, the diamondback moth, has demonstrated resistance after intensive field exposure to *Bt* sprays.

The biggest marketer of *Bt* seeds does not foresee a need to strengthen protective measures nor to require the federal regulation of resistance-management plans, citing the company's mandate that farmers establish refuges for *Bt* corn and potatoes, even without a directive from the Environmental Protection Agency. The director of the company's *Bt* corn sales charges scientists who demand larger refuges with failing to consider the potential for improved genetic engineering. "Resistance is unlikely to happen within five years, and within that time frame we'll offer new technology that will further reduce the likelihood of resistance," according to this executive.

*:aw "gene-stacking" when looking for "Bt ___" because this is also italicized, so highlighted it. Then for #61, read from first 2 sentences of paragraph. (58 words)*

One way for insects to develop resistance is by the alteration of receptors in the gut to which the toxins bind. Several companies are working either on *gene-stacking*, the engineering of plants to express multiple toxins that bind to various classes of receptors, or on combining *Bt* toxins with other proteins that disrupt an insect's life cycle. These approaches do not guarantee success. Pests can evolve resistance to multiple *Bt* toxins that target various receptors, and that resistance can evolve as a dominant trait. Furthermore, any pest lacking an enzyme required to activate a toxin would be unaffected by it.

So biopesticides that serve as alternatives to *Bt* crops may be needed. Research recently presented at the Entomological Society of America involved the cloning of genes for a toxin from a bacterium within the gut of nematodes. Just a few of the bacterial cells can kill insects. (An enzyme in the bacterium has the unusual property of making a dying insect glow blue, perhaps warning predators.) One company is trying to insert the cloned genes into various plants, enabling them to produce their own pesticide.

But even if *Bt* alternatives are found, the bugs may ultimately win. Some 500 insect species have developed resistance to synthetic pesticides. Natural selection may prove a match for natural pesticides as well.

Adapted from G. Stix, Resistance fighting: Will natural selection outwit the king of biopesticides? ©1998 by Scientific American.

[Questions 59-63 for Passage IV begin on following page.]

Might originally skip this passage and try to come back to it, since it didn't have specific paragraphs/lines to read. Might have looked for "Bt crop/spray/toxin" from the questions (highlighted) since Bt is italicized and therefore stands out from the background text.

**Answered this 3rd; ruled out A&D, picked B based on reasoning and the reading for #60.**

59. Which of the following attempts to protect dogs from fleas is essentially a refuge/high-dose strategy?

A. Applying a skin solution that changes a dog's blood chemistry so that its fleas migrate to other dogs

B. Periodically dipping some dogs in insecticide solutions and then allowing them access to untreated dogs

C. Giving a dog a monthly pill that disrupts the fleas' breeding cycle and keeping the dog isolated

D. Mating flea-resistant dogs with flea-susceptible dogs and putting flea collars on the puppies

60. Why is the high-dose part of the refuge/high-dose strategy necessary, according to passage information?

**Answered this 2nd; guessed C based on a bit of reading and logic.**

A. More than 10 percent of the pests may recover from poisoning by toxins present at a constant level.

B. If almost all of the pests are killed suddenly, the plants gain time to develop their own defenses.

C. A dosage level from which many pests recover will create a large population of resistant pests.

D. The residue from a heavily applied pesticide continues to kill successive generations of pests.

**Would probably attempt to answer this 1st because I majored in genetics**

61. Some Indian meal moths have no sites to which the molecules of *Bt* toxins can bind. Passage information suggests that a gene-stacking solution to this problem would focus on the:

A. engineering of toxic proteins that would bind to other intestinal receptors.

B. development of crops that are not attractive to the moth's larvae.

C. alteration of receptors in the gut to accept multiple toxins.

D. genetic disruption of the moth's reproductive cycle.

**Answered last.**

62. Assume that cotton growers find the refuge/high-dose method inadequate to combat bollworm infestations. What does passage information suggest as their best recourse?  **Ruled B&C out, and guessed A based on logic and the little reading that I did for the other questions.**

A. Fields of *Bt* cotton should be sprayed with a different form of insecticide.

B. Fields devoted to *Bt* cotton should be replanted with conventional cotton strains.

C. Refuges should be eliminated so that *Bt*-resistant bollworms have no safe breeding area.

D. The *Bt* content of the plants should be varied so that bollworms are less likely to develop resistance.

63. According to the author, *Bt* sprays are preferable to *Bt* crops for pest control because sprays:

**Answered this 4th.**

A. harm the environment less than does a crop.    **Ruled out B&C, picked D based on reasoning.**

B. destroy more insects than does a crop.

C. cost less than does raising a crop.

D. act for a shorter time than does a crop.

Appx1790

' After reading the questions, would probably move on to a different passage and try to come back to this one, this seems like I would have to do a lot of reading in order to answer the questions.

**Passage V (Questions 64-70)**

Total words in passage = 601; words I actually read = 126 (means I read ~21% of passage, or skipped ~79% of passage, and was able to answer (most of) the questions.)

People must sometimes perform skillfully on difficult tasks before an audience. Under such circumstances, they often wish to have friends, relatives, and other supporters present. It is worth asking whether a supportive audience is really helpful—or whether it might not instead impair the performance. Previous research shows that the effect of audience support is not simple or uniform. The following study was designed to test competing hypotheses about the effect of a supportive audience on performance.

**1st sentence (38 words)**

Because friends are the most common source of social support, Experiment 1 compared the effects of observation by a friend and by a stranger during the performance of a task that previous research had shown to be stressful. This task was to count backward aloud by thirteens, starting from 1,470. Participants were told that their goal was to perform the successive subtraction operations as quickly and accurately as possible during a two-minute trial. At this point in the instructions, the experimenter indicated a one-way "mirror" and a microphone, telling half of the participants that a friend who had accompanied them to the testing room would observe their performance. The experimenter mentioned a fictitious name to the other participants as their observer.

**1st sentence (11 words)**

The results suggest that a supportive audience has a detrimental effect. The participants who believed that a friend was watching them made a significantly higher percentage of errors than did those who believed that a stranger was watching them. Yet the number of errors made at particular stages of the performance—e.g., the second subtraction—was almost identical in the two conditions. The decrement in the supportive-audience condition resulted from a slower rate of responding, which meant that the neutral-audience condition produced more responses (with increasing accuracy on the later ones).

**1st sentence (22 words)**

The participants' answers to post-experimental questions indicated that they were not aware of the effect of the observer on their performance. In fact, participants in the supportive-audience condition were less likely than those in the neutral-audience condition to report being distracted by the observer or feeling stress while doing the task. Furthermore, the negative effect of a supportive audience is apparently not due to discomfort about being judged: The participants' ratings of their feeling of being evaluated were nearly identical in the two conditions.

**1st sentence (26 words)**

The researcher concluded that supportive observers impair the performance of a difficult, skill-based task by promoting a response style that reduces speed without increasing accuracy. Still, the reason for this audience effect was unclear. Friends and strangers differ in many ways, including their knowledge of one's abilities, their desire to witness one's success, and their expectations about one's behavior in a particular situation.

**1st sentence (14 words); last sentence (15 words)**

In Experiment 2, all the observers were strangers, and their supposed supportiveness was manipulated. The experimenter told participants in the supportive-audience condition that both they and their observer would receive a cash prize if their speed and accuracy surpassed a certain criterion. Participants in the neutral-audience condition were told that they alone were to receive the prize for a good score. They thus had no reason to suppose that the observer cared about the quality of their performance. Experiment 2 confirmed the prediction that a skilled performance would suffer with a supportive audience.

Other questions remain. Did the difficulty of the task produce an expectation of failure that impeded its performance? Is a supportive audience a special case of an especially attentive audience or one likely to respond emotionally to a performance? And why did performers report feeling less distracted by a friend than by a stranger, when their performance suggested the opposite effect?

Adapted from J. L. Butler and R. F. Baumeister, The trouble with friendly faces: Skilled performance with a supportive audience. ©1998 by the American Psychological Association.

**[Questions 64-70 for Passage V begin on following page.]**

Would likely run out of time before getting to come back to this passage, but I went through it like I would have if I had gotten to it.

64. The design of Experiment 1 reveals the researcher's assumption that:

*Answered 1st*

A. participants will not be aware of the quality of their performance.

*Guessed based on little reading & logic*

B. most participants will find the mathematical task difficult.

C. a supportive audience will impair performance.

D. a neutral audience will impair performance.

65. Which of the following facts constitutes the most serious *objection* to the researcher's conclusion about the effect measured in Experiment 2?

*Answered 2nd*

A. The instructions discouraged a cautious performance style.

B. The procedure was deceptive, since the observers were fictitious.

*Guessed based on the bit of reading I did & reasoning*

C. A monetary reward was a factor for performers in both conditions.

D. Performers' beliefs about the observer's attitude were not determined.

66. Suppose that a psychologist is interested in the performance of trial lawyers. On the basis of Experiment 1, the psychologist should predict that a legal argument will be more effectively presented if:

A. the lawyer is serving without compensation than if the case involves a large financial settlement.

*Answered 7th*

B. the judge is unknown to the lawyer than if the two have a cordial relationship.

*Ruled B out (which is actually the answer) because I misread it. I thought it said "the judge is KNOWN" not "unknown". Still may not have gotten it right, but would have at least been torn between B&D if I had read it correctly.*

C. the courtroom is empty than if it is filled with spectators whose sympathies are unknown.

D. jurors watch the trial through a one-way mirror than if they are present in the courtroom.

67. What is the most likely explanation of the slower rate of performance observed in Experiment 1?

*Answered 5th; completely guessed based on logic and context from the bit of reading I did*

A. A desire to maintain an appearance of relaxed competence before friends

B. A feeling of being judged more harshly by friends than by strangers

C. An inability to concentrate on mental tasks when friends are present

D. A belief that accuracy is more important than speed on certain tasks

68. What conclusion about the nature of audience support is justified by the results of Experiment 2 alone?

*Answered 6th; completely guessed based on logic and context from the bit of reading I did*

A. Supportive friends can disrupt a performance if they would benefit from its success.

B. Supportive strangers can enhance a performance if they would not benefit from its success.

C. Strangers can disrupt a performance if they would benefit from its success.

D. Strangers can disrupt a performance if its success would benefit the performer.

Appx1792

69. Suppose that Experiment 1 is repeated with the addition of a "hostile-audience" condition and that this condition produces data equivalent to those of the "supportive-audience" condition. Which of the following hypotheses would best accommodate this outcome?

*Answered 3rd*

A. A hostile audience does not affect performance.

B. A supportive audience impairs performance.    Doesn't address "hostile audience".

C. An involved audience impairs performance.

D. A nonhostile audience enhances performance.

70. Which of the following hypotheses would most reasonably account for the post-experimental statements made by those in the neutral condition?

*Answered 4th; completely guessed based on logic.*

A. A performer's anxiety need not adversely affect performance.

B. A performer's anxiety can be reduced with no effect on performance.

C. An audience can affect a performance by reducing performance anxiety.

D. An audience can affect a performance by causing performance anxiety.

**Passage VI (Questions 71-75)**    Total words in passage = 571; words I actually read = 196 (means I read ~34% of passage, or skipped ~66% of passage, and was able to answer (most of the questions.)

*Saw lots of italics, so read the little bit between them. (8 words)*

The Greek words *sophos* and *sophia*, usually translated *wise* and *wisdom*, were in common use from the earliest times and, because they stood for an intellectual or spiritual quality, naturally acquired some delicate shades of meaning that can be indicated here only approximately. At first, they referred primarily to skill in a particular craft. A shipwright was described by Homer as "skilled in all sophia"; a steersman, an augur, a sculptor are "sophoi," each in that occupation; Apollo was "sophos with the lyre."

The sophia of a charioteer, shipwright, or musician must have been to a large extent acquired by learning, but Pindar no doubt pleased his royal patron when he wrote that "one who knows much is sophos by nature, in contrast to chattering crows, who have gained their knowledge by learning." "Not the person who knows many things is sophos," said Aeschylus, "but one whose knowledge is useful."

*#74, read from beginning to "Euripides" (72 words)*

Shortly after this usage was recorded, there crept in a cynical note, a hint that the sophos is too clever and may presume too far. Taxed by the wily Odysseus (whom he had earlier described as "a sophos wrestler") with acting in a way that was not *sophon*, Neoptolemus replied that "what is right and just is better than what is sophon." So we get the oxymoron of a chorus in Euripides: "When mortals set themselves up against the gods, their sophia is not sophon." The verb *sophizesthai*, "to practice sophia," which Hesiod applied to the acquisition of skill in seamanship and Theognis to himself as a poet, suffered a parallel development, until it meant to trick or deceive or to be oversubtle.

*#71, Read this whole paragraph (101 words)*

Like other groups, the Athenians tended to be wary of intellectuals, pundits, professors, and the like. The qualities of these persons were summarized in a word difficult to translate: *deinotes*, with the adjective *deinos*. Derived from a noun meaning *fear*, it referred to anything terrible or dreadful and was applied by Homer to weapons, the glare of a foe, the whirlpool Charybdis, thunder, and lions. The Egyptians were *deinoi* (terrible fellows) for devising stratagems, Prometheus was *deinos* at wriggling out of difficulties, a good charioteer was *deinos* at his art. It also, and particularly, meant clever in speech or argument.

Anyone who had this quality was a natural object of suspicion to the less clever, as the orator Antiphon said that Thucydides was to the Athenian public "because of his reputation for deinotes." Degenerating, as words in popular usage do, it acquired some of the senses of *sophos*, as when Demosthenes alleged that Aeschines had called him "deinos, sorcerer, sophist, and the like." At this point, *deinos* was expressly coupled with *sophistes* as an insult to be resented.

*#74, Saw the 2 words together and so read the last line. (15 words)*

The word *sophist*, then, had a general sense as well as the special one which I have yet to mention, and in neither sense was it necessarily a term of opprobrium. Because of the vocation of Greek poets as educators, we may conclude that the word that comes nearest to this special sense is in modern English *teacher* or *professor*. It was not until the fifth century C.E. that the term was apparently sometimes pronounced with a depreciatory inflection, as may the words *pundit* or *intellectual* today. In the hands of the conservative Aristophanes, it became definitely a term of abuse, implying charlatanry and deceit, although by no means did it as yet apply exclusively to certain philosophers.

Adapted from W. K. C. Guthrie, *The Sophists.* ©1971 by Cambridge University Press.

[Questions 71-75 for Passage VI begin on following page.]

**Appx1794**

**Answered this 1st because "deinotes" is mostly in 1 paragraph; tried to guess.**

71. Which of the following words is most analogous to *deinotes* in the way its emotional connotations have changed?

positive —> negative

A. *Homely*, which referred to things "appealingly domestic" and came to mean "unattractive"

B. *Impact*, which referred to things in "violent collision" and came to mean "any outcome"    this is too broad

C. *Inflammable*, which referred to things "capable of burning" and came to mean "not capable of burning"    didn't become direct opposite

D. *Brave*, which referred to things "ostentatiously colorful" and came to mean "courageous"    not enough change

**Answered 4th. Guessed based on the little reading I did for #71 & 74**

72. The author's tone in discussing the Athenians of ancient Greece is most accurately described as:

A. understanding and sympathetic.

B. detached and conscientious.    Most neutral

C. critical and disapproving.

D. indulgent and sentimental.

**Answered 5th. Guessed based on logic and the bit of reading I did for #71 & 74**

73. One can most reasonably conclude from the passage that the ancient Athenians:

~~A. were generally indifferent to poetry and philosophy.~~

B. considered intellectuals corrupt for abusing their influence.

~~C. had contradictory feelings about those who seemed clever.~~

~~D. had greater admiration for Homer than for Demosthenes.~~

**Answered this 2nd because there was 1 line with both words in it.**

74. The passage author moves from a discussion of *sophos* to a discussion of *deinotes* to make the point that:

A. they switched meanings because they had similar connotations.

B. cleverness has always seemed threatening to those who are not clever.

~~C. ordinary Greeks did not understand the distinction between the two words.~~

D. the connotations of one spread to the other because their meanings overlapped.

Ruled out B&C, guessed D based on logic (probably wouldn't switch the meaning of words, but connotations could spread)

**Answered 3rd**

75. Which of the following concepts does the passage author NOT associate with *sophos*?

~~A. Intellectual guile~~

~~B. Scholarly learning~~

C. Political intrigue

~~D. Vocational skill~~

ruled out B & D based on reading, don't know what "guile" means, but ruled A out because it talked about intellect in general, and I didn't see anything about politics in the bit that I read.

**End of Verbal Reasoning Section**

**Appx1795**

## Verbal Reasoning Answer Key

| Question Number | Answer Key |
|:---:|:---:|
| 43 | B |
| 44 | D |
| 45 | D |
| 46 | C |
| 47 | D |
| 48 | D |
| 49 | B |
| 50 | B |
| 51 | B |
| 52 | C |
| 53 | A |
| 54 | D |
| 55 | B |
| 56 | A |
| 57 | B |
| 58 | D |
| 59 | B |
| 60 | C |
| 61 | A |
| 62 | A |
| 63 | D |
| 64 | B |
| 65 | D |
| 66 | B |
| 67 | A |
| 68 | C |
| 69 | C |
| 70 | A |
| 71 | A |
| 72 | B |
| 73 | C |
| 74 | D |
| 75 | C |

**Appx1796**

**Verbal Reasoning Raw Score to Scale Score Conversion Table**

| Raw Score | Scale Score |
|-----------|-------------|
| 0 | 1 |
| 1 | 1 |
| 2 | 1 |
| 3 | 1 |
| 4 | 1 |
| 5 | 1 |
| 6 | 1 |
| 7 | 1 |
| 8 | 1 |
| 9 | 2 |
| 10 | 2 |
| 11 | 3 |
| 12 | 4 |
| 13 | 4 |
| 14 | 5 |
| 15 | 6 |
| 16 | 6 |
| 17 | 6 |
| 18 | 7 |
| 19 | 8 |
| 20 | 8 |
| 21 | 8 |
| 22 | 9 |
| 23 | 9 |
| 24 | 10 |
| 25 | 10 |
| 26 | 11 |
| 27 | 11 |
| 28 | 11 |
| 29 | 12 |
| 30 | 13 |
| 31 | 13 |
| 32 | 14 |
| 33 | 15 |

**Appx1797**

## WIAT-III Numerical Operations

| Items | Raw Score | Events |
|---|---|---|
| Item 1. How many balls are there? | 1 | |
| Item 2. Write the number of balls. | 1 | |
| Item 3. Circle the numbers. | 1 | |
| Item 4. Draw a circle around the group of 6 triangles. | 1 | |
| Item 5. Write the number that was left out. | 1 | |
| Item 6. Point to the one that means "add" or "plus." | 1 | |
| Item 7. Point to the one that means "subtract" or "take away." | 1 | |
| Item 8. 1 + 1 | 1 | |
| Item 9. 1 + 2 | 1 | |
| Item 10. 3 + 1 | 1 | |
| Item 11. 3 + 3 | 1 | |
| Item 12. 4 + 1 | 1 | |
| Item 13. 5 + 5 | 1 | |
| Item 14. 3 − 1 | 1 | |
| Item 15. 6 − 2 | 1 | |
| Item 16. 5 + 1 + 5 + 2 | 1 | |
| Item 17. 7 + 6 | 1 | |
| Item 18. 12 − 5 | 1 | |
| Item 19. 63 + 16 | 1 | |
| Item 20. 5 x 5 | 1 | |
| Item 21. 4 x 3 | 1 | |
| Item 22. 6 x 5 | 1 | |
| Item 23. 865 + 236 | 1 | |
| Item 24. 70 − 24 | 0 | |
| Item 25. 140 − 15 | 1 | |
| Item 26. 24 ÷ 6 | 1 | |
| Item 27. 29 x 6 | 1 | |
| Item 28. 7 x 9 | 1 | |

DEFENDANT'S EXHIBIT 38

Smith-0083

| Items | Raw Score | Events |
|---|---|---|
| Item 29. 49 ÷ 7 + 3 | 1 | |
| Item 30. 6/7 + 3/7 | 1 | |
| Item 31. 72 ÷ 3 | 1 | |
| Item 32. 4z + 1 = 9 | 1 | |
| Item 33. 906 − 488 | 0 | |
| Item 34. −25 + (−2) | 1 | |
| Item 35. 834 ÷ 6 | 1 | |
| Item 36. pi | 1 | |
| Item 37. simplify 10/55 | 1 | |
| Item 38. 5z − 3 = 11 + 3z | 1 | |
| Item 39. 594 ÷ 22 | 1 | |
| Item 40. 12x − 6 = 6x + 18 | 1 | |
| Item 41. 408 x 321 | 1 | |
| Item 42. 2/3 x 30 | 1 | |
| Item 43. order of operations | 1 | |
| Item 44. (z + 2)(z − 1) = 0 | 1 | |
| Item 45. 400% of 80 | 1 | |
| Item 46. 4/5 ÷ 2/10 | 1 | |
| Item 47. area of triangle | 1 | |
| Item 48. solve for x and y | 1 | |
| Item 49. algebra | 1 | |
| Item 50. find f(1) | 1 | |
| Item 51. simplify | 1 | |
| Item 52. 21.5 ÷ 4 | 0 | |
| Item 53. geometry | 1 | |
| Item 54. logarithm | 1 | |
| Item 55. simplify | 1 | |
| Item 56. trigonometry | 0 | |
| Item 57. factor | 1 | |
| Item 58. find the limit | 0 | DK |
| Item 59. find the limit | 0 | DK |
| Item 60. differentiate | 0 | |

Appx1799

| Items | Raw Score | Events |
|---|---|---|
| ✋ Item 61. integrate | 0 | |

## WIAT-III Word Reading

| Items | Raw Score | Item Scores | | | | Events |
|---|---|---|---|---|---|---|
| ➡ Test Items | 67 | Item Number | Word | Selected CE Buttons | Item Scores | |
| | | 1 | in | | 1 | |
| | | 2 | to | | 1 | |
| | | 3 | my | | 1 | |
| | | 4 | they | | 1 | |
| | | 5 | cow | | 1 | |
| | | 6 | when | | 1 | |
| | | 7 | bear | | 1 | |
| | | 8 | don't | | 1 | |
| | | 9 | shop | | 1 | |
| | | 10 | other | | 1 | |
| | | 11 | stone | | 1 | |
| | | 12 | sky | | 1 | |
| | | 13 | breeze | | 1 | |
| | | 14 | fight | | 1 | |
| | | 15 | between | | 1 | |
| | | 16 | goat | | 1 | |
| | | 17 | foot | | 1 | |
| | | 18 | wrong | | 1 | |
| | | 19 | seat | | 1 | |
| | | 20 | cloud | | 1 | |
| | | 21 | depend | | 1 | |
| | | 22 | frozen | | 1 | |
| | | 23 | knife | | 1 | |
| | | 24 | distance | | 1 | |
| | | 25 | equipment | | 1 | |
| | | 26 | manage | | 1 | |
| | | 27 | photograph | | 1 | |
| | | 28 | crumb | | 1 | |
| | | 29 | playfully | | 1 | |
| | | 30 | rhyme | | 1 | |
| | | 31 | posed | | 1 | |
| | | 32 | budge | | 1 | |
| | | 33 | ruin | | 1 | |
| | | 34 | tough | | 1 | |
| | | 35 | garnish | | 1 | |
| | | 36 | ridiculous | | 1 | |
| | | 37 | interject | | 1 | |
| | | 38 | radiant | | 1 | |
| | | 39 | poise | | 1 | |
| | | 40 | custodian | | 1 | |
| | | 41 | pier | | 1 | |
| | | 42 | choir | | 1 | |

| Items | Raw Score | Item Scores | | | Events |
|---|---|---|---|---|---|
| | | 43 | surgery | | 1 | |
| | | 44 | idealism | | 1 | |
| | | 45 | hymn | | 1 | |
| | | 46 | philosophy | | 1 | |
| | | 47 | magnetic | | 1 | |
| | | 48 | acquaintance | | 1 | |
| | | 49 | suspicious | | 1 | |
| | | 50 | inflection | | 1 | |
| | | 51 | technique | | 1 | |
| | | 52 | insignificant | | 1 | |
| | | 53 | elude | | 1 | |
| | | 54 | symphony | | 1 | |
| | | 55 | allure | | 1 | |
| | | 56 | synthesis | | 1 | |
| | | 57 | momentary | | 1 | |
| | | 58 | adolescent | | 1 | |
| | | 59 | sarcasm | | 1 | |
| | | 60 | vestibule | | 1 | |
| | | 61 | degenerative | | 1 | |
| | | 62 | choreography | | 1 | |
| | | 63 | isthmic | >3" | 0 | |
| | | 64 | plethora | | 1 | |
| | | 65 | manipulative | | 1 | |
| | | 66 | vacillate | >3" | 0 | |
| | | 67 | sanguine | >3" | 1 | |
| | | 68 | vociferous | >3" DK | 0 | |
| | | 69 | hierarchy | | 1 | |
| | | 70 | euphonious | >3" DK | 0 | |
| | | 71 | autonomous | | 1 | |
| | | 72 | demagogue | >3" | 0 | |
| | | 73 | vicissitude | >3" | 0 | |
| | | 74 | vitiate | >3" | 0 | |
| | | 75 | quincuncial | >3" DK | 0 | |



WIAT-III Pseudoword Decoding

| Items | Raw Score | Response | Events |
|---|---|---|---|
| Sample Item A. ak | C | | |
| Sample Item B. mib | C | | |

| Items | Raw Score | Item Scores | | | | Events |
|---|---|---|---|---|---|---|
| | | Item Number | Word | Selected CE Buttons | Item Scores | |
| Test Items | 39 | 1 | ik | | 1 | |
| | | 2 | ab | | 1 | |
| | | 3 | fip | | 1 | |
| | | 4 | rix | | 1 | |

Smith-0086

Appx1801

| Items | Raw Score | Item Scores | | | Events |
|---|---|---|---|---|---|
| | | 5 | seb | | 1 | |
| | | 6 | zad | | 1 | |
| | | 7 | sluck | | 1 | |
| | | 8 | rith | | 1 | |
| | | 9 | dreep | | 1 | |
| | | 10 | snay | | 1 | |
| | | 11 | droy | | 1 | |
| | | 12 | joom | | 1 | |
| | | 13 | clurt | | 1 | |
| | | 14 | plid | | 1 | |
| | | 15 | caft | | 1 | |
| | | 16 | lirst | | 1 | |
| | | 17 | ched | | 1 | |
| | | 18 | glatch | | 1 | |
| | | 19 | taph | | 1 | |
| | | 20 | sorb | | 1 | |
| | | 21 | tuffle | | 1 | |
| | | 22 | ruckid | | 1 | |
| | | 23 | heffle | | 1 | |
| | | 24 | pragment | | 1 | |
| | | 25 | scaw | | 1 | |
| | | 26 | broan | | 1 | |
| | | 27 | wung | | 1 | |
| | | 28 | waim | | 1 | |
| | | 29 | stight | | 1 | |
| | | 30 | syle | | 1 | |
| | | 31 | floit | | 1 | |
| | | 32 | unfrodding | | 1 | |
| | | 33 | smaut | | 0 | |
| | | 34 | knep | | 1 | |
| | | 35 | retashment | >3" | 0 | |
| | | 36 | intrections | >3" | 0 | |
| | | 37 | tellitry | | 1 | |
| | | 38 | mudger | | 1 | |
| | | 39 | tumingly | | 1 | |
| | | 40 | ostique | | 0 | |
| | | 41 | rinion | | 1 | |
| | | 42 | tufle | | 1 | |
| | | 43 | libnatious | >3" | 0 | |
| | | 44 | hefle | | 0 | |
| | | 45 | eminacious | | 1 | |
| | | 46 | purellian | >3" | 0 | |
| | | 47 | psibertarian | >3" | 0 | |
| | | 48 | apturarial | >3" | 0 | |
| | |  49 | diminecial | >3" | 0 | |
| | | 50 | millemignalian | | - | |
| | | 51 | preembutyric | | - | |
| | | 52 | diphthalbarbadinyl | | - | |

WIAT-III Oral Reading Fluency

**Appx1802**

| Items | Raw Score | Completion Time | Addition Errors | Other Errors | Word Count | Responses | Events |
|---|---|---|---|---|---|---|---|
| Passage A | - | - | | | 33 | | |
| Question A | - | - | | | | | |
| Passage B | - | - | | | 93 | | |
| Question B | - | - | | | | | |
| Passage C | - | - | | | 97 | | |
| Question C | - | - | | | | | |
| Passage D | - | - | | | 96 | | |
| Question D | - | - | | | | | |
| Passage E | - | - | | | 99 | | |
| Question E | - | - | | | | | |
| Passage F | - | - | | | 113 | | |
| Question F | - | - | | | | | |
| Passage G | - | - | | | 119 | | |
| Question G | - | - | | | | | |
| Passage H | - | - | | | 136 | | |
| Question H | - | - | | | | | |
| Passage I | - | - | | | 201 | | |
| Question I | - | - | | | | | |
| Passage J | - | - | | | 258 | | |
| Question J | - | - | | | | | |
| Passage K | - | - | | | 213 | | |
| Question K | - | - | | | | | |
| Passage L | - | - | | | 207 | | |
| Question L | - | - | | | | | |

| Items | Raw Score | Completion Time | Addition Errors | Other Errors | Word Count | Responses | Events |
|---|---|---|---|---|---|---|---|
| Passage M | 187 | 187 | 0 | 1 | 298 | One of the important highlights of my experience at Martin's Pet - Shop was learning to make fish tanks. Martin told me that, although his - shop was not terribly busy, he would teach me how to make fish tanks. I had to start from basics, which meant purchasing first decide - on the length of the tank. After that, the height and the breadth are to be - proportionately calculated. The sides of the glass are held together with - silicone, which is a type of glue that feels like rubber when it hardens. Silicone does not dissolve forever. After the tank is resealed on the inside with silicone (to - give double protection), it is left to dry for a day. The next day the tank is - tested by filling it with water, and if all is well, the tank is ready for sale - and can be delivered to the customer. I After I | glass for six tanks, - having the glass pieces cut to specifications, and then having the pieces - delivered to the shop without a scratch. I Learning to make an aquarium tank is both interesting and fun. I First, one has to plan the size of the tank. For this, one must in water. The tricky part is being able to apply - the silicone only to the edges of the glass and not letting your sticky - fingers touch any other portion of the glass. Otherwise, the glass will - look dirty because the silicone marks will stay like a fingerprint on the - glass was taught how to make the first tank, I started helping with - the rest. I recall how once, by mistake, I stuck the glass upside down. - "There's something fishy about the looks of this tank," said Martin. When he realized what my mistake was, he nearly put me into the tank! | Prosody |
| Question M | 1 | - | | | | | |

Smith-0090

| Items | Raw Score | Completion Time | Addition Errors | Other Errors | Word Count | Responses | Events |
|---|---|---|---|---|---|---|---|
| Passage N | 130 | 130 | 0 | 0 | 194 | Questions about the existence of a "southern land" were not confirmed until the early 1800s when British, American, and Russian voyagers began exploring the Antarctic region. Not until 1840 was it established that Antarctica was indeed a continent and not just a land surrounded by three oceans. A layer of ice up to two miles thick covers Antarctica. Although 98 percent of Antarctica is ice, there is land underneath the ice cover, unlike the Arctic where the ice floats on top of the ocean. Antarctica has the distinction of being group of islands. In fact, Antarctica is as big as the United States and Mexico combined. Antarctica is unique among continents. Volcanoes erupt from the frozen terrain, and the land is covered with snow and ice, yet hardly any snow falls each year. It is an and the most peaceful place on Earth. No wars have ever been fought on Antarctica. No country rules over it. Tourists and scientists don't need a passport, a visa, or anyone's permission to visit. This "Zone of Peace" is dedicated to science. There is an international treaty that prohibits any country from claiming or ruling over the land. | |
| Question N | 1 | - | | | | | |

| Items | Raw Score | Completion Time | Addition Errors | Other Errors | Word Count | Responses | Events |
|---|---|---|---|---|---|---|---|
| ➜ ⬆ Passage O | 157 | 157 (OTL) | 0 | 0 | 212 | Among the many wonders of nature, few can match the powerful grandeur pictured by an active volcano. An erupting volcano is most often pictured and described as a large mountain spouting from its summit great clouds of smoke with great sheets of flame. The truth materials that are thrown up towards the top of the mountain. This glare is reflected from the clouds of dust and steam. The most interesting products of an active volcano are the streams of lava that it pours forth, sometimes from the principal crater on the spectacle. The lava streams widen and sometimes attain a breadth of several miles with a depth of several hundred feet. The longest stream of lava ever recorded was 50 miles long! is, however, that a real volcano seldom emits either true smoke or true flame. What is mistaken for smoke consists merely of great volumes of fine dust, mingled with steam and other vapors. What people often mistake as flames is simply the glare from the glowing summit and sometimes from the smaller craters lower down. This lava consists of melted stone, and when it erupts from the mountain, its heat is intense and it glows like a furnace. During the night especially, these fiery rivers present a magnificent yet frightful | Prosody |
| Question O | - | - | | | | | |
| Passage P | - | - | | | 163 | | |
| Question P | - | - | | | | | |

## WIAT-III Math Problem Solving

| Items | Raw Score | Verbatim Response(s) | Events |
|---|---|---|---|
| Item 1 | 1 | | |
| Item 2 | 1 | | |
| Item 3 | 1 | | |
| Item 4 | 1 | | |
| Item 5 | 1 | | |
| Item 6 | 1 | | |
| Item 7 | 1 | | |
| Item 8 | 1 | | |
| Item 9 | 1 | | |

| Items | Raw Score | Verbatim Response(s) | Events |
|---|---|---|---|
| Item 10 | 1 | | |
| Item 11 | 1 | | |
| Item 12 | 1 | | |
| Item 13 | 1 | | |
| Item 14 | 1 | | |
| Item 15 | 1 | | |
| Item 16 | 1 | | |
| Item 17 | 1 | | |
| Item 18 | 1 | | |
| Item 19 | 1 | | |
| Item 20 | 1 | | |
| Item 21 | 1 | | |
| Item 22 | 1 | | |
| Item 23 | 1 | | |
| Item 24 | 1 | | |
| Item 25 | 1 | | |
| Item 26 | 1 | | |
| Item 27 | 1 | | |
| Item 28 | 1 | | |
| Item 29 | 1 | | |
| *Item 30 | 1 | | |
| Item 31 | 1 | | |
| Item 32 | 1 | | |
| Item 33 | 1 | | |
| Item 34 | 1 | | |
| Item 35 | 1 | | |
| Item 36 | 1 | | |
| Item 37 | 1 | | |
| Item 38 | 1 | | |
| Item 39 | 1 | | |
| ➡ Item 40 | 1 | | |
| Item 41 | 1 | | |

Smith-0092

| Items | Raw Score | Verbatim Response(s) | Events |
|---|---|---|---|
| Item 42 | 1 | | |
| Item 43 | 1 | | |
| Item 44 | 1 | | |
| Item 45 | 1 | | |
| Item 46 | 1 | | |
| Item 47 | 1 | | |
| Item 48 | 1 | | |
| Item 49 | 1 | | |
| Item 50 | 1 | | |
| Item 51 | 1 | | |
| Item 52 | 1 | | |
| Item 53 | 1 | | |
| Item 54 | 1 | | |
| Item 55 | 1 | | |
| Item 56 | 0 | | |
| Item 57 | 1 | | |
| Item 58 | 1 | | |
| Item 59 | 1 | | |
| *Item 60 | 1 | | |
| Item 61 | 1 | | |
| Item 62 | 1 | | |
| Item 63 | 1 | | |
| Item 64 | 1 | | |
| Item 65 | 1 | *(handwritten notes)* | |
| Item 66 | 1 | slip 2/3  y=2 | |
| Item 67 | 1 | 3 14 0 | |
| Item 68 | 1 | | |
| Item 69 | 1 | | |

Smith-0093

| Items | Raw Score | Verbatim Response(s) | Events |
|---|---|---|---|
| Item 70 | 1 | | |
| Item 71 | 1 | ~~I 4 5~~ 16 65 | |
| Item 72 | 1 | | |

WIAT-III Essay Composition

## Score

| Word Count | Paragraph Count | Transitions | Introduction | Conclusion | Reasons Why | Elaborations | G & M (optional) |
|---|---|---|---|---|---|---|---|
| 83 | 1 | 2 | 1 | 0 | 3 | 0 | 77 |

## Captured Responses

| Introduction Key Words | Conclusion Key Words | Acceptable Transitions | Reasons Why Reasons | Elaborations Responses |
|---|---|---|---|---|
| | | I. One<br>II. Another | | - |

WIAT-III Spelling

| Items | Raw Score | Skills Analysis | Events |
|---|---|---|---|
| Item 1 | 1 | | |
| Item 2 | 1 | | |
| Item 3 | 1 | | |
| Item 4 | 1 | | |
| Item 5 | 1 | | |
| Item 6 | 1 | | |
| Item 7 | 1 | | |
| Item 8 | 1 | | |
| Item 9 | 1 | | |
| Item 10 | 1 | | |
| Item 11 | 1 | | |
| Item 12 | 1 | | |
| Item 13 | 1 | | |
| Item 14 | 1 | | |
| Item 15 | 1 | | |
| Item 16 | 1 | | |
| Item 17 | 1 | | |

| Items | Raw Score | Skills Analysis | Events |
|-------|-----------|-----------------|--------|
| Item 18 | 1 | | |
| Item 19 | 1 | | |
| ➡ Item 20 | 1 | | |
| Item 21 | 1 | | |
| Item 22 | 1 | | |
| Item 23 | 1 | | |
| Item 24 | 1 | | |
| Item 25 | 1 | | |
| Item 26 | 1 | | |
| Item 27 | 1 | | |
| Item 28 | 1 | | |
| Item 29 | 1 | | |
| Item 30 | 1 | | |
| Item 31 | 1 | | |
| Item 32 | 1 | | |
| Item 33 | 1 | | |
| Item 34 | 1 | | |
| Item 35 | 1 | | |
| Item 36 | 1 | | |
| Item 37 | 1 | | |
| Item 38 | 1 | | |
| Item 39 | 1 | | |
| Item 40 | 1 | | |
| Item 41 | 1 | | |
| Item 42 | 1 | | |
| Item 43 | 0 | | |
| Item 44 | 1 | | |
| Item 45 | 0 | | |
| Item 46 | 1 | | |
| Item 47 | 1 | | |
| Item 48 | 1 | | |
| Item 49 | 1 | | |

Smith-0095

| Items | Raw Score | Skills Analysis | Events |
|---|---|---|---|
| Item 50 | 1 | | |
| Item 51 | 0 | | |
| Item 52 | 1 | | |
| Item 53 | 1 | | |
| Item 54 | 0 | | |
| Item 55 | 0 | | |
| Item 56 | 0 | | |
| Item 57 | 1 | | |
| Item 58 | 0 | | |
| Item 59 | 1 | | |
| Item 60 | 0 | | |
| Item 61 | 1 | | |
| Item 62 | 1 | | |
| Item 63 | 0 | | |

## WIAT-III Sentence Composition

**Sentence Combining**

| Items | Prereq. Score | S&G Score | Mech. Score | EC Score | S&G Errors | Mech. Errors | Events |
|---|---|---|---|---|---|---|---|
| Sentence Combining Sample A | | | | | | | |
| Sentence Combining Item 1. Cats... | Y | 2 | 2 | 1 | | | |
| Sentence Combining Item 2. The frog... | Y | 2 | 2 | 1 | | | |
| Sentence Combining Item 3. Mark... | Y | 2 | 2 | 1 | | | |
| Sentence Combining Item 4. Antonio... | Y | 1 | 2 | 0 | | | |
| Sentence Combining Item 5. Marci... | Y | 0 | 2 | 0 | | | |

**Sentence Building**

| Items | Prereq. Score | S&G Score | Mech. Score | S&G Errors | Mech. Errors | Events |
|---|---|---|---|---|---|---|

Appx1811

| Items | Prereq. Score | S&G Score | Mech. Score | S&G Errors | Mech. Errors | Events |
|---|---|---|---|---|---|---|
| Sentence Building Sample A. and | | | | | | |
| ➡ Sentence Building Item 1. the | Y | 2 | 2 | | | |
| Sentence Building Item 2. or | Y | 2 | 2 | | | |
| Sentence Building Item 3. until | Y | 1 | 2 | | | |
| Sentence Building Item 4. of | Y | 2 | 2 | | | |
| Sentence Building Item 5. an | Y | 2 | 2 | | | |
| Sentence Building Item 6. than | Y | 2 | 1 | | | |
| Sentence Building Item 7. as | Y | 2 | 2 | | | |

WIAT-III Reading Comprehension

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| The Frog: Item 1 | - | | |
| The Frog: Item 2 | - | | |
| The Frog: Item 3 | - | | |
| The Frog: Item 4 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Pet Day: Item 5 | - | | |
| Pet Day: Item 6 | - | | |
| Pet Day: Item 7 | - | | |
| Pet Day: Item 8 | - | | |
| Pet Day: Item 9 | - | | |
| Pet Day: Item 10 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Baobab Tree: Item 11 | - | | |

Appx1812

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Baobab Tree: Item 12 | - | | |
| Baobab Tree: Item 13 | - | | |
| Baobab Tree: Item 14 | - | | |
| Baobab Tree: Item 15 | - | | |
| Baobab Tree: Item 16 | - | | |
| Baobab Tree: Item 17 | - | | |
| Baobab Tree: Item 18 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Tidy Tamiko: Item 19 | - | | |
| Tidy Tamiko: Item 20 | - | | |
| Tidy Tamiko: Item 21 | - | | |
| Tidy Tamiko: Item 22 | - | | |
| Tidy Tamiko: Item 23 | - | | |
| Tidy Tamiko: Item 24 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Good Neighbors: Item 25 | - | | |
| Good Neighbors: Item 26 | - | | |
| Good Neighbors: Item 27 | - | | |
| Good Neighbors: Item 28 | - | | |
| Good Neighbors: Item 29 | - | | |
| Good Neighbors: Item 30 | - | | |
| Good Neighbors: Item 31 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Toontime Tees: Item 32 | - | | |
| Toontime Tees: Item 33 | - | | |
| Toontime Tees: Item 34 | - | | |
| Toontime Tees: Item 35 | - | | |
| Toontime Tees: Item 36 | - | | |
| Toontime Tees: Item 37 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Science Fun: Item 38 | - | | |
| Science Fun: Item 39 | - | | |

Smith-0098

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Science Fun: Item 40 | - | | |
| Science Fun: Item 41 | - | | |
| Science Fun: Item 42 | - | | |
| Science Fun: Item 43 | - | | |
| Science Fun: Item 44 | - | | |
| Science Fun: Item 45 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| How California Came to Be: Item 46 | - | | |
| How California Came to Be: Item 47 | - | | |
| How California Came to Be: Item 48 | - | | |
| How California Came to Be: Item 49 | - | | |
| How California Came to Be: Item 50 | - | | |
| How California Came to Be: Item 51 | - | | |
| How California Came to Be: Item 52 | - | | |
| How California Came to Be: Item 53 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Yukon Gold: Item 54 | - | | |
| Yukon Gold: Item 55 | - | | |
| Yukon Gold: Item 56 | - | | |
| Yukon Gold: Item 57 | - | | |
| Yukon Gold: Item 58 | - | | |
| Yukon Gold: Item 59 | - | | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Words of Wisdom: Item 60 | 2 | (They are) short<br>Easy to remember | |
| Words of Wisdom: Item 61 | 2 | Clay tablets | |
| Words of Wisdom: Item 62 | 1 | He wrote Poor Richard's Almanack | He wrote r l o T of p o o v e r b s |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Words of Wisdom: Item 63 | 1 | | sayings – commin says peoplu use |
| Words of Wisdom: Item 64 | 1 | "Garbage in, garbage out" | |
| Words of Wisdom: Item 65 | 2 | "Garbage in, garbage out" | |
| Words of Wisdom: Item 66 | 2 | "Human beings almost everywhere in the world have thought up and repeated proverbs" | |
| Words of Wisdom: Item 67 | 2 | The popularity of proverbs | Prover used a widely accept as True |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| Humpback Whales: Item 68 | 2 | Help save humpback whales | |
| Humpback Whales: Item 69 | 2 | Hunting / Whales hunted<br>Whales caught in fishing nets drown / starve | |
| Humpback Whales: Item 70 | 2 | The whales pull the fishing nets off the boat | |
| Humpback Whales: Item 71 | 2 | Bones<br>Fat | |
| Humpback Whales: Item 72 | 2 | Drown<br>Starve | |
| Humpback Whales: Item 73 | 1 | People were more active in their recovery | |
| Humpback Whales: Item 74 | 0 | | at one time<br>DK |
| Humpback Whales: Item 75 | 2 | They will recover | |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|

Smith-0100

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| City Zoo: Item 76 | 0 | | Cancellionseb have touncon hwl To inrrn Lole ontin iorcess. |
| City Zoo: Item 77 | 1 | Zoo patrons may start bringing their own snacks / Reduced concession sales | |
| City Zoo: Item 78 | 2 | Zoo attendance has dropped<br>Raising ticket prices leads to a drop in attendance | |
| City Zoo: Item 79 | 0 | | other forms of enterTainm— |
| City Zoo: Item 80 | 2 | | Didn'T show any thin Toshor Twis due To any otherbeb evanT? |

| Items | Raw Score | Response | Verbatim Response(s) |
|---|---|---|---|
| The Rock: Item 81 | 2 | A 20-foot escarpment / cliff<br>A clump of rocks | |
| The Rock: Item 82 | 2 | Fatigue | Cold |
| The Rock: Item 83 | 1 | They had already come so far | |
| The Rock: Item 84 | 1 | She realized there was only 5 feet to go | |

© Copyright 2012-2019 NCS Pearson, Inc. All rights reserved.
Licensing Agreement | Privacy Policy | Terms of Use | Business Associate Addendum

Smith-0101

WOODCOCK JOHNSON IV

# Tests of Achievement
## Standard and Extended Batteries

FORM **B**

Woodcock
Johnson IV

### Response Booklet

## Identifying Information

Last
Name _____

First
Name _____

Date _____

## Worksheet _____

DEFENDANT'S
EXHIBIT

**39**

1588302
Copyright © 2014 by The Riverside Publishing Company. All rights reserved.
7 8 9 10-LSC/O-20 19 18 17 16          Printed in U.S.A.

800.323.9540
www.wj-iv.com

**Houghton
Mifflin
Harcourt**

**Riverside**

Smith-0102

## Test 9  Sentence Reading Fluency

**Sample Items**

A. A cow is an animal. ................................ Ⓨ    N

B. A fish can read. ...................................... Y    Ⓝ

**Practice Exercise**

C. An apple is blue. ..................................... Y    Ⓝ

D. A wheel is round. ................................... Ⓨ    N

E. A man has two legs. ............................... Ⓨ    N

F. Ice is hot. .............................................. Y    Ⓝ



12

**Test Items**

1. Ants are small. ........................................ Ⓨ    N
2. Cats can eat. ........................................... Ⓨ    N
3. A mouse can fly. ...................................... Y    Ⓝ
4. Dogs have five legs. ................................. Y    Ⓝ
5. A ring is round. ....................................... Ⓨ    N
6. The sun is square. ................................... Y    Ⓝ
7. Orange juice is pink. ............................... Y    Ⓝ
8. A book has pages. ................................... Ⓨ    N
9. People have teeth. ................................... Ⓨ    N
10. Houses can be sold. ................................ Ⓨ    N
11. Some farmers grow corn. ........................ Ⓨ    N
12. Cats often ride bikes. ............................. Y    Ⓝ
13. An airplane has wings. ............................ Ⓨ    N
14. Most bikes have ten wheels. ................... Y    Ⓝ
15. A girl can jump rope. .............................. Ⓨ    N
16. A cup may be full. ................................... Ⓨ    N
17. A pen is for singing. ............................... Y    Ⓝ
18. You can eat an apple. .............................. Ⓨ    N
19. A sink can hold water. ............................ Ⓨ    N
20. The ocean has water. .............................. Ⓨ    N
21. Stories can have titles. ............................ Ⓨ    N
22. A car flies in the sky. .............................. Y    Ⓝ
23. Some days the sun is green. ................... Y    Ⓝ
24. A hen can lay an egg. .............................. Ⓨ    N

25. The moon is in the house. ....................... Y    Ⓝ
26. Dogs may fight with other dogs. ............ Ⓨ    N
27. A hat goes on your head. ........................ Ⓨ    N
28. Elephants are small animals. ................... Y    Ⓝ
29. Flies are bigger than horses. ................... Y    Ⓝ
30. A banana is to eat. .................................. Ⓨ    N
31. Zebras like to wear suspenders. .............. Y    Ⓝ
32. A dictionary has many words. ................. Ⓨ    N
33. An elevator goes to the moon. ................ Y    Ⓝ
34. A flower grows in the sky. ...................... Y    Ⓝ
35. All spiders have only two legs. ............... Y    Ⓝ
36. A broken pen may leak ink. .................... Ⓨ    N
37. A banker works in a kitchen. .................. Y    Ⓝ
38. A puppy grows into a cat. ....................... Y    Ⓝ
39. Some people wear coats in winter. ......... Ⓨ    N
40. Buildings can be made of wood. ............ Ⓨ    N
41. A baby may want a bottle. ...................... Ⓨ    N
42. A house can provide warm shelter. ........ Ⓨ    N
43. A car carries giraffes to work. ................ Y    Ⓝ
44. It is often foggy in stores. ...................... Y    Ⓝ
45. A bad decision can be reversed. ............. Ⓨ    N
46. Most clocks tell the daily
    temperature. ........................................... Y    Ⓝ
47. Children are all different ages. ............... Ⓨ    N

Go to the next page →

13

Smith-0104

Appx1819

48. A box may be made of wood. ...............(Y)    N

49. A frog may swim in a pond. ...............(Y)    N

50. A shoe is worn on your ear. ...............Y    (N)

51. A calendar has weeks and days. ...............(Y)    N

52. People can earn money by working. .......Y    N

53. Horses tend to live under water. ............Y    N

54. A carpet belongs on the ceiling. ............Y    N

55. A parrot may have colorful feathers. .......Y    N

56. A spoon can be used for eating. ..............Y    N

57. A faucet can drip in a sink. ....................Y    N

58. Many cats and dogs wear long pants. .....Y    N

59. Menus offer many choices of food. ........Y    N

60. A cook works every day in a bank. .........Y    N

61. April is the next month after July. ..........Y    N

62. An insect may live under a rock. .............Y    N

63. It may be hot inside an oven. .................Y    N

64. A giraffe has a very short neck. ...............Y    N

65. A fragile piece of china can break. ..........Y    N

66. The sun is smaller than an orange. .........Y    N

67. People like to eat rice with a pen. ...........Y    N

68. A picture can be hung on a wall. .............Y    N

69. A fork is needed to make your bed. .........Y    N

70. Shoes are often sold at used car lots. .......Y    N

71. A sports referee breaks all the rules. ........Y    N

72. People usually wear socks on their knees. ...............Y    N

73. Pencils are most useful for combing hair. ...............Y    N

74. A new magazine can have several articles. ...............Y    N

75. Pickles are usually found in a dishwasher. ...............Y    N

76. A broken pitcher may have several cracks. ...............Y    N

77. A person could become a concert pianist. ...............Y    N

78. Weather in summer is always snowy. ......Y    N

79. A roof is at the top of a house. ................Y    N

80. Cattle often go to school in a bus. ...........Y    N

81. Many people grow thick leaves on their heads. ...............Y    N

82. People can light a candle with a match. ...............Y    N

83. A grocery store sells many different car parts. ...............Y    N

84. Green leafy vegetables are bad for your health. ...............Y    N

85. Doctors spend most of their time in race cars. ...............Y    N

86. A key may open the lock on a door. ........Y    N

87. Some students write stories when they are in school. ...............Y    N

88. A pebble can be thrown across a small stream. ...............Y    N

**Go to the next page →**

14

**EXTENDED BATTERY**

## Test 15  Word Reading Fluency

**Sample Items**

A. pen       red       fox       pencil

B. ham       blue      green     toe

**Practice Exercise**

C. dog       shoe      car       puppy

D. tree      man       boy       blue

E. shoe      girl      can       sock

F. green     red       cat       two

24

Smith-0106

**Test Items**

1.  cat        red        dog        boy

2.  moon       sun        ten        bag

3.  moist      call       east       west

4.  kid        pan        six        boy

5.  mom        bag        dot        dad

6.  car        pen        red        yellow

7.  boy        sun        girl       four

8.  coin       candle     robber     dime

9.  hamburger  hotdog     cocoa      fingers

10. piano      trumpet    shadow     safety

11. fire       tiger      boot       lion

12. apple      ring       hat        banana

13. car        bus        sat        cut

14. Tom        ran        Rob        gas

31C
OY

Go to the next page →

25

Smith-0107

**Appx1822**

| 15. | fork | cap | car | spoon |
| 16. | rose | dime | candy | tulip |
| 17. | museum | gallery | cement | forest |
| 18. | coffee | hotel | tea | giraffe |
| 19. | panda | uncle | fire | aunt |
| 20. | sand | rug | carpet | handle |
| 21. | pan | shoe | pot | lamp |
| 22. | bed | gum | yes | no |
| 23. | mad | six | rat | mouse |
| 24. | run | jump | pig | top |
| 25. | three | two | box | hand |
| 26. | desk | milk | cream | rattle |
| 27. | eggs | father | mother | fence |
| 28. | snow | rain | towel | golf |
| 29. | lunch | grass | hotel | supper |
| 30. | bracelet | table | necklace | mansion |
| 31. | hand | bed | sky | arm |
| 32. | water | monkey | gorilla | stable |
| 33. | drum | blue | five | red |
| 34. | orange | grass | purple | tiger |
| 35. | tail | ship | boat | cloud |
| 36. | onion | union | radio | television |
| 37. | rain | penny | quarter | balloon |
| 38. | coat | jacket | queen | web |
| 39. | street | cow | clock | road |

| 40. | ocean | glasses | fence | lake |
| 41. | hello | pillow | goodbye | inside |
| 42. | salad | mountain | lettuce | guitar |
| 43. | fan | wallet | dark | purse |
| 44. | cook | vase | hand | flower |
| 45. | rug | ship | pet | dog |
| 46. | carrot | celery | three | moan |
| 47. | sandal | slipper | stairs | counter |
| 48. | winter | gate | water | summer |
| 49. | washcloth | table | airplane | towel |
| 50. | mad | hog | pig | tag |
| 51. | orange | paper | magnet | blue |
| 52. | phone | plane | pig | jet |
| 53. | shirt | tree | branch | drink |
| 54. | couch | candle | luggage | suitcase |
| 55. | bake | paper | home | house |
| 56. | zip | bat | ball | hug |
| 57. | radish | cabbage | catfish | fungus |
| 58. | book | cat | page | moon |
| 59. | sell | buy | read | ride |
| 60. | baseball | summer | spice | football |
| 61. | agenda | schedule | vehicle | icicle |
| 62. | lucky | seal | walrus | order |
| 63. | cloud | draw | write | gorilla |
| 64. | helmet | pellet | telescope | microscope |

Go to the next page →

26

Smith-0108

Gray Oral Reading Tests, Fifth Edition

# GORT-5

**Examiner Record Booklet**

## Form A

J. Lee Wiederholt    Brian R. Bryant



### Section 1. Identifying Information

Name _____

Female _____ Male _____ Grade _____

School _____

|  | Year | Month | Day |
|---|---|---|---|
| Date Tested | ___ | ___ | ___ |
| Date of Birth | ___ | ___ | ___ |
| Age* | ___ | ___ | ___ |

*When accessing the normative tables, use years and months. Do not round up.

Examiner's Name _____

Examiner's Title _____

### Section 2. Record of GORT-5 Scores

| Story # | Rate Score | | Accuracy Score | | Fluency Score | Comprehension Score |
|---|---|---|---|---|---|---|
| 1 | 4 | + | 5 | = | 9 | 4 |
| 2 | 4 | + | 5 | = | 8 | 3 |
| 3 | 4 | + | 5 | = | 8 | 5 |
| 4 | 3 | + | 5 | = | 8 | 4 |
| 5 | 3 | + | 5 | = | 8 | 4 |
| 6 | 4 | + | 5 | = | 9 | 4 |
| 7 | | + | 4 | = | 5 | 3 |
| 8 | 0 | + | | = | | 2 |
| 9 | 0 | + | 2 | = | 2 | 3 |
| 10 | 0 | + | | = | 2 | 3 |
| 11 | 0 | + | 2 | = | 2 | |
| 12 | | + | | = | | |
| 13 | | + | | = | | |
| 14 | | + | | = | | |
| 15 | | + | | = | | |
| 16 | | + | | = | | |
| Total Score | 23 | | 36 | | 59 | 30 |

### Section 3. Performance Summary

|  | Raw Total | Age Equivalent | Grade Equivalent | %ile Rank | Scaled Score | SEM | Descriptive Term |
|---|---|---|---|---|---|---|---|
| Rate | ___ | ___ | ___ | 1 | 3 For | 1 | _____ |
| Accuracy | ___ | ___ | ___ | 5 | 5 well | 1 | _____ |
| Fluency | ___ | ___ | ___ | 2 | 4 well | 1 | _____ |
| Comprehension | ___ | ___ | ___ | 1 | 3 For | 1 | _____ |

Sum of Scaled Scores    7

| Sum of Scaled Scores | Oral Reading %ile Rank | Oral Reading Index (ORI) | SEM | Descriptive Term |
|---|---|---|---|---|
| 7 | 1 | 65  For below | 3 | _____ |

### Section 4. Descriptive Terms Corresponding to Scaled and Index Scores

| Scaled Score | 1–3 | 4–5 | 6–7 | 8–12 | 13–14 | 15–16 | 17–20 |
|---|---|---|---|---|---|---|---|
| Descriptive Term | Very Poor | Poor | Below Average | Average | Above Average | Superior | Very Superior |
| Index Score | <70 | 70–79 | 80–89 | 90–110 | 111–120 | 121–130 | >130 |

© 2012, 2001, 1992, 1986, 1967 by PRO-ED, Inc.

1 2 3 4 5 6 7 8 9 10    20 19 18 17 16 15 14 13 12 11

DEFENDANT'S EXHIBIT
40

1

Smith-0123

## Form A—Story 1

Maximum words examiner can provide: 3

1   See Father.

2   Father is here.

3   We want to play.

4   Can you play, Mother?

5   We can play here.

Time (in seconds): _10_    Deviations from Print: _0_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|---|---|---|
| 1 | \ | Where do you think "here" is in the story? | Home; yard |
| 2 | l | Who is talking in this story? | Child |
| 3 |  | With whom did the child ask to play? | Mother; Mom |
| 4 |  | Who has just come home? | Father; Dad |
| 5 | 0 | What does the story say Father wanted to do? | Play Dy |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Time | > 49 | 34–49 | 18–33 | 13–17 | 9–12 | < 9 |
| Deviations from Print | > 5 | 5 | 3–4 | 2 | 1 | 0 |

Rate Score _4_    +    Accuracy Score _5_    =    Fluency Score [ ]

4

Smith-0124

## Form A—Story 2

**Maximum words examiner can provide: 8**

1    Our cat Mimi likes to sit on the roof.

2    Mimi goes up the tall tree by the house.

3    Then she jumps on the roof.

4    She sits and looks at birds.

5    But she always comes down when it is time to eat.

Time (in seconds): __23"__          Deviations from Print: __1__

## Comprehension Questions

| # | Score | Question | | Correct Response |
|---|-------|----------|--|------------------|
| 1 | 0 | Where does the cat sit in this story? | _Tree_ | On the roof; on top of the house |
| 2 | 1 | What is the cat's name in this story? | | Mimi |
| 3 | 0 | Why do you think the cat likes to sit on the roof? | _Could be...?_ | Likes to watch the birds |
| 4 | 1 | What one word in the story was used to describe the tree? | | Tall |
| 5 | 1 | Where is the tree in this story? | | By the house |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|----------------------|-----|--------|-------|-------|-------|-------|
| Time | > 119 | 67–119 | 52–66 | 36–51 | 22–35 | < 22 |
| Deviations from Print | > 11 | 8–11 | 6–7 | 3–5 | 2 | 0–1 |

Rate Score __4__  +  Accuracy Score __5__  =  Fluency Score ____

5

Smith-0125

## Form A—Story 3

**Maximum words examiner can provide: 10**

1    A man got out of the car.

2    He had a pretty box under his arm.

3    A little girl ran from the house to meet him.

4    *Hello* "Hello, Father," she said.

5    "Do you have a surprise for me?"    *good*

6    Father said, "I have something for a good girl."

7    The girl laughed, "I am very good."

Time (in seconds): _26"_          Deviations from Print: _2_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|---|---|---|
| 1 | / | What does the story say the man was holding? | Box |
| 2 | / | Who ran to meet the man? | Little girl; daughter |
| 3 | / | What did the man plan to do with the box? | Give it to the girl |
| 4 | / | What one word in the story was used to describe the box? | Pretty |
| 5 | / | What was one of the words used to describe the girl in this story? | Little; good |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Time | > 141 | 80–141 | 58–79 | 38–57 | 24–37 | < 24 |
| Deviations from Print | > 14 | 8–14 | 5–7 | 3–4 | 1–2 | 0 |

Rate Score [4]    +    Accuracy Score [4]    =    Fluency Score [ ]

6

Smith-0126

## Form A—Story 4

**Maximum words examiner can provide: 20**

1    Two girls went to a farm for a visit. There were cows, pigs, ducks, and

2    five hens. The girls gathered the eggs every morning. The farmer showed

3    the girls how to milk a cow. One girl said, "The milk looks good. But it will

4    be better after it's cold." Then the farmer showed them how to catch fish.

5    They also helped the farmer pick the fat ears of corn. The farmer said,

6    "Now you can see where we get our food."

Time (in seconds): 43"          Deviations from Print: 0

### Comprehension Questions

| # | Score | Question | Correct Response |
|---|---|---|---|
| 1 | 1 | Where does this story take place? | On a farm |
| 2 | 1 | Name two animals in this story; name only two. | *Only two from among:* cows, hens, pigs, ducks, fish |
| 3 | 0 | What two things did the farmer show the girls how to do? | Get milk from cow; catch fish  Corn |
| 4 | 1 | How many hens are in the story? | 5 |
| 5 | 1 | What one word was used to describe the corn? | Fat |

[ ]    Comprehension Score

### Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Time | > 83 | 62–83 | 52–61 | 43–51 | 36–42 | < 36 |
| Deviations from Print | > 6 | 6 | 5 | 3–4 | 2 | 0–1 |

Rate Score  3   +   Accuracy Score  5   =   Fluency Score  [ ]

7

Smith-0127

## Form A—Story 5

**Maximum words examiner can provide: 21**

1     A blue jay was perched on a limb looking for water. Having just flown

2     a great distance, she was very thirsty. At that moment she happened to

3     spot a water jar on the ground, so she flew down and tried to get a drink

4     from the jar. But there was so little water in the jar that she was unable to

5     drink. Just as she felt that she would surely die of thirst, an idea struck her.

6     The jay gathered a pile of stones and began dropping them in the jar. Little

7     by little the water rose, and at last the jay could drink her fill.

Time (in seconds): _____        Deviations from Print: _0_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 0 | **What is the main idea of this story?** *jay getting water* | Brains are often the key to survival; use problem-solving skills to get what is needed; never give up |
| 2 | 1 | **What is the primary challenge in this story?** | Bird getting water |
| 3 | 1 | **What one word would you use to describe how the jay felt throughout most of this story?** | Frustrated; <u>thirsty</u> |
| 4 | 0 | **How do you think the jay felt at the end of the story?** *Happy* | Proud of her idea; thirst quenched; relieved; satisfied |
| 5 | 1 | **Why couldn't the jay drink the water?** | Water was too low in the jar; not enough water |

[ ]     Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|----------------------|---|---|---|---|---|---|
| Time | >119 | 76–119 | 65–75 | 50–64 | 41–49 | <41 |
| Deviations from Print | >10 | 8–10 | 6–7 | 5 | 3–4 | 0–2 |

Rate Score [ 3 ]   +   Accuracy Score [ 5 ]   =   Fluency Score [   ]

8

## Form A—Story 6

**Maximum words examiner can provide: 20**

1    On an empty lot near the park, many people were hard at work.

2    Several boys were cleaning off the lot. They picked up old boards, trash,

3    and dry branches that covered the ground. Others cut the tall weeds and

4    carried them away. Then all the girls raked the ground smooth. At last a

5    group of parents arrived. They put up some swings and a seesaw, and

6    placed an old wooden boat beside a tree. Then they built a strong fence all

7    around the lot. Now the children had a safe playground that everyone in the

8    neighborhood had helped to make.

Time (in seconds): _____     Deviations from Print: __0__

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 1 | Why were the people proud at the end of the story? | They had helped build a new playground; children had a safe place to play |
| 2 | 0 | Who built the fence? | Parents; adults |
| 3 | 1 | Who helped by raking? | Girls |
| 4 | 1 | What were the boys in this story doing? | Clearing the lot; picking up |
| 5 | 1 | What two words were used to describe the boat in this story? | Old and wooden |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Time | > 225 | 129–225 | 100–128 | 60–99 | 48–59 | < 48 |
| Deviations from Print | > 19 | 12–19 | 9–11 | 5–8 | 3–4 | 0–2 |

Rate Score [4] + Accuracy Score [5] = Fluency Score [   ]

9

## Form A—Story 7

**Maximum words examiner can provide: 21**

1    The era of the cowboy came to an end as a result of changes in the

2    cattle business. When cows roamed the vast ranges of the Southwest,

3    the herd could not be rounded up without skilled riders on horseback. But with

4    the invention of barbed wire, great stretches of ranchland were fenced into

5    smaller ranches. Then the roundup was no longer a major event and cow-

6    boys became less important. The long trail drives to the north, in which

7    the cowboy's skill at herding cattle was essential, also became a thing of the

8    past. With the coming of the railroad, cattle could be shipped directly to

9    market.

Time (in seconds): _76_        Deviations from Print: _2_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 0 | The first sentence of this story gave a reason why the era of the cowboy had come to an end. What was that reason? | Result of changes in the cattle business |
| 2 | 1 | What did the story say was the route that the cattle were moving? | North |
| 3 | 1 | What did the story say was invented to limit great stretches of ranchland? | Barbed wire |
| 4 | 0 | What did the story say triggered a more efficient means to get cattle to their destination? | Coming of the railroad |
| 5 | 2 | Why were the cattle driven on trails in this story? | Get them to market |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|---|
| Time | > 106 | 70–106 | 57–69 | 46–56 | 39–45 | < 39 |
| Deviations from Print | > 10 | 8–10 | 6–7 | 4–5 | 2–3 | 0–1 |

Rate Score [1] + Accuracy Score [4] = Fluency Score

10

Smith-0130

## Form A—Story 8

**Maximum words examiner can provide: 26**

1    Many American farm workers have been aided by the efforts of a shy, patient man

2    named César Chávez. As a youth, César traveled from one farm to another picking crops

3    as they ripened. Since his family had no permanent home, César had attended thirty-

4    seven different schools by the time he reached the seventh grade. As he grew older, he

5    became increasingly concerned about the poverty and suffering of the farm workers. He

6    began speaking to groups of workers about their need for safer housing and better health

7    care. He convinced the grape pickers in California to join together and strike for better pay and

8    working conditions. A strong believer in nonviolence, he led many peaceful protest

9    marches and organized the first successful farm workers' union in the United States.

Time (in seconds): _____ 9 7 11 _____          Deviations from Print: _____ 5 _____

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 0 | What two words were used to describe the man in the first sentence of this story? | Shy and patient  DK |
| 2 | / | What crop did the workers gather in this story? | Grapes |
| 3 | 0 | According to the story, the main character's family had no . . . what? | Permanent home  money |
| 4 | / | What two things did the main character in this story tell the workers they needed? | Safer housing and better health care |
| 5 | / | How many schools did the main character attend by the time he was in the seventh grade? | 37 |

[  ]  Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|----------------------|---|---|---|---|---|---|
| Time | > 67 | 56–67 | 52–55 | 46–51 | 42–45 | < 42 |
| Deviations from Print | > 5 | 4–5 | 3 | 2 | 1 | 0 |

Rate Score [ 0 ]  +  Accuracy Score [ 1 ]  =  Fluency Score [   ]

11

Smith-0131

## Form A—Story 9

**Maximum words examiner can provide: 30**

1    The gale's fury began to intensify as Winnie lugged the splintered rowboat onto

2    the barren reef. Her younger brother had managed to stumble to shore through the churn-

3    ing surf, despite the gash on his leg and possibly a fractured wrist. His dim outline was

4    huddled against a heap of debris above the waterline—the dismal remnant of another ves-

5    sel that had met defeat near these treacherous shoals. With nightfall upon them, Winnie

6    bent her energy toward devising a refuge from the approaching downpour. If she could

7    conquer her fatigue and invert the battered hull, it would protect them until the storm had

8    run its course. She knew that eventually they would be missed and no doubt sought by a

9    patrol boat dispatched from the coast guard station in the vicinity. But Nat needed imme-

10   diate treatment, and daybreak seemed an eternity away. Just then a feeble beacon and

11   muffled drone emerged from the darkness.

Time (in seconds): _____1291_____        Deviations from Print: _____8_____

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 1 | What is the name of the lady in this story? | Winnie |
| 2 | 0 | What does the word *bent* mean in this story? | Applied; the way she used her energy DK |
| 3 | 0 | What one word would you use to describe the way the lady feels during her experience? | Exhausted; worried; determined; stressed |
| 4 | 0 | What does the lady intend to do with the boat? DK | Turn it upside down for shelter; use it as a refuge from the storm/rain/wind |
| 5 | 1 | Why is the lady worried? | Brother (Nat) needs medical attention; afraid Nat won't last the night |

Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|----------------------|-----|--------|-------|-------|-------|------|
| Time | > 114 | 95–114 | 82–94 | 66–81 | 56–65 | < 56 |
| Deviations from Print | > 13 | 10–13 | 8–9 | 5–7 | 2–4 | 0–1 |

Rate Score [0]  +  Accuracy Score [2]  =  Fluency Score [ ]

12

Smith-0132

## Form A—Story 10

**Maximum words examiner can provide: 29**

1    The entomologist had contemplated the hazards of working with this lethal strain of

2    honeybee. Imported from Africa, these bees were high-strung and aggressive, quick

3    to incite the entire colony when antagonized. Their excitability often provoked them to mass

4    attacks that resulted in fatalities. Yet they produced extravagant quantities of honey, some-

5    times double that of their more docile European cousins. By crossing African queens

6    with the local European drones, the entomologist planned to stimulate honey output. He had

7    taken precautions to prevent catastrophes by locating the experimental hives in a sparsely

8    populated area and erecting grids that curtailed the bees' range. But as the entomologist

9    detached a grid for a routine check of his wards, he absent-mindedly crushed a stray

10    worker. Instantaneously, the murmur from the hive was amplified. A few sentinels

11    emerged, pelting against his veil in admonition. Then the torrent broke. In a furor, the

12    swarm converged on their keeper.

Time (in seconds): _____ 172"    Deviations from Print: _13_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 1 | What explains the man's cautious behavior? | The bees are dangerous; the bees are aggressive; the bees are lethal |
| 2 | 1 | What is the experiment designed to do? | Increase honey production (among European bees); stimulate honey output |
| 3 | 0 | In this story, why did the insects become enraged? | Member of colony was killed; man crushed a worker |
| 4 | 0 | According to the story, aggressive insects sometimes doubled _____. | Honey production |
| 5 | 1 | Where were the aggressive insects imported from? | Africa |

[    ]    Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|---------------------|-----|--------|--------|-------|-------|------|
| Time | > 124 | 105–124 | 91–104 | 76–90 | 67–75 | < 67 |
| Deviations from Print | > 16 | 13–16 | 10–12 | 6–9 | 3–5 | 0–2 |

Rate Score [ 0 ]   +   Accuracy Score [ 1 ]   =   Fluency Score [    ]

13

Smith-0133

Appx1834

## Form A—Story 11

**Maximum words examiner can provide: 30**

1  There are sundry definitions of jazz, all of them vague. Their vagueness seems

2  imperative, however, if they are to accommodate the custom of jazz to appropriate every-

3  thing in sight. This receptivity to sources derives from a dominant feature of jazz: improvi-

4  sation. The emphasis on improvising entails an openness to the entire legacy of diverse

5  musical elements. Although formulating the content of jazz is not feasible, there is little dif-

6  ficulty in pinpointing the group that spawns the music. Jazz musicians have always con-

7  stituted a subculture of music, a cultish but scarcely organized body of instrumentalists

8  who rarely manage to eke out a livelihood from their music. Until recently they have been

9  unschooled in their chosen music, except as they have imitated recordings of other musi-

10  cians. Never accepted by academics, only partially accepted by the public, jazz musicians

11  comprise a closed community in which innovation and experimentation are more valued

12  than tradition.

Time (in seconds): _15'9"_     Deviations from Print: _9_

## Comprehension Questions

| # | Score | Question | Correct Response |
|---|-------|----------|------------------|
| 1 | 0 | What does the story state as to why jazz is difficult to define? | Tends to absorb other types of music; composed of different elements; jazz appropriates everything in sight |
| 2 | 1 | Why are jazz musicians probably less organized than other musicians? | Jazz is individualistic; no set rules; music is improvised |
| 3 | 0 | According to the last sentence of this story, what two elements do jazz musicians value more than tradition? | Innovation and experimentation |
| 4 | / | In the story, what one word described a dominant feature of jazz? | Improvisation |
| 5 | \ | According to this story, what group has never accepted jazz? | Academics |

[ ]  Comprehension Score

## Converting Time and Deviations from Print to Rate and Accuracy

| Rate/Accuracy Scores | 0 | 1 | 2 | 3 | 4 | 5 |
|----------------------|---|---|---|---|---|---|
| Time | > 120 | 96–120 | 83–95 | 71–82 | 62–70 | < 62 |
| Deviations from Print | > 14 | 10–14 | 8–9 | 5–7 | 3–4 | 0–2 |

Rate Score [ 0 ]  +  Accuracy Score [ 2 ]  =  Fluency Score [ ]

14

# TOMM Score Sheet: Trial 1

| | A | B | | | | A | B | |
|---|---|---|---|---|---|---|---|---|
| 1. | **spinning wheel** | cookie | ☑ | | 26. | T.V. | **light bulb** | ☑ |
| 2. | tent | **tissue box** | ☑ | | 27. | **maple leaf** | boat | ☑ |
| 3. | dustpan | **mouse** | ☑ | | 28. | crutch | **wrench** | ☑ |
| 4. | **quill pen** | teepee | ☑ | | 29. | hoe | **cake** | ☑ |
| 5. | birdbath | **can** | ☑ | | 30. | **key** | sock | ☑ |
| 6. | **suitcase** | comb | ☑ | | 31. | cloud | **rose** | ☐ |
| 7. | **pennant** | boat | | | 32. | **racket** | pencil | ☑ |
| 8. | gas pump | **musical notes** | ☑ | | 33. | corn | **ladder** | ☑ |
| 9. | ring | **guitar** | ☑ | | 34. | **wheelbarrow** | fire hydrant | ☑ |
| 10. | **hat** | Christmas tree | ☑ | | 35. | **whistle** | grapes | ☐ |
| 11. | **muffin pan** | train | | | 36. | toilet paper | **birdhouse** | ☑ |
| 12. | mailbox | **paintbrush** | ☑ | | 37. | **shopping cart** | teddy bear | ☑ |
| 13. | wheat | **axe** | ☑ | | 38. | cigarettes | **ice cream** | ☑ |
| 14. | **jack o' lantern** | coat hanger | ☑ | | 39. | **roller skates** | glue | ☑ |
| 15. | wallet | **scissors** | ☑ | | 40. | cherries | **umbrella** | ☑ |
| 16. | safety pin | **elephant** | ☑ | | 41. | **life preserver** | mountains | ☐ |
| 17. | **saw** | door | | | 42. | wheelchair | **stapler** | ☐ |
| 18. | **butterfly net** | lawn mower | ☐ | | 43. | **swing set** | bunk bed | ☑ |
| 19. | pullout bed | **candle** | ☑ | | 44. | soup ladle | **pail & shovel** | ☐ |
| 20. | **motorcycle** | knife | ☐ | | 45. | dice | **iron** | ☑ |
| 21. | fishing pole | **sewing machine** | ☑ | | 46. | **carrot** | book | ☑ |
| 22. | **jack-in-the-box** | rocking chair | ☐ | | 47. | drum | **dart** | ☑ |
| 23. | **bench** | fence | ☐ | | 48. | **paper clip** | bird cage | ☐ |
| 24. | screw | **stool** | ☑ | | 49. | **vest** | telescope | ☐ |
| 25. | **toaster** | bow & arrow | ☑ | | 50. | end table | **mask** | ☑ |

**TOTAL Correct for Trial 1 =** 42

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL: legaldept@mhs.com

DEFENDANT'S EXHIBIT 36

Smith-0059

# TOMM Score Sheet: Trial 2

| | A | B | | | A | B | |
|---|---|---|---|---|---|---|---|
| 1. | **scissors** | clock | ☑ | 26. | **vest** | baseball bat | ☐ |
| 2. | banana | **musical notes** | ☐ | 27. | string of pearls | **stapler** | ☐ |
| 3. | hobbyhorse | **tin can** | ☐ | 28. | window | **spinning wheel** | ☐ |
| 4. | **ice cream cone** | lock & key | ☐ | 29. | **iron** | lipstick | ☐ |
| 5. | **sewing machine** | bird feeder | ☐ | 30. | shoe | **butterfly net** | ☐ |
| 6. | chair | **toaster** | | 31. | notebook | **roller skate** | ☐ |
| 7. | **light bulb** | eggs | ☐ | 32. | **mouse** | pine cone | ☐ |
| 8. | **elephant** | batteries | ☐ | 33. | basketball net | **maple leaf** | ☐ |
| 9. | ceiling fan | **jack o' lantern** | | 34. | **stepladder** | filing cabinet | ☐ |
| 10. | **wrench** | ashtray | ☐ | 35. | felt marker | **candle** | ☐ |
| 11. | **suitcase** | spray bottle | | 36. | wishing well | **muffin pan** | ☐ |
| 12. | container | **saw** | ☐ | 37. | **hat** | mustard bottle | ☐ |
| 13. | **carrot** | chair & table | ☐ | 38. | **guitar** | hot dog on fork | ☐ |
| 14. | saltshaker | **birdhouse** | ☐ | 39. | telephone pole | **key** | ☐ |
| 15. | eyeglasses | **rose** | ☐ | 40. | **pennant** | bell | ☐ |
| 16. | clothespin | **motorcycle** | ☐ | 41. | hairbrush | **jack-in-the-box** | ☐ |
| 17. | **swing set** | needle & thread | ☐ | 42. | playing card | **life preserver** | ☐ |
| 18. | **racket** | light switch | ☐ | 43. | **tissue box** | stump | ☐ |
| 19. | knife | **pail & shovel** | ☐ | 44. | picnic basket | **dart** | ☐ |
| 20. | onion | **bench** | ☐ | 45. | **axe** | anchor | ☐ |
| 21. | lighter | **umbrella** | ☐ | 46. | fishhook | **paintbrush** | ☐ |
| 22. | **quill pen** | mirror | ☐ | 47. | **shopping cart** | sack | ☐ |
| 23. | **cake** | purse | ☐ | 48. | **wheelbarrow** | thermos | ☐ |
| 24. | fire | **paper clip** | ☐ | 49. | **mask** | cross | ☐ |
| 25. | **whistle** | bricks | ☑ | 50. | oven mitts | **stool** | ☐ |

## TOTAL Correct for Trial 2 = ☐ 50

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL: legaldept@mhs.com

Smith-0060

**Appx1837**

# TOMM Score Sheet: Retention Trial

| | A | B | | | A | B | |
|---|---|---|---|---|---|---|---|
| 1. | light socket | **wrench** | ☑ | 26. | **tissue box** | wagon | ☑ |
| 2. | **stapler** | fridge | ☑ | 27. | cheese | **dart** | ☑ |
| 3. | **jack-in-the-box** | gondola | ☑ | 28. | **rose** | shoe | ☑ |
| 4. | tree | **mask** | ☑ | 29. | coat | **shopping cart** | ☑ |
| 5. | **maple leaf** | peanuts | ☑ | 30. | **bench** | fence | ☑ |
| 6. | **jack o' lantern** | carton | ☑ | 31. | extension cord | **umbrella** | ☑ |
| 7. | mailbox | **carrot** | ☑ | 32. | milk | **wheelbarrow** | ☑ |
| 8. | skip rope | **light bulb** | ☑ | 33. | **can** | snowman | ☑ |
| 9. | **paintbrush** | candy | ☑ | 34. | zipper | **ice cream cone** | ☑ |
| 10. | **life preserver** | bird | ☑ | 35. | package | **motorcycle** | ☑ |
| 11. | **elephant** | lamp | ☑ | 36. | **muffin pan** | trophy | ☑ |
| 12. | water faucet | **musical notes** | ☑ | 37. | **swing set** | pipe | ☑ |
| 13. | loaf of bread | **scissors** | ☑ | 38. | diving board | **whistle** | ☑ |
| 14. | **stool** | cup | ☑ | 39. | **sewing machine** | necktie | ☑ |
| 15. | slingshot | **birdhouse** | ☑ | 40. | cane | **toaster** | ☑ |
| 16. | **butterfly net** | lighthouse | ☑ | 41. | **saw** | sign | ☑ |
| 17. | clown | **racket** | ☑ | 42. | **roller skates** | scales | ☑ |
| 18. | wagon | **pail & shovel** | ☑ | 43. | drill | **spinning wheel** | ☑ |
| 19. | **quill pen** | footstool | ☑ | 44. | **iron** | plant | ☑ |
| 20. | **cake** | dinner bell | ☑ | 45. | electric fan | **key** | ☑ |
| 21. | **candle** | church | ☑ | 46. | **pennant** | rolling pin | ☑ |
| 22. | windmill | **vest** | ☑ | 47. | phone | **mouse** | ☑ |
| 23. | **hat** | kite | ☑ | 48. | **suitcase** | needle | ☑ |
| 24. | airplane | **guitar** | ☑ | 49. | clipboard | **axe** | ☑ |
| 25. | **stepladder** | water fountain | ☑ | 50. | **paper clip** | scarf | ☑ |

## TOTAL Correct for Retention Trial = 50

THIS FORM CONTAINS A COPY PROTECTION FEATURE TO PREVENT UNAUTHORIZED REPRODUCTION. TO OBTAIN PERMISSION TO COPY EMAIL: legaldept@mhs.com

Smith-0061

## Underachievement and Learning Disabilities in Children Who Are Gifted

**By Steven G. Zecker, Ph.D.**
Associate Professor of Learning Disabilities Northwestern University

**Introduction:** Children who are classified as gifted are, by definition, highly intelligent individuals who fall at the upper end of the distribution of mental ability. Yet giftedness is not a guarantee of academic success. Consider that The National Commission on Excellence in Education (1983) reported that one half of gifted students do not achieve academically at a level that is commensurate with their ability. Surprisingly, between ten and twenty percent of high school dropouts test within the gifted range (Lajoie and Shore, 1981; Whitmore, 1980). Perhaps the most startling statistic in this regard is that 40 percent of those who graduate within the top 5% of their high school classes do not complete college. A number of famous historical figures who were clearly very intelligent (and who probably who have qualified as gifted) struggled considerably in school; these individuals later became highly successful in fields ranging from politics (Woodrow Wilson and Nelson Rockefeller) to science (Albert Einstein and Thomas Edison) to the arts (Auguste Rodin and Cher). There are many possible reasons for this lack of academic success among some of the gifted population. Environmental factors (both within the school and at home), emotional and affective issues, motivational difficulties, and other factors all can contribute to a lack of academic success in students whom would, by virtue of their high level of mental ability, be expected to be high achievers. Another important factor that can result in underachievement academically, and the one that I will be discussing in this article, is the presence of learning disabilities. It comes as a surprise to many people to hear that learning disabilities are as prevalent in the gifted population as in the general population, yet there is nothing in the definition of learning disabilities (or in their diagnosis) to preclude the gifted from this category. Rather, this misconception that gifted children cannot have learning disabilities is, I believe, rooted in the erroneous belief that learning disabilities are in some way restricted to those children who are less bright than average. In fact (as I will expand upon later), children with learning disabilities are by definition of at least average mental ability. Their problem is one of lowered achievement, not lowered ability. In this article I will discuss various definitions of learning disabilities, the diagnostic process, various manifestations of learning disabilities across the school-age range, and appropriate interventions for children with learning disabilities. I will also briefly discuss Attention-Deficit Hyperactivity Disorder (ADHD) which, while not a learning disability, often co-occurs with learning disabilities and also frequently manifests itself in ways that are quite similar to learning disabilities. While some of what I will say is characteristic of all children with learning disabilities, I will also attempt to highlight some issues that are particularly relevant to children within the gifted population who have learning disabilities.

**The Definition of Learning Disabilities:** The term learning disabilities was first coined in 1963 by Samuel Kirk, but many other terms that were used prior to this time to describe children with learning problems that are now termed learning disabilities. Formulating a single definition of learning disabilities that is acceptable to all professionals in the field has proven difficult. As a result, several definitions are commonly utilized; these differ to some degree but generally have the same essential characteristics. The most commonly used definition first appeared in Public Law 94-142, the Education for All Handicapped Children Act (Federal Register, 1977). It was also a part of Public Law 101-476, the 1990 Individuals with Disabilities Education Act (IDEA) and is also a component of the 1997 Amendments to IDEA, Public Law 105-17. It reads as follows: The term "specific learning disability" means those children who have a disorder in one or more of the basic psychological process involved in understanding or using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell or perform mathematical computations. The term includes such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia. The term does not include a learning problem which is primarily the result of visual, hearing, or motor handicaps, of mental retardation, of emotional disturbance, or environmental, cultural, or economic disadvantage (PL 105-17: Federal Register, 1997). This definition of learning disabilities (and associated features of the Federal law that contains it) is important for several reasons. First, it was designed to provide an operational definition of learning disabilities that can be used by professionals to diagnose learning disabilities in a consistent, reliable manner. Second, other aspects of the law provided legal safeguards to assure that children with learning disabilities were provided with appropriate accommodations to remediate their disabilities. Third, it provided a system of checks and balances under which parents of children with learning disabilities could appeal any decisions made about the services that their children would (or would not) receive. I will not go into a detailed discussion of all aspects of Federal Law as it relates to children with learning disabilities, but I do want to elaborate upon the basic components of the

definition provided above. There are multiple dimensions to the definition, each of which must be considered in determining whether a child should be diagnosed with learning disabilities. The following major concepts are essential parts of IDEA 1997: --The child must have a disorder in one or more of the basic psychological processes. These processes refer to cognitive abilities, among them memory (auditory and visual), perception (auditory and visual), intersensory integration (for example visual-auditory intersensory integration, the ability to associate a letter or letters with its appropriate sound(s)), attention, and motor skills, among many others. --The child must have difficulty in learning, manifesting itself in oral language (receptive or expressive), reading, writing, and/or mathematics. That is, their achievement is less than would be expected given their ability. --The learning problem is not attributable to being primarily due to other causes such as visual or auditory impairment, severe motor handicaps, low mental ability, emotional disturbance, or disadvantage due to economic situation, environment, or culture. In other words, there is no other logical explanation for the child's learning difficulties. --A significant discrepancy exists between the child's potential for learning (ability) and his or her actual achievement. That is, underachievement is evident. Be aware that different states and individual school districts differ in the size of the discrepancy that is needed for "significance". Also there are different methods for calculating a discrepancy that go beyond the scope of this article. Note that this definition excludes from the diagnosis of learning disabled many children who are not achieving at a level that is commensurate with their ability: those who possess low levels of mental ability and who would therefore not be expected to achieve at age- or grade-appropriate levels; those who have other problems that are adversely impacting learning (e.g., vision impairment, depression or anxiety, cerebral palsy, and those who have not had an adequate opportunity to learn, among others); and those whose discrepancy between ability and achievement is not large enough to be considered significant in the clinical sense. Also, there must be some explanation as to why the child is underachieving; this is obtained by establishing a connection between the area of underachievement (e.g., mathematics) and a psychological process known to underlie mathematical competency (e.g., auditory memory). This definition, or one quite similar to it, is used by the vast majority of school systems in the United States to qualify children for learning disability services. Consider this example of the implications of the diagnosis for gifted children. A boy, Lucas, with an intelligence quotient (IQ) of 140 (at the 99th percentile for his age) would be expected to achieve at a level that is commensurate with that ability (i.e., that is, at or near the 99th percentile). Let's say that Lucas is not achieving at this level in an area (reading). For the sake of this example, assume that Lucas' achievement on several reading decoding (word recognition) measures places him in the middle of the average range (i.e., a standard score of 100, corresponding to the 50th percentile). Despite the fact that Lucas is decoding at a grade appropriate level, by virtually any definition of a learning disability he is underachieving due to the significant mismatch between his ability and his achievement in reading. This points out an essential (and to many people, very confusing) feature of learning disabilities: among bright children, achievement at a level that is below grade level is not required for a diagnosis of learning disabilities to apply. In fact, if we were to change Lucas' decoding standard score to 110 (corresponding to the 75th percentile), he would still qualify for the diagnosis even though his decoding skills are above those of 75 per cent of his same-grade peers. This type of scenario occurs very often with gifted underachievers, and confusion about it almost certainly results in them often not receiving the diagnosis and associated appropriate services to which they are legally entitled. Thus, it is often the case that parents need to aggressively pursue testing for the gifted child, since teachers and school administrators frequently may believe that there is no need for an evaluation to be conducted (because the child is performing at grade level). In extreme cases, it may be necessary to seek the assistance of a special education advocate or attorney in order to convince a school district of the need for beginning the diagnostic process. Because evidence indicates that early intervention results in the best long-term prognosis, it is important to attempt to determine whether services are warranted when the child is as young as possible.

**The Evaluation Process:** Once a child is determined to qualify for testing, the evaluation process can begin. It is often a time consuming and labor intensive process. If the evaluation is being conducted by the child's school, often the first step in the process is a screening--the administration of a battery of tests that determine whether there appears to be a need for a more complete diagnostic evaluation to be conducted. Typically a screening requires no more than three to four hours of total testing time, and provides an estimate of the child's ability along with measures of the child's achievement in the relevant areas. If the decision to continue with a complete diagnostic evaluation is made, and additional five or more hours of testing will generally be conducted. These tests typically will provide a more precise measure of the child's ability, more achievement measures, and a much more detailed look at the processes underlying learning. Observations of the child's behavior during testing, an examination of his or her use of strategies in problem solving situations, and the child's attentional capacity are also important components of the diagnostic process. Furthermore, one or both parents will typically be interviewed to provide a detailed birth, medical, developmental, social, and academic history of the child. An interview with the child's classroom teacher and observation of the child in the classroom environment may also be included in the assessment process. The evaluation process can

Appx1840

often take weeks or even months to complete when conducted within the school setting. Frequently a child will be tested only for brief periods at a time (e.g., a class period), meaning that a large number of testing sessions are needed to complete the process. Despite the fact that Federal law guarantees each child the right to a timely evaluation to determine whether there is a need for services, it is often the case (especially with gifted children, since their difficulties may be masked by their brightness) that school personnel are reluctant to initiate the process. In this event, parents may need to step in and advocate as strongly as they can for an evaluation. A reminder to a school psychologist that Federal law is on the child's side in these matters may be necessary in order to get the assessment process started. Still, it may be the case that the district does not agree to conduct an evaluation; in this case, a parent's only remaining option may be to seek a private evaluation (at the parent's expense). Private evaluations are essentially the same as those conducted within the school setting, except that they can usually be completed in a more timely manner due to fewer scheduling issues. A number of different types of professionals conduct learning disabilities evaluations, including learning disabilities specialists, school psychologists, and clinical psychologists. These individuals may work in private practice, or in a university or hospital clinic setting. Be advised that because of the time-intensive nature, private evaluations are expensive; in the Chicago area, for example, the cost ranges from about $1000 to well over $2000. Insurance may pay for all or part of the cost of an evaluation; it is best to check with the company before beginning the process because different insurers have varying requirements for co-payment.

**Types of Learning Disabilities:** Learning disabilities affect anywhere from four to seven percent of school-age children (in 1995-1996, 5.5% of a school children in the United States received learning disabilities services (U.S. Department of Education, 1998)) and can manifest themselves in many different ways. Moreover, the ways in which a learning disability affects a child often change as the child progresses through school. This is in part due to the maturing child changing in the ways they process information and in part due to the changing demands of the school curriculum. The most common type of learning disability results in underachievement in reading (typically decoding), which also frequently results in written language difficulties (especially in spelling). Other children experience significant underachievement only in areas requiring mathematical calculation. Still others experience a combination of reading, writing, and mathematics difficulties. For some children, difficulties in oral language (receptive and or expressive) underlie their learning disability, while some children have intact oral language skills. **A relatively new category of learning disability, nonverbal learning disabilities, is being increasingly diagnosed. Children with nonverbal learning disabilities experience difficulties in areas such as motor skills, visual-spatial orientation, social relationships, organization, and aspects of mathematics, while they are often quite strong in areas requiring verbal abilities.** Gifted children with learning disabilities often experience difficulties that are qualitatively different than those experienced by their non-gifted learning disabled peers. By virtue of their high level of mental ability, they are often able to perform surprisingly well on tasks that allow them to utilize this strength. For example, a gifted child who is experiencing significant difficulties in decoding while reading may actually be capable of comprehending what is read deceptively well, since he or she is able to utilize strong conceptualization and reasoning skills and a rich fund of general knowledge to make sense out of the material. Unless this child is asked to read aloud, it might not even be apparent that there is a problem in the area of decoding. As another example, a gifted child with significant difficulties in arithmetic computation might possess good underlying mathematical concepts (e.g., a solid understanding of place value) and might also be able to apply this conceptual understanding to a variety of "everyday" mathematical activities such as time and money concepts, reading charts, tables and figures, and utilizing good estimation skills. Given that there is a large emphasis on computational skills (especially in the early grades), these areas of strength may go largely unrecognized. Often a learning disability is not "pure", in the sense that it can be neatly categorized as belonging to a particular category or subtype. Rather, frequently the manifestations of a child's learning disability include those typically seen in two or more subtypes. For example, many children experience underachievement in reading, written language, and mathematics. Furthermore, in a number of cases, children with learning disabilities also meet the criteria for additional, co-morbid, conditions. For example, affective difficulties (e.g., depression), anxiety, and attention-deficit hyperactivity disorder, among others, are commonly diagnosed in children with learning disabilities.

**What Are Appropriate Services, and What Can Parents Do to Assure that Their Children Receive Them:** There are many potential services that can be provided for children with learning disabilities. For most children with a diagnosis of learning disabilities, in-school services are provided one or more times per week. These services may be offered in a one-on-one manner in the child's classroom or in a resource room, or they may be administered in a small group setting. Typically in a small group setting the children are matched as closely as possible in terms of grade level and the nature of the disability. In more serious cases, the child may be placed in a self-contained classroom with other children who are all experiencing some type of learning or behavior problem. These self-

contained special education classrooms are generally becoming less common as school districts increasingly attempt to provide services in the regular classroom (a process known as 'inclusion' or 'mainstreaming'). Some children also receive remedial services from trained learning disabilities professionals during after-school hours. In some instances, these after-school services are provided in lieu of interventions within the school setting. Some parents (and children) prefer the after-school remediation, feeling that it may reduce the possible stigma that can accompany leaving the child's regular classroom for special services. (My own observations suggest that this fear is often unwarranted, and that most children experience minimal trauma as a result of leaving the classroom. Keep in mind that most classrooms have at least a few children who require special education services of some type). There are also activities that are remedial in nature that can be provided within the home environment. Among this type of treatment are a variety of computer software programs that aim to strengthen deficient processes underlying learning and thus enhance academic achievement. A variety of other materials are also available, although generally I advise against a parent trying to serve as a primary provider of an intervention. Successful professionals in the field have typically have had substantial post-graduate training, and it is unrealistic for a parent to expect to be able to provide the same quality of treatment that a professional can. Additionally, I have witnessed too many instances where the parent-child relationship was seriously eroded because of stressors introduced as a result of one or both parents trying to play the role of remediator as well as mother or father. Be advised that LD services are generally required for an extended period of time. It is generally unrealistic to expect significant improvement in achievement to occur as a result of a few weeks or months of intervention, no matter how appropriate and intensive this intervention might be. Although high intelligence generally is associated with a better prognosis for children with learning disabilities, the remedial process is still a time-consuming process. Typically diagnostic re-evaluations are conducted every two to three years to assess the change that has occurred and possibly identify new areas of remedial emphasis for the future. Communication is an important aspect of the remedial process. Those individuals who are working with the child (i.e., the classroom teacher, LD specialist within the school, private practitioner, and so on) should be in communication with each other on a regular basis to guarantee that the services being provided are appropriate and not overlapping to a significant degree. Parents should be assertive in stating their expectations regarding services. Keep in mind, special education services are costly and school districts are typically not eager to provide such services. Those parents who attend school staffings, maintain regular contact with school personnel, and indicate that they will be seeking the services to which they are entitled by law typically are more successful in receiving the appropriate interventions for their children. As I mentioned previously, it behooves parents to be aware of the rights that are guaranteed them under Federal law. In meeting with parents during conferences, I always stress the role of parental education. By that I mean that parents should take it upon themselves to learn as much as they can about the disabilities that their child possesses. While it is not realistic to become an expert in the field, there are many books, videotapes, and other materials available that are oriented towards increasing parents' understanding of learning disabilities and what can be done to appropriately service children with learning disabilities. Today, most national bookstore chains have entire sections devoted to special education in general and learning disabilities in particular, Many of these materials are oriented towards laypersons who lack professional training in the field. Additionally, professional organizations such as the Learning Disabilities Association of America (LDA) and the International Dyslexia Society (IDA) offer publications and hold national and regional meetings, with much of the content aimed at the parents of children with learning disabilities. There is also an organization, Parents of Gifted and Talented Learning-Disabled Children (301-986-1422), that is specifically oriented to provide information to parents of children who are "doubly exceptional". The Internet also can be a valuable source of information for many parents, although my personal experience has been that there is also considerable misinformation disseminated via the various forums that the Internet provides. In other words, let the consumer beware when "surfing the web".

**Attention Deficit Hyperactivity Disorder**: Approximately one-quarter to one-third of all children with learning disabilities also qualify for the diagnosis of attention deficit hyperactivity disorder (ADHD). Additionally, ADHD manifests itself in ways that are often difficult to distinguish from learning disabilities. As a result, most evaluations for learning disabilities will also include at least a consideration that ADHD is a viable diagnosis as well. ADHD manifests itself in several ways; the behaviors most commonly associated with ADHD include inattention, hyperactivity, and impulsivity. Under the current conceptualization of the disorder, some children display primarily hyperactive and impulsive symptoms, while others show mostly difficulties in focusing and maintaining attention. Still others with ADHD display a combination of hyperactive/impulsive and inattentive behaviors. ADHD does not in and of itself result in academic underachievement. However, like a learning disability, ADHD often results in children performing at a level that is below that at which they are capable. One of the hallmarks of the disorder is inconsistency in performance; that is, a child with ADHD may be able to perform at a high level on a particular task on one day, yet show a much poorer level of performance on an essentially identical task shortly thereafter. As a result of this inconsistent

performance, many children with ADHD are erroneously labeled as unmotivated, lazy or uncaring. Like children with learning disabilities, many children with ADHD possess a number of strengths; as with children with learning disabilities, these strengths often go unrecognized and/or underappreciated. Moreover, many of the characteristics of children with ADHD are compatible with giftedness: these children are often energetic, creative, and excel at tasks requiring divergent thinking. In fact, there have been suggestions that the high energy level and high intensity characteristic of gifted children may at times result in them be inappropriately diagnosed with ADHD, while their giftedness remains unrecognized. Furthermore, the ways in which ADHD manifests itself change as a child grows older. Typically, overactive and impulsive behaviors decrease in frequency with age, while organizational and time management problems and difficulties related to social interactions (especially with peers) become more prominent. Unlike with learning disabilities, a medical intervention for ADHD is effective in many cases. The most commonly used treatment, stimulant medication, is effective in reducing symptoms in a large majority of children who take it. Increasingly, other pharmacological treatments, including tricyclic antidepressants and antihypertensives, are being prescribed to children who either do nor respond to psychostimulants or who have adverse side effects (most commonly insomnia and decreased appetite) to them. There are also a variety of psychologically based treatments for ADHD as well. Substantial evidence exists to support the idea that the combination of a pharmacological and a psychological intervention provides greater symptom reduction than either type of treatment alone. Among common psychologically oriented treatments are behavior modification and metacognitive training. Behavior modification requires the establishment of a reward system (a 'token economy') to reinforce desired behaviors (which could range from 'getting homework done in a timely manner' to 'not interrupting conversations' to 'getting ready for school in the morning without reminders or assistance'). A well planned token economy is often necessary because children with ADHD have been found to be less sensitive than their non-ADHD peers to the typical reinforcement contingencies that are a part of everyday living. Rather, children with ADHD require reinforcement that is more powerful, more frequent, and more linked in time to the desired behavior than do their non-ADHD peers. While many parents feel that establishing a token economy in the home (or school) must be a fairly simple manner, my experience has shown quite clearly that they benefit greatly from the guidance of a trained professional (e.g., a psychologist or social worker) in establishing, adjusting, and maintaining such a plan. Metacognitive training is an intervention that focuses on getting the child to think about and analyze his or her behavior, with the goal of becoming capable of recognizing problematic situations and dealing with them in an appropriate manner. Metacognitive training is particularly well suited to children who are gifted, since success rates are best with those who are highly intelligent and possess good verbal skills. Again, there are professionals who specialize exclusively in this type of intervention.

**Summary:** As I have described, children who are gifted are as likely to have learning disabilities or attention-deficit hyperactivity disorder as any other children. Due to some of the characteristics of gifted children (most notably their high levels of intelligence), however, gifted children often are not identified as LD or ADHD as accurately or as early in their lives as their non-gifted peers. Early diagnosis and intervention is important in reducing the difficulties that gifted children with co-occurring learning disabilities and/or attention-deficit hyperactivity disorder experience in their academic, emotional, and social lives. Parents of children who are gifted need to be aware of the criteria for inclusion for LD or ADHD and may often be required to strongly advocate for their children so that they may receive the appropriate special education services to which they are entitled under Federal law.e for references

! 1999-2000 <u>Center for Talent Development</u>   (847) 491-3782

# DEPARTMENT OF JUSTICE

## Office of the Attorney General

## 28 CFR Parts 35 and 36

**[CRT Docket No. 124; AG Order No. 3702–2016]**

**RIN 1190–AA59**

## Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008

**AGENCY:** Civil Rights Division, Department of Justice.

**ACTION:** Final rule.

**SUMMARY:** The Department of Justice (Department) is issuing this final rule to amend its Americans with Disabilities Act (ADA) regulations in order to incorporate the statutory changes to the ADA set forth in the ADA Amendments Act of 2008 (ADA Amendments Act or the Act), which took effect on January 1, 2009. In response to earlier Supreme Court decisions that significantly narrowed the application of the definition of "disability" under the ADA, Congress enacted the ADA Amendments Act to restore the understanding that the definition of "disability" shall be broadly construed and applied without extensive analysis. Congress intended that the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their statutory obligations not to discriminate based on disability. In this final rule, the Department is adding new sections to its title II and title III ADA regulations to set forth the proper meaning and interpretation of the definition of "disability" and to make related changes required by the ADA Amendments Act in other sections of the regulations.

**DATES:** This rule will take effect October 11, 2016.

**FOR FURTHER INFORMATION CONTACT:** Rebecca Bond, Section Chief, Disability Rights Section, Civil Rights Division, U.S. Department of Justice, at (202) 307–0663 (voice or TTY); this is not a toll-free number. Information may also be obtained from the Department's toll-free ADA Information Line at (800) 514–0301 (voice) or (800) 514–0383 (TTY).

You may obtain copies of this final rule in an alternative format by calling the ADA Information Line at (800) 514–0301 (voice) and (800) 514–0383 (TTY). This final rule is also available on the ADA Home Page at *www.ada.gov.*

**SUPPLEMENTARY INFORMATION:** The meaning and interpretation of the

definitions of "disability" in the title II and title III regulations are identical, and the preamble will discuss the revisions to both regulations concurrently. Because the ADA Amendments Act's revisions to the ADA have been codified into the U.S. Code, the final rule references the revised U.S. Code provisions except in those cases where the reference is to the Findings and Purposes of the ADA Amendments Act, in which case the citation is to section 2 of Public Law 110–325, September 25, 2008.[1]

This final rule was submitted to the Office of Management and Budget's (OMB) Office of Information and Regulatory Affairs for review prior to publication in the **Federal Register**.

## I. Executive Summary

### Purpose

This rule is necessary in order to incorporate the ADA Amendments Act's changes to titles II (nondiscrimination in State and local government services) and III (nondiscrimination by public accommodations and commercial facilities) of the ADA into the Department's ADA regulations and to provide additional guidance on how to apply those changes.

### Legal Authority

The ADA Amendments Act was signed into law by President George W. Bush on September 25, 2008, with a statutory effective date of January 1, 2009. Public Law 110–325, sec. 8, 122 Stat. 3553, 3559 (2008). The Act authorizes the Attorney General to issue regulations under title II and title III of the ADA to implement sections 3 and 4 of the Act, including the rules of construction set forth in section 3. 42 U.S.C. 12205a.

### Summary of Key Provisions of the Act and Rule

The ADA Amendments Act made important changes to the meaning and interpretation of the term "disability" in the ADA in order to effectuate Congress's intent to restore the broad scope of the ADA by making it easier for an individual to establish that he or she has a disability. *See* Public Law 110–325, sec. 2(a)(3)–(7). The Department is making several major revisions to the meaning and interpretation of the term "disability" contained in the title II and title III ADA regulations in order to implement the ADA Amendments Act. These regulatory revisions are based on

specific provisions in the ADA Amendments Act or on specific language in the legislative history. The revised language clarifies that the term "disability" shall be interpreted broadly and explains that the primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations not to discriminate based on disability and that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis. The revised regulations expand the definition of "major life activities" by providing a non-exhaustive list of major life activities that specifically includes the operation of major bodily functions. The revisions also add rules of construction to be applied when determining whether an impairment substantially limits a major life activity. These rules of construction state the following:

—That the term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA;

—that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population;

—that the primary issue in a case brought under the ADA should be whether an entity covered under the ADA has complied with its obligations and whether discrimination has occurred, not the extent to which the individual's impairment substantially limits a major life activity;

—that in making the individualized assessment required by the ADA, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADA Amendments Act;

—that the comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence;

—that the ameliorative effects of mitigating measures other than "ordinary eyeglasses or contact lenses" shall not be considered in assessing whether an individual has a "disability";

—that an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active; and

[1] The Findings and Purposes of the ADA Amendments Act are also referenced in the codification of the ADA as a note to 42 U.S.C. 12101.

—that an impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment. The final rule also states that an individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to a prohibited action because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity. It also provides that individuals covered only under the "regarded as" prong are not entitled to reasonable modifications.

The ADA Amendments Act's revisions to the ADA apply to title I (employment), title II (State and local governments), and title III (public accommodations) of the ADA. Accordingly, consistent with Executive Order 13563's instruction to agencies to coordinate rules across agencies and harmonize regulatory requirements, the Department has adopted, where appropriate, regulatory language that is identical to the revisions to the Equal Employment Opportunity Commission's (EEOC) title I regulations implementing the ADA Amendments Act. *See* 76 FR 16978 (Mar. 25, 2011). This will promote consistency in the application of the ADA and avoid confusion among entities subject to both titles I and II, as well as those subject to both titles I and III.

*Changes Made From the Proposed Rule*

The final rule retains nearly all of the proposed regulatory text, although some sections were reorganized and renumbered. The section-by-section analysis in appendix C to part 35 and appendix E to part 36 responds to comments and provides additional interpretive guidance on particular provisions. The revisions to the regulatory text, which include substantive changes in response to comments, include the following:

• Added Attention-Deficit/ Hyperactivity Disorder (ADHD) as an example of a physical or mental impairment in §§ 35.108(b)(2) and 36.105(b)(2).

• Added "writing" as an example of a major life activity in §§ 35.108(c) and 36.105(c).

• Revised the discussion of the "regarded as prong" in §§ 35.108(f) and 36.105(f) to clarify that the burden is on a covered entity to establish that, objectively, an impairment is "transitory and minor" and therefore not covered by the ADA.

• Modified the rules of construction to make them more consistent with the statute and to provide more clarity, including §§ 35.108(a)(2) and 36.105(a)(2), 35.108(c)(2) and 36.105(c)(2), and 35.108(d)(1) and 36.105(d)(1).

• Revised or added several provisions to more closely conform to the EEOC regulation.

## II. Summary of Regulatory Assessment

As noted above, Congress enacted the ADA Amendments Act in 2008 to ensure that persons with disabilities who were denied coverage previously under the ADA would again be able to rely on the protections of the ADA. As a result, the Department believes that the enactment of the law benefits millions of Americans, and that the benefits to many of these individuals are non-quantifiable, but nonetheless significant. This rule incorporates into the Department's titles II and III regulations the changes made by the ADA Amendments Act. In accordance with OMB Circular A–4, the Department estimates the costs and benefits of this proposed rule using a pre-ADA Amendments Act baseline. Thus, the effects that are estimated in this analysis are due to statutory mandates that are not under the Department's discretion. The Department has determined that the costs of this rule do not reach $100 million in any single year, and thus it is not an economically significant rule.

In the Initial Regulatory Assessment (Initial RA), the analysis focused on estimating costs for processing and providing reasonable modifications and testing accommodations [2] to individuals with learning disabilities and ADHD [3]

[2] For ease of reference for purposes of the discussion of costs in the Regulatory Assessment, the Department will use the term "accommodations" to reference the provision of extra time, whether it is requested as a reasonable modification pursuant to 28 CFR 35.130(b)(7) and 28 CFR 36.302, or as a testing accommodation (modifications, accommodations, or auxiliary aids and services) provided pursuant to 42 U.S.C. 12189 and 28 CFR 36.309. The Department wishes to preserve the legal distinction between these two terms in its guidance on the requirements of the ADA Amendments Act so it will use both terms where appropriate in the Section by Section Analysis and Guidance.

[3] The Department is using the term ADHD in the same manner as it is currently used in the Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM–5), to refer to three different presentations of symptoms: predominantly inattentive (which was previously known as "attention deficit disorder); predominantly hyperactive or impulsive; or a combined presentation of inattention and hyperactivity-impulsivity. The DSM–5 is the most recent edition of a widely-used manual designed to assist clinicians and researchers in assessing mental disorders. *See Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition DSM-5,* American Psychiatric Association, at 59–66 (2013).

for extra time on exams as a direct result of the ADA Amendments Act. Although the Department's analysis focused only on these specific costs, the Department recognized that the ADA Amendments Act extends coverage to people with the full range of disabilities, and the accommodation of those individuals might entail some economic costs. After review of the comments, and based on the Department's own research, the Department has determined, however, that the above-referenced exam costs represent the only category of measurable compliance costs that the ADA Amendments Act will impose and the Department was able to assess. While other ADA Amendments Act compliance costs might also ensue, the Department has not been able to specifically identify and measure these potential costs. The Department believes, however, that any other potential costs directly resulting from the ADA Amendments Act will likely be minimal and have little impact on the overall results of this analysis.

The data used to support the estimates in this Final Regulatory Assessment (Final RA) focus on (1) the increase in the number of postsecondary students or national examination test takers requesting and receiving accommodations—specifically, requests for extra time on exams—as a result of the changes made to the ADA by the ADA Amendments Act; and (2) the actual cost of these additional accommodations, which involves costs of providing staff with the training on the changes made to the ADA by the ADA Amendments Act, administrative costs to process the additional accommodation requests made as a direct result of the ADA Amendments Act, and the costs of additional proctor time needed for these additional accommodation requests. For both postsecondary institutions and national testing entities, costs are broken down into three components:

• One-time cost of training staff on relevant impact of ADA Amendments Act;

• Annual cost of processing additional accommodation requests for extra exam time made as a direct result of the ADA Amendments Act; and

• Annual cost of proctoring additional time on exams as a direct result of the ADA. Amendments Act.

Based on the Department's calculations, total costs to society for implementing the revisions to the ADA Amendments Act range from $31.4 million to $47.1 million in the first year. The first year of costs will be higher than all subsequent years because the first year includes the one-time costs of

training. Note that even the high end of this first-year cost range is well within the $100 million mark that signifies an "economically significant" regulation. The breakdown of total costs by entity is provided in the table below.

### TOTAL COSTS FIRST YEAR (2016), PRIMARY ANALYSIS

| Cost category | Low value | Med value | High value |
|---|---|---|---|
| Postsecondary Institutions: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Exam Time | $12.8 | $18.0 | $23.1 |
| Postsecondary Institutions: ONE–TIME Cost for Additional Training at Institutions | 9.9 | 9.9 | 9.9 |
| National Exams: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Exam Time | 6.8 | 9.5 | 12.2 |
| National Exams: ONE–TIME Cost for Additional Training at Institutions | 1.9 | 1.9 | 1.9 |
| Total | 31.4 | 39.3 | 47.1 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Taking these costs over the next 10 years and discounting to present value terms at a rate of 7 percent, the total costs of implementing this final rule are approximately $214.2 million over 10 years, as shown in the table below.

### TOTAL COSTS OVER 10 YEARS, PRIMARY ANALYSIS

| Total discounted value ($ millions) | Annualized estimate ($ millions) | Year dollar | Discount rate (percent) | Period covered |
|---|---|---|---|---|
| $214.2 | $28.6 | 2015 | 7 | 2016–2025 |
| 243.6 | 26.3 | 2015 | 3 | 2016–2025 |

## III. Background

The ADA Amendments Act was signed into law by President George W. Bush on September 25, 2008, with a statutory effective date of January 1, 2009. Public Law 110–325, sec. 8. As with other civil rights laws, individuals seeking protection in court under the anti-discrimination provisions of the ADA generally must allege and prove that they are members of the "protected class." Under the ADA, this typically means they have to show that they meet the statutory definition of being an "individual with a disability." *See* 154 Cong. Rec. S8840–44 (daily ed. Sept. 16, 2008) (Statement of the Managers); *see also* H.R. Rep. No. 110–730, pt. 2, at 6 (2008) (House Committee on the Judiciary). Congress did not intend, however, for the threshold question of disability to be used as a means of excluding individuals from coverage. H.R. Rep. No. 110–730, pt. 2, at 5 (2008).

In the original ADA, Congress defined "disability" as (1) a physical or mental impairment that substantially limits one or more major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. 12202(1). Congress patterned this three-part definition of "disability"—the "actual," "record of," and "regarded as" prongs—after the definition of "handicap" found in the Rehabilitation Act of 1973. *See* H.R. Rep. No. 110–730, pt. 2, at 6 (2008). By doing so, Congress intended that the relevant case law

developed under the Rehabilitation Act would be generally applicable to the term "disability" as used in the ADA. H.R. Rep. No. 101–485, pt. 3, at 27 (1990); *see also* S. Rep. No. 101–116, at 21 (1989); H.R. Rep. No. 101–485, pt. 2, at 50 (1990). Congress expected that the definition of "disability" and related terms, such as "substantially limits" and "major life activity," would be interpreted under the ADA "consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act"—*i.e.*, expansively and in favor of broad coverage. Public Law 110–325, sec. 2(a)(1)–(8) and (b)(1)–(6); *see also* 154 Cong. Rec. S8840 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("When Congress passed the ADA in 1990, it adopted the functional definition of disability from . . . Section 504 of the Rehabilitation Act of 1973, in part, because after 17 years of development through case law the requirements of the definition were well understood. Within this framework, with its generous and inclusive definition of disability, courts treated the determination of disability as a threshold issue but focused primarily on whether unlawful discrimination had occurred."); H.R. Rep. No. 110–730, pt. 2, at 5 & n.6 (2008) (noting that courts had interpreted the Rehabilitation Act definition "broadly to include persons with a wide range of physical and mental impairments").

That expectation was not fulfilled. Public Law 110–325, sec. 2(a)(3). The holdings of several Supreme Court cases sharply narrowed the broad scope of protection Congress originally intended under the ADA, thus eliminating protection for many individuals whom Congress intended to protect. *Id.* sec. 2(a)(4)–(7). For example, in *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471, 482 (1999), the Court ruled that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures. In *Sutton*, the Court also adopted a restrictive reading of the meaning of being "regarded as" disabled under the ADA's definition of "disability." *Id.* at 489–94. Subsequently, in *Toyota Motor Manufacturing, Kentucky, Inc.* v. *Williams*, 534 U.S. 184 (2002), the Court held that the terms "substantially" and "major" in the definition of "disability" "need to be interpreted strictly to create a demanding standard for qualifying as disabled" under the ADA, *id.* at 197, and that to be substantially limited in performing a major life activity under the ADA, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198.

As a result of these Supreme Court decisions, lower courts ruled in numerous cases that individuals with a range of substantially limiting impairments were not individuals with

disabilities, and thus not protected by the ADA. *See* 154 Cong. Rec. S8840 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("After the Court's decisions in *Sutton* that impairments must be considered in their mitigated state and in *Toyota* that there must be a demanding standard for qualifying as disabled, lower courts more often found that an individual's impairment did not constitute a disability. As a result, in too many cases, courts would never reach the question whether discrimination had occurred."). Congress concluded that these rulings imposed a greater degree of limitation and expressed a higher standard than it had originally intended, and unduly precluded many individuals from being covered under the ADA. *Id.* at S8840–41 ("Thus, some 18 years later we are faced with a situation in which physical or mental impairments that would previously have been found to constitute disabilities are not considered disabilities under the Supreme Court's narrower standard" and "[t]he resulting court decisions contribute to a legal environment in which individuals must demonstrate an inappropriately high degree of functional limitation in order to be protected from discrimination under the ADA.").

Consequently, Congress amended the ADA with the Americans with Disabilities Act Amendments Act of 2008. This legislation is the product of extensive bipartisan efforts, and the culmination of collaboration and coordination between legislators and stakeholders, including representatives of the disability, business, and education communities. *See* 154 Cong. Rec. H8294–96 (daily ed. Sept. 17, 2008) (joint statement of Reps. Steny Hoyer and Jim Sensenbrenner); *see also* 154 Cong. Rec. S8840–44 (daily ed. Sept. 16, 2008) (Statement of the Managers).

The ADA Amendments Act modified the ADA by adding a new "findings and purposes" section focusing exclusively on the restoration of Congress's intent in the ADA to broadly interpret the term "disability" to ensure expansive coverage. These new ADA Amendments Act-specific findings and purposes are meant to restore a broad scope of protection under the ADA by providing clear and enforceable standards that support the mandate to eliminate discrimination against people with disabilities. The "purposes" provisions specifically address the Supreme Court decisions that narrowed the interpretation of the term "disability," rejecting the *Toyota* strict interpretation of the terms "major" and "substantially;" the *Sutton* requirement that ameliorative mitigating measures

must be considered when evaluating whether an impairment substantially limits a major life activity; and the narrowing of the third, "regarded as" prong of the definition of "disability" in *Sutton* and *School Board of Nassau County* v. *Arline*, 480 U.S. 273 (1987). In addition, the ADA Amendments Act specifically rejects the EEOC's interpretation of "substantially limited" as meaning "significantly restricted," noting that it is too demanding of a standard. *See* Public Law 110–325 sec. 2(b).

The findings and purposes section of the ADA Amendments Act "gives clear guidance to the courts and . . . [is] intend[ed] to be applied appropriately and consistently." 154 Cong. Rec. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers). The Department has amended its regulations to reflect the ADA Amendments Act, including its findings and purposes.

## IV. Summary of the ADA Amendments Act of 2008

The ADA Amendments Act restores the broad application of the ADA by revising the ADA's "Findings and Purposes" section, expanding the statutory language regarding the meaning and interpretation of the definition of "disability," providing specific rules of construction for interpreting that definition, and expressly superseding the standards enunciated by the Supreme Court in *Sutton* and *Toyota* and their progeny.

First, the ADA Amendments Act deletes two findings that were in the ADA: (1) That "some 43,000,000 Americans have one or more physical or mental disabilities," and (2) that "individuals with disabilities are a discrete and insular minority." 154 Cong. Rec. S8840 (daily ed. Sept. 16, 2008) (Statement of the Managers); *see also* Public Law 110–325, sec. 3. As explained in the Senate Statement of the Managers, "[t]he [Supreme] Court treated these findings as limitations on how it construed other provisions of the ADA. This conclusion had the effect of interfering with previous judicial precedents holding that, like other civil rights statutes, the ADA must be construed broadly to effectuate its remedial purpose. Deleting these findings removes this barrier to construing and applying the definition of disability more generously." 154 Cong. Rec. S8840 (daily ed. Sept. 16, 2008) (Statement of the Managers).

Second, the ADA as amended clarifies Congress's intent that the definition of "disability" "shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent

permitted by the terms of this chapter." 42 U.S.C. 12102(4)(A).

Third, the ADA as amended provides an expanded definition of what may constitute a "major life activity," within the meaning of the ADA. 42 U.S.C. 12102(2). The statute provides a non-exhaustive list of major life activities and specifically expands the category of major life activities to include the operation of major bodily functions. *Id.*

Fourth, although the amended statute retains the term "substantially limits" from the original ADA definition, Congress set forth rules of construction applicable to the meaning of substantially limited that make clear that the term must be interpreted far more broadly than in *Toyota*. 42 U.S.C. 12102(4); *see also* Public Law 110–325, sec. 2(b)(5). Congress was specifically concerned that lower courts had applied *Toyota* in a way that "created an inappropriately high level of limitation necessary to obtain coverage under the ADA." Public Law 110–325, sec. 2(b)(5). Congress sought to convey that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.*

Fifth, the ADA as amended prohibits consideration of the ameliorative effects of mitigating measures such as medication, assistive technology, or reasonable modifications when determining whether an impairment constitutes a disability. 42 U.S.C. 12102(4)(E)(i). Congress added this provision to address the Supreme Court's holdings that the ameliorative effects of mitigating measures must be considered in determining whether an impairment substantially limits a major life activity. Public Law 110–325, sec. 2(b)(2). The ADA as amended also provides that impairments that are episodic or in remission are disabilities if they would substantially limit a major life activity when active. 42 U.S.C. 12102(4)(D).

Sixth, the ADA as amended makes clear that, despite confusion on the subject in some court decisions, the "regarded as" prong of the disability definition does not require the individual to demonstrate that he or she has, or is perceived to have, an impairment that substantially limits a major life activity. 42 U.S.C. 12102(3). With this clarifying language, an individual can once again establish coverage under the law by showing that he or she has been subjected to an action prohibited under the Act because

of an actual or perceived physical or mental impairment. The ADA Amendments Act also clarifies that entities covered by the ADA are not required to provide reasonable modifications to policies, practices, or procedures for individuals who fall solely under the regarded as prong. 42 U.S.C. 12201(h).

Finally, the ADA as amended gives the Attorney General explicit authority to issue regulations implementing the definition of "disability." 42 U.S.C. 12205a.

## V. Background on This Rulemaking and Public Comments Received

The Department published its Notice of Proposed Rulemaking (NPRM) proposing to amend its title II and title III ADA regulations in the **Federal Register** on January 30, 2014. 79 FR 4839 (Jan. 30, 2014). The comment period closed on March 31, 2014. The Department received a total of 53 comments on the NPRM from organizations representing persons with disabilities, organizations representing educational institutions and testing entities, individual academics, and other private individuals. The Section-by-Section analysis in the appendix to this rule addresses the comments related to specific regulatory language proposed in the NPRM.

Many commenters on the NPRM noted the value of the regulation to people with disabilities while a number of commenters on the Department's NPRM expressed concern that the Department's regulatory assessment unduly focused on individuals with learning disabilities who sought accommodations in testing or educational situations. These commenters asserted that the Department's discussion of the potential costs for testing entities or educational entities of complying with the ADA Amendments Act and this rule could be misunderstood to mean that the Department believed the changes in the definition of "disability" did not have an impact on individuals with other types of disabilities.

As discussed in the regulatory assessment, the Department believes that persons with all types of impairments, including, but not limited to, those enumerated in §§ 35.108(b) and 36.105(b), will benefit from the ability to establish coverage under the ADA as amended, and will therefore be able to challenge the denial of access to goods, services, programs, or benefits based on the existence of a disability. The Department's regulatory assessment is not a statement about the coverage of the ADA. Rather, it is a discussion of

identifiable incremental costs that may arise as a result of compliance with the ADA Amendments Act and these implementing regulations. As explained in the regulatory assessment and under Section VII.A below, the Department believes that those costs are limited primarily to the context of providing reasonable modifications in higher education and testing accommodations by testing entities.

## VI. Relationship of This Regulation to Revisions to the Equal Employment Opportunity Commission's ADA Title I Regulation Implementing the ADA Amendments Act of 2008

The EEOC is responsible for regulations implementing title I of the ADA addressing employment discrimination based on disability. On March 25, 2011, the EEOC published its final rule revising its title I regulation to implement the revisions to the ADA contained in the ADA Amendments Act. 76 FR 16978 (Mar. 25, 2011).[4]

Because the ADA's definition of "disability" applies to title I as well as titles II and III of the ADA, the Department has made every effort to ensure that its proposed revisions to the title II and III regulations are consistent with the provisions of the EEOC final rule. Consistency among the title I, title II, and title III rules will promote consistent application of the requirements of the ADA Amendments Act, regardless of the Federal agency responsible for enforcement or the ADA title that is enforced. Further, because most entities subject to either title II or title III are also subject to title I with respect to employment, they should already be familiar with the revisions to the definition of "disability" in the 4-year-old EEOC revised regulation. Differences in language between the title I rules and the Department's title II and title III rules are noted in the Section-by-Section analysis and are generally attributable to structural differences between the title I rule and the title II and III rules or to the fact that certain sections of the EEOC rule deal with employment-specific issues.

---

[4] On September 23, 2009, the EEOC published its NPRM in the **Federal Register** proposing revisions to the title I definition of "disability." *See* 74 FR 48431. The EEOC received and reviewed more than 600 public comments in response to its NRPM. In addition, the EEOC and the Department held four joint "Town Hall Listening Sessions" throughout the United States and heard testimony from more than 60 individuals and representatives of the business/employer industry and the disability advocacy community.

## VII. Regulatory Process Matters

*A. Executive Order 13563 and 12866— Regulatory Planning and Review*

This final rule has been drafted in accordance with Executive Order 13563 of January 18, 2011, 76 FR 3821, Improving Regulation and Regulatory Review, and Executive Order 12866 of September 30, 1993, 58 FR 51735, Regulatory Planning and Review. Executive Order 13563 directs agencies, to the extent permitted by law, to propose or adopt a regulation only upon a reasoned determination that its benefits justify its costs; tailor the regulation to impose the least burden on society, consistent with obtaining the regulatory objectives; and, in choosing among alternative regulatory approaches, select those approaches that maximize net benefits. Executive Order 13563 recognizes that some benefits and costs are difficult to quantify and provides that, where appropriate and permitted by law, agencies may consider and discuss qualitatively values that are difficult or impossible to quantify, including equity, human dignity, fairness, and distributive impacts.

The Department has determined that this rule is a "significant regulatory action" as defined by Executive Order 12866, section 3(f). The Department has determined, however, that this rule is not an economically significant regulatory action, as it will not have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. This rule has been reviewed by the Office of Management and Budget (OMB) pursuant to Executive Orders 12866 and 13563.

Purpose and Need for Rule and Scope of Final Regulatory Assessment

This rule is necessary in order to incorporate into the Department's ADA regulations implementing titles II (nondiscrimination in State and local government services) and III (nondiscrimination by public accommodations and commercial facilities) the ADA Amendments Act's changes to the ADA and to provide additional guidance on how to apply those changes. The ADA Amendments Act, which took effect on January 1, 2009, was enacted in response to earlier Supreme Court decisions that significantly narrowed the application of the definition of "disability" under the ADA. *See Sutton* v. *United Air*

*Lines, Inc.,* 527 U.S. 471 (1999); *Toyota Motor Mfg., Kentucky, Inc.* v. *Williams,* 534 U.S. 184 (2002). The ADA Amendments Act clarifies the proper interpretation of the term "disability" in the ADA and fulfills congressional intent to restore the broad scope of the ADA by making it easier for individuals to establish that they have a disability within the meaning of the statute. *See* Public Law 110–325, sec. 2(a)(3)–(7). The Act authorizes the Attorney General to issue regulations under title II and title III of the ADA to implement sections 3 and 4 of the Act, including the rules of construction presented in section 3. 42 U.S.C. 12205a. The Department is making several revisions to the title II and title III ADA regulations that are based on specific provisions in the ADA Amendments Act.

The Department notes that the Supreme Court cases limiting the application of the definition of "disability" had the most significant impact on individuals asserting coverage under title I of the ADA with respect to employment. The legislative history of the ADA Amendments Act is replete with examples of how individuals with a range of disabilities were unable to successfully challenge alleged discriminatory actions by employers because courts found that they did not qualify as individuals with disabilities under the Supreme Court's narrow standards. *See, e.g.,* S. 154 Cong. Rec. S8840–44 (daily ed. Sept. 16, 2008) (Statement of the Managers). With respect to titles II and III, while the statutory amendments required by the ADA Amendments Act affect persons with all types of disabilities and across all titles of the ADA, Congress anticipated that the ADA Amendments Act's expanded definition would especially impact persons with learning disabilities who assert ADA rights in education and testing situations. *See* H.R. Rep. No. 110–730, pt. 1, at 10–11 (2008); *see also* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008). Congress was concerned about the number of individuals with learning disabilities who were denied reasonable modifications or testing accommodations (*e.g.,* extra exam time) because covered entities claimed these individuals did not have disabilities covered by the ADA.

In the NPRM, the Department requested public comments on whether the changes made by the ADA Amendments Act to titles II and III and that are addressed in the proposed rule would have benefits or costs in areas other than additional time for postsecondary students and national

examination test takers with ADHD or learning disabilities. Those comments and the Department's response are discussed below. The Department wishes to stress that, although its economic analysis is focused on estimating costs for processing requests and providing extra time on exams as a direct result of the ADA Amendments Act, the ADA, as amended, extends coverage to individuals with the full range of disabilities and affords such individuals the full range of nondiscrimination protections under the ADA.[5] The Department is aware that the accommodation of those individuals might entail some economic costs; however, it appears that in light of the legislative history and the experience of the Department in resolving ADA claims from 1990 to the present, the above-referenced exam costs represent the only category of measurable compliance costs that the ADA Amendments Act will impose and the Department was able to assess. While other ADA Amendments Act compliance costs might also ensue, the Department has not been able to specifically identify and measure these potential costs. The Department believes, however, that any other potential costs directly resulting from restoration of coverage to individuals with disabilities who assert their rights under other ADA nondiscrimination provisions will likely be minimal and have little impact on the overall results of this analysis.

Public Comments on Regulatory Assessment and Department Responses

This section discusses public comments to the Initial RA that accompanied the NPRM, as well as changes made to the estimation of likely costs of this rule in response to those comments.

While more than 50 comments were received during the NPRM comment period, only a few of those directly addressed the assumptions, data, or methodology used in the Initial RA. The Department received comments from persons with disabilities, organizations representing educational institutions and testing entities, individual academics, and other private individuals. The preamble to this final rule provides the primary forum for

substantive responses to these comments.

General and Recurring Concerns Expressed in Comments

Many commenters expressed appreciation for the proposed regulation, with several noting that the regulation would offer qualitative and quantitative benefits. Some of the quantitative benefits noted by commenters were a reduction in litigation costs as well as access to educational opportunities for persons with disabilities that would enhance employment prospects, productivity, and future earnings and investments. Qualitative benefits referenced in the comments included enhanced personal self-worth and dignity, as well as the values of equity, fairness, and full participation. Other commenters expressed concern about costs associated with implementation of the regulation.

The Department reviewed a number of comments suggesting that it underestimated the costs that postsecondary schools or national testing entities will incur to comply with the ADA Amendments Act. Commenters stated that the ADA Amendments Act will lead to a significant increase in the number of students seeking accommodations from postsecondary schools, which will lead to substantially increased direct costs (*e.g.,* the costs of providing additional exam time and other accommodations to students with disabilities) and indirect costs (*e.g.,* the costs of processing these requests, complaints to the Office for Civil Rights at the U.S. Department of Education, and lawsuits). Commenters further stated that the Department overlooked the costs that postsecondary schools will incur in providing accommodations other than additional exam time, such as tutors, note takers, auxiliary aids, e-books, etc. These commenters suggested that postsecondary schools will need to hire additional staff to manage the additional administrative burden that the ADA Amendments Act imposes.

Those comments and as well as other related comments, are specifically addressed below. But, as a threshold matter, the Department believes that the concerns predicated on the assumption of a significant rise in students seeking accommodations due to changes brought about by the ADA Amendments Act are overstated. One of the primary purposes of the ADA Amendments Act was to restore ADA coverage to a subset of individuals with disabilities who lost ADA protection as a result of a series of

---

[5] A number of commenters on the NPRM expressed concern that the Department's focus on the economic impact of the ADA Amendments Act with respect to individuals with learning disabilities and in the area of education and testing might lead the public to think that the Department did not believe the ADA Amendments Act would benefit persons with other disabilities or in the full range of situations and contexts covered by titles II and III of the ADA.

Supreme Court decisions dating back to 1999.

While the Department recognizes that there has been an increase in the number of students with disabilities requesting accommodations at postsecondary institutions, much of this increase is likely not attributable to the passage of the ADA Amendments Act. Commenters and existing data suggest that, for the most part, increases in the number of students with disabilities attending college and seeking accommodations are likely related to the following factors:

• There are more diagnoses of disabilities in children overall since 1997; [6]

• More students are attending college generally; [7]

• Other laws such as the Individuals with Disabilities Education Act (IDEA) and section 504 are causing students with disabilities to be identified more widely and at a younger age; [8]

• The stigma of identifying as a person with a disability appears to have diminished since the passage of the ADA in 1990;

• Diagnoses of autism spectrum disorders among children have increased significantly since 1997, perhaps as a result of improved diagnostic tools and protocols; [9] and

• Postsecondary schools have improved their ability to accommodate students with disabilities, thus encouraging more students to seek such accommodations, and empowering students with disabilities to enroll in college and remain enrolled there. [10]

[6] Coleen A. Boyle, *et al.*, *Trends in the Prevalence of Developmental Disabilities in US Children, 1997–2008*, 127 Pediatrics 1034 (2011), *available at* http://pediatrics.aappublications.org/content/pediatrics/early/2011/05/19/peds.2010-2989.full.pdf (last visited April 22, 2016); *see also* Matt Krupnick, *Colleges respond to growing ranks of learning disabled*, The Hechinger Report (Feb. 13, 2014), *available at* http://hechingerreport.org/colleges-respond-to-growing-ranks-of-learning-disabled/ (last visited Feb. 3, 2016).

[7] U.S. Department of Education, National Center for Education Statistics, *Fast Facts: Enrollment*, *available at* http://nces.ed.gov/fastfacts/display.asp?id=98 (last visited Feb. 3, 2016).

[8] *See* Stephen B. Thomas, *College Students and Disability Law*, 33 J. Special Ed. 248 (2000), *available at* http://www.ldonline.org/article/6082/ (last visited Feb. 3, 2016).

[9] Centers for Disease Control and Prevention, *Prevalence of Autism Spectrum Disorder Among Children Aged 8 Years—Autism and Developmental Disabilities Monitoring Network, 11 Sites, United States, 2010*, MMWR 2014; 63 (SS–02), *available at* http://www.cdc.gov/mmwr/pdf/ss/ss6302.pdf (last visited April 22, 2016).

[10] *See* Justin Pope, *Students with Autism, Other Disabilities Have More **College Options Than Ever** Before*, Huff Post Impact, *available at* http://www.huffingtonpost.com/2013/09/16/autism-college-options_n_3934583.html (Sept. 16, 2013) (last visited Feb. 3, 2016).

Most of the students affected by the ADA Amendments Act are students whose impairments did not clearly meet the definition of "disability" under the ADA after the series of Supreme Court decisions beginning in 1999 reduced the scope of that coverage. For instance, under the narrowed scope of coverage, some individuals with learning disabilities or ADHD may have been denied accommodations or failed to request them in the belief that such requests would be denied. As a result, the most likely impact of the ADA Amendments Act is seen in the number of students with disabilities eligible to request and receive accommodations in testing situations. There are different types of accommodations requested in testing situations, but requests for additional exam time appear to be the type of accommodation most likely to have a significant, measurable cost impact. Other types of accommodations requested in testing situations are expected to incur few to no additional costs as a result of the ADA Amendments Act and this rule. For instance, requests for accommodations such as the use of assistive technology or the need for alternative text formats were the types of accommodations that would have been granted prior to the passage of the ADA Amendments Act because students with sensory disabilities needing these types of accommodations would have been covered by the ADA even under the narrower scope of coverage arising from the application of the Supreme Court's decisions in *Toyota* and *Sutton*. As a result, those types of accommodations cannot be directly attributed to the ADA Amendments Act. In addition, other types of accommodations such as adjustments to the testing environment (*e.g.*, preferential seating or alternative locations) or the ability to have snacks or drinks would result in minimal or no costs. Therefore, the Department's examination of the costs of this rule is confined to those accommodations that individuals at postsecondary institutions or taking national examinations are most likely to request as a result of the ADA Amendments Act and that are most likely to incur measurable costs—extra time on tests and examinations.

One commenter, however, asserted that costs should be estimated for entities other than postsecondary institutions and testing entities, such as elementary and secondary schools, courthouses, etc. Certain concerns related to elementary and secondary schools are addressed below, but the Department found no direct evidence to indicate that institutions other than postsecondary institutions and testing entities will incur any significant economic impact as a result of accommodating individuals now covered under the ADA after passage of the ADA Amendments Act. Even after conducting further research, the Department was unable to identify any accommodations that would result in compliance costs that could be specifically attributable to the ADA Amendments Act other than those identified and measured in this analysis—*i.e.*, accommodations for extra time on exams. While the Department anticipates that other individuals with disabilities will benefit from the ADA Amendments Act, no specific subsets of individuals with disabilities or specific accommodations were identified. Accordingly, it appears that the economic impact of ADA Amendments Act compliance for entities other than postsecondary schools and testing entities will not significantly affect the overall economic impact of the rule, and thus those costs are not analyzed here.

One commenter cited the 2013–2014 Institutional Disability Access Management Strategic Plan at Cornell University [11] as an example of the kind of careful planning done by postsecondary institutions to address the needs of students with disabilities as a basis for determining that the costs of implementing the ADA Amendments Act will be very high. This document focuses almost exclusively on initiatives taken in furtherance of ADA compliance generally, rather than compliance with the ADA Amendments Act specifically. Further, this document discloses that Cornell University annually updates its plans and policies toward individuals with disabilities. Nothing in this document indicates that Cornell University is absorbing high costs as a result of such ongoing updates, or that the ADA Amendments Act has presented Cornell University with an unusually high burden, over and above the ordinary obligations that the ADA itself imposes. It is true that this document reflects careful, comprehensive, and possibly costly planning on the behalf of students with disabilities, but the expense inherent in such planning is attributable to the overall requirements of the ADA itself, rather than the implementation of the ADA Amendments Act.

[11] Cornell University—Disability Information, *Institutional Disability Access Management Strategic Plan for Cornell University, July 1, 2013– June 30, 2014*, *available at* http://disability.cornell.edu/docs/2013-2014-disability-strategic-plan.pdf (last visited Feb. 3, 2016).

Comments Regarding the ADA and Related Laws

Many of the commenters' points regarding increased costs appear to apply to concerns about the costs of complying with the ADA generally and not to costs related to expanded coverage due to the ADA Amendments Act. It is true that in some cases the costs of accommodating some students with more severe mobility and sensory disabilities could be significant, but these students were clearly covered even under the restrictive standards set forth by *Sutton* and *Toyota*, and accordingly, such costs cannot be attributed to the implementation of the ADA Amendments Act. One commenter expressed a concern that there has been an increase in requests for "exotic or untrained animals as service or emotional support animals" in student housing provided by postsecondary institutions. The Department notes that neither "exotic animals" nor "emotional support animals" qualify as service animals under the existing regulations implementing titles II and III of the ADA and thus, any costs related to allowing such animals are not due to the application of the requirements of this rule.[12] And, similar to the observation noted above, the vast majority of students who use service animals as defined under the ADA have disabilities that would have been covered prior to passage of the ADA Amendments Act, even under the Supreme Court's more narrow application of the definition of "disability." So, although such costs may be measurable, they cannot fairly be attributed to the implementation of the ADA Amendments Act.

Comments Regarding the Costs for the Adjustment of Existing Policies

The Department acknowledges that postsecondary schools and national testing entities will incur some costs to update their written policies and training procedures to ensure that the definition of "disability" is interpreted in accordance with the requirements of the ADA Amendments Act, but has found no evidence to indicate that such costs would be high. The Department also notes that even prior to passage of the ADA Amendments Act, many postsecondary schools had policies in place that were broader and more comprehensive than would have been required under the more restrictive

coverage set forth in *Sutton* and *Toyota*. As a result, their policies and procedures may require few, if any, updates to conform to the ADA Amendments Act and the revised regulations. The Department has found no evidence to suggest that the changes required by the ADA Amendments Act have placed or will place a significant burden upon the ongoing processes of evaluating and updating policies that already exist at postsecondary schools or with national testing entities. Nevertheless, the Department has attempted in this Final RA to quantify the cost of training staff members and updating policies as a result of the changes that the ADA Amendments Act final rule may require.

Some commenters argued that the Department's estimate of a one-time cost of $500 per institution to change policies and procedures in compliance with the ADA Amendments Act was too low. Instead, one commenter proposed an estimated one-time cost of $2,500 per institution, and another commenter suggested an estimated one-time cost of $5,000 per institution for the first year's training costs. The underlying data and methodology to support these estimates were not provided by these commenters.

The Department has found no data to substantiate the claims that the cost of changing existing policies and training procedures to comply with the ADA Amendments Act will be $2,500 or $5,000 per institution. The commenters proposing those costs did not provide any detailed evidence or arguments in support of such costs, and the Department's research found no evidence to indicate that any institutions have incurred training or policy revision costs of that magnitude since the ADA Amendments Act became effective in 2009. The commenter suggesting a $5,000 cost cites to one institution's disability access plan to suggest some of the types of costs that might be incurred. The referenced document, however, does not provide specific dollar figures and is not ADA Amendments Act specific. Therefore, the Department does not believe that the commenter's projected cost increases are correct because, as discussed above, the programmatic concerns identified in this document pertained to ADA compliance as a whole, but not with changes to the ADA created by the ADA Amendments Act specifically. The Department acknowledges that the absence of evidence of such costs, however, is not necessarily conclusive that some costs do not or will not exist. Nevertheless, the Department believes that, had postsecondary schools incurred $2,500

to $5,000 in such compliance costs since 2009 or if they expected to incur such costs going forward, some indicia of these costs would be readily apparent.

Because no relevant supporting information regarding the commenters' estimates was provided, the Department conducted additional independent research and interviewed representatives at two postsecondary institutions to determine whether any additional formal or informal training had been needed to understand the implications of the ADA Amendments Act (and make adjustments to existing policies and procedures to conform to the Act's requirements). One of those two institutions stated that no additional training had been needed. The second institution said that additional training had been provided during meetings with staff. Approximately two hours per staff member (*i.e.*, two hours per meeting) had been dedicated to this training. Approximately two part-time staff and six graduate students (working part time) received this training. In addition, the staff member providing the training had to attend a one-day conference to receive the information to pass along to the other staff. The Department conducted research to determine the costs of attending such a conference and receiving training on the changes to the law resulting from the ADA Amendments Act. Based on this independent research and feedback from representatives of two postsecondary institutions, the Department increased its estimate for one-time training costs from approximately $500 to $1,371 (*see* below for greater details on how the $1,371 was derived).

Comments Regarding the Costs of Additional Staff Time for the Administration of the Rule

Some commenters argued that the rule will lead to a significant increase in postsecondary institution accessibility support staff time devoted to disability accommodation issues, perhaps even requiring postsecondary institutions to hire additional personnel. One commenter representing higher educational institutions estimated that each affected institution would be required to hire one new full-time staff member, at $40,000 per year, to address increased student requests. This commenter cited a study that indicated that the mean number of staff who assist students with disabilities is four per campus. The Department questions the commenter's estimate that each affected institution would have to increase their

---

[12] As in other types of housing environments, students who wish to have emotional support animals in housing provided by their place of education may make those requests under the Fair Housing Act, 42 U.S.C. 3601 *et seq.*, and not the ADA.

staff by one full-time staff person, or approximately 25 percent of the mean entire staff, to address the incremental changes created by the ADA Amendments Act. The general increase in accommodation requests is likely attributable to a number of other factors not related to the ADA Amendments Act, including higher enrollment of students with disabilities. While there will likely be an incremental increase in the number of testing accommodations requested and granted as a direct result of the ADA Amendments Act, this incremental increase is unlikely to be the driving factor for hiring additional staff.

Similarly, some commenters argued that the Department needed to incorporate estimates of the additional administrative time needed to review and administer additional requests for testing accommodations for both postsecondary and national testing entities. To address these concerns, the Department contacted several universities and testing entities, but received responses from only one school and one testing entity, and those responses were inconclusive. The postsecondary school said that there has been no noticeable increase in applications for accommodations since the passage of the ADA Amendments Act, but the testing entity stated that it has detected a large increase in requests for additional testing time since the passage of the ADA Amendments Act. In light of the uncertainty regarding any potential additional staff time needed to review additional requests for accommodations, the Department has made several assumptions based on research and discussions with subject matter experts and impacted entities so as to incorporate estimated costs for this item. This information is presented further below.

*Comments Regarding the Costs of Additional Disputes*

Some commenters argued that the ADA Amendments Act would lead to increased litigation and internal disputes against institutions, as the scope of potential litigants would expand due to the increase in individuals covered by the ADA as a result of the passage of the ADA Amendments Act. Other commenters disagreed, stating that the new regulation would reduce the volume of complaints and litigation and streamline outstanding complaints and litigation due to increased consistency and predictability in judicial interpretation and executive enforcement. The Department does not agree with the commenters who asserted that the

impact of the ADA Amendments Act will lead to an increase in litigation and disputes. The ADA Amendments Act clarified several contentious or uncertain aspects of the ADA, and thus may have decreased the overall amount of ADA litigation by reducing ambiguities in the law. However, assessing the impact of covered entities' failures to comply (or alleged failures to comply) with the requirements of the ADA, as amended, and the legal challenges that may result from compliance failures, are not properly within the ambit of the Final RA, nor do we have any relevant information that would assist in an analysis of such issues even if it they were appropriate to include in the Final RA.

*Comments Regarding the Computation of Costs for Additional Examinations and Testing*

One commenter stated that the Department placed too much emphasis on the cost of proctor supervision when assessing the cost of extra exam time in postsecondary institutions. The commenter posited that many tests are administered electronically; accordingly, the costs of those tests are appropriately based on the cost of "seat time" and not the cost of proctor supervision. Unfortunately, no commenter provided a description of what the additional costs per student might be in such circumstances, nor did any commenter explain how such costs could be computed. The Department contacted several postsecondary institutions and testing entities for approximations of seat time costs, but did not receive any relevant information.

Two commenters noted that for some long national examinations, additional testing time would necessitate the provision of an additional testing day that would increase costs substantially. This potential cost was not estimated in the Initial RA because research indicated that prior to the passage of the ADA Amendments Act, national examination institutions were already accommodating individuals who required additional time because of disabilities already explicitly covered by the ADA. As a result, testing entities were already providing an additional testing day where necessary. Therefore, any individuals who would now request additional time on national exams lasting six hours or more as a direct result of the ADA Amendments Act would be accommodated alongside those individuals who would have been covered prior to the ADA Amendments Act, and any potential costs would likely be minimal. Despite this

conclusion, the Department has nonetheless conducted a sensitivity analysis to assess these potential costs with the assumption that testing entities were not already providing an additional testing day to accommodate certain individuals with disabilities. Because an additional testing day for these examinations was likely already provided prior to passage of the ADA Amendments Act, the Department continues to believe that the costs of accommodating any additional students who are now seeking additional exam time as a direct result of the ADA Amendments Act will be minimal. As a result, the sensitivity analysis the Department has conducted likely overestimates these potential costs. Further information on the potential range of these costs can be found below.

*Comments Regarding the Estimate of ADHD Prevalence Among Postsecondary Students*

Several commenters questioned the Department's approach of reducing the portion of students with ADHD who would be impacted by the ADA Amendments Act. In the Initial RA, the Department had assumed based on some available research that 30 percent of those who self-identify as having ADHD as their primary disability would not need additional testing time because they would not meet the clinical definition of the disability. One commenter raised concern about presenting a specific percentage of students with ADHD who would not meet that clinical definition, because that number might inadvertently become a benchmark for postsecondary institutions and national testing entities to deny accommodations to a similar percentage of applicants requesting additional exam time because of their ADHD. The Department did not intend for this percentage to establish a benchmark. Covered entities should continue to evaluate requests for additional exam time by all individuals with disabilities on an individualized basis. In direct response to these concerns, the Department has decided not to reduce the number of individuals with ADHD who could now receive testing accommodations as a direct result of the ADA Amendments Act.

*Comments Regarding the Economic Impact of the Rule on Industries*

A commenter representing institutions of higher education stated that the rule would have a significant impact on higher education as an industry, such that the rule should be considered "economically significant." For the reasons indicated throughout

the Final RA, however, the Department does not believe that this commenter's points were persuasive. Based on the Department's own research and evaluation, it is convinced that the cost of ADA Amendments Act compliance will be far less than $100 million dollars in any given year.

The commenter stated that the Department erred in its analysis by focusing primarily on college students with learning disabilities or ADHD and did not factor in potential costs related to students with other impairments including depression, schizophrenia, obsessive compulsive disorder, traumatic brain injuries, post-traumatic stress disorder, visual impairments not rising to the level of blindness, anxiety, autism, food allergies, or transitory impairments. Prior to passage of the ADA Amendments Act, higher educational institutions already were incurring costs to accommodate students with the above-referenced impairments that constituted disabilities. These costs are not attributable to this rulemaking and thus not analyzed as such. For the relatively small number of students with the above-referenced disabilities who might not have been covered prior to the passage of the ADA Amendments Act, the Department was unable to specifically identify or measure any potential costs that postsecondary institutions would incur in accommodating these students.

The commenter also stated that the Department's Initial RA should have considered the costs of academic accommodations other than extended testing time, such as "note takers, tutors, technology-based auxiliary aids, electronic versions of text-books and class materials, and other accommodations and aids," as well as "significant costs resulting from accommodation requests outside the classroom context, such as those involving residence halls, food services or athletics." The Department notes that, as with reasonable modifications and testing accommodations required prior to the ADA Amendments Act, the accommodations or auxiliary aids or services described by the commenter were being provided before the passage of the ADA Amendments Act and will not entail new costs specifically attributable to the ADA Amendments Act.

Comments Regarding ADA/IDEA Concerns

Several commenters addressed the possibility that the expanded definition of "disability" could result in more cases arising under the ADA, rather than under the IDEA, in elementary and secondary schools. An association focusing on children with learning disabilities noted that students who manage their disabilities well often find that school districts challenge their IDEA claims of disability, but that such claims may meet with more success under the ADA or section 504 of the Rehabilitation Act. One commenter, whose comments were endorsed by several other groups, noted that particular subsets of children may be eligible for benefits under the ADA but not under the IDEA. These include students with episodic conditions, mitigated conditions, and conditions such as diabetes and seizure impairments that may require maintenance support, such as diet or medications. A national association of kindergarten through twelfth-grade educators indicated that, increasingly, in its view, some parents are more likely to seek school-related modifications for their child under the ADA, rather than the IDEA. This commenter suggested, accordingly, that ADA litigation would increase once parents become aware of the application of a broader definition of "disability" due to the ADA Amendments Act.

The Department recognizes that the definition of "disability" under the IDEA is different than that under the ADA.[13] While many students will be covered by both statutes, some students covered by the ADA will not be eligible for special education services under the IDEA; however, such students are covered by section 504 of the Rehabilitation Act and are entitled to a "free appropriate public education" (FAPE) under the Department of Education's section 504 regulation. The Department acknowledges commenters' views that some parents may assert rights for their elementary, middle, and high school students under the ADA due to the expanded definition of "disability." However, the Department believes that the overall number of additional requests for reasonable modifications by elementary and secondary students that can be attributed to the ADA Amendments Act will be small and that any resulting economic impact is likely to be extremely limited. Students with ADHD and learning disabilities who already are covered by section 504 and, in many instances, the IDEA as well, are entitled to needed special education, related aids and services, modifications or auxiliary aids or services under those statutes. Further, prior to filing suit under the ADA, any student that is covered under both the ADA and the IDEA must exhaust administrative remedies under the IDEA if seeking a remedy that is available under that statute. Thus, while the ADA is critical to ensuring that students with disabilities have a full and equal opportunity to participate in and benefit from public education, when viewed in concert with the protections already afforded by section 504 and the IDEA, the economic impact of implementing the ADA Amendments Act in K–12 schools will be minimal. The Department also notes that none of these commenters provided any data demonstrating that elementary and secondary schools have incurred additional costs due to the passage of the ADA Amendments Act more than six years ago.

Comments Regarding Possible Fraudulent Claims of Disability

A number of commenters stated that the rule might encourage some people without learning disabilities to claim that they have learning disabilities, so that they can take advantage of extra exam time. The Department has not identified any study suggesting that the release of this rule—more than six years after the effective date of the ADA Amendments Act—likely will motivate a spike in false claims for students seeking extra time on examinations. While individuals with learning disabilities previously denied accommodations may be motivated to seek recognition of their disabilities under this rule, because it may offer an improved opportunity for consideration of their unmet needs, the Department does not believe that individuals who might feign disabilities in pursuit of extra time would modify their behavior as a result of this rule; to the contrary, the motivation and opportunity to feign such disabilities would have existed prior to the passage of the ADA Amendments Act. The Department acknowledges that there will always be some individuals who seek to take advantage of rules that extend benefits to particular classes of individuals. However, the Department has determined that the costs of such fraudulent behavior cannot readily be computed. It appears that there is no generally accepted metric for

---

[13] Under the IDEA, a "child with a disability" is a child "with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . . orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities [and] who, by reason thereof, needs special education and related services." 20 U.S.C. 1401(3). The IDEA regulation elaborates on each disability category used in the statute. See 34 CFR 300.8.

determining how many claims of disability are fraudulent, or how the cost of such fraudulent activity should be computed. And, the Department found no evidence to indicate that the rate of fraudulent claims of disability has increased since the implementation of the ADA Amendments Act in 2009. It should be emphasized that individuals seeking accommodations for their disabilities in testing situations under the ADA will still undergo an individualized assessment to determine whether they have disabilities covered by the statute. Extended exam time is an accepted reasonable modification or testing accommodation under the ADA for persons whose disabilities inhibit their ability to complete timed tests. Because the Department is not able to identify or measure an increase in fraudulent claims associated with this rule, those potential costs are not reflected in the economic analysis.

Final Results of the Primary Analysis

This section presents the calculations used to estimate the total costs resulting from the revisions to the title II and title III regulations to incorporate the changes made by the ADA Amendments Act. Costs are first presented for postsecondary institutions and then for national testing entities. For a more detailed explanation of the Department's methodology and data used to calculate these costs, please refer to relevant sections in the Final RA. The Final RA is available on Department's Web site at *www.ada.gov*.

As explained above, total costs to postsecondary institutions will include three components:

• One-time cost of training staff on relevant impact of ADA Amendments Act;

• Annual cost of processing additional accommodation requests for extra exam time made as a direct result of the ADA Amendments Act; and

• Annual cost of proctoring additional time on exams as a direct result of the ADA Amendments Act.

To calculate the annual costs to all postsecondary institutions for processing these additional accommodation requests and proctoring additional exam time as a direct result of the ADA Amendments Act, the potential number of students who could request and receive these accommodations needs to be calculated. Calculations for the three costs listed above plus the number of students who are eligible to receive and likely to request accommodations for extra exam time as a direct result of the ADA Amendments Act are presented below.

The annual one-time training cost for all postsecondary institutions is presented in Table 1 below. The methodology used to calculate this cost is explained further in Section 2.1 of the Final RA, and the sources for the data used are provided in Section 3.1.1 of the Final RA.

TABLE 1—CALCULATION OF ONE-TIME TRAINING COSTS FOR POSTSECONDARY INSTITUTIONS

| Variable | Value |
| --- | --- |
| Number of Postsecondary Institutions | 7,234 |
| One-Time Cost of Training on the Impacts of ADA Amendments Act per Institution | 1,371 |
| One-Time Training Cost for Postsecondary Institutions | 9,917,633 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

The number of additional eligible students likely to request and receive extra time on exams at postsecondary institutions as a direct result of the ADA Amendments Act is calculated in Tables 2 and 3 below. The methodology used for this calculation is explained further in Section 2.2 of the Final RA, and the sources for the data used are provided in Section 3.1.2 of the Final RA.

TABLE 2—CALCULATION OF NUMBER OF STUDENTS WHO ARE ELIGIBLE TO RECEIVE ACCOMMODATIONS FOR EXTRA EXAM TIME AT POSTSECONDARY INSTITUTIONS

[First year]

| Row # | Variable | Value | Source |
| --- | --- | --- | --- |
| 1 | Total Number of Postsecondary Students | 20,486,000 | See Table 9 of the Final RA. |
| 2 | Percentage of Postsecondary Students with a Learning Disability or ADHD | 2.96% | See Table 11 of the Final RA. |
| 3 | Total Postsecondary Students with a Learning Disability or ADHD | 606,386 | Calculation (Multiply Row 1 and Row 2). |
| 4 | Percentage of Students with Learning Disabilities or ADHD Already Receiving Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act. | 51.1% | See Table 12 of the Final RA. |
| 5 | Total Number of Students with Learning Disabilities or ADHD who were Requesting Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act. | 309,863 | Calculation (Multiply Row 3 and Row 4). |
| 6 | Percentage of Students with Learning Disabilities or ADHD Not Receiving Accommodations for Extra Exam Time Prior to Passage ADA Amendments Act. | 48.9% | See Table 12 of the Final RA. |
| 7 | Total Eligible Students who Could Potentially Request and Receive Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 296,523 | Calculation (Multiply Row 3 and Row 6). |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

TABLE 3—CALCULATION OF NUMBER OF STUDENTS WHO ARE ELIGIBLE TO RECEIVE AND LIKELY TO REQUEST ACCOMMODATIONS FOR EXTRA EXAM TIME AT POSTSECONDARY INSTITUTIONS

[First year]

| Row # | Variable | Low value | Med value | High value | Source |
|---|---|---|---|---|---|
| 1 ...... | Total Eligible Students who Could Potentially Request and Receive Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 296,523 | 296,523 | 296,523 | See Table 2 above. |
| 2 ...... | Percentage of Eligible Students Who Were Not Previously Receiving Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act Who are Now Likely to Request and Receive this Accommodation. | 50% | 70% | 90% | See Table 13 of the Final RA. |
| 3 ...... | Number of Students who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 148,261 | 207,566 | 266,870 | Calculation (Multiply Row 1 and Row 2). |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Table 4 below presents the calculations of the annual cost to postsecondary institutions for processing new accommodation requests for extra exam time. These requests are in addition to the ones currently received and processed by postsecondary institutions that are not being made as a direct result of the ADA Amendments Act. Costs depend on the number of students who will now be eligible to request and receive an accommodation for extra time on an exam as a direct result of the ADA Amendments Act revisions. The methodology used to calculate this cost is explained further in Section 2.3 of the Final RA, and the sources for the data used are provided in Section 3.1.3 of the Final RA.

TABLE 4—CALCULATION OF ANNUAL COST TO POSTSECONDARY INSTITUTIONS FOR PROCESSING ADDITIONAL ACCOMMODATION REQUESTS FOR EXTRA EXAM TIME

[First year]

| Variable | Low value | Med value | High value |
|---|---|---|---|
| Number of Students who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time ...... | 148,261 | 207,566 | 266,870 |
| Number of Staff Hours to Process each Accommodation Request ...... | 2 | 2 | 2 |
| Total Staff Hours to Process New Requests ...... | 296,523 | 415,132 | 533,741 |
| Staff Hourly Wage Rate for Processing Accommodation Requests ...... | $24.91 | $24.91 | $24.91 |
| Annual Cost to Postsecondary Institutions for Processing Additional Accommodation Requests for Extra Exam Time | $7,387,118 | $10,341,966 | $13,296,813 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Tables 5 and 6 calculate the annual costs to postsecondary institutions for proctoring additional time on exams requested by eligible students as a direct result of the ADA Amendments Act. The methodology used to calculate this cost is explained further in Section 2.4 of the Final RA, and the sources for the data used are provided in Section 3.1.4 of the Final RA.

TABLE 5—CALCULATION OF ANNUAL COST TO POSTSECONDARY INSTITUTIONS FOR PROCTORING EXTRA TIME ON EXAMS, PER STUDENT

[First year]

| Variable | Value |
|---|---|
| Average Length of an Exam at a Postsecondary Institution in Hours ...... | 1.5 |
| Average Additional Time Requested, as a Percentage of Total Exam Time ...... | 75% |
| Average Amount of Extra Time per Exam in Hours ...... | 1.13 |
| Average Number of Exams per Class ...... | 3 |
| Average Number of Classes per Year ...... | 8 |
| Average Number of Exams per Student ...... | 24 |
| Average Annual Additional Exam Time per Student in Hours ...... | 27 |
| Average Proctor to Student Ratio ...... | 0.11 |
| Average Hourly Wage of Exam Proctor ...... | $12.90 |
| Annual Cost for Proctoring Additional Time on Exams per Student ...... | $36.67 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

TABLE 6—TOTAL ANNUAL COST TO POSTSECONDARY INSTITUTIONS FOR PROCTORING EXTRA TIME ON EXAMS

[First year]

| Variable | Low | Med | High |
|---|---|---|---|
| Annual Cost for Proctoring Additional Time on Exams per Student ............................................ | $36.67 | $36.67 | $36.67 |
| Number of Students who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time | 148,261 | 207,566 | 266,870 |
| Annual Cost to Postsecondary Institutions for Proctoring Extra Time on Exams ...................... | $5,437,419 | $7,612,387 | $9,787,355 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Just as with postsecondary institutions, the costs to national testing entities from the revisions to the ADA Amendments Act will include three components:

• One-time cost of training staff on relevant impact of ADA Amendments Act;

• Annual cost of processing additional accommodation requests for extra exam time made as a direct result of the ADA Amendments Act; and

• Annual cost of proctoring additional time on exams as a direct result of the ADA Amendments Act.

The annual costs of processing additional accommodation requests and proctoring the extra exam time depends on the number of test takers who will request accommodations for extra exam time as a direct result of the ADA Amendments Act. Calculations for the three costs listed above plus the number of test takers who are eligible to receive

and likely to request accommodations of extra exam time as a direct result of the ADA Amendments Act are presented below.

The annual one-time training cost for all national testing entities is presented in Table 7 below. The methodology used to calculate this cost is explained further in Section 2.1 of the Final RA, and the sources for the data used are provided in Section 3.2.1 of the Final RA.

TABLE 7—CALCULATION OF ONE-TIME TRAINING COSTS FOR NATIONAL TESTING ENTITIES

| Variable | Value |
|---|---|
| Number of National Testing Entities ................................................................................................................. | 1,397 |
| One-Time Cost of Training on the Impacts of ADA Amendments Act per Institution ..................................................... | $1,371 |
| One-Time Training Cost for National Testing Entities ...................................................................................... | $1,915,252 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

The number of test takers who are now eligible to receive and likely to request extra time on national exams is

calculated in Tables 8 and 9 below. The methodology used to calculate this number is explained further in Section

2.2 of the Final RA, and the sources for the data used are provided in Section 3.2.2 of the Final RA.

TABLE 8—CALCULATION OF NUMBER OF TEST TAKERS WHO ARE ELIGIBLE TO RECEIVE ACCOMMODATIONS FOR EXTRA EXAM TIME FROM NATIONAL TESTING ENTITIES

[First year]

| Row # | Variable | Value | Source |
|---|---|---|---|
| 1 ....... | Total Number of Test Takers ............................................................................................ | 10,450,539 | See Table 23 of the Final RA. |
| 2 ....... | Percentage of Test Takers with a Learning Disability or ADHD * ........................................... | 2.96% | See Table 11 of the Final RA. |
| 3 ....... | Total Test Takers with a Learning Disability or ADHD ........................................................ | 309,336 | Calculation (Multiply Row 1 and Row 2). |
| 4 ....... | Percentage of Test Takers with Learning Disabilities or ADHD Already Receiving Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act.* | 51.1% | See Table 12 of the Final RA. |
| 5 ....... | Total Number of Test Takers with Learning Disabilities or ADHD who were Requesting Accommodations for Extra Exam Time Prior to the ADA Amendments Act. | 158,071 | Calculation (Multiply Row 3 and Row 4). |
| 6 ....... | Percentage of Test Takers with Learning Disabilities or ADHD Not Receiving Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act.* | 48.9% | See Table 12 of the Final RA. |
| 7 ....... | Total Eligible Test Takers who Could Potentially Request and Receive Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 151,265 | Calculation (Multiply Row 3 and Row 6). |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.
*For these assumptions, the Final RA assumes the same values for national test takers as found for postsecondary students, since no specific data for national examinations was found and many national exams are designed for students or recent graduates.

TABLE 9—CALCULATION OF NUMBER OF TEST TAKERS WHO ARE ELIGIBLE TO RECEIVE AND LIKELY TO REQUEST ACCOMMODATIONS FOR EXTRA EXAM TIME FROM NATIONAL TESTING ENTITIES

| Row # | Variable | Low | Med | High | Source |
|---|---|---|---|---|---|
| 1 ...... | Total Eligible Test Takers who Could Potentially Request and Receive Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 151,265 | 151,265 | 151,265 | See Table 8 above. |
| 2 ...... | Percentage of Eligible Test Takers Who Were Not Previously Receiving Accommodations for Extra Exam Time Prior to Passage of the ADA Amendments Act Who are Now Likely to Request and Receive this Accommodation. | 50% | 70% | 90% | See Table 13 of the Final RA. |
| 3 ...... | Number of Test Takers who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time as a Direct Result of the ADA Amendments Act. | 75,633 | 105,886 | 136,139 | Calculation (Multiply Row 1 and Row 2). |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Table 10 illustrates the calculations of the annual cost to national testing entities for processing additional accommodation requests for extra exam time made as a direct result of the ADA Amendments Act. The methodology used to calculate this cost is explained further in Section 2.3 of the Final RA, and the sources for the data used are provided in Section 3.2.3 of the Final RA.

TABLE 10—CALCULATION OF ANNUAL COST TO NATIONAL TESTING ENTITIES FOR PROCESSING ADDITIONAL ACCOMMODATION REQUESTS FOR EXTRA EXAM TIME

[First year]

| Variable | Low value | Med value | High value |
|---|---|---|---|
| Number of Test Takers who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time ............................................................................ | 75,633 | 105,886 | 136,139 |
| Number of Staff Hours to Process each Accommodation Request ............................. | 2 | 2 | 2 |
| Total Staff Hours to Process Additional Accommodation Requests for Extra Exam Time | 151,265 | 211,771 | 272,278 |
| Staff Hourly Wage Rate for Processing Accommodation Requests ............................. | $24.91 | $24.91 | $24.91 |
| Annual Cost to National Testing Entities for Processing Additional Accommodation Requests for Extra Exam Time | $3,768,396 | $5,275,755 | $6,783,113 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Finally, Tables 11 and 12 calculate the annual costs to national testing entities for allowing test takers to receive additional time on exams. Again, the cost here may be calculated as the opportunity cost of the seat occupied by the test taker for the additional hours of testing. However, because the seat cost per test taker was not available for this Final RA analysis, the additional time spent by a test proctor to oversee the exam is used as a proxy for the cost. The methodology used to calculate this cost is explained further in Section 2.4 of the Final RA, and the sources for the data used are provided in Section 3.2.4 of the Final RA.

TABLE 11—CALCULATION OF ANNUAL COST TO NATIONAL TESTING ENTITIES FOR PROCTORING EXTRA TIME ON EXAMS, PER TEST TAKER

[First year]

| Variable | Value |
|---|---|
| Average Length of a National Exam in Hours ............................................................................ | 4.11 |
| Average Extra Time Requested, as a Percentage of Total Exam Time ................................ | 75% |
| Average Amount of Extra Time per Exam in Hours ................................................................ | 3.09 |
| Average Number of Exams per Test Taker per Year .............................................................. | 1 |
| Average Annual Extra Exam Time per Test Taker in Hours ................................................... | 3.09 |
| Average Proctor-to-Test-Taker Ratio ....................................................................................... | 1 |
| Average Hourly Wage of Exam Proctor ................................................................................... | $12.90 |
| Cost to National Testing Entities for Proctoring Extra Time on Exams per Test Taker ......... | $39.81 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

TABLE 12—TOTAL ANNUAL COST TO NATIONAL TESTING ENTITIES FOR PROCTORING EXTRA TIME ON EXAMS

[First year]

| Variable | Low value | Med value | High value |
|---|---|---|---|
| Cost to National Testing Entities for Proctoring Extra Time on Exams per Test Taker ............. | $39.81 | $39.81 | $39.81 |
| Number of Test Takers who are Eligible to Receive and Likely to Request Accommodations for Extra Exam Time each year ............................................................................ | 75,633 | 105,886 | 136,139 |

**TABLE 12—TOTAL ANNUAL COST TO NATIONAL TESTING ENTITIES FOR PROCTORING EXTRA TIME ON EXAMS—Continued**

[First year]

| Variable | Low value | Med value | High value |
|---|---|---|---|
| Annual Cost to National Testing Entities for Proctoring Extra Time on Exams ...................... | $3,011,096 | $4,215,534 | $5,419,973 |

**Note:** Due to rounding, totals may not equate exactly to the product of the inputs provided in the table.

Based on the calculations provided above, total costs to society for implementing the ADA Amendments Act revisions into the title II and title III regulations will range between $31.4 million and $47.1 million in the first year. The first year of costs will be higher than all subsequent years because the first year includes the one-time cost of training. Note that even the high end of this first-year cost range is well below the $100 million mark that signifies an "economically significant" regulation. The breakdown of total costs by entity is provided in Table 13 below.

**TABLE 13—TOTAL COSTS FIRST YEAR (2016) IN PRIMARY ANALYSIS, NON-DISCOUNTED**

[$ millions]

| Cost category | Low value | Med value | High value |
|---|---|---|---|
| Postsecondary Institutions: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Exam Time ........................ | $12.8 | $18.0 | $23.1 |
| Postsecondary Institutions: ONE–TIME Cost for Additional Training at Institutions .................. | 9.9 | 9.9 | 9.9 |
| National Exams: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Time ........................ | 6.8 | 9.5 | 12.2 |
| National Exams: ONE–TIME Cost for Additional Training at Institutions ........................ | 1.9 | 1.9 | 1.9 |
| Total ........................................................ | 31.4 | 39.3 | 47.1 |

**Note:** Due to rounding, totals may not equate exactly to the sum of the inputs provided in the table.

Taking these costs over the next 10 years and discounting to present value terms at a rate of 7 percent, the total cost of implementing the ADA Amendments Act revisions is approximately $214.2 million over 10 years, as shown in Table 14 below.

**TABLE 14—TOTAL COSTS OVER 10 YEARS, PRIMARY ANALYSIS**

| Total discounted value ($ millions) | Annualized estimate ($ millions) | Year dollar | Discount rate (percent) | Period covered |
|---|---|---|---|---|
| $214.2 ................................................ | $28.6 | 2015 | 7 | 2016–2025 |
| $243.6 ................................................ | 26.3 | 2015 | 3 | 2016–2025 |

**Potential Additional Costs to National Testing Entities**

The ADA Amendments Act revisions will allow eligible individuals with disabilities to receive additional time on exams, both for course-work exams at postsecondary institutions and standardized national examinations. Some national examinations are long and can last up to eight hours per test. Thus, when test takers request additional time on these longer exams, such requests will inevitably push the exam into an additional day.

As commenters pointed out in response to the Initial RA, there are costs associated with providing exams on an additional day. While there is no data to predict which exams will extend to an additional day, especially given that specific accommodations are determined individually, this Final RA assumes that exams that normally would take six hours or more to administer and be scheduled for one day may require an additional day of testing if the test taker seeks more time as an accommodation. To quantify the total costs of providing an additional day of testing for those individuals who would not previously have received this additional time, prior to the passage of the ADA Amendments Act, the following two costs are quantified:

Exam Revision Costs

While it appears that many national testing entities do not revise the content of exams that span an additional day, the exam format and materials can be affected by such an extension. For instance, computer-based exams are programmed to span a certain amount of time, allowing for timed break periods throughout. When more time is provided to take the exam, the exam must be reprogrammed to span the new amount of time, with planned breaks for the test taker. For paper-based exams, test booklets are often reprinted to allow one set of questions for one day of testing, and another set for the extra day of testing. This form of printing prevents test takers from going home and looking up the answers for the next set of questions.

Room Rental Cost

Exams are delivered in different settings depending on the type of national exam. Some exams are delivered at testing centers where different types of exams are administered at once in the same room. In this case, the cost of an extra day of testing could be captured by the seat cost per test taker. Other exams are delivered to test takers exclusively taking that exam, and those exams are often administered in rooms rented out at a university, hotel, or other building. This cost could be captured by the room rental cost. The Final RA takes a conservative approach, using the room

rental cost to approximate the cost of delivering an exam over an additional day, as this is the average of the two costs.

Based on the calculations provided in Sections 4.2.1 and 4.2.2 of the Final RA, the total additional costs of providing an extra testing day to eligible test takers will likely range between $2.7 and $4.8 million per year. Table 15 adds this into the total costs in the first year to approximate the range of total costs to society from implementing the ADA

Amendments Act revisions. For further information on the methodology, data, and assumptions used to analyze these potential additional costs for national testing entities, please refer to Section 4.2 of the Final RA.

TABLE 15—TOTAL COSTS FIRST YEAR, PLUS POTENTIAL ADDITIONAL COSTS FOR ADDITIONAL DAY OF TESTING, NON-DISCOUNTED

[$ millions]

| Cost category | Low value | Med value | High value |
|---|---|---|---|
| Postsecondary Institutions: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Exam Time | $12.8 | $18.0 | $23.1 |
| Postsecondary Institution: ONE–TIME Cost for Additional Training at Institutions | 9.9 | 9.9 | 9.9 |
| National Exams: ANNUAL Total Costs of Processing Additional Requests and Proctoring Extra Exam Time | 6.8 | 9.5 | 12.2 |
| National Exams: ONE–TIME Cost for Additional Training at Institutions | 1.9 | 1.9 | 1.9 |
| National Exams: ANNUAL Potential Additional Costs for Exams that Run over onto an Additional Day | 2.7 | 3.8 | 4.8 |
| Total | 34.1 | 43.1 | 52.0 |

**Note:** Due to rounding, totals may not equate exactly to the sum of the inputs provided in the table.

Benefits Discussion

The Department believes that the enactment of the ADA Amendments Act benefits millions of Americans, and the benefits to those individuals are non-quantifiable but nonetheless significant. The Department determined, however, that there was a group of individuals with disabilities who would be able to receive benefits in the form of increased access to accommodations in testing from postsecondary institutions and national testing entities, and that these benefits would be associated with specific costs to those institutions and entities, which are analyzed above.

With respect to specific benefits, in the first year, our analysis estimates that approximately 148,261 to 266,870 postsecondary students will take advantage of accommodations for extra exam time that they otherwise would not have received but for this rule. Over 10 years, approximately 1.6 million to 2.8 million students will benefit. An additional 802,196 to 1.4 million national exam test takers would benefit over that same 10 years (assuming that people take an exam one time only).

Some number of these individuals could be expected to earn a degree or license that they otherwise would not have as a result of the testing accommodations they are now eligible to receive as a direct result of the ADA Amendments Act. The Department was unable to find robust data to estimate the number of students who would receive a bachelor's degree or licenses after this rule goes into effect that would not otherwise have received one. However, extensive research has shown notably higher earnings for those with

college degrees over those who do not have degrees. Estimates of this lifetime earnings vary, with some studies estimating an earning differential ranging from approximately $300,000 to $1 million.[14] In addition, some number of students may be able to earn a degree in a higher-paying field than they otherwise could, and yet other students would get the same degree, but perhaps finish their studies faster or more successfully (*i.e.*, higher grades) than otherwise would be the case. All of these outcomes would be expected to lead to greater lifetime productivity and earnings.

In addition to these quantitative benefits, this rule will have significant non-quantifiable benefits to individuals with disabilities who, prior to the passage of the ADA Amendments Act and this rule, were denied the opportunity for equal access to an education or to become licensed in their chosen professions because of their inability to receive needed testing accommodations. As with all other

[14] *See* Mark Schneider, *How Much Is That Bachelor's Degree Really Worth?: The Million Dollar Misunderstanding*, American Enterprise Institute, AEI Online (May 2009), available at *http:// www.aei.org/article/education/higher-education/ how-much-is-that-bachelors-degree-really-worth/* (last visited Feb. 3, 2016); U.S. Census Bureau, *Work-Life Earnings by Field of Degree and Occupation for People with a Bachelor's Degree: 2011*, American Community Survey Briefs (Oct. 2012), *available at http://www.census.gov/prod/ 2012pubs/acsbr11-04.pdf* (last visited Feb. 3, 2016); Anthony P. Carnevale *et al.*, *The College Payoff-Education, Occupations, Lifetime Earnings*, Georgetown University Center on Education and the Workforce (2011), *available at https:// cew.georgetown.edu/wp-content/uploads/2014/11/ collegepayoff-complete.pdf* (last visited April 22, 2016).

improvements in access for individuals with disabilities, the ADA Amendments Act is expected to generate psychological benefits for covered individuals, including reduced stress and an increased sense of personal dignity and self-worth, as more individuals with disabilities are able to successfully complete tests and exams and more accurately demonstrate their academic skills and abilities. Some individuals will now be more likely to pursue a favored career path or educational pursuit, which will in turn lead to greater personal satisfaction.

Additional benefits to society arise from improved testing accessibility. For instance, if some persons with disabilities are able to increase their earnings, they may need less public support—either direct financial support or support from other programs or services. This, in turn, would lead to cross-sector benefits from resource savings arising from reduced social service agency outlays. Others, such as family members of individuals with disabilities, may also benefit from reduced financial and psychological pressure due to the greater independence and earnings of the family member whose disability is now covered by the ADA under the revised definition of "disability."

In addition to the discrete group of individuals with learning disabilities and ADHD who will benefit from the changes made to the definition of "disability," there is a class of individuals who will now fall within the nondiscrimination protections of the ADA if they are refused access to or participation in the facilities, programs,

services, or activities of covered entities. The benefits to these individuals are significant, but unquantifiable. The Department believes (as did Congress when it enacted the ADA) that there is inherent value that results from greater accessibility for all Americans. Economists use the term "existence value" to refer to the benefit that individuals derive from the plain existence of a good, service, or resource—in this case, the increased accessibility to postsecondary degrees and specialized licenses that would arise from greater access to testing accommodations or the increased accessibility to covered entities' facilities, programs, services, or activities as a result of the ADA Amendments Act. This value can also be described as the value that people both with and without disabilities derive from the guarantees of equal protection and nondiscrimination. In other words, people value living in a country that guarantees the rights of persons with disabilities, whether or not they themselves are directly or indirectly affected by disabilities. There can be a number of reasons why individuals might value accessibility even if they do not require it now and do not ever anticipate needing it in the future. These reasons include bequest motives and concern for relatives or friends who require accessibility. People in society value equity, fairness, and human dignity, even if they cannot express these values in terms of money. These are the exact values that agencies are directed to consider in Executive Order 13563.

### B. Regulatory Flexibility Act

In the NPRM, the Department stated that, based on its analysis, it "can certify that the rule will not have a significant economic impact on a substantial number of small entities." The Department sought public comment on this proposed certification and its underlying analysis, including the costs to small entities, but received no public comments on these issues. The Attorney General has again reviewed this regulation in accordance with the Regulatory Flexibility Act, 5 U.S.C. 605(b), and by approving it hereby certifies that it will not have a significant economic impact on a substantial number of small entities for the reasons discussed more fully below.

First, the ADA Amendments Act took effect on January 1, 2009; all covered entities have been required to comply with the Act since that date and thus should be familiar with the requirements of the law. Second, the rule does not include reporting requirements and imposes no new recordkeeping requirements. Third, as shown above, the only title II and title III entities that would be significantly affected by the proposed changes to the ADA regulations are national testing entities and postsecondary institutions. The type of accommodations that most likely will be requested and required by those whose coverage has been clarified under titles II and III of ADA Amendments Act will be additional time in testing situations. While many of these national testing or postsecondary institutions are small businesses or small governmental entities, the costs associated with additional testing time are minimal; therefore, the Department believes the economic impact of this rule will be neither significant for these small entities nor disproportionate relative to the costs for larger entities.

The Department estimates that approximately 7,234 postsecondary institutions could be impacted based on data from the U.S. Department of Education National Center for Education Statistics.[15] The Department used data from the U.S. Census Bureau[16] from 2012 for Junior Colleges (NAICS[17] 6112) and Colleges, Universities, and Professional Schools (NAICS 6113) to estimate the proportion of those entities that would meet the Small Business Administration's criteria for small business or small governmental entity.[18] As shown in Table 18 and Table 19 below, small postsecondary institutions are estimated to account for approximately 35.3 percent of all

[15] U.S. Department of Education, National Center for Education Statistics (2015). *Digest of Education Statistics,* 2013 (NCES 2015–011), Chapter 2. 2011–2012 academic year—Number of Title IV institutions, by level and control of institution and state or other jurisdiction, *available at https://nces.ed.gov/fastfacts/display.asp?id=84* (last visited Feb.3, 2016).

[16] U.S. Census Bureau, Number of Firms, Number of Establishments, Employment, Annual Payroll, and Estimated Receipts by Enterprise Receipt Sizes for the United States, NAICS Sectors: 2012, *available at http://www.census.gov/econ/susb/* (last visited Feb. 3, 2016).

[17] North American Industry Classification System.

[18] U.S. Small Business Administration, *Table of Small Business Size Standards, available at https://www.sba.gov/content/small-business-size-standards* (last visited April 22, 2016).

postsecondary institutions. Therefore, the Department estimates that 2,556 small postsecondary institutions would be impacted by this rule.

The overall costs of this rule for postsecondary institutions were calculated based on the number of entities and number of postsecondary students affected. The cost of processing additional accommodation requests for extra exam time and the cost of additional time spent proctoring exams depend on the number of students. This methodology assumes that per-student costs are roughly the same for institutions of differing sizes. Because larger entities have more students on average than smaller ones, the Department used the proportion of the industry sub-group's revenues for small and large entities as a proxy for the number of students. Thus, using receipts for Junior Colleges (NAICS 6112) and Colleges, Universities, and Professional Schools (NAICS 6113) as a proxy for number of students, small postsecondary institutions are estimated to bear 4 percent of the processing and proctoring costs for providing additional exam time for that industry sub-group— or approximately $726,534 of the $17.95 million first-year costs. Additionally, postsecondary institutions are expected to incur one-time costs for additional training of $1,371 per entity (*see* Tables 6–8 in the Final RA). In total, small postsecondary institutions would incur $4.2 million in costs in the first year, which would average approximately $1,655 for each of the 2,556 small postsecondary institutions. The average annual revenue for each these small postsecondary institutions is $501,600. The cost is 0.33 percent of their revenue. Therefore, the costs will not be substantial for these small entities.

In comparison to the number of small postsecondary entities, there are approximately 4,678 postsecondary institutions (64.7 percent of the 7,234) that would be considered larger entities, and these larger entities would incur $23.6 million in costs during the first year, which would average out to approximately $5,053 per large postsecondary institution during the first year. This $5,053 per large postsecondary institution during the first year is approximately 3.1 times higher than the cost that would be incurred by small postsecondary institutions during that same time.

TABLE 16—FIRM, ESTABLISHMENT, AND RECEIPTS DATA FOR JUNIOR COLLEGES (NAICS 6112) IN 2012

| | Firms | Establishments | Est. receipts ($000,000) |
|---|---|---|---|
| All Junior Colleges ................................................................................. | 464 | 953 | 8,449 |
| Small Junior Colleges (estimated)* ........................................................ | 378 | 427 | 1,723 |
| Small Junior Colleges as a Percentage of All Junior Colleges .............. | 81.5% | 44.8% | 20.4% |

* SBA small business standard is $20.5 million; small business totals here include those with receipts under $25 million. This is due to data being reported in size categories that do not exactly match industry small business classifications: *i.e.* from $10 million to $14.99 million, and from $15 million to $19.99 million; and from $20 million to $24.99 million, and from $25 million to $29.99 million.

Source: Calculated from data provided by the U.S. Census Bureau, Statistics of U.S. Businesses. *See* SBA Office of Advocacy and U.S. Census Bureau, *Statistics of U.S. Businesses, Table 2—Number of firms, establishment, receipts, employment, and payroll by firm size (in receipts) and industry, 2012, available at https://www.sba.gov/advocacy/firm-size-data* (last visited April 22, 2016).

TABLE 17—FIRM, ESTABLISHMENT, AND RECEIPTS DATA FOR COLLEGES, UNIVERSITIES, AND PROFESSIONAL SCHOOLS (NAICS 6113) IN 2012

| | Firms | Establishments | Est. receipts ($000,000) |
|---|---|---|---|
| All Colleges, Universities, and Professional Schools ............................... | 2,282 | 4,329 | 222,854 |
| Small Colleges, Universities, and Professional Schools (estimated)* ...... | 1,369 | 1,439 | 7,637 |
| Small Colleges, Universities, and Professional Schools as a Percentage of All Colleges, Universities, and Professional Schools | 60.0% | 33.2% | 3.4% |

* SBA small business standard is $27.5 million; small business totals here include those with receipts under $30 million. This is due to data being reported in size categories that do not exactly match industry small business classifications: *i.e.* from $10 million to $14.99 million, and from $15 million to $19.99 million; and from $20 million to $24.99 million, and from $25 million to $29.99 million.

Source: Calculated from data provided by the U.S. Census Bureau, Statistics of U.S. Businesses. *See* SBA Office of Advocacy and U.S. Census Bureau, *Statistics of U.S. Businesses, Table 2—Number of firms, establishment, receipts, employment, and payroll by firm size (in receipts) and industry, 2012, available at https://www.sba.gov/advocacy/firm-size-data* (last visited April 22, 2016).

TABLE 18—FIRM, ESTABLISHMENT, AND RECEIPTS DATA FOR BOTH JUNIOR COLLEGES (NAICS 6112) AND SMALL COLLEGES, UNIVERSITIES, AND PROFESSIONAL SCHOOLS (NAICS 6113), COMBINED, IN 2012

| | Firms | Establishments | Est. receipts ($000,000) |
|---|---|---|---|
| All Junior Colleges, and Colleges, Universities, and Professional Schools .................... | 2,746 | 5,282 | 231,303 |
| Small Junior Colleges, and Colleges, Universities, and Professional Schools (estimated)* ..................... | 1,747 | 1,866 | 9,360 |
| Small Junior Colleges, and Colleges, Universities, and Professional Schools as a Percentage of All Junior Colleges, and Colleges, Universities, and Professional Schools ................................ | 63.6% | 35.3% | 4.0% |

* SBA small business standard for Junior Colleges is $20.5 million; small business totals here include Junior Colleges with receipts under $25 million. This is due to data being reported in size categories that do not exactly match industry small business classifications: *i.e.* from $10 million to $14.99 million, and from $15 million to $19.99 million; and from $20 million to $24.99 million, and from $25 million to $29.99 million. The SBA small business standard for Colleges, Universities, and Professional Schools is $27.5 million; small business totals here include Colleges, Universities, and Professional Schools with receipts under $30 million. This is due to data being reported in size categories that do not exactly match industry small business classifications: *i.e.* from $10 million to $14.99 million, and from $15 million to $19.99 million; and from $20 million to $24.99 million, and from $25 million to $29.99 million.

Source: Calculated from data provided by the U.S. Census Bureau, Statistics of U.S. Businesses. *See* SBA Office of Advocacy and U.S. Census Bureau, *Statistics of U.S. Businesses, Table 2—Number of firms, establishment, receipts, employment, and payroll by firm size (in receipts) and industry, 2012, available at https://www.sba.gov/advocacy/firm-size-data* (last visited April 22, 2016).

TABLE 19—ESTIMATED SMALL ENTITY ESTABLISHMENTS FOR POSTSECONDARY INSTITUTIONS IN 2011–12

| | |
|---|---|
| Total Postsecondary Establishments (All Firms/Entities); Academic year 2010–2011 * ....................................... | 7,234 |
| Percent Small Entities (2012) ** ........................................................................................................................ | 35.3% |
| Total Impacted Small Entity Establishments *** ................................................................................................ | 2,556 |

* U.S. Department of Education, National Center for Education Statistics, (2015), *Digest of Education Statistics*, 2013 (NCES 2015–011), available at *https://nces.ed.gov/fastfacts/display.asp?id=84* (last visited Feb. 3, 2016).

** Derived from Tables 16–18 above.

*** Estimated using percentage of small establishments for NAICS sectors 6112 and 6113.

In addition to postsecondary institutions, some national testing entities would also be impacted. The Department used data on Educational Test Development and Evaluation Services (NAICS 6117102)[19] to estimate the number of affected entities. Approximately 1,397 national testing entities would be impacted by this rule, irrespective of size. Small entity establishments are estimated to account for 923 (66.1 percent) of these.

TABLE 20—FIRM AND RECEIPTS DATA FOR NATIONAL TESTING ENTITIES IN 2007: EDUCATIONAL TEST DEVELOPMENT AND EVALUATION SERVICES (NAICS 6117102)

|  | Firms | Establishments | Est. receipts ($000,000) |
|---|---|---|---|
| Small, Medium, and Large Entities * | 748 | 1,144 | 2,843 |
| Small Entities ** | 734 | 756 | 704 |
| Percentage Small Entities | 98.1% | 66.1% | 24.8% |
| Total Entities | 1,000 | 1,397 | 2,907 |
| Estimated Total Small Entities *** | 981 | 923 | 720 |

\* Includes only those entities which were categorized by annual revenue in the available data.

\*\* Data is reported in size categories that do not exactly match industry small business classifications: i.e. from $5 million to $9.99 million, and from $10 million to $24.99 million. SBA small business standard is $15.0 million for all Educational Support Services; small business totals here include those with receipts under $25 million.

\*\*\* Applying the estimated percentage of small entities to the total number of entities.

Source: Calculated from data provided by the U.S. Census Bureau. See U.S. Census Bureau, 2007 Economic Census, Educational Services: Subject Series—Estab and Firm Size: Receipts/Revenue Size of Establishments for the United States: 2007 (EC0761SSSZ4), available at http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2007_US_61SSSZ1&prodType=tableE: (last visited Feb. 3, 2016).

Small entity establishments in the Educational Test Development and Evaluation Services industry group account for 24.8 percent of that industry's receipts. If receipts are used as a proxy for number of test takers in a manner similar to that described above for postsecondary institutions, then small national testing entities can be expected to bear 24.8 percent of the industry's $9.49 million first-year costs of processing additional accommodation requests for extra exam time and additional time spent proctoring exams—or approximately $2.35 million. Additionally, national testing entities are expected to incur a fixed cost for additional training of $1,371 per entity. Thus, for the approximately 923 small national testing entities, total costs in the first year are estimated to average $3,918 each. Average revenue for these entities is $780,264. The cost is 0.50 percent of their revenue. Therefore, the costs will not be substantial for these small entities.

In comparison to the number of small testing entities, approximately 474 national testing center establishments (33.9 percent of the 1,397) would be considered larger entities, and they would incur $7.79 million in costs during the first year, which would average out to approximately $16,440 per large national testing center establishment during the first year. This $16,440 per large national testing center establishment is approximately 4.2 times as high as the cost that would be incurred by small national testing center establishments during that same time.

As explained above, the Department estimates that approximately 2,556 small postsecondary establishments and 923 small national testing establishments would be impacted by this rule, for a total of approximately 3,479 small business establishments. The estimates were based on average estimates for all entities, irrespective of size. The Department notes that the average first-year cost estimates presented above for small entities are higher than the first-year cost estimates presented in the NPRM because the Department's estimates for the initial training costs (which will be incurred during the first year) are now higher based on public comment and further research and analysis conducted by the Department. However, the overall costs of this rule for small entities over the 10-year period are lower because the Department's final overall cost estimates in the Final RA are lower as a result of refinements made to the analysis in response to public comment and based on further research conducted by the Department.

Based on the above analysis, the Attorney General can certify that the rule will not have a significant economic impact on a substantial number of small entities.

### C. Executive Order 13132: Federalism

Executive Order 13132 of August 4, 1999, Federalism, directs that, to the extent practicable and permitted by law, an agency shall not promulgate any regulation that has federalism implications, that imposes substantial direct compliance costs on State and local governments, that is not required by statute, or that preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. Because this rule does not have federalism implications as defined in the Executive Order, does not impose direct compliance costs on State and local governments, is required by statute, and does not preempt State law within the meaning of the Executive Order, the Department has concluded that compliance with the requirements of section 6 is not necessary.

### D. Plain Language Instructions

The Department makes every effort to promote clarity and transparency in its rulemaking. In any regulation, there is a tension between drafting language that is simple and straightforward and drafting language that gives full effect to issues of legal interpretation. The Department operates a toll-free ADA Information Line (800) 514–0301 (voice); (800) 514–0383 (TTY) that the public is welcome to call to obtain assistance in understanding anything in this final rule.

### E. Paperwork Reduction Act

This final rule does not contain any new or revised "collection[s] of information" as defined by the

[19] Using data reported by the Census Bureau for 2007, the most recent year for which information on NAICS 6117102 was available.

Paperwork Reduction Act of 1995. 44 U.S.C. 3501 *et seq.*

### F. Unfunded Mandates Reform Act

Section 4(2) of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1503(2), excludes from coverage under that Act any proposed or final Federal regulation that "establishes or enforces any statutory rights that prohibit discrimination on the basis of race, color, religion, sex, national origin, age, handicap, or disability." Accordingly, this rulemaking is not subject to the provisions of the Unfunded Mandates Reform Act.

### List of Subjects for 28 CFR Parts 35 and 36

Administrative practice and procedure, Buildings and facilities, Business and industry, Civil rights, Communications equipment, Individuals with disabilities, Reporting and recordkeeping requirements, State and local governments.

By the authority vested in me as Attorney General by law, including 28 U.S.C. 509 and 510, 42 U.S.C. 12134, 12186, and 12205a, and Public Law 110–325, 122 Stat. 3553 (2008), parts 35 and 36 of title 28 of the Code of Federal Regulations are amended as follows:

### PART 35—NONDISCRIMINATION ON THE BASIS OF DISABILITY IN STATE AND LOCAL GOVERNMENT SERVICES

■ 1. Revise the authority citation for part 35 to read as follows:

**Authority:** 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12134, 12131, and 12205a.

■ 2. Revise § 35.101 to read as follows:

### § 35.101  Purpose and broad coverage.

(a) *Purpose.* The purpose of this part is to implement subtitle A of title II of the Americans with Disabilities Act of 1990 (42 U.S.C. 12131–12134), as amended by the ADA Amendments Act of 2008 (ADA Amendments Act) (Pub. L. 110–325, 122 Stat. 3553 (2008)), which prohibits discrimination on the basis of disability by public entities.

(b) *Broad coverage.* The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA

have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of "disability." The question of whether an individual meets the definition of "disability" under this part should not demand extensive analysis.

■ 3. Amend § 35.104 by revising the definition of "Disability" to read as follows:

### § 35.104  Definitions.

\*    \*    \*    \*    \*

*Disability.* The definition of *disability* can be found at § 35.108.

\*    \*    \*    \*    \*

■ 4. Add § 35.108 to subpart A to read as follows:

### § 35.108  Definition of "disability."

(a)(1) *Disability* means, with respect to an individual:

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section.

(2) *Rules of construction.* (i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.

(ii) An individual may establish coverage under any one or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section.

(iii) Where an individual is not challenging a public entity's failure to provide reasonable modifications under § 35.130(b)(7), it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public entity's failure to provide reasonable modifications.

(b)(1) *Physical or mental impairment* means:

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

(2) *Physical or mental impairment* includes, but is not limited to, contagious and noncontagious diseases and conditions such as the following: orthopedic, visual, speech, and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(3) *Physical or mental impairment* does not include homosexuality or bisexuality.

(c)(1) *Major life activities* include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working; and

(ii) The operation of a *major bodily function,* such as the functions of the immune system, special sense organs and skin, normal cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive systems. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) *Rules of construction.* (i) In determining whether an impairment substantially limits a major life activity, the term *major* shall not be interpreted strictly to create a demanding standard.

(ii) Whether an activity is a *major life activity* is not determined by reference to whether it is of *central* importance to daily life.

(d) *Substantially limits*—(1) *Rules of construction.* The following rules of

construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) The primary object of attention in cases brought under title II of the ADA should be whether public entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.

(vii) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate.

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(ix) The six-month "transitory" part of the "transitory and minor" exception in paragraph (f)(2) of this section does not apply to the "actual disability" or "record of" prongs of the definition of "disability." The effects of an impairment lasting or expected to last less than six months can be substantially limiting within the meaning of this section for establishing an actual disability or a record of a disability.

(2) *Predictable assessments.* (i) The principles set forth in the rules of construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.

(ii) Applying these principles, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

(A) Deafness substantially limits hearing;

(B) Blindness substantially limits seeing;

(C) Intellectual disability substantially limits brain function;

(D) Partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function;

(E) Autism substantially limits brain function;

(F) Cancer substantially limits normal cell growth;

(G) Cerebral palsy substantially limits brain function;

(H) Diabetes substantially limits endocrine function;

(I) Epilepsy, muscular dystrophy, and multiple sclerosis each substantially limits neurological function;

(J) Human Immunodeficiency Virus (HIV) infection substantially limits immune function; and

(K) Major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and schizophrenia each substantially limits brain function.

(3) *Condition, manner, or duration.* (i) At all times taking into account the principles set forth in the rules of construction, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of "disability," the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or

learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in this section, it may often be unnecessary to conduct an analysis involving most or all of the facts related to condition, manner, or duration. This is particularly true with respect to impairments such as those described in paragraph (d)(2)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(4) *Mitigating measures* include, but are not limited to:

(i) Medication, medical supplies, equipment, appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable modifications or auxiliary aids or services as defined in this regulation;

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(e) *Has a record of such an impairment.* (1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) *Broad construction.* Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3) *Reasonable modification.* An individual with a record of a substantially limiting impairment may

be entitled to a reasonable modification if needed and related to the past disability.

(f) *Is regarded as having such an impairment.* The following principles apply under the "regarded" as prong of the definition of "disability" (paragraph (a)(1)(iii) of this section):

(1) Except as set forth in paragraph (f)(2) of this section, an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, even if the public entity asserts, or may or does ultimately establish, a defense to the action prohibited by the ADA.

(2) An individual is not "regarded as having such an impairment" if the public entity demonstrates that the impairment is, objectively, both "transitory" and "minor." A public entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the public entity must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment), objectively, both "transitory" and "minor." For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title II of the ADA only when an individual proves that a public entity discriminated on the basis of disability within the meaning of title II of the ADA, 42 U.S.C. 12131–12134.

(g) *Exclusions.* The term "disability" does not include—

(1) Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

(2) Compulsive gambling, kleptomania, or pyromania; or

(3) Psychoactive substance use disorders resulting from current illegal use of drugs.

**Subpart B—General Requirements**

■ 5. Amend § 35.130 by revising paragraph (b)(7) and adding paragraph (i) to read as follows:

**§ 35.130    General prohibitions against discrimination.**

\*    \*    \*    \*    \*

(b) \* \* \*

(7)(i) A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

(ii) A public entity is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 35.108(a)(1)(iii).

\*    \*    \*    \*    \*

(i) Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

\*    \*    \*    \*    \*

■ 6. Add Appendix C to part 35 to read as follows:

**Appendix C to Part 35—Guidance to Revisions to ADA Title II and Title III Regulations Revising the Meaning and Interpretation of the Definition of "Disability" and Other Provisions in Order To Incorporate the Requirements of the ADA Amendments Act**

**Note:** This appendix contains guidance providing a section-by-section analysis of the revisions to 28 CFR parts 35 and 36 published on August 11, 2016.

**Guidance and Section-by-Section Analysis**

This section provides a detailed description of the Department's changes to the meaning and interpretation of the definition of "disability" in the title II and title III regulations, the reasoning behind those changes, and responses to public comments received on these topics. *See* Office of the Attorney General; Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008, 79 FR 4839 (Jan. 30, 2014) (NPRM).

*Sections 35.101 and 36.101—Purpose and Broad Coverage*

Sections 35.101 and 36.101 set forth the purpose of the ADA title II and title III regulations. In the NPRM, the Department proposed revising these sections by adding references to the ADA Amendments Act in renumbered §§ 35.101(a) and 36.101(a) and by adding new §§ 35.101(b) and 36.101(b), which explain that the ADA is intended to have broad coverage and that the definition of "disability" shall be construed broadly. The proposed language in paragraph (b) stated that the primary purpose of the ADA Amendments Act is to make it easier for

people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in ADA cases should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability should not demand extensive analysis.

Many commenters supported inclusion of this information as reiterating the statutory language evincing Congress' intention "to restore a broad definition of 'disability' under the ADA. . . ." Several commenters asked the Department to delete the last sentence in §§ 35.101(b) and 36.101(b), arguing that inclusion of this language is inconsistent with the individualized assessment required under the ADA. Some of these commenters acknowledged, however, that this language is drawn directly from the "Purposes" of the ADA Amendments Act. *See* Public Law 110–325, sec. 2(b)(5). The Department declines to remove this sentence from the final rule. In addition to directly quoting the statute, the Department believes that this language neither precludes nor is inconsistent with conducting an individualized assessment of whether an individual is covered by the ADA.

Some commenters recommended that the Department add a third paragraph to these sections expressly stating that "not all impairments are covered disabilities." These commenters contended that "[t]here is a common misperception that having a diagnosed impairment automatically triggers coverage under the ADA." While the Department does not agree that such a misperception is common, it agrees that it would be appropriate to include such a statement in the final rule, and has added it to the rules of construction explaining the phrase "substantially limits" at §§ 35.108(d)(1)(v) and 36.105(d)(1)(v).

*Sections 35.104 and 36.104—Definitions*

The current title II and title III regulations include the definition of "disability" in regulatory sections that contain all enumerated definitions in alphabetical order. Given the expanded length of the definition of "disability" and the number of additional subsections required in order to give effect to the requirements of the ADA Amendments Act, the Department, in the NPRM, proposed moving the definition of "disability" from the general definitional sections at §§ 35.104 and 36.104 to a new section in each regulation, §§ 35.108 and 36.105, respectively.

The Department received no public comments in response to this proposal and the definition of "disability" remains in its own sections in the final rule.

*Sections 35.108(a)(1) and 36.105(a)(1) Definition of "disability"—General*

In the ADA, Congress originally defined "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of an individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." Public Law 101–336, sec. 3 (1990). This three-part definition—the "actual," "record of," and "regarded as" prongs—was modeled after the definition of "handicap" found in the Rehabilitation Act of 1973. H.R. Rep. No. 110–730, pt. 2, at 6 (2008). The Department's 1991 title II and title III ADA regulations reiterate this three-part basic definition as follows:

Disability means, with respect to an individual,

• a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

• a record of such an impairment; or

• being regarded as having such an impairment.

56 FR 35694, 35717 (July 26, 1991); 56 FR 35544, 35548 (July 26, 1991).

While the ADA Amendments Act did not amend the basic structure or terminology of the original statutory definition of "disability," the Act revised the third prong to incorporate by reference two specific provisions construing this prong. 42 U.S.C. 12102(3)(A)–(B). The first statutory provision clarified the scope of the "regarded as" prong by explaining that "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. 12102(3)(A). The second statutory provision provides an exception to the "regarded as" prong for impairments that are both transitory and minor. A transitory impairment is defined as "an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. 12102(3)(B). In the NPRM, the Department proposed revising the "regarded as" prong in §§ 35.108(a)(1)(iii) and 36.105(a)(1)(iii) to reference the regulatory provisions that implement 42 U.S.C. 12102(3). The NPRM proposed, at §§ 35.108(f) and 36.105(f), that "regarded as" having an impairment would mean that the individual has been subjected to an action prohibited by the ADA because of an actual or perceived impairment that is not both "transitory and minor."

The first proposed sentence directed that the meaning of the "regarded as prong" shall be understood in light of the requirements in §§ 35.108(f) and 36.105(f). The second proposed sentence merely provided a summary restatement of the requirements of §§ 35.108(f) and 36.105(f). The Department received no comments in response to this proposed language. Upon consideration, however, the Department decided to retain the first proposed sentence but omit the second as superfluous. Because the first sentence explicitly incorporates and directs the public to the requirements set out in §§ 35.108(f) and 36.105(f), the Department believes that summarizing those requirements here is unnecessary. Accordingly, in the final rule, §§ 35.108(a)(1)(iii) and 36.105(a)(1)(iii)

simply reference paragraph (f) of the respective section. *See also*, discussion in the Guidance and Section-by-Section analysis of §§ 35.108(f) and 36.105(f), below.

*Sections 35.108(a)(2) and 36.105(a)(2) Definition of "disability"—Rules of Construction*

In the NPRM, the Department proposed §§ 35.108(a)(2) and 36.105(a)(2), which set forth rules of construction on how to apply the definition of "disability." Proposed §§ 35.108(a)(2)(i) and 36.105(a)(2)(i) state that an individual may establish coverage under any one or more of the prongs in the definition of "disability"—the "actual disability" prong in paragraph (a)(1)(i), the "record of" prong in paragraph (a)(1)(ii) or the "regarded as" prong in paragraph (a)(1)(iii). *See* §§ 35.108(a)(1)(i) through (iii); 36.105(a)(1)(i) through (iii). The NPRM's inclusion of rules of construction stemmed directly from the ADA Amendments Act, which amended the ADA to require that the definition of "disability" be interpreted in conformance with several specific directives and an overarching mandate to ensure "broad coverage . . . to the maximum extent permitted by the terms of [the ADA]." 42 U.S.C. 12102(4)(A).

To be covered under the ADA, an individual must satisfy only one prong. The term "actual disability" is used in these rules of construction as shorthand terminology to refer to an impairment that substantially limits a major life activity within the meaning of the first prong of the definition of "disability." *See* §§ 35.108(a)(1)(i); 36.105(a)(1)(i). The terminology selected is for ease of reference. It is not intended to suggest that an individual with a disability who is covered under the first prong has any greater rights under the ADA than an individual who is covered under the "record of" or "regarded as" prongs, with the exception that the ADA Amendments Act revised the ADA to expressly state that an individual who meets the definition of "disability" solely under the "regarded as" prong is not entitled to reasonable modifications of policies, practices, or procedures. *See* 42 U.S.C. 12201(h).

Proposed §§ 35.108(a)(2)(ii) and 36.105(a)(2)(ii) were intended to incorporate Congress's expectation that consideration of coverage under the "actual disability" and "record of disability" prongs of the definition of "disability" will generally be unnecessary except in cases involving requests for reasonable modifications. *See* 154 Cong. Rec. H6068 (daily ed. June 25, 2008) (joint statement of Reps. Steny Hoyer and Jim Sensenbrenner). Accordingly, these provisions state that, absent a claim that a covered entity has failed to provide reasonable modifications, typically it is not necessary to rely on the "actual disability" or "record of" disability prongs. Instead, in such cases, the coverage can be evaluated exclusively under the "regarded as" prong," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. Whether or not an individual is challenging a covered entity's failure to provide reasonable modifications, the

individual may nevertheless proceed under the "actual disability" or "record of" prong. The Department notes, however, that where an individual is challenging a covered entity's failure to provide effective communication, that individual cannot rely solely on the "regarded as prong" because the entitlement to an auxiliary aid or service is contingent on a disability-based need for the requested auxiliary aid or service. *See* 28 CFR 35.160(b), 28 CFR 36.303(c).

The Department received no comments objecting to these proposed rules of construction. The final rule retains these provisions but renumbers them as paragraphs (ii) and (iii) of §§ 35.108(a)(2) and 36.105(a)(2) and replaces the reference to "covered entity" in the title III regulatory text with "public accommodation."

The Department has added a third rule of construction at the beginning of §§ 35.108(a)(2) and 36.105(a)(2), numbered §§ 35.108(a)(2)(i) and 36.105(a)(2)(i). Closely tracking the amended statutory language, these provisions state that "[t]he definition of disability shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." *See* 42 U.S.C. 12102(4)(A). This principle is referenced in other portions of the final rule, but the Department believes it is important to include here underscore Congress's intent that it be applied throughout the determination of whether an individual falls within the ADA definition of "disability."

*Sections 35.108(b) and 36.105(b)—Physical or Mental Impairment*

The ADA Amendments Act did not change the meaning of the term "physical or mental impairment." Thus, in the NPRM, the Department proposed only minor modifications to the general regulatory definitions for this term at §§ 35.108(b)(1)(i) and 36.105(b)(1)(i) by adding examples of two additional body systems—the immune system and the circulatory system—that may be affected by a physical impairment.

In addition, the Department proposed adding "dyslexia" to §§ 35.108(b)(2) and 36.105(b)(2) as an example of a specific learning disability that falls within the meaning of the phrase "physical or mental impairment." Although dyslexia is a specific diagnosable learning disability that causes difficulties in reading, unrelated to intelligence and education, the Department became aware that some covered entities mistakenly believe that dyslexia is not a clinically diagnosable impairment. Therefore, the Department sought public comment regarding its proposed inclusion of a reference to dyslexia in these sections.

The Department received a significant number of comments in response to this proposal. Many commenters supported inclusion of the reference to dyslexia. Some of these commenters also asked the Department to include other examples of specific learning disabilities such as dysgraphia [1] and dyscalculia.[2] Several

commenters remarked that as "research and practice bear out, dyslexia is just one of the specific learning disabilities that arise from 'neurological differences in brain structure and function and affect a person's ability to receive, store, process, retrieve or communicate information.'" These commenters identified the most common specific learning disabilities as: "Dyslexia, dysgraphia, dyscalculia, auditory processing disorder, visual processing disorder and non-verbal learning disorders," and recommended that the Department rephrase its reference to specific learning disabilities to make clear that there are many other specific learning disabilities besides dyslexia. The Department has considered all of these comments and has decided to use the phrase "dyslexia and other specific learning disabilities" in the final rule.

Another commenter asked the Department to add a specific definition of dyslexia to the regulatory text itself. The Department declines to do so as it does not give definitions for any other physical or mental impairment in the regulations.

Other commenters recommended that the Department add ADHD to the list of examples of "physical or mental impairments" in §§ 35.108(b)(2) and 36.105(b)(2).[3] Some commenters stated that ADHD, which is not a specific learning disability, is a very commonly diagnosed impairment that is not always well understood. These commenters expressed concern that excluding ADHD from the list of physical and mental impairments could be construed to mean that ADHD is less likely to support an assertion of disability as compared to other impairments. On consideration, the Department agrees that, due to the prevalence of ADHD but lack of public understanding of the condition, inclusion of ADHD among the examples set forth in §§ 35.108(b)(2) and 36.105(b)(2) will provide appropriate and helpful guidance to the public.

Other commenters asked the Department to include arthritis, neuropathy, and other examples of physical or mental impairments that could substantially impair a major life activity. The Department declines to add any other examples because, while it notes the value in clarifying the existence of impairments such as ADHD, it also recognizes that the regulation need not elaborate an inclusive list of all impairments, particularly those that are very prevalent, such as arthritis, or those that may be symptomatic of other underlying impairments already referenced in the list, such as neuropathy, which may be caused by

cancer or diabetes. The list is merely illustrative and not exhaustive. The regulations clearly state that the phrase "physical or mental impairment" includes, but is not limited to" the examples provided. No negative implications should be drawn from the omission of any specific impairment in §§ 35.108(b) and 36.105(b).

The Department notes that it is important to distinguish between conditions that are impairments and physical, environmental, cultural, or economic characteristics that are not impairments. The definition of the term "impairment" does not include physical characteristics such as eye color, hair color, or left-handedness, or height, weight, or muscle tone that are within "normal" range. Moreover, conditions that are not themselves physiological disorders, such as pregnancy, are not impairments. However, even if an underlying condition or characteristic is not itself a physical or mental impairment, it may give rise to a physical or mental impairment that substantially limits a major life activity. In such a case, an individual would be able to establish coverage under the ADA. For example, while pregnancy itself is not an impairment, a pregnancy-related impairment that substantially limits a major life activity will constitute a disability under the first prong of the definition.[4] Major life activities that might be substantially limited by pregnancy-related impairments could include walking, standing, and lifting, as well as major bodily functions such as the musculoskeletal, neurological, cardiovascular, circulatory, endocrine, and reproductive functions. Alternatively, a pregnancy-related impairment may constitute a "record of" a substantially limiting impairment, or may be covered under the "regarded as" prong if it is the basis for a prohibited action and is not both "transitory and minor."

*Sections 35.108(c) and 36.105(c)—Major Life Activities*

Prior to the passage of the ADA Amendments Act, the ADA did not define "major life activities," leaving delineation of illustrative examples to agency regulations. Paragraph 2 of the definition of "disability" in the Department's current title II and title III regulations at 28 CFR 35.104 and 36.104 states that "major life activities" means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

The ADA Amendments Act significantly expanded the range of major life activities by directing that "major" be interpreted in a more expansive fashion, by adding a significant new category of major life activities, and by providing non-exhaustive

---

[1] Dysgraphia is a learning disability that negatively affects the ability to write.

[2] Dyscalculia is a learning disability that negatively affects the processing and learning of numerical information.

[3] The Department is using the term ADHD in the same manner as it is currently used in the Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition (DSM–5), to refer to three different presentations of symptoms: Predominantly inattentive (which was previously known as "attention deficit disorder); predominantly hyperactive or impulsive; or a combined presentation of inattention and hyperactivity-impulsivity. The DSM–5 is the most recent edition of a widely-used manual designed to assist clinicians and researchers in assessing mental disorders. *See Diagnostic and Statistical Manual of Mental Disorders: Fifth Edition DSM–5,* American Psychiatric Association, at 59–66 (2013).

[4] Pregnancy-related impairments may include, but are not limited to: Disorders of the uterus and cervix, such as insufficient cervix or uterine fibroids; and pregnancy-related anemia, sciatica, carpal tunnel syndrome, gestational diabetes, nausea, abnormal heart rhythms, limited circulation, or depression. *See* EEOC Enforcement Guidance on Pregnancy Discrimination and Related Issues, EEOC Notice 915.003, June 25, 2015, *available at http://www.eeoc.gov/laws/guidance/ pregnancy_guidance.cfm* (last visited Feb. 3, 2016).

lists of examples of major life activities. The amended statute's first list of major life activities includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. 12102(2)(A). The ADA Amendments Act also broadened the definition of "major life activity" to include physical or mental impairments that substantially limit the operation of a "major bodily function," which include, but are not limited to, the "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. 12102(2)(B). These expanded lists of examples of major life activities reflect Congress's directive to expand the meaning of the term "major" in response to court decisions that interpreted the term more narrowly than Congress intended. *See* Public Law 110–25, sec. 3 (b)(4).

*Examples of Major Life Activities, Other Than the Operations of a Major Bodily Function*

In the NPRM, at §§ 35.108(c) and 36.105(c), the Department proposed revisions of the title II and title III lists of examples of major life activities (other than the operations of a major bodily function) to incorporate all of the statutory examples, as well as to provide additional examples included in the EEOC title I final regulation—reaching, sitting, and interacting with others. *See* 29 CFR 1630.2(i)(1)(i).

A number of commenters representing persons with disabilities or the elderly recommended that the Department add a wide variety of other activities to this first list. Some commenters asked the Department to include references to test taking, writing, typing, keyboarding, or executive function.[5] Several commenters asked the Department to include other activities as well, such as the ability to engage in sexual activity, perform mathematical calculations, travel, or drive. One commenter asked the Department to recognize that, depending upon where people live, other life activities may fall within the category of major life activities. This commenter asserted, for example, that tending livestock or operating farm equipment can be a major life activity in a farming or ranching community, and that maintaining septic, well or water systems, or gardening, composting, or hunting may be a major life activity in a rural community.

On consideration of the legislative history and the relevant public comments, the Department decided to include "writing" as an additional example in its non-exhaustive list of examples of major life activities in the final rule. The Department notes Congress

repeatedly stressed that writing is one of the major life activities that is often affected by a covered learning disability. *See, e.g.,* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers); H.R. Rep. No. 110–730 pt. 1, at 10–11 (2008).

Other than "writing," the Department declines to add additional examples of major life activities to these provisions in the final rule. This list is illustrative, and the Department believes that it is neither necessary nor possible to list every major life activity. Moreover, the Department notes that many of the commenters' suggested inclusions implicate life activities already included on the list. For example, although, as commenters pointed out, some courts have concluded that test taking is a major life activity,[6] the Department notes that one or more already-included major life activities—such as reading, writing, concentrating, or thinking, among others—will virtually always be implicated in test taking. Similarly, activities such as operating farm equipment, or maintaining a septic or well system, implicate already-listed major life activities such as reaching, lifting, bending, walking, standing, and performing manual tasks.

The commenters' suggested additions also implicate the operations of various bodily systems that may already be recognized as major life activities. *See* discussion of §§ 35.108(c)(1)(ii) and 36.105(c)(1)(ii), below. For example, it is the Department's view that individuals who have cognitive or other impairments that affect the range of abilities that are often described as part of "executive function" will likely be able to assert that they have impairments that substantially limit brain function, which is one of the major bodily functions listed among the examples of major life activities.

*Examples of Major Life Activities— Operations of a Major Bodily Function*

In the NPRM, the Department proposed revising the regulatory definitions of disability at §§ 35.108(c)(1)(ii) and 36.105(c)(1)(ii) to make clear that the operations of major bodily functions are major life activities, and to include a non-exhaustive list of examples of major bodily functions, consistent with the language of the ADA as amended. Because the statutory list is non-exhaustive, the Department also proposed further expanding the list to include the following examples of major bodily functions: The functions of the special sense organs and skin, genitourinary, cardiovascular, hemic, lymphatic, and musculoskeletal systems. These six major

bodily functions also are specified in the EEOC title I final regulation. 29 CFR 1630.2(i)(1)(i).

One commenter objected to the Department's inclusion of additional examples of major life activities in both these lists, suggesting that the Department include only those activities and conditions specifically set forth in the ADA as amended. The Department believes that providing other examples of major life activities, including major bodily functions, is within the Attorney General's authority to both interpret titles II and III of the ADA and promulgate implementing regulations and that these examples provide helpful guidance to the public. Therefore, the Department declines to limit its lists of major life activities to those specified in the statute. Further, the Department notes that even the expanded lists of major life activities and major bodily functions are illustrative and non-exhaustive. The absence of a particular life activity or bodily function from the list should not create a negative implication as to whether such activity or function constitutes a major life activity under the statute or the implementing regulation.

*Rules of Construction for Major Life Activities*

In the NPRM, proposed §§ 35.108(c)(2) and 36.105(c)(2) set out two specific principles applicable to major life activities: "[i]n determining other examples of major life activities, the term 'major' shall not be interpreted strictly to create a demanding standard for disability," and "[w]hether an activity is a 'major life activity' is not determined by reference to whether it is of 'central importance to daily life.'" The proposed language furthered a main purpose of the ADA Amendments Act—to reject the standards enunciated by the Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc.* v. *Williams* that (1) strictly interpreted the terms "substantially" and "major" in the definition of "disability" to create a demanding standard for qualifying as disabled under the ADA, and that (2) required an individual to have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives to be considered as "substantially limited" in performing a major life activity under the ADA. Public Law 110–325, sec. 2(b)(4).

The Department did not receive any comments objecting to its proposed language. In the final rule, the Department retained these principles but has numbered each principle individually and deemed them "rules of construction" because they are intended to inform the determination of whether a particular activity is a major life activity.

*Sections 35.108(d)(1) and 36.105(d)(1)— Substantially Limits*

*Overview.* The ADA as amended directs that the term "substantially limits" shall be "interpreted consistently with the findings and purposes of the ADA Amendments Act." 42 U.S.C. 12102(4)(B). *See also* Findings and Purposes of the ADA Amendments Act, Public Law 110–325, sec. 2(a)–(b). In the

---

[5] "Executive function" is an umbrella term that has been described as referring to "a constellation of cognitive abilities that include the ability to plan, organize, and sequence tasks and manage multiple tasks simultaneously." *See, e.g.* National Institute of Neurological Disorders and Stroke, *Domain Specific Tasks of Executive Functions, available at grants.nih.gov/grants/guide/notice-files/NOT-NS-04-012.html* (last visited Feb. 3, 2016).

[6] In *Bartlett* v. *N.Y. State Bd. of Law Exam'rs,* 970 F. Supp. 1094, 1117 (S.D.N.Y. 1997), *aff'd in part and vacated in part,* 156 F.3d 321 (2d Cir. 1998), *cert. granted, judgment vacated on other grounds,* 527 U.S. 1031 (1999), and *aff'd in part, vacated in part,* 226 F.3d 69 (2d Cir. 2000), then-Judge Sotomayor stated, "[I]n the modern era, where test-taking begins in the first grade, and standardized tests are a regular and often life-altering occurrence thereafter, both in school and at work, I find test-taking is within the ambit of 'major life activity.'" *See also Rawdin* v. *American Bd. of Pediatrics,* 985 F. Supp. 2d 636 (E.D. Pa. 2013), *aff'd. on other grounds,* 2014 U.S. App. LEXIS 17002 (3d Cir. Sept. 3, 2014).

NPRM, the Department proposed to add nine rules of construction at §§ 35.108(d) and 36.105(d) clarifying how to interpret the meaning of "substantially limits" when determining whether an individual's impairment substantially limits a major life activity. These rules of construction are based on the requirements of the ADA as amended and the clear mandates of the legislative history. Due to the insertion of the rules of construction, these provisions are renumbered in the final rule.

*Sections 35.108(d)(1)(i) and 36.105(d)(1)(i)— Broad Construction, Not a Demanding Standard*

In accordance with Congress's overarching directive to construe the term "disability" broadly, *see* 42 U.S.C. 12102(4)(A), the Department, in its NPRM, proposed §§ 35.108(d)(1)(i) and 36.105(d)(1)(i), which state: "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." These provisions are also rooted in the Findings and Purposes of the ADA Amendments Act, in which Congress instructed that "the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *See* Public Law 110–325, sec. 2(b)(1), (4)–(5).

Several commenters on these provisions supported the Department's proposal to include these rules of construction, noting that they were in keeping with both the statutory language and Congress's intent to broaden the definition of "disability" and restore expansive protection under the ADA. Some of these commenters stated that, even after the passage of the ADA Amendments Act, some covered entities continued to apply a narrow definition of "disability."

Other commenters expressed concerns that the proposed language would undermine congressional intent by weakening the meaning of the word "substantial." One of these commenters asked the Department to define the term "substantially limited" to include an element of materiality, while other commenters objected to the breadth of these provisions and argued that it would make the pool of people who might claim disabilities too large, allowing those without substantial limitations to be afforded protections under the law. Another commenter expressed concern about the application of the regulatory language to the diagnosis of learning disabilities and ADHD.

The Department considered all of these comments and declines to provide a definition of the term "substantially limits" or make any other changes to these provisions in the final rule. The Department notes that Congress considered and expressly rejected including language defining the term "substantially limits": "We have concluded that adopting a new, undefined term that is subject to widely disparate meanings is not the best way to achieve the goal of ensuring consistent and appropriately broad coverage under this Act. The resulting need for further judicial scrutiny and construction will not help move the focus from the threshold issue of disability to the primary issue of discrimination." 154 Cong. Rec. S8441. (daily

ed. Sept. 16, 2008) (Statement of the Managers).

The Department believes that the nine rules of construction interpreting the term "substantially limits" provide ample guidance on determining whether an impairment substantially limits a major life activity and are sufficient to ensure that covered entities will be able to understand and apply Congress's intentions with respect to the breadth of the definition of "disability."

Moreover, the commenters' arguments that these provisions would undermine congressional intent are unsupported. To the contrary, Congress clearly intended the ADA Amendments Act to expand coverage: "The managers have introduced the ADA Amendments Act of 2008 to restore the proper balance and application of the ADA by clarifying and broadening the definition of disability, and to increase eligibility for the protections of the ADA. It is our expectation that because this bill makes the definition of disability more generous, some people who were not covered before will now be covered." 154 Cong. Rec. S8441 (daily ed. Sept. 16, 2008) (Statement of the Managers).

The Department has also considered the comments expressed about the interplay between the proposed regulatory language and the diagnosis of learning disabilities and ADHD disorders. The Department believes that the revised definition of "disability," including, in particular, the provisions construing "substantially limits," strikes the appropriate balance to effectuate Congress's intent when it passed the ADA Amendments Act, and will not modify its regulatory language in response to these comments.

*Sections 35.108(d)(1)(ii) and 36.105(d)(1)(ii)—Primary Object of ADA Cases*

In the ADA Amendments Act, Congress directed that rules of construction should ensure that "substantially limits" is construed in accordance with the findings and purposes of the statute. *See* 42 U.S.C. 12102(4)(B). One of the purposes of the Act was to convey that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with the obligations and to convey that the question of whether an individuals' impairment is a disability should not demand extensive analysis." Public Law 110–325, sec. 2(b)(5). The legislative history clarifies that: "Through this broad mandate [of the ADA], Congress sought to protect anyone who is treated less favorably because of a current, past, or perceived disability. Congress did not intend for the threshold question of disability to be used as a means of excluding individuals from coverage. Nevertheless, as the courts began interpreting and applying the definition of disability strictly, individuals have been excluded from the protections that the ADA affords because they are unable to meet the demanding judicially imposed standard for qualifying as disabled."). H.R. Rep. No. 110–730, pt. 2, at 5 (2008) (House Committee on the Judiciary).

In keeping with Congress's intent and the language of the ADA Amendments Act, the

rules of construction at proposed §§ 35.108(d)(1)(iii) and 36.105(d)(1)(iii) make clear that the primary object of attention in ADA cases should be whether public or other covered entities have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. In particular, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

A number of commenters expressed support for these rules of construction, noting that they reinforced Congress's intent in ensuring that the primary focus will be on compliance. Several commenters objected to the use of the word "cases" in these provisions, stating that it lacked clarity. The word "cases" tracks the language of the ADA Amendments Act and the Department declines to change the term.

A few commenters objected to these provisions because they believed that the language would be used to supersede or otherwise change the required analysis of requests for reasonable modifications or testing accommodations. *See* 28 CFR 35.130(b)(7), 36.302, 36.309. The Department disagrees with these commenters. These rules of construction relate only to the determination of coverage under the ADA. They do not change the analysis of whether a discriminatory act has taken place, including the determination as to whether an individual is entitled to a reasonable modification or testing accommodation. *See* discussion of §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii) below.

The Department retained the language of these rules of construction in the final rule text except that in the title III regulatory text it has changed the reference from "covered entity" to "public accommodation." The Department also renumbered these provisions as §§ 35.108(d)(1)(ii) and 36.105(d)(1)(ii).

*Sections 35.108(d)(1)(iii) and 36.105(d)(1)(iii)—Impairment Need Not Substantially Limit More Than One Major Life Activity*

Proposed §§ 35.108(d)(1)(viii) and 36.105(d)(1)(viii) stated that "[a]n impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." *See* 42 U.S.C. 12102(4)(C). This language reflected the statutory intent to reject court decisions that had required individuals to show that an impairment substantially limits more than one major life activity. *See* 154 Cong. Rec. S8841–44 (daily ed. Sept. 16, 2008) (Statement of the Managers). Applying this principle, for example, an individual seeking to establish coverage under the ADA need not show a substantial limitation in the ability to learn if that individual is substantially limited in another major life activity, such as walking, or the functioning of the nervous or endocrine systems. The proposed rule also was intended to clarify that the ability to perform one or more particular tasks within a broad category of activities does not

preclude coverage under the ADA. *See* H.R. Rep. No. 110–730, pt. 2, at 19 & n.52 (2008) (House Committee on the Judiciary). For instance, an individual with cerebral palsy could have a capacity to perform certain manual tasks yet nonetheless show a substantial limitation in the ability to perform a "broad range" of manual tasks.

The Department received one comment specifically supporting this provision and none opposing it. The Department is retaining this language in the final rule although it is renumbered and is found at §§ 35.108(d)(1)(iii) and 36.105(d)(1)(iii).

*Sections 35.108(d)(1)(iv) and 36.105(d)(1)(iv)—Impairments That Are Episodic or in Remission*

The ADA as amended provides that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."

42 U.S.C. 12102(4)(D). In the NPRM, the Department proposed §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii) to directly incorporate this language. These provisions are intended to reject the reasoning of court decisions concluding that certain individuals with certain conditions—such as epilepsy or post traumatic stress disorder—were not protected by the ADA because their conditions were episodic or intermittent. The legislative history provides that "[t]his . . . rule of construction thus rejects the reasoning of the courts in cases like *Todd* v. *Academy Corp.*

[57 F. Supp. 2d 448, 453 (S.D. Tex. 1999)] where the court found that the plaintiff's epilepsy, which resulted in short seizures during which the plaintiff was unable to speak and experienced tremors, was not sufficiently limiting, at least in part because those seizures occurred episodically. It similarly rejects the results reached in cases [such as *Pimental* v. *Dartmouth-Hitchcock Clinic,* 236 F. Supp. 2d 177, 182–83 (D.N.H. 2002)] where the courts have discounted the impact of an impairment [such as cancer] that may be in remission as too short-lived to be substantially limiting. It is thus expected that individuals with impairments that are episodic or in remission (*e.g.,* epilepsy, multiple sclerosis, cancer) will be able to establish coverage if, when active, the impairment or the manner in which it manifests (*e.g.,* seizures) substantially limits a major life activity." H.R. Rep. No. 110–730, pt. 2, at 19–20 (2008) (House Committee on the Judiciary).

Some examples of impairments that may be episodic include hypertension, diabetes, asthma, major depressive disorder, bipolar disorder, and schizophrenia. The fact that the periods during which an episodic impairment is active and substantially limits a major life activity may be brief or occur infrequently is no longer relevant to determining whether the impairment substantially limits a major life activity. For example, a person with post-traumatic stress disorder who experiences intermittent flashbacks to traumatic events is substantially limited in brain function and thinking.

The Department received three comments in response to these provisions. Two commenters supported this provision and

one commenter questioned about how school systems should provide reasonable modifications to students with disabilities that are episodic or in remission. As discussed elsewhere in this guidance, the determination of what is an appropriate modification is separate and distinct from the determination of whether an individual is covered by the ADA, and the Department will not modify its regulatory language in response to this comment.

*Sections 35.108(d)(1)(v) and 36.105(d)(1)(v)— Comparisons to Most People in the Population, and Impairment Need Not Prevent or Significantly or Severely Restrict a Major Life Activity*

In the legislative history of the ADA Amendments Act, Congress explicitly recognized that it had always intended that determinations of whether an impairment substantially limits a major life activity should be based on a comparison to most people in the population. The Senate Managers Report approvingly referenced the discussion of this requirement in the committee report from 1989. *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers) (citing S. Rep. No. 101–116, at 23 (1989)). The preamble to the Department's 1990 title II and title III regulations also referenced that the impact of an individual's impairment should be based on a comparison to most people. *See* 56 FR 35694, 35699 (July 26, 1991).

Consistent with its longstanding intent, Congress directed, in the ADA Amendments Act, that disability determinations "should not demand extensive analysis" and that impairments do not need to rise to the level of "prevent[ing] or severely restrict[ing] the individual from doing activities that are of central importance to most people's daily lives." *See* Public Law 110–325, sec. 2(b)(4)– (5). In giving this direction, Congress sought to correct the standard that courts were applying to determinations of disability after *Toyota,* which had created "a situation in which physical or mental impairments that would previously have been found to constitute disabilities are not considered disabilities under the Supreme Court's narrower standard." 154 Cong. Rec. S8840– 8841 (daily ed. Sept. 16, 2008) (Statement of the Managers). The ADA Amendments Act thus abrogates *Toyota's* holding by mandating that "substantially limited" must no longer create "an inappropriately high level of limitation." *See* Public Law 110–325, sec. 2(b)(4)–(5) and 42 U.S.C. 12102(4)(B). For example, an individual with carpal tunnel syndrome, a physical impairment, can demonstrate that the impairment substantially limits the major life activity of writing even if the impairment does not prevent or severely restrict the individual from writing.

Accordingly, proposed §§ 35.108(d)(1)(ii) and 36.105(d)(1)(ii) state that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. However, an impairment does not need to prevent, or significantly or severely restrict, an individual from performing a major life

activity in order to be substantially limiting. The proposed language in the NPRM was rooted in the corrective nature of the ADA Amendments Act and its explicit rejection of the strict standards imposed under *Toyota* and its progeny. *See* Public Law 110–325, sec. 2(b)(4).

The Department received several comments on these provisions, none of which recommended modification of the regulatory language. A few commenters raised concerns that are further addressed in the "Condition, manner, or duration" section below, regarding the Department's inclusion in the NPRM preamble of a reference to possibly using similarly situated individuals as the basis of comparison. The Department has removed this discussion and clarified that it does not endorse reliance on similarly situated individuals to demonstrate substantial limitations. For example, the Department recognizes that when determining whether an elderly person is substantially limited in a major life activity, the proper comparison is most people in the general population, and not similarly situated elderly individuals. Similarly, someone with ADHD should be compared to most people in the general population, most of whom do not have ADHD. Other commenters expressed interest in the possibility that, in some cases, evidence to support an assertion that someone has an impairment might simultaneously be used to demonstrate that the impairment is substantially limiting. These commenters approvingly referenced the EEOC's interpretive guidance for its ADA Amendments Act regulation, which provided an example of an individual with a learning disability. *See* 76 FR 16978, 17009 (Mar. 25, 2011). In that example, evidence gathered to demonstrate the impairment of a learning disability showed a discrepancy between the person's age, measured intelligence, and education and that person's actual versus expected achievement. The EEOC noted that such individuals also likely would be able to demonstrate substantial limitations caused by that impairment to the major life activities of learning, reading, or thinking, when compared to most people in the general population, especially when the ameliorative effects of mitigating measures were set aside. The Department concurs with this view.

Finally, the Department added an explicit statement recognizing that not every impairment will constitute a disability within the meaning of the section. This language echoes the Senate Statement of Managers, which clarified that: "[N]ot every individual with a physical or mental impairment is covered by the first prong of the definition of disability in the ADA. An impairment that does not substantially limit a major life activity is not a disability under this prong." 154 Cong. Rec. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers).

*Sections 35.108(d)(1)(vi) and 36.105(d)(1)(vi)—"Substantially Limits" Shall Be Interpreted To Require a Lesser Degree of Functional Limitation Than That Required Prior to the ADA Amendments Act*

In the NPRM, proposed §§ 35.108(d)(1)(iv) and 36.105(d)(1)(iv) state that determining

whether an impairment substantially limits a major life activity requires an individualized assessment. But, the interpretation and application of the term "substantially limits" for this assessment requires a lower degree of functional limitation than the standard applied prior to the ADA Amendments Act.

These rules of construction reflect Congress's concern that prior to the adoption of the ADA Amendments Act, courts were using too high a standard to determine whether an impairment substantially limited a major life activity. *See* Public Law 110–325, sec. 2(b)(4)–(5); *see also* 154 Cong. Rec. S8841 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("This bill lowers the standard for determining whether an impairment constitute[s] a disability and reaffirms the intent of Congress that the definition of disability in the ADA is to be interpreted broadly and inclusively.").

The Department received no comments on these provisions. The text of these provisions is unchanged in the final rule, although they have been renumbered as §§ 35.108(d)(1)(vi) and 36.105(d)(1)(vi).

*Sections §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii)—Comparison of Individual's Performance of Major Life Activity Usually Will Not Require Scientific, Medical, or Statistical Analysis*

In the NPRM, the Department proposed at §§ 35.108(d)(1)(v) and 36.105(d)(1)(v) rules of construction making clear that the comparison of an individual's performance of a major life activity to that of most people in the general population usually will not require scientific, medical, or statistical evidence. However, this rule is not intended to prohibit or limit the use of scientific, medical, or statistical evidence in making such a comparison where appropriate.

These rules of construction reflect Congress's rejection of the demanding standards of proof imposed upon individuals with disabilities who tried to assert coverage under the ADA prior to the adoption of the ADA Amendments Act. In passing the Act, Congress rejected the idea that the disability determination should be "an onerous burden for those seeking accommodations or modifications." *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). These rules make clear that in most cases, people with impairments will not need to present scientific, medical, or statistical evidence to support their assertion that an impairment is substantially limiting compared to most people in the general population. Instead, other types of evidence that are less onerous to collect, such as statements or affidavits of affected individuals, school records, or determinations of disability status under other statutes, should, in most cases, be considered adequate to establish that an impairment is substantially limiting. The Department's proposed language reflected Congress's intent to ensure that individuals with disabilities are not precluded from seeking protection under the ADA because of an overbroad, burdensome, and generally unnecessary requirement.

The Department received several comments in support of these provisions and

a number of comments opposing all or part of them. One commenter representing individuals with disabilities expressed support for the proposed language, noting that "[m]any people with disabilities have limited resources and requiring them to hire an expert witness to confirm their disability would pose an insurmountable barrier that could prevent them from pursuing their ADA cases."

Commenters representing testing entities objected to this language arguing that they needed scientific, medical, or statistical evidence in order to determine whether an individual has a learning disability or ADHD. These commenters argued that, unlike other disabilities, assessment of learning disabilities and ADHD require scientific, medical, or statistical evidence because such disabilities have no overt symptoms, cannot be readily observed, and lack medical or scientific verifiability. One commenter stated that the proposed language "favor[s] expedience over evidence-based guidance."

In opposing these provisions, these commenters appear to conflate proof of the existence of an impairment with the analysis of how an impairment substantially limits a major life activity. These provisions address only how to evaluate whether an impairment substantially limits a major life activity, and the Department's proposed language appropriately reflects Congress's intent to ensure that individuals with disabilities are not precluded from seeking protection under the ADA because of overbroad, burdensome, and generally unnecessary evidentiary requirements. Moreover, the Department disagrees with the commenters' suggestion that an individual with ADHD or a specific learning disability can never demonstrate how the impairment substantially limits a major life activity without scientific, medical, or statistical evidence. Scientific, medical, or statistical evidence usually will not be necessary to determine whether an individual with a disability is substantially limited in a major life activity. However, as the rule notes, such evidence may be appropriate in some circumstances.

One commenter suggested that the words "where appropriate" be deleted from these provisions in the final rule out of concern that they may be used to preclude individuals with disabilities from proffering scientific or medical evidence in support of a claim of coverage under the ADA. The Department disagrees with the commenter's reading of these provisions. Congress recognized that some people may choose to support their claim by presenting scientific or medical evidence and made clear that "plaintiffs should not be constrained from offering evidence needed to establish that their impairment is substantially limiting." *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). The language "where appropriate" allows for those circumstances where an individual chooses to present such evidence, but makes clear that in most cases presentation of such evidence shall not be necessary.

Finally, although the NPRM did not propose any changes with respect to the title III regulatory requirements applicable to the provision of testing accommodations at 28

CFR 36.309, one commenter requested revisions to § 36.309 to acknowledge the changes to regulatory language in the definition of "disability." Another commenter noted that the proposed changes to the regulatory definition of "disability" warrant new agency guidance on how the ADA applies to requests for testing accommodations.

The Department does not consider it appropriate to include provisions related to testing accommodations in the definitional sections of the ADA regulations. The determination of disability, and thus coverage under the ADA, is governed by the statutory and regulatory definitions and the related rules of construction. Those provisions do not speak to what testing accommodations an individual with a disability is entitled to under the ADA nor to the related questions of what a testing entity may request or require from an individual with a disability who seeks testing accommodations. Testing entities' substantive obligations are governed by 42 U.S.C. 12189 and the implementing regulation at 28 CFR 36.309. The implementing regulation clarifies that private entities offering covered examinations need to make sure that any request for required documentation is reasonable and limited to the need for the requested modification, accommodation, or auxiliary aid or service. Furthermore, when considering requests for modifications, accommodations, or auxiliary aids or services, the entity should give considerable weight to documentation of past modifications, accommodations, or auxiliary aids or services received in similar testing situations or provided in response to an Individualized Education Program (IEP) provided under the IDEA or a plan describing services provided under section 504 of the Rehabilitation Act of 1973 (often referred to as a Section 504 Plan).

Contrary to the commenters' suggestions, there is no conflict between the regulation's definitional provisions and title III's testing accommodation provisions. The first addresses the core question of who is covered under the definition of "disability," while the latter sets forth requirements related to documenting the need for particular testing accommodations. To the extent that testing entities are urging conflation of the analysis for establishing disability with that for determining required testing accommodations, such an approach would contradict the clear delineation in the statute between the determination of disability and the obligations that ensue.

Accordingly, in the final rule, the text of these provisions is largely unchanged, except that the provisions are renumbered at §§ 35.108(d)(1)(vii) and 36.105(d)(1)(vii), and the Department added "the presentation of," in the second sentence, which was included in the corresponding provision of the EEOC final rule. *See* 29 CFR 1630.2(j)(1)(v).

*Sections 35.108(d)(1)(viii) and 36.105(d)(1)(viii)—Determination Made Without Regard to the Ameliorative Effects of Mitigating Measures*

The ADA as amended expressly prohibits any consideration of the ameliorative effects

of mitigating measures when determining whether an individual's impairment substantially limits a major life activity, except for the ameliorative effects of ordinary eyeglasses or contact lenses. 42 U.S.C. 12102(4)(E). The statute provides an illustrative, and non-exhaustive list of different types of mitigating measures. *Id.*

In the NPRM, the Department proposed §§ 35.108(d)(2)(vi) and 36.105(d)(2)(vi), which tracked the statutory language regarding consideration of mitigating measures. These provisions stated that the ameliorative effects of mitigating measures should not be considered when determining whether an impairment substantially limits a major life activity. However, the beneficial effects of ordinary eyeglasses or contact lenses should be considered when determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses refer to lenses that are intended to fully correct visual acuity or to eliminate refractive errors. Proposed §§ 35.108(d)(4) and 36.105(d)(4), discussed below, set forth examples of mitigating measures.

A number of commenters agreed with the Department's proposed language and no commenters objected. Some commenters, however, asked the Department to add language to these sections stating that, although the ameliorative effects of mitigating measures may not be considered in determining whether an individual has a covered disability, they may be considered in determining whether an individual is entitled to specific testing accommodations or reasonable modifications. The ADA Amendments Act revised the definition of "disability" and the Department agrees that the Act's prohibition on assessing the ameliorative effects of mitigating measures applies only to the determination of whether an individual meets the definition of "disability." The Department declines to add the requested language, however, because it goes beyond the scope of this rulemaking by addressing ADA requirements that are not related to the definition of "disability." These rules of construction do not apply to the requirements to provide reasonable modifications under §§ 35.130(b)(7) and 36.302 or testing accommodations under § 36.309 in the title III regulations. The Department disagrees that further clarification is needed at this point and declines to modify these provisions except that they are now renumbered as §§ 35.108(d)(1)(viii) and § 36.105(d)(1)(viii).

The Department notes that in applying these rules of construction, evidence showing that an impairment would be substantially limiting in the absence of the ameliorative effects of mitigating measures could include evidence of limitations that a person experienced prior to using a mitigating measure or evidence concerning the expected course of a particular disorder absent mitigating measures.

The determination of whether an individual's impairment substantially limits a major life activity is unaffected by an individual's choice to forgo mitigating measures. For individuals who do not use a mitigating measure (including, for example,

medication or auxiliary aids and services that might alleviate the effects of an impairment), the availability of such measures has no bearing on whether the impairment substantially limits a major life activity. The limitations posed by the impairment on the individual and any negative (non-ameliorative) effects of mitigating measures will serve as the foundation for a determination of whether an impairment is substantially limiting. The origin of the impairment, whether its effects can be mitigated, and any ameliorative effects of mitigating measures that are employed may not be considered in determining if the impairment is substantially limiting.

### Sections 35.108(d)(1)(ix) and 36.105(d)(1)(ix)—Impairment That Lasts Less Than Six Months Can Still Be a Disability Under First Two Prongs of the Definition

In §§ 35.108(d)(1)(ix) and 36.105(d)(1)(ix), the NPRM proposed rules of construction noting that the six-month "transitory" part of the "transitory and minor" exception does not apply to the "actual disability" or "record of" prongs of the definition of "disability." Even if an impairment may last or is expected to last six months or less, it can be substantially limiting.

The ADA as amended provides that the "regarded as" prong of the definition of "disability" does "not apply to impairments that are [both] transitory and minor." 42 U.S.C. 12102(3)(B). "Transitory impairment" is defined as "an impairment with an actual or expected duration of six months or less." *Id.* The statute does not define the term "minor." Whether an impairment is both "transitory and minor" is a question of fact that is dependent upon individual circumstances. The ADA as amended contains no such provision with respect to the first two prongs of the definition of "disability"—"actual disability," and "record of" disability. The application of the "transitory and minor" exception to the "regarded as" prong is addressed in §§ 35.108(f) and 36.105(f).

The Department received two comments on this proposed language. One commenter recommended that the Department delete this language and "replace it with language clarifying that if a condition cannot meet the lower threshold of impairment under the third prong, it cannot meet the higher threshold of a disability under the first and second prongs." The Department declines to modify these provisions because the determination of whether an individual satisfies the requirements of a particular prong is not a comparative determination between the three means of demonstrating disability under the ADA. The Department believes that the suggested language would create confusion because there are significant differences between the first two prongs and the third prong. In addition, the Department believes its proposed language is in keeping with the ADA Amendments Act and the supporting legislative history.

The other commenter suggested that the Department add language to provide greater clarity with respect to the application of the transitory and minor exception to the "regarded as prong." The Department does

not believe that additional language should be added to these rules of construction, which relate only to whether there is a six-month test for the first two prongs of the definition. As discussed below, the Department has revised both the regulatory text at §§ 35.108(f) and 36.105(f) and its guidance on the application of the "transitory and minor" exception to the "regarded as" prong. *See* discussion below.

### Sections 35.108(d)(2) and 36.105(d)(2)— Predictable Assessments

In the NPRM, proposed §§ 35.108(d)(2) and 36.105(d)(2) set forth examples of impairments that should easily be found to substantially limit one or more major life activities. These provisions recognized that while there are no "per se" disabilities, for certain types of impairments the application of the various principles and rules of construction concerning the definition of "disability" to the individualized assessment would, in virtually all cases, result in the conclusion that the impairment substantially limits a major life activity. Thus, the necessary individualized assessment of coverage premised on these types of impairments should be particularly simple and straightforward. The purpose of the "predictable assessments" provisions is to simplify consideration of those disabilities that virtually always create substantial limitations to major life activities, thus satisfying the statute's directive to create clear, consistent, and enforceable standards and ensuring that the inquiry of "whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *See* Public Law 110–325, sec. 2(b)(1), (5). The impairments identified in the predictable assessments provision are a non-exhaustive list of examples of the kinds of disabilities that meet these criteria, and, with one exception, are consistent with the corresponding provision in the EEOC ADA Amendments Act rule. *See* 29 CFR 1630.2(j)(3)(iii).[7]

The Department believes that the predictable assessments provisions comport with the ADA Amendments Act's emphasis on adopting a less burdensome and more expansive definition of "disability." The provisions are rooted in the application of the statutory changes to the meaning and interpretation of the definition of "disability" contained in the ADA Amendments Act and flow from the rules of construction set forth in §§ 35.108(a)(2)(i), 36.105(a)(2)(i), 35.108(c)(2)(i) and (ii), 36.105(c)(2)(i) and (ii). These rules of construction and other specific provisions require the broad construction of the definition of "disability" in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. In addition, they lower the standard to be applied to "substantially limits," making clear that an impairment need not prevent or significantly restrict an individual from performing a major life activity; clarify that major life activities include major bodily functions; elucidate that impairments that are

---

[7] In the NPRM, the Department proposed adding "traumatic brain injury" to the predictable assessments list.

episodic or in remission are disabilities if they would be substantially limiting when active; and incorporate the requirement that the ameliorative effects of mitigating measures (other than ordinary eyeglasses or contact lenses) must be disregarded in assessing whether an individual has a disability.

Several organizations representing persons with disabilities and the elderly, constituting the majority of commenters on these provisions, supported the inclusion of the predictable assessments provisions. One commenter expressed strong support for the provision and recommended that it closely track the corresponding provision in the EEOC title I rule, while another noted its value in streamlining individual assessments. In contrast, some commenters from educational institutions and testing entities recommended the deletion of these provisions, expressing concern that it implies the existence of "per se" disabilities, contrary to congressional intent that each assertion of disability should be considered on a case-by-case basis. The Department does not believe that the predictable assessment provisions constitutes a "per se" list of disabilities and will retain it. These provisions highlight, through a non-exhaustive list, impairments that virtually always will be found to substantially limit one or more major life activities. Such impairments still warrant individualized assessments, but any such assessments should be especially simple and straightforward.

The legislative history of the ADA Amendments Act supports the Department's approach in this area. In crafting the Act, Congress hewed to the ADA definition of "disability," which was modeled on the definition of "disability" in the Rehabilitation Act, and indicated that it wanted courts to interpret the definition as it had originally been modeled. *See* H.R. Rep. No. 110–730, pt. 2, at 6 (2008). Describing this goal, the legislative history states that courts had interpreted the Rehabilitation Act definition "broadly to include persons with a wide range of physical and mental impairments such as epilepsy, diabetes, multiple sclerosis, and intellectual and developmental disabilities . . . even where a mitigating measure—like medication or a hearing aid—might lessen their impact on the individual." *Id.; see also id.* at 9 (referring to individuals with disabilities that had been covered under section 504 of the Rehabilitation Act and that Congress intended to include under the ADA—"people with serious health conditions like epilepsy, diabetes, cancer, cerebral palsy, multiple sclerosis, intellectual and developmental disabilities"); *id.* at 6, n.6 (citing cases also finding that cerebral palsy, hearing impairments, intellectual disabilities, heart disease, and vision in only one eye were disabilities under the Rehabilitation Act); *id.* at 10 (citing testimony from Rep. Steny H. Hoyer, one of the original lead sponsors of the ADA in 1990, stating that "[w]e could not have fathomed that people with diabetes, epilepsy, heart conditions, cancer, mental illnesses and other disabilities would have their ADA claims denied because they would be considered too functional to

meet the definition of disability"); 2008 Senate Statement of Managers at 3 (explaining that "we [we]re faced with a situation in which physical or mental impairments that would previously have been found to constitute disabilities [under the Rehabilitation Act] [we]re not considered disabilities" and citing individuals with impairments such as amputation, intellectual disabilities, epilepsy, multiple sclerosis, diabetes, muscular dystrophy, and cancer as examples).

Some commenters asked the Department to add certain impairments to the predictable assessments list, while others asked the Department to remove certain impairments. Commenters representing educational and testing institutions urged that, if the Department did not delete the predictable assessment provisions, then the list should be modified to remove any impairments that are not obvious or visible to third parties and those for which functional limitations can change over time. One commenter cited to a pre-ADA Amendments Act reasonable accommodations case, which included language regarding the uncertainty facing employers in determining appropriate reasonable accommodations when mental impairments often are not obvious and apparent to employers. *See Wallin v. Minnesota Dep't of Corrections*, 153 F.3d 681, 689 (8th Cir. 1998). This commenter suggested that certain impairments, including autism, depression, post-traumatic stress disorder, and obsessive-compulsive disorder, should not be deemed predictable assessments because they are not immediately apparent to third parties. The Department disagrees with this commenter, and believes that it is appropriate to include these disabilities on the list of predictable assessments. Many disabilities are less obvious or may be invisible, such as cancer, diabetes, HIV infection, schizophrenia, intellectual disabilities, and traumatic brain injury, as well as those identified by the commenter. The likelihood that an impairment will substantially limit one or more major life activities is unrelated to whether or not the disability is immediately apparent to an outside observer. Therefore, the Department will retain the examples that involve less apparent disabilities on the list of predictable assessments.

The Department believes that the list accurately illustrates impairments that virtually always will result in a substantial limitation of one or more major life activities. The Department recognizes that impairments are not always static and can result in different degrees of functional limitation at different times, particularly when mitigating measures are used. However, the ADA as amended anticipates variation in the extent to which impairments affect major life activities, clarifying that impairments that are episodic or in remission nonetheless are disabilities if they would be substantially limiting when active and requiring the consideration of disabilities without regard to ameliorative mitigating measures. The Department does not believe that limiting the scope of its provisions addressing predictable assessments only to those disabilities that would never vary in functional limitation would be appropriate.

Other commenters speaking as individuals or representing persons with disabilities endorsed the inclusion of some impairments already on the list, including traumatic brain injury, sought the inclusion of additional impairments, requested revisions to some descriptions of impairments, or asked for changes to the examples of major life activities linked to specific impairments.

Several commenters requested the expansion of the predictable assessments list, in particular to add specific learning disabilities. Some commenters pointed to the ADA Amendments Act's legislative history, which included Representative Stark's remarks that specific learning disabilities are "neurologically based impairments that substantially limit the way these individuals perform major life activities, like reading or learning, or the time it takes to perform such activities." 154 Cong. Rec. H8291 (daily ed. Sept. 17, 2008). Others recommended that some specific types of specific learning disabilities, including dyslexia, dyscalculia, dysgraphia, dyspraxia, and slowed processing speed should be referenced as predictable assessments. With respect to the major life activities affected by specific learning disabilities, commenters noted that specific learning disabilities are neurologically based and substantially limit learning, thinking, reading, communicating, and processing speed.

Similarly, commenters recommended the inclusion of ADHD, urging that it originates in the brain and affects executive function skills including organizing, planning, paying attention, regulating emotions, and self-monitoring. One commenter noted that if ADHD meets the criteria established in the DSM–5, then it would consistently meet the criteria to establish disability under the ADA. The same commenter noted that ADHD is brain based and affects the major life activity of executive function. Another commenter suggested that ADHD should be included and should be identified as limiting brain function, learning, reading, concentrating, thinking, communicating, interacting with others, and working. Other commenters urged the inclusion of panic disorders, anxiety disorder, cognitive disorder, and post-concussive disorder. A number of commenters noted that the exclusion of impairments from the predictable assessments list could be seen as supporting an inference that the impairments that are not mentioned should not easily be found to be disabilities.

The Department determined that it will retain the language it proposed in the NPRM and will not add or remove any impairments from this list. As discussed above, the list is identical to the EEOC's predictable assessments list, at 29 CFR 1630.2(g)(3)(iii), except that the Department's NPRM added traumatic brain injury. The Department received support for including traumatic brain injury and did not receive any comments recommending the removal of traumatic brain injury from the list; thus, we are retaining it in this final rule.

The Department's decision to track the EEOC's list, with one minor exception, stems in part from our intent to satisfy the congressional mandate for "clear, strong,

consistent, enforceable standards." A number of courts already have productively applied the EEOC's predictable assessments provision, and the Department believes that it will continue to serve as a useful, common-sense tool in promoting judicial efficiency. It is important to note, however, that the failure to include any impairment in the list of examples of predictable assessments does not indicate that that impairment should be subject to undue scrutiny.

Some commenters expressed concern about the major life activities that the Department attributed to particular impairments. Two commenters sought revision of the major life activities attributed to intellectual disabilities, suggesting that it would be more accurate to reference cognitive function and learning, instead of reading, learning, and problem solving. One commenter recommended attributing the major life activity of brain function to autism rather than learning, social interaction, and communicating. The Department determined that it will follow the EEOC's model and, with respect to both intellectual disabilities and autism, it will reference the major bodily function of brain function. By using the term "brain function" to describe the system affected by various mental impairments, the Department intends to capture functions such as the brain's ability to regulate thought processes and emotions.

The Department considers it important to reiterate that, just as the list of impairments in these sections is not comprehensive, the list of major bodily functions or other major life activities linked to those impairments is not exhaustive. The impairments identified in these sections, may affect a wide range of major bodily functions and other major life activities. The Department's specification of certain major life activities with respect to particular impairments simply provides one avenue by which a person might elect to demonstrate that he or she has a disability.

The Department recognizes that impairments listed in §§ 35.108(d)(2) and 36.105(d)(2) may substantially limit other major life activities in addition to those listed in the regulation. For example, diabetes may substantially limit major life activities including eating, sleeping, and thinking. Major depressive disorder may substantially limit major life activities such as thinking, concentrating, sleeping, and interacting with others. Multiple sclerosis may substantially limit major life activities such as walking, bending, and lifting.

One commenter noted that the NPRM did not track the EEOC's language with respect to the manner in which it identified a major bodily function that is substantially limited by epilepsy, muscular dystrophy, or multiple sclerosis in 29 CFR 1630.2(j)(3)(iii). While the EEOC listed each of these three impairments individually, noting in each case that the major bodily function affected is neurological function, at 29 CFR 1630.2(j)(3)(iii), the NPRM grouped the three impairments and noted that they affect neurological function. In order to clarify that each of the three impairments may manifest a substantial limitation of neurological function, the final rule incorporates "each" immediately following the list of the three impairments.

Similarly, the Department added an "each" to §§ 35.108(d)(2)(iii)(K) and 36.105(d)(2)(iii)(K) to make clear that each of the listed impairments substantially limits brain function.

Some commenters representing testing entities and educational institutions sought the insertion of language in the predictable assessment provisions that would indicate that individuals found to have disabilities are not, by virtue of a determination that they have a covered disability, eligible for a testing accommodation or a reasonable modification. The Department agrees with these commenters that the determination of disability is a distinct determination separate from the determination of the need for a requested modification or a testing accommodation. The Department declines to add the language suggested by the commenters to §§ 35.108(d)(2) and 36.105(d)(2), however, because the requirements for reasonable modifications are addressed separately in §§ 35.130(b)(7) and 36.302 of the title II and III regulations and the requirements related to providing appropriate accommodations in testing and licensing are found at § 36.309.

*Sections 35.108(d)(3) and 36.105(d)(3)— Condition, Manner, or Duration*

*Overview.* Proposed §§ 35.108(d)(3) and 36.105(d)(3), both titled "Condition, manner[,] and duration," addressed how evidence related to condition, manner, or duration may be used to show how impairments substantially limit major life activities. These principles were first addressed in the preamble to the 1991 rule. At that time, the Department noted that "[a] person is considered an individual with a disability . . . when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 56 FR 35544, 35549 (July 26, 1991); *see also* S. Rep. No. 101–116, at 23 (1989).

These concepts were affirmed by Congress in the legislative history to the ADA Amendments Act: "We particularly believe that this test, which articulated an analysis that considered whether a person's activities are limited in condition, duration and manner, is a useful one. We reiterate that using the correct standard—one that is lower than the strict or demanding standard created by the Supreme Court in *Toyota*—will make the disability determination an appropriate threshold issue but not an onerous burden for those seeking accommodations or modifications. At the same time, plaintiffs should not be constrained from offering evidence needed to establish that their impairment is substantially limiting." 154 Cong. Rec. S8346 (Sept. 11, 2008). Noting its continued reliance on the functional approach to defining disability, Congress expressed its belief that requiring consistency with the findings and purposes of the ADA Amendments Act would "establish[ ] an appropriate functionality test for determining whether an individual has a disability." *Id.* While condition, manner, and duration are not required factors that must be considered, the regulations clarify that these are the types of factors that may be considered in appropriate cases. To the extent that such factors may be useful or relevant to show a substantial limitation in a particular fact pattern, some or all of them (and related facts) may be considered, but evidence relating to each of these factors often will not be necessary to establish coverage.

In the NPRM, proposed §§ 35.108(d)(3)(i) and 35.105(d)(3)(i) noted that the rules of construction at §§ 35.108(d)(1) and 35.105(d)(1) should inform consideration of how individuals are substantially limited in major life activities. Sections 35.108(d)(3)(ii) and 36.105(d)(3)(ii) provided examples of how restrictions on condition, manner, or duration might be interpreted and also clarified that the negative or burdensome side effects of medication or other mitigating measures may be considered when determining whether an individual has a disability. In §§ 35.108(d)(3)(iii) and 36.105(d)(3)(iii), the proposed language set forth a requirement to focus on how a major life activity is substantially limited, rather than on the ultimate outcome a person with an impairment can achieve.

The Department received comments on the condition, manner, or duration provision from advocacy groups for individuals with disabilities, from academia, from education and testing entities, and from interested individuals. Several advocacy organizations for individuals with disabilities and private individuals noted that the section title's heading was inconsistent with the regulatory text and sought the replacement of the "and" in the section's title, "Condition, manner, and duration," with an "or." Commenters expressed concern that retaining the "and" in the heading title would be inconsistent with congressional intent and would incorrectly suggest that individuals are subject to a three-part test and must demonstrate that an impairment substantially limits a major life activity with respect to condition, manner, and duration. The Department agrees that the "and" used in the title of the proposed regulatory provision could lead to confusion and a misapplication of the law and has revised the title so it now reads "Condition, manner, *or* duration." Consistent with the regulatory text, the revised heading makes clear that any one of the three descriptors—"condition," "manner," or "duration"—may aid in demonstrating that an impairment substantially limits a major life activity or a major bodily function.

*Condition, Manner, or Duration*

In the NPRM, proposed §§ 35.108(d)(3)(i) and 36.105(d)(3)(i) noted that the application of the terms "condition" "manner," or "duration" should at all times take into account the principles in § 35.108(d)(1) and § 36.105(d)(1), respectively, which referred to the rules of construction for "substantially limited." The proposed regulatory text also included brief explanations of the meaning of the core terms, clarifying that in appropriate cases, it could be useful to consider, in comparison to most people in the general population, the conditions under which an individual performs a major life activity; the manner in which an individual performs a major life activity; or the time it takes an

individual to perform a major life activity, or for which the individual can perform a major life activity.

Several disability rights advocacy groups and individuals supported the NPRM approach, with some referencing the value of pointing to the rules of construction and their relevance to condition, manner, or duration considerations. Some commenters noted that it was helpful to highlight congressional intent that the definition of "disability" should be broadly construed and not subject to extensive analysis. Another commenter recommended introducing a clarification that, while the limitation imposed by an impairment must be important, it does not need to rise to the level of severely or significantly restricting the ability to perform a major life activity. Some commenters sought additional guidance regarding the meaning of the terms "condition," "manner," and "duration" and recommended the addition of more illustrative examples.

In response to commenters' concerns, the Department has modified the regulatory text in §§ 35.108(d)(3)(i) and 36.105(d)(3)(i) to reference all of the rules of construction rather than only those pertaining to "substantially limited." The Department also added §§ 35.108(d)(3)(iv) and 36.105(d)(3)(iv), further discussed below, to clarify that the rules of construction will not always require analysis of condition, manner, or duration, particularly with respect to certain impairments, such as those referenced in paragraph (d)(2)(iii) (predictable assessments). With these changes, the Department believes that the final rule more accurately reflects congressional intent. The Department also believes that clarifying the application of the rules of construction to condition, manner, or duration will contribute to consistent interpretation of the definition of "disability" and reduce inadvertent reliance on older cases that incorporate demanding standards rejected by Congress in the ADA Amendments Act.

It is the Department's view that the rules of construction offer substantial guidance about how condition, manner, or duration must be interpreted so as to ensure the expansive coverage intended by Congress. Except for this clarification, the Department did not receive comments opposing the proposed regulatory text on condition, manner, or duration in §§ 35.108(d)(3)(i) and 36.105(d)(3)(i) and did not make any other changes to these provisions.

Some commenters objected to language in the preamble to the NPRM which suggested that there might be circumstances in which the consideration of condition, manner, or duration might not include comparisons to most people in the general population. On reconsideration, the Department recognizes that this discussion could create confusion about the requirements. The Department believes that condition, manner, or duration determinations should be drawn in contrast to most people in the general population, as is indicated in the related rules of construction, at §§ 35.108(d)(1)(v) and 36.105(d)(1)(v).

*Condition, Manner, or Duration Examples, Including Negative Effects of Mitigating Measures*

Proposed §§ 35.108(d)(3)(ii) and 36.105(d)(3)(ii) set forth examples of the types of evidence that might demonstrate condition, manner, or duration limitations, including the way an impairment affects the operation of a major bodily function, the difficulty or effort required to perform a major life activity, the pain experienced when performing a major life activity, and the length of time it takes to perform a major life activity. These provisions also clarified that the non-ameliorative effects of mitigating measures may be taken into account to demonstrate the impact of an impairment on a major life activity. The Department's discussion in the NPRM preamble noted that such non-ameliorative effects could include negative side effects of medicine, burdens associated with following a particular treatment regimen, and complications that arise from surgery, among others. The preamble also provided further clarification of the possible applications of condition, manner, or duration analyses, along with several examples. Several commenters supported the proposed rule's incorporation of language and examples offering insight into the varied ways that limitations on condition, manner, or duration could demonstrate substantial limitation. One commenter positively noted that the language regarding the "difficulty, effort, or time required to perform a major life activity" could prove extremely helpful to individuals asserting a need for testing accommodations, as evidence previously presented regarding these factors was deemed insufficient to demonstrate the existence of a disability. Some commenters requested the insertion of additional examples and explanation in the preamble about how condition, manner or duration principles could be applied under the new rules of construction. Another commenter sought guidance on the specific reference points that should be used when drawing comparisons with most people in the general population. The commenter offered the example of delays in developmental milestones as a possible referent in evaluating children with speech-language disorders, but noted a lack of guidance regarding comparable referents for adults. The commenter also noted that guidance is needed regarding what average or acceptable duration might be with respect to certain activities. An academic commenter expressed support for the Department's reference to individuals with learning impairments using certain self-mitigating measures, such as extra time to study or taking an examination in a different format, and the relevance of these measures to condition, manner, and duration.

The Department did not receive comments opposing the NPRM language on condition, manner, or duration in §§ 35.108(d)(3)(ii) and 36.105(d)(3)(ii) and is not making any changes to this language. The Department agrees that further explanation and examples as provided below regarding the concepts of condition, manner, or duration will help clarify how the ADA Amendments Act has expanded the definition of "disability." An

impairment may substantially limit the "condition" or "manner" in which a major life activity can be performed in a number of different ways. For example, the condition or manner in which a major life activity can be performed may refer to how an individual performs a major life activity; *e.g.*, the condition or manner under which a person with an amputated hand performs manual tasks will likely be more cumbersome than the way that most people in the general population would perform the same tasks. Condition or manner may also describe how performance of a major life activity affects an individual with an impairment. For example, an individual whose impairment causes pain or fatigue that most people would not experience when performing that major life activity may be substantially limited. Thus, the condition or manner under which someone with coronary artery disease performs the major life activity of walking would be substantially limited if the individual experiences shortness of breath and fatigue when walking distances that most people could walk without experiencing such effects. An individual with specific learning disabilities may need to approach reading or writing in a distinct manner or under different conditions than most people in the general population, possibly employing aids including verbalizing, visualizing, decoding or phonology, such that the effort required could support a determination that the individual is substantially limited in the major life activity of reading or writing.

Condition or manner may refer to the extent to which a major life activity, including a major bodily function, can be performed. In some cases, the condition or manner under which a major bodily function can be performed may be substantially limited when the impairment "causes the operation [of the bodily function] to over-produce or under-produce in some harmful fashion." *See* H.R. Rep. No. 110–730, pt. 2, at 17 (2008). For example, the endocrine system of a person with type I diabetes does not produce sufficient insulin. For that reason, compared to most people in the general population, the impairment of diabetes substantially limits the major bodily functions of endocrine function and digestion. Traumatic brain injury substantially limits the condition or manner in which an individual's brain functions by impeding memory and causing headaches, confusion, or fatigue—each of which could constitute a substantial limitation on the major bodily function of brain function.

"Duration" refers to the length of time an individual can perform a major life activity or the length of time it takes an individual to perform a major life activity, as compared to most people in the general population. For example, a person whose back or leg impairment precludes him or her from standing for more than two hours without significant pain would be substantially limited in standing, because most people can stand for more than two hours without significant pain. However, "[a] person who can walk for 10 miles continuously is not substantially limited in walking merely because on the eleventh mile, he or she

begins to experience pain because most people would not be able to walk eleven miles without experiencing some discomfort." *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers) (quoting S. Rep. No. 101–116, at 23 (1989)). Some impairments, such as ADHD, may have two different types of impact on duration considerations. ADHD frequently affects both an ability to sustain focus for an extended period of time and the speed with which someone can process information. Each of these duration-related concerns could demonstrate that someone with ADHD, as compared to most people in the general population, takes longer to complete major life activities such as reading, writing, concentrating, or learning.

The Department reiterates that, because the limitations created by certain impairments are readily apparent, it would not be necessary in such cases to assess the negative side effects of a mitigating measure in determining that a particular impairment substantially limits a major life activity. For example, there likely would be no need to consider the burden that dialysis treatment imposes for someone with end-stage renal disease because the impairment would allow a simple and straightforward determination that the individual is substantially limited in kidney function.

One commenter representing people with disabilities asked the Department to recognize that, particularly with respect to learning disabilities, on some occasions the facts related to condition, manner, or duration necessary to reach a diagnosis of a learning disability also are sufficient to establish that the affected individual has a disability under the ADA. The Department agrees that the facts gathered to establish a diagnosis of an impairment may simultaneously satisfy the requirements for demonstrating limitations on condition, manner, or duration sufficient to show that the impairment constitutes a disability.

*Emphasis on Limitations Instead of Outcomes*

In passing the ADA Amendments Act, Congress clarified that courts had misinterpreted the ADA definition of "disability" by, among other things, inappropriately emphasizing the capabilities of people with disabilities to achieve certain outcomes. *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more of the major life activities of reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, speak, write, or learn compared to most people in the general population. As the House Education and Labor Committee Report emphasized:

[S]ome courts have found that students who have reached a high level of academic achievement are not to be considered individuals with disabilities under the ADA, as such individuals may have difficulty demonstrating substantial limitation in the major life activities of learning or reading

relative to "most people." When considering the condition, manner or duration in which an individual with a specific learning disability performs a major life activity, it is critical to reject the assumption that an individual who performs well academically or otherwise cannot be substantially limited in activities such as learning, reading, writing, thinking, or speaking. As such, the Committee rejects the findings in *Price* v. *National Board of Medical Examiners*, *Gonzales* v. *National Board of Medical Examiners*, and *Wong* v. *Regents of University of California*.

The Committee believes that the comparison of individuals with specific learning disabilities to "most people" is not problematic unto itself, but requires a careful analysis of the method and manner in which an individual's impairment limits a major life activity. For the majority of the population, the basic mechanics of reading and writing do not pose extraordinary lifelong challenges; rather, recognizing and forming letters and words are effortless, unconscious, automatic processes. Because specific learning disabilities are neurologically-based impairments, the process of reading for an individual with a reading disability (*e.g.*, dyslexia) is word-by-word, and otherwise cumbersome, painful, deliberate and slow—throughout life. The Committee expects that individuals with specific learning disabilities that substantially limit a major life activity will be better protected under the amended Act.

H.R. Rep. No. 110–730 pt. 1, at 10–11 (2008).

Sections 35.108(d)(3)(iii) and 36.105(d)(3)(iii) of the proposed rule reflected congressional intent and made clear that the outcome an individual with a disability is able to achieve is not determinative of whether an individual is substantially limited in a major life activity. Instead, an individual can demonstrate the extent to which an impairment affects the condition, manner, or duration in which the individual performs a major life activity, such that it constitutes a substantial limitation. The ultimate outcome of an individual's efforts should not undermine a claim of disability, even if the individual ultimately is able to achieve the same or similar result as someone without the impairment.

The Department received several comments on these provisions, with disability organizations and individuals supporting the inclusion of these provisions and some testing entities and an organization representing educational institutions opposing them. The opponents argued that academic performance and testing outcomes are objective evidence that contradict findings of disability and that covered entities must be able to focus on those outcomes in order to demonstrate whether an impairment has contributed to a substantial limitation. These commenters argued that the evidence frequently offered by those making claims of disability that demonstrate the time or effort required to achieve a result, such as evidence of self-mitigating measures, informal accommodations, or recently provided reasonable modifications, is inherently subjective and unreliable. The

testing entities suggested that the Department had indicated support for their interest in focusing on outcomes over process-related obstacles in the NPRM preamble language where the Department had noted that covered entities "may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity." NPRM, 79 FR 4839, 4847–48 (Jan. 30, 2014). The commenters representing educational institutions and testing entities urged the removal of §§ 35.108(d)(3)(iii) and 36.105(d)(3)(iii) or, in the alternative, the insertion of language indicating that outcomes, such as grades and test scores indicating academic success, are relevant evidence that should be considered when making disability determinations.

In contrast, commenters representing persons with disabilities and individual commenters expressed strong support for these provisions, noting that what an individual can accomplish despite an impairment does not accurately reflect the obstacles an individual had to overcome because of the impairment. One organization representing persons with disabilities noted that while individuals with disabilities have achieved successes at work, in academia, and in other settings, their successes should not create obstacles to addressing what they can do "in spite of an impairment." Commenters also expressed concerns that testing entities and educational institutions had failed to comply with the rules of construction or to revise prior policies and practices to comport with the new standards under the ADA as amended. Some commenters asserted that testing entities improperly rejected accommodation requests because the testing entities focused on test scores and outcomes rather than on how individuals learn; required severe levels of impairment; failed to disregard the helpful effect of self-mitigating measures; referenced participation in extracurricular activities as evidence that individuals did not have disabilities; and argued that individuals diagnosed with specific learning disabilities or ADHD in adulthood cannot demonstrate that they have a disability because their diagnosis occurred too late.

Commenters representing persons with disabilities pointed to the discussion in the legislative history about restoring a focus on process rather than outcomes with respect to learning disabilities. They suggested that such a shift in focus also would be helpful in evaluating ADHD. One commenter asked the Department to include a reference to ADHD and to explain that persons with ADHD may achieve a high level of academic success but may nevertheless be substantially limited in one or more major life activities, such as reading, writing, speaking, concentrating, or learning. A private citizen requested the addition of examples demonstrating the application of these provisions because, in the commenter's view, there have been many problems with decisions regarding individuals with learning disabilities and an inappropriate focus on outcomes and test scores.

The Department declines the request to add a specific reference to ADHD in these provisions. The Department believes that the principles discussed above apply equally to persons with ADHD as well as individuals with other impairments. The provision already references an illustrative, but not exclusive, example of an individual with a learning disability. The Department believes that this example effectively illustrates the concern that has affected individuals with other impairments due to an inappropriate emphasis on outcomes rather than how a major life activity is limited.

Organizations representing testing and educational entities asked the Department to add regulatory language indicating that testing-related outcomes, such as grades and test scores, are relevant to disability determinations under the ADA. The Department has considered this proposal and declines to adopt it because it is inconsistent with congressional intent. As discussed earlier in this section, Congress specifically stated that the outcome an individual with a disability is able to achieve is not determinative of whether that individual has a physical or mental impairment that substantially limits a major life activity. The analysis of whether an individual with an impairment has a disability is a fact-driven analysis shaped by how an impairment has substantially limited one or more major life activities or major bodily functions, considering those specifically asserted by the individual as well as any others that may apply. For example, if an individual with ADHD seeking a reasonable modification or a testing accommodation asserts substantial limitations in the major life activities of concentrating and reading, then the analysis of whether or not that individual has a covered disability will necessarily focus on concentrating and reading. Relevant considerations could include restrictions on the conditions, manner, or duration in which the individual concentrates or reads, such as a need for a non-stimulating environment or extensive time required to read. Even if an individual has asserted that an impairment creates substantial limitations on activities such as reading, writing, or concentrating, the individual's academic record or prior standardized testing results might not be relevant to the inquiry. Instead, the individual could show substantial limitations by providing evidence of condition, manner, or duration limitations, such as the need for a reader or additional time. The Department does not believe that the testing results or grades of an individual seeking reasonable modifications or testing accommodations always would be relevant to determinations of disability. While testing and educational entities may, of course, put forward any evidence that they deem pertinent to their response to an assertion of substantial limitation, testing results and grades may be of only limited relevance.

In addition, the Department does not agree with the assertions made by testing and educational entities that evidence of testing and grades is objective and, therefore, should be weighted more heavily, while evidence of self-mitigating measures, informal accommodations, or recently provided accommodations or modifications is inherently subjective and should be afforded less consideration. Congress's discussion of the relevance of testing outcomes and grades clearly indicates that it did not consider them definitive evidence of the existence or non-existence of a disability. While tests and grades typically are numerical measures of performance, the capacity to quantify them does not make them inherently more valuable with respect to proving or disproving disability. To the contrary, Congress's incorporation of rules of construction emphasizing broad coverage of disabilities to the maximum extent permitted, its direction that such determinations should neither contemplate ameliorative mitigating measures nor demand extensive analysis, and its recognition of learned and adaptive modifications all support its openness for individuals with impairments to put forward a wide range of evidence to demonstrate their disabilities.

The Department believes that Congress made its intention clear that the ADA's protections should encompass people for whom the nature of their impairment requires an assessment that focuses on how they engage in major life activities, rather than the ultimate outcome of those activities. Beyond directly addressing this concern in the debate over the ADA Amendments Act, Congress's incorporation of the far-reaching rules of construction, its explicit rejection of the consideration of ameliorative mitigating measures—including "learned behavioral or adaptive neurological modifications," 42 U.S.C. 12102(4)(E)(i)(IV), such as those often employed by individuals with learning disabilities or ADHD—and its stated intention to "reinstat[e] a broad scope of protection to be available under the ADA," Public Law 110–325, sec. 2(b)(1), all support the language initially proposed in these provisions. For these reasons, the Department determined that it will retain the language of these provisions as they were originally drafted.

*Analysis of Condition, Manner, or Duration Not Always Required*

As noted in the discussion above, the Department has added §§ 35.108(d)(3)(iv) and 36.105(d)(3)(iv) in the final rule to clarify that analysis of condition, manner, or duration will not always be necessary, particularly with respect to certain impairments that can easily be found to substantially limit a major life activity. This language is also found in the EEOC ADA title I regulation. *See* 29 CFR 1630(j)(4)(iv). As noted earlier, the inclusion of these provisions addresses several comments from organizations representing persons with disabilities. This language also responds to several commenters' concerns that the Department should clarify that, in some cases and particularly with respect to predictable assessments, no or only a very limited analysis of condition, manner, or duration is necessary.

At the same time, individuals seeking coverage under the first or second prong of the definition of "disability" should not be constrained from offering evidence needed to establish that their impairment is substantially limiting. *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). Such evidence may comprise facts related to condition, manner, or duration. And, covered entities may defeat a showing of substantial limitation by refuting whatever evidence the individual seeking coverage has offered, or by offering evidence that shows that an impairment does not impose a substantial limitation on a major life activity. However, a showing of substantial limitation is not defeated by facts unrelated to condition, manner, or duration that are not pertinent to the substantial limitation of a major life activity that the individual has proffered.

*Sections 35.108(d)(4) and 36.105(d)(4)— Examples of Mitigating Measures*

The rules of construction set forth at §§ 35.108(d)(1)(viii) and 36.105(d)(1)(viii) of the final rule make clear that the ameliorative effects of mitigating measures shall not be considered when determining whether an impairment substantially limits a major life activity. In the NPRM, proposed §§ 35.108(d)(4) and 36.105(d)(4) provided a non-inclusive list of mitigating measures, which includes medication, medical supplies, equipment, appliances, low-vision devices, prosthetics, hearing aids, cochlear implants and implantable hearing devices, mobility devices, oxygen therapy equipment, and assistive technology. In addition, the proposed regulation clarified that mitigating measures can include "learned behavioral or adaptive neurological modifications," psychotherapy, behavioral therapy, or physical therapy, and "reasonable modifications" or auxiliary aids and services.

The phrase "learned behavioral or adaptive neurological modifications," is intended to include strategies developed by an individual to lessen the impact of an impairment. The phrase "reasonable modifications" is intended to include informal or undocumented accommodations and modifications as well as those provided through a formal process.

The ADA as amended specifies one exception to the rule on mitigating measures, stating that the ameliorative effects of ordinary eyeglasses and contact lenses shall be considered in determining whether a person has an impairment that substantially limits a major life activity and thereby is a person with a disability. 42 U.S.C. 12102(4)(E)(ii). As discussed above, §§ 35.108(d)(4)(i) and 36.105(d)(4)(i) incorporate this exception by excluding ordinary eyeglasses and contact lenses from the definition of "low-vision devices," which are mitigating measures that may not be considered in determining whether an impairment is a substantial limitation.

The Department received a number of comments supporting the Department's language in these sections and its broad range of examples of what constitutes a mitigating measure. Commenters representing students with disabilities specifically supported the inclusion of "learned behavioral or adaptive neurological modifications," noting that the section "appropriately supports and highlights that students [and individuals in other settings] may have developed self-

imposed ways to support their disability in order to perform major life activities required of daily life and that such measures cannot be used to find that the person is not substantially limited."

The Department notes that self-mitigating measures or undocumented modifications or accommodations for students who have impairments that substantially limit learning, reading, writing, speaking, or concentrating may include such measures as arranging to have multiple reminders for task completion; seeking help from others to provide reminders or to assist with the organization of tasks; selecting courses strategically (such as selecting courses that require papers instead of exams); devoting a far larger portion of the day, weekends, and holidays to study than students without disabilities; teaching oneself strategies to facilitate reading connected text or mnemonics to remember facts (including strategies such as highlighting and margin noting); being permitted extra time to complete tests; receiving modified homework assignments; or taking exams in a different format or in a less stressful or anxiety-provoking setting. Each of these mitigating measures, whether formal or informal, documented or undocumented, can improve the academic function of a student having to deal with a substantial limitation in a major life activity such as concentrating, reading, speaking, learning, or writing. However, when the determination of disability is made without considering the ameliorative effects of these measures, as required under the ADA as amended, these individuals still have a substantial limitation in major life activities and are covered by the ADA. *See also* discussion of §§ 35.108(d)(1) and 36.105(d)(1), above.

Some commenters argued that the Department's examples of mitigating measures inappropriately include normal learning strategies and asked that the Department withdraw or narrow its discussion of self-mitigating measures. The Department disagrees. Narrowing the discussion of self-mitigating measures to exclude normal or common strategies would not be consistent with the ADA Amendments Act. The Department construes learned behavioral or adaptive neurological modifications broadly to include strategies applied or utilized by an individual with a disability to lessen the effect of an impairment; whether the strategy applied is normal or common to students without disabilities is not relevant to whether an individual with a disability's application of the strategy lessens the effect of an impairment.

An additional commenter asked the Department to add language to the regulation and preamble addressing mitigating measures an individual with ADHD may employ. This commenter noted that "[a]n individual with ADHD may employ a wide variety of self-mitigating measures, such as exertion of extensive extra effort, use of multiple reminders, whether low tech or high tech, seeking a quiet or distraction free place or environment to do required activities." The Department agrees with this commenter that these are examples of the type of self-

mitigating measures used by individuals with ADHD, but believes that they fall within the range of mitigating measures already addressed by the regulatory language.

Another commenter asked the Department to add language to the regulation or preamble addressing surgical interventions in a similar fashion to the approach taken in the EEOC's title I preamble, 76 FR 16978, 16983 (Mar. 25, 2011). There, the EEOC noted that a surgical intervention may be an ameliorative mitigating measure that could result in the permanent elimination of an impairment, but it also indicated that confusion about how this example might apply recommended against its inclusion in the regulatory text. Therefore, the EEOC eliminated that example from the draft regulatory text and recommended that, "[d]eterminations about whether surgical interventions should be taken into consideration when assessing whether an individual has a disability are better assessed on a case-by-case basis." The Department agrees with the EEOC and underscores that surgical interventions may constitute mitigating measures that should not be considered in determining whether an individual meets the definition of "disability." The Department declines to make any changes to its proposed regulatory text for these sections of the final rule.

The ADA Amendments Act provides an "illustrative but non-comprehensive list of the types of mitigating measures that are not to be considered." 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers) at 9; *see also* H.R. Rep. No. 110–730, pt. 2, at 20 (2008). The absence of any particular mitigating measure should not convey a negative implication as to whether the measure is a mitigating measure under the ADA. *Id.* This principle applies equally to the non-exhaustive list in §§ 35.108(d)(4) and 36.105(d)(4).

*Sections 35.108(e) and 36.105(e)—Has a Record of Such an Impairment*

The second prong of the definition of "disability" under the ADA provides that an individual with a record of an impairment that substantially limits or limited a major life activity is an individual with a disability. 42 U.S.C. 12102(1)(B).

Paragraph (3) of the definition of "disability" in the existing title II and title III regulations states that the phrase "has a record of such an impairment" means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities. 28 CFR 35.104, 36.104. The NPRM proposed keeping the language in the title II and title III regulations (with minor editorial changes) but to renumber it as §§ 35.108(e)(1) and 36.105(e)(1). In addition, the NPRM proposed adding a new second paragraph stating that any individual's assertion of a record of impairment that substantially limits a major life activity should be broadly construed to the maximum extent permitted by the ADA and should not require extensive analysis. If an individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population or was misclassified as having had such an

impairment, then that individual will satisfy the third prong of the definition of "disability." The NPRM also proposed adding paragraph (3), which provides that "[a]n individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability."

The Department received no comments objecting to its proposed language for these provisions and has retained it in the final rule. The Department received one comment requesting additional guidance on the meaning of these provisions. The Department notes that Congress intended this prong of the definition of "disability" to ensure that people are not discriminated against based on prior medical history. This prong is also intended to ensure that individuals are not discriminated against because they have been misclassified as an individual with a disability. For example, individuals misclassified as having learning disabilities or intellectual disabilities are protected from discrimination on the basis of that erroneous classification. *See* H.R. Rep. No. 110–730, pt. 2, at 7–8 & n.14 (2008).

This prong of the definition is satisfied where evidence establishes that an individual has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. The terms "substantially limits" and "major life activity" under the second prong of the definition of "disability" are to be construed in accordance with the same principles applicable under the "actual disability" prong, as set forth in §§ 35.108(b) and 36.105(b).

There are many types of records that could potentially contain this information, including but not limited to, education, medical, or employment records. The Department notes that past history of an impairment need not be reflected in a specific document. Any evidence that an individual has a past history of an impairment that substantially limited a major life activity is all that is necessary to establish coverage under the second prong. An individual may have a "record of" a substantially limiting impairment—and thus establish coverage under the "record of" prong of the statute—even if a covered entity does not specifically know about the relevant record. For the covered entity to be liable for discrimination under the ADA, however, the individual with a "record of" a substantially limiting impairment must prove that the covered entity discriminated on the basis of the record of the disability.

Individuals who are covered under the "record of" prong may be covered under the first prong of the definition of "disability" as well. This is because the rules of construction in the ADA Amendments Act and the Department's regulations provide that an individual with an impairment that is episodic or in remission can be protected under the first prong if the impairment would be substantially limiting when active. *See* §§ 35.108(d)(1)(iv); 36.105(d)(1)(iv). Thus, an individual who has cancer that is currently in remission is an individual with

a disability under the "actual disability" prong because he has an impairment that would substantially limit normal cell growth when active. He is also covered by the "record of" prong based on his history of having had an impairment that substantially limited normal cell growth.

Finally, these provisions of the regulations clarify that an individual with a record of a disability is entitled to a reasonable modification currently needed relating to the past substantially limiting impairment. In the legislative history, Congress stated that reasonable modifications were available to persons covered under the second prong of the definition. See H.R. Rep. No. 110–730, pt. 2, at 22 (2008) ("This makes clear that the duty to accommodate . . . arises only when an individual establishes coverage under the first or second prong of the definition."). For example, a high school student with an impairment that previously substantially limited, but no longer substantially limits, a major life activity may need permission to miss a class or have a schedule change as a reasonable modification that would permit him or her to attend follow-up or monitoring appointments from a health care provider.

*Sections 35.108(f) and 36.105(f)—Is Regarded as Having Such an Impairment*

The "regarded as having such an impairment" prong of the definition of "disability" was included in the ADA specifically to protect individuals who might not meet the first two prongs of the definition, but who were subject to adverse decisions by covered entities based upon unfounded concerns, mistaken beliefs, fears, myths, or prejudices about persons with disabilities. See 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). The rationale for the "regarded as" part of the definition of "disability" was articulated by the Supreme Court in the context of section 504 of the Rehabilitation Act of 1973 in *School Board of Nassau County* v. *Arline*, 480 U.S. 273 (1987). In *Arline*, the Court noted that, although an individual may have an impairment that does not diminish his or her physical or mental capabilities, it could "nevertheless substantially limit that person's ability to work as a result of the negative reactions of others to the impairment." *Id.* at 283. Thus, individuals seeking the protection of the ADA under the "regarded as" prong only had to show that a covered entity took some action prohibited by the statute because of an actual or perceived impairment. At the time of the *Arline* decision, there was no requirement that the individual demonstrate that he or she, in fact, had or was perceived to have an impairment that substantially limited a major life activity. *See* 154 Cong. Rec. S8842 (daily ed. Sept. 16, 2008) (Statement of the Managers). For example, if a daycare center refused to admit a child with burn scars because of the presence of the scars, then the daycare center regarded the child as an individual with a disability, regardless of whether the child's scars substantially limited a major life activity.

In *Sutton* v. *United Air Lines, Inc.*, 527 U.S. 471 (1999), the Supreme Court significantly narrowed the application of this prong,

holding that individuals who asserted coverage under the "regarded as having such an impairment" prong had to establish either that the covered entity mistakenly believed that the individual had a physical or mental impairment that substantially limited a major life activity, or that the covered entity mistakenly believed that "an actual, nonlimiting impairment substantially limit[ed]" a major life activity, when in fact the impairment was not so limiting. *Id.* at 489. Congress expressly rejected this standard in the ADA Amendments Act by amending the ADA to clarify that it is sufficient for an individual to establish that the covered entity regarded him or her as having an impairment, regardless of whether the individual actually has the impairment or whether the impairment constitutes a disability under the Act. 42 U.S.C. 12102(3)(A). This amendment restores Congress's intent to allow individuals to establish coverage under the "regarded as" prong by showing that they were treated adversely because of an actual or perceived impairment without having to establish the covered entity's beliefs concerning the severity of the impairment. *See* H.R. Rep. No. 110–730, pt. 2, at 18 (2008).

Thus, under the ADA as amended, it is not necessary, as it was prior to the ADA Amendments Act and following the Supreme Court's decision in *Sutton*, for an individual to demonstrate that a covered entity perceived him as substantially limited in the ability to perform a major life activity in order for the individual to establish that he or she is covered under the "regarded as" prong. Nor is it necessary to demonstrate that the impairment relied on by a covered entity is (in the case of an actual impairment) or would be (in the case of a perceived impairment) substantially limiting for an individual to be "regarded as having such an impairment." In short, to be covered under the "regarded as" prong, an individual is not subject to any functional test. *See* 154 Cong. Rec. S8843 (daily ed. Sept. 16, 2008) (Statement of the Managers) ("The functional limitation imposed by an impairment is irrelevant to the third 'regarded as' prong."); H.R. Rep. No. 110–730, pt. 2, at 17 (2008) ("[T]he individual is not required to show that the perceived impairment limits performance of a major life activity."). The concepts of "major life activities" and "substantial limitation" simply are not relevant in evaluating whether an individual is "regarded as having such an impairment."

In the NPRM, the Department proposed §§ 35.108(f)(1) and 36.105(f)(1), which are intended to restore the meaning of the "regarded as" prong of the definition of "disability" by adding language that incorporates the amended statutory provision: "An individual is 'regarded as having such an impairment' if the individual is subjected to an action prohibited by the ADA because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, except for an impairment that is both transitory and minor."

The proposed provisions also incorporate the statutory definition of transitory

impairment, stating that a "transitory impairment is an impairment with an actual or expected duration of six months or less." The "transitory and minor" exception was not in the third prong in the original statutory definition of "disability." Congress added this exception to address concerns raised by the business community that "absent this exception, the third prong of the definition would have covered individuals who are regarded as having common ailments like the cold or flu." *See* H.R. Rep. No. 110–730, pt. 2, at 18 (2008). However, as an exception to the general rule for broad coverage under the "regarded as" prong, this limitation on coverage should be construed narrowly. *Id.* The ADA Amendments Act did not define "minor."

In addition, proposed §§ 35.108(f)(2) and 36.105(f)(2) stated that any time a public entity or covered entity takes a prohibited action because of an individual's actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action, that individual is "regarded as" having such an impairment. Commenters on these provisions recommended that the Department revise its language to clarify that the determination of whether an impairment is in fact "transitory and minor" is an objective determination and that a covered entity may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed that the impairment is transitory and minor. In addition, a number of commenters cited the EEOC title I rule at 29 CFR 1630.15(f) and asked the Department to clarify that "the issue of whether an actual or perceived impairment is 'transitory and minor' is an affirmative defense and not part of the plaintiff's burden of proof." The Department agrees with these commenters and has revised paragraphs (1) and (2) of these sections for clarity, as shown in §§ 35.108(f)(2) and 36.105(f)(2) of the final rule.

The revised language makes clear that the relevant inquiry under these sections is whether the actual or perceived impairment that is the basis of the covered entity's action is objectively "transitory and minor," not whether the covered entity claims it subjectively believed the impairment was transitory and minor. For example, a private school that expelled a student whom it believes has bipolar disorder cannot take advantage of this exception by asserting that it believed the student's impairment was transitory and minor, because bipolar disorder is not objectively transitory and minor. Similarly, a public swimming pool that refused to admit an individual with a skin rash, mistakenly believing the rash to be symptomatic of HIV, will have "regarded" the individual as having a disability. It is not a defense to coverage that the skin rash was objectively transitory and minor because the covered entity took the prohibited action based on a perceived impairment, HIV, that is not transitory and minor.

The revised regulatory text also makes clear that the "transitory and minor" exception to a "regarded as" claim is a defense to a claim of discrimination and not part of an individual's prima facie case. The

Department reiterates that to fall within this exception, the actual or perceived impairment must be *both* transitory (less than six months in duration) *and* minor. For example, an individual with a minor back injury could be "regarded as" an individual with a disability if the back impairment lasted or was anticipated to last more than six months. The Department notes that the revised regulatory text is consistent with the EEOC rule which added the transitory and minor exception to its general affirmative defense provision in its title I ADA regulation at 29 CFR 1630.15(f). Finally, in the NPRM, the Department proposed §§ 35.108(f)(3) and 36.105(f)(3) which provided that an individual who is "regarded as having such an impairment" does not establish liability based on that alone. Instead, an individual can establish liability only when an individual proves that a private entity or covered entity discriminated on the basis of disability within the meaning of the ADA. This provision was intended to make it clear that in order to establish liability, an individual must establish coverage as a person with a disability, as well as establish that he or she had been subjected to an action prohibited by the ADA.

The Department received no comments on the language in these paragraphs. Upon consideration, in the final rule, the Department has decided to retain the regulatory text for §§ 35.108(f)(3) and 36.105(f)(3) except that the reference to "covered entity" in the title III regulatory text is changed to "public accommodation."

*Sections 35.108(g) and 36.105(g)—Exclusions*

The NPRM did not propose changes to the text of the existing exclusions contained in paragraph (5) of the definition of "disability" in the title II and title III regulations, *see* 28 CFR 35.104, 36.104, which are based on 42 U.S.C. 12211(b), a statutory provision that was not modified by the ADA Amendments Act. The NPRM did propose to renumber these provisions, relocating them at §§ 35.108(g) and 36.105(g) of the Department's revised definition of "disability." The Department received no comments on the proposed renumbering, which is retained in the final rule.

*Sections 35.130(b)(7)(i)—General Prohibitions Against Discrimination and 36.302(g)—Modifications in Policies, Practices, or Procedures*

The ADA Amendments Act revised the ADA to specify that a public entity under title II, and any person who owns, leases (or leases to), or operates a place of public accommodation under title III, "need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability" solely on the basis of being regarded as having an impairment. 42 U.S.C. 12201(h). In the NPRM, the Department proposed §§ 35.130(b)(7)(i) and 36.302(g) to reflect this concept, explaining that a public entity or covered entity "is not required to provide a reasonable modification to an individual who meets the definition of disability solely under the 'regarded as' prong of the definition of

disability." These provisions clarify that the duty to provide reasonable modifications arises only when the individual establishes coverage under the first or second prong of the definition of "disability." These provisions are not intended to diminish the existing obligations to provide reasonable modifications under title II and title III of the ADA.

The Department received no comments associated with these provisions and retains the NPRM language in the final rule except for replacing the words "covered entity" with "public accommodation" in § 36.302(g).

*Sections 35.130(i) and 36.201(c)—Claims of No Disability*

The ADA as amended provides that "[n]othing in this [Act] shall provide the basis for a claim by an individual without a disability that the individual was subject to discrimination because of the individual's lack of disability." 42 U.S.C. 12201(g). In the NPRM the Department proposed adding §§ 35.130(i) and 36.201(c) to the title II and title III regulations, respectively, which incorporate similar language. These provisions clarify that persons without disabilities do not have an actionable claim under the ADA on the basis of not having a disability.

The Department received no comments associated with this issue and has retained these provisions in the final rule.

*Effect of ADA Amendments Act on Academic Requirements in Postsecondary Education*

The Department notes that the ADA Amendments Act revised the rules of construction in title V of the ADA by including a provision affirming that nothing in the Act changed the existing ADA requirement that covered entities provide reasonable modifications in policies, practices, or procedures unless the entity can demonstrate that making such modifications, including academic requirements in postsecondary education, would fundamentally alter the nature of goods, services, facilities, privileges, advantages, or accommodations involved. *See* 42 U.S.C. 12201(f). Congress noted that the reference to academic requirements in postsecondary education was included "solely to provide assurances that the bill does not alter current law with regard to the obligations of academic institutions under the ADA, which we believe is already demonstrated in case law on this topic. Specifically, the reference to academic standards in post-secondary education is unrelated to the purpose of this legislation and should be given no meaning in interpreting the definition of disability." 154 Cong. Rec. S8843 (daily ed. Sept. 16, 2008) (Statement of the Managers). Given that Congress did not intend there to be any change to the law in this area, the Department did not propose to make any changes to its regulatory requirements in response to this provision of the ADA Amendments Act.

## PART 36—NONDISCRIMINATION ON THE BASIS OF DISABILITY BY PUBLIC ACCOMMODATIONS AND IN COMMERCIAL FACILITIES

■ 7. Revise the authority citation for part 36 to read as follows:

**Authority:** 5 U.S.C. 301; 28 U.S.C. 509, 510; 42 U.S.C. 12186(b) and 12205a.

■ 8. Revise § 36.101 to read as follows:

### § 36.101  Purpose and broad coverage.

(a) *Purpose.* The purpose of this part is to implement subtitle A of title III of the Americans with Disabilities Act of 1990 (42 U.S.C. 12181–12189), as amended by the ADA Amendments Act of 2008 (ADA Amendments Act) (Pub. L. 110–325, 122 Stat. 3553 (2008)), which prohibits discrimination on the basis of disability by covered places of public accommodations and requires places of public accommodation and commercial facilities to be designed, constructed, and altered in compliance with the accessibility standards established by this **part.**

(b) *Broad coverage.* The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of "disability." The question of whether an individual meets the definition of "disability" under this part should not demand extensive analysis.

■ 9. Amend § 36.104 by revising the definition of "Disability" to read as follows:

### § 36.104  Definitions.

\*    \*    \*    \*    \*

*Disability.* The definition of *disability* can be found at § 36.105.

\*    \*    \*    \*    \*

■ 10. Add § 36.105 to subpart A to read as follows:

### § 36.105  Definition of "disability."

(a)(1) *Disability* means, with respect to an individual:

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section.

(2) *Rules of construction.* (i) The definition of ''disability'' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.

(ii) An individual may establish coverage under any one or more of the three prongs of the definition of ''disability'' in paragraph (a)(1) of this section, the ''actual disability'' prong in paragraph (a)(1)(i) of this section, the ''record of'' prong in paragraph (a)(1)(ii) of this section, or the ''regarded as'' prong in paragraph (a)(1)(iii) of this section.

(iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under § 36.302, it is generally unnecessary to proceed under the ''actual disability'' or ''record of'' prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the ''regarded as'' prong of the definition of ''disability,'' which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the ''actual disability'' or ''record of'' prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications.

(b)(1) *Physical or mental impairment* means:

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

(2) *Physical or mental impairment* includes, but is not limited to, contagious and noncontagious diseases and conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, emotional illness,

dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(3) *Physical or mental impairment* does not include homosexuality or bisexuality.

(c)(1) *Major life activities* include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working; and

(ii) The operation of a *major bodily function,* such as the functions of the immune system, special sense organs and skin, normal cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive systems. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) *Rules of construction.* (i) In determining whether an impairment substantially limits a major life activity, the term *major* shall not be interpreted strictly to create a demanding standard.

(ii) Whether an activity is a *major life activity* is not determined by reference to whether it is of *central importance* to daily life.

(d) *Substantially limits*—(1) *Rules of construction.* The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term ''substantially limits'' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. ''Substantially limits'' is not meant to be a demanding standard.

(ii) The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities

in order to be considered a substantially limiting impairment.

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term ''substantially limits'' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.

(vii) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate.

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(ix) The six-month ''transitory'' part of the ''transitory and minor'' exception in paragraph (f)(2) of this section does not apply to the ''actual disability'' or ''record of'' prongs of the definition of ''disability.'' The effects of an impairment lasting or expected to last less than six months can be substantially limiting within the meaning of this section for establishing an actual disability or a record of a disability.

(2) *Predictable assessments.* (i) The principles set forth in the rules of

construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.

(ii) *Applying these principles,* the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

(A) Deafness substantially limits hearing;

(B) Blindness substantially limits seeing;

(C) Intellectual disability substantially limits brain function;

(D) Partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function;

(E) Autism substantially limits brain function;

(F) Cancer substantially limits normal cell growth;

(G) Cerebral palsy substantially limits brain function;

(H) Diabetes substantially limits endocrine function;

(I) Epilepsy, muscular dystrophy, and multiple sclerosis each substantially limits neurological function;

(J) Human Immunodeficiency Virus (HIV) infection substantially limits immune function; and

(K) Major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and schizophrenia each substantially limits brain function.

(3) *Condition, manner, or duration.*(i) At all times taking into account the principles set forth in the rules of construction, in determining whether an

individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of "disability," the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in this section, it may often be unnecessary to conduct an analysis involving most or all of the facts related to condition, manner, or duration. This is particularly true with respect to impairments such as those described in paragraph (d)(2)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(4) *Mitigating measures* include, but are not limited to:

(i) Medication, medical supplies, equipment, appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including

ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable modifications or auxiliary aids or services as defined in this regulation;

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(e) *Has a record of such an impairment.* (1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) *Broad construction.* Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3) *Reasonable modification.* An individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability.

(f) *Is regarded as having such an impairment.* The following principles apply under the "regarded as" prong of the definition of "disability" (paragraph (a)(1)(iii) of this section):

(1) Except as set forth in paragraph (f)(2) of this section, an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, even if the public accommodation asserts, or may or does ultimately establish, a defense to the action prohibited by the ADA.

(2) An individual is not "regarded as having such an impairment" if the public accommodation demonstrates that the impairment is, objectively, both

"transitory" and "minor." A public accommodation may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the public accommodation must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment), objectively, both "transitory" and "minor." For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title III of the ADA only when an individual proves that a public accommodation discriminated on the basis of disability within the meaning of title III of the ADA, 42 U.S.C. 12181–12189.

(g) *Exclusions.* The term "disability" does not include—

(1) Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

(2) Compulsive gambling, kleptomania, or pyromania; or

(3) Psychoactive substance use disorders resulting from current illegal use of drugs.

## Subpart B—General Requirements

■ 11. Amend § 36.201 by adding paragraph (c) to read as follows:

### § 36.201    General.

\*    \*    \*    \*    \*

(c) *Claims of no disability.* Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

## Subpart C—Specific Requirements

■ 12. Amend § 36.302 by adding paragraph (g) to read as follows:

### § 36.302    Modifications in policies, practices, or procedures.

\*    \*    \*    \*    \*

(g) *Reasonable modifications for individuals "regarded as" having a disability.* A public accommodation is not required to provide a reasonable modification to an individual who meets the definition of "disability" solely under the "regarded as" prong of the definition of "disability" at § 36.105(a)(1)(iii).

\*    \*    \*    \*    \*

■ 13. Add appendix E to part 36 to read as follows:

**Appendix E—Guidance to Revisions to ADA Title II and Title III Regulations Revising the Meaning and Interpretation of the Definition of "disability" and Other Provisions in Order To Incorporate the Requirements of the ADA Amendments Act**

For guidance providing a section-by-section analysis of the revisions to 28 CFR parts 35 and 36 published on August 11, 2016, see appendix C of 28 CFR part 35.

Dated: July 15, 2016.

**Loretta E. Lynch,**

*Attorney General.*

[FR Doc. 2016–17417 Filed 8–10–16; 8:45 a.m.]

**BILLING CODE 4410–13–P**