NO. 20-1058

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

**JESSICA RAMSAY**,
*Plaintiff-Appellee*

v.

**NATIONAL BOARD OF MEDICAL EXAMINERS**,
*Defendant-Appellant*

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

_____

**BRIEF FOR PLAINTIFF-APPELLEE JESSICA RAMSAY**

_____

Lawrence D. Berger
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ  08033
(856) 354-0021

Mary C. Vargas
Michael S. Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
(240) 793-3185

*Attorneys for Plaintiff-Appellee Jessica Ramsay*

# **Table of Contents**

Table of Authorities................................................................................. iv

Counter-Statement of the Issues Presented for Review ........................... 1

Counterstatement of the Case ................................................................. 3

    A.    Jessica Ramsay ............................................................... 3

    B.    NBME and the USMLE.................................................... 9

    C.    Ramsay Applied for Accommodations, Was Turned Down, Failed The Step 1 Examination Without Accommodations, And Was Turned Down Again ................................................................. 10

    D.    Ramsay Was Placed On Leave Of Absence, And Faced An Imminent Threat Of Dismissal From Medical School, Because Of NBME's Refusal................................................................ 14

Summary of Argument ......................................................................... 16

Argument .............................................................................................. 17

    A.    The District Court Did Not Abuse Its Discretion In Entering A Preliminary Injunction To Require NBME To Provide Extended Time To Ramsay............................................................ 17

        Standard of Review ........................................................ 17

        1.    The District Court Correctly Applied The Preliminary Injunction Standards ............................................... 18

    B.    The Injunction Is Supported By Well Supported Findings of Fact Entered After a Three-Day Hearing .................................. 20

        Standard of Review ........................................................ 20

1.    The District Court Found That Jessica Ramsay Is A Person With A Disability.  That Finding, And Each of the Other Specific Findings That Is Attacked by NBME, Is Supported by the Record ............................................................................... 21

    (a)    The District Court's Finding, That NBME's Evaluators Accepted Dr. Smith's Testing Results As Valid And Credible, Was Supported by The Record ................... 22

    (b)    The District Court's Finding That Ramsay Was Unable To Read All The Questions Was Supported By The Record ....................................................................... 26

    (c)    The District Court's Finding That Ramsay's Teachers Provided Informal Accommodations Was Supported By The Record .......................................................... 29

C.    Ramsay's Imminent Dismissal From Medical School, If NBME Did Not Provide The Testing Accommodations, Was Irreparable Harm . 31

    Standard of Review ............................................................. 31

    1.    The District Court's Correctly Applied The Law To Its Findings About The Threat Of Imminent Dismissal From Medical School ...................................................... 31

D.    The District Court Correctly Balanced The Equities By Weighing The Threat of Ramsay's Imminent Dismissal From Medical School Against NBME's Self-Serving Arguments About The Integrity Of Its Examinations ..................................................................... 35

    Standard of Review ............................................................. 35

    1.    The District Court Correctly Applied The Law To Its Findings About The Relative Threats Of Harm To Ramsay, NBME And The Public Interest ................................................ 35

E.    NBME's Argument Is Based On Prior Court Decisions That Were Expressly Rejected By The ADA Amendments Act ......................... 39

Standard of Review ............................................................ 39

1.    The ADA Amendments Act Requires That The Definition Of Disability Be "Construed In Favor Of Broad Coverage" ........ 39

2.    The ADA Requires That Licensing Examinations Like The USMLE Be Made Accessible to People Like Ramsay Who Are Disabled by Slow Reading Speed ........................................... 46

3.    NBME Repeatedly Ignored The Department Of Justice Regulations And Technical Guidance Under the ADA And The ADA Amendments Act, Which Are Entitled To Judicial Deference ............................................................................ 48

Conclusion ................................................................................... 54

Certificate of Compliance With Type-Volume, Typeface and Type-Style Requirements ............................................................................. 55

Electronic Document Certificate ............................................... 56

Certificate of Service .................................................................. 57

Certificate of Bar Admission ...................................................... 58

# **Table of Authorities**

<u>Cases</u>

*A.O. Smith Corp. v. FTC,* 530 F.2d 515 (3d Cir. 1976)............................................17

*American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.,* 42 F.3d 1421, 1427 (3d Cir. 1994)............................................................................................18

*Anderson v. Bessemer City,* 470 U.S. 564 (1985)............................................ 20, 25

*B.C. v. Mt. Vernon School District,* 837 F.3d 152 (2d Cir. 2016) ..........................45

*Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141 (1st Cir. 1998) ..........................41

*Berger v. NBME,* 2019 U.S. Dist. Lexis 145666; 2019 WL 4040576 (S.D. Ohio 2019) ...................................................................................................... 44, 45

*Bibber v. Natl. Board of Osteopathic Medical Examiners,* 2016 U.S. Dist. Lexis 48181; 2016 WL 1404157 (E.D.Pa. 2016) .........................................................44

*Black & Decker Disability Plan v. Nord,* 538 U.S. 822 (2003) ..............................24

*Bragdon v. Abbott,* 524 U.S. 624, 646 (1998) .................................................. 49, 52

*Collins v. Prudential Inv. & Ret. Servs.,* 119 F.App'x. 371 (3d Cir. 2005) ............43

*Cunningham v. Nordisk,* 615 F.App'x. 97 (3d Cir. 2015) .......................................43

*Disabled Rights Action Comm. v. Las Vegas Events, Inc*., 375 F.3d 861 (9th Cir. 2004) .......................................................................................................52

*EEOC v. Chevron Phillips Chem. Cop., LP,* 570 F.3d 606 (5th Cir. 2009)............42

*Enyart v. Nat'l Conference of Bar Examiners, Inc.,* 630 F.3d 1153 (9th Cir. 2011) ...................................................................................................................47

*Gonzales v. NBME,* 225 F.3d 620 (6th Cir. 2000)............................................ 37, 41

*Hofslien v. Barnhart,* 439 F.3d 375 (7th Cir. 2006) ................................................24

*Koller v. Riley Riper Hollin & Colagreco,* 850 F.Supp.2d 502  (E.D.Pa. 2012) ....43

*Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700 (3d Cir. 2004) ...............17

*Love v. Law School Admission Council, Inc.,* 513 F.Supp.2d 206 (E.D.Pa. 2007)..
...............................................................................................................................42

*Mancini v. City of Providence,* 909 F.3d 32, 45 (1st Cir. 2018)..............................43

*Mann v. La. High School Athletic Assn.,* 535 F.App'x. 405 (5th Cir. 2013)...........18

*Marshall v. Sisters of Holy Family of Nazareth,* 399 F.Supp.2d 597 (E.D.Pa. 2005)
...............................................................................................................................42

*Martin v. Helstad,* 699 F.2d 387 (7th Cir. 1983) ...................................................33

*Neely v. PSEG Texas LP,* 735 F.3d 242 (5th Cir. 2013).........................................45

*Powell v. NBME,* 364 F.3d 79 (2d Cir. 2004).........................................................38

*Price v. Nat'l Bd. of Med. Exam'rs*, 966 F.Supp. 419 (S.D.W.Va. 1997)..............37

*Rawdin v. American Board of Pediatrics*, 985 F.Supp.2d 636 (E.D.Pa. 2013).44, 48

*Rothberg v. Law School Admission Council,* 102 F.App'x. 122 (10th Cir. 2004)
............................................................................................................. ..33, 37

*SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244 (3d Cir. 1985) .....................17

*Singh v. George Washington U. School of Medicine,* 508 F.3d 1097 (D.C. Cir.
2007) .................................................................................................................42

*Singh v. George Washington U. School of Medicine,* 667 F.3d 1 (D.C. Cir. 2011)
...............................................................................................................................42

*Steere v. George Washington U. School of Medicine,* 439 F.Supp.2d 17 (D.D.C.
2006) .................................................................................................................43

*Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999)................................ 39, 40, 43

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994) ........................................52

*Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002)............. 40, 43

*Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) ........................................................18

Federal Statutes

42 U.S.C. §12102(4)(A).............................................................................................40

42 U.S.C. §12102(4)(C)...................................................................................... 40, 42

42 U.S.C. §12102(4)(E) ............................................................................................41

42 U.S.C. §12102(4)(E)(i)(IV) .................................................................................51

42 U.S.C. §12186(b) .......................................................................................... 46, 52

42 U.S.C. §12189......................................................................................................46

42 U.S.C. §12206(c)(2)(C) .......................................................................................52

Legislative History

H.R. Rep. 110-730 (Committee Report) (footnotes omitted)...................................37

Federal Regulations and Court Rule

28 C.F.R. §36.309(b)(1)............................................................................................47

28 C.F.R. §36.309(b)(1)(v) .......................................................................................49

Rule 52(a)(6), F.R.Civ.P. ..........................................................................................18

Regulatory Guidance

Amendment of Americans With Disabilities Act Title II and Title III. Regulations
To Implement ADA Amendments Act of 2008, 81 Fed.Reg. 53,204............. passim

Nondiscrimination on the Basis of Disability by Public Accommodations and in
    Commercial Facilities,75 Fed.Reg. 56,236, 56,296. .............................. 49, 50, 51

U.S. Department of Justice Testing Accommodations:
    https://www.ada.gov/regs2014/testing_accommodations.html.................... 52, 53

<u>Other</u>

Joy, *et al., Assessment of ADHD Documentation from Candidates Requesting ADA
    Accommodations for the Natl. Board of Osteopathic Medical Examiners
    COMLEX Exam,* 14(2), J. OF ATTENTION DISORDERS 104 (2010) .....................25

## Counter-Statement of the Issue Presented for Review

Plaintiff-appellee Jessica Ramsay has dyslexia and attention deficit disorder. She receives extended time on examinations, including double-time in medical school, in order to ensure that the tests measure her knowledge rather than the extent of her disabilities. She requested extended testing time for a licensing examination, the United States Medical Licensing Examination ("USMLE"), under the Americans with Disabilities Act ("ADA"). Medical students must take and pass "Step 1" of the USMLE before their final year of medical school. Defendant National Board of Medical Examiners ("NBME") refused her request.

Ramsay took the test without extended time, failed, and faced imminent dismissal from medical school if she could not obtain the accommodations she needed. NBME persisted in its refusal to grant extended testing time, even after a neuropsychologist tested her and confirmed her severely impaired reading speed. Ramsay then brought this individual injunction action against NBME. During a 3-day hearing, NBME and its experts admitted that the neuropsychologist was qualified, and that he had used valid and appropriate measures of Ramsay's disability, but still refused to grant extended testing time. The District Court found that Ramsay had a disability, and issued a preliminary injunction requiring NBME to provide accommodations. NBME appealed. Meanwhile, with accommodations,

Ramsay subsequently took and passed Step 1 of the USMLE.  Based on this record, the following issues are presented for review:

1.    Are the District Court's findings of fact, based on three days of live testimony, entitled to substantial weight and deference from this Court under Rule 52(a)(6) of the Federal Rules of Civil Procedure, including the District Court's findings that:  Ramsay is a person with a disability (Appx55-56); that the testing results which showed her impaired reading speed and attention deficit were valid and accepted as such by NBME's experts (Appx18); that because of her disability, Ramsay was unable to read a substantial number of questions on defendant's USMLE examination without extended time (Appx14); and that Ramsay faced an imminent threat of dismissal from medical school unless accommodations were granted (Appx56)?

2.    Did the threat of imminent dismissal from medical school, as a result of NBME's refusal to provide extended testing time, constitute irreparable harm, where Ramsay had previously failed the USMLE Step 1 examination when she was forced to take it without extended time, and Ramsay was subject to immediate dismissal from medical school unless she took Step 1 of the USMLE?  Appx56, 59.

3.    In balancing the equities, was the District Court permitted to give greater weight to the concrete threat of harm to Ramsay than to the abstract harm

alleged by defendant that the "integrity" of its test would be harmed by permitting one individual medical student to receive accommodations recommended by a qualified psychologist?  Appx57.

## Counterstatement of the Case

### A.    Jessica Ramsay.

Jessica Ramsay has worked hard all her life, and succeeded at many things, but she is also a person with dyslexia and ADHD.  Appx17, 40, 56, 58, 1499-1503. She is a gifted young woman in some ways, but she is substantially limited as compared to the general population in reading fluency, speed and attention. Appx1490, 1495-1503.  Every expert and treating professional who has examined Ramsay in person has concluded that she needs extended time as a testing accommodation because of her disabilities. Appx11-12, 15-17, 52-53, 596-597, 1504.

Reading speed and fluency are not new challenges for Ramsay.  She has struggled, throughout her life, to accomplish what comes easily to others.  Appx40, 88.  For years, her teachers recognized how hard she tried to compensate and how gifted she was in other ways, and stepped in to help her informally.  Appx40-41, 89, 91-92, 313-314.  Teachers saw her tendency to reverse letters and the disparity in her performance on standardized tests and as compared to her intelligence and

knowledge.  Appx40-41, 89-91.[1]  She was seated separately from other students.
Appx40-41, 89.  She was routinely given extra time to complete assignments and
for tests. Appx41, 91-92.  For spelling tests, after reading the spelling words to the
class, Ramsay's teachers read the words additional times for her, slowly and with
sufficient time between each word for Ramsay to answer. Appx90.  She was
brought in at recess to complete tests that other students completed during class
time.  Appx41, 90.  Even in middle school, she worked late into the night, trying to
get through content that other students could read quickly. Appx42, 94.  When
even her best efforts and extended time on assignments could not compensate for
her slow reading speed, her mother would stay up late, reading aloud what Ramsay
could not read fast enough herself. Appx42, 94, 97.

Although Ramsay's report cards and school records do not completely
reflect her struggle, they do contain some examples, which were noted by the
District Court and which support Ramsay's testimony:

> Some examples of the evidence of such struggles from the record include
> Plaintiff's second and third grade school reports from Sunset Oaks Academy
> wherein her teachers noted "I will help her with the switching of
> letters"[Appx871] and "Jessica needs to focus on getting her work done on
> time;" [Appx875] her Stanford Achievement Test Record from first grade

---

[1] *See* pp. 29-31, *infra*.

reflecting that Plaintiff scored in the 13th percentile[2] in Word Reading, a score that was in stark contrast to her next lowest score in the 69th percentile for mathematics computation [Appx873]; and the notation on the report of Plaintiff's scores on the Iowa Tests of Basic Skills and Cognitive Abilities Test from the sixth grade that despite "seem[ing] to be high in overall cognitive ability" "Jessica's actual achievement is lower than expected in seven test areas [Appx893]. These are Vocabulary, Reading Comprehension, Spelling, Capitalization, punctuation, Social Studies and Math Computation. These represent areas in which Jessica is not doing as well as she might be expected. . . ."

Appx40 n.10 (footnote and references added).

The District Court also listened to, and believed, Ramsay's testimony about

the informal accommodations that she received:

These informal accommodations/interventions included providing an alphabet board to assist in reading and writing letters [Appx90], a distraction-reduced space (*i.e.* plaintiff was often seated at the "time-out desk), being kept in the classroom during recess so she could finish the classwork that she couldn't finish during regular class time [Appx89], being given extra time to complete assignments and tests and spending extra time with her teachers [Appx90], provided a quiet environment, and altered grading [Appx150] such that many of her elementary, middle and high school teachers agreed to grade her on the portions of examinations completed in lieu of the tests in their entirety and affording her opportunities to re-do work that were not afforded to all other students. . . .

Appx40 (footnote omitted and references added). As Dr. Robert Smith, the

neuropsychologist who evaluated her and issued a detailed report on her need for

accommodations for the USMLE, stated in his report, "the specificity of Jessica's

---

[2] "Percentile" refers to the percentage of data below a particular point, so that a person whose reading score is at the 13th percentile reads only as well as the bottom 13 percent, and not as well as the upper 87 percent.

descriptions, which are corroborated by her mother, attest to the presence of such struggle." Appx1459. The District Court agreed.

Like many gifted students with disabilities who got by on the basis of informal accommodations or took standardized tests during a time when test scores were flagged if extra time was provided, Ramsay took college entrance examinations and later the Medical College Admissions Test ("MCAT") without accommodations. Appx42, 44, 102-103, 845. She developed strategies to answer the MCAT questions while minimizing reading. Appx122-126. Her scores reflect the success of her use of those mitigation measures – work-arounds or test taking strategies that allowed her to answer many questions without actually reading much of the material presented. Appx122-126.

In fact, throughout her life, Ramsay has found ways not to read because of her disability. Even as an adult, her medical school classmates, her family, and her friends read aloud to her. In study groups during medical school, her peers read aloud practice test questions so that Ramsay's laborious reading rate did not slow the group down. Appx141. When the book "Game of Thrones" became popular, a friend would invite Ramsay over and read the book aloud so that Ramsay could enjoy what others were able to read for themselves. Appx317-318. Although Ramsay can read, her reading is slow and laborious, and the effort to decipher the

words fogs the meaning and interferes with comprehension, as Dr. Smith explained in his testimony.  Appx431.

When Ramsay went to college, without her parents to read for her and without the informal accommodations upon which she relied throughout her early education, it was her professors who recognized Ramsay's disability and referred her to the university disability services to finally formalize what had been informal throughout her schooling. Appx42-43, 97-99, 314

Ramsay received extended testing time for the remainder of her time in college.  Appx44, 46, 101.  She graduated college and struggled to gain admission to medical school. Appx103-104, 1437. Although some parts of her MCAT scores were strong thanks to her ability to use test taking strategies to avoid reading, she scored at the 31st percentile on writing without necessary accommodations. Appx122-126, 316.

Nevertheless, she ultimately earned admission to the Homer Stryker M.D. School of Medicine of Western Michigan University ("WMed") where she quickly earned the regard of her faculty and peers.  She was nominated by her classmates for membership in an honor society in recognition of outstanding clinical skills. Appx840, 1518, 1519, 1520-1521.  One of her treating physicians, Dr. Houtman, who had also been her medical school instructor, wrote, "I have seen first-hand the potential and knowledge that she has that will make her an excellent physician."

Appx1175.  Dr. Houtman described how Ramsay's "experiences with her own disabilities will allow her to empathize with, and show compassion for, her patients that some physicians will never experience or understand." Appx1171-1175.

Ramsay continued to receive necessary accommodations in medical school. Appx11. For example, she received 100% extended testing time (double time) on examinations that the medical school administered.  Appx11, 46-47.  Her school also provided "Kurzweil," a software application that reads textbooks and other written materials aloud to her (as her mother had in elementary and secondary school).  Appx80-82.[3]

Ramsay also developed a system, which she demonstrated to the District Court during the injunction hearing, using different colored markers to highlight and give meaning to text relating to disparate subjects such as diseases or disorders, treatment or management, diagnostic tests, physical findings, mechanism of action for drugs, histology, genetics, risk factors, protozoa, fungi or yeast, bacteria, viruses and negative symptoms.  Appx46 and n.12, 83-87.

In short, through hard work and using the accommodations that she received beginning in college, Ramsay was able to successfully complete three years of

---

[3] *See* Appx1179, the Certification of Prior Test Accommodations which WMed submitted to NBME.

medical school despite her disabilities.  Appx12, 79-80, 1517-1518.  It was at this

juncture that Ramsay was required for the first time to deal with NBME.

## B.    NBME and the USMLE.

NBME administers the USMLE, a series of tests that medical students must

take and pass in order to practice medicine in the United States. Appx10.  NBME

reported revenue of over $143 million in 2017.  Appx593.

The USMLE is broken into four parts. Appx10-11. Step 1 is a time-limited

computerized multiple-choice test that medical students must take prior to either

their third or fourth year of medical school, and prior to applying for residency

programs.  Appx10-11, 105-106.  Step 2 Clinical Knowledge ("Step 2 CK") is, like

Step 1, a computerized multiple-choice examination with longer reading passages.

Appx11, 142.  Step 2 Clinical Skills ("Step 2 CS") is an evaluation of clinical skills

based on the student examining simulated patients and preparing examination

notes.  Appx11.  Medical students must take and pass Step 2 CK and Step 2 CS

before graduating from medical school. Appx11. After graduation, medical

residents must take and pass Step 3 of the USMLE before becoming licensed to

practice medicine. Appx11.

Medical students with disabilities who require testing accommodations face

significant barriers in accessing NBME's testing that are not faced by students

without disabilities.  NBME requires medical students to obtain and submit

professional evaluations, educational records dating back through their earliest years of education, personal statements explaining their disability and need for accommodations, and certifications of accommodations signed by their educational institutions. [4]  But NBME then fails to consider the very information that it requires. Appx12-13, 55.

NBME sends accommodations requests to external reviewers, but waits as much as two months – after receiving the reviewer's report – before notifying the student of the decision.  During that waiting time, the student can do nothing. While students without disabilities can take the USMLE as soon as a few days after registration,[5] NBME waits 60 days or more before communicating its decision about accommodations.  Appx566-567.  In the case at bar, as further described in the next section, Ramsay ran out of time with her own medical school as she waited for NBME to review her requests for accommodations.

## C.    Ramsay Applied for Accommodations, Was Turned Down, Failed The Step 1 Examination Without Accommodations, And Was Turned Down Again.

In December 2016, Ramsay submitted a comprehensive request for accommodations on Step 1 of the USMLE to NBME. Appx12-13, 1068-1082.

---

[4] *See also* NBME's published guidelines, found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html.

[5] Appx587-588.

NBME sent her application to an external reviewer, Dr. Zecker who, like all of NBME's external reviewers, is a paid consultant who attends annual meetings that include training by NBME's attorney. Appx395-396, 413. Dr. Zecker promptly recommended against granting accommodations to Ramsay, a recommendation which NBME followed but waited two months to communicate. Appx1118, 1123.

Step 1 is a critical test. App10-11. Medical students cannot finish medical school without passing Step 1. Appx10-11, 849. When NBME refused to grant Ramsay extended time for Step 1, she took the test without accommodations. Because of the nature of the examination, she could not use the mitigation strategies that she was able to use on other kinds of standardized tests, to minimize the amount of reading, and she received a failing score.

As she explained to the District Court:

I can't skip reading on Step 1. . . – it's set up differently, so it's not just like one long passage and then like six or seven questions. It's like a passage as a question and then the answers. And it's like that for each question, but some questions [also] have videos or pictures or you have to listen to a heart murmur in addition to like a paragraph that you have to analyze. And everything in that paragraph is important. And you have to take that information and like consider all of it in order to be able to answer the question. And so I can't just skip reading on . . . the USMLE Step 1.

Appx127. *See also* discussion, *infra,* at 27-29. In the end, Ramsay ran out of time and was *unable* to read a significant number (30 to 35 percent) of the questions, and therefore had to simply pick an answer from many possible choices without

having read the questions.  Appx14, 78-79, 127-129, 138-140, 848, 849-850.  She failed Step 1. Appx14, 850.

The fact that Ramsay failed the Step 1 examination by a single point does not mean that she did not need accommodations.  As already noted, she was unable to read 30 to 35 percent of the questions, which means that her score for Step 1 did not reflect her true level of competency, even apart from the question of the pass/fail cutoff.  Appx139-140.  NBME admits in paragraph 16 of its Answer to the Complaint "that scores on USMLE Step 1 are considered by medical residency training programs during the residency selection process."  Appx750.  Therefore, even a passing score is harmful if it is so low that it does not fairly reflect the student's true level of knowledge.

After she failed the Step 1 examination, Ramsay submitted a second request for accommodations to NBME (Appx1127-1130), and NBME refused again.  Appx15-16, 116, 117-118, 850.  Once again, Ramsay had to wait nearly 60 days from the time that NBME's reviewer, Dr. Zecker, recommended denial, until NBME sent her the decision letter.  Appx1392, 1400. 1401.

Ramsay then tried to use NBME's procedure for requesting "reconsideration."  Appx17, 850.  NBME requires that reconsideration requests be

supported by "new substantive supporting documentation."[6]  Appx850.  To obtain the documentation, Ramsay went for evaluation to a qualified clinical psychologist, Dr. Robert Smith, who tested her using assessment instruments *that NBME's experts admitted are appropriate*.[7]  Appx371-373, 421-423.  Dr. Smith found that her oral reading fluency was at the 1st percentile, *i.e.,* better than only 1% of same-aged individuals, and far below average.  Appx832, 1431, 1446.  Her Reading Rate Cluster score on another test – also acknowledged by NBME's experts to be appropriate – was also at the 1st percentile, and her fluency on yet another found-to-be-appropriate test was at the 2d percentile. Appx371-373, 421-423, 832, 1451-1452.

Ramsay submitted Dr. Smith's report to NBME.  This time, NBME sent it to another external reviewer, Dr. Lovett, and he recommended that the new request also be denied, even though he later admitted at the District Court hearing that Dr. Smith had used appropriate tests for the evaluation.  Appx371-373.  After receiving Lovett's negative recommendation, NBME waited nearly two months, and then said no again.  Appx1507, 1511.

---

[6] "Guidelines," "Reconsideration," found on the Internet at https://www.usmle.org/test-accommodations/guidelines.html.

[7] *See* discussion, *infra,* at 22-25.

**D.    Ramsay Was Placed On Leave Of Absence, And Faced An Imminent Threat Of Dismissal From Medical School, Because Of NBME's Refusal.**

After failing Step 1 without accommodations, her medical school required Ramsay to take a leave of absence.  Appx14-15, 78-79, 851, 1517-1518, 1519, 1520-1521. For the next three years Ramsay's education and future were put on hold, while NBME reviewed and denied her requests.  Appx13, 14-18, 47-49, 115, 118, 119, 120, 121, 570, 849-851. In June 2019, Ramsay's medical school informed her in writing that she had run out of time and must take Step 1 by March 2, 2020. Appx14-15, 1520-1521, 1522-1524.  Otherwise, she could either withdraw from medical school or be kicked out of medical school.  Appx56, 851, 1520-1521.  Since a student who is not enrolled in medical school cannot register to take Step 1, she had to take Step 1 by March 2.  This was not only a "Catch 22" as the District Court said, but a certain career ender.  Appx56, 318.

In February 2020, after the Injunction in this case was issued, Ramsay took Step 1 *with accommodations* as ordered by the District Court, and passed. Appx60-61 and NBME's Brief at 32.  In order to graduate from medical school, Ramsay must still take and pass two more parts of USMLE – Step 2 CK (Clinical Knowledge) and Step 2 CS (Clinical Skills).  Appx10, 11, 104. In order to become licensed as a physician after graduation, she must take and pass Step 3 of USMLE.

14

Appx10, 11, 104. Ramsay will need testing accommodations for all of the USMLE Step examinations. Appx142, 848-849, 850-851.

As she has throughout her life, Ramsay has worked doggedly towards her goal of being a pediatrician. Appx78, 851-852. She remains a gifted young woman who has substantial impairment in reading and who requires accommodation so that she can show what she knows, as other students without disabilities can. She said it best herself at the hearing:

> Q.    Jessie, why is it important to you to have accommodations on Step 1?
>
> A.    Because the accommodations I requested are the accommodations I need in order to be able to read all of the questions and therefore have the opportunity to answer the questions based on my knowledge. . . .  [I]f I pass, I should be able to know that I passed because I knew the material. And if I fail, I should be able to know that I failed because I didn't know the material, *not because I wasn't able to read the questions* and have an opportunity to answer them, like other students get to.

Appx137-138 (emphasis added).

## Summary of Argument

Jessica Ramsay has struggled with dyslexia, a developmental disorder of impaired reading speed, and ADHD, for her entire life. She received informal help up through college, and formal accommodations, including extended testing time, in college and medical school. When she was forced by NBME to take Step 1 without extended time, she failed the examination, and faced imminent dismissal from medical school. After a three-day hearing, which included testimony from Ramsay, the neuropsychologist who evaluated her, and the two hired NBME reviewers who admitted that Ramsay's neuropsychologist used appropriate assessment instruments, the District Court ordered NBME to provide the additional time that Ramsay needed. As NBME concedes in its Brief, Ramsay now has retaken the Step 1 examination with the extended time ordered by the District Court, and passed.

This Court reviews the District Court's decision for abuse of discretion, with due regard to the District Court's opportunity to judge the credibility of witnesses, including Ramsay herself, and the neuropsychologist who conducted an in-person evaluation. The District Court's findings are all well supported by the record, and the District Court properly applied the governing law, including the ADA and the ADA Amendments Act. Most of NBME's arguments about the ADA are straw-

16

man arguments, rebutting contentions about the ADA which are nothing like what the District Court said.  The Order of the District Court should be affirmed.

## Argument

**A.    The District Court Did Not Abuse Its Discretion In Entering A Preliminary Injunction To Require NBME To Provide Extended Time To Ramsay.**

**<u>Standard of Review</u>**:  As Judge Higginbotham stated in *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1248 (3d Cir. 1985), this Court's scope of review on appeal from a preliminary injunction is "narrow."  Quoting Judge Aldisert in *A.O. Smith Corp. v. FTC,* 530 F.2d 515 (3d Cir. 1976), Judge Higginbotham continued:  "[u]nless the trial court abuses [its] discretion, commits an obvious error in applying the law, or makes a serious mistake in considering the proof, the appellate court must take the judgment of the trial court as presumptively correct."  530 F.2d at 525.  Moreover, as stated in *Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004), "[A]ny determination that is a prerequisite to the issuance of an injunction . . . is reviewed according to the standard applicable to that particular determination."  369 F.3d at 708, *citing American Tel. & Tel. Co. v. Winback and Conserve Program, Inc.,* 42

F.3d 1421, 1427 (3d Cir. 1994).[8]  Therefore, the District Court's supporting

findings of fact are reviewed pursuant to Rule 52(a)(6), F.R.Civ.P., which provides

that "Findings of fact, whether based on oral or other evidence, must not be set

aside unless clearly erroneous, and the reviewing court must give due regard to the

trial court's opportunity to judge the witnesses' credibility."  *See also* the

discussion of Rule 52(a)(6) at 20-21, *infra*.

### 1.    The District Court Correctly Applied The Preliminary Injunction Standards.

As the District Court summarized (Appx25), "A plaintiff seeking a

preliminary injunction must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest,"

*citing Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

The District Court carefully applied each of the injunction standards.  With

respect to the likelihood of success on the merits, the District Court stated at

Appx39 that the "threshold question" was "whether Ramsay truly is disabled

within the meaning of the ADA and/or the [Rehabilitation Act]."  The Court

observed that Ramsay had a record of struggling with school work beginning in 1st

---

[8] *Mann v. La. High School Athletic Assn.,* 535 F.App'x. 405, 409 (5th Cir. 2013) (per curiam), cited at p. 35 of NBME's Brief, is similar ("we review findings of fact for clear error").

or 2d grade, and received informal accommodations from her teachers. Appx40-42. In college, two professors, who observed her struggling on written tests, advised her to contact the university Office of Disability Services, and her physician diagnosed her as suffering from ADHD. Appx43. The university then provided accommodations including extended testing time. Appx44. A further evaluation resulted in additional accommodations (double time) in medical school. Appx45-47. Ramsay subsequently requested the same accommodations from NBME, was repeatedly turned down, and sought additional testing from Dr. Smith to satisfy *NBME's* requirement for additional evidence of disability. Appx49. Dr. Smith determined that Ramsay had severely impaired reading speed, and also confirmed her prior diagnosis of ADHD. Appx1453-1459. The District Court accepted Dr. Smith's findings and concluded that Ramsay had established her status as a person with a disability. Appx56.

With respect to the other injunction criteria, the District Court found that Ramsay would suffer irreparable harm because of the imminent threat that, without extended testing time, she would be dismissed from medical school, and also be badly disadvantaged in the residency Match process (www.nrmp.org). *See* Appx56, and *infra,* at 31-35. The Court further found that the balance of equities and public interest both favored the issuance of an injunction. Appx57.

19

As discussed further below, the District Court's findings of fact in support of the preliminary injunction standards were clearly correct (*infra* at 21-31), and the Court did not abuse its discretion (*infra* at 31-39), or misapply the law (*infra* at 39-54).

**B.    The Injunction Is Supported By Well Supported Findings of Fact Entered After A Three-Day Hearing.**

<u>**Standard of Review**</u>:

The standard of review for the District Court's findings of fact is set by Rule 52(a)(6), F.R.Civ.P. which provides that "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."

Rule 52(a) was authoritatively construed by the United States Supreme Court in *Anderson v. Bessemer City,* 470 U.S. 564 (1985):

> This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fac*t*, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*

470 U.S. at 573-74 (emphasis added, and citations omitted.)

NBME's whole approach to this appeal is to reargue the case that it presented to, and lost before, the District Court, and to ignore what the District Court actually said. The three findings that are specifically challenged by NBME are findings of fact and not mixed questions of law and fact. Therefore, they are to be evaluated according to the "clearly erroneous" standard, like any other findings of fact.

**1.      The District Court Found That Ramsay Is A Person With A Disability. That Finding, And Each of the Other Specific Findings That Is Attacked By NBME, Is Supported by the Record.**

The District Court found that, *despite* her "high intelligence" and remarkably hard work habits," Ramsay is a person with a disability:

> In view of all of the evidence provided by Plaintiff both in the form of the materials and supporting documentation submitted to pursuant to her numerous requests for accommodations and requests for reconsideration of the denials thereof and at the three-day hearing before the undersigned, we find that Plaintiff has sufficiently established that *she is indeed a qualified individual with a disability* within the meaning of the ADA *despite* her prior academic successes and her performances on standardized tests. Indeed, we find that the evidence as outlined above supports the conclusion that, *despite* having Attention Deficit/Hyperactivity Disorder and Dyslexia/Learning Disorder of reading/scanning/processing speeds, Ramsay has been able through her high intelligence and remarkably hard work habits to achieve great academic success. Thus, Plaintiff has shown the requisite likelihood of success on the merits of her Complaint in this matter.

Appx55-56 (emphasis added). NBME turns this finding on its head and argues that the District Court never found that Ramsay had a disability, but the Court's

actual language shows otherwise.  What the District Court actually said was that

Ramsay *was* disabled "*because of the additional time or effort . . . she must spend*

*to read, write, or learn* compared to most people in the general population"

(Appx54-55) (emphasis added), and that her general intelligence and hard work did

not *negate* this.

When, at page 60 of its Brief, NBME finally discusses the District Court's

findings, it limits its discussion to three specific findings which are amply

supported by the record, and further demonstrate that Ramsay is a person with a

disability.  The three specific findings that NBME challenges are:

> (1) that NBME denied [Ramsay's] accommodations request
> 'notwithstanding that its evaluator accepted, "that Plaintiff's exceptionally
> low scores were 'valid and credible," Appx18; (2) that 'Plaintiff was unable
> to read all the questions' when she took Step 1; Appx14; and (3) 'that many
> of [Plaintiff's] elementary, middle and high school teachers' provided
> informal accommodations, including extra testing time, Appx41."

NBME Brief at 60.  As described below, the District Court's three specific findings

are also well-founded, and should be accepted by this Court under the "clearly

erroneous" rule.

> **(a)    The District Court's Finding, That NBME's Evaluators
> Accepted Dr. Smith's Testing Results As Valid And
> Credible, Was Supported By The Record.**

NBME questions the District Court's finding that NBME's evaluators

accepted Ramsay's low scores on the evaluation instruments administered by

Dr. Smith.  These included the Wechsler Individual Achievement Test ("WIAT"),

the Woodcock Johnson IV Tests of Achievement ("WJ4"), the Gray Oral Reading Tests – 5th Edition ("GORT-5"), and the Integrated Visual & Auditory Continuous Performance Test ("IVA+").

Ramsay's Oral Reading Fluency as measured by the WIAT, and her Reading Rate and Reading Rate Cluster as measured by the WJ-4, were at the 1st percentile, and her Fluency as measured by the GORT-5 was at the 2d percentile.  As NBME's external reviewer, Dr. Lovett, explained, these scores are reflective of "[e]xtremely poor reading skills with regard to a variety of different areas of reading.  Not just the speed, but also things like accuracy and comprehension." Appx350.

NBME submitted Dr. Smith's report to two external reviewers, Dr. Lovett and also Dr. Zecker.  Both Lovett and Zecker admitted, in their testimony at the Injunction Hearing, that the WIAT, WJ4 and GORT-5, were appropriate tests to administer for a diagnosis of dyslexia; and both Lovett and Zecker also admitted that Dr. Smith had administered and scored the tests correctly.[9]  In Lovett's words, those tests "can certainly contribute useful information towards that diagnosis. Like any piece of evidence, it has to be interpreted correctly, but to give that test during a diagnostic battery would not be inappropriate."  Appx371.  In short,

---

[9] Appx371 (Lovett, WIAT); Appx372 (Lovett, WJ4); *id.* (Lovett, GORT-5); Appx422 (Zecker, WIAT); *id.* (Zecker, WJ4 and GORT-5).

Lovett and Zecker not only admitted that Dr. Smith's testing was valid, but also that it was appropriate for the diagnoses which he gave.[10]

Thus, Lovett and Zecker argued only that the test results were inconsistent with other information, mainly that Ramsay's disability was not diagnosed in childhood, that she had not received formal accommodations at school prior to college, and that she had scored well on other tests including the MCAT without accommodations.  In fact, NBME, Lovett and Zecker ignored everything else, as the District Court observed.  (Appx55.)[11]  But Lovett and Zecker did not challenge the appropriateness and accuracy of the psychological assessments used by

---

[10] NBME requires that requests for accommodations be supported by a professional evaluation, and then tries to discredit Dr. Smith (and all independent professionals) with a broad brush, *e.g.,* accusing Dr. Smith of the cardinal sin of trying to help students (NBME Brief at 26).  With further illogic, NBME then cites otherwise irrelevant cases because they refer to physicians trying to help patients, *e.g., Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006) (Social Security claim) (ALJ could give greater weight to non-treating physician).  Here, the District Court's decision to give greater weight to Dr. Smith was based on Ramsay's own testimony – about her childhood informal accommodations, and her reading disability and the reason she could answer questions on the MCAT without reading – all the facts which NBME's evaluators choose to reject, but which the District Court reasonably believed.  Another case cited by NBME is even more irrelevant:  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 832 (2003) (ERISA claim was not subject to "treating physician" rule).

[11] NBME's exclusive focus on MCAT and other standardized test scores was improper under the ADAAA, as discussed *infra* at 51.

Dr. Smith, and it was within the District Court's discretion to accept Dr. Smith's view over NBME's view.[12]

Similarly, both Lovett and Zecker agreed that the IVA+ was an appropriate test to consider towards a diagnosis of ADHD.[13]  They challenged Dr. Smith's conclusion, but not the accuracy or relevance of the psychological assessments that he used.

Lovett and Zecker did not agree with Dr. Smith's diagnosis, but that is a different matter.  As in *Anderson v. Bessemer City,* "there [were] two permissible views of the evidence,"  470 U.S. at 573-74, and "the factfinder's choice between them cannot be clearly erroneous."  Dr. Smith and NBME's evaluators were all qualified as expert witnesses.  They had different views of the evidence, which is why the District Court referred to a "battle of experts."  The District Court's

---

[12] NBME cites a general broadside against independent professionals like Dr. Smith:  Joy, *et al., Assessment of ADHD Documentation from Candidates Requesting ADA Accommodations for the Natl. Board of Osteopathic Medical Examiners COMLEX Exam,* 14(2), J. OF ATTENTION DISORDERS 104 (2010).  This highly subjective study (based on second-guessing of clinicians by researchers), using files supplied by NBME's osteopathic counterpart, is not part of the record, and has nothing to do with this case.  The other articles cited at p. 46 and n.9 of NBME's Brief are even more irrelevant:  these articles claim that some colleges are not rigorous in their evaluation of ADHD claims.  What of it?  Ramsay's claim does not rest solely on her school's evaluation, but also on her thorough evaluation by Dr. Smith, whose methods were recognized as valid by NBME's own reviewers.

[13] Appx373 (Lovett, IVA+); Appx422-423 (Zecker, IVA+).

decision to accept Dr. Smith's view cannot be clearly erroneous, especially since Dr. Smith's conclusions are also supported by corroborating evidence of informal accommodations during Ramsay's early years, and formal accommodations in both college and medical school as discussed above at 4-5.[14]

### (b) The District Court's Finding That Ramsay Was Unable To Read All The Test Questions Was Supported By The Record.

This finding relates to Ramsay's attempt to take Step 1 of the USMLE without accommodations, after NBME initially refused them. Ramsay received a failing score and testified that she had only been able to read about 65 to 70 percent of the questions. Appx139-140. NBME ignores her testimony, or claims that it is rebutted by a computer measurement of the amount of time for which she had each question displayed on the screen. However, the computer measurement (discussed below) was incomplete, and actually corroborates Ramsay's testimony. The District Court's decision to accept Ramsay's testimony, and not NBME's misleading presentation of its own computer measurement, represented a

---

[14] Dr. Smith also administered a test known as the "Test of Memory Malingering" or "TOMM" which is a performance validity test, used to assess whether the student is putting forth genuine effort during the evaluation. Appx466-467. Lovett disputed whether the TOMM was the correct performance validity test in this case (Appx353-355), but NBME has abandoned this contention on appeal, and in any event, Dr. Smith concluded that Ramsay was exerting genuine effort (Appx555-557), and the District Court found both Ramsay herself and Dr. Smith to be credible.

permissible choice between "two permissible views of the evidence," and was not clearly erroneous.

NBME's computer exhibit (Appx1030-1038) is a table it created by excerpting selected data from its database that shows the total amount of time that each question was displayed on the computer screen (Appx639). According to NBME's lawyers, this shows that "she spent time on *every* question" (NBME Brief at 23, emphasis in original), but it shows nothing about whether Ramsay was able to use that time *to read the questions*.

NBME only produced this evidence a week before the hearing, and admitted at the hearing that it did not produce other data that it had about Ramsay's test. Appx649-50, 652. Since NBME did not produce that data, the only evidence about the manner in which Ramsay answered the questions was her own testimony, which the District Court believed and for which NBME has no answer.

It may seem logical to people who are not dyslexic to read questions in order, and answer each question in order. Ramsay testified that, because of her impaired reading speed, she was forced to use a different strategy. First, she identified, reviewed and answered questions that required minimal reading because of the structure of the question but, as she explained, there were few such questions

27

on the Step 1 examination.[15]  Then, she made successive passes through the

questions, and rather than simply reading the lengthy passages would try to

identify and search for responsive information to help mitigate her reading

disability.[16]  Finally, when she was about to run out of time because of her slow

reading speed, she made an additional pass through the still un-answered questions

in which she guessed at questions that she had been unable to read.  Appx129.

The questions that remained corresponded to the number of questions for

which she had to guess.  As she testified, she was able to estimate the number of

questions remaining:

> So by the time I hit that five-minute warning and I had to fill in guesses, the
> ones that I had guessed on, I marked. And I like kept track of about how
> many I had marked or had – that were left when I guessed on them for each
> section. And it was roughly overall about 65 percent of the ones – sorry, like
> 35 percent I had guessed on. And I had only gotten to about 65 percent, an
> average over all of the sections.

Appx139-140.  The District Court believed this testimony.

Based on Ramsay's account of what she actually did, she would have looked

at least three times at *the questions that she did not have time to read,* and so

would have displayed those questions on her computer screen at least three times:

That is all that NBME's computer exhibit shows.

---

[15] *See* Appx127:  "I can't skip reading on Step 1 . . . – it's set up differently."

[16] Appx128-129.

Ramsay's testimony stands unrebutted.  The admittedly incomplete computer exhibit that NBME created and on which NBME places such stress (*see* NBME Brief at 23-24, and 61) contains no information about the order in which Ramsay answered questions, even though such information was available.

Once again, the District Court – which heard the testimony of both Ramsay and the NBME computer expert – made a choice, and believed Ramsay's testimony, and this Court must give "due regard" to that choice, because it was not clearly erroneous.

> **(c)    The District Court's Finding That Ramsay's Teachers Provided Informal Accommodations Was Supported By The Record.**

NBME also questions the District Court's finding that many of her school teachers provided her with informal accommodations, which is discussed *supra* at pp. 4-5.

In addition to the documents to which the District Court referred, Ramsay also testified about the informal accommodations that she received.  *See* Appx89 (first grade teacher sat her apart from the case to avoid distraction); Appx90 (teachers provided an alphabet chart to help with reading difficulty); *id.* (teacher worked with Ramsay individually during recess); Appx91-92 (received extra time on tests and assignments throughout elementary school); Appx95-96 (alternate assessment for entry into accelerated math program, because of slow reading

speed); Appx150 (alternate grading). Ramsay's psychologist, Dr. Smith, also commented that "the specificity of Jessica's descriptions" of the informal accommodations that she received, "which [were] corroborated by her mother, attest to the presence of such struggle." Appx1503.[17]

The District Court believed Ramsay's testimony. NBME essentially argues that this must be "clearly erroneous" because informal accommodations are not shown on her report cards, and because Ramsay got generally good grades without formal accommodations. However, the very report cards on which NBME relies also state that teachers may teach students differently "in accordance with their academic needs." Appx879 (3d grade report card from Carrollton-Farmers Independent School District). In other words, *not everything is written down on the report card*, and teachers sometimes use different strategies with different students, without formal accommodations, just as Ramsay described in her testimony.[18] The argument that Ramsay could not be disabled because she got

---

[17] At the hearing, NBME was reduced to introducing in evidence good behavior stickers that were awarded by Kindergarten and primary grade teachers (*e.g.,* Appx857 *ff.*). The District Court found Ramsay's own testimony about her struggles to be more convincing than the stickers.

[18] Ramsay's early teachers were concerned about the discrepancy between her general intelligence, and very low performance in some specific areas like reading, and therefore adopted different teaching strategies, *i.e.,* accommodations. NBME argued below that the so-called "discrepancy model" of disability, has been discredited. *See, e.g.*, Appx.340-343 (testimony of Lovett). *But see* Zecker, "Underachievement and Learning Disabilities in Children Who Are Gifted"

good grades without formal accommodations is discussed *infra* at 37 and 51, but the short answer is that people with strong abilities in some areas, like Ramsay, may also have disabilities in other areas, and therefore need accommodations under the ADA.

## C.    Ramsay's Imminent Dismissal From Medical School, If NBME Did Not Provide The Testing Accommodations, Was Irreparable Harm.

**Standard of Review**:  The standard of review for the District Court's findings of fact about Ramsay's danger of being dismissed from medical school (Appx56) is the "clear error" standard discussed above at pages 20-21.  NBME submitted no evidence concerning harm to NBME.  The standard of review for the District Court's application of the "irreparable harm" standard to the facts is abuse of discretion.

### 1.    The District Court's Correctly Applied The Law To Its Findings About The Threat Of Imminent Dismissal From Medical School.

NBME argues that the District Court "abused its discretion in finding irreparable harm where Plaintiff did not establish any alleged injury beyond a

---

(Appx1839), although Zecker himself now disclaims this view as outdated in his testimony (Appx414).  Dr. Smith testified that the discrepancy model is still recognized in one major diagnostic manual (the International Classification of Diseases) and among some scholars.  (Appx457-458.)  Ramsay's status as a person with a disability is based on far more than "discrepancy" including her very low and far below average reading scores.  In any case, the concern about discrepancy by Ramsay's teachers in early grades supports her testimony about the informal accommodations she received.

potential delay in her medical school education." NBME Brief at 63. The evidence in the record shows that NBME is wrong again.

After NBME denied Ramsay's original request for extended testing time, she took the Step 1 examination and failed. Her medical school immediately placed her on leave-of-absence which it extended several times, as she continued her attempt to obtain extended testing time. *Two years* after she was placed on leave-of-absence, her medical school offered a final extension "with the expectation that [she would] sit for the USMLE Step 1 exam" by the March 2, 2020 deadline. Appx1520. In its letter, the school also stated that if she were unable to sit for the exam by the deadline, she "would be dismissed from medical school," or required to withdraw, and permitted to reapply only "at the time you are prepared to take USMLE Step 1." *Id.* As the District Court observed, the offer of permission to re-apply was illusory, because a student must be enrolled in medical school in order to take the Step 1 examination:

> That enrollment in a medical school is a pre-requisite to being allowed to sit for the Step 1 exam is further evidence of the "Catch 22" in which Plaintiff finds herself[19] and further supports the conclusion that her medical career

---

[19] *See also* Appx1520, the letter from the medical school, which states "You must be admitted to medical school to be eligible to schedule and sit for USMLE Step 1," and NBME's own web-site, found on the Internet at https://www.usmle.org/bulletin/eligibility/, which states that a student must be either a medical student, or a graduate of a medical school, to take one of the USMLE examinations. Since Ramsay cannot graduate without first passing

will effectively end if she cannot satisfy WMed's [the medical school's] mandate by March 2, 2020.

Appx56 (footnote added).  Moreover, when Ramsay inquired, the school advised her that subsequent readmission "is not assured."  Appx1523.

None of the cases cited by NBME is similar.  *Rothberg v. Law School Admission Council,* 102 F.App'x. 122, 126 (10th Cir. 2004) concerned a student who was applying *to* law schools, and whose injury was that she *might* be admitted *to* a better school if she had a better score.  By contrast, Ramsay faced dismissal *from* medical school, and inability to take the USMLE exam once she was dismissed.  *Martin v. Helstad,* 699 F.2d 387, 391-92 (7th Cir. 1983) concerned a student whose admission to law school had been revoked because he failed to disclose that he had been convicted of a crime for which he was currently incarcerated.  *Id.* at 388.  In rejecting that student's appeal, the Court of Appeals in *Martin* explained why Ramsay's case *does* satisfy the irreparable harm requirement:

> [A] delay in obtaining admission to a graduate school for purposes of pursuing professional studies, *as distinguished from interruption or termination of attendance already in progress*, is not ordinarily considered irreparable injury warranting injunctive relief.

---

Step 1, and cannot take Step 1 unless she continues to be enrolled in medical school, the District Court's "Catch 22" analogy is apt.

699 F.2d at 391-92 (emphasis added).  "Interruption or termination of attendance already in progress" is precisely what this case is about.

NBME also argues that the harm to Ramsay was not irreparable because, when she did take Step 1 without extended time, she only failed by a single point, and (according to NBME's lawyers) it was "likely" that she would pass if she took the test again without extended time.  NBME's Brief at 23, 65.  This is patently misleading, and is contradicted by NBME's own admissions.

Even assuming for the sake of argument that Ramsay might have passed on a second attempt without accommodations, a low passing score, that was artificially depressed by NBME's wrongful refusal to allow extended time, would still have been harmful.  NBME admits that Step 1 scores "are considered by medical residency training programs during the residency selection process." Appx750.  Without accommodations, it is likely that Ramsay's score would still have been low because she would still have a reading disability, and she would still be unable to read all of the questions.  Ramsay testified and NBME did not dispute, that the effect of even a low passing score on her ability to compete in the residency Match process would be "huge," Appx138, and such a score – based on an examination in which she could not read 30 to 35 percent of the questions – would not fairly reflect her true knowledge and ability.  *Id.*  Ramsay also testified, on the basis of her own review of practice materials including those supplied by

34

NBME itself, that subsequent "Steps" in the USMLE series – including Step 2 CK which she must take and pass later this year – are even more reading intensive than Step 1.  Appx142.

**D.    The District Court Correctly Balanced The Equities By Weighing The Threat Of Ramsay's Imminent Dismissal From Medical School Against NBME's Self-Serving Arguments About The Integrity Of Its Examinations.**

**<u>Standard of Review</u>**:  The standard of review for the District Court's findings of fact about harm to Ramsay (Appx56) is the "clear error" standard discussed above at pages 20-21.  NBME submitted no evidence concerning harm to NBME.  The standard of review for the District Court's application of the "balance of equities and public interest" standard to the facts is abuse of discretion.

**1.    The District Court Correctly Applied The Law To Its Findings About The Relative Threats Of Harm To Ramsay, NBME And The Public Interest.**

As discussed above at page 32, the District Court found that Ramsay faced an imminent threat of dismissal from medical school if she could not take the Step 1 examination without accommodations.  NBME argues that the District Court erred because:  (a) it did not make any findings about alleged harm to NBME; (b) it did not consider the harm that NBME says that it proved to the "integrity" of the examination; and (c) it did not consider the harm to the public interest from providing additional testing time to a single medical student, Ramsay.

These contentions, which NBME's counsel has wisely relegated to the end of NBME's Brief, are without merit.

First, NBME did not submit any evidence of harm to NBME itself; therefore, the District Court found none. Cost is not an issue. There is no additional cost to NBME. (Ramsay's Step 1 test was already scheduled to be administered over two days because of the accommodations that NBME did grant for her clotting disorder and migraine headaches, and after the District Court also ordered additional testing time, it was still a two day examination.)[20] It is undisputed that the additional accommodation that Ramsay was requesting – additional testing time – is one that NBME can provide.[21] Indeed, NBME concedes at page 68 of its Brief that "The harm here has nothing to do with logistics or cost. . . ." Rather, NBME says, the alleged harm has:

> everything to do with ensuring fairness to other examinees, preserving the integrity of the USMLE, and protecting the public welfare. Those are the interests NBME seeks to protect, and they are important.

NBME's Brief at 68-69.

In support of NBME's dramatic language, for which it offered no evidence, NBME cites *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F.Supp. 419, 422 (S.D.W.Va.

---

[20] Appx1511-1512.

[21] *See* Settlement Agreement Between United States of America and National Board of Medical Examiners, ¶12, found on the Internet at https://www.ada.gov/nbme.htm and cited at p. 56 n.12 of NBME's Brief.

1997), and *Rothberg v. Law School Admissions Council, supra,* 102 F. App'x at

126-27.  Neither case is relevant.  *Price* is about whether the Court should order

accommodations for students who the Court found (under the pre-ADAAA version

of the ADA) were *not* disabled.  Here, the District Court found that Ramsay *is*

disabled.  *See* Appx56 and pp. 21-22, *supra*.  *Price* is also one of the cases that was

specifically rejected by the drafters of the ADA Amendments Act ("ADAAA")

who stated:

> [I]t is critical to reject the assumption that an individual who performs well
> academically or otherwise cannot be substantially limited in activities such
> as learning, reading, writing, thinking, or speaking.  As such, the Committee
> rejects the findings in *Price v. National Board of Medical Examiners*,
> *Gonzales v. National Board of Medical Examiners*, and *Wong v. Regents of
> University of California*.

H.R. Rep. 110-730, pt. 1, at 10 (2008) (Committee Report) (footnotes omitted).

*Rothberg* is about the balance of harms, but as discussed *supra* at 33.

*Rothberg* is also about a student who was still seeking admission *to* law school,

while this case is about a student – Ramsay – who was threatened with dismissal

*from* medical school and the termination of her career.  The clear implication of

*Rothberg* is that Ramsay's case – "interruption or termination of attendance

already in progress" – is irreparable harm.

The only accommodation that is in issue in this case is testing time.  The

accommodations are needed because of Ramsay's very slow reading speed and

ADHD which has been demonstrated by psychological testing which NBME's

37

experts agree was appropriate.  NBME places heavy stress on extra time for Ramsay being "unfair" to other test-takers (NBME Brief at 4-5, 7, 33-34, and 68-70) but never contends that the USMLE examinations are designed to test or measure reading speed, and simply assumes (without ever proving) that extra time would be advantageous for test-takers with average reading speeds.[22]

There is likewise no threat to the "public welfare" which NBME claims to be safeguarding.  According to NBME, the USMLE is "designed to assess an examinee's ability to apply the knowledge, concepts, and principles needed to provide safe and effective patient care."  NBME Brief at 6.  It is undisputed that *a student who is granted extended testing time is required to answer the same questions as a student who takes the test in standard time*.  NBME offered no proof that a student, who requires extended time because of a reading disability, is any less qualified as a physician.  NBME cites *Powell v. NBME,* 364 F.3d 79, 88 (2d Cir. 2004), a pre-ADAAA case, but *Powell* does not address whether the time requirement of Step 1 has anything to do with measuring a student's knowledge or ability.  In *Powell,* the Court found that the plaintiff was not "qualified" because of

---

[22] *See* B. Lovett [one of NBME's experts] and L. Lewandowski, TESTING ACCOMMODATIONS FOR STUDENTS WITH DISABILITIES (American Psychological Assn. 2015) at 97 ("if . . . speededness and length are accidental features of the test's design, timing and scheduling accommodations may be of little threat to validity and may increase validity for certain examinees").

a prior history of academic difficulties (*id.* at 87), whereas in the case at bar,

NBME essentially claims that Ramsay is *too* qualified, and therefore cannot be

disabled in spite of her low reading speed.

**E.**   **NBME's Argument Is Based On Prior Court Decisions That Were Expressly Rejected By The ADA Amendments Act**

**Standard of Review**:  The standard of review for the District Court's

interpretation of the governing laws, the ADA and the ADAAA, is plenary.

**1.**   **The ADA Amendments Act Requires That The Definition Of Disability Be "Construed In Favor Of Broad Coverage."**

NBME devotes most of its Brief to arguing that Ramsay is not a person with

a disability, and then citing cases decided before the ADA Amendments Act of

2008 ("ADAAA"). P.L. 110-325.  Congress enacted the ADAAA for the specific

purpose of rejecting these and other prior court decisions which unduly narrowed

the coverage of the ADA.

For example, NBME's Brief argues that Ramsay was not disabled because

she partially mitigated the effects of her disability, prior to medical school.  The

ADAAA, however, expressly overruled prior court decisions that unduly restricted

coverage on this ground, such as *Sutton v. United Air Lines, Inc.,* 527 U.S. 471

(1999).[23]  Yet, many of the ADA cases cited by NBME in its Brief are based on

*Sutton* and other overruled pre-ADAAA decisions.

The ADAAA also expressly rejected the Supreme Court decision in *Toyota*

*Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), finding that *Toyota*

and its application by lower courts:

> created an inappropriately high level of limitation necessary to obtain
> coverage under the ADA, to convey that it is the intent of Congress that the
> primary object of attention in cases brought under the ADA should be
> whether entities covered under the ADA have complied with their
> obligations, and to convey that the question of whether an individual's
> impairment is a disability under the ADA should not demand extensive
> analysis.

*Id.,* §2(b)(5).

In addition to these broad declarations of Congressional intent, the ADAAA

provided that the definition of disability "shall be construed in favor of broad

coverage of individuals, to the maximum extent permitted by the terms of [the

ADA];[24] that "[a]n impairment that substantially limits one major life activity need

not limit other major life activities in order to be considered a disability";[25] and

---

[23] ADAAA, §2(b):  "to reject the requirement enunciated by the Supreme
Court in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471 (1999) and its companion
cases that whether an impairment substantially limits a major life activity is to be
determined with reference to the ameliorative effects of mitigating measures."

[24] *Id.* at §4, amending 42 U.S.C. §12102(4)(A).

[25] *Id.* at §4, amending 42 U.S.C. §12102(4)(C).

that "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."[26]

The ADAAA also expanded the list of "major life activities" for which an impairment triggers ADA coverage, an issue that was frequently contested by defendants prior to the enactment of the ADAAA. Among other things, "reading, concentrating [and] thinking" are now expressly subject to ADA coverage.

Yet NBME has repeatedly cited pre-ADAAA cases – particularly testing cases. Those cases are based on superseded law, and none of them involved a student like Ramsay whose psychological assessments show that she reads at the 1st and 2d percentiles. *See, e.g., Gonzales v. NBME,* 225 F.3d 620 (6th Cir. 2000) (pre-ADAAA, relied on the *Sutton* decision which the ADAAA expressly rejected, and the student's reading ability was "average"[27]); *Bercovitch v. Baldwin School, Inc.,* 133 F.3d 141, 156 (1st Cir. 1998) (pre-ADAAA, only evidence of disability was a slight dip in grades, by contrast to Ramsay who had severely impaired reading speed and failed the Step 1 examination); *Marshall v. Sisters of Holy*

---

[26] *Id.* at §4, amending 42 U.S.C. §12102(4)(E)

[27] The reasoning of *Gonzales* was expressly rejected in the ADAAA legislative history, cited above at p. 37. The Department of Justice, in the course of promulgating regulations following the ADAAA, noted this legislative history rejecting *Gonzales*.

*Family of Nazareth,* 399 F.Supp.2d 597, 603 (E.D.Pa. 2005) (pre-ADAAA,

holding that "student is not substantially impaired if his disability affects only one

aspect of his education," a proposition which the ADAAA specifically rejected)[28];

*EEOC v. Chevron Phillips Chem. Cop., LP,* 570 F.3d 606, 614 (5th Cir. 2009)

(pre-ADAAA *citing* the overruled *Toyota* decision); *Love v. Law School Admission*

*Council, Inc.,* 513 F.Supp.2d 206 (E.D.Pa. 2007) (pre-ADAAA, *citing* the

overruled *Sutton* and *Toyota* decisions)[29]; *Singh v. George Washington U. School*

*of Medicine,* 508 F.3d 1097, 1103 (D.C. Cir. 2007) (pre-ADAAA, relied heavily on

*Toyota,* and vacated summary judgment for defendant)[30]; *Steere v. George*

---

[28] ADAAA §4, amending 42 U.S.C. §12102(4)(C), "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability."

[29] *Love* is also a decision by a District Court judge who labeled the plaintiff's below average results as "outliers," but here, under the "clearly erroneous" standard, this Court as the reviewing court is required to give "due regard" to this District Court's finding that Ramsay's evaluation results showed she had a disability.

[30] In *Singh,* following remand, the District Court held that the ADAAA should not be applied retroactively, and that plaintiff failed to prove that her alleged impairment in test-taking was the cause of her dismissal from medical school.  The Court of Appeals affirmed.  *Singh v. George Washington U. School of Medicine,* 667 F.3d 1,  6 (D.C. Cir. 2011).  NBME cites the second *Singh* decision at p. 65 of its Brief as showing the "[i]f anything is 'likely,' it is that Plaintiff will pass under standard conditions if adequately prepared."  Of course, *Singh* says no such thing.  Here, plaintiff testified about why she could only read 65 to 70 percent of the Step 1 questions; the District Court believed her; and her reading disability also suppressed her score and therefore disadvantaged her in the residency Match.

*Washington U. School of Medicine,* 439 F.Supp.2d 17, 23 (D.D.C. 2006) (pre-ADAAA and found that plaintiff's difficulty was caused by various factors such as "poor studying habits," none of which are alleged to apply to Ramsay);[31] *Collins v. Prudential Inv. & Ret. Servs.,* 119 F.App'x. 371, 378 (3d Cir. 2005) (pre-ADAAA, *citing Sutton* and *Toyota,* held under pre-ADAAA law that plaintiff did not have a disability because her ADHD was mitigated by medication).

NBME has cited some post-ADAAA cases, but none of them are similar to Ramsay's case. In *Mancini v. City of Providence,* 909 F.3d 32, 45 (1st Cir. 2018), plaintiff offered no evidence about how he was impaired by a knee injury. *Koller v. Riley Riper Hollin & Colagreco,* 850 F.Supp.2d 502, 513 (E.D.Pa. 2012) held that the ADA does not cover transitory impairments (in that case, a knee injury), but it is undisputed that dyslexia and ADHD are life-long impairments. In *Cunningham v. Nordisk,* 615 F.App'x. 97, 100 (3d Cir. 2015), the plaintiff had fully recovered from surgery, and did not suffer an adverse employment action. In *Neely v. Benchmark Family Servs.,* 640 F.App'x. 429, 433 (6th Cir. 2016), the Court affirmed summary judgment because the only claim of disability was based

---

[31] In fact, the District Court here specifically commented on Ramsay's "remarkably hard work habits" (Appx56), a point belabored at p. 47 of NBME's Brief.

on "Neely's bare assertions of sleep apnea, without any supporting medical evidence."

NBME devotes considerable attention to *Bibber v. Natl. Board of Osteopathic Medical Examiners,* 2016 U.S. Dist. Lexis 48181; 2016 WL 1404157 (E.D.Pa. 2016), and none to *Berger v. NBME,* 2019 U.S. Dist. Lexis 145666; 2019 WL 4040576 (S.D. Ohio 2019).[32]  Both are post-ADAAA cases, and reached essentially opposite results:  a difference based on the difference in facts found by two different courts.  Bibber was administered one of the same tests, the WIAT, as Ramsay.  But Bibber received average scores, and the court accordingly decided that her reading abilities were "average."  *Bibber,* 2016 U.S. Lexis at *9-*10, *23. The same was true in *Rawdin v. American Board of Pediatrics*, 985 F.Supp.2d 636, 651 (E.D.Pa. 2013), *aff'd* 582 F.Appx. 114 (3d Cir. 2014), where the District Court found that "his test scores are all either in the average or above average range."  In contrast, Ramsay received scores at the 1st and 2d percentiles,[33] indicating severely impaired reading abilities.

---

[32] *Berger* is on appeal, No. 19-3885 (6th Cir.).  Of course, NBME is aware of the *Berger* case, because NBME is the appellant, and NBME is represented by the same counsel in both the *Berger* case and the *Ramsay* case.

[33] *See* page 13, *supra*.

In *Berger,*[34] plaintiff had reading scores that were similarly low to Ramsay's scores, *e.g.* a 5th percentile score for reading fluency, 2019 U.S. Dist. Lexis at *33. The District Court found that he had a disability, citing the ADAAA, *id.* at *76-77 and, as here, entered a preliminary injunction requiring the NBME to permit Berger to take Step 2 CK with accommodations.

NBME also cites many cases for the proposition that the ADAAA does not "eliminate" the requirement that the plaintiff be a person with a disability. Ramsay does not contend otherwise, and the District Court did not hold otherwise.[35] Moreover, the cases that NBME cites to support its straw-man argument are completely unlike this case.[36]

Some of NBME's disingenuous argument is based upon a distortion of the District Court's recognition that Ramsay, "through her high intelligence and remarkably hard work habits," had "achieve[d] great academic success" *despite*

---

[34] Plaintiff in *Berger* is not related to Ramsay's counsel Lawrence Berger.

[35] *See, e.g.,* Appx29 ("Plaintiff must prove: (1) that she is disabled"); Appx30 ("[one of] the threshold issues before us for adjudication [is] whether or not the Plaintiff truly is disabled"); Appx39 ("the threshold question . . . is whether or not Ramsay truly is disabled within the meaning of the ADA"); Appx58 ("Plaintiff is disabled within the meaning of the Americans with Disabilities Act")

[36] *E.g., Neely v. PSEG Texas LP,* 735 F.3d 242, 245 (5th Cir. 2013) (the ADAAA did not "eliminate[ ] the need to prove a disability"); *B.C. v. Mt. Vernon School District,* 837 F.3d 152, 159-60 (2d Cir. 2016) (disability has a different meaning in the Individuals With Disabilities Education Act).

*her disability*.  Appx56.  The District Court addressed and *rejected* NBME's

defense that a person who is able to offset the effects of her disability because of

intelligence, and hard work, and mitigating strategies like the ones that Ramsay

employed on examinations, cannot be disabled.  NBME is wrong, and especially so

under the ADAAA.

> **2.    The ADA Requires That Licensing Examinations Like The USMLE Be Made Accessible To People Like Ramsay Who Are Disabled By Slow Reading Speed.**

Title III of the ADA, which relates to public accommodations, requires that

anyone who offers examinations for "licensing, certification, or credentialing for

secondary or postsecondary education, professional, or trade purposes shall offer

such examinations or courses in a place and manner accessible to persons with

disabilities."  42 U.S.C. §12189.[37]  It is undisputed that the USMLE is such an

examination.

The Attorney General, who has authority to issue implementing regulations

for this section,[38] has explained testing entities' obligations as follows:

> Any private entity offering an examination covered by this section must
> assure that -

---

[37] Plaintiff has also asserted a claim under the Rehabilitation Act, which is a similar statute covering programs that receive federal financial assistance.  NBME denies that it is subject to the Rehabilitation Act, but it is not necessary for purposes of this appeal to resolve that question.

[38] 42 U.S.C. §12186(b).

> (i)    The examination is selected and administered so as to *best ensure* that, when the examination is administered to an individual with a disability that impairs sensory, manual, or speaking skills, the examination results *accurately reflect the individual's aptitude or achievement level* or whatever other factor the examination purports to measure, *rather than* reflecting the individual's impaired sensory, manual, or speaking skills (*except where those skills are the factors that the examination purports to measure*).

28 C.F.R. §36.309(b)(1) (emphasis added); *see also Enyart v. Nat'l Conference of Bar Examiners, Inc.,* 630 F.3d 1153, 1162 (9th Cir. 2011) (elaborating on the "best ensures" standard").[39]  The regulations state explicitly that "[r]equired modifications to an examination may include changes in the length of time permitted for completion of the examination and adaptation of the manner in which the examination is given."  *Id.* §36.309(b)(2).  What this regulation requires is exactly what Ramsay seeks in this litigation:  the opportunity to demonstrate her knowledge of medical and clinical skills which the USMLE is designed to measure.

The skill that NBME claims it wants to test is *not* reading speed.  The evidence in this case clearly demonstrated that for Jessica Ramsay, slow reading speed was a barrier to her demonstrating her knowledge on the USMLE.  No one

---

[39] This "best ensures" standard is distinct from the "reasonable accommodation" standard used in the employment discrimination context.  *Id.*

contends that reading speed is what the USMLE is designed to test.  The ADA requires NBME to make its test accessible to someone like Jessica Ramsay.

Ramsay testified, and the District Court found, that under standard time conditions, she could not read all of the questions on the USMLE.  All she is asking for is the time that she needs to demonstrate the scientific knowledge and clinical skill that NBME is supposed to test.  She is not asking for different questions, just the time that she needs to read and answer them.[40]  NBME is not contesting that extended time is an appropriate accommodation for dyslexia.  In fact, NBME disputes only whether Ramsay is an individual with a disability.  If she is an individual with a disability it is undisputed that extra time is the appropriate accommodation.

### 3. NBME Repeatedly Ignored The Department of Justice Regulations and Technical Guidance Under the ADA and the ADA Amendments Act, Which Are Entitled to Judicial Deference.

The Department of Justice ("DoJ") regulations, which NBME has consistently ignored, and which the District Court correctly followed, emphasize that a testing entity must give "considerable weight to documentation of past

---

[40] This further distinguishes the present case from *Rawdin, supra,* where plaintiff was seeking an alternate form of assessment.  985 F.Supp.2d at 639, 643.

modifications, accommodations, or auxiliary aids or services received in similar

testing situations . . . ." 28 C.F.R. §36.309(b)(1)(v). *See* Appx36-39 and 55.[41]

Specifically, DoJ stated as part of its interpretive comments accompanying

the 2010 update of the Title III regulations:

> Generally, a testing entity should accept without further inquiry
> documentation provided by a qualified professional who has made an
> individualized assessment of the applicant. Appropriate documentation may
> include a letter from a qualified professional or evidence of a prior
> diagnosis, or accommodation, or classification, such as eligibility for a
> special education program. When an applicant's documentation is recent and
> demonstrates a consistent history of a diagnosis, there is no need for further
> inquiry into the nature of the disability. . . .

Nondiscrimination on the Basis of Disability by Public Accommodations and in

Commercial Facilities, 75 Fed.Reg. 56,236, 56,296 (Sept. 15, 2010).

The DoJ, in particular, has emphasized the great weight given to evaluations

by qualified individuals who have "individually and personally evaluated the

candidate as opposed to simply considering scores from a review of documents."

Such personal examination "is particularly important in the learning disabilities

context, where proper diagnosis requires face-to-face evaluation." *Id.* at 56,297.

---

[41] As the agency charged with issuing implementing regulations under
Title III, 42 U.S.C. § 12186(b), and rendering technical assistance, *id*. § 12206(c)
the Department's views are entitled to deference. *Bragdon v. Abbott,* 524 U.S.
624, 646 (1998).

NBME relied heavily on the evaluations of its two external reviewers who never met Ramsay in person.  The DoJ explicitly rejected reliance on such external reviewers, stating:

> Reports from experts who have personal familiarity with the candidate should take precedence over those from, for example, reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment."

*Id.* (emphasis added).  The DoJ further explained that "when testing entities receive documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested, they shall generally accept such documentation and provide the accommodation."  75 Fed.Reg. 56,297.

The DoJ also explained that an applicant's "past use of a particular modification, accommodation, or auxiliary aid or service in a similar testing setting" "provides critical information in determining those examination modifications that would be applicable in a given circumstance."  Testing entities "must consider the entirety of an applicant's history to determine whether that history, even without the context of an IEP or Section 504 Plan, indicates a need for accommodations."  75 Fed.Reg. 56,298.  As the DoJ has explained:

> [M]any students with learning disabilities have made use of informal, but effective accommodations. For example, such students often receive undocumented accommodations such as time to complete tests after school or at lunchtime, or being graded on content and not form or spelling of written work.

75 Fed.Reg. 56,298.

In the course of promulgating the current form of its regulation, §36.309, DoJ *rejected* a proposal by NBME and other testing entities "to add regulatory language indicating that testing-related outcomes, such as grades and test scores, are relevant to disability determinations under the ADA."[42]  The Department expressly disagreed "with the assertions made by testing and educational entities that evidence of testing and grades is objective and, therefore, should be weighted more heavily, while evidence of self-mitigating measures, informal accommodations, or recently provided accommodations or modifications is inherently subjective and should be afforded less consideration."  81 Fed.Reg. 53,237.  DoJ noted that even individuals with a history of academic success can still be individuals with a disability given Congress' mandate that the ADA focus on how individuals with disabilities "engage in major life activities, rather than the ultimate outcome of those activities."  81 Fed.Reg. 53,236-37.  DoJ also noted Congress' "explicit rejection of the consideration of ameliorative mitigating measures – including 'learned behavioral or adaptive neurological modifications,' 42 U.S.C. §12102(4)(E)(i)(IV), such as those often employed by individuals with learning disabilities or ADHD – and its stated intention to 'reinstat[e] a broad

---

[42] *See* Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed.Reg. 53,204.

scope of protection to be available under the ADA.'"  81 Fed.Reg. 53,237 (quoting

the ADAAA, §2(b)(1)).

DoJ is also statutorily charged with rendering technical assistance on Title

III as applied to testing entities.  42 U.S.C. §12206(c)(2)(C).  DoJ published

technical assistance specific to testing entities after NBME and other testing

entities requested that DOJ publish such guidance.  Letter from NBME counsel to

DoJ (Appx955).[43]  DoJ subsequently published technical guidance on "Testing

Accommodations,"[44] which was consistent with the DoJ regulations described

above, but substantially contrary to what NBME requested in its letter.

---

[43] The United States Supreme Court has held that the Department of
Justice's views on Title III are entitled to deference as the agency charged with
implementing regulations, 42 U.S.C. §12186(b), and rendering technical
assistance, id. §12206(c).  *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998).

Although DoJ states at the end of the technical assistance for testing entities
that the guidelines have "no legally binding effect," it accurately summarizes the
regulations and interpretive guidance that is entitled to deference.  DoJ's
interpretation of its own regulations is entitled to deference.  *E.g.*, *Disabled Rights
Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 875-876 (9th Cir. 2004)
("The guidance provided in the technical assistance manual is an interpretation of
the DOJ's regulation, and, as such, is entitled to significant weight as to the
meaning of the regulation.") (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S.
504, 512 (1994) ("We must give substantial deference to an agency's interpretation
of its own regulations.").

[44] The DoJ technical assistance is available on its website at
https://www.ada.gov/regs2014/testing_accommodations.html.

For example, the DoJ Testing Accommodations document states that testing entities like NBME "should consider the entirety of a candidate's history, including informal testing accommodations, to determine whether that history indicates a current need for testing accommodations."  The DoJ Testing Accommodations document included an illustration, which includes many of the elements in Ramsay's case, including receiving informal accommodations prior to college, and concluded that such a student might be entitled to extended time, even though she had not previously received formal accommodations.

In this case, NBME admitted at the hearing that even though it had asked DOJ to publish technical assistance, it disregarded the resulting guidance.  When asked directly, "Does the NBME follow the DOJ technical assistance on testing accommodations when it evaluates student requests for accommodations," NBME's of Disability Services said "No."  Appx628.

If there were no DoJ "Testing Accommodations" guidance, then the ADA and DoJ regulations would still require that Ramsay receive the extended time that she requested.  If there were no DoJ "Testing Accommodations" guidance, the District Court's findings of fact would still make this clear.

The District Court correctly rejected NBME's attempts to relitigate policy positions that both Congress and the DoJ had already repudiated.  The District Court correctly applied the law in giving considerable weight to Ms. Ramsay's

history of informal and formal accommodations and according considerable weight to the evaluations of Ms. Ramsay's teachers and medical professionals who have met her.  The District Court correctly gave less weight to NBME's external reviewers who have never met Ms. Ramsay.  The District Court was well within its discretion to believe the evidence that the DoJ said should be given considerable weight, and this Court should affirm the grant of the preliminary injunction.

## Conclusion

The decision of the District Court, after a three-day preliminary injunction hearing, was based on careful consideration of the testimony and the applicable law, and should be affirmed.

Respectfully submitted,

/s/ Lawrence D. Berger

Lawrence D. Berger
REISMAN CAROLLA GRAN & ZUBA LLP
19 Chestnut Street
Haddonfield, NJ  08033
(856) 354-0021

/s/ Mary C. Vargas

Mary C. Vargas
Michael S. Stein
STEIN & VARGAS LLP
10 G Street NE, Suite 600
Washington, DC  20002
(240) 793-3185

*Attorneys for Plaintiff-Appellee Jessica Ramsay*

**Certificate of Compliance With**
**Type-Volume, Typeface and Type-Style Requirements**

I hereby certify that this document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains no more than 13,000 words excluding the parts exempted by Rule 23(f).  I further certify that this document complies with the typeface and type-style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 365 in 14-point Times New Roman.

/s/     Lawrence D. Berger

**<u>Electronic Document Certificate</u>**

I hereby certify that this document has been scanned with the most recent version of McAfee Security Scan Plus and is free of viruses, and that the electronic submission is an exact copy of the paper document, filing of which has been deferred pursuant to the Court's March 17, 2020 Notice Regarding Operations to Address the COVID-19 Pandemic.

/s/    Lawrence D. Berger

## **Certificate of Service**

I hereby certify that a copy of the Brief for Plaintiff- Appellee Jessica Ramsay was electronically filed on April 22, 2020, which constitutes service on all of defendant-appellant's counsel, as listed below, all of whom are Filing Users as provided in Local Appellate Rule 113.4.

Alison R. Caditz, Esquire
Perkins Coie LLP
1201 Third Avenue
Suite 4900
Seattle, WA  98101

ACaditz@perkinscoie.com

Robert A. Burgoyne, Esquire
Caroline Mew, Esquire
Perkins Coie LLP
700 Thirteenth Street, N.W. Suite 600
Washington, D.C. 20005-3960

RBurgoyne@perkinscoie.com
CMew@perkinscoie.com


/s/    Lawrence D. Berger
          Lawrence D. Berger

Attorney for Plaintiff-Appellee Jessica Ramsay

April 22, 2020

## **Certificate of Bar Admission**

I hereby certify pursuant to Local Appellate Rule 46.1(d) that I am a member of the bar of this Court.

/s/     Lawrence D. Berger