Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**REPLY BRIEF OF DEFENDANT-APPELLANT
NATIONAL BOARD OF MEDICAL EXAMINERS**

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

# TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS ........................................................i

TABLE OF AUTHORITIES....................................................ii

INTRODUCTION....................................................................1

ARGUMENT..........................................................................3

    I.    Plaintiff does not confront the key legal issue—
        whether she is substantially limited compared
        to most people ............................................................3

        A.    Misinterpretation and misapplication of the
             ADA ......................................................................4

        B.    No evidence of substantial limitation
             relative to most people in the general
             population............................................................11

    II.    The district court clearly erred in crediting
        Plaintiff's unsupported and conflicting
        testimony ................................................................16

    III.    Plaintiff mischaracterizes the purported harm
        to herself while ignoring the harm to others...........23

CONCLUSION ....................................................................34

CERTIFICATE OF COMPLIANCE ......................................36

CERTIFICATE OF SERVICE ..............................................37

ELECTRONIC DOCUMENT CERTIFICATE......................38

CERTIFICATE OF BAR ADMISSION ................................39

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ........................................23, 29

*B.P.C. v. Temple Univ.*,
No. 13-7595, 2014 WL 4632462
(E.D. Pa. Sept. 6, 2014).....................................................25

*Bach v. Law Sch. Admission Council*,
No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632
(M.D.N.C. Feb. 4, 2014) ....................................................34

*Bennington Foods LLC v. St. Croix Renaissance, Grp.*,
528 F.3d 176 (3d Cir. 2008) ..............................................23

*Berger v. Nat'l Bd. of Med. Exam'rs*,
No. 1:19-cv-99, 2019 WL 4040576
(S.D. Ohio Aug. 27, 2019) ...................................................6

*Bibber v. Nat'l Bd. of Osteopathic Med. Exam'rs*,
No. 15-4987, 2016 WL 1404157
(E.D. Pa. Apr. 11, 2016)............................................6, 7, 30

*Black v. Nat'l Bd. of Med. Exam'rs*,
281 F. Supp. 3d 1247 (M.D. Fla. 2017) ..............................6

*Council of Alt. Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997) ..............................................19

*Cunningham v. Nordisk*,
615 F. App'x 97 (3d Cir. 2015)..........................................13

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

*D.T. v. Sumner Cty. Schs.*,
942 F.3d 324 (6th Cir. 2019)................................23

*Doe v. Ohio State Univ.*,
2:15-cv-2830, 2016 WL 692547
(S.D. Ohio Feb. 22, 2016)..................................29

*Doherty v. Nat'l Bd. of Med. Exam'rs*,
791 F. App'x 462 (5th Cir. 2019) ...................9, 29

*Healy v. Nat'l Bd. of Osteopathic Exam'rs*,
870 F. Supp. 2d 607 (S.D. Ind. 2012) .................6

*Kos Pharms., Inc., v. Andrx Corp.*,
369 F.3d 700 (3d Cir. 2004) ...............................3

*Love v. Law Sch. Admission Council*,
513 F. Supp. 2d 206 (E.D. Pa. 2007) ...................6

*Mancini v. City of Providence ex rel. Lombardi*,
909 F.3d 32 (1st Cir. 2018) ................................6

*Mann v. La. High Sch. Athletic Ass'n*,
535 F. App'x 405 (5th Cir. 2013) ........................3

*Matthews v. Pa. Dep't of Corrs.*,
613 F. App'x 163 (3rd Cir. 2015) ......................13

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015)..............................................7

## TABLE OF AUTHORITIES
### (Continued)

PAGE(S)

*Powell v. Nat'l Bd. of Med. Exam'rs*,
    364 F.3d 79 (2d Cir. 2004) .......................................... 33, 34

*Price v. Nat'l Bd. of Med. Exam'rs*,
    966 F. Supp. 419 (S.D.W. Va. 1997) .................................. 33

*Rawdin v. Am. Bd. of Pediatrics*,
    985 F. Supp. 2d 636 (E.D. Pa. 2013) ............................ 6, 13

*Rothberg v. Law Sch. Admission Council*,
    102 F. App'x 122 (10th Cir. 2004) .................................... 28

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................. 28

STATUTES

Americans with Disabilities Act,
    42 U.S.C. § 12101, *et seq.* .......................................... passim

REGULATIONS

28 C.F.R. § 36.105 .......................................................... 1, 13

28 C.F.R. § 36.309 ............................................................. 8

29 C.F.R. § 1630.2 ........................................................... 15

COURT DOCUMENTS

*Berger v. Nat'l Bd. of Med. Exam'rs*,
    No. 1:19-cv-99, ECF 45 (S.D. Ohio May 4, 2020) .............. 6

## TABLE OF AUTHORITIES
### (Continued)

PAGE(S)

*Doherty v. Nat'l Bd. of Med. Exam'rs*,
    No. 2:19-cv-11790, ECF 49 (E.D. La. Jan. 17, 2020) ........ 29

*Silverman v. Nat'l Bd. of Med. Exam'rs*,
    No. 2:16-cv-3686, ECF 31 (D.S.C. Feb. 24, 2020) ............. 30

OTHER AUTHORITIES

29 C.F.R. Pt. 1630, *Appendix to Part 1630—
    Interpretive Guidance on Title I of the ADA*
    (July 2016) ......................................................................... 15

Am. College of Family Osteopathic Physicians,
    *Bernadette Bibber*,
    https://www.acofp.org/acofpimis/Acofporg/Mem
    bership/Resident_Council_Bios/Region1_BBibb
    er.aspx .............................................................................. 30

*Diagnostic and Statistical Manual of Mental
    Disorders* (5th Ed.) ........................................................... 12

G.E. Zuriff, *Extra Examination Time for Students
    with Learning Disabilities: An Examination of
    the Maximum Potential Thesis*, 13 J. Applied
    Measurement 99 (2000) .................................................... 32

U.S. DOJ, *ADA Requirements: Testing
    Accommodations*,
    www.ada.gov/regs2014/testing_accommodation
    s.pdf .................................................................................... 7

## TABLE OF AUTHORITIES
### (Continued)

PAGE(S)

U.S. DOJ, *Mem. for Heads of Civil Litig.*
  *Components U.S. Att'ys* (Jan. 25, 2018),
  www.justice.gov./file/1028756/download ............................7

## INTRODUCTION

Plaintiff Jessica Ramsay tries to sidestep the critical legal issue on appeal by recasting the district court's erroneous legal analysis as a factual finding. Although the court's opinion has many factual errors, it falters at the first legal stop. It simply does not apply the legal standard for proving a disability—whether Plaintiff is substantially limited compared to most people. 28 C.F.R. § 36.105(d)(1)(v). The only finding made on this threshold issue was that, "in comparison to the average individual in the general population," Plaintiff has been and continues to be quite successful. Plaintiff does not argue otherwise.

At its essence, the central issue on appeal is whether testing agencies and courts must conclude that an ADA plaintiff is "disabled" if she and her expert say so—even if the legal standard has not been met and even if the plaintiff's testimony cannot be squared with a lifetime of objective evidence. In adopting that approach, the district court overlooked the controlling legal standard and drastically departed from directly analogous cases.

Plaintiff also failed to establish that she is *likely* to suffer *irreparable* harm absent a preliminary injunction. Plaintiff did not need to pass Step 1 by March 2, 2020, and she does not dispute she would likely pass without extra time. What she fears is a lower, less competitive score compared to her peers. That is not irreparable injury, and it confirms harm to other test-takers from the injunction.

Because Plaintiff failed to establish either of the "gateway factors"—likelihood of success on the merits and likely, irreparable harm—her receipt of twice the testing time afforded others was unwarranted.

But the importance of this appeal goes far beyond Ms. Ramsay. The district court's order, if left intact, virtually ensures that anyone who can obtain a diagnostic assessment and litigate will receive accommodations (and likely better scores) on high-stakes exams, regardless of how well they have performed previously without accommodations or whether they are disabled under the law. That is a perversion of the Americans with Disabilities Act.

# ARGUMENT

## I. Plaintiff does not confront the key legal issue—whether she is substantially limited compared to most people.

Plaintiff attempts to insulate the district court's errone-
ous disability determination by characterizing it as a factual
finding. Opp. 2, 16, 21, 42 n.29. It is not. Concluding that an
individual is "disabled" under the ADA requires applying the
law to the facts and is reviewed *de novo*. Br. 35.

Arguing that clear error review applies, Opp. 18-19,
Plaintiff inaptly quotes *Mann v. La. High Sch. Athletic Ass'n*,
which reviewed a disability determination *de novo*, 535 F.
App'x 405, 409-10 (5th Cir. 2013). Plaintiff also ignores her
own assertion that "mixed questions of law and fact" are *not*
reviewed for clear error. Opp. 21.

The district court's disability determination—a mixed
question of law and fact—receives **no deference**. *Kos Pharms.,
Inc., v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ("exer-
cis[ing] plenary review over the district court's . . . applica-
tion of law to the facts"). And because that determination
rests on "an erroneous view of the applicable law," this Court
"must reverse." *Id.*

## A.    Misinterpretation and misapplication of the ADA.

Although the district court's opinion is rather lengthy, its legal analysis is short and has almost nothing to do with the facts of this case. The court's conclusion that Plaintiff is likely to succeed on the merits rests squarely on its erroneous interpretation of the law.

After observing that both sides' experts "appear eminently qualified," Appx52, the court found itself "***constrained***" to defer to Plaintiff's expert based on "provisions of the ADA and the guidance and directives set forth in the implementing regulations." Appx52 (emphasis added). The court reasoned that "neither [of NBME's independent experts] evaluated or even met Plaintiff," and both "focused primarily on Plaintiff's record of academic [and standardized testing] performance" and "the paucity of documentation of disability in her primary and secondary school years." Appx52-53. Because NBME and its experts "analyze[d] the results of [Dr. Smith's] various tests themselves," they had, in the court's view, committed "***blatant error***." Appx53 (emphasis added).

Although Plaintiff claims—without citation—that the court made a credibility determination, Opp. 16, it plainly did not. In fact, beyond observing that Dr. Smith met with

Plaintiff and diagnosed her with a learning disorder and ADHD (Appx16-17, 49, 52), the court said nothing about Dr. Smith. Its disability determination relied not on a credibility finding, but rather a misreading of the ADA as (1) requiring deference to professionals who conducted in-person evaluations; (2) prohibiting meaningful consideration of real-world evidence; and (3) requiring deference to another entity's decision to grant accommodations.

That was error. Br. 45-60. The district court's improper disability determination—and the preliminary injunction that resulted—should be reversed.

**In-person assessments & real-world evidence.** Plaintiff identifies no statutory, regulatory, or case authority for the proposition that NBME and courts cannot question the results of face-to-face diagnostic assessments or rely on real-world evidence of performance. That is not surprising, because case law is to the contrary.

Numerous courts from this Circuit and others have agreed with the conclusions reached by testing agencies' independent experts, who did not meet personally with the

plaintiff and relied on both diagnostic test results and real-world grades and standardized test scores. Br. 53-55.

Plaintiff ignores most of these cases (*e.g.*, *Rawdin*, *Healy*, and *Black*) and attacks the rest on irrelevant grounds. For example, Plaintiff claims that *Bibber* is factually distinguishable and observes that *Love* was decided pre-ADAAA. Opp. 42, 44. Setting aside that *Bibber is* factually on point (Br. 53-54) and *Love* remains good law (it was cited last year by *Berger*,[1] which Plaintiff relies on), NBME cited those cases for the *legal proposition* that courts may—and do—find accommodations unwarranted where diagnostic test results are irreconcilable with real-world evidence, based on testimony from experts who did not personally evaluate the plaintiff. Plaintiff never argues those decisions misapplied the ADA.[2]

---

[1] NBME believes *Berger v. Nat'l Bd. of Med. Exam'rs*, No. 1:19-cv-99, 2019 WL 4040576, at *1 (S.D. Ohio Aug. 27, 2019), now on appeal (No. 19-3885, 6th Cir.), was wrongly decided. Notably, the district court in that case recently issued an indicative ruling that, if the Sixth Circuit were to remand, it would consider whether to vacate the injunction based on changed facts. Dist. Ct. ECF 45 (May 4, 2020).

[2] Plaintiff severs many of NBME's cases from the proposition for which they were cited. For example, she distinguishes the facts of *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32 (1st Cir. 2018), Opp. 43, but NBME cited that

Without any statutes, regulations, or a single case to support her position, Plaintiff points to DOJ interpretative comments and technical guidance, Opp. 49-53, none of which has the force of law, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96-97 (2015), and which courts have not adopted, *see, e.g.*, *Bibber*, No. 15-4987, 2016 WL 1404157, at *4, 6, 8, 11 (E.D. Pa Apr. 11, 2016) (quoting interpretative comments about face-to-face evaluations but ruling for the testing agency based on testimony from its outside consultant, who did not personally evaluate plaintiff).

Moreover, DOJ has cautioned that its guidance "cannot create binding requirements that do not already exist by statute or regulation."[3] And although Plaintiff ignores the point, DOJ has advised (post-ADAAA) that "[NBME] is ***not***

---

case to define "relative to most people," Br. 39, a standard Plaintiff does not dispute. Plaintiff also notes that some of NBME's cases are pre-ADAAA, Opp. 41-43, but that is irrelevant for many of the propositions established by those cases.

[3] U.S. DOJ, *Mem. for Heads of Civil Litig. Components U.S. Att'ys*, 2 (Jan. 25, 2018), www.justice.gov./file/1028756/download; *see also* U.S. DOJ, *ADA Requirements: Testing Accommodations*, 10 www.ada.gov/regs2014/testing_accommodations.pdf ("This guidance document . . . has no legally binding effect[.]").

*required* to defer to the conclusions or recommendations of an applicant's supporting professional." Br. 56. Although Plaintiff cites cases that deferred to other DOJ technical guidance, Opp. 52 n.43, it is difficult to imagine here that courts must defer to general guidance that is not supported by any statute or regulatory provision and is inconsistent with what the agency has said specifically about NBME.

NBME also noted that Plaintiff's position is internally inconsistent: her own expert testified that her prior in-person evaluations—by Mr. Livingston and Drs. Smiy and Lewandowski—did not result in proper diagnoses. Br. 56. How can Plaintiff both (1) endorse Dr. Smith's testimony that those assessments were deficient, and (2) argue that NBME and courts must defer to them? Plaintiff does not explain that illogical position, and this Court should reject it.

**Prior accommodations.** The court also erred by indicating that NBME should provide extra testing time because Plaintiff's college and medical school did so. Appx55 (citing 28 C.F.R. § 36.309(b)(1)(v)). The regulation states only that a testing entity must give "considerable weight" to "past . . . accommodations . . . in similar testing situations." It does not

mandate deference or duplication of such accommodations even when there is a history of accommodations on other standardized tests.

And, as the Fifth Circuit has noted, other entities may not have granted accommodations consistent with the ADA's standards. Br. 45-46 (citing *Doherty v. Nat'l Bd. of Med. Exam'rs*, 791 F. App'x 462, 466 (5th Cir. 2019)).

Unsurprisingly, Plaintiff ignores *Doherty*, which overturned a preliminary injunction because—as here—the court did not apply the correct legal standard. She also ignores Dr. Smith's testimony that her college and medical school gave her extra testing time based on faulty diagnoses. Br. 47, 56.

*    *    *    *

The threshold legal question that NBME and other testing agencies confront when accommodations are requested is whether an applicant is "disabled" under the ADA, *i.e.*, substantially limited in a major life activity compared to most people. In answering that question, NBME (and courts) need not defer to evaluators who conducted in-person evaluations or to other entities that provided accommodations. Nor are NBME and courts "constrained" to ignore grades,

standardized test performance, and other real-world evidence, which—unlike diagnostic testing conducted to secure accommodations—reflect performance when motivated to succeed. Diagnostic testing results must be considered, but *no court* has held that they must be blindly accepted, and many have rejected them as inconsistent with more objective evidence demonstrating average or above performance.

The district court's conclusion that NBME committed "blatant error" by "focus[ing] on whether Plaintiff met the definition of disability" and by "re-analyzing the results of the [Dr. Smith's] diagnostic tests," Appx53-54, suggests there is no basis for *any* testing agency to *ever* review documentation submitted by individuals seeking accommodations on high-stakes tests. That proposition is both non-sensical and untethered to any statutory or regulatory requirement. And, if valid, it would seem equally applicable to colleges, universities, employers, and governmental entities when they are asked to provide accommodations under the ADA.

This appeal is not about "providing additional testing time to a single medical student." Opp. 35. Rather, it concerns the interpretation of an important and widely

applicable legal standard that was distorted to allow one medical student to maximize her performance at the expense of her peers, including those the ADA is designed to protect.

### B.   No evidence of substantial limitation relative to most people in the general population.

Even if the district court had properly applied the ADA, the record could not, as a matter of law, support its disability determination. Although Dr. Smith testified that Plaintiff has a specific learning disorder and ADHD, he *never* testified that she is substantially limited compared to most people. *See* Br. 42. Plaintiff does not argue otherwise.

Plaintiff points to diagnostic sub-scores from the Smith evaluation, Opp. 3, but those are insufficient. Even assuming the sub-scores were valid, they were cherry-picked.[4] Plaintiff's "Total Reading Composite," for example—"an overall measure of basic reading, fluency and reading

---

[4] To be clear, they were not valid. Plaintiff's bottom-five-percent sub-scores (*i.e.*, those expected of a child in elementary or middle school, Appx1508)—on tests that required reading sentences like "[o]ur cat Mimi likes to sit on the roof," Appx1826—are not credible given her exceptional unaccommodated scores on the reading-intensive ACT and MCAT exams. Notably, Plaintiff's brief does not mention her top-three-percent ACT score.

comprehension"—was average. Appx1446. Certain below-average sub-scores, even if valid, do not show that Plaintiff is substantially limited in reading or on measures of attention compared to most people.

More fundamentally, the scores show (at most) a diagnosis, not a disability. Consistent with Dr. Smith's testimony, the district court found only that Plaintiff has diagnosed impairments. Appx58 ("Plaintiff is disabled within the meaning of the [ADA] by virtue of her diagnoses[.]").

But there is a critical distinction between (1) a clinical diagnosis, which does not necessarily require a substantial limitation compared to most people, and (2) a legal disability, which does. Br. 38-39; *see also Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.), at 25 (cautioning that "additional information is usually required beyond that contained in the DSM-5 diagnosis" to determine whether a legal standard has been met).

Dr. Smith never testified that Plaintiff is substantially limited compared to most people, and the court did not reach that conclusion (nor could it). Rather, "in comparison to the average individual in the general population," the court

found that "Plaintiff appears to have been and continues to be quite successful[.]" Appx40; *see* Br. 41-42.

That should have doomed Plaintiff's motion. Absent a showing and finding of substantial limitation, Plaintiff's purported impairments cannot—as a matter of law—establish a *legal* disability. *See Matthews v. Pa. Dep't of Corrs.*, 613 F. App'x 163, 167 (3rd Cir. 2015) ("[N]ot every impairment will constitute a disability."); *Cunningham v. Nordisk*, 615 F. App'x 97, 100 (3d Cir. 2015) (post-ADAAA plaintiffs "must still show a substantial limitation"); *Rawdin v. Am. Bd. of Pediatrics*, 985 F. Supp. 2d 636, 649 (E.D. Pa. 2013) ("The relevant inquiry remains whether the impairment 'substantially limits [the plaintiff] . . . as compared to most people[.]'"), *aff'd*, 582 F. App'x 114 (3d Cir. 2014).

Rather than confront this legal error, Plaintiff ignores the controlling standard, 28 C.F.R. § 36.105(d)(1)(v), which, remarkably, her brief does not cite even once.

Instead, Plaintiff directs the Court to the following passage from the lower court's opinion, which says nothing about Plaintiff's abilities relative to the average person:

> Plaintiff has sufficiently established that she is indeed a qualified individual with a disability within the

> meaning of the ADA despite her prior academic successes and her performance on standardized tests. Indeed, we find that the evidence as outlined above supports the conclusion that, despite having [ADHD] and [Dyslexia/Learning Disorder], Ms. Ramsay has been able through her high intelligence and remarkably hard work habits to achieve ***great academic success***. Thus, Plaintiff has shown the requisite likelihood of success on the merits of her Complaint[.]

Opp. 21 (emphasis added) (quoting Appx56). The court concluded, in other words, that she excelled "*despite her disability*." Opp. 45-46. But that puts the cart before the horse. Plaintiff is not disabled unless her alleged impairments substantially limit her ability to read or concentrate compared to most people, and there was no evidence they do. Plaintiff "achieve[d] great academic success" through most of her academic life, on standardized tests and in classes, without extra testing time.

Lastly, and contrary to what Plaintiff asserts, the court did not find that Plaintiff "*was* disabled '*because of the additional time or effort . . . she must spend to read, write, or learn* compared to most people in the general population.'" Opp. 22. The court stated only that NBME "apparently ignored ***the example*** that 'someone with a learning disability may . . . be substantially limited . . . because of the

-14-

additional time or effort he or she must spend . . . compared to most people[.]'" Appx54-55 (emphasis added) (quoting 29 C.F.R. § 1630.2(j)(4)(iii)).

That reference to an inapplicable EEOC regulation cannot reasonably be considered a factual finding, and, in any event, the record would not support a finding that the "example" describes Plaintiff. As noted in agency guidance elaborating upon this example, "the process of reading for an individual with a reading disability (e.g. dyslexia) is *word-by-word*, and otherwise *cumbersome, painful, deliberate and slow—throughout life*." 29 C.F.R. Pt. 1630, *Appendix to Part 1630—Interpretive Guidance on Title I of the ADA* (July 2016) (emphasis added).

If that description applied to Plaintiff, her functional limitations would not have gone unnoticed by her teachers and parents, from kindergarten through high school (as described in her initial personal statement to NBME), nor would she have excelled in her advanced classes and on the reading-intensive ACT and MCAT without accommodations. *See infra*, Pt. II.

## II.    The district court clearly erred in crediting Plaintiff's unsupported and conflicting testimony.

Plaintiff characterizes this appeal as a squabble over facts. It is not. As discussed, the district court's decision hinged on legal errors; it cannot stand even if all its factual findings were adequately supported. That said, the court made various findings at odds with two decades of objective evidence and disregarded significant inconsistencies between Plaintiff's testimony and her prior statements. Those clearly erroneous findings provide a separate ground for reversal.

There is an irreconcilable chasm between (1) Plaintiff's view of her performance and purported impairments, and (2) the lifetime, objective evidence of her success in situations where she was motivated to do well. Br. 8. The court never accounted for those striking discrepancies:

> **Academic & testing achievement.** According to Plaintiff, the "effects that ADHD and learning disabilities have on [her] life are most quantifiable when assessing [her] academic performance." Appx148. She claimed that ***"[t]imed tests" have been her "downfall in all of [her] classes,"*** Appx1139, and she "rarely got an exam grade that accurately reflected how much [she] knew," Appx1075 (emphasis added). For example, her ACT score "did not adequately reflect [her] knowledge or reasoning ability."

Appx845; *see also* Appx1135. She couldn't "keep up" in college. Appx97.

*But in reality*, Plaintiff excelled academically from kindergarten through college.[5] She received ***mostly As*** and above-average standardized test scores in elementary and middle school. Appx926, 928. According to her long-time physician, she had "***no problems***" in high school, Appx935 (emphasis added), during which she earned As in many Honors and AP classes without extra time, Appx180, 895. In college, Plaintiff earned As and Bs and made the Dean's List before receiving accommodations. Appx922.

She achieved a top-three-percent unaccommodated ACT score, Appx909, and a top-21-percent unaccommodated MCAT score, Appx962.[6]

**Visibility of purported struggle.** Plaintiff testified that her elementary school teachers noticed she "had difficulty with reading, spelling and writing," and her parents "were aware that [she] was struggling to read" and

---

[5] Although Plaintiff discusses various "examples" reflecting her purported struggles with reading, Opp. 4-5, her own expert testified that he saw no supporting evidence in her records, Appx454.

[6] Plaintiff tries to explain away her MCAT score by claiming she was able to "answer many questions" on this challenging exam (where answers depend on a careful reading of the introductory fact patterns, Br. 19), "without actually reading much of the material presented." Opp. 6.

"needed extra help." Appx152-153. She testified that "*friends and family and my teachers . . . realized I was struggling*[.]" Appx313 (emphasis added); *see* Opp. 3-4

Plaintiff claimed that—despite "a history of academic struggle that began [her] first day of school," Appx150, and despite suffering from 17 of 18 ADHD symptoms to the maximum severity (in her view), Appx1411-1412— she "attained [top] grades with the informal accommodations and all of the help and support [she] was getting from friends and family and [her] teachers." Appx313.

*But in reality,* "*[n]o one had suspected [she] might have a learning disability*." Appx1080. Plaintiff previously stated that "[p]rior to college my parents and teachers never pursued evaluation for learning disabilities or ADHD because I worked hard and was able to mask my mistakes at school." Appx1138 (emphasis added). She was "tipped" off she might have a problem when she received an A- in college. Appx1078-1079.

**Informal accommodations.** Plaintiff testified "each teacher provided extra individual but informal remedial spelling and writing instruction during [first, second, third, and fourth grade]." Appx152. "I received the most help in grades 1 through 4." Appx160. She purportedly received intensive support in almost every class, "on virtually a daily basis." Appx150-152, 160, 164.

*But in reality,* in third, fourth, and fifth grades—during which Plaintiff earned all As in reading and "master[ed]" the subject—not one teacher mentioned any

"Specialized Reading Support" or "Grades based on intensive teacher assistance," even though her report cards specifically asked teachers to provide that information. Appx879-880, 886-889.

Plaintiff also represented to NBME in 2016 that the *only* accommodations she received in elementary school, formal or informal, were during a single school year from one teacher. Appx1073, 1075. When her primary care doctor was asked in 2010 for "a history of the use of any education accommodations and services," he reported: "none known to date." Appx1216.

Aside from being allowed to retake an accelerated algebra test in seventh grade because she forgot a calculator, Appx1076, Plaintiff did not describe a single instance of extra support in middle or high school, and none was reflected in her school records.

Again and again, the court credited Plaintiff's testimony about her performance and purported struggle even though it was both internally inconsistent and irreconcilable with the objective, record evidence. *See Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (a finding is "clearly erroneous" if it "lacks adequate evidentiary support in the record"). The errors are easily summarized.

*First*, the court clearly erred in finding that "many" of Plaintiff's "elementary, middle and high school teachers"

provided informal accommodations. Appx41. As reflected above, that finding—based solely on Plaintiff's testimony— conflicts with: (1) Plaintiff's prior assertion (on a document she certified as truthful, Appx1073), that she received informal accommodations only during second grade from one teacher; (2) her representation that her teachers and parents were unaware she was struggling; and (3) her report cards, which reflect excellence in reading without any support. Plaintiff does not address any of these inconsistencies, simply noting that "*not everything is written down.*" Opp. 30. Compounding that error, the court disregarded its separate and inconsistent conclusion that "Plaintiff performed exceedingly well overall academically [in her early years] *with little help.*" Appx39-40 (emphasis added).

*Further*, the court clearly erred in accepting Plaintiff's assertion that, "in the last minute of each block [of her Step 1 exam], she was forced to blindly select answer choices for about 30 to 35 percent of the questions." Appx222, 848, 850. (Plaintiff similarly claimed that she did not have enough time to read the questions on the ACT, yet scored in the top

three percent of the million+ individuals who took that test. Appx200, 319, 909; Br. 16.)

Plaintiff's self-reported inability to read a significant percentage of the Step 1 exam conflicted directly with objective evidence from her computer testing records, which showed she spent time on all questions, averaging 76 seconds on questions she answered correctly and 107 seconds on those she missed. Appx642-644.

Plaintiff argues the computer data was "was incomplete" because it did not show the order in which she answered the questions. Opp. 26-29. Setting aside that Plaintiff had claimed she "never got to *see* the questions," Appx139 (emphasis added), unrefuted testimony at the hearing confirmed that the order in which she answered them is irrelevant. *See* Appx656 ("[G]iven the amount of time that each item was presented to the candidate it is not consistent with rapid guessing behavior, regardless of the order in which they were actually answered[.]").

Plaintiff argues that the data "shows nothing about whether [she] was able to use that time to *read the*

*questions*," but does not explain what she was doing if not reading. Opp. 27.[7]

\* \* \* \*

The findings based solely on Plaintiff's testimony were clearly erroneous and provide a separate basis for reversal.

But more broadly, the district court's flawed fact-finding highlights the importance of real-world evidence in this context. Plaintiff's inaccurate depiction of her academic history was relayed to, and relied upon, by the professionals she consulted to help her secure testing accommodations. It was accepted by those professionals and ultimately adopted by the district court without scrutiny. Had Plaintiff's objective performance evidence been meaningfully considered, that error would not have occurred.

---

[7] The court also clearly erred in finding that NBME and its experts accepted the aberrationally low scores from the Smith evaluation as credible. Br. 60-61 (citing Appx18). The document the court partially quoted plainly said the scores were not credible. Appx1512. That the *tests* administered were appropriate says nothing about the validity of the *results*, which Dr. Smith said himself could easily be manipulated. Br. 29.

### III.    Plaintiff mischaracterizes the purported harm to herself while ignoring the harm to others.

Although Plaintiff suggests otherwise, the question before the district court was *not* whether she would be irreparably harmed if she could not test with 100 percent extra time. The issue, rather, was whether she was likely to suffer irreparable harm if required to await a trial after complete discovery, like other plaintiffs. *See D.T. v. Sumner Cty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) ("If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit.").[8]

That is why this Circuit has "insisted that the risk of irreparable harm must not be speculative," *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000), and why a plaintiff requesting a mandatory injunction must satisfy an even "higher standard of showing irreparable harm," *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

---

[8] The court ignored that distinction, "preliminarily" awarding Plaintiff extra time on *all* the Step exams she must take to become licensed, Appx60, even though she would not, for example, take Step 3 for at least two years. Br. 64 n.13. Plaintiff never addresses that issue.

And the question of irreparable harm is not moot, even
though Plaintiff took Step 1 with extra time pursuant to the
lower court's preliminary injunction, because she has not yet
submitted her Step 1 score to residency programs or taken
the other Step exams. Indeed, Plaintiff represented to this
Court in opposing a stay that "no one [would] be harmed" by
allowing her to test with extra time during the pendency of
this appeal because she could not "enter the Match until
2021, by which time this Court will have had the benefit of
full briefing[.]" ECF 17, at 2-3, 8. If Plaintiff does not prevail,
she would simply retake Step 1 without extra time.

**Harm to Plaintiff.** The district court concluded that Plain-
tiff would be irreparably harmed absent emergency relief be-
cause it thought she was facing faced imminent dismissal:
"unless Plaintiff takes *and passes* [Step 1] by March 2, 2020,
she will be forced to withdraw from medical school." Appx56
(emphasis added); *see* Appx14-15. That finding was an abuse
of discretion in several respects.

As an initial matter, there was no "threat of imminent
dismissal from medical school." Opp. 2. After Plaintiff sought
"an indefinite leave of absence"—which her school stressed

was "neither allowable under WMed policies, nor reasonable"—she was permitted to return to her classwork "upon *taking* Step 1." Appx1520, 1522 (emphasis added). Contrary to the court's finding, ***Plaintiff did not need to pass the exam***, and she does not argue otherwise.

Plaintiff also had the option of withdrawing and reapplying when she was ready to take Step 1 (*i.e.*, after this case was resolved on the merits). Appx1520. The court never found that WMed was unlikely to readmit her. The harm she confronted was, at worst, a delay in her education, and "courts in this Circuit have held that delays in testing or education do not amount to irreparable harm." *B.P.C. v. Temple Univ.*, No. 13-7595, 2014 WL 4632462, at *5 (E.D. Pa. Sept. 16, 2014) (citations omitted).

Ignoring the record evidence, Plaintiff vaguely represents that she "faced imminent dismissal from medical school if she could not obtain the accommodations she needed." Opp. 1. That is untrue. As noted, Plaintiff's return to the curriculum was not conditioned on passing Step 1. She could have tested without accommodations before March 2 and returned to school. And even if she had failed, there is *no evidence* she

would have been dismissed. To the contrary, Plaintiff testified that her medical school permits students three attempts to pass. Appx105; *see* Appx1555 (student handbook, stating dismissal results only after third failed attempt); *compare* ECF 17, at 6 (representation by Plaintiff to this Court in earlier briefing that she would have "no opportunity to take the test again at a later time" if she did not pass by March 2).

Even if there had been a threat of dismissal, the court never found that Plaintiff was likely to fail Step 1 without extra time. She likely would have passed if prepared. Br. 65-66. Although Plaintiff claims that assertion is "patently misleading" and "contradicted by NBME's own admissions," Opp. 34, she does not say why.

She also ignores (1) her own testimony that she did poorly on medical school tests she took with double testing time because the questions were difficult, not because of the amount of time she received, Appx302, 306; (2) that her Step 1 score report reflected inadequate knowledge in certain subject areas, not insufficient time, Appx1029; and (3) that she would have accommodations she did not receive the first time she tested, to address needs she identified to NBME

after taking Step 1, related to deep-vein thrombosis and migraines (extra break time, testing over two days instead of one, and a separate testing room, Appx1403), all of which Plaintiff said would be helpful (Appx574-575, 1135-1137). Plaintiff has never alleged, and does not now argue, that she would likely fail Step 1 without extra testing time.

That is because what Plaintiff actually fears is that she may not be as *competitive* a residency candidate as she would like. Her perceived harm is earning a passing but purportedly "suppressed" score that will make her less competitive. Opp. 42 n.30.[9] Plaintiff's preoccupation with maximizing her score for purposes of applying to residency programs—the next step in her graduate medical education— belies her claim that "[i]nterruption or termination of [medical school] attendance in progress is precisely what this case is about." Opp. 34. The perceived harm is not about staying

---

[9] *See also* Appx105 ("[T]he first thing [residency programs] look at is your Step 1 score[.] . . . [W]as your score competitive. And by competitive it needs to be like higher, in the higher range for whatever field you're applying for"); Appx138 ("If you pass and have a low score, they still may filter you out").

in school (as noted, she only needed to test); it is about maximizing her score for the residency Match.

Plaintiff's theory of harm based on a potentially lower but passing score cannot support the court's preliminary injunction. *See* Opp. 34. ***First***, that perceived injury is not irreparable, and Plaintiff proffers no authority that suggests otherwise. To the contrary, she inadvertently acknowledges there is no irreparable harm where a plaintiff claims she "*might* be admitted *to* a better school if she had a better score." Opp. 33 (trying to distinguish *Rothberg v. Law Sch. Admission Council*, 102 F. App'x 122, 126 (10th Cir. 2004)).

***Second***, alleged harm based on a "suppressed" passing score is not "*likely*." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (rejecting a "'possibility' standard"). Although Plaintiff asserts that "the District Court found that Ramsay would . . . be badly disadvantaged in the residency Match process," Opp. 19, there was no such finding (and Plaintiff cites none), nor any evidence to support such a finding. *See* Appx11 (observation by the district court that "*a student . . . may* be significantly hindered in competing for a residency match with the *possible* result that they are not

selected" (emphasis added)). "[I]t would be, on this record, mere speculation" whether she would get into a better residency program with a Step 1 score achieved with double testing time than with an unaccommodated passing score, and there was no evidence "how the difference in the quality of residency" would affect Plaintiff, if at all, "over the course of a career." *Doe v. Ohio State Univ.*, 2:15-cv-2830, 2016 WL 692547, at *11 (S.D. Ohio Feb. 22, 2016) (denying preliminary injunction); *Adams*, 204 F.3d at 488 (stressing "that the risk of irreparable harm must not be speculative").

The speculative nature of Plaintiff's alleged harm has played out in similar cases. For example, a court recently granted a preliminary injunction to an examinee who claimed to have a reading disorder requiring extra time to pass the Step 2 CK exam. After the Fifth Circuit vacated the order granting her extra time, *Doherty v. NBME*, 791 F. App'x at 466, she tested under standard conditions and achieved an above-passing score (indeed, higher than her score earned with extra testing time under the vacated injunction). *Doherty v. NBME*, No. 2:19-cv-11790, ECF 49 (E.D. La. Jan. 17, 2020). The harm alleged by the plaintiff in

*Doherty* was thus shown to have been both speculative and wrong, as was her assertion that she needed extra time to get a better score.

Similarly, Bernadette Bibber—after being denied extra time on her medical licensing exam, *see Bibber*, *supra*—finished medical school and is currently chief Family Medical resident at a New Jersey medical center.[10] And after another plaintiff's motion for a preliminary injunction was denied, he passed Steps 1 and 2 without accommodations and is now a surgery resident. *Silverman v. NBME*, No. 2:16-cv-3686, ECF 31 (D.S.C. Feb. 24, 2020).

**Finally**, Plaintiff's suggestion that she was forced to pursue emergency relief because of NBME's delays is meritless. The contention that she "ran out of time with her own medical school as she waited for NBME to review her requests for accommodations," Opp. 10, is not supported by the record and ignores her own responsibility for much of the delay.

Plaintiff first applied to NBME for accommodations in 2016 and spent the next three years seeking diagnostic

---

[10] *See* Am. College of Family Osteopathic Physicians, *Bernadette Bibber*, https://www.acofp.org/acofpimis/Acofporg/Membership/Resident_Council_Bios/Region1_BBibber.aspx.

evaluations to support her many reconsideration requests. *See* Br. 22-31. For example, Plaintiff took *ten months* to re-apply for accommodations after failing Step 1 (making no attempt to retest in the meantime), and filed not one but *two* requests for reconsideration of her second application, even though the second had no new information, Appx1526.

**Harm to others.** Even if a delay in education or potentially lower score for applying to residency programs could constitute irreparable harm (and, as discussed, it cannot), that injury would be outweighed by the harm to other interested parties. Indeed, Plaintiff's own theory of harm recognizes that an advantage to her is a disadvantage to someone else. Plaintiff claims that the harm is "concrete" to her and "abstract" to everyone else, Opp. 2, but she cannot have it both ways. If Plaintiff receives the advantage she seeks—a more desirable residency position—it will necessarily be at the expense of another medical student

Plaintiff seems to recognize this, because she attempts to argue that favoring her *will not* harm other test-takers: NBME "simply assumes (without ever proving) that extra time would be advantageous for test-takers with average

reading speeds." Opp. 38, 47 ("The skill that NBME claims it wants to test is *not* reading speed.").

Setting aside that "most people, including those without disabilities, perform at a higher level under untimed conditions," Appx1398,[11] hypothetical Step 1 scores of other test-takers with average reading speed, earned with extra testing time, are irrelevant. Non-disabled test-takers should take Step 1 under standard conditions, and disabled test-takers should take Step 1 with accommodations; *those* are the scores residency programs should consider and compare.

And in disclaiming any pursuit of unfair advantage, Plaintiff asserts that NBME "never contends that the USMLE examinations are designed to test or measure reading speed." Opp. 38. But an unwarranted accommodation remains an advantage. Other test-takers might have any number of impairments or discrepant abilities that do not rise to the level of a disability. That Plaintiff's claimed impairment

---

[11] *See also, e.g.*, G.E. Zuriff, *Extra Examination Time for Students with Learning Disabilities: An Examination of the Maximum Potential Thesis*, 13 J. Applied Measurement 99, 101, 114 (2000) (discussing "empirical research" refuting the "hypothes[is] that non-disabled students would not in fact benefit from extra time on most examinations").

gets special treatment is unfair, whether it is or isn't germane to the "design" of the test.

Plaintiff also argues that "NBME did not submit any evidence of harm to NBME itself; therefore the District Court found none." Opp. 36. But courts have found inherent harm in similar cases because "the USMLE is a national standardized licensure exam for medical licensure in this country." Appx577. As the Second Circuit explained, "[a]s administrator of the national exam used . . . for licensing medical doctors, [NBME] has a duty to ensure that its examination is fairly administered to all those taking it." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88-89 (2d Cir. 2004). Failing to do so would "allow persons to advance to professional positions through the proverbial back door," thereby "undermining the integrity of the USMLE" and hindering the exam's "ability to distinguish between qualified students and unqualified students." *Price v. Nat'l Bd. of Med. Exam'rs*, 966 F. Supp. 419, 422 (S.D.W. Va. 1997).

Plaintiff suggests there is no harm to the public from granting unwarranted accommodations because "a student who is granted extended testing time is required to answer

the same questions as a student who takes the test in standard time." Opp. 38 (emphasis omitted). But most examinees would like additional time. On standardized tests, and particularly a high-stakes licensing exam for potential doctors, consistent standards are critical. NBME's "procedures are designed to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not," which in turn ensures "its examination is fairly administered to all those taking it." *Powell v. NBME*, 363 F.3d at 88-89. Awarding unwarranted accommodations undermines the "[public's] interest in the fair administration of standardized tests." *Bach v. Law Sch. Admission Council*, No. 1:13-cv-888, 2014 U.S. Dist. LEXIS 124632, at *8 (M.D.N.C. Feb. 4, 2014).

## CONCLUSION

Plaintiff has not shown that she is substantially limited in reading or attention *compared to most people*, or that she will *likely* be *irreparably harmed* absent injunctive relief. This Court should reverse.

Respectfully submitted,

Alison R. Caditz, #51530
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

/s/ Robert A. Burgoyne
Robert A. Burgoyne, #366757
Caroline Mew, #467354
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

*Counsel of Record for Defendant-Appellant*

May 13, 2020

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,460 words, excluding the parts exempted by Rule 32(f). I further certify that the brief complies with the typeface and type-style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook and Palatino Linotype fonts.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF SERVICE

I certify that on May 13, 2020, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished through the CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

**ELECTRONIC DOCUMENT CERTIFICATE**

I certify that: (1) the electronic submission is an exact copy of the paper document; and (2) the document has been scanned and is free of viruses.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF BAR ADMISSION

Pursuant to Local Appellate Rule 46.1(e), I certify that I am counsel of record and a member of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Robert A. Burgoyne
Robert A. Burgoyne