Appeal No. 20-1058

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

*JESSICA RAMSAY,*

*Plaintiff-Appellee,*

*v.*

*NATIONAL BOARD OF MEDICAL EXAMINERS,*

*Defendant-Appellant.*

On Appeal from the United States District Court for the
Eastern District of Pennsylvania, Case No. 19-CV-2002

**PETITION FOR REHEARING *EN BANC***

Alison R. Caditz
PERKINS COIE LLP
1201 Third Avenue,
Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000

Robert A. Burgoyne
Caroline Mew
PERKINS COIE LLP
700 Thirteenth Street N.W.,
Suite 600
Washington, DC 20005-3960
Telephone: 202.654.1744

Attorneys for
Defendant-Appellant
NATIONAL BOARD OF
MEDICAL EXAMINERS

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant National Board of Medical Examiners states that it is a nonprofit corporation. It has no parent corporation, and no publicly traded corporation owns ten percent or more of its stock. There is no publicly owned corporation with a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**PAGE(S)**

RULE 35.1 STATEMENT ......................................................... 1

BACKGROUND ...................................................................... 4

REASONS FOR GRANTING THE PETITION ...................... 6

   I.   The panel improperly broadened the ADA's
       scope by eliminating "substantially limits" as a
       meaningful requirement. .......................................... 7

     A.   The ADAAA did not eliminate the
          "substantially limits" requirement. ..................... 7

     B.   The panel's interpretation effectively
          eliminates the "substantial limitation"
          requirement .......................................................... 10

   II.   The panel's decision abdicates appellate review
        by allowing essential statutory and regulatory
        determinations by a district court to be
        "inferred". ................................................................. 17

   III.   The panel's legal errors will have harmful
         effects under all three Titles of the ADA ................ 19

CONCLUSION ...................................................................... 24

CERTIFICATE OF COMPLIANCE ..................................... 25

CERTIFICATE OF SERVICE .............................................. 26

ELECTRONIC DOCUMENT CERTIFICATE ...................... 27

## TABLE OF CONTENTS
### (Continued)

PAGE(S)

CERTIFICATE OF BAR ADMISSION ..................................28

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*B.C. v. Mt. Vernon Sch. Dist.*,
     837 F.3d 152 (2d Cir. 2016) ..............................................10

*Black & Decker Disability Plan* v. *Nord*,
     538 U.S. 822 (2003)..............................................13, 14, 17

*Cunningham v. Nordisk*,
     615 F. App'x 97 (3d Cir. 2015)................................................. 9

*Matthews v. Penn. Dep't of Corr.*,
     613 F. App'x 163 (3rd Cir. 2015) .....................................18

*Perez v. Mortg. Bankers Ass'n*,
     575 U.S. 92 (2015)............................................................15

*Powell v. NBME*,
     364 F.3d 79 (2d Cir. 2004) ................................................22

*Small v. Kiley*,
     567 F.2d 163 (2d Cir. 1977) .............................................19

*U.S. v. Gonzalez, Inc.*,
     412 F.3d 1102 (9th Cir. 2005)....................................18, 19

**STATUTES**

42 U.S.C. § 12102 ...........................................................*passim*

42 U.S.C. § 12189 ................................................................23

Pub. L. No. 110-325, 122 Stat. 3553 .......................................8

# TABLE OF AUTHORITIES
## (Continued)

PAGE(S)

**REGULATION**

28 C.F.R. § 36.105 ........................................................*passim*

**RULE**

Fed. R. Civ. P. 65(d) .........................................................7, 18

**OTHER AUTHORITIES**

154 Cong. Rec. S8840 (Sept. 16, 2008) ...................................9

75 Fed. Reg. 56,236 (Sept. 15, 2010) ...................................14

81 Fed. Reg. 53,204 (Aug. 11, 2016) ..................................8, 9

DOJ, *Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases* (Jan. 25, 2018)......15

Settlement Agreement Between United States & NBME, No. 202-16-181 (Feb. 23, 2011)..................................15, 16

## RULE 35.1 STATEMENT

This appeal concerns the intersection of the Americans with Disabilities Act ("ADA") and high-stakes testing—a controversial area thrust into the American sensibility by the college admissions scandal.

Undersigned counsel expresses his belief, based on a reasoned and studied professional judgment, that this appeal involves an important, timely, and regularly encountered question of exceptional importance: How should courts and covered entities apply the ADA's substantial-limitation requirement to individuals who claim to be disabled based on a late-diagnosed learning or attention disorder when their records reveal decades of not just average but exceptional academic performance?

Must testing agencies ignore evidence of an individual's above-average ability to read, learn, and concentrate—in directly analogous, real-world contexts—in favor of results from easily-manipulated diagnostic subtests taken to secure accommodations? And do the opinions of the evaluator who performed those subtests, even if flawed, necessarily outweigh those of the agency's independent professionals

simply because the former conducted an in-person evaluation?

The panel's precedential opinion holds that the answer to both questions is "yes." That unprecedented and dramatic expansion of the ADA led to the remarkable conclusion that Jessica Ramsay—who, without accommodation, scored in the top 3% on the reading-intensive ACT college-admissions test, was in the top of her high-school class, and did extremely well on the MCAT—is "disabled" and entitled to twice as much time as others to take her medical-licensing exams.

Ramsay turned to medical professionals in college when she "could not get above an A- on [Spanish] tests." Appx1078-1079. She sought three more evaluations in connection with her medical-licensing exams, until she was finally—in medical school—diagnosed with dyslexia. The psychologist who provided that diagnosis was recommended to her lawyer as having helped other students obtain extra time on their medical licensing exams (Appx282, 1353, 1404), and advertises his specialty as "**EXTENDED TIME & ACCOMMODATIONS FOR STANDARDIZED EXAMS**," (Appx503-504, 1462).

The panel provides a judicially-sanctioned roadmap to accommodations on high-stakes tests for thousands of individuals like Ramsay—students who have excelled academically without accommodation, are motivated to succeed on admissions and licensing exams, and can hire evaluators specializing in securing accommodations.

No one disagrees that Ramsay is an impressive, accomplished, and hard-working individual; her desire to become a doctor is compelling. But the same is true for thousands of others pursing the same dream and working just as hard. The ADA is intended to level the playing field, not to give unwarranted advantages. The panel's opinion will have the opposite effect, offering non-disabled students an unfair leg up in their academic and professional advancement.

The panel's interpretation of "substantial limitation," in defining "disability" under the ADA Amendments Act ("ADAAA"), will extend beyond Ramsay and medical-licensing exams. Because the terms "substantial limitation" and "disability" apply to all covered entities, the panel's opinion will apply to accommodations requested from

employers (Title I), state and local governments (Title II), and hotels, theaters, private universities, and other public accommodations (Title III).

*En banc* review is warranted to bring this Circuit's law into line with the statute and regulations, and to ensure that district courts in this Circuit apply the correct standards in evaluating disability claims.

## BACKGROUND

The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). The regulations, in turn, state that "[a]n impairment is a disability … if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). The issue on appeal is whether Ramsay is substantially limited under these definitions.

**1.**    Ramsay claims to be disabled based on late-in-life diagnoses of a learning disability and ADHD. Without accommodation, however, she excelled throughout her educational career, including on standardized tests that

require intensive reading and concentration. *See* Ex. B
(summarizing Ramsay's academic/testing history).
Significantly, she finished near the top of her high-school
class (Appx895); scored in the 97th percentile on the ACT,
with an "Arts/Literature" reading subscore in the top 1%
(Appx909); and scored in the top 21% of would-be medical
students on the MCAT (Appx962).

Ramsay requested double testing time on the United
States Medical Licensing Examination ("USMLE").
Defendant National Board of Medical Examiners ("NBME"),
the non-profit organization that administers the USMLE,
denied her requests. This litigation followed.

**2.** The district court granted a preliminary injunction
requiring NBME to provide Ramsay with double testing time
on all three "Steps" of the USMLE—one of which she would
not take for at least two years. *See* Appx60-61.

The district court did not find that Ramsay is
"substantially limit[ed] … as compared to most people in the
general population." 28 C.F.R. § 36.105(d)(1)(v). Rather, the
court conceded that, "in comparison to the average
individual in the general population, [Ramsay] appears to

have been and continues to be quite successful in her endeavors." Appx40.

The court also acknowledged that the diagnostic subtests relied upon by Ramsay's expert "are not supported by—and are often inconsistent with—other important evidence, including her performance on real-world timed tests that required significant amounts of reading." Appx52. But it rejected NBME's reliance on that real-world evidence because NBME's independent experts, unlike Ramsay's hired evaluator, had not met personally with her. Appx52-54 (NBME's experts committed "blatant error" by "re-analyzing the results of [Dr. Smith's] diagnostic tests").

## REASONS FOR GRANTING THE PETITION

The panel's published decision enshrines, as the law of this Circuit, a tenuous and easily manipulated approach to whether an impairment constitutes a "disability" under the ADA. The decision effectively guts "substantially limits" as a meaningful parameter on which impairments constitute disabilities, and provides a roadmap for any sufficiently resourceful (and resourced) individual seeking additional time for high-stakes standardized testing.

The panel also dramatically changed the standards for this Court's review in disability cases. Its conclusion that a "substantially limits" finding can be *inferred* from the decision below—where no such finding appears—trivializes Rule 65(d) and significantly alters the normal understanding that appellate courts review, rather than make, findings necessary to a plaintiff's claims.

## I.    The panel improperly broadened the ADA's scope by eliminating "substantially limits" as a meaningful requirement.

The panel adopted a truncated "substantially limits" inquiry that (1) ignores an individual's history of successfully performing the major life activities at issue without accommodations, and (2) accords undue weight to the individual's hired professionals.

### A.    The ADAAA did not eliminate the "substantially limits" requirement.

The panel believed that its broad ruling was "supported by the regulations" (Op. 16) because "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." Op. 18 (quoting 28 C.F.R. § 36.105(d)(1)(ii)). But this language—

drawn from Congress's statement of purpose in the ADAAA, Pub. L. No. 110-325, sec. 2(b)(5), 122 Stat. 3553, 3554—does not expand the ADA's scope beyond the "terms of [the statute]." 42 U.S.C. § 12102(4)(A); *see also* 28 C.F.R. § 36.105(a)(2)(i) (broad construction "to the maximum extent permitted by the terms of the ADA"). Instead, it makes clear that courts should not apply "overbroad, burdensome, and generally unnecessary" *non-statutory* limitations on which impairments constitute disabilities. 81 Fed. Reg. 53,204, 53,231 (Aug. 11, 2016).

Congress adopted the ADAAA to overturn judicial decisions holding that, "to be substantially limited," "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 53,206. The revised statute clarifies that "impairments do not need to rise to the level of 'preventing or severely restricting the individual from doing activities that are of central importance to most people's daily lives.'" *Id.* at 53,230 (quoting Pub. L. 110-325, sec. 2(b)(4)-(5)).

But Congress's rejection of a judicially-adopted *heightened* standard does not mean that Congress implicitly *lowered* the statutory standard. To the contrary, "Congress explicitly recognized that it had always intended that determinations of whether an impairment substantially limits a major life activity should be based on a comparison to most people in the population." *Id.* at 53,230.

Those determinations "should not demand extensive analysis" (28 C.F.R. § 36.105(d)(1)(ii)) because, "in most cases, people with impairments will not need to present scientific, medical, or statistical evidence," and can rely on "other types of evidence that are less onerous to collect," including "school records." 81 Fed. Reg. at 53,231. But the plaintiff "must still show a substantial limitation." *Cunningham v. Nordisk*, 615 F. App'x 97, 100 (3d Cir. 2015); *see also* 154 Cong. Rec. S8840, S8841-42 (Sept. 16, 2008) ("An impairment that does not substantially limit a major life activity is not a disability[.] … That will not change after enactment of the [ADAAA.]").

## B.    The panel's interpretation effectively eliminates the "substantial limitation" requirement.

The panel's focus on broad, introductory language from the ADAAA, designed to address a different issue, came at the expense of the statute's clear standards and limits. Indeed, the panel's interpretation of that language "reads the ADA's substantial limitation requirement … out of th[e] statute." *B.C. v. Mt. Vernon Sch. Dist.*, 837 F.3d 152, 159-60 (2d Cir. 2016). Relying on its mistaken interpretation, the panel concluded that NBME "engaged in too demanding an analysis of whether Ramsay had a disability." Op. 16. Its error was two-fold.

**1.**    The panel held that "reliance on Ramsay's academic achievement" would be "contrary to the regulations." Op. 18. On that basis, the panel determined the district court had "reasonably discounted"—*i.e.*, disregarded—Ramsay's "academic accomplishments." Op. 19. Rejecting "academic achievement" as irrelevant to whether a *learning* disability results in a "substantial limitation" would deprive courts and covered entities of a valuable—and altogether logical— source of objective evidence that they routinely and properly

rely on in evaluating claimed entitlement to accommodations.

DOJ's regulations provide that "someone with a learning disability may achieve a high level of academic success but may nevertheless be substantially limited in one or more major life activities." 28 C.F.R. § 36.105(d)(3)(iii). Under these regulations, "Ramsay's high academic performance does not *foreclose* her from having a disability." Op. 19 (emphasis added). But while Ramsay's long history of academic success might not be *dispositive*, that does not mean it is *irrelevant*—or that it cannot be considered without violating the ADA.

The panel believed the district court "could appropriately consider and discount that [Ramsay] compensated for her very weak reading and writing abilities" because she purportedly "devot[ed] more effort to her assignments than most students." Op. 12 n.7. NBME does not dispute that an individual could succeed academically despite a substantial impairment, including through mitigating measures. 28 C.F.R. § 36.105(d)(4). But "working hard" is not a mitigating measure that must be disregarded, much less (as the panel

suggested) evidence of a disability. Otherwise, any hard-working, successful individual with a diagnosed impairment would qualify as disabled.

This case illustrates the problems that the panel's decision will create. For so-called "invisible" impairments, such as reading disabilities and ADHD, an individual's academic record—including standardized test scores and grades—will likely be the only real-world evidence available. That evidence is not subject to manipulation and reflects an individual's performance when motivated to succeed. By contrast, as Ramsay's expert acknowledged, diagnostic tests can be manipulated by reading more slowly or reporting attention-deficit symptoms, (Appx513-514; *see also* Appx1535-1536), and there is no incentive for an individual to "perform well" because, if they do so, "they're not going to get a recommendation for accommodations," Appx352.

**2.**   The panel further erred by requiring covered entities to accord significant—in this case, dispositive—deference to the examinee's evaluators. According to the panel, the district court properly "discounted the Board's experts" because they "never met with Ramsay" and "'substitut[ed]

their own opinions' for those of Ramsay's healthcare providers." Op. 16, 18.

Putting aside that Ramsay's expert—the first and only one to diagnose with her dyslexia—was not her "healthcare provide[r]," there is nothing in the statute or regulations that justifies placing such heavy weight on evaluators simply because they met with the individual. And the Supreme Court's decision in *Black & Decker Disability Plan v. Nord* holds that, absent such a requirement, there is no basis for "accord[ing] special deference to opinions of treating physicians." 538 U.S. 822, 831 (2003).

In *Black & Decker*, the Ninth Circuit accorded "special weight" to the "opinions of the claimant's treating physician" in ERISA disability determinations. *Id.* at 825. The Supreme Court unanimously reversed. Because nothing in the statute or regulations "suggests that plan administrators must accord special deference to the opinions of treating physicians," "courts have no warrant to require administrators automatically to accord special weight to [those] opinions." *Id.* at 831, 834.

The same reasoning applies here. Because neither the ADA nor its regulations requires courts or covered entities to "accord special deference to the opinions of treating physicians" (much less professionals seen solely to obtain supporting documentation for accommodations), there is no basis for "judicial imposition of a treating physician rule." *Id.* at 831, 834 & n.4. The district court therefore could not "discount[] the Board's experts" because they "never met with Ramsay." Op. 16.

The panel noted that "the regulations mandate that 'the determination of whether an impairment substantially limits a major life activity requires an individualized assessment.'" Op. 17 (quoting 28 C.F.R. § 36.105(d)(1)(vi)). But that simply means courts and covered entities must assess the facts on a case-by-case basis specific to each individual; it says nothing about how the assessment should—or must—be conducted, let alone that only evaluators who meet with the individual can make an "individualized assessment." *Cf. Black & Decker*, 538 U.S. at 825 (regulations requiring "full and fair" assessment do not

"command plan administrators to credit the opinions of treating physicians over other evidence").

Nor is it relevant that the DOJ under the prior administration remarked in a rulemaking release that "reports from experts who have personal familiarity with the candidate should take precedence over those from reviewers for testing agencies." Op. 17 (quoting 75 Fed. Reg. 56,236, 56,297 (Sept. 15, 2010)).

This statement does not have the force of law, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015), and DOJ itself has subsequently stated that agency guidance "cannot create binding requirements that do not already exist by statute or regulation," DOJ, *Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases* at 2 (Jan. 25, 2018), www.justice.gov/file/1028756/download. Consistent with the statute and regulations—but contrary to the panel's conclusion—DOJ has advised that NBME is "not required to defer to the conclusions or recommendations of an applicant's supporting professional." Settlement Agreement Between United States & NBME, No. 202-16-181

¶ 17 (Feb. 23, 2011), *available at* https://www.ada.gov/nbme.htm.

The panel's ruling that evaluators who met personally with the person seeking accommodations are entitled to more weight is also illogical, unworkable in practice, and would create significant problems for courts and covered entities seeking to apply the ADA evenhandedly.

*First*, Ramsay's testifying expert stated that earlier professionals whom she consulted failed to perform proper diagnostic tests. *See* Appx282, 436-438, 520-523, 550-552. Yet the panel cherry-picked stray and misleading comments from their reports to suggest a consistent history of diagnoses from the professionals Ramsay consulted in her quest for extra testing time. Op. 4-6. That Ramsay's own evaluators reached very different conclusions after personally evaluating her—*compare* Appx968 (finding by one evaluator that she reads in the top 1%), *with* Appx1449 (reading subtest score in bottom 1% per testifying expert)—underscores the irrationality of requiring deference to an evaluator who sees the individual in person.

*Second*, Ramsay's testifying expert was not even her treating physician; he was someone recommended to her lawyer as having helped other students obtain accommodations on the USMLE. Even if a long-time treating physician might provide persuasive evidence about an individual's impairment, there is no reason to believe the same is true for an evaluator who met with someone for the sole purpose of generating a report to support an accommodation request. *See Black & Decker*, 538 U.S. at 832 ("the relationship between the claimant and the treating physician" might have "been of short duration," and "a treating physician, in a close case, may favor a finding of 'disabled'").

## II.    The panel's decision abdicates appellate review by allowing essential statutory and regulatory determinations by a district court to be "inferred".

The panel believed that the "substantially limits" determination could be "inferr[ed]" because, "when the [district court] concluded that Ramsay was disabled, it defined disability as a substantial limitation as compared to most people in the general population." Op. 14 & n.9. But stating the correct definition does not mean that the court

applied that definition—correctly or otherwise. The Court should grant rehearing *en banc* to ensure that panels fulfill their role of reviewing district courts' actual findings, rather than hypothetical or inferred ones.

The district court's resolution of the "substantial limitation" issue was necessary to issue a preliminary injunction under Rule 65(d) because "not every impairment will constitute a disability." *Matthews v. Penn. Dep't of Corr.*, 613 F. App'x 163, 167 (3rd Cir. 2015). Yet the district court failed to make any determination that Ramsay was substantially limited as compared to the general population (and her expert never testified that she was). *See* Op. 14 n.9. Rather, the court acknowledged that, "compar[ed] to the average individual in the general population, Ramsay appears to have been and continues to be quite successful." Appx40.

Appellate courts are "not in the business of putting words in the mouth of the district court to uncover a district court's phantom finding," and the "duty to evaluate all supportable bases for affirming a district court finding is triggered only when the finding itself has been explicitly made." *U.S. v.*

*Gonzalez, Inc.*, 412 F.3d 1102, 1111 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006). It "would make a mockery of Rule 65(d)" to "affirm a preliminary injunction on the assumption that the requisite findings had been made." *Small v. Kiley*, 567 F.2d 163, 164-65 (2d Cir. 1977). But that is the precise approach that the panel adopted.

The panel's approach will prevent meaningful and appropriate review of district courts' determinations under the ADA, allowing future panels to "infer" that the court below made whatever determinations might be necessary to support its order, so long as it stated the correct legal standard—even when that determination appears nowhere in the lower court's decision and where, as here, the lower court made a contrary determination.

## III.  The panel's legal errors will have harmful effects under all three Titles of the ADA.

At its essence, the panel was asked to decide whether courts and covered entities must conclude that an individual is disabled if she and her expert say so—even if the legal standard has not been met, and even if the plaintiff's testimony cannot be squared with a lifetime of objective

evidence. In an unprecedented and dramatic departure from the ADA, its implementing regulations, and relevant case law, the panel's opinion says the answer is "yes."

The opinion's precedential nature and expansive legal interpretations also make clear that the decision will have an impact beyond Ramsay. Most directly, the opinion applies to the testing context, which extends well beyond NBME and medical-licensing exams. Millions of standardized tests are administered yearly—for licensure, certification, and admissions (among others). Every year, thousands of individuals seek accommodations—most often extra time, and most often based on a learning disorder or ADHD.

Virtually all high-stakes testing programs deny some of these requests because their external reviewers (who have not personally evaluated the examinee) conclude based on the written record—and despite a diagnosed impairment— that the examinee is not disabled within the meaning of the ADA. Often, as here, that is because results from diagnostic assessments cannot be reconciled with objective evidence of academic success.

The panel now says, in effect, that any such denial violates the ADA.

Specifically, the required deference to an applicant's supporting professional under the panel's opinion effectively bars testing agencies from independently reviewing that opinion or affording weight to a candidate's records when performing the individualized assessment required under the statute. The untenable alternative would be asking examinees to undergo an in-person medical examination when they request accommodations, so that the views of the testing agency's independent expert are on the same footing as the views of the examinee's professional—an approach that would certainly be challenged by examinees and DOJ as unreasonable and discriminatory. NBME and other testing programs will inevitably be forced simply to grant requested accommodations, regardless of their impact on the integrity of the resulting scores or their unfairness to examinees who test under standard conditions or with accommodations based on a legitimate need.

In other words, despite a testing agency's "duty to ensure that [its] examination is fairly administered to all those

taking it," the panel's opinion will force testing programs to eliminate the safeguards they have implemented "to ensure that individuals with *bona fide* disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage." *Powell v. NBME*, 364 F.3d 79, 88-89 (2d Cir. 2004). Nothing in the ADA or its implementing regulations supports that result.

Stripping testing companies of their ability to deny unwarranted accommodations is a perversion of the ADA and will encourage the type of behavior that led to the recent college admission scandal, which revealed how easy it is to get a diagnosis in support of testing accommodations and the lengths to which individuals will go to gain an advantage. Paradoxically, the individuals the ADA is meant to protect will be among those disadvantaged by the panel's overreaching effort to ease the burden of supporting a request for ADA accommodations. The panel's opinion will inevitably be cited by examinees in every circuit when seeking accommodations on a high-stakes exam.

The substantial harm of the panel's opinion does not end there. Although this case involves the ADA provision that applies to testing entities, 42 U.S.C. § 12189, the definition of "disability"—and, more specifically, the "substantial limitation" requirement of that definition—is the same under all three ADA titles. The panel's opinion is thus equally applicable to employers, state and local governments, and public accommodations (*e.g.*, educational institutions, hotels, sports facilities, and movie theatres) accused of violating Titles I, II, or III of the ADA for failing to provide accommodations to individuals who claim to be disabled.

In sum, the panel's opinion addresses a central and essential statutory term of the ADA, as amended by the ADAAA. It does so in a way that will impact not only testing organizations (and the entities that rely upon standardized tests), but every entity governed by the ADA and its requirement that accommodations and auxiliary aids be provided to "disabled" individuals. In the end, the panel's opinion is a win for non-disabled individuals who have the

means to gain an advantage in their education or professions. It should not be allowed to stand.

## CONCLUSION

This Court should grant rehearing *en banc*.

Respectfully submitted,

| | |
|---|---|
| Alison R. Caditz, #51530 | /s/ Robert A. Burgoyne |
| PERKINS COIE LLP | Robert A. Burgoyne, #366757 |
| 1201 Third Avenue, | Caroline Mew, #467354 |
| Suite 4900 | PERKINS COIE LLP |
| Seattle, WA 98101-3099 | 700 Thirteenth Street N.W., |
| Telephone: 206.359.8000 | Suite 600 |
| | Washington, DC 20005-3960 |
| | Telephone: 202.654.1744 |

*Counsel for Appellant*

August 14, 2020

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Federal Rule of Appellate Procedure 35(b)(2)(A) because it contains 3842 words, as determined by the word-count function of Microsoft Word 365.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF SERVICE

I certify that on August 14, 2020, an electronic copy of the foregoing Petition for Rehearing *En Banc* was filed with the Clerk of Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## ELECTRONIC DOCUMENT CERTIFICATE

I certify that: (1) the electronic submission is an exact copy of the paper document; and (2) the document has been scanned and is free of viruses.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

## CERTIFICATE OF BAR ADMISSION

Pursuant to Local Appellate Rule 46.1(e), I certify that I am counsel of record and a member of the bar of the United States Court of Appeals for the Third Circuit.

/s/ Robert A. Burgoyne
Robert A. Burgoyne

# EXHIBIT A

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1058
_____

JESSICA RAMSAY

v.

NATIONAL BOARD OF MEDICAL EXAMINERS,
Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-19-cv-02002)
District Judge: Honorable J. Curtis Joyner
_____

Argued July 1, 2020
_____

Before: GREENAWAY, JR., SHWARTZ, and RENDELL,
<u>Circuit Judges</u>.

(Filed: July 31, 2020)
_____

Lawrence D. Berger
Reisman Carolla Gran & Zuba
19 Chestnut Street
Haddonfield, NJ 08033

Mary C. Vargas [ARGUED]
Stein & Vargas
10 G Street, N.E.
Suite 600
Washington, DC 20002

*Counsel for Plaintiff-Appellee Jessica Ramsay*

Robert A. Burgoyne [ARGUED]
Caroline M. Mew
Perkins Coie
700 13th Street, N.W.
Suite 600
Washington, DC 20005

Alison R. Caditz
Perkins Coie
1201 Third Avenue
Suite 4900
Seattle, WA 98101

*Counsel for Defendant-Appellant National Board of Medical Examiners*

————————————

OPINION

————————————

SHWARTZ, <u>Circuit Judge</u>.

Medical student Jessica Ramsay sought testing accommodations for dyslexia and attention deficit hyperactivity disorder ("ADHD") from the National Board of Medical Examiners ("the Board"). The Board denied her requests, and she sued under the Americans with Disabilities Act ("ADA"). The District Court granted a preliminary injunction, requiring the Board to provide her accommodations. We will affirm.

I

A

The Board administers the United States Medical Licensing Examination ("USMLE"). The USMLE has three components, or "Steps," that medical students must pass before they can apply for a medical license. Step 1 is a computer-based, multiple choice exam that assesses a student's grasp of scientific concepts. Students typically take Step 1 before their final year of medical school. Step 2 has two parts: Clinical Knowledge ("CK"), a computer-based, multiple choice exam that assesses medical knowledge and clinical science, and Clinical Skills ("CS") that assesses students in a clinical setting. Step 2 must be taken before graduation. Step 3 is a computer-based exam that assesses the application of medical

and scientific knowledge to the practice of medicine. Step 3 must be taken before applying for a medical license.

Ramsay, while a third-year medical student at Western Michigan University ("WMed"), requested an accommodation, namely extra testing time, for Step 1 and Step 2 CK. The basis of her request was that she had ADHD and dyslexia. She submitted to the Board:

- a diagnosis of ADHD and probable dyslexia by her family physician, Dr. Alan Smiy, made when she was an undergraduate;

- records of accommodations provided by her undergraduate institution and by WMed;

- evaluations from Charles Livingston, a licensed social worker, who administered several assessments that supported a diagnosis of ADHD and a likelihood of dyslexia and showed, in his opinion, that Ramsay had "relatively low attention and concentration and very low processing speed," although "[h]er native intelligence has been some compensation for low abilities in the identified areas";

- her MCAT scores, taken without accommodations, placing her in the 67th and 31st percentiles for verbal reasoning and writing, respectively;

- academic records and other standardized test scores, taken without accommodations, showing a high level of achievement; and

- a personal statement attesting that she struggled from an early age with maintaining concentration, reading, and writing, but that she achieved academic success through mitigating strategies, informal accommodations from teachers, and accommodations from her undergraduate and medical schools.

The Board provided Ramsay's materials to an outside reviewer, Dr. Stephen Zecker, who opined that Ramsay was not "substantially limited in functioning in a manner that warrants accommodations." App. 766. The Board also reviewed Ramsay's documentation and, noting her record of achievement without accommodations, concluded that the documents did not "demonstrate a record of chronic and pervasive problems with inattention, impulsivity, behavioral regulation, or distractibility that has substantially impaired [her] functioning during [her] development or currently." App. 1126. Based on Dr. Zecker's recommendation and the Board's review of Ramsay's materials, the Board denied her request.

Thereafter, Ramsay took Step 1 without accommodations in her third year, but she failed by one point. Because WMed requires students to pass Step 1 by the beginning of their fourth year, she took a leave of absence.

Ramsay renewed her request for extra testing time and submitted an evaluation and test data from neuropsychologist Dr. Alan Lewandowski. Dr. Lewandowski met with Ramsay, conducted assessments, found that she had abnormal functionalities in thinking, processing speed, attention, and sequencing, and concluded that she had ADHD. Ramsay also submitted a letter from her treating psychiatrist, Dr. Bruce Ruekberg, who concurred with Mr. Livingston's and Dr.

Lewandowski's assessments, stating that she had abnormal scanning and processing speed that impaired her reading and written expression. The Board denied her request for extra testing time, again concluding that she had not shown she was substantially limited in any functions as compared to most people.[1]

Ramsay sought reconsideration of the Board's denial. As additional support, she provided an evaluation by Dr. Robert D. Smith, a psychologist and neuropsychologist. Dr. Smith met with Ramsay, reviewed her records, and performed similar assessments. He reported that the assessments revealed that she had abnormally low abilities in processing information, writing, and reading, indicating dyslexia and ADHD. Among other things, his testing revealed that Ramsay, as compared to others in her age group, was in the fourth percentile in reading comprehension and fluency, second percentile in word reading speed, and first percentile in oral reading fluency.

The Board provided Ramsay's file to outside expert Dr. Benjamin Lovett, who concluded that Ramsay did not show poor academic skills or impairments compared to the general population and thus lacked a condition that would warrant accommodations. Based on Dr. Lovett's recommendation and further review, the Board denied Ramsay's request for reconsideration.

---

[1] The Board granted Ramsay's requests for additional break time and a separate testing room as accommodations for migraines and deep vein thrombosis.

B

Ramsay sued the Board in May 2019, alleging that it had violated the ADA.[2]  The next month, WMed informed Ramsay that it could extend her leave only until March 2020, "with the expectation that [she] will sit for the USMLE Step 1 exam in a manner that allows [her] to return to the WMed curriculum by that date."  App. 1520.  WMed informed Ramsay that if she did not pass Step 1 and return by March 2020, she would be dismissed or could voluntarily withdraw, but readmission would not be guaranteed.[3]  Ramsay accepted WMed's conditional extension of leave.

Because Ramsay had to pass Step 1 to avoid dismissal, she sought a preliminary injunction to require the Board to grant her accommodations.  The District Court held a three-day evidentiary hearing featuring testimony from, among others, Ramsay, Dr. Smith, Dr. Zecker, and Dr. Lovett.

For the reasons explained in its careful and thorough opinion, the District Court granted Ramsay a preliminary injunction and required the Board to provide Ramsay with double the testing time on Step 1, Step 2 CK, any written or reading portions of Step 2 CS, and Step 3.  Ramsay v. Nat'l

_____

[2] Ramsay also alleged a Rehabilitation Act claim, 29 U.S.C. § 794, but the parties agree that only her ADA claim is relevant to the preliminary injunction.

[3] The Board contends that Ramsay only had to take, not pass, Step 1 to remain enrolled in school.  Given that WMed students must pass Step 1 by the beginning of their fourth year, however, Ramsay could not continue into her fourth year at WMed without passing Step 1.

Bd. of Med. Exam'rs, No. 19-CV-2002, 2019 WL 7372508 (E.D. Pa. Dec. 31, 2019). The Court found that all the experts were qualified, but that the testimony and reports of the experts who met with Ramsay were more persuasive. Id. at *17. Those experts stated that their assessments and evaluations all showed that Ramsay had low reading, writing, and processing abilities. Id. at *15-16. The Court also found that the Board's experts' analyses contradicted applicable regulations by focusing too much on Ramsay's academic achievements, substituting their own opinions for those of experts who met with Ramsay, and placing too demanding a burden on Ramsay. Id. at *17-18. Based on this evidence and the governing law, the Court found that Ramsay had a disability under the ADA. Id. at *18.

The Court also found that: (1) Ramsay established irreparable harm because she would likely be forced to withdraw from WMed if she could not take Step 1 with accommodations and pass, (2) the balance of equities tipped in her favor because granting her accommodations would not undermine the Board's interests in fair and accurate testing, and (3) it was in the public interest for the ADA to be followed and to increase the number of physicians. Id. at *18-19. The Board appeals.[4]

---

[4] After the Board filed its appeal, Ramsay passed Step 1 with accommodations. This appeal, however, is not moot because (1) the District Court's injunction extends to Steps 2 and 3, which Ramsay has not yet taken, and (2) as to Step 1, if we vacated the injunction, the Board could invalidate her score or prevent her from submitting the score to residency programs. See Chafin v. Chafin, 568 U.S. 165, 172 (2013)

## II[5]

In issuing a preliminary injunction, a district court considers four factors:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) [that] the public interest [weighs in favor of granting the injunction].

Greater Phila. Chamber of Commerce v. City of Philadelphia, 949 F.3d 116, 133 (3d Cir. 2020) (alterations in original) (quoting Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994)).

---

(explaining that a case is not moot if the parties "'continue to have a personal stake' in the ultimate disposition of the lawsuit" (quoting Lewis v. Cont'l Bank Corp., 494 U.S. 472, 478 (1990))).

[5] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(a)(1). "We employ a tripartite standard of review for . . . preliminary injunctions. We review the District Court's findings of fact for clear error. Legal conclusions are assessed de novo. The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion." Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 114 (3d Cir. 2018) (omission in original) (quoting K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 105 (3d Cir. 2013)).

A

We first address Ramsay's likelihood of success on the merits of her ADA claim.  "On this factor, a sufficient degree of success for a strong showing exists if there is a reasonable chance or probability, of winning" on her ADA claim.  Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J., 910 F.3d 106, 115 (3d Cir. 2018) (internal quotation marks and citation omitted).  The ADA provides in relevant part:

> Any person that offers examinations . . . related to applications, licensing, certification, or credentialing  for . . . professional . . . purposes shall offer such examinations . . . in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189.  The issue here is whether Ramsay has a "disability" that entitles her to an accommodation.  Ramsay, 2019 WL 7372508, at *8.

The ADA defines "disability" in relevant part as "a physical or mental impairment that substantially limits one or more major life activities of such individual."  42 U.S.C. § 12102(1)(A).  We construe the term "disability" broadly.  Id. § 12102(4)(A).  As to the term "impairment," the applicable Department of Justice ("DOJ") regulations[6] provide that the

---

[6] In 42 U.S.C. §§ 12186(b) and 12205a, the ADA authorizes DOJ to issue regulations implementing the public

term "physical or mental impairment" includes ADHD and "dyslexia and other specific learning disabilities." 28 C.F.R. § 36.105(b)(2). As to "life activities," the ADA provides that "major life activities include . . . reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Finally, the regulations explain that "[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 28 C.F.R. § 36.105(d)(1)(v). Accordingly, "'[n]ot every impairment will constitute a disability . . . ,' but [an impairment] will meet the definition [of disability] if 'it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" J.D. by Doherty v. Colonial Williamsburg Found., 925 F.3d 663, 670 (4th Cir. 2019) (quoting 28 C.F.R. § 36.105(d)(1)(v)).

1

The Board argues that the District Court did not determine that Ramsay is substantially limited in comparison

---

accommodations provisions of the ADA. Such regulations have "the force and effect of law." See PDR Network, LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051, 2055 (2019) (quoting Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 97 (2015)); accord Pa. Dep't of Human Servs. v. United States, 897 F.3d 497, 505 (3d Cir. 2018). The regulations "are entitled to substantial deference." Helen L. v. DiDario, 46 F.3d 325, 331 (3d Cir. 1995).

to most people in the general population.[7]  We first address the concept of "most people in the general population" in the learning disability context.  In general,

> [t]he comparison to most people in the general population . . . mean[s] a comparison to other people in the general population, not a comparison to those similarly situated.  For example, the ability of an individual with an amputated limb to perform a major life activity is compared to other people in the general population, not to other amputees.  This does not mean that disability cannot be shown where an impairment, such as a learning disability, is clinically diagnosed based in part on a disparity between an individual's aptitude and that individual's actual versus expected achievement, taking into account the person's chronological age, measured intelligence, and age-appropriate

---

[7] Relatedly, the Board argues that the District Court improperly considered Ramsay's work ethic and study habits, which the Board argues are improper considerations because "working hard does not show that [Ramsay] is substantially impaired."  Appellant's Br. at 47.  However, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures."  28 C.F.R. § 36.105(d)(1)(viii).  Accordingly, in deciding whether Ramsay was disabled, the Court could appropriately consider and discount that she compensated for her very weak reading and writing abilities by devoting more effort to her assignments than most students.

education.  Individuals diagnosed with dyslexia or other learning disabilities will typically be substantially limited in performing activities such as learning, reading, and thinking when compared to most people in the general population . . . .

Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as Amended, 76 Fed. Reg. 16,978, 17,009 (Mar. 25, 2011) (explanation by the Equal Employment Opportunity Commission ("EEOC")); see Amendment of Americans with Disabilities Act Title II and Title III Regulations to Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204, 53,230 (Aug. 11, 2016) (DOJ "concur[ring] with" EEOC's "view").[8]  Thus, a clinical diagnosis of a learning disability is typically based upon a comparison between the individual and others in the general population who are of similar age and have received age-appropriate education.

Here, the District Court relied on such diagnostic information to conclude that Ramsay had ADHD and dyslexia

---

[8] "[T]he preamble to a regulation may be used as an aid in determining the meaning of a regulation."  Conn. Gen. Life Ins. Co. v. Comm'r, 177 F.3d 136, 145 (3d Cir. 1999) (quoting Commonwealth of Pa. Dep't of Pub. Welfare v. U.S. Dep't of Health & Human Servs., 101 F.3d 939, 944 n.4 (3d Cir. 1996)); see also Helen Mining Co. v. Dir. OWCP, 650 F.3d 248, 257 (3d Cir. 2011) (holding that an administrative law judge's "reference      to      the      preamble      to      the regulations . . . unquestionably supports the reasonableness of his decision to assign less weight to [an expert's] opinion").

that caused her to read and write with more difficulty than most people. For example, Dr. Smith's and Dr. Lewandowski's diagnostic assessments showed that Ramsay had abnormal functionalities in thinking, processing speed, attention, and sequencing. Indeed, some of the reading tests Dr. Smith administered placed Ramsay in less than the fifth percentile as compared to individuals her age. This is exactly the type of data DOJ contemplates as showing a learning disability that substantially limits an individual as compared to others in the general population. Equal Employment Provisions, 76 Fed. Reg. at 17,009; Title II and Title III Regulations, 81 Fed. Reg. at 53,230. Further, Ramsay explained in her personal statement that she had struggled with reading and writing tasks in comparison to her classmates since elementary school. Thus, the Court's finding that Ramsay's ADHD and dyslexia constituted a disability was based on evidence that these conditions substantially limit her reading and writing in comparison to most people. See Pryer v. C.O. 3 Slavic, 251 F.3d 448, 453 n.4 (3d Cir. 2001) (inferring the district court's reasoning where it was "otherwise apparent from the record").[9]

Moreover, the regulations provide that the "substantially limits" inquiry "should not demand extensive analysis," 28 C.F.R. § 36.105(d)(1)(ii), and that "[t]he comparison of an individual's performance of a major life

---

[9] We further disagree with the Board's contention that the District Court never found that Ramsay was substantially limited as compared to the general population because when the Court concluded that Ramsay was disabled, it defined disability as a substantial limitation as compared to most people in the general population. Ramsay, 2019 WL 7372508, at *7-8.

activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence," id. § 36.105(d)(1)(vii). Accordingly, the District Court's reliance on evidence that Ramsay's reading, processing, and writing skills were abnormally low by multiple measures provided a sufficient comparison of her abilities to those of the general population to support the finding of disability.[10]

2

Next, the Board argues that the District Court erred by giving "considerable weight" to Ramsay's past accommodations when determining that she has a disability. Appellant's Br. at 45 (quoting 28 C.F.R. § 36.309(b)(1)(v)). According to the Board, a court should consider past accommodations only after finding the individual is disabled. This argument fails.

The regulation defining disability, § 36.105, does not bar consideration of past accommodations. Indeed,

---

[10] The Board relies on Bibber v. National Board of Osteopathic Medical Examiner, Inc., Civ. A. No. 15-4987, 2016 WL 1404157 (E.D. Pa. Apr. 11, 2016), but it is distinguishable. There, the district court held that the plaintiff was not disabled because "a mountain of evidence," including some of the same diagnostic assessments that Ramsay took, "suggest[ed] that Bibber's reading and processing abilities [were] average when compared to the general population." Id. at *8. In contrast, Ramsay's scores on the same assessments were lower, and she explained at the hearing how she reads in a manner that is different from the average person.

§ 36.309(b)(1)(v) provides that "[w]hen considering requests for . . . accommodations . . . the [testing] entity gives considerable weight to documentation of past . . . accommodations." Moreover, as the preamble to the applicable regulations states, "a recent history or past accommodations is critical to an understanding of the applicant's disability and the appropriateness of testing accommodations." Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236, 56,298 (Sept. 15, 2010) (to be codified at 28 C.F.R. pt. 36). Thus, the District Court did not err in considering Ramsay's past accommodations.

3

The Board also argues that the District Court wrongly believed that the statute and regulations compelled it to defer to experts who met with and tested Ramsay. While the Court viewed Ramsay's experts more favorably and found the Board's experts unpersuasive, there is no indication that the Court believed that it was compelled to defer to Ramsay's experts. Rather, the Court discounted the Board's experts because they (1) never met with Ramsay, (2) engaged in too demanding an analysis of whether Ramsay had a disability, and (3) focused too much on Ramsay's academic achievements. Ramsay, 2019 WL 7372508, at *17-18. The Court's reasoning was within its discretion and supported by the regulations.

First, it is within the trial judge's discretion to credit a physician with firsthand observations of a patient over one who only reviewed the patient's records. See United States v. Olhovsky, 562 F.3d 530, 548-49 (3d Cir. 2009). Such a professional has the benefit of seeing how the patient actually

acts and speaks and provides a perspective not limited to the cold record. This principle is not unlike the deference an appellate court gives to a trial court who physically sees a witness. Cooper v. Harris, 137 S. Ct. 1455, 1474 (2017). This is why we rarely second-guess a district court's weighing of evidence, see, e.g., United States v. Turner, 718 F.3d 226, 231 (3d Cir. 2013), and why it makes sense for the District Court to credit the professionals who personally met with Ramsay.

Second, the regulations mandate that "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 28 C.F.R. § 36.105(d)(1)(vi). Such assessments benefit from the reports of professionals who know or have personally examined the individual. Because such examinations allow the professional to evaluate the individual's behavior, effort, and candor, DOJ understandably has stated that "[r]eports from experts who have personal familiarity with the candidate should take precedence over those from . . . reviewers for testing agencies, who have never personally met the candidate or conducted the requisite assessments for diagnosis and treatment." Nondiscrimination on the Basis of Disability, 75 Fed. Reg. at 56,297. As a result, DOJ has directed that testing entities "shall generally accept" "documentation provided by a qualified professional who has made an individualized assessment of an applicant that supports the need for the modification, accommodation, or aid requested . . . and provide the accommodation." Id. Thus, the Court's decision

17

to weigh Ramsay's experts more favorably than those of the Board was consistent with DOJ regulations.[11]

Third, "the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis." 28 C.F.R. § 36.105(d)(1)(ii). The Court could reasonably have concluded that the Board's experts were too demanding in what they required to prove a disability, for example, by demanding evidence of a lifetime of academic struggles, and "substituting their own opinions" for those of Ramsay's healthcare providers. Ramsay, 2019 WL 7372508, at *17. In fact, the Board's reliance on Ramsay's academic achievement was contrary to the regulations that explain that "someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write,

---

[11] The Board argues before us that a 2011 settlement agreement between it and DOJ eliminates the preference to be given to professionals who personally examined the individual. The Board did not make this argument before the District Court, so we do not fault the Court for not considering it. In any event, the Board is wrong. First, the settlement addresses the Board's obligations and not a court's considerations under the regulations when deciding whether an individual has a disability. Second, while the agreement states that the Board need not defer to the conclusions of such professionals, that does not mean it is relieved of showing in litigation why those professionals are unworthy of credence. Third, even if the agreement had any bearing on the regulations, which it does not, it expired in 2014.

speak, or learn compared to most people."    28 C.F.R.
§ 36.105(d)(3)(iii).[12]    Because Ramsay's high academic
performance does not foreclose her from having a disability,
the Court reasonably discounted the Board's experts' opinions,
which focused mostly on Ramsay's academic
accomplishments and ignored evidence of her limitations.
<u>Ramsay</u>, 2019 WL 7372508, at *18.

In sum, nothing in the District Court's discussion
indicates that it held that the statute and regulations "compel"
deference to Ramsay's experts.  Rather, the Court found that
Ramsay's experts provided facts more probative to the relevant
inquiries under the ADA, and its decision to view these
witnesses more favorably is consistent with the regulations.
Thus, we will not disturb how the Court chose to weigh
evidence.

---

[12] When discussing this proposition, the Court quoted
29 C.F.R. § 1630.2(j)(4)(iii), promulgated by the EEOC, which
does not implement the operative ADA title here.  42 U.S.C.
§ 12116 (providing EEOC authority to implement the
employment provisions of the ADA).  Nonetheless, DOJ has
issued an identical regulation.  <u>Compare</u> 28 C.F.R.
§ 36.105(d)(3)(iii), <u>with</u> 29 C.F.R. § 1630.2(j)(4)(iii).  Thus,
there was no legal error "infecting" the Court's weighing of
experts.  <u>Bedrosian v. United States</u>, 912 F.3d 144, 152 (3d Cir.
2018) (quoting <u>U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset
Mgmt., LLC v. Vill. at Lakeridge, LLC</u>, 138 S. Ct. 960, 968
n.7 (2018)).

4

The additional errors the Board identifies in the Court's factual findings do not amount to clear error. "A finding of fact is clearly erroneous when it is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the supportive evidentiary data." <u>VICI Racing, LLC v. T-Mobile USA, Inc.</u>, 763 F.3d 273, 283 (3d Cir. 2014) (internal quotation marks and citation omitted). We examine the entire record to determine whether there is evidentiary support for a finding, not just the evidence a district court cites. <u>See</u> <u>N.J. Rifle</u>, 910 F.3d at 120 n.24.

First, the Board argues that the District Court erred in finding that the Board's consultants found that Dr. Smith's assessments were valid and credible. Contrary to the Board's assertion, the record supports the Court's finding. Both of the Board's consultants testified that they had no reason to doubt that the assessments were properly administered, that the results were accurate, and that the data could be useful, although they disagreed with Dr. Smith's interpretation of the results. The credibility of evidence is different from the inferences a factfinder can draw from that evidence, so the Court's finding that all experts agreed the assessments were credible was supported by the consultants' testimony, even if the Board's consultants reached different conclusions from the test results themselves.[13]

---

[13] In making this finding, the District Court misquoted one piece of evidence, a letter from the Board. The Court stated that the Board found Ramsay's expert assessment to be

Second, the Board argues that the District Court erred in finding that Ramsay could not finish reading and had to guess on about a third of the questions on Step 1 because the time Ramsay spent on each question shows that "she had time to read every question."  Appellant's Br. at 61 (emphasis omitted) (citing Ramsay, 2019 WL 7372508, at *3).  The record does not contradict the Court's finding.  The Board's evidence does not indicate how much time Ramsay spent reading each question.  Rather, it shows only that she spent, on average, seventeen seconds more on the questions she got incorrect.  Further, Ramsay testified that she took a pass through the questions before answering them, answered the ones she felt she could, and repeated that strategy until she was left with a few questions she could not answer even after multiple reads.  Her strategy provides a reasonable explanation for why the time spent on correct versus incorrect answers was similar.  The Court was free to credit Ramsay's testimony over the inferences that the Board argued should be drawn from its measurements.  See Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 462 F.3d 249, 271 (3d Cir. 2006) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." (quoting Scully v. US WATS, Inc., 238 F.3d 497, 506 (3d Cir. 2001))).

---

valid.  Ramsay, 2019 WL 7372508, at *4 (quoting App. 1512).  The letter, however, was referring to Ramsay's expert accepting the assessments as valid.  Accordingly, the letter does not support the Court's finding because it does not embody the Board's view.  Nonetheless, other evidence in the record supports the finding, as explained above, so there is no clear error.  N.J. Rifle, 910 F.3d at 120 n.24.

Finally, the Board argues that the District Court erred in finding that Ramsay had received informal accommodations in her early school years. Ramsay testified about, and her mother relayed to Dr. Smith information concerning, these informal accommodations. While the Board asserts that there is no written record of these informal accommodations, Ramsay's corroborated testimony provided "minimum evidentiary support" for the Court's finding, so there was no clear error.[14] VICI Racing, 763 F.3d at 283 (citation omitted).

### B

We next determine whether Ramsay proved irreparable harm. "[T]o show irreparable harm a plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The harm must be "likely" to occur "in the absence of an injunction." Ferring Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 217 n.11 (3d Cir. 2014) (emphasis omitted) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).

The District Court had a basis to conclude that Ramsay would be irreparably harmed absent an injunction. The Court could reasonably conclude that given Ramsay's disability and that she had previously failed Step 1, she likely would fail

---

[14] Aside from her mother's statements to Dr. Smith, Ramsay's report cards from elementary school are also consistent with her testimony because her teachers noted she needed "help . . . with the switching of letters," App. 871, and "to focus on getting her work done on time," App. 875.

again and be forced to leave medical school.[15]  Ramsay, 2019
WL 7372508, at *18.  Her termination from medical school
and its consequences could not later "be redressed by a legal or
an equitable remedy."    Acierno, 40 F.3d at 653 (citation
omitted).  No damages remedy is available under the ADA.  42
U.S.C. § 12188(a)(1) (providing that the only remedies
available in an ADA action are those in § 2000a-3(a)); id.
§ 2000a-3(a) (providing for injunctive relief).  Furthermore,
because WMed is not a party to this case, the Court could not
require it to reinstate her, and the Board presents no theory for
how the Board could redress the termination of Ramsay's
medical education.    Moreover, an examiner's refusal to
provide accommodations can cause the exam-taker irreparable
harm because doing so jeopardizes her "opportunity to pursue
her chosen profession." Enyart v. Nat'l Conf. of Bar Exam'rs,
630 F.3d 1153, 1166 (9th Cir. 2011); accord Doe v. Pa. State
Univ., 276 F. Supp. 3d 300, 313-14 (M.D. Pa. 2017) (holding
that gap in medical school education and likelihood that the
student could not gain acceptance to another school constituted
irreparable harm).  Accordingly, the District Court correctly
concluded that Ramsay established she would be irreparably
harmed absent an injunction.

---

[15] The letter from WMed provided a basis for the
District Court to conclude that she would be dismissed from
the medical school if she did not pass Step 1.  The letter offered
to extend Ramsay's leave until "March 2, 2020, with the
expectation that [she] will sit for the USMLE Step 1 exam in a
manner that allows [her] to return to" WMed.  App. 1520.  As
noted above, WMed students must pass Step 1 by the
beginning of their fourth year.  Thus, to return to school,
Ramsay had to pass Step 1.

C

We next consider how the District Court "balanc[ed] the parties' relative harms; that is, the potential injury to the plaintiff[] without this injunction versus the potential injury to the defendant with it in place." Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 143 (3d Cir. 2017). In balancing the harms, the Court noted the Board's "concern for the fulfillment of its mission to provide [qualified] physicians," Ramsay, 2019 WL 7372508, at *19, and that accommodations "can affect the comparability of the resulting scores and scores achieved under standard testing conditions," id. at *4 (quoting App. 931). Nonetheless, the Court appropriately reasoned that granting a preliminary injunction would not undermine the Board's mission because the injunction would give Ramsay only "the opportunity to move forward" in her medical career "should she succeed in passing her examinations with appropriate accommodations." Id. at *19 (emphasis omitted). Moreover, the Board's concerns regarding impacts from undeserved accommodations do not apply here because Ramsay has shown a reasonable likelihood that she deserves accommodations. Cf. Issa, 847 F.3d at 143 (holding that a defendant could not assert an interest in continuing to violate a civil rights statute).

D

Finally, we consider the District Court's finding that "the public interest favors this preliminary injunction." Id. The Court concluded that an injunction furthers the public interest in ADA compliance and serves to increase the number of qualified physicians. Ramsay, 2019 WL 7372508, at *19. We agree. "In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication

of discrimination on the basis of disabilities." <u>Enyart</u>, 630 F.3d at 1167; <u>see</u> <u>Issa</u>, 847 F.3d at 143 (concluding that it was in the public interest for covered entities to comply with a civil rights statute).  Further, the injunction allows Ramsay to continue her medical education and therefore serves the public interest in training more physicians.  "Although it is true that the public also has an interest in ensuring the integrity of licensing exams," <u>Enyart</u>, 630 F.3d at 1167, Ramsay has shown a reasonable likelihood that the ADA affords her accommodations, and there is no evidence that providing her the requested accommodations will jeopardize the test's integrity.  Thus, the public interest weighs in favor of an injunction.

### III

For the foregoing reasons, we will affirm the District Court's preliminary injunction.[16]

---

[16] Given our conclusion that the District Court correctly held that Ramsay has shown a likelihood of success on the merits of her claim that she has a disability for which she is entitled to accommodations, we will affirm the preliminary injunction requiring the Board to provide the accommodations on Step 2 CK, any written or reading portions of Step 2 CS, and Step 3.

# EXHIBIT B

## JESSICA RAMSAY PRE-MEDICAL SCHOOL STANDARDIZED TESTS
## TAKEN WITHOUT ANY ACCOMMODATIONS

| | | |
|---|---|---|
| Kindergarten (DX 24) | Stanford Early School Achievement Test | **Complete Battery: 96th %**<br>**Total Reading:   96th %** |
| First Grade (DX 25) | Stanford Achievement Test | **Complete Battery: 87th %**<br>**Total Reading:   70th %** |
| Second Grade (DX 27) | Stanford Achievement Test | **Complete Battery: 92nd %**<br>**Total Reading:   88th %** |
| Sixth Grade (DX 27) | Iowa Tests of Basic Skills and Cognitive Abilities Test | **Composite:     86th %**<br>**Reading Total: 74th %** |
| Tenth Grade (DX 29) | ACT Plan exam | **Composite:     97th %**<br><br>**English:       98th %**<br>**Reading:       73rd %** |
| Tenth Grade (DX 28) | PSAT/NMSQT | **Composite:       71st %**<br>**Critical Reading: 71st %** |
| Eleventh Grade (DX 28) | PSAT/NMSQT | **Composite:       82nd %**<br>**Critical Reading: 70th %** |
| Eleventh Grade (DX 30) | ACT Exam | **Composite:     90th %**<br><br>**English:       96th %**<br>**Reading:       87th %** |
| Twelfth Grade (DX 31) | ACT Exam | **Composite:     97th %**<br><br>**English:       94th %**<br>**Reading:       91st %** |
| College (DX 32) | MCAT Exam | **Composite:     79th %**<br><br>**Verbal Reasoning:   67th %**<br>**Physical Sciences:   79th %**<br>**Biological Sciences: 88th %** |

## JESSICA RAMSAY PERFORMANCE
## ON DIAGNOSTIC ASSESSMENTS

| | | |
|---|---|---|
| Dr. Smith Evaluation Report (11/6/2018) (DX 3, Ex. B) | WIAT-III Oral Reading Fluency<br>WJ-4 Reading Rate Cluster<br>GORT-5 Reading Rate<br>GORT-5 Comprehension<br>GORT-5 Fluency<br>Nelson-Denny Reading Rate | **1st %**<br>**1st %**<br>**1st %**<br>**1st %**<br>**2nd %**<br>**1st %** |

## JESSICA RAMSAY ACADEMIC HISTORY

| | | |
|---|---|---|
| Kindergarten (DX 9) | Sunset Oaks Academy | **Grades:  All E's and S+'s** |
| First grade (DX 10) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94 in phonics, 93/spelling and 98/math)** |
| Second grade (DX 11) | Sunset Oaks Academy | **Grades:  All E's and S+'s (plus a 94/phonics, 97/spelling, 97/math)** |
| Third grade (DX 13) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"** |
| Fourth grade (DX 14) | Carrolton-Farmers Branch | **Grades:  All A's (final grades)**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
| Fifth grade (DX 15, DX 16) | Carrolton-Farmers Branch | **Grades:  Mostly A's, two B's**<br><br>**No "Specialized Reading Support" or "Grades based on intensive teacher assistance"**<br><br>**Participated in gifted & talented program** |
| | Brown Elementary School | **Grades:   All A's (final grades)** |
| Sixth Grade (DX 17) | Upton Middle School | **Grades:  All A's** |
| High School (9th - 12 grades) (DX 18) | Saint Joseph's High School | **Cumulative GPA:  3.747**<br><br>**Class rank:  28 out of 225 (top 12%)** |
| College (DX 22) | Ohio State University (No accommodations approved until May of second year) | **Cumulative GPA:        3.57**<br><br>**First Year GPA:        3.53**<br><br>**Second Year GPAs, Autumn & Winter:        3.925 & 3.641** |